Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable LAUREL BEELER, Magistrate Judge**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | NO. CR-20-0249 RS (LB) |
| | ) | |
| VS. | ) | Thursday, February 9, 2023 |
| | ) | |
| ROWLAND MARCUS ANDRADE, | ) | San Francisco, California |
| | ) | |
| | ) | Motion Hearing |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**TRANSCRIPT OF ZOOM PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 3:07 p.m. - 3:53 p.m.**

**APPEARANCES:**

**For Plaintiff:**          STEPHANIE M. HINDS, ESQUIRE
                          United States Attorney
                          450 Golden Gate Avenue, 11th Floor
                          San Francisco, California  94102
                   By:    **Ross Weingarten,**
                          Assistant United States Attorney

**FOR DEFENDANT:**          KING & SPALDING
                          50 California Street, Suite 3300
                          San Francisco, California 94111
                   By:    **MICHAEL J. SHEPARD, ESQUIRE**

                          KING & SPALDING
                          1700 Pennsylvania Avenue, NW,
                          Suite 900
                          Washington, DC 20006
                   By:    **KERRIE C. DENT, ESQUIRE**

                          (Appearances Continued)

**Transcribed By:**         Diane E. Skillman, Transcriber

**CINDY A. DIAMOND, ESQUIRE**
58 West Portal Avenue, #350
San Francisco, California 94127

| | |
|---|---|
| 1 | <u>Thursday, February 9, 2023</u>                    <u>3:07 p.m.</u> |

                          P R O C E E D I N G S

                                  o0o

4      **THE CLERK:**  Calling Criminal Action CR-20-249 U.S.A.
5 versus Rowland Marcus Andrade.
6    Counsel, if you could please state your appearances for
7 the record.
8      **MR. WEINGARTEN:**  Good afternoon, Your Honor.  Ross
9 Weingarten on behalf of the United States.
10      **MR. SHEPARD:**  Good afternoon, Your Honor.  Michael
11 Shepard, Kerrie Dent, and Cindy Diamond on behalf of the
12 defendant Marcus Andrade.  He is present by Zoom and consents
13 to proceed in that fashion.
14      **THE COURT:**  Great.  Nice to see everybody.
15    Apologies for the length of the day.  It just is -- it's a
16 typical Thursday, and I am on criminal duty on top of
17 everything else.  Things have just spun up.
18    My great idea was that we -- if we could just spend a
19 little time together because, you know, in the December
20 hearing -- and I'm a little bit strapped although I could
21 cancel it, it's Judge Cisneros' induction.  So, you know, I'm
22 a touch in between.  It would be extremely bad form for me not
23 to be there versus the fact that I promised you guys an hour.
24    And I don't really have it today.  I probably should have
25 said when it was set on a Thursday that Thursday is not a good

1    day because I have the flexibility this month of every day for

2    the criminal calendar to be there, but I am scheduled on other

3    days.

4        But I thought my great idea after the December because you

5    guys gave me a ton of stuff to look at, and I mean it was well

6    organized but it was very hard to access in the context of the

7    case what you wanted and why.

8        And more to the point, it did seem to me that, you know,

9    understanding the defense perspective of wanting illumination

10   into things, it did feel like we could stage some stuff.

11   Right?  We can start with what you wanted to prioritize, see

12   what kind of a burden it was.

13       I mean, here are the arguments why you didn't want to

14   produce it but, *Brady*, at the end of the day is backward

15   looking as opposed to forward looking but all the case law

16   counsels that you should look forward.  And it's not a big

17   deal to produce it, then -- and recognizing that, you know,

18   there's the interminable process that attaches to discovery.

19   But if it's not that big of deal, why resist it.  If it

20   doesn't -- if you've got, if it's in your possession, if

21   witnesses' safety isn't threatened by it, it's not that kind

22   of case, who cares.  Because at the end of the day, if you

23   make a fight over every little issue, you'll never get any

24   work done.

25       So, I thought we should at least get together to try and

1   talk through some of these things.  So thank you for your

2   letter.  Let me just make sure -- hang on a sec.  I am not

3   sure -- here it is.  Okay.  Got it.

4       So I don't know how you want to talk about it, but we can

5   go through things.  I have here your submissions.  We need to

6   worry about sealing.  I have a letter here that's not stamped

7   with a docket number, which is fine.  I have lost track of how

8   it was sealed.  I saw some sealing order that attached to

9   something else.  I haven't followed that.

10      I don't care.  I mean I do care about the standards, but

11  we won't address that today.  We will figure out how to

12  address it through the normal process.

13      Okay.  So, Mr. Shepard, Ms. Diamond, I don't know if you

14  want to start.

15          **MR. SHEPARD:**  I'm happy to start, Your Honor.

16          **THE COURT:**  I thought we would go through stuff and

17  discuss it in context.

18          **MR. SHEPARD:**  Sure.  Would you like to direct me to

19  where you would like me to start --

20          **THE COURT:**  No --

21                  (simultaneous colloquy)

22          **THE COURT:**  The government opposes it and, you know,

23  it's not -- what I really wanted was, we want this.  Here's

24  why we should have it.  Here's why you can't have it.  That's

25  what I was kind of looking for.  But we don't quite have that

1    in this letter.

2       I think you sort of said what you wanted and why, and the

3    government just said, you know, we've done -- they haven't

4    shown, we have given you a lot, we have given you enough.  It

5    was not really what I was hoping for.

6           **MR. SHEPARD:**  I think --

7           **MR. WEINGARTEN:**  Well --

8           **MR. SHEPARD:**  -- what the government said was, you

9    know, hey I'm always willing to work with defense counsel and

10   identify and produce discoverable material, and your discovery

11   requests are all conspiracy theories.  And I'll give you the

12   very quick abridged version in response to that.

13          **THE COURT:**  Yes.

14          **MR. SHEPARD:**  I had something much longer.  I'll give

15   you the nuts and bolts of it.

16      The Butina document, the document that the Court was

17   looking at a moment ago, the one and only document that we

18   attached to the --

19          **THE COURT:**  Yes.

20          **MR. SHEPARD:**  -- to the letter, that's a defense

21   bonanza.  And I can spend five minutes telling you why it's a

22   defense bonanza, but it's a defense bonanza.

23      It was produced after ten months of requests and motion

24   practice.  And after we repeatedly told the government why it

25   was relevant and they said it's not relevant, it has nothing

1    to do with the case, and it's just an example of you making a

2    conspiracy theory argument.

3        After we last appeared before the Court, they finally

4    produced that document.  It's a defense bonanza.  Not only is

5    it a defense bonanza, but the agents knew of its importance.

6    They knew that it was found in Butina's house, that it related

7    to AML Bitcoin.  They knew that the entire time.  We figured

8    that out when they were talking about it during a recorded

9    interview of co-schemer Jack Abramoff.

10       So I'm sure Mr. Weingarten, when he says he has the best

11   of intentions --

12           **THE COURT:**  Oh, he does have the best of intentions.

13           **MR. SHEPARD:**  I'm sure he does.  Yes.

14           **THE COURT:**  He really does.  He does a good job and

15   he tries to do a good job.

16           **MR. SHEPARD:**  I don't question that at all, but it's

17   aspirational as it's applied to the discovery in this case.

18   It's not the reality.  It's not what's happening in this case,

19   and the Butina document shows you that.

20       Let me get to the essence of one other aspect of the

21   government's response, which is we ran search terms and,

22   therefore, we concluded that none of this is relevant.

23       They ran on some of the things we requested.  They said

24   they ran six search terms.  On some they said they ran three.

25   And they chose those search terms.  They did not include even

```
 1    "Marcus," which is how people refer to our client.  Not even
 2    included.  We called that out to them.  They didn't change.
 3    They kept running those three search terms.  There is no
 4    plausible explanation for not running "Marcus" that's
 5    consistent with the government providing full discovery.
 6         Same with "cryptocurrency."  We --
 7              THE COURT:  Okay.  Mr. Weingarten --
 8         MR. SHEPARD:  And --
 9              THE COURT:  No laughing, Mr. Weingarten.  I'm on the
10    verge of tears -- I'm just kidding.  That's just a joke.  So
11    it's a long day.
12              MR. SHEPARD:  I find it discouraging also, but --
13              THE COURT:  Yeah.
14         MR. SHEPARD:  I would say that the reason that -- and
15    I don't want to spend a lot of time talking about particular
16    search terms because I don't think search terms are the right
17    approach at all.
18              THE COURT:  So then what's -- what is the right
19    approach?  Because, you know, obviously when you say the
20    government doesn't run -- and Mr. Weingarten, don't worry,
21    I'll let you weigh in on what you think does or doesn't work,
22    and we'll just kind of talk about it.
23         I wonder what -- there are buckets of information out
24    there from the government's perspective, like warehouses -- I
25    mean the equivalent of electronic warehouses, right?  And the
```

```
 1    idea is you're saying none of this really matters.  You

 2    haven't shown me why it matters.  We're doing our best to be

 3    as cooperative as possible, but at the end of the day there's

 4    kind of a limit.  And you may want to say more than that.

 5        And so what I'm really trying to get from Mr. Shepard is

 6    what would he propose that you do and what would he propose

 7    that would narrow to eliminate some of these things.

 8        So we'll start there, and then Mr. Weingarten you can kind

 9    of say why you think what he proposes doesn't work.

10        Okay.  Mr. Shepard.

11        MR. SHEPARD:  So my proposal is the government gives

12    us the information we requested and we review it.  That's my

13    proposal.  That's what I believe we are entitled to under the

14    case law, which says the burden of materiality is not high,

15    it's not a high bar, and I'm happy to talk you through exactly

16    why we think it's easily satisfied based on what we've

17    presented.

18        THE COURT:  Yeah.  I will tell you that --

19        MR. SHEPARD:  That falls on us then, the difficulty

20    falls on us at that point.

21        If it's too much, then we'll have to figure out how to

22    sort it out.  But we have made, I believe, more than a

23    sufficient showing to get the information.  And if it turns

24    out that's really burdensome on us, that's our problem.  We

25    will work through it.
```

1          It's as the Court has said, the Court went right to the

2     essence of this.  This is not a claim where there's a

3     privilege claim, where there's a claim that it would be

4     burdensome to the government to give --

5          **THE COURT:**  There may be privacy issues, I don't know

6     what it tends -- and then Mr. Weingarten would say and also

7     there's the discovery rules.  And I don't know what the

8     department has said recently, you know, if anything.

9          There used to be the Ogden memo, and that kind of went by

10    the wayside.  And now there's the new Garland memo, but I

11    think it's much more abbreviated metaphor about the exercise

12    of prosecutorial discretion.  I don't know whether there's

13    anything more.  The department used to teach that if you

14    could, you know, you are saved a lot, see *Skilling*.

15         If you turn over information, then I think what I said to

16    Mr. Dawson at the last hearing is, if you don't care and you

17    can put in procedural safeguards and there's no burden on you,

18    I added that recognizing the discovery landscape.

19         There's rules that are important, but you can't always

20    rely on the rules.  And it can be dangerous, too, because in

21    the end *Brady* can get you if there's something there you've

22    overlooked because you've got the affirmative investigative

23    obligation to look for stuff even if they've never asked for

24    it.

25         I'm not telling you about *Brady*.  You know about *Brady*.

1   And you always say you will comply with them, your

2   obligations, and I trust you well.

3       So the issue here from your perspective is conspiracy

4   theory, it's not well-founded, it's not relevant, show me

5   something.  I'm happy to look for you, but I don't see

6   anything here.  And then Mr. Shepard says, I've made the

7   showing so give it to me.

8       So what's your response to that?

9       **MR. WEINGARTEN:**  Well, my response to that is a

10  couple of things.  Number one, of course I agree with what

11  Your Honor is saying about the importance of turning over

12  discovery.

13      **THE COURT:**  It saves you buckets of trouble later.

14      I've done big investigations, too.  I'll tell you, I just

15  turned over the whole damn internal investigation because I

16  did not have any reasonable way of -- I mean, I tried my very

17  best.  I gave over my hot documents, too.  And I gave over

18  discovery that I reviewed in an organized format because I did

19  not want to get bitten in the end by something I overlooked.

20      So I did a lot of stuff myself, but I also did -- I also

21  gave over -- and I gave it over organized, my hot docs.  I am

22  sure you did, too.  It saves you a world of trouble later.

23  But I didn't resist anything I had because you kind of come

24  with your hard drive, bless you.  And it helped me, by the

25  way, in trial because all their exhibits, you know, made me

```
 1    feel confident I actually hadn't overlooked anything.

 2            MR. WEINGARTEN:  I couldn't agree more.  And Your

 3    Honor has done my job.  Of course Your Honor gets it.

 4        What I would say is a couple of things.  One, in terms of

 5    the showing that they have apparently made, it's still under

 6    seal.  We can't probe that showing.  They insist on filing --

 7            THE COURT:  That's why I wanted a letter brief around

 8    that.  I hear you on that.

 9            MR. WEINGARTEN:  So when -- when Mr. Shepard says,

10    well, I've made the showing, it's of course it's material,

11    it's material to my defenses.  We have met and conferred.  I

12    am of course meeting and conferring in good faith, but they

13    refuse to unseal the documents because they don't want to show

14    me their secret --

15            THE COURT:  The defense strategy.

16            MR. WEINGARTEN:  Their secret defense strategy.

17    That's number one.

18        Number two, with respect to the search terms, that was

19    done in an effort of good faith --

20            THE COURT:  It's good of you to do it.  It's good of

21    you to do it.

22            MR. WEINGARTEN:  I tried to understand if there were

23    any relevant materials in any of these other case files.

24        Look, as Your Honor knows I'm sure from a very quick

25    Google search, these were separate investigations of these
```

1    individuals, Ms. Butina, Mr. Levin, and Mr. Erickson.  And

2    they concerned very sensitive matters.  You know, these

3    concern matters of national security.  They were undertaken by

4    different offices.  They were undertaken not about AML Bitcoin

5    or Andrade or about selling a fake cryptocurrency that never

6    existed.

7        They were undertaken, in the case of Butina, about

8    lobbying on behalf of Russia.  And they were undertaken about

9    Mr. Erickson for a fraud scheme in South Dakota that for the

10   life of me -- (Zoom disruption) and why that would have

11   anything to do with Mr. Andrade or making claims about a

12   cryptocurrency that simply doesn't exist.

13       That's ultimately what this comes down to.  It is

14   burdensome for the government to get this discovery because,

15   you know, these are extremely sensitive files, and held in

16   other places.

17       I'll also note that as I have said to the defense, much of

18   what they want doesn't exist, as I've told them.  For example,

19   Mr. Erickson's devices no longer exist.  The privilege log

20   they keep asking for no longer exists.  So there are just --

21   there are things they are asking for that simply aren't there.

22       I agree with Your Honor, I'm still a little confused about

23   what it is exactly that they want.  Going back to the search

24   terms, I'm happy, happy, happy, happy to continue to meet and

25   confer to see whether or not there are any search terms that

1    might suggest that there are relevant materials either in the

2    images of phones that exist or in these case files.

3        I was laughing earlier, and I apologize, I shouldn't have

4    done that --

5            **THE COURT:**  It's all right.  It's been a long day.

6            **MR. WEINGARTEN:**  But the notion that I didn't run or

7    the government didn't run the search term "Marcus," but did

8    run the search term "Andrade, Marcus Andrade, Rowland Andrade,

9    and Rowland Marcus Andrade" somehow suggests bad faith on the

10   government that I wasn't actually looking for relevant

11   discovery was borderline palpable and quite frankly a little

12   offensive.  So that's why -- and I shouldn't have done that.

13           **THE COURT:**  It's okay.  For your benefit, Mr. Shepard

14   also rapped he doesn't doubt your good intentions.  When

15   Mr. Shepard does he actually -- (Zoom disruption) -- few of

16   them.  The fact that he said that to you is at least a plus.

17   So it's okay.

18           **MR. WEINGARTEN:**  Let me just say this.  Look, Your

19   Honor, what this comes down to is the people they want

20   discovery about all have connections to varying degrees to

21   Jack Abramoff.  And of course Jack Abramoff is going to be a

22   witness at trial.

23       And the question here is whether or not anyone who had any

24   contacts with Jack Abramoff, whether or not that brings the

25   purview of their case file and their devices wholesale into

1    the discoverability of this case.

2        And understanding completely, Your Honor, that it is not

3    only the government's obligation, but it is in the

4    government's interest to turn over everything that is even

5    plausibly discoverable, I could not agree more.  That is my

6    philosophy.  I want to turn over as much as I possibly can.

7        I cannot simply understand, in large part because these

8    filings are under seal, I cannot simply understand the

9    connection between these -- these case files of these people

10   who had virtually nothing to do with AML Bitcoin.

11       Mr. Shepard references the notes found in Ms. Butina's

12   apartment as a defense goldmine.  Okay.  Fine.  They are if

13   that's what Mr. Shepard says.  But the notion that Jack

14   Abramoff was trying to pitch AML Bitcoin to somebody, you

15   know, does not mean that their entire case file becomes

16   discoverable.  It just simply does not.

17       Jack Abramoff was trying to sell this fake cryptocurrency

18   to anyone who would buy it, as did Mr. Andrade.  So, you know,

19   I think it's for the Court to decide.

20       Look, again, I will repeat to you what I said to the

21   defendants.  There's no debate here.  I want to move past

22   this.  I want to get this case set for trial.  I -- this case

23   has been set for too long.  I feel bad for Mr. Andrade.  My

24   guess is he wants to put this behind him.  I want that for

25   him.  This case needs to come to a resolution.  So I want to

1    produce all discoverable materials, but I just can't see any

2    relevance that they are asking for.

3          **THE COURT:**  Okay.

4          **MR. SHEPARD:**  May I respond?

5          **THE COURT:**  Yes, of course.  Yes, definitely.

6       I will say this is helpful.  It didn't exactly accomplish

7    what I wanted to accomplish, which is kind of reduce the

8    level, but it is helpful to have the conversations.

9       So, Mr. Shepard.

10          **MR. SHEPARD:**  So, I'm going to start, if I could,

11    briefly with search terms.  So I can tell you why that doesn't

12    resolve the problem in any way.

13       Even if Mr. Weingarten had run all the search terms that

14    he just said he ran, which are different than what he put in

15    the letter.

16          **MR. WEINGARTEN:**  I am reading --

17          **MR. SHEPARD:**  The reason -- and by the way, if you

18    just run "Rowland Marcus Andrade," it doesn't get you

19    "Marcus."  And so -- but let's not talk about the particular

20    search terms because what I --

21          **THE COURT:**  You said at the beginning that you didn't

22    want to get bogged down in search terms --

23          **MR. SHEPARD:**  Yes --

24          **THE COURT:**  -- because what you really want is the

25    information.

1          **MR. SHEPARD:**  Right.  Let me just illustrate why we

2    need the information instead of search terms to give you a few

3    examples.

4       We know that Erickson referred to cryptocurrency and

5    requested a meeting with Jack Abramoff in June of 2018.  We

6    know that because we got that information from one of

7    Abramoff's devices.  We also know from --

8          **THE COURT:**  You said June 2013?

9          **MR. SHEPARD:**  June 2018.

10          **THE COURT:**  2018.

11          **MR. SHEPARD:**  We also know from the Butina document

12    that that meeting was about Mr. Andrade's cryptocurrency.  You

13    can see that from the first page of the Butina document where

14    he's -- where Mr. Erickson has notes about Mr. Andrade's

15    cryptocurrency and he's got a date on it in early June 2018.

16       We would not have known about that at all based on search

17    terms because the government won't run cryptocurrency.  They

18    say it would reveal too much --

19          **THE COURT:**  They could run it, but it doesn't

20    necessarily mean they want to produce it.

21          **MR. SHEPARD:**  Right.

22          **THE COURT:**  And I don't know whether they run it or

23    not.  One of the things about running terms is sometimes it's

24    useful to run them to see what kinds of hits you get, to see

25    what -- you know, if it's too much and it reaches too large,

1    and you sample a little bit, and you're like huh-uh, it's not

2    helpful.  That's not wrong to say that, right?

3            MR. SHEPARD:  I'm not --

4                    (simultaneous colloquy)

5            MR. SHEPARD:  Ultimately I agree with that in the

6    sense that search terms are not going to solve this problem.

7        We need to be able to look at the actual evidence and

8    compare it to the other pieces of evidence that we know --

9    I've just given you one example of where search terms would

10   not address an important piece of evidence about a meeting to

11   discuss Mr. Andrade's cryptocurrency and company between

12   Mr. Erickson and Mr. Abramoff.

13           THE COURT:  Well, I mean --

14           MR. SHEPARD:  I could give you dozens more.

15           THE COURT:  That's fine.  I mean, I understand you

16   wouldn't get the meeting.

17       I'm going to consider how I would approach this, but I

18   will say this.  I mean, it's a very big ask to ask for the

19   government -- again, the reason I said in December, hey, why

20   wouldn't you just turn it over if you don't care.  And

21   Mr. Weingarten wasn't there -- maybe he was, I think I was

22   talking to Mr. Dawson at the time, but in any event, what we

23   are saying today, look, if you've got places you want us to

24   look, happy to talk about that and see -- if we can

25   accommodate, not that we will accommodate but we will try if

1    it makes sense.

2        And a lot of this doesn't -- just because there is some

3    stuff in their interactions that may be relevant, doesn't mean

4    it's all relevant because there are specific meetings and all

5    that.

6        You counter, hey, we wouldn't have even known about this

7    meeting had we not had this.  I am skeptical -- or we wouldn't

8    have gotten it based on the search terms.  So all those things

9    are true.

10        One, I'm not sure I've ever seen sort of absent agreement

11    a uni -- you've given some specific examples of stuff that's

12    important that you know now that you didn't know then, and

13    I'll go back and look at your original briefs, even though

14    it's under seal, whether how I consider it, Mr. Weingarten, is

15    another issue altogether.  You know, I agree, I am

16    uncomfortable with the under seal aspect of it.

17        But, you know, the issue then is, well, it's wow because

18    the processes that have been employed so far haven't gotten

19    this information that at least falls within the ballpark of

20    discovery, whether it's actually Rule 16 or *Brady*, doesn't

21    mean you get all of it just because of a few examples you

22    didn't know.  That doesn't mean there isn't another strategy,

23    which is what Mr. Weingarten is proposing, but it doesn't mean

24    you get it all.

25        So maybe -- I did not go back and look through your

1    original briefs -- but, you know, what's the support for your

2    entitlement to all of it?  Because really you are not entitled

3    to it.  You are entitled to Rule 16 discovery and you're

4    entitled, you know, to the government fulfilling its *Brady*

5    obligation, and then other than sort of general, you know,

6    this is how we do things, we try to turn over information if

7    it doesn't matter -- my approach on December 20th [sic] -- now

8    the government said not only does it matter, it implicates

9    other issues that are not only related to this case but not

10   something we want to disclose.

11        **MR. SHEPARD:**  I don't know what the detail behind

12   that is.  I'll leave that --

13        **THE COURT:**  He said national security and Idaho, and

14   none of this has got anything to do with any of it.  I don't

15   know how big the files are.

16   I assume the agents have gone through the 302s.  There's

17   stuff that's been seized.  I'm sure whatever investigation the

18   government's done, it has gone through its formal, you know,

19   collection to see if there's anything relevant there.  That's

20   is pretty easy.  It's devices we are really talking about

21   here, right?

22        **MR. SHEPARD:**  Right.  And let me, if I could, because

23   I know the Court wants to go.

24        **THE COURT:**  I'm okay.  I'm okay.  I have a little bit

25   of time.

1        **MR. SHEPARD:**  I would like to make another point or

2   two about search terms as a bad alternative, and then I want

3   to get back to the --

4        **THE COURT:**  Search terms are not particularly useful

5   unless you can combine them to -- again, I don't know what the

6   device is, but if you can -- like with emails and stuff like

7   that, if you can zero in on a period of time that's important,

8   figure out the people on the emails that are important, then

9   you can run time constricted searches for correspondence among

10  individuals and possibly with search terms that could be

11  helpful because you can cull down.  Search terms can be pretty

12  bad.  I agree.

13       **MR. SHEPARD:**  And just as another reason applied to

14  this case, Mr. Abramoff coaches the -- his fellow miscreants,

15  people he's working with to be careful in the way they

16  describe things when they are writing it down, to use WhatsApp

17  and things that don't stay around.

18     So the notion that you're going to catch what he's doing

19  with search terms, it's really a nonstarter in terms of trying

20  to investigate and prepare a defense.

21       **THE COURT:**  I understand the problem.  So it's

22  helpful to talk it through.

23       **MR. SHEPARD:**  Okay.  I do want to get to what I can

24  sense is the Court's interest in making sure we have a basis

25  for what we are asking for.

1      So I would like to spend a little time doing that.

2            **THE COURT:**  Okay.

3            **MR. SHEPARD:**  Obviously we did provide you with quite

4      a bit of information under seal, with apologies for doing

5      that.

6            **THE COURT:**  That's okay --

7                        (Simultaneous colloquy.)

8            **MR. SHEPARD:**  I wanted to explain it.  But I would

9      submit -- but the way, I hear the Court's reluctance to look

10     at things that --

11           **THE COURT:**  No, I'm going to look at it.  It's

12     whether I rely on it.  I'll look at it.

13           **MR. SHEPARD:**  The Ninth Circuit says you should.  The

14     Ninth Circuit --

15           **THE COURT:**  I will definitely look at it.

16           **MR. SHEPARD:**  We're not supposed to have to reveal

17     our defense to get discovery.

18           **THE COURT:**  No, I understand --

19                        (Simultaneous colloquy.)

20           **MR. SHEPARD:**  That's the *Hernandez-Meza* case, among

21     others.

22           **THE COURT:**  My difficulty is not reading it or even

23     necessarily considering it, but one does a much better job in

24     discovery about actually, especially under the umbrella of

25     Rule 16 and *Brady* by actually being able to talk about it.

1        So it gets -- when I can only talk about it with one side,

2    at least I've never had it come up, not even in the gang Rico

3    cases where we're talking about getting discovery with witness

4    safety at issue, I've never had it come up.

5        Of course we get defense requests for tools all by

6    themselves that we don't reveal to the government.  So it's

7    fine.  I am saying it makes my job harder when you are

8    confronted with terabytes of information, it is a lot easier

9    to talk about what you want and why so you can figure out

10    where it might be found.

11        **MR. SHEPARD:**  Yes.  And I appreciate --

12        **THE COURT:**  As opposed to just asking for everything,

13    which is not okay either.

14        **MR. SHEPARD:**  I appreciate the challenge that we've

15    given the Court by doing it that way.  But ultimately it is

16    Mr. Andrade's Fifth Amendment right to be able to do it that

17    way.

18        **THE COURT:**  No, I know.

19        **MR. SHEPARD:**  But, but leaving that all aside,

20    because I've heard Mr. Weingarten say several times he can't

21    possibly respond to what we are saying because he hasn't seen

22    it, we have laid out based on, largely on documents that the

23    government has recently produced such as the Butina document,

24    we have laid out in public in our portion of the letter

25    exactly why we think this is relevant.  It's not all of our

1    reasons, but it's more than enough to meet the standards of

2    Rule 16.

3        And by the way, even if we're wrong in justifying the

4    relevance of it and we are not as I will try to encapsulate

5    for you in a couple of minutes in a moment, the Ninth Circuit

6    also says that if, when defining what's material to the

7    preparation of a defense, if this information would completely

8    refute our defense, would show there's absolutely nothing out

9    there about these people that would be helpful to our defense,

10   that in and of itself under the *Hernandez-Meza* and other cases

11   is enough because it is material to the preparation of our

12   defense that we say, okay, that's not a good defense.  That's

13   part of being material to the preparation of a defense.

14       But let me get to the essence of why we think this

15   material is important.

16           **MR. WEINGARTEN:**  The defense that I can't know about,

17   just to be clear, so I can't respond to that.

18           **THE COURT:**  He's about to tell us.  It is public

19   record.

20           **MR. SHEPARD:**  I have already said this is essentially

21   what we put in the two-page letter.  We already said it.  I

22   don't know why --

23                   (Simultaneous colloquy.)

24           **MR. SHEPARD:**  But, yes, so let me just say it then.

25       The key questions that we look at for the preparation of

1    our defense, because Mr. Andrade is charged with a whole bunch

2    of things that we think were really Mr. Abramoff's doing.  And

3    was Mr. Abramoff doing that behind Mr. Andrade's back?  That's

4    one potential issue for us.  And it's illustrated already by

5    what was going on between Mr. Erickson and Mr. Abramoff now

6    that we finally got the Butina document.

7        Similar, related question was what Mr. Abramoff doing,

8    these things that Mr. Andrade is charged with, were they done

9    for Mr. Abramoff's benefit or for Mr. Andrade's?  Was

10   Mr. Abramoff trying to take control of Mr. Andrade's business

11   behind his back or maybe kill it if he couldn't?

12       These are all things based on the evidence.  I know some

13   of that we've submitted to the Court.  I don't think we should

14   be obligated to identify what our defense evidence is to get

15   discovery, but I'm describing it in a sense so that the

16   government can understand the relevance and like we did in our

17   two-page letter.

18       **THE COURT:**  So what I would suggest is have another

19   look at your under seal that you filed previously.  This is

20   the approach I think I'm going to take.

21       Have another look at it.  See if there's anything else

22   that you want to change your mind about or you don't care.

23   You don't have to file it on the public record necessarily,

24   but maybe there's stuff you will be okay giving the

25   government.  Whatever you want to do is fine with me.

1    What I suggest I do is tackle the -- you know, this

2    letter.  I kind of get on pretty quickly.  The reality is

3    filing something on the 3rd of February, actually it's fine

4    that we are talking about it today because it was a more

5    modest -- I mean, it was helpful to talk about the attachment

6    that you said.

7    It was a more -- I really kind of hoped that the

8    government, frankly, would fold on some of it.  And that -- I

9    recognize the government's willingness to work collaboratively

10   to try and get at the information.

11   What I think you should do is, one -- this is not going to

12   stop what I am going to do -- look at whatever you filed under

13   seal, see if you want to reconsider it, see if it really

14   matters, see what's really defense strategy and what really

15   isn't.  Whatever you want to do is okay with me.  I'm not

16   going to second-guess it.

17   Two, I'm going to sit down and go through your initial

18   filings and just kind of take a crack at sorting through it to

19   see -- I will tell you, Mr. Shepard, it is -- it seems like a

20   really big reach to order disclosure of all the devices.

21   That's my reaction to where we are.  I've never seen it done

22   other than -- it doesn't have to be done.  It can be good

23   practice to do it, and there could be good reasons not to do

24   it.

25   So that's how I view that landscape.  It doesn't mean you

1   are not right about your entitlement to specific information

2   relevant to your defense.  I kind of want to chew through the

3   discovery landscape a little bit more based on the earlier

4   submissions.

5       I want to at least chew through it, and maybe in the next

6   week or so, and then try to -- I may call you guys into a

7   hearing again this month, maybe not on a Thursday.  But I want

8   to kind of follow through with some of the questions that I

9   have and see if I can come up with an approach that I think is

10  appropriate under the circumstances.

11      I didn't -- I mean, look, it's my job to do this so this

12  is not -- this is an observation not a complaint.  But most

13  disputes aren't resolved this way, even in

14  baseball-bats-to-the-knees litigation.  Of course we've got

15  the discovery processes there that allow the parties to do

16  their own work.

17      So that's intention, right, you guys dumped a lot of stuff

18  on me.  You don't get a Rule 30(b)(6) deposition, you don't

19  get to do -- you don't get to depose some of the people that

20  you would ordinarily -- so that sort of necessarily shifts the

21  burden in a slightly different direction.

22      It was just in December, it's like too heavy a lift.  I

23  don't know how I'm supposed to do this.  At least I kind of

24  read up a little bit more recreationally through your file

25  before coming here and thought a little bit more about the

1    case, which I wanted to think about what's this case about,

2    what's the case not about so I could think about it.

3        So I think it was helpful.  I suggest that I try in the

4    next week or so, before this all goes out of my head,

5    realistically I need to look at my schedule.  I have a full

6    day today, tomorrow, I cannot work this weekend.  Normally I

7    would but I cannot.  I don't know what my schedule looks like

8    after Tuesday.

9        So I think realistically when I get to dig into this a

10   little bit more it will probably be after Tuesday.  And then I

11   will -- but I am not ordering anything now.  I'm expressing

12   skepticism at a sort of a wholesale turnover of devices.  And

13   I'm going to see if I have any better ideas.

14       Again, this is not a criticism.  I recognize that the

15   government didn't have access to the under seal information.

16   I want to go through the under seal information in much more

17   detail so I can think about what an approach might look like,

18   and then figure out how I'm going to talk with you guys about

19   it.  Mr. Shepard can, in the meantime, decide if he wants to

20   change anything about the under seal landscape.  It's not

21   going to change my review of it, it just may make it a little

22   easier.  Maybe not for Mr. Weingarten.

23            **MR. SHEPARD:**  Can I just make two quick points?

24            **THE COURT:**  Yes.

25            **MR. SHEPARD:**  The first is, I would say I appreciate

1    the Court going back through our --

2            **THE COURT:**  I'm going to go through it.

3            **MR. SHEPARD:**  -- under seal filing.  I know it's

4    thick.

5            **THE COURT:**  I can do it.  No problem.

6            **MR. SHEPARD:**  I would say it got -- our argument got

7    better, even better after we got the Butina materials.

8            **THE COURT:**  Yeah.

9            **MR. SHEPARD:**  They connect a whole lot of dots for

10    us.

11        So I would at some point appreciate the opportunity to

12    connect those newer dots for the Court --

13            **THE COURT:**  I don't know how best to do that.  So,

14    you tell me.  I have the submissions, you know, the actual --

15    all the exhibits which are nicely organized.  That -- those

16    are the exhibits that attach your filing substantially under

17    seal that was filed for the hearing.  I'm looking at

18    Ms. Dent's declaration primarily.

19        I would like -- either you replace wholesale the exhibits

20    or you supplement them.  The question is, is whether you want

21    to, and it's up to you, whether you want to rework your

22    arguments in the form of that brief or not.

23        It's better for me to have one -- you know, I don't know

24    mechanically what that looks like, whether you want to

25    supplement it.  I have another case that I did get the lawyers

1   to -- it was the SEC case that you were -- you probably

2   weren't on my civil calendar today.  Of course you weren't.

3       There is a SEC case where I did make them confer and they

4   did get through a lot of stuff.  It's an insider trading case,

5   and they did give up, Norton Law Firm, they did give up a lot

6   of information along the way.  It clarified the issues.  It

7   reduced the issues.  And we sort of did a little bit of a

8   do-over, and that worked great.

9       But you don't have to do it that way, but I wonder what

10  your thoughts are now that you say, well, I think my arguments

11  got better.

12          MR. SHEPARD:  And the -- I'm sorry.

13          THE COURT:  I just don't want to have to review

14  double -- I am going to have to review it.  There's no way

15  around it.  It was daunting when I saw it.  But of course it's

16  nothing in a great Washington investigation, right, where I

17  had a roomful of information is daunting.  Ten banker's boxes

18  is not.  Not that it was ten banker's boxes.

19      I can do it.  I have to carve out the time to do it and I

20  don't want to double read stuff.  That's my big thing.

21          MR. SHEPARD:  Understood.

22          THE COURT:  I want a concise delivery of information.

23  The more you unseal, the more responsive the government can be

24  to what you ask for.

25      And then I proposed the last tame where Mr. Dawson or

1    Mr. Weingarten, I can't remember, I can't tell what you are

2    asking for.  So that's -- that's -- if you want to do

3    something procedurally that's different, I just don't want to

4    have to double do.  I don't have it in me.

5         MR. SHEPARD:  I appreciate that, Your Honor.  We will

6    talk internally and make a decision about that.  It may be

7    that you should give us like some very short period of time.

8         THE COURT:  How about you guys let me know by next

9    Thursday what you want to do.  If you could file something by

10    next Thursday, not anything substantive, just with a plan

11    going forward.

12         MR. SHEPARD:  Understood.  And just to --

13         THE COURT:  Talk to the government.  Make it joint.

14    No content, just process.

15         MR. SHEPARD:  As you consider it, Your Honor, the

16    kinds of things, and the reason why we don't have a great

17    proposal, although we will certainly consider it, but it's

18    hard to come up with a limiting proposal when, for the reasons

19    I articulated and many others, search terms do not work.

20        And also the question really is, the part of the defense

21    that we need to investigate and that this information is

22    material for the preparation of is, what is going on with

23    these other dealings with these people who are actively

24    involved in AML Bitcoin and also other things with

25    Mr. Abramoff.

1        Do they need money?  Is that why they are doing what they

2   are doing with AML Bitcoin?  Do they need the technology?

3   That's why we need to understand exactly what's going on.

4        **MR. WEINGARTEN:**  Well --

5        **MR. SHEPARD:**  And I don't know of a good limiting

6   principle --

7        **THE COURT:**  No, no, I'm not asking you to limit it.

8   What I'm asking -- let me finish this, Mr. Weingarten, because

9   I kind of have to go, but let me tell you what I'm thinking.

10       I'm not asking you to limit or even propose a limitation.

11  I can maybe come up with that all by myself.  If I come up

12  with something, Mr. Weingarten, that I think might be doable,

13  I will have another hearing where we can talk it through where

14  I will suggest, hey, here's an idea I have.

15       So, Mr. Shepard, you shouldn't propose -- and then you can

16  respond to it, Mr. Shepard.  You should ask for what you want,

17  say why you want it.  My concern here is just procedural.  If

18  you can -- however you want to queue up the dispute for me.

19       It's now supplemented here.  From reading this I'm like,

20  okay, this is a side.  I will go back to the original stuff

21  and look at it.

22       If you are rethinking how you want to frame the issue, you

23  said my thought process has become crisper or clearer since,

24  and if you want to sort of keep the exhibits and replace the

25  memo, or keep the exhibits -- you don't have to refile them,

1    I've got this nice tidy notebook here, if there's another memo

2    and four more things you want to say, or you say you don't

3    have to look at Tabs 10 through 14 any more, take them out of

4    your binder, here is the clean, updated, my best thoughts on

5    what I need and why, if you want to do that, please let me

6    know by next Thursday.

7        Talk with the government first by Wednesday, build -- if

8    it's going to change the landscape of what you submitted, come

9    up with a briefing schedule that works.  I mean, the normal

10   briefing schedule is the government gets a week and you get

11   four days, that's fine.  That's the default under the criminal

12   rules.

13       If you want to do something, talk about it on Wednesday,

14   file something on Thursday, email me a copy because if you

15   don't email it to me, I don't -- I actually probably will get

16   the ECF notification of that, so this is just about packaging

17   the information to me for my review, not my cabining what you

18   want to do.

19       I have to go or I'm not going to make it.  Mr. Weingarten,

20   on a separate matter, I have an email from you.  I will be

21   back at my desk as soon as the induction is over, and I will

22   deal with it tonight, okay, in another matter?

23           **MR. WEINGARTEN:**  Well, on that matter, Your Honor,

24   how about tomorrow or --

25           **THE COURT:**  The only thing I'll say is if it's

```
 1    dated -- if I have the time, I get through everything the same
 2    day.  That's kind of a pathetic person am I, but if it's
 3    already dated today, what I really can't stand, which it is,
 4    let me just see, it saves me time to do it today.  If someone
 5    can be available to answer my call later this afternoon, that
 6    would be lovely.
 7            MR. WEINGARTEN:  I'm happy to do it, Your Honor.
 8        Just on this matter, I have substantive responses to what
 9    Mr. Shepard said, and I appreciate that the Court doesn't want
10    to hear them right now.
11            THE COURT:  It's not that I don't want to see it, I
12    don't see how you can tell.  You can't respond because it's
13    under seal.
14        So I thought that the best we could do at this point is I
15    will take a crack at all this stuff, then try to have another
16    hearing and say, look, I've read it.  Here's some stuff I
17    think we might do.  I'm not willing -- I've told you already
18    I'm super skeptical about all the devices.  I don't see how I
19    do that.  I know that's what Mr. Shepard wants, but I feel
20    like no, no.  So that kind of mostly goes your way.
21        Then the question if that's the case, what do we do about
22    it?  That's the part I haven't thought about.  So I am
23    interested in what you have to say.  I just wonder if I'm
24    equipped enough to be able to understand what you are going to
25    say.
```

1      What you said already was super helpful.  I have an

2  induction starting in 10 minutes.  If I'm not up there in two,

3  I'm not part of it.

4          **MS. DENT:**  Your Honor --

5          **MR. WEINGARTEN:**  Your Honor --

6          **THE COURT:**  If I'm not up there in two minutes, I'm

7  not part of the induction.

8          **MS. DENT:**  Can I have 10 seconds?  Literally 10

9  seconds.

10      Something that's not -- something important that's not in

11  the papers that are filed, and that you're under the

12  misimpression because the government has told you these cases

13  aren't related.

14      The 302s that the agents have written in the Erickson,

15  Butina, and under our cases are all cross-referenced all the

16  time.  We can provide those to you if you want.

17          **THE COURT:**  I don't necessarily need that.  I just

18  assumed if they are cross-referenced they are produced.

19      Is that wrong?

20          **MR. SHEPARD:**  That's wrong.

21          **THE COURT:**  Okay.  That's an easy thing that might or

22  might not need be able to be remedied and it's not -- see, one

23  of the things is, when you tell me stuff that's not written

24  down, I can't retain it.  I mean, so that's -- I can hear the

25  argument, but I'm not sure what you would have me do today,

1   Mr. Weingarten.

2           **MR. WEINGARTEN:**  Well, I want to make sure Your Honor

3   gets to --

4           **THE COURT:**  I'm literally not going to issue any

5   order -- ordering, authorizing turnover of the devices, I'm

6   not going to do that without a further hearing.

7       And my big idea is when they really tell me what they want

8   and why, I'm going to put on my AUSA hat and think about it in

9   terms of Rule 16 and *Brady* and what we might do, and then I

10  plan to talk with you about it.

11      I don't know -- I have access to all the sealed

12  information.  You don't.  I'm not doing anything without your

13  further input.  I just don't know what else you can tell me.

14  If you've got more stuff you can tell me, I can reconvene the

15  hearing later day after the induction.

16          **MR. WEINGARTEN:**  No, I was -- without responding to

17  the substance of what was just said, all I would say about the

18  Butina documents that is the defense goldmine, is I'm more

19  than happy to meet and confer with the defense counsel again

20  to have them explain to me why that document suggested other

21  things are relevant.

22      Again, it is my great aim to produce discoverable

23  materials as quickly as possible.  So --

24          **THE COURT:**  I know it is.

25          **MS. DIAMOND:**  Your Honor?

```
 1              THE COURT:  So honestly -- yes, Ms. Dent, what?

 2              MS. DIAMOND:  I'm sorry, Your Honor, it's

 3   Ms. Diamond.

 4              THE COURT:  I'm sorry.

 5              MS. DIAMOND:  I just wanted to point out to the Court

 6   that Exhibit 11 and Exhibit 34 that were filed under seal were

 7   revealed to the government as the basis for this particular

 8   group of requests.

 9              THE COURT:  So what page of your brief is that

10   referenced on?

11              MS. DIAMOND:  Your Honor --

12              THE COURT:  You can't tell me stuff like that.

13              MS. DIAMOND:  It was in the five-page letter.

14              THE COURT:  Okay.  That's fine.  If it's written

15   down, then I can rely on what's written down and in public.

16      Mr. Weingarten, what else would you like to say?

17              MR. WEINGARTEN:  I don't want to belabor any more

18   points, Your Honor.  I know you have to go.

19              THE COURT:  My job is to do my job first.  If I have

20   to miss the induction, that's fine.  If there's something you

21   need to say for your record, I don't want to cut you off.

22              MR. WEINGARTEN:  No.  I'm sure we will have another

23   opportunity to discuss these points with the Court.

24              THE COURT:  You should go to the induction, too.

25      Okay.  All right.  Thanks everybody.  Matter is under
```

1    submission.

2        Sorry Elaine for killing your day like this.

3            **THE CLERK:**  That concludes today's calendar.

4

5            (Proceedings conclude at 3:53 p.m.)

6

7            <u>**CERTIFICATE OF TRANSCRIBER**</u>

8

9        I certify that the foregoing is a true and correct

10   transcript, to the best of my ability, of the above pages of

11   the official electronic sound recording provided to me by the

12   U.S. District Court, Northern District of California, of the

13   proceedings taken on the date and time previously stated in

14   the above matter.

15       I further certify that I am neither counsel for, related

16   to, nor employed by any of the parties to the action in which

17   this hearing was taken; and, further, that I am not

18   financially nor otherwise interested in the outcome of the

19   action.

20

21   _____

22       DIANE E. SKILLMAN, TRANSCRIBER

23       Tuesday, February 28, 2023

24

25