MICHAEL J. SHEPARD (Bar No. 91281)
   mshepard@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, California 94111
Telephone:   +1 415 318 1200
Facsimile:   +1 415 318 1300

KERRIE C. DENT (Admitted *pro hac vice*)
   kdent@kslaw.com
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone:   +1 202 626 2394
Facsimile:   +1 202 626 3737

CINDY A. DIAMOND (SBN 124995)
   cindy@cadiamond.com
**ATTORNEY AT LAW**
58 West Portal Avenue, #350
San Francisco, CA 94127
Telephone:   +1 408 981 6307

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>ROWLAND MARCUS ANDRADE,<br><br>        Defendant. | Case No. 3:20-CR-00249-RS (LBx)<br><br>**REPLY IN SUPPORT OF DEFENDANT'S FOURTH MOTION TO COMPEL**<br><br>Date:   November 21, 2024<br>Time:   10:30 a.m.<br>Judge:   Hon. Laurel Beeler |

The compelling facts behind this motion require no rhetorical introduction.

1. **The Government's Opposition, For the First Time, Gives a Partial Answer, But the Court Should Require an Unqualified Answer to Whether Abramoff Is an Informant**

On at least ten occasions before filing this motion, the defense asked the government if Abramoff was an informant. *See* Declaration of Kerrie C. Dent at ¶3 ("Dent Decl."). The government never answered this question. Its Opposition never directly defends its repeated refusal to answer this question, which required this motion.

Instead, for the first time, in its Opposition, it offers part of an answer — "*the government is not aware of Abramoff being an 'informant' against Andrade, or cooperating against Andrade, beyond what is outlined in the discovery which it has produced*"[1]—and questions Mr. Andrade's basis for asking the question. None of this explains or excuses the government's continued refusal to provide a simple answer to a simple question.

That the government is "not aware" of Abramoff being an informant against Andrade "beyond the discovery it has produced" does not satisfy the government's obligations under Rule 16. Whether Abramoff is or has been an informant against the person the government is prosecuting in this case is not a question that can be answered on the basis of what the government is "aware of." Even if the prosecutors somehow cannot answer this question, the FBI must know the answer, and, if Abramoff has been an informant against Mr. Andrade, or any other individual relating to this case,[2] then it has records in an informant file that are material to the preparation of Mr. Andrade's defense and/or are exculpatory *Brady* materials.

Nor is it an adequate response to the question for the government to say that maybe it has produced information from which the defense might divine the answer, especially when the discovery consists of more than five Terabytes of data, the majority of which was produced by the government without individual Bates-numbers and/or in formats that are not searchable.[3]

---

[1] Gov't Opp. at 2:1-3.

[2] Even if Abramoff is an informant against someone other than Mr. Andrade, in some other investigation, Mr. Andrade is entitled to any Rule 16, *Brady*, and *Giglio* material in Abramoff's informant file. Abramoff began communicating with the government about Mr. Andrade as early as 2015. Dent Decl. at ¶5.

[3] Dent Decl. at ¶5.

- 1 -

Needless to say, the government has not identified (and defense counsel does not know) where in this Raiders of the Lost Ark sized depository of data the answer to Mr. Andrade's question might be found, or at least the part of the answer of which the government "is aware."[4]

All of the Opposition's efforts fail to excuse the government's refusal to give a complete response to a simple question. It starts by asserting that Mr. Andrade's request for materials from Abramoff's informant file (if one exists) is "unnecessary" because the government's productions of materials relating to Abramoff "have been voluminous and extensive."[5] But this volume is in part a result of discovery the Court has had to order the government to produce, and, in any event, is a reflection of Abramoff's elaborate, decades-long history as a fraudster. It says nothing about whether the government should answer the simple question of whether Abramoff is or has been an informant and, if so, whether portions of his informant file should be produced. If anything, for the reasons noted above, the voluminous nature of the government's production underscores why a simple answer from the government is required, not to mention how much such an answer would have moved the case along more quickly and spared this issue from the Court's docket.

The government claims that Mr. Andrade does not need to know Abramoff's informant status to evaluate his affirmative defenses because he can provide his Rule 12.3 notice based on the information about Abramoff already produced because "Andrade already knows that Abramoff is a cooperating defendant," and "Andrade has all the Abramoff-related evidence he possibly needs to evaluate whether to assert a public authority defense."[6] The first of these assertions is unrelated to any Rule 12.3 defense, and the second is wrong. Mr. Andrade is

---

[4] As it has done in unsuccessfully opposing most of Mr. Andrade's discovery requests, the government also suggests that it is a "conspiracy theory" to ask whether Abramoff is and/or was an informant (Opp. at 3:11), and it questions whether the documents cited are sufficient to establish that Abramoff is an informant. The government offers no authority to suggest that Mr. Andrade needs proof of Abramoff's informant's status to ask if he is an informant; needless to say, such a requirement would be a Catch-22 that would make discovery unavailable. That Abramoff quickly phoned Agent Saler when the agents arrived at his house in September 2018 suggests, at a minimum, that he may still be working with her. Whether she "was" on his case or "is" on his case (it is difficult to tell from the recording), it is possible that Abramoff phoned her, and had her number readily available, because he is an informant.

[5] Gov't Opp., Dkt. #380 at 1:28-2:1 (Oct. 30, 2024).
[6] Gov't Opp. at 4:3-8 and 5:12-13.

- 2 -

entitled to know whether Abramoff is or has been an informant against him, because an affirmative answer to that question opens the door to Rule 12.3 defenses.[7] *See United States v. Conner*, Case No. 15-cr-00296-HSG-1 (N.D. Cal. Dec. 10, 2015) (disclosure of informant's identity was warranted in light of the defendant's potential affirmative defenses). *See also United States v. Pesaturo*, 519 F. Supp. 2d 177, 183 and 186 (D. Mass. 2007) (granting defendant's request for disclosure of informant's identity and related documents that were "necessary to support or explore the viability of the defense of entrapment," because the Defendant's need to know the identity of the informant to "make out or prepare his entrapment defense" outweighed any purported safety concerns posed by revealing the informant's identity."). These holdings are consistent with settled Ninth Circuit law, which establishes that information that helps defendants consider whether to pursue a defense is material for the preparation of their defense under Rule 16. *See, e.g., United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013).[8]

### 2. Contrary to the Government's Assertions, It Has More than Enough Knowledge of or Access to Subpoenas and Search Warrants Issued to Individuals and Entities in Other Cases to Require Their Production

Mr. Andrade has demonstrated the materiality of the requested subpoena and search warrant information repeatedly.[9] Not only does the Opposition fail to address those showings,

---

[7] For example, Mr. Andrade could consider the defense of entrapment "which is available even when the government agent who does the entrapping is an informant rather than a government employee" or the "defense of derivative entrapment: when a private individual, himself entrapped, acts as agent or conduit for governmental efforts at entrapment, the government as principal is bound." *See United States v Hollingsworth,* 27 F.3d 1196, 1204 (D.C. Cir. 1994).

[8] The government attempts to distinguish *United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995) (cited in Mr. Andrade's Opening Brief at 4:10-11), as if its distinctions would alter the well-established principle that information is material under Rule 16 where it is helpful to abandoning, rather than asserting, a potential defense. Opening Brief, Dkt. #375 5:10-12.  In any event, the facts of *Olano* on which the government focuses – that the defendant did not meet his "burden of demonstrating how prior notice . . . would have benefitted his defense," Gov't Opp. at 4:24-25, underscore why Mr. Andrade's motion should be granted.  As the cases cited in the text above demonstrate, the Ninth Circuit recognizes that a determination of whether an individual is an informant *is* material to the preparation of the defense.

[9] This portion of Mr. Andrade's July 15, 2022, discovery request was discussed in meet and confers, in correspondence, and in Ms. Dent's supporting Declaration. Dkt. #120-1, ¶¶42-44.  On May 10, 2023, defense counsel offered to "meet and confer" to further "explain their materiality to Andrade's defense," but the government responded on September 14, 2023 that it had fulfilled its obligations and "[t]here is no need to further discuss the [May 10] letter or to meet-and-confer about it."  The relevance of the requested individuals and entities was explained again in Mr. Andrade's third motion to compel. *See* Declaration of Kerrie C. Dent in Support of Third Motion to Compel, Dkt. #275-1, ¶¶; Declaration of Kerrie C. Dent in Support of Fourth Motion to Compel, Dkt. #374 at ¶¶ 7-10.

- 3 -

but it fails to mention that it has made its relevance arguments already and lost: this Court has already ruled that the government must produce documents responsive to Mr. Andrade's July 2022 request for subpoenas, search warrants, and related materials that individuals and entities. *See* Discovery Order, Dkt. #292 at 1:19-24 and 2:1-4 (March 17, 2024); Tr., Dkt. #292 at 42:4-12. (March 7, 2024). The Court requested that the prosecutors "talk to the agent and try to come up with a realistic time frame" for producing Rule 16 and Brady material responsive to the request. *Id. See also id.* at 43:2-6 ("And so that's just how it goes. So the government will do that. Just talk to the agent within a week, come back and give the defense an idea of like a timeline that you think will work for you"). In granting Mr. Andrade's motion to compel the production of Levin's devices[10] after (much too) extensive briefing, the Court has recognized the materiality to the defense of the relationship between Abramoff and Levin, and the "camouflaged" work they were doing,[11] and cautioned the government not to "stray into *WR Grace* territory."

As a matter of law, the government's renewed journey into *WR Grace* territory gets it wrong. It cites *United States v. Bryan* for the proposition that it is "clear that the government has no obligation to produce materials it does not have in its possession or is not aware of."[12] The *Bryan* case does not say anything about what the government is "aware of," but instead holds that the test for "in the possession of the government" for purposes of Rule 16 sometimes includes out-of-district documents, and that nothing in the text of Rule 16 suggests that the government's obligations can be "satisfied by turning over only those documents physically located within the district in which the defendant is tried." *United States v. Bryan*, 868 F.2d

---

[10] The government questions Levin's relevance again in the Opposition at 10:16-18.

[11] Contrary to the government's claim that Mr. Andrade has not argued why Levin's casefile [which Mr. Andrade did not even ask for] "contains information in any way material to his defense," Opp. at 10:16-18, the relevance of the relationship between Abramoff and Levin, and the "camouflaged" work they were doing, has been briefed (perhaps too) extensively, and the Court has found it to be material to the defense. *See, e.g.*, Second Motion to Compel, Dkt. #120 at 8:1-12; Supp. Memo iso Second MTC, # 153 at 5:16-27 and 6:1, 24-28; Supp. Reply Brief iso Second MTC, Dkt. #159 at 9:8-22; Discovery Order granting Second MTC, Dkt. #165 at 7:11-23, 8:1-2, 11:1-12, 13:13-18 (Apr. 7, 2023); Joint Status Statement, Dkt. #212; Supp. Brief iso Levin's Phone, Dkt. #215, *passim (*Sept. 26, 2023*)*; Andrade's Status Report, Dkt. #236 at 10:2-28 (Nov. 7, 2023); Third Motion to Compel, Dkt. #275 at 22-23, fn 11 (Jan.25, 2024); Motion to Compel Master Copy of Levin's Phone, Dkt. #317 at 4:9-20 and 5: 1-12 (June 28, 2024); Reply iso MTC Image of Levin's Phone, Dkt. #323 at 3:10-23, 4:1-17 (July 15, 2024).

[12] Gov't Opp. at 6:13-15.

1032, 1036 (9th Cir. 1989). The *Bryan* Court added that, as with Rule 16, it "see[s] no reason why the prosecutor's obligations under *Brady* should stop at the border of the district." *Id*. at 1037.[13]

On the facts, the government fares no better. It claims that "none of [the] specific examples" defense counsel suggested as places to check for responsive material are "from files that the government has knowledge of and access to," and that, "[a]s the Court well knows, the U.S. Attorney's Office in the Northern District of California does not have *de facto* knowledge of investigations by other U. S. Attorneys' Offices."  But even if Rule 16 and *Brady* on their face did not require the government – as opposed to an individual U.S. Attorney's Office – to produce responsive information, the Opposition's disclaimer of sufficient connections with other offices and entities would fail, as the government's own chosen examples of the Southern District of New York and the Central District of California demonstrate.

Even on the standards set forth in the Opposition, there is more than an ample basis to compel discovery because the prosecutorial team in Mr. Andrade's case has worked with both of those districts on Mr. Andrade's case, including on interviews of or about some of the individuals and entities in Mr. Andrade's request.  Although the government insists that the investigation involving Alexander Levin in the Southern District of New York is unrelated to Mr. Andrade's case,[14] discovery the government produced, and the government's own conduct, demonstrates the contrary:

---

[13] The government noted that the *Bryan* court said that "a federal prosecutor need not comb the files of every federal agency which might have documents regarding the defendant," but it failed to include the limitations the *Bryan* court placed on that statement: "**However**, we do not believe that adopting a mechanical definition of 'government' that would deny to the defendant documents accessible to the prosecution would reflect a fair balance of competing concerns of the government and the defendant in this case." *Id.* at 1036 (emphasis added). The government cites the same phrase in the *W.R. Grace* opinion, omitting the remainder of the paragraph, which states: "**But** this is a case in which the government has levied a broad and complex Indictment, and has consulted with a number of federal agencies in gathering evidence against the accused.  The Constitution does not go too far in defense of due process when it requires that the prosecution's search for evidence favorable to the accused be as far-reaching as the search for evidence against him." *United States v. W.R. Grace*, 401 F. Supp.2d 1069, 1080 (D. Mont. 2005). Contrary to the government's characterization, the *W.R. Grace* court did not limit its holding to cases with similar circumstances, but rather engaged in a fact specific analysis determine whether the government has knowledge of and access to the requested materials.

[14] Gov't Opp. at 10:2-4 .

- 5 -

- The efforts to remove the U.S. Ambassador to Ukraine in May 2019 – one of the very same pro-Russia "lobbying" activities about which Abramoff took notes when meeting with Ukrainian oligarch Ihor Kolomoisky in Geneva in May 2018 and about which Abramoff and Alexander Levin communicated in June 2018 – was part of the SDNY's investigation pursuant to which Levin's devices were produced.[15] These communications have been the subject of inquiry *in this investigation by the government*: After Abramoff initially "could not explain" in a proffer in this district why his son's company, Landfair Capital, invoiced Levin for $750,000 for "cryptocurrency consulting,"[16] Abramoff admitted in a later proffer in this district that "the idea of a 'cryptocurrency consulting' agreement between Abramoff and Levin was just a way to camouflage the actual work Abramoff was doing with Levin. This actual work had nothing to do with cryptocurrency."[17] The government's own records therefore disprove its claim that the investigations are unrelated.

- Mr. Andrade's prosecutorial team did not hesitate to reach out for assistance from the prosecutorial team in the SDNY when it sought to oppose Mr. Andrade's request for Levin's iPhone and iPad. The government responds in its Opposition that Mr. Andrade is "misstating the record," attempting to dismiss its conduct as working with the SDNY in connection with production of the devices "only because this Court ordered that the SDNY be compelled to produce them."[18] This is flatly untrue: the government reached out to the SDNY *before* the Court's order, in an effort to avoid being so ordered, as part of an effort to bolster its failed argument that Levin's phone is irrelevant.[19] In light of the government's false accusation that Mr. Andrade has misstated the record here, we note that this is the second time on this very issue that the government has misstated the record (and the second time it has falsely accused Mr. Andrade of doing so). Supp #215 at 3:4-15.[20] Having worked with the prosecutorial team at the SDNY to resist producing discovery, and then falsely denying that it commissioned the review of the entire device, until defense counsel provided the Court with documentary proof

---

[15] Dent Decl. at ¶ 7.
[16] Dent Decl. at ¶ 7.
[17] Dent Decl. at ¶ 7.
[18] Gov't Opp. at 10:5 and 10:8-11.
[19] The government emailed defense counsel on February 9, 2023, that it ran three search terms "through the seized devices" and reported that there were no hits. On February 28, 2023, AUSA Dawson emailed defense counsel a 302 report summarizing the interaction between Mr. Andrade's prosecutorial team and the SDNY's prosecutorial team in the SDNY, confirming that New York Field Office, Squad C-14 had run three search terms on "any phones and any other devices seized/imaged from Alexander Levin" and that there were no hits. Dent Decl. at ¶ 7.
[20] Gov't Opp. at 10:5 ("Andrade again misstates the record"). Defense counsel explained, and the government falsely denied, the facts surrounding the government's interactions with the SDNY on multiple occasions over several months before the government acknowledged the truth. Govt. Opposition to Andrade's Supplemental Brief in support of Request for Levin's Devices, Dkt. #220, fn 6 (Oct. 3, 2023) ("The government misspoke in the Joint Status Report when it said that the government ran the three search terms only against the Levin phone material responsive to the SDNY search warrant … Government counsel apologizes to the Court for this misstatement."). It tried to pass its false statement off as "misspeaking," to which Mr. Andrade responded that the government had in fact misspoken three times, and had done so "not off the cuff but as part of a carefully written brief that followed a meet-and-confer as well as a written reminder of the search it had conducted on Levin's device." *See* Andrade's Reply Brief in Support of Request for Levin's Devices, Dkt. #224, footnote 1 (Oct. 10, 2023). The government has now "misspoken" to the Court again.

- of the collaboration, the government should not now be allowed to resist working with the SDNY when doing so would help the defense obtain discovery that falls within Rule 16 or *Brady*.

- As an added bonus, and underscoring that criminal investigations are not compartmentalized into one specific U.S. Attorney's Office working with a singular FBI field office, leaked statements made by an FBI whistleblower to the Senate and House Judiciary Committees suggest that his FBI counterintelligence work relating to Russia and Ukraine (including intelligence on Ukrainian oligarch Ihor Kolomoisky) being conducted in the Los Angeles office was often for the benefit of SDNY and its ongoing investigations. That cross-office work included Mr. Andrade's case: the same FBI Agent worked on this case, summarizing Abramoff's hand-written notes that Abramoff told the case agents he took during a meeting with Levin associate and international money launderer Ihor Kolomoisky.[21]

There are also connections with the Central District, and with agents there who have been working both with the SDNY and with the case agents for Mr. Andrade's case:

- Three FBI Agents from the Central District – Ketrin Adam, Johnathan Buma, and James Donovan – interviewed a Confidential Human Source about handwritten notes of Jack Abramoff relating to Mr. Andrade, Landfair Capital, AML Bitcoin, and other issues. The notes of their interview also reference Charles Johnson and Dana Rohrabacher, two of the individuals whose subpoenas and search warrants are included in Mr. Andrade's discovery request.[22]

- The government produced a redacted 302 report that appears to have been prepared by the Los Angeles FBI field office and mentions a Confidential Human Source who "knows that Jack Abramoff and his "crew" identified and threatened people in the marijuana industry . . . CHS came to believe Abramoff was a violent person." The report also indicates that the crimes being investigated relate to "Bitcoin utilized by organized crime and foreign governments to move money."[23] The document is so heavily redacted that it is impossible to tell whether the USAO for the Central District is involved.

- Case agents Quinn and Wynar interviewed former Congressman Rohrabacher about Andrade, Abramoff, Landfair Capital, AML Bitcoin, and other issues with Special Agent Ketrin Adam from the Central District, and also for an interview of Paul Behrends, a former senior aide and business partner of Rohrabacher, whose interview related to Rohrabacher, Abramoff, AML Bitcoin, and other issues.[24]

- ICOBox and its founder and CEO Nick Evdokimov (both of whom are included in Mr. Andrade's discovery request) were ordered by a U.S. District Court Judge for the Central District to pay more than $16 million

---

[21] Dent Decl. at ¶ 7.
[22] Dent Decl. at ¶ 7.
[23] Dent Decl. at ¶ 8.
[24] Dent Decl. at ¶ 8.

- 7 -

to the SEC for their activities in connection with initial coin offerings it conducted beginning in August 2017, Order, *Securities & Exch. Comm'n v. ICOBox and Nikolay Evdokimov*, No. 2:19-cv-08066-DSF, Dkt. #471 (March 5, 2020). At a minimum there is a reasonable basis to infer that the U.S. Attorney's Office also investigated. In any event, that the team prosecuting Mr. Andrade has knowledge of ICOBox, Evdokimov, and any subpoenas and search warrants issued to them is easily inferred from the fact that the team overlaps substantially with the team that is prosecuting Japheth Dillman, who was a paid ICO Advisor for ICOBox, and the team questioned numerous witnesses about ICOBox and Evdokimov.[25]

When Mr. Andrade first requested the subpoena and search warrant data at issue here, the government protested that "the agents on the investigation have no idea who many of these individuals are."[26] Because Mr. Andrade has proven that this protest was demonstrably false, *see* Opening Brief at 7:1-7, the Opposition takes a different – but equally unpersuasive – tack, claiming that "several individuals [were] interviewed as part of [a] separate investigation into co-defendant Abramoff's illegal lobbying." Gov't Opp. at 10:26-27. The government selects Ghost Management Group as its example of a company that was part of the "separate investigation" into Abramoff's illegal lobbying. But that lobbying, and all of the money associated with it that went in and out of the Landfair Capital account and other bank accounts of Abramoff's various low down companies, are part of Mr. Andrade's defense. As the Court has noted, one of the themes of Mr. Andrade's defense is that "Abramoff [was] using Blockchain Entertainment, the television show about Mr. Andrade's business, Landfair Capital, and other entities, for his schemes about Mr. Andrade's business that were adverse to Mr. Andrade, at the same time that Abramoff was orchestrating the conduct for which Mr. Andrade has been charged." Discovery Order, Dkt. #165 at 7:7-10 (citing Andrade's Supplemental Brief iso Second Motion to Compel, ECF #153 at 5 and Supp. Reply Brief, Dkt. #159 at 10).

---

[25] Dent Decl. at ¶ 8. In addition to the connections to the SDNY and the Eastern District of California, Mr. Andrade's prosecutorial team sometimes participates in joint interviews in other investigations that are then cross-referenced with Mr. Andrade's case on the 302 Reports. To the extent that those cases involve individuals in Mr. Andrade's discovery request – such as Dana Rohrabacher and Charles Johnson – the case agents should produce Rule 16 and *Brady* materials from those cases. *See, e.g.*, 813C-HQ-3178392; 105I-WF-3033360; 105I-TP-3193890; 58C-LA-2207119; 281T-CG-129436.

[26] *See* Fourth Motion to Compel at 7:1-7 (citing Gov't Opp. to Second Motion to Compel, Dkt. #124 9:13-15 and 9:28-10:5).

- 8 -

Not only has Mr. Andrade made these facts part of his defense, but the government in its 89-page search warrant affidavit for Abramoff's residence recognizes that the types of evidence gathered for the supposedly separate lobbying investigation reveal important facts about Abramoff, such as his use of WhatsApp rather than email (because he thought it was more difficult for the FBI to get the communications), his insistence on not using his name, his control of other companies through proxies, his use of "consulting" agreements to hide incoming payments, his taking of kickbacks from individuals and companies he engaged to do the work, and his use of "low down" companies to hide his financial activities, including Landfair Capital Consulting and Ghost Management Group. The significance of these facts is not limited to the lobbying investigation – they not only are impeaching but also are intertwined with what he was doing with and to AML Bitcoin.

### 3. The Government, Not Mr. Andrade, Is Abusing the Discovery Process In This Case

The government concludes its brief with rhetoric, claiming that the two "discovery demands" in Mr. Andrade's fourth motion to compel are "nothing more than another effort to place an undue burden on the government" and to "delay the trial."[27] To the contrary, the two discovery requests at issue in this motion, like almost all of the discovery requests in this case, were first made more than two years ago and have been raised repeatedly since then. The suggestion that Mr. Andrade's lawyers are delaying the trial because they keep making discovery motions has it backwards. On over a dozen different requests, this Court has ordered the government to produce material that it had refused to produce. It is the government's time-consuming resistance to providing material it is required to provide – and its refusal even to respond to simple requests like whether Abramoff is an informant – that has delayed the trial.

It is true that Mr. Andrade's counsel has sent the government at least fifteen discovery letters in 2024, but they consist of far fewer than 115 different requests – much closer to 15 than to 100.[28] The vast majority are not new requests, but are reminders to the government of

---

[27] Gov't Opp. at 11:17-20.
[28] Dent Decl. at ¶ 4.

- 9 -

material that should have been produced but has not been, including requests for Andrade's own devices, for a timeline for production of the 14 categories of material the Court ordered produced on March 17, 2024, for the numerous Abramoff devices requested in March 2022 but never produced, for missing 302 reports and SEC documents, and for the two categories of material addressed here in Mr. Andrade's Fourth Motion to Compel.  For the Court's reference, the discovery letters defense counsel has written to the government are attached to the Declaration of Kerrie C. Dent at ¶¶3-4.  That Mr. Andrade has had to repeat the same requests numerous times because the government does not respond to them – or responds inaccurately -- is not a reflection of delay by the defense.  The fact that the number of these reminders is in the double digits underscores how needlessly difficult, needlessly slow, and needlessly burdensome on this Court, that the government's conduct has made the discovery process in this case.

                                                       Respectfully submitted,

DATED: November 11, 2024                  KING & SPALDING LLP

                                        By: */s/ Michael J. Shepard*
                                              MICHAEL J. SHEPARD
                                              KERRIE C. DENT
                                              CINDY A. DIAMOND

                                              Attorneys for Defendant
                                              ROWLAND MARCUS ANDRADE