ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTIAAN HIGHSMITH (CABN 296282)
DAVID WARD (CABN 239504)
Assistant United States Attorneys

MATTHEW CHOU (CABN 325199)
Special Assistant United States Attorney

       450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
       Telephone: (415) 436-7200
       FAX: (415) 436-7230
       christiaan.highsmith@usdoj.gov
       david.ward@usdoj.gov
       matthew.chou2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 20-CR-00249 RS |
| Plaintiff, | UNITED STATES' MOTIONS *IN LIMINE* |
| v. | Trial Date:  February 11, 2025 |
| ROWLAND MARCUS ANDRADE, | Pretrial Conference:  January 22, 2025 |
| | Court:  Hon. Richard Seeborg |
| Defendant. | |

U.S. MOTIONS IN LIMINE
NO. 20-CR-00249 RS

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL BACKGROUND ...............................................................................1

      A.    Andrade's NAC Foundation, AtenCoin, and AML Bitcoin ......................1

      B.    Andrade Brings on Jack Abramoff to Market and Sell AML Bitcoin by
            Misleading the Public ...............................................................................2

      C.    Andrade Sold AML Bitcoin Tokens But Never Developed an AML Bitcoin
            Cryptocurrency With the Promised Digital Identity and Biometric Verification
            Features Built Into its Software ................................................................2

      D.    False Statements Regarding AML Bitcoin ................................................3

      E.    Use of the Funds and Misappropriation by Andrade .................................4

III.  MOTIONS IN LIMINE .......................................................................................5

      A.    MOTION *IN LIMINE* NO. 1: THE COURT SHOULD PRECLUDE THE
            DEFENDANT FROM OFFERING AN IMPROPER DEFENSE OF
            BLAMING HIS VICTIMS ........................................................................5

      B.    MOTION IN LIMINE NO. 2: THE COURT SHOULD ADMIT THE
            DEFENDANT'S OUT-OF-COURT STATEMENTS IF OFFERED BY THE
            GOVERNMENT, BUT SHOULD PROHIBIT THE DEFENDANT FROM
            OFFERING PORTIONS OF HIS OWN PRIOR STATEMENTS ..................8

      C.    MOTION IN LIMINE NO. 3:  THE COURT SHOULD PRECLUDE
            DEFENDANT FROM PRESENTING AN IMPROPER GOOD FAITH
            DEFENSE ...............................................................................................10

      D.    MOTION IN LIMINE NO. 4: THE DEFENSE SHOULD BE COMPELLED
            TO PRODUCE RECIPROCAL DISCOVERY ...........................................11

      E.    MOTION IN LIMINE NO. 5: THE COURT SHOULD ADMIT BUSINESS
            AND PUBLIC RECORDS .........................................................................12

      F.    MOTION IN LIMINE NO. 6: THE COURT SHOULD ADMIT SUMMARY
            CHARTS OF VOLUMINOUS EVIDENCE AND PEDOGOGICAL AIDS ...............15

      G.    MOTION IN LIMINE NO. 7: NO NOTICE REQUIRED FOR REBUTTAL
            EXPERTS ................................................................................................17

      H.    MOTION IN LIMINE NO. 8: THE COURT SHOULD PRECLUDE THE
            DEFENSE FROM REFERENCING PUNISHMENT IN FRONT OF THE
            JURY ......................................................................................................18

      I.    MOTION IN LIMINE NO. 9: THE COURT SHOULD EXCLUDE
            WITNESSES DURING TRIAL WITH THE EXCEPTION OF THE CASE
            AGENT ....................................................................................................19

J.     MOTION *IN LIMINE* NO. 10: HEARSAY MISREPRESENTATIONS ARE
INDEPENDENTLY ADMISSIBLE NOT FOR THEIR TRUTH, BUT TO
PROVE THEY WERE MADE ......................................................................................19

IV.    CONCLUSION ............................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**                                                                                               **Page(s)**

*Anderson v. United States*, 417 U.S. 211 (1974) ......................................................... 20

*City of Phoenix v. Com/Systems, Inc.*, 706 F.2d 1033 (9th Cir. 1983) ..................................... 15

*Crawford v. Washington*, 541 U.S. 36 (2004) .......................................................... 14

*Goldberg v. United States*, 789 F.2d 1341 (9th Cir. 1986) ............................................. 16

*In re Mendez*, No 06-1111, 2008 WL 597280 (Bankr. E.D.C.A. Feb. 29, 2008) ............................ 15

*Karme v. Comm'r*, 673 F.2d 1062 (9th Cir. 1982) ...................................................... 15

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ................................................. 14

*Neder v. United States*, 527 U.S. 1 (1999) ............................................................... 7

*Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984) ..................................... 16

*People of Territory of Guam v. Ojeda*, 758 F.2d 403 (9th Cir. 1985) ..................................... 9

*Shannon v. United States*, 512 U.S. 573 (1994)........................................................ 18

*United States v. Aceves-Rosales*, 832 F.2d 1155 (9th Cir. 1987) ....................................... 12

*United States v. Allen*, 201 F.3d 163 (2d Cir. 2000) .................................................... 6

*United States v. Anekwu*, 695 F.3d 967 (9th Cir. 2012)........................................... 14, 16

*United States v. Angelini*, 607 F.2d 1305 (9th Cir. 1979) ............................................ 17

*United States v. Beecroft*, 608 F.2d 753 (9th Cir. 1979).............................................. 11

*United States v. Benny*, 786 F.2d 1410 (9th Cir. 1986) ............................................... 10

*United States v. Biesiadecki*, 933 F.2d 539 (7th Cir. 1991)............................................ 7

*United States v. Blixt*, 548 F.3d 882 (9th Cir. 2008)................................................... 5

*United States v. Cervantes-Cardenas*, 220 Fed. Appx. 718 (9th Cir. 2007) ............................ 17

*United States v. Ciccone*, 219 F.3d 1078 (9th Cir. 2000) .............................................. 5

*United States v. Colton*, 231 F.3d 890 (4th Cir. 2000) ................................................ 6

*United States v. Coyle*, 63 F.3d 1239 (3d Cir. 1995) .................................................. 6

*United States v. Daniel*, 329 F.3d 480 (6th Cir. 2003) ................................................ 7

*United States v. DiStefano*, 129 F. Supp. 2d 342 (S.D.N.Y. 2001) ...................................... 8

*United States v. Duran*, 41 F.3d 540 (9th Cir. 1994)................................................. 12

1    *United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1988) ............................................... 10

2    *United States v. Frank*, 956 F.2d 872 (9th Cir. 1992) ................................................... 18

3    *United States v. Friedman*, 593 F.2d 109 (9th Cir. 1979) ............................................ 15

4    *United States v. Gal*, 606 Fed. App'x 868 (9th Cir. Mar. 27, 2015)............................. 14

5    *United States v. Gardner*, 611 F.2d 770 (9th Cir. 1980) ............................................. 16

6    *United States v. George*, 786 F. Supp. 56 (D.D.C. 1992) ........................................... 12

7    *United States v. Gillespie*, 225 F.3d 664 (9th Cir. 2000).............................................. 20

8    *United States v. Hickey*, 580 F.3d 922 (9th Cir. 2009) ................................................ 11

9    *United States v. Johnson*, 594 F.2d 1253 (9th Cir. 1979) ........................................... 16

10    *United States v. King*, No. CR-08-002-E-BLW, 2009 U.S. Dist. LEXIS 32935 (D. Idaho Apr. 17, 2009)8

11    *United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988) ................................................... 20

12    *United States v. Kreimer*, 609 F.2d 126 (5th Cir. 1980) ............................................... 6

13    *United States v. Lindsey*, 850 F.3d 1009 (9th Cir. 2017)......................................... 5, 6, 7

14    *United States v. Little*, 753 F.2d 1420 (9th Cir. 1984)................................................. 19

15    *United States v. Matlock*, 415 U.S. 164 (1972) ............................................................ 9

16    *United States v. Meyers*, 847 F.2d 1408 (9th Cir. 1988) ............................................ 15

17    *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) .............................................. 10

18    *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007)........................................... 9, 10

19    *United States v. Molinaro*, 11 F.3d 853 (9th Cir. 1993) ............................................. 10

20    *United States v. Nakai*, 413 F.3d 1019 (9th Cir. 2005)............................................... 10

21    *United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995) ................................................ 18

22    *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000)................................................. 9

23    *United States v. Pelisamen*, 641 F.3d 399 (9th Cir. 2011)............................................ 8

24    *United States v. Pelullo*, 964 F.2d 193 (3d Cir 1992) ................................................ 15

25    *United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) ............................................... 12

26    *United States v. Shirley*, 884 F.2d 1130 (9th Cir. 1989)............................................. 16

27    *United States v. Silva*, 141 Fed. Appx. 521 (9th Cir. 2005)........................................ 17

28    *United States v. Smith*, 73 F.3d 374 (10th Cir. 1996) ................................................ 20

*United States v. Soulard*, 730 F.2d 1292 (9th Cir. 1984).............................................................. 16

*United States v. Svete*, 556 F.3d 1157 (11th Cir. 2009) ................................................................ 6

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004) ................................................................. 6

*United States v. Thomas*, 835 F.2d 219 (9th Cir. 1987)............................................................... 19

*United States v. Turkish*, 458 F. Supp. 874 (S.D.N.Y. 1978) ...................................................... 12

*United States v. Valencia-Riascos*, 696 F.3d 938 (9th Cir. 2012) .............................................. 19

*United States v. Winkle*, 477 F.3d 407 (6th Cir. 2003) ................................................................. 6

*United States v. Wood*, 943 F.2d 1048 (9th Cir. 1991).......................................................... 15, 16

*United States v. Yeager*, 331 F.3d 1216 (11th Cir. 2003) ............................................................. 7

*Zal v. Steppe*, 968 F.2d 924 (9th Cir. 1992)................................................................................. 18


**Federal Statutes**

18 U.S.C. § 3500 ............................................................................................................................ 11

**Federal Rules**

Fed. R. Crim. Proc. 16(b) & (b)(1)(A)................................................................................ 1, 4, 11

Fed. R. Crim. Proc. 16(d)(2) .......................................................................................................... 12

Fed. R. Evid. 16(a)(1)(G)............................................................................................................... 17

Fed. R. Evid. 104(a) ....................................................................................................................... 12

Fed. R. Evid. 401-403 ...................................................................................................................... 8

Fed. R. Evid. 615 ............................................................................................................................ 19

Fed. R. Evid. 801(c)(2) ................................................................................................................... 20

Fed. R. Evid. 801(d)(2) .................................................................................................................... 9

Fed. R. Evid. 801(d)(2)(A) .......................................................................................................... 8, 9

Fed. R. Evid. 803(6), (8), (14), (15) .............................................................................................. 13

Fed. R. Evid. 807 ............................................................................................................................ 15

Fed. R. Evid. 902(11)...................................................................................................................... 16

Fed. R. Evid. 1006 ............................................................................................................... 15, 16, 17

Fed. R. Evid. 902 ............................................................................................................................ 12

## I.     INTRODUCTION

The United States submits the following motions *in limine* for the Court's consideration.  The government respectfully requests the opportunity to supplement these motions *in limine* if additional legal issues arise requiring the Court's intervention.  In addition, because the defense has not provided any reciprocal discovery under Federal Rule of Criminal Procedure 16(b), the government requests the opportunity to supplement these motions *in limine* to address any issues triggered by the defense.

## II.    FACTUAL BACKGROUND

### A.     Andrade's NAC Foundation, AtenCoin, and AML Bitcoin

In February 2014, Andrade founded the National AtenCoin (NAC) Foundation.  As the founder and CEO of the NAC Foundation, Andrade claimed to have created Aten Black Gold Coin, a cryptocurrency that would facilitate oil transactions.  Andrade rebranded Aten Black Gold Coin as AtenCoin, and proclaimed AtenCoin to be a cryptocurrency with unique identity verification features.  From 2014 to August 2016, Andrade and the NAC Foundation sold AtenCoin, raising approximately $2 million from buyers.  Andrade employed several boiler-room-type sales people who earned commissions of 30% or more on their sales of AtenCoin.

In 2017, Andrade rebranded AtenCoin as AML Bitcoin, which he claimed had AtenCoin's identity verification features built into the cryptocurrency's blockchain.  As part of the rebranding, Andrade promised AtenCoin investors that their coins could be converted to AML Bitcoin.  Also in 2017, Andrade began telling associates and prospective investors that AML Bitcoin would raise funds through an ICO, or initial coin offering.  An ICO is a typical type of transaction for new cryptocurrencies.  The idea is similar to an initial public offering of stock, although even legitimate ICOs are not regulated and there are no clear rules governing the process or disclosures associated with ICOs.  NAC Foundation held an "ICO" for AML Bitcoin that began in October 2017.

According to the AML Bitcoin "White Paper" dated October 4, 2017, posted on the AML Bitcoin website, AML Bitcoin and AtenCoin both included complete anti-money laundering (also referred to as AML) and know-your-customer (KYC) features by using "biometric technologies" to confirm the identities of participants in transactions.  In the White Paper, and in statements about the cryptocurrency, Andrade and others claimed that these compliance and identity-verification features

1   would make AML Bitcoin the dominant, and perhaps the only legal, cryptocurrency.

2       **B.    Andrade Brings on Jack Abramoff to Market and Sell AML Bitcoin by Misleading
3           the Public**

4       In mid-2017, Andrade was introduced to Jack Abramoff.  Andrade retained Abramoff to work on

5   a public relations and marketing campaign for AML Bitcoin.  Beginning in approximately August 2017,

6   Abramoff and Andrade began a media campaign that involved the placement of what they claimed were

7   "op-eds" in various online publications.  In fact, the "op-eds" were merely marketing pieces written by

8   writers who had been paid to publish the promotional pieces on behalf of AML Bitcoin.  Abramoff also

9   drafted press releases that were reviewed and approved by Andrade.  The press releases and fake op-eds

10  often contained exaggerations and false statements implying that AML Bitcoin had business

11  relationships and impending deals with governmental and quasi-governmental entities such as the

12  Panama Canal, the Port of San Francisco, other ports on the West Coast, and the London Stock

13  Exchange.  In addition, Andrade posted pictures with him and government officials, and claimed he was

14  meeting with them to discuss the adoption of AML Bitcoin.  In fact, Andrade was merely engaged in a

15  touch-and-talk scheme in which he would meet briefly with a government or quasi-government entity, in

16  some cases take a photograph with an official connect to that entity, but then spin the meeting through

17  misleading press releases, photographs and public statements to imply that the government entity was

18  seriously considering using AML Bitcoin.

19      **C.    Andrade Sold AML Bitcoin Tokens But Never Developed an AML Bitcoin
            Cryptocurrency With the Promised Digital Identity and Biometric Verification
20          Features Built Into its Software**

21      At all times, Andrade and others working with him sold AML Bitcoin tokens rather than AML

22  Bitcoin itself.  The AML Bitcoin "token" was simply a placeholder cryptocurrency modeled on open-

23  source Bitcoin software.  From the outside, the token operated like the popularly known Bitcoin or other

24  cryptocurrency.  The token had none of the anti-money laundering or know-your-customer features

25  Andrade claimed he was developing (nor was it affiliated with the official Bitcoin project founded by

26  Satoshi Nakamoto).  Andrade and those working with him represented to investors that the tokens would

27  soon be exchangeable for AML Bitcoin cryptocurrency "coins" with biometric and digital identity

28  verification features built into the software (or blockchain) in the future, usually in about six months.

1    However, the fact that there was a rudimentary working cryptocurrency "token" does not mean that the

2    AML Bitcoin technology was working or existed as promised.  It wasn't.

3        Andrade hired software developers to assist with AML Bitcoin.  The software engineers initially

4    worked only on the token and wallet software.  They also did some work on the other features that were

5    supposed to be integrated into the finished AML Bitcoin "coin," but that work was only beginning.  The

6    engineers never created or saw a working AML Bitcoin with the promised identification features.

7    Although Andrade and the NAC Foundation had AML Bitcoin tokens with no special identity or

8    biometric verification features, there was never a completed AML Bitcoin cryptocurrency "coin" with

9    the promised and widely marketed biometric and identity verification technology.

10        **D.    False Statements Regarding AML Bitcoin**

11        Throughout 2017 and 2018, Andrade, Abramoff, and others working at Andrade's direction

12    made false statements about the business prospects and technology of AML Bitcoin.  Many of the false

13    and misleading representations were made in public statements, including press releases and paid op-ed

14    pieces, and others were made to undercover agents in recorded conversations.

15        From September 2017 through at least April 2018, Andrade, Abramoff, and others working at

16    Andrade's direction disseminated misleading public statements and press releases indicating that

17    Andrade and AML Bitcoin representatives were in discussions with the Port of San Francisco about the

18    Port adopting AML Bitcoin and its technology.  In fact, Port of San Francisco officials had no reason to

19    use AML Bitcoin, no plan to use it, and told Andrade as much.

20        During approximately the same period, Andrade and NAC Foundation made false statements,

21    both in press releases and paid op-eds arranged by Abramoff, regarding the prospect that AML Bitcoin

22    would be used by the Panama Canal to collect transit fees.  In September 2017, Andrade traveled to

23    Panama to meet with some private sector entities, in meetings set up by Abramoff and an associate.

24    That trip was used as the basis for a campaign to tout the potential adoption of AML Bitcoin by the

25    Panama Canal.  One op-ed, with the headline "A New Digital Currency, AML Bitcoin, Makes Landfall

26    in Panama," stated the Panama Canal was in active negotiations with the NAC Foundation.  Peter J.

27    Ferrera, A New Digital Currency, AML Bitcoin, Makes Landfall in Panama, *Investor's Business Daily*

28    (Sept. 20, 2017), available at Bates No. FBI-302-000509.  It also included the false claim that "[Port of

1    San Francisco] officials are considering using this new digital currency in the seaport's passage and

2    docking fees and other payment structures." *Id.*  After a press release, published on November 8, 2017,

3    touted the NAC Foundation's negotiations with the Government of Panama and included false and

4    misleading statements, the Panama Canal Authority contacted the NAC Foundation and demanded a

5    retraction.

6        In January 2018, the NAC Foundation made public statements claiming that it planned to run an

7    advertisement promoting AML Bitcoin during the 2018 Super Bowl.  Then, in a series of press releases,

8    paid articles, and social media posts, the NAC Foundation claimed that the ad was "banned" by NFL

9    executives and rejected by NBC, the network airing the Super Bowl.  A video titled "AML Bitcoin: The

10   Banned Super Bowl Commercial That's Sweeping the Globe" was posted on YouTube and other sites.

11   The video was a parody that included an actor portraying North Korean leader Kim Jong Un, and

12   showing the leader frustrated that he could not "hack" or steal AML Bitcoin.

13       In truth, Abramoff and Andrade knowingly developed a "rejection campaign" and disseminated

14   false claims about the ad being rejected in order to both raise visibility for AML Bitcoin during the ICO,

15   but also to imply that the NAC Foundation had the financial ability to pay for this advertising time—

16   which costs at least $5 million—in order to support claims that AML Bitcoin had significant financial

17   backing and was an established and successful startup.  There was never an intention to pay for or run

18   the ad, and at the time of this commercial campaign, the NAC Foundation had nowhere near enough

19   money in its accounts to pay for a Super Bowl ad on NBC.

20       **E.  Use of the Funds and Misappropriation by Andrade**

21       During 2017 and 2018, Andrade and the NAC Foundation raised approximately $4.3 million

22   from purchasers of AML Bitcoin tokens.  For example, on January 12, 2018, as part of the fraud

23   scheme, an investor referred to as Purchaser-1 wired the NAC Foundation $730,000 in exchange for

24   AML Bitcoin tokens.  While some of the money was spent in apparently legitimate ways, significant

25   amounts of money were spent on the promotion of AML Bitcoin tokens and on transfers to Andrade's

26   personal accounts.  During a nine-month period in 2018, approximately $1.5 million in investor money

27   flowed through multiple NAC Foundation bank accounts to Andrade personally.  During one financial

28   transaction on March 7, 2018, for example, Andrade obtained a cashier's check for $600,000, which law

1    enforcement directly traced to AML Bitcoin investor funds.  Andrade deposited the $600,000 into his

2    personal bank account and later used those funds to buy himself a house.  Andrade used additional AML

3    Bitcoin investor funds to purchase himself two vehicles and a second home.

4    **III.    MOTIONS IN LIMINE**

5        **A.    MOTION *IN LIMINE* NO. 1: THE COURT SHOULD PRECLUDE THE
6                DEFENDANT FROM OFFERING AN IMPROPER DEFENSE OF BLAMING
                 HIS VICTIMS**

7            **1.    The Defendant Cannot Claim That His Victims Should Have Exercised More
                     Diligence or Skepticism in Purchasing His Cryptocurrency**

8

9        The defendant should be precluded from arguing at trial that the victims in this case—investors

10   who purchased AtenCoin or AML BitCoin tokens—could have or should have exercised more diligence

11   or skepticism.  Defendant may also attempt to argue that the victims did not in fact rely on the materially

12   false, misleading, and incomplete statements made by him.  Defendant should be precluded from

13   pursuing this strategy, which would distract the jury from the central issues in this case: Defendant's

14   intent to defraud and the falsity and materiality of his statements and omissions.

15       The Indictment in this case charges Defendant with one count of wire fraud and one count of

16   money laundering.  Because reliance and damages are not elements of these crimes, it is no defense that

17   the victim of the fraud was gullible or negligent.  *See, e.g.*, Pretrial Conference Order, *United States v.*

18   *Alan Anderson*, Case No. 21-cr-397 EMC (N.D. Cal. Nov. 20, 2023) (Dkt. 64), at 3-4 ("it is improper

19   for the defense to argue that the alleged victims should have exercised more diligence") (citing *United*

20   *States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (In a mail fraud case, "what is important is the intent of

21   the person making the statement that it be in furtherance of some fraudulent purpose.") (citation

22   omitted); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) ("It is immaterial whether only

23   the most gullible would have been deceived by the defendants' scheme.... [T]he wire fraud statute

24   protects the naive as well as the worldly-wise.") (quotation and citation omitted).

25       Consistent with these principles, the Ninth Circuit has held in a wire fraud case that the

26   defendant could not rely on a bank's negligence in verifying loan application information and affirmed

27   the district court's preclusion of evidence and argument on that topic.  *United States v. Lindsey*, 850

28   F.3d 1009, 1015 (9th Cir. 2017).  In *Lindsey*, the defendant, a mortgage loan officer, attempted to argue

1   that mortgage lending in 2006-2007 functioned like the "Wild West," with banks not really caring about

2   the quality of their mortgage lending.  *Id.* at 1012-13.  The district court ordered the defendant to "stay

3   away" from such arguments.  *Id.*  The Ninth Circuit affirmed the district court's ruling, and noted similar

4   authority from numerous other circuits:

> Several of our sister circuits have held that a fraud victim's negligence is not a defense to
> criminal charges under the federal fraud statutes.  *See United States v. Colton*, 231 F.3d
> 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a
> financial institution, is irrelevant to the analysis: If a scheme to defraud has been or is
> intended to be devised, it makes no difference whether the persons the schemers intended
> to defraud are gullible or skeptical, dull or bright." (internal quotation marks omitted));
> *see also United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A
> perpetrator of fraud is no less guilty of fraud because his victim is also guilty of
> negligence."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (per curiam)
> ("The victim's negligence in permitting a crime to take place does not excuse the
> defendant from culpability for [the] substantive offense . . . ."); *United States v. Coyle*, 63
> F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a
> fraudulent scheme is not a defense to criminal conduct."); *United States v. Kreimer*, 609
> F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal
> conduct.").

14  *Id*. at 1014–15.

15          This reasoning is consistent with similar rulings by other courts in cases involving

16  fraudulent schemes.  For example, it would be irrelevant if some bank or lender employee had

17  overlooked a "red flag" associated with a fraudulent loan application.  *United States v. Winkle*,

18  477 F.3d 407, 414 n.3 (6th Cir. 2003) ("[T]he victim of a bank fraud is the bank, not the CEO of

19  the bank, and approval of a bank officer does not relieve a defendant of liability for bank fraud.")

20  (citations omitted).  Similarly, in a scheme to induce travel for a fraudulent purpose, the Second

21  Circuit rejected the defendant's argument that the "foolishness of the [victim] in [the

22  defendant's] scheme somehow vitiates [the defendant's] fraudulent intent."  *United States v.*

23  *Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting cases and upholding district court's

24  exclusion of evidence and testimony relating to gullibility of victim).  Under the case law above,

25  the Court should preclude the defense from arguing that the victims were negligent, were not

26  actually misled, or were otherwise at fault in this case.

27          Similarly, the Supreme Court has confirmed that, while materiality is an element of the

28  wire fraud offense, "the government does not have to prove actual reliance upon the defendant's

misrepresentations." *Neder v. United States*, 527 U.S. 1, 25 (1999).[1]  In this regard, the proof

required to establish criminal fraud is entirely different from that required in a civil case.  *See id.*

at 24-25.  Since *Neder*, Courts of Appeal have routinely affirmed district court rulings precluding

testimony relating to the question of whether a defendant's fraudulent statements actually misled

the intended victim.  *See United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir. 1991)

(affirming district court's decision precluding testimony from customers who were not misled by

defendant's statements; holding that the "excluded testimony of the other . . . customers would

have improperly shifted the jury's attention away from the knowledge and intent of [the

defendant] and focused instead on the beliefs of the victims of the alleged scheme to defraud.");

*see also United States v. Yeager*, 331 F.3d 1216, 1221 (11th Cir. 2003); *United States v. Daniel*,

329 F.3d 480, 486-87 (6th Cir. 2003).  Accordingly, the government is not required to prove that

AML Bitcoin purchasers actually relied upon Mr. Andrade's representations.  *See* Pretrial

Conference Order, *United States v. Alan Anderson*, Case No. 21-cr-397 EMC, at 5.

> **2.      The Defendant Should be Precluded from Arguing that he was Not Lying but Instead Was Merely Using Puffery, Like Other Cryptocurrency Founders, to Generate Attention**

Defendant might also attempt to introduce a related improper defense focusing on

cryptocurrency startup culture, arguing that founders in this area frequently use exaggeration and

dramatic promises to generate needed attention for their cryptocurrency projects and attract

capital.  This defense is simply a version of "other people committed the same crime."  To be

sure, Defendant was not the first person to commit fraud in connection with cryptocurrency

ventures.  At trial, the defense may attempt to minimize Defendant's conduct by eliciting

testimony regarding other instances of similar fraudulent schemes, perhaps highlighting cases

where no criminal charges were brought.  Such testimony would be improper, as there is no

"other people did it too" defense to wire fraud.  Thus, reference to any wrongdoing committed by

individuals other than the defendant during voir dire or trial would be irrelevant and prejudicial

---

[1] *Lindsey* also holds that "[a] false statement is material if it *objectively* had a tendency to influence, or was capable of influencing, a lender to approve a loan.  This standard is not concerned with a statement's subjective effect on the victim, but only the intrinsic capabilities of the false statement itself."  850 F.3d at 1015 (emphasis in original; citation and internal quotations omitted).

1   and should therefore be excluded pursuant to Federal Rules of Evidence 401-403.  *See United*

2   *States v. King*, No. CR-08-002-E-BLW, 2009 U.S. Dist. LEXIS 32935, at *7-8 (D. Idaho Apr.

3   17, 2009) ("Evidence of selective prosecution . . . would be irrelevant and unfairly prejudicial to

4   present to the jury."); *see also United States v. DiStefano*, 129 F. Supp. 2d 342, 348 (S.D.N.Y.

5   2001) (rejecting defendant's selective enforcement claim regarding the existence of other

6   uncharged co-workers engaging in the same conduct).  The sole question for this trial is whether

7   Defendant engaged in the charged conduct.  The Court should not allow any argument or

8   evidence from Defendant suggesting that he should be acquitted because others have committed

9   those offenses as well.

10          For these reasons, the Court should preclude Defendant from offering an improper

11  defense of blaming his victims.

### B.     MOTION IN LIMINE NO. 2: THE COURT SHOULD ADMIT THE DEFENDANT'S OUT-OF-COURT STATEMENTS IF OFFERED BY THE GOVERNMENT, BUT SHOULD PROHIBIT THE DEFENDANT FROM OFFERING PORTIONS OF HIS OWN PRIOR STATEMENTS

#### 1.     Out-of-Court Statements by the Defendant Are Admissible if Offered by the Government

16          At trial, the government intends to introduce in its case-in-chief statements that were made by the

17  defendant.  These statements may include:

18          (1) Oral statements made by the defendant to the government's testifying witnesses;

19          (2) The defendant's written statements, including emails, text messages, WhatsApp messages,

20              and other communications made to other individuals involved in the AML Bitcoin project

21              either as partners or investors; and

22          (3) The defendant's statements in third party records, including federal tax returns, contracts, and

23              legal filings, including filings made against investor-victims who purchased AML Bitcoin

24              and Atencoin.

25          The Rules of Evidence allow admission of out-of-court statements where they are (1) made by

26  the defendant and (2) are offered against the defendant.  Fed. R. Evid. 801(d)(2)(A) (statement is not

27  hearsay if it "is offered against an opposing party and . . . was made by the party in an individual or

28  representative capacity"); *see also United States v. Pelisamen*, 641 F.3d 399, 410 (9th Cir. 2011)

1  (defendant's own statements made during television interview admissible over hearsay objection).

2  "Cases interpreting [Rule] 801(d)(2)(A) are in agreement that statements need not be incriminating to be

3  admissions.  For statements to constitute admissions they need only relate to the offense." *See People of*

4  *Territory of Guam v. Ojeda*, 758 F.2d 403, 408 (9th Cir. 1985).  The above categories of statements

5  made by defendant Andrade are not hearsay and are squarely admissible pursuant to Fed. R. Evid.

6  801(d)(2)(A).  *United States v. Matlock*, 415 U.S. 164, 172 (1972).  The government has produced to

7  Andrade all the texts, emails, attachments, and other documents containing his statements that the

8  government intends to introduce at trial.  Accordingly, the statements are admissible if offered by the

9  United States against Andrade under Rule 801(d)(2)(A).

10              **2.    The Defendant May Not Offer His Own Out-of-Court Statements into**
                **Evidence**
11

12          While the Rules of Evidence allow the government to introduce out-of-court statements of the

13  defendant, those rules generally preclude the defendant from doing the same.  Accordingly, the

14  defendant may not seek to introduce his own out-of-court statements.

15          A plain reading of Federal Rule of Evidence 801(d)(2) exempts from hearsay only those party-

16  opponent admissions that are "offered *against* an opposing party."  Fed. R. Evid. 801(d)(2) (emphasis

17  added).  To the extent the defendant seeks admission at trial of his own out-of-court statements or those

18  of persons acting on his behalf, those statements constitute inadmissible hearsay.  This is true even if the

19  defendant's statements may be exculpatory and even if the statements are elicited through cross-

20  examination.  *See, e.g.*, *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant's attempt

21  to elicit exculpatory statements he made during interviews with agents was improper because "[t]hese

22  statements were inadmissible hearsay; as [defendant] was attempting to introduce them himself, they

23  were not party-opponent admissions"); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000)

24  ("[T]he district court did not abuse its discretion when it limited [defendant]'s ability to elicit his

25  exculpatory hearsay statements on cross-examination" because otherwise "[defendant] would have been

26  able to place his exculpatory statements before the jury without subjecting himself to cross-examination,

27  precisely what the hearsay rule forbids." (internal quotation and brackets omitted)).

28          A defendant may not use his own prior statements, even where the government introduces

1   incriminating portions of them.  *See, e.g.*, *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005)

2   (holding as inadmissible hearsay defendant's exculpatory statements that defense sought to introduce

3   after FBI agent testified about defendant's inculpatory statements); *United States v. Fernandez*, 839 F.2d

4   639, 640 (9th Cir. 1988) (district court properly sustained government's hearsay objection to defendant's

5   attempt to solicit defendant's post-arrest statements during cross-examination of FBI agent); *Mitchell*,

6   502 F.3d at 964 (exculpatory statements by defendant were inadmissible hearsay even when made in a

7   broader self-inculpatory confession).  Any attempt to place the defendant's out-of-court statements

8   "before the jury without subjecting [the defendant] to cross-examination [is] precisely what the hearsay

9   rule forbids."  *Fernandez*, 839 F.2d at 640.

10

11   **C.    MOTION IN LIMINE NO. 3:  THE COURT SHOULD PRECLUDE DEFENDANT FROM PRESENTING AN IMPROPER GOOD FAITH DEFENSE**

12         Andrade might attempt to present evidence or argument that he should be acquitted because he

13   acted in good faith.  Specifically, Andrade might claim, despite his deception of cryptocurrency buyers,

14   that he always intended to make those victims' cryptocurrency purchases profitable, such that the

15   victims would suffer no loss when all was said and done.  That argument—and any argument along

16   those lines—should be barred, as they do not constitute recognized legal defenses to the charges and are

17   therefore improper and irrelevant.  *See United States v. Anderson*, Pretrial Conference Order, Case No.

18   21-cr-397 EMC, at 8-9 ("it is improper for the defense to argue that Mr. Anderson intended to

19   compensate the investors at a later date because that is not a valid legal defense to the alleged charges.")

20   (quoting *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) ("Intent to repay, therefore, is not

21   a defense to wire fraud.")).

22         The Ninth Circuit has recognized, "[w]hile an honest, good-faith belief in the truth of the

23   misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and

24   will sustain no loss is no defense at all."  *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986)

25   (actual loss is not an element of securities fraud); *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir.

26   1993) ("a defendant's belief that the victims of the fraud will be paid in the future or will sustain no

27   economic loss is no defense to the crime").

28

In other words, even if Andrade genuinely intended that his cryptocurrency buyers would return a profit in the future once Andrade's ventures became successful, Andrade would still be guilty of the charged offenses if his actions otherwise met the elements. *See United States v. Hickey*, 580 F.3d 922, 931 (9th Cir. 2009) (finding that the trial court properly excluded expert testimony on good faith). Andrade cannot argue that he honestly believed in "the ultimate success of an enterprise." *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979). In light of the above, this Court should exclude evidence and arguments that Anderson believed in good faith that his victims would be repaid and would ultimately sustain no loss.

## D.    MOTION IN LIMINE NO. 4: THE DEFENSE SHOULD BE COMPELLED TO PRODUCE RECIPROCAL DISCOVERY

The United States next moves *in limine* for an order to (1) compel reciprocal discovery under Federal Rule of Criminal Procedure 16(b) and reciprocal *Jencks* Act material in compliance with 18 U.S.C. § 3500, or, in the alternative, (2) preclude the defense from introducing in its case-in-chief any evidence responsive to Rule 16 and 18 U.S.C. § 3500 that has not been provided to the government by the pretrial conference on January 22, 2025. Timely production of all documents responsive to Rule 16 will be necessary to provide the government with a reasonable opportunity to investigate and rebut defenses.

In the government's discovery letters accompanying the production of discovery in this case, the government has repeatedly requested reciprocal discovery pursuant to Federal Rules of Criminal Procedure 16(b) and 26.2. The government has also produced material pursuant to the *Jencks* Act. To date, the government has not received any discovery from the defense.

The Federal Rules of Criminal Procedure require the defendant to provide the following reciprocal discovery if the government complies with defense discovery requests and demands discovery itself: "books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if: (i) the item is within the defendant's possession, custody, or control; and (ii) the defendant intends to use the item in the defendant's case-in-chief at trial." Fed. R. Crim. Proc. 16(b)(1)(A). A defendant must also produce copies of any results or reports of physical or mental examinations and of scientific tests or experiments pursuant to Rule 16(b)(1)(B) and a written summary

1  of any expert testimony a defendant intends to offer under Rules 702, 703, and 705, pursuant to Rule

2  16(b)(1)(c).  Rule 16 further provides that the district court may, among other things, "order that party to

3  permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms

4  and conditions," or "prohibit that party from introducing the undisclosed evidence."  Fed. R. Crim. Proc.

5  16(d)(2).

6      In accordance with this plain language, the Ninth Circuit has held clearly and repeatedly that a

7  defendant's failure to comply with this discovery obligation can result in exclusion of evidence at trial.

8  *See United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999) (upholding district court's decision to

9  exclude defense evidence due to defendant's strategic decision to withhold discovery until the last

10  minute); *United States v. Duran*, 41 F.3d 540, 545-46 (9th Cir. 1994) (upholding district court's

11  exclusion of defense evidence where government moved to exclude all defense exhibits pursuant Rule

12  16(b), and defense counsel assured court it would comply but failed to produce evidence without

13  showing any cause); *United States v. Aceves-Rosales*, 832 F.2d 1155, 1156-57 (9th Cir. 1987) (per

14  curiam) (holding that district court did not abuse discretion in precluding medical report that the defense

15  wished to introduce in case-in-chief but which it first disclosed after the government had rested).

16  Where, as here, the government has agreed to produce its *Jencks* statements prior to trial, and has in fact

17  already produced *Jencks* statements, the district court may also order a defendant to produce its

18  reciprocal *Jencks* before trial.  *See United States v. George*, 786 F. Supp. 56, 64-65 (D.D.C. 1992)

19  (referencing agreement between government and defense whereby each would produce its *Jencks* to the

20  other 10 days before trial); *United States v. Turkish*, 458 F. Supp. 874, 884 (S.D.N.Y. 1978) (district

21  court ordered defendant to produce reciprocal *Jencks* witness statements two days before witness

22  testified).

23  **E.    MOTION IN LIMINE NO. 5: THE COURT SHOULD ADMIT BUSINESS AND**
        **PUBLIC RECORDS**
24

25      The United States next moves the Court for a pretrial ruling under Fed. R. Evid. 104(a) that

26  certified business records be admitted at trial.  These documents generally consist of bank records bank

27  records, mortgage loan files, escrow files, and tax records.  As discussed below, the United States

28  submits that these documents are all self-authenticating under FRE 902 as certified copies of public

1  records or certified domestic records of a regularly conducted activity and admissible under clearly

2  established exceptions to the hearsay rule such as FRE 803(6) (Records of Regularly Conducted

3  Activity), FRE 803(8) (Public Records), FRE 803(14) (Records of Documents That Affect an Interest in

4  Property), and FRE 803(15) (Statements in Documents that Affect an Interest in Property).  The

5  government is prepared, if required, to call custodians of record to authenticate the documents; however,

6  the government's motion in limine seeks to streamline trial by eliminating routine, uncontested

7  witnesses.

8      Rule 902(11) provides that documents which are admissible as records of regularly conducted

9  activity, as provided for under Rule 803(6), may be admitted without calling a records custodian as a

10  witness.  Rule 803(6) applies to records that are: (A) made at or near the time by, or from information

11  provided by, someone with knowledge; (B) kept in the course of a regularly conducted activity of a

12  business, organization, occupation, or calling; and (C) made as a result of a regular practice of that

13  activity.

14      Rule 902(2) provides that public records that are signed and certified may be admitted without

15  calling a records custodian as a witness if it bears the signature of a state officer, another public officer

16  who has a seal and official duties within that same entity certifies under seal—or its equivalent—that the

17  signer has the official capacity and that the signature is genuine.

18      The United States has provided notice of its intent to admit and identified the following

19  documents previously provided in discovery:

20      a)    Copies of business records provided by JP Morgan Chase.

21      b)    Copies of business records provided by Wells Fargo.

22      c)    Copies of business records provided by Comerica Bank.

23      d)    Copies of business records provided by Citibank.

24      e)    Copies of business records provided by Nevada State Bank.

25      f)    Copies of business records provided by Bank of America.

26      g)    Copies of business records provided by Woodforest State Bank.

27      h)    Copies of business records provided by Capital One.

28      i)    Copies of business and property records provided by First American Title.

j)       Copies of business and property records provided by Nueces Title Company.

k)       Copies of business records provided by David Taylor Dealership.

l)       Copies of business records provided by Google.

m)      Copies of business and property records provided by Recovco Mortgage.

n)       Copies of business and property records provided by Stewart Title Company.

o)       Copies of business records provided by Frost Bank.

p)       Copies of business records provided by Coinbase.

q)       Certified State of Nevada NAC Foundation incorporation records.[2]

The United States has provided copies of certifications received and will continue to provide outstanding certifications as they are received by the United States.[3]  The certifications received to date show that the records referenced therein satisfy the requirements of Rule 803(6).

Rule 902(11) certifications render documents self-authenticating and do not implicate the Sixth Amendment's Confrontation Clause.  *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial.") (citing *Crawford v. Washington*, 541 U.S. 36, 56 (2004)); *see also United States v. Gal*, 606 Fed. App'x 868, 875 (9th Cir. Mar. 27, 2015) (unpublished); *United States v. Anekwu*, 695 F.3d 967, 976-77 (9th Cir. 2012).

Even if the above-listed bank statements and financial institution records were found to be, or contain, hearsay, they would nevertheless be admissible.  These documents may be admitted under the residual exception to the rule against hearsay contained in Federal Rule of Evidence 807.  Rule 807 allows a statement not covered by the hearsay exceptions enumerated in Rules 803 and 804 to be admitted "if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the

---

[2] *See* Exhibit 1, State of Nevada NAC Foundation incorporation records.

[3] *See* Exhibit 2, Spreadsheet Containing Bates Numbers for Business and Property Records and Corresponding Custodian of Records Declarations.

1   proponent can procure through reasonable efforts; and (C) the general purposes of these rules [of

2   evidence] and the interests of justice will best be served by admission of the statement into evidence."

3   Fed. R. Evid. 807.  Courts "have long recognized that bank statements may be admitted under the

4   residual exception to hearsay because 'bank documents, like other business records, provide

5   circumstantial guarantees of trustworthiness because the banks and their customers rely on their

6   accuracy in the course of their business.'"  *In re Mendez*, No 06-1111, 2008 WL 597280, *9 (Bankr.

7   E.D.C.A. Feb. 29, 2008) (quoting *United States v. Pelullo*, 964 F.2d 193, 202 (3d Cir 1992)).  Bank

8   statements are precisely the types of documents that may be admitted under the residual exception to

9   hearsay.  Courts have upheld admission of such statements "[g]iven the circumstantial guarantees of

10  trustworthiness which were present . . . the distant location of the bank, and the lack of any evidence in

11  the record to suggest that the bank records are anything other than what they purport to be."  *Karme v.*

12  *Comm'r*, 673 F.2d 1062, 1065 (9th Cir. 1982) (citing *United States v. Friedman*, 593 F.2d 109, 118-119

13  (9th Cir. 1979)).

14       Accordingly, the United States respectfully requests an order stating that the records identified

15  herein are self-authenticating, and do not constitute inadmissible hearsay under Rules 902(11) and

16  803(6).  In the alternative, the United States respectfully requests an order stating that the records may

17  be admitted under Rule 807.

18       **F.    MOTION IN LIMINE NO. 6: THE COURT SHOULD ADMIT SUMMARY**
         **CHARTS OF VOLUMINOUS EVIDENCE AND PEDOGOGICAL AIDS**
19

20       The United States next moves this Court under Fed. R. Evid. 1006 for an order admitting the

21  United States' summaries of evidence at trial.  The United States seeks to introduce into evidence

22  summaries of voluminous evidence, and respectfully submits that those summaries are admissible

23  because they meet the requirements of Rule 1006.

24       Rule 1006 governs the admissibility of charts, summaries, or calculations of voluminous

25  writings, recordings, or photographs that cannot be conveniently examined in court.  *United States v.*

26  *Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991).  Rule 1006 summaries must summarize information which

27  is voluminous, available for inspection, and admissible (although not necessarily admitted).  *Id.*; *see also*

28  *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988); *City of Phoenix v. Com/Systems, Inc.*, 706

F.2d 1033, 1038 (9th Cir. 1983); *United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir. 1979).[4]  The proponent of a summary under Rule 1006 must establish the admissibility of the underlying documents as a condition precedent to introduction of the summary.  *Johnson*, 594 F.2d at 1257.  The proponent must also establish that that underlying documents were made available to the opposing party for inspection.  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984).  The underlying materials need not be admitted into evidence, but in this case the government expects to offer the underlying documents into evidence because they have independent probative value.  The Ninth Circuit has recognized that the district court has discretion to admit both a Rule 1006 summary and the underlying records themselves.  *United States v. Anekwu*, 695 F.3d 967, 981-82 (9th Cir. 2012).  Rule 1006 summaries must fairly represent the underlying documents, and their admission into evidence is left to the trial court's discretion.  The Ninth Circuit has repeatedly approved the use of Rule 1006 summaries, particularly where, as here, the summaries will aid the jury in organizing information contained in a large number of documents into understandable form.  *See, e.g.*, *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) (permitting testimony concerning summaries of voluminous tax records); *United States v. Shirley*, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (permitting summary chart of telephone calls to help jury organize and evaluate evidence).

Here, the government intends to offer into evidence Rule 1006 summaries, all of which will be based upon voluminous, admissible evidence.  The United States has obtained thousands of pages of financial records from banks, financial institutions, title companies, and automobile dealerships. The records are authentic and excepted from the hearsay rule.  *See* Fed. R. Evid. 902(11), 803(6). Summaries of these records will show the total amount of money spent by Andrade's cryptocurrency investors on AML Bitcoin and Atencoin, how that money flowed into various bank accounts controlled

---

[4] In contrast, Rule 611 pedagogical charts "analyzing testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves." *Wood*, 943 F.2d at 1053; *see also United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984) (approving the use of summary charts as testimonial aids for government); *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980) (government witness' use of Rule 611 chart summarizing facts and calculations in evidence as a testimonial aid "contributed to the clarity of the presentation to the jury, avoided needless consumption of time and was a reasonable method of presenting the evidence," and admitting the charts into evidence was not reversible error).

1    by Andrade, and how Andrade and his companies spent investor funds.  In addition, the summaries will
2    show how Andrade spent investor funds on two automobiles and two houses for himself.

3       In conclusion, the United States' Rule 1006 summaries will summarize information that is
4    voluminous, admissible, and which has been, or will be, provided to Defendant for inspection.  The
5    United States' Rule 1006 summaries will fairly represent the underlying documents, and their admission
6    into evidence will aid the jury in organizing information contained in a large number of documents into
7    understandable form.  The United States therefore respectfully requests an order stating that the United
8    States has met the requirements of Rule 1006, and that the offered summaries are admissible at trial.

9       **G.    MOTION IN LIMINE NO. 7: NO NOTICE REQUIRED FOR REBUTTAL**
             **EXPERTS**
10

11      The defendant has not yet noticed any expert witnesses.  Nonetheless, the defendant has notified
12   the government that he may introduce expert evidence relating to mental disease or defect or another
13   mental condition bearing on the issue of guilt.  Federal Rule of Crim. P. 12.2(b).  And the defendant has
14   provided the government with the name of a medical expert for Rule 12.2(b) purposes.  Accordingly, the
15   government anticipates that it may need to call an expert witness to provide rebuttal testimony if the
16   defense calls an expert.

17      The United States moves *in limine* for a ruling that it need not give expert notice regarding
18   rebuttal experts.  Pursuant to Fed. R. Evid. 16(a)(1)(G), the United States need only give expert
19   notification for experts that the United States intends to use in its case in chief at trial.
20   *See* Fed. R. Evid. 16(a)(1)(G); *United States v. Angelini*, 607 F.2d 1305, 1308-09 (9th Cir. 1979)
21   (government not required to provide notice of its rebuttal witness) (internal citations omitted); *see also*
22   *United States v. Silva*, 141 Fed. Appx. 521, 523 (9th Cir. 2005) (unpublished) ("Federal Rule of
23   Criminal Procedure 16 does not require the Government to give notice of expert rebuttal testimony");
24   *United States v. Cervantes-Cardenas*, 220 Fed. Appx. 718, 719 (9th Cir. 2007) (unpublished)
25   ("government was not required to provide notice of expert rebuttal witnesses").

26      The Court should therefore permit the United States to introduce unnoticed expert testimony in
27   rebuttal should the United States choose to do so.

28

1

2

### H.    MOTION IN LIMINE NO. 8: THE COURT SHOULD PRECLUDE THE DEFENSE FROM REFERENCING PUNISHMENT IN FRONT OF THE JURY

3        The United States moves to preclude, as irrelevant and prejudicial, any reference by the defense

4   to Andrade's alleged suffering or potential punishment during any phase of the trial, including jury

5   selection, opening statements, examination of witnesses (including Andrade, if he elects to testify), and

6   summation.  Impermissible references to punishment could be overt; for example, "The defendant is

7   facing a prison term if convicted."  But such references could also be subtler; for example, that "the

8   Defendant is facing a lot of time," "the case has serious consequences for the Defendant," "the

9   Defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to

10  come."  Once the jury hears anything about punishment or other consequences, the bell simply cannot be

11  unrung or the damage neutralized by a curative instruction.

12       "It has long been the law that it is inappropriate for a jury to consider or be informed of the

13  consequences of their verdict."  *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992).  "The jury's

14  function is to find facts and to decide whether, on those facts, defendant is guilty of the crime charged."

15  *Shannon v. United States*, 512 U.S. 573, 579 (1994).  Information about penalty and punishment

16  "draw[s] the attention of the jury away from their chief function as the sole judges of the facts, opens the

17  door to compromise verdicts, and confuses the issues to be decided."  *United States v. Olano*, 62 F.3d

18  1180, 1202 (9th Cir. 1995); *see also Shannon*, 512 U.S. at 579 ("[P]roviding jurors sentencing

19  information invites them to ponder matters that are not within their province, distracts them from their

20  factfinding responsibilities, and creates a strong possibility of confusion.").  Accordingly, the defense

21  should be precluded from making any reference to the Defendant's alleged suffering or potential

22  punishment in the presence of the jury, whether in statements, questions, or argument.

23       Other attempts at jury nullification are likewise improper.  "[N]either a defendant nor his

24  attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of,

25  the crime charged.  Verdicts must be based on the law and the evidence, not on jury nullification as

26  urged by either litigant."  *Zal v. Steppe*, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring).

27  Whether the types of comments cited above evoke punishment, encourage jury nullification, or both,

28

they are irrelevant and improper.  The Court should preclude the defense from making any such statements at trial.

### I.     MOTION IN LIMINE NO. 9: THE COURT SHOULD EXCLUDE WITNESSES DURING TRIAL WITH THE EXCEPTION OF THE CASE AGENT

The United States next moves for a sequestration order excluding all witnesses from the trial, except when testifying, with one exception.  Witnesses are generally excluded from trial, except when testifying, so that they cannot hear other witnesses' testimony.  *See* Fed. R. Evid. 615.  Rule 615(a)-(d) notes several exceptions to this general rule, one of which applies to individuals the United States may call as witnesses at trial.

Federal Bureau of Investigation (FBI) Special Agent Brendon Zartman, the lead case agent assigned to this case, and a potential fact witness for the United States, should be excluded from any sequestration order pursuant to Rule 615(b) & (c).  *See United States v. Valencia-Riascos*, 696 F.3d 938, 941-42 (9th Cir. 2012) (citing *United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984) ("[T]he district court did not abuse its discretion in allowing the case agent to remain at the prosecutor's table. The case agent was exempt from sequestration.") (citation omitted)); *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987).

Accordingly, the United States respectfully requests an order excluding all witnesses from the trial, except when testifying, with the exception of Special Agent Zartman, who should be excluded from a sequestration order and allowed to observe all portions of trial.

### J.     MOTION *IN LIMINE* NO. 10: HEARSAY MISREPRESENTATIONS ARE INDEPENDENTLY ADMISSIBLE NOT FOR THEIR TRUTH, BUT TO PROVE THEY WERE MADE

Andrade and his co-conspirators made myriad misrepresentations via various channels, as detailed in this filing and the government's concurrently filed briefs on Rule 404(b) prior acts and Rule 801(d)(2)(E) co-conspirator statements.  In the main, the Court should admit these misrepresentations as opposing party statements under one or more of Rule 801(d)(2)'s five prongs, which admit without any limiting instruction (A) Andrade's own statements; (B) statements Andrade adopted or believed to be true; (C) statements authorized by Andrade; (D) statements made by Andrade's employees or agents; and (E) co-conspirators. Others should also be substantively admissible under hearsay exceptions in

1  Rules 803 and 804.

2      But if at trial the Court is not satisfied that a hearsay exception like Rule 801(d)(2) is met, the

3  Court should still easily admit AML Bitcoin's misrepresentations for a non-hearsay purpose: "to prove

4  that the misrepresentations were made, not to prove the truth of what the salespersons [or others] stated."

5  *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988) (affirming admission of misrepresentations on

6  two independent grounds in fraud prosecution). These misrepresentations included, for example, articles

7  in prominent publications about AML Bitcoin's purported technological innovations and business deals;

8  and posts and reposts by AML Bitcoin's social media accounts touting the same. The government does

9  not seek "to prove the truth of the matter asserted in the[se] statement[s]," Fed. R. Evid. 801(c)(2). Far

10  from it. The government seeks to prove that these statements existed, that they were false, and that they

11  influenced victims to part with their money or property.

12      In other words, "the point of the prosecutor's introducing those statements [is] simply to prove

13  that the statements were made so as to establish a foundation for later showing, through other admissible

14  evidence, that they were false." *Anderson v. United States*, 417 U.S. 211, 220 (1974) (footnotes

15  omitted). "This 'proof of falsity' theory for the admissibility of evidence is clearly supported by case

16  law." *United States v. Gillespie*, 225 F.3d 664 at *2 (9th Cir. 2000) (unpublished); *accord, e.g.*, *United

17  States v. Smith*, 73 F.3d 374 (10th Cir. 1996) (affirming admission of testimony on salesmen's

18  misrepresentations, explaining that because "the Government sought to prove the making of the

19  statements but not the truth of the matters asserted by them, there is no actual hearsay question"). In

20  sum, evidence of misrepresentations about AML Bitcoin are independently admissible (with a limiting

21  instruction) for the non-hearsay purpose of proving the misrepresentations were in fact made.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

U.S. MOTIONS IN LIMINE
NO. 20-CR-00249 RS                    20

1    **IV.    CONCLUSION**

2        For all the foregoing reasons, the Court should rule as set forth above now, or if and when the

3    identified issues arise. The government respectfully reserves the right to supplement these motions in

4    limine if later presented with additional issues requiring the Court's intervention.

5

6    DATED:  January 10, 2025                        Respectfully submitted,

7                                                    ISMAIL J. RAMSEY
                                                     United States Attorney
8

9                                                    _____/s/_____
                                                     CHRISTIAAN H. HIGHSMITH
10                                                   DAVID J. WARD
                                                     Assistant United States Attorneys
11

12                                                   MATTHEW CHOU
                                                     Special Assistant United States Attorney
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28