ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTIAAN HIGHSMITH (CABN 296282)
DAVID WARD (CABN 239504)
Assistant United States Attorneys

MATTHEW CHOU (CABN 325199)
Special Assistant United States Attorney

       450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
       Telephone: (415) 436-7200
       FAX: (415) 436-7230
       christiaan.highsmith@usdoj.gov
       david.ward@usdoj.gov
       matthew.chou2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>    Defendant. | CASE NO. CR. 20-00249 RS<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR EVIDENTIARY HEARING TO ADDRESS GOVERNMENT MISCONDUCT AND TO SEEK SANCTIONS, INCLUDING POTENTIAL DISMISSAL OF THE INDICTMENT [DKT. 499]<br><br>Dept.:    Courtroom 3 – 17th Floor<br>Judge:   Hon. Richard Seeborg<br><br>Trial Date: February 10, 2025 |

<u>**TABLE OF CONTENTS**</u>

I.    Introduction ................................................................................................................1

II.   Relevant Factual Background ......................................................................................2

      A.    Agents in a Separate Case Seize Paul Erickson's Handwritten Notes About
            AML Bitcoin from Maria Butina's Apartment in Washington, DC ...................2

      B.    The FBI Executes a Search Warrant at Abramoff's House ...............................2

      C.    The Government Produces Abramoff's Electronic Devices to Andrade and
            Remedies Deficiencies From the iPhone Production..........................................3

      D.    Andrade Requests Abramoff's Other Devices Despite Having Already
            Received Them, and the Government Produces Them Again ............................4

      E.    The Government Produced the Paul Erickson Phone to Andrade .....................5

      F.    Jonathan Buma's Limited Involvement in this Case ........................................6

      G.    Emails Between Andrade and Counsel Appear in Discovery ...........................6

      H.    David Mata's Cooperation With the Government Investigation of Andrade ....7

      I.    FBI Executes a Search Warrant at Andrade's Home and Records a
            Conversation With Him ....................................................................................8

III.  Relevant Law ...............................................................................................................8

      A.    Due Process Violation........................................................................................8

      B.    Interference with Attorney-Client Privilege .....................................................9

      C.    The Court's Supervisory Powers .....................................................................10

      D.    Standard for an Evidentiary Hearing ...............................................................11

IV.   Argument ...................................................................................................................11

      A.    An Evidentiary Hearing is Unwarranted Because Andrade has Not Met His
            Burden and Because There is No Evidence of Government Misconduct.........11

      B.    Andrade has Failed to Show a Due Process Violation .....................................12

      C.    There is No Constitutional Violation and No Basis Whatsoever for the Court
            to Exercise its Supervisory Powers to Dismiss the Indictment........................22

      D.    The Court Should Not Provide the Jury With an Adverse Inference Instruction
            Because It Is Completely Unwarranted and Unsupported by the Law and
            Facts, Nor Should the Court Order Other Relief .............................................23

      E.    The Court Should Deny the Defendant's Motion Because it was Filed Late...................24

V.    Conclusion .................................................................................................................25

1

**Table of Authorities**

2

*Richards v. Jain*,
3
   168 F. Supp.2d 1195 (W.D. Wash. Oct. 17, 2001) ................................................................ 24

*United States v. Abbit*,
4
   1999 WL 1074073 (D. Or. Oct. 29, 1999) ................................................................... 11, 13

5

*United States v. Alessa*,
6
   561 F.Supp.3d 1042 (D. Nev. Sep. 17, 2021) .................................................................. 24

7
*United States v. Babichenko*,
   2020 WL 4462497 (D. Idaho Aug. 3, 2020) ................................................................... 16

8
*United States v. Black*,
9
   733 F.3d 294 (9th Cir. 2013) ................................................................................. 9

10
*United States v. Chapman*,
   524 F.3d 1073 (9th Cir. 2008) .......................................................... 8-9, 10, 22, 23
11

12
*United States v. Conte*,
   2004 WL 2988567 (N.D. Cal. Dec. 28, 2004) ........................................... 9, 11, 12-13

13
*United States v. Dominguez-Caicedo*,
   40 F.4th 938 (9th Cir. 2022) ................................................................. 9, 13, 14, 15
14

15
*United States v. Edmonds*,
   103 F.3d 822 (9th Cir. 1996) ................................................................................ 9

16
*United States v. Gann*,
17
   732 F.2d 714 (9th Cir. 1984) ............................................................................... 19

18
*United States v. Graf*,
   610 F.3d 1148 (9th Cir. 2010) ............................................................................. 17
19

20
*United States v. Haynes*,
   216 F.3d 789, 797 (9th Cir. 2000) ............................................... 10, 16, 18, 19

21
*United States v. Hungerford*,
   2019 WL 1903212 (E.D. La. Apr. 29, 2019) ...................................... 11-12, 12
22

23
*United States v. Jacobs*,
   855 F.2d 652 (9th Cir. 1985) ............................................................................... 22

24
*United States v. Lazarevich*,
   147 F.3d 1061 (9th Cir. 1998) ............................................................. 11, 13, 15
25

26
*United States v. Lopez*,
   2025 WL 275523 (D. Nev. Jan. 22, 2025) ................................................... 19

27
*United States v. Marshank*,
   777 F. Supp. 1507 (N.D. Cal. 1991) .............................................................. 22
28

*United States v. Pedrin*,
   797 F.3d 792 (9th Cir. 2015) ........................................................................... 9

*United States v. Robertson*,
   895 F.3d 1206 (9th Cir. 2018) ...................................................................... 12

*United States v. Rogers*,
   751 F.2d 1074 (9th Cir. 1985) ........................................................... 10, 22, 24

*United States v. Russell*,
   411 U.S. 423–32 (1973) ................................................................................... 9

*United States v. Schaefer*,
   13 F.4th 875 (9th Cir. 2021) .................................................................. 10, 19, 20

*United States v. Schell*,
   775 F.2d 559 (4th Cir. 1985) ......................................................................... 22

*United States v. Sivilla*,
   714 F.3d 1168 (9th Cir. 2013) ....................................................................... 24

*United States v. Smith*,
   924 F.2d 889 (9th Cir. 1991) ........................................................................... 9

*United States v. Stringer*,
   535 F.3d 929 (9th Cir. 2008) .................................................................. 9, 10, 16, 21

*United States v. White*,
   879 F.2d 1509 (7th Cir. 1989) ....................................................................... 16

*United States v. Voigt*,
   89 F.3d 1050 (3d Cir. 1996).................................................................... 10, 11

1

**I.    INTRODUCTION**

2      Defendant Andrade has filed a last-minute motion raising what he purports to be government

3  misconduct.  Andrade requests an evidentiary hearing, demands the indictment be dismissed, and seeks

4  other sanctions.  *See* Dkt. 499 (Def. Andrade's Motion for an Evid. Hrg. to Address Govt. Misconduct

5  and to Seek Sanctions, Incl. Dismissal of the Indictment, Dkt. 499 ("Def. Mot.")).[1]  He files this motion

6  two weeks after the deadline for filing pretrial motions, and two weeks before trial—even though all his

7  allegations relate to facts that occurred years ago.

8      *First*, Andrade claims that former FBI agent Jonathan Buma, who was not assigned to this

9  investigation, could testify that the government purposefully suppressed evidence related to Jack

10  Abramoff.  Andrade provides no evidence Buma would say any such thing.  Andrade claims a second

11  unnamed witness, who Andrade claims worked for an unnamed "separate" agency, could similarly

12  testify, but again, he provides no affidavits or evidence to support this.

13      *Second*, Andrade claims the government has not produced specific evidence.  He now asks this

14  Court to wade into complex discovery disputes that were resolved by Judge Beeler, most of them years

15  ago.  Andrade's motion has no basis in fact or law and should be denied without an evidentiary hearing.

16  The government has not suppressed or destroyed any exculpatory evidence.  In fact, the government

17  produced the evidence Andrade claims has been suppressed or destroyed—specifically, Jack Abramoff's

18  iPhone, Abramoff's electronic devices, Paul Erickson's handwritten notes, and Erickson's iPhone.

19      *Third*, Andrade claims the government purposefully intruded into his attorney-client privilege.

20  The facts to not support that conclusion.  Nor do they to show—as they must—any nexus between the

21  purported government misconduct and securing the indictment or actual and substantial prejudice.

22      Andrade has not met the high standard required for this Court to order an evidentiary hearing,

23  dismiss the indictment, or impose other sanctions.  Additionally, his motion is untimely.  It should be

24  denied in its entirety.

25

26

27

28

---

[1] In this brief, when citing page numbers in the Def. Mot. the government references the page numbers at the bottom of the page and not the page numbers from the Pacer ribbon at the top of the page.

## II.    RELEVANT FACTUAL BACKGROUND

The United States limits this background to the factual claims in Andrade's motion.  But to be clear, the government has made enormous and exhaustive productions of discovery in this case, nearly 5TB of data, much of it in response to specific defense requests.  This includes documents, electronic devices, social media, videos, and audio recordings, including from multiple cases in other districts.  The discovery likely far exceeds the bounds of Rule 16, *Giglio*, *Brady*, and their progeny.

### A.    Agents in a Separate Case Seize Paul Erickson's Handwritten Notes About AML Bitcoin from Maria Butina's Apartment in Washington, DC

Andrade claims the government purposefully suppressed Paul Erickson's handwritten notes and AML Bitcoin marketing materials dated June 3, 2018, which were seized from his girlfriend Maria Butina's Washington, DC apartment in July 2018.  In fact, the government produced the notes to Andrade on January 4, 2023.  Decl. of C. Highsmith in Support of the United States' Opposition to Def.'s Mot. for Evid. Hrg. to Address Govt. Misconduct ("Highsmith Decl."), Exh. 1.

The evidentiary record is undisputed: On June 3, 2018, Erickson met with Abramoff at Abramoff's home.  Highsmith Decl., Exh. 2.  During their meeting, Abramoff spoke to Erickson about AML Bitcoin and, potentially about Erickson promoting AML Bitcoin to his contacts.  *Id.*  Erickson took notes and some AML Bitcoin marketing materials.  Dent Decl., Exh. E.  In July 2018, law enforcement authorities investigating a *separate* case involving Maria Butina and her boyfriend, Paul Erickson, executed a search warrant Butina's Washington, D.C. apartment.  Dent. Decl. ¶ 16.  Inside the apartment, among other items related to their case, agents seized Erickson's handwritten notes and the AML Bitcoin marketing materials from his June 3, 2018 meeting with Abramoff.  Later, after Andrade was charged, his counsel requested Erickson's notes and the AML Bitcoin marketing materials, and the government produced them on January 4, 2023.  Highsmith Decl., Exh. 1.

### B.    The FBI Executes a Search Warrant at Abramoff's House on September 13, 2018

On September 13, 2018, agents executed a search warrant at Abramoff's residence. The search was in connection with FBI San Francisco's investigation of Abramoff for his involvement in the AML Bitcoin fraud scheme and unrelated illegal marijuana lobbying efforts.  Dent Decl., Exh. D.  Abramoff spoke at length with the investigating agents.  *Id.*  Their interview was audio recorded.  *Id.*  On the

recording, the interviewing agent mentions to Abramoff that law enforcement had found handwritten notes regarding AML Bitcoin at Butina's apartment when they executed a search warrant there. Def. Mot., at 3; Dent Decl. ¶ 14. But the 11-page FBI report of Abramoff's interview does not mention that Erickson's notes were found in Butina's apartment in July 2018. *Id.* Andrade claims this is evidence of the government's intentional suppression of these notes. On the contrary, after defense counsel requested the Erickson's notes the government produced them. Highsmith Decl., Exh. 2.

### 1. During the Search, Agents Seized Abramoff's Electronic Devices and iPhone

Agents seized several electronic devices, including Abramoff's iPhone 5, laptop computers, hard drives and a thumb drive from Abramoff's residence. Dent Decl., Exh. J. On September 27, 2018, agents delivered Abramoff's devices to the Silicon Valley Regional Computer Forensics Laboratory ("RCFL"). The RCFL imaged, processed, copied, and made images or copies of Abramoff's devices available for case agent investigative review. Dent Decl., Exh. K & Exh. L. After the RCFL processed and imaged Abramoff's devices, the FBI began the process of returning the physical devices to Abramoff's counsel. On January 31, 2019, for example, the FBI returned a Dell Inspiron laptop and an Asus laptop to Abramoff's counsel. Highsmith Decl., Exh. 3.

On October 10, 2019, agents conducted an initial, targeted review of the contents of Abramoff's iPhone, which they memorialized in an FBI report. Dent Decl., Exh. H. The 17-page report, which was produced to Andrade, discussed Abramoff's WhatsApp communications with a Ukrainian named Alexander Levin. *Id.*, at 15.

On February 14, 2020, the FBI case agent reviewed images extracted from the Abramoff devices (including his iPhone), identified relevant evidence on the devices, and seized that evidence by adding it to the FBI case file for this case. Dent. Decl., Exh. J. On October 7 and November 5, 2022, respectively, the FBI returned the Seagate external hard drives and Dell Latitude laptop to Abramoff's counsel. Highsmith Decl., Exh. 4 & Exh. 5. The FBI retained images of both devices.

### C. The Government Produces Abramoff's Electronic Devices to Andrade and Remedies Deficiencies From the iPhone Production

On March 3, 2022, Andrade sent a discovery letter to the government requesting production of the electronic devices seized from Abramoff's residence. On December 8, 2022, the government

1  produced extractions from the seized Abramoff devices, including Abramoff's iPhone. Highsmith Decl.,

2  Exh. 6.[2] Defense counsel noticed that the Abramoff iPhone production did not contain messages

3  between Abramoff and Levin discussed in the FBI's October 10, 2019 report covering its review of

4  Abramoff's iPhone messages. Dent Decl., Exh. H. On January 13, 2023, after the defense brought the

5  missing messages to the government's attention, the government produced the missing messages.

6  Highsmith Decl., Exh. 7. On July 27, 2023, the government produced Abramoff's iPhone again to

7  ensure the defense had in its possession the complete Abramoff iPhone. Highsmith Decl., Exh. 8.

8     **D.     Andrade Requests Abramoff's Other Devices Despite Having Already Received
            Them, and the Government Produces Them Again**

9

10      Despite the December 8, 2022 production of Abramoff's electronic devices, Andrade continued

11  asking the government to produce Abramoff's electronic devices. On January 25, 2024, Andrade filed a

12  motion to compel production of the devices. Andrade's motion emphasized two items of particular

13  interest to the defense—a Blu-ray disc derivative of the Abramoff iPhone produced earlier (which the

14  defense agrees the government produced in full) and an Oceana USB thumb drive. On March 15, 2024,

15  the government produced the contents of the Blu-ray disc and Oceana thumb drive. Highsmith Decl.,

16  Exh. 9. On March 17, 2024, Judge Beeler issued a Discovery Order requiring the government to

17  produce the Blu-ray disc and Oceana thumb drive, which had been done, and images of post-Attachment

18  B review material seized from Abramoff's devices. The Court also ordered the government to return

19  Abramoff's devices to Abramoff's counsel so that Andrade could subpoena them. Def. Mot., at 6:16-18.

20      On March 18 and 24, defense counsel emailed the government and asked when it would return

21  the devices to Abramoff's counsel. *Id.* at 6. On March 28, 2024, the government responded that it

22  would return the seized Abramoff devices to his counsel by May 3, 2024. Highsmith Decl., Exh. 10.

23  The FBI returned the two remaining Abramoff devices to his counsel on May 2, 2024. In addition, the

24  government explained that it would (again) produce material from the Abramoff devices by April 19,

25  2024. *Id.* The government produced the devices on April 29, 2024. *Id.*, Exh. 11.

26

27  [2] The government's December 8, 2022 discovery letter lists the extractions from the devices by Bates
    number—FBI-PHY3-0133763 to FBI-PHY3-0133770. The discovery letter also cross-references the
28  produced devices with FBI reports clarifying the Abramoff devices included in the production: the
    Seagate Hard Drive; Oceana USB Thumbdrive; Asus laptop; Dell Lattitude Laptop; iPhone.

E.      **The Government Produced the Paul Erickson Phone to Andrade**

On March 7, 2022, Andrade requested "[Paul] Erickson's statements and documents relating to Abramoff, Mr. Andrade, and AML Bitcoin."[3]  Def. Mot., at 9.  Later, Andrade specifically requested Erickson's devices.  Dent Decl., Exh. Z.  The government produced the one Erickson device in its possession to Andrade on April 12, 2023.

The government worked diligently to locate and produce the requested Erickson devices.  On January 25, 2023, after investigating whether the South Dakota case file had Erickson's devices or Cellebrite reports, the government wrote to defense counsel: "Erickson's devices were returned to him in July 2020 and Cellebrite files were deleted when the case was closed in March 2022 as part of standard FBI procedure, so no Cellebrite files exist."  Highsmith Decl., Exh. 12.  The FBI evidence report for Erickson's South Dakota case confirms the government's statement.  It shows that the FBI seized five digital items—two laptop computers, two desktop computers, and one thumb drive—and that all digital items had been disposed of (returned or destroyed) by July 15, 2020.  *Id*., Exh. 13.  The FBI evidence report also shows that the FBI did not seize a cell phone from Erickson and that the FBI did not have any Cellebrite reports or images of the devices in evidence.  *Id.*  The San Francisco FBI case agent confirmed these findings with the Erickson case agent—specifically, that the Erickson case was closed in March 2022, all seized devices were returned to Erickson by July 2020, and that no image copies of the devices existed.  *Id*., Exh. 14.

Andrade continued demanding Erickson (and Butina) evidence, and the government continued searching other district's case files for relevant evidence.  On January 25, 2023, Washington, D.C. FBI agents conducted a special review of the electronic devices seized as part of the Maria Butina investigation.  Highsmith Decl., Exh 15, at 44.  None of the electronic devices responded to the search terms "Andrade," NAC Foundation," or "AML Bitcoin."  *Id.*  The government communicated these findings to the defense.  *Id.*  Following extensive briefing about the scope of relevant discovery in this

---

[3] On February 5, 2019, a federal grand jury in South Dakota charged Paul Erickson in a separate case involving a long running real estate fraud scheme.  *United States v. Erickson*, Case No. CR 4:19-cr-40015-KES (D.S.D. Feb. 5, 2019) (Dkt. 1, Indictment).  Erickson pled guilty on November 26, 2019. *Id.*, Dkt. 43.  On January 13, 2021, Erickson was pardoned, and the case was closed in March 2022. *Id.*, Dkt. 84; *see also* Highsmith Decl., Exh. 14.

case, on April 7, 2023, Judge Beeler issued a Discovery Order and ruled that "limiting the production to references to Mr. Andrade and AML Bitcoin is too narrow…. [This case] is not just about Mr. Abramoff or Mr. Andrade and AML Bitcoin.  It is about the larger context of the business model for cryptocurrency, whether Mr. Abramoff may have been working against Mr. Andrade, and how that affects Mr. Andrade's responsibility and scienter."  Discovery Order, Dkt. 165, at 12.  Regarding Erickson, the Court ruled: "if the government has the Erickson extractions or information about them … it must produce them."  *Id.*  Regarding Butina, the Court ruled that the government must produce statements by Butina consistent with the larger context of the Andrade case, Abramoff's potentially working against Andrade, and how that affects Andrade's responsibility and scienter.  *Id.* at 12-13.

The government continued investigating whether Erickson's device extractions existed in other case files and whether additional information existed about any Erickson devices.  The government carefully reviewed evidence in the Butina case file, and on April 19, 2023, learned that the Butina casefile contained an image of Erickson's iPhone 7, which had been seized from Butina's apartment pursuant to the July 2018 search warrant discussed above.  On April 12, 2023, the government produced Paul Erickson's iPhone 7 and all devices seized from Butina's apartment to Andrade.  Highsmith Decl., Exh. 16. The government has complied with Judge Beeler's April 7, 2023 discovery order.

## F.    Jonathan Buma's Limited Involvement in this Case

On February 20, 2020, FBI agents in Anaheim, California, showed email notes dated May 31, 2018, handwritten notes, and typed notes seized from Jack Abramoff to an FBI Confidential Human Source (CHS).  Dent Decl., Exh. C.  At that time, FBI Special Agent Jonathan Buma handled the CHS.  Accordingly, Buma was present at the meeting.  *Id.*  The notes referred to certain people the CHS was familiar with in 2018.  *Id.*  The CHS advised agents he/she had met Abramoff once or twice in person and had a few telephonic contacts with him, but nothing of substance.  *Id.* The CHS did not discuss Andrade, AML Bitcoin, or anything related to AML Bitcoin at the meeting.  *Id.*

## G.    Emails Between Andrade and Counsel Appear in Discovery

There is no evidence in the record to support Andrade's claim that the government purposefully collected emails between Andrade and his attorneys.  Andrade sites to a handful of communications it has culled from 5TB of data, asserts that they contain attorney-client privileged materials and asserts,

1   without evidence, that these were knowingly retained and reviewed by the case agents.  Andrade does

2   not include Bates stamps or production dates on the exhibits to his motion, so it is difficult for the

3   government to investigate the source and history of what Andrade claims are attorney-client

4   communications.  *See* Dent Decl. ¶ 30 & Exh. BB, CC, DD, EE.  Neither undersigned counsel for the

5   government nor the current FBI case agent have seen these documents prior to the instant defense

6   motion.  The government will not introduce them, reference them, or rely on them at trial.  Further,

7   Andrade's patents are not an issue in the government's case-in-chief.  The government is not contesting

8   that Andrade held numerous patents related to cryptocurrency products with anti-money laundering

9   (AML), know your customer (KYC), or biometric identity verification features.  Nor does the

10  government's case at trial involve the value of those patents.

11      **H.    David Mata's Cooperation With the Government Investigation of Andrade**

12          Through their cryptocurrency fund "Block Bits," David Mata and Japheth Dillman worked to

13  advertise and sell AML Bitcoin tokens to Block Bits' investors.[4]  Dillman served as the Chief Strategy

14  Officer of AML Bitcoin, but Mata did not serve as an officer or employee at AML Bitcoin.  Still,

15  Andrade thought well enough of Mata's work that, by at least September 2018, Andrade and Mata

16  explored Andrade hiring Mata as AML Bitcoin's CEO.  Mata, meanwhile, was also speaking with the

17  FBI.  His first interview with the FBI took place on September 24, 2018.  It began unprompted: Dillman

18  spontaneously called Mata while agents were speaking with Dillman at Dillman's house, and Mata

19  voluntarily answered agent questions about Andrade.  The next day, Mata called Special Agent KA and

20  informed her that, to his surprise, Andrade had called him and offered a business deal: Andrade would

21  acquire Block Bits if Mata and Dillman took over Andrade's operations in North and South America.

22  (Andrade had previously offered to sell NAC Foundation and other businesses for $3 million, but Mata

23  had not liked that offer.)

24          In mid-October 2018, Mata arranged a meeting between him and Andrade "to talk about taking

25  over NAC" and informed Agent KA.  Dent Decl., Ex. MM.  This led to the recordings raised in

26

27  _____

28  [4] The government charged Mata and Dillman with wire fraud in connection with their operation of
    Block Bits.  *See United States v. Mata*, Case No. 22-cr-00171-RS (Dkt. 1, Information, Apr. 27, 2022);
    *United States v. Dillman*, 23-cr-140 JD (Dkt. 29, Superseding Indictment, May 16, 2023).  Mata pled
    guilty on June 21, 2022.  Case No. 22-cr-00171-RS (Dkt. 13).  Dillman's case is pending.

1    Andrade's motion.  Mata agreed to wear a wire and to ask due diligence questions related to the

2    corporate acquisition that Andrade had proposed.  Agent KA emailed Mata to suggest topics that mostly

3    "would fall under [Mata's] normal due diligence."  *Id.*, Exh. NN.  These included, for instance, "patent

4    ownership," "companies interested in using AML Bitcoin," and the status of purported deals with

5    entities like the Port of San Francisco and the Panama Canal.  *Id.*  Mata also informed the FBI that

6    Lawyer CP of Firm DP would attend the meeting as secretary and provide legal advice.  *Id.*, Exh. LL.

7    Lawyer CP and her Firm DP did patent work for Andrade.  They had no known role in the criminal

8    investigation.  Mata met with and recorded Andrade on November 13, 2018.  According to the defense's

9    description of the recordings—which the undersigned attorneys and case agent BZ had not listened to

10   and have deliberately avoided after Andrade filed the instant motion—Andrade discussed standard due

11   diligence topics.  *See* Def. Mot., at 14.

12       Also in mid-October 2018, as Mata and Andrade discussed the possibility of Mata taking over

13   AML Bitcoin, Mata emailed with Andrade about potential lawyers and law firms to assist Andrade with

14   patent litigation and introduced Andrade to patent attorney SM.  Dent Decl. ¶ 41.  At Mata's request,

15   Andrade emailed his patent portfolio to Mata and attorney SM.  *Id.*  Andrade did not retain SM, and no

16   ongoing attorney-client relationship ever existed.  *Id.*  Mata forwarded the emailed patent portfolio to the

17   FBI.  *Id.*

18   **I.     FBI Executes a Search Warrant at Andrade's Home and Records a Conversation**
         **With Him**
19

20       On March 12, 2020, the FBI executed a search warrant at Andrade's home in Texas.  Agents

21   spoke with Andrade and recorded their conversation.  *Id.* ¶ 43.  At the beginning of their conversation,

22   Agent EQ told Andrade that he was free to leave or to make phone calls, and Andrade asked: "Can I call

23   my attorney?"  *Id.*  Agent EQ continued speaking with Andrade for approximately 38 more minutes

24   before another agent ended the interview.  *Id.*

25   **III.   RELEVANT LAW**

26       **A.     Due Process Violation**

27       "[A] district court may dismiss an indictment on the ground of outrageous government conduct if

28   the conduct amounts to a due process violation."  *United States v. Chapman*, 524 F.3d 1073, 1084 (9th

Cir. 2008) (internal citation and quotation omitted). "A prosecution results from outrageous government conduct when the actions of law enforcement officers or informants are 'so outrageous that the due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Pedrin*, 797 F.3d 792, 795 (9th Cir. 2015) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)). "This is an extremely high standard." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (citation omitted).

Dismissing an indictment for outrageous government conduct is "limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the sense of justice." *Id.* (citation omitted). As the Ninth Circuit noted in *Black*, "there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine." *Id*.

"Outrageous government conduct requires more than negligence or poor judgment." *United States v. Conte*, Case No. CR 04–0044 SI, 2004 WL 2988567, at *1 (N.D. Cal. Dec. 28, 2004) (citing *United States v. Wiley*, 794 F.2d 514, 515 (9th Cir. 1986)). "The Government's involvement must be malum in se or amount to the engineering and direction of the criminal enterprise from start to finish." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). Moreover, "in order to secure dismissal of an indictment due to outrageous government conduct, a defendant must show a nexus between the conduct and either 'securing the indictment or [ ] procuring the conviction.'" *United States v. Dominguez-Caicedo*, 40 F.4th 938, 949 (9th Cir. 2022) (quoting *United States v. Nickerson*, 731 F.3d 1009, 1015 (9th Cir. 2013)). The defendant bears the burden of proof. *See United States v. Edmonds*, 103 F.3d 822, 825 (9th Cir. 1996).

**B.        Interference with Attorney-Client Privilege Resulting in Due Process Violation**

"A claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice." *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008) (quoting *United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000), *amended on denial of reh'g* (Aug. 15, 2000)). "A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately

1    intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial

2    prejudice." *Id.* (citing *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996)).  And to prove the third

3    element, the "defendant must prove 'substantial prejudice,' which "results from the introduction of

4    evidence gained through the interference against the defendant *at trial*, from the prosecution's use of

5    confidential information pertaining to defense plans and strategy, and from other actions designed to

6    give the prosecution an unfair advantage *at trial*."  *United States v. Schaefer*, 13 F.4th 875, 892 (9th Cir.

7    2021) (emphasis added) (quoting *United States v. Danielson*, 325 F.3d 1054, 1069 (9th Cir. 2003)).

8        Then, even if the defendant clears these three high bars, his remedies are tailored.  "The Ninth

9    Circuit traditionally has identified two remedies: 1) dismissal of the indictment, which is drastic,

10   disfavored, and thus used only in the most egregious cases; or 2) suppression at trial of evidence

11   improperly obtained."  *Haynes*, 216 F.3d at 796.  As *Haynes* held and other cases have shown, courts

12   rarely dismiss indictments outright based on a government intrusion into the attorney-client relationship.

13   *See, e.g.*, *United States v. Rogers*, 751 F.2d 1074, 1079 (9th Cir. 1985) (reinstating indictment because

14   disclosures from defendant's former attorney were before indictment); *Haynes*, 216 F.3d at 797

15   (affirming refusal to dismiss indictment even though private investigator who worked for defense

16   attorney disclosed privileged information); *Voigt*, 89 F.3d at 1066 (approvingly summarizing case where

17   court found no prejudice even though government used defendant's own attorney as an informant).

18       **C.    The Court's Supervisory Powers**

19       Where the conduct does not rise to the level of a due process violation, the Court can dismiss a

20   case under its supervisory powers "to implement a remedy for the violation of a recognized statutory or

21   constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate

22   considerations validly before a jury; and to deter future illegal conduct."  *Chapman*, 524 F.3d at 1084.

23   "However, because dismissing an indictment with prejudice encroaches on a prosecutor's charging

24   authority, this sanction may be permitted only in cases of flagrant prosecutorial misconduct."  *Id.*

25   (internal citation and quotation omitted).  "We must necessarily exercise scrupulous restraint before we

26   denounce law enforcement conduct as constitutionally unacceptable.  Unless the behavior of the F.B.I.

27   agents rose to the level of outrageousness which would bar conviction, the conduct of agents of the

28   executive branch who must protect the public from crime is more appropriately considered through the

1   political process where divergent views can be expressed in the ballot box." *Voigt*, 89 F.3d at 1065

2   (original alterations omitted) (quoting *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (en banc)).

3           **D.      Standard for an Evidentiary Hearing**

4           A defendant must present a sufficient factual basis to warrant an evidentiary hearing on an

5   outrageous government conduct motion. *See Conte*, 2004 WL 2988567, at *1 ("defendants have not

6   presented a sufficient factual basis to warrant an evidentiary hearing on this motion, given the

7   'extremely high standard' of outrageous conduct"); *United States v. Abbit*, 1999 WL 1074073, at *3 (D.

8   Or. Oct. 29, 1999) (concluding that defendants "failed to present a sufficient showing to entitle them to

9   an evidentiary hearing on the question of outrageous government conduct"). Denial of an evidentiary

10  hearing can be appropriate even where "an evidentiary hearing might have helped resolve conflicting

11  statements." *United States v. Lazarevich*, 147 F.3d 1061, 1065 (9th Cir. 1998) (internal citation omitted).

12  A defendant's motion must have more than "bald-faced allegations of misconduct." *Voigt*, 89 F.3d at

13  1067 (citing *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir. 1990) ("A district court does not have

14  to hold an evidentiary hearing just because a party asks for one. An evidentiary hearing is necessary

15  only if the party requesting the hearing raises a significant, disputed factual issue.")). "There must be

16  issues of fact material to the resolution of defendant's constitutional claim." *Id.* (collecting cases).

17  **IV.     ARGUMENT**

18          **A.      An Evidentiary Hearing is Unwarranted Because Andrade has Not Met His Burden
                      and Because There is No Evidence of Government Misconduct**
19

20          Andrade seeks an evidentiary hearing based on claims that the government has suppressed

21  evidence related to Jack Abramoff, destroyed exculpatory and potentially exculpatory evidence, and

22  invaded Andrade's attorney-client privilege to gain an advantage at trial. Def. Mot., at 17. Andrade's

23  claims are not colorable, they lack evidentiary support, and they do not warrant an evidentiary hearing.

24  Andrade has not made a sufficient showing to entitle him to one. *See* Section III-D, *supra* (Standard for

25  Evidentiary Hearing). "While the parties disagree as to the weight the Court should give to the available

26  facts," there is not "a sufficient factual dispute that would warrant an evidentiary hearing." *United*

27  *States v. Hungerford*, Case No. CR 18-112, 2019 WL 1903212, at *11 (E.D. La. Apr. 29, 2019) (denying

28  evidentiary hearing and motion to dismiss based on defense allegations that the government intruded on

the attorney-client relationship).

**B.  Andrade has Failed to Show a Due Process Violation**

> **1.  The Government has Produced Exhaustive Discovery Related to Jack Abramoff, has Not Suppressed or Destroyed Evidence Relating to Abramoff, and has Not Violated Andrade's Due Process Rights**

Andrade cites to several purported examples of the government supposedly suppressing or destroying evidence about Abramoff that is exculpatory to Andrade.  Def. Mot., at 18-19.  Andrade states that "[e]ach of the episodes detailed in this motion would be outrageous and, if established at a hearing or based on this filing, could rise to the level of a due process violation."  *Id.* at 18.

As a general matter, dismissal of an indictment on due process grounds because the government failed to preserve potentially exculpatory evidence is only appropriate where the government acted in bad faith.  *See, e.g.*, *United States v. Robertson*, 895 F.3d 1206, 1211, 1213 (9th Cir. 2018).  Here, the government acted in good faith.  As the detailed in the Factual Background above, the government sought to honor a slew of defense discovery requests that spanned far-flung districts and unrelated investigations and, in the government's view, exceeded the scope of its ordinary discovery obligations.

Moreover, Andrade's claims do not amount to *Brady* violations, due process violations, or misconduct.  As detailed in the subsections below.

> **(i)  Andrade's Purported Witnesses Do Not Support the Outrageous Government Conduct Claim**

Andrade seeks an evidentiary hearing so that he can attempt to call two former government employees—Jonathan Buma and a second unnamed individual—to testify about (1) "suppression of Abramoff material through editing 302 reports or not investigating crimes at all," and (2) "how a different government agency suppressed evidence of Abramoff's international money laundering using the Landfair Capital bank account."  Def. Mot., at 19.  Andrade submits no reliable or relevant evidence whatsoever to support his claim.  He submits no declarations from these purported witnesses.  He conceals the name of one purported witness.  Andrade's attorneys simply declare their unsupported belief about what these purported witnesses would say.  Defense counsel's unsupported proffer is insufficient basis to warrant an evidentiary hearing.  *See Conte*, 2004 WL 2988567, at *1 ("defendants have not presented a sufficient factual basis to warrant an evidentiary hearing on this motion, given the

1    'extremely high standard' of outrageous conduct"); *Abbit*, 1999 WL 1074073, *3 (concluding that

2    defendants "failed to present a sufficient showing to entitle them to an evidentiary hearing on the

3    question of outrageous government conduct").  Denial of an evidentiary hearing can be appropriate even

4    where "an evidentiary hearing might have helped resolve conflicting statements." *Lazarevich*, 147 F.3d

5    at 1065.  Even if the purported witnesses testified as defense counsel claims, and even if the Court found

6    such testimony credible, the defense would still fail to meet its burden of proving outrageous

7    government conduct because it cannot show a nexus between the purported suppression of information

8    about Abramoff's criminal conduct and either "securing the indictment or [ ] procuring the conviction."

9    *United States v. Dominguez-Caicedo*, 40 F.4th 938, 949 (9th Cir. 2022).  The government has gathered

10   significant evidence against Andrade independent of Abramoff to support the wire fraud and money

11   laundering charges against him.  And Andrade's trial has not yet occurred, so it cannot meet the second

12   prong that purported outrageous conduct secured his conviction.

13              **(ii)    The Government Did Not Suppress Paul Erickson's Handwritten**
                         **Notes and AML Bitcoin Marketing Materials Seized from Maria**
14                       **Butina's Apartment**

15         Next, Andrade argues that he is entitled to an evidentiary hearing because the government

16   supposedly tried to hide approximately 20 pieces of paper seized at Maria Butina's apartment in July

17   2018 in Washington, D.C. in a separate case.  Def. Mot., at 3.  These documents were Paul Erickson's

18   handwritten notes about AML Bitcoin and AML Bitcoin marketing materials from a meeting Erickson

19   had with Abramoff on June 3, 2018.  Def. Mot., at 3.  Erickson and Butina were in a romantic

20   relationship.  The defense claims the government tried to hide the notes because the FBI's report of its

21   search warrant interview of Abramoff on September 13, 2018 does not reference Butina or the notes but

22   the audio recording of the interview does.  *Id.* at 4.  This argument is nonsensical: the second sentence

23   on the FBI report says that the interview was recorded and entered into evidence as evidence item 1D39.

24   Dent Decl., Exh. D, page 1.  The defense therefore could readily listen to the audio recording and

25   identify areas for further investigation.  And this is exactly what the defense did: they listened to the

26   audio recording highlighted in the 302 and requested additional information from the Butina case.  Def.

27   Mot., at 4.  In response, the FBI case agent in the Andrade case reviewed the Butina case file for any

28   evidence that might be relevant to Andrade and drafted a report summarizing the relevant evidence—

1  specifically, Erickson's handwritten notes and the AML Bitcoin marketing materials.  Dent Decl., Exh.

2  F.  And the government produced Erickson's handwritten notes to Andrade more than two years ago, on

3  January 4, 2023.  Def. Mot., at 4.  The requested discovery was produced far in advance of trial.  There

4  was no misconduct by the government whatsoever, and certainly no outrageous conduct.

5              **(iii)    The Government Did Not Improperly Withhold Messages from**
                          **Abramoff's iPhone**
6

7            Next, Andrade claims the government intentionally suppressed evidence by purposefully

8  removing "more than one hundred messages from Abramoff's phone before producing it to Mr.

9  Andrade."  Def. Mot., at 19.  There is no evidence whatsoever to suggest that the government

10  intentionally suppressed messages from Abramoff's iPhone.  To the contrary, the government produced

11  the entire Abramoff iPhone to the defense more than one year before trial, including the purportedly

12  suppressed messages.  Dent Decl., at 8:26.  On these facts, there is no credible allegation of outrageous

13  government conduct.

14          To the extent the Cellebrite extraction from Abramoff's iPhone was incomplete, the government

15  proactively remedied the situation.  The FBI summarized communications between Abramoff and

16  Alexander Levin in a 302 report on October 10, 2019, which was produced to the defense several years

17  before trial.  Dent Decl., Exh. H.  When the defense brought to the government's attention the fact that

18  WhatsApp messages between Abramoff and Levin were missing from its earlier production, the

19  government produced the missing Levin-Abramoff WhatsApp messages.  Highsmith Decl., Exh. 7.  On

20  July 27, 2023, the government again produced Abramoff's iPhone.  *Id*., Exh. 8.

21              **(iv)    The Government Did Not Destroy Other Abramoff Devices**

22          Although not discussed in the argument section of Andrade's brief, Andrade claims in the factual

23  background portion of his motion that the government intended to destroy Abramoff impeachment

24  material contained on the other electronic devices seized from Abramoff's home on September 13, 2018.

25  Def. Mot., at 6-8.  Andrade infers that the government suppressed Abramoff impeachment material

26  because it purportedly (1) failed to coordinate the return of Abramoff's devices to Abramoff's counsel so

27  that Andrade could issue them a subpoena for the returned devices, and (2) failed to convince

28  Abramoff's counsel to not destroy the returned devices.  *Id.*

To the contrary.  The government produced the material it lawfully seized from Abramoff's devices on multiple occasions.  The government first produced the seized Abramoff devices to Andrade on December 8, 2022.  Highsmith Decl., Exh. 6.  The government re-produced the Abramoff Blu-ray disc and Oceana thumb drive on March 15, 2024.  *Id*., Exh. 9.  And the government again produced the Abramoff devices on April 29, 2024.  *Id*., Ex. 11.  There is no evidence in the record that the government withheld the Abramoff devices from Andrade, destroyed the Abramoff devices, failed to convince Abramoff's counsel not to destroy the devices, or failed to coordinate the return of Abramoff's devices to Abramoff's counsel so that Andrade could subpoena them.  The government properly returned some devices early in the investigation, retaining copies that were produced to Andrade, and the government returned remaining devices exactly on the schedule it communicated to Andrade.  The government did not improperly suppress evidence.

### (v) The Government Produced Erickson's Cell Phone to the Defense; It Did Not Destroy Erickson's Cell Phone

Andrade claims that the government destroyed Paul Erickson's cell phone, and he claims that there is an 80% chance the government destroyed Erickson's cell phone after the defense requested it on March 7, 2022.  Def. Mot., at 8.  There is no factual support whatsoever in the record for this claim.  As detailed in the fact section above, the government produced the Erickson phone to Andrade on April 12, 2023.  Andrade believes another Erickson phone exists, but his unsupported belief does not make it true.  Andrade asked for Erickson materials on March 7, 2022.  By that time, Erickson's case appears to have been closed, as he was pardoned more than a year earlier.  Regardless, Erickson's digital devices, seized in his South Dakota case had been properly disposed of several years earlier.  There was nothing to suggest that investigating agents in the South Dakota case ever had another Erickson phone, let alone any evidence in the record that the government destroyed another Erickson phone after the defense requested it.  The FBI evidence log for Erickson's South Dakota case shows that no cell phone was seized in that case.  The FBI evidence log for Butina's case shows that a cell phone was seized but does not reflect that the cell phone belonged to Erickson.  When the FBI opened the image of the cell phone seized in the Butina case, it learned that the cell phone belonged to Erickson and the government produced the Erickson phone to Andrade.  The government did not withhold evidence.

1     **2.  The Government has Not Invaded Andrade's Attorney-Client Privilege**

2    Andrade argues that the government engaged in "deliberate, repeated disregard" for his attorney-

3 client privilege amounting to "outrageous government conduct."  Def. Mot., at 20:1-2.  Andrade

4 misstates the law and fails to cite or discuss the legal standard in *United States v. Stringer*, 535 F.3d at

5 941 (9th Cir. 2008).  Even assuming them to be true, Andrade's factual statements about the

6 government's purported disregard for his attorney-client privilege do not state a colorable claim for

7 outrageous government conduct because they do not satisfy *Stringer*'s three prongs.  *Id.*

8     **(i)  The Government's Minimal Collection of Emails Between Andrade**

9       **and His Patent Attorney Does Not Rise to the Level of an Invasion of His Attorney-Client Privilege**

10    Among the nearly 5TB of data collected and produced by the government, Andrade notes that a

11 handful of emails between Andrade and his civil attorneys (patent and securities) appear in the

12 discovery.  *See* Def. Mot. at 12.  He claims this is an invasion of his attorney-client privilege.  It is not.

13 *See* Section III-B, *supra* (relevant law on interference with privilege).

14    The minimal emails at issue long predate the June 2020 indictment.  "Government intrusions into

15 pre-indictment attorney-client relationships do not implicate the Sixth Amendment."  *United States v.*

16 *Babichenko*, No. 1:18-CR-00258-BLW, 2020 WL 4462497, at *3 (D. Idaho Aug. 3, 2020) (quotation and

17 citation omitted).  Indeed, courts permit the prosecution to *use at trial* documents obtained from

18 attorneys where, as here, the "[attorney] was not representing [the defendant] in the criminal matter and

19 [] that matter had not yet proceeded from the investigative to the accusatorial stage."  *United States v.*

20 *White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (Posner, J.).  Andrade's claim lacks merit.

21    In any event, the government does not intend to introduce these emails in its case in chief.  This

22 is the remedy that Andrade would ordinarily receive even if his claim had merit.  *See Haynes*, 216 F.3d

23 at 796.  Indeed, before Andrade filed his baseless motion, the current trial team (undersigned counsel

24 and case agent BZ) does not believe it had ever reviewed the contents of the emails Andrade cites.  And

25 since learning of these allegedly problematic emails through Andrade's motion, the government has

26 deliberately avoided learning of their contents outside of the four corners of Andrade's filings.  Based on

27 his public descriptions of the emails, they appear to pertain to patents (because of law firm DP) and civil

28 securities regulation.

1

2

     **(ii)**  **Cooperating Witness David Mata's Recordings Did Not Interfere**
         **With Andrade's Attorney-Client Privilege**

3    Next, Andrade claims the government sought to learn about his defenses to the potential charges

4 it was investigating by listening to Andrade's conversations with his attorney. Def. Mot., at 12, 20. The

5 evidence Andrade cites does not support his claim. There is no evidence in the record that the

6 government tried to obtain information about Andrade's defense or that the government actually

7 obtained information about Andrade's defense.

8    Andrade attacks a surreptitious recording made by cooperating witness David Mata in November

9 2018, nearly two years before Andrade's indictment and six years before trial. Mata made these

10 recordings at one meeting between Andrade's patent attorneys, Andrade, and Mata himself as a non-

11 client third party. In short, the meeting was a putative arm's-length business negotiation with Mata

12 about Mata potentially becoming the CEO of AML Bitcoin. They could not have and did not discuss

13 trial strategy for a criminal case that, indeed, would not be charged until June 2020.

14    And, in any event, the government will not introduce Mata's testimony or his recordings in his

15 case-in-chief. Nor have any members of the government's current trial team even listened to the

16 disputed recording. Thus, as detailed below, the recordings did not invade Andrade's attorney-client

17 privilege nor "actually and substantially" prejudiced him. Andrade fails to clear even one of the three

18 high bars for his serious claim. *See* Section III-B, supra (relevant law on interference with privilege).

19        **(a)**  **No awareness of (or existence of) attorney-client relationship as**
          **to the criminal investigation**

20

21    To start, Andrade fails to carry his "burden of establishing the existence of an attorney-client

22 relationship and the privileged nature of the communication." *United States v. Graf*, 610 F.3d 1148,

23 1156 (9th Cir. 2010) (original alterations omitted) (quoting *United States v. Ruehle*, 583 F.3d 600, 607

24 (9th Cir. 2009)). Andrade asserts that "the government may even have known that Lawyer CP and her

25 colleagues at Law Firm DP were representing Mr. Andrade in connection with this investigation." Def.

26 Mot. at 13 (emphasis in original) (citing Dent Decl. ¶ 35). But the government did not know this—and

27 could not have known this—because nothing suggests Lawyer CP represented Andrade in his criminal

28 investigation.

The criminal investigation objectively appears to be outside the scope of Lawyer CP's relationship with Andrade. This is plain even on the face of the documents Andrade cites. The Dent Declaration at ¶ 35 cites Exhibit PP, which is a November 2019 email between attorneys at Law Firm BN: the firm that did represent Andrade against the government's criminal investigation. This email—sent more than year after the disputed Mata recording—notes merely that Lawyer CP "confirmed her firm did not make a written request for the return of property." Dent Decl., Exh. PP.

This, if anything, confirms that Lawyer CP had no role in the criminal investigation. And that makes sense: Lawyer CP was a patent attorney, not a criminal defense lawyer. So, at the time of Mata's meeting with Andrade and Lawyer CP, the government could not have been "objectively aware of an ongoing, personal attorney-client relationship" between Andrade and Lawyer CP as to criminal matters at hand. *Haynes*, 216 F.3d at 797.

### (b)    The government did not deliberately intrude into a personal attorney-client relationship

The purpose of the November 2018 meeting was to gather facts about AML Bitcoin and its purported business deals—not to gather criminal trial strategy or otherwise intrude into Andrade's relationship with his personal lawyer. Andrade had proposed that Mata, a third party who was not an employee of Andrade's, could become AML Bitcoin's CEO. The meeting took place under those auspices. The exhibits that Andrade cites again make this clear. *See* Def. Mot. at 13 (citing Dent Decl. ¶ 33 & Exh. NN, which is an October 2018 email between Agent KA and Mata). Andrade protests that Agent KA sought to "gather[] information about Mr. Andrade's defense." *Id.* Not so.

The topics Agent KA are prosaic and non-privileged. They include, for example, "profits," "amount raised in ICO," "patent ownership," "companies interested in using AML Bitcoin," and the status of various purported deals: "Port of San Francisco," "Panama Canal," "London Stock Exchange," etc. And underscoring that the meeting would explore an ordinary corporate transaction, not criminal legal strategy, Agent KA wrote to Mata: "I recognize that several of these topics would fall *under your normal due diligence* so please feel free to modify the list and make it your own." *Id.* Exh. NN (emphasis added).

What's more, Mata was a third party negotiating a possible employee role at AML Bitcoin—

1   certainly not a client of an attorney at the meeting, nor acting as an agent of Andrade's with respect to

2   his employment negotiations with Andrade. "Because [defendant] knew, or should have known, that

3   third parties were present, his attorney-client privilege claim must fail." *United States v. Gann*, 732 F.2d

4   714, 723 (9th Cir. 1984). To evade this inevitable conclusion, Andrade argues (in a footnote) that he and

5   Mata had common-interest privilege, and that the government must have known that. *See* Def. Mot. at

6   20 n.9. But common interest is "a narrow exception to the general rule that disclosing information to a

7   third party constitutes a waiver of the attorney-client privilege." *United States v. Lopez*, No. 2:23-CR-

8   00055-CDS-DJA, 2025 WL 275523, at *5 (D. Nev. Jan. 22, 2025) (quoting *Integrated Glob. Concepts,*

9   *Inc. v. j2 Glob., Inc.*, 2014 WL 232211, at *2 (N.D. Cal. Jan. 21, 2014)) (overruling magistrate's

10  application of the doctrine in criminal case). To successfully invoke this "narrow" doctrine, Andrade

11  must show three things, *see id.*, and he has failed to do so.

12          The recent ruling in *United States v. Lopez* is instructive. There, as here, the defendant disclosed

13  purportedly privileged communications during the "due diligence phase" of a business deal. 2025 WL

14  275523, at *4. And there, as here, the defendant claimed there were expectations of confidentiality.

15  Indeed, *Lopez* was a harder case: there was a contract there that expressly deemed "attorney-client

16  privileged" the so-called "Privileged Communications" at issue. *Id.* Still, the *Lopez* Court rightly held

17  that the government had not invaded the defendant's attorney-client privilege because defendant's

18  voluntary disclosure to a third-party waived privilege. *Id.* at *5. So too here.

19                          **(c)      Andrade has not suffered "actual and substantial prejudice".**

20          As to the last element of his claim, Andrade has not suffered "actual and substantial prejudice."

21  *Schaefer*, 13 F.4th at 892. Substantial prejudice "results from the introduction of evidence gained

22  through the interference against the defendant at trial, from the prosecution's use of confidential

23  information pertaining to defense plans and strategy, and from other actions designed to give the

24  prosecution an unfair advantage at trial." *Id.* (emphasis added) (quoting *Danielson*, 325 F.3d at 1069).

25          As a threshold matter, the government has already implemented the main remedy to any

26  hypothetical violation of the attorney-client privilege: "suppression at trial of evidence improperly

27  obtained." *Haynes*, 216 F.3d at 796. In an abundance of caution, the government will not introduce

28  Mata or his November 2018 recording in its case-in-chief. (The government will file an updated witness

1    list to reflect Mata's removal.)  And to the extent case agent KA testifies, the government will not

2    introduce through her any statements from that November 2018 recording/meeting either.  Her

3    anticipated testimony is largely tailored to the straightforward authentication of unrelated content in the

4    FBI casefile, such as screenshots of AML Bitcoin social media accounts.  Indeed, her testimony would

5    be unnecessary if the defendant stipulated to the authenticity of records; that is, simply agreed that the

6    FBI did not fabricate content that agents downloaded from the internet.  Thus, Andrade will not suffer

7    prejudice "from the introduction of evidence . . . at trial."  *Schaefer*, 13 F.4th at 892.

8         Furthermore, the prosecution has not and could not have gleaned "confidential information

9    pertaining to defense plans and strategy."  *Id.*  For one thing, the current trial team (undersigned counsel

10   and case agent BZ) have not even listened to the recording.  In fact, since the filing of Andrade's

11   baseless motion, deliberately avoided learning of the recording's contents outside of the four corners of

12   Andrade's filings.  The prosecution team is untainted.  For another thing, even the content cited in

13   Andrade's motion is not "confidential information pertaining to defense plans and strategy."  *See* Def.

14   Mot. at 13–14.  The status of business deals with third parties (the Panama Canal, London Stock

15   Exchange, U.S. government agencies, and the New York Stock Exchange) is not "defense plans and

16   strategy."  *Id.*  The "finances of NAC" are not defense plans and strategy either.  Nor is the "property

17   [Andrade] got down in Southern Texas," or any home that one buys on the open market.  *Id.*

18        Even if Andrade's sensational arguments were true (and they are not), any intrusion by the

19   government would fall far short of the "substantial prejudice" required to establish a due process

20   violation warranting dismissal of the indictment.  "Substantial prejudice" rarely results from conduct

21   before indictment, and courts rarely dismiss indictments outright because of government intrusion into

22   the attorney-client relationship.  *See* Section III-B, *supra*.  All told, David Mata's recordings of a

23   November 2018 business meeting with Andrade did not invade Andrade's attorney-client privilege.

24                  **(iii)    Cooperating Witness David Mata's Introduction of Andrade to Patent
                    Attorney SM Did Not Interfere With Andrade's Attorney-Client**

25                  **Relationship**

26        Andrade implies, but does not directly argue, that the government interfered with his attorney-

27   client relationship when cooperating witness DM "dangl[ed] his connection with another lawyer [SM] in

28   order to obtain information about Mr. Andrade's patents."  Def. Mot., at 15-16.  Even assuming

1  Andrade's facts and his interpretation of the facts to be true, Andrade fails to state a colorable claim of

2  government interference with the attorney-client relationship.[5]  *See Stringer*, 535 F.3d at 941.  Andrade

3  does not claim, as he must, that "the government was objectively aware of an ongoing, personal

4  attorney-client relationship."  *Id.*  Instead, Andrade claims that DM tried to set up a future attorney-client

5  relationship between Andrade and attorney DM in order to get information about his patents, and he

6  admits that "no ongoing attorney-client relationship ever resulted."  Def. Mot., at 16:7.  Andrade's claim

7  also fails because he cannot meet the second or third *Stringer* prongs.  He does not claim that the

8  government intruded into an ongoing, personal attorney-client relationship, and he does not claim that he

9  suffered any actual and substantial prejudice.  *See Stringer*, 535 F.3d at 941.

10       **(iv)    Special Agent EQ's Recording of Andrade did not Invade Andrade's**
         **Attorney-Client Privilege**

11

12       Andrade's last argument is that Special Agent EQ's interfered with Andrade's attorney-client

13  relationship during execution of the March 12, 2020 search warrant at Andrade's home by disregarding

14  Andrade's request to call his attorney and by continuing to talk with Andrade after that request.  Def.

15  Mot., at 16-17, 20.  Andrade describes the interaction in the fact section of his brief, but he does not

16  discuss it in argument.  *Id.*  Even assuming Andrade's interpretation of the facts to be true, and they are

17  not,[6] Andrade makes no colorable claim that the Special Agent EQ or any other FBI agent present at the

18  search deliberately intruded on Andrade's attorney-client relationship, or that Andrade suffered actual

19  and substantial prejudice.  *Stringer*, 535 F.3d at 941 (explaining that deliberate intrusion and actual and

20  substantial prejudice are required elements for a government interference claim).  Additionally, Andrade

21

22       [5] This case is not about Andrade's patents and the government is not contesting that he held
    relevant patents.  Further, these communications among Mata, Andrade, and SM are not related to topics

23  relevant to the criminal investigation that led to the charges in this case.

24       [6] At the beginning of their conversation, Andrade calls EQ "down to earth" and "not
    disrespectful."  Minutes later, after Andrade asks, "Can I call my lawyer," EQ says, "you can call your

25  attorney, of course you're free to do what you want to do… you can make telephone calls and things like
    that. You can leave, if you like, too."  Andrade interjects, "Wow! … thank you, … I wasn't expecting

26  that either."  Another agent reiterates, "you're not under arrest."  And Andrade just keeps talking.  The
    agents explain the logistics of the search warrant, and Andrade spontaneously and freely continues

27  talking with the agents.  They respond with questions relevant to the search warrant, such as, questions
    about where Andrade's firearms are located so they can secure them during the search.  Shortly

28  thereafter, Andrade spontaneously discusses his supposed tax filings and difficulties with his filings.

makes no claim that Special Agent EQ's recorded conversation with Andrade forced the disclosure of Andrade's confidential communications with his lawyer. *See Rogers*, 751 F.2d at 1077 (reversing district court's finding of interference with the attorney-client relationship and explaining that "attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer"). And Andrade cites no case finding outrageous government conduct where, as here, a non-custodial defendant under no coercive circumstances freely discusses underlying facts about his case. Andrade does not make a *Miranda* claim. He has not moved in *limine* to exclude the recording under the rules of evidence. Andrade's reliance on *Marshank* and *Schell* are misplaced because he is not alleging that his criminal defense lawyer collaborated with the government or helped prosecute and convict his former criminal defense clients. 777 F. Supp. 1507, 1520-22 (N.D. Cal. 1991); 775 F.2d 559, 566 (4th Cir. 1985).

### C. There is No Constitutional Violation and No Basis Whatsoever for the Court to Exercise its Supervisory Powers to Dismiss the Indictment

Andrade argues that even if the government's alleged *Brady* violations and interference with his attorney-client relationship do not rise to the level of a due process violation, the Court should dismiss the indictment to sanction the government for "its systemic suppression of exculpatory evidence relating to Abramoff and its bulldozing of Mr. Andrade's attorney-client privilege to gain an unfair advantage." Def. Mot., at 21:8-9. Andrade's argument fails because as discussed in detail above, the government has not violated Andrade's "statutory or constitutional right[s]," there is no concern on the record presented that a need exists "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury," and there is no evidence of illegal conduct to deter. *Chapman*, 524 F.3d at 1085 (setting forth the legal standard for dismissal based on the district court's supervisory powers). Dismissal based on the Court's supervisory powers requires that the government's conduct was flagrant and caused substantial prejudice to the defendant. *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1985). Andrade fails to make a colorable showing on either ground.

As detailed above, Andrade cannot show "flagrant prosecutorial misconduct" or "reckless disregard for the prosecutor's constitutional obligations" based on his claims of purported *Brady* violations by the government. *Chapman*, 524 F.3d at 1085 (emphasizing that the district court found

1   that the government acted "flagrantly, willfully, and in bad faith").

2       Here, in contrast to *Chapman*, there is no evidence that "the AUSA[s] failed to keep a log

3   indicating disclosed and nondisclosed material," "repeatedly represented to the court that [they] had

4   fully complied with *Brady* and *Giglio*, when [they] knew full well that [they] could not verify these

5   claims." *Id.*  And there is no claim that the government disclosed *Brady* and *Giglio* material after the

6   beginning of trial and after the testimony of relevant witnesses. *Id.*  To the contrary, the record reflects

7   that the government produced to Andrade what he claims was withheld or destroyed—the Abramoff

8   iPhone, Abramoff devices, Erickson handwritten notes, and Erickson iPhone.  Further, the record

9   demonstrates that the government responded to a tsunami of defense discovery requests, worked with

10  the defense to produce the material they requested and in an abundance of caution produced more than

11  the defense requested, and where the defense highlighted issues in discovery the government reproduced

12  previously produced discovery.  The record reflects that the government produced to the defense a

13  mountain of evidence spanning twenty year concerning cooperating defendant Jack Abramoff.

14      Andrade does not argue with any specificity that the government's purported interference with

15  his attorney-client relationships satisfies the legal standard for dismissal under the Court's supervisory

16  powers.  Indeed, he cannot.  As explained in detail above, Andrade fails to state a claim regarding

17  purported government interference with the attorney-client relationship that the government's conduct

18  was flagrant, violated Andrade's statutory or constitutional rights, or that it caused substantial prejudice

19  to the defendant.

20      **D.    The Court Should Not Provide the Jury With an Adverse Inference Instruction**
21      **Because It Is Completely Unwarranted and Unsupported by the Law and Facts, Nor**
         **Should the Court Order Other Relief**

22      Finally, Andrade argues that if the Court does not dismiss the indictment, it should exercise its

23  supervisory powers and fashion remedies to the purported discovery and government interference claims

24  detailed above.  Def. Mot., at 23.  Andrade asks the Court to give a jury instruction that "the

25  Government has suppressed evidence about Jack Abramoff and his misconduct during the relevant time

26  period…, destroyed evidence that the jury can infer would have been exculpatory, and invaded Mr.

27  Andrade's attorney-client privilege to gain an advantage at trial." *Id.*  Andrade seeks an additional

28  instruction about the inferences the jury can draw from the government's purported misconduct. *Id.*

"The rule governing sanctions for destruction of evidence" requires balancing "the quality of the Government's conduct against the degree of prejudice to the accused." *United States v. Sivilla*, 714 F.3d 1168, 1173-74 (9th Cir. 2013) (remanding for new trial with instructions to grant defendant a remedial jury instruction to support his requested jury instructions). But Andrade fails to show destruction of evidence in government custody. Therefore, his motion must be denied. *Id.* Nor does Andrade show that "the government was negligent in failing to adhere to reasonable standards of care in its prosecutorial functions," "failed to take affirmative steps to preserve promised evidence," or "participated in events leading to the failure to preserve." *Id.* at 1173. Nor has Andrade demonstrated prejudice, given the massive amount of material produced by the government in response to his theories about Abramoff working with Erickson, Butina, Levin, and others against Andrade's AML Bitcoin project. To the contrary, the government produced to Andrade (sometimes repeatedly) evidence he requested that he claims the government withheld. the record demonstrates that the government produced to Andrade all the evidence he requested, including, Abramoff's iPhone, Abramoff's devices, Erickson's handwritten notes, and Erickson's iPhone, and the government did not destroy any requested evidence or collaborate in its destruction.

Andrade also asks the Court to sanction the government for its purported invasion of Andrade's attorney-client privilege by disqualifying all prosecutors and agents "who have been working on the case" and suppressing Andrade's September 13, 2018 statements to law enforcement during execution of the residential search warrant after his requires to call his counsel. Def. Mot., 23. There is no factual support for Andrade's "drastic remedy that extracts a harsh penalty." *Richards v. Jain*, 168 F. Supp.2d 1195, 1200 (W.D. Wash. Oct. 17, 2001); *see also United States v. Alessa*, 561 F.Supp.3d 1042, 1052 (D. Nev. Sep. 17, 2021) (denying request for sanctions where government met with defendants' former bankruptcy attorney). "The attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer," *Rogers,* 751 F.2d at 1077, and Andrade does not present a colorable claim that any prosecutor or case agent had access to privileged information or used it.

### E.    The Court Should Deny the Defendant's Motion Because it was Filed Late

In addition, the Court should deny Andrade's motion because it is late. Andrade's files his

1    motion well after the motions in *limine* deadline, on the eve of trial, and well after discovery issues were

2    litigated in front of Judge Beeler.  Andrade's late-filed motion seeks an evidentiary hearing that likely

3    would cause another trial continuance and further delay.  *Lazarevich*, 147 F.3d at 1065.

4    **V.        CONCLUSION**

5            For all the reasons set forth above, the United States respectfully requests that the Court deny

6    Defendant Andrade's Motion for an Evidentiary Hearing, Dkt. 499, in its entirety without an evidentiary

7    hearing.

8

9    DATED:  January 29, 2025                                    Respectfully submitted,

10                                                                            ISMAIL J. RAMSEY
                                                                                United States Attorney
11

12                                                                                        /s/
                                                                                CHRISTIAAN HIGHSMITH
13                                                                              DAVID J. WARD
                                                                                Assistant United States Attorneys
14
                                                                                MATTHEW CHOU
15                                                                              Special Assistant United States Attorney

16

17

18

19

20

21

22

23

24

25

26

27

28