Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )          NO. CR 20-00249 RS
                               )
ROWLAND MARCUS ANDRADE,        )
                               )
            Defendant.         )
_____)
```

San Francisco, California
Wednesday, January 22, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

ISMAIL J. RAMSEY
United States Attorney
450 Golden Gate Avenue
San Francisco, California  94102
BY:  **CHRISTIAAN HIGHSMITH**
**DAVID WARD**
**MATTHEW CHOU**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

KING AND SPALDING LLP
50 California Street-Suite 3300
San Francisco, California  94111
BY:  **MICHAEL J. SHEPARD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
U.S. District Court - Official Reporter

1    **APPEARANCES:**  (continued)

2    For Defendant:

3                                KING AND SPALDING LLP
                                 1185 6th Avenue - 34th Floor
                                 New York, New York  10036
4                    BY:  **DAINEC STEFAN, ATTORNEY AT LAW**

5                                KING AND SPALDING LLP
                                 1700 Pennsylvania Avenue, NW
6                                Washington, D.C.  20006
                     BY:  **KERRIE C. DENT, ATTORNEY AT LAW**
7
                                 LAW OFFICE OF CINDY A. DIAMOND
8                                58 West Portal Avenue - Suite 350
                                 San Francisco, California  94127
9                    BY:  **CINDY A. DIAMOND, ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
1 | **Wednesday - January 22, 2025**                    **9:33 a.m.**

2 | **P R O C E E D I N G S**

3 | ---o0o---

4 | **THE CLERK:**  All rise.  The Honorable Richard Seeborg

5 | now presiding.  Please be seated.

6 |     Calling 20-CR-249, United States versus Rowland Marcus

7 | Andrade.

8 |     Counsel, please state your appearances.

9 | **MR. HIGHSMITH:**  Good morning, Your Honor, Chris

10 | Highsmith, David Ward and Matthew Chou for the United States.

11 | **THE COURT:**  Good morning.

12 | **MR. SHEPARD:**  Good morning, Your Honor, Michael

13 | Shepard, Cindy Diamond, Dainec Stefan, we are here on behalf of

14 | Rowland Marcus Andrade.  Our colleague Kerrie Dent is in from

15 | Washington, D.C. but back at the hotel with a nasty virus.  And

16 | Mr. Andrade is out of custody and present here in court.

17 | **THE COURT:**  Good morning.  And your colleague who is

18 | under the weather is listening?

19 | **MR. SHEPARD:**  Correct.

20 | **MS. DIAMOND:**  Thank you for that courtesy.

21 | **THE COURT:**  Certainly.  Okay.  You can -- you don't

22 | have to stand up here.  You can sit down.  Let me start with

23 | housekeeping, logistics, whatever we want to call it; and then

24 | I will talk a little about the motions that are pending and get

25 | some input from all of you.

1          Some of this is old news because I know Mr. Shepard and

2    Mr. Ward, you have gone through trials with me before, so you

3    know the general practice; but let's review it again; make sure

4    nobody has any questions.

5          The jury will consist of 12 jurors and 4 alternates.  The

6    alternates are going to be placed in the first pew on the right

7    side, and we have some -- we will have some cushions for them

8    and the monitor -- we will have one of the big monitors so that

9    they can use that.  It's not a perfect situation but we only

10   have 14 seats in the jury box.

11         I then block off the pew right behind the -- where the

12   alternate sits so there aren't people that are looking over

13   their shoulders.

14         What I do at the beginning of jury selection is call

15   forward 36 jurors.  Ms. Lew will have numbers and -- for where

16   they sit, and that will be the focus of our questioning.  We

17   will have questionnaires back -- and to digress a moment on

18   that -- the questionnaires will come in the week before, the

19   10th, the beginning of trial.

20         When I get the questionnaires, I will provide them to the

21   parties.  And then what I would like to do is on Thursday we

22   can have a Zoom discussion.  We can set up -- I'm not sure the

23   precise time on Thursday but -- and it can be just with Counsel

24   is fine with me.  If Mr. Andrade wants to be on, that's also

25   fine.  It's up to him.  But what we will do is we will go

1    through -- and this will just be, again, for hardships.  It is

2    not cause challenges.  It is just to go through the

3    questionnaires.  And if somebody has said, you know, I can't

4    for this reason or that reason, you know, I have a medical

5    thing or a travel thing or something like that, we can discuss

6    whether or not to let some of these people go and not make them

7    show up.

8         Okay.  One of the reasons that I did require both sides to

9    give me the witness list is what I'm going to do is we will

10   have a printed list of all of the names -- I will certainly,

11   you know, tell the jurors not all of these people may be called

12   as witnesses -- but each of the potential jurors will get a

13   list of the names, and I can then ask them whether or not they

14   know any of these people.

15        So, we will do that.  The way I do the challenges --

16   again, Counsel -- some counsel are pretty familiar with this --

17   once we have the 36 people in the box, once we get to the

18   for-cause challenge moment or moments because there will be

19   more than one -- if a juror is excused for cause, I don't move

20   everybody to new seats.  I call the next juror on the list, and

21   that juror replaces a seat that has been vacated.  And then we

22   do a streamlined voir dire of the new people, and we go through

23   as many rounds as we need for that.

24        And I will share with the parties the list so there isn't

25   any, you know, surprise.  You will get the scrambled list of

1    jurors that I have so you know -- you will know who is going to

2    be the next one up.  So, you will get those lists the morning

3    of the jury selection.

4         Okay.  I don't have any special rule about -- when you get

5    the questionnaire responses the week before, I don't have a

6    rule -- some of my colleagues do -- about you can't do this or

7    you can't do that in terms of looking -- doing some searching

8    about some of these folks.

9         If something is publicly available, you know, Googling and

10   that sort of thing, I don't preclude you from doing that.

11   Obviously -- and I think it goes without saying -- you can't do

12   anything more intrusive than that.  You can't friend these

13   people or do anything like that.  Believe it or not, that has

14   happened.  So, if it is publicly available, you can look at

15   whatever you want to look at.

16        I would be careful in the follow-up questions that I will

17   allow you to do.  Jurors -- I think this will be probably

18   consistent with your experience.  Jurors don't like the idea

19   that people have been nosing around in their lives.  So, if you

20   are doing follow-up, don't ask them something about their

21   internet posting or something.

22        Okay.  When we get to the point of for-cause challenge --

23   well, I should step back.  When we call the 36 people up, we

24   all have the questionnaires.  I have the questionnaires.  I go

25   through each of the questionnaires with each of the 36

prospective jurors and I ask them some follow-up questions.

If -- I don't know.  I haven't looked yet if you have provided proposed voir dire questions.  If you have, I will look at those -- I haven't done this yet -- if there's some that I just think are off base and you can't ask the question, I will tell you; but assuming that you don't hear that from me, you can use any of your proposed voir dire questions in your limited follow-up.  And I will, perhaps, take some of those for my own questioning of the jury.

So, I will do the first round of questions of the 36, and then I will afford each side the opportunity to do about a 20-minute follow-up of the questions.

Then we will do the first for cause round at the sidebar. We will replace jurors.  As I say, I will do a further streamlined voir dire with them.  I will have asked some questions -- general questions that I ask the jury -- jurors to raise their hand if they have a problem.  I will remind the new jurors, you know, was there anything that you heard that you wanted me to know.

If past experience is any indication, I'm going to be spending a lot of time on the question about your right not to testify and the question about law -- witnesses associated with law enforcement shouldn't be any -- get more credit or less credit.  You know, those questions, those take a lot of reminder to the jurors.

1    So, we will go through that, we will have the for-cause

2 round.  We will have the new jurors, another round.  We go to

3 the sidebar again as many times as we need.  And then once we

4 have all the for-cause challenges done and we have 36 people in

5 the box, then we do the peremptory challenge back and forth

6 with the list, and I ask the jurors to stay more or less where

7 they are so that you can do your work in terms of your

8 peremptory challenges.  The quicker the better.

9    I will tell the other jurors that they -- you know, they

10 can -- they can take a break if you will; stand around.  I tell

11 the jurors they can stand and stretch and all of that, and then

12 you do the back and forth.

13    The -- remember it's -- on the initial peremptories, it is

14 six for the Government, ten for the Defense.  Then because we

15 have four alternates, each of you get two -- each side gets two

16 additional peremptories for the alternates.  And then, we will

17 have the jury.

18    Before I move on to some other issues, any questions?

19 Yes, Mr. Highsmith.

20    **MR. HIGHSMITH:**  Two questions.  First, we have given

21 the Court ten joint questions for the survey, but we have --

22 neither side has given the Court voir dire questions.  Is

23 the -- the Court wants us to submit those.

24    **THE COURT:**  Yes.

25    **MR. HIGHSMITH:**  That way the Court can approve them,

1   and those are the questions that we can ask during the twenty

2   minutes of our follow-up?

3           **THE COURT:**  Yes.

4           **MR. HIGHSMITH:**  Understood.  May we have a couple of

5   days to submit those questions to the Court, Your Honor?

6           **THE COURT:**  Yes.  I mean, I think under -- there is an

7   automatic schedule that kicks in when the voir dire questions

8   were supposed to come in.  I have forgotten exactly what date

9   but you can tell me when were they supposed --

10          **MR. HIGHSMITH:**  I think we have passed that date.

11          **THE COURT:**  Are you under the assumption that --

12          **MR. HIGHSMITH:**  I was confused.

13          **THE COURT:**  -- you didn't need those because of the

14  questionnaire?

15          **MR. HIGHSMITH:**  Correct.

16          **THE COURT:**  Yes, give it -- give me the list of any

17  questions that you want the green light to use by Friday.

18          **MR. HIGHSMITH:**  Thank you, Your Honor.  Second

19  question on the peremptory strikes.  So, we strike someone

20  here.

21          **THE COURT:**  Yeah.

22          **MR. HIGHSMITH:**  Does that seat get filled right away

23  or do we wait and complete the peremptories and then --

24          **THE COURT:**  Peremptories would not have happened by

25  this point.  We discuss for-cause challenges.  Let's say, for

1    purposes of discussion, there are four people that are in the

2    first 36 that are going to be excused for cause.  We hash that

3    out.  I let the four go.  I call four new ones.  They take the

4    seats.  I do another streamlined round of my questions.  I go

5    over the new questionnaires with them.  We go to the side.  You

6    tell me whether or not -- and you can have a brief follow-up

7    with only the four new ones.  I don't want you to then start

8    off with the ones who have already had the 20-minute thing --

9    then we go to the side and have a discussion about for cause.

10    Let's say we are down to two.  Two go.  Two new come in.  Same

11    drill.  Side.  Same thing.  Makes sense?

12        **MR. HIGHSMITH:**  A hundred percent.  But then when we

13    get to the peremptories and we are striking, are we striking;

14    it gets filled?

15        **THE COURT:**  Nobody is filling anything at that point.

16        **MR. HIGHSMITH:**  Okay.  Understood.

17        **THE COURT:**  The 36 people -- by having 36 that have

18    passed the for-cause, your jury is amongst the 36 --

19        **MR. HIGHSMITH:**  Got it.

20        **THE COURT:**  -- because if you use all of your

21    peremptories, we still -- it is within the 36.

22        **MR. HIGHSMITH:**  Thank you, Your Honor.

23        **THE COURT:**  Okay.

24        **MR. WARD:**  Just briefly, are we going to do this in

25    the ceremonial courtroom?

1      **THE COURT:**  No.  Here.

2      **MR. SHEPARD:**  While we are on peremptory challenges, I

3  seem to remember the Court has a form.

4      **THE COURT:**  Yes.

5      **MR. SHEPARD:**  And it tells us the order in which --

6      **THE COURT:**  Yes.

7      **MR. SHEPARD:**  -- we are going to execute our ten and

8  they are going to execute their ten.

9      **THE COURT:**  Yes.  In fact, I think Ms. Lew can give it

10  to you right now if you want it.

11      **MR. SHEPARD:**  Thank you.

12      **THE COURT:**  You are welcome.  Okay.  Any other jury

13  logistical questions?

14                  (No response.)

15      **THE COURT:**  Okay.  Let's talk about the schedule.  I

16  think you are familiar with that but let me go over it anyway.

17    8:30 to 1:30.  Two breaks along the way.  I try to keep

18  them to 15 minutes.  Sometimes we succeed.  Sometimes we don't.

19  But roughly it will be, you know, a third of the way from

20  8:30 to 1:30.  Another third, I try to do a convenient point to

21  take a break.  You know, I'm not a stickler about this.  If

22  somebody needs a break -- you know, a restroom break or

23  something like that -- and I tell the jurors this too, you

24  know, just tell me and we will take a break.

25      That's Monday through Friday -- oh, on Monday, the 10th,

1    which is jury selection day, I don't -- I'm not going to look

2    to you to do your opening statements on that day.  It will be

3    the next day on Tuesday.  So, Monday it's only jury selection.

4    I'm hoping we can get the jury selected by early afternoon.  I

5    will take a 45-minute lunch break on the first day.  Sometimes

6    it takes a while for us to get started because the jury office

7    is trying to do their work and get the pool down to us.

8          The timing moving forward from that -- and, by the way, I

9    appreciate -- it was a moving target.  We had a -- several of

10    us on this floor have jury trials during that period of time,

11    and the jury office can't really do more than one criminal jury

12    at a time because of the numbers.  So, it was a moving target

13    and we had some in-custody cases that were bumping me off of

14    the 10th; and that's why we went to the 9th -- to the Friday

15    and then we went to the Tuesday.  Those cases resolved.  We are

16    now back on the Monday.  And that's why it was moving around so

17    much.

18          I would like Counsel to plan to be here at 8:00 so that if

19    there are things that we need to deal with, we can deal with

20    them before and not lose time with the jury.

21          One of my colleagues in San Jose has a rule that you can't

22    file a motion in limine or any kind of motion after a certain

23    time.  I think she may have a 48-hour rule or something.  I

24    have always admired that, but I haven't implemented it; but I

25    do just caution you that, you know, if you are -- if it's after

1    5:00 o'clock and you are expecting a ruling before the trial

2    day begins the next day, you may not get it.  I mean, don't do

3    that.

4         We have a lean staff.  You see them right there and me.

5    So, you know, have mercy on us in terms of timing of motions.

6    Okay.  I am hoping this won't be an issue because we will be

7    done by then, but I have to go to the Ninth Circuit Chief

8    Judge's meeting on March 6th and 7th in Pasadena.  So, on the

9    5th, we can go through our trial day -- 8:30 to 1:30 -- because

10   I don't have to fly out until the evening; but if the trial is

11   still going on then, we will have to be dark on Thursday and

12   Friday.  And then on that Monday, we could be up and running;

13   but I have a medical appointment in the early afternoon so we

14   would have to end at noon on that day.

15        Okay.  I do give the jurors -- prospective jurors when

16   they come in, they get a printed schedule and that will show

17   the days that we are in operation.  I was going to run that

18   schedule through -- for them to have through to the 5th of

19   March.  I know it's always -- we can't promise the jury that we

20   will be done; but if we -- in excess of caution do too much

21   time, we lose jurors because then we have problems with their

22   conflicts and things.  So, I'm going to put it to March 5th.

23        What do you think?  And I know Mr. Shepard is going to say

24   well, it depends on the rulings for some of that.  But let's

25   put that aside for a moment.

1          **MR. SHEPARD:**  You took my first line there.

2          **THE COURT:**  Yeah; right.

3          **MR. SHEPARD:**  But apart from that, I had on my list of

4    things to say to the Court today that I am concerned about how

5    much evidence the Government plans to offer.  And, as you can

6    tell from our filings, while one never knows how a trial is

7    going to go and what you are going to do in defense, we have

8    put a lot more effort into building a defense case than is

9    often the case.

10        So, I think it is more likely that we will have some

11   substantial amount of defense case.  And, as I look at the

12   length of the Government's witness list and the length of the

13   Government's exhibit list, now, I think I may actually be

14   presenting some defense as well.  I'm -- I'm skeptical that we

15   will be able to do that all by March the 5th or 6th.

16        **THE COURT:**  Mr. Highsmith.

17        **MR. HIGHSMITH:**  I don't know how to respond to that,

18   Your Honor, other than --

19        **THE COURT:**  Well, what I would like to know is what is

20   your assessment of when the --

21        **MR. HIGHSMITH:**  I mean, my assessment is we will take

22   maximum of three weeks to put on our case.  I think that

23   includes our closings.  So, if they are assuming more than

24   three trial days, then it may bleed over.

25        **THE COURT:**  All right.  Well, then I did -- and there

1    is a Ninth Circuit case that says I can do this and so I took

2    advantage of it -- I did prescreen in the sense of making sure

3    that we don't have jurors that for hardship reasons cannot

4    serve less than -- can't do a trial of more than three weeks.

5        So, I'm hoping that the pool we get, although we will

6    still have some hardship issues that we will talk about before

7    the -- before the 10th when we get the questionnaires, I'm

8    hoping that at least this pool we are going to get will be able

9    to do that much.

10       Going forward then on the calendar, you should know, as I

11   said, the Monday after -- I don't have my calendar here but

12   the --

13              **MR. SHEPARD:**  The 10th I think.

14              **THE COURT:**  The 6th, 7th, 8th, 9th -- the 10th of

15   March is the day that we will go to noon -- the rest of that

16   week I'm here.

17       The following week I'm supposed to speak at a conference

18   in San Diego on, I think, the 18th or 19th.  I forget which day

19   it is.  But, you know, I can maybe do some adjusting of that,

20   but it will take the time it takes.  So, I will be here.  I'm

21   not going to say it cannot go after X time.  I mean, just -- I

22   know everybody wants to put on their full case and I appreciate

23   that; but, you know, the jurors start to fade a little bit

24   after a while so keep that in mind.  We will see how it all

25   shakes out; okay.

 1          Preliminary instructions, I give the Ninth Circuit pattern

 2     preliminary instructions.  My intention is to give 1.1 through

 3     1.11.  1.2 has some bracketed information.  What I'm proposing

 4     to do -- I appreciate the fact that you gave me the neutral

 5     statement to put into the juror questionnaire.  I'm going to

 6     just use that language in 1.2.  I don't -- there's another

 7     bracket in 1.2 that talks about the elements of the offense --

 8     offenses.  I don't think we need that here.  We get closing

 9     instructions.  We will take care of that.

10          So, I will give 1.1 through 1.11.  I don't think 1.12

11     through 1.15 are applicable in this case -- you can tell me if

12     I'm wrong -- and then 1.16, which is about limiting bench

13     conferences.  So, those are the ones that I'm proposing to

14     give.

15          Okay.  And I would obviously give those on Tuesday morning

16     and then we will have opening arguments, and then my intention

17     is for you to go right into witnesses on Tuesday, the

18     Government will.  Okay.  Anything before I talk a bit about the

19     motions?

20               **MR. HIGHSMITH:**  No, Your Honor.

21               **THE COURT:**  Anything, Mr. Shepard?

22               **MR. SHEPARD:**  I don't know if this is something you

23     would want to entertain now or later but sort of the classic

24     question of advance notice of who is going to be called the

25     next day or the next day and the day after, that question.

1    **THE COURT:**  Right.  My default would be at the close

2  of the trial day, whichever party's case it is has to tell the

3  other side the list of witnesses that they intend to call for

4  the next day.

5    If the parties wanted to agree to a different reciprocal

6  arrangement, fine with me.  I mean, it is in both your interest

7  to do whatever is -- you know, particularly in this case where

8  you tell me, Mr. Shepard, there is going to be a Defense case,

9  it is in both of your interest to work out something where you

10  have some idea of who is coming.

11    **MR. SHEPARD:**  Yeah, fair enough.  We will talk about

12  it.  Given the volume of material to go through, it may be

13  helpful to do a little more advance notice than the day before

14  but we will discuss it.

15    **THE COURT:**  Okay.  All right.  With demonstratives,

16  particularly the ones that you are going to use in opening

17  statement, I do want you to -- you don't have to do this way in

18  advance -- but I want you to share them so that we don't

19  have -- I really don't like objections in the middle of opening

20  or closings because they tend to disrupt the flow and all of

21  that.  So, I want you to share those.  And if there is an

22  issue, we can talk about it before.  And hopefully there won't

23  be because most of the time my answer is it's a demonstrative.

24  They can do what they want to do.

25    Okay.  Any -- anything else before I talk about the

1  motions?

2          **MR. HIGHSMITH:**  No, Your Honor.

3          **THE COURT:**  Okay.  I have your briefing on the -- as

4  you know, on these motions.  So, I'm not proposing to have a

5  discussion about every one of them, and I will be giving you

6  orders with respect to these; but let me just touch on a few of

7  them.  I can give you some preliminary idea, and you can tell

8  me if there are particular ones that you want to highlight.

9  Some are more significant than others.

10         Going through the Government's motions first, there is a

11  motion about preclude victim blaming.  You are going to -- like

12  a lot of these motions, it is going to be granting in part and

13  denying in part and some are going to be we await trial to see

14  how it really shakes out.  So, it's a -- it's a -- you know,

15  it's not usually a hundred percent going either way, and this

16  is an example of one.

17         I mean, just to start out, victim's negligence is not a

18  defense, so, you certainly can't argue, you know, caveat

19  emptor; but at the same time the context of this industry --

20  you know, puffery, sort of discussion of that -- could go to

21  materiality.  So, it's -- I'm not going to preclude any

22  reference to what the victims are receiving and the information

23  about that.

24         Defendant's prior statements, this one is pretty clear

25  most of the time.  If the defendant doesn't testify, the

1    defense cannot introduce statements by the defendant.  The

2    Government can under the admission concept, but there are some

3    exceptions where that can come in, so it's not a hundred

4    percent either way but it is pretty clear.

5         The good faith defense, I -- it is not a defense in this

6    case that investors would make money or that the Defendant

7    thought the investors would make money; but at the same time,

8    the Defense can argue that the scheme -- that the plan started

9    out as a legitimate operation and was intended to be that way.

10   Again, kind of a mixed bag.

11        Reciprocal discovery, you know, I have already ruled when

12   the Defendant had to produce the exhibit list and witness list,

13   so I don't think there is anything more to rule on that.  I

14   would deny it without prejudice.

15        Business records, I would grant that.  I didn't really see

16   any objection from the Defense on that, but I understand they

17   reserve the right to object at trial.  And that's fine.

18        Summary charts, I would admit those.

19        This motion, do not require notice for rebuttal experts,

20   I'm not sure I understand that one.  I think we all know what

21   the -- because I did require the Defense to provide the witness

22   list.  I think the Government is in a position to know who

23   their rebuttal experts would be, so I'm not inclined to deny

24   that.

25        Reference to punishment, that one is clear.  You can't do

1  that.

2       Sequestering witnesses except the case agent, that's

3  standard.  Experts -- the exception to that, as we all know, is

4  if an expert is called, the counterpart expert can sit in and

5  listen to that testimony.

6       Let's see, there was something about hearsay exception for

7  non-hearsay, that's -- I'm going to have to see the context of

8  what these issues are.  That one is not something I can rule on

9  now.

10      Coconspirator statements, I'm inclined to think those will

11 be -- I think there is enough shown that those statements would

12 come in.  I don't know if I saw an opposition from the Defense

13 on --

14      **MR. SHEPARD:**  We did file an opposition.  Without

15 arguing it, I think part of it was they didn't offer

16 independent evidence.

17      **THE COURT:**  Okay.

18      **MR. SHEPARD:**  And the other part there was one

19 particular offered coconspirator statement that seemed to me to

20 be quite clear to me not a coconspirator.

21      **THE COURT:**  I will go back and look at that.  I will

22 give you a written ruling on all of these.  They will be short.

23 My general practice on in limine motions is we are kind of at

24 the stage of what you need from me is the ruling and a reason

25 but you don't need the law review article about each of these

1    issues.  So, it is going to be streamlined.

2        Deferred ruling on mental capacity expert, I'm not sure

3    where that stands.  I mean, you are going to have to -- let's

4    go back to that.  I want to know a little bit more about that.

5        And the other important issue is the Abramoff testimony.

6    I think we will -- I will want to talk to you all about that in

7    a moment.

8        Exclude -- the motion by the Government to exclude the

9    crypto expert, I'm inclined to deny that; but I do think the

10    Defense needs to provide some more information about the

11    sources that is -- is it Ms. or Mr. Kanoria?

12        **MR. HIGHSMITH:**  Miss.

13        **THE COURT:**  -- Ms. Kanoria is relying on.  And, again,

14    this is kind of contemplated in some of the other motions, the

15    one aspect of defense I wouldn't allow the Defense to go to is,

16    well, everybody does it defense.  That's not a defense.  And

17    so, to the extent that's suggested in some of this, that

18    wouldn't be an appropriate area.

19        Again, I think with respect to the accounting expert for

20    the Defense, I need some more information than has been

21    provided thus far beyond just this expert might testify.  So, I

22    will be looking for the Defense to do that.

23        Exclude the expert -- tech expert, I'm inclined to deny

24    the Government's motion.  Again, you may see from me I want

25    some more source information from the Defense.  Okay.

1          Let me stop on the Government's motions before I go to the

2    Defense motions.  And in particular I want to talk about -- and

3    then I will let you talk about if there are other ones on this

4    list you want to have further discussion.  Let's talk about the

5    mental capacity expert and the Abramoff testimony, so whoever

6    wants to come up and talk to me about those.

7                    (Pause in the proceedings.)

8            THE COURT:  Okay.  Mr. Highsmith.

9            MR. HIGHSMITH:  Okay.  So, we -- the logistics of this

10   are important -- a very important piece of it.  We wanted to

11   give the Defense the benefit of the doubt and hire our own

12   expert to review the testing data and also the expert

13   statements.  We weren't in a position to say, no, your

14   information is not reliable; it is not relevant before having

15   our expert look at that.

16         Our expert was able to interview Mr. Andrade yesterday, so

17   we have some preliminary findings that I think are relevant.

18   Our rebuttal expert believes that you cannot make an autism

19   diagnosis based on the records that their expert reviewed.  The

20   autism diagnosis is important for some of the conclusory

21   statements that Dr. Armstrong makes about mental capacity.

22           THE COURT:  Let me stop you there.  Why isn't that

23   just as you describe, a battle of experts?  I mean, what I'm

24   unclear on this motion is -- well, either you bring a Daubert

25   motion or you don't.  And so, this idea of, well, let's wait

1    and see, I'm not sure I understand that.  And from just what

2    you have described, it's not a Daubert situation.  It's

3    witnesses that are disagreeing on whether or not they can make

4    a diagnosis based on what they looked at or whatever.  So, why

5    is it -- this motion is, you know, a deferred ruling.  I don't

6    know what that's all about.

7          **MR. HIGHSMITH:**  So, we now have more information.

8    Our -- our view is that opinions in their expert disclosure are

9    not reliable.

10         **THE COURT:**  Then you should bring a Daubert motion.

11         **MR. HIGHSMITH:**  Agreed.  This is where it ties to the

12   logistics.  We needed our expert to have time to review their

13   findings and to conduct their interview before we could bring

14   our Daubert motion.  We worked closely -- they did not

15   oppose -- you know, so this is why we discussed the timeline.

16   They made their -- their expert interviews the Defendant on

17   July 24th, 2024.  They disclose on November 15th, one sentence.

18   Okay, that's fine.

19        I say, Hey, we need to conduct an independent examination.

20   You know, so they agree -- eventually they agree and we work

21   together.  We do a good job of working together.  The first

22   examination we can do is yesterday so that Mr. Andrade doesn't

23   have to travel for a separate examination alone.  I think we

24   actually -- on this one example we did a good job of working

25   together.

1    We would like more time, now that we have had the

2    examination, to file a Daubert motion to say some of these

3    opinions are not reliable and they are not relevant because we

4    now have the benefit of that examination.  So, that's what we

5    are asking for, Your Honor.

6         **THE COURT:**  Mr. Shepard.

7         **MR. SHEPARD:**  Well, that isn't the way the court order

8    works and that isn't the way the rule works unfortunately and

9    with good reason because they had the information they needed

10   from Dr. Armstrong, our expert, and they had it exactly in

11   accord with the Court's orders.

12   Every request we got from them we promptly responded and

13   gave them what they asked.  And I heard Mr. Highsmith say,

14   Well, we need to have our expert examine him first before

15   responding; but his argument is that our expert could not have

16   made that diagnosis from the tests that he ran.  They had the

17   test in advance.  They had their expert retained in advance.

18   That's an objection -- we don't obviously agree with it but

19   that's an objection -- there is no reason why that objection

20   could not have been made on the day the Court set for their

21   Daubert and 702 objections.

22        **THE COURT:**  I have to say I agree with that.  I also

23   don't think you have a Daubert problem.  I mean, I won't

24   prejudge this but it seems to me this is just cross-examination

25   of their expert.  This is not, they are using some methodology

1  that's not peer reviewed or they don't have the credentials or

2  it's not one of those issues.  So, just from the way you have

3  described what you think the flaw is, that's cross-examination.

4  That's not a Daubert issue as far as I can glean.

5          **MR. HIGHSMITH:**  I hear where the Court is coming from.

6  I think the question is whether the opinions are useful to the

7  jury, and the problem is that the opinions are not useful to

8  the jury because they are not reliable.  They are a step too

9  far, and we could only evaluate that by having our rebuttal

10  expert --

11          **THE COURT:**  I mean, I'm not going to preclude you from

12  filing some motion; but I'm also not going to preclude

13  Mr. Shepard from taking the position that in addition to its

14  other deficiencies, it's too late and -- what he has just

15  articulated.  So, if there's something -- right now this

16  witness of the Defense is not precluded from testifying.  If

17  you want to file something that tells me they shouldn't be

18  testifying, my advice to you is file it sooner rather than

19  later and then I will consider it; but your operating principle

20  at the moment should be that the witness is going to testify if

21  the Defense wants to call the witness.

22      Okay.  Mr. Abramoff's situation, that's one now where I'm

23  getting from the Defense, give us a little more time; we want

24  the medical records.  Understandable.  This could culminate in

25  a situation where people need to be in Washington, so I'm, you

1    know, attune to the time issues here.

2        Do you know where this currently stands, this question?

3            **MR. HIGHSMITH:**  The question of the medical records?

4            **THE COURT:**  No.  Well, just the question of

5    procedure -- how we move forward with Mr. Abramoff.

6            **MR. HIGHSMITH:**  Okay.  It's difficult because of his

7    treatment cycles, and we are recommending that we do a

8    videotaped deposition the week before trial.  They are

9    recommending we wait and try to do live video testimony during

10   trial.

11       I think here is what is controlling for me -- the one

12   thing we both agree on is we would be grateful for the Court to

13   be involved in real-time because that makes the entire process

14   more efficient -- and so, I'm guided by the Court's --

15           **THE COURT:**  You are not talking about my going to

16   Washington?

17           **MR. HIGHSMITH:**  No, Your Honor.  Here are the options:

18   The options are:  Number one, there is a videotaped deposition.

19   They will not agree to a remote deposition, so the attorneys,

20   Mr. Andrade, if he wants, go to Washington.  Everybody wears a

21   mask.  They are in a big conference room, and the Court Zooms

22   in so that the Court can rule on real-time objections.

23           **THE COURT:**  Okay.

24           **MR. HIGHSMITH:**  That's option one.  Option two is what

25   the Defense proposed where during trial we have a TV screen and

1    Abramoff is in real-time in Washington, D.C. in a conference

2    room and some subset of attorneys are in Washington, D.C.

3    during trial -- I don't know where the Defendant is at that

4    point.  That's the difficulty I think -- but those are the two

5    options.

6        In advocating I'm guided by when is the Court available

7    because if the -- what would the Court like because if the

8    Court is saying it is not going to be available in real-time in

9    the deposition, we lose the ability of the Court to rule on

10   objections.  We have to then come back to the Court later and

11   ask the Court to review the video and the deposition

12   transcripts that the Court can then rule on objections, and

13   then we cut out that segment of the videotape; and the editing

14   process takes a long time.  And it just seems inefficient.

15       So, that's why I'm kind of deferring to the Court and the

16   Court's availability.

17           **THE COURT:**  How long will this deposition be?

18           **MR. HIGHSMITH:**  Okay.  So, we are guided by a couple

19   of issues.  One is Mr. Abramoff's health, so it is sort of, we

20   don't really know because he is in the middle of a four cycle

21   treatment program.

22       And so, so I don't know how his health will be at

23   different times.  So, that may manifest itself needing to cut

24   short or requesting to cut short a deposition.  I'm estimating

25   two trial days.  If I was going to have Abramoff here at trial,

```
1    8:30 to 1:30, I would estimate a day to a day and a half of

2    Government direct going through exhibits and then the cross

3    could take a long time.

4          THE COURT:  I mean, that's an enormous time

5    commitment.  I don't have the time to spend three days or two

6    days in a deposition or -- I just can't do that.  So, that's

7    not a very good option if you expect me to be involved in that

8    sense.  I mean, I have other calendars going on before and

9    after that.  Mr. Shepard, let me hear from you on this thing.

10         MR. SHEPARD:  Well, on many of these topics

11   Mr. Highsmith and I are on the same page in terms of the

12   Court's involvement.  That's one of the reasons why it seemed

13   to me the most efficient way to have the Court's involvement

14   would be to have Mr. Abramoff testify during the trial when the

15   Court would already otherwise be involved.

16       And I think there is, of course, a third possibility,

17   which we are holding out some hope for -- although I'm not a

18   doctor -- and that is that his condition shifts or we have

19   different medical opinions and he can actually come out here

20   which obviously --

21         THE COURT:  Well, that would be the best but it

22   doesn't sound like --

23         MR. SHEPARD:  It seems like it is probably unlikely,

24   but we haven't seen his actual medical records.

25         THE COURT:  All right.  I mean, I will tell you -- you
```

1    know, I'm not a doctor -- if he is -- if responsible physicians

2    are saying it will put him at great -- you know at risk, I'm

3    not going to make somebody come here.  Have you talked with --

4    I don't -- I haven't talked with Ms. Lew or our IT people.  Are

5    we in the position to do it in real-time?

6         **MR. HIGHSMITH:**  I have not talked to the Court's IT

7    staff.  I have not talked to Ms. Lew about the Court's ability

8    to do it in real-time.  Obviously, it gives me pause.  So, we

9    would have to look at that option, Your Honor.

10        I mean, so the other option is to do the deposition

11   without the Court's involvement; for us to get the transcript

12   and the video; for us to probably show -- whatever the Court

13   prefers but -- you know, the transcript, the video or both --

14   and for the Court to rule on objections and then for the

15   Government to cut and edit.

16        **THE COURT:**  Right.  I mean, that's the usual way we

17   have done video depositions or video testimony but --

18        **MR. SHEPARD:**  If I may, my perspective on that is

19   obviously he is an incredibly central witness to the case.

20        **THE COURT:**  Understood.

21        **MR. SHEPARD:**  And so, our right to cross-examine him

22   is really important.  And the problem with cross-examining

23   somebody -- there are several problems with cross-examining

24   somebody in a deposition context.  One is that the Court isn't

25   there to say "answer the question," you know, "stop messing

around."  And the other is that if there is an objection, it is
not ruled on obviously at the time.  The Court might sustain it
later.  And so, it's a little hard to deal with that in
real-time.  One can try to say, okay, if that objection were
sustained, how would I do it differently; but without the
Court's guidance in real-time as to why the Court is sustaining
the objection, it's -- you can't always be right in terms of
how you adapt to the objection and that can undermine the
effectiveness of the cross-examination, which I'm reluctant to
see for such a central witness.

          **THE COURT:**  So, in terms of the next step, where -- we
are now awaiting further medical information.  Is that where we
are?

          **MR. HIGHSMITH:**  I think that's -- I think that's a red
herring, Your Honor.  With all due respect, I don't think
that's going to give us any more information.  I think, yes, we
are waiting for it.  It's in the mail.  John Hopkins told us
yesterday or the day before, the 20th, that it's in the mail.
I don't think that's going to move the needle in either
direction.  I will proffer to the Court, I don't think --
Mr. Abramoff's treating oncologist is a professor at the John
Hopkins Medical School.

          **THE COURT:**  I'm not going to second-guess the --

          **MR. HIGHSMITH:**  She said don't travel for a year.  He
is in a four-cycle treatment program.  So, I don't think the

medical records are going to move the needle.  I think it is a

logistical question about whether the Court can handle a

real-time during trial hybrid deposition scenario or not.

**THE COURT:**  What I would like to know more -- and I

haven't looked at these medical records, but let's assume for a

moment that we do a real-time examination with Mr. Abramoff in

Washington and I guess Counsel -- some Counsel in Washington

and here, what is the state of his condition?  Are we going to

be taking breaks, you know, every 15 minutes?  I want to know

what the flow will be.  I understand he may have more -- you

may have to have more starts and stops because of his

situation.  There's also a time difference issue.  So, probably

wouldn't be too much of a problem because it is 8:30 to 1:30;

Washington three hours later, probably okay.  He may need

breaks more than the average witness.  I will need to know

that.  I have to tell you, I haven't resolved this, but I'm

inclined to think -- although it has prospect for problems --

to do more of the real-time in the court.

**MR. HIGHSMITH:**  Oh, Mr. Chou makes a great point.  The

Defendant needs to commit that he is waiving his confrontation

right.  So, where is the Defendant going to be sitting during

this?  The Defendant under the rule -- under Rule 12.2 --

**THE COURT:**  Well, I'm assuming I can get this from

Mr. Shepard because his proposal is that we do this in

real-time.  So, we can get the waiver.

1          **MR. HIGHSMITH:**  Thank you.

2          **THE COURT:**  That's not an issue.

3          **MR. SHEPARD:**  I expect Mr. Andrade will be in D.C.

4    with the -- probably me and some other member of my team.

5          **THE COURT:**  Then he needs to get back fast.

6          **MR. SHEPARD:**  Yes, so would I.

7          **THE COURT:**  Well, you have colleagues who can -- I

8    know you are the one but there are colleagues, but we would

9    need him back here or you can waive his -- you know, it's up to

10   you, but you can't throw a wrench in it.  I'm not suggesting

11   you would.

12         **MR. SHEPARD:**  We will work it out.

13         **THE COURT:**  Yeah, we will get whatever -- it is their

14   proposal to do it this way, so I don't think they are going to

15   then take the position that now we are going to make it hard to

16   do because of this issue.  So, it can be worked out.

17         **MR. HIGHSMITH:**  Okay.

18         **THE COURT:**  The prospect of several days of deposition

19   with me sitting here and -- that doesn't work well and I'm not

20   inclined in that direction.

21         **MR. HIGHSMITH:**  Understood, Your Honor.

22         **THE COURT:**  Now, the deposition is -- I'm not

23   absolutely saying no but I think if it was -- if it was a

24   witness of lesser consequence to this case, I think that might

25   be a more attractive option; but the one thing I think everyone

1    does agree on is that Mr. Abramoff is important in this case.

2        So, I'm inclined to think -- and Ms. Lew sent me a note

3    saying we can do it and it has been done this way before -- I

4    don't think with witnesses that have these health issues -- but

5    let's assume as we go forward with this, that it is going to be

6    by real-time video.

7            **MR. HIGHSMITH:**  Understood.  I think that that makes

8    some sense, Your Honor.

9            **THE COURT:**  All right.  Let me talk about some of the

10   Defense motions.

11       The first one is the prior bad acts 404(b).  That came in

12   early.  I spent some time on that.  I think with respect to the

13   BioGreen venture, I would agree with the Defense.  I think

14   that's too attenuated and too disconnected.  And so, I would

15   agree with preclude that.

16       With respect to Atencoin, I think it is a different

17   proposition.  It is, I think, inextricably intertwined with the

18   AML Bitcoin situation on several different 404(b) grounds.  So,

19   I would be inclined to deny the motion with respect to the

20   Atencoin but grant the motion with respect to BioGreen.

21       Witness and exhibit lists, we have already dealt with

22   that.

23       Excluding certain testimony, I would grant -- and the

24   Government doesn't oppose -- with respect to the mention of sex

25   crimes, I would grant the Defense motion on that.  I would deny

1    it as to the agent because the Government said he would not

2    testify to the specific elements.

3         I think this -- I think this is similar to, just as a

4    general matter, I'm expecting that the Government witnesses are

5    not going to get close to usurping the jury's role in the sense

6    they are not going to say, "I think this constitutes, you know,

7    a wire fraud violation" or "this is indicative of -- "I think

8    this shows that there was money laundering" or whatever.

9         What the Government witnesses can testify to is the facts.

10   You know, okay, this was not disclosed or this was hidden or

11   what have you.  It is for the jury to decide whether or not the

12   elements of the charge are met or not.

13        The Super Bowl argument, I would deny the Defense mention.

14   I think the Super Bowl misrepresentation does go to the nature

15   of the bargaining and I think it is material, the Super Bowl

16   issue.

17        Excluding the victim testimony, I would deny that.  I

18   think, while it is not required for conviction, it can still be

19   relevant in proving up the charges.

20        Evidence with respect -- argument with respect to

21   misrepresentation to non-purchasers, I'm just going to have to

22   see that as it shakes out and determine whether or not

23   something is relevant or not.  I'm not sure I can really rule

24   on that in advance.

25        Failure to file tax returns, I'm not sure on that one.

1   I'm going to go back and look at that a little bit further.

2        Exclude evidence and argument about civil litigation, I

3   mean, I think some of that would kind of go to Defendant's

4   interactions with investors.  So, again, I think that one I'm

5   kind of inclined to think it's going to come in, but I'm going

6   to look at that a little more particularly.  So, I will --

7   meaning, you are going to get an order but I don't have one

8   today.

9        The pump and dump behavior as part of the crypto fraud

10  scheme, that does seem to me to be relevant and material.  And

11  so, I would deny that motion.

12       And then the final one didn't have any opposition from the

13  Government.  It was excluding argument and evidence about self

14  diagnosis of -- who is that?

15            MR. HIGHSMITH:  Ms. Foteh.

16            THE COURT:  And you didn't oppose that so --

17            MR. HIGHSMITH:  I mean, we are not going to ask her --

18  we are not going to elicit a self diagnosis of PTSD,

19  Your Honor, no.

20            THE COURT:  All right.  Okay.  Anybody want to tell me

21  anything about the Defense motions beyond what we have kind of

22  gone through?

23            MR. WARD:  Thank you.  Just a couple of

24  clarifications.  On Mr. Carfora's testimony, the Court was

25  inclined to deny the Defense motion but cautions the Government

1    that the experts cannot say that the Defendant testified to the

2    meets an element of a crime.  But in that the case law has

3    allowed for an expert to say this sort of activity is

4    indicative of facts that could support an inference of money

5    laundering.  So, this sort of activity, the financial movement

6    of money that I see is indicative --

7            THE COURT:  Yes.

8        MR. WARD:  -- or money laundering -- excuse me -- is

9    indicative of concealment.

10           THE COURT:  Yes.

11       MR. WARD:  And so, we were pretty specific in our

12   motion about the line we would draw there, and I just want to

13   make sure --

14           THE COURT:  Right.  What the witness cannot say is:

15   "In my opinion this shows there was money laundering."  That's

16   the sort of thing that the witness can't say, but the witness

17   can say, "This conduct is indicative in my experience of

18   someone trying to conceal something or something like that."

19       It's -- I mean, I think it's pretty clear when you are

20   actually in the question and answer format.  The witness cannot

21   say, "You, jurors, should decide it this way.  I think the

22   Defendant is guilty of this conduct."

23       They can't do that, but they can assess the evidence and

24   say what the evidence -- the way you described it I don't have

25   a problem with it.

1          **MR. WARD:**  Understood.  Thank you, Your Honor.

2          **MR. SHEPARD:**  Go ahead.

3          **MR. WARD:**  I was going to shift to the 404(b)

4     argument.

5          **THE COURT:**  With respect to the --

6          **MR. WARD:**  The 404(b).

7          **THE COURT:**  The Biogen thing.

8          **MR. WARD:**  Well, the Biogen I understand the Court's

9     position.  Obviously, we --

10         **THE COURT:**  Otherwise, I'm inclined to go with you on

11    that.

12         **MR. WARD:**  Then I will rest on my laurels.  Thank you,

13    Your Honor.

14                    (Laughter)

15         **MR. SHEPARD:**  All right.

16         **THE COURT:**  Okay.  Mr. Shepard.

17         **MR. SHEPARD:**  Just a couple of things, Your Honor.

18    First of all, the easy part, as to Ms. Foteh, the Government

19    said, yeah, they won't offer herself diagnosed PTSD; but then

20    they went on to say but she is going to testify about things

21    like Mr. Andrade's management style.  And I -- you know, we

22    could spend all day on different people's management styles,

23    but it doesn't really go to an element of the defense.  So, I

24    expect -- she is going to be, I expect, quite a character.  She

25    thinks the FBI has been stalking her among other things.

1          **THE COURT:**  It won't be the first time we had a

2   character testifying in this place.

3          **MR. SHEPARD:**  But she tends to have very strong

4   opinions and --

5          **THE COURT:**  Okay.  Well, why don't you tell me your

6   view of that and then I -- that reminds me to tell both sides

7   something.  Go ahead.

8          **MR. WARD:**  So, I think, Your Honor, Mr. Shepard is

9   right.  Ms. Foteh might tend to be a problematic witness.  She

10  can't like any --

11         **THE COURT:**  On that note just while we are on it

12  before you go to the other issues, you will be -- you are the

13  party calling that witness.  I expect you to explain to the

14  witness, for example, if she wants to do a rant against some

15  unconnected thing that she thinks the FBI is doing or whatever

16  else, that -- don't go there.  So, you are responsible for

17  that.  I know you can't promise me that a witness that is not a

18  Government witness is not going to go off the rails.  I

19  understand that.  But I do expect you to explain to your

20  witness this is what's going to happen here and certain things

21  are not -- it's not for today to have these discussions.

22         **MR. WARD:**  Absolutely, Your Honor.

23         **THE COURT:**  Okay.

24         **MR. WARD:**  And we will do that.

25         **THE COURT:**  Good.

1          **MR. WARD:**  To the question Mr. Shepard raises about

2    Mr. Andrade's management style, I think that goes to how he ran

3    his office, how legitimate his business was.

4          **THE COURT:**  What's the relevance of management style

5    and the legitimacy of the business.

6          **MR. WARD:**  Well, the question would be whether there

7    was a legitimate business that was legitimately working to

8    develop this cryptocurrency and evidence that there weren't --

9          **THE COURT:**  All right.  But if he -- if a witness

10   says, "My manager was a real jerk and, you know, tormented me

11   and did all of these other things," I don't think that has much

12   relevance to the issues that we are going to be litigating.

13         **MR. WARD:**  I agree and that's not where the Government

14   is going to go.  We will not allow Ms. Foteh to rant about

15   whether she likes or didn't like him, but to the extent he was

16   running a legitimate office, how many people did they have?

17   How often were they there?  Were they paid?  Things like that

18   that go to the legitimacy, that's what we would focus on.

19         **THE COURT:**  That sounds more relevant.  And, you know,

20   if he instructed the staff to hide documents or whatever,

21   that's fine but -- okay.  All right.  Yes.

22         **MR. SHEPARD:**  One brief point.  Obviously if he

23   instructed the staff to hide documents, understood.  Were they

24   paid, you know, that seems much more --

25         **THE COURT:**  It goes to the overall legitimacy of the

1   operation.

2        **MR. SHEPARD:**  I don't think there is going to be any

3   question that the operation did not have money at various

4   times.

5        **THE COURT:**  Well, in cross-examination you can ask

6   that precise question and say, you know, the fact that somebody

7   doesn't get paid, that doesn't mean there is -- I mean, some of

8   that can be dealt with on cross.  But, okay, I will listen.  I

9   mean, if it's -- yeah, okay.

10        **MR. SHEPARD:**  It just has an inherent prejudicial

11   value but I think the Court understands the issue.

12        **THE COURT:**  Okay.

13        **MR. SHEPARD:**  I don't need to say anything more about

14   it.  I did -- there was one other issue.  I don't know if you

15   were done but --

16        **MR. WARD:**  I'm done, yeah.  Go ahead.

17        **MR. SHEPARD:**  I had one other issue that I wanted to

18   address and that is to go back to the 404(b) ruling on

19   Atencoin.  I understand the Court thinks they are inextricably

20   intertwined and I -- we obviously disagree with that, but I

21   don't see the point in re-arguing it for the Court.  I'm sure

22   the Court has considered it.

23        What I would like to focus the Court on is what the

24   Government said was inextricably intertwined about it was that

25   some of the investors had previously invested and that they

were invited -- they were given the opportunity to roll their investment over into AML Bitcoin, and I can understand -- I don't think it's required but I can understand why the Government would want to offer that part of the story.

What I -- where I think they are on a bridge that has no support is in order to do that, why do you have to prove that Atencoin was a fraud? Because then you are not just telling the story, you are dumping a whole lot of prejudicial information. You are -- we are essentially going to have a second fraud in the case. I mean, there is a whole lot of expert testimony relating to Atencoin and whether it was or was not a fraud that I think we will have to complete and --

THE COURT: Well, you were -- you were talking about inextricably intertwined. There is also the argument that it is indicative of modus operandi and the other 404. Your argument goes to the inextricably intertwined aspect, but my understanding is that the Government is also saying that there is some aspects of the Atencoin operation that go to modus operandi.

MR. SHEPARD: Understood, Your Honor. So, really my argument at bottom is a 403 argument. I'm going to -- I will talk about the 404(b) aspects as well, but the 403 argument is where it sort of cuts across both. It's really what you need to tell the story is a couple of facts that are not Atencoin was a fraud, and the result of telling those couple of facts is

1    we are going to spend days about whether Atencoin was a fraud

2    is just -- it's dumping in a whole bunch of additional

3    prejudice.  And so, let me get to the:  Is there a basis for

4    all that additional prejudice under 404(b)?

5         And I think the answer to that is clearly no.  The

6    Government throws around the word "modus operandi," but the

7    Ninth Circuit is very clear about how unique it has to be to

8    qualify as modus operandi; and there is nothing unique about

9    the Government's accusations about both Atencoin and AML

10   Bitcoin.  It is the sort of cryptocurrency puffery.  Yeah, you

11   said you had it.  Maybe you didn't.  You said you were going to

12   be a big success.  You didn't.

13        Many of the other aspects of claimed similarities are not,

14   in fact, similar.  So, modus operandi I don't think flies at

15   all; just there is nothing unique about it.

16        As to the litany of:  Oh, well, that term is in the

17   rule -- in Rule 404(b) so we are going to say we are offering

18   it, I think the Ninth Circuit, like many other circuits, have

19   become a little more enlightened about that; and they say, give

20   me a propensity free inference.  Don't just tell me this is

21   intent or motive or whatever.  Give me a propensity free

22   inference.  We have been making that argument from the

23   beginning.  The Government has never offered propensity free

24   inferences from any of the 404(b) terms that they offer to

25   justify the evidence.

1        And given its prejudicial value and the amount of time we

2   are going to end up spending on it, I think that's a telling

3   and fatal omission.

4        **THE COURT:**  Now you can talk about it.

5        **MR. WARD:**  Starting with the inextricably intertwined

6   argument, the requirement is that is it part of the same

7   transaction or set of transactions or is it necessary to offer

8   a coherent story.  And clearly it's both here.

9        There were investors who bought Atencoin who had their

10  Atencoins converted into AML Bitcoin.  To tell the story of how

11  they got AML Bitcoin, how they were pitched AML Bitcoin, you

12  need to include the story of Atencoin.  I don't know how you

13  disentangle it.  You can't do it.

14       And then to the same point of offering a coherent story,

15  the story is -- by the Defendant's own words, by the marketing

16  that AML Bitcoin was simply a rebranding, a relaunching, a

17  remarketing of Atencoin.  It is all part of the same story.

18       **THE COURT:**  Mr. Shepard was asking why the evidence

19  has to go towards whether Atencoin was a fraud as opposed to,

20  okay, you mentioned a Atencoin because of the fact that, you

21  know, there was a rollover and all of that stuff, why do you

22  need to attempt to demonstrate that it was a fraud?

23       **MR. WARD:**  Well, I don't think that -- obviously we

24  would not ask our witnesses was this a fraud or not; but I

25  think what's important -- and this gets to the modus operandi

1  piece -- is the way Atencoin was marketed, the representations

2  that were made, the similarities, the fact that the investors

3  were not able to recover their money, that they were rolled

4  into AML Bitcoin, all of those were facts that are inextricably

5  intertwined and go to modus operandi.

6      So, that's where the Government wants to go.  It would be

7  for the jury to conclude ultimately whether this is evidence

8  that AML Bitcoin was a fraud.  We are not going to have our

9  witnesses assert it's a fraud.  We will say the facts

10  demonstrate that this was the same modus operandi that he was

11  using in the AML Bitcoin, which we do allege was a fraud.

12      **THE COURT:**  Okay.  I'm not -- by the way, I'm not

13  going to give you a ruling today because I do want to go back

14  and look at it and work through it again.  It will be in the

15  written order.  But back to you, Mr. Shepard.

16      **MR. SHEPARD:**  Thank you, Your Honor.  I mean,

17  investors not able to recover money, yeah, there is nothing

18  unique about that.  That's just another way of saying this is a

19  fraud case and we want to prove up another fraud.

20      And for inextricably intertwined, the Ninth Circuit says

21  single criminal transaction; but -- I think I have argued

22  inextricably intertwined enough for the Court.  I do think it

23  is really important, there is no propensity free inference that

24  justifies this under 404(b) --

25      **THE COURT:**  I will go back.  I'm sure it is in your

1  brief but --

2         **MR. SHEPARD:**  *Charley*.

3         **THE COURT:**  Which case is it?

4         **MR. SHEPARD:**  *United States versus Charley*.  It is in

5  our brief.  It is like 4 F.2d --

6         **THE COURT:**  Okay, I will find it.

7         **MR. SHEPARD:**  There's a Seventh Circuit case in *United*

8  *States versus Gomez*, I believe.  That was sort of a leading

9  edge of this re-thinking of 404(b) and *Charley*, the Ninth

10  Circuit picks it up.

11         **THE COURT:**  Okay.  All right.  Going back for a

12  minute, as I'm sitting here and thinking about it, going back

13  to Mr. Abramoff's situation, I would encourage the parties to

14  talk about a joint instruction or something before he testifies

15  to the jury just to tell the jury what the situation is.  I

16  mean, I don't -- I mean, you know, Defense may not want to talk

17  all about his medical situation and everything else; but I

18  think the jury is going to be, why are we doing this this way.

19      So, be thinking about the lead-in to tell the jury, okay,

20  we are now going to be hearing a witness who is going to be

21  providing testimony, video; and it is going to be in real-time,

22  maybe a little bit -- bear with us.  There may be some

23  technical issues that may make it cumbersome or whatever it is.

24  They are going to want to know why it is being done.  It may be

25  obvious if -- I haven't seen Mr. Abramoff but, you know, what

1    I'm saying.  It is going to be different than anything else in

2    the trial.  They will want to know why it is being done that

3    way.  So, work together on something for me to tell them.

4    Okay.  All right.

5              MR. WARD:  Your Honor, I'm sorry to interrupt.  Can we

6    be heard on two of the Defendant's proposed experts, the

7    accounting expert, Ms. Johnson, and --

8              THE COURT:  Go ahead.

9              MR. WARD:  As to Ms. Johnson, we don't have anything.

10   We have no opinion.  We have no even assurance from the Defense

11   that they even intend to call her as an expert.  They float the

12   idea that perhaps she will be a rebuttal expert; perhaps she

13   will be a summary witness.  The Court had indicated that the

14   Government needs more information --

15             THE COURT:  Right.

16             MR. WARD:  -- than has been provided, and the deadline

17   for Rule 16 disclosures was the deadline for Rule 16

18   disclosures.  We would like to know her opinion, and I think we

19   are entitled to --

20             THE COURT:  Well, I'm going to ask -- I'm going to

21   direct the Defense to provide some more -- one of them was

22   source information.  I mean, I hear you and I'm -- I will

23   require some further disclosure by the Defense.

24             MR. SHEPARD:  Obviously we will disclose what the

25   Court wants us to disclose.  Let me just illustrate the reason

why we haven't and -- so I can make sure to do what the Court
would want us to do.

The Government's expert, Ms. Chiu, gave us a report.  It's
basically taking money coming in and out from various business
accounts and adding it all up; and then, you know, it has some
government -- what I would call Government argumentative charts
that come out of that.  Fine.

The problem for us is that the way we read it, there is no
expert testimony in that.  It's just summary testimony.  It's
adding up numbers.  There is the potential for expert testimony
underneath that, which is if there are things that are not easy
to classify, does this qualify as a marketing expense?  Was
this a personal expense, whatever?  That's where there is
forensic accounting expertise.

The problem for us is there might be one footnote or
something in Ms. Chiu's report but basically there is no
expert -- essentially no expert opinion in Ms. Chiu's report.
So, we have Ms. Johnson, who is doing a lot of the same work as
Ms. Chiu -- and I will get to a related point on that in a
moment -- and she is doing her own, what we consider to be,
summary testimony.  And we could have just said she is doing
her own summary testimony.  She's not necessarily an expert.
But she is doing her own summary testimony.

But it may be that if Ms. Chiu at some point identified,
well, this was a judgment call; I put this expense into this

1  bucket and I put this expense into that bucket, that actually

2  has some expertise.  Maybe Ms. Johnson will agree with those

3  classifications.  Maybe she would not.  And that would be

4  expert testimony, which we would see an obligation to disclose;

5  but at this point all we have is essentially summary testimony

6  from Ms. Chiu.  You know, we are working on our own summary

7  testimony.

8       One of the reasons we are not done -- I guess there are

9  two really.  One is we had tried to limit the accounts that

10 Ms. Johnson looked at for cost reasons, and that proved not to

11 be workable when we got Ms. Chiu's report and she was unlimited

12 by the cost -- CJA cost reasons that we were trying to abide

13 by.  So, that was the first reason.

14      And the second reason is we got on Friday 4.8 gigabytes of

15 additional financial information from the Government -- that's

16 hundreds of thousands of pages -- and we have asked Ms. Johnson

17 please take a look at that as quickly as you can and let us

18 know is this -- have you seen anything like this before?  Is

19 this new?  Is it overlapping?  You know, what is it?  And we

20 are still awaiting that answer because unfortunately in the

21 great ways of paying for your expert by CJA, they ran out of

22 funds over the weekend, I gather, but before -- and so, we

23 are -- as the Court is probably aware, we are addressing --

24      **THE COURT:**  I did --

25      **MR. SHEPARD:**  I appreciate the Court's quick response

1    on those kind of things but that's why I don't have the answer

2    today.

3         THE COURT:  Why was this information so late in the

4    game?

5         MR. WARD:  It was a cache of documents that came from

6    the IRS that hadn't been produced.  None of the documents that

7    were produced were relied on by our expert or will be used in

8    the Government's case in chief.  It was just in a sweep through

9    of documents we did find a cache of old IRS documents that out

10   of an abundance of caution we should have produced.  So, none

11   of them relate to Ms. Chiu's testimony or --

12        THE COURT:  I'm still unclear why they weren't

13   produced before.

14        MR. WARD:  It was an oversight on the part of the

15   Government.  As we were sweeping through what is a large amount

16   of evidence in this case, I think we looked at that and out of

17   an abundance --

18        THE COURT:  You are not using any of it?

19        MR. WARD:  We are not using any of it.

20        THE COURT:  Okay.  So, on this issue of the nature of

21   the work that your expert is doing and what Mr. Shepard just

22   addressed, what's your read on this?

23        MR. WARD:  We noticed Ms. Chiu is an expert, and we

24   did so by the deadline and we provided her report.  Mr. Shepard

25   characterizes it one way.  We would characterize it a different

way.  We have also provided them with voluminous records that she relied on and a list of the records that she relied on.

I guess the larger point is this is a Daubert question. If they felt that she was not a reliable or a relevant expert, they should have filed a Daubert motion to say that the disclosures weren't sufficient.  And so, we are making this argument here; but the Court doesn't have the benefit of both parties -- she is our expert and --

THE COURT:  Well, the argument I'm sort of hearing -- maybe Mr. Shepard can tell me if I misheard him -- but I thought he was more -- the reason we are talking about this is your effort to get more information about their witness -- their expert witness.  And he is saying, well, the nature of this witness is a summary witness.  He doesn't read the report of your witness as an expert report; more just she is crunching a bunch of numbers.  So, there is no counter opinion to be provided to you.  Did I hear this right, Mr. Shepard?

MR. SHEPARD:  Right, that's correct.  You know, we are going to cross-examine her about what numbers she chose to crunch but it's not expert.

THE COURT:  Okay.  So, you're saying, no, I still need more information.  He is saying we have got numbers crunchers on both sides and they are going to crunch the numbers.  So, what is it that you think you -- you need from them that they haven't disclosed?

1          **MR. WARD:**  We don't have anything -- any expert

2    opinion, nothing that describes what she is going to testify

3    to.

4          **THE COURT:**  Well, he is saying he's going to do the

5    same thing as your witness and that's not an expert opinion.  I

6    mean, if he says -- if he's right that your summary witness is

7    doing math and their witness says we are going to check the

8    math that the Government's witness is doing, what more need to

9    be disclosed if -- and you can tell me, no, no, our witness has

10   an opinion about something -- and they are going to be giving a

11   counter-opinion, and so we need to know what that

12   counter-opinion is based on.  He is saying it is just a bunch

13   of number crunching.

14         **MR. WARD:**  No.  I do think Ms. Chiu will offer her

15   opinions as to what the numbers -- what the money flows means.

16   That's why we noticed her as an expert; to allow her to opine

17   on what the numbers mean and how they -- how the facts go to

18   what evidence supports the money laundering charges.

19         If Mr. Shepard is saying that Ms. Johnson is simply going

20   to crunch numbers and say, Here is just the facts.  Here is how

21   I see the money flow, if she will be a summary witness, then

22   that's fine.  Then he doesn't have an obligation to disclose

23   her opinion but then she is limited in what she can testify to.

24         We noticed Ms. Chiu as an expert to give her more

25   flexibility, and we provided the bases of her opinion.  Whether

1    there is enough, whether Mr. Shepard questions the foundation

2    of that opinion, that's cross-examination.  He can -- he can --

3          **THE COURT:**  Is your witness going to say, "This flow

4    of funds is indicative of money laundering?"  I mean, what is

5    she going to say?

6          **MR. WARD:**  I think she could come close.  No, no, she

7    will not say -- none of our witnesses are going to say "this is

8    money laundering."

9          **THE COURT:**  Right, because I'm not going to let you.

10         **MR. WARD:**  What she would say is "I have analyzed the

11   flow of funds.  I have seen the movement of money from this

12   account to this account to this account."  It appears to be

13   moved in a way to conceal the source to -- it moves through

14   these accounts and is eventually used by Mr. Andrade to

15   purchase property.  So, she is in many respects a summary

16   witness but she's -- we noticed her as an expert so that we can

17   have some leeway so she can offer her opinions on that.  And

18   Ms. Johnson is free to offer the same opinions but he should be

19   required --

20         **THE COURT:**  Is Ms. Johnson going to say, "I have

21   looked at the flow of these funds and that's not indicative of

22   anybody trying to hide anything"?

23         **MR. SHEPARD:**  Can I go back?  I don't think so.  Let

24   me go back one step.  Mr. Ward says Ms. Chiu is going to say

25   this money appears to be moved in a way to conceal the source.

1  That's not in their disclosure.  So, that's why Ms. Johnson is

2  not currently in a position to opine about it.  She is going to

3  respond and then that's what we have been saying when we say --

4      **THE COURT:**  She is going to be limited to whatever --

5  the disclosure that you provided.  I haven't gone back and

6  looked at it.  If it is not there, this notion that it is

7  indicative of some sort of concealment and that's not an

8  opinion in her report, she is not going to be allowed to say it

9  on the stand.

10      **MR. WARD:**  We will limit her to what's in the report,

11  and we have a second expert, who we discussed earlier who would

12  say this is indicative of concealment and --

13      **MR. SHEPARD:**  Yes, that's how I understood it and

14  that's why at this point Ms. Johnson doesn't have expert

15  opinions to disclose because there aren't any in Ms. Chiu's

16  report.

17      **THE COURT:**  Got it.  You had another one you wanted to

18  talk about.

19      **MR. WARD:**  This is Mr. Chou.  This is a Kanoria market

20  manipulation --

21      **THE COURT:**  Okay.

22      **MR. CHOU:**  Your Honor, if I can seek clarification on

23  a ruling, the Court rightly held that it wouldn't be a proper

24  defense or argument or testimony for Kanoria to say everybody

25  does market manipulation and market making and, therefore, it

1    is okay.

2        I did want to ask the Court how that ruling would be

3    implemented given that the notice of Kanoria's testimony

4    describes how, for example, she did not identify any similar

5    market making rules for crypto trading platforms that would

6    prohibit such market making -- despite, of course, cases like

7    *FTX* and *Celsius* -- that have successfully prosecuted such

8    conduct or that she would explain common methods used to

9    inflate the prices, assets in cryptocurrency platforms.

10       I'm just worried that the witness is going to say, well,

11   during the relevant time period we see all these sorts of pump

12   and dump schemes and the implication will necessarily be that

13   it's okay.

14           **THE COURT:**  Well, why don't I then ask Defense side to

15   tell me again what exactly the witness is going to be saying.

16           **MR. STEFAN:**  The witness' testimony is going to be

17   educational as outlined in our disclosure and in our motion.

18       She is going to be speaking to the prevalence of wash

19   trading and price manipulation of exchanges and to the degree

20   to which she observed evidence that that kind of behavior was

21   actually prevented by exchanges; also, the evidence that exists

22   for exchanges and other industry players to have incentivized

23   that sort of behavior.

24       So, the scope of her testimony is to speak to the context

25   of the industry in which Mr. Andrade was operating, not for the

1    purpose of saying everybody was doing it and, therefore, it was

2    okay but for the purpose of given the other evidence the

3    Government has provided to you in our opposition to the

4    Government's motion to exclude, Dr. Kanoria, in combination

5    with that information, Mr. Andrade in operating in this space

6    wasn't doing so with the intent to deceive and cheat but was

7    doing so in a way that conformed with the standards of the

8    industry at the time.

9        He had to maintain his token on exchanges that have rules

10   in place to maintain volume thresholds, exchanges encouraging

11   him or requiring him to maintain volume thresholds through

12   practices, which on regulated exchanges would be violations of

13   U.S. law; but in the instance in which -- in the area

14   Mr. Andrade was operating was, in fact, something that was just

15   expected of him -- expected of him by both those around him and

16   other industry players; right.

17       And I understand the delineation between that and

18   everybody is doing that and, therefore, it was okay may be

19   something the Government is concerned that we are not going to

20   be able to draw; but I think we clearly can under the evidence

21   that we provided you for the context of Mr. Andrade's own

22   interactions, communications with the people in the industry

23   and take that in combination with Dr. Kanoria's testimony

24   regarding the prevalence of those practices at the time and the

25   Defense has an argument that Mr. Andrade's intent wasn't to

deceive and cheat.  That's why he informed his purchasers

through his website terms and conditions that we are

interacting on the exchanges ourselves and making trades on the

exchanges ourselves to comply with exchanges requirements;

right.  Taken together, all of this speaks to some purpose

which is appropriate in this case which is --

        **THE COURT:**  Certainly I think the -- putting this into

context and understanding how this market works is something

that -- it is appropriate for the jury to hear because it is a

somewhat unusual or at least new area and not something that

the average jury may understand how it operates.  So, I think

the concept of calling somebody to explain that is appropriate,

and that's what I'm hearing they are going to be doing.

    What they can't do is take the next step and say,

therefore, because this market has these unique aspects to it

and Defendant did exactly what everybody else was doing, it

can't be a crime.  I mean, they can't do that but they can

explain to the jury so that it's -- it's a contextual thing,

how this whole thing works.

        **MR. CHOU:**  Yes, Your Honor, I certainly agree with the

Court about having background on the cryptocurrency industry

and what a cryptocurrency is, for example, is highly relevant.

This is uncharted -- relatively uncharted territory, but I

think there is a risk of confusion where 403 comes into play

where the Defense is saying common industry practice was for

1   people to secretly buy these tokens; boost the liquidity in the

2   price in the market and dump them thereafter.

3       That's the same sort of argument to say that just because

4   others are speeding, it's okay for the Defendant to speed.  And

5   I do want to direct the Court not only to the case law that was

6   cited in the motion in limine or the motion to exclude but also

7   in the *FTX* case involving Sam Bankman-Fried and the large

8   crypto fraud there.  The defense proffered an expert named

9   Mr. Wu to give the same sort of background testimony the

10  Defense argues here.  And in his expert disclosure, which the

11  government responded to, he sought to introduce evidence of

12  common money making efforts in the crypto industry.  And Judge

13  Kaplan rightly excluded that expert wholesale because he found,

14  rightly so, that common industry practice is irrelevant when

15  you are dealing with specific instances of pump and dump fraud,

16  which is prescribed by the wire fraud laws and the securities

17  laws.

18              (Pause in proceedings.)

19      **THE COURT:**  Okay.  It is a bit of a fine line.  I will

20  go back and review it again and give you an order.

21      **MR. STEFAN:**  Your Honor, if I may on that, I have not

22  reviewed the Kaplan decision that the Government is citing to

23  this in this instance; but *FTX* was a U.S. based exchange at a

24  later time period than that charged here in this case and, as I

25  recall, was a securities fraud case, not a wire fraud and money

1  laundering case where the pump and dump was -- or allegations

2  of market manipulation were essentially a piece of what the

3  Court, in this instance, has ruled as being inextricably

4  intertwined with the charged offenses or as appropriate 404(b)

5  evidence.

6       So, I think those are distinctions to draw.

7            **MR. CHOU:**  The citation for the case, Your Honor, is

8  2023 WL 6162865 at pin cite number 3, and then there is ECF

9  filings relating to --

10           **THE COURT:**  Judge Kaplan's exclusion order?

11           **MR. CHOU:**  Yes, Your Honor.

12           **THE COURT:**  Okay.  Anything else?

13      **MR. HIGHSMITH:**  May I be heard very briefly on the tax

14  records motion?

15           **THE COURT:**  Yes.  Go ahead.

16      **MR. HIGHSMITH:**  So, the Government's point on the tax

17  records are that they are evidence of mens rea.  It is

18  knowledge evidence.  If you are not filing tax records of your

19  ill gotten gains, that goes to your mens rea; that goes to your

20  knowledge that they are ill gotten gains.

21           **THE COURT:**  You have another argument, though, too,

22  don't you, that you are saying it is intertwined with the

23  fraud.

24           **MR. HIGHSMITH:**  Yes.

25           **THE COURT:**  But then you are also saying it is

1    indicative of intent.  They are two kind of separate things.

2         MR. HIGHSMITH:  They are separate but also very

3    related.  They are intertwined with the fraud because it goes

4    to an element of the fraud.  We have to prove -- we have to

5    prove mens rea.  The failure to file tax returns is a piece of

6    evidence going to that element.  Yes, it is inextricably

7    intertwined with the fraud because these are the ill gotten

8    gains from the fraud and the Defendant is taking an effort to

9    conceal those gains or not declaring them to the IRS.  So, it

10   is inextricably intertwined and it goes to knowledge.

11        THE COURT:  Well, the last piece, I think, may be the

12   best part of your argument is to say that it is part and parcel

13   of an effort to conceal because to -- because filing the return

14   would disclose it, but failing to file a -- taxes is a

15   completely separate crime than the ones you have charged.

16        So, in -- one could imagine that somebody would -- you

17   know, doesn't want to file their tax returns and has nothing to

18   do with whether or not, you know, there is a crypto fraud going

19   on.  So, there is a bit of a disconnect.  There is, though,

20   that connection of -- I'm not sure how you are going to show

21   that it really is part and parcel of this effort to conceal

22   that they don't file the tax returns.  I don't think you have

23   any evidence that is going to show admissions, say, by the

24   Defendant, "We better not file this tax return because then

25   they are going to discover that we are engaging in this other

1    conduct."  You don't have anything like that.

2         **MR. HIGHSMITH:**  Correct, Your Honor.  It can be an

3    inference.  We can offer inferential evidence.

4         **THE COURT:**  I'm anticipating what Mr. Shepard will say

5    in part.

6         **MR. HIGHSMITH:**  Yes.

7         **THE COURT:**  It is a bit incendiary to say somebody is

8    not filing their taxes, separate and apart from everything

9    else.  So, he will probably make a 403 argument as well.  But

10   why isn't that so?  I mean, saying you are failing to file your

11   tax returns is something that one can imagine the jury will

12   look askance about.  So, does its probative value outweigh --

13   does the probative value outweigh the prejudice of that

14   accusation?

15        **MR. HIGHSMITH:**  So, the Government's view is that it

16   does outweigh because we are going to offer evidence that

17   during the period of these businesses -- the AML Bitcoin and

18   the Atencoin -- the Defendant did not file tax returns.  He was

19   bringing in significant --

20        **THE COURT:**  Was there evidence he filed during other

21   years?

22        **MR. HIGHSMITH:**  We do not have the later years.

23              (Pause in proceedings.)

24        **MR. HIGHSMITH:**  I'm not sure about the earlier years

25   before.  And then, as Mr. Chou points out, it goes to the

concealment -- his money laundering concealment.  Is he
concealing -- we are charging that he engaged in financial
transactions to buy a house to benefit himself and that he sent
that money through numerous bank accounts in order to conceal
the fact that he was spending his investors' money for himself.
The fact that he is not filing his taxes is also concealing --
goes to that concealment also.

             **THE COURT:**  Okay.  Mr. Shepard.

             **MR. SHEPARD:**  As the Court noted, it's a really weak
inference.  He might not have had the records.  I think you
will hear evidence about he has many more accounts than any one
human being or business could possibly need to have.  His
records may be a mess.  There may be other reasons why people
don't file their tax returns.  Lots of people fail to file
their tax returns.  The inference is really weak.  And, as the
Court recognizes, you can have a bunch of jurors who pay their
tax returns -- who file their tax returns, pay their taxes and
it's sort of another incendiary device to toss up there into
the jury box and try to prejudice the Defendant.

        It's not by any stretch of the imagination inextricably
intertwined with the offense.  It is not a single criminal
transaction with the offense charged, and it certainly isn't
necessary to tell the story of the offense.  You can tell the
story of the offense, as I'm sure the Government will, and you
don't have to mention that he didn't fail to file -- that he

1  failed to file his tax returns.

2        MR. HIGHSMITH:  I guess the last thing I would say is

3  to the point of he had many accounts, he also had numerous

4  accountants, lawyers, advisors.  I mean, he said he had many

5  people working with him.  In addition, this again does go to

6  the money laundering.  Our money laundering charge is that he

7  took the investors' money and he concealed it through multiple

8  bank accounts and then bought himself houses and cars.  The

9  failure to file personal tax returns is direct evidence of the

10  mens rea element of concealing the proceeds of the scheme.

11                (Pause in proceedings.)

12        THE COURT:  Okay.

13        MR. HIGHSMITH:  Thank you.

14        THE COURT:  Anything else?

15        MR. SHEPARD:  The one other thing I did want to

16  mention to the Court, there was one other motion we had

17  intended to file; but due to Ms. Dent's illness, it will

18  probably be tomorrow.  It has to do with some misconduct

19  allegations.  I just wanted the Court to know it was coming.

20  We had planned to file it.  And unfortunately, due to

21  Ms. Dent's illness, we weren't able to get it on file.  I think

22  we will be able to get it on file tomorrow.

23        THE COURT:  Is it connected to the late disclosure of

24  the --

25        MR. SHEPARD:  No.  That will be -- we still need to

1    sort out what we got --

2            **THE COURT:**  Okay.  So --

3            **MR. SHEPARD:**  -- in terms of -- this is a couple --

4            **THE COURT:**  Can you give me just a preview of what the

5    alleged misconduct is?

6            **MR. SHEPARD:**  It's -- there are two major buckets.

7    One is suppression of exculpatory information relating to

8    Mr. Abramoff.  Another is invasion of Mr. Andrade's

9    attorney-client privilege.

10           **THE COURT:**  Okay.

11           **MR. SHEPARD:**  And I apologize for not getting it on

12   file before today, but we have -- hopefully we will have it for

13   you tomorrow.

14           **THE COURT:**  I will want the Government response

15   obviously on these.  I know you are strapped for time.  You are

16   going to file this tomorrow.  You haven't seen it, so it is not

17   entirely fair to ask you how much time you need to respond to

18   it.  When would you be able, do you think, to give me your

19   opposition brief to these things?

20           **MR. HIGHSMITH:**  Seven days.

21           **THE COURT:**  That would take us to next Wednesday;

22   okay.  Maybe try to get it a little faster but okay.

23           **MR. SHEPARD:**  Thank you, Your Honor.  And if we have

24   more to say about the 4.8 gigabytes that we got on Friday --

25           **THE COURT:**  I'm not asking for a motion.

1          **MR. SHEPARD:**  I know you are not.  If we have

2   something to say, we will talk to the Government about it and

3   bring it to the Court.

4          **THE COURT:**  Thank you, Your Honor.

5          **MR. HIGHSMITH:**  Thank you, Your Honor.

6          **MR. SHEPARD:**  Thank you, Your Honor.

7               (Proceedings adjourned at 11:15 a.m.)

8                        ---oOo---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    February 4, 2025

8

9

10

11    _____

12            Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25