UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ROWLAND MARCUS ANDRADE,<br>Defendant. | Case No. 20-cr-00249-RS-1<br><br>**ORDER DENYING MOTION RE: ALLEGED OUTRAGEOUS CONDUCT** |

## I. INTRODUCTION

Defendant claims the government systematically suppressed or destroyed exculpatory evidence and violated his attorney-client privileges while prosecuting him on wire fraud and money laundering charges. *See generally*, Motion, Dkt. No. 499 ("Motion"). He requests an evidentiary hearing to determine whether the indictment should be dismissed or, in the alternative, whether the jury should receive adverse inference instructions. The government responds that his allegations of evidence suppression lack any basis in fact and that his claimed privilege violations fail as a matter of law. For the reasons explained below, the motion is denied.

## II. LEGAL STANDARD

### A. Motion for Evidentiary Hearing

A district court has discretion to grant an evidentiary hearing when a defendant raises the alarm about potential due process violations. *See United States v. Hagege*, 437 F.3d 943, 951 (2006); *see also United States v. Simpson*, 813 F.2d 1462, 1464 (1987) (discussing district court

judgment to dismiss an indictment following an eight-day evidentiary hearing into alleged due process violations). Where, as here, the due process violations pertain to allegedly outrageous government conduct, the extremely high standard by which such claims are judged requires that a defendant present "a sufficient factual basis to warrant an evidentiary hearing." *United States v. Conte*, No. 04-cr-44-SI, 2004 WL 2988567, at *1 (N.D. Cal. Dec. 28, 2004).

### B. Outrageous Conduct

"[A] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation." *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (internal citation and quotation omitted). "A prosecution results from outrageous government conduct when the actions of law enforcement officers or informants are 'so outrageous that the due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Pedrin*, 797 F.3d 792, 795 (9th Cir. 2015) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)). "This is an extremely high standard," limited to cases where "the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the sense of justice." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (citation omitted). As of the Ninth Circuit noted in *Black*, "there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine." *Id.* (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir.1971)).

*1. Evidence Suppression*

Under the landmark Supreme Court decision *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87 (1963). "To establish a *Brady* violation, [a defendant] must show: '(1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government, regardless of whether the suppression was willful or inadvertent; and (3) the evidence is material to the guilt or innocence of the defendant.'" *Sanders v. Cullen*, 873 F.3d 778,

802 (9th Cir. 2017) (quoting *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013)). "[T]he terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases." *Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012) (quoting *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002)). Undisclosed evidence is material "when there is a reasonable probability that, had the evidence been disclosed [to the defense], the result of the proceeding would have been different." *Id.* (quoting *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

### 2. Attorney-Client Privilege Violations

Deliberate intrusion into the attorney client relationship can violate due process "where the defendant can point to actual and substantial prejudice." *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008) (internal quotation marks omitted). "A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial prejudice." *Id.* (citing *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996)). As to the third element, the "defendant must prove 'substantial prejudice,' which "results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *United States v. Schaefer*, 13 F.4th 875, 892 (9th Cir. 2021) (quoting *United States v. Danielson*, 325 F.3d 1054, 1069 (9th Cir. 2003)).

## III. DISCUSSION

### A. Alleged Evidence Suppression

Defendant claims the government systematically suppressed evidence about Jack Abramoff, his former associate and a key government witness.[1] Because he argues that Abramoff

---

[1] Abramoff pleaded guilty to conspiracy to commit wire fraud, predicated on his public-relations role with AML Bitcoin, and to failing to register as a lobbyist in violation of the Lobbying Disclosure Act. *See* Plea Agreement, *United States v. Abramoff*, No. 20-cr-00260-RS, Dkt. No. 14 at 1–2.

ORDER DENYING MOTION RE: ALLEGED OUTRAGEOUS CONDUCT
CASE NO. 20-cr-00249-RS-1
3

orchestrated the charged wrongdoing, Defendant believes that "[a]ny suppression by the government of information relating to Abramoff . . .cuts at the core of [his] defense." Motion at 2.

> *1. Belief that Current or Former Government Insiders Will Testify that the Government Intentionally Suppressed Information about Co-Defendant Wrongdoing*

Defendant first asserts that the court should hold a hearing so that two current or former government insiders could testify about how the government intentionally suppressed information about Abramoff's wrongdoing. One potential witness is Johnathan Buma, a former FBI counterintelligence agent who has testified to Congress about government suppression in connection with Russian influence over U.S. elections. According to Defense counsel's sworn declaration, she expects that Buma could testify about how the FBI suppressed information about Abramoff, including some that relates to Andrade's case. Another potential witness could apparently testify about the suppression of evidence concerning a consulting company that Abramoff used to engage in illegal lobbying and money laundering during the relevant time. Aside from his attorney's declared beliefs and expectations, Defendant offers no evidence that Buma would testify. As for the other witness, Defendant provides her sworn declaration that describes alleged government cover-ups but does not contain any commitment to testify were a hearing to be granted.

This evidence, standing alone, is insufficient to warrant an evidentiary hearing. First, as the government rightly notes, the instant motion comes after the deadline for motions *in limine*. While Defense counsel provides some explanation for the tardiness in a sealed declaration accompanying the reply brief, the fact remains that trial is less than one week away. Even if "an evidentiary hearing might h[elp] resolve" some of the wrinkles identified in Defendant's motion—and by no means is it clear that it would, nor that the wrinkles identified even rise to the level of misconduct, let alone outrageous misconduct—the Ninth Circuit has acknowledged that "such a hearing would [require] another continuance and further delay," and thus might not be warranted. *United States v. Lazarevich*, 147 F.3d 1061, 1065 (9th Cir. 1998). As in that case, numerous continuances have issued in this litigation. *See, e.g.*, Dkt. No. 313 (May 17, 2024 order granting

1  defendant's request for continuance to prepare for trial).  Defendant has known of all the issues
2  raised in this motion for quite a while now.

3  Even if presented in a timelier manner, Defendant's proposed witness testimony would be
4  insufficient to merit an outrageous misconduct hearing.  As to Buma, zero evidence supports the
5  conclusion that he would testify, let alone that he would testify the government suppressed
6  evidence about Abramoff.  True, Buma has reported to Congress about alleged government
7  suppression of evidence, in the abstract.  It is also true that Buma once drafted an FBI report
8  concerning a conversation he had with a confidential source about some of Abramoff's
9  handwritten notes (which include mention of Andrade's company).  What is missing in the
10 Defendant's theory, however, is any direct evidence that Buma would testify *to this court* about
11 alleged government suppression of evidence *about Abramoff* that is relevant *to this case*.

12 The same reasoning mitigates the value of the other potential witness.  Her sworn
13 declaration states that she observed systematic suppression of information at the Treasury
14 Department, including information about potential international money laundering by Abramoff.
15 While this personally attested declaration is stronger evidence than the attorney declaration which
16 supported the Buma argument, it still falls far short of warranting a hearing.  For starters, it
17 contains no assurance that the declarant will even testify.  Moreover, even if she would, there is no
18 evidence that the suppression she might describe would be relevant to this case—by all accounts,
19 the government investigated Abramoff for various schemes, not all of them connected to Andrade.
20 Without even a shred to suggest that she would testify to suppression of relevant evidence,
21 Defendant fails to make a showing sufficient to warrant a hearing.

   *2. Instances Where the Government Belatedly Produced Evidence*

23 To bolster the hardly persuasive import of his first point about potential witness testimony,
24 Defendant highlights several occasions where the prosecution in this case has been less than
25 forthright with its discovery production.  First, Defendant recounts the tale of the Maria Butina
26 documents, which has already been covered in prior orders.  In short: Abramoff discussed
27 Defendant and AML Bitcoin with Paul Erickson, a friend and fellow conservative lobbyist who

later plead guilty to a distinct fraud.[2] Erickson was romantically involved with Maria Butina, then a graduate student and now a convicted spy.[3] In conjunction with its investigation into her crimes, the government conducted a 2018 search of Butina's apartment (where Erickson kept some belongings) and found AML Bitcoin-related materials, including what appears to be a printed set of marketing slides and some handwritten notes. In one of the government's recorded conversations with Abramoff, which it produced to the defense, an agent mentions these documents. Upon request by the defendant, followed by the threat of a motion to compel, the government produced them on January 4, 2023. Motion at 4.

Defendant also alleges the government attempted to suppress certain WhatsApp messages on Abramoff's iPhone by producing an incomplete Cellebrite file of its contents. Upon noticing a discrepancy between FBI reports about the phone and the Cellebrite file itself, the defense raised it with the prosecution, which provided varying reasons for the exclusion. Motion at 5 (recounting excuses ranging from "[someone] forgot to include the messages" to "we have not been able to determine exactly what additional communications were not produced"). The government produced the missing messages on January 13, 2023, just over a month after defendant highlighted their absence. *See* July 5, 2023 Dent Decl., Dkt. No. 197-1 at ¶11–13. When Defendant noted the absence of additional messages in March 2023, the government agreed to produce the entire Abramoff iPhone, which it ultimately did (following the filing of a motion to compel) on July 13, 2023. *See* Dkt. Nos. 198–99.

---

[2] *See United States v. Erickson*, No. 4:19-cr-40015-KES (D.S.D. Feb. 5, 2019). Erickson pled guilty on November 26, 2019. *Id.*, Dkt. No. 43. On January 13, 2021, Erickson was pardoned by President Donald Trump, and the case was closed in March 2022. *Id.*, Dkt. 84. As a prior order in this case observed, Erickson's case "had nothing to do with cryptocurrency and involved his soliciting investors to invest in a real-estate venture involving the construction of single-family homes and misappropriating the funds for personal use." *See* April 7, 2023 Order, Dkt. No. 165 at 6.

[3] *See United States v. Butina*, No. CV 18-cr-218-TSC, 2021 WL 5987015, at *1 (D.D.C. Dec. 16, 2021). As with Erickson's case, Butina's case "had nothing to do with cryptocurrency and involved [her] entering the U.S. on an F-1 student visa, establishing relationships with powerful people in U.S. politics to advance Russia's interest, and not disclosing that she was a Russian agent." *See* April 7, 2023 Order, Dkt. No. 165 at 6.

1  As to each of these arguments, Defendant fairly criticizes the government's obstinate
2  participation in the discovery process.  But for the diligent advocacy of his counsel, it appears that
3  much of the evidence he intends to use in his defense might never have surfaced.  Had such
4  suppression actually occurred, a *Brady* claim may well have been appropriate.  Yet, suppression
5  did not occur; the government ultimately produced the requested materials (albeit reluctantly).
6  Defendant has had the Butina/Erickson documents for over two years and the entire Abramoff
7  phone for over a year and a half.  An inability to demonstrate actual suppression flunks the second
8  prong of the *Brady* inquiry, *see Sanders*, 873 F.3d at 802, so Defendant fails to demonstrate the
9  sort of suppression-based due process violation that might give rise to the hearing or the sanctions
10 he seeks.

### 3. Alleged Destruction of Evidence

12 Defendant separately accuses the government of having contributed to the destruction of
13 evidence.

#### a. Alleged Destruction of Abramoff Devices

15 Although the government had produced extractions from all the seized Abramoff devices
16 in December 2022, Defendant continued to request the actual devices, particularly after securing
17 Abramoff's iPhone in July 2023.  The government took the position that it could not produce these
18 devices because some of their contents were not lawfully in the government's possession, having
19 been seized inadvertently during the imaging process.  By January 2024, Defendant had filed a
20 motion to compel the production of the remaining Abramoff devices.  The magistrate judge
21 assigned to adjudicate discovery disputes ordered the government to return Abramoff's devices to
22 Abramoff so that Andrade could subpoena him for them, effectuating a workaround of the
23 government's asserted lack of lawful possession.  March 17, 2024 Order, Dkt. No. 292.
24 Although Defendant was on notice that the government was going to return Abramoff's
25 devices to his counsel by May 3, 2024, he did not subpoena Abramoff's counsel for said devices
26 until the following month—at which point, Abramoff's counsel provided what he described as the
27 only device Abramoff had in his possession at the time.  *Id.* at 7–8.  Defendant faults the

government for telling him only the date by which they intended to return the devices, rather than telling him precisely when it would occur (so as to enable the filing of a more prompt subpoena, thereby preventing any potential destruction).

As to these allegations, Defendant fails to demonstrate any need for a hearing or the existence of outrageous government misconduct. He draws a specious inference in suggesting that the government's "resistance to simply coordinate the return of the Abramoff devices through a simple call or email" must mean "that there was information incriminating of Abramoff (and exculpatory of Mr. Andrade) that Abramoff (and the government) did not want Mr. Andrade or this Court to see. Motion at 8. For one thing, the government had already produced images of relevant evidence from all the Abramoff devices, not to mention the entire Abramoff phone. Moreover, the government hardly resisted coordination; it clearly informed defense counsel that it would return the devices by a certain date. Why counsel waited an additional six weeks after that date to subpoena Abramoff is unclear, but it is certainly not the government's fault. Although the record shows that counsel were hoping for confirmation that the government would immediately notify them upon delivery, the government made no representation that it would and had no obligation to do so. At any rate, even assuming Abramoff destroyed several devices after receiving them from the government, the fact that Andrade received images of the relevant material on each of these devices forecloses any finding that the government suppressed or destroyed them in violation of due process.

b. Alleged Destruction of Erickson's iPhone

Another alleged suppression involves Erickson's iPhone, which Defendant requested on March 7, 2022 in conjunction with a bid for all of Erickson's statements regarding Andrade and AML Bitcoin. Because the FBI had investigated Erickson for distinct offenses in South Dakota, his devices had been seized by a different team of agents. That group recovered two laptops, two desktops, and five thumb drives belonging to Erickson[4]—all of which had been returned to him by

---

[4]. The evidence file pertaining to Erickson's South Dakota prosecution reflects that the

ORDER DENYING MOTION RE: ALLEGED OUTRAGEOUS CONDUCT
CASE NO. 20-cr-00249-RS-1
8

the time of Defendant's request, and none of which remained preserved in Cellebrite files, given that Erickson had been pardoned at that point and his case, long since closed. The government therefore told defense counsel that Erickson's devices were returned in July 2020 and that Cellebrite files were deleted when the case was closed in March 2022 "as part of standard FBI procedure" such that no Cellebrite files existed. April 7, 2023 Order, Dkt. No. 165 at 12.

Recognizing that "there is no relief that the court can order" where sought-after "information does not exist," the magistrate judge nevertheless instructed the government to produce the Erickson extractions, if it had them, or any information about them that it could find. *Id.* This ruling derived from the magistrate judge's determination that Andrade had established a connection between Abramoff and Erickson that related to his charges. *Id.* In the same order, the court also ordered the government to produce a broader set of materials relating to the search and seizure of the Butina documents. *Id.* at 13.

While complying with that order, the government determined on April 19, 2023 that a hard drive containing images of multiple devices it seized from Butina's apartment included an image of a phone that belonged to Erickson. It had already produced that copy to Defendant, as ordered, on April 12, 2023, and it highlighted that production in a joint status report filed the following month. Dkt. No. 178 at 7 (May 26, 2023) ("The Government's April 12 production contained an extraction from Erickson's cell phone. The government has not located any additional information beyond what has already been provided to Andrade regarding the Erickson phone.").

In insinuating that the government destroyed a phone belonging to Erickson, Defendant's arguments misrepresent the above facts. As the government has repeatedly explained, there was no Erickson phone in the South Dakota file; any records deleted as part of FBI standard procedures following Erickson's plea and subsequent pardon came from the computers and thumb drives seized in that case. It is simply inaccurate to suggest that the government "never explained what happened to the Erickson phone it told defense counsel it had destroyed," Motion at 11,

---

government did not collect an iPhone in that case.

given that the government never said it destroyed his phone (only that the files from his other devices were deleted). Nothing has been presented to call into question the government's representations that the only Erickson phone it had, it produced when ordered to do so. Defendant therefore fails to demonstrate suppression-related government misconduct worthy of an evidentiary hearing, an order to dismiss the indictment, or adverse jury instructions.

### B. Alleged Attorney-Client Privilege Violations

Defendant also asserts that the prosecution violated his attorney-client privilege. For this claim, he provides the following bases:

#### 1. *Possession of Emails Marked as Privileged*

The first evidence of alleged misconduct in this category are documents that the Government seized and produced during discovery that reflect legal advice from two of Andrade's legal advisors. The documents include emails labeled "Privileged & Confidential" and feature attorney advice and analysis on topics like cryptocurrency regulation and the application of securities law to AML Bitcoin token sales. Counsel for the government disclaims having ever seen the documents and disavows any reference or reliance on them, including by committing not to introduce them at trial.

Even assuming that the government was objectively aware of the attorney-client relationships evidenced by these emails, and further assuming without deciding that the government deliberately intruded into that relationship by collecting them, Defendant would fail to meet *Stringer*'s third requirement—that, "as a result, the defendant suffered actual and substantial prejudice." 535 F.3d at 941; *see also Schaefer*, 13 F.4th at 892 (describing the requirements of actual and substantial prejudice). Here, the government represented that it will not introduce these emails into evidence. The emails do not pertain to defense plans and strategy, and Defendant offers no explanation of how they might have provided an unfair trial advantage to the government. It follows that Defendant does not and cannot show the actual prejudice necessary to transform the government's collection and production of these emails into the sort of due process violation that might support a finding of outrageous misconduct.

*2. Recording Pre-Charge Conversation Between Andrade and His Lawyer*

Andrade further asserts that the government violated his privilege by having a cooperator named David Mata wear a wire and attend a meeting between Andrade and one of his attorneys. To show that the government knew the person at the meeting was his lawyer, Defendant cites an FBI report from before the meeting, which discusses an email (seized during a search of Abramoff's house) from Defendant that identifies the attorney as someone associated with his patents. Defendant also contends that, at the time of the recorded conversation, the lawyer's firm was representing him in connection with this investigation.

Mata helped run a cryptocurrency fund called "Block Bits," which advertised and sold AML Bitcoin tokens to its investors—and which also attracted the attention of the federal government, ultimately leading to his guilty plea for wire fraud, *see United States v. Mata*, No. 22-cr-171-RS (Dkt. 1, Information, Apr. 27, 2022). In late September 2018, Mata began cooperating with the FBI and detailing conversations he had with Andrade. When Andrade suggested a corporate acquisition between their two firms, Mata shared the news with the FBI. Agents provided a list of purported "due diligence" topics for Mata to discuss with Andrade, including many that relate directly to this case *(i.e.*, AML Bitcoin's budget, profits, Andrade's patents, the planned initial coin offering, the status of discussions with various ports and stock exchanges, etc.). They subsequently wired Mata and sent him into a meeting with Andrade and the lawyer, knowing that they would be discussing legal advice, and recorded the ensuing conversation. In Defendant's view, because his lawyer would have understood he and Mata (a potential new business partner) to have joint interests, the conversation was privileged. Buttressing this viewpoint, he claims, is a recording in which another agent learns that the meeting took place at the attorney's office and promptly stops the tape.

Defendant's argument fails to carry water. The so-called joint defense privilege that Andrade appears to invoke "is an exception to the general rule that disclosure of protected material to third parties constitutes a waiver." *Regents of Univ. of California v. Affymetrix, Inc.*, 326 F.R.D. 275, 279 (S.D. Cal. 2018). This exception applies only where "persons who share a

common interest in litigation" seek "to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (quoting *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990)). Simply put, Andrade and Mata did not share a common interest in litigation at the time of the conversation. As is clear in the recordings, Mata was exploring whether to become CEO of AML Bitcoin, but he was not actually the CEO of AML Bitcoin at the time of the recorded meeting with Andrade's counsel. He asks the attorney whether there is an ongoing investigation into the NAC Foundation associated with AML Bitcoin, underscoring the degree to which he was not yet affiliated with the company but rather (as far the attorney was concerned) conducting due diligence about joining it. Thus, even if there might have been a privilege as between Andrade and his attorney, that privilege did not extend to encompass their communications in Mata's presence. That Andrade and Mata may have "shared [a] desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this [common interest] exception." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). At bottom, the conversation between Andrade, Mata, and the attorney was not privileged, and it was therefore not misconduct for the government to record it. Moreover, even if it were privileged, the fact remains that the government will not rely on this recording as evidence in its case—scuttling any possibility that it might prejudice Andrade.

### 3. Obtaining Information about Andrade's Patents

Andrade further faults the government for an episode in which Mata convinced him to send his confidential patent information in an email that Mata then forwarded to a case agent. That email also went to a potential patent lawyer, and Defendant's motion concedes that "no ongoing attorney-client relationship ever resulted." Mot. at 16.

On its face, the motion contemplates how Andrade sent the patent information to Mata as well as the attorney, neutering any suggestion that it could have been privileged. Moreover, as Defendant concedes, no attorney-client relationship ever formed. That he sent his patent portfolio to a government informant does not mean the government violated his rights.

*4. Questioning Andrade Without Lawyer Present*

Finally, Andrade asserts that the government "disregarded" his attorney-client privilege when an FBI agent questioned him for nearly forty minutes despite Andrade having requested to call his lawyer. He concedes that the agent told him at the beginning of the interview that he was free to leave or to make phone calls, but he claims to have asked for his phone to get his lawyer's number from it and never received it—instead, the agent continued interviewing him until another agent stopped the conversation and reminded Andrade about the prospect of calling his attorney. At that point, Andrade noted that he had asked for his phone earlier and then called his attorney.

As Defendant recognizes, the interaction he had with the agents was non-custodial—he was free to leave if he wished. That he chose to continue answering questions from law enforcement, after having asked to call his lawyer but before having done so, is not evidence of any misconduct on the part of the government.

## IV. CONCLUSION

For the reasons stated above, there is no cause for an evidentiary hearing into whether the government's prosecution of this case amounts to outrageous misconduct. There is also insufficient evidence of misconduct warranting dismissal of the indictment or adverse jury instructions. Defendant argues in the alternative that the court ought to invoke its inherent supervisory powers to dismiss the indictment, but as the rest of this order demonstrates, there is no reason to do so; aside from the government's disappointingly stilted discovery practices, it committed no misconduct. Defendant's motion is dismissed with prejudice.

**IT IS SO ORDERED**.

Dated: February 5, 2025

_____
RICHARD SEEBORG
Chief United States District Judge

Order Denying Motion re: Alleged Outrageous Conduct
Case No. 20-cr-00249-RS-1

13