**Volume 3**

**Pages 340 - 504**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
   VS.                             )        NO.  3:20-CR-00249-RS-1
                                   )
ROWLAND MARCUS ANDRADE,            )
                                   )
            Defendant.             )
_____  )
                                   San Francisco, California

                                   Wednesday, February 12, 2025


                  **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        ISMAIL J. RAMSEY
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                BY:  **CHRISTIAAN HIGHSMITH**
                     **DAVID J. WARD**
                     **MATTHEW CHOU**
                     **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:
                        KING AND SPALDING, LLP
                        50 California Street, Suite 3300
                        San Francisco, CA 94111
                BY:  **MICHAEL J. SHEPARD**
                     **ATTORNEY AT LAW**


(Appearances continued on following page.)

REPORTED BY:            Stephen W. Franklin, RMR, CRR, CPE
                        Official United States Reporter

```
APPEARANCES (CONT.'D):

For Defendant:
                        KING AND SPALDING, LLC
                        1700 Pennsylvania Avenue, Northwest
                        Washington, DC 20006
                BY:     KERRIE C. DENT
                        ATTORNEY AT LAW

                        KING AND SPALDING, LLC
                        1185 6th Avenue, 34th Floor
                        New York, NY 10036
                BY:     DAINEC STEFAN
                        ATTORNEY AT LAW

                        CINDY A. DIAMOND, ATTORNEY AT LAW
                        58 West Portal Avenue, #350
                        San Francisco, CA 94127
                BY:     CINDY A. DIAMOND
                        ATTORNEY AT LAW
```

<u>**I N D E X**</u>

Wednesday, February 12, 2025 - Volume 3

<u>**GOVERNMENT'S WITNESSES**</u>                          <u>**PAGE**</u>  <u>**VOL.**</u>


<u>**JODOIN, BRANDI (RECALLED)**</u>
(PREVIOUSLY SWORN)                                347   3
Redirect Examination by Mr. Chou                  374   3



<u>**WITTE, MICHAEL CHARLES**</u>
(SWORN)                                           382   3
Direct Examination by Mr. Highsmith               382   3
Cross-Examination by Mr. Stefan                   423   3
Redirect Examination by Mr. Highsmith             438   3



<u>**DARROW, BRIAN SCOTT**</u>
(SWORN)                                           440   3
Direct Examination by Mr. Ward                    440   3
Cross-Examination by Mr. Shepard                  476   3
Redirect Examination by Mr. Ward                  491   3
Recross-Examination by Mr. Shepard                499   3
Redirect Examination by Mr. Ward                  502   3

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 41 | | 397 | 3 |
| 677 | | 387 | 3 |
| 748 | | 500 | 3 |
| 810 | | 386 | 3 |
| 811 | | 452 | 3 |
| 1048 | | 407 | 3 |
| 1243 | | 462 | 3 |
| 1441 | | 401 | 3 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1447 | | 392 | 3 |
| 1448 | | 417 | 3 |
| 1501 | | 465 | 3 |
| 1501B | | 496 | 3 |

```
 1   Wednesday - February 12, 2025                    8:11 a.m.

 2                    P R O C E E D I N G S

 3                        ---o0o---

 4       (Defendant present, out of custody.)

 5           THE COURT:  Okay.  I was told there was something you

 6   wanted to discusses with me?

 7           MR. SHEPARD:  Yes, a logistical issue.

 8           THE COURT:  Okay.

 9           MR. SHEPARD:  We would like to show the witness a

10   video, and in order to authenticate it -- I don't think there

11   will be an issue with -- it's clearly her.  But I'm told as a

12   technical matter that we don't have the ability to limit the

13   sound just to the Court, the government and the witness.

14           THE COURT:  This is at the point of seeking to admit

15   it and establishing a foundation for it?

16           MR. SHEPARD:  Yes.

17           THE COURT:  Well --

18           MR. HIGHSMITH:  Well, he's not seeking to admit it.

19   You're seeking to ...

20           MR. SHEPARD:  Not at this point, no.  I'm just --

21           THE COURT:  Oh, you're not seeking to admit it.  I

22   think you can use it.  It doesn't --

23           MR. HIGHSMITH:  The problem is he wants to publish to

24   the jury the sound, but he's not permitted to publish to the

25   jury the sound.  So the problem --
```

1          THE COURT:  Well, if he's not, though, seeking the

2     admission of it, why is he not allowed to use the sound?

3          MR. SHEPARD:  I'm sorry.

4          THE COURT:  Oh, I see.  Because ... I see.

5          MR. SHEPARD:  And ultimately I may well seek admission

6     of it.

7          THE COURT:  I see.

8          MR. SHEPARD:  But --

9          THE COURT:  So she can't hear it.  It is impossible

10    for only the witness to hear it?

11         MR. SHEPARD:  Yes, that's the issue.

12         THE COURT:  All right.  Is there something about it

13    that creates a problem for you if the jury does hear it?

14         MR. HIGHSMITH:  Well, he's not permitted to introduce

15    it.

16         THE COURT:  Well, I know, but they're going to be told

17    it's not to be admitted at this point into evidence, but, I

18    mean, it's a bit academic.  He, you know, yesterday, quite

19    appropriately, Mr. Shepard was using some documents, and he was

20    reading in the documents.

21         MR. HIGHSMITH:  Uh-huh.

22         THE COURT:  And she was reacting to it.  That's

23    impeachment.  How is that really different than the video being

24    played?  It's not being admitted.  I don't see quite the

25    difference.

1          **MR. HIGHSMITH:**  I hear you.  It's like him reading the

2   script of the movie.

3          **THE COURT:**  Yeah.

4          **MR. HIGHSMITH:**  Understood, Your Honor.

5          **THE COURT:**  Okay.  You can go ahead and do it.

6          **MR. SHEPARD:**  Okay.

7          **THE COURT:**  But now that we're up here, on a different

8   note, I did get -- I know you've made some supplemental witness

9   disclosures, and I -- then I have a handwritten -- when I was

10  inquiring why the list was not complete, I got some handwritten

11  notations that I haven't doublechecked on your supplemental

12  disclosures, but I'm assuming they're the same.

13      But there was some names on here of witnesses that pertain

14  to the government misconduct motion that I have ruled on, and

15  they're not testifying.  So I wonder why they're here.

16          **MR. SHEPARD:**  If you're telling me they're not

17  testifying, then they're not testifying.

18          **THE COURT:**  Okay.  They're not testifying absent some

19  other showing that they have some relevance to this case.

20      Okay.  Thank you.

21          **MR. HIGHSMITH:**  Thank you, Your Honor.

22      (A recess was taken from 8:14 a.m. to 8:31 a.m.)

23          **THE COURT:**  Okay.  We're ready to bring them out.

24  Ready for them?

25      Okay.

1    THE COURTROOM DEPUTY:  Ready?

2    THE COURT:  Yes.

3    (The jury enters the courtroom.)

4    THE COURT:  Good morning, members of the jury.  Thank

5    you for being right on time.  Very much appreciate it.

6    Where we left off was cross-examination.  So if we can

7    recall the witness.

8    Good morning.  Ms. Jodoin, you understand you remain under

9    oath?

10    THE WITNESS:  Yes.

11    THE COURT:  Very well.

12    Mr. Shepard, you may proceed.

13    MR. SHEPARD:  Thank you, Your Honor.

14                    <u>**BRANDI JODOIN**</u>,

15    called as a witness for the Government, having been previously

16    duly sworn, testified further as follows:

17    **BY MR. SHEPARD**

18    **Q.**   Good morning and welcome back.

19    **A.**   Good morning.

20    **Q.**   Yesterday when we ended, we had talked about the state

21    court litigation you had with Mr. Andrade.  There was also

22    federal litigation, correct?

23    **A.**   Yes.

24    **Q.**   And in the federal litigation the case Marcus brought was

25    dismissed because Marcus didn't pay his attorneys, right?

1    **A.**    I believe so, yes.

2    **Q.**    Turning now to some questions about the company's

3    technology.

4         You did go through the I.D. verification process, correct?

5    **A.**    With a third party, yes.

6    **Q.**    Yes.  And the pitch for ATEN Coin was compliance and in

7    particular the ability to track senders and receivers, the AML,

8    anti-money laundering, and know your customer compliance, and

9    safety features to protect against theft and misconduct.

10   Correct?

11   **A.**    That's correct.

12   **Q.**    And I think you said yesterday that you didn't see

13   evidence that ATEN Coin had those?

14   **A.**    I said they did not have their own.

15   **Q.**    I'm sorry, they did not have?

16   **A.**    They did not have or use their own technology, which was

17   promised.  It was a third-party technology.

18   **Q.**    That is they were using third-party technology for things

19   like the I.D. verification process?

20   **A.**    That's correct.

21   **Q.**    Okay.  But ATEN Coin did have the ability to track senders

22   and receivers, AML and KYC compliance, and safety features to

23   protect against theft and misconduct, correct?

24   **A.**    Through a third party, yes.

25   **Q.**    And you made a video saying so, right?

1    **A.**    Yes, I did.

2    **Q.**    And everything you said in the video was true, correct?

3    **A.**    At the time, to my knowledge, yes, it was.

4    **Q.**    And you said that you believed what you said in the video

5    at the time you said it, correct?

6    **A.**    Yes.

7    **Q.**    And, in fact, there was a script for the video that was

8    sent to you by your husband, correct?

9    **A.**    That Marcus had given him, yes.

10    **MR. SHEPARD:**  Well, I object to that.  That's not

11    responsive to the question.

12    **THE COURT:**  Well, just answer the particular question

13    that's asked.  Don't volunteer.

14    Go ahead.

15    **BY MR. SHEPARD**

16    **Q.**    The script was sent to you by your husband, correct?

17    **A.**    Yes, it was.

18    **MR. SHEPARD:**  And I'd like to show the witness 3074.

19    **MR. CHOU:**  Can I get a copy?

20    **MR. SHEPARD:**  We'll get you one.

21    **BY MR. SHEPARD**

22    **Q.**    Are you able to see that?

23    **A.**    Yes, I do.  Yes, I am.

24    **Q.**    And that is an e-mail from your husband dated February 2,

25    2016, and it has as an attachment, if you go, please, to the

1  next page -- sorry.  If you go to the next page, the attachment

2  is the script, correct?

3  **A.**   That is correct.

4  **Q.**   And can we go to page 9.

5         **MR. SHEPARD:**  And while we're going there, Your Honor,

6  I'd like to offer 3074.

7         **MR. CHOU:**  Objection; hearsay.

8         **THE COURT:**  Why isn't it hearsay?

9         **MR. SHEPARD:**  Well, at this point it's really

10  addressing the witness' knowledge of some of the things that

11  she said.

12         **THE COURT:**  Well, then it's being used for impeachment

13  purposes, but it's not admitted, not an admitted exhibit.

14         **MR. SHEPARD:**  Okay.  Well, we'll work through it and

15  we'll take it for that now.

16         **THE COURT:**  Okay.  All right.

17         **MR. SHEPARD:**  And if ...

18  **BY MR. SHEPARD**

19  **Q.**   So if we go to page 9.

20  **A.**   Okay.

21  **Q.**   You've seen that slide before, correct?

22  **A.**   No, I don't believe so.  I don't remember.

23  **Q.**   Okay.  Well, then let's go back to the video, if we could.

24  Let me display for you the video.

25  **A.**   All right.

1   **Q.**  And I think that will help you see that you have, in fact,

2   seen this slide before.  So let's go to the video, if we could.

3         **MR. SHEPARD:**  With the Court's permission, we'll start

4   playing the video so that the witness can see it and

5   potentially authenticate it.

6         **THE COURT:**  I understand.

7       Are you going to be playing the audio also?

8         **MR. SHEPARD:**  Yes.

9         **THE COURT:**  All right.  Members of the jury, the --

10  this item is being played.  It's a video.  It's not at this

11  juncture admitted as an exhibit in this case, but it's being

12  used because, at this point, because Mr. Shepard has some

13  questions that he wants to ask the witness.  So again, it's not

14  an admitted exhibit at this point, but we're playing it

15  nonetheless so that she can respond to some of these questions.

16      Go ahead, Mr. Shepard.

17      (Video played.)

18        **MR. SHEPARD:**  Probably best with the audio.

19        **THE COURT:**  You might want to turn it up, too, a

20  little bit volume-wise.

21        **MR. CHOU:**  Well --

22        **MR. SHEPARD:**  If we could have a moment.

23        **MR. CHOU:**  Objection, Your Honor.  I don't think the

24  jury should be allowed to hear an audio of a video that --

25        **THE COURT:**  You weren't in the room.  We had a

1    discussion about that.

2              **MR. CHOU:**  I'm so sorry.

3              **THE COURT:**  That's okay.  You don't want to miss a

4    minute.  You want to always be here.

5         (Video played.)

6    **BY MR. SHEPARD**

7    **Q.**   This is the reason I've asked to stop it here is you

8    recall before we started playing this video, you had -- I asked

9    you to look at page 9 of the script.  You had said you weren't

10   sure you had seen it before, and what is currently on the

11   screen is what was on page 9 of the script.  Correct?

12   **A.**   That's correct.

13   **Q.**   So you have seen it before, correct?

14   **A.**   I have.

15   **Q.**   And it shows -- and by the way, this is, what we just saw,

16   that was you?

17   **A.**   Yes, that was me.

18   **Q.**   And that's a true and correct copy of this video that you

19   prepared for ATEN Coin, with help from others, correct?

20   **A.**   I filmed, yes.

21   **Q.**   Yes.  And this chart on~--- that was on page 9 of the

22   script and is currently displayed on the video, that shows the

23   administrator view of the ATEN Coin Blockchain, correct?

24   **A.**   It says it is.

25   **Q.**   I'm sorry, was that a "yes"?

1    **A.**    It says it is.

2    **Q.**    Okay.  Well, you actually know a fair amount about this,

3    don't you?

4    **A.**    I was never allowed to see this.  I never seen it other

5    than the script, so I can't say if it's actually the Patriot

6    Officer.  We were never allowed to see it.  So if it says it

7    is, and it is, I can't guarantee it was.  I wasn't allowed to

8    see it.

9    **Q.**    You made this video, right?

10   **A.**    Yes, I did.

11   **Q.**    And you didn't say, no, I'm not making this video, I don't

12   know this stuff.  Right?  You just made the video.  Right?

13   **A.**    Yes.

14   **Q.**    And if you go through the rest of the chart, each entry on

15   this list represents a transaction, right?

16   **A.**    I assume so, yes.

17   **Q.**    And the column on the left-hand side shows a user I.D.,

18   right?

19   **A.**    Yeah.

20   **Q.**    And the addresses column shows wallet addresses, right?

21   **A.**    Yes.

22   **Q.**    And I'm sorry to slow you down, but nodding is --

23   **A.**    I understand.  I apologize.

24   **Q.**    So much appreciated.  Thank you.

25        And to transact, the users had to have I.D.'s, right?

1    **A.**    Yes.

2    **Q.**    Just like you wound up getting an I.D., right?

3    **A.**    Yes.

4    **Q.**    And because of that transactions could be traced, correct?

5    **A.**    Yes.

6    **Q.**    And when you select a transaction you can see information

7    about the user's location and know who they are from their user

8    I.D., correct?

9    **A.**    I don't know.

10    **Q.**    That's what you presented, though, correct?

11    **A.**    That's what I was told to say, yes.

12    **Q.**    That's what you presented, correct?

13    **A.**    Yes.

14    **Q.**    And the script was sent to you by your husband, correct?

15    **A.**    Yes.

16    **Q.**    And you pointed out earlier in response to one of my

17    questions that the identification system that you used was a

18    third-party system, correct?

19    **A.**    Yes.

20    **Q.**    And you knew that ATEN Coin was building its own system,

21    correct?

22    **A.**    Yes.

23    **Q.**    And in the meantime, they were using a third-party system,

24    correct?

25    **A.**    Yes.

1        Sorry.

2   **Q.**   No problem.  It's normal that people would just nod their

3   head; it's just in court we need you to say "yes," so, thank

4   you.

5        And you knew that there were various people who were

6   working on the technology, correct?

7   **A.**   Um, yes.

8   **Q.**   There was a Serge Petkevich, who was Ukrainian, correct?

9   **A.**   Yes.  If that's his last name, yeah.

10  **Q.**   A Dr. Terence Poon, who was a professor at the University

11  of Hong Kong, correct?

12  **A.**   He was a university professor.  I'm not sure which

13  university, but, yes.

14  **Q.**   Okay.  And then you also knew of a Sachin Agarwal,

15  correct?

16  **A.**   No.

17  **Q.**   You knew someone named Sachin?

18  **A.**   I did, yes.

19  **Q.**   Okay.  You just didn't know his last name?

20  **A.**   No.  He was not working on the project.  Not to my

21  understanding.

22  **Q.**   Well, didn't you say yesterday that he was a technical

23  person who you learned about and talked about doing the Kathy

24  Ireland presentation?

25  **A.**   Yes.  He was simply a person from India that helped with

1    the low-level technical.  He was not a developer, to what I

2    understood.

3    **Q.**    He was doing something technical.  You don't know exactly

4    what.

5    **A.**    That's correct.

6    **Q.**    Okay.  Now, yesterday you were asked about exhibit 673.

7            **MR. SHEPARD:**  If we could -- I believe that's in

8    evidence, so if we could put it back on the screen.

9    **BY MR. SHEPARD**

10   **Q.**    You remember this?

11   **A.**    Yes, I do.

12   **Q.**    This is the presentation that you and your husband gave at

13   the conference in Edmonton?

14   **A.**    Part of it, yeah.  We gave part of it, yes.

15   **Q.**    And if I understood your testimony yesterday, you

16   attributed authorship of this present station to Marcus, as you

17   did with several other documents; is that right?

18   **A.**    I contribute the technical information to Marcus, yes.

19   **Q.**    So you're not saying he authored the whole documents?

20   **A.**    There's graphs in there, like graphics that I pulled off

21   the Internet.  Like the Bitcoin graphic I pulled off.

22   **Q.**    And the rest of it you say he was the principal author of?

23   **A.**    Yes.

24   **Q.**    Correct?  Are you sure?

25   **A.**    Yes.

1              **MR. SHEPARD:**  Can we show the witness and the Court

2    and the government, please, exhibit 3073.

3    **A.**   Yes.

4    **BY MR. SHEPARD**

5    **Q.**   You see that, ma'am?

6    **A.**   Yes.

7    **Q.**   And that's an e-mail you received on January 7, 2016, from

8    someone named, and I apologize for the pronunciation.

9    **A.**   Jarek.

10   **Q.**   Jarek?

11   **A.**   I mentioned him yesterday.

12   **Q.**   Sirko?

13   **A.**   Yes.

14   **Q.**   In that e-mail from Jarek, he sends you the first draft

15   for the presentation for the Edmonton conference, correct?

16   **A.**   Yes, he did.

17   **Q.**   It came to you from him, right?

18   **A.**   Yes.  As I said yesterday.

19   **Q.**   I just --

20   **A.**   Yes.

21   **Q.**   I asked if it came from him.

22   **A.**   Yes, it did.

23   **Q.**   Yes, it did; okay.  And then based on what he sent, there

24   were several drafts that followed, correct?

25   **A.**   Yes.

1    **Q.**   And you and Marcus and your husband all went over them,

2    correct?

3    **A.**   Yes.

4         **MR. SHEPARD:**  If we could just put up exhibit 3077 for

5    the witness and the Court and the government.

6    **BY MR. SHEPARD**

7    **Q.**   And this is an e-mail that you send to Jarek, and I'm

8    going to mispronounce her name, Agnieszka.

9    **A.**   Agnieszka, or Agga.

10   **Q.**   And Marcus and others.

11   **A.**   Uh-huh.

12   **Q.**   And it is dated January 7, 2016, correct?

13   **A.**   Yes.

14   **Q.**   So it's later in the same day?

15   **A.**   Uh-huh.

16   **Q.**   You tell him you and Marcus and Corey had a chance to go

17   over the presentation, and you sent him some comments, correct?

18   **A.**   That's correct.

19   **Q.**   And that's how the presentation that you gave with others

20   in Edmonton was prepared, correct?

21   **A.**   No.  He did the putting it into the PowerPoint.  He

22   ordered it.

23         **MR. SHEPARD:**  This is not responsive to my question.

24         **THE COURT:**  Well, no, you asked, and she said no and

25   is explaining the answer.

1          MR. SHEPARD:  Okay.

2          THE COURT:  Go ahead.

3          THE WITNESS:  We were given the technical information,

4    and it was a large, unwieldy.  It wasn't meant to go into

5    PowerPoint.  It was then given to Jarek, as I said yesterday,

6    because he worked in banking and then it was put into

7    PowerPoint.  Marcus said yes or no to all of the technical

8    information, and Corey and I said yes to the administrative.

9    That was our job.  I did not write the information, nor did I

10   approve or give any of the technical information without

11   Marcus' approval.

12   BY MR. SHEPARD

13   Q.   You don't say that when you send this back to Jarek,

14   right?

15   A.   Everyone knew the chain of command.

16          MR. SHEPARD:  I ...

17          THE COURT:  Please, when he asks you a question, I

18   know you want to explain.

19          THE WITNESS:  Certainly.

20          THE COURT:  Counsel will get up and on redirect if

21   they want to.

22        I understand, but just focus on the question.

23        Go ahead, Mr. Shepard.

24   BY MR. SHEPARD

25   Q.   You didn't say that when you sent this back to Jarek,

1  correct?

2  **A.**   I said Marcus and Corey and I had a chance to go over your

3  presentation.  We definitely -- we definitely like where it's

4  going, yes.

5  **Q.**   And attached are our notes on your presentation?

6  **A.**   That's correct.

7         **MR. SHEPARD:**  If I may have a moment.

8      So could we go to exhibit 3077, page 4.

9  **BY MR. SHEPARD**

10  **Q.**   This is, I believe, the first comment that shows up.

11      And it's from you?

12  **A.**   Yes, it is.

13  **Q.**   And you're saying clarify he is an anonymous developer,

14  correct?

15  **A.**   Yes.

16  **Q.**   Then there was another comment on the next page, page 5.

17  It's also from you, right?  It says:  Is it possible to include

18  or should we consider including some of the quotes of the

19  industry use for the blockchain, right?

20  **A.**   That's correct.

21  **Q.**   And then there's another comment on page 7.  It's also

22  from you, right?  And you say:  Jarek, our Blockchain is a bit

23  different steps than this due to our verification process.  As

24  long as you understand that is the bottom a quote, and if it

25  is.  Right?

1    **A.**    Yes.

2    **Q.**    So you're correcting him about the Blockchain, right?

3    **A.**    Yes.

4    **Q.**    The next comment on page 8 is also from you.  It's more a

5    comment about presentation?

6    **A.**    Yes.

7    **Q.**    And then on page 9 there's another comment.  It's also

8    from you, right?

9    **A.**    Yes.

10   **Q.**    And you begin by talking about the bottom is quite busy,

11   and then you suggest a chart to how much revenue Bitcoin can

12   have, referring to the St. Louis Federal Reserve on Bitcoin.

13   And if you are trying to establish a market for Blockchain,

14   please use the graph sent to Agnieszka concerning the markets

15   of the Blockchain, correct?

16   **A.**    Yes.

17   **Q.**    And then there is a comment on page 10, and it's also from

18   you, right?

19   **A.**    This is correct, yes.

20   **Q.**    And it says:  How can you say nonvolatile?  No

21   cryptocurrency.  Please use digital.  Perhaps not finest

22   solution, but something else, awkward in English, correct?

23   **A.**    That is correct.

24   **Q.**    And then on page 15, more comments from you, right?

25   **A.**    That's correct, yes.

1    **Q.**   And here you've almost filled up the page.  You begin:

2    ATEN MD is a blockchain development for recording medical

3    records on the ATEN blockchain.  ATEN Verify is a blockchain

4    development for verifying biometrics for banks and

5    organizations that need to meet the AML or KYC compliance

6    regulations.  And ATEN tracker is a blockchain development for

7    businesses that require products and services that need to be

8    tracked from port to port, correct?

9    **A.**   Yes.

10   **Q.**   Page 16, another comment also from you talking about one

11   of the ways to increase the value of ATEN Coins by exploiting

12   the blockchain, correct?

13   **A.**   Yes.

14   **Q.**   Page 18, also from you a comment:  Need to also inform

15   them that BitPeso was suspended due to the lack of compliance,

16   leading to distrust from the central bank --

17   **A.**   Excuse me.  I don't have that slide.

18   **Q.**   Oh, I'm sorry.  I got ahead of you, huh?  Sorry.

19          **MR. SHEPARD:**  Ed, have I given you time to catch up

20   there?  I'm sorry, page 18.

21          **THE WITNESS:**  It's up now.

22   **BY MR. SHEPARD**

23   **Q.**   You have it now?

24   **A.**   Yeah.

25   **Q.**   Okay.  Need to also inform them that BitPeso was suspended

1    due to the lack of compliance leading to distrust from the

2    Central Bank of Kenya, correct?

3    **A.**    Yes.

4    **Q.**    Page 19, two comments also from you.

5    **A.**    Yes, that's correct.

6    **Q.**    Due to the blockchain inherent trust factor and being able

7    to guard our customers from fraudulent transactions, a customer

8    has a wider trade world, American purchasing something from a

9    small individual tradesman in Africa or Bolivar, et cetera.

10        An exponentially faster transaction platform allows for

11   almost seamless transfer of currency and a large amount of

12   savings --

13        **MR. CHOU:**  Objection, improper impeachment.  He's just

14   reading a hearsay document into the record.

15        **THE COURT:**  Yeah, just -- right.  You don't have to

16   read every single one here.

17   **BY MR. SHEPARD**

18   **Q.**    Okay.  All the comments were written by you, correct?

19   **A.**    I was the secretary, the administrative officer.

20   **Q.**    I --

21        **THE COURT:**  Just let -- don't interrupt the witness.

22        **MR. SHEPARD:**  I'm sorry.

23        **THE COURT:**  You may answer the question, go ahead.

24        **THE WITNESS:**  As administrator officer, it was my job

25   to record what was said and then put it down to Jarek.  Yes,

1  those are my comments.

2  **BY MR. SHEPARD**

3  **Q.**  And you understood what you wrote down, right?

4  **A.**  Not all of it, no.

5  **Q.**  You didn't say, Jarek, I don't know what I'm talking about

6  here, I'm just writing this down?

7  **A.**  Does your secretary?

8      **THE COURT:**  Well, answer his question.

9      **THE WITNESS:**  Yes, I didn't tell him "no".

10 **BY MR. SHEPARD**

11 **Q.**  When you were shown exhibit 349 yesterday --

12     **MR. SHEPARD:**  You can put that one back on the screen,

13 because it is, I believe, also in evidence.

14     **THE COURT:**  It is admitted.

15 **BY MR. SHEPARD**

16 **Q.**  You mentioned that you were impressed with ATEN Coin

17 publicity because it claimed to be a service member of the

18 American Bankers Association, right?

19 **A.**  Yes.

20 **Q.**  And it was a service member of the American Bankers

21 Association, wasn't it?

22 **A.**  It became one after we joined, yes.

23 **Q.**  And it was also invited to participate in online and

24 in-person conferences with the Federal Reserve Faster Payments

25 Task Force, right?

1   **A.**   Yes.

2   **Q.**   And your husband, Corey, attended a conference of that

3   task force representing ATEN Coin, correct?

4   **A.**   Yes, he did.

5   **Q.**   Now, I'd like to turn to exhibit 1122, which also I

6   believe is in evidence.  Do you remember this page?

7   **A.**   Yes, I do.

8   **Q.**   Okay.  And Mr. Chou asked you, referencing the first item,

9   he said, well, did 1000 banks use ATEN Coin, and you said "no,"

10  you remember that?

11  **A.**   Yes, I did.

12  **Q.**   This doesn't actually say that a thousand banks used ATEN

13  Coin, does it?

14  **A.**   It said started the implementation -- I apologize.

15       No, I guess it doesn't.

16  **Q.**   Yeah.  It just says it started the implementation of a

17  software that a thousand banks use, right?

18  **A.**   Yes.

19  **Q.**   And that was true, right?  It did -- it had started

20  implementing the patriot system, right?

21  **A.**   As I said earlier, I never seen that document.  Marcus

22  told us we did.  Like I never seen it in use.

23  **Q.**   So the answer is you don't know?

24  **A.**   Exactly.

25  **Q.**   Okay.  But you certainly couldn't say that this was

1  untrue, correct?

2  **A.**    That's correct.

3  **Q.**    You mentioned Mr. Mawhinney.  Am I pronouncing his name

4  correctly?

5  **A.**    Mr. Mawhinney?  Yes, I believe so.

6  **Q.**    And you mentioned that he had tossed around some

7  valuations, 140 million, a hundred million dollars, but you

8  knew that those numbers were not guaranteed even by him,

9  correct?

10  **A.**    Yes.

11  **Q.**    And eventually he was fired, right?

12  **A.**    That is correct.

13  **Q.**    And you and your husband participated in the discussions

14  that led up to that, correct?

15  **A.**    Corey more so than me, yes.

16  **Q.**    When you were looking at exhibit 349 yesterday, also in

17  evidence, so here it is again.

18  **A.**    Uh-huh.

19  **Q.**    I believe you said that you thought that the technology

20  was ready based on documents like exhibit 349, correct?

21  **A.**    Yes.

22  **Q.**    But, in fact, when you and your husband purchased ATEN

23  Coins, the purchase agreement said that NAC, the NAC

24  Foundation, only guarantees that it will create a digital

25  currency, correct?

1    **A.**   Can I see it again?

2         **MR. SHEPARD:**  Could you put up exhibit 2437 at this

3    point just for the witness and the government and Judge

4    Seeborg?

5         Just checking -- sorry, Your Honor.  We're checking to see

6    if we have some hard copies, and we can do it that way if we

7    can't find the digital version.

8         If I may?

9         **THE COURT:**  You may.

10        **THE WITNESS:**  Thank you.

11        **THE COURT:**  And for identification, this is exhibit

12   what?

13        **MR. SHEPARD:**  I'm sorry?

14        **THE COURT:**  What number?

15        **MR. SHEPARD:**  2437.

16        **THE COURT:**  Thank you.

17        **MR. SHEPARD:**  The old-fashioned way of showing

18   exhibits.

19   **BY MR. SHEPARD**

20   **Q.**   This is a purchase agreement that your husband signed,

21   correct?

22   **A.**   Yes, it is.

23   **Q.**   And you saw it, correct?

24   **A.**   Yes, I did.

25   **Q.**   If you look at the first page --

1  **A.**  Yes.

2  **Q.**  -- the last whereas clause on the first page, it says:

3  Whereas, NAC only guarantees that it will create a digital

4  currency that is AML compliant, right?

5  **A.**  Yes.

6  **Q.**  You testified towards the end of your testimony yesterday

7  at the -- toward the end of your relationship with ATEN Coin

8  you were having discussions with Marcus, right?

9  **A.**  Yes.

10 **Q.**  And your earlier agreement had been that either you and

11 your husband would put up $500,000, or 275,000, plus you would

12 raise the remaining 225,000 in order to get 5 percent of the

13 company, correct?

14 **A.**  No.

15 **Q.**  Okay.  You did talk about putting up 500,000 or putting up

16 275,000 and then raising more money, correct?

17 **A.**  We offered, yes.

18 **Q.**  And, in fact, that offer got written down and recorded,

19 correct?

20 **A.**  On a napkin.

21 **Q.**  On a napkin.  Couldn't tell if this was a napkin or not,

22 but let me show you exhibit 2942.

23          **MR. SHEPARD:**  Let's go to the next page if we could.

24 I'm sorry, stick on the first page for a moment.

25 **BY MR. SHEPARD**

**Q.**   This is from your husband to Marcus, Subject:  Handwritten Agree.  Right?

**A.**   Yes, that's correct.

**Q.**   And then attached is I guess what you were describing as a napkin.

**A.**   Uh-huh.

**Q.**   Or a copy of a napkin.

**A.**   Yes, it is.

**Q.**   I don't think I can wipe my face with this one.

**A.**   Pardon me.  It wasn't a napkin.  It was fullscape.  You're right, I apologize.

**Q.**   No, that's okay.

And that's the handwritten agreement that you had, correct?

**A.**   Yes, it is.

**Q.**   And it says 250 cash by Corey to NAC, additional 250 cash raise Alberta conference to NAC.  Commission of 15 percent of all sales above 250.  Corey and Brandi contacts, services, travel expenses, and NAC agrees to 5 percent shares in NAC. Right?

**A.**   Yes.

**Q.**   And that was the essence of the handwritten agreement, correct?

**A.**   That was Option A, yes.

**Q.**   I'm sorry.  Before you said "yes" you said?

1    **A.**    That was Option A.

2    **Q.**    And Option B is 225K to 250K by 11/28/15.  Correct?

3    **A.**    Can I see it?  The -- it's -- I can't see it.

4    **Q.**    I'm sorry.

5              **THE COURT:**  Yes?

6              **A JUROR:**  Yes, please speak up.

7              **THE COURT:**  Yes.  Could you please use the microphone?

8              **MR. SHEPARD:**  My apologies.

9              **THE COURT:**  Okay.

10   **BY MR. SHEPARD**

11   **Q.**    Do you have it back?

12   **A.**    I do have it back.

13   **Q.**    And have I read Option B correctly?

14   **A.**    I can't see where Option B is.

15   **Q.**    Well, there's -- at the -- right after where it says

16   Option A, there's a B.

17   **A.**    No, that's my name.

18   **Q.**    Oh, that's your signature?

19   **A.**    Yes.

20   **Q.**    Ah, I'm sorry.

21         Okay.  So do you see Option B on this page?

22   **A.**    No, it was not included on this page.

23   **Q.**    Okay.  But this is what your husband sent to Mr. Andrade

24   as the handwritten agreement, right?

25   **A.**    Yes.

1  Q.  And you never raised that amount of money, correct?  You

2  never raised the $500,000?

3  A.  We raised 110,000, and he told us we had four months to do

4  it.  But Option B -- okay.  Never mind.  Yeah.

5  Q.  My question was you never raised the 500,000?

6  A.  No, there was not.

7  Q.  And then you mentioned that while you were discussing

8  things, Marcus filed litigation.  Right?

9  A.  Yes.

10  Q.  But before Marcus filed litigation, your attorneys wrote

11  him a demand letter, correct?

12  A.  Yes.

13  Q.  And before that, you demanded, among other things, payment

14  of compensation that you agreed would not have been due until

15  an initial public offering, and you also wanted a bigger

16  percentage of the company; isn't that right?

17  A.  Yes.  We did write that, yes.

18  Q.  And that was all before Mr. Andrade filed litigation,

19  correct?

20  A.  That's correct.

21  Q.  I think you said yesterday that you were a person who

22  wanted to be ethical in all respects?

23  A.  Yes.

24  Q.  And then you also said that as a result of the conference

25  in Edmonton in January of 2016, you didn't want to be part of

1    ATEN Coin and didn't want to work with Marcus anymore, correct?

2    **A.**    That is not what I said.  I said it was the first doubt

3    because of the age of some of the investors.

4    **Q.**    That's the first ethical issues you had is what you're

5    saying now, correct?

6    **A.**    It was our first concern, yes.

7    **Q.**    Okay.  In fact, you said you had ethical concerns before

8    the Edmonton conference, right?

9    **A.**    In Las Vegas, yes.

10    **Q.**    Yes.  You told the FBI you had ethical concerns after

11    visiting the Las Vegas office, which you did before the

12    Edmonton conference.  Right?

13    **A.**    Yes, we did.  And I brought those to Marcus' attention.

14    **Q.**    And in spite -- that wasn't the -- you brought that to

15    Marcus' attention.  That was not responsive to my question, was

16    it?  I just asked --

17            **THE COURT:**  Well, let's not get into argument here.

18    Ask your next question.

19    **BY MR. SHEPARD**

20    **Q.**    Okay.  And in spite of those ethical concerns that you

21    raised after you were in Las Vegas, you put on the conference

22    in January in Edmonton.  You raised $90,000?

23    **A.**    Yes.

24    **Q.**    And you said you sold -- that the people there were people

25    who lacked computers?

1    **A.**    Some of the previous investors, yes.

2    **Q.**    But people didn't need computers to use ATEN Coin, right?

3    They just needed a smart phone?

4    **A.**    They didn't have their wallets downloaded.  They needed at

5    the time a computer to download the wallet.

6    **Q.**    Didn't you say in the video that people just needed a

7    smart phone, that's all they needed?

8    **A.**    That's what they were supposed to only need, yes.

9    **Q.**    And you didn't survey people to see if they had computers

10    at home, did you?

11    **A.**    There was a few that brought it to our attention, yes.

12    **Q.**    My question was you didn't survey people to see if they

13    had computers at home, did you?

14    **A.**    Which people?

15    **Q.**    The people who you were concerned about not having

16    computers.

17    **A.**    I did talk to them about it, yes.

18    **Q.**    You surveyed all of the people?

19    **A.**    No.

20    **Q.**    Okay.  In any event, you had greater concerns after the

21    conference in Edmonton, right?

22    **A.**    Yes, in February.

23    **Q.**    But even after that conference, that's when you made the

24    video extolling the virtues of AML Bitcoin, right?

25    **A.**    The video was used at the conference.

1    Q.    If we can go back to exhibit 3074.    3074 is the script for

2    the video, right?

3    A.    Yes.

4    Q.    And it was sent to you on February 2nd, 2016.    So several

5    weeks after the conference, correct?

6    A.    It says it was, yes.

7    Q.    And not only did you make the video in February, but

8    despite your ethical concerns that you said you had and despite

9    not wanting to be a part of ATEN Coin and Marcus, in February

10   of 2016 you also went on an ATEN Coin trip to Barbados, didn't

11   you?

12         **MR. CHOU:**  Objection; assumes facts not in evidence.

13         **THE COURT:**  Overruled.  Overruled.

14   Go ahead.  You may answer the question.

15         **THE WITNESS:**  Yes, I did.

16         **MR. SHEPARD:**  If I may have a moment, Your Honor.

17   Nothing further, Your Honor.  Thank you.

18         **THE COURT:**  Thank you.

19   Mr. Chou.

20                    <u>**REDIRECT EXAMINATION**</u>

21   **BY MR. CHOU**

22   Q.    Good morning, Mrs. Jodoin.

23   A.    Good morning.

24   Q.    In total how much did you -- how much money did you and

25   your family invest in Marcus Andrade's company?

1  **A.**   Just over a half a million dollars.

2  **Q.**   And how much did you invest in ATEN Coin?

3  **A.**   Oh, I apologize.  It was $275,000 in the company and just

4  over $150,000 in the coins.

5  **Q.**   Did you and your family really want the ATEN Coin project

6  to succeed?

7  **A.**   Very much so.

8  **Q.**   And how much money have you received in your investment

9  today?

10  **A.**   Nothing.

11          **MR. SHEPARD:**   Your Honor this is just repeating the

12  direct examination.

13          **THE COURT:**   Overruled.

14  **BY MR. CHOU**

15  **Q.**   Mrs. Jodoin, earlier do you remember when the defense

16  counsel asked you about lawsuits Mr. Andrade filed against you?

17  **A.**   Yes, I do.

18  **Q.**   And were there two lawsuits, a federal and a state one?

19  **A.**   Yes.

20  **Q.**   Did both of those lawsuits result in court orders in your

21  favor?

22  **A.**   Yes.

23  **Q.**   Let's first address the federal lawsuit.  Okay?

24          Mrs. Jodoin, has it been several years since the federal

25  lawsuit?

1    **A.**    Yes, it has been.

2    **Q.**    Do you remember in detail the federal court's specific

3    rulings in that lawsuit?

4    **A.**    No, I don't.  We had a lawyer.

5    **Q.**    Would reviewing a copy of the federal court orders help

6    refresh your recollection?

7    **A.**    Yes, it would.  Please.

8          **MR. CHOU:**  I'd like to show the -- just the witness

9    and the Court and the defense counsel a exhibit up on the ELMO,

10   or I can pass it up in hard copy.

11         **THE COURT:**  Pass it up.

12         **MR. CHOU:**  Okay.  May I approach, Your Honor?

13         **THE COURT:**  You may.

14   **BY MR. CHOU**

15   **Q.**    So Mrs. Jodoin, I'd like you to read this silently to

16   yourself, focusing in on the second paragraph on the page,

17   lines 16 through 21, and just look up whenever you're done.

18   **A.**    Okay.

19   **Q.**    So Mrs. Jodoin, in the federal lawsuit, did a federal

20   magistrate order a managing member of NAC Foundation to attend

21   a federal court hearing?

22   **A.**    Yes.

23   **Q.**    And did Mr. Andrade's lawyer speak to him to inform him

24   that there was a federal court hearing?

25   **A.**    Yes.

1          **MR. SHEPARD:**  Objection; leading.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  Yes.

4  **BY MR. CHOU**

5  **Q.**   Did Mr. Andrade appear as ordered at that federal court

6  hearing?

7  **A.**   No.

8  **Q.**   I'd like you to turn to the next page, please, and read

9  silently to yourself lines 9 through 12.

10  **A.**   On the second page?

11  **Q.**   Yes, please, in the all caps.  And look up when you're

12  ready.

13  **A.**   Yes.

14  **Q.**   Does this refresh your recollection about what happened in

15  this particular federal court order?

16  **A.**   Yes, it does.

17  **Q.**   Did the federal magistrate there recommend that the case

18  be dismissed with prejudice --

19  **A.**   Yes.

20  **Q.**   -- for NAC Foundation's failure to maintain counsel and

21  obey the Court's orders?

22  **A.**   Yes.

23  **Q.**   Okay.  And I'll go ahead and take that back.

24          **THE COURT:**  Would you mark this for identification so

25  we can keep a record of what was shown to the witness?

1          **MR. CHOU:**  Yes, Your Honor.  We'll mark this as ...

2      One moment, please.

3      Your Honor, I would mark this as exhibit number 5000 for

4  identification unless the defense has objections.

5          **THE COURT:**  Okay.

6  **BY MR. CHOU**

7  **Q.**   Mrs. Jodoin, was there a second federal court order in

8  your favor after that?

9  **A.**   Yes.

10  **Q.**   Do you remember the details of that federal court order?

11  **A.**   Marcus was required to pay us our legal fees.

12  **Q.**   So Mrs. Jodoin, I want to now turn to some of the

13  questions about the technology and other things that defense

14  counsel asked you.

15      Earlier do you remember hearing a video that they played

16  for you --

17  **A.**   Yes.

18  **Q.**   -- with the audio?

19      Who, if anyone, gave you the information, the content that

20  you're reciting in that video?

21  **A.**   Marcus did.

22  **Q.**   And earlier there was a discussion of a slide deck.  Do

23  you remember that?

24  **A.**   Yes.

25  **Q.**   And the jury didn't see it, but you were looking through

1    it; is that correct?

2    **A.**    Yes.

3    **Q.**    And earlier you mentioned that you didn't understand

4    necessarily everything that you were entering into the slide

5    deck?

6    **A.**    That's correct.

7    **Q.**    And could you please explain why?

8    **A.**    I didn't know a lot about blockchain when I was asked to

9    help, and my prime, my prime duty was to simply streamline

10   communications.

11       Marcus had told us numerous times in Skype and personally

12   in e-mail that there was things not getting done, bills not

13   getting paid, those type of developmental things, because he

14   was so busy dealing with all of the nuts and bolts.

15   **Q.**    And --

16   **A.**    So I was there to organize.

17   **Q.**    And earlier, do you remember testifying on

18   cross-examination that everyone knew the chain of command?

19   **A.**    Yes.

20   **Q.**    What did you mean by that?

21   **A.**    Well, in Poland, one of the things that we did was set up

22   the corporate structure or lay out a corporate structure.

23   That's when Agga got her -- became the chief legal officer.

24   And there was a whiteboard, and everyone's job was put under

25   it, and if you wanted to talk to Marcus you had to go through

1    this person and this person.

2        Jarek was put under Corey.  Agga Bilinska, the marketing,

3    was put under myself.  So if they had questions, usually daily,

4    if not every other day, Marcus and myself, depending on what it

5    was concerning, or Corey and Marcus would walk through what

6    they gave us.

7        He would tell, in this case myself.  I would make notes.

8    I would then attach the notes and then send it back to the

9    person underneath me.

10   **Q.**   Who was at the top of this chain of command?

11   **A.**   Marcus.

12   **Q.**   Earlier one of the first questions that defense counsel

13   asked you was whether Mr. Andrade was a geek who didn't know

14   what he was doing.  Do you recall that?

15   **A.**   Yes.

16   **Q.**   And your response was "no," did I get that right?

17   **A.**   Yes.

18   **Q.**   Can you please elaborate why your answer to that is "no"

19   knowing what you know now?

20   **A.**   That specific question, I was talking about the appearance

21   that Marcus gave.  When you first met Marcus, it was he was

22   just a programmer that stumbled upon this idea, and that he

23   desperately needed help building the business and with

24   administrative, and it tugs at your heart strings a little bit.

25   So we were brought on to fill those very specific roles.  We

1    made it very clear that we did not know anything than those

2    roles, but time after time, after time, you would put forward

3    solutions to the problems and you would be refused.

4        Time after time he refused to show us the financials or

5    allow us to fix the things that we brought to his attention.

6        It became very apparent that it wasn't a programmer who

7    didn't know what he was doing.

8    **Q.**   And what became apparent to you that he was?

9    **A.**   In my opinion?

10       **MR. SHEPARD:**  I think this is calling for speculation.

11       **THE COURT:**  Sustained.

12       **MR. CHOU:**  One moment, Your Honor.

13    No further questions on redirect, Your Honor.

14       **THE COURT:**  Very well anything further?

15       **MR. SHEPARD:**  Can we have a moment, Your Honor?

16       **THE COURT:**  Yes.  You said you needed a moment?

17       **MR. SHEPARD:**  Yes, I asked if this would be an

18    appropriate time for a break.

19       **THE COURT:**  No, I want to know if you have any more

20    questions for the witness.

21       **MR. SHEPARD:**  Yes, and I --

22       **THE COURT:**  Well, very brief redirect.  We're already

23    on redirect, so it's going to be brief.

24       I mean recross, I should say.

25       **MR. SHEPARD:**  Then I don't have anything further, Your

1    Honor.

2            **THE COURT:**  Very well, you may step down.

3        The government will call its next witness.

4            **MR. HIGHSMITH:**  Thank you, Your Honor.  United States

5    calls Dr. Michael Witte.

6            **THE COURT:**  Very well.  If you could come forward to

7    be sworn.

8            **THE WITNESS:**  Good morning.

9                        **MICHAEL CHARLES WITTE**,

10   called as a witness for the Government, having been duly sworn,

11   testified as follows:

12           **THE COURTROOM DEPUTY:**  Please be seated.

13       Can you state your name and spell it, please.

14           **THE WITNESS:**  Michael Charles Witte, W-i-t-t-e.

15                        **DIRECT EXAMINATION**

16   BY MR. HIGHSMITH

17   **Q.**   Good morning, sir.

18   **A.**   Good morning.

19   **Q.**   What do you do for a living?

20   **A.**   Well, I am a pulmonary critical care physician, and I work

21   for an organ procurement organization in Iowa, the Iowa Donor

22   Network.

23   **Q.**   Are you retired from your practice?

24   **A.**   From my full-time pulmonary critical care job in the

25   intensive care unit I am retired as of 2020.

1   Q.   How long have you been a physician?

2   A.   Since 1977.

3   Q.   And where do you live?

4   A.   In Cumming, Iowa.  It's a suburb of Des Moines.

5   Q.   How long have you lived there?

6   A.   Since 2003.

7   Q.   And what do you do now for work?

8   A.   Well, I assist in the recovery of lungs for organ

9   transplantation, instructions of nursing staff in the intensive

10  care unit for procedures to improve the possibility of lung

11  transplant.  And then I also transport organs, solid organs, to

12  medical institutions for the transplantation.

13  Q.   All right.  Thanks for that background.

14  A.   Uh-huh.

15  Q.   Are you family with a product called ATEN Coin?

16  A.   Yes.

17  Q.   How did you become familiar with that product?

18  A.   I received a call from a gentleman named Brian Darrow

19  sometime maybe in the spring or summer of 2015.

20  Q.   Did you know Brian Darrow before that?

21  A.   No.

22  Q.   So was this a cold call?

23  A.   I would call it that.

24  Q.   Do you know how Mr. Darrow got your phone number?

25  A.   Well, I had invested in a company that he had mentioned

1  some 12 years earlier that had some interesting biomedical

2  products, and I must have been on an investor list that he got

3  ahold of.

4  Q.   What did you learn about ATEN Coin from Mr. Darrow during

5  that first call?

6  A.   Well, as I remember, he had introduced a coin that could

7  be purchased by members of the public at an early time in its

8  presence, kinda like an initial public offering, and I guess

9  I'd call it an initial coin offering.

10  Q.   Back then in 2015, did you know -- what was your

11  understanding of -- what was cryptocurrency?

12  A.   Oh, I didn't know much about it at that time, honestly.  I

13  mean, I was aware reading headlines of Bitcoin and alternative

14  coins to Bitcoin, as well, and that they were being developed

15  and marketed on trading platforms similar to the stock

16  exchange.  They're digital currency platforms.

17  Q.   Did you end up buying some ATEN Coin?

18  A.   I did.

19  Q.   Did you buy -- if you remember, did you buy it after that

20  first call or did you buy it after a subsequent call?

21  A.   You know, I don't know.  I've thought about that, and I

22  can't tell you if I researched it a little bit before

23  purchasing it.  One or the other.

24  Q.   Did you have multiple phone calls with Mr. Darrow?

25  A.   I did.

1   Q.   You mentioned you did a little research.  Could you

2   describe for the jury the preliminary research you did into

3   ATEN Coin?

4   A.   I didn't know at what time they produced a website that

5   described it and its features, but I used that primarily.

6   Q.   Okay.  Let's go to some of your purchases.

7           MR. HIGHSMITH:  Can we show the witness only and the

8   defense and the Court exhibit 810, please.

9       If you'd -- if we can zoom into the top half, please.

10  BY MR. HIGHSMITH

11  Q.   So take a look at this.  Is that your e-mail address?

12  A.   Yes.

13  Q.   In the "to" line?

14  A.   Yes.

15  Q.   And Brian@ATEN Coin.  Do you know who Brian@ATEN Coin is

16  on the top "from" line?

17  A.   Well, I know Brian Darrow at the bottom.

18  Q.   And then the date on there is August 21st, 2015?

19  A.   Yes.

20  Q.   And is that your -- is that your e-mail exchange?

21  A.   One of mine, yes.  That was my business exchange,

22  actually.

23  Q.   And is this a fair and accurate depiction of your e-mail

24  exchange with Mr. Darrow?

25  A.   Yes.

1          **MR. HIGHSMITH:**  I'd move to admit, Your Honor.

2          **MR. STEFAN:**  No objection, Your Honor.

3          **THE COURT:**  Very well.  810 will be admitted.

4      (Trial Exhibit 810 received in evidence.)

5          **MR. HIGHSMITH:**  I'd publish to the jury, please.

6  **BY MR. HIGHSMITH**

7  **Q.**  Can you explain to the jury what's happening?  Is this you

8  basically buying ATEN Coin from Mr. Darrow for about $19,500?

9  **A.**  Yes.

10 **Q.**  All right.  And is this one of your earlier purchases of

11 ATEN Coin?

12 **A.**  I believe so.

13 **Q.**  And did you make subsequent purchases of ATEN Coin later

14 in the future?

15 **A.**  I did.

16          **MR. HIGHSMITH:**  All right.  Can we show the witness

17 only, the Court and the defense, exhibit 677, please?

18 **BY MR. HIGHSMITH**

19 **Q.**  All right.  Do you see this document?  It's a share

20 purchase agreement between Marcus Andrade and Michael Witte.

21 It's dated November 1st, 2016.

22 **A.**  Yes.

23 **Q.**  Have you seen this document before?

24 **A.**  Yes.

25 **Q.**  Are you familiar with it?

1    **A.**    Yes.

2    **Q.**    Is it a fair and accurate depiction of the share purchase

3    agreement that you had with Mr. Andrade?

4    **A.**    Well, the first page is.

5    **Q.**    Can we show the witness?  Can we scroll through so he can

6    see pages -- all the way through to page 9 where the signatures

7    are?

8          Is that your signature there?

9    **A.**    Yes.

10   **Q.**    To your knowledge, is that Mr. Andrade's signature above

11   it?

12   **A.**    I would say so.

13          **MR. HIGHSMITH:**  All right.  Move to admit, Your Honor.

14          **MR. STEFAN:**  No objection.

15          **THE COURT:**  677 will be admitted.

16       (Trial Exhibit 677 received in evidence.)

17   **BY MR. HIGHSMITH**

18   **Q.**    Did you make a purchase in ATEN Group, as well as buying

19   the ATEN Coins themselves?

20   **A.**    I don't think so.  I mean, I was purchasing coins at the

21   time.  Now, ATEN Group I think was the overriding business

22   structure that had the coin, but maybe I did and didn't know

23   it.

24   **Q.**    Let's look at page 3 and 4, please.

25          Just at the very bottom, is that showing you're making an

1    initial payment of $10,000?

2        Just at the very bottom it says you're making a payment of

3    $10,000?

4    **A.**    It appears, yes.

5    **Q.**    All right.  And let's go to the next page.

6        And in the middle there where it's showing his purchase

7    for about $10,000.  And so here, do you see you're making a

8    purchase for $10,000, buying approximately a hundred shares?

9    **A.**    Yes.

10   **Q.**    Okay.  So did you make -- you make multiple investments

11   with Mr. Andrade over time?

12   **A.**    Yes.

13   **Q.**    Did you ever talk to Mr. Andrade?

14   **A.**    Yes.

15   **Q.**    I know it's a long time ago, but approximately, based on

16   your best memory, approximately how much -- how much time after

17   you spoke with Mr. Darrow did you talk to Mr. Andrade?

18   **A.**    I would probably say within six to 12 months.

19   **Q.**    And what caused you to talk to Mr. Andrade?

20   **A.**    I received a call.  I didn't -- I had no way of knowing

21   how to contact him, so I'm assuming that my contact information

22   was through Mr. Darrow.

23   **Q.**    Okay.  And do you -- do you have a memory of getting

24   Mr. -- contact information for Mr. Andrade through Mr. Darrow?

25   **A.**    Well, I think once his phone number appeared on my phone I

1  had his contact information.

2  **Q.**   Okay.  Got it.

3     So what do you recall talking to Mr. Andrade about?  Did

4  you talk to him about ATEN Coin?  What do you recall talking to

5  Mr. Andrade about?

6  **A.**   Yes.  He talked about the features of ATEN Coin and how it

7  differed from Bitcoin, which was the predominant coin at the

8  time, and that it had security features that would prevent it

9  from being used for nefarious things.

10 **Q.**   Did you ever see those security features in action?

11 **A.**   No.

12 **Q.**   If you remember, did you buy additional ATEN Coin after

13 you spoke to Mr. Andrade?

14 **A.**   I probably did make a couple purchases.

15 **Q.**   So your purchases, you purchases small amounts --

16 **A.**   Yes.

17 **Q.**   -- over time?

18 **A.**   Over probably a couple years.

19 **Q.**   Okay.

20 **A.**   Uh-huh.

21 **Q.**   What happened with ATEN Coin?  Do you recall what happened

22 with ATEN Coin?

23 **A.**   Well, I received e-mails that it was morphing into

24 something called AML Bitcoin, and that was pretty well

25 described on the website.

1   **Q.**   Did you go to the website?

2   **A.**   Yes.

3   **Q.**   And was that the AML Bitcoin website?

4   **A.**   I think so.

5   **Q.**   Do you know, did you learn why the ATEN Coin was morphed,

6   in your words, into AML Bitcoin?

7   **A.**   Well, I think it was for marketing reasons.  The term

8   "Bitcoin" itself would probably raise an eyebrow on a potential

9   investor or purchaser, so I think it was probably more for --

10          **MR. STEFAN:**  Objection; speculation.

11          **THE COURT:**  Sustained.

12  **BY MR. HIGHSMITH**

13  **Q.**   Did you talk to Mr. Andrade about why he re-branded or

14  morphed the ATEN Coin into AML Bitcoin?

15  **A.**   I think we did discuss that.  Not because I asked him, but

16  it was maybe just part of reaching out and telling me, an

17  investor, what was going on with it.

18  **Q.**   And did you end up buying AML Bitcoin after talking to

19  Mr. Andrade?

20  **A.**   Well, if it was -- I don't know what year it changed its

21  name from ATEN Coin to AML Bitcoin, but I think there was a

22  purchase probably in 2018 of a larger amount.

23  **Q.**   Do you remember how many AML Bitcoins you bought from

24  Mr. Andrade?

25  **A.**   I think it was a million at a nickel apiece sometime in

1  2018.

2  **Q.**  So pardon my math, is that $50,000?

3  **A.**  That is 50,000.

4  **Q.**  Okay.  And in connection with that sale, did you talk to

5  Mr. Andrade?

6  **A.**  I know we had an exchange of e-mails.  Whether there was a

7  conversation about that or not I don't recall.

8  **Q.**  Okay.  Did you do your own independent research into AML

9  Bitcoin after the morphing?

10  **A.**  Probably only through the references to financial

11  publications that were on a website.

12      **MR. HIGHSMITH:**  Okay.  Let's show the witness, the

13  Court and the defense exhibit 1447, please.

14  **BY MR. HIGHSMITH**

15  **Q.**  Do you subscribe to any financial publications?

16  **A.**  Not currently.

17  **Q.**  Sorry.  Back in 2017-2018, did you subscribe to any

18  financial publications?

19  **A.**  I think I was a subscriber to IBD.

20  **Q.**  What does IBD stand for?

21  **A.**  Investor's Business Daily.

22  **Q.**  Okay.  Take a close look at this article.

23      **MR. HIGHSMITH:**  And then if we could please scroll to

24  pages 2, 3 and 4.

25  **BY MR. HIGHSMITH**

1   **Q.**   Have you seen this article before, sir?

2   **A.**   Yes.

3   **Q.**   Did you see this article in 2017?

4   **A.**   Yes.

5   **Q.**   Is this article that you're reviewing today a fair and

6   accurate depiction of the article you saw in 2017?

7   **A.**   Yes.

8           **MR. HIGHSMITH:**  Move to admit.

9           **MR. STEFAN:**  No objection.

10          **THE COURT:**  1447 will be admitted.

11      (Trial Exhibit 1447 received in evidence.)

12          **MR. HIGHSMITH:**  Thank you, Your Honor.

13      Can we publish this to the jury, please?

14  **BY MR. HIGHSMITH**

15  **Q.**   All right.  So you read this Investor's Business Daily

16  article titled:  A New Digital Currency, AML Bitcoin, Makes

17  Landfall in Panama, right?

18  **A.**   Yes.

19          **MR. STEFAN:**  Objection; leading.

20          **THE WITNESS:**  That's what it states.

21          **THE COURT:**  Wait just a second.

22      Overruled.  Go ahead.

23          **MR. HIGHSMITH:**  And can we go to page 2, please, and

24  specifically highlight the second paragraph?

25  **BY MR. HIGHSMITH**

1   Q.   Do you remember having a reaction to this business -- to

2   this article at the time?

3   A.   Well, it seemed to be trumpeting the reaction of officials

4   that were being spoken to in Panama about its utility.

5          MR. HIGHSMITH:   And could we go to the next paragraph,

6   please.

7   BY MR. HIGHSMITH

8   Q.   The second sentence says:   The coin will launch publicly

9   at an initial coin offering on October 1st, 2017, and as stated

10  in its very name, the new AML Bitcoin is designed to be

11  anti-money laundering.

12         Do you recall having a reaction to this paragraph?

13  A.   Well, it was a hopeful statement that it would be on a

14  currency exchange.

15  Q.   And why was that important to you?

16  A.   Well, it's a regulated exchange where Bitcoin and

17  alternative coins could be bought and sold.

18  Q.   And why was it important to you that a coin could be

19  bought and sold?

20  A.   Well, then I could recoup some of my investment.

21         MR. HIGHSMITH:   Let's go to the next paragraph,

22  please, that starts "in Panama."

23  BY MR. HIGHSMITH

24  Q.   The next paragraph says:   In Panama, AML Bitcoin founder

25  Marcus Andrade met with leaders in government and industry,

1    including the banking sector.

2        Did you have a reaction to that paragraph?

3    **A.**    Well, I took it to be a true statement.

4    **Q.**    And then moving to the next paragraph.

5        The next paragraph says:  We expected to raise interest,

6    but never expected the unbounded enthusiasm we encountered.

7    And then the next sentence says:  Our discussions with the

8    leading banks will lead to tremendous opportunities for our

9    digital currency, both in Panama and throughout the world.

10        Did you have a reaction at the time to that paragraph?

11    **A.**    Well, again, it was a hopeful prognostication of the

12    future of AML Bitcoin.

13    **Q.**    And why was that important to you?

14    **A.**    Because it would enhance the potential value of my

15    investment.

16    **Q.**    The next paragraph has a quote from someone named De La

17    Guardia, Carlos De La Guardia.  And his quote says:  We

18    commenced groundbreaking discussions with the Panama Maritime

19    Authority to use AML Bitcoin in their payment structures, as

20    well as with the entities that provide the world's largest ship

21    registry in Panama to incorporate AML Bitcoin in their

22    operations.

23        What was your reaction to that paragraph when you read it

24    in 2017?

25    **A.**    Well, that they were at least in talks with official

```
 1   organizations within Panama to utilize this coin.
 2   Q.   Was this article and what was said in this article
 3   important to you in your decision to invest in AML Bitcoin?
 4   A.   Yes, it was.
 5   Q.   How?
 6   A.   Well, this Investor's Business Daily is a very highly
 7   regarded financial investment paper.  It's been around for
 8   decades, and it often quoted in other financial journals.  So I
 9   took it to mean it was truthful.
10        MR. HIGHSMITH:  Can we go back to the first page,
11   please?
12   BY MR. HIGHSMITH
13   Q.   You say you took it to mean it was truthful.  What was
14   important to you about the truth of the article?
15   A.   Well, the publication in which it was placed.
16   Q.   Okay.  If you had known, sir, that the -- someone
17   affiliated with AML Bitcoin paid to have this article placed in
18   Investor's Business Daily, would that have been an important
19   fact to you?
20   A.   Yes.
21   Q.   Why?
22   A.   Well, that's not how journalism works in my mind.
23   Q.   How about investing?
24   A.   How about investing?
25   Q.   Would knowing that AML Bitcoin paid to have this article
```

1  placed have influenced your decision to invest in them?

2  **A.**   Yeah, I would not have, because I would have looked at

3  that as being deceptive.

4  **Q.**   You see the "by" line?  It's written by Peter J. Ferrara?

5  **A.**   Yes.

6  **Q.**   If someone affiliated with AML Bitcoin had substantially

7  drafted this article and provided it to Mr. Ferrara and also,

8  as we talked before, paid Mr. Ferrara to place this article,

9  would that have influenced your decision to invest in AML

10  Bitcoin?

11  **A.**   Yes.

12  **Q.**   Why?

13  **A.**   Well, it would seem to be like a spin of an advertisement,

14  kind of a glorified advertisement of something that wasn't.

15  **Q.**   And you thought this was a reliable investment

16  publication?

17  **A.**   Well, I still do, actually.

18         **MR. HIGHSMITH:**  We can take this down, and could we

19  please show the witness and the Court and defense exhibit 41.

20  **BY MR. HIGHSMITH**

21  **Q.**   Take a look at this.  This is a September 27th, 2017,

22  article on Forbes, Building a better Bitcoin.  Have you seen

23  this article before?

24  **A.**   Yes, I have.

25  **Q.**   Did you read it back in 2017?

1   **A.**   Yes, I did.

2          **MR. HIGHSMITH:**  Let's just quickly scroll through the

3   entire article to show it to the witness.

4   **BY MR. HIGHSMITH**

5   **Q.**   Is this a fair and accurate depiction of the article you

6   read in 2017?

7   **A.**   Yes.

8          **MR. HIGHSMITH:**  Move to admit, Your Honor.

9          **MR. STEFAN:**  No objection, Your Honor.

10         **THE COURT:**  Very well.  This is number?

11         **MR. HIGHSMITH:**  Forty-one.

12         **THE COURT:**  Exhibit 41 will be admitted.

13      (Trial Exhibit 41 received in evidence.)

14         **THE COURT:**  And this would probably be -- we've gone

15   for an hour and a half, so it's a good point for our break.

16      Members of the jury, remember my admonitions to not

17   discuss this amongst yourselves or with anyone else.  We'll

18   come back in 15 minutes and see you then.

19      (The jury exits the courtroom.)

20      (A recess was taken from 10:03 a.m. to 10:20 a.m.)

21         **THE COURT:**  Okay.  Please bring the jury out.

22      (The jury enters the courtroom.)

23         **THE COURT:**  Jury is present.

24      Mr. Highsmith.

25         **MR. HIGHSMITH:**  Thank you.

1    BY MR. HIGHSMITH

2    Q.   Dr. Witte, when we left off we were looking at exhibit 41,

3    which is a Forbes article.  Do you have that in front of you?

4    A.   I do.

5    Q.   Do you see it was written on September 27th, 2017, by

6    Christopher Versace, contributor?

7    A.   Yes.

8         MR. HIGHSMITH:  Let's go to page 2, please, at the

9    very bottom of page 2.  And please blow that up.

10   BY MR. HIGHSMITH

11   Q.   All right.  Do you see in the very last sentence it says:

12   Already, ports in the United States and Latin America, as well

13   as banks and governments throughout the world, are in advanced

14   discussions with NAC Foundation, the creator of AML Bitcoin, to

15   deploy AML Bitcoin in their payment systems?  At the time in

16   2017, what was your reaction to that sentence in the article?

17   A.   Well, much like the IBD article, that it's another well

18   known publication that was touting the potential benefits of

19   utilizing this coin in business transactions throughout the

20   world.

21   Q.   Did that give you a sense one way or the other of the

22   likely success of AML Bitcoin?

23   A.   No, but it seemed to be optimistic.

24        MR. HIGHSMITH:  And let's go to the next page.  So on

25   page 3, the first paragraph, could you blow that one up?  And

1    we're just going to read the last sentence.

2    **BY MR. HIGHSMITH**

3    **Q.**    The last sentence at page 3 says:  This is where AMB

4    Bitcoin's ascendance could alter the playing field, and the

5    U.S. Congress is preparing legislation to encourage merchants

6    to take AML-compliant digital currencies.

7         What was your reaction to that sentence back in 2017?

8    **A.**    Well, I thought it was very optimistic, using Congress as

9    a kind of a bullhorn for its use, but if so that would be great

10   because then it would become legislatively enacted.

11          **MR. HIGHSMITH:**  And then finally, could we please blow

12   up the last paragraph or the second to last paragraph.

13   **BY MR. HIGHSMITH**

14   **Q.**    All right.  And then in the first sentence of this

15   paragraph here it says:  As hedge funds and major investors

16   look for the October 1st, 2017, launch, there is a distinct

17   probability the value of AML Bitcoin will soar, while the value

18   of the Bitcoin Investment Trust, which has soared year-to-day,

19   could come under pressure.

20         What was your reaction to that sentence in 2017?

21   **A.**    Well, that there was a date on a calendar where AML

22   Bitcoin would be traded and would achieve a high value.  I

23   don't know so such about the Bitcoin Investment Trust and what

24   direction it would go because of its competitor, but it was,

25   again, just laudatory comments about the possibilities of this

1  coin.

2      MR. HIGHSMITH:  Could we return to page 1, please.

3  BY MR. HIGHSMITH

4  Q.  If you had known that Mr. Versace, the contributor here,

5  was paid by someone at AML Bitcoin in connection with writing

6  this article, would that have influenced your decision to

7  invest in AML Bitcoin?

8  A.  Yes.

9  Q.  Why?

10  A.  Well, I look at journalists, whether they're financial,

11  political or otherwise, as being independent, objective and not

12  able to be bought and sold for some person's interests.

13  Q.  If you had known at the time you read this article that

14  someone at AML Bitcoin or affiliated with AML Bitcoin had

15  drafted substantial portions of this article, would that have

16  influenced your decision to invest in AML Bitcoin?

17  A.  Yes.

18  Q.  Why?

19  A.  It would lessen the credence of the information in the

20  article.

21      MR. HIGHSMITH:  Can we please look at exhibit 1441,

22  and only the witness and the Court and the defense.

23  BY MR. HIGHSMITH

24  Q.  Okay.  Do you see the screenshot of an online article in

25  front of you?

```
 1   A.   Yes.

 2   Q.   Are you familiar with this article?

 3   A.   Yes.

 4   Q.   How are you familiar with it?

 5   A.   I read it.  I think it was referred to on the AML Bitcoin

 6   website as one of the publications that had information about

 7   AML Bitcoin.

 8   Q.   All right.  Do you see the byline is Peter Roff and the

 9   date is September 12th, 2017?

10   A.   Yes.

11        MR. HIGHSMITH:  Okay.  Can we scroll just through to

12   refresh or just to show Dr. Witte the article?

13   BY MR. HIGHSMITH

14   Q.   All right.  And you read this in 2017?

15   A.   I did.

16   Q.   Is this a fair and accurate depiction of the article you

17   read in 2017?

18   A.   It is.

19        MR. HIGHSMITH:  We'd move to admit, Your Honor.

20        MR. STEFAN:  No objection.

21        THE COURT:  1441 will be admitted.

22      (Trial Exhibit 1441 received in evidence.)

23        MR. HIGHSMITH:  Thank you.

24      Can we please go to the first page and publish that to the

25   jury.
```

1    BY MR. HIGHSMITH

2    **Q.**    All right.  So this article here you said was linked to

3    the AML Bitcoin web page; is that right?

4    **A.**    I believe so.

5    **Q.**    Do you have any idea what this photograph is a photograph

6    of?

7    **A.**    Looks like the San Francisco Bay docking area.

8    **Q.**    And you see the title:  Cryptocurrency's future may be

9    now, how San Francisco could help change the way we think about

10    money?

11    **A.**    Yes.

12        **MR. HIGHSMITH:**  Let's go to page 3, please, and if you

13    could please highlight and zoom in on the third paragraph.

14    BY MR. HIGHSMITH

15    **Q.**    All right.  Do you see in the third paragraph it starts:

16    Andrade is the software entrepreneur behind AML Bitcoin?

17    **A.**    Yes.

18    **Q.**    He and port officials are currently in discussions looking

19    for ways the port could utilize digital currency as a means of

20    payment free from the taint of abuse and criminality

21    historically attached to the concept.

22        Do you see that?

23    **A.**    Yes.

24    **Q.**    After reading this quote and also the article overall, did

25    that give you an impression about AML Bitcoin and the promise

1    of AML Bitcoin?

2    **A.**    Yes, it did.

3    **Q.**    Describe it, please.

4    **A.**    Well, I know up to that point in time there were issues

5    related to money laundering, weapon and drug purchases using

6    Bitcoin perhaps because it didn't have features in the

7    algorithm that would allow for the prevention of money

8    laundering and this coin appeared to have differentiating

9    features of it that would make it safer to use.

10        And there was reference to the American banking community,

11    and I think the website put the ABA as an institution that

12    backed this particular coin.

13    **Q.**    Was the reference to potential talks with the Port of San

14    Francisco relevant to you?

15    **A.**    Sure.

16    **Q.**    Why?

17    **A.**    Well, it's a busy port.  Lot of goods moving to and from,

18    a lot of transactions that could be had every day.

19        **MR. HIGHSMITH:**  Could we please turn to page 4 of this

20    exhibit and blow up the third paragraph starting "San

21    Francisco."

22    **BY MR. HIGHSMITH**

23    **Q.**    So this paragraph in the article you read reads:  San

24    Francisco is a very tech-forward thinking city, and at the port

25    we will certainly explore all opportunities to effectively use

1    cutting-edge technologies.  And there's a reference to

2    AML-compliant cryptocurrencies as preventing (sic) potential

3    opportunities that would benefit the port and its customers,

4    according to Leslie Katz.  Do you see that?

5    **A.**    Yes.

6    **Q.**    Based on this quote and your review of the article as a

7    whole, did that give you an impression of AML Bitcoin and its

8    promise?

9    **A.**    It gave me a positive impression.

10          **MR. HIGHSMITH:**  Please turn to the next page, page 5,

11    and blow up the second full paragraph starting "Andrade."

12    **BY MR. HIGHSMITH**

13    **Q.**    This paragraph starts:  Andrade, who has been in contact

14    with the heads of other ports on the west coast, believes they

15    all will become enthusiastic adopters of AML Bitcoin.  The

16    Department of Homeland Security would likely have an interest

17    in it, as well, given the innovations it brings in digital

18    currency technology.

19          **MR. HIGHSMITH:**  Could we go to the next paragraph and

20    blow that up, please.

21    **BY MR. HIGHSMITH**

22    **Q.**    This paragraph starts:  The issue is moving faster than

23    Andrade or anyone else may suspect.  Several members of

24    Congress are looking at the possibility of drafting legislation

25    to allow a wider use of digital currencies if they meet

1    existing banking standards, as AML Bitcoin does.

2        Do you see that?

3    **A.**    Yes.

4    **Q.**    So taking this information and the information contained

5    in the article as a whole, did that give you an impression

6    about the promise of AML Bitcoin?

7    **A.**    It gave me a positive impression, yes.

8        **MR. HIGHSMITH:**    We can take this down.

9    **BY MR. HIGHSMITH**

10    **Q.**    If you had known that this article was written in part

11    because someone at AML Bitcoin had paid the author several

12    thousand dollars, would that have influenced your decision to

13    invest in AML Bitcoin?

14    **A.**    Yes.

15    **Q.**    Why?

16    **A.**    Well, again, being paid to advertise a product,

17    particularly if information in the article were -- was false,

18    it would be a deceptive way of touting a product.

19    **Q.**    If you had known that someone affiliated with AML Bitcoin

20    drafted substantial portions of the article and gave it to the

21    author for publication, would that have influenced your

22    decision to invest?

23    **A.**    Yes.

24    **Q.**    Why?

25    **A.**    Because that's not independent objective journalism in my

1  mind.

2  **Q.**   You testified a few moments ago that you read these

3  articles in 2017 and you bought AML Bitcoin in 2018.  Did you,

4  in fact, buy some of your AML Bitcoin after reading these

5  articles?

6  **A.**   Yes.

7  **Q.**   Were these articles, did they influence your decision to

8  invest in AML Bitcoin?

9  **A.**   Yes, they did.

10         **MR. HIGHSMITH:**  Let's turn now to exhibit 1048, please

11  and show this only to the witness, the Court and the defense.

12  **BY MR. HIGHSMITH**

13  **Q.**   Please take a look at this.  Is this an e-mail from

14  Mr. Andrade to you?  And it's an e-mail chain, and it spans

15  July 30th, 2019 -- it's actually just -- it's a couple of

16  e-mails on July 30th, 2019.  Do you see that?

17  **A.**   I do.

18  **Q.**   Is this your e-mail exchange with Mr. Andrade?

19  **A.**   Yes.

20  **Q.**   Have you seen it before?

21  **A.**   Yes.

22  **Q.**   Are you familiar with it?

23  **A.**   Yes.

24  **Q.**   Is this a fair and accurate depiction of your e-mail?

25  **A.**   It is.

```
 1              MR. HIGHSMITH:  Move to admit, Your Honor.

 2              MR. STEFAN:  No objection.

 3              THE COURT:  1048 will be admitted.

 4         (Trial Exhibit 1048 received in evidence.)

 5              MR. HIGHSMITH:  Thank you, Your Honor.

 6         Could we please start by displaying page 2.  And could we

 7    please start by zooming in on the bottom, and if we could start

 8    with the date, that would be great.

 9    BY MR. HIGHSMITH

10    Q.   All right.  So do you see here on Sunday, June 30th, 2019,

11    you write an e-mail to Marcus Andrade?

12    A.   Yes.

13    Q.   So is this after you've purchased ATEN Coin in several

14    different tranches and after you've purchased AML Bitcoin?

15    A.   I believe so.

16    Q.   All right.  You see it starts off:  Marcus, thank you for

17    speaking with me?

18         Do you see that?

19    A.   Yes.

20    Q.   Do you have a recollection of speaking with Marcus after

21    your purchases of AML Bitcoin?

22    A.   I must have, based on this, yes.

23    Q.   Let's focus on bullet point 2.  Do you see bullet point 2

24    in your e-mail to Mr. Andrade where you say:  I remember seeing

25    on the website at one time two individuals assigned for
```

1  responsibility for:  A, Latin America, a former official from

2  Panama, question mark, and, B, a foreign British MP for

3  European affairs, as well.

4      And then I'm not going to read the whole thing, but

5  further down you also reference:  Is there an effort to promote

6  the AML/KYC advantage of AML Bitcoin for practical purposes at

7  shipping ports such as San Francisco and the Panama Canal or in

8  Poland?  Do you see that?

9  **A.**   Yes.

10 **Q.**   Why were you writing that question or those series of

11 questions to Mr. Andrade?

12 **A.**   Well, that was information I gleaned from the articles in

13 those publications, but I hadn't read any additional

14 publications or actualization of the promises from those

15 articles.  It just hadn't happened, so I was wondering, you

16 know, was the ball dropped or discussion's still ongoing.  I

17 wanted more information.

18 **Q.**   So you read those articles in 2017, and you sent this

19 e-mail in 2019, correct?

20 **A.**   Yes.

21 **Q.**   So your e-mail was coming approximately two years, give or

22 take, after you read those articles.  Is that right?

23 **A.**   Roughly, yes.

24      **MR. HIGHSMITH:**  All right.  Let's go to page 3,

25 please, and highlight the paragraph that starts with "finally".

**BY MR. HIGHSMITH**

**Q.**   So that first paragraph starts:  Finally, I have continued to reflect on all my investments with you.  I had high hopes for both business concepts, including ATEN Coin and CrossVerify initially.  My enthusiasm has been tempered by the nearly four years that has passed since my first investment.

Let's start with CrossVerify.  Did you make an additional investment in another entity that was controlled by Mr. Andrade, CrossVerify?

**A.**   Yes.

**Q.**   Okay.  Do you recall approximately how much money you invested with Mr. Andrade in that?

**A.**   I think it was $70,000.

**Q.**   Did you speak with Mr. Andrade about that investment?

**A.**   I'm sure I did.

**Q.**   On the telephone?

**A.**   Yes.

**Q.**   When you wrote that sentence that we just covered, what were you trying to communicate to Mr. Andrade?

**A.**   That it had been a long time with my investment sitting somewhere and not seeing a return on it.

**Q.**   Had you seen any money back --

**A.**   No.

**Q.**   -- out of your investment?

**A.**   None at all.

**Q.** Let's go a little bit further down, and we're going to have to dig out a little passage from the middle of that same paragraph. It's a little bit further down. It starts with: Rather than spending so much time with individual investors, can there be updates sent to investor e-mail addresses from, say, the NAC Foundation?

What did you mean by that question?

**A.** Well, I assumed that the organization had a hierarchy and a structure, that it wasn't just a one-person operation, and that we could be more timely informed of things going on with their product.

**Q.** Let's start more basic. Did you get any official e-mail updates from AML Bitcoin as an investor?

**A.** No.

**Q.** Let's go -- and so essentially were you asking for some more regular updates?

**A.** Yes.

**Q.** Or any regular updates?

**A.** Any information.

**Q.** We'll actually go up a little bit now. Let's focus -- we can stay focused on that same paragraph, and then let's particularly look at the sentence that starts: Your recent strategy may or may not work to your/our advantage, however, I would be willing to limit my return of my recent AML Bitcoin purchase amounting to $50,000 to $45,000 to allow me to retain

1    a hundred thousand of the million coins.

2         Were you essentially asking to get a little money back for

3    a little bit of a refund?

4    **A.**    Well, he had promised he would send back all of it if I

5    asked for all of it.

6    **Q.**    Describe for the jury that promise, please.

7    **A.**    Well, it was both on the phone and by e-mail.

8    **Q.**    Okay.  And what did he promise?

9    **A.**    He promised to return that investment to me by no later

10   than December of 2019.

11   **Q.**    Did he?

12   **A.**    No.

13   **Q.**    Did you want him to?

14   **A.**    Absolutely.

15   **Q.**    Let's go down to the second page.  Actually, let's go to

16   the first page and look at Mr. Andrade's responses.

17        So Mr. Andrade responded to your e-mail, correct?

18   **A.**    Yes.

19   **Q.**    He writes something, there's an agreement with Comply

20   Advantage.  It's a written agreement of being able to create a

21   digital asset would help the use case of our coins.  For

22   example, you could create your own Mike Coin.  All you would

23   need to do is just open the wallet, click create asset tab and

24   enter the amount of coins.  Do you see that?

25   **A.**    Yes.

1  Q.   Therefore at the end of the day your coin would be AML/KYC

2  compliant.  Your coins would automatically be able to be

3  received in any AML Bitcoin wallets.  Do you see that?

4  A.   I do.

5  Q.   What did you understand Mr. Andrade meant by that passage?

6  A.   I think he's referring to a process called tokenization,

7  where you can create a -- have a coin become a token for

8  something, whatever you want it to be.  I wasn't interested in

9  that.

10  Q.   Did you understand what that meant?

11  A.   Probably more so now than then because of just the, you

12  know, a greater knowledge of digital currency and what's in the

13  marketplace.  But that didn't seem to have any interest in me.

14  That wasn't why I bought AML Bitcoin.

15  Q.   Had you asked about that in your -- were you asking about

16  how you could set up a Mike Coin?

17  A.   No, absolutely not.

18  Q.   Let's go to the response to your second question, your

19  reference to the Panama and Port of San Francisco.

20       Mr. Andrade writes:  Those individuals were not able to

21  close any of the business development deals they were working

22  on at that time.  And then he goes on to explain.  I will

23  forward you an e-mail from Japheth Dillman that was sent to me

24  in association with Leslie Katz, which was a commissioner at

25  the Port of San Francisco.  Please keep this e-mail

```
 1   confidential.
 2        What did you understand Mr. Andrade to be saying to you in
 3   that passage?
 4   A.   Well, that there was still ongoing discussions with the
 5   Port of San Francisco to use these coins as an exchange of
 6   business transactions at the port.
 7   Q.   And then what did you understand about whether any deals
 8   had actually happened?  Did you have an understanding -- based
 9   on this e-mail, based on Mr. Andrade's response, did you
10   understand that any deals had happened?
11   A.   No, it looked like they had not.
12   Q.   You recall we just talked a little bit earlier about your
13   separate investment in CrossVerify, a different one of
14   Mr. Andrade's entities?
15   A.   Right.
16   Q.   If you look a little bit further down on his response
17   to 3.
18        MR. HIGHSMITH:  Could we blow up his response to 3,
19   please?
20   BY MR. HIGHSMITH
21   Q.   He says -- what was your impression of his response to
22   your question about your CrossVerify investment?  Was it clear
23   to you what he was saying?
24   A.   Well, he mentioned donating his shares, but they were
25   purchased, they weren't donated.  And he looked to monetize
```

1   shares in that company by, you know, doing business deals.

2   **Q.**   Did you -- were you ever aware of any business deals with

3   that entity?

4   **A.**   I did receive an e-mail I think from Carl Weir, who was

5   maybe the CEO of CrossVerify at the time.  Saying that they

6   were going to have a $10 million deal with Northcott Global

7   Solutions, which is a wealth management company operating out

8   of London using CrossVerify products, and I had spoken with

9   Mr. Weir one time, or actually two times.  So I assumed that

10  since this was a -- continues to be an organization, a wealth

11  management company in London, that this was verifiable

12  information that was truthful.

13  **Q.**   Did you ever get any return on your CrossVerify

14  investment?

15  **A.**   No.  I -- I did call probably in 2020 Mr. Weir, because I

16  still had his number, and he said he had disassociated himself

17  from Mr. Andrade at that time, and I just took that to be bad

18  information.

19  **Q.**   Let's go a little bit further down on page 2.  This is a

20  continuation of Mr. Andrade's response to you.

21       **MR. HIGHSMITH:**  Could we please highlight the top half

22  of the page?

23       Thank you very much.

24  **BY MR. HIGHSMITH:**

25  **Q.**   All right.  So you had written reflecting on your

1    investment.

2    **A.**    Yes.

3    **Q.**    And again, this e-mail came approximately four years after

4    your first investment with Mr. Andrade, correct?

5    **A.**    Right.

6    **Q.**    So Mr. Andrade's response is -- and then you ask in your

7    e-mail for a refund, correct?  Could I have a refund of part of

8    it?

9    **A.**    Which he had offered.

10   **Q.**    And his response, do you see it starts:  I do believe it

11   would be best to wait another 60 days?  Do you see that?

12   **A.**    Yes.

13   **Q.**    And he says:  We will start a marketing campaign with the

14   intent to create awareness of our coin.  Do you see that?

15   **A.**    Yes.

16   **Q.**    Now is the time since the product is in beta mode.

17   Especially since what is happening with Facebook right now.

18   Now is the time to start the marketing campaign.  You are good

19   for the refund agreement until December of this year.  Do you

20   see that?

21   **A.**    I do.

22   **Q.**    At that time, what did you understand Mr. Andrade was

23   telling you?  What was your impression of what he was saying to

24   you?

25   **A.**    Well, based on the previous articles in the other

1  publications saying that in October of 2017, AML Bitcoin was

2  going to be traded, and it wasn't, this is two years later, and

3  if they're doing beta testing, whatever that process is, it

4  seemed to be 24 months after they said it was going to be on

5  the market.

6  **Q.**  So was this giving you a sense of continued delays?

7  **A.**  Yes, and unexplained delays.

8  **Q.**  Also you asked for a refund, and do you see his first

9  sentence, his response to you?  What does he respond to you?

10  When you ask for a refund, how does he respond to you?

11  **A.**  Well, by his word he said I would receive it.

12  **Q.**  And did you?

13  **A.**  I did not.

14      **MR. HIGHSMITH:**  Could we please show the witness, the

15  Court and the defense exhibit 1448.

16  **BY MR. HIGHSMITH**

17  **Q.**  If you take a look at this, it's an e-mail from you --

18  it's an e-mail from Mr. Andrade to you.  It's dated May 27th,

19  2020.  Do you see that?

20  **A.**  I do.

21  **Q.**  All right.  If you scroll down, it's an e-mail chain.

22  There's an e-mail from Mr. Andrade on May 15th, 2020, there's

23  an e-mail from Mr. Andrade on April 22nd, 2020, and there's an

24  e-mail from you on April 17th, 2020.  Do you see that?

25  **A.**  Uh, yes.

1   **Q.**   Is this your e-mail exchange with Mr. Andrade?

2   **A.**   It must be, yes.

3   **Q.**   Have you seen this before?

4   **A.**   Yes.

5           **MR. HIGHSMITH:**  Move to admit exhibit 1448, please.

6           **MR. STEFAN:**  No objection.

7           **THE COURT:**  Exhibit 1448 will be admitted.

8       (Trial Exhibit 1448 received in evidence.)

9           **MR. HIGHSMITH:**  Thank you, Your Honor.

10  **BY MR. HIGHSMITH**

11  **Q.**   Can we please start at the very last page on page -- not

12  the very last, the second to last, page 3, and we'll go through

13  your e-mail exchange with Mr. Andrade.

14          **MR. HIGHSMITH:**  All right.  Can we publish this to the

15  jury and blow up the e-mail from Thursday, April 16th, 2020?

16  **BY MR. HIGHSMITH**

17  **Q.**   All right.  So this e-mail says:  Hello, Mike.  We have

18  done a soft launch of AML Bitcoin.  Before we do a full launch,

19  I would recommend we get you converted over from the tokens to

20  the AML Bitcoin that has all the specialized features.  Do you

21  see that?

22  **A.**   Yes.

23  **Q.**   All right.  What's the date on that?

24  **A.**   April 16, 2020.

25  **Q.**   So that's approximately, give or take, three years after

1    the -- the morphing from ATEN Coin to AML Bitcoin?

2    **A.**  If that change was in '16.  Or '17, I'm sorry.

3    **Q.**  All right.  So you respond back to him the next day.

4          **MR. HIGHSMITH:**  Can we blow up Dr. Witte's response,

5    please.

6    **BY MR. HIGHSMITH**

7    **Q.**  You write:  I am available today, Marcus, and your phone

8    number?

9    **A.**  Yes.

10    **Q.**  And then about six days later, a week later, Mr. Andrade

11    responds.

12          **MR. HIGHSMITH:**  Can we blow up on page 2, the bottom

13    half of page 2, please.

14    **BY MR. HIGHSMITH**

15    **Q.**  So did Mr. Andrade help you set up a new wallet?

16    **A.**  Yes.

17    **Q.**  And did he kinda walk you through that process?

18    **A.**  He did.

19    **Q.**  And he instructed you:  Make sure you have a copy of your

20    driver's license and your passport already saved on your

21    computer.  Did you do that?

22    **A.**  I did.

23    **Q.**  And did you set up the wallet?

24    **A.**  I did.

25    **Q.**  All right.  The next e-mail covers two pages, so can we go

1    to page 1, please, but we're going to look at the very bottom

2    of the page and the e-mail from May 15th.

3         All right.  So you see an e-mail from Mr. Andrade to you

4    on May 15th, 2020?

5    **A.**   Yes.

6    **Q.**   He says:  Hey, Mike, how you doing, partner?  You have

7    already completed the hardest part.  Everything else is easy.

8           **MR. HIGHSMITH:**   Now can we go to the next page and

9    zoom in on the top half of the second page, please.

10        Thank you.

11   **BY MR. HIGHSMITH**

12   **Q.**   And is this more instructions on how to set up the wallet

13   with some links to YouTube?

14   **A.**   Yes.

15   **Q.**   And then at the bottom he writes:  So do you want me to

16   repurchase those coins back, with I think a smiley face.  Do

17   you see that?

18   **A.**   Yes.

19   **Q.**   What was your impression when you got that e-mail?

20   **A.**   This was dated the spring of 2020?

21   **Q.**   Correct.

22   **A.**   Well, that he was still willing to compensate me for the

23   coins that I had purchased.

24   **Q.**   Did you get any compensation?

25   **A.**   No.

1    **Q.**   Let's scroll up to the first page and your response on

2    May 27th.

3             **MR. HIGHSMITH:**   And just zoom in on the May 27th

4    e-mail.

5    **BY MR. HIGHSMITH**

6    **Q.**   So at this point in 2020, you've invested in AML Bitcoin

7    and ATEN Coin over a hundred thousand dollars, is that

8    accurate?

9    **A.**   I think it was around 78,000.

10   **Q.**   Okay.  So you've invested about $78,000 in Mr. Andrade's

11   coins at this point, or tokens, and your response is, in the

12   second sentence:  I have a final tranche of AML tokens to

13   transfer to the wallet today, then I will have transferred them

14   all.  You say:  Will the token wallet then be obsolete?  And

15   then you say:  I've been looking at the prices of ABTC.  What

16   was ABTC?

17   **A.**   Well, that's the -- it's like a stock symbol on the stock

18   exchange.  It's the symbol given to the AML Bitcoin on

19   Coingecko or any platform that trades digital currency.

20   **Q.**   So then you talk about the prices varying from 40-cents to

21   $2.16 in January.  Were you looking at the prices on coin gecko

22   and seeing where they were?

23   **A.**   Yes, and there were no trades from January to the May

24   e-mail.

25   **Q.**   So is that what you -- later on you say:  What strategy

1  would you think should be taken with such an amount of ABTC

2  that I possess?  The volume of trades on HitBTC is pretty

3  anemic.  What did you mean by that?

4  **A.**    Well, there were probably only several hundred coins

5  traded at that time.

6  **Q.**    What price were they trading for?

7  **A.**    At the referred price it was 40 cents to $2.16.

8  **Q.**    That's a reference to Coingecko.  You say:  On HitBTC it's

9  pretty anemic.  What did you mean by that?

10 **A.**    Well, there must not have been a lot of volume of coin

11 transactions.

12 **Q.**    Based on your memory, was there any reasonable volume of

13 transactions that would enable you to sell your coins?

14 **A.**    No.

15 **Q.**    So based on those exchanges, could you get any return on

16 your coins at all?

17 **A.**    I wouldn't expect to, no.

18 **Q.**    All right.  So going down, it looks like you write:  I

19 would like to monetize my ABTC investment at some point in

20 time, but I do not know the best strategy.  Hold and wait is

21 what I'm doing now, as the dollar volume per day is very low on

22 HitBTC for our coin.  And then you say:  If I decide to take

23 CrossVerify investment as a tax loss, are there any legal

24 documents that indicates it's an insolvent company?

25     What did you mean by that?

**A.**   Well, it was a company.  I had a stock certificate, and if
it was a capital gain loss, you know, I was going to take
advantage of that if I could.

**Q.**   You were asking that because you had received no return on
that CrossVerify?

**A.**   Correct.

**Q.**   Okay.  Let's look at Mr. Andrade's response.

          **MR. HIGHSMITH:**  Could we zoom in to just the e-mail
from May 27th, 2020.

**BY MR. HIGHSMITH**

**Q.**   So if we read this he responds:  I really need you to
remember that I'm not able to give any investment advice,
because doing so would upset the SEC.

     What did you understand that to mean?

**A.**   I had no idea.

**Q.**   You had no idea what Mr. Andrade was saying?

**A.**   None at all.

**Q.**   Then he makes a reference to your CrossVerify investment,
and he says when it comes to CV -- what was CV?

**A.**   I'm assuming CrossVerify.

**Q.**   I'm going to kickstart that off again and let people
convert.

     Do you know what he meant by that?

**A.**   No.

**Q.**   He says:  With legal guidance, of course, so no SEC issue.

1    But you are free to write off anything if you choose to.  As

2    far as the AML Bitcoin, we will be listed on another exchange

3    within the next few weeks.

4         What did you understand that to mean?

5    **A.**   Well, I think in other e-mails he had referenced Bitstamp

6    and UpHold, which are two digital currency exchanges.

7    **Q.**   Were you able to trade your AML Bitcoin and get any return

8    on your investment from AML Bitcoin?

9    **A.**   I looked at those exchanges and didn't find that it was

10   listed.

11   **Q.**   What's the best approximation of the total amount of all

12   of your investments of Mr. Andrade?

13   **A.**   With CrossVerify it was 70,000, and with AML Bitcoin it

14   was 78.  So 148,000.

15   **Q.**   To your knowledge, has any company or government or any

16   entity adopted the use of ATEN Coin or AML Bitcoin?

17   **A.**   No.

18   **Q.**   Have you received any amount of your investment back

19   whatsoever?

20   **A.**   I have not.

21        **MR. HIGHSMITH:**  No further questions.

22        **THE COURT:**  Mr. Stefan.

23                        **CROSS-EXAMINATION**

24   **BY MR. STEFAN**

25   **Q.**   Good morning, Mr. Whit.

**A.**    Good morning.

**Q.**    I want to start by talking about your purchase of the ATEN Coins.  This was in 2014, right?

**A.**    '15, probably.

Unless you have a purchase agreement that's dated in '14; I don't.  I think this all started in '15.

**Q.**    Okay.  Correct.  In 2015, when you made your first purchase, you had referred to the website and whether or not a website existed for the token at the time.  Do you recall whether a website existed?

**A.**    I can't give you the specifics on my purchase and the presence of a website touting that particular coin, no.

**Q.**    And you were kind of a novice to cryptocurrency at the time?

**A.**    Yes.

**Q.**    But you understand that cryptocurrency is a digital currency, right?

**A.**    It's a digital currency.

**Q.**    And it exists in online block-chains, if you will?

**A.**    Digital files called blocks, yes.

**Q.**    So the online component of it or the, you know, the active living on the web component of it is pretty significant?

**A.**    Yes.  These aren't physical coins, yes.

**Q.**    At the time that this -- you made this purchase through Brian Darrow, you understood that the coin was still under

1    development then?

2    **A.**    No.

3    **Q.**    The website for the coin didn't exist at the time, though?

4    Right?

5    **A.**    I can't recall the timing of the website and the purchase

6    of those coins.

7          **MR. STEFAN:**    Could I have displayed government's

8    exhibit 810, page 2.    And go ahead and zoom on the clause that

9    begins "whereas, NAC only guarantees".    It's towards the middle

10   of the page, two paragraphs above "agreement".

11         Thank you.

12   **BY MR. STEFAN**

13   **Q.**    Do you recall this clause at all?

14   **A.**    Yeah, I'm sure I read it.

15   **Q.**    Just drawing your attention to the line that says:    NAC

16   only guarantees that it will create a digital currency that is

17   AML compliant and will monitor all transactions.

18   **A.**    Yes.

19         **MR. STEFAN:**    You can go ahead and remove display of

20   810.

21   **BY MR. STEFAN**

22   **Q.**    You signed subsequent purchase agreements for ATEN Coin,

23   as you recall?

24   **A.**    Yes.

25   **Q.**    They were substantially similar to the first purchase

1  agreement that you signed?

2  **A.**    I can't say word for word, but probably.

3  **Q.**    And then after the ATEN Coin period, you proceeded to do a

4  couple things with Mr. Andrade.  Invest in ATEN Group, right?

5  **A.**    Well, I guess based on that document I just recently saw,

6  yes.

7  **Q.**    Do you not have recollection of the --

8  **A.**    Well, I thought it was still just coins, not an entity

9  called ATEN Group.  I know ATEN Group created the coins, but I

10  guess my impression at the time of that purchase was that it

11  was still for coins, that my tally of coins that I had accrued

12  had gone up with that subsequent purchase.

13  **Q.**    Okay.  So at the time you bought shares in ATEN Group, you

14  didn't understand that you were buying shares in a company?

15  **A.**    Well, I must not have.

16  **Q.**    Okay.  Do you recall you had some conversation with

17  Mr. Andrade regarding ATEN Group or CrossVerify?

18  **A.**    Yes, I did, and a conversation with Mr. Weir, as well, who

19  was I think CEO of ATEN Group at some point in time, maybe a

20  short period of time.

21  **Q.**    The purpose of ATEN Group -- well, do you understand what

22  the purpose of ATEN Group was, and to your own knowledge, what

23  was the purpose of ATEN Group or CrossVerify?

24  **A.**    Well, CrossVerify I knew more of than ATEN Group because

25  of communication to me through Mark DiAdamo and Carl Weir,

1  through some of the development of CrossVerify a product, which

2  I'm assuming was going to be AML Bitcoin as part of their

3  business structure, and they had gone through a future

4  accelerator program in Dubai and had in e-mails said they're

5  getting contracts from the Dubai government, the University of

6  Dubai.  They had some biometric security arrangements with

7  Israel, either a company or the government, I'm not sure which.

8  But I knew more about CrossVerify than I did about ATEN Group.

9  **Q.**   You understood yourself to be a shareholder of

10 CrossVerify?

11 **A.**   Yes.

12 **Q.**   Okay.  Do you recall some purchase agreements separate

13 from the one that Mr. Highsmith showed you with respect to the

14 purchase of those shares in CrossVerify or would that be the

15 share purchase agreement that you recall?

16 **A.**   I did a share purchase agreement for CrossVerify and did

17 receive a certificate of the shares owned.

18 **Q.**   Okay.  You understand, then, that the CrossVerify aspect

19 of the product was for the purpose of -- well, the CrossVerify

20 work was digital identity on the blockchain, right?

21 **A.**   Using biometric identification, yes.

22 **Q.**   And this was something that was going to be worked into

23 the AML Bitcoin?

24 **A.**   Somehow, yes.  Uh-huh.

25 **Q.**   In fact, this was a distinguishing feature between the

1  prior ATEN Coin and then what became the AML Bitcoin, that it

2  would be integrated with this CrossVerify product?

3  **A.**   Well, at least minimally with that.  Perhaps other uses,

4  as well, but that's how it was going to be utilized with this

5  company, CrossVerify.

6  **Q.**   Right.  And specifically to the AML Bitcoin, the

7  progression from ATEN Coin to AML Bitcoin entailed the

8  integration of CrossVerify with the cryptocurrency, the

9  CrossVerify product?

10  **A.**   I assumed it was going to be utilized by CrossVerify, yes.

11  **Q.**   There was also this other difference between the ATEN Coin

12  and the AML Bitcoin that Mr. Andrade referenced to you in that

13  e-mail exchange that Mr. Highsmith just showed to you.  If you

14  recall, he said to you you could create your own Mike Coin,

15  right?

16  **A.**   Yes.

17  **Q.**   I think you referred to this as tokenization?

18  **A.**   I think it would be referred to that now, yes.

19  **Q.**   Does the term "white label" mean anything to you in this

20  context?

21  **A.**   No.

22  **Q.**   Okay.  So you understood this to be a feature of the ATEN

23  Coin, along with the CrossVerify implementation that was

24  different from ATEN Coin.

25       I'm sorry, I think I misspoke.

1          One of the differences between the ATEN Coin and the AML

2    Bitcoin was the implementation of this technology.

3          **MR. HIGHSMITH:**  Objection, Your Honor.  I don't think

4    he's got a foundation, and I worry the witness doesn't

5    understand because he hasn't established the witness'

6    understanding of these distinctions.

7          **THE COURT:**  Why don't you step back and go through the

8    foundational aspect of the questions.

9          **MR. STEFAN:**  Yes, Your Honor.

10         **THE COURT:**  To see what he understands or doesn't

11   understand.

12         Go ahead.

13   **BY MR. STEFAN**

14   **Q.**   The CrossVerify product we discussed, this is a digital

15   identity verification product, correct?

16   **A.**   Yes.

17   **Q.**   And you understand it to have been tied to the blockchain?

18   **A.**   Yes.  I thought it was going to be integrated perhaps with

19   the AML Bitcoin as sort of a verification part of that process.

20   **Q.**   Right.  And so to be clear, the CrossVerify product was

21   specifically going to be integrated into the AML Bitcoin

22   product.  Is that your understanding?

23   **A.**   I don't know what the business plans were.  That wasn't

24   given to me in any kind of a detail by anybody, but I may have

25   surmised that in the exchanges that I received from Mr. Were

1    and the e-mails from Mark DiAdamo.

2    **Q.**    That that integration would be happening?

3    **A.**    Yes.

4    **Q.**    And these were e-mails, communications that occurred

5    around the time that the AML Bitcoin was being brought to

6    market?

7    **A.**    Well, was it ever brought to market?  I don't know.  I

8    mean, they kept saying it's going to be brought to market, '17,

9    and then '19, and then '20, and it just kept, you know, kicking

10    the can down the road.

11    **Q.**    So you don't know?

12    **A.**    I don't know.

13    **Q.**    Okay.  Was ATEN Coin ever sold to you with the idea that

14    it would have this CrossVerify aspect to it?

15    **A.**    Not initially.

16    **Q.**    I want to talk about when you got your ATEN Coins

17    initially.  You -- when you purchased your ATEN Coins, you had

18    to go through an I.D. verification process; is that right?

19    **A.**    Yes.

20    **Q.**    As part of that I.D. verification process, I believe you

21    did yours live with a representative; is that correct?

22    **A.**    Perhaps.  I know there was a video on the website, and I

23    followed the instructions.  I don't know if somebody helped me

24    in that process or if I did it just from the instructions on

25    the website.

1   **Q.**   And to be clear, I'm referring to the ATEN Coin period.

2   **A.**   Uh-huh.

3   **Q.**   So the first time you purchased?

4   **A.**   Correct.

5   **Q.**   Okay.  You think it was on a website, then, as well?

6   **A.**   I think so.

7   **Q.**   And as part of that I.D. verification process you had to

8   take images of your face using your computer?

9   **A.**   Yes.

10  **Q.**   And images of your identification?

11  **A.**   I think passport, license, maybe both.  Maybe one or the

12  other.

13  **Q.**   And this was done so that you could obtain the wallet that

14  you could put your coins in; is that right?

15  **A.**   Yes.  Uh-huh.

16  **Q.**   Could you obtain your coins prior to performing the I.D.

17  verification?

18  **A.**   I don't think you could put them in a wallet.  I mean I

19  had a purchase agreement saying I owned them, but as far as

20  walletizing them, I think you had to go through a process,

21  which I did.

22  **Q.**   To actually be able to use the coin or to have it in a

23  wallet to potentially use it, you had to go through this I.D.

24  verification process?

25  **A.**   Yes.

1   **Q.**   And you did that with both ATEN Coin and then the AML

2   Bitcoin, as well.

3   **A.**   I don't know if I did it with AML Bitcoin.  I don't think

4   I would have had to since the change was going to be done maybe

5   automatically by the company.  I wouldn't have had to reverify

6   my personage for that, I don't think.  I don't think I did it.

7   **Q.**   Sorry, Dr. Witte.  Just a moment.

8   **A.**   Not at all.  Take your time.

9   **Q.**   Dr. Witte, could you --

10          **MR. STEFAN:**  Actually, could we please have government

11   exhibit 1448, page 2.  And zoom in on the e-mail at the bottom

12   of the page starting on Wednesday, April 22nd, 2020.

13  **BY MR. STEFAN**

14  **Q.**   Dr. Witte, do you see the line there from Marcus to you

15   saying that you need to make sure you have a copy of your

16   driver's license and passport already saved to your computer to

17   make things go faster?

18  **A.**   I see that.

19  **Q.**   And then the first paragraph, the second sentence:  After

20   you've registered, confirm your verification e-mail, click on

21   the verifications tab so you can complete the I.D. verification

22   process.

23  **A.**   Yes.

24  **Q.**   Okay.  Does that refresh you on completing the I.D.

25   verification for the AML Bitcoin wallet in particular in 2020?

**A.**   Well, if that means that I had to transfer a photo of a license and a passport to do that process and it couldn't have done it without it, then that must mean I did it.

**Q.**   Understood.  Thank you, Dr. Witte.

**A.**   Yeah.

**Q.**   I want to talk about some of the communications between you and Mr. Andrade that the government referenced in the 2020 -- well, the 2019 and 2020 timeframe, starting with government exhibit 1048.

         **MR. STEFAN:**  And if you could zoom in on the paragraph beginning in paragraph 2 of this e-mail and the paragraph below.

**BY MR. STEFAN**

**Q.**   So in this exchange you confronted Mr. Andrade directly regarding the outcome of the business arrangements that he had been attempting to make in different parts of the world?

**A.**   Correct.

**Q.**   And in response to you, Mr. Andrade did tell you that he wasn't able to close any of those business deals.

**A.**   Yes.

**Q.**   And towards the end here, I -- he had said that when it comes to San Francisco, he was gonna send you an e-mail by Japheth Dillman sent to him in association with Leslie Katz regarding something with the Port of San Francisco.  Do you see that?

```
1   A.    I do.

2   Q.    You're not aware of what Japheth Dillman or Leslie Katz

3   were telling Marcus about the Port of San Francisco and that

4   project?

5   A.    I don't.

6         MR. STEFAN:  And if you could come back out and then

7   zoom in on the -- towards the bottom of page 1, beginning "the

8   one-client licensing agreement."

9   BY MR. STEFAN

10  Q.    Marcus mentioned that this was a negotiation with Smart

11  Block Capital.  You see that?

12  A.    I do.

13  Q.    Smart Block Capital was a --

14        MR. HIGHSMITH:  Objection, Your Honor.  Assuming facts

15  not in evidence.  If he's explaining to the witness what

16  something is, that's not permitted.

17        THE COURT:  Ask him if he knows what it is.

18  BY MR. STEFAN

19  Q.    Do you have an understanding of what Smart Block Capital

20  was doing, what their arrangement was going to be with

21  Mr. Andrade?

22  A.    No.

23  Q.    Did you have any understanding of what this licensing

24  agreement entailed?

25  A.    Well, the paragraph above that, was this reference to
```

1    CrossVerify?

2    **Q.**    It is in reference to a licensing with respect to

3    CrossVerify.

4    **A.**    Okay.

5    **Q.**    Does that jog your memory?

6    **A.**    Well, CrossVerify was trying to make business arrangements

7    with I guess whoever they could, with Smart Block Capital,

8    Northcott Global Securities (sic) and other companies that were

9    mentioned in previous communications to me.

10           **MR. STEFAN:**    Okay.    You can go ahead and back out of

11    this exhibit.

12           Could we display government exhibit 1448 on page 2.

13           And zoom in on the "so you did want me to repurchase these

14    coins back."

15    **BY MR. STEFAN**

16    **Q.**    Mr. Witte, your testimony on direct examination was that

17    you took this statement from Marcus to indicate that he was

18    still willing to refund you for the coins that you had

19    purchased?

20    **A.**    Yes.

21           **MR. STEFAN:**    Could you please turn to page 1 of

22    exhibit 1448.

23    **BY MR. STEFAN**

24    **Q.**    So in subsequent communications that you had with Marcus

25    on May 27th when you e-mailed him back, you didn't take him up

1  on that -- on his offer, on his willingness to return the coins

2  to you; is that fair to say?

3  **A.**  Well, the offer had stood.  This didn't negate that

4  previous offer.

5  **Q.**  Okay.  Understood.

6      So you didn't take him up on it at this time?

7  **A.**  Well, he had offered, and I was there.  So he didn't go

8  through any kind of a process to say, I'll send you a check.

9  **Q.**  Okay.  Understood.

10      At what time do you understand yourself to have requested

11  a refund from Mr. Andrade for those coins?

12  **A.**  Well, sometime in '19.

13  **Q.**  Right.  And so that's why I'm referring with respect to

14  2020.  He says that he's still -- you know, you indicated he

15  was still willing to compensate you.

16  **A.**  No, he asked a question.  He didn't say he was willing to

17  compensate me.

18  **Q.**  No, I'm sorry, sir.  That's what you said.

19  **A.**  But he -- he asked me a question there.  He didn't -- he

20  didn't say, let's make a time to arrange a transfer of funds

21  from me to you for the agreement we reached on a previous

22  communication.

23  **Q.**  Okay.  Understood.

24      So you didn't think it worthwhile to reengage with him on

25  the refund at the time?

1    **A.**   Well, I was always engaged with him.  I was available by

2    phone, by e-mail.  I didn't have my funds to give back to me.

3    He had my funds and should have given them back to me when I

4    requested them and when he offered them.

5    **Q.**   We talked -- you talked on direct examination about

6    updates with respect to the AML Bitcoin project.

7    **A.**   Yes.

8    **Q.**   You said you hadn't received updates from Mr. Andrade

9    regarding it; is that correct?

10   **A.**   Correct.

11   **Q.**   You were aware that there were updates that happened

12   online in online forums?

13   **A.**   You mean bike communication forums?

14   **Q.**   Yes, or on the AML Bitcoin website.

15   **A.**   Well, I probably referred to the website periodically just

16   to update myself, but I can't say I came away with any specific

17   dates that something was going to happen.

18   **Q.**   When you made the purchase in 2020 of AML Bitcoin --

19        **MR. HIGHSMITH:**  Objection, Your Honor.  That was not

20   his testimony.

21        **THE COURT:**  All right.  Sustained.

22        **MR. STEFAN:**  Pardon me.

23   **BY MR. STEFAN**

24        When you made the purchase in I believe you said 2018.

25   **A.**   I believe that could have been my last purchase, or maybe

 1    '19, winter of '19.  That's six years ago, I don't recall.

 2    **Q.**   At that time the coin was not trading?

 3    **A.**   Apparently not.  I couldn't find that it was.

 4    **Q.**   Did you look into that before you made the purchase of the

 5    coin?

 6    **A.**   I can't say if I did or when I did.

 7              **MR. STEFAN:**  Okay.  Your Honor, may I have one moment?

 8              **THE COURT:**  Yes.

 9              **MR. STEFAN:**  Thank you, Dr. Witte.  I don't have any

10    further questions.

11              **THE COURT:**  Okay.

12                        <u>**REDIRECT EXAMINATION**</u>

13    **BY MR. HIGHSMITH**

14    **Q.**   Just very, very briefly.

15         Counsel mentioned to you when he showed you the exhibit

16    referencing your investment in ATEN Group.  Do you remember

17    that?

18    **A.**   I do.

19    **Q.**   And you testified to the effect that you thought you were

20    investing in coins, is that right, or tokens.  Is that right?

21    **A.**   I guess so.

22    **Q.**   Is that based on what Mr. Andrade told you?

23    **A.**   Perhaps.

24    **Q.**   Okay.  Was it based on what Mr. Andrade told you, or what

25    else would it have been based on?

1  **A.**    I -- you know, other than e-mail communication and

2  telephone communication, I wouldn't have had any other input

3  from anybody.

4  **Q.**    Okay.  So that would have been -- is it accurate to say

5  that would have been based on communications, either e-mail or

6  phone, with Mr. Andrade?

7  **A.**    Yes.

8  **Q.**    Counsel showed you an ATEN Coin contract.  Buried in the

9  contract several provisions in was a clause that he showed you

10  about no promises?

11        **MR. STEFAN:**  Objection; argumentative.

12        **THE COURT:**  He's just directing the witness to I guess

13  the point he's going to ask a question.

14    Go ahead.

15  **BY MR. HIGHSMITH**

16  **Q.**    Do you recall when counsel showed you the contract, the

17  purchase contract involving ATEN Coin, and the clause buried in

18  there that said there was no promises about tech?  Do you

19  recall that exchange with counsel?

20  **A.**    Yes.

21  **Q.**    Okay.  If you had known that the tech did not exist and

22  would not exist, would you still have invested?

23  **A.**    No.

24  **Q.**    Counsel also discussed the CrossVerify and business

25  development.  Did any of the CrossVerify negotiations come to

 1   fruition, generate any return for you?

 2   **A.**   No.

 3            **MR. HIGHSMITH:**  No further questions.

 4            **THE COURT:**  Anything further?

 5            **MR. STEFAN:**  No, Your Honor.

 6            **THE COURT:**  Very well.  You may step down.

 7            **THE WITNESS:**  Thank you.

 8            **THE COURT:**  Mr. Ward.

 9            **MR. WARD:**  The United States calls Brian Darrow.

10            **THE COURT:**  If you'll come forward to the stand to be

11   sworn.

12            **THE COURTROOM DEPUTY:**  Please raise your right hand.

13                         <u>**BRIAN SCOTT DARROW**</u>,

14   called as a witness for the Government, having been duly sworn,

15   testified as follows:

16            **THE COURTROOM DEPUTY:**  Okay.  Please state your name

17   and spell your last name.

18            **THE WITNESS:**  Brian Scott Darrow, D-a-r-r-o-w.

19            **THE COURTROOM DEPUTY:**  Thank you.

20                        <u>**DIRECT EXAMINATION**</u>

21   **BY MR. WARD**

22   **Q.**   Good morning, Mr. Darrow.

23   **A.**   Good morning.

24   **Q.**   Mr. Darrow, are you familiar with a cryptocurrency called

25   ATEN Coin?

1    **A.**    Yes, I am.

2    **Q.**    In 2015 and 2016 did you sell ATEN Coin to purchasers

3    through telephone sales?

4    **A.**    Yes.

5    **Q.**    Were you paid commissions for the ATEN Coins that you

6    sold?

7    **A.**    Yes, most definitely.

8    **Q.**    Who paid those commissions?

9    **A.**    I was paid directly from the owner and his corporation.

10   **Q.**    Who was the owner and what was his corporation?

11   **A.**    The NAC Foundation and the owner was Marcus Andrade.

12   **Q.**    Among the individuals you sold ATEN Coins to, did you sell

13   ATEN Coins to an individual named Dr. Michael Witte?

14   **A.**    Yes.

15   **Q.**    Okay.  And were you paid commissions for that sale?

16   **A.**    Most definitely.

17   **Q.**    And did the proceeds from those sales go to the NAC and

18   Marcus Andrade?

19   **A.**    Yes, all sales that were made.  I never controlled any

20   monies.  They all went to the corporation and then under his

21   control, disbursed as agreed.

22   **Q.**    Mr. Darrow, are you a convicted felon?

23   **A.**    Yes.

24   **Q.**    In 2002 did you plead guilty to conspiracy to commit wire

25   fraud in federal court in the Southern District of Florida?

1    **A.**    Yes.

2    **Q.**    What did you admit to doing in that case?

3    **A.**    That was a cryptocurrency -- excuse me, a Forex currency,

4    foreign currency option scam.

5          And we were selling and soliciting over the telephone.

6    **Q.**    You were fraudulently soliciting individuals to buy

7    foreign currency?

8    **A.**    Foreign currency options, and they weren't being purchased

9    from the ownership.

10   **Q.**    Did you plead guilty and cooperate with the government in

11   that case?

12   **A.**    Yes, I did.

13   **Q.**    And following that, were you sentenced to prison?

14   **A.**    Yes, I was.

15   **Q.**    How long did you go to prison for?

16   **A.**    I was sentenced to a term initially of 60 months and then

17   based on cooperation reduced to a term of 30 months to be

18   served.

19   **Q.**    Following your release from prison, did you then at some

20   point engage in other telephone fraud schemes?

21   **A.**    Yes.

22   **Q.**    Did you do that on multiple occasions in years following

23   your release from prison?

24   **A.**    Yes.

25   **Q.**    In 2021 were you charged with conspiracy to commit wire

1    fraud in this district, in the Northern District of California?

2    **A.**    Yes.

3    **Q.**    And did you plead guilty in that case?

4    **A.**    Yes.

5    **Q.**    And do you have a written plea agreement?

6    **A.**    Yes, I do.

7    **Q.**    As part of that plea agreement, have you agreed to

8    cooperate with the government?

9    **A.**    One hundred percent.

10    **Q.**    Are you doing so in returns for the expectation of a

11    reduced sentence?

12    **A.**    Hopefully, but nothing's been promised.

13    **Q.**    Has anyone within the government made you any specific

14    promises?

15    **A.**    Not even a guarantee.

16    **Q.**    All right.  As part of your written plea agreement, are

17    you required to tell the truth?

18    **A.**    One hundred percent.

19    **Q.**    Is your plea agreement at risk if you don't tell the

20    truth?

21    **A.**    Yes, most definitely.

22    **Q.**    In your plea agreement in that case did you admit to

23    making fraudulent misrepresentations about a cryptocurrency

24    called Java Coin?

25    **A.**    Yes, that was a company and a crypto coin that I had

1    created.

2    **Q.**    You said you had created Java Coin?

3    **A.**    Yes.

4    **Q.**    And did you admit in your plea agreement -- did you sell

5    Java Coin to individuals over the telephone?

6    **A.**    Yes.

7    **Q.**    And when you were selling this cryptocurrency did you

8    admit in your plea agreement that you told purchasers that the

9    price of the cryptocurrency would steadily increase, increasing

10   the value of their purchase?

11   **A.**    Yes.

12   **Q.**    And did you tell them that -- did you admit in your plea

13   agreement that you told investors that the cryptocurrency could

14   be worth 10 times the purchase price once it was adopted?

15   **A.**    At least that.

16   **Q.**    And did you admit in your plea agreement that you told

17   purchasers of Java Coin that it was compliant with Know Your

18   Customer and anti-money laundering regulations?

19   **A.**    Yes.

20   **Q.**    And as part of your plea, did you admit that you told

21   investors that the company behind Java Coin had secured

22   contracts with coffee growers who would use Java Coin?

23   **A.**    Coffee growers and distributors.

24   **Q.**    Did you also admit that you told purchasers that the money

25   that they purchased -- used to purchase Java Coin would be used

1    to promote and develop the business of Java Coin?

2    **A.**    Yes.

3    **Q.**    And in your plea agreement did you admit that all of those

4    representations were false?

5    **A.**    Yes.

6    **Q.**    Where did you get the idea for the Java Coin fraud scheme?

7    **A.**    Previously for a term of approximately two years, two

8    years plus, I had worked for the NAC Foundation for Mr. Andrade

9    and had cultivated a great number of investors, and they had

10    purchased his coin.  And so we made a conscious decision to

11    just model the next coin after what he had.

12    **Q.**    I see.

13        Let's go back and talk about how you first came to sell

14    ATEN Coin.  How did you first come to sell ATEN Coin?

15    **A.**    A friend of mine, a telemarketing associate, had noticed

16    an ad on Craigslist in Toronto, Canada, looking for what's

17    known in the industry as phone pros, brokers slash ex-brokers.

18    **Q.**    And did you see this ad on Craigslist?

19    **A.**    Yes.

20    **Q.**    And it was an advertisement for you said phone pros.  What

21    did you understand that term to mean in the context of that ad?

22    **A.**    Typically it means that's what you'll be selling has a

23    very good commission and good payout and no licensing required,

24    very little regulation, if any, regardless of the business

25    model.

1  Q.    All right.  Did the ad -- what was the ad -- what kind of

2  job was the ad for?

3  A.    Selling a crypto coin new to the market.

4  Q.    Okay.  And did you contact someone from the ad?

5  A.    Yes.

6  Q.    And who was that?

7  A.    The initial contact person was the gentleman that placed

8  the ad.  It was Mr. Robert Parsons, from Toronto, Canada.

9  Q.    And did you eventually accept a job as a phone pro from

10  this advertisement?

11  A.    Yes.

12  Q.    And what were -- when you accepted that job, what were you

13  told you would be selling?

14  A.    I would be selling the latest digital currency that would

15  far exceed anything that was on the market based on technology

16  and some of the other features it had.

17  Q.    And what -- and was that the ATEN Coin?

18  A.    Yes.

19  Q.    And then how did you come to begin start selling -- to

20  begin selling the ATEN Coin?

21  A.    Again, the types of ads that were typically responded to,

22  being a phone pro, broker, ex-broker, what a company owner is

23  looking for is someone that has an existing book of business,

24  being contacts or names of previous buyers and that can go

25  right into, if you will, a database and start producing money

```
 1   almost immediately.
 2   Q.   When you started selling ATEN Coin, did you then start
 3   calling people that were on the list of people you had called
 4   for prior investments?
 5   A.   Yes.
 6   Q.   All right.  And did you -- where did you physically work
 7   when you were selling ATEN Coin?
 8   A.   We started in a location in Margate, Florida.  The
 9   physical address was 1919 North State Road 7, Margate, Florida.
10   Q.   You said "we", Mr. Darrow.  Were you working with other
11   people?
12   A.   Yeah, I had several other sales agents that have worked
13   with me throughout the years.
14   Q.   And did you bring those sales agents with you to sell ATEN
15   Coin?
16   A.   Yes.
17   Q.   At some point did you speak to Marcus Andrade?
18   A.   Yes.
19   Q.   How long after you started selling ATEN Coin did you speak
20   to Marcus Andrade?
21   A.   Very, very soon, as we were having issues with
22   compensation.  Never arguing about the amount that was owed.
23   It was in the form that it was being paid.
24   Q.   I see.
25        And when you had these conversations, did you understand
```

1  that he was the creator of ATEN Coin?

2  **A.**   Yes.

3  **Q.**   Did you understand from him that it was his business that

4  was selling the ATEN Coin?

5  **A.**   Most definitely.

6  **Q.**   You said you had conversations with him about paying out

7  commissions.  What do you mean?

8  **A.**   The method that we were using with Mr. Parsons was, if you

9  will, we were using PayPal, as a matter of fact.  And so one of

10  the conditions was we were utilizing PayPal, we were only to be

11  able to have access to a small drip of the money on a daily,

12  24-hour clock basis.  And, you know, that doesn't work for us.

13  I mean, if you make a sale for $10,000, again, you're expecting

14  a commission of $3000.  And so now it would take me 15 days

15  just to get my money.

16  **Q.**   And did you understand from these conversations with

17  Mr. Andrade that your commissions were coming from him and his

18  company?

19  **A.**   Oh, most definitely.

20  **Q.**   Okay.  Did you ever discuss with Mr. Andrade, did he ever

21  discuss with you ATEN Coin and the features it had?

22  **A.**   Many times.

23  **Q.**   And what sort of things did he tell you about ATEN Coin?

24  **A.**   Look, in relationship to the technology, you know, I

25  classify my myself as earlier mentioned, someone, you know, a

1  convicted felon that's made a living on a telephone for 20

2  years, and it didn't matter to myself personally if we were

3  selling potato chips or microchips.

4      And so the technology, it was well above what I understood

5  the computer or had never heard of blockchain or any of this.

6  So as Mr. Andrade was educating me along, it just gave me more

7  power to speak to a potential investor and sound like not only

8  was the coin real, but I was real because of my lack of

9  information.

10  **Q.**   Were you basing what you were telling potential purchases

11  of ATEN Coin on what Marcus Andrade was telling you?

12  **A.**   Solely.

13  **Q.**   At the time did you have any experience in the

14  cryptocurrency business?

15  **A.**   No, I didn't have any idea.

16  **Q.**   Did, from time to time, Mr. Andrade provide you with

17  written materials to use when you were calling up individuals

18  to purchase ATEN Coin?

19  **A.**   Yes.  In the industry many times we refer to it as

20  collateral material, and this could be just a quick bullet of

21  information, perhaps even something that was a complete

22  fabrication but looked like a real press release from a valued

23  news source.  So Mr. Andrade was sending over nearly weekly, if

24  you will, I'd seen updates of what he was doing behind the

25  scenes to promote the ATEN "Black Gold" coin and moving it

1    forward.

2        Subsequently we were -- as we were getting these pieces of

3    collateral material, we were then raising the price of the coin

4    even though that it wasn't trading and there was no marketing

5    yet for it.

6            MR. WARD:  Let me stop you -- can we please bring up

7    government's exhibit 811 just for the witness?

8            THE WITNESS:  Where do I see that?

9            MR. WARD:  You'll see it on your screen.

10   BY MR. WARD

11   Q.   Mr. Darrow, do you see this -- do you see this e-mail?

12   A.   Yes, sir.

13   Q.   On the screen?

14   A.   Yes, sir.

15   Q.   The e-mail at the top where it says "from", is that the

16   e-mail that you were using at the time you were selling ATEN

17   Coin?

18   A.   Yes, that was an e-mail address that Mr. Andrade had

19   created for me to send out collateral material and stay in

20   touch with potential buyers.

21   Q.   Do you see the e-mail below in the second message that

22   says Marcus Monex?

23   A.   Yes.

24   Q.   And whose e-mail did you understand that to be?

25   A.   That was Marcus' direct e-mail.

1    **Q.**   And did Marcus Andrade from time to time communicate with

2    you by sending you e-mails from that e-mail address?

3    **A.**   Yes, very seldom.  As again, I'm not too technically

4    enhanced person.  It was, to do things like that was a little

5    more cumbersome than it needed to be.  We generally

6    communicated with just the telephone.

7              **THE COURT:**  Go ahead.

8    **BY MR. WARD**

9    **Q.**   Sorry, you were getting a bit of an echo.

10   **A.**   A little reverb there, yeah.

11   **Q.**   Do you see this indicates there is a document attached to

12   this e-mail?

13   **A.**   Yes.

14   **Q.**   And can you look at the second page of this?

15         And have you reviewed this document prior to testifying

16   here today?

17   **A.**   Oh, many times.  I mean, I've used this document when it

18   was initially created so as to solicit, you know, many, many

19   people, some for the first time.

20   **Q.**   Hold on a second, Mr. Darrow.  We'll just go one step at a

21   time.

22         Walking through this document, is this an accurate

23   representation of the document you received from Marcus

24   Andrade?

25   **A.**   Oh, it -- yeah, it's exactly the document that was

1    received.

2          MR. HIGHSMITH:  All right.  At this point, the

3    government moves to admit exhibit 811.

4          MR. SHEPARD:  No objection.

5          THE COURT:  811 will be admitted.

6      (Trial Exhibit 811 received in evidence.)

7    BY MR. WARD

8    Q.   All right.  Let's go back to the top, Mr. Darrow, and

9    we'll just start again.

10          MR. WARD:  Could we highlight the two e-mail portions?

11   BY MR. WARD

12   Q.   And again, Mr. Darrow, the e-mail, Brian@ATENCoin.com, was

13   that the e-mail you were using when you were selling ATEN Coin?

14   A.   Yes.

15   Q.   And on the original e-mail below it says Marcus Monex, is

16   that the e-mail that you understood belonged to Marcus Andrade?

17   A.   Yes.  I had used that on a few occasions to reach to him.

18   But typically, again, I always found it was easier to just

19   direct dial him.

20   Q.   Do you see the e-mail from him that says "good read"?

21   A.   Yes.  That was from -- that was from him, and, yes.

22   Q.   Let's go to the next page.

23        Was this some of the talking points and information you

24   were given to use to sell ATEN Coin?

25   A.   Yes.

1    Q.   And was part of it, this document, a comparison between

2    ATEN Coin and regular Bitcoin?

3    A.   Yes, most different.

4    Q.   If you could look at the next page, do you see where it

5    says ATEN Coin is traceable and trackable?

6    A.   Yes.  We were -- as a sales agent, he had made it very

7    clear to me that that was one of the greatest benefits of the

8    coin, is that he -- unlike Bitcoin, he always knew who has it

9    and in what wallet it's stored in.

10   Q.   And based on this, did you understand that it -- at the

11   time you were selling it, that they had an ATEN Coin that was

12   traceable and trackable?

13            MR. SHEPARD:  Objection.

14            THE WITNESS:  Again, that was --

15            THE COURT:  Wait.

16            MR. SHEPARD:  Could we have a foundation for what his

17   knowledge is going to be about this?

18            THE COURT:  Well, the question was does he have any

19   knowledge, so ...

20   BY MR. WARD

21   Q.   Well, based on this document, did you understand that the

22   NAC Foundation and Andrade had an ATEN Coin that was traceable

23   and trackable at that time?

24            THE COURT:  Why don't you ask him at the time of this

25   document what his understanding is.

1    **BY MR. WARD**

2    **Q.**   Let me ask it this way.

3         At the time of this document, what was your understanding

4    about the state of the ATEN Coin technology?

5    **A.**   The representations that are under the ATEN Coin of this

6    entire document I was led to believe were 100 percent factual

7    and actual and never questioned or researched.  Again, you

8    know, I didn't understand most days the product I was selling

9    other than to get someone to buy more.

10   **Q.**   And did you understand at the time that ATEN Coin was a

11   working coin with this technology built in?

12   **A.**   Well, there was no market for it, meaning it wasn't

13   working.  It was just a coin that was being delivered and

14   stored in a wallet, and someday there was going to be a market

15   created and a platform that it would ultimately trade on.

16   **Q.**   What were you telling investors about the technology

17   underlying ATEN Coin?  Were you telling them that it was

18   working?

19   **A.**   No, they knew that it wasn't.

20   **Q.**   If you could go to page 12 of this document.  I'm sorry, I

21   lost my place.

22        Yeah, page 12.

23   **A.**   Yes, sir.

24   **Q.**   At the time you were selling ATEN Coin, did you understand

25   that ATEN Coin had arrangements and agreements with the oil

1   industry?

2   **A.**    That was one of the selling points that we used for all

3   that we could use and stress upon a potential investor based on

4   a conversation with Mr. Andrade that that was actually

5   happening.

6   **Q.**    And what was Mr. Andrade telling you about the

7   arrangements that ATEN Coin had with the oil industry?

8   **A.**    That the oil industry based on oil refineries buying and

9   picking up from drilling rigs that the NAC Foundation owned and

10  operated would then pay them with the ATEN Coin once it was

11  upon the market in lieu of U.S. dollars.

12  **Q.**    And were you telling investors that the oil industry was

13  going to start taking payments in ATEN Coin?

14  **A.**    Yes.

15  **Q.**    And did you learn that from Marcus Andrade?

16  **A.**    Yes, that was stressed upon me heavily.

17  **Q.**    At some point did you stop telling investors that ATEN

18  Coin had arrangements with the oil industry?

19  **A.**    Yes.

20  **Q.**    And why did you stop telling them that?

21  **A.**    Well, surprisingly, again, we were working, if you will,

22  as what's known in the industry as an independent sales office,

23  meaning non-incorporated and no business licensing, and

24  Margate, Florida, by any means not a financial capital of the

25  world, and lo and behold I personally got a letter from the

```
 1    Texas Railroad Commission saying that we were guilty of -- and

 2    seize and desist any conversation regarding oil derricks, and

 3    that the coin was associated with oil whatsoever.

 4    Q.   When you got this letter from the Texas Railroad

 5    Commission, what was your understanding of why the Texas

 6    Railroad Commission was telling you what to say about the oil

 7    industry?

 8              MR. SHEPARD:  Objection.

 9              THE COURT:  Sustained.

10    BY MR. WARD

11    Q.   When you got this letter from the Texas Railroad

12    Commission telling you to stop marketing ATEN Coin this way,

13    did you talk to Marcus Andrade?

14    A.   Immediate phonecall.

15    Q.   And what did Marcus Andrade say?

16    A.   Please stop saying anything related to oil and gas, let me

17    look into this.

18    Q.   And then after that point were you ever instructed to

19    market ATEN Coin as being tied to the oil and gas industry?

20    A.   No, that ceased, and that entire part of any potential

21    sales pitch was omitted.

22    Q.   Did you then begin to sell the product based on other

23    features?

24    A.   Yes.  Well, the AML compliance, the KYC compliance, the

25    fact that even though it was not yet trading, the coin was
```

1    going to increase in value, but I still had, if you will, a

2    block of 100,000 coins at 20 cents, and Mr. Smith or Jones, you

3    could take all or some of them, but if you want to buy next

4    week, it's gonna be exponentially higher, meaning maybe as much

5    as 50 cents.

6         So, you know, you know this is good.  You've already

7    purchased two or three times.  It only makes sense to buy low,

8    sell high, and that was just down the line how it was pitched.

9    Q.   And as part of that pitch what were you telling potential

10   purchasers about when ATEN Coin would come to market?

11   A.   We were very vague about that in, you know, in every

12   single call, but it was coming sooner than later.

13   Q.   You -- from time to time, did Marcus Andrade send you

14   press releases to use to market ATEN Coin?

15   A.   Yes.  Much like the one we're looking at, these were the

16   types of documents that we were receiving.  As I said, if it

17   wasn't every week it was certainly every other week, something

18   that was just nothing but positive news about what the ATEN

19   Coin was either in the verge of accomplishing or had

20   accomplished.

21   Q.   Can we pull up exhibit 349 which has been admitted, I

22   believe?

23        You see this press release, Mr. Darrow?

24   A.   Yes.

25   Q.   And have you looked -- have you reviewed this prior to

1  your testimony here today?

2  **A.**   Yes.

3  **Q.**   And is this one of the press releases that you were sent

4  to use in marketing and selling ATEN Coin?

5  **A.**   As collateral material, sending out with e-mail.

6        **MR. WARD:**  Do you -- looking at the first paragraph,

7  if we could just blow up that, please.

8  **BY MR. WARD**

9  **Q.**   Do you see the date that's dated May 25th, 2015?

10 **A.**   Uh-huh.   Right.

11 **Q.**   And do you see where it says:   In just under 45 days

12 national ATEN Coin's groundbreaking new cryptocurrency will be

13 available from ATEN Pay?  Was that part of the representations

14 that you were making to investors?

15 **A.**   Oh, once we had in black and white writing that there were

16 just, you know, literally days and minutes from this actually

17 being on the market and the price going to be substantially

18 higher, of course we used this for -- to drive in every single

19 dollar from anyone that would answer a telephone.

20 **Q.**   You see the next sentence where it says:  The ATEN "Black"

21 Coin can be purchased through a collaboration between ATEN Pay

22 and ANXPro, one of the globe's most revered online trading

23 platforms?  Was that part of the representation that you were

24 making to investors, that the coin would trade on ANXPro?

25 **A.**    Yes, and we had another promotional item that was provided

1    that was even more specific regarding the relationship with the

2    ATEN Coin and ANXPro.

3    **Q.**    All right.  And did ATEN Coin ever trade on ANXPro?

4    **A.**    Never.

5    **Q.**    Mr. Darrow, were you paid commissions for the ATEN Coins

6    that you sold?

7    **A.**    Yes.

8              **MR. HIGHSMITH:**  We can take down this exhibit.

9              **THE WITNESS:**  Yes.

10   **BY MR. WARD**

11   **Q.**    And when you started selling, what was your commission?

12   **A.**    It was agreed upon with Bob Parsons to be paid out at a

13   rate of 30 percent.

14   **Q.**    Did you have a later agreement and understanding with

15   Marcus Andrade when you started that you were paid 30 percent?

16   **A.**    Well, yeah.  We signed an agreement, you know, that was to

17   be honored from the NAC that the payout was 30 percent.

18   **Q.**    And when you sold ATEN Coin were you, in fact, paid

19   30 percent of the purchase price?

20   **A.**    Yes.

21   **Q.**    Where did that payment come from?

22   **A.**    Directly -- again, we started out with Mr. Parsons, and

23   he~-- the money was going from the NAC to Mr. Parsons, and then

24   he was -- his method of payout was, again, via the PayPal, and

25   it wasn't working.

1    So with many conversations that weren't always pleasant,
2    Marcus and I agreed to start paying me via bank wire.
3    **Q.**    And following that agreement, were you paid your
4    commissions directly from Marcus Andrade's company via bank
5    wire?
6    **A.**    Yes.
7    **Q.**    And were those at 30 percent?
8    **A.**    Yes.
9    **Q.**    At some point did that commission rate go up?
10   **A.**    Yes.
11   **Q.**    Why did the commission rate go up?  What happened?
12   **A.**    Near September of starting work, and we had been there
13   since close to the beginning of the year, and Marcus called me
14   and said that he was in need of $50,000 that week of monies
15   brought in, and that if I could do that, he would take my
16   commission from 30 to 40 percent and leave it at 40 percent
17   ongoing.  And I just, it so happened to have a doctor that I
18   knew, you know, in the next several days had just did something
19   to get liquid for between 70 and $80,000.
20        And so I gladly accepted that, made the call to the
21   doctor, gentleman by the name of Dr. Rene Cooner from Texas.
22   And he wired the funds, and I was compensated at a rate of 40.
23   It just kept going after that.
24   **Q.**    Following that sale, for subsequent sales of ATEN Coin,
25   were you then always paid 40 percent?

1   **A.**    Yes.

2   **Q.**    Based on your experience, is that -- is that a large

3   commission?

4   **A.**    Look, sitting here admitting some of the devious and

5   conviction things that I've done, 40 percent is probably the

6   biggest red flag you could see that something's not right,

7   because you can't disclose that to the investor, because the

8   first thing they think of, well, is if you're getting

9   40 percent and there's people behind, you know, meaning out of

10  the corporate office, an owner, how much is really left for the

11  investment.

12            **MR. SHEPARD:**  Objection, Your Honor.  This is opinion

13  testimony that is baseless, as best I can tell.

14            **THE COURT:**  Well, overruled.

15       So we've now reached noon, so we can take our second

16  break.

17       Members of the jury, remember my admonitions.  Do not

18  discuss this amongst yourselves or with anyone else.  We'll be

19  back here in 15 minutes.

20       (The jury exits the courtroom.)

21       (A recess was taken from 12:02 p.m. to 12:19 p.m.)

22            **THE COURT:**  Okay.

23       (The jury enters the courtroom.)

24            **THE COURT:**  Jury is present.

25       Mr. Ward, you may proceed.

```
 1            MR. HIGHSMITH:  Thank you, Your Honor.

 2       If you could bring up exhibit 1243, please.

 3       Your Honor, this is a bank record admissible pursuant to

 4   motions in limine, certified bank record.

 5       I'd move to admit exhibit 1243.

 6            MR. SHEPARD:  No objection.

 7            THE COURT:  1243 will be admitted.

 8       (Trial Exhibit 1243 received in evidence.)

 9   BY MR. WARD

10   Q.   Mr. Darrow, looking at this bank record, do you see the

11   name of the entity it's addressed to, NAC Foundation?

12   A.   Yes.

13   Q.   Was that the entity that was paying you your sales

14   commissions?

15   A.   Yes.

16            MR. WARD:  Could we go to page 52 of this exhibit.

17   Could we blow up the withdrawals portion?

18   BY MR. WARD

19   Q.   Mr. Darrow, do you see on the second box across the

20   document where it says DMMC Corporation?

21   A.   Yes.

22   Q.   What's DMMC Corporation?

23   A.   That was a corporation that I had created so as to receive

24   funding.

25   Q.   And when you were paid commissions from the NAC Foundation
```

1    were they transferred to you through the DMMC Corporation?

2    **A.**    Yes.  And then later to another name.  Yes.

3    **Q.**    Okay.  This -- do you see the commission payments?

4    Looking at the first one, does that appear to be a commission

5    to you for selling ATEN Coin?

6    **A.**    The 14,000?

7    **Q.**    Yes, sir.

8    **A.**    Most definitely.

9    **Q.**    And then the two lines below that where it says 16,900,

10   would that also be a commission payment?

11   **A.**    Yes.

12   **Q.**    Were you paid by the NAC Foundation for anything other

13   than selling ATEN Coin?

14   **A.**    No, sir.

15   **Q.**    All right.  And then if we look at the two lines below

16   that, there's another entry for DMMC Corporation for $11,014

17   (sic).  Would that also be a commission payment?

18   **A.**    Yes.

19   **Q.**    And then, finally, there's one down at the bottom for

20   2900.  Would that also be a commission payment?

21   **A.**    Yes.

22   **Q.**    Is this reflective of the commission payments you were

23   paid for selling ATEN Coin?

24   **A.**    Yes.

25   **Q.**    All right.  I'd like to show you another document.

1          **MR. HIGHSMITH:**  Could we bring up just for the witness

2    and the Court and the parties exhibit 1501, page 12.

3    **BY MR. WARD**

4    **Q.**  Is Mr. Darrow, I'm going to ask you to read sideways for a

5    second, if you could?

6    **A.**  Sure.

7    **Q.**  Do you see the list of the names on the left column there?

8    **A.**  Yes.

9    **Q.**  Are those individuals that you sold ATEN Coin to?

10   **A.**  One hundred percent, yes.

11   **Q.**  And did you receive commissions for selling those

12   individuals ATEN Coin?

13   **A.**  Yes.

14   **Q.**  And do you see the column at the right?  Is that an

15   accurate reflection of the commissions that you received?

16   **A.**  Yes.  Those numbers all represent 40 percent payout based

17   on the initial amount that was sent.

18   **Q.**  Is this an accurate representation of those payouts?

19   **A.**  Yes.

20          **MR. WARD:**  Your Honor, I'd move to admit.

21          **MR. SHEPARD:**  The exhibit has other material on it,

22   Your Honor.  I don't have a problem with what Mr. Darrow can

23   authenticate, but there are other things about wires.  There

24   are all kinds of things in there.

25          **MR. WARD:**  I'm just moving to admit page 12 at this

```
 1   point.
 2            MR. SHEPARD:  They're on that page, as well.
 3            THE COURT:  You said there was additional material on
 4   page 12?
 5            MR. SHEPARD:  Yeah.  It talks about wires and wire
 6   instructions, wire details.
 7            MR. WARD:  Those are the Bates number.  The wire
 8   instructions are on the Bates number at the bottom.
 9            MR. SHEPARD:  Okay.  Can we -- can we --
10            THE COURT:  Oh, I see what you're talking about.
11            MR. SHEPARD:  Yeah.
12            THE COURT:  So if the request as I understand it is to
13   admit this page and then with respect to the footer I would
14   simply remind the jury that it's not something that's been
15   placed on there, not on the original document.
16       Is that correct?
17            MR. SHEPARD:  Okay.  That's not evidence.
18            THE COURT:  Pardon?
19            MR. SHEPARD:  It's not evidence, the footers.
20            THE COURT:  The footers, correct.
21            MR. SHEPARD:  Yeah.  Fine.  On that understanding.
22            THE COURT:  On that basis?  All right.
23            MR. SHEPARD:  Thank you, Your Honor.
24            THE COURT:  This is exhibit 1501.  I will admit it.
25       (Trial Exhibit 1501 received in evidence.)
```

```
 1            THE COURT:  As I mentioned to you before, members of
 2   the jury, when we were talking about those Bates numbers, this
 3   is another document where at the bottom there is some
 4   information that's not evidence in this case that's been put on
 5   there disconnected to the document when it was originally
 6   prepared.  So ignore that.  Okay?
 7        It's admitted on that basis.
 8            MR. HIGHSMITH:  We're just rotating it, Your Honor, so
 9   that it ...
10            THE COURT:  Okay.
11            MR. HIGHSMITH:  It's right side up.
12   BY MR. WARD
13   Q.   Looking again at this document, it shifted so it's right
14   side up, Mr. Darrow; do you see on the left the client names?
15   A.   Yes.
16   Q.   Were those individuals that you sold ATEN Coin to?
17   A.   Yes.
18   Q.   And then where it says the amount, was that the amount for
19   each of those sales?
20   A.   Transactions, yes.
21   Q.   And then where it says amount due to sales rep, was that
22   the amount that you received?
23   A.   The $2066.80, that was for the week of June 29th.
24   Q.   And do you see at the bottom where it says Marcus Andrade,
25   DocuSigned?
```

1    **A.**    Yes.

2    **Q.**    And, again, you were paid your commissions by Marcus

3    Andrade and the NAC Foundation?

4    **A.**    Yes.

5    **Q.**    Do these represent a little over 30 percent sales

6    commission for --

7    **A.**    No, those are based at 40.

8    **Q.**    Forty percent?

9    **A.**    If you multiply the 1875 that Mr. Bowen sent times

10    40 percent, it comes to the 744.6.

11    **Q.**    All right.  Thank you, Mr. Darrow.

12         Over the time that you worked for Marcus Andrade and the

13    NAC Foundation selling ATEN Coin, approximately how much ATEN

14    Coin did you sell in dollars?

15    **A.**    Dollars?  It's been many years, but I would estimate I

16    think at one time about 1.5 or 1.6 million in real cash.

17    **Q.**    Okay.  And in real cash.

18         And approximately how many investors?  I know it's been a

19    long time, but just approximately.

20    **A.**    Yeah.  Between 45 and 55 is the total.

21    **Q.**    All right.  And do you remember who some of your biggest

22    customers were?

23    **A.**    Oh, most definitely.

24    **Q.**    And tell me who your biggest customers you remember being.

25    **A.**    A gentleman -- the largest was a gentleman by the name of

1    Rene Blanchett.

2    **Q.**    And approximately how much ATEN Coin did you sell him?

3    **A.**    Millions of coins in U.S. dollars.  He's a Canadian

4    resident of Ontario.  He was a total investment I believe to be

5    around 220 to 240,000 U.S.

6    **Q.**    Do you remember selling ATEN Coin to an individual named

7    Rene Acuna, a different Rene?

8    **A.**    Yes.

9    **Q.**    And do you remember approximately how much ATEN Coin you

10   sold to him?

11   **A.**    Yes, he was the gentleman that provided the funding to get

12   me from 30 to 40 percent as a total payout, and he was in the

13   total of less than 200, but between 150 and 170.

14   **Q.**    Did you sell to him ATEN Coin over multiple occasions?

15   **A.**    Oh, many times.  All of these people.  I think

16   Mr. Blanchett, Rene Blanchett, the Canadian resident, had sent

17   easily 20-plus times to get to the number of where he was at.

18   **Q.**    Do you remember selling to an individual named Dr. Lauren

19   Davidhizer?

20   **A.**    Yeah.  It's actually Dr. Laverne Davidhizer, from Alaska.

21   **Q.**    Uh-huh.

22   **A.**    And he was in Java Coin and starting with me here with the

23   ATEN Coin.  And in ATEN he was probably easily well over a

24   hundred, you know.  So he was probably the third largest

25   investor that I had.

1    Q.    You testified earlier that you remember selling ATEN Coin

2    to a Dr. Michael Witte?

3    A.    Yes, sir.

4            MR. WARD:    Could we bring up exhibit 810 which has

5    been admitted?    Could we blow up the top of that e-mail?

6    BY MR. WARD

7    Q.    Again, Mr. Darrow, that's the e-mail address you were

8    using at the time when you were selling ATEN Coin?

9    A.    Yes.

10   Q.    And looking at this e-mail, MWitte@cicdoc.com, is this the

11   Dr. Michael Witte that you were selling ATEN Coin to?

12   A.    Yes.

13   Q.    And does this appear to be confirmation for a sale of

14   $19,500?

15   A.    Yes.

16   Q.    Looking at the bottom where it says, do you see where it

17   says thanks, Brian Darro?

18   A.    Yes.

19   Q.    You spell your name there D-a-r-r-o.    Do you see that?

20   A.    Yes, sir.

21   Q.    What's the accurate spelling of your last name?

22   A.    On my driver's license it's spell Brian with an "I," and

23   last name is always with a "W," D-a-r-r-o.    Social Security

24   number is spelled with a "Y" last name Darro, D-a-r-r-o.

25   Q.    So is the correct spelling of your name Darrow,

1    D-a-r-r-o-w?

2    **A.**    Every time.

3    **Q.**    But yet it says Darro, D-a-r-r-o, with no "W" here.

4    **A.**    Uh-huh.

5    **Q.**    Why did you live off the W on this e-mail?

6    **A.**    Remember this was only 2014, 2015 in time of year, and so

7    essentially 10 years earlier there was a lot of my name with

8    the correct spelling on the Internet because of the

9    telemarketing fraud that I was involved with regarding the

10    Forex, talking about organized crime association, and some

11    people were considered to be associates, some people were

12    soldiers.  I mean, it just went crazy.

13    **Q.**    Did you change the name so that potential purchasers

14    wouldn't be able to --

15    **A.**    Be able to find out who I really was.

16    **Q.**    And were you trying to conceal from them your prior

17    conviction?

18    **A.**    Oh, most definitely.

19    **Q.**    When you sold investors, did you tell them that you were

20    getting a 30 or 40 percent commission?

21    **A.**    Never.

22    **Q.**    At some point when you were selling ATEN Coin did you,

23    yourself, receive any ATEN Coin?

24    **A.**    Yes.

25    **Q.**    Do you remember how many ATEN Coin did you receive?

**A.**    When I had started with Marcus, going back to the initial

agreement -- and, again, he was so confident that this coin was

going to be listed and do amazing things, he had told me, look,

if you can do this for me and raise the money you're talking

about, I'll gift to you 50,000 coins.

**Q.**    And did he, in fact, initially gift you 50,000 ATEN Coin?

**A.**    Towards the end, yes.

**Q.**    All right.  And were you able to download those onto your

computer so that you have them?

**A.**    Yes, they were put into my electronic -- a representative

of Mr. Andrade had installed an electronic wallet onto my

laptop and the coins were then disbursed to that laptop.

**Q.**    Okay.  At the time that you were working for Mr. Andrade,

was the ATEN Coin trading on a cryptocurrency exchange called

the C-CEX?

**A.**    At the very end.

**Q.**    Did you watch the trading and the trading volume on the

C-CEX exchange?

**A.**    Yes.

**Q.**    At some point did you attempt to sell some of your coins

on the C-CEX?

**A.**    Yeah, I factually actually did.

**Q.**    And approximately how many coins did you sell?

**A.**    I was selling them in increments of let's say 100 coins,

and the price point that was showing as a cash value was seven

1   dollars and some change.

2   **Q.**   What happened when you tried to start selling the -- your

3   coins on the C-CEX exchange?

4   **A.**   The market crashed.

5   **Q.**   What do you mean the market crashed?

6   **A.**   Meaning the value of seven dollars and change went nearly

7   to pennies because there was no true support buying it.

8            **MR. SHEPARD:**  Well, objection to the last phrase.

9            **THE COURT:**  All right.  When he said because and

10  onwards, disregard that at this time.  Go ahead.

11  **BY MR. WARD**

12  **Q.**   When you offered your shares to sell were you getting your

13  initial price that you wanted for the ATEN Coin?

14  **A.**   No.

15  **Q.**   Were you only able to sell it, were there only buyers at a

16  much lower price?

17  **A.**   Yes.

18  **Q.**   All right.  Approximately how many coins did you end up

19  selling?

20  **A.**   Less than 1000.

21  **Q.**   After you sold these coins did you have a conversation

22  with Marcus Andrade?

23  **A.**   Marcus Andrade called me immediately.

24  **Q.**   And what did Marcus Andrade say?

25  **A.**   Because he could see that I was the person that was

1    selling the coins into the open market.

2    **Q.**   And what did he say to you?

3    **A.**   You need to stop doing that right now, with some profanity

4    involved.

5    **Q.**   And did he tell you, explain to you why he was telling you

6    to stop selling your shares on that exchange?

7    **A.**   Because it was crushing the market.

8    **Q.**   And following that did you ever try to sell any of your

9    remaining ATEN Coin --

10    **A.**   No.

11    **Q.**   -- tokens?

12    **A.**   Those went back to Mr. Andrade.

13    **Q.**   All right.  Did you ever see ATEN Coin trading on any

14    other exchanges?

15    **A.**   At the very end because remember I had several investors

16    involved, you know.  Just out of curiosity I saw that he had it

17    on a couple of alt exchanges, but I never saw what it was

18    actually doing.

19    **Q.**   Approximately what time did you stop selling ATEN Coin for

20    Marcus Andrade?

21    **A.**   Like, let's say April -- near April 2015.

22    **Q.**   And why did you stop selling -- why did that -- why did

23    you stop selling ATEN Coin?

24    **A.**   Once it went listed on an exchange, the way it was

25    explained to me you couldn't solicit it and sell it the way we

1    were selling it.  You know, people had to buy it from the open

2    market.

3    **Q.**    Well, and at some point the ATEN Coin that were in your

4    wallet, were those taken out of your wallet?

5    **A.**    Yes.

6    **Q.**    And do you know what happened to them?

7    **A.**    I gave them back to Mr. Andrade.

8    **Q.**    Did Mr. Andrade take them from you?

9    **A.**    No, I gave them back.

10   **Q.**    Why did you give them back?

11   **A.**    He owed me monies from another sale that I helped him

12   procure regarding a private placement offer.

13   **Q.**    And did you receive any other compensation from

14   Mr. Andrade?

15   **A.**    No.  I was -- I had made arrangements with several of my

16   coin buyers so that another one of his representatives

17   literally just had to call and take the order and send over the

18   bank wiring instructions.  The deal was done, and I was

19   supposed to receive half of that commission, and to receive

20   half of that commission I had to return the balance of my coins

21   so that he knew that I wouldn't keep selling the market and

22   crashing it down.

23   **Q.**    Did he want the coins back so that you wouldn't keep

24   selling them on the market?

25   **A.**    Yes.

1          **MR. SHEPARD:**  Objection.

2    **BY MR. WARD**

3    **Q.**   Did he tell you that?  Did Mr. Andrade tell you that --

4    why he wanted those coins back?

5          **THE COURT:**  Why don't you say:  What did he tell you?

6    **BY MR. WARD**

7    **Q.**   What did he tell you?

8    **A.**   Yeah, he had told me that to get my money from the three

9    sales that had happened, I had to return the balance of the

10   coins in my wallet.  He gave me a wallet code to send to, so as

11   he knew that I wouldn't keep selling into the market, crashing

12   the price down.

13   **Q.**   Shortly after this time did you start marketing Java Coin?

14   **A.**   Yes.

15   **Q.**   Did you ever talk to Marcus Andrade about your marketing

16   of the Java Coin cryptocurrency?

17   **A.**   No.  During our time of working together, many evenings we

18   had conversations, and I kept implying to him that the value of

19   having a book of business, meaning 40 to 50 names --

20         **THE COURT:**  Just answer the specific question that he

21   asked you.  Don't offer or volunteer.

22         **THE WITNESS:**  Thank you.

23         **THE COURT:**  Go ahead, Mr. Ward.

24   **BY MR. WARD**

25   **Q.**   Did you ever have discussions with Mr. Andrade about you

1  selling Java Coin?

2  **A.**   No.

3  **Q.**   Are you aware that Mr. Andrade filed a police report

4  against you for selling Java Coin?

5  **A.**   I didn't know that until I was informed from your office

6  that that had exactly happened.

7  **Q.**   Okay.  One second, if I might.

8              **MR. WARD:**  Thank you, Mr. Darrow.

9              **THE COURT:**  Mr. Shepard?

10             **MR. SHEPARD:**  If I may, Your Honor, take a moment, I'm

11  going to try something new, a roving microphone, so that if I

12  turn my head people can hear me.

13             **THE COURT:**  Okay.  Go ahead.

14                       <u>**CROSS-EXAMINATION**</u>

15  BY MR. SHEPARD

16  **Q.**   So Mr. Darrow, welcome.

17       Taking you back to 1998, you engaged in a telemarketing

18  fraud.  Right?

19  **A.**   Approximately around that time.

20  **Q.**   And you made three to $400,000?

21  **A.**   That was the Forex cryptocurrency options, yes.

22  **Q.**   The victims lost a lot more money than that, right?

23  **A.**   11.7 million.

24  **Q.**   You pled guilty.  You agreed to cooperate with the

25  government.  Right?

1    **A.**    Yes, sir.

2    **Q.**    And before you went to jail, you committed another

3    telemarketing fraud.  Right?

4    **A.**    Yes.

5    **Q.**    And when you -- when it came time for you to go to jail,

6    you ended up you got half off of your sentence for your

7    cooperation with the government.  Right?

8    **A.**    Yes.

9    **Q.**    And the crime that you committed before you actually had

10   to go to jail on the first one, you weren't charged with that

11   one at all.  Right?

12   **A.**    No, sir.

13            **THE COURT:**  No, you weren't, or ...

14            **THE WITNESS:**  No.

15   **BY MR. SHEPARD**

16   **Q.**    No, you were not?  You were never charged, right?

17   **A.**    I was never charged, named or anything.

18   **Q.**    Yeah.  So your deal was two crimes for the price of one.

19   **A.**    I don't know that it was a deal, but I was not named in

20   the second charge.

21   **Q.**    Okay.  And then in 2019, Special Agent Zartman, the man

22   sitting right over there.  Do you recognize him?

23   **A.**    Yes, sir.

24   **Q.**    Special Agent Zartman and one of his colleagues came to

25   execute a search warrant at your house, right?

**A.**    It was actually an office.

**Q.**    Sorry, at your office.

And they said initially that they were investigating Java Coin and Evergreen, right?

**A.**    Yes, sir.

**Q.**    And Java Coin was this coin that you say you modeled after ATEN Coin?

**A.**    Yes.

**Q.**    And it was a fraud?

**A.**    Yes.

**Q.**    And Evergreen, and the fraud, you collected over a million dollars on Java Coin, right?

**A.**    Regarding Java Coin, a little more than 1 million U.S. dollars.

**Q.**    And Evergreen was also a fraud, right?

**A.**    There have been no charges to date.

**Q.**    But it was a fraud, wasn't it?

**A.**    It's been considered and told to me that it's looked as a fraudulent company.

**Q.**    Well, you said to the FBI that Evergreen was a fraud, didn't you?

**A.**    Yes.

**Q.**    And you collected 500 to $700,000 on Evergreen, correct?

**A.**    Perhaps a little more.

**Q.**    And the first time you sat down to talk to the FBI about

1    Evergreen, you told them it wasn't a fraud, right?

2    **A.**    Yes.

3    **Q.**    And then later you told them it was a fraud, right?

4    **A.**    Yes.

5    **Q.**    Okay.  And when Agent Zartman and his colleague came to

6    talk to you in 2019, after they told you about Java Coin and

7    Evergreen, they mentioned ATEN Coin.  Right?

8    **A.**    Yes, sir.

9    **Q.**    And after they mention ATEN Coin, they kinda got right to

10   it, didn't they?  They said:  You've been through this once

11   before and we're hoping you're gonna cooperate with us similar

12   to last time.  You remember that?

13   **A.**    Yes.

14   **Q.**    And then they said, Mr. Zartman, he said:  What I'm hoping

15   is you're ready to play ball.

16            **MR. WARD:**  Objection, this is hearsay.

17            **MR. SHEPARD:**  It's not hearsay.  It is the inducement

18   that they gave Mr. Darrow to cooperate.

19            **THE COURT:**  Overruled.

20   **BY MR. SHEPARD**

21   **Q.**    Special Agent Zartman said:  What I'm hoping is you're

22   ready to play ball, you can join Team America again, just like

23   you did last time, and help us out with Marcus.  Isn't that

24   what Special Agent Zartman said?

25   **A.**    I don't remember that, but if you say so.

1  **Q.**  Well, did Special Agent Zartman tell you he was recording

2  the conversation he had with you?

3  **A.**  I don't recall that either.

4  **Q.**  Okay.  Well, we have a recording.

5  **A.**  Okay.

6  **Q.**  So, and I believe I even have an exhibit number for it

7  here somewhere.

8       **MR. SHEPARD:**  Can we key up 3085?  And Ed, I think you

9  have it cued up to the particular passage that I was just

10  quoting?

11       **MS. DENT:**  Sorry, it's 3086.

12       **MR. SHEPARD:**  Sorry.

13     So may I play that, Your Honor?

14       **MR. WARD:**  No objection.

15       **THE COURT:**  Go ahead.

16     (Audio played.)

17  **BY MR. SHEPARD**

18  **Q.**  So, I mean, did it -- did it give you a little chuckle

19  that you could commit two frauds, plead guilty, go to jail, get

20  out, commit three more and be invited to join Team America?

21  **A.**  No, sir.

22  **Q.**  Okay.  They didn't ask for your help about Jack Abramoff?

23  **A.**  No, sir.

24  **Q.**  They didn't ask for your help about Japheth Dillman?

25  **A.**  I don't know who that is, sir.

1  **Q.**  And they didn't ask you for help about him, right?

2  **A.**  Whom?

3  **Q.**  Japheth Dillman.

4  **A.**  No, as I said, I don't know that gentleman.

5  **Q.**  So they didn't mention him.  Right?

6  **A.**  No, not ever the name.

7  **Q.**  Okay.  They just asked you for help about Marcus Andrade,

8  right?

9  **A.**  Yes, sir.

10  **Q.**  And in that entire conversation they didn't even say you

11  needed to be truthful, they just asked you for your help.

12  Right?

13  **A.**  Yes, sir.

14  **Q.**  And so you began to cooperate with the government and you

15  got a plea deal.  Right?

16  **A.**  Yes.

17  **Q.**  And your plea deal is just -- the only thing you were

18  charged with was Java Coin, right?

19  **A.**  Yes.

20  **Q.**  You were not charged with anything relating to ATEN Coin,

21  right?

22  **A.**  No, sir.

23  **Q.**  You were not charged with anything relating to Evergreen,

24  right?

25  **A.**  No, sir.

1          **THE COURT:**  You've got two double negatives in that

2    last two questions.  If you want to clean that up, it's you

3    weren't convicted of that, right?  No.  I think you've got it

4    confused.

5          **MR. SHEPARD:**  I appreciate the suggestion.  I'll go

6    back to it.

7    **BY MR. SHEPARD**

8    **Q.**   You were not charged with ATEN Coin?

9    **A.**   No.

10   **Q.**   Correct?

11        You were not charged with anything relating to Evergreen,

12   correct?

13   **A.**   No.

14          **THE COURT:**  You still have it the wrong way around,

15   but that's ... go ahead.  Go ahead.

16        Correct?  No, you're not correct.

17          **MR. SHEPARD:**  I see.  Okay.  I get it now.  Thank you.

18   I missed it the first couple of times.

19   **BY MR. SHEPARD**

20   **Q.**   I think what the Judge is helping me with, Mr. Darrow, is

21   that when I ask you, you're not charged with anything relating

22   to ATEN Coin and you answer "no," it's not exactly clear what

23   you mean.  So let me rephrase it in a different way and

24   hopefully we can make it clear.

25        The government -- am I correct that the government did not

1    charge you with anything relating to ATEN Coin?

2    **A.**   Yes.

3    **Q.**   And am I correct that the government did not charge you

4    with anything relating to Evergreen?

5    **A.**   Yes.

6    **Q.**   The only charges you had to plead guilty to were relating

7    to Java Coin?

8    **A.**   Yes.

9    **Q.**   And you're hoping to get half off again on the Java Coin

10   charge, aren't you?

11   **A.**   I have been promised nothing.

12   **Q.**   I didn't ask what you were promised, I asked what you were

13   hoping for.

14   **A.**   Well, I would hope to get zero time.

15   **Q.**   And zero time for Java Coin, and you're never going to get

16   any time for ATEN Coin or Evergreen because the government

17   didn't charge you with that at all.  Right?

18   **A.**   Correct.

19   **Q.**   And in exchange for that, you helped them get Mr. Andrade,

20   right?

21   **A.**   Yes.

22   **Q.**   Just a few more topics.

23        You were talking about 30 and 40 percent commissions that

24   you received.  When you did Java Coin you paid 50 percent

25   commissions.  Right?

1  **A.**    To some individuals.

2  **Q.**    To some individuals, yes, you paid 50 percent.  Right?

3  **A.**    Yes.

4  **Q.**    And I think I understood you to say that you got

5  30 percent and then it permanently went up to 40 percent?

6  **A.**    Yes, sir.

7  **Q.**    Didn't you tell the FBI that after Marcus said he would

8  increase your commission to 40 percent, that the requests that

9  he made continued over time, and when he would need money

10  quickly, he would call and make a similar offer, meaning a

11  similar offer to go up to 40 percent?  Do you remember telling

12  the FBI that?

13  **A.**    Um, I may have misspoken on that because once I went to

14  40 percent, you can see by the payouts I was receiving, every

15  week was 40 percent.

16  **Q.**    Well, we could see you got 40 percent sometimes, but it

17  sounds like you're saying, yes, you did tell the FBI that

18  sometimes Mr. Andrade would call and make a similar offer, but

19  you're saying you were wrong when you told them that?

20  **A.**    Yeah, I misspoke.

21  **Q.**    Okay.  You were hired by a guy named Bob Parsons, not by

22  Mr. Andrade, correct?

23  **A.**    Yes, sir.

24  **Q.**    And you said that Mr. Andrade educated you, and the

25  government showed you, I think, two documents, a comparison

1  between ATEN Coin and Bitcoin and then a press releases.

2  Right?

3  **A.**  Yes.

4  **Q.**  You don't have any other materials that you say you got

5  from AML -- from ATEN Coin, from AML Bitcoin, from Marcus

6  Andrade.  You don't have anything else, right?

7  **A.**  They were on the hard drive of the laptop computer that

8  was seized from my office.

9  **Q.**  So the government might have them, but you don't have

10  them?

11  **A.**  I don't have access to them, no.

12  **Q.**  And the government didn't show you anything else that they

13  seized from your computer that had anything to do with

14  Mr. Andrade, correct?

15  **A.**  No, they've shown me other document -- at least one other

16  document.

17  **Q.**  That was something that was educational to you about what

18  to say to purchasers?

19  **A.**  Yes.

20  **Q.**  Okay.  And -- but they didn't offer it here?

21  **A.**  Today in court, no.

22  **Q.**  Okay.  And other than that, you don't have anything,

23  right?

24  **A.**  No.  I explained they took all my electronics.

25  **Q.**  Okay.  And the material that you saw today in court, the

1  ATEN Coin/Bitcoin comparison, the press releases, you don't

2  know who prepared those, do you?

3  **A.**  No, I only know where they came from.

4  **Q.**  Understood.

5      And you said that you modeled Java Coin after ATEN Coin,

6  but you don't know how many people actually worked on the ATEN

7  Coin technology to make it work, do you?

8  **A.**  No.

9  **Q.**  And do you know that people actually could do the I.D.

10  verification?  Did you know that?

11  **A.**  No.

12  **Q.**  Did you know that it actually had the features it claimed

13  to have?

14      **MR. WARD:**  Objection, assumes facts not in evidence.

15  He needs to lay a foundation as to his knowledge.

16      **THE COURT:**  Overruled.

17      **THE WITNESS:**  I didn't know that.

18  **BY MR. SHEPARD**

19  **Q.**  Yeah, you don't know.

20      You don't know the extent to which it worked?

21  **A.**  No, sir.

22  **Q.**  So when you say you modeled Java Coin after ATEN Coin,

23  Java Coin never really existed.  It didn't -- you were never

24  trying to build it into an actual technology, correct?

25  **A.**  No.

1          **MR. SHEPARD:**  Thank you, Your Honor.

2    **BY MR. SHEPARD**

3    **Q.**   When you say "no," it's not clear what that means.

4         So it is correct, isn't it, that you never tried to build

5    Java Coin into an actual technology?

6    **A.**   That's correct.

7    **Q.**   And when you were selling ATEN Coin, and I think we saw

8    this as an exhibit, you would send the people who were willing

9    to buy it a purchase agreement.  Right?

10   **A.**   Yes, sir.

11   **Q.**   And they had to sign the purchase agreement before they

12   bought it.  Right?

13   **A.**   Yes.

14   **Q.**   And the purchase agreement said that ATEN Coin -- let me

15   back up.

16        The purchase agreement said they will create a

17   cryptocurrency, correct?

18   **A.**   Well, there are actually two purchase agreements.  We

19   started with one and then later, after, for some reason behind

20   me, Marcus changed it to what appeared to be a much more

21   thorough document.

22   **Q.**   Okay.  And the one that we saw earlier during the

23   government's testimony, that was the one that says -- that you

24   would describe as a more thorough document?

25   **A.**   I didn't see that today.

1    **Q.**   Okay.  It was attached to ... let me get it.

2    **A.**   Okay.

3    **Q.**   Yeah, I think you're correct, the government just showed

4    you the first page.  So let me go back to that.  It's

5    exhibit 810.

6    **A.**   Okay.

7    **Q.**   If we could go back to 810, it's in evidence.  This is

8    what was shown to you on direct examination, and it has an

9    attachment behind it.  So could we go to the next page?

10        This is the purchase agreement that Dr. Witte had to sign.

11            **MR. SHEPARD:**  And, Ed, if you could take the last

12    whereas clause and blow it up, please.

13   **BY MR. SHEPARD**

14   **Q.**   Yes, whereas, NAC only guarantees that it will create a

15   digital currency.  You see that?

16   **A.**   Yes.

17   **Q.**   That's the purchase agreement that you sent to Dr. Witte,

18   correct?

19   **A.**   This is the second document that we utilized as a purchase

20   agreement.

21   **Q.**   Okay.  My question to you was:  That was the document that

22   you sent to Dr. Witte, correct?

23   **A.**   Yes.

24   **Q.**   Now, on the question of what you were saying about ATEN

25   Coin and oil, you don't have any pieces of paper or anything

1    showing what you were (sic) said about ATEN Coin and oil,

2    correct?

3    **A.**    No, sir.

4    **Q.**    I am correct that you don't have any pieces of paper?

5    **A.**    No, all information was taken during the initial search.

6    **Q.**    Okay.  And you don't know what arrangements Mr. Andrade

7    may have had with anyone in the oil business relating to ATEN

8    Coin, correct?

9    **A.**    No, sir.

10    **Q.**    I am correct that you don't know.  Right?

11    **A.**    Yes.

12    **Q.**    Thank you.  We'll get it.

13            And what -- then you said you got this call from a

14    regulator in Texas, and what the regulator in Texas told you

15    was that the company could not continue saying that ATEN Coins

16    were backed by oil, as these statements were illegal, correct?

17    **A.**    It wasn't a phone call.  It was actually a document that

18    came via mail.

19    **Q.**    Okay.  And what the document said was that the company

20    could not continue saying that ATEN Coins were backed by oil,

21    as these statements were illegal; is that correct?

22    **A.**    Yes.

23    **Q.**    Okay.  It didn't say the statements were untrue, it just

24    said you can't be saying them if -- you can't be saying that,

25    it's illegal to say that.  Right?

1   **A.**   That's what it said, correct.

2   **Q.**   And after that you spoke to Marcus and he said, yeah,

3   don't say that anymore.  Right?

4   **A.**   Yes.

5   **Q.**   It was not uncommon in your line of work to get a actual

6   script of what you were supposed to say; is that right?

7   **A.**   Sometimes scripts are provided; sometimes not.

8   **Q.**   And one of the people who worked for you once left a

9   script behind.  You remember that?

10  **A.**   No.

11  **Q.**   Well, you remember telling the FBI that one of the people

12  who worked for you left a script behind from a company called

13  Ross Bicycles, LLC?

14  **A.**   Oh, yeah.

15  **Q.**   Okay.  And you actually were able to provide that script

16  to the FBI.  You remember that?

17  **A.**   Yes.

18  **Q.**   So somehow they missed that in the seizure of your office?

19  **A.**   No, no.  That was taken as I believe while they were

20  there, or maybe they -- or maybe I gave that to them later when

21  I did my -- sat down and did my proffer.

22  **Q.**   Okay.  But in any event, they haven't shown you and you

23  don't have anything like that that you got from Marcus Andrade,

24  correct?

25  **A.**   Well, that didn't come from Marcus.

1    **Q.**    Right.

2        And I'm just saying they haven't shown you anything that

3    they seized from you and you don't have anything that's a

4    script from Marcus Andrade, correct?

5    **A.**    Yes.

6    **Q.**    And I -- I take it from what you said, that as far as

7    you're concerned, Marcus owes you money; is that right?

8    **A.**    Yes, there was monies that were owed.

9        **MR. SHEPARD:**    Okay.    If I may have one second, Your

10   Honor?

11       **THE COURT:**    Yes.

12       **MR. SHEPARD:**    Thank you, Mr. Darrow.

13       **THE COURT:**    Mr. Ward.

14                    <u>**REDIRECT EXAMINATION**</u>

15   **BY MR. WARD**

16   **Q.**    Mr. Darrow, Mr. Shepard asked you about Jack Abramoff and

17   said you didn't -- I'm not on?    I'll repeat the question.

18       Mr. Darrow, Mr. Shepard asked you about Jack Abramoff.

19   Was Jack Abramoff involved in ATEN Coin in any way?

20   **A.**    I only became aware of that long after I was no longer

21   with or around Marcus.

22   **Q.**    Well, when the time that you were involved in ATEN Coin,

23   did you have any dealings with Jack Abramoff?

24   **A.**    No.

25   **Q.**    To your knowledge, was he involved in any way?

1   **A.**   Only what I read in the paper.  And, again, those were

2   dates long after I was involved.

3   **Q.**   Got it.

4       Mr. Shepard asked you about a gentleman by the name of

5   Japheth Dillman.  Was Japheth Dillman involved in the promotion

6   and sale of ATEN Coin?

7   **A.**   Again, I've never heard that name, so it must have been

8   someone that was involved long after I was a part of the

9   raising capital.

10  **Q.**   Just for your knowledge, was Mr. Dillman involved in any

11  way in ATEN Coin?

12  **A.**   No, sir.

13  **Q.**   All right.  Mr. Shepard asked you a number of questions

14  about your interactions with the FBI and the Department of

15  Justice.  Did you enter into a written plea agreement with the

16  government?

17  **A.**   Yes.

18  **Q.**   As part of that agreement did you agree to cooperate?

19  **A.**   Most definitely.

20  **Q.**   And is that agreement tied to you telling the truth?

21  **A.**   One hundred percent.

22  **Q.**   When Mr. Shepard asked you if you were hoping to get half

23  off of your sentence, have you been made any promises by the

24  government?

25  **A.**   Oh, not even, you know, a minute of sentence reduction.

1    We're just hoping that the U.S. Attorney will make a

2    recommendation for a 5K1.

3    **Q.**    And do you understand that it's not the U.S. Attorney's

4    Office that imposes your sentence, it will be the Judge in your

5    case?

6    **A.**    Right.  It's ultimately he or she's decision.

7    **Q.**    And that the U.S. Attorney's Office can only make a

8    recommendation, but no promises have been made to you?

9    **A.**    One thousand percent.

10   **Q.**    And when the FBI asked you to help them get Mr. Andrade,

11   did you understand that they wanted you to help cooperate in

12   their investigation of Mr. Andrade?

13   **A.**    Yes.

14   **Q.**    Mr. Shepard asked you about commissions and he asked --

15   were you paid 50 percent commission from the sale of Java Coin?

16   When you sold Java Coin -- excuse me -- were you paying

17   50 percent?

18   **A.**    I had a couple individuals that brought in some large

19   amounts of money, and so they, I think I paid them 50 percent.

20   They were just a couple of guys.  But again, they brought in a

21   hundred thousand dollars or more.

22   **Q.**    And the remainder of the be funds from Java Coin, was any

23   of that being used for the development of any cryptocurrency?

24   **A.**    No.  It was mostly spent on lifestyle, such as

25   entertainment, gambling, drinking.  Just day-to-day office and

1    home bills.

2    **Q.**    Mr. Shepard a couple of times said you -- asked you about

3    other documents that you don't have any other materials related

4    to ATEN Coin, but I'd like to show you another document.

5           **MR. WARD:**    If I could bring up exhibit 1501 and

6    pages 14 and 15.  This is -- 1501, 12 has been admitted, but

7    not 14 or 15.  So let's start with page 14.

8    **BY MR. WARD**

9    **Q.**    Mr. Darrow, do you see this document?

10   **A.**    Yes.

11   **Q.**    Do you see the names in the left-hand column?

12   **A.**    Yes.

13   **Q.**    And do you recognize those names?

14   **A.**    Yes.

15   **Q.**    Were those individuals that you sold ATEN Coin to?

16   **A.**    Yes.

17   **Q.**    And do you see the column that says amount?

18   **A.**    Yes.

19   **Q.**    Does this appear to be an accurate representation of the

20   sales that you made of ATEN Coin and the commissions that you

21   received?

22   **A.**    Yes.

23           **MR. WARD:**    All right.  At this point I'd move to admit

24   page 14.

25           **MR. SHEPARD:**    I'm sorry, I didn't hear exactly.  Are

```
 1    you just offering to admit this page?

 2              MR. WARD:  Just the page, yeah.

 3         Sorry, this is page 15.  Same document.

 4              MR. SHEPARD:  It's the one that's on the screen right

 5    now.

 6              MR. WARD:  This one.

 7              MR. SHEPARD:  Okay.  And I still don't understand the

 8    wire fee thing, so I have a problem with that.  Otherwise the

 9    point Mr. Ward wants to make from the document is fine.

10    BY MR. WARD

11    Q.   Well, is this an accurate depiction of the commissions

12    that you were paid for selling ATEN Coin?

13    A.   Yes, yes.  The -- as I'm reading it, it shows the amount

14    that the investor sent, any internal fees that may or may not

15    have been charged, then of course how the money came in.

16    That's why it reads wire.  If you'll note the Rhode Family

17    Trust, that was a gentleman from Arizona.  His name was James

18    or Jim Rhode, and he was a gentleman that paid by snail mail

19    check.

20    Q.   So you recognize these names and these amounts?

21    A.   Yeah, because these people have purchased, when I say

22    numerous times, this is what we're talking about, to get to the

23    monies that were ultimately, you know, brought in.

24    Q.   You testified earlier, did you sell ATEN Coin to an

25    individual named Lavern Davidhizer?
```

**A.**   You'll see at the very bottom, yes.  That was probably sale number, I don't know, four, five.  It could have been sale number 8.

**Q.**   And looking at the doc you sign at the bottom of that, do you see that?

**A.**   Yes, sir.

      **MR. WARD:**  At this point, the government would move to admit this.

      **MR. SHEPARD:**  I have the same objection to the portions of the document that this witness can't -- you know, it's not his document.  He can't really speak to it.

      **THE COURT:**  Well, I think he's identified the entire document at this point.  I'll admit it.

   For keeping track of this, do you want to call an A, B and C?  I mean, these are different pages of one document.

      **MR. WARD:**  Correct.

      **THE COURT:**  So, so far you've admitted page 12.

      **MR. WARD:**  Twelve.

      **THE COURT:**  And that was exhibit what?

      **MR. HIGHSMITH:**  1501.

      **THE COURT:**  Okay.  So you want that to be 1501A and this document to be -- this page to be 1501B?

      **MR. WARD:**  That'd be great.  Sure.  Thank you.

      **THE COURT:**  All right.  1501B is admitted.

   (Trial Exhibit 1501B received in evidence.)

**BY MR. WARD**

**Q.**    Let me just ask you again, Mr. Darrow.  Did you sell $30,000-worth of ATEN Coin to Lavern Davidhizer?

**A.**    Yes, sir.

**Q.**    And from that sale did you receive $12,000?

**A.**    Yes, 40 percent.

**Q.**    And you mentioned the Rhode Family Trust.  Did you sell ATEN Coin, $3750 worth of ATEN Coin to them?

**A.**    Yes.

**Q.**    And did you also receive a 40 percent commission?

**A.**    Yes.

**Q.**    And then we talked about Dr. Witte is -- did you at one point sell him $5250 in ATEN Coin?

**A.**    Yes.

**Q.**    And did you also receive a 40 percent commission?

**A.**    Yes.

**Q.**    And to any of these people did you disclose the amount of the commission?

**A.**    No.  In fact, commission was hid in use of proceeds, simply utilizing the enticement of, that as salespeople we were compensated with salaries from the NAC Foundation and all to be bonused ultimately with coins when it got to the open market.

**Q.**    Okay.

**A.**    So commissions were hid from each and every investor that was ever sold, and then the balance of the proceeds, such as

1  Dr. Lavern Davidhizer, again, the balance left was

2  approximately 18 -- if I'm paid 12, there's 18,000.  And that

3  was monies that Mr. Andrade had control of and use of proceeds.

4  You know, I don't know what he did with the funds.

5  **Q.**   Okay.  Mr. Shepard asked you if the government had shown

6  you any scripts provided by Marcus Andrade related to ATEN Coin

7  and what you were to tell investors.

8       **MR. WARD:**  Could we pull up exhibit 811, which was

9  just admitted?

10  **BY MR. WARD**

11  **Q.**   Again, Mr. Darrow, was this document e-mailing the

12  attached document provided to you by Marcus Andrade?

13       **MR. SHEPARD:**  My question was other than this document

14  and another document that I referenced, was there anything

15  else.  He said, "no."  This is just repeating the direct.

16  **BY MR. WARD**

17  **Q.**   Well, was this a script that was provided --

18  **A.**   No, this document wouldn't have been a script.  This would

19  have fallen more under, as I had mentioned, a piece of

20  collateral material that we would add to whatever script we

21  were using to entice you to buy.

22  **Q.**   Was the information in this document used by you to sell

23  ATEN Coin?

24  **A.**   Most definitely.

25  **Q.**   All right.  And let me just go back to page 12 of this

1  document.  Do you see the point where it says supported by oil

2  and gas production projects?

3  **A.**   Yes.

4  **Q.**   Was that the oil -- tied to the oil industry that you were

5  testifying to earlier?

6  **A.**   Yes.

7  **Q.**   And this was also provided to you by Mr. Andrade?

8  **A.**   One hundred percent.

9         **MR. WARD:**  One moment.

10  Thank you, Mr. Darrow.

11                    <u>**RECROSS-EXAMINATION**</u>

12  **BY MR. SHEPARD**

13  **Q.**   Just one set of questions, Mr. Darrow, and then you can be

14  on your way.

15  **A.**   Oh, thank you, sir.

16         **MR. SHEPARD:**  Can we put up exhibit 748?  And actually

17  I don't think the jury can yet see this because you didn't

18  offer this.  Am I correct about that this?

19         **THE COURT:**  That's correct.  It's not admitted.

20         **MR. SHEPARD:**  So please remove it from the jury.

21         **THE COURTROOM DEPUTY:**  I did.

22         **MR. SHEPARD:**  And just the rest of us.  Thank you.

23  **BY MR. SHEPARD**

24  **Q.**   Mr. Ward on redirect referred to your plea agreement.

25  Take a look at exhibit 748 and tell me if that's the plea

1  agreement that you reached with the government in this

2  investigation.

3  **A.**    This is regards to the company that I created and utilized

4  as fraud.

5  **Q.**    Yes.

6  **A.**    And that was Java Enterprise.

7  **Q.**    Correct.

8  **A.**    That was the parent company, like modeled again, NAC

9  Foundation ATEN Coin.

10 **Q.**    Yes.  Okay.  So this is the plea agreement.  The Java Coin

11 thing was the one thing the government charged you with and you

12 pled guilty to and this is your plea agreement, exhibit 748.

13 That's the plea agreement you reached with the government,

14 right?

15 **A.**    Yes, sir.

16         **MR. SHEPARD:**  I offer 748.

17         **MR. WARD:**  No objection.

18         **THE COURT:**  Exhibit 748 will be admitted.

19     (Trial Exhibit 748 received in evidence.)

20         **MR. SHEPARD:**  And, Ed, if we could go to the bottom of

21 page 7 and paragraph 16, running over to paragraph -- to

22 page 8.

23 **BY MR. SHEPARD**

24 **Q.**    The government agrees not to file any additional charges

25 against the defendant that could be filed as a result of the

1    investigation.  That means you got off on Evergreen and you got

2    off on ATEN Coin.  Right?

3    **A.**    Yes.

4          **MR. SHEPARD:**  And then, Ed, if we can go to the next

5    paragraph on page 8, paragraph 17.

6    **BY MR. SHEPARD**

7    **Q.**    This is the promise that lets you get access to time, to

8    50 percent off or whatever it is, that you might get.  Right?

9    Paragraph 17.

10   **A.**    Yes.

11   **Q.**    And it says:  If, in its sole and exclusive judgment the

12   government decides that you have cooperated fully and

13   truthfully and provided substantial assistance to law

14   enforcement authorities and otherwise comply with this

15   agreement, it will file with the Court a motion under

16   Section 5K1.1.

17         That's a reference to the Sentencing Guidelines.  Right?

18   **A.**    Presentence, yes.

19   **Q.**    Yes.  That explains the nature and extent of the

20   defendant's cooperation and recommends a downward departure.

21         That would be a departure from the guideline range that

22   the Sentencing Guidelines would otherwise apply.  Right?

23   **A.**    Yes.

24   **Q.**    And only the government can make that motion.  Right?

25   **A.**    Yes, sir.

1    **Q.**   And you want them to make that motion.  Right?

2    **A.**   I'm hoping that they will.

3           **MR. SHEPARD:**  Nothing further.  Thank you.

4           **THE COURT:**  Thank you.

5       Okay.  One.  It better be short.

6           **MR. WARD:**  Just briefly.

7                          **REDIRECT EXAMINATION**

8    BY MR. WARD

9    **Q.**   Mr. Darrow, looking at your plea agreement, do you -- does

10   it say that:  I understand that the Court will not be bound by

11   any recommendations made by the government?

12   **A.**   Yes.

13   **Q.**   You understand that the sentence will be imposed by the

14   Court?

15   **A.**   Only by the Judge.

16   **Q.**   And Mr. Darrow, do you understand that as part of your

17   plea agreement you will respond truthfully and completely to

18   any and all questions put to me and will testify truthfully at

19   any grand jury, court or other proceedings as requested by the

20   government?  Do you understand that as your obligation?

21   **A.**   Yes.

22   **Q.**   And you understand that any cooperation benefit you hope

23   to receive you could lose if you're not truthful?

24   **A.**   Oh, most definitely.

25           **MR. WARD:**  Nothing further.  Thanks.

1          **THE COURT:**  All right.  You may step down.

2          **THE WITNESS:**  Thank you, sir.

3          **THE COURT:**  All right.  Members of the jury, it's kind

4    of the end of the day, and five minutes we've got left, I'm not

5    going to ask to start a witness.  So you will be done for the

6    day.

7          Remember my admonition.  Do not discuss this matter with

8    anyone.  Put this case out of your mind, enjoy the rest of the

9    day, and we'll see you here promptly at 8:30.  Don't do any

10   research, anything like that, and we'll see you tomorrow at

11   8:30.

12         (The jury exits the courtroom.)

13         **THE COURT:**  We're out of the presence of the jury.

14   The microphone does work much better.

15         **MR. SHEPARD:**  Yes, thank you.

16         **THE COURT:**  So it seems to me we're going kinda

17   slowly.

18         **MR. HIGHSMITH:**  We're going slower.

19         **THE COURT:**  And I have a list that's pretty daunting

20   of witnesses.  What's -- give me a sense of what's happening.

21         **MR. HIGHSMITH:**  We're going to cut two witnesses to

22   help make up for it, but we are going slower.  We'll see if we

23   can cut more witnesses.  If things continue this slowly, we'll

24   see if we can cut more.

25         **THE COURT:**  Okay.  All right.

1          **MR. HIGHSMITH:**  But we're cutting Mr. Aharonoff.  He's

2   one of the witnesses on there.

3          **THE COURT:**  Okay.

4          **MR. HIGHSMITH:**  We're cutting Mr. Corey Jodoin.  So

5   he's off.  And we'll see if there's additional witnesses we can

6   cut so we can keep moving quickly.

7          **THE COURT:**  Who was the other name you said?

8          **MR. HIGHSMITH:**  Corey --

9          **THE COURT:**  No, before that.

10         **MR. HIGHSMITH:**  Aharonoff.  Not Abramoff, Aharonoff.

11         **THE COURT:**  I understand.  Okay.  Who's tomorrow?

12         **MR. HIGHSMITH:**  Scott Bruffey, Ben Boyer and Rene

13   Acuna, who we heard about today.

14         **THE COURT:**  Okay.  All right.  See you tomorrow.

15        (The evening recess was taken at 1:35 p.m.)

16                         **---o0o---**

17               <u>**CERTIFICATE OF REPORTER**</u>

18         I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   DATE:  Wednesday, February 12, 2025

21

22

23   _____

24   Stephen W. Franklin, RMR, CRR, CPE
     Official Reporter, U.S. District Court

25