```
                                    Volume 7

                                    Pages 1099 - 1284

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

          Before The Honorable Richard Seeborg, Judge

          UNITED STATES OF AMERICA,        )
                                           )
                         Plaintiff,        )
                                           )
            VS.                            )        NO.  3:20-CR-00249-RS-1
                                           )
          ROWLAND MARCUS ANDRADE,          )
                                           )
                         Defendant.        )
          _____)


                                    San Francisco, California
                                    Wednesday, February 19, 2025

                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS

          APPEARANCES:

          For Plaintiff:
                              PATRICK D. ROBBINS
                              ACTING UNITED STATES ATTORNEY
                              450 Golden Gate Avenue
                              San Francisco, California 94102
                         BY:  CHRISTIAAN HIGHSMITH
                              DAVID J. WARD
                              MATTHEW CHOU
                              ASSISTANT UNITED STATES ATTORNEYS

          For Defendant:
                              KING AND SPALDING, LLP
                              50 California Street, Suite 3300
                              San Francisco, California 94111
                         BY:  MICHAEL J. SHEPARD, ATTORNEY AT LAW

                    (APPEARANCES CONTINUED ON FOLLOWING PAGE)


          REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                        CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES:** (CONTINUED)

2    For Defendant:

                        KING AND SPALDING, LLC
3                       1700 Pennsylvania Avenue, Northwest
                        Washington, D.C. 20006
4                BY:    **KERRIE C. DENT, ATTORNEY AT LAW**

5

                        KING AND SPALDING, LLC
6                       1185 Avenue of the Americas, 34th Floor
                        New York, New York 10036
7                BY:    **DAINEC P. STEFAN, ATTORNEY AT LAW**

8

                        LAW OFFICES OF CINDY A. DIAMOND
9                       58 West Portal Avenue, Suite 350
                        San Francisco, California 94127
10               BY:    **CINDY A. DIAMOND, ATTORNEY AT LAW**

11

12   Also Present:          **Special Agent Brendon Zartman**
                            **Tina Rosenbaum, Paralegal**
13                          **Ed Jackson, Trial Technician**

14

15

16

17

18

19

20

21

22

23

24

25

1

## I N D E X

2

3   Wednesday, February 19, 2025 - Volume 7

4

**GOVERNMENT'S WITNESSES**                                    **PAGE**   **VOL.**

5

**SALMON, DAVID**
6    (SWORN)                                                 1107    7
    Direct Examination by Mr. Highsmith                      1107    7
7    Cross-Examination by Ms. Diamond                        1118    7

8

9   **FOTEH, MELISSA**
     (SWORN)                                                 1126    7
10   Direct Examination by Mr. Ward                          1126    7
    Cross-Examination by Mr. Shepard                         1150    7

11

12   **DE LA GUARDIA, CARLOS**
     (SWORN)                                                 1153    7
13   Direct Examination by Mr. Highsmith                     1153    7
    Cross-Examination by Mr. Shepard                         1220    7
14   Redirect Examination by Mr. Highsmith                   1249    7

15

16   **CARLSEN, EVAN**
     (SWORN)                                                 1252    7
17   Direct Examination by Mr. Highsmith                     1252    7
    Cross-Examination by Mr. Shepard                         1275    7

18

19

20                       ## E X H I B I T S

21   **TRIAL EXHIBITS**                              **IDEN**   **EVID**   **VOL.**

22    8                                                        1199    7

23    10                                                       1202    7

24    91                                                       1259    7

25    92                                                       1259    7

1
## I N D E X

2
### E X H I B I T S

3
| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 162 | | 1271 | 7 |
| 880 | | 1163 | 7 |
| 881 | | 1169 | 7 |
| 884 | | 1180 | 7 |
| 885 | | 1183 | 7 |
| 891 | | 1194 | 7 |
| 893 | | 1205 | 7 |
| 1156 | | 1173 | 7 |
| 1223 | | 1108 | 7 |
| 1224 | | 1111 | 7 |
| 1427, page 20, lines 1 through 9 | | 1131 | 7 |
| 1427, page 28, lines 2 through 8 | | 1134 | 7 |
| 1427, page 21, lines 17 through 24 | | 1147 | 7 |
| 1427, page 22, lines 2 through 25 | | 1147 | 7 |
| 1427, page 23, lines 1 through 24 | | 1148 | 7 |
| 1457 | | 1197 | 7 |
| 1510 | | 1161 | 7 |
| 1513 | | 1191 | 7 |
| 1514 | | 1206 | 7 |
| 2599 | | 1233 | 7 |
| 3161 | | 1122 | 7 |
| 3188 | | 1119 | 7 |

| | |
|---|---|
| 1 | <u>**Wednesday - February 19, 2025**</u>                                    <u>**8:08 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | (Defendant present, out of custody.) |
| 5 | (Proceedings were heard out of the presence of the jury.) |
| 6 | **THE COURTROOM DEPUTY:**  Remain seated.  Please come to |
| 7 | order. |
| 8 | **THE COURT:**  Good morning. |
| 9 | **MR. HIGHSMITH:**  Good morning. |
| 10 | **THE COURT:**  So I'm told there's an issue. |
| 11 | **MR. SHEPARD:**  It's a reprise on an issue you've heard |
| 12 | before. |
| 13 | At 5:32 last night, we got a list of additional exhibits |
| 14 | to be used today.  Six of them were added to the exhibit list |
| 15 | for the first time at 2:45 yesterday afternoon.  I don't think |
| 16 | that's right. |
| 17 | And, you know, they've been adding things to the exhibit |
| 18 | list.  We've been adding things to ours.  This happens.  I get |
| 19 | it.  But doing it the afternoon before, when we get a whole lot |
| 20 | of new exhibits at the same time, if the Court is wondering |
| 21 | that we're moving a little more slowly this morning and that we |
| 22 | might not have everything right at our fingertips, that's why. |
| 23 | It's just, it can't be done that way. |
| 24 | **THE COURT:**  Mr. Highsmith? |
| 25 | **MR. HIGHSMITH:**  These are short exhibits.  They're a |

**PROCEEDINGS**

 1    few pages each.  They're not big ones.  They're emails.

 2        I think you're talking about some emails with

 3    Mr. De La Guardia?

 4        I can show them to the Court, if the Court would like.

 5            THE COURT:  Well, maybe what you could tell me is, and

 6    Mr. Shepard says, and we all know this is true, it's never

 7    perfect.  There's always going to be, "Oh, here's an additional

 8    one we meant to put in."  But how come it's happening so late,

 9    and how come they weren't on the exhibit list?

10            MR. HIGHSMITH:  These were new ones that popped up as

11    we were -- as we were prepping Mr. De La Guardia.  They provide

12    extra -- they're new stuff that popped up that we hadn't had on

13    our list before, and they provide additional color on sort of

14    the timeline of events.

15            THE COURT:  How many of these?  You got six, you said?

16            MR. HIGHSMITH:  I --

17            MR. SHEPARD:  Six were added to the exhibit list for

18    the first time.

19            MR. HIGHSMITH:  We're not going to use all of those.

20    We're going to use two of them.

21            THE COURT:  Well, I wish you just gave them the two.

22    That would reduce the ire.

23            MR. HIGHSMITH:  Understood.

24            THE COURT:  I know you want it in an excess of

25    caution, but if something happened on the stand and there was a

 1  specific document, "Oh, now we need to use it," that's okay.

 2  But in -- and this happened yesterday too.  If you think you're

 3  going to use two and you've got ten, don't give -- don't turn

 4  over the -- don't mark ten.  Give them the two so they can

 5  focus on what you're going to be using.

 6      I'll let you use these, but let's not have this happen

 7  again.

 8          **MR. HIGHSMITH:**  Understood.

 9          **THE COURT:**  Okay?

10          **MR. SHEPARD:**  That's all I have, Your Honor.

11  Thank you.

12          **THE COURT:**  All right.  Anything from your side?

13          **MR. HIGHSMITH:**  (Shakes head.)

14          **THE COURT:**  No?  All right.

15          **MR. HIGHSMITH:**  We talked about the -- we talked about

16  the prostitutes and Grimma -- or Grimace yesterday.

17          **THE COURT:**  Yeah.  I think we exhausted those

18  subjects.

19          **MR. HIGHSMITH:**  I think we exhausted those subjects,

20  so I won't -- I won't bring them again -- I won't bring them up

21  again this morning.  They may pop up.

22          **THE COURT:**  There was some reference to the stripper

23  clubs yesterday, which I let you do.  But I assume

24  Mr. De La Guardia knows that he's not to talk about --

25          **MR. HIGHSMITH:**  I'm not going to --

1      **THE COURT:**  -- Panamanian prostitutes.

2      **MR. HIGHSMITH:**  Hundred percent.  I'm not going to

3  raise it.  If it comes up on cross, I'll flag it for

4  the Court --

5      **THE COURT:**  Okay.

6      **MR. HIGHSMITH:**  -- and stop things.

7      **MR. SHEPARD:**  I don't intend to bring it up.

8      **THE COURT:**  I know you don't.  I know.  That was -- if

9  you do, we call that opening the door; right?

10     **MR. SHEPARD:**  Understood.

11     **THE COURT:**  Yes.  Okay.

12     **MR. HIGHSMITH:**  Thank you, Your Honor.

13     **THE COURT:**  Very good.

14                    (Recess taken at 8:12 a.m.)

15                 (Proceedings resumed at 8:32 a.m.)

16     (Proceedings were heard out of the presence of the jury.)

17     **THE COURT:**  Before I bring the jury out, just to tell

18  you, the jurors are asking about whether or not we are on

19  schedule.

20     So on Friday, I would like to tell them something

21  encouraging; say, "Yes, we are."  I won't be specific.  But

22  I'll want to talk to you, check in with you at the end of the

23  week and see what you're comfortable with me telling them.  But

24  they are getting restless.

25     Okay.  So you can bring them in.

SALMON - DIRECT / HIGHSMITH

1          (Proceedings were heard in the presence of the jury.)

2          **THE COURT:**  The jury is present.

3      Good morning, members of the jury.  As usual, you've been

4  right on the money.  Thank you very much for letting us get

5  started.

6      Okay.  Next witness for the Government.

7          **MR. HIGHSMITH:**  Yes, Your Honor.  The United States

8  calls David Salmon.

9    (Witness enters the courtroom and steps forward to be sworn.)

10         **THE COURT:**  If you could come forward, please, to the

11  witness stand to be sworn.

12         **THE COURTROOM DEPUTY:**  Please raise your right hand.

13                      <u>**DAVID SALMON**</u>,

14  called as a witness for the Government, having been duly sworn,

15  testified as follows:

16         **THE WITNESS:**  Yes.

17         **THE COURTROOM DEPUTY:**  Please be seated.

18      Can you state and spell your last name, please.

19         **THE WITNESS:**  My name is David Salmon, S-a-l-m-o-n.

20                    <u>**DIRECT EXAMINATION**</u>

21  BY MR. HIGHSMITH:

22  **Q.**   Mr. Salmon, good morning.

23  **A.**   Good morning.

24  **Q.**   What do you do for a living?

25  **A.**   I'm an attorney, licensed in the state of Nevada and Utah.

SALMON - DIRECT / HIGHSMITH

1  **Q.**   How long have you been an attorney?

2  **A.**   I passed the bar in Nevada in 1999.

3  **Q.**   Okay.  Did you open a bank account for Marcus Andrade?

4  **A.**   I did.

5       **MR. HIGHSMITH:**  Could we put up for the witness,

6  please, Exhibit 1223.

7       Could you please take -- if we could zoom in on the middle

8  of it, please, just the whole thing.

9  **Q.**   Do you see what's in front of you?

10 **A.**   I do.

11 **Q.**   Is that your signature?

12 **A.**   It is.

13 **Q.**   A fair and accurate depiction of bank materials you

14 signed?

15 **A.**   Yes.

16      **MR. HIGHSMITH:**  Move to admit 1223, Your Honor.

17      **MS. DIAMOND:**  No objection.

18      **THE COURT:**  1223 will be admitted.

19      (Trial Exhibit 1223 received in evidence.)

20 **BY MR. HIGHSMITH:**

21 **Q.**   So in January of 2018, did you open a bank account for

22 Marcus Andrade?

23 **A.**   Yes, I did.

24 **Q.**   And what was the purpose of that bank account?

25 **A.**   I was informed by Mr. Andrade that he was going to offer

**SALMON - DIRECT / HIGHSMITH**

1  AML BitCoin for purchase and that he needed an account for that

2  purpose.

3  **Q.**   Okay.  And so you opened it in January of 2018.  And did

4  it take in funds?

5  **A.**   It did.

6  **Q.**   Who did it take in funds from?

7  **A.**   A variety of individuals, a large variety of individuals.

8  **Q.**   So were these all people who were buying Mr. Andrade's

9  product?

10  **A.**   That was my understanding, yes.

11  **Q.**   And so was the purpose of the bank account just to bring

12  in money from investors into his product?

13          **MS. DIAMOND:**  Objection.  Misstates the testimony.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  That was one of the purposes.  There was

16  some additional legal work they wanted me to do as well, and I

17  wasn't sure exactly how this money was going to be used as far

18  as those legal fees go.

19  **BY MR. HIGHSMITH:**

20  **Q.**   In terms of this -- in terms of the money that came in,

21  who directed you in terms of where it went?

22  **A.**   There was two individuals.  The ultimate authority was

23  Marcus Andrade.  He also authorized an accountant by the name

24  of Karl Ruzicka to authorize disbursements from the account.

25  **Q.**   Would you ever disburse money without authorization from

1  either of those two people?

2  **A.**   No.

3  **Q.**   And approximately how long was this bank account in

4  existence or, you know, operating?  It started in January 2018.

5  Approximately how long did you have it functioning?

6  **A.**   I shut it down when my -- when the legal work I was doing

7  for Mr. Andrade was completed and I had decided that there

8  probably wasn't going to be any more.  Whether that was

9  two years or less, I'm not -- I can't quite recall.

10      **MR. HIGHSMITH:**  Okay.  Can we please show the witness

11  Exhibit 1224.

12      And can we zoom in for him, please.

13  **Q.**   So is this bank records from December 2017?

14      I'm sorry.

15      **MS. DIAMOND:**  Objection.  Foundation for this

16  witness's knowledge.

17      **MR. HIGHSMITH:**  Let's move over to -- let's move over

18  to page 48.  So could we start on page 48, please.

19      All right.  So can we zoom in on the top one-third of the

20  document.

21  **Q.**   All right.  So is this the bank account that you opened

22  for Mr. Andrade, and the date on this account statement is

23  January 5th through January 31st, 2018?

24  **A.**   It was a Chase bank account, and I have no reason to

25  believe that the dates given are not correct.

1    **MR. HIGHSMITH:**  Okay.  And then can we scroll down so

2    Mr. Salmon can see the rest of this page; zoom out.

3    **Q.**  Does this look like a fair and accurate depiction of the

4    bank records for the Chase bank account that you held for

5    Mr. Andrade?

6    **A.**  Yes.

7              **MR. HIGHSMITH:**  Move to admit 1224.

8              **MS. DIAMOND:**  Sorry, Your Honor.  Just one moment.

9                          (Pause in proceedings.)

10             **MS. DIAMOND:**  The page number that you referred to,

11   Counsel, is 48; is that right?

12             **MR. HIGHSMITH:**  Yeah.  These are also part of the bank

13   records motion in limine, so they're also admitted because

14   we've got the 90211 certificate.

15             **THE COURT:**  You're seeking to admit this --

16             **MS. DIAMOND:**  No objection, Your Honor.

17             **THE COURT:**  -- this entire document, 1224?

18             **MR. HIGHSMITH:**  Yes.

19             **THE COURT:**  1224 will be admitted.

20        (Trial Exhibit 1224 received in evidence.)

21             **MR. HIGHSMITH:**  Thank you, Your Honor.

22        Could we please take a look at page 49, which is the next

23   page after this one.

24        And could we publish this to the jury and to the parties,

25   please.

1        You can zoom in on the whole page.

2   **Q.**   Okay.  So is this -- this is the bank statement for

3   Mr. Andrade's account; correct?

4   **A.**   I assume -- I believe so, yes.

5   **Q.**   All right.  And this is January 2018; correct?

6   **A.**   That's what it says.  I have no reason not to believe it.

7            **MR. HIGHSMITH:**  Okay.  Could we zoom in, please, on --

8   let's start with the very first entry, January 8th.

9   **Q.**   All right.  So when we zoom in on this, it's a deposit of

10  $15,000 by an individual named Sam Sobania; and then if you

11  look sort of at the very bottom, it's "Investment IMAD."

12       Is this sort of typical of the money that would come in,

13  money from -- money that would come into the account?

14           **MS. DIAMOND:**  Objection.  I don't know that this

15  witness can form that opinion, "typical."

16           **THE COURT:**  Overruled.

17       You may answer.

18           **THE WITNESS:**  I didn't look that closely.  Is it -- is

19  it normal?  I would not think that it was un- -- not normal,

20  but there was varying amounts and there was varying people who

21  were making deposits.

22  **BY MR. HIGHSMITH:**

23  **Q.**   Okay.  Let's look at the next -- the next entry.  It's the

24  same date, and it's an entry for $12,465.  So this is the next

25  entry.  It's a Fedwire Credit.  It's from a Mr. Stephen -- I'm

1    not going to try to pronounce the last name -- Jed something.

2    Do you see that?

3    **A.**    I do.

4    **Q.**    And, again, is that another deposit into the account from

5    an investor into Mr. Andrade's product?

6    **A.**    I would assume so, but I didn't look at the statements

7    this closely and look at names, but I believe that's true, yes.

8    **Q.**    Okay.  Let's go to -- let's scroll down all the way to

9    page 60 of the document.

10        And then at the very bottom of page 60, there's an entry

11    on January 12th of 2018 for $850,000.

12        So do you see how on January 12th, 2018, there was a

13    transfer from Checking Account 8602 for $850,000?

14    **A.**    I see the entry, yes.

15    **Q.**    Are you familiar with the name Ben Boyer?

16    **A.**    I am not.

17    **Q.**    Okay.  And, again, this account is for investor money

18    that's being deposited into this account that you held for

19    Mr. Andrade?

20            **MS. DIAMOND:**  Objection.  Misstates the testimony.

21            **THE COURT:**  Overruled.

22            **THE WITNESS:**  We did not call them investors.

23    BY MR. HIGHSMITH:

24    **Q.**    What did you call them?

25    **A.**    Purchasers.

SALMON - DIRECT / HIGHSMITH

1   **Q.**   And purchasers of what?

2   **A.**   Purchasers of AML BitCoin.

3   **Q.**   Okay.

4   **A.**   Or at least for tokens that I understood was going to

5   eventually be used for the purchase of AML BitCoin.

6          **MR. HIGHSMITH:**   Okay.  Could we please take a look at

7   page 77.  And then if we could zoom in on 1/23.  There's a

8   transfer for $150,000.

9          That's great.  Thank you very much.

10  **Q.**   So do you see in the -- in this zoomed-up area here on

11  January 23rd, there was a transfer from Checking Account 8602

12  for another $150,000?

13  **A.**   Yes.

14  **Q.**   Did you note at that time that that was coming from the

15  exact same bank account that the $850,000 came from?

16  **A.**   I -- I did not know, no.

17  **Q.**   Okay.  So you weren't tracking exactly where the money was

18  coming in from in terms of specific bank accounts?

19  **A.**   No.  These reports were given to Mr. Andrade, and that

20  type of bookkeeping were done by his company.

21  **Q.**   Okay.  Let's look at some of the -- so these are all -- on

22  this page, it's all deposits; correct?

23  **A.**   It appears so, yes.

24         **MR. HIGHSMITH:**   Okay.  Let's move now to page 86, and

25  if we could blow up the deposits at the very top.

1  **Q.**  So it looks like the total deposits for January of 2018

2  are about $2.25 million; is that correct?

3  **A.**  That appears to be so, yes.

4  **Q.**  Okay.  You testified earlier that you would wire money or

5  transfer money out of the account at the direction of

6  Mr. Andrade or his accountant; is that right?

7  **A.**  That's correct.

8         **MR. HIGHSMITH:**  So could we zoom in on "Electronic

9  Withdrawals," please.

10 **Q.**  So looking at -- looking at that first entry for

11 January 22nd, there's a withdrawal for $150,000.  Are you

12 familiar with Frames Per Second?

13 **A.**  My understanding is that Frames Per Second was a film

14 company that was preparing a -- a -- a commercial for

15 NAC Foundation.

16 **Q.**  Do you know whether that was a commercial for the

17 Super Bowl or anything else?

18 **A.**  I know there was talk about the Super Bowl.  I saw the

19 commercial.  But I wasn't involved with anything related to the

20 Super Bowl, but there was talk about a Super Bowl commercial.

21 **Q.**  Look at the next two withdrawals, please, both for

22 $50,000, both on January 29th.  Do you see that?

23 **A.**  I do.

24 **Q.**  And do you see that they're directed to Mr. Andrade?

25 **A.**  Yes.

SALMON - DIRECT / HIGHSMITH

1    Q.    Sometimes did Mr. Andrade ask to wire money to himself?

2    A.    Yes.

3            MR. HIGHSMITH:    Could we now zoom in on the

4    "Other Withdrawals" section, please.

5    Q.    In addition to wiring, would you also write checks from

6    this account?

7    A.    It's -- I don't think I had a checkbook for this account.

8    There may have been some cashier's checks that were -- that

9    were obtained if there was a specific purpose for that.

10   Generally, they were wire transfers.

11   Q.    Okay.  And then you see here there's a withdrawal for

12   75,000, then a withdrawal for more than 425,000.  Do you see

13   that?

14   A.    Yes.

15   Q.    So let's now go to page 96.  Do you see here that there's

16   a withdrawal, another withdrawal, for $75,000 to Frames Per

17   Second?

18   A.    Yes.

19   Q.    And so that would have been directed by Mr. Andrade or

20   Mr. Ruzicka?

21   A.    Yes.

22   Q.    Could we go to page 99, please.  And do you see here

23   there's a withdrawal for more than $425,000 to NAC Payroll

24   Services?

25   A.    Yes.

1   **Q.**   And so that would have been another one of Mr. Andrade's

2   companies?

3   **A.**   I understood that to be Mr. Andrade's company.  I didn't

4   have any -- other than cutting this check, I had no association

5   with that particular company, but my understanding, it was --

6   it was associated with NAC Foundation, which was Mr. Andrade's

7   company.

8           **MR. HIGHSMITH:**  Let's go to page 105, please, and just

9   zoom in on the bottom -- the bottom three entries.

10  **Q.**   And then do you see in February -- on February 5th, 2018,

11  there's another transfer from that same Checking Account 8602,

12  this time for $197,000?

13  **A.**   Yes.

14  **Q.**   So there's quite a lot of money coming from that very same

15  account.  Did you -- did you have an impression of that at the

16  time, that there was a lot of money coming from the same

17  account?

18  **A.**   I did not.  Like I said, I didn't get into the bookkeeping

19  of this.  These numbers were handed over to NAC Foundation.

20  **Q.**   All right.  And then finally, let's take a look at

21  page 116, please.

22          And if we could zoom in on 2/14, middle of the page.

23  There's another deposit -- another transfer for $214,000.

24          All right.  Do you see on February 14th there's another

25  transfer from that same Bank Account 8602 for $214,500?

1    **A.**    I do.

2    **Q.**    All right.  So just to be clear, all the money in this

3    bank account came from -- not from what you called investors,

4    but you called them purchasers?

5    **A.**    It was all money that belonged to NAC Foundation, and I

6    don't recall any source other than those purchasers.

7    **Q.**    Okay.  And this account was effectively controlled by

8    Mr. Andrade; is that correct?

9    **A.**    That's correct.

10            **MR. HIGHSMITH:**  Okay.  No further questions.

11            **THE COURT:**  Ms. Diamond?

12                        <u>**CROSS-EXAMINATION**</u>

13    BY MS. DIAMOND:

14    **Q.**    Good morning, Mr. Salmon.

15           Your office is in Nevada; correct?

16    **A.**    Correct.

17    **Q.**    You're familiar with Nevada corporate documents --

18    **A.**    I am.

19    **Q.**    -- correct?

20            **MS. DIAMOND:**  I'd like, Mr. Jackson, if you could pull

21    up, please, Exhibit 3188.

22            **THE COURTROOM DEPUTY:**  Just for the witness?

23            **MS. DIAMOND:**  And if you could display for the witness

24    page 2.

25    \\\

SALMON - CROSS / DIAMOND

```
1    BY MS. DIAMOND:
2    Q.   I can give you a paper copy of this document, if you'd
3    like, Mr. Salmon, but do you recognize what's on your screen?
4    A.   Yes.  I've seen these quite frequently.  This is a charter
5    granted by the Nevada Secretary of State for a new corporation
6    that's just been set up.
7    Q.   What's the name of the corporation?
8    A.   NAC Foundation, LLC.
9         MS. DIAMOND:  Thank you.
10        Move to admit Exhibit 3188.
11        MR. HIGHSMITH:  No objection.
12        THE COURT:  3188 will be admitted.
13        (Trial Exhibit 3188 received in evidence.)
14   BY MS. DIAMOND:
15   Q.   Your office building has other office suites within it;
16   correct?
17   A.   That's correct.
18   Q.   Are you still in the same office that you were in -- now
19   as you were in 2018?
20   A.   I am in the same building.  I may not be in the same
21   office.
22   Q.   So I'm referring back to where you were in the beginning
23   of 2018, that office.
24        Were you aware of the accountant whose name is Karl
25   Ruzicka having an office in your building?
```

SALMON - CROSS / DIAMOND

1  **A.**    Yes.

2  **Q.**    And to your knowledge, did NAC Foundation maintain an

3  office in the office suite where Mr. Ruzicka had his office for

4  his accounting practice?

5  **A.**    That was my understanding.

6  **Q.**    Had you ever met with Mr. Andrade in his office in Nevada?

7  **A.**    No.

8  **Q.**    Had you ever met with Mr. Andrade in your office in

9  Nevada?

10  **A.**    I don't believe so.

11  **Q.**    Was your primary communication with Mr. Andrade via email

12  and telephone?

13  **A.**    Yes.

14  **Q.**    In those days, did you ever do videoconferences?

15  **A.**    No.  That was before the pandemic.

16  **Q.**    Do you have a recollection of ever meeting Mr. Andrade in

17  person?

18  **A.**    I don't recall ever meeting him in person.

19  **Q.**    Is it correct that before you were able to disburse money

20  from your trust account, that the procedure -- a procedure had

21  been in place where you would get an approval from

22  Mr. Andrade's business accountant, Mr. Ruzicka?

23  **A.**    That's correct.

24  **Q.**    And usually, that approval would come in the form of some

25  document to you from Mr. Ruzicka, and you would acknowledge it

**SALMON - CROSS / DIAMOND**

1   in turn; is that correct?

2   **A.**   Yeah.   Mr. Ruzicka would give me an authorization for a

3   disbursement out of the account.

4   **Q.**   Did you and Mr. Ruzicka ever talk about what his process

5   was before he was able to give you that authorization?

6   **A.**   I believe what he was trying to do -- and I wasn't part of

7   this process -- is that he wanted to see if the tokens that

8   were being sold were actually received; and once it was

9   confirmed that the tokens were received, then the money could

10  be disbursed, because there was a few every once in a while

11  that a glitch would happen and they wouldn't get their tokens

12  and a refund would have to take place.

13  **Q.**   And when you were asked on direct about noting a bank

14  account where a particular deposit came from, is the reason

15  that you're not familiar with that because that was something

16  that Mr. Ruzicka handled?

17  **A.**   I'm sorry.   I don't understand the question.

18  **Q.**   On direct examination, you were asked about a couple of

19  accounts ending in, I think it was, 8602, some large --

20  Mr. Highsmith walked you through some deposits.

21  **A.**   Yes, I recall.

22  **Q.**   And is the reason that you are not familiar with those

23  names because that part of the audit or reconciliation was done

24  by someone else, such as Mr. Ruzicka?

25  **A.**   That was a number that showed up on the statements from

1    some type of -- some deposit that was put into the account.  So

2    I wasn't involved with it at all.  I didn't know where it came

3    from or who it came from.

4            MS. DIAMOND:  I'd like you, if you could, please,

5    Mr. Jackson, Exhibit 3161.  If you could take a look at that

6    just for the witness and the Court, please.

7    Q.   Mr. Salmon, do you recognize this document?

8    A.   I do not recall preparing it, but it says it's from me to

9    Karl Ruzicka and Mr. Andrade and my assistant Sheila Sneed, and

10   I have no reason to believe it's not true and correct.

11           MS. DIAMOND:  Thank you.

12       Move to admit Exhibit 3161.

13           MR. HIGHSMITH:  No opposition.

14           THE COURT:  3161 will be admitted.

15       (Trial Exhibit 3161 received in evidence.)

16           MS. DIAMOND:  I would like to publish this to the

17   jury, please.

18           THE COURT:  You may.

19           MS. DIAMOND:  If we could focus, Mr. Jackson, on the

20   first top, the header with the date, so we can see that

21   enlarged, please.

22   Q.   Does this email appear to have originated with you --

23   A.   It does.

24   Q.   -- Mr. Salmon?

25   A.   Yes.

SALMON - CROSS / DIAMOND

1  Q.    And was this sent on February 1st?

2  A.    It appears so, yes.

3  Q.    And does this refer to a deposit made by Block Bits

4  Capital for $850,000?

5  A.    I believe the "subject" line was given by Mr. Ruzicka.    I

6  am not familiar with Block Bits Capital.    I believe this is a

7  responsive email to an email he sent to me.

8         MS. DIAMOND:    If we could -- thank you for the

9  enlargement.    Mr. Jackson, if we could enlarge the email at the

10 bottom, please.

11 Q.    Do you see an email on your screen, which is on

12 Exhibit 3161, that purports to be an email sent from Karl R. on

13 January 31st, 2018?

14 A.    Yes.

15 Q.    Is that -- what do you recognize this to be or to be

16 similar to, in your knowledge?

17 A.    The email seems to come from Karl Ruzicka on January 31st,

18 2018.    It is addressed to Mr. Andrade and myself.    It appears

19 to be true and correct, and I have no reason to believe it's

20 not.

21         MS. DIAMOND:    Thank you.

22      And now, Mr. Jackson, if you could blow up the top part of

23 the email, the content from Mr. Salmon to Mr. Ruzicka.

24 Q.    After you received Mr. Ruzicka's clearance to release the

25 $850,000, did you, according to this document, respond with an

SALMON - CROSS / DIAMOND

1    indication of where the disbursements for that money were going

2    to be distributed?

3    **A.**    Yes, that's correct.  This is my accounting on how that

4    800 -- that authorized $850,000 was going to be distributed,

5    when and where and in what amounts.

6         **MS. DIAMOND:**  Thank you.

7         Thank you for the exhibit.  You can remove it.

8    **Q.**    You didn't personally have a checkbook for the NAC payroll

9    accounts; is that correct?

10   **A.**    I didn't have any association with the payroll accounts.

11   I had -- I had a client trust account that the money was going

12   into, and I did not have a checkbook for the client trust

13   account that was in the name of my firm and held money for

14   NAC Foundation.

15   **Q.**    Do you have any knowledge about whether or not Mr. Ruzicka

16   had authorization to issue or sign checks from a different

17   account, from the account that you would authorize money to be

18   transferred into, if you know?

19   **A.**    Well, my understanding is the money was being put into an

20   operating account for NAC Foundation.  There was a Wells Fargo

21   account, and I believe that that was in the name of

22   NAC Foundation.  That was my understanding.

23   **Q.**    You didn't handle those accounts at all?

24   **A.**    No, I did not.

25   **Q.**    And you did not prepare Mr. Andrade's taxes at all --

**PROCEEDINGS**

1    **A.**    No.

2    **Q.**    -- is that correct?

3    **A.**    I did not.

4    **Q.**    To your understanding, he had a different accountant to

5    handle that; is that right?

6    **A.**    I had no idea who his accountant was that handled his

7    taxes.

8    **Q.**    Were you aware that Mr. Andrade had more than one

9    accountant?

10    **A.**    I did not -- I was not aware of that either.

11    **Q.**    Were you aware that Mr. Andrade had more than one

12    attorney?

13    **A.**    Yes.

14    **Q.**    Do you know how many attorneys he had in 2018?

15    **A.**    The short answer is no.

16    **Q.**    Thank you.

17    **A.**    I -- okay.

18          **MS. DIAMOND:**  Thank you.  No further questions.

19          **MR. HIGHSMITH:**  Nothing further, Your Honor.

20          **THE COURT:**  Very well.  You may step down.

21                    (Witness excused.)

22          **MR. WARD:**  The Government calls Melissa Foteh.

23     (Witness enters the courtroom and steps forward to be sworn.)

24          **THE COURT:**  If you could come forward, please, to the

25    stand to be sworn.

1    **THE COURTROOM DEPUTY:**  Please raise your right hand.

2    **THE WITNESS:**  Okay.

3                    <u>**MELISSA FOTEH**</u>,

4    called as a witness for the Government, having been duly sworn,

5    testified as follows:

6    **THE WITNESS:**  Yes.

7    **THE COURTROOM DEPUTY:**  Okay.  Please state your name

8    and spell your last name, please.

9    **THE WITNESS:**  Melissa Foteh, F-o-t-e-h.

10                   <u>**DIRECT EXAMINATION**</u>

11   **BY MR. WARD:**

12   **Q.**   Good morning, Ms. Foteh.

13        In 2017 and 2018, did you do work for Marcus Andrade?

14   **A.**   Mm-hmm.

15   **THE COURT:**  You have to say "yes" or "no."

16   **THE WITNESS:**  Yes.

17   **BY MR. WARD:**

18   **Q.**   How did you come to do work for Mr. Andrade?

19   **A.**   He became a client.  He became a client.

20   **Q.**   What were you doing for -- what were you doing for work at

21   that time?

22   **A.**   A marketing consultant.

23   **Q.**   Okay.  Did Mr. Andrade become a client of your marketing

24   and consulting firm?

25   **A.**   Mm-hmm.

FOTEH - DIRECT / WARD

1        THE COURT: You have to say "yes" --

2        THE WITNESS: Yes.  Sorry.

3   BY MR. WARD:

4   Q.   What did Mr. Andrade hire you to do?

5   A.   Marketing.  I don't recall.  This was years ago.

6   Q.   Were you hired to promote -- help him promote AML BitCoin?

7   A.   Yes.

8   Q.   Okay.  At some point were you put in charge of overseeing

9   the AML BitCoin and monitoring the AML BitCoin social media

10  sites?

11  A.   Yes.

12  Q.   And did that include Twitter, Facebook, Telegram,

13  BitcoinTalk?

14  A.   I don't know -- it's been -- like I said, it's been quite

15  a while.  I can't recall exactly, but it was social media.

16  Q.   All right.  And what was your -- what were you assigned to

17  do in terms of the social media sites?

18  A.   It's been so long.  I mean, I can't tell you.  I don't

19  know.

20  Q.   Were you asked to monitor the posts on social media sites?

21  A.   I assume so, but like I said, it's been a while, like

22  years.

23  Q.   Were you asked to create content that would then be posted

24  on the social media sites?

25  A.   Yes.

FOTEH - DIRECT / WARD

1  Q.  And when you would create content for the social media

2  sites, did you have to get approval before you posted those?

3  A.  I don't know.

4  Q.  Did you -- did you have Marcus Andrade review the social

5  media posts before you would post them?

6  A.  I -- I can't tell you.  I can't recall.

7  Q.  Did you discuss your social media posts with Marcus

8  Andrade before you posted them?

9  A.  That whole time period, this was years ago.  I have gone

10  through a lot since then, so my memory is not -- my memory

11  regarding that situation is -- this was years ago.  I cannot

12  tell you details.  It's been too long for me to recall details.

13  Q.  Did you -- did you testify about this case before a

14  federal grand jury --

15  A.  Yes.

16  Q.  -- Ms. Foteh?

17      And did you testify before a grand jury here in

18  San Francisco in November of 2019?

19  A.  Yes.

20  Q.  And when you testified, were you under oath?

21  A.  Yes.

22      **MR. WARD:**  All right.  Can we bring up Exhibit 1427,

23  please.

24  Q.  Ms. Foteh, did you review your grand jury testimony before

25  testifying here today?

1    **A.**    I find this entire situation to be highly traumatic.    I

2    found this entire situation in general to be highly traumatic.

3    So I have not been able to do that due to this being so highly

4    traumatic.

5    **Q.**    Were you provided a copy -- you were provided a copy of

6    your --

7    **A.**    I haven't been able to review it because it's very

8    traumatizing for me.

9              **THE COURT:**  He's just asking you if you were --

10             **THE WITNESS:**  Okay.

11             **THE COURT:**  -- provided a copy.

12             **THE WITNESS:**  Okay.  Yes.

13   **BY MR. WARD:**

14   **Q.**    Can we turn to page 4 of your grand jury testimony,

15   please.

16        Does this refresh your recollection, Ms. Foteh, that you

17   testified before the grand jury on November 21st, 2019, and

18   that you were duly sworn before testifying?

19   **A.**    I remember test- -- I remember being here to testify, yes.

20   **Q.**    Okay.  Can we turn to page 20 of this exhibit, please.

21   Page 20.

22             **MR. SHEPARD:**  I'm sorry.  What page?

23             **THE COURT:**  20.

24             **MR. WARD:**  20.

25             **MR. SHEPARD:**  Thank you.

1          **MR. WARD:**  If we could highlight starting with line 1

2    through line 9.

3    **Q.**  Does this refresh your recollection, Ms. Foteh, as to who

4    told you what to post on the social media sites for

5    AML BitCoin?

6    **A.**  Whatever I said at that time is what I said at that time,

7    and that was clearly accurate.  But as of right now, if you're

8    asking me if I remember this, I can't tell you I remember this.

9    This was -- like I said, this was years ago.

10          **MR. WARD:**  Your Honor, at this point the Government

11   would move to admit this portion of the grand jury testimony

12   under 801(d)(1)(A) as a prior inconsistent statement.

13          **THE COURT:**  Prior inconsistent?

14          **MR. WARD:**  A sworn prior inconsistent statement.

15          **MR. SHEPARD:**  I don't believe --

16          **MS. DIAMOND:**  She's repeatedly test- --

17          **MR. SHEPARD:**  -- it's inconsistent.

18          **THE COURT:**  How is it inconsistent?

19          **MR. WARD:**  It is an inconsistent statement when --

20   it's well-established that poor recall of events, equivocation,

21   or claims of memory loss qualify as a prior -- satisfy the

22   requirement of inconsistent testimony, Your Honor.

23          **MR. SHEPARD:**  I don't think she said anything

24   inconsistent.

25          **THE COURT:**  Well --

1        **MR. SHEPARD:**  She just doesn't remember.

2        **THE COURT:**  -- Mr. Ward is suggesting that you can

3    establish inconsistency by virtue of --

4        How did you say you're phrasing this?

5        **MR. WARD:**  The poor recall of events, equivocation,

6    and claims of memory loss.

7            **THE COURT:**  Okay.  Is he wrong about that?

8        **MR. SHEPARD:**  I haven't heard that before.  It doesn't

9    seem --

10           **THE COURT:**  What are you --

11       **MR. SHEPARD:**  -- inconsistent to me.

12           **THE COURT:**  Do you have a citation?

13       **MR. WARD:**  I do.  I have two.  One is from the

14   Ninth Circuit.  It's *United States v. Tran*, 568 F.3d 1156.

15   There's also the *Mayberry* case in the Sixth Circuit.

16           **THE COURT:**  Well, all right.  I will admit it

17   conditionally.  If you want to provide me with some contrary

18   authority, it's subject to being stricken if we conclude it's

19   not appropriate to admit it.

20       But I'll admit it at this time.  So, go ahead.

21       (Trial Exhibit 1427, page 20, lines 1 through, received in

22   evidence.)

23       **MR. WARD:**  If we could admit this portion of the

24   testimony, please, and publish it.

25           **THE COURT:**  And just so the record is clear, you're

FOTEH - DIRECT / WARD

```
 1   talking about page 20, lines 1 through 9, is what you're

 2   seeking to admit?

 3              MR. WARD:  Correct, Your Honor.

 4              THE COURT:  All right.

 5   BY MR. WARD:

 6   Q.  Ms. Foteh, do you see your testimony?

 7       [As read]:

 8              "So Marcus would tell me different things to

 9       post.  I trusted Marcus; so whatever he asked me to

10       post, I would do it without question.  I wouldn't

11       question anything about it."

12       Is that correct?

13   A.  Whatever I told you at that time would have been correct.

14   I just don't remember telling you this.  So I don't recall the

15   details, but what I told you was correct.  I just can't -- if

16   you're asking me to remember it now, I can't remember it now.

17   Does that make sense?

18   Q.  Ms. Foteh, let me move on at this point.

19       At some point when you were working at AML BitCoin, did

20   you oversee a group of tech support employees?

21   A.  Yes.

22   Q.  And as part of that, were you instructed to have them

23   create false accounts to post on social media sites?

24   A.  I -- like I said, I don't recall.  If that's what I said

25   in my grand jury testimony, then that's what happened; but I --
```

 1    I cannot recall that today.

 2         MR. WARD:  Well, let me -- let's just -- let's look at

 3    another portion of the grand jury testimony.

 4         Can we turn to page 28, please.  And then let's show

 5    line 2 through 8 for the witness, please.

 6         THE COURTROOM DEPUTY:  Just for the witness?

 7         MR. WARD:  Yes, at this point.

 8    Q.   Ms. Foteh, does that refresh your recollection that Marcus

 9    Andrade asked you to have the tech support team post various

10    things online under false accounts?

11    A.   I believe -- I believe so.  Yeah.

12    Q.   Okay.  And was Mr. Andrade's intent to make it seem like

13    they were customers or fans of AML BitCoin?

14         MR. SHEPARD:  Objection.  Leading.

15         THE COURT:  I'm going to -- yes, sustained.

16    BY MR. WARD:

17    Q.   What was Mr. Andrade's intention in -- what image did he

18    want to project with these false accounts?

19    A.   Respectfully, this was years ago.  I -- I -- I have --

20    this has all been a very traumatizing experience, as I

21    mentioned.  It's traumatizing for me in various ways.  So I --

22    I cannot -- I cannot give you an answer for that because I -- I

23    don't recall.

24         MR. WARD:  The Government would move to admit lines 2

25    through 8 of the grand jury testimony.  This is page 8.

1      **MR. SHEPARD:**  I assume the Court will allow me just a

2   continuing objection.

3      **THE COURT:**  Yes.  I will conditionally admit this

4   lines 2 through 8.  You may publish it to the jury, but it is

5   subject to -- Mr. Shepard wants to supplement his objection,

6   and I'll consider it and determine whether or not it remains in

7   the record.  But you may publish it at this point.

8      (Trial Exhibit 1427, page 28, lines 2 through 8, received

9   in evidence.)

10     **MR. WARD:**  Can we publish this, please.

11  **Q.**  Ms. Foteh, did you testify before the grand jury that

12  [as read]:

13         "So they would post various articles and -- and

14      promote the company as though they were investors

15      when they really weren't"?

16  **A.**  I don't recall.  I wish I could tell you something

17  differently, but I do not recall.  This was --

18     **THE COURT:**  We know it was many years ago.

19     **THE WITNESS:**  Yeah.

20     **THE COURT:**  You don't have to keep repeating that.

21     **THE WITNESS:**  Sorry.

22     **THE COURT:**  If you don't recall --

23     **THE WITNESS:**  Yeah.

24     **THE COURT:**  -- you don't recall.

25     **THE WITNESS:**  Okay.

1          THE COURT:  You can just say that.

2          THE WITNESS:  Sorry.  I want to just make that point.

3     I don't remember.

4   BY MR. WARD:

5   Q.   At the time that they were -- the tech support people were

6   posting on these social media sites, who were you reporting to?

7   A.   I don't recall.

8   Q.   When you were working with AML BitCoin as your client at

9   this time, who were you reporting to?

10  A.   I mean, clearly, it would have been Marcus since he was my

11  client; but I can't recall -- I can't recall details if that's

12  what you're asking.

13  Q.   Are you familiar with -- do you remember that Marcus -- a

14  Super Bowl ad created by AML BitCoin?

15  A.   Yes.

16  Q.   And did you attend the filming of that Super Bowl ad?

17  A.   Yes.

18  Q.   Where was that?

19  A.   In L.A.

20  Q.   And do you remember what the commercial was about?

21  A.   No.

22  Q.   After the commercial was created, did you work to generate

23  press about the -- about the Super Bowl ad?

24  A.   I don't think so.

25  Q.   Do you recall ever learning that the NFL -- being told

FOTEH - DIRECT / WARD

1    that the NFL had rejected the ad?

2    **A.**    No.  I had -- that, I recall I had nothing to do with any

3    of that.  I don't develop commercials.  I don't -- I have

4    not -- I have no clue about that.

5    **Q.**    Okay.  Can we turn to your grand jury testimony, page 25,

6    please, and just highlight lines 9 through the bottom.

7          Ms. Foteh, can you look at the first question and answer.

8    **A.**    (Witness examines document.)  Okay.

9    **Q.**    Does that refresh your recollection as to what you were

10   told about why the Super Bowl ad was being filmed?

11   **A.**    It doesn't.  You work with different clients.  You work

12   with different projects.  The details of all of the projects

13   years after, you don't recall.  I mean, specifically, I don't.

14   **Q.**    If you look at the next question, Ms. Foteh, does this

15   refresh your recollection as to whether you understood whether

16   the ad ran?

17   **A.**    (Witness examines document.)  Okay.

18   **Q.**    Do you remember whether -- now looking at this, do you

19   remember whether the ad actually ran during the Super Bowl?

20   **A.**    I -- I know it didn't run during the Super Bowl.  If it

21   ran elsewhere, I couldn't -- I have not a clue.

22   **Q.**    All right.  Do you remember an online ad campaign about

23   the Super Bowl ad being rejected?

24   **A.**    No.

25   **Q.**    No?

FOTEH - DIRECT / WARD

 1   **A.**   No.

 2            **MR. WARD:**  We'll move to admit Exhibit 1427, page 25,

 3   lines 9 through 25.

 4            **THE COURT:**  I think she answered your questions.

 5            **MR. WARD:**  Okay.

 6            **THE COURT:**  I don't think you have a reason for

 7   admitting this.

 8            **MR. WARD:**  We'll withdraw that.

 9   **Q.**   Let me ask you another question.  Ms. Foteh, did you ever

10   come to understand whether Marcus Andrade or AML BitCoin

11   intended -- ever intended to run the Super Bowl ad?

12            **MR. SHEPARD:**  Objection.  Calls for speculation.

13            **THE COURT:**  Sustained.

14   **BY MR. WARD:**

15   **Q.**   Did you ever learn anything about why Mr. Andrade created

16   the AML BitCoin Super Bowl ad?

17   **A.**   Not that I know of.  I -- I -- I don't -- I don't believe

18   I was really -- that wasn't -- I wasn't involved in that, so I

19   couldn't tell you anything about that.  I -- I have no idea.

20            **MR. WARD:**  Can we pull up page 26 of the grand jury

21   testimony, lines 15 through 24, just for Ms. Foteh.

22            **THE WITNESS:**  (Witness examines document.)  I don't

23   recall that whatsoever.  I -- I don't recall.

24   **BY MR. WARD:**

25   **Q.**   Do you recall any discussion of the Super Bowl ad as a

1   marketing ploy?

2   **A.**    No, not at all.  I'm a highly ethical person.  If someone

3   were telling me that this -- something was a ploy, I would

4   never in a million years help them.  So I would not -- I would

5   not -- I would not have a client that I thought was having some

6   type of ploy; right?  That's not how I operate.  I operate with

7   ethics and morals and business ethics, and that's the utmost

8   priority of what I do.  So whatever he did, I have not a clue.

9   I'm just keeping it real.  I don't know.

10          **THE COURT:**  Okay.  Okay.

11  **BY MR. WARD:**

12  **Q.**    And, in fact, Ms. Foteh, can you look at line 23.  Were

13  you aware of this at the time?

14  **A.**    (Witness examines document.)  I said I wasn't aware of it

15  on here, and it's -- I'm telling you the same thing, so...

16  **Q.**    So at the time, you weren't aware of this marketing ploy?

17  **A.**    I would never be involved in a marketing ploy.  If I -- I

18  would never be involved in a marketing ploy.  Never.

19  **Q.**    And you learned later that something was done -- the

20  marketing of the Super Bowl ad was done behind your back?

21  **A.**    I don't -- I -- if that's what I put in the grand jury

22  testimony, then that's what it is.  I -- I don't recall.

23  You know, you're asking me details that I cannot recall.

24  **Q.**    But if you testified to the grand jury that you were told

25  that it was a marketing ploy, that's accurate?

FOTEH - DIRECT / WARD

1    **A.**    Whatever I testified to the grand jury is accurate.  What

2    you're asking me to recollect now, I can't tell you details.

3    I'm having a hard time recollecting that from years ago.

4    **Q.**    Okay.  Thank you.

5        I won't move to admit this at this point.

6        When you were working at AML BitCoin, did you ever come to

7    know about a plan to buy and sell shares of AML BitCoin on a

8    cryptocurrency exchange?

9    **A.**    I'm sorry.  What?

10   **Q.**    Did you ever learn about a plan to buy and to have the

11   company buy and sell shares of AML BitCoin Token on a

12   cryptocurrency exchange?

13   **A.**    I do not recall.

14   **Q.**    Do you remember speaking to the FBI in November of 2019?

15   And, actually, you spoke to agents in the FBI and the

16   U.S. Attorney's Office and the Securities and Exchange

17   Commission.  Do you remember talking to them then?

18   **A.**    And that was a very traumatic experience as well.  And I

19   do remember talking to them, yes.

20   **Q.**    And you were truthful when you spoke to them?

21   **A.**    I have been nothing but truthful.  I'm --

22            **THE COURT:**  Just --

23            **MR. WARD:**  Let me --

24            **THE COURT:**  -- answer the question.

25        Go ahead.

FOTEH - DIRECT / WARD

1    BY MR. WARD:

2    Q.   Do you remember speaking to the FBI about cryptocurrency

3    trading and what you understood about cryptocurrency trading on

4    the AML BitCoin website?

5    A.   I don't recall the -- would you like me to tell you what I

6    have dealt with from the FBI?

7           THE COURT:  No, no.  These are -- just answer the

8    question.  If you don't remember, just say you don't remember.

9    Okay?

10          THE WITNESS:  I do not recall.

11          THE COURT:  Okay.  Next question.

12   BY MR. WARD:

13   Q.   Ms. Foteh, can I show you a copy of your grand jury

14   transcript?  Would that help refresh your recollection as to

15   what you told the FBI in November of 2019?

16   A.   Sure.

17          MR. WARD:  All right.  May I approach, Your Honor?

18          THE COURT:  You may.

19   BY MR. WARD:

20   Q.   All right.  If you could look at the bottom of page 3 and

21   then just read into page 4.

22          THE COURT:  Can you tell counsel what page you're

23   referring to?

24          MR. WARD:  Yeah.  We're looking at the bottom of

25   page 3 --

1          THE WITNESS:  Can I take a recess?

2          THE COURT:  Pardon me?

3          THE WITNESS:  This is all very traumatizing.

4          THE COURT:  I understand that, but what you need to do

5    is just listen to the question, answer it to the best of your

6    ability, and then your testimony will be concluded.  So just

7    focus on the question he's asking.  If you don't know, say you

8    don't know.  That's fine.

9        So ask the next question.

10   BY MR. WARD:

11   Q.   Ms. Foteh, looking at this paragraph, does that refresh

12   your recollection as to what you told the FBI about creating

13   accounts and self-dealing on the AML BitCoin website?

14   A.   I have no idea what -- it doesn't, no.  I don't recall.

15   Q.   When you were working at AML BitCoin, did Marcus Andrade

16   ever promise to buy you things?

17   A.   I don't recall.

18   Q.   Did Marcus Andrade actually promise to buy you a

19   Range Rover?

20   A.   I don't recall.

21        MR. SHEPARD:  Objection.  Leading and already answered

22   "no."

23        THE COURT:  Overruled.

24   BY MR. WARD:

25   Q.   Did Marcus Andrade promise to buy you a Range Rover?

FOTEH - DIRECT / WARD

1   **A.**   I don't recall.

2   **Q.**   Did Marcus Andrade ever promise you money when you were

3   working there?

4   **A.**   Money?

5   **Q.**   Like a bonus or additional payments.

6   **A.**   Not that I'm aware of.  I have an hourly rate, and that's

7   what I charged Marcus, an hourly rate, as I do with the rest of

8   my clients.

9   **Q.**   When you were working for Marcus Andrade, were there

10  instances when people would complain about unpaid bills?

11  **A.**   I don't recall.

12  **Q.**   Do you recall sending an email to the FBI in 2019?

13       Can we pull up Exhibit 204, please.

14  **A.**   (Witness examines document.)

15  **Q.**   Ms. Foteh, can you look at this document.

16  **A.**   Okay.

17  **Q.**   Is this your -- is that your email address?

18  **A.**   It is.

19  **Q.**   And is that an email to a number of agents of the FBI?

20  **A.**   Yes.

21  **Q.**   Is this the email that you sent to the FBI on

22  February 2nd, 2019?

23  **A.**   You're setting -- you're showing me an email that I don't

24  recall, but I'm seeing the email.

25  **Q.**   In this email, did you tell the FBI -- did you say that

```
 1    the Office Squad was complaining about payments from Marcus

 2    Andrade?

 3              MR. SHEPARD:  Objection, Your Honor, to the form of

 4    the question.  He's asking her -- he's asking what she wrote in

 5    an email that she said she doesn't recall.  He's just trying

 6    to -- it's just to get --

 7              THE COURT:  Well, he's entitled to see if this

 8    refreshes her recollection.

 9              MR. SHEPARD:  Yes.

10              THE COURT:  It appears she's answered "no."

11         So what's your next question, Mr. Ward?

12    BY MR. WARD:

13    Q.   Can we move on to page 2.  Ms. Foteh, do you remember

14    telling the FBI about complaints from an individual named Jamie

15    McCormick about being paid?

16    A.   I have no idea who Jamie McCormick is, so, no.

17    Q.   Pulling this back out, do you recall telling the FBI that

18    an individual named Vladimir Sofronov from ICOBox --

19              MR. SHEPARD:  Same objection, Your Honor.

20              THE COURT:  Well, he can ask whether or not she knows

21    these people and whether or not this refreshes her

22    recollection.  There's nothing wrong with that.

23         Overruled.

24              MR. SHEPARD:  I think he's just --

25              THE COURT:  Go ahead.
```

```
 1              MR. SHEPARD:  -- showing it to her.

 2              THE WITNESS:  I don't know this name from Adam.

 3              THE COURT:  Okay.  Go ahead.  If you don't know --

 4              THE WITNESS:  Don't recall.

 5              THE COURT:  -- you don't know.

 6   BY MR. WARD:

 7   Q.   You don't recall telling the FBI that ICOBox was

 8   complaining about not being paid?

 9   A.   I don't know what ICOBox is.  I don't recall, yeah.

10   Q.   This document is an email that has come from you.  Do

11   you --

12   A.   This was years ago, respectfully.

13   Q.   All right.

14              THE COURT:  We understand.

15        Mr. Ward, you've sort of exhausted this.

16              MR. WARD:  All right.  I'm moving on.

17   Q.   Did Mr. Andrade ever fail to pay you your salary?

18   A.   I don't recall.

19   Q.   Do you recall --

20        Can we pull up Exhibit 551, please.

21        When you spoke to the FBI, do you recall providing them

22   with some documents?

23   A.   Yes.

24   Q.   All right.  I'm showing you what's been marked

25   Exhibit 551.  Can you take a look at that.
```

FOTEH - DIRECT / WARD

1   **A.**   (Witness examines document.)  I don't know what this is.

2   **Q.**   Do you recall providing this Excel spreadsheet to

3   the Government?

4   **A.**   No.  I don't know what this is.

5   **Q.**   Can we look at Exhibit 552.

6        Ms. Foteh, do you remember providing this document to the

7   FBI?

8   **A.**   I don't know what that is either.

9   **Q.**   You have no memory of providing this to the FBI when they

10  talked to you in 2019?

11  **A.**   Do you know how much trauma I have encountered due to this

12  situation?

13            **THE COURT:**  Ms. Foteh --

14            **THE WITNESS:**  I don't recall.

15            **THE COURT:**  -- your testimony will go much more

16  quickly if you just answer the question.

17            **THE WITNESS:**  Okay.

18            **THE COURT:**  Okay?

19            **THE WITNESS:**  I do not recall.

20  **BY MR. WARD:**

21  **Q.**   When did you quit working for Marcus Andrade and the

22  NAC Foundation?

23  **A.**   I couldn't even tell you the -- I don't recall that

24  either.  I know it was in 2018.  I don't know exactly when.

25            **MR. WARD:**  May I have a moment?

FOTEH - DIRECT / WARD

1      **THE COURT:**  You may.

2                    (Pause in proceedings.)

3   **BY MR. WARD:**

4   **Q.**   Ms. Foteh, do you remember Marcus Andrade ever telling you

5   to delete messages?

6   **A.**   No.

7   **Q.**   Do you remember testifying before the grand jury about

8   Marcus Andrade asking you to delete messages?

9   **A.**   I do not remember my grand jury testimony, which was in

10  2019.

11       **MR. WARD:**  Can we pull up the Exhibit 1427.  Can we

12  look at page 21.  Can we blow up lines 17 through 24.

13       **THE WITNESS:**  (Witness examines document.)

14  **BY MR. WARD:**

15  **Q.**   Ms. Foteh, does this refresh your recollection as to what

16  you told the grand jury?

17  **A.**   Respectfully, I just said I don't remember my testimony,

18  so this does not ring a bell.

19       **MR. WARD:**  Your Honor, I'd move to admit this section

20  of the grand jury testimony, page 21, lines 17 through 24.

21       **MR. SHEPARD:**  Same as before.

22       **THE COURT:**  Same objection?

23       All right.  I will admit it on the same basis; and,

24  Mr. Shepard, if you want to give me a supplemental objection,

25  that's fine.

1          (Trial Exhibit 1427, page 21, lines 17 through 24,

2    received in evidence.)

3          **MR. WARD:**  Can we go to the next page, please.  And

4    can we highlight lines 2 through 25.

5    **Q.**   Does this refresh your recollection as Mr. Andrade

6    promising to buy you things?

7    **A.**   (Witness examines document.)  No.

8          **MR. WARD:**  Move to admit page 22, lines 2 through 25.

9          **THE COURT:**  I will admit it on the same basis.

10         (Trial Exhibit 1427, page 22, lines 2 through 25, received

11   in evidence.)

12   **BY MR. WARD:**

13   **Q.**   Page 23, lines 1 through 24.  Do you remember telling the

14   grand jury about Mr. Andrade offering to buy you a black

15   Range Rover?

16   **A.**   No.

17   **Q.**   Do you remember Mr. Andrade ever offering you $250,000?

18   **A.**   No.

19   **Q.**   Do you remember telling the grand jury that you didn't get

20   any of that?

21   **A.**   No.

22         **MR. WARD:**  Move to admit page 23, lines 1 through 24.

23         **THE COURTROOM DEPUTY:**  Show it to the jury?

24         **MR. WARD:**  Show it to the jury, please.

25         **THE COURT:**  I will admit it on the same basis.

```
 1          (Trial Exhibit 1427, page 23, lines 1 through 24, received
 2     in evidence.)
 3     BY MR. WARD:
 4     Q.   Do you remember saying [as read]:
 5               "I want" --
 6               "I said to him, 'I want a black' --
 7               "So I said, 'I want a black Range Rover'"?
 8     A.   I do not recall.
 9     Q.   And do you recall saying [as read]:
10               "I actually -- like, I actually called the
11          dealership and then -- anyway, that never happened"?
12     A.   No.
13     Q.   And do you recall saying, when asked "Did you ever get the
14     car, the wired money for the car, or the $250,000 bonus," you
15     said "No"?
16     A.   I don't recall.
17     Q.   You don't recall.
18          MR. WARD:  Okay.  That's all the questions I have.
19     Thank you, Ms. Foteh.
20          THE COURT:  The excerpts that you -- that I admitted
21     conditionally were Exhibit 1427?
22          MR. WARD:  Yes, Your Honor.
23          THE COURT:  And you admitted separate pages of that.
24     Is that how you want it marked in the -- just 1427 --
25          MR. WARD:  Page.
```

**FOTEH - DIRECT / WARD**

1          **THE COURT:**  All right.  Okay.

2          **MR. WARD:**  And I'll work with Ms. Lew.

3          **THE COURT:**  All right.

4      Mr. Shepard?

5          **MR. SHEPARD:**  Would it be appropriate to take a brief

6   break, Your Honor?

7          **THE COURT:**  Okay.  Just for what purpose?

8          **MR. SHEPARD:**  That was sort of unusual testimony.

9          **THE COURT:**  All right.

10         **MR. SHEPARD:**  I just would like to discuss it with my

11  team first.

12         **THE COURT:**  All right.  We will take a short break at

13  this time.  Let's try to keep it to about ten minutes.

14     Members of the jury, remember my admonitions not to

15  discuss this amongst yourselves or anyone else.  We'll see you

16  at quarter of.

17     (Proceedings were heard out of the presence of the jury.)

18         **THE COURT:**  We're out of the presence of the jury.

19     Your witness went off down the hall, so you better make

20  sure that, if you expect to see her, that you don't let her go.

21                   (Recess taken at 9:36 a.m.)

22                 (Proceedings resumed at 9:47 a.m.)

23     (Proceedings were heard out of the presence of the jury.)

24         **THE COURT:**  Okay.  Ready to bring them out?

25     (Proceedings were heard in the presence of the jury.)

FOTEH - CROSS / SHEPARD

```
 1                    (Pause in proceedings.)

 2         THE COURT:  Well, members of the jury, why don't I

 3  have you go -- we obviously need everybody here, so we can have

 4  you go back; and once your colleague is found, we'll come back

 5  out.  But why don't you go back into the jury room.  Sorry that

 6  we're shuffling you back and forth.

 7      (Proceedings were heard out of the presence of the jury.)

 8         THE COURT:  All right.  In the meantime, you can be

 9  seated.

10                    (Pause in proceedings.)

11      THE COURT:  Do you anticipate a short examination?

12      MR. SHEPARD:  I'm going to try to be extremely short.

13      THE COURT:  Very good.

14                    (Pause in proceedings.)

15      THE COURT:  They're ready.  Okay.  We still have one

16  left?  Tell me when.

17                    (Pause in proceedings.)

18      (Proceedings were heard in the presence of the jury.)

19      THE COURT:  The jury is present.

20      Mr. Shepard?

21                    CROSS-EXAMINATION

22  BY MR. SHEPARD:

23  Q.  Ms. Foteh, if I may, I'd like to ask you what I hope is

24  just a few questions.

25      You have said some things that are untrue when it suits
```

1    your purposes, haven't you?

2    **A.**    No.

3    **Q.**    Let me ask you something about something you said

4    recently.  And that is, you called Ms. Diamond on January 22 of

5    this year, saying that the FBI stalked you day and night; you

6    have video of what they did; they manipulated you.

7              **MR. WARD:**  Objection.  This is all hearsay.

8              **THE COURT:**  Overruled.

9    **BY MR. SHEPARD:**

10   **Q.**    So, sorry.  I'm going to start over.

11        That on January 22 of this year, you called my colleague,

12   Cindy Diamond.  You said that the FBI had stalked you day and

13   night, that you had videos of what they did, that they had

14   manipulated you, and that you fear they will retaliate against

15   you.  That's what you said to Ms. Diamond; correct?

16   **A.**    Yes.

17   **Q.**    Okay.  And was that true?

18   **A.**    Yes.

19   **Q.**    Okay.  And you made a number of similar statements to

20   people at the FBI and the U.S. Attorney's Office; correct?

21   **A.**    Yes.

22   **Q.**    And that was because you did not want to be here today?

23   **A.**    It's because I was stalked and I was deceived.

24              **THE COURT:**  Okay.  Just answer the question.

25              **THE WITNESS:**  I --

PROCEEDINGS

1              THE COURT:  Next question.

2    BY MR. SHEPARD:

3    Q.   You did not want to be here today; correct?

4    A.   No, I didn't, but that's not why I said what I did.  I --

5              THE COURT:  That's -- Ms. Foteh --

6              THE WITNESS:  Okay.  Sorry.

7              THE COURT:  -- you're going to be asked questions.

8              THE WITNESS:  I'm sorry.

9              THE COURT:  Answer those questions.

10             THE WITNESS:  Okay.  Yes, sir.

11             THE COURT:  Next question.

12   BY MR. SHEPARD:

13   Q.   And you do remember being unhappy with Mr. Andrade after

14   you left his employment; correct?

15   A.   Yes.

16             MR. SHEPARD:  Okay.  Nothing further.

17             THE COURT:  Thank you.

18             MR. WARD:  Nothing further.  Thank you.

19             THE COURT:  You may step down.

20                       (Witness excused.)

21             THE COURT:  The next witness?

22             MR. HIGHSMITH:  The United States calls Carlos

23   De La Guardia.

24    (Witness enters the courtroom and steps forward to be sworn.)

25             THE COURT:  Come forward to the stand, please, to be

DE LA GUARDIA - DIRECT / HIGHSMITH

1    sworn.

2            **THE COURTROOM DEPUTY:**  Please raise your right hand.

3                        <u>**CARLOS DE LA GUARDIA**</u>,

4    called as a witness for the Government, having been duly sworn,

5    testified as follows:

6            **THE WITNESS:**  I do.

7            **THE COURTROOM DEPUTY:**  Okay.  Please be seated.

8        Can you state and spell your last name, please.

9            **THE WITNESS:**  Carlos De La Guardia, C-a-r-l-o-s,

10   space -- it's a three-word last name -- D-e space, L-a space,

11   G-u-a-r-d-i-a.

12                       <u>**DIRECT EXAMINATION**</u>

13   **BY MR. HIGHSMITH:**

14   **Q.**   Good morning, sir.

15   **A.**   Good morning.

16   **Q.**   Where do you live?

17   **A.**   I live in Panama City, Panama.

18   **Q.**   How long have you lived there?

19   **A.**   I was born and raised in Panama.  I got my education in

20   the U.S.  Worked in the U.S. for ten years.  Went back to

21   Panama.  Then came back to the U.S. as a diplomat, and went

22   back to Panama in 2013.

23   **Q.**   All right.  We'll talk a little bit more about your

24   background, but currently, what do you do for a living?

25   **A.**   I am -- I have my own business.  I do a transportation --

DE LA GUARDIA - DIRECT / HIGHSMITH

1    maritime transportation business.  I carry cargo to islands and

2    remote places in -- within the coastal area of Panama, within

3    Panama.

4    **Q.**    What's the name of your business?

5    **A.**    It's DLG Development Group, Inc.

6    **Q.**    So your initials?

7    **A.**    Yes.

8    **Q.**    Let's go back to your background.  You said you were a

9    Panamanian diplomat in the United States.  Do I have that

10   right?

11   **A.**    Yes, I was.

12   **Q.**    What years were you a Panamanian diplomat serving in the

13   United States?

14   **A.**    From 2000 to -- until 2004, August 2004.

15   **Q.**    Where were you located at that time?

16   **A.**    I was in Washington, D.C.

17   **Q.**    What was your highest rank in Washington, D.C., as a

18   diplomat?

19   **A.**    I was appointed DCM, which is Deputy Chief of Mission; and

20   after the ambassador quit, I became the Chargé d´Affaires,

21   which is the temporary Chief of Mission.

22   **Q.**    So, accurate to say that you were the head of the

23   Panamanian Embassy in the United States towards the end of your

24   tenure?

25   **A.**    That is correct.

DE LA GUARDIA - DIRECT / HIGHSMITH

1    **Q.**    Did you meet Jack Abramoff when you were at the Panamanian

2    Embassy in Washington, D.C.?

3    **A.**    Yes, I did.

4    **Q.**    Did you become friends with him?

5    **A.**    We met at his restaurant.  I used to frequently go to that

6    restaurant.

7    **Q.**    What was the name of Jack Abramoff's restaurant?

8    **A.**    Signatures.

9    **Q.**    And did you become friends with him by going to that

10   restaurant frequently?

11   **A.**    Yes.  We one day came across and started talking, and he

12   asked me, "What do you do?"  "Well, I work at the Panamanian

13   Embassy."  "Oh.  Well, I'm a lobbyist."  And the relationship

14   went on.  You know, every time I would go there and I would see

15   him, I would say "Hello," we would talk, and we exchanged

16   telephone numbers, and we became friends.

17   **Q.**    When you stopped your service as a Panamanian diplomat in

18   2004, what did you do next?

19   **A.**    I became a consultant.

20   **Q.**    Where?

21   **A.**    In Alexandria, Virginia, the Washington, D.C., Metro area.

22   **Q.**    How long did you do that job?

23   **A.**    I would say for nine, ten years.

24   **Q.**    Generally speaking, what did you do in that job?

25   **A.**    My forte was to help companies develop their businesses in

DE LA GUARDIA - DIRECT / HIGHSMITH

1    Latin America.

2    **Q.**    During that time, did you do work with Jack Abramoff?

3    **A.**    I did through the contacts that I met as a -- as a result

4    of the relationship that I had with him.  In other words, every

5    now and then he would say, "Listen, I need -- I have a client

6    that needs help in Latin America.  Would you be willing and

7    able to do that?"  I said, "Yes.  If I'm going to be

8    compensated, yes.  Why not?"

9    **Q.**    Approximately what year did you move back to Panama?

10   **A.**    I moved back to Panama approximately in December 2013.

11   **Q.**    After you moved back to Panama, did you continue your

12   contacts with Jack Abramoff?

13   **A.**    Not often.

14   **Q.**    After you moved back to Panama, did you do any additional

15   work with Jack Abramoff?

16   **A.**    No, I did not.

17   **Q.**    After you moved back to Panama, did you and Jack Abramoff

18   continue to discuss business opportunities?

19   **A.**    We did not until he contacted me in 2017.

20   **Q.**    Okay.  Approximately -- before -- we're going to talk

21   about that; but before we talk about his contact in 2017,

22   approximately how many projects did you and Jack Abramoff work

23   on together?

24   **A.**    About two or three.

25   **Q.**    Very generally, please describe those projects.

1    **A.**    One was a pharmaceutical company based in California that

2    wanted to do business in Latin America and get sanitary

3    registration and find distributors.

4    **Q.**    And what was the second project?

5    **A.**    The second project was carbon sequestration bonds, find

6    governments that would be willing to -- to -- to set national

7    parks as an asset and get green bonds.

8    **Q.**    Okay.  And you continued communicating with Jack Abramoff,

9    and in 2017 he reached out to you again?

10   **A.**    Yes.

11   **Q.**    Please tell the jury what Mr. Andrade and you spoke about.

12   **A.**    He asked me if I was familiar with cryptocurrency and high

13   tech and blockchain.  And he found that he had a really good

14   opportunity because he had met -- he was working with someone

15   who was brilliant and had an interesting opportunity.

16   **Q.**    Let me stop you there.  At that point, did you have much

17   background in cryptocurrency?

18   **A.**    No, I did not.

19   **Q.**    Did you have a good understanding of what cryptocurrency

20   was at that time?

21   **A.**    Not at that time.  I did some reading, but I wasn't an

22   expert.

23   **Q.**    You testified about what Mr. Abramoff told you about his

24   business partner or the person who he was working with.  What

25   was the name of the person Mr. Abramoff was working with?

DE LA GUARDIA - DIRECT / HIGHSMITH

1   **A.**   Marcus Andrade.

2   **Q.**   You said Mr. Abramoff characterized him as brilliant; is

3   that correct?

4   **A.**   Yes.

5   **Q.**   What else did Mr. Abramoff say about Mr. Andrade during

6   that first call?

7   **A.**   He said that he had a really good opportunity to -- in the

8   U.S., and what they wanted to do is -- was to cover the whole

9   world.  And whatever region I could be helpful, then I would be

10  able to benefit from that or get some kind of compensation.

11  **Q.**   Okay.  What kind of compensation?

12  **A.**   The way when we -- when we started talking about the

13  compensation, he mentioned that by me helping the venture or

14  their business in Latin -- in Panama, I would get 20- to 25,000

15  coins.

16  **Q.**   All right.  So you mentioned coins.  What was the product

17  Mr. Abramoff was calling you about?

18  **A.**   It was a unique cryptocurrency that had AML and KYC

19  background.  AML is anti-money laundering, and KYC is know your

20  client, which are basically the two main elements of

21  compliance.

22  **Q.**   Did you understand from your conversation that Mr. Andrade

23  and Mr. Abramoff had a finished complete product at the time of

24  your call?

25  **A.**   I knew about the opportunity.  At the beginning with the

DE LA GUARDIA - DIRECT / HIGHSMITH

1    first call, I wasn't quite sure whether they had the product or

2    not, but I knew the opportunity was there.

3    Q.   Okay.  And, again, what was your understanding of the

4    product they were offering?

5    A.   I understood that it was unique -- a unique cryptocurrency

6    because it was able to have the background of the owner of the

7    currency through this process, DTN process, that goes through

8    the compliance.

9    Q.   Are you familiar with the term "biometric identification"?

10   A.   Yes, I am.

11   Q.   What does that mean to you?

12   A.   It's recognizing -- it's a technology that recognizes

13   unique body signs.  Could be fingerprint.  Could be the iris.

14   Could be face recognition.  And these are unique signs of each

15   human being.

16   Q.   Did you have an understanding then, in 2017, about whether

17   this product involved biometric identification?

18   A.   Yes.

19   Q.   What was your understanding?

20   A.   My understanding is that each client or owner would go

21   through this -- that screening process.

22   Q.   A biometric identification screening process?

23   A.   Yes.

24   Q.   Was it your understanding that biometric identification

25   would be built into the cryptocurrency's software or

1    blockchain?

2    **A.**    Yes.

3    **Q.**    What was your reaction to Mr. Abramoff's telephone call?

4    **A.**    I thought it was interesting.  I was excited about it

5    because it was a business opportunity.

6    **Q.**    Did you get some money for expenses?

7    **A.**    At one trip, I -- I did receive, I believe, $6,000.

8    **Q.**    And who did you receive that money from?

9    **A.**    From Marcus Andrade.

10   **Q.**    And did you receive a thousand dollars from Jack Abramoff?

11   **A.**    Yes, I did.

12   **Q.**    Okay.  We'll get into the trip in a second.

13   **A.**    Mm-hmm.

14   **Q.**    After your phone call with Mr. Abramoff, do you

15   remember -- or what was your role in this venture?

16   **A.**    My role was to find clients, potential clients, potential

17   investors.  And I immediately thought of the largest and

18   perhaps most important law firm in Panama, Latin America, that

19   is based in Panama.

20   **Q.**    What's the name of that?

21   **A.**    Morgan & Morgan.

22        **MR. HIGHSMITH:**  All right.  Let's show the witness

23   Exhibit 1510, please.  It's one page.  And could we please

24   start --

25   **Q.**    What is this document?  Is this your WhatsApp texts with

1   Jack Abramoff?

2   **A.**   Yes.

3   **Q.**   Okay.  And is this a fair and accurate depiction of your

4   WhatsApp texts with Jack Abramoff?

5   **A.**   Yes, sir.

6       **MR. HIGHSMITH:**  Could we zoom in, please, on -- it

7   starts with "Hi, Carlos.  Anything moving?"  And go all the way

8   down to the text that says, "Great.  Marcus pings me."

9       I move to admit 1510, Your Honor.

10      **MR. SHEPARD:**  I'm sorry.  I didn't hear him.  He

11  acknowledged these were his?  If so --

12      **THE COURT:**  Yes.

13      **MR. SHEPARD:**  -- no objection.

14      **THE COURT:**  All right.  1510 will be admitted.

15      (Trial Exhibit 1510 received in evidence.)

16      **MR. HIGHSMITH:**  Thank you.

17      Please publish this to the jury.

18  **Q.**   Do you see the first message from Jack on August 21st,

19  2017, where he says, "Hi, Carlos.  Anything moving?"

20  **A.**   Yes, I do.

21  **Q.**   Is that pretty shortly after your first phone call with

22  Jack Abramoff about this opportunity?

23  **A.**   Yes.

24  **Q.**   What did you understand Mr. Abramoff meant when he said,

25  "Anything moving?"

DE LA GUARDIA - DIRECT / HIGHSMITH

1  **A.**   He was asking me if I had already started working on

2  getting appointments.

3  **Q.**   And what was your response?

4  **A.**   My response was [as read]:

5        "Yes.  I will be meeting in person with two

6        close friends to the president.  One is a banker

7        (Banco General), the other one is a partner at

8        Morgan & Morgan (largest law firm in Panama)."

9  **Q.**   Okay.  At the bottom, do you see Jack's response

10  [as read]:

11        "Great.  Marcus pings me every few hours, in the

12        hope that you can pull this off (that we can issue

13        some PR on AML BitCoin being in negotiations on the

14        Canal thing)"?

15     What was your understanding of that message?

16  **A.**   My understanding was being able to create some news by --

17  my job was to set appointments, have meetings, and be able to

18  create some noise.

19  **Q.**   What do you mean by "create some noise"?

20  **A.**   Material to be sent out for the news.

21  **Q.**   Who would be sending out that material in the news?

22  **A.**   The team in the U.S.

23  **Q.**   The AML BitCoin team in the U.S.?

24  **A.**   Yes.

25        **MR. HIGHSMITH:**  Let's show the witness Exhibit -- we

DE LA GUARDIA - DIRECT / HIGHSMITH

 1  can take this down.  Please show the witness Exhibit 880.

 2  **Q.**   Is this your text message -- sorry -- your WhatsApp

 3  exchange with Mr. Abramoff?

 4  **A.**   Yes, sir.

 5  **Q.**   Is it a fair and accurate depiction of your exchange with

 6  Mr. Abramoff?

 7  **A.**   Yes, it is.

 8          **MR. HIGHSMITH:**  Move to admit 880, Your Honor.

 9          **MR. SHEPARD:**  No objection.

10          **THE COURT:**  880 will be admitted.

11      (Trial Exhibit 880 received in evidence.)

12          **MR. HIGHSMITH:**  Could we please zoom in on just the

13  first two lines where it says [as read]:

14          "I want you to know that, besides what Catin

15      said yesterday . . . ."

16  **Q.**   Okay.  You mentioned someone named Catin.  Who is Catin?

17  **A.**   Catin is a nickname for Mr. Vasquez.  I don't even know

18  his first name, but he's known in Panama as Catin Vasquez

19  because he was the -- at that time he was -- he had worked at

20  the Panama Canal Authority as the Director of Finance, and he

21  was very experienced and savvy about the financial industry,

22  banking industry in Panama.

23  **Q.**   All right.  What is Mr. Catin's job right now?

24  **A.**   Right now he became the main -- the CEO, the administrator

25  of the Panama Canal Authority.

DE LA GUARDIA - DIRECT / HIGHSMITH

1  Q.   Please describe briefly the importance of the Panama Canal

2  to Panama.

3  A.   The Canal is a unique corporation.  It -- it was built by

4  the Corps of Engineers in -- from 1903 and it was opened in

5  1914, and it was built by the U.S. Army for military purposes

6  because of its strategic location.  So it has always been ran

7  and operated by the U.S. Government, the Army Corps of

8  Engineers, for strategic purposes.

9       Many Panamanians, even when the Canal was -- belonged to

10  the U.S. Government, worked there.  And the culture, the

11  environment, the job environment there has always been very

12  strict and a lot of transparency.

13       Because of the Torrijos-Carter Treaty signed in 1977, the

14  U.S. decided to give the Canal back to the Panamanian

15  government, but it was going to be done gradually from 1977

16  until 1999.  December 1999, it was completely given to the

17  Panamanian government; and it became the Panama Canal

18  Authority, ran only and 100 percent by the Panamanian

19  government.

20  Q.   So just to put it very simply, is the Canal very important

21  to Panama?

22  A.   It is.

23  Q.   Okay.  Moving on to the next part of your text message,

24  you write [as read]:

25            "I'm working on" --

DE LA GUARDIA - DIRECT / HIGHSMITH

1    Oh, can we keep it zoomed in, please.

2    You write [as read]:

3        "I'm working on appointments for Marcus's trip."

4    Was Marcus going to come down to Panama in mid-September?

5    **A.**    Yes.  That was the plan.

6    **Q.**    Okay.  And were you trying to set up meetings for

7    Mr. Andrade so that he could meet with Panamanian officials?

8    **A.**    That is correct.

9    **Q.**    And what was your understanding about what Mr. Andrade was

10    going to talk about?

11    **A.**    In general, what I had been explained that Andrade was

12    going to come with a unique solution, that it was a Bitcoin or

13    a cryptocurrency that had AML/KYC background.

14        **MR. HIGHSMITH:**  So can we scroll down, please, and

15    highlight the middle of the page.  It says [as read]:

16        "Are you coming to Panama either?"

17    And we can scroll down all the way to the end.  So start

18    with "Are you coming to Panama either?"  It's a little bit

19    higher up.  Perfect.

20    **Q.**    So you asked Mr. Abramoff "Are you coming to Panama?"

21    And he says [as read]:

22        "No.  I'm best to stay in the background."

23    What did you understand Mr. Abramoff meant when he said

24    it's best -- "I'm best to stay in the background"?

25    **A.**    I assumed that because he was radioactive in Washington,

DE LA GUARDIA - DIRECT / HIGHSMITH

 1    D.C., based on the past that he had, it would be ideal that he

 2    would not show his face.

 3    **Q.**    Okay.  And when you say "radioactive," is that because he

 4    has multiple felony convictions?

 5    **A.**    Yes.

 6    **Q.**    Further on in the message, you talk about how you have

 7    some leads setting up meetings; is that correct?

 8    **A.**    Yes.

 9    **Q.**    And then at the bottom of the message, you say [as read]:

10         "I'm working.  I want to earn my coins!!!"

11         What did you mean by that?

12    **A.**    I was promised coins as a compensation, and I wanted to

13    earn my coins.

14    **Q.**    And you were hoping that they would become valuable;

15    correct?

16    **A.**    Absolutely.

17    **Q.**    Okay.  Do you see there's "Our agenda for now"?  Is that

18    an approximate agenda for you, things that you need to do?

19    **A.**    Yes.

20    **Q.**    And it says [as read]:

21         "Meetings for 9/12."

22         Does that mean meetings for Mr. Andrade on September 12th?

23    **A.**    Yes, I think so.

24    **Q.**    Okay.  And then you see it says [as read]:

25         "Soar like the Eagle!  Dance like the puppets!"

DE LA GUARDIA - DIRECT / HIGHSMITH

1    **A.**    Yes, I can see that.

2    **Q.**    And then you say [as read]:

3              "Laugh like Elmo."

4    **A.**    Yes.

5              **MR. HIGHSMITH:**  And then let's go to the next page,

6    please.  And we can highlight all the messages on the next

7    page.

8    **Q.**    At the very bottom, Mr. Abramoff writes [as read]:

9              "Super.  The key is PR and photo ops for

10        stories."

11        And you write [as read]:

12              "Exactly."

13   **A.**    Mm-hmm.

14   **Q.**    What did you understand Mr. Abramoff meant when he said,

15   "The key is PR and photo ops for stories"?

16   **A.**    Yes, I understood that by getting meetings, we would be

17   generating material to be used as press releases.

18   **Q.**    Why were press releases important?

19   **A.**    To persuade people that things were going well.

20   **Q.**    And to persuade people to buy the product?

21   **A.**    Perhaps.

22   **Q.**    You mention -- at the very end, Mr. Abramoff says [as

23   read]:

24              "Soar like the Eagle!  Dance like the puppets!"

25        You write [as read]:

**DE LA GUARDIA - DIRECT / HIGHSMITH**

1              "Laugh like Elmo."

2         And then at the top of this page, you write [as read]:

3              "Speak of the devil, Catin wrote me yesterday."

4         When you talk about -- when Mr. Abramoff says, "Soar like

5    an Eagle!  Dance like the puppets!" what is he talking about

6    when he mentions the puppets?

7    **A.**    That was an inside joke that we had.  We, in our -- the

8    way we communicated, we made fun of people.  As we -- I would

9    tell -- every time I met someone that seemed familiar with a

10   character of the TV, I would tell him, "This guy looks like

11   Elmo," for example.  And he would say, "Oh, yeah, yeah.

12   Definitely."  And we would laugh at that.

13   **Q.**    Okay.  Did you --

14   **A.**    It was a joke.

15   **Q.**    Got it.  Where did the joke start?

16   **A.**    The joke started when -- when he had to sell his

17   restaurant Signatures in Washington, D.C., he had a friend of

18   his or acquaintance that his name was Mark Smith that he said,

19   "Hey, listen, I may be able to pull a group of guys together to

20   buy your restaurant."  And they did.

21        And once -- once they took Jack out of the business, he

22   claimed that, "Oh, the seat that Jack used to be -- the table

23   that Jack used to sit at, every time I went to the restaurant,

24   that's going to be my table from now on."

25        And at some point they got into an argument, like, "You

1    know, it's not a big deal.  You know, I was allowed to use the

2    restaurant and that's part of the deal."  "Yeah, but I need to

3    conduct my board meetings at that table."

4        And Jack and I would jokingly say, like, "What board

5    meeting?  He doesn't have any members of the board.  You know,

6    it's a bunch of puppets."  And that's how the joke got started.

7    **Q.**   Is it accurate that you referred to Catin as Elmo?

8    **A.**   Yes.

9    **Q.**   Catin is a very important person; correct?

10   **A.**   Yes.

11   **Q.**   And you assigned him a puppet?

12   **A.**   Yes, I did.

13   **Q.**   Okay.  Let's move to Exhibit 881, please.

14       Is this another text message exchange with Mr. Abramoff?

15   **A.**   Yes, it is.

16          **MR. HIGHSMITH:**  Move to admit 881, Your Honor.

17          **MR. SHEPARD:**  No objection.

18          **THE COURT:**  881 will be admitted.

19       (Trial Exhibit 881 received in evidence.)

20          **MR. HIGHSMITH:**  Thank you, Your Honor.

21       Can we please highlight the first four messages.

22   **Q.**   So on September 4th, 2017 -- is this still before

23   Mr. Andrade's trip?

24   **A.**   Yes.

25   **Q.**   Okay.  On September 4th, 2017, you write [as read]:

1            "Jack, in my mind, Marcus wants/needs enough

2        material to send out Press Releases to the media and

3        create/increase expectations."

4        Correct?

5   A.   Correct.

6   Q.   What did you mean by that?

7   A.   That was the main job.  That was the main purpose of the

8   trip, was to have meetings so that they would have enough

9   material to send out press releases.

10  Q.   On the third message, you write [as read]:

11            "Now, that's not what we are going to tell

12        potential clients/end users."

13       What did you mean by that?

14  A.   I meant that the people we were contacting in Panama were

15  people that I knew; and at the beginning, I thought this was a

16  complete product; but as time went by, I realized that they

17  needed to finish the whole system and, in order do that, they

18  needed funds.

19  Q.   Okay.  Now, when you say, "We are not going to tell

20  potential clients/end users," are you saying, "We're not going

21  to tell them that our main job is to send out press releases"?

22  A.   Absolutely.

23  Q.   So you're trying to -- the idea is you're concealing from

24  clients and end users that the purpose of the trip is to send

25  out press?

DE LA GUARDIA - DIRECT / HIGHSMITH

1   **A.**   Correct.

2           **MR. SHEPARD:**  Leading.

3           **THE COURT:**  That is leading.  Sustained.

4   **BY MR. HIGHSMITH:**

5   **Q.**   Let's go to the next.  Let's look at the very bottom where

6   it says "Yes."  And this is Mr. Abramoff [as read]:

7           "The week in Panama/Brazil should generate a PR

8        opportunity from each meeting.  So there should be at

9        least 5-7 serious announcements coming from that

10       trip."

11       What did you understand Mr. Abramoff meant there?

12  **A.**   The same, that they needed to eagerly find enough material

13  to use for public press releases.

14  **Q.**   Let's pull out of this and just look at the very bottom

15  message in this same exhibit.  So do you see Mr. Abramoff's

16  message where he says [as read]:

17          "We have to flood the digital coin world and

18       overpower everyone and everything.  That's how we get

19       megarich"?

20       And then he says [as read]:

21          "By the way, if you have anyone who wants to

22       invest and buy the coin in the pre-ICO period of

23       'friends and family' . . . ."

24       Do you see that?

25  **A.**   Yes, I do.

1    Q.   And he then says [as read]:

2              "Marcus let out a bunch of his coins to his

3         friends/family and the exchange owners around the

4         world . . . ."

5         Do you see that?

6    A.   Yes.

7    Q.   And then do you see then Jack says he's brought in some

8    investors too; his father, brother, son, and rabbi all did it?

9    Do you see that?

10   A.   Mm-hmm, I do.

11   Q.   Did you bring in any additional investors?

12   A.   Yes, I did.  A good friend of mine, it says there Sasha,

13   Alex Parsiavi, he is originally -- he's an American citizen

14   now, but he's originally from Georgia, former Soviet Union, and

15   he had good contacts there.  When I share with him the

16   opportunity, he was interested and indeed he bought.  I believe

17   he bought some coins.  He invested.

18   Q.   Okay.  How did your coins work out for you?

19   A.   Terribly.

20   Q.   Do you get any money back from them?

21   A.   No.

22   Q.   Let's look at Exhibit 881, please.  Oh, I'm sorry.  We

23   just looked at 881.

24        Let's take a look at 1156.  Can we zoom in on the

25   witness's photograph and his bio, please.

1          Is that your photograph and the announcement, the press

2     release announcing that you've joined AML BitCoin?

3     **A.**    Yes, that is my photograph when I had hair.

4     **Q.**    And is that your -- is that the press release with your

5     information about you on it?

6     **A.**    Yes, sir.

7     **Q.**    Is that an accurate photo and an accurate press release?

8     **A.**    Yes, it is.

9               **MR. HIGHSMITH:**  Okay.  Move to admit, Your Honor,

10    1156.

11              **MR. SHEPARD:**  No objection.

12              **THE COURT:**  1156 will be admitted.

13         (Trial Exhibit 1156 received in evidence.)

14    **BY MR. HIGHSMITH:**

15    **Q.**    Okay.  Let's talk about Mr. Andrade's trip to Panama.

16    **A.**    Uh-huh.

17    **Q.**    In mid-September 2017, did Mr. Andrade come to Panama and

18    did you take him to a couple of meetings?

19    **A.**    Yes, I did.

20    **Q.**    Okay.  Did anybody accompany Mr. Andrade?

21    **A.**    Yes.

22    **Q.**    Who joined him?

23    **A.**    It was a gentleman.  It was a gentleman.  I believe he was

24    a security guy.

25    **Q.**    Okay.  Let's talk about -- how many meetings did you

DE LA GUARDIA - DIRECT / HIGHSMITH

1  attend with Mr. Andrade?

2  **A.**   We attended three meetings.

3  **Q.**   Let's talk about -- did you have a meeting with

4  Morgan & Morgan?

5  **A.**   Yes.

6  **Q.**   Okay.  What did Mr. Andrade say during that meeting?

7  **A.**   We -- my job was to introduce him into the group.  The

8  group of people at Morgan & Morgan were partners and founding

9  partners as well, and he basically presented the opportunity to

10  them.

11  **Q.**   And when you say "the opportunity," are you talking about

12  the AML BitCoin product?

13  **A.**   That is correct.

14  **Q.**   Okay.  When it came to explaining the technology, how did

15  Mr. Andrade come across to you?  Did he come across as

16  understanding the technology?

17  **A.**   Yes.  Definitely.

18  **Q.**   Was the law firm interested in the product?

19  **A.**   Yes, it was.

20  **Q.**   What else -- did Mr. Andrade ask the law firm for

21  anything?  Was there any request on his part?

22  **A.**   Not at that point.  The first meeting basically was to

23  touch base and present the solution that Mr. Andrade owned and

24  try to get some interest from Morgan & Morgan as a potential

25  buyer or even as an investor.

DE LA GUARDIA - DIRECT / HIGHSMITH

1    So what it was presented was the idea, the concept, and

2    pretty much the architecture.  And the way we left it was we

3    needed to have another meeting in order to present the -- the

4    solution working, itself, on the screen.

5    **Q.**   So do I understand you correctly that you had an initial

6    meeting but you needed to have a follow-up meeting to actually

7    show them the AML BitCoin product?

8    **A.**   Yes, sir.

9    **Q.**   Did you have another meeting with a different Panamanian

10   entity?

11   **A.**   Yes.  We -- in the afternoon, we visited Panama Maritime

12   Authority.

13   **Q.**   Okay.  Is that the Panama Canal?

14   **A.**   No, it is not.

15   **Q.**   Okay.  What's the Panama Maritime Authority?

16   **A.**   The Panama Maritime Authority is responsible for all the

17   maritime industry in Panama and worldwide that is related to

18   Panama as flag vessels, ship vessels, and flagging, and the

19   ports within Panama, except for the Panama Canal Authority.

20   Panama Canal Authority is a totally independent business.

21   **Q.**   Okay.  What did Mr. Andrade say at that meeting?

22   **A.**   We -- again, we presented the solution.  We wanted to --

23   we wanted to present it to the -- to the government agency as a

24   solution to satisfy their needs, and perhaps they would be

25   willing and able to buy it.

DE LA GUARDIA - DIRECT / HIGHSMITH

1  Q.   Okay.  Approximately how long was the meeting?  Was it a

2  long meeting?  Was it a short meeting?

3  A.   It was a short meeting.  It wouldn't -- if I'm not

4  mistaken, no more than 30 minutes.

5  Q.   Would you characterize the meeting as a productive

6  meeting, an unproductive meeting?  How would you characterize

7  the meeting?

8  A.   It wasn't a good meeting.

9  Q.   It was what?

10 A.   It was not a good meeting.

11 Q.   Why not?

12 A.   It was unproductive.

13 Q.   Why?

14 A.   Because the two guys who were there didn't understand very

15 well.  They could hardly speak English.  Their English was, I

16 would say, 50 percent, and perhaps they were doing it as a

17 courtesy to me.

18 Q.   Were they interested in the product?

19 A.   No.

20 Q.   Did they communicate that to you and to Mr. Andrade?

21 A.   No, they didn't.

22       MR. SHEPARD:  Objection.

23 BY MR. HIGHSMITH:

24 Q.   Did they follow up with you --

25       THE COURT:  Pardon me?

DE LA GUARDIA - DIRECT / HIGHSMITH

1          **MR. SHEPARD:**  I objected.  There seemed to be a

2    question about what Mr. Andrade understood, and I objected to

3    that.

4          **THE COURT:**  I don't actually see that, but -- I think

5    time has eclipsed the objection.  I don't see it.

6          So, go ahead.

7          **MR. HIGHSMITH:**  Thank you, Your Honor.

8    **Q.**  Was there any follow-up from the Panama Maritime Authority

9    where they -- did they follow up, expressing interest in the

10   product?

11   **A.**  No, they didn't.

12   **Q.**  Okay.  What did Mr. Andrade communicate to you about those

13   meetings?  After those meetings, did he communicate anything to

14   you about them?

15   **A.**  After the second meeting, I remember he mentioned that

16   wasn't a very good meeting.

17   **Q.**  He said it was not a very good meeting?  What did you

18   understand he meant?

19   **A.**  Well, they -- the guys couldn't even understand --

20         **THE COURT:**  Well, yeah.  The question is what

21   Mr. Andrade told him, not what was Mr. Andrade thinking.

22   That's not appropriate.

23         **MR. HIGHSMITH:**  Understood.

24   **Q.**  After the meetings, what did Mr. Andrade tell you about

25   the meetings?

**DE LA GUARDIA - DIRECT / HIGHSMITH**

1  **A.**   That meeting didn't go very well.

2  **Q.**   Did he explain why the meetings did not go very well?

3  **A.**   No, he didn't.

4  **Q.**   Did he have any comments to you about the Panama Canal,

5  wanting to have meetings with the Panama Canal?

6  **A.**   Oh, yes.  He kept asking me, "When are we going to meet

7  with the Canal?"

8  **Q.**   What did you tell him?

9  **A.**   I said, "Well, I'm working on it.  It takes time.  It is

10  not the same as the Maritime Authority."

11  **Q.**   How did Mr. Andrade react when you told him it would take

12  time to meet with the Panama Canal?

13  **A.**   At the beginning, it was okay; but later, as the day went

14  on and I could not come up with the dates, it was kind of

15  frustrating for him.

16  **Q.**   I'd like to talk a little bit about the culture in Panama,

17  the business culture in Panama.

18       Could you describe briefly the business culture in Panama

19  and specifically the business culture in Panama surrounding the

20  Panama Canal and the Panama Maritime Authority?

21  **A.**   Well, the Panama Canal, as I mentioned before, is a unique

22  corporation; and because of that, it has created its own

23  culture of fairness and transparency.  Their procurement

24  process is very transparent, very similar to the U.S.

25  **Q.**   Could you please describe the business culture in Panama,

DE LA GUARDIA - DIRECT / HIGHSMITH

1  as you understand it, in terms of how businesspeople are

2  expected to present themselves in Panama?

3  **A.**   We're at this level that I was -- that I was arranging

4  meetings.  You know, Panama is a very much Americanized

5  country.  We use the American dollar and we conduct business.

6  Many people speak English, and we dress properly, and --

7  **Q.**   What does that mean?

8  **A.**   It's pretty much --

9  **Q.**   That can be interpreted in different ways.  So in Panama,

10  what's your understanding of dressing properly for a business

11  meeting?

12  **A.**   It's the attire.  Kind of like the slang "Dress for

13  Success," but you have to dress properly.

14  **Q.**   How did Mr. Andrade during his trip fit in with the

15  business culture of Panama?

16  **A.**   It was difficult for me.

17  **Q.**   Why?

18  **A.**   Because of the attire that he had on, the shoes, the pants

19  and the suit and the jacket wouldn't match, and I was

20  concerned.

21  **Q.**   Why were you concerned?

22  **A.**   Because of the image.  It's very important in our culture

23  if you want to sell something sophisticated, that at least

24  you're sophisticated.

25  **Q.**   In terms of your appearance or something else?

1  **A.**   Appearance.

2         **MR. HIGHSMITH:**  Let's show the witness Exhibit 884,

3  please.

4  **Q.**   Is this your text exchange with Mr. Abramoff?

5  **A.**   Yes, it is.

6         **MR. HIGHSMITH:**  I move to admit 884, Your Honor.

7         **MR. SHEPARD:**  No objection.

8         **THE COURT:**  884 will be admitted.

9      (Trial Exhibit 884 received in evidence.)

10         **MR. HIGHSMITH:**  Thank you, Your Honor.

11      Can we please blow up -- let's go all the way down to the

12  middle of the page.

13  **Q.**   We're going to go through most of the page, but let's go

14  from the top of the text exchange to the middle.

15      Okay.  So this text exchange starts on September 15th,

16  2017.  Is that after your meetings with Mr. Andrade had

17  concluded in Panama?

18  **A.**   Yes.

19  **Q.**   Okay.  Mr. Abramoff writes to you [as read]:

20         ". . . make sure Marcus understands what went on

21      today better.  He did not seem to get it when I

22      chatted with him tonight."

23      Based on your communications with Mr. Andrade, based on

24  your experiences in those meetings, did you have a sense that

25  Mr. Andrade did not understand what was going on in the

**DE LA GUARDIA - DIRECT / HIGHSMITH**

1  meetings?

2  **A.**   He understood matters pertaining to technology, but the

3  business environment and the culture, he did not quite get it.

4  **Q.**   What do you mean by that?

5  **A.**   Sometimes it wasn't the appropriate time to make comments.

6  The image that I mentioned before, business attire.

7  **Q.**   I want to now direct your attention to the bottom two

8  messages.  You write [as read]:

9          "Everything went well today.  Now we need to

10      keep him hiding in a box."

11      What went well that day?

12  **A.**   That people that we presented, especially Morgan & Morgan,

13  they were interested.

14  **Q.**   When you wrote "Now we need to keep him hiding in a box,"

15  what did you mean?

16  **A.**   Is that not necessarily he had to be the face of the

17  project.

18  **Q.**   Well, let's look down at --

19      Can we now highlight two messages below that, please.

20      You write [as read]:

21          ". . . he should not be the face of his

22      invention."

23      Mr. Abramoff writes [as read]:

24          "Is he not effective in these meetings?"

25      What did you mean when you said "He should not be the face

DE LA GUARDIA - DIRECT / HIGHSMITH

1  of the invention"?

2  **A.**   I meant that it would be bring more harm to the project to

3  use him as a face of the -- the face of the project than if we

4  had him behind.

5  **Q.**   Why?

6  **A.**   Because of his image and -- and based on the culture of my

7  country and the environment that I understand very well.

8        **MR. HIGHSMITH:**  Let's go to page 2, please, and we can

9  blow up all the messages there.

10  **Q.**   You write [as read]:

11        "We did what we needed to do and he was able to

12        show that he knows . . . ."

13  What did you mean by that?

14  **A.**   That I was -- I was -- as I mentioned before, I was

15  convinced that he knew about his technology.

16  **Q.**   And then you write [as read]:

17        "He has to let me and Catin do the rest of the

18        work.  Sure, he felt like he didn't do anything

19        today, but that was the idea.  Catin and I have been

20        meeting with key members of the government in order

21        to have a say in the new regulation.  Things are

22        going great."

23  What did you mean by those messages?

24  **A.**   That apparently at that time -- by that time, Andrade had

25  already understood that his job was to present his technology

**DE LA GUARDIA - DIRECT / HIGHSMITH**

1  and to allow me and Catin to take care of the rest, contacting

2  people, talking to them, convincing them.  That's what I meant.

3  **Q.**  Mr. Abramoff writes [as read]:

4          "Now tell him he did such a great job that

5      the government wanted to move the follow-through more

6      quickly, and it is best for that to be done by you

7      guys."

8      What did -- is that basically what you were just talking

9  about, how you guys needed to run the business side of this?

10 **A.**  That's what he was advising me to do.

11         **MR. HIGHSMITH:**  Okay.  We can take that down.

12 **Q.**  Was there a press release and a newspaper article

13 published after this first visit to Panama?

14 **A.**  I think so.

15 **Q.**  Let's take a look at Exhibit 885, please.

16     Is this your text exchange -- or, sorry -- your WhatsApp

17 exchange with Mr. Abramoff?

18 **A.**  Yes, it is.

19         **MR. HIGHSMITH:**  Move to admit 885.

20         **MR. SHEPARD:**  No objection.

21         **THE COURT:**  885 is admitted.

22     (Trial Exhibit 885 received in evidence.)

23         **MR. HIGHSMITH:**  Let's move to page 2, please, and zoom

24 in starting "Did you receive it" all the way to the bottom.

25 **Q.**  Did Mr. Abramoff send you a draft newspaper article?

DE LA GUARDIA - DIRECT / HIGHSMITH

1    **A.**    Yes, he did.

2    **Q.**    Okay.  And did you review that draft newspaper article?

3    **A.**    Yes, I reviewed the part that was related to me.

4    **Q.**    Okay.  And did you sign off on that?

5    **A.**    Yes, I did.

6    **Q.**    Okay.  Do you see at the bottom it says [as read]:

7             "What we really need is not quotes from just

8        Catin and you.  We need quotes from someone from the

9        Panama Canal, the banking industry and the ship

10       registry to make this all more real.  Is that

11       possible?  That was kind of the point of the trip,

12       no?"

13       What did you understand Mr. Abramoff meant?

14   **A.**    He was putting pressure on accomplishing the meetings so

15   that we could use the participants of the meetings in quotes

16   for the press releases.

17       **MR. HIGHSMITH:**  Let's go to the next page, please, and

18   highlight the two messages at the top.

19   **Q.**    You respond to Mr. Abramoff and you said [as read]:

20            "We did not visit the Canal for a reason.  That

21       would have ruined our relationship with M & M, the

22       President.  That would have ruined the whole thing."

23       What did you mean by that?

24   **A.**    Catin was giving me advice.  He worked there and he knew

25   exactly how things worked in there.  And he always mention that

1  we should wait.  First of all, we needed to have

2  Morgan & Morgan on board so we could accomplish the project

3  because they needed funds; and after that, we could continue

4  addressing the Canal.

5  **Q.**   Okay.  Mr. Abramoff writes in that very next message

6  [as read]:

7           "The only issue is that we must get the right

8       amount of publicity before the ICO on this.  That was

9       the reason for the trip.  I just hope we have enough

10      to make it happen.  Hopefully we do."

11          When Mr. Abramoff says "We need the right amount of

12  publicity before the ICO," what's the ICO?

13 **A.**   It's a public offer- -- offering, I think.

14 **Q.**   Of what?

15 **A.**   Of the coin.

16 **Q.**   Let's back out of this and go to page 5, please.  Just

17 take a look at this.  Is this the draft newspaper article that

18 Mr. Abramoff sent you?

19 **A.**   Yes, it is.

20 **Q.**   Okay.  Let's actually right now just look at the title and

21 the author of this draft newspaper article.

22          All right.  So Mr. Abramoff sends you a draft entitled

23 "AML BitCoin Makes Landfall in Panama," and it purports to be

24 by Peter Ferrara.  Do you see that?

25 **A.**   Yes, I do.

DE LA GUARDIA - DIRECT / HIGHSMITH

1    Q.   But Mr. Abramoff put together this draft and sent it to

2    you; correct?

3    A.   Yes.

4              MR. HIGHSMITH:   Let's zoom out, and let's focus on the

5    middle of this article, starting with the paragraph "In Panama,

6    AML BitCoin founder Marcus Andrade," and then Zoom all the way

7    down, including the paragraph that reads "That was what excited

8    officials in Panama."

9    Q.   Okay.  So you read this draft; correct?

10   A.   Yes, I did.

11   Q.   And you signed off on it; correct?

12   A.   Yes, I did.

13   Q.   And you and Mr. Andrade together attended the meetings

14   summarized in this press release; is that right?

15   A.   Yes.

16   Q.   I'd like you to focus on the second paragraph where it

17   says [as read]:

18            "We expected to raise interest, but never

19       expected the unbounded enthusiasm we encountered."

20       Do you see that?

21   A.   Yes, I do.

22   Q.   When you and Mr. Andrade attended those meetings, did you

23   encounter unbounded enthusiasm?

24   A.   No, we didn't.

25   Q.   Was this misleading?

**DE LA GUARDIA - DIRECT / HIGHSMITH**

1    **A.**   Yes.

2    **Q.**   Where it says, "Our discussions with the leading banks

3    will lead to tremendous opportunities for our digital currency

4    both in Panama and throughout the world," based on the meetings

5    you and Mr. Andrade attended, was that statement true?

6    **A.**   No, it isn't.

7    **Q.**   Was that statement misleading?

8    **A.**   Yes.

9    **Q.**   Going to the next paragraph, when you -- there's a quote

10   that says [as read]:

11           "Mr. De La Guardia added, 'We commenced

12       groundbreaking discussions with the Panama Maritime

13       Authority . . . .'"

14   Did you have groundbreaking discussions with the Panama

15   Maritime Authority?

16   **A.**   No.

17   **Q.**   Was the Panama Maritime Authority even interested in

18   your -- in the AML BitCoin?

19   **A.**   No, they weren't.

20   **Q.**   Was that a misleading statement?

21   **A.**   Yes.

22   **Q.**   Further in the same sentence when it writes [as read]:

23           ". . . groundbreaking discussions with the

24       Panama Maritime Authority to use AML BitCoin in their

25       payment structures, as well as with the entities that

1          provide the world's largest ship registry in Panama

2          to incorporate AML BitCoin into their operations."

3          Was that true?

4    **A.**    No, it wasn't.

5    **Q.**    Was that misleading?

6    **A.**    Yes.

7    **Q.**    Going down to the last paragraph, where it writes

8    [as read]:

9              "That was what excited officials in Panama, and

10         is energizing government and private sector officials

11         everywhere . . . ."

12         Based on the meetings you attended with Mr. Andrade, were

13    the government officials at the Panama Maritime Authority

14    excited and energized by AML BitCoin?

15   **A.**    No, they were not.

16   **Q.**    Was that sentence misleading?

17   **A.**    Yes.

18             **MR. HIGHSMITH:**  We can take that down.

19         Can we show -- and this has already been admitted --

20    Exhibit 1447.  We can publish this because I think this has

21    already been admitted.

22   **Q.**    Have you seen this article before, this *Investors Business*

23   *Daily* article --

24   **A.**    Yes.

25   **Q.**    -- by Peter Ferrara?

DE LA GUARDIA - DIRECT / HIGHSMITH

1   **A.**   Mm-hmm.

2          **MR. HIGHSMITH:**  Can we go about to page 2, please, and

3   if we could actually just highlight the last two paragraphs.

4   **Q.**   So this article that was published contains the misleading

5   sentences that you just testified about; correct?

6   **A.**   Correct.

7          **MR. HIGHSMITH:**  We can take that down.

8          I'd like to show Mr. De La Guardia for identification only

9   Exhibit 530.  It'll be admitted through a different witness.

10  We're not going to publish it to the jury.

11  **Q.**   Do you see the AML BitCoin tweet on September 26, 2017?

12  **A.**   Yes, I can see that.

13  **Q.**   Where it says, "Government Panama launched AML BitCoin to

14  provide alternative to problems most cryptocurrencies are

15  currently facing," is that accurate?  Did the government of

16  Panama launch AML BitCoin?

17  **A.**   Not to my knowledge.

18  **Q.**   Was that misleading?

19  **A.**   Yes.

20         **MR. HIGHSMITH:**  Let's show Mr. De La Guardia

21  Exhibit 792.  It's previously admitted.

22         Could you just zoom in on paragraph 2, please.

23  **Q.**   You are not on this email, but I want you to -- I want

24  your reaction, please, to the following.  This is an email

25  dated October 10th, 2017, so a little bit less than a month

1  after your and Mr. Andrade's meetings in Panama.  The email

2  writes [as read]:

3          "Panama:  There are a few deals on the table

4      here.  Banks:  First, the banks themselves are

5      looking at buying $5 million of the ICO.  Second,

6      banks in Panama are looking to use AML BitCoin in

7      place of the SWIFT system."

8      Is that true?

9  **A.**    No.

10  **Q.**    We're going to skip the next sentence and go to the

11  sentence that reads [as read]:

12          "This deal is already in place to begin testing

13      with AML BitCoin before the end of the year.

14      AML BitCoin was their only choice for digital

15      currency because of its AML compliance."

16      Was that -- is that true?

17  **A.**    No, it isn't.

18  **Q.**    The next sentence reads [as read]:

19          "Free Trade Zone & Canal:  Both are highly

20      engaged and an MOU will likely come by early

21      December."

22      Was that true?

23  **A.**    No.

24          **MR. HIGHSMITH:**  We can back out of that.

25  **Q.**    All right.  Jumping ahead in time, you testified earlier

DE LA GUARDIA - DIRECT / HIGHSMITH

1    that Mr. Andrade wanted a relationship with the Panama Canal.

2    Did Mr. Abramoff want a press release related to the

3    Panama Canal?

4    **A.**    Yes.  He sent the press release related to the

5    Panama Canal Authority.

6          **MR. HIGHSMITH:**  Okay.  Let's put up Exhibit 1513,

7    please.  This is approximately five pages.

8       Could we scroll down to the second page, please.

9    **Q.**    Is this an email exchange that you had with Mr. Abramoff?

10      We can actually scroll up to the first page.  I'm sorry.

11   **A.**    Yes, it is.

12   **Q.**    Okay.  And then does Mr. Abramoff forward your email

13   exchange to Mr. Andrade?

14   **A.**    Yes, it seems like it.

15   **Q.**    Okay.  Is this a fair and accurate depiction of the email?

16   **A.**    Yes.

17         **MR. HIGHSMITH:**  Move to admit 1513, Your Honor.

18         **MR. SHEPARD:**  No objection.

19         **THE COURT:**  1513 will be admitted.

20      (Trial Exhibit 1513 received in evidence.)

21         **MR. HIGHSMITH:**  Can we start with the bottom portion,

22   please, that starts with "Carlos" and scroll all the way down

23   to the end.

24   **Q.**    Okay.  So is this you responding to Mr. Abramoff?

25   **A.**    Yes, it is.

DE LA GUARDIA - DIRECT / HIGHSMITH

1  **Q.**  Okay.  Do you see Mr. Abramoff's message?  There's a line

2  on the left-hand side.  Is that Mr. Abramoff's message and then

3  you're responding to it below?

4  **A.**  Yes.

5  **Q.**  So Mr. Abramoff writes [as read]:

6          ". . . we need to be able to release on Monday a

7          couple of press releases from NAC about activities in

8          Panama.  The anticipation we built in the media

9          before was about using the AML BitCoin for transit

10          fees in the Panama Canal."

11  Now, at that point, had you had any meetings, were you in

12  active discussions and meetings with the Panama Canal to use

13  AML BitCoin for transit fees?

14  **A.**  No, we didn't.

15  **Q.**  Okay.  You respond -- and you basically respond -- what's

16  your response to Mr. Abramoff when he says that?

17  **A.**  What I wrote.  Basically [as read]:

18          "There is a very good possibility we can

19          approach the Panama Canal Authority and actually be

20          able to sell them into using our cryptocurrency

21          (AMLToken) if we can" --

22  **Q.**  You don't have to read it.

23  **A.**  Mm-hmm.

24  **Q.**  At that point, had you had meetings with the Panama Canal?

25  **A.**  No.

DE LA GUARDIA - DIRECT / HIGHSMITH

1  Q.  Did you have a plan that in the future you would try to

2  set up meetings?

3  A.  That was -- I was in the process of setting up meetings.

4  Q.  At the very bottom of this email, you say:  Here in

5  Panama, we have holidays from November 3rd until November 12th.

6      Are you indicating that you're going to be approaching the

7  Panama Canal after the end of the holidays?

8  A.  I was indicating that it was very difficult because of the

9  holidays to get ahold of these gentlemen, but I was working on

10 it.

11      MR. HIGHSMITH:  Okay.  Can we go to the second page,

12 please, and just zoom in on that first two lines.

13 Q.  You write [as read]:

14      "The idea is to have an excuse to publish their

15      names in the article mentioning 'we are in

16      conversations/discussing' and be able to create the

17      expectation we are looking for."

18      Do you see that?

19 A.  Yes, I do.

20 Q.  So is that the plan you're communicating to Mr. Abramoff?

21 A.  Based on the pressure that he was putting on me, yes.

22      MR. HIGHSMITH:  Let's now go to the first page and

23 just zoom in on that first email message, please.  The very top

24 of the page, that first message.

25 Q.  And Mr. Abramoff forwards your entire email to Mr. Andrade

DE LA GUARDIA - DIRECT / HIGHSMITH

1   and informs him of your plan; correct?

2   **A.**   Yes.

3   **Q.**   And informs him of your response to his questions;

4   correct?

5   **A.**   Correct.

6           **MR. HIGHSMITH:**  We can back out of this.

7       Please put up Exhibit 891.

8   **Q.**   Did Mr. Abramoff draft a press release for you to review

9   related to the Panama Canal?

10  **A.**   Yes, he did.

11  **Q.**   Okay.  Let's go to page -- is this your text message

12  exchange -- or, sorry -- your WhatsApp exchange with

13  Mr. Abramoff?

14  **A.**   Yes, it is.

15          **MR. HIGHSMITH:**  Move to admit Exhibit 891, please.

16          **MR. SHEPARD:**  No objection.

17          **THE COURT:**  891 will be admitted.

18      (Trial Exhibit 891 received in evidence.)

19          **MR. HIGHSMITH:**  Thank you, Your Honor.

20      Can we please turn to page 3 and highlight the entire --

21  that message at the bottom.  Yeah, at the bottom.

22  **Q.**   So is Mr. Abramoff sending you a draft press release?

23  **A.**   Yes.

24  **Q.**   Okay.  Focusing on the first paragraph, where that draft

25  says that [as read]:

DE LA GUARDIA - DIRECT / HIGHSMITH

1              ". . . AML BitCoin has been in extensive

2         discussions with the governmental and private sector

3         authorities in Panama to integrate the AML BitCoin in

4         its patent-pending anti-money laundering technologies

5         into the financial and payment infrastructure of key

6         Panamanian industries and government departments."

7         Was that true?

8    A.   No, it isn't.

9    Q.   Was that misleading?

10   A.   Yes, it was.

11   Q.   Two paragraphs down where it says, "De La Guardia, former

12   Panamanian Ambassador to the United States," where that draft

13   says that you have been in discussion with Roberto Roy,

14   president of the Board of Directors and Minister of the

15   Panama Canal, about implementing an e-payment process for the

16   AML BitCoin with the Canal for payment of transit fees, was

17   that true?

18   A.   No, that was not true.

19   Q.   Was that misleading?

20   A.   Yes, it was.

21   Q.   Focusing on the paragraph that says "The discussions with

22   the key Panama Canal officials," again, when the press release

23   says that there were "very productive discussions Andrade had

24   with the Panama Maritime Authority," was that true that those

25   discussions were very productive?

1    **A.**    No, they were not true.

2    **Q.**    Further, it says that these very productive discussions

3    discussed "the digital identity innovations that undergird the

4    AML BitCoin architecture into the payment systems available to

5    thousands of crew working on ships."

6        Was that true?

7    **A.**    No.

8    **Q.**    Were these very productive discussions?

9    **A.**    No, they weren't productive.

10   **Q.**    Was that misleading?

11   **A.**    Yes, it was.

12   **Q.**    And then the second-to-last paragraph says [as read]:

13          "AML BitCoin is the world's only digital

14       currency with a patent-pending biometric digital

15       identity system tied to the blockchain . . . ."

16   **Q.**    Did you ever see an AML BitCoin product with biometric

17   digital identity tied into the blockchain?

18   **A.**    No.

19   **Q.**    Did this press release -- well, let's look at it.

20          **MR. HIGHSMITH:**    Can we please back out of this and

21   take a look at Exhibit 1457.

22   **Q.**    Have you seen this document before?

23   **A.**    Yes, I have.

24   **Q.**    What is it?

25   **A.**    This is a press release created addressing the

DE LA GUARDIA - DIRECT / HIGHSMITH

1    Panama Canal Authority.

2    **Q.**   Okay.  And is this an AML BitCoin press release?

3    **A.**   Yes.

4            **MR. HIGHSMITH:**  Move to admit 1457, Your Honor.

5            **MR. SHEPARD:**  No objection.

6            **THE COURT:**  1457 will be admitted.

7        (Trial Exhibit 1457 received in evidence.)

8            **MR. HIGHSMITH:**  Thank you.  Could we please publish

9    this.  Could we zoom in on the title.

10   **Q.**   Was AML BitCoin on track to partner with the Panama Canal?

11   **A.**   No.

12   **Q.**   Was this title true?

13   **A.**   No.

14   **Q.**   Was it misleading?

15   **A.**   Yes, it was.

16           **MR. HIGHSMITH:**  We can back out of that.

17   **Q.**   Did this press release contain the same or similar

18   misleading statements to what we covered in the draft between

19   you and Mr. Abramoff?

20   **A.**   Yes, it does.

21   **Q.**   Okay.  I'd like to show you -- we can back out of this --

22   for identification, not for publication, Exhibit 518.

23       Is this a tweet from AML BitCoin?

24   **A.**   Seems like it, yes.

25   **Q.**   And does it say "Creator" and is it dated November 8th,

DE LA GUARDIA - DIRECT / HIGHSMITH

1    2017?

2    **A.**    Yes.

3    **Q.**    And does it say "Creator of AML BitCoin on Track to

4    Partner with Panama Canal" and then link to a press release?

5    **A.**    Yes, I can see that.

6    **Q.**    And then is there a big colorful picture saying

7    "AML BitCoin negotiating with Panamanian Government"?

8    **A.**    Yes, I can see that.

9    **Q.**    Okay.  Was the creator of AML BitCoin on track to partner

10   with the Panama Canal?

11   **A.**    No.

12   **Q.**    Was this misleading?

13   **A.**    Yes.

14   **Q.**    How did the Panama Canal react to this?

15   **A.**    Oh.  To the press release?  They were furious.

16   **Q.**    Describe -- describe their reaction, please.

17   **A.**    They sent a -- their Department of Communications sent a

18   letter directly to AML BitCoin requesting to put it down.

19   **Q.**    I'd like to show you what's Exhibit 8.

20       And for this, could we actually start on page 3 and show

21   the witness from page 3 to page 2 to page 1.

22       Is this the email chain that you just described where the

23   Panama Canal is emailing AML BitCoin and that email is getting

24   forwarded to you?

25   **A.**    Yes.

DE LA GUARDIA - DIRECT / HIGHSMITH

1    Q.   Is this a fair and accurate depiction of the email

2    exchange?

3    A.   Yes, it is.

4         MR. HIGHSMITH:  Move to admit Exhibit 8.

5         MR. SHEPARD:  No objection.

6         THE COURT:  Exhibit 8 will be admitted.

7         (Trial Exhibit 8 received in evidence.)

8         MR. HIGHSMITH:  Thank you, Your Honor.

9    Let's move to page 3.  We're going to start at the back

10   and move in chronological order.  And let's blow up, please,

11   where it starts "On Thursday, November 9th," and we can stop

12   with the name "Monica Martinez."

13   Actually, go all the way down to show -- yeah, show her

14   title.  Thank you.

15   Q.   So on November 9th, does the Panama Canal Authority write

16   to -- write to AML BitCoin and say [as read]:

17        "The meeting mentioned in the press release

18        still has not taken place.  This press release is

19        misleading"?

20        Did they write that to AML BitCoin?

21   A.   Yes.

22   Q.   Okay.  What was misleading about the press release?

23   A.   That this -- I was working on the meetings, but the

24   meeting had not taken place, and that's what she writes there.

25   Q.   And did she also -- okay.  Got it.

1          And let's look at -- let's scroll up to the bottom of

2    page 2 to look at AML BitCoin's reaction.

3          So does press@amlbitcoin respond to the Panama Canal

4    Authority and Ms. Martinez and ask for some clarification?

5    A.    Yes.

6              MR. HIGHSMITH:  Okay.  And then let's back out of this

7    and scroll up to Ms. Martinez's response.

8    Q.    Okay.  Does Ms. Martinez then say [as read]:

9              "The way the release is drafted it sounds like

10          the Panama Canal has plans to implement AML BitCoin

11          as a form of payment.  However, the Panama Canal does

12          not currently have a project in place to implement

13          AML BitCoin"?

14          What was the purpose of that press release?  What was your

15    understanding of the purpose of AML BitCoin's press release?

16    A.    Being the Panama Canal Authority is so important --

17              MR. SHEPARD:  Objection.  Calls for speculation.

18              THE COURT:  He can testify to his understanding.

19          Go ahead.

20    BY MR. HIGHSMITH:

21    Q.    So the question -- the question, sir, is:  What was the

22    purpose of AML BitCoin's press release regarding the Panama

23    Canal?

24              MR. SHEPARD:  Same question.  Same objection.

25              THE COURT:  Overruled.  Overruled.

1            **THE WITNESS:**  To increase expectations.

2    **BY MR. HIGHSMITH:**

3    **Q.**   For the ICO?

4    **A.**   Yes.

5            **MR. HIGHSMITH:**  Let's go to page 1, please.  And could

6    we highlight starting with November 9th at 3:17 p.m. and zoom

7    in all the way to the bottom.

8    **Q.**   Okay.  So press@amlbitcoin essentially notifies you

9    through Jack Abramoff about the issue with the Panama Canal; is

10   that correct?

11   **A.**   Yes.

12           **MR. HIGHSMITH:**  Let's back out of this and show the

13   email at the very top.

14   **Q.**   And the same day you write to Mr. Abramoff and to

15   Mr. Andrade [as read]:

16           ". . . making an announcement as if these

17       meetings had already taken place is considered by

18       them 'misleading,' and they would like the

19       corrections being made ASAP."

20       Do you see that?

21   **A.**   Yes.

22           **MR. HIGHSMITH:**  Okay.  We can back out of this.

23   **Q.**   Describe, please, the impact of this email communication

24   with the Panama Canal on you.

25   **A.**   It created lack of credibility.  It harmed me in a way

DE LA GUARDIA - DIRECT / HIGHSMITH

1    that even though I had been in conversations to have meetings

2    and they had not taken place, it was -- it was obvious by the

3    way the press release was written that they were exaggerating

4    as if the meetings had taken place, and that made me look very

5    bad.

6        The tone of the conversations before and after the press

7    release were totally different.

8    Q.    The tone of the conversations with who?

9    A.    Between me and Oscar Vallarino, the people that worked at

10    the Panama Canal Authority that I was planning to have meetings

11    with, and Roberto Roy.  So that harmed my relationship with

12    them.

13        MR. HIGHSMITH:  Let's show the witness Exhibit 10,

14    please.

15    Q.    Is this your email to Marcus Andrade and Mr. Abramoff on

16    November 10th, 2017?

17    A.    Yes, it is.

18        MR. HIGHSMITH:  Move to admit Exhibit 10.

19        MR. SHEPARD:  No objection.

20        THE COURT:  Exhibit 10 will be admitted.

21        (Trial Exhibit 10 received in evidence.)

22    BY MR. HIGHSMITH:

23    Q.    Did you have a phone conversation with Ms. Martinez from

24    the Panama Canal?

25    A.    Yes, I did.

DE LA GUARDIA - DIRECT / HIGHSMITH

1    Q.    Why did you have a phone conversation with her?

2    A.    I wanted to understand exactly what we needed to change in

3    the press release so that it could -- it could stay up.

4    Q.    Okay.  And what did she tell you?

5    A.    She basically said, "Listen, everything -- you know, the

6    way it was written is generating false expectations because

7    those meetings haven't taken place."

8            MR. HIGHSMITH:  We can pull out of this.

9    Q.    I want to show you for identification -- we'll admit this

10   through another witness -- Exhibit 517.

11        And we can zoom in on the tweet, please.

12        Do you see that on November 10th, 2017, there was a tweet

13   from AML BitCoin?

14   A.    Yes, I see that.

15   Q.    Okay.  That's November 10th.  Is that after your

16   conversation with Ms. Martinez?

17   A.    Yes.

18   Q.    And you had communicated your conversation to Mr. Andrade

19   and Mr. Abramoff; correct?

20   A.    Correct.

21   Q.    So is this November 10th tweet accurate when it writes

22   "Creator of AML BitCoin on Track to Partner with Panama Canal"?

23   A.    No, it's not accurate.

24   Q.    Is that misleading?

25   A.    Yes.

DE LA GUARDIA - DIRECT / HIGHSMITH

1          **MR. HIGHSMITH:**  We can pull back out of this.

2      Let's show the witness Exhibit 893, please.

3      Can we please highlight starting at "We need to know on

4  the Canal really soon."  It's about one-third in.  And go all

5  the way down to the bottom.

6  **Q.**   Okay.  Was there follow-up between you and Mr. Abramoff

7  and Mr. Andrade about the Panama Canal press release?

8  **A.**   Yes.

9  **Q.**   Was there also follow-up between you and Mr. Abramoff and

10 Mr. Andrade about conversations with banks and other potential

11 partners in Panama?

12 **A.**   Yes.

13 **Q.**   You write [as read]:

14          "I have to write you an email re my meeting

15      (report) and you guys decide.  The bank doesn't have

16      plans to move into crypto until legislation in Panama

17      is completed."

18      What did you mean by that?

19 **A.**   The bank had told me that seeing as legislation in Panama

20 was not presented, they needed to wait; therefore, there was

21 no -- the business opportunity was not immediate.  We needed to

22 wait for legislation to be accomplished.

23          **MR. HIGHSMITH:**  Move to admit Exhibit 893, please.

24          **MR. SHEPARD:**  No objection.

25          **THE COURT:**  893 will be admitted.

1        (Trial Exhibit 893 received in evidence.)

2   BY MR. HIGHSMITH:

3   Q.   So is it accurate that the bank had no immediate plans for

4   any moves into cryptocurrency?

5   A.   That is correct.

6   Q.   Okay.  And so you write, a couple messages down [as read]:

7            "Nothing with crypto yet."

8        And then Mr. Abramoff writes [as read]:

9            "So that press release is toast?"

10       What was your understanding of that message where he

11  writes "That press release is toast?"

12  A.   That it was useless.

13  Q.   So when -- you then say [as read]:

14           "He told me legislation is intended to be

15       presented next year and since it's a State bank, he

16       doesn't have much flexibility."

17       Was that meaning there's no movement on crypto until next

18  year?

19  A.   Correct.

20  Q.   Okay.  Mr. Abramoff says [as read]:

21           "Please write a memo for Marcus on this."

22       And you write [as read]:

23           "I will."

24       Why?

25  A.   I -- when I see this, I realize that he wanted to show

DE LA GUARDIA - DIRECT / HIGHSMITH

 1   directly to Marcus Andrade my response and not him wanting --

 2   you know, being the person to share that information.  He did

 3   not want to have an intercommunicator himself.  He wanted me to

 4   have -- to share the information directly with Marcus.

 5   **Q.**   Why?

 6   **A.**   I don't know.  Perhaps so he --

 7           **MR. SHEPARD:**  Objection.

 8           **THE COURT:**  Sustained.

 9           **MR. SHEPARD:**  Calls for speculation.

10           **THE COURT:**  Sustained.

11   **BY MR. HIGHSMITH:**

12   **Q.**   Let's move to Exhibit 1514.  Is this an email on

13   November 19th from you to Marcus Andrade, ceo@amlbitcoin?

14   **A.**   Yes.

15           **MR. HIGHSMITH:**  Move to admit 1514, Your Honor.

16           **MR. SHEPARD:**  No objection.

17           **THE COURT:**  1514 will be admitted.

18           (Trial Exhibit 1514 received in evidence.)

19           **MR. HIGHSMITH:**  Can we zoom in on the whole thing for

20   now.

21   **Q.**   Is this the memo to Marcus that you reference in your text

22   chain?

23   **A.**   Yes, it is.

24   **Q.**   Okay.  So at the very top, you say [as read]:

25           "Marcus, I'm writing you in order to keep you

DE LA GUARDIA - DIRECT / HIGHSMITH

1          informed about the events taking place down here."
2          And then do you summarize what's happening with the
3   Panama Canal Authority?
4   **A.**   Yes.
5   **Q.**   And do you summarize that you were not authorized to
6   include any word or sentence that could be interpreted by the
7   reader as a fact, especially words like "partner" and "Canal"?
8   **A.**   Correct.
9   **Q.**   And then you write [as read]:
10             ". . . I admit I took a risk as I had already
11         contacted key decision-makers a few days before the
12         publication went out, and I assume responsibility.
13         They prefer we publish news after we have concrete
14         results after our meetings and the releases must be
15         previously approved by them."
16         What were you trying to inform Mr. Andrade about?
17  **A.**   That I had been in contact with these gentlemen at the
18  Canal and that I took a risk by approving to send out the press
19  release before having the meetings, before the meetings took
20  place.
21  **Q.**   Were you communicating to him that you had no meetings in
22  place with the Panama Canal at that point?
23  **A.**   Yes.
24  **Q.**   You then move on to brief him on your meetings with Banco
25  Nacional de Panama.

**DE LA GUARDIA - DIRECT / HIGHSMITH**

1   **A.**   Correct.

2   **Q.**   And in the second paragraph, you write [as read]:

3         ". . . they don't have plans to incur into the

4         cryptocurrency area yet . . . ."

5         Maybe in the next two to three years.

6         What did you mean by that?

7   **A.**   They weren't ready because of what I mentioned before, the

8   legislation.  And they were implementing some wallets.  They

9   were working on some merchan- -- they had other priorities.

10   **Q.**   Okay.  So was there any real near-term possibility with

11   the bank?

12   **A.**   No.

13   **Q.**   Moving, finally, to Morgan & Morgan, you write that they

14   seem to be very interested in our crypto ICO.

15        What were you telling Mr. Andrade about your meetings with

16   Morgan & Morgan?

17   **A.**   Well, they -- they were interested in the project, but

18   they were asking for more additional information.

19   **Q.**   What were they asking for?

20   **A.**   They wanted to see a beta plan or something working.

21   **Q.**   All right.

22   **A.**   And they also needed to find something in writing.

23   **Q.**   When you say they needed "to see a beta plan or something

24   working," are you referring to cryptocurrency?

25   **A.**   To the -- yeah, the cryptocurrency backed up by the DTN.

1    **Q.**   And what is the DTN?

2    **A.**   It's the AML/KYC compliance component, that it was

3    important.  This is what made the cryptocurrency unique, that

4    component.

5    **Q.**   And they needed to see it before they would move ahead?

6    **A.**   Of course.

7         **THE COURT:**  So I can plan our break, how much longer

8    do you have with this witness?

9         **MR. HIGHSMITH:**  15 minutes.

10        **THE COURT:**  Okay.  Well, let's go ahead and take our

11   break.

12        Members of the jury, let's try to keep it about a

13   ten-minute break.  And remember my admonitions not to discuss

14   this amongst yourselves or with anyone else.  See you in ten

15   minutes.

16   (Proceedings were heard out of the presence of the jury.)

17        **THE COURT:**  We're out of the presence of the jury.

18   Mr. Ward, you had something you wanted to clear up?

19        **MR. WARD:**  Yes, Your Honor.  When we had Ms. Foteh --

20        **THE COURT:**  Oh, let's not relive that experience.

21                        (Laughter.)

22        **THE COURT:**  Go ahead.

23        **MR. WARD:**  It was the sunglasses.

24   I just said I moved to admit Document 1427, and I believe

25   it came out as page 8, lines 2 through 8, when it should be

```
 1   page 28, lines 2 through 8.

 2            THE COURT:  This is the grand jury testimony?

 3            MR. WARD:  Correct.

 4            THE COURT:  Okay.  And --

 5            MR. SHEPARD:  Yes.

 6            THE COURT:  Okay.  Is there any dispute about this,

 7   where he was in the --

 8            THE WITNESS:  May I, Your Honor?

 9            THE COURT:  Yes, you may step down.

10            (Witness steps down from the stand.)

11            MR. SHEPARD:  Yes, I would prefer the opportunity just

12   to double-check.

13            THE COURT:  Why don't you take -- in addition to

14   looking at whether or not you have an argument about the

15   admission --

16            MR. SHEPARD:  Correct.

17            THE COURT:  -- you can also look at whether or not

18   it's the correct page.

19            MR. SHEPARD:  I don't expect it's a problem.

20            THE COURT:  Okay.  All right.

21       Okay?  See you shortly.

22                 (Recess taken at 11:16 a.m.)

23                 (Proceedings resumed at 11:28 a.m.)

24       (Proceedings were heard out of the presence of the jury.)

25            THE COURT:  Are we ready?
```

DE LA GUARDIA - DIRECT / HIGHSMITH

1          Bring them out.  Thank you.

2                         (Pause in proceedings.)

3          THE COURT:  Okay.  We can bring them out.

4          (Proceedings were heard in the presence of the jury.)

5          THE COURT:  The jury is present.

6      Mr. Highsmith?

7          MR. HIGHSMITH:  Thank you, Your Honor.

8  Q.   Sir, when we left off, we were pausing on your memo to

9  Mr. Andrade.  That's up on the screen in front of you.  Do you

10  see that?

11  A.   Yes, I do.

12  Q.   And in that memo, you were telling Mr. Andrade that you

13  had no scheduled meetings with the Panama Canal Authority and

14  also that the Bank of Panama was not looking at cryptocurrency

15  at that point; is that correct?

16  A.   That is correct.

17  Q.   And Morgan & Morgan is a private law firm; is that right?

18  A.   Yes.

19  Q.   So it's not the government of Panama?

20  A.   It is not.

21          MR. HIGHSMITH:  I'd like to show the witness -- we can

22  take this down.

23      Can we please show the witness Exhibit 515 for

24  identification only.

25  Q.   Is this a tweet on November 22nd, 2017?

DE LA GUARDIA - DIRECT / HIGHSMITH

1   A.    Yes, it looks like it.

2   Q.    And does this tweet say -- linking to an article, does it

3   say "AML BitCoin Negotiating with Panamanian Government"?  Does

4   it say that?

5   A.    Yes, it does.

6   Q.    And is there a link to an article that says "AML BitCoin

7   Negotiating with Panamanian Government"?

8   A.    Yes, I can see that.

9   Q.    So you had just sent, three days earlier, a memo to

10  Mr. Andrade saying there was no meetings with the Panama Canal,

11  no meetings with the National Bank of Panama; is that correct?

12  A.    Correct.

13  Q.    So at that point, were there any active negotiations with

14  the Panamanian government?

15  A.    Not with the Government.

16  Q.    All right.  You referenced Morgan & Morgan.  Was there a

17  second meeting with Morgan & Morgan?

18  A.    Yes.

19  Q.    And did Mr. Andrade speak at that meeting?

20  A.    I think so.

21  Q.    What happened at that second meeting with Morgan & Morgan?

22  A.    We were supposed to roll or to show the software or the

23  technology working on the screen as a sample.

24  Q.    Okay.  What was your impression of how that display went?

25  A.    My impression, that, you know, they were very polite and

1  diplomatic; but to me, the presentation was poor.

2  **Q.**  The presentation was what?

3  **A.**  Poor.

4  **Q.**  Who was polite and diplomatic?

5  **A.**  Mr. Andrade brought from England a technical guy who did

6  the presentation.

7  **Q.**  Why was the technical presentation poor?

8  **A.**  Because I -- this is my opinion.  I didn't think it was

9  completed.  The solution was -- needed some more work.

10  **Q.**  You didn't think what was completed?

11  **A.**  The application work in the solution.

12  **Q.**  So it appeared to you, based on that presentation, that

13  Mr. Andrade's product was not finished?

14  **A.**  It was not finished.

15  **Q.**  Was Mr. Andrade's team asking Morgan & Morgan for either

16  money or a business deal?

17  **A.**  Yes.

18  **Q.**  Did Morgan & Morgan invest in the company?

19  **A.**  No, they didn't.

20  **Q.**  Did Morgan & Morgan sign an agreement with the company?

21  **A.**  No, they didn't.

22  **Q.**  Did Mr. Andrade -- if you know, did Mr. Andrade sell a

23  couple of AML tokens to one of the partners?

24  **A.**  Yes.  I learned later on that he had sold to one of the

25  members and founders of Morgan & Morgan.

1  Q.   And that was separately, in his individual capacity?

2  A.   Yes.

3  Q.   Do you know if that man saw any return on his investment?

4  A.   I don't think so.

5  Q.   What was Morgan & Morgan's decision?  After that formal

6  presentation and the request to invest or to sign a deal, what

7  was Morgan & Morgan's official position?

8  A.   They decided to pass.

9  Q.   Do you know why they decided to pass?

10 A.   They -- it would be speculation --

11 Q.   Okay.

12 A.   -- on my part.

13 Q.   Don't speculate.

14      You mentioned a couple of times a business associate of

15 yours named Catin.

16 A.   Yes.

17 Q.   What happened with Catin's involvement in AML BitCoin?

18 A.   One day he decided to resign, that he didn't want to

19 continue working on the project.

20 Q.   Do you know why he did not want to continue working on the

21 project?

22 A.   It would be speculation also.

23 Q.   Okay.  Do not speculate.

24      What did Mr. Andrade do -- what action did he take after

25 Mr. Catin quit?

1  A.   Well, Catin wrote me, communicated to me that he received

2  a letter from an attorney that was working for Mr. Andrade.  It

3  was a threatening letter.

4        MR. SHEPARD:  Objection.  This sounds like hearsay to

5  me, Your Honor.

6        THE COURT:  Well, the question is --

7        MR. HIGHSMITH:  What's the effect on him.

8  Q.   What was the effect on you?

9        THE COURT:  And that is relevant for what?

10        MR. HIGHSMITH:  For his relationship with this

11  project.

12        THE COURT:  All right.  You may answer the question.

13        THE WITNESS:  Oh, yeah, that created a lot of trouble.

14  BY MR. HIGHSMITH:

15  Q.   How?

16  A.   My relationship with Catin was -- obviously, he was not

17  happy with that threat.  It's a legal threat, and he had to

18  hire attorneys in Panama in order to respond to the letter that

19  had been sent.

20  Q.   How did your involvement with this AML BitCoin project

21  impact your reputation and your standing in the Panamanian

22  business community?

23  A.   Terribly.

24  Q.   Why?

25  A.   Because my reputation, my credibility went down to the

DE LA GUARDIA - DIRECT / HIGHSMITH

1  floor.  I was instrumental in getting these meetings with

2  Morgan & Morgan, people who I've known for years, families,

3  family friends for years, people who understand the kind of

4  work that I do and the reputation that I had.  And after that,

5  they -- it's not that they said anything to me directly, but I

6  know that it harmed my reputation.  The same with Catin.

7  **Q.**  Did you start to have concerns about this project?

8  **A.**  Yes.

9  **Q.**  Did those come after the second meeting with

10  Morgan & Morgan?  Or, sorry.  Approximately when did your

11  concerns --

12  **A.**  They started with --

13  **Q.**  -- arise?

14  **A.**  They started when I didn't quite -- when I didn't see a

15  quite complete project on that sample, and it got worse with

16  that event with Catin.  And then I was totally discouraged,

17  you know, after what happened with Catin.

18  **Q.**  Was the meeting with -- the second meeting with

19  Morgan & Morgan, was that approximately December 2017?

20  **A.**  Could be, yeah.

21  **Q.**  And then after that meeting, did you have additional

22  concerns about the project after that meeting?

23  **A.**  Yes, I did.  I -- because Morgan & Morgan was pushing me,

24  say, "Hey, show me something, you know.  What is it that you

25  want?  Send me information."

DE LA GUARDIA - DIRECT / HIGHSMITH

1        And Catin at that moment, prior to his resignation, he was

2   asking also for information, to present something more

3   tangible, is the right word.

4   **Q.**   Did you express to Mr. Abramoff after the second

5   Morgan & Morgan meeting that you had concerns about the

6   project?

7   **A.**   Yes, I did.

8   **Q.**   Did you have concerns about continuing to work with

9   Morgan & Morgan, a very powerful law firm?

10  **A.**   Yes, I did.

11  **Q.**   What did you do with regard to the project after that?

12  **A.**   I just -- I realized that we were not going anywhere.  And

13  I also noticed that Jack Abramoff and Mr. Andrade were getting

14  in fights and they didn't get along and that I didn't see -- I

15  didn't see that the project could have made any progress after

16  that.  That was my opinion at that moment.

17  **Q.**   After you stopped working on the project, did Mr. Andrade

18  reach out to you?

19  **A.**   Yes, he did.

20  **Q.**   How did he reach out to you first?

21  **A.**   He texted me and then he called me.

22  **Q.**   Did you answer the phone call?

23  **A.**   Yes, I did.

24  **Q.**   What did Mr. Andrade say to you?

25  **A.**   He basically asked me if I could reach out to those

1  members of the Panama Maritime Authority, not the Canal, the
2  Panama Maritime Authority and ask them to confirm the press
3  releases, you know, the quotes.
4  **Q.**   What was your understanding of why Mr. Andrade was
5  reaching out to you?
6        **MR. SHEPARD:**  Objection.  It calls for speculation.
7        **THE COURT:**  Well, did he say why he was -- yes.
8  Sustained.  But you can --
9  **BY MR. HIGHSMITH:**
10 **Q.**   Okay.  So did he say why he was reaching out to you?
11 **A.**   Yes.  He wanted me to talk to these gentlemen and persuade
12 them to say that the quotes were correct.
13 **Q.**   Did you do that?
14 **A.**   No.
15 **Q.**   Why did you not do that?
16 **A.**   First I said, "Listen, these guys are not in office
17 anymore."  These are political appointments, and one of them
18 was dead; and, third, that's -- that's not true.  I mean, how
19 am I going to lie to these guys and tell them "Please do this."
20 You know, ask them to say a lie.
21 **Q.**   What's not true?
22 **A.**   That the quotes on the press releases were correct, were
23 theirs, that they had interest in the AML BitCoin.
24 **Q.**   Did you make efforts to do this communication with
25 Mr. Andrade over text message?  Did you try to text with

DE LA GUARDIA - DIRECT / HIGHSMITH

1    Mr. Andrade about this?

2    **A.**   I ask him if he wanted anything from me, to please put it

3    in writing.

4    **Q.**   Did he?

5    **A.**   No.

6    **Q.**   Approximately how long after you left the project did this

7    telephone call happen?

8    **A.**   Four years.  No.  I'm sorry.  It was 2020, I believe.

9    **Q.**   The phone call with Mr. Andrade --

10   **A.**   Yes.

11   **Q.**   -- happened in 2020?

12   **A.**   May 2020, I believe, if I'm not mistaken.

13   **Q.**   You testified earlier that you received some tokens.

14   **A.**   Yes.

15   **Q.**   Did you ever try -- did you ever sell them?

16   **A.**   No.

17   **Q.**   Did they have any value?

18   **A.**   No, that I know of.

19   **Q.**   To your knowledge, did AML BitCoin sign any business deals

20   with governmental authorities?

21   **A.**   In Panama?

22   **Q.**   Anywhere?

23   **A.**   Not that I know of.

24   **Q.**   Did they sign -- did AML BitCoin sign any deals with

25   governments or private sector entities anywhere in the world

1    that you know of?

2    **A.**    Not to my knowledge.

3          **MR. HIGHSMITH:**  Nothing further, Your Honor.

4    Thank you.

5          **THE COURT:**  Mr. Shepard?

6                (Pause in proceedings.)

7          **THE COURT:**  You may want to put your microphone up

8    even a little further.

9                (Pause in proceedings.)

10                   <u>CROSS-EXAMINATION</u>

11   BY MR. SHEPARD:

12   **Q.**    Sir, are you ready for me?  Welcome back to the

13   United States.

14   **A.**    Thank you, sir.

15   **Q.**    Let me jump directly to Exhibit 891.  You were asked some

16   questions about this by Mr. Highsmith.

17        Can we get that one back up?

18        This is the WhatsApp chain that you had with Mr. Abramoff

19   prior to the issues that the Panama Canal raised with the press

20   release; right?

21   **A.**    Correct.

22   **Q.**    And we saw a lot of WhatsApp messages between you and

23   Mr. Abramoff; right?

24   **A.**    (Nods head.)

25   **Q.**    You communicated with him by WhatsApp frequently about

1    your work for AML BitCoin; correct?

2    **A.**    Correct.

3    **Q.**    You did not have any WhatsApp communications with

4    Mr. Andrade; correct?

5    **A.**    Not many.

6    **Q.**    Have you seen any?

7    **A.**    In this court?  No.

8    **Q.**    I'm sorry.  I didn't hear you.

9    **A.**    Have I seen any --

10   **Q.**    WhatsApp communications between you and Mr. Andrade.

11   **A.**    Not in this court.

12   **Q.**    And you don't know of any anyplace else either, do you?

13   **A.**    We communicated somehow in the past, but I don't see it

14   here.

15   **Q.**    I'm saying you don't know of any other -- you don't know

16   of any WhatsApp communications you had with Mr. Andrade, do

17   you?

18   **A.**    No.

19   **Q.**    Okay.  So coming back to this communication, you were

20   asked a number of questions by Mr. Highsmith.  I wanted to ask

21   you about some parts he didn't ask you about.

22        **MR. SHEPARD:**  So if we could go to the second page

23   and -- well, I see your pagination is different than mine.  So

24   please -- sorry.  My apologies.

25        Go back to the first page.  And right down at the bottom,

1    would you highlight that small box at the bottom, please.

2        Okay.  I'm sorry.  You've got to go up one more, to the

3    top one on this page now.

4        Got it.  Thank you.  Sorry for getting it wrong.

5    **Q.**    So this is Mr. Abramoff sending you a draft of the release

6    to the Panama Canal; correct?

7    **A.**    Yes.

8    **Q.**    And he says to you [as read]:

9            "Please let me know if this works on the Canal

10        draft."

11        Right?

12   **A.**    Yes.

13   **Q.**    And then if we can go down to the box -- we're going to

14   need to go to the next page, and then the small box in the

15   middle of the page.

16       This is your response to Mr. Abramoff; correct?

17   **A.**    Yes.

18   **Q.**    You say [as read]:

19           "Please see suggested changes in parentheses."

20       Right?

21   **A.**    Yes.

22   **Q.**    And then if we look at the message or the section of this

23   WhatsApp chain immediately below -- yes, thank you -- there are

24   some things in parentheses that you changed in the press

25   release; right?

1    **A.**    Yes.

2    **Q.**    For example, just to take a small example, you put spaces

3    between the three parts of your last name?

4    **A.**    Correct.

5    **Q.**    You took enough care to make sure that was right; right?

6    **A.**    Yes.

7    **Q.**    And you also -- you also added, in the third paragraph --

8    if we could blow that up -- the one that starts, parentheses,

9    "De La Guardia."

10    In addition to correcting your name there, also you added

11    the words "in advance" in the third line; right?

12    **A.**    Mm-hmm.

13    **Q.**    And so you went carefully through this draft release in

14    response to Mr. Abramoff's request; right?

15    **A.**    De La Guardia is not written all three words together.

16    That's something very basic to me.

17    **Q.**    Okay.  But you added this "in advance"; right?

18    **A.**    Yes.

19    **Q.**    Okay.  And then two words after that, you made another

20    correction; right?  You said in parentheses [as read]:

21          "(A system that permits corruption, money

22          laundering, and theft - eliminate this sentence)."

23          Right?

24    **A.**    Correct.

25          **MR. SHEPARD:**  And now if we can back out of this, blow

1    up and go down to the next small paragraph right below where we

2    were.

3    **Q.**    It says [as read]:

4           "In addition to Minister Roy, (De La Guardia)

5           has been engaged in communications with other senior

6           Canal officials, including VP Corporate

7           Communications, Oscar" -- I love the way you

8           pronounced it, so apologies for mine -- "Vallarino,

9           and Canal Administrator . . . ."

10          And I'm not even going to try to pronounce his name.

11          You did not correct that at all other than fixing your

12   name; correct?

13   **A.**    Correct.

14   **Q.**    And then you sent this back to Mr. Abramoff.

15          And then we go down several -- to the -- there's a small

16   little paragraph from Mr. Abramoff that just says [as read]:

17          "Got it.  Thanks."

18          **MR. SHEPARD:**  It's further down from where you are,

19   Ed.  Yeah, it's the second small paragraph there on that page.

20   If you can blow that up.  Just the "Got it.  Thanks."

21          You had it there.  Sorry.  It's on the next page,

22   I believe.  You had it up on the screen before.

23   **Q.**    Okay.  So Mr. Abramoff got your response, the corrections

24   you made and the things that you left, and he said [as read]:

25          "Got it.  Thanks."

1           Right?

2    A.    Yes.

3    Q.    And then he went on to send around the press release that

4    you had approved; right?

5    A.    Right.

6    Q.    And I think you said that Mr. Andrade, you recalled, asked

7    you to follow up, maybe a year and a half later he wanted you

8    to follow up and confirm what was in the release; right?

9           MR. HIGHSMITH:  Objection.  His earlier testimony was

10   regarding the Panama Maritime Authority rather than the

11   Panama Canal, so...

12          THE COURT:  Overruled.  He can clarify if he needs to.

13      Go ahead.

14          THE WITNESS:  Would you repeat the question?

15   BY MR. SHEPARD:

16   Q.    You said Mr. Andrade got in touch with you a year and a

17   half or so after the fact and asked you to follow up and

18   correct things, and you declined.

19   A.    He asked me to get in touch with some people, not to

20   correct things.

21   Q.    Okay.  I thought you said he wanted you to get in touch

22   with them and correct that these statements in press releases

23   actually had been made; correct?

24   A.    Yes.

25   Q.    Okay.  And you declined to do that?

1  A.   Yes, I did.

2  Q.   But he knew that you had confirmed what was in the press

3  release; correct?

4  A.   I don't know that.  I was talking to Jack.

5  Q.   Okay.  Fair enough.

6       You just confirmed it to Mr. Abramoff?  You didn't have a

7  conversation about that with Mr. Andrade; correct?

8  A.   I didn't have a conversation with Mr. Andrade about it.

9  Q.   And you didn't WhatsApp him either about it --

10 A.   No --

11 Q.   -- correct?

12 A.   -- I didn't.

13        MR. SHEPARD:   And then if we can go to Government

14 Exhibit 8, and blow up there at the top the "Hi, Jack"

15 paragraph.

16 Q.   This is after the Canal had expressed concern about the

17 press release; correct?

18 A.   Correct.

19 Q.   And you're writing Mr. Abramoff and now copying

20 ceo@amlbitcoin.com for Mr. Andrade; correct?

21 A.   Correct.

22 Q.   And you say here that you had been working on schedules

23 for those meetings; correct?

24 A.   Correct.

25 Q.   And I heard you testify that you got a very adverse

DE LA GUARDIA - CROSS / SHEPARD

1  reaction from people at the Canal about the press release;

2  correct?

3  **A.**   From their communications department.

4  **Q.**   Yeah.  And that you felt your reputation was really

5  damaged and that it would hurt you in dealing with the Canal;

6  right?

7  **A.**   Yes.

8  **Q.**   You didn't say any of that to Mr. Abramoff or Mr. Andrade

9  in Exhibit 8, did you?

10 **A.**   Not at the point -- not at that time.

11 **Q.**   And then if we look at Government Exhibit 10, this is

12 another email that you wrote sort of in the wake of the Canal's

13 adverse reaction; right?

14 **A.**   Correct.

15 **Q.**   And you said that Ms. Martinez had asked "to modify the

16 title and be specific about the fact that we are in the process

17 of scheduling meetings with high-ranking members of the

18 Pan Canal and that those meetings had not yet taken place";

19 right?

20 **A.**   Correct.

21 **Q.**   And you didn't say in this letter, "Wow.  My reputation is

22 really in the dumpster over there.  I'm not really going to get

23 these meetings," did you?

24 **A.**   It wasn't in the dumpster yet, but it's starting to get

25 there.

1  **Q.**  You didn't say it was starting to get in the dumpster, did

2  you?

3  **A.**  No, I didn't.

4         **MR. SHEPARD:**  And then if we can go to Defense

5  Exhibit 2594, just for the witness and the parties, please, and

6  of course Judge Seeborg.  Sorry.

7  **Q.**  Take a moment to look at that and confirm for me that

8  that's an email that you wrote in this same time period.

9  **A.**  Yes, it is.

10        **MR. SHEPARD:**  I offer Exhibit 2594.

11        **MR. HIGHSMITH:**  Objection.  It's hearsay.

12        **THE COURT:**  So what's it being offered -- what's

13  the --

14        **MR. SHEPARD:**  It's further impeaching of the witness.

15        **MR. HIGHSMITH:**  You can't admit --

16        **THE COURT:**  Well, I don't think you can admit it.  If

17  there's something in here, you can use it for impeachment, but

18  it's not admitted.  So...

19        **MR. SHEPARD:**  Okay.

20  **Q.**  Rather than saying your reputation with the Canal was

21  headed into the dumpster, you wrote -- and, by the way, this --

22  just to set the groundwork -- sorry, I got ahead of myself

23  here.

24        You sent a suggestion to Mr. Abramoff and to

25  ceo@amlbitcoin.com, "Subject:  Suggested Article"; correct?

1    **A.**    Yes.

2    **Q.**    And in that suggested article, you didn't say, "My

3    reputation is headed to the dumpster."  You said that you will

4    soon be conferring with Francisco Miguez, Vice President of

5    Finance at the Panama Canal, about implementing an e-payment

6    process for the AML BitCoin with the Canal for payment of

7    transit fees; right?

8    **A.**    Correct.

9    **Q.**    That's what you told Mr. Andrade and Mr. Abramoff on

10   November 11th, a few days after the Panama Canal had an adverse

11   reaction to the press release; correct?

12   **A.**    Correct.

13   **Q.**    Now, let's go over to Government Exhibit 1514.  And you

14   were asked some questions about this by Mr. Highsmith also, and

15   I'll try not to backtrack through those.

16       As Mr. Highsmith was asking you about this and,

17   thereafter, he put up Exhibit 515 that said there were no

18   meetings with the Canal.

19           **MR. HIGHSMITH:**  Objection, Your Honor.  That misstates

20   515.

21           **THE COURT:**  Well, again, he can clarify it.

22       Finish your question.

23   **BY MR. SHEPARD:**

24   **Q.**    So you said to Mr. Andrade and to Mr. Abramoff in

25   Government Exhibit 1514, [as read]:

1          ". . . I am in the process" --

2     I'm sorry.  Let me start at the beginning of the sentence.

3          **MR. SHEPARD:**  This is just above the single-line

4     paragraph that says "Banco Nacional de Panama (BNP)."  Right

5     above that, that paragraph, if we could blow that up.

6     **Q.**   [As read]:

7          "As far as having the meeting with PCA" --

8     That's a reference to the Panama Canal Authority; correct?

9     **A.**   Yes.

10    **Q.**   [As read]:

11         "As far as having the meeting with PCA, I am in

12         the process of coordinating the meeting with

13         Francisco Miguez, VP Finance, but I need to know when

14         you and your technical team would be able to travel

15         to Panama."

16    Right?

17    **A.**   Correct.

18    **Q.**   So you were forecasting that you would be able to have a

19    meeting at the Panama Canal.  You were hoping that the

20    technical team would be present for it; correct?

21    **A.**   Correct.

22    **Q.**   And here again, you didn't say, "My reputation there is

23    heading into the dumpster"; right?

24    **A.**   We haven't gotten to that point yet.

25    **Q.**   Well, you just said a few minutes ago that it had, but

1  if -- that's okay.

2      You also said there was a second trip that Mr. Andrade

3  took; correct?

4  **A.**   Yes.

5  **Q.**   And I think you, correctly, I think, approximated that in

6  December of 2017; correct?

7  **A.**   I think so, yes.

8  **Q.**   And that time, Mr. Abramoff joined him; correct?

9  **A.**   Yes.

10 **Q.**   And people came from London to do the technical

11 presentation that you had asked for; correct?

12 **A.**   It was one person, yes.

13 **Q.**   Okay.  It wasn't Mr. Andrade who did the technical

14 presentation.  It was somebody from London; correct?

15 **A.**   Correct.

16 **Q.**   And what you were -- the reason you were asking for the

17 technical presentation was you thought it would be effective in

18 helping to persuade people that they should accept AML BitCoin;

19 correct?

20 **A.**   The potential client was asking for it.

21 **Q.**   So made it extra potentially helpful to be able to do it;

22 correct?

23 **A.**   Yes.

24 **Q.**   And so either Mr. Andrade or Mr. Abramoff or somebody else

25 arranged to have somebody come to do that; right?

DE LA GUARDIA - CROSS / SHEPARD

1   **A.**   Yes.

2   **Q.**   And it turned out that it didn't work as well as people

3   anticipated when they arranged to bring the person out from

4   London; right?

5   **A.**   Correct.

6   **Q.**   And if I understood you on direct examination, at that

7   point you had concerns about continuing to work with

8   Morgan & Morgan on behalf of AML BitCoin; correct?

9   **A.**   Correct.

10  **Q.**   But you did, in fact, continue to work with

11  Morgan & Morgan on behalf of AML BitCoin, didn't you?

12  **A.**   Yes.

13  **Q.**   And after the meeting, there was enough interest by

14  Morgan & Morgan that there were discussions of sending a

15  non-disclosure agreement and a memorandum of understanding;

16  correct?

17  **A.**   Correct.

18  **Q.**   And those are sort of preliminary steps to a potential

19  business deal; right?

20  **A.**   Yes.

21          **MR. SHEPARD:**  And if we can put up just for the

22  witness, the Court, and the parties Exhibit 2599.

23  **Q.**   Mr. De La Guardia, does this appear to be an email that

24  you sent to people at Morgan & Morgan copying, among others,

25  Mr. Abramoff and ceo@amlbitcoin.com?

 1    **A.**    Correct.

 2            **MR. SHEPARD:**  I offer Exhibit 2599.

 3            **MR. HIGHSMITH:**  It's hearsay again, Your Honor.

 4            **MR. SHEPARD:**  It's not.  It's an event, Your Honor.

 5            **THE COURT:**  Well, so you're not -- you're introducing

 6    it for what --

 7            **MR. SHEPARD:**  I'm introducing it --

 8            **THE COURT:**  -- relevant purpose?

 9            **MR. SHEPARD:**  I'm sorry.  I didn't mean to interrupt.

10            **THE COURT:**  What relevant purpose?

11            **MR. SHEPARD:**  It shows that, in fact, this witness did

12    continue to work with Morgan & Morgan on behalf of AML BitCoin

13    and that Morgan & Morgan was continuing to express interest in

14    AML BitCoin.

15            **MR. HIGHSMITH:**  Just two things.  Number one, if he's

16    impeaching, it's extrinsic evidence.

17        Number two, it's not inconsistent with his testimony

18    because he said in mid-December they had this meeting.

19            **THE COURT:**  Well, I'm not going to have you argue that

20    point.

21        I will admit it at this point.

22        (Trial Exhibit 2599 received in evidence.)

23            **MR. SHEPARD:**  Okay.  So we can now display it to the

24    jury, and we can, just for now, highlight the first -- the

25    first line of text after "Dear Eduardo."

1  **Q.**  [As read]:

2          "Thanks so much for your time and interest in

3       our DTN Network.  As discussed, Richard will be

4       preparing and sending an NDA later today."

5       Do you see that?

6  **A.**  Yes, I do.

7  **Q.**  And just to make sure that it's easier to follow along,

8  DTN network was another name for CrossVerify, the people in

9  London who were working on the biometric identification piece

10  of AML BitCoin; correct?

11  **A.**  Correct.

12  **Q.**  And "Richard" is a reference to Richard Naimer; correct?

13  **A.**  Correct.

14  **Q.**  And he was also present?

15  **A.**  Yes, he was present in the meetings.

16  **Q.**  Was he the person who did the presentation?

17  **A.**  No.

18  **Q.**  Or was that some -- so there were two people from London

19  who came; correct?

20  **A.**  No.  One from London, I don't remember his name, and

21  Richard came from Israel.

22  **Q.**  Okay.  Oh, you're right.  Richard is from Israel.

23  **A.**  Correct.

24  **Q.**  But did you know that he was working in London at the

25  time, working on CrossVerify?

1   **A.**   I don't remember that.

2   **Q.**   Okay.  Fair enough.

3        And it says [as read]:

4            ". . . Richard will be preparing and sending an

5        NDA later today."

6        "NDA" stands for non-disclosure agreement?

7   **A.**   Correct.

8   **Q.**   That's when a company has technology that it considers

9   proprietary, if it wants to have a discussion with somebody

10  else, there's frequently a non-disclosure --

11           **MR. HIGHSMITH:**  Objection, Your Honor.

12  **BY MR. SHEPARD:**

13  **Q.**   -- agreement; correct?

14           **MR. HIGHSMITH:**  It's a bit of testifying into the

15  record rather than asking questions.

16           **THE COURT:**  Why don't you just ask him what his

17  understanding of an NDA is.

18           **MR. SHEPARD:**  Okay.

19  **Q.**   What is your understanding of an NDA?

20  **A.**   A non-disclosure agreement to keep information

21  confidential.

22  **Q.**   So some technology company wants to share information in

23  the course of business discussions, they ask for an NDA;

24  correct?

25  **A.**   Yes.

1   **Q.**  And you continued to be rather bullish on the possibility

2   of getting something done with Morgan & Morgan and the Panama

3   Ship Registry, didn't you?

4   **A.**  No.

5           **MR. SHEPARD:**  Could we show to the witness,

6   the Government, and the Court, Exhibit 2160, please.

7   **Q.**  Have you had a chance to look at that?

8   **A.**  (Witness examines document.)  It doesn't say anything,

9   what I have on the screen.

10          **MR. SHEPARD:**  I'm sorry.  Do we have a hard copy I can

11  provide, 21- --

12          **THE WITNESS:**  Now I can see it.

13  **BY MR. SHEPARD:**

14  **Q.**  Oh, okay.  Great.  Thank you.

15      This appears to be a text chain between you and

16  Mr. Abramoff; correct?

17  **A.**  Yes.

18  **Q.**  And does it appear to be an accurate rendition of a text

19  chain between you and Mr. Abramoff in June of 2018?

20  **A.**  Yes.

21          **MR. SHEPARD:**  I offer it.

22          **MR. HIGHSMITH:**  Objection.  Hearsay.

23          **THE COURT:**  You can use it to impeach him, but it

24  doesn't come in.

25          **MR. SHEPARD:**  Okay.  I will just use it to impeach him

1    then.

2          **MR. HIGHSMITH:**  Just one other thing.  I heard you say

3    "June."  What I'm looking at shows December.

4          **MR. SHEPARD:**  Well, you -- I'm sorry.  Let me just --

5    the first page -- no, that's not it.

6          If you can go back to the first page, the first page shows

7    that this is a collection of communications between

8    Mr. Abramoff and the witness from December of 2017 through

9    September of 2018.

10         And we are looking at a page that is page 46 of

11   Exhibit 2160.  That's where I'm going.  And that page relates

12   to communications on June 8th, 2018.

13   **Q.**   And on June 8th, 2018, Mr. Abramoff asked you [as read]:

14               "Was there any progress from your call with them

15          a few days ago?  You told me you were going to be

16          speaking with Morgan & Morgan's Registry guys on

17          Tuesday."

18         And you responded [as read]:

19               "Yes, I did speak with them.  They all agreed

20          this is something Panama Registry needs."

21         Right?

22   **A.**   Yes.

23   **Q.**   And then you added [as read]:

24               "They believe this is a project the government

25          should implement, and they presented the idea to the

1            Panama Maritime Authority (government agency) and

2            they loved it."

3            Right?

4    A.   Yes.

5    Q.   Just a couple of questions on a different subject.

6            I believe I understood you to say on direct examination

7    that you remained friendly with Mr. Abramoff after your days

8    together in Washington, D.C., and you did some work with

9    Mr. Abramoff -- or you discussed work with Mr. Abramoff

10   after -- on two potential deals or deals after your return to

11   Panama in 2013.  Do I have that right?

12   A.   Correct.

13   Q.   And you mentioned a deal involving a pharma company and a

14   deal involving bonds; right?

15   A.   Yes, carbon credits.

16   Q.   I'm sorry.  I didn't under- --

17   A.   Carbon credits.

18   Q.   Carbon credits.  Okay.

19            MR. SHEPARD:  Can we show, just to the witness,

20   the Court, and the Government, Exhibit 2567, please.

21   BY MR. SHEPARD:

22   Q.   Let me know when you've had a chance to just get a sense

23   of what that is.

24   A.    (Witness examines document.)

25   Q.   Have you had a chance to look at it?

1    **A.**    Yes, I did.

2    **Q.**    Okay.  And it reflects a conversation in writing over

3    email --

4    **A.**    Mm-hmm.

5    **Q.**    -- that you and a man named Jack Maple had with

6    Mr. Abramoff about investing in Cuba and a management group to

7    do that; right?

8    **A.**    Correct.

9    **Q.**    So that was another example of your dealings with

10   Mr. Abramoff; correct?

11   **A.**    Yeah.  You could say so, yes.

12   **Q.**    I'm sorry.  I didn't hear that.

13   **A.**    I said yes.

14   **Q.**    Okay.  And related to AML BitCoin, do you remember

15   Mr. Abramoff communicating with you in September of 2017 about

16   Angola adopting AML BitCoin?  Remember that?

17   **A.**    I don't remember exactly.

18        **MR. SHEPARD:**  Could we have Exhibit 3195, just again

19   for the Court, the parties, and the witness first.

20        And if you -- I mean, you're welcome to ask Ed to move it

21   to any page that you would like to see, but I'm going to ask

22   you about material that's sort of at the bottom of the third

23   page.

24        So, Ed, if you could go there and let the witness see

25   that.

**DE LA GUARDIA - CROSS / SHEPARD**

1    **Q.**   And you see there at the bottom, you were telling

2    Mr. Abramoff, in the context of getting AML BitCoin adopted

3    around the world, that you had a contact in Angola that is

4    working on getting us letters?  Correct?

5        I'm sorry.  That's --

6          **MR. SHEPARD:**  Ed, you've blown up the wrong piece.  Do

7    you want to go down --

8          **THE WITNESS:**  Yeah, I think so.

9          **MR. SHEPARD:**  I'm sorry.  Let me help get this right.

10       If you go to the -- not the large box at the top, but the

11    small box in the middle of the page that begins "Jack."  Yeah.

12    **Q.**   Do you see that?  You were saying to Mr. Abramoff that you

13    had a contact in Angola who was working on getting letters;

14    right?

15    **A.**   Yes.

16    **Q.**   And Mr. Abramoff responded with a picture of some Angolan

17    money; right?

18    **A.**   I suppose so, yeah.  I can read that.

19    **Q.**   Okay.  Who were you talking to in Angola?  Do you

20    remember?

21    **A.**   There's a company that has contracts with the Government

22    of Angola.

23    **Q.**   Okay.  And you had a connection there from your --

24    **A.**   Yes.

25    **Q.**   -- diplomatic days?

1   A.   Well, they -- they -- they also have projects in Panama,

2   and I have helped them before.

3   Q.   Okay.  You were asked some questions about creating noise

4   through press releases.  Do you remember that?

5   A.   Yes.

6   Q.   That's what companies do.  They try to create noise so

7   that people will notice their product; correct?

8   A.   Correct.

9   Q.   There's nothing wrong with that as long as people believe

10  that what is being said is accurate; right?

11  A.   Correct.

12  Q.   And you were bullish at the beginning -- before the

13  presentation in December, you were bullish about the

14  possibilities of AML BitCoin in Panama, weren't you?

15  A.   Oh, yes.

16  Q.   And you let Mr. Abramoff and Mr. Andrade know that;

17  correctly --

18  A.   Mm-hmm.

19  Q.   -- correct?

20       And especially after Catin Vasquez got on board; correct?

21  A.   Correct.

22  Q.   So when you were first introduced by Mr. Abramoff

23  virtually to Mr. Andrade, you recalled Mr. Abramoff describe

24  Mr. Andrade as brilliant?

25  A.   Yes.

DE LA GUARDIA - CROSS / SHEPARD

1  Q.   In fact, you and Mr. Abramoff thought he was a lamebrain;
2  right?

3  A.   What is a lamebrain?

4        MR. SHEPARD:  So if we can -- let me see if I have the
5  right exhibit number for this.

6        I think it's Exhibit 896, which I believe is in evidence.
7  Let's make sure.

8        And then, Ed, if you can call it up.  You don't think so?
9  This is Government Exhibit 896.

10                     (Pause in proceedings.)

11        MR. SHEPARD:  Apparently, we're not sure it's been
12  admitted.  My records were perhaps optimistic, so I won't ask
13  to publish it to the jury at this time.

14        THE COURT:  All right.

15  BY MR. SHEPARD:

16  Q.   But do you remember you communicating with Mr. Abramoff
17  and Mr. Abramoff telling you that Marcus is a lamebrain?

18  A.   He probably wrote it, but I don't understand the term
19  because English is my second language.

20  Q.   Understood.

21        But you didn't respond to him by saying, "I don't know
22  what that means," did you?

23  A.   Correct.

24  Q.   And instead, in response to him saying Mr. Andrade is a
25  lamebrain, you said [as read]:

1              "He has shown his [ugly] face down here dressing

2         like a clown and it's my image, contacts, and

3         reputation."

4         Right?

5    A.   Correct.

6    Q.   And you said to Mr. Abramoff -- and this is in January of

7    2018 after the second meeting at Morgan & Morgan -- you said

8    [as read]:

9              "I mean, they love it, but they make me feel

10        like they are being very cautious with Marcus."

11        Right?

12   A.   Right.

13   Q.   And you added, "His judgment is," apologies, "F-word up";

14   right?

15   A.   Correct.

16   Q.   And around that same time, you asked Mr. Abramoff why

17   Mr. Andrade was doing something, and Mr. Abramoff responded

18   [as read]:

19             "Because he's a fucking idiot.  He's not backing

20        down."

21        Right?

22   A.   He was doing what?  I don't -- where is that?  It's not on

23   the screen.

24   Q.   Okay.  I've got to get a different thing to put on the

25   screen for you.  But do you remember -- apart from whether you

1    see it or not, do you remember that exchange?

2    **A.**    No, I don't.

3         **MR. SHEPARD:**    Okay.  Then let's get that one.

4         While we're finding that for you, let me go on to

5    Exhibit 3175.  That one, I have the number for, so let's go

6    there.

7         And, Ed, will you put that on the screen for

8    the Government, the witness, and the Court.

9    **Q.**    Do you recognize this one?

10   **A.**    Yes, I do.

11   **Q.**    And this is where you referred to Mr. Andrade as

12   "Grimace," the McDonaldland character?

13   **A.**    Yes.

14   **Q.**    The one that I was asking you about earlier is

15   Exhibit 3179.

16        **MR. SHEPARD:**    Ed, if we can get that on the screen.

17   Thank you, Dainec.

18   **Q.**    Do you see that?

19   **A.**    Yes, I do.

20   **Q.**    And does that remind you that Mr. Abramoff called Marcus a

21   "fucking idiot"?

22   **A.**    I don't see it here on this.

23        Oh, here it is, yes.  Because he's a fucking, yeah, idiot.

24   **Q.**    Top right.  Do you remember that?

25        **MR. HIGHSMITH:**    Your Honor, I'm going to object.  This

1    is hearsay.

2        **THE COURT:**  Sustained.

3        The question -- I don't know why counsel are getting so

4    wrapped up in the documents.  The question is:  Do you remember

5    X?  Yes.  No.  If you don't remember it, then you show him

6    something to refresh.  And instead, both counsel are putting

7    documents up which are not being admitted into evidence and

8    reading documents.  That's not the way to do it.

9        So going forward, you first ask the question.  Maybe the

10   witness will remember and we don't have to go through all these

11   documents.  So let's do that.

12       **MR. SHEPARD:**  Thank you, Your Honor.  I will.

13       **THE COURT:**  You're welcome.

14       **MR. SHEPARD:**  I thought I did that, and he said he

15   didn't remember, and that's why I got the document.

16       **THE COURT:**  Sometimes.  Once in a while that's

17   happened, but not most of the time.

18       **MR. SHEPARD:**  Okay.  I happened to get it this time,

19   though.  Thank you.

20       **THE COURT:**  Good.

21       **MR. SHEPARD:**  I will do it the other way next time.

22       **THE COURT:**  And while we're sort of having a colloquy,

23   do any jurors need a break?  Because we're barreling ahead, I'd

24   like to get to 1:30; but also at any point between now and

25   1:30, if somebody wants a break, raise your hand because I know

**DE LA GUARDIA - CROSS / SHEPARD**

 1  we're going probably a little longer without breaks than we

 2  have before.

 3       You need one now?  Would now be a good time?  Okay.

 4       Let's take a break.  Let's keep it to about ten minutes.

 5  And remember my admonitions, don't discuss this amongst

 6  yourselves or with anyone else.

 7       See you in ten minutes.

 8                    (Recess taken at 12:31 p.m.)

 9                 (Proceedings resumed at 12:42 p.m.)

10       (Proceedings were heard in the presence of the jury.)

11            **THE COURT:**  Mr. Shepard.

12            **MR. SHEPARD:**  Thank you, Your Honor.

13  **Q.**   Coming back to the communications you were having with

14  Mr. Abramoff following him calling Marcus a "fucking idiot,"

15  you remember he told you that Marcus was going to call you and

16  you should pretend you know nothing and hear him out and then

17  tell him what a problem it will be with Morgan & Morgan?

18  Remember that?  It's in the middle of the page if you're

19  looking for it.  It's at 8:09:05.

20  **A.**   (Witness examines document.)

21  **Q.**   8:09:05, yes.  It's toward the bottom of what's currently

22  on the screen.

23       Does that help you remember that Mr. Abramoff told you

24  that Marcus was going to call you and that you should

25  pretend --

 1          **THE COURT:**  Why don't you just ask him whatever the

 2    question is?  What did he tell you?  What did they -- and then

 3    if he doesn't remember, then you -- don't just read documents

 4    that are not in evidence.  Okay?

 5          **MR. SHEPARD:**  Okay.

 6    **Q.**   Do you remember Mr. Abramoff telling you that Marcus is

 7    going to call you?

 8    **A.**   No.

 9    **Q.**   Do you remember that?

10    **A.**   I didn't remember.

11    **Q.**   Okay.  Then you remember that Mr. Abramoff told you to

12    pretend you know nothing and hear him out and then tell him

13    what a problem it will be with Morgan & Morgan?  Do you

14    remember that?

15    **A.**   I don't remember.

16    **Q.**   Okay.  Do you see in front of you Exhibit 3179?  Does that

17    refresh your recollection that that's what Mr. Abramoff said to

18    you?

19    **A.**   Not really.  I mean, so many documents.

20    **Q.**   Okay.  And he said a number of things like that to you, so

21    it's hard to keep them all together --

22    **A.**   Yeah, but this in particular --

23    **Q.**   -- correct?

24    **A.**   -- I don't remember.

25          **MR. SHEPARD:**  Okay.  One other one, and this is back

1    to Exhibit 896.  Again, I don't think that's in evidence so do

2    not display it.

3    Q.   This is a conversation that you had in January of 2018,

4    and you remember expressing concern about Marcus and his

5    judgment; correct?

6    A.   Yes, sir.

7    Q.   And Mr. Abramoff said don't be --

8         THE COURT:  He answered your question.

9         MR. SHEPARD:  Yes.  I'm now moving on to the next one.

10        THE COURT:  Now, you don't just read the document to

11   him.

12        MR. SHEPARD:  I'm -- okay.  I'm asking him now.

13        THE COURT:  And he answered it.

14        MR. SHEPARD:  No.  I'm -- that was one question.  He

15   answered it.  I'm now going on to a second one.

16        THE COURT:  Not the document.  What's your question?

17        MR. SHEPARD:  Yeah.

18   Q.   My question is:  After you questioned Mr. Andrade's

19   judgment, Mr. Abramoff told you you don't need to be worried

20   about that?

21        MR. HIGHSMITH:  Objection.

22        THE COURT:  Well, he can ask -- he can ask leading

23   questions, so he can ask that question.

24        Go ahead.

25   \\\

1    BY MR. SHEPARD:

2    **Q.**    Mr. Abramoff told you you don't need to be worried about

3    that; correct?

4    **A.**    Yes.

5    **Q.**    And the reason he gave you for not being worried about it

6    is that Richard Naimer and Mr. Abramoff were taking over

7    rapidly; right?

8    **A.**    That's what it says.  I had nothing to do with that.

9    **Q.**    No.  I'm not -- I'm not saying you had something to do

10    with it.  This is what Mr. Abramoff was telling you; right?

11    **A.**    That's what it says on the document, but I don't remember

12    all this bunch of information.  It's just too much material.

13         **MR. SHEPARD:**  I don't have anything further,

14    Your Honor.  Thank you.

15         **THE COURT:**  All right.

16    Mr. Highsmith.

17         **MR. HIGHSMITH:**  Very briefly.

18                     **REDIRECT EXAMINATION**

19    BY MR. HIGHSMITH:

20    **Q.**    Mr. Andrade was on the ground in Panama in mid-September

21    2017; correct?

22    **A.**    Yes.

23    **Q.**    He was at the meetings with Morgan & Morgan and the Panama

24    Maritime Authority; correct?

25    **A.**    Yes.

1   **Q.**   In September, was Jack Abramoff at those meetings?

2   **A.**   No.

3   **Q.**   No.  Did you and Mr. Andrade discuss the meetings after

4   they took place?

5   **A.**   Yes, we did, especially with Morgan & Morgan, the first

6   one.

7   **Q.**   Okay.  Let's talk about Morgan & Morgan.

8        Morgan & Morgan is a private law firm; correct?

9   **A.**   Yes.

10  **Q.**   It is an important law firm; correct?

11  **A.**   Yes.

12  **Q.**   A very powerful law firm.  But it is not a public

13  governmental entity; correct?

14  **A.**   That is correct.

15  **Q.**   Okay.  So let's be very clear about this.  Did you ever

16  have an official meeting with the Panama Canal about

17  implementing AML BitCoin?

18  **A.**   The answer is no.

19  **Q.**   Did you ever bring the AML BitCoin demo or product and

20  display it to anyone at the Panama Canal?

21  **A.**   No.

22  **Q.**   Counsel showed you an email -- or a text message, a

23  communication about you talking to Morgan & Morgan.

24       Did Morgan & Morgan, the private law firm, ever enter into

25  a deal with AML BitCoin?

1    **A.**    No.

2    **Q.**    When Mr. Catin left the AML BitCoin project, was that a

3    big deal to you?

4    **A.**    Yes, it was, because I introduced the project to him.  He

5    seemed excited at the beginning, and I could just notice

6    gradually how his interest was disappearing.

7    **Q.**    You testified on direct that after Mr. Catin left,

8    Mr. Andrade, his lawyer sent a strong letter --

9    **A.**    A letter.

10   **Q.**    -- to Mr. Catin.

11   **A.**    Correct.

12           **MR. SHEPARD:**  Objection.  This is beyond the scope of

13   cross and just repeating the direct.

14           **MR. HIGHSMITH:**  May I have one more question?

15           **THE COURT:**  One more question.

16   **BY MR. HIGHSMITH:**

17   **Q.**    When you and Mr. Abramoff were exchanging strongly worded

18   messages about Andrade, was some of that related to

19   Mr. Andrade's reaction to Mr. Catin leaving?

20   **A.**    Absolutely.

21           **MR. HIGHSMITH:**  No further questions.

22           **MR. SHEPARD:**  Nothing further.

23   Thank you.

24           **THE COURT:**  You may step down.

25                          (Witness excused.)

CARLSEN - DIRECT / HIGHSMITH

```
 1              MR. HIGHSMITH:  Your Honor, the United States calls
 2     Evan Carlsen.
 3       (Witness enters the courtroom and steps forward to be sworn.)
 4              THE COURT:  You can come forward to the witness stand
 5     to be sworn.
 6              THE COURTROOM DEPUTY:  Please raise your right hand.
 7                            EVAN CARLSEN,
 8     called as a witness for the Government, having been duly sworn,
 9     testified as follows:
10              THE WITNESS:  I do.
11              THE COURTROOM DEPUTY:  Please be seated.
12          Can you state your name and spell your last name, please.
13              THE WITNESS:  Yeah.  It's Evan Carlsen, E-v-a-n,
14     C-a-r-l-s-e-n.
15                          DIRECT EXAMINATION
16     BY MR. HIGHSMITH:
17     Q.   Where are you from, Mr. Carlsen?
18     A.   Southern California, Los Angeles.
19     Q.   What do you do for work?
20     A.   Software engineer.
21     Q.   How long have you been a software engineer?
22     A.   25-plus years.
23     Q.   Who do you work for now?
24     A.   I'm self-employed.
25     Q.   Like, are you a consultant or --
```

1  **A.**    Yeah.

2  **Q.**    You're a software consultant?

3  **A.**    Yes.

4          **A JUROR:**  Judge?

5      Would you speak up, please?

6          **THE COURT:**  Yes.  Can you move your microphone closer?

7          **THE WITNESS:**  I wasn't sure if I was speaking too

8  loudly or not.

9          **THE COURT:**  We'll tell you if that's the case.  But

10 speak right into the microphone.

11     Go ahead, Mr. Highsmith.

12         **MR. HIGHSMITH:**  Thank you, Your Honor.

13 **Q.**    Sir, you're currently a software consultant.  What did you

14 do before your current position?

15 **A.**    I was the vice president of product solutions for a

16 company called Crowdbotics.

17 **Q.**    Was that also software development?

18 **A.**    Mm-hmm.

19 **Q.**    And did you supervise a team there?

20 **A.**    Yep.

21 **Q.**    Before -- was it Carbotics?

22 **A.**    Crowdbotics.

23 **Q.**    Say again.

24 **A.**    Crowdbotics.

25 **Q.**    Crowdbotics.  Before Crowdbotics, where did you work?

1    **A.**   I did some independent work, essentially kind of

2    consulting as well.

3    **Q.**   Did your consulting company have a name?

4    **A.**   WeCode.

5    **Q.**   Did you work with Mr. Andrade?

6            **THE COURT:**  They're still having trouble.  Can you

7    really try to keep your voice up and maybe get even closer.

8            **THE WITNESS:**  Try this one.  Better?  Okay.

9            **THE COURT:**  Okay.  Go ahead.

10   **BY MR. HIGHSMITH:**

11   **Q.**   Did you work for Mr. Andrade?

12   **A.**   Yes, as a contract, late 2018, 2019.

13   **Q.**   All right.  Let's continue back in time.

14        When did you first start working for Mr. Andrade for the

15   first time?

16   **A.**   First time was via a patent attorney for a patent that he

17   was trying to write or writing for Marcus's team.

18   **Q.**   Approximately when were you working with that patent

19   attorney?

20   **A.**   Late 2017, early 2019 -- or 2018.  Sorry.

21   **Q.**   Okay.  And describe briefly the work you were doing there.

22   **A.**   Essentially reviewing the concepts and the ideas, working

23   with the patent attorney, and then working with Marcus and team

24   to document that in a way that the patent attorney could then

25   patent it.

CARLSEN - DIRECT / HIGHSMITH

1  Q.   What was the idea you were working on?

2  A.   It was related to identity and the blockchain for

3  financial transactions for bitcoins.

4  Q.   Okay.  Was the idea patenting a cryptocurrency that had

5  biometric identity tied to its blockchain?

6  A.   Effectively, yeah.

7  Q.   Was the point that that cryptocurrency would be acceptable

8  to banks?

9  A.   Yeah.  It was AML complaint in that respect.  It had

10  higher anti-money laundering than currently was available.

11  Q.   And you're talking about the idea, or are you talking

12  about a finished, complete product?

13  A.   Concept.

14  Q.   A concept.

15  A.   Yeah.

16  Q.   At that point did you have any idea about whether

17  Mr. Andrade had a complete, finished product?

18  A.   No, not at that point.

19  Q.   Did Mr. Andrade tell you the name of his product at that

20  point?

21  A.   No.

22  Q.   Did you learn what the name of his earliest product was?

23  A.   Yeah.  It was AML -- it was AML BitCoin, but he called it

24  Aten Coin or BlackCoin.

25  Q.   Okay.  And what was your understanding of what Aten Coin

1  or BlackCoin did in terms of its features?

2  **A.**   It was a dual-signed coin, effectively.

3  **Q.**   What is a dual-signed coin?

4  **A.**   The company signed as well as the individual that was

5  conducting the transaction.

6  **Q.**   Is that for security purposes?

7  **A.**   Yeah, and somewhat for identification purposes.

8  **Q.**   Okay.  Is that very different than a regular Bitcoin

9  cryptocurrency?

10  **A.**   Other than the second signature, not really.

11  **Q.**   You testified that you stopped working with the patent

12  attorney sometime in 2018.  Do you remember approximately what

13  month that was?

14  **A.**   April roughly.

15  **Q.**   After you stopped working for the patent attorney, did

16  Mr. Andrade reach out to you?

17  **A.**   He did.

18  **Q.**   What did he say?

19  **A.**   He asked me to put together a proposal to build the

20  Bitcoin or the AML BitCoin based on the patent that we helped

21  draft.

22  **Q.**   Based on your conversation with Mr. Andrade, did you

23  understand -- what did you understand about his cryptocurrency

24  being finished and built?

25  **A.**   It wasn't.  It was just the beginnings parts of it.

1  **Q.**   And what was your understanding about what Mr. Andrade

2  wanted you to do?

3  **A.**   He wanted me to put together a plan, basically take a look

4  at his preexisting code, i.e., coin; and then from there,

5  tenure, like, the rest of the detail, but come up with a

6  high-level game plan of what it was going to take and what kind

7  of resources and price it was going to cost.

8  **Q.**   To build the product?

9  **A.**   To build it.

10  **Q.**   Did Mr. Andrade tell you anything about an initial coin

11  offering, or an ICO, that he had done?

12  **A.**   He did.   At some point during the conversations, yeah.

13  **Q.**   What did he tell you about that?

14  **A.**   That he had an ICO earlier in the year for an AML token,

15  I believe.

16  **Q.**   Was it your understanding that him asking you to build a

17  product was related to his ICO?

18  **A.**   Directly, yes.

19       **MR. SHEPARD:**  Objection, Your Honor.

20       **THE WITNESS:**  Yes.

21       **MR. SHEPARD:**  His understanding isn't -- I don't know

22  what that gets us.  It's just can we find out what was said to

23  him?

24       **THE COURT:**  Well, overruled.

25       Proceed.

1  BY MR. HIGHSMITH:

2  Q.  What was your under- -- I've forgotten the question.  Let

3  me put it back together.

4      What was your understanding at that point about the

5  relationship between the initial coin offering and Mr. Andrade

6  asking you to build him a product?

7  A.  That was to build the product that the ICO had effectively

8  sold; right?

9  Q.  So your understanding was your job was to build the

10 product that the ICO had sold?

11 A.  Yes.

12 Q.  What happened next?

13 A.  We -- I put together a proposal and passed it along to

14 Marcus and Terence for review.

15 Q.  And is that what he asked you to do?

16 A.  Mm-hmm.

17      MR. HIGHSMITH:  Can we take a look at Exhibit 91,

18 please, and just zoom in on the top.

19 Q.  Is this your email to Mr. Andrade and Mr. Poon?

20 A.  Yeah.

21 Q.  And it's got -- it has two attachments to it; is that

22 right?

23 A.  Yep.  Yes.

24      MR. HIGHSMITH:  Your Honor, I move to admit 91.

25      MR. SHEPARD:  No objection.

1     **THE COURT:**  91 will be admitted.

2     (Trial Exhibit 91 received in evidence.)

3     **MR. HIGHSMITH:**  Thank you, Your Honor.

4     Can we publish that to the jury, please.

5  **Q.**  All right.  So you testified that you emailed your -- did

6  you create a presentation for Mr. Andrade?

7  **A.**  I did.

8  **Q.**  Okay.  And did you email that to him?

9  **A.**  I did.

10  **Q.**  And is that what you're doing here on May 10th, 2018?

11  **A.**  That is correct.

12     **MR. HIGHSMITH:**  Can we show the witness Exhibit 92,

13  please.

14  **Q.**  Is this the project you put together for Mr. Andrade?

15  **A.**  It is.

16     **MR. HIGHSMITH:**  Move to admit Exhibit 92, Your Honor.

17     **MR. SHEPARD:**  No objection.

18     **THE COURT:**  92 will be admitted.

19     (Trial Exhibit 92 received in evidence.)

20     **MR. HIGHSMITH:**  Thank you.

21     Can we publish this, please.

22  **Q.**  Did you present this to Mr. Andrade?

23  **A.**  I did.

24  **Q.**  Did you do it in person?  Did you do it over

25  videoconference?  How did you make the presentation?

CARLSEN - DIRECT / HIGHSMITH

1   **A.**    I don't recall the exact methods, but it may have been

2   video; it may have been voice call.

3   **Q.**    Did you go through these slides with him?

4   **A.**    I believe so, yes.

5   **Q.**    Let's take a look at some of these slides.  So you put

6   this together and gave the presentation sometime around

7   May 10th; is that correct?

8   **A.**    In that time range, yeah.

9   **Q.**    Can we please take a look at page 2.

10      What was the -- what was your project?  What were you

11  communicating to Mr. Andrade?

12  **A.**    So essentially, what it was, was, the basis of it was to

13  review the Aten Coin current code and look at doing a migration

14  of it or rebuild of it in a later Bitcoin version.  So you'll

15  see the core Version .160.  So that's referring to the

16  build-out.

17  **Q.**    So you were going to take his Aten Coin and build

18  something on top of that; is that accurate?

19  **A.**    Salvage what I could from it.

20  **Q.**    Salvage what you could from what?

21  **A.**    From that earlier version.

22  **Q.**    Why do you use -- why do you say "salvage"?

23  **A.**    Anything that was useful, if there was any use of it.

24  **Q.**    Okay.  At that point, did you understand that Mr. Andrade

25  had a cryptocurrency with biometric identifiers built into the

1   blockchain?

2   **A.**   No.  There was nothing existing.

3   **Q.**   Do you mind just pulling it a little closer, please?

4   Thank you.

5          **A JUROR:**  I think what would help is if you slow down

6   a bit because you're a quick talker.

7          **THE WITNESS:**  Okay.

8          **A JUROR:**  Thank you.

9          **THE WITNESS:**  Will do.

10         **MR. HIGHSMITH:**  All right.  Can we turn, please, to

11  page 7 of the project.

12  **Q.**   All right.  Did you provide Mr. Andrade with cost

13  estimates for what you thought it would cost in terms of both

14  personnel and money to build the product he wanted?

15  **A.**   Yes.

16  **Q.**   Okay.  So can you describe, please, at a high level, your

17  estimates here under the "Cost Estimate" slide.

18  **A.**   So essentially, it was putting together the key staff that

19  we would need in order to build the product at various stages;

20  offices that were needed; equipment, servers and such that were

21  needed to host and provide the infrastructure for it.

22  **Q.**   And do you -- what was your -- what was your cost estimate

23  at a general level?

24  **A.**   At a thumb, it was a million-ish.

25  **Q.**   And approximately how many people would be needed to

CARLSEN - DIRECT / HIGHSMITH

1   implement this project?

2   **A.**    I think there was roughly around eight people.

3   **Q.**    Okay.  And you would lead those efforts?

4   **A.**    Yeah.

5   **Q.**    Let's go to the next page, page 8.

6         Did you provide a breakdown of the budget for different

7   aspects of the project?

8   **A.**    I did.

9   **Q.**    All right.  Let's actually go back to page 3, please.

10        So in terms of the product scope, can you describe at a

11  high level, please, what was the work that you were seeking to

12  accomplish?

13  **A.**    So the work accomplished kind of stated -- as stated

14  there, is to build an AML BitCoin platform based on the latest

15  version, which at that time was .16, and leverage the DTN, or

16  Digital Trust Network, identify verification tools.

17  **Q.**    Let's break that down a little bit.

18        You're supposed to create the AML BitCoin platform.

19  What's the Bitcoin core?

20  **A.**    That's the -- basically the free source that Bitcoin

21  provides as an offering for people to basically spin their

22  coins off of, generate, create them.

23  **Q.**    So it's free, and it's based on regular Bitcoin?

24  **A.**    Yes.

25  **Q.**    When you write "leveraging the Digital Trust Network,"

CARLSEN - DIRECT / HIGHSMITH

1    explain what you meant by that.

2    **A.**    There was a product that Marcus was working with that had

3    an identity blockchain technology tie.

4    **Q.**    And did you know that because you visited that company

5    later on, a few months later?

6    **A.**    Yes.

7    **Q.**    It says under the purpose that the purpose is to exchange

8    the AML token for AML BitCoin once the platform is available.

9    What does that mean?

10    **A.**    So the ICO had given out AML tokens, which were not

11    fungible coins.  They weren't, like, spendable.  But the plan

12    was to basically convert those, so one-for-one, to an

13    AML BitCoin that was AML compliant.

14    **Q.**    Why is it important that the AML BitCoin is AML compliant?

15    **A.**    Because it was going to be potentially leveraged by banks

16    and other institutions to give it legitimacy.

17    **Q.**    Okay.  Let's take a look, please, at page 9.

18        All right.  Is this a listing of the different personnel

19    who would be needed to implement this project?

20    **A.**    Yes.

21    **Q.**    All right.  At that time, what was your understanding --

22    was your understanding that all of these people needed to be

23    brought in to do this work?

24    **A.**    Yes.

25    **Q.**    Let's look at the next page, please.

CARLSEN - DIRECT / HIGHSMITH

1      What was your understanding about how long it would take

2  to build out the product?

3  **A.**   Roughly six to eight months.

4  **Q.**   And you broke it down into different phases?

5  **A.**   Yes.

6  **Q.**   Okay.  Can we take a look at page 11, please.

7       What was the first phase or the first sprint?

8  **A.**   Essentially, information gathering.  So it was looking at,

9  getting access to, and reviewing through the Aten Coin legacy

10  code.

11  **Q.**   What was the purpose of looking at the Aten Coin code?

12  **A.**   Understand it, get an idea of what we could leverage.

13  **Q.**   And does that mean what you could use for the new product?

14  **A.**   Mm-hmm, yes.

15  **Q.**   At that point what was your understanding of the

16  anti-money laundering, know-your-customer features that

17  Aten Coin had?

18  **A.**   It just had the dual signature.  It didn't have any of the

19  compliant things that typically a bank would want to have.

20  **Q.**   So at that point did Aten Coin have the anti-money

21  laundering, know-your-customer features that a bank would need

22  to use it?

23  **A.**   No.

24       **MR. HIGHSMITH:**  Okay.  We can back out of this.

25  **Q.**   After you gave this presentation, did Mr. Andrade follow

CARLSEN - DIRECT / HIGHSMITH

1   up with you?

2   **A.**   Not -- not so much.  He was kind of a little dark for a

3   few months.

4   **Q.**   Okay.  When was the next time you communicated with

5   Mr. Andrade?

6   **A.**   September, something like that.  Late September.

7   **Q.**   And what did he say?

8   **A.**   He took a look at -- he had taken a look at the

9   presentation.  He liked what he saw.  He wanted me to come with

10  him to London on a consulting opportunity for a week to review

11  the Digital Trust Network product and get a -- kind of give an

12  idea of how, you know, it was designed and if it was a good

13  product to be integrated.

14  **Q.**   What did you do next?

15  **A.**   Went to London.

16  **Q.**   Did you get paid for the trip?

17  **A.**   I did.

18  **Q.**   What happened on the trip?

19  **A.**   We took a review.  I talked with some of the lead

20  engineers.  I talked with the leadership there.  And, you know,

21  there was a marketing person from Europe that was there as well

22  who was doing kind of some materials, and Marcus was working

23  with them on the side.

24       And then we were essentially pulled in individually to

25  talk with the marketing person, to give a video presentation

CARLSEN - DIRECT / HIGHSMITH

1   about our thoughts on the product.

2   **Q.**   Did you do that?

3   **A.**   I did.

4   **Q.**   What was your reaction to that?

5   **A.**   I wasn't super thrilled about it.  I didn't like being put

6   on the spot.  You know, I was there to review the product, but

7   I wasn't there to be a spokesman person for it at that point

8   yet.

9   **Q.**   Okay.  Did you learn about the product on that visit?

10  **A.**   A bit, yeah.

11  **Q.**   And on that visit, was the product taking biometric

12  identifiers and storing them?

13  **A.**   Essentially, yes.  They had a bit of a workflow for the

14  starting points of capturing that, so like a registration flow.

15  **Q.**   So you said they had a workflow for the starting points.

16  Did they have a finished product in London?

17  **A.**   No.

18  **Q.**   Describe, please, the state of completion.  Was it, like,

19  almost done?  Was it --

20  **A.**   Demoing.

21  **Q.**   -- halfway done?

22       Was it just in the early stages?

23  **A.**   Early stages.  They were still talking about the

24  Corda Network, which was their blockchain that they were

25  effectively using for -- in Europe.

CARLSEN - DIRECT / HIGHSMITH

1          (Stenographer interrupts for clarification of the record.)

2          **THE WITNESS:**  It's a blockchain that they were using

3 for their storage of the identity.

4 **BY MR. HIGHSMITH:**

5 **Q.**   What happened after that trip?

6 **A.**   I came back.  Marcus and I talked.  He wanted to bring me

7 on to help kind of guide this journey.  So he brought me into a

8 90-day, essentially, contract-to-hire position.

9 **Q.**   Okay.  When you say he brought you in for this journey,

10 was he talking about he brought you in to build a coin that had

11 all the features he had promised?

12 **A.**   Yes.

13 **Q.**   Okay.  And at that point he did not have a coin with the

14 features?

15 **A.**   Not -- not in progress.  I mean, in progress, but not --

16 not finished.

17 **Q.**   Okay.  And you signed a -- were you brought on as a

18 consultant?

19 **A.**   Yes.

20 **Q.**   Was there an understanding that your role would convert to

21 a more formal role later?

22 **A.**   That was my understanding with him, is it was a 90-day

23 commit.

24 **Q.**   Okay.  And what did Mr. Andrade say about that?

25 **A.**   I mean, effectively, I was going to be brought in as a

CARLSEN - DIRECT / HIGHSMITH

1  consultant for 12,500 a month, with the ultimate plan of coming

2  in as CTO Month 3 and at 25K.  So it was effectively 250 per

3  year.

4  **Q.**  "CTO" is chief technology officer?

5  **A.**  Technology officer, yes.

6  **Q.**  All right.  So you would do the consultancy piece for

7  three months and then convert to chief technology officer at a

8  higher salary?

9  **A.**  Yes.

10  **Q.**  Were you given any tokens at that point?

11  **A.**  I think I was.  I don't recall the amount, but I believe

12  there was a wallet and some coins that were -- or tokens that

13  were given to me.

14  **Q.**  Did the wallet have any special security features, to your

15  knowledge?

16  **A.**  No.  It was just the standard, you know, essentially

17  create your password and your backups.

18  **Q.**  Did you ever sell your coins?

19  **A.**  No.

20  **Q.**  Did you get any money out of those coins?

21  **A.**  No.

22  **Q.**  Okay.  So you're brought on.  You're hired as a

23  consultant.  What do you do?

24  **A.**  Well, I mean, I went into the WeWork office that we set up

25  in L.A., and I proceeded to have conversations with Marcus and

CARLSEN - DIRECT / HIGHSMITH

1   Terence and some teams overseas, looking -- reviewing through

2   the Aten Coin code.  Got access to that code base.  Kind of

3   took a look at that.  And then started having more

4   conversations with the folks in the U.K. about how to utilize

5   their product and APIs that we needed.

6   **Q.**   So you -- a couple things you said there.  Number one, you

7   said there were teams overseas.  Was there a team in India?

8   **A.**   Yes.

9   **Q.**   And then there was the team in London.

10      What phase of your work plan was this?  You had several

11  stages in that work plan.  What stage was this?

12  **A.**   Early stage.

13  **Q.**   Was this the first stage?

14  **A.**   Yeah.  They were working to fork the coin and generate

15  the -- so, essentially, take the Version 16, .16, and create an

16  email Bitcoin version the first -- for the start of it.

17  **Q.**   And who are you talking about when you say "they"?

18  **A.**   The India team.

19  **Q.**   Okay.  Let's talk about the India team in a second.

20      Let's just focus on your efforts when you first joined.

21  Approximately what month is it when you start working

22  officially for Mr. Andrade?

23  **A.**   November 2018.

24  **Q.**   Okay.  And you're working on Stage 1, reviewing the

25  Aten Coin?

CARLSEN - DIRECT / HIGHSMITH

1   A.   Mm-hmm.

2   Q.   And that's because there's no AML BitCoin at that point?

3   A.   Yes.

4   Q.   Okay.  Let's focus on the team in India.  What was your

5   understanding of what the team in India was doing?

6   A.   They were trying to be essentially blockchain developers.

7   Q.   For Mr. Andrade?

8   A.   Mm-hmm, yes.

9   Q.   Had he hired them to also build a product?

10  A.   Yes.

11  Q.   And what was your understanding of whether they had built

12  a product or not?

13  A.   They had struggles in progress.  I think that was part of

14  the reason why he wanted to bring somebody in-house.

15  Q.   Are you talking about you specifically?

16  A.   Yes.

17  Q.   Did he tell you specifically one of the reasons he wanted

18  to bring you in was because the team in India was not making

19  progress?

20  A.   Likely, yes.

21  Q.   Well, what did he tell you?

22  A.   That he was -- he wanted me to come in and basically take

23  over the technical stuff for NAC.

24  Q.   Is that because he had been unsuccessful so far?

25  A.   Yes.

1          **MR. SHEPARD:**  Objection.  Calls for speculation.

2          **THE COURT:**  Sustained.

3     **BY MR. HIGHSMITH:**

4     **Q.**   Let's take a look at Exhibit 162, please.

5          Is this an email chain between you and Mr. Andrade?

6     **A.**   Yes.

7          **MR. HIGHSMITH:**  Move to admit, Your Honor,

8     Exhibit 162.

9          **MR. SHEPARD:**  No objection.

10         **THE COURT:**  162 will be admitted.

11         (Trial Exhibit 162 received in evidence.)

12         **MR. HIGHSMITH:**  Thank you.

13         Can we please blow up the top box.

14    **Q.**   What are you talking to Mr. Andrade about here?

15    **A.**   Essentially, the beginnings of Stage -- Stage 2; right?

16    We'd done the review, and now we're looking to start spinning

17    things up to do the full implementation.

18    **Q.**   Okay.  Do you recall who Sachin is?  There's a reference

19    to Sachin in the first sentence.

20    **A.**   Yeah.  Farther down in the email, Sachin is the India team

21    lead.

22    **Q.**   Okay.  And then here it says [as read]:

23         "Set up a meeting with Sachin to revive the

24         original Aten Coin implementation."

25         What was your understanding of what your job was there?

1   **A.**   Well, it didn't technically exist at that point.  I mean,

2   it had code base, but it wasn't -- there was no life in it at

3   the moment.  So it was essentially putting that and doing a

4   side-by-side, like, full comparison.

5   **Q.**   Okay.  Can we go down to the next message, please.

6        And is this Mr. Andrade introducing you to his India team?

7   **A.**   Yes.

8   **Q.**   Why was he introducing you to his India team?

9   **A.**   He wanted me to work with them.

10  **Q.**   To do what?

11  **A.**   To build a coin.

12  **Q.**   All right.  What happened next?

13  **A.**   Continued to work.  Continued to meet with the team over

14  in the U.K.

15  **Q.**   Did you make a second trip to the United Kingdom?

16  **A.**   I did.

17  **Q.**   Okay.  What did you do on that trip?

18  **A.**   That trip was a little more detail conversation, a little

19  bit more verification of their -- the point at which they were

20  in their development, and working with them to get the scenario

21  flows together and documented so that we could effectively

22  draft the APIs that we needed.

23  **Q.**   Okay.  Let's slow down there.

24        You testified earlier the team in London was working on

25  the biometric side; is that correct?

CARLSEN - DIRECT / HIGHSMITH

1    **A.**    Yes.

2    **Q.**    Okay.  Based on your December meeting, had they finished

3    the biometric identification piece?

4    **A.**    They had not.

5    **Q.**    Based on your meetings in London, approximately how far

6    off were they?  Was it something that was -- did you have an

7    understanding of how far off they were before being finished?

8    **A.**    Six to eight months, something like that.

9    **Q.**    Was your job to integrate the biometric identification

10   piece into the AML BitCoin blockchain?

11   **A.**    Yeah.  And it was to tie it in with the wallet primarily

12   for capture.

13   **Q.**    Okay.  After you came back from London, did you attempt to

14   implement this plan?  Did you attempt to integrate the

15   biometric piece into the AML BitCoin software?

16   **A.**    Yeah.  I was working with the team there.

17   **Q.**    Okay.  Did you finish it?  Did you successfully do that?

18   **A.**    No.  We were still -- there was delays and other things,

19   so I was having trouble getting -- kind of getting motion on

20   some things.

21   **Q.**    You went to the U.K. for the second time in December 2018.

22   Did you end up leaving AML BitCoin in January 2019?

23   **A.**    Effectively, yeah.

24   **Q.**    Why?

25   **A.**    I didn't get paid in full.  So there were financial

CARLSEN - DIRECT / HIGHSMITH

1  reasons.  The company was struggling for funding.

2  **Q.**  Did you ask to get paid from -- did you ask Mr. Andrade to

3  pay you?

4  **A.**  I did.

5  **Q.**  What was his response?

6  **A.**  He didn't have the cash.

7  **Q.**  And at that point did you leave?

8  **A.**  Yeah.

9  **Q.**  At the point that you left, was there any finished

10  AML BitCoin with biometrics built into the blockchain?

11  **A.**  No.

12  **Q.**  Approximately -- okay.

13  Did they ever hire -- you presented a plan to hire

14  numerous different individuals to work with you.  Did they ever

15  hire those other individuals to work with you?

16  **A.**  Not to my knowledge.

17  **Q.**  All right.  Briefly, could you describe Mr. Andrade's

18  understanding of the technology, of the Bitcoin technology and

19  of the biometric identity technology?

20  **MR. SHEPARD:**  Foundation.  Objection.  Calls for

21  speculation.

22  **THE COURT:**  Sustained.

23  **BY MR. HIGHSMITH:**

24  **Q.**  How about your impression of it?  What was your impression

25  of his understanding of the technology?

1          THE COURT:  What's the relevance of his impression?

2    His.

3          MR. HIGHSMITH:  Okay.  We'll move on.

4    Q.    During your time there, did you understand that

5    AML BitCoin was trying to sign deals with governments and

6    businesses?

7    A.    I stayed out of the business side of that.  I was there

8    for technology.  I was looking to build the product, and I was

9    pretty busy during -- just trying to get that going.

10    Q.    After you left, did Mr. Andrade ask you to come back?

11    A.    He did.

12    Q.    Did you go back?

13    A.    No.

14    Q.    Why not?

15    A.    I'd asked, if I was going to have a conversation, I would

16    require to be caught up, paid in full, and he wasn't able to do

17    that at that time.

18          MR. HIGHSMITH:  One moment, Your Honor.

19                 (Pause in proceedings.)

20          MR. HIGHSMITH:  No further questions.

21          THE COURT:  All right.  Mr. Shepard.

22                 **CROSS-EXAMINATION**

23    BY MR. SHEPARD:

24    Q.    I forgot something important.

25         Mr. Carlsen, welcome to the good part of California.

1    A.    Some would argue.

2    Q.    You said you thought that the biometric identification

3    piece was six to eight months away when you were working in

4    around November of 2018; correct?

5    A.    November/December, yes.

6    Q.    You don't know how long people had been working on it;

7    correct?

8    A.    Correct.

9    Q.    And you don't know how many times those people had

10   predicted they were going to be done; right?

11   A.    I know it was delayed, for sure.

12   Q.    And you don't know, like, if they came out and tested it,

13   thinking it was done, and it turned out not to be; right?

14   A.    I know they were still building.  So, yes, iterating.

15   Q.    Right.  But you don't know whether they had actually come

16   out and said, "We're nearly done.  Let's test it"; right?

17   A.    No.  They were -- they'd not made that claim.

18   Q.    And you mentioned several of the people you were -- well,

19   you mentioned one person you were introduced to, Sachin

20   Agarwal; correct?

21   A.    Yes.

22   Q.    Who was leading the team in India; right?

23   A.    Yes.

24   Q.    And then the first document that you were shown,

25   Exhibit 91 --

**CARLSEN - CROSS / SHEPARD**

1   **A.**   Mm-hmm.

2   **Q.**   -- was an email to a Terence Poon.

3        Do you remember him?

4   **A.**   I do.

5   **Q.**   He was also a developer; right?

6   **A.**   Yeah.  He was a technologist, yes.

7   **Q.**   And he had worked on the project as well; correct?

8   **A.**   Yes.

9   **Q.**   And one of the things that I think you reported was that

10  Mr. Andrade had two teams working on the software at the same

11  time; right?

12  **A.**   Yes.

13  **Q.**   One of those teams being Sachin Agarwal's team in India;

14  correct?

15  **A.**   Yes.

16  **Q.**   And you thought that didn't make a lot of sense; right?

17  **A.**   Two teams?  Yeah, definitely not.

18  **Q.**   That it was an indication that Marcus was not a good

19  businessman; correct?

20  **A.**   More so that it was duplicate spending of cash.  So you're

21  trying to build the same thing, trying to compete against two

22  things.

23  **Q.**   He was wasting cash in that sense; correct?

24  **A.**   Maybe.  I mean, it could be a stroke of genius too.  You

25  just don't know.

1  **Q.**  It looked to you like he wasn't a good businessman,

2  though; right?

3  **A.**  I didn't really claim it on that side.

4  **Q.**  Well, do you remember talking to the FBI last year?

5  **A.**  I do.

6  **Q.**  And you told the FBI last year that Marcus was not a good

7  businessman, didn't you?

8  **A.**  I -- I may have.

9  **Q.**  And the reason you cited for it was that he had two teams

10  working on the software at the same time; right?

11  **A.**  Yeah, he did.

12  **Q.**  Now, the CrossVerify product that was being built in

13  London, you really liked that product the way it was built;

14  right?

15  **A.**  I did.

16  **Q.**  It was a very good job of work; right?

17  **A.**  Yeah, the concept was good.

18  **Q.**  And you thought that based on your review of it, that

19  Marcus had probably spent about a million dollars on its

20  development; correct?

21  **A.**  I don't recall what he spent on it, to be honest.

22  **Q.**  Well, I think you estimated for the FBI what you thought

23  he probably spent; right?

24  **A.**  I knew what we were planning to spend on the Bitcoin side

25  of it, not that side of it.

**CARLSEN - CROSS / SHEPARD**

1  Q.   Okay.  Well, you told the FBI in 2019 --

2  A.   Mm-hmm.

3  Q.   -- when you were first interviewed by the FBI, that

4  Mr. Andrade probably spent about a million dollars on overall

5  development; correct?

6  A.   If that's what I said then, that's what I said.  I don't

7  recall saying that, so...

8  Q.   Okay.  And you thought that the AML BitCoin concept would

9  be an easy sell to banks; right?

10  A.   Yeah.

11  Q.   It was kind of a -- it was a good idea?

12  A.   It was a very good idea.

13  Q.   You were asked some questions about whether Aten Coin had

14  AML features built into the coin.  Remember that?

15  A.   Mm-hmm.

16  Q.   And it sounds like you looked at the coin and didn't see

17  those features; right?

18  A.   Not the current features that he was looking to do, no.

19  Q.   I'm sorry.  I didn't hear.

20  A.   Not the current versions that he was saying, no.

21  Q.   Okay.  So you didn't look back through prior versions to

22  see whether any of those had any AML features; correct?

23  A.   Whatever source code I got is what I looked through.

24  Q.   Okay.  And you also did not look at any third parties that

25  Aten Coin might have used to do third-party ID verification;

**CARLSEN - CROSS / SHEPARD**

1    correct?

2    **A.**    Correct.    That's correct.

3    **Q.**    When you -- when you first had conversations with

4    Mr. Andrade, I think that was, like, in May of 2018; is that

5    right?

6    **A.**    I mean, I talked with him before that.    Like, March,

7    April, February.

8    **Q.**    Okay.    Roughly in that time range?

9    **A.**    Yeah.

10    **Q.**    And at that point, were you introduced and did you make

11    contact with Richard Naimer?

12    **A.**    No.    Not until later.

13    **Q.**    Okay.    But you did make contact with Richard Naimer

14    sometime late July, August of 2018; correct?

15    **A.**    Possibly.    But, I mean, I didn't actually meet him or have

16    interaction until the trip to London.

17    **Q.**    Okay.    Well, you remember telling the FBI that Mr. Naimer

18    went quiet until the end of July and then you reached back out

19    to him in early August of 2018?    Do you remember that?

20    **A.**    I would have thought that would have been Marcus, not --

21    not -- not anybody else, really, because I was trying to get a

22    gauge as to if he was going to move forward with the project or

23    not.

24    **Q.**    And do you remember Mr. Naimer telling you that the

25    product was pretty much there at the time?

**CARLSEN - CROSS / SHEPARD**

1    **A.**    No.

2    **Q.**    Did you see any progress reports or updates about the

3    product at that time?

4    **A.**    Not to my knowledge, no.

5    **Q.**    What you did in April of 2019 was to respond to a request

6    by Marcus to put together a plan to develop AML BitCoin using

7    Aten Coin software; right?

8    **A.**    2018.

9    **Q.**    Twenty- -- yeah, I'm sorry.  2018.  Thank you for

10    correcting me.

11    **A.**    Yes.

12    **Q.**    And he was interested in help getting the product to work;

13    right?

14    **A.**    Yes.

15    **Q.**    And you effectively, in Exhibit 92, told him that you

16    thought you could do that for about a million dollars, six to

17    eight months; right?

18    **A.**    Give or take, yes.  Based upon things, yes.

19        **THE COURT:**  I take it you have some more.

20        **MR. SHEPARD:**  I do have a little more, Your Honor.

21        **THE COURT:**  All right.  I'm afraid, Mr. Carlsen,

22    you're going to have to join us tomorrow morning.

23        **THE WITNESS:**  Okay.

24        **THE COURT:**  Members of the jury, remember my

25    admonitions.  Do not discuss this amongst yourselves or with

**PROCEEDINGS**

1    anyone else.  No research.  Nothing to do with this case.

2        Enjoy the afternoon, and we'll see you tomorrow for 8:30.

3        (Proceedings were heard out of the presence of the jury.)

4            **THE COURT:**  We're out of the presence of the jury.

5        So after -- Mr. Carlsen, you can step down for the time

6    being.

7                (Witness steps down from the stand.)

8            **THE COURT:**  Who else will be tomorrow?

9            **MR. HIGHSMITH:**  We have Sean O'Malley.  We have

10   Kathryn Tunis.  We have Kieran McCavanagh.

11           **THE COURT:**  Slow down a little bit.

12           **MR. HIGHSMITH:**  Sorry.

13           **THE COURT:**  Sean O'Malley.  Who's next?  Sean

14   O'Malley.  Next?

15           **MR. HIGHSMITH:**  Sorry.  John Szeder.

16           **THE COURT:**  John Szeder.  All right.

17           **MR. HIGHSMITH:**  Kathryn Tunis.

18           **THE COURT:**  Kathryn Tunis.

19           **MR. HIGHSMITH:**  Mr. McCavanagh.

20           **THE COURT:**  Okay.  That would be great if we got to

21   all of these.

22        Kieran McCavanagh?

23           **MR. HIGHSMITH:**  Yes.

24           **THE COURT:**  Okay.

25           **MR. HIGHSMITH:**  And on the off chance -- one can

1   always be hopeful -- that we get through all that, we'll call

2   Kate Ablett next.

3        **THE COURT:**  Okay.  And you've got, as far as you know,

4   all the exhibits ready to go that you're going to use tomorrow

5   for these witnesses; correct?

6        **MR. HIGHSMITH:**  Yes, Your Honor.

7        **THE COURT:**  Oh, good.  Okay.

8        All right.  See you tomorrow.

9        At the end of tomorrow, I'm going to ask you -- and you

10  can be thinking about it; we talked about this before -- what

11  you want me to tell the jury about Monday and the virtual

12  proceedings we're going to have.  So be thinking about what you

13  want me to alert, just to explain to them what they're going to

14  see on that morning.

15       **MR. HIGHSMITH:**  Understood.

16       **THE COURT:**  Okay.

17       **MR. SHEPARD:**  Thank you, Your Honor.

18       **MR. WARD:**  Quickly, Your Honor, when I was questioning

19  Ms. Foteh, I moved to admit an exhibit, and it appears that the

20  record said page 8, line 2 to 8, but it should be page 28,

21  line 2 to 8, of Exhibit 1427.  So I just want to clarify that

22  the segment being admitted is Exhibit 1427, page 28, lines 2

23  through 8.

24       **THE COURT:**  Okay.  And I thought at that -- when we

25  discussed this a little earlier, Mr. Shepard wanted to fold

**PROCEEDINGS**

1    that into his analysis of whether or not there was going to be

2    an argument that it should all be stricken.

3            **MR. SHEPARD:**  That is correct.  But since then, some

4    of my team members were able to confirm that Mr. Ward's numbers

5    are correct.

6            **THE COURT:**  All right.  So that part --

7            **MR. SHEPARD:**  That part is resolved.

8            **THE COURT:**  All right.  And you're still planning --

9            **MR. SHEPARD:**  Yes.  I have not -- I'm not planning.

10   I'm just going to do the research.

11           **THE COURT:**  You're going to look at it.

12           **MR. SHEPARD:**  If I have something to tell the Court, I

13   will.

14           **THE COURT:**  Fair enough.

15           **MR. SHEPARD:**  Thank you.

16           **THE COURT:**  Okay.  See you tomorrow.

17               (Proceedings adjourned at 1:34 p.m.)

18                       ---o0o---

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Wednesday, February 19, 2025

7

8

9

10

11    _____

12           Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13           CSR No. 7445, Official United States Reporter