```
                                    Volume 8

                                    Pages 1285 - 1476

                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

    Before The Honorable Richard Seeborg, Judge

    UNITED STATES OF AMERICA,        )
                                     )
                Plaintiff,           )
                                     )
      VS.                            )      NO.  3:20-CR-00249-RS-1
                                     )
    ROWLAND MARCUS ANDRADE,          )
                                     )
                Defendant.           )
    _____ )
```

```
                        San Francisco, California
                        Thursday, February 20, 2025
```

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES:**

```
For Plaintiff:
                        PATRICK D. ROBBINS
                        ACTING UNITED STATES ATTORNEY
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                BY:  CHRISTIAAN HIGHSMITH
                     DAVID J. WARD
                     MATTHEW CHOU
                     ASSISTANT UNITED STATES ATTORNEYS

For Defendant:
                        KING AND SPALDING, LLP
                        50 California Street, Suite 3300
                        San Francisco, California 94111
                BY:  MICHAEL J. SHEPARD, ATTORNEY AT LAW

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

```
REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

1   **APPEARANCES:** (CONTINUED)

2   For Defendant:

3                           KING AND SPALDING, LLC
                            1700 Pennsylvania Avenue, Northwest
                            Washington, D.C. 20006
4                   BY:  **KERRIE C. DENT, ATTORNEY AT LAW**

5

6                           KING AND SPALDING, LLC
                            1185 Avenue of the Americas, 34th Floor
                            New York, New York 10036
7                   BY:  **DAINEC P. STEFAN, ATTORNEY AT LAW**

8

9                           LAW OFFICES OF CINDY A. DIAMOND
                            58 West Portal Avenue, Suite 350
                            San Francisco, California 94127
10                  BY:  **CINDY A. DIAMOND, ATTORNEY AT LAW**

11

12  Also Present:           **Special Agent Brendon Zartman**
                            **Tina Rosenbaum, Paralegal**
13                          **Ed Jackson, Trial Technician**

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>**I N D E X**</u>

2

3    Thursday, February 20, 2025 - Volume 8

4

5    <u>**GOVERNMENT'S WITNESSES**</u>       <u>**PAGE**</u>  <u>**VOL.**</u>

6    <u>**CARLSEN, EVAN (RECALLED)**</u>
    (PREVIOUSLY SWORN)             1300   8
7    Cross-Examination resumed by Mr. Shepard   1300   8
    Redirect Examination by Mr. Highsmith     1310   8

8

9    <u>**SZEDER, JOHN**</u>
    (SWORN)                     1312   8
10   Direct Examination by Mr. Ward        1313   8
    Cross-Examination by Mr. Stefan       1335   8
11   Redirect Examination by Mr. Ward      1360   8

12

13   <u>**O'MALLEY, SEAN**</u>
    (SWORN)                     1362   8
14   Direct Examination by Mr. Highsmith   1362   8

15

16   <u>**MCCAVANAGH, KIERAN**</u>
    (SWORN)                     1369   8
17   Direct Examination by Mr. Chou       1370   8
    Cross-Examination by Ms. Dent       1385   8

18

19   <u>**TRAN, HUNG QUOC**</u>
    (SWORN)                     1389   8
20   Direct Examination by Mr. Highsmith   1389   8
    Cross-Examination by Mr. Stefan      1413   8
21   Redirect Examination by Mr. Highsmith   1422   8

22

23   <u>**ABLETT, KATHERINE**</u>
    (SWORN)                     1423   8
24   Direct Examination by Mr. Chou       1423   8
    Cross-Examination by Mr. Stefan      1457   8

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 68 | | 1314 | 8 |
| 221 | | 1331 | 8 |
| 222 | | 1324 | 8 |
| 227 | | 1318 | 8 |
| 383 | | 1446 | 8 |
| 384 | | 1446 | 8 |
| 387 | | 1427 | 8 |
| 389 | | 1427 | 8 |
| 390 | | 1427 | 8 |
| 391 | | 1427 | 8 |
| 436 | | 1427 | 8 |
| 437 | | 1427 | 8 |
| 439 | | 1427 | 8 |
| 442 | | 1427 | 8 |
| 443 | | 1427 | 8 |
| 446 | | 1427 | 8 |
| 447 | | 1427 | 8 |
| 450 | | 1427 | 8 |
| 451 | | 1427 | 8 |
| 452 | | 1427 | 8 |
| 453 | | 1427 | 8 |

1          **I N D E X**

2          **E X H I B I T S**

3    **TRIAL EXHIBITS**                          **IDEN**  **EVID**  **VOL.**

4      455                                              1427    8

5      458                                              1427    8

6      460                                              1427    8

7      462                                              1427    8

8      463                                              1427    8

9      464                                              1427    8

10     465                                              1427    8

11     466                                              1427    8

12     467                                              1427    8

13     471                                              1427    8

14     486                                              1427    8

15     494                                              1427    8

16     495                                              1427    8

17     497                                              1427    8

18     502                                              1427    8

19     505                                              1427    8

20     512                                              1427    8

21     513                                              1427    8

22     515                                              1427    8

23     518                                              1427    8

24     523                                              1427    8

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 525 | | 1427 | 8 |
| 528 | | 1427 | 8 |
| 529 | | 1427 | 8 |
| 530 | | 1427 | 8 |
| 531 | | 1427 | 8 |
| 532 | | 1427 | 8 |
| 533 | | 1427 | 8 |
| 537 | | 1427 | 8 |
| 544 | | 1451 | 8 |
| 581 | | 1450 | 8 |
| 582 | | 1450 | 8 |
| 1106 | | 1456 | 8 |
| 1117 | | 1456 | 8 |
| 1143 | | 1446 | 8 |
| 1146 | | 1427 | 8 |
| 1150 | | 1427 | 8 |
| 1152 | | 1427 | 8 |
| 1153 | | 1427 | 8 |
| 1154 | | 1433 | 8 |
| 1474 | | 1374 | 8 |
| 1475 | | 1380 | 8 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1477 | | 1455 | 8 |
| 1478 | | 1455 | 8 |
| 1479 | | 1427 | 8 |
| 1480 | | 1427 | 8 |
| 1481 | | 1427 | 8 |
| 1482 | | 1427 | 8 |
| 3190 | | 1304 | 8 |

```
 1   Thursday - February 20, 2025                          8:06 a.m.

 2                        P R O C E E D I N G S

 3                            ---o0o---

 4              (Defendant present, out of custody.)

 5        (Proceedings were heard out of the presence of the jury.)

 6           THE COURTROOM DEPUTY:  Remain seated.  Please come to

 7   order.

 8           THE COURT:  Good morning.

 9           MR. HIGHSMITH:  Good morning.

10           THE COURT:  So some issue of some kind?

11           MR. SHEPARD:  Good morning, Your Honor.

12           THE COURT:  Good morning.

13           MR. SHEPARD:  I just wanted to address, I guess

14   there's a possibility that we will see one of the FBI agents

15   testifying today, and that raised for us the question, which

16   has not been important so far, about recalling witnesses in the

17   defense case because there are -- we have proposed a

18   stipulation to the Government relating to the authenticity of

19   material that the Government seized, either through search

20   warrants or, you know, through records from Google or,

21   you know, whatever other data companies.

22        And while they are considering that, we need to consider

23   alternatives in the event they do not agree with that.  And one

24   will be, we'll need to play whack-a-mole with different FBI

25   agents who may have been the people who gathered that evidence.
```

**PROCEEDINGS**

1  The records are produced in a way that it's impossible to know

2  who gathered which records when.

3      So we're hoping to avoid all that; but in the event we

4  don't, we may need to recall some of the FBI agent witnesses.

5  So I didn't know.  Is the Court going to -- is it -- can we

6  cover that now, or does the Court want us to address that

7  witness by witness?

8      There may be a few that we already know of that we can tie

9  to a particular witness at this point and we could ask those

10  questions now, but there's this mountain of other ones that we

11  don't know which FBI agent will be able to authenticate for us.

12      So that's what I wanted to raise with the Court.

13      Some of this we'll be able to do with Mr. Abramoff,

14  although that will lengthen his examination to authenticate

15  each one that he's on.

16      **MR. HIGHSMITH:**  I think we're fine.  If an FBI agent

17  seized it, obviously we think it's authentic.

18      The reason I pause is I'm a little -- Mr. Shepard has sent

19  me some of the materials.  So I'd just say I'm a little worried

20  about getting blindsided by something that I don't expect.  But

21  if the FBI seized it, of course --

22      **THE COURT:**  No.  I'm hearing his request at the moment

23  just to be keeping these people under subpoena to come back if

24  you can't work out some deal and obviate the circumstance where

25  you say "No" and then he wants to call the FBI agent and you

**PROCEEDINGS**

1  say, "He's gone back to wherever and he's not available, or

2  she."  He's trying to protect against that circumstance.

3      And it seems reasonable to me --

4          **MR. HIGHSMITH:**  Me too.

5          **THE COURT:**  -- that you will keep these agents, should

6  it come to that, which we hope it won't, you can -- you'll make

7  them available.

8          **MR. HIGHSMITH:**  A hundred percent, Your Honor.

9          **THE COURT:**  Okay.

10         **MR. SHEPARD:**  Okay.  That covers my issue.

11         **THE COURT:**  Okay.

12         **MR. HIGHSMITH:**  Do we want to cover -- the Court asked

13  the parties to come up with an instruction for the jury before

14  Monday.  I threw something together --

15         **THE COURT:**  I just looked at it.

16         **MR. HIGHSMITH:**  -- as a proposal.

17         **THE COURT:**  It looked fine to me, but I'm waiting to

18  hear from Mr. Shepard.

19         **MR. SHEPARD:**  I have two observations about it.

20         **THE COURT:**  Okay.

21         **MR. SHEPARD:**  One is, I don't think the diagnosis

22  matters.  I think what matters is, for medical reasons, he's

23  unable to attend live.

24         **THE COURT:**  Okay.

25         **MR. SHEPARD:**  So I think it should be limited to that.

PROCEEDINGS

1    And I think the Court should also add that the jurors

2   should consider his testimony in the same way as if he were

3   testifying --

4        **THE COURT:**  That's also fine.

5        **MR. SHEPARD:**  -- live and in person.

6        **THE COURT:**  That's fine.

7    Why don't you modify it and then give it to me.

8        **MR. SHEPARD:**  I will.  We just got this.

9        **THE COURT:**  I understand.  I understand.

10    I've been ruminating with my folks about -- and maybe I

11   shouldn't worry about this -- just the technology on Monday.

12   I think you're going to do a test run or something.

13        **MR. SHEPARD:**  Yes.

14        **THE COURT:**  I hope it works.  We don't have a Plan B,

15   and maybe there is none that would be -- I'm just concerned.

16    But maybe the better approach is to assume it's going to

17   work and then just let's do it.

18    But if there is a -- when you're trying out -- how are you

19   going to try it out tomorrow?  What's it going to be?  Somebody

20   in D.C. is going to be sitting in the room that you're going to

21   use, and we're going to see if all the things are working?

22        **MR. HIGHSMITH:**  We did this on Thursday, the 6th,

23   Your Honor, during the Government's tech check.  That's exactly

24   what we're going to do.  We're going to have the Court's Zoom

25   platform the Court usually uses.  We'll shine a camera onto the

1    conference table in D.C. and see how the Zoom platform works.

2            THE COURT:  Is there a delay at all, or is it -- none?

3            MR. HIGHSMITH:  I didn't notice a delay on the 6th.

4    It seems like it's sort of like the Court's usual --

5            THE COURT:  Zoom.

6            MR. HIGHSMITH:  -- Zoom.

7            THE COURT:  That'd be good.

8            MR. HIGHSMITH:  The one issue that I've been thinking

9    about the most are documents or exhibits.

10           THE COURT:  Yeah.

11           MR. HIGHSMITH:  So here's my plan for exhibits.  We

12   can't use this system because it takes over the -- it takes

13   over the Court's entire video screen.  So we have two thoughts

14   or two plans.

15       One is to have Sutton bring a laptop to court and log in

16   as a Zoom participant solely for the purpose of sharing

17   documents.  Basically, it's a substitute for this -- you know,

18   for Tina's Trial Director.  I'm a little worried that maybe

19   that won't work.  I think it'll work.  It worked during our

20   tech check.

21       But I also am going to prepare binders for the jurors and,

22   of course, for the Court and the parties and the witness as a

23   backup in case that doesn't work or if that sort of makes more

24   sense.

25           THE COURT:  Okay.

PROCEEDINGS

1    **MR. HIGHSMITH:** And my question for the Court is --

2    our resources are limited. Our binder-making resources are

3    limited. May the jurors -- like, may two jurors share one

4    binder, or is that acceptable or not?

5    **THE COURT:** You could even -- I don't have a problem

6    with you passing -- that's fine.

7    **MR. HIGHSMITH:** Okay.

8    **THE COURT:** That's fine.

9    **MR. HIGHSMITH:** And then just the final logistical

10   question is, the Court made an order about the number of case

11   agents we're permitted. The Court ordered one case agent.

12   We have one case agent who's going to go to Washington,

13   D.C., to be present in the conference room; and we'd like for

14   Mr. Zartman -- Special Agent Zartman to be here.

15   **THE COURT:** Yes.

16   **MR. HIGHSMITH:** May he be here?

17   **THE COURT:** That's fine.

18   **MR. HIGHSMITH:** Thank you.

19   **THE COURT:** It does occur to me that in the thing that

20   I'm going to read to the jury, do you think we -- perhaps it

21   would include, so that they know, that some of you are going to

22   be in Washington and some of you are going to be here.

23   **MR. HIGHSMITH:** Yeah.

24   **THE COURT:** Because they may see empty seats and they

25   won't know who's there.

PROCEEDINGS

```
 1        You may want to clarify that both sides will have people

 2   in both places and, also, where perhaps Mr. Andrade is going to

 3   be.

 4        MR. HIGHSMITH:  Understood.

 5        THE COURT:  Hopefully, it won't be an issue, but just

 6   to alert you, one of the jurors, the alternate -- which

 7   alternate is she?

 8        THE COURTROOM DEPUTY:  It's Michele.  She's Number 4,

 9   I believe.

10        THE COURT:  The one that often has trouble hearing.

11        Her father is, we're told, going to have heart valve

12   surgery on the 11th.  So maybe we'll need to have her go, but I

13   don't want to do that now.  If we get to the 11th and we have

14   our remaining three alternates, maybe we'll be comfortable at

15   that point letting her go.  But that's looming out there.

16        And she didn't actually ask not to be here.  She just

17   said, "Maybe I'm going to need" -- I don't know where the

18   father is.  I don't know any of the details about the surgery

19   or what's involved.

20        MR. HIGHSMITH:  One other thing I just thought of as

21   we're talking about logistics.

22        Just because of his medical condition, Mr. Abramoff may

23   get tired, really tired --

24        THE COURT:  I understand.

25        MR. HIGHSMITH:  -- and I would just ask for a little
```

 1    bit of accommodation, maybe, like, three breaks rather than two

 2    breaks --

 3             THE COURT:  Yeah, yeah.

 4             MR. HIGHSMITH:  -- something like that.

 5             THE COURT:  I'm fine with that.

 6             MR. HIGHSMITH:  And just as a preview of coming

 7    attractions, I scheduled three days for this remote testimony,

 8    but I'm hoping for less than a day of Government testimony,

 9    obviously whatever the Defense wants to do, but probably the

10    same -- approximately the same amount of time.  So I

11    aspirationally would like us to be back in full force on

12    Wednesday, wrapping up on Wednesday or Thursday.

13             THE COURT:  Yeah.  Well, my scheduling contemplated

14    two days for the Abramoff testimony.  I certainly hope it's not

15    more than that, but we'll see where we go.

16             MR. SHEPARD:  Yes.  We'll do our best.

17             THE COURT:  Okay.

18             MR. SHEPARD:  We have a lot of material we need to get

19    into.

20             THE COURT:  Yes.  But remember, there's a certain

21    point at which I am going to be -- I think there's a potential

22    danger for cumulative.  I mean, you're going to be able to

23    portray him with all his sins, and I understand that, but at a

24    certain point it just becomes cumulative.

25             MR. SHEPARD:  I understand that.  My focus is more on

CARLSEN - CROSS / SHEPARD

1    actual substantive evidence --

2         THE COURT:  Okay.

3         MR. SHEPARD:  -- that we need from him.

4         THE COURT:  That's fine.  Yeah, I understand.  I

5    understand.

6         Okay.  Very good.  It's going to be Carlsen again and then

7    off to the races.

8         MR. HIGHSMITH:  Yes, Your Honor.

9         THE COURT:  All right.  See you shortly.

10                    (Recess taken at 8:16 a.m.)

11                    (Proceedings resumed at 8:31 a.m.)

12        (Proceedings were heard in the presence of the jury.)

13        THE COURT:  The jury is present.

14   Good morning, members of the jury.  Welcome back.

15   Mr. Carlsen, you understand you remain under oath?

16        THE WITNESS:  I do.

17        THE COURT:  All right.

18                        **EVAN CARLSEN**,

19   called as a witness for the Government, having been previously

20   duly sworn, testified further as follows:

21        THE COURT:  You may proceed, Mr. Shepard.

22        MR. SHEPARD:  Thank you, Your Honor.

23                   **CROSS-EXAMINATION   (resumed)**

24   BY MR. SHEPARD:

25   Q.   And good morning, Mr. Carlsen.

**CARLSEN - CROSS / SHEPARD**

1    **A.**    Good morning.

2    **Q.**    You were not present in Texas in the late summer or early

3    fall of 2018 when the CrossVerify team came to present and test

4    the product; right?

5    **A.**    Correct.

6    **Q.**    So you don't know what they said to the people at the time

7    about the state of the product; correct?

8    **A.**    Correct.

9    **Q.**    Shortly after you returned in the fall of 2018, you had to

10   ask for access to various data, like the Jira and Confluence

11   systems.  Do you remember that?

12   **A.**    Mm-hmm, yes.

13   **Q.**    And you also asked for the feature list for the

14   DIT Network platform as of its October 19, 2018, release;

15   correct?

16   **A.**    Very likely, yes.

17   **Q.**    Okay.  So that was something -- the platform was going to

18   be released, and that was pretty soon after you arrived, and

19   you wanted to make sure you saw that; correct?

20   **A.**    Yeah.  I wanted to see what they had, yes.

21   **Q.**    Okay.  And you ultimately got both of what you requested?

22   **A.**    Yeah, I got access to those.

23   **Q.**    Okay.  And did you know that Marcus was pushing to get you

24   that access?

25   **A.**    He did, yep.

**CARLSEN - CROSS / SHEPARD**

1  **Q.**  And did you have any further issues with access?

2  **A.**  There was pushback a little bit from the other --

3  CrossVerify side, yes, for sure.

4  **Q.**  So from time to time, you got pushback from the people in

5  London about getting access to data you needed?

6  **A.**  Yes.

7  **Q.**  And was Mr. Andrade an ally for you in getting data?

8  **A.**  He was helpful in that, yes.

9  **Q.**  While you were there, the developers in India continued to

10  work on the product; correct?

11  **A.**  Yeah.

12  **Q.**  And you got status reports from them on their work; right?

13  **A.**  Starting in November, yes.

14  **Q.**  Well, I don't know exactly when.  I was going to --

15  **A.**  Yeah.

16  **Q.**  -- ask you that.

17      But I was going to -- you were saying starting in

18  November, yes, you did?

19  **A.**  It would have been in the November time frame, yeah.

20  **Q.**  Okay.  And that continued at least through May of 2019;

21  correct?

22  **A.**  I guess, yeah.  I mean, they did updates.

23          **MR. SHEPARD:**  Ed, do you have Exhibit 3190?  3190.

24      If we could just display that to the Court and the parties

25  and the witness.

1  Q.  Are you able to see that clearly enough?  I could give you

2  a hard copy.

3  A.  No.  I can see it, yeah.

4  Q.  Okay.  And is Exhibit 3190 an example of an update report

5  that you would get from the team in India?

6  A.  Yeah, more or less an example of it.  It's not one that I

7  necessarily read.  I think at that point I was already long

8  disengaged.

9  Q.  But it appears to be a --

10  A.  Similar, yeah.

11  Q.  -- of what you got?

12  A.  Mm-hmm.

13         MR. SHEPARD:  Okay.  I offer 3190.

14         THE COURT:  You're having trouble hearing?

15         A JUROR:  The witness.

16         THE COURT:  Yes.

17     Again, you're a very soft-spoken gentlemen.  Could you

18  really make an effort to keep your voice up, if you can.

19         THE WITNESS:  I will do that, yes.  Sorry.

20         THE COURT:  All right.  3190?

21         MR. HIGHSMITH:  Hearsay.

22         THE COURT:  And what are you offering it for?

23         MR. SHEPARD:  Ultimately, I expect its use will be the

24  effect on the people who read it, which include Mr. Andrade.

25     He's just authenticating it.  And it's not hearsay.  It's

 1   just a report of what's going on.  It's a status update.

 2        MR. HIGHSMITH:  I'm not sure he testified he read it

 3   yet.

 4        THE WITNESS:  Right.

 5        THE COURT:  This witness?

 6        MR. HIGHSMITH:  Correct.

 7        THE COURT:  Okay.  Well, why don't we start with that.

 8   Have you --

 9        MR. SHEPARD:  I'm happy to start with that, although

10   I think he -- I'm just at this point asking him to authenticate

11   it.

12        THE COURT:  All right.  Okay.  Well --

13        MR. SHEPARD:  And then --

14        THE COURT:  -- are you going to then seek to admit it

15   through somebody else?

16        MR. SHEPARD:  Well, I think I'm authenticating it.  It

17   shows who received it.  I think I can -- once it's

18   authenticated, I can address it, whether through a witness or

19   otherwise, once it's in evidence.

20        THE COURT:  All right.  I'm going to admit it.  It

21   seems to be important to tell the chronological events, but

22   it's not being admitted for the truth of the statements.

23        (Trial Exhibit 3190 received in evidence.)

24        THE COURT:  Go ahead.

25        MR. SHEPARD:  That's fine, Your Honor.  Thank you.

1    **THE COURTROOM DEPUTY:**  Can we show it to the jury?

2    **THE COURT:**  Yes, you may.

3    **THE COURTROOM DEPUTY:**  Okay.

4    **MR. SHEPARD:**  Okay.  I'm good to go.

5    **Q.**  I just wanted to ask you about some of the names here.

6    There's a nadeema@chetu.com.  Do you see that?

7    **A.**  I do.

8    **Q.**  Do you know who that was?

9    **A.**  Not -- not -- I don't recall, to be honest.

10   **Q.**  Do you know -- are you familiar with the Chetu Company?

11   **A.**  I believe that was one of the teams that was working, yes.

12   **Q.**  Okay.  And was that Mr. Sachin -- or was that Sachin

13   Agarwal's team or a different team?  Do you know?

14   **A.**  Different team, I think.

15   **Q.**  A different team?

16   **A.**  Different team.

17   **Q.**  Okay.  So there were at least two different teams in India

18   who were working on the project --

19   **A.**  Correct.

20   **Q.**  -- correct?

21   **A.**  Yes.

22   **Q.**  And there are -- in addition to you as a recipient and

23   ceo@amlbitcoin.com, there's Terence Poon; right?

24   **A.**  Yeah.

25   **Q.**  And did you work with Mr. Poon on this project?

CARLSEN - CROSS / SHEPARD

1  **A.**    Earlier on, yeah, for -- for a small time.

2  **Q.**    Okay.  There's also a sergey@amlbitcoin.com.  Did you work

3  with him?

4  **A.**    Not necessarily really.  I mean, I knew of him, but not

5  necessarily interacting with him.

6  **Q.**    There's -- I didn't hear all that.

7        You knew he was working on it, but you didn't necessarily

8  interact with him?

9  **A.**    I knew he was associated with Marcus and had worked with

10  Marcus, but he's not somebody that I worked with.

11  **Q.**    Okay.  Fair enough.

12        And then there are four other people associated with Chetu

13  who also got copies of this.  Did you work with any of them?

14  **A.**    I may have.  I don't recall.

15  **Q.**    As I understood your testimony yesterday, it was your plan

16  to build AML BitCoin by starting with the Aten Coin source

17  code; correct?

18  **A.**    With a review of it, yes.

19  **Q.**    Okay.  And one of the things that was needed was to update

20  it to a more current coding language; is that right?

21  **A.**    Later version of the Bitcoin, yes, base.

22  **Q.**    And the Aten Coin wallets had a dual-signature component;

23  correct?

24  **A.**    As part of it, yes.

25  **Q.**    And Mr. Andrade's company had the ability to stop a

1    transaction by disabling its wallet signature; correct?

2    **A.**    I believe so, yes.

3    **Q.**    And you had that nice PowerPoint that we saw yesterday

4    that we don't need to look at again unless you want to.  But

5    you didn't express any concerns about the system architecture;

6    correct?

7    **A.**    No.

8            **THE COURT:**  No, you didn't?

9            **THE WITNESS:**  No, I did not.

10   **BY MR. SHEPARD:**

11   **Q.**    Now, in the fall of 2018 when you started, Mr. Poon was

12   conducting an audit to ensure that the identity link credential

13   authentication protocol was reasonably secure and satisfied the

14   GDPR; correct?

15   **A.**    I'm not a hundred percent in the know on that one or

16   recall it.

17           **MR. SHEPARD:**  Ed, this is 3191.  If we could put that

18   on the screen for the witness, the Court, and the Government.

19   **Q.**    Can you see that, or would a hard copy help?

20   **A.**    No.  I can -- I can see that.

21   **Q.**    Okay.  And does that help refresh your recollection that

22   in November of 2018 Mr. Poon was working on this project

23   relating to the identity link confidential authentication

24   protocol, making sure it was secure and satisfied the GDPR?

25   **A.**    Yeah.  No.  I see that, yes.

1  **Q.**   Okay.  And just since there's so many of these acronyms,

2  the GDPR is the General Data Protection Regulation.  It governs

3  a lot of what goes on in Europe; right?

4  **A.**   Correct.  It's a European standard.

5  **Q.**   I think you said yesterday that you did not recall saying

6  to the FBI that Marcus spent about a million dollars on overall

7  development.

8  **A.**   Yeah.  I mean, I think the only real million-dollar

9  conversation came up with the budget that I knew of, which was

10  my budget.

11  **Q.**   I'm going to show you something to see if it refreshes

12  your recollection.

13  **A.**   Okay.

14  **Q.**   If you'll take a look at that.  Feel free to peruse it to

15  the extent you need to.  You can start on page 1 to see what it

16  is, an FBI report.

17  **A.**   (Witness examines document.)  Yeah, I see that.

18  **Q.**   And if you look at the end of the first complete paragraph

19  on page 3 --

20  **A.**   Mm-hmm.

21  **Q.**   -- the last sentence in that paragraph, do you see that?

22  **A.**   Yeah, I see that.

23  **Q.**   Does that refresh your recollection that you said to the

24  FBI on or about February 27, 2019, that Marcus spent about a

25  million dollars on overall development?

**CARLSEN - CROSS / SHEPARD**

1  **A.**   I mean, I read that.  I don't recall the conversation,

2  but --

3  **Q.**   Okay.

4  **A.**   -- yeah.

5  **Q.**   I'm done with that so I can take it back from you.

6       As you observed Mr. Andrade during the time that you were

7  working for him, you saw that he becomes untrusting about

8  people he is working with; correct?

9  **A.**   Correct.

10  **Q.**   And then he winds up working with too many people.  He's

11  got people coming and going; right?

12  **A.**   Yeah.  And I think that was the basis for the two teams in

13  India.  He didn't trust them necessarily.

14  **Q.**   And you observed that the people who were working in India

15  were struggling with the work; right?

16  **A.**   A hundred percent.

17  **Q.**   And you would have done a much better job had he put money

18  to you instead of to them; right?

19  **A.**   Well, I wasn't -- I wasn't going to benefit from that

20  personally.  It was more so that it needed to be a unified

21  effort, not disparaged across two different teams.

22  **Q.**   Okay.  So it would have been better had the effort been

23  unified?

24  **A.**   Yeah, unified, one team driving, know your trusted people,

25  not -- if you're unsure of them, get rid of them.  Bring in the

CARLSEN - REDIRECT / HIGHSMITH

1 right people.

2         MR. SHEPARD:  If I may just have a moment.

3                 (Pause in proceedings.)

4         MR. SHEPARD:  Nothing further.  Thank you.

5                 **REDIRECT EXAMINATION**

6 BY MR. HIGHSMITH:

7 **Q.**  Very briefly.

8 **A.**  Yeah.

9 **Q.**  Counsel asked you numerous questions about the team in

10 India.  Did you ever see any evidence that the team in India

11 had completed a cryptocurrency product with biometrics built

12 into the blockchain?

13 **A.**  I did not.

14 **Q.**  You testified on direct examination that you stopped

15 working around January 2019; is that correct?

16 **A.**  January/February time, early, yeah.

17 **Q.**  Defense counsel showed you several documents that were

18 dated May of 2019.

19 **A.**  Correct, yeah.

20 **Q.**  Is that after you stopped working for Mr. Andrade?

21 **A.**  Correct.

22 **Q.**  Could you please clarify why you were included on emails

23 after you stopped working?

24 **A.**  I think he probably just had those as a default email

25 going.  I mean, my email was still active, I'm assuming.

1    Q.   Did Mr. Andrade ask you to return to the company?

2    A.   I mean, he'd asked if I would come work, but there was --

3    there wasn't funding.

4    Q.   Let's just stop there.

5         Did Mr. Andrade ask you to come back to the company after

6    you left the first time?

7    A.   Some point later, yes.

8    Q.   Okay.  And what did you say in response?

9    A.   I said "No."

10   Q.   Why?

11   A.   Because he hadn't paid me.

12   Q.   Let's very briefly talk about this FBI 302 that counsel

13   showed you.

14   A.   Yeah.

15   Q.   What this actually refers to is what you talked about on

16   direct examination.  Is it true that in May of 2018 you

17   presented a PowerPoint to Mr. Andrade saying what your plan

18   would be to build him a product?

19   A.   Yes.

20   Q.   And in that presentation in May of 2018, did you give an

21   estimate for how much it would cost to build that product?

22   A.   I did.

23   Q.   And was that estimate approximately a million dollars?

24   A.   Yes, it was.

25   Q.   And that was because you needed to build a product

1  essentially from scratch?

2  **A.**  Yeah.

3       **MR. HIGHSMITH:**  No further questions.

4      **THE COURT:**  You may step down.  Thank you.

5               (Witness excused.)

6      **THE COURT:**  By the way, members of the jury, counsel

7  referred to an FBI 302.  That's just the number designation

8  they give to a report of interview by the FBI.  That's what a

9  302 is.

10    Go ahead, Mr. Ward.

11      **MR. WARD:**  Good morning, Your Honor.

12    The Government calls John Szeder.

13   (Witness enters the courtroom and steps forward to be sworn.)

14      **THE COURT:**  If you could come forward, please, to the

15  stand to be sworn.

16      **THE COURTROOM DEPUTY:**  Please raise your right hand.

17              **JOHN SZEDER**,

18  called as a witness for the Government, having been duly sworn,

19  testified as follows:

20      **THE WITNESS:**  I do.

21      **THE COURTROOM DEPUTY:**  Please be seated.

22    Can you state your name and spell your last name, please.

23      **THE WITNESS:**  John Szeder.  Last name S-z-e-d-e-r.

24  \\\

25  \\\

1          <u>**DIRECT EXAMINATION**</u>

2    **BY MR. WARD:**

3    **Q.**   Good morning, Mr. Szeder.

4    **A.**   Good morning.

5    **Q.**   Mr. Szeder, what's your profession?

6    **A.**   I'm a software engineering executive.   I work to either

7    build products or build teams that build products.

8    **Q.**   Where are you working now?

9    **A.**   I work at a company called Game Data Pros.

10   **Q.**   Sorry.   Can you speak a little slower and --

11   **A.**   Okay.

12   **Q.**   -- say again?

13   **A.**   I work at a company called Game Data Pros.

14   **Q.**   And what do you do for Game Data Pros?

15   **A.**   I have -- I run an engineering team that builds revenue

16   optimization engines for game publishers.

17   **Q.**   In 2017, where were you working?

18   **A.**   I was a fractional executive for three or four different

19   companies doing a handful of things because I did not have a

20   full-time job.

21   **Q.**   In September of 2017, were you approached and offered the

22   job as the chief technology officer of AML BitCoin?

23   **A.**   Yes, I was.

24   **Q.**   Who approached you and made you that offer?

25   **A.**   It was a gentleman named Japheth Dillman, who I was

1   working with at a VR start-up at the time.

2          **MR. WARD:**  All right.  Can we pull up Exhibit 68,

3   please, just for the witness, the parties, and the Court.

4   **Q.**   Mr. Szeder, is that an email from Mr. Dillman to

5   Jack Abramoff, Marcus Andrade, and yourself?

6   **A.**   That is correct.

7   **Q.**   And have you seen this email prior to your testimony here

8   today?

9   **A.**   Yes.

10  **Q.**   Is this the offer that you were made to -- made to you to

11  come to AML BitCoin?

12  **A.**   Yes.

13  **Q.**   Is this an accurate representation of that offer?

14  **A.**   Yes, it is.

15         **MR. WARD:**  We'd move to admit Exhibit 68.

16         **MR. STEFAN:**  No objection.

17         **THE COURT:**  Exhibit 68 will be admitted.

18     (Trial Exhibit 68 received in evidence.)

19         **MR. WARD:**  If we could publish for the jury.

20  **Q.**   Mr. Szeder, looking at the email, it says [as read]:

21         "As we discussed earlier, it was good for the

22     AML BitCoin to have a public-facing CTO, especially

23     for branding purposes and the post-ICO market."

24     Were you being offered a job as a public-facing CTO?

25  **A.**   That is correct.

SZEDER - DIRECT / WARD

1  **Q.**   And what did you understand that position to be?

2  **A.**   Essentially, they had someone who was working there

3  building the software that couldn't accept a public-facing

4  relationship with the -- with the company because of possible

5  employment conflicts.  I don't remember.

6      And they needed someone because when you have an ICO,

7  initial coin offering, you generally publish a white paper, and

8  then you get a bunch of people together to speak to the crypto

9  community and say:  Here's the leadership team.  Here's folks

10  who can do AMAs and answer questions and write papers.

11          **THE COURT:**  You need to slow down.

12          **THE WITNESS:**  Oh, sorry.

13      (Stenographer interrupts for clarification of the record.)

14          **THE WITNESS:**  Yeah, who can do AMAs, which stands for

15  "Ask Me Anything," or write white papers or similar.

16  **BY MR. WARD:**

17  **Q.**   As part of that role, you were expected to interact with

18  people outside of AML BitCoin that might be interested in the

19  company or the ICO?

20  **A.**   That was my expectation, yes.

21  **Q.**   Okay.  Can you look at the paragraph that starts "As

22  mentioned before"?

23  **A.**   Yes.

24  **Q.**   We won't go through all of it, but is that an accurate

25  representation of your background in the technology industry?

**A.**    Yes.

**Q.**    Okay.  Then let's go to the next paragraph that starts

[as read]:

            "After discussing with Jack and John, we feel

        it's appropriate to offer this."

        It says [as read]:

            "In exchange for 20 hours a month of his time

        and his face as the public CTO."

        Just starting with that, was the offer that you -- as you

understood it, would be that you would be working for

AML BitCoin for 20 hours a month?

**A.**    That is correct.

**Q.**    And in return for that, you would receive $5,000 a month

and 250 AML BitCoin a month?

**A.**    That is correct.

**Q.**    And looking at the last paragraph, was it left open that

your role could expand if you wanted or if the company wanted

over time?

**A.**    Yep, that is correct.

**Q.**    Okay.  When you made this offer, did you have initial

discussions about taking on this position with anyone at

AML BitCoin?

**A.**    I think I had a conversation with Marcus where he talked

about the patents and some of the background for the company,

but I don't remember how many times we chatted.  Like, maybe

1   one or two times tops.

2   **Q.**   All right.  And then at some point after this offer was

3   made, did you indicate that you would accept the offer?

4   **A.**   I said I was interested, yes.

5   **Q.**   And then following that, was then there some delay before

6   you heard back from the company again?

7   **A.**   Yeah.  There was a period of time where there was no

8   correspondence or messages, and so at one point I just followed

9   up to say, "Hey, is anything happening here?" in an email.

10          **MR. WARD:**  Let's look at the next email, if we could.

11  We can pull this down.

12      Can we pull up Exhibit 227, please.

13  **Q.**   Mr. Szeder, looking down at the bottom of this email where

14  it says "Hi, Marcus.  As we discussed earlier," is that the

15  original email that we looked at in the previous document?

16  **A.**   That is correct.

17  **Q.**   This was the offer you were made, the CTO offer?

18  **A.**   Correct.

19          **MR. WARD:**  We can pull out of that.

20  **Q.**   In looking up above, are the emails above your

21  communications with Mr. Dillman and Mr. Abramoff regarding this

22  offer?

23  **A.**   Yeah, correct.

24          **MR. WARD:**  All right.  At this point, can we move to

25  admit Exhibit 227.

1          **MR. STEFAN:**  No objection.

2          **THE COURT:**  227 will be admitted.

3          (Trial Exhibit 227 received in evidence.)

4    **BY MR. WARD:**

5    **Q.**  All right.  If we could look first at the paragraph

6    towards the bottom where it says "On October 4th, 2017."

7          So you previewed this a minute ago, Mr. Szeder, but when

8    you write a month after -- well, about three weeks after the

9    initial offer "So I guess this isn't happening?" what did you

10   mean there?

11   **A.**  You know, I received an email offer but no agreement to do

12   anything; and so in looking at that, I was just like, okay.  So

13   I guess nothing is happening here.  I just want to sort of

14   close this out as a, you know, there's something here or there

15   isn't.

16          **MR. WARD:**  All right.  And then can we pull out of

17   this, please.

18          Can we look, then, at the response right above that.

19   **Q.**  Do you see this response from Japheth Dillman?

20   **A.**  That is correct, yes.

21   **Q.**  And when Mr. Dillman writes, "Incorrect.  You just went up

22   on the site," what did you understand that to mean?

23   **A.**  That they put my face and my name and my bio up on their

24   website.

25   **Q.**  And when you read this, did you confirm that, in fact,

1    your name and face and website were up on -- your name and face

2    and bio were up on the website?

3    **A.**   I did.

4    **Q.**   At the time he sent this, did you have any agreement with

5    AML BitCoin?

6    **A.**   I did not have an executed agreement nor a draft of an

7    agreement.

8    **Q.**   And had you done any work at all with the company at this

9    point?

10   **A.**   I had not.

11   **Q.**   Below that it says [as read]:

12           "Jack, can we get John a wallet issued?"

13       What is he referring to there?

14   **A.**   As a part of accepting the AML BitCoin, there was a thing

15   where I had to go and download a piece of software to generate

16   a wallet to accept the crypto payment.

17           **MR. WARD:**   Can we pull out of this part of the email,

18   please, and then just highlight the whole top half of the email

19   from the dark line all the way down to where it says "Japheth

20   Dillman."

21   **Q.**   Starting at the bottom, on October 4th, you see that email

22   from Mr. Abramoff?

23   **A.**   Yes.

24   **Q.**   Did you understand that to be instructions to download the

25   AML BitCoin Wallet?

SZEDER - DIRECT / WARD

1    **A.**    Yes.

2    **Q.**    Were you able to download the AML BitCoin Wallet?

3    **A.**    I think I went and tried.  I don't remember receiving

4    anything.

5    **Q.**    Looking up at the next email, it's dated October 28th, so

6    a little over three weeks later, and this is from you.  And you

7    say [as read]:

8            "I wanted to follow up on this, seeing as my

9        name is on the AML BitCoin website now and I do not

10       yet have my agreement.  Can you please update me on

11       the status of the agreement?"

12       At this point, Mr. Szeder, did you have any agreement?

13   **A.**    I did not.

14   **Q.**    And were you doing any work for the company?

15   **A.**    I was not.

16   **Q.**    And then there is a response from Mr. Dillman at the top

17   [as read]:

18           "I have asked the lawyer to immediately draft up

19       the agreement."

20       Were you eventually sent an agreement, a contract

21   agreement, to work for AML BitCoin?

22   **A.**    Yes, I was sent an agreement.

23   **Q.**    And then did you negotiate with anyone at AML BitCoin over

24   the terms of that agreement?

25   **A.**    I did negotiate with the -- with an attorney who was an

1  external counsel maybe, I believe, Neil something or other,

2  Somkin, Sumtin, something like that, who was -- sent me an

3  agreement with a bunch of terms that I would not have liked to

4  have signed, and we went into negotiation for a period of time.

5  **Q.**  How long was that period of time that you negotiated your

6  contract with AML BitCoin?

7  **A.**  I don't remember the exact duration of time.  I remember

8  it being an unacceptably long period of time.

9  **Q.**  Do you have -- can you --

10 **A.**  Weeks, yeah.

11 **Q.**  It would be weeks, not months or years but --

12 **A.**  Right, yeah.  Yeah, a couple of weeks --

13 **Q.**  So --

14 **A.**  -- at a minimum.

15 **Q.**  -- within a few weeks, were you then able to reach an

16 agreement to come on as the CTO of AML BitCoin?

17 **A.**  We did sign an agreement.  I was not happy with the terms,

18 but I would like to have been paid for my face being on their

19 website as a part of, you know, what I was supposed to be doing

20 there, and so I just settled and said, "I'm just going to have

21 to sign this under duress."

22 **Q.**  The email we just discussed was dated October 30th, and

23 you said it took weeks to get the contract signed.  So would it

24 be accurate to say the contract was signed in November, maybe

25 December of 2017?

1    **A.**    That fits my recollection, yes.

2    **Q.**    And then at the time you signed the contract, had you done

3    any work or been in any way involved as the CTO of AML BitCoin?

4    **A.**    I was not.

5    **Q.**    And then following that, in that time period after you

6    signed the contract, did you at that point in time begin to go

7    to work at AML BitCoin?

8    **A.**    Well, at that point I issued an execution invoice of which

9    two-thirds was paid; and generally speaking, I don't actually

10    start work until the execution invoice is fully paid.

11    **Q.**    Do you remember how much the execution invoice was for?

12    **A.**    I believe it was $7500.

13    **Q.**    And how much were you paid initially on that invoice?

14    **A.**    I was sent $5,000.

15    **Q.**    And how long roughly, if you remember, after you received

16    that invoice were you -- did you receive the $5,000?

17    **A.**    I don't remember specifically.  I do know there was a lot

18    of front and back about it.  Every time I sent and was told to

19    check, there were at least two or three times when it was

20    supposed to be there next business day over the course of a

21    couple of weeks.  Longer than I would expect on average for

22    clients that I'd worked with.

23    **Q.**    Do you know who was telling you this from AML BitCoin,

24    that it's taking longer and that there are delays?

25    **A.**    I think I would send the emails to Marcus to say, "Hey,

 1   you know, where's my payment on this?"

 2   **Q.**   Okay.  After being paid then and going into early 2018,

 3   did you at that point begin to do work at AML BitCoin as their

 4   chief technology officer?

 5   **A.**   I did not start work because I was not fully paid.

 6   **Q.**   Okay.  Did you continue to email Mr. Andrade or others at

 7   AML BitCoin and ask about the remaining amount of money you

 8   were owed?

 9   **A.**   There was a gap of about four months because I actually

10   did find full-time employment around that time from some people

11   I was working with in the past.  And so once I had settled into

12   my new job, I believe in the May time frame, I reached out to

13   say, "Hey, what's happening here?"  Because they were in

14   arrears for, you know, $2500.

15           **MR. WARD:**  Okay.  Can we look at -- we can pull down

16   this exhibit.

17       Can we bring up Exhibit 222, please.

18   **Q.**   Mr. Szeder, looking at the top, is this an email chain

19   between you and Marcus Andrade?

20   **A.**   That is correct.

21   **Q.**   Have you reviewed this email chain prior to testifying

22   here today?

23   **A.**   Yes, I have.

24   **Q.**   If we could just go through page 2 and 3.  If you can look

25   at those, were those communications between you and Mr. Andrade

1   in 2017?

2   **A.**   Yes.

3   **Q.**   And then let's go up and look at the first page.  And are

4   those conversations in May of 2018?

5   **A.**   Yes.

6           **MR. WARD:**  Move to admit Exhibit 222.  222.

7           **MR. STEFAN:**  No objection.

8           **THE COURT:**  222 will be admitted.

9       (Trial Exhibit 222 received in evidence.)

10  **BY MR. WARD:**

11  **Q.**   All right.  Can we just go to the second page.  Looking at

12  the -- does this page reflect emails between you and

13  Mr. Andrade in December of 2018?

14  **A.**   Yes.

15  **Q.**   And then the last email, the one at the top, the most

16  recent, was that December 8th of 2017?

17  **A.**   Correct.

18  **Q.**   Can we go back to the first page, please.  You see the

19  email --

20      If we could blow up the email at the bottom.  It starts

21  "On Thursday, May 3rd."

22      You testified earlier about following up with AML BitCoin

23  about your payment in May of 2018.  Is that what this email is?

24  **A.**   That is correct.

25  **Q.**   So in May of 2018, are you still owed an outstanding

**SZEDER - DIRECT / WARD**

1    balance for --

2    **A.**    Correct.

3    **Q.**    -- for your payments?

4        Okay.  When you write, "Also, I still get random crypto

5    inquiries and a few have come back with 'where can I look at

6    volumes of third-party AML trades' and then I don't know what

7    to say," what are you referring to there?

8    **A.**    Well, because I'm on the website, there were a handful of

9    people that were looking at AML BitCoin over the next couple

10   months and starting with this, where I'd seen an inquiry where

11   it's like, "Hey, I want to get some information on how to trade

12   the AML BitCoin," and I had no idea what to say.  Right?

13       And as a result of that, I decided to sort of check back

14   and say, you know, "Hey, there's an outstanding payment here.

15   Is this project still moving forward?  Is it dead?  What is

16   happening here?"

17   **Q.**    Okay.  After sending this email to Mr. Andrade, what

18   happened?

19   **A.**    We had a small conversation talking about where the status

20   of the project was, and he introduced me to a number of people

21   on his team to have follow-up conversations.

22   **Q.**    Okay.  When he -- when you had this conversation with him,

23   initial conversation that you said about the status of the

24   product, what did he tell you at that point in May of 2018

25   about the status of the product?

SZEDER - DIRECT / WARD

1  **A.**   That things were still in development and moving forward,

2  and then he introduced me to a handful of folks.

3  **Q.**   Did you -- when you say "a handful of folks," do you mean

4  employees at AML BitCoin?

5  **A.**   Some were not employees.  One of them may have been an

6  employee.  At least one was, like, working in the U.K. on some

7  sort of biometrics thing, Nigel or Richard or something like

8  that.  And then a lady, and I don't remember her name at the

9  moment, who was a project manager responsible for the website.

10 **Q.**   And at this point, how many conversations did you have

11 with people at AML BitCoin or related companies?

12 **A.**   I think I had about one conversation with each person

13 except for the website product manager.  We had more than one

14 conversation.

15 **Q.**   And then setting aside the Web product manager

16 discussions, for the other conversations with the technology

17 people, other than one conversation with each, did you do any

18 other -- did you have any other interaction or work with them

19 as a traditional chief technology officer?

20 **A.**   I did not.  There were action items for people to follow

21 up to get me access to things that I don't remember receiving.

22 **Q.**   Did you ask for access to materials that you weren't able

23 to get access to?

24 **A.**   I think it was suggested and offered.  I don't know that I

25 asked for access, but somebody was like, "Yeah, yeah, I'll get

1    you this and I'll get you access to the biometrics thing," and

2    then some Amazon instances that were running some kind of

3    system that I was going to take a look at.

4    Q.    And that data and that information, were you ever able to

5    get access to it and review it?

6    A.    I -- I don't think I was.  My recollection is a little

7    fuzzy, but I'm pretty sure that I did not.

8    Q.    All right.  You mentioned that you had a couple of

9    conversations with a -- I don't want to put words in your

10   mouth -- a Web product --

11   A.    Product manager or website manager, yes.

12   Q.    And what was the -- who was that person?

13   A.    I forget her name.  Sorry.

14   Q.    And what were the conversations with her about?

15   A.    She was asking for some help to ensure that the website

16   page load times were low, and they had a vendor that was doing

17   some WordPress development and making just the generic website

18   functional.

19   Q.    Did you -- sorry to interrupt.

20   A.    It was a little surreal because, you know, "Help me with

21   my website" is not usually something that I am asked.

22   Q.    Did you provide her advice and help on the website?

23   A.    I did.

24   Q.    Was that something that you felt was unusual, as the chief

25   technology officer, that that's what you would be doing?

1  **A.**    Yes.

2  **Q.**    After that, did you do any other work, substantive work,

3  with AML BitCoin?

4  **A.**    I did not.

5  **Q.**    Did you ever receive the remaining $2500 that you were

6  owed?

7  **A.**    I honestly don't remember.

8  **Q.**    The earlier contract referenced an additional payment of

9  AML BitCoin tokens.  Did you receive any of those?

10 **A.**    I do not have any, and I don't remember receiving any.

11 **Q.**    Okay.  At the time you were there, did you ever see a

12 working AML BitCoin that had anti-money laundering,

13 know-your-customer technology built into it?

14 **A.**    I did not see that, no.  I had a conversation with a

15 company that was building biometric stuff that I didn't see,

16 and another conversation about, you know, having some nodes

17 that were set up for mining or setting up their cryptocurrency

18 that I also did not recall seeing.

19 **Q.**    And for the biometrics, did you ever see a working

20 biometric product?

21 **A.**    I did not.

22 **Q.**    Okay.  During this time, to your knowledge, did your face

23 remain up on -- and bio remain up on the website?

24 **A.**    I believe it did.

25        **MR. WARD:**  All right.  Can we pull up Exhibit 626,

1    which has been admitted into evidence.  And if we could go to

2    page 9, please.

3    **Q.**  Mr. Szeder, do you see the -- see your face there?

4    **A.**  I do.  That is me.

5    **Q.**  Was this how you appeared on the AML BitCoin website as

6    you remember it?

7    **A.**  Yes.

8    **Q.**  And was this the image that you recall seeing on the

9    website back in 2017 when you were first told that you were up

10   on the website?

11   **A.**  That is correct.

12   **Q.**  And at that time when this image was up, you were not the

13   chief technical officer and you -- had you -- and you had not

14   done any work?

15   **A.**  That is correct.

16   **Q.**  Okay.  And at any point between the fall of 2017 and when

17   you stopped working for AML BitCoin in 2018, did your

18   website -- did your face and image come down off the website?

19   **A.**  I don't think it did.  And in hindsight, I probably should

20   have asked for that.

21   **Q.**  Okay.  After the work helping them update their website,

22   at some point did you -- did you get a complaint about an

23   unpaid AML BitCoin bill?

24   **A.**  That is correct.

25   **Q.**  And what was the complaint?

1  **A.**   Somebody from a company called Cloudflare, which does CDN

2  data hosting, they reached out to ask, because they found me on

3  the website, that they had been in arrears for a number of

4  months for being paid as a hosting provider.

5  **Q.**   And when the Cloudflare people told you that they hadn't

6  been paid, what did you do?

7  **A.**   I forwarded it to Marcus to say, "Hey, just as a heads-up,

8  you know, you have a vendor that's unpaid."

9        **MR. WARD:**   Could we pull out of this and bring up

10  Exhibit 221, please.

11  **Q.**   Is this the -- what is this?

12  **A.**   Yeah.   This is -- this is an email that I sent to Marcus

13  where someone from LinkedIn found me through the website, said,

14  "You know, we're, you know, looking to get paid for this and,

15  you know, can you help me?"

16        **MR. WARD:**   Can we move to -- I move to admit

17  Exhibit 221.

18        **MR. STEFAN:**   No objection.

19        **THE COURT:**   221 will be admitted.

20        **MR. STEFAN:**   Your Honor, could I ask that this be

21  admitted just for effect on the listener, not for truth, given

22  that Marcus is in receipt but there is no response?

23        **THE COURT:**   Well, what are you offering this for?

24        **MR. WARD:**   I'm offering it to corroborate his

25  testimony.

1      **THE COURT:**  You're seeking to have it admitted for the

2  truth of the statements in the document?

3      **MR. WARD:**  I am seeking to admit it, yes.

4      **THE COURT:**  All right.  And then do you have an

5  objection therefor?

6      **MR. STEFAN:**  Sorry.  That he --

7      **THE COURT:**  He's offering it --

8      **MR. WARD:**  I'm offering it for the truth.

9      **THE COURT:**  He wants the jury to consider the truth of

10  the statements contained.

11      **MR. STEFAN:**  Then my objection would be hearsay.

12      **THE COURT:**  What's your answer to that?

13      **MR. WARD:**  I can also offer it for effect on the

14  listener and action in conformance with it.

15      **THE COURT:**  Well, that's what I asked you initially.

16  So now that's what you're offering it for?

17      **MR. WARD:**  Yes.

18      **THE COURT:**  All right.  This will be admitted.

19      (Trial Exhibit 221 received in evidence.)

20      **THE COURT:**  This document, like you've heard now,

21  members of the jury, sometimes documents are admitted not for

22  the truth of what's stated in the particular item, but so you

23  can understand, we can all understand what happens next, what's

24  the reaction, how people interact with these materials.  And

25  that's what -- this is an example of that.  That's what

 1    Exhibit 221 is.  That's the reason it's being admitted, not to

 2    prove the truth of what's stated in here.

 3        Go ahead.

 4    **BY MR. WARD:**

 5    **Q.**  All right.  Mr. Szeder, looking at this email, starting at

 6    the part that says "Hello, John" and then "Thanks, Aaron," was

 7    that the email --

 8            **MR. WARD:**  Oh, can we publish it?

 9            **THE COURT:**  It's admitted.

10    **BY MR. WARD:**

11    **Q.**  Where it says "Hello, John" --

12    **A.**  Yes.

13    **Q.**  -- through "Thanks, Aaron," was that the email you

14    received?

15    **A.**  Yes.

16    **Q.**  And then the statement above [as read]:

17            "Just got an email I would like to bring to your

18        attention."

19    **A.**  Yes.

20    **Q.**  And that's from you to Mr. Andrade?

21    **A.**  Correct.

22    **Q.**  And to be clear, you don't know whether or not Cloudflare

23    was behind in -- was owed five months in payment or not?

24    **A.**  That is correct.

25    **Q.**  Okay.  Did you receive a response from Mr. Andrade?

1  **A.**   I do not believe I did.  I don't remember.  I think at

2  that point I decided that I don't think that there's anything I

3  can help with here.  And, you know, if they're behind on

4  payments here, I don't know that I would have traction with

5  working towards getting more paid work.

6  **Q.**   After this, did you have any subsequent interaction with

7  Marcus Andrade or AML BitCoin?

8  **A.**   I do not believe I did.

9  **Q.**   Have you served as a chief technical officer role in other

10  companies?

11  **A.**   Yes.

12  **Q.**   How did this compare to other traditional roles as the

13  chief technical officer?

14  **A.**   It was very different.  A lot of times as a chief

15  technical officer, I'm either building something or working

16  directly with people who are building something to give them

17  guidance or review their products at a deeply technical level

18  and assisting with, you know, team management.

19  **Q.**   Looking back, do you believe that they just wanted to put

20  your name and face up on their website?

21  **A.**   I -- that was my belief and understanding.

22         **MR. STEFAN:**  Objection.  Foundation.

23         **THE COURT:**  It was leading, so I'll sustain it on that

24  basis.

25         Go ahead.

1    BY MR. WARD:

2    **Q.**  Mr. Szeder, looking back, what do you believe was the

3    reason that they entered this agreement with you and put your

4    name and face up on their website?

5         **MR. STEFAN:**  Objection.  Calls for speculation.

6         **THE COURT:**  Overruled.

7         **THE WITNESS:**  In the conversations we had, there is an

8    email referencing a gentleman named Terence Poon who was unable

9    to be put up on the website; and when you have a technical

10   company and start-up that you're putting out there, you do want

11   to have some form of technical leadership visible.  So for

12   whatever reason he was not able to be on the website, I was

13   asked to participate in that role.

14   BY MR. WARD:

15   **Q.**  To be visible?

16   **A.**  Yeah.  A public-facing CTO, yeah.  That's mentioned in the

17   introduction email and in a few other places.

18   **Q.**  Even though you weren't doing any work for them?

19   **A.**  Correct.

20        **MR. WARD:**  Nothing further.  Thank you.

21        **THE COURT:**  CTO, is it chief technology officer or --

22        **THE WITNESS:**  Yes.

23        **THE COURT:**  -- chief technical officer?

24        **THE WITNESS:**  Chief technology officer.

25        **THE COURT:**  Mr. Stefan?

1        **MR. STEFAN:**  Yes, Your Honor.

2                     **CROSS-EXAMINATION**

3    BY MR. STEFAN:

4    **Q.**  So, Mr. Szeder, picking up sort of where the Government

5    left off, you know that, functionally, through the entire

6    period that you were working in this role at the

7    NAC Foundation, they did, in fact, have a functional chief

8    technology officer?

9    **A.**  They told me there was a gentleman named Terence Poon who

10   was doing work.  I could not testify as to whether what his

11   skill set was sufficiently good.  I have no idea.

12   **Q.**  That wasn't my question, though; right?

13   **A.**  Okay.

14   **Q.**  The question was:  You understood there to be a chief

15   technology officer in place at NAC Foundation at the time that

16   you had this contract with NAC Foundation, Mr. Terence Poon?

17   **A.**  Yeah, they did have somebody named Terence Poon who was

18   doing some kind of work.  The nature of that, I couldn't tell

19   you.

20   **Q.**  You understood him, though, to be the functional chief

21   technology officer behind the scenes?

22   **A.**  I don't recall saying that.

23              **MR. WARD:**  Asked and answered, Your Honor.

24              **THE COURT:**  I'll let you answer this, but then move

25   on.

SZEDER - CROSS / STEFAN

1    **THE WITNESS:** Yeah, I don't know his skill set.

2    Right?

3    **BY MR. STEFAN:**

4    **Q.** That wasn't my question, though.

5    **THE COURT:** Well --

6    **THE WITNESS:** Okay. I'm confused.

7    **THE COURT:** -- now move to a new area.

8    It's been asked enough. So, next question.

9    **BY MR. STEFAN:**

10   **Q.** You represented to the FBI on October 16 of 2019 that

11   Terence Poon was doing the real work but they needed a

12   public-facing CTO. That was your statement to the FBI;

13   correct?

14   **A.** Yeah. Doing the real work as in building something, yes.

15   **Q.** But Mr. Poon was unable to be the public face due to

16   employment restrictions. That was your representation to the

17   FBI on October 16th of 2019; correct?

18   **A.** Yes.

19   **Q.** So you understood Mr. Terence Poon to be doing the work of

20   the technical development for the AML BitCoin project?

21   **A.** Stated like that, yes.

22   **Q.** And you were never intended to replace him in his role in

23   that way; correct?

24   **A.** That's unclear to me. Sometimes I have been hired with

25   the intent to replace somebody over time.

 1    Q.    At the time, though, that wasn't the agreement that you

 2    had reached with the NAC Foundation, that you would be doing

 3    the day-to-day actual development of technology for

 4    AML BitCoin?

 5    A.    That is correct.

 6    Q.    Your role was, as you've indicated, to essentially be a

 7    public face for the technological development of the company?

 8    A.    That is correct.

 9    Q.    Strictly, as you understood it, because Mr. Poon could

10    not?

11    A.    Yes.

12    Q.    And once you were brought to this project, I think you

13    spoke to the fact that it took quite a bit of time to get an

14    actual agreement signed and in place; is that right?

15    A.    That is correct.

16    Q.    And it wasn't easy to deal with Mr. Andrade and all of his

17    attorneys in this process; right?

18    A.    That is correct.

19    Q.    It was kind of a hassle?

20    A.    It was time-consuming, and their lawyer was very good and

21    negotiated very hard for things that I wanted changed.

22    Q.    Yeah.   That attorney was Mr. Neil Sunkin.   Do you recall

23    that?

24    A.    That is correct.

25    Q.    And you were open with Mr. Sunkin about coming into the

 1  company as a figurehead?

 2  **A.**   Yes.

 3  **Q.**   That was an understanding that Mr. Sunkin, you know,

 4  shared with you, that this was a role where you would be a

 5  public-facing CTO?

 6  **A.**   Correct.

 7  **Q.**   And it was a subject of some of the discussion that you

 8  had with Mr. Sunkin regarding the terms of the contract and the

 9  extent of the role that you would have?

10  **A.**   Correct.

11  **Q.**   Those communications with Mr. Sunkin were also relayed to

12  Mr. Andrade as well; right?

13  **A.**   I have no idea.

14  **Q.**   Would a look at some of the email communications refresh

15  you on that point?

16  **A.**   Sure.

17         **MR. STEFAN:**  Can we display for just Mr. Szeder,

18  counsel, and the judge Exhibit -- Government Exhibit 223.

19  **Q.**   You see the email at the top of this Exhibit 223 from

20  yourself to Mr. Dillman with Mr. Sunkin and Mr. Andrade cc'd on

21  it?

22  **A.**   Mm-hmm.  I do see this, yes.

23  **Q.**   And you indicate in this email that you're looking forward

24  to getting everything wrapped up with, I guess, the agreement

25  that was in discussion?

1  **A.**   That is correct.

2  **Q.**   Can we go down to the bottom of this email.  Not the very

3  bottom, but the follow-up from -- do you see -- I'll just

4  reference it.

5       There towards the middle of the page, on Monday,

6  November 6th, Mr. Dillman takes the messages from yourself and

7  Mr. Sunkin and sends them on?

8  **A.**   I do see that, yes.

9  **Q.**   And then below that, on November 6th, Mr. Sunkin indicates

10  that he's going to have Marcus review the revisions to the

11  agreement to that point?

12  **A.**   Okay.  Yes.

13  **Q.**   And then if we look at page 3, please.  I just want to

14  draw your attention specifically to the paragraph 1.  There's a

15  1 and a parentheses after it.

16       Specifically, you indicated to Mr. Sunkin [as read]:

17            "I am here for PR value only due to an existing

18       person's inability to take this role publicly."

19       Right?

20  **A.**   That is correct.

21  **Q.**   Okay.  So these communications were all ultimately relayed

22  to Mr. Sunkin and then to Mr. Andrade?

23  **A.**   Correct.

24  **Q.**   Okay.  We can leave Exhibit 223.

25       Ultimately, a contract was signed; right?

1    **A.**   That is correct.

2    **Q.**   It wasn't, though, for the terms originally discussed by

3    Mr. Dillman, for 20 hours a month and for $5,000 a month;

4    correct?

5    **A.**   I don't remember.  I did not review the contract; and as I

6    executed it, I don't remember the terms.

7    **Q.**   Would it -- well, would it sound right if I told you that

8    the amount was actually half of that?  It was $2500 a month you

9    agreed to and only 20 -- and only 10 hours of work per month?

10   **A.**   Okay.  That sounds okay.  I just don't remember that.

11   It's a long time ago.

12   **Q.**   Would taking a look at your agreement refresh your

13   recollection?

14   **A.**   Yes, it would.

15          **MR. STEFAN:**  Can we pull up just for the witness

16   Exhibit 3207, for the witness, counsel, and the judge.

17          And go ahead and go to the back page, the last page on

18   this exhibit.

19   **Q.**   Do you recognize your signature on this?

20   **A.**   I do.

21   **Q.**   And it's dated November 12th of 2017?

22   **A.**   Correct.

23   **Q.**   And if we could flip over to the second page and go to

24   paragraph 4, please.

25   **A.**   Yes, those are the terms.  Thank you for bringing that up.

SZEDER - CROSS / STEFAN

1    **Q.**    So that refreshes your recollection on the actual terms?

2    **A.**    Mm-hmm.

3            **MR. STEFAN:**    Okay.    We can remove Exhibit 3207.

4    **Q.**    So the agreement was for 10 hours of work a month at $2500

5    a month?

6    **A.**    Yes.

7    **Q.**    That amount of time would not be the amount of time that

8    you would devote to a full-time technological development

9    project; right?

10   **A.**    As a fractional CTO, I have built shippable prototypes

11   that have been on a 10-hour a month retainer basis, yes.

12   **Q.**    Okay.    So, as I think you were speaking to this a little

13   earlier on direct examination, you at different times have

14   roles in multiple companies at the same time?

15   **A.**    Correct.

16   **Q.**    And you, you said, fractional; so a small piece of work

17   for a company?

18   **A.**    Yeah.    "Fractional CTO" is the term, yes.

19   **Q.**    Okay.    Would those CTOs list you on websites or in their

20   publication materials as a CTO or fractional CTO or align you

21   with the company in some way?

22   **A.**    A lot of them didn't make it that far.

23        Japheth Dillman, who is listed there, was a co-founder to

24   which I was a CTO for a VR company would be one of them.

25        (Stenographer interrupts for clarification of the record.)

1    **THE WITNESS:**  Yes, of a VR company where I was the

2   CTO; and I was also concurrently a VP of -- was it -- I guess

3   customer services, professional services, for another company

4   at the same time.

5   **BY MR. STEFAN:**

6   **Q.**   When you're just a fractional CTO, would you ever be

7   included in a company's website or promotional material or

8   anything like that?

9   **A.**   Yes.  The two examples I stated were ones where I was up

10  on the website and public facing.

11  **Q.**   Okay.  I appreciate you for clarifying that.

12       So that wouldn't be uncommon for you?

13  **A.**   It would not be uncommon as a part of additional

14  responsibilities, yes.

15  **Q.**   You were brought into the NAC Foundation by Japheth

16  Dillman?

17  **A.**   Correct.

18  **Q.**   Japheth Dillman was someone that you worked with on this

19  other project?  I think you mentioned a VR company.

20  **A.**   Yes.

21  **Q.**   Which one was that?

22  **A.**   It was called Clever 4Ever, and it was a platform that we

23  were building with financing from HTC, the headset

24  manufacturer.

25  **Q.**   You also -- at the same time that you were working in this

1  role with the NAC Foundation, you also were working with

2  Mr. Dillman on the Block Bits Capital Company as well; is that

3  correct?

4  **A.**   Yes.  He had asked me to assist recovering the project,

5  which was in a sort of a bad state at the time.

6  **Q.**   You recall joining the Block Bits Capital project around

7  August 11th of 2017?

8  **A.**   I recall that happening around that time frame.  I

9  couldn't tell you the specific dates, but yes.

10  **Q.**   And your work on that project was also not full-time work;

11  right?

12  **A.**   Correct.

13  **Q.**   I believe you worked about 20 hours a month for Block Bits

14  Capital.  Does that sound right?

15  **A.**   I don't remember the exact hours, but it was a fixed

16  number of hours; and because the project was under duress, my

17  expectations with him was like "I can't put in a lot of

18  complimentary overtime on this.  You know, I'll help you build

19  it, but at Hour 20 each month, I have to stop and go do other

20  things."

21  **Q.**   When you say "under duress," I believe you're referring to

22  the company's difficulty in putting together an autotrader.

23  **A.**   Yes.

24  **Q.**   Specifically, this was an autotrader bot, or robot?

25  **A.**   Yes.

**SZEDER - CROSS / STEFAN**

1  Q.   And it was supposed to automatically perform arbitration

2  trades on cryptocurrency trading platforms?

3  A.   That is correct.

4  Q.   And Mr. Dillman had, to your understanding, represented to

5  his investors, stakeholders in the company, that this was

6  something that was going to be part of the Block Bits Fund

7  project?

8  A.   I -- I don't remember what he was representing to who

9  about that.  I just know that he had someone who was supposed

10  to build it, and they left the project, and he needed it built

11  urgently.

12  Q.   So you were brought in as an emergency ripcord to try to

13  save the autotrader project?

14  A.   Correct.

15  Q.   And when you took over, there was no meaningful autotrader

16  in place at all?

17          **MR. WARD:**  Objection.  Relevance.

18          **THE COURT:**  Where are you going with this?

19          **MR. STEFAN:**  Mr. -- may I have a moment, Your Honor?

20              (Co-counsel confer off the record.)

21          **MR. STEFAN:**  Your Honor, I'm impeaching an absent

22  declarant under Rule 806; and in this case, it's Mr. Japheth

23  Dillman, the alleged co-conspirator.

24          **THE COURT:**  I think the objection is not that aspect

25  of it.  But what's the relevance of all this?

1    **MR. STEFAN:**  Your Honor, I'm establishing the ultimate

2    foundation for the impeachment that --

3    **THE COURT:**  You may go ahead.  You can proceed.

4    **BY MR. STEFAN:**

5    **Q.**  So there was no meaningful autotrader in place when you

6    took over?

7    **A.**  Correct.

8    **Q.**  You had to start from scratch?

9    **A.**  Correct.

10   **Q.**  Part of the reason that you came to be involved in this

11   project was actually a connection with a gentleman named Brad

12   Grimm; right?

13   **A.**  That is correct.

14   **Q.**  He was another friend of Japheth Dillman or associate of

15   Japheth Dillman?

16   **A.**  Actually, Brad has been an employee of mine at a couple of

17   different occasions.  I knew Brad independently from Japheth.

18   **Q.**  You understood from Brad the situation at Block Bits

19   Capital was dire with respect to the autotrader?

20   **A.**  I understood it from Japheth, who asked me for help.

21   **Q.**  Okay.  Now, you wouldn't consider yourself, at least at

22   the time, to be a cryptocurrency expert?

23   **A.**  I was an enthusiast.  A lot of times when I get brought

24   into projects, it's because I'm a broad generalist and I bring

25   skills that are very broad-based to come and learn a space and

1    solve problems in it.  I would say more than half of my

2    projects are stuff that didn't exist two years before I was

3    brought in to help, and a lot of times I learn as I go.

4    **Q.**    So it would be sort of the situation that you might deal

5    with in a cryptocurrency project, at least in this time frame?

6    **A.**    Correct.

7    **Q.**    You did think yourself qualified or competent to build the

8    autotrader?

9    **A.**    Yes.

10   **Q.**    You were only allocated, though, 20 hours of work per

11   month towards that goal; yes?

12   **A.**    I said I would do my best within that time to get it to

13   completion.

14   **Q.**    There were certain aspects of the autotrading algorithm a

15   little too subtle for you to even confidently handle yourself?

16        **MR. WARD:**  Objection.  Assumes facts not in evidence

17   and relevance.

18        **THE COURT:**  Overruled.

19        **THE WITNESS:**  I don't understand the question.

20   **BY MR. STEFAN:**

21   **Q.**    There were certain parts of building the autotrader

22   algorithm that you would need assistance on, that you couldn't

23   have done yourself?

24   **A.**    Such as?

25   **Q.**    Well, were there?  I can ask -- I can ask the question

1    just openly.  Were there aspects of it?

2    **A.**    I was able to get a functioning autotrader that spotted

3    and executed trades in the final month of their fund, and I did

4    not have external help in building that.

5    **Q.**    Do you recall talking to the FBI on January 9th of 2019?

6    **A.**    I remember I spoke to them.  I don't remember specifically

7    what day.

8    **Q.**    You told them there were certain aspects of the

9    autotrading algorithm that were too subtle for you to

10    confidently handle yourself.  Those were your words to them?

11    **A.**    I don't remember that.

12    **Q.**    Also, you've represented that you had finished the

13    autotrader project?

14    **A.**    We got a prototype that was functioning, that could

15    identify and execute trades, yes, but then we ran out of time.

16    **Q.**    Specifically, you were stopped -- payments stopped coming

17    in from Japheth Dillman?

18    **A.**    Yeah.

19    **Q.**    And so you didn't get work -- or you didn't work without

20    the pay?

21    **A.**    Well, yes.  I have a family.  I have to pay my bills.  And

22    because I'm time slicing between multiple companies, I have to

23    take my commitments very seriously.  And I told them in advance

24    that this would be a very time-sliced and very limited project.

25    **Q.**    And, to your knowledge, Block Bits never actually finished

 1    a fully functional autotrader?

 2    **A.**    I sent back the laptop with the prototype, and I don't

 3    know what happened afterwards.

 4    **Q.**    Again, you spoke to the FBI on January 9th of 2019?

 5    **A.**    Mm-hmm.

 6    **Q.**    You told them the autotrader was never actually

 7    operational?

 8    **A.**    Okay.

 9    **Q.**    Those were your words?

10    **A.**    I don't remember.  Let's -- yes, let's say that that's

11    what I said.  I don't remember saying that, but I also don't

12    remember what they did with it either.

13    **Q.**    In the course of this time frame that you worked with

14    Block Bits Capital, starting in August of 2018 --

15    **A.**    Mm-hmm.

16    **Q.**    -- Mr. Dillman made representations to Block Bits

17    investors that the autotrader was functional --

18    **A.**    Okay.

19    **Q.**    -- did he not?

20          You're aware of that?

21    **A.**    Yeah, that makes sense.

22    **Q.**    He did make those representations to Block Bits investors

23    that the autotrader was functional?

24    **A.**    I think that's how he raised his money, yes.

25    **Q.**    As early as August of 2018?

1    **A.**    I don't remember when he was raising money, but, yes, that

2    sounds reasonable.

3    **Q.**    Or even whenever he was raising money aside, after the

4    money was raised, he would make representations to those people

5    who had invested in Block Bits Capital --

6    **A.**    Correct.

7    **Q.**    -- that the autotrader was functional?

8    **A.**    Right.

9        **MR. STEFAN:**    Can we please see Exhibit 3184.

10        And that's just being displayed to the witness; correct?

11    **Q.**    Mr. Szeder, this is an email that the FBI showed you in an

12    interview on October 16th of 2019; right?

13    **A.**    Okay.    Yes.

14    **Q.**    Do you recognize it as an email that they showed you?

15    **A.**    I don't remember, but I assume that they did since it's in

16    the record.

17    **Q.**    Did you have any reason to question that this is, in fact,

18    the email that they showed you?

19    **A.**    It looks like a real email, yes.

20        **MR. STEFAN:**    Defense moves to admit 3184.

21        **MR. WARD:**    Objection.    Hearsay.

22        **MR. STEFAN:**    Your Honor, we're impeaching the absent

23    declarant, Mr. Japheth Dillman, with his prior --

24        **THE COURT:**    Why are you impeaching?    He's not on the

25    stand.    You're impeaching some witness who's not here?

 1          **MR. STEFAN:**  Yes, Your Honor.  He is an absent

 2   declarant in this instance, a co-conspirator whose many myriad

 3   statements have been introduced to the Court, and the defense

 4   is impeaching Mr. Dillman under 806.

 5          **MR. WARD:**  Mr. Dillman's not a witness in this case.

 6   He's not here.  It's hearsay.  And I'm not sure it's relevant.

 7          **MR. STEFAN:**  He --

 8          **THE COURT:**  You do seem to be off on a tangent that

 9   I'm not sure where you're going.

10       I'm going to sustain the objection.

11          **MR. STEFAN:**  Your Honor, may I have a moment?

12          **THE COURT:**  Yes.

13              (Co-counsel confer off the record.)

14          **MR. STEFAN:**  Your Honor, the defense requests a

15   sidebar.

16          **THE COURT:**  Okay.

17       (The following proceedings were heard at the sidebar:)

18          **THE COURT:**  Okay.

19          **MR. STEFAN:**  He's not a witness who's testifying in

20   court, but he's a co-conspirator listed by the Government whose

21   many, many, many, many, many out-of-court statements have been

22   offered under the co-conspirator exception and under which we

23   should be able to impeach.

24          **THE COURT:**  806 says nothing about a witness who's not

25   been called to testify.  I don't know where you're getting 806.

1      You can't use this witness, who is not Mr. Dillman, to

2  start impeaching a witness who's not here.

3          **MR. SHEPARD:**  The rule says when a hearsay

4  statement -- and it specifically references the co-conspirator

5  statement -- has been admitted into evidence, the declarant's

6  credibility may be attacked by any evidence that would be

7  admissible for those purposes if the declarant had testified.

8      So that's -- they don't get to call -- they don't get to

9  introduce, through the co-conspirator exception, testimony from

10  a witness and then be immunized from attacks on that witness's

11  credibility.  That's what Rule 806 establishes.

12          **THE COURT:**  All right.

13          **MR. WARD:**  I don't read 806 -- it's [as read]:

14       "If the party against whom the statement was

15      admitted calls the declarant as a witness, the party

16      may examine the declarant on the statement as if on

17      cross-examination."

18      Here, this evidence would -- would be admissible to

19  cross-examine Mr. Dillman if he were a witness, but he's not a

20  witness.  And this witness cannot speak to Mr. Dillman's

21  credibility or the truth of his statements.

22          **THE COURT:**  806 doesn't do what you're talking about.

23      They've admitted co-conspirator statements, as they're

24  entitled to do.  You can't then just use some random witness to

25  get up there and start spending time impeaching this absent

1    witness.  Plus, I don't think the jury will know -- have a clue

2    what you're talking about.

3         **MR. SHEPARD:**  Well, that's what closing argument is

4    ultimately for.

5         **THE COURT:**  Well, okay.

6         **MR. SHEPARD:**  But the rule allows us to admit evidence

7    that we could have used to cross-examine Mr. Dillman were he

8    called.  So what we're doing is introducing that evidence

9    through this witness.

10        He doesn't have to answer questions -- we don't intend to

11   ask him questions about it.  We're just introducing this

12   evidence that is impeaching of Mr. Dillman.

13        That's what, to my understanding --

14        **THE COURT:**  It doesn't make any sense to have a

15   witness on the stand, who you've just sort of acknowledged is a

16   bystander, and then you're admitting -- you're trying to admit

17   thing that impeaches a witness who's not here.

18        Now, maybe there's a way you can submit some of this for

19   purposes of attacking Dillman.  I don't know.  But I don't

20   think it's this way.

21        **MR. SHEPARD:**  But we have to authenticate it to do

22   that, and here's a witness who can authenticate it for us.

23        **MR. WARD:**  I don't know that he can authenticate it.

24   There may be other ways to authenticate it, but that's --

25        **MR. SHEPARD:**  That's what we're trying to find out.

**MR. WARD:** But authenticating it still doesn't make it admissible. Even if he can authenticate it, you still have to --

**MR. SHEPARD:** It does make it admissible. Once it's authentic, we get to impeach Mr. Dillman as if he were here.

**THE COURT:** Well, you can do your authentication examination, but I'm not going to admit this material because I don't think, unless you give me something more than this, that 806 is the vehicle for what you're trying to do here.

So if you want to show it to him so he can say, "Yes, I know this document. I recognize it. I received it," or whatever, you can do that, but I'm not going to let you admit it into evidence, and I'm not -- I'm uncomfortable you asking this witness questions about impeaching Dillman. He's not the man to do it. So...

**MR. STEFAN:** Your Honor, he is the man to do it in many respects because he was the person responsible for developing the autotrader that Mr. Dillman was representing to other investors existed.

**THE COURT:** By the way, what's the point of all that? This seems to be a complete tangent. Dillman may have done all sorts of bad things. What are you offering that for?

**MR. STEFAN:** Mr. Dillman's credibility with respect to all of the myriad examples of communications that the Government has brought in as co-conspirator statements.

 1  Again, under 806, we're looking to impeach this --

 2      **THE COURT:**  There's no -- they put in co-conspirator

 3  statements saying Dillman is a co-conspirator.  Where's

 4  Dillman's credibility involved in co-conspirator statements

 5  being admitted by the Government?  They're not presenting him

 6  as a credible witness.

 7      **MR. STEFAN:**  Because under 806, he could be attacked

 8  as if -- in the same way as if he testified.  If he testified

 9  and he was on the stand, I would ask him:  You said X on this

10  date.  That was false.

11     That's 608(b), straightforward, you know.

12      **THE COURT:**  Well --

13      **MR. WARD:**  Well, if he's on the stand, you could, but

14  not here and not this way.

15      **MR. SHEPARD:**  806 says since he's not here on the

16  stand and you admitted his testimony that way, we get to

17  impeach him as if he were here.

18      **THE COURT:**  Again, where in 806 does it say that you

19  can take a random witness and use 806 to -- I mean, he -- he's

20  just -- you don't even need him.  What's the point here?

21      **MR. SHEPARD:**  He's authenticating the --

22      **THE COURT:**  Well, okay.  No.  Don't go down this path.

23  806 doesn't do this for you.

24     That doesn't mean you can't try to figure out some other

25  way.  You've got to present to me how it would work and why

 1  impeaching Dillman makes sense here, but this is not the way to

 2  do it.

 3                     (Sidebar concludes.)

 4      (The following proceedings were heard in open court.)

 5  **BY MR. STEFAN:**

 6  **Q.**   Thank you, Mr. Szeder --

 7  **A.**   Yeah.  No worries.  Welcome back.

 8  **Q.**   -- for your patience.

 9      Okay.  Just briefly turning back to your time at

10  AML BitCoin and in this public-facing role, in the short time

11  that you were with the company, you didn't attend any sales

12  meetings?

13  **A.**   I did not attend any sales meetings.  The vast majority of

14  the time that was under agreement was me waiting for final

15  payment of the execution invoice.  I sent him an invoice at the

16  start of this for $7500.  And as a rule of thumb, I tell people

17  I'm not a bank, so I have to wait until I'm fully paid before I

18  engage.

19  **Q.**   So in so many words, you spent most of your time, if I

20  may, doing nothing?

21  **A.**   Waiting to get paid.

22  **Q.**   Waiting.

23  **A.**   And also had my face up on the website, which, you know,

24  is not a zero-dollar value.

25  **Q.**   Right.  Which is something that you understood would be

SZEDER - CROSS / STEFAN

1   part of being the public-facing CTO?

2   **A.**   That is correct, a part of it.

3   **Q.**   You didn't attend meetings about the creation of the

4   AML BitCoin or software development?

5   **A.**   I did not.

6   **Q.**   You were aware that there were some AML BitCoin personnel

7   in England working on parts of the technology; right?

8   **A.**   That is correct.

9   **Q.**   You're not familiar with the details of their work?

10  **A.**   We had one meeting, and I didn't come away from it with an

11  action item for me to do more.

12  **Q.**   So you participated in one meeting, but you didn't have

13  anything to do after that meeting?

14  **A.**   Correct.

15  **Q.**   You never had hands on any of the source code or wrote any

16  code yourself for AML BitCoin?

17  **A.**   I did not, no.

18  **Q.**   And didn't know the details of what the London team was

19  doing?

20  **A.**   Correct.

21  **Q.**   Or the other software developers involved in the project?

22  **A.**   That is correct.

23  **Q.**   And though you were, you've described it as a figurehead

24  position, and it's been seen in some of the messages that have

25  been reviewed, you didn't go out as a spokesperson for

**SZEDER - CROSS / STEFAN**

1   AML BitCoin at conferences, say?

2   **A.**    No, that did not happen.

3   **Q.**    And you did not pitch AML BitCoin as a purchase to

4   potential buyers?

5   **A.**    I did not.

6   **Q.**    You didn't review the AML BitCoin technology yourself?

7   **A.**    I attempted to, but I don't remember getting access.    I

8   remember having a conversation with Hung something or other,

9   and I think there was a separate conversation maybe with

10  Terence, and I was supposed to get access to go and take a look

11  at it so I could be conversant in what was there, but that

12  never materialized.    And that was around the time that the

13  Cloudflare invoice showed up and I realized this might not be

14  something I can help with.

15  **Q.**    Okay.    So you didn't review the technology yourself?

16  **A.**    I tried to but was not successful.

17  **Q.**    In fact, you're familiar with what the AML BitCoin white

18  paper is or what a white paper is generally?

19  **A.**    Yes, absolutely, uh-huh.

20  **Q.**    You never read the white paper about the company?

21  **A.**    I did review the white paper for the AML BitCoin, yes.

22  **Q.**    Do you recall talking to the FBI on October 16th of 2019?

23  I think we discussed that earlier.

24  **A.**    Okay.

25  **Q.**    Do you recall speaking to the FBI?

1    **A.**    I did, mm-hmm.

2    **Q.**    You told them on October 16th, 2019, you never read the

3    white paper about the company.  That would have been --

4    **A.**    I don't remember that, but okay.  I don't know if I read

5    it before or after, but I did recall looking at it because it's

6    on the -- it's on the front page of the website.

7    **Q.**    Your words to the FBI were "Never read the white paper

8    about the company."

9    **A.**    Okay.  Maybe I did after at that point, but okay.

10    **Q.**    By October 16th of 2019, you weren't working with the

11    NAC Foundation anymore?

12    **A.**    I was not, no.

13    **Q.**    Your relationship with the NAC Foundation ended around

14    June of 2018 --

15    **A.**    Correct.

16    **Q.**    -- is that right?

17    **A.**    Mm-hmm.

18    **Q.**    Around that time, you had some pesky small claims court

19    matter that was consuming some of your time.  Do you recall

20    that?

21    **A.**    I did have a small claims court matter where I hired an

22    attorney, and I did not spend any of my time while waiting for

23    them to take care of a rental deposit, yes.

24    **Q.**    You reported at that time that you did not think you could

25    devote 10 hours to the NAC Foundation each month?

1   **A.**   Okay.  I guess I said that.  All right.

2   **Q.**   And with respect to other aspects of the company, you

3   weren't part of creating the Super Bowl ad; right?

4   **A.**   No.

5   **Q.**   Or have any --

6           **THE COURT:**  No, you were not?

7           **THE WITNESS:**  No, I was not, no.

8   BY MR. STEFAN:

9   **Q.**   And you didn't have any role in the business development

10  conversations that the company was involved in?

11  **A.**   No, I did not.

12  **Q.**   Or any knowledge of -- or at least firsthand knowledge of

13  how those conversations were progressing?

14  **A.**   No.

15  **Q.**   You're familiar, though, you had at least one conversation

16  with Dr. Terence Poon?

17  **A.**   I believe so.

18  **Q.**   To your knowledge, is he a university professor in

19  Hong Kong?

20  **A.**   I don't remember where he was or what he did.  I think

21  they said that he was at a university somewhere, but I honestly

22  couldn't tell you what country.

23          **MR. STEFAN:**  Okay.  Your Honor, may I have a moment?

24          **THE COURT:**  Yes.

25                  (Pause in proceedings.)

1    **MR. STEFAN:**  Thank you for your time.

2    No further questions.

3    **THE COURT:**  Mr. Ward?

4    **MR. WARD:**  Just briefly.

5    <u>**REDIRECT EXAMINATION**</u>

6    BY MR. WARD:

7    **Q.**   Mr. Szeder, you were asked on cross-examination about

8    having your face on the website, and you said, I believe, that

9    that is not a zero-dollar value.

10   **A.**   Yeah.

11   **Q.**   What does that mean?

12   **A.**   I wouldn't just go to somebody and say, "Yeah, I want to

13   be a part of your project and put me in your pitch deck and up

14   on your website" for free.  I would want consideration for

15   that.

16   **Q.**   Why?

17   **A.**   Because there's value.  Quid pro quo.  There's a value for

18   the business in having a technology leader associated with them

19   and, therefore, there should be compensation for that.

20   **Q.**   Does that send a certain message to investors or

21   purchasers or people interested in the company?

22   **A.**   Yes.

23   **Q.**   Because why?

24   **A.**   It shows that you have a complete team.  There's a lot of,

25   I guess -- if you have a technology company and you don't have

**PROCEEDINGS**

1  a chief technology officer, you know, what are you doing?

2  **Q.**  You were asked about your work as a fractional CTO for

3  other companies and being on their website.

4      When you were a fractional CTO and were up on their

5  website, were you doing actual work for those companies?

6  **A.**  I was working for the other companies, yes.  So I was

7  building product and being on the website for the Clever

8  website, and I was also the vice president of professional

9  services for another company and I was helping their customers

10  get online and use the product successfully.

11  **Q.**  So that's different than your role at AML BitCoin?

12  **A.**  Correct.

13          **MR. WARD:**  Nothing further.

14  Thank you.

15          **THE COURT:**  You may step down.

16          **THE WITNESS:**  Thank you.

17                  (Witness excused.)

18          **MR. HIGHSMITH:**  The United States calls Sean O'Malley,

19  Your Honor.

20          **THE COURT:**  All right.  We might as well take our

21  first break because there's a change of witness.

22      Members of the jury, remember my admonitions.  Do not

23  discuss this amongst yourselves or with anyone else.

24      And we'll start back here at 10:15.

25                  (Recess taken at 9:58 a.m.)

```
 1                 (Proceedings resumed at 10:16 a.m.)

 2            (Proceedings were heard in the presence of the jury.)

 3                 THE COURT:  The jury is present.

 4         Mr. Highsmith?

 5                 MR. HIGHSMITH:  The United States calls Sean O'Malley.

 6        (Witness enters the courtroom and steps forward to be sworn.)

 7                 THE COURTROOM DEPUTY:  Please raise your right hand.

 8                            SEAN O'MALLEY,

 9    called as a witness for the Government, having been duly sworn,

10    testified as follows:

11                 THE WITNESS:  Yes.

12                 THE COURTROOM DEPUTY:  Please be seated.

13         And state your name and spell your last name, please.

14                 THE WITNESS:  My name is Sean O'Malley, O, apostrophe,

15    M-a-l-l-e-y.

16                          DIRECT EXAMINATION

17    BY MR. HIGHSMITH:

18    Q.   Mr. O'Malley, what do you do for a living?

19    A.   I'm a managing director and I run the Financial

20    Intelligence and Investigations Unit at the Federal Reserve

21    Bank of New York.

22    Q.   How long have you worked at the Federal Reserve

23    Bank of New York?

24    A.   A little over 26 years.

25    Q.   Can you please explain briefly some of your duties and
```

1    responsibilities?

2    **A.**    Yeah.  We do a lot of different things.  A lot of my duty

3    is involved in working with the examination staff at the

4    Federal Reserve to make sure that the banks are safe and sound,

5    making sure that they meet their anti-money laundering and

6    sanctions obligations.

7        In addition, my team does -- conducts internal

8    investigations.  We're also the liaison for law enforcement.

9        And I have a team that responds to subpoenas for Fedwire

10   activity.  Fedwire is one of the -- it's the wire transfer

11   service that the Federal Reserve runs for banks throughout the

12   country; and, in fact, many banks use it internationally to

13   move money instantaneous around the globe.

14   **Q.**    Thank you for bringing up Fedwire.

15       Can you explain a little more just what Fedwire does and

16   what its purpose is?

17   **A.**    Yeah.  It's basically for liquidity, to make sure that

18   trade can flow throughout the globe unimpeded.  So we process

19   over half a million transactions per day, and it's over

20   $4 trillion a day.  So it's a huge amount of money moving

21   around the globe.

22       The only banks that can use the Fedwire system are

23   domestic banks in the United States, domestic depository

24   institutions, but foreign banks can access it indirectly.

25       So, indirectly, if they need to conduct a U.S. dollar wire

**O'MALLEY - DIRECT / HIGHSMITH**

1  transfer, they will obtain an account with a U.S. institution,

2  and that account relationship is known as a correspondent

3  banking relationship.  And then they can request money to be

4  moved on their behalf, and that money can be processed through

5  the Federal Reserve system just like any other domestic

6  transaction.

7  **Q.**  Is a Fedwire an electronic transmission?

8  **A.**  Yes, it is.

9  **Q.**  Does Fedwire have servers?

10  **A.**  Yes.

11  **Q.**  Where are Fedwire's servers located?

12  **A.**  We have two servers, in Texas and in New Jersey, and every

13  Fedwire transaction touches both servers.

14  **Q.**  Okay.  And in January 2018, where were Fedwire's servers

15  located?

16  **A.**  In Texas and in New Jersey.

17  **Q.**  Okay.  So if an electronic transmission occurs through

18  Fedwire, does it touch those servers in multiple states?

19  **A.**  Yes.

20  **Q.**  And is, therefore, a Fedwire transmission a transmission

21  in interstate -- an interstate transmission?

22  **A.**  Yes, every Fedwire is an interstate wire transfer.

23      **MR. HIGHSMITH:**  Could we please take a look at

24  previously admitted Exhibit 1224.  And we can publish this to

25  the jury because it has been admitted.

**O'MALLEY - DIRECT / HIGHSMITH**

1  **Q.**   And let's just briefly look at the first page.  Is this

2  a -- does this look to you like a Chase -- JPMorgan Chase bank

3  account kind of traditional bank statement?

4  **A.**   Yes, it is.

5  **Q.**   Okay.  And you see this is for a bank account for

6  Block Bits Capital, LLC, and the account number ends 8602.  Do

7  you see that?

8  **A.**   Yes, I do.

9  **Q.**   Okay.  And you see that we're looking at the time period

10  December 19th, 2017, through December 29th, 2017.  That's

11  page 1.  We're actually going to look at January.

12       **MR. HIGHSMITH:**  So if we could move ahead to page 5,

13  please.  And if we could zoom in on the top third, that would

14  be great.

15  **Q.**   So does this look like sort of a -- that same Chase Bank

16  account, page 5, and this time for the December 2017 through

17  January 31st, 2018, time period?

18  **A.**   Yes.

19  **Q.**   Okay.  Let's focus on that very first transaction,

20  "Deposits and Additions."

21       **MR. HIGHSMITH:**  Ms. Rosenbaum, could you please zoom

22  in on just that very first transaction, January 1st, 2012 --

23  excuse me -- January 12th, 2018.

24  **Q.**   I'd like you to just walk us through this entry.  Is this

25  a Fedwire?

1    **A.**    Yes.  This reflects a Fedwire credit.

2    **Q.**    How do you know it's a Fedwire?

3    **A.**    Well, it states Fedwire on the -- on the statement, and

4    it's also got another indication that confirms that it's a

5    Fedwire.  If you look on the second-to-the-last line, all the

6    way to the right, it says "IMAD," I-M-A-D.

7    **Q.**    Yeah.  What's that?

8    **A.**    That's a unique identifier that's only used in the Fedwire

9    system.  It's incoming message accountability data, is the

10   acronym, but it's basically giving it a unique code within the

11   Fedwire system for this particular wire transfer.  So it's

12   unique to this wire transfer.

13   **Q.**    Thank you.

14        Let's just focus on that top line.  It's a Fedwire credit

15   via Silicon Valley Bank in Santa Clara, California.  Do you see

16   that?

17   **A.**    Yes, I do.

18   **Q.**    What does that -- what information does that provide or

19   what does that say?

20   **A.**    Well, so this is a Chase statement.  So -- and it's a

21   credit.  So the receiver of the Fedwire would be Chase Bank.

22   Oh, excuse me.  And it went into this particular account.  So

23   what this transaction is telling us is where it came from.

24        And this is saying that the wire transfer came from

25   Silicon Valley Bank, and then it shows the routing number for

1    Silicon Valley Bank.  And a routing number is basically like an

2    account number at the Federal Reserve.  You can kind of think

3    of it that way.

4         And then this says "B/O."  So that's usually buy order.

5    And then it says "SVB Private Bank Santa Clara," which is

6    probably Silicon Valley Bank, "California."

7         And then --

8    Q.   Thank you.

9    A.   Okay.  That's the first line.

10   Q.   I don't want to cut you off, but thank you very much for

11   that explanation.

12        So this Fedwire is originating from Silicon Valley Bank in

13   Santa Clara and getting routed through the Fedwire system

14   servers to Chase Bank; is that right?

15   A.   That's correct.

16   Q.   And then just a couple more.  I want to pause on a couple

17   more lines here.

18        Do you see the reference on line 3?  It's a reference to

19   "AML Holdings," and then there's a reference a "Benjamin

20   Boyer."  Do you see that?

21   A.   Yes, I do.

22   Q.   Can you explain what the reference in the -- what the

23   reference line is and then also what the sort of "Ben Boyer"

24   line is?

25   A.   Yes.  So we've got the OBI.  That's -- there are certain

**O'MALLEY - DIRECT / HIGHSMITH**

1    fields that are mandated in the Fedwire system, and then others

2    are free text fields.  So that provides additional information

3    about the particular wire transfer.

4         So that information could be blank if you don't want to

5    put any additional information in, or it could be populated.

6    And if you populate it, it generally is providing additional

7    information for all parties involved in the wire transfer so

8    they can understand the purpose of the wire transfer.

9    **Q.**   Understood.  Thank you.

10        All right.  And then does it look, based on that name,

11   that this wire was sent from Benjamin Boyer through this

12   Fedwire credit?  Does that appear correct to you?

13   **A.**   No.  So -- so what it's saying, it's saying "Bnf."  So on

14   the second line, you've got a beneficiary, Block Bits Capital.

15   Okay?  And then you've got another -- that's the account holder

16   at Chase; right?

17        So then the additional information is showing the

18   beneficiary, Benjamin Boyer.  So that appears to be the

19   beneficiary at Block Bits Capital.

20        So it's kind of like for further credit to.  So

21   information -- the wire transfer is going into Block Bits

22   Capital, but then they're saying the further beneficiary, the

23   ultimate beneficiary, if you will, then is Benjamin Boyer.

24   **Q.**   Okay.  And so this is a wire for $730,000; is that

25   accurate?

**O'MALLEY - DIRECT / HIGHSMITH**

1    **A.**    That's correct.

2    **Q.**    And it's on January 12th, 2018; is that right?

3    **A.**    January 12, 2018, yes.

4    **Q.**    And this Fedwire traveled in interstate commerce because

5    it traveled through Fedwire servers; is that right?

6    **A.**    That is correct.

7            **MR. HIGHSMITH:**  No further questions.

8                    (Pause in proceedings.)

9            **MS. DIAMOND:**  No questions, Your Honor.  Thank you.

10           **THE COURT:**  Very well.  You may step down.

11           **THE WITNESS:**  Thank you.

12                   (Witness excused.)

13          **MR. HIGHSMITH:**  Your Honor, the United States calls

14   Kieran McCavanagh.

15    (Witness enters the courtroom and steps forward to be sworn.)

16           **THE COURT:**  Please come forward to the witness stand

17   to be sworn.

18           **THE COURTROOM DEPUTY:**  Raise your right hand.

19                   <u>**KIERAN MCCAVANAGH**</u>,

20   called as a witness for the Government, having been duly sworn,

21   testified as follows:

22           **THE WITNESS:**  I do.

23           **THE COURTROOM DEPUTY:**  Please be seated.

24      Can you state and spell your first and last name, please.

25           **THE WITNESS:**  Kieran McCavanagh, K-i-e-r-a-n,

1    M-c-C-a-v-a-n-a-g-h.

2                        **DIRECT EXAMINATION**

3    **BY MR. CHOU:**

4    **Q.**    Good morning, Mr. McCavanagh.

5    **A.**    Good morning.

6    **Q.**    What do you currently do for a living?

7    **A.**    I'm the VP of business development at Fox Sports.

8    **Q.**    Was there a time that you worked at the television network

9    NBC?

10   **A.**    Yes.

11   **Q.**    And when did you work at NBC?

12   **A.**    Between 1998 and 2019.

13   **Q.**    What was your role at NBC in early 2018?

14   **A.**    In 2018, I was VP of business development and oversaw a

15   number of our sports properties.

16   **Q.**    And as VP of business development at NBC, what were your

17   job responsibilities, at a high level?

18   **A.**    Oversaw NFL, Tour de France, a number of different

19   properties.

20       (Stenographer interrupts for clarification of the record.)

21       **THE WITNESS:**  NFL, the Tour de France, and a number of

22   other properties, like the NHL, and political sales and

23   advertising sales in general for the Fox -- I'm sorry -- for

24   the NBC portfolio.

25   \\\

1  BY MR. CHOU:

2  **Q.**   In 2018 -- or, actually, taking a step back, in the course

3  of your career, have you worked on advertising for the

4  Super Bowl?

5  **A.**   Yes.

6  **Q.**   And roughly how many years have you worked on advertising

7  for the Super Bowl?

8  **A.**   While I was at NBC or over --

9  **Q.**   Overall.

10  **A.**   Probably 15 years or so.

11  **Q.**   And how about while you were at NBC?

12  **A.**   I would say at least 10 to 12 years.

13  **Q.**   In the advertising world, how big of an event is the

14  Super Bowl?

15  **A.**   It's probably the largest, I would say.

16  **Q.**   And why is that?

17  **A.**   Just the sheer magnitude from a viewership perspective on

18  television and the amount of effort that goes into it from the

19  sales perspective, the costs of the units, and everything that

20  comes along with the size and scale on the Super Bowl.

21  **Q.**   How much does it cost to advertise in the Super Bowl?

22  **A.**   Currently?

23  **Q.**   Currently.

24  **A.**   Currently, it was -- this past Super Bowl, it was

25  $8 million for a 30-second commercial, plus a match of

1   $8 million to the rest of the portfolio across Fox, which is

2   where I am now.

3   **Q.**   How about for the 2018 Super Bowl?  How much did it cost

4   to advertise then?

5   **A.**   2018, my guess is probably around $5 million or so.  It

6   goes up incrementally each year.

7   **Q.**   And was there also a match component for the 2018

8   Super Bowl?

9   **A.**   Yes, most likely.

10  **Q.**   What is the process -- and let's direct our attention to

11  the 2018 Super Bowl.

12  **A.**   Sure.

13  **Q.**   What was the process for getting an ad into the 2018

14  Super Bowl?

15  **A.**   So the process basically begins with vetting the client

16  that is coming and asking to be in the Super Bowl and

17  qualifying them to make sure that they are a legitimate brand,

18  a legitimate company, that they purchase the actual spot before

19  we move on to any next, I guess, approval process or anything

20  like that.

21      So the very first thing we'll do is make sure that we have

22  what's called an AOR.  And an AOR letter is an agency of record

23  letter to justify that they are, in fact, the advertising

24  agency representing a client.  That gets entered into the

25  system.  And then we move on to the next step, which would be

1    to purchase the actual commercial time.

2        Once that is done, then we move on to the next step, to

3    send their creative, their commercial creative, to S&P, which

4    is standards and practices.  At that time it goes through a

5    reviewal process of their creative.

6        Once that process happens and their spot is either

7    creative or needs to have changes made to it, then we kind of

8    go back to the client and let them know that it's either

9    approved or needs certain changes, et cetera.

10   **Q.**   So at a high level -- did I get that right? -- there's

11   about three steps:  AOR, buy the ad, and review the creative?

12   **A.**   Yeah.  I would say qualifying, purchasing the ad, and then

13   reviewal -- reviewing of creative.

14   **Q.**   And at the end of all that process, if all goes well, the

15   ad is aired to millions of people at the Super Bowl?

16   **A.**   Yes.

17   **Q.**   Given all these steps, how far in advance before the

18   Super Bowl do advertisers tend to need to submit an ad to NBC?

19   **A.**   We always ask the advertisers to have their commercial

20   creative into us at least a month prior to the actual game.

21   **Q.**   So I'd like to direct your attention to the first couple

22   of months of the year 2018.  Around that time, did an ad agency

23   reach out to NBC about a Super Bowl ad regarding a

24   cryptocurrency named AML BitCoin?

25   **A.**   Yes.

1   **Q.**   And when was the Super Bowl in 2018?

2   **A.**   That was February 4th of 2018.

3   **Q.**   And do you remember who was playing?

4   **A.**   I want to say it was the Eagles and the Patriots,

5   I believe.

6          **MR. CHOU:**  If we could show the parties, the Court,

7   and the witness Exhibit 1474.

8   **Q.**   Mr. McCavanagh, have you -- have you reviewed this exhibit

9   in advance in preparation for your testimony here today?

10  **A.**   Yes.

11  **Q.**   Is this an internal email thread that you sent near the

12  time that you first learned about the AML BitCoin outreach?

13  **A.**   It is.

14  **Q.**   And did you send and receive these emails about a possible

15  Super Bowl ad in the ordinary course of your business at NBC?

16  **A.**   Yes.

17  **Q.**   Is this exhibit a fair and accurate depiction of those

18  emails?

19  **A.**   It is.

20          **MR. CHOU:**  The Government moves to admit 1474.

21          **MS. DENT:**  No objection.

22          **THE COURT:**  1474 will be admitted.

23      (Trial Exhibit 1474 received in evidence.)

24  **BY MR. CHOU:**

25  **Q.**   So, Mr. McCavanagh, I wanted to direct your attention to

1    the first email in this thread chronologically, which would be

2    on the second page.

3         **MR. CHOU:**  If we could scroll there.  If we could zoom

4    in on the first email here.

5    **Q.**   So you emailed somebody named Lisa Schneider.

6         **MR. CHOU:**  And then if we could zoom in on the email

7    above that.

8    **Q.**   Ms. Schneider, on January 30th, 2018, that morning, emails

9    you.  Do you see where it says "AMLB online master"?  It's like

10   a blue text, and then below that there's a password.

11   **A.**   Yes.

12   **Q.**   First of all, what was your understanding of who Lisa

13   Schneider was?

14   **A.**   I had no -- I did not know Lisa at all.

15   **Q.**   So how did she come to get your contact information?  Any

16   idea?

17   **A.**   I don't know, actually.  However, I am -- from a business

18   development perspective, people would reach out to somebody and

19   then get directed to the person who's in charge of business

20   development.  So in this regard, it was probably coming through

21   a channel that someone either directed her to me or something

22   of that effect.  But I was not familiar with her or the agency

23   that she represents.

24   **Q.**   So from your standpoint, at that time it was a relatively

25   cold outreach?

1    **A.**    That's correct.

2    **Q.**    And her email, what is that content that she sent you

3    there?

4    **A.**    So what this is, is a -- the blue is a link to her

5    commercial creative with a password that lets you into the site

6    to actually view the commercial spot.

7    **Q.**    And the date here is January 30th, 2018.  Did I get that

8    right?

9    **A.**    That's correct.

10   **Q.**    So is this about five days before that February 4th

11   Super Bowl?

12   **A.**    That's correct.

13   **Q.**    Was this the first time you had heard about this

14   AML BitCoin spot?

15   **A.**    It is, yes.

16          **MR. CHOU:**  We could zoom out.

17       And then if we turn to the next page, please.

18       And if we could please zoom in on Mr. Tim Moynihan's email

19   at the bottom.  We're just proceeding in chronological order.

20   **Q.**    So Mr. Moynihan emails Lisa Schneider and cc's you.  Who

21   was Tim Moynihan?

22   **A.**    Tim Moynihan was an account executive at NBC, reported to

23   myself and to Bob Melvin, who we work with as well.

24   **Q.**    And do you see where Mr. Moynihan emails Ms. Schneider

25   [as read]:

1                "Is there an agency of record letter that you

2           can share from the client"?

3    **A.**   Mm-hmm.

4    **Q.**   Earlier you testified about the AOR letter, or agency of

5    record letter.  What did -- what were you asking for here?

6    What was your team asking for?

7    **A.**   So this is the first -- as I mentioned, the first part of

8    qualifying a client, and he is asking Lisa to send her -- or to

9    send us at NBC that AOR letter.

10   **Q.**   And what is the significance, if any, of an agency of

11   record letter?

12   **A.**   It's significant in that it proves that an agency has been

13   retained by a client and is representing them on their behalf

14   to purchase commercial inventory from a television network.

15   **Q.**   Is it a prerequisite for having any sort of ad submission

16   entered into the system you were mentioning earlier?

17   **A.**   Yes.  In order -- the only way we can move forward with

18   any type of business with a client is to have that AOR letter

19   from them so we can enter that information into our billing

20   system, and it also helps make sure that there aren't other

21   agencies that are previously connected with them as well.

22   **Q.**   And then the step after that, as you mentioned earlier,

23   relates to, like, a buy?

24   **A.**   Correct.

25   **Q.**   What happens after an AOR letter is entered into the

1  system with respect to 2018 Super Bowl ads?

2  **A.**   So then we enter into conversations, negotiations around

3  the actual Super Bowl commercial.   And we discuss dollars; we

4  discuss the position of the commercial, where it would actually

5  run in the Super Bowl; we discuss the match dollars, where they

6  would be spent; and other factors like that.

7         **MR. CHOU:**   If we could zoom out of this email, please,

8  and then zoom in on Mr. McCavanagh's email on Jan. 31st, one

9  day later.

10        Okay.   Well, if we can just zoom in on Lisa Schneider's

11 response to the email we just looked at dated Jan. 30th,

12 2:58 p.m.

13        I'm sorry.   The email below that.   Sorry about that.

14 **Q.**   And Ms. Schneider responds that she's [as read]:

15             "Working on getting this.   Stay tuned."

16 **A.**   Yes.

17        **MR. CHOU:**   And then if we can zoom in on the email

18 above.

19 **Q.**   And in this email, you follow up with Ms. Schneider.   Am I

20 getting that right?

21 **A.**   That's correct.

22 **Q.**   Why were you following up on Jan. 31st, 2018?

23 **A.**   So based on this, what I most likely was doing, while

24 waiting for the AOR record, was also communicating to her what

25 the rates would be, not only for in-game, which we've probably

1    already discussed, but the pregame rates in case there was any

2    interest in doing a commercial or running their commercial in

3    the pregame as well.  So discussing options with her outside of

4    just running the Super Bowl -- within the Super Bowl.

5    **Q.**    Did this AML Bitcoin group ever run a pregame ad?

6    **A.**    They did not.

7    **Q.**    Did they ever run a Super Bowl ad?

8    **A.**    They did not.

9            **MR. CHOU:**  We can zoom out of this.

10        If we could please turn to Exhibit 1475, just for the

11   parties, the Court, and the witness.

12   **Q.**    So the emails below this, Mr. McCavanagh, do you see how

13   they're dated January 31st, 2018, a day later?

14   **A.**    I do.

15   **Q.**    Have you reviewed these emails in preparation for your

16   testimony today?

17   **A.**    I have.

18   **Q.**    And were these emails sent near in time to further

19   discussions about this AML BitCoin outreach you had learned

20   about a day earlier?

21   **A.**    Yes.

22   **Q.**    Is this a fair and accurate representation of those

23   emails?

24   **A.**    It is.

25            **MR. CHOU:**  I move to admit 1475.

1    **MS. DENT:**  No objection.

2        **THE COURT:**  1475 will be admitted.

3        (Trial Exhibit 1475 received in evidence.)

4    **BY MR. CHOU:**

5    **Q.**   Okay.  So, Mr. McCavanagh, if we could -- we'll look at

6    the second page chronologically, the oldest again.

7        **MR. CHOU:**  So if we could zoom in on just the entire

8    text on this page.

9    **Q.**   Do you see where Ms. Schneider writes [as read]:

10        "Please confirm this will suffice"?

11       And then does she attach some text below that or, like, an

12   email below that?

13   **A.**   Yes.

14   **Q.**   And who -- and in that attached part, who is that email

15   from?

16   **A.**   Marcus Andrade -- Andrade or Andrade.

17   **Q.**   And what's the "subject" line of that email?

18   **A.**   "Agency of Record."

19   **Q.**   So do you see where Mr. Andrade, Marcus Andrade, writes

20   [as read]:

21        "Dear Ms. Schneider, I want to confirm that

22        Executive Media Communications is our official agency

23        of record for the AML BitCoin and our company,

24        NAC Foundation, LLC, in our efforts to promote our ad

25        for the Super Bowl"?

1    **A.**    I do.

2    **Q.**    And then the signature line for Mr. Andrade says

3    "CEO NAC Foundation, LLC"?

4    **A.**    Mm-hmm.

5            **MR. CHOU:**  If we could zoom up -- go back up to the

6    first page, please.

7            This email, if we can zoom in on the bottom, the metadata

8    for that email we just saw.

9    **Q.**    And the subject for this email is "Agency of Record," and

10    is it dated January 30th, 2018?

11    **A.**    Yes.

12    **Q.**    So when you received this email, what did you understand

13    Ms. Schneider to be trying to send you?

14    **A.**    Trying to send me what maybe either her understanding of

15    an AOR letter was or some type of communication from somebody,

16    Marcus Andrade, giving her approval to say that "Yes, we are,

17    in fact, giving you the approval as the -- our agency of

18    record."

19    **Q.**    And she wrote to you [as read]:

20            "Tell me if this will suffice."

21            Something to that effect?

22    **A.**    Yes.

23    **Q.**    Was this an adequate or a sufficient agency of record

24    letter?

25    **A.**    No, it was not.

1  Q.   Why not?

2  A.   We don't accept email as verification of an agency of

3  record.   It's got to be a formal document that would be

4  submitted on letterhead, company letterhead.   It's signed by

5  the -- either a CEO or executive of the company.   And it's a

6  formal letter that we would then submit and have entered into

7  our system.

8  Q.   And then January 30th, that's about five days before the

9  Super Bowl?

10 A.   That's correct.

11         MR. CHOU:   If we could zoom in on Ms. Schneider's

12 email right above that.

13 Q.   So about a day later, does she follow up with you and

14 Mr. Moynihan?

15 A.   Yes, she does.

16 Q.   What does she ask of you-all?

17 A.   She's asking if there's any way we can let her know by

18 10:30 a.m. if we are able to run the spot.

19 Q.   And when did you -- when had you first received the link

20 to this AML BitCoin spot?

21 A.   Just the day before.

22 Q.   And so do you remember -- and she's asking for a response

23 by 10:30 a.m.?

24 A.   The following day.

25 Q.   What was your reaction, if any, at the time to receiving

1  this request about -- I don't know -- 24 hours later?

2  **A.**   I would say it was probably -- my response was probably

3  comical maybe.  It's not fathomable that we would approve a

4  commercial within a 24-hour time span.  There's so much that

5  goes into it, as I said, the qualification, purchasing the

6  spot, before it would ever even get to the point of us

7  submitting it to S&P for official approval.  And she's asking

8  for it without having gotten through those first two points.

9  **Q.**   To the best of your recollection, in the course of your

10  career, have you ever gotten a Super Bowl ad done from

11  submission to completion in 24 hours?

12  **A.**   No.

13         **MR. CHOU:**  If we can zoom out, please.  And we can

14  take this down.

15  **Q.**   So, Mr. McCavanagh, in the context of advertising and

16  Super Bowl advertising, are you familiar with the term "fishing

17  expedition"?

18  **A.**   I am.

19  **Q.**   And how are you familiar with that term?

20  **A.**   From years of working in the industry and knowing that

21  there are certain clients that look to achieve press or

22  publicity from a company denying their ability to run a

23  commercial of any type of creative.

24  **Q.**   And back at NBC in 2018, did NBC have policies and

25  procedures in place with respect to fishing expeditions?

1    **A.**    Yes.

2    **Q.**    What were those policies and procedures, to the best of

3    your understanding?

4    **A.**    So as I mentioned, the qualification process is really set

5    up so that we don't get flooded with commercial creative that

6    we have to review before a spot is actually purchased and

7    secured.  That qualification, then the purchase of the spot,

8    and then moving on to Step 3, which is submitting to S&P for

9    approval, is the process that's in place so people can't just

10   submit and say that they -- that they got denied or anything of

11   that nature.

12   **Q.**    And what's your understanding of the reasons for having

13   policies and procedures against fishing expeditions?

14   **A.**    To maintain the integrity of the company's standards.

15   **Q.**    In the steps you mentioned earlier, which was AOR, buy,

16   content review, where in those steps would the NFL review a

17   Super Bowl ad?

18   **A.**    So as part of the third step in the process, when we

19   submit creative to S&P for approval, they then review that

20   commercial creative for standards and practices of NBC to make

21   sure that they meet the qualifications of the FCC, et cetera,

22   and then they submit it over to the NFL for their approval to

23   make sure that we're meeting the NFL's, you know, guidelines

24   and standards.

25        And then once that process is completed, it then works its

1    way back to us with the communication from standards and

2    practices that says, "We, standards and practices and the NFL,

3    have approved this spot for air."

4    **Q.**    Based on your work on the 2018 Super Bowl as the

5    vice president of sales, how many steps, if any, did this

6    AML BitCoin spot clear?

7    **A.**    They did not clear any of the spots.  Starting from the

8    qualification, they never got past the qualification position.

9    **Q.**    And as part of those policies and procedures, to your

10    knowledge, did AML -- did NBC ever communicate any feedback

11    back to the folks who submitted this AML BitCoin spot?

12    **A.**    Not to my knowledge.

13            **MR. CHOU:**  One moment, please.

14                    (Pause in proceedings.)

15    **BY MR. CHOU:**

16    **Q.**    And, Mr. McCavanagh, one last question.  Did NBC ever

17    receive any money from the AML BitCoin project?

18    **A.**    They did not.

19            **MR. CHOU:**  Thank you.

20                    <u>**CROSS-EXAMINATION**</u>

21    **BY MS. DENT:**

22    **Q.**    Good morning.

23    **A.**    Good morning.

24    **Q.**    I just have a few questions for you.

25            Let's see.  You testified that the team you oversaw at NBC

1  was responsible for selling ads for the Super Bowl in 2018;

2  right?

3  **A.**    That's correct.

4  **Q.**    And you probably received all kinds of ads for

5  consideration that year; right?

6      (Stenographer interrupts for clarification of the record.)

7            **THE WITNESS:**  I didn't answer, actually.

8      Can you ask the question again, please?  I'm sorry.

9  **BY MS. DENT:**

10 **Q.**    Sure.  You received all kinds of ads for consideration --

11 right? -- from different kinds of companies, some serious, some

12 not serious, all different kinds of products?

13 **A.**    Yes.

14 **Q.**    And only a handful of potential customers actually make it

15 all the way through the review process; correct?

16 **A.**    That's not correct.

17 **Q.**    So how many of the ads actually get aired?

18 **A.**    How many commercials run in the Super Bowl?  Is that what

19 you're asking?

20 **Q.**    No.  I'm sorry.

21     Of all the people who try to get ads into the Super Bowl,

22 they don't all make it through the process; correct?

23 **A.**    I would say a large majority do, yes.

24 **Q.**    Okay.  And some of the time, you've even seen companies

25 that are actually just trying to get their Super Bowl ads

1  rejected so that they can use that fact for marketing and

2  press; correct?

3  **A.**  I'm sorry.  Can you ask that again?

4  **Q.**  Sometimes you get companies that are actually not

5  necessarily wanting their ad to be in the Super Bowl but,

6  rather, just are doing this as a way to get marketing and press

7  by saying, "Oh, we tried to get a Super Bowl ad, but they

8  rejected it"?

9  **A.**  That does happen, yes.

10  **Q.**  Yes.  When Mr. Chou showed you Exhibit 1475, you indicated

11  that Lisa Schneider had responded to your request for an AOR;

12  correct?

13  **A.**  She responded to my -- she did, yes.

14  **Q.**  Yes.  And you thought that was comical, didn't you?

15  **A.**  No, that's not correct.  There are two -- you're mixing

16  two different things.

17      I thought it was comical when she asked for approval on

18  the spot in 24 hours --

19  **Q.**  Okay.

20  **A.**  -- not for the AOR.

21  **Q.**  So --

22  **A.**  Her request for an AOR is separate from the -- from that

23  comical --

24  **Q.**  So you didn't think that her response to you was comical;

25  you just thought that the timing of her response to you was

PROCEEDINGS

1  comical?

2  **A.**    Her request to have asked for a spot to be approved within

3  24 hours I thought was comical, yes.

4  **Q.**    Okay.  Mr. Chou showed you that underneath your

5  communications with Ms. Schneider, there was an email from

6  Marcus Andrade to Lisa Schneider providing her some information

7  about who was working with NAC Foundation on this ad.  But you

8  weren't copied on that email, were you, between Lisa Schneider

9  and Mr. Andrade?

10  **A.**    I don't believe I was.  I believe, if my memory serves,

11  that she forwarded that to me.

12  **Q.**    Correct.  Okay.  So did you have any communications with

13  Mr. Andrade?

14  **A.**    Not to my knowledge.

15  **Q.**    So you didn't deal with him at all, did you?

16  **A.**    Not to my knowledge.

17  **Q.**    Never spoke to him or had a meeting with him?

18  **A.**    Not to my knowledge.

19        **MS. DENT:**  I have no further questions.

20        **MR. CHOU:**  Nothing further.

21  Thank you.

22        **THE COURT:**  You may step down.

23              (Witness excused.)

24        **MR. HIGHSMITH:**  The United States calls Hung Tran.

25   (Witness enters the courtroom and steps forward to be sworn.)

1           THE COURTROOM DEPUTY:  Please raise your right hand.

2                              HUNG QUOC TRAN,

3    called as a witness for the Government, having been duly sworn,

4    testified as follows:

5           THE WITNESS:  Yes.

6           THE COURTROOM DEPUTY:  Please be seated.

7       Can you state your name and spell your last name, please.

8           THE WITNESS:  My name is Hung Quoc Tran, Q-u-o-c and

9    T-r-a-n.

10                         DIRECT EXAMINATION

11   BY MR. HIGHSMITH:

12   Q.   Hello, Mr. Tran.

13   A.   Good morning.

14   Q.   What do you do for a living?

15   A.   I work in technology as a consultant or a senior manager.

16   Q.   Can you describe a little bit more what -- what do you do

17   in technology?

18   A.   A combination of project management, systems design, and

19   team/people management.

20   Q.   Are you a software developer also?

21   A.   Yes.  That's my former formal work.  But, you know, as I

22   rise up in kind of more senior roles, I do more people

23   management.

24   Q.   Okay.  Do you also manage software developers?

25   A.   Yes, I do.

H. TRAN - DIRECT / HIGHSMITH

1  Q.   For approximately how many years have you been working in

2  software development, either as a developer or as a manager of

3  developers?

4  A.   Close to 34 years.

5  Q.   Okay.  Did you meet Marcus Andrade?

6  A.   Yes, I did.

7  Q.   Did you do some work with Mr. Andrade?

8  A.   Yes, I did.

9  Q.   Okay.  Let's go back to start with how you met him.

10       Do you recall how you met Mr. Andrade?

11  A.   I was introduced through a mutual associate.

12  Q.   Okay.

13  A.   And then we met in Los Angeles.

14  Q.   Okay.  And why did your mutual associate introduce you to

15  Mr. Andrade?

16  A.   Mr. Andrade had need for the kind of expertise I have, and

17  my colleague thought that I was the best person to help him

18  with that.

19  Q.   Do you remember approximately when this was?

20  A.   Roughly, the later part of 2017.

21  Q.   And at that point, before you met Mr. Andrade, what did

22  you understand about Mr. Andrade's background?

23  A.   Almost nothing other than he was an entrepreneur that

24  worked in the cryptocurrency realm and his interest was

25  producing something in that realm.  So...

H. TRAN - DIRECT / HIGHSMITH

1    Q.    Did you end up taking a meeting with Mr. Andrade?

2    A.    Yes, I did.

3    Q.    Why?  What interested you about the meeting?

4    A.    One, just because of my colleague, you know, out of

5    interest.  And I was also running a consulting company and for

6    the purpose of discovering if there's work for my company,

7    you know, yeah.

8    Q.    Okay.  Did you meet with Mr. Andrade?

9    A.    Yes, I did.

10   Q.    And approximately when was that?

11   A.    September-ish 2017, I think, or somewhere around near the

12   end of the year.

13   Q.    Where did you meet him?

14   A.    At a coffee shop in Santa Monica.

15   Q.    So near Los Angeles?

16   A.    Mm-hmm.

17   Q.    What did Mr. Andrade talk about?

18   A.    Well, he introduced himself, his background and what he

19   was doing, and briefly talked about something to do with the

20   project that was -- kind of needed project management help.

21   Q.    Let's talk a little bit about the background.  What did

22   Mr. Andrade tell you about his background?

23   A.    Like, basically, how he became interested in computers and

24   how he became interested in cryptocurrency from, you know, his

25   work.

1  **Q.**   You testified a moment ago that Mr. Andrade said he needed

2  a project manager.  What did Mr. Andrade tell you he needed?

3  **A.**   Not specifically because, you know, it's a first meeting;

4  but the sense was that there was a project, there were people

5  that worked for him on that, and it wasn't going well.  And he

6  needed somebody that was a third -- kind of a third party that

7  helped understand technology and be able to come back to him

8  and said, "Hey, how are things really working out."  So...

9  **Q.**   Okay.  Did he indicate he needed you to get a project back

10  on track?

11  **A.**   I don't think that was the words said, but the context

12  kind of implies that it was not going as predicted.

13  **Q.**   Was that your impression?

14  **A.**   Yes, it was my impression.

15  **Q.**   Did he tell you -- did he provide more specifics about

16  what he wanted or what he was -- I'm sorry.

17       Did he provide more specifics about what he was building

18  at that first meeting?

19  **A.**   Not exactly.

20  **Q.**   Did he provide -- did he talk to you at all about his past

21  projects, his past crypto projects?

22  **A.**   Yes, he did.

23  **Q.**   What did he say about his past cryptocurrency projects?

24  **A.**   There was a project called Aten Coin, I think it was

25  called -- and I don't know if I discovered the name later --

1  but that it didn't go well simply because it didn't have

2  certain characteristics that was -- that was called anti-money

3  laundering; and that because of that, the project wasn't as

4  successful as he wanted it and that he's interested in that

5  kind of technology for his current project.  So...

6  **Q.**    Did he tell you anything more about that Aten Coin in

7  terms of its special features or what he wanted out of it?

8  **A.**    No.

9  **Q.**    Okay.  So he indicated to you the Aten Coin project was

10 not successful.  Did he indicate to you anything about the

11 anti-money laundering connection to his Aten Coin project?

12 **A.**    No, not that I remember.

13 **Q.**    Did he indicate to you anything about why the project was

14 not successful?

15 **A.**    Not specifically, other than it was costly from getting

16 permits or something like that.  I don't recall the exact term,

17 but some sort of license to run it.  I think what it end up

18 being was it sounded like that process would have cost more

19 than creating the coin or something like that.  So...

20 **Q.**    Okay.  So did you decide to accept his offer to be -- to

21 manage this project?

22 **A.**    During that meeting, I decided -- or he decided to

23 continue talking; and then we decide -- you know, he accepted

24 my work later, like a day or two or something like that later.

25 **Q.**    What happened next?

**A.**    Yeah.  I left the meeting.  Then I met with somebody on his team named Terence through Skype.  He described more detail, and that's when, you know, I kind of understood what they needed and, you know, kind of proceed with creating what's called a statement of work.

**Q.**   At that point, what did you understand Mr. Andrade and Mr. Poon needed?

**A.**   They needed somebody to do project management of the development team that was based in India.

**Q.**   And what did they need you to manage?  What was their -- was there a problem they needed you to solve?

**A.**    Not particularly.  I think it was to find out where the team was at in their progress and be able to summarize and communicate in a way they understood, you know, where the project was.

**Q.**   What did you understand at that time that the team in India was doing?

**A.**   At that particular time, nothing until I talked to them.

     And I guess the way to explain it is they're a software development firm, and so what they were doing was writing code for a token, I believe.  So...

**Q.**   Okay.  We'll go back to that in a second, but let's stick kind of with the chronological timeline.

     Did you have the impression that Mr. Andrade was under any pressures?

1          **MR. STEFAN:**  Objection.  Foundation.

2    BY MR. HIGHSMITH:

3    Q.   Based on your conversations with Mr. Andrade, did you

4    understand that he was under any time pressures?

5    A.   Not particularly, but it sounded like it.

6    Q.   What did Mr. Andrade say that made it sound like he was

7    under time pressure?

8    A.   I think -- it wasn't particular; but for somebody like me

9    that work with entrepreneurs and they obviously are talking to

10   me, usually they're -- they have those kind of pressure,

11   whether it's concrete or not, and that's how I understood it

12   implicitly.

13   Q.   Are you familiar --

14         **MR. STEFAN:**  Calls for speculation.

15         **THE COURT:**  Overruled.

16   BY MR. HIGHSMITH:

17   Q.   Are you familiar with the term "initial coin offering"?

18   A.   Not at that time.

19   Q.   Okay.  Did you later learn what an initial coin offering

20   is?

21   A.   Yes.

22   Q.   How much later did you learn what an initial coin offering

23   is?

24   A.   At least a few months.

25   Q.   A few months?

**H. TRAN - DIRECT / HIGHSMITH**

1  **A.**    Mm-hmm.

2  **Q.**    Okay.  Did you learn throughout your conversations with

3  Mr. Andrade whether he was involved in an initial coin

4  offering?

5  **A.**    No.

6  **Q.**    What happened next in terms of your project?

7  **A.**    So I had a call with Terence.  We formally engaged in the

8  consulting.  So I created the statement of work that would have

9  kind of spelled out the work, how long it would take and how

10 much I would get paid for it.

11        Let me see.  Yeah, and then I began work, which involved

12 talking to Terence Poon and engaging with the team in India.

13 **Q.**    Okay.  And what were you -- why were you engaging with the

14 team in India?  What were you trying to figure out from them?

15 **A.**    More detail about what they were doing and what their

16 goals were and what progress they have made.

17 **Q.**    What did you learn from them about what they were working

18 on?

19 **A.**    That they were trying to get a Bitcoin clone to finish and

20 that they were writing software code.

21 **Q.**    And what was your understanding about how successful they

22 were?

23 **A.**    They seemed to be confused on where they are, and so some

24 of my time with them was to really understand what that

25 confusion was about and -- yeah.

1    And then the second part was just to understand their

2    expertise in the job that they had, if they were doing it right

3    or not.  So that's kind of what I was looking at.

4    **Q.**  Okay.  And did you reach a conclusion, after talking to

5    them, about whether they were doing this right?

6    **A.**  Yeah.  After a few engagement over maybe a few days, it

7    did not seem like they were making progress, and it did not

8    look like they had the capability to finish that in a short

9    term.  Like, you know, definitely not while I was engaged with

10    them, they would not have finished it.

11    **Q.**  Okay.  Did you have an understanding that they were

12    working on a token or a finished cryptocurrency coin with

13    special features?

14    **A.**  At that moment, I understood that they were working on the

15    token.  But I also didn't know what a token was or a coin was

16    at that point because I'm -- from a technology standpoint, it's

17    just software.  So...

18    **Q.**  Did you come to learn what a token and what a coin are

19    later?

20    **A.**  Yes.

21    **Q.**  And did working with Mr. Andrade -- did you come to learn

22    what a token and a coin are through your work with Mr. Andrade

23    and the AML BitCoin project?

24    **A.**  That and my own research, yeah.

25    **Q.**  Okay.  So after you did this work with the tech team in

**H. TRAN - DIRECT / HIGHSMITH**

 1    India -- approximately how long after your September meeting

 2    with Mr. Andrade did you do this work with the team in India?

 3    **A.**   Over the span of one to two weeks for that initial part.

 4    **Q.**   Okay.  And so that was about a week or two after your

 5    first meeting with Mr. Andrade?

 6    **A.**   I think so, yeah.

 7    **Q.**   All right.  Did you report your findings back to

 8    Mr. Andrade and Mr. Poon?

 9    **A.**   Yes, I did.

10    **Q.**   What did you tell them?

11    **A.**   What I told them was, you know, whatever I committed to do

12    was near the end of it and that, you know, there's not much

13    more I can do; and do they want me to continue, which is,

14    again, there was no more work for me.  It was basically the end

15    of the engagement.

16         And then, you know, I believe the -- what we agreed was to

17    spell out if the team was making progress, and I said they

18    didn't and that they needed to hire more senior people that

19    either guided them better or to take over the whole project.

20    So...

21    **Q.**   What was Mr. Andrade's reaction to that?

22    **A.**   I don't remember exactly, but the impression that I

23    remember is probably he wasn't happy and that he asked me for

24    an advice for what was needed to be done.  So I believe I

25    listed out kind of the recommendation.

1  Q.   And he asked for your advice on what needed to be done to

2  build a token or to do what?

3  A.   To finish the project that I was looking at.  So that

4  would be the token, yeah.

5  Q.   Okay.  Did Mr. Andrade end up hiring you to build a token?

6  A.   Not exactly.  I think after that question, he asked, "Hey

7  can you do the work?"

8       And I said, "Well, I don't know anything."  That was my

9  first time looking at Bitcoin, but I knew how I would do the

10 work.  So I said, "Here's what I would do, but there's no way

11 for me to guarantee I'd finish," and, you know, that if he were

12 to take the chance, here's the project plan.

13      And so based on that, we agreed for me to do that part of

14 the work.

15 Q.   Okay.  Did he hire you to build the token?

16 A.   Yes.

17 Q.   Approximately how much time had passed after your first

18 meeting with him when you agreed to build the token?

19 A.   That would have been two to three weeks.

20 Q.   Okay.  Did you talk about whether you could start with any

21 existing product or whether you'd need to build the token from

22 scratch?

23 A.   I proposed that we -- that I would start from the most

24 recent version of Bitcoin's source code.

25 Q.   So is that building the product from scratch, or is that

1    using something that already existed?

2    **A.**    That was using a prior existence.

3    **Q.**    Okay.  And is that something that Mr. Andrade had

4    developed in the past or something that was publicly available?

5    **A.**    Publicly available.

6    **Q.**    Okay.  What did you do next?

7    **A.**    Yeah, I just began working on it, which is to, you know,

8    do all the software things with Bitcoin and creating the

9    blockchain from it.

10   **Q.**    And so how long did it take you to build the token?

11   **A.**    About 11 days, yeah.

12   **Q.**    Did you also build a wallet for a token?

13   **A.**    After -- I think that was an additional six days.  So

14   total, 17, 20 days or so.

15   **Q.**    So did you complete a wallet also?

16   **A.**    Yes, I did.

17   **Q.**    And was this the token and the wallet that were used with

18   the initial coin offering?

19   **A.**    I believe so.  If -- but, again, I didn't know it was --

20   it's the thing that was used in whatever sales of the token

21   that was done.

22   **Q.**    In your conversations with Mr. Andrade, did he talk about

23   building a product that had special anti-money laundering and

24   know-your-customer features with biometric identification built

25   into the blockchain?

**H. TRAN - DIRECT / HIGHSMITH**

1    **A.**    Yes, he did.

2    **Q.**    Was that the product that you built?

3    **A.**    No.

4    **Q.**    During this time that you are working on the token and

5    wallet and talking to Mr. Andrade, did you have dinner with

6    Mr. Andrade and some of his colleagues?

7    **A.**    Yes, I did.

8    **Q.**    Where did you have that dinner?

9    **A.**    At a sushi restaurant in Beverly Hills.  I don't remember

10    the name.

11    **Q.**    And approximately how long after you first met Mr. Andrade

12    did this dinner take place?

13    **A.**    Very -- probably like one week or two, but my memory could

14    be off.

15    **Q.**    Who was at the dinner?

16    **A.**    A few people.  The name -- one name I remember was

17    Jack Abramoff, and a few other people, but, yeah, I don't

18    remember specific names.

19    **Q.**    What was the purpose of the dinner?

20    **A.**    It was more a meet-and-greet for everybody that was

21    involved in -- I don't know.  It was just his colleagues, and

22    Jack was involved as an advisor, I think.  So...

23    **Q.**    And it was his colleagues in this AML BitCoin project?

24    **A.**    I don't know, or they could be friends.  That part, I,

25    you know, kind of just -- like, I don't know the specific

1  relationship.  They were just related in terms of...

2  **Q.**  Did you talk about business during the dinner?

3  **A.**  No.

4  **Q.**  What did Mr. Andrade talk about during this dinner?

5  **A.**  Nothing specific.  More things like football, TV shows.

6  It was more of a casual dinner-type thing.

7  **Q.**  Did he talk about his relationship with Mr. Abramoff?

8  **A.**  Not during the dinner.

9  **Q.**  Did he talk about that later?

10 **A.**  No.

11 **Q.**  Did he bring up the movies that Mr. Abramoff had made?

12 **A.**  Yes, but I don't know if it's during the dinner, before,

13 or after.

14 **Q.**  Okay.  So in your conversations with Mr. Andrade, what did

15 he tell you about Mr. Abramoff?

16 **A.**  That he was famous in the realm of political, I guess,

17 lobbying and that he was a movie producer of a movie that I

18 grew up with or saw when I was a kid.  And so that --

19 **Q.**  What movie was that?

20 **A.**  *Red Scorpion*.  I think it was called *Red Scorpion*, yeah.

21 **Q.**  Did Mr. Andrade express to you that he was proud to be

22 working with Mr. Abramoff?

23 **A.**  Not in those words, but he seemed quite happy about that,

24 yeah.

25 **Q.**  What did he say to you to make you get the impression he

H. TRAN - DIRECT / HIGHSMITH

1  seemed very happy to be working with Mr. Abramoff?

2  **A.**   I don't think it was word, you know.  It's more like he

3  was more uplifted, like.  You know when someone is excited when

4  they talk about something?  That's all, yeah.

5  **Q.**   Let's move on to your additional work.

6      So you built the token.  You completed the token.  Did you

7  continue working with Mr. Andrade?

8  **A.**   Yes, I did.

9  **Q.**   What did you do for him next?

10 **A.**   More like IT.  So the token required these servers to run

11 on the Amazon infrastructure.  So I did systems administration

12 for those machines, making sure that they're running, they

13 don't run out of disk space; and the network stuff, it's -- you

14 know, it's not broken.

15 **Q.**   Did you also assist with, like, tech support for the

16 wallets?

17 **A.**   Yes.

18 **Q.**   How did you feel about doing the server work and the tech

19 support for the wallets?

20 **A.**   Well, it's not what I normally do, but I did it kind of

21 just to be helpful and, obviously, billed hours for it, but it

22 wasn't really my main specialty.

23 **Q.**   Did you bill a lot of hours to those -- the work on the

24 servers and the wallet?

25 **A.**   No.

**H. TRAN - DIRECT / HIGHSMITH**

1  **Q.**  Did Mr. Andrade pay you regularly?

2  **A.**  Yes.

3  **Q.**  Did he pay you on time?

4  **A.**  Not always.

5  **Q.**  What did you do when he didn't pay you on time?

6  **A.**  I would, you know, wait and try to be courteous about

7  that; but I also tried to remind that, you know, my invoices

8  were not covered.

9  **Q.**  And how would he respond when you told him that?

10 **A.**  Sometimes he would defer and say, you know, on a certain

11 date; and then, of course, he would pay on those dates that he

12 would promise.

13 **Q.**  Did he ever say, "Hey, I'll pay you, but I need you to do

14 some more work in the future"?

15 **A.**  Not in that exact frame.  The way it works is he'll say,

16 "I need help with X," and then I'll remind him that he owes an

17 invoice, and then he'll commit to paying that, and then,

18 you know, I would agree to help with whatever work or help he

19 would need.

20 **Q.**  Did Mr. Andrade also ask you to help with the website for

21 his company?

22 **A.**  Yes.

23 **Q.**  What did he ask you to do?

24 **A.**  I don't remember, but it was more like troubleshooting

25 type of work.

1   **Q.**   And is that something that you normally do?

2   **A.**   No, it isn't.

3   **Q.**   How did you respond?

4   **A.**   Well, I would say that "That's not what I normally do,

5   but, you know, if you have no other choice, I'll look into it"

6   and then, you know, tell him what's going to be going wrong.

7   **Q.**   Okay.  And did you help him out with the website?

8   **A.**   I think so, yeah.

9   **Q.**   Did you bring on some extra help?

10  **A.**   Yes, I did.

11  **Q.**   And what did they do?

12  **A.**   Again, I don't remember the specific, but it would have

13  been not much further than what I do.  But the people I brought

14  on would have known that technology more than I do.  So they

15  did the work, but I didn't -- I didn't, like, oversee any of

16  that.  So...

17  **Q.**   Did you learn whether or not those -- that group got paid?

18  **A.**   I don't remember.

19  **Q.**   Do you remember having a conversation with them about

20  whether or not they got paid for their work?

21  **A.**   I don't remember that part.

22  **Q.**   Did Mr. Andrade ask you to help him with another project?

23  **A.**   I don't know.  If there was a name to the project, I could

24  remember.  I did help Mr. Andrade with, you know, a number of

25  things that are related to the token.

**H. TRAN - DIRECT / HIGHSMITH**

1  **Q.**   Okay.

2  **A.**   And they kind of come in successive phases.  I don't know

3  exactly which one.

4  **Q.**   Okay.  What did you help -- what did you help out with

5  regard to the token?  What did you help him with?

6  **A.**   I believe there was something to do with a commercial and

7  that there was -- I -- there was a concern that the site would

8  be hacked because the commercial was mocking the President of

9  North Korea, or something like that, and that their concern was

10 that they would hack the site and, you know, make it

11 inaccessible.

12 **Q.**   Did you help him?

13 **A.**   Yes.

14 **Q.**   How did you help him?

15 **A.**   I said that I don't have the specialty and almost no one

16 does and that, you know, my team can't do it, but what we would

17 do is point him in the right direction.

18      So the way I helped him was created a kind of -- kind of

19 an outline for who could do this work.  And then I connected

20 him with several vendors that have that specialty, folks

21 like -- I think it was, like, Cloudflare.  There's another

22 team.  Almost all of them turned it down except for one, and

23 that company did a proposal with all sorts of clauses, and they

24 worked directly with, I think, Terence or Mr. Andrade on that.

25 **Q.**   Okay.  Do you know whether they got paid?

1   **A.**   I don't think so.

2   **Q.**   Okay.  Did that harm your reputation at all with them,

3   that you had recommended they get -- they work with Mr. Andrade

4   and then he didn't pay them?

5   **A.**   Yes.

6   **Q.**   How so?

7   **A.**   Because they -- they're kind of my associates in kind of

8   the area where I work, my company; and, you know, I believe

9   they came to me and said, "Hey, did you know we didn't get paid

10   because the commercial didn't finish?"

11         **MR. STEFAN:**  Objection.  Hearsay.

12         **THE COURT:**  Well, sustained.

13   **BY MR. HIGHSMITH:**

14   **Q.**   The question is just:  How did it impact your reputation?

15   **A.**   I feel like I have the -- I mean, I made the referral.

16         **MR. STEFAN:**  Objection.  Relevance.

17         **THE COURT:**  Overruled.

18   **BY MR. HIGHSMITH:**

19   **Q.**   So how did it impact your reputation, their failure to --

20   Mr. Andrade's failure to pay these colleagues?

21   **A.**   If I refer them to future work or know that, that would

22   not happen; and vice versa, they may not point work my way.

23   **Q.**   Did Mr. Andrade later ask you if you would create a

24   proposal to build an AML BitCoin that had special security

25   features, including biometric identification built into the

**H. TRAN - DIRECT / HIGHSMITH**

1   blockchain?

2   **A.**   Yes.

3   **Q.**   And did you create a proposal for him?

4   **A.**   Yes, I did.

5   **Q.**   Is that a project in your proposal that would be -- that

6   would take a lot of effort and require many stages of work?

7   **A.**   Yes.

8   **Q.**   Based on your proposal, would that have been something

9   that was very expensive?

10  **A.**   Yes.

11  **Q.**   Did you give Mr. Andrade a ballpark sense of how much it

12  would cost to build an AML BitCoin cryptocurrency with the

13  biometrics built into the blockchain?

14  **A.**   That's part of the proposal, yeah.

15  **Q.**   And approximately how much would that have cost?

16  **A.**   That would be in the millions.  Like, I believe 5 was the

17  number that I roughly added everything up to.

18  **Q.**   What was Mr. Andrade's response?

19  **A.**   I didn't actually talk to him directly.  I sent the

20  proposal to Terence Poon; and Terence, he said that was a

21  reasonable proposal.

22  **Q.**   Did you ever hear from Mr. Andrade or Mr. Poon about your

23  proposal?

24  **A.**   I don't think so.  I know there were emails going back and

25  forth; but in my memory, we never, like, went forward with it.

1  It was just sitting there.

2  **Q.**   Did Mr. Andrade invite you to go with him to London in

3  2018, in the summer of 2018?

4  **A.**   Yes.

5  **Q.**   Why did he invite you to do that?

6  **A.**   There was a project involving digital identity, and he had

7  a new team, and that I was going to help him evaluate that

8  team.  So similar to what I did with the India team for the

9  initial phase, it's the same kind of requirement -- or request.

10 **Q.**   Was there another person who went with you on that trip,

11 another developer?

12 **A.**   Yes.  A senior manager that went along.

13 **Q.**   Do you recall that person's name?

14 **A.**   Evan.

15 **Q.**   What did you learn on that trip?

16 **A.**   I'm not sure how to answer that.  I can tell you what I

17 did on that trip.

18 **Q.**   What did you do on that trip?

19 **A.**   I met with the team, talked to some of the people on, as

20 kind of what Marcus asked me to do, and provided feedback on

21 their capabilities.  I also looked at their demo for the

22 product that the team built and then kind of gave my assessment

23 on that.

24 **Q.**   So was the team there building biometric identity storage?

25 **A.**   That's part of it.  The whole product is to be able to put

1    identity on a blockchain, and it involved a Web back end, a Web

2    front end, and a mobile application.

3    Q.   Okay.  And you saw a demo during your trip there?

4    A.   Yes.

5    Q.   Were they ready to sell that product to clients?

6    A.   At that point, it didn't look like it.

7    Q.   How long did it look like to you that it would take for

8    them to have a product that they could sell to clients?

9    A.   I could be wrong, but the impression was 9 to 12 months,

10   depending.

11   Q.   Did you report your findings back to Mr. Andrade?

12   A.   No.  That wasn't what he asked out of me.  What he asked

13   out of me was:  Was the team capable of finishing the project?

14   Were they reliable?  Can he trust them?  And the answer was

15   yes.

16   Q.   Okay.  Did he ask you questions about Evan and his role or

17   his capabilities?

18   A.   Yes.

19   Q.   What did he ask you about Evan?

20   A.   Similar question.  Is he capable of managing?  I believe

21   the idea was Evan would have been kind of their senior manager

22   and whether they would have worked together well, and I said

23   yes.

24   Q.   You said yes, Evan could satisfy those requirements?

25   A.   Those requirements, yeah.

1  **Q.**   Okay.  At that point, after your trip to London, did

2  Mr. Andrade have a cryptocurrency product where the biometric

3  identity information was built into his cryptocurrency

4  blockchain?

5  **A.**   No.

6  **Q.**   Did you continue working for Mr. Andrade after that

7  September trip to the United Kingdom?

8  **A.**   I don't think so.

9  **Q.**   Why not?

10  **A.**   Because there was nothing to do.  All the things from a

11  contractual standpoint I'd already delivered.

12  **Q.**   At some point did Mr. Andrade offer to make you the chief

13  technology officer or CTO?

14  **A.**   He had asked for that, yeah.

15  **Q.**   Before the London trip?

16  **A.**   I don't know the time exactly.

17  **Q.**   Did he say why he wanted to offer you this position?

18  **A.**   No.

19  **Q.**   Did you accept the position?

20  **A.**   No.

21  **Q.**   Why not?

22  **A.**   I don't know.  It's not interesting to -- like, I was

23  running my own company, and I had commitments with other

24  business.  So...

25  **Q.**   Did Mr. Andrade's paying you late or failure to pay you

1    factor into your decision?

2    **A.**    Probably.

3    **Q.**    Did his failure to pay that other company that had worked

4    on the website factor into your decision?

5    **A.**    Probably.  But, again, the major part was I was running my

6    own company and I had -- you know, similar to my commitment to

7    his team, I have contracts with these other companies.

8    You know, like there's no way for me to get away from those.

9    **Q.**    All right.  So after the September trip, you concluded

10    that the London team was about 9 to 12 months away from being

11    able to sell their digital identity storage product; is that

12    right?

13    **A.**    Yes.

14    **Q.**    And after your trip to London, had you seen any evidence

15    in any of the work you had done anywhere with Mr. Andrade that

16    he had a complete anti-money laundering cryptocurrency that had

17    biometric identity features built into its blockchain?

18    **A.**    I didn't see any of those.

19    **Q.**    You testified earlier that you built a token for

20    Mr. Andrade and that you built his wallets; correct?

21    **A.**    Yes.

22    **Q.**    And you also testified earlier that you helped with his

23    servers; is that correct?

24    **A.**    Yes.

25    **Q.**    Did you have concerns about the tokens being hosted on

1    unsecured servers?

2    **A.**    Not the servers I was running for him.

3    **Q.**    What were the servers that you had concerns about?

4    **A.**    So there was a -- I don't know.  He's more like a systems

5    admin.  They were running servers that were old, like old

6    versions of software, and I believe they were trying to run the

7    token on those servers.

8        But, you know, I came into it late in terms of getting an

9    email to say, "Hey, help these guys," because they were trying

10   to do it on their own and they didn't figure something out.

11       At that point, I was not working under any contract.  It

12   was more of, you know, they had my email so they sent it to --

13   they asked me to help.  And I looked and I said, "Hey, I can't

14   help you on this, but it's these guys' server, and what they

15   should do is, like, upgrade it to the most recent version."

16           **MR. HIGHSMITH:**  No further questions.  Thank you.

17                       **CROSS-EXAMINATION**

18   BY MR. STEFAN:

19   **Q.**    Good morning.

20   **A.**    Good morning.

21   **Q.**    After meeting Mr. Andrade -- it was in Santa Monica;

22   right?

23   **A.**    Yes.

24   **Q.**    After meeting him in Santa Monica, your initial

25   interactions with his company, the NAC Foundation, were through

1    Dr. Terence Poon; right?  That was the individual that you

2    coordinated with in your initial work?

3    **A.**    Yes.  I met with Terence Poon over Skype.

4    **Q.**    Over Skype.

5         Mr. Terence Poon is a university professor in Hong Kong?

6    Do you understand that to be the case?

7    **A.**    Yes.

8    **Q.**    And based on your interactions with Mr. Poon, you found

9    him to be a very smart guy?

10   **A.**    Yes.

11   **Q.**    A data scientist?  That was, like, his role; right?

12   **A.**    I don't know his title formally, but he definitely knew a

13   lot about technology.

14   **Q.**    And you were pretty impressed in your interactions with

15   him about his grasp of the concepts that you were dealing with?

16   **A.**    Yes.

17   **Q.**    The initial work that you did with Mr. Andrade was sort of

18   due diligence work, is that right, with this team he had in

19   India?

20   **A.**    Yes.  The term we used was "project management," which

21   probably is an umbrella for what you said, but I didn't

22   remember using that word at all.

23   **Q.**    Oh, understood.  That was my term, I guess.

24        Project management in this case for you was sort of

25   checking up on what this team was doing and figuring out what

1  their issues were?

2  **A.**  Pretty much, yeah.

3  **Q.**  This team was the NuGen team in India?

4  **A.**  That's correct.

5  **Q.**  And the NuGen team interacted with you a dozen or a couple

6  dozen times over the course of the period that you were doing

7  the project management oversight with them?

8  **A.**  Roughly, yeah.

9  **Q.**  These were all remote communications?

10  **A.**  Yes.

11  **Q.**  Suffice to say, you weren't particularly impressed with

12  their grasp of what they were doing?

13  **A.**  That's correct.

14  **Q.**  Or overall, what you perceived as their diligence in

15  accomplishing it?

16  **A.**  There were two things that was, you know, kind of

17  frictional.  Number one, the time difference.  Them not being

18  at a particular time we appoint, that made it difficult.  So

19  that meant I had to spend more of my time to catch up to them.

20  And then when I did, it didn't seem like they knew what they

21  were doing, yeah.  Those were the two things.

22  **Q.**  And, actually, when you came back and gave your report to

23  Mr. Poon, you recommended moving on from that team?

24  **A.**  I believe so, yeah.

25  **Q.**  And moving on from the efforts that they had made at a

1    product -- product to that point?

2    **A.**   I think what I said was they might not finish it on their

3    own.  They needed somebody that were kind of like what I was

4    doing but more full-time.

5    **Q.**   Yeah.

6    **A.**   Or he start with a different group of people.  So

7    I believe that was the way I reported it back.

8    **Q.**   Were you aware that, you know, Mr. Andrade had paid them

9    thousands of dollars to that point?

10   **A.**   I don't know.  Yeah, I don't -- I assume he's paying them,

11   but that's not something I was, like -- it was not something in

12   my mind to figure out.

13   **Q.**   It wasn't something that was a subject of conversation

14   between you and the NuGen team?

15   **A.**   No.  That's their business, right.  So...

16   **Q.**   You spoke about the trip to London that you took, which

17   we'll speak about in a moment.  But preliminarily, that trip

18   was to look at the CrossVerify technology; is that right?

19   **A.**   Yes.  I don't remember the name, but I think that rings a

20   bell.

21   **Q.**   This is specifically the biometric identification

22   integration with the blockchain?

23   **A.**   That's correct, yeah.

24   **Q.**   Were you aware that NuGen had initially been contracted to

25   begin work on that -- on that particular product?

1   A.    I don't remember that.

2   Q.    Okay.  Having seen some of the technology that was being

3   worked on in London, you had described that to Mr. Highsmith as

4   pretty -- I don't want to put the wrong words in your mouth

5   but -- complicated or difficult or challenging?  How would you

6   describe the degree of difficulty involved in what the London

7   team was doing?

8   A.    Could you re- -- like, say that all again?  I'm not sure I

9   understand you.

10  Q.    I'd be happy to, yes.

11        How would you characterize the difficulty of what the

12  London team was trying to accomplish?

13  A.    Difficult, but not impossible.

14  Q.    Would it require a lot of man-hours?

15  A.    Yes.

16  Q.    And a lot of technical expertise?

17  A.    Yes.

18  Q.    Based on your review of what they had produced so far in

19  London and your experience with the NuGen team in India, do you

20  think that the NuGen team you had been interacting with in

21  India would be capable of building that kind of software?

22  A.    No.

23  Q.    I want to talk about the token that you did make for

24  Mr. Andrade.  Specifically, this token was tied to the

25  blockchain; right?

QUOC TRAN - CROSS / STEFAN

1    **A.**    It was the blockchain.

2    **Q.**    Pardon me.

3    **A.**    Yeah.

4    **Q.**    And the token had multisignature features?

5    **A.**    I know the term was.  I don't remember if I ever

6    implemented multisig, but I may have.  It was so long ago.

7    **Q.**    Okay.  And there were digital wallets that you also

8    created associated with those tokens?

9    **A.**    Yes.

10   **Q.**    And then thereafter, once these tokens are created, your

11   understanding is that they were distributed or sold in some

12   manner?

13   **A.**    Yes.

14   **Q.**    And then you performed maintenance on the servers?

15   **A.**    Yes.

16   **Q.**    And that would primarily involve just whenever an issue

17   came up, if a server went down and there was a technical

18   problem, you would be contacted and you would go address the

19   problem?

20   **A.**    That's correct.  What I really did was, you know, looked

21   at systems log, or something like that, often, and then

22   proactively fixed things.  So typical systems administrative

23   stuff.

24   **Q.**    That seemed important to Mr. Andrade, to maintain the

25   servers and keep them online?

1  **A.**   Yes.

2  **Q.**   When you went to -- I want to turn to the CrossVerify

3  technology.

4  **A.**   Mm-hmm.

5  **Q.**   When you went to London in, I believe you said, summertime

6  of 2018 -- is that about right?

7  **A.**   I think so, but, yeah, I don't have the specific date.

8  It's relatively around that time, yeah.

9  **Q.**   So around that time when you went there, it was to, in

10 part, assess that team's ability?

11 **A.**   Yes.

12 **Q.**   And you found the team to be pretty capable?

13 **A.**   Yes.

14 **Q.**   At the time, it was a decent-sized office of seven, eight

15 people?

16 **A.**   That's correct.

17 **Q.**   And they had a physical office too; right?

18 **A.**   Yes.

19 **Q.**   They were actually meeting and working together?

20 **A.**   It would appear so.  But I don't know if they even meet

21 there after I left.  So what I saw was there's an office that

22 was a functional group of people that seemed to work really

23 well together and they had the technological skill to build

24 software.

25 **Q.**   The demo that you reviewed, it wasn't the complete

**QUOC TRAN - CROSS / STEFAN**

1  product; right?

2  **A.**   No.

3  **Q.**   So parts of the product weren't finished at that point.

4  Is that fair to say?

5  **A.**   Yeah.

6  **Q.**   It's also fair to say that parts of the product were

7  finished or near finished as well?

8  **A.**   That's correct.

9  **Q.**   And your trip to London was one of your last engagements

10 with the NAC Foundation and Mr. Andrade?

11 **A.**   That's correct.

12 **Q.**   It was a trip that Mr. Andrade paid for you to go on?

13 **A.**   Yes.

14 **Q.**   After that trip, you aren't familiar with the progress

15 made in the development of the technology after that point?

16 **A.**   No.

17 **Q.**   Just briefly, you were asked to provide a statement of

18 work for the completion of the entire AML BitCoin product; is

19 that right?

20 **A.**   Not a statement of work.  I believe that was more of a

21 proposal.  So that meant, you know, an outline for the effort,

22 the resources, the cost.  And, of course, if that moved

23 forward, then there would be a formal statement of work and, of

24 course, work engagement.  But it was more like a proposal.

25 **Q.**   In the proposal, you outlined that you thought they should

1  budget up to $5 million for the project?

2  **A.**   That's correct.

3  **Q.**   That was a ballpark figure.  Is that fair?

4  **A.**   Yeah.

5  **Q.**   And when you gave it, you wanted to be sure not to

6  underestimate the amount of cost that would have to go into the

7  development?

8  **A.**   That's correct.

9  **Q.**   You wanted to specifically make sure that they didn't have

10  an inaccurate understanding of the potential cost?

11  **A.**   That's correct.

12  **Q.**   So you would estimate higher as opposed to lower because

13  it's easier to -- well, if you have the money and you don't

14  spend it, that's better than not being able to complete the

15  product because you ran out of the money?

16  **A.**   That makes sense.

17  **Q.**   Was that the rationale in providing your figure?

18  **A.**   Yes.

19         **MR. STEFAN:**  Your Honor, may I have a moment?

20         **THE COURT:**  Yes.

21              (Pause in proceedings.)

22  **BY MR. STEFAN:**

23  **Q.**   Sir, do you recall when you were contacted by the FBI?

24  **A.**   Not particularly.

25  **Q.**   Was it before or after you stopped working with

1    Mr. Andrade?

2    **A.**    It was after.  I believe fairly well -- like, at least a

3    few months, from my recollection, after my trip to London.

4    **Q.**    After that trip to London, had there been any kind of

5    finality -- probably a poor word to use -- had there been any

6    sort of discussion between you and Mr. Andrade about parting

7    ways formally?

8    **A.**    No.  I think that -- you know, the statement of work has a

9    specific time outline, what would be paid.  When that's done,

10    that's done, and there's no new one.  So that's -- you know,

11    that's kind of it.  Right?

12    **Q.**    So either there's, like, a new statement of work or there

13    isn't?

14    **A.**    It's done, yeah.  So...

15    **Q.**    Okay.  Were you provided with information regarding --

16    actually, strike that.

17          **MR. STEFAN:**  Mr. Tran, I don't have any further

18    questions for you.  Thank you.

19          **THE WITNESS:**  Got it.

20                    <u>**REDIRECT EXAMINATION**</u>

21    BY MR. HIGHSMITH:

22    **Q.**    Mr. Tran, does Mr. Andrade still owe you money?

23    **A.**    Yes.

24          **MR. HIGHSMITH:**  No further questions.

25          **THE COURT:**  You may step down.

```
 1                      (Witness excused.)

 2           MR. HIGHSMITH:  Kate Ablett, or Katherine Ablett.

 3    (Witness enters the courtroom and steps forward to be sworn.)

 4           THE COURT:  If you can come forward, please, to be

 5   sworn.

 6                     KATHERINE ABLETT,

 7   called as a witness for the Government, having been duly sworn,

 8   testified as follows:

 9           THE WITNESS:  Yes, I do.

10           THE COURTROOM DEPUTY:  Please be seated.

11        Can you state and spell your last name, please.  State

12   your name and spell your last name.

13           THE WITNESS:  Katherine Ablett, A-b-l-e-t-t.

14                    DIRECT EXAMINATION

15   BY MR. CHOU:

16   Q.   Good morning, Agent Ablett.

17   A.   Good morning.

18   Q.   What do you do for a living?

19   A.   I'm a supervisory special agent for the FBI.

20   Q.   How long have you been a special agent at the Federal

21   Bureau of Investigation?

22   A.   I started with the FBI in August 2009.

23   Q.   And did you have a role in the investigation of the

24   defendant, Marcus Andrade?

25   A.   Yes, I did.
```

ABLETT - DIRECT / CHOU

1    Q.    For approximately what period of time were you working on

2    the investigation?

3    A.    I started my work on the investigation in late 2017.  I

4    was -- I was assigned to the investigation in late 2017, and I

5    worked on the investigation until September 2019.

6    Q.    And as part of your work on the investigation, did you

7    download content pertaining to Mr. Andrade from the Internet?

8    A.    Yes, I did.

9    Q.    Were these public records visible to members of the

10   public?

11   A.    Yes.

12   Q.    Did you take screenshots of online content?

13   A.    Yes, I did.

14   Q.    Roughly over what period of time did you take screenshots

15   of AML BitCoin-related content?

16   A.    I took screenshots in 2018.  I took a batch of screenshots

17   from the AML website in January 2018, and then took a batch of

18   AML BitCoin social media screenshots in May 2018.

19   Q.    After downloading each piece of online content, did you

20   put it into the FBI's case file?

21   A.    Yes, I did.

22   Q.    What is -- what is an FBI case file?

23   A.    It's a case management system called Sentinel.  And when

24   we do investigative activity, we enter it into Sentinel as a

25   way of tracking the work.

1    **Q.**    And when you would enter AML BitCoin-related material into

2    the case file, how was it tracked?  Is there any particular

3    identifier used?

4    **A.**    Oh, each document -- or it's called serials.  So as you

5    do -- as you submit work into the case file, it gets a serial

6    number.

7    **Q.**    So, for example, if you took a bunch of screenshots of a

8    Twitter feed, would that go into a particular serial?

9    **A.**    Yes.  So I would take screenshots, and then I would attach

10    them to a report.  I would write up my report, include the

11    screenshots as an attachment, and that report would be

12    submitted to Sentinel and be entered as a serial.

13    **Q.**    Is Sentinel the FBI's general system for tracking

14    information in case files?

15    **A.**    Yes.

16    **Q.**    Does it keep all those records in the course of the FBI's

17    regularly conducted activity?

18    **A.**    Yes.

19    **Q.**    Is it a reliable system, in your experience?

20    **A.**    Yes.

21    **Q.**    At a high level, what did you screenshot as to AML BitCoin

22    and Mr. Andrade?

23    **A.**    I screenshot the website, social media accounts, Twitter,

24    Instagram, Facebook, and then I had some articles that were

25    online.

ABLETT - DIRECT / CHOU

1    Q.   And you just mentioned articles.  You anticipated my next

2    question.  Did you also download some articles in addition to

3    taking screenshots?

4    A.   Yes.  They weren't screenshots.  They were just downloads

5    of the articles.

6    Q.   In preparation for your testimony here today, have you

7    reviewed the FBI case file on the serials pertaining to work

8    that you did on this case?

9    A.   Yes.

10   Q.   And have you reviewed screenshots and downloaded content

11   you put into Sentinel and stored on certain serials?

12   A.   Yes, I have.

13   Q.   Specifically, did you review, among other serials,

14   Serial 198 and Media Serial 10?

15   A.   Yes.

16   Q.   Are those fair and accurate depictions of AML BitCoin

17   content as you saw it and as you screenshotted it at the time

18   you were doing your work?

19   A.   Yes, they are.

20        MR. CHOU:  Well, at this time, Your Honor, I would

21   move to admit a number of different exhibits, which I've

22   provided to the defense, along with their corresponding serial.

23   I can read those into the record.

24        For Serial 198, these exhibits are 387, 389, 390, 391,

25   436, 437, 439, 442, 443, 446, 447, 450 through 453, 455, 458,

1  460, 462, 463 through 467 -- bear with me here -- 471, 486,

2  494, 495, 497, 502, 505, 512, 513, 515, 517, 518, 523, 525, 528

3  through 533, 537 -- just one more page -- 1146, 1150, 1152,

4  1153, 1479 through 1482, and that's the set from that serial.

5  The Government moves to admit.

6         **MR. STEFAN:**  No objection.

7         **THE COURT:**  The list, which I will not repeat, will be

8  admitted.

9         (Trial Exhibits 387, 389, 390, 391, 436, 437, 439, 442,

10 443, 446, 447, 450 through 453, 455, 458, 460, 462, 463 through

11 467, 471, 486, 494, 495, 497, 502, 505, 512, 513, 515, 517,

12 518, 523, 525, 528 through 533, 537, 1146, 1150, 1152, 1153,

13 1479 through 1482 received in evidence.)

14                    (Laughter.)

15        **MR. CHOU:**  Thank you, Your Honor.

16 **Q.**  So just to start, I want to show to the jury a few of

17 those screenshots that we discussed.

18        So I'd like to first show Exhibit 386, which I believe is

19 already in evidence before you testified.

20        **MR. CHOU:**  If could we publish that to the jury.

21 **Q.**  Agent Ablett, did you take this screenshot?

22 **A.**  Yes, I did.

23 **Q.**  And what does this depict?

24 **A.**  This is the AML BitCoin Twitter page.

25 **Q.**  And is there a way to tell from the face of the screenshot

1    when it was taken?

2    **A.**    Yes.  It was taken on May 27th, 2018.

3        **MR. CHOU:**  And if we zoom in on that date on the

4    bottom right.

5    **Q.**    And so in the exhibits we just mentioned, are there a

6    number of screenshots in this sort of format where the date is

7    visible in the bottom right?

8    **A.**    Yes.

9        **MR. CHOU:**  Could we please pull out of this exhibit

10   and pull up 436, which was just admitted.

11   **Q.**    Agent Ablett, what does this screenshot of yours depict?

12   **A.**    This is the About page on Facebook for AML BitCoin.

13       **MR. CHOU:**  And if we could just zoom in on, first, the

14   Contact Info box, just to show all these different websites

15   here.

16   **Q.**    And did you, in the course of your investigation, navigate

17   to the website, the Instagram page, the Twitter page, and the

18   YouTube channel?

19   **A.**    Yes.

20       **MR. CHOU:**  We can zoom out.

21       And then if we could please zoom in on just the More Info

22   section below that.

23   **Q.**    And do you see where it says "AML BitCoin is the World's

24   First AML/KYC Patriot Act Coin that's Compliant with Biometric

25   Identification"?

1  **A.**   Yes.

2  **Q.**   "AML BitCoin is Compliant with Worldwide Regulations" and

3  it continues?

4  **A.**   Yes.

5  **Q.**   This was the text as of the date of your screenshot in

6  May 2018?

7  **A.**   Yes.

8       **MR. CHOU:**  We can take this exhibit down and pull up

9  437, please, which was just admitted.

10 **Q.**   Agent Ablett, what does this depict?

11 **A.**   This is AML BitCoin's Instagram page.

12      **MR. CHOU:**  And could we please zoom in on the

13 description of how the AML BitCoin account describes itself.

14 **Q.**   Do you see where it says "The World's First

15 AML/KYC/Patriot Act Coin with Biometric Identification"?

16 **A.**   Yes.

17      **MR. CHOU:**  Okay.  We can take this down.

18 **Q.**   And last you checked, Agent Ablett, are these social media

19 accounts still online?

20 **A.**   The Instagram -- I saw the Instagram recently and I saw

21 the Twitter recently, but I don't know if the Facebook is still

22 online.

23      **MR. CHOU:**  So at this point, I'd like to just show and

24 display a number of different exhibits in, my understanding is,

25 chronological order.  So if we could please pull up

1    Exhibit 1156, 1156.

2        And this is previously in evidence.  Could we please zoom

3    in on the tweet there.

4    **Q.**   So the top tweet, the date on that is September 7th, 2017?

5    Did I get that right?

6    **A.**   Yes.

7        **MR. CHOU:**  Okay.  Can we please pull up Exhibit 531,

8    please.

9        And I believe 531 was just admitted.  So can we please

10   zoom in on the tweet that describes the Port of San Francisco.

11   **Q.**   And what's the date on this tweet?

12   **A.**   September 13th, 2017.

13   **Q.**   And do you see how the tweet -- does it link to a *U.S News*

14   article titled "Cryptocurrency's Future May Be Now"?

15   **A.**   Yes.

16       **MR. CHOU:**  And we can take this down and go to

17   Exhibit 530, please.

18       Could we please zoom in on the tweet about how

19   the Government of Panama launched AML BitCoin.

20   **Q.**   What's the date on this tweet?

21   **A.**   September 26, 2017.

22   **Q.**   And do you see how this is a tweet from AML BitCoin and it

23   links to an article?

24   **A.**   Yes.

25       **MR. CHOU:**  Okay.  We can take this down and pull up

1  Exhibit 1480, please.  Please zoom in on the entire tweet.

2      Thank you.

3  **Q.**  So, again, was this screenshot taken on May 27th, 2018?

4  **A.**  Yes, it was.

5  **Q.**  And what's the date on this tweet when you -- when it was

6  posted originally?

7  **A.**  October 4th, 2017.

8  **Q.**  And does it appear to depict a *Washington Times* article

9  titled "AML BitCoin Strides Onto the World Stage"?

10  **A.**  Yes.

11      **THE COURT:**  Would this be a convenient time for the

12  break?

13      **MR. CHOU:**  Yes, Your Honor.

14      **THE COURT:**  Members of the jury, we'll take the second

15  break.  Remember my admonitions.  Do not discuss this amongst

16  yourselves or with anyone else.

17      And we'll come back at 12:15.

18          (Recess taken at 11:58 a.m.)

19          (Proceedings resumed at 12:17 p.m.)

20      (Proceedings were heard out of the presence of the jury.)

21      **MR. HIGHSMITH:**  Thank you, Your Honor.

22      We've gone through five and a half witnesses.  This is our

23  last witness for today.  We may be done a little bit early.  I

24  wanted to give the Court a heads-up on that.  I'm sorry that we

25  don't have another witness, but we are well on track.

1      THE COURT:  I thought there was somebody you said

2  yesterday --

3          MR. HIGHSMITH:  We're not going to call --

4      THE COURT:  Transit or something.

5          MR. HIGHSMITH:  Tunis.

6      THE COURT:  Tunis.

7          MR. HIGHSMITH:  We're not going to call Tunis.

8      THE COURT:  At all?

9          MR. HIGHSMITH:  At all.

10     THE COURT:  Okay.  I won't give you a hard time about

11  that.

12      All right.  Well, so how much time do you think?  As long

13  as they don't think we're wasting their time.

14          MR. HIGHSMITH:  No, we're not.

15      We have some substantive stuff to show Special

16  Agent Ablett.  We have two videos to show.  They're on --

17      THE COURT:  Okay.

18          MR. HIGHSMITH:  -- our witness list; they're on our

19  schedule.

20      We've got other stuff.  Just wanted to give the Court a

21  heads-up.

22      THE COURT:  All right.  That's fine.  I mean, I don't

23  want anyone to prolong examinations just to get close to 1:30,

24  obviously, but I just wanted to make sure we weren't like an

25  hour less.

PROCEEDINGS

1    Okay.  And you'll have some cross, I presume.

2    **MR. STEFAN:**  Not very much.

3    **THE COURT:**  Okay.  Well, if we end early today, that's

4    all right.

5    **MR. HIGHSMITH:**  Thank you, Your Honor.

6    **THE COURT:**  Okay.  So let's bring them out, unless

7    you're suggesting we extend the break.

8    (Proceedings were heard in the presence of the jury.)

9    **THE COURT:**  The jury is present.

10    Mr. Chou, you may proceed.

11    **MR. CHOU:**  Thank you, Your Honor.

12   **Q.**  So, Agent Ablett, we were just looking at a tweet you

13   screenshotted, and the tweet is dated October 4th, 2017?

14   **A.**  Yes.

15   **Q.**  And you took this screenshot on May 27th, 2018?

16   **A.**  Yes.

17    **MR. CHOU:**  I'd like to -- before we move on, I realize

18   I forgot to read a couple of numbers for exhibits.  So in that

19   same Serial 198, the Government moves to admit Exhibit 1154.

20   1154.

21    **MR. STEFAN:**  No objection.

22    **THE COURT:**  1154 will be admitted.

23    (Trial Exhibit 1154 received in evidence.)

24    **MR. CHOU:**  So could we please pull up Exhibit 529,

25   please.

PROCEEDINGS

1    Could we please zoom in on this tweet about -- this

2    retweet.

3    **Q.**    Agent Ablett, is this a retweet by the AML BitCoin

4    account?

5    **A.**    Yes, it is.

6    **Q.**    And is it a retweet of what appears to be an article

7    published in *TheStreet*?

8    **A.**    Yes.

9    **Q.**    And what's the date of this tweet?

10    **A.**    October 2nd, 2017.

11        **MR. CHOU:**    If we could please move to Exhibit 525,

12    please.

13        Can we please zoom in on the -- perfect.

14    **Q.**    And, Agent Ablett, what's the date on this top tweet here?

15    **A.**    October 4th, 2017.

16    **Q.**    And what's depicted in the -- well, first of all, do you

17    see where it says "AML Token Sale Starts 6 October 2017"?

18    **A.**    Yes.

19    **Q.**    And then what's depicted in that image there?  If you

20    could describe it for the record.

21    **A.**    Sure.  There's an image.  There's the AML BitCoin logo.

22    And it says "AML BitCoin Token Sale Starts October 6," which

23    was 1 day, 18 hours, 58 minutes, and 54 seconds away from when

24    this was posted.

25    **Q.**    And then below that, is there -- do you see the top of an

**PROCEEDINGS**

1    October 4th tweet about AML BitCoin striding onto the world

2    stage?

3    **A.**    Yes.

4           **MR. CHOU:**  Can we please pull up Exhibit 523.

5       And please zoom in on the tweet here.

6    **Q.**    Is this an October 5th, 2017, tweet?

7    **A.**    Yes, it is.

8    **Q.**    And does it read "Soccer-Mom-Friendly AML BitCoin Will

9    Make Digital Currencies Mainstream from Target to McDonald's to

10   local gas station"?

11   **A.**    Yes.

12   **Q.**    Does it appear to link to an article in the observer.com?

13   **A.**    Yes.

14   **Q.**    And then the embedded link has a subtitle of its own.  Do

15   you see that?

16   **A.**    Yes.

17   **Q.**    Do you see where it reads "AML BitCoin will bring digital

18   currencies out of the shadows and into a family's daily use"?

19   **A.**    Yes.

20          **MR. CHOU:**  Can we please pull up Exhibit 1146.

21      And can we please zoom in on the third tweet there dated

22   October 27th by AML Blockchain @AML BitCoin.

23   **Q.**    This is a tweet dated October 27th, 2017?

24   **A.**    Correct.

25   **Q.**    And do you see the quote "Several American banks are

PROCEEDINGS

1  testing the use of our product for interbank transfers"?

2  **A.**  Yes.

3  **Q.**  And when did you take this screenshot?

4  **A.**  May 27th, 2018.

5       **MR. CHOU:**  Can we please pull up Exhibit 518.  Please

6  zoom in on this tweet.

7  **Q.**  This is a November 8th, 2017, tweet?

8  **A.**  Yes.

9  **Q.**  And do you see where it states "Creator of AML BitCoin on

10 Track to Partner with Panama Canal.  AML BitCoin is designed

11 for official usage by powerful industries and governments"?

12 **A.**  Yes.

13 **Q.**  And then there is a graphic below that includes text such

14 as "AML BitCoin Negotiating with Panamanian Government"?

15 **A.**  Yes.

16      **MR. CHOU:**  Could we please pull up Exhibit 515.  And

17 zoom in, please.

18 **Q.**  So that earlier tweet was on November 8th, 2017?

19 **A.**  Yes.

20 **Q.**  The previous one about Panama?

21 **A.**  Yes.

22 **Q.**  And this one is November 22nd, 2017?

23 **A.**  Yes.

24 **Q.**  And do you see where it states "AML BitCoin Negotiating

25 with Panamanian Government"?

**PROCEEDINGS**

1    **A.**    Yes.

2    **Q.**    And then there's a linked article?

3    **A.**    Yes.

4            **MR. CHOU:**  Could we please pull up 391.  391.  And if

5    we could please just zoom in on the visible tweet.

6    **Q.**    Is this tweet dated December 18th, 2017?

7    **A.**    Yes, it is.

8    **Q.**    And could you describe what's -- the image that's embedded

9    in the tweet?

10   **A.**    It's an image that shows [as read]:

11           "Phase 2 of the AML Token Sale is Happening

12       Now!" for $1.25 USD for tokens.

13       And it says [as read]:

14           "Bitcoin, Bitcoin Cash, Ethereum, Litecoin & USD

15       accepted."

16   **Q.**    Do you have an understanding of what Bitcoin,

17   Bitcoin Cash, Ethereum, and Litecoin are?

18   **A.**    They're cryptocurrencies.

19           **MR. CHOU:**  If we could please pull out of this

20   December 18th tweet and pull up Exhibit 513.  Could we please

21   zoom in on the top tweet there.

22   **Q.**    Is this a December 21st, 2017, tweet?

23   **A.**    Yes, it is.

24   **Q.**    And does it -- do you see where it links to an article?

25   **A.**    Yes.

**PROCEEDINGS**

1  **Q.**  Does the article -- does that link state "AML BitCoin ICO

2  extended to meet unprecedented..."?

3      And then below that, it states surge in last minute demand

4  for the initial coin offering?

5  **A.**  Yes.

6          **MR. CHOU:**  Could we please pull up Exhibit 466.  And

7  if we could zoom in on just the content, the entire box so that

8  we don't have to see the outside.

9      Sorry.  Just the part in the middle, from the top left

10  corner all the way to the bottom right.  Thank you.

11  **Q.**  Agent Ablett, what's the date of -- the date on this

12  screenshot?  It's in the bottom right in gray text right below

13  the "likes."

14  **A.**  December 27th, 2017.

15  **Q.**  Yeah.  Sorry.  It's a bit small.

16      And on December 27th, 2017, is this an Instagram post?

17  **A.**  Yes.

18  **Q.**  And over in the left, is that what appears to be a

19  checklist of items?

20  **A.**  Yes.

21  **Q.**  What's the title to that checklist?

22  **A.**  It says "Compliant With," and it lists [as read]:

23          "Anti-Money Laundering, Know Your Customer,

24      U.S. Office of Foreign Assets, U.S. Patriot Act, Bank

25      Secrecy Act, and more."

PROCEEDINGS

1  **Q.**   And then over on the right, do you see how there appears

2  to be some texts from AML BitCoin and then two other handles?

3  **A.**   Yes.

4  **Q.**   For those two other handles, what do those comments or

5  what does that text say?

6  **A.**   The first comment says "Nice," a potential emoticon.  And

7  the second one says "Love the profile.  Let's connect."

8         **MR. CHOU:**  If we could please pull up Exhibit 1122,

9  please.  1122.

10 **Q.**   And, Agent Ablett, did you also review -- so this was

11 previously in evidence.  Did you also review and screenshot the

12 AML BitCoin website?

13 **A.**   Yes, I did.

14        **MR. CHOU:**  If we could zoom in on just the top bullet

15 point there about Aten Coin.

16 **Q.**   Approximately when did you take this screenshot?

17 **A.**   In January of 2018.

18 **Q.**   And do you see where it states [as read]:

19         "Aten Coin started the implementation of the

20         Monitoring and Detecting of Suspicious Activity

21         software that over 1000 banks use to catch suspicious

22         activity in January 2015"?

23 **A.**   Yes.

24        **MR. CHOU:**  Could we please pull up Exhibit 465 and

25 zoom in on the post itself.  Thank you.

PROCEEDINGS

1    **Q.**   Is the date on this screenshot January 9th, 2018?

2    **A.**   Yes.

3    **Q.**   And on the left, just at a high level, what does this

4    image depict?

5    **A.**   Phase 2 token sale for $1.25 for tokens, and it ends

6    January 15th.

7    **Q.**   And then below that, is there a Phase 3 that begins the

8    following day, on January 16th, 2018?

9    **A.**   Correct.

10   **Q.**   Then over on the right, do you see some comments?

11   **A.**   Yes.

12   **Q.**   What does the "natedoh" comment state?

13   **A.**   [As read]:

14          "How do you respond to this being the future

15          when it was claimed that Aten was the future?"

16   **Q.**   And what does the next comment state?

17   **A.**   [As read]:

18          "And where can I find what happened to Aten?  It

19          went stale, yeah?"

20   **Q.**   Then next to the handle "AML BitCoin," what does

21   AML BitCoin respond to this natedoh fellow?

22   **A.**   [As read]:

23          "Hi" and then "@natedoh, AML BitCoin is the

24          Aten Coin rebranded."

25   **Q.**   And then what's the last comment on the slide?

1    **A.**    [As read]:

2              "Interesting."

3              **MR. CHOU:**  Could we please pull up Exhibit 506 and

4    please zoom in on the tweet.

5    **Q.**    Is this a tweet dated January 16th, 2018?

6    **A.**    Yes.

7    **Q.**    And, again, you took this screenshot on May 27th, 2018?

8    **A.**    Yes.

9    **Q.**    Is this a link to an *Observer* article about

10   soccer-mom-friendly AML BitCoin?

11   **A.**    Yes, it is.

12             **MR. CHOU:**  Okay.  Can we please pull up Exhibit 502.

13   Please zoom in on the tweet.

14   **Q.**    Is this a February 2nd, 2018, tweet?

15   **A.**    Yes.

16   **Q.**    Does it appear to link to an article in the *Spectator*?

17   **A.**    Yes, it does.

18   **Q.**    And do you see where it states at the bottom in the

19   subtitle "First the NFL refused to allow a veterans

20   organization to run and ad.  Now it . . . ."

21        And then it goes on.

22   **A.**    Yes.

23             **MR. CHOU:**  Could we please pull up Exhibit 461, and if

24   we could zoom in on the -- thank you.

25   **Q.**    Is this an Instagram post?

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    It's dated February 4th, 2018?

3    **A.**    Correct.

4    **Q.**    And there's an image on the left of what appears to be a

5    screen capture?

6    **A.**    Yes.

7    **Q.**    And do you see where it states [as read]:

8            "See the AML BitCoin Ad That The NFL Banned from

9        The Super Bowl at AMLToken.com!"?

10    **A.**    Yes.

11    **Q.**    We'll get to this ad later.

12        **MR. CHOU:**  It we could turn to Exhibit 390, please,

13    and please zoom in.

14    **Q.**    And this is a February 5th, 2018, tweet?

15    **A.**    Yes.

16    **Q.**    Do you see where it states [as read]:

17            "The AML Token Sale will end in 8 days!  Don't

18        miss your chance to purchase the world's first

19        AML/KYC/Patriot Act Coin that's compliant with

20        biometric identification"?

21    **A.**    Yes.

22        **MR. CHOU:**  Could we please pull up Exhibit 455.

23    Please zoom in on the Instagram post.

24    **Q.**    So this is dated February 13th, 2018?

25    **A.**    Correct.

**PROCEEDINGS**

1  **Q.**   And that's about nine days after that previous tweet we

2  saw?

3  **A.**   Yes.

4  **Q.**   And do you see where it states on the right, there's an

5  AML BitCoin -- what appears to be an AML BitCoin comment?

6  **A.**   Yes.

7  **Q.**   Does it state [as read]:

8       "Due to an overwhelming amount of last-minute

9       inquiries and demand, the AML Token Sale has been

10      extended by 24 hours"?

11 **A.**   Yes.

12 **Q.**   And then below, there are a number of comments and emojis?

13 **A.**   Yes.

14       **MR. CHOU:**  We can take this down.  That was 455.

15      Okay.  Can we please pull up Exhibit 453.  Please zoom in

16 on this photo.

17 **Q.**   And the date on this is April 26th, 2018?

18 **A.**   Yes.

19 **Q.**   And is this a photo of what appears to be at the time

20 Lieutenant Governor Gavin Newsome and Marcus Andrade?

21 **A.**   Yes.

22 **Q.**   Do you see where on the right there's a comment by

23 AML BitCoin?

24 **A.**   Yes.

25 **Q.**   It states, correct me if I'm wrong [as read]:

PROCEEDINGS

```
 1              "Some of the topics discussed by the group was

 2         AML BitCoin and how it can bring security and

 3         compliance to cryoto, fintech, and digital

 4         identities"?

 5    A.   Yes.

 6    Q.   And then it goes on?

 7    A.   Correct.

 8              MR. CHOU:  And lastly -- or, actually, second from

 9    last, can we pull up 488, please, and please zoom in on this.

10    Q.   Is this a tweet dated April 26th, 2018?

11    A.   April 27th, 2018.

12    Q.   I'm sorry.  April 27th.

13         And see where it states [as read]:

14              ". . . Marcus Andrade meets with the Executive

15         Director of the Port of San Francisco"?

16    A.   Yes.

17              MR. CHOU:  Can we please pull up Exhibit 488.

18         I'm sorry.  I just -- 442.  Can you zoom in.

19    Q.   So the date on this, it says "2 Days Ago."  Do you see

20    that?

21    A.   Yes.

22              MR. CHOU:  If we could just back out of this for a

23    second.

24    Q.   On what date did you take this screenshot?

25    A.   May 27th, 2018.
```

**PROCEEDINGS**

1  **Q.**    Okay.  So this Instagram post was on or about May 25th,

2  2018?

3  **A.**    Correct.

4          **MR. CHOU:**  And if we could please zoom in on the post

5  again.  Sorry about that.  Or back to -- sorry.  Same exhibit,

6  442, but if we could just zoom in on the content itself.

7  **Q.**    Do you see where AML BitCoin states in this post on about

8  May 25th [as read]:

9          "Several vendors are in active negotiations with

10          AML BitCoin to integrate the innovative coin into

11          their payment systems"?

12  **A.**    Yes.

13  **Q.**    Then there's a link to www.amlbitcoin.com?

14  **A.**    Correct.

15  **Q.**    Was that the URL for their website?

16  **A.**    Yes.

17  **Q.**    And then below that, there's what appear to be a number of

18  comments on this post?

19  **A.**    Yes.

20          **MR. CHOU:**  If we could please take this -- take this

21  exhibit down.

22  **Q.**    Agent Ablett, did you also download some press articles

23  from the Internet?

24  **A.**    Yes, I did.

25  **Q.**    And what was your process for doing so?

1    **A.**    I would download the newspaper articles and then attach

2    them to a document describing the day I took them and attach

3    the downloaded article to that document and serialize it in

4    Sentinel.

5    **Q.**    And, in addition, remember how earlier we saw that

6    *Spectator* article about North Korea and AML BitCoin?

7    **A.**    Yes.

8    **Q.**    Did you also compare -- did you compare the version of

9    that article in the case file with what's currently online?

10    **A.**    Yes, I did.

11    **Q.**    And is what's in the case file a fair and accurate

12    depiction of what's online?

13    **A.**    Yes, the content is the same.  The ads have changed and

14    the date is slightly off.  I think it says 12:00 a.m. on one

15    and 2:00 p.m. on the other, but the content of the article is

16    the same.

17           **MR. CHOU:**    At this time the Government moves to admit

18    Exhibits 383, 384, those two being from Serial 10 in the media

19    subfile, and Exhibit 1143 being from Serial 3 in the media

20    subfile.

21           **MR. STEFAN:**    No objection.

22           **THE COURT:**    The exhibits will be -- those exhibits

23    will be admitted.

24           (Trial Exhibits 383, 384, and 1143 received in evidence.)

25           **MR. CHOU:**    All right.  If we could please pull up

1    quickly Exhibit 383.  Zoom in on just the top, the title and

2    the first paragraph, please.

3    **Q.**    Agent Ablett, is this a press release dated May 25th,

4    2015?

5    **A.**    Yes.

6    **Q.**    And does it appear to be about Aten Black Gold Coin?

7    **A.**    Yes.

8        **MR. CHOU:**  Please zoom out.

9        Please zoom in on the quote that appears to be from

10   Mr. Andrade starting with "Founder of NAC" through "he said."

11   **Q.**    So in this 2015 press release, what's the quote from

12   Mr. Andrade?

13   **A.**    [As read]:

14        "'All of our hard work is finally coming to

15        fruition,' said Andrade.  'The NAC team is very proud

16        to put this incredible new coin in the digital

17        currency market.  We set our bar very high and feel

18        that our goals have not only been met for the Aten

19        'Black Gold' Coin, but exceeded,' he said."

20        **MR. CHOU:**  We can take this down and move to

21   Exhibit 384, please.

22        And can we please zoom in on, first, just the title and

23   date of this.

24   **Q.**    So the date on this press release is March 23rd, 2015?

25   **A.**    Yes.

1    **MR. CHOU:**  Could we please zoom in, then, on -- zoom

2    out.  And please zoom in on the quote that appears to be from

3    Mr. Andrade, starting with "While upholding."

4    **Q.**    What does -- what quote is attributed to Mr. Andrade in

5    this March 2015 press release?

6    **A.**    [As read]:

7         "'While upholding the complete privacy of our

8         customers,' said Andrade, 'we are able to verify

9         ownership of coin holders, secure and monitor

10        transactions, trace and track identities of senders

11        and receivers, keep recordkeeping efforts

12        transparent, protect coins from stealing, maintain

13        liquidity and stabilize value.'"

14       **MR. CHOU:**  Okay.  If we can zoom out.

15   And could we please zoom in on what appears to be the

16   second quote attributed to Mr. Andrade, starting with "Banks

17   have simply been waiting."

18   **Q.**   Do you see where this quote states [as read]:

19        "We are in negotiations with a few select banks

20        right now.  We plan to disclose NAC's U.S. banking

21        support system in the very near future"?

22   **A.**   Yes.

23       **MR. CHOU:**  And we can take this down, please.

24   **Q.**   So, Agent Ablett, earlier we saw some reference to a

25   Super Bowl advertisement.

PROCEEDINGS

1    **A.**    Yes.

2    **Q.**    Did you review what appeared to be a Super Bowl

3    advertisement in the FBI case file?

4    **A.**    Yes, I did.

5    **Q.**    And did you compare it with what's on AML BitCoin's

6    YouTube account?

7    **A.**    Yes, I did.

8    **Q.**    One moment.

9         In addition, on AML BitCoin's YouTube account, did you see

10   a video titled "What Is AML BitCoin?"

11   **A.**    Yes.

12   **Q.**    And did you compare what's in that account with -- or

13   what's online with what's in the FBI case file?

14   **A.**    Yes, I did.

15   **Q.**    And approximately what's the date on the "What Is

16   AML BitCoin?" YouTube video?

17   **A.**    I don't recall.

18   **Q.**    Okay.  But, in any event, what's in the FBI case file and

19   what's online, are they fair and accurate copies of one

20   another?

21   **A.**    Yes, they are.

22         **MR. CHOU:**  The Government moves to admit Exhibits 581

23   and 582.

24         **MR. STEFAN:**  No objection.

25         **THE COURT:**  581 and 582 will be admitted.

 1          (Trial Exhibits 581 and 582 received in evidence.)

 2          MR. CHOU:  Could we please publish to the jury the

 3    two-minute-long video, or so, which is Exhibit 581, "What Is

 4    AML BitCoin?"

 5               (Video was played but not reported.)

 6    BY MR. CHOU:

 7    Q.    So we've seen some social media content as well about the

 8    Super Bowl ad.

 9          On the YouTube channel, is there a video that asserts that

10    it's the Super Bowl ad?

11    A.    Yes.

12          MR. CHOU:  Could we please play Exhibit 582.

13               (Video was played but not reported.)

14          MR. CHOU:  If we could take this exhibit down.

15    Q.    On a different note, Agent Ablett, did you help obtain

16    records of incorporation for Mr. Andrade's companies?

17    A.    Yes, I did.

18    Q.    And how did you do that?

19    A.    Through requests and subpoena.

20    Q.    Did the State of Nevada produce certified records?

21    A.    Yes, they did.

22          MR. CHOU:  I'd like to show just the Court, witness,

23    and the parties Exhibit 544.  And if we could please jump to

24    page 19.

25    Q.    And, Agent Ablett, have you reviewed these certified

**PROCEEDINGS**

1   records in preparation for your testimony here today?

2   **A.**   Yes.

3   **Q.**   Are these certified corporate records for entities

4   including Mr. Andrade's NAC Foundation?

5   **A.**   Yes, they are.

6           **MR. CHOU:**  The Government moves to admit Exhibit 544.

7           **MR. STEFAN:**  No objection.

8           **THE COURT:**  Exhibit 544 will be admitted.

9       (Trial Exhibit 544 received in evidence.)

10          **MR. CHOU:**  Could we please scroll to the next page,

11  please, page 20.  And could we please zoom in on the "Articles

12  of Organization" box as well as the date on the right, like the

13  date box on the right.

14          **THE COURTROOM DEPUTY:**  For the jury too; right?

15          **MR. CHOU:**  Oh, I'm so sorry.  Yes, please publish it.

16  **Q.**   So, Agent Ablett, are these the articles of organization

17  for an LLC?

18  **A.**   Yes.

19  **Q.**   And what's the filing date on this entity?

20  **A.**   February 13th, 2014.

21          **MR. CHOU:**  And zooming out, please, can we please zoom

22  in on the name of the limited liability company.

23          **THE WITNESS:**  NAC Foundation, LLC.

24          **MR. CHOU:**  And zoom out, please.

25      Can we please zoom in on Box 5, "Name and address of each

1    manager or managing member."

2    **Q.**   Who are the manager or managing members of NAC Foundation,

3    LLC?

4    **A.**   Rowland Andrade.

5    **Q.**   Anyone else listed?

6    **A.**   No.

7          **MR. CHOU:**  Please turn to the next page.  So can we

8    scroll on the -- zoom in on the title at the very top of the

9    page.

10   **Q.**   So this is the initial/annual list of managers or managing

11   members for NAC Foundation, LLC?

12   **A.**   Correct.

13         **MR. CHOU:**  And if we can zoom out.

14   **Q.**   The date on this page is March 29th, 2014?

15   **A.**   Yes.

16         **MR. CHOU:**  And could we please zoom in on -- starting

17   from -- I'm sorry.  Zoom out, please.

18       Starting from where Mr. Andrade's name starts in the

19   middle of the page through the bottom where his signature

20   appears.

21   **Q.**   Who are the manager or managing members listed on -- on

22   this paperwork?

23   **A.**   Marcus Andrade.

24   **Q.**   And who signs this form on behalf of the NAC Foundation?

25   **A.**   Marcus Andrade.

PROCEEDINGS

1          **MR. CHOU:**  Okay.  We can zoom out of this and go to

2   the next page.  Or, actually, if we stay on this page -- sorry.

3   Can you go back one.

4          So you see how up at the top, if you can zoom in on the

5   filing period.  Perfect.

6   **Q.**   So the filing period on the sheet we just saw is

7   February 2014 to February 2015?

8   **A.**   Yes.

9          **MR. CHOU:**  Okay.  If you could go to the next page,

10   please.

11   **Q.**   Is this next page for the filing period of '15 to '16?

12   **A.**   Correct.

13   **Q.**   And, again, who are the managers or managing members

14   listed for the NAC Foundation for '15 through '16?

15   **A.**   Marcus Andrade.

16          **MR. CHOU:**  Next page, please.

17          So if we could zoom in on the filing period on this one up

18   at the top.

19   **Q.**   This is basically the same form but for the filing period

20   '16 through '17?

21   **A.**   Yes.

22   **Q.**   And, again, who signs the paperwork on behalf of the

23   NAC Foundation for this filing period?

24   **A.**   Marcus Andrade.

25   **Q.**   And who are the managing member or managing -- member or

1  managing members of this corporation?

2  **A.**  Marcus Andrade.

3  **Q.**  Next page.  All right.  And so for the filing period 2017

4  through 2018, is it, again, the same story, Mr. Andrade being

5  the only listed managing member or member of the

6  NAC Foundation?

7  **A.**  Yes.

8       **MR. CHOU:**  Could we please turn to Exhibit 1477, just

9  for the parties and the witness and the Court.

10  **Q.**  Did the FBI also obtain records for NAC Payroll Services,

11  Inc.?

12  **A.**  Yes.

13  **Q.**  And were these certified records that we obtained from

14  California Secretary of State?

15  **A.**  Yes, they were.

16  **Q.**  And is this the certificate of records?

17  **A.**  Yes.

18  **Q.**  Have you reviewed Exhibits 1477 and 1478 in preparation

19  for your testimony here today?

20  **A.**  Yes, I have.

21  **Q.**  And are they the certified California records?

22  **A.**  Yes.

23       **MR. CHOU:**  The Government moves to admit 1477 and

24  1478.

25       **MR. STEFAN:**  No objection.

PROCEEDINGS

1          **THE COURT:**  1477 and 1478 will be admitted.

2          (Trial Exhibits 1477 and 1478 received in evidence.)

3          **MR. CHOU:**  If we could please turn to 1478 and publish

4     that for the jury.

5          If we could please zoom in on starting where it says

6     "Statement of Information" through "Corporate Name."

7     **Q.**   What's the corporate name -- thank you.

8          What's the corporate name of this entry?

9     **A.**   NAC Payroll Services, Inc.

10    **Q.**   And when was this filed?

11    **A.**   February 2nd, 2018.

12         **MR. CHOU:**  Zoom out, please.

13         Can we please zoom in on the names and complete addresses

14    of the following officers.

15    **Q.**   For NAC Payroll Services, Inc., who is the CEO?

16    **A.**   Marcus Andrade.

17    **Q.**   Same answer for secretary?

18    **A.**   Yes.

19    **Q.**   For chief financial officer?

20    **A.**   Yes.

21    **Q.**   What about the board of directors?  Who are the directors

22    of NAC Payroll Services, Inc.?

23    **A.**   Marcus Andrade.

24    **Q.**   Anyone else listed on this form?

25    **A.**   No.

PROCEEDINGS

```
 1            MR. CHOU:  Zoom out, please.  And then at the bottom,
 2   can we just highlight the signature line.
 3   Q.   Who signed this form for NAC Payroll Services?
 4   A.   Marcus Andrade.
 5            MR. CHOU:  We can take this down.
 6        One moment.
 7                      (Pause in proceedings.)
 8   BY MR. CHOU:
 9   Q.   Just as a final cleanup, did you also review FBI
10   Serial 358 in the case file?
11   A.   Yes.
12   Q.   And did that contain more screenshots of online content?
13   A.   Yes.
14   Q.   And this was screenshots that you took in January 2018?
15   A.   Yes.
16            MR. CHOU:  The Government moves to admit 1106 and
17   1117.
18            MR. STEFAN:  One moment, Your Honor.
19                      (Pause in proceedings.)
20            MR. STEFAN:  No objection.
21            THE COURT:  1106 and 1117 will be admitted.
22        (Trial Exhibits 1106 and 1117 received in evidence.)
23            MR. CHOU:  Nothing further.
24            THE COURT:  Mr. Stefan?
25   \\\
```

<u>CROSS-EXAMINATION</u>

**BY MR. STEFAN:**

**Q.**   Good afternoon, Ms. Ablett.

**A.**   Good afternoon.

**Q.**   I want to talk to you about some of your communications with a particular witness in this case, David Mata.  Do you know who I'm referring to?

       **MR. CHOU:**  Objection.  Outside the scope.

       **MR. STEFAN:**  Your Honor, we're holding her subject to recall.  For purposes of judicial economy, it seems --

       **THE COURT:**  I agree.  I'll let you go forward.

       **MR. STEFAN:**  Thank you, Your Honor.

**Q.**   You corresponded with Mr. David Mata?

**A.**   Yes.

**Q.**   And he was a cooperating witness for the Government in the case?

**A.**   Yes.

**Q.**   Somebody who's subsequently taken a plea deal with the Government, to your knowledge?

**A.**   Yes.

**Q.**   In the course of your interactions with him, he sent you a variety of emails that he forwarded from Mr. Andrade; is that correct?

**A.**   Yes.

**Q.**   I want to show Exhibit 3202, please.

1          And, Ms. Ablett, to speed things up, I have a copy of

2    this.

3              **MR. STEFAN:**  Your Honor, if I may approach and --

4              **THE COURT:**  Yes, you may.

5              **MR. STEFAN:**  Providing a copy of 3202 to Ms. Ablett.

6    **Q.**   You can just look at the first page, then flip over to the

7    second page, and then let me know if you recognize what I've

8    given you.

9    **A.**   (Witness examines document.)  Okay.

10   **Q.**   Do you recognize this as an email that Mr. Mata sent to

11   you on October 3rd of 2018?

12   **A.**   Yes.

13   **Q.**   Forwarding to you messages from Mr. Andrade?

14   **A.**   Yes.

15   **Q.**   And beneath that, forwarding messages that he received

16   from a Mr. Richard Naimer?

17   **A.**   Yes.

18   **Q.**   And those messages from Mr. Richard Naimer relate to the

19   development timeline and progress of a particular product?

20   **A.**   Yes.

21             **MR. STEFAN:**  Your Honor, the Government [sic] moves to

22   admit 3202.

23             **MR. CHOU:**  Four layers of hearsay, Your Honor, and

24   from the face of the document, relevance.

25             **THE COURT:**  I'm going to sustain the objection.

1          **MR. STEFAN:**  Your Honor, with respect to hearsay, this

2     is not being admitted for the truth.  The primary information

3     that we're seeking to admit is the information contained on

4     page 2 for its effect on Mr. Andrade.  Specifically, this email

5     speaks to the product, with respect to the CrossVerify DITN

6     product, developing nicely and on time.

7          **MR. CHOU:**  Your Honor --

8          **MR. STEFAN:**  The product --

9          **THE COURT:**  Don't read it.  Let me just see what

10    the --

11        Well, no.  Sustained.

12        **MR. STEFAN:**  Your Honor, may I have a moment?

13        **THE COURT:**  Yes.

14                    (Pause in proceedings.)

15        **MR. STEFAN:**  Okay.  You can take down Exhibit 3202,

16    and please put up Exhibit 3203.

17        And, Your Honor, may I provide a copy of this to

18    Ms. Ablett?

19        **THE COURT:**  Yes.

20    **BY MR. STEFAN:**

21    **Q.**  Ms. Ablett, you can just flip through this and tell me

22    whether you recognize it.

23    **A.**  (Witness examines document.)  Okay.

24    **Q.**  You recognize this as an email that Mr. Mata sent to you

25    on October 3rd of 2018?

ABLETT - CROSS / STEFAN

1   **A.**   Yes.

2   **Q.**   Forwarding a series of communications between individuals

3   George Getz, David Mata, Marcus Andrade, Robert Getz, and John

4   Langdon?

5   **A.**   Yes.

6   **Q.**   And this email, the copy that you just reviewed and is on

7   the screen, that's an accurate copy of the email that you

8   received on that day from Mr. Mata?

9   **A.**   Yes.

10  **Q.**   Okay.  Moving on to Exhibit 3203.

11          **MR. STEFAN:**  And, Your Honor, if I could provide a

12  copy of 3203 to Ms. Ablett.

13  **Q.**   Same questions, ma'am.  If you can just flip through it.

14  Let me know whether you recognize it.

15  **A.**   (Witness examines document.)

16          **MR. STEFAN:**  Oh, pardon me.  I believe -- I meant to

17  say 3204.  Yes, please display 3204.

18  **Q.**   Ms. Ablett, did I give you another copy of 3203?

19  **A.**   No.  I have 3204.

20  **Q.**   Okay.  Good.

21          All right.  You can go ahead and flip through 3204 and

22  just see whether you recognize this.

23  **A.**   (Witness examines document.)  Okay.

24  **Q.**   Ms. Ablett, in a nutshell -- in a nutshell, this is the --

25  this is another email sent to you by David Mata, forwarding

SIDEBAR

1    communications that he received from Mr. Andrade and from a

2    Michael Conybeare.  He sent that to you on October 3rd, 2018?

3    **A.**    Yes.

4    **Q.**    And this also is a fair, correct copy of the email that

5    you received on that date?

6    **A.**    Yes.

7            **MR. STEFAN:**  Okay.  We can move on to 3205.

8        Actually, please remove 3205.  3206, please.

9            **THE COURT:**  Can I see counsel off to the side for a

10   moment.

11       (The following proceedings were heard at the sidebar:)

12           **THE COURT:**  Can you hear us?

13           **THE OFFICIAL REPORTER:**  Yes.

14           **THE COURT:**  As we dealt with in the motions in limine,

15   Mr. Andrade, unless and until he testifies, you can't introduce

16   his statements or other related items.

17       These are all -- you're saying -- you're introducing these

18   to show how Mr. Andrade reacts.  First of all, it's hearsay;

19   and he's not -- unless and until he testifies, there's -- what

20   are you doing?

21           **MR. SHEPARD:**  Can I address that, Your Honor?

22       **THE COURT:**  Sure.  Either one of you.

23           **MR. SHEPARD:**  Take Exhibit 3202, the first one.

24       **THE COURT:**  Okay.

25           **MR. SHEPARD:**  Because I think this is central -- it's

**SIDEBAR**

1   a good illustration, and I think it's central to the defense.

2           **THE COURT:**  Okay.

3           **MR. SHEPARD:**  The bottom portion of this is an email

4   from Richard Naimer that is ultimately forwarded to

5   Mr. Andrade.

6           **THE COURT:**  Okay.

7           **MR. SHEPARD:**  Okay?  Mr. Naimer, as you've heard, is

8   running the program in London.

9           **THE COURT:**  Right.

10          **MR. SHEPARD:**  The Government contends nothing was ever

11   done.

12          **THE COURT:**  Right.

13          **MR. SHEPARD:**  Misrepresentations were made as a

14   result.

15     Mr. Naimer is saying the product is developing nicely and

16   on time, and he's talking about a number of other things about

17   it.  That goes to Mr. Andrade's intent and understanding in

18   making whatever representations the Government accuses him of

19   making that the Government says is false.

20     He is told the product is developing nicely and on time,

21   among many other things.  That is central to his intent.

22          **THE COURT:**  But doesn't he have to testify in order to

23   get this in?

24          **MR. SHEPARD:**  No, because this was sent to him.

25          **THE COURT:**  I understand it was sent to him.

SIDEBAR

1          **MR. SHEPARD:**  It was sent to him.

2          **THE COURT:**  But that doesn't change the -- okay.

3          **MR. CHOU:**  It's the effect on the listener doctrine,

4     Your Honor; and here, Agent -- I mean, Agent Ablett is not --

5     they're trying to admit this for how Mr. Andrade perceived it;

6     and to do that, he is welcome to exercise his right to take the

7     stand.

8          **THE COURT:**  How are we supposed to know -- what?

9     They're just supposed to guess on what the reaction of Andrade

10    is to this?

11         **MR. SHEPARD:**  No.  We get to argue what the reaction

12    is.  Just like the Government has introduced a lot of evidence

13    that the Government is going to argue says Mr. Andrade must

14    have known things were false, this is --

15         **THE COURT:**  Well, you could not introduce -- let's say

16    there's an Andrade statement that says, "Oh, I'm glad to see

17    it's going on nicely."  You couldn't introduce that.

18         **MR. SHEPARD:**  I'm not suggesting I am.

19         **THE COURT:**  Well, then how is this really any

20    different then?

21         **MR. SHEPARD:**  This is as if Richard Naimer came to

22    Marcus Andrade and said, "The product is good."

23         **THE COURT:**  Naimer is not here.

24         **MR. SHEPARD:**  Yes.

25         **THE COURT:**  So what is the basis for bringing this in?

1    **MR. SHEPARD:**  This is something that, as the document

2    reflects, went to Mr. Andrade.

3        The Government alleges that he -- in fact, much of

4    the Government's case is information --

5        **THE COURT:**  Well, I understand why you want to have

6    it.  That's not the question.  The question is:  What's the

7    basis for your admitting this document?  And you're seeking to

8    admit this document, and I am unclear on what your basis is for

9    doing that.

10       **MR. SHEPARD:**  My basis is --

11       **THE COURT:**  I understand why you'd like to have it in.

12   You don't have to keep telling me why.  I just --

13       **MR. SHEPARD:**  That is why it is admissible.  It is

14   admissible because it goes to his intent.  It is information he

15   received that bears on his intent, just like the rest of

16   the Government's case which is information he received that

17   the Government says bears on his intent in a negative way.

18   This is information --

19       **THE COURT:**  Right.  But as I said, we all agree, if

20   you had a document that said, from Andrade, "Oh, I'm glad to

21   see it's going nicely," you agree you could not admit that.

22       **MR. SHEPARD:**  But that's not what this is.

23       **THE COURT:**  Well, okay.  This is --

24       **MR. SHEPARD:**  This is a document from somebody else.

25       **THE COURT:**  Quiet.  Quiet.

SIDEBAR

1    You've authenticated it.  We don't need her for admitting

2  this or not admitting this.

3         **MR. SHEPARD:**  Correct.

4         **THE COURT:**  So you can provide me with a brief as to

5  why --

6         **MR. SHEPARD:**  Okay.

7         **THE COURT:**  -- this could come in, but we don't need

8  her anymore for this.

9         **MR. SHEPARD:**  And that's why I asked Mr. Stefan, and

10  he was doing, just getting the authentication of any of these

11  other --

12         **THE COURT:**  That's fine.  That's fine.  And then we

13  can be done with this witness.  And you can tell me.  If I end

14  up allowing you to do it, you can read it to the jury if you

15  want.

16         **MR. SHEPARD:**  Understood.  Yes.  We weren't going to

17  ask her about the document --

18         **THE COURT:**  Okay.

19         **MR. SHEPARD:**  -- anyway.

20    We're just authenticating it so we can hopefully --

21         **THE COURT:**  All right.  Do we even actually need her?

22  You can probably stipulate to the authentication.

23         **MR. CHOU:**  If they're FBI documents, I don't see why

24  we wouldn't stipulate to authenticity.

25         **MR. SHEPARD:**  We've asked.  We'll be happy to take a

1    stipulation.  It's fine.

2            **THE COURT:**  Well, if you -- how many more of these do

3    you have?

4            **MR. STEFAN:**  I was on the last one.

5            **THE COURT:**  All right.  Well, then go ahead and finish

6    that up.  Then do you have other things with her?

7            **MR. STEFAN:**  I do not.

8            **THE COURT:**  Okay.  And you don't have anything?

9            **MR. CHOU:**  No, Your Honor.

10           **THE COURT:**  All right.  Then we'll end early, and

11   we'll then plan the briefing.  Okay.

12           **MR. SHEPARD:**  Okay.  Thank you.

13                         (Sidebar concludes.)

14       (The following proceedings were heard in open court.)

15           **THE COURT:**  Okay.  Mr. Stefan?

16   **BY MR. STEFAN:**

17   **Q.**   Do you still have 3206, or did I give it to you?

18   **A.**   No.

19   **Q.**   Okay.  Well, it's a single-page document, actually.  So

20   you can just take a look at it there on your screen.  Do you

21   recognize it?

22   **A.**   I'm on the email, yes.

23   **Q.**   Yeah.  You're on the cc line on this email?

24   **A.**   Mm-hmm.

25   **Q.**   And it's an email that Marcus sent to you.  Do you see

1  that?

2  **A.**    I'm copied on it.

3  **Q.**    Do you recognize the content?

4  **A.**    Yes.

5  **Q.**    And fair and accurate copy of the email that you received?

6  **A.**    Yes.

7            **MR. STEFAN:**  Thank you.

8            **THE COURT:**  All right.  And, Mr. Chou, anything

9  further?

10            **MR. CHOU:**  Nothing further, Your Honor.

11            **THE COURT:**  All right.  You may step down.

12                 (Witness excused subject to recall.)

13            **MR. STEFAN:**  Your Honor?

14            **THE COURT:**  Yes.

15            **MR. STEFAN:**  Just as a note that the defense is

16  requesting she be held subject to recall.

17            **THE COURT:**  She is subject to recall.

18            **MR. STEFAN:**  Thank you, Your Honor.

19            **THE COURT:**  You may step down.

20      So, members of the jury, we're going to be able to end a

21  little bit early today.  So I can see no one is shaking their

22  head, "No, don't do that."

23      So remember my admonitions.  Do not discuss this amongst

24  yourselves or with anyone else, and don't do anything about

25  this case, any research, anything like that.  Put it aside.

**PROCEEDINGS**

1       I know there have been some questions about how we're

2    doing.  All counsel are working very hard to get this case

3    presented to you.  As of now, I can't promise you because

4    things develop and we do the best we can, but we're still

5    planning to have the case in your hands by the 14th of March,

6    as we discussed.  So that's still our intention.  Nothing has

7    changed.  So we're still barreling ahead, but we'll keep you

8    posted as we get a better sense as we go along.

9       But for today, don't think any more about the case.  We'll

10   see you tomorrow at 8:30.

11   (Proceedings were heard out of the presence of the jury.)

12           **THE COURT:**  Okay.  We're out of the presence of the

13   jury.

14       Before we launch into the further discussion of what we've

15   just spoken about, who are the witnesses for tomorrow?

16           **MR. HIGHSMITH:**  John Bryan.

17           **THE COURT:**  John -- who's that?

18           **MR. HIGHSMITH:**  John Bryan.

19           **THE COURT:**  Okay.

20           **MR. HIGHSMITH:**  Bryant Ling.

21           **THE COURT:**  Okay.

22           **MR. HIGHSMITH:**  Theresa Chiu.

23           **THE COURT:**  Okay.

24           **MR. HIGHSMITH:**  We're not sure if we're going to call

25   Veronica Hernandez.  She's a maybe.

 1    And then next we've got James Carfora and Ethan Quinn.

 2        **THE COURT:**  Okay.

 3    Okay.  With respect to briefing on this question,

 4    timing-wise, I don't want to jam you if you don't need the

 5    answer Monday.

 6    When would you need the answer to then do whatever you

 7    want to do if I were to permit you to admit those materials?

 8        **MR. SHEPARD:**  Well, you know, we could obviously admit

 9    them in the defense case.  I'm just -- I'm trying to think, as

10    I answer, whether we're going to have this same issue during

11    Mr. Abramoff's examination.  I'm guessing not because he will

12    be saying the things to Mr. Andrade directly, and I would like

13    to think the Court would not have an issue with --

14        **THE COURT:**  If the testimony is -- and you can, again,

15    say it's being admitted not for the truth of the matter

16    asserted, but you're -- that's a different situation.  It's not

17    some agent talking about something else, I think.  If Abramoff

18    is -- give me an example of what you're thinking.

19        **MR. SHEPARD:**  I mean, it's probably some of the

20    same -- not the same document, but the same sort of thing.

21    For example, with -- Mr. De La Guardia would be an

22    example.  There were all those communications between

23    Mr. De La Guardia and Mr. Abramoff that I view as exculpatory.

24    I believe Mr. Abramoff reports some of that to Mr. Andrade.

25    And that, in my opinion, would go to Mr. Andrade's mental

 1  state, the fact that Mr. Andrade --

 2      **THE COURT:**  If you say to Abramoff "What did you say

 3  to Andrade?" I would think that would be admissible.

 4      **MR. SHEPARD:**  Yes.  Okay.

 5      **THE COURT:**  And then later you can argue that, that

 6  having been the testimony and if that was said to him, it has

 7  this ramification to it.

 8      **MR. SHEPARD:**  Okay.  And that's really what we're

 9  saying with these exhibits.

10      **THE COURT:**  Well, maybe --

11      **MR. SHEPARD:**  This is what Mr. Naimer is saying to

12  Mr. Andrade.  It just happens to be in writing, and it's now

13  authenticated.

14      **THE COURT:**  Well, okay.

15      **MR. SHEPARD:**  But, yeah.  Okay.  I won't get ahead of

16  myself.

17      **THE COURT:**  I want to think it through.  I'm not quite

18  as clear as you're indicating.  I think there's a difference.

19      But go ahead.

20      **MR. HIGHSMITH:**  I think what we're talking about -- so

21  the example that Mr. Shepard mentioned would have been like a

22  WhatsApp exchange between De La Guardia and Abramoff.  And then

23  that's hearsay.  It's inadmissible.  And then he wants to put

24  it in for Andrade's state of mind.

25      I'm not -- I don't follow that.  If it's a question to

1    Mr. Abramoff, "Did you tell Andrade about your conversation

2    with De La Guardia?" that's a different story.  But if it's

3    just "I seek to admit this WhatsApp chain between Abramoff and

4    De La Guardia because it has evidence of Mr. Andrade's mental

5    state," well, Mr. Andrade's not on the chain.  It's just

6    De La Guardia and Andrade -- and Abramoff exchanging a

7    WhatsApp.

8         MR. SHEPARD:  I've never suggested that I am trying to

9    introduce those sorts of communications if they weren't

10   conveyed to Mr. Andrade.

11        The point of the Naimer email is it was conveyed to

12   Mr. Andrade, and I expect to be able to show the same with

13   other communications that Mr. Abramoff conveyed to Mr. Andrade.

14        And they go to Mr. Andrade's --

15        THE COURT:  Your argument is going to be -- we're

16   assuming we're not hearing from Mr. Andrade.

17        You're saying:  Okay.  There's evidence he heard this; and

18   therefore, you, members of the jury, should infer that he

19   reacted in a particular way.

20        MR. SHEPARD:  Just as the Government is seeking to

21   infer that Mr. Andrade knew that these representations were

22   false, we are using evidence from which the jury can infer that

23   Mr. Andrade believed the representations were true.  It's

24   exactly what the Government has been doing for days.

25        THE COURT:  Well, that may be.  But if we go back, for

 1   example, the Government can introduce admissions by

 2   Mr. Andrade.  You can't introduce --

 3           **MR. SHEPARD:**  Right.

 4           **THE COURT:**  -- self-serving hearsay from Mr. Andrade.

 5      So it isn't -- there is not a complete congruence here.

 6           **MR. SHEPARD:**  But (a) none of this is Mr. Andrade's

 7   statements.  We're talking -- the one that --

 8           **THE COURT:**  I understand.

 9           **MR. SHEPARD:**  -- triggered this was a Mr. Naimer

10   statement; it's not Mr. Andrade's statement.

11           **THE COURT:**  I understand.

12           **MR. SHEPARD:**  So -- and a lot of what the Government

13   produced was not Mr. Andrade's statements.  It was statements

14   from other people or evidence from other people that it is

15   using to infer Mr. Andrade's intent.

16           **THE COURT:**  Well --

17           **MR. SHEPARD:**  We should be able to do the same.

18      It's not a hearsay issue.  It's not an admission issue.

19   It's just, this is information that either the Government says

20   Mr. Andrade has or we are going to show he had, and that's how

21   the jury infers intent.

22           **THE COURT:**  I'm afraid that means I probably need

23   something from you tomorrow.  And then probably Monday is going

24   to be your direct, so it's not going to come up necessarily on

25   Monday.

```
 1          And I think you should just -- I know it's not entirely
 2    clear what they're saying, I'm assuming from your expression,
 3    Mr. Highsmith, but I don't see why you can't simultaneously
 4    give me something.
 5          MR. HIGHSMITH:  Understood.
 6          THE COURT:  By midday tomorrow, I'll take whatever you
 7    can give me.
 8          MR. SHEPARD:  I'm not sure I can get you something by
 9    midday tomorrow just because we've got --
10          THE COURT:  I understand.
11          MR. SHEPARD:  -- a bunch of witnesses --
12          MR. HIGHSMITH:  We're asking for a little more time
13    too.
14          THE COURT:  Well, I'll give you all the time you want,
15    but what I don't want to have happen is the Abramoff
16    testimony -- we're kind of up against it because we're not in
17    the normal situation.  And I'll try to accommodate you guys,
18    but -- so what do you want to do?  Give me something on Monday?
19          MR. SHEPARD:  I would be much happier giving you
20    something on Monday, yes.
21          THE COURT:  All right.  Monday, simultaneously give
22    me -- I mean, we're not talking about --
23          MR. SHEPARD:  No.
24          THE COURT:  It's just --
25          MR. SHEPARD:  No.
```

1          **THE COURT:**  It's, frankly, putting into writing

2    some -- articulating your position so I can think it through

3    rather than just doing it on the fly.

4          **MR. SHEPARD:**  Understood.

5          **THE COURT:**  So I'm not expecting the Weinstein on

6    Evidence treatise.

7          **MR. SHEPARD:**  And you're not going to get it --

8          **THE COURT:**  Okay.

9          **MR. SHEPARD:**  -- respectfully.

10      We can't produce it that way.

11         **THE COURT:**  That's fine.  But organize your thoughts

12   so it'll make sense to me, and give that to me by some point in

13   the day on Monday.

14         **MR. SHEPARD:**  Okay.  Thank you, Your Honor.

15         **THE COURT:**  And then where are we on the instruction,

16   and when do you want me to give it to the jury?  It's not an

17   instruction.  It's just giving them some guidance on what's

18   going to happen on Monday.

19      I can do it on Monday morning.  I don't care.

20         **MR. HIGHSMITH:**  I just need to enter in Mr. Shepard's

21   edits --

22         **THE COURT:**  All right.

23         **MR. HIGHSMITH:**  -- and then, hopefully, get

24   something --

25         **THE COURT:**  Well, assuming it's agreeable to the

1    parties, just hand it up to me.

2        And what do you think?  Should I do it at the end of the

3    day tomorrow, or should I wait till Monday morning?

4            **MR. HIGHSMITH:**  I think it makes sense to do it at the

5    end of the day on Friday.

6            **THE COURT:**  Well, then just hand me up what you want

7    me to tell them before the end of the day tomorrow.

8            **MR. HIGHSMITH:**  Understood.

9            **THE COURT:**  Okay.

10           **MS. DIAMOND:**  One more matter, Your Honor.

11       I was going to bring this up tomorrow, but the Government

12   indicated that they may call one of their experts tomorrow

13   instead of after Mr. Abramoff's testimony.

14       We are requesting the right to have our counterpart expert

15   listen via Zoom hookup to the Government's experts, and

16   vice versa if they need it, to avoid excess travel for our

17   experts.

18           **THE COURT:**  That's fine with me, assuming

19   technologically we can do it.

20           **MS. DIAMOND:**  I'm sure I can work with Corrine and we

21   can work that out.

22           **THE COURTROOM DEPUTY:**  It's fine.

23           **THE COURT:**  That's fine.  The witnesses, expert

24   witnesses can listen to each other's testimony.  They could sit

25   in the courtroom.

PROCEEDINGS

1          **MS. DIAMOND:**  Thank you very much.

2          **MR. HIGHSMITH:**  Understood.

3          **THE COURT:**  Okay.

4      Okay.  We'll see you tomorrow.

5          **MR. HIGHSMITH:**  Thank you.

6              (Proceedings adjourned at 1:24 p.m.)

7                     ---o0o---

8

9              **CERTIFICATE OF REPORTER**

10         I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13    DATE:  Thursday, February 20, 2025

14

15

16

17

18    _____

19         Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

20      CSR No. 7445, Official United States Reporter

21

22

23

24

25