```
                                     Volume 9

                                     Pages 1477 - 1630

                      UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

            Before The Honorable Richard Seeborg, Judge

            UNITED STATES OF AMERICA,      )
                                           )
                       Plaintiff,          )
                                           )
              VS.                          )   NO.  3:20-CR-00249 RS
                                           )
            ROWLAND MARCUS ANDRADE,        )
                                           )
                       Defendant.          )
            _____)


                                     San Francisco, California
                                     Friday, February 21, 2025

                      TRANSCRIPT OF JURY TRIAL PROCEEDINGS

            APPEARANCES:

            For Plaintiff:
                              PATRICK D. ROBBINS
                              ACTING UNITED STATES ATTORNEY
                              450 Golden Gate Avenue
                              San Francisco, California 94102
                        BY:   CHRISTIAAN HIGHSMITH
                              DAVID J. WARD
                              MATTHEW CHOU
                              ASSISTANT UNITED STATES ATTORNEYS

            For Defendant:
                              KING & SPALDING, LLP
                              50 California Street, Suite 3300
                              San Francisco, California 94111
                        BY:   MICHAEL J. SHEPARD, ATTORNEY AT LAW

                  (APPEARANCES CONTINUED ON FOLLOWING PAGE)


            REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                          CSR No. 7445, Official United States Reporter
```

1   **APPEARANCES:** (CONTINUED)

2   For Defendant:

3                         KING & SPALDING, LLC
                          1700 Pennsylvania Avenue, NW
                          Washington, D.C. 20006
4               BY:   **KERRIE C. DENT, ATTORNEY AT LAW**

5                         KING & SPALDING, LLC
                          1185 Avenue of the Americas, 34th Floor
6                         New York, New York 10036
                BY:   **DAINEC P. STEFAN, ATTORNEY AT LAW**

7

8                         LAW OFFICES OF CINDY A. DIAMOND
                          58 West Portal Avenue, Suite 350
9                         San Francisco, California 94127
                BY:   **CINDY A. DIAMOND, ATTORNEY AT LAW**

10

11

12

13  Also Present:         **Special Agent Brendon Zartman**
                          **Tina Rosenbaum, Paralegal**
14                        **Ed Jackson, Trial Technician**

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                        I N D E X

2

3    Friday, February 21, 2025 - Volume 9

4

5    GOVERNMENT'S WITNESSES                    PAGE   VOL.

6    BRYAN, JR., ANTHONY ADRIAN JOHN
       (SWORN)                                 1490    9
7    Direct Examination by Mr. Ward            1490    9
     Cross-Examination by Mr. Shepard          1562    9
8    Redirect Examination by Mr. Ward          1604    9
     Recross-Examination by Mr. Shepard        1612    9
9

10   HERNANDEZ, VICTORIA
       (SWORN)                                 1618    9
11   Direct Examination by Mr. Ward            1618    9
     Cross-Examination by Mr. Stefan           1624    9
12

13                      E X H I B I T S

14   TRIAL EXHIBITS                   IDEN   EVID   VOL.

15     418                                   1607    9

16     420                                   1549    9

17     432                                   1511    9

18     433                                   1519    9

19     434                                   1515    9

20     435                                   1502    9

21     897                                   1504    9

22     902                                   1530    9

23     1029                                  1508    9

24     1034                                  1524    9

25     1037                                  1542    9
</pre>

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1069 | | 1557 | 9 |
| 1151 | | 1540 | 9 |
| 1433 | | 1623 | 9 |
| 1459 | | 1499 | 9 |
| 2105 | | 1572 | 9 |
| 2106 | | 1573 | 9 |
| 2221 | | 1591 | 9 |
| 2253 | | 1593 | 9 |

```
 1  Friday - February 21, 2025                              8:06 a.m.

 2                     P R O C E E D I N G S

 3                          ---o0o---

 4           (Defendant present, out of custody.)

 5      (Proceedings were heard out of the presence of the jury.)

 6           THE COURTROOM DEPUTY:  Remain seated.  Please come to

 7  order.

 8           THE COURT:  Okay.  Good morning.

 9           MR. HIGHSMITH:  Good morning.

10           THE COURT:  What's today's issues?

11           MS. DIAMOND:  One small thing, Your Honor.

12      We may not get to the witness that my issue concerns.

13  It's a gentleman named Bryant Ling.  We got notice yesterday,

14  at the end of court, that he was a potential for today.  And he

15  has some exhibits that I require some technical assistance to

16  identify the location on recordings and things that I might

17  need to use.

18           And because we didn't get the 24 hours' notice that we had

19  requested and mostly have been getting, sometimes not, I would

20  request that if we start that witness, we might need to split

21  his cross or have him come back for recall, because I don't

22  want to take the Court's time while I'm fumbling to try to find

23  the place in the recording that I will need.

24           THE COURT:  Are we likely to get to this witness?

25           MR. HIGHSMITH:  Yes, we are, Your Honor.
```

1        So we've got six witnesses left.  I'll tell you the --

2              **THE COURT:**  In total?

3         **MR. HIGHSMITH:**  In total.

4        So I'll tell you our plan, and it might relate to

5    scheduling for today.  We're going to call John Bryan first and

6    Bryant Ling second.  He's the Undercover Agent 7410.

7              **THE COURT:**  John Bryan.  Bryant?

8         **MR. HIGHSMITH:**  Ling.

9         **THE COURT:**  Ling.

10        **MS. DIAMOND:**  Bryant Ling has a T at the end of his

11   first name.

12             **THE COURT:**  Okay.

13        **MR. HIGHSMITH:**  And so that's the undercover.  We're

14   going to play recordings.  We produced the recordings a while

15   ago, but last night we revised it to include a little bit of

16   time earlier.  So we did, less than 24 hours, give them a

17   revision to that recording, a very small amount of time.

18        The third witness is Ms. Hernandez.  The next witness

19   after that is Ms. Chiu, Mr. Carfora, Mr. Quinn.

20        So that's our game plan in terms of scheduling.

21        I don't really have much to say.  If they want to

22   recall --

23        **THE COURT:**  Well --

24        **MR. HIGHSMITH:**  -- Mr. Ling --

25        **THE COURT:**  So the expert is Mr. Ling?

1    **MR. HIGHSMITH:**  He's not an expert.  He's just an

2    undercover who did -- who made recordings of Mr. Andrade.

3        **THE COURT:**  And this is the one you've got technical

4    problems with, Mr. Ling?

5        **MS. DIAMOND:**  Your Honor, I was not, last night, able

6    to get the assistance that I need to manipulate the recordings.

7        **THE COURT:**  But it's this witness?

8        **MS. DIAMOND:**  Yes.

9        **THE COURT:**  Okay.  And he's number two?

10       **MR. HIGHSMITH:**  Correct.

11       **THE COURT:**  So it's just you're telling me there's

12   going to be a delay of sorts?

13       **MS. DIAMOND:**  There will be a much longer delay if I

14   have to do this today than if I would do it on Wednesday when

15   we come back or whatever day we come back.

16       **MR. SHEPARD:**  I have a similar issue to raise.

17       **THE COURT:**  Well, let me finish with this issue --

18       **MR. SHEPARD:**  Yeah.

19       **THE COURT:**  -- before I get to your issue.

20      So --

21       **MR. HIGHSMITH:**  It's not a late production issue.  We

22   just -- we produced this stuff a long time ago.  I don't know

23   how to respond to their difficulties bringing up evidence that

24   was produced a very long time ago.

25       **THE COURT:**  Well, are you dead set in wanting to have

1    this person today?

2             MR. HIGHSMITH:  Yeah.  I mean, we want to move -- yes.

3             THE COURT:  I'm talking about shuffling the order, is

4    what I'm talking about.

5             MR. HIGHSMITH:  We're not prepared to shuffle the

6    order.  Mr. Carfora is in --

7             THE COURT:  All right.  Okay.

8             MR. HIGHSMITH:  -- North Carolina or something.

9             THE COURT:  Okay.  All right.  Well, if you have to --

10   unfortunately, for this person, if he has to be recalled -- if

11   we don't get through it, we don't get through it.  I mean,

12   there's not much I can do about it.  So...

13            MS. DIAMOND:  I can do as much as I can --

14            THE COURT:  Good.

15            MS. DIAMOND:  -- without the recording; and if we need

16   the recording, we may just need to recess the cross to be

17   continued when we can recall him.

18            THE COURT:  Well, or you just recall him; right?

19       Or you call him --

20            MS. DIAMOND:  I can do that.

21            THE COURT:  -- in your --

22            MS. DIAMOND:  We can do -- I mean, assuming

23   the Government would make him available.

24       Your Honor, we didn't know till this week that this

25   witness was a UCE 7410.  We made a request to have this witness

 1   identified pretrial, and the Government chose to say that they

 2   would offer him under a pseudonym.  So we did literally not

 3   know that --

 4           **THE COURT:**  Well, I'll --

 5           **MS. DIAMOND:**  -- this witness was that person.

 6           **THE COURT:**  I'll let you -- I'm not saying you can't

 7   have the time you need.  So we don't have to --

 8           **MS. DIAMOND:**  Thank you, Your Honor.

 9           **THE COURT:**  -- get into all of that.

10           **MS. DIAMOND:**  Thank you, Your Honor.

11           **THE COURT:**  We'll just see where -- plug ahead and get

12   as much done as we can get done.

13           **MS. DIAMOND:**  Thank you, Your Honor.

14           **THE COURT:**  Sure.

15           **MR. HIGHSMITH:**  Just for the record, we don't agree

16   that we --

17           **THE COURT:**  Okay.  Well, the last thing I want to do

18   is get into the historical battle.

19           **MR. HIGHSMITH:**  Me too, Your Honor.

20           **THE COURT:**  Okay.

21           **MR. HIGHSMITH:**  Me too.

22       In terms of logistics, we're trying to kind of thread the

23   needle here with Abramoff's testimony.  You know what I -- we

24   want to have a full jury day so that the jury's time is not

25   wasted, but we also know that we've got a different witness

PROCEEDINGS

 1  starting Monday and going to Tuesday.  So we're trying to

 2  thread a needle here.

 3        **THE COURT:**  I understand.  I know.  I know.  It's

 4  understandable.

 5        **MS. DIAMOND:**  Thank you, Your Honor.

 6        **THE COURT:**  Yes?

 7        **MR. SHEPARD:**  I have an issue related to the one that

 8  Ms. Diamond made, and that is relating to Theresa Chiu,

 9  Government expert, who is now on the list for today, previously

10  was on the list for last week.

11        And accompanying the notice that she was going to testify

12  today, we got a new disclosure, an updated report, updated

13  charts.  I do not have -- it wasn't redlined, so -- and it's

14  20-some pages of report, plus six or eight demonstrative

15  exhibits.  We saw some material changes in some of the

16  exhibits.

17        You know, this was a disclosure that was scheduled to be

18  made back in January.

19        **THE COURT:**  Things aren't set in stone.  Things

20  change.  People make adjustments.  I mean, it's just the way of

21  the world.  And competent lawyers, like all of you, are good on

22  the uptake and can deal with it.

23        Every time there's something like a tweak, I'm not -- it's

24  not my problem, frankly.

25        **MR. SHEPARD:**  I don't think it's a tweak.  There's

 1   some material changes in --

 2        **THE COURT:**  Well, is there something specific that --

 3   other than just "Oh, it's different" and "Oh, I haven't had a

 4   chance," is there something specific you need?  I mean, what am

 5   I supposed to do with this?  What do you want me to do?  Tell

 6   them, "No, you can't call that witness"?

 7        **MR. SHEPARD:**  No.  What I would request is that if we

 8   need to continue the cross so that we have the opportunity to

 9   actually understand the most recent set of changes, which just

10   not -- we're just not capable of doing that.

11        **THE COURT:**  Well, I think you're more --

12        **MR. SHEPARD:**  We have experts --

13        **THE COURT:**  -- capable than you say.

14        **MR. SHEPARD:**  -- who we've got to deal with.

15     So my only request is that we don't have to cross-examine

16   her today.  That's my only request.

17        **THE COURT:**  Well, I'm not slowing this train down.

18   We're cross-examining -- when a witness is finished on direct,

19   you're cross-examining them.

20     But what is the nature of these changes?

21        **MR. HIGHSMITH:**  Slight changes to the summary charts

22   based on testimony that came in during trial, Your Honor.

23        **MR. SHEPARD:**  The numbers are --

24        **MR. HIGHSMITH:**  The numbers --

25        **MR. SHEPARD:**  Some of the numbers are materially

PROCEEDINGS

1    different.

2         **MR. HIGHSMITH:**  They're different because there was

3    new testimony that came in during trial.

4         **THE COURT:**  I don't know if this is a real problem or

5    not, but I'm not going to say every cross is conditional on

6    having it continue forever.

7         Barrel ahead and we'll see where we are, and if there's a

8    particular problem, you can identify it for me.  But I'm not

9    making some sort of strange arrangement that cross-examination

10   stays in limbo subject to the moment when you think you've

11   looked at it enough.  So let's barrel ahead.

12        **MR. HIGHSMITH:**  Understood.

13        **THE COURT:**  Okay.

14        **MR. HIGHSMITH:**  And we've submitted to the Court a

15   joint stipulated instruction.

16        **THE COURT:**  I saw that.

17        **MR. SHEPARD:**  Yes.  So just for the record,

18   Your Honor, I object to the expansion of the expert witness's

19   disclosure on the night before her testimony.

20        **THE COURT:**  Okay.  Your objection is preserved.

21        **MR. SHEPARD:**  Thank you.

22             (Document handed up to the Court.)

23        **THE COURT:**  Okay.  That looks fine to me.

24        **MR. HIGHSMITH:**  Thank you, Your Honor.

25             (Recess taken at 8:15 a.m.)

1          (Proceedings resumed at 8:33 a.m.)

2     (Proceedings were heard out of the presence of the jury.)

3          **MR. WARD:**  Can I have one moment before the jury comes

4     in?

5          **THE COURT:**  Okay.

6          **MR. WARD:**  I apologize.  I should have raised this a

7     little bit earlier.

8       Mr. Bryan is here.  He has had a number of bladder and

9     other surgeries and may need to take somewhat more frequent

10    bathroom breaks.  He thinks he can go an hour and a half, maybe

11    two hours.  But I'd just ask if he needs to take, we can take a

12    short break.

13         **THE COURT:**  Sure.  And I'll make sure it's more like

14    an hour and a half than two hours.  We're usually doing it

15    at -- taking the break at an hour and a half, so I'll make sure

16    we do that.

17         **MR. WARD:**  And hopefully, he'll make it that long.  If

18    not, we'll --

19         **THE COURT:**  Okay.

20         **MR. WARD:**  Thank you.

21     (Proceedings were heard in the presence of the jury.)

22         **THE COURT:**  Good morning, jurors.  Thank you again for

23    being so prompt.  Happy Friday.

24      So, Mr. Highsmith?

25         **MR. HIGHSMITH:**  The United States calls John Bryan.

```
 1    (Witness enters the courtroom and steps forward to be sworn.)

 2         THE COURT:  If you could come forward, please, to be

 3    sworn.

 4         THE COURTROOM DEPUTY:  Please raise your right hand.

 5              ANTHONY ADRIAN JOHN BRYAN, JR.,

 6    called as a witness for the Government, having been duly sworn,

 7    testified as follows:

 8         THE WITNESS:  I do.

 9         THE COURTROOM DEPUTY:  Please be seated.

10    State your full name and spell your last name, please.

11         THE WITNESS:  Anthony John Adrian Bryan, Jr.

12                   DIRECT EXAMINATION

13    BY MR. WARD:

14    Q.   Good morning, Mr. Bryan.

15    A.   Good morning.

16    Q.   In 2017, did you work at a company called

17    The Watley Group?

18    A.   Yes, I did.

19    Q.   And what was your position?

20    A.   I was chief executive officer.

21    Q.   All right.  Just briefly, what type of company is

22    The Watley Group?

23    A.   It's a company that specializes in working with companies

24    that get into business problems, and we do consulting work to

25    restructure and to try to turn around those companies and help
```

1    them to perform better.

2    **Q.**    In 2017, did you learn about a company called the

3    NAC Foundation and a cryptocurrency called AML BitCoin?

4    **A.**    Yes, I did.

5    **Q.**    How did you learn about the NAC Foundation and

6    AML BitCoin?

7    **A.**    A close friend of mine, Jack Abramoff, called me and asked

8    me to take a look at it.  He and I were partners in many

9    different business opportunities.

10    **Q.**    And what, generally, did he tell you about AML BitCoin?

11    **A.**    He said that AML BitCoin had a long history through

12    Marcus; that they had developed technology that would bring far

13    more regulation and far more safety and far more security to

14    the cryptocurrency marketplace; that it would be more like the

15    major banks that have rules about know your client or

16    anti-money laundering, all of which are meant to prevent fraud

17    and prevent misuse of the cryptocurrency space.

18    **Q.**    Did he tell you who was in charge of the NAC Foundation?

19    **A.**    Yes.

20    **Q.**    Who was that?

21    **A.**    Marcus Andrade.

22    **Q.**    Shortly after that conversation with Mr. Abramoff, did you

23    meet with Mr. Andrade?

24    **A.**    Very briefly in Los Angeles I did.  I believe it was

25    around August or so.

1  Q.   And when you met with Mr. Andrade, did you discuss with

2  him the NAC Foundation and AML BitCoin?

3  A.   Yes.

4  Q.   Generally, what did Mr. Andrade tell you about

5  AML BitCoin?

6  A.   That he had a long -- he told -- talked about his own

7  experience, that he had a long history in the cryptocurrency

8  marketplace, that he had founded another cryptocurrency called

9  the Aten Coin and that during that period of time when he

10 launched that in an initial coin offering -- which is not

11 unlike taking a stock public on the New York Stock Exchange,

12 except for it's cryptocurrency.

13      And he had been uncomfortable with the cryptocurrency

14 market, and as part of Aten Coin, he had developed a whole

15 series of anti-money laundering and know-your-client type of

16 protocols and software that would protect investors and protect

17 owners of the cryptocurrency from hacking and from being --

18 having unethical or perhaps criminal elements be involved in

19 the shareholding and purchasing.

20 Q.   Did he discuss with you AML BitCoin and the technology

21 undergirding that cryptocurrency?

22 A.   Yes, he did.

23 Q.   And what did he tell you about the technology as it

24 related to AML BitCoin?

25 A.   He told me that that technology was developed when he was

1  at Aten Coin; that he had transferred that technology, I guess,

2  to the NAC and to AML BitCoin; and that the technology was

3  fully developed and they were working on additional services

4  and additional characteristics of this that would give it more

5  relevance to the cryptocurrency market.

6  **Q.**   Did he discuss biometrics?

7  **A.**   Yes, he did.  And he said that biometrics would be a part

8  of the protocol that would make sure that only the person

9  identified and known and trusted would be able to actually buy

10  or sell the cryptocurrency.

11  **Q.**   Did Mr. Andrade discuss with you business development

12  deals or business deals in the works at that time?

13  **A.**   Yes, both he and Jack did that.  And they described a very

14  robust adoption of this anti-money laundering, know-your-client

15  type of cryptocurrency; and they said that a number of

16  governments were on the verge of adopting it as a crypto

17  payment system within their countries and that, also, a number

18  of very large clients, such as the Panama Canal, the Government

19  of Panama, the Port of San Francisco, the Government of

20  Slovenia, and several other governments that I don't recall at

21  this time.

22  **Q.**   Did Mr. Andrade talk to you about an upcoming ICO for

23  AML BitCoin?

24  **A.**   Yes.  He said that the launch of the coin would be -- was

25  fairly imminent, that it was probably going to take place in --

1    I believe he said December/January at that time.

2    Q.   And during this conversation with Mr. Andrade, did he ask

3    anything of you?

4    A.   He said that Jack and he and -- he explained that they

5    were sort of partners in this transaction, wanted me to have an

6    opportunity to buy some of the cryptocurrency.

7    Q.   All right.  In these early meetings in August 2017, did

8    you purchase any AML BitCoin at that point?

9    A.   No, not at that point in time.  We subsequently evaluated

10   whether -- you know, I didn't know very much about the

11   cryptocurrency space, and I put together a group of my friends

12   to purchase some of the coins.

13   Q.   And --

14   A.   That was subsequent to August.  This was probably

15   September/October.

16   Q.   So in September/October, did you raise money from your

17   friends and yourself to purchase AML BitCoin?

18   A.   Yes.

19   Q.   And how much did you raise?

20   A.   I believe the initial contract was signed for

21   approximately 100- or 120,000 -- I don't remember -- dollars,

22   and I believe the final dollar amount was about 70,000.

23   Q.   Okay.  Did you have further discussions with Mr. Andrade

24   after the initial phase of the ICO for AML BitCoin?

25   A.   Yes, I did throughout, I guess, September, October,

1   November, December periodically.  I was talking to Jack

2   frequently on this and other transactions.  Jack and I --

3   excuse me -- were meeting almost every day.  I mean, we were

4   meeting biweekly at least on other things, so he was constantly

5   updating me about this opportunity.

6   **Q.**   After the ICO, what did Marcus Andrade tell you about the

7   results of the ICO?

8   **A.**   He said -- at the initial August meeting, he told me that

9   he was going to be selling 100 million coins for a dollar

10  apiece and raising $100 million.  I couldn't -- I believe at

11  that time he said this was -- he was in negotiations to do this

12  imminently.  And subsequently, he came back and said that they

13  had discounted the price slightly, that they had sold 100,000

14  at 70 cents, and that had raised for them approximately

15  $70 million.

16  **Q.**   Okay.  And did he tell you at that point how much of that

17  70 million AML -- the company still had in the bank?

18  **A.**   At some point Jack explained to me that they had a lot of

19  obligations.  They had a London software group, they had a

20  variety of things they were investing in, and that the balance

21  remaining there was about $26 million.

22          Excuse me.  Sorry.  If I may?

23              **THE COURT:**  Go ahead.

24              **THE WITNESS:**  Pardon me.

25  \\\

1    BY MR. WARD:

2    Q.   Mr. Bryan, you said your conversations continued with

3    Mr. Abramoff and Mr. Andrade through the fall of 2017.  At some

4    point did you begin to discuss with them working with the

5    company as an advisor?

6    A.   I did.  I believe that was towards the end of the year,

7    and I'm not sure exactly when.  I think over -- over time, Jack

8    was very much trying to get me involved.  I'd involved him in

9    almost all of our transactions, and at that point in time, he

10   was really my -- one of my very best friends.

11   Q.   Were you able to reach an agreement and enter into a

12   contract to come work for AML BitCoin?

13   A.   The initial contracts were really more oriented towards

14   buying coins; and up until that point, there was not really --

15   I think we had discussed a lot of potential services; but when

16   it really got down to putting together draft agreements, most

17   of them were still related to purchasing and buying the actual

18   coins.

19   Q.   Did they want you to raise more money and bring in more

20   purchasers for AML BitCoin?

21   A.   Yes, they did.  It was more of the pre-ICO, you know,

22   placement of coins within the hands of people that would add

23   value to their group of investors.

24   Q.   In addition to raising money, what type of consulting or

25   advisory services did you discuss providing to AML BitCoin?

1  **A.**   Subsequently, they asked me to get more involved in the

2  promotion and the -- the publicity that would be surrounding

3  the ICO so that they could get more eyeballs on the ICO and get

4  more eyeballs into the trading and, therefore, have a more

5  robust introduction of the ICO.

6  **Q.**   And did you agree to provide these promotional services

7  and advisory work for them?

8  **A.**   I agreed to be the umbrella, for which we brought in a

9  variety of experts that were very expert in the field of doing

10 the publicity or doing whatever specific task they needed to

11 have done.  So I was the umbrella for any of the services that

12 would be provided that were related to the publicity or the

13 other aspects.

14 **Q.**   In January of 2018, did you work with Mr. Andrade and

15 Mr. Abramoff on developing an advertisement to run in the

16 Super Bowl?

17 **A.**   Yes.  They came to me -- or I believe it was originally

18 Jack came to me and said that they had decided to purchase a

19 Super Bowl commercial because they were imminently going to

20 have their IPO -- or ICO and their launch of trading into the

21 cryptocurrency marketplace.  They wanted to tie that to a major

22 event so that it would give them publicity and more people to

23 be aware and interested in buying it.

24 **Q.**   Did you reach out to contacts who could help you -- help

25 Mr. Abramoff and Mr. Andrade submit a Super Bowl ad to the

1   network?

2   **A.**   Yes.  At the time, I had a contract with a firm called

3   WPP, which is the largest advertising agency in the world.

4   They had 180,000 employees, to give you a little scale of how

5   large they were.

6   **Q.**   Did -- let me -- did WPP, then, put you in touch with

7   someone to work with on preparing and submitting the Super Bowl

8   ad?

9   **A.**   Yes.  They assigned a former employee of theirs who was

10   responsible for doing all the diligence and due diligence on

11   this to see if WPP wanted to be involved with it and to bring

12   this to NBC, along with the consultant that they recommended.

13   **Q.**   Did you then speak to Mr. Fenster about the process for

14   submitting a Super Bowl ad?

15   **A.**   Yes.  Chet Fenster was their choice, and Chet and I

16   started talking frequently.

17   **Q.**   As part of that, did you submit to him several drafts of a

18   proposal to create and then submit an ad for the Super Bowl?

19   **A.**   Yes.

20   **Q.**   All right.

21   **A.**   Two things.  One was an agreement for him to be paid and

22   to be compensated and for us to share that with him, and the

23   second thing was draft proposals coming from the AML BitCoin

24   side for what they wanted as their advertisement or what their

25   concept was.

1      **MR. WARD:**  Could we pull up Exhibit 1459, please, for

2  the witness and the parties and the Court.

3  **Q.**   Mr. Bryan, looking at the top of this, is this an email

4  from you?

5  **A.**   Yes, it is.

6  **Q.**   And who is it to?

7  **A.**   To Chet Fenster.

8  **Q.**   Is there an attachment to this email?

9  **A.**   Yes, there is.

10      **MR. WARD:**  Can we pull out and go to the next page.

11  **Q.**   What is this generally?

12  **A.**   This is the -- this is the proposal that I was putting

13  together, cut and pasting all of the concept for the

14  advertising from AML BitCoin, and it was summarizing the -- the

15  overview of the proposal.

16  **Q.**   Is this an accurate representation of the proposal that

17  you submitted to Mr. Fenster?

18  **A.**   Yes.  This is what I submitted to Mr. Fenster.

19      **MR. WARD:**  The Government would move to admit

20  Exhibit 1459.

21      **MR. SHEPARD:**  No objection.

22      **THE COURT:**  1459 will be admitted.

23      (Trial Exhibit 1459 received in evidence.)

24      **MR. WARD:**  Can we go back to the first page, please,

25  and publish for the jury.

1  Q.   Again, Mr. Bryan, is this an email from you to Mr. Fenster

2  on January 16th?

3  A.   Yes, it is.

4  Q.   Can we go to the second page, please.  Is this the

5  proposal that you submitted to him to create and submit a

6  Super Bowl ad?

7  A.   Yes.  This is an overview of the conceptual -- of the

8  whole concept.

9         MR. WARD:  Okay.  Can we please highlight the black

10 and the red text at the top half of the document.

11 Q.   Was this your summary?  You write [as read]:

12         "The Watley Group will negotiate and purchase a

13         30-second Super Bowl commercial from NBC . . . ."

14         Was that the initial proposal?

15 A.   Yes.

16 Q.   All of the text in red, is that a summary of the ad that

17 you were proposing they create or that was proposed to be

18 created?

19 A.   Did you say in red?  I'm sorry.

20 Q.   In red, yeah.

21 A.   Yes.  The in-red section is the piece that I cut and

22 pasted from their -- from AML BitCoin's proposal.

23         MR. WARD:  Okay.  Can we back out of this, please.

24 Q.   At the time of this document, had the ad actually been

25 made?

 1    **A.**    No, it had not.

 2            **MR. WARD:**  Can we go to the second page, please.

 3        Can we highlight the paragraph that says "Phase 2,"

 4    please.

 5    **Q.**    Was the plan to negotiate with NBC over the next week to

 6    have them run the Super Bowl ad?

 7    **A.**    Yes.

 8            **MR. WARD:**  Okay.  If we could pull out of this

 9    document, please.

10    **Q.**    At the time you sent this to him, you were having separate

11    conversations with Jack Abramoff?

12            **MR. WARD:**  Can we pull up, please, Exhibit 435.

13            **THE WITNESS:**  Can I ask the date of that first

14    proposal?  What was the date of that email?

15    **BY MR. WARD:**

16    **Q.**    January 16th.

17    **A.**    January.

18    **Q.**    So take a look at this email, please.  Is this an email

19    from you to Jack Abramoff on January 17th?

20    **A.**    Yes, it is.

21    **Q.**    And is it -- does it -- does this email include

22    conversations back and forth between you and Mr. Abramoff?

23    **A.**    Yes, it does.

24            **MR. WARD:**  At this point the Government would move to

25    admit Exhibit 435.

1          MR. SHEPARD:  No objection.

2          THE COURT:  435 will be admitted.

3      (Trial Exhibit 435 received in evidence.)

4          MR. WARD:  If we could go to the bottom email that

5  says "From:  Jack Abramoff."  Right there, yes.

6  Q.  Do you see this email?

7  A.  Yes, I do.

8  Q.  Is this an email from Mr. Abramoff to -- this is an email

9  from Mr. Abramoff to Mr. Fenster cc-ing you.

10      Looking at the topic of this email, what's Mr. Abramoff

11  telling Mr. Fenster here?

12  A.  He's summarizing the story of the commercial.

13  Q.  Okay.  Great.

14          MR. WARD:  Can we pull out of that part, please.

15      Can we do the -- from -- about halfway up, "From:

16  Jack Abramoff," and then down -- yes, right there.

17      And then if we could blow that up.

18  Q.  Mr. Bryan, what was your response to the ad?  You say

19  [as read]:

20          "Love it."

21  A.  Love it.

22  Q.  And then Mr. Abramoff says [as read]:

23          "How are you guys doing on the proposal?"

24      What is he referring to there?

25  A.  He's referring to that proposal that would be -- I believe

 1    he's referring to the proposal that we were writing that you

 2    had seen previously.

 3    **Q.**   At this time, were you continuing to work on and edit the

 4    proposal?

 5    **A.**   Yes.  Yes, I was.

 6    **Q.**   Okay.  Great.

 7         **MR. WARD:**  Can we pull out of this, and can we

 8    highlight the top email that starts "Jack" and then goes down

 9    to "John."

10    **Q.**   If you look at the second paragraph, you write to

11    Mr. Abramoff [as read]:

12         "I came up with a clever way to get Super Bowl

13         results without the Super Bowl cost . . . ."

14         What are you referring to there?

15    **A.**   The -- when we were discussing how to approach this

16    commercial and the strategic options for them, one option that

17    had been brought up was that if their campaign or if their

18    commercial was rejected for any reason by NBC, that in the

19    past, people had turned that into a large-scale advertising

20    campaign of its own by saying that "Wow, this is the commercial

21    that the NFL did not want you to see; and therefore, you should

22    see it," and trying to make a story out of the rejection.

23    **Q.**   Okay.  Great.  Thank you, Mr. Bryan.

24         **MR. WARD:**  If we could pull out of this document,

25    please.

1          And then can we pull up Exhibit 897.  And can we highlight

2   the -- maybe the first half of the document for Mr. Bryan.

3   This is just for the witness.  It's not been admitted.

4   **Q.**   Mr. Bryan, is this a text chain between you,

5   Jack Abramoff, and several other people?

6   **A.**   Yes, it is.

7   **Q.**   And excuse me.  It's not a text chain.  Is this a WhatsApp

8   chain?

9   **A.**   Yes, it is.

10  **Q.**   An SMS message chain.

11         Is that your phone number at the time?

12  **A.**   Yes, it is.

13  **Q.**   And have you reviewed this message chain prior to

14  testifying here today?

15  **A.**   Yes, I have.

16  **Q.**   And is it an accurate reflection of the messages that you

17  were exchanging with Mr. Abramoff and others at the time?

18  **A.**   Yes, it is.

19         **MR. WARD:**  Move to admit Exhibit 897.

20         **MR. SHEPARD:**  No objection.

21         **THE COURT:**  897 will be admitted.

22     (Trial Exhibit 897 received in evidence.)

23         **MR. WARD:**  We can just keep this up the way it is.

24  **Q.**   Mr. Bryan, looking at the top, you see where it says

25  "Participants"?

1    **A.**    Yes.

2    **Q.**    And in addition to your name and Jack Abramoff's name,

3    who's Chris Grivakes?

4    **A.**    Chris Grivakes is my counsel -- lawyer, and he's been sort

5    of a part of The Watley Group for 20 or 30 years.

6    **Q.**    And do you know who Alex Abramoff is?

7    **A.**    Yes.  I believe that's Jack's son or brother.  I don't

8    remember which.

9    　　　　　**MR. WARD:**  Okay.  And can we highlight the

10    conversations in Box 2, 3, and 4, please.

11    **Q.**    Do you see line 2, Mr. Bryan?

12    **A.**    Yes, I do.

13    **Q.**    Is that a message from you to Mr. Abramoff?

14    **A.**    Yes.

15    **Q.**    You write [as read]:

16    　　　　"The written proposal will pretend we really are

17    　　　　buying a Super Bowl ad because if anybody ever gets

18    　　　　this in discovery or something, I don't want it to

19    　　　　look like we planned to do this.  Is that okay?"

20    　　　　Do you see that?

21    **A.**    Yes.

22    **Q.**    And when you refer to "the written proposal," what is that

23    referring to?

24    **A.**    The written proposal was the one I was working on with

25    Chet, and that's the proposal that you saw previously, and it

1    was the summary of how we'd be going to NBC and the people that

2    would be making, supposedly, a decision.

3    **Q.**    When you write "because if anybody ever gets this in

4    discovery," what does that refer to?

5    **A.**    That if there's ever a lawsuit, if there's a dispute, if

6    there's anything related to a legal thing, in discovery, we

7    would have to give up every message, every email, every

8    document, every proposal; and I didn't think it looked good

9    because they had decided at this point in time that they wanted

10    the rejection and they didn't want to get a Super Bowl ad.

11    **Q.**    All right.  If you could look at line 4, is this a

12    response from Mr. Abramoff to you?

13    **A.**    Yes, it is.

14    **Q.**    And he writes [as read]:

15            "Probably not the best idea.  Maybe you can

16        write it up in a way that says in the event NBC

17        rejects the ad, and this is the plan.  If you write

18        it up the other way, he may not understand it and

19        reject it out of hand."

20        What is he -- is he -- what is "he" referring to there?

21        **MR. SHEPARD:**  Objection.  Calls for speculation.

22        **THE COURT:**  Sustained.

23        **MR. WARD:**  Okay.  We can pull out of that.

24    Let's go to the next page.

25    Can you highlight line -- can you highlight line 10,

 1  please.

 2  **Q.**   Is this a message from you to Mr. Abramoff?

 3  **A.**   I'm sorry.  What was the question?

 4  **Q.**   This line 10, is this a text from you to Mr. Abramoff?

 5  **A.**   Yes, it is.

 6  **Q.**   When you write "Don't worry about the way I wrote The

 7  Proposal.  I wrote it so that it looks like only if they reject

 8  the commercial then we do all these things but forget," are you

 9  responding to Mr. Abramoff's request?

10  **A.**   Yes, I am.

11  **Q.**   All right.  And let's do the next line just for

12  completeness, line 11.

13      When you write "It all looks fine.  I think I don't care

14  if somebody gets this.  Who cares?" what are you referring to

15  there?

16  **A.**   That's from me to Jack, yes.

17      I'm referring to I don't think that it -- I just say, "Who

18  cares?"  I didn't care if it -- I thought it looked fine.

19  **Q.**   And following this exchange with Mr. Abramoff, did you

20  submit updated drafts of the proposal to Mr. Fenster?

21  **A.**    Mr. Fenster and I were exchanging these proposals all the

22  way through.  He was part of writing it.

23  **Q.**   And what did you tell him about the rejection campaign and

24  the plan?

25  **A.**   We discussed that -- you know, I was honest with Chet

1  because he was working for me; and I said that, you know,

2  there's a -- you know, the -- there were several contingencies;

3  and I told him that -- you know, that the rejection campaign

4  was not the first strategy.  I told him that the primary

5  strategy was to do the Super Bowl ad.

6  Q.  Was that different than what you and Mr. Abramoff were

7  discussing?

8  A.  Yes, it is.

9       MR. WARD:  All right.  Can we look at Exhibit 1029,

10  please.

11  Q.  Is this a WhatsApp exchange between you and Mr. Abramoff?

12  A.  Yes, it is.

13       MR. WARD:  Move to admit Exhibit 1029.

14       MR. SHEPARD:  No objection.

15       THE COURT:  1029 will be admitted.

16       (Trial Exhibit 1029 received in evidence.)

17  BY MR. WARD:

18  Q.  Mr. Abramoff writes [as read]:

19          "Where are we on getting it submitted to NBC?

20       I'll get you an email in a few minutes, but we need

21       to get it in and rejected ASAP."

22       At this point in time, was Mr. Abramoff pressing you to

23  get the ad submitted to NBC?

24  A.  Well, quite frankly, the ad did not exist yet, so I didn't

25  even know what he was talking about here.  You have to actually

1  submit the commercial to have them review it; and if you don't

2  have the commercial, you can't -- you can't have anything

3  rejected, accepted, or even reviewed.  They need to see the

4  final product.

5  **Q.**  Okay.  And, to your knowledge, was a Super Bowl ad

6  created?

7  **A.**  No, it wasn't.

8  **Q.**  No.  Was a Super Bowl advertisement created with actors?

9  **A.**  No.  The -- the commercial that they had specified or that

10  they were contemplating had not been produced or created.  So

11  it was still only a piece of paper with a few photos on it.

12  **Q.**  Sorry.  I should be more clear.

13      After this point, was a Super Bowl commercial actually

14  created?

15  **A.**  After the 25th, yes; but I think it was well into February

16  before it was actually created, if I'm not -- my memory is not

17  exact on that.  But it was not created at this point in time

18  when he's asking me to submit it to NBC.

19  **Q.**  I see.

20      When you were having these discussions with Mr. Abramoff,

21  did you also have discussions with Mr. Andrade?

22  **A.**  On occasion when Jack and I were together, we'd call him.

23  Jack and I were spending a lot of time together.  He was living

24  in L.A., and we were working on several other things at the

25  same time.

1  Q.   Was Mr. Andrade aware of the efforts to get the Super Bowl

2  ad rejected?

3  A.   Yes.  Mr. Abramoff told me that it was the decision of

4  Mr. Andrade that this --

5           MR. SHEPARD:  Objection.

6           THE WITNESS:  -- rejection campaign --

7           MR. SHEPARD:  His answer is Mr. Abramoff saying that's

8  what Mr. Andrade said.

9           THE COURT:  Is that coming in under -- what's the

10 basis for that answer being admitted?

11          MR. WARD:  Mr. Abramoff's statements would be

12 co-conspirator statements.

13          THE COURT:  Well, right.

14          MR. SHEPARD:  If that's the basis for admission --

15          THE COURT:  I believe that's the basis.

16          MR. SHEPARD:  -- fine.

17          THE COURT:  Go ahead.

18          THE WITNESS:  Thank you, Your Honor.

19 BY MR. WARD:

20 Q.   What did Mr. Abramoff tell you about Mr. Andrade's

21 knowledge of the Super Bowl rejection campaign?

22 A.   That Mr. Andrade had decided that they wanted to -- he was

23 the decision-maker amongst the two of them on this particular

24 issue, I guess, due to the extensive cost of a $5 million,

25 30-second spot on the Super Bowl, and that Mr. Andrade had

1    decided he preferred to -- his decision was to go with the

2    rejection -- with what they were calling a rejection campaign.

3    **Q.**   Did you discuss this directly with Mr. Andrade?

4    **A.**   I was on conference calls, and it was discussed in several

5    calls and chats, yes.

6    **Q.**   And in these conference calls and chats, these were

7    conference calls and chats in which Mr. Andrade was present?

8    **A.**   Right.  On the conference calls, yes.

9        **MR. WARD:**  All right.  Can we pull up Exhibit 432.

10   **Q.**   Is this an email from you -- from Marcus Andrade to you?

11   **A.**   Yes, it is.

12   **Q.**   Is this an accurate representation of that email?

13   **A.**   Yes.  I asked him to write this.

14       **MR. WARD:**  Can we admit Exhibit 432?  Move to admit

15   Exhibit 432.

16       **MR. SHEPARD:**  No objection.

17       **THE COURT:**  432 will be admitted.

18   (Trial Exhibit 432 received in evidence.)

19       **MR. WARD:**  Can we highlight the "to" and "from" line

20   and then the -- we can just leave it like this, actually.

21   **Q.**   Did this -- did Mr. Andrade send you this email?

22   **A.**   Yes, sir.

23   **Q.**   And at the time he sent it, did he, to your knowledge,

24   understand that the plan was to have the Super Bowl ad

25   rejected?

1           **MR. SHEPARD:**  Objection.

2           **THE COURT:**  Sustained.

3    **BY MR. WARD:**

4    **Q.**   What did you understand was the purpose of this email?

5           **MR. SHEPARD:**  Objection.

6           **THE COURT:**  Sustained.

7    **BY MR. WARD:**

8    **Q.**   Does Mr. Andrade ask you to please -- when Mr. Andrade

9    says "please proceed representing us with Comcast/NBC and

10   report to me as soon as you can," was he asking you to report

11   back once you had heard back from NBC?

12   **A.**   Yes.  And I drafted this --

13   **Q.**   And why did you --

14   **A.**   -- sent it to Mr. Andrade, and said, "You have to send me

15   this email so that I'm authorized to initiate these

16   discussions."

17          So I drafted this --

18   **Q.**   Okay.

19   **A.**   -- sent it to him, and said, "I need you to send this back

20   to me signed and properly authorized so that Chet and I and our

21   team are authorized to go ahead with this."

22          **MR. WARD:**  We can pull out of this exhibit.

23   **Q.**   Mr. Bryan, did you personally ever negotiate directly with

24   NBC on the Super Bowl ad?

25   **A.**   No, I didn't.  I might have been on one conference call,

1    but I don't believe I even contributed to that call.

2    **Q.**    And did you ever see any -- any formal rejection or notice

3    from NBC that NBC had, in fact, rejected the ad?

4    **A.**    No, I didn't.  And I'm not sure that the deadlines were

5    met for actually submission, which several of the deadlines NBC

6    had left for us were missed, missed, missed, missed, missed,

7    and I think they were fed up with that.  And I don't believe it

8    was -- I mean, to my knowledge, it was never even reviewed or

9    accepted or rejected, in other words.

10    **Q.**    Following the Super Bowl, did you and Jack Abramoff

11    discuss generating publicity about the ad not running?

12    **A.**    We had discussed that prior to the Super Bowl because that

13    was their decision on how to go forward.  So we had discussed

14    that, when they received the rejection, what they would do.

15    **Q.**    And what did Mr. Abramoff tell you they would do if they

16    received a rejection?

17    **A.**    Well, I had submitted a proposal to them, and that

18    proposal was to do advertising on the Super Bowl regionally

19    instead of nationally, which is, instead of having your

20    commercial go to 100 million while watching the Super Bowl, it

21    goes to all the people in Washington, D.C., watching the

22    Super Bowl or Los Angeles, New York, or any other territory.

23    **Q.**    Did they ever adopt that strategy of advertising

24    regionally?

25    **A.**    No, I don't believe -- to the best of my knowledge, no.

1  Q.   Did you discuss with Mr. Abramoff promoting the rejection

2  campaign on social media and through press releases?

3  A.   Not really.  I had only proposed doing this regional

4  marketing campaign where it would be on NBC in Washington or

5  New York or one of the markets.  You'd be advertising it

6  nationwide, except for you'd be doing it a little less -- much

7  less than a national campaign would.

8  Q.   All right.  But, to your knowledge, did the NAC Foundation

9  and Andrade spend any money on Super Bowl advertising?

10  A.   No, I don't believe -- they did in creating the

11  commercial.  So I believe that was approximately, what they

12  said was $299,000 or something like that.

13  Q.   All right.  In June of 2018, did Mr. -- did Mr. Abramoff

14  email and ask you to write a letter about the Super Bowl ad and

15  the efforts to get the Super Bowl ad run?

16  A.   I believe in May or so, Jack and I were together

17  somewhere -- I'm not sure where -- and he asked me to do him a

18  favor, would I write a letter summarizing what had happened in

19  the Super Bowl.

20  Q.   Following that conversation, did he send you a draft of

21  what he wanted you to write?

22  A.   Yes, he did.

23       MR. WARD:  Can we look at Exhibit 434.

24  Q.   Looking at this document, Mr. Bryan, is this an email

25  chain between you and Mr. Abramoff?

BRYAN - DIRECT / WARD

```
 1   A.   Yes, it is.

 2   Q.   And have you reviewed this prior to the testimony here

 3   today?

 4   A.   Yes, I have.

 5   Q.   Does this accurately reflect the conversation you had with

 6   Mr. Abramoff by email at this time?

 7   A.   Yes, it does.

 8           MR. WARD:  Move to admit Exhibit 434.

 9           MR. SHEPARD:  No objection.

10           THE COURT:  434 will be admitted.

11       (Trial Exhibit 434 received in evidence.)

12           MR. WARD:  All right.  Can we highlight the bottom

13   email from Mr. Abramoff.

14   Q.   Mr. Bryan, do you see the "subject" line?

15   A.   Yes, I do.

16   Q.   It says "For letterhead/signature/PDF ASAP" and then

17   contains some text below that.  What is this text?

18   A.   That was his request for me to take this and put it on my

19   letterhead and sign it and send it back to him.

20   Q.   Okay.  And, first of all, who's Eric Olsen?

21   A.   I didn't know.

22   Q.   Looking at the text, looking at the bottom paragraph, do

23   you see where it says [as read]:

24           "Based on my past experience, I recommended that

25       the company attempt to secure a slot to air an ad
```

1          during the Super Bowl"?

2          Does that refer to the efforts to get the ad placed in the

3     Super Bowl?

4     **A.**   Can I just read this quickly one more time?

5     **Q.**   Sure.

6     **A.**   (Witness examines document.)  It's saying that -- what was

7     your question again?  Sorry.

8     **Q.**   Does this refer to the efforts to create and submit a

9     Super Bowl ad to NBC?

10    **A.**   Yes.  It misstates it completely, but, yes, it's his

11    proposal of what I should say.

12    **Q.**   And why does it misstate?

13    **A.**   Because it says I recommended that the company secure a

14    slot to air an ad on the Super Bowl.

15         They came to me with the proposal.  I never considered

16    this to be an option.

17         **MR. WARD:**  All right.  Can we pull out of this and go

18    to the next page.

19         You can just highlight the entire text.

20    **Q.**   Do you see the paragraph that says [as read]:

21             "We pressed as hard as we could, but were never

22         able to get the commercial approved, unfortunately,

23         in time for broadcast . . . ."?

24    **A.**   Yes.

25    **Q.**   Is that an accurate representation of what actually

1  happened?

2  **A.**   I don't think it -- I mean, it's certainly not accurate.

3  If you're asking is that an accurate representation, I don't

4  believe it is.  We did -- no, I don't believe it is an accurate

5  representation.

6  **Q.**   All right.  If you can go to the paragraph above, do you

7  see it says [as read]:

8          "With the commercial in hand, we worked with our

9      associates at Group M to get the network to accept

10     our commercial, but we were warned that with the NFL

11     having turned down advertising from a veterans

12     organization related to standing for the National

13     Anthem, the path may be complicated"?

14     Is that accurate?

15 **A.**   No.  I never heard any of that.

16         **MR. WARD:**  Okay.  Can we pull out of this document,

17 please.

18     And can we now go to Exhibit 4- -- wait.  Sorry.  Back to

19 434.  I'm sorry.  I wasn't done with that one yet.

20     Can we -- can we highlight from the line "Fine" down to

21 about halfway through the page.

22 **Q.**   Do you see where you write [as read]:

23         "Can you give me Eric's email address so I can

24     send it directly?"

25 **A.**   Yes, I do.

BRYAN - DIRECT / WARD

1  Q.  Are you referring there to the Eric Olsen in the header of

2  that proposed letter?

3  A.  Yes.

4  Q.  And then when Mr. Abramoff says, "No, send it to me.  I am

5  getting to Marcus and he'll get it to his lawyer," what is --

6  does this refresh your recollection as to who this letter was

7  being sent to?

8  A.  Not really, because I thought he was saying, "Send it to

9  me, I'll send it to Marcus, and then Marcus will send it to his

10  lawyer for review before he sends it to Mr. Olsen."

11      I had no idea that Mr. Olsen, at that point in time, was a

12  lawyer.  So I thought they were taking an extra step of

13  reviewing it with their own lawyers.

14      MR. WARD:  All right.  Can we pull out of this

15  document and now go to Exhibit 433.

16  Q.  What is this document?

17  A.  This is the one that I -- this is the document that I sent

18  to Jack on letterhead, signed, as he had requested.

19  Q.  And you've reviewed this document prior to testifying here

20  today?

21  A.  Yes, I have.

22  Q.  Is this an accurate representation of the letter that you

23  drafted?

24  A.  Yes, it is.

25      MR. WARD:  Move to admit Exhibit 433.

1          **MR. SHEPARD:**  No objection.

2          **THE COURT:**  433 will be admitted.

3       (Trial Exhibit 433 received in evidence.)

4          **MR. WARD:**  All right.  If we could look, again, at the

5    top part of the letter, who it's addressed to and the header.

6    **Q.**   And this letter was addressed to Eric Olsen, Esquire?

7    **A.**   Yes, it is.

8    **Q.**   All right.  And at this point, do you know who Mr. Olsen

9    is?

10   **A.**   I didn't know Garman Turner Gordon.  I didn't know Eric

11   Olsen.  I don't believe I'd ever met him.  So I didn't know who

12   he was or what his purpose was.  I was just told to write it to

13   that gentleman.

14         **MR. WARD:**  If we could back out of this, please.

15      Can we -- can we highlight the bottom paragraph.

16   **Q.**   When you wrote, "Watley worked with Group M (the company

17   that had more experience than any other in placing ads during

18   the Super Bowl and could get us the best price), and we also

19   worked directly with NBC, the network with the rights to air

20   the event.  It was immediately clear that, without a fully

21   produced" --

22         **THE COURT:**  You should slow down a bit.

23         **MR. WARD:**  Sorry.

24   **Q.**   -- "it was immediately clear that, without a fully

25   produced commercial, we would not be considered for broadcast

 1   by the network," is that accurate?

 2   **A.**   Yes, to the best -- that's what I believed was the case.

 3            **MR. WARD:**  Can we go to the next page, please.

 4       Can we highlight the paragraph that says -- starting "With

 5   the commercial in hand" and then the next paragraph.

 6   **Q.**   Is this paragraph that says "With the commercial in hand,"

 7   is that the same language that was in the draft from

 8   Mr. Abramoff?

 9   **A.**   Yes --

10   **Q.**   And, again --

11   **A.**   -- it is.

12   **Q.**   Again, was this an accurate representation of what

13   happened?

14   **A.**   I don't believe it is.  I don't believe it is an accurate

15   representation.

16   **Q.**   And you've reviewed this prior to testifying.  Anywhere in

17   this letter did you disclose that there was a campaign to get

18   the Super Bowl rejected?

19   **A.**   No.

20   **Q.**   Not to get the Super Bowl rejected.  To get your

21   Super Bowl ad rejected.  Excuse me.

22   **A.**   Correct.  No.

23            **MR. WARD:**  All right.  Can we pull out of this.

24   **Q.**   And do you see at the bottom, is that your signature?

25   **A.**   Yes.

1  Q.    And who did you send this letter to?

2  A.    I sent it to Jack.

3  Q.    All right.  I want to switch topics, if I could.

4        In May of 2018 --

5             MR. WARD:  We can pull this document down.

6  Q.    In May of 2018, did AML BitCoin begin trading on any

7  cryptocurrency exchanges?

8  A.    Yes, it did.

9  Q.    Which exchanges did it start trading on around this time?

10  A.    I believe -- I don't remember precisely, but I believe it

11  started on two exchanges.  One was called the IDAX, and one was

12  called Extremities.  I don't really remember the actual name of

13  it, but it was a name like that.

14  Q.    When the coins started -- when the tokens started trading,

15  were you following the trading activity on the exchanges?

16  A.    Yes, I was.

17  Q.    And during this time, how was the -- how was -- how was

18  the price and volume on the -- of the trading?

19  A.    If I can just elaborate a little bit.

20        We had engaged a very expert fund and experts in the

21  campaigns, publicity, and all of the expertise that was

22  necessary to advise and to put together proposals for

23  publicizing and doing a proper ICO, and they were under my

24  umbrella as, like, Chet Fenster was and other people were.

25  Q.    Let me just stop you.  I just asked you, did once the

1    token was trading, did you watch the trading on the exchanges?

2    **A.**    Yes.  The experts were watching it constantly.

3    **Q.**    All right.  And what did -- what did you see in terms of

4    how the price and volume was doing at the time?

5    **A.**    It was extremely disappointing.

6    **Q.**    In what -- in what sense?

7    **A.**    There was no buyers.  They had not generated any activity

8    amongst their -- all these people that were in their community,

9    and none of them came in to buy.  So it was a very, very

10    disappointing ICO, initial coin offering, if you will.

11    **Q.**    At this point or shortly thereafter, did you discuss with

12    Mr. Abramoff or Mr. Andrade ways to boost the volume or boost

13    the price of trading on the exchange?

14    **A.**    Yes, I did.

15    **Q.**    And did you propose -- what did you propose that

16    Mr. Abramoff and Mr. Andrade do?

17    **A.**    We proposed an elaborate multipoint campaign that included

18    publicy -- publicity, campaigns that would be involved in going

19    directly to retail investors, institutional investors, and

20    creating a real robust group of people that would be buying and

21    selling and trading in this security and that would increase

22    the liquidity and trading volume.

23    **Q.**    Did you work with your associates at The Watley Group and

24    elsewhere to draft a proposal along these lines?

25    **A.**    Yes, I did.  With our -- with our experts in the publicity

 1  side, we put forward a proposal to Marcus and to Jack.

 2          MR. WARD:  And let's look at Exhibit 1034, please,

 3  just for the witness and the parties.

 4  Q.   Is this a WhatsApp conversation exchange between you and

 5  Mr. Abramoff?

 6  A.   Yes, it is.

 7  Q.   In one of these WhatsApps, did you send Mr. Abramoff a

 8  document called "Watley Cryptocurrency Trading Platform

 9  Business"?

10  A.   Yes.

11  Q.   And did he send you a response that said "JA Notes" with a

12  document attached?

13  A.   Yes.

14          MR. WARD:  And going through this document, please, if

15  we could scroll through a couple of pages.

16  Q.   Did you review this document prior to testifying here

17  today?

18  A.   Yes, I did.

19  Q.   Does this document accurately reflect the WhatsApp

20  exchange and the two attachments that you exchanged with

21  Mr. Abramoff?

22  A.   Yes, it does, and I believe one of them has his comments

23  on it or responses.

24          MR. WARD:  Okay.  Can we -- the Government moves to

25  admit Exhibit 1034.

 1          **MR. SHEPARD:**  No objection.

 2          **THE COURT:**  1034 will be admitted.

 3      (Trial Exhibit 1034 received in evidence.)

 4          **MR. WARD:**  Let's go back to the first page and look at

 5  the exchange.

 6  **Q.**   Mr. Bryan, again, is this the exchanging of documents with

 7  you and Mr. Abramoff?

 8  **A.**   Yes, it is.

 9          **MR. WARD:**  Okay.  Let's pull out of this.

10      If we could go down about five pages, please.  Keep going

11  down.

12  **Q.**   All right.  Is this the original draft that you sent

13  Mr. Abramoff?

14  **A.**   Yes, it is.

15  **Q.**   Was this the proposal you created -- well, let me

16  highlight paragraph 3, please, "We propose."

17      [As read]:

18          "We propose deploying this system to immediately

19      bolster and hypercharge the market position of

20      AML BitCoin . . . ."

21      Is that an accurate summary of what you're proposing in

22  this memo?

23  **A.**   Yes.  It's hyperbole, but yes, it does accurately reflect

24  it.

25          **MR. WARD:**  All right.  If you pull back out of it.

1    If we can highlight the bottom half starting with "There

2    are 5."

3    **Q.**    The first bullet point there says "Earned Media."  What

4    are you proposing here?

5    **A.**    This is just standard, giving information to the public at

6    large through the major distribution -- media distribution

7    companies and giving them information about your progress,

8    milestones, and what you're doing in your company.

9    **Q.**    Okay.  And do you see Number 2 where it says "Market

10   Makers"?

11   **A.**    Yes, I do.

12       **MR. WARD:**  All right.  Can we pull out of this and go

13   to the next page, please.

14   **Q.**    Looking at Number 3, do you see where it says "Chat

15   rooms"?

16   **A.**    Yes, I do.

17   **Q.**    About halfway through, you say [as read]:

18       "You should continue your AMA, but we need a

19       vigorous echo chamber.  Plus, our chat teams can say

20       things that you cannot - or would not . . . ."

21       What are you proposing to do here?

22   **A.**    In the chat rooms, the -- introducing -- these chat rooms

23   are cryptocurrency chat rooms where people talk to each other,

24   meet each other and discuss their holdings, what they're buying

25   and selling, what they like, what they don't like; and being

1  very active in those rooms where you are introducing people to

2  AML BitCoin, since nobody had ever heard of it, it would be

3  very positive to convert some of those people in the chat rooms

4  into buyers.

5  **Q.**  Do you have -- did you, at the time, have people working

6  for you that could post in chat rooms?

7  **A.**  I did.

8  **Q.**  You write [as read]:

9          ". . . Watley had a total of 10 people in a

10         small call center in the Philippines."

11     Does that refer to the people that could write chats for

12  you?

13  **A.**  Yes.

14     Let me just read that for one second.

15     (Witness examines document.)  Yes, that is accurate.

16  **Q.**  Looking at the sentence above, you say [as read]:

17         ". . . our chat teams can say things that you

18         cannot - or would not - since they are on their own."

19     Do you see that?

20  **A.**  Yes.

21  **Q.**  As part of this proposal, would the people that you would

22  be -- in the Philippines that would be posting in these chat

23  rooms, would they identify themselves as being from

24  AML BitCoin?

25  **A.**  No.  They would identify themselves as being one of the

1  community.

2  **Q.**   Were they -- did -- would they identify themselves as

3  being purchasers or investors?

4  **A.**   Yes.  Or they would really not propose whether they were

5  investors or buyers.  What they would do is educate the

6  community and they'd say, "Have you guys heard of this?  Do you

7  guys know how great this is?  Wow, I think I may go buy it,"

8  and they really try to influence.

9  **Q.**   Got it.

10       **MR. WARD:**  If we could pull out of Number 3, please.

11  **Q.**   Number 4 says "Institutions."  What does that refer to?

12  **A.**   Well, I think the most important part of our whole process

13  was to institutionalize the ownership base of AML BitCoin so

14  that it included real bona fide -- this is, supposedly, the

15  AML/KYC, we're just like Morgan Stanley.  Well, let's bring in

16  Morgan Stanley.

17       And so this was the real major plank of our process, which

18  was to create institutional interest and bring real

19  institutional investors into this trading and to buy -- to buy

20  it.

21  **Q.**   Got it.

22       **MR. WARD:**  Can we pull out of that, please.

23       And we can go to the next page, please.

24       Can we highlight the paragraph 2, "Market Making."

25  **Q.**   You write -- you submitted to them [as read]:

1          "Watley will become your first market maker and

2     create more over time.  You should budget about

3     100,000 coins per month in this program for

4     six months."

5          What are you proposing they budget a hundred thousand

6     coins for?

7     **A.**   There's a considerable cost.  Very common in the

8     cryptocurrency world is to use the coins to incentivize people

9     to purchase, and you do that by giving it to them, giving it to

10    communities.  There's things called airdrops and other things.

11         But in this particular case, what we were proposing to do

12    is to pay institutional investors to, hey, take a good look at

13    this.  Often if somebody's doing due diligence on a deal, they

14    want to be paid to do that.

15    **Q.**   And were you giving them coins to trade those coins on the

16    exchanges?

17    **A.**   Two things.

18              **MR. SHEPARD:**  Objection.

19              **THE WITNESS:**  Oh, sorry.

20              **MR. SHEPARD:**  Objection.  Leading.  He gave very --

21              **THE COURT:**  Sustained.

22    **BY MR. WARD:**

23    **Q.**   What did you want the people you were giving the tokens to

24    to do with those tokens?

25    **A.**   I wanted them to do two -- to -- to hold -- our main first

1    client was our group called Polyblock, which was the group that

2    we had engaged to put together this proposal; and Polyblock was

3    a major fund in the cryptocurrency space and they were major

4    investors in many cryptocurrencies.

5        So, for example, with them, we would give them a block

6    of -- of the coins, and that would incentivize them to really

7    look deeply into it, to evaluate it, and to start buying and

8    selling and trading in the cryptocurrency.

9            **MR. WARD:**  All right.  If we could back out of this,

10   please.

11       And could we pull up Exhibit 902.  And if we could

12   highlight in 902, please --

13   **Q.**  Well, let me first ask you.  Is this a WhatsApp

14   conversation between you and Jack Abramoff?

15   **A.**  Yes, it is.

16   **Q.**  And have you reviewed this WhatsApp chain prior to

17   testifying here?

18   **A.**  Yes, I have.

19   **Q.**  And is it an accurate reflection of your conversation at

20   that time with Mr. Abramoff?

21   **A.**  Yes, it is.

22           **MR. WARD:**  We move to admit Exhibit 902.

23           **THE COURT:**  902.

24           **MR. SHEPARD:**  It has some co-conspirator statements in

25   it.  If they're admitted on that basis, I don't have any

```
 1   objection.

 2            MR. WARD:  That's correct.

 3            THE COURT:  902 will be admitted.

 4       (Trial Exhibit 902 received in evidence.)

 5            THE COURT:  Is this a good time to take the short

 6   break before -- how much more time do you have on direct?

 7            MR. WARD:  A bit.  20 minutes maybe.

 8            THE COURT:  All right.  Okay.  Let's go ahead and take

 9   a bit of an early break.

10       Remember, members of the jury, my admonitions.  Do not

11   discuss this amongst yourselves or with anyone else.  Don't

12   talk about it.

13       We'll see you back at about five of.

14                     (Recess taken at 9:39 a.m.)

15                 (Proceedings resumed at 9:58 a.m.)

16     (Proceedings were heard out of the presence of the jury.)

17            THE COURT:  Okay.

18            MR. WARD:  Ready.

19       (Proceedings were heard in the presence of the jury.)

20            THE COURT:  The jury is present.

21       You may proceed, Mr. Ward.

22   BY MR. WARD:

23   Q.  Mr. Bryan, we are looking at Exhibit 902, which has been

24   admitted.

25            MR. WARD:  Can we please highlight the first two
```

1  conversations down through the green -- the first green box.

2  **Q.**  Is this an instant message conversation between you and

3  Jack Abramoff?

4  **A.**  Yes, it is.

5  **Q.**  Mr. Abramoff writes [as read]:

6       "I had a chance to review things with Marcus.

7       Here is what he is willing to do.  He will sell

8       500,000 ABTC for $1 a token.  He is willing to leave

9       250,000 of that with you to be used for the

10      program . . . ."

11      What is Mr. Abramoff referring to here?

12 **A.**  He's referring to the -- the advertising and publicity

13 program that we had recommended with Quintin and our

14 publicity -- our team.  And I believe we had asked for

15 considerably more than that, but he's saying that he will only

16 agree to 500,000.

17 **Q.**  Well, in the next sentence, he writes [as read]:

18      "So, you will have a budget of $250,000 to

19      effect a significant change in the volume and, more

20      importantly, the price of the token."

21      What is he referring to there?

22 **A.**  Well, it's a misnomer because what he's ask -- what he's

23 saying here is he will sell us 500,000 for a dollar.  So we're

24 actually going to pay for those.  And then he's saying, "So you

25 have a budget of 250,000 of something that you bought from us."

1    It doesn't really make sense, to be honest.

2    **Q.**   When he says --

3    **A.**   What he's saying is --

4    **Q.**   When he says "You will have a budget of 250,000 to effect

5    a significant change in the volume and, more importantly, the

6    price of the token," what is he asking you to do?

7    **A.**   He's asking us to spend the 250,000 to significantly

8    change the volume and the -- and, therefore, affect the price

9    of the token.

10   **Q.**   Okay.  And you write [as read]:

11          "Okay.  Great.  Let me give -- let me work on

12       this and see what I can do."

13       Did you then work with any of your contacts to effect a

14   significant change in the volume and price of the market?

15          **MR. SHEPARD:**  Objection.

16          **THE WITNESS:**  Yeah.

17          **MR. SHEPARD:**  He's now mischaracterizing --

18          **THE COURT:**  Wait, wait.

19          **MR. SHEPARD:**  He mischaracterized the witness's

20   answer.

21          **MR. WARD:**  I just asked him if you work with your

22   contacts to --

23          **THE COURT:**  Why don't you start again.  Ask a new

24   question -- or ask the question again so I can hear it.

25   \\\

1    BY MR. WARD:

2    Q.    Following this, did you use that budget, Mr. Bryan, to

3    effect a significant change in the volume and, more -- to

4    attempt to effectively -- to effect a significant change in the

5    volume and price of the coin?

6    A.    Well, what I did -- actually, what I was saying is that I

7    would work on it and see if this proposal they were making was

8    even a start -- whether it was a non-starter or whether we

9    could actually have any impact --

10    Q.    Okay.

11    A.    -- for that low an amount of money.

12    Q.    Great.

13          MR. WARD:    Well, let's go -- pull out of this, and can

14    we highlight the next series of chats that starts with "The

15    token" and goes through the "Let me show you what happens."

16          Down a little farther.

17          THE WITNESS:    Yes.

18    BY MR. WARD:

19    Q.    Do you see Mr. Abramoff, when he says "The token is down

20    to 73 cents," what is he referring to?

21    A.    He's referring to the price, the market price and the most

22    recent trade for the AML BitCoin coin, for the -- for the

23    trades.

24    Q.    All right.  Then you respond [as read]:

25          "Let me work on it now.  Hold on."

1    And then at the bottom, you write [as read]:

2         "Let me show you what happens.  We buy and then

3    we get S on.  I will push it up and you can watch

4    it."

5    What are you saying there?

6    **A.**    Quintin and I are communicating constantly.  He's actually

7    trading and looking at every bid, every offer, every sale

8    offer, every buy offer.  He's constantly monitoring that.  And

9    so Quintin is giving me real time, and I'm looking at it on my

10    screen.  So he's indicating to me exactly what's happening.

11    **Q.**    And who's Quintin?

12    **A.**    Quintin is the head of Polyblock Capital -- or the head of

13    trading for Polyblock Capital, and he's the one that we've

14    engaged their team to do the entire program of publicity and

15    those things.

16    **Q.**    And did you provide them with AML BitCoin Tokens provided

17    to you by Mr. Abramoff and Mr. Andrade?

18    **A.**    Yes, but not at this stage.  This is --

19    **Q.**    All right.

20    **A.**    He's only offered this two minutes before.  I think this

21    is merely minutes later.  So we've never received anything yet.

22    This is just our report on what's actually happening now.

23         **MR. WARD:**  Okay.  Can we go to the next page, then,

24    and highlight the top three texts.

25    **Q.**    At the time when you write "There is no buying at all,"

1    what are you referring to?

2    **A.**    I'm referring to the marketplace, not unlike New York

3    Stock Exchange or NASDAQ or any of the others where you have

4    buying and selling taking place.  When you have buying and

5    selling taking place, you theoretically have buyers and you

6    have sellers.  And in this case, what I was referring to here

7    is that there was absolutely nobody buying.

8    **Q.**    All right.  And when you say "here," what specific trading

9    are you talking about?

10   **A.**    AML BitCoin, to be specific.

11            **MR. WARD:**  All right.  Can we pull out of this.

12   **Q.**    I know you've reviewed this prior to your testimony.  Does

13   this reflect your ongoing conversation with Mr. Abramoff at

14   this time?

15   **A.**    Yes, it does.

16            **MR. WARD:**  All right.  Can we go to page 4, please.

17        And can you highlight from the top text down through --

18   down through "And one at .65."

19   **Q.**    When you write "I just did a trade with myself," what do

20   you mean?

21   **A.**    It means that Quintin just relayed to me that he had done

22   a trade between his own accounts.

23   **Q.**    And then down further you say [as read]:

24            "I bought it and I sold it to show some volume.

25        I did 10,000."

1    What do you mean there?

2  **A.**  Quintin had told me that he'd done trades for 10,000

3  coins.

4         **MR. WARD:**  All right.  Can we back out of this,

5  please, and then do the next segment down through "important to

6  see we are fighting."

7  **Q.**  When you write -- you write [as read]:

8            "For 10,000 people get more confident.  It is

9         important for everyone to see what we are fighting."

10   What are you referring to there?

11 **A.**  What I'm referring to is when a -- when the people who are

12 watching the buying and selling, when they see a trade go

13 through for 10,000 coins, it's more significant.  20,000 is

14 more.  If you see a 50,000 go through, it gives you more

15 confidence that a slightly more institutional level of trading

16 is starting to take place.

17        **MR. WARD:**  Okay.  Can we back out of this, please, and

18 just go back to the top text again.

19 **Q.**  Where you say [as read]:

20           "I just did a trade with myself at 3 cents."

21   So are you just trading --

22 **A.**  I believe that's a typo.  It's not possible that that took

23 place at 3 cents when previously I said it was trading at

24 95 cents.  So I must have made a mistake in writing.

25 **Q.**  But in terms of the "I did a trade with myself," what does

BRYAN - DIRECT / WARD

 1   that mean?

 2   **A.**   What it means is between -- Quintin had set up five

 3   different accounts, and some of those accounts -- I'm not --

 4           **MR. WARD:**  We can back out, because I think you're --

 5       Just do four or five texts.  The four or five from the

 6   top.

 7           **THE WITNESS:**  Sorry.  Now I see.

 8   BY MR. WARD:

 9   **Q.**   So where you write "Sorry.  95 cents" --

10   **A.**   Yes.

11   **Q.**   -- is that a reference to the typo?

12   **A.**   Yes.

13   **Q.**   It's not 3 cents; it's at 95 cents?

14   **A.**   It's not 3 cents.  It was 95.

15   **Q.**   But, again, you write [as read]:

16           "I just did a trade with myself . . . ."

17       And below, you say [as read]:

18           "I bought and sold it."

19       Were you --

20   **A.**   Correct.

21   **Q.**   You said -- you just said that Polyblock had set up five

22   different accounts?

23   **A.**   Correct.

24   **Q.**   Were they trading among those accounts?

25   **A.**   Yes.  They put money into those accounts.  It's a fund.

1   They have $500 million worth of assets, and they're a major

2   cryptocurrency fund.  So they put -- they have to put some of

3   their own money into those accounts because I don't believe we

4   had the 250,000 yet.  You know, this is -- they had just

5   approved this five minutes ago, so we didn't -- I don't --

6   I believe this is all part of the same conversation.

7   **Q.**   Was it your understanding, though, that Polyblock was just

8   trading between the accounts it had created?

9   **A.**   Between their own accounts, correct.

10  **Q.**   So it wasn't trades with -- was it trades with outside

11  buyers or just --

12  **A.**   No.  Just a trade within his own five accounts that he had

13  set up.  He probably had hundreds of accounts, in reality.

14  **Q.**   What was -- what was the purpose, as you understood it, of

15  trading between your own accounts?

16  **A.**   Because he's -- his intent was just to show volume.  Just

17  as it said there, "to show some volume."

18  **Q.**   And when you say "show volume," show volume to who?

19  **A.**   People that were looking and watching this trading would

20  see more volume.

21  **Q.**   And what would be the advantage -- what did you understand

22  would be the advantage of people seeing more volume in the

23  trading and --

24  **A.**   More -- when there's more liquidity, it gives people more

25  confidence to be able to -- if somebody's buying one of these,

1  the one thing they want to know is that they can sell it.  And

2  so if they have confidence that there's more buying and

3  selling, it brings more buyers and sellers into the market.

4  **Q.**   And was it your intention to create that impression by

5  having these accounts trade among themselves?

6  **A.**   Say that again.

7  **Q.**   Was it your intent to create that impression that there

8  was more volume by having these accounts trade among

9  themselves?

10  **A.**   Yes, exactly.

11  **Q.**   Can we --

12  **A.**   That was the purpose of him setting up five accounts for

13  him to be able to trade.

14        **MR. WARD:**  Okay.  Can we pull out of this document,

15  please, and pull up, just for the witness, Exhibit 1151.

16  **Q.**   Do you see this document?

17  **A.**   Yes, I do.

18  **Q.**   Did you review this prior to your testimony today?

19  **A.**   Yes, I did.

20  **Q.**   Is this a document you created?

21  **A.**   Quintin wrote it, and I probably made some edits to it.

22  This is the Polyblock plan.

23  **Q.**   Okay.  And is this an accurate reflection of the plan you

24  had with Polyblock?

25  **A.**   Yes.

1          **MR. WARD:**  We move to admit Exhibit 1151.

2          **MR. SHEPARD:**  I seem to be missing my own copy.  If I

3    could just have a moment, Your Honor.  Thank you.

4                      (Pause in proceedings.)

5          **MR. SHEPARD:**  I think we're all missing it.

6          **MR. WARD:**  It's on the screen.

7          **MR. SHEPARD:**  I know, but it's -- is it only one page?

8          **MR. WARD:**  It's -- I think it's two pages.

9          **MR. SHEPARD:**  Okay.  If you can just let me see the

10   other page.

11                     (Pause in proceedings.)

12         **MR. SHEPARD:**  Okay.  And then back to page 1, if I

13   could.

14                     (Pause in proceedings.)

15         **MR. SHEPARD:**  No objection.

16         **THE COURT:**  Exhibit 1151 will be admitted.

17      (Trial Exhibit 1151 received in evidence.)

18         **MR. WARD:**  Can we highlight just the title and the top

19   paragraph, please.

20   **Q.**   What does the term "Project Sunshine" mean?

21   **A.**   That's what Quintin called it.

22   **Q.**   Okay.

23   **A.**   It was just a...

24   **Q.**   And the next paragraph, does that refer to the plan that

25   you've just been testifying to as to trading in AML BitCoin

1    Tokens?

2    **A.**    Yes.

3            **MR. WARD:**    Can we back out of this, please.

4        Can you go down and highlight the paragraph "We will set

5    up" and then go through the next paragraph as well.

6    **Q.**    What did you mean when you say "We will set up 10 trading

7    accounts on the 2 current exchanges with a focus on IDAX"?

8    **A.**    That's what -- that's exactly what Quintin did, set up ten

9    trading accounts.  I'm sure they were existing trading accounts

10   that he already had, so he didn't really need to set them up.

11   But I believe they were -- you know, that that's part of their

12   business.

13   **Q.**    Okay.  When you write and the document says "The goal is

14   to trade approximately U.S. 50,000 to 70,000 per day" --

15   **A.**    Right.

16   **Q.**    -- what trading are you talking about?

17   **A.**    That's the goal of Polyblock, to actually do that much

18   volume per day.

19   **Q.**    And was the goal to trade between these ten accounts that

20   were created?

21   **A.**    Partially, but also to -- you know, they were being

22   compensated and would also be buying for their own account.

23   **Q.**    All right.

24   **A.**    So it was a combination of the two, buying for their own

25   account and also trading amongst their own accounts.

 1  Q.  Trading with themselves?

 2  A.  Right.  They still had to buy a certain amount.

 3      MR. WARD:  Can we pull out of this document and pull

 4  up Exhibit 1037, please.

 5      That's 1057.  1037.

 6  Q.  Is this another WhatsApp exchange between you and

 7  Mr. Abramoff?

 8  A.  Yes, it is.

 9  Q.  And does this appear to be -- is this on May 27th, 2018?

10  A.  Yes, it is.

11  Q.  Have you reviewed this prior to testifying here?

12  A.  Yes, I did.

13  Q.  Does that accurately reflect the conversation?

14  A.  Yes, it does.

15      MR. WARD:  Move to admit Exhibit 1037.

16      MR. SHEPARD:  No objection.

17      THE COURT:  1037 will be admitted.

18      (Trial Exhibit 1037 received in evidence.)

19  BY MR. WARD:

20  Q.  All right.  Let's walk through the conversation.  We can

21  do the first half of the page.

22      Mr. Abramoff writes [as read]:

23          "Well, he gave you 250,000 ABTC to get this

24      going."

25      What is that in reference to?

1    **A.**    That's a completely inaccurate statement.  If you

2    remember, on the previous one, he said, "I'm selling you

3    500,000," not giving.  So I don't believe this was -- I believe

4    it's referring to that proposal that he said Marcus has agreed

5    to on the previous exhibit.

6    **Q.**    Well, they gave you the tokens.  Did they give you the

7    tokens to use for trading?

8    **A.**    Yes, but I had to sign a purchase agreement to get them.

9    I agreed to buy them for a dollar.

10    **Q.**    And then down below, you say [as read]:

11            "I have to sell part of them in order to buy or

12        trade with myself."

13    **A.**    Right.

14    **Q.**    What are you referring to there?

15    **A.**    Quintin had all of the trading accounts.  I'm not really

16    referring to myself when I'm doing that.  And Quintin was the

17    trader.

18        And in order to purchase something in the marketplace from

19    sellers, you first have to sell to get some cryptocurrency,

20    Bitcoin or Ethereum or other cryptocurrency, in order to buy

21    anything.  You have to sell first.

22        **MR. WARD:**  Let's pull out of this and go to the next

23    bottom half that says "I sell, then I buy."

24    **Q.**    Mr. Bryan, when you write "I trade with myself.  That is

25    not new buyers or even real.  It is me trading with myself" --

1  **A.**   Right.

2  **Q.**   -- what are you referring to there?

3  **A.**   Well, that's when you're purely trading between -- when

4  Quintin is purely trading between what he said are those ten

5  accounts; and if he's buying from Account 1 and Account 8 is

6  buying from Account 1, he's actually paying himself and selling

7  to himself.

8  **Q.**   So when you write "That is not new buyers or even real" --

9  **A.**   It's -- it's not real, and it's not going to impact the

10  market to the extent you want to, which is doing real

11  purchasing, meaning buying from unrelated people who want to

12  sell.

13  **Q.**   And down below when you say, "We need real buyers and real

14  traders," at the time, were there real buyers and real traders

15  in the market for the AML BitCoin Token?

16  **A.**   There were virtually no buyers, to the best of my

17  knowledge, and that was from my examination, from Quintin's.

18  **Q.**   Down at the bottom, Mr. Abramoff writes to you [as read]:

19          "John, I wasn't the one who proposed all of

20      this.  You did.  I hope you can find a way to

21      stabilize the price while you are working on raising

22      the money."

23      When Mr. Abramoff says "I hope you can find a way to

24  stabilize the price," the price of what?

25  **A.**   Because the price was going down.

BRYAN - DIRECT / WARD

1   Q.   The price of --

2           THE COURT:  His question is:  Price of what?

3           THE WITNESS:  Oh, sorry.

4   BY MR. WARD:

5   Q.   The price of what?

6   A.   AML BitCoin.

7   Q.   Okay.  And what did he mean when he wanted you to

8   stabilize the price of AML BitCoin?

9   A.   He wanted it to stop going down.

10  Q.   And then he writes "while you are working on raising the

11  money."  At this time, were you trying to raise money?

12  A.   Yes.  Quintin was going out to all the institutional

13  investors, and we were starting this institutional program, and

14  we were trying to raise $750,000 to go into buying.

15  Q.   Do you believe it would have been important to keep -- to

16  stabilize the price while you're trying to find buyers for the

17  coin?

18  A.   Yes.  I mean, it's important for the price to stabilize,

19  yes.

20          MR. WARD:  Can we go to the next page.

21      And we could highlight down through "The first 3 guys"

22  from the top.

23      A little farther down.  A little farther.  One -- a little

24  more.  One more.

25      There you go.  Thank you.

BRYAN - DIRECT / WARD

1  **Q.**  Mr. Abramoff writes [as read]:

2          "At this point, rather than spending time

3      texting me, please try to do something on the coin."

4      And you reply [as read]:

5          "Jack, people cannot even get the coins out."

6      What are you referring to there?

7  **A.**  The IDAX exchange -- a number of people went into that

8  exchange, including Quintin and others, with their own capital

9  in order to actually buy and sell.  And then IDAX notified us

10 that we could not re- -- we could not take the money out.

11     As an analogy, it would be like putting your money in

12 Morgan Stanley and saying, "I want my" -- "Send my money back

13 to my bank" and they say, "No, we can't" -- "You can't get your

14 money back."

15     And they wouldn't give the money back, which was

16 catastrophic.

17 **Q.**  When you write "The first 3 guys I got in think I scammed

18 them," what do you mean there?

19 **A.**  Well, I got three people to go into this, and they weren't

20 experts in the field, and suddenly they saw that their money

21 was lost and they couldn't get it back from this exchange.  So

22 I felt that, inadvertently, I had scammed them.  They couldn't

23 get their money back --

24 **Q.**  All right.

25 **A.**  -- and I was horrified.

1            **MR. WARD:**  Let's back out of this and just go to the

2    next set of texts in this chain.

3    **Q.**   Mr. Abramoff writes [as read]:

4            "John, the only chance for this to move forward

5        is for you to keep things as close to parity as

6        possible while you raise the 750K and then move as

7        fast as you can."

8        When he says "while you raise the 750K," what is that

9    referring to?

10   **A.**   That's referring to what our plan was, to go raise a

11   significant amount of investor capital from

12   institutional-quality investors that would really be used to go

13   in and significantly buy a lot of the -- to be a major buyer.

14   **Q.**   When Mr. Abramoff says "The only chance for this to move

15   forward is for you to keep things as close to parity as

16   possible," is he referring to the trading in the AML BitCoin

17   Token?

18   **A.**   Yes, he is.  And I believe what he means by "parity," he

19   means as close to today's price as possible.  I don't know what

20   the price was at that time, but whatever the price was, they

21   didn't want it to go down any more.  Let me put it that way.

22   **Q.**   Okay.  And you respond [as read]:

23           "Okay.  But, Jack."

24       And then he says [as read]:

25           "Otherwise, this will be over very quickly."

1        What does he mean?

2   **A.**   Well, I think he's subtly threatening that he's going to

3   fire all of us, I guess.  I mean, I'm not sure what it means.

4   **Q.**   You say [as read]:

5            "Just so you know."

6        And then Mr. Abramoff says [as read]:

7            "Stop texting on this."

8        Why did he want you to stop texting on this?

9            **MR. SHEPARD:**  Objection.

10           **THE COURT:**  Sustained.

11  **BY MR. WARD:**

12  **Q.**   What did you understand he meant by --

13  **A.**   Actually, I didn't know.  I didn't think there was

14  anything wrong with -- these were all facts.

15  **Q.**   Okay.  When you wrote "We have no buyers," again, are you

16  referring to the AML BitCoin Token trading?

17  **A.**   Yes.

18           **MR. WARD:**  All right.  Let's pull out of this

19  document, if we could.

20       Can I have one moment?

21                   (Pause in proceedings.)

22           **MR. WARD:**  Can we pull up Exhibit 420, please.

23  **Q.**   Do you see this email, Mr. Bryan?

24  **A.**   Yes, I do.

25  **Q.**   Is this an email from you and Jack Abramoff?

1    **A.**    Yes, it is.

2    **Q.**    And does it include an exchange with John Bryan and Marcus

3    Andrade?

4    **A.**    Yes, it does.

5    **Q.**    And was this an exchange on May 16th, 2018?

6    **A.**    Yes.

7            **MR. WARD:**    All right.  I'd move to admit Exhibit 420.

8            **MR. SHEPARD:**    Is that the only page?  Because that one

9    wasn't on our list either.

10           **MR. WARD:**    Yeah, that's the only page.

11           **MR. SHEPARD:**    That's the only page?

12       No objection.

13           **THE COURT:**    420 will be admitted.

14       (Trial Exhibit 420 received in evidence.)

15   **BY MR. WARD:**

16   **Q.**    Mr. Andrade writes [as read]:

17           "Please send a check for 2K to John."

18       And then you respond at the top [as read]:

19           "Can he wire?  I can give him a FedEx if he

20       needs it.  I still have a Board of Directors

21       account."

22       What did you mean by that?

23   **A.**    I was going to just give him a label, a FedEx label.

24   **Q.**    And was Mr. Andrade paying you $2,000?

25   **A.**    It was for compensation to the two or three people in the

1   Philippines that were going to go active in the chat rooms.

2   **Q.**   Okay.  And at the time, did you have people in the

3   Philippines monitoring the AML BitCoin chat rooms?

4   **A.**   Yes.  I had trained one person quite extensively, Mary Joy

5   Cancino, and she had spent quite a bit of time, actually, with

6   Marcus's assistance and other people getting her training.

7   **Q.**   And what was your instruction to the people in the

8   Philippines chat room as it relates to --

9   **A.**   To introduce people and give them information.  I gave

10  them all the attachments, all the business summaries that

11  Marcus had created.  I trained them on what the concept was,

12  and so they were making it a subject matter of the chat rooms.

13  **Q.**   Were you instructing them to post certain things about

14  AML BitCoin?

15  **A.**   Yes.

16  **Q.**   What type of things were you instructing them to post?

17  **A.**   To introduce them to it, to include some of the -- if

18  somebody, you know, expressed interest, "Here, let me send you

19  the documentation and some of the presentations that were

20  related to the technology and all of the concept."

21  **Q.**   And when you instructed these people to post, did you

22  instruct them to post as being affiliated with AML BitCoin?

23  **A.**   No.  They were really, I would call it, posing as members

24  of the chat room community.  So just like everybody else was

25  there, they were there.

1      **MR. WARD:**  All right.  Let's pull out of this

2   document, if we could.

3        Can we pull up Exhibit 1036, please.

4        And we can highlight the participants in the first few

5   chats.  One more down farther.

6   **Q.**   Mr. Bryan, during your time working for AML BitCoin, did

7   you monitor the Telegram channel?

8   **A.**   I don't believe I ever did previously, but on this

9   particular occasion, Quintin came to me and said, "Come into

10  the Telegram channel and take a look at this."  He was

11  monitoring it.

12  **Q.**   And just explain what a Telegram channel is.

13  **A.**   Telegram is not unlike a chat room system that creates --

14  you can have groups of many thousands of people or just one

15  person.  And it allows for communities of people to chat with

16  each other, talk to each other, discuss what they're investing

17  in, and like-minded cryptocurrency investors can discuss

18  opportunities and what they're planning on doing.

19  **Q.**   Is this text chain a conversation regarding the Telegram

20  channel between you and Mr. Abramoff?

21  **A.**   Yes, it is.  And this is -- I believe, if I'm not

22  mistaken, Marcus or somebody at Marcus's company had set up a

23  chat room specifically probably called AML BitCoin.

24          **MR. WARD:**  All right.  Can we admit Exhibit --

25          **THE WITNESS:**  I believe.  And that's just to the best

 1   of my knowledge.  I don't know if that's correct.

 2            **MR. WARD:**  Okay.  Can we admit -- move to admit

 3   Exhibit 1036.

 4            **MR. SHEPARD:**  Two things, Your Honor.

 5        One, can we ask the witness to confine his answers --

 6            **THE COURT:**  Yes.

 7            **MR. SHEPARD:**  -- to the questions?

 8            **THE COURT:**  Please don't --

 9            **THE WITNESS:**  Sorry.

10            **THE COURT:**  -- elaborate.

11        If counsel want more information --

12            **THE WITNESS:**  Yes, sir.

13            **THE COURT:**  -- they'll ask the question, but focus

14   just on the question.

15            **THE WITNESS:**  Yes, Your Honor.  I'm sorry.

16            **THE COURT:**  Now --

17            **MR. SHEPARD:**  I object to this one.  It's hearsay.

18   It's not a co-conspirator statement.

19   **BY MR. WARD:**

20   **Q.**  Mr. Bryan, was this a conversation you were having with

21   Jack Abramoff?

22   **A.**  Yes, it was.

23   **Q.**  Were these comments that you made to Jack Abramoff?

24   **A.**  Yes, they were.

25            **MR. SHEPARD:**  Same objection.  It's still hearsay.  It

1    doesn't matter what Mr. Abramoff knows.  He's not a defendant.

2         **THE COURT:**  Well, why would statements to Mr. Abramoff

3    be a co-conspirator statement?

4         **MR. WARD:**  Well, they would be going to show

5    Mr. Abramoff's knowledge and understanding of what was

6    happening in these Telegram rooms.

7         **THE COURT:**  Sustained.

8    **BY MR. WARD:**

9    **Q.**   Okay.  Let me just ask you, Mr. Bryan, did you see people

10   in the Telegram channel commenting on AML BitCoin?

11   **A.**   Yes, I did.

12        **MR. WARD:**  And you can take this down.

13   **Q.**   Did you -- what sort of things were the people -- do you

14   remember the people saying in those Telegram channels?

15   **A.**   There were individuals in the Telegram channel that were

16   basically stating that AML BitCoin's trading, which was

17   currently at 60 cents or 50 cents, and they were saying, "Just

18   wait, everybody.  It's going to go to $1,250 very soon."

19   **Q.**   And what was your concern about comments like "It's going

20   to go to $1,350 soon"?

21   **A.**   Because it's completely absurd and it's -- it's -- it

22   sounds -- it's -- it is reflective of a -- it's a -- it sounds

23   like a pump-and-dump scheme that many of the cryptocurrencies

24   had been subjected to.

25        **THE COURT:**  Just --

 1          THE WITNESS:  Yes.

 2          THE COURT:  -- answer the question.

 3          THE WITNESS:  Sorry.

 4   BY MR. WARD:

 5   Q.   Well, let me follow up.  What do you mean by a

 6   "pump-and-dump scheme"?

 7   A.   A pump-and-dump scheme --

 8          MR. SHEPARD:  It's irrelevant.

 9          THE COURT:  Well, overruled.

10      You can answer that question.

11          THE WITNESS:  A pump-and-dump scheme is where insiders

12   create a market that goes vastly higher very quickly; and as

13   soon as it does, attracting everybody else to go in and buy,

14   they are selling; and then there's no buyers and it

15   subsequently goes back down to zero.  And it's called a

16   pump-and-dump scheme.

17   BY MR. WARD:

18   Q.   Okay.  Moving on, at some point did you observe trading of

19   AML BitCoin Tokens on the HitBTC exchange?

20   A.   Yes.  It did start trading on a more substantial exchange,

21   which was called HitBTC.

22   Q.   And how was the trading on the HitBTC exchange?

23   A.   I don't remember.  Anemic and very poor.  It did not help.

24   It did not bring in a lot of additional buyers.

25   Q.   All right.  Did you -- when you were working with Marcus

1    Andrade and Jack Abramoff, did you try to introduce the

2    AML BitCoin team and project to Wall Street investors?

3    **A.**    Yes, we did.  We brought in a very close friend of mine

4    from Morgan Stanley named George Getz.  George asked us to hire

5    a specific person that had worked for KKR, one of the largest

6    investment companies in the world; and they said, "If you can

7    convince him that this is okay, then we're interested."

8         And so we hired John Langdon, and we put together a whole

9    institutional team to go out and market this.

10   **Q.**    Did you have meetings with various Wall Street banks and

11   institutional investors?

12   **A.**    Yes, we did, lots.

13   **Q.**    And did any of those banks or institutions ever invest in

14   any way in AML BitCoin?

15   **A.**    I don't -- not to my knowledge.

16   **Q.**    All right.  Did you -- at the time you were meeting with

17   these banks, were you asking AML BitCoin for information about

18   the company?

19   **A.**    Yes, I was.  Or, yes, our team was.  John Langdon and all

20   of the team were very aggressively marketing this, and

21   everybody that they approached had lots of technical questions.

22   **Q.**    And were you asking Marcus Andrade for information about

23   the company?

24   **A.**    Yes.  We were asking everybody:  Jack, Marcus, and anybody

25   else that was in the chain of emails.

1    Q.    Were you getting the information from them that you

2    wanted?

3    A.    No.  It started to become a serious problem because the

4    institutional investors would ask us questions and we could not

5    get the answers.

6    Q.    What sort of questions could you not get the answers to?

7    A.    Technical questions.  You know, mostly technical or

8    financial or particularly related to, you know, what -- how

9    much money they had raised, what was their financial statements

10   and other things like that.

11   Q.    Were you ever able to see the financial statements from

12   AML BitCoin?

13   A.    Not that I remember.  I wasn't the one in charge of that,

14   John Langdon was, but I don't believe we did, no.

15   Q.    Can you take a look --

16        MR. WARD:  Can we pull up Exhibit 1069, please.

17   Q.    Did you send an email to Mr. Abramoff expressing your

18   concerns about the meetings you were having with Wall Street

19   investors?

20   A.    Yes, I did.

21   Q.    Is this email at the bottom an accurate reflection of

22   that --

23   A.    Yes, it is.

24   Q.    -- exchange?

25        Did you complain to Mr. Abramoff --

1      **MR. WARD:**  If we could go to page 2, please.

2  **Q.**   You see the paragraph "We can't go to"?

3      Were you complaining to Mr. Abramoff about the inability

4  to get information?

5  **A.**   Yes, I was.

6      **MR. WARD:**  Okay.  Can we pull out of this, please.

7      Can we highlight the "We expect," the little three

8  paragraphs.

9      **THE COURT:**  Have you admitted this exhibit?

10     **MR. WARD:**  I haven't.  I'm just using this to refresh

11 his recollection.

12     **THE COURT:**  Well, his recollection, he hasn't

13 indicated he needs to be refreshed.

14     **MR. WARD:**  Then we can -- then I'll move to admit

15 this.  Move to admit 1069.

16     **THE COURT:**  All right.

17     **MR. SHEPARD:**  I'm sorry.  You moved to admit it?

18     **THE COURT:**  1069, he's moving to admit it.

19     **MR. SHEPARD:**  No objection.

20     **THE COURT:**  1069 will be admitted.

21     (Trial Exhibit 1069 received in evidence.)

22 **BY MR. WARD:**

23 **Q.**   So is this the second page of this email with

24 Mr. Abramoff?

25 **A.**   Yes, it is.

1          **MR. WARD:**  And let's highlight the paragraph "We can't

2    go to the best and brightest."

3    **Q.**   When you write "We can't go to the best and" -- "the

4    brightest and best players in the market and not fully

5    understand the technology, IP, and competent landscape," what

6    are you referring to?

7    **A.**   I'm referring to all of the technical information related

8    to all of the NAC-related technology that they had developed

9    around AML/KYC and all of these anti-money laundering aspects

10   of the coin.

11         **MR. WARD:**  All right.  Let's pull out of this and

12   highlight the three bottom paragraphs here.

13   **Q.**   You write [as read]:

14         "We expect that you will be supportive of our

15    efforts and responsive to our requests and help us to

16    get information we need quickly."

17   Then you write [as read]:

18         "So, we have to wonder, why are you guys holding

19    back on us?  We don't understand."

20   What are you referring to there?

21   **A.**   I'm referring to all of our requests for information from

22   the institutional investors and we're not getting anything

23   back.

24   **Q.**   In the next paragraph, are you also -- what are you

25   referring to there?

1  **A.**   Again, we'd make requests on behalf of an investor or an

2  institution, and we would get no response for over a week.  And

3  in the institutional investor world, that's catastrophic.  They

4  just dump your opportunity.  They just don't even want to look

5  at it.

6  **Q.**   In the end, were you ever able to get the information from

7  Mr. Andrade and Mr. Abramoff that you needed?

8  **A.**   I think in some cases we might have gotten it weeks later,

9  but then it's moot.  We've already lost that opportunity.

10 **Q.**   You talked about the Philippine call center.  Did you hire

11 people in the Philippine call center to interact in the chat

12 rooms?

13 **A.**   Yes, I -- I mean, I had one person who was doing that,

14 yes.

15 **Q.**   And did you ever use the Philippine call center people to

16 trade in AML BitCoin?

17 **A.**   No, I did not.

18 **Q.**   Did you --

19 **A.**   They had no trading capability.

20 **Q.**   Did you ever tell Mr. Abramoff or Mr. Andrade that you did

21 have them working on the trading?

22 **A.**   Yes, I did.  And I did not have that capability.  They did

23 not have that capability.

24 **Q.**   Why did you tell them that?

25 **A.**   I think, you know, I -- you know, they were putting such

1  pressure on me to do more, more, more, more, more, and there

2  was just nothing more.  So I was really, to some extent,

3  deceiving them on that and was trying to take credit for

4  trading that we were not actually doing.

5  **Q.**   Okay.  And were you ever able to recuperate any money you

6  had invested in the AML BitCoin Token?

7  **A.**   No.

8  **Q.**   And if you know, were any of the people that you brought

9  in able to -- as purchasers, were they ever able to recover any

10  of the money they put in?

11  **A.**   I can't accurately say whether they -- I think most of

12  them took very substantial losses.  I know many of them took

13  losses, but I don't know about all of them.

14        **MR. WARD:**  All right.  One moment.

15                    (Pause in proceedings.)

16  **BY MR. WARD:**

17  **Q.**   Can I go back to this email about your complaints to

18  Jack Abramoff.

19        **MR. WARD:**  Can we pull this up and go to page 1,

20  please.

21  **Q.**   Looking at the top part, just the email, at the bottom

22  half of the email, is that from you to Mr. Abramoff?

23  **A.**   Yes, it is.

24        **MR. WARD:**  If we could pull out of that and look at

25  the top part of the email.

BRYAN - DIRECT / WARD

1          If you could highlight that.

2    **Q.**   You see that this is forwarded to Marcus Andrade?

3    **A.**   Yes, I do.

4    **Q.**   Did you ever have conversations with Mr. Andrade directly

5    about the complaints that he was forwarded in this email?

6    **A.**   We had numerous conference calls, and I think most of my

7    gripes were sent to Jack, but we certainly complained to Marcus

8    and all of the team there, everybody that we could complain to.

9              **MR. WARD:**  Thank you.

10   Nothing -- nothing further.

11             **THE COURT:**  Mr. Shepard?

12             **THE WITNESS:**  Your Honor, can I take a quick break?

13             **THE COURT:**  Certainly.

14             **THE WITNESS:**  Very quick.

15             **THE COURT:**  We're going to -- the witness would like

16   to have a quick break.  So we'll take a break.  We'll make this

17   one a short one.

18             **THE WITNESS:**  Yes.

19             **THE COURT:**  Let's come back at five of.

20   And remember my admonitions, members of the jury.  Don't

21   discuss this amongst yourselves or with anyone else.

22   We'll see you at five of 11:00.

23                    (Recess taken at 10:45 a.m.)

24               (Proceedings resumed at 10:59 a.m.)

25        (Proceedings were heard in the presence of the jury.)

```
 1              THE COURT:  The jury is present.

 2         Mr. Shepard?

 3              MR. SHEPARD:  Thank you, Your Honor.

 4                        CROSS-EXAMINATION

 5    BY MR. SHEPARD:

 6    Q.   Good morning.

 7    A.   Good morning, sir.

 8    Q.   Mostly you dealt with Jack Abramoff; correct?

 9    A.   I would say 80 percent Jack Abramoff, 20 percent with

10    Marcus.

11    Q.   And the ones where you interacted with Marcus, Abramoff

12    was present for most of those; right?

13    A.   Yes, except for when I met him individually or I went to

14    Houston.  And so there was times when I don't believe Jack was

15    there but...

16    Q.   But mostly he was there when you --

17    A.   Yes, mostly.

18    Q.   Okay.  And, in fact, he limited your exposure to Marcus,

19    didn't he?

20    A.   I don't know if "limited" is the right word.  I'd say he

21    was working on the operational aspects and would report to

22    Marcus as he's meant to report to him.

23              MR. SHEPARD:  I move to strike the "he would report to

24    Marcus as he was meant to."  That was not responsive.

25              THE COURT:  All right.  The jury will disregard that
```

BRYAN - CROSS / SHEPARD

```
 1   part of the answer.
 2   BY MR. SHEPARD:
 3   Q.   Do you remember talking to the FBI several times?
 4   A.   Yes, I do.
 5   Q.   And when you talked to them last year, you told them,
 6   didn't you, that Mr. Abramoff limited your exposure to Marcus?
 7   A.   Possibly.  I don't have -- I don't have access to that
 8   but...
 9                    (Pause in proceedings.)
10        THE WITNESS:  But I'd say it's a fair, accurate
11   statement.
12   BY MR. SHEPARD:
13   Q.   Okay.  Thank you.
14        And I think you said that Mr. Abramoff was one of your
15   closest friends; right?
16   A.   Yes, he was at the time.
17   Q.   At the time.  And as I understood your direct examination,
18   you lied on his behalf when he asked you to write a letter to
19   that Eric Olsen guy, remember?
20   A.   I don't know specifically how you mean.  I think most of
21   that was fairly accurate.
22   Q.   Most of it was fairly accurate, but part of it was not;
23   right?
24   A.   Part of it was not.
25   Q.   And you did that because Mr. Abramoff asked you to do it;
```

1    right?

2    **A.**    Yes, I did.

3    **Q.**    And not only did you make that, we'll call it, inaccurate

4    statement, you knew it was inaccurate; right?

5    **A.**    Yes, I did.

6    **Q.**    Yeah.  Not only did you make that inaccurate statement on

7    behalf of Mr. Abramoff, you also lied to him in the course of

8    your work with AML BitCoin; correct?

9    **A.**    In what regard?  I don't know.

10    **Q.**    Well, didn't you just say on direct examination, toward

11    the end, that you had told Mr. Abramoff that your team in the

12    Philippines did some trading for him but, in fact, that was not

13    true?

14    **A.**    Yes.  That's accurate.  I misrepresented that.

15    **Q.**    Okay.  And that wasn't the only misrepresentation you made

16    to Mr. Abramoff, was it?

17    **A.**    I'm sure it wasn't.

18    **Q.**    And he was one of your very closest friends; right?

19    **A.**    Yes, he was.

20    **Q.**    So as I understand it, the first time you met

21    Mr. Abramoff -- I'm sorry -- the first time you met Marcus was

22    set up after you had heard about AML BitCoin from Mr. Abramoff;

23    correct?

24    **A.**    That's correct.

25    **Q.**    And then Mr. Abramoff arranged a meeting for you and

1   Mr. Andrade, for the three of you, in Beverly Hills; right?

2   **A.**   Yes, but I don't believe Mr. Abramoff was there at the

3   first meeting.  Just -- just me and Marcus, I think.

4   **Q.**   Let me show you --

5           **MR. SHEPARD:**  If we could, Ed, go to Exhibit 2801 and

6   just for the Court, the witness, and the Government.

7   **Q.**   Do you see that, sir?

8   **A.**   Yes, I do.

9   **Q.**   And does that refresh your recollection that it wasn't

10  just you and Marcus at that meeting?

11  **A.**   It's a -- it's -- it doesn't indicate who's going to be at

12  the meeting.  It just says a destination, and I don't -- I

13  don't --

14  **Q.**   And it has names at the top; right?

15  **A.**   I see.  Yeah, Marcus, Darren, and -- yes.

16  **Q.**   So it wasn't just you and Marcus; right?

17  **A.**   I don't know if Darren showed up or not.  I don't -- I

18  just don't recollect.

19          Actually, I sort of do recollect.  I think Darren did show

20  up.

21  **Q.**   Okay.  And when Mr. Abramoff -- and Mr. Abramoff set that

22  up; right?

23  **A.**   Yes, he did.

24  **Q.**   And when he did, you felt like you were being used as a

25  prop to impress Marcus; right?

BRYAN - CROSS / SHEPARD

```
 1              MR. WARD:  Objection.

 2              THE WITNESS:  No.

 3              MR. WARD:  Misstates his testimony.

 4              THE COURT:  Overruled.  He can answer the question.

 5              THE WITNESS:  No, I didn't feel that way at all.

 6   BY MR. SHEPARD:

 7   Q.   Do you remember talking to the FBI in 2019, not too long

 8   after you met Marcus?  Much closer in time than today; right?

 9   A.   Yes.

10   Q.   You talked to the FBI in 2019, and you told them "Abramoff

11   possibly wished to use Bryan as a prop to impress Andrade."  Do

12   you remember telling them that?

13   A.   I don't remember saying that specifically, but it's quite

14   possible I did.  But it's -- it was a possibility, but I

15   don't -- I don't believe it was -- I'm not -- I couldn't -- I

16   couldn't say that it was the reason that he did that, which is

17   what your question was.

18   Q.   My question was you felt that.  You obviously can't know

19   everything Mr. Abramoff --

20   A.   Right.

21   Q.   -- was thinking, but you felt that, and that's what you

22   towed the FBI; right?

23   A.   I told them it was a possibility.

24   Q.   And you showed up in a Ferrari; right?

25   A.   Yes.
```

1  Q.  Let me turn to the Super Bowl for a minute.

2        MR. SHEPARD:  If we could go back to Exhibit 435,

3  which I believe is in evidence.  Get it back on the screen.

4  Q.  So the rejection campaign was your idea; right?

5  A.  No, it wasn't.

6  Q.  Well --

7  A.  I had no experience in Super Bowl advertising ever in my

8  life.

9  Q.  You told Mr. Abramoff it was your idea; right?

10  A.  I was as our umbrella and for Chet Fenster.  Chet was

11  asked by Mr. Abramoff, "What happens if we submit a perfectly

12  good advertisement and we're rejected?"  And Chet, in a --

13  trying to be humorous in a way, said, "Hey, several years ago

14  there was a case where it happened," and he told them about a

15  case where an advertiser had been rejected and then ran the

16  campaign as, "Hey, this is the ad that the Super Bowl

17  didn't" -- or "the NFL did not want you to see."

18     So I had no experience in this.  This was Chet's --

19  Q.  Okay.  Can you come back to my question?  My question was:

20  You told Mr. Abramoff it was your idea, didn't you?

21  A.  It's -- it's Chet's idea.  It's not my idea.

22        THE COURT:  His question is what you told

23  Mr. Abramoff.

24        THE WITNESS:  In this email?

25  \\\

1    BY MR. SHEPARD:

2    **Q.**    Yes.

3    **A.**    Yes, I'm taking credit for all of our team.

4    **Q.**    Okay.

5    **A.**    So, yes.

6    **Q.**    And --

7    **A.**    But he was -- he knew it was Chet.

8         THE COURT:  Just --

9         THE WITNESS:  Okay.  Sorry.

10        THE COURT:  Just answer his question.

11   BY MR. SHEPARD:

12   **Q.**    In your answer, you added that you were trying to be

13   humorous.  Is --

14   **A.**    No, I wasn't.  Chet was.

15   **Q.**    Chet was.  But you didn't say, when you passed this idea

16   along to Mr. Abramoff, that you were trying to be humorous, did

17   you?

18   **A.**    No, but Chet was -- Chet directly told him.

19        THE COURT:  Again, Mr. Bryan, just listen to the

20   question.

21        THE WITNESS:  Okay.

22        THE COURT:  The other counsel will ask you to

23   elaborate if they think it's appropriate.

24        THE WITNESS:  Okay.

25        THE COURT:  But answer his question.

 1          **MR. SHEPARD:**  I think we're done with this one, Ed.

 2   Thank you.

 3        And can we move on to 897.

 4   **Q.**   And just before I move on to 897 -- we can leave it up on

 5   the screen -- but when you suggested the rejection campaign to

 6   Mr. Abramoff, that was a communication just between you and

 7   Mr. Abramoff?  Marcus was not included; correct?

 8   **A.**   That's correct -- or it's not specifically correct.

 9   Mr. Fenster was on the phone as well.

10   **Q.**   Okay.  Marcus was not?

11   **A.**   Marcus was not.

12   **Q.**   And now we look at Exhibit 897.  This is the one where you

13   say -- or where we see the words "The written proposal will

14   pretend we are really buying a Super Bowl ad."

15   **A.**   That's correct.

16   **Q.**   Do you remember this one?

17        Yes.  And that's a communication between you and

18   Mr. Abramoff, and Marcus is not included; right?

19   **A.**   Correct.

20   **Q.**   And then let's go to Exhibit 434.  This is the one where

21   Mr. Abramoff proposes that you send a letter to Eric Olsen;

22   right?

23   **A.**   Yes.

24   **Q.**   Remember that?

25        And you now know that Eric Olsen is one of Mr. Andrade's

BRYAN - CROSS / SHEPARD

1  many lawyers; right?

2  **A.**  Yes.  I subsequently -- yes.

3  **Q.**  Okay.  And when Mr. Abramoff wrote to you to ask you to

4  write a letter to Mr. Olsen, he did not copy Marcus on it, did

5  you -- did he?

6  **A.**  No, he didn't.

7  **Q.**  And your response to Mr. Abramoff did not copy Marcus

8  either; right?

9  **A.**  No, it didn't.

10  **Q.**  A few more questions about the Super Bowl.

11      At one point you were willing to take AML BitCoin Tokens

12  and pay the -- pay NBC the $5 million yourself in cash; right?

13  **A.**  Not -- no, not myself.  It would have been AML BitCoin was

14  offered to pay 1 million in cash and they would receive

15  4 million in the AML BitCoin coins.  So they were offering to

16  accept 5 million in the form of 1 million in cash and 4 million

17  in coins.

18  **Q.**  That was definitely one thing that was discussed; right?

19  You remember discussing a million in cash and 4 million in

20  coins; correct?

21  **A.**  Yes.

22  **Q.**  There were many different possible ways --

23  **A.**  Absolutely.

24  **Q.**  -- that were talked about to pay for the ad.

25      That was one of them; correct?

BRYAN - CROSS / SHEPARD

1    **A.**    Yes, sir.

2    **Q.**    But another was that you were willing to take the

3    tokens -- maybe not you personally but your company -- willing

4    to take the tokens and pay NBC in cash; right?

5    **A.**    Yes.  But, again, that's not us.  That was Group M --

6    **Q.**    Okay.

7    **A.**    -- and the WPP organization that would barter the

8    transaction, and it's very common for them to do that.

9    **Q.**    But that was another proposal that you made to Marcus

10   and -- actually, let me back up.

11         That was another proposal that you made to AML BitCoin as

12   a way to pay, and that would be you or Group M would pay NBC in

13   cash and get paid in tokens in order to do so; correct?

14   **A.**    Exactly.

15   **Q.**    Okay.  And at one point, Mr. -- as I understand your

16   testimony, Mr. Abramoff told you that Marcus had decided that

17   "We will submit it knowing it will be rejected, and when it is

18   rejected, we'll do this rejection campaign"; right?

19   **A.**    Correct.

20   **Q.**    That's what Abramoff said to you; right?

21   **A.**    Yes.  Yes, he did.

22   **Q.**    And what Abramoff said was, "We know it'll be rejected,

23   and after it is rejected, we will do this rejection campaign";

24   right?

25   **A.**    Correct.

1  Q.   One subject related to the Super Bowl that you did include

2  Marcus on in your communications was efforts to get additional

3  funding -- another funding possibility for the ad; right?

4  A.   I'm not sure what you're referring to but --

5  Q.   Okay.

6        MR. SHEPARD:  Could we put up Exhibit 2105 just for

7  the witness, the parties, and the Court.

8  Q.   Do you see that, sir?

9  A.   Yes, I do.

10 Q.   And that is an email from Mr. Abramoff to you dated

11 January 29, 2018; correct?

12 A.   Yes, sir.

13 Q.   And it appears to be a true and correct copy of an email

14 chain that you received at that time?

15 A.   Yes, it is.

16        MR. SHEPARD:  I offer 2105.

17        MR. WARD:  No objection.

18        THE COURT:  2105 will be admitted.

19     (Trial Exhibit 2105 received in evidence.)

20        MR. WARD:  Is this just one page?

21        MR. SHEPARD:  This is one page.  I'm going to

22 separately mark what I believe to be the attachment, but this

23 is just one page.  That's all I've offered at this point.

24        MR. WARD:  No objection to this page.

25        THE COURT:  2105 has been admitted.

```
 1   BY MR. SHEPARD:

 2   Q.   And what this is, is a communication around a consulting

 3   agreement that was being used as a way to get funding from a

 4   man named Allan Migdall; correct?

 5   A.   Correct.

 6        MR. SHEPARD:   And now let's put up Exhibit 2106 just

 7   for the witness, the parties, and the Court.

 8   Q.   Do you recognize that as the agreement that was drafted

 9   and prepared for Mr. Migdall and Mr. Andrade?

10   A.   Yes, I do.

11        MR. SHEPARD:   I offer Exhibit 2106.

12        MR. WARD:   No objection.

13        THE COURT:   2106 will be admitted.

14        (Trial Exhibit 2106 received in evidence.)

15   BY MR. SHEPARD:

16   Q.   And this was a financing arrangement that you helped

17   facilitate; right?

18   A.   Yes.

19   Q.   Okay.  And you'll see on the second page Mr. Andrade's

20   signature.  There's no signature of Mr. Migdall; right?

21   A.   Correct.

22   Q.   So it became close but never got across the finish line;

23   right?

24   A.   Exactly.

25   Q.   When you were asked questions about the call center in the
```

**BRYAN - CROSS / SHEPARD**

 1    Philippines and the inaccurate statement that you made to

 2    Mr. Abramoff about the Philippines, you explained in answer to

 3    Mr. Ward's question that you made that statement because "They

 4    were putting pressure on me."  Do you remember that?

 5    **A.**   Yes.

 6    **Q.**   And we saw some communications between you and

 7    Mr. Abramoff where Mr. Abramoff was putting pressure on you;

 8    right?

 9    **A.**   Yes.

10    **Q.**   We didn't see anything in writing from Mr. Andrade putting

11    pressure on you, did we?

12    **A.**   No.

13    **Q.**   And so when you used the word "they," we're just relying

14    on your word that Mr. Andrade had anything to do with that;

15    right?

16    **A.**   Yes.

17    **Q.**   And, by the way, when you felt pressured by your very good

18    friend Mr. Abramoff, did you say to him, "Jack, don't -- you're

19    pressuring me"?

20    **A.**   No, I don't believe I did.

21    **Q.**   You just decided to lie to him instead?

22    **A.**   In that particular case, yes.

23    **Q.**   And you said you had this call center in the Philippines.

24    That was a common practice; right?

25    **A.**   What's a common practice?

**BRYAN - CROSS / SHEPARD**

1  **Q.**   Well, you used it with some frequency; right?

2  **A.**   Yes.  I had that in operation for quite some time.

3  **Q.**   And you said you sent them documentation relating to the

4  technology.  Did that include the white paper?

5  **A.**   Yes, and included all of the NAC and TrustVerify [sic] and

6  all of the other NAC-created documents.

7  **Q.**   Did you give them a purchase agreement, a purchase

8  agreement that would be required to acquire AML BitCoin Tokens?

9  **A.**   No, because this was not going to be a private sale.

10  There would be no private sales, so there would be no agreement

11  for that.

12  **Q.**   Okay.  I understand.  But you did give them the white

13  paper; right?

14  **A.**   I'm not sure if the white paper was included.  I --

15  possibly.  I think it was so nascent and so early, it doesn't

16  really say that much.  I think most of it was the presentation

17  material because it's so much more descriptive.

18  **Q.**   Sorry.  But you did say a moment ago that you did give him

19  the white paper.  Now you're not sure?

20  **A.**   I'm not totally certain, but I believe I probably would

21  have.

22  **Q.**   Okay.  And there was a reference to the price of

23  AML BitCoin Tokens possibly going to $1,350.

24  **A.**   Correct.

25  **Q.**   You have no idea who said that; right?

BRYAN - CROSS / SHEPARD

1  **A.**    I don't.

2  **Q.**    I'm now going to turn my attention to this

3  Project Sunshine.

4  **A.**    Yes, sir.

5  **Q.**    You were asked a number of questions about that.

6  **A.**    Okay.

7  **Q.**    The proposal was called an investor relations plan; right?

8  **A.**    Yes.

9  **Q.**    And Mr. Abramoff edited it with you; is that right?

10 **A.**    I think when we initially sent it to him, I don't think

11 he'd had an opportunity to see it yet, so I believe he did

12 comments in bold and underlined.

13 **Q.**    And so you sent it to Mr. Abramoff first; he made some

14 comments; and as far as you know, Mr. Andrade didn't see it

15 until after that; right?

16 **A.**    I have no idea.

17 **Q.**    Fair enough.

18      And I think you explained that there was this company

19 called Polyblock.

20 **A.**    Correct.

21 **Q.**    A very reputable company in the crypto space; right?

22 **A.**    Correct.

23 **Q.**    And they were going to be -- they were going to buy coins

24 and be a market maker in the coin; right?

25 **A.**    Correct.

**BRYAN - CROSS / SHEPARD**

1  Q.   And the strategy was to stimulate organic trading, meaning

2  trading by others; right?

3  A.   Right.  Yes.

4  Q.   And if we could go to Exhibit 902.  Just putting this back

5  up, this was used and shown to you on direct examination.  I'm

6  just trying to place it back for you.

7  A.   Yes, sir.

8  Q.   You were saying that there was buying and selling to show

9  some volume; right?

10  A.   Yes.

11  Q.   And some international exchanges require minimum volumes;

12  right?

13  A.   I don't know.  I'm not certain of that.  I don't --

14  Q.   Okay.

15  A.   Yeah.

16  Q.   And are you aware that some international exchanges offer

17  to buy and sell themselves in order to generate volume?

18  A.   Not -- I've never experienced that, so I can't -- I can't

19  say.

20  Q.   Okay.  And I think I understood your testimony on direct

21  to be that, when Mr. Ward was saying you wanted to increase the

22  volume and increase the price, and your answer would be

23  increasing volume could sort of -- it could affect the price --

24  A.   Yes.

25  Q.   -- right?

**BRYAN - CROSS / SHEPARD**

1  A.  Right.  Right.

2  Q.  But you weren't directly affecting the price.  You were

3  just increasing the volume in the hopes that it would impact

4  the price; right?

5  A.  Exactly.

6  Q.  Okay.  And ultimately, your view was that you couldn't

7  really do that effectively, given the small amount of money you

8  were given, and even that was just -- you had to buy the coins;

9  right?

10  A.  Exactly.

11  Q.  And, by the way, in terms of your participation in these

12  market-making activities, did the Government ever threaten you

13  with prosecution?

14  A.  Never.

15  Q.  And so you don't have any kind of agreement with

16  the Government; right?

17  A.  Never.

18  Q.  Okay.  Because you don't -- you don't feel you did

19  anything wrong; right?

20  A.  Right.  This is --

21  Q.  Okay.

22  A.  None of these activities were in the United States.  They

23  were all in offshore countries.

24  Q.  One of the things that you did in your dealings with

25  Mr. Abramoff and Mr. Andrade was that you sort of held yourself

1   out as being able to bring in really important, respected

2   entities like Morgan Stanley; correct?

3   **A.**   Correct.

4   **Q.**   And you thought that AML BitCoin agreed to give you those

5   250,000 tokens, which, as you noted, you had to pay for or

6   agree to pay for, they agreed to do that because you were

7   bringing organizations like Morgan Stanley to them; correct?

8   **A.**   Those coins they were giving to me, the 250,000, were not

9   for me.  I never took those.  They were all for specified

10  individuals, such as Polyblock and others who were given those

11  coins.

12  **Q.**   Okay.  But the reason you were able to get those coins for

13  Polyblock and others was because you were bringing

14  organizations like Morgan Stanley to AML BitCoin; correct?

15  **A.**   And Polyblock.  Really, Polyblock was the main player.

16  Polyblock was recommended to us by Morgan Stanley.

17  **Q.**   Okay.  Polyblock was definitely part of it, but you told

18  the FBI, didn't you, when you spoke to them in 2019, that

19  Marcus Andrade and Jack Abramoff agreed to provide those

20  250,000 AML BitCoin Tokens because you were bringing

21  organizations like Morgan Stanley to them?

22  **A.**   Correct.

23  **Q.**   And I think the way you described it was that you had a

24  lot of bait in the water; right?

25  **A.**   A lot of?

**BRYAN - CROSS / SHEPARD**

1    Q.   Bait, b-a-i-t.

2    A.   I -- I'm not sure exactly what I was referring to.

3    Q.   But you remember telling the FBI that you had a lot of

4    bait in the water in order to trigger that transfer of 250,000

5    AML BitCoin Tokens; right?

6    A.   I'm not sure if it's a typo.  I don't know what "bait in

7    the water" -- I don't know what I was referring -- I can't

8    remember what I was referring to.

9    Q.   Okay.  Have you ever gone fishing?

10   A.   Yeah.  Well, not really.  I'm not a fisherman.

11   Q.   Okay.  But you know enough about fishing to know that what

12   "bait in the water" is, it attracts the fish; right?

13   A.   Yes.  So you're referring to the coins as bait in the

14   water?

15   Q.   I'm referring to Morgan Stanley, the lure of Morgan

16   Stanley as bait in the water --

17   A.   I see.

18   Q.   -- to get --

19   A.   Now, I understand.  Yes.

20   Q.   -- Mr. Andrade and Mr. Abramoff to provide AML BitCoin

21   Tokens; right?

22   A.   Yes.

23   Q.   That's what happened; right?

24   A.   Yes.  I now understand the reference.

25   Q.   Sorry I wasn't clearer earlier, but thank you.

**BRYAN - CROSS / SHEPARD**

 1         And after you got the tokens, there wasn't a lot of

 2    movement in the volume of trading of AML BitCoin; correct?

 3    **A.**    No.

 4    **Q.**    Okay.

 5    **A.**    No.

 6    **Q.**    And -- and the trading, I think, as I understood it, you

 7    were quite active in observing it, but the trading was actually

 8    being done by this Quintin Miller at Polyblock --

 9    **A.**    Correct.

10    **Q.**    -- correct?

11    **A.**    He was the lead trader.

12    **Q.**    And in order to conceal the fact that he, Quintin Miller,

13    was not generating any volume at all, you told Abramoff that

14    all the visible trading on IDAX was due to Project Sunshine;

15    right?

16    **A.**    Could you repeat that?

17    **Q.**    Yeah.  You told Abramoff that all the visible trading on

18    IDAX was due to Project Sunshine; right?

19    **A.**    I -- I don't know what specific date that refers to.  I

20    can't say that that's blanket for months or weeks or days or

21    hours.

22    **Q.**    Yes, I understand that qualification, but my question to

23    you was:  At some point in time, you told Jack Abramoff that

24    all the visible trading on IDAX was due to Project Sunshine --

25    **A.**    Correct.

BRYAN - CROSS / SHEPARD

1  **Q.**   -- correct?

2  **A.**   And I believe on the specific date when I was saying that,

3  it was accurate.

4  **Q.**   Well, you remember when you talked to the FBI in 2019, you

5  said that you falsely claimed to Abramoff that all the visible

6  trading on IDAX was due to Project Sunshine?

7  **A.**   Right.

8  **Q.**   Do you remember telling the FBI that?

9  **A.**   Yes, I did.

10  **Q.**   Okay.  So that was another false statement that you made

11  to your very close friend Jack Abramoff; right?

12  **A.**   No.

13  **Q.**   Okay.  Mr. Bryan --

14        **THE COURT:**  Oh.

15        **A JUROR:**  Can I get a repeat?

16        **THE COURT:**  Certainly.

17        **A JUROR:**  Sorry.  I couldn't hear.

18        **THE COURT:**  Certainly.  Actually, why don't we just

19  have the court reporter read back the question and the answer.

20     (Record read as follows:

21     ▪**QUESTION:**  Do you remember telling the FBI that?

22     ▪**ANSWER:**  Yes, I did.

23     ▪**QUESTION:**  Okay.  So that was another false statement

24     that you made to your very close friend Jack Abramoff;

25     right?

1    **"ANSWER:** No.")

2        **A JUROR:** The question before that.

3    (Record read as follows:

4    **"QUESTION:** Well, you remember when you talked to the FBI

5    in 2019, you said that you falsely claimed to Abramoff

6    that all the visible trading on IDAX was due to

7    Project Sunshine?

8    **"ANSWER:** Right.

9    **"QUESTION:** Do you remember telling the FBI that?

10   **"ANSWER:** Yes, I did.

11   **"QUESTION:** Okay. So that was another false statement

12   that you made to your very close friend Jack Abramoff;

13   right?

14   **"ANSWER:** No.")

15       **MR. SHEPARD:** And was it me who you couldn't hear or

16   was it Mr. Bryan? Just so we know.

17       **A JUROR:** I couldn't hear you very clearly.

18       **MR. SHEPARD:** Okay. Thank you for letting me know.

19   **Q.** And do you recall telling Abramoff that you had previously

20   used several different companies to market manipulate?

21   **A.** He liked to call it that. I was using those terms very

22   loosely.

23   **Q.** But you do remember telling him that; right?

24   **A.** Yes, I think -- I did tell him. I probably used that

25   language.

**BRYAN - CROSS / SHEPARD**

1  Q.   And that was also a lie; right?

2  A.   I don't know what -- whether -- I don't know what that

3  specific reference was to, so I can't say whether it was

4  accurate or not.

5  Q.   Okay.  Well, do you remember when you talked to the FBI in

6  2019, you were trying to tell them the truth?  Right?

7  A.   Yes.

8  Q.   And you told them that you may have told Abramoff that he

9  had previously used several -- "he," meaning you -- had

10  previously used several different companies to market

11  manipulate but that was a lie?  Do you remember telling them

12  that?

13  A.   Yes, I do.  And --

14  Q.   Okay.

15  A.   Yes, I do.

16  Q.   And you sent text messages to your very close friend

17  Jack Abramoff claiming credit for market making when, in fact,

18  what had happened was organic and unpredictable price

19  increases; right?

20  A.   Yes.  I don't know which specific things, but I think,

21  yes, that's correct in certain cases.

22  Q.   And at the time you were telling these lies, you were

23  thinking that if Abramoff and Marcus had the slightest amount

24  of expertise, they would have realized that your lies were

25  changing over time, but they didn't; right?

**BRYAN - CROSS / SHEPARD**

1   **A.**  Well, I don't know what you're specifically referencing,

2   but, you know -- I don't know what that means.  You'd have to

3   be more specific.

4   **Q.**  Okay.  Well, I'll try to be more specific.  But do you

5   remember thinking "These people aren't sophisticated enough to

6   figure out I'm lying to them"?  Do you remember thinking that?

7   **A.**  No.  I thought Jack was very sophisticated, and I thought

8   Marcus was pretty sophisticated.  So I may have thought that in

9   certain aspects, but I don't think I thought that generally --

10   **Q.**  Okay.  Let's --

11   **A.**  -- throughout everything.

12   **Q.**  Let's go back to when you spoke to the FBI in 2019.

13   **A.**  Okay.

14   **Q.**  You told them that if Abramoff and Andrade had the

15   slightest amount of expertise, they would have realized that

16   your lies were changing over time.  That's what you told them,

17   didn't you?

18   **A.**  Yes, I did.

19   **Q.**  Okay.  And you also thought at the time that Quintin

20   Miller was lying to you about his trading activity, didn't you?

21   **A.**  I did.  I suspected it.

22   **Q.**  Because you asked him for backup about what he was doing

23   and he never supplied it to you; right?

24   **A.**  That's exactly correct.  I asked him for the trading

25   statements.

**BRYAN - CROSS / SHEPARD**

1    **Q.**    Okay.  And when you were discussing the details of the

2    self-trading that Mr. Ward was asking you about, you were lying

3    to Abramoff about that as well, weren't you?

4    **A.**    In what regard?  I'm not sure I understand the question.

5    **Q.**    You were creating a problem that you could claim to solve,

6    but in reality, you thought it would just solve itself.  Do you

7    remember that?

8    **A.**    Yes.  I mean, are you referring to the intercompany trades

9    that --

10    **Q.**    Yes.

11    **A.**    -- Quintin was doing?

12    **Q.**    Yes.

13    **A.**    And what are you referring to?  I'm sorry.

14    **Q.**    I'm saying that you were creating a problem.  That is, you

15    were telling Mr. Abramoff that AML BitCoin needed to do certain

16    things.  You created that problem and you could claim to solve

17    it; but in reality, it would just solve itself.  Do you

18    remember that?

19    **A.**    Yes, but I don't see how it applies in this particular

20    case.  I don't know if my statement was applying to that

21    particular situation.

22    **Q.**    Well, you remember talking to the FBI in 2019?

23    **A.**    Yes.

24    **Q.**    And telling them that when you were discussing the details

25    of the self-trading with Abramoff, you were actually just lying

1    to Abramoff?  Do you remember telling the FBI that?

2    **A.**   Yes, I did, but it's not related to that point in time.  I

3    don't believe these points in times are similar.

4        So when I was talking to Abramoff in the specific examples

5    that were discussed here, I believe I was watching the trading

6    and I saw Quintin doing the trading.  So there was times when

7    it was very accurate and times when I suspected it wasn't.

8    **Q.**   And times that you admit lying to Abramoff about what was

9    happening; correct?

10   **A.**   I think that, occasionally, when Quintin would tell me

11   certain things would happen, I'd relay it; and then later on

12   I'd say, "Gosh, why didn't you give me the statements?"  And

13   I'd suspect that it wasn't true.

14       So I had, in many cases -- some cases, inadvertently taken

15   credit for something that I subsequently didn't believe

16   happened.

17   **Q.**   That's not how you explained it to the FBI, though, is it?

18   **A.**   Well, I don't think we went into that much detail.

19   **Q.**   You said to the FBI, when you were discussing the details

20   of the self-trading with Abramoff, you were actually just lying

21   to him?

22   **A.**   Yes, but there's no --

23   **Q.**   Isn't that what you said?

24   **A.**   -- point in time related --

25          **THE COURT:**  There's no arguing back and forth.

1          **THE WITNESS:**  Sorry.

2          **THE COURT:**  Question, answer, question.

3    **BY MR. SHEPARD:**

4    **Q.**    And you routinely misrepresented your role in the AMLB

5    token market by taking unjustified credit and placing

6    unjustified blame; correct?

7    **A.**    I -- I would say that in certain cases.

8    **Q.**    Routinely, you did that; correct?

9    **A.**    At certain times.

10   **Q.**    Routinely, at certain times?

11   **A.**    Right.  So on a specific day, I might have been taking

12   credit for something that we later found out wasn't accurate.

13   **Q.**    Well, you didn't say to the FBI you later found out that

14   your statements were inaccurate.  You said you were lying,

15   didn't you?

16   **A.**    Yes, I did.  And on certain occasions, I did specifically

17   misrepresent.  So that is accurate.

18   **Q.**    And the reason that you kept lying to Abramoff is because

19   he was the gatekeeper to your payments and you were

20   manipulating your very close friend in order to secure

21   payments; right?

22   **A.**    I think this was well after receiving the payment.  We

23   never received subsequent payments.  So this was -- I believe

24   that the engagement took place in March.  This is May and June

25   when the trading started.  So it's at a different point in

**BRYAN - CROSS / SHEPARD**

1    time.  Our payments started in March.

2    **Q.**   Do you remember, when you were talking to the FBI in 2019,

3    you said you did this because Abramoff was the gatekeeper to

4    Bryan's payments and you manipulated Abramoff to secure your

5    payments?  Do you remember that?

6    **A.**   Yes, but --

7    **Q.**   You remember saying that; yes?

8    **A.**   It's -- it's -- I don't believe that that's strictly

9    accurate, to be honest.

10   **Q.**   You did say it, but it wasn't accurate?

11   **A.**   Well, it's not at the same time.  My payments took place

12   in March, and the trading doesn't start till May.

13   **Q.**   Okay.  Did you or did you not say that you did this

14   because Abramoff was the gatekeeper to your payments and you

15   manipulated Abramoff to secure your payments?  Did you say that

16   to the FBI or not?

17   **A.**   Yes, but what I was referencing was wanting to get

18   additional payments, not to the payments that had already been

19   made.

20   **Q.**   Okay.  So you did tell that lie; you just say it was at a

21   different time?

22   **A.**   Correct.

23        **MR. SHEPARD:**  Okay.  And if we could go to Government

24   Exhibit 1069.  I'm not sure this one is in evidence, so please,

25   just for now, to the parties, the witness, and the Court.

1          **THE COURTROOM DEPUTY:**  It was admitted.

2          **MR. SHEPARD:**  It is?

3      Yes.  Okay.  It is in evidence.  So I guess we can just

4  put it up.

5      Give me one moment, please.

6                    (Pause in proceedings.)

7          **MR. SHEPARD:**  Okay.  If we go to the second page,

8  please, Ed.

9      I'm afraid mine is paginated a little differently.  Hold

10  on one second.  Try the next -- try scrolling down.

11      Yeah, there it is.  Thank you, Ed.  Thanks for bearing

12  with me there.

13      If you'd highlight for us the first -- I guess it's the

14  second paragraph that starts "The fact is."

15  **Q.**  And just to put this in context, this is in April of 2018,

16  and you were writing to Jack Abramoff and you were talking

17  about what was going on with Morgan Stanley.  And you told

18  Mr. Abramoff [as read]:

19          "The fact is that we have made great progress

20      over the past two weeks, both in terms of reaching

21      out to the Morgan Stanley players, 'socializing' the

22      AML opportunity, and digging deep into the play.  We

23      only need a few more pieces to finalize our effort to

24      get scheduled" -- "and get scheduled."

25      Right?

1   **A.**   Yes.  This is all written by John Langdon, but, yes, this

2   is accurately reflecting his comments.

3   **Q.**   Okay.  And Mr. Abramoff -- well, okay.

4         **MR. SHEPARD:**  If we can go to Exhibit 2221, just the

5   parties, the witness, and the Court.

6   **Q.**   And this is communication between you and Mr. Abramoff;

7   correct?

8   **A.**   Yes.

9   **Q.**   And it's dated April 12, 2018?

10  **A.**   Correct.

11  **Q.**   And it appears to be a true and correct copy of your

12  communications with Mr. Abramoff at that time?

13  **A.**   Yes, it does.

14        **MR. SHEPARD:**  I offer 2221, Your Honor.

15        **MR. WARD:**  No objection.

16        **THE COURT:**  2221 will be admitted.

17      (Trial Exhibit 2221 received in evidence.)

18  **BY MR. SHEPARD:**

19  **Q.**   And what is going on here is that you and Mr. Abramoff

20  are, together, drafting an email; correct?

21  **A.**   Sorry.  What's the question?  I apologize.

22  **Q.**   You're working with Mr. Abramoff to draft an email;

23  correct?

24  **A.**   Correct.

25  **Q.**   And Abramoff says [as read]:

1          ". . . the draft was very well done, but I did

2       tweak it a bit.  Marcus is intimidated being near/in

3       this world and would be mortified if he knew that I

4       conveyed his hissy fits."

5       Right?

6   A.   Yes.

7   Q.   And with that, he makes a suggested edit in the document;

8   right?

9   A.   Yes.

10          MR. SHEPARD:  If we can put up Exhibit 2253, please,

11  again, just to the parties, the witness, and the Court.

12  Q.   Take a minute to take a look at that, and then I'll ask

13  you if you can identify it.

14  A.   (Witness examines document.)

15  Q.   That appears to be an internal memorandum going between

16  you and Mr. Langdon and Mr. Getz.  Or it's just going between

17  you and Mr. Langdon?

18  A.   Yes.  And we sent it out to lots of other people, but yes.

19  Q.   Okay.  And this relates to The Watley Group's approach to

20  supporting and facilitating the NAC Foundation; correct?

21  A.   Right.  And AML BitCoin.

22  Q.   And -- yes.  And AML BitCoin, correct.

23          MR. SHEPARD:  I offer Exhibit 2253.

24          MR. WARD:  Objection.  This is hearsay.

25          MR. SHEPARD:  Not being offered for the truth,

BRYAN - CROSS / SHEPARD

1  Your Honor.

2         **THE COURT:**  It's being offered, therefore, for what

3  relevant purpose?

4         **MR. SHEPARD:**  It's being offered to show how they were

5  setting things up to impress the AML BitCoin people so that

6  they could get money out of them.

7         **THE COURT:**  I'll admit it on that basis.

8      (Trial Exhibit 2253 received in evidence.)

9         **MR. SHEPARD:**  So, Ed, if we could go on the first page

10  there, underneath the heading "ABTC Trading Support," and

11  highlight the first two paragraphs underneath that heading.

12  **Q.**   And this is sort of your internal strategy discussions;

13  correct?

14  **A.**   Yes.

15  **Q.**   And --

16  **A.**   But not just extern- -- internal.  It's internal at this

17  point in time, but it's for external distribution.

18  **Q.**   You're working on it for eventual distribution?

19  **A.**   Correct.

20  **Q.**   Like we all do from time to time.  Just sorting it out

21  internally and then it's going to go out after that; right?

22  **A.**   Correct.

23  **Q.**   You say [as read]:

24          "Providing NAC with relationships and potential

25      partnerships with some key players will facilitate

1          NAC's token and coin offering."

2          Correct?

3     A.   Which paragraph?

4     Q.   I'm sorry.  That's --

5     A.   Ah, there we go.

6          MR. SHEPARD:  Thank you, Ed.

7          THE WITNESS:  Yes.

8     BY MR. SHEPARD:

9     Q.   And then at the start of the next paragraph, you say [as

10    read]:

11          "These relationships are coming from you, from

12    John Langdon (formerly with KKR), and George Getz and

13    the Morgan Stanley" --

14    That "MS" refers to Morgan Stanley; correct?

15    A.   Correct.

16    Q.   [As read]:

17    -- "the Morgan Stanley relationship ecosystem."

18    A.   Correct.

19    Q.   Right?  Because George Getz was at Morgan Stanley and he

20    had a lot of connections with other impressive people; correct?

21    A.   Well, yes.  He's managing money there.  He's a money

22    manager and a fund manager, so he's responsible for

23    investments.

24    Q.   And this is part of what you were offering to AML BitCoin

25    in order to get their business; correct?

1  **A.**    I don't think we were -- this had nothing to do with a

2  proposal for getting their business.  This was a -- this was

3  our concept, outline of our concept of how to do this properly.

4  **Q.**    Well, it was a concept --

5  **A.**    I don't believe anywhere in here do we say an offer to

6  hire us.  This is just a concept for how to approach the

7  upcoming initial trading of the coin.

8  **Q.**    Okay.  And it was a concept that you wanted to communicate

9  to AML BitCoin to make sure that they would continue to engage

10  you and to continue to do business with you; correct?

11  **A.**    Well, I believe we were already engaged, so -- we were

12  engaged to do exactly this.

13  **Q.**    And you wanted to continue and continue to get funding

14  from them; correct?

15  **A.**    Well, we'd already been paid only for two months, and that

16  was all we were due.  So they had paid us for two months, and

17  now we were on the -- we had to work for another six for free.

18  **Q.**    And part of that six months that you worked for free was a

19  conference in Washington, D.C.?

20  **A.**    Yes, strategic planning seminar.

21  **Q.**    And that was also leveraging some of these important

22  people, like George Getz, John Langdon, who's a -- I guess he's

23  in private equity of Allied Wealth Partners; is that right?

24  **A.**    KKR.

25  **Q.**    Oh, and also KKR.

**BRYAN - CROSS / SHEPARD**

1    **A.**    The biggest --

2    **Q.**    Yes.  Okay.

3    **A.**    -- fund in the world at the time.

4    **Q.**    Yeah.  And I think you described KKR on your direct

5    examination, but just, can you explain what KKR is?

6    **A.**    Kohlberg Kravis & Roberts, which is a private equity firm,

7    which probably at the time or over the years, has been one of

8    the most famous in the world.  And John worked there for many

9    years.

10   **Q.**    Mr. Abramoff told you that the coin had already been

11   developed; correct?

12   **A.**    I'm not sure exactly what you mean.

13   **Q.**    Okay.  You had described some information that you say you

14   learned as you were learning about AML BitCoin, and I was

15   asking you if Abramoff had said the coin was already developed.

16   **A.**    Well, they had software teams developing different

17   portions of it.  I mean, I can --

18   **Q.**    Okay.  So some of it was still being developed?

19   **A.**    Some of it was under development, yes.

20   **Q.**    Okay.  And --

21   **A.**    Some of it had been developed, and some of it was under

22   development.

23   **Q.**    And you learned that from --

24   **A.**    Excuse me for --

25   **Q.**    That's okay.

**BRYAN - CROSS / SHEPARD**

1      And you learned that from Mr. Abramoff; correct?

2   **A.**   And -- no.  He occasionally would bring in some of the

3   technology people on conference calls.  We had some calls with

4   some of the experts.

5   **Q.**   Okay.  I understand.  Thanks.

6      I think you mentioned on direct examination that Marcus

7   had told you that AML BitCoin had sold about 70 million tokens.

8   **A.**   I believe it was a hundred.

9   **Q.**   A hundred.  Okay.

10  **A.**   At 70 cents.

11  **Q.**   Okay.  I thought I asked you 70 million tokens, but it

12  sounds like you might have interpreted it as dollars.

13  **A.**   I didn't -- maybe I just didn't understand.  Sorry.

14  **Q.**   Okay.  So a hundred million tokens, $70 million?

15  **A.**   Correct.

16  **Q.**   Okay.  When you spoke to the Government yesterday, you

17  told them 75 million; right?

18  **A.**   I don't know if it was 70 cents or 75.  I can't remember

19  that precisely, but I believe it was 70.

20  **Q.**   Okay.

21  **A.**   I might have said --

22  **Q.**   But my question was --

23  **A.**   -- 75.

24  **Q.**   -- when you told the Government -- when you talked to the

25  Government about this same question yesterday, you told them

**BRYAN - CROSS / SHEPARD**

1  75; correct?

2  **A.**   I -- I'm not sure.  It might have been in error or written

3  down wrong, because I'm not sure exactly what I said.

4  **Q.**   You're not sure if you said that or not.  You might have

5  said it?

6  **A.**   It's possible.  But I've got my own documents that I

7  referred to that show me 70 cents for a hundred million and the

8  total revenue of that being $70 million.

9  **Q.**   When you spoke to the FBI in 2019, you told them

10  60 million; right?

11  **A.**   Dollars?

12  **Q.**   You said they had raised $60 million?

13  **A.**   That's possible.

14  **Q.**   And when you talked to the FBI last year, you said that

15  Marcus claimed to have raised millions of dollars in the ICO;

16  correct?

17  **A.**   I don't -- I don't -- I mean, yes, I could have referred

18  to it as millions of dollars.

19  **Q.**   In the times that you did deal directly with Marcus, your

20  impression was, when there's an issue that he doesn't

21  understand very well, he doesn't want to seem like he doesn't

22  understand it so he doesn't ask the questions he should be

23  asking; right?

24  **A.**   That's -- I could very well have said that.  I don't know

25  what specific conversation but --

**BRYAN - CROSS / SHEPARD**

1  **Q.**  But that was your --

2  **A.**  Yes.

3  **Q.**  That's your impression of --

4  **A.**  It was an impression, one of my impressions.

5  **Q.**  And from time to time, he would say strange things to you,

6  didn't he?

7  **A.**  Yes.

8  **Q.**  He told you at one point that he was requesting a

9  congressional investigation into the Government's investigation

10  of him.  Remember that?

11  **A.**  I don't remember it right now, but it --

12  **Q.**  Sounds about right?

13  **A.**  Yeah.  Something.

14  **Q.**  He told you he was writing a letter to Attorney -- then

15  Attorney General William Barr requesting appointment of a

16  special prosecutor.  Do you remember that?

17  **A.**  I don't specifically remember that but...

18  **Q.**  It sounds like things he said?

19  **A.**  It sounds conceivable.

20  **Q.**  And he said he would tell you more because he was looking

21  for a person to confide in?  Do you remember that?

22  **A.**  Yes.

23  **Q.**  One of the duties that you were engaging in for

24  AML BitCoin was sort of related to what people in the corporate

25  world call a turnaround; right?

1  **A.**   No.  We never -- this was never a -- our turnaround

2  business is completely different.

3  **Q.**   You remember when you talked to the FBI in 2019 saying

4  your duties for AML BitCoin were all related to the turnaround

5  of AML BitCoin?

6  **A.**   After the trading started, trying to get a turn- -- I

7  wasn't referring to that as turnaround the way we do business

8  turnaround, but to reverse the downslide of the coin, the price

9  of the coin.

10 **Q.**   My question was:  You said to the FBI that your duties for

11 AML BitCoin were all related to the turnaround of AML BitCoin?

12 **A.**   Yes.

13 **Q.**   And that -- you did say that?

14 **A.**   I misunderstood, when you said that, what you meant.

15 **Q.**   Okay.  And you had observed that AML BitCoin had wasted a

16 significant amount of money on bad suppliers and other things;

17 right?

18 **A.**   Yes.

19 **Q.**   And you also learned that a year before September of 2018,

20 Marcus was spending money on the system but the people working

21 on it were idiots?

22 **A.**   That's correct.  Or that was my impression, and I believe

23 Marcus told me that.

24 **Q.**   You said to the -- when you reported that to the FBI, you

25 didn't say you got that from him; right?

BRYAN - CROSS / SHEPARD

1   **A.**   I don't -- I don't think so but...

2   **Q.**   Okay.  And I think what you -- what you did say -- and let

3   me ask you just more directly.

4        He hired three different software companies to build parts

5   of the gateway; right?

6   **A.**   Correct.

7   **Q.**   And you didn't think that was a good idea, did you?

8   **A.**   It wasn't whether I thought it was a good idea or not.

9   Marcus communicated that to me and said, "I made a mistake and

10  I had to replace them."  So it was really my hearing Marcus

11  talk about it.

12  **Q.**   Okay.  So he was making mistakes and trying to learn from

13  them --

14  **A.**   Correct.

15  **Q.**   -- correct?

16  **A.**   Yeah.

17  **Q.**   And when you went to London -- you went to London; right?

18  **A.**   Yes, I did.

19  **Q.**   And you met with the team there?

20  **A.**   Yes, I did.

21  **Q.**   When was that?

22  **A.**   You know, I have just no idea.  I'd have to really look

23  that up.  I'm just not sure.

24  **Q.**   2018, while you were doing this other work for

25  AML BitCoin?

1   **A.**   Yes, yes, but I don't know specifically which month even.

2   **Q.**   And your impression of the team there was that they didn't

3   understand how markets and banks work and they were too naive

4   to understand what the banks wanted; right?

5   **A.**   Correct, among -- among other comments.

6   **Q.**   And you also expressed concern about Marcus's paranoia and

7   being scared all the time.  Remember that?

8   **A.**   Yes, I do.

9   **Q.**   And you thought his organization was disorganized and not

10  ready to execute effectively; correct?

11  **A.**   Yes, I did.

12  **Q.**   The one thing that did impress you was the patents; right?

13  **A.**   Yes.

14  **Q.**   They were broad and significant; right?

15  **A.**   I believed so.

16  **Q.**   And speaking of London, the operation there was headed by

17  Richard Naimer; correct?

18  **A.**   I don't remember.  I thought he lived in Israel.  I mean,

19  I don't think he was directly -- I'm not certain.  But I don't

20  believe he lived in London.  He possibly was supervising it

21  from afar.

22  **Q.**   Okay.  That's fine.

23       And you were asking him for information, but he didn't

24  give it to you; right?

25  **A.**   No.

**BRYAN - CROSS / SHEPARD**

1  **Q.**  I am correct that you asked and he didn't give it;

2  correct?

3  **A.**  Yes.  I'm not sure which information you're specifically

4  referring to, but sometimes he didn't.

5  **Q.**  Yes.  There was information you asked for that he didn't

6  give?

7  **A.**  There was some information I asked for that he didn't

8  give, correct.

9      **MR. SHEPARD:**  And on the subject of requesting

10  information, if we could just briefly put up Exhibit 1069.

11  I believe this is in evidence also.

12  **Q.**  You looked at this an hour or two ago.  It probably seems

13  like forever to you but...

14      This was an occasion on which you were complaining about

15  not getting information.  You remember?

16  **A.**  In the bottom email?

17  **Q.**  Yes.

18  **A.**  Yes.

19  **Q.**  And your complaint was made to Mr. Abramoff; correct?

20  **A.**  Yes, it was.

21  **Q.**  You did not copy Mr. Andrade; correct?

22  **A.**  No, I didn't.

23  **Q.**  And I think, ultimately, you said you did get information

24  but it was too slow to be useful to you.  Your opportunity had

25  passed.  Correct?

**BRYAN - REDIRECT / WARD**

1  A.   Certain -- the people that had requested information

2  didn't get information, so they passed.

3          **MR. SHEPARD:**  If I may have a moment, Your Honor.

4                  (Pause in proceedings.)

5          **MR. SHEPARD:**  Thank you, Mr. Bryan.

6      I don't have anything further.

7          **THE WITNESS:**  Thank you.

8                  <u>**REDIRECT EXAMINATION**</u>

9  **BY MR. WARD:**

10  **Q.**   Mr. Bryan, Mr. Shepard asked you about meetings with

11  Mr. Andrade.  Did you travel to Houston and meet with

12  Mr. Andrade?

13  **A.**   Yes.  I don't know how many times, but yes, I did.

14  **Q.**   And when you met with Mr. Andrade, was Mr. Andrade

15  specifically telling you about AML BitCoin and the technology

16  and the business?

17  **A.**   Yes, he was.

18          **MR. WARD:**  Can we bring up Exhibit 434.

19  **Q.**   Mr. Bryan, is this the draft letter that Mr. Abramoff

20  asked you -- that letter that Mr. Abramoff asked you to draft?

21  **A.**   Yes, it is.

22  **Q.**   Mr. Shepard asked you whether you drafted this just for

23  Mr. Abramoff.  Can you -- do you know what Mr. Abramoff --

24          **MR. SHEPARD:**  I object to his --

25  \\\

1    BY MR. WARD:

2    Q.   Do you know what Mr. --

3              MR. SHEPARD:  -- characterization.

4              THE COURT:  Wait, wait.

5         What's the objection?

6              MR. SHEPARD:  I object to Mr. Ward's characterization

7    of what I asked.  I don't think he -- I don't think it's

8    necessary to his question.

9              THE COURT:  All right.  Just ask the question.

10   BY MR. WARD:

11   Q.   Mr. Bryan, do you know what Mr. Abramoff did with this

12   letter?

13   A.   He gave it to -- according to what he told me, he gave it

14   to Mr. Andrade.

15   Q.   And did he write to you [as read]:

16             "I am getting to Marcus and he'll get it to his

17        lawyer"?

18   A.   Correct.

19   Q.   All right.  Mr. Shepard asked you a number of questions

20   about paying for the Super Bowl ad.  Do you remember that?

21   A.   Yes.

22   Q.   Was there any payments ever made for any Super Bowl ad?

23   A.   No.

24   Q.   And when you were speaking to Mr. Abramoff, did you --

25   what did you understand the plan was in regards to the

BRYAN - REDIRECT / WARD

1   Super Bowl ad?

2   **A.**   That they had decided to pursue the rejection campaign, as

3   we called it.

4   **Q.**   And did you discuss that with Mr. Andrade?

5   **A.**   On -- he was on conference calls during many of those

6   conversations -- or some of those conversations.

7   **Q.**   Based on your conversations in those conference calls,

8   what did Mr. Andrade understand about the Super Bowl plan?

9           **MR. SHEPARD:**  Objection.

10          **THE COURT:**  Sustained.

11  **BY MR. WARD:**

12  **Q.**   Mr. Shepard asked you about the Project Sunshine plan, and

13  he said that "We're relying on your word that you worked with

14  Marcus Andrade on this."  Do you remember that?

15  **A.**   Yes.

16          **MR. WARD:**  Can we bring up Exhibit 817, please.  This

17  has not been admitted.

18          Sorry.  418.  Excuse me.

19  **Q.**   Do you see this email, Mr. Bryan?

20  **A.**   Yes, I do.

21  **Q.**   Is this an email --

22  **A.**   Yes, I do.

23  **Q.**   Is this an email from you at The Watley Group?

24  **A.**   Yes, it is.

25  **Q.**   And do you see the individuals on the "to" line?

1   **A.**   Yes, I do.

2   **Q.**   Does that include Marcus Andrade and others?

3   **A.**   Yes, it does.

4   **Q.**   And then looking below in this email, are there

5   communications from Mr. Andrade prior to this?

6   **A.**   Yes.

7          **MR. WARD:**  The Government would move to admit

8   Exhibit 418.

9          **MR. SHEPARD:**  No objection.

10         **THE COURT:**  418 will be admitted.

11     (Trial Exhibit 418 received in evidence.)

12         **MR. WARD:**  All right.  Can we highlight the top part

13  in the first email.

14     Down with the email too.

15  **Q.**  Mr. Bryan, do you see this email?  Do you see where it

16  says "Attachments:  Project Sunshine"?

17  **A.**  Yes, I do.

18  **Q.**  And then you write [as read]:

19         "As discussed yesterday, attached is the

20     overview of our marketing campaign for tokens."

21     What does that refer to?

22  **A.**  I believe that refers to the Project Sunshine proposal

23  that had been reviewed by all the parties.

24  **Q.**  All right.  And did you send this to all the people on

25  this email, including Marcus Andrade?

BRYAN - REDIRECT / WARD

1    **A.**    Yes, I did.

2    **Q.**    And Melissa Foteh?

3    **A.**    Yes.

4    **Q.**    And Jack Abramoff?

5    **A.**    Yes.

6    **Q.**    You testified on cross that the market manipu- -- the

7    market-making activities you engaged with were -- Mr. Shepard

8    asked you whether you were ever prosecuted for them, and you

9    said they were all offshore.

10        Why was that important and significant that they were all

11    offshore?

12    **A.**    Offshore of the United States meant that they were not

13    regulated by the U.S. SEC, FINRA, or any other regulatory

14    agency.

15    **Q.**    Okay.  Mr. Shepard asked you questions about the trading

16    that was done through Polyblock in the AML BitCoin shares.

17    **A.**    Yes.

18    **Q.**    To your knowledge, was Polyblock trading AML BitCoin

19    shares?

20    **A.**    Yes.

21    **Q.**    And was that trading, in your view, effective in pushing

22    up the price?

23    **A.**    The trading included actual buying.  They were buying on

24    their own account.

25    **Q.**    But my question was:  Was that -- was that trading for

1  their own account, was that effective?

2  **A.**  Yes, because it effectively stopped the price from going

3  down faster.

4  **Q.**  Well, Mr. Bryan, you've said, in fact, it wasn't

5  effective.

6  **A.**  Well, it wasn't effective because according to the

7  objectives, the price kept going down; but if they hadn't been

8  buying, it would have gone down much faster.  So it was

9  effective in -- in delaying the downward slide.

10  **Q.**  And Mr. Shepard asked you about what you told the FBI in

11  2019.

12      Did you tell the FBI you were trying to conceal the fact

13  that Miller's plan wasn't working by claiming that the natural

14  trading was?

15  **A.**  It wasn't -- it wasn't achieving the effect and the goals

16  that Jack and Marcus had.

17  **Q.**  And so you lied to them about that to try to make it

18  appear more effective?

19  **A.**  I exaggerated the impact that we were having, and -- but

20  it still -- the price was going down.  So, I mean, at the end

21  of the day, there was no way we could fight all of the sellers.

22  We had no way to succeed.

23  **Q.**  And so you misled Mr. Abramoff and Mr. Andrade about the

24  success of that plan?

25  **A.**  Well, I don't believe that they thought it was successful,

1    so -- because it was going down.  So they were complaining

2    about how fast it was going down.  And we weren't lying to say,

3    "No, it's actually going up."  It was saying to them, "This is

4    the best we can do."

5        And we are taking credit -- when I'm saying "we're taking

6    credit for the organic trading," yes, we were taking credit for

7    things that were not organically us, but I do believe we were

8    very effective in slowing down the downward spiral.

9    **Q.**    But you told the FBI that you misled Mr. Abramoff and

10   Mr. Andrade about the success of their plan?

11   **A.**    Right.  But --

12           **MR. SHEPARD:**  Objection.

13           **THE COURT:**  This has --

14           **MR. WARD:**  Thank you.

15           **THE COURT:**  This has been covered and covered --

16           **THE WITNESS:**  Yes.

17           **THE COURT:**  -- and covered.

18           **THE WITNESS:**  Yes.

19           **MR. WARD:**  All right.

20           **THE COURT:**  Time to move on.

21           **MR. WARD:**  Let's pull up Exhibit 1069, please.

22   **Q.**    Looking at this exhibit, Mr. Shepard asked you about this.

23       The email below, were those the concerns that you raised

24   with Mr. Abramoff about your struggles in raising any

25   institutional interest in AML BitCoin?

1  **A.**   Correct.  This was dated three or four weeks before

2  trading started, and we were trying to get a very successful

3  initial start to trading and getting the institutions involved,

4  and this prevented us from getting that done.

5          **MR. WARD:**  All right.  And let's back out of this.

6  **Q.**   And you see this was forwarded to Mr. Andrade?

7  **A.**   Yes.

8  **Q.**   And did you express to Mr. Andrade your frustrations in

9  trying to get institutional interest in AML BitCoin?

10 **A.**   Yes.

11 **Q.**   And did you tell Mr. Andrade that you needed more

12 financial information and technology information and

13 information about the company in order to gain interest?

14 **A.**   Yes.  Most of that was conducted by John Langdon, and John

15 was asking for all types of information:  technical,

16 financial, everything.

17         **THE COURT:**  Okay, okay.  Just answer the question.

18 **BY MR. WARD:**

19 **Q.**   And in the end, did Marcus Andrade ever provide you with

20 the financial or technical or business information that you

21 needed?

22 **A.**   No.  We did not get --

23         **THE COURT:**  You answered it "No."

24         **THE WITNESS:**  Yes.

25         **THE COURT:**  That's good.

BRYAN - RECROSS / SHEPARD

1      Next question.

2  **BY MR. WARD:**

3  **Q.**   And were you ever able to finalize any deals with anyone

4  on Wall Street?

5  **A.**   I'm sorry?

6  **Q.**   Were you ever able to finalize any interest in AML BitCoin

7  among anybody on Wall Street?

8  **A.**   Of the institutional groups, no.

9                     (Pause in proceedings.)

10         **MR. WARD:**  Nothing further.

11  Thank you.

12         **THE WITNESS:**  Thank you.

13         **THE COURT:**  Very brief recross.

14         **MR. SHEPARD:**  Understood, Your Honor.

15  If we can put up 418, Ed, please.

16                  <u>**RECROSS-EXAMINATION**</u>

17  **BY MR. SHEPARD:**

18  **Q.**   Mr. Ward just showed you this document.  I had asked you

19  if Mr. Andrade had ever pressured you in writing; and after

20  directing your attention to that question, he put up this

21  document.

22         There's no pressure here from Mr. Andrade, is there?

23  **A.**   No.

24  **Q.**   And this is actually a forwarding of some of your

25  Project Sunshine materials to a number of people; correct?

**BRYAN - RECROSS / SHEPARD**

1  A.   No.  It's just my direct email.  It's not a forward.  I'm

2  just directly emailing.

3  Q.   Okay.  Thank you for the correction.

4       You are sending --

5  A.   Yes.

6  Q.   -- directly Project Sunshine material to a number of

7  people --

8  A.   Yes.

9  Q.   -- correct?

10      And among those people are some of Mr. Andrade's lawyers;

11  correct?

12  A.   Yes, I believe so.  I'm not sure who they all are.

13  Q.   Eric Olsen is on here, and that's one of the names you

14  know now to be one of Mr. Andrade's --

15  A.   Yes.

16  Q.   -- lawyers?

17  A.   That's correct.

18  Q.   So what was going on with Project Sunshine was being

19  shared with Mr. Andrade's lawyers?

20  A.   Correct.

21  Q.   You were asked about what Polyblock was doing, and you

22  cited as a success when Polyblock was buying for their own

23  account?

24  A.   Correct.

25  Q.   So that wasn't when they were engaging in this market

1   making where they were buying on the one hand and selling on

2   the other.   They had just decided on their own to buy on their

3   own account; correct?

4   **A.**   Throughout the whole process, there was a percentage of it

5   that was actual purchases on their own account and a certain

6   amount of trading amongst the entities that they had created;

7   and I would say it was probably 70/30, maybe 60/40.

8   **Q.**   And the purchases they made on their own account were what

9   you attributed to keeping the price up some; correct?

10  **A.**   Yes.   Helping to -- helping to slow down the decline,

11  I think is a better way to say it.

12        **MR. SHEPARD:**   And then if we could get 1069 back up,

13  please.

14  **Q.**   This was put up here to show that after you had complained

15  to Mr. Abramoff, he passed that along to Mr. Andrade; correct?

16  **A.**   Yes.   Yes, but -- yes.

17  **Q.**   And you saw Mr. Andrade -- I'm sorry.

18        You saw Mr. Abramoff complain in writing to you about the

19  fact that the price of the shares of the coin -- the price of

20  the tokens was declining; correct?

21  **A.**   At the very beginning of trade- -- yes.

22  **Q.**   Yes.

23  **A.**   I believe that was on the --

24  **Q.**   You didn't get --

25  **A.**   -- first --

1    **Q.**    -- anything in writing --

2                        (Simultaneous speaking.)

3        (Stenographer interrupts for clarification of the record.)

4            **MR. SHEPARD:**  I'm sorry.

5            **THE WITNESS:**  I believe that was the WhatsApp messages

6    that we looked at that were right at the beginning, when

7    trading had first started.

8    **BY MR. SHEPARD:**

9    **Q.**    And you didn't get anything in writing from Marcus about

10   not supporting -- about the price dropping; correct?

11   **A.**    No.

12           **MR. SHEPARD:**  Nothing further.

13       Thank you.

14           **THE COURT:**  You may step down.

15           **THE WITNESS:**  Thank you very much, Your Honor.

16                        (Witness excused.)

17           **THE COURT:**  Members of the jury, we'll take a

18   ten-minute break, because we've had a couple of breaks, and so

19   we'll start at 20 of.

20       And remember, don't discuss this amongst yourselves or

21   with anyone else.

22       See you shortly.

23       (Proceedings were heard out of the presence of the jury.)

24           **THE COURT:**  We're out of the presence of the jury.

25       The parties are moving, both sides, at a truly glacial

**PROCEEDINGS**

1  pace.  I mean, in my humble opinion, it would have been -- both

2  sides would have been more effective if it was about half the

3  time with that particular witness.

4      So this is not to cover every single fact with every

5  witness in this case.  So let's target this process.

6      I'm assuming that the next witness will not be completed

7  by 1:30.  So is the plan that we will then just have that

8  witness start again after you get back from Washington?

9          **MR. HIGHSMITH:**  There's two options.  There's one --

10  that's one option.

11      The second is we could put somebody on who will end today

12  but a little bit early.  So I would recommend we do that but --

13      **THE COURT:**  Well, I think that's better for the jury

14  to be able to follow it.

15      **MR. HIGHSMITH:**  Yeah.

16      **THE COURT:**  But I don't want to do that if it means

17  this will go on even longer.

18      **MR. HIGHSMITH:**  No, no, no, absolutely not.  No, no.

19  What I mean is we'll be -- there's a chance we could be -- the

20  risk is that we could be done a little bit early.  That's -- I

21  just -- that's the risk, is we're done a little bit early.

22      **THE COURT:**  I understand.

23      **MR. HIGHSMITH:**  I think that's good.  Better than

24  holding somebody over.

25      **THE COURT:**  All right.  Who is the person you want to

PROCEEDINGS

 1   put on?

 2           **MR. HIGHSMITH:**  Ms. Hernandez.  She's an IRS witness.

 3           **THE COURT:**  Okay.  That's what we're going to do.

 4           **MR. HIGHSMITH:**  Thank you.

 5           **THE COURT:**  I mean, the problem of having -- I love

 6   ending early, but the problem is I don't want to just waste

 7   time that we otherwise could fill up.

 8       But if you're representing to me it will be easier, then,

 9   to have a complete examination, and then the issue that

10   Ms. Diamond had will be addressed.

11           **MS. DIAMOND:**  Yes.  Thank you, Your Honor.

12           **THE COURT:**  All right.  So we'll do it that way.

13           **MR. HIGHSMITH:**  Thank you.

14           **THE COURT:**  Oh, and one other question.

15       In reading this statement, it says, "You will hear a

16   witness on Monday."  Is there some reason we're not telling

17   them it's going to be Mr. Abramoff?

18           **MR. HIGHSMITH:**  I suggest we tell them it's

19   Mr. Abramoff.

20           **MR. SHEPARD:**  That's fine.

21           **THE COURT:**  Yeah.  I didn't know -- you know, "You

22   will" --

23           **MR. SHEPARD:**  They're certainly going to find out.

24           **THE COURT:**  -- "hear a witness."

25       It's, like, come on.  Okay.

 1                    (Recess taken at 12:31 p.m.)

 2                  (Proceedings resumed at 12:41 p.m.)

 3          (Proceedings were heard in the presence of the jury.)

 4              **THE COURT:**  The jury is present.

 5      Mr. Ward?

 6              **MR. WARD:**  The Government calls Victoria Hernandez.

 7      (Witness enters the courtroom and steps forward to be sworn.)

 8              **THE COURT:**  If you could come forward to be sworn.

 9              **THE COURTROOM DEPUTY:**  Please raise your right hand.

10                        **VICTORIA HERNANDEZ**,

11      called as a witness for the Government, having been duly sworn,

12      testified as follows:

13              **THE WITNESS:**  I do.

14              **THE COURTROOM DEPUTY:**  Please be seated.

15          Can you state your name and spell your last name, please.

16              **THE WITNESS:**  My name is Victoria Hernandez,

17      H-e-r-n-a-n-d-e-z.

18                          **DIRECT EXAMINATION**

19      **BY MR. WARD:**

20      **Q.**   Good afternoon, Ms. Hernandez.

21          Where do you work?

22      **A.**   I work for the Internal Revenue Service.

23      **Q.**   And what's your title?

24      **A.**   I'm a court witness coordinator.

25      **Q.**   And as part of your responsibilities, do you review IRS

HERNANDEZ - DIRECT / WARD

1    files for information that's requested?

2    **A.**    Yes, I do.

3            **MR. WARD:**  All right.  Can we pull up Exhibit 1433 for

4    the witness, please.

5    **Q.**    Ms. Hernandez, did you review the entirety of this exhibit

6    prior to your testimony here today?

7    **A.**    Yes, I have.

8    **Q.**    Okay.  In 2019, was the IRS asked to search for records of

9    whether individuals and entities had filed tax returns?

10   **A.**    Yes, they were.

11   **Q.**    And did the IRS search their files and produce information

12   on a number of individuals and entities as to whether they

13   filed tax returns?

14   **A.**    Yes.

15   **Q.**    And was the IRS requested to determine whether Rowland

16   Marcus Andrade filed tax returns?

17   **A.**    Yes.

18   **Q.**    And were they also asked to determine whether the

19   NAC Foundation filed tax returns?

20   **A.**    Yes.

21   **Q.**    And did they ask whether the NAC Payroll Services had

22   filed tax returns?

23   **A.**    Yes.

24   **Q.**    And then, finally, were they asked about the Fintech Fund,

25   whether they had filed tax returns?

1    **A.**    Yes.

2    **Q.**    Did the IRS search through its records for tax returns

3    filed from 2013 to 2018?

4    **A.**    Yes.

5    **Q.**    All right.  Can we turn to page 6, please.  Is this a

6    summary of the results of the IRS search for filing tax

7    returns?

8    **A.**    Yes, it is.

9    **Q.**    For Marcus Andrade, did he file tax returns in 2013 to

10   2015?

11   **A.**    For this request, some returns had been filed and some

12   were not filed during the time of this request.

13   **Q.**    At the time of this request, did he file his tax returns

14   for 2013 to 2015?

15   **A.**    Yes.

16   **Q.**    But at the time of this request in November 2019, had he

17   filed tax returns for tax years 2016 to 2018?

18   **A.**    No.

19   **Q.**    Looking down at the NAC Foundation, based on your search

20   of -- the IRS search of records, was the NAC Foundation

21   established in 2014?

22   **A.**    It was established in 2014, yes.

23   **Q.**    From the time periods 2014 to 2018, did the NAC Foundation

24   file -- had they filed tax returns as of the time of this

25   request?

HERNANDEZ - DIRECT / WARD

1    A.   No.

2    Q.   For the NAC Payroll Services, did you determine -- the IRS

3    determine that it was established in 2018?

4    A.   Yes.

5    Q.   And had they filed tax returns in 2018?

6    A.   At the time of this request, no.

7    Q.   Did you search -- did the IRS search for funds for a

8    company called the Fintech Fund Family?

9    A.   Yes.

10   Q.   And was that established in 2016?

11   A.   Yes, it was.

12   Q.   And from 2016 to 2018, had they filed tax returns at the

13   time of this request?

14   A.   No, they had not.

15   Q.   Did you search your files and determine that some tax

16   returns had been filed after the Government made this request

17   in 2019?

18   A.   Yes.

19   Q.   For Mr. Andrade, did he file his 2016 taxes after this

20   letter, later in 2019?

21   A.   Yes.

22   Q.   And did he file his 2017 taxes in April of 2020?

23   A.   Yes.

24   Q.   And did he file his 2018 taxes in December of 2023?

25   A.   Yes.

HERNANDEZ - DIRECT / WARD

1  **Q.**  For the NAC Foundation, did they file their 2017 taxes in

2  2020?

3  **A.**  The 2017?

4  **Q.**  Yes.

5  **A.**  Yes.

6  **Q.**  And did they file their 2018 taxes in 2021?

7  **A.**  Yes.

8  **Q.**  And for the NAC Payroll, did they file 2018 taxes in 2021?

9  **A.**  Yes.

10  **Q.**  And for the Fintech Fund, did they file their 2016, 2017,

11  and 2018 taxes in December of 2019?

12  **A.**  Yes.

13  **Q.**  All right.  I'd like to show you -- have you look at a

14  couple of pages.  Can we go to page 9 of this exhibit, please.

15      Is this a certification of lack of IRS records for the

16  NAC Payroll Services as of -- as of November 2019?

17  **A.**  Yes.

18  **Q.**  And is that an official IRS seal affixed to this document?

19  **A.**  Yes, it is.

20  **Q.**  Is that an accurate certified document of the search that

21  the IRS conducted?

22  **A.**  Yes, this is a certified document.

23      **MR. WARD:**  The Government moves to admit page 9 of

24  this exhibit.

25      Can we go to page --

```
 1              THE COURT:  Hello?  And, again, this is exhibit which
 2   number?
 3              MR. WARD:  It's 1433, page 9.
 4              THE COURT:  Page 9.
 5              MR. STEFAN:  Sir, may I have a moment?
 6              THE COURT:  Okay.  Take the moment.
 7                      (Pause in proceedings.)
 8              MR. STEFAN:  Your Honor, the Government is attempting
 9   to introduce just this single page of the record, and the
10   defense would object on the rule of completeness basis and seek
11   to have the entire Exhibit 1433 admitted.
12              MR. WARD:  No objection.
13              THE COURT:  1433 will be admitted.
14        (Trial Exhibit 1433 received in evidence.)
15   BY MR. WARD:
16   Q.   Looking at page 9, is this the certified record of the
17   NAC Payroll Services?
18   A.   Yes, it is.
19   Q.   Is 11 the certified record of the NAC Foundation lack of
20   payments?
21   A.   Exhibit 11?
22   Q.   Page 11.
23   A.   Oh, page 11.
24              MR. HIGHSMITH:  We're on page 9 right now.
25   \\\
```

1    BY MR. WARD:

2    Q.    Page 11.

3    A.    I'm sorry.  I don't see page 11.

4          (Witness examines document.)  Yes, this is a certified

5    record.

6    Q.    Page 13.  And is that a record of the Fintech Family

7    Fund's lack of tax returns for 2016, 2017, and 2018?

8    A.    Yes, this is a certified record.

9    Q.    And then moving to page 22, is that a certification of a

10   lack of tax returns filed in 2016, 2017, and 2018 by Marcus

11   Andrade?

12   A.    Yes, it is.

13          MR. WARD:  One moment.

14                    (Pause in proceedings.)

15          MR. WARD:  Nothing further.

16   Thank you.

17                    <u>CROSS-EXAMINATION</u>

18   BY MR. STEFAN:

19   Q.    Good afternoon.

20   A.    Good afternoon.

21   Q.    Just to clarify, I believe you said on direct examination

22   that since the period of 2016, 2017, and 2018, Mr. Andrade has,

23   in fact, since filed tax returns for those years.

24   A.    Once I researched for the filings to this request, I did

25   see that 2016, 2017, and 2018 had been filed late, yes.

1    **Q.**    But have been subsequently filed?

2    **A.**    Yes, but they were not timely.

3    **Q.**    But they have been subsequently filed?

4    **A.**    Yes.

5            **MR. STEFAN:**  Thank you, ma'am.

6            **MR. WARD:**  Nothing further.

7            **THE COURT:**  All right.  You may step down.

8            **THE WITNESS:**  Thank you.

9                    (Witness excused.)

10           **THE COURT:**  Members of the jury, we, again, are going

11   to end a little bit early, it being Friday and the beginning of

12   the weekend.

13       Let me tell you what's coming on Monday.  On Monday, you

14   are going to hear testimony from a remote witness,

15   Jack Abramoff, via the Court's Zoom platform.  The reason for

16   the remote testimony is that the witness has a medical

17   condition that does not allow him to travel from Washington,

18   D.C., where he lives.

19       Some of the lawyers from each side will be in Washington,

20   D.C., while me and other lawyers will be here with you in the

21   courtroom.  Mr. Andrade will be in D.C., Washington, D.C., as

22   well during the examination of Mr. Abramoff.

23       You may observe the effects of the witness's condition and

24   treatment during his testimony.  As we may need to adjust our

25   break schedule during this testimony, because we may have to do

**PROCEEDINGS**

1    that, you should consider the testimony of the witness in the

2    same way as any witness who would testify live here in court.

3        The other thing I would ask of you is, our technology, as

4    you've from time to time witnessed, is perhaps not the absolute

5    best in the world.  It's pretty good.  It's worked all right so

6    far.  But bear with us.  If you could have some patience.  We

7    may have some bumps in the road because of the distance and all

8    of it.  So I do ask you to be a little patient with us if we do

9    have some hiccups in terms of the technological process.

10       With that, have a wonderful weekend.  It's apparently

11   going to be nice weather.

12       Do not do any research, anything associated with this

13   case, talk about it with anyone.  Put it out of your mind.  And

14   we'll get together again on Monday at 8:30 and go forward.

15       Have a wonderful weekend.

16   (Proceedings were heard out of the presence of the jury.)

17       **THE COURT:**  Okay.  We're out of the presence of the

18   jury.

19       Just to remind me of how this is going to work on Monday

20   morning, the screen will have -- what's going to -- what will

21   show up on the monitors?

22       **MR. HIGHSMITH:**  It's the Court's Zoom feed.  You'll

23   have the conference room in Washington, D.C., focused on

24   Mr. Abramoff, the witness.

25       **THE COURT:**  Will they be able to see the -- whoever --

**PROCEEDINGS**

```
 1   it's the two of you, I guess, and Mr. Andrade.  Will they be in
 2   the picture or not?
 3          MR. HIGHSMITH:  I don't know the answer to that.  The
 4   reason is that the focus is having them be able to see
 5   Mr. Abramoff as closely as possible; and if we're social
 6   distanced, it'll be harder for them to see Mr. Abramoff if
 7   they're also getting us in the picture.
 8          THE COURT:  I just want to know what the lay of the
 9   land is.
10          MR. HIGHSMITH:  That's the lay of the land.
11          THE COURT:  If there are objections or -- well, so
12   let's assume for a minute you're doing the examining -- you're
13   doing the direct?
14          MR. HIGHSMITH:  Yes.
15          THE COURT:  Will you be -- will we see you?
16          MR. HIGHSMITH:  I don't know the answer to that.
17          THE COURT:  Okay.
18          MR. HIGHSMITH:  It's sort of do we want to focus -- my
19   priority is to show Mr. Abramoff.  We'll do what we can.  I'm
20   just worried about the social distancing.  That's the issue.
21          THE COURT:  Well, I want to make sure for the court
22   reporter.  When people start speaking --
23          MR. HIGHSMITH:  Yes.
24          THE COURT:  -- she's not going to know who's talking.
25          MR. HIGHSMITH:  Yes.
```

1          **THE COURT:**  I mean, she may recognize your voices by

2  now, but keep that in mind, and you may have to identify

3  yourself if you're saying something.  Okay?

4          **MR. HIGHSMITH:**  Yes.

5          **THE COURT:**  And then in Washington, will you see me?

6          **MR. HIGHSMITH:**  Yes.

7          **THE COURT:**  Okay.  Will you see the jury?  No,

8  probably.

9          **MR. HIGHSMITH:**  Probably not.

10     There's a camera for you.  There's a camera for the --

11  there's a camera on you.  There's a camera here on this area,

12  but it's not pointed at the jury.

13          **THE COURTROOM DEPUTY:**  It's right here.

14          **MR. HIGHSMITH:**  Is that pointed at the jury?

15          **THE COURTROOM DEPUTY:**  No.  It's pointed right at you.

16          **THE COURT:**  Do you even want that one to -- what's

17  that --

18          **MR. HIGHSMITH:**  Nothing.  It does nothing.

19          **THE COURT:**  That's actually nothing.

20          **MR. HIGHSMITH:**  It does nothing.

21          **THE COURT:**  So can that actually be turned off maybe?

22          **THE COURTROOM DEPUTY:**  Yes.

23          **THE COURT:**  Because then there'll be more space.

24          **THE COURTROOM DEPUTY:**  We'll do that at the tech check

25  today.

1          **THE COURT:**  Okay.  All right.

2      Okay.  Well, we'll see how it goes.

3      See you on -- nothing else, I assume.

4          **MR. SHEPARD:**  Nothing else.  Thank you.

5          **THE COURT:**  Okay.  See you on Monday.

6          **MR. HIGHSMITH:**  See you on Monday.

7          **THE COURT:**  Oh.  And then whatever you're going to be

8  filing for me, which you need -- if I understand it correctly,

9  you will need an answer pretty much on Monday or Tuesday

10 morning, I assume.

11         **MR. SHEPARD:**  Probably.

12         **THE COURT:**  So when will you be giving me what you're

13 going to give me?

14         **MR. SHEPARD:**  I saw a partial draft earlier this

15 morning.  So I guess the answer is:  When would be the last

16 time that we could give it to the Court that the Court would

17 have, you know, the --

18         **MR. HIGHSMITH:**  It's a reasonable question.

19         **MR. SHEPARD:**  -- sufficient availability to review it?

20     And that's when we'll get it.  It's in the works.  I

21 just --

22         **THE COURT:**  I understand.  I will turn to it at

23 1:30 Pacific Time on Monday because I'm freed up at

24 1:30 Pacific Time on Monday.  So that is your -- if it's after

25 that, no promises I'll read it.

**PROCEEDINGS**

1          **MR. SHEPARD:**  Yeah.  Well, since we will be mostly

2    occupied, I think we will shoot for, you know, 8:30 Pacific

3    Time in the morning.

4          **THE COURT:**  Well, that's good because then my diligent

5    clerks can get a head start.

6          **MR. SHEPARD:**  Yeah.

7          **THE COURT:**  Okay.  And you'll do the same?

8          **MR. HIGHSMITH:**  Same.

9          **THE COURT:**  Okay.

10              (Proceedings adjourned at 12:59 p.m.)

11                         ---o0o---

12

13                   <u>**CERTIFICATE OF REPORTER**</u>

14          I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled matter.

16

17    DATE:  Saturday, February 22, 2025

18

19

20

21                   _Ana Dub_

22         _____

23          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

24      CSR No. 7445, Official United States Reporter

25