```
                                    Volume 10

                                    Pages 1631 - 1804

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable Richard Seeborg, Judge

        UNITED STATES OF AMERICA,        )
                                         )
                    Plaintiff,           )
                                         )
          VS.                            )   NO.  3:20-CR-00249 RS
                                         )
        ROWLAND MARCUS ANDRADE,          )
                                         )
                    Defendant.           )
        _____ )
```

San Francisco, California
Monday, February 24, 2025

**TRANSCRIPT OF HYBRID JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        PATRICK D. ROBBINS
                        ACTING UNITED STATES ATTORNEY
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                **BY:   CHRISTIAAN HIGHSMITH (Via Zoom)
                        DAVID J. WARD
                        MATTHEW CHOU
                        ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        KING & SPALDING, LLP
                        50 California Street, Suite 3300
                        San Francisco, California 94111
                **BY:   MICHAEL J. SHEPARD (Via Zoom)
                        ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES: (CONTINUED)

 2   For Defendant:
                              KING AND SPALDING, LLC
 3                            1700 Pennsylvania Avenue, NW
                              Washington, D.C. 20006
 4                     BY:    KERRIE C. DENT, ATTORNEY AT LAW

 5
                              KING AND SPALDING, LLC
 6                            1185 Avenue of the Americas, 34th Floor
                              New York, New York 10036
 7                     BY:    DAINEC P. STEFAN (Via Zoom)
                              ATTORNEY AT LAW
 8
                              LAW OFFICES OF CINDY A. DIAMOND
 9                            58 West Portal Avenue, Suite 350
                              San Francisco, California 94127
10                     BY:    CINDY A. DIAMOND, ATTORNEY AT LAW

11

12

13

14   Also Present:          Special Agent Brendon Zartman
                             Tina Rosenbaum, Paralegal
15                           Ed Jackson, Trial Technician

16

17

18

19

20

21

22

23

24

25
```

1

# I N D E X

2

3   Monday, February 24, 2025 - Volume 10

4

5   **GOVERNMENT'S WITNESSES**         **PAGE**  **VOL.**

6   **ABRAMOFF, JACK ALAN (VIA ZOOM)**
    (SWORN)                         1644  10
7   Direct Examination by Mr. Highsmith      1644  10
  Cross-Examination by Mr. Shepard        1737  10

8

9             # E X H I B I T S

10   **TRIAL EXHIBITS**         **IDEN**  **EVID**  **VOL.**

11    6                         1664  10

12    7                         1664  10

13    16                      1664  10

14    17                      1664  10

15    114                    1664  10

16    141                    1664  10

17    142                    1664  10

18    170                    1664  10

19    171                    1664  10

20    764                    1664  10

21    765                    1664  10

22    884                    1772  10

23    898                    1664  10

24    900                    1664  10

25    901                    1664  10

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 909 | | 1664 | 10 |
| 913 | | 1664 | 10 |
| 914 | | 1664 | 10 |
| 920 | | 1664 | 10 |
| 926 | | 1664 | 10 |
| 930 | | 1664 | 10 |
| 932 | | 1664 | 10 |
| 938 | | 1664 | 10 |
| 951 | | 1664 | 10 |
| 966 | | 1664 | 10 |
| 1064 | | 1664 | 10 |
| 1445 | | 1664 | 10 |
| 2987 | | 1796 | 10 |

PROCEEDINGS

```
 1   Monday - February 24, 2025                          8:10 a.m.

 2                     P R O C E E D I N G S

 3                          ---o0o---

 4        (Defendant present via Zoom, out of custody.)

 5     (Proceedings were heard out of the presence of the jury.)

 6        THE COURT:  Good morning.

 7      I was told somebody wanted to talk to me.

 8        MR. HIGHSMITH:  Good morning, Your Honor.

 9        THE COURT:  Good morning.

10        MR. HIGHSMITH:  Mr. Shepard is coming over.  We're

11   going to stand next to each other to address you.

12        THE COURT:  All right.

13        MR. HIGHSMITH:  He's going to turn himself on first,

14   Your Honor.

15        THE COURT:  Okay.

16        MR. SHEPARD:  Good morning.

17        THE COURT:  Good morning.

18        MR. SHEPARD:  I thought it might make sense to talk

19   for a moment and get the Court's sense of what, if anything,

20   should be said about Mr. Abramoff's medical condition --

21        THE COURT:  Well, we -- we --

22        MR. SHEPARD:  -- like keeping an eye on, yes, there's

23   obviously something, but we don't want to -- we don't want to

24   make it a big issue.  We don't want to generate sympathy.  We

25   just -- you know, as the Court did when you --
```

**PROCEEDINGS**

1   **THE COURT:**  Well, I thought we had kind of covered

2   that in the thing -- in what I said to them.

3       **MR. SHEPARD:**  Yeah.

4       **THE COURT:**  So I wasn't planning to say anything else

5   unless somebody wants me to.

6       **MR. SHEPARD:**  No, I don't -- I don't think the Court

7   needs to say anything else.  I was more focused on whether that

8   would come up in the testimony and how.

9       **THE COURT:**  Oh, I see.  All right.

10      **MR. HIGHSMITH:**  I think he was focused on me,

11  Your Honor.

12      **THE OFFICIAL REPORTER:**  You know, I can hear

13  Mr. Highsmith much better than I can hear Mr. Shepard.

14      **MR. HIGHSMITH:**  Move it up higher.

15      **THE COURT:**  Well, I wonder if --

16      **MR. SHEPARD:**  How about now?

17      **THE OFFICIAL REPORTER:**  No.

18      **THE COURT:**  Is has a bit of an echo.

19      **MR. SHEPARD:**  No?

20      **THE COURT:**  I'm wondering if you really need the --

21  are you going to have microphones in front of you when you're

22  talking?  It may be a different situation than when you're in

23  the courtroom.  Maybe that handheld doesn't help you that much.

24  We could try it just -- where are you going to be when you're

25  examining -- where you're talking?

 1          MR. SHEPARD:  Right where we are now.

 2          THE COURT:  Oh, really?  Oh --

 3          MR. HIGHSMITH:  You can --

 4          THE COURT:  -- you're not going to be at a table or

 5     anything, huh?

 6          MR. HIGHSMITH:  Your Honor, the direct -- the person

 7     questioning -- the attorney questioning the witness will be at

 8     the podium.  So it will be me, and then I'll hand over the

 9     podium to Mr. Shepard.  And then the counsel objecting will be

10     sitting at a table with a different microphone, socially

11     distanced, but in the same room.

12          THE COURT:  Okay.  Well, you're coming through loud

13     and clear, Mr. Highsmith.  It's not --

14        Your microphone, Mr. Shepard, sounds like it's kind of --

15          MS. DENT:  Muffled.

16          THE COURT:  -- under water.

17          MS. DENT:  Yeah.

18                    (Pause in proceedings.)

19          MR. CHOU:  Your Honor, meanwhile, on the instructional

20     issue, there is a Ninth Circuit case on habeas review where the

21     Ninth Circuit said that where a witness was terminally ill,

22     the Court had discretion to give, actually, a favorable

23     credibility instruction, telling the jury that it was

24     essentially like a dying declaration.  We're not asking for

25     that here, of course, but just for the Court's awareness.

**PROCEEDINGS**

1        **THE COURT:**  Okay.  Okay.  Interesting to know.

2     Okay.  Try it again, Mr. Shepard.

3        **MR. SHEPARD:**  How's this?

4        **THE COURT:**  I'll ask the court reporter.

5        **THE OFFICIAL REPORTER:**  Can you say something more?

6        **MR. SHEPARD:**  Something more.

7        **THE OFFICIAL REPORTER:**  I can hear him.

8        **THE COURT:**  It's better.

9     Okay.  If we have problems, we'll just stop you and ask

10   you to fiddle with it.

11     Okay.  So Mr. Abramoff will be in the seat that's off to

12   the -- I see down on the right quadrant here.

13     Are you -- just for my spatial understanding, are you

14   standing -- vis-à-vis where he's going to sit, where are you

15   people standing?

16       **MR. HIGHSMITH:**  We are 15 feet away from the witness.

17   We are to the witness's left, and we are about 15 feet away

18   from the witness.

19       **THE COURT:**  Okay.  And will Mr. --

20       **MR. HIGHSMITH:**  Can you sit down?

21       **THE COURT:**  And will Mr. --

22       **MR. HIGHSMITH:**  We have a test witness for you.

23       **THE COURT:**  All right.

24     Okay.  Will Mr. Abramoff have a lawyer present?

25       **MR. HIGHSMITH:**  Yes.  That is his lawyer on your

PROCEEDINGS

 1  screen.

 2          **MR. WEBER:**  Good morning, Judge.  Richard Weber from

 3  Winston & Strawn.

 4          **THE COURT:**  That, I couldn't hear at all.  So try it

 5  again.

 6          **MR. WEBER:**  The microphone was off.  Can you hear me

 7  now, Judge?

 8          **THE COURT:**  Yes.

 9          **MR. WEBER:**  Good morning.  Richard Weber from

10  Winston & Strawn.

11          **THE COURT:**  Okay.  Good morning.

12          **MR. WEBER:**  Good morning.

13          **THE COURT:**  Okay.  Fine.

14      So anything else before we --

15          **MR. HIGHSMITH:**  May I tell the Court what I'm planning

16  to ask in terms of the health issues for Mr. Abramoff?

17      I'm planning to say the following:  How are you feeling

18  this morning?  Does your medical condition affect your

19  mental -- your memory?  Please tell us if you're feeling tired.

20          **THE COURT:**  That's fine.  And on that issue,

21  Mr. Shepard may want to ask some questions about whether or not

22  his memory has been negatively impacted, and that's certainly

23  appropriate.

24      Okay.

25                  (Discussion held off the record.)

PROCEEDINGS

1    **THE COURT:** I asked them on Friday.

2    If you're going to object, in addition to objecting, you

3    need to identify who you are because -- for that reason,

4    because you can't see them.

5    So keep that in mind. It's going to be a little

6    artificial; but if it's -- Mr. Shepard, this is -- I don't know

7    how we -- let's see. We could do it shorthand. "Shepard, I

8    object," or whatever you want to do, but you do need to

9    identify yourself, although, of course, if there's an objecting

10   counsel when the other counsel is up, it's by definition going

11   to be one of the two of them. So we don't have to guess.

12   There's nobody else there; right?

13   **MR. SHEPARD:** No. There are other people here, but

14   they are not going to be speaking.

15   **THE COURT:** All right. Yeah.

16   Ana, we can just -- it's Shepard or Highsmith, depending

17   upon if the other one is asking questions.

18   (Discussion off the record.)

19   **THE COURT:** Okay. All right? Anything else?

20   **MR. WARD:** Just briefly, Your Honor, we have binders

21   of exhibits for the witness. We have a copy for you that we've

22   given to defense counsel.

23   **THE COURT:** Great.

24   **MR. WARD:** It includes all the documents Mr. Highsmith

25   will use on direct with the exhibit number tabbed in the order

**PROCEEDINGS**

 1   that he will present them during the testimony.

 2       In your binder and the defense counsel binder, there's

 3   also a group of documents in the back that are for redirect.

 4       We have seven binders for the jury.  They don't include

 5   the redirect documents at this point.  If Mr. Highsmith uses

 6   them on redirect, we'll probably just hand out copies of those,

 7   but we didn't want to give them those --

 8           **THE COURT:**  Okay.

 9           **MR. WARD:**  -- documents yet.

10           **THE COURT:**  And now you've reminded me.  They're going

11   to have to share?

12           **MR. WARD:**  Yes.  We have seven binders, so they'll

13   have to share, but we've also been able to set up a system

14   where the document will appear on that screen and can be blown

15   up --

16           **THE COURT:**  Good.

17           **MR. WARD:**  -- as well.

18       We had this in the Makras trial and it didn't work.  The

19   video is better, I think, here, you can see.

20           **THE COURT:**  Yeah.

21           **MR. WARD:**  So I think between that and the binders,

22   our hope is that all the jurors will be able to see the

23   documents.

24           **THE COURT:**  Yeah.  In the Makras trial, it just was

25   too small, wasn't it?  You couldn't read it from across the

 1  room.

 2       **MR. WARD:**  I think it was too small and the light

 3  wasn't good.  They have a higher-quality video.

 4       **THE COURT:**  Okay.

 5     All right.  Good.  Well, as soon as the jury comes in,

 6  we'll get going.

 7     And you will all tell me when you want to -- unlike the

 8  break situation here, I'm going to kind of look to maybe the

 9  counsel to suggest times to take a break.  And I know we may

10  have a few more, but I assume if breaks are taken, they could

11  be short breaks.

12     What office are you in, by the way?  It's a law firm;

13  right?

14       **MR. SHEPARD:**  Sorry.

15     We're in a large conference room at Winston & Strawn.

16       **THE COURT:**  Okay.

17       **MR. SHEPARD:**  Looks like you could have a little party

18  here.

19       **THE COURT:**  Okay.

20       **MR. SHEPARD:**  It's long and -- it's long and -- you

21  know, it's a long rectangle.

22       **THE COURT:**  Okay.  Good.

23     Thank you.  I'll see you as soon as we get the jury.

24               (Recess taken at 8:20 a.m.)

25               (Proceedings resumed at 8:32 a.m.)

**PROCEEDINGS**

 1      (Proceedings were heard out of the presence of the jury.)

 2           **THE COURT:**  Okay.  Shall we?

 3           **THE LAW CLERK:**  Shall we?

 4           **THE COURT:**  Yes.

 5           **THE LAW CLERK:**  We're ready for you.

 6      (Proceedings were heard in the presence of the jury.)

 7           **THE COURT:**  Welcome back, members of the jury.

 8  Hopefully, you-all had a good weekend.  Thank you for being

 9  here so promptly.

10      As you know, we are doing something new, a

11  technologically, hopefully successful, examination of our next

12  witness.  I think I mentioned to you, the witness and some of

13  our counsel are in Washington, D.C., so that's what you're

14  seeing on the screen.  We have the monitors, and then we're

15  going to be using this monitor -- or this screen.  I don't know

16  how helpful that will be when some of the exhibits come up, but

17  we'll try it.

18      You'll have it in various different forms.  And I believe

19  counsel have told me they will have some binders for you to use

20  when exhibits are being admitted.  We don't have a binder for

21  everyone, but you can -- there are quite a few -- I think you

22  said seven or something, Mr. Ward -- and you can kind of share

23  them.  So there will be several different ways in which you'll

24  be seeing these exhibits, and so hopefully that'll be

25  sufficient.

ABRAMOFF - DIRECT / HIGHSMITH

 1        Okay.  So we can begin the proceedings.

 2        Mr. Abramoff?  Mr. Abramoff?

 3            THE WITNESS:  Yes.

 4            THE COURT:  All right.  I'm going to ask my Courtroom

 5    Deputy to put you under oath at this time.

 6            THE COURTROOM DEPUTY:  Please raise your right hand.

 7            THE WITNESS:  Do I stand?

 8            THE COURT:  No.  You may sit, but raise your right

 9    hand.

10                        <u>JACK ALAN ABRAMOFF</u>,

11    called as a witness for the Government, having duly affirmed,

12    testified via Zoom as follows:

13            THE WITNESS:  Yes, I so affirm.

14            THE COURTROOM DEPUTY:  Thank you.

15            THE COURT:  And could you state your -- state your

16    name for us and spell it.

17            THE WITNESS:  Jack Alan Abramoff, J-a-c-k, A-l-a-n,

18    A-b-r-a-m-o-f-f.

19            THE COURT:  Thank you.

20        Mr. Highsmith?

21            MR. HIGHSMITH:  Thank you, Your Honor.

22                       <u>DIRECT EXAMINATION</u>

23    BY MR. HIGHSMITH:

24    Q.   Mr. Abramoff, how are you feeling today?

25    A.   A little weak.

ABRAMOFF - DIRECT / HIGHSMITH

1   **Q.**   Is your medical treatment affecting your memory today?

2   **A.**   No.

3   **Q.**   If you are feeling the effects of your treatment, will you

4   please indicate that you need a break?

5   **A.**   Yes.

6   **Q.**   Do you live in the Washington, D.C., area, sir?

7   **A.**   Yes.

8   **Q.**   Have you lived here for many decades?

9   **A.**   Yes.

10  **Q.**   Let's first start by going through your professional

11  history, and we're going to start at the beginning.

12       Were you the national head of the College Republicans?

13  **A.**   Yes.

14  **Q.**   And was that from approximately 1981 to 1984?

15  **A.**   Yes.

16  **Q.**   Were you -- what did you do after that?

17  **A.**   I became executive director of a group called Citizens for

18  America.

19  **Q.**   Was that a grassroots lobbying political action committee?

20  **A.**   Yes.

21  **Q.**   What did you do after that?

22  **A.**   I went to work for my father's real estate development

23  company.

24  **Q.**   Did you -- did you also get a law degree from Georgetown

25  Law School?

ABRAMOFF - DIRECT / HIGHSMITH

 1   **A.**   Yes.

 2   **Q.**   Did you ever take the bar examination?

 3   **A.**   No.

 4   **Q.**   Did you ever practice law?

 5   **A.**   No.

 6   **Q.**   How long did you work at your father's real estate

 7   development company?

 8   **A.**   Approximately a year.

 9   **Q.**   What did you do after that?

10   **A.**   I produced action motion pictures.

11   **Q.**   What are the names of some of the movies you produced?

12   **A.**   *Red Scorpion*, *Red Scorpion II*, *Spirit Destiny*, *Karate*

13   *Masters*.

14   **Q.**   Approximately what year did you stop being a movie

15   producer?

16   **A.**   1994.

17   **Q.**   What did you do next?

18   **A.**   I joined a law firm as a lobbyist, called Preston Gates

19   Ellis.

20   **Q.**   How long did you work for a -- as a lobbyist?

21   **A.**   As a lobbyist, I worked until approximately 2004.

22   **Q.**   Did you work for a second lobbying firm as well?

23   **A.**   Yes.

24   **Q.**   What was the name of that?

25   **A.**   Greenberg Traurig.

ABRAMOFF - DIRECT / HIGHSMITH

1  Q.   And in your job, did you lobby members of the

2  United States Congress?

3  A.   Yes, I did.

4  Q.   In 2005, were you charged with federal crimes by

5  authorities in Florida?

6  A.   Yes.

7  Q.   Specifically, were you charged with conspiracy and wire

8  fraud?

9  A.   Yes.

10  Q.   And were the charges essentially that you lied to a lender

11  to get a $60 million loan because you said that you and your

12  business partner had made a $23 million equity contribution?

13  A.   Yes.

14  Q.   And you did that in order to acquire a casino; is that

15  right?

16  A.   It was a company of casino ships.

17  Q.   Were you sentenced for that case in approximately

18  September 2018?

19  A.   Yes.

20  Q.   And was your sentence reduced because you cooperated with

21  the Government?

22  A.   Yes.

23  Q.   Were you also ordered to pay restitution as part of the

24  sentence in that case?

25  A.   Yes.

**ABRAMOFF - DIRECT / HIGHSMITH**

1  **Q.**    In approximately 2006, were you charged by federal

2  authorities in Washington, D.C., with conspiracy, honest

3  services fraud, and tax evasion?

4  **A.**    Yes.

5  **Q.**    Were the allegations in that case that you bribed members

6  of Congress, concealed it, failed to pay taxes?  Are those the

7  general allegations?

8  **A.**    Yes.

9  **Q.**    Did you plead guilty to those allegations?

10  **A.**    Yes.

11  **Q.**    Were you sentenced in approximately September 2018 in

12  connection with that case?

13  **A.**    My sentencing in that case actually was later, I believe.

14  2018, you said?

15  **Q.**    I'm sorry.  I misspoke.  I said -- what I meant to say was

16  2008.

17  **A.**    2008, yes.  Correct.

18  **Q.**    Was your sentence in the Washington, D.C., case reduced as

19  well because you cooperated with the Government?

20  **A.**    Yes.

21  **Q.**    And was your sentence in the Washington, D.C., case to run

22  concurrent, meaning at the same time, as your sentence in the

23  Florida case?

24  **A.**    Mostly.  I started serving my Florida sentence before the

25  D.C. sentence was given, but it mostly was concurrent.

ABRAMOFF - DIRECT / HIGHSMITH

1    Q.    I believe you just testified that you were sentenced in
2    2008.  What did you do next?
3    A.    After I was released from prison?
4    Q.    Well, you served a stint in prison; is that correct?
5    A.    That's correct.
6    Q.    What did you do after your release from prison?
7    A.    For six months I worked at a pizza shop in Baltimore
8    during my halfway house and home confinement.
9    Q.    What did you do next?
10   A.    After that, I wrote a book and did a book tour and media
11   for a while.
12   Q.    What did you do after that?
13   A.    After that, I started consulting to companies and
14   individuals who needed political advice on how Washington
15   worked.
16   Q.    And you would take clients?
17   A.    Yes.
18   Q.    Was there a company that you had called Seppo Holdings
19   that you used to receive income?
20   A.    It was a loan-out company I worked for, but I did not own
21   it, yes.
22   Q.    Did you also participate in trainings with the FBI?
23   A.    Yes.
24   Q.    What kind of trainings did you participate in?
25   A.    I spoke at FBI training seminars to agents on the matters

1    that related to my case, in conjunction with the FBI agents who

2    worked on my case.

3    **Q.**    What was the purpose of those sessions?

4    **A.**    To give the agents a viewpoint of somebody unfortunately

5    on the other side of the law at that point and how people like

6    I was were thinking and how to interact with them more

7    effectively.

8    **Q.**    Were you paid?

9          **THE COURT:**    One second.

10    Could -- Mr. Abramoff, could you try the microphone a

11    little closer to you?  I know it's already close, but try it a

12    little closer.

13          **THE WITNESS:**    Is this better?

14          **THE COURT:**    A bit.  A bit.

15    Okay.  Let's try that.

16          **THE WITNESS:**    Okay.  Yes, sir.

17    **BY MR. HIGHSMITH:**

18    **Q.**    Were you reimbursed your expenses by the FBI for those

19    training sessions?

20    **A.**    Yes.

21    **Q.**    Did you provide information that you thought relevant to

22    the Government as well?

23    **A.**    Yes.

24    **Q.**    And were you paid to provide information?

25    **A.**    No.

**ABRAMOFF - DIRECT / HIGHSMITH**

1  **Q.**   Did you receive a benefit for providing additional

2  information?

3  **A.**   No.

4  **Q.**   Did you provide that information in order to protect

5  yourself in case you committed future crime?

6  **A.**   No.

7  **Q.**   Why did you provide the information?

8  **A.**   Because I felt that that's the duty of a citizen; that if

9  I encountered information that could cause harm or cause

10  security issues, that I felt it was my duty to inform law

11  enforcement to try to prevent problems.

12  **Q.**   How did you first come into contact with Marcus Andrade?

13  **A.**   Well, approximately 2015 --

14  **Q.**   Let me stop you for a second.

15       **MR. HIGHSMITH:**   I see something on the screen in front

16  of me that says "incoming call."  Can the courtroom see that as

17  well?

18       **THE COURT:**   No.

19       **MR. HIGHSMITH:**   I will proceed unless I get

20  instructions from the Court otherwise.

21  **Q.**   So my question was:  How did you first come into contact

22  with Marcus Andrade?

23  **A.**   In approximately August, I believe, of two thousand- --

24  2015, I received an Internet communication from Marcus making

25  contact with me to tell me about his project and -- his

1  cryptocurrency project.

2  **Q.**   Did he tell you why he was reaching out to you?

3  **A.**   Yes.  He was interested in getting someone in the federal

4  government or in Congress to provide some sort of imprimatur or

5  approval or support of the project that he was embarking upon.

6  **Q.**   Did he describe his project to you?

7  **A.**   Yes.

8  **Q.**   What did he tell you about his project?

9  **A.**   He told me that he had a cryptocurrency that, unlike

10  Bitcoin, which was being used by terrorists and criminals to

11  avoid law enforcement, that his cryptocurrency had components

12  of anti-money laundering and know-your-customer components that

13  would enable the owners of this cryptocurrency to be known and

14  not be able to engage in criminal activity.

15  **Q.**   Did he tell you the name of his cryptocurrency project?

16  **A.**   Yes.  It was called Aten Coin.

17  **Q.**   Did you discuss with Mr. Andrade your criminal history

18  and, specifically, the fact that you had prior felony

19  convictions?

20  **A.**   I'm sorry.  Could you repeat the very first part of it?  I

21  coughed and didn't hear you.

22  **Q.**   Did you discuss with Mr. Andrade your prior criminal

23  convictions?

24  **A.**   Well, I don't remember the conversation exactly, but he

25  was well aware of who I was and indicated that --

1           **MR. SHEPARD:**  Objection.

2           **THE WITNESS:**  -- that was one of the reasons that --

3           **THE COURT:**  Hold on a moment.

4      And the objection is what?

5           **MR. SHEPARD:**  It's speculating about Mr. Andrade's

6   mental state.  He did not have -- he did not recall a

7   conversation he said.

8           **THE COURT:**  Right.  Okay.

9           **MR. SHEPARD:**  He --

10          **THE COURT:**  Right.  Sustained.  I'll sustain the

11  objection.

12     Next question, Mr. Highsmith.

13          **MR. HIGHSMITH:**  Thank you.

14  **Q.**   Did Mr. Andrade communicate to you or talk to you or email

15  with you about your history as someone convicted for --

16  you know, for your activities with regard to Congress?

17  **A.**   Yes.  I recall that, yes.

18  **Q.**   What do you recall he said or communicated with you?

19  **A.**   That he knew my background, which was very public, and

20  that he was aware of the scandal and what I had endured,

21  including prison, and so he was knowledgeable about it.

22  **Q.**   Did he say anything else about your time in prison or your

23  illegal lobbying activities?

24  **A.**   I don't recall.

25  **Q.**   Did Mr. Andrade say or communicate to you that he wanted

1   you to be involved in Aten Coin?

2   A.   Yes.

3   Q.   What did he want you to do?

4   A.   At that point he wished that I would obtain a letter of

5   support from a member of Congress for what he was doing with

6   Aten Coin, which, again, was promoting a digital currency that

7   was compliant with anti-money laundering and know-your-customer

8   regulations and statutes.

9   Q.   Did you and Mr. Andrade communicate about you joining his

10  company in a formal capacity?

11  A.   Yes.

12  Q.   Describe those communications, please.

13  A.   He -- well, it was not in that initial phone call.  It was

14  in a subsequent meeting that we had the next month.

15  Q.   And where was your subsequent meeting?

16  A.   In Los Angeles.

17  Q.   Describe where the meeting took place.

18  A.   We met at a sushi restaurant close to the L.A. Airport in

19  Marina Del Rey, California.

20  Q.   Who initiated the meeting?  You or Mr. Andrade?

21  A.   I told Mr. Andrade I was in California, and he said he

22  wanted to meet and he flew out to meet me.

23  Q.   Did you discuss compensation or the terms of your work?

24  A.   Yes.

25  Q.   What did you discuss?

1    **A.**   I told Mr. Andrade that for me to be involved in the

2    project, I would need to be paid and that I needed to be paid a

3    rate of -- I can't remember exactly what I told him, but

4    somewhere in the range of 25- to $50,000 a month.  Mr. Andrade

5    responded that he couldn't pay me that, but he would give me

6    50,000 of his Aten Coin per month instead.

7    **Q.**   Did he -- okay.  What was your response to that?

8    **A.**   I asked him if the Aten Coin could pay for the dinner that

9    we were then having, and he said, no, it couldn't.  And I said,

10   "Well, then I can't really accept it because I really need to

11   be paid for the work I do so I can survive financially."

12   **Q.**   Did you have further communications with Mr. Andrade

13   shortly thereafter?

14   **A.**   I did.

15   **Q.**   And what were the nature of those?

16   **A.**   They continued about the possibility of my getting actual

17   dollar payment for joining the company or for providing

18   services.  And Mr. Andrade indicated that I would, before

19   getting anything, have to show him that I was capable by

20   obtaining congressional action.  In particular, he talked,

21   I believe, about legislation at that point; and if I could do

22   that, then he would be able to pay me a monthly fee.

23   **Q.**   And what was your response to that, if you remember?

24   **A.**   Yes.  I told him that I am unwilling to do that without

25   being hired to be paid and that -- I broke off our discussions.

1    **Q.**    At some point during the course of these communications

2    about Aten Coin, did Mr. Andrade discuss the success of the

3    Aten Coin with you?

4    **A.**    During these initial conversations?

5    **Q.**    During these initial conversations.

6    **A.**    No, I don't believe during the initial conversations he

7    did.  In a subsequent conversation he did, but not during the

8    initial.

9    **Q.**    In the subsequent conversations, what did Mr. Andrade tell

10    you about the success of the Aten Coin project?

11    **A.**    I reconnected with Mr. Andrade, I think July of 2017, and

12    he told me that his Aten Coin was launched, indeed became very

13    successful.  Its price value reached $80 a coin and that he

14    pulled it off the market, however, because the compliance

15    companies that he had hired to check identification were not

16    doing their job; and, in fact, that he and his engineers had

17    submitted false identifications to the compliance companies,

18    including a submission in the name of Homer Simpson with a

19    cartoon picture; and that these compliance companies approved

20    the -- these submissions.

21        And so he, therefore, pulled the coin off the market to

22    reconfigure its properties, AML/KYC, anti-money laundering,

23    know-your-customer properties, and that it was not presently

24    trading.

25    **Q.**    Let's talk about how that second set of conversations in

1    2017 came about.  Can you please describe for the jury how the

2    second set of conversations came about?

3    **A.**    Yes.  I was having lunch with one of my sons who was

4    playing on his phone, and I asked him what he was doing, and he

5    said he was buying and selling cryptocurrencies.  And I was

6    unaware of the fact that he, until then, was doing such things.

7    And I told him the story of the previous dinner in Los Angeles

8    and conversations with Mr. Andrade.  And he said that I made a

9    big mistake in not being involved with him because the

10    cryptocurrency world was booming forward and these alternative

11    coins were doing very well, and he thought it would be a good

12    idea for me to get back involved and to contact him.  And so I

13    made contact with Mr. Andrade in the second go-around.

14    **Q.**    And when you made contact with Mr. Andrade in the second

15    go-around, what did you tell him?

16    **A.**    I told him that I would like to get back involved with --

17    with the project, and that's when he gave me a history of what

18    had happened with Aten Coin.  I felt kind of foolish that I

19    didn't accept the coins at that point if they had been worth

20    $80 apiece, and I told him I'd like to get back involved.

21        The task at that point still was to move forward to get

22    congressional -- congressional support of the coin; and the

23    discussion lended itself, if I recall, to a discussion that

24    getting congressional support would help the coin stand out in

25    a very crowded coin world in addition to getting the federal

1    government involved in the coin.

2        And I believe he wanted us -- wanted me to organize an

3    effort to get congressional legislation at that point to

4    support the -- the Aten Coin, or the new coin which was not the

5    Aten Coin.

6    **Q.**    What was the new coin called?

7    **A.**    Well, I don't know when it was called this, but eventually

8    it was called AML BitCoin --

9    **Q.**    Did --

10   **A.**    -- but I can't remember if it was at that moment or not.

11   **Q.**    Did Mr. Andrade tell you how he transitioned from

12   Aten Coin to AML BitCoin?

13   **A.**    How he transitioned?

14   **Q.**    Did he tell you that he rebranded the Aten Coin to become

15   an AML BitCoin?

16   **A.**    Yes.  Yes.  He was rebranding the coin.  Yeah.  I'm sorry.

17   **Q.**    What did he tell you about why he did that, if anything?

18   **A.**    I don't recall.

19   **Q.**    So you just testified about congression- -- that

20   Mr. Andrade wanted congressional support for his project,

21   including potentially legislation.

22   **A.**    Yes.

23   **Q.**    Did you tell him -- did you give him a reaction to that

24   idea?  Did you tell him a likelihood of success for that plan?

25   **A.**    Well, I believe I told him that it was an arduous and

1    difficult task, but not impossible.  Many things get

2    congressional support, but it would take a lot of work to do

3    it.  But it was certainly going to be difficult, particularly

4    since, at that point in time, very few members of Congress knew

5    what Bitcoin was, let alone the alternative coins.

6    Q.   So you've just testified about obtaining congressional

7    support.  Did you talk to Mr. Andrade about challenges

8    obtaining congressional legislation?

9    A.   Yes, I had at numerous times, but likely then, because it

10   was the initial discussion, that having -- to get congressional

11   legislation through to the point of signatures by a president

12   was an extremely rare and difficult process to go through

13   and -- and could take a long time, particularly since, again,

14   the congressmen themselves were unaware really of what this

15   world was all about.

16   Q.   Did -- I want to step back.

17        Do you have a recollection of Mr. Andrade sending you

18   press releases related to Aten Coin?

19   A.   Yes.  Mr. Andrade sent me materials so that I could learn

20   about what was going on, including press releases.

21   Q.   And was that in the 2015 time frame, or was that in the

22   2017 -- early 2017 time frame?

23   A.   I can't recall.  I can't recall.

24   Q.   Did Mr. Andrade want you to help build media attention for

25   his AML BitCoin project?

1    **A.**    Yes.

2            **MR. SHEPARD:**  Objection.  Leading.

3            **THE COURT:**  Overruled.

4        You can continue.

5    **BY MR. HIGHSMITH:**

6    **Q.**    Please describe what Mr. Andrade told you about a media

7    campaign.

8    **A.**    Mr. Andrade, from -- other than the initial ask to get a

9    congressional letter and action, Mr. Andrade was very

10   interested, wildly interested in getting media attention for

11   the coin so as to enable the coin to stand out in the very

12   crowded coin world and thereby have success later at the

13   initial coin offering, which is where the coin would be first

14   sold publicly, and encouraged as much media activity throughout

15   the entire time I was involved.

16   **Q.**    Did you discuss compensation with Mr. Andrade during this

17   2017 time period?

18   **A.**    Yes, I did.

19   **Q.**    And what did he say about your compensation?

20   **A.**    He needed me, again, to prove my worth by getting

21   something done first.  I stuck with it, as I recall.  I

22   continually told him I needed to get a fee.  I needed to get

23   paid, since I was --

24           **THE OFFICIAL REPORTER:**  I'm sorry.  I'm sorry.  This

25   is the court reporter.

1    **THE COURT:**  Stop for a moment.

2    **BY MR. HIGHSMITH:**

3    **Q.**  Move the microphone closer to you, please.  Thank you.

4    **A.**  Sorry.

5    Can you give me the question again, please?

6    **Q.**  Yes.  The question is:  Please describe Mr. Andrade's

7    instructions to you and discussions with you regarding a media

8    strategy?

9    **A.**  A media strategy.  Well, Mr. Andrade wanted to get as much

10   media attention as possible for the coin throughout the entire

11   process, including any kind of media attention possible, to

12   enable the coin to be able to emerge from the sea of alternate

13   coins that were out there.

14   **Q.**  And what was the -- explain, please, the relationship

15   between the media strategy and the initial coin offering that

16   you testified about moments ago.

17   **A.**  Well, the coin was going to be put into what I was told is

18   called an ICO, which is an initial coin offering, and that it

19   would be available to the public to purchase, I guess, online.

20   And in order for the public to seek out to purchase the coin,

21   they would have to learn about the coin through exposure in the

22   media predominantly.

23   **Q.**  Did you end up executing a media strategy?

24   **A.**  Yes.

25   **Q.**  Was the media strategy designed to sell an AML BitCoin

1   Token or an AML BitCoin coin?

2   **A.**   I believe an AML BitCoin Token was all that was available.

3   **Q.**   Did Mr. Andrade discuss with you the technical or

4   specialized security features of his AML BitCoin

5   cryptocurrency?

6   **A.**   At a technical level that I would be able to understand.

7   I don't have technical expertise, but at a level that a

8   non-tech person like me would understand, yes.  I needed to

9   understand what was going on, and he explained it to me.

10  **Q.**   What did he tell you about the security features of his

11  cryptocurrency?

12  **A.**   That because of the need for the buyers to identify

13  themselves and to go through a -- eventually a biometric

14  identification process that would then check them -- their

15  identities against sanctions lists and criminal lists and other

16  lists, that it would prevent terrorists and criminals from

17  purchasing this coin.

18  **Q.**   Did he represent to you that the biometric identification

19  features would be built into the blockchain of the AML BitCoin

20  cryptocurrency?

21  **A.**   Yes, I believe so.

22  **Q.**   Focusing back on the token you testified to, did the token

23  you were discussing earlier have those specialized security

24  features?

25  **A.**   No.

**ABRAMOFF - DIRECT / HIGHSMITH**

1  **Q.**   In the buildup to the ICO and in the ICO itself, was

2  AML BitCoin selling the token or the coin?

3  **A.**   The token.

4  **Q.**   To your knowledge, was a complete coin with all of the

5  security features you just testified about ever in place and

6  available to the market?

7  **A.**   To my knowledge, no.

8  **Q.**   So Mr. Andrade hired you; is that correct?

9  **A.**   Yes.

10  **Q.**   And did you come to communicate frequently with

11  Mr. Andrade?

12  **A.**   Yes.

13  **Q.**   Did you communicate with him over WhatsApp?

14  **A.**   Yes.

15  **Q.**   Did you call him on the phone?

16  **A.**   Yes.

17  **Q.**   Did you email with him?

18  **A.**   Yes.

19  **Q.**   Please grab the binder that's to your right and open it

20  up.  Could you please look at those documents briefly.  You

21  don't need to read their comments, but could you leaf through

22  them and then tell me, have you seen these documents before?

23  **A.**   (Witness examines document.)  Yes.

24  **Q.**   Are these WhatsApp messages and emails between you and

25  Mr. Andrade?

1  **A.**   Yes.  Yes, they are.

2  **Q.**   Please go all the way to the end of the binder, and I'm

3  going to ask you if you have seen all of these materials before

4  your testimony today.

5  **A.**   (Witness examines document.)  Yes, I have.

6  **Q.**   Are these documents all a fair and accurate depiction of

7  your WhatsApp and email communications with Mr. Andrade?

8  **A.**   Yes.

9      **MR. HIGHSMITH:**  Your Honor, I move to admit a large

10  number of exhibits.  Specifically, I move to admit Exhibit 171,

11  170, 142, 114, 1445, 913, 914, 141, 765, 764, 7, 6, 920, 926,

12  930, 898, 1064, 900, 938, 17, 16, 951, 901, 909, 932, and 966

13  into evidence.

14      **MR. SHEPARD:**  Your Honor, may I ask Mr. Highsmith if

15  those are the same documents that were -- that he sent us in a

16  list?  If they are, I don't have objection, but I can't check

17  that quickly with that many.

18      **MR. HIGHSMITH:**  Yes, this is what was previously sent

19  to you.

20      **MR. SHEPARD:**  Okay.

21      **THE COURT:**  All right.  The list of exhibits recited

22  by Mr. Highsmith will be admitted.

23      (Trial Exhibits 171, 170, 142, 114, 1445, 913, 914, 141,

24  765, 764, 7, 6, 920, 926, 930, 898, 1064, 900, 938, 17, 16,

25  951, 901, 909, 932, and 966 received in evidence.)

ABRAMOFF - DIRECT / HIGHSMITH

1      **MR. HIGHSMITH:**  Thank you, Your Honor.

2    **Q.**   I'd like to move to some specifics of your congressional

3    support strategy.

4         Did you use your lobbying contacts to get pro AML BitCoin

5    statements read into the Congressional Record?

6    **A.**   Yes.

7    **Q.**   Did you attempt to conceal your involvement in these

8    efforts from the public?

9    **A.**   Yes.

10   **Q.**   Why?

11   **A.**   Because I have a very damaged reputation as far as

12   lobbying is concerned.

13   **Q.**   Describe Mr. Andrade's level of support for these efforts.

14   **A.**   He was completely supportive of these efforts and

15   requested them.

16   **Q.**   Did you and Mr. Andrade then move to publicize, through

17   media channels, that pro-AML BitCoin statements were in the

18   Congressional Record?

19   **A.**   Yes.

20   **Q.**   What was the purpose of that?

21   **A.**   To present an image to the potential future buyers that

22   the AML BitCoin was something that was starting to receive

23   support in Washington and on Capitol Hill.

24   **Q.**   So you just testified about support from Washington and

25   Capitol Hill.  Did you ever tell Mr. Andrade that passing

1  favorable congressional legislation is extremely difficult?

2  **A.**   Yes.

3           **MR. SHEPARD:**  Objection.  Asked and answered.

4           **THE COURT:**  Overruled.

5  **BY MR. HIGHSMITH:**

6  **Q.**   Did you and Mr. Andrade also discuss a television show?

7  **A.**   Yes.

8  **Q.**   Describe the nature of the proposal.

9  **A.**   The proposal was to create a reality docudrama, a

10  multi-episode show that revolved around efforts of AML BitCoin

11  to lobby Congress to be supportive of cryptocurrency in general

12  and basically AML BitCoin in particular.

13  **Q.**   Did the proposal for that show play in your negative

14  reputation?

15  **A.**   Yes, it did.

16  **Q.**   Was Mr. -- describe, please, Mr. Andrade's level of

17  support for the TV show.

18  **A.**   Mr. Andrade was very supportive and committed to fund the

19  production of the program, which would have been required to

20  enable the program to go forward, out of the ICO proceeds.

21  **Q.**   And what was the purpose of the show?

22  **A.**   To promote AML BitCoin.

23  **Q.**   And ultimately, to sell the product?

24  **A.**   Yes.

25  **Q.**   In addition to providing congressional expertise and --

1   oh, what happened with the TV show?

2   **A.**   Well, the ICO did not succeed, there was no funding, and

3   the show eventually was dropped as an idea.

4   **Q.**   So it never ran?

5   **A.**   No.

6   **Q.**   Did you bring your -- some of your contacts into the

7   AML BitCoin project?

8   **A.**   Some of my contacts?

9   **Q.**   Yes.

10  **A.**   In what capacity?  I brought numerous of my contacts in in

11  various capacities.

12  **Q.**   Let's describe -- let's go category by category.

13  **A.**   Yes.

14  **Q.**   So please describe the different kinds of contacts you

15  brought in and their purpose.

16  **A.**   Well, at the beginning, being a very big believer of what

17  Mr. Andrade was telling me and thinking the project had immense

18  worth and potential, Mr. Andrade invited me to offer to my

19  friends and family an opportunity to purchase the coins at a

20  discount before the initial coin offering.  And so I then

21  brought friends and family into the project as purchasers,

22  including my father, my brother, my rabbi, and basically

23  everyone who I knew who evidenced to me an interest in doing

24  so.  So that's one level.

25  **Q.**   Did you also get a sales commission --

1        **MR. SHEPARD:**  Your Honor, may I ask that the witness

2   confine his answer to the actual question.  There's so many

3   asides in the answer that it makes it impossible to object to.

4        **THE COURT:**  I would request you, Mr. Abramoff, to

5   focus on the particular question.

6        I don't think that last answer was as you characterize it,

7   Mr. Shepard.

8        But as you go forward, really focus on the question, and I

9   ask you not to elaborate.  Counsel will ask you to if they

10  think they want more information.

11       Go ahead, Mr. Highsmith.

12       **THE WITNESS:**  Yes, Your Honor.  Yes, Your Honor.

13       **MR. HIGHSMITH:**  Thank you, Your Honor.

14  **Q.**  Did you receive a sales commission or any sort of payment

15  for bringing in those friends and family?

16  **A.**  Yes.

17  **Q.**  Do you recall how much or what percentage?

18  **A.**  It was a varying percentage that he offered.

19  **Q.**  Do you recall approximately the percentage?

20  **A.**  I don't recall.

21  **Q.**  Did you bring in some of your foreign contacts into this

22  endeavor?

23  **A.**  Yes, I did.

24  **Q.**  Describe why you brought them in.

25  **A.**  I brought in contacts overseas in order to create

ABRAMOFF - DIRECT / HIGHSMITH

1  opportunities for us to have interaction -- the coin to have --

2  Marcus and the coin to have interaction with overseas

3  governments so as to potentially interest those governments in

4  the coin and to create promotional opportunities for the coin.

5  **Q.**  When you say "promotional opportunities," was one of the

6  jobs of your contacts to set up meetings between Mr. Andrade

7  and foreign representatives?

8  **A.**  Yes.

9  **Q.**  What was the purpose of setting up those meetings with

10  foreign representatives?

11  **A.**  To enable us to be able to have activities that we could

12  then use to promote the coin.

13  **Q.**  And how would you promote the coin based on those

14  activities and meetings?

15  **A.**  By creating press releases or articles that described, in

16  general and specifically, what was going on with those meetings

17  and then getting them out to media outlets.

18  **Q.**  Was Carlos De La Guardia one of your foreign contacts?

19  **A.**  Yes.

20  **Q.**  Did you also bring your press contacts into the

21  AML BitCoin project?

22  **A.**  Yes.

23  **Q.**  Why?

24  **A.**  For the same purpose, to get promotion to enable our

25  coin -- the coin to rise above the sea of other coins.

ABRAMOFF - DIRECT / HIGHSMITH

1  **Q.**   Let's describe your press contacts.  Can you please

2  describe how you used your press contacts to promote the

3  AML BitCoin project.

4  **A.**   Well, we would ask them -- we would bring in people who

5  had the capacity to place articles in various publications to

6  do an article either at their own -- well, I don't want to

7  expand too much, but basically to write articles about the

8  project.

9  **Q.**   So let me stop you there.  Were you communicating with

10  Mr. Andrade about this specific strategy?

11  **A.**   Yes.

12  **Q.**   Who was the final decision-maker on this specific

13  strategy?

14  **A.**   Mr. Andrade.

15  **Q.**   Speaking of which, who was the final decision-maker on all

16  business strategies at AML BitCoin?

17  **A.**   Mr. Andrade.

18  **Q.**   Let's talk a little bit more about the specific press

19  strategy.  If you could please turn to the Exhibit 171 in the

20  binder in front of you.  That's the first tab.

21  **A.**   Okay.

22  **Q.**   Is Exhibit 171 an email from you to Mr. Andrade on

23  September 8th, 2017, at 3:35 p.m.?

24  **A.**   Yes.

25  **Q.**   Okay.  If we start a little bit lower down, do you see the

ABRAMOFF - DIRECT / HIGHSMITH

 1   email from Peter Roff to you on September 8th earlier in the

 2   day?

 3   **A.**   Yes.

 4   **Q.**   Who is Peter Roff?

 5   **A.**   Peter Roff is a longtime friend of mine, a former employee

 6   decades ago who was a writer for various publications.

 7   **Q.**   Was he involved in your media placement campaign?

 8   **A.**   Yes.

 9   **Q.**   Was he drafting an article for publication in

10   *U.S. News & World Report*?

11   **A.**   Yes.

12   **Q.**   Did you pay Mr. Roff to draft and place that article?

13   **A.**   Yes.

14   **Q.**   Did you provide the information, the facts, and the

15   information underlying the article?

16   **A.**   Yes.

17   **Q.**   Did you communicate with Mr. Andrade about paying

18   Mr. Roff?

19   **A.**   Yes.

20   **Q.**   Did you disclose to the public that AML BitCoin was paying

21   Mr. Roff?

22   **A.**   No.

23   **Q.**   Did you disclose to the public that AML BitCoin was

24   providing substantial underlying material for his article?

25   **A.**   No.

1  **Q.**  Based on your communications with Mr. Andrade, what was

2  his reaction to this, to paying authors and to placing articles

3  without disclosing the payments to the public?

4  **A.**  He approved and supported it.

5  **Q.**  Let's -- let's take a look at page 2 in the document in

6  front of you.  This is a draft of Peter Roff's

7  *U.S. News & World Report* article; correct?

8  **A.**  Correct.

9  **Q.**  Please look at the third paragraph and the second

10  sentence.

11  **A.**  Could you please tell me what the paragraph begins with?

12  **Q.**  The paragraph begins "As the use of digital currency."

13  **A.**  Yes.  Okay.

14  **Q.**  Do you see where it says [as read]:

15          "AML BitCoin, which launches publicly on

16      October 1st, 2017, has attracted intense governmental

17      interest . . . ."?

18  **A.**  Yes.

19  **Q.**  Was it true that AML BitCoin, as of that period, had

20  attracted intense governmental interest?

21  **A.**  No.

22  **Q.**  Was that misleading?

23  **A.**  Yes.

24  **Q.**  Focusing on the second-to-last paragraph that says,

25  "Andrade may be more ahead of the curve than he realizes," do

1    you see that?

2    **A.**    Yes.

3    **Q.**    The second sentence reads [as read]:

4         "Florida Republican Rep Ted Yoho will soon be

5         introducing legislation prohibiting U.S. merchants

6         from accepting non-compliant digital currency in

7         their provision of goods and services."

8         Do you see that?

9    **A.**    Yes.

10    **Q.**    Was that true?

11    **A.**    No.

12    **Q.**    Please go now to the first page, and the very top of the

13    page, where you write to Mr. Andrade [as read]:

14         "Please read (but do not forward to anyone else)

15         and let's discuss before sunset."

16         What were you communicating with Mr. Andrade?

17    **A.**    That he needed to read the draft that Peter provided to

18    ensure that he approved it.

19    **Q.**    When you wrote "Let's discuss before sunset," why were you

20    writing that?

21    **A.**    Well, it was on a Friday; and at sunset, I would be

22    unavailable because of our Sabbath; and so I asked him if we

23    could discuss, in essence, before I was unavailable.

24    **Q.**    Please turn to the next tab.  That's Exhibit 170.

25    **A.**    Okay.

ABRAMOFF - DIRECT / HIGHSMITH

1  Q.   Is this an email chain in which Mr. Roff and you are

2  discussing revisions to the *U.S. News* draft?

3  A.   Yes.

4  Q.   If you turn to page 2, are you forwarding those revisions

5  to Mr. Andrade?

6  A.   Yes.

7  Q.   Why are you forwarding them to Mr. Andrade?

8  A.   So he could see them and let me know if they were okay.

9       **MR. HIGHSMITH:**  Your Honor, would this be a good time

10  to take a break?

11      **THE COURT:**  If you'd like, sure.

12  So let's take a break.  Try to resume at 9:30 Pacific

13  Time.

14  Members of the jury, remember, do not discuss this amongst

15  yourselves or with anyone else.

16  And we'll come back in about ten minutes.

17  (Proceedings were heard out of the presence of the jury.)

18      **THE COURT:**  We're out of the presence of the jury.

19  I appreciate saving paper, but -- and it's very nice you

20  have all the binders.  Is there a reason we didn't have one for

21  each juror?

22      **MR. WARD:**  It was just -- it's a resource issue with

23  the Government and the amount of time we could ask our

24  paralegals to spend on this.

25      **THE COURT:**  Okay.  All right.

1          **MR. WARD:**  Sorry.

2          **THE COURT:**  That's all right.  I know the Government

3    is being very frugal these days.  I understand.  So, okay.

4                    (Recess taken at 9:22 a.m.)

5                  (Proceedings resumed at 9:34 a.m.)

6        (Proceedings were heard out of the presence of the jury.)

7          **THE COURT:**  Okay?  Are we ready to bring the jury in?

8    Okay.

9        (Proceedings were heard in the presence of the jury.)

10          **THE COURT:**  The jury is present.

11        Mr. Highsmith, you can proceed.

12          **MR. HIGHSMITH:**  Thank you, Your Honor.

13   **Q.**   Please pull the microphone close to you, sir.

14        All right.  Could you please take a look at the next tab,

15   which is Exhibit 142.

16   **A.**   Yes.

17   **Q.**   Did you receive another draft of the *U.S. News* article?

18   **A.**   Yes.

19   **Q.**   And did that next draft remove the Congressman Yoho

20   section?

21   **A.**   Yes.

22   **Q.**   Why?

23   **A.**   Because Peter Roff did not want to include mention of that

24   since a bill had not been introduced.

25   **Q.**   You write to Mr. Andrade [as read]:

1          "Please let me know if this is still okay.

2      Peter made some changes."

3      And could you please turn to the second page.

4      What does Mr. Andrade write in response?

5  **A.**   [As read]:

6          "Looks great."

7  **Q.**   Is this another example of Mr. Andrade approving the

8  deceptive press releases?

9  **A.**   Yes.

10 **Q.**   Did you pay Mr. Roff for these articles?

11 **A.**   Yes.

12 **Q.**   Did you pay him from your own account?

13 **A.**   Well, not my personal account.  It was paid from a company

14 owned by my son.

15 **Q.**   Did Mr. Andrade know -- or did Mr. Andrade talk to you --

16 did you communicate with Mr. Andrade about paying Mr. Roff out

17 of your son's company or out of your funds?

18 **A.**   Yes.

19 **Q.**   What was the nature of that conversation?

20 **A.**   That we had to pay Peter Roff and he did not want to get

21 paid directly from AML BitCoin and so we would pay him out of

22 the other company and be reimbursed by Mr. Andrade.

23 **Q.**   Why didn't Mr. Roff want to be paid directly from

24 AML BitCoin?

25 **A.**   I do not know.

**ABRAMOFF - DIRECT / HIGHSMITH**

1   **Q.**   Please take a look at the next tab, which is Exhibit 114.

2   **A.**   Okay.

3   **Q.**   Do you see that document?

4   **A.**   Yes.

5   **Q.**   Is this an email chain that starts with Brian Darling?

6   **A.**   Yes.

7   **Q.**   Who is Brian Darling?

8   **A.**   Brian Darling is a lobbyist, was a friend and a media

9   advisor in Washington, D.C.

10  **Q.**   Did you bring Mr. Darling into the AML BitCoin project?

11  **A.**   Yes.

12  **Q.**   Why?

13  **A.**   Because we needed press and we needed promotion for the

14  coin.

15  **Q.**   Did you also bring in Mr. Darling as an investor?

16  **A.**   I can't recall.

17  **Q.**   Did you -- did you provide the information in

18  Mr. Darling's articles?

19  **A.**   Yes.

20  **Q.**   The factual information?

21  **A.**   Yes.

22  **Q.**   Did you provide payment to Mr. Darling?

23  **A.**   I can't recall if he was provided payment by me or was

24  provided payment by Mr. Andrade through receiving AML BitCoins.

25  **Q.**   Please take a look at the contents of the article, and I

ABRAMOFF - DIRECT / HIGHSMITH

1  direct your attention to the second paragraph on the first

2  page.  It reads [as read]:

3           "With the introduction of AML BitCoin, the first

4       digital currency that incorporates patent-pending

5       anti-money laundering and 'know your customer'

6       provisions of America's strict banking laws . . . ."

7       Do you see that?

8  A.   Yes.

9  Q.   At that time in early October, did the AML BitCoin Token

10  have these security features in place?

11  A.   No.

12  Q.   At this time in October 2017, was there an existing

13  AML BitCoin with these security features in place?

14  A.   No.

15  Q.   Was the provision I just read accurate?

16  A.   No.

17  Q.   Was it misleading?

18  A.   Yes.

19  Q.   Why were you publishing misleading material?

20  A.   Well, we were trying to promote the coin, and I believe we

21  thought that eventually we'd get there but it wasn't there yet.

22  Q.   I'd like to direct your attention to the next page.

23  There's a paragraph, the third -- excuse me -- the fourth

24  paragraph that starts "She's not alone."

25  A.   Yes.

1  **Q.**  It says [as read]:

2          "Marcus Andrade, the CEO of NAC Foundation, the

3          creator of AML BitCoin, has been furiously traveling

4          the world for the past few weeks, trying to keep up

5          with governments' requests to meet him and explore

6          his new AML BitCoin as a solution to the difficulties

7          confronting cryptocurrency."

8          Do you see that?

9  **A.**  Yes.

10 **Q.**  Was it accurate and true that governments around the world

11 were requesting to meet with him?

12 **A.**  No.

13 **Q.**  Was that misleading?

14 **A.**  Yes.

15 **Q.**  Do you see the next paragraph?  It reads [as read]:

16          "In Panama, Andrade met with regulatory and

17          financial authorities in urgent and productive

18          conclaves."

19          Do you see that?

20 **A.**  Yes.

21 **Q.**  I'd like to direct your attention to the next paragraph.

22 There, the second sentence reads [as read]:

23          "Since Andrade's visit" -- referring to

24          Panamanian officials -- "they have been scurrying to

25          find a way to integrate the AML BitCoin into payment

1        structures for everything from banks to the

2        Panama Canal . . . ."

3        Do you see that?

4   **A.**   Yes.

5   **Q.**   Is that true and accurate?

6   **A.**   No.

7   **Q.**   Is that misleading?

8   **A.**   Yes.

9   **Q.**   I direct your attention to the first page of this exhibit.

10  Do you forward this article to Mr. Andrade?

11  **A.**   Yes.

12  **Q.**   What is his response?

13  **A.**   [As read]:

14        "Looks great.  Post it.  Thanks."

15  **Q.**   Was Mr. Andrade approving these misleading press releases?

16  **A.**   Yes.

17  **Q.**   Did he know that the authors were being paid?

18  **A.**   Yes.

19  **Q.**   Did you talk to Mr. Andrade or communicate with him about

20  how these articles were not disclosing that AML BitCoin had

21  paid and provided the underlying information?

22  **A.**   Could you repeat that question?

23  **Q.**   You testified earlier that in this press strategy, you and

24  your AML BitCoin colleagues provided underlying information to

25  the authors of articles and paid the authors of those

ABRAMOFF - DIRECT / HIGHSMITH

1  articles --

2  **A.**   Yes.

3  **Q.**   -- correct?

4  **A.**   Correct.

5  **Q.**   You also testified earlier that those authors did not

6  disclose payments --

7  **A.**   Yes.

8  **Q.**   -- or that you had sourced the information.

9  **A.**   Correct.

10  **Q.**   Did you discuss those omissions with Mr. Andrade?

11  **A.**   Those omissions?

12  **Q.**   Did you discuss failing to disclose the payments and the

13  sourcing to the authors with Mr. Andrade?

14  **A.**   I can't recall.  I can't recall.

15  **Q.**   Did you discuss with Mr. Andrade paying the authors of

16  these articles?

17  **A.**   Yes.

18        **MR. SHEPARD:**  Objection.  Asked and answered.

19        **THE COURT:**  Well, if he's going over some -- one more

20  time some information he's already gone over, that shouldn't

21  prompt an asked and answered.  If you keep going over it, it

22  becomes a problem.  At this point, overruled.

23  **BY MR. HIGHSMITH:**

24  **Q.**   Did you discuss with Mr. Andrade providing the underlying

25  information in these articles?

ABRAMOFF - DIRECT / HIGHSMITH

1   **A.**   Yes.

2   **Q.**   I'd like to move on to some of the other articles.

3        Are you familiar with the name Peter Ferrara?

4   **A.**   Yes.

5   **Q.**   Did you retain and did AML BitCoin retain Peter Ferrara

6   for its media campaign?

7   **A.**   Yes.

8   **Q.**   And did Mr. Ferrara publish articles about AML BitCoin in

9   *Investors Business Daily* and the *Washington Times*?

10  **A.**   Yes.

11  **Q.**   Was he paid for those?

12  **A.**   I believe so, yes.

13  **Q.**   Were those articles approved by Mr. Andrade?

14  **A.**   Yes.

15  **Q.**   Did you retain Peter Versace to publish an article with

16  *Forbes*?

17  **A.**   I did not retain him directly.

18  **Q.**   Who retained him?

19  **A.**   I believe it was Brian Darling.

20  **Q.**   Did you discuss with Mr. Andrade paying people retained by

21  Mr. Darling --

22  **A.**   Yes.

23  **Q.**   -- to place articles?

24        Please take a look at the next exhibit in your binder,

25  913.

ABRAMOFF - DIRECT / HIGHSMITH

1    Is this a WhatsApp chain between you and Mr. Andrade dated

2  November 8, 2017?

3  **A.**    Is this Exhibit 913?

4  **Q.**    Yes.  Please look at Exhibit 913.

5  **A.**    Okay.  Yes.  Yes.

6  **Q.**    In that, does Mr. Andrade write "Call me when you can" and

7  then provide a draft statement about the NAC Foundation?

8  **A.**    Yes.

9  **Q.**    And does he write that [as read]:

10        "The NAC Foundation is the creator of the

11        AML BitCoin and its predecessor digital currency, the

12        Aten Coin, both of which were built with anti-money

13        laundering, anti-terrorism, and theft-resistant

14        properties built into the coin"?

15  **A.**    Yes.

16  **Q.**    At that time in November 2017, did the token being offered

17  for sale offer anti-money laundering, anti-terrorism,

18  theft-resistant properties built into the coin?

19  **A.**    No.

20  **Q.**    Was there a finished coin product that had all of those

21  security features?

22  **A.**    No.

23  **Q.**    Okay.  Do you see how later down you rewrite the paragraph

24  and then send it to Mr. Andrade?

25  **A.**    Yes.

1    **Q.**   He writes [as read]:

2           "Thanks.   Sending now."

3    Do you see that?

4    **A.**   Yes.

5    **Q.**   Is this reflective of your seeking Mr. Andrade's approval

6    for draft press releases?

7    **A.**   Yes.

8    **Q.**   Please turn to Exhibit 914.

9    Is this a WhatsApp chain between you and Mr. Andrade dated

10   November 8th, 2017?

11   **A.**   Yes.

12   **Q.**   Do you see the top paragraph that reads [as read]:

13          "Here is the PR for your trip to Estonia/

14    Slovenia approved by Natko"?

15    Do you see that?

16   **A.**   Yes.

17   **Q.**   Who is Natko?

18   **A.**   Natko is the individual contact of mine from Croatia who's

19   a lobbyist and media person in Croatia and connected throughout

20   that region, who was engaged to help us secure meetings and

21   opportunities in that region.

22   **Q.**   The title of the draft is "AML BitCoin Announces

23   Breakthrough Meetings with Estonian and Slovenian Government

24   Leaders."  And the next paragraph reads [as read]:

25          "Marcus Andrade, chief operating officer of the

ABRAMOFF - DIRECT / HIGHSMITH

1    NAC Foundation and creator of the innovative new

2    digital currency AML BitCoin, met with Slovenian and

3    Estonian officials to probe how their governments

4    could utilize AML BitCoin's patent-pending digital

5    blockchain platform."

6    Do you see that?

7  **A.**    Yes.

8  **Q.**    And then three paragraphs down it reads [as read]:

9        "Because of its AML/KYC (anti-money laundering,

10    know-your-customer features) AML BitCoin is the

11    digital currency most able to engage in mainstream

12    commerce, taking its place among traditional payment

13    options."

14    Do you see that?

15  **A.**    Yes.

16  **Q.**    Again, at that time did the AML BitCoin product have the

17    anti-money laundering, know-your-customer security features

18    built into its product?

19  **A.**    No.

20  **Q.**    Further down in this proposal, it writes [as read]:

21        "AML BitCoin's white label platform is unique."

22    Do you see that?

23  **A.**    Yes.

24  **Q.**    [As read]:

25        "It relies on complex verification methods, such

ABRAMOFF - DIRECT / HIGHSMITH

1          as patent-pending biometric digital identification,

2          that other digital currencies and financial

3          technology platforms do not have and have not yet

4          developed."

5          Do you see that?

6     A.   Yes.

7     Q.   Again, at that time did AML BitCoin have those security

8     features in its product?

9     A.   Not to my knowledge.

10    Q.   Finally, it says in two more paragraphs down [as read]:

11              "'In the United States, Members of Congress are

12         considering legislation bearing or barring the use by

13         U.S. merchants of anonymous, non-AML compliant

14         cryptocurrencies,' explained Andrade."

15         Do you see that?

16    A.   Yes.

17    Q.   So please turn to the next page.

18         How does Andrade respond to your drafts?

19    A.   [As read]:

20              "Great work.  I will be providing you with

21         updates shortly."

22    Q.   What did you take -- what did you understand Mr. Andrade

23    meant with those comments?

24    A.   That he approved those press releases.

25    Q.   You testified earlier that you would bring in investors.

ABRAMOFF - DIRECT / HIGHSMITH

1    Do you recall that?

2    **A.**    Yes.

3    **Q.**    You also testified earlier that you brought in some of

4    your contacts.  Do you recall that?

5    **A.**    Yes.

6    **Q.**    Are you familiar with the name Japheth Dillman?

7    **A.**    Yes.

8    **Q.**    How are you familiar with that name?

9    **A.**    He was somebody that I introduced to Marcus Andrade.

10   **Q.**    Why did you introduce him to Marcus Andrade?

11   **A.**    Because I felt he had the potential to raise money and

12   provide technological assistance to the project.

13   **Q.**    In your conversations with Mr. Andrade, is that something

14   that Mr. Andrade wanted?

15   **A.**    Yes.

16   **Q.**    Please describe your enthusiasm for the project at this

17   point.

18   **A.**    Well, I -- my enthusiasm?

19   **Q.**    Yes.

20   **A.**    I was very enthusiastic about this project.

21   **Q.**    Did you want it to succeed?

22   **A.**    Very much so.

23   **Q.**    Why?

24   **A.**    Well, first, I thought it was an incredibly important and

25   good idea.

1    Second, I thought it could be immensely successful; and as

2   a participant, I would be able to make money and the people,

3   family and friends, that I had brought into the project at the

4   invitation of Mr. Andrade would also be able to succeed along

5   with it.

6   **Q.**   So is it accurate to say you brought people who you

7   thought could help the project?

8   **A.**   Yes.

9   **Q.**   Please turn to the next tab in front of you.  It's

10  Exhibit -- it may be two tabs in.  It's Exhibit 765.  It's

11  titled "Investment Into AML BitCoin."

12  **A.**   Okay.

13  **Q.**   Do you see this email in front of you?

14  **A.**   I do.

15  **Q.**   Is this an email from Japheth Dillman, copying Marcus

16  Andrade and blindly copying you?

17  **A.**   Yes.

18  **Q.**   Do you see in the email it says, "Hi," and then it has a

19  placeholder?

20  **A.**   Yes.

21  **Q.**   And then do you see the second sentence?  It says [as

22  read]:

23          "The coin used to trade at $80 under the name

24      Aten Coin . . . ."

25      And then skipping ahead [as read]:

ABRAMOFF - DIRECT / HIGHSMITH

1           "There are several enormous multi-billion-dollar

2       deals being secured."

3       Do you see that?

4  A.   Yes.

5  Q.   It also says [as read]:

6           "I'll let Marcus share with you the details of

7       some of these deals . . . ."

8       Do you see that?

9  A.   Yes.

10 Q.   And then three paragraphs down, it says [as read]:

11          "There are literally billions of dollars in

12      deals that are currently being negotiated right

13      now . . . ."

14      Do you see that?

15 A.   Yes.

16 Q.   Did you ever -- this email -- Mr. Andrade's copied on

17 this; correct?

18 A.   Correct.

19 Q.   Did you ever -- my first question is:  Did you ever

20 research whether Aten Coin was actually traded for $80?

21 A.   Eventually, I did.

22 Q.   What did you learn?

23          **MR. SHEPARD:**  Objection.  Foundation.

24          **THE COURT:**  Well, you could establish, Mr. Highsmith,

25 the timing of when he's learning this and -- why don't you

 1  start with that.

 2  BY MR. HIGHSMITH:

 3  Q.   Sir, approximately how long after this email in September

 4  of 2017 did you begin researching or learning about the value

 5  of Aten Coin, the predecessor coin?

 6  A.   I don't recall when I -- when I did that.  I just do

 7  remember that it wasn't at the beginning.  When Mr. Andrade

 8  first told me that Aten Coin had sold for $80, I believed him;

 9  but I don't recall when it was that I decided that I better

10  start trying to check this out.

11  Q.   Do you recall what kind of research you did to check out

12  whether Aten Coin had sold for $80?

13  A.   I can't recall exactly, but I believe I tried to go on

14  to -- I can't -- I can't recall.  I just can't recall what I

15  did.

16  Q.   Okay.  What was your under- -- after you did that

17  research, what was your understanding of the claim that

18  Aten Coin had traded for $80?

19        MR. SHEPARD:  Objection to the relevance of his

20  understanding.

21        THE COURT:  Overruled.

22        THE WITNESS:  Can you please repeat?

23        THE COURT:  You may answer the question.

24  BY MR. HIGHSMITH:

25  Q.   After you conducted that research, what was your

1   understanding of whether Aten Coin traded for $80?

2   **A.**   Well, the research that I did I believe was rather

3   inconclusive; and so I approached Mr. Andrade again, querying

4   whether the $80 price was true and accurate; and he told me at

5   that point that he never told me $80.  He told me that it was

6   $80 worth of a Bitcoin that it traded at.  Meaning if Bitcoin

7   was trading for a thousand dollars, this would be 80 over a

8   thousand dollars was the value of the coin, which was vastly

9   different than what he had told me before.

10  **Q.**   Did Mr. Andrade ever correct this email, responding to it,

11  saying there are not billion-dollar deals in the works?

12  **A.**   Not to my knowledge.

13          **MR. SHEPARD:**  Objection.  Calls for -- okay.

14          **THE COURT:**  Overruled.

15  **BY MR. HIGHSMITH:**

16  **Q.**   Turning to the next document, Exhibit 674 [sic].  Do you

17  see that?

18  **A.**   Yes.

19  **Q.**   It's titled "Introduction."  Do you see that?

20  **A.**   Yes.

21  **Q.**   Do you see that it's an email from Mr. Dillman to Bill

22  Shihara and Marcus Andrade?

23  **A.**   Yes.

24  **Q.**   And you are blindly carbon copied.  Do you see that?

25  **A.**   I do.

**ABRAMOFF - DIRECT / HIGHSMITH**

1  Q.  And Mr. Dillman is blindly carbon copied.  Do you see

2  that?

3  A.  Yes.

4  Q.  Does this appear to be that same form email but this time

5  with an addressee?

6  A.  No, I don't believe this is the same type email.  The

7  previous email looked to me to be going to somebody to invest

8  in coin, and this looks to be going to a crypto exchange to get

9  the coin listed on Bittrex -- Bittrex, the crypto exchange.

10  Q.  So let's examine the first sentence.  Is this first

11  sentence the same as the first sentence in the email we just

12  looked at?

13       [As read]:

14          "Hi, Bill.  Marcus Andrade (cc'd here) is the

15       CEO and Founder of AML BitCoin."

16  A.  Yes.

17  Q.  And is the second sentence the same?

18       [As read]:

19          "The coin used to trade at $80 under the name

20       Aten Coin, but they pulled all coins back and have

21       undergone a rebranding."

22  A.  Yes.

23  Q.  And then --

24          **THE COURT:**  Mr. Highsmith.

25  \\\

1    **BY MR. HIGHSMITH:**

2    **Q.**   -- is that also the same?

3    **A.**   Yes.

4           **THE COURT:**  Mr. Highsmith, 674 doesn't seem to be in

5    my binder.

6           **MR. SHEPARD:**  I believe it's 764, Your Honor.

7           **THE COURT:**  What is it?

8           **MR. SHEPARD:**  764.

9           **THE COURT:**  Okay.  Thank you.

10    Go ahead.

11           **MR. HIGHSMITH:**  Thank you, Your Honor.

12    **Q.**   Is the third sentence of 764 the same as the earlier

13    email?  And the third sentence reads [as read]:

14           "Between us, there are several enormous

15       multi-billion-dollar deals being secured with

16       governments for use of this coin."

17    **A.**   Yes.

18    **Q.**   And is the next sentence the same?  It says [as read]:

19           "I'll let Marcus share with you the details of

20       some of these deals . . . ."

21    **A.**   Yes.

22    **Q.**   And then the final full paragraph, is that first sentence

23    also the same?

24       [As read]:

25           "There are literally billions of dollars in

1    deals that are currently being negotiated right

2    now . . . ."

3 **A.** Yes.

4 **Q.** To your knowledge, did you ever receive an email from

5 Mr. Andrade or another communication from Mr. Andrade

6 correcting any of the statements in this email?

7 **A.** No.

8 **Q.** Please turn to the next -- I guess before we talk about

9 that, let's talk about bringing in investors.  So you can put

10 that down for a second.

11    In addition to bringing in friends and family, did you

12 also bring in or try to bring in investors outside of the

13 friends-and-family period?

14 **A.** Well, I -- I did outside of the so-called

15 friends-and-family period.  The friends-and-family period

16 continued to expand.

17 **Q.** By "expand," do you mean the length of time, that

18 opportunity existed over more and more time?

19 **A.** Yes.

20 **Q.** And you continued to try to bring in investors; is that

21 right?

22 **A.** Yes.

23 **Q.** Why did you do that?

24 **A.** Because I wished the project to succeed, and the ICO

25 failure left us without sufficient funds to succeed, and so I

1    wanted to do everything I could to help it succeed.

2    **Q.**    Were you also getting commissions from some of the

3    investors you brought in?

4    **A.**    Some of them, yes.

5    **Q.**    Please take a look now at Exhibit Number 7.  That's

6    several tabs into the binder in front of you.

7          Do you see that exhibit?

8    **A.**    Yes.

9    **Q.**    Let's move to the next exhibit, please.

10   **A.**    Exhibit 6?

11   **Q.**    Yes.

12   **A.**    All right.

13   **Q.**    Please, let's pause on the draft.

14         Do you see how the first email at the bottom of the first

15   page is from Marcus Andrade to you?

16   **A.**    Yes.

17   **Q.**    And it's dated Sunday, November 5th.  Do you see that?

18   **A.**    Yes.

19   **Q.**    2017?

20   **A.**    Yes.

21   **Q.**    And the subject is "Please confirm PR 1."  Do you see

22   that?

23   **A.**    Yes.

24   **Q.**    This press release -- or this draft reads [as read]:

25              ". . . AML BitCoin, announced today that it has

1    been in extensive discussions with the governmental

2    and private sector authorities in Panama to integrate

3    the AML BitCoin and its patent-pending anti-money

4    laundering and know-your-customer technologies into

5    the financial and payment infrastructure of key

6    Panamanian industries . . . ."

7        Was it, in fact, true that AML BitCoin had been in

8    extensive discussions with governmental and private sector

9    authorities?

10   **A.**   No.

11   **Q.**   Was that misleading?

12   **A.**   Yes.

13   **Q.**   Do you see where you write to him -- to Mr. Andrade [as

14   read]:

15           "Did you make any edits"?

16   **A.**   Yes.

17   **Q.**   And do you see his response?

18       [As read]:

19           "I made no edits."

20   **A.**   Yes.

21   **Q.**   And then you write [as read]:

22           "I think they should go with the Panama Canal

23   tomorrow, and the banks on Wednesday.  I hope to have

24   a U.K. or Estonia by tomorrow which we should go with

25   on Tuesday, and the other on Thursday."

1    Do you see that?

2  **A.**   Yes.

3  **Q.**   What were you communicating with this message?

4  **A.**   The release of press releases related to those topics.

5  **Q.**   And are you also seeking Mr. Andrade's approval for this

6    strategy?

7  **A.**   Yes.

8  **Q.**   Let me ask you, before we resume with the documents, about

9    some of the other people that you brought in.

10    You testified that you brought Mr. Dillman into the

11    project and Carlos De La Guardia into the project.  You

12    testified that you would bring in investors into the project.

13    Did you bring a man named Richard Naimer into the project?

14  **A.**   Yes.

15  **Q.**   And did you bring him in to run a separate business in the

16    United Kingdom?

17  **A.**   Well, I didn't bring him in for that, but that's what

18    eventually evolved.

19  **Q.**   What did you initially bring him in for?

20  **A.**   Richard Naimer had significant technology experience in

21    Israel, owned and sold a technology company, and so I felt that

22    he would be a very positive addition to the AML BitCoin team.

23  **Q.**   Did Mr. Naimer eventually join the team?

24  **A.**   Yes.

25  **Q.**   In what capacity?

1    **A.**    I believe he eventually wound up heading -- I forgot what

2    it was called -- DTR Network or something, CrossVerify,

3    something like that, which related to the biometric digital

4    identity components of the project.

5    **Q.**    To your knowledge, was Mr. Andrade funding that piece of

6    the project?

7    **A.**    Yes.

8    **Q.**    And who, based on your understanding of the project, was

9    ultimately in charge?  Mr. Naimer or Mr. Andrade?

10    **A.**    Mr. Andrade.

11    **Q.**    Previously, you've testified quite a bit about an initial

12    coin offering.  Let's pause on initial coin offering for a

13    moment.

14        Can you take a look, please, at the Exhibit 926.

15    **A.**    Yes.

16    **Q.**    Midway down the page it reads [as read]:

17            "Marcus, our final chance to turn around this

18        disaster is now.  Our final chance ends in 18 days.

19        If we haven't somehow created a market during the ICO

20        (and so far we have not) and sold a ton so we have

21        funds to build this project, this project is over."

22        Do you see that?

23    **A.**    Yes.

24    **Q.**    Let's start foundationally.  What is the ICO?

25    **A.**    The ICO stands for inner -- initial coin offering, which

1    was the first public sale of the AML BitCoin Token.

2    **Q.**    What's the purpose of an initial coin offering?

3    **A.**    To sell, in our case, tokens in advance -- or to the

4    public, rather, to be able to bring funds into the project to

5    be able to execute the project.

6    **Q.**    Was the ICO successful?

7    **A.**    No.

8    **Q.**    Why not?

9    **A.**    I'm not certain all the reasons why it wasn't successful,

10    but it was -- it was just a calamity in terms of what everyone

11    in the project, myself included, was promised by Mr. Andrade

12    would happen and what, in fact, did happen.

13    **Q.**    Okay.  Let's break that down.  What did he promise would

14    happen?

15    **A.**    That upon the issuance of the ICO, buyers would flood and

16    buy the coin; and the company would be and the project would be

17    fully funded, being able to complete all of the work, do the

18    television show, make a profit for everyone involved, and

19    provide an opportunity for the people, including my friends and

20    family who had put money into this, to be able to hold

21    something of value.

22    **Q.**    So your message, you write -- you reference having funds

23    to build this project.

24    **A.**    Yes.

25    **Q.**    Was that a reference to needing funds to build the

ABRAMOFF - DIRECT / HIGHSMITH

1  cryptocurrency with the security features you had -- the

2  project had promised?

3  **A.**    Yes.

4  **Q.**    So what did that statement indicate about the completion

5  of the cryptocurrency product with the special security

6  features?

7  **A.**    That it was not complete.

8  **Q.**    Do you see -- one, two, three, four -- five lines down

9  Mr. Andrade responds [as read]:

10        "Remember, all we have to do is get listed.  PR

11      would do the rest"?

12  **A.**    Yes.

13  **Q.**    What was your understanding of what that meant?

14      **MR. SHEPARD:**  Objection.  Calls for speculation.

15      **THE COURT:**  Overruled.

16      **THE WITNESS:**  My understanding?

17  **BY MR. HIGHSMITH:**

18  **Q.**    What did that mean to you?

19  **A.**    It meant that after the ICO, the plan was to get the coin

20  listed on a crypto exchange so that it could trade with buyers

21  and sellers and the price could rise, giving value to it.

22      And Marcus was, in essence, I believe, saying, as he did

23  say, that, in essence, don't worry about the failure of the ICO

24  because the coin will be listed on a crypto exchange and the

25  public relations -- the publicity would do the rest, meaning

1   draw sufficient attention to it so that there would be buyers

2   as well as sellers to increase the price and value of the

3   enterprise.

4   **Q.**  Did you understand that you and Mr. Andrade would be

5   engaging in a further PR effort to publicize the product?

6   **A.**  Yes.

7   **Q.**  Let's turn to the next page, please.

8      Do you see the second box by Mr. Andrade reads [as read]:

9         "Also when I mean listed, I mean getting on the

10       exchange, which is a done deal"?

11   **A.**  Yes.

12   **Q.**  [As read]:

13         "If there was no exchange, then I would be

14       really panicking, but there is."

15   **A.**  Yes.

16   **Q.**  What was your understanding of those messages?

17   **A.**  That he had secured a position on the exchange.  That's

18   what he was telling me, but I did not believe him.

19   **Q.**  Why not?

20   **A.**  Because he didn't give any information about which

21   exchange it was or any proof that this was going to happen or

22   had happened.

23   **Q.**  I direct your attention to the last message.  It reads [as

24   read]:

25        "Given the track record of assurances and

1     disappointments on this project, I am sure you can

2     appreciate the fact that I am less hopeful than you

3     seem to be."

4     Why were you less hopeful?

5  **A.**  Because virtually everything he had told me and everyone

6  else in this project did not happen.

7  **Q.**  So further on in that message, you write [as read]:

8     "In fact, I believe we will likely see many

9     Aten Coin holders and pre-ICO investors dumping their

10    coins as soon as they can, since they smell that we

11    have problems."

12    What did you mean by that?

13  **A.**  That once the coin was available on an exchange, the

14  activity would be from the sellers, not buyers; and as sellers

15  put their coins up without buyers, the price would start

16  falling, as is normal in a market exchange.

17  **Q.**  I direct your attention to Exhibit 930.  That's the next

18  tab.

19    Do you see this WhatsApp chain from December 13th, 2017?

20  **A.**  Yes.

21  **Q.**  It starts with a message from you [as read]:

22     "How's this for a press release?"

23    Do you see that?

24  **A.**  Yes.

25  **Q.**  Do you see your draft that writes [as read]:

**ABRAMOFF - DIRECT / HIGHSMITH**

1              ". . . initial coin offering for the

2         AML BitCoin - the world's only patent-pending

3         compliant digital currency - has been extended for

4         another month to accommodate a torrent of last-minute

5         new coin purchasers . . . ."?

6         Do you see that?

7    **A.**   Yes.

8    **Q.**   Was that true?

9    **A.**   No.

10   **Q.**   Why did you write that?

11   **A.**   Because I -- I was desperate -- we were all desperate to

12   try to get this going, and it was extended in the hope that we

13   could get someone to come in and buy it.  And we had not yet

14   been able to get an exchange to put it on there, so we --

15   Marcus and I discussed creating that extension, but it was as a

16   consequence of -- of failure, not of success.

17   **Q.**   I direct your attention to the second-to-last paragraph in

18   that same message.  It reads [as read]:

19            "NAC Foundation has not been consumed only with

20        the massive response to the launch of AML BitCoin,

21        but also with negotiations around the world to enable

22        the coin, and its underlying patent-pending

23        anti-money laundering and know-your-customer

24        features, to be integrated into governmental and

25        industry payment systems."

ABRAMOFF - DIRECT / HIGHSMITH

1        Do you see that?

2    **A.**    Yes.

3    **Q.**    Was it accurate to say that NAC Foundation had been

4    consumed with the massive response to the launch of the coin?

5    **A.**    No.

6    **Q.**    Was it accurate to say that the NAC Foundation had been

7    consumed with a massive response and also negotiations around

8    the world to enable the coin to be integrated into governmental

9    and industry payment systems?

10   **A.**    No.

11   **Q.**    I direct your attention to the second page in the very

12   last message.  What does Mr. Andrade write in response to you?

13   **A.**    [As read]:

14            "Draft looks good."

15   **Q.**    I want to direct your attention to the Super Bowl in 2018.

16            Were you involved in a Super Bowl rejection campaign for

17   AML BitCoin?

18   **A.**    Yes.

19   **Q.**    Let me direct your attention to Exhibit 9 -- excuse me --

20   898.  Do you see that this is an email -- excuse me -- a

21   WhatsApp between you and Mr. Andrade dated January 18th, 2018?

22   **A.**    Yes.

23   **Q.**    Midway through the page, you write [as read]:

24            "I have two production teams on the commercial

25            standing by.  Team 1 (Peter Tilden) is getting me a

ABRAMOFF - DIRECT / HIGHSMITH

1     budget late tonight.  Team 2 (John Bryan) told me a

2     few minutes ago that their estimate is 500,000,

3     though it could be less."

4     Who are Peter Tilden and John Bryan?

5  **A.**  Peter Tilden is somebody in the media -- the entertainment

6  world, production world, the radio world, has a lot of

7  experience in production.  And both of them are friends of

8  mine.  They're both people who I brought into the project, and

9  both of them had production possibilities to create the

10 Super Bowl rejection commercial.

11 **Q.**  Okay.  And what was the purpose of telling Mr. Andrade

12 about these two options?

13 **A.**  To choose between them.

14 **Q.**  Well, who was going to choose?

15 **A.**  Mr. Andrade.

16 **Q.**  Not you?

17 **A.**  No.  I presented both of them to him, but ultimately, he

18 would make every decision.

19 **Q.**  Further down in that same message, you write [as read]:

20     "The reason delivery is important is that we

21     need to launch the rejection campaign as early in the

22     week of the 29th as possible . . . ."

23     Do you see that?

24 **A.**  Yes.

25 **Q.**  What are you communicating to Mr. Andrade here?

1    **A.**   That we had to get the commercial made so as to submit it

2    to NBC to be rejected in time to be able to launch a campaign

3    talking about how they would not accept the ad.

4    **Q.**   What was the purpose of a rejection campaign as opposed to

5    actually getting a Super Bowl -- excuse me -- actually getting

6    an ad on the Super Bowl?

7    **A.**   It would be much less expensive to do a rejection campaign

8    than to get the commercial approved and accepted by NBC.

9    **Q.**   Okay.  At that time did AML BitCoin have the money it

10   would take to get an ad placed on the Super Bowl?

11   **A.**   No.

12            **MR. SHEPARD:**  Objection.  Foundation.

13            **THE COURT:**  Overruled.

14   **BY MR. HIGHSMITH:**

15   **Q.**   I'd like to direct your attention to the next exhibit,

16   Exhibit 1064.  Do you see that one?

17   **A.**   Yes.

18   **Q.**   I want to start at the back of the exhibit and then move

19   forward.

20        Do you see that it's an email from you to Mr. Andrade on

21   January 21st, 2018?

22   **A.**   Yes.

23   **Q.**   And in your email, it looks like you're attaching

24   something related to a draft, and you write [as read]:

25            ". . . this is what we will use with NBC to get

ABRAMOFF - DIRECT / HIGHSMITH

1     rejected, and believe me, they will reject us!"

2        Do you see that?

3  A.   Yes.

4  Q.   Mr. Andrade responds the same day, five -- sometime later

5  [as read]:

6           "I wish they could have done better than that.

7        There's nothing insulting about it so I see no

8        critics."

9        Do you see that?

10 A.   Yes.  Yes.

11 Q.   What did you understand that meant?

12 A.   That he felt that whatever was attached here was

13 insufficiently inflammatory to get a rejection from NBC.

14 Q.   And were you convinced NBC would reject the ad?

15 A.   Yes.

16 Q.   Why?

17 A.   Because this was during the time when there was a lot of

18 political controversy in the NFL about the Star Spangled

19 Banner, and they had rejected an ad of an American flag, and

20 this ad was highly political.  The concept of the ad for

21 AML BitCoin was highly political, and so I felt that, in

22 concept, it would not be something they would approve.

23 Q.   I'd like to direct your attention to the next tab in front

24 of you, Exhibit 900.

25 A.   Yes.  Yes.

ABRAMOFF - DIRECT / HIGHSMITH

1  Q.   Before we talk about the specifics of this message,

2  I believe in your testimony you described some urgency in

3  submitting an ad; is that correct?

4  A.   Yes.

5  Q.   Why were you -- why was there a sense of urgency in

6  getting the ad submitted?

7  A.   Well, if we were going to run a rejection campaign with

8  very few weeks left, the rejection campaign would run out of

9  steam as soon as the Super Bowl took place because it would be

10 overtaken by the media of the Super Bowl and no one would care

11 at that point.

12      So we had to obtain a rejection in enough time to then be

13 able to mount a publicity campaign to inform people that this

14 is an ad that NBC rejected.

15 Q.   Were you concerned that there wouldn't be time for NBC to

16 actually reject it?

17 A.   Yes.

18 Q.   Why were you concerned?  What's the problem there?

19 A.   Well, I was concerned because we were running out of time

20 and NBC was likely -- in fact, most likely to sit on an ad like

21 this and not reject it.

22 Q.   So why is that a problem?

23 A.   Because then we couldn't say the ad was rejected.

24 Q.   And what's the value in saying the ad's rejected?

25 A.   Well, if the campaign is, in essence, that this is the ad

ABRAMOFF - DIRECT / HIGHSMITH

1   NBC doesn't want you to see, or something of that ilk, if they

2   didn't reject it, it's hard to say they didn't want anybody to

3   see it.

4   **Q.**   Please turn to the next, Exhibit 900, please.  It's a

5   WhatsApp chain from January 23rd, 2018.  Do you have that in

6   front of you?

7   **A.**   Yes.

8   **Q.**   Okay.  Do you see the first message is from Mr. Andrade

9   and it reads [as read]:

10          "Have you spoken to Japheth yet?"

11  **A.**   Yes.

12  **Q.**   You write [as read]:

13          "He thought you told him that we were doing an

14      ad on the Super Bowl, not the rejection ad."

15      What did you mean by that?

16  **A.**   That he was assuming we were trying to buy an ad on the

17  Super Bowl, not have a campaign of rejection versus doing the

18  actual ad.

19  **Q.**   You write [as read]:

20          "I tried to spin it positively, but he thought

21      you told him that."

22      Do you see that?

23  **A.**   I do.

24  **Q.**   What did you mean by that?

25  **A.**   I don't remember what I meant by that.

ABRAMOFF - DIRECT / HIGHSMITH

1  Q.   Do you see two lines down where Mr. Andrade writes

2  [as read]:

3           "I did not mention a rejection ad.  No one

4       should know that other than you and me and those

5       around us"?

6       Do you see that?

7  A.   Yes.

8  Q.   What was your impression of that message?

9  A.   That --

10          MR. SHEPARD:  Objection.  Calls for speculation.

11  Vague.

12          THE COURT:  Well, the question is asking about his

13  reaction.  Overruled.

14          THE WITNESS:  Could you ask the question one more

15  time, please?

16  BY MR. HIGHSMITH:

17  Q.   What was your reaction or impression regarding this

18  message from Mr. Andrade that reads [as read]:

19          "I did not mention a rejection ad.  No one

20       should know that other than you and me and those

21       around us"?

22  A.   That Marcus was saying, in essence, we should keep it

23  quiet that we're doing the rejection campaign.

24  Q.   Was one of the purposes of trying to run a Super Bowl ad

25  to make it seem like AML BitCoin had enough money to buy a

1  Super Bowl ad?

2  **A.**   I don't remember if that purpose was discussed.  I think

3  the main purpose was to get promotion, either through actually

4  running an ad or the rejection campaign, and visibility for the

5  coin.

6  **Q.**   Do you see the next line where it says [as read]:

7         "It could be looked at negatively if people know

8      that we were going that route"?

9  **A.**   Yes.

10  **Q.**   What was your impression or reaction to that message?

11  **A.**   That Mr. Andrade was saying that if people knew that we

12  were doing a rejection campaign, it would be negative.

13  **Q.**   Was it your impression that Mr. Andrade at that time was

14  trying to conceal the fact that this was a rejection effort?

15  **A.**   Yes.

16         **MR. SHEPARD:**  Objection.

17         **THE COURT:**  I'll sustain that objection.

18  **BY MR. HIGHSMITH:**

19  **Q.**   Please direct your attention to Exhibit 938.

20      Is this a message from you to Mr. Andrade on January 30th,

21  2018?

22  **A.**   Yes.

23  **Q.**   It starts [as read]:

24         "We have a plan to move forward later today with

25      the campaign, but we still have a second group

1          working to get an official no from NBC.  We might not

2          get it (for reasons I'll tell you about after my

3          lunch") . . . ."

4          Do you see that?

5    A.    Yes.

6    Q.    What are you trying to do with this message to

7    Mr. Andrade?

8    A.    I'm telling him that we're going to move forward, even

9    though we haven't gotten an official rejection from NBC.

10   Q.    Do you see further down an AML BitCoin letter to Goodell?

11   A.    Yes.

12   Q.    Who is Goodell?

13   A.    He, I believe, is the head of the National Football

14   League.

15   Q.    So did your -- did you end up -- to your knowledge, did

16   you end up getting a rejection from NBC?

17   A.    No.

18   Q.    Okay.  Did your strategy change to try to get a rejection

19   from the NFL?

20   A.    Yes.

21   Q.    If you turn to page 2 of that message, is that the

22   attached letter to the NFL signed by Marcus Andrade?

23   A.    Yes.

24   Q.    And is this an attempt to get a rejection?

25   A.    It's an attempt to get a rejection and a response of any

1  kind.

2  **Q.**  Did you get any response?

3  **A.**  No.

4  **Q.**  Did Mr. Andrade approve that letter to the NFL?

5  **A.**  Yes.

6  **Q.**  Did he approve the idea of trying to get a response from

7  the NFL?

8  **A.**  Yes.

9  **Q.**  Did he approve the rejection campaign overall?

10  **A.**  Yes.

11  **Q.**  I'd like to step back for a second.

12      You've pled guilty in this case; correct?

13  **A.**  Correct.

14  **Q.**  And you have a plea agreement with the Government?

15  **A.**  Yes.

16  **Q.**  That plea agreement with the United States includes a

17  guilty plea to the conduct in this case and a guilty plea to

18  separate conduct not involving Mr. Andrade; is that right?

19  **A.**  Yes.

20  **Q.**  For the separate case that does not involve Mr. Andrade,

21  is that a criminal conviction related to illegal lobbying for a

22  marijuana organization?

23  **A.**  Yes.

24  **Q.**  And were you essentially trying to lobby for that

25  marijuana organization but concealing your involvement?

ABRAMOFF - DIRECT / HIGHSMITH

1    **A.**    Yes.

2    **Q.**    Did you, as part of that effort, travel to the Republic of

3    Congo to arrange a meeting between the president of that nation

4    and a member of U.S. Congress?

5    **A.**    No, that was not part of that effort.

6    **Q.**    Was it a separate effort?

7    **A.**    I went to Congo, accompanying a member of Congress, at my

8    own expense, but it was at his request.

9    **Q.**    Did you have to retroactively register as a foreign

10   lobbyist?

11   **A.**    FARA, the Foreign Agent Office determined that

12   notwithstanding my not having a client or being compensated in

13   any way, that I must register, and I did.

14   **Q.**    Did you also take money from an individual who was trying

15   to get appointed to be the U.S. ambassador to India?

16   **A.**    Yes.  I consulted for him, yes.

17   **Q.**    Did you refer that same client to a friend of yours and

18   take kickbacks from that friend?

19   **A.**    Yes.

20   **Q.**    Were you engaged in other government consulting work for

21   foreign clients?

22   **A.**    Other government work -- other consulting work for foreign

23   clients during what period?

24   **Q.**    During the period after -- the period before your guilty

25   plea in this case but after -- so after your release from

1    prison but before your guilty plea in this case.

2    **A.**    I do not recall.

3    **Q.**    Were you involved in other lobbying efforts after you were

4    released from prison but before this case?  So that's been --

5    **A.**    Other lobbying efforts?

6    **Q.**    Yes.

7    **A.**    Yes.

8    **Q.**    Did some of those lobbying efforts include efforts with

9    foreigners?

10    (Stenographer interrupts for clarification of the record.)

11    (Record read as follows:

12    **"QUESTION:**  Were you involved in other lobbying efforts

13    after you were released from prison but before this

14    case?")

15    **THE WITNESS:**  Yes.

16    **BY MR. HIGHSMITH:**

17    **Q.**    Did some of the other lobbying efforts unrelated to

18    Mr. Andrade involve foreign clients?

19    **A.**    I -- I don't recall that, no.

20    **Q.**    Did you direct that payment be made to your company

21    Landfair Capital Consulting?

22    **A.**    That payment for?

23    **Q.**    Payment for your consulting work.

24    **A.**    At times.

25    **Q.**    Was that done to conceal your income?

ABRAMOFF - DIRECT / HIGHSMITH

1  **A.**   I don't -- I don't recall.  I don't recall the incidences;

2  but if it was sent there and I didn't receive it, then, yes.

3  **Q.**   Did you sometimes refer to your lobbying efforts as

4  cryptocurrency consulting work --

5  **A.**   Yes.

6  **Q.**   -- in order to -- you did?

7      Did you do that to conceal your lobbying income?

8  **A.**   Yes.

9  **Q.**   Did Mr. Andrade know about your marijuana lobbying work,

10  to the best of your -- well, let me put it differently.

11      Did you tell Mr. Andrade about your marijuana lobbying

12  work?

13  **A.**   Yes.

14  **Q.**   Did you tell Mr. Andrade that you were lobbying on behalf

15  of other clients unrelated to Mr. Andrade?

16  **A.**   Yes.

17  **Q.**   Are you testifying here in the hope of receiving a reduced

18  sentence?

19  **A.**   Yes.  In part, yes.

20  **Q.**   Do you know that the judge and not -- that the judge

21  imposes the sentence in this case?

22  **A.**   Yes.

23  **Q.**   And do you understand that the plea agreement you've

24  signed with the United States requires you to tell the truth?

25  **A.**   Yes.

ABRAMOFF - DIRECT / HIGHSMITH

1   **Q.**   In addition, after you entered a guilty plea in this case,

2   did you provide additional information to the Government about

3   other unrelated cases?

4   **A.**   Yes.

5   **Q.**   Did you do that in hopes of receiving a reduced sentence?

6   **A.**   In part, yes.

7   **Q.**   With regard to the Super Bowl, did the rejection campaign

8   result in publicity?

9   **A.**   A very small amount of publicity, yes.

10  **Q.**   Did AML BitCoin end up spending several hundred thousand

11  dollars to create an advertisement?

12  **A.**   Yes.

13  **Q.**   In your -- is your impression that that was money well

14  spent, that it was a good strategy, or that the strategy did

15  not work?

16  **A.**   The strategy did not work.

17  **Q.**   Why not?

18  **A.**   We didn't get publicity.

19  **Q.**   Well, you received some publicity; right?

20  **A.**   We didn't get sufficient publicity to make it worth the

21  money that was spent.

22  **Q.**   Did you conceal from Mr. Dillman that, initially,

23  AML BitCoin was running a rejection campaign rather than a real

24  Super Bowl ad?

25  **A.**   Yes.

1  **Q.**   Why do you do that?

2  **A.**   Because Mr. Dillman was trying to raise money to actually

3  do an ad and had Mr. Dillman been able to succeed, we would

4  have tried to do the ad.

5  **Q.**   Did he succeed?

6  **A.**   No.

7  **Q.**   Did you communicate with Mr. Andrade about that?

8  **A.**   Yes.

9  **Q.**   You've testified about the ICO not being successful;

10  correct?

11  **A.**   Yes.

12  **Q.**   Did the ICO cause friction -- or the unsuccessful ICO

13  cause friction between you and Mr. Andrade?

14  **A.**   Yes.

15  **Q.**   Did the unsuccessful ICO cause investors to complain about

16  the product?

17  **A.**   Yes.

18  **Q.**   Let me direct your attention to Exhibit 951, which is the

19  next one in your binder.  I believe it's Tab 22.

20  **A.**   Yes.

21  **Q.**   This is a WhatsApp chain from April 27th, 2018.  Do you

22  see that?

23  **A.**   Yes.

24  **Q.**   Do you see your message [as read]:

25          "I got a call from one of the pre-ICOs that coin

1        holders online are planning to go to the SEC and FBI

2        about us"?

3        Do you see that?

4   A.   Yes.

5   Q.   You write [as read]:

6            "I'll get the info from him when he gets to his

7        office.  Have you heard about this?"

8        Mr. Andrade responds [as read]:

9            "We know who he is.  Already have a lawsuit on

10       him."

11       Do you see that?

12  A.   Yes.

13  Q.   What was your impression about Mr. Andrade's response to

14  investors who complained about the product?

15  A.   That he would attack them and threaten them with lawsuits

16  or claim that he has filed lawsuits, although I never had

17  evidence of him actually doing that.

18  Q.   Do you see his response [as read]:

19           "We won the suit"?

20  A.   Yes.

21  Q.   And then he writes [as read]:

22           "Default judgment."

23  A.   Yes.

24  Q.   Was this something Mr. Andrade did frequently, threaten

25  lawsuits?

1   **A.**   Yes.

2   **Q.**   You testified some time ago that you brought in John Bryan

3   to assist with the project.  Do you recall that?

4   **A.**   Yes.

5   **Q.**   Did he assist with the Super Bowl advertisement?

6   **A.**   He wanted to, but I don't think we went with him.

7   **Q.**   Did you also hire Mr. Bryan to engage in market

8   manipulation or market making?

9   **A.**   Mr. Andrade did, yes.

10  **Q.**   Okay.  Why -- how do you know that Mr. Andrade hired

11  Mr. Bryan for that?

12  **A.**   Both of them told me.

13  **Q.**   I'd like to direct your attention to Exhibit 901.

14      So, first, did the tokens eventually get listed on an

15  exchange?

16  **A.**   Yes.

17  **Q.**   And was that quite a while after you expected they would

18  be listed?

19  **A.**   Yes.

20  **Q.**   Okay.  So looking at Exhibit 901, which is a series of

21  messages between you and Mr. Andrade on May 7th, 2018, is this

22  after -- shortly after the token was listed on an exchange?

23  **A.**   I don't remember exactly when the token was listed.  But

24  it seems to be indicating a discussion of trading on the

25  exchange, so it indicates that it was listed.

**ABRAMOFF - DIRECT / HIGHSMITH**

1   Q.   You write [as read]:

2         "Our price is dropping rather rapidly.  Any

3    ideas?"

4    And Mr. Andrade responds [as read]:

5         "That's because people were selling off."

6    And then he writes [as read]:

7         "As soon as market making kicks in, will be good

8    to go."

9    Do you see that?

10   A.   Yes.

11   Q.   What was your impression of that message?

12   A.   That Mr. Andrade felt that the market making, so-called

13   market making, would enable the price to go up based on the

14   manipulation of market making.

15   Q.   What was your understanding of what Mr. Bryan was hired to

16   do?

17   A.   I didn't and probably still don't completely understand

18   the market-making concept, but it seemed to be that he would be

19   getting the coins --

20         **MR. SHEPARD:**  Objection, Your Honor.  No foundation.

21         **THE COURT:**  No what?  What did you say?

22         **MR. SHEPARD:**  I said:  Objection.  No foundation.

23   Just speculation.

24         **THE COURT:**  All right.  Sustained.

25   \\\

ABRAMOFF - DIRECT / HIGHSMITH

```
 1   BY MR. HIGHSMITH:
 2   Q.   Well, I'd like to ask:  What was your understanding at
 3   that time of what Mr. Bryan's market-making activity was?
 4        MR. SHEPARD:  Objection to the relevance of his
 5   understanding.
 6        THE COURT:  What is the relevance, Mr. Highsmith?
 7        MR. HIGHSMITH:  Well, it goes directly to his
 8   understanding of the conspiracy and the actions engaged -- that
 9   they were engaged in to manipulate the price of the coin.
10        THE COURT:  What's his understanding matter?
11        MR. HIGHSMITH:  Whether or not they were engaged in a
12   deceptive practice on the exchanges.
13        THE COURT:  All right.  Overruled.
14        You may answer the question.
15   BY MR. HIGHSMITH:
16   Q.   What was your understanding of what these market-making
17   activities were?
18   A.   My understanding was that John Bryan would have in his
19   possession a group of AML BitCoin Tokens and some funds and
20   that he would buy -- in essence, buy and sell with himself so
21   as to raise the price, because there would then be an
22   unidentified buyer buying the coins that he was selling even
23   though it was himself.
24   Q.   Returning to the document, you write [as read]:
25             "We are under $1.50!"
```

1    Do you see that?

2  **A.**   Yes.

3         **MR. HIGHSMITH:**  Your Honor, I'd like to finish this

4  document and, if it's permissible with the Court, take a break

5  after this document.

6         **THE COURT:**  Yes.

7         **MR. HIGHSMITH:**  Thank you, Your Honor.

8  **Q.**   So just to continue with this document, Mr. Andrade

9  responds to you [as read]:

10        "It means people are really dumping their

11    coins."

12   What was your impression of that comment?

13  **A.**   That the people who held AML BitCoin Tokens were selling

14  them as fast as they could.

15        **THE COURT:**  Do you want to take a break at this point?

16   Go ahead.  If you have another question, go ahead.

17        **MR. HIGHSMITH:**  Thank you, Your Honor.  Just two more

18  questions and then we'll take a break.

19  **Q.**   You write at the bottom of the page [as read]:

20        "When does the marketing start?"

21   Do you see that?

22  **A.**   Yes.

23  **Q.**   What did you mean with that?

24  **A.**   When does the market-making plan begin?

25  **Q.**   And Mr. Andrade responds --

ABRAMOFF - DIRECT / HIGHSMITH

1  **A.**   I'm sorry.  Could you repeat that?

2  **Q.**   Mr. Andrade responds [as read]:

3          "The good thing is we're at $2 and we're not

4      even market making."

5      What was your impression or reaction to that comment?

6  **A.**   I don't remember my impression.

7          **MR. HIGHSMITH:**  Your Honor, would this be a good time

8  to take a break?

9          **THE COURT:**  Yes.

10          **MR. HIGHSMITH:**  Thank you.

11          **THE COURT:**  Members of the jury, remember my

12  admonitions not to discuss this amongst yourselves or with

13  anyone else.

14      And we'll be back here at ten of.

15                  (Recess taken at 10:40 a.m.)

16              (Proceedings resumed at 10:54 a.m.)

17      (Proceedings were heard out of the presence of the jury.)

18          **THE COURT:**  We're not quite ready, it looks like.

19          **MR. HIGHSMITH:**  Sorry, Your Honor.  Just one

20  more minute.

21          **THE COURT:**  Okay.

22                  (Pause in proceedings.)

23          **MR. HIGHSMITH:**  We are ready.

24          **THE COURT:**  All right.  Bring them out.

25      (Proceedings were heard in the presence of the jury.)

 1              **THE COURT:**  The jury is present.

 2       You may proceed, Mr. Highsmith.

 3              **MR. HIGHSMITH:**  Thank you, Your Honor.

 4   **Q.**   Mr. Abramoff, I've got a handful or more of questions for

 5   you.

 6       I'd like you to return to the Super Bowl one last time at

 7   Tab 21 in the binder in front of you, which is Exhibit

 8   Number 16.

 9   **A.**   Okay.

10   **Q.**   Do you see that this is an email exchange between you and

11   Marcus Andrade dated January 31st, 2018?

12   **A.**   Yes.

13   **Q.**   And do you see that you are writing to Mr. Andrade

14   [as read]:

15            "Good to go?"

16   **A.**   Yes.

17   **Q.**   I'd like to direct your attention to page 3, please.

18       Is this the letter sent from AML BitCoin to Roger Goodell,

19   the commissioner of the NFL?

20   **A.**   Yes.

21   **Q.**   Did Mr. Andrade approve this letter?

22   **A.**   Yes.

23   **Q.**   Did you send him a draft or multiple drafts of this

24   letter?

25   **A.**   Yes.

ABRAMOFF - DIRECT / HIGHSMITH

1  Q.   I'd like to direct your attention to the first paragraph

2  [as read]:

3        "We have been informed by our media buyers that

4        the network carrying the NFL's Super Bowl game, NBC,

5        will not accept our television ad for placement

6        during the broadcast."

7        Was that true, that NBC would not accept the ad?

8  A.   No.  We did not know.

9  Q.   Okay.  Do you see the next sentence that says [as read]:

10       "I cannot express more profoundly my shock and

11       disappointment in NBC and the NFL"?

12       Do you see that?

13 A.   Yes.

14 Q.   Was that sentence deceptive?

15 A.   Yes.

16 Q.   Why?

17 A.   Because Mr. Andrade knew what we were doing in terms of

18 not getting the rejection and in terms of proceeding with the

19 rejection campaign.

20 Q.   I direct your attention to the fourth paragraph down that

21 starts [as read]:

22       "Our ad was produced by one of Hollywood's most

23       creative talents . . . ."

24       Do you see that?

25 A.   Yes.

**ABRAMOFF - DIRECT / HIGHSMITH**

1   **Q.**   At the end of that second sentence, it reads [as read]:

2          ". . . but thanks to the unreasonable refusal to

3          accept our ad, the Super Bowl viewers won't have a

4          chance to find out, at least during the game."

5          Do you see that?

6   **A.**   Yes.

7   **Q.**   Was that deceptive?

8   **A.**   Yes.

9   **Q.**   Why is that?

10  **A.**   Because we didn't -- we didn't get a refusal.

11  **Q.**   I want to direct your attention to the final sentence of

12  the final paragraph in the letter.  That sentence reads [as

13  read]:

14          "Not accepting our ad after it was produced and

15          presented to NBC and the NFL in a timely manner is

16          outrageous and violates the ideas supporting the

17          First Amendment to the Constitution that protects

18          free speech."

19          Was that a deceptive sentence?

20  **A.**   Yes.

21  **Q.**   How so?

22  **A.**   Well, we don't know if they were accepting or rejecting.

23  They didn't respond to us.

24  **Q.**   Why do this letter?  What was the purpose of this false

25  letter to the NFL?

ABRAMOFF - DIRECT / HIGHSMITH

1  **A.**   To try to draw the NFL into a discussion, which would then

2  be parlayed into the media to get publicity for the coin.

3  **Q.**   Okay.  Was it a deceptive attempt to draw in the NFL?

4  **A.**   Yes.

5  **Q.**   Was Mr. Andrade aware of this letter and its contents?

6  **A.**   Yes.

7  **Q.**   So moving on to -- I'd like to move on to Exhibit 966.

8  It's not a tab.  It's in the back of your binder in loose-leaf.

9       And it's a WhatsApp chain dated September 12th, 2018?

10 **A.**   Yes.

11 **Q.**   Do you see that document?

12 **A.**   Yes.

13 **Q.**   On December [sic] 12th, 2018, you write to Mr. Andrade

14 [as read]:

15          "ABTC on HitBTC is only around 37 cents?"

16 **Q.**   Do you see that?

17 **A.**   Yes.

18 **Q.**   What is ABTC?

19 **A.**   That was the symbol, the letter symbol, for AML BitCoin.

20 **Q.**   And was that the token that was on HitBTC?

21 **A.**   Yes.

22 **Q.**   Mr. Andrade writes in response [as read]:

23          "I will check.  It's a little higher than that,

24       but yes, it is.  I'll bring it up in just a second."

25       Do you see that?

ABRAMOFF - DIRECT / HIGHSMITH

1    **A.**    Yes.

2    **Q.**    What was your impression at that time of how Mr. Andrade

3    would bring it up in just a second?

4         **MR. SHEPARD:**    Objection.    Calls for speculation.    His

5    impression doesn't matter.

6         **THE COURT:**    Sustained.

7    **BY MR. HIGHSMITH:**

8    **Q.**    Do you see the next sentence that writes -- you write

9    [as read]:

10        "How can we get this price moving up beyond a

11        dollar without us having to do it?"

12        Do you see that?

13   **A.**    Yes.

14   **Q.**    What did you mean by that?

15   **A.**    I meant how do we actually get our coin to attain value

16   without one of us, meaning in this case Mr. Andrade or

17   Mr. Bryan in the other case, buying and selling to manipulate

18   the price.

19   **Q.**    Do you see Mr. Andrade's reaction, which reads [as read]:

20        "Also, I have been trying to get ahold of John

21        Bryan and take possession of the coins that he has in

22        his trading account"?

23        Do you see that?

24   **A.**    Yes.

25   **Q.**    You respond [as read]:

ABRAMOFF - DIRECT / HIGHSMITH

1           "How do we fix this?  How can we get this

2       moving?  A price under $2 is killing my ability to

3       raise money for us."

4       What did you mean by that?

5   **A.**   I was still trying to -- at Mr. Andrade's behest, to sell

6   the coin at a discount, but I believe the discount was a dollar

7   at that point, and a price of under double at least that price

8   was no bargain for someone, and so I couldn't really sell it to

9   people and raise money.

10  **Q.**   Okay.  You can put that document down.

11      Over time, did your impression of Mr. Andrade change?

12  **A.**   Yes.

13  **Q.**   Let's go back in time to 2017 and even as far back as

14  2015.

15      Based on your conversations with Mr. Andrade about

16  cryptocurrency, what was your impression about his knowledge of

17  cryptocurrency?  How did he appear to you in terms of his

18  knowledge of cryptocurrency?

19  **A.**   He appeared very knowledgeable.  And I should add that he

20  actually told me that he made a fortune in Bitcoin when we

21  first had our initial conversations.  So I believed he knew

22  very much everything about the cryptocurrency world.

23  **Q.**   During the 2015 and 2017 period time frame, describe

24  generally your understanding of cryptocurrency.

25  **A.**   Well, I had almost no understanding of cryptocurrency

1  before I started talking to Mr. Andrade.  I didn't pay any

2  attention to that.  And I tried to learn about it.  I even

3  bought that *Bitcoin for Dummies* book to read it.  But my

4  knowledge was never really on par, I felt, with Mr. Andrade's.

5  **Q.**  And is it accurate that you brought your contacts into the

6  project because you believed in Mr. Andrade's project?

7  **A.**  Yes.

8  **Q.**  And is it true that you brought them in because you

9  believed in his idea and his business?

10  **A.**  Yes.

11  **Q.**  Over time, did you come to have concerns about the

12  AML BitCoin project?

13  **A.**  Yes.

14  **Q.**  Why?

15  **A.**  Because everything Mr. Andrade predicted and promised

16  didn't happen and the great value that was supposed to be

17  created to build this project never materialized, and so I

18  started to doubt everything Mr. Andrade was telling me in terms

19  of where things would go going forward.

20  **Q.**  Did you communicate your concerns about the project with

21  your contacts, the other people you had brought into the

22  project?

23  **A.**  Some of them I did, yes.

24  **Q.**  For example, did you communicate your concerns with

25  Richard Naimer?

ABRAMOFF - DIRECT / HIGHSMITH

1   **A.**   Yes.

2   **Q.**   Did you discuss your concerns with Mr. Andrade with Carlos

3   De La Guardia?

4   **A.**   Yes.

5   **Q.**   Did you sometimes speak in a demeaning way about

6   Mr. Andrade with those people?

7   **A.**   Yes.

8   **Q.**   Did you sometimes use insulting language to describe

9   Mr. Andrade when talking to those people?

10   **A.**   Yes.

11   **Q.**   Why did you do that?

12   **A.**   I regret I did it.  It was probably as a consequence of

13   being emotionally distraught on my part, having brought my

14   family and friends into this.

15   **Q.**   Why were you emotionally distraught?

16   **A.**   Because he seemed to be lying to me at every stage.

17   **Q.**   Did you try to take control of the company?

18   **A.**   No.

19   **Q.**   Did you try to take over the AML BitCoin project?

20   **A.**   The only time I made an effort to exert any kind of

21   influence that I recall was when, toward the end of my

22   involvement, I found a potential buyer for the project from

23   Mr. Andrade who would come in to take it -- to buy it from him.

24   **Q.**   And did you propose that to Mr. Andrade?

25   **A.**   Yes.

**ABRAMOFF - DIRECT / HIGHSMITH**

1  Q.   What did you tell him?

2  A.   That an investor fund based in Los Angeles was willing to

3  pay a substantial amount of money, primarily for the patents of

4  the company, and that it would enable him to attain tremendous

5  wealth, but they wanted control of the project and I would be

6  involved with them.

7  Q.   Would you have taken over control of the company at that

8  point?

9  A.   I would not have had control, but I would have been

10 involved.   They would have had control because they would have

11 been the owners.

12 Q.   Would Mr. Andrade, under this proposal, still have been

13 involved in the project?

14 A.   No.

15 Q.   Did that work out?

16 A.   No.

17 Q.   Why not?

18 A.   He rejected their offer.

19 Q.   Okay.  Did you take over the company anyways?

20 A.   No.

21 Q.   Did Mr. Naimer take over the company?

22 A.   No, not to my knowledge.

23 Q.   What was -- describe, please, Mr. Andrade's response when

24 you suggested selling the patents and the business to an

25 investor.

ABRAMOFF - DIRECT / HIGHSMITH

1   A.   Well, he was very much against me being involved in the

2   transaction because he was angry at me at that point, and so I

3   had to have others approach him.

4        One of the people who I had brought in as a coin purchaser

5   approached him as an intermediary to convince him to do this

6   transaction as a way to salvage the project and enable those

7   who had invested their money and time in this to get something

8   from it, but he ultimately rejected it.

9   Q.   Do you recall the name of that coin purchaser investor?

10  A.   David Cohen.

11  Q.   Why did that -- to your understanding, did that investor

12  have an incentive in selling -- in having Mr. Andrade sell the

13  business?

14  A.   Yes.  Everyone who owned the coins did.

15  Q.   Why did everyone who owned the coins have an incentive in

16  Mr. Andrade selling the business?

17  A.   Because the proposal was that the coin holders would be

18  made whole from this -- from that transaction.  That was a

19  requirement of the buyer.

20  Q.   But just to be clear, that never happened; correct?

21  A.   It did not happen.

22  Q.   Did Mr. Andrade retain control of the company?

23  A.   Yes.

24  Q.   Did you decrease and then cease your involvement?

25  A.   Yes.

ABRAMOFF - DIRECT / HIGHSMITH

1   **Q.**   Why?

2   **A.**   Well, Mr. Andrade was, I think, angry at us, Richard

3   Naimer and myself, for requesting that he return money that he

4   had taken out of the company to the company and, after that

5   moment, started becoming hostile to us, removed from Richard

6   Naimer the coins that he had sent to -- he had given to him and

7   which included coins for me but neither of us saw them, and at

8   that point pushed us out of the company.

9   **Q.**   You just testified about funds.  Did you learn that

10  Mr. Andrade had bought a house with investor funds?

11  **A.**   Yes.

12  **Q.**   Who did you learn that from?

13  **A.**   The FBI agent.

14  **Q.**   Did you confront Mr. Andrade about that?

15  **A.**   Yes.

16  **Q.**   What was his response?

17  **A.**   He admitted that he did that, and he said that he was owed

18  money because he had put so much money into the project and he

19  was merely taking out money he had put into the project to buy

20  a home and a car or something like that.  I can't remember what

21  he bought.

22  **Q.**   Did you try to influence Mr. Andrade to take out a loan on

23  that house to return money to the business?

24  **A.**   Yes.

25  **Q.**   Describe that, please.

ABRAMOFF - DIRECT / HIGHSMITH

1   **A.**   Well, Richard Naimer and I strongly encouraged him to sell

2   the house as quickly as possible or, if not a sale, then to get

3   a mortgage on the house, because the company was still trying

4   to develop itself and had no funds and were missing now this

5   million dollars.  And so we were strongly asking him -- pushing

6   him to do that, and he at first committed to do so, but never

7   did it.

8   **Q.**   Was part of your --

9         **MR. SHEPARD:**  I'll object to the last phrase about

10  "never did it."  No foundation.

11        **THE COURT:**  Sustained.

12  **BY MR. HIGHSMITH:**

13  **Q.**   Was part of your motivation for telling Mr. Andrade to

14  take out a home loan that the FBI was investigating or

15  involved?

16  **A.**   I told him the FBI had told me this and was involved,

17  but -- and I'm certain that that was part of it as well, that

18  he had done that and we felt that that was an improper act.

19  **Q.**   Did AML BitCoin, to your knowledge, ever have the full

20  technology it publicized, including biometric identity

21  verification, built into the AML blockchain?

22  **A.**   No.

23  **Q.**   Did AML BitCoin ever have signed partnership deals with

24  government and business entities?

25  **A.**   Not to my knowledge.

**ABRAMOFF - CROSS / SHEPARD**

1   Q.   Did investors ever get a return on their investment?

2   A.   No, not to my knowledge.

3        MR. HIGHSMITH:  Your Honor, may I have a brief moment,

4   please?

5        THE COURT:  Yes.

6        MR. HIGHSMITH:  Thank you.

7                    (Pause in proceedings.)

8        MR. HIGHSMITH:  Yes, there are no other questions.

9   Thank you very much, Your Honor.

10       THE COURT:  All right.  Very well.

11                   (Pause in proceedings.)

12                   <u>CROSS-EXAMINATION</u>

13  BY MR. SHEPARD:

14  Q.   Are you doing okay over there?

15       THE COURT:  You're really muffled, Mr. Shepard.

16  You're going to have to redouble your efforts to be heard here.

17       MR. SHEPARD:  Your Honor, I think I've got the

18  microphone as close to my mouth as I can possibly get it.

19       THE COURT:  Let me just make sure the court reporter

20  can hear.  With a mask, it's making it a bit more problematic.

21       Can you hear him?

22       Okay.  Go ahead.

23  BY MR. SHEPARD:

24  Q.   Mr. Abramoff, you are a very persuasive man, aren't you?

25  A.   At times.

1   Q.   You got a rabbi to say, at your sentencing in 2008 --

2          THE COURT:   Stop, Mr. Shepard.   I'm afraid -- I think

3   the mask is compounding the problem, but I understand it's good

4   you're wearing the mask.

5          We couldn't hear what you just said, so...

6   BY MR. SHEPARD:

7   Q.   Is it okay with you, Mr. Abramoff?

8   A.   Yes.   We have enough distance, yes.

9          MR. SHEPARD:   Give me a moment.   I've got many things

10  connected.

11                    (Pause in proceedings.)

12         THE COURT:   Okay.   Try it out, Mr. Shepard.   See if

13  it's --

14         MR. SHEPARD:   How about now?   Is that better?

15         THE COURT:   I think so.   Try -- well, go ahead.   Why

16  don't you start, and we'll give you the sign if it's not

17  working.

18         MR. SHEPARD:   Okay.   Thank you, Your Honor.

19  Q.   You got a rabbi to say, at your sentencing in 2008, that

20  you'd never commit another crime.   Remember?

21  A.   I don't recall.

22  Q.   You don't recall your sentencing from 2008?

23  A.   I had over 300 letters to the judge, so I don't recall the

24  letters.

25  Q.   And you don't recall getting a rabbi to say you'd never

1  commit another crime?

2  **A.**   I don't recall the letters.  I had 300 letters, including

3  many rabbis.

4  **Q.**   Yes.  Many rabbis said that, actually; right?

5  **A.**   I don't recall the letters, sir.

6  **Q.**   I'm sure you do remember, though, getting the judge to

7  agree at the sentencing that he had no worries about you ever

8  committing another crime; right?

9  **A.**   I don't recall the sentence in those details, sir.  It was

10  a long time ago.

11  **Q.**   You -- you said that you -- there was a good chance you

12  could get up to 50 years at your sentencing.  Do you remember

13  writing that in your book?

14  **A.**   I do.

15  **Q.**   But you say you don't remember at your sentencing that the

16  judge said, "Oh, it's okay.  I'm comfortable you're not going

17  to commit another crime"?

18  **A.**   I don't recall the judge saying that, no.  I'm sorry.

19       **MR. SHEPARD:**  One moment, Your Honor.

20       **THE COURT:**  Okay.

21            (Pause in proceedings.)

22       **THE COURT:**  Are these all exhibits that have been --

23  there's an agreement to admit them all?  Don't give a binder of

24  exhibits if they have not been admitted.

25       **MS. DIAMOND:**  I'll wait, Your Honor, until they're

**ABRAMOFF - CROSS / SHEPARD**

```
 1   announced.  Thank you.
 2               THE COURT:  Okay.
 3               A JUROR:  Can we maybe in this case bring it, for
 4   once, down a little bit?
 5               THE COURT:  Mr. Shepard, you're talking about?
 6       One of the jurors has asked you, Mr. Shepard, to now try
 7   maybe moving your microphone a little bit lower.
 8               MR. SHEPARD:  Sure.  How's that?
 9               THE COURT:  I think people like that.  You're getting
10   thumbs-up.
11               MR. SHEPARD:  Okay.  Hopefully, we got the sweet spot
12   there.
13               THE COURT:  Good.
14   BY MR. SHEPARD:
15   Q.   Would you prefer I put a mask on to approach you,
16   Mr. Abramoff?
17   A.   Yes, sir.
18               MR. SHEPARD:  Why don't you -- Dainec, do you mind?
19               THE WITNESS:  Thank you.
20   BY MR. SHEPARD:
21   Q.   Sir, this is a transcript of your sentencing hearing.  Do
22   you remember it now?
23   A.   Well, I remember having a sentencing hearing, but I don't
24   remember the details of what took place there, sir.
25   Q.   If you take a look at page 56, lines 8 and 9.
```

1    **A.**    Yes.

2    **Q.**    Does that refresh your recollection that the judge said he

3    wasn't concerned about recidivism?

4    **A.**    (Witness examines document.)  It doesn't refresh my

5    memory.  I don't remember the judge saying that, but I see it

6    here.

7    **Q.**    Okay.

8    **A.**    The judge, I believe, was a woman, by the way, sir, in

9    this trial.

10   **Q.**    You said on direct examination that Mr. Andrade knew about

11   your scandal when you and he talked about working together.  Do

12   you remember that?

13   **A.**    Yes.

14   **Q.**    But isn't it also the case that you were projecting as

15   someone who had come clean and was now not ever going to engage

16   in criminal activity again?

17   **A.**    That was my intent, yes.

18   **Q.**    And that's what you proclaimed, right, repeatedly?

19   **A.**    Well, I -- that was what I proclaimed and what I intended

20   for the rest of my life.

21   **Q.**    You wrote in your book that in prison, you had an epiphany

22   and you decided that [as read]:

23          "In order to move myself closer to the angels, I

24       would take what happened in my life, try to learn

25       from it, and use it to educate others."

1          Do you remember writing that?

2    **A.**    Yes.

3    **Q.**    And do you remember telling the sentencing judge that you

4    "regret in every fiber of my being what I put my beloved

5    children and my wife and my parents and my mother's blessed

6    memory through, let alone those that I have caused harm to, and

7    I wish with all my power that I could undo what I did do, those

8    things that I did do that were wrong"?  Do you remember saying

9    that?

10   **A.**    Yes.

11   **Q.**    Now, Mr. Highsmith mentioned some of what you were

12   convicted of, and I want to address some of what he didn't

13   mention, which was the fraud that you committed on a number of

14   Native American tribes.  Do you remember that?

15   **A.**    I pled to three counts in that case, and one of them was

16   fraud.

17   **Q.**    And it involved Native American tribes; correct?

18   **A.**    It involved a number of my clients.

19   **Q.**    And a number of your clients were Native American tribes;

20   correct?

21   **A.**    Correct.  Yes.

22   **Q.**    And a lot of the work that you were doing at that time was

23   work for Native American tribes that were operating or

24   interested in operating gambling casinos; right?

25   **A.**    Correct.

ABRAMOFF - CROSS / SHEPARD

1    **Q.**   And you encouraged your Native American tribe clients to

2    obtain what was called grassroots and public relations services

3    as a critical part of your lobbying strategy and programs on

4    their behalf --

5    **A.**   Yes.

6    **Q.**   -- correct?

7    **A.**   Correct.

8    **Q.**   And to do that, you recommended a firm called Capital

9    Campaign Strategies, LLC.  That was who you recommended for the

10    grassroots and public relations work; correct?

11    **A.**   Among the firms I recommended, yes.

12    **Q.**   Well, you did recommend Capital Campaign Strategies, LLC;

13    yes?

14    **A.**   Correct.

15    **Q.**   And the man who ran CCS, Capital Campaign Strategies, was

16    named Michael Scanlon; correct?

17    **A.**   Correct.

18    **Q.**   And he agreed to kick back half of his net profits to you;

19    right?

20    **A.**   Correct.

21    **Q.**   And you didn't tell your Native American tribe clients

22    that; correct?

23    **A.**   No.  Correct.

24    **Q.**   And you got a lot of money out of that, didn't you?

25    **A.**   Yes.

1  Q.  Because tribes paid Scanlon -- over the course of a few

2  years in the early 2000s, they paid him over $55 million;

3  correct?

4  A.  Correct.

5  Q.  And it seems to me that was a pretty high-profit-margin

6  business; right?

7  A.  Depending on the tribal effort that we put in.  Each tribe

8  had different requirements.  Some were more profitable; some

9  were less profitable.

10  Q.  Well, you got 50 percent of the net profits, and your take

11  was over $21 million; correct?

12  A.  I don't recall if that number correlated to the tribal

13  work only or other work as well.  I don't recall.

14          MR. SHEPARD:  Excuse me, Dainec.  Can you give --

15  since you have a mask on, can you show Mr. Abramoff the factual

16  basis for his plea agreement.

17      Just give us a moment.  I want to make sure it's somebody

18  with a mask who's --

19          THE COURT:  Understand.

20          MR. SHEPARD:  -- in your direction.

21                  (Pause in proceedings.)

22  BY MR. SHEPARD:

23  Q.  So I'm now showing you Attachment A, the factual basis for

24  your plea agreement in Washington, D.C.  Do you see that?

25  A.  Yes.

1  Q.  And if you look at paragraph 13, there are, I think, five

2  different tribes mentioned here.  The first one is mentioned at

3  paragraph 13.  It says [as read]:

4        "From June 2001 until April 2004, the

5     Mississippi tribe paid Scanlon and related entities

6     approximately $14,765,000.  Abramoff and Scanlon

7     concealed from the Mississippi tribe that

8     approximately 50 percent of the profit, approximately

9     $6,364,000, was paid to Abramoff pursuant to your

10     undisclosed arrangement with Scanlon."

11     Do you see that?

12  A.  I do.

13  Q.  And then if you turn to paragraph 16.

14      And, by the way, in your plea agreement, you agreed that

15  this was all correct; correct?

16  A.  I just didn't recall the numbers.

17  Q.  That's okay.  We can walk through them.

18      Paragraph 16 says [as read]:

19        "From March 2001 to May 2003, the Louisiana

20     tribe paid CCS" -- that's Scanlon's company -- "and

21     related entities approximately 30,510,000 and

22     Abramoff and Scanlon concealed from the Louisiana

23     tribe that approximately 50 percent of the profit,

24     approximately $11,450,000 was paid to Abramoff

25     pursuant to their undisclosed arrangement."

1    Do you see that?

2    **A.**    Yes.

3    **Q.**    And so 50 percent of the profit on the payment of

4    $30 million was $11,450,000; right?

5    **A.**    Yes.

6    **Q.**    That's a pretty high-margin business; right?

7    **A.**    In that case, yes.

8    **Q.**    And then if we go to paragraph 19 [as read]:

9    "From June 2002 to October 2003, the Michigan

10    tribe paid Scanlon and related entities approximately

11    $3,500,000.  Abramoff and Scanlon concealed from the

12    Michigan tribe that approximately 50 percent of the

13    profit, approximately 540,000, was paid to Abramoff

14    pursuant to their undisclosed agreement."

15    Right?

16    **A.**    Yes.

17    **Q.**    And then paragraph 20, this one relates to a Texas tribe.

18    And the Texas tribe paid Scanlon's company 4,200,000 in fees,

19    and the net profits that were paid to you, pursuant to your

20    undisclosed arrangement with Scanlon, the net profits out of

21    that $4,200,000 -- or 50 percent of the net profits out of the

22    $4,200,000 was $1,850,000; right?

23    **A.**    Yes.

24    **Q.**    And then the fifth tribe is covered at paragraph 28 -- I'm

25    sorry -- 29.  A New Mexico tribe paid Scanlon and related

1   entities approximately $2,750,000 in March of 2002, and you and

2   Scanlon concealed from the tribe that Scanlon's profit margin

3   was approximately 80 percent and that approximately 50 percent

4   of the next -- of the net profit, $1,175,000, was paid to you

5   pursuant to your undisclosed arrangement with Scanlon; correct?

6   **A.**    Yes.

7   **Q.**    And my math is not the greatest, but when I added up the

8   five numbers that we just went through that were paid to you,

9   my total was $21,379,000.  Does that sound about right?

10  **A.**    My math is also not very good, but that generally sounds

11  right.

12  **Q.**    And not only were you defrauding the tribes out of tens of

13  millions of dollars, some of them had competing interests;

14  right?

15  **A.**    I can't recall at this point.  It's been 20 years.

16  **Q.**    Well, you remember you -- you've forgotten about what you

17  did to the tribes?

18  **A.**    No, I haven't forgotten what happened with the tribes.  I

19  just don't remember the competing interests.

20  **Q.**    Well, you remember in your factual basis you acknowledged

21  that you represented a Texas tribe seeking to reopen its casino

22  through federal legislation and you also represented a

23  Louisiana tribe.  And on behalf of the Louisiana tribe, you

24  opposed legislation in Texas that would have provided a basis

25  to reopen the Texas tribe's casino under state law.  Do you

1    remember that?

2    **A.**    I recall that, yes.

3    **Q.**    And you knew that the Texas tribe was pushing for that

4    legislation, but you didn't tell them that you were helping the

5    Louisiana tribe to fight the legislation; correct?

6    **A.**    I don't recall -- I just don't recall the details of it,

7    sir.  I'm sorry.

8    **Q.**    Okay.  Is the factual basis that you agreed to still in

9    front of you there?

10   **A.**    Yes, it is.

11   **Q.**    Okay.  If you look at paragraph 22.

12   **A.**    Yes.

13   **Q.**    And do you see there that after being retained by Texas --

14        **MR. HIGHSMITH:**  Objection, Your Honor.  Defense

15   counsel is reading into the record rather than asking if a

16   document would refresh his recollection.

17        **THE COURT:**  So what is the pending question?

18        **MR. SHEPARD:**  I think the pending question had about

19   three words to it.  So could I finish?

20        **THE COURT:**  Yes, go ahead.

21   **BY MR. SHEPARD:**

22   **Q.**    Okay.  You acknowledged in your -- in the factual basis to

23   your plea agreement, didn't you, that after being retained by

24   Texas Tribe Number 1 in early 2002 to reopen its casino through

25   federal legislation --

1          **MR. HIGHSMITH:**  I renew my objection.  Reading into

2    the record --

3          **THE COURT:**  Well, he can --

4          **MR. HIGHSMITH:**  -- rather than asking a question.

5          **THE COURT:**  Overruled.  He can ask the question.  He

6    can't just stand there and quote from documents as impeachment,

7    but he can ask the question "Do you recall" and present some

8    proposition, and then the witness can either say "yes" or "no."

9          So, go ahead.

10   **BY MR. SHEPARD:**

11   **Q.**   So you recall agreeing, don't you, that after being

12   retained by Texas Tribe Number 1 in early 2002 to reopen its

13   casino through federal legislation, you continued representing

14   the Louisiana tribe for millions of dollars in fees and failed

15   to disclose to the Texas tribe that you opposed legislation in

16   the 2003 Texas state legislative session that would have

17   provided a basis to reopen Texas Tribe Number 1 casino under

18   state law?  You admitted that --

19   **A.**   Yes.

20   **Q.**   -- right?

21   **A.**   Yes.

22   **Q.**   And you also admitted that you knew that Texas Tribe

23   Number 1 supported and promoted that legislation while you were

24   working to present -- to prevent the passage of that

25   legislation for the benefit of your other client, the Louisiana

1    tribe; right?

2    A.    Yes.

3    Q.    And you mentioned that you disparaged Mr. Andrade at

4    various times.  While you were defrauding those tribes out of

5    tens of millions of dollars, you disparaged them also, didn't

6    you?

7    A.    Yes.

8    Q.    You said:  These mofos are the stupidest idiots in the

9    land"; right?

10   A.    Yes.

11   Q.    You called them troglodytes; right?

12   A.    Yes.

13   Q.    Actually, not just regular troglodytes but "effing

14   troglodytes"; right?

15   A.    Yes.

16   Q.    And morons; right?

17   A.    Yes.

18   Q.    And in this same time frame when you were defrauding the

19   Native American tribes, you were also committing other crimes,

20   including bribing congressmen; right?

21   A.    Yes.

22   Q.    And you were also taking affirmative steps to conceal your

23   income to evade federal income tax; right?

24   A.    Yes.

25   Q.    And ultimately, the number that was computed in terms of

1   the tax that you evaded for the tax year 2002 was $628,000;

2   correct?

3   **A.**   I believe so.

4   **Q.**   It should work out to something over a million dollars

5   today; right?

6   **A.**   I don't know that.

7   **Q.**   Yeah, you're -- that's my math, so you may be right,

8   but...

9        And this was shortly after you committed the bank fraud in

10  Florida that Mr. Highsmith asked you about; right?

11  **A.**   Yes.

12  **Q.**   And that was the one with the counterfeit copy of a wire

13  funds transfer saying $23 million had been transferred as part

14  of a payment to equity; right?

15  **A.**   Yes.

16  **Q.**   And based on that set of criminal conduct, you could have

17  ended up with 50 years in jail; right?

18  **A.**   I believe that's possible.

19  **Q.**   Well, that's what you wrote in your book, isn't it?

20  **A.**   Yes.

21  **Q.**   And you said that was under what you called the harsh

22  sentencing guidelines; right?

23  **A.**   Yes.

24  **Q.**   And you ended up serving a little more than three and a

25  half years, right, from November --

ABRAMOFF - CROSS / SHEPARD

1  **A.**   Yes.

2  **Q.**   -- 2006 to June 2020?

3  **A.**   No.

4  **Q.**   I'm sorry.  June 2010.

5  **A.**   Yes.

6  **Q.**   And you got that three-and-a-half year -- a little more

7  than three and a half years' sentence in part because you

8  cooperated with the Government; right?

9  **A.**   Yes.

10 **Q.**   And that allowed you to get a big break from the harsh

11 sentencing guidelines; right?

12 **A.**   Yes.

13 **Q.**   And the judge in the District of Columbia gave you

14 60 percent off the sentencing guidelines because of your

15 cooperation; right?

16 **A.**   I don't remember the calculation.

17 **Q.**   Do you still have the sentencing transcript there?

18 **A.**   Yes.

19 **Q.**   Would you take a look at page 72 and see if that refreshes

20 your recollection?

21 **A.**   This does not have pages other than pages 1 through 14 --

22 15.

23 **Q.**   I think you're looking at the factual basis to the plea

24 agreement rather than --

25 **A.**   That's the only thing I have here.

ABRAMOFF - CROSS / SHEPARD

1   Q.   Sorry.  I'll get the sentencing transcript.

2        So I believe you'll find this at page 72.  Take a look at

3   that, see if that refreshes your recollection that the judge

4   gave you 60 percent off.

5   A.   (Witness examines document.)  Yes.

6   Q.   And part of your tax fraud was -- had to do with

7   charitable gifts; right?

8   A.   Yes.

9   Q.   You solicited the tribes for payments to an entity called

10  the Capital Athletic Foundation; correct?

11  A.   Yes.

12  Q.   And some of the money that went to the Capital Athletic

13  Foundation you used to help pay for golfing trips to Scotland

14  for you and some public officials --

15  A.   Yes.

16  Q.   -- right?

17  A.   Yes.

18  Q.   And that wasn't one of the charitable purposes of the

19  Capital Athletic Foundation; correct?

20  A.   Yes.

21  Q.   And you caused to be created false invoices and false

22  entries in financial records to make it appear that funds had

23  been received and expended for tax-exempt purposes when, in

24  fact, what you were doing was a misuse of the tax-exempt entity

25  Capital Athletic Foundation; correct?

ABRAMOFF - CROSS / SHEPARD

1    **A.**    Yes.

2    **Q.**    Are you okay over there?

3    **A.**    Thank you.

4    **Q.**    I think I heard you say on direct examination that, from

5    time to time, you have reported things to the FBI based on the

6    duty of a citizen to try to prevent problems.

7    **A.**    Yes.

8    **Q.**    Mr. Highsmith showed you Exhibit 171.  Do you still have

9    your exhibits up there?

10    **A.**    This?

11    **Q.**    171, I believe, was one of the articles that was written

12    by Peter Roff, and I think it came pretty early.  It's Tab 1,

13    I believe, in your binder.

14    **A.**    Yes.

15    **Q.**    Do you see that?

16    **A.**    Yes.

17    **Q.**    And you said that this article contained

18    misrepresentations; correct?

19    **A.**    Yes.

20    **Q.**    Did you report that to the FBI as part of your duty of a

21    citizen to help prevent problems --

22    **A.**    No.

23    **Q.**    -- or to try to help prevent problems?

24          No.  Okay.

25          And you were also shown Exhibit 913.  Let me see.  The

1  binder you have is tabbed differently than the binder we

2  created, so it will take me a moment to find 913 for you.

3       It's behind Tab Number 6.  Do you remember that?

4  **A.**  Yes.

5  **Q.**  And this was an example of Mr. Andrade approving press

6  releases that you drafted; right?

7  **A.**  I believe he was approving a rewriting of my -- of his

8  paragraph about the NAC Foundation.

9  **Q.**  Yes.  He drafted something; you rewrote it --

10  **A.**  Yes.

11  **Q.**  -- and sent it back to him?

12  **A.**  Yes.

13  **Q.**  And he said, "Thanks"?

14  **A.**  Yes.

15  **Q.**  And then, "Sending now"; right?

16  **A.**  Yes.

17  **Q.**  And you sent him your redraft at 3:41 and 24 seconds?

18  **A.**  Yes.

19  **Q.**  And he sent his thanks at 3:41 and 45 seconds; right?

20  **A.**  Yes.

21  **Q.**  And we saw several examples of him approving things that

22  you had written.  We didn't see any examples of him actually

23  ever editing or changing what you wrote; correct?

24  **A.**  I don't recall.

25  **Q.**  You don't recall just from the direct examination earlier

1  this morning that you didn't see anywhere he --

2  **A.**   Well, you asked me if there's anything he ever edited, and

3  I said, "I don't recall."

4  **Q.**   I thought I asked you if there was anything that you were

5  shown this morning.

6  **A.**   Oh.

7  **Q.**   But you've jumped ahead --

8  **A.**   Sorry.

9  **Q.**   -- to my next -- that's okay.

10       You've jumped ahead to where I was going.  You got the

11  drift.  You jumped ahead to where I was going, which was:  You

12  don't recall him ever editing anything you said; right?

13  **A.**   I don't recall.

14  **Q.**   He would just respond, "Okay.  Go.  Thanks," whatever,

15  things like that; right?

16  **A.**   I don't recall.

17  **Q.**   And sometimes those responses would come 10, 15 seconds

18  after you sent what you sent him; correct?

19  **A.**   I -- I don't -- I don't recall.  I don't have those

20  responses to review right now.

21  **Q.**   Okay.  Well, we just looked at one like that --

22  **A.**   We did.

23  **Q.**   -- correct?

24  **A.**   That one, yes.

25  **Q.**   And that's because he trusted you; right?

1  **A.**   I don't know.  I can't determine whether he trusted me or

2  not.

3  **Q.**   Mr. Highsmith referenced you disparaging Mr. Andrade.  And

4  it wasn't just that you disparaged him.  You disparaged the

5  level of which he understood what was going on; correct?

6  **A.**   I don't recall the specifics.  I certainly can look at an

7  example and tell you.

8  **Q.**   Okay.  And you also thought he was an idiot; right?

9  **A.**   I used pejorative language out of frustration for what I

10  thought were the lies he was telling me and everyone else, and

11  the projects --

12  **Q.**   I asked you if you called him an idiot.  Can you tell me

13  yes --

14  **A.**   I --

15  **Q.**   -- or no?

16  **A.**   I don't recall calling him an idiot, but I certainly may

17  have called him an idiot.

18      **THE COURT:**  As the court reporter indicates, there's a

19  certain amount of talking over each other.  So let's redouble

20  the effort to differentiate between question and answer.

21      **MR. SHEPARD:**  Yes, Your Honor.  Thank you.

22  **Q.**   Do you remember saying that Marcus seemed like a dunce who

23  came up with a great idea?

24  **A.**   Yes.

25  **Q.**   And that the great idea came along with Marcus's idiocies,

1  conspiracy theories, and other problems; right?

2  **A.**  Correct.

3  **Q.**  And you often called Marcus an idiot; right?

4  **A.**  I don't know how many times I used that word.

5  **Q.**  I didn't ask you a specific number of times.  I asked

6  you --

7  **A.**  I just don't --

8  **Q.**  -- if you did it often.

9  **A.**  -- recall whether it was often, infrequent, or -- I don't

10  recall.

11  **Q.**  Well, do you recall talking to the FBI on January 30th of

12  this year and telling them that you often called Marcus an

13  idiot?

14  **A.**  I don't recall that, but I'm not denying I may have called

15  him an idiot frequently because I felt he was doing things that

16  are problematic with the project, yes.

17  **Q.**  My question to you was:  Didn't you tell the FBI on

18  January 30 of this year that you often called Marcus an idiot?

19  **A.**  I don't recall what I told them.

20  **Q.**  And that was three weeks ago; right?

21  **A.**  Sir, I don't recall.

22  **Q.**  Okay.  You said -- well, sorry.  Let me start that over

23  again.

24      When you were working with him, you saw that he imputed

25  motivations about others that were not real, and that's because

1    he had paranoia; right?

2    **A.**    Correct.

3    **Q.**    And he would do things that you and others felt undermined

4    the AML BitCoin project and his ability to lead it; right?

5    **A.**    Correct.

6    **Q.**    Are you okay there?  Do you need a break?

7    **A.**    At some point, I think I do.  I don't know what the Court

8    wishes to do.

9            **THE COURT:**  Oh, Mr. Abramoff, if you need a break,

10   just tell me.  Raise your hand and we'll take a break.

11           **THE WITNESS:**  I need a break, sir.

12           **THE COURT:**  Okay.  All right.  We'll take a break.

13       Remember, members of the jury, my admonitions.  Don't

14   discuss this amongst yourselves or anyone else.

15       And we'll shoot to come back in the -- how about ten after

16   12:00.

17                   (Recess taken at 11:57 a.m.)

18               (Proceedings resumed at 12:11 p.m.)

19       (Proceedings were heard out of the presence of the jury.)

20           **THE COURT:**  Okay.  You wanted to tell me something,

21   Mr. Ward?

22           **MR. WARD:**  Yeah, just briefly, Your Honor.

23       I just spoke to Mr. Highsmith.  We believe the defense has

24   binders of exhibits that they want to show the jury.  We

25   haven't seen --

1    **THE COURT:**  I made it quite clear that they were not

2    to give it to the jury until it's hashed out as to whether or

3    not these are admitted or not.  So don't worry.  They're not

4    getting these binders until that's all resolved.

5    **MR. WARD:**  Yeah, I understand.  We would just like a

6    copy.  We haven't seen or been provided with a list of what the

7    exhibits are either.  We'd like --

8    **MS. DENT:**  We're planning to give you exhibits when

9    they come up, when the jury sees them.  I'm going to switch.

10   Instead of having binders, we'll bring redwells tomorrow, and

11   we'll give you the documents as --

12   **THE COURT:**  Okay.  So you're not --

13   **MS. DENT:**  -- the witness is looking at them.

14   **THE COURT:**  -- going to use this binder?

15   **MS. DENT:**  No.  I'm going to take them back to the

16   office and use redwells because, that way, if Mr. Shepard shows

17   the witness a document, I can just give the Government and the

18   jury --

19   **THE COURT:**  Okay.

20   **MS. DENT:**  -- the document.

21   **THE COURT:**  That's fine.

22   **MS. DENT:**  I think that's --

23   **THE COURT:**  That's fine.

24   **MS. DENT:**  Okay.

25   **MR. WARD:**  Could we see them in advance so we can make

1    hearsay objections or -- I mean, given the --

2         THE COURT:  Well, wasn't the deal that you exchange

3    exhibits before the examinations?

4         MR. WARD:  We provided them our exhibit list, I think,

5    Friday or Saturday.  We haven't received any exhibits on their

6    list for witnesses for cross-examination.

7         THE COURT:  Okay.  Are you going to provide that to

8    them?

9         MS. DENT:  I will have to check with Mr. Shepard on

10   what the plan is because I don't remember exactly.

11        MR. SHEPARD:  I'm here.  So far, we've just been doing

12   impeachment and --

13        THE COURT:  Okay.  Impeach -- they don't have to give

14   you impeachment materials.

15        MR. WARD:  I'm not interested in the impeachment

16   materials; but if they're going to show documents to the jury

17   and ask that they be admitted, we would just like to see them

18   so that we can make hearsay objections.

19        THE COURT:  Anything that you're going to be seeking

20   to have admitted, I want you to have exchanged.

21        Documents that are going to be used solely for

22   impeachment, I wouldn't expect those to be exchanged.

23        And also, let me give you a little more guidance with

24   respect to -- because there seems to be a bit of a disconnect.

25        If you are impeaching a witness, it doesn't mean that you

 1   can't paraphrase something in the document.  That's okay.  What

 2   you can't do -- and what was happening at one point -- was

 3   reading sections of a document and then, under the auspices of

 4   impeachment, having the witness say "Yes" or whatever, where it

 5   wasn't actually impeaching what the witness was saying.

 6        But by way of example, in the plea agreement, I don't have

 7   a problem with Mr. Shepard using the language in the plea

 8   agreement because it was proper impeachment against

 9   Mr. Abramoff at that point.  So it's not an objection to say,

10   "Oh, that sounds like what's written down there."  Okay?

11        Do you sort of get what I'm trying to get at?

12        All right.

13             **MR. WARD:**  Thank you.

14             **MR. SHEPARD:**  And the only other thing I would say,

15   Your Honor, is that because Mr. Highsmith, thankfully, was

16   considerably shorter than he predicted, we're a little behind

17   on exhibits.  We've got plenty of material.  We'll plow, but

18   we're just a little behind where I would have liked us to be on

19   actually having things to hand out.

20             **THE COURT:**  Okay.  Just for -- now that we're on that

21   subject, for timing purposes, I'm sure you're going -- you'll

22   be on cross for the rest of the day -- he'll be on cross for

23   the rest of the day.  Then tomorrow, further cross.  I know

24   there's some redirect.

25        My expectation is that you are finishing with Mr. Abramoff

 1  tomorrow, but is there a prospect you might finish fairly early

 2  with Mr. Abramoff?  What's the plan?

 3          **MR. SHEPARD:**  It is hard to predict, Your Honor,

 4  because you just don't know whether Mr. Abramoff is going to

 5  fight about things or not.  If he does, you know, it takes

 6  longer.  So --

 7          **THE COURT:**  So far, he hasn't.

 8          **MR. SHEPARD:**  -- so far, he's not been terribly --

 9  from time to time, he plays around a little bit, in my view;

10  but he's, you know, taking the things that he should be taking

11  and that does speed it up some.

12      So, I mean, if we continue in this fashion, I would say

13  we'll easily finish tomorrow.  How much time we'll have left

14  over is --

15          **THE COURT:**  Well, and I don't -- we can --

16          **MR. SHEPARD:**  -- hard to know.

17          **THE COURT:**  As far as I'm concerned, you can go all

18  the way to 1:30.  It's fine with me.  Pacific Time.

19      I just want to -- I'm sending a different message.  If you

20  happen to finish early, that's okay.  I mean, I'm not

21  expecting -- I understand you have to get back from Washington.

22  So I am not expecting you to have to have some other witness or

23  something like that.

24      So certainly don't feel you need to go all the way to 1:30

25  Pacific Time tomorrow if you're otherwise ready to be done with

1    Mr. Abramoff.  But if you need to go to 1:30 tomorrow,

2    that's perfectly fine.  I'm expecting that.  I mean, it's going

3    to be tight for you to get back to the airport and get back to

4    California and start in on Wednesday morning, but it's possible

5    you can do it.  So...

6            **MR. SHEPARD:**  Yes.  I -- I think we'll be able to do

7    that.

8            **THE COURT:**  Okay.

9            **MR. SHEPARD:**  That's our plan and our expectation.

10            **THE COURT:**  Good.

11            **MR. SHEPARD:**  Sometimes things don't work that way,

12    but that's our plan and our expectation.

13            **THE COURT:**  Well --

14            **MR. SHEPARD:**  We have -- we have flights tomorrow

15    evening.

16            **THE COURT:**  Okay.  Well, that would be great.

17        Okay.  Are we ready to have them come out?  Yes?

18            **MR. SHEPARD:**  Sure.

19            **THE COURT:**  Okay.  Oh, but we don't have the witness

20    yet.  We'll have Mr. Abramoff resume the stand, and then I'll

21    bring the jury out.

22                        (Pause in proceedings.)

23            **THE COURT:**  Mr. Abramoff, are you doing all right?

24    And the jury is not here.  I just want to know how you're doing

25    and if the pace is okay for you.

1          THE WITNESS:  Thank you, Your Honor.  Yes, I'm -- as I

2    proceed through the day, I get weaker, but I'm okay.

3          THE COURT:  Good.

4          THE WITNESS:  Thank you for asking.

5          THE COURT:  I understand you have significant

6    challenges, and I appreciate your hanging in there on this.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  The plan is we will go to what will be

9    1:30 Pacific Time, so that's 4:30, I guess, your time, and

10   then --

11         THE WITNESS:  Yes, sir.

12         THE COURT:  -- we will call it a day.

13       So if you can hang in there.  And if you need another

14   break between now and 1:30, just raise your hand and we'll do

15   it.

16         THE WITNESS:  Thank you.  Thank you, Your Honor.

17   Thank you.

18         THE COURT:  You're welcome.

19       Okay.  We'll bring the jury out.

20       (Proceedings were heard in the presence of the jury.)

21         THE COURT:  The jury is present.

22       Mr. Shepard, you may proceed.

23         MR. SHEPARD:  Thank you, Your Honor.

24   Q.   I'm just getting a few exhibits ready.  And while we do

25   that, let me -- are you ready for me Mr. Abramoff?

ABRAMOFF - CROSS / SHEPARD

1   A.   Yes, sir.

2   Q.   While we're getting some exhibits ready, I wanted to come

3   back to something you said on direct examination.

4        My recollection is you said that you had a conversation

5   with Marcus Andrade in -- sometime in 2017, heard about

6   Aten Coin having gone to $80, and then you had a conversation

7   with your son Alex about it.  Remember that?

8   A.   No, I don't believe that was the order of it, sir.

9   Q.   That -- are you saying that isn't what you just said on

10  direct examination?

11  A.   Yes.  I don't recall saying that because that wasn't the

12  order of when I found out about the $80.

13  Q.   Right.

14  A.   It was in the subsequent conversation after I chatted with

15  my son.

16  Q.   Well, actually, what happened was that your son Alex told

17  you that Aten Coin had risen to $80 before being taken off the

18  market, and then he encouraged you to get back in touch with

19  Mr. Andrade; isn't that correct?

20  A.   I don't believe that is correct, sir.  I don't know how my

21  son would have found out the price of Aten Coin.

22  Q.   Well, don't you remember having a conversation with

23  somebody who purportedly had the name Ravi Gupta?

24  A.   That was much later, I believe, sir.

25  Q.   Yes.  And when you had your conversation with Gupta, you

1  said that your son Alex said that Aten Coin had risen to $80

2  before being taken off the market so that an earlier offer of

3  coins would be worth 20 million, and Alex encouraged you to get

4  back in touch with Marcus, so you did.

5  **A.**   It is possible that I misspoke to Mr. Gupta because my son

6  was not the one --

7  **Q.**   Okay.

8  **A.**   -- who told me it was $80.

9  **Q.**   I did not ask you that.  I asked you if that's what you

10  said to Mr. Gupta.

11  **A.**   I don't recall what I said to Mr. Gupta.

12  **Q.**   Okay.  Do you deny telling him that your son Alex said

13  Aten Coin had risen to $80 before being taken off the market so

14  that an earlier offer of coins would be worth 24 million and

15  that Alex encouraged you to get back in touch with Marcus

16  Andrade so you did?

17  **A.**   I don't deny saying it.  I may have misspoken that Alex

18  said the $80 part, but Alex definitely encouraged me to get

19  back involved.

20       **MR. SHEPARD:**  I move to strike everything after "I

21  don't deny saying it."

22       **THE COURT:**  I'll grant that motion.

23       **MR. SHEPARD:**  Now, if we could look at Government

24  Exhibit 920 just for the witness, and we've given a copy to

25  Mr. Highsmith.

1    Dainec, can you give the witness a copy of -- since you've

2 got a mask on.

3 **Q.** It's not in your binder.

4 **A.** Oh.

5 **Q.** I don't think.

6 **A.** You said 920.  Exhibit 920.

7 **Q.** Okay.  Even better.  Thank you.

8    So this is one that was in the binder but may not have

9 been used.  I don't know.

10    And do you recognize this as part of your WhatsApp

11 communications with Mr. Andrade?

12 **A.** Yes.

13    **MR. SHEPARD:**  I offer Exhibit 920.

14    **MR. HIGHSMITH:**  Already admitted, Your Honor.

15    **THE COURT:**  Okay.  Is it -- what's the number?  It is

16 Exhibit 920?

17    **MR. SHEPARD:**  Nine two zero.

18    **THE COURT:**  All right.  Well, apparently, it's already

19 been admitted.

20 **BY MR. SHEPARD:**

21 **Q.** And in Exhibit 920, you are referring to something called

22 banner ads; right?

23 **A.** Yes.

24 **Q.** And can you just tell us what a banner ad is?

25 **A.** Well, I believe they are headline-type banner ads that are

1  put out on the Internet, I believe.  I'm not totally familiar

2  with it, but that's what I believe.

3  Q.   Okay.  And you were referring to banner ads in this

4  communication with Marcus; correct?

5  A.   Correct.

6  Q.   And you were saying that the banner ads were beyond

7  horrible and terrible; correct?

8  A.   Correct.

9  Q.   And you were commenting on those because Marcus was using

10  at least one of the beyond horrible and terrible ads; right?

11  A.   I don't recall whether he was using them.  Is there a part

12  here that could refresh my memory?  I thought they were being

13  proposed, but I may be wrong.

14  Q.   Okay.  Let's just -- let's go with that because I don't

15  think it -- let's just go with that.

16      He was proposing banner ads that you thought were beyond

17  horrible and terrible; right?

18  A.   Correct.

19  Q.   And you then sent him some alternatives and he accepted

20  your alternatives; right?

21  A.   Correct.

22  Q.   And then if you go to Government Exhibit 926, which is

23  also in your binder.

24  A.   Yes.

25      MR. SHEPARD:  And I didn't think this was in evidence,

 1   but before I ask someone who has better records than I --

 2         **THE COURT:**  Everything in the binder that was provided

 3   this morning by the Government --

 4         **MR. SHEPARD:**  Ah, okay.

 5         **THE COURT:**  -- is admitted; so we admitted it in one

 6   fell swoop.

 7   **BY MR. SHEPARD:**

 8   **Q.**  So 926 is in evidence.

 9         And in Exhibit 926, this is the one where Marcus expressed

10   hope that getting on an exchange will turn things around.  And

11   you told him, "No, that's not going to happen"; right?

12   **A.**  I'm reading it to see --

13   **Q.**  Yeah.  It's on the -- I'm sorry.

14   **A.**  Yeah, I don't see it yet.

15   **Q.**  There on the second page.

16   **A.**  Second page?  Sorry.  Just one second, please.

17         (Witness examines document.)  Ah, yes, I see that there.

18   **Q.**  So you're -- he was wrong.  He had an expectation.  You

19   told him he was wrong; correct?

20   **A.**  Could you ask the question for me to be able to answer

21   properly?  Sorry.

22   **Q.**  He had an expectation that getting on the exchange was

23   going to be very helpful, and you told him he was wrong;

24   correct?

25   **A.**  He had an -- he said in this email that we were on an

1  exchange.  It was a done deal.  And if there was no exchange,

2  then he would be panicking.

3       And I said, "I don't believe that is correct any longer."

4  **Q.**  You were saying [as read]:

5            "If that were correct, people would already be

6       buying, since we have had far more PR than any other

7       coin.  Yet people are not buying.  They have no

8       reason to buy on the exchange."

9       And you say [as read]:

10           "I think your hope is misplaced.  Why do you

11      think that going to the exchange is going to somehow

12      make us have more buyers when almost no one bought

13      during the ICO?"

14      Right?

15 **A.**  Yes.

16 **Q.**  And you were affirmatively trying to keep him away from

17 various people who he was dealing with on behalf of

18 AML BitCoin; correct?

19 **A.**  I don't recall that.

20      **MR. SHEPARD:**  Can we distribute Exhibit 884, not to

21 the jury yet.

22 **Q.**  Have you had a chance to take a look at that?

23 **A.**  I'm reading it now.

24 **Q.**  Yeah.  Take your time.

25 **A.**  (Witness examines document.)  Could you repeat your

 1  question, please?

 2  **Q.**   Let me just first ask.  This appears to be a true and

 3  correct copy of your WhatsApp exchange with Mr. Carlos

 4  De La Guardia?

 5  **A.**   Yes.

 6          **MR. SHEPARD:**  I offer Exhibit 884.

 7          **MR. WARD:**  Objection.  Hearsay.

 8          **MR. HIGHSMITH:**  No objection.

 9          **THE COURT:**  Wait a minute.  We've got --

10          **MR. WARD:**  I'll defer to Mr. Highsmith.

11          **THE COURT:**  All right.  Mr. Highsmith, did you say,

12  "No objection"?

13          **MR. SHEPARD:**  I believe he did, Your Honor.

14          **THE COURT:**  All right.  It's 884.

15          **MR. HIGHSMITH:**  I'm not sure if this is already in

16  evidence.  I'm sorry.

17          **THE COURT:**  Well, let's speed it up.  Is there any

18  objection to 884, Mr. Highsmith?

19          **MR. HIGHSMITH:**  No.

20          **THE COURT:**  All right.  884 will be admitted.

21      (Trial Exhibit 884 received in evidence.)

22  **BY MR. SHEPARD:**

23  **Q.**   Okay.  And in 884, Mr. De La Guardia was reporting to you

24  about meetings that he was having with Mr. Andrade; correct?

25  **A.**   Correct.

1    **Q.**    And he said [as read]:

2              "Now" --

3         And this is in the middle of the first page.

4         [As read]:

5              "Now we need to keep him hiding in a box."

6         Right?

7    **A.**    Yes.

8    **Q.**    And on the second page, he said [as read]:

9              "He" -- and here he's referring to

10        Mr. Andrade -- "has to let me and Catin do the rest

11        of the work."

12        Correct?

13   **A.**    Yes.

14   **Q.**    And you said -- and this is at the bottom of the second

15   page -- [as read]:

16             "Just tell him that he did such a great job that

17        the Government wanted to move the followthrough more

18        quickly, and it is best for that to be done by you

19        guys."

20        Right?

21   **A.**    Yes.

22   **Q.**    Then the "you guys" there was Mr. De La Guardia and

23   Mr. Catin Vasquez; correct?

24   **A.**    Correct.

25   **Q.**    And now if we can move ahead to Exhibit 8- -- Government

1    Exhibit 885.

2        I don't think 885 is in your binder, so a copy is coming

3    to you.

4        And is this a true and correct copy of another extraction

5    report from communications on WhatsApp that you had with

6    Mr. De La Guardia?

7    **A.**    Yes.

8            **MR. SHEPARD:**  I offer 885.

9            **MR. HIGHSMITH:**  Your Honor, 885 is hearsay.

10           **THE COURT:**  Well, a lot of 885 is already admitted but

11   in a different format.

12           **MR. SHEPARD:**  May I address that, Your Honor?

13           **THE COURT:**  You may.  Go ahead.

14           **MR. SHEPARD:**  It's not offered for the truth.  This is

15   an -- this is -- Mr. Highsmith was asking the witness on direct

16   examination about some of the disparaging things he said, and

17   I'm now just exploring that.

18           **THE COURT:**  Well, you can certainly --

19           **MR. SHEPARD:**  And none of it is for the truth.  It all

20   reflects -- it's part of this "Marcus isn't doing things right,

21   and we want to take control away from him."

22           **THE COURT:**  So you can certainly use it to refresh his

23   recollection and to go -- that area of inquiry is fine.  I

24   don't have a problem with it.  But it wouldn't come in as an

25   admitted exhibit.  So you could use it for what you want, to

1    ask him whether or not he disparaged Mr. Andrade; and if he

2    says "No," you can remind him with this document; but the

3    document doesn't come into evidence because there's no basis

4    for its admission.

5         **MR. SHEPARD:**  Well, I appreciate the Court letting me

6    pursue that.  I do think it is evidence of an important fact,

7    which is that Mr. De La Guardia and Mr. Abramoff -- and this is

8    true with several other witnesses -- did not think Mr. Andrade

9    was capable of running the business, and therefore, were trying

10   to move him out.

11        **THE COURT:**  Well, I understand that's the point you

12   want to make.  And if I recall correctly, this witness

13   testified he did indeed make those comments.  So you don't need

14   the document for that.  He hasn't -- he's agreeing with you on

15   the point that you're trying to make.  So you don't need the

16   document, is my point --

17        **MR. SHEPARD:**  Okay.

18        **THE COURT:**  -- as an exhibit.

19        **MR. SHEPARD:**  I understand the Court's ruling.  I will

20   use the document as the Court suggests.

21   **Q.**   Toward the bottom of the first page, you write -- and

22   these are the last two boxes -- [as read]:

23            "DFATMPIOL."

24        And I believe that's explained in the next entry where

25   you're saying [as read]:

1              ". . . don't forget all the moronic puppets in

2        our life."

3        Right?

4   A.    Yes.

5   Q.    And that was a reference, wasn't it, to Mr. De La Guardia

6   referring to Mr. Andrade as Grimace?

7   A.    I do not know that.

8        Mr. De La Guardia -- oh, can I -- I'll wait for you to ask

9   a question, I guess.

10  Q.    Okay.  You don't remember what the reference to moronic

11  sock puppet is?

12  A.    No, I don't.  It was a phrase that he and I used for

13  20 years together jokingly, but I don't know whether it was a

14  reference to Mr. De La Guardia -- Mr. Andrade or not.

15  Q.    Okay.  Exhibit 896.

16        And this is another WhatsApp chain, you and

17  Mr. De La Guardia; correct?

18  A.    Yes.

19  Q.    And the point of this WhatsApp chain is that

20  Mr. De La Guardia was expressing concern about Marcus and his

21  judgment; correct?

22  A.    Yes.

23  Q.    And you said:  Don't be worried; don't be concerned.

24            MR. HIGHSMITH:  Objection.  Reading a document not in

25  evidence.

1       **THE COURT:**  Well, no.  Overruled.

2       I mean, you have gone into, Mr. Highsmith, this area and

3  talked about disparaging of Mr. Andrade, and they're -- counsel

4  is entitled to follow up on that.  So he can ask, for example:

5  Did you ever say -- whatever it is?  He says, "No."  He can

6  give him the document to try to refresh his recollection.  But

7  it's a perfectly appropriate area of examination.

8       So, go ahead.

9       **MR. SHEPARD:**  Thank you, Your Honor.

10 **Q.**   And in response to Mr. De La Guardia expressing concern

11 about Marcus and his judgment, you said [as read]:

12          "Don't be concerned.  We need to move forward.

13     Richard and I are taking over rapidly."

14     Right?

15 **A.**   Yes.

16 **Q.**   And the "Richard" there is Richard Naimer?

17 **A.**   Yes.

18 **Q.**   And a little below the halfway mark, you say [as read]:

19          "He's a lamebrain."

20     Right?

21 **A.**   Yes.

22 **Q.**   And that's a reference to Marcus; right?

23 **A.**   Yes.

24 **Q.**   If we can go to Exhibit 973.

25     And just for reference, this is a WhatsApp chain that you

1    had with Mr. Naimer; correct?

2    A.    Yes.

3    Q.    And Mr. Naimer says -- refers to some correspondence that

4    he had with Marcus and says [as read]:

5              "Marcus may be on denial."

6         Seems to me "in denial"; right?

7    A.    It would seem so.

8    Q.    And that was in reference to some communications about

9    TokenLot and token sales; correct?

10   A.    To the ICO, it seems.

11   Q.    Yeah.  And you said [as read]:

12             "Marcus hired some real idiots."

13        Right?

14   A.    Yes.

15   Q.    Go to Exhibit 976.

16        THE COURT:  Again, I suppose -- Mr. Shepard, I don't

17   understand why we're going to a document and -- for example, if

18   the question -- a perfectly appropriate question to

19   Mr. Abramoff:  Did you ever call Mr. Andrade a lamebrain?  And

20   let's say he says "Yes," which he did.  Then you don't need the

21   document.  If he says "No," you say, "I'd like you to look at

22   this document and maybe it'll refresh your recollection that

23   you called him a lamebrain."  That's the progression.

24        But to start out with "Take a look at this exhibit" is

25   where it's getting all confused.  If you just ask whatever it

1  is proposition you want to establish and if -- then you use the

2  document if he says, "I didn't say that."  So...

3         **MR. SHEPARD:**  Okay.  Thank you, Your Honor.

4  **Q.**  You remember at one point, for context, a discussion about

5  needing to get new people in London to work on the biometric

6  identification part of the product?

7  **A.**  Yes.

8  **Q.**  Because the people who Mr. Andrade had had working on the

9  project, in Mr. Naimer's view, didn't produce anything worth

10  using; correct?

11  **A.**  Correct.

12  **Q.**  And the person who had been in charge in London before

13  Mr. Naimer was a man named Ralph Horn; right?

14  **A.**  Correct.  Yes.

15  **Q.**  And when Mr. Naimer explained to you and Mr. Andrade that

16  the work that had been done by people in India while Mr. Horn

17  was in charge wasn't any good and needed to be replaced, Marcus

18  responded by -- with a paranoid response; right?

19  **A.**  I can't recall, but sounds consistent.

20  **Q.**  Okay.  Let's now take a look at Exhibit 976, and I think

21  that will help refresh your recollection.

22         If you take a look at the large communication in the

23  middle and the first -- not the bottom paragraph of that large

24  communication but the paragraph above the bottom.

25  **A.**  Do you want me to read it?

1  Q.   Yeah.   Take your time.

2  A.   (Witness examines document.)   So you want my focus on the

3  penultimate paragraph?

4  Q.   Yeah.   My question to you is:   Does that refresh your

5  recollection that Marcus had a very paranoid response to

6  Mr. Naimer's description of the quality of the work that had

7  been done under Ralph Horn's direction and that Mr. Andrade

8  then had a paranoid response to Mr. Naimer's suggestion about

9  Ralph Horn and the work that was done?

10  A.   This -- I recall that this was one instance of where I

11  felt he was being paranoid about Ralph Horn, yes.

12  Q.   Okay.   And there was a question of whether he was just

13  distressed and disappointed that he had been taken for a ride;

14  correct?

15  A.   I -- I'm sorry.   I didn't see that in here.

16  Q.   The bottom -- that small box at the bottom.

17  A.   Small box.   All right.

18      (Witness examines document.)   That seems to be a comment

19  of Richard Naimer.

20  Q.   And you recall that; right?

21  A.   I mean, I don't recall it, but I'm reading it here.

22  Q.   Okay.   And you and Mr. Naimer then followed up about

23  needing a CEO to come in as soon as possible; right?

24  A.   I don't remember the timing, but we definitely wanted to

25  get a CEO in --

ABRAMOFF - CROSS / SHEPARD

1  **Q.**   Okay.  If you --

2  **A.**   -- and Marcus did as well.

3  **Q.**   Right.  You were suggesting it, and he was willing to go

4  along with it; right?

5  **A.**   That's my recollection.

6  **Q.**   And you were saying that he could remain as the president

7  but you needed a CEO to run the -- run the business; right?

8  **A.**   I generally recall that, yes.

9  **Q.**   And do you recall it in December of 2017, and does the

10  second page of this exhibit refresh your recollection about

11  that?

12  **A.**   I only have one page of this exhibit.

13  **Q.**   Just -- you don't have a second?  Okay.

14       Oh, I'm sorry.  Exhibit 985.

15       Before you look at that, I guess I've already asked the

16  question.  I'm trying to date the conversation -- a

17  conversation that you had about needing a CEO to come in as

18  soon as possible.

19       Does Exhibit 985 refresh your recollection about the date

20  of one of those conversations?

21  **A.**   (Witness examines document.)  Yes.  I believe this was in

22  the context of a potential reverse merger in Canada; therefore,

23  the need for the CEO.

24  **Q.**   And the conversation was in December of 2017; correct?

25  **A.**   Yes.

1  Q.  And one of the other things that caused you to disparage

2  Mr. Andrade was that he conflated capital with revenue;

3  correct?

4  A.  I don't recall that.

5  Q.  Okay.  998 -- I'm sorry.  988.

6  A.  (Witness examines document.)

7          MS. DIAMOND:  May I ask, is that Exhibit 988?

8          MR. SHEPARD:  Yes, 988.  Sorry to have misspoken.

9  Q.  Does that refresh your recollection about being concerned

10  that he conflated capital with revenue?

11  A.  Yes.

12  Q.  Okay.  And then there were times when you thought that he

13  would create a reality in his mind; right?

14  A.  I believe that is accurate.

15  Q.  Okay.  And after you -- at the time that you were

16  commenting on that, you referred to him as Captain Queeg;

17  correct?

18  A.  Correct.

19  Q.  You said [as read]:

20          "As with almost everything on this dysfunctional

21      ship, we have to wait for Captain Queeg to let us

22      know what's happening."

23      Right?

24  A.  Yes.

25  Q.  And at another point, you referred to Marcus as such a

1  sucker; right?

2  **A.**   I don't recall it.

3  **Q.**   Let me give you some context; and then if that doesn't

4  refresh your memory, I'll bring out the document.

5       But the context is you got him on the phone, but he cut it

6  short so he could meet --

7            **MR. HIGHSMITH:**  Objection, Your Honor.  I'm not sure

8  he can refresh by testifying.

9            **THE COURT:**  Overruled.

10      Keep going.

11  **BY MR. SHEPARD:**

12  **Q.**   The context is you got him on the phone.  He cut it short

13  because he wanted to meet with an IP lawyer.  Does that refresh

14  your recollection?

15  **A.**   No.

16  **Q.**   Okay.  1009.

17  **A.**   (Witness examines document.)

18  **Q.**   Does that refresh your recollection --

19  **A.**   Yes.

20  **Q.**   -- of the context of you calling him a sucker?

21  **A.**   Yes.

22  **Q.**   Some law firm was saying, "You can meet with our IP

23  person," as if that was something really special when every law

24  firm has somebody like that; right?

25  **A.**   Marcus was, in this instance, neglecting his

ABRAMOFF - CROSS / SHEPARD

1  responsibilities to meet with yet another IP lawyer, and I felt

2  that the law firms saw him as a sucker because he would be

3  somebody who was spending a great deal of the money of the

4  company on IP activities that we all felt were unnecessary at

5  that point.

6  **Q.**  And you-all would have preferred that he stopped doing

7  that; right?

8  **A.**  Yes.

9  **Q.**  The business would have been better had he stopped; right?

10  **A.**  Yes.

11  **Q.**  And you do remember Mr. De La Guardia referring to

12  Mr. Andrade as Grimace?

13  **A.**  Yes.

14  **Q.**  Do you remember at one point sort of commenting on

15  Mr. Andrade's understanding about things, saying that, "As far

16  as Mr. Andrade is concerned, the Super Bowl ad already ran and

17  we sold $100 million in the ICO in 40 seconds"?

18  **A.**  I don't recall that.

19  **Q.**  3292.

20      Showing you this document marked as 3292, it's a WhatsApp

21  communication between you and Mr. Naimer.

22  **A.**  (Witness examines document.)

23  **Q.**  And do you remember saying [as read]:

24      "As far as Marcus is concerned, the Super Bowl

25      already ran and we sold a hundred million in the ICO

1      in 40 seconds"?

2  **A.**    Yes.  It was in response to Richard saying that as far as

3  he's concerned, you already raised the money for the ad.

4  **Q.**    Right.

5  **A.**    And my comment was along the lines that Marcus was

6  basically exaggerating constantly and here was another example.

7  **Q.**    Well, you say here he was exaggerating.  You said just a

8  moment ago he was exaggerating.  You didn't say exaggerating in

9  this communication to Mr. Naimer; right?  That word does not

10  appear?

11  **A.**    No, but it was a general comment about that.

12  **Q.**    Yes.  You were instead suggesting that he had these

13  different ideas about what actually was occurring?

14  **A.**    I don't know what his ideas were, but he was constantly

15  communicating things that were not true to us.

16  **Q.**    Okay.  But saying the ad already ran, that's not a

17  misrepresentation.  That's just a misperception of reality;

18  correct?

19  **A.**    Well, I think it was meant as a bit of a joke, but it was

20  in reference to his constant exaggerating and blowing up the

21  truth.

22          **MR. SHEPARD:**  I move to strike as nonresponsive.

23  **Q.**    The question was:  "The ad already ran" is just a

24  misperception of reality?  He didn't --

25          **THE COURT:**  Overruled.

1  **BY MR. SHEPARD:**

2  **Q.**   He's not misrepresenting anything; right?

3         **THE COURT:**  He answered the question.  Overruled.

4         **THE WITNESS:**  I'm sorry.

5         **THE COURT:**  Okay.  Go ahead.  Question, Mr. Shepard.

6  **BY MR. SHEPARD:**

7  **Q.**   The statement "The ad already ran" is not a willful

8  misrepresentation, is it?

9  **A.**   No, it's not.  It is a -- it was said as a joke.  It's not

10 said as something Marcus actually said.

11 **Q.**   Right.

12 **A.**   It's in reference to his other misstatements in the form

13 of a joke.

14 **Q.**   But it is said as a joke because it reflects that he

15 misperceived the reality; correct?

16 **A.**   Possibly.  I don't know how to answer that.

17 **Q.**   Okay.  And then remember in these conversations that you

18 were having with Mr. Andrade and Mr. Naimer about the old team

19 in London not having done good work and bringing in a new team?

20 In that context, do you remember Mr. Andrade saying that he

21 thought this could be done for 15- or 20,000 dollars by the

22 Indian team under Mr. Naimer's direction?

23 **A.**   I don't recall that.  I -- I -- I don't know.

24 **Q.**   Okay.  This is 3291.  And for context, this is another

25 communication chain between you and Mr. Naimer.

1    A.    (Witness examines document.)   Okay.

2    Q.    Okay.  Does that refresh your recollection that at this

3    point Mr. Andrade was saying he thought this could be done for

4    15- or 20,000 dollars by the Indian team under Mr. Naimer's

5    direction?

6    A.    I'm reading it.  I just don't remember when it happened,

7    but I don't doubt it because it's here.

8    Q.    Okay.  And that was not a good reflection of reality;

9    right?

10   A.    I -- I don't know.

11   Q.    Well --

12   A.    I said I was suspicious.  I didn't say it wasn't a

13   reflection of reality.

14   Q.    Right.  But --

15   A.    In the next sentence, I said [as read]:

16         "I don't know much about this, but I'm

17    suspicious."

18   Q.    Right.  And it turned out that your suspicions were

19   correct because hundreds of thousands of dollars were spent by

20   Mr. Naimer to try to do this work; correct?

21   A.    I don't recall.

22   Q.    Well, you do recall Mr. Naimer working with a team in

23   London for --

24   A.    Yes --

25   Q.    -- quite some time?

1  A.   -- but I don't recall how much money was spent.

2  Q.   Okay.  But he spent a whole lot of time working on this, a

3  lot more than 15- or 20,000 dollars' worth; correct?

4  A.   I believe so, yes.

5  Q.   You were asked some questions about the plea agreement

6  that you have in this case.

7       And is this the only case in which you have testified

8  pursuant to the cooperation and the plea agreement that you

9  signed in July of 2020?

10  A.   Yes.

11  Q.   And when did you begin cooperating with the Government?

12  A.   I can't recall the date that I began.  I'm not certain.

13  Q.   Was it before or after the plea agreement was signed in

14  July of 2020?

15  A.   I can't recall.

16  Q.   It could have been before?

17  A.   It's possible.  I just -- I just don't recall.

18  Q.   And did you ever work as an informant for the Government?

19  A.   No.

20  Q.   And even though this is your third plea to serious

21  felonies, the agreement that the Government presented, which

22  I think is Exhibit 747, you got a pretty darn good deal, didn't

23  you?

24  A.   I don't know that that's true.

25  Q.   Well, having been through this before, you understand that

1  the sentencing guidelines consist of two main components:  an

2  offense level reflecting what you did and a criminal history

3  category that takes into account your criminal record --

4  **A.**    Yes.

5  **Q.**    -- right?

6      And the offense level and the criminal history category

7  get combined in a grid to read out a range of months, which

8  provides guidelines for the Court's sentencing consideration --

9  **A.**    Yes.

10  **Q.**    -- right?

11      And one escape from those guidelines is if you engage in

12  substantial cooperation with the Government, then

13  the Government, and only the Government, can move the Court to

14  give you an exception to the guidelines; right?

15  **A.**    I believe that's accurate.

16  **Q.**    Literally, I think, called a departure from the

17  guidelines; right?

18  **A.**    Okay.

19  **Q.**    And to come back to the first of those two components, the

20  offense level, the offense level for fraud is largely driven by

21  the amount of the loss; right?

22  **A.**    I'm not familiar with the language of it, but that sounds

23  right.

24  **Q.**    And your plea agreement does not use the amount of the

25  loss; right?

1  **A.**   I believe that's accurate, but I haven't looked at it for

2  a while.

3  **Q.**   Okay.  Well, I think the Government showed it to you

4  before your testimony; right?

5  **A.**   Yes.  I just don't recall the loss part.

6  **Q.**   Okay.  Well, take a look at Exhibit 747, paragraph 8 on

7  page 5.

8      Do you have 747 there?  It's kind of in the middle.

9  **A.**   (Witness examines document.)

10 **Q.**   Have you had a chance to look at it?

11 **A.**   Yes.

12 **Q.**   Okay.  So in paragraph 8, there is no amount of loss.

13 Instead, the agreement says [as read]:

14      "The appropriate measure of any offense level

15      adjustment in this case is the pecuniary gain of the

16      defendant as a result of the offense conduct

17      described above, and the amount of pecuniary gain is

18      between 150,000 and 250,000."

19      Do you see that?

20 **A.**   Yes.

21 **Q.**   The loss would have been much, much higher; correct?

22 **A.**   I don't know that I was involved in the loss, sir.

23 **Q.**   Oh, you don't think you had any responsibility for the

24 loss?

25 **A.**   I'm not certain that I did, but it's not part of this.

1  Q.   You did make a number of knowing misrepresentations;

2  right?

3  A.   Yes.

4  Q.   But you still question whether you were responsible for

5  the loss?

6  A.   Well, in this paragraph, it is not listed.

7  Q.   Yes.  Exactly.

8       Instead of applying the loss, which would have been many

9  millions of dollars, you got a deal in which that calculation

10 is based on your pecuniary gain, and that was, according to the

11 plea agreement, between 150- and 250,000 dollars; correct?

12 A.   Correct.

13 Q.   And that makes a really big difference in the guideline

14 range, doesn't it?

15 A.   Yes.

16 Q.   And do you know how rare it is for the Government to agree

17 to use gain instead of loss?

18 A.   I do not know.

19 Q.   And you're aware of the guideline provision that says gain

20 to the defendant should be used only if there is a loss but it

21 reasonably cannot be determined?

22 A.   I'm unaware of that language, but okay.

23 Q.   Okay.  And you don't know of any reason why the Court

24 couldn't make a reasonable estimate of the amount of the loss,

25 do you?

1    **A.**    I don't recall the discussions that were held at the time

2    I made a plea, but I imagine it was determined that my

3    responsibility for the loss was not quite that.

4    **Q.**    Well, that's not what the plea agreement says, is it?

5              **THE OFFICIAL REPORTER:**  I did not hear an answer.

6         (Record read as follows:

7         **"QUESTION:**  Well, that's not what the plea agreement says,

8         is it?")

9              **THE WITNESS:**  I -- what was the predicate of the --

10   what is "that" in the sentence?

11   **BY MR. SHEPARD:**

12   **Q.**    The "that" that the plea agreement doesn't say is anything

13   about any inability or inapplication of loss in this case;

14   right?

15   **A.**    I don't recall, again, the discussions, but I believe that

16   it was determined that I was not responsible for the loss.  I

17   was responsible to the extent that I gained.

18   **Q.**    The Government told you you were not responsible --

19   **A.**    I don't recall discussions --

20   **Q.**    -- for the loss?

21   **A.**    -- as I mentioned.

22             **THE COURT:**  Wait.  Wait.  You're talking over each

23   other again.

24             **THE WITNESS:**  Sorry.  Sorry.

25             **THE COURT:**  Go ahead.  Ask it -- ask it again.

**BY MR. SHEPARD:**

**Q.**   Did the Government tell you that you were not responsible for the loss in this case?

**A.**   I don't recall.

**Q.**   And nowhere in the plea agreement does it say a reasonable estimate of the loss could not be made; right?

**A.**   I don't have full memory of everything in the plea agreement in front of me, but at least as far as paragraph 8 goes, that is correct.

**Q.**   And do you remember that one of the things at your sentencing in Washington, D.C., was that your lawyer argued for a lower criminal history category, and the Government objected to that and the Court agreed with the Government?  Do you remember that?

**A.**   I don't remember that, but I do remember an agreement that the Government made to combine my two cases that the judge rejected.

**Q.**   Okay.  Do you dispute that the judge also rejected your request to have a lower criminal history category?

**A.**   The judge in D.C.?

**Q.**   Yes.

**A.**   Do I dispute -- could you repeat it?

**Q.**   Yeah.  Do you dispute that the judge refused to give you a lower criminal history category as your lawyer argued?

**A.**   No, I don't dispute that at all.  That's what I said.

ABRAMOFF - CROSS / SHEPARD

1  **Q.**    Okay.  And here in this plea agreement, the Government did

2  agree to give you a lower criminal history category; correct?

3  **A.**    Correct.

4  **Q.**    And have you seen the impact that having a calculation

5  based on gain rather than loss has on your sentencing

6  guidelines?

7  **A.**    I may have.  I don't recall.

8          **MR. SHEPARD:**  Let's show the witness Exhibit 3287.

9          **THE WITNESS:**  (Witness examines document.)

10  **BY MR. SHEPARD:**

11  **Q.**    Does that refresh your recollection about how the

12  guidelines work?

13  **A.**    No.  I've never seen this before.  I mean, it doesn't --

14  **Q.**    Okay.  That's a --

15  **A.**    I see it.

16  **Q.**    Okay.

17  **A.**    It doesn't refresh my recollection.

18  **Q.**    Okay.

19  **A.**    I didn't have a recollection.

20          **MR. SHEPARD:**  I'm about to move into a different

21  subject area that will require some additional documents.  I'm

22  happy to keep plowing ahead, but I wonder if this might be a

23  good time to break.

24          **THE COURT:**  Well, we still do have 15 minutes.  So why

25  don't you go ahead and plow ahead.

ABRAMOFF - CROSS / SHEPARD

1          **MR. SHEPARD:**  Okay.

2    **Q.**    Let me ask you some questions about the Port of

3    San Francisco.

4    **A.**    Yes, sir.

5    **Q.**    You had less involvement in the Port of San Francisco

6    than, say, you did with the Super Bowl or the Panama Canal;

7    correct?

8    **A.**    Correct.

9    **Q.**    But you were aware of a meeting between Mr. Naimer,

10    Mr. Andrade, and some people at the Port of San Francisco on

11    April 27, 2018; right?

12    **A.**    Correct.

13    **Q.**    And following the meeting, Mr. Naimer sent an email around

14    summarizing the meeting; correct?

15    **A.**    That sounds correct.  I don't recall it, but yes.

16          **MR. SHEPARD:**  2987, please.

17          **THE WITNESS:**  (Witness examines document.)

18    BY MR. SHEPARD:

19    **Q.**    Have you seen Exhibit 2987 before?

20    **A.**    Yes.

21    **Q.**    And it's a copy of a memorandum summarizing the Port of

22    San Francisco meeting sent by Richard Naimer to you and to

23    Mr. Andrade; correct?

24    **A.**    Correct.

25          **MR. SHEPARD:**  I offer 2987.

1      **MR. HIGHSMITH:**  I don't have a copy, Your Honor.

2  That's the only problem.

3      **MR. SHEPARD:**  Sorry.

4      **THE COURT:**  I think this has been admitted before.  It

5  certainly looks familiar to me.

6      Does the Government -- was this introduced before in some

7  other form?

8      **MR. WARD:**  This is a defense exhibit.  I don't think

9  we would have introduced it.  Some of the content looks

10  familiar.  I think we went over some of this with --

11      **THE COURT:**  I think you did.  It really looks

12  familiar.

13      **MR. SHEPARD:**  Some -- I believe Mr. Ward is correct.

14  Some of the content is very familiar, and I can connect that up

15  as we go along.

16      **MR. WARD:**  Some of this has been -- the Government has

17  no objection to the exhibit.

18      **THE COURT:**  Yeah, I think it was effectively admitted

19  before.

20      All right.  So it will be admitted now.  It may be a

21  duplicate, members of the jury, but it's -- this one is 2987

22  and it's admitted.

23      (Trial Exhibit 2987 received in evidence.)

24      **THE COURT:**  Go ahead.

25      **MR. SHEPARD:**  Thank you, Your Honor.

 1    Q.    So Mr. Naimer summarized this meeting in this email, and
 2    among the things he said was [as read]:
 3              "Further discussed were possible use cases and
 4         practical implementation of these NAC blockchain
 5         application by and in the Port of San Francisco and
 6         that the outcome of the meeting were three primary
 7         use cases which the Port of San Francisco would be
 8         most applicable, both for the Port and for similar
 9         West Coast ports."
10    Right?
11    A.    Yes.
12    Q.    And then he listed three potential use cases.  One was
13    possible implementation of a blockchain-based identification
14    and tracking system for passengers and cargo which may be
15    adopted by the California Association of Ports, the second was
16    transferring of the transportation worker identification
17    credential to the NAC CrossVerify platform, and the third was
18    adoption of the CrossVerify platform by Carnival and other
19    major cruise ship operators which can be integratable with
20    immigration and security authorities; right?
21    A.    Yes.
22    Q.    And Mr. Naimer, as far as you knew, he's an intelligent,
23    honest guy; right?
24    A.    Yes.
25    Q.    And this was his report of what occurred at the meeting?

1   **A.**   Yes.

2   **Q.**   And he also said that [as read]:

3          "Executive Director Elaine Forbes will be

4       following up on all three of these use cases and make

5       the required introductions for NAC to discuss the

6       implementation of the NAC applications for these use

7       cases."

8       Right?

9   **A.**   Yes.

10  **Q.**   And then if we can go to Exhibit 3109, which I believe is

11  in evidence.

12         **THE OFFICIAL REPORTER:**  I think the Zoom froze.

13         **MR. SHEPARD:**  I don't think much has happened since

14  then because we're having masked Dainec approach the witness

15  with the exhibits.  So it's a big room, so it takes a bit.

16  **Q.**   And have you had a chance to take a look at that?

17  **A.**   I'm reading it now.

18  **Q.**   Okay.

19  **A.**   (Witness examines document.)  Okay.

20  **Q.**   And you see that the draft press release there lines up

21  pretty closely with the memo that Mr. Naimer wrote that we just

22  looked at; correct?

23  **A.**   Generally, yes.

24  **Q.**   And you drafted that press release based on the memo from

25  Mr. Naimer that we just looked at; correct?

1    A.    Yes.

2    Q.    And after you drafted that memo based on -- after you

3    drafted that press release based on the memo that Mr. Naimer

4    wrote, Marcus said to Japheth Dillman [as read]:

5              "Let me know if this is okay for us to send out.

6         Please get Leslie's approval and the Port's approval

7         and feel free to make any modifications."

8         Correct?  That's --

9    A.    Correct.

10   Q.    And it turned out that Leslie Katz did object to what you

11   had written in the press release based on Mr. Naimer's summary;

12   correct?

13   A.    Is that -- is that in here?  I don't recall it.

14   Q.    If you go to the --

15   A.    Penultimate page?

16   Q.    I wouldn't -- yes.  It's not -- the last page doesn't

17   really have anything on it, but the penultimate page.

18   A.    Yes, I see it.

19   Q.    Okay.  So she objects to it.

20        And, by the way, you did know that Dillman was the

21   connection here to Leslie Katz?

22   A.    Yes.

23   Q.    In fact, she represented him --

24   A.    Yes.

25   Q.    -- as a lawyer; right?

1   **A.**   Correct.

2   **Q.**   And so after she objected, Marcus wrote back and said

3   [as read]:

4          "My apologies.  Obviously, I didn't write it and

5          it will not go out."

6          Right?

7   **A.**   Yes.

8   **Q.**   And as far as you know, that press release never did go

9   out; correct?

10  **A.**   As far as I know.

11         **MR. SHEPARD:**  Your Honor, I'm about to shift gears

12  again.

13         **THE COURT:**  Okay.  Well, now we're close enough to

14  1:30.

15      Members of the jury, remember my admonitions.  Do not

16  discuss this amongst yourselves with anyone else.  No research.

17  Nothing to do with the case.

18      We'll see you here tomorrow at -- for 8:30 start time.

19     (Proceedings were heard out of the presence of the jury.)

20         **THE COURT:**  We're out of the presence of the jury.

21      The lawyers in Washington, if you can stay for a moment,

22  but Mr. Abramoff and his counsel can depart.

23      So is it just counsel?

24         **MR. HIGHSMITH:**  Not yet.

25         **THE COURT:**  All right.

PROCEEDINGS

1          **MR. HIGHSMITH:**  15 seconds.

2          **THE COURT:**  Okay.

3          **MR. WEBER:**  Thank you, Judge.

4          **MR. HIGHSMITH:**  We're good.

5          **THE COURT:**  Okay.  So let me -- first of all,

6    thank you.  I got the submissions that you had for me, which I

7    appreciate.

8          And let me go ahead and give you some guidance on going

9    forward.  Let's focus first on Exhibit 3202, which was the

10   subject -- specific subject of the motion.

11         I am going to admit 3202, having gone through it and what

12   you provided to me, but with one adjustment.  I do think that

13   it is not hearsay for communications that go to the issue of

14   the effect on Mr. Andrade and, in particular, communications

15   which are concerning, for want of a better way to describe it,

16   "Things are going well" communications.  I think that that's

17   not hearsay.  It's not being offered for the truth that things

18   are going well.  Indeed, they're not.  But I do think it's a

19   relevant fact how Mr. -- Mr. Andrade reacts to that

20   information, and therefore, I think it can come in.

21         With 3202, that's true about the exhibit, with the

22   exception of the portion of the exhibit which is going on to

23   the FBI agent from Mr. Mata, which I don't think has any

24   particular relevance and I don't think it's otherwise

25   admissible.

 1        So in this case, under 3202, going all the -- and I think,

 2   however, the link from Mr. Andrade to Mr. Mata reflects his

 3   reaction to receiving the information that things are going

 4   well; and, therefore, 3202 can come in; but it would redact out

 5   the final piece of it, which is the communication between Mata

 6   and Ms. Ablett of the FBI.  So that is about the specific

 7   exhibit.

 8        Going forward, again, if statements are being offered

 9   for -- to show the effect on the listener -- in this instance,

10   we're talking about Mr. Andrade -- I don't think that's

11   hearsay.  Defense can go ahead and introduce that material.

12        But if Mr. Andrade is not part of the communication, if

13   other even co-conspirators or witnesses are talking about him

14   and concluding how he's reacting to certain things, that is not

15   outside of the hearsay problem, and also there may be some

16   relevance issues there, I don't think that comes in.

17        In other words, you've got to link it up to -- if you're

18   offering it for showing us what the impact is on Mr. Andrade,

19   Mr. Andrade has got to be part of the loop because that's the

20   relevant point you're making.

21        I also might note that to the extent that I hear in answer

22   to a hearsay objection, "Well, it's subject to a hearsay

23   exception," something along the lines of, "Well, it goes to

24   intent," going to intent is not a hearsay exception.  So that

25   isn't a basis on which material would come in over an objection

 1    of hearsay.

 2        So that's where we are.

 3            MR. CHOU:  Your Honor, may I ask a question?

 4            THE COURT:  You may.

 5            MR. CHOU:  So with respect to the Ninth Circuit's

 6    *Bishop* case, which I believe is cited in the nested hearsay

 7    part of the Government's motion, does the Court have any

 8    guidance about how to apply that particular principle?

 9            THE COURT:  No.  I'm going to -- I'm going to have to

10    deal with these things as they come along.  I don't have a

11    general -- general guidance for you.

12        Are you clear on what I've discussed thus far?

13            MR. CHOU:  Yes, Your Honor.

14            THE COURT:  Okay.  So to the extent you have

15    additional objections, I'll take them up as they come, and

16    we'll do it that way.  All right?

17            MS. DIAMOND:  Thank you, Your Honor.

18            THE COURT:  So the defense is offering 3202.  So I'm

19    looking to the defense to make the adjustment that the portion

20    going to Ms. Ablett is not included in what is the admitted

21    3202.

22            MS. DIAMOND:  We'll redact it today, Your Honor, and

23    present a redacted version --

24            THE COURT:  Okay.

25            MS. DIAMOND:  -- to swap out with the same exhibit

**PROCEEDINGS**

 1   number --

 2          **THE COURT:**  Good.

 3          **MS. DIAMOND:**  -- if that's okay.

 4      Thank you.

 5          **MR. SHEPARD:**  And then, Your Honor, I would ask since

 6   you sustained that objection in the presence of the jury, if

 7   you would in some way --

 8          **THE COURT:**  Sure.

 9          **MR. SHEPARD:**  -- explain that you reconsidered and

10   have admitted it so the jury understands that.

11      And then at some point, we may publish it.  We can wait

12   till our case to do that.

13          **THE COURT:**  Yes.  When you're ready to publish it, I

14   will then remind the jury that when this first came up, I

15   didn't admit it.  I've had the benefit of further input, and

16   I've now determined that it is admissible, and I will admit it.

17      But I'll wait until you're ready to offer it, however you

18   want to do it.

19          **MR. SHEPARD:**  Okay.  Thank you, Your Honor.

20          **THE COURT:**  All right.  Okay?

21          **MS. DIAMOND:**  Thank you, Your Honor.

22          **THE COURT:**  Thank you.

23          **MR. HIGHSMITH:**  Thank you, Your Honor.

24          **THE COURT:**  Thank you.

25              (Proceedings adjourned at 1:34 p.m.)

1

2                          **CERTIFICATE OF REPORTER**

3              I certify that the foregoing is a correct transcript

4       from the record of proceedings in the above-entitled matter.

5

6       DATE:  Monday, February 24, 2025

7

8

9

10                              *Ana Dub*

11       _____

12              Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13              CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25