```
                                    Volume 11

                                    Pages 1805 - 1916

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable Richard Seeborg, Judge

        UNITED STATES OF AMERICA,      )
                                       )
                    Plaintiff,         )
                                       )
          VS.                          )   NO.  3:20-CR-00249 RS
                                       )
        ROWLAND MARCUS ANDRADE,        )
                                       )
                    Defendant.         )
        _____)


                                    San Francisco, California
                                    Tuesday, February 25, 2025

                    TRANSCRIPT OF HYBRID JURY TRIAL PROCEEDINGS

        APPEARANCES:

        For Plaintiff:
                                PATRICK D. ROBBINS
                                ACTING UNITED STATES ATTORNEY
                                450 Golden Gate Avenue
                                San Francisco, California 94102
                        BY:  CHRISTIAAN HIGHSMITH (Via Zoom)
                             DAVID J. WARD
                             MATTHEW CHOU
                             ASSISTANT UNITED STATES ATTORNEYS

        For Defendant:
                                KING & SPALDING, LLP
                                50 California Street, Suite 3300
                                San Francisco, California 94111
                        BY:  MICHAEL J. SHEPARD (Via Zoom)
                             ATTORNEY AT LAW

                    (APPEARANCES CONTINUED ON FOLLOWING PAGE)

        REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                      CSR No. 7445, Official United States Reporter
```

1  **APPEARANCES:** (CONTINUED)

2  For Defendant:

3                     KING & SPALDING, LLC
                   1700 Pennsylvania Avenue, NW
                   Washington, D.C. 20006

4                BY:  **KERRIE C. DENT, ATTORNEY AT LAW**

5                     KING & SPALDING, LLC
                   1185 Avenue of the Americas, 34th Floor

6                     New York, New York 10036
              BY:  **DAINEC P. STEFAN (Via Zoom)**

7                     **ATTORNEY AT LAW**

8

9                     LAW OFFICES OF CINDY A. DIAMOND
                   58 West Portal Avenue, Suite 350
                   San Francisco, California 94127

10              BY:  **CINDY A. DIAMOND, ATTORNEY AT LAW**

11

12 Also Present:        **Special Agent Brendon Zartman**
                   **Tina Rosenbaum, Paralegal**

13                    **Ed Jackson, Trial Technician**

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                          I N D E X

 2

 3   Tuesday, February 25, 2025 - Volume 11

 4
</pre>

<pre>
 5   GOVERNMENT'S WITNESSES                      PAGE   VOL.

 6   ABRAMOFF, JACK ALAN (VIA ZOOM) (RECALLED)
     (PREVIOUSLY SWORN)                          1813   11
 7   Cross-Examination resumed by Mr. Shepard    1814   11
     Redirect Examination by Mr. Highsmith       1884   11
 8   Recross-Examination by Mr. Shepard          1907   11
</pre>

<pre>
 9

10

11                       E X H I B I T S
</pre>

<pre>
12   TRIAL EXHIBITS                      IDEN  EVID  VOL.

13    555                                      1902   11

14    939                                      1901   11

15   1090                                      1890   11

16   1091                                      1890   11

17   1092                                      1890   11

18   3047                                      1821   11
</pre>

<pre>
19

20

21

22

23

24

25
</pre>

PROCEEDINGS

```
 1   Tuesday - February 25, 2025                          8:17 a.m.

 2                      P R O C E E D I N G S

 3                         ---o0o---

 4        (Defendant present via Zoom, out of custody.)

 5      (Proceedings were heard out of the presence of the jury.)

 6        THE COURTROOM DEPUTY:  Remain seated.  Please come to

 7   order.

 8        THE COURT:  Good morning.

 9        MS. DENT:  Good morning.

10        MR. HIGHSMITH:  Good morning.

11        MR. SHEPARD:  Good morning.

12        THE COURT:  Is it Mr. Shepard wants to talk to me?

13        MR. SHEPARD:  Yes.  Good morning, Your Honor.

14        THE COURT:  Good morning.

15        MR. SHEPARD:  One brief complication relating to

16   Mr. Andrade's return flight.  Apparently there was some

17   confusion or something, and he's now on a 10:00 p.m. departure

18   out of Dulles, which will get him in at 2:00 a.m.  So I'm

19   wondering if the Court would consider starting a little later

20   tomorrow morning.

21        THE COURT:  There's nothing --

22        MR. SHEPARD:  Some of us could probably use the rest

23   also.

24        THE COURT:  There's nothing we can do about adjusting

25   his flight so he has some other kind of flight?
```

PROCEEDINGS

1        **MS. DIAMOND:**  May I speak to that, Your Honor?

2        **THE COURT:**  Yes.

3        **MS. DIAMOND:**  I was on the phone with -- sorry -- on

4   email late last night and early this morning.  We were talking

5   with the National Travel Agency.

6        Mr. Andrade was booked on a flight that would not -- there

7   was no time frame to get to the airport after testimony to take

8   the flight.  There was no flight from that airport that left

9   after 6:00 p.m., so he had to go to a more remote airport and

10  leave at a much later time.  This was the only way to get him

11  here to California before 6:00 a.m.

12       And I apologize.  Everyone on the chain of that process

13  was trying their best.

14       **THE COURT:**  Well, I mean, I make the trip to

15  Washington with some regularity, and there are a lot of flights

16  out of Dulles and there are a lot of flights out of National,

17  and it just is confusing to me that there's no alternative,

18  because I know there are non-stops that leave at 8:00 from

19  Dulles and 5:00 -- 6 o'clock from National, and that's just

20  United.  So I'm a bit surprised there's no other way he can get

21  back here, but I don't want to spend a lot of time worrying

22  about his travel arrangements.

23       So how late are you asking to start?

24       I can't hear you.

25       **MR. SHEPARD:**  What I was told about the flight

1    schedule is there is a -- like a 6:00 something, in the first

2    part of the 6:00s out of Dulles; but if we actually go until

3    4:30, the chances of getting on a flight out of Dulles that

4    leaves a little after 6:00 are not good.  And my -- what I was

5    informed was that the next flight out of Dulles was at 10:00.

6         **THE COURT:**  Okay.  Well, I haven't checked the

7    schedule of late, so you may be right.

8         So what time is it that you're proposing you want to

9    start?

10         **MR. SHEPARD:**  I just -- whatever dispensation

11    the Court could allow would be appreciated.

12         **THE COURT:**  Well, when are you going to be here, you

13    and Mr. Highsmith?

14         **MR. SHEPARD:**  Assuming that we end as scheduled or,

15    hopefully, a little before, I think we, Mr. Highsmith and I and

16    Mr. Stefan were all on the -- a 5:59 departure out of Reagan

17    National.

18         **THE COURT:**  Yeah.

19         **MR. SHEPARD:**  So we will be available at an

20    earlier hour, although perhaps a little worn out but available.

21         **THE COURT:**  So in that regard, explain to me again why

22    Mr. Andrade can't get on the same plane you're on.

23         **MR. SHEPARD:**  I do not know the answer to that,

24    Your Honor.  Perhaps Ms. Diamond does.  I'm only reporting

25    things I've gotten second- and thirdhand.

PROCEEDINGS

1          **THE COURT:**  Okay.  Is there -- is there some cost

2    problem on him getting on the plane that Mr. Shepard is on?

3          **MS. DIAMOND:**  Your Honor, there have been costs to get

4    him onto the 10:15 flight.  That has been approved, so we have

5    the additional funding.  I was not participating in making the

6    arrangements because, literally, I was on Muni this morning

7    while that was happening.

8        If the Court likes, I can make a phone call to try and see

9    if that can be moved.

10         **THE COURT:**  I would like you to find out.  For many

11   reasons, I think it would be preferable for Mr. Andrade to fly

12   back with his own counsel and all of that.  So let's see if we

13   can get him on the same plane that Mr. Shepard is on.

14         **MS. DIAMOND:**  I will make --

15         **THE COURT:**  If the only seat is one next to

16   Mr. Highsmith, I understand that's not going to work --

17                         (Laughter.)

18         **THE COURT:**  -- but --

19         **MS. DIAMOND:**  Maybe Mr. Stefan will change seats with

20   Mr. Highsmith in that case.

21         **THE COURT:**  Maybe we'll do that.  That would be good.

22       So why don't you -- why don't you explore --

23         **MR. STEFAN:**  Your Honor?

24         **THE COURT:**  Yes.

25         **MR. STEFAN:**  Apologies.  I know that I've been in

1  communication with the people responsible for booking the

2  flights.

3      Mr. Andrade was booked on a flight out of Reagan that was

4  earlier hours than Mr. Shepard's and myself at 5:59.  The

5  5:59 flight out of Reagan is completely sold out.  There's no

6  additional flights out of Reagan after that point that are

7  feasible, and the next best available options are that 6:19 or

8  so out of Dulles and the 10:00 p.m. flight that we referenced.

9      **THE COURT:**  Well, okay.  I understand that it's going

10  to be tough but -- and Mr. Andrade is entitled to be here.

11  He's not testifying.  So the lawyers are the ones that are

12  probably going to be more wiped out than the defendant.

13      Again, what is -- I mean, what's the request here?  That

14  we start at what time?  I don't -- I obviously want to keep

15  going.  I don't want to lose time, but I understand this is a

16  strange situation.

17      What's the ask, Mr. Shepard, other than just "Please give

18  us some more time"?  I would like some suggestion.

19          **MR. SHEPARD:**  How about 9:30?

20          **THE COURT:**  9:30.  Okay.  We will start at 9:30.

21          **MR. SHEPARD:**  Thank you, Your Honor.

22          **THE COURT:**  You're welcome.

23  Okay.

24          **MR. WARD:**  Nothing further from us.

25          **THE COURT:**  All right.  I'll tell the jury that at the

1    end of the day.

2        Okay.  As soon as we get them all, we'll bring them

3    back -- or come back.

4                    (Recess taken at 8:24 a.m.)

5                 (Proceedings resumed at 8:40 a.m.)

6        (Proceedings were heard out of the presence of the jury.)

7            THE COURT:  Okay?  Everyone ready?

8        And in Washington, are we ready?

9            MR. SHEPARD:  Yes, Your Honor.

10           THE COURT:  All right.

11           THE LAW CLERK:  We're ready.

12       (Proceedings were heard in the presence of the jury.)

13           THE COURT:  Good morning, members of the jury.

14       The jury is present.

15       Mr. Abramoff, you understand you remain under oath?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  Thank you.

18                    **JACK ALAN ABRAMOFF**,

19   called as a witness for the Government, having been previously

20   duly sworn, testified further as follows:

21           THE COURT:  Mr. Shepard, you may proceed.

22           MR. SHEPARD:  Thank you, Your Honor.

23       Can I ask if everyone is hearing me clearly?

24           THE COURT:  Yes, everyone is indicating they are.

25           MR. SHEPARD:  Excellent.  Thanks.

1    <u>CROSS-EXAMINATION</u>    (resumed)

2    BY MR. SHEPARD:

3    Q.    Mr. Abramoff, I'd like to take you back to a part of your

4    direct examination yesterday when you talked about a deal that

5    had been offered to Mr. Andrade toward the end of your time

6    with him.  And that was a deal that you strongly recommended

7    that he accept; correct?

8    A.    Correct.

9    Q.    And ultimately, as I understood your testimony, he was

10   angry, he didn't accept it, and he pushed you out of the

11   company; correct?

12   A.    Correct.

13   Q.    And the way you saw it, he should have taken that deal;

14   right?

15   A.    Yes.

16   Q.    And the reason he didn't was because of his

17   misconceptions, thoughts of conspiracy, and suspicions; right?

18   A.    I don't -- I don't know what his thinking was.

19   Q.    Well, didn't you write him a letter in which you said

20   [as read]:

21          "I hope you make the choice that will secure

22       both of our futures and not the one that is likely to

23       lead to disaster hatched from misconceptions and

24       baseless suspicions"?

25       Do you remember writing that to him?

1   **A.**   I do.

2           **THE COURT:**  Okay.  Mr. Abramoff, if you could try to

3   get a little closer to the microphone.

4           **THE WITNESS:**  Yes, Your Honor.  Is this better, sir?

5           **THE COURT:**  Yes.  Everyone's nodding "yes."

6           **THE WITNESS:**  Okay.

7   **BY MR. SHEPARD:**

8   **Q.**   And you also said that you did not take over

9   NAC Foundation and that neither did Mr. Naimer; correct?

10  **A.**   Yes.

11  **Q.**   But Mr. Naimer did wind up taking over DITN; correct?

12  **A.**   He was directed to do so by Mr. Andrade.  That's what he

13  was hired to do.

14  **Q.**   And he ultimately -- although Mr. Andrade had funded

15  CrossVerify, later known as DITN, Mr. Naimer ultimately took

16  ownership of the entity; correct?

17  **A.**   I do not know that.

18          **MR. SHEPARD:**  Show the witness Exhibit 2439.

19      Dainec, if you'll put your mask on.

20  **Q.**   Showing you this nice U.K. document, have you seen that

21  before?

22  **A.**   I don't recall seeing it.

23  **Q.**   Well, if you look at the third page, the page marked

24  2439-003, does that refresh your recollection that the share

25  of -- the one share of DITN Network Limited was transferred to

ABRAMOFF - CROSS / SHEPARD

1    Mr. Naimer?

2    **A.**   I see that here, but I don't recall it.

3    **Q.**   And both before and after Mr. Andrade turned down that

4    deal -- and the deal was that the company would receive a

5    hundred -- sorry.  The deal was that the company would get

6    $100,000, valuing the patents at $100 million; right?

7    **A.**   I don't recall them being -- getting $100,000.  My

8    recollection is that they were offered -- or the offer was

9    around $100 million.

10   **Q.**   Yes.  I'm sorry.  I dropped a zero.  Thank you.

11        $100 million because the patents were going to be valued

12   at -- and there was an option as well; correct?

13   **A.**   I can't recall the --

14   **Q.**   Okay.

15   **A.**   -- details of the deal.

16   **Q.**   But you remember the company would have had a lot of

17   money?

18   **A.**   Yes.

19   **Q.**   Mr. Andrade would have had a lot of money?

20   **A.**   Yes.

21   **Q.**   You would have had a lot of money?

22   **A.**   Yes.

23   **Q.**   And he ultimately turned down that deal?

24   **A.**   Yes.

25   **Q.**   And both before and after that, there were disagreements.

ABRAMOFF - CROSS / SHEPARD

 1  Things between you and Mr. Andrade were not as they had been

 2  before; correct?

 3  **A.**    Correct.

 4  **Q.**    And you remember telling Mr. Andrade that you had put in

 5  approximately three years of intense work on the project?

 6  **A.**    Yes.

 7  **Q.**    And you told him that in January of 2019; correct?

 8  **A.**    Possibly.  I mean, I definitely told him that at some

 9  point.

10          **MR. SHEPARD:**  Let's show the witness Exhibit 3006.

11          **MS. DIAMOND:**  One moment.

12          **MR. SHEPARD:**  I'm sorry.  I didn't hear that.

13          **MS. DIAMOND:**  It just takes us one moment to get the

14  exhibits.

15          **THE COURT:**  Your colleagues are saying it's taking a

16  little time.

17          **MR. SHEPARD:**  Oh, I'm sorry.  I need to slow down a

18  little is what I'm hearing.  It's okay.  It takes Mr. Stefan

19  a minute or two also.

20          **MS. DIAMOND:**  Thank you, Mr. Shepard.  We're getting

21  that.

22          **THE COURT:**  Go ahead.

23          **THE WITNESS:**  Do you want me to read the whole thing?

24  **BY MR. SHEPARD:**

25  **Q.**    Well, you're free to read as much of it as you would like.

 1  The portion that I was going to suggest that you read starts at

 2  the fourth line of the text.

 3  **A.**   Ah, yes.  Okay.

 4  **Q.**   And just for context, this is a text chain of some kind

 5  between you and Mr. Andrade; correct?

 6  **A.**   Correct.

 7  **Q.**   And the portion I pointed your attention to is dated

 8  January 30, 2019; correct?

 9  **A.**   Correct.

10  **Q.**   And that refreshes your recollection as to when you said

11  you had approximately -- you had put in approximately

12  three years of intense work on this project; correct?

13  **A.**   Correct.

14  **Q.**   Okay.  Do you recall when a Block Bits entity said it was

15  going to order 50 million -- that said it was ordering

16  $50 million of AML BitCoin?

17  **A.**   Yes.

18  **Q.**   And that was in January of 2018; correct?

19  **A.**   I don't remember dates, but that sounds -- that sounds

20  correct.

21       **MR. SHEPARD:**  Dainec, if we could show the witness

22  Exhibit 3047.

23  **Q.**   And does this appear to be an email chain between you,

24  Mr. Andrade, and Mr. Naimer that began with an email from

25  Mr. Dillman dated January 13 and 14 of 2018?

 1    **A.**    Yes.

 2    **Q.**    And this email chain contains Mr. Dillman's statement that

 3    Block Bits is putting in an order for $50 million worth of

 4    AML BitCoin; correct?

 5    **A.**    Correct.

 6              **MR. SHEPARD:**  Your Honor, I offer Exhibit 3047.

 7              **MR. HIGHSMITH:**  No objection, Your Honor, to the

 8    bottom half of the first page and the -- and the second page,

 9    but there's no foundation for the first -- that Mr. Andrade is

10    on the first half of the first page.

11              **THE COURT:**  So, Mr. Shepard, do you want to amend your

12    request to introduce the portions of this chain that

13    Mr. Andrade is part of?

14              **MR. SHEPARD:**  I -- I think, actually, Your Honor, he

15    is part of all of them.

16              **MS. DIAMOND:**  Your Honor, I'm familiar --

17              **MR. SHEPARD:**  It begins with -- let me just make sure,

18    first of all, that I understand what is being objected to, and

19    then I can address it more succinctly.

20         Is it just the top half of the first page?  Is that the

21    objection?

22              **MR. HIGHSMITH:**  Yes.

23              **MR. SHEPARD:**  Okay.  I believe the evidence will be,

24    Your Honor, that fintechfund@crossverify.global is an email

25    address to which Mr. Andrade has access.  I think we've already

1  seen that a number of times.

2          **THE COURT:**  And, again, what is this being offered

3  for?

4          **MR. SHEPARD:**  This is being offered for the fact

5  that -- the part that is not objected to is being offered for

6  the fact that Mr. Dillman, through a Block Bits entity, was

7  ordering $50 million worth of AML BitCoin.  That's an important

8  event in the case.  And I can describe it in more detail --

9          **THE COURT:**  Well, but, I mean, I'm --

10          **MR. SHEPARD:**  -- if you would like, but I expect that

11  would just prompt some further discussion.

12          **THE COURT:**  I mean, what I'm trying to get at is, I'm

13  not sure what the basis for admitting this is because it

14  appears to be a hearsay problem unless I'm missing something.

15      But what's the nature -- what's your objection,

16  Mr. Highsmith?  What's the objection to the portion you don't

17  want to have admitted?  What are you objecting to?  On what

18  basis?

19          **MR. HIGHSMITH:**  I'm objecting that the defense has not

20  laid a foundation -- I'm referring to the Court's earlier

21  ruling and objecting that the defense has not laid a foundation

22  for Mr. Andrade being on the top email.

23          **THE COURT:**  All right.  Well, if it's a foundation

24  objection, based on the representation from Mr. Shepard that

25  the address, the CrossVerify address, is linked to Mr. Andrade

 1  and he can establish that, so that we can move things along, I

 2  will admit this document, 3047.

 3       (Trial Exhibit 3047 received in evidence.)

 4            **THE COURT:**  Okay.

 5            **MR. SHEPARD:**  Thank you, Your Honor.

 6  **Q.**   And, Mr. Abramoff, you do recognize that email address

 7  fintechfund@crossverify.com?

 8  **A.**   Yes.

 9  **Q.**   And that was an address that Mr. Andrade used --

10  **A.**   Yes.

11  **Q.**   -- correct?

12       And in this Exhibit 3047, Mr. Naimer reports -- well, let

13  me -- let me take that back.

14       Mr. Naimer reported to you that Mr. Andrade was quite

15  excited by the $50 million offer or plan to purchase; right?

16  **A.**   Is that in this document?

17  **Q.**   No.  I'm asking more generally.

18  **A.**   I don't remember.

19            **MR. SHEPARD:**  If we can then look at Exhibit 3298.

20            **MS. DIAMOND:**  One moment.

21                 (Pause in proceedings.)

22            **MS. DIAMOND:**  Thank you, Mr. Shepard.  We're ready on

23  this end.

24            **MR. SHEPARD:**  Okay.  Your Honor, how about if I come

25  back to it rather than spend more time on it now.

1  Q.   You were under the impression that more money was spent on

2  AML BitCoin technology than on marketing; correct?

3  A.   I -- I can't recall.

4  Q.   Do you remember telling the FBI, when you were interviewed

5  by them on November 14th of last year, that you were under the

6  impression that more money was spent on AML BitCoin technology

7  than on marketing?

8  A.   I don't recall making the statement, but it makes sense in

9  terms of what I was thinking about the project, but I don't

10  recall the statement.

11  Q.   And you did get regular updates from Mr. Naimer on the

12  progress of the technology; correct?

13  A.   Yes.

14  Q.   Because that was important to the company --

15  A.   Yes.

16  Q.   -- right?

17       And you trusted Mr. Naimer; right?

18  A.   Yes.

19  Q.   And you saw the reports, the regular updates that were

20  prepared by CrossVerify/DITN; correct?

21  A.   Correct.

22       **MR. SHEPARD:**  To try to move this along, Dainec, can

23  we batch together a series of reports that begin with 2334 and

24  run to -- I'm sorry -- that begin with 2327 and run to 2334.

25  Actually, 2336.

1    THE OFFICIAL REPORTER:  What was the last number you

2    said?

3    MR. SHEPARD:  2336.

4    MR. HIGHSMITH:  I'm just seeing these now, Your Honor,

5    so I'm leafing through them right now.

6    (Pause in proceedings.)

7    MR. HIGHSMITH:  These look to be hearsay, Your Honor.

8    THE COURT:  Well, he hasn't sought to introduce them

9    yet.  So let's see what he's going to do with these things.

10   BY MR. SHEPARD:

11   Q.   And take as much time as you need, but what I'm going to

12   ask you at the end is if these are at least some of the reports

13   that Mr. Naimer would send to you or have sent to you to keep

14   you updated on the progress of the technology.

15   A.   (Witness examines document.)  These look like progress

16   reports of the technology.  I don't have a present recollection

17   of seeing them in the past.  I am listed on the distribution of

18   some of them, but I don't recall seeing them in the past, but

19   that's what they seem to be to me.

20   Q.   Okay.  Well, you did say that you saw reports that

21   Mr. Andrade -- I'm sorry -- that Mr. Naimer would circulate

22   reflecting the progress; correct?

23   A.   Correct.  But it may be that there were other reports that

24   I also received.

25   Q.   Okay.  Do you recall receiving these reports?

1  **A.**   I don't -- I don't recall receiving these reports.

2  **Q.**   Okay.  You said your name was on some of them; correct?

3  **A.**   Yes.

4  **Q.**   And the ones that your name is on you're not denying that

5  you received; correct?

6  **A.**   No.  I just don't recall.

7  **Q.**   And were you part of the all staff at DIT Network email

8  alias?

9  **A.**   No.

10  **Q.**   When -- when you say you saw reports from Mr. Naimer, can

11  you describe the reports that you did see?

12  **A.**   I don't have present recollection of what the reports

13  were.  Some of the reports were likely oral from Mr. Naimer as

14  well.

15  **Q.**   Well, you actually saw reports in addition to oral

16  reports; correct?

17  **A.**   I believe I did, but I just don't have present

18  recollection.

19  **Q.**   Now, do you dispute that the ones that are in front of you

20  are ones you saw?

21  **A.**   I cannot dispute it.  I just don't recall.

22       **MR. SHEPARD:**  I move to admit them, Your Honor.

23       **MR. HIGHSMITH:**  Objection, Your Honor.

24       **THE COURT:**  Sustained.

25       The point you wanted to elicit is that he received

 1    reports.  He's established that.  There is a great deal of

 2    material in these documents that are hearsay, and there's no

 3    basis -- you've established the relevant fact you wanted to

 4    establish.  You don't need these reports in evidence.  So,

 5    sustained.

 6         **MR. SHEPARD:**  If I may on the hearsay issue,

 7    Your Honor, I think this is the same issue that the Court

 8    addressed yesterday afternoon.

 9         **THE COURT:**  No, it's not the same.

10         **MR. SHEPARD:**  So it's not -- it's not being offered

11    for the truth.

12         **THE COURT:**  Well, then what's it being offered for?

13    He's already established that he received these reports.  Why

14    do you need the reports themselves?

15         **MR. SHEPARD:**  Because the reports also go to

16    Mr. Andrade.

17         **THE COURT:**  So what's the significance of the reports

18    themselves?

19         **MR. SHEPARD:**  There are a number of reports reflecting

20    updates on the technology, and those are important for the

21    reasons that we previously addressed with the Court.

22         **THE COURT:**  Well, they're only important to the extent

23    that he received reports of this nature.  It's not the specific

24    content of these reports, is it?

25         **MR. SHEPARD:**  I -- I think it is, yes.

 1          **THE COURT:**  My concern is that these reports are

 2    filled with information that go beyond just his receipt of

 3    reports.  So if this was a bit more targeted, it might be

 4    somewhat different.  But I'm concerned about the nature of

 5    these reports having a lot of information that you may say it's

 6    not being offered for the truth but it seems to me, in a sense,

 7    it is.

 8        Do you want to respond, Mr. Highsmith, to Mr. Shepard's

 9    comments?

10          **MR. HIGHSMITH:**  Yes, Your Honor.

11        There's two points.  One is that they're filled with

12    factual hearsay assertions that are detailed facts that appear

13    to be coming in for the truth beyond just the event.

14        Second is that the defendant -- excuse me.  Second is that

15    the witness has testified he does not recall receiving these,

16    was not on the all staff at DITN Network email and, therefore,

17    there's that objection, and also a relevance objection,

18    Your Honor.

19          **THE COURT:**  What was admitted before was on the

20    proffer that it was being admitted to show Mr. Andrade's

21    reaction to receiving certain information.  That's not what

22    this is doing.

23        You've established the fact that he's on the -- that he

24    too was receiving these reports.  At least that's what

25    Mr. Abramoff indicated was the "to" and the "from" line.

1    I don't think these documents come in.  So I'll sustain

2    the objection.

3              **MR. SHEPARD:**  The -- will the Court hear me further on

4    that at some later time?

5              **THE COURT:**  Okay.

6              **MR. SHEPARD:**  Thank you.

7    **Q.**   Shifting gears for a moment to the articles that you paid

8    people to write, you considered those to be opinion pieces;

9    correct?

10   **A.**   Correct.

11   **Q.**   And you got the idea of running paid op eds from your

12   prior work as a lobbyist; correct?

13   **A.**   In part, yes.  Correct.

14   **Q.**   Turning your attention now to the Panama Canal, you

15   brought Carlos De La Guardia into the project; correct?

16   **A.**   Correct.

17   **Q.**   And the press release that ended up causing trouble with

18   the Panama Canal, you drafted it with Mr. De La Guardia;

19   correct?

20   **A.**   Correct.

21   **Q.**   And before it was sent out, you let Marcus know that you

22   wouldn't be sending it out unless Mr. De La Guardia signed off

23   on it; correct?

24   **A.**   Correct.

25   **Q.**   And as far as you know, the statements about the Canal in

1   the draft press release were accurate; right?

2   **A.**   I'd have to review the press release.

3   **Q.**   Let me start helping you, and then we can go through

4   different documents.

5       Let's start with 1513.  I believe this document is in

6   evidence.

7       And so if you'd take a look at it, and then I'll ask you

8   some questions about it.  Okay?

9   **A.**   (Witness examines document.)

10          **THE COURTROOM DEPUTY:**  It's admitted.  Did you want to

11  give it to the jury?

12          **MS. DIAMOND:**  Our records had shown --

13          **MR. SHEPARD:**  Yes.

14          **MS. DIAMOND:**  -- it's not.

15      If it is admitted, yes.

16      Mr. Jackson, please display it to the jury.  Thank you.

17          **THE COURTROOM DEPUTY:**  I have it February 19th it was

18  admitted.

19          **THE COURT:**  Okay.

20          **MS. DIAMOND:**  Thank you.

21  **BY MR. SHEPARD:**

22  **Q.**   Mr. Abramoff, I'm first going to direct your attention to

23  the bottom paragraph on page 1.

24  **A.**   I've read that paragraph.

25  **Q.**   Okay.  And in the middle of the bottom paragraph on page 1

1    is an email from Mr. De La Guardia in which he says [as read]:

2            "If you like the idea, we could mention in our

3        article that our team (myself) has been in

4        conversations with the President of the Board of

5        Directors and Minister of the Panama Canal,

6        Roberto Roy, about implementing an e-payment process

7        that would help them (the Panama Canal) save money

8        (transfer fees, et cetera, SWIFT, Euroclear) and

9        provide a much better customer service when it comes

10       to making transit payments through the Canal."

11       Right?

12   A.   Yes.

13   Q.   So when you included in the press release references to

14   Mr. De La Guardia having had discussions with Mr. Roy, that's

15   because he was telling you he had; right?

16   A.   Well, he was telling me -- my reading of this is that he

17   was telling me we could mention that he was in conversations

18   along those lines.

19   Q.   Yes.

20   A.   Yes.

21   Q.   And you don't think he was lying to you about that, do

22   you?

23   A.   I don't know whether he was exaggerating, but I obviously

24   just took what he said.

25   Q.   Yes.  You believed he was accurate and you, therefore, put

1  it in the press release; right?

2  A.   Yes.

3  Q.   And you were the primary contact for these electronic

4  communications between Mr. De La Guardia and the company;

5  correct?

6  A.   I was one of the -- one of the contacts.

7  Q.   Well, you were the --

8  A.   I don't know the extent of his volume of communication

9  with Marcus Andrade or Richard Naimer or the others.

10  Q.   Okay.  But when you were working on the press release, you

11  were the primary contact; right?

12  A.   I believe so.

13  Q.   And when you were working on the press release and having

14  communications with Mr. De La Guardia about it, Marcus was not

15  on that chain; correct?

16  A.   I don't know.  I don't know whether he was included in

17  those emails or not.

18       **MR. SHEPARD:**  Let's look at 891, please, Dainec.  891

19  is also in evidence.

20  Q.   So this is the -- I guess it's a WhatsApp chain where you

21  and Mr. De La Guardia were working out what the press release

22  would say; right?

23  A.   Yes.

24  Q.   Mr. Andrade was not part of that chain; correct?

25  A.   He was not part of this -- this particular texting --

1   **Q.**   Yes.

2   **A.**   -- but I don't know if he was involved in other -- other

3   communications.

4   **Q.**   Yes, you've said that.  But my question is:  He was not

5   part of this chain; correct?

6   **A.**   Not this exhibit.

7   **Q.**   Yes.  The answer is he was not; correct?

8   **A.**   Yes.

9   **Q.**   Sometimes the judge corrects me if I don't get a clear,

10  not a negative answer.  That's why I asked you again.

11       And I think you mentioned Morgan & Morgan and what

12  happened with them on direct examination.  Your view was that

13  when you and Mr. Andrade and Mr. De La Guardia went to

14  Morgan & Morgan in December of 2017, Marcus did a dreadful job

15  of presenting to them; correct?

16  **A.**   Marcus was not the main presenter, but the portion that he

17  presented was not presented well.

18  **Q.**   It was dreadful; right?

19  **A.**   Yes.

20  **Q.**   And Morgan & Morgan -- perhaps, as you say, because Marcus

21  was not the only presenter, Morgan & Morgan nonetheless

22  discussed buying AML BitCoin Tokens and sounded interested in

23  the AML BitCoin concept; correct?

24  **A.**   Yes, correct.

25  **Q.**   And Morgan & Morgan discussed the possibility of working

1  on the government of Panama to adopt AML BitCoin; correct?

2  **A.**   I don't recall.

3  **Q.**   Well, you remember talking to the FBI in November of last

4  year, November 14th, and you told them at that time that

5  Morgan & Morgan discussed the possibility of working on

6  the government of Panama to adopt AML BitCoin?  That's what you

7  said; correct?

8  **A.**   I just don't have present recollection.

9  **Q.**   Okay.  You don't remember what you said to them in

10  November?

11  **A.**   I don't remember that portion.

12  **Q.**   You don't recall whether the Super Bowl commercial --

13  changing gears again, trying to move on.  You don't recall

14  whether the Super Bowl commercial was a rejection campaign from

15  the start; right?

16  **A.**   I do recall that it was.

17  **Q.**   Well, you told the FBI in that same interview in November,

18  November 14 of last year, that you don't recall whether the

19  Super Bowl commercial was a rejection campaign from the start,

20  didn't you?

21  **A.**   Yes.  Since that time, I reviewed materials, emails, and

22  plans, and I've changed my -- my answer on that, and I believe

23  it was a rejection campaign from the beginning.

24      **MR. SHEPARD:**  I -- I move to strike everything after

25  the answer that, yes, he did say that, because that was the

1    question, did he say that or not.

2         **THE COURT:**  I'm going to overrule it.  He could

3    explain his answer.

4    **BY MR. SHEPARD:**

5    **Q.**   Okay.  So you gave the FBI your best recollection in

6    November of 2024; correct?

7    **A.**   Yes.

8    **Q.**   And what happened after that was you spent a lot of time

9    with the prosecutors and the FBI agents; correct?

10   **A.**   The material related to the Super Bowl I went into my

11   computer and looked at myself.

12   **Q.**   And you also spent a lot of time with the prosecutors and

13   the FBI agents --

14   **A.**   Yes.

15   **Q.**   -- correct?

16        And they inquired about this with you; correct?

17   **A.**   Correct.

18   **Q.**   And after that, you changed -- it sounds like you now

19   changed your recollection; correct?

20   **A.**   Correct.

21   **Q.**   Now, in terms of the change of your recollection, you did

22   engage in a considerable effort to get funding to pay for the

23   Super Bowl ad, didn't you?

24   **A.**   Well, the Super Bowl ad was paid for by Marcus Andrade,

25   the production of the Super Bowl ad.

1   Q.   Okay.  I'm not asking about the production of the

2   Super Bowl ad.  I'm asking about raising money to pay to run

3   the ad on NBC.  You spent a lot of time doing that; correct?

4   A.   I'm not sure it's a lot of time.  I spent some time trying

5   to do it.

6   Q.   And if it was a rejection campaign from the start, you

7   didn't really need to raise money for it; right?

8   A.   Correct.

9   Q.   If we could look at 2127.

10        MR. SHEPARD:  And can you come grab mine?

11        MS. DIAMOND:  Can we have that number, again, please,

12   in the courtroom?

13        MR. SHEPARD:  2127.  And we're looking at pages 16 and

14   17.

15        MS. DIAMOND:  Your Honor, I'm sorry.  We do not have a

16   copy of that in the courtroom.

17        THE COURT:  Can you just move along with the

18   examination.  They can't find it, and I'm not waiting, so let's

19   move on.

20        MR. SHEPARD:  Yes.  I'm happy to move along,

21   Your Honor.

22   Q.   Do you see Exhibit 2127 in front of you?

23   A.   Yes.

24   Q.   And is that a text chain that you are a part of?

25   A.   I see it's a text chain between Steve Stephens and Moshe

1  Lapin, but I don't -- I don't see my name on it.

2  **Q.**   Yes.  But you use the name Steve Stephens quite

3  frequently, don't you?

4  **A.**   No.

5  **Q.**   Hmm.

6  **A.**   No.  But Steve Stephens, however that appeared, does have

7  my phone number there, but I don't know where Steve Stephens

8  comes from.  I don't use that name.

9  **Q.**   So Steve Stephens happens to be using your phone number

10 and texting about raising money for the Super Bowl?

11 **A.**   Well, I don't know -- I don't know that it was not me

12 doing this.  I just saw the name Steve Stephens.  I don't know

13 what that name is doing there.

14 **Q.**   Well, take a look at it --

15 **A.**   But the phone number --

16 **Q.**   -- and tell me --

17 **A.**   I'll read it.  But the phone number is my phone number.

18 **Q.**   -- tell me if you deny --

19       **THE COURT:**  Stop.  Stop.

20 **BY MR. SHEPARD:**

21 **Q.**   -- being Steve Stephens in that text chain.

22 **A.**   (Witness examines document.)  Well, I don't, again, know

23 where the Steve Stephens came from, but that is my phone, and

24 it looks like what I engaged in in a discussion with Moshe

25 Lapin.

1    **MR. SHEPARD:**  Okay.  I offer -- I think it's 2127.

2    **MR. HIGHSMITH:**  Objection.  I don't have a copy of

3    that, and it's hearsay.

4    **THE COURT:**  Yeah.  Again, you're using this document,

5    Mr. Shepard, to impeach the witness.  He has now acknowledged

6    what you asked.  Why do you need the document?

7    **MR. SHEPARD:**  The document is an event, Your Honor.

8    It reflects Mr. Abramoff's effort to raise money for --

9    **THE COURT:**  And he just admitted that he did.  So why

10   do you need the document?  It is not independently probative.

11   **MR. SHEPARD:**  Because it's an illustration of the

12   evidence --

13   **THE COURT:**  You don't --

14   **MR. SHEPARD:**  -- that he, in fact --

15   **THE COURT:**  Illustration --

16   **MR. SHEPARD:**  -- did engage in this.

17   **THE COURT:**  No.  It's --

18   **MR. SHEPARD:**  It provides the details that show how he

19   was engaged in --

20   **THE COURT:**  Right.  So you're --

21   **MR. SHEPARD:**  -- using money to pay for the ad.

22   **THE COURT:**  Yeah, you're offering it, therefore, for

23   the truth, and it's hearsay.  You're asking him some questions

24   using a document to impeach him.  As you know, those documents

25   do not come into evidence.  I don't know why we keep going over

 1  this.

 2      You ask him a question.  He says he doesn't remember.  You

 3  show him a document.  It refreshes his recollection, and he

 4  acknowledges it.  Move to the next issue.  You don't admit the

 5  document.

 6      So, sustained.  Next.

 7  **BY MR. SHEPARD:**

 8  **Q.**  In addition to raising money to run the Super Bowl ad, you

 9  were still hoping to actually be able to run the Super Bowl ad

10  as late as January 26, 2018; correct?

11  **A.**  Correct.

12      **MR. SHEPARD:**  And, Your Honor, for the record, I would

13  present to the witness Exhibit 3307; but understanding what

14  the Court just said to me, I -- if you would like me to do that

15  and then make the offer, I will; but I think the Court is going

16  to say to me the same thing the Court just said to me.

17      **THE COURT:**  Well, what is -- what is the question that

18  is pending?

19      **MR. SHEPARD:**  The question that was pending was that

20  Mr. Abramoff was still hoping to actually run the ad on NBC as

21  late as January 26 --

22      **THE COURT:**  Okay.

23      **MR. SHEPARD:**  -- 2018, and he said he was.

24      **THE COURT:**  And you asked him that question, and he

25  said -- and I believe his answer was "yes," wasn't it?

 1          **MR. SHEPARD:**  Yes, that is correct.

 2          **THE COURT:**  So you don't need a document for this

 3   purpose.  You've asked him a question.  He answered the

 4   question.  So then why are you introducing a document which,

 5   frankly, the offer is it's just going to say the same --

 6   there's no basis for the document to come into evidence.

 7          **MR. SHEPARD:**  Yes.  We've --

 8          **THE COURT:**  That's the problem.

 9          **MR. SHEPARD:**  We've been in trial for several weeks

10   now, and there've been -- there's been lots of testimony

11   offered by the Government with supporting documents, and the

12   supporting documents have been admitted.

13          **THE COURT:**  Right, and they always had a basis for

14   admission of those documents.  You don't.  So that's your

15   problem.  You are not -- there is no basis for these documents

16   which are otherwise hearsay.  You don't have a basis for them.

17      Listen, that's my ruling.  Let's move on.

18          **MR. SHEPARD:**  Yes, that's what I was trying to

19   anticipate.  So under these circumstances, I would have offered

20   3307.

21   **Q.**   And you testified on direct that you worked with your old

22   friend Brian Darling on the articles relating to the rejection;

23   correct?

24   **A.**   Correct.

25   **Q.**   And we saw some examples during your direct testimony

1  where you ran articles about the Panama Canal past Marcus

2  before sending them out; right?

3  **A.**   Correct.

4  **Q.**   The articles about the rejection, we did not see yesterday

5  you running them past Marcus; correct?

6  **A.**   We did not see them yesterday?

7  **Q.**   Yes.

8  **A.**   Correct.

9  **Q.**   And you don't recall doing so, do you?

10  **A.**   I do recall doing so.

11  **Q.**   And yet the Government didn't show you those yesterday;

12  correct?

13  **A.**   Correct.

14  **Q.**   And the letter to which Mr. Andrade's signature was

15  attached to the NFL, that was written initially by someone on

16  Mr. Darling's team and reviewed by you; correct?

17  **A.**   Correct.

18  **Q.**   And then sent to Mr. Andrade for his signature?

19  **A.**   Correct.

20          **MR. HIGHSMITH:**  Pardon me.  Would this be a good time

21  for a break, Counsel?

22          **MR. SHEPARD:**  Sure.  Whatever -- whatever suits

23  Mr. Abramoff and the Court is fine with me.

24          **THE COURT:**  All right.  We'll go ahead and take a

25  break.  Let's look to start at quarter of.

1    Remember my admonitions.  Don't discuss this amongst

2    yourselves or with anyone else.

3    And we'll see you in ten minutes or so.

4    (Recess taken at 9:34 a.m.)

5    (Proceedings resumed at 9:50 a.m.)

6    (Proceedings were heard out of the presence of the jury.)

7    **THE COURTROOM DEPUTY:**  Are you ready for the jury?

8    **THE COURT:**  Yes.

9    (Proceedings were heard in the presence of the jury.)

10   **THE COURT:**  The jury is present.

11   You may proceed, Mr. Shepard.

12   **MR. SHEPARD:**  Thank you, Your Honor.

13   **Q.**  Mr. Abramoff, you earlier mentioned that at some point

14   Mr. Naimer owned CrossVerify/DITN.  Are you also aware that he

15   sold it after that?

16   **A.**  No, I'm not aware of that, or at least I don't recall it.

17   **Q.**  Okay.  And can you describe any different form of written

18   report that you saw from Mr. Naimer about the technology other

19   than the weekly management updates I showed you earlier?

20   **A.**  I'm afraid I can't.  I don't recall them.

21   **Q.**  Okay.  I'd like to pick up from when -- where you

22   testified yesterday about talking to your son Alex and then

23   being in contact with Marcus in 2017.

24   And is it fair to say that at that time, you had some

25   other things going on that showed you ways that you could use a

1    cryptocurrency?

2    **A.**    Showed me ways I could use a cryptocurrency?  I'm not

3    certain I understand your question.

4    **Q.**    Okay.  Let me -- let me ask it a different way, then.

5            **MR. SHEPARD:**  Let's show the witness Exhibit 3261.

6            **MS. DIAMOND:**  We have one marked as -001.  I

7    distributed to the Court, the one without the extension,

8    Exhibit 3261.

9            **MR. SHEPARD:**  Yes.  What we have here is three -- a

10    document with writing on three pages, 3261-001 to 3261-003.

11            **MS. DIAMOND:**  One moment.

12                    (Pause in proceedings.)

13            **MS. DIAMOND:**  Thank you.

14    **BY MR. SHEPARD:**

15    **Q.**    Have you had a chance to look at that?

16    **A.**    Well, no.  It's lengthy.  And do you want me to read the

17    whole thing or --

18    **Q.**    Well, let me just start by asking you if you recognize

19    this as a text chain between you and a man named

20    Eliezer Scheiner.

21    **A.**    Yes.

22    **Q.**    And you were texting with him at the time about a man

23    whose name I will mispronounce, Gennadiy Bogolyubov?

24    **A.**    Gennadiy Bogolyubov, yes.

25    **Q.**    Okay.  And to make this easier, can we call him G.B.?

1  **A.**  Sure.

2  **Q.**  And he needed your help, G.B.; right?

3  **A.**  Yes.

4  **Q.**  And Mr. Scheiner is an old friend of yours; correct?

5  **A.**  Correct.

6  **Q.**  G.B. is a Ukrainian billionaire, one of the pro-Russian

7  Ukrainian billionaires; correct?

8  **A.**  I don't believe he's pro-Russian, but he is -- he was a

9  Ukrainian billionaire, yes.

10 **Q.**  Okay.  And his assets were frozen and he couldn't go back

11 to London; correct?

12 **A.**  I -- I haven't had a chance to read this, and I don't

13 recall at this point this matter or the details of it

14 eight years ago.  I just don't recall them.

15 **Q.**  Okay.  Well, if you'd take a look at the bottom of page 2.

16 **A.**  Yes.

17 **Q.**  All of his assets were frozen and he couldn't go back to

18 London; right?

19 **A.**  That's what it says, yes.

20 **Q.**  And you ultimately agreed to help G.B.; correct?

21 **A.**  Yes.

22 **Q.**  You arranged to meet him in person in New York City in

23 June of 2017?

24 **A.**  Yes.

25 **Q.**  And then soon after that is when you and Mr. Andrade

1  discussed doing an ICO together; correct?

2  **A.**    Soon after that, I reconnected with Mr. Andrade, yes.

3  **Q.**    Yes.  And you said to Mr. Andrade that you were approached

4  by one of your "friends in the New York finance world who is

5  very bullish on this and wants me to get involved, but I

6  figured I should do it only with you, if you are into it";

7  correct?

8  **A.**    Is that in this document?

9  **Q.**    It is.

10  **A.**    I don't recall it.

11  **Q.**    Okay.  Let's --

12       (Stenographer interrupts for clarification of the record.)

13       **THE WITNESS:**  I said I don't see it in this document

14  and requested to have the counsel point me to where that is.  I

15  don't recall that.

16       **MR. SHEPARD:**  Dainec, 3260, please.

17  **Q.**  And here we're looking at, like, the second and third

18  entries on the page.

19  **A.**  (Witness examines document.)

20  **Q.**  Actually, the first, second, and third.

21  **A.**  Yes.

22  **Q.**  And you say to Marcus [as read]:

23       "Are you familiar with the whole ICO

24  world . . . ."

25  Right?

ABRAMOFF - CROSS / SHEPARD

1    **A.**    Yes.

2    **Q.**    And he says:  Yes, I've considered it.  I've been

3    approached by others.

4        And you say [as read]:

5            "I was approached today by one of my friends in

6        the New York finance world who is very bullish on

7        this and wants me to get involved, but I figured I

8        should do so only with you, if you are into it."

9        Right?

10   **A.**    Yes.

11   **Q.**    And the next day you told Mr. Andrade that your son Lev

12   was going to put together a TV show about AML BitCoin; right?

13   **A.**    I don't recall if it was the next day, but eventually I

14   did tell him that, yes.

15   **Q.**    If you look further down the page --

16   **A.**    Yes.

17   **Q.**    -- on 3262, you see we've moved from June 19, 2017, to

18   June 20?

19   **A.**    Yes.

20   **Q.**    And you say [as read]:

21            "I spoke to my" -- "I spoke with Lev (my son)

22        this morning.  He's working on formulating a show."

23        Right?

24   **A.**    Yes.  Yes.

25   **Q.**    And that was the next day?

1   **A.**   Yes.

2   **Q.**   And within a couple of weeks after that, you were using

3   your contacts on Capitol Hill, and you told Mr. Andrade that

4   senators were introducing a bill that calls for more oversight

5   of digital currency business activity; right?

6   **A.**   Possibly.  I don't recall it but --

7          **MR. SHEPARD:**  Okay.  3246, please.

8          **THE WITNESS:**  (Witness examines document.)

9   BY MR. SHEPARD:

10  **Q.**   Okay.  And feel free to look at as much as you would like

11  to, but I'm going to direct your attention -- or the questions

12  I'm going to ask you start in the lower half of page 2.

13  **A.**   Page 2 being the back of page 1?

14  **Q.**   Correct.  The one that's marked 3246-002.

15  **A.**   I have it.

16         (Witness examines document.)  Okay.

17  **Q.**   And you see that you said to Mr. Andrade that [as read]:

18         "We need to move our ICO along as quickly as we

19         can, and might want to reconsider separating them

20         into two ICOs, with the big one in February.  Let's

21         discuss."

22  **A.**   Yes.

23  **Q.**   Right?

24         And you also told Mr. Andrade that you had written a

25  statement advocating for tighter rules on digital currencies;

1  right?

2  **A.**   Is that in this same part of the page?

3  **Q.**   We're moving ahead to the next piece of the story.  It's

4  in Exhibit 3247.

5          **MR. SHEPARD:**  So, Dainec, if you could get that.

6          **THE WITNESS:**  (Witness examines document.)

7  **BY MR. SHEPARD:**

8  **Q.**   And here, I'm looking at the first page, the bottom half

9  of the first page.

10  **A.**   Yes.

11  **Q.**   So you said that you had written a statement advocating

12  for tighter rules on digital currencies and that

13  Congressmen Dana Rohrabacher would read the statement on the

14  House floor; right?

15  **A.**   Yes.  I'm just missing the first part where you say that I

16  said I've written a statement of -- tightening the rules.  I

17  don't see that here.

18  **Q.**   Okay.  I -- I think that that's -- the first part of my

19  question was reference to the prior exhibit, but let me make it

20  easier by just carving it up here.

21      You attached a file containing a floor statement from the

22  House of Representatives; correct?

23  **A.**   Correct.

24  **Q.**   And do you dispute that that statement was one you drafted

25  advocating for tighter rules on digital currencies?

1    **A.**    I can't dispute or affirm it because I can't -- the

2    statement is not here, so I'm not certain what the statement

3    said.

4    **Q.**    Okay.

5    **A.**    I don't have a recollection at this point.

6    **Q.**    But you do remember that at this time one of the things

7    that you were doing was trying to get attention in Congress

8    toward writing tighter rules on digital currencies; correct?

9    **A.**    I know that we were trying to get attention in Congress.

10    I just can't recall the content of what I wrote or what we were

11    advocating at this point.

12    **Q.**    Okay.  And Dana Rohrabacher, he was from

13    Southern California; right?

14    **A.**    Yes.

15    **Q.**    And he was a longtime friend of yours --

16    **A.**    Yes.

17    **Q.**    -- right?

18    And Mr. Andrade responded to what you had attached and

19    said [as read]:

20            "You're a Genius!!!  It is perfect."

21    Right?

22    **A.**    Yes.

23    **Q.**    And you said [as read]:

24            "I'm going to ask him to put it in, even if the

25    others move forward."

1    Right?

2  **A.**    Yes.

3  **Q.**    And the reference to "the others" was that you were also

4  in contact with other members of Congress on the same subject;

5  correct?

6  **A.**    I -- I don't recall.  I'm not certain that that's what

7  that means, but I just don't know.

8  **Q.**    And then -- then you were providing Mr. Andrade with

9  additional details about TV work; right?

10  **A.**    Provided Mr. Andrade additional detail about TV work?

11  **Q.**    Right.  Do you have a recollection of that?

12  **A.**    I'm not certain I understand what you mean by "TV work."

13  **Q.**    Okay.  Well, you had been talking with Mr. Andrade about

14  putting together a TV show, having your son Lev put together a

15  TV show about AML BitCoin; right?

16  **A.**    Yes, correct.

17  **Q.**    And you were continuing to talk up that possibility --

18  **A.**    Yes.

19  **Q.**    -- right?

20        **MR. SHEPARD:**  And why don't we show 3248.

21  **Q.**    And this is now on July 20th, and you are telling

22  Mr. Andrade that you're going to meet with the *Duck Dynasty*

23  showrunner --

24  **A.**    Yes.

25  **Q.**    -- right?

1     With a term sheet being drafted by the attorneys; right?

2  **A.**   Yes.

3  **Q.**   And for those who are not into this aspect of popular

4  culture, can you explain *Duck Dynasty*?

5  **A.**   *Duck Dynasty* was a popular reality television show for

6  many years.

7  **Q.**   And you told Mr. Andrade [as read]:

8        "Tomorrow is going to be very exciting, assuming

9        all is on track.  More later after the meeting with

10       the *Duck Dynasty* guy."

11 **A.**   Yes.

12 **Q.**   Right?

13    You were pushing ahead with the prospect of having a TV

14 show for AML BitCoin?

15 **A.**   Yes.

16 **Q.**   And at the same time, you said -- I guess the next day,

17 you said you could talk to Marcus but you were going to be in

18 your car driving with someone, but we could -- the two of you,

19 you and Marcus, could chat while he was in the car.

20    This other person was in the car; right?  It's toward the

21 bottom of page 2.

22 **A.**   (Witness examines document.)  Yes.

23 **Q.**   And the person who was going to be in the car was G.B.;

24 right?

25 **A.**   Yes.

1    Q.    And then the next day you were saying [as read]:

2              "Super!!!  Wow, this is so exciting!!!!!"

3        Right?

4    A.    That is not on this sheet, and I can't recall what I

5    said --

6    Q.    Oh.

7    A.    -- that next day.

8    Q.    Move to 3249.

9    A.    (Witness examines document.)  Yes.

10   Q.    And that's where you're saying [as read]:

11             "Super!!!  Wow, this is so exciting!!!!!"

12       Right?

13   A.    Yes.

14   Q.    And you said that you'd send Marcus an email and then you

15   are running to see Randy Jackson; right?

16   A.    Yes.

17   Q.    And for those not into that aspect of pop culture, can you

18   explain who Randy Jackson is?

19   A.    He's an executive in the music industry who was a host of

20   *American Idol*.

21   Q.    And then later that same day, July 23rd, you said [as

22   read]:

23             "I'm back from my meeting.  Randy Jackson wants

24       in.  We'll discuss when we chat."

25   A.    Could you give me a time -- the timestamp on that so I

**ABRAMOFF - CROSS / SHEPARD**

1    could come to it?  I don't see it.

2    **Q.**   Yeah.  The timestamp is 21:42 and 43 seconds.

3    **A.**   Okay.  Yes, I see it.

4    **Q.**   And that's what you said; right?

5    **A.**   Yes.

6    **Q.**   This was sounding really exciting; right?

7    **A.**   Well, I'm not certain what Randy Jackson was going to be

8    in on, based on this, and I can't recall.  I discussed -- if I

9    remember, I discussed a few different things with Randy Jackson

10   that evening.

11   **Q.**   Okay.  But you were communicating to Mr. Andrade "Wow,

12   this is so exciting!!!!!"; correct?

13   **A.**   Correct.

14   **Q.**   And the following day you told Marcus [as read]:

15           "We're going to change the world, my dear

16       friend."

17       Right?

18   **A.**   Possibly.  I, again, don't recall, but it does not sound

19   inconsistent.

20   **Q.**   It sounds like what you were saying --

21   **A.**   Yes.

22   **Q.**   -- to him at the time?

23           **MR. SHEPARD:**  3250.

24   **Q.**   And do you see there where you say [as read]:

25           "We're going to change the world, my dear

1    friend"?

2  **A.**   Could you please give me a timestamp so I can find it

3  within this?

4  **Q.**   It's right up by the top.  It's 3:37:25.

5  **A.**   The hour of 3:37:25, you say?

6  **Q.**   Yes.  And, I'm sorry, it appears to be on page 4.

7  **A.**   Yes.

8  **Q.**   And when you said, "We're going to change the world, my

9  dear friend," Marcus responded [as read]:

10        "I so much agree.  Thank you for everything,

11     partner."

12     Right?

13 **A.**   Yes.

14        **MR. SHEPARD:**  Sorry.  If I could just have a moment.

15                 (Pause in proceedings.)

16 **BY MR. SHEPARD:**

17 **Q.**   And this is July 24 of 2017?

18 **A.**   Yes.

19 **Q.**   And leaving this one aside for a moment, you recall

20 Mr. Andrade saying that he looked up to you?

21 **A.**   Yes.

22 **Q.**   That your kids were lucky to have you as a father?  Do you

23 remember that?

24 **A.**   I don't remember that statement, but it's consistent with

25 the relationship we had at the beginning.

1    **Q.**   Okay.  And it was around this time that a term sheet with

2    Blockchain Entertainment was signed; correct?

3    **A.**   Correct.

4    **Q.**   And that was to do a docuseries that would provide

5    entertainment to, hopefully, millions of viewers; right?

6    **A.**   Correct.

7    **Q.**   And you remember that you were in discussions with the

8    likes of Mike Odair of *Duck Dynasty* as well as Randy Jackson;

9    right?

10    **A.**   Correct.

11    **Q.**   And by early August, you were working on websites and bios

12    and preparing to do an ICO; right?

13    **A.**   That sounds right.

14    **Q.**   And do you remember an article being published that said,

15    "Famed lobbyist Jack Abramoff's criminal past will serve him

16    well in new reality show"?

17    **A.**   I don't remember the article, but it sounds like something

18    that likely could have been produced.

19    **Q.**   And do you remember after that article came out, Marcus

20    saw a photo of you with that article that you said you didn't

21    like?

22    **A.**   I don't remember that.

23         **MR. SHEPARD:**  3253, please.

24    **Q.**   Are you doing okay there, Mr. Abramoff?

25    **A.**   Thank you.  Thank you.

ABRAMOFF - CROSS / SHEPARD

1              (Witness examines document.)  Yes.

2    **Q.**   So you said you hated that hat picture?

3    **A.**   Yes.

4    **Q.**   And Marcus said [as read]:

5              "I like that hat"?

6    **A.**   Yes.

7    **Q.**   And he said [as read]:

8              "After we hit a home run in the fund-raise, I'm

9         going to have to buy me one of those."

10        Right?

11   **A.**   Yes.

12   **Q.**   And you responded [as read]:

13             "Hahaha.  First a new mansion.  Then the hat!"

14        Right?

15   **A.**   Yes.

16   **Q.**   And that was around August 1st; right?  July 31st and

17   August 1st?

18   **A.**   Yes.

19   **Q.**   And within a few days after that, you drafted and shared

20   with Marcus a letter that appears to be for the leader of the

21   country of Angola to announce that Angola was looking forward

22   to working with AML BitCoin; right?

23   **A.**   I don't recall it at this point.

24             **MR. SHEPARD:**  3254, please.

25             **THE WITNESS:**  (Witness examines document.)  Yes.

1  BY MR. SHEPARD:

2  Q.   So you shared that letter and you sent it to Marcus, and

3  he responded very promptly [as read]:

4          "Very good.  Use it."

5       Right?

6  A.   Yes.

7  Q.   And then you started talking about having him come to

8  Beverly Hills; right?

9  A.   Could you give me a timestamp, please.

10 Q.   4:22 -- I'm sorry.  22:42:20 on August 4, 2017.

11 A.   Yes.

12 Q.   And so after that, you shared an itinerary for Marcus to

13 visit Beverly Hills; right?  I guess that's back on page 2.

14 A.   Visit Beverly Hills?  I don't see Beverly Hills listed

15 here.

16 Q.   Okay.  Well, you did share --

17 A.   I think he was staying in Santa Monica.

18 Q.   You did share an itinerary of the various people who he

19 was going to meet when he was in the Los Angeles area --

20 A.   Oh.

21 Q.   -- right?

22 A.   Yes.

23 Q.   And that included Blockchain Entertainment?  It included a

24 company called Ignition?

25 A.   Yes.

1   **Q.**   And can you explain to the jurors what Ignition is?

2   **A.**   I believe they are -- I can't recall at this point, but

3   I believe they were either a production company or somehow

4   involved in television.

5   **Q.**   And also you mentioned a Peter Berg, who's a showrunner?

6   **A.**   Yes.

7   **Q.**   Mike Odair, another potential showrunner.  That was the

8   *Duck Dynasty* guy --

9   **A.**   Yes.

10  **Q.**   -- right?

11       Congressmen Rohrabacher --

12  **A.**   Yes.

13  **Q.**   -- right?

14  **A.**   Correct.

15  **Q.**   John Bryan --

16  **A.**   Yes.

17  **Q.**   -- right?

18       And Randy Jackson; right?

19  **A.**   Yes.

20  **Q.**   And did you go to the dinner that Marcus had with

21  John Bryan?

22  **A.**   Likely.  I just can't recall.

23  **Q.**   Do you remember him driving up in a red Ferrari?

24  **A.**   He owned and drove a red Ferrari, but I don't remember him

25  driving up in it.

1  **Q.**   Okay.  And while you were in Beverly Hills, you told

2  Marcus that the entertainment folks were working on getting

3  Jackie Chan involved too; right?  That's going to be on a

4  different document.

5  **A.**   Okay.  Again, I don't have present recollection of the

6  details of this discussion, but I can certainly look at a

7  document.

8          **MR. SHEPARD:**  3256, please, Dainec.

9          **THE WITNESS:**  (Witness examines document.)

10 **BY MR. SHEPARD:**

11 **Q.**   Do you see there where you're telling Marcus that

12 [as read]:

13          "They're on Jackie Chan right now to get it

14     lined up"?

15 **A.**   Yes.

16 **Q.**   Right?

17 **A.**   But I believe that was related to the coin, to endorse the

18 coin, not the TV show.

19 **Q.**   Okay.  But that would be a good thing, having Jackie

20 Chan --

21 **A.**   Yes.

22 **Q.**   -- endorse your coin?

23     For those who are not familiar with this aspect of pop

24 culture, he's -- still is, I think -- a very popular action

25 movie figure; right?

 1    **A.**   Correct.

 2    **Q.**   Does a lot of fighting stuff, but also has a great sense

 3    of humor, as best I can tell; right?

 4    **A.**   I don't know about his sense of humor, but I certainly

 5    know he's a popular action star.

 6    **Q.**   Okay.  And you said to Marcus, referring to Jackie Chan

 7    [as read]:

 8            "I am sure we'll get him.  The whole matter will

 9        be how much we need to pay him, but let's see what

10        they come back with."

11        Right?  That's 18:26:16.

12    **A.**   Yes.

13    **Q.**   And Marcus says [as read]:

14            "You're the best partner."

15        Right?

16    **A.**   Yes.

17    **Q.**   And then in October, you communicated with a man named

18    Roger Engone.  Am I pronouncing that correctly?

19    **A.**   Yes.

20    **Q.**   And he's another friend of yours; correct?

21    **A.**   Yes.  Yes.

22    **Q.**   And you were talking about a deal in which you would use

23    AML BitCoin; right?

24    **A.**   I don't recall.

25            **MR. SHEPARD:**  3262, please, Dainec.

1  Q.   And here, I'm looking first at the bottom of page 1, where

2  you write -- and this is a communication you're having with

3  Roger Engone; correct?

4  A.   Yes.

5  Q.   And you tell Mr. Engone that you're going to use

6  AML BitCoin as part of this transaction that you're describing;

7  correct?

8  A.   Yes.

9  Q.   And this is your telephone number, but these

10 communications are using the name Steve Stephens; right?

11 A.   Yes.

12 Q.   Your name doesn't appear here.  It's Steve Stephens

13 talking to Roger Engone; correct?

14 A.   Yes.

15 Q.   And the participants in this transaction are going to

16 include two Angolan participants, each of whom will designate

17 to Mr. Engone an Angolan bank where they have deposits; right?

18 A.   Yes.

19 Q.   And ultimately, AML BitCoin would sell $100 million of

20 AML BitCoin to the first participant, who would wire

21 $100 million to an AML account, after which AML would deposit

22 75 million AML BitCoin in the first participant's wallet;

23 right?

24 A.   Yes.

25 Q.   And Participant Number 2 would buy 75 million AML BitCoin

1  from Participant 1 for 100 million, or market price, and would

2  get 100 million, or the sale price; would transfer 75 million

3  AML BitCoin into the second participant's wallet; and would

4  deposit $100 million, or the sale price, into the first

5  participant's account in Dubai; right?

6  **A.**   Yes.

7  **Q.**   Except it wouldn't be the entire amount.  There'd be

8  20 percent of the funds deposited in Participant 1's Dubai

9  account to be paid to Mr. Engone's account?

10  **A.**   To Mr. Engone's account?

11  **Q.**   Yes.  This is Number 13.

12  **A.**   (Witness examines document.)  Okay.  I didn't see

13  Mr. Engone's name listed as the account but --

14  **Q.**   Well, you see the initials R.E.?

15  **A.**   Oh, I'm sorry.  Yes.

16  **Q.**   And in the context of this, that's Mr. Engone, isn't it?

17  **A.**   Yes.  Sorry.  I didn't see that.

18  **Q.**   And this approach could enable deposits of more than

19  1 billion U.S. dollars per month in each Dubai account --

20  **A.**   Yes.

21  **Q.**   -- right?

22  **A.**   Yes.

23  **Q.**   And it sounds like if the sale price for this initial

24  transaction was $100 million, Mr. Engone, your friend, would

25  get 20 million; right?

1   **A.**    Yes.

2   **Q.**    Was Engone the only person participating in this plan that

3   was a friend of yours?

4   **A.**    I'm reading this, but to be honest with you, I can't

5   recall this.

6   **Q.**    You can't recall this billion-dollar proposed deal?

7   **A.**    No, I do not recall it.

8   **Q.**    Do you have a lot of billion-dollar proposed deals?

9   **A.**    Well, I mean, it was a proposal.  I don't know --

10  obviously, it didn't proceed, but I don't -- I don't recall

11  this.

12  **Q.**    My question was:  Do you have a lot of --

13  **A.**    No, I do not have a lot of billion-dollar proposed deals.

14  **Q.**    Okay.  So this one would have been pretty memorable if it

15  came off; right?

16  **A.**    If it had come off?  Probably.

17  **Q.**    And -- okay.  And ultimately, you sent Mr. Engone an

18  AML BitCoin purchase agreement; right?  It's not going to be in

19  that one.

20  **A.**    Again, I don't recall the transaction.

21  **Q.**    Okay.  It sounds like you would have needed to do so to

22  make the transaction work; right?

23  **A.**    Possibly.  I just don't recall.

24          **MR. SHEPARD:**  Dainec, do you have 2795, page 12?

25          **MS. DIAMOND:**  Is that 2795?

1          **MR. SHEPARD:**  2795.

2      It seems like it's missing, so we'll just move on.

3   **Q.**  Shifting subjects now, Mr. Abramoff, you had a

4   conversation in August of 2018 with someone who turned out to

5   be cooperating with the Government.  Has the FBI explained that

6   to you?

7   **A.**  Yes.

8   **Q.**  And, in fact, they did that a number of times, both to you

9   and to Marcus; right?

10  **A.**  Correct.

11  **Q.**  And you knew that Dillman prepared his own marketing

12  material and Marcus made him have AML BitCoin lawyers review

13  them; right?

14  **A.**  I don't recall the review of the lawyers, but I do recall

15  that Dillman prepared his own materials.

16  **Q.**  Well, you remember telling this person who was working

17  undercover for the FBI on August 27, 2018, that Dillman

18  prepared his own marketing material and Marcus made him have

19  AML BitCoin lawyers review them?

20  **A.**  I don't recall saying it.  I'm not denying it, but I don't

21  recall it.

22  **Q.**  And you also told the cooperating witness that Dillman did

23  not follow that requirement; right?

24  **A.**  Likely.  I just -- I just don't recall, but likely.

25  **Q.**  And you told a different undercover person, around this

ABRAMOFF - CROSS / SHEPARD

1   same time in July, this time of 2018, that the company has

2   high-level intellectual talent, such as a professor at the

3   University of Macao, who was part of the original

4   Satochi Group; right?

5   **A.**   I don't recall the actual comment, but that is consistent

6   with something I would have said.

7   **Q.**   Okay.  And just a couple of things to place this better in

8   context.

9        Macao is right next door to Hong Kong; right?  Short ferry

10  ride?

11  **A.**   It's not right next door, but it is a territory -- former

12  Portuguese territory in China, yes.

13  **Q.**   And it's a short ferry ride from Hong Kong?

14  **A.**   Again, I don't know the -- whether "short" is accurate,

15  but it is near Hong Kong.

16  **Q.**   About 40 minutes?

17  **A.**   (Nods head.)

18  **Q.**   And you also referred to the original Satochi Group.

19  Satochi is the alias for the person who authored the original

20  Bitcoin white paper; correct?

21  **A.**   Yes.

22  **Q.**   And you knew Marcus had been working for a long time with

23  a man named Terence Poon; right?

24  **A.**   Yes.

25  **Q.**   And it was Mr. Poon or Professor Poon who you were

1  referring to as being at the University of Macao; right?

2  **A.**  Correct.

3  **Q.**  A brief subject here.  Yesterday, I believe you said you

4  did get commissions when you sold AML BitCoin, but the amount

5  varied and you didn't remember the percentages; correct?

6  **A.**  Correct.

7  **Q.**  There was a time when you were getting 50 percent; right?

8  **A.**  Correct.

9  **Q.**  And Mr. Andrade said to you, "Okay, Jack, but please, we

10  can no longer do this 50 percent deal because I need funds for

11  the company."

12      Do you remember him telling you that?

13  **A.**  Yes.

14  **Q.**  And that was in May of 2018?

15  **A.**  I don't recall exactly when it was, but, yes, he did say

16  that to me.

17      **MR. SHEPARD:**  I'm sorry.  I didn't hear that.  Was

18  somebody trying to tell me to do or not do something?

19      **THE COURT:**  I coughed.

20      **MR. SHEPARD:**  Oh.  My apologies.

21  **Q.**  You testified yesterday that the -- when you were

22  interviewed by the FBI in September of 2018, that's when they

23  came to search your house; right?

24  **A.**  Yes.

25  **Q.**  You said that they told you that the company was -- they

1    told you that the company was missing a million dollars because

2    Marcus had bought a million-dollar house; right?

3    **A.**    No.  They told me that Marcus had taken a million dollars

4    and, with it, bought a house, a truck, and I think something

5    else.

6    **Q.**    And the something else was some land in Corpus Christi,

7    Texas; correct?

8    **A.**    Correct.

9    **Q.**    And you advised him to buy that land, didn't you?

10   **A.**    I don't recall telling him to buy it knowing that he was

11   taking money from the company, and I don't recall --

12   **Q.**    I didn't --

13   **A.**    -- telling him -- I may have told him that; I just don't

14   recall if I did.

15   **Q.**    I didn't ask you whether you told him to do that knowing

16   that he was taking money from the company.  I asked you if you

17   told him to buy property in Corpus Christi.  Could I have --

18   **A.**    I don't recall.

19   **Q.**    -- an answer to that question?

20   **A.**    I don't recall.

21   **Q.**    Okay.

22       (Simultaneous speaking.  Stenographer interrupts for

23   clarification of the record.)

24   **BY MR. SHEPARD:**

25   **Q.**    I think she was telling us not to talk over each other.

1    A.    I'm sorry.

2    Q.    So am I.

3         And you had known prior to the FBI's interview in

4    September that Mr. Andrade had bought a house; correct?

5    A.    I had seen Mr. Andrade in a house on Skype, but I -- and I

6    believed he owned that house, but I didn't have any information

7    from him that he bought a house.

8              MR. SHEPARD:    Can we show Exhibit 3301, please.

9              THE WITNESS:    Yes.

10   BY MR. SHEPARD:

11   Q.    And this is an email from Mr. Andrade to you dated

12   August 14, 2018?

13   A.    Yes.

14   Q.    And he told you that his house is new construction, that

15   it took over a year to build, and that he paid around $765,000

16   for it; correct?

17   A.    That's correct.

18   Q.    And he told you that roughly a month before the FBI came;

19   correct?

20   A.    Yes.

21   Q.    And he told you that in the context of asking you if you

22   knew someone who could give him a loan so the company could use

23   the house as collateral; right?

24   A.    Correct.

25   Q.    And you told him that the person you contacted would not

1    do a loan against a house in Texas?

2    **A.**    Yes.

3         **MR. SHEPARD:**  And then, Dainec, if we can do

4    Exhibit 3314.

5         And sorry, Dainec, also 2934.

6         We'll get to 3314 in a second.  I just got one -- got one

7    exhibit ahead.  I'm sorry.

8         **MS. DIAMOND:**  One moment.

9         **MR. HIGHSMITH:**  Sorry to interrupt.  Would it be

10   possible to take a break shortly?  Not necessarily now, but in

11   the next few minutes.

12   **BY MR. SHEPARD:**

13   **Q.**   Mr. Abramoff, would you like a break now or can we --

14   should we get through this little topic?  Your choice.

15   **A.**   We can try to get through this topic.  It's fine.

16   **Q.**   Okay.  To make it a little shorter, I think Mr. Stefan has

17   just given you the particular page of Exhibit 2934, and this is

18   page 8.

19   **A.**   (Witness examines document.)

20   **Q.**   Do you see that?

21   **A.**   I do.

22   **Q.**   This is a page of notes that, among other things, was

23   seized by the FBI when they came to your house in September of

24   2018; correct?

25   **A.**   Yes.

**ABRAMOFF - CROSS / SHEPARD**

1  **Q.**  And on the bottom part of the page, you see it says, "Get

2  piece of land for $200,000"; right?

3  **A.**  Yes.

4  **Q.**  And this is your handwriting; right?

5  **A.**  It is.

6  **Q.**  And then it says, "5 acres Corpus Christi"; right?

7  **A.**  Yes.

8  **Q.**  And there's a little diagram to the right of "Get piece of

9  land for $200,000."  There's a little diagram that has one box

10  that says "14 lots" and another box that says "14 lots"; right?

11  **A.**  Yes.

12  **Q.**  So this was a discussion about getting a piece of land in

13  Corpus Christi for about $200,000 and then there would be a lot

14  split; right?

15  **A.**  It seems so.  I can't remember -- I can't remember, but it

16  seems so.

17  **Q.**  And then to the right of the two boxes that I just

18  described, it says, "3 million appraisal.  Donate to

19  non-profit"; right?

20  **A.**  Yes.

21  **Q.**  That's suggesting that after the land was purchased and

22  subdivided, it might be worth a whole lot more than what was

23  paid for it; and to help with the taxes, some funds would be

24  donated to a non-profit; right?

25  **A.**  I can't recall.  I believe these were notes that I took on

1  a plan Mr. Andrade had for this property, but I can't remember

2  the full plan.

3  **Q.**  This is what you suggested that he do; correct?

4  **A.**  No, I don't know that.  I don't know that.  These look

5  like notes that I took, not plans that I made.

6  **Q.**  Well, it says, "Get piece of land"; right?

7  **A.**  Right.

8  **Q.**  And donating to non-profits, that's something that you

9  have made a part of transactions in the past; correct?

10  **A.**  I have given to non-profits, yes.

11  **Q.**  And the material on the top part of the page relates to a

12  possible name change for AML BitCoin; correct?

13  **A.**  It notes that there is a need -- new name for NAC, which

14  was the name of the company.

15  **Q.**  Yes.  Okay.  And those discussions occurred in March --

16  discussions about changing the name of the company occurred in

17  March of 2018; correct?

18  **A.**  I don't -- I don't recall.

19          **MR. SHEPARD:**  If we could show the witness 3310.

20          **THE COURT:**  Is this the point that there was a request

21  for a break once you got through the --

22          **MR. SHEPARD:**  I'm happy to take a break any time,

23  Your Honor.

24          **THE COURT:**  All right.  Let's go ahead and do it.

25          Members of the jury, remember my admonitions.  Don't

1    discuss this amongst yourselves or with anyone else.

2        And we'll be back here in ten minutes.

3            (Recess taken at 10:59 a.m.)

4            (Proceedings resumed at 11:15 a.m.)

5        (Proceedings were heard out of the presence of the jury.)

6        **THE COURT:**  Okay.  You can bring them out.

7        (Proceedings were heard in the presence of the jury.)

8        **THE COURT:**  The jury is present.

9    You may proceed, Mr. Shepard.

10       **MR. SHEPARD:**  Thank you, Your Honor.

11   **Q.**   Mr. Abramoff, when we left off, I had been asking you

12   about the timing of the note -- of the page of notes of yours

13   that we were looking at and, in particular, the timing of the

14   discussions about a possible name change for the

15   NAC Foundation.  Do you remember that?

16   **A.**   Yes.

17   **Q.**   And I think before we broke, Mr. Stefan gave you a copy of

18   Exhibit 3310.

19   **A.**   I don't have Exhibit 3310.

20   **Q.**   Okay.  Well, we'll fix that right away.  Thank you.

21   **A.**   All right.

22   **Q.**   And I'm going to direct your attention to the bottom half

23   of page 1 of Exhibit 3310 and ask you if that refreshes your

24   recollection about the timing of discussions about the name

25   change for NAC.

1   **A.**   Yes.

2   **Q.**   And it's March of 2018; correct?

3   **A.**   Yes.

4   **Q.**   And Mr. Andrade bought his property in Corpus Christi

5   after that; correct?

6   **A.**   I don't -- do I have information as to when he bought the

7   property?

8   **Q.**   I think you may, but first of all, let's -- let's -- this

9   was -- the conversation that refreshed your recollection in

10  Exhibit 3310 referred to the first half, like the 13th of March

11  of 2018; right?

12  **A.**   Yes.

13  **Q.**   And previously, we had put in front of you Exhibit 3314.

14  **A.**   Yes.

15  **Q.**   And do you recognize 3314?

16  **A.**   Thirty- -- I don't recall seeing it in the past.

17  **Q.**   Okay.  In that case, I won't ask you about it unless it

18  jogs a memory of Mr. Andrade's purchase of property in Corpus

19  Christi.  As you'll see it, it looks a lot like the diagram.

20  **A.**   Yes.  Again, I don't recall having seen it in the past.

21  **Q.**   Okay.  One brief set of questions.

22      The Government yesterday showed you Government

23  Exhibit 951.  That was a text chain that referenced litigation

24  with a token holder.  Remember that?

25  **A.**   Litigation with a token holder?

ABRAMOFF - CROSS / SHEPARD

1    **Q.**    Yes.

2    **A.**    Yes.

3    **Q.**    And Mr. Andrade said he won the suit.

4        Did you ever see a copy of the preliminary injunction

5    order from that case?

6    **A.**    I don't recall ever seeing it.

7            **MR. SHEPARD:**  Dainec, can we show 2560.

8    **Q.**    And does that refresh your recollection of --

9    **A.**    It doesn't.  I don't recall ever having seen this in the

10   past, but I see it now.

11   **Q.**    Okay.  And it's what's called a preliminary injunction;

12   right?

13   **A.**    Yes.

14   **Q.**    And a preliminary injunction is a ruling pending the rest

15   of the case --

16   **A.**    Yes.

17   **Q.**    -- that orders one side to do or not to do something;

18   right?

19   **A.**    Yes.

20           **MR. HIGHSMITH:**  Your Honor, I'm going to object

21   because the witness said this document did not refresh his

22   recollection.

23           **MR. SHEPARD:**  Yes.  And I have not asked him about the

24   document.  I'm asking him about preliminary injunctions, since

25   the word came up.

1      **THE COURT:**  It's fine.  Proceed.

2  **BY MR. SHEPARD:**

3  **Q.**  And sometimes when parties win preliminary injunctions,

4  the other side gives up; right?

5  **A.**  Yes.

6  **Q.**  A different set of questions now.

7      When the FBI came to your house in September of 2018, they

8  started talking to you about a friend of yours named Paul

9  Erickson; right?

10  **A.**  Correct.

11  **Q.**  And they told you that they had found a number of things

12  related to AML BitCoin in the search of the house of a woman

13  named Maria Butina; correct?

14  **A.**  I don't recall what they told me then.

15  **Q.**  You do know who Maria Butina is; right?

16  **A.**  Yes.

17  **Q.**  She was a -- for want of a better term, a partner of Paul

18  Erickson's for a while?

19  **A.**  Yes.

20  **Q.**  And she was Russian; right?

21  **A.**  Yes.

22  **Q.**  And convicted of an offense; right?

23  **A.**  I know she was convicted.  I don't know what she was

24  convicted of.

25  **Q.**  Okay.  And when they searched her house, they said to you

 1    that they had found things relating to AML BitCoin there;

 2    right?

 3    **A.**    Again, I don't recall.

 4    **Q.**    Okay.  Well, you had spoken to Paul Erickson about

 5    AML BitCoin; correct?

 6    **A.**    Yes.

 7              **MR. SHEPARD:**  Dainec, show the witness 3833.

 8              **MS. DIAMOND:**  If I may, could we have the exhibit

 9    number?  I believe that's the FBI report number.

10              **MR. SHEPARD:**  Oh, good point.  Thank you, Cindy.

11       Exhibit 2360.

12                        (Pause in proceedings.)

13              **THE COURT:**  This is not an FBI report.  What is it

14    that you're looking to get?

15              **MR. SHEPARD:**  It is a set of documents which the FBI

16    informed Mr. Abramoff were found in the home of Maria Butina --

17              **THE COURT:**  Okay.

18              **MR. SHEPARD:**  -- when her home was searched.

19              **THE COURT:**  All right.

20    BY MR. SHEPARD:

21    **Q.**    Have you seen any portion of this document before?

22    **A.**    The promotional documents that are starting on the -- what

23    seems to be the forth page and on, other than the map of my

24    house, I guess the promotional documents starting on the

25    seventh page and on, I think I've seen before.  The others, I

1  don't recall ever seeing.

2  **Q.**  Okay.  Do you recognize the handwriting on the first page

3  where it says "Jack, 6/3/18," as in a date?

4  **A.**  Yes.

5  **Q.**  And do you know whose handwriting that is?

6  **A.**  I believe it's Paul Erickson's handwriting.

7  **Q.**  And did you have a conversation with Paul Erickson on or

8  about June 3, 2018?

9  **A.**  I don't recall it, but likely I did.

10  **Q.**  About AML BitCoin?

11  **A.**  Yes.

12  **Q.**  And did either of you in that conversation say, "Adopt

13  AML BitCoin platform or die"?

14  **A.**  I don't -- I don't recall that.

15  **Q.**  Anything to that effect?

16  **A.**  I don't recall that at all.

17  **Q.**  There are two pages with maps that appear to be directions

18  to your house.

19  **A.**  Yes.

20  **Q.**  Do you see those?

21  **A.**  Yes.

22  **Q.**  And did you meet with Mr. Erickson or Ms. Butina at your

23  house?

24  **A.**  I believe I met with Mr. Erickson at my house.

25  **Q.**  Okay.  And the last three pages, did you and Mr. Erickson

1  ever talk about "Politics is downstream from culture.  The best

2  way to win the 'idiotic regulation' war is to win the pop

3  culture war first"?

4  **A.**   That sounds like a statement made by Andrew Breitbart that

5  many in the conservative movement repeat.  I don't recall my

6  repeating it or Paul Erickson repeating it to me, but that is a

7  famous statement in the conservative culture.

8  **Q.**   Okay.  That you and Mr. Erickson were both part of?

9  **A.**   I beg your pardon?

10  **Q.**   You and Mr. Erickson were both part of that culture; is

11  that right?

12  **A.**   Well, we're both conservatives.

13  **Q.**   Okay.  Shifting gears for a moment to market manipulation

14  allegations, you don't have any trading records showing any

15  buying or selling of AML BitCoin Tokens; right?

16  **A.**   Correct.

17  **Q.**   And the Government didn't show you any trading records;

18  correct?

19  **A.**   Not to my recollection, no.

20  **Q.**   And, therefore, no records showing any impact on price;

21  correct?

22  **A.**   Well, I was given no materials to see that.

23  **Q.**   Okay.  And you don't know whether the exchanges on which

24  AML BitCoin was traded actually required market-making

25  activities, do you?

1   **A.**    I do not.

2   **Q.**    Am I correct in saying that John Bryan would know more

3   than you do about any trading activity that was done?  Correct?

4   **A.**    I -- I can't speak as to what John Bryan knows, but I know

5   virtually nothing.  So assuming he knows anything, yes.

6   **Q.**    Fair enough.

7        And Bryan was working with a guy named Quintin Miller of

8   Polyblock; right?

9   **A.**    I don't recall that name.

10  **Q.**    Are you aware that Polyblock is a reputable cryptocurrency

11  trading firm?

12  **A.**    I can't recall hearing of -- hearing of them before.

13  **Q.**    Do you recall being introduced to Polyblock by George Getz

14  at Morgan Stanley?

15  **A.**    I don't recall.

16        **MR. SHEPARD:**  Dainec, do you have 2124?

17        Okay.  One moment.

18                    (Pause in proceedings.)

19  **BY MR. SHEPARD:**

20  **Q.**    You were also shown Exhibit 966.  That was one in which

21  there was conversation about getting ahold of John Bryan and

22  taking possession of the coins in his trading account.  Do you

23  remember being asked about that on direct?

24  **A.**    Yes.

25  **Q.**    You don't know whether Bryan was obligated to pay for

1  those coins or tokens and whether he had, in fact, paid, do

2  you?

3  **A.**  Obligated to personally pay for them?

4  **Q.**  Well, that someone associated with John Bryan was

5  obligated to pay.

6  **A.**  My recollection was that John Bryan was being given money

7  by Mr. Andrade to pay for the coins.  I don't believe John

8  Bryan had any funds personally at that point available.

9  **Q.**  And Mr. Andrade didn't give him any money; right?

10  **A.**  I -- I can't recall.  I don't know.

11  **Q.**  You testified yesterday that in addressing the proposal of

12  a TV show, you testified that the ICO did not succeed, there

13  was no funding, and the show was dropped as an idea; right?

14  **A.**  Yes.

15  **Q.**  But it actually stuck around for a while before being

16  dropped, didn't it?

17  **A.**  My recollection is that we made other efforts to try to

18  revive the show, notwithstanding the failure of the ICO.  I

19  can't recall as to how long we attempted to do that.

20  **Q.**  Well, do you remember it was still going on in July of

21  2018?

22  **A.**  I don't -- I don't recall the time frame.

23       **MR. SHEPARD:**  Can we show 3318.

24       **MS. DIAMOND:**  I do not have a document with that

25  number in the courtroom.

1    **MR. SHEPARD:**  I'm sorry.  I was just trying to help

2    Mr. Stefan rustle up the document that I referenced.  My

3    apologies.

4        While he is looking for that, let me pull out a different

5    one and ask Mr. Stefan to take that to the witness.

6    **MS. DIAMOND:**  What exhibit are you looking for?

7    **THE COURT:**  Ms. Diamond, I understand you're in a

8    difficult situation trying to do this, but don't talk into the

9    record.  We have one counsel for Mr. Andrade.  So you can hand

10   documents up, but don't speak into the record.

11   **MS. DIAMOND:**  Would --

12   **MR. SHEPARD:**  I'm going to shift to a different

13   document --

14   **THE COURT:**  Yeah.

15   **MR. SHEPARD:**  -- so as to keep things moving.

16   **Q.**   And I'm asking you to look at Exhibit 3298.  And this is

17   one that we couldn't put our finger on a little earlier during

18   the examination.  My apologies.  We're used to being able to do

19   this all electronically.  It's much easier that way.

20       But this is a document that we were referencing earlier

21   relating to the $850,000 coming into the NAC Foundation

22   AML BitCoin from a Block Bits Capital entity.  Okay?

23   **A.**   Yes.

24   **Q.**   Just to set you back in the stage then.

25       And there was an email chain that got circulated about

1  that, and around that same time, you and Mr. Naimer were

2  texting about it; correct?

3  **A.**   Correct.

4  **Q.**   And Mr. Naimer said [as read]:

5       "I just got off the phone with Marcus.  He is

6  all excited with the 50 million guy."

7  Right?

8  **A.**   Yes.

9  **Q.**   And you said [as read]:

10      "He told me the same thing on all fronts.  So I

11  hope he is flying close to the earth on this one."

12  Right?

13 **A.**   Yes.

14 **Q.**   And this does appear to be a true and correct copy of your

15 exchange with Mr. Naimer on or about January 18, 2018 --

16 **A.**   Yes.

17 **Q.**   -- right?

18      **MR. SHEPARD:**  If I may have a moment, Your Honor, to

19 sort out that other document.

20      **THE COURT:**  Yes.

21           (Pause in proceedings.)

22      **MR. SHEPARD:**  Still a slight document issue there, so

23 I will move to something else.

24 **Q.**   We spent a while yesterday, and we just saw another one a

25 moment ago, seeing you and your colleagues calling Marcus an

1  idiot, a lamebrain, somebody who had a distorted view of

2  reality, and somebody who you were hoping was flying close to

3  the earth; right?  We saw a number of those?

4  **A.**  Yes.

5  **Q.**  In none of those that we saw did you ever call him a liar;

6  right?

7  **A.**  The ones I've seen so far, that is accurate.

8  **Q.**  And in none of them did you say he was engaged in a fraud;

9  right?

10  **A.**  Well, the documents that were presented here to me, that

11  is accurate.

12  **Q.**  And you never reported him to the FBI as part of what you

13  said was your duty as a citizen to try to prevent problems;

14  right?

15  **A.**  Yes.

16  **Q.**  And when the FBI came to you in September of 2018, they

17  first started asking you questions about Paul Erickson and then

18  later they started asking you questions about AML BitCoin;

19  right?

20  **A.**  Yes.

21  **Q.**  And then after that, they told you that there was a whole

22  group of agents outside who were going to search your house --

23  **A.**  Yes.

24  **Q.**  -- right?

25      And when they were asking you questions, you said

1    AML BitCoin was not a scam; right?

2    **A.**    Yes.

3    **Q.**    And you said you had seen a demonstration model of the

4    biometric identification system with facial and thumbprint

5    identification; right?

6    **A.**    Yes.

7    **Q.**    And you said about CrossVerify, "They're very close to

8    finishing it"; right?

9    **A.**    Yes.

10   **Q.**    And you said -- when the FBI asked you about alleged

11   misrepresentations relating to dealings with the London Stock

12   Exchange, you said, "I'm actually involved in that"; right?    In

13   dealing with the London Stock Exchange?

14   **A.**    Yes.

15   **Q.**    And you said that the company has real engineers; right?

16   **A.**    Yes.

17   **Q.**    And you said Marcus was getting angry at Japheth Dillman

18   about sending stuff out without approvals; right?

19   **A.**    Yes.

20   **Q.**    You said Japheth Dillman was a liar; right?

21   **A.**    Yes.

22   **Q.**    You didn't say Marcus was a liar; right?

23   **A.**    Yes.

24   **Q.**    And on the technology, you said it was extremely

25   sophisticated technology for what they are trying to

1  accomplish; right?

2  **A.**   Yes.

3  **Q.**   And you also said that you had actually seen update

4  reports from Mr. Naimer?

5  **A.**   Yes.

6        **MR. SHEPARD:**   Cleaning up those couple of documents we

7  were missing.   Can I ask Dainec to show you 2124 and 3318.

8  **Q.**   Taking a look at 2124 first.   That's the one without the

9  big block in it.

10  **A.**   (Witness examines document.)

11  **Q.**   2124, the only question I'm going to ask about is:   That

12  refreshes your recollection that Morgan Stanley arranged the

13  introduction to Polyblock Capital; correct?

14  **A.**   Yes.

15  **Q.**   And 3318, that refreshes your recollection, doesn't it,

16  that you were continuing to work on the sizzle reel toward the

17  TV show on July 24 of 2018?

18  **A.**   Yes.

19  **Q.**   Mr. Abramoff, you do not want to go back to jail, do you?

20  **A.**   No.

21  **Q.**   You would really like the Government to file a motion to

22  allow the judge to depart from the sentencing guidelines;

23  correct?

24  **A.**   Yes.

25  **Q.**   And you know only the Government can file that motion to

1    get that process started; right?

2    **A.**   Yes.

3         **MR. SHEPARD:**  Nothing further.

4                    <u>**REDIRECT EXAMINATION**</u>

5    **BY MR. HIGHSMITH:**

6    **Q.**   Hello, sir.

7    **A.**   Hello.

8    **Q.**   I have a few follow-up questions for you.

9    **A.**   Yes.

10   **Q.**   Number one, do you have the binder from yesterday in front

11   of you?  I'd like you to look at Tab 24, please.

12   **A.**   Yes.

13   **Q.**   Is Tab 24 your plea agreement?

14   **A.**   Yes.

15   **Q.**   Please look at paragraph 11, which is on page 7.

16   **A.**   Yes.

17   **Q.**   Okay.  Do you see the paragraph that reads your

18   cooperation will include, but will not be limited to, the

19   following?

20   **A.**   Yes.

21   **Q.**   Do you see (b) where it says that you will respond

22   truthfully and completely to any and all questions put to me?

23   **A.**   Yes.

24   **Q.**   Do you see where it says at (d) that you will testify

25   truthfully at any grand jury, court, or other proceeding?

1    **A.**    Yes.

2    **Q.**    Please turn to the next page.

3        Do you see at paragraph 13, lines 9 through 11, that if

4    you fail to comply with your promises, the plea agreement

5    essentially will no longer be in effect?

6    **A.**    Yes.

7    **Q.**    Who controls your sentencing?  The judge or the

8    prosecution?

9    **A.**    The judge.

10   **Q.**    Based on your plea agreement, is it your understanding

11   that you are required to tell the truth?

12   **A.**    Yes.

13   **Q.**    What happens to you if you fail to tell the truth under

14   your plea agreement?

15   **A.**    My plea agreement is absolved.

16   **Q.**    I'd like to turn now to Exhibit 913, which is in Tab 6 of

17   the -- yesterday's binder.

18       Are you looking at a WhatsApp exchange that starts in

19   November 8, 2017?

20   **A.**    Yes.

21   **Q.**    Defense counsel asked you several questions about the

22   context of Mr. Andrade approving draft press releases.  Do you

23   recall that?

24   **A.**    Yes.

25   **Q.**    Just so that the record is clear, because counsel asked

**ABRAMOFF - REDIRECT / HIGHSMITH**

1  you questions about whether you drafted or whether Mr. Andrade

2  drafted, I believe referring to this document, who drafted the

3  first description of the NAC Foundation in this WhatsApp chain?

4  **A.**   Mr. Andrade.

5  **Q.**   Did you then revise that?

6  **A.**   Yes.

7  **Q.**   And then did Mr. Andrade agree to it and send it out?

8  **A.**   Yes.

9  **Q.**   Let's pause on this for one moment.

10      Just on Mr. Andrade's draft, I'd like you to focus on

11  where it says "NAC Foundation."

12  **A.**   Yes.

13  **Q.**   Do you see it says [as read]:

14          "NAC Foundation, headquartered in the U.S., is

15      the creator of the AML BitCoin and its predecessor

16      digital currency, the Aten Coin, both of which were

17      built with anti-money laundering, anti-terrorism and

18      theft-resistant properties built into the coin"?

19      Do you see that?

20  **A.**   Yes.

21  **Q.**   At that time was that statement true?

22  **A.**   No.

23  **Q.**   Could you please turn to the large defense binder --

24  sorry.  It's Exhibit 988, and it was provided by the defense.

25  And you don't have it in front of you.  It's not in that.

1    **A.**    Oh.

2            **MR. HIGHSMITH:**  May I approach, Your Honor?

3            **THE COURT:**  Yes.

4    BY MR. HIGHSMITH:

5    **Q.**    Do you see the WhatsApp chain in front of you?

6    **A.**    Yes.

7    **Q.**    Is that the WhatsApp chain in which you testified earlier

8    and defense counsel directed you to the portion where

9    Mr. Andrade -- or you mentioned Mr. Andrade confused the term

10   "capital"?

11   **A.**    Yes.

12   **Q.**    Okay.  In that exact same message, are you also stating

13   that Mr. Andrade is spending investor money, in the

14   parenthetical?

15   **A.**    Yes.

16   **Q.**    Is that a reference to Mr. Andrade spending AML BitCoin

17   investors' money?

18   **A.**    Yes.

19   **Q.**    You may put that document down.

20            Who controlled how AML BitCoin spent investor money?

21   **A.**    Mr. Andrade.

22   **Q.**    Defense counsel asked you questions about an investor who

23   you brought in and you received a 50 percent commission on that

24   investor.  Do you recall that?

25   **A.**    Yes.

ABRAMOFF - REDIRECT / HIGHSMITH

1    **Q.**  Where did that investor's money go?  Did it go to accounts

2    controlled by you or accounts controlled by Mr. Andrade?

3    **A.**  To accounts controlled by Mr. Andrade.

4    **Q.**  When you wanted your 50 percent commission, where did you

5    go to get it?

6    **A.**  To Mr. Andrade.

7    **Q.**  Who did you need approval for to get the money?

8    **A.**  Mr. Andrade.

9    **Q.**  In the back of the small binder is Exhibit 909.  Can you

10   please review that.

11   **A.**  (Witness examines document.)

12       **MR. HIGHSMITH:**  This is previously admitted, and it

13   may be published to the jury.

14   **Q.**  Do you see this WhatsApp exchange dated November 5th,

15   2017, sir?

16   **A.**  Yes.

17   **Q.**  Do you see at the bottom, after you send Mr. Andrade a

18   draft press release and after he says he will read it, he asks

19   you to set up a meeting with the Vatican?  Do you see that?

20   **A.**  Yes.

21   **Q.**  Sometimes did Mr. Andrade ask you to set up meetings with

22   prominent officials?

23   **A.**  Yes.

24   **Q.**  And he wanted you to do that; is that right?

25   **A.**  Yes.

ABRAMOFF - REDIRECT / HIGHSMITH

1    **Q.**    You can put that aside.

2          Do you have Exhibit 3006 in front of you?

3    **A.**    Is it one of the tabs in the book?

4    **Q.**    It was provided by the defense.  It was a demonstrative to

5    refresh your recollection.

6    **A.**    No, I do not.

7    **Q.**    Okay.  I will provide you with a copy of it.

8          Oh, thank you so much.  Appreciate it.

9          Do you see on the bottom of that document on the very last

10   line where you say to Mr. Andrade [as read]:

11              "Well, then you shouldn't have taken a million

12         dollars of our funds to buy a house and a piece of

13         f'ing raw land, huh?  No wonder we have failed"?

14   **A.**    Yes.

15   **Q.**    What did you mean by that?

16   **A.**    That the previous lines talk about that he had negative

17   $3,000 in the company account; and I said that, therefore, his

18   taking a million dollars out of the company and putting us in

19   that position was a terrible thing.

20   **Q.**    Put that document down, please.

21         Yesterday you testified, and counsel asked you several

22   follow-up questions, about your early meetings with Mr. Andrade

23   in the Aten Coin phase.  I'd like you to take a look at

24   Tabs 25, 26, and 27, please.

25         These, for the record, are Exhibits 1090, 1091, and 1092.

1            When you're finished reviewing them, please look up.

2     **A.**    (Witness examines document.)

3     **Q.**    Are these your emails with Mr. Andrade?

4     **A.**    Yes.

5     **Q.**    Are they a fair and accurate depiction of your emails with

6     Mr. Andrade?

7     **A.**    Yes.

8            **MR. HIGHSMITH:**  Move to admit 1090, 1091, and 1092,

9     Your Honor?

10           **MR. SHEPARD:**  No objection.

11           **THE COURT:**  1091, '92, and -- '90, '91, and '92 are

12    admitted.

13         (Trial Exhibits 1090, 1091, and 1092 received in

14    evidence.)

15           **MR. HIGHSMITH:**  Thank you, Your Honor.

16    **Q.**    Please turn to 1091.

17           **THE COURT:**  Hold on a second.

18           **MR. WARD:**  These were not in -- these are redirect

19    documents, so they were not in the binders.  I have paper

20    copies for the jury --

21           **THE COURT:**  The jury?

22           **MR. WARD:**  -- if I could pass out, please.

23           **THE COURT:**  You may.

24    **BY MR. HIGHSMITH:**

25    **Q.**    Focusing on Exhibit 1091, sir.

1    **A.**    Yes.

2    **Q.**    Defense counsel asked you several questions about the

3    chain of approvals for press releases.  Do you recall that?

4    **A.**    Yes.

5    **Q.**    Do you see in the email dated September 30th, 2015, at

6    4:48 a.m., Mr. Andrade writes to you, and he sends you press

7    releases and his quotes from him in press releases?  Do you see

8    that?

9    **A.**    Yes.

10    **Q.**    Turning now to document -- to Exhibit 1092.

11    **A.**    Yes.

12    **Q.**    This references your -- some of your first communications

13    with Mr. Andrade; is that right?

14    **A.**    Correct.

15    **Q.**    Please look at the email that is dated October 16th, 2015,

16    at 7:39 p.m.  Do you see that?

17    **A.**    Yes.

18    **Q.**    Please look at the third paragraph, which states [as

19    read]:

20              "The contract is more of a lobbyist advisor and

21        not of a lobbyist.  For a lobbyist advisor we would

22        pay a straight fee . . . ."

23        Is that you and Mr. Andrade discussing your role and your

24    fee?

25    **A.**    Yes.

ABRAMOFF - REDIRECT / HIGHSMITH

1  **Q.**   And is that Mr. Andrade making clear that you are his

2  employee, working at his direction?

3  **A.**   Yes.

4          **MR. SHEPARD:**  Objection.  Leading.

5          **THE COURT:**  Well, that was leading, so I'll sustain

6  that objection.

7          **MR. HIGHSMITH:**  Let me rephrase, Your Honor.

8  **Q.**   Returning to 1092, what did Mr. Andrade -- and turning to

9  the third paragraph, initially, in your first round of

10 meetings, what did Mr. Andrade want to hire you to do?

11 **A.**   To do lobbying.

12 **Q.**   And, again, had you communicated with him about your

13 criminal past?

14 **A.**   Yes.

15 **Q.**   Please describe the chain of command for Mr. Andrade's

16 proposal.

17 **A.**   He would be the boss, and I would be the employee or the

18 consultant.

19 **Q.**   Please take a look at Tab 28 in the small binder in front

20 of you.

21 **A.**   Yes.

22 **Q.**   Please take a look at Exhibit 111.  And could we please --

23 this is an email between you and Mr. Andrade with an

24 attachment; is that right?

25 **A.**   Yes.

ABRAMOFF - REDIRECT / HIGHSMITH

1   Q.   Okay.  Is it a fair and accurate depiction of the email

2   and attachment that you received --

3   A.   Yes.

4   Q.   -- back in 2017?

5   A.   Yes.

6           MR. HIGHSMITH:  Move to admit Exhibit 111, Your Honor.

7           MR. SHEPARD:  I have a cover page.  I do not have the

8   attachment.

9           MR. HIGHSMITH:  I'll give it to you.

10          THE WITNESS:  I also do not have attachments.  I have

11  a cover page.

12  BY MR. HIGHSMITH:

13  Q.   Can you turn to the next tab in your binder.  Is that an

14  attachment?

15  A.   No.

16  Q.   Let me show it to you.

17          THE COURT:  That makes three of us.  What is the

18  attachment?

19          MR. HIGHSMITH:  It's a description of Aten Coin.

20      May I show it to the witness?

21          THE COURT:  Yes, and also to Mr. Shepard so he can

22  determine if --

23          MR. HIGHSMITH:  He's reviewing it.

24          MR. SHEPARD:  I have it now, Your Honor.  Thank you.

25          MR. HIGHSMITH:  May I show your copy to him?

**ABRAMOFF - REDIRECT / HIGHSMITH**

1  Thank you.

2          **MR. WARD:**  This is just the cover page.  Can I --

3  **BY MR. HIGHSMITH:**

4  **Q.**  Please review this document and look up when you're done.

5  **A.**    (Witness examines document.)

6          **THE COURT:**  So has it been -- you requested admission

7  of 111.

8          **MR. HIGHSMITH:**  Yes, Your Honor.

9          **THE COURT:**  And then we had the discussion about the

10  missing attachment.  So where is it now?  You're moving for

11  admission of 111, both the cover email and the attachment;

12  correct?

13          **MR. HIGHSMITH:**  Correct, Your Honor.

14          **THE COURT:**  And, Mr. Shepard, are you objecting to

15  that?

16          **MR. SHEPARD:**  Well, I no longer have it.  The witness

17  has it.  I wasn't done reviewing it.

18      What I was looking for was something that assured us that

19  it was the correct attachment to the email, and I don't know

20  that -- I hadn't seen that as of the time that Mr. Highsmith

21  asked if he could have it back to show the witness.

22          **THE COURT:**  Okay.  Well, when Mr. Abramoff finishes,

23  before we start talking about the substance of it, give it back

24  to Mr. Shepard, and then I want to hear from Mr. Shepard

25  whether or not he objects, and then we can go -- then you can

1  start asking questions about it.

2       **MR. HIGHSMITH:**  Thank you, Your Honor.

3       **THE WITNESS:**  Do you want me to read all of it or --

4  **BY MR. HIGHSMITH:**

5  **Q.**  No.

6  **A.**  -- just the underlying --

7  **Q.**  I want you to leaf through all the pages and then look up

8  after you've reviewed all the pages.  You do not need to read

9  every single word, but you do need to familiarize yourself with

10  that document.

11      And the question is:  Is that the attachment to the email

12  that you testified you just received or exchanged with

13  Mr. Andrade?

14  **A.**  (Witness examines document.)

15  **Q.**  Is that the attachment to the email that you exchanged

16  with Mr. Andrade?

17  **A.**  I actually don't know.  I don't know because the email

18  references "Blockchain Entertainment questions" as a subject,

19  and that's not what seems to be attached.

20       **MR. HIGHSMITH:**  Okay.  Let me retrieve that from you

21  and give it to Mr. Shepard, and we'll move on.

22      We will offer this later, Your Honor.

23       **THE COURT:**  Okay.

24       **MR. HIGHSMITH:**  We'll move on.

25  **Q.**  Mr. Shepard asked you several questions about the

1   Super Bowl.  Do you recall that?

2   **A.**   Yes.

3   **Q.**   And he asked you several questions related to whether

4   Mr. Andrade was in the approval chain for the Super Bowl

5   rejection campaign.  Do you recall that?

6   **A.**   Yes.

7   **Q.**   Please take a look at, in the binder in front of you,

8   Exhibit 17, and that is behind Tab 21.

9   **A.**   Yes.

10      (Witness examines document.)  Yes.

11  **Q.**   Is this exhibit, which has been admitted, Mr. Andrade

12  approving the Super Bowl -- the message that you were sending

13  in connection with the submission to NBC?

14  **A.**   It seems to me that he's actually advocating that the ad

15  be more vociferous in his comment.

16      **MR. SHEPARD:**  I move to strike as not responsive.

17      **THE COURT:**  All right.  There wasn't a question about

18  what he was advocating.  Just answer --

19      **THE WITNESS:**  Oh.

20      **THE COURT:**  -- Mr. Highsmith's question.

21  **BY MR. HIGHSMITH:**

22  **Q.**   The question was:  Is this Mr. Andrade indicating that he

23  sent a message and that he approved the rejection campaign

24  and -- with NBC?

25      **MR. SHEPARD:**  Objection.  Leading.

ABRAMOFF - REDIRECT / HIGHSMITH

1          THE COURT:  Overruled.

2     BY MR. HIGHSMITH:

3     Q.   Are you looking at Exhibit 17?

4     A.   Oh.

5     Q.   The bottom right.

6     A.   1064?

7     Q.   It should be Exhibit 017 in the bottom right in front of

8     you.  It should be Tab -- it should be Tab 20.  I may have --

9     A.   Oh, I'm sorry.

10    Q.   -- misled you with the tab.

11         (Simultaneous speaking; stenographer interrupts for

12    clarification of the record.)

13          THE COURT:  We can't hear you.

14    We can't hear you.

15    No.

16    No.

17    There's a mute indicator on the Zoom.  It says it's muted.

18    "AV muted," it says, on the --

19          THE COURTROOM DEPUTY:  He's had that the whole time.

20          THE COURT:  Really?

21          THE COURTROOM DEPUTY:  Yeah.

22          THE COURT:  Oh.  Mr. Abramoff, can you say something

23    to see if I can -- we can hear you?

24    Okay.  Well, why don't we -- let's take a break, let's

25    keep it to ten minutes, and see if you can work out the

**ABRAMOFF - REDIRECT / HIGHSMITH**

1  difficulty.

2      Remember -- you know what I'm going to say.  Remember my

3  admonitions not to discuss this amongst yourselves or with

4  anyone else.

5      See you in ten minutes.

6                  (Recess taken at 12:10 p.m.)

7              (Proceedings resumed at 12:20 p.m.)

8      (Proceedings were heard out of the presence of the jury.)

9          **THE COURT:**  Okay.  Is everything working and --

10         **MR. HIGHSMITH:**  I think we're back in action.

11         **THE COURT:**  All right.  And let's see.  We don't have

12  Mr. Abramoff yet, but any moment, I assume.

13                  (Pause in proceedings.)

14     (Proceedings were heard in the presence of the jury.)

15         **THE COURT:**  The jury is present.

16     Mr. Highsmith.

17  **BY MR. HIGHSMITH:**

18  **Q.**  Where we left off was Exhibit 17.  So could you please

19  take a look at Exhibit 17.

20      And is that an email dated January 30th, 2018?

21  **A.**  Yes.

22  **Q.**  And is that between you and Mr. Andrade?

23  **A.**  Yes.

24  **Q.**  Okay.  Let's look at the middle of the page.  It says --

25  you write [as read]:

1              "Here's the message:  We have a plan to move

2        forward later today with the campaign, but we still

3        have a second group working to get an official no

4        from NBC."

5        Do you see that?

6   **A.**   Yes.

7   **Q.**   You then continue [as read]:

8              "We might not get it . . . ."

9        What are you talking about there?

10  **A.**   The official rejection.

11  **Q.**   Then you write [as read]:

12             ". . . but in order to have a shot, we need you

13       to send an email to the following person with the

14       following text."

15       Do you see that?

16  **A.**   Yes.

17  **Q.**   Who needed to send the email?

18  **A.**   Marcus Andrade.

19  **Q.**   Do you see the next message up where Mr. Andrade says,

20  "Just sent it"?

21  **A.**   Yes.

22  **Q.**   Is that Mr. Andrade participating in this rejection

23  campaign?

24  **A.**   Yes.

25  **Q.**   Please turn to Exhibit 16, which is in Tab 21, and it's

1    one day later.

2        Do you see that document?

3    **A.**    Yes.

4    **Q.**    And do you see that it's a message from you to Mr. Andrade

5    on January 31st, 2018?

6    **A.**    Yes.

7    **Q.**    And in that message, do you write to Mr. Andrade "Good to

8    go?" attaching the NFL letter?

9    **A.**    Yes.

10   **Q.**    Is that you again seeking Mr. Andrade's approval for this

11   campaign?

12   **A.**    Yes.

13   **Q.**    I'd like you now to turn to a new exhibit, so you can put

14   that down, and it is Exhibit 939.

15   **A.**    Yes.

16   **Q.**    Is that a WhatsApp chain between you and Mr. Andrade?

17   **A.**    Yes.

18          **MR. HIGHSMITH:**  Move to admit Exhibit 939, Your Honor.

19              (Discussion held off the record.)

20          **MR. HIGHSMITH:**  How's this?

21          **THE COURT:**  That's better.

22          **MR. HIGHSMITH:**  Okay.

23          **THE COURT:**  Mr. Shepard, 9 -- what is the number?

24   939?

25          **MR. HIGHSMITH:**  939, Your Honor.

1        **MR. SHEPARD:**  I'm sorry.  We're just looking at it,

2   Your Honor.

3                       (Pause in proceedings.)

4        **MR. SHEPARD:**  We do not object.

5        **THE COURT:**  939 will be admitted.

6        (Trial Exhibit 939 received in evidence.)

7        **MR. HIGHSMITH:**  Can we please publish 939 to the jury.

8   **Q.**  All right.  What is -- so this is a WhatsApp message from

9   you to Mr. Andrade; is that accurate?

10  **A.**  Yes.

11  **Q.**  And it's dated February 2nd, 2018; is that accurate?

12  **A.**  Yes.

13  **Q.**  What is contained in this WhatsApp message?

14  **A.**  Six websites of articles that we generated about the

15  rejection campaign.  And not just articles, but one of them or

16  several of them are Twitter mentions.

17  **Q.**  Please describe Mr. Andrade's level of support for this

18  rejection campaign and the media it generated.

19  **A.**  Complete support.

20  **Q.**  Please turn to Exhibit 555.

21  **A.**  Yes.

22  **Q.**  Is this a message between you and Melissa Foteh dated

23  February 5th, 2018?

24  **A.**  Yes.

25       **MR. HIGHSMITH:**  I move to admit Exhibit 555.

1    **MR. SHEPARD:**  No objection.

2    **THE COURT:**  555 will be admitted.

3    (Trial Exhibit 555 received in evidence.)

4    **MR. HIGHSMITH:**  Thank you.  Move to publish.

5    **THE COURT:**  You may.

6    **MR. HIGHSMITH:**  Thank you.

7    **Q.**  Okay.  Sir, in the email in front of you, are you

8    communicating that a -- that the letter, the rejection letter,

9    has been delivered to Roger Goodell, the commissioner of the

10   NFL?

11   **A.**  Yes.

12   **Q.**  And are you also communicating that Mr. Andrade wants this

13   letter up on the website?

14   **A.**  Yes.

15   **Q.**  And he also wants an explanation up on the website?

16   **A.**  Yes.

17   **Q.**  Is the explanation put up on the website true and correct?

18   **A.**  No.

19   **Q.**  You can put that to the side.

20   Counsel asked you several questions about Exhibit 1513.

21   Could you please -- this is admitted.  Could you please locate

22   Exhibit 1513.

23   **MR. HIGHSMITH:**  Could we please publish Exhibit 1513

24   to the jury.

25   **THE WITNESS:**  Is it in the tab book?

1  **BY MR. HIGHSMITH:**

2  **Q.**   It was provided to you by the defense.  It should be a

3  loose-leaf in front of you.

4  **A.**   They took back most of the exhibits, so I'm not certain I

5  have it.  1513?  I do not have it.

6  **Q.**   I'll provide it to you.

7     Okay.  1513, is this the email between -- involving you,

8  Mr. De La Guardia, and Mr. Andrade concerning a Panama Canal

9  press release?

10 **A.**   Yes.

11 **Q.**   Counsel asked you several questions about this; correct?

12 **A.**   Correct.

13 **Q.**   First of all, do you recall whether or not Mr. Andrade

14 made multiple trips to Panama?

15 **A.**   I recall his making at least two trips to Panama.

16 **Q.**   Okay.  For the first trip, were you present on that trip?

17 **A.**   No.

18 **Q.**   So that was Mr. Andrade attending meetings with

19 Mr. De La Guardia?

20 **A.**   Yes.

21 **Q.**   In the email in front of you, do you see

22 Mr. De La Guardia's message on the first page where he says "If

23 you like"?

24 **A.**   Yes.

25 **Q.**   So is that Mr. De La Guardia offering a suggestion for

 1   your and Mr. Andrade's approval?

 2   **A.**   Yes.

 3   **Q.**   Please turn to the second page.  Do you see where

 4   Mr. De La Guardia mentions an excuse?

 5   **A.**   Yes.

 6   **Q.**   And so what was your understanding of -- what did you

 7   understand that "excuse" meant?

 8         **MR. SHEPARD:**  Objection.  Calls for speculation.

 9         **THE COURT:**  Sustained.

10   **BY MR. HIGHSMITH:**

11   **Q.**   Was Mr. -- was it your understanding that that email was

12   asking for approval to go ahead with this excuse?

13         **MR. SHEPARD:**  Same objection.

14         **THE COURT:**  Sustained.  It was also leading.

15   **BY MR. HIGHSMITH:**

16   **Q.**   What was your understanding of what Mr. De La Guardia was

17   asking you and Mr. Andrade to do in this email?

18         **MR. SHEPARD:**  I don't think his understanding is

19   relevant.  This is just an effort to have him say what he

20   thinks Mr. De La Guardia meant, and I object.

21         **THE COURT:**  What's the relevance of what Mr. Abramoff

22   thought about this?

23         **MR. HIGHSMITH:**  The relevance is the following:

24   Defense counsel on cross-examination asked many questions about

25   whether or not the defendant knew or was part of an email chain

1    concerning this press release and statements -- false

2    statements made in the press release.

3        This email shows that the defendant received the suggested

4    false statements and approved the suggested false statements.

5        **THE COURT:**  But the question was about Mr. Abramoff's

6    reaction to something.  Why don't you ask the question again.

7    **BY MR. HIGHSMITH:**

8    **Q.**  What did you understand Mr. De La Guardia meant by this

9    message?

10        **MR. SHEPARD:**  Same objection, Your Honor.

11        **THE COURT:**  Yes.  Sustained.  Sustained.

12        **MR. HIGHSMITH:**  All right.  Let's move on.

13   **Q.**  Counsel -- you can put that down.

14        Counsel showed you Exhibit 891, which was a press release

15   regarding the Panama Canal.  Do you recall that?

16   **A.**  Yes.

17   **Q.**  And he stated that Mr. Andrade was not on that press

18   release.  Do you recall that?

19        **MR. SHEPARD:**  First of all, I didn't show him 891;

20   and, second, I didn't say anything like that.

21        **THE COURT:**  Okay.  Do you wish to rephrase the

22   question, Mr. Highsmith, or what?

23        **MR. HIGHSMITH:**  What I would like to do, Your Honor,

24   is show the defendant Exhibit 909.

25        Could we publish to the jury Exhibit 909, please.

1  **Q.**  Do you have that in front of you, sir?  It would be on the

2  bottom right-hand corner.

3  **A.**  Yes, sir.

4  **Q.**  Please look at the bottom right-hand corner.  Is

5  Mr. Andrade on that message?

6  **A.**  Yes.

7  **Q.**  Okay.  And is the timestamp on that message 6:39 p.m.?

8  **A.**  Yes.  It starts at 6:39:05 p.m.

9  **Q.**  And in that message, are you sending Mr. Andrade a draft

10 press release and seeking his approval for it?

11 **A.**  Yes.

12 **Q.**  Okay.  You can put that down.

13     Very briefly, I'm going to ask you about Jackie Chan.

14     Do you recall the effort to get Jackie Chan involved in

15 the AML BitCoin project?

16 **A.**  Yes.

17 **Q.**  Do you recall Jackie Chan's representatives doing due

18 diligence on AML -- the AML BitCoin project?

19 **A.**  I don't recall that.

20        **MR. SHEPARD:**  Objection.  Leading.

21 **BY MR. HIGHSMITH:**

22 **Q.**  Okay.  Did Jackie Chan's representatives agree to work

23 with AML BitCoin?

24 **A.**  No.

25 **Q.**  Mr. -- the defense counsel asked you several questions

1  about the company CrossVerify.  Do you recall that?

2  **A.**  Yes.

3  **Q.**  CrossVerify was separate from the cryptocurrency; is that

4  correct?

5  **A.**  Correct.

6  **Q.**  Did the AML BitCoin cryptocurrency ever have biometric

7  identification built into its blockchain?

8  **A.**  No.

9       **MR. SHEPARD:**  Objection.  Lack of foundation.

10       **THE COURT:**  Well, he's answered to the extent he

11  knows, so we'll go to the next question.

12       **MR. HIGHSMITH:**  Thank you, Your Honor.

13   May I have one minute, please?

14       **THE COURT:**  Yes.

15            (Pause in proceedings.)

16       **MR. HIGHSMITH:**  No further questions, Your Honor.

17  Thank you.

18       **THE COURT:**  Very well.

19   Mr. Shepard?

20            (Pause in proceedings.)

21                **RECROSS-EXAMINATION**

22  **BY MR. SHEPARD:**

23  **Q.**  Mr. Abramoff, thank you for your patience.  I'm going to

24  be very brief.

25   You were asked about the provision in the plea agreement

1    that says you need to testify truthfully, and I'm going to

2    follow up a little bit about that.

3        In terms of your access to a departure from the sentencing

4    guidelines for substantial cooperation, the plea agreement

5    says, at paragraph 18, that [as read]:

6            ". . . in its sole and exclusive judgment,

7        the Government decides that the defendant has

8        cooperated fully and truthfully . . . ."

9        Right?  Paragraph 18.  It's on page 9 of Exhibit 747.

10   **A.**   (Witness examines document.)  Yes.

11   **Q.**   I don't get any input into that; right?  It's just

12   the Government's sole and exclusive discretion --

13   **A.**   Yes.

14   **Q.**   -- right?

15       And when the Government pointed out that the plea

16   agreement would no longer be in effect if you didn't testify

17   truthfully, they're the one who can move to dissolve the plea

18   agreement if they think you haven't testified truthfully;

19   right?

20   **A.**   Yes.

21   **Q.**   I'm not part of that process either; right?

22   **A.**   Yes.

23   **Q.**   And in terms of the sentencing guideline departure, even

24   the judge doesn't get to make that motion.  Only the Government

25   does; right?

1   **A.**   I don't know what the law is.

2   **Q.**   Well, but you do know in paragraph 18 it says "in its sole

3   and exclusive judgment"; right?

4   **A.**   Regarding my cooperation truthfully, yes.

5   **Q.**   Yes.  Regarding whether you are eligible for a departure

6   under the sentencing guidelines, that's in the sole and

7   exclusive judgment of the Government; right?

8   **A.**   That seems to be what it's saying, but I'm not an expert

9   on this.

10  **Q.**   And you pled guilty in the year 2000; correct?

11  **A.**   2000?

12  **Q.**   I'm sorry.  2020.

13  **A.**   Yes.

14  **Q.**   And the Government has postponed your sentencing until

15  after you testify today; right?

16  **A.**   Yes.

17  **Q.**   Because they want to see how you do; right?

18  **A.**   I don't know the reasons.  They didn't share with me the

19  reasons why they were not moving forward on sentencing.

20  **Q.**   You can't think of another reason why they are not moving

21  forward on sentencing, can you?

22  **A.**   I could probably think of other reasons, but I -- I

23  haven't had a discussion with them about this.

24  **Q.**   Okay.  And you were fine going along with that --

25  right? -- delaying your sentencing?

1    **A.**    Yes.  I'm -- yes.

2    **Q.**    Yes.  So that the Government could then judge, in its sole

3    and exclusive judgment, whether you were eligible for a

4    departure from the sentencing guidelines; right?

5    **A.**    Yes.

6          **MR. SHEPARD:**  Nothing further.

7    Thank you.

8          **THE COURT:**  Very well.  Thank you, Mr. Abramoff.

9    You're now excused.

10         **THE WITNESS:**  Thank you, Your Honor.

11         **THE COURT:**  Very well.

12                         (Witness excused.)

13         **THE COURT:**  Members of the jury, because the

14   participants all now have to get back from Washington, we're

15   going to start just an hour later tomorrow at 9:30.  That'll

16   give them the chance to get back and get reconstituted.

17        But we're done with the video testimony, and we'll be back

18   to the in-person tomorrow.  But 9:30 tomorrow instead of 8:30.

19   So a little bit of a reprieve.

20        So please remember my admonitions.  Don't discuss this

21   case with anybody.  Don't do any research.  Put it out of your

22   mind.

23        We'll see you at 9:30 tomorrow.

24     (Proceedings were heard out of the presence of the jury.)

25         **THE COURT:**  Okay.  We're out of the presence of the

1    jury.

2        Can you remind me, Mr. Ward, the -- I think you have, if I

3    recall correctly, four witnesses remaining; is that right?

4        **MR. WARD:**  Yes, Your Honor, we do.

5        The four remaining witnesses are FBI forensic analyst

6    Theresa Chiu, who's been noticed as an expert; IRS CI

7    Special Agent James Carfora, also noticed as an expert; and FBI

8    Agent -- a former FBI agent by the name of Bryant Ling,

9    L-i-n-g.  He was one of the undercover agents during the

10   investigation.  And, finally, an FBI Special Agent Ethan Quinn.

11       A couple of issues related to both of those.

12       First, in terms of the experts, we would ask -- we

13   submitted, in our preliminary instructions, Instruction 3.14,

14   which is the model instruction to be given before an expert

15   testifies, and so we'd ask the Court to give that.  We can

16   provide -- it has a blank for the name but is otherwise --

17       **THE COURT:**  I have that.  And you want that to be --

18   you want me to give that instruction before the first expert

19   testifies?

20       **MR. WARD:**  I think that's appropriate.  I defer to

21   the Court on -- the model says you can give it either before or

22   after.  I would propose doing it in advance, and part of that

23   is because I would -- I would advise the Court that

24   the Government will lay the foundation and the qualifications

25   for the expert, but we believe it's not the best practice to

**PROCEEDINGS**

 1   then ask the Court in the presence of the jury to say, "We now

 2   move to certify this witness as an expert."

 3       We can provide briefing on it, but the advisory notes to

 4   Rule 703 say [as read]:

 5           "There is much to be said for a practice that

 6        prohibits the use of the term 'expert' by both the

 7        parties and the Court at trial.  Such a practice

 8        ensures that trial courts do not inadvertently put

 9        their stamp of authority on a witness's opinion and

10        protects against the jury being overwhelmed by the

11        so-called experts."

12   I defer --

13       **THE COURT:**  Are you then contemplating -- I don't have

14   the instruction in front of me.  I usually give that

15   instruction at the end of the case.

16       Are you saying that would obviate the part of the process

17   where you seek to have the Court designate the witness as an

18   expert and the defense or the other side, depending on whose

19   expert it is, gets to, if they want, to voir dire on the

20   qualifications?  Are you saying this would obviate that process

21   or not?

22       **MR. WARD:**  No.  No.  What I'm saying is that when we

23   get to that point, the way I would propose is, once we've

24   established their qualifications as an expert, we turn to

25   the Court and say, "Your Honor, may I proceed?"  And at that

 1    point if the defense wants to object, we can do that out of the

 2    presence of the jury.

 3        But we just don't -- the caution we get from the notes is

 4    to not use the term "expert" in front of the jury because that

 5    may be somewhat prejudicial and go beyond the instruction.

 6        **THE COURT:**  Well, I don't know.  I mean, I'll hear if

 7    the other side cares about this one way or the other.

 8        The drill that I'm used to is:  You call the witness.  The

 9    first part of it is establishing the witness's bona fides.  The

10    moment comes and the party says, "I seek to have this witness

11    designated as an expert on whatever."  The other side could get

12    up and voir dire.  Nine times out of ten they don't.  And the

13    witness is designated, and then they start providing their

14    expert opinion.

15        So I'm not clear, number one, on when you want this

16    instruction to be given.  Is it at that moment, or is it before

17    the witness starts to testify?

18        And I guess I'm missing something because I don't quite

19    understand the -- maybe I'll go back and read the commentary --

20    the danger that you think is lurking here because, I mean, I've

21    been doing this for 15 years, it hasn't been a problem, but

22    I'll consider it.

23        **MR. WARD:**  Well, if this is the way the Court

24    proceeds, then we can do it that way.  We can just say -- we

25    will establish his bona fides or her bona fides and say --

1          **THE COURT:** Yeah.

2          **MR. WARD:** -- "The Government now moves to admit

3     forensic accountant Theresa Chiu as an expert in the financial

4     documents related to the NAC Foundation and Marcus Andrade."

5          **THE COURT:** Okay.

6          **MR. WARD:** Unless the defense objects.

7          **THE COURT:** Who would -- Mr. Shepard is still there.

8     I don't know if he's listening.

9          **MR. SHEPARD:** I am listening, Your Honor, and we will

10    be here, but not for long if we're going to get our flight.

11         **THE COURT:** Right.  Well, do you want Ms. Dent to

12    carry the ball for the defense, or do you want to comment on

13    this?

14         **MR. SHEPARD:** I'll give you my comment.  And then,

15    you know, obviously, we're hearing about this for the first

16    time, so we haven't had a chance to discuss internally, and

17    that would be my preference to be able to discuss internally.

18    My initial reaction is experts are experts and that's why

19    they get to testify without having percipient knowledge.  So it

20    seems a little strange to me not to explain that to the jury.

21    But I'd prefer an opportunity to discuss it with my team.

22         **THE COURT:** All right.  What we're going -- our

23    modus operandi for the moment is I'm going to do -- I'm

24    planning to do things in the traditional way that I've always

25    done them.

**PROCEEDINGS**

1    In the meantime, if you want to talk to the other side --

2    to your colleagues and then talk to the other side and if you

3    jointly want to propose some change to that protocol, I will be

4    happy to accept it.  Otherwise, I will simply do my usual.

5        **MR. WARD:**  Thank you.

6    I have one other issue.

7        **THE COURT:**  Okay.

8        **MR. WARD:**  For when the FBI Agent Bryant Ling

9    testifies, we intend to play recordings that he made with the

10   defendant.  At that point, we would ask that the

11   Instruction 2.6 on transcripts be given.

12   We have provided the defense with copies of the

13   transcripts for the portions of the testimony we intend to

14   play.  We would ask if they have any objection to that, that

15   they tell us today so we can work out --

16       **THE COURT:**  Okay.

17       **MR. WARD:**  -- any discrepancies.

18       **MS. DIAMOND:**  Your Honor, I have not had an

19   opportunity to vet the content of the transcript.  And I --

20   I've read the instruction but quite a long time ago.  So it's

21   my understanding that transcripts are aids to the jury; that

22   the evidence is the recording.

23   And so long as that is what is contained in there, the

24   transcripts appear to me to be substantially correct.  If I

25   haven't -- I will bring it to counsel's attention if I note any

**PROCEEDINGS**

1  other issue.

2      **THE COURT:**  All right.  Continue to meet and confer on

3  this, and then I'll look at in 2.6.  I don't remember it

4  offhand, and I'm happy to give it, assuming there's no problems

5  floating around here.

6      **MR. WARD:**  And Ms. Diamond is correct, that the

7  transcripts themselves are to aid the jury only.  They will not

8  come in as substantive evidence.

9      **THE COURT:**  That's right.  Whatever 2.6 says is fine.

10  It's the pattern instruction.

11      And you want me to give that before you go down the path

12  of the --

13      **MR. WARD:**  Yes.

14      **THE COURT:**  That's fine.

15      **MR. WARD:**  Great.  Thank you, Your Honor.

16      **THE COURT:**  Okay.  See you tomorrow.

17          (Proceedings adjourned at 12:51 p.m.)

18                  ---o0o---

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Wednesday, February 26, 2025

7

8

9

10

11    _____

12            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13          CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25