Volume 12

Pages 1917 - 2050

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
   VS.                       )   NO.  3:20-CR-00249 RS
                             )
ROWLAND MARCUS ANDRADE,      )
                             )
          Defendant.         )
_____)

                        San Francisco, California
                        Wednesday, February 26, 2025

          **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    PATRICK D. ROBBINS
                    ACTING UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
               BY:  **CHRISTIAAN HIGHSMITH**
                    **DAVID J. WARD**
                    **MATTHEW CHOU**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    KING & SPALDING, LLP
                    50 California Street, Suite 3300
                    San Francisco, California 94111
               BY:  **MICHAEL J. SHEPARD, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1    **APPEARANCES:** (CONTINUED)

2    For Defendant:
                         KING & SPALDING, LLC
3                        1700 Pennsylvania Avenue, NW
                         Washington, D.C. 20006
4             BY:    **KERRIE C. DENT, ATTORNEY AT LAW**

5                        KING & SPALDING, LLC
                         1185 Avenue of the Americas, 34th Floor
6                        New York, New York 10036
              BY:    **DAINEC P. STEFAN, ATTORNEY AT LAW**

7

8                        LAW OFFICES OF CINDY A. DIAMOND
                         58 West Portal Avenue, Suite 350
9                        San Francisco, California 94127
              BY:    **CINDY A. DIAMOND, ATTORNEY AT LAW**

10

11   Also Present:       **Special Agent Brendon Zartman**
                         **Tina Rosenbaum, Paralegal**
12                       **Ed Jackson, Trial Technician**

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

3      Wednesday, February 26, 2025 - Volume 12

4

5      **GOVERNMENT'S WITNESSES**                          **PAGE**  **VOL.**

6      **CHIU, THERESA**
       (SWORN)                                      1934   12
7      Direct Examination by Mr. Chou               1934   12
       Cross-Examination by Mr. Shepard             1974   12
8      Redirect Examination by Mr. Chou             2019   12
       Recross-Examination by Mr. Shepard           2028   12

9

10     **CARFORA, JAMES**
       (SWORN)                                      2031   12
11     Direct Examination by Mr. Ward               2031   12

12

13

14

15                          **E X H I B I T S**

16     **TRIAL EXHIBITS**                    **IDEN**  **EVID**  **VOL.**

17       1517                                        1940   12

18       1518                                        2025   12

19       1519                                        1943   12

20       1520                                        2020   12

21       3338                                        2002   12

22       3342                                        1979   12

23

24

25

| | |
|---|---|
| 1 | <u>**Wednesday - February 26, 2025**</u>                                    <u>**9:11 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | (Defendant present, out of custody.) |
| 5 | (Proceedings were heard out of the presence of the jury.) |
| 6 | **THE COURTROOM DEPUTY:**  Remain seated.  Please come to |
| 7 | order. |
| 8 | **THE COURT:**  Good morning.  Welcome back to those of |
| 9 | you who were traveling. |
| 10 | Okay.  So both of you want to talk -- both sides want to |
| 11 | talk to me, so who goes first? |
| 12 | Why don't you, Mr. Chou, go ahead. |
| 13 | **MR. CHOU:**  Your Honor, yesterday the Government just |
| 14 | filed a brief motion with respect to, essentially, the |
| 15 | admissibility, or lack thereof, of recordings on |
| 16 | cross-examination, essentially just teeing up the law on this |
| 17 | issue, and we don't know exactly which clips the defense is |
| 18 | going to try to play on cross, if any. |
| 19 | We had met and conferred regarding refreshment likely |
| 20 | outside the presence of the jury or at least not in a way that |
| 21 | the jury could overhear.  So I don't know if there's a present |
| 22 | disagreement, but I did want to tee up the issue since it |
| 23 | seemed liked it was still in flux. |
| 24 | **THE COURT:**  Are we able to do refreshing -- can the |
| 25 | witness hear something that's not played on our system for the |

PROCEEDINGS

1    jury?  In other words, technologically, can we do this?  If

2    somebody wants to refresh a witness's recollection but the jury

3    is not to hear it, do we have a setup so that the witness can

4    hear the recording and then see if it's refreshing their

5    recollection?

6          MR. CHOU:  The Government doesn't have a setup

7    currently ready to go because we're not planning to do any sort

8    of refreshment.  We've told the witness which recordings to

9    review in their entirety, but I understand there are other

10   recordings which we've also asked him to review.  But if the

11   defense is going to ask, let's say, about a particular very

12   small clip, the witness may not remember in the moment, and I

13   defer to the defense on how they want to do refreshment there.

14         THE COURT:  Okay.

15         MS. DIAMOND:  Your Honor, if I may.

16         MR. SHEPARD:  On the tech.

17         THE COURT:  Go ahead.

18         MS. DIAMOND:  One of the witness will be a witness

19   that I will be handling, and I have arranged to have -- sorry.

20   Excuse me.

21       We have clips marked, and we have a laptop and a wired

22   headset.  And I would ask permission in those -- if needed, to

23   approach the witness, give him a transcript, give him the

24   marked clip, have him listen, and then if it refreshes his

25   recollection, I can just question the witness.

1          **THE COURT:**  Fine with me.

2          **MS. DIAMOND:**  And if not, then we would, you know,

3    seek a different route to get that information in front of the

4    jury.

5          **THE COURT:**  All right.

6          **MS. DIAMOND:**  And I do understand the law in counsel's

7    brief.  Honestly, it depends on the witness's testimony whether

8    or not there are any clips that would need being admitting for

9    a non-hearsay purpose; and if that's the case, I'll present it

10   in context and --

11         **THE COURT:**  Okay.

12         **MS. DIAMOND:**  -- Your Honor can rule on it.

13         **THE COURT:**  Okay.

14         **MS. DIAMOND:**  Thank you.

15         **THE COURT:**  All right.

16         **MR. SHEPARD:**  And we did not file a responsive brief,

17   in part because this was already briefed as part of the motions

18   in limine.  It fell within that rubric of the Government saying

19   we don't get to introduce things --

20         **THE COURT:**  Right.

21         **MR. SHEPARD:**  -- we find helpful when the Government

22   introduces the rest of a statement.

23         **THE COURT:**  Yes.

24         **MR. SHEPARD:**  So it's already briefed.

25     I think the one additional application here potentially --

**PROCEEDINGS**

1    and, again, as Ms. Diamond says, obviously, it's going to

2    depend on what the witness says.  But one additional issue that

3    I think should be okay but, you know, since it's come up, this

4    is in the context of these are undercover agents who come to

5    Mr. Andrade and in some senses spout things frequently said by

6    Dillman and want to see if Mr. Andrade's going to agree with

7    that or not.

8        And we think it's appropriate to admit the parts where

9    Mr. Andrade says, "No, that's not true."  And those aren't

10   being offered for the truth because the Government already

11   agrees that those things aren't true.  They're offered to

12   reflect Mr. Andrade's state of mind and the fact that he didn't

13   agree with Mr. Dillman.

14       **THE COURT:**  Well, but that runs right into the --

15   that's classic effort to have exculpatory statements by the

16   defendant, who, until he testifies, you can't do that.

17       **MR. SHEPARD:**  I don't think the Court is correct about

18   that.

19       **THE COURT:**  Well, I'd be surprised on that one because

20   that's pretty much hornbook law.  You can't -- the defense

21   can't introduce statements by the defendant.  You can't do it,

22   other than very limited circumstances; and you'd have to show

23   me why it would fall into one of those very quirky exceptions,

24   frankly.

25       But you agree with me that is the hornbook law?

PROCEEDINGS

1    **MR. SHEPARD:**  They're not being offered for the truth.

2    So, no, I don't agree with you.

3    **THE COURT:**  Well, of course they are.  They're offered

4    for the truth that he -- they are offered for the truth.

5    **MR. SHEPARD:**  No.  There's no question about the truth

6    here.

7    **THE COURT:**  His statement.  His statement.  Not the

8    statement --

9    **MR. SHEPARD:**  Right.

10   **THE COURT:**  -- that's prompting his statement.

11   His statement "I didn't know anything about this" is being

12   offered for the truth.

13   **MR. SHEPARD:**  No.  It's not that he's saying, "I

14   didn't know anything about this."

15   And maybe we should just do it in particular statements.

16   **THE COURT:**  Okay.

17   **MR. SHEPARD:**  Because if he says, "No, I don't agree

18   with that," or, "No, we didn't" -- you know, "No, that's not

19   correct," that is a fact.  It is, he is not agreeing with

20   something.  We're not offering it for the truth of what he is

21   saying because we all agree what the truth is.

22   **THE COURT:**  Well, that's a very artful argument, but

23   there is no way that is not being -- attempt- -- you're not

24   offering it to try to convince the jury that the statement he

25   made, "I knew nothing about this," is the truth.  That's why

PROCEEDINGS

```
1   you're offering it.  And I admire the creativity of the

2   argument, but no.

3          MR. SHEPARD:  It's not a statement -- and that's why

4   I think the Court should do this statement by statement --

5          THE COURT:  Okay.  I'm happy to.

6          MR. SHEPARD:  -- because I don't think the Court is

7   correctly characterizing -- because, of course, the Court

8   hasn't heard them, so the Court doesn't know --

9          THE COURT:  There you go.

10          MR. SHEPARD:  -- the Court doesn't know what the

11   statements are.

12      So I think it's best to --

13          THE COURT:  Okay.

14          MR. SHEPARD:  -- deal with them piece by piece.

15      And there are also completeness issues with --

16          THE COURT:  Okay.

17          MR. SHEPARD:  -- all of these things as well --

18          THE COURT:  All right.

19          MR. SHEPARD:  -- as we've previously previewed.

20      So that's one issue.

21          THE COURT:  Do you disagree with my characterization

22   on any of this?

23          MR. CHOU:  No.  The Government's view is the Court has

24   it exactly right.

25      Two brief points, Your Honor.
```

1          First, factually, the clips that we're planning to play

2     have context.  So there is -- there are moments where

3     Mr. Andrade denies knowing what Mr. Dillman is saying, and the

4     jury gets to hear that self-serving part.  And I think

5     the Government's argument is, in the course of all the evidence

6     in this case, those self-serving statements are not true.

7          Secondly, when it comes to the logistics of teeing up

8     additional recordings the defense wants to play, I just wanted

9     to highlight that that might be logistically difficult or

10    cumbersome in the moment.

11         They have not identified, which the case law appears to

12    require, they have not identified what clips they would like to

13    play that are going to complete the context of transcripts

14    they've had for over a week now.  And if, in the moment,

15    they're trying to play for the Court a clip from a one-hour

16    long recording and then asking for admission of that, I can

17    just see that violating Rule 403 and other principles.

18         **THE COURT:**  So your concern is logistics, how we're

19    going to do this?

20         **MR. CHOU:**  That would be -- that would be a concern as

21    well, Your Honor, to the extent they think there's something --

22    we don't think there's anything misleading.  We wouldn't put

23    forward a misleading clip.

24         But to the extent Mr. Shepard is asking for a chance, in

25    the moment during cross-examination, to present a clip to

PROCEEDINGS

1   the Court and then have a ruling in that moment on whether it's

2   going to come in, they should have done that a little bit

3   sooner, in our view.

4       **THE COURT:**  Well, I don't want to take time that's

5   going to make it -- exacerbate the time it's going to take to

6   do all this, so let's just barrel ahead and see what we can do.

7       With respect to the issues you brought up yesterday, the

8   instructions that you wanted to have, the recording

9   instruction, the 2.6, is fine; and if you want me to give that

10  before we get to a recording, I can do that.  It says in the

11  guidance you can do it once.  You don't have to keep doing it.

12  So is that what you're requesting?

13      **MR. CHOU:**  I believe that was the Government's

14  preference, Your Honor, but we defer to the Court on the exact

15  timing of that instruction.

16      **THE COURT:**  Okay.  Well, what I'm asking you is, the

17  first time we're going to go through this drill -- and you're

18  going to be handing them a transcript and then taking it back?

19      **MR. CHOU:**  Yes, Your Honor.

20      **THE COURT:**  Okay.  So before you do that the first

21  time, I will give this Instruction 2.6.

22      Okay.  Then we had some back-and-forth about the expert,

23  whether or not to instruct -- it was with Mr. Ward -- whether

24  or not to instruct in some fashion before they hear an expert.

25  And I did read -- I know what you were getting at because I

PROCEEDINGS

 1    read the commentary that you were alluding to.

 2         I'm still inclined to just do things the normal way, but

 3    what's your -- is there a request to do anything?

 4         **MR. WARD:**  I think our request, given the Court's

 5    review, is to do it the normal way.  We'll certify Ms. Chiu,

 6    Agent Carfora as experts in money laundering or financial

 7    analysis.  I think that's the appropriate way to do it.

 8         **THE COURT:**  Are any of the experts the Government's

 9    going to call, are they going to be dual-role experts or are

10    they just experts?  Are they also testifying about -- you know,

11    as a percipient witness involved in the investigation?

12         **MR. WARD:**  Theresa Chiu is a -- not a -- no.  She'll

13    be testifying as to the documents and things she's reviewed in

14    preparation for her testimony.  She was obviously involved as a

15    financial analyst during the investigation, but her testimony

16    is based on her review of records.

17         Agent Carfora was not a part of the investigative team,

18    and he will solely be testifying based on his review of

19    evidence in this case, the indictment, testimony -- things that

20    have been introduced.

21         **THE COURT:**  So we're not going to need the dual-role

22    instruction?  We're going to eventually just have the expert,

23    the 3.14 instruction?

24         **MR. WARD:**  Correct, yeah.

25         **THE COURT:**  3.15 is the one that's got lay and expert

PROCEEDINGS

```
 1   testimony together, and it's more complicated.  So I'm glad to

 2   hear we got the --

 3         MR. WARD:  I mean, to be fair, we will say, "This

 4   document, what does this say?  What does this show?"  He'll

 5   introduce facts, but it all leads up to --

 6         THE COURT:  Well, that's just expert --

 7         MR. WARD:  Yeah.

 8         THE COURT:  -- stuff.

 9      They weren't undercover.  They didn't do anything like

10   that.

11         MR. WARD:  No.

12         THE COURT:  Okay.  Did you have something else to talk

13   to me about?

14         MR. SHEPARD:  We do have a few other short items.

15      Did you have anything else --

16         MS. DIAMOND:  I'm okay.

17         MR. SHEPARD:  -- you wanted to add?

18      So with respect to Chiu, first of all, since our potential

19   expert on this subject -- since our potential expert on this

20   subject is not present but will be present --

21         THE COURT:  Listening.

22         MR. SHEPARD:  -- by phone, I would ask for a break at

23   the end of her direct examination so that I have a chance to

24   get on the phone and speak to our expert.

25      That might be a little bit longer than our normal breaks,
```

PROCEEDINGS

```
 1    but --
 2              THE COURT:  All right.
 3              MR. SHEPARD:  -- I'd ask for a break then.
 4         And with respect to Ms. Chiu, I don't have any question
 5    about her qualifications.  I do not intend to challenge or
 6    inquire about that.  I do have some questions about whether she
 7    has complied with Rule 16 in the sense of showing all of her
 8    work for us to address, and I --
 9              THE COURT:  You can cover that on cross.
10              MR. SHEPARD:  Yes.  That's -- I just wanted to be sure
11    with the Court that it's okay --
12              THE COURT:  Yes.
13              MR. SHEPARD:  -- for me to address that on cross.
14              THE COURT:  Yes.
15              MR. SHEPARD:  And I will do it that way.
16              THE COURT:  So I will ask, when the moment comes that
17    the Government is ready to say "And I tender her as an
18    expert" -- and I want you to identify exactly what the
19    expertise is she's being tendered as -- and then you can just
20    tell me "No objection" or --
21              MR. SHEPARD:  Yeah.
22              THE COURT:  -- "We don't wish to voir dire at this
23    time," or whatever else you want to.
24              MR. SHEPARD:  Yeah.  I'll probably say the latter
25    because I --
```

 1          THE COURT:  That's fine.  I understand why you would

 2    do that.

 3          MR. SHEPARD:  And then there are a number of issues

 4    relating to the potential testimony of Special Agent Quinn, who

 5    is on the list as a maybe for today, depending on how far we

 6    get.  So we could take those up now, or we could wait until

 7    some later break or likely tomorrow morning, before he probably

 8    will testify.  I just wanted to note that we have some issues

 9    relating to his testimony.

10          THE COURT:  Is he likely to be on today?

11          MR. HIGHSMITH:  I'm always optimistic that we're going

12    to get through things faster than we end up getting through

13    them.  So the trial has moved slower than I anticipated, but I

14    am always optimistic we'll get to the next witness.

15          THE COURT:  Okay.  Well, I think the upshot is I don't

16    want to spend time now hashing that out.  If things move

17    quickly, which I hope they will, we'll take it up at that time

18    and do it that way.

19          MR. WARD:  And one last -- sorry.

20          THE COURT:  And just so that we also are planning

21    ahead, when the Government rests, I know you'll want to make a

22    motion.  What I'll -- I do want you to be ready to start your

23    case.  We can even go to the sidebar.  You can make the motion,

24    not -- it will come as no surprise to you, I'm going to reserve

25    it under 29(b).  So you can then file things or do whatever you

PROCEEDINGS

 1   want, but I don't want it to slow down our process.

 2       I am not -- I am not expecting an argument from the

 3   defense.  I'm just -- you need to make your motion, I

 4   understand that, and I'll give you the opportunity to do that,

 5   but then we won't stop and have argument.

 6           **MR. SHEPARD:**  Understood, Your Honor.

 7           **THE COURT:**  Okay.

 8       Yes?

 9           **MR. WARD:**  We've agreed that the defense's experts can

10   be present during both Agent Carfora and Theresa Chiu's

11   testimony.  We'd like to request that Agent Carfora, our

12   expert, be able to listen to Theresa Chiu's testimony as he's

13   relying for his testimony on her report and her work.

14           **THE COURT:**  Okay.

15           **MR. SHEPARD:**  I have an objection to that.  It is true

16   that we have said our expert on the financial accounting can

17   listen to the Government's expert on financial accounting and

18   that our potential expert on money laundering can listen to

19   their money laundering.  We have not agreed to

20   cross-pollination from one expert to the other.

21       It's fine that he says he's -- Carfora says he's relied on

22   Ms. Chiu's report, but there are things that are common to my

23   cross-examination of both of them.  And I think under the basic

24   rule of witness sequestration, he, therefore, shouldn't get to

25   hear my cross-examination of Ms. Chiu.

PROCEEDINGS

1    **THE COURT:**  Okay.  We're going to keep it in the

2  channels.  So the expert witness in one area can hear their

3  counterpart, but I'm not going to, using Mr. Shepard's words,

4  cross-pollinate.  So we will -- so "no" is the answer.

5    **MR. WARD:**  Okay.

6    **THE COURT:**  Okay.  Anything else?

7    **MR. WARD:**  Nothing from the Government.

8    **MR. SHEPARD:**  Thank you, Your Honor.

9    **THE COURT:**  We'll see if -- are they all here?

10    **THE COURTROOM DEPUTY:**  I don't know.

11    **THE COURT:**  Okay.  We'll go check and see if they're

12  here.

13    (Recess taken at 9:28 a.m.)

14    (Proceedings resumed at 9:34 a.m.)

15    (Proceedings were heard out of the presence of the jury.)

16    **THE COURT:**  Okay.  Are you ready?

17    **MR. CHOU:**  Yes, sir.

18    **THE COURT:**  All right.

19    (Proceedings were heard in the presence of the jury.)

20    **THE COURT:**  The jury is present.

21    Good morning.  Hopefully, you enjoyed the extra hour.

22  Don't get too used to it.  It's a one-time deal, but glad to

23  see you-all.

24    So, Mr. Chou.

25    **MR. CHOU:**  The United States calls FBI -- the

 1    United States calls FBI forensic accountant Theresa Chiu.

 2     (Witness enters the courtroom and steps forward to be sworn.)

 3            THE COURT:  If you could come forward, please, to be

 4    sworn.

 5                           THERESA CHIU,

 6    called as a witness for the Government, having been duly sworn,

 7    testified as follows:

 8            THE WITNESS:  Yes.

 9            THE COURTROOM DEPUTY:  Please be seated.

10        Can you state and spell -- state your name and spell your

11    last name, please.

12            THE WITNESS:  Yes.  Theresa Chiu, C-h-i-u.

13                       DIRECT EXAMINATION

14    BY MR. CHOU:

15    Q.   Good morning, Ms. Chiu.

16    A.   Good morning.

17    Q.   What do you currently do for a living?

18    A.   I am a forensic accountant with the FBI in the

19    San Francisco office.

20    Q.   How long have you been working for the FBI?

21    A.   I started in December 2019, so about five years.

22    Q.   What has been your role in the federal criminal

23    investigation into Marcus Andrade?

24    A.   I analyze and summarize bank records and business records.

25    Q.   And what is the purpose of your testimony here today?

**CHIU - DIRECT / CHOU**

1  **A.**    To provide those summaries and charts.

2  **Q.**    Let's start with your qualifications.  Okay?

3  **A.**    All right.

4  **Q.**    What did you study in college?

5  **A.**    In college, I got a bachelor's in accountancy and a

6  bachelor's in economics, and then I also got a master's in

7  accountancy.

8  **Q.**    And in college, did you graduate with honors?

9  **A.**    I did.  I graduated with *summa cum laude*.

10  **Q.**    In addition, did you obtain a couple of licenses after

11  graduating from grad school and college?

12  **A.**    I did.  I am licensed in certified public accountant, CPA,

13  and certified fraud examiner, CFE.

14  **Q.**    Let's talk about each of those licenses briefly.

15      Could you walk us through what it takes, at a high level,

16  to become a certified public accountant, or CPA?

17  **A.**    Yes.  There's four major parts.  One would be graduating

18  with about 150 semester units, so bachelor plus some units, so

19  maybe a master degrees.

20      And then you had to take the CPA exam, which consists of

21  four parts, and each part takes about four hours to complete.

22  So if I was to study full-time for the exam, it will take about

23  three months full-time; and if I was working doing part-time,

24  it could take up to two years to complete the exam.

25      And then I would have to work under somebody who is a

CHIU - DIRECT / CHOU

 1   licensed CPA for a year and also take an ethics exam.

 2   **Q.**   In what year did you first become licensed as a CPA?

 3   **A.**   I believe twenty- -- no -- yeah -- 2008.

 4   **Q.**   And how long have you been practicing as a CPA, given that

 5   there may have been a brief gap in between?

 6   **A.**   Yeah.  Since 2008.  And then I took a gap, and then I

 7   moved to California, and then I reinstated my license in 2017.

 8   **Q.**   You also mentioned a license or certification called

 9   certified fraud examiner.  Could you please explain what that

10   is?

11   **A.**   Yes.  Similar process.  You have to have a bachelor

12   degree, four-part exam you had to pass, and then this one

13   requires two years' work experience in fraud-related areas.

14   **Q.**   Let's talk about your work history.

15       So your first job after school and your CPA examination

16   was at KPMG?

17   **A.**   That's correct.

18   **Q.**   What is KPMG, and what did you do there?

19   **A.**   KPMG is one of the Big Four accounting firm worldwide, and

20   I worked in the forensic advisory group.  There, I analyzed

21   thousands of transactions for patterns related to fraud, such

22   as bribery, money laundering, asset misappropriation.

23   **Q.**   And that was from 2007 through 2010?

24   **A.**   That's correct.

25   **Q.**   Then from 2010 through 2014, did you work at a company

1   called AbbVie?

2   **A.**   Yes.   That is a pharmaceutical manufacturing company.   I

3   started there in the audit department leading financial and

4   global audits -- financial and compliance audits in their

5   global subsidiaries in over ten countries.

6        And then I became the financial planning and analysis

7   supervisor for a medical group, doing their financial

8   forecasting and reporting.

9   **Q.**   Then from 2014 to 2017, were you at another company called

10  McKesson Corporation?

11  **A.**   That's correct.   That's when I moved to San Francisco and

12  I worked for McKesson, which is a pharmaceutical distribution

13  company.   There, I was the risk advisory and senior operations

14  senior manager -- financial operations senior manager.   And I

15  built the pricing compliance group there, which we review

16  pricing discrepancies between contract and actual price

17  charged; and if there is a discrepancy, I would create models

18  to calculate the exposure to the company.

19  **Q.**   From 2017 to 2019, did you work at Tesla?

20  **A.**   I did.   I worked there as -- in their assurance group in

21  the -- as a program manager; and since I have background in

22  forensic accounting, I helped with some of their internal

23  investigations into employee expense fraud or asset

24  misappropriation; and then I also started their anti-money

25  laundering global review.

1    Q.   And, lastly, before joining the FBI, did you work at a law

2    firm called Morrison & Foerster?

3    A.   Yes.  That's an international law firm, and I worked as a

4    forensic accountant manager.  I supported attorneys with

5    litigation and investigations with accounting knowledge, and I

6    also helped reconstruct some of the claims that were submitted

7    by the plaintiffs.

8    Q.   Is it fair to say that by the time you joined the FBI in

9    December 2019, you had worked as an accountant or a financial

10   analyst for about 12 years?

11   A.   That's correct.

12   Q.   When you joined the FBI, what training, if any, did you

13   receive that's relevant to your testimony today?

14   A.   When I first joined the FBI, I went to Quantico academies,

15   and I was there for five weeks.  And we -- I learned about the

16   different tools FBI uses for financial analysis.  They also

17   teach us the methods of doing financial analysis, charting, and

18   then also have some legal -- legal backgrounds and helping

19   understanding about charges.

20   Q.   And after graduating from Quantico, could you just

21   summarize for us at a high level the sort of work you've done

22   at the FBI?

23   A.   I have worked on different cases such as bank fraud,

24   investment fraud, money laundering, and public corruption.

25   Q.   Have you testified before in trial?

CHIU - DIRECT / CHOU

1    **A.**    Yes, I have.

2    **Q.**    Were those also federal criminal jury trials?

3    **A.**    Yes.

4    **Q.**    What were the general topics of your testimony in those

5    trials?

6    **A.**    One was related to a PPP loan fraud.  Similar, providing

7    analysis and summary.  And then the other one was an honest

8    services, public corruption fraud, also providing financial

9    summary.

10            **MR. CHOU:**  Your Honor, at this time the United States

11   tenders Theresa Chiu, certified public accountant and certified

12   fraud examiner, as an expert to provide financial analysis

13   regarding defendant, Marcus Andrade.

14            **THE COURT:**  All right.

15            **MR. SHEPARD:**  No questions or objections about her

16   qualifications.  Thank you.

17            **THE COURT:**  Very well.  The witness will be so

18   designated as an expert.

19        You may proceed.

20   **BY MR. CHOU:**

21   **Q.**    Ms. Chiu, let's start from the beginning of your analysis

22   and walk through it step by step.  Okay?

23   **A.**    Okay.

24   **Q.**    First, let's talk about what you analyzed.

25        Did you review financial records pertaining to Mr. Andrade

1  and AML BitCoin in preparation for your testimony today?

2  **A.**   Yes, I did.

3  **Q.**   And did you prepare tables essentially summarizing and

4  listing the records you analyzed?

5  **A.**   I did.

6         **MR. CHOU:**  Could we please pull up Exhibit 1517 just

7  for the Court, the parties, and the witness.

8       Can you see that okay?

9       Can we please zoom in on just the content.  You can

10  include the notes.

11  **Q.**   Ms. Chiu, is this a fair and accurate depiction of your

12  table?

13  **A.**   Yes, it is.

14         **MR. CHOU:**  I move to admit Exhibit 1517.

15         **MR. SHEPARD:**  I'm sorry.  1517 is just the chart

16  that's on the screen?

17         **MR. CHOU:**  That's correct.

18         **MR. SHEPARD:**  No objection.

19         **THE COURT:**  1517 will be admitted.

20       (Trial Exhibit 1517 received in evidence.)

21  **BY MR. CHOU:**

22  **Q.**   So do you see how this table is titled "List of Bank

23  Accounts Used in Preliminary Financial Summary Report"?

24  **A.**   Yes.

25  **Q.**   And then there's two tables.  The one at the top says

**CHIU - DIRECT / CHOU**

1    "Personal Related"?

2    **A.**    Yes.

3    **Q.**    The one at the bottom says "Business Related"?

4    **A.**    Yes.

5    **Q.**    Just, first, could you just explain to us what each of

6    those two tables shows?

7    **A.**    As part of the investigation, I pulled a lot of --

8    **Q.**    And, sorry, Ms. Chiu.  If you could pull the microphone

9    closer to you.

10    **A.**    Sorry.

11        As part of the investigation, I review a lot of the bank

12    accounts.  So for clarity and ease for -- in my analysis, for

13    the personal section, if the account title was Mr. Andrade

14    and/or his wife's name, I put it as personal accounts; and then

15    all the rest would -- are noted as business accounts.

16    **Q.**    And could you please walk us through what the different

17    columns represent?

18    **A.**    Yes.  The first column, the account title, is what the

19    bank account is title as.

20        And then the second column, bank name, is where the bank

21    account was held at.

22        The -- and then the next one is the account number.

23        And the date the account was open.

24        And then the signers -- signer or signers on the account.

25        And then the date range I reviewed.

CHIU - DIRECT / CHOU

1  Q.   Did you base these fields off of certified bank records

2  you received from financial institutions?

3  A.   Yes.

4  Q.   What distinguished -- so we -- at the top, personal

5  related accounts have Mr. Andrade or his wife's name on them.

6       How did you determine what were business-related accounts?

7  A.   Mostly if they don't have Mr. -- solely have Mr. Andrade

8  or his wife's names or if it has, like, a company name or if it

9  has his business partner on the account, then it would be

10 business accounts.

11 Q.   How did you determine, though, which accounts were

12 Mr. Andrade's business accounts as opposed to accounts

13 unaffiliated with Mr. Andrade?

14 A.   Most of the time it's in the signature.  He is a signer on

15 the account, and/or the accounts were open under his

16 discretion.

17 Q.   Let's talk about a couple of the accounts in the

18 business-related section that don't have Mr. Andrade's name in

19 the signer field.

20      Could you tell us more about the David Salmon IOLTA trust

21 account and the Neil Sunkin client trust account?

22 A.   Yes.  Both of these accounts were open in the discretion

23 of Mr. Andrade, where the fund held investor money, and then

24 subsequently transferred to one of the other business account

25 where Mr. Andrade is the signer.

1    Q.   In addition to looking through bank account records, did

2    you also review financial records that were seized or obtained

3    from Mr. Andrade's business?

4    A.   Yes.

5             MR. CHOU:  Could we please turn to Exhibit 1520, just

6    for the witness, Court, and the parties.

7         I'm sorry.  1519.  I misspoke.

8    Q.   Ms. Chiu, is this a fair and accurate depiction of the

9    business records that you reviewed?

10   A.   Yeah.  These are the key ones I used.

11            MR. CHOU:  Move to admit Exhibit 1519.

12            MR. SHEPARD:  No objection.

13            THE COURT:  1519 will be admitted.

14        (Trial Exhibit 1519 received in evidence.)

15   BY MR. CHOU:

16   Q.   Ms. Chiu, could you please walk us through what this table

17   summarizes?

18   A.   Yes.  The first column is the "Record Title."  It's just

19   kind of like a description on what the document is.

20        The next column is where the source of the document came

21   from.

22        And then if there is any record number, it would be in the

23   next column.

24        And if there's any activity date, and then if there is any

25   signer related to those activities.

1  **Q.**   Some of the records, it says "NAC Foundation," then

2  there's an exhibit number.  Could you just explain for us at a

3  high level what those are?

4  **A.**   Those are documents obtained from NAC Foundations, and

5  they're submitted as exhibits, and they mainly contain lists of

6  investors.

7  **Q.**   And were these records that were either obtained via a

8  grand jury subpoena or seized pursuant to a search warrant?

9  **A.**   Yes.

10  **Q.**   All right.  All these financial records we just discussed,

11  they span thousands of pages; right?

12  **A.**   Yes, definitely.

13  **Q.**   And after analyzing all these records, did you create

14  charts that summarized and analyzed those records?

15  **A.**   Yes, I did.

16  **Q.**   I'd like to show you what's been marked as Exhibit 1520.

17      Are these the summary exhibits you prepared?

18  **A.**   Yes, it is.

19      **MR. CHOU:**  Sorry.  If we could go back to the top.

20      At this point, the Government moves to admit these summary

21  exhibits, which has been provided to the defense pursuant to

22  the Court's motion in limine, which was -- or order in limine,

23  which was not opposed.

24      **MR. SHEPARD:**  We don't have any objection to the use

25  of these.  I would ask the Court to await any ultimate

1    admission until after cross-examination, but it's fine --

2    they're fine to --

3         THE COURT:  Okay.  So we'll use them for the moment as

4    a demonstrative, and then you can move again for their

5    admission and I'll --

6         MR. SHEPARD:  They may be fine.

7         THE COURT:  Pardon?

8         MR. SHEPARD:  They all may be fine.  I just --

9         THE COURT:  Understand.

10        MR. SHEPARD:  -- haven't had the opportunity to

11   cross-examine.

12        THE COURT:  So, but you can use them.  Go ahead.

13        MR. CHOU:  Okay.  Thank you.

14   If we could publish these for the jury.

15   Okay.  If we could please turn to the second page, first

16   slide, and zoom in on just the content, please.

17   Q.   Ms. Chiu, do you see the graph that's titled "Investor

18   Funds to Business Bank Accounts - January 2014 to

19   October 2018"?

20   A.   Yes, I do.

21   Q.   Could you please describe for us what this chart shows?

22   A.   Yes.  This shows investor funds that were deposited into

23   the business bank accounts that -- about -- there's 13 of them

24   that was listed in the prior exhibit.

25   Q.   And you mentioned the term "investor funds."  How did you

1    determine what to categorize as investor funds for the purpose

2    of your analysis?

3    **A.**    I used three ways.

4        One is based on the bank transaction description, and I

5    compare that description with the investor lists that were from

6    Exhibit 38, 551, 1100, 1420, 1469, and 1470.

7        The second bucket would be looking at the -- even further

8    into the description of the bank transactions; and if they

9    contain any description related to Aten Coin or AML BitCoin

10   investment-related descriptions, I would also include that as

11   investor money.

12       And then the last bucket would be deposits into David

13   Salmon's account were considered investor money because that

14   account was open solely to obtain AML BitCoin investment money

15   for Mr. Andrade.

16   **Q.**    Based on those three buckets, were those three buckets

17   just inflows of cash?

18   **A.**    Yes.    Inflow through wires or checks into the bank

19   accounts.

20   **Q.**    Were there also separate purchases that you saw and

21   analyzed that were made with cryptocurrency?

22   **A.**    That is correct.

23   **Q.**    And that's in a later -- later slide?

24   **A.**    Yes, it is.

25   **Q.**    Okay.    So just looking at the cash, could you please walk

1    us through what the horizontal and vertical, the X and Y axes,

2    show?

3    **A.**    Yes.  The Y axis, the vertical, is showing the dollar

4    amounts from 1 million to 8 million; and then on the

5    horizontal, which is the bottom axis, is a timeline from 2014

6    to October 2018.

7    **Q.**    And each bar, it basically stacks on one another; and

8    there's, like, a light green below it.  Could you just explain

9    to us how to -- how to read the bars?

10   **A.**    Yes.  So the dark green is the incremental investor money

11   that is invested into the business accounts each year, and the

12   light green is the cumulative total of the prior year.

13           For example, in 2014, there's .8 million of investor funds

14   into the business accounts, and then in 2015, there's

15   incremental $1 million, for a total of 1.8 million by the end

16   of 2015.  And then that's so on and so forth.

17           And then we look all the way to the right, in January

18   through October 2018, during that time period, there's an

19   incremental 4.5 million investor funds, for a total investor

20   money into the business account for 7.6 million from 2014

21   through October 2018.

22   **Q.**    It appears that you've bucketed the time period into three

23   buckets:  Aten Coin, pre-ICO, and AML BitCoin.

24           Could you just explain for us at a high level what those

25   three different buckets are?

1    **A.**    Yes.  I did it based on timeline.

2        Aten Coin was rebranded around at the end of June 2017.

3    So from 2014 through June 2017 is the Aten Coin period.

4        And then I know AML BitCoin was launched in October 2017.

5    So in July 2017 to September 2017, that's the pre-ICO, which is

6    before the initial coin offering.

7        And then post-October 2017 is the AML BitCoin period.

8    **Q.**    So all together, between 2014 -- January 2014 and

9    October 2018, you saw that $7.6 million U.S. flowed into the

10   business accounts we looked at earlier?

11   **A.**    That's correct.

12       **MR. CHOU:**  Could we please turn to the next page,

13   page 3.

14       Please zoom in on the content.

15   **Q.**    So, Ms. Chiu, we're looking at a slide that appears to be

16   titled "Investor Funds to Business Bank Accounts - July 2017 to

17   October 2018."  Could you please walk us through what this

18   chart shows?

19   **A.**    Yes.  This chart shows -- it's similar to the one before;

20   however, this time period only spans from July 2017 to

21   October 2018.

22   **Q.**    So it's a zoomed-in view of the chart we saw earlier?

23   **A.**    Exactly.

24   **Q.**    Before we move on, I just wanted to ask you about the term

25   "investor funds."

CHIU - DIRECT / CHOU

1    You thought about different ways you could determine

2    whether something was investor funds or not.  Is that fair to

3    say?

4    **A.**  Yes.

5    **Q.**  In your opinion, based on your training and experience,

6    how conservative or aggressive were the criteria you used to

7    identify investor funds?

8         **MR. SHEPARD:**  Objection.  This goes beyond the

9    disclosure of her testimony.

10         **MR. CHOU:**  I don't believe that's the case,

11   Your Honor.  We're simply asking her what she categorized as

12   investor funds and the different options she could have picked

13   from.

14         **MR. SHEPARD:**  We're now hearing the basis for that,

15   which we have not been provided.

16         **MR. CHOU:**  Your Honor, we've provided the defense with

17   several disclosures, including supplemental disclosures, a

18   20-plus page financial report.  They've never asked for

19   additional information.  This is --

20         **MR. SHEPARD:**  None of which contains this.

21         **THE COURT:**  Overruled.

22    You may proceed.

23   **BY MR. CHOU:**

24   **Q.**  Ms. Chiu, based on your training and experience, in your

25   opinion, how conservative or aggressive were the criteria you

1  used to identify what we call investor funds?

2  **A.**    I would consider conservative.

3  **Q.**    And could you please explain why?

4  **A.**    As I noted before, I used three method to calculate the

5  investor funds.  However, for deposits into the account that

6  didn't meet those three criteria -- let's say they weren't on

7  the investor list and they didn't have the description, but

8  they were deposited around the same times as all the ones I

9  identify and they sometimes are even dollar amounts and they're

10  from an individual.  Based on my training and analysis, they

11  appear to be investor funds; but to be conservative, I did not

12  include those.

13            **MR. CHOU:**  Let's please move to the next slide,

14  page 4.

15  **Q.**    Ms. Chiu, do you see the chart that's titled "Business

16  Bank Accounts:  Expenditures - July 2017 to October 2018," so

17  about a year-and-five-month period?

18  **A.**    Yes.

19  **Q.**    Could you please explain for us what this chart shows?

20  **A.**    Yes.  So these are expenditures from the same set of

21  business accounts as noted earlier, and they're categorized by

22  different categories.

23  **Q.**    And the bars are pointing downwards here because those are

24  withdrawals from the business accounts to be used elsewhere?

25  **A.**    That's correct.  They're coming out of the account.

CHIU - DIRECT / CHOU

1    That's why it's going downwards with the negative dollar sign.

2    **Q.**    And the M symbol, that's millions, and K is thousands?

3    **A.**    That's correct.

4    **Q.**    The categories are on the horizontal axis at the top?

5    **A.**    Yes.

6    **Q.**    What were -- what was the single biggest use of funds,

7    according to your analysis, from these business bank accounts

8    during this year-and-four-month period?

9    **A.**    The biggest use would be the 2.1 million that were

10   transferred to Mr. Andrade's personal accounts.

11   **Q.**    And what were some of the other major uses, based on your

12   analysis?

13   **A.**    Legal fees, marketing fees, employees or individuals,

14   CrossVerify/DIT Network.

15   **Q.**    Let's pause briefly on your categorization method, and

16   then we'll ask a couple follow-ups about these categories.

17       What was your method for determining how to categorize

18   something?

19   **A.**    Categorizing financial transaction is pretty common in all

20   financial analysis, and the method I usually use could be

21   bucket into, like, four different ways.

22       The first way would be based on the bank details, I would

23   categorize as such.  If it's payment to, let's say, Google

24   AdWords, I would characterize it as "Marketing Expense."  If

25   it's to Walmart, "Retail Purchases."  That's one method.

CHIU - DIRECT / CHOU

1    A second way would be looking at the descriptions of those

2  transactions, like a "memo" line on a check.  And sometimes

3  it'll tell me if it's rent or it's payroll.  Then I would

4  categorize as "Rent Expense" or "Employee Expense."

5  **Q.**  And if you weren't sure what category something was, what

6  would you do with that transaction?

7  **A.**  I would do, first thing, would be Googling the company to

8  see if I could find out what type of company it is.  If it's,

9  let's say, a law firm, then I would put it into "Legal Fees."

10    And then throughout the investigation, we would obtain

11  business records.  That would also help me categorize some of

12  these, such as, like, documents from a dealership, it'll tell

13  me it's for auto purchase.

14  **Q.**  And after all that, if you still weren't sure what

15  something was, what would happen to that transaction, if any,

16  for the purposes of your analysis?

17  **A.**  I would put it under "Other" or "Miscellaneous."

18  **Q.**  And "Miscellaneous," is that one of the bars in the middle

19  there between "Software" and "Travel and Meals"?

20  **A.**  That's correct.

21  **Q.**  Earlier we looked at a slide that showed investor money

22  flowing into the business accounts; right?

23  **A.**  Yes.

24  **Q.**  And this graph shows money coming out of the business

25  accounts?

CHIU - DIRECT / CHOU

1    **A.**    That's correct.

2    **Q.**    Did you see any other income -- sources of income into

3    these business accounts other than the investor funds we looked

4    at earlier?

5    **A.**    There are other that I didn't categorize as investor

6    funds, but they appear to be investor funds.  But for the

7    demonstration purpose, I didn't.  But I didn't see any other

8    type of income into the business accounts.

9    **Q.**    Still, if we were to be conservative and count that bucket

10   of money as non-investor funds, roughly how much money was

11   that?

12   **A.**    I think it would be 2.3-ish of the non- -- that I did not

13   categorize as investor fund.

14   **Q.**    2.3 what?

15   **A.**    Million.

16   **Q.**    Okay.  And if you were to include all those funds that you

17   conservatively excluded, what any other income -- sources of

18   income did you see go into those business accounts?

19   **A.**    Outside of if I have included that -- can you repeat the

20   question?  Sorry.

21   **Q.**    Earlier we discussed how there are three buckets -- three

22   categories that you used to determine what were investor funds.

23   Did I get that right?

24   **A.**    Correct.

25   **Q.**    And you also opined that that was a conservative

CHIU - DIRECT / CHOU

1   methodology.  Did I get that right?

2   **A.**   That's correct.

3   **Q.**   Outside of those funds and the ones that you say, if I

4   heard you correctly, were investor funds, what were the other

5   sources of income, if any, into the business accounts?

6   **A.**   Then it would be the ones that I didn't categorize but

7   they appear to be investor funds.

8   **Q.**   And approximately how much money -- and I apologize for

9   the inartful questions.

10      How much money do not appear to be investor funds that

11  went into the business accounts?

12  **A.**   2.3 million.

13  **Q.**   And that was a conservative estimate; right?

14  **A.**   Corre- -- that would be -- so it would be the 7.6 I

15  presented earlier and then the 2.3 million that I didn't

16  categorize as investor funds that could be investor funds.  And

17  then I didn't see any other income outside of that two

18  categories.

19  **Q.**   Okay.  So you didn't see any other income aside from those

20  two categories?

21  **A.**   Correct.

22  **Q.**   All right.  And so let's talk about -- let's talk about

23  some of these buckets here.

24      Did you do an analysis of how much money individuals like

25  Richard Naimer or Jack Abramoff received from these business

CHIU - DIRECT / CHOU

1    bank accounts?

2    A.    Yes, I did.

3    Q.    And what categories would those two individuals be in on

4    this chart?

5    A.    For Jack Abramoff, part of the Landfair Capital, I put it

6    under "Employees/Individual Contractor," that section.  And

7    I believe he was paid, like, $160,000.  It would be part of

8    that 1.1 million.

9    Q.    And so how much money went to Richard Naimer?

10   A.    Richard Naimer and his company received 340K-ish.

11   Q.    And how much money went to Jack Abramoff?

12   A.    160K.

13   Q.    And how much money was transferred to Mr. Andrade's

14   personal accounts?

15   A.    2.1 million.

16   Q.    Let's look at some of the other buckets here.

17        Did you analyze travel and meal expenses?

18   A.    Yes, I did.

19   Q.    What sort of travel and meal expenses did you see?

20   A.    In this $300,000, or .3 million, bucket, I saw about

21   200,000 related to flights and hotels using Turkish Airlines

22   and United Airlines, intercontinental hotels, hotels in London.

23   So they span a few thousand dollars each.

24        And then meals, there are several high-dollar meals, over

25   a thousand dollars, such as Morton's Steakhouse that's $2,000,

1  to a Divine Restaurant in London, a thousand-plus piece, and

2  then some to a nightclub and gentleman club.

3  **Q.**  In addition, did you see auto purchases or car purchases

4  from the business bank accounts?

5  **A.**  Yes, I did.

6  **Q.**  And where is that on the chart?

7  **A.**  That is the fifth bar from the right.  It say "Auto

8  Purchases/Expenses."

9  **Q.**  All right.  We can move to the next table, please.

10  Ms. Chiu, do you see the table that's titled "Estimated

11  Value of Investor Purchases with Cryptocurrency"?

12  **A.**  Yes.

13  **Q.**  Could you please walk us through what this table shows?

14  **A.**  Yes.  So these shows cryptocurrencies -- the investors

15  that used cryptocurrencies to invest into the AML BitCoin.  And

16  I obtained these information from the two black binders that

17  were from NAC Foundation.  They were Exhibit 1096 and 1097.

18  **Q.**  Okay.  And could you just remind us what 1096 and 1097 are

19  in terms of where those binders came from?

20  **A.**  They came from NAC Foundation, and they are about 100-page

21  each per binder, and each page lists the details of the

22  investments of using cryptocurrency to purchase the

23  AML BitCoin.

24  **Q.**  And those binders that are in the Government's possession,

25  do they span a narrower time period than the one we saw

CHIU - DIRECT / CHOU

1    earlier?

2    **A.**    Yes.   They span from October 2017 to February 2018.

3    **Q.**    Based on your analysis of all those cryptocurrency

4    transactions in those binders, roughly how much in U.S. dollars

5    was put into AML BitCoin tokens using cryptocurrency?

6    **A.**    About 2.9 million.

7           **MR. SHEPARD:**   Objection.   Excuse me.   Objection.

8    Vague because the value of cryptocurrency compared to U.S.

9    dollars widely varies.

10          **THE COURT:**   Sustained.

11      Maybe you can go back and pinpoint this.

12   **BY MR. CHOU:**

13   **Q.**   Ms. Chiu, do you see there's a row that you created called

14   "Blended Average Price (October 2016 through February 2018)"?

15   **A.**    Yes.

16   **Q.**   Could you please explain how you calculated or estimated

17   that blended average price for cryptocurrency during this

18   relevant time period?

19   **A.**    Yes.   So as I mentioned before, each binder has about a

20   hundred pages.   So each page would list a date and the investor

21   and the amount they used to purchase AML BitCoin.

22      So I captured the date that is on the page.   If there's

23   more than one date on that page, then I'll take the date that

24   is -- has the most transactions.   They're in sequential, so

25   they would just be a day before, a day after the price that I

1  used.

2      And then I looked in Yahoo!/Google for a list of the past

3  value for those dates at the closing price, and then I multiply

4  that -- each date closing price with the amount of

5  cryptocurrency that was noted in those binder pages.  And then

6  I summed it up all together to get the past value.

7  **Q.**  And each of the columns here -- "Bitcoin," "Ether,"

8  "Litecoin," "Bitcoin Cash" -- are those four different types of

9  cryptocurrency aside from AML BitCoin?

10  **A.**  That's correct.  Those are the cryptocurrency used to

11  purchase the AML BitCoin.

12  **Q.**  So did you take the total number of crypto that you found

13  in those binders as shown in Row 1 and multiply that with the

14  blended price you just described to get the estimate for that

15  time period?

16  **A.**  I -- it's more granular, where I took the amount per page

17  and then I calculated the blended average price using the

18  total.  So it's more accurate than just a blended average

19  price.

20  **Q.**  Got it.

21      So then based on that process you just described, what is

22  the estimated investor funds in USD for this relevant time

23  period?

24  **A.**  I calculated about 2.9 million.

25  **Q.**  And this $2.9 million estimated in crypto, that was not

1  shown on the slides earlier when we were looking at cash

2  payments for AML tokens?

3  **A.**    That's correct.  The ones we were looking at earlier, the

4  7.6 million, were just deposits into bank accounts.  It does

5  not include the cryptocurrencies.

6  **Q.**    Could we please move to page 6.  Do you see a table

7  that's -- or chart that's titled "Transfers from Business

8  Accounts to Personal Accounts - January 2014 through

9  October 2018"?

10  **A.**    Yes, I do.

11  **Q.**    Could you just please remind us what you categorized as

12  so-called business accounts versus personal accounts?

13  **A.**    The business account would be the 13 business accounts I

14  noted earlier, and then the personal accounts would be the

15  accounts that were titled with Mr. Andrade and/or his wife's

16  names.

17  **Q.**    All right.  And would you please summarize for us what

18  this chart shows?

19  **A.**    Yes.  So similar to the ones with the investor fund into

20  the account, this one is money coming out of the business

21  account.  So that's why it's going downwards and its negative.

22     The dark yellow indicates the incremental withdrawal from

23  the business account to personal accounts, and then the light

24  yellow are the cumulative total from the prior years.

25     So, for example, in 2014, there's .07 million dollars

1   transferred from the business account to personal; and then in

2   2015, there's an incremental of .1 million, with a cumulative

3   total of .17 million at the end of 2015, and so on and so

4   forth.

5        In January -- all the way to the right, from January to

6   October 2018, there was incremental of 1.6 million transferred

7   to the personal account, for a cumulative total of 2.4 million.

8   Q.   So in this four-year-ten-month period, Mr. Andrade

9   transferred about 2.4 million from his business accounts into

10  his personal accounts?

11  A.   That's correct.

12  Q.   And, again, the three blue buckets at the bottom, are

13  those corresponding to the same three time periods we discussed

14  earlier in those green charts?

15  A.   Yes.

16       MR. CHOU:  Can we please turn to the next slide,

17  page 7.

18  Q.   Do you see how this is -- it's "Transfers from Business

19  Accounts to Personal Accounts - July 2017 to October 2018"?

20  A.   Yes.

21  Q.   Is this like the zoomed-in version of the income chart we

22  saw a few pages ago?

23  A.   That's correct.  This only spans the 14-, 15-month time

24  period.

25  Q.   And July 2017 to October 2018, what's the significance of

**CHIU - DIRECT / CHOU**

1    that time period?

2    **A.**    That's the time period for the AML BitCoin period.

3    **Q.**    And all together, it's $2.1 million in withdrawals?

4    **A.**    Yes.

5             **MR. CHOU:**  Could we please turn to page 8.

6    **Q.**    Do you see how it's titled "Personal Bank Accounts:

7    Expenditures - July 2017 through October 2018"?

8    **A.**    Yes.

9    **Q.**    So the time period for this chart is the AML BitCoin

10   period we just saw in the previous zoomed-in slide.  Is that

11   fair to say?

12   **A.**    That's correct.

13   **Q.**    Could you please summarize for us what this chart shows?

14   **A.**    Similar to the ones we saw before, but these focuses on

15   the personal bank accounts and the outflows and is separated by

16   different categories.

17   **Q.**    And what were the largest uses of funds out of

18   Mr. Andrade's personal accounts, held in his name?

19   **A.**    They would be the $1 million to use for property

20   purchases.

21   **Q.**    And, in addition, do you see over in 2 and 3 you note

22   "Marketing Expenses" and "Andrade to Business"?

23   **A.**    That's correct.

24   **Q.**    Could you please explain what each of those two buckets

25   contain?

CHIU - DIRECT / CHOU

1    **A.**    They're similar -- I used a similar process I use for the

2    business account to categorize these expenses.  So the

3    marketing expenses would be, if the expenditure or the

4    transaction went to a company -- an advertising company, like

5    Google AdWords, et cetera, then I categorize it as marketing

6    expense.  And then "Andrade to Business" would be the money he

7    transferred to the business.

8    **Q.**    And by "to the business," do you just mean those business

9    accounts that you listed earlier?

10   **A.**    Correct.  The 13 business accounts.

11   **Q.**    Did you also look at auto purchases?

12   **A.**    Yes, I did.

13   **Q.**    What did you -- what did you see in the auto purchases

14   category?

15   **A.**    From his personal account, there was an Escalade purchase,

16   a Cadillac Escalade purchase from one of his personal

17   business -- personal bank accounts.

18   **Q.**    So this chart tracks spending out of Mr. -- accounts held

19   in either Mr. Andrade's name and possibly the addition of his

20   wife's name?

21   **A.**    That's correct.

22   **Q.**    In your opinion and based on your analysis, did you see

23   any sources of income during this period that were not investor

24   funds?

25   **A.**    No.

1      **MR. CHOU:** All right. Turn to the next slide.

2      If you could zoom this in, please.

3    **Q.** All right. Ms. Chiu, do you see the diagram in front of

4    you that's titled "Tracing Investor Money to $600,000 Cashier's

5    Check - January 2018 to May 2018"?

6    **A.** Yes.

7    **Q.** What is the purpose of this chart?

8    **A.** The purpose of this chart is to show the Benjamin Boyer

9    wire on the left side for 730K, as described in Count One of

10   the indictment, and how his wire, along with other AML

11   investment, following the money through the several accounts to

12   the purchase of the cashier check, the $600,000 in March 2018

13   as described in Count Two of the indictment, and then the

14   subsequent use of that cashier check.

15   **Q.** And over on the left, you just mentioned Ben Boyer. Is

16   that the -- that's the January 12th, 2018, wire in the amount

17   of 730,000?

18   **A.** That's correct.

19   **Q.** And then the other blue bubble, "Other AML Investments,"

20   could you please explain how you categorized other AML

21   investments for the purposes of this chart?

22   **A.** So I used the same method as I noted earlier, the three

23   main buckets I used. So I used the same method for these blue

24   bubbles.

25   **Q.** Then on the right, we have a few different green squares.

**CHIU - DIRECT / CHOU**

1  The one on the top, do you see where it says "Cashier's Check

2  600K Dated:  March 7th, 2018"?

3  **A.**   Yes.

4  **Q.**   Is that the cashier's check alleged in Count Two of the

5  indictment?

6  **A.**   That's correct.

7  **Q.**   And then what are the green boxes below?

8  **A.**   They're purchases out of these accounts.  There was a

9  Ford F-250 purchase out of the Fintech Fund; there's a

10  44 Violet Road property purchased out of the Woodforest

11  National Bank account for 226,000; and then a 9414 Plaza Point

12  property that was also purchased out of the Woodforest National

13  Bank account for 730,000.  And these were purchased outright

14  without mortgages.

15  **Q.**   So let's start from -- let's walk through this slide

16  starting from the left side or the beginning.

17  **A.**   Okay.

18  **Q.**   What do the -- what do the yellow arrows between these

19  various accounts show?

20  **A.**   It shows the tracings from one account to the other.

21  It'll be from the left account to the right account.

22  **Q.**   So just looking at Benjamin Boyer's wire, which is the

23  blue bubble all the way on the left --

24  **A.**   Mm-hmm.

25  **Q.**   -- where does -- where does that money go first?

1  **A.**   Mr. Benjamin Boyer deposited or wired his 730 into the

2  Block Bits Capital's account.

3  **Q.**   And then meanwhile, there were other AML BitCoin Token

4  investments that went into Block Bits Capital and David Salmon

5  Trust between January 2018 and May 2018?

6  **A.**   That's correct.

7  **Q.**   And then that money flows from Block Bits Capital to David

8  Salmon Trust to NAC Payroll Services, which is that yellow box

9  in the middle?

10 **A.**   That's correct.

11 **Q.**   And then where does it go next?

12 **A.**   And then 1.5 million went into Fintech Fund.

13 **Q.**   What is Fintech Fund?

14 **A.**   From my review of the business records, I believe the

15 Fin- -- the full name is Fintech Fund Family LP, and it's a

16 family limited partnership.

17 **Q.**   And then you see how there's a couple arrows going from

18 Fintech Fund, or there's three?  There's the cashier's check

19 box at the top, there's one that goes straight to the Andrade

20 account to the right, and there's one down to the Ford F-250.

21 **A.**   Yes.

22 **Q.**   And what do those different arrows depict?

23 **A.**   So the top arrow depicts that there's -- on March 7, 2018,

24 I was able to trace out $600,000 from the Fintech Fund to

25 purchase the $600,000 cashier check.

1    The middle arrow indicates that I was able to trace out an

2    additional $400,000 that was transferred to Mr. Andrade's

3    account also via cashier check.

4    And then on the bottom arrow, I was able to trace out

5    52,000 went to the purchase of the Ford F-250.

6    **Q.**    And is the Ford F-250 what's circled in that photo in

7    white there?

8    **A.**    That's correct.

9    **Q.**    And on the left, was that the Cadillac you mentioned

10   earlier?

11   **A.**    Correct, the one on the left.

12   **Q.**    Then let's talk about this cashier's check up at the top.

13   How do you know that the cashier's check was bought with

14   Fintech funds on March 7th, 2018?

15   **A.**    It was -- in the bank statement, it was a withdrawal from

16   the account of $600,000, and then we also have a copy of the

17   cashier checks.

18   **Q.**    And then below that, do you see the 400K transfer from

19   Fintech Fund to Andrade?

20   **A.**    Yes.

21   **Q.**    How were those transfers made?

22   **A.**    They were also with cashier checks.

23   **Q.**    And then, ultimately, the money ends up in those two

24   properties at the bottom right from Mr. Andrade's Woodforest

25   bank account?

1  **A.**    That's correct.

2  **Q.**    Taking a step back, does this table or this chart show all

3  of the investor money or all of the spending that related to

4  AML BitCoin Tokens and Mr. Andrade?

5  **A.**    No.  This is only the subset of accounts, as you see that

6  there's only four business accounts here and then one personal

7  account.

8  **Q.**    And so why are we focusing on just a subset of accounts

9  and a snapshot in time?

10 **A.**    To demonstrate the flow of funds from Mr. Benjamin Boyer's

11 wire, through the account, to the purchase of the 600K, on how

12 it flows through those accounts.

13 **Q.**    To determine how funds flow, you did something called

14 tracing.  Is that fair to say?

15 **A.**    Yes.

16        **MR. CHOU:**  Could we turn to the next slide, please.

17 Please zoom in on the content, and blow it up a little bit

18 more.

19        Thank you.

20 **Q.**    Earlier we talked about Benjamin Boyer's $730,000 wire.

21 Could you just explain to us what the side by side shows?

22 **A.**    Yes.  On the left side of this slide is the Block Bits

23 Capital account ending in 86 -- 8602, and then a snapshot of

24 the account statement for the month of January showing the

25 Benjamin Boyer wire deposit on January 12 for 730, and then a

1    second deposit from Mr. Benjamin Boyer for 120 on the same day.

2    **Q.**   All right.  So on the left, that's the Block Bits bank

3    statement?

4    **A.**   That's correct.

5    **Q.**   On the right, that's the David Salmon account bank

6    statement showing deposits coming in?

7    **A.**   That's correct.

8    **Q.**   So on the left, Benjamin Boyer's wire is received by

9    Block Bits on January 12th, 2018?

10   **A.**   Yes.

11   **Q.**   And then based on your analysis, on the same day, do you

12   see that money being transferred from Block Bits to

13   Mr. Andrade's David Salmon Trust account?

14   **A.**   Yes.  As noted as January 12, transfer from Account 8602

15   for a total of $850,000.

16   **Q.**   So the same amount of money?

17   **A.**   That's correct.

18           **MR. CHOU:**  If we could turn to the next slide, please.

19   **Q.**   Does this chart show essentially the same exercise for a

20   different wire in the amount of 150,000?

21   **A.**   That's correct.

22   **Q.**   Could you please explain for us what's -- what's happening

23   here?

24   **A.**   Similar to the one we saw earlier, this one is regarding

25   the wire on January 23rd, 2018, also from Mr. Benjamin Boyer,

1    for 150,000 and how it was transferred to David Salmon's trust

2    account on the same day for $150,000.

3         MR. CHOU:  Could we please turn to --

4    Q.   And so before we turn to the next slide, this -- this --

5    what we just walked through describes wires that are being

6    received and transferred out to a different account on the same

7    day; right?

8    A.   Yes.

9    Q.   Is that, at a simplified and general level, the sort of

10   tracing analysis you did to determine how investor funds got

11   from one account to another?

12   A.   Correct.  I will apply an accounting method, but, yes,

13   that's generally how it goes.

14        MR. CHOU:  Could we please turn to the next slide.

15   Q.   Do you see the chart titled "January 12th, 2018, $730,000

16   Wire Transfer from Benjamin Boyer"?

17   A.   Yes.

18   Q.   This is the wire alleged in Count One of the indictment?

19   A.   That's correct.

20   Q.   And what can you -- what can you tell from the face of

21   this document?  What are you highlighting here?

22   A.   That the date is January 12th, it's from Benjamin Boyer in

23   the middle, and then it's for $730,000.

24   Q.   And is that the wire or one of the wires we just looked at

25   in the past couple slides and also the one that was shown in

CHIU - DIRECT / CHOU

1    the tracing diagram earlier?

2    **A.**    Yeah.  It was the far left blue bubble.

3    **Q.**    In that diagram on the far right, there was that green box

4    at the top for a cashier's check.

5    **A.**    That's correct.

6         **MR. CHOU:**  Can we please turn to the next slide.

7    **Q.**    Do you see the chart titled "March 7, 2018, $600,000

8    Cashier's Check Purchased from Fintech Wells Fargo and

9    Deposited into Andrade Woodforest National Bank"?

10   **A.**    Yes.

11   **Q.**    Is this the cashier's check alleged in Count Two of the

12   indictment?

13   **A.**    That's correct.

14   **Q.**    Could you please explain for us -- first of all, what is a

15   cashier's check?

16   **A.**    Cashier check is a bearer instrument, meaning that it

17   is -- it's a bank -- a check that's issued from the bank itself

18   versus your personal account because the bank will take the

19   money out of your account, create this check, so then this

20   check is already backed by funds.  So it's guaranteed when you

21   deposit it there is funds there.  That's why it's called

22   cashier checks.

23   **Q.**    And how is it different from a wire?

24   **A.**    A wire would be a transfer through -- there's no physical

25   checks.  It's just online you send, "I want to send money from

1    Account 1 through Account 2," and then it goes through the

2    Fedwire system, going through different netting between banking

3    accounts, and then the money would show up into the recipient's

4    account a day or two later.

5    **Q.**  Could you walk us through what you've highlighted on the

6    cashier's check on left?

7         **MR. CHOU:**  And maybe, Ms. Rosenbaum, we could zoom in

8    on just the right two images here so we can -- or right -- or

9    left two so we can see a little better.

10        **THE WITNESS:**  All right.  On the top left of the

11   cashier check, it says -- it says "Remitter," and the name is

12   Rowland Andrade.  And then underneath it says "Pay to the order

13   of Rowland Marcus Andrade."  And going to the right boxes, the

14   date of the check is March 7, 2018, for the amount of $600,000.

15        And on the bottom is the image of a deposit slip.  So

16   that's something you fill out when you go into a bank to make a

17   deposit.  And it's from Woodforest National Bank, and it's

18   dated March 7, 2018, with the name of Rowland Marcus -- Rowland

19   Andrade for the Account 0910 for the amount of $600,000.

20   **BY MR. CHOU:**

21   **Q.**  So based on your analysis, on March 7, 2018, Mr. Andrade

22   buys a cashier's check from the Fintech Wells Fargo account?

23   **A.**  That's correct.

24   **Q.**  And then on the same day, that check is deposited into the

25   Woodforest account held not at Fintech, but under the name

CHIU - DIRECT / CHOU

1    Rowland Marcus Andrade?

2    **A.**    That's correct.

3                   **MR. CHOU:**  One moment, Your Honor.

4                        (Pause in proceedings.)

5    **BY MR. CHOU:**

6    **Q.**    Ms. Chiu, earlier we looked at the tracing of investor

7    funds all the way over to different transactions.  Did you see

8    that?

9    **A.**    Yes.

10   **Q.**    Did defendant buy this cashier's check with AML token

11   investor money?

12   **A.**    Yes.  That's what the tracing shows.

13   **Q.**    And based on your analysis and your accounting

14   methodology, what percent of the cashier's check was purchased

15   with AML token investor money?

16   **A.**    100 percent.

17                   **MR. CHOU:**  Nothing further.

18              **THE COURT:**  Very well.  We'll take our break.

19        Mr. Shepard, is this when you needed the slightly

20   longer --

21                   **MR. SHEPARD:**  Yes.

22              **THE COURT:**  All right.  Members of the jury, we're

23   going to take our morning break.  We're going to take a

24   slightly longer break.  I'll check in -- I'll have Corrine

25   check in with you about ten of and we'll see how it's going.

**PROCEEDINGS**

1      But in the meantime, please do not discuss this amongst

2  yourselves or with anyone else.

3      And we'll be back, hopefully, not too much longer than our

4  normal break but perhaps a little bit longer.

5      (Proceedings were heard out of the presence of the jury.)

6          **MR. CHOU:**  Your Honor, just one brief question.

7          **THE COURT:**  Okay.  We're out of the presence of the

8  jury.

9      Go ahead.

10         **MR. CHOU:**  The Government prepared, printed a large

11 poster board that shows that diagram.  It's a little small on

12 the screen.

13         **THE COURT:**  Okay.

14         **MR. CHOU:**  May the Government bring it up and put it

15 up on an easel?

16         **THE COURT:**  Are you going to do that on redirect or

17 something?

18         **MR. CHOU:**  Sure, Your Honor, yeah.

19         **THE COURT:**  I mean, yeah, you want to do it in

20 conjunction with some examination, not just have it up there.

21         **MR. CHOU:**  Absolutely.

22         **THE COURT:**  Okay.  All right.

23                 (Recess taken at 10:34 a.m.)

24             (Proceedings resumed at 11:05 a.m.)

25      (Proceedings were heard out of the presence of the jury.)

1           THE COURT:  Okay?

2           MR. SHEPARD:  Yes.  Thank you.

3           THE COURT:  Ready to bring them out?

4       (Proceedings were heard in the presence of the jury.)

5           THE COURT:  The jury is present.

6   You may proceed Mr. Shepard.

7   If we can get the witness back.

8               (Witness resumes the stand.)

9           THE COURT:  Mr. Shepard?

10                  **CROSS-EXAMINATION**

11  BY MR. SHEPARD:

12  Q.   Ms. Chiu, nice to meet you.

13  A.   Nice to meet you.

14          MR. SHEPARD:  I would like to put up Exhibit 1520-7,

15  please, Government exhibit.

16          THE COURTROOM DEPUTY:  For everyone?

17          MR. SHEPARD:  Yes.  It's in evidence.

18          THE COURTROOM DEPUTY:  Okay.

19  BY MR. SHEPARD:

20  Q.   This was one of your charts; right?

21  A.   That's correct.

22  Q.   Carefully prepared; right?

23  A.   Yes.

24  Q.   And if we look at the minus 1.6 million there on the

25  right, that's from July 2017 to October 2018; right?

1    **A.**    That's correct.

2    **Q.**    And to get to the 1.6 million, I assume you went through a

3    number of transactions and identified the ones that went to

4    Mr. Andrade's personal accounts; correct?

5    **A.**    That's correct.

6    **Q.**    But you did not produce your list of what you were

7    including; right?

8    **A.**    All the bank statements was provided, and this is a

9    summary of all the transfers from all the business account to

10   personal accounts.

11   **Q.**    There are thousands of pages of bank statements, but I'm

12   sure you prepared a schedule that showed you $1.6 million of

13   money that went to Mr. Andrade's personal accounts; correct?

14   **A.**    Correct.

15   **Q.**    And you didn't produce that; correct?

16   **A.**    I don't think I was asked.

17   **Q.**    Well, the only people who ask you to produce things are

18   the Government; right?

19   **A.**    Yeah.

20   **Q.**    And you're aware that the Federal Rules of Evidence

21   require you to produce all the bases for your conclusions and

22   opinions; correct?

23   **A.**    I provided a detailed report of the financial summary, and

24   then these are high level of the charts.

25   **Q.**    Okay.  I asked if you were aware that the federal rules

1  require you to produce the bases for your opinions and

2  conclusions.

3  **A.**   I guess, sure.

4  **Q.**   Okay.  And you didn't -- you have a schedule that would

5  support this 1.6 million but you didn't produce it; right?

6  **A.**   I mean, all the bank records were produced, so this all

7  derive from the bank records.

8  **Q.**   Yes, but those are thousands of pages.  And you prepared a

9  schedule to get you to the 1.6 million; correct?

10 **A.**   Correct.  I went through those thousands of pages --

11 **Q.**   And you didn't --

12 **A.**   -- to get to that schedule.

13         **THE COURT:**  Wait.  Wait.

14         **MR. SHEPARD:**  I'm sorry.

15         **THE COURT:**  One at a time.

16 **BY MR. SHEPARD:**

17 **Q.**   You prepared a schedule --

18 **A.**   Mm-hmm.

19 **Q.**   -- based on your review of those thousands of pages and

20 you didn't produce it; correct?

21 **A.**   That's correct.

22 **Q.**   Okay.  So we tried to re-create your schedule.

23         **MR. SHEPARD:**  And just now for the witness,

24 the Government, and the Court, Ed, if you would put up

25 Exhibit 3343.

CHIU - CROSS / SHEPARD

1   **Q.**   And this is our effort to try to re-create the schedule

2   that you created to get to that $1.6 million number.  Do you

3   see that?

4   **A.**   Yes.

5   **Q.**   And does that look pretty close to what you were looking

6   at when you came up with your $1.6 million figure?

7   **A.**   I mean, your total, but I don't know about the details

8   because I have a list of schedules.

9   **Q.**   You have a schedule.  You just didn't --

10  **A.**   Correct.

11  **Q.**   -- produce it; right?

12  **A.**   Correct.

13  **Q.**   Okay.  So when we tried to re-create your schedule, the

14  only way we could get to $1.6 million was to count an error

15  that the bank made and corrected in early 2016.

16      Did you see -- did you include $275,000 twice in

17  January 2016 as our exhibit reflects?  Do you remember

18  including $275,000?

19  **A.**   I do, but I only included one.  If there was an error, it

20  would be reversed.  I excluded those from my charts.

21      **THE COURT:**  Mr. Shepard, you know, you can even -- I

22  don't know what you're going to do about admitting this, but

23  this is certainly a demonstrative.  You said it's only being

24  shown.  You can show it to the jury --

25      **MR. SHEPARD:**  Okay.

1    THE COURT:  -- if you want.

2    MR. SHEPARD:  Yes, please.

3    This is 3343.  I'm sorry.  This is what I have given to

4  her.

5    THE COURT:  Yes, and the jury can see it because

6  it's --

7    MR. SHEPARD:  Okay.

8    THE COURT:  -- it's a demonstrative at least.

9  BY MR. SHEPARD:

10 Q.  Okay.  So this was the only way we could get to your

11 $1.6 million number.

12    And you see in order to get there, there are two different

13 bank entries for $275,000 a day or so apart in January;

14 correct?

15 A.  Correct, but my list is a lot longer than this list.

16 Q.  Okay.  The list that you've never produced?

17 A.  Correct.

18 Q.  And just to drill into this $275,000, look at --

19    MR. SHEPARD:  Ed, just for the witness, the Court, and

20 the parties, if you can put up 3342.

21 Q.  This is one of the bank statements you reviewed; correct?

22 A.  Correct.

23    MR. SHEPARD:  I offer 3342.

24    MR. CHOU:  No objection.

25    THE COURT:  3342 will be admitted.

1          (Trial Exhibit 3342 received in evidence.)

2    **BY MR. SHEPARD:**

3    **Q.**    And it reflects a $275,000 entry as a customer deposit

4    followed by a deposit correction debit; correct?

5    **A.**    Correct, and I excluded that from my 1.6 million.

6    **Q.**    From the document you didn't produce to us?

7    **A.**    And it was excluded because it was a reversal.

8    **Q.**    And then there's another $275,000; correct?

9    **A.**    Correct.

10   **Q.**    Okay.  So tell us how you got it -- can you describe for

11   us the entries that you relied on to get to the 1.6 million if

12   you don't double count the $275,000?  Can you explain that for

13   us?

14   **A.**    So, for example, in this particular statement, if it was

15   reversed, I excluded that from my analysis, and then I did

16   include one of the 275,000 because it wasn't reversed.

17   **Q.**    Okay.  I understand that.

18        What I'm saying is:  What number did you add and from

19   where in order to get to 1.6 million if you exclude the

20   reversed $275,000?

21        Take a look at Exhibit 3343 and tell me what other number

22   you found and added to those numbers to get to the 1.6 million.

23   **A.**    Sure.  Can you show -- can you display the other one

24   again?  The 1.6?

25   **Q.**    Which one would you like me to display?

1    **A.**    The previous demonstrative that you have shown to get to

2    the 1.6.

3    **Q.**    3343?

4    **A.**    Yes.

5    **Q.**    Okay.  Sure.  Take a look.

6    **A.**    Can you --

7            **THE COURT:**  Blow it up.

8            **THE WITNESS:**  -- zoom in?

9        Yes, please.

10        Can I get it full screen so I could look at the accounts

11    on the left?

12            **MR. SHEPARD:**  Sure.

13        Please, Ed, whatever Ms. Chiu would like, if you can try

14    to accomplish it.

15            **THE WITNESS:**  So -- and can you tell me, were all

16    these the transfers from the 13 accounts I noted for?  Because

17    this is a lot shorter than what I have calculated, and the

18    amounts equate to 1.6 was a lot longer where one of the

19    13 business account had transferred to Mr. Andrade's four

20    accounts.

21    BY MR. SHEPARD:

22    **Q.**    My question to you was:  Can you tell me what's missing

23    from here, the specific entry that would be missing from here

24    that would account for an additional roughly $275,000 to get to

25    the $1.6 million total?  Can you tell me specifically what's

**CHIU - CROSS / SHEPARD**

1  missing?

2  **A.**    Yes.  I see that it's missing a lot of the Capital One

3  Account 1839 transfers.  I remember seeing multiple tens of

4  thousands of dollars, multiple of them, into one of

5  Mr. Andrade's account, which I don't see it here, and they had

6  spanned over 20 transactions from Capital One 1839.

7  **Q.**    So you don't have a specific transaction to give me;

8  right?

9  **A.**    I could give it to you.  I could print it out and give it

10 to you.

11 **Q.**    Yes, but you didn't give it to us; right?  We don't have

12 a -- you don't -- we don't have your list; right?

13 **A.**    Correct, because you have all the underlying statements.

14 **Q.**    Yes.  But you based your testimony on a schedule that you

15 prepared that we don't have; right?

16 **A.**    I gave the summary.

17 **Q.**    You gave us the bottom-line total --

18 **A.**    Correct.

19 **Q.**    -- and that's all?

20         **MR. SHEPARD:**  Okay.  Let me go back to

21 Exhibit 1520-04.  If we can get that.  This is in evidence.

22 It's a Government exhibit.

23     That's 1504, Ed.  Sorry.  I was asking for 1520-04.

24 **Q.**    So 1520-04 is displayed in such a way that it has

25 "Transfers to Mr. Andrade" as the biggest bar graph; correct?

**CHIU - CROSS / SHEPARD**

1    **A.**    Correct.

2    **Q.**    And -- and then immediately to the right it has

3    1.3 million paid in legal fees, 1.1 million in marketing

4    expenses, 1.1 million in employee and individual expenses, and

5    1.1 million in CrossVerify and DIT Network expenses; right?

6    **A.**    That's correct.

7    **Q.**    And just those four expenses -- and those are all business

8    expenses; right?

9    **A.**    They appear to be.

10   **Q.**    Those four -- well, you looked at them; right?

11   **A.**    Correct.

12   **Q.**    That's why you categorized them this way; correct?

13   **A.**    Correct.

14   **Q.**    And those four expenses, by my poor math, would amount to

15   $4.6 million; right?

16   **A.**    Correct.

17   **Q.**    And that doesn't count a few of these others that would be

18   business expenses, such as software and IT services; correct?

19   **A.**    Correct.  And also auto purchases and retail purchase that

20   could be --

21   **Q.**    That's not responsive to my question.

22   **A.**    Okay.

23   **Q.**    I asked:  It didn't count things like software and IT,

24   which would be business expenses?

25   **A.**    That's correct.

**CHIU - CROSS / SHEPARD**

1    **Q.**   Okay.  And so if you had lumped the business expenses

2    together, we would have had a bar in excess of $4.6 million.

3    It would have been more than double the transfers to

4    Mr. Andrade; correct?

5    **A.**   Correct.

6    **Q.**   But you chose to display it this way instead; right?

7    **A.**   Because they're in -- this is normal process where we

8    categorize them by different categories.

9    **Q.**   And you chose the categories and presented them in the way

10   you did; right?

11   **A.**   They're pretty standard.  I do that in every case.

12   **Q.**   Okay.  You said that Mr. Naimer and his company got

13   $340,000.  Do you remember saying that to Mr. Chou a little bit

14   ago?

15   **A.**   Yes.

16   **Q.**   Mr. Naimer was in charge of the company that is listed

17   here as CrossVerify/DIT Network.  Did you know that?

18   **A.**   I was told, I believe.  I don't know if he's in charge.  I

19   know he was part of it.

20   **Q.**   Okay.  So you display on your chart that CrossVerify/DIT

21   got around $1.1 million to do their work; correct?

22   **A.**   That's correct.

23   **Q.**   And was the $340,000 that you said Mr. Naimer and his

24   company got, was that in addition to the 1.1 million?

25   **A.**   No.  That's within the 1.1 million.

1  Q.    Okay.  Then when you said that Mr. Naimer and his company

2  got $340,000 in response to Mr. Chou's question, was that

3  wrong?

4  A.    No.  When I refer to his company, it's the Worldwide

5  Financials in his name directly, which is $342,000.  And then

6  this 1.1 million made up of transfers to CrossVerify, Ltd.,

7  DIT Network, and then also other individuals.

8  Q.    So you found Mr. Naimer had another company called

9  Worldwide Financial?

10  A.    Correct.

11  Q.    And how much money did Worldwide Financial get?

12  A.    I think maybe 200,000.

13  Q.    And you probably have a schedule that shows that; right?

14  A.    Correct.

15  Q.    But you didn't produce that, did you?

16  A.    It's listed in the bank statements that it went to

17  Worldwide Financials.

18  Q.    I did not ask you if we could find it in thousands of

19  pages of bank statements.  I asked you if you made a schedule

20  and if you produced it to us.  And the answer is no; right?

21  A.    Correct.

22        MR. SHEPARD:  If we can look at Exhibit 1520-008, also

23  in evidence.  It's a Government exhibit.

24  Q.    And these are -- as I understood your testimony, these

25  were expenditures that you tracked from Mr. Andrade's personal

**CHIU - CROSS / SHEPARD**

1   accounts; correct?

2   **A.**   That's correct.

3   **Q.**   And after the property purchases, the two biggest expenses

4   were "Marketing Expenses" and "Andrade to Business," totaling

5   about $600,000; correct?

6   **A.**   That's correct.

7   **Q.**   So he was paying business expenses out of his personal

8   accounts; right?

9   **A.**   Yeah.

10   **Q.**   And when you tracked the money that went into

11   Mr. Andrade's personal accounts, there were other sources for

12   the money in Mr. Andrade's business accounts that went to his

13   personal accounts beyond just token purchaser money; correct?

14   **A.**   From my analysis, I think there were very minimal --

15   minimal income other than token purchasers.

16   **Q.**   So the answer to my question is, yes, there were some

17   other sources of income; right?

18   **A.**   Yeah.   Very minimal.   I would say 50,000 or less.

19   **Q.**   And you probably have a schedule for that; right?

20   **A.**   Yes.

21   **Q.**   But you didn't produce that; right?

22   **A.**   I think it's in my financial report that I produced.

23   **Q.**   Okay.   The actual schedule you created or just some

24   reference summary?

25   **A.**   It categorized the types of income into those account in

1    the detailed financial report.

2    **Q.**   My question was:  Did you produce the actual schedule you

3    created?

4    **A.**   No.

5    **Q.**   And did you see that there were sales of stock that

6    belonged to Mr. Andrade that were sources of income into his

7    personal -- into his business accounts that went into his

8    personal accounts?  Did you see that?

9    **A.**   Sales of stock?  No, I'm not aware.

10   **Q.**   Okay.  And you gave a figure of how much money went to

11   Jack Abramoff.  I believe you said 160,000; right?

12   **A.**   To -- yes.

13   **Q.**   And did you get a list of companies or at least company

14   names that Mr. Abramoff was using to take in money?

15   **A.**   I don't know if I got the complete list, but a majority of

16   the list.

17   **Q.**   Okay.  A majority of what list?  What do you recall of a

18   list?

19   **A.**   I recall Landfair Capitals.

20   **Q.**   Okay.

21   **A.**   I think that's what I calculated.

22   **Q.**   Okay.  In fact, there were other companies that he used to

23   get money besides Landfair Capital; right?

24   **A.**   I guess.  I'm not sure.

25   **Q.**   Well, do you have a schedule that you used to figure out

1    how much Jack Abramoff got?

2    **A.**    I used only Landfair Capital.

3    **Q.**    You used only Landfair Capital?

4    **A.**    Correct.

5    **Q.**    Okay.  So you didn't use Sepo Holdings; right?

6    **A.**    Sepo Holdings was held by L.A. Ziggerman as the signer on

7    the account.

8    **Q.**    And, therefore, you're saying you didn't use it; correct?

9    **A.**    Correct.  It's in -- it's in the analysis, but not for

10   Jack Abramoff.

11   **Q.**    Okay.  So any money that Jack Abramoff was able to get out

12   of Sepo Holdings was not included in your $160,000 figure;

13   correct?

14   **A.**    Correct.

15   **Q.**    And didn't the agents have a list of lowdown companies

16   that Mr. Abramoff used to get income?

17   **A.**    I don't -- I'm not sure.

18   **Q.**    Okay.  If they did, they didn't share it with you, huh?

19   **A.**    No.

20        **MR. SHEPARD:**  In terms of the exhibit that reflected

21   how much money was spent on IT and software development, if we

22   could go back to that one.  Let me grab the number again.

23        Yes, thank you.  1520-04.

24   **Q.**    You have categories for "Legal Expenses," 1.3 million;

25   "Marketing Expenses," 1.1 million; "Employees/Individuals,"

```
 1    1.1 million; and "CrossVerify/DIT Network," 1.1 million.
 2         Do you have a schedule -- did you prepare a schedule of
 3    what employees and individuals you were tracking to get to that
 4    1.1 million?
 5    A.   Yes.
 6    Q.   Okay.  But you didn't produce it?
 7    A.   Correct.
 8    Q.   I'm going to give you a list of names.
 9    A.   Okay.
10    Q.   And I want you to tell me if you can tell me for sure that
11    these people were on the list of people that you included in
12    employees/individuals.
13         Sergey Petrovich, did you track expenses to him?
14    A.   He sound familiar.
15    Q.   I'm sorry?
16    A.   He sounded familiar in my list of employees.
17    Q.   He sounds familiar, but you don't know for sure whether
18    you did or not; right?
19    A.   I think Sergey -- I think he did.  It was included.
20    Q.   You think so?
21    A.   Yes.
22    Q.   But you're not sure?
23    A.   His name sounds familiar, so I would say, yes, he was
24    included in the employees.
25    Q.   Okay.  Terence Poon?
```

**CHIU - CROSS / SHEPARD**

1    **A.**    Yes.

2    **Q.**    Evan Carlsen?

3    **A.**    Evan Carlsen.  That one, I'm not sure.

4    **Q.**    Okay.  Warren Culley?

5    **A.**    I'm not sure.  But this category is employees and

6    individuals, so they're most likely in there because --

7    **Q.**    I'm --

8    **A.**    -- they're individual names.

9    **Q.**    I'm asking you about these individual names since I don't

10    have your schedule, and can you tell me if they're on your

11    list.  Okay?  Those are my questions.

12        Warren Culley, you're not sure; right?

13    **A.**    Correct.

14    **Q.**    Click Ripple?

15    **A.**    Not sure.

16    **Q.**    I'm not going to be able to pronounce some of these, so

17    I'm going to spell them for you.

18        Esferasoft, E-s-f-e-r-a-s-o-f-t?

19    **A.**    Don't remember.

20    **Q.**    Mridula Gupta?

21    **A.**    I think she is included.

22    **Q.**    But you're not sure?

23    **A.**    There's high likely because all the individual names are

24    in that category.

25    **Q.**    Okay.  I just asked if you were sure.

1   **A.**   Correct.  Not sure.

2   **Q.**   Sachin Agarwal?

3   **A.**   Don't know.

4   **Q.**   Neha Verma?

5   **A.**   That one is included.

6   **Q.**   Neha Sharma?

7   **A.**   There was two Neha, yes.

8   **Q.**   Hung Tran?

9   **A.**   Yes.

10  **Q.**   Kushal Chouhan, C-h-o-u-h-a-n?

11  **A.**   C-h-o-u-h-a-n.  He does sound familiar.  Not a hundred

12  percent.

13  **Q.**   Wasim Bari, B-a-r-i?

14  **A.**   Not sure.

15  **Q.**   Ron Brogdon, B-r-o-g-d-o-n?

16  **A.**   Most likely, but unsure.

17  **Q.**   Felipe Albacete, A-l-b-a-c-e-t-e?

18  **A.**   Most likely, but unsure.

19  **Q.**   But not sure.

20      Okay.  And then the categories "Marketing Expenses,"

21  "Employees/Individuals," and "CrossVerify/DIT Network."

22      "Employees/Individuals," you think, may have at least --

23  may have some, but not all, of the people that I identified for

24  you as people who were working on the software.  Maybe they're

25  in there; maybe they're not.  Right?

CHIU - CROSS / SHEPARD

1    **A.**   Most likely they're in there, since they include

2    individual names, but I'm not hundred percent sure.

3    **Q.**   You're not sure, right.

4         And then there are companies that also worked on the

5    software and they wouldn't be in the "Employees/Individuals"

6    category, would they?

7    **A.**   They would be -- depending on which company were you

8    talking about.

9    **Q.**   Okay.  I'm going to give you a list of company names.

10   **A.**   I can try.

11   **Q.**   NuGen?

12   **A.**   NuGen would be under software.

13   **Q.**   Okay.  Chetu?

14   **A.**   Chetu, I think that's under software.

15   **Q.**   You think?  You're not sure?

16   **A.**   How do you spell Chetu?  Can you --

17   **Q.**   I believe it's C-h-e-t-u.

18   **A.**   Yes, that's under software.

19   **Q.**   And that's on a schedule that you prepared and you gave to

20   the Government but you did not produce?

21   **A.**   Correct.

22   **Q.**   Jumio?

23   **A.**   Say it again.

24   **Q.**   Jumio, J-u-m-i-o.

25   **A.**   J-u-m-i-o.

CHIU - CROSS / SHEPARD

1    **Q.**   J.

2    **A.**   Oh.

3    **Q.**   J-u-m-i-o.

4    **A.**   J-u-m-i-o.

5    **Q.**   I thought you said "G," so...

6    **A.**   Most likely software.  That one, I'm not sure.

7    **Q.**   Direct ID?

8    **A.**   That sounds familiar.  Software.

9    **Q.**   Authentic ID?

10   **A.**   That one, I'm not sure.

11   **Q.**   ID Checker?

12   **A.**   Ooh, I remember that one.  I think, yes, software.

13   **Q.**   But not sure?

14   **A.**   Correct.

15   **Q.**   MII Card?

16   **A.**   Not sure.

17   **Q.**   And, Ms. Chiu, you're aware that the IRS seized a large

18   volume of records from Mr. Andrade's accountant Karl Ruzicka in

19   2020; right?

20   **A.**   I believe so.

21   **Q.**   And you have not reviewed any of those records; correct?

22   **A.**   I have reviewed some of the records.  I have looked at it,

23   but I didn't use it for my analysis.

24   **Q.**   Okay.  You did not use any of them in your analysis?

25   **A.**   That's correct.

1    Q.   Okay.  You were aware that Mr. Andrade's business was

2    building a product that used a lot of intellectual property,

3    patented intellectual property; right?

4         MR. CHOU:  Objection.  Foundation.

5         THE COURT:  Overruled.

6         THE WITNESS:  Sure.

7    BY MR. SHEPARD:

8    Q.   And did you at any time attempt to assess the value of

9    those patents and the technology that was being used?

10   A.   No.

11   Q.   You know the business did not actually own the patents;

12   correct?

13   A.   I don't know.

14   Q.   You don't know.

15        Okay.  And did you see any payments of any kind by the

16   business to the owner of the patent -- to the owner of the

17   patents that were identified as payments for the use of that

18   intellectual property?

19   A.   I saw, under legal fees, there's the Hoffman Patent Group.

20   Q.   There were some payments to a patent lawyer, but that's

21   not what I was asking you.  What my -- what I was asking you

22   was:  Did you see any payments of any kind by the business to

23   the person who owned the patents that were identified as being

24   payments for the use of that intellectual property?

25   A.   That would probably be categorized under "Individual" if

1    they're a payment to an individual.

2    **Q.**   Okay.  And so you did not see or include under payments to

3    individuals, as reflected in this exhibit --

4        **MR. SHEPARD:**  If you scroll up a little, Ed, I can see

5    the number.  1524, it seems like.

6    **Q.**   And you did not see any payments in that category to

7    Mr. Andrade, the patent owner, for the use by the business of

8    that intellectual property, did you?

9    **A.**   I don't know who the patent owners are.  So I -- if

10   they're -- they're categorized all here and if they're

11   individual names, it would be under the individual category.

12   **Q.**   Okay.  You don't recall any payments that you categorized

13   as payments to employees or individuals, you don't recall

14   including any in that category to Mr. Andrade as payments for

15   the use of his patented intellectual property; correct?

16   **A.**   I wouldn't know.  Because they're individuals, I wouldn't

17   know if they're owners or not.

18   **Q.**   Okay.  Leave owners aside for a second.

19       There's nothing included in this list of payments to

20   employees/individuals that reflects a payment to Mr. Andrade

21   for the use of his intellectual property; correct?

22   **A.**   I don't know.  If you're saying they're individuals, they

23   would be included there.

24   **Q.**   I understand you're saying that if it's a payment to an

25   individual, it would be included there.

1          What I'm asking you is:  Is there a payment there to

2    Mr. Andrade for the use of his intellectual property?

3    **A.**    There could or there could not be.  I would not know.

4    **Q.**    The only way we would know is to see your schedule, which

5    you didn't produce; right?

6    **A.**    They're also listed in the bank statements.

7    **Q.**    We could look through thousands of bank statements also?

8    **A.**    Yep.

9    **Q.**    But we could also see your schedule if you had produced

10   it; right?

11   **A.**    Yeah.  And since I went through those thousands of pages,

12   yes.

13   **Q.**    The schedules that you presented today relating to the

14   AML BitCoin period went from July 2017 to October 2018;

15   correct?

16   **A.**    This particular one, yes.

17   **Q.**    Okay.  Were there others that went past October 2018?

18   **A.**    No.

19   **Q.**    And was it your decision to stop in October 2018?

20   **A.**    That was the indictment period in the indictment,

21   October 2018.

22   **Q.**    You think the indictment ends the period of the conspiracy

23   as October 2018?

24   **A.**    I used the time period in -- noted in the indictment.

25   **Q.**    And you're saying the indictment says the conspiracy ended

1   in October 2018?  Is that -- is that what you're saying?

2   **A.**    That's my financial analysis time period.

3   **Q.**    I understand that's your financial analysis time period.

4   I'm trying to figure out why it ends in October 2018.

5       Are you saying that it ends in October 2018 because the

6   indictment says the conspiracy ended in October 2018?

7   **A.**    I don't know when the conspiracy ends, but for my

8   analysis, I supported what was noted in the indictment.

9   **Q.**    Okay.  I'm still trying to figure out if you're saying the

10  indictment says the conspiracy ended in October 2018.

11      **MR. CHOU:**  Objection.  Misstates the indictment.

12  Conspiracy?

13      **THE COURT:**  Sustained.

14  You can ask her why she used this period, but that's --

15      **MR. SHEPARD:**  I'm trying -- that's what I'm trying

16  to -- that's what I'm trying to do.

17      **THE COURT:**  Well, why don't you ask her that question.

18  **BY MR. SHEPARD:**

19  **Q.**    Why did you end in October 2018?

20  **A.**    Because I was asked to provide financial analysis for this

21  indictment and the indictment noted October 2018.

22  **Q.**    In fact, the indictment has no end date to the conspiracy

23  or scheme, does it?

24      **MR. CHOU:**  Objection.  Misstates the indictment.

25      **THE COURT:**  Well, do you want to show her the

 1   indictment and ask her if it --

 2          MR. SHEPARD:  I didn't expect to have to have the

 3   indictment here, so we're seeing if we -- if we have it.

 4   Q.   But the indictment says --

 5          THE COURT:  Well, just wait a minute.

 6       You know, the jury does not get a copy of the indictment.

 7          MR. SHEPARD:  I understand.

 8          THE COURT:  So I don't want us to be characterizing

 9   the indictment unless you want to provide the indictment to the

10   jury.

11          MR. SHEPARD:  No, that's okay.

12       If I could approach the witness.

13          THE COURT:  You may.

14   BY MR. SHEPARD:

15   Q.   There are some different things here, but if you start at

16   paragraph 9 --

17   A.   Mm-hmm.

18   Q.   -- and take a look at that.

19   A.   Okay.

20   Q.   And then I also want to show you under Count One.

21   A.   Correct.

22   Q.   Okay?

23   A.   Okay.

24   Q.   So there's one place in the indictment that says

25   [as read]:

1            "Beginning on or about July 2017 and continuing

2       through on or about October 2018 . . . ."

3       And there's another place in the indictment where it says

4  [as read]:

5            "Beginning at a date unknown to the grand jury

6       but no later than July 2017 and continuing through a

7       date unknown to the grand jury but to at least

8       December 2018 . . . ."

9       Right?

10           MR. CHOU:  Your Honor, calls for a legal conclusion.

11      If counsel would like to do this, I would ask that the

12  jury get a copy of the whole indictment.

13           THE COURT:  My concern is this witness is not an

14  expert on the indictment in this case.  You asked, which was

15  fine, why she used the period she did, and she said she used it

16  because her understanding was that is what the indictment

17  period is.

18      The indictment says what it says.  I don't know why we're

19  using this witness to --

20           MR. SHEPARD:  Okay.

21           THE COURT:  -- do that.

22           MR. SHEPARD:  It has -- it has several different

23  things.  Some are later than that; some are not.

24           THE COURT:  Okay.

25           MR. SHEPARD:  Okay.

1    **Q.**    But, in any event, you cut off in October of 2018?

2    **A.**    Correct.

3    **Q.**    And have you been advised of the testimony that has been

4    given during the trial?  I've seen you've updated your charts

5    from time to time based on testimony given in the trial;

6    correct?

7    **A.**    It's based on the exhibits that are admitted.  If they

8    were admitted, I could adjust my analysis accordingly.

9    **Q.**    Okay.  And the prosecutors were giving you those exhibits?

10   **A.**    Correct.  They were giving me which one were admitted.

11   **Q.**    And did they tell you that on Monday they elicited

12   testimony about activity in 2019?

13   **A.**    Regarding?

14   **Q.**    Mr. Andrade and Mr. Abramoff.

15   **A.**    But what type of activities?

16   **Q.**    Conversations.  Did they tell you that?

17   **A.**    Maybe they were mentioning a mortgage in 2019.

18   **Q.**    Okay.  Well, we'll get to that.  But I was asking you

19   about whether you knew that the Government had introduced

20   evidence about activity in 2019.

21   **A.**    No.

22   **Q.**    Don't know?

23   **A.**    No, I don't know.

24   **Q.**    Okay.  But it sounds like you were told by the Government

25   about a mortgage in 2019; correct?

CHIU - CROSS / SHEPARD

1    **A.**    That's correct.

2    **Q.**    And you didn't include that in your analysis because your

3    analysis stopped in October 2018; right?

4    **A.**    Correct.    That's what the count indictment noted.

5    **Q.**    Well, that's what part of the indictment said.    We saw two

6    different parts; right?

7    **A.**    Correct.

8    **Q.**    And you are aware that the AML BitCoin business extended

9    well beyond October 2018?

10   **A.**    I mean, I'm not sure it's well beyond, but that's my -- a

11   key part of my analysis ended in October 2018.

12   **Q.**    You saw bank records that went past October 2018, didn't

13   you?

14   **A.**    Yes, a little bit.

15   **Q.**    And did you give any attention to whether after the period

16   that you stopped looking in October of 2018, whether after that

17   period Mr. Andrade took steps to deliver more money into the

18   business?

19   **A.**    I was aware about the mortgage, as I noted in 2018 -- I

20   mean, 2019.    I'm sorry.

21   **Q.**    Okay.

22   **A.**    And the sale of the property -- of the other property.

23   **Q.**    The Corpus Christi property?

24   **A.**    Correct.

25   **Q.**    So you are aware that in 2019 Mr. Andrade mortgages --

1    mortgaged his home; correct?

2    **A.**    Correct.

3    **Q.**    And that after the debts were paid off, prepaid items,

4    closing costs, he deposited the vast majority of that amount

5    into his bank account at the Frost Bank, and then it went from

6    there to the ABTC Corporation, one of the -- the sort of new

7    name for the NAC Foundation; correct?

8    **A.**    Correct.

9    **Q.**    But you didn't include that in your testimony because you

10   cut things off at the end of October of 2018; correct?

11   **A.**    Because the noted period was October 2018 and the cashier

12   check was purchased at that point.

13   **Q.**    I did not ask you why.  I just asked if you didn't include

14   it.  And the answer to that is yes, you didn't include it;

15   correct?

16   **A.**    Correct.

17           **MR. SHEPARD:**  Can we, Ed, please put up for the

18   witness, the Court, and Government Exhibit 3338.

19   **Q.**    Okay.  Exhibit 3338 appears to be a bank record.  Have you

20   seen that bank record before?

21   **A.**    Yes.

22   **Q.**    And it was one of the bank records that the Government

23   gathered and is among the thousands of pages of bank records;

24   right?

25   **A.**    Correct.

1          MR. SHEPARD:  And I offer Exhibit 3338.

2          MR. CHOU:  No objection.

3          THE COURT:  3338 will be admitted.

4     (Trial Exhibit 3338 received in evidence.)

5     BY MR. SHEPARD:

6     Q.   And it shows money being wired in the amount of $320,000

7     from Mr. Andrade into the ABTC Corporation; right?

8     A.   Correct.

9     Q.   In all of your charts, you use the word "investor"; right?

10    A.   Correct.

11    Q.   And during your direct testimony, in response to a

12    question from Mr. Chou, you listed a number of exhibits that

13    you said supported what you were describing, and I was only

14    able to write down the first one, which was Exhibit 38.

15         MR. SHEPARD:  If we could get Exhibit 38.  I'm not

16    sure this one is in evidence, so just for the parties,

17    the Court, and the witness, please.

18         THE COURTROOM DEPUTY:  I show it is.

19         MR. SHEPARD:  It is in evidence?

20         THE COURTROOM DEPUTY:  38?  Yes.

21         MR. SHEPARD:  38.  Yes.

22         THE COURTROOM DEPUTY:  Show it to the jury then?

23         MR. SHEPARD:  Yes.  Thank you.

24    BY MR. SHEPARD:

25    Q.   So when Mr. Chou was asking you what exhibits you used to

1  support your identification of investor funds, this was one of

2  them; right?

3  **A.**   That's correct.

4  **Q.**   And it reflects you adding up -- or someone -- maybe not

5  you -- adding up money that came in from various people;

6  correct?

7  **A.**   Correct.

8  **Q.**   There's nothing about them -- about Exhibit 38 that

9  describes those people as investors; right?

10 **A.**   It noted post-ICO, so that's initial coin offering.  So

11 that, to me, is investors, since they -- and then it listed the

12 number of coins purchased.

13 **Q.**   Did you review the evidence of what documents the people

14 who purchased -- as reflected on Exhibit 38, did you review

15 what documents they signed before they obtained AML BitCoin

16 Tokens?

17 **A.**   Not in details, no.

18         **MR. SHEPARD:**  Okay.  Ed, can we put up Exhibit 2471,

19 which has been admitted.

20         And if we can go to page 4, paragraph 15 -- well,

21 actually, before we go to page 4, can you scroll through

22 pages -- just so the witness can see the rest of the document,

23 can you scroll through page 2 and 3?

24         I'm sorry.  Just slow down a little bit.  Back to page 2.

25 **Q.**   This is the terms and conditions for AML BitCoin Token

CHIU - CROSS / SHEPARD

1    sales.  Do you see that?

2    **A.**    Yes.

3            **MR. SHEPARD:**  And then, Ed, if we can go to page 4,

4    paragraph 15, and if you can highlight paragraph 15, please.

5    **Q.**    It says [as read]:

6            "You have not purchased and have no intention of

7        purchasing AML BitCoins and/or AML BitCoin Tokens for

8        investment purposes and You expect no return on

9        investment."

10       Right?

11   **A.**    That's what it says.

12   **Q.**    And those were the terms and conditions that purchasers

13   agreed to; correct?

14   **A.**    I'm not sure.

15   **Q.**    That's beyond your analysis?

16   **A.**    Correct.  This doesn't look like an agreement, so I don't

17   know.

18           **MR. SHEPARD:**  Let's move on, Ed, to Exhibit 3170, also

19   admitted into evidence.

20       Yeah, if we can go to page 45 and 46.

21   **Q.**    This is a -- the front page is a -- this is a collection

22   of purchase agreements which starts with this front page.  And

23   what we're going for is paragraph -- or page 45, which is a

24   copy of a purchase agreement, this one for a guy named Brian

25   Darling.  Do you see that?

**CHIU - CROSS / SHEPARD**

1    **A.**    Yes.

2    **Q.**    And did you review this at all?

3    **A.**    No.

4    **Q.**    Okay.  If you look at page 4 of this particular purchase

5    agreement, at paragraph (k) it says [as read]:

6            "Coin purchaser understands, acknowledges, and

7        agrees that it has not purchased the AML BitCoins for

8        investment purposes and expects no return on

9        investment."

10       Right?

11   **A.**    That's what it says.

12   **Q.**    And did you ever review the AML BitCoin white paper?

13   **A.**    Not in details.

14   **Q.**    But you did in a little bit, it sounds like?

15   **A.**    Probably I heard there exists, so I don't think I reviewed

16   it.

17   **Q.**    You didn't review it.  So you didn't determine whether it

18   also said you're not really making an investment; this isn't

19   really quite an investment.  Right?

20   **A.**    Correct.

21   **Q.**    By the way, do you have any expertise on what a typical

22   profit margin is in a cryptocurrency business?

23   **A.**    Probably not on cryptocurrency.

24   **Q.**    Okay.  If we go to Exhibit 1520-005, do you remember this?

25   This was the subject of your testimony on direct examination.

1    **A.**    Yes.

2    **Q.**    And you gave a helpful description of how you worked with

3    this blended average price to come up with the figure you used;

4    correct?

5    **A.**    Correct.

6    **Q.**    And as I understand it, that was the blended actual price

7    reflecting the value of what you have reported as incoming

8    cryptocurrency as of approximately the date it came in;

9    correct?

10    **A.**    Most of the time it's the same date because if the page

11    has all the same date, then I pulled the price for that date.

12    If there's multiple dates, I pulled the price with the majority

13    of that date.

14    **Q.**    And the value of cryptocurrency has been quite volatile;

15    correct?

16    **A.**    Yes.

17    **Q.**    And so in terms of how much value actually was able to be

18    used, that would depend on when and if the cryptocurrency was

19    turned into regular United States or other company [sic]

20    currency; correct?

21    **A.**    Correct.

22    **Q.**    And you don't know when or if that happened; correct?

23    That is, the conversion of cryptocurrency into what

24    cryptocurrency people call Fiat currency.  You don't know when

25    that happened; right?

1    **A.**    Correct.  I only know when it was used to purchase the

2    AML, and I used that price.

3    **Q.**    One thing you -- your charts demonstrated was that

4    Mr. Andrade had a lot of bank accounts; right?

5    **A.**    He has a few.

6    **Q.**    I'm sorry.  He has?

7    **A.**    He has a few.

8    **Q.**    He has a few.  Well, he has more than a few, doesn't he?

9    **A.**    Depends on how you define "few."

10   **Q.**    Well, let's define.

11          **MR. SHEPARD:**  If we could put up Appendix 1 shown

12   earlier today.

13          That's Appendix 1a.  I'll get there, but there's also an

14   Appendix 1.  Keep 1A handy, but start with Appendix 1, if we

15   can.

16   **Q.**    Okay.  Math is a little beyond me.  Addition, I can

17   sometimes -- I can sometimes count, and I count 21 accounts on

18   Appendix 1; correct?

19   **A.**    13 plus 8, 21, yes.

20   **Q.**    That's more than a few; right?

21   **A.**    I have seen more, so that's why.  In my cases, there is a

22   wide variety of accounts.

23   **Q.**    Well, this is -- this is a business that I think you

24   tracked -- I don't know -- $7 1/2 million into over a period of

25   2014 to 2018, four years or so?

CHIU - CROSS / SHEPARD

1  **A.**    Yes.

2  **Q.**    And there were 21 accounts that you showed on Appendix 1.

3  And then there was an Appendix 1a; right?

4  **A.**    That's correct.

5  **Q.**    And those were a bunch of other accounts that you thought

6  were small enough that you didn't need to include in your

7  analysis; right?

8  **A.**    Yes.  That's standard practice.

9  **Q.**    I'm sorry?

10  **A.**    That's standard practice.

11  **Q.**    Oh, I'm not criticizing the fact that you didn't go past

12  21 accounts.  But you left out a number of other accounts that

13  Mr. Andrade had; right?

14  **A.**    Correct, but they're listed in the report.

15  **Q.**    Yes.  They're listed in --

16  **A.**    Correct.

17  **Q.**    -- Appendix 1a, which we now have on the screen.

18      And that's 19 more accounts that he had; right?

19  **A.**    Correct.

20  **Q.**    Okay.  You had a chart, Exhibit 1520-009, and I just want

21  to ask you some follow-up questions about that.

22      So thank you for getting that back on the screen.

23      And the incoming money from Mr. Benjamin Boyer you've

24  listed here as $730,000; correct?

25  **A.**    That's one of his many wires.

1    Q.    Yes.  And you have on Exhibit 1520-10 --

2          If we could get that one up; it's also in evidence.

3          In 1520-10, there were actually -- there was a $730,000

4    wire, followed, it looks like later that same day, by another

5    wire from Mr. Boyer in the amount of $120,000; correct?

6    A.    That's correct.

7    Q.    So totaling $850,000?

8    A.    Correct.

9          MR. SHEPARD:  And if we can look at Exhibit 3161 just

10   for the parties, the Government, and the Court for now.

11   Q.    Ms. Chiu, have you seen Exhibit 3161 before?

12   A.    No.

13   Q.    And that's because you haven't reviewed Mr. Ruzicka's

14   financial records; correct?

15   A.    That's correct.

16         MR. SHEPARD:  So let's take that down, Ed.

17         Okay.  I guess we can put it back up because it is in

18   evidence.

19         THE COURTROOM DEPUTY:  It is.

20         MR. SHEPARD:  Yeah.

21   Q.    And this is some evidence that it sounds like you didn't

22   consider because you didn't look at anything from Mr. Ruzicka's

23   materials; correct?

24   A.    When you say I didn't consider, in terms of considering

25   this email?  Because I just -- I followed the bank

CHIU - CROSS / SHEPARD

1  transactions.

2  **Q.**   Okay.  And this was a tracking for Mr. Ruzicka from David

3  Salmon.  You recognize that name; right?

4  **A.**   Correct.

5  **Q.**   Because money would come in from purchasers to

6  Mr. Salmon's account; he would make sure that the purchaser

7  actually received their tokens; and then he would release the

8  money to NAC; correct?

9  **A.**   I'm actually not sure that's the role of David Salmon.

10 **Q.**   Okay.  You didn't inquire into why the money first went to

11 David Salmon's account and then to NAC?

12 **A.**   I was -- I know that it was opened to obtain those funds

13 and then subsequently transferred to one of the NAC Foundation

14 accounts or NAC Payroll.

15 **Q.**   Okay.  But you didn't look into why the money first went

16 to him and then on to NAC; right?

17 **A.**   I know he was hired by Mr. Andrade.

18 **Q.**   Okay.  That's not my question.  My question is:  You don't

19 know why it was that the money went first to him and then to

20 NAC; correct?

21 **A.**   Correct, I don't know why.

22 **Q.**   Okay.  And so Mr. Salmon is sending to Mr. Ruzicka in

23 Exhibit 3161 sort of a description of the disbursements that

24 followed Mr. Boyer's $850,000 purchase and the wire transfer in

25 support of that; right?

CHIU - CROSS / SHEPARD

1    **A.**    Okay.  Sorry.  Can you repeat the question again?

2    **Q.**    Well, maybe I'll just keep moving along.

3            **THE COURT:**  Actually, at this point, how much more

4    time do you have with this witness?

5            **MR. SHEPARD:**  I've got this topic and one other topic

6    that will take a little bit, and then I hope to be done.  But

7    I've got a little more, so...

8            **THE COURT:**  Okay.  Well, we'll go ahead and take the

9    second break.

10           Members of the jury, remember my admonitions.  Do not

11   discuss this amongst yourselves or with anyone else.

12           And we'll come back at 12:30.

13                    (Recess taken at 12:16 p.m.)

14                (Proceedings resumed at 12:31 p.m.)

15       (Proceedings were heard in the presence of the jury.)

16           **THE COURT:**  The jury is prevent.

17           And you may proceed, Mr. Shepard.

18           **MR. SHEPARD:**  Thank you, Your Honor.

19           I think when we left off, we were looking at Exhibit 3161.

20   If we can get that one back.

21   **Q.**    And in terms of the -- let me -- I'll come back to that.

22           This exhibit shows that the majority of the money that

23   came in from Mr. Boyer went to the NAC Foundation but that some

24   went to Craft Media, $95,000; right?

25   **A.**    (Witness examines document.)

CHIU - CROSS / SHEPARD

1  Q.    It's on the third -- the third line.  I'll just read it

2  then.

3  A.    Okay.

4  Q.    [As read]:

5          "Out of this" --

6      This is David Salmon writing to Karl Ruzicka and saying

7  [as read]:

8          "Thanks for the $850,000 authorization."

9  A.    Correct.

10 Q.    And then [as read]:

11         "Out of this disbursement authorization, the

12      following transactions are going to take place."

13     And one of them is a wire transfer to Craft Media/Digital

14 for $95,000; right?

15 A.    Correct, but I don't know if they are con- -- like, if

16 this 850 paid for that 95.  I see there's an 850 authorization,

17 and then I see a wire transfer out on February 1st, 2018.

18 Q.    Yes.  And it says [as read]:

19         "Out of this second disbursement authorization,

20      the following transactions have or will by the end of

21      the day take place."

22     Correct?

23 A.    Correct.

24 Q.    Okay.  And then, in addition to the one to

25 Craft Media/Digital, there's also a cashier's check used to pay

CHIU - CROSS / SHEPARD

1   legal fees to DS & Associates.  That's going to be David

2   Salmon; right?

3   **A.**   I don't know.

4   **Q.**   Okay.  But this says there's going to be a cashier check

5   for legal fees to DS & Associates; right?

6   **A.**   That's what it says.

7   **Q.**   And so in Exhibit 1520-009, you tracked the first of the

8   two Ben Boyer deposits and not the second Ben Boyer deposit,

9   the two that were made both on January 12 of 2018 as reflected

10  in Government Exhibit 1520-10; correct?

11  **A.**   No.  I tracked all of his wire transfer.  It's part of

12  that 2.5 bubble on top.

13  **Q.**   Okay.  You tracked them all, but what you displayed on

14  this screen did not include the money that went -- and by

15  "screen," I mean 1520-009 -- you did not show that some of the

16  money went to Craft Media and some of the money went to David

17  Salmon; correct?

18  **A.**   I'm -- you mean individual expenses?  I was tracking money

19  from one account to the -- money transfer from one account to

20  the other.  That was the purpose.

21  **Q.**   Well, in 1520-009, you did not only track money that went

22  from one account to another, did you?

23        **MR. SHEPARD:**  If you can, yeah, put it...

24  **Q.**   You also tracked money going to purchases of property for

25  Mr. Andrade and purchases of a vehicle; right?

CHIU - CROSS / SHEPARD

1   **A.**    That's correct.

2   **Q.**    And my point or my question was:  You didn't track the

3   money from the Boyer payment that went to payment of expenses

4   like expenses to Craft Media and expenses to David Salmon, one

5   of his lawyers; correct?

6   **A.**    I don't know if it would be from Boyer's payment, but it's

7   not shown here.  That's -- if that what's you're --

8   **Q.**    Yes.  It's not -- you didn't track that and include it on

9   Exhibit 1520-009; correct?

10  **A.**    Correct, it's not displayed here.

11  **Q.**    Okay.  And, by the way, while we have that still up,

12  before we take it down, the vehicle that's circled on this

13  chart --

14  **A.**    Yes.

15  **Q.**    -- did you follow up to see when it was sold?

16  **A.**    That, I did not.

17  **Q.**    Okay.  Or whether money was used from car sales to pay,

18  say, Evan Carlsen?  You don't know?

19  **A.**    No.

20  **Q.**    In your -- just look at 1520-007.  We've looked at that

21  one before at the beginning of the examination.  I just wanted

22  to come put it back on the screen to ask a different set of

23  questions about it.

24      This is a chart that displays a time period from July 2017

25  to October 2018; right?

1    A.    That's correct.

2    Q.    And you've sort of lumped all the expenses from that

3    period, broken down a little bit in terms of July to September,

4    and October to December, and then January to October, you've

5    lumped those three different periods together --

6    A.    Correct.

7    Q.    -- right?

8          And I want to focus on the January to October 2018 period.

9    That's like ten months; right?

10   A.    Correct.

11   Q.    A lot of different things happened over a ten-month

12   period; right?

13   A.    Could be.  Could not be.

14   Q.    And so I want to break that down a little with you.

15         In terms of your tracking of the evidence in this case,

16   were you advised that on January 13, 2018, Mr. Japheth Dillman

17   of Block Bits Capital placed an order for 50 million

18   AML BitCoin Tokens?

19   A.    No.

20         **MR. SHEPARD:**  If we can put up Exhibit 3047, which is

21   in evidence.

22   Q.    You have -- have you seen this before?

23   A.    No.

24   Q.    Well, it shows Mr. Dillman's order for $50 million worth

25   of AML BitCoin; right?  That would be at the -- toward the

1    bottom of the page in the email from Japheth Dillman [as read]:

2            "Block Bits is putting in an order for

3        $50 million worth of AML BitCoin."

4        And it was on January 13th, 2018; correct?

5    **A.**   That's what the email said.

6    **Q.**   Okay.  And the majority of the $1.6 million that appears

7    on Exhibit 1520-006 that we were just looking at, the majority

8    of that was from the purchase of the property in Corpus Christi

9    and the purchase of Mr. Andrade's home; correct?

10   **A.**   You mean the use of that fund?

11   **Q.**   The majority of the 1.6 million was those two items;

12   right?

13   **A.**   Yes.  1 million of it.

14   **Q.**   And did you track when Mr. Andrade entered into contracts

15   to purchase the home and the property in Corpus Christi?

16   **A.**   I know when it was settled.

17   **Q.**   I appreciate your sharing that, but my question is:  Did

18   you track when he entered the contracts to do those two

19   transactions?

20   **A.**   No.

21           **MR. SHEPARD:**  Let's put up Exhibit 3209 just for

22   the Court, the parties, and the witness, please.

23   **Q.**   In the course of -- it sounds like you did some review of

24   records relating to the transaction in which Mr. Andrade

25   purchased his house.  Did you see Exhibit 3209?

**CHIU - CROSS / SHEPARD**

1  **A.**   I may came across it.

2  **Q.**   Well, does it look like one of the documents that you

3  reviewed?

4  **A.**   It could be.  There were -- the production was, like,

5  hundreds and thousand pages.

6  **Q.**   Yes.

7        **MR. SHEPARD:**  Can we just -- let's see.  We can go to,

8  Ed, please, 3209-12.

9  **Q.**   Did you look at that page?  Do you remember seeing that?

10  It's got the date that the contract was entered to purchase the

11  home.

12  **A.**   I don't remember specifically this page, but yeah.

13  **Q.**   But you do remember the document?

14  **A.**   It's -- if it's part of the production, yes.

15        **MR. SHEPARD:**  I offer 3209, Your Honor.

16        **MR. CHOU:**  Objection.  Foundation.  Hearsay.  It

17  appears to be an uncertified record.

18        **THE COURT:**  Sustained.

19  **BY MR. SHEPARD:**

20  **Q.**   Ms. Chiu, this was one of the documents that

21  the Government provided to you; correct?

22  **A.**   Can you tell me which entity?  I mean, I don't even know

23  which entity produced this document.

24  **Q.**   I don't think I know from this copy of the document.  But

25  it was one that you reviewed and relied upon; correct?

CHIU - CROSS / SHEPARD

1    **A.**    I review a lot of documents, so I don't know where this

2    particular is from.

3    **Q.**    Okay.  So did you determine as part of your analysis when

4    Mr. Andrade contracted to purchase the home?

5    **A.**    No, because I looked at the --

6    **Q.**    Okay.

7    **A.**    Oh.

8    **Q.**    "No" is the answer.  You didn't -- you didn't determine

9    that?

10    **A.**    I didn't take when he entered the contract.  I take when

11    he settled.

12    **Q.**    I'm sorry.  You said you looked at when he did what?

13    **A.**    Settle, meaning --

14    **Q.**    When he settled.

15    **A.**    -- the payment of the property.

16    **Q.**    I understand.  Okay.  Thank you.

17         And is the same true for the Corpus Christi property?

18         Let's take a look at 3211.  Have you seen this document

19    before?

20    **A.**    Was this produced -- do you know the entity that produced

21    this document?

22    **Q.**    Can you tell me if you've seen it before?

23    **A.**    Not sure since --

24    **Q.**    Okay.

25         Okay.  Did you track when Mr. Andrade entered into a

1    contract to purchase the house -- I'm sorry -- the property in

2    Corpus Christi?

3    **A.**    No.  I -- again, I track when they settled.

4    **Q.**    Okay.  So you don't have any reason to dispute that he

5    entered into the contract to buy the house and entered into the

6    contract to purchase the property in Corpus Christi after he

7    was told that Mr. Dillman was going to buy $50 million worth of

8    AML BitCoin?

9    **A.**    I would have no idea.

10           **MR. SHEPARD:**  If I may have just one moment,

11   Your Honor.

12           **THE COURT:**  Yes.

13                        (Pause in proceedings.)

14           **MR. SHEPARD:**  Thank you for your patience, Ms. Chiu.

15   I don't have anything further.

16           **THE WITNESS:**  Thank you.

17           **THE COURT:**  Mr. Chou?

18                    <u>**REDIRECT EXAMINATION**</u>

19   BY MR. CHOU:

20   **Q.**    Just briefly, Ms. Chiu.

21           **MR. CHOU:**  First, just as a housekeeping matter, the

22   Government would renew its motion to admit Exhibit 1520 as a

23   summary exhibit under 1006 and also to admit the poster board,

24   which is just a duplicate of the tracing chart.

25           **THE COURT:**  Okay.  You had indicated conditional --

 1          **MR. SHEPARD:**  Yes.  And I think that some of the

 2    cross-examination reflects potential inaccuracies in the chart,

 3    starting with titles and running into some of the data.

 4          **THE COURT:**  Well, you can certainly argue those points

 5    to the jury, but I will admit the --

 6          And the number again is?

 7          **MR. CHOU:**  I believe it's 1520, Your Honor.  And the

 8    other exhibits the Government mentioned I don't believe drew an

 9    objection.  So it was just 1520, being the slide deck, as well

10    as the duplicate of the tracing page, which is printed on that

11    board over there.

12          **THE COURT:**  All right.  And you can go ahead and show

13    the board.  Make sure, though, that the defense can see it.

14          Have you seen this board?

15          **MR. SHEPARD:**  My understanding -- I have not, but my

16    understanding is it's just a blowup of the chart that we were

17    looking at.

18          **THE COURT:**  Yes.

19          **MR. SHEPARD:**  So I don't have any objection to it.

20          **THE COURT:**  Okay.  Very good.

21          So you can go ahead and put that up.

22          Admitted.

23          (Trial Exhibit 1520 received in evidence.)

24    **BY MR. CHOU:**

25    **Q.**  Ms. Chiu, do you remember when counsel asked you a number

CHIU - REDIRECT / CHOU

 1  of questions about your disclosures and schedules and how they

 2  claimed they didn't receive certain materials?

 3  **A.**   Correct.

 4  **Q.**   Did you produce to the Government for the defense a

 5  financial report a few months ago, a first draft of that?

 6  **A.**   Yes.

 7  **Q.**   And have you produced subsequent updated versions as well?

 8  **A.**   Correct.

 9       **MR. CHOU:**   In addition, if we can turn -- publish

10  Exhibit 1520, the very last page of that presentation.

11       Please zoom in on the annotations content.

12  **Q.**   Did you also produce to the Government for the defense a

13  series of sources that you used to form the basis of your

14  opinions?

15  **A.**   Yes.

16  **Q.**   And have you updated those sources over the past few

17  months and included the exhibit numbers that were marked for

18  trial?

19  **A.**   That's correct.

20       **MR. CHOU:**   We can please turn to -- we can just take

21  this down for a moment.

22  **Q.**   Counsel asked you a number of questions or a couple of

23  questions about how business expenses -- that business expenses

24  came out of Mr. Andrade's personal accounts.  Do you recall

25  that?

1    **A.**    Yes.

2    **Q.**    Did personal expenses also come out of Mr. Andrade's

3    business accounts?

4    **A.**    Yes.

5    **Q.**    What were some of the personal expenses, based on your

6    training and experience, that came out of Mr. Andrade's

7    business accounts?

8    **A.**    I remember the car, that was the F-250, that was under

9    Mr. Andrade's name -- that was purchased under Mr. Andrade's

10   name.  There were some retail purchases.  Maybe a certificate

11   of deposit also, which is $50,000, and then it was under

12   Mr. Andrade and his wife's name.

13   **Q.**    Let's next talk about the individuals bucket of payments.

14   Do you remember that?

15   **A.**    Yes.

16        **MR. CHOU:**  Could we please pull up 1520 again, and

17   I think it's probably page 4.

18   **Q.**    Do you see the "Individuals" category over fourth from the

19   left?

20   **A.**    Yes.

21   **Q.**    Counsel earlier asked you a number of questions, asking

22   you to recall from your memory individual names and whether you

23   had included those in this chart.

24   **A.**    Yes, I remember.

25   **Q.**    If you saw in the bank statements or financial records a

CHIU - REDIRECT / CHOU

1  person's -- a name you didn't recognize, where would you slot

2  them into this table, if anywhere?

3  **A.**  I would put them in "Individual."  That's why I call it

4  "Individual," since I wasn't sure, and they're payments to

5  individuals' names, so "Employee/Individuals."

6  **Q.**  Are there any individuals you saw that you chose to

7  selectively just leave out?

8  **A.**  Leave out, no.  If -- let's say, Richard Naimer, I know

9  they were associated with CrossVerify, I put it in the

10  CrossVerify bucket.

11  **Q.**  Understood.

12      But you didn't exclude anybody from this list of

13  expenditures here?

14  **A.**  That's correct.

15  **Q.**  Counsel asked you about some events and mortgages that

16  happened in 2019.  Do you recall that?

17  **A.**  Yes.

18  **Q.**  Did the FBI execute its search on Mr. Andrade's office in

19  September of 2018?

20  **A.**  Yes.

21  **Q.**  Were those mortgages that -- and other transactions that

22  defense counsel was referring to, did those take place before

23  or after that September 2018 FBI search?

24  **A.**  It's after, since the mortgage was September 2019.

25  **Q.**  So a year after?

1   **A.**   Correct.

2   **Q.**   In addition, was a federal grand jury subpoena served on

3   Mr. Andrade's business in June of 2019?

4   **A.**   I don't remember the exact date.

5   **Q.**   Earlier defense counsel showed you a number of snippets

6   from documents that claim to be terms of service or purchase

7   agreements.  Do you remember that?

8   **A.**   Yes.

9   **Q.**   Do you have any idea how long those documents are or how

10  deeply those clauses are put inside those documents?

11  **A.**   From the scrolling, it seems to be multiple pages.

12  **Q.**   Earlier --

13          **MR. CHOU:**  If we could scroll to page 5, please, the

14  next page.

15  **Q.**   Counsel asked you questions about cryptocurrency

16  valuation.  Do you remember that?

17  **A.**   Yes.

18  **Q.**   Do you remember counsel asked you whether -- you knew

19  whether or not any of this cryptocurrency had been sold,

20  disposed of, or otherwise realized into cash?

21  **A.**   Yes.

22  **Q.**   This 2.8 million number assumes valuation at -- roughly at

23  the time of October 2017 through February 2018?

24  **A.**   Correct.

25  **Q.**   Did you estimate how much this cryptocurrency would be

1  worth today if it had never been sold at that time?

2  **A.**    Yes.  I took the most recent -- well, the February 19

3  closing date and just multiplied the number with the closing

4  costs or price on February 19, 2025, and it's upwards of

5  12 million.

6  **Q.**    12 million U.S. dollars?

7  **A.**    That's correct.

8  **Q.**    And why didn't you include that on this slide?

9  **A.**    Because those coins were purchased at those time, so

10  that's why I included just the value when it was purchased into

11  the AML BitCoin.

12  **Q.**    Did you want to be conservative?

13  **A.**    Yes.

14  **Q.**    Earlier counsel asked you about some of the other bank

15  accounts that Mr. Andrade had.  Do you remember that?

16  **A.**    Yes.

17  **Q.**    And he showed you what you've titled Appendix 1a produced

18  to the defense but marked as Exhibit 1518?

19  **A.**    Correct.

20          **MR. CHOU:**  Could we show the witness 1518.

21      And at this time, the Government moves to admit 1518.

22          **MR. SHEPARD:**  No objection.

23          **THE COURT:**  1518 will be admitted.

24      (Trial Exhibit 1518 received in evidence.)

25  \\\

1    BY MR. CHOU:

2    Q.    And, Ms. Chiu, just briefly, could you explain what this

3    chart shows and why it's not included in those tables that we

4    saw earlier?

5    A.    Yes.  I review all these statements, and I excluded them

6    because their inflow or the activity in the account is not very

7    significant.  It's minimal activities.

8         For example, the first row for Bank of America, the date

9    it was opened, August 2014, and closed in September 2014, with

10   only a hundred dollars in and out of the account.  So I did not

11   include those.

12        And I reviewed the bank statements for each of these, and

13   then I sum up the inflows and outflow, and they total around

14   $60,000.  And that accounted only for 0.2 percent of all the

15   total dollar amount I review for all the bank accounts.  So

16   it's deem immaterial, minimal activity.

17            MR. CHOU:  We can take this down, please.

18   Q.    Shifting gears, do you recall counsel's questions about

19   certain transactions pertaining to Mr. Dillman and promises

20   that Mr. Dillman may have made to Mr. Andrade?

21   A.    Yes.  An email he showed.

22   Q.    Do you -- do you happen -- do you know at all what

23   communications were between Mr. Andrade and Mr. Dillman that

24   were of a -- that were pertaining to transactions between them?

25   A.    No.

1    Q.   Your analysis just pertains to bank records; right?

2    A.   Correct.  I follow the money.

3    Q.   Counsel asked you a number of questions about the tracing

4    chart, which is up on the easel there and also one of the pages

5    in the summary exhibits.  Remember that?

6    A.   Yes.

7         MR. CHOU:  Could we please pull up that chart.

8    I believe it's probably page 7 or 8.  Excuse me.

9    Q.   And counsel asked you a number of questions about Ben

10   Boyer's other investments.  Remember that?

11   A.   Oh, yes.

12   Q.   Why does the blue bubble on the left focus in on one

13   particular wire from Ben Boyer in the amount of 730,000, dated

14   January 12th, 2018?

15   A.   Because that was the wire that was described in Count One

16   of the indictment.

17   Q.   And does this chart show all of the investor money that

18   came into the AML BitCoin project?

19   A.   No.  As I noted in the earlier chart, for just the AML

20   period, it was 5.5 million, and this shows 730 plus the 2.5.

21   So it's a snapshot of the activities through these accounts.

22   Q.   And when you traced -- so the arrows in between, those are

23   less than the total investment that came in that we saw in the

24   other charts?

25   A.   Correct.

CHIU - RECROSS / SHEPARD

1    Q.    Just one last thing.  For the cashier's check in the upper

2    right, that's what's described in Count Two of the indictment?

3    A.    That's correct.

4    Q.    When you traced the subset of investor money described in

5    this slide, what percent of that investor's -- of that

6    cashier's check was bought with AML token investor money?

7    A.    A hundred percent.

8             MR. CHOU:  One moment, please.

9                     (Pause in proceedings.)

10            MR. CHOU:  Nothing further.

11            THE COURT:  Anything further?

12            MR. SHEPARD:  Yes, Your Honor.

13                     RECROSS-EXAMINATION

14    BY MR. SHEPARD:

15    Q.    So Mr. Chou established on redirect that he made -- that

16    he made personal expenses out of his business accounts; right?

17            THE COURT:  Mr. Andrade you're speaking of?

18            MR. SHEPARD:  Yes, that Mr. -- yeah.  No, Mr. Chou did

19    not.  Maybe he did.

20                     (Laughter.)

21            MR. SHEPARD:  I don't know for sure, but I assume not.

22    Q.    That Mr. Chou established by asking you questions that

23    Mr. Andrade had made personal expenses out of his business

24    account?

25    A.    Correct.

1   **Q.**   But you had actually already illustrated that earlier in

2   your exhibits; right?  Calling out the car purchase, for

3   example?

4   **A.**   Correct.

5   **Q.**   And so really what we now know is that he made business

6   expenses out of his personal account and personal expenses out

7   of his business accounts.  So his accounts were all messed up;

8   right?

9   **A.**   There is some commingling.

10  **Q.**   And Mr. Chou asked you some questions about the current

11  value of various cryptocurrencies.  You don't have any evidence

12  that Mr. Andrade still has those cryptocurrencies, do you?

13  **A.**   I don't know what happened to them.

14  **Q.**   And Mr. Chou showed the end of your report, which refers

15  to various sources of your data, including the many thousands

16  of pages of bank records; right?

17  **A.**   Yes.

18  **Q.**   But none of those sources that were listed there were

19  schedules of things like how you came up with the $1.6 million

20  that you say Mr. Andrade took out of business accounts, put

21  into personal accounts in the January to October 2018 time

22  period; correct?

23  **A.**   They're derived from those because they're the underlying

24  documents that were admitted.

25  **Q.**   Your schedules were derived from thousands of pages --

CHIU - RECROSS / SHEPARD

1    **A.**    Mm-hmm.

2    **Q.**    -- but you didn't produce the schedules; right?

3    **A.**    Correct.

4    **Q.**    So we have no way to check your numbers.  We tried, but we

5    have no way to do it because we don't have your schedules;

6    right?

7    **A.**    You have the underlying bank records.

8    **Q.**    Yes.  But we can't check your schedules without having

9    your schedules; right?

10   **A.**    I mean, they could be recalculated using the bank records

11   because that's exactly what my schedules are from.

12   **Q.**    And you saw we tried to do that; right?  That's the piece

13   of paper I showed you earlier; right?

14   **A.**    Correct.

15   **Q.**    Right.  And you -- you're obviously a very experienced

16   accountant.  Accountants produce schedules so that they can be

17   checked; right?

18   **A.**    Correct.

19          **MR. SHEPARD:**  Nothing further.

20          **THE COURT:**  You may step down.

21          **THE WITNESS:**  Thank you.

22                    (Witness excused.)

23          **MR. WARD:**  The Government calls IRS Special Agent

24   James Carfora.

25    (Witness enters the courtroom and steps forward to be sworn.)

```
 1              THE COURT:  If you could come forward, please, to be

 2     sworn.

 3              THE COURTROOM DEPUTY:  Please raise your right hand.

 4                        JAMES CARFORA,

 5     called as a witness for the Government, having been duly sworn,

 6     testified as follows:

 7              THE WITNESS:  Yes.

 8              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

 9         State your name and spell your last name, please.

10              THE WITNESS:  James Carfora, C-a-r-f-o-r-a.

11                        DIRECT EXAMINATION

12     BY MR. WARD:

13     Q.   Good afternoon, Agent Carfora.

14          Where do you work?

15     A.   I work for IRS's Criminal Investigation Division.

16     Q.   And how long have you worked for the IRS Criminal

17     Investigations Division?

18     A.   Almost 17 years.

19     Q.   What's your position?

20     A.   I'm a special agent.

21     Q.   What types of crimes generally do you investigate in this

22     position?

23     A.   We investigate potential and alleged violations of the

24     Internal Revenue Code and related financial statutes, such as

25     securities fraud, wire fraud, money laundering.
```

CARFORA - DIRECT / WARD

1  Q.   Do you investigate cases -- fraud cases involving

2  businesses?

3  A.   Yes.

4  Q.   Do you investigate and have you investigated cases

5  involving cryptocurrencies?

6  A.   Yes.

7  Q.   And approximately how many of your cases have involved

8  investigations into one type of money laundering or another?

9  A.   I've been involved as a primary or support investigator in

10 several hundred individuals and business entities involved in

11 money laundering cases.

12 Q.   Okay.  Do you have an undergraduate degree?

13 A.   Yes.

14 Q.   What was your major?

15 A.   Accounting.

16 Q.   Do you have a graduate degree?

17 A.   Yes.

18 Q.   In what?

19 A.   I have a Master's of Business Administration in finance.

20 Q.   Master's of Business Administration in finance?

21 A.   Yes.

22 Q.   Have you received specialized training during your

23 17 years at the IRS?

24 A.   Yes, I have.

25 Q.   Did you receive a new agent training?

CARFORA - DIRECT / WARD

1  **A.**    Yes.  I received special agent basic training at the

2  Federal Law Enforcement Training Center.

3  **Q.**    How long was that training?

4  **A.**    A little over six months.

5  **Q.**    And as part of that, describe generally the training you

6  received that's relevant to the testimony you're going to

7  provide today?

8  **A.**    So there's a basic law enforcement academy and then

9  there's specialized training in tax investigations and

10  financial crimes.

11  **Q.**    Did part of that investigation -- part of that training

12  include investigations into money laundering?

13  **A.**    Yes.

14  **Q.**    And did part of that training include investigations into

15  business fraud?

16  **A.**    Yes.

17  **Q.**    Did you later in your career at the IRS receive advanced

18  training?

19  **A.**    Yes.

20  **Q.**    In what topic?

21  **A.**    I've received several advanced trainings in the areas of

22  money laundering and cryptocurrency investigations.

23  **Q.**    All right.  For the money laundering training, describe

24  this advanced training that you took.

25  **A.**    In the basic academy, you receive sort of a

CARFORA - DIRECT / WARD

1  familiarization course with money laundering.  The advanced

2  training goes into various types of money laundering

3  techniques; some more simplistic, some more sophisticated.

4  Q.   And this advanced money laundering training, how long was

5  that training period or training program?

6  A.   I've gone through several, so they vary in length, but I'd

7  say the most recent one I took was a week long.

8  Q.   All right.  And do you have a specialist designation at

9  the IRS because of this advanced training that you've taken?

10  A.   Yes.

11  Q.   Do you currently teach or train other agents in money

12  laundering investigations?

13  A.   Yes, I do.

14  Q.   Do you advise other IRS agents and other federal agents on

15  their investigations into money laundering?

16  A.   Yes.

17  Q.   Do you advise prosecutors on their prosecutions and

18  investigations into money laundering?

19  A.   Yes.

20  Q.   Have you provided trial testimony before?

21  A.   Yes, I have.

22  Q.   Are you familiar with the federal money laundering -- the

23  federal criminal money laundering statutes?

24  A.   Yes.

25  Q.   And does that include specifically 18 U.S.C. 1956?

1    A.    Yes.

2              MR. WARD:    Your Honor, at this point the Government

3    would move to certify Agent Carfora as an expert in criminal

4    money laundering statutes and investigations.

5              MR. SHEPARD:    No questions.    No problem.

6              THE COURT:    He will be so designated.

7    BY MR. WARD:

8    Q.    Agent Carfora, starting at a high level, what's money

9    laundering?

10   A.    From a high level, money laundering is the process in

11   which someone engaged in criminal activity and making money

12   from criminal activity would make that money appear to be from

13   a legitimate source.

14   Q.    Is money laundering common in fraud cases?

15   A.    Yes.

16   Q.    There are two general -- how many general categories of

17   money laundering are there?

18   A.    There are two general categories of money laundering.

19   Q.    And what are they?

20   A.    The first is concealment money laundering, and the second

21   is promotional money laundering.

22   Q.    I want to focus on concealment money laundering.

23         What, in general, is concealment money laundering?

24   A.    Concealment money laundering is the process by which a

25   series of financial transactions are conducted in an effort to

CARFORA - DIRECT / WARD

1    hide the true source, nature, location, control, or ownership

2    of the proceeds of crime, of the money that is made from

3    committing crimes.

4    **Q.**    Are there general steps in the process of conducting

5    concealment money laundering?

6    **A.**    Yes.

7    **Q.**    And what are they in general?

8    **A.**    So there's three phases.

9         The first phase is the placement phase.  This is the phase

10   where the proceeds of crime are placed into the financial

11   system, and that can be accomplished in a numerous of -- a

12   number of ways, such as the deposit of cash into a financial

13   system or a check into a financial bank account or investment

14   account.  It could also be that the money is already in a bank

15   account and is then transferred to an account that's involved

16   in the money laundering process.

17   **Q.**    All right.  After the placement stage, what is the next

18   general stage in concealment money laundering?

19   **A.**    Yeah.  The second phase is called layering.  Layering is

20   the movement of funds through a series of financial

21   transactions in an attempt to hide where the funds came from

22   and who controls the funds.

23   **Q.**    And when you use the term "layering of funds," describe

24   what that means, to layer funds?

25   **A.**    So there's numerous ways that the layering process can

CARFORA - DIRECT / WARD

1    occur.  An easy way to understand this would be funds are

2    placed into an account that's involved in the money laundering

3    process in the placement phase; and then in the layering phase,

4    a series of wire transfers occur from account to account to

5    account, making it difficult to trace the money back to its

6    original point of origin.

7    **Q.**   Thank you.

8         And then what's the final stage in concealment money

9    laundering?

10   **A.**   The final stage is called integration.  Integration is

11   where the funds arrive at their destination, whether that be a

12   bank account, a check, or withdrawal back in cash, conversion

13   to cryptocurrency, whatever their final destination is.  And

14   then they are brought together with -- could be brought

15   together with other funds and then eventually for use -- made

16   available for use.

17   **Q.**   And what do you mean by "made available for use"?

18   **A.**   Once the integration occurs, generally, people who are

19   committing these types of frauds and crimes want to use the

20   funds, so they want to use it to purchase properties or assets

21   or, you know, vehicles or high-end jewelry, things like that.

22   **Q.**   You mentioned moving money from account to account as one

23   of the ways to conceal -- engage in concealment money

24   laundering.  Are there other ways in which you can engage in

25   concealing the transactions?

1    **A.**    Sure.  You can take out loans.  You can fail to file

2    financial reports or reports that are required to go to

3    the government, fail to file tax returns.  Those are different

4    ways that you can try to conceal the activity that you're

5    conducting.

6    **Q.**    All right.  Agent Carfora, I want to turn to the specific

7    facts of the case.

8        Generally, what did you review to prepare for your

9    testimony today?

10   **A.**    So I reviewed the indictment.  I reviewed Analyst Chiu's

11   report.  I reviewed several bank statements from different

12   accounts that were involved in this investigation.

13        **MR. WARD:**  If we could pull up Exhibit 1520.

14   I believe it's page 9.

15   **Q.**    Agent Carfora, turning your attention to this slide here,

16   I want to focus first on the box that says "NAC Payroll

17   Services."

18        Did you review Analyst Chiu's financial report related to

19   the NAC Payroll Services bank account?

20   **A.**    Yes.

21   **Q.**    And what was the primary source of income to this account?

22   **A.**    Investor funds.

23   **Q.**    And do you remember approximately how much of the money

24   that went into this account during the time period Analyst Chiu

25   analyzed it were investor funds?

CARFORA - DIRECT / WARD

1    **A.**    I believe it was about 90 percent.

2    **Q.**    And did you look at the withdrawals and transfers out of

3    this account?

4    **A.**    Yes.

5    **Q.**    What was the largest set of transfers out of this account

6    according to Ms. Chiu's report?

7    **A.**    That would be transfers to the Fintech Fund.

8    **Q.**    Okay.  And approximately how much was that transferred out

9    of the payroll account into the Fintech Fund account?

10   **A.**    There was about $3 million transferred out.

11   **Q.**    Other than the transfers to the Fintech Fund, what were

12   other transfers out of the account used for?

13   **A.**    They -- I believe they were used for legal expenses,

14   marketing, meals and entertainment, business expenses.

15   **Q.**    Okay.  Agent Carfora, you testified about the money that

16   went out of the NAC Payroll Services account into the

17   Fintech Fund account, but I want to make sure you're testifying

18   accurately.

19       Is this the analyst report you reviewed?

20   **A.**    Yes.

21       **MR. WARD:**  Can I -- may I approach, Your Honor?

22       **THE COURT:**  You may.

23   BY MR. WARD:

24   **Q.**    If you'd just...

25   **A.**    (Witness examines document.)

CARFORA - DIRECT / WARD

1    Q.    Does that refresh your recollection --

2    A.    Yes.

3    Q.    Does that refresh your recollection of how much went out

4    of the payroll services account into the Fintech Fund account?

5    A.    Okay.  Yes.  I said earlier it was $3 million.  It's

6    incorrect.  It was $1.6 million --

7    Q.    All right.  Thank you.

8    A.    -- into the Fintech Fund.

9    Q.    Looking at the Fintech Fund account, who was the -- who

10   controlled that account?

11   A.    Mr. Andrade.

12   Q.    And what type of account was it?

13   A.    I believe it was a limited partnership.

14   Q.    All right.  And then during -- for the Fintech Fund

15   account, what was the largest source of money coming into that

16   account from July 2017 through October 2018?

17   A.    So that was from NAC Payroll.

18   Q.    Correct.  And how much was that approximately?

19   A.    From NAC Payroll to Fintech, there was 1.6 million --

20   approximately 1.6 million that went from NAC Payroll to

21   Fintech.

22   Q.    All right.  From the Fintech Fund, were there -- did you

23   look at the withdrawals from the Fintech Fund account?

24   A.    Yes.

25   Q.    And approximately how much money out of that account went

1    to Mr. Andrade's personal accounts?

2    **A.**    A little less than 1.8 million.

3    **Q.**    All right.  In your review of the evidence in this case,

4    did you -- did you review cashier's checks from the

5    Fintech Fund account to Mr. Andrade's personal accounts?

6    **A.**    Yes.

7              **MR. WARD:**  And if we could go to I believe it's

8    page 15 of this exhibit.

9              **MR. SHEPARD:**  By "this exhibit," you're referring to

10   Ms. Chiu's report?

11             **MR. WARD:**  Yes.

12        Can you scroll forward four pages, please.

13        Thank you.

14   **Q.**    Were these the cashier's checks that were drawn on the

15   Fintech Fund account -- was this the cashier's check that was

16   drawn on the Fintech Fund account?

17   **A.**    Yes.

18   **Q.**    And was this a hand-signed document?

19   **A.**    Yes, it appears to be.

20   **Q.**    And generally, how does an individual obtain a cashier's

21   check?

22   **A.**    In general, they usually go to the bank.  They'll verify

23   that the funds are in the account.  They'll then move the funds

24   and fund the check from the bank's centralized account.

25   **Q.**    All right.  Who was this cashier's check made out to?

1   **A.**   Rowland Marcus Andrade.

2   **Q.**   And where it says "Remitter," what name is in the remitter

3   box?

4   **A.**   Rowland Andrade.

5   **Q.**   Anywhere on this document does it say "Fintech Fund"?

6   **A.**   No.

7   **Q.**   Anywhere on this document -- on this cashier's check does

8   it say "NAC Foundation"?

9   **A.**   No.

10   **Q.**   All right.  If you look at the document below, what is

11   that?

12   **A.**   A deposit slip.

13   **Q.**   And what is the date of the deposit slip?

14   **A.**   March 7th, 2018.

15   **Q.**   Is that the same date as the cashier's check?

16   **A.**   Yes.

17   **Q.**   And is this filled out by hand?

18   **A.**   It appears to be, yes.

19   **Q.**   Is this the deposit of the cashier's check into

20   Mr. Andrade's account --

21   **A.**   Yes.

22   **Q.**   -- on the same day?

23        **MR. WARD:**  If we could move out of this, and if we

24   could pull up Exhibit 1411, please, which has been admitted.

25   It's one of the bank records that has been admitted.

CARFORA - DIRECT / WARD

```
 1              And can we turn to page 172, please.  Could we blow that
 2    up.
 3    Q.    Did you review these records and this page prior to your
 4    testimony today?
 5    A.    Yes.
 6    Q.    And what is the document in the box on the top left?
 7    A.    Another cashier's check.
 8    Q.    What account was that cashier's check drawn from?
 9    A.    This came from the Fintech Fund.
10    Q.    The same account that the other cashier's check came from?
11    A.    Yes.
12    Q.    And, again, it's in the name of Marcus Andrade.  Does it
13    say "Fintech Fund" or "NAC Foundation" anywhere?
14    A.    No.
15    Q.    And looking at the back of the check, does that appear to
16    be a handwritten signature on the check?
17    A.    Yes.
18    Q.    And what's the date of the check?
19    A.    March 20th, 2018.
20    Q.    So that's three -- two weeks after the initial check on
21    March 17th [sic]?
22    A.    Yeah, approximately.
23    Q.    And looking at the document on the bottom, where it says
24    "Deposit," what is that?
25    A.    That's a deposit slip.
```

CARFORA - DIRECT / WARD

1    **Q.**   And what does that reflect?

2    **A.**   It's a deposit into Mr. Andrade's personal account.

3    **Q.**   What was the date of the deposit on that account?

4    **A.**   March 20th, 2018.

5    **Q.**   So in this instance, a cashier's check was drawn from the

6    Fintech account and then later deposited in Mr. Andrade's

7    personal account on the same day?

8    **A.**   Yes.

9            **MR. WARD:**   Could we go to page 181 of this document,

10   please.   And if you could blow that up, please.

11   **Q.**   Looking at the box on the left, again, what is that

12   document?

13   **A.**   That's a cashier's check.

14   **Q.**   And what account was that drawn from?

15   **A.**   Again, from the Fintech Fund.

16   **Q.**   And then below that, what is that?

17   **A.**   That's a deposit slip.

18   **Q.**   And what is the date on the cashier's check?

19   **A.**   It is April 25th, 2018.

20   **Q.**   And what's the date on the deposit slip?

21   **A.**   The same day, April 25th, 2018.

22   **Q.**   Does this indicate that there was a cashier's check drawn

23   on the Fintech account, taken out, and then deposited in

24   Mr. Andrade's personal account on the same day?

25   **A.**   Correct.

CARFORA - DIRECT / WARD

1  Q.   Given the handwriting on the two documents, can you tell

2  how the withdrawal and deposit was completed?

3  A.   It appears to have been done in person.

4       **MR. WARD:**  And then if we could go back out to 1520,

5  please, and go to page 9 again.

6  Q.   Do you see the property purchases --

7  A.   Yes.

8  Q.   -- in the two boxes?

9  A.   Yes.

10 Q.   What was the date of the -- that the purchase of the

11 Violet Road property was posted?

12 A.   April 11th, 2018.

13 Q.   And what's the date that the Plaza Point property was

14 purchased?

15 A.   May 10th, 2018.

16 Q.   Okay.  Agent Carfora, looking at these cashier's checks,

17 what -- in your view and based on your training and experience,

18 what's significant about the way those transactions were

19 conducted?

20 A.   Conducting the transactions in this fashion is indicative

21 of trying to obscure the source of the funds, trying to conceal

22 the -- where the funds came from that ended up in Mr. Andrade's

23 accounts.

24 Q.   And what specifically about the cashier's checks leads you

25 to say that it appears to be an effort to conceal the source of

1   the funds?

2   **A.**    So the easiest way to move money between bank accounts is

3   through wire transfers or ACH transfers.  Those can be done

4   usually over the phone, but they forever connect the bank

5   accounts.  The bank records will always reflect that those two

6   accounts had transfers between them.

7        By getting these cashier's checks, the receiving bank

8   would never know where the funds came from.  You would have to

9   have subpoena power.  You'd have to have a government entity

10  that could then backtrace through to where those funds came

11  from.  That's why these cashier's checks are significant.

12  **Q.**    And what is the significance, in your mind, of the fact

13  that the cashier's checks did not include the name

14  NAC Foundation, Fintech Fund --

15  **A.**    Yeah.

16  **Q.**    -- or --

17  **A.**    To me it appears as though this deposit into Mr. Andrade's

18  account looks like it's moving his own money into those

19  accounts.

20  **Q.**    All right.  And, Agent Carfora, are these actions, in your

21  view, consistent with or indicative of -- what are they

22  consistent with and indicative of?

23  **A.**    They're indicative of money laundering transaction.

24            **MR. WARD:**  Nothing further.  Thank you.

25            **THE COURT:**  Okay.  Can you get started, or do you want

**PROCEEDINGS**

 1    us to --

 2              **MR. SHEPARD:**  I won't be able to finish, so I'd rather

 3    just --

 4              **THE COURT:**  All right.

 5         Okay.  Members of the jury, we will conclude for the day.

 6    Remember my admonitions.  Don't discuss this amongst yourselves

 7    or with anyone else.  No research.  Nothing to do with the

 8    case.

 9         See you tomorrow.  We're back to 8:30 tomorrow morning.

10         (Proceedings were heard out of the presence of the jury.)

11              **THE COURT:**  Anything else?  No?

12              **MR. HIGHSMITH:**  Do you want to do witnesses for

13    tomorrow?

14              **MR. WARD:**  Yes.  Your Honor, I think --

15              **THE COURT:**  I almost got out the door.

16                        (Laughter.)

17         **MS. DENT:**  Nice try.

18              **MR. WARD:**  For tomorrow, we'll obviously finish up

19    with Agent Carfora.

20         Then we will put on Special Agent Quinn, who will

21    introduce a good number of documents.

22         And then we'll play -- oh, I'm sorry.

23         We have the UCE, Bryant Ling, and then Ethan Quinn.  Both

24    Bryant Ling, the undercover, and Ethan Quinn will be

25    introducing audio recordings, but then that's it for

1   the Government.

2           **THE COURT:**  Right.  Well, I'm counting on you being

3   able to close the Government's case tomorrow, and maybe we can

4   get started on the defense case.

5           **MS. DIAMOND:**  We have arrangements to have a witness

6   here, Your Honor.

7           **THE COURT:**  Good.

8           **MS. DIAMOND:**  Hope it works.

9           **MR. WARD:**  When can we know who your witness is for

10  tomorrow?

11          **THE COURT:**  Yes.  Tell them.

12          **MS. DIAMOND:**  Jeffrey Tinker, T-i-n-k-e-r.

13          **MR. WARD:**  He's on your witness list?

14          **MS. DIAMOND:**  Yes.

15          **MR. WARD:**  And can we get -- since we've given you

16  documents a day in advance, can we please get documents for

17  Mr. Tinker?

18          **MR. SHEPARD:**  If only you had given us documents a day

19  in advance.  It's frequently late at night.  But we will -- if

20  we have documents, we will get them to you as soon as we can.

21  They won't be a day in advance because it's already past that

22  and we never got them.

23          **THE COURT:**  Well, for tomorrow's, I mean, I assume if

24  they do get to one defense witness, we're not going to go

25  beyond that probably.  So you've got some Tinker documents.

PROCEEDINGS

1    Give it to them.

2             MR. SHEPARD:  We will give them to them.

3             THE COURT:  And then tomorrow when we conclude for the

4    day, then, before Friday, we'll go back to the -- I'll get the

5    list from you, and do your best to get documents over to the

6    other side.

7         At some point during the defense case, I will need to have

8    the colloquy with Mr. Andrade about his testifying.  I'll look

9    to you, Mr. Shepard, to tell me when you're ready to have that

10   colloquy.

11            MR. SHEPARD:  Understood, Your Honor.  Thank you.

12            THE COURT:  Okay.  Good.

13            MR. CHOU:  Sorry, Your Honor.  I just wanted to flag

14   for the Court that at least one of our rebuttal witnesses is

15   across the country, and I assume the defense has some

16   out-of-district witnesses as well.

17        Is it possible to get a bit more advance notice from the

18   defense as to when they expect, in particular, Eric Min to be

19   on, as well as their medical witness, so that we can line up

20   travel arrangements for our witnesses who are traveling?

21            THE COURT:  Why don't you meet and confer on that and

22   see if you can hone in on that; and then if there are issues,

23   you can bring it up to me.  But it's in both parties' interest

24   when it's coordinating travel to do the best you can because

25   the worst thing would be for us to just have downtime with

**PROCEEDINGS**

1    nothing to do, making the jury hang around.  So work together

2    about that.

3         I mean, it's not -- is that going to be this week?

4              **MR. SHEPARD:**  I don't know for sure.

5              **THE COURT:**  Well, meet and confer and --

6              **MR. SHEPARD:**  But, yes, happy to discuss.  We did

7    solve that problem today, though, by having our experts come in

8    remotely to listen --

9              **THE COURT:**  Yes.

10             **MR. SHEPARD:**  -- as opposed to having to travel, so...

11             **THE COURT:**  Well, I thought Mr. Chou was talking about

12   rebuttal witnesses --

13             **MR. SHEPARD:**  Oh, I see.

14             **THE COURT:**  -- getting ready to come out --

15             **MR. SHEPARD:**  Okay.

16             **THE COURT:**  -- because they're going to have to

17   testify.

18             **MR. SHEPARD:**  Yeah.  Understood.  We will --

19             **THE COURT:**  Meet and confer.

20             **MR. SHEPARD:**  Yeah.

21             **MR. CHOU:**  Yes, Your Honor.

22             **THE COURT:**  Good.

23                  (Proceedings adjourned at 1:30 p.m.)

24                       ---o0o---

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Thursday, February 27, 2025


_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter