```
                                    Volume 13

                                 Pages 2051 - 2230

                  UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable Richard Seeborg, Judge


UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
   VS.                          )   NO.  3:20-CR-00249 RS
                                )
ROWLAND MARCUS ANDRADE,         )
                                )
            Defendant.          )
_____ )


                             San Francisco, California
                             Thursday, February 27, 2025
```

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES:**

For Plaintiff:

                PATRICK D. ROBBINS
                ACTING UNITED STATES ATTORNEY
                450 Golden Gate Avenue
                San Francisco, California 94102
       **BY:  CHRISTIAAN HIGHSMITH**
            **DAVID J. WARD**
            **MATTHEW CHOU**
            **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

                KING & SPALDING, LLP
                50 California Street, Suite 3300
                San Francisco, California 94111
      **BY:  MICHAEL J. SHEPARD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES: (CONTINUED)

 2   For Defendant:
                         KING & SPALDING, LLC
 3                       1700 Pennsylvania Avenue, NW
                         Washington, D.C. 20006
 4               BY:  KERRIE C. DENT, ATTORNEY AT LAW

 5                       KING & SPALDING, LLC
                         1185 Avenue of the Americas, 34th Floor
 6                       New York, New York 10036
                 BY:  DAINEC P. STEFAN, ATTORNEY AT LAW

 7

 8                       LAW OFFICES OF CINDY A. DIAMOND
                         58 West Portal Avenue, Suite 350
 9                       San Francisco, California 94127
                 BY:  CINDY A. DIAMOND, ATTORNEY AT LAW

10

11   Also Present:       Special Agent Brendon Zartman
                         Tina Rosenbaum, Paralegal
12                       Ed Jackson, Trial Technician

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2

3    Thursday, February 27, 2025 - Volume 13

4

5    **GOVERNMENT'S WITNESSES**                    **PAGE**  **VOL.**

6    **CARFORA, JAMES (RECALLED)**
     (PREVIOUSLY SWORN)                            2070   13
7    Cross-Examination by Mr. Shepard              2070   13
     Redirect Examination by Mr. ward             2082   13

8

9    **LING, BRYANT**
     (SWORN)                                       2084   13
10   Direct Examination by Mr. Chou                2085   13
     Cross-Examination by Ms. Diamond             2107   13
11   Redirect Examination by Mr. Chou             2161   13
     Recross-Examination by Ms. Diamond           2169   13

12

13   **QUINN, ETHAN**
     (SWORN)                                       2170   13
14   Direct Examination by Mr. Ward                2171   13
     Cross-Examination by Mr. Stefan              2204   13

15

16                      **E X H I B I T S**

17   **TRIAL EXHIBITS**                    **IDEN**  **EVID**  **VOL.**

18    99                                            2097   13

19    342                                           2196   13

20    347                                           2194   13

21    348                                           2195   13

22    380                                           2180   13

23    598                                           2176   13

24    652                                           2190   13

25    716                                           2177   13

1            **I N D E X**

2          **E X H I B I T S**

3    <u>TRIAL EXHIBITS</u>                    <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

4    776                                       2182  13

5    777                                       2184  13

6    778                                       2185  13

7    779                                       2185  13

8    780                                       2185  13

9    781                                       2185  13

10   782                                       2185  13

11   783                                       2185  13

12   784                                       2185  13

13   785                                       2185  13

14   786                                       2185  13

15   805                                       2191  13

16   865                                       2186  13

17   1087                                      2192  13

18   1088                                      2174  13

19   1465                                      2188  13

20   1485                                      2197  13

21   1486                                      2200  13

22   1487                                      2202  13

23   1488                                      2093  13

24   1489                                      2093  13

25

1                    **I N D E X**

2                  **E X H I B I T S**

3    **TRIAL EXHIBITS**                    **IDEN**  **EVID**  **VOL.**

4    1490                                          2093   13

5    1491                                          2093   13

6    1492                                          2103   13

7    1493                                          2103   13

8    1494                                          2103   13

9    1495                                          2103   13

10   1516                                          2093   13

11   1521                                          2202   13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1   Thursday - February 27, 2025                        8:09 a.m.

 2                    P R O C E E D I N G S

 3                        ---o0o---

 4        (Defendant present, out of custody.)

 5     (Proceedings were heard out of the presence of the jury.)

 6        THE COURTROOM DEPUTY:  Remain seated.  Please come to

 7   order.

 8        THE COURT:  Good morning.

 9        MR. HIGHSMITH:  Good morning.

10        THE COURT:  Okay.  So?

11        MR. HIGHSMITH:  I have one item, and there's also a

12   defense motion.

13        THE COURT:  Yeah, I saw, about ten minutes ago.

14     What's your item?

15        MR. HIGHSMITH:  My item is, yesterday on

16   cross-examination for Mr. Chiu -- for Theresa Chiu, defense

17   brought up her -- what they call her schedules.  In my view,

18   those are not Rule 16 material.  Those are her work product.

19   They're not her opinion.

20     We produced a very long report which is her opinion.  We

21   produced numerous summary charts.  We produced the underlying

22   bank records.  So, in our view, her schedules, what they call

23   her schedules, is not Rule 16.

24     Nonetheless, because it featured prominently in cross, I

25   produced her spreadsheet compiling her bank records to the
```

 1    defense last night.  If they want to use that for their expert

 2    witness, obviously, they can do as they like.  If they want to

 3    recall Ms. Chiu and use that spreadsheet, I don't have a

 4    problem with that.

 5        So I want to make a record of that.

 6        **THE COURT:**  Well, I didn't understand the cross

 7    because it seemed to me that this was a discovery issue that

 8    should have been hashed out in front of Judge Beeler.  And it

 9    really doesn't go to the credibility of the witness.  She has

10    no control over what gets turned over in the course of

11    discovery.

12        I let you do it, but frankly, I didn't think it had a

13    whole lot of relevance; so I don't know why you were going into

14    it.  But it's done.  You did it.  They didn't object, so...

15        **MR. SHEPARD:**  The reason I went into it is there is no

16    way to reconstruct the numbers that are on her chart.

17        **THE COURT:**  Then why wasn't that motion practice in

18    front of Judge Beeler?  I mean, that's what it is.  If you

19    thought there was an in- -- or in front of me -- inadequate

20    disclosure, you litigate.  It's a legal question about -- or

21    it's a procedure question about Rule 16.  It doesn't go to her

22    credibility at all.

23        **MR. SHEPARD:**  I was going to take a different approach

24    to it, Your Honor, and that is, her testimony should be

25    stricken.  The Government didn't comply with their Rule 16 --

 1          THE COURT:  Overruled.

 2          MR. SHEPARD:  -- obligation.

 3          THE COURT:  That's overruled.

 4      Rule 16 is done.  We have done that issue.  You litigated

 5  up one side and down the other in front of Judge Beeler.

 6      This jury is not -- that was part of the problem I had

 7  with some of the Government misconduct motion.  It needs to be

 8  resolved, if it was or it wasn't, before trial.  And we're not

 9  going to have a trial about whether or not the Government did

10  or did not comply with Rule 16.  That's something you should

11  litigate before.

12      That's overruled.  I'm not going to --

13          MR. SHEPARD:  Okay.

14          THE COURT:  -- strike the testimony.

15          MR. SHEPARD:  Can I just --

16          THE COURT:  And I'm even a little concerned with you

17  arguing it, that somehow that should undermine her testimony

18  because she really didn't have any control over what

19  the Government turned over.

20          MR. SHEPARD:  Well, the Government still hasn't turned

21  it over, Your Honor.  What Mr. Highsmith just identified is a

22  spreadsheet with 16,000 entries.

23          THE COURT:  But shouldn't these issues have been -- if

24  you had a problem with what they disclosed, why wasn't that a

25  motion to force further disclosure?

**PROCEEDINGS**

1    You can't just not do anything and then complain they

2   didn't disclose.  You had an avenue to litigate the question.

3   As far as I know, you didn't do it.  Maybe you did and I didn't

4   see it.

5            MR. SHEPARD:  No.  A lot of these, as I have mentioned

6   to the Court frequently, Ms. Chiu's disclosures continued to

7   change right up to the time she testified, right up to the time

8   she testified.

9            THE COURT:  But the schedule disclosure thing, you

10  knew she hadn't -- for good or for bad, hadn't given you these

11  schedules for a while, didn't you?

12           MR. SHEPARD:  Once we got into it based on her latest

13  reports, yes.

14           THE COURT:  Okay.  Was that before trial?

15           MR. SHEPARD:  No.

16           THE COURT:  I thought you disclosed her report before

17  trial.

18           MR. HIGHSMITH:  We disclosed her report before trial,

19  well before trial.

20    As we've stated numerous times, testimony came in, and she

21  made very minor updates based on admitted testimony and

22  admitted exhibits, such as those binders.  So, yes, Your Honor,

23  she -- absolutely, she made minor updates based on admitted

24  exhibits and testimony.

25           THE COURT:  Okay.  I think this whole schedule thing

**PROCEEDINGS**

1   is a sideshow that has no particular relevance for this jury.

2   So that's overruled.

3       But if you want to do something with what Mr. Highsmith's

4   given you, I don't --

5           **MR. SHEPARD:**  Well, he hasn't --

6           **THE COURT:**  -- it's up to you but --

7           **MR. SHEPARD:**  He still hasn't given me --

8           **THE COURT:**  Well --

9           **MR. SHEPARD:**  -- the schedules.

10          **THE COURT:**  -- I don't want to hear about it.

11          **MR. SHEPARD:**  Okay.

12          **THE COURT:**  I really don't.  I mean, I think this is

13  all noise that is beside the point that we're trying to get at

14  in this case.

15      Okay.  Next issue.

16          **MR. SHEPARD:**  Can we take down the chart?

17          **THE COURT:**  I agree with that.  I don't know why that

18  chart's still up there.

19          **MR. SHEPARD:**  Next -- next issue.  There are a series

20  of issues relating to Mr. Quinn's testimony.  I think they fall

21  into three buckets.

22      One, I think, should be easy; and that is, the Government,

23  I think this week -- all the days blend in -- but after we

24  finished with Mr. Abramoff, the Government added an item to its

25  exhibit list, Number 1522.  The Government has added a number

of items to its witness list.  We haven't -- it's been fine.
We've dealt with it.

The problem with Exhibit 1522 is that it's a communication
between Mr. Abramoff and Mr. Bryan that gets added to the
witness list -- to the exhibit list after both Mr. Abramoff and
Mr. Bryan are done testifying.  So I can't -- I can't follow up
on that.

And so that's one where the failure to have given us an
exhibit list with that item on it before is prejudicial.

MR. WARD:  Exhibit 1522 is a -- it's a short
conversation between Mr. Bryan and Mr. Abramoff.  It is clearly
being admitted for Mr. Abramoff's statements, which are
co-conspirator statements.

In essence, he says that Marcus Andrade wants an invoice,
should be just for services and nothing more.  He doesn't want
to have anything describing anything.

It's admissible as a co-conspirator statement, and it
was --

THE COURT:  Why was it disclosed when it was?

MR. CHOU:  Just to add a bit of context, Your Honor,
during the testimony, Exhibit 420 was admitted, which refers to
that invoice being transmitted from Mr. Andrade to Mr. Ruzicka,
cc'ing John Bryan.  That was examined in an issue on redirect.

And this WhatsApp thread that we're trying to add now is a
co-conspirator statement that is discussion between Mr. Bryan

 1    and Mr. Abramoff about that invoice on the same day.

 2             MR. WARD:  The evidence of the invoice was admitted,

 3    and counsel had an opportunity to question Mr. Abramoff, and we

 4    just want to add this to provide additional context and

 5    understanding for that email.

 6             MR. SHEPARD:  I don't think any of that changes the

 7    underlying fact.  It got added to the exhibit list after both

 8    of those witnesses testified.  What am I supposed to be able to

 9    do with that?

10             THE COURT:  It's too late.  You're not going to use

11    it.

12             MR. WARD:  Okay.

13             MR. SHEPARD:  Two other issues relating to Special

14    Agent Quinn.

15         One, we filed a memorandum earlier this morning.  That

16    goes to, I believe Mr. Quinn will introduce portions of a

17    statement that Mr. Andrade gave.  For the reasons in our

18    misconduct motion, we object to the admission of the statement

19    in its entirety.  I understand from the Court's ruling on our

20    misconduct motion that you have ruled on that, and I don't mean

21    to reargue it.  I just want to preserve our objection to it.

22             THE COURT:  Okay.

23             MR. SHEPARD:  And the rest of that memorandum is about

24    introducing the entirety of the statement as opposed to just

25    selected snippets from it.  We've given you case authority on

1    that.  And in particular, one of the things the Government

2    proposes to exclude is -- and this harkens back a little to the

3    misconduct motion that addresses this statement.  One of the

4    things they want to exclude is the fact that Mr. Andrade asked

5    to call his lawyer.  They didn't give him his phone back.  He

6    said he needed the number from the phone.  They didn't give him

7    his phone back.  They questioned him aggressively for

8    35 minutes.

9            THE COURT:  He wasn't detained, though, at that time.

10           MR. SHEPARD:  I'm sorry?

11           THE COURT:  He wasn't detained.  Detained.

12           MR. SHEPARD:  That is correct.  That is correct, and I

13   understand that's why the Court denied my motion to exclude it.

14       But what I'm saying now is that the fact that they did not

15   honor his request until one of the other agents came in and

16   honored his request, that goes to the voluntariness and the

17   circumstances of his statement; and under the Pattern Jury

18   Instruction in the Ninth Circuit, the jury is entitled to know

19   about all the circumstances under which the statement was made.

20   So that portion should not be excluded.

21       The other portions that the Government is excluding are

22   addressed under the rule of completeness in the filing we made.

23       So that's my -- that's that issue.

24           THE COURT:  Mr. Chou?

25           MR. SHEPARD:  I'm sorry.

1          **MR. CHOU:**  Your Honor, the Court -- or, excuse me --

2    the Government disagrees with those facts.  And it's difficult

3    for the Court to evaluate this factual dispute given that with

4    the timing of this motion being filed, I imagine the Court

5    hasn't had a chance to listen through the entire recording

6    recently, if at all.

7          And, in addition, I would note that we provided these

8    clips from this entire recording, which has been produced many

9    years ago, to the defense last week.  We flagged this issue in

10   a motion that the Government filed a couple of days ago

11   proactively.  And to say now that the entire recording needs to

12   be admitted without pointing to specific things that need to be

13   fixed runs headlong into the Ninth Circuit precedent that was

14   cited in the Government's motion as of a couple days ago.

15         I would note that on page 3 of that motion, for example,

16   there are a couple of Ninth Circuit unpublished opinions about

17   how an entire recording cannot be admitted simply to show,

18   quote, a full picture of what happened or the interrogating

19   officer's tone or to attack the person who's recording, their

20   accuracy or reliability.

21         And I think those are the sort of things that Mr. Shepard

22   is trying to get into here, and he still hasn't really directed

23   us to what specifically is misleading about the very clips

24   the Government is trying to play.

25         **THE COURT:**  Is there a transcript of this thing?

PROCEEDINGS

1     **MR. CHOU:**  Yes, Your Honor, and we've produced it.

2     **THE COURT:**  No.  So that I can see it?

3     **MR. CHOU:**  Yes, Your Honor.  We can provide that.

4     **THE COURT:**  Okay.  Let me look at that.

5     **MR. CHOU:**  Okay.

6     Do we have the whole thing, or should we bring it out?

7     **MR. WARD:**  Yeah, I'll have to go get it.

8     **MR. CHOU:**  Okay.

9     **MR. SHEPARD:**  And then, just before you turn, there

10    are also some completeness -- let me back up one step.

11    In addition to authenticating that recording and playing

12    that recording, it appears that Special Agent Quinn will also

13    be used to introduce a bunch of documents.  And those documents

14    present completeness issues that we're also talking about, not

15    that the documents are spliced up but, rather, that, for

16    example, one of them says the lawyer gets back -- gets off the

17    communications.

18    You remember we've, at various times, noted that lawyers

19    get added to communications to review them.

20    There's a document where the Government says the lawyer

21    gets off the communications, but it appears to us that he's

22    back on the communications the next day.  So there are a series

23    of completeness issues there that we will want to address with

24    the Court.

25    We could do that in conjunction with Special Agent Quinn's

1   testimony now, or we can just address that in the defense case

2   if that would be easier and deal with at least some of those

3   completeness issues then because, as we noted, we're going to

4   need to recall him -- unless we get a stipulation about the

5   authenticity of Government-seized exhibits, we're going to need

6   to recall him to authenticate those in the defense case.

7       So I just raise that for the Court's consideration.

8          **THE COURT:**  I'm not sure what you're asking me to do,

9   to be candid with you.  I don't -- this witness will take the

10  stand, and the Government's proposing to play excerpts

11  apparently.  Okay.

12         **MR. HIGHSMITH:**  Yes.

13         **THE COURT:**  And then you have an argument -- we had

14  discussions about this yesterday -- about putting the whole

15  thing in, and there was discussion about you can't put in

16  self-serving statements and the like.

17      But now I'm not sure what you're asking me to do.  Are you

18  saying that -- when you said something about recalling and

19  doing it in the defense case -- I don't know what you're

20  asking.  Are you asking me to preclude anything or -- I

21  don't --

22         **MR. SHEPARD:**  No.  I'm just alerting the Court to this

23  issue and trying to figure out how we can best address it

24  without spending a lot of time with the jury.  That's all I'm

25  trying to do.

 1      **THE COURT:**  That's what I want to make sure.  That's a

 2  high priority for me.

 3      **MR. SHEPARD:**  Yes.

 4      **THE COURT:**  So --

 5      **MR. SHEPARD:**  And so that's why I raised it.

 6      **THE COURT:**  Yes.  So today, when they call this

 7  witness and they propose to play certain things, when you say

 8  "we can handle something in the defense case," your expectation

 9  would be that, in your case, you would recall this witness and

10  say, "We would now like to play the rest of this"?  Is that

11  where you're going with this?

12      **MR. SHEPARD:**  That's one possibility.  I'm just trying

13  to --

14      **THE COURT:**  Okay.

15      **MR. SHEPARD:**  -- identify the different possibilities.

16      **THE COURT:**  That's one.  What's the other possibility?

17      **MR. SHEPARD:**  We can hash them out today as to whether

18  the additional documents/exhibits that we believe we should be

19  entitled to present are subject to the rule of completeness

20  and, therefore, should come in with the witness's testimony

21  today.

22      **THE COURT:**  Okay.  I don't like that option --

23      **MR. SHEPARD:**  Okay.

24      **THE COURT:**  -- because I want to keep the case moving.

25    But go ahead.

PROCEEDINGS

1          **MR. HIGHSMITH:**  No.  I was just saying everyone wants

2     to keep the case moving.

3          He may recall a witness.  So I don't know how the Court's

4     viewing that in terms of keeping the case moving.  I view that

5     as a problem, like, slowing the case down, but maybe the Court

6     has a different view.

7          **THE COURT:**  Well, it seems to me that some of these

8     issues are not going to involve the jury being here.  We have

9     to figure out whether or not things come in or do not come in.

10         What I don't want to do is stop while we have a jury here

11    and me, along with you, start to decide these questions of

12    completeness while they're sitting in the room.  I don't want

13    to do that.

14         I don't understand why these issues can't be dealt with

15    with all of us in the afternoon or something like that.  I

16    don't quite know why this is this morning and the guy is coming

17    on today.  But the option I don't want is to have them sitting

18    in there and we're dealing with rule of completeness issues on

19    things.  That's my least preferred approach.

20         So whatever way we can do it that will provide for

21    the Government to be able to close its case today, as we hoped

22    would be the case, I'm all for that.  And then if we have to

23    have an afternoon proceeding where we hash this out, not my

24    preference, but okay, we can do it.

25         **MR. SHEPARD:**  Understood.

1          **THE COURT:**  Is that -- will that work and --

2          **MR. SHEPARD:**  No, that is fine.  If there are things

3    that there aren't objections to that we can accomplish today,

4    we'll try to do that.

5          **THE COURT:**  That's great.

6          **MR. SHEPARD:**  But if we anticipate issues, we'll

7    just --

8          **THE COURT:**  Okay.

9          **MR. SHEPARD:**  -- take it up in our case.

10         **THE COURT:**  Good.  Okay.

11         **MR. WARD:**  So, Your Honor, I have a full rough

12   transcript of the recording, and then I also have the three --

13   the transcripts made of the three clips that we're going to

14   use.

15         **THE COURT:**  Okay.  Can I --

16         **MR. WARD:**  I haven't, in this, marked where they

17   appear.  I can do that if that would help the Court.

18         **THE COURT:**  That actually would help me.  If you could

19   do that, and then I can take a look at it as we go, that would

20   be good.

21         **MR. WARD:**  Yeah, I'll do that.  Thank you, Your Honor.

22         **THE COURT:**  All right.  And, obviously, show it --

23   after you've done that, show it to the defense so that we don't

24   have some dumb issue about, "Well, that's not the ones that we

25   wanted," or whatever.

CARFORA - CROSS / SHEPARD

1        Okay.

2                    (Recess taken at 8:29 a.m.)

3                 (Proceedings resumed at 8:37 a.m.)

4        (Proceedings were heard in the presence of the jury.)

5            THE COURT:  Good morning, members of the jury.

6        The jury is present.

7        Mr. Carfora, you understand you remain under oath?

8            THE WITNESS:  Yes.

9            THE COURT:  All right.  Mr. Shepard,

10   cross-examination.

11           MR. WARD:  Thank you, Your Honor.

12                    **JAMES CARFORA**,

13   called as a witness for the Government, having been previously

14   duly sworn, testified further as follows:

15                    **CROSS-EXAMINATION**

16   BY MR. SHEPARD:

17   **Q.**   Good morning, Special Agent Carfora.

18   **A.**   Good morning, sir.

19   **Q.**   When you were speaking of the conduct being indicative of

20   money laundering, you addressed moving funds multiple times.

21   Remember that?

22   **A.**   Yes.

23   **Q.**   And when you described your expertise, you did not include

24   expertise in ADHD, attention deficit hyperactivity disorder;

25   correct?

 1   **A.**   No, I did not.

 2   **Q.**   And you're not an expert in that; correct?

 3   **A.**   No.

 4   **Q.**   Not an expert in OCD, obsessive/compulsive disorder;

 5   correct?

 6   **A.**   No.

 7   **Q.**   Not an expert in autism spectrum disorder; correct?

 8   **A.**   No.

 9   **Q.**   Not an expert in bipolar disorder; correct?

10   **A.**   No.

11   **Q.**   And so --

12          **THE COURT:**  You're getting:  Correct?  No.

13       I mean, it's up to you, but I --

14          **MR. SHEPARD:**  Yes.  Thank you, Your Honor.

15          **THE WITNESS:**  I'll fix it.  I'm not an expert in any

16   of those questions --

17                          (Laughter.)

18          **THE WITNESS:**  -- that you asked me, those last four or

19   so questions that you asked me.

20   **BY MR. SHEPARD:**

21   **Q.**   Thank you for shortcutting that.

22       So you don't know how often people who have those mental

23   conditions, let alone who have all four of them in combination,

24   might use more fund movement than other people; right?

25          **MR. WARD:**  Objection.  Lack of foundation.

1      **THE COURT:**  Overruled.

2      **THE WITNESS:**  Could you just ask it again?

3  **BY MR. SHEPARD:**

4  **Q.**  Yeah.  Sure.

5  **A.**  Okay.

6  **Q.**  Sure.

7      Taking you back to moving funds multiple times, you don't

8  know whether people who have those four conditions all in

9  combination might move funds more times than other people;

10  right?

11  **A.**  I do not know that.

12  **Q.**  You talked a little bit about the use of cashier's checks,

13  and I want to take you back to that for a moment.

14      It's fair to say that seven years ago cashier's checks

15  were a common form of payment for large purchases like

16  real estate; correct?

17  **A.**  Yes.

18  **Q.**  And that's still true today; right?

19  **A.**  Yes.

20  **Q.**  And I think you said the easiest means of payment for

21  items like that was -- were wire transfers; right?

22  **A.**  I think what I said was that the easiest way to move money

23  is a wire transfer.

24  **Q.**  Okay.  Wire transfers have costs, right, for most

25  consumers?

CARFORA - CROSS / SHEPARD

1    **A.**   Generally speaking, yes.

2    **Q.**   And the cost for most consumers of wire transfers is

3    considerably more than the cost for a cashier's check; correct?

4    **A.**   I think it would vary based on financial institution.  In

5    my experience, wires may cost, say, $30 while a check may cost

6    $15 or $10 or something like that.

7    **Q.**   There is a difference between the two, and wire transfers

8    cost more; correct?

9    **A.**   Generally speaking, yes.

10   **Q.**   And you said with cashier's checks, the receiving bank

11   wouldn't know where the money came from.  You'd need a

12   subpoena; right?

13   **A.**   Yes, in general, because the check is coming from a

14   centralized account.  They'll know what financial institution

15   it's coming from, but not the originating funds.

16   **Q.**   You do know where the financial -- you do know the

17   originator of the cashier's check, though; correct?

18   **A.**   Correct.

19   **Q.**   That's on the face of the check; right?

20   **A.**   Correct.

21   **Q.**   And, of course, if you have subpoena power, it's very easy

22   to track all that; correct?

23   **A.**   If you subpoenaed the -- if you knew which financial

24   institutions to subpoena, then you can get those records.

25   **Q.**   Right.  And the name of the financial institution that

CARFORA - CROSS / SHEPARD

1    issued the cashier's check is on the cashier's check; right?

2    **A.**    Yes.

3    **Q.**    You also mentioned as a way to move money something called

4    ACH transfers --

5    **A.**    Yes.

6    **Q.**    -- right?

7         Those are pretty sophisticated?  Most people don't even

8    know what those are; right?

9    **A.**    I don't think I could speak to what most people know.

10   It's a common way of moving funds between banks.  People may

11   just recognize it as an online transfer.

12   **Q.**    But most consumers aren't using ACH transfers; right?

13   **A.**    I don't think I can answer that.

14   **Q.**    Okay.  Would you agree that, going back to your paradigm

15   with placement and layering, that placement is using a means

16   that minimizes detection?

17   **A.**    The -- the goal of placement is to get the funds into an

18   account involved in the money laundering process without

19   alerting the financial institutions or law enforcement or a

20   government entity.

21   **Q.**    Well, would you agree with me, going back to my question,

22   that placement is using a means that minimizes detection?

23   **A.**    Yes, I would agree with that.

24   **Q.**    Okay.  And the banks -- and I'm focusing now on the flow

25   of money that led to the cashier's check used to purchase the

**CARFORA - CROSS / SHEPARD**

1    house -- okay? -- just to focus you on --

2    **A.**    Yes.

3    **Q.**    -- on that.

4    The banks and the accounts used there included no fake

5    names or fake identification; correct?

6    **A.**    I don't believe so.

7    **Q.**    And the banks involved were the Woodforest Bank; right?

8    **A.**    Yes.

9    **Q.**    And that's a local bank to where Mr. Andrade lives;

10   correct?

11   **A.**    I'm not sure.  I don't know where that bank is.

12   **Q.**    Okay.  Well --

13   **A.**    But I know his personal accounts were there, so...

14   **Q.**    Yes.  And so you didn't check -- as part of your

15   consideration about your testimony, you didn't check to see

16   whether he was using a local bank?

17   **A.**    I just reviewed the documents, and those were his personal

18   accounts.

19   **Q.**    But my question was:  As part of your analysis, did you

20   check to see if he was using a local bank?

21   **A.**    No.

22   **Q.**    And then another bank that was involved was the Fintech

23   Family Fund Limited Partnership account at Wells Fargo; right?

24   **A.**    Yes.

25   **Q.**    And, by the way, did you -- did you find out what the

1    Fintech Fund account was for?  What the -- you know, like it

2    was a family trust?  Did you look into that?

3    **A.**    I just reviewed some documents where -- I believe an email

4    where Mr. Andrade said it was his family trust account.

5    **Q.**    Okay.  And did you look and see who the signatories were

6    on that account?

7    **A.**    Yeah.  I believe Mr. Andrade was the signatory on that

8    account.

9    **Q.**    Did you see reference to a Randy Wooten, a lawyer named

10   Randy Wooten?

11   **A.**    Yes.

12   **Q.**    And he was also a signatory; correct?

13   **A.**    I believe so, yeah.

14   **Q.**    And you didn't inquire the extent to which Mr. Wooten

15   reviewed any transactions, did you?

16   **A.**    No.

17   **Q.**    And the Wells Fargo, they had a local branch right by

18   Mr. Andrade's house; correct?

19   **A.**    Yes.

20   **Q.**    And the other account was the NAC Payroll Services, which

21   was also at Wells Fargo; correct?

22   **A.**    Yes.

23   **Q.**    And, again, they had a branch right by Mr. Andrade's

24   house; correct?

25   **A.**    I believe so, yes.

1  Q.   And I'm sure you're aware there are foreign countries that

2  make it easier -- well, let me put it a different way.

3       There are foreign countries that make it a little harder

4  for the U.S. government to subpoena bank records; correct?

5  A.   Generally, yeah.

6  Q.   And Mr. Andrade didn't use any of those; right?

7  A.   Oh, I'm not sure.  I didn't review any foreign bank

8  records.

9  Q.   You didn't see anything where he used any foreign bank

10 accounts in connection with your review of this transaction --

11 A.   No.

12 Q.   -- correct?

13      And you didn't see any use of shell companies, did you?

14 A.   No, I don't believe I saw any shell companies.

15 Q.   And when you were testifying about the deposit of funds,

16 I think it was Exhibit 2045, you saw -- you identified

17 handwriting that suggested to you that the deposit had been

18 made in person; correct?

19 A.   Yes.

20 Q.   At the local bank; right?

21 A.   Yes.

22 Q.   Local bank with, I assume like all banks, cameras; right?

23 A.   Yes.

24 Q.   And did you talk to the case agents about whether they had

25 difficulty in following the trail to these funds?

**CARFORA - CROSS / SHEPARD**

1   **A.**   No.  Well, we discussed the tracing of the funds.

2   **Q.**   Okay.  But did they tell you -- Agent Wynar, did he tell

3   you that he had told Jack Abramoff that following the trail of

4   money for the purchase of the house isn't difficult?  Did he

5   tell you that?

6   **A.**   No, I never had that conversation.

7   **Q.**   You had a couple of references in your testimony to items

8   in Ms. Chiu's report.  I take it you didn't examine all the

9   financial records that she examined to write her report;

10  correct?

11  **A.**   Not every document, no.

12  **Q.**   And so if she is wrong about something, you wouldn't have

13  any way of knowing; correct?

14  **A.**   From what I reviewed, her analysis appears to be correct;

15  so -- but if she was wrong, then -- then she -- then it would

16  be incorrect.

17  **Q.**   And you didn't do your own independent check of what she

18  computed; correct?

19  **A.**   I reviewed the bank -- some of the bank statements that

20  involved the transfers and movement of funds; but her complete

21  analysis, I didn't reproduce her complete analysis.

22  **Q.**   Okay.  You didn't recompute any of it; right?

23  **A.**   No.

24  **Q.**   You referred in your testimony to Mr. -- to some of the

25  transfers of money around the time of the purchase of the

1    property in Corpus Christi; correct?

2    **A.**    Yes.

3    **Q.**    Mr. Andrade is not charged with any of those transfers of

4    money; correct?

5    **A.**    Not those specific transactions.

6    **Q.**    Did you review any of the documents relating to the

7    Corpus Christi transaction?

8    **A.**    No.

9    **Q.**    You referenced this model about placement and layering and

10    integration, and that's a model that is derived from drug cases

11    in the 1980s; right?

12    **A.**    It's a generally accepted model for money laundering.  I

13    don't know the exact origin of that.  I did try to figure it

14    out, and I can't exactly figure out where it came from.  But in

15    the money laundering process, that is the generally accepted

16    set of phases for money laundering transactions.

17    **Q.**    Okay.  But the first step in this model that was

18    underlying your testimony, placement, that has to do with

19    taking money that wasn't in the financial system, like a large

20    quantity of bills collected by people selling drugs, and

21    getting that money into the financial system; right?

22    **A.**    That's one type of placement.  The funds involved in a

23    money laundering transaction could already be in a financial

24    account, but just not in a financial account that's connected

25    to the money laundering system.

1    **Q.**    Okay.  But all of the financial accounts in this case were

2    connected to the money laundering system; right?  I'm sorry.

3    Connected to the financial system; correct?

4    **A.**    Yeah, I don't believe there was any cash transactions

5    involved in -- if that's what you're asking me.

6    **Q.**    And so the classic example of placement is like -- did you

7    ever watch *Breaking Bad*?

8    **A.**    Yes.

9    **Q.**    And the guy opened a carwash so that he could take drug

10   money and turn it into a way that he could deposit it into a

11   bank; right?

12   **A.**    Yes, that's what happened in that show.

13   **Q.**    And nothing like that happened here; right?  There was no

14   need to turn cash into something that could be deposited into a

15   financial institution?

16            **MR. WARD:**  Objection.  Relevance.

17            **THE COURT:**  Overruled.

18            **THE WITNESS:**  To answer your question, no, there was

19   no conversion of cash into a financial account -- deposit of

20   cash into a financial account that I'm aware of involved in

21   this -- in this case.

22   **BY MR. SHEPARD:**

23   **Q.**    Okay.  And you testified yesterday, I think, that you'd

24   gotten extensive training in money laundering and maybe had

25   even provided some training yourself; correct?

1   **A.**   Yes.

2   **Q.**   And so you're aware that the statute under which this

3   charge against Mr. Andrade was brought has two parts,

4   concealment and promotion; right?

5   **A.**   Correct.

6   **Q.**   And you only testified about concealment; correct?

7   **A.**   Correct.

8   **Q.**   And you're also aware, aren't you, that there's a

9   different statute that's known as the money spending statute --

10  **A.**   Yes.

11  **Q.**   -- right?

12       And under that statute, just spending the money of

13  criminally derived property is a violation; correct?

14  **A.**   Correct.

15  **Q.**   That statute is not charged in this case; right?

16  **A.**   Correct.

17  **Q.**   In this case, the Government has to prove, among other

18  things, that the activity was designed in part or in whole to

19  conceal the nature, location, source, ownership, or control of

20  the proceeds of unlawful activity; correct?

21  **A.**   Yes.

22          **MR. SHEPARD:**  If I may have a moment.

23                    (Pause in proceedings.)

24          **MR. SHEPARD:**  Thank you, Special Agent Carfora.

25          **THE WITNESS:**  Yes, sir.

1          **MR. SHEPARD:**  I don't have any questions.

2                        <u>**REDIRECT EXAMINATION**</u>

3    **BY MR. WARD:**

4    **Q.**    Good morning, Agent Carfora.

5    **A.**    Good morning.

6    **Q.**    Mr. Shepard asked you questions about who was the

7    originator on the cashier's checks.

8          Was the Fintech Fund listed as the originator of any of

9    the cashier's checks?

10   **A.**    No.

11   **Q.**    And was the NAC Foundation or the NAC Payroll Services

12   listed as the originator on the cashier's checks?

13   **A.**    No.

14   **Q.**    Mr. Shepard asked you about ACH transfers.  Were those a

15   common way of transferring money in 2018?

16   **A.**    I -- yeah, I believe so.

17   **Q.**    And can they be more cost effective than a wire transfer

18   or a cashier's check?

19   **A.**    Yes.

20   **Q.**    Mr. Shepard asked you a number of questions about the

21   money laundering model and the placement segment of the money

22   laundering model.

23        Can -- are there other pieces in the model that you

24   testified to that go to the concealment of the source and

25   control of the funds?

CARFORA - REDIRECT / WARD

1    **A.**    Yes.    The layering phase.

2    **Q.**    And what specifically within the layering phase would go

3    to the concealing the source, ownership, or control of the

4    funds?

5    **A.**    Moving the funds through multiple accounts to ultimately

6    get them to their destination.

7    **Q.**    Okay.    Mr. Shepard asked you about the two other cashier's

8    checks that occurred around the time of the $600,000 charged

9    transfer.    Were both of those other transfers within several

10   weeks of the $600,000 cashier's check?

11   **A.**    Yes.

12   **Q.**    And were both of those transactions in and around the

13   exact time that Mr. Andrade purchased the two properties in

14   Corpus Christi and Houston?

15   **A.**    Yes.

16   **Q.**    And what were the total of the three cashier's checks?

17   **A.**    A little over a million dollars.

18   **Q.**    And is that over the price of the -- a little over the

19   price of the house and the Corpus Christi property?

20   **A.**    Yes.

21   **Q.**    Mr. Shepard asked you about the modeling you used and the

22   methodology -- the modeling you used in investigating money

23   laundering cases and asked if they originated in drug cases.

24          Is that modeling also commonly used in fraud cases?

25   **A.**    Yeah.    It's -- that modeling is used in any case that

CARFORA - REDIRECT / WARD

1   involves a money laundering charge.

2   **Q.**   Mr. Shepard asked you whether the use of cashier's checks

3   were common in real estate transactions.

4        Were either -- any of these cashier's checks presented to

5   a title company?

6   **A.**   No.

7   **Q.**   Were any of these cashier's checks presented to a broker

8   or a purchaser -- or, excuse me -- a seller of the property?

9   **A.**   No.

10  **Q.**   In fact, did they go from one of Mr. Andrade's accounts

11  into another one of his personal accounts?

12  **A.**   Yes.

13              **MR. WARD:**  Thank you, Agent Carfora.

14              **MR. SHEPARD:**  Nothing further, Your Honor.

15              **THE COURT:**  You may step down.

16              **THE WITNESS:**  Thank you.

17                        (Witness excused.)

18              **MR. CHOU:**  The United States calls Bryant Ling.

19   (Witness enters the courtroom and steps forward to be sworn.)

20              **THE COURT:**  You could come forward to the witness

21  stand to be sworn.

22              **THE WITNESS:**  Raise your right hand.

23                        **BRYANT LING**,

24  called as a witness for the Government, having been duly sworn,

25  testified as follows:

LING - DIRECT / CHOU

1    THE WITNESS:  I do.

2         THE COURTROOM DEPUTY:  Please be seated.

3    Can you state and spell your last name, please.  State

4    your name and spell your last name.  Sorry.

5         THE WITNESS:  Bryant Ling, spelled B-r-y-a-n-t,

6    L-i-n-g.

7                   **DIRECT EXAMINATION**

8    BY MR. CHOU:

9    **Q.**  Good morning, Mr. Ling.

10   **A.**  Good morning, sir.

11   **Q.**  What do you currently do for a living?

12   **A.**  I'm currently an associate -- excuse me -- associate

13   managing director at Kroll.  It's a global consultancy

14   headquartered in New York.

15   **Q.**  Before you started working at Kroll, did you work at the

16   FBI?

17   **A.**  Yes, sir, I did.

18   **Q.**  How long were you at the FBI?

19   **A.**  About 25 years.

20   **Q.**  And when did you -- basically, what time period were you

21   at the FBI?

22   **A.**  I was there from 1995 to 2020.

23   **Q.**  And what roles did you hold at the FBI?

24   **A.**  I was a special agent, and for about six and a half years

25   of that, I was a supervisory special agent.

1    Q.   Did you also work certain cases, including the case

2    against Rowland Marcus Andrade?

3    A.   Yes, sir, I did.

4    Q.   And in connection with the investigation of Mr. Andrade,

5    did you serve in undercover roles?

6    A.   I did.

7    Q.   While you were at the FBI, what sort of training did you

8    receive in undercover operations?

9    A.   The undercover certification course, which was a two-week

10   course.

11   Q.   And what were some of the things that were taught in that

12   course?

13   A.   There's everything from practical scenarios to legal

14   situations or legal briefings, techniques, interview

15   techniques, things of that nature.

16   Q.   Turning to the investigation into Mr. Andrade,

17   approximately when did you start working on the investigation

18   and when did you stop?

19   A.   I worked the investigation from approximately 2017 to

20   2018.

21   Q.   And during that whole time, were you taking on undercover

22   personas?

23   A.   I did.

24   Q.   Let's talk about those undercover personas.

25        In connection with this investigation, which personas did

**LING - DIRECT / CHOU**

1  you present to Mr. Andrade and his associates?

2  **A.**    The first persona that I presented was Dr. Mason Wong, and

3  that was a cryptocurrency investor.

4  **Q.**    And what was the other persona?

5  **A.**    The other persona was Bryant Lee, and that was an angel

6  investor or investor in cryptocurrency.

7  **Q.**    And in connection with your work, was one of those

8  personas purely online and the other one was in person,

9  interacting with individuals like -- associated with

10  AML BitCoin?

11  **A.**    Yes, that's true.  Mason Wong was purely online.

12  **Q.**    So let's start chronologically with the steps you took in

13  this investigation.

14      What was the first main thing that you did?  If you turn

15  your attention to 2017.

16  **A.**    In 2017, the first major thing that I did was I obtained

17  permission to obtain cryptocurrency Ether to make a purchase of

18  cryptocurrency of AML.

19  **Q.**    You obtained permission to use Ether to buy AML BitCoin

20  Tokens?

21  **A.**    Correct.

22  **Q.**    And why -- why were you buying AML BitCoin Tokens?

23  **A.**    I'd been informed by the investigating agents that they

24  wanted to explore the AML token initial coin offering.

25  **Q.**    And could you just walk us through what the purchase

1  process was when it came to buying AML BitCoin Tokens in 2017?

2  **A.**    There was a website, an AML token website, that had been

3  started up; and on that website there was a wallet that needed

4  to be downloaded, an application that needed to be downloaded

5  as part of that participation; and you had to create an account

6  on that website to be able to transfer your choice of

7  cryptocurrency into that -- into your account for exchange into

8  AML tokens.

9  **Q.**    And just remind us, what month in 2017 did this

10  transaction take place?

11  **A.**    I believe my transactions all occurred during the month of

12  November in 2017.

13  **Q.**    So you have Ether; correct?

14  **A.**    Yes.

15  **Q.**    Which is a cryptocurrency?

16  **A.**    Yes.

17  **Q.**    And what do you do with that to -- what did you do with

18  that to buy the AML BitCoin Token?

19  **A.**    So I received a wallet address from the website to

20  transfer the Ether to, and I took that address and I entered

21  that into my wallet where I held my cryptocurrency separately

22  and I transferred that into the website.

23  **Q.**    And what happened next?

24  **A.**    The website had listed a statement of being able to

25  exchange my cryptocurrency for token at a later time, and that

**LING - DIRECT / CHOU**

1  didn't happen.  That actually instantly transferred and became

2  registered as tokens according to the email receipts that I

3  received.

4  Q.  Could you just walk us through what you mean by that?  So

5  the Ether was transferred into an AML BitCoin Token wallet.

6  Could you just walk us through what you expected and what

7  happened?

8  A.  So it was a wallet address that I had no control over, but

9  it was receiving my Ether that I had deposited; and that Ether

10  was subsequently instantaneously, for the first several

11  deposits, converted to AML token.  That was the original intent

12  down the road, but not necessarily instantaneously at that

13  moment.

14  Q.  I see.

15  A.  And when I received that -- when I received that

16  notification that it had been converted, I sent an email to the

17  website asking about that.

18  Q.  During this purchase and registration process for the

19  AML BitCoin Token, did you have to put in any sort of biometric

20  verification?

21  A.  No, I did not.

22  Q.  And, in fact, you were serving in an undercover role

23  pretending to be somebody named Dr. Mason Wong?

24  A.  Yes, that's correct.

25  Q.  Going into the process, were you concerned that this

**LING - DIRECT / CHOU**

1  anti-money laundering, biometric verified cryptocurrency might

2  figure out who you were?

3  **A.**    I was.  That was my first concern when approached by the

4  investigating agents.

5  **Q.**    And ultimately, did the AML BitCoin project, to your

6  knowledge, unearth you as a fake identity?

7  **A.**    Not that I'm aware of.

8  **Q.**    Did the Dr. Mason Wong persona have biometric documents?

9  **A.**    No.  I had no documents whatsoever.

10  **Q.**    So after making those purchases in approximately November

11  or December 2017, what did you do next in your other persona?

12  **A.**    So following that November 17 purchase, on somewhat short

13  notice, I was told that there was a cryptocurrency conference

14  coming up in the area and I was asked to attend.

15  **Q.**    And did you?

16  **A.**    I did.

17  **Q.**    Where was that conference?

18  **A.**    The conference was in East Palo Alto.

19  **Q.**    And what did you do there?

20  **A.**    I attended the conference.  So it was at an attorney's

21  office, and the attorney's office was sponsoring this

22  conference for angel investors or cryptocurrency -- people who

23  had interest in cryptocurrency, and so I attended that meeting.

24  **Q.**    And who did you meet at that meeting that had relevance to

25  the AML BitCoin investigation?

**LING - DIRECT / CHOU**

1    **A.**    I met the chief strategy officer of AML, Japheth Dillman.

2    **Q.**    And what was your -- could you tell us more about this

3    Bryant Lee identity and what it was representing to AML BitCoin

4    and Mr. Dillman?

5    **A.**    Bryant Lee was representing an angel -- was presented as

6    an angel investor with associates who were interested in

7    investing in cryptocurrency.

8    **Q.**    And when you spoke with Mr. Dillman, what happened next?

9    **A.**    I spoke with Mr. Dillman after the conference and

10   subsequently connected with him and had dinner with him.

11   **Q.**    Did there come a time a few months later when you spoke

12   with defendant Marcus Andrade?

13   **A.**    There was.

14   **Q.**    How did that come about?

15   **A.**    That came about through an introduction to someone that

16   Mr. Andrade knew, that was working with; and the introduction

17   basically said that I was interested as a -- as an investor.    I

18   don't know if an amount was specified in that introduction, but

19   it wasn't just a casual introduction.    It was somebody who

20   wanted to invest in AML.

21   **Q.**    And in your -- in that introduction, were you again

22   representing yourself as Bryant Lee, the angel -- the major

23   angel investor?

24   **A.**    Yes.

25   **Q.**    When did you first speak with Mr. Andrade directly?

1    **A.**    I believe I spoke with him after an introduction.  So

2    there was an introduction made, and I --

3    **Q.**    Excuse me.

4    **A.**    -- got a phone number.

5    **Q.**    Just when?

6    **A.**    Twenty- -- about July 2018.

7    **Q.**    And was this over the phone, in person?  What was the

8    medium of the conversation?

9    **A.**    The medium of the conversation started out with a phone

10    call.  And the phone call -- the quality of the call was really

11    poor, and we transitioned to Skype.

12    **Q.**    Okay.  So let's talk about the first conversation you had

13    with Mr. Andrade.  Did that take place in July of 2018?

14    **A.**    I believe it did.

15    **Q.**    And was that over the phone?

16    **A.**    Yes.

17    **Q.**    Did you secretly record that call?

18    **A.**    I did.

19    **Q.**    Have you reviewed that recording in preparation for your

20    testimony here today?

21    **A.**    I have.

22    **Q.**    And have you reviewed five clips from that conversation

23    which have been marked as Trial Exhibit 1488, 1489, 1490, 1516,

24    and 1491?

25    **A.**    I don't have those referenced in front of me, but I have

LING - DIRECT / CHOU

1  reviewed the entire conversation from beginning to end.

2  **Q.**  And you've reviewed in meetings with the Government team

3  clips from that recording?

4  **A.**  Yes, I have.

5  **Q.**  Are those fair and accurate clips from the entire

6  recording?

7  **A.**  Yes, they are.

8        **MR. CHOU:**  The Government moves to admit those five

9  exhibits.

10        **MS. DIAMOND:**  No objection.

11        **THE COURT:**  The exhibits will be admitted.

12        (Trial Exhibits 1488, 1489, 1490, 1516, and 1491 received

13  in evidence.)

14  **BY MR. CHOU:**

15  **Q.**  So, Mr. Ling, I want to direct your attention to each of

16  those clips in chronological order in that longer recording.

17        And do you recall in that conversation where Mr. Andrade

18  mentioned how he had a lot going on right now and he described

19  the Panama Canal and London Stock Exchange?

20  **A.**  Yes, I do.

21        **MR. CHOU:**  At this time, Your Honor, I would ask that

22  I be allowed to pass out the demonstrative transcripts that set

23  forth the rough text of all five of these clips.

24        **THE COURT:**  And you're then going to play them?

25        **MR. CHOU:**  Yes, Your Honor.

1      **THE COURT:**  Okay.  Members of the jury, you're about

2  to hear some recordings that have just been received in

3  evidence.  Please listen to them very carefully.

4      Each of you will be given, momentarily, a transcript of

5  the recording to help you identify speakers and as a guide to

6  help you listen to the recording.  However, bear in mind that

7  the recording is the evidence, not the transcript.  If you hear

8  something different from what appears in the transcript, what

9  you hear is controlling.  That's the evidence.

10      After the recording has been played, we will be taking

11  back the transcript.

12      Do you have a transcript for me?

13      **MR. CHOU:**  May I approach the witness with a

14  transcript, Your Honor?

15      **THE COURT:**  Yes.

16                      (Pause in proceedings.)

17      **THE COURT:**  Mr. Chou, just for my information, are you

18  going to play these one after the other, or are you going to

19  stop and then ask questions, or what are you going to do?

20      **MR. CHOU:**  I will, between each of those marked

21  exhibits, Your Honor, ask a brief question that just tees up

22  the following clip.

23  **Q.**  So turning to the first clip, about five minutes into this

24  conversation, do you recall when Mr. Andrade mentioned the

25  Panama Canal, the London Stock Exchange, and an MOU being

LING - DIRECT / CHOU

 1  floated?

 2  **A.**   Yes.

 3        **MR. CHOU:**  At this time I'd like to play for the jury

 4  what's been marked as Exhibit 1488.

 5              (Audio was played but not reported.)

 6  **BY MR. CHOU:**

 7  **Q.**   Mr. Ling, about three minutes later in this conversation,

 8  do you recall discussing a 1 to 2 million dollar investment

 9  with Mr. Andrade and then Mr. Andrade discussing getting ready

10  to sign some contracts?

11  **A.**   Yes, I do.

12        **MR. CHOU:**  I'd like to play what's been marked as

13  Exhibit 1489.

14              (Audio was played but not reported.)

15  **BY MR. CHOU:**

16  **Q.**   Mr. Ling, about ten minutes after that segment we just

17  heard, do you -- was there a moment in the conversation where

18  Mr. Andrade talked about how the Port of San Francisco is not

19  going to happen this year and that they're discussing

20  negotiations with Long Beach and other entities?

21  **A.**   I do.

22        **MR. CHOU:**  Could we please play about a three-minute

23  clip that's been marked as Exhibit 1490.

24              (Audio was played but not reported.)

25  \\\

LING - DIRECT / CHOU

```
 1   BY MR. CHOU:
 2   Q.   About three minutes after that clip, is there a discussion
 3   of how Mr. Andrade visits San Francisco and sees Leslie and
 4   Lieutenant Governor Gavin?
 5   A.   Yes.
 6        MR. CHOU:   I'd like to play a one-minute clip that's
 7   been marked as Exhibit 1516.
 8             (Audio was played but not reported.)
 9        MR. CHOU:   I misspoke.   It was about 20 seconds.
10   Q.   And then, lastly, in this particular conversation -- just
11   a second here.
12        Do you -- do you recall speaking with -- Mr. Andrade
13   speaking about how he's one of the straightest guys you'll ever
14   meet?
15   A.   Yes, I do.
16        MR. CHOU:   Could we please play Exhibit 1491.
17             (Audio was played but not reported.)
18   BY MR. CHOU:
19   Q.   Mr. Ling, shortly after this July 9th call with
20   Mr. Andrade, does Mr. Andrade send you an email?
21   A.   Yes, he did.
22   Q.   And was this in response to your outreach about again
23   potentially buying several million dollars of AML BitCoin
24   Token?
25   A.   Yes.
```

1          **MR. CHOU:**  I'd like to show the witness, the Court,

2    and the parties what's been marked as Exhibit 99.

3    **Q.**   And --

4          **MS. DIAMOND:**  Excuse the interruption.

5    **BY MR. CHOU:**

6    **Q.**   Mr. Ling, have you reviewed Exhibit 99 in preparation for

7    your testimony here today?

8    **A.**   Yes, I have.

9    **Q.**   And does it contain not only your response -- if you can

10   scroll all the way -- or your first email -- if we can scroll

11   all the way to the bottom -- as well as Mr. Andrade's response

12   on the first page?

13   **A.**   Yes, it does.

14   **Q.**   And is this a fair and accurate depiction of your email

15   and then his response?

16   **A.**   Yes, the forwarded message is an accurate representation.

17          **MR. CHOU:**  The Government moves to admit Exhibit 99.

18          **MS. DIAMOND:**  No objection, Your Honor.

19          **THE COURT:**  Exhibit 99 will be admitted.

20          (Trial Exhibit 99 received in evidence.)

21   **BY MR. CHOU:**

22   **Q.**   Okay.  So let's just first go over with your emails.

23          **MR. CHOU:**  If we could scroll to the bottom -- or the

24   second page, rather, and if you could please zoom in on what

25   you email Mr. Andrade and Jack Abramoff.

1  **Q.**  And in the first paragraph, do you see where you wrote

2  [as read]:

3          ". . . talking with both of you this week

4      motivated me to increase our purchase from the

5      initial 2 million"?

6  **A.**  Yes.

7  **Q.**  And do you then propose, in that third paragraph there,

8  buying $5 million in AML token?

9  **A.**  Yes.

10  **Q.**  And then lastly, do you propose a Skype call?

11  **A.**  Yes.

12          **MR. CHOU:**  If we could take this down, please, and

13  then -- or zoom out, and go up to the first page, starting with

14  Mr. Andrade's response.

15      If we could zoom in on the forwarded message, the one that

16  he forwards to Jack Abramoff.

17  **Q.**  And so this is Mr. Andrade's response on July 13, 2018.

18  Is that fair to say?

19  **A.**  Yes.

20          **MR. CHOU:**  Could we please zoom in on the paragraph

21  starting with "Regarding Aten Coin," the third paragraph.

22  **Q.**  And do you see where Mr. Andrade wrote [as read]:

23          "Regarding Aten Coin, when it was launched on

24      the exchange a number of years ago, it did very

25      well . . . ."?

1    Mr. Ling, to the best of your understanding of the

2    investigation, did Aten Coin do very well on exchanges?

3    **A.**   I was told that it had done very well, but to my

4    knowledge, it had not.

5    **Q.**   Just to clarify there, Mr. Andrade told you it had done

6    very well; but to the knowledge of your investigation, it had

7    not?

8    **A.**   Correct.

9    **Q.**   Then --

10           **MS. DIAMOND:**  Objection.  Speculation.  Move to

11   strike.

12           **THE COURT:**  Overruled.

13       And objections need to come before the answer, not

14   afterwards.

15       Go ahead.

16           **MR. CHOU:**  Then could we please turn to the next

17   paragraph of the response.

18   **Q.**   So in the previous paragraph, Mr. Andrade had stated that

19   he had taken Aten Coin off the market at some point.

20   **A.**   Yes.

21   **Q.**   And then in this paragraph, he wrote [as read]:

22           ". . . turns out, that was the best thing that

23       ever happened to us, since we retooled by developing

24       a sophisticated biometric digital identification

25       system using biometrics and identifiers on the

```
 1           blockchain, with the AML/KYC verified by trusted

 2           parties."

 3           Do you see that?

 4    A.     I do.

 5    Q.     Did Mr. Andrade write -- strike that question.

 6           And did you ever provide biometrics to buy AML BitCoin

 7    Token?

 8    A.     I did not.

 9           MR. CHOU:  Then could we scroll down to the next

10    paragraph, please.

11    Q.     So do you see earlier you had mentioned to Mr. Andrade,

12    via email, that you were looking to buy 5 million in AML token?

13    A.     Correct.

14    Q.     And here Mr. Andrade replies [as read]:

15           "I cannot release the total amount of tokens

16           sold and distributed yet, but the tokens you

17           anticipate acquiring do not represent even 10 percent

18           of those that have been distributed."

19           Do you see that?

20    A.     I do.

21    Q.     By 10 percent and 5 million, what did -- what did that

22    imply to you about the valuation, or what was Mr. Andrade

23    implying about the valuation of AML BitCoin Token?

24           MS. DIAMOND:  Objection.  No foundation.  Calls for

25    speculation.
```

1      **MR. CHOU:**  It's a mathematical calc- -- yeah.

2      **THE COURT:**  Overruled.

3      **THE WITNESS:**  So based on the 5 million investment and

4   the -- it being 10 percent of that value, my rough numbers

5   would be that it would be over 50 million.

6   **BY MR. CHOU:**

7   **Q.**   What would be over 50 million?

8   **A.**   The value of the ICO.

9   **Q.**   Based on Mr. Andrade's representations here?

10  **A.**   Yes, sir.

11      **MR. CHOU:**  Then can we zoom out here.

12      Could we please turn to the next page of Mr. Andrade's

13  reply to your email.

14      And could we please zoom in on the first paragraph up at

15  the top.

16  **Q.**   Do you see where Mr. Andrade writes [as read]:

17          "Our AML Token/AML BitCoin team is headed by

18          Hung Tran . . . ."?

19  **A.**   Yes.

20  **Q.**   And do you see where he goes on to write [as read]:

21          "We are currently in the process of bringing our

22          tech teams together in one location and hope to have

23          achieved this in the next 45 days"?

24  **A.**   Yes, I do.

25  **Q.**   Based on your understanding of the investigation, did that

LING - DIRECT / CHOU

1    ever happen?

2    **A.**    No, it did not.

3         **MR. CHOU:**  And zooming out.

4    Could we please zoom in on the third-from-last paragraph,

5    "I am happy to do a Skype call, but we need to do it quickly."

6    **Q.**    Do you see where Mr. Andrade states that he asks -- he

7    says [as read]:

8              ". . . get me a signed agreement by tomorrow

9         (and a wire by COB Monday) . . . ."?

10   **A.**    Yes.

11   **Q.**    Was it your understanding Mr. Andrade was communicating

12   urgency?

13   **A.**    Yes.

14   **Q.**    Did Mr. Andrade tell you in that previous conversation why

15   there was such a hurry to close?

16   **A.**    I don't -- I don't recall that right now.

17   **Q.**    And as Mr. Andrade and you discussed in this email, did

18   you end up holding a video Skype call with him?

19   **A.**    We did.

20   **Q.**    And did the FBI covertly record that video call?

21   **A.**    Yes.

22   **Q.**    Have you reviewed the entirety of that videoconference

23   call in preparation for your testimony here today?

24   **A.**    I have.

25   **Q.**    And have you reviewed four clips from that call?

1    **A.**    I have.

2    **Q.**    And those are about four minutes apiece -- four minutes,

3    four minutes, one minute and eight minute, and they're marked

4    1492, 1493, 1494, and 1495?

5    **A.**    Yes.

6         **MR. CHOU:**  The Government moves to admit those four

7    exhibits, Your Honor.

8         **MS. DIAMOND:**  No objection.

9         **THE COURT:**  The exhibits just recited will be

10   admitted.

11        (Trial Exhibits 1492, 1493, 1494, and 1495 received in

12   evidence.)

13        **MR. CHOU:**  And at this time, Your Honor, similarly, I

14   would ask permission to approach the witness and the jury with

15   a copy of a transcript.

16        **THE COURT:**  You may.

17   **BY MR. CHOU:**

18   **Q.**    Mr. Ling, when did this Skype call take place?

19   **A.**    July of 2018.

20   **Q.**    And this was a few days after your -- or about a day after

21   your email with Mr. Andrade?

22   **A.**    Correct.

23   **Q.**    And do you recall about 30 seconds into the conversation

24   there was a discussion -- Mr. Andrade mentions creating an

25   AML/KYC gateway and digital identity?

**LING - DIRECT / CHOU**

1    **A.**   Yes.

2           **MR. CHOU:**  I'd like to now publish for the jury

3    Exhibit 1492.

4           **THE COURT:**  You may.

5               (Video was played but not reported.)

6    **BY MR. CHOU:**

7    **Q.**   Mr. Ling, about five minutes after that clip, does

8    Mr. Andrade discuss huge use cases for AML BitCoin Token and

9    then asks you and your colleague there who you are?

10   **A.**   Yes.

11          **MR. CHOU:**  Can we please publish Exhibit 1493.

12              (Video was played but not reported.)

13   **BY MR. CHOU:**

14   **Q.**   Mr. Ling, in the clip we just heard, at the end there, did

15   Mr. Andrade state [as read]:

16           "If he's mentioning anything about market making

17       or return on investments or, you know, whatever that

18       is, those are his own beliefs"?

19   **A.**   He did say that, yes.

20          **MR. CHOU:**  I'd like to turn to the following clip.

21   **Q.**   So about 15 seconds later, does Mr. Andrade talk a bit

22   about Aten Coin?

23   **A.**   Yes.

24          **MR. CHOU:**  I'd like to -- could we please publish

25   Exhibit 1494.

1      (Video was played but not reported.)

2  **BY MR. CHOU:**

3  **Q.**   About three minutes after that conversation, does

4  Mr. Andrade discuss London, SWIFT, OECD, and the Panama Canal?

5  **A.**   Yes.

6  **Q.**   And then does he also discuss an MOU and non-disclosure

7  agreement?

8  **A.**   Yes, he did.

9          **MR. CHOU:**   I'd like to play Exhibit 1495, which is

10  about an eight-minute clip.

11          (Video was played but not reported.)

12  **BY MR. CHOU:**

13  **Q.**   Mr. Ling, in that clip we just heard, did Mr. Andrade say

14  [as read]:

15          "Right now they're actually accepting,

16      I believe, payments through WeChat"?

17  **A.**   Yes.

18  **Q.**   And did he say earlier in the clip [as read]:

19          "But me, personally, I never really shoot from

20      the hip"?

21      Then he goes on [as read]:

22          "If something was, you know, where the

23      probability on that was about 10 percent, as straight

24      as I am, I would tell you"?

25  **A.**   Yes.

**LING - DIRECT / CHOU**

1  **Q.**   Mr. Ling, after this conversation, what happened next with

2  respect to your part of the investigation?

3  **A.**   I believe after this, Mr. Andrade sent me an email

4  contract attachment.

5  **Q.**   And did you follow -- did the FBI follow through with that

6  contract?

7  **A.**   We did not turn the contract signed.

8     (Stenographer interrupts for clarification of the record.)

9            **THE WITNESS:**  We did not sign the contract.

10  **BY MR. CHOU:**

11  **Q.**   Why didn't you sign the contract to try to gather more

12  information about AML BitCoin Token?

13  **A.**   It didn't seem like it was a good use of taxpayer dollars.

14  **Q.**   How much taxpayer money would you have to have put in to

15  sign the contract?

16  **A.**   We were looking at -- we had mentioned up to $5 million.

17  **Q.**   And earlier you mentioned an investment in AML -- or not

18  investment -- a purchase of AML BitCoin Token that you had made

19  in December of -- or November 2017 at the FBI's direction?

20  **A.**   Correct.

21  **Q.**   What return, if any, has -- or recovery of funds has been

22  realized from that purchase?

23  **A.**   There's been no recovery that I'm aware of since I left

24  the bureau.

25            **MR. CHOU:**  One moment.

LING - CROSS / DIAMOND

```
 1                    (Pause in proceedings.)

 2          MR. CHOU:  At this time, Your Honor, I can either take

 3   the transcripts back or wait till the end of cross, whatever

 4   the Court would prefer.

 5          THE COURT:  Are you going to be using the transcripts?

 6          MS. DIAMOND:  I think it may be useful for the jury to

 7   retain them.

 8          THE COURT:  All right.  We'll leave them with the jury

 9   then.

10      We'll go ahead and take our first break.

11      Members of the jury, remember my admonitions.  Do not

12   discuss this amongst yourselves or with anyone else.

13      And we will return in 15 minutes.

14                    (Recess taken at 10:02 a.m.)

15               (Proceedings resumed at 10:18 a.m.)

16      (Proceedings were heard in the presence of the jury.)

17          THE COURT:  The jury is present.

18      Ms. Diamond?

19          MS. DIAMOND:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21   BY MS. DIAMOND:

22   Q.  Good morning --

23   A.  Good morning.

24   Q.  -- Mr. Ling.

25      When you first requested Ethereum from the FBI in order to
```

 1  make AML token purchases, that was in mid-November 2017;

 2  correct?

 3  **A.**   No, ma'am.  That was actually, I believe -- the request

 4  was -- I believe was made in October, end of October.

 5  **Q.**   And the request was granted in November; is that correct?

 6  **A.**   I don't remember the exact date, but it was granted prior

 7  to November 7th.

 8  **Q.**   Thank you.

 9      And you mentioned Ethereum was a particular type of

10  cryptocurrency.  Is that what you were referring to?

11  **A.**   I believe the terminology is Ether with the blockchain

12  being referred to as Ethereum.

13  **Q.**   And the shorthand symbol for that is ETH; is that correct?

14  **A.**   Yes, ma'am.

15  **Q.**   When you requested the cryptocurrency, had, to your

16  knowledge, the FBI already been told that there was someone

17  that was going to be attending and recording a seminar put on

18  by Japheth Dillman at a law firm in Palo Alto on January 16th,

19  2017?

20  **A.**   No.  That was much -- that was in the future when I

21  received the -- when I received the ETH.

22  **Q.**   When you received the ETH and began to purchase

23  AML tokens, were you at that time aware that there was an

24  undercover agent using a persona or a false name Ravi Gupta who

25  had been working on an investigation of Jack Abramoff?

**LING - CROSS / DIAMOND**

**A.**    I don't recall when I became aware of that, but I was aware of that at a later date.

**Q.**    So at this point you don't know if, when you started investigating AML tokens, you knew that there was a concurrent undercover investigation of Jack Abramoff, or is it just that you didn't know that Ravi Gupta was part of that investigation?

**A.**    I'm sorry.  Could you repeat the question?

**Q.**    I'm going to break it down for you --

**A.**    Thank you.

**Q.**    -- make it a little more simple.

At some point you found out that there was an informant using the name Ravi Gupta who was associated with Jack Abramoff; correct?

**A.**    Yes, ma'am.

**Q.**    And at some point you learned that Mr. Abramoff was the subject of undercover investigations; correct?

**A.**    Yes, ma'am.

**Q.**    Did you learn both of those facts at the same time?

**A.**    I believe I did.

**Q.**    And to the best of your recollection, you just cannot recall whether or not it was before or after you began your undercover purchase of AML tokens?

**A.**    I believe it was close to that time just because the -- yeah, I believe it was close to that time.

**Q.**    And within your knowledge, you knew that Mr. Gupta was

LING - CROSS / DIAMOND

1    using a false name; correct?

2    **A.**    Yes, ma'am.

3    **Q.**    And that is not a fact that you revealed personally to

4    Mr. Abramoff; correct?

5    **A.**    Correct.

6    **Q.**    And you did not reveal that to Mr. Andrade; correct?

7    **A.**    Yes, ma'am.

8    **Q.**    When you purchased AML tokens on the website, that was

9    through their ICO offering; correct?

10    **A.**    Yes, ma'am.

11    **Q.**    If the --

12         **MS. DIAMOND:**    Mr. Jackson, if we could display

13    Exhibit 2471, please, for the witness.    It's already been

14    admitted.

15         I'm sorry.    For the jury as well, since it's in evidence.

16         And if we could look at page 2, please.

17         **MR. CHOU:**    Objection.    This likely runs headlong into

18    *Lindsay's* bright-line rule, Your Honor.

19         **THE COURT:**    It runs headlong into what?

20         **MR. CHOU:**    *United States v. Lindsay*, the Ninth Circuit

21    case's bright-line rule on investor behavior, Your Honor.

22         **THE COURT:**    I'm not sure I know what you're talking

23    about.

24         This document was admitted into evidence; correct?

25         **MS. DIAMOND:**    That's my understanding, Your Honor,

SIDEBAR

```
 1   yes.
 2          THE COURT:  So she certainly can use it.
 3          MR. CHOU:  Yes, Your Honor.
 4          THE COURT:  Well, do you want to -- do you want to
 5   explain this further at the sidebar or --
 6          MR. CHOU:  If I may, Your Honor.
 7          THE COURT:  All right.
 8       (The following proceedings were heard at the sidebar:)
 9          MR. CHOU:  Your Honor, what I believe the defense is
10   trying to do is engage in the cumulative exercise of putting
11   forward that snippet in the terms of service that says, "This
12   is not an investment," et cetera, which apparently their
13   argument is investors have overlooked.
14       And the argument is that when it comes to specific
15   investor behavior, the Ninth Circuit held squarely in
16   United States v. Lindsay, which was a topic of one of the
17   motions in limine as well as a recent filing a couple of days
18   ago, that specific investor disregard or negligence or even
19   intentional disregard is inadmissible, even with a limiting
20   instruction.
21       And so on that basis, I would ask that they stop doing
22   this.
23          MS. DIAMOND:  I was just simply going to ask whether
24   or not the witness had seen the terms of the service because he
25   had to click through on the website and if he recognized -- if
```

**SIDEBAR**

 1   he could recognize it.  I don't know if he even read it.  He

 2   may or may not recognize it.

 3          THE COURT:  Okay.  Well, I'll let you ask that

 4   question.  Mr. Chou is right that we said -- I said in the

 5   order that the victim -- the, quote/unquote, "victims," whether

 6   or not they knew that they -- or read something about "This

 7   isn't an investment," or whatever, is not directly relevant.

 8   You have pointed it out now many times.  I'll let you do this

 9   one question, but don't go any further with this.

10          MS. DIAMOND:  Your Honor, our relevance is for

11   Mr. Andrade's knowledge because these are Mr. Andrade's

12   contracts that Mr. Andrade signed.

13          THE COURT:  Okay.

14          MS. DIAMOND:  And --

15          THE COURT:  But that's already -- you've now pointed

16   it out --

17          MS. DIAMOND:  I understand.

18          THE COURT:  -- repeatedly; so --

19          MS. DIAMOND:  I'm not going to go into a great deal of

20   them.

21          THE COURT:  You can do that one and then --

22          MS. DIAMOND:  Thank you.

23          THE COURT:  -- move to --

24          MS. DIAMOND:  Thank you.

25          THE COURT:  Okay.

```
 1          (The following proceedings were heard in open court:)
 2              MS. DIAMOND:  May I proceed, Your Honor?
 3              THE COURT:  Yes.
 4              MS. DIAMOND:  Thank you.
 5     Q.   Mr. Ling, regarding the document on the screen, is it
 6     true -- or it is true, rather, that when you had to purchase
 7     through the ICO, there was a button that was required for you
 8     to click through in order to see terms and conditions of
 9     Mr. Andrade's token sale; correct?
10     A.   Yes, ma'am.
11     Q.   Does this document look familiar to you?  And we can have
12     Mr. Jackson scroll through it so you can view it, and just give
13     me an answer "yes" or "no" if this looks like the terms and
14     conditions you saw.
15     A.   It does.
16     Q.   Thank you.
17              MS. DIAMOND:  Mr. Jackson, thank you for the exhibit.
18     You can take it down.
19     Q.   So sometime after your purchase of tokens, you then
20     attended a seminar, as you testified, in -- you said it was in
21     East Palo Alto at the law firm of Greenberg Traurig; is that
22     correct?
23     A.   I didn't state the law firm name, but yes, that is where
24     it was held.
25     Q.   That was the law firm; correct?
```

1   **A.**    Yes, ma'am.

2   **Q.**    And when you attended there, you did not see my client at

3   that seminar; correct?

4   **A.**    I'm sorry.  Did I not see which client?

5   **Q.**    You did not see Mr. Andrade, my client here?  He was not

6   at that seminar; correct?

7   **A.**    No, he was not.

8   **Q.**    Okay.  And Mr. Dillman was at that seminar; is that right?

9   **A.**    Yes, ma'am.

10  **Q.**    And Mr. Dillman was also at that seminar with a woman

11  named Leslie Katz; is that correct?

12  **A.**    I believe so.

13  **Q.**    And the subject of that seminar, broadly speaking, was the

14  value of investing in cryptocurrency for people who wanted to

15  make profit; correct?

16  **A.**    Yes, ma'am.

17  **Q.**    And when you were testifying earlier, you indicated that

18  you posed as Bryant Lee, as an angel investor.  Do you remember

19  that?

20  **A.**    Yes, ma'am.

21  **Q.**    An angel investor is generally a term for a venture

22  capitalist that has a lot of money to invest and may or may not

23  expect a high return on his investment -- his or her

24  investment; is that right?

25  **A.**    Yes, ma'am.

1  Q.  And it's usually applied to a start-up company that needs

2  seed money in order to hire engineers to build a product;

3  correct?

4  A.  Yes, ma'am.

5  Q.  What product was Mr. Dillman selling?

6  A.  Mr. Dillman was presenting about cryptocurrency.

7  Q.  He was presenting an investment opportunity for

8  cryptocurrency; correct?

9  A.  Correct.

10 Q.  So that's not a typical use of angel investment fund;

11 correct?

12 A.  That is correct.

13 Q.  Do you remember what month in 2020 that you stopped

14 working for the FBI?

15 A.  It was February of 2020.

16 Q.  You were not working for the FBI in April of 2020;

17 correct?

18 A.  I was not working for the FBI, that is correct.

19 Q.  The email address that you used to impersonate someone

20 named Dr. Mason Wong in November and December of 2017, was that

21 an email address that you had access to after you left the FBI?

22 A.  I did not.

23 Q.  So if there had been communication to you from the

24 NAC Foundation or its successor company in April of 2020 about

25 the opportunity to redeem your tokens for AML BitCoins, you

**LING - CROSS / DIAMOND**

1  would not have received that email; is that correct?

2  **A.**    That is correct.

3  **Q.**    So at no time after April 2020 did you have access to the

4  credentials necessary to complete the exchange of a token, an

5  AML token for an AML BitCoin; correct?

6  **A.**    Correct.

7  **Q.**    You testified on direct that your introduction to

8  Mr. Andrade in July of 2018 came through someone, a friend; is

9  that right?

10  **A.**    Correct.

11  **Q.**    And that someone was Jack Abramoff, wasn't it?

12  **A.**    Correct.

13  **Q.**    By "a friend," you were referring to the fact that he was

14  Mr. Andrade's friend.  He was not your friend; is that right?

15  **A.**    Correct.

16  **Q.**    Your introduction to Mr. Abramoff came through Ravi Gupta,

17  the informant that was working on Mr. Abramoff's investigation;

18  correct?

19  **A.**    Yes, ma'am.

20  **Q.**    And you had a phone call with Mr. Abramoff; correct?

21  **A.**    Yes.

22  **Q.**    And after that, you had your first phone call with

23  Mr. Andrade; correct?

24  **A.**    Correct.

25  **Q.**    And that was on July 9th; is that correct?  Is that the

 1  date?

 2  **A.**    That's the approximate date.  I don't remember the exact

 3  date.

 4  **Q.**    Sometimes with FBI recordings, is it true that when you do

 5  an investigation or make a recording, when it's turned in or

 6  when a report is filed, the date may be the next day or a day

 7  after, and that's why we're seeing -- we're using approximate

 8  dates for that recording?  Is that right?

 9  **A.**    It is possible that it's turned in the next day.

10  **Q.**    So Mr. Chou played you a number of recordings in the 1488,

11  1489 series, the first set of clips that he played.  Those

12  recordings were the recordings that you made on your first

13  substantive conversation with my client; correct?

14  **A.**    Yes, ma'am.

15  **Q.**    Do you have a copy of the transcription clips in front of

16  you?

17  **A.**    I do.

18  **Q.**    Okay.  I just want to highlight a couple of things because

19  sometimes the words on the recording went through very quickly.

20       It's true that my client told you he's got, quote, "too

21  much stuff going on in various parts of the world"; correct?

22  **A.**    Yes.

23  **Q.**    He also told you that some of the arrangements, deals, or

24  contracts that his company was trying to make for AML BitCoin

25  sometimes take a little longer than he might otherwise like;

1  correct?

2  **A.**    Yes, ma'am.

3  **Q.**    He wanted to know your background; right?

4  **A.**    Yes.

5  **Q.**    And you lied to my client in answer; correct?

6  **A.**    Yes.

7  **Q.**    That was part of your job as an FBI undercover agent;

8  correct?

9  **A.**    Yes.

10 **Q.**    You at some point expressed a willingness to give my

11 client your driver's license and passport, but the time never

12 came to do that, and you did not have credentials that were

13 appropriate in the name of your assumed persona; correct?

14 **A.**    No, that is not correct.

15 **Q.**    You had credentials in the name of Bryant Lee if you

16 needed them?

17 **A.**    I had them, yes.

18 **Q.**    Ah.  Were they created for this investigation?

19         **MR. CHOU:**  Objection.  Relevance.

20         **THE COURT:**  Overruled.

21         **THE WITNESS:**  They were created before this

22 investigation.

23 **BY MS. DIAMOND:**

24 **Q.**    When you told my client that you were in the IT sector

25 doing a lot of sales and engineering sales, was that true?

**LING - CROSS / DIAMOND**

1  **A.**  That was not true.

2  **Q.**  Before you spoke with my client on July 9th, 2017, did you

3  understand that the investigation broadly against my client was

4  focusing in on events such as the Panama Canal and the

5  San Francisco Port?

6  **A.**  I'm sorry.  Could you repeat that?

7  **Q.**  Yes.  There was an investigation into what the FBI is now

8  alleging is a scheme to defraud that began in 2017 and went

9  through most of 2018; correct?

10  **A.**  Yes.

11  **Q.**  During that investigation, were you aware in July of 2018

12  that the FBI was focusing in on a few key events, such as the

13  Panama Canal and the San Francisco Port?

14  **A.**  I was aware that they were looking at those mentions.

15  **Q.**  You were also aware that you were -- that the FBI was

16  looking at those back when you attended Mr. Dillman's seminar

17  on January 31st, weren't you?

18  **A.**  Yes, ma'am.

19  **Q.**  And you made a point after the seminar to have some

20  friendly conversation with Mr. Dillman as part of your assumed

21  persona of a cryptocurrency enthusiast; correct?

22  **A.**  Yes, ma'am.

23  **Q.**  And you later had subsequent conversations with

24  Mr. Dillman; is that right?

25  **A.**  I did.

1   Q.   And during your conversations that were not part of the

2   general seminar, that were between you and he, either

3   afterwards or at your dinner, you asked Mr. Dillman

4   specifically about these items, the Panama Canal and the

5   San Francisco Port?

6   A.   Yes, ma'am.

7   Q.   You also asked him about a Super Bowl ad that he brought

8   up during the seminar; correct?

9   A.   I did.

10  Q.   When my client was asked, in Exhibit 1488 -- that's the

11  first clip Mr. Chou played for you -- about the Panama Canal,

12  he told you that that agreement was not in place; is that

13  right?

14  A.   I believe he stated that there was an MOU being floated.

15  Q.   "MOU" stands for memorandum of understanding; is that

16  right?

17  A.   Yes, ma'am.

18  Q.   At one point my client even referred to it is as an MDU

19  and then corrected himself; is that correct?

20  A.   Yes.

21  Q.   And a memorandum of understanding is not a signed deal; is

22  that right?

23  A.   Someone can sign the memorandum of understanding and then

24  it would be a signed memorandum of understanding.

25  Q.   Yes.  And a memorandum of understanding is not a contract

1  with an exchange of promises where the parties are bound and

2  can seek the protection of courts for enforcement if it fails;

3  is that right?

4  **A.**   Correct.

5  **Q.**   My client mentioned that he had been meeting with

6  Morgan & Morgan, a law firm in Panama; correct?

7  **A.**   Yes, ma'am.

8  **Q.**   I want to turn your memory back to Clip Number 1489, if

9  you may.  This is on page 3 of the transcript that Mr. Chou

10  provided.

11       In that clip, my client referred to his -- the product he

12  was selling as a token; correct?

13  **A.**   Yes, ma'am.

14  **Q.**   He also indicated that people might be able to utilize his

15  technology or licensing; correct?

16  **A.**   Yes.

17  **Q.**   He had -- and he explained to you, both in this

18  conversation and your subsequent conversation on Skype, a

19  varying degree of uses for the biometric identification

20  technology that was being developed by the people in London;

21  correct?

22  **A.**   Yes.

23  **Q.**   It was the use for -- in other words, the use was not

24  being developed only to join on the blockchain the biometric

25  identification with the AML BitCoin.  There were additional

1  uses for the biometric identification technology that were

2  under development, according to what you learned from my

3  client?

4  **A.**   Yes.

5  **Q.**   Did Mr. Dillman discuss that with you?

6  **A.**   I believe he may have mentioned that in passing.  I don't

7  recall.

8  **Q.**   That wasn't the main focus of Mr. Dillman's interest;

9  correct?

10 **A.**   Correct.

11 **Q.**   Mr. Dillman was mostly interested in a way to make big

12 money for everyone; right?

13          **MR. CHOU:**  Objection.  Hearsay.

14          **THE COURT:**  Sustained.

15 BY MS. DIAMOND:

16 **Q.**   Would you say that Mr. Dillman is a charismatic person?

17 **A.**   Not to me.

18 **Q.**   Do you know if he was a smooth presenter at his seminar?

19 **A.**   He -- he was an adequate presenter.

20 **Q.**   Staying still on Clip Number 2, 1489, at the bottom of

21 page 3, there was a repetition about -- from my client that

22 they're preparing to sign contracts but contracts have not been

23 signed; correct?

24 **A.**   Looking at the transcript, it appears that they're ready

25 to sign contracts but doesn't specifically state that they're

1  not being signed -- that they're not signed or --

2  **Q.**  Okay.

3  **A.**  Yeah.

4  **Q.**  So he said they were ready to sign contracts, and he did

5  not tell you there were signed contracts; correct?

6  **A.**  Correct.

7  **Q.**  I'd like to turn your attention to Clip 1490.  The

8  transcript appears at the top of page 4.

9       When my client talked about a meeting with the Port of

10 San Francisco, he told you that he thought it was a good

11 meeting, and the first example he gave to you is that they,

12 quote, "did put out pictures and stuff like that when I was

13 actually there with all of the directors"; is that right?

14 **A.**  Yes, ma'am.

15 **Q.**  Later in that same portion of his conversation,

16 Mr. Client -- sorry -- Mr. Andrade told you that he has to get

17 with Richard Naimer to talk about the details; correct?

18 **A.**  Yes, ma'am.

19 **Q.**  Richard Naimer was a person who was working on the

20 identification technology portion of the project who usually

21 worked in London; is that right?

22 **A.**  I don't recall now.

23 **Q.**  Did you do any investigation on Richard Naimer?

24 **A.**  I did at the time.

25 **Q.**  And at the time, you were familiar with the reference.  Is

1    that why you didn't ask Mr. Andrade --

2    **A.**    Correct.

3    **Q.**    -- who he was?

4        Mr. Andrade also explained to you that Leslie Katz is a

5    very strong supporter; correct?

6    **A.**    Yes, ma'am.

7    **Q.**    Do you remember her to be an attorney at Greenberg

8    Traurig?

9    **A.**    I believe she was an attorney, yes.

10   **Q.**    Mr. Andrade actually told you that they would not be

11   signing contracts with the Port that year; is that right?

12   **A.**    Yes, ma'am.

13   **Q.**    And he told you that he'd have to pass you off to Richard

14   and Leslie about those details; he wasn't handling those

15   details.    Correct?

16   **A.**    I believe that's correct.

17   **Q.**    He even told you that he has different people that handle

18   different things for him; right?

19   **A.**    Yes, ma'am.

20   **Q.**    He mentioned to you his patents.    Did you look up the

21   patents?

22   **A.**    I did not look up the patents.

23   **Q.**    You know that when someone applies for a patent, there is

24   a public record of that application, and it's available to

25   anybody who digs in the right place in public records; correct?

1    A.   Yes, ma'am.

2    Q.   So you could have looked up the patents to see whether or

3    not Mr. Andrade was telling you the truth, but you did not;

4    correct?

5    A.   I referred it to the investigating agents.

6    Q.   You trusted other people on your team to do that?

7    A.   Yes.

8    Q.   Further on in the same conversation in Clip Number 4 --

9    and I'm referring you to the bottom of page 5 of the transcript

10   that was offered -- my client again refers to Leslie Katz using

11   the same expression, quote, "one of our strongest supporters,"

12   unquote; is that right?

13   A.   Yes.

14   Q.   And he referred to our present Governor Newsom, then our

15   Lieutenant Governor, as Lieutenant Governor Gavin; correct?

16   A.   Yes, ma'am.

17   Q.   You knew who he was talking about?

18   A.   Yes, ma'am.

19   Q.   Did you see the picture that Mr. Andrade had with

20   Governor Newsom?

21   A.   I don't remember that now.

22   Q.   Did you learn from your colleagues that Mr. Andrade had,

23   in fact, a picture of him standing with Governor Newsom, who

24   was then Lieutenant Governor?

25   A.   My colleagues didn't share that with me, to my

**LING - CROSS / DIAMOND**

1    recollection.

2    **Q.**    Did you know -- do you know what Lionsgate is?

3    Mr. Andrade mentioned Lionsgate, didn't he, at the end of the

4    clip in Exhibit 1491?

5    **A.**    Yes, ma'am.

6    **Q.**    What is Lionsgate?

7    **A.**    It's a film company.

8    **Q.**    And at the time you had this conversation with

9    Mr. Andrade, you had already learned from Mr. Abramoff that

10   they were planning to produce a reality television show;

11   correct?

12           **MR. CHOU:**  Objection.  Hearsay.

13           **MS. DIAMOND:**  Context, Your Honor.

14           **THE COURT:**  Where are you going with this?

15           **MS. DIAMOND:**  Not far.  Not far.  I'd like to

16   establish that Mr. --

17           **THE COURT:**  All right.  On the basis you're not going

18   far, overruled.  Go ahead.

19                        (Laughter.)

20           **THE WITNESS:**  So could you repeat the question again?

21   I'm sorry.

22   **BY MS. DIAMOND:**

23   **Q.**    Sure.  When Mr. Abramoff talked to you after you were

24   introduced to him through Ravi Gupta, he, with great -- he told

25   you that they were working on producing a reality TV show;

**LING - CROSS / DIAMOND**

1    correct?

2    **A.**    Yes, ma'am.

3    **Q.**    He even told you it was called *Bitcoin Brigade*; correct?

4    **A.**    I believe that was the name.

5            **MS. DIAMOND:**  May I ask, is Exhibit 99 in evidence?

6            **THE COURTROOM DEPUTY:**  This morning.

7            **MS. DIAMOND:**  Great.

8        Could we display that for the witness and the jury,

9    please.

10        Can we scroll down to the bottom of the email on page 2,

11    please.

12        If we could please highlight the time and date, the header

13    of the bottom email.  Thank you.

14    **Q.**    So this email from -- excuse me.

15            **MS. DIAMOND:**  One moment.

16        Please take that down.  Sorry.  Can't scroll.

17        On page 2 of this exhibit -- thank you -- the bottom email

18    on that page, please highlight the header.  Thank you.

19    **Q.**    Mr. Lee [sic], this email was sent on July 13 at

20    approximately 2:55 p.m. to Mr. Andrade and Mr. Abramoff; is

21    that correct?

22    **A.**    Yes.

23    **Q.**    And my client then responded to you --

24            **MS. DIAMOND:**  If we could take this down and look at

25    the header of the middle part of page 1, please.

**LING - CROSS / DIAMOND**

1  **Q.**   My client responded to you more than an hour later;

2  correct?

3  **A.**   No, that's not correct.

4         **MS. DIAMOND:**  Can we take this down.

5  **Q.**   Ah.  When did my client respond to you?

6  **A.**   It appears that the response was sent at 4:22 p.m. on

7  July 13th.  I believe that is Central -- Central Daylight Time.

8  **Q.**   So you think that this email has two different time --

9  time stamps from two different locations, two different

10  jurisdictions?

11  **A.**   The -- my previous email, I believe, was quoted; and

12  I believe my -- I believe that my message was sent on -- at

13  2:55; and so that would have been less than -- less than

14  an hour with the two-hour time difference between Pacific

15  and -- Pacific and Central times.

16  **Q.**   What time -- what time zone was this email printed from?

17  **A.**   I'm sorry?

18  **Q.**   What time zone was this email printed from?

19         **MR. CHOU:**  Objection.  Foundation.

20  **BY MS. DIAMOND:**

21  **Q.**   It's okay if you don't know.  You can tell me that you

22  don't know.

23         **THE COURT:**  Overruled.

24     Go ahead.

25         **THE WITNESS:**  It doesn't say.

**LING - CROSS / DIAMOND**

1  **BY MS. DIAMOND:**

2  **Q.**   And you don't know; correct?

3  **A.**   I don't know, correct.

4  **Q.**   Okay.  At the top of this email, you see that there's an

5  email from Jack Abramoff to Mr. Andrade; correct?

6  **A.**   Yes, ma'am.

7  **Q.**   Did you talk to Mr. Abramoff about why he sent this email

8  to Mr. Andrade?

9  **A.**   I did not.  I didn't receive it.

10  **Q.**   And do you have any knowledge about why Mr. Abramoff asked

11  for an email to be sent to his printer?

12  **A.**   I do not.

13  **Q.**   Do you have any knowledge about what Mr. Abramoff and my

14  client may have communicated, either in writing or by phone,

15  prior to Mr. Andrade sending you his response to your email?

16  **A.**   I don't know the specifics of his conversation.

17  **Q.**   You do not know whether my client drafted his email and

18  shared it with Mr. Andrade or whether Mr. Abramoff drafted my

19  client's email and sent it to my client to send to you;

20  correct?

21       I can repeat the question if it's confusing.

22  **A.**   Thank you.

23  **Q.**   You are not aware of what communication took place between

24  Mr. Abramoff and Mr. Andrade about the creation of

25  Mr. Andrade's email to you; is that right?

**LING - CROSS / DIAMOND**

1  **A.**   That is correct.

2  **Q.**   It is possible that my client drafted it?  In your

3  opinion, that's possible?

4         **MR. CHOU:**  Objection.  Foundation.

5         **THE COURT:**  Sustained.

6         **MS. DIAMOND:**  Thank you, Mr. Jackson.  We can take

7  that exhibit down.

8  **Q.**   Now, you testified, before we listened to the recordings,

9  that you had -- the day after the email chain on July 14th,

10  2018, that you had two conversations with my client; correct?

11  **A.**   I believe that's correct.

12  **Q.**   The first one was not played for the jury.  It was a very

13  short conversation and it took place by telephone; correct?

14  **A.**   Yes, ma'am.

15  **Q.**   And one party at least was on a mobile device.  There

16  seemed to be some problem with transmission on that call;

17  correct?

18  **A.**   Yes, ma'am.

19  **Q.**   And between yourself and my client, the decision was made

20  to jump to Skype; is that right?

21  **A.**   Yes, ma'am.

22  **Q.**   And seamlessly you jumped to Skype, and a microphone had

23  to be muted or the phone call had to be ended before background

24  noise cleared up on the Skype call.  Do you remember that?

25  **A.**   Yes, ma'am.

1   Q.   Mr. Woods was on the call with you when you were on the

2   Skype call with my client; correct?

3   A.   Yes, ma'am.

4   Q.   In fact, when the clips were played, there was at the top

5   right-hand corner a circle with a number 2 indicating there

6   were two additional participants besides the one who's -- the

7   visual of Mr. Woods on the Skype call; correct?

8   A.   Correct.

9   Q.   So the two additional people were yourself and my client?

10  A.   Yes, ma'am.

11  Q.   Was Mr. Woods on the phone call with you that you made

12  with my client before you jumped to Skype?

13  A.   Yes, he was.

14  Q.   You did not tell my client that Mr. Woods was on that

15  phone call with you, did you?  I'm talking about the first

16  phone call, not the Skype call.

17  A.   Oh, okay.

18       I believe he was on the first call, and the intent was to

19  introduce him.  So I don't know -- like, I don't remember the

20  specifics of introductions until the Skype call was made.  The

21  intent was to make the introduction, and we didn't get to that

22  point until the Skype call occurred.

23  Q.   And you're stating this out of the best of your -- I'm

24  sorry.  Strike that.

25       To make sure I understand you, you introduced Mr. Woods

1    when the Skype call occurred, but you would have introduced him

2    if you had stayed on the cell phone; correct?

3    A.    Yes, ma'am.

4    Q.    You just didn't tell my client that he was on the cell

5    phone call initially, right at the outset; is that right?

6    A.    I did not make an announcement, that is correct.

7    Q.    And then once on Skype, as it would be apparent to any

8    Skype user that there were three participants on the call, not

9    two, you then introduced Mr. Woods as J.P. Woods; correct?

10    A.    That is correct.

11    Q.    Mr. Woods was also an undercover employee, wasn't he?

12    A.    Yes, ma'am.

13    Q.    He was working on this investigation with you; correct?

14    A.    Yes, ma'am.

15    Q.    And Woods is not his real name; is that right?

16    A.    That is correct.

17    Q.    And he also used other names during the investigation,

18    just like you did; correct?

19    A.    I'm not aware of any other names he used.

20    Q.    Are you aware that he created an email address that had

21    "Bitcoin concerns" as part of the name of his email address

22    during the course of your investigation?

23    A.    I don't recall that now.

24    Q.    Do you know whether or not Mr. Woods was tasked with doing

25    some online investigation as a false persona at any point other

LING - CROSS / DIAMOND

1  than your phone call with him?

2  **A.**   I am not aware.

3  **Q.**   You testified on direct that prior to hearing any of the

4  phone calls -- sorry -- the Skype clips that Mr. Chou played,

5  that my client told you why Aten Coin was taken off the market;

6  correct?

7  **A.**   He stated that, I believe, on the call.

8  **Q.**   He stated that on the first call and he stated that on the

9  second call; correct?

10  **A.**   Yes.

11  **Q.**   Do you recall the Homer Simpson incident?  If you don't,

12  I'm happy to refresh your recollection.

13  **A.**   I do not.  Please refresh my recollection.

14         **MS. DIAMOND:**  Your Honor, the simplest way to do this

15  is to, if I may, approach the witness with a portion of a

16  transcript.  I may not need to play the transcript.

17         **THE WITNESS:**  Actually, I do recall now.

18  **BY MS. DIAMOND:**

19  **Q.**   Ah.  Could you tell the jury what you recall?

20         **MR. CHOU:**  Objection.  Elicits hearsay.

21         **MS. DIAMOND:**  It's -- it completes the explanation

22  that my client offered to this witness that he testified about

23  on direct.

24         **THE COURT:**  I will allow him to answer the question.

25     Go ahead.

1          **THE WITNESS:**  I believe there was some -- and this is

2    not verbatim, but there was a statement about someone using,

3    I believe, the name and possibly even a picture of

4    Homer Simpson to -- to become identified, and it succeeded.

5    That's the general context of that -- that quote.

6    **BY MS. DIAMOND:**

7    **Q.**    And in the context, it was expressed to you that

8    Mr. Andrade thought that was a problem with Aten Coin that

9    required retooling; correct?

10   **A.**    Yes, ma'am.

11   **Q.**    You also testified that Mr. Andrade said that there was --

12   there were 50 million coins distributed, and you did some math

13   to figure out that was not even 10 percent.  Did I get that

14   right of what you were trying to explain?

15   **A.**    I believe he did the math, ma'am.

16   **Q.**    He told you that the amount of coins that you were

17   thinking of was a small fraction of what had been distributed;

18   correct?

19   **A.**    10 percent.  Correct, less than 10 percent.

20   **Q.**    And he used the word "distributed"; is that right?

21   **A.**    I believe so.  That would be in the transcript.

22   **Q.**    I'd like you to take a look, if you could, just for

23   reference, to some of the excerpts Mr. Chou used for the Skype

24   exhibits, looking at first the reference to Exhibit 1492, which

25   is on page 1 of the 7/14 recording excerpt.

1    When Mr. Woods was introduced and he spoke rather quickly,

2  there's a point in the transcript where Mr. Woods said

3  "basically involved in a bunch of," and then the parentheses

4  "UI" shows up in the transcript.  Do you see that?

5  **A.**   I do.

6  **Q.**   And that's a general shorthand for unintelligible;

7  correct?

8  **A.**   Yes, ma'am.

9  **Q.**   You know that Mr. Woods said "philanthropic"; correct?

10 **A.**   I do know that.

11 **Q.**   And he said that again two lines down when he said,

12 "raised more money for our philanthropic efforts"; correct?

13 **A.**   Yes, ma'am.

14 **Q.**   And that was the section where Mr. Andrade told you that

15 he doesn't make any decisions without polling his advisors; is

16 that right?

17 **A.**   I believe he said that several minutes later, yes.

18         **MS. DIAMOND:**  Now, one moment.

19              (Pause in proceedings.)

20 **BY MS. DIAMOND:**

21 **Q.**   The first portion of that recording with my client, the

22 Skype call, after a question or two, my client spoke for a long

23 time; correct?

24 **A.**   Yes, ma'am.

25 **Q.**   He spoke for -- I don't have the exact figure, but it was

1    more than ten minutes or approximately ten minutes.

2    **A.**    I don't have the full transcript or timing of that call,

3    so I don't know the length of it.

4    **Q.**    The first portion, Clip 1, the Exhibit 1492, that was not

5    my client's entire answer to you; is that right?

6    **A.**    Correct.  Yes.

7    **Q.**    That call, as noted in the transcript, ended at

8    approximately 4 -- sorry.  That clip, 1492, ended at

9    approximately 4 minutes and 28 seconds into the recording;

10   correct?

11   **A.**    Yes, that clip ended at 4:28, as indicated on the

12   transcript.

13   **Q.**    But my client didn't stop talking and wait for your next

14   question at that moment; is that right?

15   **A.**    I don't know what happened between 4:28 and the next clip.

16   I don't recall or have the specifics right now.

17   **Q.**    If I showed you a transcript that started at minute

18   4:31 and ended at minute 8:57 of that exact Skype recording,

19   would you -- would that help refresh your recollection?

20   **A.**    It would.

21           **MS. DIAMOND:**  May I approach?

22           **THE COURT:**  Help refresh his recollection about what?

23           **MS. DIAMOND:**  As to the last question, whether or not

24   my client spoke for some amount of minutes, over eight minutes,

25   without there being an intervening question.

| | |
|---|---|
| 1 | **THE COURT:**  He said -- I think he said he did, didn't |
| 2 | he? |
| 3 | **THE WITNESS:**  I believe he did. |
| 4 | **MS. DIAMOND:**  I thought he said that he didn't know |
| 5 | because he didn't have the transcript in front of him.  That |
| 6 | if -- thank you, Your Honor. |
| 7 | **Q.**   Mr. Ling, you do recall it was over eight minutes that my |
| 8 | client spoke to you without your asking any questions? |
| 9 | **A.**   It's possible.  I don't have the exact timing down. |
| 10 | **Q.**   One of the things that my client told you -- and he did it |
| 11 | in -- |
| 12 | **MR. CHOU:**  Objection. |
| 13 | **THE COURT:**  Sustained. |
| 14 | **BY MS. DIAMOND:** |
| 15 | **Q.**   Your answer to my question is that you don't recall?  It's |
| 16 | possible?  Or was it that you know that he did speak with you |
| 17 | without intervening questions? |
| 18 | **A.**   The call lasted a lot longer than the first clip -- |
| 19 | **Q.**   Yes. |
| 20 | **A.**   -- so I don't know. |
| 21 | **Q.**   Yes.  The call lasted 38 minutes and change; correct? |
| 22 | **A.**   I believe so.  I believe 38 minutes might be accurate. |
| 23 | **Q.**   You don't see the end of the call on Mr. Chou's |
| 24 | transcripts, do you? |
| 25 | **A.**   Correct. |

1   Q.   I'm not going to ask you everything my client said in the

2   first eight minutes of the call, but I want to know generally,

3   do you understand that my client told you of various uses,

4   different uses for the blockchain technology and for the

5   biometric identification technology that he was working on in

6   the summer of 2018?

7           MR. CHOU:  Your Honor, objection.

8           THE COURT:  Sustained.

9           MS. DIAMOND:  With respect, Your Honor, I will return

10  to this after -- no worries.  I'm going to ask my next

11  question.

12  Q.   Turning to Clip Number 2 of that same Skype call that you

13  testified about, in the second full paragraph, the transcript

14  says that my client said [as read]:

15          "It's very huge cases."

16      Do you see that?

17  A.   Yes, ma'am.

18  Q.   Is it possible that my client said, "There's various use

19  cases," that this transcript might be incorrect?

20  A.   It's possible.

21  Q.   And you understood that my client was talking about

22  various uses for his technology in addition to marrying it to

23  the blockchain for AML BitCoin; correct?

24  A.   Yes, ma'am.

25  Q.   Looking at the next paragraph -- this is on page 3 of the

LING - CROSS / DIAMOND

1  demonstrative exhibit, the transcript for Exhibit 1493 --

2  there's another indication of an unintelligible portion of this

3  transcript where the word "know" appears in parentheses;

4  correct?

5  **A.**  Yes, ma'am.

6  **Q.**  The phrase says, "Because I don't," and then the word

7  "know" appears, and then the words "you two individuals"; is

8  that right?

9  **A.**  Yes, ma'am.

10  **Q.**  In context, is it possible that what my client said was,

11  "Because I don't know anything about you two individuals"?

12  **A.**  That is possible.

13  **Q.**  The concept was described to you, not just from my client

14  but also from Mr. Abramoff, that any sizable purchaser would be

15  someone they would want to vet to know who they were?

16      **MR. CHOU:**  Objection.  Hearsay.  Abramoff's

17  statements.

18      **THE COURT:**  Sustained.

19  **BY MS. DIAMOND:**

20  **Q.**  My client told you that he needs to know you if you were

21  going to make a sizable purchase; correct?

22  **A.**  He said -- yes.

23  **Q.**  And he did say that he isn't the salesperson, that's not

24  his job usually; correct?

25  **A.**  I believe that's what he said.

LING - CROSS / DIAMOND

1    **Q.**    In trying to explain yourself to my client, you again

2    furthered the false persona that Bryant Lee was a big IPO and

3    ICO guy; correct?

4    **A.**    I don't believe I ever mentioned that I had participated

5    in any other IPOs or ICOs.

6    **Q.**    Ah.  Could you please look at page 4 of the transcript of

7    Exhibit 1493.  And didn't you say [as read]:

8              ". . . I've had some great opportunities with

9         both pre-IPO and post-IPO firms"?

10    **A.**    Correct.  That was with firms, but not necessarily

11    investing in ICOs or IPOs.

12    **Q.**    But you didn't actually have those opportunities; right?

13    That was part of your persona's opportunities; correct?

14    **A.**    I do have experience with that, but yes, this was part of

15    the persona.

16    **Q.**    And the same thing with taking a leave of absence from

17    your company?  That also was something that was not true that

18    you told Mr. Andrade as part of the undercover investigation;

19    correct?

20    **A.**    Yes, ma'am.

21    **Q.**    And Mr. Andrade, upon hearing that you went to one of

22    Japheth's presentations -- Japheth is Mr. Dillman's first name;

23    is that right?

24    **A.**    Yes, ma'am.

25    **Q.**    -- he explained to you that he needed to view any

 1    materials that Mr. Dillman was using and that his attorneys

 2    needed to view them as well; correct?

 3    **A.**   Yes, ma'am.

 4    **Q.**   And he told you that his beliefs about investment and

 5    market making were not Mr. Dillman's; correct?

 6    **A.**   I believe he said that.

 7    **Q.**   He also corrected something that you had heard, that

 8    Aten Coin had been trading as high as $80 a coin; correct?

 9    **A.**   Yes, ma'am.

10    **Q.**   He knew, in his mind -- in his understanding, that that

11    had never been -- sorry -- that Aten Coin had never been that

12    high; correct?

13            **MR. CHOU:**  Objection.  Calls for the defendant's

14    understanding.

15            **THE COURT:**  Yeah.  You can ask -- you can point out

16    what was said in this, but don't --

17            **MS. DIAMOND:**  Sure.

18            **THE COURT:**  -- start talking about what he -- his view

19    or what he knows about your client's understanding.

20    **BY MS. DIAMOND:**

21    **Q.**   Looking at the clip for Exhibit 1494, this is on page 5,

22    the second paragraph, my client said, quote [as read]:

23             "Me personally, I saw it as high as maybe like

24             30, 40 dollars."

25             Correct?

**LING - CROSS / DIAMOND**

1  **A.**    Yes, ma'am.

2  **Q.**    And he also said, quote [as read]:

3         "I don't believe I saw it at 80, I believe I saw

4      it more at the 30, 40 mark."

5      Correct?

6  **A.**    Yes.

7  **Q.**    Now, also in this clip, Mr. Andrade referred to the fact

8  that, quote [as read]:

9         "We found out that there was a flaw in the

10     third-party -- the third-party contractors that we're

11     using for ID verifications."

12     Do you see that?

13  **A.**    Yes.

14  **Q.**    That's also referring to Aten Coin; correct?

15  **A.**    I believe so.

16  **Q.**    And during the conversation, not in this clip but during

17  that conversation, Mr. Andrade used the word "devil's

18  advocate"; correct?  That he's a big believer in using devil's

19  advocate; is that right?

20         **MR. CHOU:**  Objection.  Hearsay.

21         **THE COURT:**  Sustained.

22         **MR. CHOU:**  403.

23         **THE COURT:**  Counsel knows that I have made a ruling

24  that you're not to go beyond these clips; correct?  You

25  understand that?

 1          MS. DIAMOND:  Your Honor, I'm eliciting only

 2   additional context to this statement with that question.

 3   That's the --

 4          THE COURT:  If you stick to these clips and you want

 5   to go back over it, that's perfectly fine.  You don't go beyond

 6   the clips.

 7          MS. DIAMOND:  Your Honor, there is -- if the witness's

 8   memory is refreshed, there are -- there's an additional context

 9   to this statement about the use of "devil advocates."  That's

10   the only --

11          THE COURT:  I am telling you don't go beyond the

12   clips.

13          MS. DIAMOND:  Thank you.

14          THE COURT:  Okay?  Do you understand that?

15          MS. DIAMOND:  I understand.  Thank you.

16          THE COURT:  Next question.

17   BY MS. DIAMOND:

18   Q.   Do you remember seeing my client's contract?  It was

19   presented to you.  You testified about that.

20   A.   The email attachment?

21   Q.   Yeah.  Did you read it?

22   A.   Yes.

23   Q.   It doesn't say that it's offering an investment

24   opportunity that Mr. Dillman was talking about; correct?

25          MR. CHOU:  Objection.  Ruling at sidebar.

 1              **THE COURT:**  I'll let him answer this question.

 2              **THE WITNESS:**  Could you repeat that question, please?

 3    **BY MS. DIAMOND:**

 4    **Q.**   Yes.

 5         The contract that was presented to you for a private AML

 6    token purchase did not offer you a portion of a company or

 7    shares.  It wasn't an investment opportunity.  It was a

 8    purchase agreement for tokens; correct?

 9    **A.**   I believe so.

10    **Q.**   In a very long excerpt, Exhibit 1495, towards the bottom

11    of page 7 in the transcript over to the top of page 8, my

12    client was talking about perspectives for working with banks;

13    correct?

14    **A.**   Yes, ma'am.

15    **Q.**   And, once again, he told you that he wasn't saying that

16    they were going to use his tokens, just that there were

17    discussions; correct?

18    **A.**   Yes, in that discussion.

19    **Q.**   And my client also repeated, with reference to the

20    Panama Canal, that they have an end goal but they're starting

21    with ships' registries and there was no deal in place; correct?

22    **A.**   Correct.

23    **Q.**   And with reference to Panama, I'm looking now, for your

24    reference and the jury's, on the top portion of page 9, the

25    same clip.  Mr. Andrade told you that he had been meeting with

1  Morgan & Morgan for about seven months; correct?

2  **A.**   Yes, ma'am.

3  **Q.**   So this conversation took place in July.  Mr. Andrade was

4  referring to something that took place in December; correct?

5  **A.**   This is about seven months, so January/December would

6  be -- appear to be correct.

7  **Q.**   It could have even been the end of November?

8  **A.**   Yes, ma'am.

9  **Q.**   And it's with reference to that that my client made a

10  verbal gap saying "MOU."  He corrected himself, but he first

11  called it an "MDU"; correct?

12  **A.**   Yes.

13  **Q.**   And when he said to you at the end of that -- the

14  paragraph, where he refers to the MDU and then the MOU, that,

15  quote [as read]:

16          ". . . with these guys" --

17      Sorry.  I'll say the whole sentence [as read]:

18          "The thing there with these guys is that with of

19      is" --

20      My mistake.  My verbal gap.  We all make -- gaff.  We all

21  make them.

22      The sentence that Mr. Andrade told you was [as read]:

23          "The thing there with these guys is with that

24      other play is a digital identity play."

25      Correct?

```
 1   A.    Yes, ma'am.

 2   Q.    And that's one of the use cases that he had described to

 3   you using the digital identity software separately from

 4   AML BitCoin?  That was one of the projects that Mr. Andrade was

 5   working on; correct?

 6   A.    I believe so.

 7   Q.    After this phone call went on -- sorry.

 8         After this clip ended, the last exhibit that Mr. Chou

 9   played you, your conversation went on for about 12 more

10   minutes; correct?

11   A.    Approximately.

12   Q.    And Mr. Andrade wanted a copy of Mr. Dillman's

13   presentation; is that right?

14            THE COURT:  Counsel --

15            MR. CHOU:  Your Honor --

16            THE COURT:  -- don't go beyond the transcript.

17       You have -- you can --

18            MS. DIAMOND:  It's --

19            THE COURT:  Don't interrupt me.

20       You can ask the question about did it go on and for the

21   period of time, but don't then launch into what was said.  You

22   know you're not to do that at this juncture.

23            MS. DIAMOND:  Perhaps we can have a sidebar so I

24   can --

25            THE COURT:  No.  Just ask the next question.
```

1    BY MS. DIAMOND:

2    Q.    Did you ever get a copy of Mr. Dillman's presentation?

3    A.    I don't recall getting a copy of it.

4    Q.    When you purchased tokens from my client in the fall of

5    2017, you used the name Dr. Mason Wong; correct?

6    A.    Yes, ma'am.

7    Q.    To your knowledge, there was also another undercover agent

8    using the name Dr. Mason Wong; correct?

9    A.    I am unaware of that.

10           MS. DIAMOND:   May I show to the witness and the Court,

11   not the jury, Exhibit -- one moment, Your Honor.

12                       (Pause in proceedings.)

13           MS. DIAMOND:   One moment, Your Honor.

14                       (Pause in proceedings.)

15           MS. DIAMOND:   Your Honor, if I may, my client requires

16   a small break for a medical reason.

17           THE COURT:   Okay.

18           MS. DIAMOND:   Thank you.

19           THE COURT:   We'll take a break now.

20       Members of the jury, remember my admonitions.   Do not

21   discuss this amongst yourselves or with anyone else.

22       And we'll resume at 11:30.

23                   (Recess taken at 11:21 a.m.)

24               (Proceedings resumed at 11:32 a.m.)

25       (Proceedings were heard out of the presence of the jury.)

PROCEEDINGS

```
 1            THE COURT:  Okay.  We're out of the presence of the

 2    jury.

 3            MS. DIAMOND:  Thank you, Your Honor.

 4        There's one sentence that I wanted to elicit from this

 5    witness under the rule of completeness.  The Government offered

 6    the first part of the sentence in Exhibit 1494, and the

 7    sentence ends in the middle of a sentence, and I wanted to

 8    offer the complete sentence.

 9            THE COURT:  This is in the July 14th excerpts?

10            MS. DIAMOND:  Yes.  I do have a --

11            THE COURT:  Point --

12            MS. DIAMOND:  Sorry.

13            THE COURT:  Point me to where you're talking about.

14            MS. DIAMOND:  Oh.  It's on page 5, right before Clip

15    Number 4 begins.

16            MR. CHOU:  This is in the Skype call, Your Honor, the

17    one at the top that says July 14, 2018.

18            THE COURT:  It's Clip Number 4?

19            MS. DIAMOND:  Yes.  And the sentence at the last --

20            MR. CHOU:  Clip Number 3.

21            THE COURT:  What?

22            MS. DIAMOND:  Oh, I'm so sorry.  1494 was the exhibit

23    number.

24        Clip Number 3 on this transcript, the sentence reads, as

25    written [as read]:
```

 1             "Okay, now, respecting confidentiality, I can

 2       give you a few names."

 3       In the actual recording, the sentence reads [as read]:

 4             "Okay, now, respecting confidentiality, I can

 5       give you a few names like Jumio, like ID Checker,

 6       like -- I'm sorry, ID Checker, like Jumio.  Okay.

 7       What is it called?  Something IBM.  I got a list of

 8       them."

 9       That's the full answer, the full end of that thought.

10  That is what I would like to refresh this witness's

11  recollection about.

12          MR. CHOU:  Well, Your Honor, she's welcome to refresh

13  recollection; but to the extent she wants to elicit this,

14  the Government makes the same objection.  This is hearsay, and

15  there's no rule of completeness issue here because there's

16  nothing misleading about the way the Government has clipped

17  this.

18       The end of the clip is, "I can give you a few names," and

19  then Mr. Andrade proceeds to elaborate on what those few names

20  are, which is all just self-serving 403, hearsay.

21          MS. DIAMOND:  It shows his mindset, what he was

22  thinking of during the conversation, and it shows --

23          THE COURT:  His mindset is not a hearsay exception.

24          MS. DIAMOND:  His intent is at issue in this case.

25          THE COURT:  It's an issue, but it's not a hearsay

 1    exception.  It doesn't --

 2            MS. DIAMOND:  Your Honor, I --

 3            THE COURT:  Sure, you want -- intent is important and

 4    it's an issue here, but that doesn't -- you can't just say to a

 5    hearsay objection, "Well, intent is important; therefore, it

 6    comes in."  That's not a hearsay exception.

 7            MS. DIAMOND:  Your Honor, we are not asking the jury

 8    to take from this statement that there was names that were

 9    involved with this in this -- at this particular time.  Rather,

10    that in one of the few conversations that my client had with a

11    purported token purchaser, he stated this was his

12    understanding.  And he couldn't -- sorry, Your Honor.  He

13    didn't --

14            THE COURT:  I'm going to --

15            MS. DIAMOND:  Okay.  Sorry.

16            THE COURT:  I am going to allow that rest of the

17    sentence just because, for a different reason, I think it --

18    when it says, "I can give you a few names," it sounds slightly

19    evasive, and then -- but he actually does provide some.  So

20    I think you can add the portion that Ms. Diamond wants to add.

21            MR. CHOU:  Your Honor, could I ask for perhaps some

22    specificity as to where we should cut it off in this entire --

23            THE COURT:  I thought -- yes.  I thought she more or

24    less ended it.  I didn't realize it's that long.  It's not all

25    of those names.  Can I see what the rest of it is?

1          **MR. CHOU:**  Yes, Your Honor.  May I approach -- or I'll

2    hand it over.

3          **MS. DIAMOND:**  Your Honor, I had proposed ending just,

4    he says, "What is it called?  Something IBM."  That's the end

5    of that sentence.

6          **THE COURT:**  So it's, so we're all clear, "I can give

7    you a few names, like Jumio, like ID Checker, like -- I'm

8    sorry, ID Checker, like Jumio.  Okay.  What is it called?

9    Something IBM."  End.

10          **MR. CHOU:**  Understood, Your Honor.

11          **THE COURT:**  Okay.

12          **MS. DIAMOND:**  Thank you, Your Honor.

13          **THE COURT:**  You can do that.

14          **MS. DIAMOND:**  Thank you, Your Honor.

15          **THE COURT:**  Now, seeing the jury isn't here, I can ask

16    the question.  With respect to this transcript that I received,

17    I know this is going to Mr. Quinn, but I still want to ask the

18    question now for logistical reasons.

19          The defense has said they want the entire transcript.  I

20    don't think the entire transcript needs to be or should be read

21    under a rule of completeness concept; but if there are a couple

22    of excerpts that I conclude it is appropriate for completeness

23    purposes to put in, logistically, how could that be done?

24    Because you've prepared these excerpts.

25          So let's say I want three or four additional excerpts to

PROCEEDINGS

1    go in, to be included.  Do you have the capability to do that?

2            **MR. WARD:**  We do, but not on the fly --

3            **THE COURT:**  Immediately.

4            **MR. WARD:**  -- while the witness is on the stand.

5            **THE COURT:**  Right.

6            **MR. WARD:**  So if you said, "I'd like this clip, this

7    clip, this clip," we would go back this afternoon, we can make

8    them, and we can have them played tomorrow.

9            **THE COURT:**  Okay.  One of the alternatives was to,

10   well, have him called in the defense case, and I was trying to

11   think of a way, if I do decide to do that -- and I haven't had

12   time, obviously, to look through this -- how best that should

13   be presented.

14     But, okay.  You've told me what I need to know.  I want

15   you to barrel ahead; and if you can close, close; and don't

16   worry about what I just said.

17           **MR. WARD:**  Well, if it's really just a few clips and

18   we'd rather just have them played with Agent Quinn, we can do

19   it in the morning first thing rather than --

20           **THE COURT:**  Well, but I don't want to -- I don't want

21   to end early today.  I mean, we're sort of -- a couple of days

22   we've been ending early, and I don't want -- I can see the jury

23   getting irritated about that.  So I want us to just go to

24   1:30 today.

25           **MR. WARD:**  Okay.

1        **THE COURT:**  So -- but I understand your thinking of

2   what I'm thinking about, which is, logistically, how best is it

3   to present this.  But, again, that puts the cart before the

4   horse because I may not want to add anything.

5        So, okay.  That tells me what I need to know.

6        Can we bring them out?

7        (Proceedings were heard in the presence of the jury.)

8        **THE COURT:**  The jury is present.

9        Ms. Diamond, you may proceed.

10       **MS. DIAMOND:**  Thank you.

11  **Q.**   Mr. Ling, during the break, I placed a piece of paper on

12  the witness stand that has Exhibit 3000-C at the bottom.  Do

13  you see that?

14  **A.**   Yes, ma'am.

15  **Q.**   I'd like you to take a look, if you could, to the

16  transcript for Exhibit 1494, which is page 5 of the July 14th

17  transcripts that were given to you by Mr. Chou.

18       Could you read, please, the last sentence as written on

19  Exhibit 1494 to the jury?

20  **A.**   [As read]:

21       "Okay, now, respecting confidentiality, I can

22       give you a few names."

23  **Q.**   Thank you.

24       Now, could you please review the first sentence in

25  Exhibit 3000 -- I'm sorry -- the transcript, just silently to

1  yourself please review the first sentence of the excerpt that I

2  have handed to you and please look up when you're done.

3  **A.**   (Witness examines document.)  Yes.

4  **Q.**   Does this refresh your recollection that the sentence that

5  ended with the word "names" on Government's Exhibit 1494 was

6  not actually the end of the sentence that was spoken by

7  Mr. Andrade?

8       **THE COURT:**  I don't think he indicated he didn't

9  remember.  Under the ruling of the Court, we ended at that

10  point.  You can simply ask him now to read the remainder of the

11  sentence.

12       **MS. DIAMOND:**  I appreciate that, Your Honor.

13  **Q.**   Mr. Ling, would you please read the first sentence on the

14  excerpt that I have given you that starts with "Okay, now,

15  respecting confidentiality"?

16  **A.**   Yes, ma'am.

17       [As read]:

18            "Okay, now, respecting confidentiality, I can

19       give you a few names like Jumio, like ID Checker,

20       like -- I'm sorry, ID Checker, like Jumio.  Okay.

21       What is it called?  Something IBM?"

22  **Q.**   Thank you.

23       I want to ask you something about the Skype exhibit.  The

24  Skype exhibit itself was recorded by multiple people; is that

25  correct?

 1   **A.**    I don't recall if multiple people recorded the Skype call.

 2   **Q.**    Did you -- you may or may not know this.  Did you have a

 3   chance to see that there were multiple versions of this

 4   recording with different FBI numbers produced in discovery?

 5   **A.**    I'm not aware of what was produced in discovery.

 6   **Q.**    Next I would like to turn your attention, please, to

 7   Exhibit 2403.

 8           **MS. DIAMOND:**  If it could be displayed for the witness

 9   and the Court and counsel.

10   **Q.**    If you could look at the bottom of the big portion of the

11   content of that document and tell me if you recognize the

12   content that's in that document.

13           **MS. DIAMOND:**  And, Mr. Jackson, please take down the

14   highlight so the witness can read the document.

15   **Q.**    When you're done, let me know.  I'll follow up with a

16   question.  Thank you.

17   **A.**    (Witness examines document.)

18   **Q.**    Does that -- sorry.

19           Does this document look familiar to you?  Not the form,

20   but the content.

21   **A.**    That paragraph, that content looks familiar.

22   **Q.**    This is an email that you sent to Ravi Gupta in his

23   persona as Ravi Gupta while you were using your persona

24   Bryant Lee; correct?

25           **MR. CHOU:**  Objection.  403.  Relevance.

1          **THE COURT:**  What's the relevance?

2          **MS. DIAMOND:**  Is this something -- the relevance is

3    that this is --

4          **MR. CHOU:**  Foundation as well, Your Honor.  The top

5    metadata, it's from someone not the declarant.

6          **MS. DIAMOND:**  That was going to be the subject of the

7    question.  Mr. Gupta was a -- the two -- I'll ask a different

8    question, and I'll see if we can get there.  All right?  I may

9    not need the document.  Let me ask another question.

10         **THE COURT:**  Go ahead.

11         **MS. DIAMOND:**  Thank you.

12   **Q.**  Mr. Ling, after your second conversation with Mr. Andrade,

13   you told Mr. Gupta that you were not going to pursue buying a

14   large amount of AML tokens; correct?

15   **A.**  I'm sorry.  What was the context of that comment?

16   **Q.**  After the Skype call with my client, you informed the

17   undercover agent working on Mr. Abramoff's case that you were

18   not going to make a large purchase of AML tokens; correct?

19   **A.**  Correct.

20   **Q.**  And in the course of that, you also emailed him something

21   about that; correct?

22   **A.**  I believe I did.

23   **Q.**  And that is the content in Exhibit 2403; correct?

24   **A.**  That's a quoted copy of what appears to be what I wrote.

25   **Q.**  It doesn't come from your email directly -- I'm sorry.

 1    Excuse me.

 2        You don't know why this email appears in an email with a

 3    header that involves Jack Abramoff to Jack Abramoff; correct?

 4            MR. CHOU:  Objection.  Hearsay and relevance.

 5            THE COURT:  Well, he can answer that question, but I'm

 6    not sure this is going to go very far.

 7        But go ahead.  You may answer that question.

 8            THE WITNESS:  So, I'm sorry.  What was the question

 9    again?

10            THE COURT:  Do you know why it's from and to

11    Mr. Abramoff?

12            THE WITNESS:  I don't.  That's -- he would have sent

13    that or someone using his account would have sent that, and I

14    have no knowledge of it.

15    BY MS. DIAMOND:

16    Q.   You do recall, though, that when you declined to buy AML

17    tokens, you not only spoke to Mr. Gupta, but you also spoke to

18    Mr. Abramoff; correct?

19    A.   Yes, ma'am.

20    Q.   And you told them that there seemed to be a disconnect?

21    Mr. Dillman and Mr. Andrade didn't seem to be talking about the

22    same things; correct?

23            MR. CHOU:  Objection.  Hearsay.

24            THE COURT:  Overruled.

25        You can answer that question.

1        **THE WITNESS:**  There did seem to be some disconnect

2   with what Dillman said and what Mr. Andrade was telling me.

3        **MS. DIAMOND:**  Thank you.

4      Mr. Jackson, if you could take this down, please, and put

5   up for the witness and the Court Exhibit 2293.

6   **Q.**   Mr. Ling, I'd ask you to take a look at this document and

7   ask you whether or not this appears to be something that you've

8   seen before.  Yes or no.

9        **MR. CHOU:**  Objection.  Improper refreshment.

10       **MS. DIAMOND:**  It's not refreshment.  The question is:

11  Has this witness seen this document?

12       **THE COURT:**  Well, I'll let him answer that question.

13       **THE WITNESS:**  (Witness examines document.)

14  **BY MS. DIAMOND:**

15  **Q.**   We can display the second page if you need to see that.

16  **A.**   That'd be great.  Thank you.

17       **MS. DIAMOND:**  Mr. Jackson, if you would, for the

18  witness.  Thank you.

19       **THE WITNESS:**  (Witness examines document.)  Okay.

20  **BY MS. DIAMOND:**

21  **Q.**   Is this document familiar to you?

22  **A.**   It is familiar.

23  **Q.**   Were you aware in January of 2018, after you purchased

24  tokens from my client's website using the name Dr. Mason Wong,

25  that there was another undercover FBI agent also using the name

1   Dr. Mason Wong?

2   **A.**   I don't believe that there was another -- I'm not aware of

3   anyone else using that -- that name.

4   **Q.**   And you had a number designated to you when you were an

5   undercover employee; correct?  That number was 7410; is that

6   right?

7   **A.**   Yes, ma'am.

8   **Q.**   Did you also use the number 8026?

9   **A.**   I believe I used it once or a few times.

10  **Q.**   If you could look at Exhibit 2293, please, page 1.

11          **MS. DIAMOND:**  Mr. Jackson, if you can highlight for

12  the witness the bottom portion where it says "Investigation

13  on."

14          **THE WITNESS:**  Yes, ma'am.

15  **BY MS. DIAMOND:**

16  **Q.**   You've seen that?

17  **A.**   I do.

18  **Q.**   Is this your report, Mr. Ling?

19  **A.**   I believe it is.

20  **Q.**   In this report, you indicated -- sorry.  Not looking at

21  the report.

22          As this re- -- again, withdrawn.

23          Mr. Ling, on January 24th, 2018, did you call my client to

24  discuss AML token sales with him?

25          **MR. CHOU:**  Objection.  Foundation.

```
1              THE COURT:  Overruled.

2         You can answer that question.

3              THE WITNESS:  I believe I did.

4    BY MS. DIAMOND:

5    Q.   Did you record the conversation?

6    A.   I did not.

7    Q.   Why not?

8    A.   I don't recall the circumstances of that -- of that call.

9    Q.   You've been trained as an undercover investigation that

10   when you make a call to a significant person in an

11   investigation, it's wise for you to record that conversation;

12   correct?

13   A.   Yes, ma'am.

14   Q.   But in this case, you did not do that; correct?

15   A.   Yes, ma'am.

16   Q.   And in this instance in January of 2018, six months before

17   you talked to him in July of 2018, my client told you that this

18   was not an investment --

19             THE COURT:  No, no.

20   BY MS. DIAMOND:

21   Q.   -- correct?

22             THE COURT:  No, no, no.

23             MS. DIAMOND:  Your Honor, it's an unrecorded phone

24   call.

25             THE COURT:  Yes.  That isn't the entree to bring in
```

 1  statements that otherwise are not admissible.

 2  **BY MS. DIAMOND:**

 3  **Q.**   Do you remember that phone call in January 24th, 2018?

 4  **A.**   I remember it now.

 5  **Q.**   Did my client tell you anything substantially inconsistent

 6  with what he told you in July of 2018?

 7          **THE COURT:**  Sustained.

 8          **MS. DIAMOND:**  May I have a moment, Your Honor?

 9          **THE COURT:**  Yes.

10          **MS. DIAMOND:**  Thank you.

11                  (Pause in proceedings.)

12          **MS. DIAMOND:**  I have no further questions at this

13  time.

14      Thank you, Your Honor.

15          **THE COURT:**  Mr. Chou?

16                  <u>**REDIRECT EXAMINATION**</u>

17  **BY MR. CHOU:**

18  **Q.**   Mr. Ling, briefly, just to circle back to what was marked

19  as Defense Exhibit 2293, the FBI report, do you see at the

20  bottom it says "By UCE-8026-SAC"?

21  **A.**   Yes.  It's not showing right now, but I do recall.

22  **Q.**   And this is a report that defense counsel just showed you

23  in the moment; is that right?

24  **A.**   Yes, sir.

25  **Q.**   Is it possible you're mistaken about who authored this

1    report?

2    **A.**    It is possible.

3    **Q.**    Let's turn to some other questions that defense counsel

4    asked you earlier, starting with, do you recall when counsel

5    asked you about that January 2018 meeting in Palo Alto where

6    Mr. Dillman was attending?

7    **A.**    Yes, sir.  It was in East Palo Alto.

8    **Q.**    And at the time, did Mr. Dillman hold himself out as the

9    chief strategy officer of AML BitCoin?

10    **A.**    I believe that's his exact words, his introduction.

11    **Q.**    And, in fact, did you go and look on the AML BitCoin

12    website in the course of your duties as an FBI agent and look

13    through the personnel listed on the website?

14    **A.**    Yes, I did.

15         **MR. CHOU:**  And could we please publish for the jury

16    what's been admitted into evidence as Exhibit 626.

17    **Q.**    And, sir, do you see -- do you recognize this document?

18    **A.**    I do.

19    **Q.**    And what is it?

20    **A.**    It's the -- it's the web page for the AML token sale.

21    **Q.**    And did you take these screenshots?

22    **A.**    I did.

23         **MR. CHOU:**  If we can scroll down just one by one until

24    we get to the list of all the faces on the website.  Thank you.

25    Right below NAC team.

1    Q.    Do you see --

2            MR. CHOU:  Oh, if we could just zoom in on the NAC

3    team, please.

4    Q.    You downloaded or screenshotted this website page in 2018;

5    right?

6    A.    Yes, I did.

7    Q.    And is that Mr. Dillman on the right?

8    A.    It is.

9    Q.    Chief strategy officer?

10   A.    Yes, it is.

11   Q.    And then on the left, is that Marcus Andrade, founder and

12   CEO?

13   A.    Yes, it is.

14   Q.    And after you met with Japheth Dillman, chief strategy

15   officer, in January 2018, did you, a few months later, speak

16   with Marcus Andrade, founder and CEO of NAC Foundation?

17   A.    I did.

18           MR. CHOU:  You can take this down, please, the whole

19   exhibit.

20   Q.    Counsel asked you a number of questions about

21   misrepresentations or lies that you told to AML BitCoin

22   executives in the course of your undercover duties.  Do you

23   remember that?

24   A.    Yes.

25   Q.    And what is the -- what is the approval process for doing

1   an undercover operation?

2   **A.**   The undercover operation has to be drafted in a proposal.

3   There's a -- there's a standard form that it has to follow, and

4   it's submitted to -- through the investigating office to

5   headquarters.

6   **Q.**   And headquarters has to review and approve undercover

7   operations of this nature?

8   **A.**   Yes, sir.

9   **Q.**   And so does the -- in your experience, 25 years as an FBI

10  agent, do folks just go out and do these undercover operations

11  willy-nilly?

12  **A.**   They do not.

13  **Q.**   Earlier counsel returned to each of these two

14  recordings -- well, actually, let's see here -- yeah, each of

15  these two recordings that we discussed earlier.

16      Do you remember there were two separate recordings we

17  played excerpts from?  There's the recorded phone call on

18  July 7th, 2018, according to the transcript, and then a Skype

19  video call on July 14, 2018?

20  **A.**   Yes.

21  **Q.**   Let's discuss each one in turn.

22      **MR. CHOU:**  So starting with the July 9th, 2018,

23  transcript with the five clips up at the top, if we could turn

24  to page 2.

25  **Q.**   July 9th, "Recorded Telephone Call Between

1    Andrade/UCE-7410," page 2.  Do you see in the middle of the

2    page where it says [as read]:

3             "Andrade:  There's actually NDAs in place"?

4    A.    Yes, I do.

5    Q.    Counsel asked you a number of questions about MOUs and

6    MDUs and how those aren't contracts.  Do you recall that or

7    something along those lines?

8    A.    I do recall that.

9    Q.    Do you -- did Mr. Andrade say to you in that paragraph

10   about the Panama Canal [as read]:

11            ". . . that deal was actually going back and

12            forth right now.  And we're waiting to sign actual

13            agreements now"?

14   A.    Yes.

15   Q.    Okay.  And moving on to the Skype call, other transcript,

16   July 14, 2018, first turning to page 3, counsel asked you a

17   number of questions about Mr. Andrade and some of the

18   statements he made about deals not being completely done.  Do

19   you remember that?

20   A.    Yes.

21   Q.    And she directed your attention, if you recall, to the

22   paragraph with some of the inaudible markings where it started

23   with "Now on my side," and then he goes on to say, "Because I

24   don't know anything about you individuals," or something along

25   those lines?

1    **A.**    Yes.

2    **Q.**    Based on your 25 years at the FBI as well as your

3    conversations with Mr. Andrade and the fact that here he says,

4    "The reason I'm feeling a little skeptical about, you know,"

5    was Mr. Andrade coming across to you as suspicious, seeing

6    these two folks?

7                **MS. DIAMOND:**  Objection.  No foundation.  Calls for

8    speculation.

9                **THE COURT:**  Overruled.

10    **BY MR. CHOU:**

11    **Q.**    Was Mr. Andrade coming across as suspicious, to you,

12    seeing these two folks with crewcuts show up and speak with him

13    that he hadn't met before?

14    **A.**    I'm sorry.  Could you repeat that question?

15    **Q.**    Did Mr. Andrade come across as suspicious to you, based

16    on -- suspicious of you and your colleague, based on your

17    25 years at the FBI and your conversations with Mr. Andrade,

18    including this paragraph?

19                **MS. DIAMOND:**  Objection.  Calls for an improper

20    opinion.

21                **THE COURT:**  Actually, I'm going to sustain it.  I know

22    initially I was going to overrule it, but I'm going to sustain

23    it.

24    **BY MR. CHOU:**

25    **Q.**    Turning to page 5, counsel asked you questions about what

1  appeared to be a -- what you perceived to be a disconnect

2  between some of the statements Mr. Dillman had told you, as

3  well as -- and some of the statements Mr. Andrade was recorded

4  saying.  Do you remember that?

5  **A.**    Yes.

6  **Q.**    And looking at page 5, the paragraph at the top, for

7  example, does Mr. Andrade -- did Mr. Andrade say to you

8  [as read]:

9             ". . . if he's mentioning anything about market

10        making, or return on investments, or, you know,

11        whatever that is.  Those are his own beliefs"?

12  **A.**    Yes, sir.

13  **Q.**    You don't know what conversations Mr. Andrade had with

14  Mr. Dillman in writing or otherwise, the specifics of those;

15  right?

16  **A.**    Correct, I don't.

17  **Q.**    And you don't know whether Mr. Andrade messaged people

18  about market making, do you?

19  **A.**    Correct, I don't.

20  **Q.**    Turning to page 9 of this same transcript, counsel asked

21  you questions about the MDU/MOU distinction.  Do you recall

22  that, and just MOUs in general?

23  **A.**    Yes.

24  **Q.**    And do you see down in the paragraph with Mr. Andrade

25  where he starts with, "So we're going back and forth with

1    them"?  Do you see that?  Page 9 of the Skype conversation.

2    **A.**    Yes.

3    **Q.**    Did Mr. Andrade say to you [as read]:

4            "We did finally send them over an MDU -- I'm

5        sorry, an MOU.  And, you know, we're waiting for that

6        to be signed already"?

7    **A.**    Yes.

8    **Q.**    And did he go on to say, in the next paragraph in this

9    transcript [as read]:

10           ". . . they're also interested in the

11       AML BitCoin as well.  Right now they're actually

12       accepting um I believe payments through WeChat"?

13   **A.**    Yes.

14   **Q.**    Counsel asked you some questions about Exhibit 99, the

15   email between you and Mr. Andrade that was then -- Mr. Andrade

16   forwarded to Mr. Abramoff.  Do you remember that?

17   **A.**    Yes.

18           **MR. CHOU:**  Could we please publish Exhibit 99.

19           **MS. DIAMOND:**  No objection.

20           **MR. CHOU:**  Could we please zoom in on "As it turns

21   out" in Mr. Andrade's email to you.  That's the fourth

22   paragraph.

23       Thank you.

24   **Q.**    Do you see where Mr. Andrade wrote on July 13, 2018

25   [as read]:

1            "We retooled by developing a sophisticated

2        biometric digital identification system using

3        biometrics and identifiers on the blockchain"?

4    A.    Yes.

5    Q.    During the course of your investigation, did you ever see

6    a biometric digital verification system using biometrics and

7    identifiers on the blockchain when it came to AML BitCoin?

8    A.    I did not.

9            MR. CHOU:  One moment.

10                    (Pause in proceedings.)

11            MR. CHOU:  Nothing further.

12                    **RECROSS-EXAMINATION**

13    BY MS. DIAMOND:

14    Q.    Mr. Lee, the subject of Mr. Dillman being on Mr. Andrade's

15    website was raised by you in your conversation on July 14th

16    with Mr. Andrade; is that correct?

17    A.    Yes, ma'am.

18    Q.    And he expressed surprise; correct?

19    A.    Yes, ma'am.

20    Q.    With respect to Mr. Chou's last question, that you did not

21    see any evidence of the biometric identification being on the

22    blockchain, are you technical enough to examine code?

23    A.    I do have coding experience.

24    Q.    Did you examine any of the code that was found during any

25    of the searches in this case before you retired from the FBI in

**LING - RECROSS / DIAMOND**

 1  February 2020?

 2          **MR. CHOU:**  Objection.  Foundation.  No code produced.

 3          **MS. DIAMOND:**  There is code in discovery, Your Honor.

 4  I'm just asking --

 5          **THE COURT:**  There's what?

 6          **MS. DIAMOND:**  I'm not going into the details of it

 7  here.  I just want to know if this witness has seen any code.

 8          **THE COURT:**  Well, okay.  You can answer whether or not

 9  you've seen any code.

10          **THE WITNESS:**  I have not seen any code.

11          **MS. DIAMOND:**  Thank you, Your Honor.

12          **THE COURT:**  You may step down.

13                          (Witness excused.)

14          **MR. WARD:**  The Government calls FBI Special Agent

15  Ethan Quinn.

16   (Witness enters the courtroom and steps forward to be sworn.)

17          **THE COURT:**  You could come forward, please, to be

18  sworn.

19                          **<u>ETHAN QUINN</u>**,

20  called as a witness for the Government, having been duly sworn,

21  testified as follows:

22          **THE WITNESS:**  Yes.

23          **THE COURTROOM DEPUTY:**  Please be seated.

24      Can you state your full name and spell your last name,

25  please.

1      **THE WITNESS:**  Yes.  My name is Ethan Quinn.  Last name

2  is spelled Q-u-i-n-n.

3                    **DIRECT EXAMINATION**

4  BY MR. WARD:

5  **Q.**   Good afternoon, Agent Quinn.

6      Where do you work and what is your title?

7  **A.**   I am a special agent at the San Francisco office of the

8  Federal Bureau of Investigation.

9  **Q.**   Did you participate in the investigation into Marcus

10  Andrade?

11  **A.**   I did.

12  **Q.**   When did you start participating in that investigation?

13  **A.**   It would have been December of 2016.

14  **Q.**   And what was your role in the investigation?

15  **A.**   I was one of the case agents.

16  **Q.**   And have you continued to be a part of the investigation

17  since then?

18  **A.**   I have.

19  **Q.**   I want to ask you about steps that were taken during the

20  investigation.

21      During the investigation, did you and other agents work on

22  search warrants for electronic devices?

23  **A.**   We did.

24  **Q.**   And did you obtain a search warrant and receive

25  information -- data from Mr. Andrade's cell phone?

 1   **A.**   We did.

 2   **Q.**   And did you obtain a search warrant and receive data from

 3   Mr. Jack Abramoff's cell phone?

 4   **A.**   We did.

 5   **Q.**   Did you issue a search warrant and obtain information

 6   pursuant to that warrant from electronic devices of Japheth

 7   Dillman?

 8   **A.**   We did.

 9   **Q.**   Did you also issue a search warrant for emails from an

10   individual named John Bryan?

11   **A.**   We did.

12   **Q.**   And you received emails?

13   **A.**   That's correct.

14   **Q.**   And did you also, in addition to your search warrants, did

15   you and the other agents issue a grand jury subpoena to the

16   NAC Foundation?

17   **A.**   We did.

18   **Q.**   And was that a grand jury subpoena for documents,

19   communications?

20   **A.**   That's correct.

21   **Q.**   Including business records?

22   **A.**   That's correct.

23   **Q.**   And did you receive documents and records and

24   communications back from counsel for Mr. Andrade?

25   **A.**   We did.

QUINN - DIRECT / WARD

1  Q.   Okay.  Did you conduct search warrants on physical

2  locations in this investigation?

3  A.   We did.

4  Q.   Did you conduct a search warrant of the NAC Foundation

5  offices in Las Vegas?

6  A.   That's correct.

7  Q.   And when was that?

8  A.   That would have been September of 2019, I think.  Sorry.

9  I would have to refresh to take a look.  It might have been

10  2018.  I'm sorry.

11  Q.   Twenty- -- September of 2018?

12  A.   September of 2018, yes.

13  Q.   At the time you and other agents executed the search

14  warrant on the NAC Foundation offices, did you also conduct --

15  execute search warrants on other locations?

16  A.   That's correct.

17  Q.   Did that include Jack Abramoff's residence?

18  A.   That -- it was.

19  Q.   And did that also include, a week later, Japheth Dillman's

20  residence?

21  A.   That's correct.

22  Q.   Did you later in the investigation conduct a search of

23  Marcus Andrade's residence?

24  A.   We did.

25  Q.   And when was that?

1   **A.**   That was March of 2020.

2   **Q.**   All right.  And did you search his -- the NAC Foundation

3   offices later that same day in March 2020?

4   **A.**   That's correct.

5   **Q.**   And during the search of Mr. Andrade's residence, was he

6   there?

7   **A.**   He was.

8   **Q.**   And did you speak with him?

9   **A.**   I did.

10  **Q.**   All right.  I want to go through a number of documents.

11          **MR. WARD:**  Can we look at Exhibit 1088 just for the

12  witness, please, and the parties.

13  **Q.**   Do you recognize this document?

14  **A.**   I do.

15  **Q.**   And was this a document produced pursuant to this grand

16  jury subpoena to the NAC Foundation?

17  **A.**   It was.

18  **Q.**   And what does it appear to be?

19  **A.**   It appears to be an email from Marcus Andrade, his

20  monex247 Yahoo! email account, to Terence Poon.

21          **MR. WARD:**  Move to admit Exhibit 1088.

22          **MR. STEFAN:**  No objection.

23          **THE COURT:**  1088 will be admitted.

24      (Trial Exhibit 1088 received in evidence.)

25          **MR. WARD:**  If we could blow up the top half of this,

 1    please.  That's fine.

 2    **Q.**    Agent Quinn, do you know who Terence -- did you learn who

 3    Terence Poon was in your investigation?

 4    **A.**    I did.

 5    **Q.**    And who was Mr. Poon?

 6    **A.**    Mr. Poon is a Chinese national, I believe a medical

 7    professor who helped Mr. Andrade on this project.

 8    **Q.**    If you could look at the third paragraph, does Mr. Andrade

 9    write [as read]:

10            "We already have over $9 million per year worth

11        of potential contracts.  Companies that have already

12        agreed to use our product.  Contracts are pending, we

13        already have verbal agreements in place.  We also

14        have BANKS!"?

15    **A.**    I see that.

16    **Q.**    Was that a statement Mr. Andrade made?

17    **A.**    That's correct.

18            **MR. WARD:**  All right.  We can pull that down, please.

19        If we could pull up Exhibit 598.  This is not admitted

20    either.

21    **Q.**    Do you recognize this document?

22    **A.**    I do.

23    **Q.**    Do you know how it was obtained by the FBI?

24    **A.**    This was obtained as part of the search warrant of the

25    ceo@amlbitcoin.com email account.

1    **Q.**    And who is the email from?

2    **A.**    This is from Marcus Andrade using his Yahoo! email

3    account.

4    **Q.**    And what's the date?

5    **A.**    The date is March 12th, 2017.

6         **MR. WARD:**    Move to admit Exhibit 598.

7         **MR. STEFAN:**    No objection.

8         **THE COURT:**    598 will be admitted.

9         (Trial Exhibit 598 received in evidence.)

10        **MR. WARD:**    Can you highlight the top half of this,

11    including the to/from?

12    **Q.**    This is addressed to an individual named Thomas Kane.  Did

13    you learn in your investigation who Mr. Kane was?

14    **A.**    I believe so, yes.

15    **Q.**    And who was Mr. Kane?

16    **A.**    Our understanding was Mr. Kane is a person who engages in

17    private wealth management.

18        **MR. WARD:**    Hold on one second.

19             (Pause in proceedings.)

20    **BY MR. WARD:**

21    **Q.**    You said Mr. Kane was a -- repeat the answer to the last

22    question.  Who's Mr. Kane?

23    **A.**    My understanding of Mr. Kane is that he is a person who

24    engages in private wealth management, managing money for

25    individuals who have significant funds.

1  Q.  Do you see the bottom sentence where it says [as read]:

2         "I have hired an executive team that comes from

3      Fortune 5 companies" -- "Fortune 500 companies.  We

4      will be announcing a government contract soon.  Worth

5      30 million a year"?

6      Was that a statement of Marcus Andrade?

7  A.  Yes, sir.

8         MR. WARD:  Can we go to Exhibit 716.  Again, this is

9  not admitted.

10 Q.  Do you recognize this document?

11 A.  I do.

12 Q.  How was this obtained?

13 A.  This was obtained by a grand jury subpoena.

14 Q.  To the NAC Foundation?

15 A.  That's correct.

16 Q.  Have you reviewed this document?  Is it an accurate --

17 A.  I --

18 Q.  -- reflection of the document that was produced by the

19 NAC Foundation?

20 A.  Yes, it is.

21        MR. WARD:  Move to admit 716.

22        MR. STEFAN:  No objection.

23        THE COURT:  716 will be admitted.

24     (Trial Exhibit 716 received in evidence.)

25        MR. WARD:  Can we publish the first page, please.

1   **Q.**   What is this document?

2   **A.**   This is the white paper for AML BitCoin and its business

3   model.

4        **MR. WARD:**  Can we go to the second page, please.  And

5   stop there.

6      Can we highlight the second paragraph, please.

7   **Q.**   Do you see where it says [as read]:

8        "Both coins contain the innovative safety and

9        compliance features developed by NAC"?

10  **A.**   Yes.

11       **MR. WARD:**  Can we go -- pull this out and look at the

12  next paragraph, please.

13  **Q.**   Agent Quinn, do you -- in part of your investigation, do

14  you under- -- do you know how the NAC paper was used by Marcus

15  Andrade?

16  **A.**   I believe this is one of the things that was shown to

17  potential purchasers or investors in order to tell them about

18  how the project and what their intents were -- or how the

19  project went and what the intents are and what it does.

20       **MR. WARD:**  Okay.  Thank you.  We can pull out of that.

21      Can we look at the next paragraph, please.

22  **Q.**   It says [as read]:

23        ". . . NAC will utilize a biometric

24        identification system to verify owners of wallets

25        that hold the AML BitCoin."

1          Was that part of the white paper that was used to -- shown

2    to investors?

3    **A.**    That's correct.

4          **MR. WARD:**  All right.  If we could move out of this

5    document.

6    **Q.**    As part of the investigation, was Marcus Andrade's

7    LinkedIn page accessed online and downloaded?

8    **A.**    It was.

9    **Q.**    And who did that?

10   **A.**    That was an analyst on our squad named Theresa

11   DeMaria-Valdes.

12   **Q.**    And did you review what she downloaded at the time?

13   **A.**    I did.

14         **MR. WARD:**  All right.  Can we look at Exhibit 380.

15   **Q.**    Is this an accurate representation of what she downloaded

16   from the LinkedIn page?

17   **A.**    That's correct.

18         **MR. WARD:**  And we can go to the second page and third

19   page, please.

20   **Q.**    And do you see at the bottom it's got the LinkedIn logo?

21   **A.**    I see that.

22         **MR. WARD:**  The Government moves to admit and publish

23   Exhibit 380.

24         **MR. STEFAN:**  Can I have a moment, Your Honor?

25         **THE COURT:**  Pardon?

1      **MR. STEFAN:**  May I have a moment?

2      **THE COURT:**  Okay.

3                      (Pause in proceedings.)

4      **MR. STEFAN:**  No objection.

5      **THE COURT:**  380 will be admitted.

6      (Trial Exhibit 380 received in evidence.)

7      **MR. WARD:**  Can we please highlight the paragraph that

8   says "The Aten Coin," comma, the second full paragraph.

9   **Q.**   Where it says, "The Aten Coin, rebranded as 'AML BitCoin,'

10  is perhaps the first and possibly only coin that, because of

11  its structure, is compliant with anti-money laundering,

12  anti-terrorism, and anti-terrorist financing laws, bank secrecy

13  laws," was that a statement that was reflected on Marcus

14  Andrade's LinkedIn page?

15  **A.**   That's correct.

16     **MR. WARD:**  All right.  Can we pull out of that,

17  please, and can we call up Exhibit 765, which has already been

18  admitted.  And can we highlight the content.

19  **Q.**   This is an email from Japheth Dillman to Marcus Andrade.

20  Agent Quinn, what is this document?

21  **A.**   This is -- this is an email from Mr. Dillman to -- cc'ing

22  Mr. Andrade and bcc'ing Jack Abramoff, and what it appears to

23  be is a template that Mr. Dillman intended to use to solicit

24  money for AML BitCoin.

25     **MR. STEFAN:**  Objection.  Foundation.

1          THE COURT:  Objections really do need to have to be

2     before the answer comes in, but overruled.

3          MR. STEFAN:  Well, Your Honor, and nonresponsive.  I

4     mean, the last part of his answer had nothing to do with the

5     question that was actually asked, which was:  What was the

6     document?  He then speculated regarding the purpose of the

7     document.

8          THE COURT:  Overruled.

9     BY MR. WARD:

10    Q.   Did you conduct a search of Japheth -- you said -- you

11    testified earlier you conducted a search of Japheth's email --

12    Japheth Dillman's emails.

13    A.   Correct.

14    Q.   Did you find other documents and emails -- did you find

15    other emails that used this template?

16    A.   I did.

17          MR. WARD:  Can we look at Exhibit 776.

18          THE COURTROOM DEPUTY:  Is that admitted already?

19          MR. WARD:  No.  Sorry.  This is not admitted.

20     And can we highlight the top part for the witness, please.

21    Q.   Agent Quinn, is this an email seized from Mr. Dillman's

22    electronic devices?

23    A.   It is.

24    Q.   And does this appear to be an email he sent to an

25    individual, cc'ing Marcus Andrade?

 1   **A.**   It is.

 2   **Q.**   And is the content there the same content that was in the

 3   template email you just testified to?

 4   **A.**   Correct.   The only difference is, is the addition of

 5   names.

 6          **MR. WARD:**  Move to admit Exhibit 776.

 7          **MR. STEFAN:**  No objection.

 8          **THE COURT:**  776 will be admitted.

 9       (Trial Exhibit 776 received in evidence.)

10   **BY MR. WARD:**

11   **Q.**   Looking at the to/from line, it says

12   "sanjipaularvind@gmail.com."  Do you know who that individual

13   is?

14   **A.**   Beyond this email, no.

15   **Q.**   All right.   And looking at the email, let's look at some

16   of the things that it said.   In this email, do you see where it

17   says [as read]:

18          ". . . Marcus is currently on a whirlwind tour

19       between Central America and Europe literally speaking

20       with Presidents and Prime Ministers of several

21       countries"?

22   **A.**   I do.

23   **Q.**   Is that the same language that was in the template?

24   **A.**   That's correct.

25   **Q.**   Looking at the next paragraph [as read]:

1           "The interest by these entities lies in Marcus's

2      patent portfolio that allows him to create AML

3      compliance with cryptocurrency ensuring the

4      AML BitCoin isn't used by terrorist

5      organizations . . . ."

6  **A.**   I do see that.

7  **Q.**   The next -- do you see the next sentence [as read]:

8           "I'm reaching out to you to discuss investing in

9      the initial launch of the token . . . ."?

10     Was that also in the template?

11 **A.**   It was.

12 **Q.**   The next paragraph [as read]:

13          "There are literally billions of dollars in

14     deals that are currently being negotiated right now

15     for the use of the coin . . . ."

16     Again, was that in the template?

17 **A.**   That's correct.

18 **Q.**   Do you see below where it highlights, where it says [as

19 read]:

20          "Marcus, Paul is an investor that heavily

21     invests in cryptocurrency and ICOs"?

22 **A.**   I do.

23 **Q.**   Based on your knowledge of this investigation, what does

24 this email appear to be?

25 **A.**   This appears to be Mr. Dillman soliciting an investment

1    into AML BitCoin.

2           **MR. STEFAN:**  Objection.  Foundation.  Speculation.

3           **THE COURT:**  Overruled.

4           **THE WITNESS:**  It appears to be an investment of --

5    Mr. Dillman soliciting an investment into AML BitCoin per the

6    "subject" line and the content of the email.

7           **MR. WARD:**  Can we go to Exhibit 777, not admitted into

8    evidence.

9    **Q.**   Was this also an email seized from Mr. Dillman's

10   electronic devices?

11   **A.**   It is.

12   **Q.**   Does it contain the same template that we've been

13   discussing in the other two emails?

14   **A.**   It does.

15   **Q.**   And is Marcus Andrade cc'd on the email?

16   **A.**   He is.

17           **MR. WARD:**  Move to admit Exhibit 777.

18           **MR. STEFAN:**  No objection.

19           **THE COURT:**  777 will be admitted.

20        (Trial Exhibit 777 received in evidence.)

21   **BY MR. WARD:**

22   **Q.**   Is this the same template that we've discussed with the

23   prior two emails?

24   **A.**   It is.

25   **Q.**   Agent Quinn, did you -- prior to testifying, did you

1  review Exhibits 778, 779, 780, 781, 782, 783, 784, 785, and

2  786?

3  **A.**   I did.

4  **Q.**   Are all of those emails seized from Mr. Dillman's

5  electronic devices?

6  **A.**   They were.

7  **Q.**   Are they all emails to individuals using the investor

8  template that you see in this document?

9  **A.**   That's correct.

10       **MR. WARD:**  Would move to admit all of those documents,

11  and I can -- do you want me to read them again?

12       **THE COURT:**  No.  We have the record.

13       **MR. WARD:**  Move to admit 778, 779, 780, 7801 -- 781 --

14  sorry -- 782, 783, 784, 785, and 786.

15       **MR. STEFAN:**  No objection.

16       **THE COURT:**  The exhibits just recited will be

17  admitted.

18       (Trial Exhibits 778, 779, 780, 781, 782, 783, 784, 785,

19  and 786 received in evidence.)

20       **MR. WARD:**  We don't need to publish those for the jury

21  at this point.

22       Can we look at --

23  **Q.**   Let me ask you -- let me ask you a different question.

24       As part of the investigation, did you go to an online

25  forum called BitcoinTalk?

1    **A.**    I did.

2    **Q.**    And did you make images of what was posted on that forum

3    and preserve them?

4    **A.**    I did.

5    **Q.**    Can you look at Exhibit 865.  And it's a -- it's a long

6    exhibit.

7         Did you review this exhibit prior to testifying here

8    today?

9    **A.**    I did.

10   **Q.**    And is this an accurate depiction of the images you took

11   from the BitcoinTalk forum, downloaded and imaged those

12   forms --

13   **A.**    That's correct.

14   **Q.**    -- those pages?

15        And the date at the top says October 16th, 2017?

16   **A.**    Yep.

17   **Q.**    Is that the date that you downloaded these?

18   **A.**    It is.

19            **MR. WARD:**  Move to admit Exhibit 865.

20            **MR. STEFAN:**  No objection.

21            **THE COURT:**  865 will be admitted.

22        (Trial Exhibit 865 received in evidence.)

23            **MR. WARD:**  All right.  We can publish for the jury.

24   **Q.**    Is this -- is this an image of the page -- the first part

25   of the page?

 1   **A.**   That's correct.

 2         **MR. WARD:**  And can we go to the second page, please.

 3   **Q.**   And when it says, "The AML BitCoin ICO is now live," what

 4   does that -- what do you understand that to mean?

 5   **A.**   I believe it's referring to the beginning of the ICO for

 6   the AML BitCoin Token.

 7         **MR. WARD:**  All right.  We can pull out of that,

 8   please.

 9         Can we go to the next page, please.

10         Down one more.

11         And can we highlight where it starts "Latest Press" down

12   to the bottom.

13   **Q.**   Are these links to -- what are these?

14   **A.**   These are links to the various press articles that are

15   associated with AML BitCoin.

16         **MR. WARD:**  All right.  We can pull that down.

17         Can we pull up Exhibit 1465, not admitted.

18   **Q.**   Have you reviewed this email?

19   **A.**   I have.

20   **Q.**   And where did this email come from?

21   **A.**   This, I believe, came from Mr. Dillman's search warrant.

22   **Q.**   All right.  And is Marcus Andrade cc'd on this email?

23   **A.**   He is.

24         **MR. WARD:**  Move to admit 1465.

25         **MR. STEFAN:**  Your Honor, this exhibit gets at one of

 1    the completeness issues that was addressed with the Court

 2    earlier.

 3        This exhibit gets at one of the completeness objections

 4    that the defense had raised for the Court earlier.

 5            **THE COURT:**  Suggesting more -- I'm not sure what

 6    you're talking about.

 7            **MR. STEFAN:**  Yes, Your Honor.  Before we came on with

 8    the jury today, the discussion that Mr. Shepard had with you

 9    regarding potential completeness issues and some of the --

10            **THE COURT:**  What is -- is there -- what aspect of this

11    are you saying is incomplete?

12            **MR. STEFAN:**  Contextually, that there were subsequent

13    involvements of Mr. --

14            **THE COURT:**  Well, no, no, no, no.  Is there more to

15    this document than is being offered at the moment?

16            **MR. STEFAN:**  Not to this document, no, Your Honor.

17            **THE COURT:**  All right.  Overruled.

18        1465 will be admitted.

19        (Trial Exhibit 1465 received in evidence.)

20            **MR. WARD:**  Can we highlight the top part of it,

21    please.

22        I'm sorry, not this part.  Can we highlight the bottom

23    half, from October 26th on.

24        Can we highlight that.

25    **Q.**    Is this an email from Marcus Andrade?

1   **A.**   It is.

2   **Q.**   Where he says, "I saw the Telegram exchange on the press

3   releases being held up by Neil.  Obviously, we can't have that.

4   I have loaded up a huge workload for Neil, most of which is

5   urgent, so I think we should take him out of this press loop,"

6   do you know who -- based on what you've learned in the

7   investigation, do you know who the Neil is that Mr. Andrade is

8   referring to?

9   **A.**   Yes.  I believe that to be Neil Sunkin.

10  **Q.**   And who was Neil Sunkin?

11  **A.**   He was an attorney who was associated with them, who was

12  doing some for work for the AML BitCoin project at the time.

13         **MR. WARD:**  All right.  We can pull out of this.

14  **Q.**   Agent Quinn, did you, at some point in the investigation,

15  subpoena Twitter for information about the AML BitCoin Twitter

16  website?

17  **A.**   Correct, we did.

18         **MR. WARD:**  Can we look at Exhibit 652.  652.

19  **Q.**   Do you recognize this?

20  **A.**   I do.

21  **Q.**   What is it?

22  **A.**   This is some of the records provided to us by Twitter,

23  including information on who controlled a particular account.

24  **Q.**   Does it have a phone number indicating the phone number

25  that is tied to the AML BitCoin account?

1    **A.**    It does.

2    **Q.**    And do you recognize the phone number?

3    **A.**    I do.

4    **Q.**    And whose phone number is it?

5    **A.**    That's Mr. Andrade's.

6         **MR. WARD:**  Move to admit 652.

7         **MR. STEFAN:**  No objection.

8         **THE COURT:**  652 will be admitted.

9         (Trial Exhibit 652 received in evidence.)

10   **BY MR. WARD:**

11   **Q.**    You testified earlier, Agent Quinn, that you -- well, did

12   you at some point seize a cell phone from Marcus Andrade?

13   **A.**    Correct.  It was seized during the search warrant of his

14   home.

15   **Q.**    And did you search that cell phone?

16   **A.**    The FBI did, yes.

17   **Q.**    Did you search and seize various photographs on the

18   device?

19   **A.**    We did.

20        **MR. WARD:**  Could we pull up Exhibit 805.

21   **Q.**    What is 805?

22   **A.**    805 is an image that was on the cell phone that we

23   searched.

24        **MR. WARD:**  Move to admit Exhibit 805.

25        Just don't highlight it yet.

1          **MR. STEFAN:**  No objection.

2          **THE COURT:**  805 will be admitted.

3      (Trial Exhibit 805 received in evidence.)

4          **MR. WARD:**  So can we back out of the highlighting

5  first.

6  **Q.**  Just to be clear, Agent Quinn, this appears to be an image

7  taken of a piece of paper.  What did you seize -- what did you

8  actually seize?

9  **A.**  So we seized his phone, and on the phone, was an image

10  that was -- appeared to be a picture of a piece of paper.

11  **Q.**  So someone took the picture, and it's the image that's on

12  the phone?

13  **A.**  That's correct.

14  **Q.**  And looking at this, what does this appear to be?

15  **A.**  It appears to be a list of accounts, email accounts,

16  Twitter accounts, and so forth, as well as the username,

17  abbreviated "UN," and then the password with those accounts.

18  **Q.**  And what are the first two letters of all the passwords?

19  **A.**  They're M and A.

20  **Q.**  All right.  Thank you.

21      At the time you began investigating AML BitCoin, was there

22  a -- did you become aware of a separate investigation into

23  Aten Coin?

24  **A.**  That's correct.

25  **Q.**  And who was investigating Aten Coin?

1    **A.**    That was our field -- the FBI field office in Houston.

2    **Q.**    And did you speak to agents in the Texas office?

3    **A.**    We did.

4    **Q.**    And then what happened to that investigation in relation

5    to your investigation?

6    **A.**    The FBI San Francisco took the lead on investigating.

7    **Q.**    And did they ever bring any charges --

8    **A.**    They did not.

9    **Q.**    -- in that case?

10    **MR. WARD:**  Okay.  Going back to the grand jury

11    subpoena to the NAC Foundation, can you -- can we look at

12    Exhibit 1087, please.

13    **Q.**    Do you recognize this email?

14    **A.**    I do.

15    **Q.**    And was this one of the emails produced pursuant to the

16    grand jury subpoena issued to the NAC Foundation?

17    **A.**    It is.

18    **Q.**    And the email, who is it from?

19    **A.**    It is from Marcus Andrade, using his Yahoo! email account.

20    **MR. WARD:**  Move to admit Exhibit 1087.

21    **MR. STEFAN:**  No objection.

22    **THE COURT:**  1087 will be admitted.

23    (Trial Exhibit 1087 received in evidence.)

24    **MR. WARD:**  All right.  Can we highlight the top part

25    of it, please.  Yeah, that's fine.

1  Q.  Who is this email from?

2  A.  It's from Mr. Andrade using his Yahoo! email account.

3  Q.  And who is it to?

4  A.  It's to a PR team at ereleases dot -- or ERE release --

5  sorry -- ereleases.org.

6  Q.  And when it says "Different PRs that need to go out," what

7  does "PR" stand for?

8  A.  My understanding, it would be public relations.

9        MR. WARD:  Okay.  Can we back out of this part of the

10  email, please.

11     And then let's go to the bottom part.

12  Q.  Where it says Number 3, "ANXPRO, a major Bitcoin exchange,

13  is proud to announce that he will soon be listing Aten Coin,"

14  was that one of the bullet points under the PR that needs to go

15  out?

16  A.  That's correct.

17  Q.  And then it says [as read]:

18        "BGC International is proud to announce that it

19     has purchased ownership of a Poland-based Bitcoin

20     Payment Processing Company . . . ."

21     Was that also under the heading of PR that needs to go

22  out?

23  A.  That's correct.

24  Q.  Okay.  As part of the grand jury subpoena to the

25  NAC Foundation, did the FBI request the production of source

1    code for AML BitCoin and Aten Coin and the underlying

2    technology?

3    **A.**   We did.

4    **Q.**   And was any of that produced pursuant to that grand jury

5    subpoena?

6    **A.**   Not to my knowledge.

7    **Q.**   Okay.  You testified that you -- the FBI conducted a

8    search of Marcus Andrade's house in March of 2020.

9    **A.**   That's correct.

10    **Q.**   And prior to that search, did you take photos of the

11    house?

12    **A.**   Yes.

13         **MR. WARD:**  Can we look at Exhibit 347, please.

14    **Q.**   Is that a picture of the house?

15    **A.**   It is.

16         **MR. WARD:**  Move to admit Exhibit 347.

17         **MR. STEFAN:**  No objection.

18         **THE COURT:**  347 will be admitted.

19    (Trial Exhibit 347 received in evidence.)

20         **MR. WARD:**  Can we pull up now Exhibit 348.

21    **Q.**   What is this?

22    **A.**   It's also a picture of his house.

23         **MR. WARD:**  And move to admit Exhibit -- oh, we're

24    not -- did we publish 347?

25         **THE COURTROOM DEPUTY:**  No.

 1              **THE COURT:**  You need to ask us.

 2              **MR. WARD:**  I thought admitting and publishing happened

 3   together.

 4         Can we admit and publish -- let's go back to 347.

 5   **Q.**   Is that the front of Marcus Andrade's house?

 6   **A.**   That is.

 7              **MR. WARD:**  All right.  Let's look at Exhibit 348.

 8         Move to admit Exhibit 348.

 9              **MR. STEFAN:**  No objection.

10              **THE COURT:**  348 will be admitted.

11         (Trial Exhibit 348 received in evidence.)

12              **MR. WARD:**  Can we publish for the jury.

13   **Q.**   Is this another image of Mr. Andrade's house and the truck

14   in the driveway?

15   **A.**   It is.

16              **MR. WARD:**  Can we look at Exhibit 342.

17   **Q.**   Again, what is that?

18   **A.**   It is another image of Mr. Andrade's house.

19              **MR. WARD:**  Move to admit Exhibit 342.

20              **MR. STEFAN:**  No objection.

21              **THE COURT:**  342 will be admitted.

22         Pardon?  Yes.

23              **MR. STEFAN:**  I was not objecting.

24              **THE COURT:**  Okay.  342 will be admitted, and you may

25   publish it.

1           (Trial Exhibit 342 received in evidence.)

2           **MR. WARD:**  Please publish.

3  **Q.**   Okay.  Agent Quinn, during the search of Mr. Andrade's

4  house, did you speak to Mr. Andrade?

5  **A.**   I did.

6  **Q.**   And were you wear- -- were you wearing a recording device

7  during that conversation?

8  **A.**   I was.

9  **Q.**   Did Mr. Andrade know that you were wearing a recording

10  device when you spoke to him?

11  **A.**   He did not.

12  **Q.**   Have you reviewed Exhibits 1485, 1486, 1487, and 1521?

13  **A.**   I have.

14  **Q.**   Are those excerpts of that conversation -- that

15  conversation?

16  **A.**   That's correct.

17  **Q.**   Is it the entire conversation?

18  **A.**   It is not.

19  **Q.**   Okay.  Approximately how long was the entire conversation?

20  **A.**   I believe it was approximately an hour.

21          **MR. WARD:**  Okay.  Your Honor, at this point, I would

22  like to hand out transcripts of Exhibit 1485.  Thank you.

23          **THE COURT:**  Have you moved 1485 in?

24          **MR. WARD:**  No, but I will.  I want to admit, move into

25  evidence, and then we'll play.

1          **THE COURT:**  Okay.

2          **MR. WARD:**  Well, let's do it first.  The Government

3   moves to admit Exhibit 1485 into evidence.

4          **MR. STEFAN:**  The Government reraises its objection.

5          **THE COURT:**  You're not the Government.

6          **MR. STEFAN:**  Pardon me.  Once upon a time.

7      The defense moves, again, under the filing that we made

8   with the Court earlier under rule of completeness.  We just

9   renew our objection, Your Honor.

10         **THE COURT:**  Right.  You're actually not, as I

11  understand it, objecting.  You're saying you want to supplement

12  it.  So are you -- but you're objecting to it in its

13  non-supplemented form.

14     Okay.  Overruled.  It'll be admitted.

15     (Trial Exhibit 1485 received in evidence.)

16         **MR. WARD:**  The Government moves to play Exhibit 1485.

17  Actually, let me stop first.

18     In this recording -- may I approach the witness with it?

19         **THE COURT:**  Yes.

20  **BY MR. WARD:**

21  **Q.**   Is this -- is this a recording of your conversation with

22  Mr. Andrade?

23  **A.**   It is.  Or, I'm sorry.  This is a transcript of that

24  recording.

25  **Q.**   And is it -- and who was present during -- you were

1  present during this conversation.  Was there another agent

2  present during the conversation?

3  **A.**   Yes.  There's a number of agents conducting the search

4  warrant, but another agent sitting there with me talking to

5  Mr. Andrade.

6  **Q.**   And who was that?

7  **A.**   That was IRS Special Agent Bryan Wong.

8           **MR. WARD:**  All right.  The Government would move to

9  publish and play Exhibit 1485.

10          **THE COURT:**  You may.  1485 is admitted, and you may

11 play it.

12               (Audio was played but not reported.)

13          **THE COURT:**  Can you stop for a moment?  Can you stop

14 it?

15      The jurors have commented, can you tone down the volume?

16               (Audio was played but not reported.)

17          **THE COURT:**  It's still pretty loud.  Is that the best

18 we can do?

19          **MR. WARD:**  Let me see.

20          **THE COURT:**  I want to inquire of the jury if they're

21 okay to go to 1:30.  We took breaks early.  So, everybody okay?

22 They can hang in there till 1:30?

23      Okay.  Good.

24               (Audio was played but not reported.)

25 \\\

```
 1   BY MR. WARD:

 2   Q.   A couple of questions, Agent Quinn.  Did you learn in your

 3   investigation who Mark D'Adamo was?

 4   A.   Yes, I did.

 5   Q.   Who was he?

 6   A.   Mark D'Adamo was a Canadian who engaged in selling --

 7          MR. STEFAN:  Objection.  Hearsay.

 8          THE COURT:  Overruled.

 9          THE WITNESS:  -- engaged in selling investment folks

10   opportunities.

11        He also worked with Mr. Andrade on these projects.

12          MR. STEFAN:  Objection.  Foundation.

13          THE COURT:  Overruled.

14   BY MR. WARD:

15   Q.   Let me ask you, sir.  Did you -- in your investigation,

16   did you learn that Mark D'Adamo worked with and for Marcus

17   Andrade?

18   A.   I did.

19   Q.   In the recording, Mr. Andrade talks about quality

20   assurance forms.  Do you know what he's referring to?

21   A.   I believe he's referring to quality assurance forms that

22   were -- that we found at --

23          MR. STEFAN:  Objection.  Speculation.

24          THE COURT:  Overruled.

25          THE WITNESS:  We found forms -- quality assurance
```

1  forms at his NAC Foundation office in Las Vegas.  I believe

2  that's what he was referring to.

3  **BY MR. WARD:**

4  **Q.**   And what are the -- generally, what do the quality

5  assurance forms contain?

6  **A.**   They were one-page forms that had, I believe, four

7  questions on it, which would ask how many -- what was the price

8  of the coin that they purchased, how many, if they understood

9  that Black Gold Coin did not have oil and gas as a collateral,

10  and if they felt their salesperson was honest and acted with

11  integrity.

12  **Q.**   And were some of those filled out --

13  **A.**   That's correct.

14  **Q.**   -- from what you reviewed?

15        Okay.  I want to go to another exhibit.  Can we -- have

16  you reviewed Exhibit 1486?

17  **A.**   I have.

18  **Q.**   Is that another portion of the same conversation with

19  Mr. Andrade?

20  **A.**   It is.

21        **MR. WARD:**  The Government would move to admit 1486.

22        **MR. STEFAN:**  Contingent on the same.

23        **THE COURT:**  All right.  I will admit 1486.

24        (Trial Exhibit 1486 received in evidence.)

25        **MR. WARD:**  May I pass out?

1          **THE COURT:**  Yes.

2          **MR. WARD:**  Thanks.

3      Can we play 1486, please.

4      We're going to test the audio, if we could.

5          **THE COURT:**  Okay.

6              (Audio was played but not reported.)

7   BY MR. WARD:

8   **Q.**   Agent Quinn, in your search of the NAC Foundation offices,

9   did you find recordings of calls with investors or purchasers

10  of Aten Coin or AML BitCoin?

11  **A.**   I did not find any.

12  **Q.**   And did you find any recorded conversations between Marcus

13  Andrade and investors or purchasers of Aten Coin?

14  **A.**   I did not.

15  **Q.**   When Mr. -- when you said "You didn't sell a coin to

16  anybody beside -- before August of this last year before we got

17  involved" and Mr. Andrade says "Okay.  Not that I recall, that

18  I -- that I personally," based on your investigation, did you

19  find evidence that Marcus Andrade did speak to investors prior

20  to your investigation?

21  **A.**   I did.

22  **Q.**   Agent Quinn, have you reviewed Exhibits -- the recordings

23  for Exhibit 1487 and 1521?

24  **A.**   I have.

25  **Q.**   Are they another segment of the same conversation?

 1   **A.**   That's correct.

 2   **Q.**   And they're broken down into two consecutive exhibits?

 3   **A.**   That's correct.

 4   **Q.**   And are they accurate?

 5   **A.**   They are.

 6        **MR. WARD:**  Your Honor, at this point I would move to

 7   admit and play first Exhibit 1487 and then Exhibit 1521 and

 8   pass out transcripts to the jury.

 9        **THE COURT:**  All right.  You can make your objection,

10   Mr. Stefan, if that's what you want to do.

11        **MR. STEFAN:**  No objections additional to those that

12   we've already posed.

13        **THE COURT:**  All right.  So 1487 and 1521 will be

14   admitted, and you may proceed.

15     (Trial Exhibits 1487 and 1521 received in evidence.)

16   **BY MR. WARD:**

17   **Q.**   While they're passing those out, Agent Quinn, did IRS

18   Special Agent Bryan Wong also participate --

19   **A.**   He did.

20   **Q.**   -- in this?

21        **MR. WARD:**  Okay.

22             (Audio was played but not reported.)

23        **MR. WARD:**  Can we pull up Exhibit 1521.

24             (Audio was played but not reported.)

25   \\\

 1   BY MR. WARD:

 2   Q.   Mr. Andrade -- you had a back-and-forth with Mr. Andrade

 3   about the purchase of his house.  Do you know when the house

 4   was purchased?

 5   A.   I don't know off the top of my head.  It was -- yeah, I

 6   would have to refresh my recollection on that.

 7   Q.   Was it some months after the ICO was completed?

 8   A.   That is correct.

 9           MR. WARD:  Can I have one moment, Your Honor?

10           THE COURT:  Yes.

11                       (Pause in proceedings.)

12   BY MR. WARD:

13   Q.   One last thing, Agent Quinn.

14           MR. WARD:  Can we pull up Exhibit 1465, which has been

15   admitted.

16       Can we look at the top part from Japheth Dillman --

17   sorry -- the middle.  I'm sorry.  The middle -- the middle

18   part.

19       Farther down.

20       That's good.

21   Q.   When Mr. Dillman writes to Mr. Andrade, "Okay, thanks for

22   the heads-up.  I'm forging some agreements to buy a large bulk

23   (in the millions)," do you know what he meant when he said "I'm

24   forging some agreements"?

25           MR. STEFAN:  Objection.  Calls for speculation.

```
 1          THE COURT:  Sustained.

 2          THE WITNESS:  Oh, sustained.

 3          MR. WARD:  Sustained.

 4      Nothing further.  Thank you.

 5                      CROSS-EXAMINATION

 6  BY MR. STEFAN:

 7  Q.   Good afternoon, Agent Quinn.

 8  A.   Good afternoon.

 9  Q.   First I want to clarify, the search of the house,

10  Mr. Andrade's residence, happened on a different day than the

11  search of his office; right?

12  A.   Well, there was the search of the NAC Foundation office in

13  Las Vegas.  We also searched an office in Houston the same day,

14  to my recollection.

15  Q.   Understood.

16      The search of those two offices was on separate occasions?

17  A.   They were separate search warrants, and maybe I'm

18  misremembering.  I believe we did the search warrant of the

19  office in the afternoon after doing the house.

20  Q.   Specifically, though, I'm referring to the search of the

21  Las Vegas office.

22  A.   Correct.  Yes, that was done on a prior time.

23  Q.   That was done back in 2018.  I believe you had said

24  September 2018?

25  A.   Yes.
```

1  **Q.**  When you searched the Las Vegas office, Mr. Andrade wasn't

2  present at the time of that search; right?

3  **A.**  He was not.

4  **Q.**  There were some other office staff who were present.  Do

5  you recall that?

6  **A.**  I wasn't physically present at the Las Vegas search

7  warrant, but my understanding, there were other people there.

8  **Q.**  Would it have been surprising to you that those agents

9  instructed the office staff there at the Las Vegas office to

10  not relay that the search had occurred to Mr. Andrade?

11          **MR. WARD:**  Objection.  Lack of foundation.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  Would it be surprising to me that

14  they -- it wouldn't be surprising.

15  **BY MR. STEFAN:**

16  **Q.**  Would that be standard when conducting a search in an

17  office?

18  **A.**  When we conduct a search in an office, we would leave a

19  receipt of what we seized and a copy of the search warrant for

20  the official notification of the owner.

21          My understanding from the NAC Foundation office in

22  Las Vegas is it was a communal office area.  There was a group

23  called the Office Squad, which managed a number of different

24  kind of day-use offices.  So it wouldn't be uncommon to say,

25  "Hey, don't notify" if it's people who aren't the owners of the

1    property.

2    **Q.**    Don't notify those people?

3    **A.**    Correct.  We would have left -- I mean, he would have

4    gotten his official notification through the receipt; and, of

5    course, obviously, we ultimately contacted -- were contacting

6    counsel.  So...

7    **Q.**    Right.  There could be some period of time that would

8    transpire before somebody could come into receipt of the

9    receipt that you're indicating?

10   **A.**    Correct, but typically, it would be that day, so...

11   **Q.**    Not necessarily, though?

12   **A.**    No.  Once we leave that receipt, it's kind of up to the

13   property owner.

14   **Q.**    Exactly.  It's basically whenever the property owner acts

15   on the receipt or sees the receipt; right?

16   **A.**    Correct.

17   **Q.**    And the property owner could delay that or could

18   immediately provide it?  Or really, it's up to the property

19   owner's discretion?

20   **A.**    That's correct.

21   **Q.**    You're not aware of any evidence that Mr. Andrade was

22   alerted the same day that that search occurred in the Las Vegas

23   office?

24   **A.**    Not to my recollection right now, no.

25   **Q.**    Turning to the search of Mr. Andrade's home on March 12 of

1    2020, that's the correct date; right?

2    **A.**    I believe so, yes.

3    **Q.**    We heard in the videos a whole lot of ruckus in the

4    background.  Who all was present for this search?

5    **A.**    So from my recollection, we had IRS agents who were

6    physically conducting the search, looking through the rooms and

7    seizing information.  There was also Mr. Andrade's family who

8    was present as well.

9    **Q.**    Who was that comprised of?

10   **A.**    His wife and his children.

11   **Q.**    How many children?  Do you recall?

12   **A.**    I don't recall -- he had two or three, but I don't recall

13   the total amount.

14   **Q.**    Their ages?

15   **A.**    They were young.  I don't recall their age.

16   **Q.**    And the other individuals present, you said IRS agents.

17   Were there any local authorities in support as well?

18   **A.**    I don't remember if there was local authorities.  It's

19   common for us to have a uniformed officer assisting, not

20   typically in the -- during the search, but maybe assisting

21   during the entry, but I don't recall if we specifically had a

22   Houston police officer there or not.

23   **Q.**    Of course you were present in the search --

24   **A.**    Yes.

25   **Q.**    -- correct?

1      And I know Agent Wynar --

2  **A.**   Correct.

3  **Q.**   -- was also present.

4      What other FBI agents can you recall were present?

5  **A.**   I believe Brendan Zartman was also present.  I don't

6  remember if we had any other FBI personnel present the day.

7  **Q.**   And about how many IRS personnel do you recall being

8  present?

9  **A.**   I believe eight, but I -- that's just a ballpark.  I don't

10  recall a specific amount.

11  **Q.**   And if you were to hear back your recording and hear

12  discussion with Mr. Andrade regarding the presence of local

13  authorities, would that be surprising to you?

14  **A.**   It wouldn't be surprising.  We oftentimes have local

15  authorities during the assistance of -- they may even enter,

16  but they typically stay on the outside.  But it wouldn't be

17  shocking if there was a uniformed officer there, but I don't

18  have a specific recollection of it.

19  **Q.**   So there's at least, I think, 11 IRS and FBI agents that

20  we've accounted for between yourself, Agents Zartman and Wynar,

21  and then the IRS personnel; is that correct?

22  **A.**   Yes, approximately.

23  **Q.**   And then potentially, though you don't have a specific

24  recollection, the local authorities who are in support of the

25  search as well?

1    **A.**    That's correct.

2    **Q.**    Would you have conducted this search while armed?

3    **A.**    Yes, we were armed.

4    **Q.**    And would that be the case for all of the agents who were

5    present during the search?

6    **A.**    That's correct.

7    **Q.**    Is that standard procedure?

8    **A.**    It is.

9    **Q.**    Was Mr. Andrade compliant when you conducted your search

10    of his home?

11    **A.**    He was.

12    **Q.**    So describe the process here.  You come up to the door.

13    You knock on the door, say, "FBI present" or "Open up"?  What

14    did you do?

15    **A.**    So in this particular case, the IRS is the one that did

16    the knock-and-announce and entered the property.  Myself, I

17    wasn't present at the front door until afterwards.

18        But the typical procedure is you knock, you announce

19    there's a search warrant, tell them to come to the door.  Once

20    they come to the door, we enter.

21    **Q.**    And when you-all enter, it will be basically everybody

22    who's conducting the search or providing security for the

23    search?

24    **A.**    Correct.

25    **Q.**    Some number of people there aren't just there to collect

1  material.  They may also just be there to provide some kind of

2  overwatch; is that right?

3  **A.**  Yes.  During the initial portion of the clearing the

4  house, you're not conducting a search.  You're clearing to

5  ensure it's safe and secure.  So that would have been the IRS

6  personnel in this case.

7      And then there would be people there who would --

8  you know, if there's other folks present when you're conducting

9  the search, after the area is secure, you might have an agent

10  or two staying with those other people while you conduct the

11  search.

12  **Q.**  And when you say "securing the area," there's -- it's

13  basically a room-to-room process; is that right?

14  **A.**  That's correct.

15  **Q.**  You and the other agents, before conducting the search of

16  the house, are going room by room, checking corners, checking

17  doors; right?

18  **A.**  That's correct.

19  **Q.**  You want to make sure that nobody is concealed in the

20  house somewhere that you don't know about?

21  **A.**  That's correct.

22  **Q.**  And that process would be done pretty meticulously --

23  correct? -- going room by room and checking everything?

24  **A.**  Yeah.  The standard practice is to clear every room in the

25  home.

1  **Q.**  Would you in these circumstances be announcing "Clear" to

2  each other as you were going through the different rooms in the

3  home?

4  **A.**  Well, in this case, it was conducted by the IRS.  I was

5  not present internally.  But that is standard law enforcement.

6  **Q.**  As the agents are entering the room, would weapons have

7  been drawn in this instance?

8  **A.**  That would be my understanding.  That would have been

9  standard at the time.

10  **Q.**  So they would enter the room weapons drawn, and they're

11  essentially checking their corners, if you will?

12  **A.**  That's correct.

13          **MR. WARD:**  Object as irrelevant.

14          **THE COURT:**  What is the relevance of this?

15          **MR. STEFAN:**  Providing the context regarding the

16  statements that Mr. Andrade provided to the agent and all

17  the --

18          **THE COURT:**  All right.  Go ahead.

19  **BY MR. STEFAN:**

20  **Q.**  It will be difficult for me to restate my question exactly

21  as I asked it before, but this was essentially room-by-room

22  check with weapons drawn to ensure that there's no hazards in

23  the room to pose to the agents?

24  **A.**  That's correct.

25  **Q.**  And the agents would announce that after they had verified

1    that, in fact, a room was clear?  They would announce that?

2    **A.**    That's correct.

3    **Q.**    And you might hear the kind of chatter that you would hear

4    in movies or video games, you know, "Checking left" or

5    "Checking right" or, you know, "Clear this way," "Clear that

6    way."  Is that about right?

7    **A.**    Potentially.  Again, I wasn't on the interior of this, but

8    it would be fairly standard you would say "Closet clear" or

9    something along those lines.

10   **Q.**    The weapons that were employed that day, was it only

11   handguns or also rifles?

12   **A.**    I actually don't recall if the IRS was using long guns

13   during that.  I believe it was just handguns, but I actually

14   don't remember if there was any long guns used or not.

15   **Q.**    How about body armor or, like, shields or helmets?  What

16   kind of tactical gear?

17   **A.**    I don't believe there was any helmets.  I believe the IRS

18   agents were wearing body armor that stated "IRS" or "Police" on

19   that, and I don't recall if they used a shield or not for this

20   search warrant.

21   **Q.**    And in this instance, was a ram brought?  I assume a ram

22   wasn't used; right?

23   **A.**    That's correct.  I believe we had a ram available, but no

24   ram was required.  Mr. Andrade came to the door.

25   **Q.**    And just to give an idea, I mean, 11 agents, about how

1  many vehicles do you recall being present?

2  **A.**   Probably about five or six.

3  **Q.**   And of what variety?  Are these SWAT team vehicles, just

4  patrol cars?  What kind of vehicles are we talking?

5  **A.**   These would have been fairly standard-looking, just

6  regular cars.

7  **Q.**   Okay.  How long does this process of clearing the house

8  take before getting into the search portion of the work?

9  **A.**   It obviously depends on the situation.  This case, I don't

10  believe it took very long, maybe ten minutes, but I don't

11  recall specifically how long it took.  It didn't feel

12  particularly longer than standard.

13  **Q.**   Was it during this process that you made contact with

14  Mr. Andrade in the house?

15  **A.**   I made contact with him after the house was secured.

16  **Q.**   Okay.  So following the house being secured, you initiated

17  a conversation with Mr. Andrade?

18  **A.**   Correct.  He was already talking to folks when I arrived.

19  I believe he had been talking to Agent Wong initially, but then

20  I began talking to him shortly thereafter.

21  **Q.**   And soon after you began talking with him, he asked you if

22  he could call his attorney; is that right?

23  **A.**   I believe he did, yes.

24  **Q.**   And at the time, you said that you needed his personal

25  phone; correct?

**QUINN - CROSS / STEFAN**

1    **A.**    Correct.

2    **Q.**    You did offer and indicate that another phone could

3    potentially be used?

4    **A.**    Yes.

5    **Q.**    But he -- you also said you don't know which -- when he

6    says "attorney," which attorney because your understanding is

7    that he had a lot?

8    **A.**    Correct.

9    **Q.**    And you kind of made a joke about that.

10    Is that right?

11    **A.**    Oh, I didn't realize that was a question.  Yes.

12    **Q.**    And you had seized his phone at that point already; is

13    that correct?

14    **A.**    My understanding is, yes, I believe an IRS agent seized

15    his phone at that point.

16    **Q.**    And he did indicate to you, after you kind of asked the

17    joking question about which attorney, he indicated to you he

18    had an attorney with Bell Nunnally law firm; right?

19        **MR. WARD:**  Objection, Your Honor.  This is hearsay.

20        **THE COURT:**  Why isn't it hearsay?

21        **MR. WARD:**  He's eliciting Mr. Andrade's --

22        **THE COURT:**  No.  I'm asking counsel.

23        **MR. STEFAN:**  Well, regardless of the truth content of

24    the statement, it is evidence that is indicia of the potential

25    voluntariness of --

1          **THE COURT:**  That's why I've let you set the stage of

2     what the -- all these questions you've been asking about, the

3     atmosphere, which, arguably, you're doing so we can understand

4     the context of his statements.  But that then doesn't go to

5     specific hearsay statements.  So that is sustained.

6          Go ahead.

7     **BY MR. STEFAN:**

8     **Q.**  He did indicate to you that he had an attorney?

9          **MR. WARD:**  Same objection.

10          **THE COURT:**  I'll allow that.

11          Go ahead.

12          **THE WITNESS:**  He did.

13    **BY MR. STEFAN:**

14    **Q.**  Now, you didn't stop the conversation at that point;

15    correct?

16    **A.**  I did not.  I told him he was free to leave and he can --

17    we can potentially arrange for him to have a phone call, but I

18    was asking him which one.

19    **Q.**  You'd asked him which attorney?

20    **A.**  Yes, if he wanted to make a call.

21    **Q.**  He had indicated he wanted to make the call?

22    **A.**  Correct.

23    **Q.**  But you did continue to speak with him; correct?

24    **A.**  I did.

25    **Q.**  You didn't inform him he was being recorded?

QUINN - CROSS / STEFAN

1  **A.**   I did not.

2  **Q.**   And then you continued interviewing Mr. Andrade for about

3  another 38 minutes or so?

4  **A.**   Correct.

5  **Q.**   And in the course of that interview, you discussed quite a

6  few topics with him; is that right?

7  **A.**   We did.

8  **Q.**   You talked about -- or asked him about how he had come to

9  purchase the house; right?

10 **A.**   I did.

11 **Q.**   About certain people who had worked with him in his

12 businesses before.  I think we heard, you know, one on the

13 recording, a Brian Darrow; right?

14 **A.**   That's correct.

15 **Q.**   You talked about his tax history?

16 **A.**   Correct.

17 **Q.**   And the development of his cryptocurrency?

18 **A.**   That's correct.

19 **Q.**   How far along his technology was?

20 **A.**   Correct.

21 **Q.**   You asked him any number of statements in that context

22 that would potentially cause someone to say something that

23 would inculpate themselves; right?  That would incriminate

24 themselves?

25      **MR. WARD:**  Objection.  Calls for speculation.

1            **THE COURT:**  Sustained.

2   **BY MR. STEFAN:**

3   **Q.**   You asked questions in an effort to elicit specific

4   information from him about the activities that you suspected

5   him of committing?

6   **A.**   Yes.  We were trying to find out information from him.

7   **Q.**   And in the process of doing that, of having that

8   conversation with him, as he would provide answers, sometimes

9   you would interrupt him to try to redirect his answer?

10  **A.**   Occasionally, if I found he wasn't answering the question

11  I asked him.  I was trying to find out specific information,

12  and if Mr. Andrade was, in my opinion, moving off it, I'd try

13  to go back to find out the answer to my question.

14  **Q.**   And you would interrupt him at that point and attempt to

15  redirect him?

16  **A.**   That's correct.

17  **Q.**   You did that repeatedly throughout the course of the

18  interview?

19  **A.**   I did.

20  **Q.**   At points you expressed disbelief in his statements or

21  what he was telling you?

22  **A.**   Yes.

23  **Q.**   And it is fair to say that at points you were

24  confrontational with Mr. Andrade?

25  **A.**   I don't know if I would describe myself as

1  confrontational, but I mean, I certainly was asking him

2  questions.

3  **Q.**   And expressing dissatisfaction with his answers?

4  **A.**   I suppose.  It depends how you define "dissatisfaction,"

5  I guess.

6  **Q.**   You were dissatisfied with some of his answers?

7  **A.**   I wasn't.  I mean, if he was answering my que- -- if he --

8  when he answered my questions, it was information that I was

9  looking for, whether inculpatory, exculpatory.  I mean, Ethan

10 Quinn doesn't have a particular personal investment in his

11 answers.

12 **Q.**   I mean, you did have some investment, of course, in the --

13 in his answers; correct?

14 **A.**   I mean, I wanted to know the information, yes.

15 **Q.**   Your role is a law enforcement officer?

16 **A.**   Correct, but the content in the answers is -- I mean,

17 that's what I wanted to get, whether it was in inculpatory,

18 exculpatory.  It's not really whether I'm satisfied or not.

19 It's just the information to answer the questions that we need

20 to -- that we need to fill out.

21 **Q.**   You were seeking information that you --

22 **A.**   Correct.

23 **Q.**   -- believed would be valuable?

24 **A.**   Correct.

25 **Q.**   And about 38 minutes into the interview is when

1    Agent Wynar intervened; is that right?

2    A.    Yes.

3    Q.    And Agent Wynar told Mr. Andrade to stop talking?

4          MR. WARD:  Objection.  Hearsay.

5          THE COURT:  Okay.  Why not?  Why is it not hearsay?

6          MR. STEFAN:  An instruction or an injunction to

7    somebody to do something or not do something is never hearsay.

8          THE COURT:  It's not being offered for the truth, so

9    you can go ahead and ask the question.

10         MR. STEFAN:  Thank you, Your Honor.

11   Q.    He instructed Mr. Andrade to stop talking?

12   A.    He did.

13   Q.    And that was the point at which effort was made to get

14   Mr. Andrade's -- Mr. Andrade information for his attorney?

15   A.    That's correct.

16   Q.    Because he didn't have his phone at the time; right?

17   A.    That's correct.

18   Q.    So efforts had to be made to get that information to him

19   for the attorney he had talked about when he first started the

20   conversation with you?

21   A.    That's correct.

22   Q.    Ultimately, that was -- that was done?

23   A.    It was.

24   Q.    In the course of that conversation with Mr. Andrade, he

25   made quite a few statements within 38 minutes; right?

1   **A.**   He did.

2   **Q.**   Many more statements than the ones that you introduced

3   here in court today?

4   **A.**   Correct.   About 38 minutes' worth.

5   **Q.**   And those included the interactions you had with him about

6   potentially contacting his attorney?

7   **A.**   That's correct.

8   **Q.**   Of course, with respect to the remaining statements that

9   were in those 38 minutes, Mr. Highsmith, Mr. Chou, and Mr. Ward

10  have not introduced those statements here in court today?

11  **A.**   That's correct.

12  **Q.**   I want to talk about another aspect of your search or,

13  I guess, of the investigation generally.

14       There were subpoenas that were issued in the course of the

15  investigation; correct?

16  **A.**   There were.

17  **Q.**   And you had referred specifically to a subpoena that was

18  issued for source code?

19  **A.**   Correct.

20  **Q.**   And your own understanding that there hadn't been a

21  response to that subpoena?

22  **A.**   We received a response to the subpoena.   I don't believe

23  it included the source code.

24  **Q.**   The subpoena in question would have been issued to

25  Mr. Andrade's attorneys; correct?

QUINN - CROSS / STEFAN

1  **A.**  Correct.

2  **Q.**  Because he was represented at the time; right?

3  **A.**  Correct.

4  **Q.**  So it wouldn't be issued directly personally to him?

5  **A.**  No.  It was served, actually, on the NAC Foundation, not

6  Mr. Andrade.

7  **Q.**  Okay.  Understood.

8      And the NAC Foundation was represented by counsel at that

9  time too, as you understood it?

10 **A.**  Correct.  If I remember, the initial subpoena was served

11 on David Salmon, who I believe represented the NAC Foundation

12 at the time.

13 **Q.**  Okay.  There was a time, Agent Quinn, that Mr. Andrade

14 personally offered you his source code; isn't that correct?

15 **A.**  There was a time he said he would.  He called me once.

16     **MR. STEFAN:**  Your Honor -- actually, could I have

17 displayed Exhibit 3355 just to counsel, the judge, and the

18 witness.

19 **Q.**  Go ahead and take a look at this document, Agent Quinn.

20 Do you recognize it?

21 **A.**  I do.

22 **Q.**  This is an email from Mr. Andrade to yourself; correct?

23 **A.**  Correct.

24 **Q.**  It's dated Monday, August 19th, 2019?

25 **A.**  That's correct.

**Q.** And this is an email where Mr. Andrade offers you access --

    **THE COURT:** Why don't we first -- if you seek to introduce it, seek to introduce it. Don't start saying what it is before it's been introduced into evidence.

    **MR. STEFAN:** Yes, Your Honor.

**Q.** This email, fair, accurate representation of an email you actually received from Mr. Andrade on this -- on this date?

**A.** That's correct.

    **MR. STEFAN:** We move to admit it.

    **MR. WARD:** Objection. Hearsay.

    **THE COURT:** Sustained.

    **MR. STEFAN:** Your Honor, if I may?

    **THE COURT:** If you may what?

    **MR. STEFAN:** If I may be heard on this hearsay objection.

    **THE COURT:** Well, all right. We'll call it a day.

    Members of the jury, remember my admonitions. Do not discuss this amongst yourselves or with anyone else. Don't do any research, anything associated with the case.

    And we'll see you tomorrow for 8:30.

    (Proceedings were heard out of the presence of the jury.)

    **THE COURT:** All right. We're out of the presence of the jury.

    You can step down for this.

**PROCEEDINGS**

1          All right.  We're out of the presence of the jury.

2          **MR. STEFAN:**  Yes, Your Honor.  It's not being offered

3    for the truth of the matter stated.  It's --

4          **THE COURT:**  It's not being offered for the proposition

5    that he offered the code?  Isn't that what you want to

6    establish?

7          **MR. STEFAN:**  The fact he offered the code, Your Honor,

8    is a fact.

9          **THE COURT:**  No.  It's -- and you want to prove that

10   fact; right?  What other reason -- listen, I understand you're

11   all -- you know, I've made some rulings.  You're trying to test

12   those rulings.  That's fine.  But I don't think in good

13   conscience you can tell me you are seeking to introduce this

14   document not for the fact.

15         **MR. STEFAN:**  Well, Your Honor, there's an additional

16   step I would take.  I do think -- well, here's the thing.

17         You can admit -- my understanding of the rules of hearsay

18   is that you can admit things that are facts, that are verbal

19   facts or verbal acts.  In this case, an offer is made.  Offers

20   don't necessarily embrace truth concepts.  The hearsay rules

21   restrict the admission of out-of-court statements for the truth

22   of the matter stated.

23         **THE COURT:**  Right.

24         **MR. STEFAN:**  This is just a fact that he made an

25   offer.  That is all.  There's no truth --

PROCEEDINGS

1          **THE COURT:**  The truth of the matter stated and this is

2     a fact, I don't see your distinctions.  I really don't see your

3     distinction, because the only reason you want this document in

4     there is for the proposition that he offered the source code.

5          **MR. STEFAN:**  Which is --

6          **THE COURT:**  You've already asked that question.  To

7     then have a hearsay document that corroborates that is not --

8     it's not appropriate to admit that.

9          **MR. STEFAN:**  Your Honor, the secondary piece of the

10    basis for this is also that, to the best of the defense's

11    knowledge, Mr. Quinn did not take up Mr. Andrade on this -- on

12    this offer or didn't respond to him.

13         So there is also an effect on the listener aspect of this,

14    which is, the investigator -- from an impeachment perspective

15    of the Government's work on this case, the investigator, with

16    an opportunity to obtain from Mr. Andrade evidence immediately

17    relevant to the case and potentially exculpatory to

18    Mr. Andrade, declined to take up the offer.

19         **THE COURT:**  You asked him the question:  Did

20    Mr. Andrade offer the source code?  And he said:  Yes.

21         And then you can ask the question.  You get hung up on

22    then trying to introduce documents which are hearsay.  You

23    can -- no one -- the proposition that you are presenting, you

24    can inquire about.  But this constant trying to get documents

25    in which are hearsay, you don't get to ask a question, have an

PROCEEDINGS

1  answer, and then say, "I want a document in here to corroborate

2  it."  That's the problem.

3      It's not the area of your inquiry.  I'm not stopping that.

4  As you noticed, I didn't stop you from asking that.

5      And I presume, then, on cross-examination we're going to

6  hear, "Well, did you ever follow up on this?"  And, "No, I

7  never got the source code," or whatever.

8      But these documents -- efforts to get these documents in,

9  there isn't a basis for that.

10      **MR. STEFAN:**  Your Honor, I can feel the heat from

11  Mr. Shepard burning on my --

12      **THE COURT:**  Well, I don't preclude Mr. Shepard from

13  weighing in.  I mean, usually, we only have one; but go ahead,

14  Mr. Shepard.

15      **MR. STEFAN:**  I don't want to encroach --

16      **MR. SHEPARD:**  He's doing great.  I don't have

17  anything.

18      My understanding of the law, as Mr. Stefan has expressed,

19  offers, contracts, they're not hearsay.  They are --

20      **THE COURT:**  This isn't either of those things.  This

21  is a communication from Mr. Andrade making a statement.  It's

22  not a contract.  It's not a --

23      **MR. SHEPARD:**  It's -- we don't need to belabor it.

24  It's not a statement that is either true or false.  It's an

25  offer.  An offer is an offer.  It's not offered for the truth.

**PROCEEDINGS**

 1   It's an offer.

 2       But the Court has heard that --

 3           **THE COURT:**  I really don't see that distinction.

 4           **MR. SHEPARD:**  Okay.  We'll find some --

 5           **THE COURT:**  I think in fairness, you would have to

 6   admit to me that the reason you would want this document in

 7   there is because you want the jury to believe that Mr. Andrade

 8   offered up the source code, and that's why you want it.  And so

 9   you want it for the truth of this statement.

10       The issue of whether or not he offered it has already been

11   testified to.  But then you're saying:  In addition to that, we

12   want to put in a document, a hearsay document, that says what

13   we just said to prove it up.  That, you cannot do.  That, you

14   cannot do.

15           **MR. SHEPARD:**  I understand the Court's ruling.  I'll

16   find a case.  If I find a nice case, I'll send it to the Court.

17           **THE COURT:**  I always love to read, yeah.

18           **MR. SHEPARD:**  You've heard us.  We appreciate it.

19           **THE COURT:**  You don't want to hear me again.  I

20   understand that.

21           **MR. SHEPARD:**  No.  We disagree, so we'll -- if we find

22   something --

23           **THE COURT:**  Fair enough.

24           **MR. SHEPARD:**  -- we'll send it to you.

25           **THE COURT:**  Fair enough.

 1          Do you want to chime in?

 2              **MR. WARD:**  I do not, Your Honor.

 3              **THE COURT:**  Okay.

 4              **MR. WARD:**  But I do want -- I would like to ask, since

 5      we're about --

 6              **THE COURT:**  Although all kidding aside -- this is a

 7      digression, I realize -- but the U.S. Attorney has an

 8      obligation -- wants to protect the record, a good record.

 9          So if you think, "Oh, great, we just won that but he's

10      totally out to lunch," you ought to protect the record.

11              **MR. WARD:**  I appreciate that, Your Honor.  I think

12      we've briefed the issue of the -- when the defense can admit

13      out-of-court statements that may have an effect on Mr. Andrade

14      or may go to a non-hearsay purpose.

15          I think the Court's absolutely right on this one.  They

16      want it in to prove that Mr. Andrade offered to produce the

17      source code, but it's the truth of the matter of that statement

18      and it's hearsay.  He can ask, he can inquire to Agent Quinn.

19          The Court was -- the Court said it better than I can.

20              **THE COURT:**  Okay.  So tomorrow -- well, one thing I

21      want to mention, stopping now may have the benefit of I will

22      read the transcript; and if I think there are some items that

23      I think should be included, I will advise the

24      U.S. Attorney's Office to include them, and then either side

25      can use it as they wish.

**PROCEEDINGS**

1          We're still on cross, so they can use it and then, in

2     redirect, you can use it if I'm adding material.

3          And I'll try to get it to you -- I have a 2:30 calendar,

4     so I'll do it as soon as I can but...

5               **MR. HIGHSMITH:**  We'll try to get you a copy of the

6     recording too.  Sometimes the recording is better.  You know

7     what I mean?  It can add something.

8               **THE COURT:**  Sure.  No, I'll take it.  I'll take it.

9               **MR. WARD:**  Can we ask about witness order for the --

10              **THE COURT:**  That's what I was just --

11              **MR. WARD:**  -- defense tomorrow?

12              **THE COURT:**  -- about to ask.

13         So Ethan Quinn will start the day.

14         And then we'll go to the side, if it's not a convenient

15    stopping point, a break point, and we'll have them -- you'll

16    rest.  They'll do their thing.

17         Then the defense will call?

18              **MR. SHEPARD:**  So Mr. Tinker remains at the top of our

19    list.

20              **THE COURT:**  What's Mr. Tinker's first name?

21              **MR. SHEPARD:**  Jeffrey, I think.

22              **THE COURT:**  Okay.

23              **MR. SHEPARD:**  He remains at the top of our list

24    because he's been here this afternoon, so we would want to make

25    sure to get through him tomorrow.

1          THE COURT:  And just for my -- who is he?  Just,

2  generally, who is he?

3          MR. SHEPARD:  One of Mr. Andrade's many lawyers.

4          THE COURT:  He's a lawyer.  Okay.

5          MR. SHEPARD:  Yes.

6          THE COURT:  All right.

7          MR. SHEPARD:  Depending on when he is completed, I

8  would like to get Mr. Fahy, another one of Mr. Andrade's

9  lawyers, on after Tinker; but we have someone else,

10  Mr. Ruzicka, one of Mr. Andrade's accountants --

11          THE COURT:  Accountant.  Yeah, I know who he is.

12          MR. SHEPARD:  -- who cannot stay overnight.

13      So if it looks like we would not get through Mr. Fahy and

14  Mr. Ruzicka, then we would put Mr. Ruzicka on before Mr. Fahy.

15          THE COURT:  Okay.

16          MR. SHEPARD:  And we also have -- I think his name is

17  Arthur Weissman --

18          MS. DIAMOND:  Yes.

19          MR. SHEPARD:  -- who will be available tomorrow as

20  well.

21          THE COURT:  Okay.  Okay.

22          MR. WARD:  And, Your Honor, we would just renew our

23  request, as we have done for them, if you can provide us today

24  the exhibits.  I believe you've provided us for --

25          MR. SHEPARD:  We have -- you have --

PROCEEDINGS

1          **MR. WARD:** -- Mr. Tinker.

2          **MR. SHEPARD:** -- Tinker already.

3          **MR. WARD:** Yeah.

4          **MS. DIAMOND:** We are working on it as we speak, and we

5    will continue and, as soon as we can, get them to

6    the Government.

7          **THE COURT:** All right.  Okay.  And I'll read the

8    transcript and get back to you.

9                (Proceedings adjourned at 1:36 p.m.)

10                          ---o0o---

11

12                   CERTIFICATE OF REPORTER

13          I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:  Friday, February 28, 2025

17

18

19

20                      _Ana Dub_

21    _____

22          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

23          CSR No. 7445, Official United States Reporter

24

25