```
                                    Volume 14

                                    Pages 2231 - 2428

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable Richard Seeborg, Judge


        UNITED STATES OF AMERICA,      )
                                       )
                Plaintiff,             )
                                       )
          VS.                          )  NO.  3:20-CR-00249 RS
                                       )
        ROWLAND MARCUS ANDRADE,        )
                                       )
                Defendant.             )
        _____)


                                    San Francisco, California
                                    Friday, February 28, 2025


                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS

        APPEARANCES:

        For Plaintiff:
                            PATRICK D. ROBBINS
                            ACTING UNITED STATES ATTORNEY
                            450 Golden Gate Avenue
                            San Francisco, California 94102
                      BY:   CHRISTIAAN HIGHSMITH
                            DAVID J. WARD
                            MATTHEW CHOU
                            ASSISTANT UNITED STATES ATTORNEYS

        For Defendant:
                            KING & SPALDING, LLP
                            50 California Street, Suite 3300
                            San Francisco, California 94111
                      BY:   MICHAEL J. SHEPARD, ATTORNEY AT LAW

                (APPEARANCES CONTINUED ON FOLLOWING PAGE)

        REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                      CSR No. 7445, Official United States Reporter
```

```
 1   APPEARANCES: (CONTINUED)

 2   For Defendant:
                              KING & SPALDING, LLC
 3                            1700 Pennsylvania Avenue, NW
                              Washington, D.C. 20006
 4                       BY:  KERRIE C. DENT, ATTORNEY AT LAW

 5                            KING & SPALDING, LLC
                              1185 Avenue of the Americas, 34th Floor
 6                            New York, New York 10036
                         BY:  DAINEC P. STEFAN, ATTORNEY AT LAW
 7

 8                            LAW OFFICES OF CINDY A. DIAMOND
                              58 West Portal Avenue, Suite 350
 9                            San Francisco, California 94127
                         BY:  CINDY A. DIAMOND, ATTORNEY AT LAW
10

11   Also Present:          Special Agent Brendon Zartman
                            Tina Rosenbaum, Paralegal
12                          Ed Jackson, Trial Technician

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **I N D E X**

2

3    Friday, February 28, 2025 - Volume 14

4                                              **PAGE**  **VOL.**

5    Government Rests                          2295   14

6

7    **GOVERNMENT'S WITNESSES**                **PAGE**  **VOL.**

8    **QUINN, ETHAN (RECALLED)**
     (PREVIOUSLY SWORN)                        2245   14
9    Cross-Examination resumed by Mr. Stefan   2245   14
     Redirect Examination by Mr. Ward          2284   14
10   Recross-Examination by Mr. Stefan         2294   14

11

12   **DEFENDANT'S WITNESSES**                 **PAGE**  **VOL.**

13   **TINKER, JEFFREY**
     (SWORN)                                   2297   14
14   Direct Examination by Mr. Stefan          2297   14
     Cross-Examination by Mr. Highsmith        2318   14
15   Redirect Examination by Mr. Stefan        2325   14
     Recross-Examination by Mr. Highsmith      2328   14

16

17   **RUZICKA, KARL STEVEN**
     (SWORN)                                   2329   14
18   Direct Examination by Ms. Diamond         2329   14
     Cross-Examination by Mr. Chou             2360   14
19   Redirect Examination by Ms. Diamond       2368   14

20

21   **FAHY, JOHN RICHARD**
     (SWORN)                                   2370   14
22   Direct Examination by Mr. Stefan          2370   14
     Cross-Examination by Mr. Ward             2384   14
23   Redirect Examination by Mr. Stefan        2395   14
     Recross-Examination by Mr. Ward           2397   14

24

25

1                        **I N D E X**

2

   **DEFENDANT'S WITNESSES**                          **PAGE**  **VOL.**
3
   **WEISSMAN, ARTHUR NORMAN**
4    (SWORN)                                          2398    14
     Direct Examination by Ms. Diamond                2399    14
5    Cross-Examination by Mr. Highsmith               2417    14
     Redirect Examination by Ms. Diamond              2422    14
6

7

8                    **E X H I B I T S**

9    **TRIAL EXHIBITS**                     **IDEN**  **EVID**  **VOL.**

10    560                                             2287    14

11    1523                                            2252    14

12    2277                                            2390    14

13    2743                                            2411    14

14    2744                                            2411    14

15    3132                                            2346    14

16    3133                                            2346    14

17    3134                                            2346    14

18    3135                                            2346    14

19    3136                                            2346    14

20    3137                                            2346    14

21    3138                                            2346    14

22    3139                                            2346    14

23    3140                                            2346    14

24    3141                                            2346    14

25

1                    **I N D E X**

2                 **E X H I B I T S**

3  <u>**TRIAL EXHIBITS**</u>                    <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

4     3142                                        2346  14

5     3143                                        2346  14

6     3144                                        2346  14

7     3146                                        2346  14

8     3147                                        2346  14

9     3149                                        2337  14

10    3325                                        2306  14

11    3363                                        2416  14

12    3369                                        2412  14

13    3376                                        2414  14

14    3384                                        2303  14

15    3386                                        2355  14

16    3387                                        2353  14

17    3388                                        2358  14

18    3389                                        2358  14

19

20

21

22

23

24

25

```
 1   Friday - February 28, 2025                        8:11 a.m.

 2                     P R O C E E D I N G S

 3                        ---o0o---

 4              (Defendant present out of custody.)

 5        (Proceedings were heard out of the presence of the jury.)

 6             THE COURTROOM DEPUTY:  Remain seated.  Please come to

 7   order.

 8             THE COURT:  Good morning.

 9             MR. HIGHSMITH:  Good morning, Your Honor.  I've got a

10   couple of issues.

11        Number one, it appears the defense is treading towards an

12   advice-of-counsel defense, and we've received no notice of an

13   advice-of-counsel defense.  So I think that's precluded.

14             THE COURT:  Okay.  Do you want to respond to that?

15             MR. SHEPARD:  We are not offering an advice-of-counsel

16   defense.  We are offering a defense of good faith.  Mr. Andrade

17   had a conversation with a lawyer.  It informs his good faith.

18             THE COURT:  I think that's correct.  I mean, there's a

19   difference between saying, "I did this because I'm relying on

20   legal advice," and, "I'm operating on the assumption that I'm

21   not violating law."

22        I mean, the issue would be whether or not there's sort of

23   the suggestion that you can rely on these lawyers, and that, I

24   wouldn't let you do.  If it's, these are one of many people

25   that are consistent with his view that he's operating in good
```

 1    faith, that's okay.

 2            **MR. SHEPARD:**  Yes.  That's how we will argue it.

 3            **THE COURT:**  I mean, just because he's a lawyer doesn't

 4    mean he's preclu- -- these witnesses, can't say, "Well, they're

 5    a lawyer; so, therefore, they can't testify."  It's all in how

 6    they ask the questions.

 7            **MR. HIGHSMITH:**  Understood.  I just wanted to be very

 8    clear that he can't say, "I relied on my lawyer's advice.

 9    That's why I lied."

10            **THE COURT:**  Correct.  Well, yeah.  I mean, he probably

11    disagrees with your characterization.

12        But you cannot --

13            **MR. SHEPARD:**  Slightly.

14            **THE COURT:**  You cannot say, "I did this because I got

15    legal advice that said it was okay."

16            **MR. HIGHSMITH:**  I want the --

17            **THE COURT:**  You can't do that.

18            **MR. HIGHSMITH:**  Thank you, Your Honor.  I want the

19    contours to be clear.

20        Second, a bunch of the evidence that's going to come in

21    today, or try to come in today, is after the charged time

22    period.  It's far -- it's 2020, 2021.

23        The Court made a ruling in motions in limine on --

24    you know, the defendant's precluded from saying, "In the

25    future, my product is finished," or, "In the future, I'm going

**PROCEEDINGS**

1    to repay everybody."

2        So we're going to be moving to exclude any evidence that's

3    far after the charged time period.  The defendant's trying to

4    introduce evidence, saying, "Well, my product eventually was

5    finished.  I eventually was going to repay everybody."  That

6    falls within the Court's order on the motions in limine.

7            THE COURT:  Well, your argument is, regardless of

8    whether or not this thing would ever have worked, he made

9    misrepresentations that it was almost done or done and that was

10   a lie.

11           MR. HIGHSMITH:  Yes.

12           THE COURT:  That's as I understand your case.

13           MR. HIGHSMITH:  Yes.

14           THE COURT:  I'm not sure what the relevance is later

15   on, but I'm not sure why it's objectionable.  I mean, what --

16           MR. HIGHSMITH:  That's the issue.

17           THE COURT:  Let's cut to the chase on this.

18       Are you going to be, Mr. Shepard, eliciting testimony

19   about whether or not this thing ever got off the ground in

20   2020, or whenever it is?

21           MR. SHEPARD:  Our focus here, again, is on our

22   client's good faith that he was always trying to complete this

23   and thinking he was about to complete this, and that's part of

24   his good faith.

25       It is interesting to me to hear the Government say, "Oh,

 1    it doesn't matter that he never completed the technology,"

 2    because I lost count of the number of witnesses who were asked:

 3    Did you ever, ever see --

 4         **THE COURT:**  True.

 5         **MR. SHEPARD:**  -- whether this technology was

 6    completed?

 7         **THE COURT:**  Fair.

 8        You know, I mean, your argument, it doesn't -- there is a

 9    bit of a relevance issue, but it's not undercutting your

10    argument because I assume what you're going to say is it

11    doesn't matter.

12         **MR. HIGHSMITH:**  It goes to the Court's relevance

13    point, is that it confuses the jury.  The issue is:  During

14    this time period, he made statements about the state of the

15    technology that we say were not true, and they bring in

16    statements that, "Oh, two years later, it was finished."

17         **THE COURT:**  You can point out it was two years later.

18         **MR. HIGHSMITH:**  Yes.

19         **THE COURT:**  I mean, Mr. Shepard is right that -- I

20    mean, I may not think it was quite as many times as he thinks;

21    but you did elicit testimony with some -- you, collectively --

22    regularly that "You knew this thing never worked.  This never"

23    -- "You never saw this."  So I think he's entitled to a little

24    latitude on that.

25         **MR. HIGHSMITH:**  Understood.

PROCEEDINGS

1    The last thing is, we received some exhibits this morning

2    at 5:30 a.m. that they intend to produce.  We've never seen

3    them before 5:30 this morning.  We received some documents at

4    11:20 p.m. last night.  I was asleep, thankfully.  We received

5    some at 11:00, some at 10:00 p.m., and that was a tremendous

6    number of documents previously unproduced.

7    So, look, I get it's trial, I get things are scrambling,

8    but that's sort of unprecedented.

9    **MR. SHEPARD:**  We got a lot of this.  We had a

10   technical issue last night.  We've been trying to upload

11   exhibits to them to make it easier, rather than just send

12   numbers, and we've been trying to upload exhibits to them.

13   I know Mr. Stefan had a great deal of difficulty last

14   night trying to upload them, which delayed the delivery of

15   several of them.  He tried sending them by ZIP files.  You

16   know, he was trying all different sorts of things.

17   **MR. HIGHSMITH:**  This stuff is not on an exhibit list.

18   It's one thing if it's on an exhibit list.  I totally get -- I

19   totally get it.  We're not complaining about this stuff.  But

20   it's 5:00 in the morning, 11:24 at night, 11:00 at night.

21   That's the only issue.  Not on the exhibit list.

22   **THE COURT:**  Okay.  What do you think should flow from

23   this?

24   **MR. HIGHSMITH:**  I mean, I also think they're not

25   admissible.

1          **THE COURT:**  Well --

2          **MR. HIGHSMITH:**  I think they're mostly hearsay.

3          **THE COURT:**  -- that may be a different issue.

4      I mean, that doesn't really have to do with when it was

5  produced.

6      But the bottom line is this:  I was there.  I understand

7  the situation.  I hope that -- the one thing I will count on

8  everyone not to do is to play games with this stuff.  I think

9  some -- I'm confident that it's a logistical difficulty as

10 opposed to a strategic effort to make life difficult for the

11 other side, which I would be quite upset about.

12     You're going to have to -- I hear you.

13     I want -- now it's the defense side's time.  Please do

14 everything you can to get the stuff to them, please.

15     But I think this would be one of those things that if

16 there is a particular document or particular documents that you

17 say, "We've been sandbagged.  We can't deal with this for

18 whatever reason," I'll think about it.  If it's the general,

19 "We got this at 11:30 and it's not nice," I hear you, but I

20 don't think there's really that much I can do.

21     I'm not going to take the position that any paper that

22 wasn't on the exhibit list is out of the case because I want to

23 get to the merits of this thing.  But if you can identify some

24 specific thing that you said you've now been put in a position

25 where you can't argue your case, I'll hear you; but, otherwise,

PROCEEDINGS

 1    I'm just going to use the bully pulpit and ask you to please do

 2    this, as best you can.

 3            **MR. SHEPARD:**  I appreciate that, Your Honor.  I assure

 4    you there's nothing strategic about it.

 5            **THE COURT:**  I understand.  I accept that

 6    representation.

 7            **MR. SHEPARD:**  We're doing the best we can.

 8            **THE COURT:**  I understand.

 9            **MR. SHEPARD:**  And it's just a huge volume of material.

10            **MR. HIGHSMITH:**  I would just make, on one -- we

11    received two documents this morning at 5:30.  One is a

12    declaration that was filed in a court case, and we can't file

13    up -- we can't follow up and research the docket of that court

14    case if we get something at 5:30 in the morning.  We can't

15    explore that.

16        So I would move for that document to be excluded.  It's a

17    declaration from a witness.  I think it's hearsay anyways, and

18    I'll move to exclude it because it's hearsay.  It's an

19    out-of-court statement, a declaration by an attorney who will

20    be testifying today.

21            **MR. SHEPARD:**  We're not offering that statement.  We

22    are just trying to fulfill our obligation to provide any prior

23    statement that we have.  That's why we produced it.

24            **THE COURT:**  Okay.

25            **MR. HIGHSMITH:**  Thank you.

**PROCEEDINGS**

 1          Oh, we have one clip we're going to play on redirect.  The

 2    focus of yesterday's cross for Mr. Quinn -- for Special

 3    Agent Quinn was the search and how it was very scary.  So we're

 4    going to play the first six minutes of the interview with

 5    Mr. Andrade, showing that it was not scary and Mr. Andrade was

 6    very happy to talk to Special Agent Quinn.

 7          **THE COURT:**  I assume that Mr. Shepard won't mind.

 8    You wanted more of it played anyways --

 9          **MR. SHEPARD:**  Yeah.

10          **THE COURT:**  -- so --

11          **MR. SHEPARD:**  We're fine with that.  We had asked for

12    the whole thing, so we won't have a problem with that.  In

13    fact, maybe we'll do it ourselves if the Government is open to

14    its admission.

15          **THE COURT:**  All right.

16          So how much more time, Mr. Stefan, on Mr. Quinn would you

17    estimate?

18          **MR. STEFAN:**  Less than 30 minutes.

19          **THE COURT:**  Okay.  Then you'll do the --

20          **MR. HIGHSMITH:**  We'll do the clip.

21          **THE COURT:**  -- redirect.

22          **MR. HIGHSMITH:**  Yeah.

23          **THE COURT:**  And then we'll do the sidebar, or it may

24    be -- you probably, hopefully, won't have -- if he has half an

25    hour, you'll have less than that.

1          **MR. HIGHSMITH:**  Yes.

2          **THE COURT:**  So I don't think we'll be quite at the

3    break time.  So we'll do a sidebar for the defense to make its

4    record, and then we'll proceed with, I guess, Mr. Tinker;

5    right?

6          **MR. SHEPARD:**  Yes, Mr. Tinker will be next; and

7    thankfully, we've gotten them his exhibits quite a while ago by

8    the standards of this case.

9          **THE COURT:**  Okay.  And let's be careful with the

10   lawyer.  It's going to be a -- I unders- -- it's easier said

11   than done when we do have lawyer witnesses, so let's be

12   careful.  At least give an opportunity to object and stuff

13   on -- if we're getting close to the legal advice issue.

14       Okay.

15          **MR. HIGHSMITH:**  Thank you, Your Honor.

16                  (Recess taken at 8:23 a.m.)

17                  (Proceedings resumed at 8:33 a.m.)

18       (Proceedings were heard out of the presence of the jury.)

19          **THE COURTROOM DEPUTY:**  Are you ready for the jury?

20          **THE COURT:**  I think so.  Yes.

21       (Proceedings were heard in the presence of the jury.)

22          **THE COURT:**  The jury is present.

23       Good morning, members of the jury.  Happy Friday.

24       Special Agent Quinn, you understand you remain under oath?

25          **THE WITNESS:**  I do.

```
 1          THE COURT:  Very well.

 2      Mr. Stefan?

 3                        ETHAN QUINN,

 4  called as a witness for the Government, having been previously

 5  duly sworn, testified further as follows:

 6                 CROSS-EXAMINATION  (resumed)

 7  BY MR. STEFAN:

 8  Q.   Good morning.

 9  A.   Good morning.

10  Q.   Yesterday when we left off, you had testified that

11  Mr. Andrade had offered to provide you source code for the --

12  well, for the AML BitCoin and CrossVerify projects; is that

13  correct?

14  A.   He did.

15  Q.   Okay.  I want to turn back to the search that you

16  conducted of -- well, where you were at least present for, for

17  Mr. Andrade's home in March of 2020.

18  A.   Okay.

19          MR. STEFAN:  With respect to that search,

20  the Government -- pardon me -- the defense would move to admit

21  what's been marked by the Government as Exhibit 1523, an audio

22  recording of the search of Mr. Andrade's residence.

23          MR. WARD:  Your Honor, we'll play this on redirect.

24          THE COURT:  Well, is there an understanding of what

25  portion you're planning to play?  Have you discussed it with
```

**QUINN - CROSS / STEFAN**

 1    the other side?

 2            **MR. WARD:**  We provided it to the defense.  It's the

 3    first five and a half minutes of the recording.

 4            **THE COURT:**  Well, if they want to play it now, they

 5    can do it.

 6        So, you may.

 7            **MR. STEFAN:**  Thank you, Your Honor.

 8        Could we get --

 9            **THE COURT:**  Wait, wait.

10            **MR. WARD:**  One moment, Your Honor.

11        We have copies of the transcripts of the recording, so...

12            **THE COURT:**  With this new section?

13            **MR. WARD:**  With this new section.

14            **THE COURT:**  Okay.  So I assume, Mr. Stefan, that's

15    fine with you.

16            **MR. STEFAN:**  That is fine with me, Your Honor.

17            **THE COURT:**  Very good.  You can pass it out.

18                        (Pause in proceedings.)

19            **THE COURT:**  Mr. Ward, do you happen to have one I

20    could have?

21            **MR. WARD:**  Yes, I do.

22            **THE COURT:**  Thank you.

23                    (Document handed up to the Court.)

24            **THE COURTROOM DEPUTY:**  I need to -- I switch it

25    otherwise.

**QUINN - CROSS / STEFAN**

1                      (Pause in proceedings.)

2           **THE COURTROOM DEPUTY:**  I can show it to the jury?

3           **THE COURT:**  You may.

4           **MR. STEFAN:**  Could we please tee up 1523.  I

5     appreciate it.

6           Good?  Thank you, ma'am.

7                      (Audio was played but not reported.)

8           **MR. STEFAN:**  Can you please pause publication at this

9     point.

10    **Q.**   So, Agent Quinn, you're tracking that we're probably about

11    three minutes into this recording or thereabouts?

12    **A.**   Thereabouts.

13    **Q.**   This document at the beginning of the conversation to the

14    three-minute mark, or thereabouts, of a 38-minute conversation?

15    **A.**   That seems about right.

16    **Q.**   And within the first three minutes, Mr. Andrade had spoken

17    to you about his desire to speak with his attorney?

18    **A.**   He asked if he could call his attorney.  He did not say he

19    wanted to speak with his attorney.  He asked if he was able to

20    call, which we said yes.

21    **Q.**   Right.  First, that you would have to seize his phone?

22    **A.**   That's correct.

23    **Q.**   And there would have to be some other means that he would

24    call his attorney?

25    **A.**   Correct.  We would have to get another phone, which is

1    ultimately what we did, or he was free to leave and get a

2    neighbor's phone.  He was free to -- he asked if he could.  We

3    said, yes, he could, but we would have to seize his phone as

4    part of the search warrant.

5         (Stenographer interrupts for clarification of the record.)

6         **THE WITNESS:**  He asked if he could, and we said he

7    could and he was free to leave, and, you know, he could get a

8    neighbor's phone if he wanted to.  He wasn't restricted from

9    action of calling his attorney.

10   **BY MR. STEFAN:**

11   **Q.**   Understood.  And as you indicated within the recording to

12   Mr. Andrade, you weren't keeping him there?  You didn't tell

13   him you were keeping him there; right?

14   **A.**   That's correct.

15   **Q.**   And you did tell him that "Oh, you can call your attorney,

16   just not with your phone"; right?

17   **A.**   That's correct.

18   **Q.**   Regardless, you didn't stop the conversation at that point

19   and say, "Oh, go ahead and talk to your attorney"?

20   **A.**   We did not.

21   **Q.**   Later on, when Agent Wynar stepped in at around the

22   38-minute mark and overheard the conversation between you and

23   Mr. Andrade, that's exactly what he did; right?  He shut the

24   conversation down?

25   **A.**   He said -- he said, "Yes, you" -- I believe, if I'm

1    remember correctly, he said, "Marcus, you're asking to talk to

2    an attorney.  Why don't you talk to an attorney."

3    **Q.**    Well, specifically, he said, "Marcus, stop talking"?

4    **A.**    That's correct.

5    **Q.**    And that was just based on his overhearing of the

6    conversation that was happening between you and Mr. Andrade;

7    correct?

8    **A.**    Yes.

9    **Q.**    Okay.

10         **MR. WARD:**  Objection to the context of why he said

11    that.

12         **THE COURT:**  That's also a little late.  Overruled.

13         Keep going.

14    **BY MR. STEFAN:**

15    **Q.**    And, of course, to actually contact his attorney, he would

16    need the attorney's telephone number; right?

17    **A.**    That's correct.

18    **Q.**    And you had just taken his phone?

19    **A.**    Yes, as part of the search warrant.

20    **Q.**    So he would have to rely on you or another member of his

21    team in order to actually get his contact information for his

22    attorney; right?

23    **A.**    Or he could leave the -- leave the house.  He could get a

24    phone book.  He could go to a neighbor.  Again, he was free to

25    do what he was.  He wasn't under any restriction.  The easiest

1  thing was for him to use one of our phones, which is ultimately

2  what we did.

3  **Q.**   And you instructed him that he was free to leave, as you

4  indicated; right?

5  **A.**   Correct.

6  **Q.**   But his wife was there in the house with him; correct?

7  **A.**   Correct.  She was also free to leave if he wanted to.

8  **Q.**   His children were there in the house with him?

9  **A.**   Correct.  We had set aside a room for them to try to be as

10  comfortable as possible.  It's an uncomfortable situation to

11  have law enforcement there.

12  **Q.**   Now, you hadn't set aside the room for them before

13  securing the house; correct?  When you secure the house, you

14  just secure the house?

15  **A.**   That's correct.

16  **Q.**   So when you entered the house, they weren't in some

17  secluded room; right?

18  **A.**   Well, when I entered the house, they had been set aside

19  on -- I believe on a couch by the IRS --

20  **Q.**   When the --

21  **A.**   -- at that point.

22  **Q.**   When the agents who were actually initiating the securing

23  of the house entered the house, they hadn't already been

24  secluded elsewhere?

25  **A.**   That's correct.

1  **Q.**   That couldn't have been something arranged in advance?

2  **A.**   Yes.  They were still in the home, yes.

3  **Q.**   So when the agents came into the home with weapons drawn

4  and were clearing from room to room, the children and wife were

5  there in the house with the agents?

6  **A.**   That's correct.

7  **Q.**   And there were some -- at this point, when you're talking

8  to Mr. Andrade, there's some 11 IRS and FBI agents in the

9  house; right?

10  **A.**   I believe it's approximately that number.

11  **Q.**   In addition to whatever number of civilian Sheriff's

12  Office individuals you had present?

13  **A.**   I believe, by that point, there wouldn't have been any

14  local law enforcement there.

15  **Q.**   Okay.  If the recording said otherwise, if there in the

16  recording, you and Mr. Andrade have a conversation about how

17  there's local law enforcement present, that would obviously

18  mean that there was, in fact, local law enforcement present?

19  **A.**   Correct.  I just don't have a recollection of it at this

20  point.  But typically, local law enforcement will leave once

21  we've secured the home.  But there may still have been one

22  there.  I just don't recall.

23  **Q.**   The conversation continued for another 35 minutes after

24  this point; right?

25  **A.**   That's correct.

QUINN - CROSS / STEFAN

1   Q.   In much the same fashion that it was proceeding at this

2   point except in a more, as we discussed yesterday,

3   confrontational manner with respect to your questions of him?

4   A.   Correct.

5   Q.   And, I mean, throughout the interview, throughout the

6   portions that the Government played for us yesterday, based on

7   the noise you could hear in the background, you understand that

8   Mr. Andrade's children and wife were present with him there in

9   the house?

10  A.   That's correct.

11  Q.   In close enough proximity that we could, you know, hear

12  them -- hear his children making a ruckus, crying, making

13  noise?

14  A.   I believe for at least part of the interview it was.

15  I believe at some point they were moved to another room, but I

16  don't have a specific recollection of that.

17         MR. STEFAN:  Okay.  We can go ahead and continue

18  publication of this exhibit, please.

19              (Audio was played but not reported.)

20         THE COURT:  Just so it's clear, that exhibit -- and

21  that's 1523; is that right?

22         MR. STEFAN:  Correct, Your Honor.

23         THE COURT:  1523 is admitted.

24      (Trial Exhibit 1523 received in evidence.)

25  \\\

1    BY MR. STEFAN:

2    Q.    Thereafter, there's another 35 minutes of conversation?

3    A.    That is correct.

4    Q.    And apart from that clip, in addition to the ones that

5    the Government played yesterday, there's additional

6    conversation, of course, that hasn't been played for the jury?

7    A.    That's correct.

8    Q.    I want to talk about some of the -- well, I first want to

9    talk about some of the other evidence that you seized in

10   searches or that your fellow agents seized.

11        You said that you weren't present for the search of the

12   Las Vegas office; is that right?

13   A.    That's correct.

14   Q.    I just want to -- I want to clarify.  Yesterday you spoke

15   to how a property owner would be informed that a search had

16   been performed on like the office in question here.

17        Can you describe exactly what was done in this instance?

18   A.    In the NAC Foundation search?

19   Q.    Yes.

20   A.    I could not.  I wasn't present.

21   Q.    Okay.  Normal procedure, then, would be that notification

22   is made to, you said, the property owner?

23   A.    The possessor.  It may not be the property owner.  It

24   could be someone renting an apartment.  It would be the

25   leaseholder, whoever lives there or controls that.

QUINN - CROSS / STEFAN

1    Q.    So say my apartment is searched and I'm not home.

2    A.    Yeah.

3    Q.    And I come home.  My apartment's been searched.  How would

4    I know that my apartment's been searched?

5    A.    It would be -- it would be a receipt that would be left

6    there, along with a copy of the search warrant.

7    Q.    It'd just be, like, on a counter or --

8    A.    It would typic- --

9    Q.    -- desk or something like that?

10   A.    It would typically be somewhere visible, you know, dinner

11   table, whatever makes the most sense.  It wouldn't be hidden

12   away somewhere.

13   Q.    If I didn't come home for, you know, a month and see it,

14   then I wouldn't know that my apartment had been searched?

15   A.    I mean, we're engaged in a pretty hypothetical situation.

16         We often call people during search warrants.  It's pretty

17   unusual for us to just come in, leave something, and go out,

18   but it really depends on the facts of the case.

19   Q.    So that could easily transpire?

20   A.    I wouldn't say easily.  I'd say that's probably a pretty

21   rare situation, but it would kind of be up -- if the person

22   doesn't come to the property, then, yes, they might not be

23   aware of it for a while.

24   Q.    Are you aware that in this instance in the Las Vegas

25   search, the Office Squad staff who were there in the Las Vegas

 1    office were instructed not to inform Mr. Andrade regarding the

 2    execution of the search warrant on the office?

 3    **A.**    I wasn't present for it, so I don't -- I wasn't privy to

 4    that conversation.  It's possible per our conversation

 5    yesterday, but I actually don't have firsthand knowledge of

 6    whether the Office Squad was instructed one way or another.

 7    **Q.**    Possible as in that would be consistent with standard

 8    procedures, that the individuals other than the owner would be

 9    instructed -- with knowledge of the search would be instructed

10    to refrain from speaking to the possessor of the search?

11    **A.**    I wouldn't necessarily say it's standard procedure.  It

12    may be depending on what the facts of the case are.

13        You know, very frequently, you know, neighbors might

14    witness us doing a search warrant.  We wouldn't instruct them

15    one way or the other about talking to someone.  It's very fact

16    dependent.

17    **Q.**    Okay.  Certainly conceivable in this instance that that

18    instruction could have been given then?

19    **A.**    I suppose so.

20            **MR. STEFAN:**  Can we display Exhibit 3357.

21            **THE COURTROOM DEPUTY:**  Just for the --

22            **MR. STEFAN:**  Oh, yes, for the judge and counsel and

23    Mr. Quinn, Agent Quinn.

24        I actually have a physical version of this I'm providing

25    to Agent Quinn.

1  Q.   Agent Quinn, do you recognize what I just gave you?

2  A.   The binder?  Which tab would you like me to open it to?

3  Q.   How about the first page.  I think you need to flip all of

4  those pages over.

5  A.   Oh, I see.

6  Q.   Yeah.

7  A.   This coin purchaser agreement for Hicham Chahine?  Is that

8  what you're looking for?

9           MR. STEFAN:  Your Honor, may I assist the witness?

10           THE COURT:  Sure.

11           THE WITNESS:  Oh, I see.  You meant the cover.

12 BY MR. STEFAN:

13 Q.   Yes.  Apparently, the cover is actually the first page --

14 A.   All right.

15 Q.   -- as it appears in the exhibit.

16      Okay.  Can you look down at the bottom right corner?

17 A.   Yes.

18 Q.   Below the Exhibit 3357 number, what's the information

19 that's stamped there in the bottom right-hand corner?

20 A.   You're talking about the one on the image or the binder?

21 Because the binder doesn't have an exhibit number on it.

22 Q.   I apologize.  The one on the image.

23 A.   I'm sorry.  Could you repeat where you wanted me to look?

24 Q.   The bottom right-hand corner.

25 A.   Okay.

QUINN - CROSS / STEFAN

1    **Q.**    What's the information reflected there?

2    **A.**    It appears to be a Bates stamp number.

3    **Q.**    And who would have applied this Bates stamp number?

4    **A.**    I -- potentially, the U.S. Attorney's Office.  I'm

5    actually not sure who put this particular Bates stamp number on

6    it.

7    **Q.**    Does this do something to indicate that this was a

8    document seized by the Government?

9    **A.**    Yes.  The one in the front where it says "1B85," that

10   would typically be an evidence number applied by the FBI to

11   designate something in our file system.

12   **Q.**    Have you had the opportunity to review the evidence in

13   this case?

14   **A.**    Yes.

15   **Q.**    And specifically to this binder -- I know there was a lot

16   of evidence -- do you have any recollection of reviewing this

17   binder during the course of the case?

18   **A.**    This binder?  I don't have a particular recollection of

19   reviewing this binder.

20   **Q.**    Given the Bates stamp number that's applied there in the

21   corner, can you be confident that the exhibit represented here

22   on the screen is an exhibit that was -- or a document that was

23   seized by the FBI?

24   **A.**    Yes.

25            **MR. STEFAN:**  The Government moves to admit it.  Or

1    pardon me.  In a previous life.  The defense moves to admit it.

2         **MR. WARD:**  The Government objects.  There's no

3    business records foundation.  It's hearsay.  The witness has

4    said that he doesn't specifically recollect looking at this

5    binder, and we haven't seen it either.

6         **THE COURT:**  Sustained.

7         **MR. STEFAN:**  Okay.  Your Honor, may I retrieve the

8    binder?

9         **THE COURT:**  Yes.

10        **MR. STEFAN:**  I want to display for Mr. Quinn

11   Exhibit 2743.

12   **Q.**   Agent Quinn, in the course of your investigation, did you

13   interact with Benjamin Boyer?

14   **A.**   I did.

15   **Q.**   And you interacted with him fairly extensively; correct?

16   **A.**   Depends on "extensively," but I talked to him several

17   times.

18   **Q.**   In the course of your investigation, Mr. Boyer provided

19   you and the other investigators documents; correct?

20   **A.**   That's correct.

21   **Q.**   And among those documents was the company agreement that

22   he signed with Block Bits AML Holdings, the special purchase

23   vehicle through which he obtained AML BitCoins; is that

24   correct?

25   **A.**   I believe so, yes.

QUINN - CROSS / STEFAN

1  Q.   Can you take a look at Exhibit 2743 there on your screen?

2  A.   Yes.

3  Q.   And tell me whether you recognize the document.

4  A.   I believe so.  I don't have a specific recollection of it,

5  but I recall seeing something like this.

6  Q.   And does the Bates stamp down in the bottom right corner

7  indicate that you-all received this from Benjamin Boyer?

8  A.   I believe so.

9  Q.   And can we take a look at Exhibit 2744.

10     Do you recognize this to be the signature page for the

11 Block Bits AML Holdings company agreement that I was referring

12 to?

13 A.   That's what it appears to be.

14 Q.   And you recognize the exhibit stamp there in the corner

15 indicating it was received by the FBI?

16 A.   That's -- I believe that Bates stamp number was applied by

17 Mr. Boyer's lawyers, but that's the best I can recall.

18         **MR. STEFAN:**  Defense moves to admit.

19         **MR. WARD:**  The Government objects.  Lack of

20 foundation.  It's hearsay.  And I also think this is running up

21 against *Lindsay* that we discussed yesterday at sidebar.

22         **THE COURT:**  What's the basis for admitting it through

23 this witness?  All he can testify to is, okay, it was retrieved

24 at some point.  What are you offering -- what's the basis for

25 this?  What's the exception to the hearsay rule that applies to

 1   this document?

 2           MR. STEFAN:  Well, it's a contract, Your Honor, and --

 3           THE COURT:  Yeah.

 4           MR. STEFAN:  -- we're not admitting the contract for

 5   the truth of any of its contents, but just for --

 6           THE COURT:  What are you admitting it for?

 7           MR. STEFAN:  For its existence, for the fact that it

 8   was signed.

 9           THE COURT:  What's the relevant fact?

10           MR. STEFAN:  The information within the contract, what

11   the contract reflects regarding the arrangement between Mr. --

12           THE COURT:  Sustained.  Sustained.  It's not coming

13   in.

14           MR. STEFAN:  Your Honor, may we request a sidebar?

15           THE COURT:  All right.

16       (The following proceedings were heard at the sidebar:)

17           MR. STEFAN:  Your Honor, understanding maybe

18   the Government seems to think that we have an authenticity

19   issue, despite the fact that this is a document that the FBI

20   specifically received --

21           THE COURT:  They didn't object on authenticity

22   grounds.

23           MR. STEFAN:  Okay.  Well, then on the hearsay issue --

24           THE COURT:  Right.

25           MR. STEFAN:  -- it's a contract.  It doesn't --

**SIDEBAR**

1          **THE COURT:**  You keep saying these -- that's fine.

2    Then you have to have a reason why it's -- you're sort of

3    saying, "Well, it's not hearsay because it's a contract."

4    Fine.  Let me assume I accept that.  Then what are you doing?

5          **MR. STEFAN:**  The terms of the contract reflect an

6    arrangement between Block Bits Capital and Mr. Benjamin Boyer

7    which contravenes in many ways the terms and conditions that

8    were set out by Mr. Andrade's NAC Foundation and that reflect

9    an arrangement between Boyer and Block Bits AML Holdings which

10   is different than the one that would have existed between Boyer

11   and Mr. Andrade had he signed that contract.

12         **THE COURT:**  Mr. Boyer was on the stand.  Why didn't

13   you go through it with him?  This witness, all he can say is

14   "We got it."

15         **MR. SHEPARD:**  And as far as I understand the law,

16   that's all we need to get it admitted.  I'm happy to submit

17   something to the Court.  Contracts, offers, they are not

18   hearsay.  So we have now --

19         **THE COURT:**  They still have to be relevant.

20         **MR. SHEPARD:**  Yes.  And --

21         **THE COURT:**  And usually, you would need a witness to

22   establish the relevance.  You don't just get up and say, we

23   seized these 25 documents, and you have some reason to say they

24   shouldn't be hearsay, so admit them all.

25         I mean, that's what you guys are doing.

SIDEBAR

1          **MR. SHEPARD:**  First of all, the Government just spent

2     their direct examination --

3          **THE COURT:**  Yeah.

4          **MR. SHEPARD:**  -- with -- by introducing, I lost count

5     of how many documents this witness --

6          **THE COURT:**  Did you object to any of them?

7          **MR. SHEPARD:**  -- seized.

8        No, because the law --

9          **THE COURT:**  Therefore, they all came in.

10         **MR. SHEPARD:**  The law says we're entitled to -- they

11    are entitled to admit those, and so are we.  And --

12         **THE COURT:**  Okay.

13         **MR. SHEPARD:**  And, for example, the post-ICO binder,

14    the binder that Mr. Stefan showed shortly before we got to this

15    exhibit, the pre-ICO binder --

16         **THE COURT:**  Yes.

17         **MR. SHEPARD:**  -- was introduced by the Government same

18    way.

19         **THE COURT:**  Over no objection and it came in.

20         **MR. SHEPARD:**  Because it is -- and I'll submit to

21    the Court some legal authority on this.  Contracts are not

22    hearsay.  They --

23         **THE COURT:**  I don't dis- --

24         **MR. SHEPARD:**  -- are verbal; they are events.

25         **THE COURT:**  Yes.  So you get over the hearsay problem.

**SIDEBAR**

 1          **MR. SHEPARD:**  Yes.  We're over --

 2          **THE COURT:**  But then you don't -- then it seems to be

 3    you think, if you get over the hearsay problem, everything

 4    comes in.  It doesn't come in.  It has to be linked up.  The

 5    witness has to be telling us why it's relevant and all of that.

 6          There's a sloppiness to the offering of these materials on

 7    your side, frankly, that is making it very hard for me to

 8    follow because you just kind of get up and say "Here," and I

 9    don't get a thoughtful going through, "Okay, it's not hearsay

10    because of this reason and it's relevant because of this

11    reason."  I'm not getting any of that.  I'm getting "Here it

12    is," and it's not helping me to try to understand.

13          Now, this document -- frankly, I'm going to just admit

14    this so we can move it along.  I mean, I'm getting tired of

15    this but --

16          **MR. STEFAN:**  Well --

17          **THE COURT:**  Go ahead.

18          **MR. STEFAN:**  And if I may?

19          **THE COURT:**  Let me hear from Mr. Ward.

20          **MR. WARD:**  We renew our objection.  There's no

21    foundation for the document.  It is -- they are offering it for

22    the truth of the matter.  They're offering it for what it says

23    in the document as to what Ben Boyer believed about the

24    contract.  Ben Boyer was on the stand.  They could have asked

25    him about it.  Agent Quinn doesn't know anything about the

1    document.

2        It's also -- again, I'm worried that they're wandering

3    into this *Lindsay* area where they're going to pick out

4    different provisions in a boilerplate contract to argue.

5            **MR. STEFAN:**  Your Honor, we --

6            **THE COURT:**  You've already introduced -- and I think

7    Mr. Ward has a point, but you've already introduced the

8    documents that say this is not an investment; this is whatever.

9    You've already got that into evidence.  So what --

10           **MR. SHEPARD:**  Your Honor, this is the opposite of

11   that.  This is Mr. Dillman selling something that is an

12   investment, and that's the contrast.  That's why we think

13   Dillman is not really a co-conspirator.

14           **MR. STEFAN:**  Your Honor, you are right.  We should

15   have done this through Boyer.  However, Boyer testified to this

16   exact issue.

17           **THE COURT:**  All right.

18           **MR. STEFAN:**  He testified that there were terms within

19   his Block Bits AML Holdings company agreement which

20   contrasted -- you can check the transcript -- which contrasted

21   with the terms that we presented to him in the terms and

22   conditions for AML BitCoin and the purchase agreements for

23   AML BitCoin.  And so he -- that contrast was laid out for him

24   in his testimony.  Remiss that I didn't introduce it at that

25   time.

1      **THE COURT:**  Well, I'm going to -- I'll let this one

2  come in.

3      But I don't agree with you, for future reference, just

4  labeling it a contract doesn't mean it's not being offered for

5  the truth of the matter asserted.  It may be a contract, but

6  that doesn't mean, oh, there are no hearsay problems anymore

7  because it's a contract.  I don't agree with that.

8      So --

9      **MR. SHEPARD:**  Okay.  I will submit the Court some

10  authority on that.  We've authenticated it.

11      **THE COURT:**  Well, I'm going to let this one come in.

12      **MR. SHEPARD:**  I'm now also going back to the pre-ICO

13  binder, the one before that.

14      If I may, I will submit the Court authority.  Contracts,

15  offers, they're not hearsay; they're events.  And --

16      **THE COURT:**  Events.  Yeah, that's where I'm having

17  trouble.

18      **MR. SHEPARD:**  Okay.  I'll submit some authority.

19      **THE COURT:**  You may have some authority that in a

20  particular case says, "Okay.  This isn't hearsay.  It comes in

21  for whatever."  But there's not going to be authority that

22  says:  If you label it a contract, you're not -- automatically,

23  it becomes some sort of a judicial fact that is not being

24  offered for the truth.  It doesn't matter what the label is.

25      But I'll read whatever you give me.

1        **MR. SHEPARD:**  I appreciate that.

2        **THE COURT:**  So I will admit this over their strenuous

3    objection, but be careful, because I agree with the Government

4    that you cannot make the argument that -- because it gets into

5    this *Lindsay* problem -- that everybody, the victims, it's their

6    fault; they knew they weren't doing an investment here.  I'm

7    not going to let you go down that path.

8        **MR. STEFAN:**  That's not -- we're not trying to go down

9    that path at all.  That wasn't the path we took with Mr. Boyer

10   either.  The path we took with Mr. Boyer was contrasting the

11   agreement he made in one place with the agreement that existed.

12       **THE COURT:**  Okay.

13       **MR. WARD:**  It's a distinction without a difference.

14   He's asking -- he's seeking to get this in to say Mr. Boyer

15   should have read the contract --

16       **MR. STEFAN:**  No.

17       **MR. SHEPARD:**  No.

18       **MR. WARD:**  -- more closely or should have read the

19   AML Bitcoin --

20       **MR. SHEPARD:**  No.

21       **MR. WARD:**  -- contract more closely --

22       (Simultaneous speaking; stenographer interrupts for

23   clarification of the record.)

24       **MR. WARD:**  -- should have read the boilerplate in

25   these contracts more clearly as an excuse for overlooking the

**SIDEBAR**

 1  misrepresentation.

 2          THE COURT:  What are you offering it for?  You're

 3  saying that's not what you're offering it for.

 4          MR. SHEPARD:  Right.

 5          THE COURT:  What are you offering it for?

 6          MR. SHEPARD:  We're offering it to contrast

 7  Mr. Dillman from Mr. Andrade.  We're offering it to contrast

 8  what Mr. Dillman was selling from what Mr. Andrade is selling,

 9  which is part of:  We don't think they're part of the same

10  conspiracy.

11          THE COURT:  Well --

12          MR. SHEPARD:  That's part of our defense, and

13  contrasting these two documents is part of it.

14          THE COURT:  But that's nothing to say that what

15  Mr., quote/unquote, Andrade was selling was not -- you can't

16  say:  Mr. Andrade was selling to his purchasers something that

17  is plainly not an investment.  They should know better.  I

18  mean, you can't go there.

19          MR. SHEPARD:  We're not --

20          MR. WARD:  Your Honor, can I make a --

21          MR. SHEPARD:  We're not saying that.  This is

22  contrasting Dillman --

23          THE COURT:  Okay.

24          MR. SHEPARD:  -- from Andrade --

25          THE COURT:  I'll let you do it.

SIDEBAR

```
 1              MR. SHEPARD:  -- to address the conspiracy.

 2              MR. WARD:  Can I make a suggestion?  That you admit it

 3    conditionally, not allow Mr. Stefan to question Agent Quinn

 4    about it because he doesn't know.

 5              THE COURT:  Well, Agent Quinn doesn't know anything

 6    about it.

 7              MR. WARD:  He doesn't know anything about it.

 8         And we can admit it conditionally, and then we can brief

 9    the issue and make a determination of whether it should come in

10    and the scope of their ability to make this argument in a more

11    reasoned fashion.

12              THE COURT:  All right.  All right.  I'll conditionally

13    admit it.

14              MR. SHEPARD:  And I would ask the same be done for the

15    pre-I -- the post-ICO binder, that --

16              MR. WARD:  I haven't even seen --

17              MR. SHEPARD:  -- it's the same --

18              MR. WARD:  We don't even know what's in it.

19              THE COURT:  Well --

20              MR. STEFAN:  You know what's in it.  You seized it.

21              MR. WARD:  Come on.

22              THE COURT:  Conditionally admitting it is -- it's

23    fine.  We'll do both of those so the record -- I mean, I'm not

24    going to -- in front of the jury, I don't think they need to

25    hear all this.
```

1          **MR. SHEPARD:**  Correct.

2          **THE COURT:**  These are conditionally admitted, and the

3    parties will brief the issue, and then we'll move on because

4    Agent Quinn doesn't know anything about this.

5          **MR. SHEPARD:**  Correct.  Thank you.

6          **MR. WARD:**  Thank you, Your Honor.

7          (The following proceedings were heard in open court:)

8          **THE COURT:**  Thank you.

9          Members of the jury, I think so far, relative to many

10   trials I've sat through, we haven't had that many sidebars.

11   Actually, some trials can be quite frustrating to the jury

12   because we're going to the side all the time.  The lawyers have

13   been very good in this case limiting that.  But once in a

14   while, we have an issue that we really need to hash out, and

15   that was one of those times.

16         But thank you very much for your patience.

17         Mr. Stefan, you may proceed.

18   **BY MR. STEFAN:**

19   **Q.**   Thanks for your patience, Agent Quinn.

20         I want to talk about some of the exhibits that were

21   introduced through you by the Government.

22         **MR. STEFAN:**  Let's start with Exhibit 560.  Go ahead

23   and just zoom in on the text that appears.  So, like the entire

24   block below the email line at the top, below the date.  The

25   entire email, please.

1  Q.    Agent Quinn, in looking over this document, I'm looking at

2  paragraph 6 below the line "Workers."  Do you see that?

3  A.    I do.

4  Q.    The text says [as read]:

5         "Have them find a total of 10 articles per week

6      pertaining to AML and KYC of exchanges and digital

7      currencies."

8      Correct?

9  A.    Yes.

10 Q.    It doesn't say anything about AML BitCoin in particular.

11 It just says "AML and KYC of exchanges of digital currencies"

12 generally; correct?

13 A.    That's correct.

14 Q.    And they're to send 15 per week and then select the

15 10 best to post; right?

16 A.    That's correct.

17 Q.    Nothing in that language about selecting articles specific

18 to AML BitCoin?

19 A.    No.

20 Q.    And then paragraph 7, if you look below, in paragraph 7

21 the instruction is that they're going to post a couple of

22 times -- four times per day on social media and then they're

23 going to respond to each other's posts; right?

24 A.    I believe so, yes.

25 Q.    There's nothing in that paragraph at all that addresses

QUINN - CROSS / STEFAN

1  posts specific to AML BitCoin; right?

2  A.   That's correct.

3  Q.   Or hyping AML BitCoin?

4  A.   That's correct.

5  Q.   In fact, looking through this email, there's not a single

6  place where it appears that the individuals being tasked are

7  told to hype AML BitCoin?

8  A.   I do not see that in this email.

9  Q.   These instructions that are being given is to post more

10 general information about AML/KYC compliance issues on

11 exchanges and digital currencies; yes?

12 A.   Well, that, and asking for additional -- asking -- Marcus

13 directing her to -- or saying he's going to explain more to

14 her.  So presumably, there's additional instructions outside

15 this email.

16 Q.   And outside the scope of your individual knowledge?

17 A.   Beyond what potentially we've learned from interviews of,

18 you know, individuals who worked at the NAC Foundation or on

19 the AML BitCoin project.

20 Q.   You don't know the substance of the conversation, if it

21 occurred, between Mr. Andrade and this individual?

22 A.   That's correct.  I would not have been present for that.

23           MR. STEFAN:  Can we show Exhibit 598, please.

24           THE COURTROOM DEPUTY:  Just to the witness?

25           MR. STEFAN:  This has been published, so...

1          **THE COURTROOM DEPUTY:**  Okay.

2          **MR. WARD:**  Exhibit 560 has not been admitted.

3          **MR. STEFAN:**  I said 598.

4          **MR. WARD:**  Oh, 598.

5          **MR. STEFAN:**  Can we turn to the second page.

6     **Q.**   You discussed this exhibit previously with Government

7     counsel; correct?

8     **A.**   That's correct.

9     **Q.**   Who is Thomas Kane to you?

10    **A.**   My understanding, simply from public information, is he is

11    a private wealth manager.

12    **Q.**   Beyond being a private wealth manager, are you familiar

13    with any relationship that he had with Mr. Andrade?

14    **A.**   Beyond the subject -- beyond this email, no.

15    **Q.**   Did you know that he was a mentor in the American

16    Mentorship Program?

17    **A.**   I did not.

18    **Q.**   Did you interview him at all to figure out in what

19    capacity he actually individually dealt with Mr. Andrade?

20    **A.**   I did not.

21    **Q.**   And you did not know, then, that he served as mentor,

22    under the American Mentorship Program, to Mr. Andrade?

23    **A.**   I did not.

24    **Q.**   Can we turn to Exhibit 765.

25         Mr. Quinn, you recognize this, of course?

1    **A.**    I do.

2    **Q.**    So this is the template email which began a string of

3    emails that Japheth Dillman sent thereafter to different

4    individuals that you identified in your testimony?

5    **A.**    That's correct.

6    **Q.**    With respect to this template email, you did not identify

7    anywhere in the evidence any response from Mr. Andrade to this

8    email?

9    **A.**    That's correct.

10    **Q.**    And with respect to the subsequent emails that were sent

11    to the individuals you identified in your direct examination

12    that were based on this template, you never identified any

13    responses from Mr. Andrade to those individuals either;

14    correct?

15    **A.**    That's correct.

16    **Q.**    Or to Mr. Dillman's email to those individuals?

17    **A.**    Correct.

18    **Q.**    And, in fact, you don't have any responses from those

19    individuals to Mr. Andrade or to Mr. Dillman either?

20    **A.**    I would have to review the emails to see if any exist.  I

21    don't recall one today.

22    **Q.**    You don't recall any such responses?

23    **A.**    There may have been some.  I don't recall any, sitting

24    here today.

25    **Q.**    You don't recall such responses, then?

**QUINN - CROSS / STEFAN**

1   **A.**   I believe I answered the question.  Yes.

2   **Q.**   With respect to the bcc line, you see that Mr. Abramoff is

3   listed there?

4   **A.**   I do.

5   **Q.**   And you understand, of course, that blind carbon copy

6   indicates that Mr. Andrade, as a recipient of that email,

7   wouldn't have seen Mr. Abramoff bcc'd?

8   **A.**   Correct.

9   **Q.**   All of these messages --

10         **MR. STEFAN:**  And we can advance to 76 -- pardon me --

11   776.

12   **Q.**   And just take a look at the date on the email,

13   25 September 2017.  You see that?

14   **A.**   I do.

15   **Q.**   All of the messages that were sent by Mr. Dillman were all

16   sent on this day, 25 September 2017; correct?

17   **A.**   I believe all the ones we admitted, correct.

18   **Q.**   You didn't identify anywhere in the evidence the same

19   emails or emails following that template that were sent on

20   different days; correct?

21   **A.**   Mr. Dillman sent a lot of emails, and I believe most of

22   them are around this time period.  I don't know if they were

23   all sent on 25 September or if some may have been sent later.

24   I just don't recall at this point.  But there were a

25   significant number of these emails.

1    **Q.**    Each of the ones that the Government has introduced

2    through you yesterday were all sent on this day?

3    **A.**    I believe so, yes.

4    **Q.**    You have no specific recollection of any emails following

5    that template in 765 being sent on any other days?

6    **A.**    There may have been.  I don't have a specific recollection

7    of it.

8    **Q.**    These emails are to you, from an evidentiary standpoint,

9    of some significance; is that correct?

10    **A.**    They were, yes.  That's why we identified them.

11    **Q.**    You identified them.  And any other emails that followed

12    that same template, you would have done your absolute best to

13    identify?

14    **A.**    Yes.  We seized a number of emails from Mr. Dillman.

15    **Q.**    But my specific question is that with respect to any

16    emails that followed the template that's provided in 765, you

17    would have ensured to have collected those emails in

18    particular?

19    **A.**    To the best of my ability, yes.

20    **Q.**    You have no specific recollection, after exercising the

21    best of your ability, to collecting any emails like this on any

22    other days except 25 September 2017?

23        **THE COURT:**  You've kind of covered this.

24    You can answer that, but let's move on.

25        **THE WITNESS:**  I seized these emails a number of years

1    ago, and I believe there's literally thousands of emails of

2    Mr. Dillman's for both his scheme and this scheme that we

3    seized.  So I just don't have enough instant recollection of

4    every date of every email I seized, sitting here today in 2025.

5    **BY MR. STEFAN:**

6    **Q.**    All right.  Clearly, you have no knowledge or

7    understanding of what Mr. Andrade was specifically doing that

8    particular day?

9    **A.**    Correct.

10   **Q.**    And you have no specific confirmation that Mr. Andrade

11   actually read these emails?

12   **A.**    Correct.

13   **Q.**    There's no read receipts on them, say?

14   **A.**    Correct.

15   **Q.**    You testified --

16          **MR. STEFAN:**  We can take down this exhibit.

17   Thank you.

18   **Q.**    You conducted a search of Mr. Andrade's office in Houston

19   the same day as the search of his home; correct?

20   **A.**    That's correct.

21   **Q.**    In March of 2020?

22   **A.**    Correct.

23   **Q.**    In the process of searching that office, you would have

24   seized a complaint that Mr. Andrade filed against you and

25   Agent Wynar; is that correct?

QUINN - CROSS / STEFAN

1   A.   You know, I don't remember if we seized that at his -- the

2   search of his office.  I don't recall.

3   Q.   You have learned of that at another time, then?

4   A.   Yes.  I believe that was sent to us by another witness.

5   Q.   And specifically, Mr. Andrade had provided a complaint

6   against you and Agent Wynar for misconduct?

7            MR. WARD:  Objection.  Hearsay, relevance, and 403.

8            THE COURT:  I'll allow it.

9       Go ahead.

10            THE WITNESS:  Sorry.

11            THE COURT:  Answer the question.

12            THE WITNESS:  Could you restate the question?  I

13   apologize.

14   BY MR. STEFAN:

15   Q.   Mr. Andrade had filed a complaint against you and

16   Mr. Wynar with respect to your conduct in the case?

17   A.   I believe so.  I believe he also filed a complaint against

18   Bryant Wong, the IRS agent.

19   Q.   And you're aware, of course, of that complaint?  It

20   happened during the course of your investigation; right?

21   A.   Correct.

22   Q.   Before the indictment?

23   A.   I don't recall if it was before the indictment, but it

24   seems likely.

25   Q.   You became aware of this, certainly, prior to the

QUINN - CROSS / STEFAN

1  indictment in June of 2020?

2  **A.**   Potentially.  I don't recall specifically when it

3  occurred, but that seems likely.

4  **Q.**   After reviewing that complaint -- which I assume you did

5  thoroughly; correct?

6  **A.**   I don't know how thorough I was with it, but I did read

7  it.

8  **Q.**   I mean, these were statements of Mr. Andrade; correct?

9  **A.**   Yes.  We read through it, but it wasn't that meaningful

10  for our investigation.  Beyond it, of course, if there's

11  allegations of misconduct against an FBI agent, the appropriate

12  authorities would investigate that:  OIG, Attorney General,

13  whomever.  So, read it, but it wasn't as relevant to our

14  investigation.

15  **Q.**   And speaking to its relevance, did you take any kind of

16  investigative action with respect to the issues that

17  Mr. Andrade raised in his complaint to you?

18  **A.**   I don't -- I mean, his complaint wasn't to me.  It was

19  regarding me.  I don't recall what the issues were he raised in

20  the complaint.

21  **Q.**   So you don't recall doing any follow-up investigation

22  regarding whether Jack Abramoff had threatened Mr. Andrade that

23  he would get the Government involved against him?

24  **A.**   Well, I believe Mr. Andrade mentioned that when he called

25  me one time in -- what?  I forget the exact time he called.  I

1    believe August of 2018.  But the -- but we certainly were

2    running out allegations of misconduct by Mr. Abramoff.  He was

3    one of our subjects of this case.  So, certainly, if he was

4    threatening someone, that would be of interest to us.

5    **Q.**    You investigated the claim that Mr. Andrade had been

6    threatened by Jack Abramoff with Government action; correct?

7            **MR. WARD:**  Objection.  Hearsay, lack of foundation,

8    and relevance.

9            **THE COURT:**  Sustained.

10            **MR. STEFAN:**  May I have a moment, Your Honor?

11            **THE COURT:**  Yes.

12                    (Pause in proceedings.)

13    **BY MR. STEFAN:**

14    **Q.**    Agent Quinn, you testified on direct examination that the

15    pre-ICO purchasers did not know that they were purchasing

16    tokens from Mr. Andrade personally.

17    **A.**    I believe so potentially.  I don't recall specifically the

18    question, though.

19    **Q.**    This was in response to a question from Mr. Ward regarding

20    your knowledge of that, what the pre-ICO purchasers'

21    impressions were of who they were obtaining AML BitCoins from.

22    **A.**    Yeah.  I think we could potentially read back the

23    transcript for my exact answer.  I want to make sure I'm

24    answering the proper question or affirming the proper response.

25    **Q.**    I mean, do you recall testifying --

1    **A.**    Yeah.

2    **Q.**    -- that the pre-ICO purchasers were under the impression

3    that they were not buying AML BitCoins personally from

4    Mr. Andrade?

5    **A.**    I'm not sure I answered that exact question, or maybe I'm

6    misremembering.  I don't know if I could go into the minds of

7    every ICO purchaser.  That's why I'd like to hear the question

8    as asked before I affirm my answer.

9    **Q.**    Okay.  Is your understanding, then, that the pre-ICO

10    purchasers were not -- did not understand or did not believe

11    that they were purchasing tokens directly from Mr. Andrade?

12          **MR. WARD:**  Your Honor, I'm going to object to what the

13    purchasers' -- his opinion as to what the purchasers'

14    understanding of these contracts were.

15          **THE COURT:**  Sustained.

16          **MR. STEFAN:**  Can we please display Exhibit 3170 at

17    page 45.

18          Yes, it was admitted.

19          And please zoom in on subparagraph C on this exhibit.  The

20    first C, the big letter C.

21    **Q.**    Do you see that text there, Agent Quinn?

22    **A.**    I do.

23          **MR. WARD:**  Your Honor, I'm going to object to this

24    line of questioning.

25          **THE COURT:**  Based on?

1          **MR. WARD:**  Based on its relevance and based on our

2    discussion of *Lindsay*.

3          **MR. STEFAN:**  Your Honor, I understand that Agent Quinn

4    doesn't recall apparently testifying on direct examination that

5    the AML BitCoin pre-ICO purchasers didn't understand that they

6    were buying directly from Mr. Andrade.  That is what

7    the Government understands -- or, pardon me -- the defense

8    understands his testimony to have been.  So it addresses his

9    prior testimony.

10        Moreover, this is evidence that's already been admitted.

11         **THE COURT:**  Well, I'll let you ask a question.

12        This witness does not know what people who were buying

13    these tokens had in mind.  He's not the witness for that.  So

14    don't ask questions to him about what was in the mind of

15    purchasers because he doesn't know.

16        So form -- you've got -- this is an exhibit in evidence;

17    that's fine.  Now, what is your question about this?

18    **BY MR. STEFAN:**

19    **Q.**   The representation made in the pre-ICO purchase agreements

20    from Mr. Andrade to purchasers was that Mr. Andrade could make

21    coins available from his own accounts to provide to purchasers;

22    is that correct?

23    **A.**   I'm sorry.  Could you restate that question?

24    **Q.**   The representation made in the purchase agreements for

25    pre-ICO buyers was that Mr. Andrade was selling these tokens

1    from his own personal supplies?

2              **MR. WARD:**  Objection.  Again, lack of foundation.  I

3    don't know that --

4              **THE COURT:**  Sustained.

5         This is not the witness to ask this question.  He doesn't

6    have knowledge of this subject.  So, sustained.

7              **MR. STEFAN:**  Understood.

8         You can take down that exhibit.

9         May I have one moment, Your Honor?

10             **THE COURT:**  Yes.

11                       (Pause in proceedings.)

12   **BY MR. STEFAN:**

13   **Q.**   Okay.  One last area to address, Agent Quinn.  Before --

14   or in the same month that you searched Mr. Andrade's Las Vegas

15   office, you also conducted a search warrant at the home of

16   Jack Abramoff; is that correct?

17   **A.**   Yes.  I believe it was on the same day.

18   **Q.**   And when you initially reported to Mr. Abramoff's home and

19   had conversation with him, you and Agent Wynar indicated to him

20   that you were there regarding a Paul Erickson; is that correct?

21   **A.**   That's correct.

22   **Q.**   That's an individual for whom the agency was running a

23   separate investigation; right?

24             **MR. WARD:**  Objection.  Relevance.

25             **THE COURT:**  Well, I'm not sure where it's going, but

 1    you may answer that question.

 2            **THE WITNESS:**  Well, Mr. Erickson was both a subject of

 3    a separate fraud investigation, as well as other things by the

 4    FBI.

 5    **BY MR. STEFAN:**

 6    **Q.**   Yes.  So he was the subject of a separate investigation,

 7    fraud investigation?

 8    **A.**   Correct.

 9    **Q.**   And other matters?

10    **A.**   Correct.

11    **Q.**   And when you reported to Mr. Abramoff's home to ultimately

12    serve the search warrant and perform the search of his house,

13    that was the basis that you provided to him initially to get a

14    conversation going?

15    **A.**   Correct.  We were interested in his answers as well, but

16    for -- regarding Mr. Erickson, but that was the initial

17    approach.

18    **Q.**   And this had been inspired in part by a search that you

19    had conducted of Mr. Erickson's girlfriend about two months

20    prior in July of 2018; correct?

21            **THE COURT:**  Where are you going with this?  Where is

22    this going?

23            **MR. STEFAN:**  Your Honor, on this occasion, Agent Quinn

24    and the FBI seized documents related directly to AML BitCoin

25    from Maria Butina's apartment --

QUINN - REDIRECT / WARD

```
 1                THE COURT:  So?

 2                MR. STEFAN:  -- and failed to deliver those to

 3    prosecutors.

 4                THE COURT:  These --

 5                MR. WARD:  Objection.  Relevance.

 6                THE COURT:  Sustained.  Sustained.  This is not an

 7    area -- you know this is not an area to go into.

 8          Next question.

 9                MR. STEFAN:  I have no further questions, Your Honor.

10                THE COURT:  Very well.

11                         REDIRECT EXAMINATION

12    BY MR. WARD:

13    Q.    Good morning.

14    A.    Good morning.

15    Q.    Mr. Stefan asked you about the complaint that Mr. Andrade

16    filed against you and maybe other agents at the FBI.

17          Are you aware of other complaints Mr. Andrade filed

18    against people that crossed his path?

19    A.    Yes.  I believe Mr. Andrade will -- he files lawsuits; he

20    makes complaints.  It's common.

21    Q.    Did you -- did you determine that he had filed lawsuits

22    against purchasers of AML BitCoin?

23    A.    He did.

24    Q.    And did he file lawsuits against his -- some of his former

25    employees?
```

QUINN - REDIRECT / WARD

1  **A.**   He has.

2  **Q.**   And did he file lawsuits against people who posted

3  negative comments about him?

4         **MR. STEFAN:**  Objection.  Leading.

5         **THE COURT:**  Overruled.

6  **BY MR. WARD:**

7  **Q.**   Did he file --

8         **MR. STEFAN:**  Hearsay.

9  **BY MR. WARD:**

10  **Q.**   To your knowledge, did he file lawsuits against people who

11  posted negative comments about AML BitCoin?

12  **A.**   Yes.

13  **Q.**   Did he file --

14         **MR. STEFAN:**  Objection.

15  **BY MR. WARD:**

16  **Q.**   Did he file a --

17         **MR. STEFAN:**  Hearsay.

18         **THE COURT:**  Overruled.

19  **BY MR. WARD:**

20  **Q.**   Sorry.  Did he file an opposition to the seizure of his

21  property?

22  **A.**   He did.

23  **Q.**   Did it surprise you that he filed a lawsuit against you

24  after the nice things he said to you when you were interviewing

25  him and searching his house?

QUINN - REDIRECT / WARD

```
 1   A.    Well, I don't believe --

 2          MR. STEFAN:  Objection.  Relevance.

 3          THE COURT:  Sustained.  Yes.  Yes.  Sustained.

 4          MR. WARD:  Can we bring up Exhibit 765.

 5          A JUROR:  Can you speak up?

 6          MR. WARD:  Yes, I'm sorry about that.  I'm just going

 7   to bring the mic closer.

 8   Q.    Mr. Stefan asked you a number of questions about whether

 9   you'd identified any responses to Mr. -- from Mr. Andrade to

10   this email.

11          Mr. Andrade's cc'd on this email?

12   A.    That's correct.

13   Q.    Did you ever find any objections to -- from Mr. Andrade,

14   saying that he was currently on a whirlwind tour between

15   Central America and Europe literally speaking with presidents

16   and prime ministers?

17   A.    I did not.

18   Q.    And did you see any objection to the phrase "There are

19   literally billions of dollars in deals that are currently being

20   negotiated"?

21          MR. STEFAN:  Objection.  Foundation.

22          MR. WARD:  I'm asking if he saw any responses or any

23   objections in the emails he searched.

24          THE COURT:  All right.  Overruled.

25          MR. CHOU:  Did you publish it?
```

1    **MR. WARD:**  Yeah, I think this is --

2    **Q.**   Again, did Mr. Andrade object -- in the review of the

3    emails and the documents that you seized and searched, did you

4    ever see Mr. Andrade objecting to any of the statements in

5    these?

6    **A.**   I did not.

7    **Q.**   In all of the subsequent documents that were admitted that

8    used this template, was Mr. Andrade cc'd on all of those?

9    **A.**   He was.

10       **MR. WARD:**  Can we turn to Exhibit 560, please.

11       Mr. Stefan asked you a number of questions about this

12   document, but it wasn't admitted.  So at this point,

13   the Government would move to admit Exhibit 560.

14       **THE COURT:**  560 will be admitted.

15       (Trial Exhibit 560 received in evidence.)

16   **BY MR. WARD:**

17   **Q.**   Agent Quinn, this is an email from Mr. Andrade to Melissa

18   Foteh.  Do you see that?

19   **A.**   I do.

20   **Q.**   And do you see where he writes [as read]:

21       "Create 10 different Yahoo! email accounts" and

22       (do not share the passwords)"?

23   **A.**   I do.

24   **Q.**   Do you know what he's referring to there?

25   **A.**   I believe these are the email accounts associated with

QUINN - REDIRECT / WARD

1   the -- I guess we called it, like, sock puppet accounts that

2   were to post.

3   Q.   And --

4        MR. STEFAN:  Objection.  Speculation.

5        THE COURT:  Overruled.

6   BY MR. WARD:

7   Q.   Remind us what the term "sock puppet accounts" refers to.

8   A.   In -- my understanding of it is that it is someone posting

9   on a social media or Internet account purporting to be someone

10  but is, in fact, controlled by someone else.  So like a fake

11  person or a fake poster.

12  Q.   And then, again, when he says, "Create 10 different

13  BitcoinTalk accounts and 10 different Skype accounts," is that

14  also in reference to the sock puppet?

15  A.   I believe so.

16       MR. STEFAN:  Objection.  Speculation.

17       THE COURT:  Overruled.

18  BY MR. WARD:

19  Q.   Looking at Number 7, Mr. Andrade writes [as read]:

20       "They should post a total of 4 times per day on

21       all social media.  The first two posts should be them

22       posting the articles.  The second two posts should be

23       them responding to the post of a co-worker.  Ask me

24       to explain this to you."

25       Is that referencing posting on online forums like

**QUINN - REDIRECT / WARD**

1    BitcoinTalk and others?

2    **A.**    Yes.

3    **Q.**    Okay.  Mr. Stefan asked you a number of questions about

4    the search of the NAC Foundation office in Las Vegas.  When did

5    that search occur?

6    **A.**    That was on the same day as Mr. Abramoff, which I believe

7    was September of 2018.

8    **Q.**    In September of 2018, was that an active office being used

9    by the NAC Foundation?

10    **A.**    It was rented by the NAC Foundation, but I don't believe

11    anyone worked there except for some of the Office Squad folks

12    who maintained it.

13    **Q.**    The folks that worked there, they were working for

14    Mr. Andrade?

15    **A.**    Correct, among other clients, I believe.

16    **Q.**    And there were documents related to the NAC Foundation --

17    were there documents from the NAC Foundation in those offices?

18    **A.**    That's correct.

19    **Q.**    And were those documents seized by the FBI?

20    **A.**    They were.

21    **Q.**    And was there any specific instruction to keep this search

22    secret from Mr. Andrade?

23    **A.**    There was no instruction from us as the case agents.  And

24    I wasn't present for the interactions between the Office Squad.

25    And may have been, but there may not have been.  I don't

QUINN - REDIRECT / WARD

```
 1   recall.
 2   Q.   Do you have any reason to believe that weeks or months or
 3   years would have gone by and Mr. Andrade wouldn't have
 4   understood there was a search of an office that he was using?
 5            MR. STEFAN:  Objection.  Foundation.
 6            THE COURT:  Sustained.  Sustained.
 7   BY MR. WARD:
 8   Q.   Mr. Stefan asked you about the source code for the
 9   AML BitCoin.  Did the FBI and the grand jury subpoena
10   specifically request that Mr. Andrade and his company produce
11   the source code for AML BitCoin?
12   A.   We did.
13   Q.   Did you have discussions with Mr. Andrade about the
14   production of that source code?
15   A.   We did.
16   Q.   Did you -- did he tell you that he would produce the
17   source code to you?
18   A.   He did.
19   Q.   And did you ever, during the investigation, receive that
20   source code?
21   A.   I have not seen any source code.
22   Q.   Mr. Stefan asked you yesterday about agents wearing
23   bulletproof vests during the search.  Is it FBI protocol that
24   agents wear bulletproof vests when conducting a search?
25   A.   Correct, during the initial entry and the securing of the
```

QUINN - REDIRECT / WARD

1    location.

2    **Q.**    Why is that?

3    **A.**    For personal safety in case -- I mean, these are stressful

4    times when we do search warrants.  So you have to wear it for

5    personal safety.  In this particular case, I was not wearing

6    one because I came in after the area was secured.

7    **Q.**    Is one of the concerns the FBI has is it that there may be

8    weapons in the property?

9    **A.**    That's correct.

10   **Q.**    And this is a stressful time?

11   **A.**    Correct.

12   **Q.**    In this search, did the FBI agents find weapons in

13   Mr. Andrade's house?

14            **MR. STEFAN:**  Objection.  Relevance, 403.

15            **THE COURT:**  What is the relevance of that?

16            **MR. WARD:**  The relevance is that Mr. Stefan asked

17   questions about why the agents were wearing protective gear.

18            **THE COURT:**  He's answered that question.  So...

19            **MR. WARD:**  Well, I think part of the reason as to why

20   they were doing it is relevant as to whether there were weapons

21   in Mr. Andrade's house.

22            **THE COURT:**  Whether or not there were weapons found,

23   your question goes to why they approached the search in the way

24   they did.  You've gotten that answer.  What was found is not

25   relevant.  So, sustained.

```
 1    BY MR. WARD:

 2    Q.   Did the agents do a check to determine whether any weapons

 3    were registered to Mr. Andrade before they went into that

 4    search?

 5    A.   We did.

 6    Q.   And what did they find?

 7    A.   I believe there were registered weapons.

 8            MR. STEFAN:  Objection.  Same objection.

 9            THE COURT:  No.  It's a different issue.  He's

10    talking -- no.  Overruled.

11        Go ahead.  You can answer that question.

12    BY MR. WARD:

13    Q.   What did they find when they checked whether Mr. Andrade

14    owned weapons?

15    A.   I believe there were weapons, though I don't have the

16    specific recollection of which weapons or anything like that.

17    Q.   Well, the question was:  Did they -- was there a -- did

18    they believe that there could be weapons in the house?

19    A.   Yes.

20            MR. STEFAN:  Objection.  Speculation.

21            THE COURT:  Overruled.

22    BY MR. WARD:

23    Q.   And did they find weapons in the house?

24            THE COURT:  You've already asked that question, and I

25    sustained that objection.
```

QUINN - REDIRECT / WARD

1          **MR. WARD:**  Withdrawn.

2     **Q.**   Agent Quinn, you heard the first seven minutes of your

3     interaction with Mr. Andrade.  During that interaction, did

4     Mr. Andrade say that you're down to earth and not

5     disrespectful?

6     **A.**   He did.

7     **Q.**   And did you tell him, "You can call your attorney.  You're

8     free to do what you want"?

9     **A.**   I did.

10    **Q.**   And did you tell him again, "You can make a telephone

11    call," and things like that.  "You can leave if you want"?

12    **A.**   I did.

13    **Q.**   And did you then say, "We have to do our search warrant,

14    but you can leave"?

15    **A.**   I did.

16    **Q.**   Was there any time that Mr. Andrade and his family were

17    ever not free to leave?

18    **A.**   At no point, no.

19    **Q.**   And was there ever -- was Mr. Andrade ever prevented from

20    using his wife's phone or his landline or somebody else's phone

21    to call his attorney?

22    **A.**   I believe -- I don't specifically know about his wife's

23    phone, but I don't believe we were seizing that phone, so he

24    could have used that.

25    **Q.**   And after all of this, did Mr. Andrade continue to

1  voluntarily talk to you?

2  **A.**    That's correct.

3  **Q.**    After he called his attorney, did he continue to talk to

4  you for some time after he called his attorney?

5  **A.**    He attempted to talk to me several times, and I told him

6  we had to sit there quietly.

7              **MR. WARD:**  One moment.

8                     (Pause in proceedings.)

9              **MR. WARD:**  Thank you, Agent Quinn.

10             **MR. STEFAN:**  May I, Your Honor?

11             **THE COURT:**  Yes.

12                     <u>**RECROSS-EXAMINATION**</u>

13  BY MR. STEFAN:

14  **Q.**    Agent Quinn, Mr. Andrade offered you the source code prior

15  to the subpoena being served upon him for the source code;

16  correct?

17  **A.**    He did not.  He said he would potentially offer and he

18  would give us a log-in for his GitHub account.  At no point did

19  I receive that log-in.  He sent an email saying that about

20  9:00 p.m. at night after he called me.

21        At 7:00 in the morning the following day, he sent an email

22  saying he had spoken to his attorneys and he would go through

23  the attorneys, which I was fine with.

24        So I don't believe he ever actually provided us a log-in

25  for the GitHub.  So he said he would provide it, but I don't

1    believe an offer was actually truly made.

2    **Q.**    At the time that he sent you the email, which we reviewed

3    yesterday, you didn't send him the share link to provide the

4    source code?

5    **A.**    I actually did send him a link from our Dropbox -- or

6    Dropbox equivalent, called Teleporter for him to upload

7    information to it, which he did not do.

8    **Q.**    This is information you didn't relay to us yesterday

9    during your direct examination?

10    **A.**    I mean, you didn't ask a question about that.

11    **Q.**    Or the cross-examination?

12    **A.**    I'm sorry.  What's the question?

13            **MR. STEFAN:**  I have no further questions.

14            **THE COURT:**  You may step down.

15                        (Witness excused.)

16            **MR. HIGHSMITH:**  The United States rests, Your Honor.

17            **THE COURT:**  Very well.

18        We will take our break, members of the jury, first break.

19    Remember my admonitions.  Do not discuss this amongst

20    yourselves or with anyone else.

21        And we'll come back at about five after.

22        (Proceedings were heard out of the presence of the jury.)

23            **THE COURT:**  We are out of the presence of the jury.

24        Mr. Shepard?

25            **MR. SHEPARD:**  Yes.  I move, pursuant to Rule 29 --

PROCEEDINGS

1          **THE COURT:**  Wait.  You need to get closer to the

2  microphone.

3          **MR. SHEPARD:**  I move, pursuant to Rule 29, to dismiss

4  the indictment, direct a verdict, everything under Rule 29 that

5  I can request.

6      And my understanding is the Court's going to reserve

7  ruling.  If you want me to spend some time arguing, I can, but

8  it seems like we might all be better off having a break.

9          **THE COURT:**  I am going to reserve under 29(b).  If you

10  want to -- well, you can either submit something written, if

11  you want, or I'm expecting you will probably renew your motion

12  and you can do it in that -- however you want to do it, is fine

13  with me.

14          **MR. SHEPARD:**  I appreciate that, Your Honor.

15  Thank you.

16          **THE COURT:**  Okay.

17          **MR. SHEPARD:**  Thank you.

18          **THE COURT:**  Thank you.

19              (Recess taken at 9:51 a.m.)

20          (Proceedings resumed at 10:07 a.m.)

21      (Proceedings were heard out of the presence of the jury.)

22          **THE COURTROOM DEPUTY:**  Are we ready?

23          **THE COURT:**  Okay.

24      (Proceedings were heard in the presence of the jury.)

25          **THE COURT:**  The jury is present.

**TINKER - DIRECT / STEFAN**

1      Move from that side?

2           **MR. STEFAN:**  The defense calls Mr. Jeffrey Tinker.

3           **THE COURT:**  And, members of the jury, just so it's

4  clear to you, the Government has now rested and the defense is

5  presenting evidence.

6           **THE COURTROOM DEPUTY:**  Please raise your right hand.

7                        **JEFFREY TINKER,**

8  called as a witness for the Defendant, having been duly sworn,

9  testified as follows:

10          **THE WITNESS:**  I do.

11          **THE COURTROOM DEPUTY:**  Please be seated.

12     Can you state your name and spell your last name, please.

13          **THE WITNESS:**  Jeffrey Tinker, T-i-n-k-e-r.

14                     **DIRECT EXAMINATION**

15 BY MR. STEFAN:

16 **Q.**  Good morning, Mr. Tinker.

17 **A.**  Good morning.

18 **Q.**  I want to start by giving a little bit of your background.

19     What do you do for a living, Mr. Tinker?

20 **A.**  I'm an attorney.

21 **Q.**  And how long have you been practicing?

22 **A.**  17 years.

23 **Q.**  Where do you practice currently?

24 **A.**  So I am in-house counsel at a software company, and I am

25 of counsel at my former law firm.

**TINKER - DIRECT / STEFAN**

1  **Q.**   What was your former law firm?

2  **A.**   Bell Nunnally.

3  **Q.**   And what's your specialty?

4  **A.**   I'm a patent attorney.  So I do all sorts of intellectual

5  property, copyrights, trademarks.  I say "patent attorney"

6  because you have to take a separate bar exam to be able to be a

7  patent attorney.  So I'm a lawyer, a patent attorney, IP

8  attorney.

9  **Q.**   Do you have a background in a technical field?

10  **A.**   So to be a patent attorney, you have to have an

11  engineering degree.  My undergrad was at Texas A&M University

12  in electrical engineering.

13  **Q.**   How long have you been doing patent-specific work?  Is

14  that your entire career?

15  **A.**   My entire career.  I started out in 2007 as a patent

16  attorney.  I was actually a patent agent for two years while I

17  was in law school, if that matters but...

18  **Q.**   What's a patent agent?

19  **A.**   It's basically a patent attorney, but you can only

20  practice in front of the Patent and Trademark Office.  So if

21  you have an engineering degree, you don't have to go to law

22  school.  You can just take the Patent Bar and write patents.

23  So a patent attorney would be an attorney that is also a patent

24  agent.

25          **THE COURT:**  Can the jury hear?  You had raised your

**TINKER - DIRECT / STEFAN**

 1    hand.

 2              **A JUROR:**  I can hear.

 3              **THE COURT:**  You can hear?

 4              **A JUROR:**  Up a little bit for you, but I think I can

 5    hear.

 6              **THE WITNESS:**  I can talk louder.

 7              **A JUROR:**  You can talk louder.

 8    BY MR. STEFAN:

 9    **Q.**    Do you know Mr. Marcus Andrade?

10    **A.**    Yes.

11    **Q.**    And how did you come to know Mr. Andrade?

12    **A.**    So it was five, six, probably seven years ago I changed

13    law firms, moved from Winstead over to Bell Nunnally.  And one

14    of the lawyers there was a former -- I think former FTC lawyer,

15    and he specialized in white-collar criminal defense work.  And

16    so I think however Marcus and him met, he -- Marcus started

17    using him as a -- as a -- as his attorney.

18          And he said, "Hey, I've got this patent portfolio.  Do

19    you-all have -- does this law firm have a patent attorney?"

20    And he said, "Yeah, of course we do."

21          And so that's how we got connected.  That's what I recall.

22    I just -- I just know I started at a new firm and, shortly

23    thereafter, they said, "Hey, we've got this big patent

24    portfolio.  Can you help manage it?"  And that -- and it came

25    with a large trademark portfolio also.

**TINKER - DIRECT / STEFAN**

1  Q.   Do you recall when about that occurred, when about you met

2  Mr. Andrade?

3  A.   It would have been in 2019 midyear.

4  Q.   And can you describe the patent portfolio that Mr. Andrade

5  brought to you?

6  A.   Behemoth.  Is that accurate or descriptive?  It was

7  massive, would be the way to describe it.  Hundreds, hundreds

8  of applications to keep track of.

9       The former law firm that was handling it, when it got sent

10 over, it was an Excel spreadsheet with tons of lines on it

11 because he had -- not only did he have a large -- I say

12 "large" -- probably ten U.S. patent applications and patents he

13 had filed, still part of the same family but in multiple

14 different countries.  And when I say "multiple," it's like 60.

15 There was countries on this list that I had never even heard

16 of, if that makes -- makes it -- help understand the scope of

17 it.

18      And so my job was to coordinate with the foreign counsel.

19 So I can't file a patent in a foreign country, but -- so we

20 have law firms in each different country.  And then my job was

21 to coordinate with them to get those patents issued.

22 Q.   Mr. Tinker --

23 A.   Yes.

24 Q.   -- appreciate the background.

25      So that was your role with respect to the patents.  How

1    about the trademarks?

2    **A.**    So he had a number -- had filed for a number of

3    trademarks.  I'd say 20 or 30.  And that's a large number of

4    trademarks.  You know, 2- or 3,000 dollars each, it adds up.

5         All sorts of aspects of AML BitCoin, CrossVerify,

6    identity, letter of credit.  Anything you could think of that

7    was a catchphrase that related to what he was doing, which was

8    biometrics on a blockchain, he had filed for.

9         So a lot of them went abandoned.  He wasn't using a lot of

10   them.  But for, I'll say, five or six, we ultimately got the

11   trademarks registered for him.

12   **Q.**    What's essentially the purpose of a trademark?

13   **A.**    So the definition is source identifier.  So you're wearing

14   a Gap shirt.  That's the source.  I know that shirt came from

15   Gap.  No one else is allowed to say, "This is a Gap shirt"

16   except for Gap.  So that would be the purpose of a trademark.

17   **Q.**    You indicated Mr. Andrade had filed for about how many of

18   these you can recall?

19   **A.**    I'm -- I mean, this was six or seven years ago now, but it

20   was -- it was, like, 20 or 30.  It could have been more than

21   that.  I know, ultimately, the number that we got registered

22   was much smaller than that; but when we first started on it, it

23   was a big number.

24   **Q.**    Were there costs associated with each filing?

25   **A.**    Yeah.  Oh, yeah.  So the filing fee at the Trademark

**TINKER - DIRECT / STEFAN**

```
 1   Office is around $300 per application, and then there's some
 2   other fees down the road when it's ready to issue, but then
 3   attorney time to draft the application and get it filed.  So I
 4   just -- rough number, $2,000 per trademark.
 5           MR. STEFAN:  Can we display Exhibit 3384 to just
 6   counsel, the judge, and Mr. Tinker.
 7       And go ahead and scroll to the next page.
 8       And next.
 9       Next.
10       Next.
11       Next.
12       And last page.
13   Q.   Mr. Tinker, do you recognize what I just showed you?
14   A.   Yes.
15   Q.   How do you recognize it?
16   A.   These are trademark registrations.  It's the official,
17   formal -- I don't know the right word, but it's what the
18   U.S. Patent and Trademark Office, when the trademark
19   registers -- so now the little circle R that you see next to
20   named brands, that means they have a registered trademark, so
21   the official registration.
22   Q.   More specifically, do you recognize these as trademarks
23   that were filed --
24   A.   Yes.
25   Q.   -- for?
```

**TINKER - DIRECT / STEFAN**

1    **A.**    These were -- these were --

2    **Q.**    And these are --

3    **A.**    I believe two of them were filed by someone else and they

4    got transferred in.  And then I believe I filed the first one

5    that you showed us, the AML BitCoin one.  So that would have

6    been one that I prosecuted from start to finish.

7    **Q.**    Are you familiar with these documents?

8    **A.**    Yes.

9    **Q.**    And are they true and accurate reflections of the

10    trademarks as certified by the Trademark Office?

11    **A.**    Yes, I believe so.

12            **MR. STEFAN:**  Defense moves to admit.

13            **MR. HIGHSMITH:**  Objection.  Hearsay.  Objection.  403

14    pursuant to our briefing on legal documents.

15            **THE COURT:**  I'm going to admit them.

16        (Trial Exhibit 3384 received in evidence.)

17            **MR. STEFAN:**  Could we please publish these to the jury

18    starting at page 1, if we may.

19    **Q.**    So I'll go through these pretty quickly with you.

20        What's reflected on this first page?  What's being

21    trademarked here?

22    **A.**    Yeah.  So of all those trademarks, I think this one is

23    probably the most important one.  But the name "AML BitCoin"

24    was kind of -- that was his catchphrase of the -- everything

25    was kind of built around the phrase "AML BitCoin."

1      We couldn't get a trademark on just the name

2   "AML BitCoin," so we had to do it as a -- as a logo.  That's

3   why it's kind of in color and it has the circle.

4      "AML" is a pretty common term.  It's anti-money

5   laundering.  So the Trademark Office rejected that, saying,

6   "Look, 'AML' is a common word.  'Bitcoin' is a common word.

7   We're not going to let you get it."  So we got it as a logo.

8          **MR. STEFAN:**  And could we turn to page 3.

9   **Q.**   What trademark -- what is being trademarked here?

10  **A.**   So CrossVerify.  And now, this is different than the first

11  one.  The first one was a logo so it had the circle.  It has to

12  look that way.  It wasn't the phrase.

13      This is a wordmark, and the word would be "CrossVerify"

14  that we were able to get a trademark registration for.  And I

15  know this is one I didn't file because the corporation is

16  different than the one that I filed on that first one.

17         **MR. STEFAN:**  Okay.  And we can take down this exhibit.

18  **Q.**   Did Mr. Andrade have any copyrights?

19  **A.**   Yes.

20  **Q.**   What copyright did he have?

21  **A.**   So -- so, first of all, just to clarify, not to be too

22  nitpicky, but it's a copyright registration.  You have your

23  copyright -- as soon as I draw a picture, hand sketch it, I own

24  the copyright in that picture.  I then take it to the

25  Copyright Office and register it.  Now I have a copyright

TINKER - DIRECT / STEFAN

1    registration.

2         Nuance, but he has a copyright registration in addition to

3    all the other copyrights he might have.

4              **MR. STEFAN:**  Can we show Exhibit 3325.

5              **THE COURTROOM DEPUTY:**  Just to the witness?

6              **MR. STEFAN:**  Yes, to the witness, counsel, and --

7              **THE WITNESS:**  So --

8    **BY MR. STEFAN:**

9    **Q.**   And before you speak to this, just do you recognize it?

10   **A.**   Yes.

11   **Q.**   And is this the -- is this a copyright that --

12   registration from Mr. Andrade?

13   **A.**   So this is the deposit that would have been associated

14   with his copyright registration.  This is the registration

15   number below it.  So, yes.

16   **Q.**   And how are you confident that this is what you're -- what

17   you're saying it is?

18   **A.**   So I -- I did not file the copyright, the application to

19   register his copyright, but I did submit a petition to the

20   Copyright Office to obtain the deposit materials.

21        So whenever you register a copyright, you have to file

22   something with the Copyright Office.  So I wanted to get a copy

23   of what was filed.  That's what this is.

24   **Q.**   And you recognize it as being what was filed?

25   **A.**   I recognize it as what the Copyright Office sent to me

**TINKER - DIRECT / STEFAN**

1  when I requested a certified copy of the deposit materials.

2          **MR. STEFAN:**  Defense moves to admit.

3          **MR. HIGHSMITH:**  No objection.

4          **THE COURT:**  3325 is admitted.

5      (Trial Exhibit 3325 received in evidence.)

6          **MR. STEFAN:**  Thank you.

7      Your Honor, can we just scroll to the next page.

8  **Q.**  We're not going to go through this entire document, but

9  just generally, what's reflected in the document?

10 **A.**  So this is -- this is source code.  I don't -- I could not

11 tell you the details of this.  We could scroll through and

12 maybe we could recognize some things to kind of associate it

13 with what was the program.  It would make sense to a computer

14 programmer.

15     But when you register software, the Copyright Office

16 doesn't want your actual -- the software that you would run on

17 your computer.  They want the source code.  They want what you

18 would use, compile that into the software that you would

19 actually run.

20     So they also don't want the entire -- the entirety of the

21 source code, which could be, you know, millions of lines long.

22 They want the first -- it used to be the first 50 pages and the

23 last 50 pages.  I think -- I think now it's the first 25 and

24 the last 25 pages of the source code.  And so that's what this

25 reflects.

**TINKER - DIRECT / STEFAN**

1   Q.   So this is -- as you said, it reflects the first 25 and

2   last 25 pages of source code that Mr. Andrade copyrighted?

3   A.   Yes.

4         **MR. STEFAN:**  Okay.  We can take down this exhibit.

5   Q.   When it came to managing Mr. Andrade's portfolio, you had

6   indicated, before, dealing with filings in other countries.

7         How else did you assist Mr. Andrade with his patent

8   portfolio?

9   A.   I mean, responding to office actions.  Is that --

10  Q.   I guess more specifically, did you engage in any kind of

11  negotiations for acquisition of Mr. Andrade's patent portfolio?

12  A.   Yes.  So --

13  Q.   And if I may, sir, who did you engage in negotiations

14  with?  Who were these people?

15  A.   So -- well, I was going to explain how it -- how it got

16  dumped in my lap.  But I had -- specifically, the two people

17  that I spoke with on negotiating a sale of the patent portfolio

18  was David Cohen and Jack Abramoff.

19  Q.   When about did you have discussions with David Cohen and

20  Jack Abramoff regarding this sale?

21  A.   So it was late -- so I think September-ish 2019.

22  Q.   How did this come about?

23  A.   So, again, this large patent portfolio, excessively large,

24  got dumped on me; and we're -- we're, you know, scrambling to

25  make sure everything stays alive.

```
 1        And around this same time, Marcus said, "Hey, I'm in the
 2   process of selling this.  Will you talk to David" --
 3            MR. HIGHSMITH:  Objection.  Hearsay, to what
 4   Mr. Andrade said, not to what the witness said.
 5            THE COURT:  Well, but --
 6            MR. STEFAN:  It did sound as if the witness was about
 7   to explain what he did in reaction to something that
 8   Mr. Andrade --
 9            THE COURT:  I'll allow it.
10        Go ahead.
11            THE WITNESS:  So Mr. Andrade told me, "Hey, have a
12   conversation with this guy and see what he -- see what he has
13   to say."  So I did.  That was David Cohen.
14        We started -- we had several phone calls.  And he was
15   going to send me a document, basically a referral fee.  And
16   then after a couple of conversations, he said, "Hey, I'm
17   turning this over to Jack Abramoff."
18        And when he did that, I -- there was a -- there was a big
19   rush.  For whatever reason, it had to get done fast.  And I
20   remember sitting on my front porch on a Friday, sunny, after --
21   after 5 o'clock, which for a lawyer is no big deal, having a
22   phone call with Jack Abramoff; and I was -- I was in shock that
23   I was having a phone call with this infamous person.  And then
24   when we started talking about dollars, I was -- I was even more
25   in shock.
```

 1          But then it was like, "Hey, we've got to get this done

 2     fast."  And I'm like, "All right.  I'll work this weekend."

 3     You know, again, as a lawyer, we work weekends.  That's just

 4     what you do.  And he was like, "Oh, but I can't work tomorrow."

 5               MR. HIGHSMITH:  Objection.  Sorry.

 6               THE COURT:  Yeah.  Just wait for the question.

 7          Okay.  Next question.

 8               THE WITNESS:  Sorry.  I forgot what the question was.

 9                         (Laughter.)

10               THE COURT:  No.  I'm saying, that's why we want you to

11     stop.

12          So now ask a new question.

13     BY MR. STEFAN:

14     Q.   Okay.  What was the nature of -- so I want to clarify

15     something.

16          You had mentioned, I believe, a referral fee.  What were

17     you speaking to with respect to that and David Cohen?

18     A.   Yeah.  So they had a potential purchaser of this patent

19     portfolio, and in order to introduce them to Marcus, they

20     wanted a percentage of whatever the final sale price was, and

21     so that's what we were negotiating.

22          I think they called it a consulting agreement, but in

23     reality, it was, "Hey, we've got a name.  We're going to attach

24     this name as Exhibit A to the document, but we're not going to

25     show you Exhibit A until you sign the agreement."  So that's

**TINKER - DIRECT / STEFAN**

```
 1  where we were.

 2       There was negotiations like exclusivity.  You know, is he

 3  allowed to sell it outside of them?  Is there, you know --

 4           THE COURT:  Well, remember, he's asking about the

 5  referral fee.

 6           THE WITNESS:  Sorry.  Yes.

 7           THE COURT:  Now you've answered the question.

 8       Next question.

 9           MR. STEFAN:  Yes.

10  Q.   Okay.  And after your initial conversation with

11  Mr. Abramoff, did negotiations proceed from that point?

12  A.   They proceeded to a point and then they, I would say,

13  abruptly ended.

14  Q.   What was under negotiation?  What was the offer?

15  A.   So the deal was they wanted, what I recall, 40 percent.

16  And I say "they."  I think it was half to Abramoff and half to

17  Cohen.  But they wanted 40 percent of the final sale price.

18       The conditions were that there had to be an up-front

19  payment of $500,000.  In order for them to get 40 percent,

20  there had to be an up-front payment to Marcus, and then there

21  had to be a sale price.  And the up-front payment had to be

22  over $500,000, and the sale price had to be over $100 million

23  in order for them to get their 40 percent.

24  Q.   What happened with that offer and the negotiations that

25  followed?
```

**TINKER - DIRECT / STEFAN**

1  **A.**   So I took the offer back to Marcus, and that was the rapid

2  ending of these negotiations.  When Marcus found out that they

3  wanted 40 percent, that was -- that was unacceptable to him.

4  **Q.**   As in too high a percentage?

5  **A.**   Way -- yeah, way too high.

6  **Q.**   Were there any subsequent attempts to keep the

7  negotiations alive?

8  **A.**   So after -- we did some redlines to the agreement.  I

9  don't -- the 40 percent, maybe it came down some.  I don't

10 know.  But it was never going to get low enough that Marcus was

11 comfortable with that amount of money.  There was all sorts of

12 allegations back and forth.

13      Jack Abramoff called me and --

14 **Q.**   So just --

15 **A.**   -- and said, "Hey, can" --

16         **THE COURT:**  Wait.

17         **MR. HIGHSMITH:**  Objection.  Hearsay.

18         **THE COURT:**  Yes.  Just let's wait for the question and

19 focus on the specific question.

20      So, Mr. Stefan, next question.

21 **BY MR. STEFAN:**

22 **Q.**   So suffice to say, the deal did not go through?

23 **A.**   Correct.

24 **Q.**   Okay.  In the course of your representation of

25 Mr. Andrade, did you ever review his technology?

TINKER - DIRECT / STEFAN

1    A.   Yes, I did.

2    Q.   I'm sorry.  Returning one moment to the prior discussion

3    regarding the negotiations with Jack Abramoff and David Cohen,

4    the condition was that they were going to bring in a buyer?

5              MR. HIGHSMITH:  Objection.  Leading.

6              THE WITNESS:  They had a buyer.

7    BY MR. STEFAN:

8    Q.   So, okay.  What was represented to you with respect to the

9    ability that they had to complete this deal?

10   A.   So my understanding was they had a buyer.  The only --

11   they wanted the referral fee signed before they would disclose

12   who that buyer was to us.

13   Q.   And what was the buyer willing to offer?

14   A.   It was $100 million with a $500,000 up-front, like a firm

15   offer, "Hold this deal in place until we get the final deal

16   done."  The reason I know it was something north of

17   $100 million is because in the contract it said, "The

18   current" -- "The current potential buyer satisfies these

19   requirements."

20   Q.   Of bringing in the hundred million?

21   A.   Right.

22   Q.   Okay.  Turning, again, to the technology, did you, in the

23   course of your representation, review Mr. Andrade's technology?

24   A.   Yes, I did.

25   Q.   And how did that come about?

**TINKER - DIRECT / STEFAN**

1    **A.**   So it was not in relation to the patents, which you can

2    get a patent on anything.  You don't have to have a working

3    prototype.  This would have been in relation to the trademarks.

4        I told Marcus, "Hey, we have to prove to the

5    Trademark Office that these trademarks are in use, that we're

6    actually using them."  And he said, "Well, here, I'll give you

7    a" --

8            **MR. HIGHSMITH:**  Sorry.  Objection, Your Honor.

9    Hearsay.

10           **THE COURT:**  Sustained.

11           **THE WITNESS:**  I needed -- so --

12           **THE COURT:**  No, no.  No question.  Wait for the

13   question.

14           **THE WITNESS:**  Okay.

15   **BY MR. STEFAN:**

16   **Q.**   So what was -- describe the process of -- or do you have

17   familiarity with submitting matters to the Patent Office?

18   **A.**   Yes.

19   **Q.**   Okay.  And what was the -- what's that involve?  What does

20   that process involve?

21   **A.**   In a typical trademark filing, usually it's my client's

22   website or a product; and I'll ask my client, "Hey, will you

23   send me a screenshot or a picture of the product with the name

24   on it?" or I'll go to their website and I will do a -- take a

25   screenshot of their website showing the trademark in use.

**TINKER - DIRECT / STEFAN**

1      I will then submit that screenshot to the Trademark Office

2  in what's called a specimen of use.

3  **Q.**   How many times have you done this on behalf of clients?

4  **A.**   Hundreds.

5  **Q.**   How many applications have you reviewed?

6  **A.**   Hundreds.

7  **Q.**   And I speak specifically to, like, technology

8  applications, say on phones or computers.

9  **A.**   Gotcha.   Okay.

10      Yes.   Probably not hundreds, but dozens, yes.   I'll go to

11  the App Store.   I'll take a screenshot of the App Store

12  showing, you know, them using that logo on their app.   I'll

13  download the app.   I'll log in.   I'll take screenshots.   All

14  ways to submit to the Trademark Office showing, "Hey, we're

15  actually using this."

16  **Q.**   Did you do this for Mr. Andrade?

17  **A.**   Yes, I did.

18  **Q.**   Can you describe what you did with respect to

19  Mr. Andrade's technology?

20  **A.**   So with respect to AML BitCoin, the trademark that we saw

21  earlier, I went to the website.   I took screenshots of the

22  website.

23          **MR. HIGHSMITH:**   Objection as to timing.   When did this

24  happen?

25          **THE COURT:**   Well, can you provide us -- go ahead and

TINKER - DIRECT / STEFAN

1    ask.

2    **BY MR. STEFAN:**

3    **Q.**    When about did you perform this process?

4    **A.**    I'm going to guess 2020.  I'm not sure.

5    **Q.**    Okay.  So around 2020 time frame?  Go ahead.  What did you

6    do?

7    **A.**    It would be in the records that were submitted to the

8    Trademark Office.

9          So I took screenshots of the website.  I downloaded the

10   mobile app.  I actually created an account.  I registered.  And

11   I took screenshots of various steps in that process, and then I

12   submitted those screenshots to the Trademark Office.

13   **Q.**    When you downloaded the app and created an account, did

14   the application work for you?

15   **A.**    It appeared to work for me, yes.

16   **Q.**    And when you say "it appeared to work," can you describe

17   what it was doing, what it did?

18   **A.**    So there was a couple different, I guess, interfaces to

19   log into.  One of them was the wallet, the AML BitCoin Wallet

20   or something like that, and then the other one was the actual

21   AML BitCoin exchange.

22         And then there was the mobile app.  I, from what I recall,

23   had to take a picture using my phone and record a video using

24   my phone, take a picture of, like, my passport or something,

25   and all of that was kind of verification of my identity,

TINKER - DIRECT / STEFAN

1    I guess.

2    **Q.**   What was being -- what was requiring you to do that?  What

3    were you doing that to accomplish?

4    **A.**   In order to create an account.

5    **Q.**   Okay.  And you said that there was a video feature?

6    **A.**   Yeah.  Again, this has been five years, but what I

7    recall -- the thing that sticks out in my mind was I was trying

8    to log in on my computer and it was like, "Hey, you need to

9    verify yourself"; and I had to go to the mobile app to do it,

10   to, like, you know, video of myself saying, "I'm Jeffrey

11   Tinker."

12       And that was just really -- what stuck out in my mind was

13   that I'm trying to log in on the website and it's asking me to

14   verify myself over here.  It -- I thought it was pretty cool,

15   so...

16   **Q.**   And when you logged into the application on your phone,

17   would you have to go through facial ID verification?

18   **A.**   Yeah.  It was a little annoying, actually, because as soon

19   as -- as soon as I -- my phone would go into sleep mode or

20   whatever.  If I pulled it back up, I had to redo it.  I had to

21   show my face again.  So, yes, it was literally every time I

22   wanted to do anything, I had to reshow my face to it.

23   **Q.**   At that time did you have a phone that had facial ID

24   recognition on it?

25   **A.**   So I did not.  I didn't remember that until I read my

**TINKER - DIRECT / STEFAN**

1  declaration.  My phone was an older one that didn't have the

2  facial recognition.  It had the thumbprint thing.

3       And so now on my phone, you know, you look at it, it looks

4  at your face, and you log in that way.  But back then, my phone

5  did not have that.  So my -- it taking a video of my face

6  was not authentication within my phone itself.  It was -- it

7  was going out on the Internet somewhere, not just, you know,

8  here's my phone.  It was not just opening the lock screen on my

9  phone, if you will.

10 **Q.**  Based on your experience with Mr. Andrade's applications,

11 was the technology in working order?

12 **A.**  From my perspective, it was.

13       **MR. STEFAN:**  Your Honor, may I have a moment?

14       **THE COURT:**  Yes.

15       **THE WITNESS:**  Can I clarify my last answer real quick?

16 It was -- it was a prototype.  So when you say "working

17 order," the prototype was working.

18       **MR. STEFAN:**  Understood.

19 May I have a moment, Your Honor?

20       **THE COURT:**  Yes.

21                 (Pause in proceedings.)

22       **MR. STEFAN:**  Thank you.

23 I don't have any further questions.

24       **THE COURT:**  Mr. Highsmith?

25       **MR. HIGHSMITH:**  Thank you, Your Honor.

1          <u>**CROSS-EXAMINATION**</u>

2     **BY MR. HIGHSMITH:**

3     **Q.**   Good morning, Mr. Tinker.

4     **A.**   Good morning.

5     **Q.**   So do I have it right that you first started working for

6     Mr. Andrade in mid-2019?

7     **A.**   I believe that's correct.

8     **Q.**   Did you do any work for Mr. Andrade before 2019?

9     **A.**   I don't believe so.

10    **Q.**   You were laughing.  Why -- or --

11    **A.**   I'm laughing because I believe it was in 2019.  Did the

12    patent portfolio come to Bell Nunnally in 2018?  I don't think

13    so.

14    **Q.**   The question is just whether you started working for him

15    before 2019.

16    **A.**   No, I don't believe so.

17    **Q.**   Okay.  And when did you stop working for Mr. Andrade?

18    **A.**   Officially, I mean, it's probably been three years.  And

19    the reason I say "officially" is because my firm is no longer

20    working for him, but he has called me and said, "Hey, can you

21    help us keep these patents alive?  Will you pay this

22    maintenance fee?"  He gives me a credit card; I pay the

23    maintenance fee.  I don't bill him for it.  It's just kind

24    of -- I don't want to see these patents go abandoned.

25    **Q.**   I didn't catch the last word.  I don't want to see these

TINKER - CROSS / HIGHSMITH

1    patents what?

2    **A.**    I don't want to see the patents go abandoned.  So I

3    have -- I have helped him keep the patents alive.  Bare

4    minimum, just pay the maintenance fee.

5    **Q.**    Okay.  So approximately when did you stop officially

6    working for Mr. Andrade?

7    **A.**    Like I said, it's probably been two -- two or three years.

8    **Q.**    Okay.  So about, like, 2023?

9    **A.**    I'll say 2022.

10   **Q.**    Okay.  So you worked for Mr. Andrade from approximately

11   mid-2019 to mid- -- excuse me -- to 2022; is that accurate?

12   **A.**    It sounds accurate.

13   **Q.**    Approximately how many hours did you bill Mr. Andrade or

14   his companies during that time period?

15   **A.**    I have no idea.

16   **Q.**    More than five?

17   **A.**    Oh, certainly more than five.

18   **Q.**    More than ten?

19   **A.**    Certainly more than ten.

20   **Q.**    More than 50?

21   **A.**    I would say yes, but I don't know.

22   **Q.**    What was your hourly rate during that time period?

23   **A.**    It was probably around 400 to 450 dollars an hour, if I

24   had to guess.

25   **Q.**    All right.  So you've done a lot of work in the patent

1    space; is that accurate?

2    **A.**    That's correct.

3    **Q.**    Have you heard the term "patent troll" before?

4    **A.**    Yes, I have.

5    **Q.**    Can you please describe what a patent troll is?

6    **A.**    So a patent troll would be some -- some people call them

7    non-practicing entities.  It's basically somebody who has a

8    patent and uses it -- asserts it against people to make money

9    and not necessarily because they're trying to defend their

10   product.

11   **Q.**    When you say "asserts it against somebody," is one way of

12   thinking about that suing somebody?

13   **A.**    Yes, litigation or licensing.

14   **Q.**    Litigation or licensing?  I've got that right?

15   **A.**    The licensing would be with the threat of litigation.

16   **Q.**    Licensing with the threat of litigation --

17   **A.**    Yes.

18   **Q.**    -- is that correct?

19   **A.**    Yes.

20   **Q.**    You looked at Exhibit 334.

21            **MR. HIGHSMITH:**  Could we please display Exhibit 334.

22   **Q.**    Or I'll just show it to you on the -- I'll show it to you

23   on the Elmo.

24            So you looked at 334.  You're familiar with this exhibit;

25   is that right?

**TINKER - CROSS / HIGHSMITH**

```
1    A.    Yes.

2              MR. HIGHSMITH:  Let's just zoom out for a second.

3          Sorry.  3384, we're looking at.

4      (Stenographer interrupts for clarification of the record.)

5              MR. HIGHSMITH:  I'm looking at 3384.

6    Q.    Do you see that in front of you, sir?

7    A.    If that's what this is, then, yes.

8    Q.    Yeah, this is 3384.

9          What date was that registered?

10   A.    May 11th, 2021.

11             MR. HIGHSMITH:  Let's take a look at the next page.

12         Oh, I'm sorry.  Thank you so much.

13   Q.    Let's take a look at the CrossVerify.

14         So you testified about CrossVerify before on direct

15   examination; correct?

16   A.    Yes.

17   Q.    What's the date this was registered?

18   A.    February 2nd, 2021.

19   Q.    Thank you.

20         You testified about negotiations concerning acquisition of

21   the patent portfolio; is that correct?

22   A.    Correct.

23   Q.    And the date on that was late September 2019; is that

24   correct?

25   A.    Correct.
```

1   **Q.**   Okay.  Did you provide any -- did you discuss with

2   Mr. Andrade anything about press releases in 2018 regarding his

3   product?

4   **A.**   If -- if my recollection is correct that I started working

5   for him in 2019, I would not have had any conversations with

6   him in 2018.

7   **Q.**   Okay.  Did you talk to Mr. Andrade in 2018 about the

8   Super Bowl and a potential Super Bowl ad?

9   **A.**   I did not.

10  **Q.**   Based on your understanding of Mr. Andrade's companies and

11  their financial resources, was it your impression that they

12  would be able to afford a Super Bowl advertisement on network

13  television?

14          **MR. STEFAN:**  Objection.  Foundation, at minimum.

15          **THE COURT:**  Sustained.  Sustained.

16  **BY MR. HIGHSMITH:**

17  **Q.**   You talked on direct examination quite a bit about

18  Mr. Andrade's patents and your experience with patents.

19          Would you agree that you can get a patent on almost

20  anything?

21  **A.**   I would not agree with that.

22  **Q.**   No?  Is it -- can you get a patent on many, many things?

23  **A.**   I mean, if it's new, which is novel, Section 102;

24  non-obvious, which would be Section 103; useful, which would be

25  Section 112 --

1    Q.   I didn't ask --

2    A.   -- 101.

3    Q.   I didn't ask you to recite the --

4    A.   You said --

5    Q.   -- statute.

6    A.   -- anything.

7    Q.   Excuse me.

8         THE COURT:  Wait, wait, wait.  Don't talk over each

9    over.

10        THE WITNESS:  All right.

11        THE COURT:  So restate the question.

12   And could you put the microphone, Mr. Tinker, a little

13   closer to you?  Thank you.

14   Okay.  Go ahead, Mr. Highsmith.

15        MR. HIGHSMITH:  Thank you.

16   Q.   Are there millions of patents in the United States?

17   A.   Yes, there are.

18   Q.   To get a patent, do you have to have a working,

19   functioning product?

20   A.   You do not.

21   Q.   You testified about downloading the AML BitCoin app, the

22   wallet.  You testified regarding an exchange.  Again, when did

23   you do that?

24   A.   When did I say that I did it on the earlier --

25   Q.   That wasn't the question.  When did you do that?

**TINKER - CROSS / HIGHSMITH**

1   **A.**   So if this -- the previous one was registered in 2021, it

2   probably would have been shortly before that.  So I think 2021

3   would be a good guess.

4   **Q.**   I don't want you to guess.  What is your best estimate for

5   when you downloaded the application, the wallet, and engaged in

6   the activity you just testified to?

7   **A.**   2021.

8   **Q.**   On direct examination, you mentioned an exchange, but I

9   don't recall you elaborating on that.

10        Did you ever attempt to trade any AML BitCoins or

11  AML BitCoin Tokens?

12  **A.**   I did not.

13  **Q.**   You also testified on direct examination that you were

14  working with a prototype; is that accurate?

15  **A.**   I think that is a -- I mean, that is what I said.  I can

16  clarify what I meant by "a prototype," but yes.

17  **Q.**   What did you mean by "a prototype"?

18  **A.**   So when I downloaded the app, it was not available in the

19  App Store like you would go to just download a normal app.  You

20  had to download something what was called Testflight from

21  Apple.  And once you downloaded Testflight, then you could

22  download the app.  And that was why I wanted to clarify that it

23  was a prototype.

24  **Q.**   What is a prototype, to the best of your knowledge?

25  **A.**   A -- it is -- it's kind of self-explanatory, I guess.  A

TINKER - REDIRECT / STEFAN

 1    product that is still in testing or that needed -- needs to be

 2    finalized through, you know, testing, actual use, on a trial

 3    basis.

 4        **MR. HIGHSMITH:**  No further questions.

 5                    <u>**REDIRECT EXAMINATION**</u>

 6    **BY MR. STEFAN:**

 7    **Q.**   Do you recall when the copyright was filed?

 8    **A.**   I do not.

 9        **MR. STEFAN:**  Can we -- I think it's 3325 -- display

10    3325.

11    **Q.**   Okay.  I was hoping to refresh you with 3325, but it

12    doesn't look like it's printed there on 3325.

13    **A.**   Yeah.  Unfortunately, this is the deposit materials.  The

14    copyright registration would be, you know, one page on top of

15    this.  That's not on this exhibit.  So that would have the

16    information of when it was filed, when it registered.

17    **Q.**   Okay.  Understood.

18        Mr. Highsmith asked you about whether you could patent

19    almost anything.  Well, first of all, is that actually the

20    case?  Could you patent almost anything?

21    **A.**   I disagree that you can patent anything.

22    **Q.**   And you were kind of describing some of the requirements

23    that exist for patents.  What would those be?

24    **A.**   So it has to be new, non-obvious, and useful.

25    **Q.**   And would you expect to receive a $100 million offer on a

**TINKER - REDIRECT / STEFAN**

1  patent for almost anything?

2  **A.**  No.

3  **Q.**  People with patents sometimes have to sue to protect their

4  intellectual property.  Would you agree with that?

5  **A.**  Yes.

6  **Q.**  And do you know whether or not the AML BitCoin is still in

7  testing or was still in testing at the time?

8           **THE COURT:**  "At the time" is what?

9           **MR. STEFAN:**  Pardon me.

10  **Q.**  At the time that you were performing your review of

11  Mr. Andrade's application.

12  **A.**  So the mobile app, as I said, the way that I was able to

13  download it was through something called Testflight through the

14  App Store.  But the website appeared to me to be working, and

15  that was not a demo version.

16       So in my -- you know, I don't know the backend, but the

17  mobile app was -- I downloaded through Testflight.  But the

18  App Store has a lot of requirements just to be able to put an

19  app on the App Store.  There's a lot of hoops you have to jump

20  through.  So me having to do it through Testflight did not --

21  to me, wasn't evidence that the website wasn't working.

22  **Q.**  And is it true that a prototype could work, like a working

23  prototype?

24  **A.**  Yeah, of course.  That's -- that's the whole -- this is a

25  beta release.  It means:  We feel really confident about this,

1    but it's not necessarily our final version.  A beta release, to

2    me, would be a working prototype.

3    Q.    Was that your understanding of what the -- what you

4    reviewed, was a beta?

5    A.    It -- it may have been, or it could have been something

6    much more advanced than a beta.  I don't -- that's not

7    something I have knowledge of.

8    Q.    Okay.  And what was your overall -- if you could describe

9    your overall experience using the application as compared to

10    other experiences you've had in reviewing other applications.

11    A.    So this was the first time that I had downloaded the

12    Testflight app from the App Store, so that was kind of neat.

13          As far as the app working, it worked fine.  If it was a

14    beta version, I would have expected it to crash and, you know,

15    you have to restart and all that sort.  I didn't have any

16    issues like that.

17          I did -- I do remember the reason I -- so when I look at

18    my phone now and it recognizes my face, it's, you know,

19    instantaneous.  I can be looking away and it still will

20    recognize my face.

21          This was a rudimentary version of that.  And the reason I

22    say that is, I would -- I had to, like, adjust my face in front

23    of the camera and make sure I was perfectly square.  And if I

24    didn't do it just right, I had to, you know, kind of play with

25    it like that.

1      So, I mean, to me, that showed that it was working, like

2  it was actually recognizing my face; but now five years later,

3  or however long it's been, it seems a little rudimentary

4  compared to what Apple can do.  So I don't know.  Overall, I

5  was fine with the experience.

6          **MR. STEFAN:**  Okay.  I have no further questions.

7  Thank you.

8                          **RECROSS-EXAMINATION**

9  **BY MR. HIGHSMITH:**

10 **Q.**   Did you buy any AML BitCoin?

11 **A.**   I did not.

12 **Q.**   Did you sell any AML BitCoin?

13 **A.**   I did not.

14 **Q.**   Do you know if your biometrics were uploaded to the

15 AML BitCoin blockchain?

16 **A.**   I have no idea.

17         **MR. HIGHSMITH:**  No further questions.

18         **THE COURT:**  You may step down.

19                      (Witness excused.)

20         **MS. DIAMOND:**  Your Honor, the defense will call Karl

21 Ruzicka to the stand.

22     If I may have just have a moment to get --

23         **THE COURT:**  Yes.

24                      (Pause in proceedings.)

25   (Witness enters the courtroom and steps forward to be sworn.)

RUZICKA - DIRECT / DIAMOND

```
 1              THE COURT:  If you could come forward to the witness
 2   stand to be sworn.
 3              THE COURTROOM DEPUTY:  Please raise your right hand.
 4              THE WITNESS:  Can I have a second, please?
 5                        KARL STEVEN RUZICKA,
 6   called as a witness for the Defendant, having been duly sworn,
 7   testified as follows:
 8              THE WITNESS:  I do.
 9              THE COURTROOM DEPUTY:  Thank you.  Please be seated.
10       State your full name.
11              THE WITNESS:  Karl Steven Ruzicka.
12              THE COURTROOM DEPUTY:  And spell your last name.
13              THE WITNESS:  R-u-z-i-c-k-a; Steven, S-t-e-v-e-n.
14                        DIRECT EXAMINATION
15   BY MS. DIAMOND:
16   Q.   Good morning.  Thank you, Mr. Ruzicka.
17   A.   Good morning.
18   Q.   Can you tell the jury, please, what it is that you do for
19   a living?
20   A.   CPA.
21   Q.   And --
22   A.   Certified public accountant.
23   Q.   Sorry.  We spoke over each other.  That's my fault.
24   A.   Certified public accountant.
25   Q.   Could you bring the microphone just a little closer to
```

RUZICKA - DIRECT / DIAMOND

1   your mouth?  We need to make sure that everybody can hear you.

2       How long have you been a certified public accountant?

3   **A.**  20 years.

4   **Q.**  Can you -- if you don't mind -- sorry.  Where do you --

5   sorry.

6       Are you currently working as a CPA?

7   **A.**  Yes.

8   **Q.**  And where do you conduct your business?

9   **A.**  Las Vegas, Nevada.

10          **THE COURT:**  Could you try to keep your voice up a bit?

11          **THE WITNESS:**  Okay.

12      Las Vegas, Nevada.

13          **THE COURT:**  Thank you.

14          **MS. DIAMOND:**  Thank you.

15          **THE WITNESS:**  Sorry about that.

16  **BY MS. DIAMOND:**

17  **Q.**  In the course of your work in Las Vegas, Nevada, did you

18  come at some point to have a client named Rowland Marcus

19  Andrade?

20  **A.**  Yes.

21  **Q.**  Do you see him in the courtroom?

22  **A.**  Yes.

23  **Q.**  He is the defendant; is that correct?

24  **A.**  Yes.

25  **Q.**  Do you remember approximately what year you started

RUZICKA - DIRECT / DIAMOND

1   working with Mr. Andrade?

2   **A.**    2014.

3   **Q.**    And do you remember what businesses Mr. Andrade was

4   working on in that period of time?

5   **A.**    Yes.

6   **Q.**    Could you tell the jury, please.

7   **A.**    Bitcoin or his -- At Coins.  He was establishing At Coins.

8   **Q.**    Would the name "Aten Coin" sound familiar to you?

9   **A.**    Yes, but I think back then, it was -- yeah, Aten Coins.

10  That's what I meant, mm-hmm.

11  **Q.**    And were you the person that was doing Mr. Andrade's taxes

12  personally?

13  **A.**    No.

14  **Q.**    Did you -- in the course of your business, tell the jury

15  what sort of work you did when he was working on the Aten Coin

16  project in 2014, 2015, 2016, just generally based on your

17  memory.

18  **A.**    Basically, they had a bookkeeper firm called Office Squad.

19  They would keep the books for NAC Foundation, and I would

20  review them monthly -- I think monthly -- and reconcile the

21  bank accounts; and at the end of the year, I would prepare a

22  trial balance to send to Rowland's CPA in Texas.

23  **Q.**    In the course of your work for Mr. Andrade, would you

24  regularly prepare weekly reports, quarterly reports, profit and

25  loss statements, balance statements, those sort of business

RUZICKA - DIRECT / DIAMOND

```
 1    financial documents?

 2    A.    During that first four years, '14 to '18 --

 3    Q.    Yes.

 4    A.    -- or '14 to '16?

 5          No, not really.

 6    Q.    Was there a time after that that you began to prepare some

 7    of those kinds of reports for Mr. Andrade?

 8    A.    No, not specifically.

 9    Q.    Okay.  Do you recall interfacing with his company in 2018,

10    reviewing some records relating to AML BitCoin token sales?

11    A.    Yes.

12    Q.    Can you tell the jury what tasks you were asked to do with

13    respect to Mr. Andrade's sale of AML BitCoin?

14    A.    Basically, we had an attorney that would pick up the --

15    the buyer -- or the buyers of the bitcoins, purchasers -- not

16    bitcoins.  I'm sorry -- of the cryptocurrency.  And I would

17    tally them up.  I would actually compare them to the contracts

18    themselves, make sure that the amount that we have going in the

19    deposit in his IOLTA account, the attorney's IOLTA account, it

20    matched the --

21    Q.    I'm going to slow you down for a second --

22    A.    Okay.  Sorry.

23    Q.    -- if you could.

24          Were you referring to something called an IOLTA account?

25    A.    Yes.
```

**RUZICKA - DIRECT / DIAMOND**

1  **Q.**   I-O-L-T-A?

2  **A.**   Mm-hmm.

3  **Q.**   And what is your understanding of what the nature of that

4  account is?

5  **A.**   It's a special account that attorneys use, that are also

6  supervised by the board, by the attorneys board, the bar -- by

7  the bar.

8  **Q.**   So during the course of the sales of the tokens, money

9  would be sent to an attorney's IOLTA account rather than to

10  Mr. Andrade directly; correct?

11  **A.**   Yes.

12  **Q.**   And you were -- was -- were you serving a function for him

13  to determine whether or not that money could leave the

14  attorney's trust account?

15  **A.**   Yes.

16  **Q.**   And in doing so, you communicated with people at

17  Mr. Andrade's business; correct?

18  **A.**   One or two, yes.

19       **MS. DIAMOND:**  Mr. Jackson, could I ask you, please, to

20  display to the jury and the Court and the witness Exhibit 3161,

21  which is already in evidence.

22  **Q.**   This document, Mr. Ruzicka, will appear on your screen.

23  **A.**   Okay.

24       **MS. DIAMOND:**  Mr. Jackson, when you are ready, if you

25  could highlight for the jury the email at the bottom of -- and

RUZICKA - DIRECT / DIAMOND

```
 1  the witness -- the email at the bottom of that exhibit.
 2  Q.   Do you see this email, Mr. Ruzicka?
 3  A.   Yes.  Yes.
 4  Q.   Does this look familiar to you?
 5  A.   Yes.
 6  Q.   And could you describe to the jury generally what's going
 7  on in this email?
 8  A.   Basically, what we would do is we would match up the
 9  actual deposit amounts to the actual contracts to make sure
10  they both agree; and then once we had that done, we would go
11  ahead and acknowledge that we're ready to -- the funds are
12  legitimately received, and therefore, he can release them --
13  Q.   And in this --
14  A.   -- to the bank.
15  Q.   -- you communicate --
16       (Simultaneous speaking.  Stenographer interrupts for
17  clarification of the record.)
18           THE WITNESS:  To the bank account at Wells Fargo,
19  I think it was.
20  BY MS. DIAMOND:
21  Q.   Is that a bank account that was held by the
22  NAC Foundation?
23  A.   Yes.  Yes.
24  Q.   Is that a bank account that you had access to?
25  A.   No.
```

1    **MS. DIAMOND:**  Could you scroll, Mr. Jackson, up to the

2   top of this email and highlight the top header of the email for

3   Mr. Ruzicka or for the jury.

4   **Q.**   Do you see that you're copied on an email sent by David

5   Salmon --

6   **A.**   Mm-hmm, yes.

7   **Q.**   -- on February 1st, 2018?

8   **A.**   Yes.

9   **Q.**   And would that be part of your regular procedure with

10  Mr. Salmon, that after he received an authorization from you to

11  release funds from his IOLTA account to the NAC account, that

12  you would then receive a copy of his confirmation that he is

13  doing so?

14  **A.**   I don't know if I received a confirmation.  I don't

15  recall.  Like a physical document?  I don't recall that I

16  actually got a confirmation, but I just assumed it was -- I did

17  not see the bank account, so I did not check to --

18  **Q.**   You would receive --

19     (Stenographer interrupts for clarification of the record.)

20          **THE WITNESS:**  The Wells Fargo Bank account.  So I did

21  not know, you know, what was deposited, what wasn't deposited.

22  **BY MS. DIAMOND:**

23  **Q.**   Would you regularly save your emails connected to your

24  communication with your work for --

25  **A.**   Yes.

1    Q.    -- Marcus Andrade?

2        And are those emails that were records that were made at

3    or near the time by or from information transmitted by someone

4    with knowledge?

5    A.    Yes.

6    Q.    And were those records kept in the course of your

7    regularly conducted activity of a business organization,

8    occupation, or calling, whether or not for profit?

9    A.    Yes.

10   Q.    And was using emails for this purpose a regular practice

11   of your activity?

12   A.    Yes.

13        MS. DIAMOND:  Thank you.  We could take down

14   Exhibit 361 [sic], please.

15        If we could put up for the witness and the Court and

16   counsel Exhibit 3149, please.  3149.

17   Q.    Mr. Ruzicka, can you read that, or do you need us to make

18   it a little clearer?

19   A.    Read it to you, did you say?

20   Q.    No.  I just want to know, do you recognize this?

21   A.    Oh.  Yes, mm-hmm.

22   Q.    Is this one of your emails?

23   A.    Yes.

24        MS. DIAMOND:  And move to admit.

25        MR. CHOU:  Objection, Your Honor.  Lacks business

 1   records foundation.  Specifically, at the start of his

 2   testimony he said "not regularly" and "not specifically."

 3        **THE COURT:**  So your objection is a hearsay objection.

 4   Overruled.

 5        I'll admit it, 3149.

 6        (Trial Exhibit 3149 received in evidence.)

 7        **MS. DIAMOND:**  Thank you.

 8        May I publish to the jury, please?

 9        **THE COURT:**  Yes.

10   **BY MS. DIAMOND:**

11   **Q.**   Mr. Ruzicka, this email purports to show a

12   communication -- or shows a communication with someone --

13   what's -- someone working with Mr. Andrade's business.

14        Can you take a look at the attachments line.

15        **MS. DIAMOND:**  Could we highlight the header, please,

16   Mr. Jackson.  Thank you.

17        **THE WITNESS:**  Yes.

18        **MS. DIAMOND:**  One moment.

19                    (Pause in proceedings.)

20        **MS. DIAMOND:**  Thank you.

21   **Q.**   You see the attachment line to this email?

22   **A.**   Yes, ma'am.

23   **Q.**   And do these attachments appear to you to be records that

24   you prepared and named?  Are those file names consistent with

25   your memory --

1  **A.**    Yes.

2  **Q.**    -- of the types of files?

3  **A.**    Yes.

4  **Q.**    Thank you.

5           **MS. DIAMOND:**  We can take this down.  Thank you,

6  Mr. Jackson.

7           One moment, Your Honor, please.

8                        (Pause in proceedings.)

9           **MS. DIAMOND:**  I have a number of exhibits I'd like to

10 have the witness take a look at.  I'm not sure if I can get my

11 hands on the paper copy.  It may just take a moment.

12          But for the record, I would like, in sequence, Mr. Ruzicka

13 to view Exhibit Numbers 3132, 3133, 3134, 3135, 3136, 3137,

14 3138, 3139, 3140, 3141, 3142, 3143, 3144, 3146, and 3147.

15          If I may have a moment, Your Honor, I'll see if we can do

16 this as quickly as possible.

17          **THE COURT:**  All right.

18                        (Pause in proceedings.)

19          **MS. DIAMOND:**  If I may approach to hand the witness

20 some paper copies?

21          **THE COURT:**  You may.

22          **MS. DIAMOND:**  Thank you.

23 **Q.**   Mr. Ruzicka, I've just handed you some folders that

24 contain the exhibit numbers that we just mentioned, and if you

25 could just simply take a look at them.  I'm going to ask you if

**RUZICKA - DIRECT / DIAMOND**

1    you recognize them after you're done just looking through the

2    pile.  I'm not going to ask you any specific questions yet

3    about any of them.  Thank you.

4    **A.**  (Witness examines documents.)  Yes.

5    **Q.**  Thank you.

6         Before we continue, Mr. Ruzicka, I am going to ask you,

7    it's difficult for people who are not used to public speaking,

8    but please speak slowly and try to project a little.

9    **A.**  Okay.

10   **Q.**  I want to ask you to say that again audibly.

11   **A.**  Yes.

12   **Q.**  Thank you.  Just like that.  That's a big help to the

13   jury.  They're trying to hear you.

14   **A.**  Okay.  Sorry.

15   **Q.**  This pile of exhibits that you just looked through, do

16   these look to you to be your business records?

17   **A.**  Yes.

18   **Q.**  Were these documents -- do they look like documents that

19   were attached to Exhibit 3419?

20        **MS. DIAMOND:**  And I have a paper copy, if I may

21   approach, so the witness can view that list --

22        **THE COURT:**  Okay.

23        **MS. DIAMOND:**  -- quickly?

24        Thank you.

25   **Q.**  Do they look similar to that list?  There's a spreadsheet

 1   on there that was not included in your package, an Excel

 2   spreadsheet.

 3   **A.**   Yes.  Yes.

 4   **Q.**   Thank you.

 5           **MS. DIAMOND:**  Move to admit the --

 6           **MR. CHOU:**  Objection, Your Honor.  Renewed business

 7   records foundation objection, plus massive hearsay because the

 8   cover email refers to information coming from someone named

 9   Dillon, a non-declarant, non-witness.

10           **THE COURT:**  Well, I don't know what -- no one's shown

11   me these documents, so I don't know what they are.  So is there

12   some mechanism for me to see them?

13           **MS. DIAMOND:**  Yes.

14       Your Honor, I'm so sorry.  I did not prepare the paper,

15   and I'm -- if I may.  Thank you.

16               (Document handed up to the Court.)

17           **MR. CHOU:**  And 403, Your Honor.

18           **THE COURT:**  Are these all the same in some --

19   structurally?  I don't know what this is.  So perhaps you can

20   explain what it is you're offering to have admitted.  At least

21   characterize these documents.

22           **MS. DIAMOND:**  Yes.  These documents had file names

23   that Mr. Ruzicka prepared, and Mr. Ruzicka sent them as an

24   attachment to an email to Bernadette Tran who testified.

25       Bernadette Tran asked for the files that Mr. Ruzicka

```
 1   shared with her predecessor, Dillon Pugliese.

 2          THE COURT:  And these documents are what?  Schedules?

 3          MS. DIAMOND:  We're going to go into just a couple of

 4   them, not a lot.

 5          THE COURT:  Well, let me ask you --

 6          MS. DIAMOND:  They're samples of --

 7          THE COURT:  -- this:  If I look at -- can we -- is

 8   there -- is there an exem- -- your representation is that these

 9   all rise or fall together; is that fair?

10          MS. DIAMOND:  Yes.

11          THE COURT:  Okay.  Can you focus me in on one of them

12   so I can understand what the objection is and what the document

13   is?

14          MS. DIAMOND:  Yes.

15       And perhaps we can redisplay Exhibit 3161, please,

16   Mr. Jackson.  This is in evidence.

17          THE COURT:  Yes.  I admitted that.

18          MS. DIAMOND:  Sorry.  Not this exhibit.  Sorry.  One

19   moment.  3149.

20          THE COURT:  3149.  All right.

21          MS. DIAMOND:  We admitted that just this morning.

22   Q.  Mr. Ruzicka, looking again at the attachments part of

23   Exhibit 3149 --

24   A.  Mm-hmm.  Yes.

25   Q.  -- do the files in front of you look to be the attachments
```

RUZICKA - DIRECT / DIAMOND

1    of your records that you sent to Bernadette Tran in response to

2    her request?

3    **A.**    Yes.    These are pretty much a catch-up from what Dillon

4    did, and Dillon was let go.

5    **Q.**    And who prepared the documents in front of you?    Were they

6    prepared by Dillon, or were they prepared by yourself?

7    **A.**    By myself.    I mean, it was a group effort.    He would -- I

8    would send it to them, send them the documents; and they would

9    confirm or say, "We don't have this one," or, "There's,

10   you know, discrepancies here and there."    So we would work out

11   the discrepancies.

12   **Q.**    You would email your business documents back and forth

13   with people working for Mr. Andrade in the process of

14   confirming the token sales took place; is that right?

15   **A.**    Right.    Right.    I actually reviewed the contracts so I

16   knew what was going on.    And then I think Dillon was reviewing

17   the actual deposits.    And then we married them up to confirm

18   that each one agrees with each other; and if there was a

19   discrepancy, then we resolved it.    The contract says this, the

20   deposit says that, and whatever trumped it, won.

21        (Stenographer interrupts for clarification of the record.)

22            **THE WITNESS:**    Yeah.    I'm from Vegas.

23   **BY MS. DIAMOND:**

24   **Q.**    Again, just speak a little slower and a little louder.

25   It's not a natural way of speaking.

1    **A.**    Okay.  Repeat what I just said?

2            **THE COURT:**  No.

3            **MS. DIAMOND:**  If I could show the witness one document

4    as an example.

5            **THE COURT:**  Yes.

6            **MS. DIAMOND:**  On the screen, just for the witness and

7    the Court, please, and counsel, Mr. Jackson, we'd like to see

8    Exhibit 3138.

9    **Q.**    This is the first page of 3138, Mr. Ruzicka.  Do you

10   recognize this document?  There are 22 pages in this exhibit.

11   **A.**    Whenever there's a red dash on it, which I just looked at,

12   that means I confirmed it.

13   **Q.**    So you would have received this document in the course of

14   your business and then made a note on it as you used it in your

15   reconciliation process --

16   **A.**    Right.

17   **Q.**    -- is that correct?

18   **A.**    Right.  So if there's a red mark, red tag, that means that

19   they matched up.  And there's, like -- like I said, there's a

20   lot of pages there, so they were all matched up or --

21           **MS. DIAMOND:**  Move to admit Exhibit 3138.

22           **MR. CHOU:**  Same objections, Your Honor.  Also, this

23   is -- this particular document is different from some of the

24   others, the spreadsheets that are in the folder.  So this is

25   not an apt example.

1          **MS. DIAMOND:**  Your Honor, there's several different

2   categories of documents in this example -- in the attachments.

3   I'm not representing that they are identical or the same.  They

4   are Mr. Ruzicka's business records.

5          **THE COURT:**  What I'm trying to get at is to understand

6   what -- answer these questions for me.

7       The document -- I understand that you've gone through the

8   litany for a business record.  Let's not go back over that.

9   And the Government has objected, but I've found that that was a

10  sufficient basis for a business record.

11      Now, what are these documents?  They're what?  They're

12  invoices and they're Excel spreadsheets that are reflecting

13  what?

14         **MS. DIAMOND:**  That's what I was going to have the

15  witness explain to the jury.

16         **THE COURT:**  Well, give me a proffer so that -- you've

17  asked --

18         **MS. DIAMOND:**  Sure.

19         **THE COURT:**  -- me to admit them --

20         **MS. DIAMOND:**  Sure.

21         **THE COURT:**  -- so I need to know that before I make my

22  admission decision.

23         **MS. DIAMOND:**  Sure.

24         **THE COURT:**  Good.

25         **MS. DIAMOND:**  When token sales during the ICO were

 1    made, the spreadsheets of purchasers and contracts, apparently,

 2    were made available to Mr. Ruzicka.

 3        Mr. Ruzicka would confirm that tokens were distributed,

 4    that money was received; and once all of that was confirmed by

 5    an outside person, his own -- Mr. Ruzicka, as an independent

 6    CPA, he would then give word to the person holding the token

 7    purchase funds that they were cleared for release to

 8    Mr. Andrade's business.

 9        THE COURT:  So these documents that you're offering

10    now all reflect payments for tokens?  Is that what's going on

11    here?

12        MS. DIAMOND:  A portion of them reflect some invoices

13    during the ICO process.  This is not the entire set.

14        My proffer is that Mr. Ruzicka will be explaining to the

15    jury that he would --

16        THE COURT:  All right.  And you will represent that

17    all of these are -- they're not the same in the sense that it's

18    the same particular information.  But the format, they're all

19    the same in that sense; is that right?

20        MS. DIAMOND:  They're all the same in that they were

21    prepared by this witness and sent by this witness, as his

22    records that he maintained, to Mr. Andrade's business when

23    Mr. Andrade's business was conducting the audit mentioned in

24    Exhibit 3149.

25        THE COURT:  Okay.  So, Mr. Chou, you can repeat what

1  your objections are.

2        **MR. CHOU:**  403, Your Honor.  And I would just object

3  to essentially extended attorney proffer in front of the

4  witness.

5        **THE COURT:**  Well, I asked her, so let's not fault her

6  for that.

7        **MR. CHOU:**  Yes, sir.

8        **THE COURT:**  So, and the 403 is undue prejudice from

9  this?

10        **MR. CHOU:**  Danger of confusing the jury, cumulative

11  evidence, and --

12        **THE COURT:**  Well, there's a danger the jury will be

13  confused because I have been confused.

14                          (Laughter.)

15        **THE COURT:**  But we'll get over that.

16     I will admit these documents on the proffer that you have

17  made, and I'll count on you to -- these are all -- they all

18  rise or fall together is what you told me; and based on that

19  representation, I will admit them.

20        (Trial Exhibits 3132 through 3144, 3146, and 3147 received

21  in evidence.)

22        **MS. DIAMOND:**  Thank you.

23  **Q.**  Mr. Ruzicka --

24        **THE COURT:**  Before you go on, somebody did hand this

25  to me and I think it's Mr. Chou's.

```
 1              MS. DIAMOND:  He did.

 2              MR. CHOU:  It's counsel's, Your Honor.

 3              THE COURT:  It's yours?  Do you want me to have this?

 4     Let me make it easy.  Do you want me to have this?

 5              MR. CHOU:  That's fine, Your Honor, yes.

 6              THE COURT:  All right.  Let's keep going.

 7              MS. DIAMOND:  Thank you, Your Honor.

 8     Q.  Mr. Ruzicka, you heard my proffer to the judge.  Can you

 9     tell the jury how that process worked?  I want it in your

10     words, not my words.  Can you explain that, please.

11     A.  The process was, there was initial contact with the --

12     Q.  Speak up and speak slowly.

13     A.  There was initial contact between the -- the buyer would

14     ask for, you know, coins.  Then there would be a deposit that

15     was made.  And then there would be -- that deposit would go

16     into an account; and then the deposit -- once we got the

17     contract signed --

18     Q.  Slow down, again.  Thank you.

19     A.  Once the contract was signed, then the rest of the money

20     was remitted to the attorney.

21          And then what we would do is we would check.  I would

22     actually review the contracts.  I would actually just review

23     the amounts, the dates, the time, the people, but I wouldn't

24     read the whole contract because they were pretty big.

25          I'll slow down.
```

**RUZICKA - DIRECT / DIAMOND**

1    **Q.**   When you engaged in that process, would you review every

2    single transaction, or would you use some other method to

3    confirm that the transactions were valid?

4    **A.**   Recalling, every single one was -- it was ticked off.  If

5    I ticked it off, that means it was reviewed.  We did a -- I'll

6    stop there.

7    **Q.**   Did you ever use a sampling method for any of your

8    reviews?

9    **A.**   Okay.  So when we worked with Dillon, the other person,

10   and Bernadette, yes, then we used a sample method.

11   **Q.**   Could you explain to the jury what that means?

12   **A.**   There's, like, thousands of entries.  And we didn't hit

13   each one of them.  We did a sample.  I think it was -- I don't

14   know -- a 10 percent sample, which is adequate.

15        This is not an audit.  We're not doing accounting,

16   you know, auditing, anything like that.

17        But -- and then if we did find discrepancies, we would

18   inquire about that, and then we would increase the sample size

19   to compensate for that.  That was the process.

20        So that would happen.  And then when all that was done,

21   then Mr. Salmon would give the okay to release the funds; get

22   the okay, you know, the email, the funds have been verified.

23   **Q.**   Thank you.

24        **MS. DIAMOND:**  Just one more example from this group.

25        Mr. Jackson, please display to the jury Exhibit -- and the

 1  witness and the Court, Exhibit -- if I may publish, Your Honor,

 2  3143.

 3          **THE COURT:**  Okay.

 4  **BY MS. DIAMOND:**

 5  **Q.**  Can you take a look at this document, Mr. Ruzicka, and

 6  describe this document to the jury, what this document is?

 7  **A.**  Basically, it's the, yeah, the purchaser, it's the invoice

 8  number, it's the date, and it's the amount.

 9  **Q.**  We need you to speak in the microphone.  Thank you.

10  **A.**  Oh, I'm sorry.

11          It's the purchaser, the person that bought the coin; the

12  invoice number it relates to; the date it was transpired; and

13  the amount that related to that particular transaction.

14  **Q.**  And are these the lists from which you would take samples

15  when you did sampling for the work that you were doing?

16  **A.**  Yes, but I think it was -- the spreadsheet we used was

17  larger.  So this is just a PDF they would use, so...

18  **Q.**  This is a PDF of a very large spreadsheet; correct?

19  **A.**  Right.  This is the section we wanted to use for the

20  verification purposes.

21  **Q.**  Thank you.

22          **MS. DIAMOND:**  Thank you, Mr. Jackson.  You may take

23  that down.

24  **Q.**  In the course of your work for Mr. Andrade, 2018 and

25  onward, was there a period of time that he asked you to make

1    some expenses for him -- to pay some expenses for him out of

2    one of his business accounts?

3    **A.**    Yes.  Yes.

4    **Q.**    And what did he provide to you in order to allow you to do

5    that work?

6    **A.**    Well, basically, I would eventually get the invoices, and

7    then he directed the vendors to mail them directly to me.  And

8    so I would get the invoices from the vendors, and then I would

9    tally them up, put together an email that would itemize each

10    one, who it was from, the remaining balance due, and then ask

11    for his approval to pay it.

12    **Q.**    And if he gave you approval to pay it, would you pay it by

13    check, wire, or some other method?

14    **A.**    Handwritten check.

15    **Q.**    Did you have a checkbook in your office for that purpose?

16    **A.**    Yes.

17    **Q.**    Could you describe what that checkbook looked like to the

18    jury, please?

19    **A.**    It was a big one with a carbon back on it, you know,

20    carbon back, you know, maybe three checks per page, you know,

21    like the big books, not a little tiny checkbook.

22    **Q.**    Did you save that and maintain that checkbook as part of

23    your regular work for Mr. Andrade?

24    **A.**    Yes.

25    **Q.**    Did you also save, as part of your regular work for

RUZICKA - DIRECT / DIAMOND

1  Mr. Andrade, any invoices that were given to you by vendors for

2  NAC Foundation?

3  **A.**   I don't recall.

4  **Q.**   If you -- if you did, would you have saved them in your

5  electronic files?

6  **A.**   Yes.

7  **Q.**   And did you also ever receive invoices in the mail, paper

8  invoices?

9  **A.**   Yes.

10 **Q.**   And as to those invoices, would you save those in a paper

11 file in your office?

12 **A.**   We would probably -- maybe.  We would scan them; and then

13 once we scanned them, they were probably, you know, shredded.

14 **Q.**   Were there any that you may have saved, or do you not

15 recall?  It's fine if you do not recall.

16 **A.**   I don't recall.

17 **Q.**   I'd like you, please, to take a look --

18        **MS. DIAMOND:**  Mr. Jackson, if you could display

19 Exhibit 3387 for the witness and the Court and counsel.

20 **Q.**   Do you see this document, Mr. Ruzicka?

21        **THE COURT:**  Can you stop for a moment?

22      Is there some difficulty in hearing?

23        **A JUROR:**  I'd like to request a break.

24        **THE COURT:**  Oh, of course.

25        **MS. DIAMOND:**  Oh.

RUZICKA - DIRECT / DIAMOND

1    **THE COURT:**  All right.  Members of the jury, remember

2    my admonitions.  Do not discuss this amongst yourselves or with

3    anyone else.

4         And we'll come back in about -- let's shoot for 20 of.

5                    (Recess taken at 11:28 a.m.)

6               (Proceedings resumed at 11:44 a.m.)

7         (Proceedings were heard in the presence of the jury.)

8         **THE COURT:**  The jury is present.

9    You may proceed, Ms. Diamond.

10        **MS. DIAMOND:**  Thank you.

11   **Q.**   Before we specifically look at the exhibit that has not

12   yet been admitted that is on your screen, I want to ask you

13   that during the course of your work for Mr. Andrade, did you

14   also save things like shareholder agreements for the Aten Coin

15   Group?

16   **A.**   No.

17   **Q.**   Did you -- did you save copies of purchase agreements,

18   some documentation if there were shares of one of his

19   companies --

20   **A.**   There were --

21   **Q.**   -- that were sold?

22   **A.**   -- purchase agreements.

23   **Q.**   I'm sorry.  Could you --

24   **A.**   There were purchase agreements, purchases.

25   **Q.**   Could you take a look at Exhibit 3387 and let me know if

1   you recognize it to be one such purchase agreement.

2   **A.**   Yes, I do recognize it.

3   **Q.**   This is a purchase agreement for Michael Witte; is that

4   correct?

5   **A.**   Yes.

6   **Q.**   Thank you.

7          **MS. DIAMOND:**  Move to admit.

8          **MR. CHOU:**  No objection except for the *Lindsay* issue

9   potentially down the road.

10         **THE COURT:**  Okay.  I will admit 3387.

11      (Trial Exhibit 3387 received in evidence.)

12         **MS. DIAMOND:**  Thank you.

13      Publish to the jury just the first page so the jury can

14   see.

15      Thank you.  Mr. Jackson, you may remove that exhibit.

16      I'd like to show the witness, please, Exhibit 3386.

17  **Q.**   And just -- Mr. Ruzicka, if you could just take a look at

18   this document and let me know if this is one of your emails.

19  **A.**   Yes.

20  **Q.**   And was this dated January 19th, 2018?

21  **A.**   Yes.

22         **MS. DIAMOND:**  Move to admit.

23         **THE WITNESS:**  Pardon?

24         **MS. DIAMOND:**  Sorry.  That was to the judge.

25         **THE WITNESS:**  Okay.

1          **MS. DIAMOND:**  Move to admit, Your Honor.

2          **MR. CHOU:**  Objection.  Hearsay.  Can't be a business

3    record.

4          **MS. DIAMOND:**  He testified it was a record maintained

5    in his files and the way he communicated with his client,

6    Your Honor.

7          **THE COURT:**  Well, that doesn't mean every email

8    becomes a business record.  It has to be kept in the ordinary

9    course of business, all the litany, and I'm not sure you've

10   established that with this document.

11         **MS. DIAMOND:**  I can ask the questions of this

12   document, Your Honor, if you need.

13         **THE COURT:**  It's not in any sort of regular form that

14   would be a business record, but go ahead and ask the

15   foundational questions.

16   **BY MS. DIAMOND:**

17   **Q.**   Mr. Ruzicka, was this document sent to you from Marcus?

18   **A.**   Yes.

19   **Q.**   And was this something you received in the regular course

20   of your business?

21   **A.**   Yes.

22   **Q.**   Was this record, your record of this email, this email

23   entirely, made at or near the time that the information was

24   transmitted by someone with knowledge of the contents?

25   **A.**   Yes.

1    **Q.**    And was this record kept by you in the course of your

2    regularly conducted business?

3    **A.**    Yes.

4    **Q.**    And was making such records, saving your emails with your

5    client, one of your regular practice of your business?

6    **A.**    Yes, it was.

7            **MR. CHOU:**  Objection.  Lacks foundation.  There's a

8    number of different declarants in this email, and the top part

9    is full of content that is plainly --

10           **THE COURT:**  Well, I'll admit it.  3386 is admitted.

11       (Trial Exhibit 3386 received in evidence.)

12           **MS. DIAMOND:**  Thank you, Your Honor.

13   **Q.**    And now, Mr. Ruzicka, I want to turn your attention not to

14   the documents.

15           **MS. DIAMOND:**  Mr. Jackson, you can -- oh, sorry.

16   Thank you.  This has been published to the jury.  They can see

17   it.  They will have it.

18       Mr. Jackson, you may take this down.

19   **Q.**    I want to focus your attention just on your place of

20   business.

21       Could you describe to the jury the office suite in which

22   your office was in 2018, just generally speaking?

23   **A.**    Yeah.  Executive Suite.  It's its own office.

24   **Q.**    Again, speak into the microphone and slowly.

25   **A.**    An Executive Suite with its own office in the Executive

1    Suite.

2    **Q.**   Was your office close to where Mr. Andrade had an office

3    in Las Vegas in 2018?

4    **A.**   Yes.

5    **Q.**   In 2018, did you see Mr. Andrade at that office

6    frequently?

7    **A.**   No.  Just rarely.

8    **Q.**   And were you there the day that the office was searched in

9    2018?

10    **A.**   I believe so.

11    **Q.**   Do you recall -- do you recall that event clearly at this

12    time in 2025?

13    **A.**   I remember something happened, but I don't know what it

14    was about.

15    **Q.**   Did you later, years later in 2020, receive a visit from

16    IRS criminal investigators?

17    **A.**   Yes.

18            **MS. DIAMOND:**  And if we could have the witness and

19    the Court and counsel, please, Mr. Jackson, take a look at --

20    one moment -- Exhibit 3388.  Please, if you could show that to

21    the witness.

22    **Q.**   Do you recognize this?

23    **A.**   Yes.

24    **Q.**   And what is this document?

25    **A.**   It's a scanned PDF of the agent's card, dated.

1    **Q.**   Is this something that you received from the agents who

2    visited you in 2020?

3    **A.**   Yes.

4    **Q.**   And is this something that you saved in the course of your

5    business to maintain your business records with notes, records,

6    and things?

7    **A.**   Yes.

8          **MS. DIAMOND:**  If we could then display to the jury,

9    please, Exhibit 33- -- I'm sorry, not to the jury -- to the

10   witness and the Court Exhibit 3389.

11   **Q.**   This is a several-page document, Mr. Ruzicka.  Do you

12   recognize the cover page that's displayed to you?

13   **A.**   Yes.

14   **Q.**   And is this a letter on Department of Justice stationery

15   dated February 7th, 2020?

16   **A.**   Yes.

17   **Q.**   And does this letter advise you that it is a cover letter

18   for a subpoena and that disclosure of the subpoena to any third

19   party may impede or obstruct the investigation?

20   **A.**   Yes.

21   **Q.**   Did you receive this in February of 2020 from the agents

22   that visited with you?

23   **A.**   Yes.

24         **MS. DIAMOND:**  Move to admit Exhibit 3388 and 3389.

25         **MR. CHOU:**  No objection.

1          **THE COURT:**  3388 and 3389 will be admitted.

2      (Trial Exhibits 3388 and 3389 received in evidence.)

3          **MS. DIAMOND:**  Mr. Jackson, would you please display

4   3389 and highlight the paragraph that begins with "This letter

5   is written."

6   **Q.**  Mr. Ruzicka, after you read this portion of the cover

7   letter of the subpoena that was given to you, what was your

8   sense of what you needed to do after the agents had left?

9   **A.**  Keep it confidential.

10  **Q.**  Did you, in fact, follow their instructions and keep it

11  confidential?

12  **A.**  Yes.

13  **Q.**  Did you tell your client, Marcus Andrade, that the IRS

14  agents had been to see you?

15  **A.**  No.

16  **Q.**  When the IRS agents came to see you, did they also, in

17  fact, ask for files of yours?

18  **A.**  Yes.

19  **Q.**  And did you maintain electronic files similar, but greater

20  in volume, than the ones that we have admitted as exhibits?

21  **A.**  Yes.

22  **Q.**  Do you have an estimate of the approximate volumes of

23  files that were electronic files that you produced to the IRS?

24  **A.**  Thousands.

25  **Q.**  It was over a thousand; correct?

```
 1   A.    Yeah.  Yeah.  Way over a thousand.

 2          MS. DIAMOND:  One moment.

 3                  (Pause in proceedings.)

 4   BY MS. DIAMOND:

 5   Q.    Sitting here today, is your memory less clear than it

 6   would have been in 2020 and 2021 about the work that you did

 7   for Mr. Andrade?

 8   A.    Yes.

 9   Q.    Did you --

10   A.    Less clear.

11   Q.    -- work for Mr. Andrade after 2018?

12   A.    I believe so.

13   Q.    You have a memory of doing some work in 2019 and some

14   phone contact thereafter; is that right?

15   A.    Yeah.  There were emails that were shared.

16   Q.    And any records of notes of communications with Marcus --

17   phone communications would also have been saved in your files;

18   is that right?

19   A.    I believe so, yes.

20   Q.    Thank you.

21          When the IRS did a search at your office, did they also

22   take paper files?

23   A.    They confiscated everything.

24   Q.    They took all of your saved --

25   A.    Right.
```

1   **Q.**   -- files in paper, such as they were; is that right?

2   **A.**   Yeah.  All the physical -- physical records, they took.

3   **Q.**   Did they also take your checkbook?

4   **A.**   Yes.

5   **Q.**   And your checkbook had the carbon copies of the checks you

6   had written?

7   **A.**   Yes.

8   **Q.**   Did you ask them when they took these documents for them

9   to return them to you?

10   **A.**   Yes.

11   **Q.**   Did they ever return them to you?

12   **A.**   No.

13        **MS. DIAMOND:**  Thank you.

14   No more questions.

15        **THE COURT:**  Mr. Chou?

16               **CROSS-EXAMINATION**

17   **BY MR. CHOU:**

18   **Q.**   Good morning, Mr. Ruzicka.

19   **A.**   Good morning.  Is it morning?

20   **Q.**   Counsel just asked -- briefly, counsel just asked you some

21   questions about a subpoena.  And you saw that up on the screen?

22   **A.**   Mm-hmm, yes, sir.

23   **Q.**   That was a February 2020 subpoena served on your business;

24   correct?

25   **A.**   Yes, sir.

1    Q.    And that is a different subpoena than what was served on

2    the defendant; correct?

3    A.    I don't understand.

4    Q.    You don't know whether or not there was a separate

5    subpoena or search warrant served on Mr. Andrade; correct?

6    A.    Correct, I don't know that.  I'm not aware of any other

7    subpoena.

8    Q.    I want to just turn to your working relationship and your

9    relationship with Mr. Andrade.

10        You were -- Mr. Andrade was your client; correct?

11   A.    Yes.  One of many.

12   Q.    And he paid you by the hour; correct?

13   A.    Yes.

14   Q.    How much did he pay you by the hour?

15   A.    We did a retainer agreement, and so it varied, depending

16   on who worked on it.  And, yeah, in other words, we invoice

17   based on our hourly rate, but also I have people that are

18   independent contractors or bookkeepers that we don't charge the

19   same rate for, so the rates vary from job to job.

20   Q.    Fair to say that he paid you thousands of dollars?

21   A.    Oh, yeah.  Yeah, yeah.

22   Q.    And then did there come a time where your relationship

23   with Mr. Andrade became more personal?

24   A.    Sometimes, yes.  Good acquaintances, not personal.

25   Q.    Earlier, do you remember testifying on direct about the

 1   approval process for transmitting funds belonging to

 2   Mr. Andrade?

 3   **A.**   Yes, sir.

 4   **Q.**   What was the chain of command?  Was the chain of command

 5   in this process that you would only transfer funds at

 6   Mr. Andrade's direction?  Mr. Andrade sat at the top of the

 7   chain of command; correct?

 8   **A.**   Right.  I'm trying to think how this was done.  Once it

 9   was satisfied -- satisfy the inquiry about whether it was,

10   you know, properly presented, I believe, yes, then we would

11   tell Marcus that; and then Marcus would say -- or tell me to

12   tell the attorney to release the funds, or he might have told

13   the attorney directly.  No, I think I told him.  Actually, I

14   told the attorney.

15   **Q.**   But fair to say, transactions, you had to speak with

16   Mr. Andrade and get his approval; correct?

17   **A.**   Yes.  I would not do it without the owner's consent.

18   **Q.**   Mr. Ruzicka, do you recall speaking with federal law

19   enforcement on January 6th, 2025, from about 3:00 p.m. to

20   4:17 p.m.?

21   **A.**   Yes.

22   **Q.**   And --

23   **A.**   On the phone.

24   **Q.**   -- in that conversation, you told law enforcement that you

25   worked on and off for Andrade over a period of years; correct?

1    **A.**    Yes.

2    **Q.**    As you testified on direct, it wasn't for a -- for the

3    whole period of time; correct?

4    **A.**    No, it was not.

5            **MS. DIAMOND:**  Objection.  Misstates the evidence.

6            **THE COURT:**  Overruled.

7    **BY MR. CHOU:**

8    **Q.**    And, Mr. Ruzicka, you told law enforcement that you felt

9    you were unable to help with cryptocurrency-related dealings

10   because you were not familiar with Bitcoin; correct?

11   **A.**    Right.  It was new to me, anyway.

12   **Q.**    And then, nonetheless, Mr. Andrade asked you to write an

13   article about the capital gains on cryptocurrency; correct?

14   **A.**    Yes, but I did a lot of research.  After I did that, then

15   I was more -- more savvy in that area.  I just didn't write it,

16   you know.  And then I would, you know, make sure we're doing

17   the right things.

18        But we never really -- and that was for tax codes only,

19   for tax returns, how to report the capital gains on selling of

20   your cryptocurrency.  So it had nothing really to do with,

21   you know, anything as far as cash flow was concerned or --

22   so...

23   **Q.**    Mr. Ruzicka, you told the -- you told law enforcement that

24   the NAC Payroll bank account -- do you recall that account? --

25   that you believed that money in the account was sales from --

 1    was money from sales from an ICO; correct?

 2    **A.**   I believe, but I wasn't sure.  I didn't even know about

 3    the account until later, so...

 4    **Q.**   But that's what you told law enforcement --

 5    **A.**   Right.

 6    **Q.**   -- at the time; correct?

 7    **A.**   Yeah.  I -- I -- in the same breath, I want to say that

 8    that happened many years before that too.  So I did the best I

 9    could to recall what they were asking, the questions they were

10    asking.

11        And I think if you listen to it, you can see me -- you can

12    hear me hemming and hawing, you know, as far as, you know,

13    "Well, maybe, yeah," kind of responses.  But I don't know

14    exactly if everything I said was, you know, at the peak of my

15    memory.

16    **Q.**   Understood.

17        And, Mr. Ruzicka, do you recall being asked about why the

18    name of that account was NAC Payroll?

19            **MS. DIAMOND:**  Objection.  This is not impeaching this

20    witness.  He can ask the witness what he said or what he

21    remembers.  He hasn't given an inconsistent statement.

22            **THE COURT:**  Right.  You ask the question, and then if

23    he -- if you need to remind him or attempt to refresh based on

24    law enforcement interviews, you can do that, but just ask him

25    the questions.

1    BY MR. CHOU:

2    Q.   Mr. Ruzicka, you weren't sure why the NAC Payroll bank

3    account was named a payroll account; correct?

4    A.   Correct.

5    Q.   Even though it received sales from an ICO; correct?

6            MS. DIAMOND:  Objection.  Calls for speculation.

7            THE WITNESS:  Yeah.  I'd have to --

8            THE COURT:  Overruled.

9            THE WITNESS:  Basically, I was -- at the time, I was

10   informed that this was a convenient way to run -- for this bank

11   account as far as...

12   BY MR. CHOU:

13   Q.   Mr. Ruzicka, just turning your -- directing your attention

14   to something that you testified on direct, counsel asked you

15   some questions about a 2018 search.  Do you recall that?  Do

16   you recall the counsel asking those questions?

17   A.   Yes.

18   Q.   And you testified on direct that you believe your -- you

19   were, in fact, at the office in 2018 when there was a search;

20   correct?

21   A.   I was down the hallway.

22   Q.   And you were Mr. Andrade's accountant; correct?

23   A.   Yeah, CPA.

24        As far as that's concerned, like someone can go in and out

25   of the Executive Suites without anybody even knowing it.  So, I

1  mean, I think I saw something, you know, a flash come and go,

2  and then I -- you know, but I didn't know what it was about.

3  At the time, I didn't.

4      Does that make sense?  I mean, never mind, I guess.  Ask

5  questions.

6  **Q.**  Mr. Ruzicka, just a few more -- a few more questions.

7      You don't -- do you know whether or not Marcus Andrade

8  filed his personal taxes on time?

9  **A.**  No, I don't -- I do not know that.

10 **Q.**  As you testified on direct, you didn't do his personal

11 taxes; correct?

12 **A.**  That's correct, mm-hmm.

13 **Q.**  And did you have any personal knowledge about the

14 representations Mr. Andrade was making about his AML BitCoin

15 product?

16 **A.**  Repeat the question.

17 **Q.**  Did you have any personal knowledge about the

18 representations Mr. Andrade was making about the AML BitCoin

19 product?

20 **A.**  Define "representation."

21      **MS. DIAMOND:**  Objection.  Beyond the scope.

22      **THE COURT:**  Overruled.

23 **BY MR. CHOU:**

24 **Q.**  Statements.

25 **A.**  Okay.  Repeat the question.  Sorry.  Use "statements" this

1    time.

2    **Q.**   Mr. Ruzicka, you don't have any personal knowledge about

3    the statements Mr. Andrade was making about AML BitCoin;

4    correct?

5    **A.**   I don't recall -- I can't recall how to answer that

6    question with a couple of words.

7    **Q.**   Sure.  And, in fact, on direct examination, you weren't

8    really sure what the name of Mr. Andrade's cryptocurrency or

9    cryptocurrencies were; correct?

10   **A.**   It changed, and I didn't really pay attention to it until

11   later.

12   **Q.**   And so you don't know whether Mr. Andrade claimed to have

13   fully functioning technology built into the blockchain;

14   correct?

15   **A.**   I do not know.

16   **Q.**   And you don't know whether he represented or stated that

17   there were business deals in active negotiations about to be

18   signed; correct?

19           **MS. DIAMOND:**  Objection.  Beyond -- no foundation that

20   this would be in this witness's knowledge.

21           **THE COURT:**  Overruled.

22   **BY MR. CHOU:**

23   **Q.**   Sorry, sir.  The question was:  You don't know whether

24   Mr. Andrade told folks that he had business deals that were

25   about to close; correct?

RUZICKA - REDIRECT / DIAMOND

```
1   A.   No, I don't know.  I mean, I wasn't...
2        Business dealings?  I don't know what that means, but
3   okay.
4            MR. CHOU:  One moment.
5                    (Pause in proceedings.)
6            MR. CHOU:  Nothing further.
7        Thank you, sir.
8            THE WITNESS:  All right.  Thank you.
9            MS. DIAMOND:  If I may?
10                   REDIRECT EXAMINATION
11  BY MS. DIAMOND:
12  Q.   Mr. Ruzicka, did you do the tax returns for
13  NAC Foundation?
14  A.   No.
15  Q.   And as a business accountant, did you consider
16  NAC Foundation to be needing a corporate tax return?
17  A.   It didn't qualify for one.
18  Q.   Could you explain to the jury why it didn't qualify?
19  A.   Basically, it was a single-member LLC, which is a limited
20  liability company.
21  Q.   Please, into the microphone and slowly.  Thank you.
22  A.   It was a single-member LLC, which is a limited liability
23  company; and per tax codes, those have to be reported on the
24  personal tax returns, Schedule C, which is the business portion
25  of a personal tax return.  And so you couldn't really file a
```

1   business return, you couldn't file a partnership return, you

2   couldn't file a corporate return because he wasn't a

3   corporation, because he didn't have any partners.  So that's

4   why.

5   **Q.**   And did you ever communicate with another accountant where

6   Mr. Andrade lived in a different state about the -- any

7   information that that person needed to file personal tax

8   returns --

9   **A.**   Yes.

10  **Q.**   -- for Mr. Andrade?

11          **MS. DIAMOND:**  Thank you.

12      Nothing further.

13          **THE COURT:**  Very well.  Mr. Chou?

14          **MR. CHOU:**  Nothing further, Your Honor.

15          **THE COURT:**  All right.  You may step down.

16          **THE WITNESS:**  Thank you.

17                      (Witness excused.)

18          **MR. STEFAN:**  The Government calls Mr. -- the defense

19  calls Mr. John Fahy.

20          **THE COURT:**  Could you repeat the name for me?

21          **MR. STEFAN:**  Mr. John Fahy.

22          **THE COURT:**  Fahy.

23   (Witness enters the courtroom and steps forward to be sworn.)

24          **THE COURT:**  All right.  Mr. Fahy, if you could come up

25  to the sworn.

1                    <u>JOHN RICHARD FAHY</u>,

2   called as a witness for the Defendant, having been duly sworn,

3   testified as follows:

4            **THE WITNESS:**  I do.

5            **THE COURTROOM DEPUTY:**  Please be seated.

6        State your full name and spell your last name, please.

7            **THE WITNESS:**  John, J-o-h-n, Richard, R-i-c-h-a-r-d,

8   Fahy, F-a-h-y.

9                    <u>DIRECT EXAMINATION</u>

10  BY MR. STEFAN:

11  **Q.**   Good afternoon, sir.

12           **MR. STEFAN:**  Your Honor, if I may retrieve the

13  exhibits, please.

14  BY MR. STEFAN:

15  **Q.**   Hello, Mr. Fahy.

16       What is your current occupation, Mr. Fahy?

17  **A.**   I'm an attorney at the law firm of Whitaker Chalk in

18  Fort Worth, Texas.

19  **Q.**   How long have you been an attorney?

20  **A.**   Since 1989.

21  **Q.**   And how long have you been at Whittaker Chalk?

22  **A.**   Since 2006.

23  **Q.**   And prior to working at Whitaker Chalk, did you have roles

24  working for the government?

25  **A.**   Yes.

**FAHY - DIRECT / STEFAN**

1    Q.    What were those roles?

2    A.    I started out my attorney career with the Texas State

3    Securities Board in the Dallas office.  I then moved to the

4    Houston office where I was in charge of the Houston office of

5    the Texas State Securities Board for five years.

6         And then in 2000, I moved to Fort Worth, which is my

7    hometown, to work for the Fort Worth regional office of the

8    Securities and Exchange Commission, which governed a five-state

9    region.

10   Q.    And I want to make sure that everyone can hear you well

11   enough.  So you can -- yeah, or pull the mic a little bit

12   closer to your face too.

13   A.    Okay.

14   Q.    There we go.  I think that's better.

15         And what's your specialty?

16   A.    And then after leaving the SEC, I was general counsel for

17   two related broker-dealer investment advisors that were

18   eventually purchased by Fidelity.

19   Q.    Thank you, Mr. Fahy.

20   A.    And then the last thing is I worked for Fidelity after

21   acquisition.

22   Q.    What is your specialty in practice?

23   A.    I'm a securities lawyer.

24   Q.    And I want to talk about how your practice came to include

25   Mr. Andrade.  How did you meet Mr. Andrade?

**FAHY - DIRECT / STEFAN**

 1   **A.**   I was referred to Marcus in 2015 by Toby Galloway, who was

 2   another attorney in Fort Worth, who had been one of my

 3   colleagues at the SEC.

 4   **Q.**   Did Mr. Andrade retain you to assist him?

 5   **A.**   Mr. Andrade did not personally retain me.  I was -- our

 6   firm was retained in various matters by NAC Foundation as well

 7   as Black Gold Coin.

 8   **Q.**   The NAC Foundation, was that Mr. Andrade's -- one of

 9   Mr. Andrade's companies?

10   **A.**   Yes.

11   **Q.**   And Black Gold Coin, was that another one of his

12   companies?

13   **A.**   Yes.

14   **Q.**   So to be clear, Mr. Andrade didn't retain you personally,

15   but his companies --

16   **A.**   That's correct.

17   **Q.**   -- retained your firm?

18   **A.**   That's correct.

19   **Q.**   Okay.  And what would -- how would you describe your role

20   with respect to Mr. Andrade's companies?

21   **A.**   I was a consulting attorney on one narrow issue, so...

22   **Q.**   What was the narrow issue on which you were a consulting

23   attorney?

24   **A.**   On whether the tokens and coins would be securities or

25   not.

FAHY - DIRECT / STEFAN

1    Q.   What is the importance of that question, or what was the

2    importance to the companies?

3    A.   If it is a security, then there's a lot of regulation that

4    applies to it, and you would have to approach things in a

5    different manner.  If it's not a security, then there's not.

6    Q.   I don't want to get too far into the weeds, but just at a

7    thousand-foot level, what goes into determining whether or not

8    something is a security?

9    A.   There's the definition of "security" under federal and

10   state law, and you would go through the various types of

11   securities to see if any of them applied, and then there's some

12   judicial case law that defines some of the types of securities.

13   Q.   In your role advising Mr. Andrade on these matters, did

14   you review documents related to the company?

15   A.   Yes.

16   Q.   What was your purpose in reviewing the company's

17   documents?

18   A.   To make sure that they weren't making representations that

19   could lead them to be classified as a security.

20   Q.   Can you give some examples of what those representations

21   might look like?

22   A.   I'll grab two of them.

23        One is an expectation of profit.  If they're issuing press

24   releases saying that they're going to make -- people are going

25   to make a ton of money off this, that would tend to show that

1    it's a security.

2        Another one is if you're purchasing an interest in a

3    venture or in a business enterprise, that would also tend to

4    show that it would be a security.

5    **Q.**   What's the difference between making those purchases and

6    making some non-security purchase?

7    **A.**   Those purchases are subject to the regulation of the -- by

8    the SEC and, in Texas, the Texas State Securities Board.  And

9    this means that people selling it have to be registered with

10   the SEC or the Texas State Securities Board or be subject to a

11   qualified exemption.  It means that the offering needs to be

12   registered with the SEC and the Texas State Securities Board or

13   subject to an applicable exemption.

14       And that applies to resales as well.  Every securities

15   regulation governs the transaction.  It doesn't govern the

16   actual instrument.  It's in the actual transaction.  So if the

17   same instrument is sold multiple times, each transaction either

18   has to be registered or exempt.  Intermediaries, such as

19   investment advisors, would need to be registered.

20   **Q.**   And just on a practical level, if somebody is purchasing a

21   security, what's the difference between purchasing something

22   that's a security and purchasing something that's just a

23   commodity or some other asset?  From a practical level, what's

24   the difference to that person?

25   **A.**   Well, commodities are subject to their own regulatory

**FAHY - DIRECT / STEFAN**

1  regime, and I'm not a commodities lawyer.  And I should be more

2  precise.  Commodity -- you know, derivatives of commodities

3  are.  And I was not engaged on commodities, but commodities are

4  not --

5  **Q.**  I think I -- I think I misspoke.

6  **A.**  Okay.

7  **Q.**  What's the difference between buying a security and just

8  buying a trinket, buying something that, you know, you like at

9  the store to take home and put on your mantel?

10 **A.**  Well, then you have an asset that you own.  And a

11 security, you have -- when you're getting a security, you're

12 getting, you know, interest in a business enterprise.

13 **Q.**  Okay.  So that would be the difference then?

14 **A.**  That would be a big difference, yes.

15 **Q.**  Prior to you beginning work with the NAC Foundation and

16 Black Cold Coin, were you aware of prior attorneys offering

17 Mr. Andrade advice regarding his coin or token security status?

18 **A.**  I believe there was a letter in 2014 from somebody named

19 Tracy.

20        **MR. STEFAN:**  Can we please show Mr. Fahy Exhibit 2814.

21 **Q.**  Mr. Fahy, do you see Exhibit 2814?

22 **A.**  Yes.  I see the first page of it.

23        **MR. STEFAN:**  We can advance to the second page.

24 And then the third page.

25        **THE WITNESS:**  Okay.

1  BY MR. STEFAN:

2  **Q.**    Do you recognize this document?

3  **A.**    Yes.

4  **Q.**    How do you recognize it?

5  **A.**    It was provided to me in my -- connection with my work for

6  NAC Foundation.

7  **Q.**    Is the document in the same condition -- or, basically,

8  does the document accurately reflect a copy of the document

9  provided to you in your role in the NAC position?

10  **A.**    Yes.

11          **MR. STEFAN:**  Defense moves to admit.

12          **MR. WARD:**  Objection.  Hearsay.  He didn't write the

13  document.

14          **THE COURT:**  Sustained.

15          **MR. STEFAN:**  Your Honor, the Government is not --

16  pardon me -- the defense is not moving to admit for the truth

17  of the matters asserted but, rather, for the fact that this

18  opinion regarding the status of the coin was provided to

19  Mr. Andrade and the effect that that had on the course of his

20  business thereafter.

21          **THE COURT:**  You're running right into the issue we

22  talked about this morning, in my view.

23          **MR. STEFAN:**  Mr. Andrade, in this instance --

24          **THE COURT:**  I understand, but, no, you're --

25          **MR. STEFAN:**  Understood, Your Honor.

```
 1            THE COURT:  We discussed an issue this morning, and
 2   this opinion letter goes right to that issue.  So, sustained.
 3            MR. STEFAN:  I'll move on, Your Honor.
 4            THE COURT:  Very good.
 5   BY MR. STEFAN:
 6   Q.    Did you review the letter that was provided to Mr. Andrade
 7   from another attorney?
 8   A.    Yes.
 9   Q.    And did you have feedback on that letter for Mr. Andrade?
10   A.    I recall that my primary feedback is that this letter
11   only --
12            MR. WARD:  Objection.  This is --
13            THE COURT:  Yes.  Just a "yes" or "no."
14            THE WITNESS:  Oh.  Yes.
15   BY MR. STEFAN:
16   Q.    Okay.  Following the --
17            MR. STEFAN:  And we can take down Exhibit 2814.
18   Q.    I want to turn to a period around the 2017 time frame.
19   Were you involved in work on the terms and conditions and white
20   paper for the AML BitCoin ICO?
21   A.    Yes, I was a consulting attorney on that.
22   Q.    I want to show you Exhibit 2471, which was previously
23   admitted.
24            MR. STEFAN:  And we can go ahead and move to the
25   second page.
```

1    Q.    Mr. Fahy, do you recognize this?

2    A.    Yes.

3    Q.    Are these the terms and conditions that you consulted on

4    for the NAC Foundation during the AML BitCoin ICO?

5    A.    Yes.

6    Q.    What was your objective and your role as consultant for --

7    for the NAC Foundation in reviewing the terms and conditions?

8    A.    It was to make sure that it had provisions in there

9    addressing the elements of when something is a security.

10         MR. STEFAN:  Can we turn to page 4, please, and zoom

11   in on paragraph 14, 15, and -- 14 and 15.

12         MR. WARD:  Your Honor, I'm going to object on the same

13   ground we discussed before.

14         MR. STEFAN:  Your Honor, this is an admitted

15   document --

16         THE COURT:  I understand.

17         MR. STEFAN:  -- and --

18         THE COURT:  So what are you -- what is your basis for

19   this question?  What's the relevance you're trying to derive

20   here?

21         MR. STEFAN:  Well, these are representations that were

22   made to the purchasers of the AML BitCoin in terms and

23   conditions that they reviewed prior to purchase and reflect

24   Mr. Andrade's intent with respect to what he was marketing the

25   coin as.

1    **THE COURT:**  All right.  I'll allow the question.

2    Go ahead.

3    **BY MR. STEFAN:**

4    **Q.**   What was your -- well, what was your purpose in --

5    actually, strike that question.

6    Just reviewing this language here, what's the significance

7    of the representation that it's a medium of exchange and not a

8    pooled interest?

9    **A.**   It says a medium of exchange, it's an asset.  It's not an

10   interest in a business enterprise.

11   **Q.**   This would be a distinction.  If it was a business --

12   interest in a business enterprise, it could be a security?

13   **A.**   That's correct.

14   **MR. STEFAN:**  And if we could make sure we get the

15   entirety of line 15.

16   **Q.**   How about line 15?  What's the significance of this line

17   with respect to the coin's status?

18   **A.**   Expectation of profit is one of the elements of one of the

19   tests to whether something's a security or not.

20   **MR. STEFAN:**  We can back out of this exhibit.

21   And please display Exhibit 2470, which was previously

22   admitted.

23   **Q.**   This is just the first page, but do you recognize what's

24   being shown to you here in 2470?

25   **A.**   Yes.

**FAHY - DIRECT / STEFAN**

1  Q.   This is the white paper for the AML BitCoin ICO?

2  A.   Yes.

3  Q.   What was your role with respect to the AML BitCoin white

4  paper?

5  A.   I was a consulting attorney on certain issues involving

6  the white paper.

7  Q.   And did you work with anyone else in the process of

8  consulting on the white paper?

9  A.   An attorney named Neil Sunkin, S-u-n-k-i-n.

10  Q.   This white paper, does it contain any language regarding

11  the use of purchaser funds?

12  A.   It does not contain a use-of-proceeds provision --

13  disclosure.

14  Q.   When you say "use of proceeds," what do you mean?

15  A.   If it is a security, it would be common and expected to

16  have a table in the disclosure document showing what the

17  enterprise is going to be spending the funds raised on.  This

18  white paper does not include a use-of-proceeds table or other

19  disclosure.

20  Q.   Why doesn't it include that language?

21  A.   Because if you have a use of proceeds, that indicates that

22  you're being involved in a business enterprise.  If there is no

23  business enterprise, you're just buying an asset.  Then that

24  would not be relevant.

25  Q.   So per the terms of the white paper and the terms and

1   conditions, how could purchaser money be spent?

2   **A.**   The net proceeds could be spent as NAC Foundation want

3   them to be spent.

4   **Q.**   Were there any restrictions, based on the terms that we've

5   reviewed, on how those proceeds could be spent?

6   **A.**   No.  I want to clarify.  It's net proceeds was my answer.

7   You said "proceeds."  Net proceeds.

8   **Q.**   Understood.

9        What was communicated to Mr. Andrade regarding how the net

10  proceeds could be used?

11           **MR. WARD:**  Objection.  Hearsay.

12           **MR. STEFAN:**  Your Honor, this is --

13           **THE COURT:**  Was communicated to him by this witness?

14           **MR. STEFAN:**  Yes, Your Honor.

15           **THE COURT:**  All right.  You can testify to that.

16           **THE WITNESS:**   I had specific conversations with him

17  about using the proceeds to pay my -- to pay the Black Gold

18  Coin invoices generated by my firm in applying for

19  international patents across the world.  So I had a specific --

20  I had specific conversations regarding using these proceeds to

21  do intellectual property work that would be owned by him.

22  **BY MR. STEFAN:**

23  **Q.**   And the intellectual property work you indicated was for

24  this Black Gold Coin, Incorporated, business?

25  **A.**   Yes, that's correct.

**FAHY - DIRECT / STEFAN**

1    **Q.**    Beyond specific statements, when you say it would be owned

2    personally by him, can you explain that?  What do you mean by

3    that?

4    **A.**    Well, I spoke inexactly.  It would be owned by -- the

5    intellectual property is owned by Black Gold Coin.  Black Gold

6    Coin was our client.  The proceeds could be -- you know, I told

7    Marcus that the proceeds could be used to pay our firm for the

8    Black Gold Coin work, and Black Gold Coin was beneficially

9    owned by Marcus.

10   **Q.**    Did you communicate to Mr. Andrade any restrictions on the

11   use of the proceeds based on the terms and conditions or the

12   white paper?

13   **A.**    No.  I communicated to him that it could be used for --

14   the net proceeds could be used for purposes as he desires.

15   **Q.**    So essentially, for whatever purposes he saw fit?

16   **A.**    That's correct.

17   **Q.**    And part of that conversation was discussion of the IP

18   that he was using your firm to work on?

19   **A.**    Yes.  He could pay my firm.

20   **Q.**    That's one example of the things he could do with --

21   **A.**    Right.

22   **Q.**    -- the money?

23        I believe you said correct?

24   **A.**    Yes.

25   **Q.**    And with respect to the terms and conditions and the white

1   paper, was there any restriction endorsed by those documents on

2   Mr. Andrade spending the funds on a house?

3   **A.**    No.

4   **Q.**    Or on a car?

5   **A.**    No.

6            **MR. STEFAN:**  Your Honor, may I have a moment?

7            **THE COURT:**  You may, yes.

8                         (Pause in proceedings.)

9            **MR. STEFAN:**  I have what's been marked as

10  Exhibit 2274.  And, Your Honor, I'm just going to authenticate

11  this document.

12           **THE COURT:**  Okay.

13           **MR. STEFAN:**  I provided a copy to Mr. Fahy so we can

14  quickly look through it.

15  **Q.**    If you can flip through that and just let me know if you

16  recognize it.

17  **A.**    (Witness examines document.)  Yes.  This is an 11-page

18  letter I wrote.

19  **Q.**    Okay.  And is that an accurate copy of the letter that you

20  wrote?

21  **A.**    Yes.

22  **Q.**    What's the date on it?

23  **A.**    September 26, 2017.

24  **Q.**    And the title?

25  **A.**    "AML BitCoin" is the subject matter.

FAHY - CROSS / WARD

```
 1              MR. STEFAN:  Thank you, Your Honor.

 2         No further questions.

 3              THE COURT:  Mr. Ward?

 4                      CROSS-EXAMINATION

 5    BY MR. WARD:

 6    Q.   It's afternoon.  Good afternoon, Mr. Fahy.

 7    A.   Hi.

 8    Q.   Mr. Fahy, you're a securities lawyer -- a securities

 9    lawyer?

10    A.   That's correct.

11    Q.   And you specialize in securities law; correct?

12    A.   Yes.

13    Q.   And when you were advising Marcus Andrade, you testified

14    that you were advising him on the narrow issue of securities

15    law, a narrow securities law issue?

16    A.   I want to be clear that Marcus wasn't personally a client.

17    NAC and Black Gold Coin were.

18    Q.   But you were personally advising Marcus Andrade?

19    A.   Yes, on behalf of NAC Foundation or Black Gold Coin.

20    Q.   And you were advising him on the narrow issue of whether

21    or not AML BitCoin was a security?

22    A.   That's almost right.  I was advising him on how to draft

23    documents that indicate that -- so that the elements of what is

24    a security are not met by drafting those documents.

25    Q.   Because the goal was to have AML BitCoin not be classified
```

FAHY - CROSS / WARD

1    as a security?

2    **A.**    That's correct.

3    **Q.**    And there are different rules and regulations that governs

4    when you sell something as a security versus selling it when

5    it's not a security?

6    **A.**    That's correct.

7    **Q.**    And they can be very technical and nuanced distinctions?

8    **A.**    Yes.

9    **Q.**    But at the end of the day, the laws governing fraud and

10   fraudulent misrepresentations, those apply to securities or

11   non-securities?

12   **A.**    Yes.

13   **Q.**    And there's nothing that allows a material

14   misrepresentation to be made if something's a security or not a

15   security?

16   **A.**    Those would be different causes of action, but yes.

17   **Q.**    They would be different causes of action, but they would,

18   nonetheless, be a cause of action if there were material

19   representations made, regardless of whether it's a security or

20   a commodity?

21   **A.**    Yes.

22   **Q.**    Or a stock or a cryptocurrency?

23   **A.**    Yes.

24   **Q.**    And your advice wasn't -- your advice was just on whether

25   it was a security?

1    **A.**    I'm sorry.  I didn't think that that was a question.

2    **Q.**    Your advice was just focused on this narrow technical

3    question of whether AML BitCoin was a security and the

4    representations being made about whether it was a security?

5    **A.**    Yes, at this time.

6    **Q.**    Even within that context, you're -- you just testified

7    that you were advising Marcus Andrade and the NAC Foundation

8    that they shouldn't make representations that would lead

9    purchasers to believe they could make a profit?  That they --

10   that they would --

11   **A.**    Yes, to avoid language promising profits.

12           **MR. WARD:**  Can we pull up Exhibit 776.  This has

13   already been admitted.  If we could blow up the...

14   **Q.**    Mr. Fahy, this is a letter -- an email from Japheth

15   Dillman, cc'd to Marcus Andrade, to potential investors.

16       When it's written -- do you see at the bottom, in the

17   third-to-the-last paragraph, where it says [as read]:

18           "In my humble opinion, it would be an incredible

19       boon to your investment funds"?

20       That's a statement that would lead someone to believe they

21   could make a profit from investing or purchasing AML BitCoin?

22   **A.**    Or investing whatever we're talking about here.

23       Who is Japheth Dillman?

24   **Q.**    Mr. Fahy, I just asked you about the sentence.

25   **A.**    Okay.

**FAHY - CROSS / WARD**

1  **Q.**  The sentence --

2  **A.**  That sentence indicates an intent to -- that somebody

3  would be making more money than they put in, an expectation of

4  profits.

5  **Q.**  Okay.  Thank you.

6      Mr. Fahy, did you ever test or analyze the AML BitCoin

7  technology?

8  **A.**  No.

9  **Q.**  Were you ever able to determine whether AML BitCoin was a

10  developed product that was complying with AML or KYC?

11  **A.**  No.  That was beyond the scope of my engagement.

12  **Q.**  And you never confirmed whether or not it had biometrics

13  embedded in the blockchain or in the coin?

14  **A.**  That was beyond the scope of my engagement.

15      **MR. WARD:**  Let's pull up the white paper, then, of

16  the -- sorry -- Exhibit 2470.  It's been admitted.

17      I don't know that we have that.  I can throw it up on

18  the -- I'm going to throw it up on the Elmo because we don't

19  have it.

20      Can we show the Elmo, publish to the jury and the witness,

21  please.

22      **THE COURTROOM DEPUTY:**  There it is.

23  **BY MR. WARD:**

24  **Q.**  So you testified, Mr. Fahy, that you advised Marcus

25  Andrade and the NAC Foundation on this white paper.

**FAHY - CROSS / WARD**

1    **A.**   On certain portions of the white paper, not the whole

2    thing.

3    **Q.**   Oh, just certain portions?

4    **A.**   Yes.

5    **Q.**   Okay.  So that wouldn't -- when it says here in the third

6    paragraph, "AML BitCoin was created with anti-money laundering,

7    anti-terrorism, and theft-resistant properties built into the

8    code," you didn't advise Mr. Andrade on whether that was true

9    or not true?

10   **A.**   No.

11   **Q.**   Okay.

12        **THE COURT:**  No, you didn't?

13   **BY MR. WARD:**

14   **Q.**   You didn't advise him?

15   **A.**   I did not -- was not advising him on those provisions.

16   **Q.**   Okay.  And any of the representations in the white paper

17   about the state of the technology, the state of the product,

18   that was beyond the scope of what you were advising him on?

19   **A.**   That's correct.

20        **MR. WARD:**  Okay.  We can take this off.

21   **Q.**   Mr. Fahy, did you review any of the tweets or Facebook

22   posts that Mr. Andrade posted?

23   **A.**   I don't recall.  It's a long time ago.

24   **Q.**   Did Mr. Andrade ever ask -- clear with you any of the

25   representations that he made in any of his social media before

1    he posted?

2    **A.**    I did mark up some press releases.  I don't recall social

3    media.  I don't know if that was part of that or not.

4    **Q.**    You didn't review any of the tweets that Marcus Andrade --

5    **A.**    I don't recall reviewing tweets.

6    **Q.**    All right.  Did you review any of the news articles that

7    were drafted and written about AML BitCoin?

8    **A.**    I drafted -- I reviewed a few press releases that were

9    provided to me.

10    **Q.**    Okay.  But let's -- I want to make a distinction.  I get

11    it.  The press release is one thing, but did you review drafts

12    of newspaper articles?

13    **A.**    I don't recall.

14    **Q.**    Do you recall ever looking at an article that ran in the

15    *Washington Times*?

16    **A.**    I don't recall that.

17    **Q.**    All right.  And what about *Investors Business Daily*?  Do

18    you remember that article?

19    **A.**    I don't recall that.

20    **Q.**    All right.  And you said you reviewed some press releases.

21          **MR. WARD:**  Could we show the witness Exhibit 2277.

22    This has not been admitted.

23          **THE COURT:**  Has not, you say?

24          **MR. WARD:**  Has not been admitted.  It's a defense

25    exhibit.

```
 1              THE COURT:  So -- okay.

 2   BY MR. WARD:

 3   Q.   Can you take a look at that, Mr. Fahy.  Can you see that?

 4   A.   I don't see anything.

 5              MR. WARD:  Can we do the Elmo just for the witness?

 6              THE COURTROOM DEPUTY:  I think so, yeah.

 7   BY MR. WARD:

 8   Q.   It's a little harder on this, Mr. Fahy, so I'll...

 9        Does this appear to be a press release that you reviewed?

10   A.   Yes, this looks like a press release that I reviewed.

11   Q.   And would the redlines be the things that you advised be

12   taken out of the press release?

13   A.   Yes.

14              MR. WARD:  We can move to admit Exhibit 2277.

15              MR. STEFAN:  No objection.

16              THE COURT:  2277, it is?  Yes, 2277 will be admitted.

17        (Trial Exhibit 2277 received in evidence.)

18   BY MR. WARD:

19   Q.   This was a press release you received from Marcus Andrade

20   and the NAC Foundation?

21   A.   I believe that's where it came from.

22              MR. WARD:  Oh, can we publish too?

23              THE COURTROOM DEPUTY:  I did.

24              MR. WARD:  Can we see it?

25   Q.   In the redline, you advised Mr. Andrade not to say that
```

FAHY - CROSS / WARD

1   [as read]:

2           "The NAC Foundation has fielded a torrent of

3       demand from potential purchasers, but has been unable

4       to offer" --

5           **THE COURT:**  You have to slow down.

6           **MR. WARD:**  Sorry.

7   **Q.**   [As read]:

8           -- "but has been unable to offer these excited

9       buyers a chance to acquire the AML BitCoin, after its

10      successful initial coin offering was concluded weeks

11      ago."

12      And you advised him not to say that?

13  **A.**   That's what it appears.

14  **Q.**   And looking at page 2, but nonetheless, he could say

15  [as read]:

16          "NAC Foundation is the creator of AML BitCoin,

17      the world's only patent-pending digital currency with

18      anti-money laundering, know-your-customer

19      technology"?

20  **A.**   I was not dealing with technology issues.

21  **Q.**   Okay.  Did you advise Mr. Andrade on any of his potential

22  business deals?

23  **A.**   For Black Gold Coin, yes.  There was -- I was his counsel

24  in a contract that was entered between Black Cold Coin and

25  Deloitte Corporate Finance.

1    **Q.**   Were you involved in any negotiations with Panama or

2    Panama Canal?

3    **A.**   No.

4    **Q.**   And were you involved in any negotiations or any

5    discussions with the Port of San Francisco?

6    **A.**   No.

7    **Q.**   Mr. Fahy, looking at the white paper, in your

8    understanding of the business, the white paper is representing

9    that the NAC Foundation is working to develop and has developed

10   the AML BitCoin technology; correct?

11   **A.**   Yes.

12   **Q.**   And the expectation was that the NAC Foundation and Marcus

13   Andrade would continue to work on developing the coin and the

14   technology?

15   **A.**   Can you give me a time frame?

16   **Q.**   During the time frame of the white paper and the ICO in

17   2017, was the expectation that the NAC Foundation was going to

18   continue to develop the technology and had developed the

19   technology related to AML BitCoin?

20   **A.**   Yeah, once again, technology was not what I was engaged

21   on.

22   **Q.**   But in terms of the business, wasn't the expectation that

23   the business was working on this technology?

24   **A.**   It was a deliverable.

25         **MR. STEFAN:**  Objection.  Vague.  Whose expectation?

FAHY - CROSS / WARD

1              THE WITNESS:  Whose expectation?  Yeah.

2    BY MR. WARD:

3    Q.   Was it the expectation of the readers of the white paper

4    that the NAC Foundation was working on the AML BitCoin

5    technology?

6              MR. STEFAN:  Objection.  Speculation.

7              THE COURT:  Sustained.

8    BY MR. WARD:

9    Q.   When you worked on the white paper, was it your

10   understanding that the white paper would be given to investors

11   and purchasers of the coin?

12   A.   Can you rephrase that question, since it's --

13   Q.   Did you understand that the white paper was going to be

14   used and presented to purchasers of the coin?

15   A.   Yes, the white paper would go to purchasers of the coin.

16   Q.   And that they would --

17   A.   And the tokens as well.

18   Q.   And purchasers of the token and the coin would look to the

19   white paper and rely on the white paper in making their

20   purchasing decisions?

21   A.   Yes.

22   Q.   And as part of that reliance, was it not part of the white

23   paper that the NAC Foundation would be using the money to

24   develop the coin and develop the technology?

25   A.   I don't recall the white paper saying that.  If you can

 1    refresh my recollection, I'd like to see that.

 2    **Q.**    Did the -- did the white paper say that the money would be

 3    used by Marcus Andrade to buy a house and a car?

 4    **A.**    I don't think that it specifically said house or car.

 5    **Q.**    And did it say anywhere that he would take the money and

 6    use it for his personal expenses?

 7    **A.**    That was understood.   That's what happens when you delete

 8    the "use of proceeds."

 9    **Q.**    It doesn't say that in the white paper, though?

10    **A.**    The "use of proceeds" was deleted from the white paper.

11    **Q.**    Oh, that part was deleted?

12    **A.**    Yes.

13          **MR. WARD:**   Okay.   One moment.

14                (Pause in proceedings.)

15    **BY MR. WARD:**

16    **Q.**    Did Mr. Andrade ever ask your advice on purchasing a

17    Super Bowl ad?

18    **A.**    I don't recall that.

19    **Q.**    And did Mr. Andrade ever discuss with you the use of

20    trading between accounts on a cryptocurrency exchange?   Did he

21    ever discuss that with you?

22    **A.**    I don't recall that.

23          **MR. WARD:**   Okay.   Nothing further.

24    Thank you.

25          **THE COURT:**   Anything further?

 1          **MR. STEFAN:**  Yes, Your Honor.

 2      Can I inquire, has Exhibit 824 been admitted?

 3          **THE COURTROOM DEPUTY:**  824?

 4          **MR. STEFAN:**  Yes.

 5          **THE COURTROOM DEPUTY:**  I don't see it.  No, I don't

 6  think so.

 7          **MR. STEFAN:**  Okay.  We can pull that down.

 8                    **REDIRECT EXAMINATION**

 9  **BY MR. STEFAN:**

10  **Q.**   Mr. Fahy, the Government counsel asked you about

11  Exhibit 2277, which was that IDAX press release.  Do you recall

12  making the edits to the document that they spoke to you about?

13  **A.**   Yes.

14  **Q.**   Do you know in what state the document was eventually

15  released or if it was released?

16  **A.**   I don't.

17  **Q.**   Okay.  You had mentioned to -- you'd mentioned to

18  Government counsel a contract that you assisted Mr. Andrade

19  with in a negotiation with Deloitte.

20  **A.**   That's correct.

21  **Q.**   Do you recall when about you engaged in that negotiation?

22  **A.**   In 2019-2020.

23  **Q.**   What was the nature of the negotiation that you were

24  engaged in with Deloitte?

25  **A.**   They were going -- Deloitte Corporate Finance is a FINRA

FAHY - REDIRECT / STEFAN

1    member, and it was going to act as a broker in the sale of the

2    Black Gold -- some of the Black Gold Coin patent and other

3    intellectual property.

4    **Q.**    What was contemplated with respect to the price of the

5    sale that Deloitte was expecting to receive?

6    **A.**    Deloitte was expecting to receive 15 percent of 80 to

7    100 million.

8    **Q.**    80 to 100 million dollars?

9    **A.**    Yeah, with them getting 15 percent.

10          **MR. STEFAN:**    Can I see Exhibit 2232.

11    Thank you, Ed.

12    **Q.**    Do you recognize what I have just shown you?

13    **A.**    Can we go forward to see the signature pages?

14    **Q.**    Yes.

15          **MR. STEFAN:**    Could we advance to page 4, please.

16    **Q.**    So that's one signature.  And then -- okay.  I apologize.

17    I cannot find the second signature block.

18    **A.**    I am familiar with that Deloitte also signed it, and I

19    have seen the executed version.

20    **Q.**    Okay.  So the version that you're seeing on this screen is

21    absent Deloitte's execution of the signature on the document?

22    **A.**    But I have seen the executed version --

23    **Q.**    Okay.

24    **A.**    -- in preparation for this testimony.

25    **Q.**    Absent that execution signature, is the rest of this

1    document, as far as you can tell, substantially the contract

2    that was entered into with Deloitte?

3    **A.**    Yes, it is.  It's the execution version.  It's not the

4    execution -- it's not the fully executed copy, though.

5    **Q.**    Understood.

6           **MR. STEFAN:**  Your Honor, at this time we're just

7    authenticating this document.

8           **THE COURT:**  Okay.

9           **MR. STEFAN:**  Thank you, sir.

10    I don't have any further questions.

11           **MR. WARD:**  Just briefly.

12                       <u>RECROSS-EXAMINATION</u>

13    BY MR. WARD:

14    **Q.**    Mr. Fahy, Mr. Stefan asked you about this contract with

15    Deloitte.  That was in February of 2020; correct?

16    **A.**    It was the first part of 2020.  I don't -- I'm not going

17    to be able to -- it's five years ago.  The exact month, I'm not

18    going to be able to tell you.

19    **Q.**    Okay.  But that was two years after the ICO?

20    **A.**    Yes.

21    **Q.**    And it was two years after the pre-ICO sales?

22    **A.**    Yes.

23    **Q.**    And there was never -- nothing ever came of the Deloitte

24    engagement?  There was never any sale of any patent portfolio?

25    **A.**    Deloitte terminated it after he was -- Marcus was

PROCEEDINGS

 1   indicted.

 2          **MR. WARD:**  Nothing further.

 3      Thanks.  Thank you.

 4          **THE COURT:**  You may step down.

 5                      (Witness excused.)

 6          **MS. DIAMOND:**  Your Honor, the defense will call Arthur

 7   Weissman to the stand.

 8      If I may have a moment.

 9          **THE COURT:**  How's the jury doing?  We've got another

10   40 minutes.  Does anybody need a break or can you hang in

11   there?  A break is requested?

12      Oh, good.  All right.  Thank you.

13      I assumed the thumbs-up was in favor of a break as opposed

14   to the other way around.

15    (Witness enters the courtroom and steps forward to be sworn.)

16          **THE COURT:**  If you could come forward, please, and

17   come to the stand.

18          **THE COURTROOM DEPUTY:**  Right this way.

19      Please raise your right hand.

20                      **ARTHUR NORMAN WEISSMAN,**

21   called as a witness for the Defendant, having been duly sworn,

22   testified as follows:

23          **THE WITNESS:**  I do.

24          **THE COURTROOM DEPUTY:**  Please be seated.

25      Can you state your full name and spell your last name?

 1          **THE WITNESS:**  Sure.  May name is Arthur Norman

 2    Weissman, W-e-i-s-s-m-a-n.

 3                          <u>**DIRECT EXAMINATION**</u>

 4    **BY MS. DIAMOND:**

 5    **Q.**   Good morning -- or good afternoon, Mr. Weissman.

 6          I'd ask, when you testify, if you could speak directly

 7    into the microphone.  Feel free to face the jury if you feel

 8    comfortable doing that, and speak slowly enough so we can all

 9    understand you clearly.  Thank you.

10    **A.**   Sure.

11    **Q.**   Mr. Weissman, did you have -- what is your field of

12    business?

13    **A.**   My field of business is providing back-office services to

14    privately held companies that have investors' investments.

15    **Q.**   And what does back-office services involve?

16    **A.**   So that involves administrative work, organizing items,

17    compliance, bookkeeping, just for the most part making sure

18    that you're following the rules.

19    **Q.**   So when people create companies, they would hire someone

20    like you to help them do the details to keep them in check; is

21    that fair?

22    **A.**   I think that's fair, yeah.

23    **Q.**   Did you have occasion to do some work, whether or not you

24    were paid for it, with a man named Japheth Dillman in 2020 --

25    sorry -- 2017 or 2018?

**WEISSINGER - DIRECT / DIAMOND**

1   **A.**   Yes.

2   **Q.**   Could you describe to the jury what sort of work or

3   discussions about work that you and Mr. Dillman engaged in?

4   Just briefly.

5   **A.**   Sure.

6   **Q.**   High level.

7   **A.**   Mr. Dillman wanted to launch investment vehicles, wanted

8   to start companies, and was asking for help and support on how

9   to structure them, how to set them up, and how to operate them.

10  **Q.**   Was one of the companies that you helped him with named

11  Block Bits AML Holdings LLC?

12  **A.**   Yes.

13  **Q.**   What is an LLC?

14  **A.**   LLC stands for limited liability company.  It's a type of

15  corporation that is registered with the states.

16  **Q.**   Does it create a sort of partnership or shareholder

17  arrangement between the members?

18  **A.**   Correct.  So an LLC would have members, and all the

19  members are part owners of the LLC.

20  **Q.**   And all the members would accrue or receive some tax

21  consequence as a result of any money in, money out to the

22  corporation; is that right?

23  **A.**   Yes.  It's sometimes referred to as a pass-through entity.

24  So each one of the members are shareholders, and they would

25  receive their pro rata share of taxes and profits and losses.

**WEISSINGER - DIRECT / DIAMOND**

1   Q.   "Pro rata" meaning it's per share, not per member; is that
2   right?
3   A.   Correct.  Correct.
4   Q.   So some members may have a lot of shares, and some members
5   may have few?
6   A.   Correct.
7   Q.   For Block Bits AML Holdings, did you yourself become a
8   member at some point?
9   A.   Yes, I did.
10  Q.   And were you familiar with a member whose name is
11  Ben Boyer?
12  A.   I am familiar, yes.
13  Q.   Thank you.
14       **MS. DIAMOND:**  One moment.
15       Mr. Jackson, could you please display for the witness and
16  the Court and counsel Exhibit 2743.
17  Q.   Mr. Weissman, are you familiar with the first page of the
18  document that appears on your screen?
19  A.   It looks familiar, yes.
20  Q.   And what is this document?
21  A.   This document is a company agreement of
22  Block Bits AML Holdings LLC.
23  Q.   Thank you.
24       **MS. DIAMOND:**  Move to admit.
25       **MR. HIGHSMITH:**  Hearsay.

1          **THE COURT:**  And what is the exception?

2          **MS. DIAMOND:**  I -- this -- sorry.

3      This witness used this document, signed this document,

4  participated in this document.  I can establish more,

5  Your Honor, more foundation for him to be familiar with this

6  document and what it is, to explain to the jury.  If I may,

7  I'll ask a few more questions.

8          **THE COURT:**  I'm not sure that's going to take care of

9  the objection, but what is this?

10          **MS. DIAMOND:**  It's not offered for the truth of the

11  matter itself.  It's offered as an exem- -- to show what the

12  document is.  There's relevance to this case that will be

13  evident in the next exhibit that this witness will be

14  identifying, but I can ask some more questions of this witness

15  if --

16          **THE COURT:**  Well, you can go ahead.  I am not sure the

17  questions you sort of suggest you're going to ask are going to

18  go to the objection that Mr. Highsmith has made.

19      But you're saying you're offering it not for the truth?

20          **MS. DIAMOND:**  I'm offering it for the fact of --

21          **THE COURT:**  I understand -- pardon?

22          **MS. DIAMOND:**  Sorry.  We will be offering it for the

23  fact of the signature pages that will be in the next exhibit.

24          **THE COURT:**  Okay.  And what's the significance or

25  relevance of the signature pages?  If it's not -- okay.  Fine.

1    It's not offered for the truth.  So then what's the relevance?

2          MS. DIAMOND:  The relevance is it's directly connected

3    to the Count One funds, the funds --

4          THE COURT:  To what?

5          MS. DIAMOND:  The transaction charged in Count One in

6    this case is directly relevant to this document, and I will

7    establish that.

8          THE COURT:  Why don't you ask a few more questions

9    because I --

10          MS. DIAMOND:  Sure.

11   Q.   Mr. Weissman, do you know how this document came to be

12   drafted?

13   A.   I -- my recollection of this document, it was drafted off

14   of a template that was taken down from -- purchased from the

15   Internet.

16   Q.   And was this for one of the companies that Mr. Dillman was

17   starting?

18   A.   That is my understanding, yes.

19   Q.   And did you help him in adapting the template to create

20   this document?

21   A.   I provided some administrative help.  I did not do any

22   legal work on the document.

23   Q.   And you reviewed it before it was finalized; correct?

24   A.   From an administrative perspective.  I'm not a lawyer.  So

25   just from -- just from reviewing that it's there.

**WEISSINGER - DIRECT / DIAMOND**

1    **Q.**   And is this a document that any of the partners that

2    joined Block Bits AML Holdings LLC signed in order to become a

3    member?

4    **A.**   Yes.  So to become a member, you would have to sign the

5    operating agreement, which is what this agreement is.

6         **MS. DIAMOND:**  If we could take this exhibit down for

7    now.

8         And for the witness and the Court, please display

9    Exhibit 2744.

10   **Q.**   Are you familiar with this document, Mr. Weissman?

11   **A.**   I've seen this document before, yes.

12   **Q.**   What is this document?

13   **A.**   This is the signature page for someone that would sign to

14   become a member of the LLC.

15   **Q.**   Is this a document signed by Ben Boyer on January 11th,

16   2018?

17   **A.**   I believe that's Ben Boyer's signature, but I can't tell

18   for sure.

19        **MS. DIAMOND:**  If you could scroll to the next page,

20   Mr. Jackson, to display the schedule of contribution by the

21   signer of this document.

22   **Q.**   Do you see that there, Mr. Weissman?

23   **A.**   Yes, I do.

24   **Q.**   And can you read the name of the member that was joining

25   Block Bits AML Holdings?

1  **A.**   Yes.  It says --

2        **MR. HIGHSMITH:**  Your Honor, I'm going to object to --

3  she can just ask the question directly rather than just reading

4  off the document --

5        **MS. DIAMOND:**  Fine.

6        **MR. HIGHSMITH:**  -- that's not admitted into evidence.

7     It's entering the hearsay document rather than just asking

8  the question straightforward.

9        **THE COURT:**  Well, depending -- all right.

10     Well, I'll sustain that objection.  Ask a new question.

11        **MS. DIAMOND:**  Your Honor, I'm so sorry.  May I have

12  the court reporter tell me the objection that was sustained?  I

13  don't want to ask that question again.  I want to --

14        **THE COURT:**  Okay.  Well, why don't -- I think the

15  easier way to do it is, let's just try a new question, and then

16  we'll see if that works.

17        **MS. DIAMOND:**  Sure.

18  **Q.**   In creating the Block Bits Holding AM -- sorry -- Block

19  Bits AML Holding LLC, was the purpose -- the purpose was to

20  create a pooled resource for investing in AML BitCoin; is that

21  right?

22  **A.**   That's what Japheth Dillman wanted to do, correct.

23  **Q.**   Japheth Dillman is the person who told you what you

24  learned about AML BitCoin; is that right?

25  **A.**   Correct.

 1   **Q.**   He actually engaged in a lot of sales presentations to

 2   people to try to solicit more investors into --

 3          **MR. HIGHSMITH:**  Object.  Leading.

 4          **MS. DIAMOND:**  Oh, sorry.

 5          **THE COURT:**  Why don't you rephrase it.

 6   **BY MS. DIAMOND:**

 7   **Q.**   Are you aware of any marketing or presentation efforts by

 8   Mr. Dillman that were conducted in your presence to solicit

 9   investors into Block Bits AML Holdings LLC?

10   **A.**   Yes.

11   **Q.**   Could you tell the jury about what you were aware of, what

12   you participated in?

13   **A.**   What I'm aware of is that Japheth Dillman made a --

14          **MR. HIGHSMITH:**  Objection, Your Honor.  If it's

15   Mr. Dillman's statements, then it's hearsay.  If it's his

16   statements, it's not.  But I'm objecting to Mr. Dillman's

17   hearsay statements.

18          **MS. DIAMOND:**  Not offered for the truth, Your Honor.

19   They're offered for the fact that they were made as marketing

20   pitches for Dillman's entity in Mr. Weissman's presence.

21          **THE COURT:**  And what's missing is the relevance of

22   that.  What is the relevance?

23          **MS. DIAMOND:**  The relevance is --

24          **THE COURT:**  You know, I tell you what.  Why don't

25   we --

SIDEBAR

```
 1         Members of the jury, after I patted ourselves on the back
 2    for not having sidebars, you can forget that.  I need a
 3    sidebar.
 4                         (Laughter.)
 5              THE COURT:  So let's go to the side.
 6         (The following proceedings were heard at the sidebar:)
 7              THE COURT:  Okay.  Where are we going?
 8         MS. DIAMOND:  There's an entity that did its own
 9    plans, that had its own members, that excluded Mr. Andrade.
10    They had emails.  They didn't include Mr. Andrade.  They were
11    working for their own profit that was in contravention of the
12    terms of Mr. Andrade's own contracts, which permit using token
13    purchases for investments, pooled resources, shares, equity,
14    expectation of partnership in companies.  Their contract is
15    materially different than Mr. Andrade's company.
16         And Ben Boyer signed their contract, not Mr. Andrade's
17    contract.  There's no evidence that he signed Mr. Andrade's
18    contract.  He didn't interact with Mr. Andrade.  He only
19    interacted with the people that Mr. Weissman was working on.
20              THE COURT:  Okay.  So you're saying this goes to
21    the -- to the wire that is Mr. Boyer's --
22              MS. DIAMOND:  Yes.
23              THE COURT:  -- wire?
24              MS. DIAMOND:  Yes.
25              THE COURT:  All right.
```

1      **MS. DIAMOND:**  That is where the wire went to.

2      **THE COURT:**  Okay.

3      **MS. DIAMOND:**  It was under the control of Mr. Dillman,

4  and Mr. Andrade was not aware of it, was not told of it, and

5  that goes to Mr. Andrade's intent.

6      **THE COURT:**  It sounds like she should be able to

7  explore that.

8      **MR. HIGHSMITH:**  As long as she's not getting the

9  hearsay statements for truth of the hearsay statements, then --

10      **MS. DIAMOND:**  I would never offer Mr. Dillman's

11  statements for the truth.

12      **MR. HIGHSMITH:**  We don't --

13      **THE COURT:**  I'll let -- I mean, it goes to -- they're

14  attacking the nitty-gritty of the wire here and who signed

15  what.

16    And I'm willing to let you do that.

17      **MS. DIAMOND:**  And the joint intent between Mr. Andrade

18  and Mr. Dillman, which we do not think existed.

19      **THE COURT:**  Now, the fact that Dillman may have been

20  doing other bad things with his own investors does not --

21  doesn't exculpate --

22      **MS. DIAMOND:**  I will not go into the entire Block Bits

23  case.  I have read it.  I know what it is.  I know they had

24  many different schemes.  I am not soliciting any of that from

25  this witness.

1          THE COURT:  Okay.

2          MR. HIGHSMITH:  This witness may not have foundation

3     for what Mr. Boyer signed off on or what -- so --

4          THE COURT:  Well, we'll see.  You can continue to make

5     that objection, which is a different one than -- all right.

6     Let's see where it goes.

7          (The following proceedings were heard in open court:)

8          THE COURT:  You may proceed.

9          MS. DIAMOND:  Do we have a question pending?  Just so

10    I can find where we were.  Thank you.

11         THE COURT:  You're asking the court reporter to read

12    the question?

13         MS. DIAMOND:  If there was a question pending, yes.

14    If not, I will ask a new question.

15         THE COURT:  It was a long time ago.

16         MS. DIAMOND:  It was.  Not back in 2018, fortunately.

17         THE COURT:  Right.

18         MS. DIAMOND:  I can ask another question.

19         THE COURT:  Why don't you do that.

20    BY MS. DIAMOND:

21    Q.   Between the dates of January 10th and January 11th, 2018,

22    are you aware that there were emails sent to you that referred

23    to the formation of Block Bits AML Holdings LLC?

24    A.   I'm aware of emails to that, yes.

25    Q.   And are you aware that some of those emails were sent to a

1    man named Ben Boyer?

2    **A.**    Yes.

3    **Q.**    Did you ever meet Ben Boyer personally?

4    **A.**    No.

5    **Q.**    Did you ever talk to him on the phone?

6    **A.**    I think once.

7    **Q.**    And you do recognize that the signature pages, which have

8    more than the two we have shown to you on Exhibit 2744, were

9    Mr. Boyer's initial investment into Block Bits AML Holdings

10   LLC?

11   **A.**    I believe that's his signature.

12            **MS. DIAMOND:**    I would move -- oh, sorry.  Is it --

13   sorry.

14   **Q.**    Mr. Weissman, in your business, are there times when you

15   see a signature page of a document alone, not connected to the

16   rest of the document?

17   **A.**    Yeah.  It's very common when signing operating agreements,

18   which sometimes can be a hundred pages long, you just store the

19   signature page and the confirmation of the original operating

20   agreement.

21   **Q.**    So looking -- if you were to look at the Block Bits

22   AML Holdings LLC agreement and look at the signature pages,

23   someone familiar with the agreement could understand that they

24   match and the signature pages go with that agreement; is that

25   right?

WEISSINGER - DIRECT / DIAMOND

1   **A.**   That would be correct.

2          **MS. DIAMOND:**  I would move Exhibits 2743 and 2744 into

3   evidence.

4          **MR. HIGHSMITH:**  I'm going to object.  I don't think

5   he's established the foundation.  He spoke generally, but not

6   about this specific document.

7          **THE COURT:**  Well, I will admit 2744.

8       And what was the other number?

9          **MS. DIAMOND:**  2743.  Thank you, Your Honor.

10          **THE COURT:**  All right.  Those are admitted.

11       (Trial Exhibits 2743 and 2744 received in evidence.)

12          **MS. DIAMOND:**  Mr. Jackson, could we please see

13   Exhibit 3369 for the witness and the Court.

14   **Q.**   Do you see your name on the email that's displayed to you?

15   **A.**   Yes, I do.

16   **Q.**   And in the course of your business activities, did you

17   usually use an email that would display this name?

18   **A.**   Yes.

19   **Q.**   And was -- were emails that you received through this

20   email address records made at or near the time by or from

21   information transmitted by somebody with knowledge of the

22   content?

23   **A.**   Yes.  I would assume so, yes.

24   **Q.**   Do you keep your emails in the course of your regularly

25   conducted activity for a business organization, occupation,

1  calling, whether or not for profit?

2  **A.**    What was the question?  Do I keep emails?

3  **Q.**    Yes.

4  **A.**    Oh, yes.  I -- this is a Gmail account, so it's stored in

5  my Gmail account.

6  **Q.**    And do you rely on the storage in your Gmail account to

7  conduct your regularly -- your regular business activities?

8  **A.**    Yes.

9          **MS. DIAMOND:**  I'd like to move Exhibit 3369 into

10  evidence.  The witness has identified it as an email that he

11  received.

12          **MR. HIGHSMITH:**  No objection.

13          **THE COURT:**  3369 will be admitted.

14      (Trial Exhibit 3369 received in evidence.)

15          **MS. DIAMOND:**  May this be published to the jury?

16          **THE COURT:**  It may.

17  BY MS. DIAMOND:

18  **Q.**    Is Ben Boyer included as a recipient on this email?

19  **A.**    I do see his name there, yes.

20  **Q.**    When was this email sent?

21  **A.**    It's dated January 12th, 2018.

22  **Q.**    And what does this email instruct the recipients?

23  **A.**    This is an email, which is rather standard in type, for

24  doing a wire transfer for payments.

25  **Q.**    And what was this a wire transfer for payments for?

1   **A.**    It says AML Holdings.

2   **Q.**    And that would be the Block Bits AML Holdings LLC that we

3   referred to just recently; correct?

4   **A.**    Correct.

5          **MS. DIAMOND:**  Mr. Jackson, if you could please scroll

6   down to the address on Pierce Street in San Francisco and

7   highlight that.

8   **Q.**  Mr. Weissman, are you familiar where Mr. Dillman lived in

9   2018?

10  **A.**    I believe it's that address.

11  **Q.**    The address displayed connected to the bank information

12  for the wire transfer that was sent to Ben Boyer on

13  January 12th?

14  **A.**    Correct.

15  **Q.**    Thank you.

16         **MS. DIAMOND:**  Mr. Jackson, you can take that down.

17  Thank you.

18       Could you please display to the witness an exhibit marked

19  3376, and the Court and counsel.  Thank you.

20  **Q.**  Mr. Weissman, do you recognize this to be an email that

21  you received and stored as part of the records for your

22  business or other organization or activity that you were doing

23  with Mr. Dillman?

24  **A.**    It has my email address on it, yes.

25  **Q.**  Were you sent this directly or were you copied, or in what

**WEISSINGER - DIRECT / DIAMOND**

1  form were you given this email?

2  **A.**   It is -- it has my email address listed as bcc, which

3  would be a blind copy.

4  **Q.**   Does that mean that the other recipients of the email

5  would not know that you got it?

6  **A.**   Correct.

7              **MS. DIAMOND:**  Move to admit 3376.

8              **MR. HIGHSMITH:**  No objection.

9              **THE COURT:**  3376 will be admitted.

10      (Trial Exhibit 3376 received in evidence.)

11  **BY MS. DIAMOND:**

12  **Q.**   Do you recall at some point in March being introduced to

13  Marcus Andrade's attorney Mr. Fahy?

14  **A.**   I do remember a phone call with him, yes.

15  **Q.**   And what was the purpose of the phone call from your

16  perspective?

17  **A.**   My recollection of it was that it was a phone call to have

18  a better understanding, from a legal perspective, around

19  AML BitCoin.

20  **Q.**   That phone call took place on or about March 9th, 2018;

21  isn't that right?

22  **A.**   I -- I don't remember specifically, but I'm sure it's

23  somewhere in that range.

24              **MS. DIAMOND:**  Could we see -- one moment,

25  Your Honor -- Exhibit 3377, and if it could just be displayed

WEISSINGER - DIRECT / DIAMOND

```
 1   to the witness, not the Court.
 2   Q.   Mr. Weissman, let me know if this email helps to refresh
 3   your memory about when you spoke to Mr. Fahy.
 4   A.   Yes.  It has a date of March 9th, 2018.
 5   Q.   Thank you.
 6           MS. DIAMOND:  And now I would like to show the witness
 7   and the Court and counsel, please, Mr. Jackson, Exhibit 3363.
 8   Q.   Do you recognize this form?  And we can scroll through,
 9   it's four or five pages, for you if you need.
10   A.   It's a standard Form D filing with the SEC.
11   Q.   What is a standard Form D filed with the SEC?
12   A.   So a Form D is filed -- whenever a company's taking in
13   investor dollars using the Reg D exemption, a Form D is filed.
14   Q.   And did you file this particular form for Block Bits
15   AML Holdings LLC?
16   A.   Yes, we did.
17   Q.   And does your name appear on the signature line of this
18   document?
19   A.   It does.
20           MS. DIAMOND:  And if we could have the witness please
21   look at page 3 of this document.
22   Q.   Does this document indicate the date of the Block Bits
23   AML Holdings first sale?
24   A.   It -- yes, it does.
25   Q.   What is that date?
```

WEISSINGER - DIRECT / DIAMOND

1    **A.**    It states January 12th, 2018.

2         **MS. DIAMOND:**  Move to admit Exhibit 3363.

3         **MR. HIGHSMITH:**  No objection.

4         **THE COURT:**  3363 will be admitted.

5    (Trial Exhibit 3363 received in evidence.)

6         **MS. DIAMOND:**  Thank you.

7    And one more.  Mr. Jackson, if you could please display to

8    the witness Exhibit 3381.

9    **Q.**    Is this, Mr. Weissman, an email sent to you by Ben Boyer

10   on April 29th, 2018?

11   **A.**    Yes.

12   **Q.**    And this is one of the emails that you received and kept

13   in the course of your work for -- with Mr. Dillman and his

14   Block Bits companies?

15   **A.**    Yes, it was sent to me.

16        **MS. DIAMOND:**  Move to admit Exhibit 3381.

17        **MR. HIGHSMITH:**  Objection.  Hearsay.

18        **MS. DIAMOND:**  It's his business record.  It's a fact

19   that these things were stated.

20        **THE COURT:**  Well, it's an email that was sent to him.

21   That doesn't make it a business record.

22        **MS. DIAMOND:**  Yes.  We're using it for the fact that

23   Mr. Boyer was communicating with Mr. Dillman and Mr. Weissman

24   about the subject of the email.  We do not care if the subject

25   is true, Your Honor, just the fact that this email was sent to

1    these individuals, but not to Mr. Andrade.

2            **THE COURT:**  Again, what's the relevance?  If it's not

3    offered for the truth, what's the relevance of it?

4            **MS. DIAMOND:**  Mr. Boyer's testimony was pretty

5    extensive, and he testified that there were things that he did

6    with respect to purchases of AML BitCoin through Mr. Dillman's

7    company and not through Mr. Dillman's company that postdated

8    this email.

9         And this goes to the state of mind of the difference, not

10   that we are proving the state of mind of other people not on

11   trial here, but Mr. Andrade was not included in this email, not

12   subject to these discussions, and the jury may find that

13   relevant when the jury is trying to determine issues of intent.

14           **THE COURT:**  Okay.  I'm going to sustain the objection.

15   This doesn't come in.

16           **MS. DIAMOND:**  Thank you for your time.

17        Thank you, Your Honor.

18                          <u>**CROSS-EXAMINATION**</u>

19   BY MR. HIGHSMITH:

20   **Q.**   Good afternoon, Mr. Weissman.

21        So you liked the idea of AML BitCoin?

22   **A.**   I did originally, yes.

23   **Q.**   It seemed like a good idea?

24   **A.**   It did originally, yes.

25   **Q.**   You say "originally."  Did your view change over time?

1   **A.**   Well, yes.

2   **Q.**   Why did it change over time?

3   **A.**   Because it did not come to fruition, and I -- I and many

4   of my friends who I spoke to about this lost a lot of money.

5   **Q.**   You invested $10,000?

6   **A.**   That sounds about right.  I don't remember the exact

7   amount.

8   **Q.**   You considered it an investment?

9   **A.**   Yes.

10  **Q.**   Did you get any money back?

11  **A.**   No.

12  **Q.**   You understood, at the time you invested, that you were

13  investing in order to build an actual product that worked;

14  correct?

15  **A.**   That was my understanding, yes.

16  **Q.**   So your understanding at the time you made the investment

17  was that the product was not complete; correct?

18  **A.**   Correct.

19  **Q.**   Did you know at the time that the sellers of AML BitCoin

20  were earning commissions from the owner of the product?

21  **A.**   No, not at all.

22  **Q.**   Is that relevant to you?

23  **A.**   It would have been if I -- I wish I had known that, yes.

24  **Q.**   Why do you wish you had known about commission payments?

25  **A.**   Because they have to be disclosed if someone's getting

1  paid a commission on a sale.

2  Q.   In addition to having to be disclosed, as someone who buys

3  a product, is the fact that a salesman's earning a commission,

4  is that important to you?

5  A.   I don't mind if someone's earning commission, but I do

6  mind if I don't know that the person's earning commission

7  because that would change the reason for, you know, what I'm --

8  the entire sales process.

9  Q.   Move the microphone closer to you, please.

10  A.   Oh, I'm sorry.

11  Q.   Sticking for just a moment on commissions --

12  A.   Mm-hmm.

13  Q.   -- would you want to know if someone was earning a

14  30 percent commission on a sale?

15  A.   Yes.

16  Q.   How about a 50 percent commission?

17  A.   Yes.

18  Q.   You met Mr. Andrade and Mr. Abramoff at least once; is

19  that right?

20  A.   Yes.

21  Q.   And Mr. Abramoff was with Mr. Andrade at the meeting?

22  A.   Correct.

23  Q.   It was your understanding at that meeting that

24  Mr. Abramoff was not connected to the AML BitCoin project?

25  A.   I did not know who he was.  He was just someone sitting at

**WEISSINGER - CROSS / HIGHSMITH**

1    a meeting.

2    **Q.**    Did you -- did he identify himself at the meeting?

3    **A.**    I think he just introduced himself with his first name.

4    **Q.**    Did you know Jack Abramoff had multiple prior

5    convictions --

6    **A.**    No.

7    **Q.**    -- at that time?

8    **A.**    No.  I found that out after an FBI agent called me and

9    told that to me.  I didn't know who that person was.

10   **Q.**    Would you have been involved in a project if you had known

11   that the CEO and founders, one of his key advisors was a felon?

12   **A.**    Absolutely not.

13   **Q.**    Why not?

14   **A.**    Because I don't want to be affiliated with anybody who's a

15   felon.

16   **Q.**    Did Mr. -- did you get an update regarding the technology

17   at any point, the AML BitCoin technology?

18   **A.**    I never received a formal update, no.

19   **Q.**    Did Mr. Andrade tell you anything about the technology

20   during your meeting?

21   **A.**    I don't recall anything specific about the technology.

22   **Q.**    Do you recall learning about a Super Bowl advertisement?

23   **A.**    Yes.

24   **Q.**    Who did you learn that from?

25   **A.**    From Japheth Dillman.

1  **Q.**   Did you ever learn that Mr. Andrade specifically hid from

2  Mr. Dillman that it was not a real Super Bowl plan but a

3  rejection campaign?

4  **A.**   I did not know that.

5  **Q.**   Is that significant to you?

6        **MS. DIAMOND:**  Objection.  Misstates the testimony.  No

7  foundation.

8        **THE COURT:**  Overruled.

9  **BY MR. HIGHSMITH:**

10 **Q.**   Is that a fact that would be significant to you?

11 **A.**   Yes.

12 **Q.**   Why?

13 **A.**   It just goes to transparency and accuracy.

14 **Q.**   Do you know -- there were a lot of questions about

15 Mr. Boyer's wire.  Do you recall those questions?

16 **A.**   Oh, that were asked today?  Yes.

17 **Q.**   Yeah.  There were questions about January 12th, 2018.  Do

18 you recall that?

19 **A.**   Mm-hmm.  Yes.

20 **Q.**   And I think you saw instructions to send Mr. Boyer's money

21 to Block Bits Capital.  Did you recall seeing that?

22 **A.**   I saw the wire instructions, yes.

23 **Q.**   Did you know that the very same day Mr. Boyer's money was

24 sent to Block Bits Capital, it was sent to accounts controlled

25 by Marcus Andrade?

1    **A.**    No, I did not know that.

2        **MR. HIGHSMITH:**  No further questions.

3        <u>**REDIRECT EXAMINATION**</u>

4    **BY MS. DIAMOND:**

5    **Q.**    Mr. Weissman, the investment that you made for AML tokens,

6    AML BitCoin Tokens, was made through your shares of

7    AML Holdings; is that right?

8    **A.**    That's correct.

9    **Q.**    So you paid money that went to Japheth Dillman.  That was

10   your connection to your investment in AML BitCoin; correct?

11   **A.**    That is correct.

12   **Q.**    You did not read Mr. Andrade's website; correct?

13   **A.**    No, I did not.

14   **Q.**    You did not read Mr. Andrade's private purchase contracts;

15   correct?

16   **A.**    No, I did not.

17   **Q.**    And you were not told that Japheth Dillman and David Mata

18   received commissions from Mr. Andrade for any token purchasers

19   that they brought to his ICO, were you?

20   **A.**    No, I did not.  No, I did not.

21   **Q.**    And did you ever pay money to the NAC Foundation?

22   **A.**    I did not.

23       **MS. DIAMOND:**  Thank you.

24       Nothing further.

25       **THE COURT:**  You may step down.

PROCEEDINGS

1          **THE WITNESS:**  Thank you.

2                              (Witness excused.)

3          **THE COURT:**  I take it, do you have any further

4    witnesses for the day, or are we done?

5          **MS. DIAMOND:**  We do not have any witness for the last

6    ten minutes, Your Honor.

7          **THE COURT:**  All right.  Members of the jury, we have

8    reached the end of the week.  There we go.

9          You're going to roll your eyes, I know, but I have to say

10   these things because they're important.  Remember, do not

11   discuss this amongst yourselves or with anyone else.  Do not do

12   any research.  Do nothing associated with this case.  If you

13   saw anything about this case, turn it away and do other things.

14         Have a wonderful weekend.  I do want to give you the

15   update.  We are, I think, still on schedule, so all is well.

16         Remember also, for your planning purposes, next week

17   Thursday and Friday we will not be in session.  So remember

18   that as you're planning for your week.

19         And have a wonderful weekend, and I'll see you Monday at

20   8:30.  You've been great about being here ready to go, and it

21   makes life so much easier for all of us.  So have a great

22   weekend.

23         (Proceedings were heard out of the presence of the jury.)

24         **THE COURT:**  We're out of the presence of the jury.

25         First question is the witnesses for Monday.

PROCEEDINGS

1        MR. SHEPARD:  I expect the main witness on Monday will

2   be Eric Min.

3        THE COURT:  Okay.

4        MR. SHEPARD:  We have some other potential witnesses

5   that I do not know whether we will call, but in case we do,

6   they would be Eric Olsen and Raul Torres.

7        THE COURT:  And Torres is Raul Torres?  Okay.

8        MR. SHEPARD:  Correct.

9        THE COURT:  Okay.  You think that would get us through

10  the day, in any event?

11       MR. SHEPARD:  That would be my expectation, yes.

12     And then our expectation would be Dr. Armstrong, the

13  forensic neuropsychologist, for Tuesday.

14     And hard to know exactly, but that might be the end,

15  obviously subject to Mr. Andrade's decision on whether he would

16  want to take the stand or not.

17       THE COURT:  Okay.

18       MR. HIGHSMITH:  Should we be prepared to do

19  Mr. Armstrong on Monday if Mr. Olsen and Mr. Torres do not end

20  up being called?

21       MR. SHEPARD:  Yeah, I just don't know his availability

22  at this point.

23       MS. DIAMOND:  He's rearranged patients to be here

24  Tuesday, but he's seeing some patients in the morning on

25  Tuesday and will be --

PROCEEDINGS

1      MR. SHEPARD:  You mean Monday.

2      MS. DIAMOND:  I'm sorry.  Monday.  And will be

3  traveling Monday afternoon.

4      THE COURT:  Okay.  Well, on the representation that

5  we're heading towards the end, then we're going to have

6  rebuttal, I understand.  With Thursday-Friday not being

7  available, we're almost, under any scenario, going into the

8  following week in one form or another; but if it can be going

9  into the following week for closings, that would be excellent.

10      MR. SHEPARD:  Yes.

11      THE COURT:  So we can do that, shooting for Monday or

12  Tuesday for the closings.

13      MR. SHEPARD:  If would be nice if the Government could

14  do its rebuttal case on Wednesday, assuming we finish on

15  Tuesday, and then we could do instructions and closings on

16  Monday --

17      THE COURT:  Right.

18      MR. SHEPARD:  -- or so, something like that.

19      THE COURT:  Well, we'll see.

20     What it does cause me to think is that next week, probably

21  maybe Tuesday, we should have our conference about the

22  instructions.

23     You might go back and look.  Some of the instructions that

24  are not in dispute, nonetheless, have a lot of brackets that

25  need to be filled in because we've got witnesses that have past

PROCEEDINGS

 1    conviction.  And there are other things that it's not -- it's
 2    just they're brackets because we hadn't gotten to the point of
 3    knowing exactly who's going to testify.  And the experts, which
 4    experts' names to put in there.  So you might help me with
 5    doing some revision of the basics so we can kind of just get
 6    those out of the way.
 7        When we're talking about instructions, it does occur to me
 8    that one way possibly to navigate this question, for want of a
 9    better way to phrase it, we can do it as the abbreviation
10    "the *Lindsay* problem" or "the *Lindsay* issue" because I suspect
11    we're going to have some issues floating out there.
12        The Government could propose -- I'm not saying I would
13    give it necessarily but -- an instruction to make clear that it
14    is not a defense that victims might get paid or those issues.
15    And then you wouldn't be -- it might be a clearer path that the
16    defense can go into the areas that they want to about intent
17    without -- with the knowledge that the jury's going to be
18    instructed that that whole area is, to the extent it talks
19    about what happens down the line with the technology and the
20    like, that it's -- that part is not a defense.  It might be
21    that is one way to go.
22            **MR. HIGHSMITH:**  Understood.
23            **THE COURT:**  Okay.
24            **MR. SHEPARD:**  I don't think that's necessary,
25    Your Honor.  I assure the Court, I'm not going to argue that

PROCEEDINGS

```
 1  victims were --

 2          THE COURT:  Well, I know.

 3          MR. SHEPARD:  Our focus on that language relates to

 4  Mr. Andrade's understanding and intent.

 5          THE COURT:  Well, and I understand you can do that,

 6  but I think it's going to be hard to walk that line.  So maybe

 7  you can do it, and I accept your representation that you think

 8  that you'll be able to do that.  I'm just -- I think it's going

 9  to be a tough divide, to some extent.  So, anyway...

10          MR. HIGHSMITH:  Thank you, Your Honor.

11      I'm sorry to hold the party.  Is there any reason we

12  should be planning that it's going to move faster next week

13  than we've just discussed and we might get to closing on

14  Wednesday, or is that -- it's tough because if we don't have --

15  if we only have one witness Monday --

16          THE COURT:  I'll tell you one of my concerns about

17  that --

18          MR. HIGHSMITH:  Yeah.

19          THE COURT:  -- is then I'm gone Thursday-Friday.

20          MR. HIGHSMITH:  Yeah.

21          THE COURT:  And that doesn't preclude my asking one of

22  my colleagues to take the verdict or deal with questions, but

23  this is a complicated enough case that I would rather be

24  available.

25      And so if we did that, I would have to tell them, "Okay.
```

**PROCEEDINGS**

1   You've heard all this, but don't come and start deliberation

2   until Monday."  I don't -- I don't like that.

3           **MR. HIGHSMITH:**  Understood.

4           **THE COURT:**  Okay.

5           **MR. HIGHSMITH:**  Got it.

6       Thank you, Your Honor.

7           **MR. SHEPARD:**  Thank you, Your Honor.

8           **THE COURT:**  Okay.  Have a good weekend.

9           **MR. CHOU:**  Thank you.

10          (Proceedings adjourned at 1:27 p.m.)

11                  ---o0o---

12

13              **CERTIFICATE OF REPORTER**

14      I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  DATE:  Saturday, March 1, 2025

18

19

20

21                  _Ana Dub_

22      _____

23      Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

24      CSR No. 7445, Official United States Reporter

25