**Volume 15**

**Pages 2429 - 2452**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   **NO. 3:20-CR-00249 RS** |
| | ) |
| ROWLAND MARCUS ANDRADE, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Monday, March 3, 2025


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    PATRICK D. ROBBINS
                    ACTING UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
             **BY:  CHRISTIAAN HIGHSMITH**
                    **DAVID J. WARD**
                    **MATTHEW CHOU**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    KING & SPALDING, LLP
                    50 California Street, Suite 3300
                    San Francisco, California 94111
             **BY:  MICHAEL J. SHEPARD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1   **APPEARANCES:** (CONTINUED)

2   For Defendant:
                            KING & SPALDING, LLC
3                           1700 Pennsylvania Avenue, NW
                            Washington, D.C. 20006
4                   BY:   **KERRIE C. DENT, ATTORNEY AT LAW**

5                           KING & SPALDING, LLC
                            1185 Avenue of the Americas, 34th Floor
6                           New York, New York 10036
                    BY:   **DAINEC P. STEFAN, ATTORNEY AT LAW**

7

8                           LAW OFFICES OF CINDY A. DIAMOND
                            58 West Portal Avenue, Suite 350
9                           San Francisco, California 94127
                    BY:   **CINDY A. DIAMOND, ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2

3    Monday, March 3, 2025 - Volume 15

4                                          <u>**PAGE**</u>   <u>**VOL.**</u>

5    Proceedings                           2432    15

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Monday - March 3, 2025**</u>                                    <u>**10:00 a.m.**</u>

P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

(Defendant not present.)

**THE COURTROOM DEPUTY:**  Please come to order.

**THE COURT:**  Good morning.

**MR. HIGHSMITH:**  Good morning.

**THE COURT:**  So I had a few odds and ends that I wanted to talk to you about.

But, first of all, why don't you -- what's the status with respect to the defendant?

**MS. DENT:**  He is out of the hospital.  He was released from the hospital last evening.  He's back in the hotel and he's resting.  So...

**THE COURT:**  Our expectation is we can proceed tomorrow; correct?

**MS. DENT:**  We hope that that's what we can do.

And he's going to wear a mask.  My understanding, from what the doctor said yesterday, was that once the fever broke, he would still be contagious for 24 to 48 hours.  So I think everyone may want to mask up if they're going to be anywhere near him.  I know I probably will, since I sit next to him at the counsel table but --

**THE COURT:**  That's fine.

**PROCEEDINGS**

1    I wasn't going to force the issue about him watching

2    virtually, but, of course, if this goes on for a while, we have

3    to revisit that because --

4         **MS. DENT:**  Understood.

5         **THE COURT:**  -- we can't lose time like this.

6    Okay.  That takes care of that issue.

7    I did look through materials regarding the Min testimony,

8    and I wanted to give you some guidance on that.

9    I do have some concerns about the authentication issues

10   with respect to the source code, but that was litigated before.

11   My view is that's something the Government can test with Min on

12   cross; so I'm not going to exclude it.

13   I do -- and I think that Mr. Min -- is it mister? doctor?

14   What is it?

15        **MS. DENT:**  Mister.

16        **THE COURT:**  Mister.

17   Mr. Min can testify about, in the 2017-2018 period,

18   whether or not it was advancing towards functionality; but what

19   he can't testify to, he cannot render an opinion that in 2020

20   it would have been functional.

21   The focus here is, even from the proffers that the defense

22   has made, what Mr. Andrade knew or his understandings in the

23   period of time in which the alleged misrepresentations were

24   made.  Whether or not years later it would have worked or not

25   worked is not relevant.  So that is not a permissible area for

1    his testimony.

2         That's it with Mr. Min.  I'm going to move on to something

3    else unless anybody has --

4         **MR. SHEPARD:**  May I just briefly address the years

5    later point?

6         I mean, I understand where the Court is coming from on

7    that, but I believe the Government has opened the door to that

8    by continually asking witnesses:  Did it ever work?  Did it

9    ever work?  Did it ever work?  Did it ever work?

10        **THE COURT:**  Who wants to respond to that on

11   the Government's side?

12        **MR. CHOU:**  Well, Your Honor, the gravamen of the

13   charge is for the conspiracy period July 2017 through

14   October 2018.  By asking our victim witnesses whether it ever

15   worked, I don't think we were specifically trying to draw

16   attention to 2020 or 2019.  It was more of a general question

17   about whether they ever saw anything work with respect to their

18   investment in the product.

19        **THE COURT:**  You might have confined it more to the

20   time period, but I don't think whether or not it would ever

21   work later on is -- whether or not you suggested -- you didn't

22   close out the time period.  I don't think it's appropriate to

23   go into that.  I also think it's pretty speculative as to

24   whether or not it would ever work.  But it's certainly not an

25   area of expert opinion testimony about whether or not the thing

1    would have worked or not.  So that's my ruling on that.

2        The next issue I want to talk about is the jury

3    instructions.  I am going to send you this afternoon a draft

4    set.  It's not what either side asked for in total.  So look

5    through it because I have not given some instructions people

6    wanted; I have added things.  So neither side got a hundred

7    percent.

8        What I would like to do is to use that as the jumping-off

9    point.  However you want to memorialize your objections, I

10   leave it to you to do.  You've each submitted your proposed

11   set.  So in some ways, I think you've preserved your position

12   to the extent that the final instructions don't match up with

13   what you proposed; but if you, nonetheless, want to make an

14   objection, that's fine with me.  You can do it any way you want

15   to do it.

16       There are a couple of instructions that are -- that need

17   information, and those are impeachment instructions in

18   particular.  So there will be brackets, and I do want the

19   parties to give me the information or at least tell me what

20   each side wants with respect to that.  But most of it is pretty

21   clear-cut.

22       The set that you will get will have headings on it to make

23   it easy for us to talk about it, but in the set that the jury

24   ultimately gets, I just put a number on the top.  There's no

25   heading.  It just is 1, 2, 3, 4, 5.

**PROCEEDINGS**

1    I don't think this set of instructions has the issue of

2    referring back, which sometimes can be a problem when we then

3    shuffle it around and then the numbers get all out of kilter.

4    But I don't think -- thinking about it, I don't think we have

5    any that say "Refer to Instruction 1" or "As set forth in

6    Instruction 5" or something like that, which, in my experience,

7    can go off the rails pretty quickly if we lose track of it.  I

8    don't think we have that problem.

9    The Government provided me with a proposed verdict form.

10   I haven't got anything from the defense.  Does -- I mean, it's

11   Count One, Count Two.  My personal preference -- and I've given

12   up on this.  The instructions and the verdict form talk about

13   the particular statutes.  I guess people think that's useful.

14   I don't think the jury cares.  Title 18, United States Code

15   Section, I don't think it -- I think it's pretty meaningless to

16   the jury, but I've left it in there because people seem to like

17   it.

18   Have you, Mr. Shepard, looked at the verdict form?

19            **MR. SHEPARD:**  We'll look back at them, Your Honor.

20            **THE COURT:**  All right.  So tomorrow be prepared --

21            **MR. SHEPARD:**  Yes.

22            **THE COURT:**  -- to tell me if you have a problem with

23   it.

24   Okay.  So the defense has been busy, and I've gotten a

25   motion last night and I got a motion this morning.  What I

 1  propose to do is to give you just a written order.

 2      I guess my first question, I want to -- most of these are

 3  rehashes of what we've all discussed ad nauseam here.  I think

 4  the one this morning may be something new.  I'm trying to

 5  remember what --

 6      **MR. SHEPARD:**  It is -- it is new, although the Court

 7  did address -- it's a -- it's a different way to impeach

 8  Dillman.

 9          **THE COURT:**  Dillman, yes.

10      **MR. SHEPARD:**  The Court did address a separate attempt

11  to address Dillman, but this one is new.

12          **THE COURT:**  All right.  So the one that was filed last

13  night, if the Government wants to respond to it, you need to do

14  it quickly because I want to issue an order on it, frankly.

15      With the one this morning, because it's a bit of a new

16  twist on an old song, if you want, certainly, you can respond;

17  but because I don't want this to hold up our progress, I'm

18  going to want something fast.

19          **MR. HIGHSMITH:**  Got it.  Yes.

20          **THE COURT:**  So when would you -- well, number one, do

21  you propose to file something with respect to either or both of

22  these?  And if so, when will I get it?

23      **MR. CHOU:**  Your Honor, whatever deadline you set, we

24  will meet.  It'll just determine how thorough the response will

25  be.

1        I think the Government's initial response with respect to

2   the emails purportedly received by the defendant would refer

3   back to the motion we previously filed.  And particularly,

4   there were quite a few emails in there that are nested hearsay.

5        So like in the *United States v. Bishop* case where you had

6   a witness who was claiming to talk about something that the

7   defendant had heard, in a lot of emails that the defense tees

8   up, there are statements that are quoted from David Mata, who

9   then forwards it on to Special Agent Ablett.  And so you have

10  the same sort of issue there, where you have to assume the

11  truth of David Mata's quoted statements to therefore make the

12  conclusion that Mr. Andrade received those emails.  So I just

13  stress that point.

14        And then with respect to the Christine Lee testimony, the

15  victim of Japheth Dillman, even though rule -- the rule that

16  the defense cites allows impeachment of out-of-court

17  declarants, it's only through otherwise admissible means.  And

18  even if Mr. Dillman took the stand, I don't think the defense

19  could call in some outside witness to impeach him with

20  extrinsic evidence about his other acts unrelated to this case.

21        Christine Lee was a circus troupe performer, as I

22  understand it.  And so in any event, I don't think that comes

23  in either.

24        **THE COURT:**  There's apparently some circuit split on

25  this issue.  There's the Second Circuit versus the Third and

**PROCEEDINGS**

 1    the D.C., something like that.  I have to look back on it.

 2          **MR. SHEPARD:**  The law is definitely mixed on it.

 3          **THE COURT:**  All right.

 4          **MR. SHEPARD:**  But our view is, the rule has no meaning

 5    if you can't do this.  There's -- 806 allows you to impeach the

 6    witness as if the witness was here if you can't put on

 7    extrinsic -- it's not like I can ask Dillman a question.  So

 8    the only way the rule has any meaning is if we can put on the

 9    evidence.  That's -- that's our position.

10       And, yes, I think the law is mixed on the question.

11          **THE COURT:**  Okay.  I'll look at it.

12       But going back to the issue of what, if anything,

13    the Government wants to file.

14          **MR. CHOU:**  We can do it today, Your Honor.  And what

15    time would the Court like?

16          **THE COURT:**  Well, I'd like it by, like,

17    about 2 o'clock or something so I can --

18          **MR. CHOU:**  Yes, Your Honor.

19          **MR. SHEPARD:**  And if I may just address the other

20    thing Mr. Chou said about nested and targeted and -- I mean, we

21    have identified, in the motion we filed -- I don't remember

22    whether it actually fell into last night or early this morning,

23    but that one -- we have identified some very specific language

24    in the weekly management updates, and if that's all the Court

25    would want us to admit, we would just admit the very specific

1    language.  It's not nested.  It's not anything.  It's just a

2    report on the status of the technology that Mr. Andrade

3    received.

4         MR. CHOU:  Just an initial response, Your Honor, is,

5    one, I'm not sure that's at all authenticated.  It's from

6    emails that have a defense Bates stamp or no Bates stamp.

7         And, secondly, I think as the Court correctly identified

8    when it came up in the moment, it's, at a minimum, 403,

9    confusing and prejudicial because it includes all these

10   different entries from various declarants purporting to talk

11   about all these different technical issues; and at most,

12   I think they got in the fact that Mr. Andrade received

13   management updates.

14        THE COURT:  I mean, at a certain point, it also has a

15   cumulative issue because I do think there's already in the --

16   evidence in the trial that Mr. Andrade had been told in some

17   respects that the technology was advancing.  I don't remember

18   exactly which evidence it is, but I think it's in there.

19        But be that as it may, okay.  I'll take a look at what you

20   give me, and I'll try to get something as soon as I can.

21        So that brings us to tomorrow.  The list that I -- you had

22   given me for today was Eric Min, Eric Olsen, Raul Torres, and

23   Dr. Armstrong was going to be Tuesday.  So has this changed --

24   Mr. Andrade's situation changed our batting order?

25        MR. SHEPARD:  Not materially.  We're still considering

1  whether we're going to call Eric Olsen, but I expect tomorrow

2  would be Torres, who will be very short, followed by Min.  And

3  if we get through Min, then Armstrong.

4      **THE COURT:**  Armstrong -- at some point you had told me

5  Armstrong had some scheduling issues and needed to be Tuesday.

6      **MR. SHEPARD:**  Yes.  That meant he couldn't be here

7  today.

8      **THE COURT:**  Yes.

9      **MR. SHEPARD:**  He is available Tuesday and also

10 Wednesday.

11     **THE COURT:**  All right.  Today was the problem?

12     **MR. SHEPARD:**  Yes, today was the problem.

13     **THE COURT:**  Okay.  All right.

14     **MR. SHEPARD:**  So we're good to go with those.

15     If we can call Christine Lee, she would also be very

16 short.  That's the Dillman impeachment witness.

17     **THE COURT:**  All right.  Yes.

18     **MR. SHEPARD:**  She would be very short.  We would want

19 to do her as soon as we could.

20     And then the only remaining thing is, we've asked

21 the Government to stipulate to the authenticity of certain

22 Government-seized exhibits and also to stipulate to the

23 completion of impeachment of witnesses who either denied or did

24 not recall statements they made to the FBI.

25     If the Government agrees, great.  If the Government does

**PROCEEDINGS**

 1    not agree, then we may need to call a couple of FBI agents.

 2        And, obviously, I can't speak to whether Mr. Andrade will

 3    testify because that's his decision --

 4            **THE COURT:**  When will you be able --

 5            **MR. SHEPARD:**  -- ultimately.

 6            **THE COURT:**  -- to speak to that, do you think?

 7            **MR. SHEPARD:**  Well, I would love to be able to speak

 8    to it right now, and you can probably imagine what I am

 9    recommending to him.  But ultimately, as everyone knows, that's

10    his choice, and I can't --

11            **THE COURT:**  Right.

12            **MR. SHEPARD:**  -- make it for him.

13            **THE COURT:**  Well, you can tell him -- I'm in complete

14    agreement with everything you've just said.  At a certain

15    point, he has to call the question.

16            **MR. SHEPARD:**  Agreed.

17            **THE COURT:**  And I'll give him leeway.  We're now into

18    your case, and -- but I think you can communicate to him for me

19    that when we do have our break Wednesday -- then Thursday,

20    Friday we're not in session -- I would hope by Wednesday he

21    will be prepared to tell me.

22            **MR. SHEPARD:**  Yes.

23            **THE COURT:**  Okay.

24            **MR. SHEPARD:**  I will communicate that to him.

25    Thank you.

PROCEEDINGS

1          **THE COURT:**  All right.

2      So anything else while we're together?

3          **MR. HIGHSMITH:**  I think that's it, Your Honor.

4          **THE COURT:**  Okay.

5          **MR. STEFAN:**  Your Honor, if I could just get as much

6   clarity as possible on the scope of the Court's restriction on

7   Min's testimony.

8      So he can speak to development of the technology in 2017

9   and 2018 but can't render an opinion that in 2020 it would have

10  been functional?

11         **THE COURT:**  Right.

12         **MR. STEFAN:**  What about developments of the technology

13  past 2018?  So developments that were occurring in 2019, say?

14         **THE COURT:**  Well, I don't think there's much relevance

15  to that.  I mean, your -- meaning the defense -- presentation

16  has been that Mr. Andrade -- the important point you want to

17  make is that at the time of the alleged misrepresentations, he

18  was under the impression that it was a real deal, that there

19  was real technology there, and that it had the promise perhaps

20  of working.

21     After that, it's really not relevant if it -- whatever

22  happens to the technology because it doesn't go to his good

23  faith or lack thereof when he's making these representations.

24     So whether or not the thing could have worked in 2022 or

25  2025 doesn't matter.

**PROCEEDINGS**

1       So 2019, if it's after the alleged representations, I

2   don't think it has much relevance, if any.

3       **MR. CHOU:**  And to confirm, just for the record, the

4   investors at issue that the Government put up as witnesses all

5   invested in 2018 or sooner.

6       **THE COURT:**  Right.  So use those dates as your cutoff.

7       **MR. STEFAN:**  The one --

8       **MR. SHEPARD:**  Go ahead.

9       **MR. STEFAN:**  The one clarification I'd ask for is that

10  part of Mr. Min's testimony is essentially, given the

11  restrictions of the world in which he's operating, he has a

12  dataset and the dataset is from a repository with date stamps

13  that start in 2018, like November of 2018, later 2018.

14      But the volume of the material is such that he will opine

15  that there is -- there's no way that all of this material which

16  was entered into their repositories was created all at the

17  initiation date in November of 2018 but that this was the

18  product of development that had occurred prior to that point.

19  And he would back that up with date stamps that appear within

20  the databases in that repository, if that makes sense.

21      **THE COURT:**  That's part of the problem of why you're

22  on shaky ground of this coming in at all, because the

23  authentication issues are pretty squirrelly here.

24      I'm willing to let you use Min to go down this path, but

25  you can't now bootstrap the very fact that there's some

 1  problems with our necessarily saying you've shown enough to

 2  show that was the source code that was at issue during the

 3  operative time and say:  Well, now we can go way into the

 4  future because that goes -- relates back to the past.  That's a

 5  problem for you rather than the opportunity to go later on.

 6      So, no.  I mean, all he can testify to, as far as I'm

 7  concerned, is to say that as of the date, it's his opinion that

 8  there was some real "there" there in terms of technology, not

 9  that it ever worked or ever could work.  It's a snapshot in

10  time, and his basis for that is this repository that he thinks

11  is indicative of what the source code was at the time.

12      And the Government can say, "Well, you don't really have a

13  basis for thinking that was the source code at the time."  They

14  can do that.

15      Now, the problem is maybe in answering that question, if

16  the Government goes down that path, he will say, "Well, I have

17  to refer to something from 2019 and 2020 and 2021."

18      I don't know how you don't open the door on that, but

19  that's up to you.

20          **MR. SHEPARD:**  But to make sure we're following, what

21  I'm understanding is the Court is saying his testimony about

22  the state of the technology should be confined to some period,

23  and I would like to talk a little bit --

24          **THE COURT:**  I agree.

25          **MR. SHEPARD:**  -- about what that period is.

1      **THE COURT:**  I mean, I understand what you're saying.

2      As I understand his testimony, he is going to say that in

3  trying to glean what the technology was in 2018, he is looking

4  at material from a later period because he thinks that tells

5  him what --

6      **MR. SHEPARD:**  Yes.

7      **THE COURT:**  -- the state of the world was in 2018.

8      I understand that, and I don't have a problem with that,

9  although I think the Government can also go after that and say,

10  "Well, you don't have any basis for thinking that's the case."

11      What I don't think you can do is to have him opine that

12  after the period that the misrepresentations have come and

13  gone, alleged misrepresentations, that after that point, he is

14  of the opinion that this technology, by 2020, by 2021, whenever

15  it is, would have worked.  He can't opine about that.

16      **MR. SHEPARD:**  I --

17      **THE COURT:**  Does that make sense?

18      **MR. SHEPARD:**  Yes, that makes sense.

19      The important thing for us is the fact that he's got to

20  work a little backwards to get to the --

21      **THE COURT:**  I understand.

22      **MR. SHEPARD:**  -- the period that the Court has said we

23  should focus on.

24      In terms of that period, though, I do recall -- and if

25  it's important, we can dig this out -- there was testimony

from, I think, Evan Carlsen that went into 2019 in terms of his work on the technology and things like that.

So I think -- I understand the Court's ruling about 2020. I do think that, in light of what the Government has proved, though, that 2018 is too soon of a cutoff.

**THE COURT:**  Well, I'm focusing on the timing of the alleged representations because that is the critical time.

Your position is Mr. Andrade's good faith.  His good faith rises or falls at that time.  It doesn't matter if in 2019 he's -- it doesn't matter what he's thinking in 2019, quite frankly, because the representations that the Government is making have come and gone.

And you're going to make the point that, I assume in many different ways, that he can only be convicted of whether or not those were misrepresentations at the time they were made; that what happens afterwards, if he does things that the jury doesn't like, they can't convict him for that, because that's going to be one of your points.  So for good or for bad, we're focused on that.

So what happens -- I mean, I don't know about -- I don't remember that testimony offhand.  But I'm not disputing that work is going on in 2019 for this code, but I don't think it's relevant.

**MR. SHEPARD:**  I think the door was opened to it, but I think I understand where the Court's coming from.

1        If I could just --

2            **THE COURT:**  Yeah.

3            **MR. SHEPARD:**  -- confer for a moment.

4            **THE COURT:**  Does that make sense to you, Mr. Chou?

5            **MR. CHOU:**  Yes, Your Honor.

6        And just to respond for the record on Evan Carlsen's

7    testimony, his testimony was that in November of 2018, which is

8    a month after the charged indictment period, that he was

9    starting from scratch.  So that's a different sort of line of

10   testimony than saying that around the times the misreps were

11   being made, that there was technology in place.  Actually,

12   quite to the contrary.  And he's not an investor, Your Honor.

13       If we were moving off of Eric Min, I wanted to just touch

14   on a couple brief things regarding the jury instructions, more

15   just logistical questions.

16           **THE COURT:**  Okay.

17           **MR. CHOU:**  So first, I'm not sure if the Court was

18   already contemplating this, but could the parties receive a

19   Word document version of the jury instructions to work off of?

20           **THE COURT:**  Yes.

21           **MR. CHOU:**  And then, secondly, the Court, I believe on

22   Friday, had flagged the idea of potentially a supplemental

23   instruction on this idea of *United States v. Lindsay* and being

24   able to walk the fine line between introducing evidence --

25           **THE COURT:**  Well, I think you will find -- look at the

**PROCEEDINGS**

 1    instructions I'm going to send you first.

 2        My inclination now, as you will see, over the Government's

 3    objection, is to include a good faith element in one of the

 4    instructions.  But in the good faith element, there's language

 5    that also says it's not a defense that maybe someday the

 6    victims would get their money back or whatever.  I think I've

 7    folded those two things into one concept.  So take a look.

 8        Now, I don't think a standalone -- now that I've gone over

 9    the instructions again over the weekend, I don't think a

10    standalone is needed, but that doesn't preclude you from asking

11    me for it if you think it doesn't do it.

12        **MR. CHOU:**  Understood, Your Honor.

13        Thank you.

14        **MR. SHEPARD:**  One last thought that I just got

15    triggered, and that is, I appreciate the Court's point about

16    the effect on investors and the time period of intent that

17    matters as it relates to representations.

18        I do think, in a larger sense, though, one's good faith

19    can be judged by things that they continue to do.  And the fact

20    that there's continued work on the technology, even after all

21    the investor money has come in -- you know, it's not like he's

22    defrauding more investors; he's continuing to work on the

23    technology, still trying to make it work, which I think is a

24    reflection of his --

25        **THE COURT:**  Well, I think there's some --

1          **MR. SHEPARD:** -- his good faith.

2          **THE COURT:** -- evidence of that now.

3     Remember, what we're talking about is Min's opinion; and

4     what I'm saying is off base is the ultimate decision -- the

5     ultimate opinion by him that "Hey, this would have worked."

6     That's what I don't think there's any basis for.

7          I think we already have some evidence that beyond the

8     period where the misrepresentations are made, that stuff is

9     going on, but that's already in the record.

10         Besides which, Min is not the witness who's going to be

11    talking about the timeline.  I mean --

12         **MR. SHEPARD:** Well, he could be talking about

13    continued work in 2019.

14         **THE COURT:** Well, yeah.  I -- well, that's --

15         **MR. SHEPARD:** And that's a basis for.

16         **THE COURT:** The proposition, not if the thing would

17    ever have worked, but the fact of continued work, what's

18    the Government's view on that?

19         **MR. HIGHSMITH:** I don't see how -- we have that

20    testimony.  We've got the testimony that there was continued

21    work into 2019.  We think it's -- the reason that's in is

22    because during the relevant period, there was no tech.  So to

23    show that they were still working in 2019 shows, okay, well,

24    during 2018 and 2017, there was no technology; that's why they

25    had to keep working on it.

1        Min is dangerous because of the reliability of his

2    opinions.  What he says about what is happening in 2019, what

3    he's opining, it's not relevant to the key period, 2018-2017.

4        **THE COURT:**  Well, I also think -- I do think there's

5    some evidence in there of going into 2019.  You just alluded to

6    Mr. Carlsen, for example.

7        Min is not a fact witness.  So I don't know why he -- he's

8    not presenting any facts.  He's saying what he relies on.  And

9    I understand from our discussion that there'll be some

10   post-misrepresen- -- alleged misrepresentation period that will

11   go to this question of why he thinks this is indicative of what

12   the software was in the operative period.  But beyond that, I

13   don't think he should be talking about later years or later

14   periods.

15       His opinions about that are only relevant on the issue of

16   why he thinks this was the operative software back in

17   2017-2018, not that work is continuing in 2019.  I don't think

18   he's the witness to talk about that, frankly.

19       **MR. SHEPARD:**  Well, he does have a basis as an expert

20   for that, based on the review of the code that shows work being

21   done in 2019.  So --

22       **THE COURT:**  Well, you already have testimony that work

23   was continuing in 2019.  I don't know -- what is his opinion

24   going to be?  That there was work in 2019?

25       **MR. SHEPARD:**  Yes.

**PROCEEDINGS**

1          **THE COURT:**  That's kind of just restating the facts

2   you already have in there.

3          I mean, and then the only opinion he could have is, well,

4   it's the quality of the ongoing work, and I'm not going to let

5   you talk about that.  So --

6          **MR. SHEPARD:**  Okay.  Understood, Your Honor.

7          **THE COURT:**  Okay.

8          All right.  The longer we stay here, the more issues you

9   guys come up with.

10                         (Laughter.)

11          **MR. HIGHSMITH:**  We have a 2 o'clock deadline, so we

12   need to get back.

13          **THE COURT:**  I think we should call it a day.

14          So, all right.  Okay.

15          **MR. HIGHSMITH:**  Thank you, Your Honor.

16          **MR. CHOU:**  Thank you.

17              (Proceedings adjourned at 10:30 a.m.)

18                      ---o0o---

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Tuesday, March 4, 2025

7

8

9

10                          _Ana Dub_

11    _____

12           Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13         CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25