**Volume 17**

**Pages 2665 - 2845**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO.  3:20-CR-00249 RS** |
| | ) | |
| ROWLAND MARCUS ANDRADE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, March 5, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        PATRICK D. ROBBINS
                        ACTING UNITED STATES ATTORNEY
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                BY:  **CHRISTIAAN HIGHSMITH**
                        **DAVID J. WARD**
                        **MATTHEW CHOU**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        KING & SPALDING, LLP
                        50 California Street, Suite 3300
                        San Francisco, California 94111
                BY:  **MICHAEL J. SHEPARD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                        CSR No. 7445, Official United States Reporter

1    **APPEARANCES:** (CONTINUED)

2    For Defendant:

3                             KING & SPALDING, LLC
                             1700 Pennsylvania Avenue, NW
                             Washington, D.C. 20006
4                    BY:    **KERRIE C. DENT, ATTORNEY AT LAW**

5                             KING & SPALDING, LLC
                             1185 Avenue of the Americas, 34th Floor
6                             New York, New York 10036
                     BY:    **DAINEC P. STEFAN, ATTORNEY AT LAW**

7

8                             LAW OFFICES OF CINDY A. DIAMOND
                             58 West Portal Avenue, Suite 350
9                             San Francisco, California 94127
                     BY:    **CINDY A. DIAMOND, ATTORNEY AT LAW**

10

11   Also Present:          **Special Agent Brendon Zartman**
                            **Tina Rosenbaum, Paralegal**
12                           **Ed Jackson, Trial Technician**

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3    Wednesday, March 5, 2025 - Volume 17

 4

 5                                               PAGE  VOL.

 6    Defense Rests                              2813   17

 7

 8    GOVERNMENT'S WITNESSES                     PAGE  VOL.

 9    QUINN, ETHAN (CALLED IN REBUTTAL)
        (SWORN)                                  2813   17
10    Direct Examination by Mr. Ward             2813   17
      Cross-Examination by Mr. Stefan            2827   17
11

12    GREGORY, AMANDA (CALLED IN REBUTTAL)
        (SWORN)                                  2835   17
13    Direct Examination by Mr. Highsmith        2835   17

14

15    DEFENDANT'S WITNESSES                      PAGE  VOL.

16    ARMSTRONG, LEVI (RECALLED)
        (PREVIOUSLY SWORN)                       2697   17
17    Direct Examination resumed by Ms. Diamond  2697   17
      Cross-Examination by Mr. Highsmith         2754   17
18    Redirect Examination by Ms. Diamond        2780   17
      Recross-Examination by Mr. Highsmith       2792   17
19

20

21                      E X H I B I T S

22    TRIAL EXHIBITS                      IDEN  EVID  VOL.

23      23                                      2823   17

24      671                                     2817   17

25      672                                     2817   17
```

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 705 | | 2815 | 17 |
| 807 | | 2820 | 17 |
| 2327 | | 2808 | 17 |
| 2333 | | 2808 | 17 |
| 2334 | | 2808 | 17 |
| 2337 | | 2808 | 17 |
| 3056 | | 2805 | 17 |
| 3202 | | 2808 | 17 |
| 3344 | | 2805 | 17 |
| 3392 | | 2805 | 17 |

| | |
|---|---|
| 1 | **Wednesday - March 5, 2025**                                    **8:09 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | (Defendant present, out of custody.) |
| 5 | (Proceedings were heard out of the presence of the jury.) |
| 6 | **THE COURTROOM DEPUTY:**  Please come to order. |
| 7 | **THE COURT:**  All right.  Good morning. |
| 8 | **MR. HIGHSMITH:**  Good morning. |
| 9 | **THE COURT:**  So what's first? |
| 10 | **MR. SHEPARD:**  Well, there's quite a list, so let me -- |
| 11 | **THE COURT:**  Why should there be quite a list at this |
| 12 | point in time? |
| 13 | **MR. SHEPARD:**  Well -- |
| 14 | **THE COURT:**  Go ahead. |
| 15 | **MR. SHEPARD:**  -- I guess -- |
| 16 | **THE COURT:**  Go ahead.  I don't want to waste time.  Go |
| 17 | ahead. |
| 18 | **MR. SHEPARD:**  Number one on my list, the Court had |
| 19 | asked us to remind the Court about Mr. Andrade and his right to |
| 20 | testify -- |
| 21 | **THE COURT:**  Yes. |
| 22 | **MR. SHEPARD:**  -- and whether we would do that this |
| 23 | morning.  So that's number one. |
| 24 | Number two on my list is that there are several documents |
| 25 | that the Court has now allowed us to admit that the Court |

1  previously said we could not admit, two sets of them, in the

2  presence of the jury.  So I just wanted to let the Court know,

3  and I think we had talked about the Court advising the jury.

4  This is 3202, 2337, 2333, 2334, and 2327.

5      The last four have all been redacted in compliance with

6  the Court's order.  We have sent the redacted versions to

7  the Government.  They agree that we have redacted those

8  documents in compliance with the Court's order.

9          **THE COURT:**  In that regard, the Government's motion

10  that I got yesterday or this morning, there's some discussion

11  about more of these.

12          **MR. SHEPARD:**  No.

13          **THE COURT:**  No.  This is it?

14          **MR. SHEPARD:**  This is -- and, you know, just in the

15  dizzy back-and-forth the last few days, we had sent

16  the Government on Sunday, before the Court's ruling -- I think

17  it might have been Saturday; it was over the weekend -- we sent

18  the Court -- the Government a list of things we asked them to

19  agree to the authentication of --

20          **THE COURT:**  Okay.

21          **MR. SHEPARD:**  -- and did they have any other

22  objections.

23      They did not respond to that until we got this motion late

24  last night.  And, you know, in the intervening period of time,

25  the Court had ruled on the --

PROCEEDINGS

1          **THE COURT:**  I gotcha.

2          **MR. SHEPARD:**  -- weekly management updates.

3          **THE COURT:**  So could you run that list of exhibits by

4   me again?

5          **MR. SHEPARD:**  2337.

6          **THE COURT:**  2237.

7          **MR. SHEPARD:**  2337.

8          **THE COURT:**  2- --

9          **MR. SHEPARD:**  It's 2337.

10          **THE COURT:**  -- 337.

11     2237 and 2337?

12          **MR. SHEPARD:**  No.  Just 2337.

13          **THE COURT:**  2337.  Okay.

14          **MR. SHEPARD:**  2333.

15          **THE COURT:**  2333.

16          **MR. SHEPARD:**  2334.

17          **THE COURT:**  2334.

18          **MR. SHEPARD:**  And 2327.

19          **THE COURT:**  2327.

20     Okay.  And you want -- and these are the ones that have

21   been redacted consistent with my order, and you want me to

22   admit them.  And anything else?

23     And they want a limiting instruction that says [as read]:

24          "You're about to hear evidence" -- "You're about

25     to hear evidence that is being received for a limited

**PROCEEDINGS**

1          purpose.  I instruct you that this evidence is

2          admitted only for the limited purpose of its effect

3          on Mr. Andrade; and therefore, you must consider it

4          only for that limited purpose and not for any other

5          purpose."

6               **MR. SHEPARD:**  Yes.

7               **THE COURT:**  Okay.

8               **MR. SHEPARD:**  So there are two sets of these.  One is

9    3202, and the other are these four.  They both were previously

10   offered, and in the presence of the jury, the Court excluded

11   them; so I think the Court should address that as they are now

12   being admitted, just to say --

13              **THE COURT:**  Oh, you want me to say, "I made a mistake,

14   and I want to" --

15              **MR. SHEPARD:**  No.  No.

16                              (Laughter.)

17              **THE COURT:**  What do you want me to tell them?

18              **MR. SHEPARD:**  I do not want to say -- I just want them

19   to know that they previously heard this exhibit was excluded

20   and --

21              **THE COURT:**  By the way, I don't think I made a

22   mistake.  I got further argument and then --

23              **MR. SHEPARD:**  I did not --

24              **THE COURT:**  I'm kidding.  I'm kidding, Mr. Shepard.

25   I'm kidding.

PROCEEDINGS

```
 1                        (Laughter.)

 2          MR. SHEPARD:  Okay.  Okay.  That's all --

 3          THE COURT:  Okay.

 4          MR. SHEPARD:  -- I'm asking about that.

 5          THE COURT:  So, but, again, when they come in and I

 6   say -- at what point do you want these admitted into evidence?

 7          MR. SHEPARD:  Well, right now we're in the midst of

 8   Dr. Armstrong.  We don't need to admit them right this moment.

 9          THE COURT:  Right.

10          MR. SHEPARD:  But there'll be a number of cleanup

11   items once he's done.

12          THE COURT:  Okay.

13          MR. SHEPARD:  And this is on that list.

14          THE COURT:  This is post-Armstrong but before the next

15   witness.

16      Okay.  And they'll be introduced.  Are you going to show

17   them to the jury?

18          MR. SHEPARD:  Yeah.  We'll just publish them.

19          THE COURT:  Okay.

20          MR. SHEPARD:  You know, highlight the --

21          THE COURT:  Okay.

22          MR. SHEPARD:  -- relevant portions.

23          THE COURT:  Okay.

24          MR. SHEPARD:  And then I noticed yesterday that

25   the Court did not include the multiple conspiracy instruction
```

 1  that we had requested.  I just wanted to --

 2         **THE COURT:**  Correct.

 3         **MR. SHEPARD:**  -- preserve the record that we are

 4  requesting that instruction, and any others that we requested

 5  that the Court didn't give, I just --

 6         **THE COURT:**  Correct.  And I think, as I said -- but

 7  feel free.  If you want to file -- if you want to clean it up

 8  with some filing that says -- however you want to phrase it.  I

 9  do think by virtue of you haven't said you're withdrawing any

10  of the ones that you requested, so I think you're -- you've

11  preserved your record; but far be it from -- you've got to

12  preserve the record however you think you want to do it.  So

13  feel free.

14         **MR. SHEPARD:**  Okay.  Thank you, Your Honor.

15      I think -- I think the record is probably good and we have

16  however many --

17         **THE COURT:**  I would think so.

18         **MR. SHEPARD:**  -- filings already.

19      We had proposed a stipulation to the Government, and they

20  got back to us late last night.  This is to obviate the

21  testimony on impeachment witnesses.

22         **THE COURT:**  Yes.

23         **MR. SHEPARD:**  There appears to be one small rule of

24  completeness issue that has been raised about that that would

25  either arise if we stipulated to it or, I guess, if the

 1   witnesses were -- if the witness were called.  So I thought we

 2   could address that.  It's a pretty simple one.

 3       Let me --

 4           **THE COURT:**  What's that one?

 5           **MR. SHEPARD:**  -- make sure.

 6       If I could just hand -- this is --

 7           **MR. HIGHSMITH:**  I've got it.

 8           **MR. SHEPARD:**  -- the email that you sent me.

 9           **MR. HIGHSMITH:**  I have kind of a nice version with

10   some highlights on it.

11           **MR. SHEPARD:**  So there are -- this is -- it's -- the

12   highlighting is probably rather faint, but this is just --

13           **MR. HIGHSMITH:**  Here's a nice version.

14           **MR. SHEPARD:**  Yeah, that's an easier version.

15           **THE COURT:**  Okay.

16               (Document handed up to the Court.)

17           **THE COURT:**  Okay.  So --

18           **MR. SHEPARD:**  So I'm okay with the first of those two.

19       The second of those two goes onto a new sentence, and

20   based on the Court's earlier ruling when we were seeking

21   completeness, I'm good with completing a sentence.  I don't

22   think we go on to the next sentence.

23       So the second one, I think, should be limited just to the

24   statement that we -- that the witness denied making or said he

25   did not recollect making and not the next sentence.

 1          The first proposed addition, I'm fine with.  It's in the

 2     same sentence.

 3          And I have the whole 302 if the Court wants to look at

 4     that.

 5               **THE COURT:**  Okay.  So what's your --

 6               **MR. HIGHSMITH:**  The issue --

 7               **THE COURT:**  -- perspective?

 8               **MR. HIGHSMITH:**  This is a 302.  It's the agent's notes

 9     of an interview, and the defense wants to cut off the agent's

10     best recollection of the conversation; so -- and, therefore,

11     present a misleading version of events.  So we just want to not

12     cut off the agent from answering the question.

13               **THE COURT:**  So who's the agent going to be?

14               **MR. HIGHSMITH:**  Special Agent Zartman.

15               **THE COURT:**  Okay.  So he's going to get on the stand.

16     And what is the -- what additional --

17               **MR. HIGHSMITH:**  The highlighted.

18               **THE COURT:**  I see what Mr. Shepard wants.  I'm not

19     sure what you want.

20               **MR. HIGHSMITH:**  The highlighted portions in the email,

21     the yellow.

22               **THE COURT:**  Just these two things?

23               **MR. HIGHSMITH:**  Yeah.  Exactly.

24               **THE COURT:**  Okay.

25          [As read]:

PROCEEDINGS

1          "Never read the white paper about the company

2       and was never asked to read it."

3          **MR. SHEPARD:**  And I'm okay with that one.  It's in the

4   same sentence -- following what the Court earlier ruled, it's

5   in the same sentence, I'm okay.

6          **THE COURT:**  So 1 and 2 are fine.

7          **MR. SHEPARD:**  Well, no.  Yes, 1 and 2 are fine.  And

8   then we're talking about 3, the proposed addition in 3 --

9          **THE COURT:**  Okay.

10          **MR. SHEPARD:**  -- which is a new sentence.

11          **THE COURT:**  So you don't want [as read]:

12           "However, this discussion was aspirational" --

13          **MR. SHEPARD:**  Correct.

14          **THE COURT:**  -- dot-dot-dot.

15          **MR. SHEPARD:**  And, you know, the sentence goes on.

16   That's sort of cutting off the sentence in the middle, but

17   that -- the sentence goes on from there.

18      I mean, this is just -- we're just impeaching him on what

19   he said he didn't say.

20          **THE COURT:**  Okay.  I don't think we need the "however"

21   sentence, so we'll end it at "adopt AML BitCoin," period.

22      Okay.  Next?

23          **MR. SHEPARD:**  Okay.

24          **MR. HIGHSMITH:**  Then I think we can do that by

25   stipulation.

PROCEEDINGS

1      **MR. SHEPARD:**  Yes.

2      **MR. HIGHSMITH:**  We can read that by stipulation --

3      **THE COURT:**  That's fine.

4      **MR. HIGHSMITH:**  -- and not call Special Agent Zartman.

5      **MR. SHEPARD:**  Correct.

6      **THE COURT:**  That's fine.

7      **MR. SHEPARD:**  That's what we proposed.  We're happy to

8  do it either way.  A stipulation will make it faster.

9      **THE COURT:**  Okay.  Next one?

10      **MR. SHEPARD:**  Just for the record, we filed, as

11  the Court suggested, last night ECF 607, which is the full set

12  of impeachment that we had proposed to the Court.  The Court

13  allowed us to do three of those.  I just wanted the record to

14  have the ones -- the full set, and that's what Exhibit 60- --

15  ECF 607 is.  We don't need to talk about it.

16      **THE COURT:**  Would it be clear, if somebody looked at

17  it, what it was?  Or is it just your chart there?

18      **MR. SHEPARD:**  I think we had the chart and we put a

19  title on it.

20      **MS. DENT:**  Yeah.  We added the word "proposed" to the

21  title of the document so that it would be more clear on the

22  record that these were the --

23      **THE COURT:**  Okay.

24      **MS. DENT:**  -- impeachment --

25      **THE COURT:**  I see.

1    **MS. DENT:**  -- that we were requesting.

2    **THE COURT:**  All right.  That's fine.

3    **MS. DENT:**  And that's all we changed.  Otherwise, it's

4    the same.

5    **THE COURT:**  That's fine.

6    **MR. SHEPARD:**  Then the last two items are

7    the Government's filing last night at 10:00-whatever objecting

8    to -- this goes back to what I was mentioning a few minutes

9    ago.  We had sent them a list of documents over the weekend,

10   asked them to agree to the authenticity, asked them if they had

11   other objections they wanted to make.

12   This was the response to it.  And they don't appear to be

13   objecting to the authenticity, but they do have a number of

14   other objections that they have raised, and, obviously, we need

15   to address those at some point in time because we would be

16   proposing to offer those after Dr. Armstrong's testimony.

17   **MR. HIGHSMITH:**  So this is basically, rather than them

18   coming on the fly and saying, "We want to admit these 20

19   exhibits," we're fronting for the Court our objections so that

20   we don't have to do that on the fly at a sidebar or in front of

21   the jury.  So that's what this filing is.

22   **THE COURT:**  Is this a -- is some of this ships that

23   are passing in the night?  That's what I was sort of hearing

24   from Mr. Shepard.  But no?

25   **MR. HIGHSMITH:**  They're relevant because, in our view,

```
 1    some of the Court's rulings for the prior exhibits applies
 2    here.  So they're not ships passing in the night because
 3    they're different exhibits, but there's some similarity with
 4    the Court's prior order on exhibits.
 5         For instance, they want to introduce some additional
 6    weekly management updates, and the Court has issued a ruling on
 7    that.
 8              MR. SHEPARD:  We don't.
 9              THE COURT:  See, that's where I think you may be --
10              MR. SHEPARD:  That was the one --
11              THE COURT:  -- ships passing in the night.
12              MR. SHEPARD:  That was the ships passing in the night.
13              MR. HIGHSMITH:  Okay.
14              MR. SHEPARD:  That was, we had sent that list to them
15    before the Court's ruling.
16              THE COURT:  Right.  So that is, your Section B on this
17    filing, if I'm understanding things correctly, is sort of
18    mooted.
19              MR. SHEPARD:  Correct.
20              THE COURT:  Okay.  So then we've got Number A, which I
21    also thought I had -- for good or for bad, I thought I had
22    ruled before such that this would no longer be an issue.  But
23    these are new documents.  These are new terms and conditions.
24              MR. SHEPARD:  Yes.  I believe this is a different set.
25    The terms and conditions get updated, and that is what is
```

**PROCEEDINGS**

 1  reflected in this offer.

 2      The Government's objection -- their first objection is

 3  hearsay.  The Court has heard that one repeatedly.

 4      The rest of the objection is some rule of law that I've

 5  never heard of before that we can't offer documents in our

 6  defense case.  That would obviously hamper the right to present

 7  an effective defense.

 8      The remaining argument is that we're trying to circumvent

 9  *Lindsay* and blame fraud victims.  I assure the Court I'm not

10  using these to blame fraud victims.  These are a reflection of

11  Mr. Andrade continuing to learn and showing his good faith

12  because these are what is appearing in the terms and conditions

13  on the website.

14      The Government says he's responsible for the website.  The

15  website is maturing, reflecting his good faith, and that's what

16  these exhibits would show, and that's how we would argue them.

17      I'm definitely not suggesting in any way that these --

18  that the victim should have read these terms and conditions

19  and, therefore, Mr. Andrade is innocent.  But he's not -- he's

20  not charged with knowledge of the Ninth Circuit's *Lindsay*

21  opinion.

22          **THE COURT:**  What are the terms and conditions?  How do

23  they show his good faith?

24      The danger that the Government has, I think, fairly

25  pointed out is that the reference in these terms and

**PROCEEDINGS**

 1    conditions, particularly the one that says "Don't expect you're

 2    ever going to get any money back for this," and they have a

 3    legitimate concern that that could lead to a misunderstanding

 4    by the jury that these victims, *caveat emptor*.  It's not --

 5    forget it.

 6        You're saying, "Oh, I'm not going there with this.  I'm

 7    introducing it to show his good faith."  How does it -- I guess

 8    I'm not clear on how it shows his good faith.

 9            **MR. SHEPARD:**  Well, I'll give you one example.  But

10    just to address the Court's concern, the Court, as I followed

11    it, is instructing the jury that that's not a defense.

12            **THE COURT:**  I don't have that.  I don't have it said

13    that way.

14            **MR. SHEPARD:**  Okay.

15            **THE COURT:**  I have it in -- in the good faith

16    instruction, which is a slightly different issue, it is alluded

17    to.  But I haven't yet given an instruction along that lines --

18            **MR. SHEPARD:**  Okay.

19            **THE COURT:**  -- or said I was going to.

20            **MR. SHEPARD:**  But you are -- you are addressing the

21    potential misuse in the instructions.

22        And the Government has been allowed to admit a ton of much

23    more prejudicial evidence based on the fact that the jury is

24    going to be instructed that they should only consider it for

25    these limited purposes.  That's -- and so we're -- the way the

PROCEEDINGS

 1    law works -- and I question this, but this is obviously settled

 2    law -- if the jury is so instructed, that impacts the supposed

 3    prejudice.

 4        And so if the Government gets to introduce evidence that

 5    it thinks is relevant, even though there's, I submit, massive

 6    prejudicial -- unfairly prejudicial value in that because the

 7    jury is going to be instructed "Oh, don't consider it for

 8    that," I think this unprejudicial evidence, it's not going to

 9    bias anybody against anything.

10        When the Court has instructed the jury, it just doesn't --

11            **THE COURT:**  Let's go back to my question, though.  How

12    does it reflect good faith --

13            **MR. SHEPARD:**  Yes.  Okay.

14            **THE COURT:**  -- by Mr. Andrade?

15        I don't understand that.

16            **MR. SHEPARD:**  Here's an example.

17        One set of these terms and conditions has language about

18    what the company is doing in terms of engaging in market

19    making.  The Government says market making, terrible, part of

20    the fraud.  They are disclosing market making in the terms and

21    conditions.  That is a reflection of good faith.  I believe

22    it's based on advice.  They're disclosing it.  It shows that

23    Mr. Andrade is not attempting to defraud.

24        Again, it goes to his mental state.  He's not -- he

25    doesn't read the Ninth Circuit's opinion in *Lindsay* and know

 1    that "Ah, you can't really do that and rely on people to have

 2    read your terms and conditions carefully."  He thinks he's

 3    disclosing what he's doing, and that goes to his good faith.

 4         **MR. CHOU:**  Your Honor, the Court had it right before

 5    and has it right now.  I'm not sure I entirely follow defense

 6    counsel's argument, but essentially this -- this proffer fails

 7    in at least two ways, if not all four ways, mentioned in

 8    the Government's brief.

 9         First, to the extent that -- and I think defense concedes

10    that these are Mr. Andrade's statements.  This runs headlong

11    into the hearsay rule.  If Mr. Andrade, for example, had said

12    to the FBI, "Oh, by the way, I'm being totally forthright now

13    with market making.  I'm telling you right now, Mr. Law

14    Enforcement Agent, that I've been market making," they could

15    not take that statement, introduce it against -- in their

16    defense case, nor can they do it now when they are burying it

17    inside of terms and conditions on a website.

18         Secondly, I just want to direct the Court's attention to a

19    case out of the Second Circuit that cites the *Lindsay* opinion

20    out of the Ninth Circuit to apply this same principle to, I

21    think, facts that are highly analogous to this one.  The Second

22    Circuit case on page 2, *Weaver*, discusses how contractual

23    disclaimers of liability and other fine print is no defense in

24    a federal wire fraud or other fraud case because, as the

25    Supreme Court explained all the way back in *Kneeder*, reliance

PROCEEDINGS

1     is not an element and so --

2          THE COURT:  Does that case or any other talk about

3     this good faith concept?  I mean, I think it's a bit of a thin

4     read, but it is the argument that Mr. Shepard is making.  He

5     could accept all of what you said and say but it still comes in

6     with a limiting principle on the issue of good faith.

7          MR. CHOU:  Well, I'd have to go back and read that

8     Second Circuit case again.  I know the Ninth Circuit has

9     established what they call, quote, "a bright-line rule" that

10    prevents even that sort of evidence coming in with a limiting

11    instruction.

12         And I would further note that in the Government's prior

13    briefs on hearsay, the Ninth Circuit has regularly excluded

14    defendants from introducing self-serving hearsay statements

15    that those defendants claim have gone to their good faith

16    statements to law enforcement or in longer recordings of

17    conversations where they say things that are a mix of

18    inculpatory evidence and exculpatory evidence.

19         MR. SHEPARD:  This is not a statement that the

20    defendant makes to somebody that is self-serving.  This is a

21    fact.  It's a fact that disclosure was made about what the

22    company was doing.  And the fact that the Government -- that

23    the company made that disclosure is evidence of Mr. Andrade's

24    good faith.

25         THE COURT:  Going to -- well, first of all, we've got

**PROCEEDINGS**

 1   several more of these categories.  We've got the jury here.

 2        Let me deal with Mr. Andrade's testimonial question first,

 3   and then we'll deal with the rest of this.

 4        Mr. Andrade, will you come up here, please.

 5                 (Defendant Andrade comes forward.)

 6        **THE COURT:**  So have you had an opportunity to discuss

 7   with your counsel whether or not you're going to testify in

 8   this case?

 9        **DEFENDANT ANDRADE:**  Yes, sir.

10        **THE COURT:**  Okay.  You understand you have a

11   constitutional right to testify?  You understand that?

12        **DEFENDANT ANDRADE:**  Yes, sir.

13        **THE COURT:**  And do you also understand you have a

14   right to say, "I'm not going to testify"; and if you decide to

15   not testify, the Government would be precluded from making any

16   reference suggesting to the jury that they should infer

17   anything from your decision not to testify?  You understand

18   that as well?

19        **DEFENDANT ANDRADE:**  Yes, sir.

20        **THE COURT:**  Okay.  So all that being said, what is

21   your decision?  Do you want to or not want to testify?

22        **DEFENDANT ANDRADE:**  I will not be testifying, sir.

23        **THE COURT:**  Will not.  Okay.  Thank you.  That's all I

24   need to hear from you.

25        **DEFENDANT ANDRADE:**  Thank you, sir.

PROCEEDINGS

1          THE COURT:  Okay.  So going back to the list, C is

2    property contracts and home mortgage.

3          MR. CHOU:  So, Your Honor, these are lengthy real

4    property contracts, a lot of fine print.  And I think

5    the Government's -- the main thrust of the Government's motion

6    is we just would like a more detailed proffer from the defense,

7    at a minimum, as to why these contracts should be admissible,

8    given the case law and how legal documents going back to the

9    jury can be, at a minimum, confusing and waste time and cause

10   other issues.

11         MR. SHEPARD:  So, first of all, there's nothing

12   confusing about it.

13         THE COURT:  By the way, it doesn't have to be

14   detailed.  It just has to be a proffer.

15      Go ahead.

16                         (Laughter.)

17         MR. SHEPARD:  I'll try to be undetailed.

18         THE COURT:  Yes.  Okay.

19         MR. SHEPARD:  There's nothing confusing about a

20   real estate contract.  It can't possibly --

21         THE COURT:  Oh, I don't know if I agree with you about

22   that.

23                         (Laughter.)

24         MR. SHEPARD:  Well, not confusing in the evidentiary

25   sense in this case.  I take the Court's point.

PROCEEDINGS

1        But there's nothing confusing or prejudicial about the

2   terms of a real estate contract.

3        The importance of it, this goes back to the

4   cross-examination we did of the Government's forensic

5   accountant Theresa Chiu and the timing of when -- you know,

6   remember, she had this $1.6 million figure that the Government

7   says Mr. Andrade took out of the company during a time period

8   in early 2018 running through October; and part of our defense

9   is to note that when he took the vast bulk of that, it was at a

10  time that he understood that $50 million was coming into the

11  business.

12       And we have proven that that $50 million claimed purchase

13  was made -- was -- the supposed order was made in January, and

14  we want a date when he purchased the real estate.

15       THE COURT:  Couldn't this be addressed with a

16  stipulation about dates?  I mean, the concern the Government is

17  expressing is that -- I haven't looked at these contracts, but

18  these contracts probably have all sorts of stuff in them, and

19  they're saying that could lead to some confusion.

20       You're telling me, "Well, I don't care about all the stuff

21  that's in there.  I care about the date."

22       MR. SHEPARD:  (Nods head.)

23       THE COURT:  And I don't know.  Is the date disputed,

24  these dates; or are they dates that everybody agrees to and we

25  could just have a stipulation that says, "These are the dates"?

PROCEEDINGS

1          **MR. CHOU:**  I mean, I think a stipulation is probably

2     fine, Your Honor, or perhaps if the defense would redact it

3     down to the signature page or whatever page that has the date

4     that they are trying to point out.

5               (Co-counsel confer off the record.)

6          **MR. CHOU:**  Oh, it's a little confusing, yeah.

7          **MR. SHEPARD:**  We think we should be entitled to

8     because redacting the document, I think, is going to be more

9     confusing.

10          **THE COURT:**  No, I agree.

11          **MR. SHEPARD:**  But if the Court wants us to redact it,

12     we having been through this game a little before in this case,

13     and understanding --

14          **THE COURT:**  So you don't like the stipulation idea?

15     The following -- "This property was sold on X" or "This

16     agreement to sell the property was entered into on X."

17          **MR. SHEPARD:**  It's really the agreement, you know,

18     when he enters into the agreement to buy it.

19          **THE COURT:**  Well, could that be a stipulated fact?

20     No?

21          **MR. HIGHSMITH:**  The problem is that they want to say

22     there's an agreement in January to buy the house, and we say,

23     "Well, the document was signed in March."

24          **MR. SHEPARD:**  No, that's fine.  We're going with the

25     date in the agreement, which is in March, I believe.  We've

**PROCEEDINGS**

1    already said, you know, like the Corpus Christi one is in

2    March.  That's when at least Abramoff was discussing it.

3        Remember, in our -- I think the evidence suggests that it

4    was Abramoff who suggested the purchase of the Corpus Christi

5    property, and he placed that conversation in March, so...

6        **THE COURT:**  Well, why don't you do this:  Why don't

7    you have delegates meet and confer about this while we're doing

8    other things.  I mean, I just think it would be simpler -- this

9    doesn't favor either side.  It would be simpler for both sides

10   if the jury just -- I mean, the jury doesn't want to read

11   contracts.  If it's redacted, they think:  Are people hiding

12   something?

13       If you just say to them -- if what we're all fighting

14   about is operative dates, I would think we just tell them that.

15   But if that can't be done, then we'll do it another way.  But

16   why don't you talk about it and see if you can get it done.

17       **MR. CHOU:**  Yes, Your Honor.

18       **THE COURT:**  Okay.  Now let's look at -- then we've got

19   one that's actually agreed to, it looks like, the Frost Bank

20   account.  Okay.

21       **MR. SHEPARD:**  Yeah.  I think we'll just have a very

22   small slice of that, just to focus on what really matters.

23       **THE COURT:**  Okay.  And then we have emails from Foteh,

24   Dillman, and Andrade.

25       **MR. CHOU:**  And someone else named Dylan Pugilese.

PROCEEDINGS

1    **MR. SHEPARD:**  We know who he is.  He's in the evidence

2 as the person who was doing a number of things at AML BitCoin.

3 He's been testified about a few times.

4    The Government objection here is this completely new rule,

5 to me, that we don't get to allow -- we don't get to admit

6 documents in the defense case if there's a theory that we could

7 have admitted them in the Government case.

8    I know of no case that ever says that.  And this would be

9 a particularly peculiar example because the witness who we were

10 supposed to introduce it to, according to the Government --

11 through, according to the Government, is Melissa Foteh.  Were

12 we really -- is anybody going to rely on anything she says?

13 Were we really supposed to ask her more questions?  Really?

14    **THE COURT:**  I was glad we got her off the stand.

15    **MR. SHEPARD:**  Yes, I thought so.

16 So the notion that we were supposed to have authenticated

17 this through Melissa Foteh, wow.

18    **THE COURT:**  Well, I think the point -- I don't know if

19 this is the point the Government is making; but just purely for

20 the jury to understand and to have things in context, when

21 things just get dumped into the record, I think there's a

22 potential for confusion because they don't know where is this

23 coming from and what's the context and all of that.

24    As a matter of best practice, it's better to introduce

25 things through witnesses who are sponsoring things.  But I

```
 1   agree with you that I don't want you to recall Ms. Foteh.

 2   That, certainly, I don't want you to do.

 3       So it's just -- it's this one exhibit?

 4       MR. CHOU:  Yes, Your Honor.  It's one long email

 5   thread.  And the Government would renew its hearsay objection,

 6   understanding the Court's point of view on recalling Ms. Foteh.

 7       THE COURT:  Okay.  And then we've got this new -- this

 8   is new, the Platinum Exchange and the MM Solutions.  What's

 9   that?

10       MR. CHOU:  Your Honor, it's, like, a 19-page slide

11   presentation that appears to have been seized from one of

12   Jack Abramoff's devices.  I've checked with at least one case

13   agent.  We don't know what this is, whether it has -- we don't

14   think it has any relevance to AML BitCoin or anything in this

15   case.  It was just a document found on one of his devices.  And

16   so on that basis, it's inadmissible as just -- under 403.  At a

17   minimum, they could have asked Mr. Abramoff about it.  I think

18   that's a more reasonable, perhaps, statement here.

19       The Court has been holding the Government to the similar

20   reciprocal rule of not being able to introduce documents that

21   should have come in through, for example, Abramoff or Bryan.

22       THE COURT:  Okay.  Mr. Stefan?

23       MR. STEFAN:  We haven't been able to identify the

24   communications directly to Mr. Andrade regarding this document,

25   but as the Government has agreed to, they did seize it directly
```

**PROCEEDINGS**

 1  from Mr. Andrade's devices.  So --

 2          **MR. CHOU:**  Abramoff.  Abramoff.

 3          **MR. STEFAN:**  Oh, pardon me.  Okay.

 4          **THE COURT:**  Well, they seized it from Mr. Abramoff.

 5  That, by itself, doesn't mean it comes into evidence.  Why does

 6  it come into evidence?

 7          **MR. STEFAN:**  Your Honor, we would withdraw our --

 8          **THE COURT:**  Okay.

 9          **MR. STEFAN:**  -- intent on this one.

10          **THE COURT:**  And then we have AML BitCoin post -- this,

11  I think we already dealt with, I thought.

12          **MR. CHOU:**  It's likely, Your Honor.  There was no

13  exhibit number on that post --

14          **THE COURT:**  Go ahead.

15          **MR. CHOU:**  Pardon me.

16      There was no exhibit number on that post-ICO binder that

17  the Court ruled inadmissible in a prior order.  If this is a

18  different binder, we would just renew the same objection.

19          **THE COURT:**  Is this something new?

20          **MR. SHEPARD:**  I think what we want to focus on is just

21  a couple of them.  The Court had said in its ruling that these

22  were after the period of representations.  And so there are

23  just -- I think it's one or two of them that relate to a

24  different issue within the time period of the representations;

25  and that is, the Government has suggested that one or two

PROCEEDINGS

1  purchasers bought AML BitCoin in private sales and that it was

2  withheld from them not by Mr. Andrade, because he wasn't

3  dealing with them; it was withheld from them by his alleged

4  co-conspirators that these were Mr. Andrade's tokens that were

5  being purchased.

6      And, in fact, the agreements show that these were

7  Mr. Andrade's tokens that were being purchased.  So that

8  information was not withheld from them.

9      That is the specific offer.  I think it is not in any way

10 contrary to what the Court said.

11     THE COURT:  So it's two documents, you say.  Can you

12 put exhibit numbers on them so we know what it is?

13     MR. CHOU:  And, Your Honor, for reference, I'm looking

14 at Docket 601, the Court's order, on page 5.  The Court

15 excluded post-ICO purchase agreements on at least two grounds:

16 one, that probative value was low, given the

17 cross-examination of Mr. Boyer and the like on these sort of

18 issues; secondly, that it runs into *Lindsay* and this -- and now

19 we see the Second Circuit case; and then, thirdly, I would

20 note, to the extent that these are contracts that it seems to

21 be that Mr. Andrade is imposing on his victim investors, that's

22 hearsay, Your Honor.

23     MR. SHEPARD:  Mr. Andrade --

24     THE COURT:  But it doesn't have -- the overall issue

25 about timing is not implicated in this.

PROCEEDINGS

1     **MR. CHOU:**  Well, I don't know specifically which two

2  documents they're --

3     **THE COURT:**  Well, why don't we start with, can you get

4  me the two documents and label -- put an exhibit number on each

5  one of them so I can see them?

6     **MR. SHEPARD:**  Yes.  It'll take us a few moments to do

7  that.

8     **THE COURT:**  Well, why don't we -- we can start with

9  Dr. Armstrong?

10     **MR. SHEPARD:**  Somebody can be doing that while

11  Dr. Armstrong is on.

12     **THE COURT:**  Okay.  They're all here, so let's get

13  rolling.

14     **THE COURTROOM DEPUTY:**  Are you ready?  Okay.

15     **THE COURT:**  Actually, before you come out, so

16  timing-wise, I am operating on the assumption that you're going

17  to still have, at the very least, probably rebuttal stuff on

18  Monday.  Is that right?

19     **MR. HIGHSMITH:**  Yeah, Dr. Gregory and Ethan Quinn very

20  briefly.

21     **THE COURT:**  Okay.  So if I tell the jury -- I can

22  double-check with you at the end of today; but if I tell the

23  jury that we're on schedule, our hope is that we can actually

24  get this case to them perhaps even a little earlier than the

25  end of next week, but come back on Monday at 8:30 and maybe we

```
 1    can -- I will them this -- maybe we can shoot to close on

 2    Tuesday.

 3              MR. HIGHSMITH:  Yes.

 4          THE COURT:  Okay.  That sounds good.

 5       Actually, let's take a very brief break, and then we'll

 6    come back.

 7        You can tell them we're almost ready to start.

 8                   (Recess taken at 8:46 a.m.)

 9                (Proceedings resumed at 8:54 a.m.)

10      (Proceedings were heard out of the presence of the jury.)

11          THE COURT:  Okay.  Are we ready?

12      (Proceedings were heard in the presence of the jury.)

13          THE COURT:  The jury is present.

14        Thank you, members of the jury, for your patience.  I know

15    it's frustrating to wait, but I will tell you that I think it's

16    making progress towards getting -- we had an opportunity to

17    work together, the lawyers and me, and, you know, I think we're

18    advancing the ball as a result.

19        I'll be able to tell you at the end of the day, but to

20    encourage you, I think we're actually a bit ahead of schedule.

21    So if -- you know, things happen, and I can't promise this, but

22    it could well be that sort of by the middle of next week,

23    you'll have the case.

24        So we're making progress, so hang in there with us.

25        Okay.  Dr. Armstrong, you understand you remain under
```

 1   oath?

 2        **THE WITNESS:**  Yes, sir.

 3        **THE COURT:**  All right.

 4                     **LEVI ARMSTRONG**,

 5   called as a witness for the Defendant, having been previously

 6   duly sworn, testified further as follows:

 7        **THE COURT:**  Go ahead, Ms. Diamond.

 8        **MS. DIAMOND:**  Thank you.

 9      Mr. Jackson, if we could put up on the screen 3394,

10   page 3, for the jury -- for the Court, the jury.

11               **DIRECT EXAMINATION**   (resumed)

12   BY MS. DIAMOND:

13   **Q.**   Good morning, Dr. Armstrong.

14   **A.**   Good morning.

15   **Q.**   Before we broke, we were having a discussion about the

16   hypothesis that you formed early on in your diagnostic

17   interview portion of the comprehensive neuropsychological

18   evaluation you performed on Marcus.

19      You had mentioned something in your questionnaire.  Could

20   you please let the jury know if there was anything in the

21   questionnaire that alerted you to the possibility that ASD

22   might be in a cluster of conditions that Mr. Andrade has?

23   **A.**   Sure.  So my intake questionnaire begins kind of

24   sequentially through the lifespan with the first part that asks

25   about early childhood development and whether or not there were

1  any developmental delays.  And in that portion, there are parts

2  of it that ask about delays with like language acquisition and

3  social skills, fine motor coordination, and as well as, like,

4  participation in early childhood intervention with various

5  forms of physical therapies or occupational therapies and so

6  forth.

7       And Mr. Andrade had circled speech/language delays and had

8  also circled, I believe, fine motor coordination deficits and

9  as well as, I believe, participation in speech therapies, yeah.

10  **Q.**  And what did these things indicate to you based on your

11  training and experience; specifically, the last three

12  characteristics that you described?

13  **A.**  Sure.  So delayed -- developmental delays by themselves

14  don't always mean a diagnosis, but a delay is abnormal.  And

15  there are pretty straightforward cutoffs for what might be a

16  normal acquisition of speech/language skills or social skills

17  at an age-appropriate level where, when evaluating someone, I

18  am always -- I've got to start with the story of the brain

19  beginning from conception because that's when it begins.  And

20  if there are delays that are noted, it generally points towards

21  their being a neurodevelopmental condition.

22  **Q.**  You also mentioned something, I think you used the word

23  "mutism," that was indicated on your questionnaire.  Could you

24  please describe to the jury what that means and whether that's

25  similar to a speech delay or something different?

ARMSTRONG - DIRECT / DIAMOND

1    **A.**    Yeah.  So it's actually different than a speech/language

2    delay, where he had written down that he had selective mutism

3    I think between the ages of 9 and 13.  He wasn't sure.  And

4    that is a period of time that a child might stop talking just a

5    hundred percent or generally only speak very limited

6    conversation at all to just a very few people but, for the most

7    part, not communicating to others.

8        That's different than a speech/language delay, which is

9    where we are trying to track it ideally in the first, you know,

10   five years of life, whenever language is coming on board in the

11   brain.

12   **Q.**    When you indicated that Mr. Andrade's scores, some of

13   them, were exceptionally low, in general, does an exceptionally

14   low score indicate that a person will always consistently

15   function in an exceptionally low range on those factors, or is

16   there a variance?  And could you explain your answer, please?

17   **A.**    Absolutely.  Our tests are measured to -- are given to

18   measure a snapshot in time, and there are no -- there's no such

19   thing as a perfect test in any form or fashion.  However, what

20   I love about my specialty is that we are trying to measure the

21   probability of dysfunction.

22       So if I give a test of, let's say, mental flexibility and

23   I know that there's maybe three or four different tests that

24   measure that aspect of that mental function, the odds increase

25   that there is true legitimate neurological dysfunction as the

1    number of tests increase that show exceptionally low scores.

2         So one score by itself doesn't equate to impairment in any

3    given situation outside of that one specific moment in time

4    during testing.  However, when the whole picture and all the

5    results are put together, including integrating it into the

6    history, we begin to kind of piece together and explain what

7    past behaviors might have been caused by and try to predict

8    what future behaviors might be.

9    **Q.**  Can you describe, please, in laymen's terms what sort of

10   biology is going on in a person who has autism's brain?

11   **A.**  So autism spectrum disorder is a neurodevelopmental

12   disorder that is a lifetime condition that begins at birth in

13   most cases, but not always, but it always begins during the

14   neurodevelopmental time frame.

15        And so what we know is that the frontal lobe does not

16   fully develop or mature until you're 25.  It's kind of like the

17   steering wheel, brake pedal, and gas pedal for the engine that

18   is the brain.  Where the rest of the brain is built, those

19   parts of the brain aren't fully developed until you're around

20   25.

21        Now, autism spectrum disorder is a condition that affects

22   how that frontal lobe develops, and it's a combination of both

23   genetics and environment that tend to ultimately, what the

24   research shows, cause that frontal lobe to be delayed as

25   compared to age-matched peers.

**ARMSTRONG - DIRECT / DIAMOND**

1   Q.   Could you, using either your own head or a fist,

2   demonstrate for the jury where is the frontal lobe so they have

3   an idea of what you're talking about?

4   A.   Sure.   Yeah.   So the frontal lobe being up here and

5   including -- you might have heard of the terms "prefrontal

6   cortex" or the "frontal cortex," and that's what we're talking

7   about.

8   Q.   And is this the portion of the brain that you found were

9   affected by the cluster of conditions that you diagnosed Marcus

10  with?

11  A.   Yes.

12  Q.   Thank you.

13      MS. DIAMOND:   Mr. Jackson, could we see the next

14  slide, please.

15  Q.   Focusing, Dr. Armstrong, again still on ASD, what sorts of

16  findings do you see in the history of people that you've

17  diagnosed or treated with ASD with relationship to friendships?

18  Particularly, let's start with early childhood friendships.

19  We're not going to go into that in depth, but just if you have

20  any opinions about what you would ordinarily find, please share

21  those.

22      MR. HIGHSMITH:   Objection.   Lack of foundation.   We

23  haven't clarified the severity of autism.   Autism exists on a

24  spectrum.   We haven't discussed at all the severity of the

25  autism.

1           **MS. DIAMOND:**  I'm happy to do that, Your Honor.

2           **THE COURT:**  Do that.

3           **MS. DIAMOND:**  I thought Dr. Armstrong covered that.

4    **Q.**   What was -- I recall you saying something about high

5    functioning.

6    **A.**   Mm-hmm.

7    **Q.**   Could you describe the level of severity of autism that

8    you determined Marcus has?

9    **A.**   Sure.  So Level 1 severity is where I would label the

10   functional implications of his form of autism.  I would

11   identify that there are three severity levels, Level 1 being

12   the highest functioning of all three; but I -- there is a

13   misnomer, in my opinion, by calling it Level 1 or high

14   functioning because it assumes a much higher level of

15   functioning than what the other levels would assume; whereas,

16   the truth is, is Level 1 comes with functional impairment,

17   yeah.

18   **Q.**   Is there something in your research, in your training that

19   you know about people with ASD and their ability to form

20   friendships in their early life?

21   **A.**   Yeah.  So one of the criteria for a diagnosis of autism is

22   identification in some form or fashion, as best as you can, for

23   limited social skills and especially during childhood and

24   adolescence, and that's the period of time that the frontal

25   lobe is learning how to develop relationships.

ARMSTRONG - DIRECT / DIAMOND

1    **Q.**  Would you expect these people to have good friendships,

2    long-lasting friendships, lifelong friendships, or the

3    opposite?

4    **A.**  It's -- it's, in general, the opposite, yeah.

5    **Q.**  I want to take you back for a moment before we go into

6    more -- sorry.

7         Referring to the slide that is on the screen, these --

8    does this slide -- this is page 4 of Exhibit 3394 -- does this

9    indicate common traits and factors associated with ASD?

10   **A.**  Yes.

11        **MR. HIGHSMITH:**  Well, objection again.  Level 1?

12   Level 2?  Level 3?

13        **THE COURT:**  Overruled.

14   **BY MS. DIAMOND:**

15   **Q.**  For clarification, we're always talking about the level of

16   ASD that Marcus has.

17   **A.**  Mm-hmm.

18   **Q.**  I'm not going to be asking you about other forms of ASD

19   except for this.

20        Are you familiar with the myth or the modern trope of the

21   idiot savant?

22   **A.**  Yes.

23   **Q.**  In your experience, how accurate is that in defining a

24   person with autism?

25   **A.**  Not accurate at all.

1  Q.  Is it true that all people with autism have a special

2  gift?

3  A.  No.

4  Q.  Taking you back again to your diagnostic interview, that

5  preceded your testing regime; is that correct?

6  A.  Yes.

7  Q.  And during the interview itself, after you'd read the

8  questionnaire, you conducted a conversation with Marcus.  Was

9  there anything in that conversation that alerted you to the

10  possibility of ASD or any of Marcus's other diagnoses during

11  the interview itself?

12  A.  Sure.  Just what I've -- what I observed with Marcus was

13  an attempt at warmth.  And when asked questions, he would at

14  times have a harder time staying on topic, would often switch

15  to talking about passions of his, and required frequent

16  redirection.

17      And we're limited in time when we're doing evaluations,

18  and just because there's a time limit of how much we're

19  allotted, so I've learned along the way to have to be prepared

20  for that if a neurodevelopmental disorder such as autism is

21  present.  And, in other words, so it required quite a bit of

22  redirection.

23  Q.  And did Mr. Andrade convey to you his interest in several

24  different areas, or did he focus on one?

25  A.  It was primarily the blockchain technologies, I believe,

1    that he had invented.

2    Q.   Have you found any correlation between a deep interest in

3    technological matters and individuals with ASD?  And if so,

4    could you describe your findings?

5    A.   Yes.  And it's -- and this is anecdotal, but take it for

6    what it is.

7        MR. HIGHSMITH:  Well, I'm going to object, then, if

8    it's anecdotal.

9        THE COURT:  Well, he can -- he's put the parameters on

10   it.  He can testify about it.

11       Go ahead.

12       THE WITNESS:  It is quite common for folks with autism

13   spectrum to be drawn toward the calculation style of math

14   computation and technology and IT, where it's all predictable

15   with ones and zeros.

16   BY MS. DIAMOND:

17   Q.   Is there anything about the literal nature of a person

18   with autism's brain that correlates to what you just described?

19   A.   Yes.  It's the -- being drawn to externally supplied

20   structure and knowing what to expect, what's ahead often eases

21   anxiety.  And in IT, in general, there is a programming aspect

22   of linear logical predictability that they can be drawn to.

23   Q.   Could you describe -- you used a term in your slide

24   "mental flexibility," and you put examples about hyperfixated

25   and info dumping.  What does that look like to laypeople --

**ARMSTRONG - DIRECT / DIAMOND**

1   **A.**   Sure.

2   **Q.**   -- if they encounter that?

3   **A.**   It can look like a person who is very passionate about a

4   topic or is very invested in a topic who goes on a monologue

5   where they just will talk and talk and talk and talk, often

6   unaware that you're even present.

7        And I happen to love that about my patients because I can

8   relate as a professor, but it's often a challenge in social

9   situations because, obviously, it can interfere with

10  communication and efficiency, yeah.

11  **Q.**   Is it difficult to diagnose an adult with ASD?

12  **A.**   As of right now, it is, yeah.

13  **Q.**   Why is that?

14  **A.**   We have come a long way in the science in the past --

15  gosh -- even ten years, whereas the older the adult is, the

16  harder it is to at times get reliable information about early

17  childhood.  And we do our best to try to piece together the

18  whole picture, in addition to having a whole lot of --

19  experiencing a whole lot of people and kind of having an idea

20  of what we know to be normal or not.

21       But, more importantly, we use our tests to correct for our

22  bias as much as possible because the last thing I want to do is

23  assume that I'm correct by just eyeballing somebody.

24  **Q.**   So with regard to that, when you formed your hypothesis --

25  sorry.

1      Is there a technical term for what you described about

2   going on and on about a topic of interest --

3   **A.**   Mm-hmm.

4   **Q.**   -- that is used in your profession?

5   **A.**   Yes.  So that would be the perseveration.

6           **MS. DIAMOND:**  Mr. Jackson, could you please display

7   page 9 of the demonstrative.

8   **Q.**   What is perseveration?

9   **A.**   Perseveration has -- is a broad term that is probably best

10  described as being mentally stuck.

11  **Q.**   What happens in conversation when somebody has persev- --

12  sorry.  When someone is experiencing or exhibiting

13  perseveration, how does their conversation appear?

14  **A.**   Somehow the topic will always come back to that topic that

15  they are perseverating on.

16          **MS. DIAMOND:**  Could we please, Mr. Jackson, display

17  Slide Number 8, page 8 of this.

18  **Q.**   Are people with autism aware that they have a different

19  communication style?

20  **A.**   Sometimes yes; sometimes no.  I would say in general,

21  their awareness, if present, tends to be more literal and

22  concrete rather than applied in the moment.

23      So it's one thing to say, "I know I have some difficulties

24  communicating."  It's another thing to be aware of that in the

25  moment and course-correct along the way.

ARMSTRONG - DIRECT / DIAMOND

1  Q.   Could you describe the term aso- -- sorry --

2  anosognosia --

3  A.   You got it.

4  Q.   -- and explain its relation to a person who has ASD?

5  A.   So anosognosia is a term I learned from Dr. Mears, my old

6  mentor, in relation to talking about frontal lobe impairment.

7  Anosognosia is when you're unaware of your own deficits, and

8  it's the inability to be aware of how those deficits are

9  affecting you presently.

10       So it's not uncommon, for example, for people with

11  anosognosia due to, let's say, autism or anything that affects

12  the frontal lobe to act in ways that are not realistic, given

13  their deficits.

14  Q.   What sorts of behaviors might someone, an adult with

15  autism look towards or present with when they're in, say, a

16  business meeting?

17  A.   There's going to be a -- in general, usually like a -- I

18  would imagine -- I'll say this:  I've had patients before in

19  business meetings with high-functioning autism who have clear

20  difficulty, based on spouse report, not -- being able to adjust

21  on the fly outside of whatever goal they had in mind.  So it's

22  kind of the "My way or, you know, the highway."

23       Did that answer your question?

24  Q.   Would a person with ASD ever present as being particularly

25  stern or harsh for a reason other than meanness?

**ARMSTRONG - DIRECT / DIAMOND**

1  **A.**   Yes.  And that's -- that's actually a quite common finding

2  that's easily Googleable, that they tend to be more blunt and

3  harsh in interpersonal interactions.

4  **Q.**   What are the reasons connected to the condition that would

5  make someone's affect be blunt or harsh or stern?

6  **A.**   Well, and the technical term would probably be related to

7  alexithymia.

8  **Q.**   Could you -- we don't have a slide for that.  Could you

9  spell that, please?

10 **A.**   Sure.  A-l-e-x-i-t-h-y-m-i-a.

11 **Q.**   What is alexithymia?

12 **A.**   It's the inability to be aware of one's own emotions and

13 correctly reading one's own emotions.

14 **Q.**   So if someone were particularly mean or stern to

15 employees, if they have ASD, does that imply that they're aware

16 that they're being mean or the opposite?

17 **A.**   It -- it's frequent that it is the opposite, right.

18 They're not generally aware.

19        **MS. DIAMOND:**  If we could turn, Mr. Jackson, please,

20 to page 5 of the demonstrative exhibit.

21 **Q.**   Dr. Armstrong, could you tell the jury what this slide

22 represents?

23 **A.**   Yeah.  So this is -- this slide outlines the diagnosis of

24 ADHD kind of as my attempt at the anti-TikTok thing, really

25 highlighting the importance of how ADHD actually plays itself

1  out in real life versus what even at times our diagnostic

2  manual will try to pinpoint, because there's been research even

3  since that was published.

4  Q.  I'm going to, again, take you back just one step here.

5       When you were forming your -- sorry.  When you were

6  forming your hypothesis during Mr. Andrade's clinical interview

7  where he went on and on and you had to redirect him, with

8  respect to your choice of tests, did you choose tests to find

9  ASD or did you choose tests to eliminate ASD, or how did that

10  hypothesis affect your choice of the particular test that you

11  gave?

12  A.  I think I had mentioned it a little bit yesterday, that

13  most neuropsychologists approach it with a fixed flexible

14  battery where we've got a general idea of all the tests that we

15  will give to everybody.  That's selected based on its ability

16  to screen for a wide range of things that we might not be

17  thinking of.

18       Along the way, as hypotheses are created, we will choose

19  and modify when necessary our battery.  And in Marcus's case, I

20  added the social cognition affect naming subtest.

21  Q.  What does that test entail and how does it get to the

22  issue that you're searching for biologically?

23  A.  Yeah.  So the social cognition test is a rather, I would

24  say, specific test, meaning most people are going to pass it.

25  It shows you pictures of faces of people, and you have to be

1  able to choose which emotion is being expressed on their face.

2     And in the healthy normal population, like I said, we

3  expect a near perfect score on that test, and I believe there's

4  30 items.

5     That test measures non-verbal communication style.  It

6  measures the ability to imagine what someone else is meaning in

7  non-verbal communication, mm-hmm.

8  Q.  How did Marcus do?

9  A.  His score was less than the first -- I'm sorry.  His score

10  was at the first percentile on that test.

11  Q.  Did that test help you eliminate any other possible

12  conditions for the perseveration and the need to repeat what

13  was in -- foremost in his mind that you found during the

14  clinical diagnosis?

15  A.  It helped me narrow down at that point that we had a

16  frontal lobe something interfering with social cognition.

17  Q.  Did you at any point in your regime of testing determine

18  that Marcus was not, as psychologists define it, a narcissist?

19  A.  I'm sorry.  Can you repeat that again?

20  Q.  Yes.

21     Is there a difference between narcissism and ASD?

22  A.  Yes.

23  Q.  Could you tell the jury what that is, please.

24  A.  Narcissistic personality disorder is, first and foremost,

25  a highly debated reality.  It's always a joke that the American

1    Psychiatric Association is trying to get rid of it because a

2    bunch of psychiatrists have gotten together and decided it

3    doesn't exist.

4         But narcissistic personality disorder is characterized by

5    grandiosity and a deep need for affirmation from others, almost

6    in a worship kind of style, yet with sophisticated impression

7    management skills, as compared to autism spectrum disorder that

8    does not come with impression management skills and, in

9    general, is not attempting to manipulate others to get their

10   psychological needs met, yeah.

11   Q.   Does someone with ASD have the social cognition ordinarily

12   present in people who manipulate others?

13   A.   And you said do people with autism or narc- --

14   Q.   People with autism --

15   A.   Okay.

16   Q.   -- do they ordinarily possess traits that would permit

17   them to understand the reactions of others in order to

18   manipulate them?

19   A.   Not in general.

20   Q.   Are there any other tests that you can think of that you

21   gave Mr. Andrade that helped you pinpoint during your testing

22   process other possible causes of the factors that you

23   determined in the initial part of your evaluation when you

24   formed a working hypothesis?

25   A.   Yeah.   I mean, I would put it, across all the tests that I

1   gave, one test, specifically the spouse report from the

2   executive functioning questionnaire, the behavior rating

3   inventory of executive functioning that is not specific for

4   autism but I have found to be a good tool that gives me another

5   perspective outside of my own -- my own bias.

6       I like it because compared to other autism questionnaires

7   that are out there, which there are very few, by the way, it

8   has objective validity indices in it.  And that's important to

9   know because, you could imagine, if you were taking a

10  questionnaire and you wanted to have a diagnosis, you might

11  answer it in a certain way.

12      Well, most screening questionnaires appear like that.  And

13  this questionnaire, however, has embedded statistical measures

14  in ways that we can see whether or not that person who

15  completed the questionnaire is underreporting or overreporting

16  or exaggerating symptoms.

17      And with the spouse report, all those validity indices

18  were valid, meaning that I could look at those results and see,

19  okay, this is from his spouse's perspective which areas of

20  executive functioning are we finding impairment or is his

21  spouse observing impairment.

22      There tends to be a pattern of spousal observations that

23  are consistent with autism versus other forms of frontal lobe

24  impairment.

25  **Q.**   So as you're describing your testing procedure,

1    Dr. Armstrong, is it correct that you are looking for patterns

2    over the cluster of tests and probabilities resulting from

3    those?

4    **A.**    Right.  So we are -- again, we're not looking at any one

5    score by itself.  We are -- we are trying to measure most brain

6    functions multiple times so that we get a pattern of scores

7    that reflect each area's functioning.  And when we have more

8    scores that point towards specific areas of the brain being

9    abnormally low or dysfunctional compared to the normative data,

10   that increases the probability of there being actual

11   dysfunction.

12        And that's important only because prior to MRIs for the

13   brain, neuropsychology used to pinpoint localized lesions in

14   the brain.  Before they could visualize it, we would be able to

15   identify that.

16   **Q.**    Now, you -- did you conduct an MRI of Mr. Andrade's --

17   **A.**    I did not.

18   **Q.**    -- brain?

19   **A.**    No.

20   **Q.**    Okay.  Were you asked to do that by our offices?

21   **A.**    No.

22   **Q.**    Finally, turning to the slide that's on the screen, this

23   is page 5 of our demonstrative exhibit, is -- first, I want to

24   ask you, is ADHD, attention-deficit/hyperactivity disorder, the

25   same as ADD?  Are they different?  Are they similar?

**ARMSTRONG - DIRECT / DIAMOND**

1  **A.**  So since 2013, ADD no longer exists.  That's not an

2  official diagnosis.

3  　　We now have three types of ADHD.  We have the

4  predominantly inattentive presentation, which used to be called

5  ADD; we have the hyperactive-impulsive presentation, which is

6  the general stereotype of what ADHD is; and then we have the

7  combined "you've got it all" subtype, yep.

8  **Q.**  And what did you find Marcus had?

9  **A.**  I labeled it as combined presentation.

10 **Q.**  Can you describe the relationship of ADHD with a person's

11 hyperfocus, please?

12 **A.**  So with ADHD, there is a uniqueness about how the brain

13 processes reward.  And so the stereotype is that it impairs

14 attention.  However, the reality is that people with ADHD and

15 autism, for that matter, have a difference in how their reward

16 systems work, where when they are interested in something

17 and/or they're anticipating, you know, being interested in

18 something, they can hyperfocus way better and way longer than

19 most people.

20 　　So they go from having impaired attention for daily tasks

21 like folding socks to exceptional attention for extended

22 periods of time and duration for things that they find

23 particularly interesting.

24 　　**MS. DIAMOND:**  Mr. Jackson, could you please blow up

25 the three bullet points at the bottom of the demonstrative on

ARMSTRONG - DIRECT / DIAMOND

1    page 5.

2    **Q.**    And I'd like to spend a little time with these,

3    Dr. Armstrong, if you could.

4        Could you go through the first bullet point and explain it

5    in a little more depth to the jury?

6    **A.**    Yeah.  So in general with ADHD, as far as that first point

7    goes, we are -- we would expect somebody with ADHD to have

8    difficulty sustaining, well, I would say active listening,

9    especially for topics that, in their mind, they might feel that

10   they already know the answer to.

11   **Q.**    So what is active listening?  Can you define that, please?

12   **A.**    Sure.  Active listening is an intentional stance of

13   listening, where we are going to be reflecting back to that

14   person what they said and ensuring that we are comprehending

15   and understanding what they said, what they meant, and asking

16   for clarification, summarization, repetition, and so forth.

17   **Q.**    So is this a trait that is not common both in people who

18   have ADHD and in people who have ASD?

19   **A.**    It's certainly less common in autism, and -- but it is

20   possible with ADHD.

21   **Q.**    What about the second bullet point [as read]:

22        "Hypersensitive to rejection and criticism from

23    others"?

24        How does that manifest in the ADHD person or the person

25   that has ADHD?

1  **A.**   Yeah.  So in general, the brain of an individual with ADHD

2  grew up learning to anticipate making mistakes.  One of the

3  number one ways that our brain learns how to survive, because

4  that's what it cares about, is through social interactions.

5  Well, all kindergarteners are sociopaths, and I mean that

6  because our brains learn very quickly early on that when we

7  make mistakes, there are -- there's a punishment socially.

8       As a result of that, people with ADHD will often develop,

9  unconsciously, through conditioned social interactions, a

10  hypersensitivity or an anticipation of rejection from others.

11  **Q.**   And does that manifest in the way that they communicate,

12  either verbally or non-verbally?

13  **A.**   It can, absolutely, especially if they are particularly

14  nervous.

15  **Q.**   Is this aggravated or enhanced in someone who has both

16  ADHD and ASD?

17  **A.**   It is absolutely exacerbated.

18  **Q.**   What about the third bullet point [as read]:

19       "Impaired judgment, decision-making, planning,

20       prioritizing, and time management"?

21       Are these particular characteristics of someone with ADHD?

22  **A.**   Yes.

23  **Q.**   And how would they manifest for an adult with ADHD who's

24  trying to operate a business?

25  **A.**   Well, in general, ADHD being another frontal lobe disorder

1   or developmental difference condition, it's going to affect

2   executive functions, which are listed there:  judgment,

3   decision-making, planning, prioritizing, time management.

4   Those are all executive functions.

5   **Q.**   So by this, you don't mean executive like a boss is an

6   executive and an assistant is lower than the executive?  Do you

7   mean executive in the term -- the use of the word as able to

8   execute?

9   **A.**   Right.  It is -- it's actually not a bad metaphor to think

10  about as executive functions being the CEO of the brain, where

11  executive functions are taking all the brain functions together

12  and problem solving.

13  **Q.**   So does a person with significant ADHD have the ability to

14  do things like plan their time properly and prioritize tasks?

15  **A.**   Depending on the severity, yes, they would have the

16  ability, but it's going to vary substantially, depending on the

17  context.

18  **Q.**   Add in the piece that someone may also have ASD with a

19  low-intelligence quotient.  How does that factor into the

20  ability to juggle planning, time management, prioritize tasks?

21  **A.**   I would imagine that would be very chaotic

22  decision-making.

23  **Q.**   Would you be surprised --

24       **MR. HIGHSMITH:**  I'm going to object to that answer

25  "I imagine" and move to strike.  That's speculative,

ARMSTRONG - DIRECT / DIAMOND

1    Your Honor.

2         **THE COURT:**  Sustained.

3    **BY MS. DIAMOND:**

4    **Q.**    Do you have training and experience that gives you the

5    ability to answer how a person with a combination of these

6    conditions might approach time management, priority, planning?

7    **A.**    Yeah.  In general, those disorders absolutely affect those

8    functions.

9    **Q.**    And this just isn't your imagination?  This is based on

10   some science; is that right?

11   **A.**    Correct.

12   **Q.**    Are --

13   **A.**    Years and years and years of neuroscience.

14   **Q.**    Are any of the tests that you gave to Mr. Andrade related

15   to that?

16   **A.**    Yes.

17   **Q.**    Could you describe that to the jury, please.

18   **A.**    So --

19   **Q.**    And if you need to refer to any of your notes that you

20   have on your computer, just let us know.  You're permitted to

21   do so if you need to.

22   **A.**    Sure.  So one of the tests that I gave was the category

23   test, which is another executive functioning test that measures

24   abstract reasoning and the ability -- it's learning to learn

25   and anticipate change and on-the-spot kind of problem solving.

1    That's one of the tests.

2        Another test that I gave was the Trail Making Test A

3    and B, which Part B is a mental flexibility test that is timed,

4    and it measures one's ability to hold multiple bits of

5    information in mind and fluidly switch back and forth between

6    the two.  So if you're thinking about having a conversation

7    with someone, it requires the ability to listen while also

8    formulating your next response, yeah.

9    **Q.**   And is that listening and thinking about their next

10   response something that someone with ADHD and ASD would be good

11   at or not good at?

12   **A.**   Not good at.

13   **Q.**   How might behaviors manifest in such a person with respect

14   to organizing bank accounts?

15   **A.**   In my experience and based on the research literature,

16   financial decision-making and organization tend to be

17   significant areas of stress for individuals with ADHD and

18   autism.

19   **Q.**   Might they seek outside advisors or assistance from

20   authorities?

21          **MR. HIGHSMITH:**  Objection.  Calls for speculation.

22          **THE COURT:**  Well, you can -- I think you can cover

23   this in cross-examination.  He may answer the question.

24          **THE WITNESS:**  I would imagine -- again, we teach

25   compensations --

```
 1              THE COURT:  If your answer is "I would imagine," that
 2   means it's sort of sending us the message it's speculation.
 3              THE WITNESS:  I see.
 4              THE COURT:  Don't speculate.
 5              THE WITNESS:  Gotcha.
 6              THE COURT:  Just answer the question.
 7         Go ahead.
 8              THE WITNESS:  I teach compensation strategies,
 9   executive functioning compensation strategies.
10   BY MS. DIAMOND:
11   Q.   To patients with frontal lobe disorders?
12   A.   Correct.
13   Q.   And is seeking advice from trusted professionals or other
14   authority figures part of that --
15   A.   Correct.
16   Q.   -- process?
17         Could you describe that to the jury, please?
18              MR. HIGHSMITH:  I'm going to object.  Calls for a
19   narrative response.
20              THE COURT:  Start the answer.
21         If it's going into a narrative, I'll intercede.
22         Go ahead.
23   BY MS. DIAMOND:
24   Q.   In just a short --
25   A.   Sure.
```

**ARMSTRONG - DIRECT / DIAMOND**

1   **Q.**   -- summary.

2       We don't need the class here.  Thank you, Dr. Armstrong.

3   **A.**   So I teach patients, adults, young adults with autism and

4   ADHD to reach out to other surrogate frontal lobes who are

5   willing to help with executive dysfunction.

6   **Q.**   In other words, somebody might hire a good assistant to

7   keep them on track with appointments?

8   **A.**   Correct.

9   **Q.**   Are there any characteristics about these combination, so

10  far what we've discussed, the ASD and ADHD, that might result

11  in a person being accessible or vulnerable to someone who

12  desires to manipulate them through the guise of friendship?

13          **MR. HIGHSMITH:**  Objection.  Calls for speculation.

14          **THE COURT:**  Sustained.  Sustained.

15  **BY MS. DIAMOND:**

16  **Q.**   Do people with ASD have a lot of friends?

17  **A.**   In general, no.

18  **Q.**   Do you have any understanding of what happens if a person

19  with ASD is disappointed or felt betrayed by a friend?

20          **MR. HIGHSMITH:**  Objection.  Speculation.  Calls for a

21  narrative.

22          **MS. DIAMOND:**  Based on his training and experience.

23          **THE COURT:**  You seem to be going off on areas that do

24  sound like speculation.  So let's keep it to his conclusions in

25  terms of the testing and the other things.

ARMSTRONG - DIRECT / DIAMOND

**BY MS. DIAMOND:**

**Q.**   With respect to A -- sorry -- ADHD, does this affect the
same part of the brain as ASD, the frontal lobe, or is there a
different part of the brain that gets involved?

**A.**   It shares overlap functionally with the frontal lobe, but
not the exact location.  So there's been some research in
neuroscience identifying that they are distinct diagnoses from
a frontal lobe dysfunction standpoint but also share quite a
bit of overlap too.

           **MS. DIAMOND:**  If we could turn to the next slide,
please, Mr. Jackson.

**Q.**   This slide, Dr. Armstrong, is where you've listed things
related to obsessive-compulsive disorder, or OCD.  Does this
area -- sorry.  Does this condition similarly affect frontal
lobe functions or another part of the brain?

**A.**   It affects the frontal lobe in relation to a whole system
that begins with the basal ganglia in the brain.

**Q.**   Where is and what is the basal ganglia?

**A.**   The basal ganglia is the part of the brain affected in
Parkinson's, for example, that allows for not just smooth
movement, but smooth thoughts, fine -- fine-tuning of both
thought and motor coordination.

**Q.**   Is it -- so can you tell us the key characteristics of OCD
in behavioral characteristics?

**A.**   Sure.  It is characterized by a combination of obsessions,

ARMSTRONG - DIRECT / DIAMOND

1  another way of saying that is intrusive thoughts, and

2  compulsions.

3  **Q.**  Are the compulsions physical, mental, or both?  Or do they

4  man- -- do they have a physical manifestation?  Let's start

5  with that.  Do they --

6  **A.**  Compulsions are --

7  **Q.**  -- ever have a physical manifestation?

8  **A.**  Yes.  They are behaviors.

9  **Q.**  And to diagnose someone with OCD, is there a requirement

10  that particular compulsions or behaviors extend for a set

11  period of time in order to be classified as OCD?

12  **A.**  Yes.  I don't -- I don't know that I have that memorized

13  off the top of my head, though, but I've got -- I could look it

14  up in the DSM.

15  **Q.**  Okay.  We're going to come back to that.

16  **A.**  Okay.

17  **Q.**  Can you -- have you found in your practice, your clinical

18  practice and your research and your training a relationship

19  between OCD and ADHD?

20  **A.**  Yes.  The research definitely shows that.

21  **Q.**  And based on your understanding of the research, what

22  happens behaviorally with a person who has a compulsive

23  interest in something if they also have ADHD?

24  **A.**  There is an exacerbation of the ability to put the brakes

25  on the compulsion, yep.

**ARMSTRONG - DIRECT / DIAMOND**

1  Q.    "Exacerability" meaning someone can't stop it?

2  A.    Correct.

3  Q.    And when the area of compulsion lines up with the area of

4  hyperfocus or interest present in someone with ADHD or even

5  autism, how does that affect the OCD?

6  A.    And that goes back to, the system dynamics at play with

7  OCD and the frontal lobe is that OCD relies on the frontal lobe

8  as direct input for correction or for toning down of the

9  anxiety caused by the intrusive thought such that if ADHD is

10  present, it's interfering with the frontal lobe's ability to

11  put the brakes on anxiety.

12  Q.    So does the hyperfocus, in fact, make the compulsion worse

13  or more common?

14  A.    It tends to make it worse because it's reinforced.  It

15  relieves the anxiety for a time, which we know with operant

16  conditioning, reward-based learning, that it's a reward to feel

17  relief when you're less anxious.

18  Q.    Is there a chemical in the brain that's related to that?

19  A.    Yes.

20  Q.    What is that?

21  A.    Dopamine.

22  Q.    Does someone with these clusters of conditions such that

23  Marcus has have a limit to the access to the dopamine in his

24  brain?

25  A.    Can you repeat that question for me?

1  Q.   Sure.  What are the -- I'm going to make it more

2  open-ended for you.

3       What are the characteristics of someone with these

4  conditions with relate -- related to the levels of dopamine?

5  A.   So --

6            MR. HIGHSMITH:  Objection.  Which condition?

7            MS. DIAMOND:  The cluster of conditions that

8  Dr. Armstrong has testified about so far, the ASD and the ADHD

9  and the OCD.

10            THE COURT:  You may answer the question.

11            THE WITNESS:  So all of those diagnoses are implicated

12  in its effects to the dopamine system.

13  BY MS. DIAMOND:

14  Q.   When someone's dopamine depletes, is there anything

15  related to stress or anxiety that the person feels?

16  A.   So stress and anxiety work to serve as a backup sometimes

17  to dopamine deficiencies, thankfully, because if we were being

18  chased by a bear, we don't want ADHD or your dopamine

19  inefficiencies to not allow us to concentrate and get away from

20  that bear.

21       With these disorders that I diagnosed, we're talking about

22  a system that does not produce the typical dopamine

23  efficiencies or the dopamine response as everyone else; and as

24  a consequence of that, most people diagnosed with particularly

25  ADHD and autism will have a higher cortisol level throughout

1   childhood, and it can be measured directly in relation to their

2   overall stress response in that way.

3   **Q.**   What does cortisol do in the brain?

4   **A.**   Cortisol is kind of like the jet fuel.  It's your backup

5   plan where if you're being chased by a bear, if you don't have

6   sufficient dopamine, it's going to pump and flood your brain in

7   a similar fashion that an ADHD medication would, except it's --

8   it is a time-limited release that isn't meant to be chronic.

9   So, like, there's a difference between acute stress and chronic

10  stress.

11  **Q.**   Does cortisol cause stress, or is it present when someone

12  is experiencing stress?

13  **A.**   Cortisol is present all the time and it fluctuates.

14  External stressors, as interpreted through the brain, can

15  trigger a stress response, yeah.

16          **MS. DIAMOND:**  Mr. Jackson, could you, on the slide on

17  the screen, please blow up the second-to-the-last listed point.

18  **Q.**   And, Dr. Armstrong, this slide describes that a person

19  with OCD [as read]:

20          "Can result in rigid, inflexible thinking

21      patterns with anger reactions when others attempt to

22      stop or prevent the compulsions."

23      Can you describe a little bit about the behavioral traits

24  that a typical brain person might see in relationship to these

25  characteristics?

1              **MR. HIGHSMITH:**  I'm going to object to the question as

2    compound and confusing and calling for a narrative.

3              **THE COURT:**  Sustained.

4    **BY MS. DIAMOND:**

5    **Q.**   Could you describe this feature, please, in a little -- in

6    your own words a little more -- in a little more detail,

7    please --

8    **A.**   Sure.

9    **Q.**   -- the behavioral traits that are related to this feature?

10             **MR. HIGHSMITH:**  Objection.  Speculation and also

11   vague.

12             **THE COURT:**  Sustained.

13   **BY MS. DIAMOND:**

14   **Q.**   Could you describe this feature, please, to the jury?

15             **THE COURT:**  He can answer that question.

16        Go ahead.

17        **THE WITNESS:**  OCD often produces an exacerbated stress

18   response, fight or flight, when that person's compulsions are

19   interrupted or prevented.

20             **MS. DIAMOND:**  You can take the highlight down.

21   Thank you.

22   **Q.**   Dr. Armstrong, in your practice, in your experience, have

23   you seen a common correlation between people with ASD and ADHD

24   with people with OCD?

25   **A.**   Yes.

1          **MS. DIAMOND:**  If we could turn to the next slide,

2    please.

3    **Q.**   Dr. Armstrong, you prepared this slide to describe some of

4    the traits of bipolar disorder.  Could you please describe some

5    highlights from that for the jury?

6    **A.**   Yeah.  So bipolar disorder is a classical psychiatric

7    diagnosis that has undergone substantial research since the

8    beginning of time from psychiatry.  That matters because --

9          **MR. HIGHSMITH:**  I'm going to object.  Narrative.

10   Calls for a narrative.

11         **THE COURT:**  Well, he can -- hopefully, it's coming to

12   a conclusion.

13       Go ahead.  Keep going.

14         **THE WITNESS:**  That matters because we now know it

15   consists of a fluctuation between depressive states and manic

16   states.

17       These fluctuations can lead to behavioral patterns during

18   each episode of depressive or manic episode that interfere with

19   brain functioning during those episodes, particularly executive

20   functioning.

21   **BY MS. DIAMOND:**

22   **Q.**   That's the decision-making, planning, time management

23   features that you were discussing initially; correct?

24   **A.**   Correct.

25   **Q.**   Is there any correlation that you have seen in your

**ARMSTRONG - DIRECT / DIAMOND**

1  practice, that you have learned in your training between people

2  with bipolar and taking -- making complex financial decisions?

3  **A.**   Yes.  And, in fact, it is in our diagnostic manual

4  somewhere that financial -- or impulsive financial

5  decision-makings are quite common with manic episodes.

6  **Q.**   When you say "manic," I know there's some pop culture idea

7  of mania that's out there that envisions someone staying up for

8  days.  Are there various levels of severity in a bipolar

9  diagnosis, and if so, where did you find Marcus fall in that

10  level of severity?

11  **A.**   So the various severity levels -- yes, there are various

12  severity -- I'm sorry.

13       Yes, there are various severity levels.  Pinpointing

14  exactly whether or not it's Bipolar I or II -- and there are

15  theories out there that go from .5 to 5 as far as trying to

16  distinguish between the severity level.  The reality is, is

17  that unless you lived with the person or you had them in an

18  inpatient hospital setting, an observation for extended periods

19  of time, it's not very easy or reliable to try to pinpoint

20  exactly which severity level we're talking about.

21  **Q.**   And when you say that there was a level 0 to .5 and 1 and

22  2, is this the same as with ASD, where the lower number is, a

23  higher functioning, less impaired person?

24  **A.**   Yeah.  And I'm sorry.  I need to clarify that.

25       The types or subtypes of bipolar don't distinguish

1  severity.  That's the old way of thinking about it.  Since the

2  newest update to our diagnostic manual, the severity level is

3  the same.  There are just different subtypes.

4  **Q.**  Did you see any evidence that Marcus had been hospitalized

5  for bipolar disorder at all?

6  **A.**  I did not see evidence of that.

7  **Q.**  Did you review his medical records from the Veterans

8  Administration?

9  **A.**  Correct.

10  **Q.**  Did you review any other medical records of Mr. Andrade's?

11  **A.**  No.

12  **Q.**  Are there traits in common with bipolar disorder with some

13  of the other frontal lobe disorders that you've described

14  Marcus as having?

15  **A.**  Yes.

16  **Q.**  What are some of those, please?

17  **A.**  Executive dysfunction being a common overlap trait there,

18  including impaired judgment, impaired self-monitoring, impaired

19  emotional regulation.

20  **Q.**  Does this condition also come with anosognosia?

21  **A.**  In the extreme swings of it, yes.

22  **Q.**  Could you describe a bit about how these conditions all

23  relate with each other in a person's daily life if -- in a

24  person that has all of these conditions?

25      **MR. HIGHSMITH:**  Objection.  Calls for a narrative.

1          THE COURT:  Overruled.

2          THE WITNESS:  So --

3          MS. DIAMOND:  If we could have Slide Number 11,

4    please, Mr. Jackson.

5          THE WITNESS:  These diagnoses are commonly what's

6    called comorbid.  They co-occur frequently together, mainly

7    because our brains don't really care about the names that we

8    give this stuff.  And it's expected that if you meet the

9    diagnostic criteria for one, you're going to have an

10   above-average amount of traits at least for the others, if not

11   meeting the other diagnostics criteria.

12         Not everybody meets all diagnostic criteria if you have

13   one, but there's a vacillating severity of function.  What that

14   means is, depending on the level of stress, one may or may not

15   have met the full criteria of OCD that day versus autism and

16   ADHD, which are lifelong diagnoses that don't go away depending

17   on stress.

18   BY MS. DIAMOND:

19   Q.   Is OCD always related to stress?

20   A.   Yes.

21   Q.   So does that mean on a particular day, a person with OCD

22   might not feel an effect of that and, on another occasion, they

23   would?  Does it fluctuate in that way from day to day?

24   A.   There's a waxing and waning of symptoms for sure across

25   the lifespan.

**ARMSTRONG - DIRECT / DIAMOND**

1  **Q.**  And that's different from ASD; is that right?

2  **A.**  That's correct.

3  **Q.**  Have you found in your research and training that someone

4  with ASD, OCD, ADHD, and bipolar disorder is gullible or

5  vulnerable to someone who wants to take advantage of them?

6  **A.**  Yes.  And it is both in the literature and in my written

7  reports most of the time, especially to parents of young

8  adults, that those diagnoses, particularly autism, come with a

9  substantial risk for being taken advantage of by others for two

10  reasons, yeah.

11  **Q.**  Yeah.  What are the reasons?  Thank you.

12  **A.**  One is a limited social cognition, like we've discussed

13  already, the inability to read between the lines and understand

14  motivations or what might be motivations.

15      The other is a general people-pleasing approach, that

16  people with autism will often try to meet what they believe or

17  perceive to be the social demands and expectations and, you can

18  imagine without social cognition, are not frequently good at

19  that, yeah.

20  **Q.**  Could you let the jury know, please, how these conditions

21  might manifest in what you've indicated in your slide

22  presentation as cognitive rigidity?

23  **A.**  So cognitive --

24      **MR. HIGHSMITH:**  Objection.  Calls for speculation, how

25  they might manifest.

1    BY MS. DIAMOND:

2    **Q.**    How they do manifest, in your experience and training --

3         **THE COURT:**  Overruled.

4    Go ahead.

5    BY MS. DIAMOND:

6    **Q.**    -- in someone with these conditions?

7    **A.**    So those conditions cause cognitive rigidity, which we've

8    talked about.  It's an inability to remain mentally flexible,

9    and whether we're talking about a thought or a behavior or an

10   emotion, it's being stuck.

11   **Q.**    In common parlance, could you call it an inability to

12   pivot?

13   **A.**    Yes.

14   **Q.**    Are the social skill challenges that you've described a

15   person with ASD as having in any way increased or repeated in

16   any -- sorry -- based on any other conditions that Marcus has

17   besides the ASD?

18   **A.**    Yeah.  I would say the other diagnoses certainly

19   exacerbate the foundation, which is an impaired social

20   cognition from autism.

21                    (Pause in proceedings.)

22        **THE COURT:**  We're getting close to the end of direct?

23        **MS. DIAMOND:**  We're getting close, Your Honor.  If

24   the Court wants to take a break, it's probably a good --

25        **THE COURT:**  Well, I want you to conclude.

1        **MS. DIAMOND:**  Great.

2        **THE COURT:**  So how much more time do you think?

3        **MS. DIAMOND:**  I'm just reviewing my notes.  Thank you.

4                    (Pause in proceedings.)

5    **BY MS. DIAMOND:**

6    **Q.**   Is there any unique characteristic about a person with ASD

7    in relationship to sincerity or directness about what's going

8    on in their brain when they communicate with others?

9    **A.**   Yeah.  I would say the alexithymia present with autism,

10   which is, again, the inability to read one's own emotions,

11   interferes with what ends up being perceived by others as

12   authenticity and which is why individuals with autism can

13   sometimes appear robotic or preprogrammed as if they're acting.

14   **Q.**   The alexithymia is the unawareness of one's own emotions?

15   **A.**   Mm-hmm.

16   **Q.**   So a person who's communicating doesn't -- does this mean

17   that they don't know how they come across?

18   **A.**   Correct.

19   **Q.**   Is such a person with ASD usually aware if they are

20   misdirecting anyone?  Are they --

21   **A.**   I -- based on my experience, no.

22   **Q.**   Are they capable of misdirecting people intentionally?

23   **A.**   I'm not sure how to answer that.

24   **Q.**   Fair.  Withdraw the question.  No problem.

25   **A.**   I'd like to answer it, though.  It's important.

ARMSTRONG - DIRECT / DIAMOND

1   **Q.**   Do you -- I mean, have you --

2              **THE COURT:**  There's no question pending.

3              **THE WITNESS:**  Okay.

4              **THE COURT:**  Ask a question.

5   **BY MS. DIAMOND:**

6   **Q.**   Do you have a list handy of the objective tests that you

7   gave Mr. Andrade?

8   **A.**   I do.

9   **Q.**   Could you -- these tests have names; correct?

10  **A.**   Mm-hmm.

11  **Q.**   Could you list the tests, please, for the jury?

12  **A.**   Sure.  I'm just going to pull them up here.

13  **Q.**   And if you could just -- if it refreshes your memory, just

14  look up when you're done reviewing what you're reviewing and

15  let us know.  And if you need to check the list again to

16  refresh your memory, that's fine.

17  **A.**   Sure.

18  **Q.**   Just tell us so we know on the record that that's

19  happened.  Thank you.

20  **A.**   Yeah.  I'm just trying to pull up the test data sheet.

21       (Witness examines document.)  All right.  Yeah, so I've

22  got the tests.  The tests that I gave and administered included

23  the Wechsler Adult Intelligence Scale Fourth Edition.

24  **Q.**   May I stop you there?

25       Is that the intelligence test that you said was the gold

ARMSTRONG - DIRECT / DIAMOND

1  standard?

2  **A.**    Correct.

3  **Q.**    Okay.  Next test, please.

4  **A.**    The Wide Range Achievement Test Fifth Edition, which

5  included three subtests from that.

6  **Q.**    What, very briefly, does that testing process entail?

7  **A.**    It measures and screens out academic achievement for

8  reading, spelling and math, and screens out learning

9  disabilities.

10 **Q.**    Next test, please.

11 **A.**    The Repeatable Battery for the Assessment of

12 Neuropsychological Status, RBANS.

13 **Q.**    And what does that -- briefly, what does that test entail?

14 **A.**    It measures short- and long-term verbal and visual memory,

15 simple attention span, processing speed and language, and

16 visual-spatial processing.

17 **Q.**    And the next test, please?

18 **A.**    I gave the Delis-Kaplan Executive Functioning System

19 subtest, the color word subtest, Conditions 1 through 4, which

20 is a measure of processing speed in addition to aspects of

21 mental flexibility and filtering distractions.

22 **Q.**    And the next test, please.

23 **A.**    The Sentence Repetition Test, which is a test of auditory

24 working memory and which is a receptive and expressive language

25 test measuring the left temporal lobe in most cases.

ARMSTRONG - DIRECT / DIAMOND

1    Q.    The next test, please.

2    A.    Mm-hmm.   I gave the Halstead -- selected subtest from the

3    Halstead, one that measures mental flexibility, the Trail

4    Making Test B, and the category test which measures abstract

5    reasoning, learning to learn.

6         And I forgot to mention on the D-KEFS test, I also gave

7    the 20 questions test as a measure of executive function.

8    Q.    What is the 20 questions test?

9    A.    It is a simple test of utilizing external feedback to

10   problem solve where an examinee is shown 30 items on a page

11   that some are related, some are not.   They're told that I've

12   picked out one of those items, but I'm not going to tell you

13   which one.   And your job is to ask me questions to figure out

14   which one I picked.   And I will -- you can only answer -- you

15   can only ask questions that I can answer with a "yes" or a

16   "no," and the goal is to ask the fewest number of questions

17   possible.

18   Q.    What does this -- what part of the brain -- what function

19   of the brain does that measure?

20   A.    It's a frontotemporal test that is sensitive for

21   frontotemporal dementia, not particularly sensitive for much

22   else.

23   Q.    As you went through these tests, are all these -- we're

24   going to get back to your list, but are all these tests tests

25   that you always give to all of your patients or only when

**ARMSTRONG - DIRECT / DIAMOND**

1    you're suspecting a frontal lobe issue?

2    **A.**    These are tests that I give to all my patients.

3    **Q.**    Could you go through the next test, please?

4    **A.**    Sure.

5          **THE COURT:**  I take it you're not getting close to the

6    end?

7          **MS. DIAMOND:**  It's a long list of tests, Your Honor,

8    and we'll be --

9          **THE COURT:**  All right.  We'll take our break.

10    Members of the jury, remember my admonitions.  Do not

11    discuss this amongst yourselves or with anyone else.

12    And we'll be back in 15 minutes.

13          (Recess taken at 10:15 a.m.)

14          (Proceedings resumed at 10:35 a.m.)

15    (Proceedings were heard out of the presence of the jury.)

16          **THE COURT:**  Okay?

17    (Proceedings were heard in the presence of the jury.)

18          **THE COURT:**  The jury is present.

19    You may proceed.

20    **BY MS. DIAMOND:**

21    **Q.**    We were reviewing before the break, Dr. Armstrong, your

22    list of tests that you gave as part of your comprehensive

23    neuropsychological evaluation of Marcus.

24          What is the next test, please, that you gave?

25    **A.**    Sure.  It's the Grooved Pegboard test.

**ARMSTRONG - DIRECT / DIAMOND**

1    Q.    What does that entail?

2    A.    Measures fine motor coordination and speed with the right

3    and left hand.

4    Q.    And what conditions does that relate to, if any, of

5    Marcus's conditions?

6    A.    It can relate to dysgraphia, which is a learning disorder

7    with impairment in written expression or tremor, things like

8    that.

9    Q.    When you say "a tremor," is that indicative or does that

10    correlate to any particular diagnosis?

11    A.    In some cases, yes.

12    Q.    What diagnosis, if any, of Marcus's diagnoses?

13    A.    I didn't observe a tremor with him.

14    Q.    Can you -- a tremor is a physical movement; correct?

15    A.    Mm-hmm.

16    Q.    Can you describe what the term "stimming" means in

17    relationship to people with ASD?

18    A.    Stimming is a self-soothing repetitive behavior that can

19    range from vocalizations that are repeated all the way to real

20    subtle physical-like movements of tapping the foot or blinking,

21    yeah.

22    Q.    And are these conditions that may sometimes manifest in

23    someone with ASD or -- sorry.  Not conditions.

24         The stimming, is that a behavior that sometimes manifests

25    or always manifests?

ARMSTRONG - DIRECT / DIAMOND

1    **A.**    It has always manifest, in my experience.

2    **Q.**    And is this -- would a person with ASD use stimming at all

3    times, 24/7, or would that fluctuate throughout a person's day?

4    **A.**    It certainly fluctuates and is context dependent and

5    stress dependent.

6    **Q.**    So it increases with stress.  Is that what you're saying?

7    **A.**    Correct.

8    **Q.**    Turning back to your tests, were there other tests that

9    you gave?  And if so, please let us know the name of the next

10   one.

11   **A.**    Sure.  The Lateral Dominance Exam.

12   **Q.**    What is that?

13   **A.**    The measure of handedness, which can help us pinpoint

14   the -- which hemisphere in the brain is where language is

15   localized or the dominant hemisphere.

16   **Q.**    Was there anything remarkable about that test that

17   indicated any diagnosis to you?

18   **A.**    No.

19   **Q.**    Okay.  Next test, please.

20   **A.**    The Line Bisection Test.

21   **Q.**    What does that test entail?

22   **A.**    It is a measure of what's called hemispatial attention.

23   So it's sensitive to things like stroke and especially

24   impaired, like, dementias and different types of biologically

25   based diseases of the right hemisphere particularly.

ARMSTRONG - DIRECT / DIAMOND

Q.    Is this one of the tests that you gave in order to see if
there were other explanations for the behaviors that you
preliminarily identified as possibly being related to frontal
lobe disorders?

A.    Correct.

Q.    And what was -- what were your findings from that test?

A.    It was normal.

Q.    Next test, please.

A.    I gave, well, several Performance Validity tests.

Q.    What are those, and can you describe how you used them in
Marcus's exam?

A.    So neuropsychologists are often asked to administer all
these tests and interpret these tests, and ethically we're
required to be able to speak to the validity of those results.
We have tests that measure how hard an examinee is trying
during testing, where people with severe brain injuries can
pass these tests.  And so they're not sensitive to
neuropsychological deficits, but they tend to be quite
sensitive and specific for motivational inconsistency or effort
during testing.

Q.    Are these some of the tests that neuropsychologists have
developed to determine if someone's trying to trick the
examiner or fool them?

A.    Yes.

Q.    And in your reading of the test data, did Marcus's tests

**ARMSTRONG - DIRECT / DIAMOND**

1    indicate that he was trying to trick you?

2    **A.**    No.  He passed, essentially, all of my effort tests.

3    **Q.**    You used the word "essentially."  Can you explain how

4    you -- why you clarified that, please?

5    **A.**    He was right on the cusp of -- well, there are two types

6    of effort tests.  There are tests that have been designed

7    specifically to measure effort, which are really good at

8    pinpointing what is -- might be malingering or the faking of

9    symptoms, versus embedded tests where I gave the IQ test that

10   includes a test built into it that I can use also and calculate

11   what's called the Reliable Digit Span, which is another form of

12   effort test.  But it's given to everybody.  It's not a new test

13   that was added to it.

14          And so I used a combination of three standalone effort

15   tests and three embedded tests of effort.  The embedded tests

16   of effort, like I said, tend to have less reliability, less

17   specificity when it comes to identifying malingering.  And

18   I believe it was the repeatable battery for the assessment of

19   neuropsychological status, the effort index, which was a 2 that

20   suggests -- it suggests a score consistent with individuals who

21   have moderate to severe brain damage.

22   **Q.**    Is that another way of saying impairment --

23   **A.**    Yes.

24   **Q.**    -- that we've been talking about?

25   **A.**    Yep.

ARMSTRONG - DIRECT / DIAMOND

1   Q.   Is there anything in the tests that measure effort or

2   attention to the tests of the subject that indicate to you that

3   your results might be wrong?

4   A.   The other test that I gave was the Personality Assessment

5   Inventory, which is the objective personality test that

6   contains several, like, hundred questions in relation to one's

7   mood and symptoms and so forth.  And on that test, when someone

8   scores higher on the symptom exaggeration scales, for whatever

9   reason, they will often have elevations across multiple

10  diagnostic possibilities.

11       So, in other words, when someone scores -- when someone

12  reports a wide range of many different symptoms, the PAI is

13  good about picking that up.  It's not very good at helping me

14  differentiate between what might be Bipolar I or Bipolar II or

15  OCD versus obsessive-compulsive personality disorder.

16       But that test, by itself, is not used in isolation for

17  diagnostic purposes, which is why we give the whole battery of

18  tests and look at the whole picture.

19  Q.   Are any one of these tests good enough to diagnosis the

20  conditions we've been talking about alone?

21  A.   No.  I always say that a test doesn't make a diagnosis

22  because otherwise my student loans were for naught.

23  Q.   Were there other tests that you gave to Marcus during your

24  evaluation?

25  A.   I think we covered all of them.

ARMSTRONG - DIRECT / DIAMOND

1    Q.    Are these tests considered to produce objective data?

2    A.    Yes.

3    Q.    Were these tests relied upon by yourself in making your

4    diagnosis?

5    A.    Yes.

6    Q.    Are the tests and the science behind them the primary

7    reason for your diagnosis?

8    A.    Yes.

9    Q.    If we could, I just want to make sure we've covered the

10    behavioral traits of each of these.

11            MS. DIAMOND:   I think that we have, but if we could

12    quickly look at -- Mr. Jackson, please, display page 4.  This

13    is the ASD cluster of traits.

14    Q.    I know the jury has seen your slide.  For the record, I

15    would like to just address a few of them.

16            We've talked about the frontal lobe functioning

17    impairment; correct?

18    A.    Correct.

19    Q.    And that's related to cognitive impairment and executive

20    dysfunction; is that right?

21    A.    Correct.

22    Q.    You've listed a number of bullet points on the slide.  Can

23    you address them in turn, please, starting with "perception of

24    relationships (overly trusting and mistrusting)"?

25    A.    Yes.  So individuals with autism often will have literal

**ARMSTRONG - DIRECT / DIAMOND**

1  interpretations of relationship interactions and communicated,

2  you know, speech, whether they're listening or in written form.

3  **Q.**   Does that relate to their inability to read subtext in

4  social interactions?

5  **A.**   Yes.

6  **Q.**   You've written down that these people have -- individuals

7  with this condition have difficulty with recall of

8  autobiographical data.

9  **A.**   Mm-hmm.

10  **Q.**   How does that manifest?

11  **A.**   The research that I've seen that has been pretty

12  long-standing now highlighting that autobiographical memory or

13  the ability to remember what I did when I was five years old is

14  often more limited than the individual without autism.

15  **Q.**   Would a person possibly misremember behaviors or --

16  sorry -- events that occur in their adult life if they had not

17  been diagnosed or in treatment for this condition?

18  **A.**   Correct.  So there's often the memory of their perception

19  of events.

20  **Q.**   Does that mean that they remember what they think is going

21  on rather than what actually occurred?

22  **A.**   Correct.

23  **Q.**   Is that related to the anosognosia?  Did I say that right?

24  Would you say that again, please?

25  **A.**   Anosognosia.  Yeah, anosognosia.

**ARMSTRONG - DIRECT / DIAMOND**

1   **Q.**    What does that term entail?

2   **A.**    Right.  It's the lack of self-awareness, not knowing what

3   you don't know.

4   **Q.**    So, in other words, if a person has a conversation -- a

5   person with ASD has a conversation, they're forming an

6   impression of the conversation while they're having it.  And

7   are you saying that their memory would be related to their own

8   perception of the conversation rather than misremembering it

9   later?

10  **A.**    Correct.

11  **Q.**    Could you talk about the next bullet point, please, which

12  says [as read]:

13          "Emotional regulation and stress tolerance."

14      How does that interact with ASD?

15  **A.**    So there's a general lower threshold for stress tolerance

16  for individuals with autism spectrum, and that's present all

17  the time, present since birth, which is where they can often

18  get overstimulated, not just environmentally but even

19  cognitively.  And that will often play itself out with

20  secondary diagnoses that we've mentioned already with bipolar

21  mood swings, exacerbations of OCD-like episodes.

22  **Q.**    So are you saying that someone who has these cognitive

23  impairments might emotionally react to the stress of trying to

24  understand something that's beyond their capacity to

25  understand?

ARMSTRONG - DIRECT / DIAMOND

1    **A.**    Correct.

2    **Q.**    And is there a term that's used sometime "autistic

3    meltdown"?

4    **A.**    Yes.

5    **Q.**    Have you heard that term?  I don't know.  Is it a term

6    that you use in your profession?

7    **A.**    I don't use it because it's kind of derogatory or it has

8    been turned into a negative connotation, yeah.

9    **Q.**    Does that relate to the idea of a person expressing anger

10   or some sort of forceful comment in relation to a cognitive

11   impairment that they're experiencing?

12   **A.**    Yes.  The cognitive -- it's an explosive anger reaction

13   that's fight or flight often due to the disinhibited frontal

14   lobe.

15   **Q.**    Turning back to your slide, we've already discussed mental

16   inflexibility and the hyperfixation.

17       When you've listed here "self-awareness and

18   self-monitoring," does that refer to the two words beginning

19   with A, one talking about not being aware of what one doesn't

20   know and not being aware of what one's emotions actually are?

21   **A.**    Mm-hmm, yeah, anosognosia and alexithymia.

22   **Q.**    Yes.

23   **A.**    Right.

24   **Q.**    Is that what you're referring to here?

25   **A.**    Yes.

**ARMSTRONG - DIRECT / DIAMOND**

1   **Q.**   Thank you.

2        **MS. DIAMOND:**  If we could see, please, the next page,

3   the slide discussing ADHD.

4   **Q.**   Let's look at the impulse control problems.  You've

5   written that they're often stress responses and contextually

6   dependent.  Can you describe what that means, please, to the

7   jury?

8   **A.**   An example of impulse control problems that would be

9   contextually dependent in ADHD would be, let's say a young

10  adult playing a video game who's able to sustain attention and

11  have excellent impulse control in that moment versus while in

12  college and trying to listen to a lecture by a professor

13  that -- for a class that they're not interested in.

14  **Q.**   So when an ADH- -- sorry.  When a person with ADHD is more

15  interested in someone, their stress level goes down -- is that

16  right? -- in something?  I'm sorry.  I'm going to say that

17  question again.  Thank you.

18       A person with ADHD, when they're more interested in

19  whatever they're focusing on, is it less stressful for that

20  person at that moment to engage in that interest?

21  **A.**   I'm not sure I know that answer.

22  **Q.**   Are they able to focus their attention for a greater

23  duration of time when they're looking at something on the

24  subject of their interest?

25  **A.**   Yes.

**ARMSTRONG - DIRECT / DIAMOND**

1  **Q.**   How does -- returning to the slide -- difficulty attending

2  and listening to details in conversation manifest?

3  **A.**   With ADHD, again, it's going to be interest dependent and

4  much more variable, depending on how hangry or tired that

5  person is.

6  **Q.**   And you said "hangry," meaning hungry or angry?

7  **A.**   Correct.

8  **Q.**   Turning next to the hyperactivity of the mind which can

9  interfere with sleep, tell the jury a little bit about that,

10  please.

11  **A.**   ADHD and autism both often interfere with the brain's

12  ability to use dopamine at night because dopamine is a gas and

13  a brake fluid.  So part of its job at night is to be able to

14  stop intrusive thoughts.  People with differences or disorders

15  of the dopamine system frequently have difficulty turning their

16  brain off at night as a product of their dopamine dysfunction.

17  **Q.**   Does this relate in any way also to bipolar disorder?

18  **A.**   Yes and no.  I hate to say it depends, but it depends.

19  **Q.**   When someone's in a manic phase in bipolar disorder, are

20  they experiencing effect of chemicals in their brain that might

21  interfere with sleep?

22  **A.**   Yes.

23  **Q.**   And delayed frontal maturation, you indicated that it

24  leads to several behavioral features such as impaired listening

25  and attention to detail -- we've discussed that a little bit --

**ARMSTRONG - DIRECT / DIAMOND**

1    hypersensitivity to rejection and criticism to others.  Can you

2    describe what that entails?

3    **A.**    Right.  So there's often a less than adulthood mature --

4    like, with adults with ADHD, there will often be what can

5    appear to be more of a teenage-level emotional response to

6    perceived slights, criticisms, or social rejection.

7    **Q.**    Does this clue into the fight or flight reaction that you

8    mentioned a little earlier?

9    **A.**    Yes.

10    **Q.**    So --

11    **A.**    Absolutely.

12    **Q.**    -- might someone resort -- with this condition resort to

13    what looks like bullying in response to a situation they

14    perceive is dangerous?

15    **A.**    Certainly on the fight side of that fight or flight, yes.

16    **Q.**    And, lastly, we have discussed the executive function

17    problems, impaired judgment, decision-making, planning,

18    prioritizing, and time management.

19          **MS. DIAMOND:**  So, Mr. Jackson, please let's turn to

20    the OCD slide, if you would.

21        That's the next one.  Thank you.

22    **Q.**    For each of these diagnoses, Dr. Armstrong, did you rely

23    on the criteria listed in the DSM-5 in order to make these

24    diagnoses?

25    **A.**    I did.  It was the DSM-5 Text Revision, which is the

1    newest edition.

2    **Q.**    What is the DSM-5, for those --

3         **THE COURT:**  This is getting awfully repetitive.  We've

4    gone over this.  So let's move on.

5         **MS. DIAMOND:**  Very well, Your Honor.  Thank you.

6    **Q.**    So as you've noted on the slides, the OCD does result in

7    impaired frontal lobe networking, but the symptoms do wax and

8    wane; they're not always present.  Is that correct?

9    **A.**    Correct.

10   **Q.**    And this is one of the conditions that adds to inflexible

11   thinking; is that right?  Is that what the second-to-last --

12   **A.**    Correct.

13   **Q.**    -- indication --

14   **A.**    Yep.

15   **Q.**    -- on your slide is about?

16        Do you know the percentage of people or the approximate

17   percentage of people who have these frontal lobe conditions in

18   common, meaning more than just ASD?  Is it -- if you know, how

19   much of the population of people with ASD also suffer from some

20   form of ADHD or OCD?

21   **A.**    I don't know that percentage off the top of my head.

22   **Q.**    What about bipolar disorder?  Is there a correlation where

23   you've seen bipolar disorder not infrequently among people that

24   you've treated with ASD?

25   **A.**    Correct.

1          **MR. HIGHSMITH:**  Objection, Your Honor.  This is

2     cumulative.  Asked and answered.

3          **THE COURT:**  It's awfully cumulative.

4          **MS. DIAMOND:**  May we turn to the next slide, please,

5     Mr. Jackson.

6          **THE COURT:**  For example, haven't we seen this slide?

7          **MS. DIAMOND:**  We've seen this slide.

8          **THE COURT:**  So why are we going back over it again?

9          **MS. DIAMOND:**  I'm just making sure that we've covered

10    them for the record and --

11         **THE COURT:**  Well, you've covered it, and you've got --

12         **MS. DIAMOND:**  Thank you.

13         **THE COURT:**  -- a redirect opportunity as well, so

14    let's move along.

15         **MS. DIAMOND:**  Thank you.

16    **Q.**  Dr. Armstrong, when you conducted your neuropsychological

17    evaluation of Marcus, were you the person who determined how

18    long you thought you needed with Marcus when you were asked to

19    do an evaluation?

20    **A.**  Yes.

21    **Q.**  And how long did you spend with him that day in total?

22    **A.**  I think it was five hours.

23    **Q.**  And --

24    **A.**  Five and a half, yep.

25    **Q.**  After your five or five and a half hours with him, if you

1   had needed more time, would you have asked for more time?

2   **A.**   Mm-hmm.

3   **Q.**   Did you find that necessary?

4   **A.**   No.

5   **Q.**   Would you say that you are a little confident, somewhat

6   confident, or highly confident of your diagnosis?

7   **A.**   I never make a diagnosis lightly.  I'm highly confident.

8           **MS. DIAMOND:**  Thank you.

9           Nothing further, Your Honor.

10          **THE COURT:**  Mr. Highsmith?

11                          **CROSS-EXAMINATION**

12  **BY MR. HIGHSMITH:**

13  **Q.**   Hello, sir.

14  **A.**   Hello.

15  **Q.**   You have a master's degree in psychology from the

16  University of the Rockies; correct?

17  **A.**   Yes, sir.

18  **Q.**   You have a Phys.D. from the University of the Rockies; is

19  that correct?

20  **A.**   No, sir.

21  **Q.**   What do you have from there?

22  **A.**   The Psy.D.

23  **Q.**   Psy.D.  Sorry.

24  **A.**   Yes, sir.

25  **Q.**   And you teach graduate-level courses related to psychology

1   at Amberton University; is that right?

2   **A.**    That's correct.

3   **Q.**    Are you familiar with the American Psychological

4   Association?

5   **A.**    I am.

6   **Q.**    And is the American Psychological Association a scientific

7   organization that advocates for psychology and mental health

8   professionals in the United States?

9   **A.**    Yes, sir.

10  **Q.**    So it's correct that the University of the Rockies, where

11  you got your master's degree in psychology and your

12  Phys.D. [sic], is not accredited?

13  **A.**    That's correct.

14  **Q.**    By the American Psychological Association; is that

15  correct?

16  **A.**    Yes, sir.

17  **Q.**    And is it also correct that Amberton University, where you

18  teach graduate-level courses, is not accredited by the American

19  Psychological Association; correct?

20  **A.**    Correct.

21  **Q.**    So you have a YouTube channel for your students at

22  Amberton; is that right?

23  **A.**    Yes, sir.

24  **Q.**    And in one of your videos on ADHD medication options, you

25  say that you cannot prescribe medication in Texas; right?

**ARMSTRONG - CROSS / HIGHSMITH**

1   **A.**   Correct.

2   **Q.**   So to be clear, Texas does not permit you to prescribe

3   medication; correct?

4   **A.**   That's correct.

5   **Q.**   In your video, your YouTube video for students at

6   Amberton, there's a video on June 12th, 2013, where you say,

7   quote, "Stats is the poor man's math," unquote; is that right?

8   **A.**   That's correct.

9   **Q.**   And then you tell your students, quote, "But I don't say

10  that in court," end quote; correct?

11  **A.**   Correct.

12  **Q.**   You testified on direct examination that you have never

13  testified on behalf of the prosecution; is that right?

14  **A.**   Correct.

15  **Q.**   And I think you testified on direct examination that you

16  have been hired by defense teams; is that correct?

17  **A.**   Yes, sir.

18  **Q.**   And you've been hired by this defense team; correct?

19  **A.**   Yes, sir.

20  **Q.**   And you're paid for your time; is that correct?

21  **A.**   Correct.

22  **Q.**   What's your hourly rate, sir?

23  **A.**   For this -- the services I'm doing for this case?

24  **Q.**   In this case, what is your hourly rate, sir?

25  **A.**   400 an hour, I believe.

**ARMSTRONG - CROSS / HIGHSMITH**

1    **Q.**    So $400 per hour?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  Are you billing for your testimony here today?

4    **A.**    Yes, sir.

5    **Q.**    Are you billing -- did you bill for the time that you

6    spent with the defendant, Mr. Andrade?

7    **A.**    Yes, sir.

8    **Q.**    Did you bill for all the hours that you spent reviewing

9    medical records?

10    **A.**    Yes, sir.

11    **Q.**    Did you bill for time you're waiting outside the

12    courtroom?

13    **A.**    I will, yes, sir.

14    **Q.**    Approximately how many hours have you worked on for this

15    case?

16    **A.**    I'd say well over 50.

17    **Q.**    And that's at $400 an hour; correct?

18    **A.**    No, sir.  I think it's half that time for my time here.

19    **Q.**    I don't understand.

20    **A.**    So travel time is billed at half the time, right.

21    **Q.**    What else is billed at halftime?

22    **A.**    I'm not really fully sure just yet, but I'm figuring that

23    out.

24    **Q.**    So some things are billed at full-time $400 an hour and

25    travel is billed at $200 an hour; is that correct?

**ARMSTRONG - CROSS / HIGHSMITH**

1   **A.**   I believe so.

2   **Q.**   Okay.  You have a profile in *Psychology Today*; is that

3   right?

4   **A.**   Yes, sir.

5   **Q.**   And your profile in *Psychology Today* states, quote -- that

6   you have a, quote, "genuine desire to be as clinically helpful

7   as possible," end quote; is that correct?

8   **A.**   I believe so.

9   **Q.**   And your profile in *Psychology Today* states that you

10   specialize in testing and evaluation; correct?

11   **A.**   Yes, sir.

12   **Q.**   And that you charge $250 per session; is that correct?

13   **A.**   I think that's what -- since the last time it's been

14   updated, yes, sir.

15   **Q.**   All right.  So you testified on direct that in July,

16   approximately July 26, you conducted a diagnostic clinical

17   interview and testing of Mr. Andrade; correct?

18   **A.**   Yes, sir.

19   **Q.**   And you did that at the defense team's request; correct?

20   **A.**   Yes, sir.

21   **Q.**   And in July of 2024, you conducted a comprehensive battery

22   of tests; is that right?

23   **A.**   Yes, sir.

24   **Q.**   And you did that at the defense team's request; is that

25   right?

1    **A.**   Correct.

2    **Q.**   And you reviewed Mr. Andrade's medical records; is that

3    right?

4    **A.**   Yes, sir.

5    **Q.**   And you did that at the defense team's request; is that

6    right?

7    **A.**   Correct.

8    **Q.**   And those records -- those medical records included his

9    Veterans Administration medical records; correct?

10    **A.**   Yes, sir.

11    **Q.**   And there were approximately, give or take, 1500 pages of

12    Veterans Administration records; correct?

13    **A.**   Yes, sir.

14    **Q.**   Now, you tested Mr. Andrade in July of 2024; correct?

15    **A.**   Correct.

16    **Q.**   And you signed a disclosure where you disclosed to the

17    United States your diagnoses on January 10th, 2025; is that

18    right?

19    **A.**   Correct.

20    **Q.**   So when did you make your diagnosis?

21    **A.**   It would have been within the next couple months

22    afterward, yeah, after I evaluated him.

23    **Q.**   So you reviewed over 1500 pages of medical records;

24    correct?

25    **A.**   Yes, sir.

1  **Q.**   So, to the best of your knowledge, your diagnosis of

2  autism spectrum disorder was the first time Mr. Andrade has

3  ever been diagnosed with that; correct?

4  **A.**   Correct.

5  **Q.**   And when you diagnosed Mr. Andrade with

6  attention-deficit/hyperactivity disorder, to the best of your

7  knowledge, that's the first time he had ever been diagnosed

8  with that condition; correct?

9  **A.**   I'm not sure.

10  **Q.**   And to the best of your knowledge, based on your review of

11  all the medical records you've reviewed, when you diagnosed

12  Mr. Andrade with obsessive-compulsive disorder, that was the

13  first time he had ever been diagnosed with OCD; correct?

14  **A.**   I believe so.

15  **Q.**   And when you diagnosed Mr. Andrade with bipolar disorder,

16  based on your review of all of the records, that was the first

17  time he had ever been diagnosed with bipolar disorder; is that

18  correct?

19  **A.**   Correct.

20  **Q.**   So to be clear, to the best of your knowledge, the first

21  time Mr. Andrade has ever been diagnosed with those four

22  conditions is just a couple of months before his first federal

23  criminal trial?

24  **A.**   Correct.

25  **Q.**   Let's talk about the specific diagnoses.

1      You diagnosed Mr. Andrade with autism spectrum disorder;

2  is that right?

3  **A.**    Yes, sir.

4  **Q.**    And the diagnostic tests you used you said are based on

5  the gold standard of tests; is that right?

6  **A.**    Yes, sir.

7  **Q.**    And you're very confident, I think you said you're very

8  confident in your diagnosis that Mr. Andrade has autism

9  spectrum disorder; is that right?

10 **A.**    Yes, sir.

11 **Q.**    How confident are you?  90 percent confident?

12 **A.**    I wouldn't be able to put a percentage on it.  It would

13 just be making something up.

14 **Q.**    It would just be making something up?

15 **A.**    If I were to put a percentage on it because there's no way

16 to measure that.

17 **Q.**    So just to be clear, to the best of your knowledge, the

18 Veterans Administration, which treats Mr. Andrade, has never

19 diagnosed him with autism spectrum disorder; correct?

20 **A.**    Correct.

21 **Q.**    And you saw no diagnosis for autism spectrum disorder in

22 over 1500 pages of medical records for Mr. Andrade; correct?

23 **A.**    Correct.

24 **Q.**    And you did not review any of his childhood medical

25 records; correct?

1    **A.**    That's correct.

2    **Q.**    And you did not review any of his school records; correct?

3    **A.**    That's correct.

4    **Q.**    But autism spectrum disorder is a developmental disorder;

5    correct?

6    **A.**    That's right.

7    **Q.**    And it's correct that autism spectrum disorder begins in

8    early childhood; correct?

9    **A.**    Yes, sir.

10    **Q.**    And it's true that autism spectrum disorder typically

11    becomes apparent before a child enters school; correct?

12    **A.**    Yes.

13    **Q.**    So in order to diagnosis autism spectrum disorder

14    correctly, you need to ensure that the symptoms were present

15    during early childhood; correct?

16    **A.**    No.

17    **Q.**    No.  So you can ignore all of the records from early

18    childhood, even though it's a developmental disorder?

19         **MS. DIAMOND:**  Objection.  Assumes facts not in

20    evidence.

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  So can you repeat that?

23         **MR. HIGHSMITH:**  Could you read that back for me?

24    (Record read as follows:

25    "QUESTION:  So you can ignore all of the records from

1  early childhood, even though it's a developmental disorder?")

2       **THE WITNESS:** No, you can't ignore it.

3  **BY MR. HIGHSMITH:**

4  **Q.** But you reviewed no childhood records?

5  **A.** Correct.

6  **Q.** So you diagnosed Mr. Andrade with Level 1 autism spectrum

7  disorder; is that right?

8  **A.** Yes, sir.

9  **Q.** And that is a mild form of autism spectrum disorder?

10  **A.** What do you mean by "mild"?

11  **Q.** I mean that it's the lowest level of ASD; is that correct?

12  **A.** No, that's not correct.

13  **Q.** What's the lowest level?

14  **A.** Level 3 is the lowest level.

15  **Q.** Okay.  And what does that mean?

16  **A.** It is characterized by almost constant supervision and

17  externally supplied structure and support.

18  **Q.** Okay.  So is Level 1 the highest functioning level of

19  autism spectrum disorder?

20  **A.** Correct.

21  **Q.** Okay.  Are you familiar with Bill Gates?

22       **MS. DIAMOND:** I'm sorry.  I didn't hear the question.

23  **BY MR. HIGHSMITH:**

24  **Q.** Are you familiar with Bill Gates, the founder of

25  Microsoft?  Do you know who that person is?

1   **A.**   Yes, sir, I do.

2   **Q.**   Do you know who Elon Musk is?

3   **A.**   Yes, sir.

4   **Q.**   Now, you know that Bill Gates has said in his recent

5   memoirs that he would likely be diagnosed with autism today;

6   correct?

7   **A.**   I didn't know that, but yeah.

8   **Q.**   And Bill Gates is one of the richest men in the world;

9   correct?

10  **A.**   I would assume so.

11  **Q.**   And he founded Microsoft; correct?

12  **A.**   I think so.

13  **Q.**   Do you know that Elon Musk has said he may have mild

14  autism?

15  **A.**   I didn't know that.

16  **Q.**   Elon Musk is one of the richest people in the world;

17  correct?

18  **A.**   I guess so.

19  **Q.**   You guess so?

20  **A.**   Yes, sir.  I don't know who is --

21         **MS. DIAMOND:**  Objection.

22         **THE WITNESS:**  -- the richest people in the world.

23         **THE COURT:**  What?

24         **MS. DIAMOND:**  Objection.  Irrelevant.

25         **THE COURT:**  Overruled.

1    BY MR. HIGHSMITH:

2    Q.    And he runs multiple companies; correct?

3    A.    Correct.

4    Q.    So clearly, people with mild autism spectrum disorder can

5    plan, make decisions, evaluate outcomes, run businesses, and

6    accumulate huge amounts of wealth; correct?

7              MS. DIAMOND:  Objection.  No foundation --

8              THE COURT:  Overruled.

9              MS. DIAMOND:  -- in context.

10             THE WITNESS:  I've never evaluated those people, so I

11    don't know that they have autism.

12    BY MR. HIGHSMITH:

13    Q.    Let's talk about your bipolar disorder diagnosis.

14          Just to be clear, Mr. Andrade, before he met you, to the

15    best of your knowledge, was never diagnosed with bipolar

16    disorder; is that right?

17    A.    Yes, sir.

18    Q.    So on direct examination, you testified that you diagnosed

19    Mr. Andrade with bipolar disorder; correct?

20    A.    Correct.

21    Q.    Yes or no?

22    A.    Yes, sir.

23    Q.    And in your disclosure to the Court, you said something

24    different.  You said that Mr. Andrade was diagnosed with

25    unspecified bipolar disorder; correct?

1  **A.**    Yes, sir.  That's --

2  **Q.**    Okay.  So which diagnosis does he have?  Does he have

3  bipolar disorder, or have you diagnosed him with unspecified

4  bipolar disorder?

5  **A.**    Unspecified bipolar disorder.

6  **Q.**    But that's not what you said on direct examination;

7  correct?

8  **A.**    Correct.

9  **Q.**    So unspecified bipolar disorder means -- is evidence of

10  shorter manic or depressive episodes; correct?

11  **A.**    No.

12  **Q.**    No?  What is -- what is required for a diagnosis of

13  unspecified bipolar disorder?

14  **A.**    It's often when you don't have all of those details to be

15  able to pinpoint which subtype, unspecified, but you still have

16  a history or a pattern of behaviors that would reflect probable

17  manic episodes or hypomanic episodes.

18  **Q.**    So you just testified that you lacked the details to make

19  a more specific bipolar diagnosis?

20  **A.**    Correct.

21  **Q.**    In all of the medical records that you reviewed for

22  Mr. Andrade, did you see that he was prescribed any medicine

23  for bipolar disorder?

24  **A.**    No, sir.

25  **Q.**    You diagnosed Mr. Andrade with obsessive-compulsive

1  disorder; correct?

2  **A.**    Correct.

3  **Q.**    However, you saw no indication in any of the VA medical

4  records that he had previously been diagnosed with OCD;

5  correct?

6  **A.**    Correct.

7  **Q.**    In fact, your psychological testing does not report

8  significant symptoms of OCD; correct?

9  **A.**    That's incorrect.

10  **Q.**    Incorrect.  Well, let's take a look at your Personality

11  Assessment Inventory subscale profile.

12       On that test, Mr. Andrade had one of the lowest scores for

13  OCD; correct?

14  **A.**    Correct.  I --

15  **Q.**    I can refresh your memory, but you don't need to open that

16  up right now.

17  **A.**    Okay.

18  **Q.**    I can show you on the screen --

19  **A.**    All right.

20  **Q.**    -- your Personality Assessment Inventory.

21  **A.**    Can you also include the rest of the tests too?

22  **Q.**    I can include what you have disclosed to me.

23  **A.**    Great.

24  **Q.**    I cannot show you anything that you have not disclosed to

25  me.

A.    Yeah, I just need the test scores for the rest of the tests.

         MR. HIGHSMITH:  Can we show this just to the witness and the parties, please.  Thank you.

Q.    So your subscale profile for Mr. Andrade is an obsessive-compulsive score of 12 and a T score of 57; is that right?

A.    Correct.

Q.    And then going down a little bit lower on the same page, your score for -- and I've highlighted it here -- antisocial behavior, egocentricity, and stimulus seeking is low -- one of the lowest findings on this entire scale; is that correct?

A.    Yes, sir.

Q.    One of the findings that you made in your report under clinical features is that Mr. Andrade does not appear to have significant problems with obsessive-compulsive thoughts and behaviors; correct?

A.    Does not appear to have obsessive-compulsive problems?

Q.    Correct.  Is that what's written in your disclosure?  I'll show it to you.

A.    Okay.  Yeah.

Q.    So look at the highlighted portion which states [as read]:

         "He does not appear to have significant problems

         with obsessive-compulsive thoughts and behaviors."

         Is that what that says?

 1   **A.**   Yeah.  This is --

 2   **Q.**   Yes or no.  Is that what that says?

 3   **A.**   What that report says?

 4   **Q.**   Yes, what that report says.

 5   **A.**   Right, which is not mine.

 6   **Q.**   Is that accurate?

 7   **A.**   Correct.

 8        That report, which is not mine.

 9   **Q.**   Oh, this is not your report?

10   **A.**   No, sir.

11   **Q.**   So you disclosed someone else's report?

12   **A.**   No, sir.

13   **Q.**   Whose report is that?

14   **A.**   That's the computer-generated report.

15   **Q.**   And who hit the button to generate that?

16   **A.**   I did.  Yes, sir.

17   **Q.**   You testified that Mr. Andrade scores low for social

18   cognition; is that right?

19   **A.**   Yes, sir.

20   **Q.**   And you used one test for that; is that right?

21   **A.**   Yes.

22   **Q.**   You used a test that shows pictures of people's faces and

23   then matches them to a list of emotions; is that right?

24   **A.**   Correct.

25   **Q.**   And based on that one test of photographs, you

1  extrapolated that Mr. Andrade has limited or extremely limited

2  social cognition; is that right?

3  **A.**    No, sir.

4  **Q.**    No?  You did not extrapolate based on that test?

5  **A.**    Correct.

6  **Q.**    You used a different test?

7  **A.**    In addition to that, yes.

8  **Q.**    So you did not use the findings of your social cognition

9  test?

10        **MS. DIAMOND:**  Objection.  Misstates the testimony.

11  Argumentative.

12        **THE COURT:**  It's a question.  He can answer it.

13        **THE WITNESS:**  I did use the findings from social

14  cognition tests.

15  **BY MR. SHEPARD:**

16  **Q.**    Oh, so you did.  What -- you did use those findings?

17  **A.**    Yes, sir.

18  **Q.**    So you testified earlier that Mr. Andrade has low-average

19  intelligence; is that right?

20  **A.**    Yes, sir.

21  **Q.**    And you conducted numerous tests regarding his

22  intelligence; is that right?

23  **A.**    Yes, sir.

24  **Q.**    Okay.  So you tested him for academics; is that right?

25  **A.**    Yes.

ARMSTRONG - CROSS / HIGHSMITH

1   Q.   And you tested him for word reading; is that right?

2   A.   That's correct.

3   Q.   You tested him for spelling; is that right?

4   A.   Yes, sir.

5   Q.   You tested him for math computation; is that right?

6   A.   Yes, sir.

7   Q.   And he scored average for word reading; correct?

8   A.   Yes, sir.

9   Q.   He scored average for spelling; correct?

10  A.   Yes, sir.

11  Q.   He scored average for math computation; correct?

12  A.   Yes, sir.

13  Q.   Overall intelligence, you tested him on a battery of

14  tests, and he scored average on more than half of those tests;

15  is that right?

16  A.   Yes, sir.

17  Q.   He scored average on vocabulary; is that right?

18  A.   That's correct.

19  Q.   You also testified fairly extensively about executive

20  functioning.  Do you recall that?

21  A.   Yes, sir.

22  Q.   On executive functioning, you administered something

23  called the 20 questions test; is that right?

24  A.   That's correct.

25  Q.   And Mr. Andrade scored average on that test; correct?

1   A.    That's correct.

2   Q.    And you also administered 20 questions total achievement,

3   and he scored average for that test as well; correct?

4   A.    That's all one test.  Those are three subscores from the

5   same test.

6   Q.    And they were all average; correct?

7   A.    That's correct.

8   Q.    And that's Mr. Andrade's executive functioning; correct?

9   A.    On that test, yes.

10  Q.    There's no need to read from your computer.  If we need to

11  refresh your memory, we'll just refresh your memory with --

12  A.    Okay.

13  Q.    So you can close your computer.

14  A.    Okay.

15  Q.    I think you testified that Mr. Andrade is easily

16  influenced by others; is that correct?

17  A.    I don't recall that specifically, but -- yeah, I don't

18  know.

19  Q.    You don't know?  Is Mr. Andrade easily influenced by

20  others?  You spent five hours with him.

21  A.    In certain contexts yes, sir.

22  Q.    Which contexts?

23  A.    Stressful.

24  Q.    Stressful.  Is he easily influenced by others when he's

25  running a multimillion-dollar business?

 1   **A.**   I don't know how to answer that.

 2   **Q.**   Is he easily influenced by others when he's obtaining more

 3   than $7 million in investor proceeds from investors?

 4           **MS. DIAMOND:**   Objection.   Beyond the scope of this

 5   witness's testimony.

 6           **THE COURT:**   Overruled.   This is cross-examination.

 7   They can test this witness.   Overruled.

 8           **THE WITNESS:**   If it were stressful for him, yeah.

 9   **BY MR. HIGHSMITH:**

10   **Q.**   If it was stressful for him while he's taking almost

11   $10 million, he could be easily influenced by others; is that

12   right?

13   **A.**   Correct.

14   **Q.**   While he's traveling the world, meeting with business and

15   government entities --

16           **MS. DIAMOND:**   Objection.

17   **BY MR. HIGHSMITH:**

18   **Q.**   -- is he easily influenced by others?

19           **THE COURT:**   Overruled.   This is cross-examination.

20           **THE WITNESS:**   Can you repeat that again?   I'm sorry.

21   **BY MR. HIGHSMITH:**

22   **Q.**   While Mr. Andrade is traveling the world, meeting with

23   business and government entities, is he easily influenced by

24   others?

25   **A.**   If he is stressed, yes.

1   Q.   So let's take a look at your report or the

2   computer-generated report that you created.

3        So you've testified repeatedly that it's possible for

4   Mr. Andrade to be easily influenced by others; is that right?

5   A.   Under stress, correct.

6   Q.   Under stress.

7        And your report says that Mr. Andrade is, quote, "likely

8   to be a hypervigilant individual who often questions and

9   mistrusts the motives of those around him," end quote; correct?

10  A.   No, sir.  That's not my report.

11  Q.   Not your report.

12       So take a look, please, at the highlighted portion that

13  reads [as read]:

14            "He is likely to be a hypervigilant individual

15       who often questions and mistrusts the motives of

16       those around him."

17       This is not your report?

18  A.   That's the computer-generated interpretive report.

19  Q.   Ah, okay.  And who hit the button to generate that

20  computer report?

21  A.   I believe that was me.

22  Q.   So this report also writes Mr. Andrade, quote, "describes

23  a level of suspiciousness and mistrust in his relations with

24  others that is unusual even in a clinical sample"; is that

25  correct?

1    **A.**    If that's what it says, then, yes, sir.

2    **Q.**    And yet your testimony is that he's easily influenced by

3    others; is that right?

4    **A.**    Yes, under stress.

5    **Q.**    So you have talked about how Mr. Andrade filled out this

6    form; is that right?

7    **A.**    Which form is that?

8    **Q.**    He provided a questionnaire for you; is that correct?

9    **A.**    Yes, sir.

10   **Q.**    And you -- I think you've testified repeatedly that he has

11   limited executive functioning; is that right?

12   **A.**    Yes, sir.

13   **Q.**    And yet when he says how he earns a living, he says he's

14   living off of stock; is that right?

15   **A.**    Correct.

16   **Q.**    So does living off of the returns from investments

17   indicate limited executive functioning to you?

18   **A.**    Sometimes.

19   **Q.**    You testified that his wife submitted a test about him.

20   Do you recall that?

21   **A.**    Yes, sir.

22   **Q.**    And you suggested that that test could correct for some of

23   the biases in the other tests; is that right?

24   **A.**    No, sir.

25   **Q.**    You're not -- that's not -- it does not correct for

ARMSTRONG - CROSS / HIGHSMITH

1    biases?

2    **A.**    In other tests, right.

3    **Q.**    What biases does it correct for?

4    **A.**    It measures the validity of her report.

5    **Q.**    Would you agree that the wife's test regarding her husband

6    just months before his criminal trial would have some bias in

7    it?

8    **A.**    Yes.

9    **Q.**    You testified about malingering.  Let's talk a little bit

10   about what malingering is.  What is malingering?

11   **A.**    It is a label assigned to individuals who are attempting

12   to magnify or exaggerate symptoms or minimize symptoms as a --

13   as a product of a situation where, by doing so, they get either

14   a reward or out of trouble.

15   **Q.**    So in your testing, when you tested Mr. Andrade on the

16   malingering index, he scored relatively high with a T score of

17   84; correct?

18   **A.**    Yes, sir.

19   **Q.**    Let's talk about the reliability of some of your

20   conclusions.

21       This report, the computer-generated report that you hit

22   the button to generate, says [as read]:

23           "The interpretive hypotheses in this report

24       should be reviewed cautiously."

25       Correct?

1   **A.**   Yes, sir.

2   **Q.**   The report that you caused to be generated states [as

3   read]:

4           "The respondent may not have answered in a

5       completely forthright manner."

6       Correct?

7   **A.**   Yes, sir.

8   **Q.**   The report that you caused to be generated states

9   [as read]:

10          "The nature of his responses might lead the

11      evaluator to form a somewhat inaccurate impression of

12      the client based upon the style of responding

13      described below."

14      Correct?

15  **A.**   Correct.

16  **Q.**   The report that you generated states [as read]:

17          "The respondent's response patterns are unusual

18      in that they indicate a defensiveness about

19      particular personal shortcomings as well as an

20      exaggeration of certain problems."

21      Correct?

22  **A.**   Incorrect.

23  **Q.**   Incorrect.  It does not say that?  Let me refresh your

24  memory by showing you the report you generated.

25  **A.**   Oh, I'm sorry.  That's the computer-generated report.

1   **Q.**   Okay.  And who pressed the button to generate it?

2   **A.**   I did.

3   **Q.**   The computer-generated report that you caused to be

4   generated also states [as read]:

5          "The clinical scale evaluations may

6      overrepresent the extent and degree of significant

7      test findings in particular areas."

8      Correct?

9   **A.**   Yes, sir.

10  **Q.**   I think you testified on direct examination that if you

11  wanted to have a certain diagnosis, you must answer questions

12  in a certain way; is that accurate?

13  **A.**   In reference to?

14  **Q.**   In reference to a respondent can manipulate the test;

15  right?

16  **A.**   Yes, sir.

17  **Q.**   So in rendering your diagnosis of Mr. Andrade, you did not

18  look at his childhood medical records; correct?

19  **A.**   Correct.

20  **Q.**   You did not look at his school records; correct?

21  **A.**   Correct.

22  **Q.**   None of his VA records had any of those diagnoses that you

23  diagnosed him with; correct?

24  **A.**   Correct.

25  **Q.**   In rendering your diagnoses, did you interview

1    Mr. Andrade's employees?

2    **A.**    No, sir.

3    **Q.**    In rendering your diagnosis, did you consider that

4    Mr. Andrade was the founder and CEO of multiple companies?

5    **A.**    No, sir.  I --

6    **Q.**    In rendering your diagnosis, did you consider that

7    Mr. Andrade supervised numerous employees across multiple

8    locations?

9    **A.**    No, sir.

10    **Q.**    In rendering your diagnosis of Mr. Andrade, did you

11    consider that he traveled to Central America, Europe, Canada,

12    and other locations to meet with business and government

13    representatives to promote his companies?

14    **A.**    No, sir.

15    **Q.**    In rendering your diagnosis of Mr. Andrade, did you

16    interview the numerous accountants, lawyers, consultants, and

17    advisors that all worked under him?

18    **A.**    No, sir.

19    **Q.**    In rendering your diagnosis, did you interview any of the

20    investors who invested a total of almost $10 million with him?

21    **A.**    No, sir.

22    **Q.**    You testified earlier about alex- -- I can't pronounce

23    it -- alexithymia.  Do you recall that?

24    **A.**    Yes, sir.  Alexithymia.

25    **Q.**    Is a symptom of alexithymia suing the victims of your

1    fraud?

2    **A.**    No, sir.

3        **MR. HIGHSMITH:**  No further questions.

4            **REDIRECT EXAMINATION**

5    **BY MS. DIAMOND:**

6    **Q.**   Dr. Armstrong, what was the computer printout test about?

7    Can you explain that to the jury?

8    **A.**    Sure.  It is a -- an option for psychologists.  When we go

9    to score the PAI, we have the option of getting just the score

10   report, or we get an option of the computer using its algorithm

11   to kind of generate a generic report that explains what each

12   index is and what the various scores might mean.

13   **Q.**   Is that report using the scores to see what those scores

14   might mean in an otherwise healthy individual; in other words,

15   an individual who has a normal brain?

16   **A.**    No.

17   **Q.**   How do you use those printout descriptions in your

18   evaluation process?

19   **A.**    Very minimally because while it can help give me words

20   that I lack a vocabulary for in describing aspects of different

21   scores, it's more frequent that those descriptions are

22   inaccurate because they can't take in the context of all the

23   other scores.  It's just -- doesn't matter who you are; you get

24   the same printout results if your score is this -- this much.

25   **Q.**   So the printout of a test that might -- one of the tests

1  that you conducted wouldn't take into account the pattern

2  evident over the course of all the tests?

3  **A.**   Right.  Correct.

4  **Q.**   Is that something that you do as a practitioner?

5  **A.**   Correct.

6  **Q.**   Do you ever take just the words of one test and rest on

7  that conclusion without your review of the pattern and

8  evaluation of the other tests?

9  **A.**   No.  No, ma'am.

10 **Q.**   Mr. Highsmith made a big deal about the fact that there

11 were some unaccreditations in your educational background.

12     Could you describe what was going on at your college, at

13 your undergraduate, when you were there?  Did they meet the

14 qualifications for accreditation?

15     **MR. HIGHSMITH:**  Objection.  We did not ask about his

16 undergraduate degree.

17     **THE COURT:**  I'll let you answer the question.

18     **THE WITNESS:**  Okay.

19     **MS. DIAMOND:**  I might have -- I might have been

20 misdirected.

21 **Q.**   There was a question about one of the schools, I think,

22 where you got your Psy.D., about whether or not it was

23 accredited.

24 **A.**   Correct.

25 **Q.**   Why do you have confidence that your degree is valid if

1  your school was unaccredited?

2  **A.**    I was supervised by two board-certified neuropsychologists

3  the whole time.

4  **Q.**    You were already a clinical psychologist when you pursued

5  your psychological doctorate; is that correct?

6  **A.**    No.

7  **Q.**    Did you, along the way, become a psychologist prior to

8  getting your degree in neuropsychology?

9  **A.**    My degree was in clinical psychology where I became a

10  psychologist, licensed psychologist afterward in my postdoc.

11  **Q.**    And you became a licensed psychologist, and at that point

12  were you qualified to work as a neuropsychologist as well?

13  **A.**    Not at the point of becoming licensed as a psychologist,

14  no.

15  **Q.**    You had to do the additional practicum hours that we

16  talked about and were there other educational requirements

17  before you could call yourself a neuropsychologist?

18  **A.**    Yes.  There's -- a two-year postdoc is considered standard

19  to be a neuropsychologist.

20  **Q.**    So could you have been awarded your Psy.D. if your

21  educational or comprehension of your education was subpar?

22  **A.**    I suppose I could be awarded my Psy.D, but not my

23  licensure.

24  **Q.**    What did you have to do in addition to getting your

25  doctorate to get your license?

ARMSTRONG - REDIRECT / DIAMOND

1  **A.**    I had to have a predoctoral internship that was 2000 hours

2  supervised.

3  **Q.**    You don't award yourself a Doctorate in Psychology; is

4  that right?

5  **A.**    No, ma'am.

6  **Q.**    Let's talk about where you teach at grad school.  What is

7  the name of that college?

8  **A.**    Amberton University.

9  **Q.**    Is that anywhere near where you live?

10  **A.**    It's pretty close.

11  **Q.**    Did you choose to work there?

12  **A.**    Yes, ma'am.

13  **Q.**    Why did you choose to work there?

14  **A.**    It gave me an opportunity to educate, which I'm passionate

15  about.

16  **Q.**    And do you also, as well as teaching, maintain a clinical

17  practice?

18  **A.**    Yes, ma'am.  We're actually required to.

19  **Q.**    To teach at your school, you must be a practicing

20  psychologist?

21  **A.**    In the -- on the counseling -- in the counseling

22  department, yes, ma'am.

23  **Q.**    Is your practice also located near where you live?

24  **A.**    It is now, thankfully.

25  **Q.**    Mr. Highsmith brought up the fact that you cannot

1  prescribe medication in Texas.  Did you seek your

2  psychopharmacological master's degree because you wanted to

3  prescribe medication?

4  **A.**   No, ma'am.

5  **Q.**   Why did you seek that extra credential?

6  **A.**   My old supervisor, Dr. Mears, was the first -- one of the

7  first Texas psychologists to get that degree, and he ingrained

8  it in me how important that training is when it comes to

9  interpreting neuropsychological tests.

10  **Q.**   So do you find that what you learned in that course of

11  study aids your diagnostic capacity?

12  **A.**   Yes, ma'am.

13  **Q.**   You testified today that you're being paid $400 an hour;

14  is that correct?

15  **A.**   Yes, ma'am.

16  **Q.**   What's your ordinary rate for forensic psychological work

17  that is not provided by a court-paid agency?

18  **A.**   It can range between 400 on the low side through 850 an

19  hour.

20  **Q.**   Approximately how much of your practice is devoted to

21  forensic work compared to clinical work?

22  **A.**   About 10 percent.

23  **Q.**   10 percent forensic work?

24  **A.**   That's right.

25  **Q.**   And about approximately how much of your income is --

1  comes from forensic work compared to clinical work?  We're not

2  talking about teaching.

3  **A.**    Right.  Well, the forensic work certainly pays for the

4  either chosen pro bono or pro bono services that we end up

5  providing on the clinical side pretty frequently.

6  **Q.**    When you say "pro bono," do you mean no pay?

7  **A.**    Correct.

8  **Q.**    You do some clinical work for no pay?

9  **A.**    We do a lot of clinical work with no pay.

10  **Q.**    Do you do some clinical work for reduced pay?

11  **A.**    Yes, ma'am.

12  **Q.**    I recall when Mr. Highsmith asked you about reviewing my

13  client's medical records, that you were not sure if there was

14  something in the medical records about

15  attention-deficit/hyperactivity disorder.  Is that because you

16  recall seeing something about Mr. Andrade seeking treatment for

17  anxiety?

18  **A.**    Yes.  And I thought I had remembered there -- him

19  mentioning -- mentioning in his records somewhere receiving

20  academic help for ADHD.

21  **Q.**    What does academic help for ADHD mean?

22  **A.**    Like accommodations or special education.

23  **Q.**    In some sort of his own education?

24  **A.**    Right.

25  **Q.**    Was there any indication in Mr. Andrade's medical records

1  that he had undergone a comprehensive neurological evaluation

2  prior to the one that you gave him?

3  **A.**   No.  I don't recall that.

4  **Q.**   When you were seeking to evaluate Mr. Andrade at the

5  defense team's request, did you request any known or existing

6  school records or early childhood medical records?

7  **A.**   Yes.  We asked -- I asked for all of it.

8  **Q.**   Did you receive any?

9  **A.**   No.

10  **Q.**   When you discussed bipolar disorder here, were you

11  discussing something different than an unspecified bipolar

12  disorder that had been written in one of the documents?

13  **A.**   No.  I used that term "bipolar" just because it was more

14  likely to be understood by everybody.

15  **Q.**   Does -- "unspecified," is that a term of art referring to

16  the presence of bipolar disorder without enough information to

17  specifically classify it as Bipolar Type I or Type II?

18  **A.**   Correct.

19  **Q.**   Just briefly about the social cognition test, the face

20  recognition part.  Is this one of the tests that you used in

21  combination with other tests in order to make your diagnoses?

22  **A.**   Yes.

23  **Q.**   You didn't rely on the social cognition test alone;

24  correct?

25  **A.**   Correct.

1   **Q.**   Did you rely on any one test alone for any portion of

2   these diagnoses?

3   **A.**   No.

4   **Q.**   Mr. Highsmith asked you a number of questions very

5   specific to behavior related to this case.

6        Were you asked to go into the facts of Mr. Andrade's case

7   during your evaluation, or were you given limitations when you

8   went into your diagnostic evaluation?

9   **A.**   No.

10  **Q.**   Sorry.  That's a poor question.  I asked an "or" question

11  and we got a "no" answer.  So --

12  **A.**   Okay.

13  **Q.**   -- did you go into any of the facts of Mr. Andrade's

14  criminal case with him?

15  **A.**   No.

16  **Q.**   Were you asked to refrain from going into facts of

17  Mr. Andrade's criminal case before you started your evaluation?

18  **A.**   Yes.

19  **Q.**   Did anybody tell you, for instance, that Mr. Andrade has

20  had multiple bank accounts related to his criminal case?

21  **A.**   No.

22  **Q.**   Did anybody tell you that Mr. Andrade had redundant

23  advisors on the same subject or redundant technical teams prior

24  to your giving --

25          **MR. HIGHSMITH:**  Objection, Your Honor.

1  **BY MS. DIAMOND:**

2  **Q.**   -- doing your evaluation?

3          **MR. HIGHSMITH:**  Leading the witness.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  No.

6  **BY MS. DIAMOND:**

7  **Q.**   Does the presence of multiple experts or advisors indicate

8  anything to you that's consistent with the conditions that

9  Marcus experiences?

10 **A.**   I think it could be.  I think it could be a sign of

11 executive dysfunction.

12 **Q.**   How so?

13 **A.**   The reliance on externally supportive structure.

14 **Q.**   You made reference in your direct testimony to someone

15 possibly using another person as their so-called frontal

16 lobe --

17 **A.**   Mm-hmm.

18 **Q.**   -- unquote.

19          Is that the kind of thing that you're referring to here?

20 **A.**   Yep.  The surrogate frontal lobe, yep.

21 **Q.**   Mr. Highsmith brought up the idea of a T score, the 84, on

22 a test where he discussed the concept of malingering with you.

23 Are you testing specifically for malingering?

24 **A.**   Not specifically for, but certainly screening it with

25 along -- along with every other diagnosis out there.

1  Q.   So along with every other diagnosis here, are you able to

2  rely on just one test to see whether or not Marcus was trying

3  to fool you, or are there a multitude of tests that help you

4  make that determination?

5  A.   There are a multitude of tests to help me make that

6  determination.

7  Q.   And overall, did you find that Marcus was trying to trick

8  you or using effort to distract you or in some way being

9  deceitful with you?

10 A.   No, ma'am.

11 Q.   And that conclusion is based on the great many tests you

12 gave, not just on one test; is that right?

13 A.   Correct.  And it's been shown that neuropsychologists,

14 despite our training, are pretty unreliable at eyeballing

15 people's reliability and validity.

16 Q.   Is that why you've got built-in validity tests?

17 A.   Yes, ma'am.

18 Q.   And are those validity tests given all at once in the

19 beginning of a testing procedure, or how are they administered

20 during the five hours of your examination?

21 A.   They're spread out as evenly as we can.

22 Q.   Why is that?

23 A.   Because we're attempting to assess effort across the

24 entire evaluation, not just at the beginning.

25 Q.   Do your tests indicate whether or not effort over time

ARMSTRONG - REDIRECT / DIAMOND

1    comes into play with how a person scores on their tests?

2    **A.**   Mm-hmm.

3    **Q.**   Tell the jury a little bit about that, please.

4    **A.**   So --

5            **MR. HIGHSMITH:**  Calls for a narrative, Your Honor.

6            **THE COURT:**  Overruled.

7        Go ahead.

8            **THE WITNESS:**  So the tests give us the ability to

9    measure the validity of effort throughout the whole evaluation

10   so that we can look at, from the start to finish, what is

11   statistically most likely their level of effort and was it good

12   enough for us to look at the scores around it and say, "Well,

13   that's valid."

14   **BY MS. DIAMOND:**

15   **Q.**   Based on your impression on the number of validity tests

16   given over the course of his evaluation, do you still maintain

17   confidence in your evaluation of Marcus?

18   **A.**   Absolutely.

19   **Q.**   Did you ever see any evidence in Marcus's Veterans

20   Administration medical records that he was ever tested for ASD?

21   **A.**   No, ma'am.

22   **Q.**   What about OCD?

23   **A.**   No, ma'am.

24   **Q.**   What about ADHD?

25   **A.**   No, ma'am.

1    **Q.**    What about bipolar disorder?

2    **A.**    No, ma'am.

3             **MS. DIAMOND:**  Thank you.

4        May I have one moment, Your Honor?

5             **THE COURT:**  You may.

6                      (Pause in proceedings.)

7    **BY MS. DIAMOND:**

8    **Q.**    Does stress play a part in how one tests on

9    neuropsychological tests that are given?

10   **A.**    Yes, ma'am.

11   **Q.**    Is there a particular -- sorry.  How would the stress of

12   travel or being away from home affect test results, if at all?

13   **A.**    We would expect that stress to possibly interfere with the

14   validity of the results.

15   **Q.**    And you maintain your practice in Texas; is that right?

16   **A.**    That's right.

17   **Q.**    And Mr. Andrade lives in Texas; is that right?

18   **A.**    That's right.

19   **Q.**    To your knowledge, did he fly to see you or drive?

20   **A.**    I think he drove, yeah.

21            **MS. DIAMOND:**  Thank you.

22       No further questions.

23            **MR. HIGHSMITH:**  Just a couple of questions.

24   \\\

25   \\\

1     **RECROSS-EXAMINATION**

2     **BY MR. HIGHSMITH:**

3     **Q.**    So you met with Mr. Andrade for approximately five hours;

4     correct?

5     **A.**    Yes, sir.

6     **Q.**    And based on that meeting, you don't know what Mr. Andrade

7     did in 2014, in 2015, 2016, and 2017 and 2018; correct?

8     **A.**    What do you mean by "did"?

9     **Q.**    How he conducted his life, how he lived his life.

10    **A.**    Correct.  I don't know all the details there.

11    **Q.**    You just testified on redirect that you did not consider

12    information related to this case; correct?

13    **A.**    Correct.

14    **Q.**    Who gave you the direction not to go into this case?

15          **MS. DIAMOND:**  Your Honor --

16    **BY MR. HIGHSMITH:**

17    **Q.**    Was it his lawyers who gave you that direction?

18          **MS. DIAMOND:**  Sidebar, please.

19          **THE COURT:**  Okay.

20       (The following proceedings were heard at the sidebar:)

21          **MS. DIAMOND:**  I'm concerned that Mr. Highsmith is

22    leaning towards discussing Mr. Andrade's Fifth Amendment

23    privilege.  His examination was specifically proscribed to not

24    go into the facts of the case because he was not willing to

25    waive his Fifth Amendment privilege, and the same constraint

SIDEBAR

1    was given to the Government's expert.

2        Mr. Highsmith is suggesting that it's his lawyer's fault

3    for protecting his Fifth Amendment right, and so I object to

4    this line of questioning, respectfully.

5        **MR. HIGHSMITH:**  We're not doing that at all.  We're

6    saying that he didn't consider loads of critical information in

7    rendering his opinion.

8        **MR. SHEPARD:**  That, they did on cross-examination.

9    The Court allowed it.  That's fine.

10       But now he's suggesting that information was hidden from

11   Dr. Armstrong when what was happening was we were protecting

12   his Fifth Amendment privilege.

13       **THE COURT:**  I do think -- you've established that he

14   didn't consider any of the facts pertaining to this case.  What

15   more -- I don't understand why you need to then go into at

16   whose direction or -- you've established he didn't.  What's the

17   significance of what directive he received?

18       **MR. HIGHSMITH:**  It goes directly to his bias.  The

19   attorneys told him not to consider relevant facts about his

20   operating businesses, employing people.

21       **THE COURT:**  Well, although, as Mr. Shepard and

22   Ms. Diamond indicate, their reason was that they didn't -- they

23   wanted to protect his Fifth Amendment rights.  Why are they

24   wrong about that?

25       **MR. HIGHSMITH:**  Well, that might have -- I'm fine.  I

1    can move on.

2            **THE COURT:**  Move on.

3            **MR. HIGHSMITH:**  Let's move on.

4            **THE COURT:**  Move on.

5            **MS. DIAMOND:**  Thank you.

6        (The following proceedings were heard in open court:)

7    BY MR. HIGHSMITH:

8    **Q.**   All right.  So to be clear, you considered no evidence of

9    Mr. Andrade running multiple businesses in rendering your

10   diagnoses; is that right?

11   **A.**   That's correct.

12   **Q.**   All right.  You testified pretty extensively about

13   executive function or dysfunction.  Do you recall that?

14   **A.**   Yes, sir.

15   **Q.**   And you testified fairly recently that reliance on

16   external advisors is evidence of or could be evidence of

17   external dysfunction -- executive -- sorry -- executive

18   dysfunction.  Do you recall that?

19   **A.**   Can you repeat that?

20   **Q.**   Yes.

21   **A.**   I'm sorry.

22   **Q.**   Do you recall that you just testified a few moments ago

23   that reliance on external advisors can be evidence of executive

24   dysfunction?

25   **A.**   Correct.

1  **Q.**    Okay.  So when a CEO hires an assistant, is that evidence

2  of external -- of executive dysfunction?

3  **A.**    All the time, or just --

4  **Q.**    Just answer the question.  Is it dysfunctional for a CEO

5  to hire an assistant?

6  **A.**    Sometimes.

7  **Q.**    Sometimes.  Is it dysfunctional for a CEO to hire

8  employees?

9  **A.**    Sometimes.

10 **Q.**    Is it dysfunctional for a CEO to hire attorneys, to hire

11 accountants, to hire advisors?

12 **A.**    Sometimes.

13 **Q.**    That's all dysfunctional behavior for a CEO?

14 **A.**    Sometimes.

15 **Q.**    You testified that travel or being away from home could

16 lead to stress that interferes with the validity of the test

17 results.  Do you recall that?

18 **A.**    Yes, sir.

19 **Q.**    Did you consider the fact that Mr. Andrade was flying all

20 around the world in 2017 and 2018 to further his business

21 interests?

22 **A.**    When?

23 **Q.**    When you rendered your diagnoses.

24 **A.**    Oh.  No, sir.

25          **MR. HIGHSMITH:**  No further questions.

PROCEEDINGS

```
 1            THE COURT:  You may step down.

 2                      (Witness excused.)

 3            MR. SHEPARD:  Your Honor, might I suggest that this

 4    would be a good time to break?  There are several things to

 5    address.

 6            THE COURT:  Okay.  Members of the jury, we'll take our

 7    next break.  Remember my admonitions.  Do not discuss this

 8    amongst yourselves or with anyone else.

 9        And we'll see you in 15 minutes.

10    (Proceedings were heard out of the presence of the jury.)

11            THE COURT:  Okay.  We're out of the presence of the

12    jury.

13        Did you say there's something you wanted to talk to me

14    about?

15            MR. SHEPARD:  So two things.  One -- and thank you,

16    Your Honor.  One is that we would next want to publish some of

17    these exhibits that we talked about.  We still don't have

18    rulings on some of them.

19            THE COURT:  Okay.

20            MR. SHEPARD:  So that was Topic Number 1.

21        And if I can just forecast Topic Number 2, following the

22    cross-examination of Mr. Min yesterday, we followed up on an

23    item, and that suggests we are likely to want to recall

24    Agent Quinn, who we had reserved the right to recall in our

25    case.  I don't think that would take long.
```

PROCEEDINGS

1          **THE COURT:**  I think -- didn't the Government say they

2     were calling him --

3          **MR. HIGHSMITH:**  We are.

4          **THE COURT:**  -- in rebuttal?

5          **MR. HIGHSMITH:**  We are.

6          **MR. SHEPARD:**  Okay.  I just --

7          **THE COURT:**  You want him --

8          **MR. SHEPARD:**  We could do it then.  I just want to

9     make sure we have the right to ask him additional questions.

10    Very few, but I want to make sure we have the opportunity.

11         If the Court would -- I'm okay doing that Monday.  I just

12    want to make sure I'm not waiving the right to do so.

13         **THE COURT:**  Is he here?

14         **MR. HIGHSMITH:**  Yeah.

15         **THE COURT:**  I don't -- I mean, I'm not -- I'm not

16    running either side's case.  So do you want -- it would seem to

17    me to have him -- have witnesses on the stand the fewest amount

18    of time is preferable; but if you want to -- you need to

19    represent that you're going to have him available and you'll

20    call him in your rebuttal case.

21         **MR. HIGHSMITH:**  I think we're fine calling him right

22    now.  I mean, that makes a lot of sense.  We've got an hour and

23    a half.

24         **THE COURT:**  You won't need to call him in your

25    rebuttal case?

PROCEEDINGS

1          **MR. HIGHSMITH:**  Correct.  Correct.

2          **MR. SHEPARD:**  Well, I don't want -- I don't want --

3     there are a series of issues about his testimony.  We got

4     exhibits on his testimony last night.  We haven't had time to

5     address these with the Court.

6          Plus, I'd rather not have whatever it is the Government

7     wants to introduce, you know, polluting the end of our defense

8     case.

9          So if the Court is giving me my druthers, if

10    the Government is willing to represent that they will, in fact,

11    produce him on Monday and that I can address any issue that I

12    want to address with him had we called him in our case, then I

13    would probably prefer that option for the reasons I identified.

14         And it could be -- since it's still a bit of a moving

15    target, we'll -- maybe we won't even need to on Monday, but I

16    need to reserve the opportunity.

17         **MR. HIGHSMITH:**  Could we have a proffer of what he

18    wants to explore that he failed to explore on cross?

19         **THE COURT:**  Why don't you at least tell us what this

20    is all about.

21         **MR. SHEPARD:**  Well, I don't think I should have to

22    reveal what I want to cross-examine Agent Quinn about, but I

23    would -- I think I've -- given the subject matter it -- we've

24    been -- you know, there were probably other hints and

25    indications about this, but it was very clear in Mr. Min's

1    cross-examination that there was something else we should do,

2    and that's --

3              MR. HIGHSMITH:  Well --

4              MR. SHEPARD:  -- that's --

5              MR. HIGHSMITH:  It's not the cross.  It's his rebuttal

6    case.  It's his case-in-chief that he's talking about.

7              MR. SHEPARD:  Yes.  And that's why I'm saying I could

8    call him --

9              THE COURT:  Well, maybe -- I mean --

10             MR. HIGHSMITH:  He's ready to go.

11             THE COURT:  Maybe you need to just -- if it's your --

12    this is something that you want to do in your case-in-chief,

13    maybe we should just have you call him, because otherwise it'll

14    get all confused if it's while they're in the Government's

15    rebuttal case but you're -- I mean, maybe the cleanest thing

16    is -- it may mean he's going to be on twice, I guess; right?

17    Right?

18             MR. HIGHSMITH:  Sure.

19             THE COURT:  I don't -- fine.  Okay.  So you can call

20    him, I guess.

21             MR. SHEPARD:  Okay.  That's fine, Your Honor.  I

22    just -- I would rather do the -- I think I would rather do

23    these exhibits first.

24             THE COURT:  Okay.  Is there anybody besides Quinn?

25             MR. SHEPARD:  No.

1    **THE COURT:**  Okay.  All right.  Well, so let's go

2    through what's going to happen with respect to these items.

3        With respect to the four exhibits that now are coming in,

4    I will give the limiting instruction, and you can introduce

5    those.  I'm talking about 2337 -- right? -- 2333, 2334, and

6    2327?

7        **MR. SHEPARD:**  Correct, Your Honor.

8        **THE COURT:**  So you can -- and I don't know how you

9    want to do that.  You're going to say, "I'm moving to introduce

10   those."  I will say, "Initially those exhibits were not coming

11   into evidence.  Now they are coming into evidence."  And then

12   I'll give the limiting instruction.

13       Okay.  That takes care of that one.

14       **MR. SHEPARD:**  Yes, although just to keep in mind,

15   Exhibit 3202 also falls into that category.

16       **THE COURT:**  Isn't that -- but that's already been

17   admitted.  I thought 3202 was the one where it gets -- it's

18   been redacted.  Maybe I'm mis- --

19       **MR. SHEPARD:**  Yeah.  It was not admitted when

20   initially offered.  It's now been redacted, and the Court

21   entered an order saying we could admit it.  I don't think it's

22   been admitted as far as the jury is concerned.

23       **THE COURT:**  Okay.  Well, I mean, you can readmit it

24   even if it's admitted before.  Let's not worry about -- I mean,

25   okay.

 1    So it's five.  We've got five of them.

 2        **MR. SHEPARD:**  Yes.

 3        **THE COURT:**  That's what we'll do.

 4    And are you going to show them as you --

 5        **MR. SHEPARD:**  Yes.

 6        **THE COURT:**  -- introduce them?

 7        **MR. SHEPARD:**  They have, I'm told, been uploaded and

 8    we can display them.

 9        **THE COURT:**  All right.  Okay.  That's fine.

10    And this list, I'm just going to go down this list.  We're

11    so far down the path here, you don't need -- I'm not going to

12    give you a discussion with respect to each of these.  We've

13    exhausted the discussions.

14    The terms and conditions, I'm not going to admit those.

15    With respect to the -- this goes to what we were just

16    talking about.  Just to confirm my understanding, we're talking

17    about those five, and this was the "ships that passed in the

18    night" discussion.  That's the only issue on the weekly updates

19    that remains to be resolved; correct?

20        **MR. SHEPARD:**  Yes.  You have resolved all the issues

21    on weekly updates.

22        **THE COURT:**  All right.  The property contracts,

23    I think the understanding was they -- if it's redacted to the

24    signature page, it would be admissible.

25        **MR. SHEPARD:**  I'm sorry.  If we -- if we redact them?

PROCEEDINGS

1          **THE COURT:**  For the signature page, which is what

2    I think you said you wanted.

3          **MR. SHEPARD:**  I think I have -- I think I have

4    redacted now; right?  So let me just show them.

5          **THE COURT:**  And you're going to do that after the five

6    exhibits?

7          **MR. SHEPARD:**  Yes.

8          **THE COURT:**  Okay.

9       Okay.  Are we -- are you calling -- great.  I've forgotten

10   his name.  What's the agent's name?

11         **MR. HIGHSMITH:**  Ethan Quinn.

12         **THE COURT:**  Oh, that's Ethan Quinn.

13         **MR. HIGHSMITH:**  No.  That's Special Agent Zartman.

14         **THE COURT:**  All right.  Is he being called?  At some

15   point someone pointed at him.

16         **MR. SHEPARD:**  No.  We were going to call him because

17   he is the person who actually covers all three of the

18   impeachment items that the Court allowed us to do, but we now,

19   I believe, have a stipulation on that.

20         **THE COURT:**  Okay.

21         **MR. SHEPARD:**  And so we will not need to call

22   Agent Zartman because I will read the stipulation.

23         **THE COURT:**  I gotcha.

24      Okay.  And you can come in.

25      This is our IT person, so...

PROCEEDINGS

1       So in the Foteh email thread, I'm not going to admit that.

2       The post-ICO purchase agreements, I'm not admitting those.

3       The bank account, that's coming in, so that can be added.

4       And the slide deck was withdrawn.

5       And I think that's it.  Did I miss anything that needs to

6 be covered?

7           **MR. HIGHSMITH:**  No.

8           **THE COURT:**  Okay.

9       All right.  Anything else?

10          **MR. SHEPARD:**  I don't think so.

11          **THE COURT:**  All right.  And we all need a break as

12 well as the jury, so it'll be probably more like --

13          **MR. HIGHSMITH:**  Your Honor, we've got an hour and

14 20 minutes left.  We're ready to go with Dr. Gregory as our

15 rebuttal --

16          **THE COURT:**  That would be great.

17          **MR. HIGHSMITH:**  -- if there's time.

18          **THE COURT:**  You can start.

19          **MR. HIGHSMITH:**  Yeah.  We're ready to go.

20          **THE COURT:**  We won't finish.

21          **MR. HIGHSMITH:**  No problem.  Just to fill the -- just

22 to fill in to 1:30.

23          **THE COURT:**  No, no.  I'm all for it.  I'm all for it.

24          **MR. HIGHSMITH:**  Okay.

25          **THE COURT:**  But I just -- yeah, okay.  Good.

PROCEEDINGS

```
 1        If we can go to 1:30, let's go to 1:30.

 2           MR. HIGHSMITH:  Okay.

 3                  (Recess taken at 12:11 a.m.)

 4              (Proceedings resumed at 12:26 p.m.)

 5    (Proceedings were heard out of the presence of the jury.)

 6           THE COURT:  All right.  Are we ready?

 7    We're ready.

 8    (Proceedings were heard in the presence of the jury.)

 9           THE COURT:  The jury is present.

10    Mr. Shepard?

11                    (Pause in proceedings.)

12           THE COURT:  Mr. Shepard?

13           MR. SHEPARD:  Yes.  Thank you, Your Honor.

14        At this time we are going to move some documents into

15    evidence and then publish them.

16           THE COURT:  Yes.

17           MR. SHEPARD:  The first one is Exhibit 3344 and then

18    3392 and 3056.

19           THE COURT:  And those are not subject to the limiting

20    instruction?  That wasn't on my --

21           MR. SHEPARD:  Correct.  These are purchase agreement,

22    the loan, the bank record.

23           THE COURT:  Okay.  Is that -- no objection?

24           MR. HIGHSMITH:  No objection, Your Honor.

25           THE COURT:  All right.  You may publish them.
```

PROCEEDINGS

```
 1        (Trial Exhibits 3344, 3392, and 3056 received in
 2   evidence.)
 3        MR. SHEPARD:  Ed, if you can put up on the screen
 4   Exhibit 3344.
 5        And this is a redacted copy of -- if you can highlight up
 6   at the top what exactly it is and blow that up so the jurors
 7   can see it.  Hopefully, they can see it better than I can.
 8        Okay.  And this is a purchase contract for a property in
 9   Corpus Christi, Texas.
10        Okay.  And then --
11        THE COURT:  Before you go to the next one, it's
12   probably obvious to the members of the jury, but it occurs to
13   me we haven't actually talked about it.
14        When lawyers -- we all use the term "redacted," which is
15   kind of a term of art, but what it means is that there's
16   certain material in a particular document that has been blocked
17   out.  You shouldn't speculate about what any blocked-out
18   information is.  It's a function of our working together,
19   determining what is the appropriate evidence to go in to the
20   jury.
21        So this is an example, and there'll be others, I think,
22   where we have the black block, and that is the, quote/unquote,
23   "redactions."  And, again, you're not to speculate about what
24   has been omitted.
25        Go ahead, Mr. Shepard.
```

PROCEEDINGS

1          **MR. SHEPARD:**  Thank you, Your Honor.

2      And then, Ed, if you could go to the second page and

3  highlight and blow up the material beneath the redaction on the

4  second page.

5      And so this shows the date of the purchase agreement as

6  March 14, 2018.

7      Okay.  Ed, if you can pause one more beat and then take

8  that one down.

9      And then move on to Exhibit 3392.  And if you can blow up

10  the material in the upper left corner there to make it easier

11  for us to read.

12      So this is a purchase agreement for a home at 9414 Plaza

13  Point Drive in Missouri City, Texas.

14      And then as before, if we can go to the second page; and

15  in the lower left-hand corner, if you can blow up the material

16  there so we can see the date signed by the purchasers March 19,

17  2018.

18      One more beat or two, and then we can move on to

19  Exhibit 3056.  And we can start with page 2, Ed.  And then just

20  blow up the check at the top.

21      This is a check from Mr. Andrade in the amount of $320,000

22  to ABTC Corporation dated September 25, 2019.

23      And then just to flip it over to the page 1, the

24  withdrawal slip, and if you'll just blow that up also.

25      We can see it's the $320,000 amount, and then it says

 1  beneath it "Loan."

 2      I'm going to publish a few more documents, but first I'd

 3  like to read a stipulation of the parties.  And I don't know if

 4  the Court wants to mention -- I think the Court has already

 5  instructed the jury on stipulations.

 6      **THE COURT:**  I don't think I have.  I'll give the

 7  standard instruction, which is about one sentence, but I'll use

 8  the one in the book.

 9      Stipulations of Fact.  The parties have agreed to certain

10  facts that are about to be stated to you.  Those facts are now

11  conclusively established.

12      **MR. SHEPARD:**  Thank you, Your Honor.

13      The Government and Mr. Andrade stipulate as follows:

14      Number one, if Brendan Zartman were called to testify, he

15  would say that he is an FBI agent, FBI special agent, and that

16  on February 27, 2019, he interviewed Evan Carlsen.  Among other

17  things, Mr. Carlsen told Special Agent Zartman that Andrade

18  probably spent about $1 million on overall development.

19      Two, if he were called to testify, Special Agent Zartman

20  would also say that on October 26 -- I'm sorry -- October 16,

21  2019, he interviewed John Szeder.  Among other things,

22  Mr. Szeder told Special Agent Zartman that Szeder never read

23  the white paper about the company and was never asked to read

24  it.

25      Three, if he were called to testify, Special Agent Zartman

1  would also testify that on November 14, 2024, he interviewed

2  Jack Abramoff.  Among other things, Mr. Abramoff told

3  Special Agent Zartman that Morgan & Morgan discussed the

4  possibility of working on getting the Government of Panama to

5  adopt AML BitCoin.

6       You should give this stipulation the same weight as if

7  Special Agent Zartman made these same statements under oath on

8  the witness stand.

9       And now I move to admit Exhibits 2333, 3202, 2327, 2337,

10  and 2334.

11            **THE COURT:**  Those exhibits will be admitted.

12       (Trial Exhibits 2333, 3202, 2327, 2337, and 2334 received

13  in evidence.)

14            **THE COURT:**  Members of the jury, the exhibits that

15  were just referenced by Mr. Shepard are being admitted for the

16  limited purpose that defendant received weekly updates about

17  AML BitCoin.

18       I instruct you that this evidence is admitted only for the

19  limited purpose of its effect on Mr. Andrade; and, therefore,

20  you must consider it only for that limited purpose and not for

21  any other purpose, such as the truth of the matter contained in

22  the updates.

23            **MR. SHEPARD:**  Okay.  Ed, if we can publish

24  Exhibit 2333, please.  Yes, the redacted version of 2333.  And

25  if you can start by just blowing up the middle section there.

1      It's from CrossVerify, dated July 3, 2018, and the

2  distribution includes Mr. Andrade and many others.

3      And then if you can go to the second page, first

4  highlighting the material above the redaction, "Welcome to the

5  new look weekly update" [as read]:

6          "Above you will see the latest.  Please bear in

7      mind that this is dynamic.  This is where we are

8      right now."

9      And then if you can now back out of this and highlight the

10 material beneath the first redaction.

11     It says [as read]:

12         "MVP 2.0 - Minimum viable product version for

13     implementation in the FCA sandbox scheduled for

14     release at the end of August.  This covers all the

15     required functionality present in App 1.0 and will

16     include the Corda integration."

17     And, again, back on the first page, the date of this is

18 July 3, 2018.

19     And then, Ed, if we can go to 2327 next just to provide

20 some background on the sandbox.

21     If you'll just first highlight the box that gives the --

22 well, I guess if you first highlight the "to" and the "from" at

23 the top there.  Nigel Quantick, yes.  And this is to a number

24 of people, Richard Naimer and ceo@amlbitcoin.com.

25     And then if you can highlight the unredacted material at

PROCEEDINGS

1    the bottom, it says [as read]:

2            "AK has had a further meeting with Antonella.

3        Chris Corrado is waiting to hear back from the

4        various department heads he emailed about partnering

5        us in the UK FCA sandbox.  Once they have identified

6        the most appropriate partner, we will have to be

7        ready to move quickly.  I have told AK to assure them

8        that we will be in a position to do just that.

9            "In addition, Chris has intimated that he feels

10       the LSE should get into blockchain developments more

11       widely and wants us involved and, to that end, wants

12       an R&D tax credit.  We are having that looked into as

13       the tax credit system is not straightforward with IT.

14       Will keep you fully up to speed with all of this."

15           And now, Ed, if we can look at Exhibit 3202.  And if you

16   just orient us here, the material above the "FYI" on page 1

17   from Richard Naimer to Marcus, just blow that up briefly.

18           Well, that's good.  That is Marcus sending it to David

19   Mata.  But if you'll go down to the next entry, yes, that's

20   Richard Naimer sending this material to Marcus that we're about

21   to look at, and this is on July 25, 2018.

22           And then if you -- if you flip to the second page, please,

23   and then highlight the material at the top going down to the

24   first three bullet points [as read]:

25           "This is just a short note to tell you where we

1    are at.  The product is developing nicely and on

2    time."

3    And then in the third bullet point there [as read]:

4        "Now that the product is pretty much there, we

5    are starting to put together a marketing team.  I

6    interviewed a high-level team of two last week who

7    are higher-level fintech marketing veterans for

8    part-time outsourcing.  The advantage is that they

9    have experience, good contacts in the industry, which

10    I think is better than taking lower-level guys

11    full-time, as the level of connections and

12    experience, I think, are more critical at this point

13    than time on the job.  In any case, we are eager to

14    start generating revenue."

15    And now, Ed, if we can go to Exhibit 2337 and highlight

16    here the material just beneath the redaction on page 1 showing

17    the "to" and "from" here.

18    From Mikail Conybeare to all staff at DIT Network.  And

19    then if you follow along in the box that starts on the first

20    page and runs onto a couple of lines on the second page, if you

21    could highlight that box for us.

22    Can you get the little piece on the second page?

23    Perfect.  Thanks.

24    So this shows a date of July 24, 2018, and includes

25    various recipients, including Mr. Andrade.

**PROCEEDINGS**

1      And then if we could go to exhibit -- same exhibit,

2  page 5, the unredacted material at the top, it says [as read]:

3          "HitBTC" --

4      Oh, sorry.  We lost it there.  Go ahead.  I'll slow down.

5      Thank you.

6      [As read]:

7          "HitBTC confirmed that ABTC will be listed on

8      exchange.  Tentative time frame roughly three weeks."

9      And then, finally, if we could go to Exhibit 2334, and if

10  you will -- this is another one of these weekly management

11  updates.  If you will blow up the box at the top there, near

12  the top of page 1.

13      Okay.  And then the box underneath that that begins with

14  the September 18 date and shows Marcus to be on the

15  distribution.

16      And then if we could go to page 2 and blow up the

17  unredacted material, it says [as read]:

18          "Rackspace:  Discussions underway to have them

19      help build and manage the operational services which

20      will be hosted on AWS.  Timeline for them to

21      document, design, and build the system is six to

22      eight weeks.  They follow a structured process

23      methodology, and it will not be quicker than that.

24      This fits in with our 2.0.2 commercial release

25      timing."

 1          And that concludes the publication of these exhibits.

 2          If I just may have a moment.

 3                        (Pause in proceedings.)

 4          **MR. SHEPARD:**  Your Honor, at this point, the defense

 5   rests.

 6          **THE COURT:**  Very well.

 7          Mr. Highsmith?

 8          **MR. HIGHSMITH:**  In rebuttal, the United States calls

 9   Special Agent Ethan Quinn.

10    (Witness enters the courtroom and steps forward to be sworn.)

11          **THE COURT:**  If you'd come forward, Agent Quinn.

12          You were sworn in when you were previously called, but

13   because this is a new phase in the case, I'm going to ask my

14   Courtroom Deputy to administer the oath again.

15                           **ETHAN QUINN,**

16   called as a witness in rebuttal for the Government, having been

17   duly sworn, testified as follows:

18          **THE WITNESS:**  I do.

19          **THE COURTROOM DEPUTY:**  Please state your name, please.

20          **THE WITNESS:**  My name is Ethan Quinn, Q-u-i-n-n.

21                        **DIRECT EXAMINATION**

22   BY MR. WARD:

23   **Q.**   Good afternoon, Special Agent Quinn.

24          I want to show you some documents.

25          **MR. STEFAN:**  Your Honor, if I may, the Government's

```
 1   expert, psych expert, is in the courtroom and the defense --

 2   since she's still slated to testify, the defense would request

 3   that --

 4            THE COURT:  Okay.

 5            MR. STEFAN:  Okay.  Looks like that's been addressed,

 6   Your Honor.

 7   BY MR. WARD:

 8   Q.  Agent Quinn, can you please --

 9            MR. WARD:  Can we call up for the witness, the Court,

10   and the parties Exhibit 705, please.

11   Q.  Agent Quinn, do you recognize this document?

12   A.  I do.

13   Q.  And what is it?

14   A.  It appears to be a written biography of Mr. Andrade.

15   Q.  And how did you obtain this document?

16   A.  This one was obtained by a grand jury subpoena.

17            MR. WARD:  Move to admit Exhibit 705.

18            MR. STEFAN:  Defense objects.  This is not proper

19   rebuttal evidence.

20            MR. WARD:  There was significant testimony during the

21   defense case as to Mr. Andrade's credentials, his executive

22   functioning.  I think this goes directly to that.

23            THE COURT:  All right.

24            MR. STEFAN:  I mean, that --

25            THE COURT:  Yes?
```

1      **MR. STEFAN:**  Sorry, Your Honor.

2      **THE COURT:**  Go ahead.

3      **MR. STEFAN:**  Not his credentials, but I mean, with

4  respect to his executive function, presumably the Government's

5  purpose in introducing this document is not to rebut the

6  allegations that -- or the statements regarding Mr. Andrade's

7  low executive function, but to instead draw attention to

8  seemingly claims that were made.  I mean, this isn't rebuttal

9  of the actual testimony that was elicited from Dr. Armstrong.

10     **THE COURT:**  Well, I think it does go to the question

11  of Mr. Andrade's capabilities, and so I will admit it.

12     705 will be admitted.

13     (Trial Exhibit 705 received in evidence.)

14     **MR. WARD:**  Can we blow up the first paragraph, please.

15  **Q.**   Agent Quinn, in this bio, does Mr. Andrade say that he's a

16  former United States Marine computer programming maven and

17  successful businessman who spearheaded the development of a new

18  structure for cryptocurrency?

19  **A.**   Yes, that's what's written there.

20     **MR. WARD:**  Can we go to the second page, please.

21  First paragraph, please.

22  **Q.**   Does this document represent that Marcus Andrade, quote,

23  "established a reputation as one of the leading developers in

24  the digital currency fields using his skills as chief architect

25  and CEO of numerous other digital currency projects"?

1    **A.**    It does.

2            **MR. WARD:**    We could go to the next paragraph, please.

3    **Q.**    And does this represent "a prolific inventor, Marcus has

4    patents pending for personal client identification and

5    verification process, pseudonymous system, and transaction

6    network for monitoring and restricting transactions of

7    cryptography-based electronic money"?

8    **A.**    It does.

9            **MR. WARD:**    And, finally, can we go to the

10    second-to-last paragraph, the first full -- the second-to-last

11    paragraph.    Thanks.

12    **Q.**    And does this state that Marcus has founded and

13    successfully managed businesses in the energy and environmental

14    sectors?

15    **A.**    It does.

16            **MR. WARD:**    We can take this document down.

17        I would -- can we call up for the -- for the witness

18    Exhibit -- just briefly, Exhibit 671, please.

19    **Q.**    Is this -- what is this document?

20    **A.**    This is an email from the monex247@yahoo.com email account

21    to a Rajesh DEL email account.

22    **Q.**    And what's the date?

23    **A.**    It is July 20th, 2017.

24    **Q.**    Is there an attachment to this email?

25    **A.**    There is.

1       **MR. WARD:**  And can we pull up Exhibit 672.

2   **Q.**   Is this the attachment to that email?

3   **A.**   Yes, it is.

4   **Q.**   And what is it?

5   **A.**   It is a chart that has "AML token pre-ICO" written at the

6   top and discusses a number of things related to the

7   AML BitCoin.

8   **Q.**   Does it contain information about the state of the

9   development of the AML BitCoin technology?

10  **A.**   It does.

11      **MR. WARD:**  The Government would move to admit

12  Exhibit 671 and 672.

13      **MR. STEFAN:**  Yes, objecting as for improper rebuttal.

14  To which defense witness and to what statements they made is

15  this applicable?

16      **THE COURT:**  Exhibit 671 and 672 will be admitted.

17      (Trial Exhibits 671 and 672 received in evidence.)

18      **THE COURT:**  And I don't know if you're publishing

19  these but --

20      **MR. WARD:**  I would like to publish.  Let's just start

21  briefly with 671, if we could.

22      And, again, if we could just blow up this paragraph.

23  **Q.**   Agent Quinn, Marcus Monex, that's Marcus Andrade?

24  **A.**   It is.

25  **Q.**   And the date is July 20th, 2017?

1  **A.**   It is.

2  **Q.**   And do you know who Rajesh DEL is or rajesh.satkartar?

3  **A.**   I actually do not.

4  **Q.**   Okay.  Is this an email from Marcus where he says

5  [as read]:

6       "I have some confidential information coming out

7       on Tuesday.  We need to discuss it"?

8  **A.**   It does.

9       **MR. WARD:**  And can we now look at Exhibit 672, please.

10      And can we do the top paragraph, please.

11 **Q.**   It says at the top [as read]:

12      "AML token pre-ICO.  This is a private

13      offering."

14      What do you understand that statement to be, based on what

15 you've learned in this investigation?

16 **A.**   I believe this to be related to offering a sale of

17 AML BitCoin Tokens prior to the actual public offering of the

18 ICO.

19 **Q.**   Did Marcus Andrade offer and sell shares of AML BitCoin

20 Tokens to investors prior to the ICO?

21 **A.**   That's my understanding.

22 **Q.**   And what was the time -- approximate time frame of those

23 sales?

24 **A.**   It would have been in the summer to early fall of 2017.

25 **Q.**   And where it says "Private raise July 31st to August 15th,

1    2017," does that appear right to you?

2    **A.**   That appears correct.

3        **MR. WARD:**  Can we pull out of this, please.

4        Can we go to page 3 of this exhibit, please, and highlight

5    Bullet Point 7 and 8, please.  Both of them.  Both, please.

6    **Q.**   The question where it says, "Where can I buy the AML

7    token," it has a list.  What are those items on the list 1

8    through 5?

9    **A.**   My understanding is these would be cryptocurrency

10   exchanges.  I particularly recognize CCEX and HitBTC.

11   **Q.**   Looking at the next question, it says [as read]:

12        "How long will it take until the AML BitCoin is

13       ready?"

14   What was the answer to that question?

15   **A.**   It states [as read]:

16        "It is anticipated that it will take between

17       three to six months."

18   **Q.**   And this is from a document dated July of 2017?

19   **A.**   That's correct.

20       **MR. WARD:**  Can you go back to the first page of this

21   document, please.  Can you highlight the box where it says "Use

22   of Proceeds"?

23   **Q.**   Is this what's being represented to pre-ICO investors as

24   to what the use of the proceeds will be?

25   **A.**   It's being represented in this document anyways.

1   **Q.**   And is there any representation there that these proceeds

2   will be used for personal expenses?

3   **A.**   No, there is not.

4           **MR. WARD:**  And I'm sorry.  Can we go back to page 3?

5   I want to highlight one last thing.

6       Can you highlight Number 9, please.

7   **Q.**   See the question [as read]:

8           "What happens to the AML token after the capital

9       raise?"

10      What does Bullet Point 3 say?

11  **A.**   Bullet Point 3 says [as read]:

12          "Any capital gains made will be kept by the coin

13      holder."

14          **MR. WARD:**  Let's go to another exhibit, if we could.

15  This is Exhibit 807.

16  **Q.**   What is this document?

17  **A.**   This appears to be marketing material associated with the

18  Aten Black Gold Coin.

19  **Q.**   And where was this obtained?

20  **A.**   This was part of the NAC Foundation subpoena.

21          **MR. WARD:**  Move to admit Exhibit 807.

22          **MR. STEFAN:**  Same objection.

23          **THE COURT:**  807 will be admitted.

24      (Trial Exhibit 807 received in evidence.)

25          **MR. WARD:**  Can we publish this for the jury, please.

 1              THE COURT:  You may.

 2              MR. STEFAN:  Your Honor, if I may, also -- disregard.

 3      BY MR. WARD:

 4      Q.   Is this the cover page of a -- was this a brochure-type

 5      document that was obtained?

 6      A.   That's what it appears to be.

 7              MR. WARD:  Can we go to page 2, please.  Page 2,

 8      please.

 9      Q.   Can you read the second representation in those --

10              MR. WARD:  Can we highlight the four bullet points.

11      Q.   And, Agent Quinn, can you read the second bullet point,

12      please?

13      A.   Yes.  It is -- the second bullet point states [as read]:

14              "Accepted for exchange of goods and services all

15          across the world."

16      Q.   And what is that reference to?  What is the reference as

17      being "Accepted for exchanges of goods and services" --

18      A.   It appears to be --

19      Q.   -- "all across the world"?

20      A.   -- a reference to the Aten Black Gold Coin.

21              MR. WARD:  And then can we go to page 4, please.  And

22      please highlight the -- where it says, "Here are some of our

23      unique advantages."  If we could open the two bullet points,

24      please.

25      Q.   And the first bullet point, Agent Quinn, reads [as read]:

1            "Aten Coin value is backed by oil and gas

2       production projects."

3       Is that correct?

4    **A.**   Correct.

5            **MR. WARD:**  Can we go to the next page, please.

6    Page 5.  And if we could highlight the paragraph that says "Oil

7    and gas companies."

8    **Q.**   Can you read the second sentence of that paragraph that

9    says "By the end"?

10   **A.**   [As read]:

11           "By the end of 2015, Aten Coin's oil and gas

12      market is expected to be in the millions."

13           **MR. WARD:**  Page 6, please.  Can we highlight the

14   paragraph with the heading "A unique approach to creating

15   market demand"?

16   **Q.**   Agent Quinn, is this representing that Aten Coin is in

17   the -- BGC International is investing in oil and gas production

18   businesses?

19   **A.**   That's correct.

20   **Q.**   And then the third bullet point says [as read]:

21           "All proceeds from the oil and gas production

22      projects are used to fund Aten Coin."

23   **A.**   That's correct.  The second bullet point.

24   **Q.**   Second bullet point.  Thank you.

25           **MR. WARD:**  Can we look at Exhibit 23, please.  Just

1    for the -- and can we bring this up?  This has not been

2    admitted.  This is just for the witness and the parties and

3    the Court.

4    **Q.**   Who is this email from?

5    **A.**   This is from Marcus Andrade using his ceo@amlbitcoin.com

6    email address.

7    **Q.**   And is it an email exchange with a company called CoinEgg?

8    **A.**   It is.

9    **Q.**   Is there an attachment to this document?

10   **A.**   There is.

11   **Q.**   And is that attachment actually part of Exhibit 23 that

12   goes on for about 18 pages?

13   **A.**   I believe so, yes.

14          **MR. WARD:**  And if we could look at page 9, please.

15   **Q.**   Is this a documentation being provided by AML BitCoin?

16   **A.**   Correct.

17          **MR. WARD:**  Move to admit Exhibit 23.

18          **MR. STEFAN:**  No objection.

19          **THE COURT:**  23 will be admitted.

20          (Trial Exhibit 23 received in evidence.)

21          **MR. WARD:**  If we could go back to page 1 and please

22   publish this for the jury.

23   **Q.**   This is an email, you testified, to CoinEgg.  What's

24   CoinEgg?

25   **A.**   I believe CoinEgg is a cryptocurrency exchange.

1   **Q.**   Based on what you learned in your investigation, was

2   Marcus Andrade attempting to get AML BitCoin listed on CoinEgg?

3   **A.**   That's what these emails appear to show.

4           **MR. WARD:**   And if we could go to the second page,

5   please, and highlight the top part starting, "Hello, CoinEgg

6   Team," down all the way to the bottom of -- that's fine.

7   **Q.**   Is this an email from Marcus Andrade to the CoinEgg team?

8   **A.**   It is.

9   **Q.**   And when he writes, "I would like to know more about the

10  coin listing process on your exchange," is that in reference to

11  listing AML BitCoin on the CoinEgg cryptocurrency exchange?

12  **A.**   That's what it appears to be.

13  **Q.**   And he writes, the next page [as read]:

14          "Please note that we are the only digital

15          currency that is not only AML/KYC compliant, we

16          actually use certified digital identities in

17          partnerships with banks, insurance companies, and

18          government entities."

19          Is that correct?

20  **A.**   That's correct.

21  **Q.**   If you look at the -- does it contain a link to the white

22  paper?

23  **A.**   It does.

24  **Q.**   It says [as read]:

25          "Below are some articles about us as well."

 1           Does this include links to articles, including

 2    "AML BitCoin Makes Landfall in Panama"?

 3    **A.**   It does.

 4    **Q.**   That is www.investors.com?

 5    **A.**   That's correct.

 6           **MR. WARD:**   If we could go to page 9 of this exhibit,

 7    please.   Highlight --

 8    **Q.**   Is this the documentation that Mr. Andrade submitted as

 9    part of the application?

10    **A.**   Yes.   This was attached to the email.

11    **Q.**   And it says [as read]:

12           "Your relationship with the project team?"

13    What was his answer?

14    **A.**   He says [as read]:

15           "I am the president and chief executive

16    officer."

17    **Q.**   Down to Question 9, when it asks, "The circulation volume

18    of tokens," what was the answer?

19    **A.**   It was 76 million.

20           **MR. WARD:**   If we could pull out of that, please.

21    Go to the next page.   Can you highlight Question

22    Number 12?

23    **Q.**   The question is "Tutorial to deploy the wallet?"

24    **A.**   The answer is [as read]:

25           "No special instructions.   Just follow the

1          procedure for Bitcoin.  Source code based on Bitcoin

2          Core Version 1.5.  Please see the attached

3          documentation."

4               **MR. WARD:**  If we could pull out of this and look at

5     Question 17, please.

6     **Q.**  Can you -- Agent Quinn, can you read the last sentence of

7     the answer to how to appreciate in the future?

8     **A.**  The last sentence of the answer?

9          [As read]:

10              "Laws that are coming out worldwide fully

11         support our initiative."

12    **Q.**  And does this also link to an article "AML BitCoin Creator

13    Talks European Governments"?

14    **A.**  That's correct, the third one.

15              **MR. WARD:**  Can we look at Question 18 on the next

16    page, page 11, please.

17    **Q.**  As to the question "How many users are there in the

18    project now," that's referring to AML BitCoin Tokens?

19    **A.**  I believe so, yes.

20    **Q.**  And what was the answer?

21    **A.**  34,285.

22              **MR. WARD:**  Can we pull out of this, please.

23    **Q.**  And look at Question Number 22.  It lists the main members

24    of your project.  Who's listed at 1.14?

25    **A.**  1.14 is Japheth Dillman, chief strategy officer.

1   Q.   And who's listed as 1.1.5?

2   A.   John Szeder, chief technical officer.

3   Q.   And can we go to Question Number 23 on the next page,

4   please.  Question Number 23 asks [as read]:

5            "Are the members of your team involved in other

6        projects?"

7        What was the answer?

8   A.   The answer is no.

9            MR. WARD:  May I have one moment, Your Honor?

10                   (Pause in proceedings.)

11           MR. WARD:  Thank you, Agent Quinn.

12           THE COURT:  Mr. Stefan?

13           MR. STEFAN:  Thank you, Your Honor.

14                   <u>CROSS-EXAMINATION</u>

15  BY MR. STEFAN:

16  Q.   Agent Quinn, you got some 5 terabytes' worth of discovery

17  in this case; is that right?

18  A.   I don't know the full volume of discovery -- of the

19  discovery we got in this case.

20  Q.   It is a substantial amount of discovery?

21  A.   It was.

22  Q.   More than 1 terabyte?

23  A.   I don't know the volume of what we got.  There was a lot.

24  Q.   You worked on this case for how long, how many years at

25  this point?

**QUINN - CROSS / STEFAN**

1   **A.**   I worked on this case for a number of years, yes.

2   **Q.**   Can you ballpark the volume of data you received in terms

3   of megabytes, gigabytes, or terabytes to any degree of

4   certainty?

5   **A.**   I cannot.

6   **Q.**   The documents that you received in this case, I want to

7   turn to some of them.

8       First, Government Exhibit 807, please.  We don't need to,

9   like, go into the nitty-gritty of this document, but I'd just

10  ask you:  Where did you get this from?

11  **A.**   I believe that one came from the NAC Foundation subpoena.

12  **Q.**   So, in other words, this was delivered to you by

13  Mr. Andrade or by Mr. Andrade's attorneys, more specifically?

14  **A.**   Yes.  This one was -- I forget which firm brought us this,

15  but it was from his attorneys.

16  **Q.**   Where was it located?

17  **A.**   I don't recall.  I believe they gave us a -- actually, I

18  don't recall what format it came in.  It may have been a thumb

19  drive but...

20  **Q.**   So you don't know what format this came in?

21  **A.**   I mean, it was seven years ago we received this.  I mean,

22  it came in a digital format.

23  **Q.**   Okay.  You don't know if it was an image?

24  **A.**   Well, this was an image.  I believe this was a PDF.

25  **Q.**   Okay.  So you believe it's a PDF.  Why do you believe it's

1    a PDF as opposed to an image?

2    **A.**    I mean, because I believe we got a number of PDFs with it,

3    but I don't recall specific formats.

4    **Q.**    You don't know whether or not this was a PDF?

5    **A.**    We received a huge volume of material.  Some came in PDFs.

6    Some came in, like, PNGs or other.  There was a few

7    different --

8    **Q.**    Like a PNG file?

9    **A.**    -- formats.

10    Yeah.

11            **THE COURT:**  One at a time.

12            **THE WITNESS:**  A PNG file potentially.  There was a

13    number of different formats that were provided.

14    **BY MR. STEFAN:**

15    **Q.**    And in response to my question that you don't know this

16    was a PDF, your answer was you got files in a bunch of

17    different formats; correct?  That was your answer to my

18    question right now?

19    **A.**    Correct.

20    **Q.**    You do not know that this came in a PDF format?

21    **A.**    I don't.

22    **Q.**    You do not know from where within Mr. Andrade's files this

23    document came from?

24    **A.**    Well, it came within the files because all the files came

25    in a Bates-stamped number.  So this would have come at the

 1   70,000 era of the Bate stamps, because the format it came in,

 2   we had a number of different file -- subfolders that were

 3   provided by his attorneys which ranged between hundreds of

 4   thousands of documents.  So I could place it probably in

 5   Volume 3 of the four volumes, but I don't recall specifically

 6   which format this was, and it may -- this may have been

 7   produced in multiple different formats.

 8   Q.   I'm referring specifically to the, like, actual origin of

 9   this document.  You referred to Volume 3 of what?  Four

10   volumes, you said?

11   A.   I believe there was four total volumes in this production.

12   Q.   Volume 3 of four volumes, 70,000 documents within there --

13   A.   Yeah.

14   Q.   -- right?

15        What I'm referring to is not where was this in Volume 3,

16   but where was this document within NAC's, Mr. Andrade's total

17   documents.  Right?  Was this on his email?  Do you know?

18   A.   On his email?  No.  This came out of the production from

19   the attorneys, so I don't know if he kept this in his email, if

20   it was printed up.  I don't know.

21   Q.   You don't know if it was in a binder?

22   A.   Correct.

23   Q.   Or you don't know if this was published anywhere?

24   A.   That's correct.

25   Q.   If it was on a website?

1  **A.**   Correct.

2  **Q.**   You have no idea if anyone outside of Mr. Andrade or his

3  attorneys ever saw this document?

4  **A.**   That's correct.

5  **Q.**   Turn to Exhibit 671.

6  This is another email that you got from the production

7  from Mr. Andrade; right?

8  **A.**   That's correct.

9  **Q.**   You see the recipient on the email is this Rajesh DEL,

10  D-e-l; right?  And it looks like it's a

11  rajesh.satkartar@gmail.com; right?

12  **A.**   Correct.

13  **Q.**   You don't know who that person is?

14  **A.**   I do not.

15  **Q.**   You have no idea if he's a purchaser?

16  **A.**   Correct.

17  **Q.**   Or a potential purchaser?

18  **A.**   Correct.  I do not recognize the name.

19  **Q.**   Or a software developer?

20  **A.**   Correct.

21  **Q.**   You have no -- you have no -- you don't know him from

22  Adam; right?

23  **A.**   Correct.

24  **Q.**   And Mr. Andrade sends this email indicating that

25  confidential information is coming out Tuesday, and he provides

1    672.

2              **MR. STEFAN:**  If we could show that.

3    **Q.**   This is that flier or a couple-pager that you were

4    testifying about on direct; right?

5    **A.**   Correct.

6    **Q.**   It's an attachment to that email that Mr. Andrade sent to

7    this individual you don't know; right?

8    **A.**   Correct.

9    **Q.**   You didn't see this file sent to anybody else; right?

10   **A.**   Not to my recollection.

11   **Q.**   No other instances of this document appeared anywhere in

12   the evidence?

13   **A.**   That, I can't say.

14   **Q.**   Not to your recollection?

15   **A.**   Correct.  There's a significant amount of evidence, and my

16   review of it was several years ago.

17   **Q.**   You never saw this published on Mr. Andrade's website?

18   **A.**   I did not.

19   **Q.**   You never saw it put up on a social media web page?

20   **A.**   I did not.

21   **Q.**   And you never saw use of it by Mr. Andrade in soliciting

22   potential purchasers or investors; right?

23   **A.**   Beyond this, but, correct, no, I did not.

24   **Q.**   Well, the information that we referred to in Exhibit 671,

25   you acknowledge you don't even know if that person was a

1   potential investor or purchaser; right?

2   **A.**   That's correct.

3   **Q.**   Your knowledge of this document is limited to the fact

4   that it was attached to one email; right?

5   **A.**   Correct.

6   **Q.**   To one person who you have no idea who they are?

7   **A.**   Correct.

8   **Q.**   I mean, specifically, you referred to -- or you were

9   directed towards the "use of proceeds" language in this

10  document; right?

11  **A.**   I was.

12  **Q.**   It's there on the first page, "use of proceeds," and

13  there's a series of listings provided; right?

14  **A.**   Correct.

15  **Q.**   And the document was emailed on July 20th of 2017; right?

16  **A.**   Correct.

17  **Q.**   The ICO hadn't occurred at that point; right?

18  **A.**   That's correct.

19  **Q.**   And, in fact, the white paper, which was ultimately

20  published on the AML BitCoin website for the ICO, was dated

21  4 October 2017; is that correct?

22  **A.**   That's correct.

23  **Q.**   And there's no mention in that white paper of the use of

24  proceeds from the AML BitCoin Token sale; is that correct?

25  **A.**   I don't recall at this time, but potentially.

PROCEEDINGS

1    **Q.**    Would you need to review 2470 in its entirety to determine

2    that that's the case?

3    **A.**    I mean, for me to testify to it, yes, correct.  I would

4    have to review it to make sure that language isn't in there,

5    but I don't recall it being in there.

6    **Q.**    You have no recollection of that language appearing in the

7    AML BitCoin white paper that was actually published on the

8    website; right?

9    **A.**    That's correct.

10    **Q.**    This information you have no knowledge was ever published

11    anywhere; right?

12    **A.**    Correct.

13        **MR. STEFAN:**  Your Honor, may I have a moment?

14        **THE COURT:**  Yes.

15                (Pause in proceedings.)

16        **MR. STEFAN:**  Thank you.

17    No further questions.

18        **MR. WARD:**  Nothing further.

19    Thank you.

20        **THE COURT:**  You may step down.

21        **THE WITNESS:**  Thank you.

22                (Witness excused.)

23        **MR. HIGHSMITH:**  The United States calls Dr. Amanda

24    Gregory, Your Honor.

25        **THE COURT:**  Very well.

1      (Witness enters the courtroom and steps forward to be sworn.)

2             **THE COURT:**  Come forward, please, to be sworn.

3                        <u>**AMANDA GREGORY**</u>,

4      called as a witness in rebuttal for the Government, having been

5      duly sworn, testified as follows:

6             **THE WITNESS:**  I do.

7             **THE COURTROOM DEPUTY:**  Please be seated.

8         Can you state and spell your last name?  State your name

9      and spell your last name, please.  Thank you.

10            **THE WITNESS:**  Sorry.  Amanda Gregory.  That's

11     G-r-e-g-o-r-y.

12                      **DIRECT EXAMINATION**

13     **BY MR. HIGHSMITH:**

14     **Q.**   Dr. Gregory, what do you do for a living?

15     **A.**   I'm a clinical and forensic neuropsychologist.

16     **Q.**   I'd like to go over your education, some of your clinical

17     experience, some of your teaching experience, and your

18     professional background.  Okay?

19     **A.**   Okay.

20     **Q.**   Let's start with your education.  Where did you get your

21     bachelor's degree?

22     **A.**   The University of Wisconsin at Madison in psychology and

23     film.

24     **Q.**   Where did you get your master's degree in psychology?

25     **A.**   The University of Texas at Austin.

1    **Q.**    Where did you get your Doctor of Philosophy in clinical

2    psychology?

3    **A.**    The University of Texas at Austin.

4    **Q.**    Did you do a postdoctoral fellowship?

5    **A.**    I did.

6    **Q.**    What did you do that in?

7    **A.**    I did that in forensic psychiatry and clinical

8    neuropsychology at the University of California San Francisco.

9    **Q.**    Are those educational institutions accredited with the

10    American Psychological Association?

11    **A.**    Yes.

12    **Q.**    Let's talk about your clinical experience.

13         Do you do work in private practice?

14    **A.**    I do.

15    **Q.**    Please describe that briefly.

16    **A.**    My private practice work is in forensic and clinical

17    neuropsychology and psychology.  So that means that I do

18    patient evaluations, so clinical evaluations and forensic

19    evaluations, so evaluations for the Court.  I also do

20    psychotherapy.

21    **Q.**    Are you also an attending psychologist at the University

22    of California San Francisco?

23    **A.**    I am.

24    **Q.**    Please describe that position.

25    **A.**    In that position, I supervise psychology fellows who are

1    both predoctoral and postdoctoral.  Most recently I've been

2    supervising them doing clinical neuropsychology evaluations

3    with patients.

4        I've also supervised psychotherapy at UCSF in the past,

5    and I've also done forensic evaluations while representing

6    UCSF.

7    **Q.**   Let's cover the time frame on those experiences.

8        You've done private practice from approximately 2004 until

9    the present; is that correct?

10   **A.**   Yes.

11   **Q.**   And you've been an attending psychologist at UCSF since

12   approximately 2009; is that correct?

13   **A.**   I think I was a lecturer from 2009, and then 2011 I was an

14   attending psychologist.

15   **Q.**   Since 2011?

16   **A.**   I think so, yeah.

17   **Q.**   What's the difference between a lecturer and an attending?

18   **A.**   As a lecturer, I wasn't actually considered faculty; and

19   then once I became an attending psychologist, I started out as

20   an assistant professor and now I'm an associate professor.

21   **Q.**   So you've been on faculty with UCSF for more than a

22   decade; is that right?

23   **A.**   Yes.

24   **Q.**   Do you also do work at Alta Bates Summit Medical Center in

25   Berkeley?

**GREGORY - DIRECT / HIGHSMITH**

1   **A.**   I did a six-month stint there where I was covering for

2   somebody who had a medical illness, but I worked on their

3   inpatient unit there.

4   **Q.**   And was that also neuropsychology?

5   **A.**   Yes.

6   **Q.**   Going over your extensive experience, were you also

7   working at the Meridell Achievement Center in Liberty Hill,

8   Texas?

9   **A.**   Yes.  So right after I graduated and got my Ph.D., I

10  worked at a residential treatment center for children,

11  adolescents that was just outside of Austin, Texas.

12  **Q.**   What did you do there?

13  **A.**   I did neuropsychological evaluation.  I met with treatment

14  teams and family to go over the findings and help with the

15  treatment of the young people that were at the treatment

16  center.

17  **Q.**   Were you a -- you were a postdoctoral fellow in clinical

18  psychology at UCSF as well from 2001 to 2002; is that right?

19  **A.**   Yes.

20  **Q.**   Can you very briefly describe that experience?

21  **A.**   So during the year there, I did a lot of clinical

22  neuropsychology evaluations, and I also participated in the

23  forensics -- the forensic psychiatry and the law program.  So

24  it was a combination of neuropsychology and forensics.

25  **Q.**   And also from 2000 to 2001, you have experience at UCSF as

1    a clinical psychology fellow, American Psychological

2    Association-approved clinical internship; is that accurate?

3    **A.**    Yes.

4    **Q.**    Can you just briefly describe that, please?

5    **A.**    So in order to get your Ph.D. in clinical psychology, you

6    have to do a year placement, ideally at a hospital, and so my

7    year placement was at UCSF.

8    **Q.**    In addition, do you have experience at the Austin

9    Neurological Clinic, St. David's Hospital, which was a

10    specialty hospital, in Austin, Texas?

11    **A.**    Yes.

12    **Q.**    Very briefly, can you describe that experience?

13    **A.**    So for several years before I got my Ph.D., while I was a

14    graduate student, I was placed at different hospitals doing

15    clinical neuropsychological evaluations.

16    **Q.**    Additionally, at the University of Texas Austin, did you

17    do practicum training clinic as a therapist?

18    **A.**    Yes.

19    **Q.**    And just very briefly describe that, please.

20    **A.**    That was an outpatient clinic where basically we did

21    cognitive behavioral psychotherapy with patients.

22    **Q.**    I'd like to turn to your teaching experience now, please.

23         You've already testified you're an associate clinical

24    professor at UCSF; correct?

25    **A.**    Yes.

1  Q.    And you have more than ten years of experience teaching at

2  UCSF.  Is that all in the department of psychiatry?

3  A.    Yes.

4  Q.    You previously testified you were a lecturer.  Was that

5  also in the department of psychiatry?

6  A.    It was.

7  Q.    Do you have additional teaching experience as well?

8  A.    I taught in Rwanda, teaching on post-traumatic stress

9  disorder interventions on two occasions, on one occasion at a

10 graduate school there and on another occasion with community

11 mental health workers.

12 Q.    Did you also do advising and training of student research

13 assistants at the University of Texas?

14 A.    Yes.

15 Q.    And did you do that in their department of psychology?

16 A.    I did.

17 Q.    And for approximately four years, four to five years?

18 A.    Correct.

19 Q.    Let's turn now to some of your research experience.

20       Do you also have research experience?

21 A.    I do, but not recently.

22 Q.    And is that also in the area of psychiatry?

23 A.    Yes, psychiatry and psychology.

24 Q.    Let's turn to some of the publications that you're listed

25 on.

**GREGORY - DIRECT / HIGHSMITH**

1          More than ten years ago, but from approximately 1999

2    spanning all the way through 2006, did you participate in

3    publishing in relevant psychology journals approximately one,

4    two, three, four, five, six, seven, eight, nine publications?

5    **A.**    Yes.

6    **Q.**    You also present at neuropsychological conferences?

7    **A.**    Correct.

8    **Q.**    Could you briefly describe, please, the types of

9    presentations you give at these conferences?

10   **A.**    I've given presentations on traumatic brain injury,

11   conducting neuropsychological evaluations in forensic cases,

12   violence risk assessment.  Those are the ones I can remember.

13   **Q.**    Have you also given academic presentations?

14   **A.**    I have.

15   **Q.**    And is that also in the area of neuropsychology?

16   **A.**    Mainly, yes.

17   **Q.**    Have you also received grants and awards in your

18   professional role?

19   **A.**    I have.

20   **Q.**    Do you also have professional affiliations?

21   **A.**    I do.

22   **Q.**    Are you -- do you have a professional affiliation with the

23   American Psychological Association?

24   **A.**    Yes.

25              **MR. SHEPARD:**  Your Honor, at this time -- oh.

GREGORY - DIRECT / HIGHSMITH

1  **Q.**   Before I do that, have you testified in court previously

2  as an expert?

3  **A.**   I have.

4  **Q.**   Have you testified more than one time?

5  **A.**   Yes.

6  **Q.**   Have you testified more than five times?

7  **A.**   Yes.

8  **Q.**   Have you testified approximately ten times?

9  **A.**   I probably testified approximately 50 times in adult

10 court.

11 **Q.**   And additionally in juvenile court?

12 **A.**   Yes.

13 **Q.**   And that's on top of what you've done in adult court; is

14 that correct?

15 **A.**   Yes.

16 **Q.**   And have you testified as an expert witness?

17 **A.**   I have.

18 **Q.**   And in what areas have you testified as an expert witness?

19 **A.**   I've testified as an expert witness, as an expert in

20 clinical and forensic psychology, clinical and forensic

21 neuropsychology, post-traumatic stress disorder, traumatic

22 brain injury.  Those are the ones I can remember right now.

23       **MR. HIGHSMITH:**  Your Honor, at this time I'd move to

24 qualify Dr. Amanda Gregory as a rebuttal expert.

25       **MS. DIAMOND:**  No objection, Your Honor.

1          **THE COURT:**  The witness will be so designated.

2      And I think this is probably the place to stop.

3      You may step down.

4          **THE WITNESS:**  Thank you.

5          **THE COURT:**  Members of the jury, we've come to the end

6  of the day.  A few things to mention.

7      First of all, as you know, we're going to have a bit of an

8  extended break.  So we're not in session tomorrow and Friday,

9  and then we'll be back in session on Monday.

10      The good news, and it continues, I think, is that we are

11  looking to conclude the case early in the week.  What will

12  happen then, I want to harken back to something I told you

13  right at the beginning of jury selection.  Once we get to the

14  stage that we have closing arguments, my instructions, and then

15  deliberation for you, our 8:30 to 1:30 schedule will adjust,

16  and that will be that it'll go to 8:30 to 4:00 because at that

17  point we want you to have the time to do your work.

18      So it won't be Monday.  Monday will still be the 8:30 to

19  1:30.  But be prepared for me to tell you, once we're sure

20  we're going into the closing phase of it, that I may trigger

21  the 8:30 to 4 o'clock.  And my best guess is Tuesday or

22  Wednesday that will be the case.

23      So in the meantime, I could probably ask you to recite

24  what I'm about to say, but I'm going to do it, nonetheless.

25  Remember my admonitions particularly now.  We're almost at the

**PROCEEDINGS**

1   close.  Don't discuss this with anyone.  Don't do any research,

2   no -- nothing associated with this case for the four days we're

3   going to be off.  Do other things.  And then come back; we'll

4   fully focus on it on Monday morning.

5        Stay healthy.  We really need you to stay healthy.  So

6   don't talk to anyone.  That would be the easy thing.  If you

7   just don't talk to anybody, then there won't be a problem.

8        But enjoy your four days, and we will see you back here

9   bright and early on Monday morning.

10   (Proceedings were heard out of the presence of the jury.)

11        **THE COURT:**  We're out of the presence of the jury.

12        The alternate -- one of the three remaining alternates,

13   Ms. -- what's her name?

14        **THE COURTROOM DEPUTY:**  It's Michele.

15        **THE COURT:**  Yeah.  She had alerted us her father has

16   some medical procedure, and it's at some point next week.  I

17   don't think we should do anything now.

18        But did she -- it wasn't Monday that she has the problem,

19   is it?

20        **THE COURTROOM DEPUTY:**  No.  The 11th.

21        **THE COURT:**  The 11th.  Okay.

22        **THE COURTROOM DEPUTY:**  Which is Tuesday.

23        **THE COURT:**  It's Tuesday?

24        Well, I don't think we should say she can go now; but if

25   we get -- on Monday, it's looking like we're okay, I think

PROCEEDINGS

1    we'll probably let her go, particularly because she's an

2    alternate and we'll have two left.

3              **MR. HIGHSMITH:**  Understood.

4              **MR. SHEPARD:**  Understood.

5              **THE COURT:**  Okay.  Very good.

6        See you on Monday.

7              **MR. HIGHSMITH:**  See you on Monday, Your Honor.

8                  (Proceedings adjourned at 1:31 p.m.)

9                          ---o0o---

10

11                  <u>**CERTIFICATE OF REPORTER**</u>

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:  Thursday, March 6, 2025

16

17

18

19                      _Ana Dub_

20   _____

21        Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

22        CSR No. 7445, Official United States Reporter

23

24

25