```
                                    Volume 19

                                    Pages 2943 - 3158

                   UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

           Before The Honorable Richard Seeborg, Judge


UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,         )
                                )
    VS.                         )   NO.  3:20-CR-00249 RS
                                )
ROWLAND MARCUS ANDRADE,         )
                                )
              Defendant.         )
_____ )


                                San Francisco, California
                                Tuesday, March 11, 2025
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        PATRICK D. ROBBINS
                        ACTING UNITED STATES ATTORNEY
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                    BY: **CHRISTIAAN HIGHSMITH**
                        **DAVID J. WARD**
                        **MATTHEW CHOU**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        KING & SPALDING, LLP
                        50 California Street, Suite 3300
                        San Francisco, California 94111
                    BY: **MICHAEL J. SHEPARD, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter

```
1   APPEARANCES: (CONTINUED)

2   For Defendant:
                        KING & SPALDING, LLC
3                       1700 Pennsylvania Avenue, NW
                        Washington, D.C. 20006
4               BY:   KERRIE C. DENT, ATTORNEY AT LAW

5                       KING & SPALDING, LLC
                        1185 Avenue of the Americas, 34th Floor
6                       New York, New York 10036
                BY:   DAINEC P. STEFAN, ATTORNEY AT LAW
7

8                       LAW OFFICES OF CINDY A. DIAMOND
                        58 West Portal Avenue, Suite 350
9                       San Francisco, California 94127
                BY:   CINDY A. DIAMOND, ATTORNEY AT LAW
10

11  Also Present:       Special Agent Brendon Zartman
                        Tina Rosenbaum, Paralegal
12                      Ed Jackson, Trial Technician

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            <u>I N D E X</u>

2

3       Tuesday, March 11, 2025 - Volume 19

4
                                                    <u>PAGE</u>   <u>VOL.</u>
5
        Jury Instructions                           2952   19
6       Closing Argument by Mr. Chou                 2967   19
        Closing Argument by Mr. Shepard             3031   19
7       Rebuttal Argument by Mr. Highsmith          3124   19
        Final Jury Instructions                      3153   19
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1   Tuesday - March 11, 2025                          8:10 a.m.

 2                     P R O C E E D I N G S

 3                          ---o0o---

 4           (Defendant present, out of custody.)

 5       (Proceedings were heard out of the presence of the jury.)

 6           THE COURTROOM DEPUTY:  Come to order.

 7           THE COURT:  Good morning.

 8           MR. HIGHSMITH:  Good morning.

 9           THE COURT:  So what are the issues?

10           MR. STEFAN:  Yeah, Your Honor, briefly, we previously

11   addressed the jury instructions.  We wanted to flag again

12   specifically what's now 20, which is the money laundering

13   instruction, and the language regarding the financial

14   transaction, specifically the first element about the proceeds

15   of the fraud.

16       As of now, it just includes language that the defendant

17   conducted or intended to conduct a financial transaction

18   involving property that represented the proceeds of the fraud,

19   and we have some language that we would offer the Court to --

20           THE COURT:  You've had this instruction for over a

21   week.

22           MR. SHEPARD:  Yes.  And we -- we did --

23           THE COURT:  Why is it this morning?

24           MR. SHEPARD:  We did object to this.

25           THE COURT:  Well, then you preserved it.
```

1          **MR. SHEPARD:**  I know.  I just -- I bring it back to

2    the Court just because it seemed so fundamentally wrong to me.

3          **THE COURT:**  Isn't this the pattern Ninth Circuit jury

4    instruction?

5          **MR. SHEPARD:**  It's the question of how you fill in the

6    pattern.  And what we have now is we have an indictment that

7    describes a particular transaction and alleges that it's money

8    laundering, and we have an instruction that just says

9    "a transaction."  It doesn't have what the indictment

10   describes.

11         **THE COURT:**  Does the instruction say it needs to be

12   specific, in the pattern?

13         **MR. SHEPARD:**  I think it has a space to put it in.

14   Otherwise, the jury is just, what transaction are they even

15   deciding?

16         **THE COURT:**  Okay.

17         **MR. HIGHSMITH:**  Our understanding is that we're

18   modeling the pattern and that the pattern does not specify it.

19         **THE COURT:**  Yes.

20         **MR. HIGHSMITH:**  Obviously, our argument is focused on

21   the transaction, but we want to follow the pattern.

22         **THE COURT:**  I mean, you've preserved the objection.

23   To the extent you haven't, I think you waived it because it is

24   the last day, but it sounds like you preserved it, but I'm not

25   going to change the instructions.

PROCEEDINGS

1          You had an issue?

2          **MR. HIGHSMITH:**  We have two issues.  I'm going to turn

3     it over to Mr. Chou.

4          **MR. CHOU:**  Good morning, Your Honor.

5          **THE COURT:**  Good morning.

6          **MR. CHOU:**  The first issue is, to the extent that the

7     defense plans to use any sort of demonstrative in closing that

8     tries to quantify or illustrate reasonable doubt,

9     the Government is going to object and does object to that.

10         This seems to be a practice, a recent trend in

11    white-collar practice.  In the chicken price-fixing trial

12    before Chief Judge Brimmer --

13         **MR. SHEPARD:**  We're not going to do that.

14         **MR. CHOU:**  Not going to do that.

15         All right.  Well, if the Court would like briefing on the

16    issue, we have it, but it sounds like it's mooted.

17         **THE COURT:**  Okay.  And then there was a picture issue.

18         **MR. CHOU:**  Yes.  And so the second issue, Your Honor,

19    which relates to the Government's motion yesterday, is we would

20    like to give the jury, during their deliberations, photos of

21    the witnesses along with their names divided by day.  We met

22    and conferred with the defense.  They object to such a

23    demonstrative.  So the Government just teed up why that would

24    be helpful in this case and the precedent that supports it.

25         **THE COURT:**  Generally -- and Ms. Lew is relieved of

1    this this time.  Mr. Shepard may remember from one of our

2    cases.  I actually have Ms. Lew take the picture when the

3    witness comes up, although sometimes that kind of surprises the

4    witness -- but I learned that from Judge Illston, who does

5    it -- and then she gives the pictures to the jury.

6        The only difference here is I looked real quickly at the

7    pictures.  I mean, obviously, they can't be favorable for one

8    set of witnesses and bad pictures for another.

9        Mr. Shepard, or whoever?

10        **MR. SHEPARD:**  And so, yes, having done this before

11    Your Honor before, when there's a photo as the witness comes up

12    to the witness stand, you know, great, I get it; but this is,

13    like, we're going to pick photos.  We didn't -- they didn't

14    tell us about this till last night, so we don't have photos.

15    This is --

16        **MR. CHOU:**  Your Honor, well, first of all, we reached

17    out a little bit sooner than that, but point taken.

18        If the Court looks at the photos, the Court --

19        **THE COURT:**  I did.  I did.  I mean, they're photos

20    like -- there's a photo of Mr. Abramoff which is pre his

21    illness, I assume.  He looks very different than he did on the

22    stand.  So I'm a little concerned about that.

23        The problem is I do think it's helpful to the jury because

24    this has been a long enough trial that I looked at the pictures

25    and, quite candidly, I didn't remember some of the people.  But

 1    at the same time, I think Mr. Shepard's point is -- either we

 2    do it through Ms. Lew or we don't do it at all.

 3        So don't use the pictures.

 4        **MR. CHOU:**  Is it -- are they fine -- can we use them

 5    in closing, Your Honor?

 6        **THE COURT:**  You can use them in closing, but they're

 7    not going to go back to the jury room.

 8        **MR. CHOU:**  Understood, Your Honor.

 9        **THE COURT:**  Okay.

10        **MR. SHEPARD:**  The only other thing, Your Honor,

11    the Government's case is now closed.  I would renew our Rule 29

12    motion.  We have discussed the briefing on these, and I don't

13    think we've yet filed it.

14        **THE COURT:**  If necessary.

15        **MR. SHEPARD:**  If necessary, right.

16        **THE COURT:**  Right.

17        **MR. SHEPARD:**  That's what the stipulation is going to

18    say.

19        **THE COURT:**  Yes.

20        **MR. SHEPARD:**  We have a stipulation that just says

21    we're going to package up all the Rule 29 motions and the new

22    trial motion, if one is necessary, that we won't have waived

23    any of those, and we've agreed on a schedule that we will

24    submit to the Court.

25        **THE COURT:**  That's all fine with me.

1          MR. HIGHSMITH:  Thank you.

2          THE COURT:  Okay.  Can you give me an idea -- who's

3    doing what?

4          MR. HIGHSMITH:  Mr. Chou is doing the closing

5    argument.  I'm doing the --

6          THE COURT:  The opening closing?

7          MR. HIGHSMITH:  The opening closing.  I'm going to do

8    the rebuttal.  He's going to be about an hour and a half, maybe

9    a little bit less.

10          THE COURT:  Okay.  So we probably will take a break

11    during yours.  I'll just pick a time.

12       Mr. Shepard?

13          MR. SHEPARD:  That's me, and it'll depend on,

14    you know, whether I've correctly anticipated what Mr. Chou is

15    going to say.  I may need to add; I may need to subtract.

16    So --

17          THE COURT:  All right.

18          MR. SHEPARD:  -- it's a moving target --

19          THE COURT:  Well --

20          MR. SHEPARD:  -- but it'll be a while.

21          THE COURT:  We're going to today --

22       Did you get them vouchers, Corrine?

23          THE COURTROOM DEPUTY:  I did, yes.

24          THE COURT:  Okay.  Today we'll do a lunch break, so

25    we'll figure out a time.  I will try to avoid -- well, we'll

1    just see.  I prefer not to do the lunch break in the middle of,

2    say, your argument.  At the same time, if it gets a little

3    late, it's late.

4         **MR. SHEPARD:**  I get it.  That's fine.

5         **THE COURT:**  Okay.

6      All right.  We'll see when they're here.

7         **MR. HIGHSMITH:**  Thank you, Your Honor.

8               (Recess taken at 8:17 a.m.)

9              (Proceedings resumed at 8:34 a.m.)

10     (Proceedings were heard out of the presence of the jury.)

11        **THE COURT:**  Okay.  Shall we bring the jury out?

12      (Proceedings were heard in the presence of the jury.)

13        **THE COURT:**  The jury is present.

14      Good morning.  As I indicated yesterday, what's going to

15    happen is I'm going to be giving you some instructions on the

16    law which you are to apply in this case.  Then we will be

17    hearing closing arguments.  I'll give you a few final

18    instructions, and then the case will be in your hands.

19        And also, you'll see that as I read the instructions, they

20    will be scrolling on your screen.

21        **THE COURT:**  Members of the jury, now that you have

22    heard all the evidence, it is my duty to instruct you on the

23    law that applies to this case.  A copy for each of you of these

24    instructions will be available in the jury room for you to

25    consult.

**JURY INSTRUCTIONS**

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  You will recall that you took an oath promising to do so at the beginning of the case.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.

You must follow all these instructions and not single out some and ignore others; they are all important.  Please do not read into these instructions or into anything I may have said or done as any suggestion as to what verdict you should return. That is a matter entirely up to you.

The indictment is not evidence.  The defendant has pleaded not guilty to the charges.  The defendant is presumed to be innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.  In addition, the defendant does not have to testify or present any evidence.  The defendant does not have to prove innocence; the Government has the burden of proving every element of the charges beyond a reasonable doubt.

1    A defendant in a criminal case has a constitutional right

2  not to testify.  In arriving at your verdict, the law prohibits

3  you from considering in any manner that the defendant did not

4  testify.

5    Proof beyond a reasonable doubt is proof that leaves you

6  firmly convinced the defendant is guilty.  It is not required

7  that the Government prove guilt beyond all possible doubt.

8    A reasonable doubt is a doubt based upon reason and common

9  sense and is not based purely on speculation.  It may arise

10  from a careful and impartial consideration of all the evidence,

11  or from lack of evidence.

12    If after a careful and impartial consideration of all the

13  evidence, you are not convinced beyond a reasonable doubt that

14  the defendant is guilty, it is your duty to find the defendant

15  not guilty.  On the other hand, if after a careful and

16  impartial consideration of all the evidence, you are convinced

17  beyond a reasonable doubt that the defendant is guilty, it is

18  your duty to find the defendant guilty.

19    The evidence you are to consider in deciding what the

20  facts are consists of, first, the sworn testimony of any

21  witness; second, the exhibits received in evidence; and, third,

22  any facts to which the parties have agreed.

23    In reaching your verdict, you may consider only the

24  testimony and exhibits received in evidence.  The following

25  things are not evidence, and you may not consider them in

1    deciding what the facts are:

2        One, questions, statements, objections, and arguments by

3    the lawyers are not evidence.  The lawyers are not witnesses.

4    Although you must consider a lawyer's questions to understand

5    the answers of a witness, the lawyer's questions are not

6    evidence.  Similarly, what the lawyers have said in their

7    opening statements, closing arguments, and have said at other

8    times is intended to help you interpret the evidence, but it is

9    not evidence.  If the facts as you remember them differ from

10   the way the lawyers state them, your memory of them controls.

11       Two, any testimony that I have excluded, stricken, or

12   instructed you to disregard is not evidence.  In addition, some

13   evidence was received only for a limited purpose.  When I've

14   instructed you to consider certain evidence in a limited way,

15   you must do so.

16       Three, anything you may have seen or heard when the court

17   was not in session is not evidence.  You are to decide the case

18   solely on the evidence received at the trial.

19       Evidence may be direct or circumstantial.  Direct evidence

20   is direct proof of a fact, such as testimony by a witness about

21   what that witness personally saw or heard or did.

22   Circumstantial evidence is indirect evidence; that is, it is

23   proof of one or more facts from which you can find another

24   fact.

25       You are to consider both direct and circumstantial

evidence.  Either can be used to prove any fact.  The law makes

no distinction between the weight to be given to either direct

or circumstantial evidence.  It is for you to decide how much

weight to give to any evidence.

You have heard evidence that the defendant committed other

wrongs or acts not charged here.  You may consider this

evidence only for its bearing, if any, on the question of the

defendant's intent, opportunity, preparation, plan, knowledge,

absence of mistake, and absence of accident and for no other

purpose.

You have heard evidence that witnesses Jack Abramoff and

Brian Darrow were convicted of crimes unrelated to this case.

You may consider this evidence in deciding whether or not to

believe these witnesses and how much weight to give to the

testimony of these witnesses.

You have heard testimony from Jack Abramoff, a witness who

received benefits from the Government in connection with this

case, and admitted being an accomplice to the crime charged.

An accomplice is one who voluntarily and intentionally joins

with another person in committing a crime.

Mr. Abramoff pleaded guilty to a crime arising out of the

same events for which the defendant is on trial.  This guilty

plea is not evidence against the defendant, and you may

consider it only in determining this witness's believability.

For these reasons, in evaluating the testimony of

1   Jack Abramoff, you should consider the extent to which or

2   whether his testimony may have been influenced by any of these

3   factors.  In addition, you should examine the testimony of

4   Jack Abramoff with greater caution than that of other

5   witnesses.

6       You have also heard testimony from Brian Darrow, a witness

7   who received benefits from the Government in connection with

8   this case, and pleaded guilty to a crime arising out of the

9   same investigation for which the defendant is on trial.  This

10  guilty plea is not evidence against the defendant, and you may

11  consider it only in determining this witness's believability.

12      For these reasons, in evaluating the testimony of

13  Brian Darrow, you should consider the extent to which or

14  whether his testimony may have been influenced by any of these

15  factors.  In addition, you should examine the testimony of

16  Brian Darrow with greater caution than that of other witnesses.

17      You have heard testimony from James Carfora, Theresa Chiu,

18  Erik Min, Levi Armstrong, and Amanda Gregory, who testified

19  about his or her opinions and the reasons for those opinions.

20  This opinion testimony is allowed because of the specialized

21  knowledge, skill, experience, training, or education of these

22  witnesses.

23      Such opinion testimony should be judged like any other

24  testimony.  You may accept it or reject it and give it as much

25  weight as you think it deserves, considering the witness's

knowledge, skill, experience, training, or education, the

reasons given for the opinion, and all the other evidence in

the case.

In deciding the facts in this case, you may have to decide

which testimony to believe and which testimony not to believe.

You may believe everything a witness says, or part of it, or

none of it.

In considering the testimony of any witness, you may take

into account the following:

First, the opportunity and ability of the witness to see

or hear or know the things testified to; second, the witness's

memory; third, the witness's manner while testifying; fourth,

the witness's interest in the outcome of the case, if any;

fifth, the witness's bias or prejudice, if any; sixth, whether

other evidence contradicted the witness's testimony; seventh,

the reasonableness of the witness's testimony in light of all

of the evidence; and, eighth, any other factors that bears on

believability.

Sometimes a witness may say something that is not

consistent with something else he or she said.  Sometimes

different witnesses will give different versions of what

happened.  People often forget things or make mistakes in what

they remember.  Also, two people may see the same event but

remember it differently.  You may consider these differences,

but do not decide that testimony is untrue just because it

 1  differs from other testimony.

 2      However, if you decide that a witness has deliberately

 3  testified untruthfully about something important, you may

 4  choose not to believe anything that witness said.  On the other

 5  hand, if you think the witness testified untruthfully about

 6  some things but told the truth about others, you may accept the

 7  part you think is true and ignore the rest.

 8      You must avoid bias, conscious or unconscious, based on a

 9  witness's race, color, religious beliefs, national ancestry,

10  sexual orientation, gender identity, gender, or economic

11  circumstances in your determination of credibility.

12      The weight of the evidence as to a fact does not

13  necessarily depend on the number of witnesses who testify.

14  What is important is how believable the witnesses were, and how

15  much weight you think their testimony deserves.

16      During the trial, certain charts and summaries were shown

17  to you to help explain the evidence in the case.  Certain of

18  these charts and summaries were not admitted into evidence and

19  will not go into the jury room with you.  They are not

20  themselves evidence or proof of any facts.  If they do not

21  correctly reflect the facts or figures shown by the evidence in

22  the case, you should disregard these charts and summaries and

23  determine the facts from the underlying evidence.

24      Certain other charts and summaries have been admitted into

25  evidence.  Charts and summaries are only as good as the

1  underlying supporting material.  You should, therefore, give

2  them only such weight as you think the underlying material

3  deserves.

4      You are here only to determine whether the defendant is

5  guilty or not guilty of the charges in the indictment.  The

6  defendant is not on trial for any conduct or offense not

7  charged in the indictment.

8      A separate crime is charged against the defendant in each

9  count of the indictment.  You must decide each count

10  separately.  Your verdict on one count should not control your

11  verdict on any other count.

12      The indictment charges that the offenses alleged in

13  Count One and Count Two were committed "on or about" certain

14  dates.

15      Although it is necessary for the Government to prove

16  beyond a reasonable doubt that the offense was committed on a

17  date reasonably near the date alleged in Count One and

18  Count Two of the indictment, it is not necessary for

19  the Government to prove that the offense was committed

20  precisely on the date charged.

21      You have heard testimony that the defendant made

22  statements.  For each statement, it is for you to decide, one,

23  whether the defendant made the statement; and, two, if so, how

24  much weight to give to it.  In making those decisions, you

25  should consider all of the evidence about the statement,

including the circumstances under which the defendant may have made it.

I will now instruct you on the elements of the crimes charged, beginning with Count One.  The defendant is charged in Count One of the indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code.  For the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  Deceitful statements of half-truths may constitute false or fraudulent representations.

Second, the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property.

Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat.

And, fourth, on or about January 12th, 2018, the defendant used, or caused to be used, an interstate or foreign wire communication, specifically, a wire transfer in the amount of $730,000 originating from a bank account in the Northern

District of California, to carry out or attempt to carry out an essential part of the scheme, as charged in Count One.

In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements but also the circumstances in which they are used as a whole.

A wiring is caused when one knows that a wire will be used in the ordinary course of business or one can -- or when one can reasonably foresee such use.

To convict a defendant of wire fraud, the false or fraudulent pretenses, representations, or promises must directly or indirectly deceive the victim about the nature of the bargain. A misrepresentation will go to the nature of the bargain if it goes to price or quality, or otherwise to essential aspects of the transaction. Whether a misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue.

It need not have been reasonably foreseeable to the defendant that the wire communication would be interstate or foreign in nature. Rather, it must have been reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme, and the interstate or foreign wire communication charged in Count One must have actually occurred in furtherance of the scheme.

If the defendant acted in good faith, then he lacked the intent to defraud required to prove the offense of wire fraud

as charged in Count One.  The defendant acted in good faith if,
at the time, he honestly believed in the truth of the
representations or promises that the Government has charged as
being false or fraudulent.  However, a defendant's belief that
the victims of the fraud will be paid in the future or will
sustain no economic loss is not a defense to the crime.

The defendant is charged in Count Two of the indictment
with laundering and attempting to launder money in violation of
Section 1956(a)(1)(B) of Title 18 of the United States Code.
For the defendant to be found guilty of that charge,
the Government must prove each of the following elements beyond
a reasonable doubt:

First, the defendant conducted or intended to conduct a
financial transaction involving property that represented the
proceeds of wire fraud.

Second, the defendant knew that the property represented
the proceeds of some form of unlawful activity.

Third, the defendant knew that the transaction was
designed in whole or in part to conceal or disguise the nature,
location, source, ownership, or control of the proceeds.

And, fourth, the defendant did something that was a
substantial step towards committing the crime.

A "substantial step" is conduct that strongly corroborated
the defendant's intent to commit the crime.  To constitute a
substantial step, a defendant's act or actions must

1  unequivocally demonstrate that the crime will take place unless

2  interrupted by independent circumstances.  Mere preparation is

3  not a substantial step towards committing the crime.

4      Jurors do not need to agree unanimously as to which

5  particular act or actions constituted a substantial step toward

6  the commission of a crime.

7      A financial institution -- a financial transaction is a

8  transaction involving one or more monetary instruments that

9  affect interstate or foreign commerce in any way.

10     The phrase "knew that the property represented the

11 proceeds of some form of unlawful activity" means that the

12 defendant knew that the property involved in the transaction

13 represented proceeds from some form, though not necessarily

14 which form, of activity that constitutes a felony.  I instruct

15 you that wire fraud is a felony.

16     If you decide that the defendant was a member of a scheme

17 to defraud and that the defendant had the intent to defraud,

18 the defendant may be responsible for other co-schemers' actions

19 during the course of and in furtherance of the scheme, even if

20 the defendant did not know what the other co-schemers said or

21 did.

22     For the defendant to be guilty of an offense committed by

23 a co-schemer in furtherance of the scheme, the offense must be

24 one that the defendant could reasonably foresee as a necessary

25 and natural consequence of the scheme to defraud.

 1      A defendant may be found guilty of, one, wire fraud, as

 2  charged in Count One of the indictment, and/or, two, money

 3  laundering, as charged in Count Two of the indictment, even if

 4  the defendant personally did not commit the act or acts

 5  constituting the crime but aided and abetted in its commission.

 6  To "aid and abet" means intentionally to help someone else

 7  commit a crime.

 8      To prove a defendant guilty of wire fraud, as charged in

 9  Count One of the indictment, by aiding and abetting,

10  the Government must prove each of the following beyond a

11  reasonable doubt:

12      First, someone else committed the wire fraud charged in

13  Count One.

14      Second, the defendant aided, counseled, commanded,

15  induced, or procured that person with respect to at least one

16  element of wire fraud.

17      Third, the defendant acted with the intent to facilitate

18  wire fraud as charged in Count One.

19      And, fourth, the defendant acted before the crime was

20  completed.

21      To prove a defendant guilty of money laundering, as

22  charged in Count Two of the indictment, by aiding and abetting,

23  the Government must prove each of the following beyond a

24  reasonable doubt:

25      First, someone else committed money laundering, as charged

1    in Count Two.

2        Second, the defendant aided, counseled, commanded,

3    induced, or procured that person with respect to at least one

4    element of money laundering.

5        Third, the defendant acted with the intent to facilitate

6    money laundering.

7        And, fourth, the defendant acted before the crime was

8    completed.

9        It is not enough that the defendant merely associated with

10   the person committing the crime, or unknowingly or

11   unintentionally did things that were helpful to that person or

12   was present at the scene of the crime.  The evidence must show

13   beyond a reasonable doubt that the defendant acted with the

14   knowledge and intention of helping that person commit wire

15   fraud as charged in Count One or money laundering as charged in

16   Count Two.

17       A defendant acts with the intent to facilitate the crime

18   when the defendant actively participates in a criminal venture

19   with advance knowledge of the crime.

20       The Government is not required to prove precisely which

21   defendant actually committed the crime and which defendant

22   aided and abetted.

23       You may find that the defendant acted knowingly if you

24   find beyond a reasonable doubt that, first, the defendant was

25   aware of a high probability that wire fraud or money laundering

 1  was occurring; and, second, the defendant deliberately avoided

 2  learning the truth.

 3       You may not find such knowledge, however, if you find that

 4  the defendant actually believed that no wire fraud or money

 5  laundering was occurring, or if you find that the defendant was

 6  simply negligent, careless, or foolish.

 7       Evidence has been admitted that the defendant may have

 8  suffered from diminished capacity at the time the crime charged

 9  was committed.  You may consider evidence of the defendant's

10  diminished capacity in deciding whether the Government has

11  proved beyond a reasonable doubt that the defendant acted with

12  the intent required to commit wire fraud, as charged in

13  Count One, and money laundering, as charged in Count Two.

14       Mr. Chou, the Government's initial closing.

15       **MR. CHOU:**  Testing?

16                        **CLOSING ARGUMENT**

17       **MR. CHOU:**  May it please the Court, Counsel, and

18  members of the jury.

19       Over 25,000 people, over $10 million stolen from victims

20  from all walks of life, from stay-at-home moms like Brandi

21  Jodoin, critical care doctors like Mike Witte, professional

22  investors like Ben Boyer, and even the elderly.  This was the

23  real human cost of the fraud led for years by the defendant,

24  Rowland Marcus Andrade.

25       Marcus Andrade had a scheme, and the scheme revolved

1    around three simple points.  One, he made a half-baked, hollow

2    shell of a product.  Two, he lied about it worldwide.  He built

3    it up using fake press, fake PR, public relations.  And, three,

4    for years, time and again, he profited personally.

5         His goal, as this exhibit shows, was to get AML BitCoin

6    listed on the exchange, and then his misleading public

7    relations strategy, his misleading PR would do the rest.  This

8    was nothing real.  This was wave after wave of lies and smoke

9    and mirrors.

10        And, members of the jury, I just want to pause for a

11   moment here on this slide as an example.

12        Throughout today's presentation, you will see a number of

13   slides that you will not be able to get in the jury room.  And

14   at the bottom of many of the slides, there will be an exhibit

15   number at the bottom right; and if you wish, if you want to go

16   back to that exhibit while you're deliberating, I would suggest

17   perhaps writing down that exhibit number.

18        So Mr. Andrade had a half-baked product, he advertised it

19   worldwide with misleading PR, and he profited personally.  And

20   how do you know that that product was half-baked?  Well, at its

21   core, it was googly eyes, something that is a filter for one's

22   face.  It was mooSocial, something that didn't require any sort

23   of coding skill.  All together, it was smoke and mirrors.

24        The defendant, Marcus Andrade, has been charged with two

25   counts, wire fraud and money laundering.  And as

1    Chief Judge Seeborg has instructed you -- and his instructions

2    absolutely control -- wire fraud and money laundering has four

3    elements and three elements, respectively.  And today, we will

4    walk through the evidence that shows beyond a reasonable doubt

5    that each of these elements has been met.

6         Let's talk about the scheme to defraud, the first element

7    of wire fraud.  A scheme or plan to defraud is a plan for the

8    purpose of obtaining money or property by means of false or

9    fraudulent pretenses, and deceitful statements or half-truths

10   may constitute false or fraudulent representations.

11        And Dr. Witte put it well.  What Marcus Andrade did time

12   and again was to market a scheme to use cryptocurrency as a

13   vehicle for repeating fraud, and he just kept kicking the can

14   down the road, whether in 2016, 2017, or 2018.

15        This was a morphing fraud that spanned many years, and

16   we'll walk through it, first, just some of the evidence that

17   covers the Aten Coin evidence that you have heard over the

18   course of the past four weeks.

19        Marcus Andrade used cryptocurrency as a vehicle for fraud,

20   and his Aten Coin, his Aten Black Gold Coin, that shows that

21   his AML BitCoin fraud wasn't just an innocent mistake; it was

22   Andrade's way of doing business for years.

23        Like AML BitCoin, Aten Coin was a half-baked hollow shell

24   of a product, one that he marketed worldwide with public

25   relations and one that he profited from.

1    And like with AML BitCoin, when Marcus Andrade was caught

2    lying, he took -- when the illusion could hold no longer, he

3    dodged, he morphed his fraud from one scheme to another to

4    cover his tracks and to make new promises to delay his day of

5    reckoning.

6    Let's talk about Aten Coin.  Marcus Andrade claimed that

7    Aten Coin was a reality as early as 2014.  2014.  He said it

8    implemented a fourth type of blockchain.  And as early as 2014,

9    before Japheth Dillman, Jack Abramoff, David Mata, Richard

10    Naimer were in the picture, Marcus Andrade was carrying out the

11    same sort of plan, the same sort of strategy.

12    Take a look at this email here.  In 2014, Marcus Andrade

13    wrote to his Aten Black Gold team [as read]:

14        "Different," press releases, "PR's that need to

15        go out."

16    And that Aten Coin, like its later AML BitCoin successor,

17    would succeed Bitcoin because it was a hundred percent

18    anti-money laundering compliant.

19    In 2015, again, the same lies.  Marcus Andrade wrote in

20    press releases that his goals for Aten Black Gold Coin had not

21    only been met, they had been exceeded.  And he touted the

22    features of his Aten Black Gold Coin:  again, AML/KYC

23    compliance and non-volatile value and liquidity.

24    And on top of that, with Aten Black Gold Coin, he had

25    claims on oil wells, oil and gas investments.

1       Well, when the Texas Railroad Commission wrote to Marcus

2   Andrade and told him that his oil well representations were

3   misleading or lies, he dodged and he rebranded Aten Black Gold

4   Coin as Aten Coin.  And Aten Coin, again, was a hundred percent

5   anti-money laundering compliant.

6       And Marcus Andrade in 2016 wrote to his supposed chief

7   technology officer, Terence Poon, the one that's -- that you've

8   heard could be in China.  And Marcus Andrade told Terence Poon

9   [as read]:

10          ". . . I do not need you to be able to make this

11      work."

12      And that he already had over $9 million per year worth of

13  potential contracts, companies that already agreed to use the

14  product, and banks, banks that signed on board to use Aten Coin

15  in 2016.

16      Those were lies then, and he lied again with AML BitCoin.

17      So AML BitCoin, this was, in Marcus Andrade's own words, a

18  simple rebranding of Aten Coin.  And as before with Aten Black

19  Gold Coin, with AML BitCoin, Marcus Andrade lied.  He claimed

20  that AML BitCoin could trade and transact with cryptocurrency

21  safely and fully.  He claimed that AML BitCoin was the world's

22  first AML/KYC/Patriot Act compliant coin that had biometric

23  source code built into the blockchain.

24      And like before, he lied.  He lied about business deals,

25  and he lied about technology that was half-baked.

1    With business deals, for example, in March of 2017, before

2    the ICO, before the initial coin offering October of 2017, he

3    stated that he'd be announcing government contracts soon worth

4    $30 million a year.

5    Members of the jury, there was never a single contract

6    worth even a million, let alone 30 million, in March of 2017.

7    Let's talk about the tech and the PR strategy.  Marcus

8    Andrade wrote in March of 2018, in his search for getting

9    listed on an exchange for being able to cash out easily on the

10   open market, an email that encapsulates his scheme.

11   He said that AML BitCoin actually used, actually used

12   certified digital identities in partnerships with banks,

13   insurance companies, and government entities.  And then he

14   amplified those lies, he built up his half-baked product with

15   press articles, articles written by third-party publications

16   like *U.S. News & World Report* and *Investors Business Daily*.

17   As you've heard over the past four weeks and as we'll

18   highlight in the coming presentation, those articles were lies.

19   They were bought and paid for by AML BitCoin; they were

20   approved personally by Marcus Andrade; and they were secretly

21   published by so-called journalists who took money in exchange

22   for publishing those lies.

23   And then Marcus Andrade amplified those lies through all

24   the different social media accounts that he controlled, such as

25   his Twitter feed, where he said in October of 2017, just a week

1    or so after the initial coin offering, that banks, banks were

2    using the AML BitCoin product.

3        Overall, for the past four to five weeks, you've heard a

4    lot of different buzzwords.  You've heard about the

5    Panama Canal, the Port of San Francisco, anti-money laundering,

6    the 2018 Super Bowl; but at its core, Marcus Andrade's scheme,

7    his grift, was simple.  He built a half-baked product; he built

8    it up and lied about it through misleading public relations and

9    press worldwide; and then he himself profited.

10        Take a look at this timeline, which summarizes at a high

11   level the events leading up to the AML BitCoin scheme as

12   charged in Count One of the indictment, the one that spans

13   October 2017 -- or, sorry -- July 2017 through October 2018.

14        At first there was Aten Black Cold Coin in '14 and '15,

15   Aten Coin in 2016 through '17, and then AML BitCoin for the

16   rest of the period.  And throughout all the years, there was a

17   steady drumbeat of lies, lies about money laundering

18   compliance, about deals, about technology, contracts worth

19   millions of dollars.

20        And then on the bottom of the timeline throughout, there

21   was a steady drumbeat of investors who lost -- put in and lost

22   their money into the various cryptocurrencies that Marcus

23   Andrade made.

24        And then, as the evidence that you've heard over the past

25   four weeks focused on, you had three pivotal storylines, or

 1    lies, that came out during the AML BitCoin period, those that

 2    were meant to market the initial coin offering.  You heard

 3    about the Port of San Francisco; you heard about the

 4    Panama Canal; and you heard about the Super Bowl.

 5         And then when Marcus Andrade was caught, when the FBI

 6    executed a search warrant on his office in September of 2018,

 7    he took steps to cover up his tracks.  Among other things, he

 8    directed Melanie Cowan to edit and delete content online to

 9    make it from future -- from past and present tense to future

10    tense because he knew and his co-schemers knew that AML BitCoin

11    was a lie.

12         Here's another way of thinking about that timeline.  The

13    initial coin offering when Mr. Andrade sold his token, his

14    AML BitCoin Token, was in October of 2017.  And then a few

15    months later he started cashing out.  Before his token turned

16    into the coin that he promised, the one that had biometric

17    identification built into the blockchain, he was already

18    cashing out.  He was buying two properties, all cash, a red

19    Cadillac, a Ford F-250.  Then when the FBI searched his office

20    in September of 2018, he started taking steps to cover up his

21    tracks.

22         And overall, you've heard evidence about the thousands of

23    people who Marcus Andrade hurt.  You heard about a spreadsheet

24    that tracked manually, by Bernadette Tran, all the different

25    people who registered or who bought into AML BitCoin; and you

1    saw that that spreadsheet had over 25,000 rows of people's

2    names, emails, and other identifying information.

3        You also saw an email from Marcus Andrade himself where he

4    told an exchange that the number of people -- number of people

5    who are using his product and, therefore, hurt by his product

6    was over 34,000.

7        So, members of the jury, when it comes to the scheme to

8    defraud, we'll talk about next Marcus Andrade's tech and then

9    each of those three different business deals that he claimed to

10   have, all to market his token into profit at others' expense.

11       So for the tech, he didn't build a software company; he

12   built a story, a story designed to bring in investors and hook

13   them with false promises and illusions of progress, all to keep

14   their money flowing in and all to help him benefit from a

15   jet-setting and self-important lifestyle.

16       He said that AML BitCoin was decentralized banking on the

17   blockchain.  And these were the same sort of lies that he told

18   time and again with Aten Black Gold Coin, Aten Coin, and

19   AML BitCoin.  Again, for much of that period, it was just

20   Marcus Andrade in the picture.  There's no Japheth Dillman,

21   Jack Abramoff, or Richard Naimer.

22       And the technology was never really all there.  You heard

23   testimony from several different developers who worked on the

24   AML BitCoin project.  You heard from Evan Carlsen, who said

25   that in late 2018, more than a year after the initial coin

1    offering, more than a year after Marcus Andrade repeatedly lied

2    that he had a completed product and millions of dollars in

3    business deals, Evan Carlsen was building out this technology

4    from scratch.  And he gave you a date for when he was building

5    things out from scratch, November of 2018, where he had a

6    timeline as a developer for what a product needed to be built

7    out, a dozen-stage timeline, and he was on Stage 1, looking at

8    the old Aten Coin code and trying to salvage it for anything

9    that was even remotely useful.

10   And he also told you that AML BitCoin didn't have any of

11   the compliant things that a bank would want to have and that

12   Aten Coin even, the code he was looking at, didn't have any of

13   the anti-money laundering, know-your-customer features that one

14   would want.

15   And just to pause for a minute, the past few slides have

16   shown clips of testimony.  This is a rough transcript of the

17   testimony that you heard in this courtroom.  You won't get a

18   copy of this transcript when you're deliberating, but this is

19   what it is.

20   You heard also from John Szeder.  John Szeder was the

21   chief technology officer listed on the AML BitCoin website.

22   And John Szeder told you that he was hired as what's called a

23   fractional or part-time CTO.  And he told you that as a

24   fractional CTO in other companies, he's a technology leader; he

25   helps push the product forward; he advises.  But that's not at

1    all what happened with AML BitCoin.

2        Before he even signed his contract, before he was ever

3    fully paid, Marcus Andrade slapped his face on the website.

4    And then when he demanded payment, when he followed up, all

5    they asked him to do was to work on that website rather than do

6    the things a developer needs to do, like build out a

7    functioning anti-money laundering cryptocurrency.  He found it

8    surreal.

9        You heard also from Hung Tran, the project manager listed

10   on the website and the developer who built out the token, the

11   token that defrauded thousands of people.  And Hung Tran told

12   you that all he did was build out that placeholder token.  He

13   was never asked to do the actual product.

14       And later, in September of 2018, he, along with Evan

15   Carlsen, flew out to the U.K.  He flew out to look at this

16   biometric technology at CrossVerify.  And he found that there

17   was no evidence anywhere of a complete anti-money laundering

18   compliant cryptocurrency with biometric identification built

19   into the blockchain, what Marcus Andrade had sold and lied

20   about time and again in '14, '15, '16, '17, and '18.

21       Each of these developers also told you that none of them

22   were paid in full.  John Szeder didn't even start work because

23   he wasn't paid.  Hung Tran told you that after he worked on

24   that token, he wasn't interested in going any further because,

25   among other things, Marcus Andrade still owed him money.  And

1    Evan Carlsen also told you he didn't get paid in full.

2    So overall, AML BitCoin didn't have a functioning chief

3    technology officer.  And as Evan Carlsen put it well, if you're

4    a technology company building, supposedly, a revolutionary

5    product and you don't even have a CTO, what exactly are you

6    doing?

7    Well, members of the jury, you know the answer.  In the

8    Aten Coin days, the tech there was half-baked and so, too, in

9    the AML BitCoin days.

10    In Aten Coin, you heard a story about Homer Simpson.

11    Aten Coin biometrically verified a picture of Homer Simpson to

12    become identified, and it succeeded.

13    With AML BitCoin and CrossVerify, you heard about verified

14    users like Donald J. Tramp, and you saw comments in code that

15    include exclamation points and question marks about things not

16    working.  You heard about googly eyes where the code referenced

17    Googly Face Tracker rather than real biometric verification.

18    And the defense's own expert confirmed to you that both

19    Aten Coin and AML BitCoin were not done at the time that Marcus

20    Andrade made his lies.  Erik Min told you that with Aten Coin,

21    he never saw any evidence that it was a daily payment service,

22    that it was integrated into businesses.  He never saw a

23    blockchain transaction at all.  And, yet, you heard evidence

24    about slides, about marketing materials Marcus Andrade put out

25    about Aten Coin that claimed that Aten Coin had attained

1    key-to-success factors like integration into business, like

2    acceptance as a daily payment service.

3        And Erik Min also told you that AML BitCoin wasn't done.

4    In October of 2017 when Marcus Andrade was selling a

5    groundbreaking technology to the world, it wasn't entirely

6    completed.  And in January 2018, when Ben Boyer invested his

7    $730,000 wire and then some, Erik Min couldn't even conclude or

8    understand what was happening during that time period.

9        But the AML BitCoin website told you something different.

10   The AML BitCoin website said that AML BitCoin was state of the

11   art, a truly global currency, government friendly, and gave

12   clients access to the latest online currency features.

13       And what did Marcus Andrade do with these lies?  He used

14   them to benefit and profit at other's expense.  He took

15   millions of dollars just in a one-plus-year period from his

16   so-called business accounts into his personal accounts, over

17   $2.1 million plus, potentially, cryptocurrencies that have not

18   been traced.  And he used this on all-cash purchases of a home,

19   another property, a $80,000 Ford F-250, a $90,000 red Cadillac,

20   and a lifestyle, one that was high status and jet-setting,

21   involved traveling the world, going to strip clubs, and eating

22   well.

23       As part of this scheme, Marcus Andrade amplified his lies

24   through fake press, so-called journalists, and sock puppet

25   accounts.  And we'll talk about each of those in turn.

1      Remember, he made a half-baked product; he built it up

2  with fake press and fake business deals; and then he profited

3  personally.  This is all part of his scheme to obtain money or

4  property through either misleading half-truths or false and

5  fraudulent pretenses.

6      Marcus Andrade said, "Remember, all we have to do is get

7  listed and PR would do the rest."  His focus on PR was strong.

8  And to carry out this PR strategy, he hired a convicted felon,

9  a notorious lobbyist named Jack Abramoff.  You probably don't

10 like Jack Abramoff, but that's exactly who Marcus Andrade

11 wanted.  He's not the witness the Government picked.  It's who

12 Marcus Andrade hired.  And Andrade wanted a lobbyist skilled in

13 the arts of buying attention and buying press and not worried

14 about breaking the law.

15     Marcus Andrade hired Jack Abramoff to carry out the press

16 strategy that Andrade himself wanted, and Marcus Andrade hid

17 Jack Abramoff behind the scenes because he knew that Abramoff,

18 as a notorious convicted lobbyist, was radioactive if members

19 of the public knew that he was involved in the project.

20     And Abramoff's testimony explained this, and Abramoff's

21 text messages and WhatsApp chats that you saw over the course

22 of the past four weeks corroborated that what he told you was

23 exactly what happened.

24     Again, Marcus Andrade amplified his lies through press.

25 He reached out to exchanges.  For example, he cited articles

1   from *Investors Business Daily*, *U.S. News*, and other places.

2   And this focus on the press was evident from his own words.

3       As he wrote to David Hargreaves at SHIFT Communications in

4   San Francisco, he wanted journalists; he wanted to guarantee

5   that people would pick up his stories.  He wanted this

6   information, his lies, to be seen worldwide; and he directed

7   his deputies, chief strategy officer Japheth Dillman, lobbyist

8   Jack Abramoff, to do his bidding.

9       But it's hard to guarantee something like press unless you

10  go to the means that Marcus Andrade did.  As David Hargreaves

11  told you, a reputable journalist, a reputable journalist

12  couldn't write the stories that Marcus Andrade wanted written.

13  So what did he do?  He paid people off.

14      He worked with and approved the articles written and

15  farmed out by Brian Darling.  And Brian Darling kept a Rolodex

16  of so-called journalists who would take payments in exchange

17  for content ghostwritten by AML BitCoin and approved by Marcus

18  Andrade, and then published those articles online without any

19  disclosure anywhere that those articles that appeared to be

20  real journalism were, in fact, ghostwritten and paid

21  advertisements.

22      And then he kept -- he tracked these different lies, these

23  misleading articles in a spreadsheet that listed the author,

24  the platform, the title of the piece, the link to it, as well

25  as how much was paid for each of these articles, whether in

1  cryptocurrency or in dollars.

2      And here's one example of such a misleading article.

3  Brian Darling reached out in October of 2017, again, just about

4  a week before the initial coin offering where Marcus Andrade

5  wanted to raise money, and Brian Darling wrote that Andrade was

6  having very productive conclaves with the Panama Canal and

7  other important government entities.

8      And what did Marcus Andrade do despite this being false?

9  He said [as read]:

10          "Looks great.  Post it."

11      This is just one example of many of the misleading press

12  that Marcus Andrade directed and commissioned.  Again and again

13  and again, Marcus Andrade released a steady drumbeat of

14  misleading press and lies and amplified it through social media

15  and other channels.

16      And then he even received compilations from Brian Darling

17  about all the different articles that were going out, and Brian

18  Darling kept a spreadsheet of those lies.  And then this press

19  went out all over the world.

20      Marcus Andrade led and directed this press strategy.  Take

21  this as one example.  On October 4th, just before or around the

22  ICO, he wrote to Japheth Dillman [as read]:

23          ". . . get this PR out to your team . . . ."

24      And then he talked about a *Washington Times* article that

25  touted AML BitCoin as a solution that policy leaders were

1  looking to adopt.

2      And what was Japheth Dillman's response, the chief

3  strategy officer's response?

4      [As read]:

5          "Yes, sir."

6      And sure enough, that article, which was also amplified in

7  social media accounts Marcus Andrade controlled, it said that

8  AML BitCoin was anti-money laundering, know-your-customer

9  compliant.  It lied that the Port of San Francisco and the

10  Panama Canal and other government entities were looking to

11  adopt a product that was half-baked, never had the features

12  that he claimed, and touted negotiations that never really took

13  place.

14      And through this all, Marcus Andrade called the shots and

15  even cut his attorneys out of the loop sometimes.  In this

16  email, for example, Marcus Andrade wrote to Jack Abramoff,

17  wrote to Japheth Dillman, that because the press releases are

18  being held up by Neil Sunkin, his attorney, they obviously

19  couldn't have that.  They had to cut him out of the press loop.

20      And then he told Dillman and Abramoff each what they had

21  to do.  For Dillman, he said [as read]:

22          "I want you focused on getting this ICO moving

23      as fast as possible . . . ."

24      For Abramoff, he said he wanted press release drafts

25  forwarded to an email address he controlled,

1    press@amlbitcoin.com.

2         And for both of them, he said [as read]:

3              ". . . strip out any mention of Jack

4    Abramoff . . . ."

5    Because, as they all knew, he was a notorious felon.

6         And in reviewing this content, reviewing it as it went

7    out, he would take a look at it; he would look at plain lies,

8    like when, in December, AML BitCoin's ICO wasn't going well, he

9    would approve statements like AML BitCoin being "consumed with

10   a massive response to the launch" and that he anticipated "a

11   public announcement within the next month."  He wrote things

12   like [as read]:

13              "Draft looks good."

14        And then he amplified those lies to exchanges and to

15   potential investors through different news articles and links.

16        Now, in addition to buying and paying for so-called

17   journalists and ghostwritten articles, he also bought and paid

18   for sock puppet accounts, accounts that are those that pretend

19   to be of real investors and people who are excited about the

20   cryptocurrency but are, in fact, just an illusion somebody paid

21   to type on a keyboard.

22        And Marcus Andrade directed the creation of these

23   accounts.  You heard evidence about how he told Melissa Foteh

24   to tell Melanie Cowan to create over a dozen different accounts

25   and to have those posted online.

1    And Melanie Cowan told you on the stand -- and she's not

2    on this email.  She told you on the stand exactly what she was

3    told to do, the fact that she did it for her first job out of

4    college, and the fact that she felt, in retrospect, it was

5    unethical.

6    And then if you take a look at the different social media

7    posts that are admitted into evidence, you will see what

8    appears to be, what looks like those sock puppet accounts in

9    action.  Posts like, "Boom," "Great profile," "Change your

10    future."

11    So using press and sock puppet accounts, Marcus Andrade

12    amplified lies about three major business deals in order to get

13    money.  The first one that we'll talk about is the

14    Panama Canal.

15    In mid-September 2017, about a month before the initial

16    coin offering, Marcus Andrade went down to Panama with his

17    Panamanian advisor, Carlos De La Guardia, who you heard from on

18    the stand.  And De La Guardia set up some courtesy meetings, no

19    more than 30 minutes long, with the Panama Maritime Authority,

20    which does some ship registries, and a law firm named

21    Morgan & Morgan.  But those meetings were no more than

22    30 minutes long; and, importantly, they weren't able to get in

23    to meet with the Panama Canal.

24    And Carlos De La Guardia explained to you that the

25    Panama Canal is one of the world's most important shipping

1    lanes.  It lets ships cut across South America as opposed to

2    going all the way around.  And because of its storied history,

3    because of its transparent procurement processes, it wasn't so

4    easy just to walk in and get a meeting with them.  So they

5    weren't able to meet with the Panama Canal.

6        And in the few meetings that they had in Panama with other

7    entities, Marcus Andrade was there; he sat through those

8    unproductive meetings; and he told Carlos De La Guardia those

9    meetings didn't go well.  He saw them with his own eyes, after

10   all.

11       And when Jack Abramoff, who, again, wasn't there, heard

12   about the fact that they had failed to even meet with the

13   Panama Canal Authority, his response was [as read]:

14           "Incredulous.  That was kind of the point of the

15       trip, no?"

16       Well, that didn't stop Marcus Andrade from lying and lying

17   repeatedly about purported negotiations with the Panama Canal,

18   an important global entity that he had never even met at that

19   point.

20       He said that the few meetings that they had had with other

21   entities didn't even go well; and, yet, just about a week or so

22   after those meetings that he himself was at, he tweeted that

23   the government of Panama, the government of Panama, had

24   launched AML BitCoin.  This was a ridiculous claim and one that

25   was a knowing lie.

 1        He doubled down as well.  Around the same time, Marcus

 2    Andrade approved a template written by his chief strategy

 3    officer and salesperson Japheth Dillman.  And this template,

 4    which started with, "Hi," first name, and had various

 5    placeholders throughout, said that Marcus Andrade was helping

 6    close multi-billion dollar deals being secured with governments

 7    at that very moment.  He was on a whirlwind tour and that there

 8    were literally, literally billions of dollars in deals being

 9    negotiated.

10        This was a lie.  All he had had was a couple courtesy

11    meetings in Panama, and not even meeting with the Panama Canal,

12    which was the whole point of the trip.

13        And after approving this template email, he was cc'd on an

14    email that went out to many, many potential investors; and

15    never once did he say, "This is misleading.  These are lies.

16    Can't be saying this," because he approved the template.

17        He also, as you heard, approved ghostwritten articles

18    about these lies.  On October 5th, for example, he signed off

19    on Brian Darling marketing to soccer moms -- not aggressive

20    risk-taking investors, soccer moms nationwide -- that Andrade

21    was having Panamanian officials scurrying to find a way to

22    integrate his half-baked coin and that they were going to

23    integrate it into payment structures from everything from banks

24    to the Panama Canal.

25        And then Marcus Andrade was confronted about his lies in

1  November of 2016.  He put out a press release called "Creator

2  of AML BitCoin on Track to Partner with the Panama Canal,"

3  again, an entity he had never even met; and this press release

4  talked about extensive discussions and named different

5  Panama Canal authorities by name.

6      And so the Panama Canal Authority caught wind of this

7  misleading press release.  They wrote to Marcus Andrade and

8  they told Marcus Andrade that they saw the release and that it

9  was misleading as no talks had taken place with Panama Canal

10 executives cited.  Panama Canal Authority went on [as read]:

11         ". . . the Panama Canal does not currently have

12     a project in place to implement AML BitCoin.  In

13     addition, the meeting with the Canal executives

14     mentioned," in that press release, "has not taken

15     place yet . . . ."

16     These -- this warning, this request for a correction went

17 to Marcus Andrade.  And then Carlos De La Guardia, Andrade's

18 Panamanian advisor, echoed this warning.  He told Marcus

19 Andrade the Panama Canal considered this press release to be,

20 quote [as read]:

21         ". . . 'misleading' and they would like

22     corrections being made ASAP."

23     Did Marcus Andrade make corrections?  Did he step back

24 from telling lie after lie?  He doubled down.  The very next

25 day after receiving those repeated warnings, he tweeted again

CLOSING ARGUMENT / CHOU

1    [as read]:

2            "Creator of AML BitCoin on Track to Partner with

3        the Panama Canal."

4        Carlos De La Guardia kept repeating his warnings, telling

5    Andrade that what they were doing was wrong.

6        November 19th, 2017, just about a month after the ICO, he

7    wrote to Andrade.  He said [as read]:

8            ". . . I'm writing to keep you informed . . . ."

9        And he talked about the Panama Canal and he talked about

10   the banks.  The Panama Canal, he said:  As you already know, we

11   were not authorized to put out that misleading press release.

12       And with the banks, he said they don't even have plans to

13   enter the cryptocurrency arena at all, let alone adopt

14   AML BitCoin.

15       And, again, Marcus Andrade doubled down.  He tweeted just

16   about a week after that email that AML BitCoin was negotiating

17   with the Panamanian government, despite being told time and

18   again that this was false.

19       And how do you know that Marcus Andrade knew this was

20   false?  Well, just a couple of months after the FBI searched

21   his house -- and you heard him recorded by Special Agent Quinn

22   in that March 2020 search warrant -- he called Carlos

23   De La Guardia and he said to Mr. De La Guardia that he needed

24   to reach out to those Panamanian officials mentioned in that

25   press release and have them say publicly that, in fact, there

 1  had been meetings and that press release was not misleading at

 2  all.

 3       And what De La Guardia told Andrade is, "You're asking me

 4  to have these gentlemen tell lies.  And if you want a request

 5  like that you, have to put it in writing."  And, of course,

 6  Marcus Andrade never did.

 7       In addition to the Panama Canal, Marcus Andrade had

 8  another iron in the fire, the Port of San Francisco.  He had

 9  another shipping freight governmental entity.  And, again, his

10  focus was on PR above all else:  Just get listed, have the PR

11  do the rest.  Half-baked product, advertised worldwide that he

12  profited from.

13       And the timeline for the Port of San Francisco set of lies

14  is worth mentioning, where, like with the Panama Canal, he was

15  claiming to have meetings that hadn't taken place until at the

16  time that he was lying about them.

17       So September of 2017, he reviews and approves a deceptive

18  *U.S. News & World Report* article, which goes out and is

19  published on the Internet.

20       In January 2018, an independent journalist from

21  *Port Strategy* reaches out and confronts him about those lies.

22       And so then in April, they have their first and only

23  meeting ever with some Port of San Francisco staff, a courtesy

24  meeting that lasted about 30 minutes.

25       And then in May of 2018, he tries again to double down;

1    but Leslie Katz, a Port of San Francisco commissioner at the

2    time, blocks that misleading press release.

3         So let's walk through the evidence.  In September, Marcus

4    Andrade receives a draft of that *U.S. News & World Report*

5    article, and Abramoff tells him don't forward it to anyone else

6    and let's discuss.

7         Then Abramoff again asks [as read]:

8              ". . . let me know if this is okay."

9         And how does Andrade respond, despite not having had any

10   meetings with the Port of San Francisco at that point?

11        [As read]:

12             "Looks great."

13        And what did the article say, this *U.S. News & World*

14   *Report* article that, again, through Brian Darling, Mr. Andrade

15   approved personally, paid for, and then knowingly had go out to

16   the world?  It said that Andrade was currently in discussions,

17   looking for ways the Port could utilize digital currency as a

18   means of payment; that with AML BitCoin, digital currency can

19   now engage in mainstream commerce; and it quotes Marcus Andrade

20   himself.  And then it goes on to quote Leslie Katz and talk

21   about negotiations with the Panama -- with the Port of

22   San Francisco.

23        And then this *U.S. News & World Report* article is

24   amplified through the accounts that Marcus Andrade controls,

25   just like he amplified those same lies with the Panama Canal.

1        In January of 2018, "Cryptocurrency's Future May Be Now,"

2   he wrote, right around the same time they were trying to get

3   the AML token, that fund-raise, taking investor and victim

4   funds over the finish line and they were extending it over and

5   over again because it wasn't really going that well.

6        Leslie Katz told you that that *U.S. News & World Report*

7   article, it profoundly misrepresented the Port's position.  She

8   was quoted in it, but she hadn't even spoken with anybody and

9   didn't see the article until January of 2024.  And she said,

10  she told you the Port had never agreed to do any contracting

11  with AML BitCoin and it was profoundly misrepresenting.

12       *Port Strategy* too, an outside publication, reached out to

13  Marcus Andrade in January of 2018 to confront him about

14  basically the same thing.  *Port Strategy* wrote [as read]:

15            "I have spoken to the Ports of San Francisco and

16       Los Angeles, and both deny the report."

17       Remember, Los Angeles is mentioned in there too because

18  we're focusing on just some of the evidence here, but

19  Los Angeles had come up in the course of AML BitCoin's

20  misrepresentations.

21       And so what did Marcus Andrade do?  He wrote [as read]:

22            "Japheth, please handle this.  This is very

23       important."

24       He didn't back down, but he tried to cover up his tracks;

25  and how he did that was that in April of 2018, many months

after that misleading September 2017 *U.S. News & World Report*
article that he himself approved, that he himself paid for,
they had their first and only meeting with Port of
San Francisco staff, a courtesy meeting, one that lasted
probably about 30 minutes, just like some of the meetings he
had had in Panama.  And at that meeting, as Leslie Katz told
you, it was clear that AML BitCoin was a non-starter.

In this photo here, you can see on the left, that's
Leslie Katz; next to her is Elaine Forbes, the executive
director of the Port at the time; and then over on right was
Byron Rhett, chief operating officer.

And Elaine Forbes told Marcus Andrade at that meeting that
the Port of San Francisco wasn't going to use cryptocurrency,
let alone AML BitCoin; and she was a little bit polite and
said, "Well, perhaps we could put you in touch with cruise
ships."

Byron Rhett told you too that the meeting wasn't going to
go anywhere.  He explained, in fact, that Marcus Andrade --
just like how in Panama he was meeting with the wrong people,
meeting with maritime authority folks and law firms -- was
meeting with the wrong people here, too, to market a product
that was half-baked.  Byron Rhett told you that all
solicitations, something like getting a cryptocurrency adopted,
would have had to go through a formal process and that he would
have heard about it as chief operating officer and senior

 1   leadership team member.

 2        And he also told you that the Port of San Francisco, to

 3   adopt cryptocurrency, it wouldn't really have been that team's

 4   decision anyway.  It above been something through the mayor and

 5   the City, not the people that Marcus Andrade had a 30-minute

 6   meeting with and then had a photo op that Byron Rhett thought

 7   was strange.

 8        This was the same sort of way of doing business that

 9   Marcus Andrade employed time and again.

10        Around the same time, you heard about a photo op that

11   Marcus Andrade had with then Lieutenant Governor Gavin Newsom

12   where he put some money down on a fundraiser and took a photo

13   and then claimed that he had had some sort of extensive

14   discussion with the Lieutenant Governor about AML BitCoin, just

15   like he claimed with the Port of San Francisco where he blew a

16   30-minute meeting, that was a courtesy meeting, completely out

17   of proportion.

18        And then what did Marcus Andrade do?  Just like with the

19   Panama Canal, he tried to put out a false press release.  He

20   wrote this -- with this -- in this press release, even though

21   Elaine Forbes had told him at the meeting that AML BitCoin was

22   not going to be adopted by the Port, Abramoff and Andrade wrote

23   that several key Port leaders at the meeting, people like Byron

24   Rhett, were going to be following up on possible uses for

25   AML BitCoin.

1    And then he tried to sneak it by Leslie Katz by sending

2   her the complete draft and saying, "Is this okay?"

3        And Leslie Katz responded quickly that [as read]:

4            "This is disappointing.  It way overstates what

5        transpired, invites a retraction from the Port."

6        It was inaccurate.  This was much like what happened with

7   the Panama Canal, where Marcus Andrade kept telling knowing

8   lies until, finally, he could dodge no longer and had to pivot

9   on to something else.

10       Now, the third fake deal was the 2018 Super Bowl,

11  Super Bowl ad.  And with the Super Bowl, here's the thing.

12  People know that when a company is running an ad in the

13  Super Bowl, that it's made it.  Whether it was with Apple's

14  1984 ad before it launched the Macintosh or Open AI's first ad

15  just this year, a Super Bowl ad communicates two very important

16  things:  one, that a company like AML BitCoin is well

17  connected and has the financing and resources to put out a 5-

18  to 10 million dollar ad plus production; and, two, that when

19  the ad airs at the Super Bowl, millions of people are going to

20  learn about the company and potentially start buying into its

21  product.

22       And so investors thought and investors relied upon this

23  idea that AML BitCoin is going to have an ad in the

24  February 2018 Super Bowl, but this was never going to be the

25  case.  Marcus Andrade knew, and he tried to hide the fact, that

1    a Super Bowl ad was never a prospect and that he was simply

2    trying to run what he called a rejection campaign and what NBC

3    told you was a fishing expedition.

4         Remember, his strategy was just to get listed and then

5    have the PR, the smoke and mirrors of misleading press, do the

6    rest.

7         Marcus Andrade, in January 23rd, 2018, just a couple weeks

8    before the Super Bowl, tried to hide what he was doing.  He

9    told Jack Abramoff that [as read]:

10             "No one should know about this rejection

11         campaign other than you and me and some of the people

12         around us."

13        They even tried to hide it from their own chief strategy

14    officer, Japheth Dillman, because Marcus Andrade knew

15    [as read]:

16             "It could be looked at negatively if people knew

17         we were going that route."

18        And Jack Abramoff responded [as read]:

19             "I need to know what you've told Dillman so that

20         I don't contradict it."

21        Again, Andrade himself wrote [as read]:

22             "No one should know that because it could be

23         looked at negatively if people know."

24        People that Andrade hired knew the same thing too.

25    John Bryan wrote [as read]:

1          "The written proposal will pretend we really are

2      buying a Super Bowl ad because if anybody ever gets

3      this in discovery or something like that, I don't

4      want it to look like we planned to do this."

5          Well, members of the jury, you've received this document

6   in discovery, and that's exactly what they were trying to do.

7          Then a few days before the Super Bowl, Marcus Andrade

8   started fishing for a rejection, one that he could pretend

9   meant that AML BitCoin was actually able to run that

10  $10 million ad but, in fact, was rejected on some baseless

11  grounds.

12         And so he approved Lisa Schneider to write an email just a

13  few days before the Super Bowl that demanded a response from

14  NBC within 24 hours, within 24 hours, on that ad that he

15  submitted and that you saw.

16         Kiernan McCavanagh, NBC's vice president for sales at the

17  time, told you this was comical.  He said it wasn't fathomable

18  that a commercial would be approved within 24 hours and that

19  what Andrade was asking for was something that needed several

20  steps to occur before even getting there.  They needed to put

21  down an agency of record letter.  They needed to put down the

22  $10 million, or 5 plus a 5 match, in order to get that ad

23  aired, and they are skipping all those steps just to rush

24  headlong into a supposed rejection.

25         And Marcus Andrade was planning for this behind the scenes

1   in secret.  He approved a letter that was addressed to

2   NFL Commissioner Goodell that pretended as if NBC and the NFL

3   itself had rejected this ad when, in fact, the NFL had never

4   even seen it.

5        And then he asked Jack Abramoff to call him when he could

6   so that they could discuss it.

7        And then the letter went out with Marcus Andrade's name at

8   the bottom, where he said that AML BitCoin was designed with

9   features -- again, this was a half-baked product with googly

10  eyes at its core -- and that accepting our ad after it was

11  produced and presented in a timely manner was outrageous, the

12  ad that they had asked for a 24-hour turnaround on before

13  putting down any money.

14       And then they amplified this lie, this impression that

15  AML BitCoin was a successful company that merely encountered

16  some bad luck with NBC and NFL, through different press

17  channels, on Twitter, through more bought-and-paid secret

18  media, secretly bought-and-paid media, like that article at the

19  bottom from *Red State*.  This was all to create the impression

20  that AML BitCoin had substance, that it was a real company that

21  functioned and had a real product, when all it was was smoke

22  and mirrors.

23       Another example of smoke and mirrors, Marcus Andrade

24  directed and engaged in what he called market making, but

25  really was market manipulation.  And this was in May of 2018,

1    when AML BitCoin Token was finally listed on an exchange where

2    people can buy and trade cryptocurrency.  They wanted to make

3    it seem like the token had real value, so high price, and was

4    liquid, that you could easily by and trade it, so had volume.

5        And so Marcus Andrade hired somebody named John Bryan.

6    And John Bryan told you exactly what he was doing, and you'll

7    hear more evidence about this -- or more summary of the

8    evidence in a bit.  He took about a quarter million dollars and

9    a quarter million in tokens from Marcus Andrade, and he bought

10   and traded with himself.  He said [as read]:

11           "I sell and then I buy and then I trade with

12       myself.  That is not new buyers or even real.  It is

13       me trading with myself."

14   And that created the illusion of high prices and high

15   volume when, again, this was all smoke and mirrors.

16       This was all as part of a scheme and a plan to defraud to

17   obtain money or property from unwitting victims by means of

18   false or fraudulent pretenses, representations, and promises.

19       Let's talk about the second element, materiality, material

20   false statements.  Remember, Marcus Andrade made a half-baked

21   coin, advertised it worldwide, and he profited personally.  So

22   on that profit point, materiality means that the statements

23   made as part of the scheme had a natural tendency to influence

24   or were capable of influencing people to part with their money

25   or property.  And the best evidence that Andrade's false

1   statements were material is that people actually were

2   influenced by those lies and they actually invested millions of

3   dollars and lost all of it.

4        You heard from Special -- from FBI forensic accountant

5   Theresa Chiu about her financial analysis, and you saw that in

6   just over the one-year period for the AML BitCoin ICO alone,

7   Marcus Andrade brought in over $5.5 million in cash, plus

8   millions in cryptocurrency, depending on when you value that

9   cryptocurrency.

10       And why did people put millions of dollars into

11  AML BitCoin?  Because they thought because Marcus Andrade lied

12  and represented that they had a completed product, not a

13  start-up.  Scott Bruffey put it well.

14       And you heard from various different victim investors at

15  trial, just a sliver of people who were affected by this

16  scheme.  Start with Aten Coin and work forward all the way

17  through AML BitCoin.

18       With Aten Coin, Brandi Jodoin, stay-at-home mother, an

19  Aten Coin employee, told you that she relied on lies, lies that

20  Marcus Andrade, for example, told on the Kathy Ireland Show,

21  lies about Aten Coin being a state-of-the-art system, one that

22  every major financial regulatory agency thought was compliant.

23       She relied on lies that Marcus Andrade personally approved

24  about Aten Coin being a mature digital currency -- this was

25  back in '14, '15, '16 -- that it had attained AML, it had

1  integrated into businesses, and was accepted as a daily payment
2  service.
3      And she told you how, as she worked on this company that
4  she so desperately wanted to work, she saw with her own eyes
5  that a lot of the victims, a lot of the investors were people
6  like the elderly, folks from every walk of life, some of whom
7  didn't even have computers and didn't have their wallets
8  downloaded.
9      And Bernadette Tran, in the AML BitCoin period,
10  corroborated this too.  She told you that when she saw a lot of
11  the investors and she was speaking with them over the phone and
12  trying to set them up with their wallets, a lot of them just
13  seemed older, couldn't really use computers.
14      And Brandi Jodoin, even though she really wanted the
15  project to succeed and she put in over $375,000 of her family's
16  savings, she lost all of it and more when Marcus Andrade sued
17  her in two different courts to try to get even more from her.
18      You heard too from Dr. Rene Acuna, who's a family practice
19  physician in Texas.  He relied on a variety of the lies that
20  you've heard about over the course of this trial and in this
21  closing statement.  He relied, for example, on this
22  *U.S. News & World Report* article that talked about deals with
23  the Port of San Francisco.
24      And, in addition, he heard lies firsthand from Marcus
25  Andrade and one of his salespeople, Brian Darrow.  And just to

1    pause for a moment on Brian Darrow.  Brian Darrow was a known

2    convicted fraudster, convicted felon, who Marcus Andrade hired.

3    And just like with Jack Abramoff, you may not like

4    Brian Darrow, but he's not the witness the Government picked;

5    it's who Marcus Andrade hired.  And Marcus Andrade hired this

6    known felon, this salesperson who had no scruples about calling

7    people up to demand money from them for made-up products.  And

8    he had Brian Darrow reach out to people like Dr. Acuna because

9    behind the scenes, Marcus Andrade wanted money to finance his

10   lifestyle and Brian Darrow wanted a higher secret commission,

11   up to 40 percent in secret of the money that he would bring in

12   from these victim investors.

13       And Dr. Acuna told you that after putting a lot of money

14   in, finally he told Brian Darrow, "I can't put in any more."

15   And what happened immediately after that?  Well, Marcus Andrade

16   called him.  Dr. Acuna hadn't given Marcus Andrade his contact

17   information, but Brian Darrow must have passed it along

18   because, out of the blue, Marcus Andrade calls Dr. Acuna and

19   asks him, as founder and CEO, if he'd be interested in

20   investing more money.

21       And he told Dr. Acuna about that Poland investor

22   conference, the same one that Brandi Jodoin told you about.

23   Andrade said to Acuna, "Why don't you go to that meeting and

24   just tell folks you bankrolled the whole project?  You can look

25   really good."

1    And then he told Dr. Acuna and Dr. Acuna saw on the

2    website, his understanding was the technology was pretty much

3    completed.  It was ready to be traded.  Well, Dr. Acuna

4    invested over $150,000, and he too lost all of it.

5    You heard from Dr. Witte, a critical care and organ

6    transplant physician; and Dr. Witte, like other victims, relied

7    on the press, a press that he thought was written by

8    independent journalists but, in fact, was bought and paid for

9    my Marcus Andrade, like this *Forbes* article that told the same

10   sort of lies you just heard about, lies about the Port of

11   San Francisco, ports in the United States, and ports in

12   Latin America.

13   And Dr. Witte, like Dr. Acuna, first did his sales or his

14   purchases through Brian Darrow; and then when Brian Darrow

15   could no longer close the deal, Mr. Darrow brought in the big

16   guns; he brought in Marcus Andrade.  And Andrade told

17   Dr. Witte, as he told some other investors, about the great

18   features of his cryptocurrency projects.  He talked about

19   security features that would prevent AML BitCoin or, in this

20   case, Aten Coin from being used for nefarious things.  And

21   Dr. Witte never saw those features in action because, as you

22   know, those features never really existed.  They were

23   half-baked.

24   And Dr. Witte, seeing the writing on the wall, wanted to

25   get his money back.  He asked for a return on his investment.

1    Andrade promised such a refund by December of 2019, but that

2    never came.  He tried to delay the day of reckoning by telling

3    Dr. Witte, "You know, how are you doing?  You've already

4    completed the hardest part.  Everything else is easy."

5        Well, nothing about this investment was easy because

6    Dr. Witte invested over a hundred thousand dollars and he lost

7    all of it.

8        You heard too from Scott Bruffey, a store clerk and a

9    tobacconist, and Scott Bruffey also did his due diligence.  He

10    looked at the website for AML BitCoin, the social media

11    accounts, the newspaper articles that were secretly bought and

12    paid for; and he understood, as Marcus Andrade wanted people to

13    understand, that the technology was complete, it was ready to

14    go.  He invested $100,000 and he too lost all of it.

15        Then you heard from Ben Boyer, who is a venture capitalist

16    and entrepreneur.  Ben Boyer heard about AML BitCoin through

17    one of Marcus Andrade's deputies, Japheth Dillman.  And Ben

18    Boyer, based on what Japheth Dillman told him, did additional

19    research.  He went online and looked up the CEO and founder of

20    the company, Marcus Andrade; looked at his LinkedIn profile and

21    saw that Marcus Andrade was, appeared to him, somebody early in

22    Bitcoin, a founder, somebody good at what he was doing.  And it

23    corroborated what Dillman was telling him because Dillman and

24    Andrade were on the same page and marketing the same lies.

25        And on the LinkedIn page that Marcus Andrade put out to

 1   the world, he said, again, that he had created Aten Coin in

 2   2014; that it had built into the source code of the coin those

 3   technology features that Andrade claimed were real but were

 4   really just half-baked; and that Aten Coin was a rebrand of

 5   AML BitCoin and it was compliant with all these different laws

 6   and regulations, both in the U.S. as well as abroad.

 7       And then Ben Boyer did additional diligence.  He looked at

 8   technology, and in his view, as an experienced investor, the

 9   representations that were being told to him showed the tech was

10   going to be built in weeks or months.

11       He also looked at the financing of the company; and based

12   on what he read in the Telegram channel and elsewhere,

13   AML BitCoin had raised, in his view, he thought a hundred

14   million dollars when, in fact, you know there was only a few

15   million brought in and never near that amount.  Again, an

16   illusion of a well-funded functioning company that's really

17   just a house of cards.

18       And then Ben Boyer told you about the Super Bowl ad and

19   how important that was because when a company says it's going

20   to advertise in the Super Bowl, a company has made it, and it's

21   an amazing opportunity to grow adoption.  Well, he didn't know,

22   but you know, that that Super Bowl ad was a known lie from the

23   very start.

24       And then when Ben Boyer bought his tokens, a good chunk of

25   them -- well, he thought that they were from third parties; but

1   a good chunk of them was actually from Marcus Andrade himself,

2   sold in secret, dumped in secret by Marcus Andrade.  And when

3   Ben Boyer learned that, he explained to you why that was so

4   misleading.

5       If the founder of a company and the CEO is secretly

6   dumping their coins, essentially their share of their

7   cryptocurrency business, that means they don't believe in the

8   project; they know it's on its way to failure; and if they're

9   hiding that from investors, that's a very negative signal.

10      Altogether, Ben Boyer invested over $1.2 million and he

11  lost all of it, plus legal fees where Marcus Andrade sued him,

12  sued him with investor funds, his own money, to try to take

13  even more.

14      You heard as well from an FBI undercover, Bryant Ling, who

15  reached out to Marcus Andrade in July of 2018.  And Andrade

16  sold to Bryant Ling via emails, as well as a telephone call and

17  a Skype call, and Marcus Andrade told a lot of the same lies.

18  He told Bryant Ling that Aten Coin had done very well, it had

19  biometrics and identifiers on the blockchain, and that they

20  should get together on a Skype call.

21      Even the defendant's own witnesses show that Marcus

22  Andrade misled and his statements were capable of influencing

23  people.

24      Arthur Weissman said that the friends he introduced into

25  the AML BitCoin project, they lost a lot of money; and that he

1    considered the money that he put into AML BitCoin token as an

2    investment, not a slush fund that Marcus Andrade could use to

3    spend on whatever he pleased, including strip clubs and cars

4    and homes.  And he thought that he was investing to build an

5    actual product.

6         He also wouldn't have invested if he had known that known

7    felons like Jack Abramoff or Brian Darrow were one of Andrade's

8    key advisors.  And Andrade knew that too because he told folks

9    time and again to strip out any mention of Jack.

10        These are all statements that were material because people

11   bought AML BitCoin and they bought it because of Andrade's

12   lies, and they lost all of it.

13        The third element of wire fraud is the intent to defraud,

14   which is the intent to deceive and to cheat.  In other words,

15   did Marcus Andrade tell lies to get money?  Absolutely, yes.

16   Money doesn't accidentally fall into people's pockets, and

17   millions of dollars did not accidentally fall into Marcus

18   Andrade's pockets.

19        Marcus Andrade told an undercover on a recording that you

20   heard that he promised he's one of the most straightest guys

21   you'll ever meet and he never makes promises or representations

22   that he can't keep.  Well, let's just walk through some of the

23   many lies that Marcus Andrade told.  He cheated and lied time

24   and again.

25        With the Panama Canal, he was told by the Panama Canal

1    Authority in November of 2017 that his press release was

2    misleading, that the meetings he had claimed to have had had

3    never even taken place.  And, yet, Marcus Andrade doubled down

4    again and again, tweeting the very next day, for example, that

5    he was on track to partner with the Panama Canal.

6        Think about the Port of San Francisco where he put out and

7    approved that *U.S. News & World Report* article that said that

8    the Port of San Francisco was going to adopt his half-baked

9    cryptocurrency project.

10       Well, Leslie Katz, *Port Strategy*, Byron Rhett all told you

11   this wasn't true.  And in January of 2018, *Port Strategy* wrote

12   to him and said the Ports of SF and L.A. both deny the report,

13   but he kept going.

14       Think about the Super Bowl ad where to the public he was

15   claiming that AML BitCoin had a Super Bowl ad ready to go but

16   that NBC and NFL, they were just too afraid of offending

17   North Korea.  And then he amplified those lies on social media

18   and through press that he had bought.

19       Well, behind the scenes, Marcus Andrade was saying no one

20   should know that and it could be looked at negatively if people

21   know.  And he even tried to hide this fact from his chief

22   strategy officer, Japheth Dillman, the one the defense wants

23   you to believe was one of the masterminds of the scheme,

24   because he knew that it would be negative if this news went

25   out.

1        Andrade told the FBI in March 2020 that he never directly

2   knew Brian Darrow, that convicted telephone salesman that

3   Marcus Andrade hired to sell Aten Coin.  Well, in 2015, Marcus

4   Andrade emailed Brian Darrow, attaching a sales document that

5   compared Aten Coin to Bitcoin, much like in the future how

6   AML BitCoin can be compared with Bitcoin.

7        And soon after Dr. Acuna and Dr. Witte were tapped out and

8   said no to Brian Darrow, they received a call out of the blue

9   from Marcus Andrade himself, showing that Brian Darrow passed

10  along that contact information to Marcus Andrade.

11       In March of 2020, Andrade lied again that before August of

12  2018 or so or September of 2018, he had never sold a coin to

13  anybody, not to his recollection.  Well, you heard from

14  Dr. Witte and Dr. Acuna how those sales were made over the

15  phone.

16       And you heard from Bernadette Tran that whenever money was

17  tight after Andrade would get back from his extravagant

18  business trips, he would go into a room, lock his door, get on

19  the phone for hours, and then come out and, as she did on the

20  stand, put a card down on the table and say, "Here's the money.

21  Let's go get a nice meal and I'm going to go grab some ones."

22       Marcus Andrade tried to hide his market manipulation, his

23  market making.  In July of 2018, he tried to pin it all on

24  Japheth Dillman.  He said if he's mentioning anything about

25  market making or return on investments, whatever it is, those

 1    are his own beliefs.

 2        Well, just a couple of months before that, Marcus Andrade

 3    was messaging Jack Abramoff, telling him about what they were

 4    going to do with market making, and he wrote [as read]:

 5            "As soon as market making kicks in, we'll be

 6        good to go."

 7        And [as read]:

 8            "First we're hitting Asia."

 9        This was all part of a scheme to amplify lies about

10    business deals that didn't exist and a half-baked technological

11    product.

12        In March of 2018, in an attempt to get listed and then

13    have PR do the rest, he wrote that they actually had certified

14    digital identities in partnerships with banks, insurance

15    companies, and government entities when, at its core, it was

16    nothing but googly eyes.

17        And then if you follow the money, while his employees in

18    Las Vegas, the ones who were spending their first job out of

19    college working for him, were often working in the dark because

20    the light bills were unpaid and the phone bills were unpaid,

21    Marcus Andrade spent a lot of that money on all-cash purchases

22    of two properties and a Cadillac and a Ford F-250.

23        And through it all, Marcus Andrade intended to deceive and

24    cheat because he was at the top of the chain of command.  You

25    heard this from several different witnesses who worked with

1  Marcus Andrade throughout the years.  Brandi Jodoin said

2  everybody knew the chain of command.  Bernadette Tran said

3  everything she did was through his direction.  And Japheth

4  Dillman wrote, "Yes, sir."

5      As Ben Boyer explained, when you're the founder and CEO of

6  a company, like Marcus Andrade was in '14, '15, '16, '17, and

7  '18, you are the one who's at the top of the chain of command.

8  And as Marcus Andrade put it on an FBI recording, at the end of

9  the day, the liability resides with him.

10     Let's talk a bit about what the witnesses told you about

11 Marcus Andrade being at the top of the chain of command.

12 Brandi Jodoin told you during the Aten Coin days -- '14, '15,

13 '16 -- Marcus approved every slide and edited every slide,

14 sometimes line by line.

15     In the AML BitCoin days -- '17, '18 -- Bernadette Tran

16 said the same thing.  She explained that Marcus Andrade was

17 incredibly involved in reviewing public-facing content in those

18 public-facing lies.

19     [As read]:

20         "He always made sure to review everything.

21     Multiple times."

22     Even if an employee changed a single word on those

23 public-facing lies from, let's say, "and" to "or," as she told

24 you, he would need to review that change.

25     Then you also heard from Melissa Foteh.  Melissa Foteh,

1    when she took the stand in this courtroom, she claimed not to

2    really remember much; but when she testified before the grand

3    jury under oath in 2019, she remembered plenty.  And she was

4    very specific.  She told the grand jury that Marcus would tell

5    her what to do and that she would do it without question, just

6    like Bernadette Tran and just like Brandi Jodoin.

7        And then Marcus Andrade, in his own words, would direct

8    his deputies as to what he wanted done.  Think back to this

9    October 2017 email where he cut his attorney out of the press

10   loop.  He told Dillman:  You've got to stop working on the

11   press stuff and start focusing on the ICO.

12       And then as to Jack Abramoff, they had to have the press

13   releases forwarded to him or he would forward the press

14   releases to Jack, and then they had to make sure to strip out

15   Abramoff from any sort of press because he was a notorious

16   felon.

17       If this mountain of evidence weren't enough, look at what

18   the FBI found on Marcus Andrade's phone when they searched it.

19   On his phone was a photo, and this photo was of the username

20   and passwords of every account that AML BitCoin ran and even

21   some of the usernames and passwords of his employees' accounts,

22   like Bernadette at the bottom, as well as Aten Coin at the

23   bottom as well.  And every password began with the same two

24   letters, "MA," or Marcus Andrade.

25       And then when the FBI followed up with some additional

1  diligence when they subpoenaed Twitter, or what's now called X,

2  for user data, they found that the phone that was registered --

3  that registered that Twitter account was Marcus Andrade's phone

4  at Verizon.

5      This all showed that Marcus Andrade intended to deceive

6  and he intended to cheat and he directed his deputies to do

7  what he wanted.

8      There's yet more evidence, members of the jury, which was

9  the market-making scheme which we touched on earlier, the

10 market-making way of carrying out the scheme.

11     As Abramoff warned Andrade in November of 2017, they

12 needed to create a market for the ICO, and they hadn't done it

13 yet.  And so once the coin was listed on an exchange in May of

14 2018, they did everything they could to create a market.

15     Jack Abramoff was the one who was asking the questions and

16 Andrade was answering them.  Abramoff asked Andrade in May of

17 2018 [as read]:

18         "Our price is dropping rather rapidly.  Any

19     ideas?"

20     And Andrade responded [as read]:

21         "As soon as market making kicks in, we'll be

22     good to go."

23     Now, what was market making?  You heard earlier in that

24 message from John Bryan it was misleading trades, John Bryan

25 buying and trading with himself at any price he wanted to just

1   push up the price of AML tokens and to push up the volume.

2        Again, Abramoff asked Andrade, not the other way around

3   [as read]:

4           "When is that going to start?  We need to launch

5           immediately."

6        And Andrade answered [as read]:

7           "First we're hitting Asia."

8        And this was all part of the PR strategy to build up a

9   half-baked product for Andrade's profit.  As Andrade wrote,

10  [as read]:

11          "Just get me the PR from your side.

12          "Pedal to the metal," Abramoff responded.

13       And Andrade then said [as read]:

14          "I can assure you that Melissa" -- Melissa Foteh

15          -- "knows what she's doing on her side."

16       And then these directives, just like all the other ones,

17  went down the chain of command.

18       Abramoff, having gotten the orders from Andrade, reached

19  out to John Bryan and wrote [as read]:

20          "Okay.  I had a chance to review things with

21          Marcus.  Here is what he is willing to do.  You're

22          going to have a budget of $250,000 to effect a

23          significant change in the volume and, more

24          importantly, the price of the token."

25       And then John Bryan carried out his orders from on high.

1    As Abramoff reminded him [as read]:

2         "Andrade gave you 250,000 in these tokens to get

3      this going."

4    And then John Bryan wrote [as read]:

5         "I sell and then I buy.  I trade with myself.

6      That is not new buyers or even real.  It is me

7      trading with myself."

8    And even he knew doing this misleading -- these misleading

9    acts, that it was a catastrophe.  Despite doing this market

10   manipulation, the people that he brought in to invest into the

11   business, three different people, they couldn't even get the

12   money out once they put it in.

13        Those people that John Bryan had brought in thought that

14   he had scammed them because, in truth, AML BitCoin was a scam.

15   And he told Jack Abramoff that [as read]:

16        "We have no buyers."

17   This AML token, the one that's supposed to be adopted by

18   government entities around the world, by banks, the

19   Panama Canal, the Port of San Francisco, it was all fake.  He

20   said [as read]:

21        "Just so you know, we have no buyers."

22   And then Abramoff, like Andrade would do throughout the

23   entirety of his scheme, said [as read]:

24        "Stop texting on this."

25        Victims saw this market manipulation too.  Dr. Acuna told

1  you that he would check the coin in the morning and he would

2  see the price fluctuate back and forth.

3      Scott Bruffey told you that he would see the price shoot

4  up to as high as $10; and then when he would try to sell some

5  of his investment, try to get some of his money back at an even

6  lower price, those trades wouldn't clear.  And you know why?

7  It was because people, through John -- because John Bryan was

8  doing fake trades to manipulate the price and the volume of the

9  coin.

10     And then Marcus Andrade paid John Bryan for his services.

11 In vague emails, he wrote to Mr. Bryan [as read]:

12         "Please send a check for 2K to John."

13     And then he lied about it.  Mr. Andrade lied about it when

14 he was caught later, where in July 2018, he tried to pin it all

15 on Japheth Dillman.  It wasn't in any of those threads that you

16 saw earlier.  He said [as read]:

17         "If he's mentioning anything about market

18         making, or return on investment, those are his own

19         beliefs."

20     Whereas, just a couple months before he had said

21 [as read]:

22         "As soon as market making kicks in, we'll be

23         good to go."

24     On top of this mountain of evidence of deception and

25 cheating, follow the money.  Look at Ben Boyer's wire in

 1   July 12, 2018, the wire that's alleged in Count One of the

 2   indictment.

 3        On January 12th, 2018, $730,000, along with another

 4   120,000, went into Block Bits Capital account, the account that

 5   Japheth Dillman was running.  And did Japheth Dillman take a

 6   cut?  Did he withhold the money as somehow the mastermind of

 7   the scheme?  No.  On the same day, he transferred that money up

 8   the chain of command to his boss, the founder and CEO of

 9   AML BitCoin.

10        And Japheth Dillman explained a bit about what he was

11   doing.  As he wrote to Andrade in October of 2017, he wrote [as

12   read]:

13             "I'm forging some agreements to buy a large bulk

14        (in the millions)."

15        So what Dillman was doing was buying AML BitCoin, forging

16   the agreements to do so, and then using himself as a

17   distribution channel to sell out these tokens and then push the

18   money up the chain of command.

19        And Bernadette Tran told you a bit about where this money

20   was going.  It was going to Marcus Andrade and his leisurely

21   lifestyle.  And when money was tight, he would simply call up

22   more investors to steal yet more money from them; and all the

23   while, he couldn't pay rent, he couldn't pay his workers, and

24   sometimes they had to work in the dark.  This was all part of

25   Marcus Andrade's intent to deceive and cheat.  And then when he

1   was caught, Marcus Andrade hid, he lied, and he intimidated.

2       **THE COURT:**  Mr. Chou, would this be a good place for

3   our morning break?

4       **MR. CHOU:**  Yes, Your Honor.

5       **THE COURT:**  Members of the jury, remember my

6   admonitions.  Do not discuss this amongst yourselves or with

7   anyone else.

8       And we will come back in 15 minutes.

9                    (Recess taken at 10:15 a.m.)

10              (Proceedings resumed at 10:32 a.m.)

11   (Proceedings were heard in the presence of the jury.)

12       **THE COURT:**  The jury is present.

13   You may proceed, Mr. Chou.

14       **MR. CHOU:**  Members of the jury, Marcus Andrade hid, he

15   lied, and he intimidated when he was caught.

16       Think back to the Super Bowl ad.  Again, Marcus Andrade

17   wrote Jack Abramoff that no one should know that because it

18   could be looked at negatively if people did.  And this is, time

19   and again, the strategy he employed to cover up what he knew

20   was deception and was cheating.

21       Then fast-forward to September of 2018 when the FBI's

22   investigation first went public, when they searched his office

23   in Las Vegas.

24       Just a month or two after that search, Marcus Andrade

25   directed Melanie Cowan to edit and change content that Marcus

 1    Andrade had directed the posting of online and that was

 2    knowingly misleading.

 3         Remember, that content, the social media posts you saw,

 4    those were written in the past and present tense about a

 5    half-baked product that supposedly was complete, about business

 6    deals that didn't exist that had somehow been closed.

 7         And so when Marcus Andrade knew the FBI was on his case,

 8    he directed Melanie Cowan to change the language in those posts

 9    to go from the misleading past and present tense to the more

10    speculative and hopeful future tense.

11         And the reason why they did that, Melanie Cowan explained

12    to you, is because Marcus Andrade knew that it was false.  He

13    knew that AML BitCoin wasn't completed yet.  It wasn't the

14    world's first.  So they had to change from past tense to future

15    tense.  And he knew it didn't have those features when those

16    posts were being made during the ICO and before.  So, again, he

17    changed those posts.

18         You didn't just hear this from Melanie Cowan.  You also

19    heard it from Melissa Foteh and others.  Melissa Foteh told the

20    grand jury back in 2019 under oath that Marcus Andrade would

21    ask her to delete messages and emails, and he would be very

22    specific about how they communicated.  He wanted to hide and

23    cover up his tracks.  He told Melissa Foteh, "Don't text me

24    about things.  Don't email.  You have to talk to me about it."

25         But he wasn't quite careful enough because you've seen a

 1  mountain of evidence about all the knowing lies that he told.

 2      And then in the timeline of different lies and events that

 3  happened, all the way from the Aten Coin period in '14, '15,

 4  and '16 and then AML BitCoin in '17, '18, and '19, after

 5  cashing out in 2018 with the red Cadillac, the Ford F-250, two

 6  all-cash properties, when the FBI came knocking and then when

 7  the grand jury subpoena subpoenaed Mr. Andrade in June of 2019,

 8  Marcus Andrade tried to further cover up his tracks by

 9  refinancing the homes that he had bought, or one of the homes

10  he had bought, and taking that money and putting it back into a

11  shell of a business, as if that would fix things.

12      Then Marcus Andrade previously had never filed his taxes

13  for the income that he had taken in from investors, that he had

14  stolen from thousands of people.  He hadn't filed it for

15  himself, for the NAC Foundation, for his Payroll Services, or

16  for his Fintech Family Fund Partnership.  But after the FBI

17  executed the search warrant, after the grand jury subpoenaed

18  him, he filed those taxes, as you heard from Victoria Hernandez

19  from the IRS.

20      And then when the FBI searched his home in March 2020 and

21  the walls were closing in, Marcus Andrade reached out to Carlos

22  De La Guardia about the lies he had told years ago about the

23  Panama Canal.  And he told De La Guardia that he needed to fix

24  those press releases to make -- or fix those press releases by

25  having the people that were quoted in them say that what was

1  said in those press releases was actually true.

2      And when De La Guardia asked that request be put in

3  writing, of course Andrade never did because, as you heard from

4  Foteh, as you've heard from Ms. Cowan, Marcus Andrade, time and

5  again, tried to cover up his tracks.

6      And then when that wasn't enough, when deception and

7  concealment couldn't get him to escape accountability, he would

8  twist the legal system against those it was meant to protect.

9  He would take the money that he had brought in from investors,

10  and he would use that to finance lawsuits.  He would sue people

11  like Brandi Jodoin.  He would sue people like Ben Boyer.  He

12  would sue people like Melissa Foteh.

13      And then in his own words, he would explain why.  When

14  Jack Abramoff told Marcus Andrade in April of 2018 that one of

15  the pre-ICO investors, somebody before October 17th, was

16  planning to go to the SEC and the FBI about Marcus Andrade's

17  scheming, Andrade was already on the case.  He already knew who

18  that person was, and he'd already sued them, twisting the legal

19  system against those it was meant to protect.

20      And overall, Marcus Andrade was trying to blame everybody

21  but himself.  As founder, CEO, CFO, a one-man board of

22  directors, somehow his argument is that he wasn't accountable.

23      And you've heard testimony in this courtroom about, among

24  other things, a psychological evaluation that Mr. Andrade went

25  through.  And the Government does not mean to cast -- make

light of any sort of serious mental health conditions, but Marcus Andrade is not somebody who suffers from those things.

You heard that he lied on his psychological evaluation, and you heard that not only from the Government's expert but also the defense expert. He was diagnosed for the first time with any sort of the conditions that were mentioned in this courtroom a month before his federal criminal trial.

You heard from Professor Amanda Gregory at UCSF, an attending psychologist there, that Marcus Andrade scored high for what's called malingering or, in simple laymen's terms, faking or grossly exaggerating symptoms or problems to get some sort of gain; namely, escaping accountability in this courtroom.

And Professor Gregory told you about just how much of a malingering or faker Marcus Andrade was, in her professional opinion. She helped quantify it for you. She said that he scored five standard deviations above the mean on the malingering scale. And what is five standard deviations? Well, it's above the 99th percentile. If you put a thousand people in a room, she explained, maybe one or two people might score higher.

You heard this too from the defendant's own exert, Dr. Levi Armstrong from Texas. The computer-generated report, that report that took the answers that were put in and then spit out what the algorithm and the authors of the report

 1    suggested were the right answers, that report said that Marcus

 2    Andrade may not have answered in a completely forthright manner

 3    because his malingering score on that test, too, was several

 4    standard deviations above the mean.

 5         Overall, Marcus Andrade blames everyone but himself, and

 6    he also blames the felons that he hired.  But you also heard

 7    testimony, not just from the convicted felons that he hired,

 8    but innumerous other people who told you and saw with their own

 9    eyes or analyzed records that show that Marcus Andrade knew

10    what he was doing was wrong and that he deceived and he

11    cheated.

12         And, members of the jury, on top of all that, if all of

13    the evidence you've heard is not enough, as Chief Judge Seeborg

14    instructed you -- and, of course, his instructions control --

15    Marcus Andrade may be held responsible for other co-schemers'

16    actions even if, even if he didn't know the specific details of

17    what those other co-schemers said or did.

18         Overall, Marcus Andrade undoubtedly had the intent to

19    deceive and cheat.  He told lies to get money and he profited

20    as a result.  The millions of dollars that he took, the

21    millions of dollars that went into AML BitCoin's accounts

22    didn't accidentally fall into his pockets.

23         Now, the last element of wire fraud is the use of a wire

24    as a part of a scheme, and the wire that's alleged in the

25    indictment is Ben Boyer's $730,000 wire in January of 2018.

 1          Members of the jury, look at Exhibit 1224 at page 5.
 2   That's the bank statement that contains the wire.  And you'll
 3   see, as you heard uncontested testimony about, that that wire
 4   went from Ben Boyer's account in San Francisco out to the
 5   Fedwire servers in Texas and New Jersey and then back, back to
 6   San Francisco.  So it traveled interstate.

 7          And you heard uncontested testimony from Sean O'Malley, a
 8   director at the Federal Reserve, that this Fedwire traveled in
 9   interstate commerce.  It was uncontested.

10          And then this money, the 730 plus the 120 plus additional
11   investments Ben Boyer made, when they went into the Block Bits
12   Capital account, Japheth Dillman didn't delay.  He didn't take
13   a cut of the money that his boss owned.  He forwarded it up the
14   chain of command on the same day to Marcus Andrade.

15          And if you follow the money, if you look at Exhibit 1520,
16   you can look at those bank statements.  You can see that on the
17   same day when those two wires flowed into Block Bits, they were
18   transferred and received by the David Salmon Trust account, the
19   attorney trust account held for Marcus Andrade's benefit for
20   the receipt of AML BitCoin investor victim funds.

21          And you heard testimony and analysis from Theresa Chiu, an
22   FBI forensic accountant.  And if you follow the money from
23   Ben Boyer's wire, another AML BitCoin investor's money, you can
24   see it go through a series of accounts that Marcus Andrade
25   controlled.  And it turned into -- he turned it into that

1    Ford F-250; 44 Violet Road, Corpus Christ property; and that

2    Plaza Point property in all-cash purchases.

3        The second count is money laundering.  Money laundering

4    has three elements, and the first element is that Marcus

5    Andrade conducted or intended to conduct a financial

6    transaction involving property that represented the proceeds,

7    basically the money, from wire fraud.

8        And so how do we know this money was the proceeds of wire

9    fraud?  Well, first of all, you heard testimony and evidence

10   about the investor funds that came into Marcus Andrade's bank

11   accounts.  In the AML BitCoin period, the charged indictment

12   period, over $5.5 million plus over $2 million in

13   cryptocurrency.

14       And then what did Marcus Andrade do with that money?

15   Well, he didn't fully build out his half-baked product.  John

16   Szeder didn't start work.  Hung Tran was still owed money.

17   Evan Carlsen didn't get paid in full and was building out from

18   scratch in November of 2018.

19       And for his photo ops, even those things, Leslie Katz told

20   you that photo op with Gavin Newsom, for example, the check

21   there bounced.

22       But a check that didn't bounce and what underlies

23   Count Two, money laundering, is a cashier's check in the amount

24   of $600,000.  And this cashier's check flowed from Marcus

25   Andrade's Fintech Fund -- one of those business accounts that

1    was not held under his name; it was held under Fintech -- and

2    then, on the same day, went into an account he personally

3    controlled or had his personal name on it, Marcus Andrade.

4        And on the check that he took from the Fintech Fund, in

5    the upper left -- and we'll zoom in on this in another slide --

6    the remitter line showing where the money came from, it didn't

7    say "Fintech Fund."  It said "Marcus Andrade," making it appear

8    as if that cashier's check was coming from Andrade's own

9    personal accounts into another personal account.

10       But if you follow the money, that's not what happened.

11   The investor proceeds, what Marcus Andrade stole from thousands

12   of people, flowed through a variety of different accounts.  He

13   channeled them through them and then turned it into that

14   cashier's check.  As Theresa Chiu told you, a hundred percent

15   of that check, a hundred percent is traceable to AML BitCoin

16   investor funds.

17       And so why is this money laundering?  Well, as IRS Special

18   Agent James Carfora told you, normally, the easiest way to move

19   money between bank accounts is via an electronic transfer like

20   an ACH or a wire; but when you transfer money in that way, it's

21   easily traceable.  Both the sending bank and the receiving bank

22   can see where the money is coming from and where it's going.

23       But with a cashier's check, the sending bank just sees the

24   check go out, but it doesn't necessarily know where it goes,

25   and the receiving bank also doesn't know which account that

1   money came from.  You'd have to be a government entity, law

2   enforcement, you'd have to subpoena every bank in that chain to

3   figure out the source and the destination of that money.

4       The second element of money laundering is that Marcus

5   Andrade knew the money was from some form of unlawful activity.

6       Members of the jury, you've heard a mountain of evidence

7   about how Marcus Andrade's AML BitCoin scheme was unlawful and

8   a fraud.  And Japheth Dillman, who was sending along the money

9   to Marcus Andrade, told him as much.  He wrote [as read]:

10          "I'm forging some agreements to buy a large bulk

11          (in the millions)."

12      And the money that Marcus Andrade received from

13  AML BitCoin investors, he took millions of it out into his

14  personal accounts, 2.1 million over just over a year.

15      And then rather than declare that income, rather than not

16  being afraid to hide proceeds that supposedly the defense would

17  have you believe were legitimate, he failed to file his taxes.

18  He hid that income for years until, of course, the FBI and the

19  grand jury came knocking.

20      The third and last element of money laundering is Marcus

21  Andrade's intent to hide money from fraud.  For this element,

22  Marcus Andrade either knew or knew that the transaction that he

23  designed and carried out, that cashier's check, either knew in

24  whole or in part it was designed to conceal or disguise the

25  nature, the location, the source, ownership, or control of

 1    AML BitCoin investor money.  And as the Court has instructed

 2    you, just an attempt is enough, a substantial step towards

 3    committing the crime.

 4        But of course Marcus Andrade did a lot more than just an

 5    attempt here.  He routed AML BitCoin investor funds through a

 6    convoluted series of accounts; some not held under his own

 7    name, some held by attorneys that were working for him, like

 8    David Salmon.  He routed it through a Payroll Services account,

 9    through his Fintech Fund, and then he converted it into a

10    series of cashier's checks, including the one that was $600,000

11    on March 7th, 2018, and then deposited on March 7th, 2018.

12        This check, he went to the bank, he bought the check.  At

13    the top left it said "Rowland Andrade," not "Fintech Fund."

14        He then took that physical check and, on the same day,

15    went to a different bank with that check and deposited it.  It

16    went from Fintech to Woodforest.  Rather than transferring the

17    funds in the normal, traceable, easy way of electronic funds

18    and not having to walk around with a check that's basically

19    $600,000 you could lose, he did it this way because he knew and

20    he wanted -- he attempted to hide the AML BitCoin investor

21    proceeds.  You'd have to be a government entity with subpoena

22    power to trace where those funds came from and where they were

23    going.

24        And what did Marcus Andrade do with those funds?  Well, a

25    legitimate entrepreneur keeps his office lights on and takes a

1    half-baked product and turns it into a real one.  A fraudster

2    cashes out with homes, Cadillac Escalade, and with strip clubs.

3        Overall, members of the jury, you've heard a mound of

4    evidence on both wire fraud and money laundering.  With wire

5    fraud, Marcus Andrade had a sophisticated and multiyear scheme

6    to defraud, as evidenced both by his prior conduct during the

7    Aten Coin period as well as the charged period of 2017 to 2018.

8        He went to extraordinary lengths to take money and

9    property through false and fraudulent pretenses.  He lied to

10   investors personally.  He bought paid stories from so-called

11   journalists and didn't publicize and disclose that those

12   journalists were writing on his behalf.  He hired known felons

13   to carry out his bidding.

14       The lies he told were material, they were capable of

15   influencing people to part with their money and property; and

16   the best evidence of that, is that thousands of people actually

17   did.  Millions of dollars were lost.

18       He intended to defraud, to deceive and cheat because, time

19   and again, people told him that what he was doing was false and

20   he doubled down and did it anyway.  And then when he was

21   caught, when the FBI came knocking, he took steps to hide, to

22   lie, to conceal, and then to bully and intimidate his own

23   victims, financing those lawsuits with the money that they had

24   put into his company.

25       And then lastly, you heard uncontested testimony about how

1    the scheme involved the use of an interstate wire.

2         The money laundering, again, there was a transaction

3    involving money from the fraud.  A $600,000 cashier's check

4    that was a hundred percent from investor proceeds, as Theresa

5    Chiu explained to you.

6         You knew the money -- or he knew the money was from

7    unlawful activity because that money was a hundred percent

8    investor proceeds from a scheme that he had carried out for

9    years using the same sort of playbook of cryptocurrency as a

10   vehicle for fraud.

11        And then he intended to hide money from the fraud because

12   rather than just do an ACH transfer from one account to

13   another, he routed that investor money through a series of

14   accounts, used a cashier's check that didn't show where the

15   money was coming from or where it was going, and then didn't

16   declare his taxes at all for any of those entities until the

17   FBI and the grand jury came knocking.

18        Members of the jury, thousands of people from every walk

19   of life were hurt by Marcus Andrade's scheme, from stay-at-home

20   mothers like Brandi Jodoin to store clerks like Scott Bruffey.

21        After years, though, of fraud, Marcus Andrade's bill has

22   finally come due.  Return the only verdict consistent with the

23   evidence.  Guilty on all counts.

24        Thank you.

25             **THE COURT:**  Thank you.

 1      Mr. Shepard.

 2                      (Pause in proceedings.)

 3           **MR. SHEPARD:**  May I proceed, Your Honor?

 4           **THE COURT:**  You may.

 5           **MR. SHEPARD:**  Thank you.

 6                       **<u>CLOSING ARGUMENT</u>**

 7           **MR. SHEPARD:**  Would you buy something from Marcus

 8      Andrade?  I'm going to say no.  Would you work for Marcus?

 9      Hmm, probably no.  Do you like him?  Hmm, no.

10           Did the Government prove beyond a reasonable doubt that he

11      committed either of the two crimes they charged him with?

12      Answer also no.  And I'm going to spend some time talking to

13      you about that and walking through the proof as best I can.

14           And I want to get as quickly as I can to what Mr. Chou

15      called the three main components of the fraud -- the

16      Panama Canal, the Port of San Francisco, the Super Bowl --

17      because -- and then the whole question of the technology, which

18      Mr. Chou decided was just googly eyes.  And we'll talk about

19      that in some detail later because you remember you heard expert

20      testimony about that.

21           So I want to get as quickly as I can to those four main

22      topics and show you the Government didn't prove any of them.

23      In fact, in several of them, I think it's pretty clear that

24      they proved he didn't do it; Marcus didn't do it.

25           But before we get there -- and, by the way, just so you

1    get the lay of the land of what I'm proposing to do, I'm going

2    to talk about -- I'm going to get to those four things in a

3    little bit, and then I'm going to talk about a bunch of the,

4    what I would call, spaghetti, where the Government was just

5    throwing different things at the wall, sock puppet accounts,

6    different linings like that.  I'm going to try to get through

7    all of them, as many as I can.  And then I'm going to get on to

8    money laundering.  And along the way, we'll talk about Marcus's

9    good faith.  And we'll eventually get into that deep dive that

10   we spent a couple of days on into neuropsychological testing.

11        And after I get through all the evidence, I'm going to

12   give you a bonus reason why you can't convict Marcus on

13   Count One and probably the same sort of thing on Count Two.

14        But before I get into the -- I see we're going to have

15   papers flying.  Before I get into the heart of the Government's

16   case, those three main alleged frauds along with the

17   technology, I want to come back to the themes that I talked

18   about in my opening statement and add one more, and we'll talk

19   about that for just a minute or two.

20        And then I want to set the stage by talking about the

21   evidence that leads up to what happened, and by that, I mean

22   the Aten Coin story and then, how in Abramoff's words, he gets

23   reengaged with Marcus -- I don't think that's actually what

24   happened, but that's what he says -- he gets reengaged with

25   Marcus in the late summer-fall of 2017 and how he romances him

1    into starting the ICO and doing things Abramoff wanted him to

2    do.

3         So we're going to lay that scene, and then we're going to

4    get into the Government's main evidence.

5         But, first, a brief return to the three themes I talked

6    about in my opening statement; and as you'll see, there is a

7    new one.

8         The first theme is that Marcus was working hard and

9    proceeding in good faith.  He genuinely believed that he had a

10   great idea, and he did, and he genuinely believed he had the

11   ability to make it work as a business, which, unfortunately, he

12   didn't.  But at all times, he was proceeding in good faith and

13   believing what he was doing.

14        The Government proved that he's a really bad manager and a

15   really poor businessman and he couldn't execute what he thought

16   he could execute.  The Government certainly proved that.  But

17   I'm going to explain to you why they didn't prove that he was

18   engaged in a fraud.

19        So that was the first theme.  He was proceeding in good

20   faith.

21        Second theme, he was swimming with the sharks.  Mr. Chou

22   tried to discount that by making it seem like Mr. Andrade was

23   in charge.  I'm going to get to that in a few minutes.

24        And, third, he was more of a fool than anything else,

25   certainly more of a fool than a fraudster.

1    And I'll eventually get to the deep dive into

2    neuropsychiatric testimony.  But you remember at the end, when

3    Mr. Highsmith was asking questions like, "Well, didn't Marcus

4    supervise all these different employees?"  Remember those

5    questions?  Of course, Dr. Gregory knew nothing about that.

6    That was just Mr. Highsmith trying to make a point that

7    Mr. Andrade had supervised a bunch of employees and suggesting

8    that if you supervised all these employees, how could you

9    possibly have all these conditions that Dr. Armstrong had

10   described.

11       And I hope you thought about that as he was asking those

12   questions, because pretty much every single witness in this

13   case who dealt with Marcus, people who spent hours and hours

14   and hours with him, much more than it takes to conduct a

15   neuropsychiatric exam, they all observed and reported on

16   serious mental deficiencies.  And you remember I had a slide

17   about that in opening.  I'll have a slide later collecting some

18   of that.

19       But those are the people who lived with him, and they were

20   the people who were saying:  He's paranoid.  He doesn't

21   understand what's going on.  He's living in another world.

22   They observed it every single day.  He was more of a fool than

23   anything else.

24       And while I think I had laid out most of those

25   descriptions of Marcus in my opening statement, you got a much

 1    better illustration of it, at least to me, that I hadn't

 2    anticipated would come out when I gave you my opening

 3    statement, and that is the story that Mr. Abramoff first

 4    reported and then you heard more about from Mr. Tinker when we

 5    started the defense case.  And that is that Marcus turned down

 6    a hundred million dollars for his patents.

 7         And why did he do that?  As Abramoff described it, it was

 8    because he was paranoid that Abramoff was trying to take over

 9    his business.

10         And I ask you:  Who in his right mind would turn down a

11    hundred million dollars for his patents when he was just, as

12    Mr. Chou would tell it, running a business where he couldn't

13    keep the lights on?  What does that tell you about his ability,

14    his -- to use Dr. Armstrong's phrase, his mental flexibility,

15    his executive function?  What does that tell you about it?  He

16    turned down a hundred million dollars.

17         And you remember how frustrated Abramoff was because

18    Abramoff knew he was going to get in trouble over all this and

19    he wanted this way out so that investors, purchasers, could be

20    paid off.  And don't you think Abramoff is still a little angry

21    about Marcus about that, as are all of Abramoff's buddies?

22         So those were the three themes I highlighted, I think, in

23    my opening statement.  I think you saw all of them coming

24    through during the evidence, and I'll talk more about them as I

25    continue my argument.

1        But I added a new theme, which is that you got a large

2   quantity of proof from the Government but the quality was poor,

3   and that's because they thought, through this investigation,

4   that Marcus was no different than Brian Darrow, that he was

5   just a fraudster through and through.  They did not appreciate

6   that Marcus actually believed in his product, believed he could

7   carry this off and was trying really hard to do it and that

8   Marcus, in his own way, as Jack Abramoff would describe him,

9   was a sucker.

10       What's wrong with the quality of their proof?  This is

11  Chart Number 3.  I'm not going to spend much time on this now

12  because you'll kind of see it coming through during the

13  testimony.  But some of it was:  See no evil.  You had a lot of

14  people who were asked, "Huh, did you see it work?"  And they

15  would say, "No."  But nobody ever said, "Did you look?  Did you

16  test it?" like Erik Min did.  That was never asked.  Dozens of

17  people were asked questions like that.

18       And the classic example of that was Special Agent Quinn's

19  testimony.  Remember the Government wanted to make that big

20  point, "Oh, we had subpoenaed source code from Marcus and from

21  NAC Foundation" -- I guess the subpoena was just to

22  NAC Foundation -- "We had subpoenaed NAC Foundation for source

23  code," and they wanted you to think, "We never got any."  And

24  the way Special Agent Quinn described it when he testified --

25  and we can put up Chart 12 which, I think, has some of that --

1    when Special Agent Quinn was -- when Special Agent Quinn was

2    testifying and they asked him, you know, "Did you get any

3    source code," he said, "Not to my knowledge," or, "I haven't

4    seen any."

5        But nobody said to him, "Did you look?"  And the answer

6    turns out to be, no, he didn't look.  He just said, "I didn't

7    see any."  Because there were 13,000 pages of source code that

8    NAC had produced in response to the grand jury subpoena.

9        How do you miss 13,000 pages?  You miss 13,000 pages

10   because you assumed Marcus is guilty, he's Brian Darrow, he's

11   just a straight fraudster, and you miss what he was actually

12   trying to do in good faith.

13       And that's a theme that runs through the evidence in this

14   case.  Did they misjudge Marcus?  Absolutely.  And I think you

15   will -- I think you probably saw -- and maybe I'll be able to

16   point them out -- several examples of that both in the

17   Government's proof and in Mr. Chou's closing argument.

18       You'll see it in the proof most clearly like in the Panama

19   Canal, where they skipped over all the things that

20   Mr. De La Guardia was reporting that were the bases for what

21   the press releases that were issued were saying about what

22   happened in the Panama Canal.  They just skipped those.

23       And another example of that that I picked up in the

24   opening statement -- in the opening argument by Mr. Chou, he

25   was making it seem like Mr. Andrade, Marcus, was really running

1    the whole show.  Was that consistent with the evidence you

2    heard?

3        You remember, for example, when I was cross-examining

4    Jack Abramoff; and Carlos De La Guardia, like pretty much

5    everybody else who dealt with Marcus, was saying, "I question

6    his judgment.  He's not presenting well," all these criticisms

7    that De La Guardia had over -- about Marcus.

8        And I asked Abramoff [as read]:

9        **"QUESTION:**  And the point of this WhatsApp chain is that

10       Mr. De La Guardia was expressing concern about Marcus and

11       his judgment; correct?

12       **"ANSWER:**  Yes."

13       And I started to ask a question.  There was an objection.

14   The objection was overruled, and the question went [as read]:

15       **"QUESTION:**  And in response to Mr. De La Guardia

16       expressing concern about Marcus and his judgment, you said

17       to De La Guardia, 'Don't be concerned.  We need to move

18       forward.  Richard and I are taking over rapidly.'"

19       That's Abramoff.  He's a little tired of trying to pull

20   the strings on Marcus.  Marcus isn't doing it right.

21   Abramoff's going to take control.

22       That's what was really going on.  And that was just

23   another example of the Government skipping over what the

24   evidence actually showed, which is why I sort of, in a bit of

25   juvenile behavior, put Skippy Peanut Butter up on this slide.

 1        You saw that a little bit, again, in Mr. Chou's opening

 2   statement.  He put up Exhibit 751.  That was the one quoting

 3   Marcus saying, "We already have a lawsuit on the guy."  You

 4   remember the evidence about that?  The lawsuit was -- Marcus

 5   won that lawsuit.  The guy was wrong.  That's part of running a

 6   business.  People say things; they do things.  Sometimes you

 7   have to sue them.  And if you're right, what can possibly be

 8   wrong with doing that?  They won that litigation.  That's what

 9   the evidence showed.

10        And I think, just to keep things moving, I will move on

11   from the themes and get to Aten Coin where, in the Government's

12   view, this fraud supposedly begins.

13        The bottom line on Aten Coin, though, is that while it was

14   obviously not a success and those who bought the coins lost

15   their money, not every failure is a fraud.  Businesses fail all

16   the time.  And the Government failed to prove that Aten Coin

17   was a fraud.  They didn't come close.

18        Marcus built a functioning coin using a third-party ID

19   verification; and because he is not a fraudster, he was

20   checking to see how well the third-party verification worked.

21   And he, as part of that testing, figured out it wasn't working

22   as he wanted it to work.

23        So he stopped selling the coin, started over on the

24   biometric identification piece, and took it in-house with, as

25   you heard, what turned out to be CrossVerify in London.

1    And he offered all of the people who had Aten Coins the

2    opportunity to convert their Aten Coins into AML BitCoin

3    Tokens, no extra charge.  Just take your Aten Coins, turn them

4    into AML BitCoin Tokens, and ultimately into AML BitCoins.

5    That's not a fraud.  The Government's proof of fraud is

6    full of holes; and even the part that isn't the holes, it's

7    based on completely unreliable testimony, and I want to walk

8    through that with you.

9    Before I do, and I want to remind you, though -- and this

10   is Slide 29 which reflects the judge's Instruction Number 15 --

11   Aten Coin is not part of the charge in the indictment.  And

12   keep in mind that.  As the judge has told you, you are here

13   only to determine whether the defendant is guilty or not guilty

14   of the charges in the indictment.  The defendant is not on

15   trial for any conduct or offense not charged in the indictment.

16   You probably noticed how thin and jumping around the

17   Aten Coin evidence was.  Part of that is because the Government

18   never charged it as a crime.  They looked at it.  They didn't

19   charge it as a crime as you heard during the testimony; and as

20   a result, a whole lot of information was lost.  The internal

21   communications, the exact type of communications I was using

22   with Mr. Abramoff to show that he and Mr. Naimer were going to

23   run the whole business, take it over from Marcus, all of those

24   sorts of communications, those WhatsApp communications, they no

25   longer exist for the Aten Coin period.  You didn't see any of

1   them.  And that makes it much harder for us to defend those

2   charges and, I would say, for the Government to prove them.

3   But that's their problem, not ours.  And that's all because

4   the Government chose not to prosecute the case at the time.

5       One impact of the evidence being so thin is that you don't

6   know anything, at least, as I say, not in a reliable way, which

7   I'll talk about in a minute, about the people who are involved

8   in Aten Coin besides Marcus.  The way Mr. Chou describes

9   things, you would think this was some one-man Marcus Andrade

10  band.  Not so.

11      When you get the exhibits, I ask you to check Exhibit 672,

12  which lists nine people on the team around the end of

13  Aten Coin.  Two of them, whose names you've heard quite a bit

14  of, Sergey Petkevich, Terence Poon, were described by Brandi

15  Jodoin as partners of Marcus's.  And even that list leaves out

16  a number of really important players:  Bob Parsons, the guy who

17  hired Brian Darrow; and Mark D'Adamo also.

18      And I dwell on that for a moment because that was the

19  testimony by Brian Darrow himself.  He was hired by Bob

20  Parsons.  So Bob Parsons may have known that Brian Darrow was a

21  felon, but there's no evidence Marcus knew that.  And when

22  Mr. Chou said to you that Marcus hired Brian Darrow, that was

23  wrong.  Bob Parsons hired Brian Darrow.  Brian Darrow said so.

24      There was also a woman you heard about named -- and I'll

25  do my best; she's in Poland -- Agnieszka Cenzartowicz,

1    described by Brandi Jodoin in her testimony as the marketing

2    head for Aten Coin.  How much of the Aten Coin-related press

3    did she write?  Did Marcus review it and approve it?  You have

4    no real evidence about that other than from people -- possibly

5    from people who I'm going to tell you, and I think you will

6    agree with me, are completely unreliable.

7        And did you pick up on this, this small -- this small

8    little moment, but a very important moment?  Another person

9    involved in Aten Coin was Jack Abramoff.  You remember a small

10   moment in his cross-examination in which he admitted that he

11   told Marcus in January 2019 -- he tried to fight the date, but

12   eventually he conceded.  He said this in January 2019, that he

13   had worked intensely on the project for three years, which, if

14   my math is correct, would put him at least to January of 2016

15   in the midst of the Aten Coin period, and he said he was

16   intensely involved.

17       You may recall the Government mocked me about whether --

18   you know, they asked Brandi Jodoin four times:  Was Abramoff

19   involved?  Was Abramoff involved?  Was Abramoff involved?  Yes.

20   She didn't know, or so she said, but the answer, yes.

21       What did all those other people do?  What were they

22   responsible for as opposed to Marcus?  No evidence about that,

23   at least no reliable evidence.

24       The only people involved who the Government presented to

25   you were Brian Darrow and Brandi Jodoin.  So let me talk

 1    briefly about both of those.

 2        First, Brian Darrow.  Imagine someone comes to your front

 3    door or calls you on the phone and he says, "Hi.  I'm

 4    Brian Darrow.  For the last 25 years, I've been defrauding a

 5    lot of people out of a lot of money.  I got caught after one of

 6    my frauds, an $11 million fraud.  My take was 3-, 400,000

 7    dollars.  And before I went to jail for that, I defrauded a lot

 8    more people out of a lot more money.  But I joined what the FBI

 9    calls Team America and got half off the sentence in my first

10    case, and I got a free -- get-out-of-jail-free card for the

11    second case."

12        It's almost like I have to be making this stuff up but,

13    no, no.  That's exactly -- remember the recording, when they

14    went to Brian Darrow, when they searched his house and they

15    said -- you might have wondered:  How do they do this?  How do

16    they get people to cooperate?  They go and they say, "Hey,

17    you've done this before.  Why don't you join Team America and

18    help us get Marcus Andrade?"  That's it.

19        So he says, "Sure.  Sounds great to me."

20        But sorry for that little diversion.  Back to Brian Darrow

21    at your door or on the phone.  And he says, "After I got out of

22    jail for all that, I did it again.  Not once, not twice, this

23    time I did it three times -- Aten Coin, Javacoin, and

24    Evergreen -- many millions of dollars of fraud.  And this

25    time," he would tell you, "I got two get-out-of-jail free

1    cards.  I only got charged with one of these various frauds

2    because, of course, I, Brian Darrow, am a proud member of Team

3    America.  Now," says Brian Darrow to you, "let me tell you what

4    I want to sell you."

5        How many of you would listen to another word that man

6    would say?  I submit no one would listen to another word that

7    man would say.

8        And the fact that the Government brings him here into the

9    majesty of a federal courtroom and presents his testimony to

10   you like you should believe it, I don't think you should.  I

11   don't think you would in your everyday life, and I certainly

12   don't think you should when it comes to the kind of serious

13   decision you're asked to make in this case.

14       The only question I wonder about -- and this would be

15   Slide 10 -- is:  What are they going to do when he does it the

16   third time as a proud member of Team America?  Where do you go

17   from here?  Can you add him to Mount Rushmore?  Is that what

18   they're going to do for him the third time?

19       Okay.  That was Slide 10.

20       So -- and that's my thought about Brian Darrow.  If they

21   have something that proves something he says, okay.  Like

22   I think they did prove that at least on a couple of occasions,

23   he got a 40 percent commission.  Everything else he said, I

24   don't think you should believe a word of it.

25       Brandi Jodoin, not really any better.  You remember she's

the person who told the FBI that she won her litigation against
Marcus, and she won in the sense that Marcus ran out of money
and couldn't pay his lawyers.  But her claim against Marcus was
false, and the judge not only -- in the state case not only
ruled in Marcus's favor on summary judgment and said the
Jodoins were liable to Marcus, the judge also said that she
lied on five different occasions in that litigation.  She
falsely claimed reliance on valuations of the business.  She
said they -- the judge said they made -- she and her husband
made a false claim to the Alberta Securities Commission and --
I won't run through all of them, but one of the key ones for me
is the judge ruled that she falsely told FBI agents that she
had not seen the Aten Coin function when, in fact, she had done
so, having gone through the ID verification process to obtain
her digital wallet.  According to the Court, she knew the coin
functioned and she lied about it.

        And how did she deal with that?  She came into this
courtroom and told you that same lie right to your face,
another example of the prosecutors taking somebody's word for
Marcus being a fraudster and not really looking into it, not
really looking into what happened in the litigation in Nevada.

        And then sticking now with what she said to you, remember
she said several times during her testimony -- this is
Slide 11 -- she said several times during her testimony, "I
very much tried to always be ethical."  So I'm thinking of a

 1  Brandi Jodoin School of Ethics.

 2       And you remember she said that she told the FBI she had

 3  ethical concerns about the Aten Coin business after visiting

 4  the Las Vegas office in December of 2015?  And what did she do

 5  about those ethical concerns?  Well, she put on a conference in

 6  Edmonton, Alberta, and sold more than $90,000 of AML BitCoin

 7  and said that this bothered her because a lot of the buyers

 8  were old and didn't know what they were doing.  But she managed

 9  to overcome her ethical concerns and sold $90,000 of

10  AML BitCoin.

11       So having decided to at least tell you that there were

12  these old people who didn't understand things and she sold to

13  them anyway, she must have been racked with guilt; right?  Not

14  exactly, because the next thing she did was to make a video

15  extolling the virtues of AML BitCoin.  I think you saw a little

16  bit of that video.  That, she did the following month in early

17  February 2016.

18       And did her ethics kick in after the video?  Because she

19  was pretty convincing on the video that AML BitCoin worked --

20  I'm sorry -- that Aten Coin worked, which it did, except for,

21  it turns out, the third-party verification piece.  After she

22  persuasively explained in the video that it did work, she tried

23  to tell you that it didn't work, repeating the lie that she

24  made in state court in Nevada.

25       And after that, did her ethics kick in?  You remember what

 1  she did after that was she took a trip to Barbados paid for by

 2  Aten Coin.  That is the Brandi Jodoin School of Ethics.  How

 3  can you believe anything she says?

 4      Apart from being a proven liar, she also has a bias.  She

 5  lost a lot of money.  Holds Marcus responsible.  I'm not

 6  arguing that -- about any of the people who lost money.  We all

 7  should have sympathy for them.  They lost money.  That's bad.

 8  The judge will tell you, however, that sympathy is not

 9  something you should be considering in delivering your verdict.

10      I mention this just because she, like almost all the

11  witnesses in this case, has an axe to grind against Marcus; and

12  just to pluck one piece of her testimony that Mr. Chou

13  mentioned, Mr. Chou mentioned that she said Marcus edited

14  everything.

15      We went through, when I was cross-examining her, the draft

16  of the presentation that she made at the conference in

17  Edmonton.  There were a lot of edits on it.  They were all

18  hers.  She said Marcus told her to make those edits.  That's

19  just her word.  The written record says they're her edits.  How

20  can you trust anything she says, given what you know about her?

21      And as I mentioned, a lot -- in fact, almost all

22  the Government witnesses in this case are either purchasers --

23          **UNIDENTIFIED SPEAKER:**  Bingo.  Bingo.  Bingo.

24          **MR. SHEPARD:**  I'm sorry?

25          **THE COURT:**  I don't know where that came from.

1     **MR. SHEPARD:**  Okay.

2     **THE COURT:**  If anyone has any electronic device in the

3     courtroom, shut it off or the Court will own it.  Okay?

4          Go ahead, Mr. Shepard.

5     **MR. SHEPARD:**  Thank you, Your Honor.

6          The Government's witnesses almost entirely were purchasers

7     who lost their money, an understandable reason to be angry; or

8     people who say -- and, again, here, I'm not arguing with them

9     in any way -- that Marcus owes them a lot of money, like people

10    who work for him who say he didn't pay them, or the Government

11    witnesses are proven liars, or some combination of all of these

12    things.

13         And having done this maybe once or twice before,

14    the Government will typically respond as Mr. Chou already has:

15    Well, Mr. Andrade picked these terrible people like Dillman,

16    Abramoff, De La Guardia, Brian Darrow, Marcus picked those

17    people so he's stuck with them.

18         The problem is, in this case, that's not true.  In this

19    case -- and I'll get to this in a minute -- Abramoff came in

20    2017 and romanced Marcus for his own reasons, for Abramoff's

21    own reasons, because he wanted to use a digital cryptocurrency.

22    And Abramoff is the person who brought in Dillman.  He brought

23    in De La Guardia.  He brought in Brian Darling, the guy with

24    the paid articles.  That's all Abramoff.  Marcus didn't pick

25    those people.  Marcus was a sucker.  As we'll talk about in a

 1    little bit, Abramoff knew he was a sucker and took advantage of

 2    that.

 3         So was there anything fraudulent about Aten Coin?  No.

 4    Aten Coin was an unsuccessful business, but it was not

 5    fraudulent.

 6         The first claim that Aten Coin was fraudulent -- and this

 7    is something Mr. Chou mentioned earlier -- it had some oil

 8    component.  There was no evidence offered as to whether it did

 9    have an oil component or not other than Brandi Jodoin from the

10    School of Ethics saying that she never saw any oil proceeds.

11    It's sort of like pulling in a Special Agent Quinn.  She never

12    saw it.  Did she look?  Did she find out?  We'll get to some

13    more on that subject in a minute.

14         Mr. Chou made it sound like some Texas agency said the

15    statements that were being made were untrue, and that's not

16    what they said at all.  They were told, according to Brian

17    Darrow, cease and desist any conversations about oil derricks

18    and that the coin was associated with oil, which sounds a lot

19    like this:  Is there a security issue here?  And you're not

20    allowed to sell a security, so don't be talking about oil as

21    securing your coin because you're not allowed to do that unless

22    you've registered.  And so told, they stopped referring to the

23    oil part.  There's nothing fraudulent about that.

24         Then there's the question of whether there was a

25    functioning coin.  Here you have the "see no evil" testimony.

1   People would say, "I didn't see it working," except for several

2   people who did look, like Dr. Witte and Dr. Acuna.  Witte said

3   he did look.  He asked for help and, with that help, was able

4   to get through the ID verification process; and that until he

5   did, he couldn't get his coins in a wallet; but once he did,

6   things worked out.

7       The only person who actually checked about whether

8   Aten Coin worked was Erik Min, our expert, who said, "Yes, it

9   did work.  It was a functional coin."  And he also said that he

10  could have told you much more about it had it not been

11  ten years earlier.  Again, the Government didn't bring any

12  claims about it until it was too late to find all that data.

13      And, yes, there was a cross-examination of Mr. Min.  It

14  was rather bombastic -- I'll come back to that later -- but it

15  in no way questioned his ultimate result.

16      The third claim was that publicity issued about Aten Coin

17  was false, and that comes from the unreliable Brandi Jodoin and

18  from Brian Darrow.

19      And was the publicity even false?  Let me give you one

20  insight, one example.  This is one of the first documents

21  admitted.  It's Exhibit 1122, Slide 4.

22      Brandi Jodoin tried to convince you that Exhibit 1122 was

23  false.  This is the one it says [as read]:

24          "Aten Coin started the implementation of the

25      monitoring and detecting of suspicious activity

1      software that over 1,000 banks use to catch

2      suspicious activity in January 2015."

3          And that it was a member -- that Aten Coin was a member of

4    the U.S. Federal Reserve Faster Payment Task Force Committee.

5    Her husband, as part of his Aten Coin work, was part of that

6    committee so that part was definitely true.

7          She was asked by the Government [as read]:

8          "QUESTION:  Did you ever see a thousand banks use

9      Aten Coin?

10         "ANSWER:  No.

11         "QUESTION:  Did you ever see any banks use Aten Coin?

12         "ANSWER:  No."

13         But as I asked her to read what the post actually said,

14   she agreed it doesn't say any banks used Aten Coin; just that

15   they used the Patriot software that Aten Coin had started to

16   implement.  That was the point of that post.  The post was

17   completely accurate, as she agreed.

18         And throughout Aten Coin, Marcus was proceeding in good

19   faith.  At times even Brandi Jodoin acknowledged that.  She

20   said -- do you remember this? -- "Marcus really wanted to have

21   a way to verify our clients that was as unbeatable as the coin

22   was."  Marcus wanted it to work.  He was working hard to try to

23   make it work.

24         And, yes, there were purchasers who thought that they were

25   actually buying something that was completely 100 percent

 1   functional, including the third-party identification system.

 2   And, again, I have no argument with anybody who purchased and

 3   lost their money.  That's bad.

 4       But the question in this case is not whether purchasers

 5   lost their money.  When you look back at the elements of the

 6   offense of wire fraud, that's not one of them.  The real

 7   question here is:  What did Marcus intend, and was he

 8   proceeding in good faith?

 9       And you will see the purchase agreements that people like

10   Dr. Witte signed.  An example would be Exhibit 810 and another

11   example is Exhibit 231.  The purchase agreements said that

12   Marcus will create, that the company will create a compliant

13   digital currency.  That's what he was intending to do.  That's

14   what he wanted people to understand.  Maybe they didn't

15   understand that, but that's what was in his mind.

16       Exhibit 810 is Slide 22, and this is the language that I'm

17   referring to [as read]:

18           "NAC only guarantees that it will create that

19       digital currency."

20       And, you know, Theresa Chiu spent a lot of time -- that

21   was the Government's forensic accountant expert -- she spent a

22   lot of time summing up numbers.

23       You'll see Marcus was not taking a lot of money out of

24   Aten Coin.  He wound up taking a fair amount of money out of

25   AML BitCoin.  That's because he thought $50 million was coming

1    in.

2        You go back and look at Theresa Chiu's slides.  It's not

3    like he wasn't paying himself.  He certainly was.  But in terms

4    of this millions of dollars stuff that's thrown around about

5    AML BitCoin, which I say only happened because he thought

6    $50 million was coming in, you don't see that in Aten Coin.

7        So there's this hazy, incomplete --

8            **UNIDENTIFIED SPEAKER:**  Testing.  Testing.  Testing.

9            **THE COURT:**  There's something strange going on.

10       Well, why don't we go ahead and take a break, and then

11   we'll investigate what's going on, and we'll hopefully rectify

12   it.

13       We might as well -- are you ready for the lunch break,

14   members of the jury?  Yeah?  It's okay.

15       Why don't we go ahead and take a lunch break, and we'll

16   plan to start up at 12:30.  In the meantime, we'll investigate

17   what this problem is.

18        (Luncheon recess was taken at 11:41 a.m.)

19   <u>**Afternoon Session**</u>                                    <u>**12:35 p.m.**</u>

20        (Proceedings were heard out of the presence of the jury.)

21           **THE COURT:**  Are we ready?

22           **MR. SHEPARD:**  Yes.

23           **THE COURT:**  Okay.

24        (Proceedings were heard in the presence of the jury.)

25           **THE COURT:**  The jury is present.

1    I think we figured out the mystery.  They were doing some

2    work in one of my colleague's courtrooms, and that's what

3    happened, but I think it's all rectified and we won't be

4    disturbed again.

5        All right.  Mr. Shepard.

6        **MR. SHEPARD:**  Thank you, Your Honor.  I'm glad to hear

7    it wasn't just crazy voices in my head.

8                        (Laughter.)

9        **MR. SHEPARD:**  So finishing up with Aten Coin, hazy,

10   incomplete mass of evidence that ultimately shows nothing more.

11   Marcus built a complete product.  It wasn't a success.  He

12   identified a problem, he went about to fix it.

13       I said next I was going to talk about how Jack Abramoff

14   said he got reinvolved in 2017, the lead-up to AML BitCoin.

15   Let's talk about that.  I think it tells you a few important

16   things.

17       Number one, Abramoff was not there to help Marcus.  He was

18   not there to do Marcus's bidding.  He was not there to be a

19   co-schemer.  He had his own interests, and that's what he was

20   pursuing.  Second, advancing AML BitCoin was not as high on his

21   list as a number of other things; and, third, neither is

22   telling the truth.

23       Abramoff told a story about how he reengaged with Marcus

24   after he talked to his son Alex.  You know that story is false.

25   You know that for several reasons.  Number one, it contradicted

1    what he told the FBI.  He told the FBI that Alex had told him

2    that Aten Coin had traded at $80 and that's why he decided to

3    go reengage with Marcus.

4        On the stand in this case, he said Marcus told him about

5    the $80 that Aten Coin was trading at and how could his son

6    have possibly known; but his son, he already had said, was on

7    the phone always checking the cryptocurrencies.  So he could

8    have known.  And, in any event, that's what Abramoff told the

9    FBI first, that his son Alex had clued him into that.

10       There's another reason you know he's lying, and that is

11   his admission on cross-examination that in January 2019, the

12   one I mentioned earlier, he told Marcus that he'd been working

13   intensely with Marcus for the past three years.  So there was

14   no big reconnect as Abramoff described it in his testimony, but

15   what there was was Abramoff romancing Marcus so that Marcus

16   would do an ICO.

17       Remember all the romancing that went on.  This is,

18   I think, Slide 6.  He's going to make him a TV show about

19   AML BitCoin.  He's going to make him introductions to the *Duck*

20   *Dynasty* guy, to Randy Jackson, maybe even to Jackie Chan.  He

21   takes him to Beverly Hills.  Anybody old enough to remember the

22   *Beverly Hillbillies*?  Okay.  A little image there.  He takes

23   him to Beverly Hills.  He brings John Bryan as a prop with John

24   Bryan's red Ferrari.  He says, "We're going to change the

25   world, my dear friend, Marcus.  We're going to change the

1    world."

2         And he tells him, "You know, buy a mansion."  And this is

3    Slide 5.  Marcus liked a hat Abramoff was wearing, and Abramoff

4    says -- and Marcus talks about buying the hat after the ICO;

5    and Abramoff tells him, "Not a hat.  Go get a mansion after the

6    ICO."

7         That's the nature of the relationship that they had.  It

8    was a bum's rush.  Marcus looked up to him.

9         And, of course, at this point, the coin isn't really

10   ready, but Abramoff wants it to be ready because he's in the

11   middle of what appears to be a real money laundering business,

12   unlike what the Government has charged Marcus with.  He's not

13   involving his local bank taking a photo of him.  He's involving

14   people in Angola where a cryptocurrency would be useful.

15        Remember on my cross-examination of Abramoff that

16   crazy-sounding billion-dollar deal involving people in Angola?

17   And do you remember what he said when I confronted him with

18   that?  "Hah, I don't remember that."  The billion-dollar deal

19   he forgot completely?  Because there's so many billion-dollar

20   deals going around in the world, it's really easy to forget

21   them.

22        He was not a co-schemer with Marcus.  He was romancing

23   Marcus and using Marcus and AML BitCoin for his own purposes.

24        And one of his purposes was he was employing his buddies

25   so he could pay his buddies, De La Guardia, Darling, all these

1  other guys.  Those were his guys.  But, you know, Abramoff,

2  he's on Team America, so he can do it.  He can get away with

3  it.

4      You heard a number of times how Marcus looked up to him,

5  considered him a partner, trusted him.  Told him at one

6  point -- he told Abramoff at one point, "Your kids are so lucky

7  to have you as a father."  He trusted him.  He worshiped him.

8  He was taken in, and that proved to be a big mistake.  And it's

9  not just me saying he was taken in.  You know, Abramoff is the

10 guy who keeps talking about Marcus as a sucker.

11     Brief diversion to say, should you believe anything

12 Abramoff said on the witness stand?  No, no, a thousand times,

13 no, unless it was something that he didn't think it was in his

14 interest, like things he would say on cross-examination.

15     Consider him like Brian Darrow on steroids, only much more

16 clever and convincing.  When Brian Darrow wants a different

17 name, he just drops the "W" off the end of his last name.  When

18 Abramoff wants to hide what he's doing, he's -- all of a sudden

19 he's is a Steve Stephens.  Remember that?  I started asking him

20 about some WhatsApps that were in the same Steve Stephens, and

21 at first he says, "No, that's not me.  Oh, wait a minute.  It's

22 my phone number and, yeah, this is exactly what I was talking

23 about at the time.  So, yeah, that is me, Steve Stephens."

24     And I won't run through all the things I ran through on

25 cross-examination because you seem all very attentive and I'm

1    sure you heard them.  But some of the things that most strike

2    me is after he gets out of jail the first time, he writes a

3    book, declares he had an epiphany in prison and decided that

4    "In order to move myself closer to the angels, I would take

5    what happened in my life, try to learn from it, and educate

6    others."  It lasted as long as a few book sales, I guess.  But

7    he was able to take people in with that, Marcus among them.

8        One of the other things that really struck a chord for me

9    is he told you he was giving information to the FBI.  And why

10   was he doing that?  His duty as a citizen to try to prevent

11   problems while he's committing crimes himself and not telling

12   them.  So much for that duty, huh?

13       And I don't need to remind you about all the other frauds

14   that he admitted with the Native American tribes, with banks.

15   He's very good at fooling people.  He fooled his own Rabbis and

16   so many times that he couldn't even remember that he'd done it.

17   He fooled the sentencing judge in his case in Washington, D.C.

18   They all thought he'd never do this again.  Enough.

19       Clues in his case.  Remember, I'm no Perry Mason.  There's

20   no *Law & Order*, guy confesses on the stand.  But he

21   contradicted himself about Aten Coin trading at $80 and how he

22   learned it.  He made up a story about how he reconnected --

23   supposedly reconnected with Marcus.

24       He told you that Marcus was lying and exaggerating when at

25   the time all these events occurred, he's constantly talking

1    about Marcus with his friends De La Guardia, Naimer, et cetera.

2    He never says Marcus is untruthful.  He just says Marcus

3    doesn't understand what's going on, and he says that in

4    multiple different ways that you heard about.

5        He didn't even say to the FBI that Marcus had been lying.

6    He just eventually gets around to that.  What he instead was

7    saying consistently is that Marcus was disconnected with

8    reality.

9        Remember on the $50 million coming in from Dillman, that

10   Marcus believed was coming in from Dillman?  And Abramoff

11   recognized he believed it was coming in, because Abramoff at

12   the time said to Naimer, "Hope he is flying close to the earth

13   on this one."  Again, a reflection that Abramoff knows Marcus

14   does not necessarily get what's going on, and Abramoff was

15   taking advantage of him for doing that.

16       And even Abramoff, you know, when Marcus turned down

17   $100 million, Abramoff attributed that to his misperceptions

18   and his paranoia, which is a good insight into the workings of

19   Marcus's mind.

20       One other sort of blatant contradiction to me in

21   Abramoff's testimony was his claim that the Super Bowl was a

22   rejection campaign from the start.  I'm going to get to the

23   Super Bowl in a minute.  It was not a rejection campaign from

24   the start, and Abramoff had previously told the FBI that he

25   didn't remember whether it was a rejection campaign from the

 1   start.  But when he came to you, all of a sudden it's a

 2   rejection campaign from the start.

 3       And you remember what he said about that when I confronted

 4   him with what he had previously said to the FBI?  He said,

 5   "Well, the FBI talked to me about it.  I went back and looked

 6   at some things, and I changed my recollection."  I'm going to

 7   show you, as we talk about the Super Bowl, he was right the

 8   first time.  It was a rejection campaign from the start.

 9       And he and Naimer were talking about the Super Bowl

10   campaign even back in December, long before John Bryan

11   suggested a rejection campaign.  That's what they were talking

12   about when they were talking about Marcus thinking that the ad

13   had already run and the ICO had already sold for a million

14   dollars, again, underscoring that Marcus doesn't understand

15   what's going on.  They were talking about that in December,

16   long before -- so they were talking about running the ad long

17   before anybody talked about a rejection campaign.

18       And you'll see, as we get through it in the Super Bowl, he

19   was still trying to raise money and run the ad almost right up

20   to the end.

21       Why is he continuing to lie?  I wish I could tell you.  It

22   seems to be his nature.  He keeps getting sweetheart deals for

23   doing it.  He got an incredible sweetheart deal in this case

24   for the reasons I described on cross-examination and won't --

25   you know, I won't keep us talking about it again.

1      And he keeps lying because he does not want to go back to

2  jail, and only the Government can unlock for him the sentencing

3  guidelines so that he can get a departure from the sentencing

4  guidelines.  Only the Government can do that.  That's why he's

5  continuing to lie.

6      Let me give you one final perspective on Abramoff.  You

7  recall the end of my cross-examination, Abramoff admitted

8  telling the FBI a bunch of things when they came to search his

9  house in September of 2018, a bunch of things that are

10  exculpatory, that is, helpful to Marcus's defense.  Like he

11  said, "AML BitCoin is not a scam."  He said he saw a

12  demonstration model of the biometric ID system with facial and

13  thumbprint identification.  He said, "The company has real

14  engineers.  It has extremely sophisticated technology."  He

15  talked about real dealings with the London Stock Exchange.  He

16  talked about Marcus being angry at Dillman for sending out

17  material without getting it approved.  And he said Dillman was

18  a liar.  This is what he said to the FBI in 2018, Dillman was a

19  liar.  He never said the same thing about Marcus.

20      So I wonder if you were sitting there thinking:  Okay.

21  How's the Government going to deal with that?  Are they going

22  to say he was lying then or he's lying now?  What?  What's

23  the Government going to do with that?

24      The answer, if you remember, nothing.  They asked him some

25  questions on redirect.  They didn't ask him any questions about

1    that at all.

2        Is it that they didn't trust him because they hadn't

3    scripted him yet?  Who knows?  All we know is they didn't want

4    to go near him on that subject.  They didn't want to hear what

5    he had to say.

6        In light of that record, you cannot trust Abramoff on

7    anything.  Just like Brian Darrow, if somebody with that

8    history came to you to try to sell you something, you would

9    say, "No, thank you," and I urge you to do the same with

10    Abramoff.

11        Okay.  That gets me to the three main pieces of

12    the Government's case, starting with the Panama Canal.  The

13    central event of the Panama Canal is the press release that in

14    the eyes of the Panama Canal Authority went too far.  And if

15    there is a villain behind that, if that was more than a

16    misunderstanding, which it may well have been, it is either

17    Abramoff or De La Guardia.  It is not Marcus.

18        Based on what Marcus was told, the press release that

19    triggered that response, as well as any other press he had any

20    knowledge or participation in, seemed reasonable.

21        Remember how this went with the direct examination of

22    Carlos De La Guardia?  It was a really interesting direct

23    examination.  They established Abramoff sent Carlos

24    De La Guardia the draft press release about the Canal.

25    De La Guardia then told you that draft press release was

1  misleading.  They then show him the actual press release that

2  was issued, and he says that too was misleading and that

3  the Canal was furious after the press release.

4       And then we got this:  Oh, whoa, Carlos, so sad for you.

5  This harmed him.  It affected his reputation.  It affected his

6  standing terribly, and his credibility went down to the floor.

7  They presented him as a victim.  Pass the Kleenex for Carlos

8  De La Guardia.

9       That's not at all what happened.  This was an example of

10 Skippy again.  What the Government skipped over completely --

11 they did in his testimony, they did it again this morning --

12 they skipped over completely that Carlos De La Guardia had

13 carefully, very, very carefully edited that draft press

14 release.  He fixed his name a number of times.  This is

15 Slide 23.  He fixed his name -- hopefully, we'll see -- he

16 fixed his name a number of times.  He added a phrase.  He took

17 out a line.  And he did not correct or edit any of the

18 statements about having engaged in communications with senior

19 Canal officials.  He was saying he had engaged in those

20 communications.  He left that in the press release.  He did not

21 take it out.

22       So when he said the press release was a misrepresentation,

23 it was his misrepresentation aided by Abramoff, not by Marcus,

24 who is not part of that text chain at all.  Marcus received,

25 but did not respond to, Exhibit 1513, which was before the text

 1  chain.  And Abramoff let him know that he was waiting for word

 2  from Carlos De La Guardia if they could move forward.

 3      If Marcus had read the whole thing, he might have seen

 4  something from De La Guardia about the Canal; he might have

 5  seen bullish language from De La Guardia about the Canal in

 6  Exhibit 1513, that he had, in fact, been in conversations with

 7  the president of the board of directors and Minister of the

 8  Panama Canal, Roberto Roy, about implementing an e-payment

 9  process.

10      If he got all the way to the second page, he might have

11  seen some puzzling language about the ideas to have an excuse

12  to publish their names; but other than Abramoff's word, there

13  is nothing to suggest that Marcus had been clued in on any of

14  the back discussions back and forth between Abramoff and Carlos

15  De La Guardia about generating publicity on this subject.

16      They had been discussing creating some news, some noise,

17  and the key is PR; but that set of communications between

18  De La Guardia and Abramoff had not been sent to Marcus.  What

19  Marcus was getting was the bullish statements from Carlos

20  De La Guardia about how he was connecting with important people

21  at the Panama Canal.

22      And you can tell that Marcus was not clued in on any of

23  that because of the way that Carlos De La Guardia apologizes to

24  him after the fact in Exhibit 1514 [as read]:

25          "I took a risk.  I assume responsibility."

 1          The Government suggested that after this, they shouldn't

 2     have continued to allow publication of articles about their

 3     dealings with the Canal; but far from telling Marcus that his

 4     credibility was down at the floor, the communications that

 5     Carlos De La Guardia was making after the Canal expressed their

 6     disagreement with the press release were bullish about

 7     continued progress with the Canal, at least for a while,

 8     essentially saying that the release was accurate and the Canal

 9     was being hypertechnical about it.

10          You'll see that -- I won't put them up here, but you'll

11     see that in Exhibit 10.  You'll see it in Exhibit 11.  And he

12     was saying not that this was some PR stunt, but that the Canal

13     prefers we publish news after we have concrete results from his

14     meetings.  And at least for a period of time there when the

15     press was going out, he was talking about setting up those

16     meetings so that they could have those conversations.

17          Marcus had been in Panama earlier in September.  He met --

18     he had two meetings on the same day.  In the morning he met

19     with Morgan & Morgan, this law firm that's like apparently the

20     most important law firm in Central America, and also with the

21     Panama Maritime Authority.  The Panama Maritime Authority is

22     important because they're in charge of, among other things, the

23     ship registry, and they were the people described by Carlos

24     De La Guardia as the best way to get into the Canal.

25          In part of his testimony to you cited this morning by

1   Mr. Chou, De La Guardia said the meeting with the PMA, the
2   Panama Maritime Authority, was not a good meeting and he
3   claimed that Marcus had also said so.  But that was false, and
4   De La Guardia couldn't even keep his story straight on the
5   stand.  One way you know it is false is that at the time he
6   told Abramoff -- and this is Exhibit 884 -- he told Abramoff,
7   "Everything went well today and things are going great."
8   That's what he told Abramoff after those meetings.
9       And even when he was testifying to you a few minutes after
10  he said, "Ah, that meeting was no good," this is what he said.
11  He said [as read]:
12          "The people we presented, especially
13      Morgan & Morgan, but the people we presented, they
14      were interested."
15  He couldn't even keep his new story straight.  And as you
16  heard from both Abramoff and Carlos De La Guardia afterwards,
17  the Panama Maritime Authority continued to be interested with
18  meetings and discussions continuing into the summer of 2018.
19      Recall that in June 2018, Carlos De La Guardia told
20  Abramoff that he had spoken with Morgan & Morgan.  This is like
21  many months later.  He told Abramoff he had spoken to
22  Morgan & Morgan, and they all agreed that this is what Panama
23  registry needs and that they presented the idea to the PMA and
24  they loved it.
25      So the notion that they weren't getting anywhere with the

1    Panama Canal, that's something he came up with on the stand to

2    help his friend Abramoff or because the FBI encouraged him.  I

3    don't know.  I got know -- I just know it is contradicted by

4    what he said at the time and contradicted by what he said even

5    on the witness stand later.

6        The Government put up some other press releases, some of

7    which seemed true, like Exhibit 518.  Some may go a little too

8    far, like Exhibit 530.  But although they announce that Marcus

9    was responsible for them, they didn't actually provide any

10   evidence of that.  Did you see, did Marcus approve any of those

11   other than possibly something Abramoff might have said?  Not

12   written down.  Didn't see anything.

13       Maybe they attribute that to Melissa Foteh saying Marcus

14   was responsible for things.  You remember Melissa Foteh.  I

15   remember her because I've been doing this a while.  I've never

16   seen a witness come in shades for their testimony.  And

17   remember, she's the one who would say all kinds of crazy stuff,

18   and she says all kinds of crazy stuff to get what she wants.

19   And she was unhappy.  The Government winds up having -- reading

20   her her grand jury testimony, but her grand jury testimony was

21   given after she had a falling out with Marcus.  So you cannot

22   believe her grand jury testimony any more than you can believe

23   whatever it was that she was trying to communicate to you when

24   she was on the witness stand.

25       You know, she's the one who said she was being stalked by

1    the FBI, that -- and it's good to see that they're all back

2    here in the courtroom and they've left her alone.  Sorry.  I'm

3    just kidding about that.  But, you know, you cannot rely on

4    anything that she says.

5        Continued work in Panama, proceeding in good faith, again,

6    ineptly, though.  Remember, they do have another set of

7    meetings in December.  Abramoff says Marcus did a dreadful job

8    presenting to Morgan & Morgan, but Morgan & Morgan was still

9    interested in the possibility of working with the government of

10   Panama to adopt AML BitCoin.

11       So Marcus was getting a rosy picture from Carlos

12   De La Guardia.  Was it true?  Not true?  It doesn't really

13   matter.  Marcus relied on the rosy picture he was getting from

14   Carlos De La Guardia, including about progress with the Canal,

15   and that's why Marcus was proceeding in good faith.

16       The Government put up one this morning, Exhibit 8

17   [as read]:

18            "On track to partner with the Panama Canal."

19       That's kind of what Carlos De La Guardia was saying for a

20   while at least.  He changes his tune at various times; but for

21   a while, that's what he was saying.

22       Port of San Francisco.  This one comes in two parts.

23   There's an article written in 2017 and a proposed press release

24   in 2018.

25       Marcus is not guilty of anything relating to the first

 1    one; and although we are not required to prove anything,

 2    I think we actually may have proved him innocent on the second

 3    one.

 4         The first one is one of those articles that Abramoff

 5    arranged.  Abramoff sends drafts to Marcus, but Marcus does not

 6    comment on them or respond approval; but regardless, he had

 7    good reason to believe they were accurate.  He had good reason

 8    to believe they were accurate because Dillman had many meetings

 9    with Katz, Leslie Katz, who's the Port commissioner who was

10    quoted in the article.  Marcus was present for a few of them.

11    Remember that Dillman and Katz had a relationship in that Katz

12    was Dillman's lawyer.  So most of the dealings on behalf of

13    AML BitCoin with Katz were done by Dillman.

14         And in one of the meetings where Marcus was present, Katz

15    recalled discussing the possibility of proposing -- and

16    remember she first pushed back on that word but ultimately

17    agreed -- she was discussing the possibility of proposing the

18    AML BitCoin technology to the Port.

19         So Marcus had good reason to believe that he had a chance

20    to do business with the Port, that the Port was considering it.

21    And she also said she thought there may be opportunities there.

22         And remember, she had already -- at a meeting of the Board

23    of the Port Commissioners in the fall of 2017, she had already

24    made a request that the staff inquire into the use of

25    cryptocurrency.

1    So Marcus had good reason to believe that the thrust of

2    the article, the Port's interest in cryptocurrency and in

3    AML BitCoin was accurate.

4    As for the quotes and other statements, those were put

5    together by Dillman.  And as Marcus understood -- and you'll

6    see that reflected in Exhibit 115 -- Marcus understood Dillman

7    had discussed the accuracy of those quotes with Katz after

8    Marcus, Dillman, and Katz had met together.

9    Just as he had presented to Marcus the one general

10   quotation attributed to him, Dillman had written the whole

11   thing, and Marcus understood, reasonably, that he had talked

12   about it with Katz.

13   And one other way you know that that wasn't unreasonable

14   is that Katz continued to deal with Dillman; that is, it wasn't

15   like she said, "You wrote that thing that ended up in the

16   newspaper and I wash my hands of you."  She was just continuing

17   to deal with Dillman.

18   This morning the Government put up Exhibit 14 where Marcus

19   says, "Please handle.  This is important."  After there is bad

20   publicity about the earlier newspaper article, Marcus says,

21   "Please handle.  This is very important."

22   Of course he did.  He sent that to Dillman, of course,

23   because Dillman is the one who had drafted the article and

24   talked to Katz.  So of course he goes to Dillman and says,

25   "Hey, you know, follow up on this."  If there was any wrong

1    there, it was Dillman.  Unclear to me exactly how that

2    occurred.

3         On to Part 2.  This is the time that they actually have a

4    meeting with the Port in late April of 2018, and they prepare a

5    draft press release afterwards.

6         And you got the Port's perspective on this.  You remember

7    that really nice gentleman Mr. Rhett who had retired but who

8    had attended the meeting?  And he said this was just a courtesy

9    meeting, although, of course, he didn't say that to Marcus.

10        Mr. Chou said the meeting lasted only half an hour.  That

11   may well have been Rhett's recollection.  Katz's was half an

12   hour to an hour.

13        Naimer was the main presenter at the meeting, according to

14   Katz.  He was the one who had come from across the Atlantic to

15   make what he hoped was a compelling presentation.  Katz agreed

16   that the meeting was not just educational, but also was an

17   effort to make the Port interested in using AML BitCoin

18   technology.

19        It turns out -- and those of us who live in San Francisco

20   can appreciate this -- the Port isn't really much of a Port

21   anymore.  It's more a landlord because all these places on the

22   waterfront that used to be Port facilities are now, like,

23   amusement facilities instead.  And so they weren't, it turned

24   out, all that interested, and so the meeting seemed to have

25   pivoted to other possible uses where the Port could be of

1    assistance to AML BitCoin.

2        And Naimer wrote up a summary of the meeting, talking

3    about those potential uses that were discussed at the meeting.

4    That's Exhibit 2987.

5        And you may recall, when I offered that document during

6    Abramoff's testimony, people said, "Wow, that looks familiar."

7    That's because Abramoff used Naimer's memo to draft a press

8    release, which was Exhibit 3109.  And that's the one that

9    Marcus said to Dillman, "Get Leslie Katz' approval before this

10   goes out.  Make sure she's okay with it."  She was not.

11       And that's the one where Marcus then says [as read]:

12           "My apologies" -- this is Exhibit 3109.

13       [As read]:

14           "My apologies.  Obviously, I didn't write it.

15       There's no way I would allow anything to go out

16       without your prior approval."

17       He was proceeding in good faith.  He had seen some

18   problems in the past.  He was trying to do it right.  He

19   apologized.  It did not go out.  I think he's innocent of that.

20       The use cases were, in fact, the use cases that Mr. Naimer

21   had described.  Leslie Katz didn't approve of them.  Marcus

22   said, "Fine.  Don't send out the release."

23       The Super Bowl.  The Government says this marketing effort

24   is a fraud because it led people to believe that the company

25   had the money to pay for a Super Bowl ad, and I think Ben Boyer

 1  said that he was misled on that basis.

 2      Okay.  Marcus was not a part of any effort to mislead

 3  anyone about whether the company had the money to pay for a

 4  Super Bowl ad.  For one thing, he believed the company would

 5  have the money to pay for a Super Bowl ad.  And I'll talk about

 6  that a little more in a minute.  And, in addition, at least

 7  initially, it's quite clear that the concept of a rejection

 8  campaign was hidden from him and he believed that the company

 9  was making an effort to run the ad.

10      Eventually, it became more likely that the ad would not be

11  run; and the evidence suggests that at some point along the

12  way, he was clued into the fact that if NBC rejected it or the

13  NFL rejected it, that they should do a rejection campaign but

14  they should keep that quiet.  And he went along with that,

15  thinking they were going to try to get the ad placed and that

16  they had the money to do so.

17      So he wasn't trying to trick or deceive anyone.  He was

18  thinking:  Let's get this ad presented.  Let's get it

19  submitted.  Let's get it run on the Super Bowl.  And if we

20  can't, then we can do a rejection campaign.

21      Now, I don't think there's anything wrong with that.

22  Remember, the key question here is Marcus's intent.  There's

23  nothing about, in the elements of the offense, whether Boyer is

24  fooled.  The question is:  Was Marcus intending to deceive or

25  cheat people by trying to get a Super Bowl ad placed and, if it

 1   wasn't run, by then trying to get publicity out of that anyway?

 2       Marcus had plenty of reason to believe the company would

 3   be able to pay for a Super Bowl ad.  For one thing, remember,

 4   this is in January of 2018, right after Dillman had ordered

 5   $50 million of AML BitCoin, plenty of money to pay for the ad,

 6   plenty of money to pay for the technology, plenty of money to

 7   pay for a whole lot of things.

 8       In addition to the Dillman money, there was other

 9   fundraising going on to have separate and additional funds to

10   pay for the ad.  There was a deal with a man named Allan

11   Migdall arranged by John Bryan.  You'll see it in Exhibit 2106.

12   It almost got across the finish line.  According to Bryan, not

13   quite.

14       Even easier is the fact that Bryan, John Bryan, said that

15   Group M, a big reputable company, would barter the transaction,

16   that they did so commonly, and that meant that Group M would

17   pay NBC in cash and get paid in tokens, in AML BitCoin Tokens,

18   in order to do so.  Very easy way to have paid for the ad that

19   Marcus reasonably understood and that John Bryan was saying

20   could be done.

21       What happens after that is more hazy, and the Government's

22   proof -- this is another Skippy -- the Government's proof

23   skipped over some of the critical communications.

24       Contrary to Abramoff's testimony, at least the version he

25   gave after talking to the FBI about it, this started as an

1    effort to run the ad.  That's what Abramoff's very close friend

2    John Bryan said on direct examination.  He said, "They came to

3    me" -- or I believe it was originally "Jack came to me and said

4    they had decided to purchase a Super Bowl commercial."

5    Abramoff said they had decided to purchase a Super Bowl

6    commercial, not a rejection campaign from the start.

7        And Bryan told you that after that, he reached out to Chet

8    Fenster to bring the ad to NBC.  He prepares a draft proposal.

9    He sends it to Fenster.  That's Exhibit 1459.  It's a

10   legitimate proposal, what it should look like.  It's not a

11   rejection campaign.  And he testified that the plan was to

12   negotiate with NBC over the next week and have them run the ad.

13       And Abramoff was still hoping to run the ad as late as

14   January 26, 2018, about a week before the Super Bowl.  He was

15   telling his pal Brian Darling that he was running the ad and

16   that he had Dillman raising money for it so that they could run

17   it.

18       Not a rejection campaign from the start, a continued

19   effort to actually get the ad run.  And that it started out for

20   real and continued as an effort to try to get the ad run is

21   really important because you can infer that it was described

22   that way to Marcus, who was paying for the filming of the ad.

23       But what happens next is that the day after Bryan sends

24   the legit proposal to Fenster, Bryan emails Abramoff and offers

25   the idea of a rejection campaign.  That's Exhibit 435.  Marcus

1    is not copied.

2        It looks from their text communications that Bryan and

3    Abramoff then have a telephone call -- again, no Marcus --

4    after which they text each other.  That's Exhibit 897 and

5    that's Slide 14.

6        Some of it is a little inside communication, but Abramoff

7    says, and that's the part that we've blown up [as read]:

8            "Maybe you can write it up in a way that says in

9        the event NBC rejects the ad and this is the plan.

10       If you write it up the other way, he may not

11       understand and reject it."

12       I think reject it out of hand.  That's what he's saying.

13   I read that to mean write it up so that NBC will -- write it up

14   so that in the event NBC rejects the ad, then we could do a

15   rejection campaign.  If you write it up the other way, that

16   we're doing a rejection campaign straight out, he may not

17   understand and reject it out of hand.

18       Who's the "he"?  Well, they ask Bryan who Abramoff meant

19   by "he"; but since only Abramoff would know who he meant, an

20   objection was sustained, and that was it.

21       When Abramoff got on the witness stand, they did not ask

22   him about this.  They did not say, "Who was the "he"?  I think

23   it's pretty clear the "he" was Marcus and they were hiding the

24   rejection campaign from Marcus.

25       I can only guess they would say, "Well, maybe it was

 1    Fenster they were hiding it from," but Abramoff knew that the
 2    rejection campaign was Fenster's idea.  That was clear from
 3    Bryan's testimony.  And Bryan said he was honest with Fenster.
 4    So it's not Fenster and it's not -- I can't imagine who else it
 5    could be.  It's Marcus.  They're hiding the rejection campaign
 6    from Marcus so it can get approved.

 7        And eventually Marcus does understand that if they don't
 8    get the ad approved, they are going to try to get some free
 9    publicity out of it and that it's probably not a good idea to
10    have told a bunch of people that was at all part of their plan.
11    So he goes along with that and he doesn't share with others
12    that that is part of the plan; but as far as he's concerned,
13    it's just part of the plan.  The real plan is to try to get the
14    ad run, and they're continuing to raise money to do so.

15        The only thing -- and this is just sort of an example of
16    ships passing in the night kind of evidence and the poor
17    quality of the Government's proof.  I think the only evidence
18    they had other than from Abramoff in talking about the
19    rejection campaign was this question and answer to John Bryan
20    talking about the rejection campaign [as read]:
21        ▪**QUESTION:**  Did you discuss this directly with
22        Mr. Andrade?
23        ▪**ANSWER:**  I was on conference calls and it was discussed."
24        What exactly was discussed, given the nuances of all this?
25    That the rejection campaign was Plan B in case the ad didn't

get accepted?  Who knows because they didn't present you with
the proof as they're required to do.

At one point the Government showed Exhibit 1064, which
they tried to say meant that Marcus wasn't complaining -- that
Marcus was complaining that the ad wasn't insulting enough to
get rejected.  I don't think you can read it that way at all.
I mean, I suppose you could, but I think what Marcus is really
saying is he doesn't think there's enough criticism in there to
make it go viral, that it's not nasty enough to go viral.

And since the whole point of the ad and paying for the ad
and getting it run is to get it to go viral, to me that's a
good illustration of Marcus poorly reading things, because that
ad was pretty outrageous and insulting.  So Marcus is wrong
that it wouldn't have generated a lot of criticism, but that's
what he was writing.

So your sole source of information here is Abramoff and,
to that limited extent that I noted, John Bryan.  And I won't
spend a lot of time talking about John Bryan.  You probably
remember him.  But he's another person who demonstrated on the
witness stand that he cannot be believed.

Remember he said, "Abramoff, one of my closest friends,"
and then he explained how he lied for Abramoff on at least two
occasions, and then he explained how, even though Abramoff was
one of his closest friends, he lied to Abramoff on a number of
occasions.  We tipped him off about a call center in the

1  Philippines; and when I asked him if that was the only lie, he

2  said, "I'm sure it wasn't."  And it turned out he was right

3  about that at least.  There were a number of other lies.

4       He lied about claiming credit for market making when he

5  wasn't really doing it.  He lied about self-trading.  And then

6  he was giving you these miserable excuses for his lies.

7  Remember, he's the guy who even though he had written these

8  words, decided that he had no idea what the phrase "bait in the

9  water" meant.  That was -- that was John Bryan.  He's not

10 worthy of belief.

11      He told the FBI he falsely told Abramoff that all the

12 visible trading was due to Project Sunshine.  That's what he

13 told the FBI.  And then he denied to you that his statement to

14 Abramoff was false.  Either he lied to you or he lied to the

15 FBI, one or the other.

16      So the evidence that you have does not tell a full, clear

17 story.  The only witnesses that you heard from cannot be

18 trusted.  What you're left with is a very mixed bag that gives

19 you no clear idea what Marcus was told, when he was told about

20 the rejection campaign, how it was presented to him.  Was it

21 presented to him as "We're really trying to run the ad and

22 we'll do this in case we don't"?

23      Think back.  Did anyone ever tell you with any specificity

24 what Marcus was told about that?  Nope.  Not a word.

25      In any event, he wasn't trying to fool anyone about the ad

1  because he believed they had the money to pay for it, and he

2  certainly had tokens to pay for it, which John Bryan was

3  telling him could be used by Group M to pay for it.

4      And, you know, just as a topper, did you ever hear from

5  anybody how much cash AML BitCoin actually had at the time?  I

6  didn't.  So failure of proof.  Complete failure of proof there.

7      Even worse is this thing with Newsom.  This is another one

8  with, we don't have any burden.  We might be okay even if we

9  had it.  You might not like this particular Twitter post, but

10  it is not a fraud.  It is accurate, much more accurate than

11  stuff Abramoff writes.

12      And it does not claim -- I think this is Slide 15,

13  Exhibit 489.  This is the Twitter post about Newsom.  Mr. Chou

14  said this morning, that Marcus claimed to have extensive

15  discussion with Newsom.  It doesn't say that.  It says [as

16  read]:

17          "Marcus met with Newsom along with others."

18      It acknowledges that he met with him along with others.

19  No claim that this is a private meeting.

20      It says [as read]:

21          "Some topics discussed by the group was" --

22      You can kind of see who wrote it because it should be

23  "were."

24      [As read]:

25          "Some topics discussed by the group was

1          AML BitCoin and how it can bring security and

2          compliance to crypto/fintech/digital identities."

3          I'll finish the rest in a second, but let's pause there

4     for a second.

5          There was one witness about this meeting who testified.

6     That was Leslie Katz.  The Government put her on the witness

7     stand and did not ask her if Marcus had discussed AML BitCoin

8     and how it can bring security and compliance.  In fact, she had

9     already told the FBI that Marcus may have raised that issue at

10    the -- at the meeting with Governor Newsom.  So they knew what

11    she'd likely say.  They chose not to ask her.  A little bit of

12    Skippy there.

13         Instead, they asked if Marcus sought adoption by the State

14    of California of AML BitCoin, which was a silly question

15    because nobody ever said Marcus said anything along those lines

16    or that he ever asked any state to adopt AML BitCoin, whatever

17    that means.

18         We asked the question the Government avoided, and here is

19    what the question and answer was [as read]:

20         "QUESTION:  So you wouldn't deny that Marcus spoke about

21         AML BitCoin and how it can bring security and compliance

22         to crypto/fintech/digital identities, would you?

23         "ANSWER:  I don't have a specific recollection, but it is

24         likely that he raised that issue."

25         So that part of the Twitter post is accurate.  That leaves

1    this rather incoherent addition of reducing poverty, which just

2    kind of gets stuck there at the end and reflects that the post

3    was not very well written.  But that also was likely true

4    because, as Katz also testified, she would not have been

5    surprised if that had been discussed because that topic was of

6    particular interest to Newsom, particularly reducing poverty

7    through technological solutions and vocabulary development for

8    zero to three-year-olds because education during that age

9    significantly reduces the risk of poverty.

10       So this post is pretty much proven to be accurate.  Would

11   you have written it that way?  Maybe not, but it's not a fraud.

12   It's accurate.

13       And there may well have been a lot more because remember,

14   Katz was -- said she was not present when Marcus took his photo

15   with Newsom.  The photo is just the two of them.  And remember,

16   this was a small event, a fundraiser.  Maybe just 12 people.

17   So Marcus may have had an opportunity to talk privately with

18   Newsom at least a little more about AML BitCoin.

19       Katz made clear that he would have been stopped had he

20   said, "Can I get the State of California to adopt AML BitCoin?"

21   But there's no representation that he said anything like that.

22   So he may well have had a whole lot more discussion with

23   Governor Newsom about AML -- then Lieutenant Governor Newsom

24   about AML BitCoin.  You don't know.  Again, a complete failure

25   of the Government's proof.

1      Okay.  So that gets through those main pieces of the

2   fraud.  I want to switch gears and talk for a little bit about

3   the technology.

4      You heard Mr. Chou this morning describe the technology as

5   a half-baked product, not real, and nothing but googly eyes.

6   We'll talk more about that in some more detail.  But nothing

7   but googly eyes?

8      You remember Mr. Min's testimony there were 16.5 million

9   lines of code, and the Government cherry-picked a couple.  As

10  Mr. Min said, you'll see that kind of stuff in a lot of code

11  collections.  People start with something; they go from there.

12     They picked that little bit out of 16.5 million lines of

13  code, and they then stand up in front of you and say, "This was

14  nothing but googly eyes."

15     And the only other thing they said about Min -- and I'll

16  talk a little more about him in a minute -- that they didn't

17  see a transaction -- that he said he didn't see a transaction.

18  That doesn't mean the code didn't exist.  That means maybe

19  there weren't records in what he found of transactions.

20     And remember, the product was not all that successful so

21  there may not have been a lot of records of actual

22  transactions.  He was saying the code was functional, which it

23  was.

24     Okay.  So we got into the technology because

25  the Government made what I believe to be palpably false

1    statements about its state -- its status.

2        Two things to keep in mind about the technology.  First,

3    the question here is Marcus's good faith, his intent.  He

4    believed he was telling people the technology was not complete.

5    He said that in the terms and conditions.  He said that in the

6    purchase agreements.  He said that in the white paper.  And

7    even more simply, AML BitCoin was selling tokens, not coins.

8    It was selling tokens and saying, "When the coin is complete,

9    you can exchange these tokens for the coins."  And that, as you

10   heard from Leslie Katz, a lot of ICOs are sold that way.

11       So he was proceeding in good faith.  He was not a good

12   manager.  In fact, I would describe him as a pretty miserable

13   manager.  And things took much longer than he expected.  And

14   that's really the story of the technology.

15       His completion estimates were off, but he wasn't making

16   them up.  People were telling him they were done, close to

17   done, various things like that.  The real problem was he didn't

18   hire the best people; or when he hired good people, he didn't

19   keep them long enough because he kept flitting from one set of

20   developers to another set of developers.  It wasn't like he was

21   trying.  He was just a really bad manager with bad executive

22   functioning.

23       And he continued to work on the technology until it was

24   completed in 2020, where you heard from people like Jeff Tinker

25   who said it worked fine.  How many fraudsters continue to do

1    the work several years after the money has come in?

2         After weeks of the Government offering witnesses who said,

3    "I never saw it work," without asking if they checked, we had a

4    guy check, Erik Min, and he drew three main conclusions:

5    Aten Coin appears to have been a complete functional product,

6    albeit relying on third-party software for ID verification;

7    that consistent work by intelligent developers was performed

8    for the AML BitCoin CrossVerify product throughout 2017 and

9    2018; and that integrating the CrossVerify product into a

10   preexisting cryptocurrency could have been accomplished within

11   a few months.

12        In response, he was treated to a rather out-of-character

13   bombastic cross-examination or, to butcher *Macbeth*, sound and

14   fury signifying nothing.

15        Remember, it began with questions suggesting:  How could

16   we have possibly not told you that he was getting paid $250 an

17   hour for his time testifying and for his work?  As if you would

18   have thought he was would have done all this work for free.

19        And it turned out that Mr. Min was being paid -- to be

20   more precise, not Mr. Min, but the company he works for -- was

21   being paid far, far less than Mr. Min's normal rate, which

22   I think he said was $810 an hour.

23        For a busy expert, losing the opportunity -- losing the

24   opportunity cost of close to $600 an hour to work on a

25   court-appointed criminal case does not really justify

1    the Government's attack on him for getting paid.  And as he

2    told you, he's just calling them the way he sees them, just

3    like experts who are getting paid by the Government, I expect,

4    are calling them the way they see them.

5        It turns out all the government -- all the experts in this

6    case are being paid by the government, from one government

7    pocket or another.  Is that a big deal?  I don't think so.

8        Then there were a lot of questions about his

9    qualifications that seemed to assume that doing this work for

10   20 or so years for very sophisticated clients is not a good

11   credential and as if he was doing the work by himself as

12   opposed to part of a team with a lot of experienced

13   programmers.

14       I would dare say that he's a lot more qualified to talk

15   about the technology than, say, Brandi Jodoin, who is all that

16   the Government offered about Aten Coin, although I don't know.

17   Maybe she's teaching programming at the -- at her School of

18   Ethics.

19       Eventually, they did get around to asking him some

20   questions about the case, mostly about four topics.  One --

21   they all can be easily dismissed.  One, maybe in the course of

22   giving Min access to a data repository, Marcus altered the

23   data.  As he -- as Min explained, this would essentially be

24   impossible to do without detection.  Out of the question, he

25   said.  No response from the Government.

1    Next, they suggested that work was done only after

2    Marcus's Las Vegas office was searched.  They've suggested that

3    about a number of different things in the case.  The suggestion

4    as applied here, to use a technical legal term, is loony tunes.

5        How many witnesses did you hear talking about all the work

6    being done in London in the spring and summer of 2018?

7    Carlsen, Tran, Abramoff.  You saw weekly update reports,

8    Exhibits 3302, 2333, 2334.  So the notion that people were

9    scrambling to do work only after Abramoff was searched and

10   Marcus's Las Vegas office was searched in September 2018,

11   that's just loony tunes.  Remember, even the team had come from

12   London to Houston to test the CrossVerify product by this time.

13       In any event, Min explained that the suggestion that all

14   the work was done after September 2018 was impossible because

15   the data that he reviewed necessarily established that lots of

16   work had been done prior to September.

17       It looks like what happened was they moved to a new data

18   repository and access to the older data repository was lost.

19   Maybe it was Naimer refusing to give up his code.  Recall there

20   were several witnesses, like Bryan, who said they had

21   difficulty getting information from Naimer about the

22   technology.  But, in any event, the new data reflected that it

23   was based on lots of prior work.

24       One other problem with the Government's argument, their

25   argument assumes that Marcus was told of the search in

 1    Las Vegas.  The evidence actually suggested the contrary.  The

 2    evidence was that that was a lightly staffed office by other

 3    people or rented communal space; that Marcus rarely was there

 4    and apparently was not there when the office was searched in

 5    September of 2018.  And as Dainec was questioning Special

 6    Agent Quinn, that there's a good chance that whoever was

 7    present for the search was instructed not to tell anyone that

 8    that would not be uncommon.

 9        Special Agent Quinn, being Special Agent Quinn, had not

10    inquired as to whether people were told that, but that was what

11    he testified.

12        So not evidence that anyone found out about the search and

13    jumped into action and created code that reflected all this

14    work that was previously done.  That was loony tunes.

15        Okay.  The next criticism of Min was -- and I talked about

16    this briefly so I'll do it really quickly -- they cherry-picked

17    from the roughly 16.5 million lines of code and found a few

18    blank lines, some googly eyes, different things like that.

19        So what?  That's what you'd expect, as Mr. Min said, in

20    any collection of 16.5 million lines of code.  Often there's

21    third-party or open-source material often used as a starting

22    point.

23        Their own witness, Carlsen, praised the CrossVerify

24    software, said it was great stuff, really liked the product.

25    The London people thought it was close to functional.

1          They also said that Aten Coin used third-party ID

2    verification that can be fooled, and it turned out that was

3    correct.  That's what Marcus figured out, and that's why he set

4    about to fix it.

5          So the evidence showed that there were delays in the

6    technology.  But the problem was not bad intent; it was bad

7    management; and he would never stick with anyone long enough to

8    get the problem fixed.

9          You'll see that at numerous times Marcus thought the

10   software was close to complete, as it should have been, given

11   all the money he spent on it.  Remember Abramoff explaining in

12   December of 2017 how Naimer told Marcus that the work being

13   done in India while Ralph Horn was in charge was no good and

14   needed to be replaced?  That is, a whole lot of work had been

15   done that Marcus thought was good and Naimer came in and said,

16   "It's not good.  We've got to start over."

17         And then other people wind up saying Naimer's work wasn't

18   all that good.  Some didn't; some did.

19         But, in any event, Marcus responded to that in

20   December 2017 by thinking it was close to ready and it could be

21   finished under Naimer's direction for 15- or 20,000 dollars.

22   That was what Marcus understood about it.

23         And this belief of being close continued.  You saw it

24   again in 2018, in those weekly management updates that I gave

25   you.  You saw it in the London people coming out to test a

 1   completed iPhone version for testing.  They thought it was

 2   ready to go.  Turned out it wasn't.

 3       Exhibit 3202 [as read]:

 4           "Product is developing nicely and on time."

 5       2333 [as read]:

 6           "Minimum viable product version ready for

 7       implementation.  Scheduled for release at the end of

 8       August 2018."

 9       September 18, Exhibit 2334, suggesting a timeline for the

10   commercial release in six to eight weeks.

11       They did have a chief technology officer.  It was Terence

12   Poon.  And I'll talk about John Szeder when I talk a little bit

13   more about marketing.

14       So good faith belief in the technology and its continued

15   progress.  The problem is really poor management, poor

16   executive functioning.

17       This is the spaghetti part where the Government threw in

18   all kinds of different things about marketing.  I'm not going

19   to be able to touch on them all, but I want to give you some of

20   the highlights and a guide to it.

21       First of all, they started this morning with Exhibit 926,

22   which was Marcus looking for marketing.  Of course he was, and

23   there's nothing wrong with that.  He had a great product.  He

24   had what he believed to be -- and I think was -- a really good

25   idea that he thought should have taken off and it was not

1    taking off, and he wanted to get it noticed, like any business

2    that thinks they have a good product.  There's nothing wrong

3    with marketing.  That's why people like Todd Hargreaves are in

4    business.

5         Did he cut his attorney out of it as was suggested this

6    morning?  I don't know.  There are lots of attorneys who get

7    involved in marketing all the time, looking over the PR all the

8    time and looking over Project Sunshine.  That's Exhibit 418.

9    Looking over press releases, Exhibit 2277, Exhibit 3165.  He

10   used a lot of attorney review after the Government says he cut

11   the attorneys out.

12        One of the other things relating to what was going on in

13   his office and the marketing is the Government sort of smooshes

14   things together.  Had I been redoing my little themes chart and

15   the problems in the Government's proof after Mr. Chou's

16   argument this morning, I would have put a clock in there

17   because what you have is testimony like, "Wow, he was spending

18   all this money when he was having trouble keeping the lights

19   on."

20        Remember that?  That's not how it happened.  He was

21   spending a lot of money in January, February, March; but the

22   testimony about keeping the lights on, if you remember

23   Bernadette Tran Cowan's testimony, she said she started in

24   March and money became short six or seven months later.

25        So she started in March of 2018.  Money was short starting

1    in the fall.  That's long after the house purchase and these

2    other things because, obviously, the Dillman $50 million did

3    not come in.

4        They just smooshed a lot of times together there.  He was

5    not buying a house when he couldn't keep the lights on.  Turned

6    out that he was running short of money, but that's because

7    money he thought was coming in did not come in.

8        They talked about Melanie Cowan's changing of the

9    marketing to change from "is" to "will be."  They made the

10   accusation that that was in response to the search of Marcus's

11   business in Las Vegas.  Again, there's nothing showing he knew

12   about that, at least not as of the time that Cowan did that

13   work, which is pretty quickly after she started in the second

14   half of September or the beginning of October.

15       So I'm not going to be able to go through all the

16   different pieces of marketing.  I will go through a few; but

17   before I do, let me give you this guide to the rest.

18       First of all, did it go out?  You remember at this --

19   during the cross-examination -- one of the cross-examinations

20   with Special Agent Quinn, he threw in some document that

21   appeared to go to somebody nobody even knows, not necessarily a

22   purchaser, nothing.  It wasn't sent around.  You know, so,

23   first of all, if you see some document, ask:  Did it go out at

24   all?  Ask:  Did Marcus see it?  Did he approve it?  Was he

25   relying on Abramoff for its accuracy?  Did the Government prove

 1  it's false?  And if so, what's the proof that Marcus knew it

 2  was false and intended to deceive people?  Remembering, as

 3  Abramoff has said, that Marcus is a sucker.

 4      Look at what was actually said as opposed to some

 5  witness's understanding of it, and look at whether it was just

 6  the sort of fraud marketing hype that we're all used to.

 7  You know, we've got the greatest product, we're the best,

 8  whenever -- or there's a specific false representation.  And if

 9  there is something inaccurate, is it significant enough amidst

10  all the other evidence to establish beyond a reasonable doubt

11  that Marcus was not acting in good faith?  Not every falsity

12  equals an intent to deceive and cheat.

13      The Government wants to make it seem Marcus is behind all

14  the press.  In fact, Abramoff is behind all the press.

15  Abramoff agreed that Marcus never edited the press.  He did not

16  want to admit that this was because Marcus trusted him, but

17  that's why.

18      Marcus never did a Carlos De La Guardia going through a

19  draft press release and picking things out and offering to

20  correct them.  And not only did Marcus never make any edits,

21  but Darling, Brian Darling, agreed that Marcus did not give him

22  any information for any of those articles.  All the information

23  came from Abramoff.

24      And remember Melanie Cowan saying that Marcus was not

25  capable of any form of sophisticated writing.  Just not capable

CLOSING ARGUMENT / SHEPARD

 1    of it.

 2        Some of the examples, it's hard to figure out what

 3    the Government is thinking.  If they've highlighted

 4    Exhibit 196, Marcus furiously traveling the world, sometimes

 5    they mock that as that's got to be untrue.  Sometimes they use

 6    it to holler at witnesses like Dr. Armstrong, asking:  How

 7    could someone with Marcus's illnesses travel the world like

 8    that furiously?  In any event, there's no evidence that he

 9    didn't, and there is some evidence of travel expenses.  So who

10    knows?

11        Make sure you look at the actual document as opposed to

12    some witness's understanding of it.  I don't begrudge any

13    witness's understanding of it, but that doesn't really reflect

14    Marcus's intent.  You've got to look at the document and

15    Marcus's connection to it.

16        You heard a little bit this morning about Todd Hargreaves.

17    I think that's a helpful story.  Marcus went to Todd Hargreaves

18    looking for help getting known.  That's what companies do.  As

19    is true of so many witnesses with whom Marcus actually spoke

20    directly, Marcus was honest with him.  Hargreaves knew that

21    conversations were happening with places like the Panama Canal

22    and the Port of San Francisco, but there were no deals.

23        And Hargreaves told him, "Okay.  If you're in that

24    position, it would be best if you had deals; but if you don't

25    have deals, here's a different, more effective way to try to

1    get publicity.  That's go to third parties and see if you can

2    get quotes from them."

3         And, unfortunately, Marcus got into another one of his

4    little disputes over payment, and nothing came of Hargreaves'

5    advice.  Bad business, a mistake, but good faith.  He was

6    trying to get help.  He was being honest and, unfortunately,

7    not much came of it.  Wish that had been different.

8         Sock puppet accounts.  The Government made these sound as

9    if they were bad.  Maybe they are.  But Cowan, who was

10   responsible for them for a time and said this before she got a

11   talking to from the Government, Cowan viewed this as just

12   keeping it positive to combat some of the hate that was

13   circulating and was not dissimilar to buying followers, which

14   she considered to be a common marketing practice.

15        John Bryan, who had those people in the Philippines, saw

16   it pretty much the same way.  He trained and instructed people

17   to post things like here, "Let me send you the documentation

18   and some of the presentations that are related to the

19   technology and the concept."

20        It's unclear whether there's evidence of any lies there,

21   let alone lines Marcus knew about.  Maybe Melissa Foteh says

22   something about that; but, like I say, you can't believe what

23   she says.

24        There was one piece of evidence showing a little direction

25   from Marcus, Exhibit 560, most of which was that people should

1    find ten articles pertaining to AML and KYC of exchanges in

2    digital currencies per week to post.  This is largely pumping

3    the industry as opposed to AML BitCoin, from time to time,

4    material already posted by AML BitCoin.  You couldn't possibly

5    do that many AML BitCoin posts.  No evidence they were told to

6    post lies.

7        After Foteh left, Cowan and Cowan Tran took charge and

8    report that Marcus was reviewing press releases, but there was

9    no report of Marcus reviewing any press release that he knew to

10   be false.  There were very few press releases during that time,

11   which is, you know, sort of starting in the fall of 2018.  The

12   only release Cowan Tran mentioned was the one about a listing

13   on HitBTC, and they did ultimately get listed on HitBTC as you

14   heard from the evidence.

15       Okay.  A little bit about John Szeder, the fractional

16   executive.  It seemed like every day the Government was asking

17   another witness, "Well, I wouldn't have purchased if I knew

18   this article wasn't true."  As I say, that doesn't really

19   affect Marcus's intent.  But no one was ever asked:  If you

20   knew John Szeder was not the CTO but, in fact, Terence Poon

21   was, would it have mattered?  No, it wouldn't have mattered,

22   and that's why this isn't meaningful at all.  John Szeder was

23   good with being a front-facing CTO, said it was not uncommon.

24       But gotcha, they left him on their website for too long.

25   Updating your website is a good thing, but many of us don't do

1    it as frequently as we should, and there's no federal statute

2    making it a crime not to update your website.  It's just a sign

3    of inattention or a poorly run business, which definitely

4    AML BitCoin was, and it's not CEO-level work anyway.  John

5    Szeder didn't remind him to do it either.

6        That some articles were paid for, yes.  Abramoff was

7    paying one of his pals with Marcus's money, and Marcus knew the

8    money was being paid, and Abramoff was able to pay his pals.

9        Darling told you these are all op eds as far as Darling is

10    concerned.  Some of them are marked that way.  And Darling told

11    you that he still writes op eds for clients and still writes

12    them for money; that the work he did for Abramoff and

13    AML BitCoin was similar to what he has done for others.  And

14    Abramoff told you that he does not recall ever discussing with

15    Marcus the -- the -- or ever discussing the author -- whether

16    the authors disclosed their payments and sources.

17        So was it wrong?  Maybe.  Was that something Marcus

18    understood to be wrong?  No, there's no indication that Marcus

19    understood it to be wrong.  Darling didn't seem to think it was

20    wrong, and this is something on which Marcus was trusting

21    Abramoff.

22        And it seems like, interestingly enough, these paid

23    articles come to an end following a meeting in February 2018.

24    According to Abramoff, some old articles were collected at

25    Marcus's request for the meeting.  You don't know whether

that's true or not because it's from Abramoff; but what you do
know is that after that, there weren't any more paid articles.
Did Marcus put a stop to them?  Don't know, but they stopped.

Mr. Chou highlighted this morning some -- one day of
Japheth Dillman emails in September of 2017.  Marcus was copied
but never responded.  None of the people emailed ever responded
or at least Quinn did not recall any responses.  Don't know
whether Marcus opened it, whether he -- where he was that day,
what he was doing.  Don't know if he read them.

One of the interesting things about that email was that
Abramoff was blind-copied; that is, Dillman wanted Abramoff to
have a copy but didn't want Marcus to know that he was sending
Abramoff a copy.  So there might well have been something going
on between Abramoff and Dillman about those letters, but we
don't know.

One other quick marketing thing before we move on to other
subjects.  There were at times statements about the number of
tokens sold or the number of tokens issued or the number of
tokens distributed, and I think the Government was trying to
suggest that Marcus might have said there were more tokens sold
than actually were sold.

And Ben Boyer's testimony was offered about this.  He said
he saw a post saying that the company sold $60 million.  He was
a little bit equivocal about that because, thereafter, he said
maybe they'd issued tokens to buy a new business.  But a key

1  moment about this is Dainec asked him on cross-examination,

2  "Well, do you have any record of this posting that 60 million

3  tokens were sold?"  And Boyer said, "Yes, I took a screenshot

4  of it and gave it to the Government."  "I took a screenshot of

5  it and I gave it to the Government."  This is another Skippy.

6      I was waiting, okay, on redirect examination of Ben Boyer,

7  is the Government going to present him with this screenshot?

8  No.  Didn't.  And then Quinn comes in at the end of the trial

9  and he dumps in a whole lot of evidence that the FBI had

10  collected in their files on the case, and I was thinking:  Well

11  are we going to see that $60 million posting now?  Nope.

12      These are very capable prosecutors.  If Ben Boyer had

13  taken a screenshot showing $60 million being claimed to have

14  sold or 60 million tokens being claimed to have sold, you can

15  bet that these guys would have brought it in and showed it to

16  you.  They didn't because Boyer didn't have one and didn't send

17  it to him.  That was a lie.  And they didn't -- they didn't

18  show you anything like that or explain why they didn't have it.

19      John Bryan also said something like that about the number

20  of tokens sold or maybe issued or distributed, which all mean

21  different things.  But his testimony was so inconsistent.  He

22  said at one point that Marcus said he sold 70 million.  Then

23  the night before he gave you that testimony, he told

24  the Government it was 75 million.  In a previous statement to

25  the FBI, he said it was 60 million.  And last year he told the

 1    FBI just that millions were sold.

 2         We have no idea what Bryan was told by whom or whether --

 3    what the amount was or whether he was told sold or issued or

 4    distributed.  Sold, issued, and distributed mean different

 5    things.  And, in any event, as I've talked about, Bryan is

 6    quite a liar.

 7         The only other thing that I remember on this is

 8    Exhibit 99, which is a communication with one of the FBI

 9    undercovers, Bryant Ling.  The most interesting thing about

10    this communication, which was I don't think highlighted at the

11    time, was that it was quite obviously an Abramoff production

12    because Marcus is told to forward it on to Abramoff.  This is

13    Exhibit 99.  Abramoff wrote this one.  It doesn't say "sold."

14    I think it may say "distributed" or "issued" or one of those

15    other terms, the meaning of which is completely unknown because

16    of a failure of proof.  It doesn't just say "sold."

17         And, in any event, it seems like an Abramoff construction,

18    and the extent to which Marcus knows it or participates in it

19    is unknown.

20              **THE COURT:**  How much longer do you have?

21              **MR. SHEPARD:**  I don't know.  I tend to get carried

22    away, but long enough that we should take a break.

23              **THE COURT:**  Can you give me an answer?

24              **MR. SHEPARD:**  45 minutes.

25              **THE COURT:**  Okay.  Members of the jury, we'll take a

1  break.  Remember my admonitions not to discuss this amongst

2  yourselves or with anyone else.

3      And we'll be back here at 20 after.

4    (Proceedings were heard out of the presence of the jury.)

5        **THE COURT:**  We're out of the presence of the jury.

6      I didn't put time limits on you folks, but I want this to

7  get to the jury before the end of the day.  You have been going

8  over three hours, Mr. Shepard.  So it's really time to speed

9  this up.  I don't know how long Mr. Highsmith's going to go.

10     But do you have an estimate on yours?

11        **MR. HIGHSMITH:**  It will end before 4:00.

12        **THE COURT:**  Well --

13        **MR. SHEPARD:**  I cut quite a bit at the break.  I'll

14  try to cut some more.

15        **THE COURT:**  Cut more.

16        **MR. SHEPARD:**  I'm cutting as best I can.

17        **THE COURT:**  Good.

18        **MR. SHEPARD:**  A lot of material to cover because we

19  didn't --

20        **THE COURT:**  I understand.

21        **MR. SHEPARD:**  Yeah.

22            (Recess taken at 2:08 p.m.)

23          (Proceedings resumed at 2:24 p.m.)

24    (Proceedings were heard out of the presence of the jury.)

25        **THE COURT:**  Okay?  Yes.

1    (Proceedings were heard in the presence of the jury.)

2        **THE COURT:**  The jury is present.

3    Mr. Shepard.

4        **MR. SHEPARD:**  I appreciate everybody's patience.  I've

5    cut some slides trying to get through to the good stuff.

6        First, let me talk briefly about tax and Marcus not filing

7    tax returns.  Is that somehow indicative of him trying to hide

8    something?  No.  He had this ridiculous mass of records.  He

9    was employing a team to sort through them to figure out what

10   expenses were business and personal because he mixed them.

11   They were working.  He had nothing he could file.  He continued

12   to work on it.  The Government eventually seized some of his

13   stuff, making it harder; and as you heard, he's been catching

14   up on those filings.

15       I believe the first year for which he failed to file was

16   2016.  Did he get some big haul in 2016 and he didn't -- he

17   wanted to hide it and didn't want to pay tax on it?  No.

18       If you look back at Theresa Chiu's charts, she lays out

19   that he did not get all that much income in 2015.  Maybe

20   $150,000 at the most.  It doesn't take into account business

21   expenses or other deductions.  It wasn't some huge tax haul.

22   He had already been doing Aten Coin, so he wasn't hiding

23   Aten Coin.  So just he just a bad recordkeeper.  He had mixed a

24   whole bunch of expenses, and there's nothing more to it than

25   that.

 1        That's a good segue into Theresa Chiu's testimony.  You

 2   got a bunch of charts from her.  The main point seemed to have

 3   been tracing the money Marcus used to buy his house and

 4   presenting the numbers in such a way to play up the amount of

 5   money that went to Marcus.  No dispute about tracing the money.

 6   As we noted with Carfora, it was not a challenging job to do

 7   that.

 8        As to the way the numbers were presented, it will come as

 9   no surprise to you that we have some charts that would present

10   them a little differently.

11        And so we have -- 20 is the one I'm going to go to next,

12   Ed, just very briefly.

13        We have different versions of three of Chiu's charts.  In

14   all three, we set aside our other arguments.  Remember, we had

15   some issues.  You didn't get any schedules from her so you

16   can't double-check her work.  But set that -- set that all

17   aside.  You can't determine whether she double counted or not,

18   but set that all aside.  Just look at the presentation of the

19   numbers.

20        We have put the essence of Chiu's slide on ours in this

21   one.  It's in the upper right.  The upper right is what Chiu

22   is.  And this is about transfers from business to personal.

23        Hers seems like it's intended to show that he took a lot

24   of money into personal accounts in the July 2017 to

25   October 2018 time period.  We have displayed that in a way to

1    reflect the money Marcus thought the business would have when

2    he transferred the funds.  It shows that he transferred a very

3    small percentage of the money he thought the business was going

4    to have.  That's the $50 million from Dillman.

5        The next one I want to look at is 18.  This is business

6    bank accounts.  In this one, Ms. Chiu's chart is going to be on

7    the top left.  She broke the business expenses into different

8    groups with the transfers to Marcus being displayed as the

9    largest bar.  We combined all the business expenses except for

10   those that we could not identify as clearly business or

11   personal from her categorizations, and you will see the vast

12   bulk of money from the business accounts went to business

13   expenses.

14       Finally, to look at Chart 19, this relates to personal

15   bank accounts.  Her chart is going to appear in the upper left.

16   Here, again, we combined bars with different expenses, and you

17   see that from his personal accounts, he still spent a lot of

18   money on business expenses, a reflection of the mixing of

19   accounts that made filing his taxes much more difficult.

20       Market making.  This was a mysterious part of the case and

21   a good example of a failure of proof.  It's not clear what, if

22   anything, was done.  As I predicted in opening, there were no

23   records of even a single trade; and since I called it out,

24   the Government has had plenty of time to find a record.  They

25   found nothing.

1    They -- we got some reports of Quentin Miller from

2  Polyblock claiming to have done some trading and John Bryan

3  reporting that on.  He wasn't the person doing the trading;

4  Quintin Miller was.  But Bryan testified on cross-examination

5  that he thought Miller was lying, that he wasn't trading, that

6  Bryan had asked for records and didn't get any.

7    If something was done, it was not clear whether there was

8  anything wrong with it, let alone that Marcus thought there

9  was.

10    Even Bryan, when the Government tried to get him to say,

11  "Hey, the purpose of your Project Sunshine was to manipulate

12  prices," he resisted.  He said, "No.  We were trying to make

13  volume."

14    He was dealing with very reputable companies,

15  Polyblock Capital and other parts of what was called the Morgan

16  Stanley relationship ecosystem.  Marcus's lawyers were included

17  on communications about Project Sunshine.  You can see that in

18  Exhibit 418.

19    Bryan was not certain whether international exchanges --

20  and all the exchanges on which AML BitCoin was listed were

21  international -- whether those exchanges actually required

22  minimum volume and offered to buy and sell themselves to help

23  meet the volume minimums.  Bryan, as he testified to you, did

24  not think any of that was wrong in any way.

25    All of this was orchestrated by Abramoff, not Marcus.  The

1  communications that Bryan had were with Abramoff, and Abramoff

2  limited Brian's exposure to Marcus, as he grudgingly admitted.

3       Much or all of what was discussed as a plan of action

4  makes no sense, as Bryan wound up testifying, and Marcus

5  appeared to provide no funding or meaningful funding.

6       Remember, it started with Bryan and Polyblock having to

7  buy 500,000 tokens at a dollar, which I don't think they ever

8  paid for; and Bryan seemed to regard that as a non-starter, as

9  a way to have any impact on the market because you have to sell

10 part of them in order to buy or trade with myself, and you

11 cannot increase volume or price this way.  That's what he said.

12      The only impact on price, according to Bryan himself, was

13 when Polyblock supposedly was buying on its own account.  That

14 is when they were buying for themselves, not as part of

15 Project Sunshine.  That was the only impact ever on price.

16      So there was a lot of sound and fury about market making.

17 What actually Marcus believed about it is unclear, whether he

18 thought it was okay or not okay.  Bryan thought it was okay.

19 And, in any event, nothing was funded or done to do anything in

20 any meaningful way.

21      Let me talk about the purchase of Marcus's house and other

22 items.  You may have heard about that maybe once or twice from

23 the Government, maybe a few more times.

24      He did it at a time, as I've said, that he thought

25 $50 million was coming in from Dillman, and he did it because

1    he thought it was okay, that he could use payments for tokens

2    as he saw fit.  He was not selling an investment, in his mind,

3    and as his documents reflected.  He was selling a medium of

4    exchange, like he was selling a trinket.

5         His belief was reasonable.  He had spoken to John Fahy, a

6    well-credentialed lawyer who specializes in securities law,

7    used to work at the SEC.  Fahy told him he could use the net

8    proceeds as he saw fit, and Marcus saw that there would be

9    plenty from that proceeds.

10         He had no reason to hide his home purchase or where the

11   money came from, and he didn't.  He had no reason to hide it

12   because of what he learned from Fahy, and he never hid it when

13   Quinn and ten or so other armed agents rushed into his house

14   early one morning in the chaos of crying children and Quinn

15   asked him about the house.  Marcus didn't say, "No, I didn't

16   use money from the business to buy the house.  You'll never

17   prove I did because I cleverly hid it."  He would have left

18   unsaid.  He never said anything like that.

19         He said, "Yeah."  He starts to explain why he did it.  He

20   said it was his own money, that the business owed him money.

21   And with all the interruptions and perhaps because of the chaos

22   or the fact that he thought it may be privileged, he didn't

23   talk about his conversation with Fahy.

24         The conversation didn't get that far.  As you may

25   remember, Quinn kept interrupting him.  But he did not hesitate

1  to answer.  He did not hide it.  In his mind, he had absolutely

2  no reason to hide anything.

3      The Government tried to get at Marcus's hiding, or lack

4  thereof, by suggesting he hid his purchases from Abramoff and

5  the source of the funds.  That doesn't add up.  For one thing,

6  it was Abramoff who suggested, knowing Marcus's financial

7  condition, that Marcus could buy a mansion after the ICO.  You

8  remember we saw -- we talked about that communication earlier.

9      And Marcus had told Abramoff about his house purchase well

10 before his house was purchased, seeking Abramoff's help getting

11 a loan -- I'm sorry -- well before his house was searched, and

12 he was seeking Abramoff's help to get a loan or to sell it.

13     And Abramoff's own notes show that he was coaching Marcus

14 about buying the Corpus Christi property before the

15 Corpus Christi property was bought.  Remember, the note said

16 "Get the property.  Use a charitable foundation," all these

17 classic Abramoff things.

18     Why make the purchase in March when Dillman ordered the

19 tokens in January?  Well, Dillman was continuing to string

20 Marcus along -- you'll see that in Exhibit 3376 -- in February.

21 So anyone, especially a dreamer like Marcus, or, as Abramoff

22 described him, someone not flying close to the earth, might

23 reasonably have expected the money to come in.  Was it a great

24 decision to buy a house thinking the money would come in from

25 Dillman?  No.  Was it a fraud?  No.

1          That brings me to Count Two, the money laundering charge,

2     a key element of which is knowledge.  First, knowledge that the

3     money was proceeds of wire fraud, unlawful activity; and,

4     second, and probably more importantly, knowledge that the

5     transaction was designed in whole or in part to conceal or

6     disguise the nature, location, source, ownership, or control of

7     the proceeds.

8          The first knowledge requirement kind of tied up in

9     Count One -- and I've talked plenty about Count One.  He

10    doesn't -- he's not guilty of it, and he certainly doesn't

11    think he's guilty of it.  So he doesn't see those as unlawful

12    proceeds.  He sees those as what he's entitled to use because

13    that's what Fahy told him.

14         The second knowledge requirement, even harder for

15    the Government.  Marcus did not have any reason to hide his use

16    of the funds.  He never did hide his use of the funds.

17         What about Carfora's testimony?  His point was that the

18    use of multiple accounts and transfers was indicative of money

19    laundering.  I will question for a moment whether what Marcus

20    did is indicative of money laundering, but probably the more

21    important point is it is also indicative of other things.  More

22    likely indicative of other things, especially with somebody

23    like Marcus.

24         This is a guy who, the evidence shows, does too much of

25    everything.  Too much switching one thing to another.  Too many

1  bank accounts; 40 as found by Theresa Chiu.  Too many software

2  developers; I lost count at 33.  Too many lawyers.  Too many

3  patents.  Remember Jeffrey Tinker told you he had 60 patents.

4  Too many trademarks; 20 or 30 trademarks.  It is -- his conduct

5  is indicative of a guy who does too much of everything.

6      It is also indicative of somebody who is paranoid and

7  compulsive and who does all kinds of things that you cannot

8  explain.  Remember all the witnesses who described him as

9  paranoid?  That would include Abramoff, Bernadette Tran,

10  Melanie Cowan, and John Bryan.

11     Mr. Chou this morning mentioned, "Oh, well, he used a

12  family account and then he used his own name."  Who knows?

13  Maybe he needed money in his own name for the real estate

14  transaction.  But whatever, it was a family account.  It was

15  his family.  He owned the account.  So I don't see the big deal

16  in changing the name.  He's using his name with his ID.  Very

17  hard to imagine hiding anything that way.

18     Please keep in mind, this is a man who turned down a

19  hundred million dollars because he was too paranoid to take the

20  money from Jack Abramoff.  Jack Abramoff, a guy who's very

21  persuasive, who couldn't persuade him to take a hundred million

22  dollars because he was paranoid.

23     And I said I would come back to the question, an

24  alternative of the argument I just made, of whether the

25  transfer was indicative of money laundering.  Remember, while

 1   the Government makes Marcus out to be some fancy fraudster,

 2   clever enough that he's also hiding his taxes, if that's so,

 3   how does the Government explain what a terrible effort to

 4   conceal Marcus engaged in?

 5       Let's use accounts in my own name with my personal

 6   identification information.  Let me actually go down to my

 7   local bank as part of the transaction so that they can take a

 8   photo of me.

 9       Why not use a bank in a country that the FBI can't

10   subpoena?  Not me.  Maybe they wouldn't take my photo someplace

11   else.

12       Concealment seems pretty low on the list of possible

13   reasons for what he's doing because he's not concealing

14   anything.  He doesn't need to conceal anything.  Paranoia?

15   Much higher.  And concealment isn't, beyond a reasonable doubt,

16   the reason he did it.

17       I hope -- and what I hope is in the unlikely possibility

18   that I haven't persuaded you, I've got a bonus reason why

19   the Government didn't prove beyond a reasonable doubt that

20   Marcus was doing this for concealment.

21       Go back to Theresa Chiu for a second.  She has a very nice

22   chart suggesting that Marcus got 2.874 million in

23   cryptocurrency from purchasers.  I don't know if that's right

24   because we don't have a schedule.  But assuming it's right, if

25   Marcus had any desire to hide the source of the money that he

1   was using to buy his house, why didn't he use the crypto?

2   Perfect way to hide the source of money.  Flawless.  There is

3   no good answer to that question other than this:  He was not

4   trying to hide anything because he saw no reason to do so.

5        He's not guilty of money laundering.

6        And now for a little dive into neuropsychology.  A few

7   important things about what the Government did with

8   Dr. Gregory, some of which was striking in the testimony, some

9   of which more subtle.

10       Mr. Highsmith wanted to talk about malingering.  Mr. Chou

11  too.  Did you pick up maybe Dr. Gregory was a little reluctant

12  to go there?  Maybe that was because everything said about

13  malingering was based on only one of the many validity tests

14  that both doctors ran, the API.  Every other test showed that

15  he was not malingering.  Why would you malinger on only one?

16       Maybe her reluctance was because there is such a thing as

17  a malingering diagnosis, which Dr. Gregory expressly did not

18  make.

19       Maybe it was because her test results, as reported by the

20  authors of the test in the printout, were invalid; that is, the

21  authors of the test have a printout that showed that her

22  results were invalid, which could be -- there could be a number

23  of reasons, one of which is he answered questions too literally

24  which makes the results look off.  That's a common trait of

25  people with ASD, autism spectrum disorder.

1    And one other interesting thing that struck me -- and this

2    gets away from neuropsychology a bit -- she didn't describe any

3    statement that he supposedly exaggerated.  This was just part

4    of a subjective interview, this PII thing.  What she did

5    describe repeatedly were statements Marcus made or things he

6    did that, in her view, undermined Dr. Armstrong's diagnosis.

7        Remember she said he looked her in the eye; he shook her

8    hand.  He said he only went four days with, I think,

9    obsessive-compulsive behavior when he needed to go a week.  He

10   was not reporting a need for structure, and he said he was

11   honorably discharged from the military.

12       All of those things that she relied on to undermine

13   Dr. Armstrong's diagnosis came from Marcus.  So if he was

14   malingering, if he was trying to cheat the test, to steal

15   Leslie Katz's term, he is the all-time putz of malingerers.

16       What about Marcus's social cognition?  What about the

17   tests that actually were valid?  Both Dr. Armstrong and

18   Dr. Gregory tested his social cognition.  Both found he's at

19   the bottom of the range on social cognition at the 1 percent

20   band.  A valid test at the 1 percent band.

21       Mental flexibility, same story.  Scores in the first,

22   second, fifth, and ninth percentiles.  Takeaway from these

23   tests is his executive functioning is abnormally low, a finding

24   that supported Dr. Armstrong's diagnosis of autism spectrum

25   disorder.  Dr. Gregory, as I understand it, also thinks Marcus

1    has ADHD and an unspecified bipolar disorder.

2        The next interesting thing was the Government did not ask

3    her to actually perform her own diagnosis to gather what she

4    needed to tell you what symptoms or conditions Marcus had.

5    They just asked for a critique.  They asked her to critique

6    what Dr. Armstrong did.

7        So, of course, being an expert, she had some criticisms,

8    not, as I understood it, that Marcus didn't have autism

9    spectrum disorder, but that Armstrong didn't do enough to be

10   able to say so, largely, it seems, because he lacked childhood

11   records.

12       So you can be from a broken home with all sorts of mental

13   conditions, spend time in an institution as a child, and if the

14   institution doesn't keep the records that long, then you can't

15   be diagnosed with autism spectrum disorder unless it's pretty

16   severe if you're an adult.  And no one ever said his autism

17   spectrum disorder was severe.  So it's just a "You can't get

18   there from here," according to Dr. Armstrong.

19       They had her testify about how a lot of his scores were

20   low-average or sometimes average, and it sounded like, wow, the

21   guy is not that bad, until on cross-examination, Cindy

22   elicited, among many other things that I've noted here, that

23   low-average includes the ninth percentile.  Talk about grade

24   inflation.  And average includes the 25th percentile, which is

25   where Marcus ranked on her IQ test.  I guess 27th percentile.

1        Her IQ test was the non-preferred IQ test.  He was lower

2   on Dr. Armstrong's, the preferred test.

3        You remember all the cross-examination about, well, Elon

4   Musk and Bill Gates say they are autistic.  I don't think any

5   of them are in the first, fifth, ninth, seventh percentile or

6   the 27th percentile on IQ.

7        They made a big deal out of the fact that Marcus was never

8   found to have any of the four conditions Dr. Armstrong found --

9   autism spectrum disorder, ADHD, OCD, and bipolar -- until we

10  had him examined last summer.  Yes, we looked at the evidence,

11  worked with him, and sent him to be examined.

12       I lost count of how many times we were told the VA never

13  found he had any of those things, and that appears to be

14  because the VA did a Special Agent Quinn; they never looked;

15  they never gave him a neuropsychological examination.  And all

16  the people who worked with Marcus would tell you that's a very

17  sad commentary on the care provided by the VA.

18       Why did we pick Dr. Armstrong, given all the attack that

19  he took?  You think Marcus might have been a little resistant

20  to doing this?  Really anxious about it?  We found a local,

21  easygoing, very caring guy in Texas, a Texas guy, well

22  respected in the local courts where the judges appoint him, not

23  a professional witness, someone who was out there treating

24  people like Marcus on the ground every day, including people

25  who can't afford to pay, which is why he does this kind of

1    work.

2         What do you do with all of that?  By the way, for that, he

3    got this bombastic cross-examination, including being attacked

4    for the fact that he couldn't dispense medicine.  But no

5    neuropsychologists dispense medicine.  As Dr. Gregory said,

6    that's something only psychiatrists, who are medical doctors,

7    do.

8         What do you do with all that?  Well, I think if you look

9    at the Government's reluctance to have her do a full exam as

10   opposed to a critique and you see all the low scores that came

11   out of that, it speaks volumes, and the focus on malingering

12   based on an invalid test.

13        But more important, as I kind of said in my opening

14   statement, we wanted to present you with some diagnoses; but

15   the best evidence of what Marcus's mental abilities are is what

16   you heard from the people who work with him day in and day out;

17   and they were uniform in describing how low functioning he was,

18   how paranoid he was, how he was a dreamer, how he misperceived

19   reality all the time.  And I think that's very important in

20   considering his intent.

21        It's not our focus that his capacity is diminished.  Our

22   focus from the opening statement has always been this relates

23   to his intent and his good faith.

24        A few other things about Marcus.  He showed his good faith

25   by recognizing he was struggling.  He kept asking for help.  He

1   asked Corey Jodoin for help.  He asked Hargreaves.  He asked

2   Hung Tran.  He asked Carlsen.  He stopped the paid articles.

3   He started asking for confirmation from people who were being

4   quoted, like Leslie Katz.  He cut back the trips according to

5   Bernadette Tran.

6       When people spoke to him directly, he did not repeat

7   alleged misrepresentations.  The Government ran undercover

8   people at him repeatedly.  They presented to you the best of

9   what they got, but largely, he corrects alleged

10  misrepresentations that the judge presented in some of the

11  things with Agent Ling.  Agent Ling tried to get him to say

12  something about deals with the Panama Canal and the Port of

13  San Francisco, and he said, "No.  The Panama Canal, that was

14  more with the ship registry."  That's the PMA that they were

15  still talking to.  "And now there's other stuff we'd like to do

16  with the Canal, but, obviously, you know, you just put your

17  first deal together and, from there, then you move on to a

18  second," like they were.

19      As Carlos De La Guardia had suggested, they were starting

20  with the PMA.  They thought they could get to the Canal.

21      You'll see the same thing as you listen to those

22  recordings.  He does the same thing with the Port of

23  San Francisco.  He says, "No, we don't have a deal.  Talk to

24  Richard Naimer because he knows better."  Remember, he's the

25  one who put together all the use cases and was following up on

1    those.

2    Repeatedly he did not endorse the representations that
3    the Government wanted him to endorse.

4    They say that during that chaotic interview of Ethan
5    Quinn, that he said he didn't sell any coins personally before
6    August of 2018.  I think his recollection was somewhat
7    qualified, but that's supposed to be untrue, according to
8    the Government, based on Melanie Cowan and Bernadette Cowan
9    Tran saying that they heard him doing some selling.

10    But here's the clock again.  Cowan didn't start until
11    after August of 2018.  Remember, she had been working for Foteh
12    first.  She didn't come to the office where she could have
13    heard Marcus make those calls until September.  So that's after
14    August 2018.  Nothing she says refutes what Marcus said.

15    And the same with Tran.  Tran said he made those calls
16    when the money got tight.  And she said that she started in
17    March and the money didn't get tight until six or seven months
18    later, which also puts the calls that she may have overheard
19    after August of 2018.  So that one just isn't false.

20    They put up Exhibit 1088, suggesting that there was some
21    lie about $9 million in potential contracts, but the testimony
22    from Dr. Witte around that same time was that Aten Group
23    CEO Karl Weir told Witte that Aten Group had a $10 million deal
24    on the table.

25    I can well understand, as I've said, purchasers being

1    upset with Marcus.  They lost a lot of money.  But people who

2    worked closely with him understood his good faith.  Remember

3    Leslie Katz?  Even after the articles and the Port meeting and

4    the draft release, she did not think that Marcus was a liar or

5    a fraudster.

6         Abramoff told the FBI AML BitCoin was not a scam.

7         And Melanie Cowan said, after talking to Marcus many times

8    and after hearing him talk about the potential deals he was

9    working on, her impression was that he believed they were all

10   going to happen, because he did.  He was a dreamer.  He did not

11   have a great grasp of reality.

12        You will hear an instruction that if the defendant acted

13   in good faith, he lacked the intent to defraud required to

14   prove the offense of wire fraud as charged in Count One.

15        Good faith does not mean that everything has to be

16   correct.  It just means you were acting in good faith.  If you

17   have a reasonable doubt whether Marcus was acting in good

18   faith, you must acquit him.

19        Remember -- and I won't do this again because I'm sure

20   you've heard enough of it -- how many people called him a

21   lamebrain, an idiot, a putz, Grimace, all those things,

22   paranoid.  Like I say, I won't repeat that because I've been

23   talking too long and I know you remember all the many things

24   that people described.

25        I want to talk about Count One.  I've talked about

 1   Count Two.  I want to talk about Count One.  Again, the key is

 2   intent and good faith, whether it's the count itself or aiding

 3   and abetting, which also requires intent.

 4       I told you at the beginning that before I was finished, I

 5   would give you a bonus reason why even if I hadn't convinced

 6   you so far, you should still find Marcus guilty -- not guilty

 7   on Count One.  Okay.  Here's my bonus reason.

 8       A necessary element of conviction on Count One is that the

 9   specific wire charged in the count occurred in furtherance of

10   the charged scheme or plan to defraud.  Also, he has to have

11   used a wire to carry out or attempt to carry out an essential

12   part of the scheme.  But I think it's best to focus on was this

13   in furtherance of his scheme.

14       To meet those requirements, the Government charged a wire

15   transfer on January 12, 2018.  That's the wire transfer from

16   Ben Boyer to Block Bits Capital.  There is a later transfer of

17   money from Block Bits Capital to AML BitCoin, but that's not

18   what's charged.  What's charged is the transfer from Boyer to

19   Dillman's Block Bits Capital entity.

20       That wire was not in furtherance of any scheme in which

21   Marcus was a part.  Rather, that was done behind Marcus's back.

22   It undermined an essential component of what he was doing, and

23   it was used as part of a scheme by Boyer to cheat Marcus.

24       Let me walk through that with you.

25           THE COURT:  You have five more minutes.

1      **MR. SHEPARD:**  You recall from Fahy that Marcus was

2  focused on the permitted uses of his funds, and this wire was

3  payment for a purchase that in a manner hidden from Marcus

4  undermined all those provisions that Marcus was obsessing

5  about.

6      Dillman also wanted the wire to be credited at the

7  1.25 percent price that was about to end.  It would soon be

8  1.50.  That was all a lie.  All Dillman had was Boyer's

9  $850,000 purchase, which he hid from Marcus; and Boyer, as a

10  result, was not bound by any of Marcus's requirements.  Boyer

11  was investing in Block Bits Capital, not buying AML BitCoin

12  tokens.

13      Dillman also hid the fact that he was using AML BitCoin to

14  pitch his Block Bits funds so that he could get bought out for

15  billions of dollars.

16      Dillman lied -- I'm sorry.  Dillman lied to Marcus about

17  what was going on.  Dillman also lied to Boyer and sold him

18  more coins at a dollar fifty, even though he purchased them

19  only for a dollar and a quarter because he got the discount.

20      Boyer says Marcus is responsible for everything as a CEO.

21  Maybe so as a ship captain, but that's not how the law works.

22  You'll see that in the instructions.

23      Pulling this all together, Marcus didn't cause Boyer to

24  wire money to Block Bits Capital.  Boyer's wire to Block Bits

25  was not in furtherance of this scheme.  It undermined what

 1   Marcus wanted, the central tenet of his business, not an

 2   investment.  It undermined that.  It syphoned away money.  It

 3   was a lie about where the money was coming from.

 4       Marcus is a guy who turned down a hundred million dollars

 5   because he didn't like the deal terms.  There's more than a

 6   reasonable doubt that he would have turned down this money had

 7   he known what it really was.  And had he known that it was

 8   being hidden, that Dillman was hiding Boyer from him, you know

 9   how paranoid Marcus is, that's another reason why he would have

10   turned it down.  This was not in furtherance of his scheme.

11       So in the few minutes I have remaining, this is my least

12   favorite part of the case.  I have to shut up.  I lose my

13   captive audience.  I really appreciate the attention that

14   you've given me.  You are really important because you protect

15   people from the Ethan Quinns of the world.

16       I don't get the last word.  If the Government in rebuttal

17   gives you half the story, as they have repeatedly, I don't get

18   to correct it.  You go with your recollection of the facts, not

19   the Government's.

20       Presume Marcus to be innocent, subject there proof to

21   beyond a reasonable doubt standard; and if, after all that,

22   you're worried about something Mr. Highsmith says, ask

23   yourself:  What would I have said about it had I had the chance

24   to answer it?  If that argument was so good, why did

25   the Government wait to present it to you until I was done?  Do

 1   not convict him on an argument I haven't had the opportunity to

 2   address.

 3       And now, the reason that bothers me the most that I have

 4   to sit down and shut up, my time to help Marcus is coming

 5   rapidly to an end.  Marcus has some serious flaws.  He did not

 6   get everything right, but he acted in good faith.  He was not

 7   hiding how he bought his house.

 8       It is my fervent hope that as my time to help Marcus comes

 9   to an end, that I am passing the baton to all 12 of you to take

10   him across the finish line and find him not guilty.

11       If, however, I have messed up -- and don't count that

12   against him because he didn't pick me, I was appointed by

13   the Court.  If I have messed up and I'm passing the baton to

14   protect Marcus only to some of you, I ask you to heed the

15   judge's instructions:  Do deliberate as the instruction calls

16   for, but do not change an honest belief about the weight and

17   effect of the evidence simply to reach a verdict.

18       A compromised verdict that convicts Marcus on either of

19   these two counts is a terrible defeat for him.  So do not

20   compromise if, in your opinion, the Government has not proven

21   its case beyond a reasonable doubt.

22       In this case, it did not do so.  They saw him as a bad

23   guy.  They decided he was Brian Darrow.  They didn't look very

24   hard.  They missed all the ways he was trying to do this right.

25   They missed how he was taken advantage of by Abramoff and by

1  Dillman.  They missed his mental conditions, his poor business

2  acumen.  They charged the wrong things.  They can't prove

3  concealment.  There was another charge, just spending, that

4  Carfora told you about.  They didn't charge that.  So they

5  didn't charge what he actually did, even if you believe their

6  evidence.  They missed his good faith.

7      And now I pass the baton to you.  Please take Marcus

8  across the finish line.  Send him back to his wife and his

9  children.  Find him not guilty.  Thank you.

10      **THE COURT:**  Thank you.

11      Mr. Highsmith.

12                **REBUTTAL ARGUMENT**

13      **MR. HIGHSMITH:**  Well, Mr. Shepard just spoke to you

14  for nearly three hours and, I submit to you, blamed almost

15  everybody who stepped into this courtroom except for the

16  defendant.

17      He blamed Brandi Jodoin.  He blamed Dr. Acuna.  He blamed

18  Dr. Witte.  He blamed Dr. Gregory.  He blamed Jack Abramoff.

19  He blamed Brian Darrow.  He blamed Japheth Dillman.  He blamed

20  Ben Boyer.  He blamed mental health issues that were just

21  raised on the eve of a criminal trial.  He blamed everybody

22  else except the defendant.

23      My co-counsel, Mr. Chou, spoke with you this morning, and

24  he detailed in great depth Mr. Andrade's lies.  Mr. Andrade's

25  lies didn't start with AML BitCoin.  They started long before.

 1    They started with Aten Black Gold Coin, and then he lied about
 2    Aten Coin.  And then when Aten Coin failed, he lied about a
 3    token, an AML BitCoin token.  And then he lied about
 4    AML BitCoin, and then he kept lying.
 5        He lied to his employees.  He lied to his advisors.  He
 6    lied to the public through an extensive press strategy that he
 7    wanted.  He's the one who hired Jack Abramoff.  He's the one
 8    who fired David Hargreaves.  This was the strategy that
 9    Mr. Andrade wanted.
10        There are two big categories of lies, and Mr. Chou talked
11    about them in detail.  The two big categories of lies are the
12    tech was never done.  Mr. Andrade spoke to the world about this
13    groundbreaking technology.  It was never finished.  It was
14    never complete.  And he raised money from a variety of
15    investors, thousands of people, based on these lies,
16    approximately $10 million in losses.  And now Mr. Shepard comes
17    in and he says it was everybody else's fault except for the
18    defendant.
19        I submit to you that's just not how the evidence came in
20    during this trial.  I'm going to try to not take too much time
21    because you've been here all day, and I think both sides have
22    observed you've been incredibly attentive, incredibly careful,
23    and so I really don't want to walk through too much of the
24    evidence.
25        What I want to do is just hit some of the key evidence and

1    point out to you some of -- I want to respond to some of

2    Mr. Shepard's claims because I submit to you that when you step

3    back and you reflect on all of the evidence that came in in

4    this case, you'll see that what Mr. Shepard tried to do was

5    distract you with terms like "spaghetti" and "peanut butter"

6    rather than allowing you to focus on the evidence, all of the

7    evidence, in this case.

8        What's another way that Mr. Shepard tried to distract you?

9    By trying to get you to focus on one piece of evidence and

10   ignore everything else, the entire mountain of evidence that

11   Mr. Chou talked to you about this morning.

12       For instance, Mr. Shepard would say:  Just look at that

13   one Gavin Newsom post and ignore everything else.  Ignore the

14   fact that that was part of a press strategy designed to put up

15   photographs with high-profile people and publish it to the

16   world to sell tokens.  Mr. Shepard said ignore that.  Ignore

17   the entire press strategy.  Ignore everything that happened and

18   focus on this one tweet.

19       What Mr. Shepard is basically telling you to do, I submit,

20   it's like when you go to a TV screen, if you stand up right in

21   front of the screen and just look right at the screen, you

22   don't see anything.  That's what he's trying to do when he

23   says, "Look at one little piece of evidence only."

24       When you step back from the screen, the picture becomes

25   clear.  Step back from the screen and look at all of the

REBUTTAL ARGUMENT / HIGHSMITH

 1    evidence in this case.

 2        This is a wire fraud scheme.  It is a long-running

 3    multiyear endeavor.  It's a plan to get money from thousands of

 4    innocent people with false claims.  It's a scheme.

 5        I want to try to move through some of my comments quickly

 6    because I don't have much time.  The first thing and I think

 7    the most important thing you can do right now is reflect back

 8    to what happened this morning when my colleague, Mr. Chou,

 9    walked, in very careful detail, through each element of the two

10    charged crimes.  In very careful detail, he cited a tremendous

11    number of exhibits that meet, beyond a reasonable doubt, each

12    element of the two charged crimes.  What I want you to do,

13    first of all, is just reflect back on Mr. Chou's presentation

14    and his very careful review of the evidence.

15        I'll give you a couple of examples of what Mr. Shepard was

16    asking you to look at and a couple of examples of how

17    Mr. Shepard's trying to distract you.

18        He's trying to distract you from the core of the case,

19    which is that when you look at all of the evidence, all of the

20    evidence demonstrates beyond a reasonable doubt that Marcus

21    Andrade is guilty of a wire fraud scheme and of money

22    laundering.

23        Let's talk first about the Super Bowl because Mr. Shepard

24    made some pretty powerful statements about the Super Bowl.  He

25    said the defendant was not a part of that effort.  Well, the

 1    evidence does not support that claim.

 2        He said Mr. Abramoff hid the rejection campaign from

 3    Mr. Andrade.  The evidence does not support that claim.  We're

 4    going to walk through it in a second.

 5        He said -- Mr. Shepard said Mr. Andrade was not trying to

 6    trick anyone.  That is not what the evidence shows.

 7        May I take a look at the -- thank you so much.  Thank you.

 8        All right.  Let's look as early as January 18th, a few

 9    weeks before the Super Bowl.  This is an exhibit that's in

10    evidence, and it's a text message chain between Jack Abramoff

11    and Marcus Andrade.

12        And I'll talk a little bit more about Mr. Abramoff, of

13    course, but the key is the hard evidence, the text messages,

14    not claims about what people said.  The text messages.

15        What does Mr. Abramoff say to Mr. Andrade?  This is

16    totally different than what Mr. Shepard claimed.  He said:  We

17    need to launch the rejection campaign as early as next week.

18    As early -- as early in the week of the 29th as possible.

19        Mr. Andrade knew definitively that he was involved in a

20    rejection campaign by January 18th.  That's a fact.  That is a

21    fact that's in evidence in this case.  That's a fact.  It's

22    supported by a document, not by a claim from an attorney,

23    because what we say is not evidence.  What I say, it's not

24    evidence.  What Mr. Shepard says, that is not the evidence.

25    Let's look at the evidence.

1        On January 21st, again, Mr. Shepard claimed that

2    Mr. Abramoff was hiding the rejection claim from Mr. Andrade.

3    That was the claim.  That's what he said.

4        [As read]:

5            "This is what we will use with NBC to get

6        rejected, and believe me they will reject us."

7        That's January 21st.  How does Mr. Andrade respond?

8        [As read]:

9            "I wish they could have done better than that."

10       Mr. Shepard made a claim that Mr. Andrade was not trying

11   to trick anyone.  He was not trying to deceive anyone.

12       January 23rd, Marcus Andrade [as read]:

13           "Have you spoken with Japheth yet?"

14       Mr. Abramoff [as read]:

15           "He thought you told him we were doing an ad on

16       the Super Bowl, not the rejection ad.  I tried to

17       spin it positively, but he thought you told him

18       that."

19       Marcus Andrade [as read]:

20           "I did not mention a rejection ad.  No one

21       should know that other than you and me."

22       It's not Jack Abramoff saying that.  Jack Abramoff isn't

23   telling Mr. Andrade to hide this.  Mr. Andrade is saying to

24   hide the rejection campaign.

25       This is evidence.  These are text messages.  This is hard

1    evidence.

2          Mr. Andrade [as read]:

3                "It could be looked at negatively if people knew

4          we were going that route."

5          Mr. Andrade, I submit to you, knows.  He knows about the

6    deception because he's saying:  Our whole campaign could be

7    looked at negatively.  Hide this from Japheth Dillman.  Hide it

8    from my chief strategy officer, my top salesman.  Hide it from

9    my top salesman.

10         Why?  Why are we hiding the Super Bowl ad from

11   Mr. Andrade's top salesman, the chief strategy officer of his

12   enterprise?  Because his top salesman is going to do exactly

13   what Ben Boyer testified about.  He's going to talk to

14   potential customers like Ben Boyer about how AML BitCoin is

15   going to run an ad in the Super Bowl, and people like Ben Boyer

16   are going to be impressed.  They're going to want to buy into

17   this.  This is exciting.  But it wasn't real.  It was

18   half-baked.  It was unformulated.

19         You can't lie about your business to get $10 million.

20   That's what this case boils down to.  You can't lie to get

21   $10 million from tens of thousands of people.

22         Mr. Shepard said this is a failure of proof on

23   the Government's part.  Mr. Shepard says Mr. Andrade wasn't

24   trying to fool anybody.  Just look at the evidence.  Look at

25   the text messages.  They definitively establish, I submit to

1  you, that Mr. Andrade was trying to fool investors and even his

2  own salespeople.

3      There are more -- there's more evidence in the Super Bowl

4  rejection campaign.  There's more evidence of Mr. Andrade's

5  intimate involvement in it, and Mr. Chou walked you through it,

6  and you can look at these additional pieces of evidence.

7      It was a fake Super Bowl rejection campaign because there

8  was a fake product.  There was a half-baked cryptocurrency

9  product.

10      There was a criminal lobbyist, Jack Abramoff, because this

11  was a fake product.  We had a half-baked cryptocurrency.  We

12  had a convicted -- Mr. Andrade hired a convicted, disgraced

13  lobbyist.  Mr. Andrade had, essentially, deceptive salespeople

14  like Brian Darrow.  This was the scheme.  This was

15  Mr. Andrade's scheme.

16      Deceptive salespeople, deceptive Super Bowl ad, deceptive

17  press campaign, especially when you step back and look at all

18  of the press on Twitter, on Facebook, on social media, look at

19  all of that information as Mr. Chou walked you through in great

20  detail.

21      Okay.  The technology.  Mr. Shepard made a big deal about

22  the state of the technology.  I want to make one argument about

23  this, and then we'll talk about the evidence about the state of

24  the technology.

25      I submit to you this is actually not really a case about

REBUTTAL ARGUMENT / HIGHSMITH

1  cryptocurrency.  It's not a case about source code.  You don't

2  have to be a cryptocurrency enthusiast to understand this case.

3  You don't have to be a computer scientist.

4      This is a case about fraud.  It's about lying to people to

5  get their money.  That's what it's about.  Cryptocurrency was

6  Mr. Andrade's vehicle.  He had some expertise in it.  He was

7  good at it.  He knew about it.  He was early to cryptocurrency.

8      But at its core, this case is a fraud.  Cryptocurrency was

9  a vehicle for him to line his pockets with $2.1 million in

10  investor money to bring in $10 million.  That's what the case

11  is.  It's a fraud case.

12      Mr. Andrade was a grifter.  He was somebody who lied to

13  people; and as Mr. Chou explained to you, he did that

14  repeatedly throughout the years.

15      Mr. Shepard made an accusation about the Government and

16  some of the source code, and that is true.  There were -- there

17  was source code received by the Government that the Government

18  did not review.  That is true.  But then Mr. Shepard wants to

19  distract you by saying:  Ignore what all the witnesses said

20  about the source code.

21      So we're going to cover the source code right now and go

22  through what the witnesses said about the technology.

23      What did the witnesses who worked for Mr. Andrade, his

24  employees, what did they say about the technology?  Numerous

25  witnesses came into this case, one after another:  Evan

1  Carlsen, Hung Tran, Melanie Cowan, Bernadette Tran.  They came

2  in and they testified about the state of the technology.  And

3  even Mr. Andrade's own expert witness looking at the evidence

4  many, many, many years later said something consistent with

5  what those employees said.  So don't get distracted.  Focus on

6  the evidence.

7       The tech never existed in complete form, and Mr. Andrade

8  knew it.  How do we know that?  Look at the testimony.

9       Let's start with Hung Tran and we'll start early.

10  Hung Tran [as read]:

11       "QUESTION:  Did he talk to you at all about his past

12       projects, such as his past crypto projects?

13       "ANSWER:  Yes, he did.

14       "QUESTION:  What did he say about his past cryptocurrency

15       projects?

16       "ANSWER:  There was a project called Aten Coin, I think it

17       was called, and I don't know if I discovered the name

18       later, but it didn't go well simply because it didn't have

19       certain characteristics that was called anti-money

20       laundering.  And because of that, the project wasn't

21       successful as he wanted it to be.  And that -- he's

22       interested in that kind of technology for his current

23       project."

24       So what did Hung Tran do?  Well, there was testimony about

25  the developers in India, and this is the fall of 2017 [as

1  read]:

2      **"QUESTION:** Did you" --

3      And if you remember Mr. Tran, Hung Tran's testimony was he

4  was there to figure out for Mr. Andrade had they developed a

5  token.  We're not even talking about the AML BitCoin

6  cryptocurrency with the biometric identity built into its

7  software.  We're not talking about that.

8      Did they have just a placeholder token that they could use

9  to raise money on an ICO and then get listed on an exchange so

10 they could dump their coins and get rich?

11     Did they have a token when Hung Tran came in the fall of

12 2017?  Was there an AML BitCoin Token?  Had the developers in

13 India built it?

14     [As read]:

15     **"QUESTION:** Did you report your findings back to

16     Mr. Andrade and Mr. Poon?

17     **"ANSWER:** Yes, I did.

18     **"QUESTION:** What did you tell them?

19     **"ANSWER:** Well, we needed to hire more senior people that

20     either guided them better or to take over the whole

21     project because there was no token built.

22     **"QUESTION:** What was Mr. Andrade's reaction to that?

23     **"ANSWER:** The impression I remember is probably he wasn't

24     happy, and he asked me for advice, what needed to be done,

25     so I listed out the recommendation."

**REBUTTAL ARGUMENT / HIGHSMITH**

1    Mr. Andrade knew that he didn't have a token, let alone a

2    cryptocurrency with the biometric features built in that he

3    purported to the world existed.

4    So what did he hire Hung Tran to do?

5    [As read]:

6    **"QUESTION:**  He asked for your advice on what needed to be

7    done to build a token?

8    **"ANSWER:**  Yeah, to finish the project I was looking at.

9    That would be to build a token.

10    **"QUESTION:**  Okay.  Did he hire you to build a token?

11    **"ANSWER:**  Yes.

12    **"QUESTION:**  How long did it take you to build the token?

13    **"ANSWER:**  About 11 days.

14    **"QUESTION:**  Did you also build a wallet for the token?

15    **"ANSWER:**  Yeah.  It took an additional six days."

16    Hung Tran in the fall of 2017 is building a token.  This

17    is his testimony.

18    [As read]:

19    **"QUESTION:**  In your conversation with Mr. Andrade, did he

20    talk about building a product that had special anti-money

21    laundering and know-your-customer features with biometric

22    identification built into the blockchain?

23    **"ANSWER:**  Yes, he talked about that.

24    **"QUESTION:**  Was that the project you built?

25    **"ANSWER:**  No."

1    Mr. Andrade knew about the state of his technology.

2    Hung Tran's not the only person who said that.  Evan

3    Carlsen said the same thing.

4    [As read]:

5    "QUESTION:  Based on your conversation with Mr. Andrade,

6    did you understand about his cryptocurrency being finished

7    and built?

8    "ANSWER:  It wasn't.  It was just the beginning parts of

9    it.

10    "QUESTION:  Again, late 2018, after all the misleading

11    statements in the press had gone out, after the

12    *U.S. News & World Report* article, after *Washington Times*

13    article, after the *Business* Insider article, after the

14    entire press strategy, well after the entire press

15    strategy, there was no finished product?

16    "ANSWER:  No.  There was nothing existing."

17    Mr. Andrade knew he did not have a product, but he wanted

18    to travel the world, meeting with business and government

19    leaders, claiming falsely that he had a product.

20    Going back to Aten Coin.  I'm sorry.  We're going to go

21    back in time a little bit to Aten Coin.

22    So Aten Coin, Evan Carlsen testified about Aten Coin, and

23    Evan Carlsen testified that he had to use the Aten Coin product

24    as a baseline to build up this anti-money laundering Bitcoin.

25    [As read]:

1    **"QUESTION:** So at that point" --

2    Remember, Evan Carlsen came in?  He said he gave a

3    presentation to Mr. Andrade in May 2018?  So after Mr. Andrade

4    made all those false statements in the press, after he released

5    all those tweets, after he released all that social media with

6    claims about a fully baked product with biometric verification

7    built into the blockchain, well after all of that, Evan Carlsen

8    goes to Mr. Andrade because Mr. Andrade asked for it.

9    Mr. Andrade, I submit to you, knows that he needs to build a

10   product because he brings in Evan Carlsen and says, "Can you

11   build one for me?"  There's no product.  After all the lies,

12   there's no product.

13   But then going back in time, we go back in time to

14   Aten Coin.  Let's go back years to Aten Coin.

15   [As read]:

16   **"QUESTION:** So at that point did Aten Coin have the

17   anti-money laundering and know-your-customer features that

18   a bank would need to use it?

19   **"ANSWER:** No."

20   Aten Coin didn't have the features either.  Mr. Andrade

21   knew from these developers, who he brought in because he asked

22   them to build a product, that he did not have a product.

23   Here's Exhibit 162.  This is November 2018.  This is a

24   year after all of those false press statements.  Mr. Andrade is

25   connecting Evan Carlsen with the development team in India to

1    look at the original Aten Coin, the original Aten Coin from

2    years before.

3         Hung Tran.  Evan Carlsen.

4         I submit to you also that the testimony of Mr. Andrade's

5    two young employees, Bernadette Tran and Melanie Cowan, was

6    powerful evidence.  Why?  It came from two young people who

7    worked directly for Mr. Andrade.  They were with him.  They

8    observed him.  They saw him.  They saw his product.

9         What did they say about the product?  They said [as read]:

10        "QUESTION:  During the time you worked for Mr. Andrade,

11        did AML BitCoin ever have a major announcement?"

12        They also made comments about the deals.  We'll talk about

13   the deals in a second.  They also said Mr. Andrade had no

14   finished product.  They also referenced the testing from the

15   CrossVerify product that came in again in 2018.  It didn't

16   work.  It had bugs.  We couldn't get it to work.  It was in

17   demo stage.

18        The tech was not finished.  That's just a fact.  It's been

19   established by multiple witnesses who came in and testified

20   consistently with that.  The tech did not exist and Mr. Andrade

21   knew it.

22        Before we move on, Mr. Andrade's own expert witness said

23   the same thing.  This is not somebody who was there with

24   Mr. Andrade at the time.  This is not his employees who are

25   working with him every day.  This is somebody who came back

 1  years and years later and tried to re-create things [as read]:

 2      **QUESTION:**  At that point did you see any integration of

 3      Aten Coin into the business?

 4      **ANSWER:**  I don't recall.

 5      **QUESTION:**  Did you see any integration of Aten Coin as

 6      some sort of daily payment service?

 7      **ANSWER:**  No.

 8      **QUESTION:**  You didn't see Aten Coin blockchain

 9      transactions in the code that you were able to review;

10      right?

11      **ANSWER:**  Correct."

12      That's Aten Coin.  That's not even the AML BitCoin.

13      [As read]:

14      **QUESTION:**  From your review of the code in January 2016,

15      Aten Coin wasn't entirely complete; correct?

16          "Excuse me.  My question was:  In your expert

17      opinion, as of January 26, 2016, Aten Coin was not

18      entirely complete; correct?

19      **ANSWER:**  Based on my findings, no, it wasn't."

20      Erik Min corroborated exactly what all the developers

21  said.  There was no Aten Coin finished product.

22      Same thing with AML BitCoin.  Mr. Chou asked [as read]:

23      **QUESTION:**  In October 2017, in your opinion, AML BitCoin

24      wasn't entirely completed; correct?

25      **ANSWER:**  Correct."

1        That's Mr. Andrade's own witness.  His own witness.

2        Then Mr. Shepard came up and tried to blame Michael Witte.

3   He tried to say, "Oh, the tech must have existed because

4   Dr. Witte could download a wallet."

5        I submit to you that's classic misdirection.  Okay.  He

6   could download a wallet.  Could he sell -- could he sell --

7   could he sell anything?  Could he get anything out of this

8   investment?  Not a penny.  Nothing.

9        There was no Aten Coin with special features.  There was

10  no way to get a return on your investment.

11       The press strategy.  I think the press strategy is

12  important, and I think it's important to look at the press

13  strategy after it's been established definitively by witness

14  after witness that the tech was not there.

15       Look at the press strategy with that eye.  Look at the

16  press releases that are in evidence.  After you've considered

17  the testimony of all of these employees, of all of these

18  developers, look at the press strategy.

19       Here's the early piece of press from the *U.S. News & World*

20  *Report* article, September 2017.  There's not even a token.

21  Hung Tran hasn't even built the token, the placeholder, with

22  nothing special in it yet.  He hasn't even built it.  Forget

23  about the AML BitCoin with biometric identity built into the

24  blockchain.

25       Here's the *U.S. News & World Report* article [as read]:

1          "The Port of San Francisco, like many other

2      international ports, want to include digital

3      currencies in their payment structures and they may

4      soon be able to thanks to Marcus Andrade, the

5      software entrepreneur behind AML BitCoin.  The Port

6      could utilize digital currency as a means of payment

7      free from the abuse and criminality attached to the

8      concept."

9      Of course Mr. Andrade approves it.  "Looks great."  This

10  is the press strategy.  This is it.

11      Misstate the state of evidence, build attention.

12      You saw this with Mr. Chou before.  This is Brian

13  Darling's article [as read]:

14          "With the introduction of AML BitCoin, the first

15      digital currency that incorporates patent-pending

16      anti-money laundering and know-your-customer

17      provisions of America's strict banking laws."

18      It didn't exist in Aten Coin, didn't exist in the token,

19  didn't exist in AML BitCoin.

20      [As read]:

21          "Looks great.  Post it."

22      There was some talk during Mr. Shepard's closing and also

23  in my colleague's closing about taking attorneys off email

24  chains.  Here we have in October 2017 Mr. Andrade clearly

25  directing his subordinate.  Who's in charge here?  Mr. Andrade

1  is in charge.  He is directing his subordinate Japheth Dillman

2  [as read]:

3          "Cut Neil out of the loop.  I want you focused

4      on getting this ICO moving as fast as possible."

5      Why does he need to be focused on getting the ICO moving?

6  That's the initial coin offering.  That's how they're going to

7  make money.  He's telling his top salesperson, his chief

8  strategy officer:  Cut the attorney out of the press.  I need

9  you focused on selling.  I need you focused on the initial coin

10  offering.

11      Mr. Shepard basically wanted to excuse Mr. Andrade from

12  being in charge.  This is -- this is not somebody who's being

13  taken for a ride or directed by Japheth Dillman or

14  Jack Abramoff.  This isn't somebody who is influenced by

15  others.  This isn't somebody who is following directions from

16  somebody else.  This is the founder and CEO.  This is the boss,

17  and he's telling his people what to do.  I've asked Jack to

18  help us with this.  He's telling Dillman:  I've asked Jack to

19  help with this.  I want them to send all drafts to Jack.

20      Strip out any mention of Jack.  He is in charge.

21  Mr. Andrade is in charge.  Take Abramoff out of the press.  We

22  can't have him in the press.  Take him out.

23      What does Mr. Dillman say in response to this directive by

24  his boss?

25      [As read]:

1          "Okay.  Thanks for the heads-up.  I'm forging

2      some agreements."

3      Does his boss -- does that send red flags?  Does the CEO,

4  the founder, somebody who's been working on this project for

5  years say, "What are you doing?  Why are you forging

6  agreements?  What are you doing?"  That is not what he says.

7          Look at the evidence.  Focus on the evidence.  Focus on

8  the emails and the texts.  Focus on the hard evidence.

9          **THE COURT:**  You've got ten more minutes,

10  Mr. Highsmith.

11          **MR. HIGHSMITH:**  That's not much.

12          **THE COURT:**  No.  So better not waste it talking to me.

13                       (Laughter.)

14          **MR. HIGHSMITH:**  I'm just going to show you -- there

15  are a mountain of press releases.  I'm just going to show you a

16  couple of press releases.

17          There was no tech.  What does Mr. Abramoff say to do?

18  Here's his draft.  What's the date on this?  November 5th,

19  2017.  What's the date?  Well before.  Hung Tran is basically

20  just finishing up a placeholder token with no special features.

21          What does -- what does this say?

22          [As read]:

23          "AML BitCoin is the world's only digital

24      currency with patent-pending biometric digital

25      identity tied to the blockchain enabling strict

 1        adherence to all bank secrecy security provisions,

 2        including AML and KYC."

 3        "Looks good," says Mr. Andrade.  "This looks good."

 4        Also, he wants more.  He says [as read]:

 5             "Let's see if we can get a meeting with the

 6        Vatican."

 7        He wants more because he knows this is the strategy.  This

 8   is his -- this is his understanding.  This is his strategy.

 9        He wants to do the same thing that he did in Panama, that

10   he did with the Port of San Francisco, that he did with the

11   London Stock Exchange, that he did with the Parliament in the

12   United Kingdom, now he wants to do it with the Vatican.

13        Who's direct- -- is that Jack Abramoff directing him to

14   set up the meeting with the Vatican?  No.  He's the one with

15   that idea.

16        Mr. Shepard tried to distract you by saying that

17   Mr. Andrade wasn't -- didn't know about the press strategy,

18   wasn't in charge of it.

19        Reflect on the trial testimony of Melanie Cowan and

20   Bernadette Tran.

21        Melanie Cowan [as read]:

22        "QUESTION:  Who would approve what was updated or added to

23        the website?

24        "ANSWER:  Marcus.

25        "QUESTION:  Okay.  Was there anyone else that had to --

1    that approved changes to the website before they were

2    made -- updated and made live?

3    **"ANSWER:**  No."

4    Bernadette Tran, another employee [as read]:

5    **"QUESTION:**  How involved was Mr. Andrade in reviewing

6    public-facing content like press releases?

7    **"ANSWER:**  Oh, he would have to check that.  He made sure

8    to always review everything.

9    **"QUESTION:**  Would he review it once, more than once?

10   **"ANSWER:**  Multiple times.  If we made any edit, even if

11   you changed an 'and' to an 'or,' he would have to check

12   it.

13   **"QUESTION:**  And did he review the text on the website?

14   **"ANSWER:**  Yes, he did."

15   Mr. Andrade had a press strategy as far back as 2014.

16   Mr. Chou walked you through that.  I'm not going to repeat it

17   again.  But he had it as early as 2014.

18   He continued it through 2016, before Jack Abramoff, before

19   Japheth Dillman, before Carlos De La Guardia, before anyone.

20   He was talking about a press strategy in 2016 with Terence

21   Poon.  He had -- he said he had a marketing plan to pour in

22   $2 million.  Exhibit 1088.

23   You know what else he told Mr. Poon?  He said [as read]:

24   "Terence, please know that, Terence, I do not

25   need you to be able to make this work.  We already

1          have over $9 million per year worth of potential

2          contracts, companies that have already agreed to use

3          our product.  Contracts are pending."

4          These are lies.  This is 2016.  There were no deals.

5     Witness after witness came in here and testified to you there

6     were no business deals.  There were no deals with governments.

7     There's no deals with business entities.

8          Okay.  Jack Abramoff.  All right.  Jack Abramoff is a

9     criminal.  True statement.  Jack Abramoff committed fraud prior

10    to this case.  True statement.  Jack Abramoff pled guilty and

11    entered into a plea deal with the United States.  True

12    statement.

13         Why did he plead guilty to that crime?  What's his big

14    flaw?  Why was he here?  Why was he on the stand?  He was on

15    the stand because he worked with Mr. Andrade.  Jack Abramoff

16    knew about Mr. Andrade's business because Mr. Andrade had hired

17    him.

18         Mr. Andrade knew that Mr. Abramoff was a convicted felon,

19    a disgraced lobbyist, and he went out and he hired him.  It's

20    in the emails.  This is in the emails.

21         Now, Mr. Shepard made a big deal about, "Oh, you know, how

22    did -- how did Mr. Abramoff come into the picture?"

23         It's in the emails.  He reached out to him.

24         And then Mr. Abramoff said, "No, I don't want to -- I'm

25    not going to work with you on Aten Coin."

1     October 2015 [as read]:

2          "I'm grateful that we had the chance to meet,

3     and I wish you the very best on this project, but I'm

4     going to have to pass on this opportunity.  I hope

5     our paths cross again in the future."

6     Okay.  Mr. Abramoff is a criminal, and he is -- he

7     testified he's got a court-approved plea agreement.  It has the

8     provisions about testifying truthfully.  Fine.  Set all that

9     aside.  Set his testimony aside.  Set Mr. Abramoff's testimony

10    aside.  Set it aside and just look at the text messages between

11    him and Mr. Andrade.  Just read Mr. Andrade's own words.

12         You're going to have some of the text messages.  There was

13    a mountain of communications between the two of them.  Just

14    look at Mr. Andrade's words.  You don't have to listen -- you

15    don't have to believe Mr. Abramoff's testimony.  Look at all

16    those text messages that are in evidence, and then examine

17    Mr. Abramoff's testimony.  Look at the hard evidence first, and

18    then examine Mr. Abramoff's testimony.

19         Well, okay.  So Mr. Shepard then tried to distract you by

20    saying, "Oh, when Mr. Abramoff was caught by the FBI,

21    Mr. Abramoff said exculpatory things about himself."  Of course

22    he did.  Mr. Abramoff was under investigation also.  He was

23    also under investigation.  He was under investigation for this

24    fraud scheme and other fraud schemes.  Of course he tried to

25    talk -- of course he tried to dodge from the FBI.  Of course he

 1    didn't say things about Marcus Andrade's criminal activity

 2    because they were in bed together.  They were working together.

 3    They were co-schemers.

 4        If Mr. Abramoff had said -- had talked about Mr. Andrade's

 5    fraud scheme, he would have been talking about his own.  He

 6    would have been admitting his own fraud scheme.  They were in

 7    bed together, and at that point Mr. Abramoff was trying to

 8    protect Mr. Andrade.

 9        Look at the text messages.  Look at the text messages.

10        Did Mr. Andrade know that -- that his product was in

11    trouble?  Did he know that it was -- there were problems with

12    it?  Of course he did.  People used words like "scam" and

13    "fraud" to him.

14        Jack Abramoff [as read]:

15            "We are coming off like a scam."

16        Mr. Andrade knew.  He knew about this.  He knew.  This was

17    in the middle of the ICO when they were supposed to be making

18    money, he knew that.

19        What was Mr. Andrade's response?  This is the ICO that

20    is -- this is their chance -- their chance to make money.

21    Mr. Abramoff is sounding alarm bells, and Mr. Andrade's

22    response is [as read]:

23            "Remember, all we have to do is get listed on an

24        exchange.  The PR will do the rest."

25        This is the strategy.  Lie and pump it up through a press

 1    strategy.

 2        Mr. Abramoff made very clear in those text messages that

 3    you just read that the initial coin offering was not

 4    succeeding.  It was not succeeding.

 5        And what did Mr. Andrade and Mr. Abramoff then try to do?

 6    They put out more misleading press [as read]:

 7            "The ICO has been extended for another month to

 8        accommodate a torrent of last-minute new coin

 9        purchasers and demands."

10        They had just been texting about how it was a failure, and

11    now they wanted to lie to the public.

12        What does Mr. Andrade say?

13        [As read]:

14            "Draft looks good.  Approved."

15            **THE COURT:**  Time to sum up.

16            **MR. HIGHSMITH:**  All right.  How many minutes do I

17    have?

18            **THE COURT:**  One.

19                        (Laughter.)

20            **MR. HIGHSMITH:**  Well, I've got -- I've got a mountain

21    more material, and so what I'm going to do is tell you to look

22    at the evidence.  Look at the evidence in this case.  Go

23    through it very carefully.

24        You've been a very attentive jury, and I know that you'll

25    look at the evidence carefully.  I know you won't be distracted

1    by little pieces.  I know you won't look at the TV screen and

2    just focus on one small piece of evidence.  I know you'll step

3    back and you'll look at everything.

4        I know you're not going to fall for the misdirection of

5    blaming Mr. Andrade's victims, of saying, "Oh, there was,

6    you know, a disclaimer buried in the bottom of my contract that

7    said I could do anything I wanted with your money after I lied

8    to you to get it."

9        No, he cannot blame his victims.  He cannot bully his

10   victims.  That's exactly what he did.

11       What did he do?  Victim after victim came in and they

12   testified.  It could be Ben Boyer, a sophisticated victim.

13   Brandi Jodoin, an unsophisticated victim.  It could be in the

14   text messages with Mr. Abramoff.

15       What happened when someone raised a red flag?  What

16   happens when someone said, "I'm going to the FBI or the SEC"?

17   What happens when someone said, "My money is all gone.  I can't

18   get it back"?  Mr. Andrade sued them, and then Mr. Andrade

19   bullied them.  Bullied them by suing them.

20       Mr. Chou put it very eloquently.  He said -- I can't say

21   it as eloquently as Mr. Chou did.  He bullied them with the

22   legal system.

23       Then, finally, we've got the mental health issue, and

24   that's Mr. Shepard's next excuse.  Mr. Andrade didn't have the

25   intent because he has mental health issues.  It's an excuse.

1        Dr. Gregory was clear on the stand.  And I submit to you

2   Dr. Gregory was far more credible than Dr. Armstrong.

3   Dr. Gregory testifies more for the defense than she does for

4   the prosecution.  Dr. Armstrong never testifies for the

5   prosecution.  Dr. Armstrong came in and said, "Yes, I have a

6   YouTube channel for my students, and I tell my students I don't

7   say that in court."

8        Look at their training.  Dr. Gregory went through -- has

9   multiple degrees and her extensive clinical experience through

10  UCSF.  That's in stark contrast to Dr. Armstrong.

11       And when she was asked, "Does Mr. Andrade know the

12  difference between right and wrong," she said, "Yes, of course

13  he knows the difference between right and wrong."

14       That's really what it boils down to.  Does he understand

15  the consequences of his actions?  She said, "Yes, of course, he

16  does."  That's someone who testifies for the defense more often

17  than they testify for the prosecution.

18       Look, it's not a crime to make mistakes.  It is not a

19  crime to be a bad businessperson.  But you know what's not a

20  mistake?  When $2 million falls into your pocket.  You know

21  it's not a mistake when $2 million in investor money falls in

22  your pocket.  When you buy a house, a mansion, all cash, that's

23  not a mistake.  That's not bad business.  When you buy an

24  $80,000 Ford F-250, when you buy a Cadillac Escalade with

25  investor money, that's not a mistake.

 1          The idea that Mr. Andrade believed in good faith that he

 2     had a product, that's just not the evidence.  That's not what

 3     came in through witness after witness after witness after

 4     witness.  That's not the testimony that you heard during this

 5     trial.  That is just not the testimony you heard.

 6          All right.  So let's finish it up.  Put aside

 7     Mr. Shepard's misdirection, what he's trying to get you to

 8     focus on, and focus return to the evidence.

 9          Mr. Andrade did not have the real cryptocurrency product

10     he proclaimed to the world that he had.  He didn't have honest

11     salespeople.

12          He had Mr. Darrow, who he paid a 40 percent commission;

13     Mr. Darrow, who said, "You know what the biggest red flag is?

14     If you get a commission that big, that is a huge red flag."

15     And what did Mr. Darrow do?  He copied Mr. Andrade's idea and

16     then did it himself somewhere else.  He saw what Mr. Andrade

17     was doing and he went off and did the same thing and got caught

18     for it.

19          And Mr. Shepard said --

20          **THE COURT:**  Mr. Highsmith, you're going back into

21     this.  Sum up.  That's what I told you.

22          This jury -- I want to get the final instructions, get

23     them organized.  I promised them we were going to be done

24     today, so sum up.

25          **MR. HIGHSMITH:**  Yes, Your Honor.  Absolutely.

**FINAL JURY INSTRUCTIONS**

 1        Who's at the middle of all of this?  When it comes down to

 2   it, who's at the middle?  Mr. Andrade, the founder and CEO.

 3   Look at the LinkedIn profile that he has, that Ben Boyer

 4   introduced into evidence.  Extensive experience.  Don't let

 5   Mr. Andrade distract you by blaming other people.  Focus on

 6   who's at the middle of everything, who made money.

 7        All the people Mr. Shepard wants to blame the case on,

 8   they lost money.  They lost money.  They did not get their

 9   investment back.  They got nothing.

10        Who did get money?  Follow the money.  Who made money out

11   of this case?  $2.1 million at a minimum.

12        Stay focused on the evidence.  Look at the chain of

13   command.  Follow the money.  We're confident that if you do all

14   of those things, you look carefully at the evidence, after you

15   deliberate, you will return the only verdict that is consistent

16   with the facts and the law.  That's a verdict of guilty on both

17   counts.

18        Thank you.

19        **THE COURT:**  Members of the jury, I'm going to give you

20   a couple of final instructions, and then you're going to go off

21   with Ms. Lew and she's going to get you organized, and then the

22   case is in your hands.

23        When you begin your deliberations, elect one member of the

24   jury as your foreperson who will preside over the deliberations

25   and speak for you here in court.

1    You will then discuss the case with your fellow jurors to

2  reach agreement if you can do so.  Your verdict, whether guilty

3  or not guilty, must be unanimous.

4    Each of you must decide the case for yourself, but you

5  should do so only after you have considered all the evidence,

6  discussed it fully with the other jurors, and listened to the

7  views of your fellow jurors.

8    Do not be afraid to change your opinion if the discussion

9  persuades you that you should.  But do not come to a decision

10 simply because other jurors think it is right.

11   It is important that you attempt to reach a unanimous

12 verdict but, of course, only if each of you can do so after

13 having made your own conscientious decision.  Do not change an

14 honest belief about the weight and effect of the evidence

15 simply to reach a verdict.

16   Perform these duties fairly and impartially.  You should

17 also not be influenced by any person's race, color, religious

18 belief, national ancestry, sexual orientation, gender identity,

19 gender, or economic circumstances.  Also, do not allow yourself

20 to be influenced by personal likes or dislikes, sympathy,

21 prejudice, fear, public opinion, or biases, including

22 unconscious biases.  Unconscious biases are stereotypes,

23 attitudes, or preferences that people may consciously reject

24 but may be expressed without conscious awareness, control, or

25 intention.

It is your duty as jurors to consult one another and to deliberate with one another with a view towards reaching an agreement if you can do so.  During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or the issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, text messaging, or any Internet chat room, blog, website or any forms -- other forms of social media.  This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to us.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with

it; do not do any research, such as consulting dictionaries,

searching the Internet, or using other reference materials; and

do not make any investigation or in any other way try to learn

about the case on your own.

The law requires these restrictions to ensure the parties

have a fair trial based on the same evidence that each party

has had an opportunity to address.  A juror who violates these

restrictions jeopardizes the fairness of these proceedings, and

a mistrial could result that would require the entire trial

process to start over.  If any juror is exposed to any outside

information, please notify the Court immediately.

Some of you have taken notes during the trial.  Whether or

not you took notes, you should rely on your own memory of what

was said.  Notes are only to assist your memory.  You should

not be overly influenced by your notes or those of your fellow

jurors.

The punishment provided by law for these crimes is for

the Court to decide.  You may not consider punishment in

deciding whether the Government has proved its case against the

defendant beyond a reasonable doubt.

A verdict form has been prepared for you.  After you have

reached unanimous agreement on a verdict, your foreperson

should complete the verdict form according to your

deliberations, sign and date it, and advise Ms. Lew that you

are ready to return to the courtroom.

1    It's a very simple verdict form.  It has a blank space and

2  the two options, guilty or not guilty.  We ask that you write

3  in the verdict on each -- on both questions, then date it and

4  sign it.  The foreperson signs it.

5    If it becomes necessary during your deliberations to

6  communicate with me, you may send a note through the courtroom

7  deputy, signed by any one or more of you.  No member of the

8  jury should ever attempt to communicate with me except by a

9  signed writing, and I will respond to the jury concerning the

10  case only in writing or here in open court.  If you send out a

11  question, I will consult with the lawyers before answering it,

12  which may take some time.  You may continue your deliberations

13  while waiting for the answer to any question.  Remember, please

14  remember that you are not to tell anyone, including me, how the

15  jury stands, numerically or otherwise, on any question

16  submitted to you, including the question of the guilt of the

17  defendant, until after you have reached a unanimous verdict or

18  have been discharged.

19    So at this point we will let our alternates go.  It's

20  always, I know, bittersweet because you've sat through all of

21  the trial and you've done your duty.  We're very grateful to

22  you.

23    Mr. Han, Mr. Montville, and Ms. Lapedis, please continue

24  to avoid having any discussions, doing any research, anything

25  associated with the case because if a juror is not able to

**PROCEEDINGS**

1    serve, we may then have to reach out to you and have you come

2    in.

3        But you will be relieved at this point and won't

4    participate in the deliberations, but don't alter that

5    *modus operandi* of not talking with anybody or doing any

6    research until you've heard from the Court that the case has

7    reached a verdict and been resolved.

8        So what I'm going to ask you to do now is for the jury to

9    go with Ms. Lew, and the only thing you have to do before you

10   leave today is to select your foreperson and to give us your

11   schedule for tomorrow and thereafter.

12       You can deliberate any time from 8:30 to 4 o'clock.

13       With that, thank you.  You may begin your work.

14      (At 4:04 p.m. the jury retired to commence deliberations.)

15       (Proceedings were heard out of the presence of the jury.)

16           **THE COURT:**  We are out of the presence of the jury.

17       You know the drill.  You need to be within ten minutes of

18   the Court if we need to get you.

19                   (Proceedings adjourned at 4:05 p.m.)

20                           ---oOo---

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Wednesday, March 12, 2025

*Ana Dub*

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter