**Volume 6**

**Pages 907 - 1098**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|           Plaintiff, | ) | |
| | ) | |
|   VS. | ) | **NO. CR 20-00249 RS** |
| | ) | |
| ROWLAND MARCUS ANDRADE, | ) | |
| | ) | |
|           Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Tuesday, February 18, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                PATRICK D. ROBBINS
                ACTING UNITED STATES ATTORNEY
                450 Golden Gate Avenue
                San Francisco, California 94102
       BY:  **CHRISTIAAN HIGHSMITH**
             **DAVID J. WARD**
             **MATTHEW CHOU**
             **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                KING & SPALDING, LLP
                50 California Street, Suite 3300
                San Francisco, California 94111
       BY:  **MICHAEL J. SHEPARD,  ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official United States Reporter

1    **APPEARANCES:** (CONTINUED)

2    For Defendant:

3                        KING & SPALDING, LLP
                         1700 Pennsylvania Avenue, NW
                         Washington, D.C. 20006
4                  BY:  **KERRIE C. DENT, ATTORNEY AT LAW**

5

6                        KING & SPALDING, LLP
                         1185 Avenue of the Americas, 34th Floor
                         New York, New York 10036
7                  BY:  **DAINEC P. STEFAN, ATTORNEY AT LAW**

8

9                        LAW OFFICES OF CINDY A. DIAMOND
                         58 West Portal Avenue, Suite 350
                         San Francisco, California 94127
10                 BY:  **CINDY A. DIAMOND, ATTORNEY AT LAW**

11

12   Also Present:      **Special Agent Brendon Zartman**
                        **Tina Rosenbaum, Paralegal**
                        **Ed Jackson, Trial Technician**

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          __I N D E X__

2

3        Tuesday, February 18, 2025 - Volume 6

4

5        __GOVERNMENT'S WITNESSES__                    __PAGE__   __VOL.__

6        __KATZ, LESLIE (RECALLED)__
         (PREVIOUSLY SWORN)                          923      6
7        Cross-Examination resumed by Mr. Shepard    923      6
         Redirect Examination by Mr. Ward            937      6
8        Recross-Examination by Mr. Shepard          945      6

9

10       __TRAN, BERNADETTE__
         (SWORN)                                     946      6
11       Direct Examination by Mr. Chou              946      6
         Cross-Examination by Mr. Stefan             993      6
12       Redirect Examination by Mr. Chou            1023     6
         Recross-Examination by Mr. Stefan           1029     6
13

14       __COWAN, MELANIE__
         (SWORN)                                     1030     6
15       Direct Examination by Mr. Ward              1030     6
         Cross-Examination by Mr. Shepard            1079     6
16       Redirect Examination by Mr. Ward            1094     6

17

18

19                      __E X H I B I T S__

20       __TRIAL EXHIBITS__                    __IDEN__   __EVID__   __VOL.__

21         38                                           1074     6

22         58                                            976     6

23         60                                            979     6

24         62                                            982     6

25         66                                            984     6

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | WITHDRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 143 | | | 1054 | 6 |
| 449 | | | 1052 | 6 |
| 473 | | | 1049 | 6 |
| 551 | | | 951 | 6 |
| 1057 | | | 1047 | 6 |
| 1096 | | | 1067 | 6 |
| 1097 | | | 1066 | 6 |
| 1422 | | | 1075 | 6 |
| 1469 | | | 954 | 6 |
| 1470 | | | 958 | 6 |
| 2471 | | | 933 | 6 |
| 3054 | | | 935 | 6 |
| 3150 | | | 932 | 6 |
| 3164 | | | 1023 | 6 |
| 3165 | | | 1018 | 6 |
| 3168 | | | 925 | 6 |
| 3170 | | | 1088 | 6 |
| 3313 | 912 | | | 6 |

<u>**Tuesday - February 18, 2025**</u>                                  <u>**8:06 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---o0o---**

(Defendant present, out of custody.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  Remain seated.  Please come to order.

**THE COURT:**  Good morning.

**MR. HIGHSMITH:**  Good morning.  We've only done healthy things.

**THE COURT:**  Good.  Excellent.  You all look hale and hearty.

All right.  So what do we need to deal with?

**MR. HIGHSMITH:**  I think we want to clean up an exhibit issue from the defense perspective, and they may have one other thing.

**MS. DIAMOND:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MS. DIAMOND:**  There was a little confusion on Friday about Exhibit 3313.

**THE COURT:**  33- -- what was that again?

**MS. DIAMOND:**  3313 was an exhibit that was marked. And the number was actually out of sequence.  It was transposed.

The defense at this time would like to withdraw it.

1    There's another exhibit that contains its content, and we're

2    satisfied with the record.

3              **THE COURT:**  Okay.  So 3313 is withdrawn.

4         (Trial Exhibit 3313 withdrawn.)

5              **MS. DIAMOND:**  Thank you.

6              **THE COURT:**  And was there anything else?

7              **MR. SHEPARD:**  We have a few items.

8         Do you want to take yours first?

9              **MR. STEFAN:**  Yes.

10        Yes.  Your Honor, with respect to Cowan-Tran, who's going

11   to be testifying today, the defense has identified in her

12   statements to the Government, including recent statements,

13   claims about Mr. Andrade that would be unfairly prejudicial and

14   404(b) evidence, that he would go to strip clubs, go on

15   benders, he was a perv, that he was homophobic.  Just a series

16   of aspersions like that that we have moved to, at this point,

17   get excluded.

18             **THE COURT:**  Remind me who this witness is.

19             **MR. WARD:**  The witness is Melanie Cowan-Tran.  She

20   worked for Mr. Andrade.  She was part of his marketing and

21   office staff.

22        She did say in one of her interviews that -- when we were

23   talking about expenses, that Mr. Andrade would go to strip

24   clubs.  I do not recall any description of him being a perv or

25   saying that Mr. Andrade was homophobic.  Certainly,

1   the Government is not going to elicit any evidence about

2   Mr. Andrade being a perv or homophobic.

3            THE COURT:  Well --

4        MR. HIGHSMITH:  There's just one other factual matter

5   on the prostitutes issue.  They made a big to-do about the

6   Grimma -- Grimmer, the McDonald's character, in their opening.

7            THE COURT:  Okay.

8        MR. HIGHSMITH:  And in a separate -- not this witness,

9   but in a separate exchange involving a separate witness,

10  Carlos De La Guardia, a Panamanian official who's going to be

11  testifying tomorrow, in the same text chain where

12  Mr. De La Guardia and Mr. Abramoff first talk about this

13  character, this McDonald's character, they also mention that

14  Mr. Andrade went to see the prostitutes on his trip to Panama.

15       And so it comes up -- it may come up separately.  So I'm

16  just bringing it up now so that there's no surprises.

17           THE COURT:  Well, with respect to the perv comment and

18  whatever the other one was, you should instruct your witness

19  not to -- you say you're not going to go into it.  So tell them

20  not to volunteer that.

21           MR. WARD:  I will.

22           THE COURT:  Okay.  With respect -- but you were -- on

23  the strip clubs, I didn't get -- are you in agreement that that

24  is not something that should come in?

25           MR. WARD:  Well, we believe he's spending investor

 1   money.  It's part of the expenses, the entertainment expenses,

 2   fancy meals, travel, hotels --

 3          **THE COURT:**  Right.

 4          **MR. WARD:**  -- strip clubs; so we think that's fair

 5   game, Your Honor.

 6          **THE COURT:**  Okay.  So the other items, homophobic,

 7   perv items, they're going to -- the Government's going to say,

 8   "Don't volunteer that," and they won't ask -- I'll trust them

 9   not to ask a question that would -- I can't imagine what

10   question would actually elicit that anyway.  So that's taken

11   care of.

12       The strip club thing, if part of the Government's case is

13   that investor money is going off to entertainment, I would

14   think they can show where the money went; and if the money went

15   to strip clubs, it went to strip clubs.

16          **MR. SHEPARD:**  Your Honor, the amount of money that

17   would have gone to a strip club compared to the amount of money

18   the Government has focused on, like, a house, Cadillac

19   Escalade -- I forget -- maybe there's some other vehicle they

20   allege, the amount of money that goes to a strip club -- oops,

21   sorry -- is infinitesimal and yet very highly prejudicial.

22       So I think on any 403 balance, it doesn't fly.

23          **MR. WARD:**  Well, I think just the fact that business

24   executives would go to a strip club is -- maybe has some -- is

25   slightly prejudicial; but it's certainly -- I don't think it's

1  unduly prejudicial; and it shows, it demonstrates -- it's one

2  of the factors that demonstrate Mr. Andrade spending investor

3  money on personal entertainment expenses.

4      **THE COURT:**  Okay.  I've had several trials where some

5  reference to money going to the strip clubs has shown up.

6      No, you can't go into anything that would elicit the other

7  two comments; but if -- not in the sense of dwelling on it; but

8  if, in the course of where money is going, there's some

9  reference to it going to a strip club, I'm not -- I'm going to

10  permit you to pursue where the money is going to include that.

11      So, okay.  Next?

12      **MR. STEFAN:**  Well, I mean, the Government just raised

13  a separate issue, which is apparently that they intend to

14  elicit information that our client hired prostitutes in

15  Panama --

16      **THE COURT:**  Are you going to go into that?

17      **MR. STEFAN:**  -- which we would also object to.

18      **MR. WARD:**  That -- no, not with Ms. Cowan.  That's --

19      **MR. HIGHSMITH:**  That's an issue for tomorrow.

20      **THE COURT:**  Well, will you tell this former ambassador

21  not to talk about prostitutes in Panama?

22      **MR. HIGHSMITH:**  Here's the issue:  The issue is a

23  little bit different.  It's actually a rule-of-completeness

24  issue, Your Honor.  I'm sort of previewing an issue for

25  tomorrow.

**PROCEEDINGS**

1    So if they introduce -- if they want to introduce an

2    extended discussion about this McDonald's character, this --

3    then in that same exchange, they're talking about Mr. Andrade

4    going to visit the prostitutes in the exact same exchange.

5        **THE COURT:**  Remind me.  I have to concede, I don't

6    know what this McDonald character is.  What is it?

7        **MR. HIGHSMITH:**  So in the opening, they made a -- they

8    had spent a bunch of time on Government witnesses speaking

9    about Mr. Andrade as though he wasn't very smart or whatever.

10       **THE COURT:**  Oh, no, I remember that.

11       **MR. HIGHSMITH:**  So there's one character.  He's this

12   purple, like, McDonald's character.

13       **THE COURT:**  Is he -- okay.

14       **MR. HIGHSMITH:**  And so this Panamanian employee of

15   Mr. Andrade's and Jack Abramoff are referring to Mr. Andrade as

16   this McDonald's character.

17       **THE COURT:**  Okay.  And is this character kind of a

18   putzy character?

19       **MR. HIGHSMITH:**  I don't know anything about the

20   character, but, yes, he looks like a putzy character.

21       **MR. SHEPARD:**  But he's a McDonald's character.  He

22   doesn't go to strip clubs.

23       **MR. HIGHSMITH:**  Well, no, he does go to strip clubs

24   because it's in the exact same -- I mean, it's right there.

25   It's, like, three messages after the discussion --

**PROCEEDINGS**

1          **THE COURT:**  Some might think being compared to a

2  McDonald's character is a favorable thing.  I don't know.

3          **MR. SHEPARD:**  Yes.  Yes, I'm fine with the reference

4  to Grimace.  Mr. Highsmith seems to have taken a completely new

5  slant on the rule of completeness.

6      The question is:  Is something left out that makes the

7  reference unfair?  And Grimace is not a strip club.

8          **THE COURT:**  Right.

9          **MR. SHEPARD:**  He's not a strip club guy.

10          **MR. HIGHSMITH:**  Actually, I disagree.  Actually,

11  I think he's making my argument for me.  If he's saying these

12  guys are talking about Grimace and this, "Oh, he's just a putzy

13  whatever; he's not a guy who goes to strip clubs," well,

14  actually, according to this text exchange, he does go to the

15  prostitutes.

16      So if they're going to raise this whole idea of Grimace,

17  you know, three messages later or whatever, they're talking

18  about him going to see the prostitutes.

19          **THE COURT:**  This is an interesting morning argument.

20          **MR. HIGHSMITH:**  Welcome back from the three-day

21  weekend.

22          **THE COURT:**  Okay.  We've got Grimace and Panamanian

23  prostitutes.  It's really going to be a lively week.

24      I don't -- I think -- the reference to strip clubs I don't

25  think is quite as prejudicial as Mr. Shepard indicates, but

**PROCEEDINGS**

 1    I think going to Panamanian prostitutes when you're in Panama

 2    is pretty prejudicial.  So I am inclined not to let that get

 3    into the record.  And I'll see it tomorrow on this completeness

 4    notion, but I'm not there with you that it's connected.

 5            **MR. HIGHSMITH:**  I'll show you the text messages so

 6    the Court has an idea.

 7            **THE COURT:**  All right.

 8       Okay.  Next?

 9            **MR. STEFAN:**  Yeah.  Another matter, Exhibit 672,

10    Government Exhibit 672, is -- and if we could get a copy for

11    the judge from one of our binders.

12            **MR. HIGHSMITH:**  Is it already admitted?  Is it --

13            **MR. STEFAN:**  It's not admitted.

14            **MR. HIGHSMITH:**  What is it?

15            **MR. STEFAN:**  We'll get you a copy as well.

16                (Counsel reviewing document.)

17            **MR. STEFAN:**  So the basis of our objection to this

18    will be foundation; namely, the Government has nobody on their

19    witness list who was with Mr. Andrade at the time that this was

20    made, and there's been no evidence shown that it was sent to

21    anybody who could possibly lay foundation for it.

22            **THE COURT:**  Can I see it?

23            **MR. STEFAN:**  It's just without any context.

24            **THE COURT:**  Can I see it?

25            **MR. STEFAN:**  Yes, Your Honor.

 1          **MR. CHOU:**  And, Your Honor, for context, Exhibit 672,

 2   if I'm understanding it correctly, is an attachment to an email

 3   that Mr. Andrade sends and that was produced pursuant to

 4   Mr. Andrade with a grand jury subpoena.  So our plan was that

 5   the -- one of the FBI case agents, named, likely, Ethan Quinn,

 6   would admit this as a subpoenaed opposing party statement.

 7          **THE COURT:**  So this was an attachment to something

 8   Mr. Andrade sent?

 9          **MR. CHOU:**  Correct.  And this was all produced by

10   Mr. Andrade, as indicated by the Bates stamp that he put on the

11   document "Andrade DOJ."

12          **THE COURT:**  And remind me now, Mr. Stefan, what your

13   objection is.

14          **MR. STEFAN:**  Foundation.

15          **THE COURT:**  Well, this is, as I understand it, your

16   own client's document, and the FBI agent's going to say they

17   got it from your client.  What's lacking?

18          **MR. STEFAN:**  Okay.  Well, we can, I guess, reserve

19   that objection for the time that the FBI agent puts on the

20   evidence; but beyond that, I would have to see the email and to

21   whom it was sent because to the defense's knowledge, this was

22   never actually distributed to anybody who acted on it or -- it

23   was never more than a draft of a document as opposed to any

24   kind of implemented plan.  So in that context, it doesn't

25   have -- I mean, nominal relevance and potentially --

1          **THE COURT:**  So what's the relevance of it, Mr. Chou?

2          **MR. CHOU:**  It's Mr. Andrade describing his vision for

3     the pre-ICO sales, and as Theresa Chiu will explain in her

4     testimony, there was about a half million dollars collected

5     during the pre-ICO.

6          To the extent the defense's argument is that nobody ever

7     saw this or this didn't reflect Mr. Andrade's state of mind in

8     some way, that, to me, seems like a matter for

9     cross-examination in their ample defense case, not for

10    admissibility of a document.

11         **THE COURT:**  Okay.  Well, you can bring it up at the

12    time this -- is this going to be introduced through this FBI

13    agent or somebody else?

14         **MR. CHOU:**  That's the plan, Your Honor.

15         **THE COURT:**  All right.

16         **MR. CHOU:**  And the email that attaches it is on the

17    exhibit list as well, if I understand correctly.

18         **THE COURT:**  Okay.  Well, you can renew your objection.

19    I'll take a look at it at the time.

20         You want this back, I assume.

21         **MR. STEFAN:**  Yes, Your Honor.

22         **THE COURT:**  Okay.  Anything else?

23         **MR. SHEPARD:**  I just had one issue to forecast.  This

24    relates to Exhibit 129.  It was one of about 200 exhibits we

25    got over the weekend for today.  It's 133 pages with multiple

1    documents.  It's not a 133-page document.  It's 133 pages of

2    many different documents and --

3            **MR. HIGHSMITH:**  You just need to raise it with us.

4    Just tell us.  We're going to use pages 1 through 29.  It's the

5    WeCode.  It's the Evan Carlson -- we're not going to use it

6    until Evan Carlson comes.

7            **MR. SHEPARD:**  1 through 29.

8            **MR. HIGHSMITH:**  And it's just his work contract.

9        So all you have to do is say, "How many pages are you

10   going to use?"  And we'll tell you.

11           **MR. SHEPARD:**  Okay.

12           **THE COURT:**  How come the whole thing went over, then?

13           **MR. HIGHSMITH:**  Because when we -- when we collect

14   documents, like, when we seize them, sometimes we get them as

15   individuals and then sometimes we get them as packets.

16           **THE COURT:**  Okay.  Well, you might -- if you know in

17   advance you're using -- for example, you're sending over

18   something that's more than 29 pages but you're only going to

19   use the 29 pages, you ought to tell them that rather than wait

20   for them to do this.

21           **MR. HIGHSMITH:**  Understood.

22           **MR. SHEPARD:**  Thank you, Your Honor.

23           **THE COURT:**  You're welcome.

24       Okay.  Anything else?

25           **MR. HIGHSMITH:**  No.

1          **THE COURT:**  All right.  Thank you.

2                    (Recess taken at 8:20 a.m.)

3                 (Proceedings resumed at 8:32 a.m.)

4      (Proceedings were heard out of the presence of the jury.)

5          **THE COURTROOM DEPUTY:**  Remain seated, please.  Come to

6    order.

7          **THE COURT:**  One of our jurors called us over the

8    weekend and she was not feeling well, Ms. Hancock; but

9    fortunately, she doesn't have COVID and she doesn't have the

10   flu.  So she's intrepid.  She came in, but she's going to be

11   wearing a mask, and she's switched seats.  So don't be

12   surprised.  She's going to be sitting kind of off by herself.

13      Right?

14         **THE COURTROOM DEPUTY:**  No.  She's going to sit with

15   the other alternate on the bench.

16         **THE COURT:**  With the other alternate.

17      (Proceedings were heard in the presence of the jury.)

18         **THE COURT:**  Good morning, members of the jury.

19   Hopefully, you had an enjoyable three-day weekend.  Thank you

20   for being prompt, as usual, and back, ready to go.

21      Where we left off was Ms. Katz is on the stand.

22      And, Ms. Katz, you understand you remain under oath?

23         **THE WITNESS:**  Yes.

24   \\\

25   \\\

**LESLIE KATZ**,

called as a witness for the Government, having been previously

duly sworn, testified further as follows:

**CROSS-EXAMINATION**    (resumed)

**BY MR. SHEPARD:**

**Q.**    Welcome back.

**A.**    Thanks.

**Q.**    Let me start back when you said correctly on direct

examination that you did not represent AML Bitcoin.  Remember

that?

**A.**    Yes.

**THE COURT:**  I'm getting the sign.

**MR. SHEPARD:**  Okay.  I'm --

**THE COURTROOM DEPUTY:**  Are you on?

**MR. SHEPARD:**  I believe I'm on.  So let me see.  Maybe

there's a volume issue.

**THE COURTROOM DEPUTY:**  Okay.  Now try it.

**MR. SHEPARD:**  How about now?

**A JUROR:**  It worked last week when you had it up

closer to your...

(Discussion off the record.)

**BY MR. SHEPARD:**

**Q.**    You did later agree to do legal work for a different

company of Marcus's; correct?

**A.**    I don't recall.

1    Q.    Do you remember in June of 2018, after your purchase of

2    AML BitCoin tokens and after the meeting with the Port of

3    San Francisco, that you agreed to do an engagement with a

4    company called Black Gold Coin, Inc.?  Remember that?

5    A.    Vaguely.

6          MR. SHEPARD:  Let's show to the witness, the Court,

7    and the Government, Ed, if you would, please, Exhibit 3168.

8    Q.    Let me ask you, Ms. Katz.  Take a look at that, and you'll

9    see there's several pages of emails.

10   A.    Yes.

11   Q.    And does that help you remember that you did --

12   A.    Yes, it does.

13         MR. HIGHSMITH:  One quick moment.

14   It should not be published to the jury quite yet.

15         MR. SHEPARD:  Yeah.  Sorry.  I -- correct.

16   It's right after a long weekend.  We've all got to get

17   back into it.

18   Q.    So this does refresh your recollection; correct?

19   A.    Yes.

20   Q.    You did agree to work for Mr. Andrade, one of his

21   companies called Black Gold Coin; correct?

22   A.    Yes.

23   Q.    And Exhibit 3168 consists of email traffic relating to

24   what's called an engagement letter, which is something that

25   lawyers get clients to sign and the lawyer signs, setting forth

1    the terms of their representation; correct?

2    **A.**    Correct.

3    **Q.**    And that's what Exhibit 3168 is; correct?

4    **A.**    That's what it looks like, yes.

5         **MR. SHEPARD:**  I offer 3168, Your Honor.

6         **MR. WARD:**  No objection.

7         **THE COURT:**  3168 will be admitted.

8         (Trial Exhibit 3168 received in evidence.)

9    **BY MR. SHEPARD:**

10   **Q.**    Okay.  And I just have a couple of questions about it.

11   I'm not going to ask you about exactly what you did, but this

12   was -- this correspondence begins in May of 2018 and runs

13   through June, and that was after you bought your AML BitCoin

14   tokens; correct?

15   **A.**    Yes.

16   **Q.**    And after the meeting with the Port of San Francisco in

17   late April of 2018; correct?

18   **A.**    Yes.

19   **Q.**    And when you agreed to do this engagement for

20   Mr. Andrade's company, you didn't think he was a liar or a

21   fraudster who had cheated you out of your token money; right?

22   **A.**    I was certainly hoping not.

23   **Q.**    And you didn't think he was, did you?

24   **A.**    I didn't think so at the time, obviously.

25   **Q.**    Now, let me direct your attention to the part of your

1    testimony when Mr. Ward was questioning you on Friday when you

2    talked about the roundtable with then Lieutenant

3    Governor Newsom.  Okay?  I want to take you back to that.

4    **A.**    Okay.

5    **Q.**    During that examination by Mr. Ward, you were showed

6    Exhibit 489, which was admitted into evidence.

7         So if we could get it back up on the screen so everybody

8    recalls it.

9         And Mr. Ward asked you if you recalled a discussion about

10   reducing poverty and AML BitCoin, you know, launching off the

11   words in the last line of the text on Exhibit 489.  You recall

12   that?

13   **A.**    I recall the testimony and the exhibit, yes.

14   **Q.**    Yeah.  And you didn't have a recollection of talking about

15   poverty, so let me ask you a slightly broader question.

16        Do you recall that one of the topics that was discussed at

17   the roundtable was reducing poverty by using technological

18   solutions, the importance of education, especially vocabulary

19   development for zero to three-year-olds because education

20   during that age range significantly reduces the risk of

21   poverty?  Do you remember that discussion?

22   **A.**    Not at all.

23   **Q.**    That topic was of particular interest to Governor Newsom;

24   correct?

25   **A.**    Correct.

**KATZ - CROSS / SHEPARD**

1  Q.   And so you're not saying it didn't happen.  You just

2  say --

3  A.   I just --

4  Q.   -- you don't --

5  A.   Correct.

6  Q.   -- remember?

7       Okay.

8  A.   I don't recall it happening, but I would not have been

9  surprised if that topic came up, given his interest.

10  Q.   Okay.  And during the roundtable, you testified on Friday

11  that there was a broad discussion about blockchain and

12  maintaining blockchain in California; right?

13  A.   Correct.

14  Q.   And that was another interest of then Lieutenant

15  Governor Newsom's; correct?

16  A.   No.

17  Q.   You didn't think so?

18  A.   We were trying to get him to focus on it.  That was the

19  discussion, was the possibilities of blockchain and urging him

20  to pay attention to it.

21  Q.   Okay.  And now he seems more in tune with those sorts of

22  issues.  Like now he seems to be big into AI; right?

23  A.   Yes, absolutely.

24  Q.   And you were encouraging him to get current with

25  technology, which at that time the blockchain was significant;

1    correct?

2    **A.**    And, in particular, focusing on ensuring that the

3    technology companies stay in California and not be exported

4    overseas.

5    **Q.**    And all the attendees, any one of them who spoke would

6    have introduced themselves and what their business was;

7    correct?

8    **A.**    That would probably have occurred, yes.

9    **Q.**    And also would have shared what they were working on;

10    correct?

11    **A.**    Possibly.  Often it's just name and company name.

12    **Q.**    Well, didn't you say on Friday that the participants

13    probably would have shared what they were working on?

14    **A.**    Not necessarily in the introduction, but if they spoke

15    subsequently, yes.

16    **Q.**    Okay.  So you wouldn't deny that Marcus spoke about

17    AML BitCoin and how it can bring security and compliance to

18    crypto/fintech/digital identities, would you?

19    **A.**    I don't have a specific recollection, but it's likely that

20    he raised that issue.

21    **Q.**    And, by the way, you told the FBI that it's possible he

22    raised that issue, but you weren't asked by Mr. Ward whether he

23    raised that issue; right?

24    **A.**    I don't recall.

25    **Q.**    Okay.  Mr. Ward asked you if you recalled whether there

 1  were any specific discussions of California adopting

 2  AML BitCoin, and you said you didn't recall.  Remember?

 3  A.   I don't recall, and as I -- it's unlikely because people

 4  weren't supposed to be pushing for anything specific at the

 5  meeting.

 6  Q.   But nothing in Exhibit 489 says that Mr. Andrade discussed

 7  California adopting AML BitCoin; correct?

 8  A.   Correct.

 9  Q.   Did Lieutenant Governor Newsom come with an entourage or

10  did he come by himself?

11  A.   I don't recall.  I assume he probably had a fundraiser

12  with him.

13  Q.   Okay.  And I believe that there were 12 to 20 attendees?

14  A.   That's my recollection, yes.

15  Q.   And you had a co-host, another lawyer named Michael Kahn?

16  A.   Correct.

17  Q.   And this was at your firm as opposed to Mr. Kahn's firm,

18  so you probably had various hostly duties?

19  A.   Correct.

20  Q.   Did you take this photo that's in Exhibit 489?

21  A.   I don't think so, but I don't know.

22  Q.   Okay.  And so you don't recall whether you were present

23  when it was taken?

24  A.   I don't recall.

25  Q.   And, therefore, you don't know what Mr. Andrade and Mr. --

1  and Lieutenant Governor Newsom might have discussed as they got

2  together for the photo; correct?

3  **A.**   I don't know, no.

4  **Q.**   We talked a lot about the meeting with the Port staff.   I

5  don't want to ask about that again other than to ask you:

6  Mr. Naimer did most of the talking; correct?

7  **A.**   Yes.

8  **Q.**   I want to direct your attention to the testimony you gave

9  on direct examination about having a general understanding that

10 AML BitCoin had reached an agreement with the Panama Canal.

11      In fact, what you knew was that AML BitCoin was in

12 conversations with the Panama Canal Authority and perhaps the

13 governor -- and perhaps the government of Panama; correct?

14 **A.**   I don't recall what I knew at the time.

15 **Q.**   Okay.   But you told the FBI last year that what you knew

16 was that AML BitCoin was in conversations with the Panama Canal

17 Authority and perhaps the government of Panama; correct?

18 **A.**   Yes.   That was my understanding at the time.

19 **Q.**   Let me direct you back to your testimony on Friday about

20 buying tokens in the ICO because it seemed like an interesting

21 and good opportunity.   And that was, in part, I guess, because

22 you practice law sort of in that space; correct?

23 **A.**   Correct.

24 **Q.**   And when you bought your tokens through the ICO, you had

25 to buy using the website; correct?

 1  **A.**   As I recall, yes.

 2          **MR. SHEPARD:**  And, Ed, if we could show -- and my

 3  records say this is in evidence.  This is Exhibit 626.

 4          **THE COURT:**  I have that admitted.

 5          **MR. SHEPARD:**  So, Ed, if you can then display for all

 6  Exhibit 626.

 7  **Q.**   This is, I guess, the landing page of the website; and

 8  then if we go to page 2, this is where you can click and start

 9  the process of buying.  You remember that?

10  **A.**   Vaguely, yes.

11  **Q.**   And if you click and start the process of buying, that

12  gets you to a different page that I'm going to show you in a

13  moment.

14      It's Exhibit 3150, which is not in evidence so we're going

15  to show it just to you, the Court, and the Government first.

16      Does that look familiar as the page you get to?

17  **A.**   I think so.  It looks familiar.

18          **MR. SHEPARD:**  Your Honor, I --

19          **THE WITNESS:**  It would have been appropriate.  I don't

20  recall it specifically, but it looks right.

21  **BY MR. SHEPARD:**

22  **Q.**   That looks like the one you got to?

23  **A.**   Yes.

24          **MR. SHEPARD:**  Okay.  I offer 3150, Your Honor.

25          **MR. WARD:**  No objection.

1          **THE COURT:**  3150 will be admitted.

2      (Trial Exhibit 3150 received in evidence.)

3          **MR. SHEPARD:**  And then if you -- Ed, if you could

4   highlight the bottom left of 3150 where it's got that little

5   box.

6   **Q.**   And it says [as read]:

7          "I have read and accept Terms & Conditions."

8   **A.**   Yes.

9   **Q.**   Okay.  So do you remember taking a look, because it would

10  be interesting, taking a look at the terms and conditions?

11  **A.**   I recall going through, yes.

12  **Q.**   Okay.  So that's going to be a different exhibit, which is

13  not yet in evidence.  So that's Exhibit 2471.

14          **MR. SHEPARD:**  And so, please, Ed, show that to

15  the Court, the witness, and the Government, 2471.

16      Okay.  And then if you can go to page -- well, first --

17  sorry.  If you can just click through to page 4 slowly enough

18  so the witness can recognize it.

19  **Q.**   Does that look familiar as the terms and conditions?

20  **A.**   I don't specifically recall, but it looks like it would be

21  what I looked at.

22          **MR. SHEPARD:**  Okay.  I offer 2471, Your Honor.

23          **MR. WARD:**  Your Honor, the Government objects.  This

24  is hearsay.  There's a lack of foundation.  There's no date on

25  the contract.  There's no date on the document, and there's no

1    indication that this was the document that Ms. Katz saw.

2        MR. SHEPARD:  I think she said this appears to be what

3    she saw.  And it's certainly not hearsay.  It's an agreement

4    that she clicked through and ultimately entered.

5        THE COURT:  All right.  I'll admit it.

6        (Trial Exhibit 2471 received in evidence.)

7        MR. SHEPARD:  So, Ed, if we could move to page 4 and

8    highlight paragraph 15.

9    Q.   It says [as read]:

10        "You have not purchased and have no intention of

11        purchasing AML BitCoins and/or AML BitCoin Tokens for

12        investment purposes and You expect no return on

13        investment."

14   That was part of the terms and conditions; correct?

15   A.   That's part of the terms and conditions listed here.  I

16   don't have a specific recollection if this is the document I

17   saw.

18   Q.   Okay.

19   A.   I do remember seeing a document of terms and conditions

20   that I thought was inadequate from a legal perspective, and I

21   raised that issue.

22   Q.   Okay.  So you didn't particularly think the terms and

23   conditions were terribly well drafted?

24   A.   That would be correct.

25       MR. SHEPARD:  Okay.  Ed, if we could move on to page 5

1    and highlight paragraph 21.

2    **Q.**   And there it says [as read]:

3         "NAC will use its best efforts to create a

4    digital currency (or cybercurrency or cryptocurrency)

5    that is compliant with AML Laws."

6    AML, they're referring to anti-money laundering; correct?

7    **A.**   Correct.

8         **MR. SHEPARD:**   Okay.  I think we can take that one

9    down.

10   **Q.**   I know you are familiar with ICOs based on your practice.

11   And you know that sometimes people buy coins in ICOs even if

12   the tech isn't ready; correct?

13   **A.**   That's part of the process, that it's in process.

14   **Q.**   And, in fact, lots of ICOs are launched without

15   capabilities; correct?

16   **A.**   I can't speak to "lots," no.

17   **Q.**   Okay.  Well, you remember talking to the FBI earlier this

18   year and telling them that lots of ICOs are launched without

19   capabilities?

20   **A.**   Many are, yes, and they failed.

21        **MR. SHEPARD:**   Then, Ed, if we can show just to

22   the Court, the witness, and the Government Exhibit 3054.

23   **Q.**   I ask you to take a look at it, and if you'd like, I can

24   give you a hard copy to make it easier for you to page through

25   at your own pace if you need it.

1    **A.**    (Witness examines document.)  Yes.

2    **Q.**    You recognize this?

3    **A.**    Not specifically, but it looks accurate.  I recall that

4    taking place.

5    **Q.**    Okay.  It's an email chain up at the top starting with a

6    man named Arthur Weissman and then further down with Japheth

7    Dillman, who was a client of yours at this time in

8    January 2018, the time of this email; correct?

9    **A.**    Yes.

10    **Q.**    And it relates to a meeting to get together to talk about

11    Mr. Dillman's company Block Bits Capital; correct?

12    **A.**    Correct.

13          **MR. SHEPARD:**  I offer Exhibit 3054.

14          **MR. WARD:**  No objection.

15          **THE COURT:**  3054 will be admitted.

16        (Trial Exhibit 3054 received in evidence.)

17    **BY MR. SHEPARD:**

18    **Q.**    And at the bottom of page 1, there's discussion of getting

19    together for a meeting at, it looks like, your office.

20    **A.**    Correct.

21    **Q.**    And among the people who are going to be there -- and I'm

22    now on page 2 -- are David Mata and Japheth Dillman; correct?

23    **A.**    Under Block Bits, yes.

24    **Q.**    Yeah.  And a number of other people who we don't

25    particularly need to call out.

1          But you'll see in the paragraph on page 2, above where it

2     says "Proposed Roles," toward the bottom, it says "Idea."

3          **MR. SHEPARD:**  And, Ed, if you can highlight where it

4     says "Idea" a little above -- right above where you just

5     highlighted.

6     **Q.**   [As read]:

7               "Idea:  Quickly spin up all of the financial

8          services that are utterly lacking in the

9          crypto-space.  Create Block Bits Capital as an

10         unavoidable acquisition for a financial giant from

11         the traditional space (like Goldman Sachs or

12         JPMorgan) in a lightning quick 18 to 24 months.  We

13         want the sale to be measured in Bs."

14    I take it "Bs" is a reference to billions; right?

15    **A.**   I -- looks like it, yes.

16    **Q.**   And what that appears to say is that Block Bits was

17    seeking to get acquired for billions of dollars within 18 to

18    24 months; correct?

19    **A.**   That's what it states here, yes.

20         **MR. SHEPARD:**  May I have a moment, Your Honor?

21         **THE COURT:**  Yes.

22                    (Pause in proceedings.)

23         **MR. SHEPARD:**  Nothing further, Ms. Katz.  Thank you

24    very much.

25         **THE WITNESS:**  Thank you.

1          <u>**REDIRECT EXAMINATION**</u>

2     **BY MR. WARD:**

3     **Q.**   Good morning.

4     **A.**   Good morning.

5     **Q.**   Mr. Shepard asked you about the meeting with the Port

6     staff in April of 2018.

7          Following that meeting, were there any other meetings with

8     the Port of San Francisco?

9     **A.**   None that I'm aware of.

10    **Q.**   Was there any follow-up by anyone from the Port that

11    you're aware of?

12    **A.**   Not that I'm aware of, no.

13    **Q.**   Mr. Shepard mentioned potential work with something called

14    TWIC.  Was there any ever follow-up from your end or from

15    anyone at the Port with TWIC?

16    **A.**   Not that I'm aware of.  All that was discussed was that's

17    where they should look, rather than to the Port, and

18    potentially an introduction was offered, but I don't think it

19    ever took place.

20    **Q.**   And what about Carnival?  Were there any meetings with

21    Carnival Cruise about their use of AML BitCoin?

22    **A.**   Not that I'm aware of, no.

23    **Q.**   So other than the one meeting that you had set up between

24    the AML BitCoin team and staff, was there any other work that

25    you know of with the Port?

**KATZ - REDIRECT / WARD**

1  **A.**   No, none.

2  **Q.**   And prior to that meeting, had anyone -- had Mr. Andrade

3  or anyone from AML BitCoin had any other meetings with the Port

4  other than the discussions with you?

5  **A.**   Not that I'm aware of, no.

6  **Q.**   Okay.  Mr. Shepard asked you about potential introductions

7  or negotiations or discussions with other ports,

8  San Francisco -- or, excuse me -- Oakland or Long Beach.

9       Were there any other --

10           **MR. SHEPARD:**  I did not ask that.

11           **THE COURT:**  Well, why don't you just ask.

12  **BY MR. WARD:**

13  **Q.**   Was there any other discussions between AML BitCoin and

14  any other port on the West Coast that you know about?

15  **A.**   Not that I'm aware of, no.

16  **Q.**   Okay.  Mr. Shepard asked you this morning about later work

17  that you did for Mr. Andrade involving a company called Black

18  Gold Coin, Inc., and he showed you an email chain.  Was that

19  work related to Mr. Andrade's patents?

20  **A.**   Yes.

21  **Q.**   Was that -- did that work have any connection at all with

22  the Port of San Francisco?

23  **A.**   No.

24  **Q.**   Mr. Shepard asked you about the Newsom roundtable, and you

25  said that during these -- people are not to be pushing for

**KATZ - REDIRECT / WARD**

1  anything specific during these meetings.  What did you mean by

2  that?

3  **A.**   I think, as I said earlier, because it was a fundraiser,

4  it shouldn't be viewed as a quid pro quo; that people can

5  discuss what they're doing, but it's not the appropriate time

6  to ask for any specific action on the part of the candidate.

7  **Q.**   So other than an introduction and a brief description,

8  attendees are not allowed to promote or pitch their product?

9        **MR. SHEPARD:**  Objection.

10        **THE WITNESS:**  They might --

11        **THE COURT:**  Wait, wait, wait.

12        **THE WITNESS:**  Sorry.

13        **MR. SHEPARD:**  He's now asking about what attendees

14  were permitted to do, and there's no foundation about any rules

15  or permissions of what they could or couldn't do.

16        **MR. WARD:**  I just asked her if there were rules -- as

17  a political fundraiser, are there rules about what you can and

18  cannot do?

19        **THE COURT:**  Overruled.

20     You may answer.

21        **THE WITNESS:**  Yes, there are rules.  So either then

22  Lieutenant Governor Newsom or me, or whoever the staffer was,

23  would have probably stopped if anyone was pushing for a

24  specific action item.

25  \\\

**KATZ - REDIRECT / WARD**

1   BY MR. WARD:

2   Q.   And do you have any recollection of Mr. Andrade being able

3   to disregard those rules?

4   A.   I don't have any recollection.

5   Q.   Was there any follow-up from Gavin -- Lieutenant

6   Governor Newsom or the staff about AML BitCoin after this

7   meeting?

8   A.   Not that I'm aware of.

9        MR. SHEPARD:   Objection.   No foundation.

10       THE COURT:   Well, to the extent she's aware of it, she

11   can answer the question.   Overruled.

12   BY MR. WARD:

13   Q.   To the extent you're aware of it, was there any follow-up?

14   A.   I'm not aware of any, no.

15   Q.   Okay.   Mr. Shepard showed you a document that contained

16   about four pages of legal boilerplate, and he highlighted a

17   statement that says you expect no return on investment.   Do you

18   remember that?

19   A.   Yes.

20   Q.   When you purchased the AML BitCoins, did you expect that

21   you would make money?

22   A.   Hoped to, but also hoped that it would work and solve a

23   problem.

24   Q.   And when your spouse purchased, I think you said, $40,000

25   of AML BitCoin Tokens, was it your understanding that she also

KATZ - REDIRECT / WARD

1    hoped that there would be a return on that investment?

2    **A.**    Sorry.  I don't know what her understanding was, and we

3    weren't married at the time, and I flipped out a little bit

4    when I found out how much she bought.

5    **Q.**    Well, as someone who's a significant other and someone you

6    know well, would you -- would it be your understanding that if

7    she was to purchase $40,000 of something, that she would expect

8    that it could possibly make money?

9              **MR. SHEPARD:**  Objection.

10             **THE COURT:**  Sustained.

11   **BY MR. WARD:**

12   **Q.**    For your purchase, Ms. Katz, you said you hoped that it

13   would succeed and do well.  Was that based on representations

14   made to you by Mr. Andrade?

15   **A.**    Either Mr. Andrade or Mr. Dillman.

16   **Q.**    You anticipated my next question.  Was it also based on

17   representations by Mr. Dillman?

18   **A.**    Through one or the other or both.  I don't recall

19   specifically.  Definitely through Mr. Dillman.

20   **Q.**    Well, you met with Mr. Andrade on two occasions,

21   I believe.

22   **A.**    Yes.

23   **Q.**    And did he discuss with you the potential --

24   **A.**    Yes.

25   **Q.**    -- as he understood it, for AML BitCoin?

1    **A.**    Sorry.  Yes, he did.

2    **Q.**    And so based on what he told you about AML BitCoin's

3    potential, did that go into your thinking when you purchased

4    AML BitCoin Tokens?

5    **A.**    Yes.

6    **Q.**    All right.  If he had told you you should expect no return

7    on your investment, would you have still purchased the

8    AML BitCoin token?

9    **A.**    Probably not.  It would have been throwing money away.

10   **Q.**    Okay.  Mr. Shepard showed you an email chain with

11   Mr. Weissman and others related to a Block Bits acquisition at

12   the end of his cross-examination.  Do you remember that email

13   chain?

14   **A.**    I remember the email chain.  I'm not sure it was

15   specifically regarding an acquisition.

16   **Q.**    He quoted to you the Block Bits --

17   **A.**    Oh, I'm sorry.  I'm sorry.  You mean the acquisition --

18   potential acquisition by -- yes.

19   **Q.**    Yes --

20   **A.**    Yes, I do recall that.

21   **Q.**    -- the potential acquisition.

22         Did that have anything to do with Marcus Andrade and

23   AML BitCoin?

24   **A.**    No.

25   **Q.**    All right.  On Friday, Mr. Shepard asked you about whether

1    you talked to a reporter named Peter Roff.  Do you recall that?

2    **A.**   I recall him asking me the question, yes.

3    **Q.**   And you said at the time that you couldn't recall

4    specifically whether you'd spoken to Mr. Roff.

5    **A.**   Correct.

6    **Q.**   All right.  I'd like to show you -- do you remember

7    speaking to the FBI in January of 2024?

8    **A.**   Yes.

9    **Q.**   All right.  I'm going to show --

10            **MR. WARD:**  May I approach, Your Honor?

11            **THE COURT:**  You may.

12   **BY MR. WARD:**

13   **Q.**   I'd like to show you, and you can take a look at that --

14            **MR. SHEPARD:**  What page are you looking at, please?

15            **MR. WARD:**  Page 5.

16            **MR. SHEPARD:**  Thank you.

17   **BY MR. WARD:**

18   **Q.**   Does that refresh your recollection that you were shown an

19   article that was written by Mr. Roff called "Cryptocurrency's

20   Future May Be Now"?

21   **A.**   Yes.

22   **Q.**   And does this refresh your recollection as to whether you

23   at the time spoke to Mr. Roff about that article?

24   **A.**   I thought, as I stated Friday, I don't recall ever having

25   spoken to Mr. Roff.

1   **Q.**   All right.  When you -- did you also tell the FBI that you

2   never permitted anyone to use your name in that article?

3   **A.**   Yes.

4   **Q.**   You read the article at the time.  What was your -- what

5   was your reaction when you read the article in January of 2024?

6   **A.**   I was surprised.  I hadn't seen it before, and I recalled

7   the only reporter I spoke to was one that called following the

8   meeting with the Port staff.

9   **Q.**   And do you recall what you said in terms of describing the

10  content of the article and how it represented the Port's

11  position regarding AML BitCoin?

12  **A.**   Yes.  That the Port had never agreed to do any contracting

13  or interaction with AML BitCoin.

14  **Q.**   Well, Ms. Katz, didn't you say that the article profoundly

15  misrepresents the Port's position regarding AML BitCoin?

16  **A.**   Yes.

17          **MR. SHEPARD:**  Objection.  Leading.

18          **THE COURT:**  Overruled.

19  **BY MR. WARD:**

20  **Q.**   You said -- do you remember saying that you did not have

21  the authority, when you met with Mr. Andrade, to represent the

22  Port?

23  **A.**   That's correct.

24          **MR. WARD:**  Thank you, Ms. Katz.

25          **MR. SHEPARD:**  Just one last question.

1      <u>RECROSS-EXAMINATION</u>

2  BY MR. SHEPARD:

3  Q.   These rules that you were talking about about what could

4  be discussed with the Lieutenant Governor, those weren't, like,

5  posted on the wall at the meeting; right?

6  A.   No.

7  Q.   That's just what you and people who give money or host

8  events understand people should do at these meetings; correct?

9  A.   And they're set forth in California's Fair Political

10 Practices Commission's Rules and Regulations for candidates and

11 events; but, yes, they're not posted on the wall at a

12 fundraiser, no.

13 Q.   Okay.  And there was not a speech about that.  You just

14 had to look at -- if you knew where to look, you'd check out

15 the California rules about fair conduct; correct?

16 A.   That would be correct.

17         MR. SHEPARD:  Okay.  Thank you.

18         THE COURT:  You may step down.

19         THE WITNESS:  Thank you.

20                   (Witness excused.)

21         MR. CHOU:  The United States calls Bernadette Tran.

22    (Witness enters the courtroom and steps forward to be sworn.)

23         THE COURT:  If you can come forward, please, to the

24 stand to be sworn.

25         THE COURTROOM DEPUTY:  Please raise your right hand.

**B. TRAN - DIRECT / CHOU**

1          **BERNADETTE TRAN**,

2   called as a witness for the Government, having been duly sworn,

3   testified as follows:

4          **THE WITNESS:**  I do.

5          **THE COURTROOM DEPUTY:**  Please be seated.

6      Can you state your name and spell your last name, please.

7          **THE WITNESS:**  Sure.  My name is Bernadette Tran.  Last

8   name T-r-a-n.

9              **DIRECT EXAMINATION**

10  BY MR. CHOU:

11  **Q.**   Good morning, Ms. Tran.

12  **A.**   Good morning.

13  **Q.**   Ms. Tran, what do you currently do for a living?

14  **A.**   I do operations for Apple.

15  **Q.**   And how long have you been doing that job?

16  **A.**   Just over three years.

17  **Q.**   Before doing what you do now for a living, was there a

18  time that you worked for a person named Marcus Andrade?

19  **A.**   I did.

20  **Q.**   And when did you work for Marcus Andrade?

21  **A.**   Around 2018 to -- 2018 to 2019.

22  **Q.**   And did you join before or after the 2018 Super Bowl?

23  **A.**   After.

24      Is this better?

25  **Q.**   Yes.  When you started working for Mr. Andrade, how old

1  were you at the time?

2  A.   23, 24.

3  Q.   Was this your first job after graduating college?

4  A.   It was, yeah.  Well, first promising job.  I was, like,

5  serving and bartending tables before then.

6  Q.   How did you come to work for Marcus Andrade for your first

7  job out of college?

8  A.   It was through Melanie.  She was working with Melissa at

9  the time, and they -- she said she needed some help with some,

10  like, clerical work.

11  Q.   You mentioned a couple names there, Melanie and Melissa.

12  Did I get that right?

13  A.   That's correct, mm-hmm.

14  Q.   Who are Melanie and Melissa?

15  A.   Melissa worked with Marcus, I believe was like his CFO,

16  marketing coordinator, and Melanie worked for her.

17  Q.   Do you -- do you know their full names?

18  A.   Melissa Foteh and Melanie Cowan.

19  Q.   And where did you work for Marcus Andrade?

20  A.   In Houston, Texas.

21  Q.   Was this in person?

22  A.   It was in person.

23  Q.   During the time that you worked for Andrade, how often did

24  you see him in person?

25  A.   The first bit was with Melissa, like the first four to

B. TRAN - DIRECT / CHOU

 1    six months was with Melissa exclusively, and then I worked with

 2    him directly.

 3    Q.    How often did you see him in person?

 4    A.    When I was working with him exclusively, every day almost.

 5    Q.    And how often did he speak to you?

 6    A.    Every day almost.

 7    Q.    What were your roles working for Mr. Andrade?

 8    A.    I kind of wore a lot of hats.  I was office administrator,

 9    sometimes a project manager, sometimes I did, like, payroll,

10    things like that.

11    Q.    You mentioned payroll.  Did I get that right?

12    A.    That's correct, mm-hmm.

13    Q.    Would you -- would you help make payments?

14    A.    I did.  That was part of my main roles, was to do

15    payments.

16    Q.    And how would you make the payments?

17    A.    It was through PayPal mainly.

18    Q.    Did you also have a card with which you would make

19    payments?

20    A.    It was never the same card.  It was something different.

21    But it would be something that he would give me directly.

22    Q.    Who's "he"?

23    A.    Marcus Andrade.

24    Q.    What was the name of Marcus Andrade's company?

25    A.    AML BitCoin NAC Foundation.

1    **Q.**    And what was his role in the company?

2    **A.**    He was the CEO and founder.

3    **Q.**    Let's talk about the product that Mr. Andrade claimed he

4    was building.  What was that product called?

5    **A.**    The AML BitCoin.

6    **Q.**    And was AML BitCoin a rebrand of any prior cryptocurrency?

7    **A.**    I believe it was a rebrand of the Aten Coin.

8    **Q.**    Ms. Tran, are you familiar with a term called "initial

9    coin offering," or ICO, for short?

10   **A.**    I am.

11   **Q.**    Did AML BitCoin have an initial coin offering?

12   **A.**    It did.  I believe it did, yes.

13   **Q.**    And when was that?

14   **A.**    It was before my time.  So I'm assuming like 2017, late

15   2017.

16   **Q.**    And do you recall roughly how many AML BitCoin Tokens were

17   sold during the ICO?

18   **A.**    I can't recall an exact number, but it was quite a bit.

19   **Q.**    Okay.  When you worked for Mr. Andrade, what was your role

20   with respect to AML BitCoin's ICO?

21   **A.**    When I first started with him, it was mainly ensuring that

22   people who did buy into the ICO got their tokens.

23   **Q.**    And what do you mean by -- could you explain what you mean

24   by "making sure they got their tokens"?

25   **A.**    Sure.  I had kind of like this really long Excel

1  spreadsheet and it had their names and things like that, and I

2  would have to go down and kind of cross-verify this person got

3  their tokens and this person didn't.  And then the people who

4  didn't, I would have to then try to contact them about trying

5  to get them their tokens.

6  **Q.**   And who directed you to send tokens to people tracked on

7  those spreadsheets?

8  **A.**   Melissa Foteh at the time.

9  **Q.**   And then did there come a time when you started working

10  for Mr. Andrade directly that he continued to have you use

11  those spreadsheets?

12  **A.**   Yes.  I continued -- I only worked with the spreadsheets,

13  yeah.

14  **Q.**   Okay.

15        **MR. CHOU:**  At this time I'd like to show just the

16  parties and the witness and the Court Exhibit 551.

17  **Q.**   Ms. Tran, can you see that okay?

18  **A.**   I can, yeah.

19  **Q.**   Do you recognize this spreadsheet?

20  **A.**   I do recognize this.

21  **Q.**   And what is this spreadsheet?

22  **A.**   It looks like the spreadsheet I was using during the

23  ICO -- well, that was used during the ICO.

24  **Q.**   And did you rely on this in the ordinary course of

25  NAC Foundation's business to send AML tokens?

```
 1   A.   I did, yes.

 2   Q.   And did you review this spreadsheet in preparation for

 3   your testimony today?

 4   A.   I did.

 5   Q.   Is this a fair and accurate depiction of that spreadsheet?

 6   A.   Yes.

 7             MR. CHOU:  Move to admit 551.

 8             MR. STEFAN:  No objection.

 9             THE COURT:  551 will be admitted.

10        (Trial Exhibit 551 received in evidence.)

11   BY MR. CHOU:

12   Q.   So, Ms. Tran, I just want to direct your attention to the

13   columns here.  Over in Column J, do you see that where it says

14   "Number"?

15   A.   I do.

16   Q.   And then below that, there's a series of "INV," dash, and

17   then there's like a number below that.

18   A.   Yep, I see that.

19   Q.   What does that represent?

20   A.   I believe those are the invoices that was generated

21   through the ICO.  So these are all invoice numbers.

22   Q.   Could you move the microphone a little closer to you.

23   A.   Sure.

24   Q.   Thank you.

25   A.   I believe they're invoice numbers that was generated
```

1  automatically through the ICO.

2  **Q.**   And over to the right, do you see where it says "Date"?

3  What does that represent?

4  **A.**   So the date that they bought into the ICO, and then

5  I believe the date that they were supposed to be sent tokens is

6  next to it.

7  **Q.**   And then all the way over to the right, Column P under

8  "Total," what did total represent?

9  **A.**   I believe that was the total that they bought using U.S.

10  dollars.

11  **Q.**   And then the customer name and information, their email

12  addresses, are those the columns over on the left?

13  **A.**   That's correct, yes.

14         **MR. CHOU:**  Okay.  Go ahead and take this down.

15      If we could pull up Exhibit 1469, please, for just the

16  parties and the witness.

17  **Q.**   Ms. Tran, did you send tokens to individuals based on

18  information you received regarding the ICO?

19  **A.**   I did, yeah, attempt to send tokens through the ICO.

20  **Q.**   Were some of those -- while we're waiting for 1469 to

21  load, earlier you mentioned the predecessor cryptocurrency

22  called Aten Coin.  Do you remember that?

23  **A.**   Yes, I remember.

24  **Q.**   Were some of the people that you were directed to send

25  AML BitCoin Tokens to Aten Coin investors as well?

1    **A.**    They were, yes.  I had to do the conversion.

2    **Q.**    So I'd like to direct your attention to Exhibit 1469.

3    It's a spreadsheet up on the screen, just visible to you at the

4    moment and the Court and the parties.

5        Do you recognize this spreadsheet?

6    **A.**    I do, yes.

7    **Q.**    What is it?

8    **A.**    It is the spreadsheet I made for the Aten Coin holders

9    that needed to do the conversion to AML BitCoin.

10    **Q.**    And under the "Notes" column, do you see where some of the

11    note cells will say "UT" inside?

12    **A.**    Mm-hmm, yes.  That's my initial.

13    **Q.**    And earlier you introduced yourself as Bernadette Tran.

14    How is "UT" your initials?

15    **A.**    The full name I go by -- I don't go by is Uyen Tran.

16    Bernadette is my middle name.

17    **Q.**    And you made this spreadsheet?

18    **A.**    I did.

19    **Q.**    How did you make it?

20    **A.**    I made it through Excel, and it was through paperwork that

21    Marcus gave me, and I just kind of put it together.

22    **Q.**    Okay.  And did you rely on this spreadsheet in the

23    ordinary course of business to figure out which Aten Coin

24    holders to send AML tokens to?

25    **A.**    I did, yes.

1          **MR. CHOU:**  At this time the Government moves to admit

2    Exhibit 1469.

3          **MR. STEFAN:**  No objection.

4          **THE COURT:**  1469 will be admitted.

5          (Trial Exhibit 1469 received in evidence.)

6    **BY MR. CHOU:**

7    **Q.**   So, Ms. Tran, could you just walk us through what each of

8    these columns means in brief?

9    **A.**   Sure.  It's -- so there's the name, an email that they

10   provided, a U.S. dollar amount that they paid, the ABTC

11   conversion rate.  The notes starts with me giving them an

12   initial coin to ensure that their wallet was functioning, and

13   then I'd give them the rest.  And then the wallet address and

14   then a blockchain link.

15   **Q.**   And if we could jump to, on this tab, Row 103.

16         Do you see that name there, Rene Acuna?

17   **A.**   I do, yes.

18   **Q.**   Was that -- because this name was on this spreadsheet, was

19   that one of the names you would have sent AML tokens to as part

20   of the conversion?

21   **A.**   I did.  It looks like I sent him tokens, or sent them.

22   Sorry.

23   **Q.**   Could we jump to Row 245, please.

24         Do you see the name Michael Witte?

25   **A.**   I do.

B. TRAN - DIRECT / CHOU

1    **Q.**   In response to getting these records for Mr. Andrade, what

2    did he tell you to do?

3    **A.**   It was pretty much ensuring that they had their -- because

4    they had to do the conversion from Aten to AML, so it was just

5    making sure that their wallets were working properly, and then

6    I would send them the correct amount that they were due.

7    **Q.**   In response to that task that he gave you, did you call

8    some Aten Coin investors?

9    **A.**   I did.  A couple times, yeah.

10   **Q.**   And why is that?

11   **A.**   A lot of them -- the ones I spoke to didn't know how to

12   download the wallet or use cryptocurrency; and so it was -- I

13   kind of called them and, you know, helped them, walked them

14   through it and so they could get their tokens.

15          **MR. CHOU:**  Could we jump to Row 212, please.

16       No, that's typing into the cell.  If we could jump to that

17   row, please.

18   **Q.**   What, if anything, stood out to you about the Aten Coin

19   investors that you spoke with?

20   **A.**   The few that I spoke with, they didn't really seem tech

21   savvy, to put it lightly.  A lot of times I would have to --

22   for instance, Janell Beck, I called her a couple times just

23   because she couldn't get her wallet functioning.  So I actually

24   had to take control of her computer and download the wallet and

25   then send the tokens to her.  And that happened on a couple of

 1    occasions for a couple of them.

 2    **Q.**    Did you get a sense, from speaking with these investors,

 3    as to their age range?

 4    **A.**    Probably around my parents' age, a little bit older.

 5    Like, 60s maybe.  They just seemed older.  This is just me

 6    guessing but...

 7    **Q.**    I want to direct your attention to the second tab here

 8    called "Awaiting Aten Holders."  Do you see that?

 9    **A.**    Oh, yeah.  Yes.

10          **MR. CHOU:**  If we could just click on that, that second

11    tab of the spreadsheet, please.

12    **Q.**    What did this tab track, Ms. Tran?

13    **A.**    This tab was people who never got -- I wasn't able to

14    either get their wallet or send them tokens.  So, I couldn't

15    contact them either.

16    **Q.**    But based on the records you had that you relied on, were

17    these people who had received -- who had paid for Aten Coin?

18    **A.**    Yes, they did.

19    **Q.**    And so what did this -- what did this tab track?

20    **A.**    I recall making this just to make it easier to track all

21    the people that didn't get -- or I couldn't really get in

22    contact with them very well.  So either they weren't really

23    responding to emails or something like that.  But these people

24    did pay in, bought Aten Coins, and I just couldn't send them

25    the AML BitCoin conversion.

1    **Q.**   And was there anyone else in charge of sending tokens, or

2    were you the primary person who was executing the token

3    transfers?

4    **A.**   For the most part, it was all me.

5    **Q.**   So these individuals, to your knowledge, never received

6    AML tokens?

7    **A.**   I don't believe so.

8            **MR. CHOU:**  Let's pull this down.

9        And if we could pull up Exhibit 1470 just for the parties,

10   witness, and the Court.

11   **Q.**   Ms. Tran, was there also -- was there a spreadsheet that

12   Mr. Andrade directed you to use for auditing who should receive

13   AML tokens?

14   **A.**   Yes, I did have a spreadsheet.

15           **MR. CHOU:**  Could we click on the tab titled "Main

16   Audit List," please, and scroll to the top.

17   **Q.**   And do you see the Exhibit 1470 in front of you?

18   **A.**   I do.

19   **Q.**   What is this Excel workbook?

20   **A.**   This was directly downloaded from the ICO after it ended,

21   and it was the spreadsheet that I worked with mainly when I was

22   trying to send tokens that weren't sent during the ICO.

23   **Q.**   And who told you that this was -- or how did you know this

24   was data downloaded for -- with respect to the ICO?

25   **A.**   Melissa handed me a flash drive and she said, "This is

1  our, like, main copy of the ICO," because when it ended, we

2  were going to lose that data.  So she put it on this flash

3  drive, gave it to me, and then this was generated.

4  Q.   And once you started working for Mr. Andrade directly, did

5  he have you continue to rely on this spreadsheet to figure out

6  who to send AML tokens to?

7  A.   Yes.  It's the only spreadsheet from the ICO that I worked

8  with.

9  Q.   I'm sorry.  Could you say that again?

10  A.   It is the only spreadsheet I worked with from the ICO,

11  yes.

12          MR. CHOU:  The Government moves to admit Exhibit 1470.

13          MR. STEFAN:  No objection.

14          THE COURT:  1470 will be admitted.

15      (Trial Exhibit 1470 received in evidence.)

16  BY MR. CHOU:

17  Q.   So there's quite a few different tabs in the spreadsheet

18  here, but let's just start with this one -- okay? -- "Main

19  Audit List."

20      So at a high level, what was this spreadsheet tracking?

21  A.   It mainly tracked -- so all of this was generated from the

22  ICO, and it tracked how much they paid, how many tokens you

23  should have gotten, and if they got their tokens.

24  Q.   And over on the left where it says "Email," "Phone

25  Number," "Name," were those the names of individuals who had

1  registered for AML tokens during the ICO?

2  **A.**   Yes, that's correct.   Those were -- when they created

3  their accounts, that's what was -- they put there.

4  **Q.**   And then all the way over to the right, if we could look

5  at Column P.

6       If we could blow that up.   Thank you.

7       That says "Purchased Amount."   What is your understanding

8  of what that reflected?

9  **A.**   I believe that's the U.S. dollar, how much they -- how

10  much they paid and put into their accounts.

11  **Q.**   What was the process for the NAC Foundation sending --

12  deciding -- or determining who to send tokens to after they

13  bought them?

14  **A.**   I'm sorry.   Can you repeat that?

15  **Q.**   What was the process by which the NAC Foundation

16  decided -- or how did the NAC Foundation send tokens to people

17  after they bought them?

18  **A.**   So on the website, they had a link, and they would have

19  access to it to download their wallet.   And then they would --

20  once they downloaded that, they would have to send us their

21  wallet address, which you can -- that's the AML token wallet.

22  And then I would initiate, like, a small amount of the token to

23  ensure that their wallet was working, and then I would send the

24  amount.   And it would be -- so it should show who bought how

25  much, and then that would be who I sent it to.

**B. TRAN - DIRECT / CHOU**

1  **Q.**   Was it an automated process that sent people their tokens

2  or was it a manual process?

3  **A.**   It was a manual process.  We had to go through each one.

4  **Q.**   So could you please just walk us through an example of how

5  you would go about -- if somebody bought a hundred dollars of

6  tokens, what would be the process for that?

7  **A.**   So we would email them, and then they would show us

8  proof -- right? -- either through however they paid, receipt

9  through the ICO, things like that.

10      And then we would verify through their wallet, and like I

11  said, we would send them, like, a small -- really small amount.

12  But we would go through, like -- I guess it was just -- yeah,

13  that's pretty much all I recall.

14  **Q.**   Would you do this for each person who bought AML BitCoin

15  Tokens?

16  **A.**   Each person here had that, yes.

17      **MR. CHOU:**  And if we could just scroll all the way

18  over to the left.

19  **Q.**   Do you recall how many rows are in this spreadsheet

20  approximately?

21  **A.**   Probably a couple thousand.

22      **MR. CHOU:**  If we could scroll all the way down to the

23  bottom, please.

24  **Q.**   I think it's Row at least 25,900.

25  **A.**   Yeah, I do remember it being a huge amount.

**B. TRAN - DIRECT / CHOU**

1  **Q.**   And each of these rows represents an individual who what?

2  **A.**   Each one of these rows are people that bought into the ICO

3  or, I believe, registered for accounts to potentially buy into

4  the ICO.

5          **MR. CHOU:**  And could we do a control F for the name

6  B-r-u-f-f-e-y, Bruffey.

7          E-y, please.

8  **Q.**   So, for example, do you see Scott Bruffey's name there?

9  **A.**   I do, yes.

10  **Q.**   So earlier, you described how this was a manual process

11  for --

12  **A.**   Mm-hmm.

13  **Q.**   -- looking at token purchases, then sending folks tokens.

14  **A.**   Mm-hmm.

15  **Q.**   And was anyone else sending tokens?  Or who else did

16  Mr. Andrade assign to this task?

17  **A.**   Before me, I think there was a group of probably, like,

18  six -- five to six people that were distributing tokens.

19  Afterwards, though, it was just me.

20  **Q.**   When you say "afterwards," what time period are you

21  referring to?

22  **A.**   When I first started, it was only me.  I never met them.

23  So probably like March, April 2018.

24  **Q.**   And at the time you joined, were there many or few names

25  of people who still needed to be sent their tokens?

1   **A.**   There was quite a few left.

2   **Q.**   And those are represented on this spreadsheet?

3   **A.**   Yes.

4   **Q.**   Were you able to send tokens to every single person on

5   this spreadsheet?

6   **A.**   I was not, no.  It was -- some of them were difficult or I

7   couldn't find at all.

8   **Q.**   And how much time did it take, roughly, per person to send

9   their tokens?

10  **A.**   It depends.  Sometimes -- it usually took over a course of

11  a couple of days -- right? -- because we would have to email

12  them.  Then I'd have to wait for them to get back to me.  Then

13  I would have to email then again, "I sent you your initial

14  really small amount."  Then they would have to be, like,

15  confirmed, sent me the confirmation link, and then I would

16  then, again, send them the tokens.

17      So it could be 20 minutes to a couple days.

18  **Q.**   Per person?

19  **A.**   Per person.

20  **Q.**   And there are over 25,000 on this spreadsheet?

21  **A.**   Yes.  Looks like it, yeah.

22      **MR. CHOU:**  We can take this down, please.

23  **Q.**   Ms. Tran, when people bought AML BitCoin Tokens, did they

24  pay -- what did they pay with?

25  **A.**   I believe anything that the ICO allows you to pay with.

1   So it could be a range of, you know, your American Express to

2   cryptocurrency to a wire transfer.

3   **Q.**   So both U.S. dollars and cryptocurrency?

4   **A.**   Yes, that's correct.

5   **Q.**   Where was -- where were the U.S. dollars deposited?

6   **A.**   Into a bank account.  I'm not sure the exact one but...

7   **Q.**   And where was the cryptocurrency deposited?

8   **A.**   I truly do not know.

9   **Q.**   With respect to the U.S. dollar deposits, did you -- did

10  there come a time where you formed an understanding about --

11  about the bank accounts that were receiving those funds?

12  **A.**   I did see them later on, yes.

13  **Q.**   And how did you form that understanding?

14  **A.**   Well, Marcus gave me these binders that were basically, he

15  said, his bank statements, and they were just huge binders that

16  had just rows and rows of deposits and things like that.

17  **Q.**   Where did he -- where did he give you these binders?  And

18  were they physical?

19  **A.**   They were physical.  It was in the office, probably not

20  until, like, a year into working for Marcus.

21  **Q.**   And what did he ask you, if anything, to do with those

22  binders?

23  **A.**   He said just to cross-verify too if people didn't get

24  their tokens too, just see if we could attach them,

25  investigate, and see if, you know, there was some way we could

 1    find them through the bank statements.  And also just to, like,

 2    cover his bases.

 3    **Q.**   And in looking at these binders, did you look at the

 4    transactions within?

 5    **A.**   I did, yes.  I looked at all of them.

 6    **Q.**   What, if anything, stood out to you about deposits or

 7    withdrawals?

 8    **A.**   I mean, what I thought was kind of weird, like, the

 9    Western Union ones, I couldn't track down.  They didn't have

10    names.  So I would highlight them because those were just -- I

11    couldn't attach them to anybody from the ICO.  And it would be

12    quite a few of them.

13        And then just large withdrawals at the end.  So you'd have

14    rows and rows of deposits and then a huge withdrawal, and it

15    kind of happened over and over again.

16    **Q.**   So these were deposits going into accounts that

17    Mr. Andrade said were his and then withdrawals coming out?

18    **A.**   Yes, that's correct.

19    **Q.**   What, if anything, did you do in response to seeing those

20    large withdrawals?

21    **A.**   I mean, I remember on, like, one occasion, I did mention

22    it because it was just like -- I remember, like, I saw, like,

23    three withdrawals back to back, and I just highlighted them and

24    I asked him, "You know, what are these withdrawals?  Where are

25    they going?"  Just because he would ask us to make sure,

 1  like -- right? -- he was -- everything was clear.  And so I

 2  asked him, and he would say that "I'm paying myself back.

 3  Don't worry about it."

 4  **Q.**   What words did he use exactly?

 5  **A.**   He would say, "I'm paying myself back."  Like, he would

 6  go -- he would go on these little tangents and he would just

 7  say, "I'm paying myself back.  You know, I have all these other

 8  things going on, and I paid for this, so I'm just paying myself

 9  back."

10  **Q.**   And how large were these withdrawals, to the best of your

11  recollection?

12  **A.**   Probably -- all of them, probably hundreds of thousands of

13  dollars.

14  **Q.**   Did Mr. Andrade tell you these were AML BitCoin token

15  investor funds?

16  **A.**   Oh, yeah.  All those books were, yes.

17  **Q.**   Did Mr. Andrade talk to you about how he spent money he

18  received from the ICOs -- the ICO?

19  **A.**   He did on occasion, yeah.  He would -- you know, when I

20  first started with him, he was really proud he got a new house,

21  a couple cars, travel, things like that.

22  **Q.**   And you mentioned travel.  How did you know that

23  Mr. Andrade was spending ICO funds on travel?

24  **A.**   That would just be me assuming -- right? -- he was

25  spending the funds that we were getting because the time --

1            MR. STEFAN:  Objection.  Speculation.

2    BY MR. CHOU:

3    Q.    Did you speak with Mr. Andrade --

4            THE COURT:  Overruled.

5        Go ahead.

6            MR. CHOU:  Sorry.

7    Q.    Did you speak with Mr. Andrade about his travel?

8    A.    I did.

9    Q.    When did you speak with him about his travel?

10   A.    He would, like, randomly leave and he would come back, and

11   he would just kind of go on and on about his trips, you know,

12   like what he did, the people, the food.

13   Q.    And when would he have these conversations with you?

14   A.    When he came back in person.  And he would just be, like,

15   "You gotta go.  You know, the food is great, the people," the

16   things that he did.  It always sounded, like, extravagant.

17   Right?

18   Q.    What did he tell you about what he did on those trips?

19   A.    I don't know.  It kind of seemed like he partied a lot.

20   But he -- I know he would eat a lot.  He would hang out with,

21   like, the guys a lot.  Right?  And he would talk about kind of

22   like crass things but, like, going to strip clubs and going out

23   drinking.

24           MR. STEFAN:  Objection.  404(b), 403.

25           THE COURT:  Overruled.  We discussed this.

1    BY MR. CHOU:

2    **Q.**    I'm sorry, Ms. Tran.  Would you mind just -- what did

3    Mr. Andrade tell you about what he did on these trips?

4    **A.**    I'm sorry.  You kind of threw me off.

5         But he would -- like I said, it was kind of crass things.

6    But it was a little bit of my relationship with Marcus.  He

7    kind of treated me like one of the guys.  So he would talk

8    about going to strip clubs and going out drinking and he would

9    spend, like, all night awake, like 24 hours straight.  And,

10   yeah, it was -- that was it.  Like, women a lot.

11   **Q.**    When Mr. Andrade came back from these trips, were there

12   times that money was tight?

13   **A.**    Yes, quite a few times.

14   **Q.**    And how did you know that money was tight after these

15   trips?

16   **A.**    Well, first, he couldn't pay me a few times.  He

17   couldn't -- we couldn't pay our rent.  We couldn't pay the

18   light bill once, our phone bill.  Pretty much at some point a

19   lot of us didn't get paid.

20   **Q.**    And did there come a time that you had to move offices

21   because the rent wasn't paid?

22   **A.**    Yeah.  During my time with him, we had three offices.  One

23   we left because it was shared with Melissa, the second we were

24   kicked out of because we couldn't pay, and then the third one.

25   **Q.**    And what actions, if any, did Mr. Andrade take in response

1  when money was tight?

2  **A.**    I mean, I recall a couple of times he would -- I would

3  tell him, "Hey, we can't pay this and this.  This is really

4  important.  Like, we have to pay our rent."

5      And, you know, he would kind of get frustrated and he

6  would go lock himself in his office, and I wouldn't see him for

7  hours.  And then he would kind of like come back.  He'd be

8  like, "We have money and you can pay yourselves," and things

9  like that.

10  **Q.**    You made a -- just for the record, you made a gesture of

11  hitting the podium there.

12  **A.**    Like, "Here's the card.  Pay yourselves."  You know, he's

13  a generous guy; right?  He would always be like, "Pay

14  yourselves.  Let's go out to eat.  You know, I might go -- go

15  out and grab a couple ones," kind of thing.  It was always,

16  like, his entire demeanor would change when he knew he had

17  money.

18  **Q.**    When you mentioned grabbing a couple ones, was that cash

19  withdrawals of $1 bills?

20  **A.**    Yeah.  A couple of times he would invite me to go out with

21  him.  I never went because, truth be told, I wasn't

22  comfortable; but he would, like, kind of gesture, like, "I have

23  a stack of ones.  Like, let's go," but...

24  **Q.**    What did Mr. Andrade tell you about what he was doing in

25  that room while the door was closed?

 1    **A.**    I was under the impression that he was calling investors,

 2    like potential investors.  Like one name does -- Tyler Hoff.

 3              **MR. STEFAN:**  Objection.  Speculation.

 4              **THE COURT:**  Overruled.

 5              **THE WITNESS:**  I remember him calling Tyler Hoff, and I

 6    had to send him tokens afterwards.

 7          Whenever he gave us money, he's like, "He gave us money.

 8    Pay yourselves."

 9    **BY MR. CHOU:**

10    **Q.**    You mentioned that your understanding was he was speaking

11    with investors.  Were these AML BitCoin token investors,

12    Aten Coin investors?  What sort of investors?

13    **A.**    I believe it's -- no.  It's more so the Aten Coin token

14    holders because I would have to send them the tokens

15    afterwards.

16    **Q.**    I see.

17          And when did you -- when did you first notice that money

18    was tight?

19    **A.**    Well, when we got kicked out of the second office, that

20    was tight.  He was adamant that he did pay the rent.  And then

21    when we moved to the third office, there was a few times where

22    he couldn't pay us.

23    **Q.**    Sorry.  That was a poorly formed question.

24          Was money tight shortly after you first joined or towards

25    the end of your tenure?  When in your tenure, starting in

**B. TRAN - DIRECT / CHOU**

1  March 2018?

2  **A.**   Probably about a year in.  So late 2018.  Or your question

3  was when money was tight -- when I believe money was tight?

4  **Q.**   When did you first notice that money was tight?

5  **A.**   I started with him March 2018.  So probably around

6  six months in, six to seven months in.

7  **Q.**   And what was your understanding of how much money he had

8  raised in the initial coin offering?

9  **A.**   It was a few million.

10  **Q.**   So about six months after you joined the company, he was

11  short on cash?

12  **A.**   Yes.

13  **Q.**   Let's talk about the AML BitCoin product.

14  **A.**   Okay.

15  **Q.**   What features did Mr. Andrade claim to the public that it

16  had?

17  **A.**   That it would be compliant.  You could use it like you

18  used --

19          **MR. STEFAN:**  Objection.  Foundation.

20          **THE COURT:**  Overruled.

21          **THE WITNESS:**  You could use it like you used a U.S.

22  dollar.  Right?  It was supposed to compete with Bitcoin, which

23  was gaining traction at the time, but it was supposed to be a

24  traceable, compliant form of cryptocurrency.

25  \\\

1    BY MR. CHOU:

2    **Q.**   And earlier, did I -- earlier -- could you just describe

3    to us how often you were seeing Mr. Andrade in person?

4    **A.**   I saw him quite a bit.   I probably was -- when I was with

5    him exclusively, it was just him and I and Melanie in the

6    office.   So I would see him every day unless he was traveling.

7    **Q.**   And how long did you work closely with Mr. Andrade?

8    **A.**   For a little over a year.

9    **Q.**   During the time that you worked with Mr. Andrade, did

10   AML BitCoin ever have the features that you just mentioned?

11   **A.**   No, I don't believe so.   It didn't.

12   **Q.**   Let's discuss each part of the AML BitCoin product or a

13   couple parts.

14       Did AML BitCoin advertise a mobile app?

15   **A.**   It did.   It was supposed to be the biometrics part.

16   **Q.**   Did there come a time that you personally tested that

17   mobile app?

18   **A.**   Yes.   Shortly after I was working with him, I did test it.

19   The team actually came out, and they had us test the app.

20   **Q.**   And where did they come out from?

21   **A.**   London.   I believe it was like CrossVerify or something,

22   their name.

23   **Q.**   And could you please describe for us what the app looked

24   like?

25   **A.**   It was very evidently poorly made.   It -- like, you would

1   open up your phone and it was just, like, this purple -- purple

2   background and you had just an empty, like, profile picture

3   there.  And you would -- then you would -- it would ask you to

4   take your picture, and it was supposed to work as a biometrics

5   to attach to a -- you had to go online and you had to upload

6   your driver's license or something.  And then you'd take the

7   picture on your phone, and it was supposed to attach the two.

8   Like, it was supposed to automatically know this is your

9   driver's license and this is your face.  However, it didn't

10  work.

11  **Q.**  And describe this testing event for us.  Who else was in

12  the room?  Was Mr. Andrade in the room?

13  **A.**  He was.  It was probably, like, three to four people that

14  came from the team.  One of Marcus's associates, I believe he

15  was from Canada, Marcus, me, and Melanie.

16  **Q.**  And did you try uploading a photo and following the

17  instructions to test the app?

18  **A.**  I did.  I kind of spent, like, all day doing it because

19  they -- we would give them feedback; they would say they fixed

20  it and they didn't.

21  **Q.**  And what happened when you tried to upload a facial photo?

22  **A.**  It would just -- it would reject it.  So it would be like,

23  "No data found."  And we would have to do this over and over.

24  Like, we would constantly upload the driver's license, do our

25  picture because they were like, "Try it now."  And then it

 1    never worked, though.  It never attached -- it never saved our

 2    faces and it never attached to our driver's license.

 3    Q.   Ms. Tran, have you used many other smartphone apps?

 4    A.   I have.

 5    Q.   And compared to other apps you've used, how functional,

 6    relatively speaking, was this AML BitCoin app you saw?

 7    A.   Very early.  Very, like, poorly done.  Like, I would say,

 8    you know, really early stages of an app.

 9    Q.   What did Mr. Andrade say publicly about the app and its

10    biometric features, to the extent you know?

11    A.   It seemed like he -- the team actually that came out were

12    more --

13    Q.   Sorry.

14    A.   Go ahead.

15    Q.   What did Mr. Andrade say about the app and its biometric

16    features?

17    A.   Before they came out, he said it was almost done.  Before

18    the team came out.

19    Q.   And could Mr. Andrade even open the app?

20    A.   No, because it only worked on iPhones and he didn't have

21    an iPhone at the time.

22    Q.   What sort of phone did he have at the time?

23    A.   He loved his Motorola phones.

24    Q.   So we talked about a mobile app, and was there also an

25    AML BitCoin Wallet?

**B. TRAN - DIRECT / CHOU**

1    **A.**    There was, yes.

2    **Q.**    What did Mr. Andrade claim the AML BitCoin Wallet could

3    do?

4    **A.**    The AML BitCoin Wallet was supposed to be unique because

5    it was traceable and encrypted.  So you were supposed to also

6    use it with your biometrics and it would protect your wallet,

7    so you would never be, like, hackable, things like this.  But

8    it's also traceable and compliant so you could use it

9    regularly.

10   **Q.**    During your year and change working for Mr. Andrade, did

11   AML BitCoin Wallet ever enable biometric verification?

12   **A.**    It did not, no.

13   **Q.**    And throughout your time working for Mr. Andrade, did the

14   AML BitCoin Wallet appear to change at all?

15   **A.**    In my time with Marcus, it did not.  It was the same when

16   I started and when I left.

17   **Q.**    Let's talk about Mr. Andrade's role in AML BitCoin.  He

18   was the -- was he the founder?

19   **A.**    He was the founder, yes.

20   **Q.**    Was he the CEO?

21   **A.**    Yes.

22   **Q.**    On a scale of, you know, a hands-off manager to a more

23   detail-oriented manager, how involved was Mr. Andrade in the

24   management of the company?

25   **A.**    He was very hands-on.  He had to know everything.

**B. TRAN - DIRECT / CHOU**

1   **Q.**   And did you ever see Mr. Andrade himself report to anyone?

2   **A.**   No, I don't believe so.

3   **Q.**   How involved was Mr. Andrade in reviewing public-facing

4   content like press releases?

5   **A.**   Oh, he would have to check that.  He made sure to always

6   review everything.

7   **Q.**   Would he review it once?  More than once?

8   **A.**   Multiple times.  If we made any edit, even if you changed

9   an "and" to an "or," he would have to check it.

10  **Q.**   Did he review the text on the website?

11  **A.**   He did, yes.

12  **Q.**   I'd like to show you what's been marked as Exhibit 58 at

13  this time.

14      Just to the Court, the parties, and the witness.

15      And, Ms. Tran, are you able to see this okay?

16  **A.**   I am.

17  **Q.**   Is this an email between you and Marcus Andrade where he

18  uses the email address ceo@amlbitcoin.com?

19  **A.**   Yeah.  That was his only email he emailed me from.

20  **Q.**   And the "to" line, it says AML Adim or Admin, and it's

21  admin@amlbitcoin.com?

22  **A.**   Mm-hmm.

23  **Q.**   Was that an email address that you used while you were

24  working for Marcus Andrade?

25  **A.**   Yes, that was me.

1   Q.   And this email is dated September 11th, 2018?

2   A.   Yes.

3   Q.   Is this a fair and accurate depiction of an email thread

4   that you exchanged with Marcus Andrade?

5   A.   It is.  I recall these emails.

6           MR. CHOU:  Okay.  I move to admit Exhibit 58.

7           MR. STEFAN:  No objection.

8           THE COURT:  58 will be admitted.

9       (Trial Exhibit 58 received in evidence.)

10          MR. CHOU:  If we can please publish that.

11  Q.   So in this email thread, the email at the bottom is the

12  oldest in chronological order; right?

13  A.   Yes.

14  Q.   Okay.  So I'll just scroll, zoom in on that.

15       And so here, Melanie Cowan is sending you an edited press

16  release?

17  A.   Yes, it looks like she's sending me.

18  Q.   And do you see where she writes [as read]:

19          "Please forward to Marcus to give it another

20       once over before sending it out"?

21  A.   Yes, that's correct.

22  Q.   Was that the ordinary practice you're referring to of

23  making sure he reviewed everything?

24  A.   Yes.  This was -- because I would have to send it to him,

25  and he would make sure that I sent it to him, yeah.

**B. TRAN - DIRECT / CHOU**

1  Q.    Do you see where this email mentions a PR Newswire and

2  Business Wire?

3  A.    Yes.

4  Q.    What were PR Newswire and Business Wire?

5  A.    I believe they're the ones that facilitated getting PR

6  out, like public press releases out.

7  Q.    Then the subject of this email thread is "Edited HitBTC

8  Press Release."  What's your understanding of what "HitBTC"

9  was?

10  A.    It was a marketplace for cryptocurrency, so you can buy

11  and sell.  It was just a large marketplace, like a stock

12  market.

13  Q.    And this email is from Melanie Cowan.  And what was your

14  relationship with Melanie Cowan at the time?

15  A.    She was my partner at the time.

16  Q.    And is she still your partner?

17  A.    She's my wife now.

18          **MR. CHOU:**  We can take this down.

19  Zoom out.

20  Q.    And then zooming up here, do you see where it says

21  [as read]:

22          "Melanie made some minor changes"?

23  A.    Yes.

24  Q.    Is this you emailing Mr. Andrade the press release?

25  A.    Yes.

1      MR. CHOU:  We can zoom out of this and then just zoom

2   in on the top part, which is Mr. Andrade's response.

3      THE COURTROOM DEPUTY:  Is this still 58?

4      MR. CHOU:  Yes.

5      THE COURTROOM DEPUTY:  Okay.  Sorry.

6      MR. CHOU:  Sorry.

7   Q.   And so on 58, Exhibit 58, do you see where Mr. Andrade

8   writes [as read]:

9           "Please get Melanie and NAC Skype and let's form

10      a group Skype between us all"?

11  A.   Yes.

12  Q.   What does that refer to, "group Skype"?

13  A.   Other than through email, Skype was our main form of

14  communication.  So everybody had to be on Skype all the time.

15  If you were in the office, you had to be on Skype.

16      So he was just making sure that they also had Skype.

17  Q.   And who was in this group Skype channel?

18  A.   Anybody who was in the office.  Me, Melanie, Travis for a

19  short time, whoever else came into the office.

20  Q.   Was Mr. Andrade in this group chat?

21  A.   Oh, yes, Marcus Andrade was in it.

22  Q.   And media@amlbitcoin.com and press@amlbitcoin.com, do you

23  see those two email addresses?

24  A.   Yes.

25  Q.   Are those email address that were used by NAC Foundation

**B. TRAN - DIRECT / CHOU**

1    for media and press?

2    **A.**   Yes.

3           **MR. CHOU:**  We can take this exhibit down, please.

4    So this was a September 11th, 2018, exhibit.  I'd like to

5    now pull up Exhibit 60 just for the Court, parties, and the

6    witness.

7    **Q.**   Do you see this email that's dated also September 11th but

8    just later in the day?

9    **A.**   Yes.

10   **Q.**   And do you recognize this email?

11   **A.**   I do.  I remember this email, yes.

12   **Q.**   Is it a fair and accurate depiction of an email between

13   you and David Mata?

14   **A.**   Yes.

15          **MR. CHOU:**  Government moves to admit Exhibit 60.

16          **MR. STEFAN:**  No objection.

17          **THE COURT:**  Exhibit 60 will be admitted.

18       (Trial Exhibit 60 received in evidence.)

19   **BY MR. CHOU:**

20   **Q.**   So, Ms. Tran, again, the oldest email in the chain is at

21   the bottom?

22   **A.**   Mm-hmm.

23          **MR. CHOU:**  Could we please zoom in on the email from

24   Ms. Tran starting Tuesday, September 11th, 15:56.  Thank you.

25   **Q.**   So in this email, are you asking Mr. Mata for approval of

1  a quote related to HitBTC?

2  **A.**   I am, yes.  This is when I contacted David.

3  **Q.**   And this is for -- this is for a press release regarding

4  AML BitCoin being listed on HitBTC?

5  **A.**   Yeah.  I was asking him for -- to verify a quote that he

6  gave so I can add it to the press release.

7  **Q.**   And just take a step back.

8      What was your understanding, if any, of David Mata's role

9  with respect to AML BitCoin and Marcus Andrade?

10  **A.**   I don't -- the name is very familiar.  This is probably my

11  one and only time speaking to him, but I believe he was, like,

12  friends with Marcus, cohorts of Marcus somehow.

13          **MR. CHOU:**  Okay.  And we can zoom out, please.

14      And then if we could zoom in on Mr. Mata's response where

15  he says [as read]:

16          "I'd like to propose replacing."

17      It's in the middle of the page.  It's time stamped

18  8:33 p.m.  Thank you.

19  **Q.**   So, Ms. Tran, is this Mr. Mata's proposed substitution for

20  his quote in the press release?

21  **A.**   Yes.  Yeah, he revised it.

22  **Q.**   And he revised it from a quote about Mark Zuckerberg -- or

23  comparing AML BitCoin to Mark Zuckerberg to something about

24  comparisons to Brin, Page, and Bezos?

25  **A.**   Yes.  Yeah.

1      **MR. CHOU:**  Okay.  If we could zoom out, please.

2          And then if we could zoom in on just the top couple

3      emails, both Bernadette's response as well as Mr. Mata's

4      response.

5      **Q.**   And, Ms. Tran, when you responded to Mr. Mata, do you see

6      where he wrote [as read]:

7              "I showed it to Marcus as well and he was good

8          with it"?

9      **A.**   Yes.  Yeah.

10     **Q.**   Did you later go on to, nonetheless, also show this press

11     release again to Marcus Andrade?

12     **A.**   Yes, absolutely.  Yeah.  He probably -- like I said, any

13     edits would have to go through Marcus.

14             **MR. CHOU:**  We could take this down, please, and --

15     this exhibit down.

16         And then if we could pull up Exhibit 62, please, again,

17     just for the parties and the witness and the Court.

18     **Q.**   Ms. Tran, is this the HitBTC press release that was

19     released?

20     **A.**   Yes.

21     **Q.**   And did you receive this press release?

22     **A.**   I did, yes.  I looked -- I received it, I looked it over,

23     and I sent it to Marcus a few times.

24     **Q.**   And then on the second page -- just to scroll down -- it's

25     your name listed as the press contact at the bottom there?

1    **A.**    Yes.

2           **MR. CHOU:**  All right.   The Government moves to admit

3    Exhibit 62.

4           **MR. STEFAN:**  No objection.

5           **THE COURT:**  62 will be admitted.

6    (Trial Exhibit 62 received in evidence.)

7           **MR. CHOU:**  So just scrolling up to the first page,

8    perfect.

9         If we could scroll in on -- if we could zoom in on the

10   second paragraph there.  It starts with "Marcus Andrade" and

11   goes through "we are that coin!"

12   **Q.**    Who provided you the content for this press release?

13   **A.**    I believe it was one we had previously with Melissa and

14   one that Marcus has already previously looked over.

15   **Q.**    And then Mr. Andrade would approve the content in this

16   press release?

17   **A.**    Yes.

18          **MR. CHOU:**  Could we scroll to the second page, please.

19        Could we please zoom in on the paragraph beginning with

20   "Our international team has been working for months"?  It's the

21   second paragraph from the top.  Thank you.

22   **Q.**    So do you -- so the question marks in this text, are those

23   meant to be quotation marks and there's some odd formatting

24   here?

25   **A.**    I believe so, yeah, because those question marks wouldn't

1    be there.

2    **Q.**    And so if I'm reading this correctly, it's [as read]:

3          "Our international team has been working for

4          months with governments and industry worldwide to

5          help introduce the AML BitCoin into their payment

6          systems.  We expect to have a major announcement

7          soon."

8    **A.**    Yes.

9    **Q.**    During the time that you worked for Mr. Andrade, did

10   AML BitCoin ever have a major announcement with respect to

11   working with a government or an industry player?

12   **A.**    During my time, no.  He would talk about it, but nothing

13   ever actually happened.

14          **MR. CHOU:**  Okay.  We can take this down, please.

15          And if we could turn to Exhibit 66 just for the Court,

16   parties, and the witness.

17   **Q.**    Do you remember earlier talking about how Mr. Andrade

18   would review website text?

19   **A.**    Yes.

20   **Q.**    Is this an email between you and Mr. Andrade regarding the

21   AML BitCoin website text?

22   **A.**    Yeah.  I believe this is when we had Chris come in and

23   potentially make us a new website, and he was making sure

24   everything was good, and so he would read over everything with

25   that website.

1  Q.   And is this email a fair and accurate depiction of an

2  email thread you had with Mr. Andrade?

3  A.   Yes.

4          MR. CHOU:  Okay.  I move to admit Exhibit 66.

5          MR. STEFAN:  No objection.

6          THE COURT:  66 will be admitted.

7      (Trial Exhibit 66 received in evidence.)

8          MR. CHOU:  And if we could just zoom in on the first

9  email chronologically, so at the bottom.

10  Q.   You write to Mr. Andrade [as read]:

11          "I wanted to get your final stamp of approval

12          before we move forward with integrating

13          amlbitcointalk.com."

14      Did I get that right?

15  A.   Yes, mm-hmm.

16  Q.   Was it the company's practice to make sure Mr. Andrade got

17  the final stamp of approval on public-facing documents?

18  A.   Yeah.  On everything.

19          MR. CHOU:  And if we can zoom out, please.

20      If we can please zoom in on Mr. Andrade's response.

21  Q.   And did Mr. Andrade respond [as read]:

22          ". . . before the website goes live, please have

23          someone send me over all the website text in a Word

24          document so that I can review it all for compliance

25          reasons"?

1   **A.**    Yes.

2           **MR. CHOU:**  Okay.  And zoom out, please.

3   **Q.**    And then, ultimately, was -- did a website go live?

4   **A.**    This website?  No.  The BitcoinTalk didn't go live.  It

5   didn't -- he didn't like the formatting.

6           **MR. CHOU:**  We can take this down.

7   **Q.**    At a general level, what were the channels through which

8   Mr. Andrade would advertise AML BitCoin?

9   **A.**    I know a lot of social media, like Instagram, Twitter a

10  lot, Telegram a lot.

11  **Q.**    And what was Mr. Andrade's role, if any, when it came to

12  producing or writing AML BitCoin's online content?

13  **A.**    He had to approve everything that went out.  So

14  everything, we'd probably, like, send him a version, and then

15  he would say "yes" or "no," and then we would post it.

16  **Q.**    Did you see Mr. Andrade also post content of his own under

17  his own name?

18  **A.**    Just through Telegram.

19  **Q.**    And could you just explain to us what Telegram is?

20  **A.**    Sure.  It's kind of like a forum.  Like, it's just like

21  you can join and you just talk.  It's just, like, rows and rows

22  of people talking.  You can put anything you want into it.

23  People would have to, like, moderate it.  It's just kind of

24  like a 24/7 chat room.

25  **Q.**    Live -- live group chat?

**B. TRAN - DIRECT / CHOU**

1    **A.**    Yes.

2    **Q.**    And how often would Mr. Andrade post in AML BitCoin's

3    Telegram channel?

4    **A.**    Pretty often.  He was in there all the time and it was

5    always going.  Even when we were working, we had to oversee it.

6    Our support team would have to be in there as well.

7    **Q.**    What did Mr. Andrade say, if anything, about the timing of

8    AML BitCoin milestones?

9    **A.**    It would be a lot of like, "It's coming soon.  Just wait.

10    You know, we'll have an announcement."  Things along those

11    lines.

12    **Q.**    And over the course of your time working for him, how

13    often would he be posting things like "It's coming soon"?

14    **A.**    Probably weekly.  It would -- you know, people would be

15    angry and happy in the Telegram -- right? -- because anybody

16    could join.  So he would be like, "Just wait.  You know,

17    something's coming.  You don't know."  You know, like, even

18    support would have to post things like that, but pretty

19    regularly.

20    **Q.**    You mentioned something called support --

21    **A.**    Mm-hmm.

22    **Q.**    -- and support posting.

23        Did I get that right?

24    **A.**    Yes.

25    **Q.**    Who or what was support?

1   **A.**   It was a small team we had.  I believe they were actually

2   all in Mexico.  They -- about two to three of them.  And they

3   would -- we would have support tickets, people who couldn't do

4   wallets and stuff, but also they monitored Telegram and stuff

5   like that, yeah.

6   **Q.**   And did Mr. Andrade ever direct you to tell the support

7   folks to do anything with respect to Telegram.

8   **A.**   Just to kind of -- like, they were moderating it, but they

9   were also, you know, deflating situations.  They would -- I

10  would recall, you know, a couple times they would say things

11  that were --

12  **Q.**   Hold on.

13  **A.**   Go ahead.

14  **Q.**   What did Mr. Andrade tell you, if anything, to tell the

15  support folks to do in Telegram?

16  **A.**   Just to, like, deflate them and let them know something's

17  coming soon, you know, to appease people.

18  **Q.**   So Mr. Andrade instructed you to have the support folks

19  post that things were coming soon?

20          **MR. STEFAN:**  Objection.  Leading.

21          **THE COURT:**  That is leading.  Sustained.

22          **THE WITNESS:**  Sorry.

23  BY MR. CHOU:

24  **Q.**   What did Mr. Andrade tell you to instruct the support

25  staff?

1    **A.**    Mainly just to, like I said, be moderators and to deflate

2    situations, you know, because a lot of people would be unhappy

3    after the ICO.  So he would, you know, just kind of let them

4    know, like, "Things are coming soon.  Things are happening

5    behind the scenes.  You know, we can't wait to share with you,"

6    stuff like that.

7    **Q.**    Now, was Mr. Andrade secretive about his company's inner

8    workings or transparent?

9    **A.**    I would say very secretive.  I didn't know a lot of things

10   that were going on.

11   **Q.**    And were there -- were there times where you would ask for

12   information and Mr. Andrade would respond a particular way?

13        **MR. STEFAN:**  Objection.  Leading.

14        **THE COURT:**  Overruled.

15        **THE WITNESS:**  Can you repeat that?

16   **BY MR. CHOU:**

17   **Q.**    Were there times that you would ask for more information

18   and Mr. Andrade would respond one way or another?

19   **A.**    Sorry.  My nose is -- I'm adjusting to the allergies in

20   San Francisco.

21        Repeat that one more time for me, please.

22   **Q.**    Were there times when you asked Mr. Andrade for more

23   information about the operation of his company and he would

24   respond one way or another?

25   **A.**    Oh, yeah.  I would ask him, you know, just kind of out of

1    my own curiosity.  And he said, "We got a team working on that.

2    You know, we'll see something soon," things like that.

3    **Q.**    That's how Mr. Andrade would respond?

4    **A.**    Yeah.  Pretty vague.

5    **Q.**    Did Mr. Andrade make you sign an NDA?

6    **A.**    He did before I started with him.  Before I touched

7    anything AML, I would have to sign that.

8    **Q.**    And what is an NDA?

9    **A.**    A non-disclosure agreement.

10   **Q.**    Did Mr. Andrade also talk about suing people?

11   **A.**    Quite a few times, yeah.

12   **Q.**    And who did he talk about suing?

13   **A.**    One, Melissa -- quite a few times Melissa Foteh.  I

14   wouldn't be surprised if he wanted to sue me.  Friends that

15   screwed him over.  The team in London.  Multiple people.

16   **Q.**    And when people would -- you mentioned earlier there was a

17   Telegram channel and other channels where people would post

18   things.

19   **A.**    Yes.

20   **Q.**    And would some people post negative content about

21   AML BitCoin?

22   **A.**    All the time.

23   **Q.**    Would Mr. Andrade talk about litigation with respect to

24   those people at all?

25   **A.**    Yeah.  He would say, like, you know, he would want to send

**B. TRAN - DIRECT / CHOU**

1  them, like, cease and desist letters or, like, defamation,

2  things like that.

3  **Q.**  And while you worked at AML BitCoin, did you see any

4  lawsuits filed one way or another?

5  **A.**  No, I don't believe so.

6  **Q.**  Did there come a time when you stopped working for

7  Mr. Andrade?

8  **A.**  There was, yes.

9  **Q.**  And when was that?

10  **A.**  About a year and a half in, so I'm pretty sure it's around

11  my birthday in August -- thank you so much -- in August of

12  2019.

13  **Q.**  And why did you stop working for him?

14  **A.**  He couldn't pay me.  He -- there was a few times he

15  couldn't pay me.  One time, you know, I said, "This is enough."

16  And then the second time, I even went down in pay to help him,

17  and then he never even paid me back for that either.  And then

18  that's when I told him, "If it happens again, I'm not coming

19  back."  And it did, and I never saw him again.

20  **Q.**  Through all your time working for Mr. Andrade, did you

21  ever take directions from someone named Japheth Dillman?

22  **A.**  No.

23  **Q.**  Did you ever take directions from someone named

24  Jack Abramoff?

25  **A.**  No.

1    Q.    From the David Mata we talked about earlier?

2    A.    Other than that email, no.

3    Q.    Did you ever see Mr. Andrade take orders from anyone else?

4    A.    No.

5    Q.    Between the time you joined in about March 2018 all the

6    way through -- was it August 2019?

7    A.    Mm-hmm.

8    Q.    -- did you personally see any progress on AML BitCoin's

9    Wallet?

10   A.    Personally, no.  It was the same when I started and the

11   same when I left.

12   Q.    Did you personally see any progress on the biometric

13   identification tech?

14   A.    No.  He had a falling out with that group, and then I

15   never saw it again.

16   Q.    Did you see any progress on integration with the

17   blockchain?

18   A.    No.

19   Q.    Based on all your experience working with Mr. Andrade, at

20   the time you quit AML BitCoin, did you think he would ever

21   finish the project?

22   A.    Honestly, no.

23   Q.    And why is that?

24   A.    Just because my time there, I saw how kind of chaotic the

25   business was, and it was the same when I -- when I started and

```
 1   when I left.  It was he had falling outs with many people.

 2   Nobody there was the same when I left either.

 3           MR. CHOU:  One moment, please.

 4                     (Pause in proceedings.)

 5           MR. CHOU:  Nothing further.

 6           THE COURT:  Very well.  We'll take our morning break.

 7       Members of the jury, remember my admonitions.  Do not

 8   discuss this matter amongst yourselves or with anyone else.

 9       We'll be back in 15 minutes.

10   (Proceedings were heard out of the presence of the jury.)

11           THE COURT:  We're out of the presence of the jury.

12       The defense has kindly followed my requests or my comment

13   that I like the binders for the witnesses and has given me

14   them, and I appreciate it very much, but it's a lot of paper

15   and I'm doing fine with this.  So I know you have much to do.

16   You don't have to give me the binders for the witnesses every

17   day because it's a lot of work and a lot of paper.  So I'll

18   just deal with this.  Thanks.

19                   (Recess taken at 10:15 a.m.)

20               (Proceedings resumed at 10:34 a.m.)

21     (Proceedings were heard out of the presence of the jury.)

22           THE COURT:  Okay.

23           THE COURTROOM DEPUTY:  Bring them in?

24           THE COURT:  Yes, please.

25       (Proceedings were heard in the presence of the jury.)
```

1          **THE COURT:**  The jury is present.

2      Mr. Stefan?

3                      <u>**CROSS-EXAMINATION**</u>

4  **BY MR. STEFAN:**

5  **Q.**  Good afternoon -- or good morning, I believe, still.

6  **A.**  Good morning.

7  **Q.**  I want to talk about when you first got to know

8  Mr. Andrade.

9  **A.**  Mm-hmm.

10 **Q.**  I believe you said this was in March of 2018.

11 **A.**  That's when I started with Marcus, but that's not when I

12 met him.

13 **Q.**  Oh, okay.  Pardon me.

14     You started with Marcus what?  In the office in March of

15 2018?

16 **A.**  No.  I started with Melissa originally.  For the first few

17 months, I was with Melissa exclusively.

18 **Q.**  Okay.  When did you meet Marcus?

19 **A.**  Probably four months after March.  Summertime.

20 **Q.**  And that's when you started working with him in person?

21 **A.**  Mm-hmm, that's correct.

22 **Q.**  Now, when you were working with him in person, I think you

23 said Marcus was there every day.

24 **A.**  He was pretty much there every day, yeah.

25 **Q.**  And that was -- that allowed you to actually interact with

1  him pretty much daily?

2  **A.**   Yes.

3  **Q.**   And when you first got to know Mr. Andrade in this

4  setting, you had the impression that he genuinely believed in

5  what he was doing, that he genuinely thought that his product

6  would work; isn't that right?

7  **A.**   Are you asking me a question?

8  **Q.**   Well, yes.  Didn't you -- did you genuinely believe -- or

9  did you have the impression that he genuinely believed in his

10 product when you initially met him?

11        **MR. CHOU:**  Objection.  Speculation.

12        **THE COURT:**  Why don't you first provide some

13 foundation for whether or not she'd have an impression one way

14 or the other.

15        **MR. STEFAN:**  Yes, Your Honor.

16 **Q.**   So he showed up every day to the office?

17 **A.**   That's correct, yeah, unless he was traveling or

18 something.  It wasn't -- I was there pretty regularly 9:00 to

19 5:00 every time, but he would come in later -- right? -- as

20 perks, of course, of the CEO.

21 **Q.**   But he was still there every day with you in the office?

22 **A.**   For the most part, yeah.

23 **Q.**   And he was working on this particular AML BitCoin project?

24 **A.**   According to my knowledge, yeah.

25 **Q.**   And directing you as you were doing your work on the

1  project; right?

2  **A.**   Yeah.   I mean, everything -- everything I did was through

3  his direction.

4  **Q.**   And he was also coordinating with this team in London as

5  well?

6  **A.**   For a time, I believe he was partners with them, yes.

7  **Q.**   So for at least some period of time he's working with this

8  team in London too?

9  **A.**   Mm-hmm.

10  **Q.**   And other staff that's in, you said, Mexico, a tech

11  support staff?

12  **A.**   They were tech support, yeah.

13  **Q.**   So there were, I think you said, three of them, as you

14  understand, in Mexico supporting as well?

15  **A.**   Two -- there was two when I left.   I had to let one go.

16  **Q.**   Okay.   Regardless, Mr. Andrade was coordinating with all

17  those people?

18  **A.**   He was coordinating through me to coordinate those people,

19  yes.

20  **Q.**   And Mr. Andrade expressed to you quite a bit of confidence

21  in his patents; is that right?

22        **MR. CHOU:**   Objection.   Hearsay.

23        **THE COURT:**   He expressed to you -- what's the question

24  again?

25        **MR. STEFAN:**   Confidence in his patents.

1          THE COURT:  Sustained.

2          MR. STEFAN:  Your Honor, not for the -- it's for his

3    then existing mental, emotional, and physical condition, his

4    beliefs regarding the strength in his IP.

5          MR. CHOU:  Truth of his beliefs, Your Honor.

6          THE COURT:  What's the hearsay exception?

7          MR. STEFAN:  It's not admitted for the truth.  It's

8    whether he expressed, you know, confidence in what he was

9    doing, Your Honor.  So not --

10          THE COURT:  That, then, has to be relevant.  For what

11   purpose?  I understand your concept.  What is it then -- what's

12   the relevance of -- you're saying it's not being offered for

13   the truth of the matter asserted.  It's being offered

14   because we -- whether or not he expresses confidence then

15   prompts some action or some activity or something that's

16   relevant.  What's the relevant thing we're looking for here?

17          MR. STEFAN:  His good faith belief in what he was

18   doing.

19          THE COURT:  That's not -- that's for the truth of the

20   matter asserted.  Sustained.

21          THE WITNESS:  So I don't answer?

22          THE COURT:  So you don't answer the question.

23   BY MR. STEFAN:

24   Q.   Mr. Andrade's engagement in the project gave you an

25   impression about his intentions in this case; is that right?

1    **A.**    Yeah.  As anything would, he gave me an impression, yes.

2    **Q.**    And specifically, he gave you the impression that he was

3    not intending to defraud?

4         **THE COURT:**  Sustained.

5    **BY MR. STEFAN:**

6    **Q.**    Okay.  Mr. Andrade, when he was initially interacting with

7    you, you thought he came across as quite charming; isn't that

8    right?

9    **A.**    I don't recall ever saying that.

10   **Q.**    When you spoke to the Government on September 5th of

11   2024 -- specifically I'm talking about speaking to FBI

12   agents -- you told them that you initially found Mr. Andrade

13   quite charming.  Does that sound correct?

14   **A.**    I think the context was narcissists are charming.

15   **Q.**    I mean, to be clear, your statement --

16   **A.**    That's what I said, is -- it was the context of he's a

17   narcissist, which tend to be charming.  That was the context of

18   that.  But I didn't personally find him very charming.

19   **Q.**    Okay.  So if you stated to the FBI on September 5th of

20   2024 that you initially found him quite charming, that would

21   not be an accurate statement?

22   **A.**    I mean, in the context like I said, he could be considered

23   charming; but me, personally, I would not consider him

24   charming.

25   **Q.**    Okay.  You did say or you've said that you found him to be

1  paranoid; is that right?

2  **A.**   That is correct.

3  **Q.**   And obsessive?

4  **A.**   That is correct.

5  **Q.**   And sometimes a little bit like a child?

6  **A.**   I guess we all, but yeah.

7  **Q.**   And he wasn't able to keep teams around him for very long,

8  by your observation?

9  **A.**   No.  He would -- there would always be something behind

10 the scenes that I didn't know was going on, and then all of a

11 sudden those people would not be part of our team anymore.

12 **Q.**   And by your observation, this would happen with some

13 frequency?

14 **A.**   It happened on multiple occasions, yes.

15 **Q.**   I want to talk about some of the people that you worked

16 with --

17 **A.**   Sure.

18 **Q.**   -- and namely Melissa Foteh.

19 **A.**   Sure.

20 **Q.**   What was your working relationship with Melissa Foteh

21 like?

22 **A.**   I didn't work with her that long.  It was part-time.  It

23 was pretty short, unmemorable.

24 **Q.**   You didn't like working with Ms. Foteh?

25       **MR. CHOU:**  Objection.  Relevance.

B. TRAN - CROSS / STEFAN

1          **THE COURT:**  Overruled.

2     Go ahead.

3          **THE WITNESS:**  No, I wouldn't say I personally felt any

4     type of way.  I mean, as a person, we clashed, but

5     professionally, it didn't really matter to me.  I still came in

6     and did my job.

7     **BY MR. STEFAN:**

8     **Q.**   Do you recall speaking to the FBI on August 27th of 2024?

9     **A.**   Yeah.

10    **Q.**   And do you recall telling them at that time that you hated

11    Melissa Foteh?

12    **A.**   Yeah.  I mean, I said I disliked her, but I more so

13    disliked her practices as a person.  I didn't know her very

14    well; but as a businessperson, I didn't like her practices.

15    **Q.**   Specifically with respect to Mr. Andrade, you thought --

16    you had the impression that there was an inappropriate interest

17    in her part to Mr. Andrade?

18    **A.**   Can you clarify?

19    **Q.**   It was insinuated to you that there was a relationship

20    with her and Mr. Andrade that went beyond work?

21    **A.**   I never thought anything too deep into it because it

22    didn't -- you have to think that it came from a time where she

23    was really angry.  So I took it with a grain of salt.  But

24    that's what she said, yeah.

25    **Q.**   Okay.  So the answer to that question is yes, then, that

1   you understood there was some interest on her part that went

2   beyond work?

3   **A.**   From -- on her part?  Potentially.  I never saw anything,

4   but that's just what she said.  I actually never saw them in

5   the same room together, to be fair.

6   **Q.**   And with respect to Mr. Andrade, you noticed that she

7   had -- she engaged in sort of obsessive-type behavior in

8   checking in on his activity; is that right?

9   **A.**   What do you mean?

10  **Q.**   Well, for instance, she would look through Mr. Andrade's

11  emails?

12  **A.**   I don't -- I don't know.

13  **Q.**   Do you recall talking to a defense investigator, Mr. Sandy

14  Bautista, around the time of your honeymoon?

15  **A.**   The time of my wedding, he called me on a plane, yes.

16  **Q.**   Yes.  And in the conversation that you had with him, you

17  recall telling him that Ms. Foteh would look through

18  Mr. Andrade's emails?

19  **A.**   I think I said Skype.  But she would look through his

20  Skype, yeah.  I don't know about the email part.

21  **Q.**   Okay.  So she would look through his Skype messages?

22  **A.**   Mm-hmm.

23  **Q.**   And she would engage in --

24  **A.**   Bless you.

25  **Q.**   -- what you described as stalkery-type behavior?

 1           **MR. CHOU:**  Objection.  403.  Relevance.  Also

 2    impeaching one witness through another witness.

 3           **THE COURT:**  Where is this going?  What's the relevance

 4    of this?

 5           **MR. STEFAN:**  Your Honor, relevant for the relationship

 6    between Ms. Foteh --

 7           **THE COURT:**  Well, I know that's what the questions are

 8    about.  I'm not sure what that relevance is.  I'm going to

 9    sustain that objection.

10       Go ahead.

11           **MR. STEFAN:**  Understood.

12    **Q.**  And then in her work, she did some things that you found

13    questionable, like taking photos from Google and putting them

14    in her own content?

15           **MR. CHOU:**  Objection, Your Honor.  Same objection.

16    Impeaching one witness through extrinsic evidence testimony of

17    another.

18           **THE COURT:**  Well, again, what is the relevance of this

19    witness's perception of another witness's business activity?

20    What's the relevance of it?

21           **MR. STEFAN:**  I mean, in this case, Your Honor, we're

22    speaking specifically to social media postings and photos,

23    content that she would use in those postings that were not her

24    original content.

25           **THE COURT:**  She's not on trial here.  So what was --

1    this witness going after that witness, I don't understand what

2    the point of this is.

3            **MR. STEFAN:**  Understood, Your Honor.  I'll move on.

4            **THE COURT:**  Go ahead.

5    **BY MR. STEFAN:**

6    **Q.**   You spoke with the Government about some of your initial

7    activity with the NAC Foundation and specifically an audit that

8    you did.  Do you recall that?

9    **A.**   Yeah.  That was what was shown.

10   **Q.**   So it was the ICO token sale audit; right?

11   **A.**   Yeah.

12   **Q.**   And as part of the audit, you also checked some bank

13   records --

14   **A.**   I did.

15   **Q.**   -- correct?

16       And you received bank records from a Mr. Karl Ruzicka.  Do

17   you recall that?

18   **A.**   No.  The name -- I'm really bad with names.  But, no.

19   I believe I got them directly from Marcus.

20           **MR. STEFAN:**  Could I have Exhibit 3149 displayed to

21   just the witness, judge, and counsel?

22   **Q.**   Can you see that well enough?

23   **A.**   I can, yeah.

24   **Q.**   Okay.  Do you recognize the email you got from Mr. Karl

25   Ruzicka on August 24th of 2018?

1    **A.**    Yes.

2    **Q.**    And the language below that directed to you?

3    **A.**    Yes.

4    **MR. STEFAN:**  And can we go ahead and scroll down to

5    the bottom portion of her email.

6    **Q.**    Do you recognize your own name there and the date and

7    Karl's name?

8    **A.**    Mm-hmm, yeah.

9    **Q.**    Is this email a fair and accurate representation of an

10   email sent between you and Mr. Karl Ruzicka in this time frame,

11   August 22nd of 2018?

12   **A.**    Yes.

13   **MR. STEFAN:**  The Government moves to admit --

14   **THE COURT:**  You mean the defense?

15   **MR. STEFAN:**  Pardon me, Your Honor.

16   Defense moves to admit Exhibit 3149.

17   **MR. CHOU:**  Objection.  Hearsay and lacks foundation.

18   The witness also doesn't remember receiving records.

19   **THE WITNESS:**  Yeah, I don't remember receiving the

20   records.  This also -- oh.

21   **THE COURT:**  Well, so I'll let you try to establish

22   more of a basis to admit it; but conditionally, I'll sustain

23   the objection; but if you want to try to develop it a little

24   more, go ahead.

25   **MR. STEFAN:**  Yes, Your Honor.

1    So can we go back up to the top email and zoom in on that

2 first email.

3 **Q.**    So, Ms. Tran, do you see the attachments to this email?

4 **A.**    I do, yes.

5 **Q.**    A series of invoices?

6 **A.**    It looks like it, yes.

7 **Q.**    Okay.  You said you didn't recall outside records.

8    Can we take down Exhibit 3149 and display for the witness

9 and counsel only Exhibit 3135?

10    Ma'am, do you recognize the Excel sheet that's attached

11 here?

12 **A.**    I can't say I do.  I don't recall this.  If it did, then

13 it was given to Raul, which I worked with Raul more than I did

14 with Karl.

15 **Q.**    Okay.  Understood.

16        **MR. STEFAN:**  And can we back out of this and display

17 Exhibit 3137.

18    And go ahead and zoom in on the top.  Say, the top five

19 rows or so.

20 **Q.**    Do you recognize any of these names:  Block Bits Capital,

21 Japheth Dillman, HQ Tran?

22 **A.**    I do you recall those names, yes.

23 **Q.**    Okay.  And you see the invoice number there listed along

24 with some dates, currency listings, subtotal, and total?

25 **A.**    Mm-hmm.

B. TRAN - CROSS / STEFAN

1   **Q.**   Again, do you --

2   **A.**   I see that.

3   **Q.**   -- recognize this document?

4   **A.**   I do not recognize this document.

5          **MR. STEFAN:**   Okay.   Go ahead and back out of this,

6   please.

7   **Q.**   Speaking to Mr. Torres, I want to talk about that aspect

8   of the ICO or the ICO audit that you performed.   What exactly

9   were you doing with Mr. Torres?

10  **A.**   I kind of just gave him the documents.   He came into the

11  office one day.   We went out to lunch and got Italian food, and

12  I gave him all these documents because Marcus was adamant about

13  giving it to him in person and doing everything in person

14  really.

15       But I only met him maybe on two occasions.   But I didn't

16  work on, like, the audit per se.   Mine was more so ensuring

17  that the customers got their tokens.   But any, like, CPA

18  accounting work was either through Karl or Raul, really, on my

19  end because he had a falling out with Karl.

20  **Q.**   And you're referring to Karl Ruzicka; right?

21  **A.**   Yeah.

22  **Q.**   There was an individual who preceded you in your role

23  named Dylan Pugliese.   Do you recall that, the name of the

24  individual?

25  **A.**   I don't know who that is.

1   Q.   With respect to why you were performing the ICO, there was

2   an issue with collecting --

3   A.   I didn't perform the ICO.  I just want to make sure.  I

4   didn't perform during the ICO.  I came in after.

5   Q.   Pardon me if I misspoke.

6        With the work that you were doing after the ICO and

7   sorting out where tokens had come from and/or needed to go to,

8   I guess I should say, you understood that there had been a

9   problem in transferring data from the ICO after it was

10  concluded; is that correct?

11  A.   So I remember it was, like, when I first came on, it was

12  kind of like a big thing that Marcus didn't want to pay for the

13  ICO upkeep because it was just basically to keep the data.  So

14  it was downloaded onto a flash drive.  And that was what was

15  shown earlier, that long Excel sheet with, like, 20,000 things

16  on it.  But that was -- yeah, that was the only data that was

17  given.  But I don't know if there was, like, a flaw in it.  It

18  was just that was the last bit from the ICO and that's what I

19  was given.

20  Q.   You received that data from who?  The flash drive?

21  A.   Melissa.

22  Q.   Okay.  So your testimony today is that you don't recall

23  Mr. Ruzicka ever sending you the financial records shown to you

24  in that -- as attachments to that email?

25  A.   I believe that looked like Karl was sending me information

1    that I would send to Raul; but whenever I looked at it, it was

2    just physical.  The bank statements were just physical, which

3    were in binders.  But, no, I didn't look over that.  I think

4    that was just I was the middle person between that.

5    **Q.**    Okay.  When you were reviewing those bank statements

6    with -- for Mr. Andrade, you spoke to seeing withdrawals from

7    the NAC accounts; is that right?

8    **A.**    I did, yeah.

9    **Q.**    But you didn't have an actual look into Mr. Andrade's

10   personal accounts; correct?

11   **A.**    No.  I couldn't ever foresee him allowing me to do that.

12   **Q.**    So with respect to funds that went into his account

13   from -- or that were withdrawn from the NAC accounts, you don't

14   know exactly where all that money went?

15   **A.**    No.  Like I mentioned before, when I asked him about it,

16   he would just say, "I'm going to pay myself back."  So that was

17   the base of it.  It was very vague, and I wasn't privy to that

18   information.

19   **Q.**    So you don't know whether he took any of that -- any of

20   that money and put it into, say, the project in London?

21   **A.**    No, because I don't know directly where that money went.

22   Like I said, he just took it, yeah.

23   **Q.**    Right.  You didn't have access to his account?

24   **A.**    No.

25   **Q.**    When he went on these trips that you spoke of, you don't

1  know where the money he was spending came from?

2  **A.**   Personally, like, no.  It would just be assuming; right?

3  **Q.**   Right.  So the money could have been his personal funds

4  from some other venture; right?

5  **A.**   I guess you could say, but I never saw for myself any

6  other personal ventures.

7  **Q.**   I guess the point is:  You didn't have access to the

8  accounts; you can't know where those funds came from?

9  **A.**   That he was using to personally fund himself?

10  **Q.**   Yeah.

11  **A.**   Is that what you're asking?

12  **Q.**   That he was using on trips or in his own personal life.

13  **A.**   No, I couldn't see his accounts; but when you would see

14  Marcus on his rants and he would talk about all his different

15  businesses, like, that protected -- right? -- he said, "I have

16  one for the patents.  I have one for AML BitCoin.  I have one

17  for fintech."  He would be, "I'm paying myself back."

18      So that was where my basis came from, is why we would

19  think he was using those funds, especially because he wouldn't

20  have funds to pay us when he came back.

21  **Q.**   Mr. Andrade, with respect to the token sale, was paying

22  you, though, to do the audit; right?

23  **A.**   To send tokens, yeah, and then admin work.

24  **Q.**   And not only did you send tokens, you also had to track

25  down some people to send tokens to; right?

1    **A.**    I did have to, yeah.

2    **Q.**    That involved reaching out to these people with emails and

3    sometimes phone calls?

4    **A.**    Yeah.  I would have to -- probably regularly, like every

5    three days, I would have to email again.  And then if it

6    didn't, I would have to try calling them.  And then if it

7    didn't happen, like, if I couldn't contact them, that was it.

8    I think it was, like, after three tries.

9    **Q.**    And this project took some substantial amount of time on

10   your part; right?

11   **A.**    It did because there was quite a few people.

12   **Q.**    And your work on that was -- consumed the majority of your

13   day, your working day?

14   **A.**    You're asking what consumed most of my day?  Contacting

15   people?

16   **Q.**    Not just contacting people, but the work on the ICO audit

17   generally was consuming most of your time in this period?

18   **A.**    In the beginning with Marcus -- like I said, with Melissa,

19   it was exclusively that.  In the beginning with Marcus, it

20   wasn't the priority of my day.  It didn't consume all of my

21   day.  It was more so like other admin work, the office,

22   sometimes hiring, letting people go.  I wore a lot of hats.

23   **Q.**    Okay.  But eventually, this became one of the primary hats

24   you were wearing?

25   **A.**    Only in the beginning was it my primary hat; but in the

1    office with Marcus, it was not my primary hat.

2    **Q.**   Okay.  But it was at a certain point your primary hat?

3    **A.**   Yeah.

4    **Q.**   And you were able to contact quite a few of those

5    individuals; right?

6    **A.**   A good bit, yeah.  I would say I was pretty good at

7    investigating.

8    **Q.**   And were able to get them their tokens?

9    **A.**   Some of them, yeah.

10   **Q.**   There were some that you weren't able to get?

11   **A.**   There were.

12   **Q.**   You did attempt multiple times to make contact with those

13   people before you would give up; right?

14   **A.**   Yes.

15   **Q.**   And these people, you call them token holders; right?

16   **A.**   Mm-hmm.

17   **Q.**   They were people who had purchased tokens in the ICO?

18   **A.**   Yes.

19   **Q.**   Within the company, they weren't referred to as investors;

20   right?  The language used with respect to them was "token

21   holders" or "token purchasers"; is that correct?

22   **A.**   Yeah.  But I guess a basis of an ICO, though, is to invest

23   into an item, into something.

24        **MR. STEFAN:**  I'd object, Your Honor.

25        **THE WITNESS:**  But my --

1        MR. STEFAN:  It's nonresponsive.

2        THE COURT:  Overruled.

3        THE WITNESS:  But, yeah, I would call them token --

4        THE COURT:  Wait for the next question.

5        THE WITNESS:  Oh, sorry.

6   BY MR. STEFAN:

7   Q.   Within the company, you called them "token purchasers" or

8   "token holders"; yes?

9   A.   Yes.

10  Q.   And you spoke to how you contacted people who weren't tech

11  savvy; right?

12  A.   Yes.

13  Q.   These were people who hadn't been able to take care of the

14  wallet on their own?

15  A.   Yes.

16  Q.   Maybe had difficulty using the computer?

17  A.   Mm-hmm.

18  Q.   The people most likely to contact you with technical

19  difficulties would be people who are less adept at using tech;

20  isn't that right?

21  A.   Yes.

22  Q.   Okay.  The other people, you would reach out with the

23  email?

24  A.   Mm-hmm.

25  Q.   Yes?

 1    **A.**    I would reach out through email pretty much exclusively.

 2    **Q.**    Give them their wallet address?

 3    **A.**    Well, they would have to generate a wallet; and then,

 4    yeah, they would give me their wallet address and then I would

 5    have to ensure it worked.

 6    **Q.**    And then you could send wallet -- you could send tokens to

 7    that person using your own company wallet; right?

 8    **A.**    Yes, uh-huh.

 9    **Q.**    And the transaction would get recorded on the

10    AML BitCoin --

11    **A.**    The blockchain?

12    **Q.**    -- blockchain?

13    **A.**    Yes.

14    **Q.**    So you could actually go in and see the transaction that

15    you had made and the funds that they had received in their

16    wallet?

17    **A.**    That's correct.

18    **Q.**    You can't know the age range of every purchaser that you

19    spoke to on the phone; right?

20    **A.**    No.

21    **Q.**    You had the impression, based on some of their technical

22    abilities, that they were older?

23    **A.**    I mean, most specifically the Aten Coin token holders, but

24    yes.

25    **Q.**    Okay.  Understanding that you didn't have access to

1    Mr. Andrade's personal accounts, did you know that he was

2    spending hundreds of thousands of dollars on technological

3    development?

4    **A.**    Did I know?

5    **Q.**    Yes.

6    **A.**    No.

7    **Q.**    And that brings me to this demo that was discussed in --

8    I believe it was around what?  Summer-fall of 2018, the London

9    team came to your office?

10    **A.**    I believe so, yeah.

11    **Q.**    And when the London team came to the office, they had

12    announced they were going to give the demo of this technology?

13    **A.**    Yes.  Well, we knew they were coming, yeah.

14    **Q.**    And the technology you understood from them to be complete

15    at that time?

16    **A.**    We were given the impression, yeah, that it was close to

17    near done.  They just had to make the Android version.

18    **Q.**    And this was something that the London team was going

19    to -- going to do after the testing with all of you; right?

20    **A.**    I guess so.

21    **Q.**    The idea with the version that they were bringing to you

22    was, "We have a completed iPhone version and it's time to get

23    it tested"?

24    **A.**    Yeah.  I mean, that's what we were told.  We never

25    actually spoke to them until that meeting.  It was all through,

**B. TRAN - CROSS / STEFAN**

1  like, Marcus.  And then Marcus was just like, "You guys have to

2  test it" because we have the iPhones, and that's what we did.

3  **Q.**  And you said that you spent a whole day testing it?

4  **A.**  I did, yeah.

5  **Q.**  Over and over, multiple times?

6  **A.**  Yes.

7  **Q.**  And, in fact, you tested it at Mr. Andrade's direction;

8  yes?

9  **A.**  Yes.  The team was still there too.

10  **Q.**  And when you say "the team," you're talking about the

11  London team?

12  **A.**  Yes.

13  **Q.**  Do you recall how many people had come out from London?

14  **A.**  It wasn't a lot.  Like I said, I think it was like four of

15  the team and then Marcus's friend from Canada.  I just remember

16  a tall guy, kind of buff.

17  **Q.**  And you understood that the team in London was working on

18  the biometric identification feature of the AML BitCoin?

19  **A.**  That's what I was told, yeah.

20  **Q.**  The idea there being that that technology would be

21  integrated with the coin itself ultimately?

22  **A.**  Eventually, yeah.  It was like the big playing, like, card

23  that was going to be integrated, mm-hmm.

24  **Q.**  And it was something that had been under development for

25  some time?

**B. TRAN - CROSS / STEFAN**

1  **A.**    Yeah, I guess so.  I don't know when it started, to be

2  fair.  I just saw the demo.

3  **Q.**    And so during the testing of the CrossVerify product,

4  Mr. Andrade was frustrated with the results?

5  **A.**    Yeah.  I remember him being frustrated because it -- he

6  didn't know it wasn't going to work on the Androids, and we

7  were the only ones that could test it.

8  **Q.**    And with the -- the fact that the testing showed that the

9  product wasn't complete yet, this was a source of frustration

10  as well?

11  **A.**    Yeah, he was frustrated with that.

12  **Q.**    Your impression after reviewing the demo was that a lot

13  more work had to be done on it?

14  **A.**    Yeah.  My impression would be, that would be correct,

15  yeah.

16  **Q.**    Was your understanding at that time that additional work

17  was, in fact, going to be done on it, at minimum to develop the

18  additional application for the Android?

19  **A.**    I think so, yeah.  I mean, the team did say they were

20  going to work on the Android version, but I believe there was a

21  falling out between them.

22  **Q.**    Between the London team and Mr. Andrade?

23  **A.**    That's correct, yeah.

24  **Q.**    I want to talk about some of the PR or press releases that

25  got posted during your time with the company.

1    **A.**    Sure.

2    **Q.**    You said that you joined after February of 2018?

3    **A.**    I did, yeah.

4    **Q.**    And who at that time -- were you writing the press

5    releases?

6    **A.**    No.  I had no hand in marketing.

7    **Q.**    You were basically a conduit between other people and the

8    final product, if that makes sense?

9    **A.**    What do you mean?

10   **Q.**    So like in the instance that the Government showed you of

11   Melanie forwarding an email to Marcus for review of PR, that

12   would be the sort of role that you would have in the process?

13   **A.**    Yeah.  Like I said, my hand's not really in the marketing.

14   There was other people for that.  And so I would just be -- I

15   was kind of Marcus's direct line for a time, and so a lot of

16   people would go through me to get to him.

17   **Q.**    And sometimes that line involved running his potential PR

18   for review; is that right?

19   **A.**    Yeah.  That instance, yeah.  I think I only did it one

20   time.

21           **MR. STEFAN:**  Could we please display Exhibit 3165 just

22   for the witness and counsels.

23   **Q.**    Ms. Tran, can you please take a look at that.

24   **A.**    I see it.

25   **Q.**    Do you recognize your own name on this email?

1    **A.**   I do.

2    **Q.**   And how about the name of John Fahy?

3    **A.**   Kind of familiar.  I can't say I remember him very well.

4    **Q.**   You see the date on the email, 20 September, 2018?

5    **A.**   I do, yeah.

6    **Q.**   And then if you scroll down, in this first email you

7    introduce yourself.

8         If we could go to the email on the bottom of the page, you

9    introduce yourself on September 19th, 2018, to Mr. Fahy and

10   then send over "FATF PR release for your revisions and review."

11   Do you recall this?

12   **A.**   Very vaguely.  I remember -- the only reason I remember is

13   because the email is different.  And the email, I could only

14   use it for a short amount of time because it belonged to

15   somebody else, and then it changed to my name, but then it

16   didn't work anymore.  So that's the only reason why this kind

17   of looks familiar to me.

18   **Q.**   You mean the bernadette@amlbitcoin.com email?

19   **A.**   Mm-hmm.  I remember there was, like, a hassle between

20   that, like through the AML BitCoin.  Like, I remember trying to

21   fix it.  But I used that very briefly.

22        **MR. STEFAN:**  Can you zoom back out.

23   **Q.**   Is this email, then, a fair and accurate representation of

24   an email that you sent on September 19, 2018, to Mr. John Fahy?

25   **A.**   I don't recall it very well, but it is my email.

1          **MR. STEFAN:**  Okay.  Government moves to admit --

2     pardon me.

3          Defense moves to admit 3165.

4          **MR. CHOU:**  Objection.  Foundation.  Hearsay.

5          **THE COURT:**  I'm going to admit it.

6          (Trial Exhibit 3165 received in evidence.)

7          **MR. STEFAN:**  And can we go ahead and publish it for

8     the members -- or for the jury.

9          And go ahead and zoom in on the bottom paragraph.

10    **Q.**   So, Ms. Tran, this is an email from you to a John Fahy;

11    right?

12    **A.**   Yes.

13    **Q.**   You introduce yourself in this email; yes?

14    **A.**   Mm-hmm.

15    **Q.**   And you say that you're sending over an FATF PR release

16    "for your revisions and review"?

17    **A.**   Yes.

18    **Q.**   PR release, that's a press release; is that right?

19    **A.**   That's correct.

20    **Q.**   And you asked him to please make any revisions necessary

21    and you'll work on getting the PR published once you received

22    edits.  Do you see that?

23    **A.**   Mm-hmm, I do.

24    **Q.**   Mr. John Fahy was an attorney for Mr. Andrade --

25    **A.**   Mm-hmm.

1  **Q.**   -- is that right?

2  **A.**   Yes, I guess so.

3  **Q.**   And in sending him this email, you were sending Mr. Fahy a

4  press release for him to review before it was published?

5  **A.**   That's probably on the guidance of Marcus to send to his

6  attorneys at the time, yeah.

7  **Q.**   Okay.  So this is something that Marcus would have told

8  you to do, to send it to Mr. Fahy?

9  **A.**   Yeah, mm-hmm.

10  **Q.**   That would be something that would be in keeping with

11  Marcus's directions to you regarding PR at the time?

12  **A.**   At the time, yeah.

13  **Q.**   That you're going to release it to the attorneys before it

14  gets published more broadly; is that right?

15  **A.**   It'd probably be Marcus, attorneys, and Marcus again, and

16  then it would get released.

17  **Q.**   So it would have to go through the attorneys prior to the

18  release?

19  **A.**   Mm-hmm, yeah.  Just, I guess, to make sure everything was

20  good.

21        **MR. STEFAN:**  Okay.  We can take down 3165.

22  **Q.**   The PR releases that occurred before you joined the

23  NAC Foundation, obviously you had nothing to do with; right?

24  **A.**   No.  I don't really recall them.

25  **Q.**   So like the Super Bowl PR, you didn't have anything to do

1    with that creation?

2    **A.**    No.  I just heard about it.

3    **Q.**    Or the Panama Canal?

4    **A.**    Panama Canal came into when I worked with him a little bit

5    just because of the picture; but, no, working on the press

6    releases, I never did, no.

7    **Q.**    And the Port of San Francisco, that wasn't something that

8    you had worked on either?

9    **A.**    No.

10    **Q.**    And you're not familiar with who Mr. Andrade consulted

11    with when those press releases were made?

12    **A.**    No.  I wasn't really privy to that information.

13    **Q.**    All of that stuff had happened prior to you joining the

14    company?

15    **A.**    Yeah.  That was probably during the ICO or before.  I

16    wasn't part of the team then.

17             **MR. STEFAN:**  Can we display Defense Exhibit 3170.

18    **Q.**    And while that gets teed up, as part of your work with

19    NAC, you also created a binder with all of the people who had

20    purchased tokens prior to the ICO; is that right?  You assisted

21    in creating a binder like that?

22    **A.**    Yeah.  It was that spreadsheet printed out.

23    **Q.**    Well, there was -- there was more to the binder than the

24    spreadsheet, you may recall.  There were purchase agreements

25    that were written documents that people purchasing the coins

**B. TRAN - CROSS / STEFAN**

1  had signed.  Do you recall that?

2  **A.**   Vaguely.  During the ICO or the Aten Coin?  Because I

3  remember the Aten Coin holders had that.

4  **Q.**   It was pre- -- it was purchases related -- that were made

5  by purchasers prior to the ICO that you then subsequently had

6  put together into a binder.

7  **A.**   To the Aten Coin holders?

8  **Q.**   It was AML BitCoin orders.  Do you recall AML BitCoin

9  orders being placed into a binder?

10  **A.**   I built quite a few binders.

11        **MR. STEFAN:**  Okay.  Your Honor, may I approach the

12  witness with the original of what we see displayed here on

13  3170?

14        **THE COURT:**  Yes.

15        **THE WITNESS:**  Thanks.

16  **BY MR. STEFAN:**

17  **Q.**   And, ma'am, you can flip through that for a second to see

18  what you recognize of it.

19  **A.**   (Witness examines document.)  I don't know if I really

20  built this one.  It's not my handwriting either.

21        **THE COURT:**  So the pending question is:  Does she

22  recognize it or not?

23        **MR. STEFAN:**  Yes, Your Honor.

24        **THE COURT:**  All right.

25        **THE WITNESS:**  No, I don't.  I didn't really build this

1    one, admittedly.  I don't recognize the handwriting either.  I

2    don't -- I don't remember this one.

3        Yeah, it's just purchase agreements.  I was more so

4    looking at spreadsheets.  I built, like, the ICO one just like

5    that because he wanted to have physical copies.

6            **THE COURT:**  You've answered the question.

7            **MR. STEFAN:**  Your Honor, may I retrieve 3170?

8            **THE COURT:**  You may.

9    **BY MR. STEFAN:**

10   **Q.**   I just have one more item to go over with you.

11       Can we display Exhibit 3164.

12       Do you recognize that?

13   **A.**   I do, yeah.

14   **Q.**   And what is it?

15   **A.**   It just looks like an announcement that we're on HitBTC.

16   That's a tweet.

17   **Q.**   And does the picture that you see here accurately reflect

18   your own recollection of the picture as it appeared on the

19   tweet -- or pardon me -- how that tweet was posted to the

20   AML BitCoin Twitter page?

21   **A.**   Yeah, sure.  I'm not too privy on, like, the marketing,

22   but I recognize the graphic.

23           **MR. STEFAN:**  We move to admit.

24           **MR. CHOU:**  No objection.

25           **THE COURT:**  3164 will be admitted.

1          (Trial Exhibit 3164 received in evidence.)

2    **BY MR. STEFAN:**

3    **Q.**   So you had talked to the Government earlier about the

4    HitBTC press release.  This would be the announcement.

5          And we can -- okay.  It's published.

6          And this would be the announcement to the purchasers that

7    the HitBTC had actually been released?

8    **A.**   Yes.

9    **Q.**   And, to your knowledge, was AML BitCoin actually released

10   on HitBTC at this time?

11   **A.**   I believe it was for a short time, yeah.

12          **MR. STEFAN:**  Your Honor, may I have a moment?

13          **THE COURT:**  Yes.

14          **MR. STEFAN:**  Thank you.

15                    (Pause in proceedings.)

16          **MR. STEFAN:**  Thank you.  No further questions.

17                    <u>**REDIRECT EXAMINATION**</u>

18   **BY MR. CHOU:**

19   **Q.**   Ms. Tran, just a few questions.

20          First of all, do you remember when counsel was asking you

21   about the source of Mr. Andrade's income?

22   **A.**   Yeah.

23   **Q.**   And he asked you about how perhaps he was making money on

24   other projects?

25   **A.**   I do recall.

1  **Q.**   When Mr. Andrade spoke with you, did he ever mention

2  working on anything other than AML BitCoin?

3  **A.**   Not really, no.  I don't recall him ever talking about

4  anything other than AML BitCoin.

5  **Q.**   And for the year and change that you worked with him, how

6  often did you see him in person?

7  **A.**   Pretty often.  Every day other -- unless he was doing

8  something else, but that would be like one day here and there.

9  But every day almost.

10 **Q.**   So most of his time was spent in your physical presence?

11 **A.**   Yes.

12 **Q.**   And when Mr. Andrade would come back from trips, he'd

13 often be short of money?

14 **A.**   Yes.

15 **Q.**   And then he would make phone calls, as we discussed

16 earlier?

17 **A.**   Yes.

18 **Q.**   Did I get that right?

19 **A.**   Yeah.

20 **Q.**   Earlier, do you remember when counsel asked you about some

21 issues or I think the word used was "flaws" with the ICO

22 process?

23 **A.**   I do recall that, yeah.

24 **Q.**   Were -- did you receive -- and also earlier, you remember

25 on direct you testified about people being unhappy after the

1   ICO?

2   **A.**    Mm-hmm.

3   **Q.**    What was your understanding of why people were unhappy

4   after the ICO?

5   **A.**    I -- probably because nothing --

6            **MR. STEFAN:**  Objection.  Speculation.  Foundation.

7   **BY MR. CHOU:**

8   **Q.**    Did you receive messages from individuals who were unhappy

9   with the ICO?

10  **A.**    On Telegram, social media, yeah, emails.

11  **Q.**    And did you speak with Mr. Andrade about those messages

12  and complaints from customers?

13  **A.**    Sometimes, yeah.

14  **Q.**    And what did you communicate to Mr. Andrade about people's

15  unhappiness with the ICO?

16  **A.**    Just, you know, it would be like, "Hey" -- especially,

17  like, on Telegram, a lot of people are unhappy, you know --

18  "Are we, like, expecting anything?"

19       But I wasn't really a direct hand in that, but it would

20  just be like, "Something's coming soon.  We're working on it,"

21  things like that.

22  **Q.**    So what did you tell Mr. Andrade about why people were

23  unhappy with the ICO?  What were you relaying to him?

24  **A.**    People were just unhappy with there's been no, like,

25  update, no additional things happening to the wallet, no new

1    compliance, no new news really.

2    **Q.**   Earlier, do you remember when counsel asked you about the

3    exact terminology you used --

4           **MR. STEFAN:**  Objection and move to strike.

5           **THE COURT:**  Well, I first have to hear the question.

6           **MR. STEFAN:**  Sorry, Your Honor.  The answer to her

7    last question was pure hearsay.  The question -- line of

8    questioning was:  What did you tell Marcus?  And she just

9    stated what she told Marcus.  There was no additional evidence

10   elicited from her apart from her out-of-court statements.

11          **MR. CHOU:**  Telegram, Your Honor, and effect on the

12   listener.

13          **THE COURT:**  Overruled.  Let's proceed.

14   **BY MR. CHOU:**

15   **Q.**   Ms. Tran, do you remember earlier counsel's questioning

16   about the exact terminology used at the company to refer to

17   people who bought AML BitCoin Tokens?

18   **A.**   Like calling them "purchasers"?

19   **Q.**   Right.  Do you remember that discussion with counsel about

20   whether the terminology was "purchasers" or "investors" or

21   something else?

22   **A.**   Yes.

23   **Q.**   And do you remember how you were trying to elaborate on

24   that distinction?

25   **A.**   Yes.

1    Q.    Would you like to elaborate further?

2    A.    It's just kind of like an understanding of an ICO, initial

3    coin offerings, they're for -- you initial invest into a

4    product.  So it's kind of understood that they're investors.

5    Q.    And you had that understanding even with your first job

6    out of college?

7    A.    Yes.

8    Q.    I'd like to pull back up the defense exhibit, which

9    I believe was admitted, it's 3165.  It's an email dated

10   September 19th, 2018.

11         Are you able to see that okay, Ms. Tran?

12   A.    I can see it, yeah.

13   Q.    And so do you remember when counsel asked you about how a

14   lawyer was essentially looped into this conversation on

15   September 19th, 2018?

16   A.    Yes.

17   Q.    Are you aware whether or not a -- the FBI executed a

18   search warrant on Mr. Andrade's offices on September 18th,

19   2018?

20   A.    I think I recall him mentioning it, yeah.  The Las Vegas

21   offices?

22         MR. CHOU:  We can take this down.

23   Q.    Earlier, you talked about a listing on HitBTC.  Do you

24   remember that?

25   A.    Yes.

1  Q.  And you testified on cross that it was listed for a short

2  time.  Did I get that right?

3  A.  Yes.

4  Q.  Was it your understanding that AML BitCoin was delisted

5  shortly after its listing on HitBTC?

6  A.  I do recall it being delisted.

7  Q.  And why was it delisted?

8  A.  I think it was because people were unhappy.

9       MR. STEFAN:  Objection.  Foundation.

10       THE COURT:  Sustained.

11  BY MR. CHOU:

12  Q.  Did -- for the delisting of HitBTC, did you speak with

13  Mr. Andrade about that?

14  A.  It's hard for me to recall; but, no, I can't remember.

15  Q.  Did you have conversations with other individuals at

16  NAC Foundation about the delisting?

17  A.  Yeah.  People who were in the office with me.

18  Q.  Who are those individuals?

19  A.  Melanie.  There was somebody named Amanda too at the time.

20  Q.  And did you also monitor the Telegram channels as part of

21  your work at NAC Foundation?

22  A.  I did, yeah.

23  Q.  Did you see posts about the HitBTC delisting?

24  A.  I did, yeah.

25  Q.  What was your understanding of why HitBTC delisted

1   AML BitCoin Token?

2   **A.**   It didn't have any of the features that it said it did,

3   and everybody was really unhappy with it.

4           **MR. CHOU:**  One moment.

5                    (Pause in proceedings.)

6           **MR. CHOU:**  Nothing further, Your Honor.

7           **MR. STEFAN:**  May I, Your Honor?

8           **THE COURT:**  Yes, go ahead.

9                    **RECROSS-EXAMINATION**

10  **BY MR. STEFAN:**

11  **Q.**   You don't know whether prior to September of 2018

12  Mr. Andrade was using attorneys to review his PR?

13  **A.**   I mean, in this instance, I guess I sent it to the

14  attorney.  But we had a lot of attorneys.  So if he sent

15  everything, I'm not really sure.  But I know he had a close

16  relationship at one point with a certain group of attorneys

17  that I met very briefly.

18  **Q.**   And your prior testimony, on cross-examination when we

19  last spoke, was that this is something that Marcus would do,

20  have you send the PR or have his staff send PR past attorneys?

21  **A.**   Not every time.  I only did it that one time.  With my

22  time with him, we had multiple different attorneys due to

23  fallouts.  So it didn't happen every occasion.

24  **Q.**   But it was something that was done with some frequency in

25  the time that you were there, to your knowledge?

1   **A.**   To my knowledge, just that one time.  The one with HitBTC,

2   I don't believe we put that through an attorney.

3           **MR. STEFAN:**  Okay.  No further questions.

4           **THE COURT:**  You may step down.

5                   (Witness excused.)

6           **MR. WARD:**  The Government calls Melanie Cowan.

7    (Witness enters the courtroom and steps forward to be sworn.)

8           **THE COURT:**  Please come forward to be sworn.

9           **THE COURTROOM DEPUTY:**  Please raise your right hand.

10                  **MELANIE COWAN**,

11   called as a witness for the Government, having been duly sworn,

12   testified as follows:

13          **THE WITNESS:**  Yes.

14          **THE COURTROOM DEPUTY:**  Please be seated.

15      Can you state and spell your last name, please.

16          **THE WITNESS:**  My last name?

17          **THE COURTROOM DEPUTY:**  Yes.

18          **THE WITNESS:**  Cowan, C-o-w-a-n.

19          **THE COURT:**  Can you state your first name too?

20          **THE WITNESS:**  Oh.  Melanie, M-e-l-a-n-i-e.

21                  **DIRECT EXAMINATION**

22   BY MR. WARD:

23   **Q.**   Good morning, Ms. Cowan.

24   **A.**   Good morning.

25   **Q.**   How are you?

1   **A.**   I'm well.

2   **Q.**   In March of 2018, were you hired by a company called

3   Republic One Exhibitions?

4   **A.**   Yes.

5   **Q.**   Was this your first job out of college?

6   **A.**   Yes.

7   **Q.**   What kind of company is Republic One Exhibitions?

8   **A.**   It's a marketing firm.

9   **Q.**   Who hired you to work there?

10   **A.**   Melissa Foteh.

11   **Q.**   And what was Melissa Foteh's role, as you understood it,

12   at Republic One Exhibitions?

13   **A.**   She was the owner.

14   **Q.**   All right.  When she hired you, what was your title?

15   **A.**   Account coordinator.

16   **Q.**   Okay.  When you started working at Republic One, were you

17   assigned to work for a company called the NAC Foundation?

18   **A.**   Yes.

19   **Q.**   At the time, was the NAC Foundation a client of Republic

20   One Exhibitions?

21   **A.**   Yes.

22   **Q.**   What was your first assignment at Republic One?

23   **A.**   Distribute AML BitCoin Tokens.

24   **Q.**   Who gave you that assignment?

25   **A.**   Melissa Foteh.

COWAN - DIRECT / WARD

1  **Q.**  And what did you do to distribute AML BitCoin Tokens?

2  **A.**  We pulled from a spreadsheet of who purchased them, and we

3  sent them from our wallets to the purchasers' wallets.

4  **Q.**  Were the spreadsheets that you used -- who gave you those

5  spreadsheets?

6  **A.**  Melissa.

7  **Q.**  Okay.  How long did you spend working on this task?

8  **A.**  About five days.

9  **Q.**  Okay.  And approximately, if you remember, how many people

10  did you distribute AML BitCoin Tokens to?

11  **A.**  Hundreds.  Probably maybe even over a thousand.

12  **Q.**  When you were working on this, were you working with

13  anyone else?

14  **A.**  Yes.  There was about two or three other people doing

15  this.

16  **Q.**  And -- okay.  Following this assignment, did you do

17  additional work for the NAC Foundation account?

18  **A.**  Yes.

19  **Q.**  Did part of that -- did part of your responsibilities

20  include managing the NAC Foundation's social media sites?

21  **A.**  Yes.

22  **Q.**  What were your responsibilities generally in -- as it

23  related to the NAC Foundation's social media?

24  **A.**  Creating social media posts for the various platforms,

25  create graphics to go along with those, community management.

**COWAN - DIRECT / WARD**

 1  So monitoring the comments, answering comments, kind of things

 2  of that nature.

 3  **Q.**   Did you, from time to time, write posts that would go up

 4  on the AML BitCoin social media sites?

 5  **A.**   Yes.

 6  **Q.**   And where did you get the information that you would use

 7  when you would post that information on those sites?

 8  **A.**   The website or the white paper.

 9  **Q.**   And who approved the posts that you would -- did anyone

10  approve the posts before you would post them?

11  **A.**   Yes.

12  **Q.**   Okay.  Who was that?

13  **A.**   Melissa.

14  **Q.**   All right.  At the time when you were at Republic One, was

15  Melissa Foteh your direct report?

16  **A.**   Yes.

17  **Q.**   Do you know who she reported to in relation to the

18  NAC Foundation account?

19  **A.**   Marcus.

20  **Q.**   How do you know that?

21  **A.**   He would call quite often, and every time he called her on

22  the phone, she would say, "Oh, I have to take this," or,

23  you know, she'd leave my office or I'd leave her office so she

24  could take that phone call to speak to him.

25  **Q.**   During the time you were at Republic One, how often did

1    you see Melissa Foteh speaking -- or hear Melissa Foteh

2    speaking with someone you understood to be Marcus Andrade?

3    **A.**    Probably about eight to ten times every day.

4    **Q.**    Okay.  Did you ever speak directly to Mr. Andrade when you

5    were at Republic One?

6    **A.**    Never.

7    **Q.**    Okay.  When you were working at Republic One, at some

8    point did you create social media accounts using false names

9    and identities?

10   **A.**    Yes.

11   **Q.**    For what social media platforms did you create these false

12   names and identities?

13   **A.**    For Twitter and for BitcoinTalk.

14   **Q.**    Was there a term that you referred to the creation of

15   these false social media accounts?

16   **A.**    Like a sock puppet account or like a fake dummy account.

17   **Q.**    Okay.  From time to time, did you refer to these false

18   accounts as sock puppet accounts?

19   **A.**    Yes.

20   **Q.**    Who directed you to create the false accounts for the

21   social media sites?

22   **A.**    Melissa.

23   **Q.**    Okay.  And when she directed you to create these accounts,

24   did she give you specific instructions as to what type of

25   accounts to create?

COWAN - DIRECT / WARD

1   **A.**   Yes.

2   **Q.**   And what did she instruct you to do?

3   **A.**   She said to just make them look as believable as possible,

4   as real as possible, and just kind of make their profiles look

5   convincing.

6   **Q.**   Did she -- was she instructing you to make them appear to

7   be real people?

8   **A.**   Yes.

9   **Q.**   Okay.  And when you created these accounts, did you note

10  or was it noted anywhere on the accounts that they were

11  connected to the NAC Foundation and AML BitCoin?

12  **A.**   No.

13  **Q.**   Was that on purpose?

14  **A.**   Yes.

15  **Q.**   What were you -- what did you understand was the purpose

16  of creating these false accounts?

17  **A.**   Just to drum up good buzz, to combat negative comments, to

18  just make sure everything that was being said kind of on the

19  forefront was just really positive.

20  **Q.**   How many false accounts did you personally create?

21  **A.**   Between three and five.  I don't quite remember the exact

22  number, but it was probably about between three and five.

23  **Q.**   I believe you said you created false Twitter accounts.

24  Did you create any other false accounts on any other social

25  media platforms?

1   **A.**   BitcoinTalk.

2   **Q.**   Okay.  What's BitcoinTalk?

3   **A.**   So it's kind of like a forum, similar to Reddit, if you're

4   familiar, but it's where different cryptocurrency projects can

5   have a topic and/or a forum.  People go in there and they can

6   just write comments underneath the topic.

7   **Q.**   Okay.  Let's walk through BitcoinTalk a little bit.

8   **A.**   Okay.

9   **Q.**   This is a website that you would go to, and it would

10  include -- would it include comments about various topics?

11  **A.**   Yes.

12  **Q.**   And when you were involved in BitcoinTalk, was there a

13  place where you could post comments about AML BitCoin?

14  **A.**   Yes.

15  **Q.**   Okay.  Now, when you were working for Republic One, were

16  you monitoring that AML BitCoin BitcoinTalk site?

17  **A.**   Yes.

18  **Q.**   And did it appear that outside people were posting

19  comments about AML BitCoin?

20  **A.**   Yes.

21  **Q.**   Okay.  And what was your instruction in terms of the false

22  BitcoinTalk accounts that you created?  What were you

23  instructed to do?

24  **A.**   Just sound like you're a token holder, that you're really

25  excited about the project, really excited about the features

COWAN - DIRECT / WARD

1  that it would have, and just overall just drumming up really

2  positive sentiment for the project.

3  **Q.**    Were there negative comments that you saw on

4  AML BitcoinTalk about AML BitCoin?

5  **A.**    Yes.

6  **Q.**    And were you -- would you post in response to those

7  comments?

8  **A.**    From the sock puppet accounts, yes.

9  **Q.**    Okay.  And when you would post, did you give any

10 indication that the posts were coming from any -- from someone

11 at AML BitCoin?

12 **A.**    No.

13 **Q.**    Were the BitcoinTalk accounts you created designed to

14 conceal the fact that you were posting from AML BitCoin?

15 **A.**    Yes.

16 **Q.**    And were you using these accounts to counter the negative

17 comments that were being posted on AML BitcoinTalk?

18 **A.**    Yes.

19 **Q.**    Okay.  I believe you mentioned -- were there other social

20 media sites where you created sock puppet accounts?

21 **A.**    And Twitter.

22 **Q.**    Okay.  Did you create a Twitter handle in the name of a --

23 in a false name or false-type username?

24 **A.**    So the Twitter accounts and the BitcoinTalk accounts were,

25 like, correlating.  So if I made a person's name or username on

1    BitcoinTalk, they had the same username on Twitter.

2    **Q.**    I see.

3        Would you create one account for Twitter and another for

4    AML BitcoinTalk but they both had the same username or handle?

5    **A.**    Right.  Like, so that way, if you're a real person on

6    Twitter, you made a BitcoinTalk account.  And you're the same

7    person, so you can connect the two people -- the same person.

8    **Q.**    And why make it the same account?  What was the purpose of

9    doing that?

10   **A.**    Probably to make it seem more convincing if they're on

11   several platforms.  A normal person would probably be on

12   several platforms at the same time.  Also, to just kind of make

13   it seem more convincing.  BitcoinTalk, you don't have a profile

14   picture or anything.  It's just a handle.  But Twitter, you

15   have a profile picture and profile and a bio, so it's a little

16   more humanizing.

17   **Q.**    I see.

18       And when you created these Twitter handles, you said there

19   was a bio and additional information.  Were you writing

20   information to appear that you were a person independent from

21   AML BitCoin?

22   **A.**    Yes.  They each had their own, like, personas, not super

23   well-thought-out, but very much a woman in her thirties,

24   you know, who's a mom.  You know, they each had their own

25   personas.

COWAN - DIRECT / WARD

1  **Q.**  And for the sock puppet accounts on Twitter, what were you

2  instructed to do with those accounts?

3  **A.**  Just post on them, you know, kind of monitor what people

4  were saying, post in response if need be.  Post on their own,

5  saying how excited they were about the project.  Just overall

6  just being, like, really positive advocates for the project.

7  **Q.**  Did you represent in these Twitter posts that you had --

8  that you were a purchaser of AML BitCoin Tokens?

9  **A.**  Yes.

10 **Q.**  Were there negative comments on Twitter about AML BitCoin?

11 **A.**  Yes.

12 **Q.**  What type of negative comments do you remember seeing on

13 Twitter?

14 **A.**  People being displeased that there wasn't enough movement

15 on the project early on, that they were worried that it

16 wouldn't live up to the promises that were made, overall just

17 really unhappy with the fact that it wasn't -- nothing was

18 really ready yet.  They didn't get super frequent updates on,

19 like, the project itself.  Just overall that kind of thing.

20 **Q.**  And were you responding to those negative comments using

21 the sock puppet accounts?

22 **A.**  Sometimes, yes.

23 **Q.**  Okay.  Did you clear your posts or the things that you

24 were going to write when you were using the sock puppet

25 accounts with anyone?

1   **A.**   Melissa was the one who kind of set me up with the

2   direction in what to say.  She didn't tell me, "You need to say

3   these exact words," but she said, "You know, keep it positive

4   and, you know, steer in the right direction," and that kind of

5   thing.  So she gave me direction on what to say, but I didn't

6   have to get those particular posts approved by her.

7   **Q.**   Okay.  Did you get direction from anyone else about

8   posting using the sock puppet accounts?

9   **A.**   No.

10  **Q.**   How long -- for how long of a time period did you post on

11  BitcoinTalk and Twitter using the sock puppet accounts?

12  **A.**   A month, maybe two, because then we passed that over to

13  the tech support team to take over.

14  **Q.**   Who instructed you to pass over the assignment to the tech

15  support people?

16  **A.**   Melissa.

17  **Q.**   And when you say "the tech support people," what do you

18  mean?

19  **A.**   We had three individuals that were located in

20  Latin America, so they were all remote.  And once the ICO kind

21  of ended and a lot of people had gotten their tokens, they

22  didn't have much to do because there wasn't much technical

23  support that was needed, so they were kind of bored.  So

24  Melissa had given them this task to kind of take on during the

25  slow times when they weren't getting support tickets.

COWAN - DIRECT / WARD

1    **Q.**    I see.

2          And then did you personally interact with any of these

3    three tech support people?

4    **A.**    Every now and again, yeah.

5    **Q.**    Okay.  Now, you said they were in another country.  So you

6    weren't talking to them in person?

7    **A.**    No.

8    **Q.**    When you were communicating with them online, were you

9    instructing them on how to create sock puppet accounts?

10   **A.**    They weren't creating them.  They were just taking over

11   the ones that I made.

12   **Q.**    I see.

13         And after the project was transferred to the tech support

14   people, did you see posts that continued using those accounts?

15   **A.**    Yes.

16   **Q.**    Did it follow the same modus operandi, the same process

17   that was used when you were posting on the accounts?

18   **A.**    Yes.

19   **Q.**    Were you giving them any instruction on what sort of

20   things to post?

21   **A.**    I would more assist them with sounding more, like,

22   convincing because they weren't -- English is not their first

23   language.  A lot of their responses were, like, broken English.

24   Like, you could tell that it was very much not of someone

25   located in the U.S.

**COWAN - DIRECT / WARD**

1    So we would kind of say, "Okay.  Maybe you should tailor

2    it to say" -- you know, kind of sound a little more fluid, a

3    little more -- you know, less foreign.  So we would -- I would

4    kind of direct them in that way, but we just kind of told them

5    the same thing, keep the sentiments positive.

6    **Q.**  Okay.  How long did that go on, to your knowledge?

7    **A.**  Not too much longer.  Maybe another month.  We didn't keep

8    it up for too long.

9    **Q.**  Do you know why the false sock puppet account postings

10   stopped?

11   **A.**  When the tech support individuals took it over and, again,

12   a lot of the responses were very not super convincing, people

13   were starting to catch on to the fact that they weren't real or

14   they were bots or they weren't -- I don't think people

15   connected that it was from us directly, but people just knew

16   that they weren't real and people were calling it out, and we

17   just decided to, like, cut our losses.

18   **Q.**  Okay.  And who gave the instruction to stop using --

19   **A.**  Melissa.

20   **Q.**  Melissa.

21   **A.**  Yes.

22   **Q.**  Foteh.

23   All right.  At some point did you come to learn that

24   Melissa Foteh had stopped working for Marcus Andrade and the

25   NAC Foundation?

1   **A.**   Yes.

2   **Q.**   And when approximately -- you said you started in March of

3   2018.  When approximately in time did that happen?

4   **A.**   Maybe July.  Maybe August.  Somewhere around there.  Of

5   2018.

6   **Q.**   After Ms. Foteh and her company stopped working with the

7   NAC Foundation, what happened to you?

8   **A.**   About a few weeks later, I got laid off.

9   **Q.**   Okay.  Did you later go to work directly for Marcus

10  Andrade at the NAC Foundation?

11  **A.**   Yes.

12  **Q.**   And how did that come about?

13  **A.**   So I got laid off.  Melissa couldn't afford to keep me on

14  once her and Marcus parted ways, so I didn't have a job.  And

15  Bernadette was like -- knew I needed a job, and she asked

16  Marcus if they could take me on.

17  **Q.**   At the time -- at this time was Bernadette -- you're

18  referring to Bernadette Tran -- was she working at -- working

19  for Marcus Andrade and the NAC Foundation?

20  **A.**   Yes.  She always was.

21  **Q.**   Well, at the time that --

22  **A.**   Yes.

23  **Q.**   Right.  And at that time were you in a personal

24  relationship with her?

25  **A.**   She was my girlfriend at the time, yes.

COWAN - DIRECT / WARD

1   **Q.**   And she's your spouse now?

2   **A.**   Yes.

3   **Q.**   All right.  Were you then hired to work at the

4   NAC Foundation?

5   **A.**   Yes.

6   **Q.**   Did you have a title?

7   **A.**   Not really.  And if we did, I didn't really know what it

8   was but...

9   **Q.**   Where did you physically work when you started working

10  directly for the NAC Foundation?

11  **A.**   It was in Houston, in an office probably down the street

12  from where Melissa's office was located.

13  **Q.**   Okay.  And when you went to work in the NAC Foundation's

14  office, how many people were working there?

15  **A.**   It was me, Bernadette Tran, and this guy named Travis, who

16  was there for a short time.

17  **Q.**   Was Mr. Andrade in the office?

18  **A.**   Not at first.  Not enough to, like, be there all the time

19  at first.

20  **Q.**   Meaning he didn't have an office, or he was just out of

21  the office quite a bit?

22  **A.**   He was out of the office.

23  **Q.**   Okay.  What were your general responsibilities when you

24  went to work directly for the NAC Foundation?

25  **A.**   A little bit of the same thing I was doing before.  Still,

1  like, working on some social media posts every now and again,

2  assisting with press releases, and then just general, like,

3  admin work, things that needed to be done around the office.

4  So a little bit of everything.

5  **Q.**  At the time that you were at NAC Foundation, did it

6  maintain a website?

7  **A.**  Yes.

8  **Q.**  Was part of your responsibilities to monitor that website?

9  **A.**  Yes.

10 **Q.**  Was part of your responsibilities to edit and update the

11 website from time to time?

12 **A.**  Yes.

13        **MR. WARD:**  Can we bring up Exhibit 626.  It's already

14 been admitted.  626.

15 **Q.**  Ms. Cowan, is this the AML BitCoin website as you remember

16 it at the time that you were working there?

17 **A.**  Yes.

18        **MR. WARD:**  Can we scroll down through the next page.

19 **Q.**  Again, does this appear to be the website that was up --

20 **A.**  Yes.

21 **Q.**  -- during the time you were working there?

22 **A.**  Yes.

23        **MR. WARD:**  And we'll go down one more page.

24        And one more.

25        One more.

1    And one more.

2  **Q.**   When you would review or update information for the

3  website, did you need to seek approval before anything updated

4  or new could be posted on the website?

5  **A.**   Oh, yes.

6  **Q.**   And who would approve what was updated or added to the

7  website?

8  **A.**   Marcus.

9  **Q.**   And when you would update or add to the website, where was

10  the information you were getting to update the website?

11  **A.**   Marcus.

12  **Q.**   Did sometimes -- did Mr. Andrade sometimes directly

13  instruct you to update the website with various things?

14  **A.**   Yes.

15  **Q.**   Okay.  Was there anyone else that had to -- that approved

16  changes to the website before they were -- before they were

17  updated and made live?

18  **A.**   No.

19  **Q.**   Okay.  At some point did you work with a website designer

20  named Chris Bibb on the AML BitCoin website?

21  **A.**   Chris Bibbs, yes.

22  **Q.**   Chris Bibbs.  And what did you and Mr. Bibbs do?

23  **A.**   He was a website builder.  So Marcus had wanted to update

24  the website.  So we just worked with him on, like, updating the

25  website, how it looked, the information, that kind of thing.

1    So we would just go back and forth with him on edits.

2         MR. WARD:  Okay.  Can we bring up Exhibit 1057, which

3    has not been admitted.  Show this to the witness, please, and

4    the parties.

5    Q.   Do you see the "to" and "from" line on this?

6    A.   Yes.

7    Q.   Is that an email that you were using at the time you were

8    working at AML BitCoin?

9    A.   Yes.

10   Q.   And do you see the email to Chris Bibbs?  Is that the

11   Mr. Bibbs that was working on updating the website?

12   A.   Yes.

13   Q.   Did you communicate with him by email when you were

14   updating the website?

15   A.   Yes.

16   Q.   Have you reviewed this email prior to your testimony here

17   today?

18   A.   Yes.

19   Q.   Is it an accurate reflection of your communication with

20   him?

21   A.   Yes.

22        MR. WARD:  I would move to admit Exhibit 1057.

23        MR. SHEPARD:  No objection.

24        THE COURT:  1057 will be admitted.

25        (Trial Exhibit 1057 received in evidence.)

1    **MR. WARD:**  All right.  Can we -- can we just highlight

2    the part that says "Hi, Chris" and then the next paragraph.

3    **Q.**  When you wrote to Chris "The site looks great!" are you

4    referring to the AML -- the AML BitCoin website?

5    **A.**  Yes.

6    **Q.**  When you write "I know Bernadette sent the link over to

7    Marcus to see what he thinks," what did that mean?

8    **A.**  Bernadette sent the test link over to Marcus to get his

9    opinion, see if he had any edits.

10   **Q.**  Okay.  And was that the practice when -- throughout the

11   process of updating the website, that Marcus Andrade would

12   review and approve -- it would be sent to Marcus Andrade for

13   his review?

14   **A.**  Yes.

15        **MR. WARD:**  Okay.  You can pull out of that.

16   **Q.**  You talked earlier about the NAC Foundation, AML BitCoin

17   Twitter page.  Was part of your responsibilities when you were

18   directly employed there to monitor and update the AML BitCoin

19   Twitter site?

20   **A.**  Yes.

21        **MR. WARD:**  All right.  Can we look at Exhibit 473.

22   **Q.**  Do you recognize this?

23   **A.**  Yes.

24   **Q.**  When you were working for the NAC Foundation, was this the

25   site that you were working on and updating?

 1    **A.**   Yes.

 2          **MR. WARD:**  The Government would move to admit

 3    Exhibit 473.

 4          **MR. SHEPARD:**  I'm sorry.  Is this one page, or is

 5    there more to it?

 6          **MR. WARD:**  It's just one page.

 7                       (Pause in proceedings.)

 8          **MR. SHEPARD:**  I'm sorry.  This isn't in our binder of

 9    today's exhibits, which is why I'm asking.

10          **THE COURT:**  It's this one-page document.  It's on the

11    screen if you want to take a look.

12          **MR. SHEPARD:**  If it's just that one page, I don't have

13    any objection to it.

14          **THE COURT:**  All right.  473 will be admitted.

15       (Trial Exhibit 473 received in evidence.)

16          **THE COURT:**  And, Mr. Ward, is this a good time for our

17    second break?

18          **MR. WARD:**  This would be a good time for the second

19    break.  Thank you, Your Honor.

20          **THE COURT:**  All right.  Members of the jury, remember

21    my admonitions not to discuss this amongst yourselves or with

22    anyone else, and we'll see you in 15 minutes.

23                    (Recess taken at 12:02 p.m.)

24                (Proceedings resumed at 12:19 p.m.)

25       (Proceedings were heard in the presence of the jury.)

```
 1              THE COURT:  The jury is present.
 2         Mr. Ward, you may proceed.
 3              MR. WARD:  Thank you, Your Honor.
 4         Can we admit and publish Exhibit 473.
 5              THE COURT:  It was admitted.
 6    BY MR. WARD:
 7    Q.   Ms. Cowan, can you -- is this the AML BitCoin Twitter page
 8    as it looked during the time that you were working on it?
 9    A.   Yes.
10    Q.   What sort of things would you do to update the Twitter
11    page?
12    A.   Just, like, create social media posts; that banner cover
13    photo up top, I created the graphic for that; and just, like,
14    make posts and stuff.
15    Q.   Let me stop you right there.  When you say "the banner
16    post at the top," are you referring -- what exactly are you
17    referring to?
18    A.   The cover photo, that big graphic that spans the top of
19    the page.
20    Q.   That says "AML BitCoin" and then under "The World's First
21    AML/KYC/Patriot Act Coin"?
22    A.   Yes.
23    Q.   You created that?
24    A.   Yes.  Yes.
25    Q.   Where did you get the information that you used to create
```

 1  this banner?

 2  **A.**   From the website or the white paper, one of them; but, I

 3  mean, a lot of the information on the website was also in the

 4  white paper.

 5  **Q.**   And was it your practice to review the updates to the

 6  Twitter post with Marcus Andrade before they went up?

 7  **A.**   When I was with Republic One, it was with Melissa and then

 8  with Marcus, yes.

 9  **Q.**   And when you were at the NAC Foundation, it was with

10  Marcus Andrade directly?

11  **A.**   Yes.  But I made this banner when I was with Republic One.

12  **Q.**   And when you were at Republic One, you ran your posts by

13  Melissa Foteh?

14  **A.**   Yes.

15  **Q.**   Okay.  And do you know if she got approval for the posts?

16  **A.**   I would assume, yes.

17          **MR. SHEPARD:**  Objection, Your Honor.

18          **THE COURT:**  Sustained.

19          **MR. WARD:**  Okay.  We can step out of this.

20       Let's look at another exhibit.  This has not yet been

21  published.  This is Exhibit 449.

22  **Q.**   Do you recognize this, Ms. Cowan?

23  **A.**   Yes.

24  **Q.**   Okay.  What is it?

25  **A.**   It's an Instagram post.

1  Q.   All right.  Do you see the date at the bottom?

2  A.   Yes.

3  Q.   During that time, were you working at Republic One or the

4  NAC Foundation?

5  A.   Republic One.

6  Q.   Okay.  And were you updating the Instagram posts at

7  Republic One at that time?

8  A.   Yes.

9       MR. WARD:  At this point we would move to admit

10  Exhibit 449.

11       MR. SHEPARD:  No objection.

12       THE COURT:  449 will be admitted.

13       (Trial Exhibit 449 received in evidence.)

14  BY MR. WARD:

15  Q.   Was this another -- was this an Instagram post that you

16  worked on when you were at Republic One?

17  A.   Yes.

18  Q.   Okay.  And as with the Twitter site, where did you get the

19  content for this post?

20  A.   The website or the white paper.

21  Q.   And when you refer to the white paper, what are you

22  referring to?

23  A.   I understand the white paper to be just a document that

24  talks about the project, what the features will be, people

25  working on the project, and just all about AML BitCoin that

1    people can view before buying it.

2    **Q.**   And where did you access the white paper?

3    **A.**   The website.

4         **MR. WARD:**  Okay.  If we could take this down.

5    **Q.**   I want to talk about some of your tasks when you were at

6    the NAC Foundation.

7         Can you pull up Exhibit 143, please.

8         Do you recognize this document?

9    **A.**   Yes.

10   **Q.**   What is it?

11   **A.**   It's a list of things that I was tasked with doing when I

12   started working directly for AML BitCoin.

13   **Q.**   Have you reviewed this document prior to testifying here?

14   **A.**   Yes.

15   **Q.**   Did you create this document?

16   **A.**   Yes.

17   **Q.**   Did you create this document -- where were you working

18   when you created this document?

19   **A.**   For NAC Foundation, AML BitCoin.

20   **Q.**   All right.  And does this accurately reflect at least some

21   of the tasks that you were working on at AML BitCoin?

22   **A.**   Yes.

23        **MR. WARD:**  The Government would move to admit

24   Exhibit 143.

25        **MR. SHEPARD:**  No objection.

 1          **THE COURT:**  143 will be admitted.

 2      (Trial Exhibit 143 received in evidence.)

 3          **MR. WARD:**  Okay.  If we could publish that.

 4  **Q.**  Let me walk through some of the tasks.  Ms. Cowan, looking

 5  at the first task, it says [as read]:

 6          "Consistently monitor Telegram for any questions

 7      or issues that may arise."

 8      Let me start with Telegram.  Please provide a brief

 9  description of what Telegram is.

10  **A.**  It's like another, not necessarily a forum, but like a

11  chat room where people can kind of go back and forth,

12  communicate with each other, make a group chat; and AML BitCoin

13  had their own group chat, so to speak.

14  **Q.**  Okay.  Was part of your job like with AML BitcoinTalk to

15  monitor the chats in the Telegram channel?

16  **A.**  Yes.

17  **Q.**  Okay.  And it says [as read]:

18          ". . . monitor for any questions or issues that

19      may arise."

20      What does that mean?

21  **A.**  So if anyone had questions that we could easily answer or

22  issues, like negative comments or complaints or whatever, we

23  would monitor those or answer -- like, you know, address those

24  or, yeah, just make sure that they were addressed or we knew

25  that it was happening.

**COWAN - DIRECT / WARD**

1   **Q.**   I see.

2       And when you were addressing those posts, at this time

3   were you using the AML BitCoin handle in Telegram to --

4   **A.**   Yes.

5   **Q.**   -- answer those requests?

6   **A.**   Yes.

7   **Q.**   Okay.  Next bullet point says [as read]:

8           "Check all social media for any messages and

9       comments that need to be answered."

10      Were you conducting a similar review and oversight of the

11  website and the social media sites like you were for the

12  Telegram site?

13  **A.**   Yes.

14  **Q.**   Bullet Point 3 refers to working with Chris Bibbs on the

15  Bitcoin press website.

16      Was this the Mr. Bibbs you referred to earlier in terms of

17  updating the website?

18  **A.**   Yes.

19  **Q.**   And approximately when in time were you working with him

20  on this?

21  **A.**   On just the website in general or Bitcoin Press website

22  or --

23  **Q.**   Well, this says "Bitcoin Press website."  When were you

24  working with him on the Bitcoin Press website?

25  **A.**   It was probably maybe the beginning of 2019.  I can't say

1  for sure.  It wasn't right when I started working directly for

2  NAC Foundation, but it was a few months after.

3  **Q.**  And remind us when you started working directly for

4  AML Bit- -- the NAC Foundation.

5  **A.**  September 11th of 2018.

6  **Q.**  And you believe that this refers to work you were doing

7  several months later?

8  **A.**  Yes.

9  **Q.**  Okay.

10  **A.**  Yes.

11  **Q.**  The next bullet point refers to [as read]:

12       "Edit any documents to go on the website."

13  When you would edit documents for the website, did you

14  need to get approval for those?

15  **A.**  Yes.

16  **Q.**  And did that come from Marcus Andrade?

17  **A.**  Yes.

18  **Q.**  Okay.  Can we go down to the bullet point that says

19  [as read]:

20       "Working with Bernadette to edit previous social

21       media posts . . . ."

22  Do you see that?

23  **A.**  Mm-hmm.

24  **Q.**  It says [as read]:

25       "Working with Bernadette to edit previous social

1      media posts that contain inaccuracies and misleading

2      information."

3          What was your assignment that you're referring to here?

4  **A.**   So Marcus informed us that the social media posts that

5  were created during my time at Republic One Exhibitions or

6  before I started working there during the ICO, they weren't in

7  compliance.  So we needed to edit those captions to make sure

8  they were in compliance.

9  **Q.**   And what did Marcus Andrade tell you he meant by "they

10 were not in compliance"?

11 **A.**   A lot of the verbiage was similar to, like, the Twitter

12 cover photo, "AML BitCoin is the World's First AML/KYC

13 Compliant," et cetera.  But because AML BitCoin wasn't

14 completed yet, it is not the world's first.  So it will be,

15 you know, changing things to the future tense.  It will be.  It

16 will be this.  It will have these features, not it does have

17 these features, because it did not have those features when --

18 at the time of the social media posts being made.

19 **Q.**   And Mr. Andrade asked you to change the language on the

20 Twitter post?

21 **A.**   Twitter, Instagram, Facebook, et cetera.  Even the white

22 paper, I believe, got updated to reflect the -- to be in

23 compliance.

24 **Q.**   And when you did this, did you go back and change posts

25 from 2018?

1    **A.**    Yes.

2    **Q.**    And did you go back and change posts -- how far back did

3    you go to change the posts?

4    **A.**    I mean, probably during ICO, like, from the beginning of

5    ICO.    From what I know, that's probably about as far back as we

6    went.

7    **Q.**    And you would go back and change the posts from saying

8    that "AML BitCoin is compliant" to "It will be compliant"?

9    **A.**    Yeah.    Like "It does have these features" to "It will have

10    these features."    Speaking in the future tense because it

11    didn't have them at the time.

12    **Q.**    And these were posts that had been up on the Twitter page

13    or the Instagram posts for months?

14    **A.**    Yes.

15    **Q.**    And were these posts that were posted during the period of

16    the ICO?

17    **A.**    Yes.

18    **Q.**    And were these posts that were put up when pre-ICO

19    investors were purchasing AML BitCoin?

20    **A.**    Yes.

21    **Q.**    And why did Marcus Andrade tell you that he needed to

22    change it?    Why did he say it was inaccurate?

23            **MR. SHEPARD:**    This is asking what he said or --

24    **BY MR. WARD:**

25    **Q.**    I'm asking what Marcus Andrade said to you.

 1            **MR. SHEPARD:**  Okay.  No objection to that.

 2            **THE WITNESS:**  He said that the copy of those posts,

 3    the messaging of what those posts contained were not in

 4    compliance; and so in order to be compliant, we needed to make

 5    these changes.

 6    **BY MR. WARD:**

 7    **Q.**   Do you remember approximately when Marcus Andrade told you

 8    that?

 9    **A.**   This was probably around the time I started.  So probably

10    the end of 2018; maybe October, November of 2018.  Shortly

11    after my time starting to work there.

12    **Q.**   But prior to October, November when you were at

13    Republic One --

14    **A.**   No.

15    **Q.**   -- he never asked you to change it?

16    **A.**   I never spoke to him before then.

17    **Q.**   It was only after September 2018 --

18    **A.**   Yes.

19    **Q.**   -- into October, the fall, that's when he asked you to

20    make those changes?

21    **A.**   Yes.  Yes.

22            **MR. SHEPARD:**  Objection.  That was leading.

23            **THE COURT:**  Overruled.

24    **BY MR. WARD:**

25    **Q.**   Did Marcus Andrade ever discuss with you something called

1    Aten Coin?

2    A.    Yes.

3    Q.    What did he say?

4    A.    He had -- I don't remember everything that he said, but I

5    know he had just explained that it was the project before

6    AML BitCoin.   It was a -- so Aten Coin purchasers, some early

7    adopters of Aten Coin could exchange their Aten Coins for

8    AML BitCoin Tokens on a one-to-one ratio, so they just kind of

9    rolled over into those.   But I just know it was a project that

10   he had previously.

11   Q.    And did you work on rolling over Aten Coin investors into

12   AML BitCoin?

13   A.    Some of the ones that I distributed during my very first

14   five days of my employment at Republic One Exhibitions, some of

15   them could have been Aten Coin holders, sure.   I'm not sure.

16   Q.    Okay.   Did Marcus Andrade ever talk to you or talk about

17   calling up individuals to make investments in AML BitCoin?

18   A.    Yes.

19   Q.    And what would he say?

20   A.    I wasn't in the room for those conversations, so I can't

21   say exactly what he told them.

22   Q.    What would -- would he say things to you before he

23   would -- did he say things to you about calling people to

24   purchase --

25   A.    Yes.

1  **Q.**    -- AML BitCoin Tokens?

2  **A.**    Oh, yes.

3  **Q.**    And what would he say?

4  **A.**    He would just say, "Oh, I'm going to call so-and-so,

5  you know, see if they want to purchase some tokens so we can

6  get some more money."  I would leave the room for those

7  conversations.  Afterwards, he would tell me to contact people

8  to draft up the agreements for those so that they could make

9  the purchase agreement.

10 **Q.**   Were there certain times when he would say that he was

11 going to call people to raise more money?

12 **A.**    It was toward the end of my employment there.

13 **Q.**   And what was happening at the business when he was saying

14 that he would call investors and ask for more money?

15 **A.**    You know, bills were late to be paid.  We weren't getting

16 paid on time.  We had to move part-time for a bit because he

17 didn't have the money to pay us at full-time.  You know, we got

18 paid every other Friday, but it didn't come on Friday because

19 he didn't have the money on Friday.  Things like that.

20 **Q.**   Did Marcus Andrade ever tell you that he had managed to

21 land more investors to raise more money?

22 **A.**    Yes.

23 **Q.**   And did you do things after that?  What happened when he

24 would tell you he'd raised money?

25 **A.**    He'd have money.  You know, we'd get paid what was owed.

1  We would, you know, pay the bills that needed to be paid.

2  You know, he would take us out to lunch at Morton's Steakhouse.

3  You know, he would -- you know, we would, you know, make sure

4  everyone was all settled up in terms of the bills that weren't

5  paid.

6  **Q.**  When he would -- when would he take you to Morton's

7  Steakhouse?

8  **A.**  During the workday.  It happened a couple of times.

9  **Q.**  And was that after he had raised more money from

10  investors?

11  **A.**  Yes.

12  **Q.**  All right.  At some point in time, were you instructed to

13  create binders of financial documents for Marcus Andrade?

14  **A.**  Yes.

15  **Q.**  What type of financial binders did he instruct you to

16  create?

17  **A.**  There were business bank statements, personal bank

18  statements that needed to be categorized.  The transaction

19  needed to categorized.  So during the ICO, just categorizing

20  those business expenses.

21  **Q.**  So just to be clear, this didn't happen during the ICO?

22  **A.**  No.

23  **Q.**  But when in time?  Was this after you went to work for the

24  NAC Foundation?

25  **A.**  Yes.

1    **Q.**    And did you create binders with the financial documents

2    that Andrade asked -- Mr. Andrade asked you to include?

3    **A.**    Yes.

4    **Q.**    Did that include NAC Foundation bank accounts?

5    **A.**    Yes.

6    **Q.**    Did that include his personal bank accounts?

7    **A.**    Yes.

8    **Q.**    And then after you made the binders and collected the

9    transactions, what were you instructed to do with those -- with

10    those -- with that information, those binders?

11    **A.**    We would all sit at a table, and I'd read off the

12    transaction say, "Okay.  What was this for?"  And he would tell

13    me what the category was, whether it was a business expense,

14    travel expense, office-related expense, et cetera.  So we would

15    just write them down for his CPA so that he -- for tax

16    purposes.

17    **Q.**    Did he tell you why he was having you go through this

18    process, Mr. Andrade?

19    **A.**    It was for tax purposes, from what I understand.

20    **Q.**    Okay.  Did you review -- as part of this, were you able to

21    review expenses from the NAC Foundation accounts?

22    **A.**    Yes.

23    **Q.**    Did you see travel expenses?

24    **A.**    Yes.

25    **Q.**    How many and how often did you see travel expenses?

1  **A.**    It really depended.  Like, during the ICO, there was a lot

2  of travel expenses during that time period.  And then,

3  obviously, like, toward the end of my tenure there, he wasn't

4  traveling nearly as much.

5  **Q.**    Did you see expenses for entertainment?

6  **A.**    Yes.  Like dining out, things like that.

7  **Q.**    Did you see transactions that moved from Mr. Andrade's

8  personal account into his business account?

9  **A.**    Yes.

10  **Q.**    Or, excuse me.  From his business account into his

11  personal accounts?

12  **A.**    Yes.

13  **Q.**    Did you ask Mr. Andrade about those transactions?

14  **A.**    Yes.

15  **Q.**    And what did he tell you?

16  **A.**    He just said that it was what he was owed from the

17  business.  He put his money into the business, so that was the

18  portion of his that was owed to him.

19  **Q.**    Do you recall how many transactions that you saw from the

20  NAC Foundation account into his personal accounts?

21  **A.**    I wouldn't be able to say for sure.

22  **Q.**    Do you have an estimate of how much money you saw moving

23  from the NAC Foundation accounts into his personal accounts?

24  **A.**    I mean, it was like in the thousands or tens of thousands,

25  but I can't say for sure.  I don't remember.

1  Q.   Okay.  Did Mr. Andrade ever ask you to create physical

2  binders of cryptocurrency purchasers on AML BitCoin?

3  A.   Yes.

4  Q.   All right.  I'd like to show you a document.

5       MR. WARD:  For ease I'm going to show her the physical

6  copies of the Exhibit 1097 and 1096.

7       May I approach, Your Honor?

8       THE COURT:  You may.  And what number is it?

9       MR. WARD:  It's Exhibit 1097 and 1096.

10 Q.   Ms. Cowan, do you recognize those binders?

11 A.   Yes, they look familiar.

12 Q.   Have you reviewed them prior to your testimony here today?

13 A.   Yes.

14 Q.   And looking at the handwriting on the spine of the

15 documents, do you recognize the handwriting?

16 A.   Yes.

17 Q.   All right.  If you would take 1097 first, can you look at

18 the pages in that document.

19 A.   (Witness examines document.)

20 Q.   What is this generally?

21 A.   So these are people who purchased AML BitCoins using

22 cryptocurrency.

23 Q.   The information on the paper inside the document, where

24 did you get that information?

25 A.   CoinPayments.

1  **Q.**  And under whose instruction did you compile this?

2  **A.**  Marcus.

3  **Q.**  Did Mr. Andrade ask you to be accurate in what you

4  compiled?

5  **A.**  Yes.

6  **Q.**  And did you work to make sure that that binder contained

7  accurate information?

8  **A.**  Yes.

9  **Q.**  And did you keep and use that binder of information when

10  you were working with Mr. Andrade at the NAC Foundation?

11  **A.**  Yes.

12      **MR. WARD:**  Move to admit Exhibit 1097.

13      **MR. SHEPARD:**  No objection.

14      **THE COURT:**  It's admitted.

15  (Trial Exhibit 1097 received in evidence.)

16      **THE COURT:**  You said 1097 and 1096?

17      **MR. WARD:**  1096 is the second binder.

18      **THE COURT:**  All right.  So 1097 is admitted.

19      **MR. WARD:**  Correct.

20  **Q.**  And why don't we do 1096, since we're here.  Can you look

21  at 1096.

22  **A.**   (Witness examines document.)

23  **Q.**  Do you recognize that document?

24  **A.**  Yes.

25  **Q.**  Do you recognize the handwriting on the spine?

COWAN - DIRECT / WARD

1   **A.**   Yes.

2   **Q.**   Do you see where it says "Part 2"?

3   **A.**   Yes.

4   **Q.**   Is that Part 2 of the information that you compiled in

5   1097?

6   **A.**   Yes.

7   **Q.**   And, again, is this a list of the individuals who

8   purchased AML BitCoin Tokens?

9   **A.**   Yes.

10  **Q.**   Was the information collected in the same manner, intended

11  to be accurate in the same way that 1097 was?

12  **A.**   Yes.

13          **MR. WARD:**  Move to admit 1096.

14          **MR. SHEPARD:**  No objection.

15          **THE COURT:**  1096 will be admitted.

16      (Trial Exhibit 1096 received in evidence.)

17  **BY MR. WARD:**

18  **Q.**   If you could take a look at 1097.

19      And can we pull up 1097.  Can we look at the -- starting

20  with the -- let's start with the spine.

21      Do you see the -- do you see the writing on the spine?

22  You see it on the screen?  It's the same.

23  **A.**   Mm-hmm, yes.

24  **Q.**   When you wrote "Cryptocurrency credits from CoinPayments,"

25  what was CoinPayments?

1    **A.**    CoinPayments is a website where people can make payments,

2    like, can purchase things with cryptocurrency.

3    **Q.**    Okay.  And did you access information from the

4    CoinPayments website?

5    **A.**    Yes.

6    **Q.**    What information specifically were you pulling down for

7    this document?

8    **A.**    The date and time of purchase, their wallet address of the

9    cryptocurrency they were using, whether that's Bitcoin,

10    Ethereum, Litecoin, the amount of cryptocurrency; and then if

11    they were -- if they were given their tokens, the AML BitCoin

12    Token Wallet address that it was sent to.

13    **Q.**    All right.  Looking again at the spine, it has a date of

14    10/17/17 through 1/7/2018.  Were these purchases made during

15    that period?

16    **A.**    From what I understand, yes.

17        **MR. WARD:**  All right.  Can we go to the next page.

18    Next page, please.

19    And we can just stop right here.  Can we scroll down a

20    little bit so we get the top of it.

21    **Q.**    Looking at the second column where it says "Address," is

22    that a wallet address?

23    **A.**    That is a -- yeah, a cryptocurrency wallet address.

24    **Q.**    And next to it, if we could pull out where it says

25    ".0738," and so on, "ETH," what does that refer to?

COWAN - DIRECT / WARD

1    **A.**    So I believe that was the amount before the fee was taken

2    out, because there's always, like, a fee taken out when you

3    make cryptocurrency payments.

4    **Q.**    Does this line represent a purchase of AML BitCoin Tokens?

5    **A.**    Yes.

6    **Q.**    And was the purchase made using the cryptocurrency

7    Ethereum, ETH?

8    **A.**    Yes.

9    **Q.**    Okay.  Thank you.

10        If we could go down to the bottom of the page here.

11        Do you recognize the handwriting at the bottom?

12    **A.**    Yes.

13    **Q.**    Is that your handwriting?

14    **A.**    I believe so, yes.

15    **Q.**    And when it says "BTC," what does that refer to?

16    **A.**    Bitcoin.

17    **Q.**    And when it says "LTC," what does that refer to?

18    **A.**    Litecoin.

19    **Q.**    And ETH we just discussed, is that Ether- --

20    **A.**    Ethereum.

21    **Q.**    Are those all cryptocurrencies?

22    **A.**    Yes.

23    **Q.**    Do you know what these numbers at the bottom of the page

24    represent?

25    **A.**    They were the total amounts from each page.  Like, we

 1    added them all up and those were the totals of each.

 2    Q.    And if you look at the paper document, did you go through

 3    the document and is there a total at the bottom of each page?

 4    A.    Yes.

 5    Q.    And does that represent the total of AML BitCoin purchases

 6    in these various cryptocurrencies from that page?

 7    A.    Yes.

 8            MR. WARD:    All right.    If we could just pull up

 9    Exhibit 1096 and just look at the spine, please.

10    Q.    Is this the spine that's on the second binder?

11    A.    Yes.

12    Q.    Does the second binder contain cryptocurrency payments --

13    AML BitCoin purchased in cryptocurrency from January 7th to

14    March -- 2018 to March 19th, 2018?

15    A.    Yeah.    To March 9th, yes.

16    Q.    Oh, March 9th.    Yes.    Thank you.

17            And is it compiled in the same fashion as the other --

18    A.    Yes.

19    Q.    -- the other binder?

20            All right.    Okay.    Thank you.

21            Ms. Cowan, let's drop out of this exhibit.

22            If we could pull up Exhibit 38.

23            Do you recognize that handwriting?

24    A.    Yes.

25    Q.    Did you compile a list of -- did you compile this list?

COWAN - DIRECT / WARD

```
 1   A.   Yes.

 2   Q.   And what is it?

 3   A.   It's a list of post-ICO purchases.

 4           MR. WARD:  All right.  We can pull out of this

 5   exhibit.

 6   Q.   Were you aware of people who purchased AML BitCoin after

 7   the ICO?

 8   A.   Yes.

 9   Q.   And approximately how much was raised post-ICO that you

10   know?

11   A.   I don't know the total amount.

12   Q.   Could it be over a million dollars?

13   A.   It could be.

14   Q.   During the time that you were working at AML BitCoin, were

15   there -- the NAC Foundation, were there times that the bills

16   weren't paid?

17   A.   Yes.

18   Q.   Was the Internet ever turned off when you were working at

19   the NAC Foundation?

20   A.   Yes.

21   Q.   Did you discuss the Internet being turned off with

22   Mr. Andrade?

23   A.   Yes.

24   Q.   And what did he say?

25   A.   He would give me the card to pay it after it was turned
```

COWAN - DIRECT / WARD

1  off.

2  **Q.**  And would it eventually get turned on?

3  **A.**  Yes.

4  **Q.**  Was the phone service ever -- was the phone service ever

5  turned off?

6  **A.**  Yes.

7  **Q.**  And would you raise that issue with Mr. Andrade?

8  **A.**  Yes.  The phone and the website -- and the Internet were

9  the same company.

10 **Q.**  Were there times that the rent wasn't paid?

11 **A.**  Yes.

12 **Q.**  And how do you know that the -- how did you know that the

13 rent wasn't paid?

14 **A.**  We would get notices that we were late.

15 **Q.**  And after you got notices that you were late, would you

16 just -- would you ask Mr. Andrade about this?

17 **A.**  Yes.

18 **Q.**  And what would happen then?

19 **A.**  He would say, "Oh, well, I'll pay it," or, "Oh, you know,

20 I just need a little bit of time."

21     And the second office, when we couldn't pay, he said,

22 "This is too expensive anyway."  So we ended up coming on a

23 weekend, gathering all the stuff, and then moving before our

24 lease was up to another office.

25 **Q.**  So during your time there, you moved from one office to

1   the next?

2   **A.**   Yes.

3   **Q.**   And did you later move to a third office when you were

4   there?

5   **A.**   The first office was the one that was with Melissa.  Like,

6   that was in Melissa's office building.  The second one was

7   after that, after they went their separate ways.  And then the

8   third one was the last one that I was in.

9   **Q.**   And you would move after getting notices that the rent had

10  not been paid in your prior --

11  **A.**   Yes.

12  **Q.**   -- spot?

13       And this was all occurring after the ICO and after Marcus

14  Andrade had raised millions of dollars?

15  **A.**   Yes.

16  **Q.**   Were there times when he failed to pay your salary?

17  **A.**   Several times, yes.

18  **Q.**   And did you confront Mr. Andrade about failing to pay your

19  salary?

20  **A.**   Yes.

21  **Q.**   And what did he say?

22  **A.**   At first it was just, "Oh, you know, my money's all tied

23  up right now.  I'll pay it," or, "Give me some time."

24       **THE COURT:**  Mr. Highsmith seems to want to talk to

25  you.  Do you want to just have a consult with him?

 1          MR. HIGHSMITH:  We just need to admit this exhibit.

 2   We haven't admitted it.

 3          THE COURT:  Just figure out what it is rather than

 4   continuing to come back.

 5          MR. WARD:  Clearly, Mr. Highsmith has some notes for

 6   me.

 7      Can we look at Exhibit 38.  Can we admit that, please.

 8          THE COURT:  You're moving to admit 38?

 9          MR. WARD:  Yes.

10          THE COURT:  All right.

11          MR. SHEPARD:  No objection.

12          THE COURT:  38 will be admitted.

13      (Trial Exhibit 38 received in evidence.)

14   BY MR. WARD:

15   Q.   Let's go back to Exhibit 38, Ms. Cowan.  Is this your

16   handwriting?

17   A.   Yes.

18   Q.   It says "Post-ICO."  What does that refer to?

19   A.   Purchases made after the ICO ended.

20          MR. SHEPARD:  I think this has all been asked and

21   answered.

22   BY MR. WARD:

23   Q.   Looking down at the document, do you see where it says

24   "Boyer Family Trust"?

25   A.   Yes.

1  **Q.**   Do you know who that refers to?

2  **A.**   Ben Boyer.

3  **Q.**   Okay.  Who asked you to create this list?

4  **A.**   Marcus.

5  **Q.**   And -- okay.  Let me ask you to look at another exhibit.

6       Could you look at Exhibit 1422?  This has not been

7  admitted.  Do you recognize that handwriting?

8  **A.**   Yes.

9  **Q.**   Whose handwriting is it?

10 **A.**   Looks like mine.

11 **Q.**   Okay.  Where it says "CoinPayments," do you know what that

12 refers to?

13 **A.**   The website where people can make purchases of AML BitCoin

14 using cryptocurrency.

15          **MR. WARD:**  Okay.  Can we move to admit Exhibit 1422.

16          **MR. SHEPARD:**  Is that these handwritten notes?

17          **MR. WARD:**  That's this handwritten Post-it, yeah.

18          **MR. SHEPARD:**  No objection.

19          **THE COURT:**  1422 will be admitted.

20       (Trial Exhibit 1422 received in evidence.)

21 **BY MR. WARD:**

22 **Q.**   Do you see, Ms. Cowan, where it says "Totals"?

23 **A.**   Mm-hmm.

24 **Q.**   What does BTC 92.53984 refer to?

25 **A.**   The total amount of Bitcoin that was, like, used, raised.

COWAN - DIRECT / WARD

1  **Q.**  And where it says LTC 2.12513382, what does that refer to?

2  **A.**  The total amount of Litecoin.

3  **Q.**  And was that the total amount raised through CoinPayment?

4  **A.**  Yes.

5  **Q.**  And for Ethereum, was that the total amount that was

6  raised in --

7  **A.**  Yes.

8  **Q.**  -- for AML BitCoin in Ethereum?

9  **A.**  Yes.

10  **Q.**  And the same for -- what's "BCH" stand for?

11  **A.**  Bitcoin Cash.

12  **Q.**  And, again, same --

13  **A.**  Yes.

14  **Q.**  -- question.

15      Okay.  And where it says Litecoin, is that 2,125.13382?

16  Can you tell?

17  **A.**  It was listed somewhere.  I can't tell.

18  **Q.**  Okay.  When you were working at the NAC Foundation, did

19  you see any of the technology?

20  **A.**  Yes.

21  **Q.**  And did you get a chance to work with the AML BitCoin

22  technology?

23  **A.**  Yes.

24  **Q.**  What was your assessment of the state of the technology

25  when you worked there?

1  **A.**  Early, early beta stages; very buggy; very early stages.

2  **Q.**  And what sort of technology did you see?  What were you

3  working with?

4  **A.**  At first I saw the CrossVerify app in its early, early

5  stages.  We were supposed to test it and for, you know, edits

6  and things, but rarely did it work.  Like, you know, scan your

7  face or your iris, and it did not say it was me or, you know,

8  that kind of thing.  Just very not in working order.

9  And then right before I left, they had come out with a

10  beta version of the AML BitCoin Wallet that would work in

11  tandem with the app where people -- a few select people were

12  able to test it, send fake coins back and forth, et cetera, and

13  that was also just very early beta stages.

14  **Q.**  Did you ever see a working version of the AML BitCoin

15  itself?

16  **A.**  No.

17  **Q.**  And, to your knowledge, did a working version ever get

18  pushed out to customers during the time you were there?

19  **A.**  No.

20  **Q.**  When you were working for the NAC Foundation, did you ever

21  see any companies that had adopted the use of AML BitCoin?

22  **A.**  No.

23  **Q.**  What about governments?

24  **A.**  No.

25  **Q.**  When did you quit working at the NAC Foundation?

1    **A.**    New Year's Eve of 2019.

2    **Q.**    And why did you quit?

3    **A.**    Because for the fourth time, he could not pay me on time.

4    **Q.**    Did anyone else quit, to your knowledge, on the same day?

5    **A.**    My co-worker Kelsey Prevost.  She told me she was quitting

6    and I said, "Okay.  I'm also going to quit."

7    **Q.**    Okay.  And what did Mr. Andrade say to you when you quit?

8    **A.**    He thought I was being unreasonable for wanting to get

9    paid on time and that I was -- you know, like, I had to give

10   him more time.  This is ridiculous.  And then, ultimately, he

11   had accused me of stealing AML BitCoin's Tokens upon on my

12   departure.

13   **Q.**    And did you steal any AML BitCoin Tokens?

14   **A.**    No.

15   **Q.**    At the time that you were working for the NAC Foundation

16   and Mr. Andrade, did you ever take direction or instruction

17   from a man named Japheth Dillman?

18   **A.**    No.

19   **Q.**    Did you know Japheth Dillman?

20   **A.**    No.

21   **Q.**    Had you ever taken direction from a man named

22   Jack Abramoff?

23   **A.**    No.

24   **Q.**    Who did you take direction from when you were at

25   AML BitCoin?

1  **A.**    Marcus.

2  **Q.**    And who was your understanding of who was in charge at the

3  NAC Foundation and AML BitCoin?

4  **A.**    Marcus.

5          **MR. WARD:**  Okay.  Thank you.

6          **THE WITNESS:**  Thank you.

7          **THE COURT:**  Mr. Shepard?

8                          **CROSS-EXAMINATION**

9  BY MR. SHEPARD:

10  **Q.**    Good afternoon.  It's Ms. Cowan?  Am I pronouncing it

11  correctly?

12  **A.**    Yes.

13  **Q.**    I want to take you back to talking about the sock puppet

14  accounts, what you called the sock puppet accounts, for a

15  moment.

16      As I understand it, Ms. Foteh asked you to create some of

17  those; correct?

18  **A.**    Yes.

19  **Q.**    And the purpose of those was to combat some of the hate

20  that was circling -- that was surfacing on the social media

21  platforms; correct?

22          **MR. WARD:**  Objection.  Misstates Ms. Cowan's

23  testimony.

24          **THE COURT:**  Overruled.

25  \\\

BY MR. SHEPARD:

Q.   Do you need me to repeat it?

A.   Oh, go ahead.  Sure.

Q.   The purpose of those accounts was to combat some of the
hate that was surfacing on the social media streams; correct?

A.   Yes.

Q.   And the way you saw it, that practice was not too
dissimilar to buying followers, which was a common marketing
tactic; correct?

A.   Yes and no.

Q.   Well, didn't you say to the FBI when they interviewed you
in August of 2021 that this practice was not too dissimilar to
buying followers, which was a common marketing tactic?  Didn't
you say that?

A.   I did.

Q.   And you didn't say yes or no; you just said that this
practice was not too dissimilar to buying followers, which was
a common marketing tactic; correct?

A.   Yes, but --

Q.   Okay.  Now, you talked about updating or adding to the
website, and I think you said you did that after you were done
working for Ms. Foteh and started working for NAC.  You said
you did that at Mr. Andrade's direction; right?

A.   Yes.

Q.   But you don't know with whom he consulted before he asked

**COWAN - CROSS / SHEPARD**

1  you to do that; correct?

2  **A.**  Correct.

3  **Q.**  In the time that you worked with him, he frequently

4  proposed to do things he wasn't qualified to do; right?

5  **A.**  Can you repeat the question?

6  **Q.**  Sure.  He frequently proposed to do things that he was not

7  qualified to do?

8  **A.**  Such as?  Can you give me an example?

9  **Q.**  Well, do you remember being interviewed by the FBI on

10  August 12th, 2021?

11  **A.**  Yes.

12  **Q.**  And you told them at that time that he frequently proposed

13  to do things that he was not qualified to do, didn't you?

14  **A.**  Yes.

15  **Q.**  And at the time you quit -- and understandably so, given

16  that you weren't getting paid, so I don't mean anything

17  pejoratively with the word "quit" -- Marcus was in a spiral;

18  right?

19  **A.**  After --

20      **MR. WARD:**  Objection.  Vague.

21      **THE WITNESS:**  Yeah, I don't know what you mean.

22  BY MR. SHEPARD:

23  **Q.**  Back to the time you spoke to the FBI in August of 2021,

24  you used the word "spiral," didn't you, and you said, "Marcus

25  was in a spiral"?

COWAN - CROSS / SHEPARD

1  **A.**    I don't know in the context that I -- what I meant when I

2  said that.

3  **Q.**    But leaving the context aside for just a moment, you did

4  say he was in a spiral, didn't you?

5  **A.**    I guess so.

6  **Q.**    And to give you a little more context, what you said was

7  he didn't know even the passwords to his own accounts, although

8  you had left them for him; correct?

9  **A.**    Yes.

10  **Q.**    And it sounded like you worked with him rather closely for

11  some period of time; correct?

12  **A.**    Yes.

13  **Q.**    And he was a dreamer; right?

14  **A.**    Definitely.

15  **Q.**    And you were asked some questions by Mr. Ward about some

16  of the deals to accept AML BitCoin that Mr. Andrade was trying

17  to accomplish.   Remember that?

18  **A.**    Yes.

19  **Q.**    And you talked to Marcus about that on a number of

20  occasions; correct?

21  **A.**    Yes.

22  **Q.**    And you heard him talk about those potential deals on a

23  number of occasions; correct?

24  **A.**    Yes.

25  **Q.**    And your impression was that he believed they were all

COWAN - CROSS / SHEPARD

1   going to happen; right?

2   **A.**   Yes.

3   **Q.**   You talked about this time in the late summer or early

4   fall of 2018 when you tested the application, the CrossVerify

5   application.  Do you recall that?

6   **A.**   Yes.

7   **Q.**   And CrossVerify was -- they were supplying the biometric

8   identification piece of the AML BitCoin; correct?

9   **A.**   Yes.

10  **Q.**   And so they came out and said it was almost done; right?

11  **A.**   Who's "they"?

12  **Q.**   "They," the people from CrossVerify.

13  **A.**   They said it was ready to start testing.

14  **Q.**   Okay.  They said it was ready to start testing.  So they

15  thought it was in good shape; right?  That's what they were

16  saying?

17  **A.**   Sure.  Yeah.

18  **Q.**   And you and Ms. Cowan-Tran, you both tested it and it

19  didn't work well; right?

20  **A.**   Right.  Yes.

21  **Q.**   And it wouldn't work on Mr. Andrade's Motorola at all;

22  right?

23  **A.**   Right.  Yeah.

24  **Q.**   You were asked to test it because I guess you had

25  iPhones --

COWAN - CROSS / SHEPARD

1    **A.**    Yes.

2    **Q.**    -- correct?

3    **A.**    Yes.

4    **Q.**    And Marcus was very frustrated about that; right?

5    **A.**    Yes.

6    **Q.**    And there was also work being done that you were aware of

7    on the VIN network by a company in India; right?

8    **A.**    Yes.

9    **Q.**    And that related to what the people in London at

10   CrossVerify were doing; correct?

11   **A.**    Yes.

12   **Q.**    And the way you saw it, that application was also full of

13   bugs; correct?

14   **A.**    Yes.

15   **Q.**    And Marcus was unhappy because the team in India wasn't

16   working fast enough; right?

17   **A.**    Yes.

18   **Q.**    And your perspective on that -- it seems like it makes

19   sense to me -- is you didn't think that outsourcing to India

20   was a good idea; right?

21   **A.**    Yes.

22   **Q.**    They seemed like they didn't know what they were doing;

23   right?

24   **A.**    Yes.

25   **Q.**    And there was another person who worked with Marcus on the

1    technology, a guy named Sergey; right?

2    **A.**    The name sounds familiar, yes.

3    **Q.**    And you spoke to him a few times; right?

4    **A.**    Probably.  The name sounds familiar, but I don't recall.

5    **Q.**    I'm sorry.  I didn't hear the last part.

6    **A.**    The name sounds familiar.  I just don't recall my

7    conversations with him.

8    **Q.**    Okay.  You regarded Sergey as sort of the de facto chief

9    technology officer of the company; right?

10   **A.**    Yes.

11   **Q.**    And you actually thought he was pretty smart; right?

12   **A.**    I really don't remember him, so I can't say for sure.

13   **Q.**    Okay.  Well, you remembered him when you spoke to the FBI

14   in 2021, didn't you?

15   **A.**    Sure, but that was four years ago.  So...

16   **Q.**    Yeah.  Understood.

17   **A.**    Yeah.

18   **Q.**    We all --

19   **A.**    Yeah.

20   **Q.**    Things leave our mind.  I get that.  I'm not being

21   critical.

22        But in 2021, you said he was the de facto chief technology

23   officer and he was brilliant; right?

24   **A.**    Okay.  If that's what I said, yeah.

25   **Q.**    Turning to marketing again for a moment, based on your

**COWAN - CROSS / SHEPARD**

1  time working with Marcus, he was not capable of any form of

2  sophisticated writing; correct?

3  **A.**  Correct.

4  **Q.**  He could speak fine, but he did not keep his conversations

5  focused; correct?

6  **A.**  It depends on the conversation.  I'm not sure.

7  **Q.**  Okay.  Well, I take you back to the conversation you had

8  with the FBI in August of 2021.  You told them that Marcus

9  could speak fine but he did not keep his conversations focused;

10  right?

11  **A.**  Sure.  Yes.

12  **Q.**  And one of the many duties that you had was to take

13  dictation from Marcus and then improve the language so he would

14  sound more educated; correct?

15  **A.**  "More educated" isn't a great word, but to make him -- to

16  make it sound more concise, sure.

17  **Q.**  Okay.  And when you spoke to the FBI, do you recall using

18  the word "more educated"?

19  **A.**  Perhaps in a -- in, like, a general sense, but it's more

20  concise language.

21  **Q.**  Okay.  Okay.

22  **A.**  Yeah.

23  **Q.**  What he would have written, what he was dictating to you,

24  you thought needed some improvement; correct?

25  **A.**  Yes.

1  **Q.**  And there was one other man I wanted to ask you about, a

2  guy named Terrence Poon.  You remember that name, don't you?

3  **A.**  Yes.

4  **Q.**  And he'd been working with Marcus on Aten Coin and also on

5  AML BitCoin; correct?

6  **A.**  From what I understand, yes.

7  **Q.**  And he was very close to Marcus; correct?

8  **A.**  I would assume so.

9  **Q.**  Well, sorry to go back to 2021 again, but when you talked

10  to the FBI in August of 2021, you said Terrence Poon was very

11  close to Marcus, didn't you?

12  **A.**  From what I understand, yes.

13      **MR. SHEPARD:**  One moment.

14      If I may approach.

15      **THE COURT:**  You may.

16  **BY MR. SHEPARD:**

17  **Q.**  I'm going to show you what's been marked as Exhibit 3170

18  and ask you to take a -- take a look at it.

19  **A.**  Okay.

20  **Q.**  Feel free to page through it.  And what I'm going to ask

21  you is:  Is that something you recognize?  Did you have

22  anything to do with it?

23  **A.**  (Witness examines document.)  Yes.

24  **Q.**  Okay.  So tell me what it is.

25  **A.**  So these are purchase agreements from direct sales before

1    the ICO.

2    **Q.**    And you collected those and put them in that binder?

3    **A.**    Yes.

4    **Q.**    And was that at Marcus's direction?

5    **A.**    Yes.

6    **Q.**    And did you do your best to collect the purchase

7    agreements and the other materials in there?  And it looks like

8    everything is nicely tabbed.  And that was all your work;

9    correct?

10   **A.**    Yes.

11            **MR. SHEPARD:**  I offer 3170.

12            **MR. WARD:**  No objection.

13            **THE COURT:**  3170 will be admitted.

14        (Trial Exhibit 3170 received in evidence.)

15   **BY MR. SHEPARD:**

16   **Q.**    I'll get that out of your way; and while I'm here, I will

17   return these to Mr. Ward.

18   **A.**    Thank you.

19   **Q.**    Mr. Ward asked you about a number of other binders that

20   you worked on and prepared, and there was -- that was part of

21   a -- some of those, at least, were part of a considerable

22   effort to get material together for Mr. Andrade's tax

23   accountant; correct?

24   **A.**    Yes.

25   **Q.**    Because he wanted to get his records together so his

1    accountants could work on his taxes; right?

2    **A.**    Yes.

3    **Q.**    And it seemed like there was a lot of time and effort put

4    into that; correct?

5    **A.**    Yes.

6    **Q.**    And at one point, I think you needed some information; and

7    Mr. Ward, I think, referred during your direct examination to

8    Mr. Andrade's business being searched.

9         Some of the information that you needed was taken in the

10    search; right?

11    **A.**    I don't understand the question.

12    **Q.**    Okay.  Some of the information that you were trying to

13    collect for the accountants had been seized by the Government

14    when they searched Mr. Andrade's business; correct?

15    **A.**    From what I understand, yes.

16    **Q.**    And one of the people you were working with relating to

17    Mr. Andrade's taxes was a guy named Raul Torres; right?

18    **A.**    Yes.

19    **Q.**    And Raul was one of Mr. Andrade's accountants; correct?

20    **A.**    Yes.

21    **Q.**    And you worked with him a fair amount; correct?

22    **A.**    In regards to, like, the binders, yes.

23    **Q.**    Yeah.  And he was trying to get Marcus's finances in

24    order, wasn't he?

25    **A.**    Trying, yes.

COWAN - CROSS / SHEPARD

1    Q.    Yes.  It was quite a job, wasn't it?

2    A.    It sure was.

3    Q.    And one of the reasons it was quite a job was he used many

4    different banks; right?

5    A.    Yes.

6    Q.    And not only did he use many different banks, but the

7    accounts, at least until you started getting them in order,

8    they appeared to be a mess; right?

9    A.    Yes.

10   Q.    And his personal and business accounts were mixed up;

11   right?

12   A.    Absolutely, yes.

13   Q.    And there was also a project I think while you were there,

14   a woman named Amanda was assigned the task of taking

15   screenshots of emails between Japheth Dillman, Jack Abramoff,

16   and others and Mr. Andrade; correct?

17   A.    Yes.

18   Q.    And that was around the time you -- that was around

19   September of 2019; correct?

20   A.    Probably.  I can't say for sure.

21   Q.    You thought Mr. Andrade was paranoid; right?

22   A.    Yes.

23   Q.    And one of the things that he did was he had you sign a

24   whole bunch of affidavits or declarations about conversations

25   that you had overheard; correct?

**COWAN - CROSS / SHEPARD**

1  **A.**   Yes.

2  **Q.**   And I don't mean to say "overheard" pejoratively.  He

3  asked you to listen to conversations, and then he would have

4  you write up a sworn statement about what you heard?

5  **A.**   Yes.

6  **Q.**   And so you heard conversations like with a man named --

7  with Marcus talking to Richard Naimer when they were talking

8  about a deal that Richard Naimer and Jack Abramoff wanted to

9  make with Mr. Andrade about his patents and his business;

10  correct?

11  **A.**   Yes.

12  **Q.**   And that was in October of 2019; correct?

13  **A.**   If that's what the affidavit said.

14  **Q.**   Okay.  Well, let me see if I can -- hold on one second.

15              (Pause in proceedings.)

16          **MR. SHEPARD:**  I'm going to come back to that one in

17  one second.

18  **Q.**   You were shown Exhibit 1442.  Remember that?

19       I'll ask one of our tech people -- this was Government

20  Exhibit 1442.  It was the small little sheet of paper that you

21  used to calculate up some values of digital currencies.

22  **A.**   I recall that.  The Post-it Note?

23  **Q.**   Yeah.

24  **A.**   Yes.

25  **Q.**   1442.

1    Does anyone have that handy?  1422.  I'm sorry.

2    Thank you.  Anybody have it?

3    Well, it's okay.  You remember it.

4  A.  I remember it, yes.

5  Q.  We'll keep going.

6    The value of digital currency, certainly as we've seen

7  recently, bounces around quite a bit; correct?

8  A.  Correct.

9  Q.  And I take it you don't have information about when, if

10  ever, the digital currencies that you noted and added up, when

11  they were turned into what cryptocurrency people call Fiat

12  currency?  You don't know whether or when it was turned into

13  Fiat currency and what the value was at the time; correct?

14  A.  Correct.  I don't know.

15  Q.  Okay.  So thanks to people who are better organized than I

16  am, I'd now like to put up just for the witness, the Court, and

17  Counsel, Exhibit 2019, page 3.

18    Are you able to see that?

19  A.  Yes.

20  Q.  And that's one of these sworn declarations that

21  Mr. Andrade asked you to prepare; correct?

22  A.  Yes.

23  Q.  And in it, you are recounting this conversation that I

24  mentioned between Richard Naimer and Marcus; correct?

25  A.  Correct.

1            **MR. WARD:**  Objection, Your Honor.  This is hearsay.

2            **MR. SHEPARD:**  I'm never going to offer it for the

3    truth.  I may offer it just because it is a good bit of indicia

4    of paranoia.

5            **THE COURT:**  To the extent you were to offer it, I

6    would sustain the objection because it's hearsay.  So if you

7    want to use it for some other purpose --

8            **MR. SHEPARD:**  Okay.

9            **THE COURT:**  -- go ahead, but it's not coming in.

10           **MR. SHEPARD:**  Like I said, I'm not offering it for the

11   truth, and it sounds like, based on what you said, I'm not

12   offering it at all.

13           **THE COURT:**  Well, I haven't heard your basis for --

14   saying "I'm offering it for paranoia" is not telling me very

15   much, so --

16           **MR. SHEPARD:**  I'm offering it to reflect the fact that

17   Mr. Andrade was paranoid, and this is a manifestation of it,

18   declarations like this.

19           **THE COURT:**  This witness has already -- this document

20   is not necessary for that point.

21           **MR. SHEPARD:**  Okay.  That's fine.  That's fine,

22   Your Honor.

23           **THE COURT:**  All right.

24           **MR. SHEPARD:**  That is all.  That is the only point I

25   wanted to make with it, so it sounds like I've already made it

1    to the extent I can.

2        Let me lastly go to Exhibit 38, Government Exhibit 38.  If

3    we can get that one back on the screen.

4    **Q.**    And I think when Mr. Ward put this on the screen, he was

5    asking you if there were over a million dollars in post-ICO

6    sales.  We could all -- I would say we could all add it up, but

7    my addition isn't that good.

8        But I wanted to ask you something different, which is:

9    During this period of time, you don't know how much money went

10   to CrossVerify for that tech work that those people came over

11   and delivered and didn't work?  You don't know how much was

12   spent on that; right?

13   **A.**    No.

14   **Q.**    And you don't know how much the people in India who were

15   working, not effectively from your perspective, you don't know

16   how much money was spent on that either; correct?

17   **A.**    Correct.

18   **Q.**    And you don't know whether Mr. Andrade ultimately

19   mortgaged his home to put money back into the business, do you?

20   **A.**    No.

21           **MR. SHEPARD:**  I don't have anything further.

22           **THE COURT:**  Thank you.

23                  <u>**REDIRECT EXAMINATION**</u>

24   **BY MR. WARD:**

25   **Q.**    Ms. Cowan, Mr. Shepard asked you about your collecting

1    documents for Mr. Andrade.  Was Mr. Andrade asking you to

2    collect documents to prepare his tax returns?

3    **A.**    Yes.

4    **Q.**    Do you know how many years he failed to file tax returns?

5    **A.**    Some were as far back as 2017, maybe 2016.

6    **Q.**    And were these -- do you know whether they were his

7    personal taxes or the business taxes or both?

8    **A.**    Both.

9    **Q.**    All right.  Mr. Shepard asked you about the sock puppet

10   accounts and asked you about your interview with the FBI

11   regarding those accounts.

12        Do you remember, when you talked to the FBI in 2024,

13   telling them how you felt about working on the sock puppet

14   accounts?

15   **A.**    Yes.

16   **Q.**    And what did you say?

17        **MR. SHEPARD:**  Objection.  This is -- she's being asked

18   to recite what she said to the FBI, and it's not --

19        **THE COURT:**  Well, you were asking her to do that in

20   your examination as well.

21        So what is the objection?

22        **MR. SHEPARD:**  If he wants to ask her what she thinks

23   about the sock puppet accounts --

24        **THE COURT:**  Yeah, why don't you do it that way.

25        **MR. SHEPARD:**  -- that's a different question.

PROCEEDINGS

```
 1          THE COURT:  I agree.  Ask her that.
 2   BY MR. WARD:
 3   Q.   Ms. Cowan, how do you feel now about the work you did on
 4   the fake sock puppet accounts?
 5   A.   That it was extremely unethical and it wasn't the right
 6   thing to do.
 7          MR. WARD:  Thank you.
 8          THE WITNESS:  Thank you.
 9          MR. WARD:  Nothing further.
10          THE COURT:  You may step down.  Thank you.
11                  (Witness excused.)
12          THE COURT:  Members of the jury, we've reached the end
13   of the day.  Remember my admonitions, do not discuss this
14   matter with anybody, amongst yourselves or anybody else.  Don't
15   do any research.  Don't think about it.
16      See you tomorrow at 8:30.
17    (Proceedings were heard out of the presence of the jury.)
18          THE COURT:  Okay.  We're out of the presence of the
19   jury.
20      Who are the witnesses for tomorrow?
21          MR. HIGHSMITH:  David Salmon, Evan Carlsen, Melissa
22   Foteh, Carlos De La Guardia; and if we get there, we've got
23   John Szeder and Hung Tran.
24          THE COURT:  Okay.  Let's see.  Dennis -- David Salmon.
25   Yes.  Next?
```

PROCEEDINGS

1      **MR. HIGHSMITH:**  Evan Carlsen.

2      **THE COURT:**  Carlsen.

3      **MR. HIGHSMITH:**  Melissa Foteh, Carlos De La Guardia.

4  We may call Carlos De La Guardia before Melissa Foteh,

5  Your Honor.

6      **THE COURT:**  All right.

7      **MR. HIGHSMITH:**  Next we've got John Szeder and

8  Hung Tran.

9      **THE COURT:**  John Szeder.

10      Okay.  Would that you were able to get through that list,

11  because it's really slow, I mean, we're getting two witnesses a

12  day; and at this pace, I shudder to think how long we're going

13  to be at it.  So, hopefully, you are scaling this down to some

14  extent.  Both sides could maybe target their examinations a

15  little bit more and not kind of meander.

16      So are you on track?

17      **MR. HIGHSMITH:**  We're close.

18      **THE COURT:**  Okay.

19      **MR. HIGHSMITH:**  We're close, Your Honor.  We're really

20  targeting coming in at under three weeks.  We're coming in

21  at -- I'd love to come in Wednesday, Thursday next week.

22      **THE COURT:**  Okay.  All right.  I'll give the defense a

23  hard time when it's their turn, so I'll leave them alone for

24  the moment.

25      **MR. SHEPARD:**  We're looking forward to it.

PROCEEDINGS

1          **THE COURT:**  Yes, but it behooves everybody that this

2     case not just linger along.  I mean, it really needs to get

3     going.

4          Okay.  See you tomorrow.

5               (Proceedings adjourned at 1:29 p.m.)

6                        ---o0o---

7

8                    **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10    from the record of proceedings in the above-entitled matter.

11

12    DATE:  Tuesday, February 18, 2025

13

14

15

16

17    _____

18          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

19          CSR No. 7445, Official United States Reporter

20

21

22

23

24

25