1    MICHAEL J. SHEPARD (Bar No. 91281)
        *mshepard@kslaw.com*
2    **KING & SPALDING LLP**
     50 California Street, Suite 3300
3    San Francisco, California 94111
     Telephone:    +1 415 318 1200
4    Facsimile:    +1 415 318 1300

5    KERRIE C. DENT (Admitted *pro hac vice*)
        *kdent@kslaw.com*
6    **KING & SPALDING LLP**
7    1700 Pennsylvania Avenue, NW, Suite 900
     Washington, DC 20006-4707
8    Telephone:    +1 202 626 2394
     Facsimile:    +1 202 626 3737
9
     CINDY A. DIAMOND (SBN 124995)
10      *cindy@cadiamond.com*
     **ATTORNEY AT LAW**
11   58 West Portal Avenue, #350
12   San Francisco, CA 94127
     Telephone:    +1 408 981 6307
13
     Attorneys for Defendant
14   ROWLAND MARCUS ANDRADE

15                   **UNITED STATES DISTRICT COURT**

16                  **NORTHERN DISTRICT OF CALIFORNIA**

17                       **SAN FRANCISCO DIVISION**

18

19   UNITED STATES OF AMERICA,              Case No. 3:20-CR-00249-RS

20               Plaintiff,                 **DEFENDANT MARCUS ANDRADE'S**
                                            **MOTION FOR NEW TRIAL AND FOR**
21        v.                                **JUDGMENT OF ACQUITTAL**

22   ROWLAND MARCUS ANDRADE,                Judge:      Hon. Richard Seeborg
                                            Hearing:    June 17, 2025, 9:30 am
23               Defendant.

24

25

26

27

28

---

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT          CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ III

I.    INTRODUCTION ...................................................................................................... 1

II.   THE COURT MADE THREE CRITICAL ERRORS IN INSTRUCTING THE JURY .......... 1

    A.  Mr. Andrade Is Entitled to a New Trial Because the Court's Instructions Allowed the
        Jury to Convict Mr. Andrade of Money Laundering for Conduct Other than that
        Charged by the Grand Jury ............................................................................. 2

    B.  Mr. Andrade Is Entitled to a New Trial Because the Court Did Not Properly Instruct
        the Jury About Good Faith .............................................................................. 5

    C.  Mr. Andrade Is Entitled to a New Trial (and a Judgment of Acquittal) Because the
        Court Refused to Give a Multiple Conspiracies Jury Instruction, Despite Evidence
        that the Lone Wire Did Not Further the Scheme ................................................ 8

        2.  There Was More than Ample Evidence of Multiple Schemes ........................ 9

            a.  Dillman's separate scheme ............................................................. 9

            b.  Abramoff's Separate Schemes. ...................................................... 11

        3.  At a Minimum, a New Trial Is Therefore Required .................................. 12

        4.  A Judgment of Acquittal Should Be Entered ......................................... 13

III.  THE GOVERNMENT PRESENTED MISLEADING TESTIMONY IN VIOLATION
      OF NAPUE v. ILLINOIS, AND IT KNEW OR SHOULD HAVE KNOWN THE
      TESTIMONY WAS MISLEADING ............................................................................ 13

    A.  There Were Many Deceptions Behind the Government's Presentation of Exhibit 805 .... 14

    B.  The Government Knew or at Least Should Have Known that the Testimony It
        Offered and the Argument It Made Was Misleading ......................................... 16

    C.  These Deceptions Require, at a Minimum, a New Trial ..................................... 17

IV.   THE COURT'S EVIDENTIARY RULINGS DEPRIVED MR. ANDRADE OF A
      FAIR TRIAL ........................................................................................................ 19

    A.  The Court Erroneously Excluded Exculpatory Evidence Based Largely on Erroneous
        Application of Hearsay Rules ......................................................................... 19

    B.  The Court Admitted, Over Defense Objections, Incompetent Evidence Offered by the
        Government ................................................................................................. 29

    C.  The Court Placed Date-Based Restrictions on Evidence in the Defense Case After the
        Government Was Allowed to Present Evidence Regardless of Dates ................... 32

    D.  The Court Erroneously Admitted Rule 404(b) and Other Unfairly Prejudicial
        Evidence ..................................................................................................... 33

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E.  The Court Erred in Limiting Impeachment of Government Witnesses ............................ 34

    1.   The Court Erred in Limiting Impeachment Allowed by Rule 806 ............................. 34

    2.   The Court Erred in Limiting Impeachment Based on Prior Inconsistent Statements
       Under Rule 613 ....................................................................................................... 38

V.  THE COURT ERRED IN DENYING MR. ANDRADE'S CONTINUANCE AND
OTHER MOTIONS, PREJUDCING THE DEFENSE AND VIOLATING MR.
ANDRADE'S CONSTITUIONAL RIGHTS .......................................................................... 41

VI. THIS ACCUMULATION OF ERRORS WAS IN NO WAY HARMLESS ......................... 42

CONCLUSION ........................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v Montgomery*,
  2022 WL 868889 (CD Cal. Jan. 27, 2022) ............................................................... 17

*Brady v. Maryland*,
  373 U.S. 83 (1963) ........................................................................................ 19, 40, 42

*Bush v. United States*,
  267 F.2d 483 (9th Cir. 1959) .................................................................................. 39

*Carter v. Kentucky*,
  450 U.S. 288,304 (1981) .......................................................................................... 5

*Chambers v. Mississippi*,
  410 U.S. 284 (1973) ........................................................................................... 35, 38

*Clements v. Madden*,
  112 F.4th 792 (9th Cir. 2024) ................................................................................ 18

*DePetris v. Kuykendall*,
  239 F.3d 1057 (9th Cir. 2001) ............................................................................... 28

*Dow v. Virga*,
  729 F.3d 1041 (9th Cir. 2013) ............................................................................... 18

*Government of Virgin Islands v. Brown*,
  685 F.2d 834 (3d Cir. 1982) .................................................................................... 4

*Hayes v. Brown*,
  399 F.3d 972 ........................................................................................... 17, 18, 19

*Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Labor Ass'n of U.S.*
  *Pension Tr.*,
  153 F. Supp. 3d 1217 (E.D. Cal. 2015) ................................................................. 22

*Jackson v. Brown*,
  513 F.3d 1057 (9th Cir. 2008) ............................................................................... 17

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ................................................................................................ 18

*Maxwell v. Rose*,
  628 F.3d 486 (9th Cir. 2010) .................................................................................. 17

iii

*Montana v. Egelhoff*,
    518 U.S. 37 (1996) ................................................................................ 28

*Napue v. Illinois*,
    360 U.S. 264 (1959) .............................................................. 1, 17, 18, 19

*Panah v. Chappell*,
    935 F.3d 657 (9th Cir. 2019) ................................................................ 17

*Phillips v. Ornoski*,
    673 F.3d 1168 (9th Cir. 2012) ........................................................ 17, 19

*Schmuck v. United States*,
    489 U.S. 705 (1989) .............................................................................. 13

*Searway v. United States*,
    184 F. 716 (8th Cir. 1910) .................................................................... 39

*Sherman v. Gittere*,
    92 F.4th 868 (9th Cir. 2024) ............................................................ 28, 42

*Territory of Guam v. Marquez*,
    963 F.2d 1311 (9th Cir. 1992) .............................................................. 42

*United States v. Ayers*,
    924 F.2d 1468 (9th Cir. 1991) .............................................................. 32

*United States v. Baird*,
    712 F.3d 623 (1st Cir. 2013) ................................................................... 5

*United States v. Barham*,
    595 F.2d 231 (5th Cir.1979) .................................................................. 18

*United States v. Barkley*,
    985 F.2d 574, 1993 WL 11858 (9th Cir. 1993) ..................................... 7

*United States v. Becerra*,
    939 F.3d 995 (9th Cir. 2019) ................................................................ 42

*United States v. Berry*,
    627 F.2d 193 (9th Cir. 1980) ................................................................ 43

*United States v. Brandon*,
    17 F.3d 409 (1st Cir. 1994) ................................................................... 12

*United States v. Bullcalf*,
    563 F. App'x 535 (9th Cir. 2014) ......................................................... 38

iv

*United States v. Cisneros-Gutierrez,*
517 F.3d 751 (5th Cir. 2008) ........................................................................ 39

*United States v. Corona,*
41 F. App'x 33 (9th Cir. 2002) ..................................................................... 20

*United States v. Dean,*
487 F.3d 840 (11th Cir. 2007) ........................................................................ 5

*United States v. Dennis,*
625 F.2d 782 (8th Cir. 1980) ........................................................................ 39

*United States v. Dorsey,*
418 F.3d 1038 (9th Cir. 2005) ........................................................... 22, 24, 28

*United States v. Escobar de Bright,*
742 F.2d 1196 (9th Cir.1984) ......................................................................... 5

*United States v. Fernandez,*
388 F.3d 1199 (9th Cir. 2004) ........................................................................ 8

*United States v. Friedman,*
854 F.2d 535 (2d Cir. 1988) .............................................................. 34, 35, 38

*United States v. Gajo,*
290 F.3d 922 (7th Cir. 2002) ........................................................................ 39

*United States v Garcia-Villanueva,*
855 F.2d at *2 ............................................................................................. 21

*United States v. Gering,*
716 F.2d 615 (9th Cir. 1983) .......................................................................... 7

*United States v. Ghazaleh,*
58 F.3d (6th Cir. 1995) ................................................................................ 12

*United States v. Gianandrea,*
38 F. App'x 434 (9th Cir. 2002) .................................................................. 6, 7

*United States v. Gibson,*
675 F.2d 825 (6th Cir. 1982) ........................................................................ 20

*United States v. Gilley,*
836 F.2d 1206 (9th Cir. 1988) ........................................................................ 4

*United States v. Graham,*
123 F.4th 1197 (11th Cir. 2024) ................................................................... 43

v

*United States v. Hadley*,
 431 F.3d 484 (6th Cir. 2005)......................................................................................... 39

*United States v. Higa*,
 55 F.3d 448(9th Cir. 1995).......................................................................................... 39

*United States v. Iglesias*,
 535 F.3d 150 (3d Cir. 2008)......................................................................................... 39

*United States v. Johnson*,
 459 F.3d 990 (9th Cir. 2006).......................................................................................... 5

*United States v. Kaplan*,
 490 F.3d 110 (2d Cir. 2007)......................................................................................... 30

*United States v. Kramer*,
 2020 WL 5408165 (N.D. Cal. Sept. 9, 2020) ............................................................... 1

*United States v. Kuzniar*,
 881 F.2d 466 (7th Cir. 1989).......................................................................................... 7

*United States v. LaPage*,
 231 F.3d 488 (9th Cir. 2000)......................................................................................... 18

*United States v. Lin*,
 2018 U.S. Dist. LEXIS 68194 (N.D. Cal. Apr. 23, 2018) ............................................ 19

*United States v. Lopez*,
 913 F.3d 807 (9th Cir. 2019)......................................................................................... 19

*United States v. Lothian*,
 976 F.2d 1257 (9th Cir. 1992).......................................................................................... 8

*United States v. Mc Kee*,
 506 F.3d 225 (3d Cir. 2007)........................................................................................... 4

*United States v. McBride*,
 862 F.2d 1316 (8th Cir. 1988).......................................................................................... 7

*United States v McHenry*,
 951 F.2d 364, 1991 WL 278830 (9th Cir. 1991) ........................................................... 7

*United States v. Mena-Robles*,
 4 F.3d 1026 (1st Cir. 1993) .......................................................................................... 12

*United States v. Mendoza*,
 2022 WL 958381 (N.D. Cal. Mar. 30, 2022)................................................................. 1

*United States v. Miller*,
  891 F.3d 1220 (3d Cir. 2018)............................................................................ 4

*United States v. Moe*,
  781 F.3d 1120 (9th Cir. 2015) ........................................................................... 8

*United States v. Montana*,
  199 F.3d 947 (7th Cir. 1999) ........................................................................... 28

*United States v. Moreno*,
  233 F.3d 937 (7th Cir. 2000) ........................................................................... 28

*United States v. Narciso*,
  446 F. Supp. 252 (E.D. Mich. 1977) .................................................................. 7

*United States v. Ocegueda-Ruiz*,
  663 F. App'x 560 (9th Cir. 2016) ................................................................... 8, 9

*United States v. Pang*,
  362 F.3d 1187 (9th Cir. 2004) ......................................................................... 22

*United States v. Rogers*,
  549 F.2d 490 (8th Cir 1976)............................................................................ 39

*United States v. Rubier*,
  651 F.2d 628 (9th Cir. 1981) (per curiam) ...................................................... 22

*United States v. Saada*,
  212 F.3d 210 (3d Cir. 2000)............................................................................ 36

*United States v. Shuemake*,
  124 F.4th 1174 (9th Cir. 2024)........................................................................ 39

*United States v. Sine*,
  493 F.3d 1021 (9th Cir. 2007), *as amended* (July 17, 2007) ........................... 32

*United States v. Singh*,
  924 F.3d 1030 (9th Cir. 2019).......................................................................... 13

*United States v. Sotelo-Murillo*,
  887 F.2d 176 (9th Cir. 1989).......................................................................... 5, 42

*United States v. Straker*,
  800 F.3d 570 (D.C. Cir. 2015) (per curiam) .................................................... 17

*United States v. Truman*,
  688 F.3d 129 (2d Cir. 2012)............................................................................ 39

*United States v. Vicaria*,
12 F.3d 195 (11th Cir. 1994) ................................................................. 7

*United States v. Voorhies*,
658 F.2d 710 (9th Cir.1981) ................................................................. 32

*United States v. Walker*,
25 F.3d 540 (7th Cir. 1994) ................................................................. 12

*United States v. Wallace*,
848 F.2d 1464 (9th Cir.1988) ................................................................. 43

*United States v. Ward*,
747 F.3d 1184 (9th Cir. 2014) ................................................................. 3, 4, 5

*United States v. White*,
116 F.3d 903 (D.C. Cir. 1997) (per curiam) ...................................... 35, 36

*United States v. Williams*,
668 F.2d 1064 (9th Cir.) ................................................................. 40

*United States v. Ziska*,
267 F. App'x 717 (9th Cir. 2008) ...................................................... 33

*Wagner v. County of Maricopa*,
747 F.3d 1048 (9th Cir. 2013) ................................................................. 28

*Woods v. United States*,
279 F. 706 (4th Cir. 1922) ................................................................. 39

*Zurmot v. Borders*,
483 F. Supp. 3d 788 (N.D. Cal. 2020) ................................................ 18

**Other Authorities**

3 Wright & Miller, Federal Practice & Procedure § 581 (5th ed.) ........... 18

Fed. R. Evid. Rule 102 .................................................................... 36, 38

Fed. R. Evid. Rule 29 ...................................................................... 13

Fed. R. Evid. Rule 403 .................................................................... 30

Fed. R. Evid. Rule 404(b) ............................................................... 33

Fed. R. Evid. Rule 608(b) ............................................................... 35, 36

Fed. R. Evid. Rule 613 .................................................................... 38

Fed. R. Evid. Rule 613(b) ................................................................................. 39

Fed. R. Evid. Rule 801(d)(1)(A) ....................................................................... 39

Fed. R. Evid. Rule 806 ................................................................... 34, 35, 36, 37

Fed. R. Evid. Rule 806(c) ................................................................................. 34

Fed. R. Evid. Rules 608(b) and 806 ............................................... 34, 35, 38

Federal Rule of Criminal Procedure 33 .................................................... 1, 7, 18

Federal Rules of Criminal Procedure 487 ........................................................ 4

United States Constitution, Fifth Amendment ................................... 4, 21, 36

1

2   **I.      INTRODUCTION**

3          During the trial, the Court made an unusual request of the government: "the U.S. Attorney

4   has an obligation — wants to protect the record, a good record. So if you think, 'Oh, great, we

    just won that but he's totally out to lunch,' you ought to protect the record."  Tr. 2227.

5          The prosecutors did not heed the Court's request.[1]  To the contrary, the government

6   convinced the Court to refuse jury instructions to which Mr. Andrade was entitled and that were

7   critical for the jury's understanding of his defenses and for the protection of his constitutional

8   rights.  The government also repeatedly and successfully urged the Court to apply the rules of

9   evidence to allow the government to admit a flood of unfairly prejudicial, often incompetent

10  evidence, while limiting to a trickle the exculpatory evidence the defense was allowed to admit,

11  including the preclusion of evidence directly responsive to what the government was allowed to

12  admit. And the government compounded these errors by violating *Napue v. Illinois*, 360 U.S. 264

13  (1959), to fill an important gap in its proof.  For these and other reasons, a new trial is required

14  under Federal Rule of Criminal Procedure 33.

15  **II.     THE COURT MADE THREE CRITICAL ERRORS IN INSTRUCTING THE
            JURY**
16
           For issues that have been preserved, as Mr. Andrade did for each of the three errors
17
    identified below, "a motion for a new trial under Rule 33 may be granted for failure to give
18
    proper jury instructions" if the instructional error affects substantial rights. *United States v.*
19
    *Mendoza*, 2022 WL 958381, at *4 (N.D. Cal. Mar. 30, 2022) (quoting *United States v. Chang*,
20
    2020 WL 5702131, at *15 (N.D. Cal. Sept. 24, 2020)). *See also United States v. Kramer*, 2020
21
    WL 5408165, at *5 (N.D. Cal. Sept. 9, 2020) ("A motion for a new trial under Rule 33 may be
22

23  _____

24  [1] This brief sets out dozens of occasions in which the government did not heed the Court's advice,
    many of which gutted critical components of the defense.  *See* Declaration of Kerrie C. Dent,
25  Exhibit A (list of documents cited herein that were offered but not admitted by the Court) and
    Exhibit B (list of documents cited herein that were excluded but later admitted).  In response to
26  the specific government objection that triggered the Court's comment — a hearsay objection to a
    document reflecting Mr. Andrade's offer to provide Agent Quinn with AML Bitcoin's source
27  code, Tr. 2224-2227, the prosecutors assured the Court that it was "absolutely right on this one."
    Tr. 2227:15. It was not. *See* n. 25 *infra*.
28
                                                      1

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT                    CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

granted for failure to give proper jury instructions.")

### A. Mr. Andrade Is Entitled to a New Trial Because the Court's Instructions Allowed the Jury to Convict Mr. Andrade of Money Laundering for Conduct Other than that Charged by the Grand Jury

The grand jury charged Mr. Andrade with money laundering, alleging, *inter alia*, that he engaged in money laundering on or about March 7, 2018, when he knowingly conducted "a financial transaction." Indictment (June 22, 2020), ECF #1 at 5-6. The indictment specifically defines this transaction as "the purchase of a cashier's check drawn on an account held in the name of Fintech Fund Family LP involving $600,000 in United States Currency later deposited in an account in the name of Marcus Andrade." *Id.* At trial, the government put on evidence of a collection of at least ten financial transactions that it said related to the flow of money from Mr. Boyer to the purchase of real estate and an automobile by Mr. Andrade, one of which was the purchase of the $600,000 cashier's check.[2]

Before trial, defense counsel proposed a jury instruction for the money laundering charge that required the jury to find that "the defendant conducted or intended to conduct a financial transaction involving property that represented the proceeds of proceeds of the wire fraud charged in Count One, that is, the purchase of a cashier's check drawn on an account held in the name of Fintech Fund Family LP involving $600,000 in United States Currency later deposited in an account in the name of Marcus Andrade[.]" Parties' Joint Proposed Jury Instructions (Jan. 17, 2025), ECF #480 at 49:12-16. The government objected, *id*. at 51:6-27, and the Court did not include the instruction in its proposed instructions.

Before the instructions were given, Mr. Andrade re-raised the lack of any mention of the specific transaction that had been charged by the grand jury, first with the government and then

---

[2] This collection of financial transactions started with Boyer's wire of $730,000 to Block Bits Capital, and included a transfer from Block Bits Capital to a David Salmon Trust account, a transfer from there to NAC Payroll Services, then to a Fintech Fund account, followed by the purchase of the $600,000 cashier's check, as well as the transfer of an additional $400,000, also by cashier's check, which was then used to purchase a truck, while the $600,000 was deposited into an account at Woodforest Bank, where it was used in the purchase of two pieces of real estate. *See* Tr. 1963-1967; Ex. 1520-009.

2

1   with the Court, again to no avail.[3]  As a result, the jury was not instructed that the government

2   had to establish all the elements of money laundering as to the specific transaction charged in the

3   indictment – the purchase of the $600,000 cashier's check.  ECF #1 at 6:7-10.  Rather, it was

4   instructed only that it had to find, in pertinent part, that "the defendant conducted or intended to

5   conduct *a financial transaction* involving property that represented the proceeds of wire fraud."

6   Tr. 2963 (emphasis added).  Nor was the jury instructed that it had to find Mr. Andrade guilty of a

7   financial transaction that occurred on or about March 7, 2018, the date the charged in the

8   indictment – there was an instruction telling the jury that the government needed to prove that the

9   offense was committed on a date reasonably near the date charged in Count Two, Tr. 2960, but

10  the jury was never told what that date was or provided with the indictment so that it could figure

11  out what transaction had been charged as money laundering by the grand jury.

12          This failure to direct the jury in the instructions to the specific transaction alleged in the

13  indictment and its date "destroy[ed] the defendant's substantial right to be tried only on charges

14  presented in an indictment."  *United States v. Ward,* 747 F.3d 1184, 1191 (9th Cir. 2014) (quoting

15  *Stirone v. United States*, 361 U.S. 212, 217 (1960))  In *Ward,* the Ninth Circuit reversed identity

16  theft convictions, even though the jury was given a copy of the indictment, because the jury

17  instructions did not include the date of the offenses and the credit card numbers possessed alleged

18  in the indictment; the Court explained that when the proof includes uncharged conduct that would

19  _____

20  [3] With the government, defense counsel wrote to "follow[] up on [his] quick call to Dave [Ward]

21  earlier regarding our concerns on the money laundering elements as drafted and their omission of

    the transaction charged in the indictment."  The government responded: "That issue was settled

22  when Judge Seeborg finalized the jury instructions.  As he has said multiple times now, you have
    preserved your objections.  No need for further meet and confers on that issue, in our view."

23  Dent Decl., Exhibit E.

24  The defense then re-raised the issue with the Court, explaining that it was bringing the issue back
    "because it seemed so fundamentally wrong."  The Court inquired about whether the instruction

25  followed the pattern and then stated: "you've preserved your objection.  To the extent you
    haven't, I think you waived it because it is the last day, but it sounds like you preserved it, but I

26  am not going to change the instructions."  Tr. 2947:1-2, 22-25.  During the charging conference,
    the Court had stated that while the parties could memorialize their objections any way they

27  wanted, "I think you probably have preserved [instructions requested but not given] by virtue of
    having a different set."  Tr. 2641:6-8.

28

satisfy the same element, "we need some way of assuring that the jury convicted the defendant based solely on the conduct actually alleged in the indictment," which "typically" will be provided by jury instructions requiring the jury to find the conduct charged in the indictment before it may convict." Many other cases have also so held.[4]

Although Mr. Andrade preserved his objection to this instruction twice, this error is so fundamental that it would require correction even if no objection had been raised. *See United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) (in contrast with variance, "characterizing an instruction as a constructive amendment typically mandates reversal. . .”); *United States v. Mc Kee,* 506 F.3d 225, 229 (3d Cir. 2007) (a constructive amendment, which occurs when jury instructions "effectively amends the indictment by broadening the possible bases for conviction from that which appeared in the indictment," is "a per se violation of the fifth amendment's grand jury clause" and "our plain error analysis presumes prejudice"); *Government of Virgin Islands v. Brown,* 685 F.2d 834 (3d Cir. 1982) ("Where counsel has made timely objection as required by this rule, it is reversible error for the trial court to omit instructions on essential fact-findings"); Wright & Miller, *supra* (submitting a case to a jury without accurately defining the offense

---

[4] There are too many to list them all here. A collection of some of them are in *United States v. Miller*, 891 F.3d 1220, 1235-36 (3d Cir. 2018) (reversing false statement conviction when a specific false statement was charged in the indictment, the government offered evidence of multiple false statements, and the jury was instructed only that the defendant knowingly and intentionally furnished false information, explaining that the defendant's fifth amendment rights are violated when "the indictment alleges a violation of the law based on a specific set of facts, but the evidence and instructions then suggest that the jury may find the defendant guilty based on a different, even if related, set of facts," adding that "it is settled law in this circuit, as elsewhere, that the language employed by the government in the indictments becomes an essential and delimiting part of the charge itself, such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars," and also citing five other cases to that effect); Wright & Miller Federal Practice and Procedure, Federal Rules of Criminal Procedure, section 487 ("it is error to submit a case to a jury without accurately defining the offense charged . . . [t]he test is whether the instruction leaves no doubt as to the circumstances under which the crime can be found to have been committed"). By broadening the possible bases for conviction, this Court's erroneous instruction also violated Mr. Andrade's right to a unanimous jury verdict, as guaranteed by Article III section 2, and the sixth amendment of the constitution, *see United States v. Gilley*, 836 F.2d 1206, 1212-13 (9th Cir. 1988) – another issue addressed in Mr. Andrade's proposed instruction argument about the instruction. *See* ECF #480 at 52:23-54:20.

4

1    charged and its elements "is not excused or waived by failure to request a proper instruction").[5]

2    **B.  Mr. Andrade Is Entitled to a New Trial Because the Court Did Not Properly
3    Instruct the Jury About Good Faith**

4    A criminal defendant is entitled to a jury instruction "on any defense which provides a

5    legal defense to the charge against him and which has some foundation in the evidence, even

6    though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility."  *United*

7    *States v. Sotelo-Murillo*, 887 F.2d 176, 178 (9th Cir. 1989) (quoting *United States v. Yarbrough*,

8    852 F.2d 1522, 1541 (9th Cir. 1988); *United States v. Escobar de Bright*, 742 F.2d 1196, 1201

9    (9th Cir.1984) ("The right to have the jury instructed as to the defendant's theory of the case is

10   . . . 'basic to a fair trial'").  In deciding whether to give a requested instruction, a court must take

11   the evidence in the light most favorable to the defense, without making credibility determinations

12   or weighing conflicting evidence, with the standard of plausibility being quite low.  *United States*

13   *v. Baird*, 712 F.3d 623, 627 (1st Cir. 2013); *see also United States v. Johnson*, 459 F.3d 990, 993

14   (9th Cir. 2006) ("[T]he defendant is entitled to his proposed instruction even if his evidence is

15   "weak, insufficient, inconsistent, or of doubtful credibility. In assessing the evidence, we will

16   leave credibility determinations to the jury.").

17   Consistent with this precedent, Mr. Andrade timely requested a good faith instruction. *See*

18   ECF #480 at 45-48. Good faith was, from the start of the trial to the end, a central element of Mr.

19   ---

[5] Nor does it matter that there the government's forensic accountant Theresa Chiu made two
20   references to the $600,000 cashier's check as described in Count Two of the indictment. Tr. 1963,
1964.  There is no question that this Court's obligation to instruct the jury is not replaced by
21   anything that happened during the trial, or anything (other than an instruction) that was provided
to the jury. *See, e.g., Carter v. Kentucky,* 450 U.S. 288,304 (1981) (argument of counsel "could
22   not substitute for instructions by the court, and did not justify refusal of trial court" to give
requested instruction, adding that "jurors are not experts in legal principles; to function
23   effectively, and justly, they must be accurately instructed in the law")); *United States v. Ward,*
747 F.3d at 1192-93 (even a copy of the indictment is insufficient absent features that would
24   sufficiently clarify ambiguity); Wright & Miller, *supra*, section 485 ("it is the duty of the trial
judge to charge the jury on all essential questions of law").  Equally unimportant is that whether
25   the instruction follows a Ninth Circuit model (which in any event may assume the jury at least has
a copy of the indictment), because reliance on pattern instructions "are not precedent and cannot
26   solely foreclose the construction of the necessary elements of a crime as stated in the
statute." *United States v. Dean*, 487 F.3d 840, 852 (11th Cir. 2007).

27

28

5

1    Andrade's defense. Tr. 218:7-18 (calling out good faith as a theme of the defense); Tr. 219:7-

2    221:8 (citing to examples of good faith to watch for in the evidence); Tr. 3033:8-20 (returning to

3    Opening Statement theme of good faith). And Mr. Andrade's good faith defense was supported

4    by substantial evidence, such as his many and expensive efforts to build the technology to make

5    AML Bitcoin work, and his efforts to verify the accuracy of publicity before it went out,

6    including his rejection of proposed publicity about a meeting with the Port of San Francisco —

7    accurately based on Richard Naimer's firsthand report of the meeting — after Mr. Andrade

8    insisted that the publicity be ran past Port Commissioner Katz, who did not approve of it. *See,*

9    *e.g.,* Tr. 902:4-18; Ex. 3109.

10        The Court correctly decided that it would give a good faith instruction, but it erred when it

11    did not use the instruction requested by Mr. Andrade, and especially when its instruction omitted

12    Mr. Andrade's requested language that "[t]he defendant does not have to prove his good faith.

13    Rather, the government must prove beyond a reasonable doubt that the defendant acted with

14    intent to defraud." ECF #480 at 47:24-25. After the Court advised counsel about its good faith

15    instruction, Mr. Andrade objected to the omission of language about the burden of proof on good

16    faith. Tr. 2656-57 [6]

17        The omission of this language was a critical error. Not only was Mr. Andrade's good

18    faith the centerpiece of his defense, but in *United States v. Gianandrea*, 38 F. App'x 434, 436

19    (9th Cir. 2002) (reversing conviction), the Ninth Circuit found the omission from a good faith

20    instruction of language about the burden of proof on that issue to be error. This Court's election

21    not to tell the jury what the government had to establish about good faith — that the government

22    had to disprove good faith beyond a reasonable doubt — was in marked contrast to its specific

23    directions to the jury on what the government *did* have to establish beyond a reasonable doubt.

24    *See, e.g.,* Tr. 2961, 2963. As *Gianandrea* explained, this omission of burden of proof from the

25    _____

26    [6] The defense called out the omission from the Court's instruction of language that the defendant
     does not have to prove his good faith, noting that this language is "very important" and asking the
27    Court to it. The Court explained why it was not doing so, and added: So I heard you, you
     preserved the evidence, but I'm leaving it out." Tr.2657:1-7.

28

6

good faith instruction "likely left confusion in the jury's mind as to where the burden of proof lay with the good faith defense, and how high that burden was," and the omission "may have caused the jury to convict [the defendant] where it might not have done so had it known that the government had to *disprove* good faith beyond a reasonable doubt." *Id.* (emphasis in original).[7]

While other Ninth Circuit cases have decided that it is not an abuse of discretion to decline to give good faith instructions that place the burden of disproving good faith on the government, *see, e.g., United States v. Gering*, 716 F.2d 615 (9th Cir. 1983), the courts in those cases at least expressly told the jury that if the defendant acted in good faith, "the defendant must be acquitted," coupled with "the burden of proof never shifts from the government throughout the trial." *Id.* at 622; *see United States v McHenry*, 951 F.2d 364, 1991 WL 278830, at *4 & n.2 (9th Cir. 1991) (Table) ("if the evidence leaves you with a reasonable doubt whether the defendant entertained such good faith, you must then find that defendant not guilty"); *United States v. Seymour*, 576 F.2d 1345 (9th Cir. 1978) (same). In any event, even if the Ninth Circuit might find that the instruction in this case — which lacked any such direct connection with acquittal — would not be an abuse of discretion, this motion requires less. *See, e.g., United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994) ("The basis for granting a new trial under Rule 33 . . . is a broad standard" that "is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous.").[8] The Ninth Circuit in *Gianandrea* correctly noted the substantial risk of confusion created by a good faith instruction without the burden of proof, and there was no reason to risk any such confusion on this critical issue.

---

[7] *See generally United States v. Barkley*, 985 F.2d 574, 1993 WL 11858, at *1 (9th Cir. 1993) (Table) (good faith instruction included that "the burden is on the Government to prove beyond a reasonable doubt that each of the Defendants did not have a good faith misunderstanding of the law or a good faith belief that he or she was not violating the law").

[8] *See also United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (Rule 33 relief available where substantial rights of the defendant have been jeopardized by errors or omissions during the trial); *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988) (the "interest of justice" standard "requires the district court to balance the alleged errors against the record as a whole and evaluate the fairness of the trial); *United States v. Narciso*, 446 F. Supp. 252, 304 (E.D. Mich. 1977) ("[T]he very words of the rule 'interest of justice' mandate the broadest inquiry into the nature of the challenged proceeding.").

1

**C. Mr. Andrade Is Entitled to a New Trial (and a Judgment of Acquittal) Because the Court Refused to Give a Multiple Conspiracies Jury Instruction, Despite Evidence that the Lone Wire Did Not Further the Scheme**

2

3

Because a criminal defendant is entitled to a jury instruction "on any defense which

4

provides a legal defense to the charge against him and which has some foundation in the

5

evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful

6

credibility," *see* Part IIB, *supra*, Mr. Andrade was also entitled to a multiple conspiracies

7

instruction. As with the good faith instruction, in deciding whether to give this instruction, the

8

Court must take the evidence in the light most favorable to the defense, without making

9

credibility determinations or weighing conflicting evidence, with the standard of plausibility

10

being quite low. *See* Part IIB, *supra*.

11

**1. Background and Governing Legal Standards**

12

Before trial, defense counsel proposed a multiple schemes jury instruction.[9] ECF #480

13

(Jan. 17, 2025) at 43:1-6. The government objected and the Court did not include the

14

instruction.[10] "A multiple conspiracies instruction is warranted where a jury could reasonably

15

interpret the evidence presented at trial to show separate conspiracies and there is a risk that the

16

defendant may be convicted on the basis of acts committed by those in a conspiracy of which he

17

was not a part." *United States v. Ocegueda-Ruiz*, 663 F. App'x 560, 561 (9th Cir. 2016); *see*

18

*United States v. Moe*, 781 F.3d 1120, 1127 (9th Cir. 2015); *Anguiano*, 873 F.2d at 1317-18.

19

*United States v. Fernandez,* 388 F.3d 1199, 1247 (9th Cir. 2004) (multiple conspiracy instruction

20

required if theory of charged conspiracy "is supported by law and has some foundation in the

21

evidence"). Although the risks associated with multiple conspiracies often are absent when a

22

23

[9] The proposed instruction was properly modeled on the pattern instruction for multiple conspiracies. *See* United States Court of Appeals for the Ninth Circuit, MANUAL OF MODEL JURY INSTRUCTIONS, 11.3; *United States v. Lothian*, 976 F.2d 1257, 1262-63 (9th Cir. 1992)." ECF #480 at 44:8-11.

24

25

[10] While letting the parties preserve any objections as the parties saw fit, the Court declared that proposing the instruction probably preserved any objection to the Court not giving the instruction. Tr. 2641:6-10. In any event, the defense re-raised the issue after the Court circulated its proposed instructions, and the Court assured counsel that "you've preserved your record." Tr. 2673:24-25 to 2674:1-13.

26

27

28

8

defendant is tried alone, s*ee Anguiano*, 873 F.2d at 1318, that is not true where, as here, there is

evidence of a second conspiracy. *See Ocegueda-Ruiz*, 663 F. App'x at 561-62 (the fact that

defendant was tried alone negated the risk of multiple conspiracies only because the government

presented no evidence that was separate from the one with which he was charged).

### 2.   There Was More than Ample Evidence of Multiple Schemes

Before trial, the Court granted, over Mr. Andrade's objection, the government's motion to

admit co-conspirator statements of alleged co-conspirators Abramoff, Dillman, and Mata, and

ordered that all but one of the more than 100 statements could be admitted. Order (Jan. 30, 2025),

ECF #514 at 3. Abramoff, Dillman and Mata were indicted in related cases and were engaged in

conspiracies separate from, and in conflict with, the scheme for which Mr. Andrade was

convicted. There was plenty of evidence – none of which was questioned by the government --

that Mr. Andrade's alleged co-conspirators, David Mata, Japheth Dillman and Jack Abramoff,

were engaged in schemes involving activities that were separate from and in conflict with Mr.

Andrade's goals for AML Bitcoin.  That same evidence showed that they did so in ways that are

central to whether they were participating in a scheme in which Mr. Andrade knowingly

participated.

### a.   Dillman's separate scheme

Along with Mata, Dillman's separate scheme was to use Mr. Andrade's cryptocurrency to

convince potential buyers not to buy the coins from Mr. Andrade but instead to put their money

into Dillman's investment fund, which would acquire the coins as an investment, among other

investments.  Dillman hid this separate scheme from Mr. Andrade.[11]  The benefits of this separate

---

[11] Multiple, independent lines of evidence support this this fact. Ben Boyer, the purchaser who
sent the $730,000 wire to Block Bits Capital on January 12, 2018 — the wire that is at the core of
both counts of the indictment — dealt only with Dillman in making that purchase, having met
Dillman on an airplane and having been convinced by Dillman to acquire AML Bitcoins.
Tr. 582:10-25, 606:17-25; 607:1-12.  Boyer's agreement with Dillman was a share purchase
vehicle with Block Bits Capital that was explicitly an investment agreement in which he and other
members of Block Bits AML Holdings purchased shares of the company, the money was pooled,
and the purchases of AML tokens were made from the common fund.  Tr. 594:1-14. This was
very different the purchase agreement Boyer signed to purchase directly from NAC in October

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT            CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1  scheme for Dillman and Mata were to increase his assets under management so they could sell

2  their investment fund for, according to Dillman's plans, billions[12] to defraud Mr. Andrade by

3  fabricating a purported order for $50 million in AML tokens (Tr. 1818:14-17; 1819:2-5; Ex.

4  3047), which Dillman used to get a discounted price from Mr. Andrade on the much smaller

5  amount of coins he did buy — while cheating both Mr. Andrade and the coin purchasers by

6  skimming the discount for themselves; Tr. 598-600; and even plotting to take over Mr. Andrade's

7  company.[13]

8      In addition to having his ownership put at risk and being cheated out of money by

9  Dillman, Mr. Andrade suffered as a result of Dillman's separate scheme because Dillman's use of

10  Mr. Andrade's cryptocurrency to obtain investments in Dillman's fund undermined a central tenet

11  of Mr. Andrade's business — that his cryptocurrency was *not* an investment.  Mr. Andrade put

12  substantial effort into building his company around this tenet, Tr. 932:32-933:13; 2372:22-

13  2373:19, and used it to govern how he spent funds. Tr. 2379:23-2382:16.[14] These tenets were so

14  central to Mr. Andrade's business, and Mr. Andrade was so paranoid and compulsive about his

15  deal terms (recall that he turned down $100,000,000 for his patents over deal terms, Tr. 1815:23-

16

17  2018, which said that the purchase was not a pooled interest and was not being made for
   investment purposes, and that the AML purchaser expected no return on investment. Ex. 602;

18  Tr. 593:3-19.  *See also* Tr. 2157:16-25 to 2158:1-2 (government witness UCE Ling told Abramoff
   and UCE Gupta that was a "disconnect" between what Dillman told him and what Mr. Andrade

19  told him regarding the purchase of AML Bitcoin tokens). On January 16, 2018, Dillman pitched
   AML Bitcoin at a panel for Silicon Valley Blockchain and ICO Investors, at which Mr. Andrade

20  did not appear or speak. Tr. 899:13-902:3. *See also* Tr. 2416:7-2417:16, Ex. 3381 (court
   erroneously excludes exhibit offered to show exclusion of Mr. Andrade from Dillman discussion

21  of possible FBI investigation). Dent Decl., Exhibit A-13.

22  [12] Exhibit 3054, an email chain between Arthur Weisman (a member of Block Bits AML

23  Holdings) and Dillman in January 2018 showed that the members of Block Bits Capital were
   planning a meeting to use assets under management to get acquired for billions of dollars within

24  18 to 24 months. Tr. 935-36.

25  [13] *See also* Tr. 2416:7-2417:16, Ex. 3381 (court erroneously excludes exhibit offered to show
   exclusion of Mr. Andrade from Dillman discussion of possible FBI investigation).

26  [14] Mr. Fahy instructed Mr. Andrade that the net proceeds from AML bitcoin sales could be used

27  for whatever purposes he saw fit. There were no restrictions on the use of the proceeds for a home
   or car purchase.

28

1    1816:24, that the evidence suggests he would not have accepted the money from Dillman had he

2    known that it came from an investment in Dillman's funds.  Tr. 3122:5-10.  For further

3    corroboration, look no further than Dillman: he feared Mr. Andrade would have turned down the

4    money, which is why he repeatedly hid from Mr. Andrade the fact that he was using AML

5    Bitcoin to attract investors for the Block Bits investment fund.

6              **b.  Abramoff's Separate Schemes.**

7         Abramoff conceded on cross-examination that from the start of his involvement with

8    AML Bitcoin he used the coin behind Mr. Andrade's back to engage in what could not be

9    explained as anything other than money laundering.  At the same time that Abramoff was seeking

10   to help a Ukrainian billionaire friend whose money had been frozen, in Exhibit 3262, Abramoff

11   and another friend, Roger Engone, planned a series of transactions in which they, some of their

12   other friends, and two Angolan participants would use AML Bitcoin and Dubai bank accounts,

13   with the ultimate result being that more than a billion dollars per month would be held in each

14   Dubai account. Tr. 1858-61.

15        While Abramoff testified that he somehow forgot all the other details of this billion dollar

16   money laundering deal, the deal appears to have been the reason he pushed Mr. Andrade to start

17   the ICO for AML Bitcoin before the coin was ready, to the detriment of both Mr. Andrade and

18   the purchasers of the tokens.[15]  As a result, the billion-dollar deal reflects that Abramoff wanted

19   the coins to exist to be used for his own separate purposes, purposes that were more important to

20   him than the success of AML Bitcoin. Other evidence also suggested that Abramoff wanted to get

21

22

23

24   [15]Abramoff told Mr. Andrade on July 10, 2017 that "we need to move our ICO along as quickly

25   as we can. . ." Tr. 1845:18-21. Evidence throughout the trial pointed to the damaging result from
     Abramoff's rush.  For example, software developer Hung Tran testified to the urgency

26   surrounding his hiring to do project management with the Newgen team developing the AML
     Bitcoin token. Tr. 1394:1-1395:12. He also described the rushed development of a token stand-in

27   for the AML Bitcoin when the Newgen team was unable to deliver. Tr. 1396:17-1397:10;
     1399:12-1400:14

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT                    CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1    control of the coin away from Mr. Andrade, Tr. 767-69, and confirmed that Abramoff's intended

2    uses of business were contrary to those of Mr. Andrade.[16]

3        **3.    At a Minimum, a New Trial Is Therefore Required.**

4        Because the Court refused to give the proposed multiple conspiracy instruction, the jurors

5    were left with only an instruction that if they decided that Mr. Andrade was "a member of a

6    scheme to defraud" and had intent to defraud, then he may be "responsible for other co-schemers'

7    actions during the course of and in furtherance of the scheme, even if the defendant did not know

8    what the other co-schemers said or did."  Jury Instruction No. 21, ECF #612 at 24; Tr. 2964:16-

9    21. That instruction left the jurors without the tools the law allowed them to consider whether

10   there was a separate scheme, which would have aided their consideration of whether various

11   conduct of Mr. Dillman and Mr. Abramoff, and all of their alleged co-conspirator statements,

12   should be attributed to Mr. Andrade, and whether the wire charged in Count One was in

13   furtherance of a scheme in which Mr. Andrade knowingly participated.

14       A rational jury could have found Mr. Andrade not guilty if the Court had given the

15   requested instruction, either because it separated the conduct and statements of Dillman and

16   Abramoff from that of Mr. Andrade, or because it determined that there was at least a reasonable

17   doubt about whether Boyer's wire to Dillman as part of an investment in Dillman's fund was

18   conduct that was part of any scheme to which Mr. Andrade agreed, as opposed to a separate

19   scheme by Dillman.  On these facts, whether Dillman and Mr. Andrade were "directed toward a

20   common goal," *United States v. Ghazaleh,* 58 F.3d at 240, 245 (6th Cir. 1995), whether they had

21   "distinct purposes," *United States v. Walker*, 25 F.3d 540, 547 (7th Cir. 1994), and whether there

22   was a single conspiracy or multiple conspiracies, were "factual matter[s] for the jury to

23   determine," *United States v. Mena-Robles*, 4 F.3d 1026, 1033 (1st Cir. 1993), with the benefit of a

24   multiple conspiracy or scheme instruction. *United States v. Brandon*, 17 F.3d 409, 449 (1st Cir.

25   1994) (which should be given when "'a reasonable jury could find more than one . . . illicit

26   agreement, or could find an agreement different from the one charged.'").  This is a benefit that

27   _____

     [16] *See* p. 25-28, *infra*.

28
                                                    12

     ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT                    CASE NO. 3:20-CR-00249-RS
     OF ACQUITTAL

1    has been properly extended to juries in other multiple conspiracy cases. *See United States v.*

2    *Singh*, 924 F.3d 1030, 1054 (9th Cir. 2019) (jury instructed to find the defendant not guilty of

3    conspiracy if he was not a member of the charged conspiracy, even if he was part of some other

4    conspiracy).

5        **4.  A Judgment of Acquittal Should Be Entered**

6        There was no rebuttal to the proof identified in part II.C.2.a. above that Mr. Andrade

7    would not have accepted the money from Dillman had he known it came from an investment in

8    Mata and Dillman's funds — as Dillman himself understood, given that he hid those facts from

9    Mr. Andrade.  Because "[t]he relevant question at all times is whether the [wire] is part of the

10   execution of the scheme *as conceived by the perpetrator at the time*," *Schmuck v. United States*,

11   489 U.S. 705, 715 (1989) (emphasis added), no reasonable juror could conclude beyond a

12   reasonable doubt that the government met its burden to prove the wire was in furtherance of the

13   scheme.  The Court should therefore grant Mr. Andrade's Rule 29 Motion on Count One, and

14   more generally on the ground that the prosecution failed to present sufficient proof from which

15   any rational juror could conclude beyond a reasonable doubt that Mr. Andrade was guilty on

16   either count[17]

17   **III.   THE GOVERNMENT PRESENTED MISLEADING TESTIMONY IN**
         **VIOLATION OF NAPUE v. ILLINOIS, AND IT KNEW OR SHOULD HAVE**
18        **KNOWN THE TESTIMONY WAS MISLEADING**

19        The government pulled a fast one with Exhibit 805.  Exhibit 805 was used to mislead the

20   jury into thinking that Mr. Andrade was handling the Twitter and other social media accounts for

21   AML Bitcoin when alleged misrepresentations on those accounts were made.  Exhibit 805 was a

22   critical piece of that proof—emphasized during the government's closing arguments and crucial

23   for its claims-*see, e.g.*, Tr. 3012:17-24 (trial counsel pointing directly to Ex. 805 as evidence of

24

25   [17] For example, the government also had no answer to its own proof showing that Mr. Andrade
     had ample cryptocurrency to make his real estate purchases using cryptocurrency if he had any
26   interest in hiding the source of his funds, requiring acquittal on Count Two.  Theresa Chiu
     testified to Mr. Andrade's receipt of over $2.8 million in cryptocurrency, Tr. 1956:9-1958:24, and
27   the defense pointed out in closing how trivially easy it would be for Mr. Andrade to have
     concealed the home purchase using those funds. Tr. 3111:24-3112:5.
28
                                                    13

Mr. Andrade's control of social media); Tr. 2972:23-2973:2 (saying Mr. Andrade amplified lies through social media accounts that "he controlled"); Tr. 2983:6-9 (same)—because Melissa Foteh, who controlled the accounts when the alleged misrepresentations on social media were made, proved to be an utterly unreliable source of information , Tr. 1127:8-1128:6, and because Bernadette Tran and Melanie Cowan, the government's other witnesses on this subject, were not dealing directly with Mr. Andrade about the social media during the period that any of the alleged misrepresentations on social media were made.[18]

### A. There Were Many Deceptions Behind the Government's Presentation of Exhibit 805

Exhibit 805 was introduced during the testimony of Special Agent Quinn.  As he described the exhibit, it is "an image taken of a piece of paper" from Mr. Andrade's cell phone that the FBI had seized and searched pursuant to the search warrant for his home in March 2020, Tr. 2191:6-10, and "appears to be a list of accounts, email accounts, Twitter accounts, and so forth," and usernames and passwords for the accounts. Tr. 219114-17.  The first two letters of all the passwords were "M and A."  Tr. 2191:18-19.  The impression left by the introduction of the exhibit, by Quinn's testimony, and by the government's argument about the exhibit, is that Mr. Andrade controlled the social media accounts in 2017 and 2018.

The government left this impression by concealing from the jury and the defense a series of material facts about Exhibit 805.  Most importantly, the image first appeared on Mr. Andrade's phone in 2020 — long after the alleged misrepresentations on social media — and *was not created until January 2020*, and the passwords with Mr. Andrade's initials that the government emphasized to the jury *had just been changed in 2020*.  Second, the image came to Mr. Andrade in a communication from one of his lawyers, Axel Lindholm, and should never have been

---

[18] Tr. 993:7-21 (Tran began doing work for Mr. Andrade in March 2018, but was under Foteh's exclusive supervision at Republic One until around four months later (~July 2018), when she began working for Mr. Andrade directly); Tr. 1031:2-4, 1042:23-1043:5 (Cowan began working for Foteh at Republic One in March 2018, and did not begin working directly for Mr. Andrade until around August 2018).

1   reviewed by the prosecution team, at least until it was reviewed by a taint team.Declaration of

2   Kerrie C. Dent in Support of Motion for New Trial (Dent Decl.), Exs. K and L.  Third, despite

3   extensive discovery practice,[19] requests for a production of a complete Cellebrite report from Mr.

4   Andrade's phone, representations by the government that it had complied with its obligations,

5   and orders (over government objection) on this very issue by Judge Beeler — one of which

6   required the government to "produce the unminimized version of the Motorola G7 and the

7   unminimized Cellebrite report" — the image that turned up at trial and was marked as Exhibit

8   805 was not on the Cellebrite report of Mr. Andrade's phone that the government produced to

9   defense counsel, so the defense could not easily determine that the image had not been created or

10  put on his phone until 2020, or that it was part of a lawyer-client communication.

---

[19] *See* Dent Decl. para. 8 (Mr. Andrade's phone was the only device seized from him for which
the case agents requested and received immediate working copies. The reports from the forensics
laboratory made it clear that, in addition to the three minimized reports that were provided to the
case agents almost immediately after the phone was seized, there also was an unminimized, pre-
taint review image. Even after numerous pleadings were filed, many letters were written, hearings
were held, and orders were issued, the government never produced the unminimized extraction of
the G7. Judge Beeler ordered that "*the government must produce the unminimized version of the
Motorola G7 and the unminimized Cellebrite report.*" Order Granting Motion to Compel, Dkt.
#292 at 2:6-7 (March 17, 2024) (emphasis added). But, despite the government's representation
that it had produced the unminimized image of Mr. Andrade's Motorola G7 (Dkt. #299 at 2:26,
April 19, 2024), the government only re-produced the minimized extraction of the phone that it
previously had produced. King & Spalding eDiscovery Operations and an outside vendor
confirmed , that the government has not produced the unminimized, pre-taint version of the phone
phone.  Attempting to explain producing only such a small portion of the phone, the government
claimed that there were technical difficulties with imaging the phone, rendering it impossible to
obtain a full image.  But when defense counsel asked for the forensics reports that would have
been written by the RCFL to document the difficulty in imaging the phone, no such forensics
reports were provided.  Instead, the government produced an FBI 302 report written by Agent
Zartman in July 2024, more than four years after the phone was seized and imaged, and several
months after the parties briefed the Judge Beeler's March 17, 2024 Order directing the
government to produce the unminimized version of the phone. In addition, another 302 produced
by the government indicates that in August 2020, the FBI conducted a taint review of Mr.
Andrade's phone, tagging potentially privileged documents using a list of attorneys, and placed
the Cellebrite file in the case file for "later review by a prosecutor," further proving that a pre-
taint report of the phone existed at some point in time.)

15

### B. The Government Knew or at Least Should Have Known that the Testimony It Offered and the Argument It Made Was Misleading

The government knew better than to have suggested that Exhibit 805 told the jury anything about who was handling Twitter and other social media accounts for AML Bitcoin at the time the alleged misrepresentations on those accounts were made. The screenshot that was marked and admitted as Exhibit 805 did not appear on Mr. Andrade's phone until 2020, and as best the defense can determine, no such document with the initials "MA" as part of the passwords — the key to the government's argument that Mr. Andrade controlled the accounts — was on his phone prior to 2020.

Facts learned through exhaustive post-trial research demonstrate that, the government knew, or had every reason to know, that the list of social media passwords in Exhibit 805 was a newly-created list, and that the passwords that began with "M and A," as Quinn testified, were not put in place until 2020. First, the FBI seized and produced to Mr. Andrade all the prior versions of the social media password list, none of which included passwords that began with the letters "M and A." *See* Dent Decl., Ex. F.[20]    Second, the Cellebrite report from Mr. Andrade's G7 phone, produced by the government, includes a message from Mr. Andrade to Melanie Cowan on January 13, 2020, showing that they were changing the social media passwords as Cowan was departing. Dent Decl., Ex. J.

Third, if those facts are not enough, the screenshot the government chose to use as Exhibit 805 (which was sent in a WhatsApp message by one of Mr. Andrade's lawyers, as can be identified from the telephone number) was a screenshot of an attachment to an email message that

---

[20] From late 2017 to November 2018, Dylan Pugliese maintained the passwords for the social media accounts. The metadata shows that this version of the passwords, "AML PWs Updated," was created by Pugliese on December 3, 2017 and last updated by him on November 16, 2018. From November 2018 to April 2019, Melanie Cowan maintained the passwords for the social media accounts. Dent Decl., Ex. G. The metadata shows that this version of "AML PWs Updated" was created by Melanie Cowan on November 14, 2018 and last updated on April 22, 2019. And from April 2019 to December 2019, Bernadette Tran maintained the passwords for the social media accounts. Dent Decl., Exs. H and I. The metadata shows that she renamed the list "ABTC Corp Password and Vendors List" on April 5, 2019, and last updated that document on December 11, 2019. Dent Decl, para 7.

was sent to Mr. Andrade in January 2020, both of which were also on Mr. Andrade's phone. The email was from an employee of Mr. Andrade's lawyer and unambiguously explained that "the doc attached [a screenshot of which was Exhibit 805] *has the passwords we have changed thus far*." (emphasis added).[21]  Dent Decl. para 7 & Ex. L.  Suggesting the opposite to the jury was, at the very least, misleading.  Having seized the phone, reviewed it, identified Ex. 805 as a potential exhibit, and done due diligence about the exhibit before using it, the government knew or should have known not only that Ex. 805 first came into existence in 2020, but also that it came into existence to report that the passwords that it used to tie the accounts to Mr. Andrade *did not exist prior to January 2020*.

### C.  These Deceptions Require, at a Minimum, a New Trial

While Quinn's testimony may have been literally true, its sole purpose was to suggest falsely that Mr. Andrade controlled the social media accounts when the misrepresentations alleged by the government were made – a proposition that could not in any way be established by Exhibit 805, as evidenced by the information the government withheld from the jury.  The testimony about and presentation of Exhibit 805 therefore violated *Napue v. Illinois*, 360 U.S. 264 (1959), which establishes that the prosecution violates due process when it presents false or misleading testimony.  *See Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (Napue is triggered by testimony or evidence that is "false or misleading)"; *Alvarez v Montgomery*, 2022 WL 868889, at *24 (CD Cal. Jan. 27, 2022) (same); *United States v. Straker*, 800 F.3d 570, 602-03 (D.C. Cir. 2015) (per curiam) (same).[22] *Phillips v. Ornoski*, 673 F.3d 1168, 1184 (9th Cir.

---

[21] Perhaps a taint team removed the messages from Mr. Andrade's phone before providing it to the prosecutorial team – although as noted in Mr. Andrade's misconduct motion, the government appears to have largely disregarded taint teams in this investigation –but the remaining question would be why the attachment to the privileged messages (the screenshot that the government offered as Exhibit 805) was provided to the prosecutors.

[22] While the government had knowledge — or at least should have known — of the misleading nature of the testimony for the reasons described above, due process was violated whether the prosecutors had that knowledge or not.  *See Maxwell v. Rose*, 628 F.3d 486, 506-507 (9th Cir. 2010) (under de novo review, a conviction based on uncorrected false testimony may violate due process, regardless of whether the prosecutor knew of the falsity); *Alvarez,* 2022 WL at *25 (While "there is no clearly established federal law that a prosecutor's unknown use of false testimony violates due process," "under Ninth Circuit precedent, [a defendant] is not required to

17

2012) ( when prosecution knew that deal had been struck with the witness's counsel); *Hayes v. Brown,* 399 F.3d 972, 977-89 (prosecution violated *Napue* by instructing a cooperating witness's attorney to not inform the witness of a plea deal granting him transactional immunity so that the witness could testify that there was no deal in place without perjuring himself); *Clements v. Madden*, 112 F.4th 792, 801 (9th Cir. 2024) (finding a *Napue* violation when the prosecutor elicited false testimony from a cooperating witness that he did not receive a parole benefit pursuant to his cooperation); *United States v. Barham*, 595 F.2d 231, 240-41 (5th Cir.1979) (holding evidence was false when witnesses testified they had not been offered leniency by "any of the attorneys" or "anybody in the Northern District of Alabama," but had in fact received promises from other authorities).[23]

Due to the government's deceptions, the defense did not know when the evidence was presented that it was misleading, but because such conduct by prosecutors violates principles "implicit in any concept of ordered liberty," *Napue*, 360 U.S. at 269, due process was violated even if defense counsel had known at the time. *United States v. LaPage*, 231 F.3d 488, 491 (9th Cir. 2000). As a result of this violation, reversal is "virtually automatic," *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)), and required unless the testimony was "harmless beyond a reasonable doubt." *LaPage*, 231 F.3d at 491 (quoting *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985)).

While any error that requires reversal on appeal is an adequate ground for granting a new trial, 3 Wright & Miller, Federal Practice & Procedure § 581 (5th ed.), the "interest of justice"

---

prove that the prosecutor knew that [a witness's] testimony . . . was false."); *Jackson v. Brown,* 513 F.3d 1057, 1075 (9th Cir. 2008) ("If the prosecutor has a duty to investigate and disclose favorable evidence known only to the police, he 'should know' when a witness testifies falsely about such evidence.").

[23] Statements and arguments by prosecutors, even without testimony, can be the basis for a *Napue* claim. *See Zurmot v. Borders*, 483 F. Supp. 3d 788, 812 (N.D. Cal. 2020) (citing *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991)). Improprieties in closing arguments can, themselves, violate due process."); *Dow v. Virga*, 729 F.3d 1041, 1045 (9th Cir. 2013)) (noting that the prosecutor had "exploited her knowing presentation of false evidence" in argument). *See generally Kyles v. Whitley*, 514 U.S. 419, 444 (1995) ("[t]he likely damage [of the false evidence] is best understood by taking the word of the prosecutor" in closing argument).

18

standard in Rule 33 requires less.  See Part IIC supra. In making this assessment under Rule 33, the Court should also take into account that despite a specific order from Judge Beeler, the government never produced an extraction from Mr. Andrade's phone that included Exhibit 805 or the associated communication from Mr. Andrade's lawyer, thereby adding to the deception and eliminating the chance for the defense to raise a privilege claim.[24]  It also proceeded in violation of its *Brady* and *Giglio* obligations, and its obligation to have a taint team review seized items for privileged materials — all of which could provide separate grounds for relief.

## IV.    THE COURT'S EVIDENTIARY RULINGS DEPRIVED MR. ANDRADE OF A FAIR TRIAL

At the urging of the government, the Court made dozens of erroneous evidentiary rulings. The result was a one-sided presentation of evidence that unfairly prejudiced Mr. Andrade.  As set forth in more detail below, the government's offering of inadmissible evidence and its incorrect objections to Mr. Andrade's proffered evidence resulted in at least five categories of erroneous, prejudicial evidentiary rulings.

### A.  The Court Erroneously Excluded Exculpatory Evidence Based Largely on Erroneous Application of Hearsay Rules

It is beyond dispute that "an out-of-court statement is *not* hearsay if offered for any purpose other than the truth of whatever the statement asserts." *United States v. Lopez*, 913 F.3d

---

[24] The Court should also consider that Exhibit 805 does not appear to be the government's only violation of *Napue*.  On direct examination, the government elicited from Boyer a claim that he had seen on AML Bitcoin's telegram channel a post asserting that the company had sold 76 million tokens.  Tr. 569.  On cross examination, he claimed that he had taken a screenshot of that post and set it to the FBI.  Tr. 611.  No such post was produced or offered into evidence at trial, suggesting that this testimony was false — but never corrected by the government.  *Napue* applies to testimony from government witnesses on cross examination, as the government has a constitutional obligation to correct false evidence even if it did not solicit it.  *Hayes*, 399 F.3d at 983-84; *Phillips v. Ornoski*, 673 F.3d 1168, 1181-82 (9th Cir. 2012). And the Court will recall another instance of misleading testimony from Special Agent Quinn on a different important topic — whether Mr. Andrade had produced source code in response to a subpoena served on his company — misleading testimony that the defense was able to catch during trial, but only after investing considerable time. Tr. 2851:24-2853:5.

19

807, 826 (9th Cir. 2019).[25]  Based on this principle, a considerable amount of prejudicial evidence was admitted by the government against Mr. Andrade, over his objection, often based on unpersuasive or even non-existent non-hearsay rationales.  *See, e.g.*, Tr. 887:3-2 (Katz permitted to testify that someone from the governor's campaign advised her that Mr. Andrade's check for the fundraiser bounced; no non-hearsay explanation offered); Tr. 1215:1-11 (De La Guardia permitted to testify that Catin Vasquez told De La Guardia that Vasquez received a threatening letter from Mr. Andrade's attorney, testimony offered "for the effect on De La Guardia" and "for his relationship with this project," without any showing that either of those purposes had any relevance); Some of this evidence elicited by the government was information provided to Mr. Andrade, offered for the more appropriate purpose of showing its impact on him.  *See, e.g.*, Tr. 1025:1-25 to 1026:1-13 (B Tran permitted to testify about what she told Mr. Andrade about the unhappiness of people on social media).

But when Mr. Andrade offered vital exculpatory evidence using this same principle — its non-hearsay purpose of its impact on him — the government objected and the Court sustained the objections, either excluding the evidence entirely or, in a few instances, after follow-up briefing by the defense, admitting fragments of the proffered exhibits at a later time.  In sustaining the government's objections, the Court raised questions about whether a defendant was ever entitled to admit evidence given or told to him in order to show its impact on his intent, especially if the defendant did not testify.[26]  But there is no question that the principle admitting statements for the non-hearsay purpose of their impact on the recipient applies equally to evidence offered by the defendant. *See e.g.*, *United States v. Corona*, 41 F. App'x 33, 34 (9th Cir. 2002) (reversing conviction due to exclusion of statements offered by defendant that were "probative on the issue

---

[25] *See also United States v. Lin*, 2018 U.S. Dist. LEXIS 68194, at *17 (N.D. Cal. Apr. 23, 2018); 2 McCormick on Evidence § 249 (9th ed.) (providing examples).

[26] *See, e.g.*, Tr. 1461:14-20 ("[Y]ou're introducing these to show how Mr. Andrade reacts.  First of all, it's hearsay; and he's not — *unless and until he testifies*, there's — *what are you doing*?" (emphasis added).  After defense counsel explained to the Court that the statements are not hearsay because what Mr. Andrade was told was "central to his intent," the Court asking rhetorically, "*But doesn't he have to testify in order to get this in*?" Tr. 1462:15-24 (emphasis added).

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT                    CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

of government inducement, not for the truth of the out-of-court statements but to show the effect they had on Corona's state of mind").[27]  Nor is there any question that criminal defendants, who of course have constitutional rights both to present an effective defense and not to testify if they so choose, *see* United States Constitution, Fifth Amendment, can present such evidence even if they do not testify. *See, e.g., United States v Garcia-Villanueva*, 855 F.2d at *2.

Equally meritless were other bugaboos expressed by the Court in excluding defense evidence on hearsay or other grounds.  Beyond erroneously excluding evidence because it considered the evidence to be hearsay, even though the evidence was not being offered for the truth of any matter asserted therein or constituted verbal acts; the Court appeared to be excluding documents because it considered them to be extrinsic evidence of impeachment, when in fact they were important substantive evidence.  Whatever the Court's erroneous reasons, the jury was deprived of important, admissible evidence, and the contrast between the government's mass of exhibits and what the defense was able to admit was an advantage that the government used to its benefit in closing,[28] and that the jury commented on when it spoke to counsel after delivering its verdict.[29]

*Good faith.*  Examples of these erroneous exclusions touch on many of the most important issues and witnesses in the case. Consider, for instance, the government's accusations of market manipulation. The government asserted in closing that Mr. Andrade "tried to hide his market manipulation, his market making." Tr. 3009. This was false, but the jury did not know of its falsity because when the defense offered Exhibits 2472, 2473, and 2474, the Terms & Conditions provided to purchasers, the government objected based on hearsay and the court sustained the

---

[27]*See also United States v. Gibson*, 675 F.2d 825, 833-34 (6th Cir. 1982) (where defendant offered utterance solely for the fact that it was made by a union official and heard by the defendant, witness's account of union official's statement was non-hearsay admissible as "testimony about a circumstantial utterance, which could have been received properly on the issue of [defendant's] belief or state of mind in consequence of the utterance").

[28] *See, e.g.,* Tr. 2968:12-17 (government told the jury to annotate the various exhibit numbers on the closing slide deck so they could reference them during deliberations); Tr. 3024:1-6 (government cited Ex. 1224); Tr. 3024:15-20 (government cited Ex. 1520).

[29] *See* Decl. of Dainec P. Stefan in Support of Defendant Andrade's Motion for a New Trial.

objection. *See, e.g.*, Tr. 2683:16-25; 2684:10-11; 2801:14. Had the Terms & Conditions been admitted, the jury would have known that Mr. Andrade had made disclosures to purchasers about these activities.[30]   The Terms & Conditions were not hearsay; rather, they were legal documents governing the underlying relationship between Mr. Andrade and AML Bitcoin purchasers, and such documents are not hearsay. *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) ("out-of-court statements that are offered as evidence of legally operative verbal conduct are not hearsay"); *Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Labor Ass'n of U.S. Pension Tr.*, 153 F. Supp. 3d 1217, 1234 (E.D. Cal. 2015) (operative documents such as contracts "are not hearsay"); *United States v. Rubier*, 651 F.2d 628, 630 (9th Cir. 1981) (per curiam) (where defense cross examined witness based on his agreement with the government, the agreement and related letters were admissible and not hearsay).

In addition, the fact that Mr. Andrade made these disclosures is a non-hearsay verbal act that was important evidence establishing his good faith.  *See United States v. Dorsey*, 418 F.3d 1038, 1044 (9th Cir. 2005) (citing Fed. R. Evid. 801(c) advisory committee's notes on proposed rules ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised at to the truth of anything asserted, and the statement is not hearsay."), *abrogated on other grounds, Arizona v. Gant*, 556 U.S. 332 (2009), The exclusion of the Terms & Conditions was a critical error that materially prejudiced Mr. Andrade's good faith defense[31]

---

[30] *See, e.g.*, Ex. 2473-004 ("NAC reserves the right, but not the obligation, to engage in volume-making for purposes of Exchange compliance."). To the government's chagrin, when asked if he was engaged "to effect a significant change in the volume and, more importantly, the price of the token," Bryan resisted the notion that he was engaged to change the price of the tokens and instead testified that he was engaged to increase the volume. Tr. 1532, 1577.  An increase in volume *could* impact the price, he explained, but not with the resources he was provided.  Tr. 1578.  As a result, what was done was volume making, as had been disclosed (but not to the jury). The Court admitted an earlier version of the Terms & Conditions that did not have volume making language, Ex. 2471, before excluding subsequent versions.

[31] For the same reason, the post-ICO purchase agreements, which included the agreements signed beginning in March 2018, Ex. 3357, were not hearsay. Even though the Court readily admitted one of the post-ICO purchase agreements offered by the government, Tr. 571:4-572:7, Ex. 602, the Court initially excluded the post-ICO binder, Ex. 3357, a collection of such agreements offered by the defense. Tr. 2255:20-2257:6.  Although the Court later excluded the documents

22

1    The exclusion of the Terms & Conditions and of the post-ICO binder, Exs. 2472, 2473,

2  2474, 3357, were not the only examples of the damage the Court inflicted on Mr. Andrade's good

3  faith defense.  After the government elicited testimony  from, and played recordings made by, an

4  FBI agent working undercover who arranged to talk to Mr. Andrade in an effort to get Mr.

5  Andrade to make false statements, the Court cut off any use by the defense of statements made by

6  Mr. Andrade that the government skipped, regardless of whether they were not offered for the

7  truth..[32] This was error that deprived Mr. Andrade of valuable exculpatory evidence reflecting his

8  good faith, and that rebutted the impression left by the government that Mr. Andrade's

9  conversations with the agent were incriminating.

10    What Mr. Andrade sought to admit was not hearsay.  Most notably, Mr. Andrade told the

11  undercover agent that aspects of AML Bitcoin were not ready.[33] This was not offered for the truth

12  of the statement; to the contrary, such a statement was exactly what *the government* had been

13  based on relevance, Order, ECF #601 at 5:10-15 (March 3, 2025) (Court denied admission of the
14  post-ICO binder based on relevance, in part based on the Court's mistaken belief that all the
agreements post-dated the 2017-2018 time period), this was wrong.  Even if there were a basis to
15  exclude evidence because it post-dated late 2018, *see* Part IV.C below, most of the post-ICO
binder was comprised of contracts from 2018.  Ex. 3357-044-181.  And the relevance of the
16  binder was illustrated by the government's closing argument , in which it claimed that "[Mr.
Andrade] didn't build a software company; he built a story," Tr. 2975, and that he was "trying to
17  fool investors" with "a half-baked  cryptocurrency," Tr. 3131.  The agreements in the post-ICO
binder were a vital answer to this accusation.  They also supported Mr. Andrade's good faith and
18  his belief that he was not trying to fool anyone about the development of his technology, by
showing not only that Mr. Andrade was selling tokens rather than completed coins, but also that
19  he expresslytold his purchasers that "the AML Bitcoin *is in the process of being upgraded* to be
compliant with anti-money laundering laws. When that process is completed, Coin Purchaser will
20  be able to convert AML Tokens to AML Bitcoins." Ex. 602-02(emphasis added)
21
[32] When defense counsel previewed this issue before the agent's testimony, the Court rejected the
22  argument that Mr. Andrade's statement was not offered for the truth as "creativity." Tr. 1924:22-
1925:2.  During the cross examination of the agent, the Court repeatedly directed counsel not to
23  go beyond the clips, Tr. 2143:4-6; 2142:11-12, 2143:14, 2143:16, 2146L2146, refused to allow a
sidebar to permit counsel to argue or proffer the statements to be admitted.  Tr. 2146:23-25, and
24  later rejected any argument that the statements could be offered as evidence of Mr. Andrade's
indset and lack of intent.  Tr. 2149::31-2150:6.
25

26  [33] See Declaration of Cindy Diamond para 5; Ex. 3000-D (Mr. Andrade explains to agent that the
AML Bitcoin gateway applies to the eventual launch of the coin, not to the tokens that were being
27  sold at the time, and Mr. Andrade explains to agent that the coin would go through AML identity
checks when launched but the token did not have that feature active )
28
23

1  contending from the opening statement and throughout the trial. Tr. 202:2-14; 202:25-203:3;

2  207:4-9; 2975:22-23; 2979:4-6; 3125:12-14. Rather, it was offered to show that, despite the

3  agent's efforts to elicit lies, Mr. Andrade told the agent about his technology not being ready.

4  Such a statement made to an undercover agent who was posing as a buyer would have been a

5  powerful rebuttal to repeated government arguments that Mr. Andrade was lying to the public

6  (mostly through press and social media statements, Mr. Andrade's responsibility for which was

7  disputed) about whether he had completed technology.  Not letting Mr. Andrade present this

8  important exculpatory evidence on a key government accusation was devastating to his defense,

9  and the government took full advantage of the error, arguing to the jury what happened in the

10  conversation is that Mr. Andrade told the agent "a lot of the same lies."  Tr. 3006:17

11      Other statements Mr. Andrade made to the undercover agent were also wrongly excluded.

12  For example, when the undercover agent referred to AML Bitcoin as an investment, Mr. Andrade

13  corrected him.[34] That he did so was a verbal act that further demonstrated Mr. Andrade's good

14  faith.  *See United States v. Dorsey*, 418 F.3d at 1044.  Equally important is that the recordings

15  would also have given the jury real-time insight into some of Mr. Andrade's mental disabilities.

16  *See* Declaration of Cindy Diamond at para. 3.

17      *Abramoff's separate and destructive schemes.*  In addition to excluding important,

18  admissible evidence of Mr. Andrade's good faith, the Court also severely limited Mr. Andrade's

19  proof about Abramoff: Mr. Andrade had documentary evidence to show that Abramoff was

20  engaged in a separate scheme, and also that Abramoff's separate scheme undermined Mr.

21  Andrade's efforts to make AML Bitcoin a success, but the jury saw none of these documents.  For

22  example, the jury did not see the documents showing that, apparently in order to help a Ukrainian

23  billionaire, Abramoff was involved in separate money laundering scheme in which he needed a

24  digital currency under his control — which is why he pushed Mr. Andrade to begin the ICO of

25

26

27  ---
[34] *See* Declaration of Cindy Diamond at paragraphs. 2, 3.

28

24

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT           CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1    AML Bitcoin before the technology was ready.[35]  The jury never saw these documents because

2    the Court instructed counsel in the presence of the jury during Abramoff's cross-examination that

3    counsel should not try to put documents into evidence after the witness testifies about them. Tr.

4    1838:2-6 ("You've asked him a question.  He answered the question. So . . . there's no basis for

5    the document to come into evidence.").  *See also* Tr. 1245:3-4 ("I don't know why [defense]

6    counsel are getting so wrapped up in the documents.")

7         This limitation was erroneous.  Not only was the government's proof burdened with no

8    such limitation,[36] but the documents were not mere impeachment of Abramoff; rather, they were

9    evidence that Abramoff was involved in a separate scheme, a scheme that not only undermined

10   the claim that Mr. Andrade and Abramoff were co-schemers, but also showed that, in order to

11   advance his separate scheme, Abramoff was responsible for triggering the ICO before the

12   technology was ready.  There was no basis to exclude important substantive evidence on an

13   element of the crime charged, or evidence responsive to one of the government's central

14   allegations.

15        Documents about Abramoff's separate money laundering scheme and its impact on AML

16   Bitcoin were not the only Abramoff-related materials that the Court erroneously excluded.  The

17   Court also rejected Mr. Andrade's offer of a document with Abramoff's handwritten notes that

18   was seized from a search of the residence of Maria Butina. That document showed, among other

---

19   [35] *See, e.g.,* Ex. 3261 (shown to Abramoff at Tr. 1841:5) (May 2017 communications between

20   Abramoff and his friend Eliezer Scheiner regarding the need to assist Ukrainian billionaire and
     notorious money launderer Gennadiy Bogolyubov with his money issues after Bogolyubov's

21   assets were frozen by law enforcement in the United Kingdom — which directly preceded
     Abramoff reaching out to Mr. Andrade to convince him to do an ICO); Ex. 3262 (shown to

22   Abramoff at Tr. 1858:25 to 1861:7) (Abramoff claims he does not recall the $1 billion deal that
     involved Abramoff and some of his friends laundering money through Angola using AML

23   Bitcoin).

24   [36] *See, e.g.,* Tr. 1329:21 to 1333:8 (after government witness John Szeder testified that

25   "somebody" from a vendor had found him on the NAC website and asked for his assistance in
     helping them get paid for an overdue invoice, the Court admitted over objection Exhibit 221, the

26   email to Mr. Andrade regarding the overdue payment about which Szeder testified)  As the Court
     explained in admitting testimony about a document to which the defense objected on the basis

27   that the testimony mischaracterized the document, "The jury has the exhibit and the witness's
     testimony. They're the ones that will make the determination. Overruled." Tr. 567:21 to 568:4.

28

                                               25

1    things, that Abramoff, without Mr. Andrade's knowledge, was discussing with his friend Paul

2    Erickson (Butina's boyfriend at the time) the use of Mr. Andrade's technology for purposes

3    antithetical to their use for Mr. Andrade's business. Among other things, the document describes

4    a multi-platform campaign to promote the *deregulation* of the cryptocurrency industry — the

5    opposite of Mr. Andrade's approach, which was to sell AML Bitcoin as the only cryptocurrency

6    that would be compliant with regulations such as anti-money laundering and "know your

7    customer."[37] The Butina documents would have demonstrated another aspect of Abramoff's

8    separate scheme, but the jury never saw them. *See* Tr. 2283-84; Ex. 2360 (sustaining

9    government's objection). The Court also erroneously precluded Mr. Andrade from showing

10   through documents that Abramoff was behind at least one of the real estate purchases that the

11   government highlighted as fraudulent.[38]

12        *Panama Canal.* Refutation of the government's main substantive allegations was also

13   erroneously limited. On the Panama Canal, for instance, the Court permitted questioning on

14   cross-examination, but refused to admit a text exchange between DeLaGuardia and Abramoff that

15   reported Morgan & Morgan's agreement that AML Bitcoin was "something that Panama's ship

16   registry needs, and that Morgan & Morgan believed that "this is a project reflected government

17   should implement, and they presented the idea to the Panama Maritime Authority (Gov't Agency)

18   and they loved it." Tr. 1236, Ex. 2160-046. Given the government's assertions that interest in

19

20

---

21   [37] *See* Declaration of Kerrie C. Dent in Support of Motion for Evidentiary Hearing on
     Government's Outrageous Conduct (Jan. 23, 2025), ECF #498-3 ¶¶ 9-11; Andrade's
22   Supplemental Memorandum in Support of Motion to Compel Discovery (Mar. 15, 2023),
     ECF #153 at 5:4-15; Discovery Order (Apr. 7, 2023), ECF #165 at 6-7, 12 ("It is not just about
23   Mr. Abramoff or Mr. Andrade and AML Bitcoin. It is about the larger context of the business
     model for cryptocurrency, whether Mr. Abramoff may have been working against Mr. Andrade,
24   and how that affects Mr. Andrade's responsibility and scienter.").

25   [38] Ex. 2934 (shown to Abramoff at Tr. 1867:17 to 1868:19) (Abramoff's handwritten notes
     describing a piece of land in Corpus Christi that would be purchased for $200,000, developed,
26   appraised for $3 million, and donated to a non-profit). Had the Court not precluded the defense
     offers of Abramoff documents, there were others that could have been admitted. *See, e.g.*, [could
27   use January 4, 2018 Abramoff email to Marcus re Alex Praisac]

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT                    CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1    AML Bitcoin by government officials in Panama "didn't exist," Tr. 208, [39]  the fact that such

2    interest *did* exist, or at least that Mr. Andrade had reason to so believe, was important substantive

3    evidence rather than mere impeachment; the defense should not have been limited to asking

4    questions and should have been allowed to admit the corroborating documentation.

5         *Super Bowl.*  As to the Super Bowl, where part of Mr. Andrade's defense was that he

6    believed he would have the money to pay for the advertisement and that there had been, in fact,

7    an intent to run the ad (contrary to Abramoff's testimony that it was a rejection campaign from

8    the start), the Court excluded as hearsay the record of communications between Abramoff and

9    Moshe Lapin. In those communications, Abramoff tells his friend Lapin about a decision to

10   "hypercharge the trading value of the coin" by "secur[ing] an ad during the Super Bowl

11   broadcast," and adds that $4 million is needed for the advertisement, that the company will sell

12   some of the coins "at a significant discount" and that this approach "would virtually guarantee a

13   significant profit." On that basis, Abramoff asked Lapin if he had "an interest in getting in on

14   this," with the minimum investment being $1 million.  Ex. 2127-017.[40]  This was admissible,

15   substantive evidence that Mr. Andrade and NAC were raising money to pay for the

16   advertisement, as well as further support that Mr. Andrade was proceeding in good faith.

17        *Redactions.*  In addition, even when documentary evidence ultimately was admitted,

18   defense counsel was required to heavily redact the documents, diluting the impact on the jury

19   both because the substance was limited and because the documents did not get into evidence

20   contemporaneously with the testimony on the subject, as the government was allowed to do.  For

21   example, when defense counsel first offered four weekly updates from the London software

22   company that was developing the technology in order to rebut Abramoff's testimony, Exs. 2327,

23   2333, 2334, 2337, the Court sustained the government's hearsay objection, stating: "The point

24   you wanted to elicit is that he received reports.  He's established that.  There is a great deal of

---

[39] *See also, e.g.*, Tr. 2985:18-23 (government closing dismissive of any efforts with Morgan & Morgan, stating that the meetings with the law firm were "no more than 30 minutes long").

[40] Dent Decl., Ex. A-2

27

1    material in these documents that are hearsay." Tr. 1824:22 to 1825:5. After additional expedited

2    briefing, the Court admitted the exhibits subject to extensive redactions. Order (Mar. 3, 2025),

3    ECF #601.  These redactions excluded non-hearsay evidence that supported Mr. Andrade's good

4    faith belief that AML Bitcoin was succeeding.  *See, e.g.,* Ex. 2327 (April 29, 2018 update on

5    meetings with other entities interested in the technology, the expected finalization of a

6    Memorandum of Understanding with R3 (owner of blockchain platform Corda), consideration of

7    new software from Aware (a company that does biometric matching), hiring of experienced

8    senior developers); Ex. 2333 (July 3, 2018, update included reports on additional follow-up with

9    Morgan & Morgan, additional follow-up with banks, and progress with negotiations with Aware);

10   Ex. 2334 (September 18, 2018 included details about a possible tech presentation to Chinese

11   President Xi and meetings with Barclays and EY); Ex. 2337 (October 3, 2018 update reported

12   that Corda integration was ongoing and Aware expressed a strong interest in partnering for sales

13   in Brazil).[41]

14          *Prejudice.*  The erroneous exclusion of non-hearsay testimony on critical issues such as

15   Mr. Andrade's good faith, Abramoff's separate conspiracies, and Mr. Andrade's defenses to

16   central accusations such as the Panama Canal and the Port of San Francisco was prejudicial and

17   therefore requires reversal.  *Wagner v. County of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013);

18   *DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001) (granting writ of habeas corpus

19   based on exclusion of evidence going to defendant's state of mind that was critical to her ability

20   to defend the charge). It also violated Mr. Andrade's right to present a defense. *See Sherman v.*

21   *Gittere*, 92 F.4th 868, 878-79 (9th Cir. 2024) ("The constitutional right to 'a meaningful

---

[41] The Court also erred in excluding Ex. 3355, Mr. Andrade's offer of source code to the FBI. Tr. 2221:16-2226:25. *See* note 1, *supra.* The admission of an offer to prove the operative fact of the offer being made is not hearsay. *See United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999) (treating "[p]erformative utterances," illustrated by promise, offer, or demand, as non-hearsay because they do not make any truth claims). *See also Dorsey*, 418 F.3d at 1044 (citing Fed. R. Evid. 801(c) advisory committee's notes on proposed rules ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised at to the truth of anything asserted, and the statement is not hearsay."); *United States v. Moreno*, 233 F.3d 937, 940 (7th Cir. 2000) (refers to verbal acts as not hearsay, and refers to offer and acceptance as "classic examples of verbal acts").

28

1   opportunity to present a complete defense' is rooted in both the Due Process Clause and the Sixth

2   Amendment" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986))); *Montana v. Egelhoff*, 518

3   U.S. 37, 63 (1996) (O'Connor, Stevens, Souter and Breyer dissenting) (the right to present an

4   effective defense "must include the right to present relevant, probative evidence").

5       The significance of and prejudice from the Court's exclusion of most of Mr. Andrade's

6   proffered documents was underscored by the government's closing argument, during which the

7   prosecutors emphasized to the jury the importance of relying on the documents when

8   deliberating.[42]   The defense lost its ability to respond in kind, because the government

9   convinced the Court to exclude documents critical to its case.

10      **B. The Court Admitted, Over Defense Objections, Incompetent Evidence Offered**
11          **by the Government**

12      The government's case was riddled with damaging testimony that lacked any semblance

13   of a foundation and that was admitted over objection.  This included testimony from Abramoff

14   that the company lacked sufficient funds to pay for a Super Bowl ad, Tr. 1706 — a critical issue

15   given that a central theme of Mr. Andrade's defense to the Super Bowl allegations was his belief

16   that he would and/or did have sufficient funds and therefore was not intending to defraud anyone

17   with a "rejection campaign." Tr. 3074:2-20 (Defendant's closing argument, explaining several

18   reasons why Mr. Andrade believed the company would be able to pay for a Super Bowl ad) and

19   Tr. 1818:14-15 (Abramoff testifying that he recalled a Block Bits entity it was ordering $50

20

---

21   [42] *See* Tr. 2968:13-17 ("And at the bottom of many of the slides, there will be an exhibit number
22   at the bottom right; and if you wish, if you want to go back to that exhibit while you're
     deliberating, I would suggest perhaps writing down that exhibit number."); Tr. 3130 ("Just look at
23   the evidence.  Look at the text messages."); Tr. 3131 ("look at these additional pieces of evidence
     . . .  look at all of the press on Twitter, on Facebook, on social media"); Tr. 3133 ("So don't get
24   distracted.  Focus on the evidence."); Tr. 3140 ("Look at the press strategy with that eye. Look at
     the press releases that are in evidence."); Tr. 3143 ("Look at the evidence. Focus on the evidence.
25   Focus on the emails and the texts. Focus on the hard evidence."); Tr. 3147 ("Set Mr. Abramoff's
     testimony aside. Set it aside and just look at the text messages between him and Mr. Andrade.");
26   Tr. 3148 ("Look at the text messages. Look at the text messages."); Tr. 3149 ("what I'm going to
     do is tell you to look at the evidence. Look at the evidence in this case. Go through it very
27   carefully.")

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT                    CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1  million of AML Bitcoin). Ex. 3047

2  No foundation was offered that Abramoff had any knowledge of the company's financial

3  situation at any time, let alone around the time of the Super Bowl, and Abramoff could not have

4  provided such a foundation.  All the evidence suggested that he lacked a foundation for his

5  statement: he testified that he was brought into the company as a consultant on Congressional

6  legislation and media issues.  Tr. 1658, 1659. And other witnesses described Mr. Andrade as very

7  secretive about company finances.  See Testimony of B. Jodoin, Tr.  314:3-21, 314:23-315:2,

8  321:3-10, 321:23-322:5.

9  Abramoff was also allowed over objection to provide speculation — characterized by the

10  government as Abramoff's "understanding" — on another critical issue: what John Bryan's

11  market making activities were.  According to Abramoff, Bryan was "buying and selling with

12  himself so as to raise the price" of AML Bitcoin.  Tr. 1722:2-14.  Bryan had already testified

13  about what actually was done; Abramoff's testimony was an effort by the government to fix

14  Bryan's testimony, which did not come out as the government wanted and instead suggested that

15  no trading may have been performed and that nothing was done with the intent of increasing the

16  price of AML Bitcoin tokens, and that nothing wrong was done. Tr. 1577:20-1578:23.

17  Abramoff's "understanding" was at best thirdhand — from Polyblock, which did the trading,

18  through Bryan — and the basis on which Abramoff's understanding of the trading was offered

19  was nonsense: according to the government, Abramoff's understanding bore on "whether or not

20  they were engaged in a deceptive practice on the exchanges."  Tr. 1722.  But what *Abramoff*

21  understood about Bryan's[43] activities does not matter, especially given that Bryan was not alleged

22  to be a co-conspirator, nor was there any claim that Abramoff's understanding was ever

23  communicated to Mr. Andrade, or that Mr. Andrade was present for whatever communications

24  led to Abramoff's claimed understanding.  *See United States v. Kaplan*, 490 F.3d 110 (2d Cir.

25  2007) (reversing conviction based on admission of the understanding of a co-defendant,

26  _____

[43] *See* Government's Motion to Admit Co-Conspirator Statements (Jan. 10, 2025), ECF # 449 at
27  4:6-11 (identifying Mr. Andrade's alleged co-conspirators as "co-conspirators Jack Abramoff,
Japheth Dillman, and David Mata").

28

30

1    explaining that testimony regarding knowledge of individuals other than the defendant should be

2    admitted only if there is evidence that the defendant would have the same knowledge).  In any

3    event, this excuse was a poor fig leaf under Rule 403 for admitting substantive testimony s on a

4    critical issue for the jury that the government had failed to prove — "whether or not they were

5    engaged in a deceptive practice on the exchanges."

6         In another significant example, Boyer was allowed to testify over objection that "he had

7    been told multiple times that the ICO had sold out, that all 76 million tokens were sold."  Tr. 567.

8    No foundation was offered for this significant alleged misrepresentation  being made "multiple

9    times;" and the only basis for even one such time that was offered elsewhere in his testimony

10   proved to be illusory: Boyer testified that a Telegram channel used the words "76 million tokens

11   sold," that he took a screenshot of that language on the Telegram screenshot, and that he provided

12   the screen shot to the government, Tr. 611, but the government never offered the screenshot at

13   trial.

14        There are numerous other examples of the government admitting over objection testimony

15   that lacked any foundation.  *See, e.g.,* Tr. 277-78 (Jodoin testimony on "what she learned about

16   the Warsaw conference"); Tr. 454 (Darrow allowed to testify about his "understanding" of

17   whether the tech was working); Tr. 1200 (DeLaGuardia allowed to testify about his

18   understanding of the purpose of a press release); Tr. 2180 (Quinn allowed to testify about

19   Dillman's intent);[44] Tr. 2199 (Quinn allowed to report what he "learned in his investigation"

20   about Diadamo working with Mr. Andrade); Tr. 2285. This inadmissible testimony bolstered key

21   government accusations, see, e.g., Tr. 2995-96 (government argues Mr. Andrade knew and tried

22   to hide that the Super Bowl ad was "never a prospect"); Tr. 3009 (government argues Mr.

23   Andrade tried to hide his market manipulation), and was used to support the claim that the

24   government had offered a lot of evidence of guilt. As a result, it was extremely prejudicial.

---

[44] The Court viewed Mr. Andrade's objection to this testimony as too late because it came after
the answer, Tr. 2181, but that was because the objectionable part of the answer was not
responsive to the question and therefore could not have been the basis for an objection to the
question.

1

2

### C. The Court Placed Date-Based Restrictions on Evidence in the Defense Case After the Government Was Allowed to Present Evidence Regardless of Dates

3

During its case-in-chief, the government elicited testimony from at least six witnesses to

4

the effect that AML Bitcoin never had the technology it claimed, or at least did not have that

5

technology until after November 2019; often the importance of this claim was underscored by

6

having the witness repeat it multiple times. *See, e.g.,* Tr. 580 (Boyer states that AML Bitcoin

7

project was never completed with full biometric identification built into the blockchain); Tr. 667,

8

668 (Bruffey never saw a final product with biometric identifiers built into the blockchain and

9

never saw evidence of specific anti-money laundering features being built into the code or the

10

blockchain); Tr. 991 (B. Tran worked through August 2019, and never saw progress on the

11

wallet, on the biometric identification technology, or integration with the technology, and did not

12

think Mr. Andrade would ever finish the project); Tr. 1077-78 (Cowan worked through New

13

Years Eve of 2019 and never saw a working version of AML Bitcoin); Tr. 1254, 1269, 1273

14

(Carlsen worked for Mr. Andrade from November, 2018, through January, 2019, and when he left

15

there was no finished AML Bitcoin with biometrics built into the blockchain); Tr. 1663, 1683,

16

1685, 1736 (to Abramoff's knowledge no complete coin with all the security features was ever in

17

place and available in the market, or anti-money laundering features).

18

But when Mr. Andrade prepared to present an expert, Erik Min, who would have disputed

19

all that testimony, the government did a 180 and objected that Mr. Min's response should not be

20

allowed because it addressed a time period after what was charged in the indictment. Tr. 2237.[45]

21

Tr. 2443. Ultimately the Court agreed with the government and precluded the portion of Mr.

22

Min's testimony that discussed the continued development of the technology after 2018.

23

Tr. 2449. This was error because Mr. Andrade's continuing work to complete the technology

24

_____

25

[45] The government also elicited other testimony from outside what it contended was the time period in the indictment. *See, e.g*., Tr. 419; Ex. 1448. In fact, the indictment was ambiguous about when the alleged wrongdoing ended, with part of it leaving the suggestion that the wrongdoing had no known end date. *See, e.g.,* ECF #1 at 3:15-16 (alleging that the scheme to defraud was "continuing through a date unknown to the grand jury, but to at least December, 2018"). *Compare id.* at 5:4-5 ("continuing through on or about October 2018").

26

27

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT
OF ACQUITTAL

CASE NO. 3:20-CR-00249-RS

long after funds from buyers stopped coming in reflects his good faith, *see United States v. Voorhies,* 658 F.2d 710, 715 (9th Cir.1981) ("acts both prior and subsequent to the indictment period may be probative of the defendant's state of mind"); *United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991) (same), and because, once the government opened the door on this issue — especially when it did so repeatedly — Mr. Andrade was entitled to rebut the government's evidence and to use Mr. Min's testimony to cast doubt on the reliability of the government's witnesses. *See, e.g., United States v. Sine,* 493 F.3d 1021, 1037 (9th Cir. 2007), *as amended* (July 17, 2007) ("the 'opening the door' principle allows parties 'to introduce evidence on the same issue to rebut any *false* impression that might have resulted" from the earlier admission of evidence (quoting *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988)); *United States v. Ziska*, 267 F. App'x 717, 718-19 (9th Cir. 2008). Given the importance the government attached to its claim that technology never worked, *see, e.g.,* Tr. 202, 203, 206, 2971, 2978, 3005, 3010, 3133 (emphasizing in closing that "the tech never existed in complete form"), precluding Mr. Andrade from proving the contrary was devastating to his defense.

### D. The Court Erroneously Admitted Rule 404(b) and Other Unfairly Prejudicial Evidence

Over defense objection, the government was allowed to offer evidence of what it claimed was a fraud committed by Mr. Andrade in the sale of AtenCoins. The government failed to prove a fraud,[46] but used the opportunity it was given to present evidence about AtenCoin to parade in

---

[46] Defense expert Erik Min testified that the company had in fact built a functioning coin. Tr. 2479. No contrary expert evidence was offered. The only percipient testimony to the contrary came from Brandi Jodoin, who had no experience in cryptocurrency, Tr. 285, and who was held to have lied repeatedly in her litigation against Mr. Andrade, including when she said she had not seen AtenCoin function, and when she said that it did not employ anti-money laundering and know your customer features. Tr. 332-337; Tr. 337-338 (Nevada court also held that she knew the technology existed but told the government it did not). Jodoin also claimed to have been disillusioned with AtenCoin, Tr. 321, to have been horrified by Mr. Andrade's conduct, Tr. 323, and to have determined that the company was unethical, Tr. 328, but nonetheless went with the company on a trip to Barbados. Tr. 374. Other supposed "frauds" relating to AtenCoin melted on cross-examination. *Compare, e.g.,* Tr. 271 (suggesting Ex. 1122 was a fraud) *with* Tr. 365-66 (admitting no knowledge whether the statements in Ex. 1122 were false). The suggestion that the Warsaw conference was "a paid venue" — hardly a fraud in and of itself — came with no foundation whatsoever. *See* Tr. 278.

front of the jury the sorry tales of buyers of the coin who lost money, including Brandi Jodoin, who went so far as to cry about her losses during the government's redirect examination. *See, e.g.,* Tr. 327, 375 (stay-at-home mother Jodoin lost just over $500,000) Tr. 409:22-25, 411:2-14, 419:15-25, 640:9-12, 668:23-25

If this was not enough unfair prejudice, the government added to it by also eliciting over objection needless and irrelevant but damaging information about Mr. Andrade. The jury was told that he bounced a check at then-Lt. Governor Newsom's fundraiser, Tr. 887, that he stiffed a large percentage of his employees,[47] and that he partied a lot and went to strip clubs. Tr. 996. Even Carlos De La Guardia, who lied to Mr. Andrade and Abramoff about his dealings with the Panama Canal Authority, was licensed to describe the woes he suffered as a result, as if this too was Mr. Andrade's fault, or somehow mattered to what the jury was asked to decide. Tr. 1215-16 (his involvement with AML Bitcoin had a terrible impact on his reputation and his credibility "went down to the floor"). None of this made it more likely that Mr. Andrade was guilty of the charges in the indictment, but the government put it all in evidence and further buried Mr. Andrade in unfair prejudice.

### E. The Court Erred in Limiting Impeachment of Government Witnesses

Finally, the Court erred in two different ways in limiting Mr. Andrade's impeachment of government witnesses. Based on a disputed interpretation of the intersection between Federal Rules of Evidence 608 and 806, it disallowed important impeachment of Dillman, which further exacerbated the damage from its refusal to give a multiple conspiracy instruction. And, contrary to Ninth Circuit jurisprudence, it refused to let Mr. Andrade complete multiple points of impeachment of Abramoff and another witness. Both sets of errors were prejudicial.

### 1.    The Court Erred in Limiting Impeachment Allowed by Rule 806

Denying Mr. Andrade's requests under Federal Rule of Evidence 806 to impeach Dillman,

---

[47] Tr. 491:6-8, 967:14-19, 990:6-19, 1273:21-1274:8, 1061:15-19, 1073:16-23, 1078:2-14, 1324:22-1325:2, 1328:5-10.

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT    CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1   a non-testifying hearsay declarant, was error.  When hearsay statements are admitted into

2   evidence, Rule 806 permits a party to attack the declarant's credibility "by any evidence that

3   would be admissible for those purposes if the declarant had testified as a witness."  *See* Fed. R.

4   Evid. 806.  In this circumstance, the hearsay declarant is a witness whose credibility "should in

5   fairness be subject to impeachment[.]"[48]  *See* Fed. R. Evid. 806(c) advisory committee's notes on

6   proposed rules; *see also United States v. Friedman*, 854 F.2d 535, 569 (2d Cir. 1988).

7      Rule 608(b) permits specific instances of conduct to be "inquired into" on cross-

8   examination.  At least in the context of the cross-examination of the declarant, the Rule precludes

9   the use of extrinsic evidence, but without ever expressly addressing how to "inquire into" specific

10  instances of conduct in the event the declarant does not testify.  While the interplay between

11  Rules 806 and 608(b) has not been assessed by the Ninth Circuit, the Second Circuit's decision in

12  *Friedman* recognizes that the restriction imposed on the cross-examination of a witness should

13  not govern the impeachment of a non-testifying hearsay declarant where the only reasonable

14  means of "inquiring into" specific instances of conduct is through extrinsic evidence.  *See*

15  *Friedman*, 854 F.2d at 570 n.8.

16     This Court should have applied *Friedman* and permitted Mr. Andrade to impeach Dillman

17  by calling a witness and/or admitting a document, because it was the only reasonably available

18  means of "inquiring into" specific instances of conduct that would impeach Dillman.  In assessing

19  the interplay of Rule 608(b) and Rule 806 in *Friedman*, the Second Circuit found that Rule 806

20  permits a party to resort to extrinsic evidence when the declarant "has not testified" and "there

21  has been by definition been no cross-examination" and, therefore, the "resort to extrinsic evidence

22  may be the only means of presenting such evidence to the jury."  854 F.2d at 570 n.8.

23     *Friedman's* approach provides the necessary flexibility to allow specific instances of

24  conduct by a non-testifying hearsay declarant to be "inquired into" when that conduct could

25

26

---

27  [48] *See, e.g.,* Tr. 622 (Boyer testimony that Dillman told Boyer that Mr. Andrade told Dillman that they sold out the ICO).

28

1   otherwise not be presented to the jury.[49] *See id.*; *see also Chambers v. Mississippi*, 410 U.S. 284,

2   302 (1973) ("where constitutional rights directly affecting the ascertainment of guilt are

3   implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice").

4   Flexibility is warranted in assessing the interplay between Rule 806 and Rule 608(b), given that

5   the former was drafted with the understanding that the declarant is not testifying, while the latter

6   assumes the witness is testifying and subject to cross-examination. See Margaret Meriwether

7   Cordray, *Evidence Rule 806 and the Problem of Impeaching the Nontestifying Declarant*, 56 Ohio

8   St. L.J. 495, 497 (1995). Without such flexibility, the important benefits of Rule 806 would be

9   undermined for non-testifying declarants, and the central purpose of the rules of evidence—to

10  "ascertain the truth and [secure] a just determination," see Fed. R. Evid. 102—would be

11  compromised.

12          The contrary reasoning offered in *United States v. Saada*, 212 F.3d 210, 221 (3d Cir.

13  2000) and *United States v. White*, 116 F.3d 903, 920 (D.C. Cir. 1997) (per curiam) does not apply

14  to this case. *Saada* acknowledged the drawbacks of rejecting *Friedman's* approach — such as

15  preventing the use of prior misconduct as a form of impeachment unless by chance the witness

16  testifying to the hearsay statement has knowledge of the declarant's misconduct, *Saada* 212 F.3d

17  at 222 — but found those drawbacks outweighed by the rationale for Rule 608(b): preventing

18  unfair surprise and avoiding minitrials. *Id.* In this case, there would have been no unfair surprise,

19  as the government had interviewed the defense's proffered witness, Christine Lee, in March 3,

20  2022,[50] and learned about her potential testimony almost three years before trial, and had been in

21  possession of the defense's proffered confirming documents[51] since February 23, 2022. Nor

22  would there have been any minitrials: at the time of trial, Dillman was under indictment, and

23  unavailable to testify given his fifth amendment privilege, and there could have been no dispute

---

[49] *White* is also dicta because the court was able to decide the case on a totality of the impeachment evidence basis. *See United States v. White*, 116 F.3d 903, 920 (D.C. Cir. 1997) (per curiam).

[50] *See* Dent Decl., Exs. M and N.

[51] *See* Andrade's Second Amended Exhibit List (Feb. 2, 2019), ECF #580, at 3, Exs. 2082-2085.

1    about Lee's testimony given the existence of corroborating documents.

2        Precluding Mr. Andrade from "inquiring into" Dillman's defrauding of his good friend

3    Christine Lee[52] precluded the defense from bringing to the jury's attention information about a

4    critical aspect of Andrade's defense: that Dillman was undermining Mr. Andrade rather than

5    working with him, and that the government's was wrong in repeatedly suggesting that efforts to

6    suggest that Dillman was obedient and worked well with others (by repeated references to one

7    time that Dillman replied "yessir" to Mr. Andrade).[53]  In fact, had Dillman been cross examined,

8    he would have had to admit that he lied even to close friends in order to advance his own

9    interests, interests such as trying to impress his girlfriend. Dent Decl., Exhibits M and N.

10    Providing such information to the jury would raise reasonable doubt by tending to show not only

11    that that Andrade should not be liable for Dillman's lies but also that Boyer's wire of funds to

12    Dillman was not in furtherance of any scheme in which Mr. Andrade knowingly participated —

13    compounding the Court's refusal to instruct the jury on this issue.

14        Similarly erroneous and prejudicial was the Court's ruling denying admission of

15    Exhibit 3184 and preventing further impeachment of Dillman through John Szeder's testimony.

16    Tr. 1349-55.  Exhibit 3184 was needed to Dillman for lying to the investors in his fund about

17    having an auto-trader (which was the core of what he was promising to investors).  Szeder, who

18    had been hired by Dillman to build the Autotrader, Tr. 1344-45, confirmed that there was no

19    Autotrader as of August 11, 2017, Tr. 1345, but was equivocal about what Dillman was

20    representing to investors about the Autotrader, and when.  Exhibit 3184-002 showed that on

21    August 1, 2017, Dillman was lying about the Autotrader, claiming among other things, that Block

22    Bits had been testing it in July 2017.  If Dillman had testified, Andrade could have "inquired into"

23    whether he made those statements on August 1, 2017, but in Dillman's absence, the only way to

24    make that point was to admit Exhibit 3184.  The Court not only excluded Exhibit 3184 but also

25    precluded any further impeachment of Dillman through John Szeder under a Rule 806 basis.

26    _____

27    [52] *See* ECF #601 at 7-8.

       [53] Tr. 2982:24-2983:5; 3010:23-3011:4.

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT        CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

Tr. 1351:24-1352:1; 1353:13-1354:23.  The Court's preclusion of this impeachment evidence deprived the jury of vital information regarding the extent of Dillman's misrepresentations.[54]

On these facts and with Rule 102's admonition to construe the rules of evidence so as to "ascertain[] the truth and secur[e] a just determination," this Court should have interpreted the intersection between Rules 608(b) and 806 in accord with *Friedman*. Fed. R. Evid. 102; *see Chambers*, 410 U.S. at 295.  In failing to do so, a fundamental aspect of the "truth-determining process[,]" of cross-examination was eliminated by a hearsay declarant's unavailability to testify, leaving the jury without impeachment evidence needed to assess the declarant's co-conspirator statements that were admitted despite the declarant's absence. *Chambers*, 410 U.S. at 295 (quoting *Dutton v. Evans,* 400 U.S. 74, 89 (1970)); *see id.* ("The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'" (quoting *Dutton v. Evans,* 400 U.S. 74, 89 (1970) & citing *Bruton v. United States,* 391 U.S. 123, 135-37 (1968))).

### 2. The Court Erred in Limiting Impeachment Based on Prior Inconsistent Statements Under Rule 613

Following the defense's submission of the Ninth Circuit's decision in *United States v. Bullcalf*, 563 F. App'x 535 (9th Cir. 2014), the Court allowed the defense to prove up three items

---

[54] The Court's preclusion of Dillman impeachment evidence resulted in a substantial amount of evidence being kept from the jury.  For example, but for the Court's ruling, after admitting Exhibit 3184 the Defense would have offered Exhibit 3185, a subsequent email from Dillman to the BlockBits Capital investors on October 7, 2017, where he falsely asserted that "the Autotrader rolled out in October, finally making its debut to much rejoicing by the tech team!"  In addition to impeaching Dillman, this evidence was relevant to show Dillman's focus on retaining his investors no matter what he had to do or say, facts that advance Mr. Andrade's defense that Dillman's scheme was separate from any scheme of which Mr. Andrade was a part.  Had the Court not so ruled, the defense could have offered other documents impeaching of Dillman.  *See e.g.,* ECF #484, Ex. 2786 (Dillman's Chief Strategy Officer employment contract, wherein he continued to falsely assert that BlockBits Capital utilized "an in-house proprietary trading algorithm, AI, and Machine Learning" to trade cryptocurrencies); Ex. 2522 (Dillman's pitch email for the CSO position, sent to Abramoff, wherein he falsely claims that BlockBits Capital has an autotrader); Ex. 2685 (Dillman's messages with Bradley Grimm wherein he makes false statements about BlockBits Capital's non-existent autotrader and encourages Grimm to lie about his accredited investor status to join the fund.

38

1    of impeachment of government witnesses based on prior inconsistent statements that the

2    witnesses refused to admit that they had made.[55] Tr. 2637-38.  But the Court erred when it did not

3    allow the admission of evidence to impeach prosecution witnesses with a number of other

4    inconsistent statements.  The Court based its refusal on the proposition that some of the proposed

5    refusals to admit to having made prior inconsistent statements were equivocal and others were

6    "collateral."  Tr. 2637.  Neither proposition justifies the Court's rulings.

7        The Ninth Circuit established unequivocally in *Bullcalf* that witnesses who claim not to

8    recall their prior inconsistent statements can be impeached with extrinsic evidence that they made

9    the statements.  Other answers that fall short of or otherwise evade an admission are equally

10   sufficient to trigger extrinsic proof that the proffered statements were made.  *See, e.g., Bush v.*

11   *United States*, 267 F.2d 483, 489 (9th Cir. 1959) ("might have said so"); *United States v. Rogers,*

12   549 F.2d 490, 495-96 (8th Cir 1976) (equivocal answers); *Woods v. United States*, 279 F. 706,

13   711 (4th Cir. 1922) (district court erred by preventing defendant from attempting to impeach

14   witness who "could not remember," by calling other witnesses to whom he had made statements

15   respecting the same subject-matter, contradictory to those he had testified to); *Searway v. United*

16   *States,* 184 F. 716 (8th Cir. 1910) ("The rule is general and well settled that a categorical denial

17   by a witness is not an essential preliminary to his impeachment. It is sufficient, his attention being

18   properly directed, if there is forgetfulness, partial admission, or an uncertain, evasive, or

19   indefinite answer." (citing 2 Wigmore on Evidence § 1037)); *see generally United States v. Higa*,

20   55 F.3d 448, 452(9th Cir. 1995) ("Rule 613(b) contains no bar, beyond foundation requirements,

21   to extrinsic evidence of prior inconsistent statements"). [56]

---

22   [55] The Court had previously indicated its intention to disallow any such impeachment.  Tr. 2468

23   ("I'm not going to let you call an extrinsic witness to impeach someone that's already testified").

24   [56] *See generally United States v. Shuemake,* 124 F.4th 1174, 1178 (9th Cir. 2024) ("We affirm

25   these prior decisions and are aligned with our sister circuits in holding that a district court may
     find that dubious claims of memory loss satisfy Rule 801(d)(1)(A)'s inconsistency

26   requirement").[56]  The *Shuemake* Court cited numerous additional examples of answers that are
     sufficient to trigger extrinsic proof that proffered statements were made: *United States v. Truman*,

27   688 F.3d 129, 142 (2d Cir. 2012) ("the refusal to answer" may be "inconsistent with his prior
     testimony"); *United States v. Iglesias*, 535 F.3d 150, 159 (3d Cir. 2008); *United States v.*

28

1     Similarly, assuming the Court has discretion to preclude impeachment on matters that are

2   "collateral," that term excludes only "a point not related to the matters at issue," *Higa*, 55 F.3d at

3   452 (citing 1 McCormick on Evidence § 47 (9th ed.)), and cannot preclude testimony on matters

4   such as whether more money was spent on the company's technology than on marketing.  As a

5   result, the Court erred in precluding the defense from impeaching at least seven additional

6   statements.[57]

7     Precluding the defense from impeaching Abramoff was especially damaging because the

8   Ninth Circuit has "repeatedly expressed its concern that defense counsel be given maximum

9   opportunity to impeach the credibility of key government witnesses," and that "[t]esting a

10  witness' credibility is especially important when he is an accomplice of the accused." *United*

11  *States v. Williams,* 668 F.2d 1064, 1070 (9th Cir.), *as corrected* (Feb. 8, 1982).  Leaving the jury

12  with the impression that Abramoff might have been truthful, and that defense counsel were wrong

13  in accusing Abramoff and other witnesses of contradicting themselves, wrongly enhanced the

14  credibility of government witnesses and undermined the credibility of defense counsel.[58]

15  _____

16  *Cisneros-Gutierrez*, 517 F.3d 751, 757 (5th Cir. 2008) ("[A] witness's feigned memory loss can
    be considered inconsistent under the Rule, for the unwilling witness often takes refuge in a failure

17  to remember" (quotation marks omitted)); *United States v. Hadley*, 431 F.3d 484, 512 (6th Cir.
    2005) ("limited and vague recall of events, equivocation, and claims of memory loss satisfy the

18  requirement of Rule 801(d)(1)(A)"); *United States v. Gajo*, 290 F.3d 922, 931 (7th Cir. 2002);
    *United States v. Dennis*, 625 F.2d 782, 796 (8th Cir. 1980).  *See Shuemake*, 124 F.4th at 1178 n.1.

19
20  [57] *See, e.g.,* Tr. 1758 (Abramoff testimony about calling Mr. Andrade an idiot); 1767 (Abramoff
    testimony about Mr. Andrade telling him AtenCoin had risen to $80); 1822 (Abramoff testimony

21  about whether more money was spent on the company's technology than on marketing); 1862
    (Abramoff testimony about Dillman preparing his own marketing material and Mr. Andrade

22  subjecting that material to legal review); 1278 (Carlsen testimony about Mr. Andrade not being a
    good businessman); 1279-80 (Carlsen testimony about Mr. Andrade spending a million dollar on

23  development); 1280 (Carlsen testimony that Naimer had gone quiet).

24  [58] The Court further deprived Mr. Andrade of his ability to impeach his alleged co-conspirators
    when it ruled at the beginning of the trial that would not allow testimony about matters addressed

25  in Mr. Andrade's misconduct motion, or from witnesses identified in that motion. Among other
    things, this precluded Mr. Andrade from letting the jury know about additional examples of

26  Abramoff using AML Bitcoin to engage in money laundering, about statements Mata made in a
    recorded conversation he arranged with Mr. Andrade and Mr. Andrade's counsel, and about FBI

27  Agent Buma's knowledge that Abramoff was, contrary to Abramoff's testimony, an informant.

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT          CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.    THE COURT ERRED IN DENYING MR. ANDRADE'S CONTINUANCE AND OTHER MOTIONS, PREJUDCING THE DEFENSE AND VIOLATING MR. ANDRADE'S CONSTITUIONAL RIGHTS

What Mr. Andrade learned during trial confirmed that the Court erred in denying his continuance motion, ECF 511 and 511-1. which grew out of a five-year delay in the production of Mr. Andrade's accounting records in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). Far from being not "exculpatory or otherwise material," or "merely cumulative," ECF 541 at 5:1-8, the eve-of-trial dump of records that the government seized from Mr. Andrade's accountant Karl Ruzicka in 2020 (as well as related government conduct) prejudiced the defense. *See* Diamond Declaration paragraphs 6-12.

First, the dump of files turned out to contain inaccessible files, containing financial analysis and backup of Mr. Andrade's AML Token sales, and also separate documents tracking the shareholders in his company that was licensing the use of patents he obtained. Many of Ruzicka's records of the AML Token sales were electronically connected to QuickBooks databases maintained by Office Squad, a bookkeeping business,[59] which had also been subject to search in 2020 when Ruzicka's own files were seized. Office Squad personnel were unwilling to cooperate with defense counsel, and the data remained unavailable. Had the government's production been made in 2020, or at any reasonable time before trial, the loss of data could have been remedied through subpoenas of other discovery efforts –or the problem would likely have been solved had the government produced the Office Squad material in timely fashion.

---

Tr. 1788:18-19; Dent Decl. at5para. 8. Denial of the misconduct motion was also erroneous for the reasons stated in that motion and the motion to reconsider its denial.

[59] The spreadsheets included the work of Ruzicka reviewing the QuickBooks data, linked to the Office Squad's database. There were periods of time when Office Squad performed bookkeeping for Mr. Andrade, without Ruzicka, and then later, Ruzicka subcontracted out some of his bookkeeping work to Office Squad. Office Squad therefore had the ownership rights/possession of the database that some of Ruzicka's own work-product relied upon. Ultimately, the defense was able to figure out that the government seized material from both Ruzicka and Office Squad that was linked, but never produced the Office Squad data to the defense. *See* Diamond Declaration, paragraphs 10-12.

41

Second, because the production was not made in timely fashion, because the government instructed Ruzicka to remain quiet about the seizure, and because Ruzicka, admits to a failing memory during the intervening five-year period, Mr. Andrade – who did not know the content or extent of Ruzicka's files or that they had been taken by the FBI– was deprived of the ability to capture exculpatory recollections from Ruzicka. *See* Diamond Declaration, paragraphs 6 through the end. Third, the Ruzicka documents included a check book register with original carbon-copy records, physical receipts, and other records that were not produced to the defense until February 3, 2025, after the amendment to the motion to continue was filed. *See* Diamond Declaration, paragraphs 6 et seq.

This flood of new but incomplete data, adding to thousands of exhibits and 5TB of discovery, came on top of other misconduct (much of which was also discovery-related; *see also* Part III, supra), identified in Mr. Andrade's Misconduct Motion, see ECF 499 and supporting documents, which the Court also erred in denying. Especially in combination, these errors violated *Brady* and prejudiced Mr. Andrade's ability to present his defense. *See Sherman v. Gittere*, 92 F.4th 868, 878-79 (9th Cir. 2024)

## VI.    THIS ACCUMULATION OF ERRORS WAS IN NO WAY HARMLESS

The over forty errors described in this brief cannot be washed away as harmless error. First, some of them, such as the failure to instruct based on what the grand jury charged for Count Two, are structural errors that are essentially never harmless. *See United States v. Becerra*, 939 F.3d 995, 1004 (9th Cir. 2019) Second, other errors impacted dispositive issues on which there was no contrary evidence: for example, Mr. Andrade's evidence that Dillman lied to him and cheated him out of proceeds of AML Bitcoin tokens, and that Dillman used AML Bitcoin to further Dillman's business in ways that jeopardized a critical tenet of Mr. Andrade's business — far more than the limited amount of evidence needed to trigger a jury instruction, *see Sotelo-Murillo*, 887 F.2d at 178; for which there was no substitute. *See Territory of Guam v. Marquez*, 963 F.2d 1311, 1316 (9th Cir. 1992) (jury instruction error required reversal despite fact that lawyer argued what would have been in instruction). Third, the magnitude of the errors — and the

42

one-sided way in which they repeatedly licensed government evidence that should never had been

admitted while excluding evidence the defense was entitled to admit — would make this a case in

which the accumulation of errors requires a new trial even if some of the errors individually could

be argued to be harmless.  *See United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988); *see*

*also United States v. Berry,* 627 F.2d 193, 200-01 (9th Cir. 1980) (in reviewing for cumulative

error, the court must review all errors preserved for appeal and all plain errors). When one party is

licensed to introduce very prejudicial but inadmissible evidence, and the other party is denied the

opportunity to introduce important exculpatory and impeaching information, "the cumulative

prejudicial effect of many errors may be greater than the sum of the prejudice caused by each

individual error.'  *See generally United States v. Graham*, 123 F.4th 1197, 1283 (11th Cir. 2024),

Finally, while the government may have introduced a high volume of evidence, it was of

low quality, as exemplified by Special Agent Quinn's testimony that he did not see any source

code in what Mr. Andrade's company had produced, Tr. 2852, which turned out to be because he

didn't look, and therefore missed *more than 13,000 pages* of it that were produced.  Tr. 2852.  *See*

*also* Tr. 3077 (rather than describing *what Mr.* Andrade was told about the rejection campaign,

jury is told only that "it was discussed"). The government's case was based on the testimony of

untrustworthy miscreants who lied repeatedly to their own closest friends (Bryan), were

previously caught lying and then repeated those same lies to the jury (Jodoin), were notorious

liars who nonetheless got sweetheart deals from the government to testify against Mr. Andrade

(Abramoff, Darrow), or who insisted on incredible statements like being motivated to help the

FBI as a good citizen while deceiving the FBI at the same time (Abramoff).

Not only was the quality of proof low, but the proof of each of the government's main

allegations, Tr. 202-03, proved to be full of holes.  The Super Bowl proof was weak because Mr.

Andrade reasonably believed he had the money to pay for the ad, Exs. 3047, 2106; because the

original intent was to place the ad, Ex. 1459, with the "rejection campaign" hidden from Mr.

Andrade based on the correct belief that he would not have approved it, Ex. 897; and he went

along with it only because he believed it would be triggered only after the ad was actually

1    rejected.  Tr. 3072-80.  The Panama Canal proof was weak because De La Guardia, the man on

2    the ground in Panama, represented that he was meeting with the Canal officials (and apologized

3    afterwards, Ex.1514), as the allegedly false publicity reported, and because Morgan & Morgan

4    repeatedly and consistently expressed interest in, and great possibilities with, using AML Bitcoin.

5    Tr. 3062-68: Exs. 8, 10, 11, 884, 891, 2160. The Port of San Francisco proof was weak because

6    the publicity in 2017 was based conversations with Port Commissioner Leslie Katz about her

7    proposing use of the AML Bitcoin technology, Tr. 892, on Dillman's report of what his lawyer

8    and Port Commissioner Leslie Katz was saying, Ex. 115, and because the proposed 2018

9    publicity — accurately based on Naimer's report of the meeting — never saw the light of day

10   after Mr. Andrade insisted that it be checked with Katz and killed the publicity when she did not

11   approve it.  Ex. 3109; Tr.3068-72.  What was written about Lt. Governor Newsom was accurate,

12   Tr. 928, 3080-82, Ex. 489, and the government never proved that any market manipulation was

13   ever performed, or that there was anything wrong with anything that was done, especially given

14   that government witness John Bryan, who supervised the activity, denied that the purpose was to

15   manipulate prices, and did not think there was any wrongdoing.  Tr. 1581:6-1582:9, 1585:19-25,

16   1609:11-1610:18; 3104-06 (addressed by defense counsel in closing argument).

17       No better were the money laundering allegations, which never had an answer for the facts

18   that Mr. Andrade always had too many transactions and engaged in needless activities due to his

19   paranoia and other disabilities, that he had been told by reputable counsel told he was free to

20   spend the proceeds of his token sales as he saw fit and therefore had nothing to hide, and that, if

21   he had wanted to hide the his purchases of real estate, the government showed that he possessed

22   more than enough cryptocurrency to purchase property in ways that could not be traced.

23       These holes were further weakened by the evidence from the government's own witnesses

24   that Mr. Andrade frequently misunderstood what was going on, Tr. 2898:21-2899:20, and that he

25   suffered from disabilities that impacted his decision-making.  Tr. 2899:24-2900:6. In the end,

26   these potentially good defenses were eviscerated by repeated rejections of admissible exculpatory

27   evidence, were overrun by a mass of inadmissible and unfairly prejudicial evidence admitted by

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT                    CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

the government over objection, and were lost in the absence of necessary instructions that the Court declined to give.  In the interests of justice, a new trial is required.

## CONCLUSION

For the reasons stated above, Mr. Andrade requests a judgment of acquittal and/or a new trial.

Dated: May 23, 2025                                      **KING & SPALDING LLP**


By:  _/s/ Michael J. Shepard_
MICHAEL J. SHEPARD
KERRIE C. DENT
DAINEC STEFAN
CINDY A. DIAMOND

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

45