MICHAEL J. SHEPARD (SBN 91281)
 mshepard@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, California 94111
Telephone:     +1 415 318 1221

KERRIE C. DENT (admitted *pro hac vice*)
 kdent@kslaw.com
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone:     +1 202 626 2394

CINDY A. DIAMOND (SBN 124995)
 cindy@cadiamond.com
**ATTORNEY AT LAW**
58 West Portal Ave #350
San Francisco, CA 94127
Telephone:     +1 408 981 6307

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>Defendant. | Case No. 3:20-cr-00249-RS<br><br>**DECLARATION OF CINDY A. DIAMOND IN SUPPORT OF DEFENDANT ANDRADE'S MOTION FOR NEW TRIAL AND FOR JUDGMENT OF ACQUITTAL**<br><br>Judge: Hon. Richard Seeborg<br>Hearing: June 24, 2025 9:30 a.m. |

1

I, Cindy A. Diamond, hereby state and declare:

1. I am one of the attorneys representing Mr. Andrade in the above-entitled case. I write this declaration as supplemental support for matters raised in Mr. Andrade's motion for retrial that are within my personal knowledge, based on my work as an attorney for Mr. Andrade before, during and after trial.

2. I cross-examined Agent Bryant Ling during trial, and I prepared to elicit any statements made by Mr. Andrade to Ling, in either of Ling's two undercover personas, if Ling's direct testimony suggested Mr. Andrade (a) represented untrue things about his token-sale with respect to the state of AML Bitcoin's development or partnership agreements, or (b) was in an agreement with Japheth Dillman to create an investment vehicle in cryptocurrency tokens with a design for financial profit through fraudulent sales. I knew that Mr. Andrade had explained the truth of the state of the token sales to Ling, and that if Ling represented otherwise, the long recorded conversation (and the short unrecorded conversation six-months earlier) would prove what Mr. Andrade actually said. A theme of the defense was to show Mr. Andrade, personally, had a good faith belief in his product and did not personally mispresent facts to his customers, and Mr. Andrade's literal statements, and their consistency over time (from January to July 2018) could help the jury form an opinion about Mr. Andrade's actual mental state. A finding that there was insufficient evidence of an intent to deceive and cheat would exonerate Mr. Andrade.

3. During trial I prepared five excerpts from Ex 3000, which was a duplicate copy of a Skype conversation that Ling (in one of his undercover identities) and another undercover FBI agent had with Mr. Andrade. The government's exhibits 1492, 1493, 1494, and 1495, noted at trial on 2-27-2025 Tr. 2103:2-22, came from that Skype recording. After I prepared the transcripts of these excerpts, before court started, I provided them to the Mr. Ward, the government' attorney handling Ling's direct examination. The Ling-Andrade July 2018 conversation lasted more than a half-hour. During the conversation, Mr. Andrade exhibited what I grew to learn were some of the behaviors consistent with Dr. Armstrong's neuropsychological

2

1  examination, for instance, during the conversation, Mr. Andrade continually redirected the
2  conversation to talk about the technology (his special interest, the uses of technology in various
3  forms) not the investment side of the cryptocurrency business.
4      4.     During Ling's examination, the Court precluded me from questioning Ling about
5  the content of the terms and conditions within (admitted) Exhibit 2471, the terms under which
6  Ling's first undercover-persona purchased AML Bitcoin Tokens from Mr. Andrade.  The Court
7  made clear that I was to limit my questions to steer clear of questioning aimed at diminishing the
8  victim's loss from the terms of a contract. *See* 2-27-2025 Tr.  2110:12-2112:9 ("I'll let you do
9  this one question, but don't go any further with this."  2112:8-9.)  My intent was otherwise and I
10 stated to the Court, "our relevance is for Mr. Andrade's knowledge because these are the
11 contracts Mr. Andrade signed."  2-27-2024 Tr. 2112:10-12.  The stated terms from the January
12 2018 Ling-as-Mason-Wong interaction with Mr. Andrade were consistent with the stated terms
13 from the July 2018 conversation that Ling-as-Lee had with Mr. Andrade.  Mr. Andrade was
14 neither ambiguous nor did he vary in either conversation about the material points relevant to the
15 token sale.  The Court's narrowing of my examination ("You can do that one and then – move to
16 --" 2112:21-23) prevented me from introducing the evidence we had to elucidate this evidentiary
17 point.
18     5.     I was unable to introduce transcript excerpts I had labeled Ex 3000 B through E,
19 due the Court's limitation on the subject matter of my cross examination of Ling. See prepared
20 but not offered Exhibit 3000-B (unprompted, Mr. Andrade describes the uses of blockchain for
21 things other than currency, objection sustained at Tr. 2138:1-8), and Exhibit 3000-B and 3000-C
22 (Mr. Andrade told Ling how his testing of Aten Coin failed due to his belief the devil's advocate
23 method of testing software, as it authenticated Homer Simpson, and AML Bitcoin was developed
24 to fix that problem, curtailed by the Court at 2142:14-2143:12; "I am telling you don't go beyond
25 the clips," at 2143:11-12.).  As Ling brought the conversation back to the finances, Ling was told
26 repeatedly that Ling's statements about the details of AML Bitcoin were incorrect:  that only a
27 token was being sold (Exhibit 3000-D), that the coin would go through AML identity checks
28

when launched but the token did not have that feature active (Exhibit 3000-D), that Dillman had been removed as an officer of AML because Dillman's interests were different and covered by different regulations. (Exhibit 3000-E, curtailed entirely by the Court at Tr. 2146:14-25, sidebar request denied.)

6. The balance of this declaration addresses new information that helped the defense understand the relevance of the IRS-Ruzicka documents that were the subject of defense motion to continue the trial for *Brady* reasons, filed in ECF 511 and 523. Specifically, this declaration is intended to supplement the declaration I filed on February 2, 2025, when the defense sought to exclude financial transaction records or obtain a 30-day continuance, due to the prosecution's error in not delivering Mr. Andrade's accountant's own financial-data that was seized by the government five years earlier, until the eve of trial.

7. I had further conversations with Mr. Ruzicka during the trial. Several times. Mr. Ruzicka insisted that he could have remembered details of the documents he prepared and/or stored in his files, had he been interviewed nearer to the date the material was seized by the IRS-CI unit. By the time I discussed them with him in early January 2025, Mr. Ruzicka had trouble remembering the context and meaning of some of his own notes, receipts, records, and annotations to backup documentation used for his accounting work. Back in 2020 after the search, Mr. Ruzicka waited for instructions from the IRS, because the documents he was given ordered him not to tell Mr. Andrade that they had seized his physical and electronic files. 2-28-2025 Tr. 2357:8-2358:15. Mr. Ruzicka was 70-years old when he testified; based on his demeanor and the repetition to me in preparation before his testimony, where he expressed his frustration at his slow ability to recall details, I believe his claim that his memory at age 65 is likely an accurate one.

8. During the trial and through preparation of the defense case, I learned that Mr. Ruzicka was Mr. Andrade's business accountant, entrusted with obtaining and keeping receipts for business income and expenses, throughout the time that Mr. Andrade attempted to create and produce a cryptocurrency with anti-money laundering features. It was Ruzicka who kept track of

4

Mr. Andrade's financial records with respect to the company that obtained his patents, and, separately, with the sale of the AML Bitcoin Tokens in 2018. After our *in limine* motion was filed, we received photocopies of paper records seized by the IRS from Ruzicka . Ruzicka had direct communication with Mr. Andrade's vendors and often obtained invoices or receipts directly without Mr. Andrade acting as intermediary. Ruzicka kept copy of shareholder agreements. Ruzicka apportioned interests by shares, in entities that were not wholly owned by Mr. Andrade. I believe that Mr. Andrade was personally unaware of the depth and breadth of the records Ruzicka kept.

9. The government's financial forensic witness, Theresa Chiu, testified about her conclusions with respect to monetary profit obtained by Mr. Andrade, which the government is expected to claim as victim loss. During trial Chiu did not produce a table indicating which bank accounts, and which transactions, prompted her conclusions. Chiu did not see or review anything in the Ruzicka files seized by the IRS in 2020, but the defense could not recreate her work for the defense accountants' analysis.

10. The accounting firm hired to assist the defense (through CJA) was asked to review the IRS Ruzicka documents, but that task could not be completed partially because many critical records needed access to a Quickbooks database, and the database was not included. The defense accountants did not have compatible software with the older version of Quickbooks, but even if they purchased an older version, without the precise database the Ruzicka files were linked to, those Ruzicka files could not opened or used. I discussed the Quickbooks database question with Mr. Ruzicka and he indicated that some of that material was created by Office Squad, the bookkeeping service that worked in the "bullpen" of the office suite in Las Vegas where Ruzicka had his office, and where NAC Foundation had a seldom-used office. Off and on, during the period of time covered in the indictment, Office Squad did bookkeeping work for Mr. Andrade, and they shared their data with Ruzicka when requested.

11. During our pretrial preparation, I sought contact with Office Squad to determine whether they were present for an earlier search of Mr. Andrade's office (in 2018). I did not even

1. know they had been searched – they, directly – in 2020 at that time.  I was told by the owner, who would not inform me of their current address, that neither she nor anyone who works for her wanted to talk about anything related to the FBI visit to their office, at all, ever. I refrained from contacting her again at her request. Later, during preparation of the defense case, I found out that that some material Ruzicka relied upon for his accounting work had been in Office Squad's possession (as it was their work product) when the office was searched in 2020, and that it, too, was taken by the IRS (under the authority of a warrant) when Ruzicka's documents were taken. I saw the subpoena served on Mr. Ruzicka , see 2-28-2025 Tr. 2357:8-2358:15  (in accordance with instructions on the cover letter with his subpoena, Mr. Ruzicka did not tell his client, Marcus Andrade, that the FBI seized his business financial files), and Mr. Ruzicka informed me that the Office Squad people received a similar one, with a similar cover letter, informing the recipient not to discuss the event of the subpoena with anyone.

12. During trial before the defense case started, I requested help from the team and King & Spalding, and from our client, to find any of the Office Squad material among the millions of documents produced in discovery.  None was found.  Due to the late disclosure of the Ruzicka documents that the IRS had for nearly five years, which in-turn alerted the defense to the need to obtain the Office Squad database material, the defense could not litigate the missing Office Squad Quickbooks data.  Trial was already underway.

13. Considering the descriptions of  the files, *see* ECF 523-1 and the attached exhibit, the content of Ruzicka's paper files, and the nature of the records kept for Mr. Andrade, it is likely the existence of these documents would have informed defense counsel's choice of strategy had they been known from the outset. These records would have allowed a forensic accountant to reconstruct NAC Foundation's asset and liabilities, and to track the income and expenses related to the patents obtained by Mr. Andrade, and held by his Family Trust. The detail alone of Mr. Andrade's hired surrogates would have been a factor that may have assisted the jury in finding Mr. Andrade operated his token sales in good faith.  Mr. Andrade himself was not capable of identifying financial records relevant to give defense counsel a full and complete

picture of his business expenses, income, or debt. Mr. Ruzicka could have done so, but defense counsel did not even know these records existed until late December 2024.

14. There was no legal excuse for the late disclosure; rather, the prosecution chose not to rely on the information in its case in chief as if this cured the error. Due to the nature of the evidence, amounting to Mr. Andrade's own business records in an alleged business-fraud scheme criminal case, it was error not to grant the continuance requested. The error not only allowed the government to produce summary evidence (through Chiu) about Mr. Andrade's financial gain without being subject to review, but the error deprived Mr. Andrade to review and use evidence that could have led to the jury's finding that he operated in good faith and without an intention to deceive or cheat.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on May 23, 2025, in San Francisco, California.

/s/ Cindy A. Diamond
CINDY A. DIAMOND / Declarant