1  MICHAEL J. SHEPARD (Bar No. 91281)
    *mshepard@kslaw.com*
2  **KING & SPALDING LLP**
    50 California Street, Suite 3300
3  San Francisco, California 94111
    Telephone:    +1 415 318 1200
4  Facsimile:    +1 415 318 1300

5  KERRIE C. DENT (Admitted *pro hac vice*)
    *kdent@kslaw.com*
6  **KING & SPALDING LLP**
7  1700 Pennsylvania Avenue, NW, Suite 900
    Washington, DC 20006-4707
8  Telephone:    +1 202 626 2394
    Facsimile:    +1 202 626 3737

9
   CINDY A. DIAMOND (SBN 124995)
10   *cindy@cadiamond.com*
    **ATTORNEY AT LAW**
11  58 West Portal Avenue, #350
    San Francisco, CA 94127
12  Telephone:    +1 408 981 6307

13
   Attorneys for Defendant
14  ROWLAND MARCUS ANDRADE

15
                **IN THE UNITED STATES DISTRICT COURT**
16
           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
17
                     **SAN FRANCISCO DIVISION**
18

19
   UNITED STATES OF AMERICA,            Case No. 3:20-CR-00249-RS
20
              Plaintiff,                **DEFENDANT MARCUS ANDRADE'S**
21                                       **CORRECTED MOTION FOR NEW**
        v.                               **TRIAL AND FOR JUDGMENT OF**
22                                       **ACQUITTAL**
   ROWLAND MARCUS ANDRADE,
23                                       Judge:    Hon. Richard Seeborg
              Defendant.                 Hearing:  June 24, 2025, 9:30 am
24

25

26

27

28

---

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 1

II.   THE COURT MADE THREE CRITICAL ERRORS IN INSTRUCTING THE JURY .......... 1

   A. Mr. Andrade Is Entitled to a New Trial Because the Court's Instructions Allowed the
      Jury to Convict Mr. Andrade of Money Laundering for Conduct Other than that
      Charged by the Grand Jury ................................................................................... 2

   B. Mr. Andrade Is Entitled to a New Trial Because the Court Did Not Properly Instruct
      the Jury About Good Faith ................................................................................... 5

   C. Mr. Andrade Is Entitled to a New Trial (and a Judgment of Acquittal) Because the
      Court Refused to Give a Multiple Conspiracies Jury Instruction, Despite Evidence
      that the Lone Wire Did Not Further the Scheme ................................................... 8

      2. There Was More than Ample Evidence of Multiple Schemes...................................... 9

         a. Dillman's separate scheme................................................................................ 9

         b. Abramoff's Separate Schemes. ...................................................................... 11

      3. At a Minimum, a New Trial Is Therefore Required...................................................... 12

      4. A Judgment of Acquittal Should Be Entered ........................................................... 13

III.  THE GOVERNMENT PRESENTED MISLEADING TESTIMONY IN VIOLATION
      OF NAPUE v. ILLINOIS, AND IT KNEW OR SHOULD HAVE KNOWN THE
      TESTIMONY WAS MISLEADING ........................................................................... 13

   A. There Were Many Deceptions Behind the Government's Presentation of Exhibit 805 .... 14

   B. The Government Knew or at Least Should Have Known that the Testimony It
      Offered and the Argument It Made Was Misleading ........................................... 15

   C. These Deceptions Require, at a Minimum, a New Trial...................................... 17

IV.   THE COURT'S EVIDENTIARY RULINGS DEPRIVED MR. ANDRADE OF A
      FAIR TRIAL ........................................................................................................... 19

   A. The Court Erroneously Excluded Exculpatory Evidence Based Largely on Erroneous
      Application of Hearsay Rules ............................................................................. 19

   B. The Court Admitted, Over Defense Objections, Incompetent Evidence Offered by the
      Government ........................................................................................................ 29

   C. The Court Placed Date-Based Restrictions on Evidence in the Defense Case After the
      Government Was Allowed to Present Evidence Regardless of Dates ................. 31

   D. The Court Erroneously Admitted Rule 404(b) and Other Unfairly Prejudicial
      Evidence ............................................................................................................. 33

- i -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E.  The Court Erred in Limiting Impeachment of Government Witnesses .............................. 34

1.  The Court Erred in Limiting Impeachment Allowed by Rule 806 .............................. 34

2.  The Court Erred in Limiting Impeachment Based on Prior Inconsistent Statements Under Rule 613 ........................................................................................................ 38

V.  THE COURT ERRED IN DENYING MR. ANDRADE'S CONTINUANCE AND OTHER MOTIONS, PREJUDCING THE DEFENSE AND VIOLATING MR. ANDRADE'S CONSTITUIONAL RIGHTS ........................................................................ 41

VI. THIS ACCUMULATION OF ERRORS WAS IN NO WAY HARMLESS ......................... 42

CONCLUSION ..................................................................................................................... 45

- ii -

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alvarez v Montgomery,*
 2022 WL 868889 (CD Cal. Jan. 27, 2022) ............................................................. 17

5

*Brady v. Maryland,*
6
 373 U.S. 83 (1963) ...................................................................................... 19, 40, 42

7

*Bush v. United States,*
 267 F.2d 483 (9th Cir. 1959) ..................................................................................... 39

8

9

*Carter v. Kentucky,*
 450 U.S. 288,304 (1981) .............................................................................................. 5

10

*Chambers v. Mississippi,*
11
 410 U.S. 284 (1973) ............................................................................................. 35, 38

12

*Clements v. Madden,*
 112 F.4th 792 (9th Cir. 2024) .................................................................................... 18

13

14

*DePetris v. Kuykendall,*
 239 F.3d 1057 (9th Cir. 2001) ................................................................................... 28

15

*Dow v. Virga,*
16
 729 F.3d 1041 (9th Cir. 2013) ................................................................................... 18

17

*Government of Virgin Islands v. Brown,*
 685 F.2d 834 (3d Cir. 1982) ........................................................................................ 4

18

19

*Hayes v. Brown,*
 399 F.3d 972 .................................................................................................. 17, 18, 19

20

*Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Labor Ass'n of U.S.*
21
 *Pension Tr.,*
 153 F. Supp. 3d 1217 (E.D. Cal. 2015) ...................................................................... 22

22

23

*Jackson v. Brown,*
 513 F.3d 1057 (9th Cir. 2008) ................................................................................... 17

24

*Kyles v. Whitley,*
25
 514 U.S. 419 (1995) ................................................................................................... 18

26

*Maxwell v. Rose,*
 628 F.3d 486 (9th Cir. 2010) ..................................................................................... 17

27

28

- iii -

*Montana v. Egelhoff*,
    518 U.S. 37 (1996) ........................................................................................... 28

*Napue v. Illinois*,
    360 U.S. 264 (1959) ..................................................................... 1, 17, 18, 19

*Panah v. Chappell*,
    935 F.3d 657 (9th Cir. 2019) .......................................................................... 17

*Phillips v. Ornoski*,
    673 F.3d 1168 (9th Cir. 2012) ................................................................. 17, 19

*Schmuck v. United States*,
    489 U.S. 705 (1989) ........................................................................................ 13

*Searway v. United States*,
    184 F. 716 (8th Cir. 1910) .............................................................................. 39

*Sherman v. Gittere*,
    92 F.4th 868 (9th Cir. 2024) ..................................................................... 28, 42

*Territory of Guam v. Marquez*,
    963 F.2d 1311 (9th Cir. 1992) ........................................................................ 42

*United States v. Ayers*,
    924 F.2d 1468 (9th Cir. 1991) ........................................................................ 32

*United States v. Baird*,
    712 F.3d 623 (1st Cir. 2013) ............................................................................ 5

*United States v. Barham*,
    595 F.2d 231 (5th Cir.1979) ........................................................................... 18

*United States v. Barkley*,
    985 F.2d 574, 1993 WL 11858 (9th Cir. 1993) ............................................... 7

*United States v. Becerra*,
    939 F.3d 995 (9th Cir. 2019) .......................................................................... 42

*United States v. Berry*,
    627 F.2d 193 (9th Cir. 1980) .......................................................................... 43

*United States v. Brandon*,
    17 F.3d 409 (1st Cir. 1994) ............................................................................ 12

*United States v. Bullcalf*,
    563 F. App'x 535 (9th Cir. 2014) ................................................................... 38

*United States v. Cisneros-Gutierrez*,
   517 F.3d 751 (5th Cir. 2008).................................................................................... 39

*United States v. Corona*,
   41 F. App'x 33 (9th Cir. 2002) ................................................................................ 20

*United States v. Dean*,
   487 F.3d 840 (11th Cir. 2007)................................................................................... 5

*United States v. Dennis*,
   625 F.2d 782 (8th Cir. 1980)................................................................................... 39

*United States v. Dorsey*,
   418 F.3d 1038 (9th Cir. 2005)................................................................ 22, 24, 28

*United States v. Escobar de Bright*,
   742 F.2d 1196 (9th Cir.1984).................................................................................... 5

*United States v. Fernandez*,
   388 F.3d 1199 (9th Cir. 2004).................................................................................... 8

*United States v. Friedman*,
   854 F.2d 535 (2d Cir. 1988)................................................................ 34, 35, 38

*United States v. Gajo*,
   290 F.3d 922 (7th Cir. 2002).................................................................................. 39

*United States v Garcia-Villanueva*,
   855 F.2d at *2................................................................................................................ 21

*United States v. Gering*,
   716 F.2d 615 (9th Cir. 1983)..................................................................................... 7

*United States v. Ghazaleh*,
   58 F.3d (6th Cir. 1995)............................................................................................... 12

*United States v. Gianandrea*,
   38 F. App'x 434 (9th Cir. 2002) ......................................................................... 6, 7

*United States v. Gibson*,
   675 F.2d 825 (6th Cir. 1982)................................................................................... 20

*United States v. Gilley*,
   836 F.2d 1206 (9th Cir. 1988).................................................................................... 4

*United States v. Graham*,
   123 F.4th 1197 (11th Cir. 2024) ........................................................................... 43

- v -

*United States v. Hadley*,
   431 F.3d 484 (6th Cir. 2005)................................................................. 39

*United States v. Higa*,
   55 F.3d 448(9th Cir. 1995)................................................................... 39

*United States v. Iglesias*,
   535 F.3d 150 (3d Cir. 2008)................................................................. 39

*United States v. Johnson*,
   459 F.3d 990 (9th Cir. 2006)................................................................. 5

*United States v. Kaplan*,
   490 F.3d 110 (2d Cir. 2007).................................................................. 30

*United States v. Kramer*,
   2020 WL 5408165 (N.D. Cal. Sept. 9, 2020) ....................................... 1

*United States v. Kuzniar*,
   881 F.2d 466 (7th Cir. 1989)................................................................. 7

*United States v. LaPage*,
   231 F.3d 488 (9th Cir. 2000)................................................................. 18

*United States v. Lin*,
   2018 U.S. Dist. LEXIS 68194 (N.D. Cal. Apr. 23, 2018) ...................... 19

*United States v. Lopez*,
   913 F.3d 807 (9th Cir. 2019)................................................................. 19

*United States v. Lothian*,
   976 F.2d 1257 (9th Cir. 1992)............................................................... 8

*United States v. Mc Kee*,
   506 F.3d 225 (3d Cir. 2007).................................................................. 4

*United States v. McBride*,
   862 F.2d 1316 (8th Cir. 1988)............................................................... 7

*United States v McHenry*,
   951 F.2d 364, 1991 WL 278830 (9th Cir. 1991) .................................. 7

*United States v. Mena-Robles*,
   4 F.3d 1026 (1st Cir. 1993).................................................................. 12

*United States v. Mendoza*,
   2022 WL 958381 (N.D. Cal. Mar. 30, 2022) ........................................ 1

- vi -

*United States v. Miller*,
891 F.3d 1220 (3d Cir. 2018) ................................................................ 4

*United States v. Moe*,
781 F.3d 1120 (9th Cir. 2015) ............................................................... 8

*United States v. Montana*,
199 F.3d 947 (7th Cir. 1999) ................................................................ 28

*United States v. Moreno*,
233 F.3d 937 (7th Cir. 2000) ................................................................ 28

*United States v. Narciso*,
446 F. Supp. 252 (E.D. Mich. 1977) ..................................................... 7

*United States v. Ocegueda-Ruiz*,
663 F. App'x 560 (9th Cir. 2016) ....................................................... 8, 9

*United States v. Pang*,
362 F.3d 1187 (9th Cir. 2004) .............................................................. 22

*United States v. Rogers*,
549 F.2d 490 (8th Cir 1976) ................................................................. 39

*United States v. Rubier*,
651 F.2d 628 (9th Cir. 1981) (per curiam) ........................................... 22

*United States v. Saada*,
212 F.3d 210 (3d Cir. 2000) ................................................................. 36

*United States v. Shuemake*,
124 F.4th 1174 (9th Cir. 2024) ............................................................ 39

*United States v. Sine*,
493 F.3d 1021 (9th Cir. 2007), *as amended* (July 17, 2007) ............... 32

*United States v. Singh*,
924 F.3d 1030 (9th Cir. 2019) .............................................................. 13

*United States v. Sotelo-Murillo*,
887 F.2d 176 (9th Cir. 1989) ........................................................... 5, 42

*United States v. Straker*,
800 F.3d 570 (D.C. Cir. 2015) (per curiam) ........................................ 17

*United States v. Truman*,
688 F.3d 129 (2d Cir. 2012) ................................................................. 39

*United States v. Vicaria*,
12 F.3d 195 (11th Cir. 1994)..................................................................... 7

*United States v. Voorhies*,
658 F.2d 710 (9th Cir.1981)...................................................................... 32

*United States v. Walker*,
25 F.3d 540 (7th Cir. 1994)....................................................................... 12

*United States v. Wallace*,
848 F.2d 1464 (9th Cir.1988).................................................................... 43

*United States v. Ward*,
747 F.3d 1184 (9th Cir. 2014)............................................................. 3, 4, 5

*United States v. White*,
116 F.3d 903 (D.C. Cir. 1997) (per curiam) ...................................... 35, 36

*United States v. Williams*,
668 F.2d 1064 (9th Cir.)............................................................................ 40

*United States v. Ziska*,
267 F. App'x 717 (9th Cir. 2008) .............................................................. 33

*Wagner v. County of Maricopa*,
747 F.3d 1048 (9th Cir. 2013)................................................................... 28

*Woods v. United States*,
279 F. 706 (4th Cir. 1922)......................................................................... 39

*Zurmot v. Borders*,
483 F. Supp. 3d 788 (N.D. Cal. 2020) ...................................................... 18

**Other Authorities**

3 Wright & Miller, Federal Practice & Procedure § 581 (5th ed.)............... 18

Fed. R. Evid. 102 ................................................................................... 36, 38

Fed. R. Evid. 608 and 806........................................................................... 34

Fed. R. Evid. 806(c).................................................................................... 34

Fed. R. Evid. Rule 102's.............................................................................. 38

Fed. R. Evid. Rule 29 .................................................................................. 13

Fed. R. Evid. Rule 403 ................................................................................ 30

Fed. R. Evid. Rule 404(b) .................................................................................. 33

Fed. R. Evid. Rule 608(b) and Rule 806 .......................................................... 35

Fed. R. Evid. Rule 608(b) .......................................................................... 35, 36

Fed. R. Evid. Rule 613 ...................................................................................... 38

Fed. R. Evid. Rule 613(b) .................................................................................. 39

Fed. R. Evid. Rule 801(d)(1)(A) ....................................................................... 39

Fed. R. Evid. Rule 806 and Rule 608(b) .......................................................... 35

Fed. R. Evid. Rule 806 ...................................................................... 34, 35, 36, 37

Fed. R. Evid. Rules 608(b) and 806 .................................................................. 38

Fed. R. Evid. Rules 806 and 608(b) .................................................................. 35

Federal Rule of Criminal Procedure 33 ...................................................... 1, 7, 18

Federal Rules of Criminal Procedure 487 ........................................................... 4

United States Constitution, Fifth Amendment .......................................... 4, 21, 36

1

2    **I.    INTRODUCTION**

3            During the trial, the Court made an unusual request of the government: "the U.S. Attorney

4    has an obligation — wants to protect the record, a good record. So if you think, 'Oh, great, we

5    just won that but he's totally out to lunch,' you ought to protect the record."  Tr. 2227.

6            The prosecutors did not heed the Court's request.[1]  To the contrary, the government

7    convinced the Court to refuse jury instructions to which Mr. Andrade was entitled and that were

8    critical for the jury's understanding of his defenses and for the protection of his constitutional

9    rights.  The government also repeatedly and successfully urged the Court to apply the rules of

10   evidence to allow the government to admit a flood of unfairly prejudicial, often incompetent

11   evidence, while limiting to a trickle the exculpatory evidence the defense was allowed to admit,

12   including the preclusion of evidence directly responsive to what the government was allowed to

13   admit. And the government compounded these errors by violating *Napue v. Illinois*, 360 U.S. 264

14   (1959), to fill an important gap in its proof.  For these and other reasons, a new trial is required

15   under Federal Rule of Criminal Procedure 33.

16   **II.   THE COURT MADE THREE CRITICAL ERRORS IN INSTRUCTING THE
             JURY**

17           For issues that have been preserved, as Mr. Andrade did for each of the three errors

18   identified below, "a motion for a new trial under Rule 33 may be granted for failure to give

19   proper jury instructions" if the instructional error affects substantial rights. *United States v.*

20   *Mendoza*, 2022 WL 958381, at *4 (N.D. Cal. Mar. 30, 2022) (quoting *United States v. Chang*,

21   2020 WL 5702131, at *15 (N.D. Cal. Sept. 24, 2020)). *See also United States v. Kramer*, 2020

22   WL 5408165, at *5 (N.D. Cal. Sept. 9, 2020) ("A motion for a new trial under Rule 33 may be

23   ────────────────────

24   [1] This brief sets out dozens of occasions in which the government did not heed the Court's advice, many of which gutted critical components of the defense.  *See* Declaration of Kerrie C. Dent, Exhibit A (list of documents cited herein that were offered but not admitted by the Court) and

25   Exhibit B (list of documents cited herein that were excluded but later admitted).  In response to the specific government objection that triggered the Court's comment — a hearsay objection to a

26   document reflecting Mr. Andrade's offer to provide Agent Quinn with AML Bitcoin's source code, Tr. 2224-2227, the prosecutors assured the Court that it was "absolutely right on this one."

27   Tr. 2227:15. It was not. *See* n. 24 *infra*.

28

ANDRADE'S MOTION FOR NEW TRIAL AND JUDGMENT          CASE NO. 3:20-CR-00249-RS
OF ACQUITTAL

1    granted for failure to give proper jury instructions.").

2
     **A. Mr. Andrade Is Entitled to a New Trial Because the Court's Instructions Allowed
3        the Jury to Convict Mr. Andrade of Money Laundering for Conduct Other than
         that Charged by the Grand Jury**

4        The grand jury charged Mr. Andrade with money laundering, alleging, *inter alia*, that he

5    engaged in money laundering on or about March 7, 2018, when he knowingly conducted "a

6    financial transaction."  Indictment (June 22, 2020), ECF #1 at 5-6. The indictment specifically

7    defines this transaction as "the purchase of a cashier's check drawn on an account held in the

8    name of Fintech Fund Family LP involving $600,000 in United States Currency later deposited in

9    an account in the name of Marcus Andrade." *Id.* At trial, the government put on evidence of a

10   collection of at least ten financial transactions that it said related to the flow of money from Mr.

11   Boyer to the purchase of real estate and an automobile by Mr. Andrade, one of which was the

12   purchase of the $600,000 cashier's check.[2]

13       Before trial, defense counsel proposed a jury instruction for the money laundering charge

14   that required the jury to find that "the defendant conducted or intended to conduct a financial

15   transaction involving property that represented the proceeds of proceeds of the wire fraud charged

16   in Count One, that is, the purchase of a cashier's check drawn on an account held in the name of

17   Fintech Fund Family LP involving $600,000 in United States Currency later deposited in an

18   account in the name of Marcus Andrade[.]" Parties' Joint Proposed Jury Instructions (Jan. 17,

19   2025), ECF #480 at 49:12-16. The government objected, *id*. at 51:6-27, and the Court did not

20   include the instruction in its proposed instructions.

21       Before the instructions were given, Mr. Andrade re-raised the lack of any mention of the

22   specific transaction that had been charged by the grand jury, first with the government and then

23

24   ───────────────
     [2] This collection of financial transactions started with Boyer's wire of $730,000 to Block Bits
25   Capital, and included a transfer from Block Bits Capital to a David Salmon Trust account, a
     transfer from there to NAC Payroll Services, then to a Fintech Fund account, followed by the
26   purchase of the $600,000 cashier's check, as well as the transfer of an additional $400,000, also
     by cashier's check, which was then used to purchase a truck, while the $600,000 was deposited
27   into an account at Woodforest Bank, where it was used in the purchase of two pieces of real
     estate. *See* Tr. 1963-1967; Ex. 1520-009.
28                                                    - 2 -

1   with the Court, again to no avail.[3]  As a result, the jury was not instructed that the government

2   had to establish all the elements of money laundering as to the specific transaction charged in the

3   indictment – the purchase of the $600,000 cashier's check.  ECF #1 at 6:7-10.  Rather, it was

4   instructed only that it had to find, in pertinent part, that "the defendant conducted or intended to

5   conduct *a financial transaction* involving property that represented the proceeds of wire fraud."

6   Tr. 2963 (emphasis added).  Nor was the jury instructed that it had to find Mr. Andrade guilty of a

7   financial transaction that occurred on or about March 7, 2018, the date charged in the indictment

8   – there was an instruction telling the jury that the government needed to prove that the offense

9   was committed on a date reasonably near the date charged in Count Two, Tr. 2960, but the jury

10  was never told what that date was or provided with the indictment so that it could figure out what

11  transaction had been charged as money laundering by the grand jury.

12          This failure to direct the jury in the instructions to the specific transaction alleged in the

13  indictment and its date "destroy[ed] the defendant's substantial right to be tried only on charges

14  presented in an indictment."  *United States v. Ward,* 747 F.3d 1184, 1191 (9th Cir. 2014) (quoting

15  *Stirone v. United States*, 361 U.S. 212, 217 (1960))  In *Ward,* the Ninth Circuit reversed identity

16  theft convictions, even though the jury was given a copy of the indictment, because the jury

17  instructions did not include the date of the offenses and the credit card numbers alleged in the

18  indictment; the Court explained that when the proof includes uncharged conduct that would

19  _____

20  [3] With the government, defense counsel wrote to "follow[] up on [his] quick call to Dave [Ward]
    earlier regarding our concerns on the money laundering elements as drafted and their omission of

21  the transaction charged in the indictment."  The government responded: "That issue was settled
    when Judge Seeborg finalized the jury instructions.  As he has said multiple times now, you have

22  preserved your objections.  No need for further meet and confers on that issue, in our view."
    Dent Decl., Exhibit E.

23  The defense then re-raised the issue with the Court, explaining that it was bringing the issue back

24  "because it seemed so fundamentally wrong."  The Court inquired about whether the instruction
    followed the pattern and then stated: "you've preserved your objection.  To the extent you

25  haven't, I think you waived it because it is the last day, but it sounds like you preserved it, but I
    am not going to change the instructions."  Tr. 2947:1-2, 22-25.  During the charging conference,

26  the Court had stated that while the parties could memorialize their objections any way they
    wanted, "I think you probably have preserved [instructions requested but not given] by virtue of

27  having a different set."  Tr. 2641:6-8.

28                                         - 3 -

satisfy the same element, "we need some way of assuring that the jury convicted the defendant based solely on the conduct actually alleged in the indictment," which "typically" will be provided by jury instructions requiring the jury to find the conduct charged in the indictment before it may convict." Many other cases have also so held.[4]

Although Mr. Andrade preserved his objection to this instruction twice, this error is so fundamental that it would require correction even if no objection had been raised. *See United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) (in contrast with variance, "characterizing an instruction as a constructive amendment typically mandates reversal. . ."); *United States v. Mc Kee,* 506 F.3d 225, 229 (3d Cir. 2007) (a constructive amendment, which occurs when jury instruction "effectively amends the indictment by broadening the possible bases for conviction from that which appeared in the indictment," is "a per se violation of the fifth amendment's grand jury clause" and "our plain error analysis presumes prejudice"); *Government of Virgin Islands v. Brown,* 685 F.2d 834 (3d Cir. 1982) ("Where counsel has made timely objection as required by this rule, it is reversible error for the trial court to omit instructions on essential fact-findings"); Wright & Miller, *supra* (submitting a case to a jury without accurately defining the offense

---

[4] There are too many to list them all here. A collection of some of them are in *United States v. Miller*, 891 F.3d 1220, 1235-36 (3d Cir. 2018) (reversing false statement conviction when a specific false statement was charged in the indictment, the government offered evidence of multiple false statements, and the jury was instructed only that the defendant knowingly and intentionally furnished false information, explaining that the defendant's fifth amendment rights are violated when "the indictment alleges a violation of the law based on a specific set of facts, but the evidence and instructions then suggest that the jury may find the defendant guilty based on a different, even if related, set of facts," adding that "it is settled law in this circuit, as elsewhere, that the language employed by the government in the indictments becomes an essential and delimiting part of the charge itself, such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars," and also citing five other cases to that effect); Wright & Miller Federal Practice and Procedure, Federal Rules of Criminal Procedure, section 487 ("it is error to submit a case to a jury without accurately defining the offense charged . . . [t]he test is whether the instruction leaves no doubt as to the circumstances under which the crime can be found to have been committed"). By broadening the possible bases for conviction, this Court's erroneous instruction also violated Mr. Andrade's right to a unanimous jury verdict, as guaranteed by Article III section 2, and the sixth amendment of the constitution, *see United States v. Gilley*, 836 F.2d 1206, 1212-13 (9th Cir. 1988) – another issue addressed in Mr. Andrade's proposed instruction argument about the instruction. *See* ECF #480 at 52:23-54:20.

1   charged and its elements "is not excused or waived by failure to request a proper instruction").[5]

2

3   **B.  Mr. Andrade Is Entitled to a New Trial Because the Court Did Not Properly
      Instruct the Jury About Good Faith**

4

5       A criminal defendant is entitled to a jury instruction "on any defense which provides a

6   legal defense to the charge against him and which has some foundation in the evidence, even

7   though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility."  *United*

8   *States v. Sotelo-Murillo*, 887 F.2d 176, 178 (9th Cir. 1989) (quoting *United States v. Yarbrough*,

9   852 F.2d 1522, 1541 (9th Cir. 1988); *United States v. Escobar de Bright*, 742 F.2d 1196, 1201

10  (9th Cir.1984) ("The right to have the jury instructed as to the defendant's theory of the case is

11  . . . 'basic to a fair trial'").  In deciding whether to give a requested instruction, a court must take

12  the evidence in the light most favorable to the defense, without making credibility determinations

13  or weighing conflicting evidence, with the standard of plausibility being quite low.  *United States*

14  *v. Baird*, 712 F.3d 623, 627 (1st Cir. 2013); *see also United States v. Johnson*, 459 F.3d 990, 993

15  (9th Cir. 2006) ("[T]he defendant is entitled to his proposed instruction even if his evidence is

16  "weak, insufficient, inconsistent, or of doubtful credibility. In assessing the evidence, we will

17  leave credibility determinations to the jury.").

18       Consistent with this precedent, Mr. Andrade timely requested a good faith instruction. *See*

19  _____
    [5] Nor does it matter that the government's forensic accountant Theresa Chiu made two references
20  to the $600,000 cashier's check as described in Count Two of the indictment. Tr. 1963, 1964.
    There is no question that this Court's obligation to instruct the jury is not replaced by anything
21  that happened during the trial, or anything (other than an instruction) that was provided to the
    jury. *See, e.g., Carter v. Kentucky,* 450 U.S. 288,304 (1981) (argument of counsel "could not
22  substitute for instructions by the court, and did not justify refusal of trial court" to give requested
    instruction, adding that "jurors are not experts in legal principles; to function effectively, and
23  justly, they must be accurately instructed in the law")); *United States v. Ward,* 747 F.3d at 1192-
    93 (even a copy of the indictment is insufficient absent features that would sufficiently clarify
24  ambiguity); Wright & Miller, *supra*, section 485 ("it is the duty of the trial judge to charge the
    jury on all essential questions of law").  Equally unimportant is whether the instruction follows a
25  Ninth Circuit model (which in any event may assume the jury at least has a copy of the
    indictment), because reliance on pattern instructions "are not precedent and cannot solely
26  foreclose the construction of the necessary elements of a crime as stated in the statute." *United*
    *States v. Dean*, 487 F.3d 840, 852 (11th Cir. 2007).

27

28

1  ECF #480 at 45-48. Good faith was, from the start of the trial to the end, a central element of Mr.

2  Andrade's defense. Tr. 218:7-18 (calling out good faith as a theme of the defense); Tr. 219:7-

3  221:8 (citing to examples of good faith to watch for in the evidence); Tr. 3033:8-20 (returning to

4  Opening Statement theme of good faith).  And Mr. Andrade's good faith defense was supported

5  by substantial evidence, such as his many and expensive efforts to build the technology to make

6  AML Bitcoin work, and his efforts to verify the accuracy of publicity before it went out,

7  including his rejection of proposed publicity about a meeting with the Port of San Francisco —

8  accurately based on Richard Naimer's firsthand report of the meeting — after Mr. Andrade

9  insisted that the publicity be run past Port Commissioner Katz, who did not approve of it. *See,*

10 *e.g.,* Tr. 902:4-18; Ex. 3109.

11      The Court correctly decided that it would give a good faith instruction, but it erred when it

12 did not use the instruction requested by Mr. Andrade, and especially when its instruction omitted

13 Mr. Andrade's requested language that "[t]he defendant does not have to prove his good faith.

14 Rather, the government must prove beyond a reasonable doubt that the defendant acted with

15 intent to defraud." ECF #480 at 47:24-25. After the Court advised counsel about its good faith

16 instruction, Mr. Andrade objected to the omission of language about the burden of proof on good

17 faith. Tr. 2656-57.[6]

18      The omission of this language was a critical error.  Not only was Mr. Andrade's good

19 faith the centerpiece of his defense, but in *United States v. Gianandrea*, 38 F. App'x 434, 436

20 (9th Cir. 2002) (reversing conviction), the Ninth Circuit found the omission from a good faith

21 instruction of language about the burden of proof on that issue to be error.  This Court's election

22 not to tell the jury what the government had to establish about good faith — that the government

23 had to disprove good faith beyond a reasonable doubt — was in marked contrast to its specific

24 directions to the jury on what the government *did* have to establish beyond a reasonable doubt.

25

26 [6] The defense called out the omission from the Court's instruction of language that the defendant
   does not have to prove his good faith, noting that this language is "very important" and asking the

27 Court to include it. The Court explained why it was not doing so, and added: "So I heard you, you
   preserved the evidence, but I'm leaving it out." Tr.2657:1-7.

28

- 6 -

1   *See, e.g.,* Tr. 2961, 2963.  As *Gianandrea* explained, this omission of burden of proof from the

2   good faith instruction "likely left confusion in the jury's mind as to where the burden of proof lay

3   with the good faith defense, and how high that burden was," and the omission "may have caused

4   the jury to convict [the defendant] where it might not have done so had it known that the

5   government had to *disprove* good faith beyond a reasonable doubt." *Id.* (emphasis in original).[7]

6          While other Ninth Circuit cases have decided that it is not an abuse of discretion to

7   decline to give good faith instructions that place the burden of disproving good faith on the

8   government, *see, e.g., United States v. Gering*, 716 F.2d 615 (9th Cir. 1983), the courts in those

9   cases at least expressly told the jury that if the defendant acted in good faith, "the defendant must

10  be acquitted," coupled with "the burden of proof never shifts from the government throughout the

11  trial." *Id.* at 622; *see United States v McHenry*, 951 F.2d 364, 1991 WL 278830, at *4 & n.2 (9th

12  Cir. 1991) (Table) ("if the evidence leaves you with a reasonable doubt whether the defendant

13  entertained such good faith, you must then find that defendant not guilty"); *United States v.*

14  *Seymour,* 576 F.2d 1345 (9ᵗʰ Cir. 1978) (same).  In any event, even if the Ninth Circuit might find

15  that the instruction in this case — which lacked any such direct connection with acquittal —

16  would not be an abuse of discretion, this motion requires less.  *See, e.g., United States v. Vicaria*,

17  12 F.3d 195, 198 (11th Cir. 1994) ("The basis for granting a new trial under Rule 33 . . . is a

18  broad standard" that "is not limited to cases where the district court concludes that its prior ruling,

19  upon which it bases the new trial, was legally erroneous.").[8] The Ninth Circuit in *Gianandrea*

20  correctly noted the substantial risk of confusion created by a good faith instruction without the

21
22  [7] *See generally United States v. Barkley*, 985 F.2d 574, 1993 WL 11858, at *1 (9th Cir. 1993)
    (Table) (good faith instruction included that "the burden is on the Government to prove beyond a
23  reasonable doubt that each of the Defendants did not have a good faith misunderstanding of the
    law or a good faith belief that he or she was not violating the law").

24  [8] *See also United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (Rule 33 relief available
25  where substantial rights of the defendant have been jeopardized by errors or omissions during the
    trial); *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988) (the "interest of justice"
26  standard "requires the district court to balance the alleged errors against the record as a whole and
    evaluate the fairness of the trial); *United States v. Narciso*, 446 F. Supp. 252, 304 (E.D. Mich.
27  1977) ("[T]he very words of the rule 'interest of justice' mandate the broadest inquiry into the
    nature of the challenged proceeding.").

28

ANDRADE'S CORRECTED MOTION FOR NEW TRIAL AND                    CASE NO. 3:20-CR-00249-RS
JUDGMENT OF ACQUITTAL

1   burden of proof, and there was no reason to risk any such confusion on this critical issue.

2   **C.   Mr. Andrade Is Entitled to a New Trial (and a Judgment of Acquittal) Because the Court Refused to Give a Multiple Conspiracies Jury Instruction, Despite Evidence that the Lone Wire Did Not Further the Scheme**

3

4   Because a criminal defendant is entitled to a jury instruction "on any defense which

5   provides a legal defense to the charge against him and which has some foundation in the

6   evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful

7   credibility," *see* Part IIB, *supra*, Mr. Andrade was also entitled to a multiple conspiracies

8   instruction.  As with the good faith instruction, in deciding whether to give this instruction, the

9   Court must take the evidence in the light most favorable to the defense, without making

10   credibility determinations or weighing conflicting evidence, with the standard of plausibility

11   being quite low.  *See* Part IIB, *supra*.

12   **1.   Background and Governing Legal Standards**

13   Before trial, defense counsel proposed a multiple schemes jury instruction.[9]  ECF #480

14   (Jan. 17, 2025) at 43:1-6. The government objected and the Court did not include the

15   instruction.[10] "A multiple conspiracies instruction is warranted where a jury could reasonably

16   interpret the evidence presented at trial to show separate conspiracies and there is a risk that the

17   defendant may be convicted on the basis of acts committed by those in a conspiracy of which he

18   was not a part." *United States v. Ocegueda-Ruiz*, 663 F. App'x 560, 561 (9th Cir. 2016); *see*

19   *United States v. Moe*, 781 F.3d 1120, 1127 (9th Cir. 2015); *Anguiano*, 873 F.2d at 1317-18.

20   *United States v. Fernandez,* 388 F.3d 1199, 1247 (9th Cir. 2004) (multiple conspiracy instruction

21   required if theory of charged conspiracy "is supported by law and has some foundation in the

22   ───────────────

23   [9] The proposed instruction was properly modeled on the pattern instruction for multiple conspiracies.  *See United States Court of Appeals for the Ninth Circuit*, MANUAL OF MODEL JURY INSTRUCTIONS, 11.3; *United States v. Lothian*, 976 F.2d 1257, 1262-63 (9th Cir. 1992)."  ECF #480 at 44:8-11.

24

25   [10] While letting the parties preserve any objections as the parties saw fit, the Court declared that proposing the instruction probably preserved any objection to the Court not giving the instruction. Tr. 2641:6-10.  In any event, the defense re-raised the issue after the Court circulated its proposed instructions, and the Court assured counsel that "you've preserved your record."  Tr. 2673:24-25 to 2674:1-13.

26

27

28

1  evidence").  Although the risks associated with multiple conspiracies often are absent when a

2  defendant is tried alone, s*ee Anguiano*, 873 F.2d at 1318, that is not true where, as here, there is

3  evidence of a second conspiracy. *See Ocegueda-Ruiz*, 663 F. App'x at 561-62 (the fact that

4  defendant was tried alone negated the risk of multiple conspiracies only because the government

5  presented no evidence that was separate from the one with which he was charged).

6  **2.  There Was More than Ample Evidence of Multiple Schemes**

7  Before trial, the Court granted, over Mr. Andrade's objection, the government's motion to

8  admit co-conspirator statements of alleged co-conspirators Abramoff, Dillman, and Mata, and

9  ordered that all but one of the more than 100 statements could be admitted. Order (Jan. 30, 2025),

10  ECF #514 at 3. Abramoff, Dillman and Mata were indicted in related cases and were engaged in

11  conspiracies separate from, and in conflict with, the scheme for which Mr. Andrade was

12  convicted. There was plenty of evidence – none of which was questioned by the government --

13  that Mr. Andrade's alleged co-conspirators, David Mata, Japheth Dillman and Jack Abramoff,

14  were engaged in schemes involving activities that were separate from and in conflict with Mr.

15  Andrade's goals for AML Bitcoin.  That same evidence showed that they did so in ways that are

16  central to whether they were participating in a scheme in which Mr. Andrade knowingly

17  participated.

18  **a.  Dillman's separate scheme**

19  Along with Mata, Dillman's separate scheme was to use Mr. Andrade's cryptocurrency to

20  convince potential buyers not to buy the coins from Mr. Andrade but instead to put their money

21  into Dillman's investment fund, which would acquire the coins as an investment, among other

22  investments.  Dillman hid this separate scheme from Mr. Andrade.[11]  The benefits of this separate

---

[11] Multiple, independent lines of evidence support this fact. Ben Boyer, the purchaser who sent
the $730,000 wire to Block Bits Capital on January 12, 2018 — the wire that is at the core of both
counts of the indictment — dealt only with Dillman in making that purchase, having met Dillman
on an airplane and having been convinced by Dillman to acquire AML Bitcoins.  Tr. 582:10-25,
606:17-25; 607:1-12.  Boyer's agreement with Dillman was a share purchase vehicle with Block
Bits Capital that was explicitly an investment agreement in which he and other members of Block
Bits AML Holdings purchased shares of the company, the money was pooled, and the purchases
of AML tokens were made from the common fund.  Tr. 594:1-14. This was very different from

1  scheme for Dillman and Mata were to increase his assets under management so they could sell

2  their investment fund for, according to Dillman's plans, billions[12] to defraud Mr. Andrade by

3  fabricating a purported order for $50 million in AML tokens (Tr. 1818:14-17; 1819:2-5; Ex.

4  3047), which Dillman used to get a discounted price from Mr. Andrade on the much smaller

5  amount of coins he did buy — while cheating both Mr. Andrade and the coin purchasers by

6  skimming the discount for themselves; Tr. 598-600; and even plotting to take over Mr. Andrade's

7  company.[13]

8         In addition to having his ownership put at risk and being cheated out of money by

9  Dillman, Mr. Andrade suffered as a result of Dillman's separate scheme because Dillman's use of

10  Mr. Andrade's cryptocurrency to obtain investments in Dillman's fund undermined a central tenet

11  of Mr. Andrade's business — that his cryptocurrency was *not* an investment.  Mr. Andrade put

12  substantial effort into building his company around this tenet, Tr. 932:32-933:13; 2372:22-

13  2373:19, and used it to govern how he spent funds. Tr. 2379:23-2382:16.[14] These tenets were so

14  central to Mr. Andrade's business, and Mr. Andrade was so paranoid and compulsive about his

15  deal terms (recall that he turned down $100,000,000 for his patents over deal terms, Tr. 1815:23-

16  1816:24, that the evidence suggests he would not have accepted the money from Dillman had he

17  _____

18  the purchase agreement Boyer signed to purchase directly from NAC in October 2018, which said
    that the purchase was not a pooled interest and was not being made for investment purposes, and
    that the AML purchaser expected no return on investment. Ex. 602; Tr. 593:3-19.  *See also*
19  Tr. 2157:16-25 to 2158:1-2 (government witness UCE Ling told Abramoff and UCE Gupta that
    there was a "disconnect" between what Dillman told him and what Mr. Andrade told him
20  regarding the purchase of AML Bitcoin tokens). On January 16, 2018, Dillman pitched AML
    Bitcoin at a panel for Silicon Valley Blockchain and ICO Investors, at which Mr. Andrade did not
21  appear or speak. Tr. 899:13-902:3.

22  [12] Exhibit 3054, an email chain between Arthur Weisman (a member of Block Bits AML
    Holdings) and Dillman in January 2018, showed that the members of Block Bits Capital were
23  planning a meeting to use assets under management to get acquired for billions of dollars within
    18 to 24 months. Tr. 935-36.
24
25  [13] *See also* Tr. 2416:7-2417:16, Ex. 3381 (court erroneously excludes exhibit offered to show
    exclusion of Mr. Andrade from Dillman discussion of possible FBI investigation).
26
    [14] Mr. Fahy instructed Mr. Andrade that the net proceeds from AML bitcoin sales could be used
27  for whatever purposes he saw fit. There were no restrictions on the use of the proceeds for a home
    or car purchase. Tr. 2382:10-16 and 2383:1-4.
28
                                          - 10 -

1   known that it came from an investment in Dillman's funds.  Tr. 3122:5-10.  For further

2   corroboration, look no further than Dillman: he feared Mr. Andrade would have turned down the

3   money, which is why he repeatedly hid from Mr. Andrade the fact that he was using AML

4   Bitcoin to attract investors for the Block Bits investment fund.

5               **b.  Abramoff's Separate Schemes.**

6               Abramoff conceded on cross-examination that from the start of his involvement with

7   AML Bitcoin he used the coin behind Mr. Andrade's back to engage in what could not be

8   explained as anything other than money laundering.  At the same time that Abramoff was seeking

9   to help a Ukrainian billionaire friend whose money had been frozen, in Exhibit 3262, Abramoff

10  and another friend, Roger Engone, planned a series of transactions in which they, some of their

11  other friends, and two Angolan participants would use AML Bitcoin and Dubai bank accounts,

12  with the ultimate result being that more than a billion dollars per month would be held in each

13  Dubai account. Tr. 1858-61.

14              While Abramoff testified that he somehow forgot all the other details of this billion dollar

15  money laundering deal, Tr. 1861:6-7, the deal appears to have been the reason he pushed Mr.

16  Andrade to start the ICO for AML Bitcoin before the coin was ready, to the detriment of both Mr.

17  Andrade and the purchasers of the tokens.[15]  As a result, the billion-dollar deal reflects that

18  Abramoff wanted the coins to exist to be used for his own separate purposes, purposes that were

19  more important to him than the success of AML Bitcoin. Other evidence also suggested that

20  Abramoff wanted to get control of the coin away from Mr. Andrade, Tr. 767-69, and confirmed

21  that Abramoff's intended uses of business were contrary to those of Mr. Andrade.[16]

22

---

23  [15]Abramoff told Mr. Andrade on July 10, 2017 that "we need to move our ICO along as quickly
24  as we can. . ." Tr. 1845:18-21. Evidence throughout the trial pointed to the damaging result from
    Abramoff's rush.  For example, software testifier Hung Tran testified to the urgency
25  surrounding his hiring to do project management with the Newgen team developing the AML
    Bitcoin token. Tr. 1394:1-1395:12. He also described the rushed development of a token stand-in
26  for the AML Bitcoin when the Newgen team was unable to deliver. Tr. 1396:17-1397:10;
    1399:12-1400:14.
27
    [16] *See* p. 25-28, *infra*.
28
[16] *See* p. 25-28, *infra*.

- 11 -

ANDRADE'S CORRECTED MOTION FOR NEW TRIAL AND             CASE NO. 3:20-CR-00249-RS
JUDGMENT OF ACQUITTAL

1

### 3.  At a Minimum, a New Trial Is Therefore Required.

Because the Court refused to give the proposed multiple conspiracy instruction, the jurors were left with only an instruction that if they decided that Mr. Andrade was "a member of a scheme to defraud" and had intent to defraud, then he may be "responsible for other co-schemers' actions during the course of and in furtherance of the scheme, even if the defendant did not know what the other co-schemers said or did."  Jury Instruction No. 21, ECF #612 at 24; Tr. 2964:16-21. That instruction left the jurors without the tools the law allowed them to consider whether there was a separate scheme, which would have aided their consideration of whether various conduct of Mr. Dillman and Mr. Abramoff, and all of their alleged co-conspirator statements, should be attributed to Mr. Andrade, and whether the wire charged in Count One was in furtherance of a scheme in which Mr. Andrade knowingly participated.

A rational jury could have found Mr. Andrade not guilty if the Court had given the requested instruction, either because it separated the conduct and statements of Dillman and Abramoff from that of Mr. Andrade, or because it determined that there was at least a reasonable doubt about whether Boyer's wire to Dillman as part of an investment in Dillman's fund was conduct that was part of any scheme to which Mr. Andrade agreed, as opposed to a separate scheme by Dillman.  On these facts, whether Dillman and Mr. Andrade were "directed toward a common goal," *United States v. Ghazaleh*, 58 F.3d at 240, 245 (6th Cir. 1995), whether they had "distinct purposes," *United States v. Walker*, 25 F.3d 540, 547 (7th Cir. 1994), and whether there was a single conspiracy or multiple conspiracies, were "factual matter[s] for the jury to determine," *United States v. Mena-Robles*, 4 F.3d 1026, 1033 (1st Cir. 1993), with the benefit of a multiple conspiracy or scheme instruction. *United States v. Brandon,* 17 F.3d 409, 449 (1st Cir. 1994) (which should be given when "'a reasonable jury could find more than one . . . illicit agreement, or could find an agreement different from the one charged.'").  This is a benefit that has been properly extended to juries in other multiple conspiracy cases. *See United States v. Singh*, 924 F.3d 1030, 1054 (9th Cir. 2019) (jury instructed to find the defendant not guilty of

- 12 -

1   conspiracy if he was not a member of the charged conspiracy, even if he was part of some other

2   conspiracy).

3        **4.   A Judgment of Acquittal Should Be Entered**

4        There was no rebuttal to the proof identified in part II.C.2.a. above that Mr. Andrade

5   would not have accepted the money from Dillman had he known it came from an investment in

6   Mata and Dillman's funds — as Dillman himself understood, given that he hid those facts from

7   Mr. Andrade.  Because "[t]he relevant question at all times is whether the [wire] is part of the

8   execution of the scheme *as conceived by the perpetrator at the time*," *Schmuck v. United States*,

9   489 U.S. 705, 715 (1989) (emphasis added), no reasonable juror could conclude beyond a

10  reasonable doubt that the government met its burden to prove the wire was in furtherance of the

11  scheme.  The Court should therefore grant Mr. Andrade's Rule 29 Motion on Count One, and

12  more generally on the ground that the prosecution failed to present sufficient proof from which

13  any rational juror could conclude beyond a reasonable doubt that Mr. Andrade was guilty on

14  either count.[17]

15  **III.   THE GOVERNMENT PRESENTED MISLEADING TESTIMONY IN
16         VIOLATION OF *NAPUE v. ILLINOIS*, AND IT KNEW OR SHOULD HAVE
           KNOWN THE TESTIMONY WAS MISLEADING**

17       The government pulled a fast one with Exhibit 805.  Exhibit 805 was used to mislead the

18  jury into thinking that Mr. Andrade was handling the Twitter and other social media accounts for

19  AML Bitcoin when alleged misrepresentations on those accounts were made.  Exhibit 805 was a

20  critical piece of that proof—emphasized during the government's closing arguments and crucial

21  for its claims, *see, e.g.*, Tr. 3012:17-24 (trial counsel pointing directly to Ex. 805 as evidence of

22  Mr. Andrade's control of social media); Tr. 2972:23-2973:2 (saying Mr. Andrade amplified lies

23  through social media accounts that "he controlled"); Tr. 2983:6-9 (same)—because Melissa

24  ─────────────────

25  [17] For example, the government also had no answer to its own proof showing that Mr. Andrade
    had ample cryptocurrency to make his real estate purchases using cryptocurrency if he had any
26  interest in hiding the source of his funds, requiring acquittal on Count Two.  Theresa Chiu
    testified to Mr. Andrade's receipt of over $2.8 million in cryptocurrency, Tr. 1956:9-1958:24, and
27  the defense pointed out in closing how trivially easy it would be for Mr. Andrade to have
    concealed the home purchase using those funds. Tr. 3111:24-3112:5.

28                                              - 13 -

1    Foteh, who controlled the accounts when the alleged misrepresentations on social media were

2    made, proved to be an utterly unreliable source of information, Tr. 1127:8-1128:6, and because

3    Bernadette Tran and Melanie Cowan, the government's other witnesses on this subject, were not

4    dealing directly with Mr. Andrade about the social media during the period that any of the alleged

5    misrepresentations on social media were made.[18]

6        **A.  There Were Many Deceptions Behind the Government's Presentation of
         Exhibit 805**

7

8        Exhibit 805 was introduced during the testimony of Special Agent Quinn.  As he

9    described the exhibit, it is "an image taken of a piece of paper" from Mr. Andrade's cell phone

10   that the FBI had seized and searched pursuant to the search warrant for his home in March 2020,

11   Tr. 2191:6-10, and "appears to be a list of accounts, email accounts, Twitter accounts, and so

12   forth," and usernames and passwords for the accounts. Tr. 219114-17.  The first two letters of all

13   the passwords were "M and A."  Tr. 2191:18-19.  The impression left by the introduction of the

14   exhibit, by Quinn's testimony, and by the government's argument about the exhibit, is that Mr.

15   Andrade controlled the social media accounts in 2017 and 2018.

16       The government left this impression by concealing from the jury and the defense a series

17   of material facts about Exhibit 805.  Most importantly, the image first appeared on Mr. Andrade's

18   phone in 2020 — long after the alleged misrepresentations on social media — and *was not*

19   *created until January 2020*, and the passwords with Mr. Andrade's initials that the government

20   emphasized to the jury *had just been changed in 2020*.  Second, the image came to Mr. Andrade

21   in a communication from one of his lawyers, Axel Lindholm, and should never have been

22   reviewed by the prosecution team, at least until it was reviewed by a taint team. Declaration of

23   Kerrie C. Dent in Support of Motion for New Trial (Dent Decl.), Exs. K and L.  Third, despite

24

25   [18] Tr. 993:7-21 (Tran began doing work for Mr. Andrade in March 2018, but was under Foteh's
     exclusive supervision at Republic One until around four months later (~July 2018), when she
26   began working for Mr. Andrade directly); Tr. 1031:2-4, 1042:23-1043:5 (Cowan began working
     for Foteh at Republic One in March 2018, and did not begin working directly for Mr. Andrade
27   until around August 2018).

28                                        - 14 -

1    extensive discovery practice,[19] requests for a production of a complete Cellebrite report from Mr.

2    Andrade's phone, representations by the government that it had complied with its obligations,

3    and orders (over government objection) on this very issue by Judge Beeler — one of which

4    required the government to "produce the unminimized version of the Motorola G7 and the

5    unminimized Cellebrite report" — the image that turned up at trial and was marked as Exhibit

6    805 was not on the Cellebrite report of Mr. Andrade's phone that the government produced to

7    defense counsel, so the defense could not easily determine that the image had not been created or

8    put on his phone until 2020, or that it was part of a lawyer-client communication.

9       **B.  The Government Knew or at Least Should Have Known that the Testimony It
        Offered and the Argument It Made Was Misleading**

10

11      The government knew better than to have suggested that Exhibit 805 told the jury

12   anything about who was handling Twitter and other social media accounts for AML Bitcoin at the

13   _____

14   [19] *See* Dent Decl. para. 8 (Mr. Andrade's phone was the only device seized from him for which
     the case agents requested and received immediate working copies. The reports from the forensics
15   laboratory made it clear that, in addition to the three minimized reports that were provided to the
     case agents almost immediately after the phone was seized, there also was an unminimized, pre-
16   taint review image. Even after numerous pleadings were filed, many letters were written, hearings
     were held, and orders were issued, the government never produced the unminimized extraction of
17   the G7. Judge Beeler ordered that "*the government must produce the unminimized version of the
     Motorola G7 and the unminimized Cellebrite report.*" Order Granting Motion to Compel, Dkt.
18   #292 at 2:6-7 (March 17, 2024) (emphasis added). But, despite the government's representation
     that it had produced the unminimized image of Mr. Andrade's Motorola G7 (Dkt. #299 at 2:26,
19   April 19, 2024), the government only re-produced the minimized extraction of the phone that it
     previously had produced. King & Spalding eDiscovery Operations and an outside vendor
20   confirmed that the government has not produced the unminimized, pre-taint version of the phone.
     Attempting to explain producing only such a small portion of the phone, the government claimed
21   that there were technical difficulties with imaging the phone, rendering it impossible to obtain a
     full image.  But when defense counsel asked for the forensics reports that would have been
22   written by the RCFL to document the difficulty in imaging the phone, no such forensics reports
     were provided.  Instead, the government produced an FBI 302 report written by Agent Zartman in
23   July 2024, more than four years after the phone was seized and imaged, and several months after
     the parties briefed Judge Beeler's March 17, 2024 Order directing the government to produce the
24   unminimized version of the phone. In addition, another 302 produced by the government
     indicates that in August 2020, the FBI conducted a taint review of Mr. Andrade's phone, tagging
25   potentially privileged documents using a list of attorneys, and placed the Cellebrite file in the case
     file for "later review by a prosecutor," further proving that a pre-taint report of the phone existed
26   at some point in time.

27

28
                                              - 15 -

1   time the alleged misrepresentations on those accounts were made. The screenshot that was

2   marked and admitted as Exhibit 805 did not appear on Mr. Andrade's phone until 2020, and as

3   best the defense can determine, no such document with the initials "MA" as part of the passwords

4   — the key to the government's argument that Mr. Andrade controlled the accounts — was on his

5   phone prior to 2020.

6          Facts learned through exhaustive post-trial research demonstrate that, the government

7   knew, or had every reason to know, that the list of social media passwords in Exhibit 805 was a

8   newly-created list, and that the passwords that began with "M and A," as Quinn testified, were

9   not put in place until 2020.  First, the FBI seized and produced to Mr. Andrade all the prior

10  versions of the social media password list, none of which included passwords that began with the

11  letters "M and A."  *See* Dent Decl., Ex. F.[20]  Second, the Cellebrite report from Mr. Andrade's G7

12  phone, produced by the government, includes a message from Mr. Andrade to Melanie Cowan on

13  January 13, 2020, showing that they were changing the social media passwords as Cowan was

14  departing. Dent Decl., Ex. J.

15         Third, if those facts are not enough, the screenshot the government chose to use as Exhibit

16  805 (which was sent in a WhatsApp message by one of Mr. Andrade's lawyers, as can be

17  identified from the telephone number) was a screenshot of an attachment to an email message that

18  was sent to Mr. Andrade in January 2020, both of which were also on Mr. Andrade's phone. The

19  email was from an employee of Mr. Andrade's lawyer and unambiguously explained that "the

20  doc attached [a screenshot of which was Exhibit 805] *has the passwords we have changed thus*

21

22  ───────────────
    [20] From late 2017 to November 2018, Dylan Pugliese maintained the passwords for the social

23  media accounts.  The metadata shows that this version of the passwords, "AML PWs Updated,"
    was created by Pugliese on December 3, 2017 and last updated by him on November 16, 2018.

24  From November 2018 to April 2019, Melanie Cowan maintained the passwords for the social
    media accounts.  Dent Decl., Ex. G. The metadata shows that this version of "AML PWs

25  Updated" was created by Melanie Cowan on November 14, 2018 and last updated on April 22,
    2019.  And from April 2019 to December 2019, Bernadette Tran maintained the passwords for

26  the social media accounts.  Dent Decl., Exs. H and I. The metadata shows that she renamed the
    list "ABTC Corp Password and Vendors List" on April 5, 2019, and last updated that document

27  on December 11, 2019.  Dent Decl., para 7.

28
                                        - 16 -

*far*." (emphasis added). [21]  Dent Decl. para 7 & Ex. L.  Suggesting the opposite to the jury was, at the very least, misleading.  Having seized the phone, reviewed it, identified Ex. 805 as a potential exhibit, and done due diligence about the exhibit before using it, the government knew or should have known not only that Ex. 805 first came into existence in 2020, but also that it came into existence to report that the passwords that it used to tie the accounts to Mr. Andrade *did not exist prior to January 2020*.

### C.  These Deceptions Require, at a Minimum, a New Trial

While Quinn's testimony may have been literally true, its sole purpose was to suggest falsely that Mr. Andrade controlled the social media accounts when the misrepresentations alleged by the government were made – a proposition that could not in any way be established by Exhibit 805, as evidenced by the information the government withheld from the jury.  The testimony about and presentation of Exhibit 805 therefore violated *Napue v. Illinois*, 360 U.S. 264 (1959), which establishes that the prosecution violates due process when it presents false or misleading testimony.  *See Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (Napue is triggered by testimony or evidence that is "false or misleading)"; *Alvarez v Montgomery*, 2022 WL 868889, at *24 (CD Cal. Jan. 27, 2022) (same); *United States v. Straker*, 800 F.3d 570, 602-03 (D.C. Cir. 2015) (per curiam) (same). [22] *Phillips v. Ornoski*, 673 F.3d 1168, 1184 (9th Cir. 2012) (when prosecution knew that deal had been struck with the witness's counsel); *Hayes v.*

---

[21] Perhaps a taint team removed the messages from Mr. Andrade's phone before providing it to the prosecutorial team – although as noted in Mr. Andrade's misconduct motion, the government appears to have largely disregarded taint teams in this investigation –but the remaining question would be why the attachment to the privileged messages (the screenshot that the government offered as Exhibit 805) was provided to the prosecutors.

[22] While the government had knowledge — or at least should have known — of the misleading nature of the testimony for the reasons described above, due process was violated whether the prosecutors had that knowledge or not.  *See Maxwell v. Rose*, 628 F.3d 486, 506-507 (9th Cir. 2010) (under de novo review, a conviction based on uncorrected false testimony may violate due process, regardless of whether the prosecutor knew of the falsity); *Alvarez*, 2022 WL at *25 (While "there is no clearly established federal law that a prosecutor's unknown use of false testimony violates due process," "under Ninth Circuit precedent, [a defendant] is not required to prove that the prosecutor knew that [a witness's] testimony . . . was false."); *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008) ("If the prosecutor has a duty to investigate and disclose favorable evidence known only to the police, he 'should know' when a witness testifies falsely about such evidence.").

- 17 -

1    *Brown,* 399 F.3d 972, 977-89 (prosecution violated *Napue* by instructing a cooperating witness's

2    attorney to not inform the witness of a plea deal granting him transactional immunity so that the

3    witness could testify that there was no deal in place without perjuring himself); *Clements v.*

4    *Madden*, 112 F.4th 792, 801 (9th Cir. 2024) (finding a *Napue* violation when the prosecutor

5    elicited false testimony from a cooperating witness that he did not receive a parole benefit

6    pursuant to his cooperation); *United States v. Barham*, 595 F.2d 231, 240-41 (5th Cir.1979)

7    (holding evidence was false when witnesses testified they had not been offered leniency by "any

8    of the attorneys" or "anybody in the Northern District of Alabama," but had in fact received

9    promises from other authorities).[23]

10          Due to the government's deceptions, the defense did not know when the evidence was

11    presented that it was misleading, but because such conduct by prosecutors violates principles

12    "implicit in any concept of ordered liberty," *Napue*, 360 U.S. at 269, due process was violated

13    even if defense counsel had known at the time.  *United States v. LaPage*, 231 F.3d 488, 491 (9th

14    Cir. 2000). As a result of this violation, reversal is "virtually automatic," *Hayes v. Brown*, 399

15    F.3d 972, 978 (9th Cir. 2005) (en banc) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d

16    Cir. 1991)), and required unless the testimony was "harmless beyond a reasonable doubt."

17    *LaPage*, 231 F.3d at 491 (quoting *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985)).

18          While any error that requires reversal on appeal is an adequate ground for granting a new

19    trial, 3 Wright & Miller, Federal Practice & Procedure § 581 (5th ed.), the "interest of justice"

20    standard in Rule 33 requires less.  *See* Part IIC supra. In making this assessment under Rule 33,

21    the Court should also take into account that despite a specific order from Judge Beeler, the

22    government never produced an extraction from Mr. Andrade's phone that included Exhibit 805 or

23

24    ─────────────────────────
      [23] Statements and arguments by prosecutors, even without testimony, can be the basis for a *Napue*

25    claim.  *See Zurmot v. Borders*, 483 F. Supp. 3d 788, 812 (N.D. Cal. 2020) (citing *Brown v. Borg*,
      951 F.2d 1011, 1017 (9th Cir. 1991)). Improprieties in closing arguments can, themselves, violate

26    due process."); *Dow v. Virga*, 729 F.3d 1041, 1045 (9th Cir. 2013)) (noting that the prosecutor
      had "exploited her knowing presentation of false evidence" in argument).  *See generally Kyles v.*

27    *Whitley*, 514 U.S. 419, 444 (1995) ("[t]he likely damage [of the false evidence] is best understood
      by taking the word of the prosecutor" in closing argument).

28
                                            - 18 -

the associated communication from Mr. Andrade's lawyer, thereby adding to the deception and eliminating the chance for the defense to raise a privilege claim.[24]  It also proceeded in violation of its *Brady* and *Giglio* obligations, and its obligation to have a taint team review seized items for privileged materials — all of which could provide separate grounds for relief.

## IV.     THE COURT'S EVIDENTIARY RULINGS DEPRIVED MR. ANDRADE OF A FAIR TRIAL

At the urging of the government, the Court made dozens of erroneous evidentiary rulings. The result was a one-sided presentation of evidence that unfairly prejudiced Mr. Andrade.  As set forth in more detail below, the government's offering of inadmissible evidence and its incorrect objections to Mr. Andrade's proffered evidence resulted in at least five categories of erroneous, prejudicial evidentiary rulings.

### A.  The Court Erroneously Excluded Exculpatory Evidence Based Largely on Erroneous Application of Hearsay Rules

It is beyond dispute that "an out-of-court statement is *not* hearsay if offered for any purpose other than the truth of whatever the statement asserts." *United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019).[25]  Based on this principle, a considerable amount of prejudicial evidence was admitted by the government against Mr. Andrade, over his objection, often based on unpersuasive or even non-existent non-hearsay rationales.  *See, e.g.,* Tr. 887:3-2 (Katz permitted

---

[24] The Court should also consider that Exhibit 805 does not appear to be the government's only violation of *Napue.*  On direct examination, the government elicited from Boyer a claim that he had seen on AML Bitcoin's telegram channel a post asserting that the company had sold 76 million tokens.  Tr. 569.  On cross examination, he claimed that he had taken a screenshot of that post and sent it to the FBI.  Tr. 611.  No such post was produced or offered into evidence at trial, suggesting that this testimony was false — but never corrected by the government.  *Napue* applies to testimony from government witnesses on cross examination, as the government has a constitutional obligation to correct false evidence even if it did not solicit it.  *Hayes*, 399 F.3d at 983-84; *Phillips v. Ornoski*, 673 F.3d 1168, 1181-82 (9th Cir. 2012). And the Court will recall another instance of misleading testimony from Special Agent Quinn on a different important topic — whether Mr. Andrade had produced source code in response to a subpoena served on his company — misleading testimony that the defense was able to catch during trial, but only after investing considerable time. Tr. 2851:24-2853:5.

[25] *See also United States v. Lin*, 2018 U.S. Dist. LEXIS 68194, at *17 (N.D. Cal. Apr. 23, 2018); 2 McCormick on Evidence § 249 (9th ed.) (providing examples).

- 19 -

1   to testify that someone from the governor's campaign advised her that Mr. Andrade's check for

2   the fundraiser bounced; no non-hearsay explanation offered); Tr. 1215:1-11 (De La Guardia

3   permitted to testify that Catin Vasquez told De La Guardia that Vasquez received a threatening

4   letter from Mr. Andrade's attorney, testimony offered "for the effect on De La Guardia" and "for

5   his relationship with this project," without any showing that either of those purposes had any

6   relevance). Some of this evidence elicited by the government was information provided to Mr.

7   Andrade, offered for the more appropriate purpose of showing its impact on him.  *See, e.g.,*

8   Tr. 1025:1-25 to 1026:1-13 (B. Tran permitted to testify about what she told Mr. Andrade about

9   the unhappiness of people on social media).

10        But when Mr. Andrade offered vital exculpatory evidence using this same principle — its

11   non-hearsay purpose of its impact on him — the government objected and the Court sustained the

12   objections, either excluding the evidence entirely or, in a few instances, after follow-up briefing

13   by the defense, admitting fragments of the proffered exhibits at a later time.  In sustaining the

14   government's objections, the Court raised questions about whether a defendant was ever entitled

15   to admit evidence given or told to him in order to show its impact on his intent, especially if the

16   defendant did not testify.[26]  But there is no question that the principle admitting statements for the

17   non-hearsay purpose of their impact on the recipient applies equally to evidence offered by the

18   defendant. *See e.g.*, *United States v. Corona*, 41 F. App'x 33, 34 (9th Cir. 2002) (reversing

19   conviction due to exclusion of statements offered by defendant that were "probative on the issue

20   of government inducement, not for the truth of the out-of-court statements but to show the effect

21   they had on Corona's state of mind").[27]  Nor is there any question that criminal defendants, who

22   _____

23   [26] *See, e.g.,* Tr. 1461:14-20 ("[Y]ou're introducing these to show how Mr. Andrade reacts.  First
    of all, it's hearsay; and he's not — *unless and until he testifies*, there's — *what are you doing*?"
24   (emphasis added)).  After defense counsel explained to the Court that the statements are not
    hearsay because what Mr. Andrade was told was "central to his intent," the Court asked
25   rhetorically, "*But doesn't he have to testify in order to get this in*?" Tr. 1462:15-24 (emphasis
    added).

26   [27]*See also United States v. Gibson*, 675 F.2d 825, 833-34 (6th Cir. 1982) (where defendant
    offered utterance solely for the fact that it was made by a union official and heard by the
27   defendant, witness's account of union official's statement was non-hearsay admissible as

28                                                    - 20 -

1    of course have constitutional rights both to present an effective defense and not to testify if they

2    so choose, *see* United States Constitution, Fifth Amendment, can present such evidence even if

3    they do not testify. *See, e.g., United States v Garcia-Villanueva*, 855 F.2d at *2.

4          Equally meritless were other bugaboos expressed by the Court in excluding defense

5    evidence on hearsay or other grounds.  Beyond erroneously excluding evidence because it

6    considered the evidence to be hearsay, even though the evidence was not being offered for the

7    truth of any matter asserted therein or constituted verbal acts, the Court appeared to be excluding

8    documents because it considered them to be extrinsic evidence of impeachment, when in fact they

9    were important substantive evidence.  Whatever the Court's erroneous reasons, the jury was

10   deprived of important, admissible evidence, and the contrast between the government's mass of

11   exhibits and what the defense was able to admit was an advantage that the government used to its

12   benefit in closing,[28] and that the jury commented on when it spoke to counsel after delivering its

13   verdict.[29]

14         *Good faith.*  Examples of these erroneous exclusions touch on many of the most important

15   issues and witnesses in the case. Consider, for instance, the government's accusations of market

16   manipulation. The government asserted in closing that Mr. Andrade "tried to hide his market

17   manipulation, his market making." Tr. 3009. This was false, but the jury did not know of its

18   falsity because when the defense offered Exhibits 2472, 2473, and 2474, the Terms & Conditions

19   provided to purchasers, the government objected based on hearsay and the court sustained the

20   objection. *See, e.g*., Tr. 2683:16-25; 2684:10-11; 2801:14. Had the Terms & Conditions been

21   admitted, the jury would have known that Mr. Andrade had made disclosures to purchasers about

22

23

24   "testimony about a circumstantial utterance, which could have been received properly on the
     issue of [defendant's] belief or state of mind in consequence of the utterance").

25

26   [28] *See, e.g.,* Tr. 2968:12-17 (government told the jury to annotate the various exhibit numbers on
     the closing slide deck so they could reference them during deliberations); Tr. 3024:1-6
     (government cited Ex. 1224); Tr. 3024:15-20 (government cited Ex. 1520).

27

28   [29] *See* Decl. of Dainec P. Stefan in Support of Defendant Andrade's Motion for a New Trial.

- 21 -

1    these activities.[30]  The Terms & Conditions were not hearsay; rather, they were legal documents

2    governing the underlying relationship between Mr. Andrade and AML Bitcoin purchasers, and

3    such documents are not hearsay. *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004)

4    ("out-of-court statements that are offered as evidence of legally operative verbal conduct are not

5    hearsay"); *Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Labor Ass'n of U.S.*

6    *Pension Tr.*, 153 F. Supp. 3d 1217, 1234 (E.D. Cal. 2015) (operative documents such as contracts

7    "are not hearsay"); *United States v. Rubier*, 651 F.2d 628, 630 (9th Cir. 1981) (per curiam)

8    (where defense cross examined witness based on his agreement with the government, the

9    agreement and related letters were admissible and not hearsay).

10           In addition, the fact that Mr. Andrade made these disclosures is a non-hearsay verbal act

11   that was important evidence establishing his good faith.  *See United States v. Dorsey*, 418 F.3d

12   1038, 1044 (9th Cir. 2005) (citing Fed. R. Evid. 801(c) advisory committee's notes on proposed

13   rules ("If the significance of an offered statement lies solely in the fact that it was made, no issue

14   is raised at to the truth of anything asserted, and the statement is not hearsay."), *abrogated on*

15   *other grounds, Arizona v. Gant*, 556 U.S. 332 (2009). The exclusion of the Terms & Conditions

16   was a critical error that materially prejudiced Mr. Andrade's good faith defense.[31]

17   _____

18   [30] *See, e.g.*, Ex. 2473-004 ("NAC reserves the right, but not the obligation, to engage in volume-
     making for purposes of Exchange compliance."). To the government's chagrin, when asked if he
19   was engaged "to effect a significant change in the volume and, more importantly, the price of the
     token," Bryan resisted the notion that he was engaged to change the price of the tokens and
20   instead testified that he was engaged to increase the volume. Tr. 1532, 1577.  An increase in
     volume *could* impact the price, he explained, but not with the resources he was provided.  Tr.
21   1578.  As a result, what was done was volume making, as had been disclosed (but not to the jury).
     The Court admitted an earlier version of the Terms & Conditions that did not have volume
22   making language, Ex. 2471, before excluding subsequent versions.

23   [31] For the same reason, the post-ICO purchase agreements, which included the agreements signed
     beginning in March 2018, Ex. 3357, were not hearsay. Even though the Court readily admitted
24   one of the post-ICO purchase agreements offered by the government, Tr. 571:4-572:7, Ex. 602,
     the Court initially excluded the post-ICO binder, Ex. 3357, a collection of such agreements
25   offered by the defense. Tr. 2255:20-2257:6. Although the Court later excluded the documents
     based on relevance, Order, ECF #601 at 5:10-15 (March 3, 2025) (Court denied admission of the
26   post-ICO binder based on relevance, in part based on the Court's mistaken belief that all the
     agreements post-dated the 2017-2018 time period), this was wrong.  Even if there were a basis to
27

28

ANDRADE'S CORRECTED MOTION FOR NEW TRIAL AND            CASE NO. 3:20-CR-00249-RS
JUDGMENT OF ACQUITTAL

1    The exclusion of the Terms & Conditions and of the post-ICO binder, Exs. 2472, 2473,

2   2474, 3357, were not the only examples of the damage the Court inflicted on Mr. Andrade's good

3   faith defense.  After the government elicited testimony  from, and played recordings made by, an

4   FBI agent working undercover who arranged to talk to Mr. Andrade in an effort to get Mr.

5   Andrade to make false statements, the Court cut off any use by the defense of statements made by

6   Mr. Andrade that the government skipped, regardless of whether they were not offered for the

7   truth.[32] This was error that deprived Mr. Andrade of valuable exculpatory evidence reflecting his

8   good faith, and rebutted the impression left by the government that Mr. Andrade's conversations

9   with the agent were incriminating.

10    What Mr. Andrade sought to admit was not hearsay.  Most notably, Mr. Andrade told the

11   undercover agent that aspects of AML Bitcoin were not ready.[33] This was not offered for the truth

12   of the statement; to the contrary, such a statement was exactly what *the government* had been

13   contending from the opening statement and throughout the trial. Tr. 202:2-14; 202:25-203:3;

14

15   exclude evidence because it post-dated late 2018, *see* Part IV.C below, most of the post-ICO
binder was comprised of contracts from 2018.  Ex. 3357-044-181.  And the relevance of the
16   binder was illustrated by the government's closing argument, in which it claimed that "[Mr.
Andrade] didn't build a software company; he built a story," Tr. 2975, and that he was "trying to
17   fool investors" with "a half-baked cryptocurrency," Tr. 3131.  The agreements in the post-ICO
binder were a vital answer to this accusation.  They also supported Mr. Andrade's good faith and
18   his belief that he was not trying to fool anyone about the development of his technology, by
showing not only that Mr. Andrade was selling tokens rather than completed coins, but also that
19   he expressly told his purchasers that "the AML Bitcoin *is in the process of being upgraded* to be
compliant with anti-money laundering laws. When that process is completed, Coin Purchaser will
20   be able to convert AML Tokens to AML Bitcoins." Ex. 602-02 (emphasis added).

21   [32] When defense counsel previewed this issue before the agent's testimony, the Court rejected the
22   argument that Mr. Andrade's statement was not offered for the truth as "creativity." Tr. 1924:22-
1925:2. During the cross examination of the agent, the Court repeatedly directed counsel not to go
23   beyond the clips, Tr. 2143:4-6; 2142:11-12, 2143:14, 2143:16, 2146L2146, refused to allow a
sidebar to permit counsel to argue or proffer the statements to be admitted, Tr. 2146:23-25, and
24   later rejected any argument that the statements could be offered as evidence of Mr. Andrade's
25   mindset and lack of intent.  Tr. 2149::31-2150:6.

26   [33] *See* Declaration of Cindy Diamond para 5; Ex. 3000-D (Mr. Andrade explains to agent that the
AML Bitcoin gateway applies to the eventual launch of the coin, not to the tokens that were being
27   sold at the time, and Mr. Andrade explains to agent that the coin would go through AML identity
checks when launched, but the token did not have that feature.).

28
- 23 -

207:4-9; 2975:22-23; 2979:4-6; 3125:12-14. Rather, it was offered to show that, despite the agent's efforts to elicit lies, Mr. Andrade told the agent about his technology not being ready. Such a statement made to an undercover agent who was posing as a buyer would have been a powerful rebuttal to repeated government arguments that Mr. Andrade was lying to the public (mostly through press and social media statements, Mr. Andrade's responsibility for which was disputed) about whether he had completed technology. Not letting Mr. Andrade present this important exculpatory evidence on a key government accusation was devastating to his defense, and the government took full advantage of the error, arguing to the jury that what happened in the conversation is that Mr. Andrade told the agent "a lot of the same lies." Tr. 3006:17.

Other statements Mr. Andrade made to the undercover agent were also wrongly excluded. For example, when the undercover agent referred to AML Bitcoin as an investment, Mr. Andrade corrected him.[34] That he did so was a verbal act that further demonstrated Mr. Andrade's good faith. *See United States v. Dorsey*, 418 F.3d at 1044. Equally important is that the recordings would also have given the jury real-time insight into some of Mr. Andrade's mental disabilities. *See* Declaration of Cindy Diamond at para. 3.

*Abramoff's separate and destructive schemes.* In addition to excluding important, admissible evidence of Mr. Andrade's good faith, the Court also severely limited Mr. Andrade's proof about Abramoff: Mr. Andrade had documentary evidence to show that Abramoff was engaged in a separate scheme, and also that Abramoff's separate scheme undermined Mr. Andrade's efforts to make AML Bitcoin a success, but the jury saw none of these documents. For example, the jury did not see the documents showing that, apparently in order to help a Ukrainian billionaire, Abramoff was involved in a separate money laundering scheme in which he needed a digital currency under his control — which is why he pushed Mr. Andrade to begin the ICO of AML Bitcoin before the technology was ready.[35] The jury never saw these documents because

---

[34] *See* Declaration of Cindy Diamond at paragraphs. 2, 3.

[35] *See, e.g.,* Ex. 3261 (shown to Abramoff at Tr. 1841:5) (May 2017 communications between Abramoff and his friend Eliezer Scheiner regarding the need to assist Ukrainian billionaire and notorious money launderer Gennadiy Bogolyubov with his money issues after Bogolyubov's

the Court instructed counsel in the presence of the jury during Abramoff's cross-examination that counsel should not try to put documents into evidence after the witness testifies about them. Tr. 1838:2-6 ("You've asked him a question.  He answered the question.  So . . . there's no basis for the document to come into evidence.").  *See also* Tr. 1245:3-4 ("I don't know why [defense] counsel are getting so wrapped up in the documents.").

This limitation was erroneous.  Not only was the government's proof burdened with no such limitation,[36] but the documents were not mere impeachment of Abramoff; rather, they were evidence that Abramoff was involved in a separate scheme, a scheme that not only undermined the claim that Mr. Andrade and Abramoff were co-schemers, but also showed that, in order to advance his separate scheme, Abramoff was responsible for triggering the ICO before the technology was ready.  There was no basis to exclude important substantive evidence on an element of the crime charged, or evidence responsive to one of the government's central allegations.

Documents about Abramoff's separate money laundering scheme and its impact on AML Bitcoin were not the only Abramoff-related materials that the Court erroneously excluded.  The Court also rejected Mr. Andrade's offer of a document with Abramoff's handwritten notes that was seized from a search of the residence of Maria Butina. That document showed, among other things, that Abramoff, without Mr. Andrade's knowledge, was discussing with his friend Paul Erickson (Butina's boyfriend at the time) the use of Mr. Andrade's technology for purposes

---

assets were frozen by law enforcement in the United Kingdom — which directly preceded Abramoff reaching out to Mr. Andrade to convince him to do an ICO); Ex. 3262 (shown to Abramoff at Tr. 1858:25 to 1861:7) (Abramoff claims he does not recall the $1 billion deal that involved Abramoff and some of his friends laundering money through Angola using AML Bitcoin).

[36] *See, e.g.,* Tr. 1329:21 to 1333:8 (after government witness John Szeder testified that "somebody" from a vendor had found him on the NAC website and asked for his assistance in helping them get paid for an overdue invoice, the Court admitted over objection Exhibit 221, the email to Mr. Andrade regarding the overdue payment about which Szeder testified).  As the Court explained in admitting testimony about a document to which the defense objected on the basis that the testimony mischaracterized the document, "The jury has the exhibit and the witness's testimony. They're the ones that will make the determination. Overruled." Tr. 567:21 to 568:4.

1    antithetical to their use for Mr. Andrade's business. Among other things, the document describes

2    a multi-platform campaign to promote the *deregulation* of the cryptocurrency industry — the

3    opposite of Mr. Andrade's approach, which was to sell AML Bitcoin as the only cryptocurrency

4    that would be compliant with regulations such as anti-money laundering and "know your

5    customer."[37] The Butina documents would have demonstrated another aspect of Abramoff's

6    separate scheme, but the jury never saw them. *See* Tr. 2283-84; Ex. 2360 (sustaining

7    government's objection). The Court also erroneously precluded Mr. Andrade from showing

8    through documents that Abramoff was behind at least one of the real estate purchases that the

9    government highlighted as fraudulent.[38]

10       *Panama Canal.*  Refutation of the government's main substantive allegations was also

11   erroneously limited.  On the Panama Canal, for instance, the Court permitted questioning on

12   cross-examination, but refused to admit a text exchange between DeLaGuardia and Abramoff that

13   reported Morgan & Morgan's agreement that AML Bitcoin was "something that Panama's ship

14   registry needs, and that Morgan & Morgan believed that "this is a project the government should

15   implement, and they presented the idea to the Panama Maritime Authority (Gov't Agency) and

16   they loved it."  Tr. 1237-38, Ex. 2160-046.  Given the government's assertions that interest in

17   AML Bitcoin by government officials in Panama "didn't exist," Tr. 208,[39] the fact that such

18   interest *did* exist, or at least that Mr. Andrade had reason to so believe, was important substantive

19

20   ───────────────

     [37] *See* Declaration of Kerrie C. Dent in Support of Motion for Evidentiary Hearing on

21   Government's Outrageous Conduct (Jan. 23, 2025), ECF #498-3 ¶¶ 9-11; Andrade's
     Supplemental Memorandum in Support of Motion to Compel Discovery (Mar. 15, 2023),

22   ECF #153 at 5:4-15; Discovery Order (Apr. 7, 2023), ECF #165 at 6-7, 12 ("It is not just about
     Mr. Abramoff or Mr. Andrade and AML Bitcoin. It is about the larger context of the business

23   model for cryptocurrency, whether Mr. Abramoff may have been working against Mr. Andrade,
     and how that affects Mr. Andrade's responsibility and scienter.").

24
     [38] Ex. 2934 (shown to Abramoff at Tr. 1867:17 to 1868:19) (Abramoff's handwritten notes

25   describing a piece of land in Corpus Christi that would be purchased for $200,000, developed,
     appraised for $3 million, and donated to a non-profit).  Had the Court not precluded the defense

26   offers of Abramoff documents, there were others that could have been admitted.

27   [39] *See also, e.g.*, Tr. 2985:18-23 (government closing dismissive of any efforts with Morgan &
     Morgan, stating that the meetings with the law firm were "no more than 30 minutes long").

28

1   evidence rather than mere impeachment; the defense should not have been limited to asking

2   questions and should have been allowed to admit the corroborating documentation.

3       *Super Bowl.*  As to the Super Bowl, where part of Mr. Andrade's defense was that he

4   believed he would have the money to pay for the advertisement and that there had been, in fact,

5   an intent to run the ad (contrary to Abramoff's testimony that it was a rejection campaign from

6   the start), the Court excluded as hearsay the record of communications between Abramoff and

7   Moshe Lapin. In those communications, Abramoff tells his friend Lapin about a decision to

8   "hypercharge the trading value of the coin" by "secur[ing] an ad during the Super Bowl

9   broadcast," and adds that $4 million is needed for the advertisement, that the company will sell

10  some of the coins "at a significant discount" and that this approach "would virtually guarantee a

11  significant profit." On that basis, Abramoff asked Lapin if he had "an interest in getting in on

12  this," with the minimum investment being $1 million.  Ex. 2127-017.  This was admissible,

13  substantive evidence that Mr. Andrade and NAC were raising money to pay for the

14  advertisement, as well as further support that Mr. Andrade was proceeding in good faith.

15      *Redactions.*  In addition, even when documentary evidence ultimately was admitted,

16  defense counsel was required to heavily redact the documents, diluting the impact on the jury

17  both because the substance was limited and because the documents did not get into evidence

18  contemporaneously with the testimony on the subject, as the government was allowed to do.  For

19  example, when defense counsel first offered four weekly updates from the London software

20  company that was developing the technology in order to rebut Abramoff's testimony, Exs. 2327,

21  2333, 2334, 2337, the Court sustained the government's hearsay objection, stating: "The point

22  you wanted to elicit is that he received reports.  He's established that.  There is a great deal of

23  material in these documents that are hearsay."  Tr. 1824:22 to 1825:5. After additional expedited

24  briefing, the Court admitted the exhibits subject to extensive redactions. Order (Mar. 3, 2025),

25  ECF #601.  These redactions excluded non-hearsay evidence that supported Mr. Andrade's good

26  faith belief that AML Bitcoin was succeeding.  *See, e.g.,* Ex. 2327 (April 29, 2018, update on

27  meetings with other entities interested in the technology, the expected finalization of a

28

- 27 -

1    Memorandum of Understanding with R3 (owner of blockchain platform Corda), consideration of

2    new software from Aware (a company that does biometric matching), hiring of experienced

3    senior developers); Ex. 2333 (July 3, 2018, update included reports on additional follow-up with

4    Morgan & Morgan, additional follow-up with banks, and progress with negotiations with Aware);

5    Ex. 2334 (September 18, 2018, included details about a possible tech presentation to Chinese

6    President Xi and meetings with Barclays and EY); Ex. 2337 (October 3, 2018, update reported

7    that Corda integration was ongoing and Aware expressed a strong interest in partnering for sales

8    in Brazil).[40]

9        *Prejudice.*  The erroneous exclusion of non-hearsay testimony on critical issues such as

10   Mr. Andrade's good faith, Abramoff's separate conspiracies, and Mr. Andrade's defenses to

11   central accusations such as the Panama Canal and the Port of San Francisco was prejudicial and

12   therefore requires reversal.  *Wagner v. County of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013);

13   *DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001) (granting writ of habeas corpus

14   based on exclusion of evidence going to defendant's state of mind that was critical to her ability

15   to defend the charge). It also violated Mr. Andrade's right to present a defense. *See Sherman v.*

16   *Gittere*, 92 F.4th 868, 878-79 (9th Cir. 2024) ("The constitutional right to 'a meaningful

17   opportunity to present a complete defense' is rooted in both the Due Process Clause and the Sixth

18   Amendment" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)); *Montana v. Egelhoff*, 518

19   U.S. 37, 63 (1996) (O'Connor, Stevens, Souter and Breyer dissenting) (the right to present an

20   effective defense "must include the right to present relevant, probative evidence").

21       The significance of and prejudice from the Court's exclusion of most of Mr. Andrade's

22   ───────────────

[40] The Court also erred in excluding Ex. 3355, Mr. Andrade's offer of source code to the FBI.
Tr. 2221:16-2226:25. *See* note 1, *supra.* The admission of an offer to prove the operative fact of
the offer being made is not hearsay. *See United States v. Montana*, 199 F.3d 947, 950 (7th Cir.
1999) (treating "[p]erformative utterances," illustrated by promise, offer, or demand, as non-
hearsay because they do not make any truth claims). *See also Dorsey*, 418 F.3d at 1044 (citing
Fed. R. Evid. 801(c) advisory committee's notes on proposed rules ("If the significance of an
offered statement lies solely in the fact that it was made, no issue is raised at to the truth of
anything asserted, and the statement is not hearsay."); *United States v. Moreno*, 233 F.3d 937, 940
(7th Cir. 2000) (refers to verbal acts as not hearsay, and refers to offer and acceptance as "classic
examples of verbal acts").

1   proffered documents was underscored by the government's closing argument, during which the

2   prosecutors emphasized to the jury the importance of relying on the documents when

3   deliberating.[41]  The defense lost its ability to respond in kind, because the government convinced

4   the Court to exclude documents critical to its case.

### B.  The Court Admitted, Over Defense Objections, Incompetent Evidence Offered by the Government

7       The government's case was riddled with damaging testimony that lacked any semblance

8   of a foundation and that was admitted over objection.  This included testimony from Abramoff

9   that the company lacked sufficient funds to pay for a Super Bowl ad, Tr. 1706 — a critical issue

10  given that a central theme of Mr. Andrade's defense to the Super Bowl allegations was his belief

11  that he would and/or did have sufficient funds and therefore was not intending to defraud anyone

12  with a "rejection campaign." Tr. 3074:2-20 (Defendant's closing argument, explaining several

13  reasons why Mr. Andrade believed the company would be able to pay for a Super Bowl ad) and

14  Tr. 1818:14-15 (Abramoff testifying that he recalled a Block Bits entity that was ordering $50

15  million of AML Bitcoin). Ex. 3047.

16      No foundation was offered that Abramoff had any knowledge of the company's financial

17  situation at any time, let alone around the time of the Super Bowl, and Abramoff could not have

18  provided such a foundation.  All the evidence suggested that he lacked a foundation for his

19  statement: he testified that he was brought into the company as a consultant on Congressional

---

[41] *See* Tr. 2968:13-17 ("And at the bottom of many of the slides, there will be an exhibit number at the bottom right; and if you wish, if you want to go back to that exhibit while you're deliberating, I would suggest perhaps writing down that exhibit number."); Tr. 3130 ("Just look at the evidence.  Look at the text messages."); Tr. 3131 ("look at these additional pieces of evidence . . . look at all of the press on Twitter, on Facebook, on social media"); Tr. 3133 ("So don't get distracted.  Focus on the evidence."); Tr. 3140 ("Look at the press strategy with that eye. Look at the press releases that are in evidence."); Tr. 3143 ("Look at the evidence. Focus on the evidence. Focus on the emails and the texts. Focus on the hard evidence."); Tr. 3147 ("Set Mr. Abramoff's testimony aside. Set it aside and just look at the text messages between him and Mr. Andrade."); Tr. 3148 ("Look at the text messages. Look at the text messages."); Tr. 3149 ("what I'm going to do is tell you to look at the evidence. Look at the evidence in this case. Go through it very carefully.")

1    legislation and media issues.  Tr. 1658, 1659. And other witnesses described Mr. Andrade as very

2    secretive about company finances.  *See* Testimony of B. Jodoin, Tr.  314:3-21, 314:23-315:2,

3    321:3-10, 321:23-322:5.

4         Abramoff was also allowed over objection to provide speculation — characterized by the

5    government as Abramoff's "understanding" — on another critical issue: what John Bryan's

6    market making activities were.  According to Abramoff, Bryan was "buying and selling with

7    himself so as to raise the price" of AML Bitcoin.  Tr. 1722:2-14.  Bryan had already testified

8    about what actually was done; Abramoff's testimony was an effort by the government to fix

9    Bryan's testimony, which did not come out as the government wanted and instead suggested that

10   no trading may have been performed and that nothing was done with the intent of increasing the

11   price of AML Bitcoin tokens, and that nothing wrong was done. Tr. 1577:20-1578:23.

12   Abramoff's "understanding" was at best thirdhand — from Polyblock, which did the trading,

13   through Bryan — and the basis on which Abramoff's understanding of the trading was offered

14   was nonsense: according to the government, Abramoff's understanding bore on "whether or not

15   they were engaged in a deceptive practice on the exchanges."  Tr. 1722.  But what *Abramoff*

16   understood about Bryan's[42] activities does not matter, especially given that Bryan was not alleged

17   to be a co-conspirator, nor was there any claim that Abramoff's understanding was ever

18   communicated to Mr. Andrade, or that Mr. Andrade was present for whatever communications

19   led to Abramoff's claimed understanding.  *See United States v. Kaplan*, 490 F.3d 110 (2d Cir.

20   2007) (reversing conviction based on admission of the understanding of a co-defendant,

21   explaining that testimony regarding knowledge of individuals other than the defendant should be

22   admitted only if there is evidence that the defendant would have the same knowledge).  In any

23   event, this excuse was a poor fig leaf under Rule 403 for admitting substantive testimony on a

24   critical issue for the jury that the government had failed to prove — "whether or not they were

25   engaged in a deceptive practice on the exchanges."

26   ───────────────────

[42] *See* Government's Motion to Admit Co-Conspirator Statements (Jan. 10, 2025), ECF # 449 at

27   4:6-11 (identifying Mr. Andrade's alleged co-conspirators as "co-conspirators Jack Abramoff,
     Japheth Dillman, and David Mata").

28                                           - 30 -

1    In another significant example, Boyer was allowed to testify over objection that "he had

2  been told multiple times that the ICO had sold out, that all 76 million tokens were sold."  Tr. 567.

3  No foundation was offered for this significant alleged misrepresentation  being made "multiple

4  times;" and the only basis for even one such time that was offered elsewhere in his testimony

5  proved to be illusory: Boyer testified that a Telegram channel used the words "76 million tokens

6  sold," that he took a screenshot of that language on the Telegram screenshot, and that he provided

7  the screen shot to the government, Tr. 611, but the government never offered the screenshot at

8  trial.

9    There are numerous other examples of the government admitting over objection testimony

10  that lacked any foundation.  *See, e.g.,* Tr. 277-78 (Jodoin testimony on "what she learned about

11  the Warsaw conference"); Tr. 454 (Darrow allowed to testify about his "understanding" of

12  whether the tech was working); Tr. 1200 (DeLaGuardia allowed to testify about his

13  understanding of the purpose of a press release); Tr. 2180 (Quinn allowed to testify about

14  Dillman's intent);[43] Tr. 2199 (Quinn allowed to report what he "learned in his investigation"

15  about Diadamo working with Mr. Andrade); Tr. 2285. This inadmissible testimony bolstered key

16  government accusations, *see, e.g.*, Tr. 2995-96 (government argues Mr. Andrade knew and tried

17  to hide that the Super Bowl ad was "never a prospect"); Tr. 3009 (government argues Mr.

18  Andrade tried to hide his market manipulation), and was used to support the claim that the

19  government had offered a lot of evidence of guilt. As a result, it was extremely prejudicial.

20   **C.  The Court Placed Date-Based Restrictions on Evidence in the Defense Case After**
      **the Government Was Allowed to Present Evidence Regardless of Dates**
21

22    During its case-in-chief, the government elicited testimony from at least six witnesses to

23  the effect that AML Bitcoin never had the technology it claimed, or at least did not have that

24  technology until after November 2019; often the importance of this claim was underscored by

25  

26  [43] The Court viewed Mr. Andrade's objection to this testimony as too late because it came after
    the answer, Tr. 2181, but that was because the objectionable part of the answer was not
27  responsive to the question and therefore could not have been the basis for an objection to the
    question.
28

having the witness repeat it multiple times. *See, e.g.,* Tr. 580 (Boyer states that AML Bitcoin project was never completed with full biometric identification built into the blockchain); Tr. 667, 668  (Bruffey never saw a final product with biometric identifiers built into the blockchain and never saw evidence of specific anti-money laundering features being built into the code or the blockchain); Tr. 991 (B. Tran worked through August 2019, and never saw progress on the wallet, on the biometric identification technology, or integration with the technology, and did not think Mr. Andrade would ever finish the project); Tr. 1077-78 (Cowan worked through New Years Eve of 2019 and never saw a working version of AML Bitcoin); Tr. 1254, 1269, 1273 (Carlsen worked for Mr. Andrade from November, 2018, through January, 2019, and when he left there was no finished AML Bitcoin with biometrics built into the blockchain); Tr. 1663, 1683, 1685, 1736 (to Abramoff's knowledge no complete coin with all the security features was ever in place and available in the market, or anti-money laundering features).

But when Mr. Andrade prepared to present an expert, Erik Min, who would have disputed all that testimony, the government did a 180 and objected that Mr. Min's response should not be allowed because it addressed a time period after what was charged in the indictment.  Tr. 2237.[44]Tr. 2443.  Ultimately the Court agreed with the government and precluded the portion of Mr. Min's testimony that discussed the continued development of the technology after 2018. Tr. 2449.  This was error because Mr. Andrade's continuing work to complete the technology long after funds from buyers stopped coming in reflects his good faith, *see United States v. Voorhies,* 658 F.2d 710, 715 (9th Cir.1981) ("acts both prior and subsequent to the indictment period may be probative of the defendant's state of mind"); *United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991) (same), and because, once the government opened the door on this issue — especially when it did so repeatedly — Mr. Andrade was entitled to rebut the

---

[44] The government also elicited other testimony from outside what it contended was the time period in the indictment. *See, e.g.*, Tr. 419; Ex. 1448.  In fact, the indictment was ambiguous about when the alleged wrongdoing ended, with part of it leaving the suggestion that the wrongdoing had no known end date. *See, e.g.,* ECF #1 at 3:15-16 (alleging that the scheme to defraud was "continuing through a date unknown to the grand jury, but to at least December 2018"). *Compare id.* at 5:4-5 ("continuing through on or about October 2018").

government's evidence and to use Mr. Min's testimony to cast doubt on the reliability of the government's witnesses. *See, e.g., United States v. Sine*, 493 F.3d 1021, 1037 (9th Cir. 2007), *as amended* (July 17, 2007) ("the 'opening the door' principle allows parties 'to introduce evidence on the same issue to rebut any *false* impression that might have resulted" from the earlier admission of evidence (quoting *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988)); *United States v. Ziska*, 267 F. App'x 717, 718-19 (9th Cir. 2008). Given the importance the government attached to its claim that technology never worked, *see, e.g.,* Tr. 202, 203, 206, 2971, 2978, 3005, 3010, 3133 (emphasizing in closing that "the tech never existed in complete form"), precluding Mr. Andrade from proving the contrary was devastating to his defense.

### D. The Court Erroneously Admitted Rule 404(b) and Other Unfairly Prejudicial Evidence

Over defense objection, the government was allowed to offer evidence of what it claimed was a fraud committed by Mr. Andrade in the sale of AtenCoins. The government failed to prove a fraud,[45] but used the opportunity it was given to present evidence about AtenCoin to parade in front of the jury the sorry tales of buyers of the coin who lost money, including Brandi Jodoin, who went so far as to cry about her losses during the government's redirect examination. *See, e.g.,* Tr. 327, 375 (stay-at-home mother Jodoin lost just over $500,000) Tr. 409:22-25, 411:2-14, 419:15-25, 640:9-12, 668:23-25

---

[45] Defense expert Erik Min testified that the company had in fact built a functioning coin. Tr. 2479. No contrary expert evidence was offered. The only percipient testimony to the contrary came from Brandi Jodoin, who had no experience in cryptocurrency, Tr. 285, and who was held to have lied repeatedly in her litigation against Mr. Andrade, including when she said she had not seen AtenCoin function, and when she said that it did not employ anti-money laundering and know your customer features. Tr. 332-337; Tr. 337-338 (Nevada court also held that she knew the technology existed but told the government it did not). Jodoin also claimed to have been disillusioned with AtenCoin, Tr. 321, to have been horrified by Mr. Andrade's conduct, Tr. 323, and to have determined that the company was unethical, Tr. 328, but nonetheless went with the company on a trip to Barbados. Tr. 374. Other supposed "frauds" relating to AtenCoin melted on cross-examination. *Compare, e.g.,* Tr. 271 (suggesting Ex. 1122 was a fraud) *with* Tr. 365-66 (admitting no knowledge whether the statements in Ex. 1122 were false). The suggestion that the Warsaw conference was "a paid venue" — hardly a fraud in and of itself — came with no foundation whatsoever. *See* Tr. 278.

If this was not enough unfair prejudice, the government added to it by also eliciting over objection needless and irrelevant but damaging information about Mr. Andrade.  The jury was told that he bounced a check at then-Lt. Governor Newsom's fundraiser, Tr. 887, that he stiffed a large percentage of his employees,[46] and that he partied a lot and went to strip clubs.  Tr. 996.  Even Carlos De La Guardia, who lied to Mr. Andrade and Abramoff about his dealings with the Panama Canal Authority, was licensed to describe the woes he suffered as a result, as if this too was Mr. Andrade's fault, or somehow mattered to what the jury was asked to decide.  Tr. 1215-16 (his involvement with AML Bitcoin had a terrible impact on his reputation and his credibility "went down to the floor").  None of this made it more likely that Mr. Andrade was guilty of the charges in the indictment, but the government put it all in evidence and further buried Mr. Andrade in unfair prejudice.

### E. The Court Erred in Limiting Impeachment of Government Witnesses

Finally, the Court erred in two different ways in limiting Mr. Andrade's impeachment of government witnesses.  Based on a disputed interpretation of the intersection between Federal Rules of Evidence 608 and 806, it disallowed important impeachment of Dillman, which further exacerbated the damage from its refusal to give a multiple conspiracy instruction.  And, contrary to Ninth Circuit jurisprudence, it refused to let Mr. Andrade complete multiple points of impeachment of Abramoff and another witness.  Both sets of errors were prejudicial.

#### 1. The Court Erred in Limiting Impeachment Allowed by Rule 806

Denying Mr. Andrade's requests under Federal Rule of Evidence 806 to impeach Dillman, a non-testifying hearsay declarant, was error.  When hearsay statements are admitted into evidence, Rule 806 permits a party to attack the declarant's credibility "by any evidence that would be admissible for those purposes if the declarant had testified as a witness."  *See* Fed. R. Evid. 806.  In this circumstance, the hearsay declarant is a witness whose credibility "should in

---

[46] Tr. 491:6-8, 967:14-19, 990:6-19, 1273:21-1274:8, 1061:15-19, 1073:16-23, 1078:2-14, 1324:22-1325:2, 1328:5-10.

fairness be subject to impeachment[.]"[47]  *See* Fed. R. Evid. 806(c) advisory committee's notes on proposed rules; *see also United States v. Friedman*, 854 F.2d 535, 569 (2d Cir. 1988).

Rule 608(b) permits specific instances of conduct to be "inquired into" on cross-examination.  At least in the context of the cross-examination of the declarant, the Rule precludes the use of extrinsic evidence, but without ever expressly addressing how to "inquire into" specific instances of conduct in the event the declarant does not testify.  While the interplay between Rules 806 and 608(b) has not been assessed by the Ninth Circuit, the Second Circuit's decision in *Friedman* recognizes that the restriction imposed on the cross-examination of a witness should not govern the impeachment of a non-testifying hearsay declarant where the only reasonable means of "inquiring into" specific instances of conduct is through extrinsic evidence.  *See Friedman*, 854 F.2d at 570 n.8.

This Court should have applied *Friedman* and permitted Mr. Andrade to impeach Dillman by calling a witness and/or admitting a document, because it was the only reasonably available means of "inquiring into" specific instances of conduct that would impeach Dillman.  In assessing the interplay of Rule 608(b) and Rule 806 in *Friedman*, the Second Circuit found that Rule 806 permits a party to resort to extrinsic evidence when the declarant "has not testified" and "there has been by definition been no cross-examination" and, therefore, the "resort to extrinsic evidence may be the only means of presenting such evidence to the jury."  854 F.2d at 570 n.8.

*Friedman's* approach provides the necessary flexibility to allow specific instances of conduct by a non-testifying hearsay declarant to be "inquired into" when that conduct could otherwise not be presented to the jury.[48]  *See id.*; *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice").

---

[47] *See, e.g.,* Tr. 622 (Boyer testimony that Dillman told Boyer that Mr. Andrade told Dillman that they sold out the ICO).

[48] *White* is also dicta because the court was able to decide the case on a totality of the impeachment evidence basis. *See United States v. White*, 116 F.3d 903, 920 (D.C. Cir. 1997) (per curiam).

- 35 -

1    Flexibility is warranted in assessing the interplay between Rule 806 and Rule 608(b), given that

2    the former was drafted with the understanding that the declarant is not testifying, while the latter

3    assumes the witness is testifying and subject to cross-examination. *See* Margaret Meriwether

4    Cordray, *Evidence Rule 806 and the Problem of Impeaching the Nontestifying Declarant*, 56 Ohio

5    St. L.J. 495, 497 (1995). Without such flexibility, the important benefits of Rule 806 would be

6    undermined for non-testifying declarants, and the central purpose of the rules of evidence—to

7    "ascertain the truth and [secure] a just determination," *see* Fed. R. Evid. 102—would be

8    compromised.

9            The contrary reasoning offered in *United States v. Saada*, 212 F.3d 210, 221 (3d Cir.

10    2000) and *United States v. White*, 116 F.3d 903, 920 (D.C. Cir. 1997) (per curiam) does not apply

11    to this case. *Saada* acknowledged the drawbacks of rejecting *Friedman's* approach — such as

12    preventing the use of prior misconduct as a form of impeachment unless by chance the witness

13    testifying to the hearsay statement has knowledge of the declarant's misconduct, *Saada* 212 F.3d

14    at 222 — but found those drawbacks outweighed by the rationale for Rule 608(b): preventing

15    unfair surprise and avoiding minitrials. *Id.* In this case, there would have been no unfair surprise,

16    as the government had interviewed the defense's proffered witness, Christine Lee, in March 3,

17    2022,[49] and learned about her potential testimony almost three years before trial, and had been in

18    possession of the defense's proffered confirming documents[50] since February 23, 2022. Nor

19    would there have been any minitrials: at the time of trial, Dillman was under indictment, and

20    unavailable to testify given his fifth amendment privilege, and there could have been no dispute

21    about Lee's testimony given the existence of corroborating documents.

22            Precluding Mr. Andrade from "inquiring into" Dillman's defrauding of his good friend

23    Christine Lee[51] precluded the defense from bringing to the jury's attention information about a

24    critical aspect of Andrade's defense: that Dillman was undermining Mr. Andrade rather than

---

[49] *See* Dent Decl., Exs. M and N.

[50] *See* Andrade's Second Amended Exhibit List (Feb. 2, 2019), ECF #580, at 3, Exs. 2082-2085.

[51] *See* ECF #601 at 7-8.

1   working with him, and that the government was wrong in repeatedly suggesting that efforts to

2   suggest that Dillman was obedient and worked well with others (by repeated references to one

3   time that Dillman replied "yessir" to Mr. Andrade).[52] In fact, had Dillman been cross examined,

4   he would have had to admit that he lied even to close friends in order to advance his own

5   interests, interests such as trying to impress his girlfriend. Dent Decl., Exhibits M and N.

6   Providing such information to the jury would raise reasonable doubt by tending to show not only

7   that Andrade should not be liable for Dillman's lies but also that Boyer's wire of funds to Dillman

8   was not in furtherance of any scheme in which Mr. Andrade knowingly participated —

9   compounding the Court's refusal to instruct the jury on this issue.

10      Similarly erroneous and prejudicial was the Court's ruling denying admission of

11   Exhibit 3184 and preventing further impeachment of Dillman through John Szeder's testimony.

12   Tr. 1349-55.  Exhibit 3184 was needed to show that Dillman was lying to the investors in his fund

13   about having an auto-trader (which was the core of what he was promising to investors).  Szeder,

14   who had been hired by Dillman to build the Autotrader, Tr. 1344-45, confirmed that there was no

15   Autotrader as of August 11, 2017, Tr. 1345, but was equivocal about what Dillman was

16   representing to investors about the Autotrader, and when.  Exhibit 3184-002 showed that on

17   August 1, 2017, Dillman was lying about the Autotrader, claiming among other things, that Block

18   Bits had been testing it in July 2017.  If Dillman had testified, Andrade could have "inquired into"

19   whether he made those statements on August 1, 2017, but in Dillman's absence, the only way to

20   make that point was to admit Exhibit 3184.  The Court not only excluded Exhibit 3184 but also

21   precluded any further impeachment of Dillman through John Szeder under a Rule 806 basis.

22   Tr. 1351:24-1352:1; 1353:13-1354:23. The Court's preclusion of this impeachment evidence

23   deprived the jury of vital information regarding the extent of Dillman's misrepresentations.[53]

24   _____

[52] Tr. 2982:24-2983:5; 3010:23-3011:4.

25

26   [53] The Court's preclusion of Dillman impeachment evidence resulted in a substantial amount of evidence being kept from the jury.  For example, but for the Court's ruling, after admitting Exhibit 3184, the Defense would have offered Exhibit 3185, a subsequent email from Dillman to

27   the BlockBits Capital investors on October 7, 2017, where he falsely asserted that "the Autotrader

28

- 37 -

On these facts and with Rule 102's admonition to construe the rules of evidence so as to "ascertain[] the truth and secur[e] a just determination," this Court should have interpreted the intersection between Rules 608(b) and 806 in accord with *Friedman*. Fed. R. Evid. 102; *see Chambers*, 410 U.S. at 295. In failing to do so, a fundamental aspect of the "truth-determining process[,]" of cross-examination was eliminated by a hearsay declarant's unavailability to testify, leaving the jury without impeachment evidence needed to assess the declarant's co-conspirator statements that were admitted despite the declarant's absence. *Chambers*, 410 U.S. at 295 (quoting *Dutton v. Evans,* 400 U.S. 74, 89 (1970)); *see id.* ("The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'" (quoting *Dutton v. Evans,* 400 U.S. 74, 89 (1970) & citing *Bruton v. United States,* 391 U.S. 123, 135-37 (1968))).

### 2. The Court Erred in Limiting Impeachment Based on Prior Inconsistent Statements Under Rule 613

Following the defense's submission of the Ninth Circuit's decision in *United States v. Bullcalf*, 563 F. App'x 535 (9th Cir. 2014), the Court allowed the defense to prove up three items of impeachment of government witnesses based on prior inconsistent statements that the witnesses refused to admit that they had made.[54] Tr. 2637-38. But the Court erred when it did not allow the admission of evidence to impeach prosecution witnesses with a number of other

---

rolled out in October, finally making its debut to much rejoicing by the tech team!" In addition to impeaching Dillman, this evidence was relevant to show Dillman's focus on retaining his investors no matter what he had to do or say, facts that advance Mr. Andrade's defense that Dillman's scheme was separate from any scheme of which Mr. Andrade was a part. Had the Court not so ruled, the defense could have offered other documents impeaching of Dillman. *See e.g.,* ECF #484, Ex. 2786 (Dillman's Chief Strategy Officer employment contract, wherein he continued to falsely assert that BlockBits Capital utilized "an in-house proprietary trading algorithm, AI, and Machine Learning" to trade cryptocurrencies); Ex. 2522 (Dillman's pitch email for the CSO position, sent to Abramoff, wherein he falsely claims that BlockBits Capital has an autotrader); Ex. 2685 (Dillman's messages with Bradley Grimm wherein he makes false statements about BlockBits Capital's non-existent autotrader and encourages Grimm to lie about his accredited investor status to join the fund).

[54] The Court had previously indicated its intention to disallow any such impeachment. Tr. 2468 ("I'm not going to let you call an extrinsic witness to impeach someone that's already testified").

- 38 -

1   inconsistent statements.  The Court based its refusal on the proposition that some of the proposed

2   refusals to admit to having made prior inconsistent statements were equivocal and others were

3   "collateral."  Tr. 2637.  Neither proposition justifies the Court's rulings.

4         The Ninth Circuit established unequivocally in *Bullcalf* that witnesses who claim not to

5   recall their prior inconsistent statements can be impeached with extrinsic evidence that they made

6   the statements.  Other answers that fall short of or otherwise evade an admission are equally

7   sufficient to trigger extrinsic proof that the proffered statements were made.  *See, e.g., Bush v.*

8   *United States*, 267 F.2d 483, 489 (9th Cir. 1959) ("might have said so"); *United States v. Rogers,*

9   549 F.2d 490, 495-96 (8th Cir 1976) (equivocal answers); *Woods v. United States*, 279 F. 706,

10  711 (4th Cir. 1922) (district court erred by preventing defendant from attempting to impeach

11  witness who "could not remember," by calling other witnesses to whom he had made statements

12  respecting the same subject-matter, contradictory to those he had testified to); *Searway v. United*

13  *States,* 184 F. 716 (8th Cir. 1910) ("The rule is general and well settled that a categorical denial

14  by a witness is not an essential preliminary to his impeachment. It is sufficient, his attention being

15  properly directed, if there is forgetfulness, partial admission, or an uncertain, evasive, or

16  indefinite answer." (citing 2 Wigmore on Evidence § 1037)); *see generally United States v. Higa*,

17  55 F.3d 448, 452(9th Cir. 1995) ("Rule 613(b) contains no bar, beyond foundation requirements,

18  to extrinsic evidence of prior inconsistent statements"). [55]

19        Similarly, assuming the Court has discretion to preclude impeachment on matters that are

20

21  [55] *See generally United States v. Shuemake,* 124 F.4th 1174, 1178 (9th Cir. 2024) ("We affirm
    these prior decisions and are aligned with our sister circuits in holding that a district court may
22  find that dubious claims of memory loss satisfy Rule 801(d)(1)(A)'s inconsistency requirement").
    The *Shuemake* Court cited numerous additional examples of answers that are sufficient to trigger
23  extrinsic proof that proffered statements were made: *United States v. Truman*, 688 F.3d 129, 142
    (2d Cir. 2012) ("the refusal to answer" may be "inconsistent with his prior testimony"); *United*
24  *States v. Iglesias*, 535 F.3d 150, 159 (3d Cir. 2008); *United States v. Cisneros-Gutierrez*, 517
    F.3d 751, 757 (5th Cir. 2008) ("[A] witness's feigned memory loss can be considered inconsistent
25  under the Rule, for the unwilling witness often takes refuge in a failure to remember" (quotation
    marks omitted)); *United States v. Hadley*, 431 F.3d 484, 512 (6th Cir. 2005) ("limited and vague
26  recall of events, equivocation, and claims of memory loss satisfy the requirement of Rule
    801(d)(1)(A)"); *United States v. Gajo*, 290 F.3d 922, 931 (7th Cir. 2002); *United States v. Dennis*,
27  625 F.2d 782, 796 (8th Cir. 1980).  *See Shuemake*, 124 F.4th at 1178 n.1.

28                                         - 39 -

"collateral," that term excludes only "a point not related to the matters at issue," *Higa*, 55 F.3d at 452 (citing 1 McCormick on Evidence § 47 (9th ed.)), and cannot preclude testimony on matters such as whether more money was spent on the company's technology than on marketing.  As a result, the Court erred in precluding the defense from impeaching at least seven additional statements.[56]

Precluding the defense from impeaching Abramoff was especially damaging because the Ninth Circuit has "repeatedly expressed its concern that defense counsel be given maximum opportunity to impeach the credibility of key government witnesses," and that "[t]esting a witness' credibility is especially important when he is an accomplice of the accused." *United States v. Williams,* 668 F.2d 1064, 1070 (9th Cir.), *as corrected* (Feb. 8, 1982).  Leaving the jury with the impression that Abramoff might have been truthful, and that defense counsel were wrong in accusing Abramoff and other witnesses of contradicting themselves, wrongly enhanced the credibility of government witnesses and undermined the credibility of defense counsel.[57]

///

///

///

---

[56] *See, e.g.,* Tr. 1758 (Abramoff testimony about calling Mr. Andrade an idiot); 1767 (Abramoff testimony about Mr. Andrade telling him AtenCoin had risen to $80); 1822 (Abramoff testimony about whether more money was spent on the company's technology than on marketing); 1862 (Abramoff testimony about Dillman preparing his own marketing material and Mr. Andrade subjecting that material to legal review); 1278 (Carlsen testimony about Mr. Andrade not being a good businessman); 1279-80 (Carlsen testimony about Mr. Andrade spending a million dollar on development); 1280 (Carlsen testimony that Naimer had gone quiet).

[57] The Court further deprived Mr. Andrade of his ability to impeach his alleged co-conspirators when it ruled at the beginning of the trial that would not allow testimony about matters addressed in Mr. Andrade's misconduct motion, or from witnesses identified in that motion. Among other things, this precluded Mr. Andrade from letting the jury know about additional examples of Abramoff using AML Bitcoin to engage in money laundering, about statements Mata made in a recorded conversation he arranged with Mr. Andrade and Mr. Andrade's counsel, and about FBI Agent Buma's knowledge that Abramoff was, contrary to Abramoff's testimony, an informant. Tr. 1788:18-19; Dent Decl., para. 8. Denial of the misconduct motion was also erroneous for the reasons stated in that motion and the motion to reconsider its denial.  ECF ## 499 and 548.

1
2

## V.  THE COURT ERRED IN DENYING MR. ANDRADE'S CONTINUANCE AND OTHER MOTIONS, PREJUDCING THE DEFENSE AND VIOLATING MR. ANDRADE'S CONSTITUIONAL RIGHTS

3

What Mr. Andrade learned during trial confirmed that the Court erred in denying his

4

continuance motion, ECF 511 and 511-1, which grew out of a five-year delay in the production of

5

Mr. Andrade's accounting records in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).  Far

6

from being not "exculpatory or otherwise material," or "merely cumulative," ECF 541 at 5:1-8,

7

the eve-of-trial dump of records that the government seized from Mr. Andrade's accountant Karl

8

Ruzicka in 2020 (as well as related government conduct) prejudiced the defense.  *See* Diamond

9

Declaration paragraphs 6-12.

10

First, the dump of files turned out to contain inaccessible files, containing financial

11

analysis and backup of Mr. Andrade's AML Token sales, and also separate documents tracking

12

the shareholders in his company that was licensing the use of patents he obtained.  Many of

13

Ruzicka's records of the AML Token sales were electronically connected to QuickBooks

14

databases maintained by Office Squad, a bookkeeping business,[58] which had also been subject to

15

search in 2020 when Ruzicka's own files were seized.  Office Squad personnel were unwilling to

16

cooperate with defense counsel, and the data remained unavailable. Had the government's

17

production been made in 2020, or at any reasonable time before trial, the loss of data could have

18

been remedied through subpoenas of other discovery efforts –or the problem would likely have

19

been solved had the government produced the Office Squad material in timely fashion.

20

Second, because the production was not made in timely fashion, because the government

21

instructed Ruzicka to remain quiet about the seizure, and because Ruzicka admits to a failing

22

23
24
25
26
27

---

[58] The spreadsheets included the work of Ruzicka reviewing the QuickBooks data, linked to the Office Squad's database.  There were periods of time when Office Squad performed bookkeeping for Mr. Andrade, without Ruzicka, and then later, Ruzicka subcontracted out some of his bookkeeping work to Office Squad.  Office Squad therefore had the ownership rights/possession of the database that some of Ruzicka's own work-product relied upon.  Ultimately, the defense was able to figure out that the government seized material from both Ruzicka and Office Squad that was linked, but never produced the Office Squad data to the defense.  *See* Diamond Declaration, paragraphs 10-12.

28

ANDRADE'S CORRECTED MOTION FOR NEW TRIAL AND          CASE NO. 3:20-CR-00249-RS
JUDGMENT OF ACQUITTAL

1    memory during the intervening five-year period, Mr. Andrade – who did not know the content or

2    extent of Ruzicka's files or that they had been taken by the FBI – was deprived of the ability to

3    capture exculpatory recollections from Ruzicka. *See* Diamond Declaration, paragraphs 6 through

4    the end. Third, the Ruzicka documents included a check book register with original carbon-copy

5    records, physical receipts, and other records that were not produced to the defense until February

6    3, 2025, after the amendment to the motion to continue was filed. *See* Diamond Declaration,

7    paragraphs 6 et seq.

8        This flood of new but incomplete data, adding to thousands of exhibits and 5TB of

9    discovery, came on top of other misconduct (much of which was also discovery-related; *see also*

10   Part III, supra), identified in Mr. Andrade's Misconduct Motion, see ECF # 499 and supporting

11   documents, which the Court also erred in denying. Especially in combination, these errors

12   violated *Brady* and prejudiced Mr. Andrade's ability to present his defense. *See Sherman v.*

13   *Gittere*, 92 F.4th 868, 878-79 (9th Cir. 2024).

14   **VI.    THIS ACCUMULATION OF ERRORS WAS IN NO WAY HARMLESS**

15       The over forty errors described in this brief cannot be washed away as harmless error.

16   First, some of them, such as the failure to instruct based on what the grand jury charged for Count

17   Two, are structural errors that are essentially never harmless. *See United States v. Becerra*, 939

18   F.3d 995, 1004 (9th Cir. 2019). Second, other errors impacted dispositive issues on which there

19   was no contrary evidence: for example, Mr. Andrade's evidence that Dillman lied to him and

20   cheated him out of proceeds of AML Bitcoin tokens, and that Dillman used AML Bitcoin to

21   further Dillman's business in ways that jeopardized a critical tenet of Mr. Andrade's business —

22   far more than the limited amount of evidence needed to trigger a jury instruction, *see Sotelo-*

23   *Murillo*, 887 F.2d at 178, for which there was no substitute. *See Territory of Guam v. Marquez*,

24   963 F.2d 1311, 1316 (9th Cir. 1992) (jury instruction error required reversal despite fact that

25   lawyer argued what would have been in instruction). Third, the magnitude of the errors — and the

26   one-sided way in which they repeatedly licensed government evidence that should never had been

27   admitted while excluding evidence the defense was entitled to admit — would make this a case in

28

- 42 -

1   which the accumulation of errors requires a new trial even if some of the errors individually could

2   be argued to be harmless.  *See United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988); *see*

3   *also United States v. Berry,* 627 F.2d 193, 200-01 (9th Cir. 1980) (in reviewing for cumulative

4   error, the court must review all errors preserved for appeal and all plain errors). When one party is

5   licensed to introduce very prejudicial but inadmissible evidence, and the other party is denied the

6   opportunity to introduce important exculpatory and impeaching information, "the cumulative

7   prejudicial effect of many errors may be greater than the sum of the prejudice caused by each

8   individual error." *See generally United States v. Graham*, 123 F.4th 1197, 1283 (11th Cir. 2024).

9       Finally, while the government may have introduced a high volume of evidence, it was of

10  low quality, as exemplified by Special Agent Quinn's testimony that he did not see any source

11  code in what Mr. Andrade's company had produced, Tr. 2852, which turned out to be because he

12  didn't look, and therefore missed *more than 13,000 pages* of it that were produced.  Tr. 2852.  *See*

13  *also* Tr. 3077 (rather than describing *what Mr.* Andrade was told about the rejection campaign,

14  jury is told only that "it was discussed"). The government's case was based on the testimony of

15  untrustworthy miscreants who lied repeatedly to their own closest friends (Bryan), were

16  previously caught lying and then repeated those same lies to the jury (Jodoin), were notorious

17  liars who nonetheless got sweetheart deals from the government to testify against Mr. Andrade

18  (Abramoff, Darrow), or who insisted on incredible statements like being motivated to help the

19  FBI as a good citizen while deceiving the FBI at the same time (Abramoff).

20      Not only was the quality of proof low, but the proof of each of the government's main

21  allegations, Tr. 202-03, proved to be full of holes.  The Super Bowl proof was weak because Mr.

22  Andrade reasonably believed he had the money to pay for the ad, Exs. 3047, 2106; because the

23  original intent was to place the ad, Ex. 1459, with the "rejection campaign" hidden from Mr.

24  Andrade based on the correct belief that he would not have approved it, Ex. 897; and he went

25  along with it only because he believed it would be triggered only after the ad was actually

26  rejected.  Tr. 3072-80.  The Panama Canal proof was weak because De La Guardia, the man on

27  the ground in Panama, represented that he was meeting with the Canal officials (and apologized

28

- 43 -

afterwards, Ex.1514), as the allegedly false publicity reported, and because Morgan & Morgan repeatedly and consistently expressed interest in, and great possibilities with, using AML Bitcoin. Tr. 3062-68: Exs. 8, 10, 11, 884, 891, 2160. The Port of San Francisco proof was weak because the publicity in 2017 was based on conversations with Port Commissioner Leslie Katz about her proposing use of the AML Bitcoin technology, Tr. 892, on Dillman's report of what his lawyer and Port Commissioner Leslie Katz was saying, Ex. 115, and because the proposed 2018 publicity — accurately based on Naimer's report of the meeting — never saw the light of day after Mr. Andrade insisted that it be checked with Katz and killed the publicity when she did not approve it.  Ex. 3109; Tr.3068-72.  What was written about Lt. Governor Newsom was accurate, Tr. 928, 3080-82, Ex. 489, and the government never proved that any market manipulation was ever performed, or that there was anything wrong with anything that was done, especially given that government witness John Bryan, who supervised the activity, denied that the purpose was to manipulate prices, and did not think there was any wrongdoing.  Tr. 1581:6-1582:9, 1585:19-25, 1609:11-1610:18; 3104-06 (addressed by defense counsel in closing argument).

No better were the money laundering allegations, which never had an answer for the facts that Mr. Andrade always had too many transactions and engaged in needless activities due to his paranoia and other disabilities, that he had been told by reputable counsel that  he was free to spend the proceeds of his token sales as he saw fit and therefore had nothing to hide, and that, if he had wanted to hide the his purchases of real estate, the government showed that he possessed more than enough cryptocurrency to purchase property in ways that could not be traced.

These holes were further weakened by the evidence from the government's own witnesses that Mr. Andrade frequently misunderstood what was going on, Tr. 2898:21-2899:20, and that he suffered from disabilities that impacted his decision-making.  Tr. 2899:24-2900:6. In the end, these potentially good defenses were eviscerated by repeated rejections of admissible exculpatory evidence, were overrun by a mass of inadmissible and unfairly prejudicial evidence admitted by the government over objection, and were lost in the absence of necessary instructions that the Court declined to give.  In the interests of justice, a new trial is required.

- 44 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated above, Mr. Andrade requests a judgment of acquittal and/or a new trial.

Dated: June 3, 2025                                      **KING & SPALDING LLP**


By:  _/s/ Michael J. Shepard_
MICHAEL J. SHEPARD
KERRIE C. DENT
DAINEC STEFAN
CINDY A. DIAMOND

Attorneys for Defendant
ROWLAND MARCUS ANDRADE