## COMPANY AGREEMENT

### OF

### BLOCK BITS AML HOLDINGS LLC

This Company Agreement ("Agreement") of Block Bits AML Holdings LLC, a Delaware limited liability company (the "Company"), is adopted effective as of January 11, 2018, by and among the undersigned initial Members of such limited liability company for and in consideration of the mutual agreements and provisions herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

### ARTICLE I. - DEFINED TERMS

**Section 1.1**    Definitions.  As used in this Agreement, the following capitalized terms shall, unless the context otherwise requires, have the meanings specified in this Article:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:  (i) credit to such Capital Account any amounts which such Member is obligated to restore (pursuant to the terms of such Member's promissory note payable to the Company or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentence of Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital Account the amounts specified in Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (d)(5) and (d)(6).  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" shall mean, when used with respect to a specified person, any person that directly or indirectly controls, is controlled by or is under common control with such specified person.  As used in this definition, the term "control" means possession, directly or indirectly (through one or more intermediaries), of the power to vote five percent (5%) or more of the voting securities of such Person, or direct or cause the direction of management and policies of a person through an ownership of voting securities (or other ownership interests), contract, voting trust or otherwise.

"Bankruptcy" shall mean bankruptcy under the United States Bankruptcy Code or insolvency under any state insolvency act.

"Board of Managers" shall mean the Managers collectively.

"Business Day" shall mean any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. § 6103(a), as amended from time to time

"Capital Account" shall mean the Capital Account maintained for each Member pursuant to Section 6.4 of this Agreement.

"Capital Contribution" shall mean the total amount of cash or property contributed to the Company by all the Members or any one Member, as the case may be and shall include the Capital Contributions to Invest and listed on Exhibit A hereto.

"Certificate of Formation" shall mean the Certificate of Formation of Block Bits AML Holdings LLC, filed with the Secretary of State of the State of Delaware by which the Company is organized as a Delaware limited liability company pursuant to the Law.

EX2743-001

HIGHLY CONFIDENTIAL    BOYER0000139

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and any successor statute.

"Company" shall mean Block Bits AML Holdings LLC, a Delaware limited liability company, as such limited liability company may from time to time be constituted.

"Company Property" or "Property" shall mean all interests, investments, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired, including, without limitation, its interest in any Subsidiary (as hereinafter defined).

"Disposition" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other disposition, whether voluntary or involuntary, and whether during the lifetime of the person involved or upon or after his or her death, including, but not limited to, any Disposition by operation of law, by court order (including without limitation in connection with termination of a marital relationship), by judicial process, or by foreclosure, levy or attachment.

"General Interest Rate" means a rate per annum equal to the lesser of (a) a varying rate per annum equal to the interest rate publicly reported by the *Wall Street Journal*, from time to time as the prime commercial or similar reference interest rate, with adjustments in that rate to be made on the same date as any change in that rate, and (b) the maximum rate permitted by applicable law.

"Interest" or "Units" shall mean all rights and interests of a Member under this Agreement and the Act, including (i) the right of a Member, expressed in units on Exhibit A, to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement, and (ii) all management rights, voting rights or rights to consent.

"Law" shall mean the Delaware Business Organizations Code, as the same may be amended from time to time, and any successor statute.

"Liquidation Process" shall mean a Member must provide written notification to the Manager for request to liquidate Membership Units.  Manager will liquidate the Membership Units and provide Member with U.S. Dollars, or equivalent currency.  There will be a 1.5% liquidation transaction fee deducted to process all Liquidation requests.

"Super Majority-in-Interest of the Members" shall mean Members having the right to vote more than seventy nine percent (79%) of the total Units in the Company.

"Manager" shall mean the person(s) appointed to the Board of Managers by the Members pursuant to Article X hereof.  Japheth Dillman is the initial Manager of the Company.  Unless otherwise expressly indicated, the reference to Manager or Managers in this Agreement shall be read "Managers" when more than one Person is serving as Manager, and the reference to Manager or Managers in this Agreement shall be read "Manager" when only one Person is serving as Manager.

"Member" shall mean a Person listed on Exhibit A, as amended from time to time, including any Person who is subsequently admitted to be a Member to the extent of the Interest issued or transferred to such Person.

"Nonrecourse Deductions" has the meaning given to it in Reg. § 1.704-2(b)(1).

"Notification" shall mean a writing containing any information required by this Agreement to be communicated to any Person, which may be personally delivered, sent by

HIGHLY CONFIDENTIAL

BOYER0000140

registered or certified mail, postage prepaid, or sent by facsimile transmission promptly confirmed by mail, to such Person, at the last known address of such Person on the Company records. Any such Notification shall be deemed to be given (i) when delivered, in the case of personal delivery, (ii) on the date on which it is deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid, in the case of mail, and (iii) within the first business hour (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) after receipt by the addressee, in the case of facsimile transmission. Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute Notification as of the date of such receipt for all purposes of this Agreement.

"Partner Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Reg. § 1.704-2(i).

"Partner Nonrecourse Debt" has the meaning given to it in Reg. § 1.704-2(b)(4), being generally any nonrecourse debt of the Company for which any Member (or related Person within the meaning of Reg. § 1.702-4(b)) bears the economic risk of loss.

"Partner Nonrecourse Deductions" has the meaning given to it in Reg. §§ 1.704-2(i)(1) and (j)(2).

"Partnership Minimum Gain" means that amount determined by first computing, for each Company nonrecourse liability, any gain the Company would realize if it disposed of the Company property subject to such liability for no consideration other than full satisfaction of the liability, and by then aggregating the separately computed gains. For purposes of determining the amount of such gain, the additional rules set forth in Reg. § 1.704-2(d) shall be followed.

"Percentage Interest" shall mean, as to each Member or class of Members, the ratio of the total number of Units held by such Member to the total number of all Units then outstanding.

"Person" shall mean a natural person, partnership, limited partnership, limited liability company, foreign limited liability company, trust, estate, corporation, custodian, trustee, executor, administrator, nominee or entity in a representative capacity, general partnership, joint venture, cooperative or association.

"Subsidiary" shall mean any foreign or domestic limited liability company, corporation, partnership, joint venture, trust or other enterprise of which the Company owns an interest.

## ARTICLE II. - ORGANIZATION

**Section 2.1**    Formation.    A Certificate of Formation for the Company was filed with the Secretary of State of the State of Delaware on January 11, 2018.

**Section 2.2**    Name.    The name of the Company is "Block Bits AML Holdings LLC".

**Section 2.3**    Assumed Names.    The Manager may cause the Company to do business under one or more assumed names. In connection with the use of any such assumed names, the Members shall cause the Company to comply with the Delaware Assumed Business or Professional Name Act § 71.001 et seq, Tex. Bus. & Com. Code § 36.01 et seq., as amended.

**Section 2.4**    Registered Office; Registered Agent; Offices.    The registered office of the Company required by the Law to be maintained in the State of Delaware shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of

EX2743-003

HIGHLY CONFIDENTIAL                                                                                          BOYER0000141

the Company) as the Members may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Members may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at ███████████████████████████████████████████, or at such place as the Manager may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there as required by Section 101.501 of the Law. The Company may have such other offices as the Members may designate from time to time.

Section 2.5     No State Law Partnership. No provision of this Agreement (including, without limitation, the provisions of Article IX) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer with any other Member, for any purposes other than federal and state tax purposes.

## ARTICLE III. - TERM

The existence of the Company began with the filing of a Certificate of Formation January 11, 2018. The Company shall exist for the duration specified in the Certificate of Formation, unless sooner terminated in accordance with this Agreement.

## ARTICLE IV. - PURPOSE

The purpose of the Company is to transact any and all lawful businesses and engage in any lawful act and/or activities for which limited liability companies may be organized under the Law, and further to engage in any other business or activity that may be incidental, proper, advisable or convenient to accomplish the foregoing purpose and that it is not forbidden by the law of the jurisdiction in which the Company engages in that business.

## ARTICLE V. - MEMBERS

Section 5.1     Initial Members. The names and addresses of the Members of the Company are as set forth on Exhibit A of this Agreement. At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company.

Section 5.2     Restrictions on Disposition and Additional Members. Prior to admission to the Company, a Person must execute an agreement agreeing to be bound by all of the terms and conditions set forth herein, such agreement to be in a form approved by the Board of Managers.

Section 5.3     Recognition of Disposition. A Disposition of Units may not be recognized until: (i) the applicable provisions of this Article are satisfied; (ii) the Board of Managers receive a document executed by both the Disposing and acquiring Persons (or their representative) providing:  the notice address of any Person to be admitted to the Company and its agreement to be bound by this Agreement; the Percentage Interests and Capital Contributions of the Disposing and acquiring Persons after the Disposition (the sum of which must equal the pre-Disposition Percentage Interest and Capital Contribution of the Disposing Person) and a representation and warranty that the Disposition was made in accordance with all applicable laws and regulations (including securities laws) (any Disposition and admission complying with this section is effective as of the first day of the calendar month immediately succeeding the month in which the Board of Managers receive notification of Disposition and compliance with this Article); (iii) the Units subject to the Disposition or admission is registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or the Company receives a favorable opinion from its legal counsel (or legal counsel acceptable to it) that the Disposition is exempt from registration under those laws; and (iv) the Company receives a favorable opinion from its legal counsel (or legal counsel acceptable to the Company) that the Disposition will not result in the Company being

HIGHLY CONFIDENTIAL

taxable as a corporation for federal income tax purposes. Notwithstanding the foregoing, the Board of Managers, however, may waive the requirements of this section.

Section 5.4    Disposition Expenses.    The Disposing and acquiring Persons shall pay or reimburse the Company for all costs incurred in connection with the Disposition or admission (including legal fees incurred in connection with the legal opinions referred to in Section 5.3) within ten (10) days after receipt of the Company's invoice for the amount due; provided, however, the Company may deduct all such costs from the amount payable by the Company. If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from that date until paid at the General Interest Rate.

## ARTICLE VI. - CAPITAL CONTRIBUTIONS AND INTERESTS

Section 6.1    Capital Contributions.    Each Member shall contribute to the capital of the Company the amount set forth as such Member's Capital Contribution on Exhibit A.

Section 6.2    Percentage Interests.    Upon making the Capital Contribution specified on Exhibit A, each Member shall own the Units set forth opposite such Member's name on Exhibit A.

Section 6.3    No Further Capital Contributions.    No Member shall be obligated to make any Capital Contribution other than that set forth opposite such Member's name on Exhibit A. Without the approval of all the Members, no Member may make any Capital Contributions beyond those specified on Exhibit A.

Section 6.4    Capital Accounts.    A Capital Account shall be maintained for each Member. The Capital Accounts shall be maintained in accordance with applicable U.S. Treasury Department regulations. The Company shall compute on a current basis the Capital Contribution and Capital Account of each Member and their adjusted tax basis in their Interest. The Company shall maintain current and accurate records concerning Members' capital contributions, Capital Accounts and adjusted tax bases and, promptly after the request of any Member, shall make these records available to the Member.

Section 6.5    Return of Capital Contributions.    Except as otherwise provided herein or in a nonwaivable provision of the Law, no Member shall have the right to withdraw from the Company or to withdraw, or receive any return of, his or her Capital Contribution.

Section 6.6    Interest.    No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts.

Section 6.7    Loans From Members.    No Member nay make a loan or other advancement of funds to the Company, other than with the unanimous consent of the Members. Loans by a Member to the Company shall not be considered Capital Contributions. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by him to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in Section 13.4 hereof.

## ARTICLE VII. - ALLOCATIONS AND DISTRIBUTIONS

Section 7.1    Allocations.

A.    Company profits, losses, gain, deduction and credit for each fiscal year shall be allocated among the Members in accordance with their Percentage Interests (the "General Allocation of

HIGHLY CONFIDENTIAL

Profits and Losses"). Notwithstanding the forgoing, in accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

   B. The losses allocated pursuant to the General Allocation of Profits and Losses shall not exceed the maximum amount of losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of losses pursuant to the General Allocation of Profits and Losses, the limitation set forth in this Section 7.1(B) shall be applied on a Member-by-Member basis so as to allocate the maximum permissible losses to each Member under Reg. § 1.704-1(b)(2)(ii)(d). Notwithstanding the General Allocation of Profits and Losses, the provisions of this Section 7.1(B) (collectively referred to as the "Regulatory Special Allocations") shall be applicable to all Company allocations of profits and losses for each fiscal year in the following order:

   (i) Minimum Gain Chargeback Allocations. Except as otherwise provided in Reg. § 1.704-2(f), if there is a net decrease in Partnership Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Reg. § 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. §§ 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.1(B)(i) is intended to comply with the minimum gain chargeback requirement in Reg. § 1.704-2(f) and shall be interpreted consistently therewith.

   (ii) Partner Nonrecourse Debt Minimum Gain Chargeback Allocations. Except as otherwise provided in Reg. § 1.704-2(i)(4), if there is a net decrease in Partner Minimum Gain attributable to a Partner Nonrecourse Debt during any fiscal year, each Member who has a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Reg. § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Reg. § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. §§ 1.704-2(i)(4) and 1.704-2(j)(2). This provision is intended to comply with the minimum gain chargeback requirement in Reg. § 1.704-2(i)(4) and shall be interpreted consistently therewith.

   (iii) Qualified Income Offset Allocations. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 7.1(B)(iii) shall be made only if and to the extent that any such member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 7.1(B)(iii) were not in this Agreement. The allocation contained in this Section 7.1(B)(iii) shall be referred to herein as the "Qualified Income Offset Allocation."

   (iv) Gross Income Allocations. In the event any Member has an Adjusted Capital Account Deficit at the end of any fiscal year which is in excess of the sum of (1) the amount such Member is obligated to restore (pursuant to the terms of such Member's promissory note payable to the

HIGHLY CONFIDENTIAL

BOYER0000144

Company or otherwise), and (2) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.1(B)(iv) shall be made only if and to the extent that any such Member would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Agreement have been tentatively made as if the Qualified Income Offset Allocations and this Section 7.1(B)(iv) were not in this Agreement.

(v) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any fiscal year or other periods shall be allocated among the Members in proportion to their respective Percentage Interests.

(vi) <u>Partner Nonrecourse Deductions</u>. Any Partner Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members who bear the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Reg. § 1.704-2(i)(1).

(vii) <u>Section 754 Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required, pursuant to Reg. §§ 1.704-1(b)(2)(iv)(m)(2) or (m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its Percentage Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their Percentage Interests (in the event that Reg. § 1.704-1(b)(2)(iv)(m)(2) applies), or to the Members to whom such distribution was made (in the event that Reg. § 1.704-1(b)(2)(iv)(m)(4) applies).

C. The Regulatory Special Allocations are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Special Allocations shall be offset either with other Regulatory Special Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 7.1(C). Therefore, notwithstanding any other provision of this Agreement (other than the Regulatory Special Allocations), the Members shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Special Allocations were not part of this Agreement and all Company items were allocated among the Members in accordance with the General Allocation of Profits and Losses. In exercising their discretion under this Section 7.1(C), the Members shall take into account future Regulatory Special Allocations under Section 7.1(B)(i) and Section 7.1(B)(ii) that, although not yet made, are likely to offset other Regulatory Special Allocations previously made under Section 7.1(B)(v) and Section 7.1(B)(vi).

**Section 7.2** <u>Cash Distributions</u>. The Board of Managers shall, at least quarterly, balance the Company's accounts and distribute to the Members the amount by which cash on hand exceeds the amount necessary to meet the current costs, expenses and liabilities of the Company (including, without limitation, the Mgmt Fee Contributions listed on <u>Exhibit A</u> and a reasonably adequate reserve for working capital and contingencies) ("<u>Net Cash Flow</u>") in accordance with their respective Percentage Interests. The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of Company Property, except that the fair value of Company Property that is subject to a liability for which recourse of creditors is limited shall be included in the Company assets only to the extent that the fair value of that Company Property exceeds that liability.

HIGHLY CONFIDENTIAL                                                                 BOYER0000145

**Section 7.3**     <u>Distributions of Other Property</u>.  From time to time, the Board of Managers, upon the affirmative vote of a Super Majority-in-Interest of the Members, also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Interests and may be made subject to existing liabilities and obligations. Immediately prior to such distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

**Section 7.4**     <u>Distribution to Pay Taxes</u>.  To the extent of available Net Cash Flow, the Managers shall use commercially reasonable efforts to cause the Company to make cash distributions for each taxable year in amounts sufficient to enable each Member to discharge any federal tax liability for such taxable year (excluding penalties) arising as a result of their interest in the Company, determined by assuming the applicability to each Member of the highest combined effective marginal federal income tax rates for any individual or corporation actually obligated to report on any tax returns income derived from the Company. Distributions under this <u>Section 7.4</u> shall be taken into account in computing subsequent distributions to the Members under <u>Section 7.2</u> so that the aggregate distributions to each Member under <u>Section 7.2</u> shall, to the maximum extent possible, be equal to the aggregate distributions that would have been made to the Members under <u>Section 7.2</u> had there been no distributions pursuant to this <u>Section 7.4</u>. Any distributions under this <u>Section 7.4</u> shall be treated as an advance against future distributions and shall be taken into account in determining subsequent distributions under <u>Sections 7.2</u> and <u>13.4</u>, applicable so that each Member would receive the same aggregate distributions such Member could have received thereunder if this <u>Section 7.4</u> were not contained in this Agreement. If upon liquidation of the Company a Member had received distributions under this <u>Section 7.4</u> in excess of what the Member could have received pursuant to <u>Section 13.4</u>, such Member shall be required to immediately repay the Company the difference.  Notwithstanding <u>Section 7.2</u>, in the event there is an allocation of items of taxable income or gain allocated to the Members for a fiscal year that exceed the items of taxable loss, deductions or credit allocated to the Members for such year and cumulatively for all previous years, then to the extent there is cash available for distribution for such year, and to the extent that a Member has a tax liability for such year because of allocations to such Member pursuant to <u>Section 7.1</u>, distributions of cash to the extent available shall be made to such Member in accordance with that Member's Percentage Interest to the extent necessary, as solely determined by the Board of Managers, to pay such income tax liability taking into account the maximum marginal tax rates and such other facts as the Board of Managers deem applicable.

**Section 7.5**     <u>Tax Withholding; Withholding Advances</u>.

A.     *Tax Withholding.* If requested by the Board of Managers, each Member shall, if able to do so, deliver to the Board of Managers:

(i)     an affidavit in form satisfactory to the Board of Managers that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other applicable law;

(ii)     any certificate that the Board of Managers may reasonably request with respect to any such laws; and/or

(iii)     any other form or instrument reasonably requested by the Board of Managers relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board of Managers the affidavit described in Section 7.5(A) the Board of Managers may withhold amounts from such Member in accordance with Section 7.5(B).

B.     *Withholding Advances.* The Company is hereby authorized at all times to make payments ("<u>Withholding Advances</u>") with respect to each Member in amounts required to

HIGHLY CONFIDENTIAL

BOYER0000146

discharge any obligation of the Company (as determined by the Partnership Representative based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "Taxing Authority") with respect to any distribution or allocation by the Company of income or gain to such Member (including payments made pursuant to the BBA and allocable to a Member as determined by the Partnership Representative in its sole discretion) and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 7.5(B) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

C.     *Repayment of Withholding Advances.* Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the General Interest Rate:

(i)     be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board of Managers shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)     with the consent of the Board of Managers, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount shall be deemed to have been distributed to the Member, but which shall not further reduce the Member's Capital Account if the Board of Managers shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

D.     *Indemnification.* Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this Section 7.5(D) and the obligations of a Member pursuant to Section 7.5(D) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.5(D), including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

E.     *Overwithholding.* Neither the Company nor the Board of Managers shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

HIGHLY CONFIDENTIAL

BOYER0000147

## ARTICLE VIII. - OWNERSHIP OF COMPANY PROPERTY

Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Board of Managers may determine.  All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

## ARTICLE IX. - FISCAL MATTERS; BOOKS AND RECORDS

**Section 9.1**      Bank Accounts; Investments.  Capital Contributions, revenues and any other Company funds shall be deposited by the Board of Managers in a bank account established in the name of the Company, or shall be invested by the Board of Managers in furtherance of the purposes of the Company.  No other funds shall be deposited into Company bank accounts or commingled with Company investments.  Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's purposes, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**Section 9.2**      Records; Right of Inspection.

A.      *Records Required*.  During the term of the Company, the Board of Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2.4 hereof all records required to be kept pursuant to the Law.

B.      *Right of Inspection*.  On written request stating the purpose, a Member or a permitted assignee of a Member's Interest (an "eligible Person") may examine and copy in person or by the eligible Person's representative, at any reasonable time, for any proper purpose, and at the eligible Person's expense, records required to be maintained under the Law and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the eligible Person to examine and copy.  Upon written request by any eligible Person made to the Company at the address of the Company's principal office in the United States specified in Section 2.4 hereof, the Company shall provide to the eligible Person, without charge, true copies of (i) this Agreement and the Certificate of Formation and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

**Section 9.3**      Books and Records of Account.  The Board of Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting determined by the Board of Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

**Section 9.4**      Tax Returns and Information.  The Members intend for the Company to be treated as partnership for tax purposes.  The Board of Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file.  Within the shorter of (i) such period as may be required by applicable law or regulation, or (ii) seventy-five (75) days after the end of each calendar year, the Board of Managers shall send or deliver, or cause to be sent or delivered, to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his or her federal income tax return and state income and other tax returns.

**Section 9.5**      Delivery of Financial Statements to Members.  As to each fiscal year of the Company, the Board of Managers shall send, or cause to be sent, to each Member a copy of (i) a balance sheet of the Company as of the end of the fiscal year, (ii) an income statement of the Company for such

HIGHLY CONFIDENTIAL                                                                          BOYER0000148

year, and (iii) a statement showing the revenues distributed by the Company to Members in respect of such year.  Such financial statements shall be delivered by no later than ninety (90) days following the end of the fiscal year to which the statements apply.  Unless a Member requests in writing prior to the end of the fiscal year to which the financial statements apply that the financial statements shall be audited (in which case Section 9.6 below shall apply), such statements need not be audited.

Section 9.6     <u>Audits at Request of Member</u>.  Any Member shall have the right to have an audit conducted of the Company books, which audit may be requested with respect to the annual financial statements under Section 9.5 above.  The cost of the audit shall be borne by the Member or Members requesting that the audit be performed or, upon the approval of a Super Majority-in-Interest of the Members, by the Company.  The audit shall be performed by an accounting firm acceptable to the Company and the Members, including the Member requesting the audit.  Not more than one (1) audit shall be required by any or all of the Members for any fiscal year.

Section 9.7     <u>Fiscal Year</u>.  The Company's fiscal year shall end on December 31 of each calendar year.

Section 9.8     <u>Tax Elections</u>.  The Company shall make such elections for tax purposes as a Super Majority-in-Interest of the Members may deem appropriate and in the best interests of the Members. Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

Section 9.9     <u>Partnership Representative</u>.

A.     Japheth Dillman is hereby designated the "partnership representative" (the "<u>Partnership Representative</u>") (as defined in Code Section 6223(a)). The Partnership Representative is hereby authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Partnership Representative shall have sole authority to act on behalf of the Company in any such examinations and any resulting judicial proceedings, and shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. The Company and its Members shall be bound by the actions taken by the Partnership Representative.

B.     The Members acknowledge that the Bipartisan Budget Act of 2015, H.R. 1314, P.L. 114-74, 114th Cong. (2015) (the "<u>BBA</u>") potentially makes tax partnerships liable for income taxes attributable to adjustments of partnership items of income, gain, loss, deduction or credit.  The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings. Notwithstanding the repeal by the BBA of the unified audit rules contained in Section 6221 through 6234 of the Code, (i) the Partnership Representative shall have substantially the same rights and obligations as required of, or granted to, the Partnership Representative pursuant to this Agreement to the extent such rights and obligations are not in conflict with, or not inapplicable to, the Code (as amended by the BBA) or the Treasury Regulations promulgated thereunder, and (ii) each Member shall have substantially the same rights and obligations as required of, or granted to, such Member pursuant to this Agreement to the extent such rights and obligations are not in conflict with, or not inapplicable to, the Code (as amended by the BBA) or the Treasury Regulations promulgated thereunder.

EX2743-011

HIGHLY CONFIDENTIAL

BOYER0000149

C.     The Members agree that the Company shall elect out of the application of Section 6221(a) of the Code (as amended by the BBA) for its first fiscal year, and for each fiscal year thereafter, if possible.  If such election out is impossible, the Members further agree that the Company will elect the application of Section 6226 of the Code (as amended by the BBA) for its first fiscal year, in the event that it receives a "notice of final partnership adjustment" that would otherwise permit the Internal Revenue Service to collect from the Company a deficiency of tax, for each relevant year.  The Members covenant to take into account and report to the Internal Revenue Service any adjustment to their items for the reviewed year as notified to them by the Company in a statement furnished to them pursuant to Section 6226(a) of the Code (as amended by the BBA), in the manner provided in Section 6226(b) of the Code (as amended by the BBA), whether or not any of the Members own any Units in the year of the Company's statement.  To the extent that the Partnership Representative does not make an election under Code Section 6221(b) or Code Section 6226 (each as amended by the BBA), the Company shall use commercially reasonable efforts to (i) make any modifications available under Code Section 6225(c)(3), (4), and (5), as amended by the BBA, and (ii) if requested by a Member, provide to such Member information allowing such Member to file an amended federal income tax return, as described in Code Section 6225(c)(2) as amended by the BBA, to the extent such amended return and payment of any related federal income taxes would reduce any taxes payable by the Company.  Any Member which fails to report its share of such adjustments on its tax return for its taxable year including the date of the Company's statement as described immediately above shall indemnify and hold harmless the Company against any tax, interest and penalties collected by the Internal Revenue Service from the Company as a result of such Member's failure.  The foregoing covenants and indemnification obligation of the Member shall survive indefinitely and shall not terminate, without regard to any transfer of a Member's Units, withdrawal as a Member, or liquidation, dissolution or termination of the Company.

D.     The Company shall reimburse the Partnership Representative for all reasonable expenses incurred by it in connection with any administrative or judicial proceeding with respect to the tax liabilities of the Members.

E.     Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency imposed pursuant to Code Section 6226 as amended by the BBA) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.5(D).

**Section 9.10**     Indemnity of Partnership Representative. The Company shall, to the fullest extent permitted by law, indemnify and reimburse the Partnership Representative for all expenses (including legal and accounting fees) incurred as Partnership Representative pursuant to this Section in connection with any administrative or judicial proceeding with respect to the tax liability of the Members as long as the Partnership Representative has determined in good faith that its course of conduct was in, or not opposed to, the best interests of the Company. The payment of all such expenses shall be made before any distributions are made to the Members, and shall not be considered a distribution hereunder. The taking of any action and the incurring of any expense by the Partnership Representative in connection with any such proceeding, except to the extent provided herein or required by law, is a matter in the sole discretion of the Partnership Representative and the provisions on limitations of liability of the Partnership Representative and indemnification set forth in Article XIV shall be fully applicable to the Partnership Representative in its capacity as such.

## ARTICLE X. - MANAGEMENT OF THE COMPANY

**Section 10.1**     Managers of the Company.

EX2743-012

HIGHLY CONFIDENTIAL                                                           BOYER0000150

A.  *Powers of Manager.*  The Board of Managers shall be the Persons appointed by a Super Majority-in-Interest of the Members from time to time to serve as the Managers of the Company.  The powers of the Company shall be exclusively exercised by and under the exclusive authority of, and the business and affairs of the Company shall be managed under the exclusive direction of, no less than a majority of the Board of Managers at any time there is more than one Manager and at the sole discretion of the Manager at any time there is one Manager.  The Board of Managers shall have the power and authority to do or cause to be done any and all acts deemed by the Board of Managers to be necessary or appropriate to conduct the business of the Company, including the authority to bind the Company in making contracts and incurring obligations in the Company's name in the course of the Company's business, without obtaining the consent of the Members.  The Board of Managers shall, subject to the provisions of this Agreement and the availability of cash funds of the Company, use reasonable efforts to implement the Company's then applicable business plan, and, subject to the provisions of this Agreement, shall have all right, power and authority to do so.  Without limiting the generality of the foregoing and except as otherwise provided in this Agreement, the power and authority of the Board of Managers shall include, without limitation, the power and authority:

1.  to employ, retain, consult with and dismiss on behalf of the Company such accountants, attorneys, agents, employees, managers, consultants, engineers, clerical help, and to obtain such other assistance and services as the Manager may determine proper and to pay therefor such remuneration and compensation as the Manager may determine;

2.  to invest the Capital Contribution to Invest as set forth on Exhibit A of this Agreement into AML BITCOIN;

3.  to purchase, lease, rent, or otherwise acquire or obtain the use of computers, equipment, software and all other kinds and types of real or personal property that may in any way be determined by the Manager to be necessary, convenient, or advisable in connection with carrying on the business of the Company, and to incur expenses for travel, telephone, facsimile, insurance, and for such other things, whether similar or dissimilar, as may be determined by the Manager to be necessary or appropriate for carrying on and performing the business of the Company;

4.  to open and close bank accounts, to receive, transfer, and disburse funds, to invest funds and other similar transactions in the normal course of business;

5.  to procure and maintain in force the insurance coverage, co-insurance and self-insurance as the Manager shall determine to serve as protection for the Company or its assets or against liability for loss and damage that may be occasioned by the activities to be engaged in by the Company;

6.  to pay, extend, renew, modify, adjust, submit to arbitration or mediation, prosecute, defend, or compromise on behalf of the Company, upon such terms as the Manager may determine and upon such evidence as it may determine sufficient, any obligation, suit, liability, cause of action or claim, including a suit or claim for taxes, in favor of or against the Company;

7.  to make such classifications, determinations, accounting procedures and allocations as the Manager may determine, having due regard for any relevant generally accepted accounting principles and applicable laws;

8.  to determine the method of accounting of the Company;

EX2743-013

HIGHLY CONFIDENTIAL
BOYER0000151

9.      to take such other actions, to execute and deliver such other documents, and to perform such other acts as may be determined by the Manager to be appropriate to carry out the business and affairs of the Company.

B.      *Restrictions on the Authority of the Board of Managers*.  The Board of Managers shall have the authority to do any of the following only with the written approval of a Super Majority-in-Interest of the Members:

1.      to acquire on behalf of the Company any equipment, facilities and property other than as expressly allowed in Section 10.1(A);

2.      to make and enter into such agreements and contracts with such parties and to give such receipts, releases, and discharges with respect to any and all of the foregoing and any matters incident thereto;

3.      to purchase or otherwise acquire any real or personal property of any nature;

4.      to borrow monies for the business of the Company or draw, make, execute and issue promissory notes and other negotiable or nonnegotiable instruments and evidences of indebtedness; to secure the payment of the sums so borrowed and to mortgage, pledge, or assign in trust all or any part of the property of the Company; to assign any monies owing or to be owing to the Company; and to engage in any other means of financing;

5.      to enter into any agreement for the sharing of profits, joint venture, or partnership with any Person, government or agency thereof engaged in any business or transaction in which the Company is authorized to engage, or any business or transaction capable of being conducted, so as to directly or indirectly effect the Company, or that cause the Company to assume obligations;

6.      to do or perform any material activity or expenditure which is materially inconsistent with the Company purpose;

7.      to enter into any agreement authorizing the merger or consolidation of the Company with any other entity, whether foreign or domestic, or the sale of all or substantially all of its assets;

8.      to cause or permit the Company to be converted under state law from a limited liability company to another form of entity;

9.      to make the election to change the federal income classification of the Company as a partnership;

10.      to approve the withdrawal of a Member from the Company;

11.      to approve any transaction or contract between the Company and any of the Members, Managers or officers or between the Company and any other corporation, partnership, association or other organization in which one or more of its Members, Managers or officers are shareholders, partners, members, directors, managers or officers, or have a financial interest;

12.      to negotiate the terms of any settlement agreement with the Internal Revenue Service with respect to any tax audit or judicial review;

EX2743-014

HIGHLY CONFIDENTIAL                                                                 BOYER0000152

13.     to pay salary or compensation to any Person; and

14.     to do any action that would make it impossible to carry on the ordinary business of the Company, including the filing for bankruptcy protection.

C.     *Duties and Services of Managers*.  The Board of Managers shall comply in all respects with the terms of this Agreement.  In the conduct of the business and operations of the Company, the Board of Managers shall (a) use its reasonable good faith efforts to cause the Company (i) to comply with the terms and provisions of all agreements to which the Company is a party or to which its properties are subject, (ii) to comply with all applicable laws to which the Company is subject and (iii) to obtain and maintain all licenses, permits, franchises and other governmental authorizations necessary with respect to the ownership of Company properties and the conduct of the Company's business and operations and (b) attend to other day-to-day affairs of the Company.

D.     *Reliance by Board of Managers*.  Consistent with the Board of Manager's duties and responsibilities as Managers hereunder, the Board of Managers may rely and shall be protected in acting or refraining from acting upon any certificate, instrument, opinion, report, notice, request, consent, order, bond, debenture or other substantially similar third-party paper or document reasonably believed by Manager to be genuine and to have been signed or presented by the proper party or parties.  Consistent with the Board of Manager's duties and responsibilities as the Board of Managers hereunder, the Board of Managers may consult with legal counsel, and third-party accountants, appraisers, management consultants, engineers and other consultants and advisers reasonably selected by it.  No member of the Board of Managers shall have liability for any action taken or suffered or omitted hereunder in good faith and in reasonable reliance upon, and in accordance with, the opinion of any such persons as to matters within such person's professional or expert competence.

E.     *Costs and Expenses*.  Subject to the other express provisions of this Agreement, all costs and expenses reasonably incurred in the Company's business shall be paid from Company funds, including costs of preparing Company tax returns, costs of reports to Members, reasonable outside legal costs, interest expense, general and administrative expenses, operating expenses, marketing costs, taxes and other costs and expenses of the Company.  In conducting the business and operations of the Company, the Board of Managers may use its own or its Affiliates' personnel (including consultants retained by the Board of Managers or its Affiliates), properties and equipment; provided that any such services, properties or equipment utilized by the Board of Managers on behalf of the Company shall be for such consideration and on such terms and conditions that are no less favorable than those available from unaffiliated third parties and that the Board of Managers determines in good faith to be in the best interests of the Company.

F.     *Manager's Compensation*.  No member of the Board of Managers shall receive or be entitled to receive any compensation from the Company for his or her service as such.  Nothing herein contained shall be construed to preclude a member of the Board of Managers or such member's Affiliates from serving the Company in any other capacity and receiving compensation therefore.

G.     *Time Devoted to Company*.  Each member of the Board of Managers shall devote such time to Company business as such member deems necessary to manage, supervise and conduct Company business and affairs in an efficient manner; but nothing in this Agreement shall preclude, subject to any approval requirements set forth in this Agreement, the employment of any officer, employee, agent, third party or Affiliate to manage or provide other services with respect to the Company's assets or business as the Board of Managers shall determine.

EX2743-015

HIGHLY CONFIDENTIAL                                                          BOYER0000153

H.    *Liability of Managers*.  The Board of Managers shall not be liable for the debts, liabilities, contracts or other obligations of the Company.

I.    *Removal of Manager*.  Each member of the Board of Managers agrees to serve as a Manager of the Company until such time as the Company has completed its liquidation and termination pursuant to Article XIII, and there shall be no requirement for the annual or other periodic re-election or re-appointment of the Manager.  Each member of the Board of Managers shall serve in such capacity until removed by a Super Majority-in-Interest of the Members.

**Section 10.2**    Officers.

A.    *Appointment of Officers*.  The Members and the Board of Managers may appoint one or more individuals to serve as officers of the Company.  The Company shall have such officers as the Board of Managers may from time to time determine, which officers may (but need not) include a Chief Executive Officer, President, one or more Vice Presidents (and in case of each such Vice President, with such descriptive title, if any, as the Board of Managers shall deem appropriate), a Secretary, a Treasurer and one or more Assistant Secretaries and Assistant Treasurers.  Any two or more offices may be held by the same person.

B.    *Compensation*.  The compensation, if any, of all officers of the Company shall be fixed from time to time by the Board of Managers.  The Board of Managers may from time to time delegate to the President the authority to fix the compensation of any or all of the other officers of the Company.

C.    *Term of Office; Removal; Filling of Vacancies*.  Each officer of the Company shall hold office until his or her successor is chosen and qualified in his or her stead or until his or her earlier death, resignation, retirement, disqualification or removal from office.  Any officer designated by the Board of Managers may be removed at any time by the Board of Managers whenever in his or her judgment the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Appointment of an officer shall not of itself create contract rights.  If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Managers.

D.    *Limitations on Powers and Duties of Officers*.  No officer of the Company shall have the power and authority to cause the Company to take any action that requires the approval of the Members unless the Members have specifically approved such action.

**Section 10.3**    Conflicts of Interest; Outside Activities.

A.    *Conflicts of Interest*.  No contract or transaction between the Company and one or more of its Members, a Manager or officers or between the Company and any other corporation, partnership, association, or other organization in which one or more of its Members, a Manager or officers are shareholders, partners, members, directors, managers or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Member, Manager or officer is present at or participates in the meeting of the Members or the determination of the Manager, as the case may be, that authorizes the contract or transaction, or solely because his, her or their votes are counted for such purpose, if, in addition to any other requirement for approval set forth in this Agreement:  (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Managers, and the Board of Managers in good faith authorizes the contract or transaction; or (2) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by the vote of Members holding not less than a Super Majority-in-Interest of the Members; or (3) the contract or transaction is fair as to the Company

HIGHLY CONFIDENTIAL                                                                                    BOYER0000154

as of the time it is authorized, approved or ratified by the Board of Managers or the Members. Interested Members may be counted in determining the presence of a quorum at a meeting of the Members that authorizes the contract or transaction.

      B.    *Outside Activities*.  Subject to the other express provisions of this Agreement and any valid contract, each member of the Board of Managers may engage in and possess interests in other business ventures of any and every type and description, independently or with others, and neither the Company nor any of its Members shall have any right, title or interest in or to such independent ventures.  No such Manager shall have any obligation to offer any such business activity or venture to the Company.

### ARTICLE XI - RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

**Section 11.1**   <u>Liability to Third Parties</u>.  No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**Section 11.2**   <u>Members of Record; Related Matters</u>.  The Company will be entitled to consider the owner of any Interest as set forth in the books and records of the Company as the absolute owner thereof for all purposes.  Upon the Disposition of an Interest, neither the Company nor its officers or the Board of Managers will incur any liability for distributions of cash or other property made in good faith to the owner of an Interest in the Company until such time as all the applicable provisions of <u>Section 5.2</u> have been met and the admission of a new Member has become effective in accordance therewith.  The Company may refuse to accept a purported assignment of an Interest until the end of the next succeeding monthly accounting period.  In no event will any purported Disposition of any Interest, by operation of law or otherwise, require the Company to account to more than one Person with respect to such Interest subject to the Disposition.  In the event of a valid Disposition by a Member, allocations between the assignor and assignee of deductions, credits and income of the Company for federal, state and local income tax purposes shall be based on the portion of the year during which the assignor and assignee each owned such Interest.

**Section 11.3**   <u>Limitations on Members</u>.  Other than as specifically provided for in this Agreement and applicable law, no Member shall, solely as a result of its status as such:  (a) be permitted to take part in the business or control of the business or affairs of the Company; (b) have any voice in the management or operation of any Company Property; (c) have the authority or power to act as agent for or on behalf of the Company or any other Member, to do any act that would be binding on the Company or any other Member, or to incur any expenditures for or on behalf of the Company, or (d) take any action inconsistent with the actions of the Board of Managers taken in accordance with Section 10.1 of this Agreement.

**Section 11.4**   <u>Confidentiality</u>.  Each Member recognizes and acknowledges that the Company's trade secrets and other confidential or proprietary information, as they may exist from time to time, are valuable, special and unique assets of the Company's business.  Accordingly, during the term of the Company's existence and for the two years subsequent to the term of the Company's existence or the two years subsequent to the termination of such Member's ownership or control of any Interest in the Company, whichever is later, each Member shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any Person, or use for his or her personal benefit or for the benefit of anyone else, any trade secrets, confidential dealings or other confidential or proprietary information of any kind, nature or description (whether or not acquired, learned, obtained or developed by a Member alone or in conjunction with others) belonging to or concerning the Company, or any of its customers or clients or others with whom they now or hereafter have a business relationship, except (i) with the prior written unanimous consent of the Members, (ii) in the course of the proper performance of the Member's duties hereunder or (iii) as required by applicable law or legal process.  Each Member confirms (i) that all such information constitutes the exclusive property of the Company and (ii) the survival of the provisions

EX2743-017

HIGHLY CONFIDENTIAL
BOYER0000155

of this Section 11.4 for the period specified above subsequent to the term of the Company's existence or the termination of such Member's ownership or control of any Interest in the Company.

Section 11.5    Business Records.  Given the competitive environment in which the Company does business, each Member agrees to promptly deliver to the Company, at any time when the Board of Managers so requests, all memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) in any way relating to the business or affairs of the Company or any of its customers and clients, whether made or compiled by such Member or furnished to it by the Company or any of its employees, customers, clients, consultants or agents, which such Member may then possess or have under its control.  Each Member confirms that all such memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) constitute the exclusive property of the Company.  Notwithstanding the foregoing provisions of this Section 11.5 or any other provision of this Agreement, each Member shall be entitled to retain any written materials received by such Member in its capacity as a Member of the Company.

## ARTICLE XII. - MEETINGS OF MEMBERS

Section 12.1    Meetings.  Meetings of the Members, for any purpose or purposes, unless otherwise prescribed by the Law, the Certificate of Formation or this Agreement, may be called by the Board of Managers or any Member.  Until so called, the Company need not hold any meetings of the Members.  Any business may be conducted at a properly called meeting of the Members; provided that inasmuch as the Board of Managers has been vested, pursuant to Section 10.1 of this Agreement, with exclusive power to manage and direct the business and affairs of the Company, the Members shall not be permitted, pursuant to this Article XII or otherwise, to take any action in the place or stead of the Board of Managers or any action that would circumscribe, limit or otherwise adversely affect the power and authority of the Board of Managers, except as otherwise specifically required by applicable law.

Section 12.2    Place of Meetings; Chairman.  Meetings of Members shall be held at the principal office of the Company as provided in Section 2.4 above, or at such other places, within or without the State of Delaware, as may from time to time be fixed by the Board of Managers.  The Board of Managers shall appoint a Chairman to preside when present at all meetings of the Members.  In the absence of such Chairman at any meeting of the Members, the Members present at such meeting shall designate another Member to preside at such meeting.

Section 12.3    Notice.  A Notification of all meetings, stating the place, day, and hour of the meeting shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting to each Member entitled to vote.

Section 12.4    Waiver of Notice.  Attendance of a Member at a meeting shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Notification of a meeting may also be waived in writing, either before or after the meeting.  Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

Section 12.5    Quorum.  A Super Majority-in-Interest of the Members shall constitute a quorum at any meeting of the Members, whether present in person or by proxy.  Unless otherwise provided in the Certificate of Formation, the Members represented in person or by proxy at a meeting of Members at which a quorum is not present may adjourn the meeting until such time and to such place as may be determined by a vote of the holders of a majority of the Interests represented in person or by proxy at that meeting.  At any such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally convened.  Unless otherwise provided in the Certificate of Formation, once a quorum is present at a meeting of Members,

HIGHLY CONFIDENTIAL                                                                                    BOYER0000156

the Members represented in person or by proxy at the meeting may conduct such business as may be properly brought before the meeting until it is adjourned, and the subsequent withdrawal from the meeting of any Member represented in person or by proxy, or the refusal of any Member represented in person or by proxy to vote, shall not affect the presence of a quorum at the meeting.

**Section 12.6**    Voting.

A.    *Voting and Voting Power*.  All Members shall be entitled to vote at meetings. Members may vote either in person or by proxy at any meeting.  Each Member shall have the number of votes at a meeting equal to such Member's Interest divided by the total Interests of all Members multiplied by one hundred.

B.    *Voting*.  With respect to any matter other than the sale of all or substantially all of the assets of the Company or a matter for which the affirmative vote of Members owning a specified portion of the Interests is required by the Law, the Certificate of Formation or this Agreement, including, without limitation, Sections 10.1(B), 13.1(B), 15.7(C) and (D) and this Section 12.6(B), the affirmative vote of the holders of a Super Majority-in-Interest of the Members at a meeting at which a quorum is present shall be the act of the Members.  A Super Majority-in-Interest of the Members shall be required to approve the sale of all or substantially all of the assets of the Company.

C.    *Change in Voting Percentages*.  No provision of this Agreement requiring that any action be taken only upon approval, consent, vote or action of Members holding a specified percentage or all of the Interests may be modified, amended or repealed unless such modification, amendment or repeal is approved by Members holding at least such specified percentage of Interests.

**Section 12.7**    Voting List.  The Company shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting, arranged in alphabetical order, showing the address of, and Interest owned by, each Member, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the meeting and shall be subject to inspection by any Member during the meeting.  Failure to comply with these requirements shall not affect the validity of any action taken at such meeting.  The chairman of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the adjourned meeting.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

**Section 12.8**    Action by Written Consent.  Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by Members holding the percentage of Interests required to approve such action under the Law, the Certificate of Formation or this Agreement.  Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article XII.  No prior notice from the signing Members to other Members shall be required in connection with the use of a written consent pursuant to this Section.  Any such writing or writings shall be filed with the minutes of proceedings of the Members.  A pdf, photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section 12.8. Notification of any action taken by means of a written consent of Members shall, however, be sent within a reasonable time after the date of the consent by the Company to all Members who did not sign the written consent.

**Section 12.9**    Proxies.  A Member may vote either in person or by proxy executed in writing by the Member.  A facsimile, telegram, telex, cablegram or similar transmission by the Member, or a

HIGHLY CONFIDENTIAL                                                                                  BOYER0000157

photographic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Company, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the chairman of the meeting who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two (2) or more Persons to act as proxies, unless such instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one (1) is present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify a method for the voting of the Interests that are the subject of such proxy that resolves the disagreement with respect to such issue.

Section 12.10    Member Expenses.  Any direct and reasonable costs and expenses incurred by the Members in connection with the business and affairs of the Company, including travel expenses and costs, may be paid or reimbursed by the Company as a Company expense if and only if such payment or reimbursement is approved by the Board of Managers of the Company. All such requests for reimbursement by the Members shall be accompanied with appropriate written documentation, including the purpose or purposes for the incurrence of such costs and expenses.

## ARTICLE XIII. - DISSOLUTION AND WINDING UP

Section 13.1    Events Causing Dissolution.  The Company shall be dissolved upon the first of the following events to occur:

A.      the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation;

B.      the written consent of Super Majority-in-Interest of the Members at any time to dissolve and wind up the affairs of the Company; or

C.      the occurrence of any other event that requires, under a nonwaivable provision of applicable law, the dissolution of a limited liability company under the Law.

Section 13.2    Winding Up.  If the Company is dissolved pursuant to Section 13.1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

A.      *Appointment of Liquidator*.  The winding up of the Company's affairs shall be supervised by a Liquidator, or Liquidators. The "Liquidators" shall be the Board of Managers or, if a Super Majority-in-Interest of the Members prefer, a liquidator or liquidating committee selected by a Super Majority-in-Interest of the Members.

B.      *Powers of Liquidator*.  In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company:

1.      to prosecute and defend civil, criminal or administrative suits;

2.      to collect Company assets, including obligations owed to the Company;

EX2743-020

HIGHLY CONFIDENTIAL                                                                                   BOYER0000158

3.    to settle and close the Company's business;

4.    to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions,

5.    to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property;

6.    to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed two (2) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

7.    to distribute any remaining proceeds from the sale of Company Property to the Members;

8.    to prepare, execute, acknowledge and file articles of dissolution under the Law and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

9.    to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Members under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions.  The Liquidator (if not the Members) shall not be liable to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in Article XIV hereof.

**Section 13.3**    <u>Compensation of Liquidator</u>.  The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Super Majority-in-Interest of the Members.

**Section 13.4**    <u>Distributions from Company</u>.

A.    *Statement of Account*.  The Liquidator shall prepare as promptly as possible a final statement of account showing the status of each Member's Capital Account and the amount that each Member owes to the Company.  The final statement of account shall also reflect all allocations of gain and loss provided in this Agreement.  The Liquidator shall determine the interest of the Company in each of the remaining Company Properties.  The Liquidator shall determine the fair market value of the remaining Company Properties using appraisal techniques that it deems to be appropriate and shall determine the amount of any nonrecourse indebtedness secured by the remaining Company Properties.  Any difference between the fair market value and the basis of Properties as carried on the books of the Company shall be allocated among the Members as though such Properties had been sold or transferred; provided, however, in the case of Company Property having a fair market value less than the nonrecourse indebtedness that it secures, for purposes of determining gain or loss on the sale or transfer of the Property the amount of the nonrecourse indebtedness shall be treated as the amount realized on the sale or transfer.

HIGHLY CONFIDENTIAL                                                                    BOYER0000159

B.     *Order of Distribution*.   Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

1.     to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves;

2.     to satisfy Company obligations to Members to pay past due Company distributions;

3.     to the Members in accordance with the positive balances in their respective Capital Accounts; and

4.     to the Members pro rata in accordance with their Percentage Interests.

C.     *Insufficient Assets*.   The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.   If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Interests of each Member in such group.

**Section 13.5**    <u>Final Audit</u>.   Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 13.4.

**Section 13.6**    <u>Deficit Capital Accounts</u>.   In the event any Member has a deficit balance in such Member's Capital Account upon liquidation of the Member's Interest in the Company after making all adjustments thereto, such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other person for any purpose whatsoever.

## ARTICLE XIV. – EXCULPATION, INDEMNIFICATION AND INSURANCE

**Section 14.1**    <u>Exculpation</u>.   Neither the Board of Managers, any Affiliate of any member of the Board of Managers nor any officer of the Company or the Board of Managers, shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member by reason of, or arising from, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company, except to the extent that any of the foregoing is determined, by a final, non-appealable order of a court of competent jurisdiction (or by any other means approved by a Super Majority-in-Interest of the Members) to have been primarily caused by any act of such person; provided that if the act of any person claiming exculpation shall consist of a conviction of or plea of no contest to a felony, then such person shall not be entitled to exculpation unless it is determined, by final, nonappealable order of a court of competent jurisdiction (or by any other means approved by a Super Majority-in-Interest of the Members) that exculpation should be granted in whole or part or that such act was not the primary cause of any of the matters for which exculpation is being sought.   THE MEMBERS RECOGNIZE THAT THIS PROVISION SHALL RELIEVE ANY SUCH PERSON FROM ANY AND ALL LIABILITIES, OBLIGATIONS, DUTIES, CLAIMS, ACCOUNTS AND CAUSES OF ACTION WHATSOEVER EVEN THOUGH CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), OR STRICT LIABILITY OF SUCH PERSON.

HIGHLY CONFIDENTIAL

**Section 14.2** <u>Indemnification</u>.

A. *Indemnitees and Indemnifiable Claims*. The Company shall indemnify and hold harmless (i) each member of the Board of Managers, (ii) any Member, (iii) any Affiliate of a member of the Board of Managers or any Member, (iv) any officer, director, employee, agent, stockholder, member or partner of the Company, a Member or any of its Affiliates or (v) any Person who is or was serving at the request of the Company as a manager, member, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise (each, an "<u>Indemnitee</u>"), to the fullest extent provided by, and in accordance with the procedures set forth in Sections 101.401 and 101.402 of the Law and Chapter 8 of the Delaware Business Organizations Code ("TBOC") and any other applicable laws; provided, however, that Chapter 8 of the TBOC shall be modified in the following respects as applied to the Company:

1. Indemnification of any Person who has satisfied the standard of conduct set forth in Section 8.101 of the TBOC shall be mandatory rather than optional. The determination under Section 8.101 of the TBOC that indemnification shall be made shall also constitute authorization of indemnification under Section 8.103 of the TBOC;

2. Advancement of expenses to a Person who has satisfied the requirements of Section 8.104 of the TBOC shall be mandatory rather than optional; and

3. Payment or reimbursement of expenses to a Person pursuant to Section 8.106 of the TBOC in connection with his or her appearance as a witness or other participation in a proceeding shall be mandatory rather than optional.

THE MEMBERS RECOGNIZE THAT AN INDEMNITEE SHALL BE ENTITLED TO INDEMNIFICATION FROM ACTS OR OMISSIONS EVEN THOUGH CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), OR STRICT LIABILITY OF SUCH INDEMNITEE.

B. *Insurance and Other Sources of Indemnification*. Subject to Section 8.151 of the TBOC, the Company may purchase and maintain insurance or make other arrangements on behalf of any Person, who is or was a Member, officer, employee, agent or other Person identified in Section 14.2A above, against any liability asserted against or incurred by him or her in such a capacity or arising out of his or her status as such a Person, whether or not the Company would have the power to indemnify such Person against that liability under Section 14.2A or otherwise.

C. *Settlements*. Notwithstanding Section 14.2A of this Agreement, the Company shall not be obligated to make any indemnification payment to any Indemnitee in respect of any settlement unless such settlement shall have been approved (i) by the Board of Managers in writing or (ii) by final, nonappealable order of a court of competent jurisdiction (or by any other means approved by a Super Majority-in-Interest of the Members).

D. *Source of Funds*. The indemnification provided by this Section 14.2 shall be made and shall be recoverable by the Indemnitee only out of the tangible net assets of the Company and not from the Members.

**Section 14.3** <u>Entitlement</u>. These indemnification provisions shall inure to each of member of the Board of Managers, the Members, officers, employees and agents of the Company, and to other Persons serving at the request of the Company (as provided in this Article), regardless of whether any such Person ceases to serve as such at any time and whether or not the claim asserted against any such Person is based on matters that antedate the adoption of this Article, and in the event of any such Person's

HIGHLY CONFIDENTIAL

death, shall extend to such Person's legal representatives; but such rights shall not be exclusive of any other rights to which any of the foregoing Persons may be entitled.

## ARTICLE XV. - GENERAL PROVISIONS

**Section 15.1**    Entire Agreement.    This Agreement contains the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto that are not contained herein are terminated.

**Section 15.2**    Law Governing.    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, excluding any conflicts of law rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. In particular, this Agreement is intended to comply with the requirements of the Law and the Certificate of Formation.  In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Law or any provision of the Certificate of Formation, the Law and the Certificate of Formation, in that order of priority, will control.

**Section 15.3**    Conference Telephone Meetings.    Meetings of the Members or any committee designated by the Members may be held by means of conference telephone or similar communications equipment so long as all Persons participating in the meeting can hear each other.  Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

**Section 15.4**    Successors and Assigns.    This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**Section 15.5**    Severability.    This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed herein, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

**Section 15.6**    Headings.    The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section.

**Section 15.7**    Amendment.

A.    Amendments to this Agreement may be proposed by the Board of Managers or by a Super Majority-in-Interest of the Members.  Any such amendment must be proposed by submitting to all Members in writing the proposed amendment.  Subject to Sections 15.7(B), (C) and (D) below, any such amendment shall be approved only upon (and at the time of receipt of) the affirmative vote or written consent of Members holding at least a Super Majority-in-Interest of the Members.

B.    Notwithstanding the foregoing Section 15.7(A), amendments to this Agreement that are of an inconsequential nature and do not adversely affect any Member, or are necessary to comply with any applicable law or governmental regulation, or are necessary in the opinion of counsel to the Company to ensure that the Company will not be treated as an association taxable as a corporation for United States Federal income tax purposes, or are required or contemplated by this Agreement, may be made by the Board of Managers without the consent of any Member.

HIGHLY CONFIDENTIAL

The Board of Managers shall provide each Member with a copy of any amendment made by the Board of Managers pursuant to this Section.

C.     Notwithstanding Sections 15.7(A) and (B), no amendment that (i) increases the obligation of any Member to make or cease to make Capital Contributions to the Company, (ii) provides for any change in allocations or distributions under Article VII, or (iii) in the opinion of counsel to the Company, would cause the Company to be treated as an association taxable as a corporation for United States Federal income tax purposes, shall be made without the approval of all Members.

D.     No provision of this Agreement that establishes a percentage of the Members required to take any action shall be amended, altered, changed, repealed or rescinded in any respect that would have the effect of reducing such voting requirement, unless such is approved by written consent or the affirmative vote of Members holding at least such percentage of Interests then outstanding as the Member voting requirements sought to be reduced. This Section 15.7(D) shall only be amended with the approval of all of the Members.

**Section 15.8**     Construction.  Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter.  Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes.

**Section 15.9**     Offset.  Whenever the Company is to pay any sum to any Member, any amounts that such Member owes the Company may be deducted from that sum before payment.

**Section 15.10**     Effect of Waiver or Consent.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

**Section 15.11**     Further Assurances.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 15.12**     Waiver of Certain Rights.  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company not otherwise existing under Section 13.1 or for partition of the Property of the Company.

**Section 15.13**     Counterparts and Binding Effect.  This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.  This Agreement shall be binding upon each Member upon adoption by the Initial Members as evidenced by their signatures below, regardless of whether any Member has executed the same or any counterpart thereof.

[signatures to follow on next page]

EX2743-025

HIGHLY CONFIDENTIAL                                                                                          BOYER0000163

IN WITNESS WHEREOF, the undersigned, being the initial Members of Block Bits AML Holdings LLC, and having read this Agreement, approve this Agreement as evidenced by their respective signatures below, effective as of January 11, 2018.

**MEMBERS:**

_____

EX2743-026

**HIGHLY CONFIDENTIAL**

BOYER0000164

**Exhibit A**
TO
COMPANY AGREEMENT
OF
BLOCK BITS AML HOLDINGS LLC

| Name of Member | Date of Contribution | Total USD Contribution | AML Bitcoin Purchased |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EX2743-027

HIGHLY CONFIDENTIAL                                    BOYER0000165