MICHAEL J. SHEPARD (SBN 91281)
 *mshepard@kslaw.com*
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, California 94111
Telephone:     +1 415 318 1221

CINDY A. DIAMOND (CA SBN 124995)
ATTORNEY AT LAW
58 West Portal Ave, # 350
San Francisco, CA 94127
408.981.6307
cindy@cadiamond.com

DAINEC P. STEFAN (Admitted pro hac vice)
 *dstefan@kslaw.com*
King & Spalding LLP
1185 6th Ave
34th Floor
New York, NY 10036
212-556-2291
Email: dstefan@kslaw.com

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>Defendant. | Case No. 3:20-cr-00249-RS<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**  (Redacted)<br><br>Sentencing Date: July 29, 2025 |

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................... 5

II. MR. ANDRADE SHOULD BE SENTENCED WITH CONSIDERATION OF HIS
DIFFICULT EXPERIENCES AND CONDITIONS UNDER 18 USC 3553(A).
DEFENDANT ........................................................................................... 7

    A.  Background ................................................................................... 7

        1.  History of Childhood Trauma and Young Adulthood ............................... 7

        2.  Mental Health Condition of Defendant ........................................ 9

        3.  Medical Condition of Defendant .............................................. 12

        4.  Family and Dependents of Defendant ......................................... 12

    B.  A Small Amount of Incarceration Will Be Quite Large for Mr. Andrade ........... 13

    C.  Other Relevant Considerations ................................................. 16

        1.  Criminal History: Zero points .............................................. 16

III. THE COURT SHOULD GIVE LITTLE OR NO WEIGHT TO THE SENTENCING
GUIDELINES, AND PROBATION'S RECOMMENDATION IS FAR TOO HARSH 16

    A.  The Court Should Give Little or No Weight to the Guidelines ...................... 17

    B.  Guideline Enhancements Are Incorrect and Unsupported by the Evidence ......... 22

        1.  No Enhancement Should be Added for Obstruction ............................ 22

            a.  Claim that Mr. Andrade "pressured Mr. De La Guardia to get
Panamanian officials to lie in an attempt by Mr. Andrade to
cover up his fraud scheme." ........................................... 22

            b.  Claim that Mr. Andrade "filed lawsuits against his fraud victims
in an attempt to prevent them from reporting the fraud." ............. 24

        2.  The Loss Calculation Is Overstated ......................................... 25

        3.  No Enhancement Should be Added for Running a Sophisticated
Scheme or for a Substantial Part of the Scheme Committed from
Outside the United States ................................................. 31

    C.  The Court Should Not Follow the Recommendation of the Probation Office
and Should Instead Sentence Mr. Andrade to 24 months .......................... 34

IV. OTHER SENTENCING CONSIDERATIONS .............................................. 38

    A.  Defendant is Unable to Pay a Fine ............................................. 38

    B.  Restitution Orders Cannot Be Made ........................................... 38

C.    Forfeiture Issues are Not Ripe ................................................................. 40

D.    Recommendation to Bureau of Prisons.................................................. 40

E.    Surrender date ........................................................................................ 41

F.    Factual Issues in the Presentence Report ............................................ 41

V.    CONCLUSION.................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**

*Andrade v. Dillman*,  2021 WL 4394254, at *1-3 (D.Nev., 2021) ................................ 21

*Hudson v. Palmer*, 468 U.S. 517, 523 (1984)............................................................. 21

*Nken v. Holder*, 556 U.S. 418, 426 (2009) ................................................................. 36

*NAC Foundation vs. Corey Jodoin and Brandi Jodoin*, 2021 Nev. Dist. LEXIS 1679 (July 29, 2021)…………………………………………………………………………………………..25

*United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ........................ 33

*United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016)..................................... 18

*United States v. Annamalai,* 939 F.3d 1216 (11th Cir. 2019)....................................... 29

*United States v. Beckner*, No. CR 15-2218, 2023 U.S. Dist. LEXIS 108616, 2023 WL 4157269, at *42 (D.N.M. June 23, 2023) ................................................................. 30

*United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008) ....................................... 36

*United States v. Chaika,* 695 F.3d 741, 748 (8th Cir. 2012)......................................... 36

*United States v. David Miller*, CR 15-0234 CRB............................................................. 16

*United States v. De Aguiar*, 453 F. App'x 927, 929 (11th Cir. 2012) .......................... 30

*United States v. Emmenegge*r, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ............... 14

*United States v. Faibish,* 2015 WL 4637013 (E.D.N.Y. 2015) ............................... 14, 15

*United States v. Farano,* 749 F.3d 658, 666-67 (7th Cir 2014)..................................... 36

*United States v. Ferguson*, 942 F.Supp.2d 1186, XXX (M.D. Ala. 2013) .................... 18

*United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023) ........................................ 31

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ..................... 15, 18

*United States v. Harris,* 821 F.3d 589, 606 (5th Cir. 2016)......................................... 27

*United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. 2018) .................................... 15

*United States v. Lazarenko*, 624 F.3d 1247, 1250, 1252 (9th Cir. 2010) ..................... 38

*United States v. Lo*, 815 F.3d 1054 (9th Cir. 2016)..................................................... 37

Defendant's Sentencing Memorandum          (Redacted)          Case Number:  3:20-cr-00249-RS

*United States v. Luton*, No. 21-1285, 2022 U.S. App. LEXIS 19572, 2022 WL 2764202, at *5 (10th Cir. July 15, 2022) .................................................................................. 30

*United States v. May,* 706 F.3d 1209, 1214 (9th Cir. 2013) .................................... 38

*United States v. Montano*, 250 F.3d 709 (9th Cir. 2001) ........................................ 31

*United States v. Ogunbanke*, 619 F. App'x 586, 587–88 (9th Cir. 2015) ................ 30

*United States v. Olis*, 2006 U.S. Dist. LEXIS 68281, at *43 (S.D. Tex. Sept. 22, 2006) ............ 33

*United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024) ...................................... 27

*United States v. Reifler,* 446 F.3d 65, 127 (2d Cir. 2005) ...................................... 38

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) ...................................... 36

*United States v. Stoddard*, 150 F.3d 1140, 1147 (9th Cir. 1998) .......................... 36

*United States v. Valdez*, 723 F.3d 684 (5th Cir. 2013) .......................................... 32

*United States v. Waknine,* 543 F.3d 546, 556 (9th Cir. 2008) ................................ 38

*United States v. Yan Zhu*, No. 09-00722, 2012 U.S. Dist. LEXIS 12952, 2012 WL 359734, at *4-5 (D.N.J. Feb. 2, 2012) ...................................................................................... 29

**Statutes**

18 U.S.C. § 3664(d)(4) ........................................................................................ 37

18 U.S.C. 3553(a), ............................................................................................... 3

18 USC 3664 ....................................................................................................... 38

18 USC 3664(d)(1) .............................................................................................. 37

18 USC 3771 ....................................................................................................... 38

Section 2B1.1 (10) ............................................................................................... 29

**Other Authorities**

Frank Bowman, *Loss Revisited: A Defense of the Centerpiece of the Federal Economic Crime Sentencing Guideline*, 82 MO. L REV 1 (2017) .............................................. 14, 15

Frank Bowman, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Federal Sentencing Reporter 167, at 171 (Feb. 2008) .................................................. 14

*Representing People With Autism Spectrum Disorder*, by Elizabeth Kelly, Editor, 2020, (Paperback Ed), Chapter 13, "Prison Accommodations," by Jack T. Donson, Appendix B, at pp. 171-172 .................................................................................................................... 11

Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005) .................................. 33

Wright & Miller, 3 Fed. Prac. & Proc. Crim. § 546 (5th ed.)....................................................... 37

Defendant's Sentencing Memorandum                    (Redacted)                    Case Number:  3:20-cr-00249-RS

## I.    INTRODUCTION

To sentence Mr. Andrade, this Court needs to consider not just the jury's verdict but also the uniquely mitigating circumstances about Marcus Andrade.  The sentencing guidelines proceed as if Mr. Andrade were a typical fraudster like the government's witness Brian Darrow, with his Java Coin – someone who had no intention to offer a functional product and did not lift a finger to do so.  But unlike Darrow, Mr. Andrade devoted years of effort and substantial sums of money as he threw himself into efforts to make AML Bitcoin a success; he believed his purchasers would ultimately be rewarded and never stopped trying to make that happen.  Also unlike Darrow, Mr. Andrade struggled with serious mental conditions that impacted his understanding of events and people around him and that interfered with his ability to act in the best interests of his business; the government's own witnesses called him a "fucking idiot," a "lamebrain," a "putz," a "sucker," and a "clown."  These disabilities mitigate and help put in perspective the offenses for which he was convicted.  They also, especially in combination with his serious physical health issues, will make time in prison much more difficult for him than for most defendants, will delay needed treatment, and likely add another set of poor experiences to the challenges of treatment after his release.

Without sufficiently accounting for the significance of these critical facts, the presentence report exacerbates those errors.  While recognizing that the guidelines are too high, its recommendation nonetheless weighs them too heavily, given the recognition by judges, commentators, those who drafted the guidelines, and members of the Sentencing Commission that the fraud guidelines are "fundamentally broken" and "irrational on their face" in high loss cases like this one.  The report's recommendation is inconsistent with its own recommendations and decisions by judges in this district that have moved much farther from the draconian fraud guidelines, even in cases with far greater losses, much more severe aggravating factors, and far fewer mitigating circumstances than this one.  And its recommendation pays no heed to the fact that the government itself, even before any downward departure for its cooperator Jack

Defendant's Sentencing Memorandum                                    Case Number:  3:20-cr-00249-RS

Abramoff, put huge distance between the untenable result that the guidelines would require and the light-years lower guideline level to which it agreed in Abramoff's plea agreement.

Adding to its error in failing to recognize that the guidelines should play little or no role in this sentencing, the presentence report goes further in the wrong direction by inflating the guidelines even more, credulously accepting enhancements proposed by the government that have no basis in the evidence.  For example, the report accuses Mr. Andrade of "pressuring" Carlos De La Guardia to get Panamanian officials to lie by asking them to confirm what had previously been said in press releases, when De La Guardia never claimed to have been pressured, had previously offered assurances that the press releases were accurate, and, when interviewed by the FBI shortly after the alleged contact by Mr. Andrade, told the agents that his "first thought was that there was no problem with the press releases."  Equally credulous is the presentence report's acceptance of other proposed enhancements and of the government's loss amount, which was offered with no supporting data and appears to include amounts that are double-counted, that do not relate to crimes of which Mr. Andrade was convicted, and that grow out of payments the government never even tried to show to be the result of any fraud.

Putting aside the broken guidelines as further inflated in the presentence report, the sentence in this case should be a compassionate one.  It should give considerable weight to Mr. Andrade's efforts to fulfill the promises about his cryptocurrency attributed to him by the government.  It should give considerable weight to his mental conditions that contributed to the offense and that will make prison time so difficult for him, and to his physical conditions that will make that time even worse.  It should give considerable weight to his service in the Marines, to the devotion to his family that he has demonstrated, and to the difficult circumstances in which his wife and children will find themselves without him.  And it should give considerable weight to the fact that both Mr. Andrade and the community will be better off if he is allowed to continue the treatment he needs, rather than to have him wallow for a lengthy period of time in

Defendant's Sentencing Memorandum

Case Number:  3:20-cr-00249-RS

(Redacted)

prison without the ability to obtain the care and treatment that will best allow him to reintegrate into the community.[1]

## II.   MR. ANDRADE SHOULD BE SENTENCED WITH CONSIDERATION OF HIS DIFFICULT EXPERIENCES AND CONDITIONS UNDER 18 USC 3553(A).

There is much more to Mr. Andrade than what the Court was able to learn during the trial, and he asks to be sentenced with consideration of his personal history and life experience. As directed by 18 U.S.C. 3553(a), and given that this case is Mr. Andrade's first exposure to court sanctions for criminal behavior, the Court should consider the complex set of challenges with which Mr. Andrade has grappled since early childhood.  Starting from an abusive upbringing with only rare support and riddled with trauma and life-changing heartbreak, Mr. Andrade suffers from challenging mental disabilities and psychiatric conditions that impact his ability to understand the meaning imparted by those around him.  He also suffers from physical disabilities that require chronic, daily care.  Together, Mr. Andrade's time in custody will be more difficult than for most prisoners: he will feel the punitive impact of incarceration more than a typical inmate might, and he will likely miss out on needed treatment.

Other consequences are shared with most inmates who may have, as Mr. Andrade has, a dependent wife and young children who will be struggling without his assistance as he serves his sentence – here, with the added complication that due to new government policies, his wife will be cut off from her family.  All these circumstances should be considered in determining how much incarceration is sufficient, but no greater than necessary to satisfy the purposes of punishment in Section 3553(a).

### A.  Background

#### 1.  History of Childhood Trauma and Young Adulthood

---

[1] Although the government filed its sentencing memorandum shortly before this memorandum was filed, this memorandum does not address the government's memorandum; Mr. Andrade will respond to it, after giving it due consideration, in his reply.

Defendant's Sentencing Memorandum                                Case Number:  3:20-cr-00249-RS
(Redacted)

Mr. Andrade's early life reflects trauma, tragedy, and insufficient resources to grow and learn, all of which set the stage for an early life full of struggle, isolation, and disconnection. He was left by his natural father when he was two-years old. PSR ¶ 76. His mother remarried when Mr. Andrade was five, PSR ¶ 77, but when Mr. Andrade was still at home his mother and stepfather divorced due to trouble caused by Mr. Andrade's older brother. PSR ¶ 81. Mr. Andrade's older brother beat him and choked him until he passed out, resulting in doctor's visits (where the doctor was not told the reason for the injuries) and scars to Mr. Andrade's face. PSR ¶ 78. After his stepfather left, Mr. Andrade lived for a time with his natural father and stepmother, where his access to healthy food was limited by household rules. PSR ¶ 81.

Chief among Mr. Andrade's early childhood influences was his mother, who was schizophrenic and suffered from a cluster of related mental health disorders such as depression, anxiety, and bipolar disorder. PSR ¶ 77. Mr. Andrade's own mother's history was tragic. As a child, she witnessed her father shoot her mother and then kill himself. *Id.* After growing up in foster care, Mr. Andrade's mother was hospitalized off and on throughout her adult life for mental health treatment. *Id.* Often, for discipline at home, Mr. Andrade's mother would beat him and his sister – with implements such as sticks and a clothes-iron. PSR ¶ 77, PSR ¶ 78.



PSR ¶ 79. ▮▮▮▮▮▮▮▮▮. *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮ PSR ¶ 79, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PSR ¶ 80.

▮▮▮▮ *see* PSR ¶ 79), Mr. Andrade went mute and, for approximately a year, was hospitalized in a Texas facility for developmentally disabled children called Bayview Behavioral Hospital (no longer operational). PSR ¶ 80.

Defendant's Sentencing Memorandum                    Case Number:  3:20-cr-00249-RS

(Redacted)

1 ████████████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ███████████████  PSR ¶ 79

5        Mr. Andrade had struggles in school apart from the year he was physically absent due to

6 hospitalization for his mutism.  He had noted learning disabilities and speech impediments, for

7 which he received special education resources and speech therapy.  PSR ¶¶ 80, 101.  Such delays

8 in normal learning and speech-markers are some of the signposts of Autism Spectrum Disorder

9 ("ASD"), a condition with which Mr. Andrade was diagnosed as trial-preparation was underway

10 (see subsection 2, below).  In January of 1997, a few months before Mr. Andrade was to turn 19,

11 Mr. Andrade achieved his school diploma.  PSR ¶ 101.  Within two months, Mr. Andrade

12 enlisted in the Marines, signing up the day before he turned 19 years old.  *Id.*  Mr. Andrade was

13 honorably discharged███████████████████████████████.  PSR ¶ 103.

14        Mr. Andrade's full siblings have all suffered from the troubled family history they

15 shared.  Mr. Andrade's older brother – formerly his bully – is estranged from Mr. Andrade; they

16 have not had much contact since 1997.  PSR ¶ 76.  █████████████████████████

17 ██████████████████████████  *Id.*

18        During and after the Marines, Mr. Andrade attended college off and on for nine years,

19 and came close to achieving his AA degree.  PSR ¶ 101.  Mr. Andrade worked a variety of jobs

20 after the military.  PSR ¶¶ 108-111.  In the early 2000s, Mr. Andrade was the victim of a

21 stabbing.  PSR ¶ 88.  He used proceeds from his settlement to invest and eventually to start his

22 own companies. He started NAC Foundation in 2014, a year before his mother died of colon

23 cancer.  PSR ¶¶ 5, 76, 89.  He believed in the technology underlying the business and devoted

24 himself fully to making the business succeed, only to learn in hindsight that he lacked the ability

25 to turn a great idea and valuable patents into a viable business, at least in a timely manner.

26        **2.  Mental Health Condition of Defendant**

27

28

Defendant's Sentencing Memorandum                              Case Number:  3:20-cr-00249-RS

(Redacted)

During trial preparation, Mr. Andrade was diagnosed with mental health conditions that impair his functioning and require treatment.  These are lifelong and biological conditions, of which Mr. Andrade had previously been unaware.  How could he have been, truly?  There was little to no medical care provided for Mr. Andrade while he was a child, PSR ¶ 78, one parent left him, his primary parent was severely mentally ill and often hospitalized, and other parental-figures did not actively "parent" young Mr. Andrade for long enough stretches of time to notice he needed such care.

With his conditions, and were he not to be incarcerated, Mr. Andrade would likely receive a combination of medication, and multiple CBT or cognitive and behavioral therapy sessions per week, for years and possibly for the rest of his life.  His conditions are chronic.  They can be managed, with treatment.  Behaviors that will ease his way in the world can be taught.  Mr. Andrade only began treatment relatively soon before trial, and thanks to referrals from the local V.A. (which took a while to accomplish), Mr. Andrade now receives treatment at a community care center set up to integrate his medication, psychiatric visits, and cognitive and behavioral therapy several times per week.  PSR ¶ 94.

The conditions Mr. Andrade has are: Autism Spectrum Disorder (where he is high-functioning and has learned adaptive behaviors over more than 40 years), severe ADHD, OCD, and bi-polar disorder.  PSR ¶ 92.  He is currently being medicated for mood swings (Lamotrigine) and anxiety (Buspirone), and his medications are changed every other week because his adjustments are being monitored.  PSR ¶ 91.  While these are mitigating circumstances that put his behavior in context, for sentencing, this Court is asked to take particular note of the way the combination of ASD and ADHD presents in Mr. Andrade personally, for these characteristics predict that Mr. Andrade's time in prison will be rough time and his adjustment there is likely to make every day of incarceration a struggle.

As outlined in Mr. Andrade's PSR, ¶ 93, Mr. Andrade's ASD and ADHD results in certain behavioral patterns that will negatively impact his time in custody.  It is more important for the Court's sentencing analysis to note the psychological functions rather than diagnosis

names. Mr. Andrade's test results indicated that Mr. Andrade lacks social cognition; he fixates on his special interests inflexibly, experiences the need to change his focus as anxiety, has a history of insomnia, has impaired executive functioning, low intelligence, and a low ability to mentally retain and recall information once learned. PSR ¶ 93. Put all together, what his mental functions means is this: Mr. Andrade cannot read facial expressions well. He cannot interpret body language as most people can, or as the body-language-user intended. He is unable to correctly recognize emotions in others. He has not learned to modulate his voice or reactions in times of stress, and he is as-yet unaware of his need to learn this behavior. He has severe retention difficulties. He has vocabulary limitations while being painfully literal with respect to what he reads, does not understand ambivalence, and has no awareness that others in the world are not similarly specific. He is blunt and hypersensitive, and particularly vulnerable to misinterpret manipulations as offers of friendship.

Consequently, due to his mental conditions Mr. Andrade lacks skills that most inmates rely upon to help them adapt to the many challenges of prison life. *See* Attach-1, Declaration of Jack Donson, BOP Expert, at 5-7. Furthermore, his likelihood of violating a rule resulting in discipline is greater than the average inmate, due to his lack of social cognition. Donson Declaration at 6-7. His inability to discern ulterior motives will make him susceptible to predatory inmates. Donson Declaration at 6-7.

Nevertheless, Mr. Andrade is motivated. He seeks a carceral recommendation to a location where he can receive the best treatment available. Even knowing he is facing prison time, Mr. Andrade has begun and continues to pursue treatment while he is still on release in the community. The diagnoses were a turning point in Mr. Andrade's life, and his future productivity and adjustability stands to be markedly improved when Mr. Andrade receives adequate medication and treatment. As Mr. Donson's declaration reflects, Mr. Andrade will not receive the standard of care for treatment of his mental health illnesses and conditions. *See* Donson Declaration at 7. At the BOP, medications will be issued to mask symptoms of anxiety and suppress mood swings, but the recommended medications for people with his conditions in

the community will not be available to Mr. Andrade.  *Id.*  Therapy will be time-limited and non-targeted in nature, regardless of the type of facility to which he will be designated. *Id.*  Mr. Andrade will endure what will be very difficult experiences for someone with his conditions, *see, e.g.,* Donson Declaration at 5-7, which will make his treatment after release more difficult. Mr. Andrade will seek a surrender date allowing him at a minimum to complete scheduled medical procedures through October 2025.  During that time, Mr. Andrade will continue his psychotherapy.  The psychiatric medications are expected to increase, gradually, as Mr. Andrade continues on supervised release pending incarceration.  Mr. Andrade may request an Addendum to the PSR be prepared prior to incarceration to provide the BOP – through the PSR – the most current list of his medications.

### 3.  Medical Condition of Defendant

██████████████████████████████████████████████████

██████████████  Mr. Andrade developed Juvenile Diabetes.  PSR ¶ 81.  Mr. Andrade's high level of anxiety and stress contributed to his extremely high blood sugar levels.  He is insulin dependent and needs to test several times daily, to determine if he needs to eat or inject insulin during the day, *id.*; he takes over 80 units of insulin per day, at random times.  Mr. Andrade's Type 1 diabetes, which is occasionally unstable, requires multiple finger-sticks per day on top of diet adjustments to manage, and recently has caused proliferative diabetic retinopathy, which threatens his eyesight if not treated properly.  PSR ¶ 90.  He has severe arthritic ankles and is scheduled for surgery on August 6, 2025, at the VA in Texas where he receives his primary medical care.  *Id.*  He takes 19 medications daily.  PSR ¶ 91.  Mr. Andrade also stands at higher-than-normal risk for colon cancer, since his mother died of that disease.  After cancelling his scheduled colonoscopy for case-related reasons, when Mr. Andrade returned to Texas after trial, the VA rescheduled his appointment for October 16, 2025.  PSR ¶ 89.  Mr. Andrade will request a stay of surrender until a date after his scheduled October 16th procedure.

### 4.  Family and Dependents of Defendant

Mr. Andrade is married and has two young daughters, nine-year-old Melody, and six-year-old Madeline.[2] Mr. Andrade's wife Solmaz immigrated from Iran and–due to recently-adopted United States policy–she cannot return to that country to visit her family or receive their support in caring for Melody or Madeline during any period of Mr. Andrade's incarceration. Solmaz describes her relationship with Marcus as one of empowerment: he has granted her confidence in herself as a woman from a patriarchal society and given their daughters love, attention, and devotion which she wishes she could have received as a child. Solmaz cannot imagine life without her husband.

Melody and Madeline are American citizens. Mr. Andrade is their sole financial support. He presently supports them based on soon-to-expire payments from sales of stock in the company that holds and licenses the patents Mr. Andrade obtained in 2015 and 2016; Solmaz knows this is tantamount to no plan at all for their support in his absence. PSR ¶ 85, 86, and 87.

Mr. Andrade and his wife are dreading his separation from his children, with whom Mr. Andrade is very close. PSR ¶ 87. The letters received by the Court reflect Mr. Andrade's devotion to his daughters, who both adore and depend on him. The girls' great aunt, Lydia Benavides, wrote that Mr. Andrade plays a "vital role" in caring for them. This was further attested by Mr. Andrade's sister-in-law Elham Attari, who recounted that when they were separated from him (due to restrictions of his bond) his daughters spoke about him constantly, missed him deeply, and insisted on video calling him multiple times a day. Solmaz wrote about Mr. Andrade's devotion to his family in the midst of his work; whether he is taking the girls to their ballet class or a birthday party, "they know Dada is going to bring his laptop along but he will make sure to be there and finish up working real quick so he can play with them." During trial, his daughters asked Solmaz to postpone planned activities "till Dada is back," because it felt really strange to go anywhere or do anything without him. The Andrades never use

---

[2] Family pictures including Mr. Andrade's children are being filed under seal.

babysitters, and the Court has not seen Mr. Andrade's family because Solamz stayed at home to protect the girls, who were correctly deemed too young to attend the trial.

Although dealing with those outside of his family has been a challenge, a few non-family members who have interacted with Mr. Andrade for a long time have come to appreciate some of the same kind of devotion that his family sees. His friend of sixteen years, Anji Maddox, described him as "one of the kindest human beings I have ever met," and his former employee and IT specialist Sachin Agrawal – who the jury heard about during trial – has spoken to his "generosity of spirit," and "genuine[] care[] for others."

**B.  A Small Amount of Incarceration Will Be Quite Large for Mr. Andrade**

Mr. Andrade addresses in Part III below the guidelines, the need for deterrence and punishment, and the period of incarceration recommended by Probation. For now, he endorses Probation's recommendation that he be sentenced well below the Guideline range, PSR at 45, and explains that what the Court might otherwise consider to be a small amount of punishment will have a severe impact on Mr. Andrade. As the presentence report put it succinctly, *"any length of time will be a significant punishment for Mr. Andrade."* ECF 706 at Recommendation, page 3 (emphasis added).

To help understand what life will be like for Mr. Andrade in prison, the defense turned to Mr. Donson, an expert in BOP conditions, including in how people with Mr. Andrade's conditions fare in custody. Previously, Mr. Donson has written:

> "Autistic individuals commonly have processing delays and may need extra time to respond to questions or instructions. They take things very literally and may not fully understand instructions unless those directions are concise. The failure to immediately get on the ground or respond to a staff command in an institutional emergency situation can result in being physically taken down and/or make the individual subject to the disciplinary system for failure to comply.
>
> "Autistic individuals may not understand the unwritten social rules in the secure prison environment, such as maintaining proper body spacing, which may be interpreted as rude or disrespectful by both staff and inmates. Disrespect in a secure prison environment can

be detrimental regarding inmate peer relationships and can even result in assault by inmates and the issuance of incident reports by staff."

ABA publication *Representing People With Autism Spectrum Disorder*, by Elizabeth Kelly, Editor, 2020, (Paperback Ed), Chapter 13, "Prison Accommodations," by Jack T. Donson, Appendix B, at pp. 171-172.

In his declaration in this case, Mr. Donson elaborated on the danger for Mr. Andrade:

"Vulnerable inmates also move within the population with similarly situated inmates, referred to as a '*car*.' A car is a group of inmates that collectively move within the facility to protect each other and avoid certain areas of a facility that are without cameras and/or constant staff supervision. Mr. Andrade' social cognition deficits, executive functioning deficits, and memory retention limitations will make it difficult to be accepted in a car."

Donson Dec at p. 6. Based on his experience, Mr. Donson added:

"Other inmates may also take his social cognition deficits, such as hyperfocus about his special interests – including his literal interpretation of written rules, without recognition that others do not follow along - as disrespect. His lack of ability to read the room, understand and remember everything he's told, or interpret body language, combined with his difficulty regulating emotions (due to his bipolar disorder) and the difficulty following and accepting re-direction (due to both his ASD and his ADHD) will have negative ramifications in a carceral environment."

Donson Declaration at p. 7.

Not only will Mr. Andrade face danger, but he will also miss out on necessary treatment, regardless of the facility to which he is designated. As best Mr. Donson can predict, the BOP will determine that Mr. Andrade should reside at a Level 3 medical care facility as a result of his serious case of diabetes and other health issues; the only two camps with level 3 facilities are usually full and also are outside of Mr. Andrade's region, making it more likely he will be housed in a more dangerous, higher-security facility. *See* Donson Declaration at 4-5. Unfortunately, regardless of the facility designation, the BOP is not staffed for individual, weekly clinical counseling, and Mr. Andrade's social cognition deficits, executive dysfunction, and memory retention limitations will make it difficult to participate in the largely group-setting treatment programs. Donson Declaration at 7. With respect to Mr. Andrade's ADHD, Mr.

Donson has been informed by a formerly BOP-employed clinical psychologist who works with him in a non-profit that none of the Cognitive Behavioral Therapy BOP programs are targeted at ADHD and that prescribed medications will treat the symptoms such as anxiety and mood swings, but will not be equivalent to the medications used in the standard of care for ADHD in the community.  Donson Declaration at 7.

As described above and in the PSR at 44-45 (Sentencing Recommendation), Mr. Andrade's traumatic childhood contributed to the development of his current conditions, and has led to a life of repeated efforts that miss their mark.  He will struggle to adapt, behaviorally, to the conditions he must live with.  His time in prison will be slow, difficult, with challenges greater than those most inmates face.  Ordinarily, staff dealing with an inmate with ASD are not trained to recognize the reactions resulting from the difficulties those inmates have in communication, or – in Mr. Andrade's case – in receiving the information given to him as the person who talks to him intends that information to be interpreted. The deficit in social cognition (combined with a below or very low-end of average intelligence) will make every day of Mr. Andrade's life in prison literally a struggle: full of anxiety, fear, and tension, as he expends all his efforts to "mask"—i.e. to avoid showing people in prison that he is vulnerable.  Furthermore, the only psych meds that will be available for Mr. Andrade in prison are medications to help with symptoms (such as a mood stabilizer and possibly something for anxiety) but social cognition or behavioral therapy will not be provided.  Masking his symptoms through medication stalls forward progress on Mr. Andrade's conditions.  The medications and limited therapy available will make Mr. Andrade more docile in prison, and thus less likely to be a security concern ,which is sensible from a BOP staffer's perspective.  But none of what will be provided will help Mr. Andrade learn how to adapt to or manage his lifelong conditions, and will instead result in additional difficult experiences and pain, which will add to the challenges of treatment after his release.

Some time in prison, any time in prison, will make its needed impression on Mr. Andrade.  The real work for Mr. Andrade's success in life will be when he can seek the kind of

behavioral therapy not offered at the BOP.  Mr. Andrade seeks a sentence that takes into account his background, physical and mental characteristics, and his young family.

### C.  Other Relevant Considerations

#### 1.  Criminal History: Zero points

Mr. Andrade has zero criminal history points and thus is a criminal history category of 1. PSR ¶ 68.

#### 2.  Performance on Pretrial Release After Custody

Mr. Andrade was on Pretrial Services supervision since July 8, 2020, PSR ¶ 3; he performed well on supervision.  PSR at 45.

### III.   THE COURT SHOULD GIVE LITTLE OR NO WEIGHT TO THE SENTENCING GUIDELINES, AND PROBATION'S RECOMMENDATION IS FAR TOO HARSH

Mr. Andrade agrees with the presentence report that the guideline range is far too high to make a reasonable sentence, and that a proper sentence under 18 U.S.C. § 3553 will be significantly lower than the Guideline range.  His area of disagreement with the PSR is that it did not go nearly far enough in distancing itself from the guidelines, and that it included enhancements that are not supported by the evidence.  The Court should not rely on the guidelines to determine Mr. Andrade's sentence – especially as computed by Probation – and/or should sentence Mr. Andrade only after a very large variance from the advisory guideline range, as detailed below.

### A.  The Court Should Give Little or No Weight to the Guidelines

The Court should give little or no weight to the guidelines, for four reasons.  *First,* the fraud guideline allows for no distinction between Mr. Andrade, who believed in his product, believed that it would work, that its development would have been completed more quickly, and that purchasers would be rewarded, and who made considerable efforts and spent considerable sums of money to make his product work, and defendants who exhibit none of those qualities, like the government's witness Brian Darrow.  Darrow's takeaway from his work on AtenCoin

---

13

was to market his own cryptocurrency, but without making any effort to create an actual product or to get people to use it, Tr. 443:22-445:11; Darrow "never tried to build Java Coin [his cryptocurrency] into an actual technology."[3] Any reasonable assessment of the relative culpability of Darrow and Mr. Andrade would give considerable weight to that difference, but the guidelines give it no weight whatsoever. *See* Frank Bowman, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Federal Sentencing Reporter 167, at 171 (Feb. 2008) ("A defendant who consciously sets out to steal or cause economic loss is more culpable and deserving of greater punishment than one who acts dishonestly but without the desire to steal or cause loss."); *United States v. Emmenegge*r, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (noting problems with fraud guidelines' focus on loss, including "the weakness of the correlation between loss and moral seriousness").

> *Second,* as Mr. Bowman, one of the principal architects of guideline section 2B1.1 in the consolidated form it took in 2001 (and largely maintains today) has explained, the pinball game machine-like quality of the fraud guideline "embod[ies] two basic quantification errors." *Id.* at 170. The initial quantification error is "the assignment of independent weight to factors . . . that, in practice, often are present together." *Id.* The result is that enhancements like those in the government's proposed calculation effectively double-count aggravating factors. As Mr. Bowman explains, when the fraud guideline was initially drafted:

> "loss was understood to serve as a valid proxy for most of the considerations relevant to offense seriousness in economic crimes. Now there are dozens, with likely offense-level adjustments [including, use of a sophisticated scheme, number of victims, and leadership role]. All these factors are closely correlated . . . In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus."

*Id. See also United States v. Faibish,* No. 12-cr-265 (ENV), 2015 WL 4637013, at *4 (E.D.N.Y. 2015) ("most courts seem to recognize" the sophisticated means enhancement as "a double counting")

---

[3] Tr. 487:4-6.

The second quantification error "arises out of the logarithmic structure of the Guidelines' sentencing table."  Frank Bowman, *Loss Revisited: A Defense of the Centerpiece of the Federal Economic Crime Sentencing Guideline*, 82 MO. L REV 1 (2017).  As Mr. Bowman explains, "the size of the sentence increase associated with each one offense-level increase grows steadily the further one travels up the vertical offense-level axis, so that "a one offense-level increase at the bottom of the table changes a defendant's sentencing range not at all, whereas the same one-offense-level increase at the top of the sentencing table increases the defendant's minimum sentence by 3 years and his maximum sentence from 30 years to life imprisonment."  *Id.*  The result is that "many factors for which loss already was a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself," and do so where sentencing ranges are wide.  *Id.*

Even members of the Sentencing Commission have acknowledged these errors: In the Commission's Fifteen-Year Report on the operation of the Guidelines between 1987 and 2002, the Commission acknowledged the deleterious effects of what it called "factor creep" and observed that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness."  *Id.*  For these reasons, "for high loss defendants, the fraud guideline is . . . '*fundamentally broken.*'"  Bowman, *Loss Revisited: A Defense of the Centerpiece of the Federal Economic Crime Sentencing Guideline*, *supra* (quoting Judge Patti Saris, who was then the Chair of the US Sentencing Commission) (emphasis added).

*Third,* as a result of the broken nature of the fraud guideline in high loss cases, most judges understandably reject these significant loss-based enhancements.  *See, e.g., United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission ... effectively guaranteed that many such sentences would be irrational on their face"); *United States v. Johnson*, 16-cr-457-1 (NGG), 2018 WL 1997975, at *2  (E.D.N.Y. 2018) ("many in the legal

community have urged the Sentencing Commission to right this grievous wrong [the loss enhancement numbers in the fraud guideline], and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators"); *Faibish,* 2015 WL 4637013, at *2 ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime").

This is especially true in this district, where over 60% of the fraud sentences vary from the guidelines to begin with.[4]  That a guideline sentence as proposed by the government would be not in the correct solar system is confirmed by a comparison with the sentencing of Elizabeth Holmes – a far more sophisticated defendant, who committed a far more sophisticated and dangerous fraud (fooling far more sophisticated people, and messing with laboratory test results in addition to defrauding people of money), and whose fraud was *forty times larger* – who was sentenced to *less than half* of the government's proposed guideline range for Mr. Andrade.[5]

Another illustration of the fact that the fraud guidelines (as well as the recommendation of the Probation Office) are off the reservation can be found in a recent case before Judge Breyer, *United States v. David Miller*, CR 15-0234 CRB.  Mr. Miller was far more culpable and worthy of punishment than Mr. Andrade: not only did he engage in fraud to the tune of $233 million, but his fraud "put the health and well-being of people at risk" by distributing tampered medication.[6]  To make matters even worse, and again in contrast with Mr. Andrade, after having been raised "in a loving environment and [having] everything he needed as a child," Miller "used

---

[4] *See* United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2023, Northern District of California, at Table 10.

[5] Press Release, U.S. Dep't of Just., *Elizabeth Holmes Sentenced to More Than 11 Years for Defrauding Theranos Investors of Hundreds of Millions of Dollars* (Nov. 18, 2022), https://www.justice.gov/usao-ndca/pr/elizabeth-holmes-sentenced-more-11-years-defrauding-theranos-investors-hundreds.

[6] Press Release, IRS-CI, *California Lawyer Sentenced for Multiple Crimes Including the Illegal Distribution of $157 Million in Diverted Prescription Drugs* (Oct. 16, 2023), https://www.irs.gov/compliance/criminal-investigation/california-lawyer-sentenced-for-multiple-crimes-including-the-illegal-distribution-of-157-million-dollars-in-diverted-prescription-drugs.

his privilege as a lawyer to bolster his credibility and further his criminal enterprise."[7]  ECF 139 at 9 (government sentencing memorandum).

Miller's guideline calculations produced a total offense level of 39 and a guideline range of 262 to 327 months.  The government recommended 180 months.  Probation recommended 72 months – *less than what Probation recommended to this Court.*  Judge Breyer imposed a sentence of 72 months, which was a little more than a quarter of the low end of the guideline range.  Applied to the range Mr. Andrade has calculated in this case, this would produce a sentence of 29.7 months.  But the many mitigating factors in Mr Andrade's case, including his belief in his products and his costly efforts to make it a success, as well as his mental conditions, are in marked contrast to the serious aggravating factors in Miller.  Mr. Andrade therefore merits a substantially greater percentage reduction than Miller, something in a much lower ballpark entirely.

*Fourth,* the government itself recognizes that an appropriate sentence for this case should have no relationship whatsoever with the guidelines.  Consider the guideline calculation in the plea agreement the government constructed for Mr. Andrade's alleged co-schemer, Jack Abramoff.   Although the government appears to have had no difficulty coming up with a loss calculation for Mr. Andrade, and although the guidelines allow use of a defendant's gain instead of loss "only if there is a loss there is a loss but it cannot reasonably be determined," USSG 2B1.1(b)(1) note B to table, Abramoff's guideline calculation was not enhanced by any of the losses detailed in the presentence report; rather it was enhanced only by 10 levels (half of the number of levels by which the presentence report would enhance Marcus's sentence, with an exponential impact on the guideline range for  the reasons explained above) based on a *gain* of between $150,000 and $250,000.

Not only does this amount of gain understate what Abramoff gained, but it does violence to the commands of the guidelines – a decision the government apparently made because it could

---

[7] ECF 139 at 9 (government sentencing memorandum).

Defendant's Sentencing Memorandum                                    Case Number:  3:20-cr-00249-RS

(Redacted)

not fathom the high guideline range that adherence to the guidelines would call for, *even for a notorious, lying recidivist and even for someone whose sentence would depart substantially downwards for cooperation.*  That the government voted with its feet and ran away from the calculation unambiguously required by the fraud guideline speaks volumes in favor of a very large variance (e.g., the 10 levels gifted to Abramoff), if the Court gives any weight at all to the "fundamentally broken" and "irrational on their face" guidelines.  *See* paragraph IIIA *supra*; *United States v. Algahaim,* 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence"); *Gupta*, 904 F. Supp. 2d at 351 (recognizing that the Guidelines' emphasis on gain or loss "effectively ignore[s] the statutory requirement[s] that federal sentencing take many factors into account").

 *Finally*, as described more fully in Part IIA above and Part IIC below, there is substantial mitigating evidence that would compel a variance from any guideline calculation. *See, e.g., United States v. Ferguson,* 942 F.Supp.2d 1186, 1192-93 (M.D. Ala. 2013) (wire fraud sentencing of a defendant with IQ of 84-87, ADHD, PTSD, schizoaffective-disorder and marijuana dependency, noting 2010 guideline amendment changing mental and emotional conditions from "not ordinarily relevant" to "may be relevant;" acknowledging "the growing recognition that treating mentally ill criminal defendants rather than imprisoning them better serves both the defendants and society;" recognizing how "such individuals may be more vulnerable to difficult living conditions and abuse from other prisoners" given their "great difficulty coping with  the prison code, and concluding that "providing comprehensive, effective treatment for those mentally ill defendants whose disorder drives their criminality will more likely protect the public from suffering future crime – and that treatment does not come from incarceration").

**B.  Guideline Enhancements Are Incorrect and Unsupported by the Evidence**

Mr. Andrade objected to three guideline enhancements (but not to several other enhancements). While the Probation Office's opinion about the merits of these enhancements is opaque (see n.62 *supra*), the presentence report fails to mention the substance of those objections, and includes the enhancements in its guideline calculation.[8] There is no basis for any of the three enhancements.

### 1. No Enhancement Should be Added for Obstruction

In his response to the draft presentence report, Mr. Andrade thoroughly rebutted the threadbare theories on which the obstruction enhancement was based. The final presentence report does not mention this rebuttal, let alone explain why it nonetheless added the enhancement in paragraph 60, and included incorrect statements in that paragraph. Mr. Andrade therefore presents to the Court a summary of the evidence showing Mr. Andrade should not receive the obstruction enhancement under §3C1.1. as the PSR recommends.

    a. <u>Claim that Mr. Andrade "pressured Mr. De La Guardia to get Panamanian officials to lie in an attempt by Mr. Andrade to cover up his fraud scheme."</u>

This claim is an exaggeration by the government that is not supported even by Mr. De La Guardia, and that, in any event, does not meet the elements of obstruction of justice. Relying on Mr. De La Guardia for anything is unjustified, let alone relying on his two-faced claims that not only are uncorroborated but are contrary to written evidence.[9] Even assuming he could be relied

---

[8] Throughout this document, defense counsel references Mr. Andrade's objections to the draft presentence report, which is incorporated by reference herein, along with its supporting documents, and which is available for review via the Probation Officer.

[9] De La Guardia, in his official role as Vice President of Latin American Affairs, apparently misled Mr. Andrade regarding the prospects of opportunities in Panama, telling Mr. Andrade that their meetings with Panamanian officials were successful while testifying the opposite at trial. Compare Tr. 1181:7-13 (telling Abramoff that "everything went well" in Panama meetings, by which he meant "That people we presented, they were interested"), 1182:16-22 ("Catin and I have been meeting with key members of the government in order to have a say in the new regulation. Things are going great" (emphasis added); and Ex. 884-001; with Tr. 1195:21-1196:9 (meetings "weren't productive"); 1176:5-12 (meeting with Panama Maritime Authority "wasn't a good meeting" and "was unproductive"). He was two-faced when testifying that working for Mr. Andrade damaged his reputation, *See* Tr. 1215:20-1216:6, in a manner pinning the blame on

---

Defendant's Sentencing Memorandum                    Case Number:  3:20-cr-00249-RS

upon, Mr. De La Guardia never said he was pressured by Mr. Andrade as paragraph 60 asserts, either when he testified or when he was interviewed by the FBI. Rather, Mr. De La Guardia testified for the government that in May, 2020, Mr. Andrade *asked* him if he would *ask* some officials to confirm what had been reported in press releases.[10] Or, as Mr. De La Guardia testified initially on cross examination, Mr. Andrade "*asked me* to get in touch with some people, *not to correct things*" (emphasis added).[11] And when Mr. De La Guardia declined to comply with what he described as Mr. Andrade asking him "to get in touch with some people," Mr. Andrade apparently did not push back, make any threats, or seek to impose any consequences.[12] Even if there had been a whit of evidence that Mr. De La Guardia was pressured, there is nothing to suggest that Mr. Andrade was knowingly asking Mr. De La Guardia to compel Panamanian officials to lie. First, what Mr. Andrade allegedly said would have been an appropriate response to what Mr. De La Guardia had previously said: he had assured Mr. Andrade and Mr. Abramoff of the truth of the statements in the press releases he claims Mr. Andrade was asking him to confirm – releases that were carefully edited by Mr. De La Guardia before they were issued.[13] When Mr. De La Guardia apologized to Mr. Andrade and Mr. Abramoff immediately after the Panama Canal raised issues with one of the releases, he insisted that he *had* contacted the key decision-makers at the Canal before the release went out, and apologized for not confirming the quotes with the officials as he indicated at the time that he had done, rather than making an apology because he made up his contacts with Canal officials or the quotes in the releases about those contacts.[14] And when De La Guardia first told the FBI about this conversation with Mr.

---

Mr. Andrade, while in the course of his work for Mr. Andrade he only ever showed concern for his own reputation when questioning Mr. Andrade's intelligence, attractiveness, and wardrobe, but never his honesty or ethics. *See* Tr. 1226:25-1227:9; 1227:21-1228:3; 1228:20-1229:12; 1242:24-1243:15.

[10] Tr. 1217:25-1218:3.

[11] Tr. 1217:25-1218:3.

[12] *See* Tr. 1718-19.

[13] Tr. 1221:19-1225:5; Ex. 891; Tr. 1226:13-24; Ex. 8; Tr. 1228:4-1229:12; Ex. 2594.

[14] Tr. 1229:13-1230:21; Ex. 1514.

Andrade -- in May, 2020, very close to the time the conversation occurred – Mr. De La Guardia reported that his "first thought was that *there was no problem with the press releases*."[15]

In this context, it would not be unreasonable, let alone an act of obstruction, for Mr. Andrade to ask Mr. De La Guardia to see whether the Panamanian officials would confirm the interactions with Mr. De La Guardia that he previously claimed to have had with them. In any event, there is no hint in anything Mr. De La Guardia (or any other witness) said that provides any basis to believe that even if Mr. Andrade was knowingly asking Mr. De La Guardia to lie, he was doing so in order *to obstruct justice*, as opposed to furthering the original purpose of the releases in 2017, which was to get publicity to promote Mr. Andrade's cryptocurrency. The timing suggests the latter, given that in May, 2020, the work on the coin had just been completed, enhancing its ability to be accepted and sold, and Mr. Andrade was generating publicity to make the coin well known and attractive.[16]

> b. <u>Claim that Mr. Andrade "filed lawsuits against his fraud victims in an attempt to prevent them from reporting the fraud."</u>

This claim is a non-sequitur. Filing a lawsuit cannot prevent anyone from reporting a fraud, and there is no hint that any lawsuit filed by Mr. Andrade ever made such a request for relief, or that he ever threatened anyone with litigation contingent on their not talking with law enforcement or testifying in court. Rather, the evidence at trial suggested that Mr. Andrade filed lawsuits for good reasons and established that he was entitled to relief,[17] and/or won summary

---

[15] FBI-302-006867 (emphasis added).

[16] *See* e.g. 2020.02-06 NAC Foundation Twitter Posts; AML BitCoin, AML BitCoin Wallet 2020: How to Backup your Wallet in 3 Steps, YOUTUBE (Apr. 15, 2023), https://youtu.be/y8qegk3gdG0 (last visited July 3, 2025); AML BitCoin, AML Bitcoin Wallet 2020: How To Convert AML Tokens into AML Bitcoins, YOUTUBE, https://youtu.be/y8qegk3gdG0 (last visited July 3, 2025).

[17] See, e.g., Tr. 3039:1-9. *See also Andrade v. Dillman*, No. 2:20-cv-01021-JAD-NJK, 2021 WL 4394254, at *1-3 (D.Nev., 2021). Mr. Andrade won declaratory judgement against Japeth Dillman and BlockBits Capital, with the court ruling that Mr. Andrade and the NAC Foundation had no duty or liability to the defendants related to their clients, investors, or customers, including but not limited to Mr. Boyer or the Boyer Trusts. The court found that Mr. Andrade

Defendant's Sentencing Memorandum                    Case Number: 3:20-cr-00249-RS

(Redacted)

judgment on liability but ran out of funds to pay his attorneys before he could get a final

judgment.[18]  Filing meritorious lawsuits is not obstruction of justice.

Without ever addressing the fact that Mr. Andrade filed lawsuits with ample supporting

facts, as is his first amendment right, *see, e.g., Hudson v. Palmer*, 468 U.S. 517, 523 (1984)

("reasonable right of access to the courts"), the only evidence presented by the government to

support its claim that this litigation constituted obstruction of justice was a single WhatsApp

communication,[19] in which Abramoff reports that a pre-ICO purchaser told him that other

coinholders were saying on line that they "are planning" to go to the SEC or FBI.  Mr. Andrade's

contemporaneous response was that "we know who it is," and that the company had *already* sued

that person *and won*.  There is not a whit of evidence that Mr. Andrade knew at the time the suit

was filed that the person sued was planning to go to the SEC or FBI.  To the contrary, since it

takes a while to get even a default judgment and it takes no time to go to the SEC or FBI, this

sequence suggests that the person sued was *not* planning to go to the SEC or the FBI, let alone

that Mr. Andrade so knew at the time the suit was filed.  In addition, when Mr. Andrade was told

by Abramoff in Ex. 951 that *multiple people* were (still) planning to go to the SEC or FBI, he did

not respond, as the government's theory would suggest, that he would sue any of them.  As a

result, not only is the government lacking any evidence to support its theory, but the evidence

that does exist suggests that the theory is wrong.

### 2.  The Loss Calculation Is Overstated

Mr. Andrade objects to the amount of loss at $10,474,609 as stated in paragraph 45. This

objection has several components. *First*, while it is impossible to tell from the government's

submission (or from the testimony of its expert, Theresa Chiu) how the $2.1 million number

---

had "shown a legal right to a declaration that neither Andrade nor NAC is under a contractual
obligation or other duty to the Dillman Defendants to bear liability for their actions or inaction."
[18] Tr. 331:10-25, and 3044:25-3045:3; 2022.04.22 Judgment Against Lisa Tippett; 2022.07.08
Judgment Against Maurice Musiitwa; 2018.04.30 Preliminary Injunction Against Anthony
Morris; 2021.07.29 Summary Judgment on Liability Against Jodoins.
[19] *See* Ex. 951.

Defendant's Sentencing Memorandum                                          Case Number:  3:20-cr-00249-RS

(Redacted)

attributed to AtenCoin was derived – no supporting schedule has ever been produced – as best the defense can determine, a substantial portion of that total incorrectly includes not just the proceeds from the sale of *coins* (AtenCoins and/or Aten Black Gold Coins) but also proceeds from the sale of *shares* in a *different entity* with *different ownership* offering a *different product* – an entity and product that the government did not even try to prove to be fraudulent, and in fact was not fraudulent.

   *Sales of Cross Verify shares.*  One part of what the government incorrectly included are proceeds from sales of Mr. Andrade's shares in a company that was first called Aten Group Limited, and later called Cross Verify Limited.[20]  That company never marketed or sold any cryptocurrency.  Rather, it developed software permitting the tracking of digital identity on the blockchain using biometric verification—technology that was intended to be integrated with the AML Bitcoin product, but was also being developed for use in other types of products that could be sold separately.[21]  CrossVerify was staffed by a team of competent software developers located in London.[22]  Even leaving aside funds spent before the fall of 2017, Mr. Andrade spent over $1.1 million on the development of the CrossVerify product,[23] and the product was successfully developed as intended.  Even government witness Evan Carlsen, who was critical of the work on AML Bitcoin, was impressed with the Cross Verify product,[24] and defense expert

---

[20]  Aten Group Limited was founded in London, England, on February 24, 2016. 2016.02.24 Companies House Registry for Aten Group. On November 2, 2016, the company's name was changed to CrossVerify Limited (CrossVerify). 2016.11.02 Companies House Registry Shows Aten Group Renamed CrossVerify. *See* also Tr. 427:16-428:10; Tr. 2508:17-2509:12.

[21]  Among other things, Cross Verify was a digital identity platform that allowed users to cross-share their AML and KYC data with others. Weekly management update emails sent by CrossVerify leadership show the company pursuing dozens of separate opportunities with governments and private entities for the use of Cross Verify products. 2018.07.24 CrossVerify Weekly Management Update; 2018.08.14 CrossVerify Weekly Management Update.

[22]  Tr. 1409:2-23, 1410:11-15; Exs. 3302, 2333, and 2334. In addition, some of Jodoin's payments were for stock in NAC rather than for coins; no proof was offered about whether she paid fair value for NAC stock at the time of the purchase.

[23]  *See* Tr. 1983:20-21; Ex. 1520-004.

[24]  *See* Tr. 1278:12-17.

Defendant's Sentencing Memorandum                    Case Number:  3:20-cr-00249-RS

1  Erik Min testified that the CrossVerify product was ready for integration into an existing

2  cryptocurrency by the end of 2018.[25]

3       Mr. Andrade's role in Cross Verify was very different from his role in AML Bitcoin. He

4  was a director of CrossVerify when it was founded; however, on December 15, 2016, Mr.

5  Andrade was removed from company leadership[26] while remaining the company's majority

6  shareholder.[27] Between May 1, 2016, and May 9, 2017, Mr. Andrade sold personally owned

7  shares in CrossVerify to various private individuals; in total, he sold around $1.2 million worth

8  of those shares.[28] Including the proceeds of shares in this separate business that was not run by

9  Mr. Andrade nor was a fraud is error.

10      *Sales of AtenCoins.* The government failed to prove that AtenCoin was a fraud, and the

11  proceeds of those sales were also included erroneously in the loss calculation. The jury verdict

12  had nothing to do with whether AtenCoin was a fraud – part of the jury instructions were that the

13  jury was only to decide whether *AML Bitcoin* was a fraud.[29]

14      To the contrary, the evidence showed that Mr. Andrade did develop AtenCoin as he

15  promoted,[30] that the amount of money he took out of the business as his compensation was

16

17  [25] *See* Tr. 2479:18-4. The government offered no expert on the technology to rebut Mr. Min's conclusions.

18  [26] 2016.12.07 Companies House Registry - Mr. Andrade Terminated as Director.

19  [27] 2018.02.24 Companies House Registry Statement of Capital.

20  [28] 2017.05.26 Schedule of CrossVerify Share Sales. Mr. Andrade funded this company through the sale of his private stock; it appears that over 85% of the stock sale proceeds were provided to Cross Verify (and ultimately lost to Mr. Andrade).

21  [29] *See* e.g. The Court's instructions to the jury, Tr. 2956:5-10 ("You have heard evidence that

22  the defendant committed other wrongs or acts not charged here. You may consider this evidence

23  only for its bearing, if any, on the question of the defendant's intent, opportunity, preparation, plan, knowledge, absence of mistake, and absence of accident and for no other purpose."); and

24  Tr. 2960:4-7 ("You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment. The defendant is not on trial for any conduct or offense not charged in

25  the indictment.").

26  [30] Erik Min testified that the AtenCoin had the features required for cryptocurrency to function– a digital wallet and a blockchain–and included integrated third-party ID verification services, *See* Tr. 2611:3-2612:4; and that it was a complete, functional product. Tr. 2479:1-17; 2610:9-13.

27

28

Defendant's Sentencing Memorandum                    Case Number: 3:20-cr-00249-RS

small,[31] that he used third parties for biometric identification,[32] and that when Mr. Andrade himself initiated testing of the third party ID verification product, he determined that it was not functioning as he hoped, and he shut it down.[33]  Making amends, he then allowed those who purchased AtenCoin to turn their AtenCoins into AML Bitcoin tokens, at no charge.[34]  Not all business failures are frauds; this  was not a fraud.  The government recognized the weakness of its claim that AtenCoin was a fraud, and made the right decision, when it looked at AtenCoin at the time it was being sold and decided not to prosecute.

---

Evan Carlsen affirmed that AtenCoin wallets had a dual-signature component, that Mr. Andrade's company had the ability to stop transactions by disabling crypto wallet signatures, and that he did not have any concerns about the AtenCoin system architecture. *See* Tr. 1306:15-1307:9. In addition to the evidence at trial that Brandi Jodoin had been caught lying when she told the FBI, among other things, that NAC did not employ AML/KYC features in AtenCoin and had not seen a functional demonstration of AtenCoin, *See* Tr. 337:5-16, and that AtenCoin's ID verification technology did not exist, *See* Tr. 337:22-338:3, and that they relied on false aftermarket valuation figures while investing in the NAC Foundation, *See* Tr. 336:20-337:3,Brandi and Corey Jodoin previously acknowledged the AML/KYC compliance built into AtenCoin in depositions. Both acknowledged that there is an ID verification process for every person who received AtenCoins, *See* Attach-2 Brandi Jodoin Deposition, at 70:13-18 and Attach-3 Corey Jodoin Deposition, at 47:12-24; and Brandi acknowledged that she and her husband went through this process themselves. Brandi Jodoin Deposition at 70:14-15. On the basis of having established an AtenCoin wallet, Corey Jodoin anticipated that NAC still possessed his biometric and ID verification data. Corey Jodoin Deposition at 55:20-56:1. Corey stated, "In my knowledge . . . the ID verification had changed three times while I was there. *The third time it looked like it was seamless and it looked like it was working well.*" *Id.* at 107:10-20 (emphasis added). In granting summary judgment, the Eighth Judicial District Court of Nevada found that the evidence showed that the AtenCoin technology "includes code written to tie personal AML/KYC biometric information to that person's digital wallet address." *NAC Foundation vs. Corey Jodoin and Brandi Jodoin*, 2021 Nev. Dist. LEXIS 1679, at *16 (July 29, 2021). Citing Brandi Jodoin's own statements from her deposition, the Court found that "one aspect of the technology includes credential authentication and the other a two-party signature theft resistant scheme that was built into the code, and the digital currency wallet address that was linked to a person's AML and KYC data." *Id.* The court found that the Jodoins lied to the FBI about the state of AtenCoin's technology, stating, "the facts belie the statement to the FBI that the Aten Coin did not have AML technology and/or that the Jodoins had not seen it work . . ." *Id.* at *24.

[31]  *See* Ex. 1520-006.

[32]  Tr. 2505:7-11;2506:11-14; 2507:5-17.

[33]  Tr. 2134:10; 1656:11-24.

[34]  Tr. 636:3-7, 1060:6-9, 952:20-953:9,  956:7-25; and Ex. 1469.

No reliable witness was ever presented by the government to testify about whether AtenCoin was a fraud, or, if it was, the extent of Mr. Andrade's culpability for such a fraud;[35] instead, the government used AtenCoin to present victim testimony.  The only two employees who testified did not fill in any of the gaps in the government's proof, but in any event were unworthy of belief. Brian Darrow spent most of his life committing multiple, major frauds, getting caught, pleading guilty to one of them and being given a get-out-of-jail free card on the others, and then getting a sweetheart deal to testify—in this case, the government told him expressly that he had to help them get Mr. Andrade in order to get another sweetheart deal.[36] Only one small fact in his testimony came with any corroboration whatsoever.[37]

The only other insider to testify was Brandi Jodoin.  Beyond her bias as someone seeking half a million dollars from Mr. Andrade, *she was previously found to have lied repeatedly under oath about Mr. Andrade and about whether AtenCoin was a functioning coin*, and she nonetheless repeated those lies under oath at trial.[38]  Those were not the only lies Jodoin told at trial: she also made false statements on the stand about winning litigation against Mr. Andrade in Nevada -- when in fact summary judgment was granted in Marcus's favor[39] – and compounded all her lies by reporting how ethical she was, how she would not participate in anything that was not legal and ethical "in every aspect," and how she "began to lose faith in the AtenCoin project" and became "disillusioned,"[40] – after which she sold $90,000 of AtenCoin to people she thought

---

[35] During the AtenCoin period, Polish attorney Agnieszka Cenzartowicz was head of marketing, Tr. 280:4-5, and Brandi Jodoin oversaw her. Tr. 288:17-18; 380:2-3.

[36] Tr. 476:16-479:13; 481:7-483:21.

[37] Tr. 460:3-461:1, 484:4-20.

[38] *Compare* Tr. 307:13-20 *with* 337:4-338:3.

[39] Tr. 332:13-25.

[40] Tr. 258:3-7; 262:9-14; 316:11-320:2-4; 321:23-324:3

Defendant's Sentencing Memorandum                    Case Number:  3:20-cr-00249-RS

(Redacted)

did not understand it,[41] made a video extolling how well AtenCoin worked,[42] and took an all expenses paid trip to Barbados on the company's dime.[43]

*Second*, the government's total appears to include as losses funds expended by co-conspirators and/or their nominees, who should not be treated as victims.  To take a few examples, it appears that included in the presentence report's loss totals are purchases by Dillman and Mata's company Block Bits Capital, in the amount of $129,400 on January 12, 2018,[44] and $197,000 from the ICO on February 5, 2018,[45] and by Abramoff's company Landfair Consulting on July 31, 2017, to the tune of $20,000.00.[46]  The government presented evidence that Landfair's funds were owned and controlled by Abramoff.[47]  Without an accounting, a supporting schedule, or any hint of what was included in the government's total, it appears that the government included all funds delivered to Mr. Andrade in the target timeframe, including from his alleged co-conspirators.

All of these "losses" should be deleted from the total.  *See United States v. Harris,* 821 F.3d 589, 606 (5th Cir. 2016) ("[P]ecuniary harm suffered by a coparticipant in a procurement fraud scheme can sometimes count toward the losses used in determining the defendant's

---

[41] Tr. 371:21-373:19.

[42] Tr. 373:23-374:6.

[43] Tr. 374:7-15.

[44] Trial Exhibit 3170 at 212-223.

[45] *See* Trial Exhibit 3143 at 002.  at

[46] *See* Trial Exhibit 3170 at 26-34.  Other examples include another $20,000 from Landfair (later putting the contract under the name David Lapin) on October 5, 2017, *see* Attach-4 FBI-GJ-002203 at 3 and another $25,000 through Abramoff's proxy company Sepo Holdings via Sugar Mountain Holdings in August 2017. Attach-5 FBI-GJ-0003170 (showing Abramoff directing transfer of $25,000 to Sugar Mountain Holdings on July 9, 2017); Trial Exhibit 3170 at 6 (showing Sugar Mountain Holdings purchase of $35,000 on August 2, 2017). Additionally, from the way the government presented its case at trial (but disputed by the defense), John Bryan was also acting as a co-conspirator by knowingly manipulating the market; losses of his company the Watley Group totaled $70,000.  Ex. 3170 at 4.

[47] During direct examination, Abramoff acknowledged that Landfair Capital Consulting was his company, which he used to conceal lobbying income. Tr. 1715:20-1716:8. Moreover, government forensic accountant Theresa Chiu testified that Landfair Capital was one of the companies Mr. Abramoff used to take in funds from AML Bitcoin sales. Tr. 1986:10-21.

sentence, but we have described that possibility only in the context of a co-participant whose involvement in the scheme amounted to 'assent to extortion''); *United States v. Rainford*, 110 F.4th 455, 483 n.10 (2d Cir. 2024) (majority determines that certain unindicted co-conspirators in a slip-and-fall accident fraud scheme qualified as victims for guideline purposes when they were "exploited because of their economic vulnerability, " and "were [physically] injured" and "duped into borrowing high-interest loans," over dissent that those who knowingly joined a conspiracy and willfully participated in the scheme cannot be victims and that any suggestion to the contrary in the application notes is a plainly erroneous reading of the guidelines that would lead to absurd results and should not be followed).

*Third*, the $5 million in PSR 45 appears to double count at least $770,357.98 of the money received in cryptocurrency. Although as noted below there is no supporting schedule for the government's numbers, from all appearances the government counted in its $5 million figure for the proceeds of AML Bitcoin sales all the US dollars coming into certain bank accounts, but included in that total $770,357.98 that came into those accounts in three deposits, made in May, June and July of 2018, which were the proceeds from the sale of some of the cryptocurrency that Mr. Andrade received for ICO sales in 2017 and early 2018.[48] That the amount paid for tokens

---

[48] Mr. Andrade, using Block Bits' services as coordinated by David Mata, converted cryptocurrency he had obtained in the early ICO sales. The income to NAC Payroll from May ($235,261), June ($222,782.80), and July, 2018 ($312,314.18) total $770,357.98. *See* Block Bits LLC's bank statements (account ending in 8602, sent to Mata, for May, June, and July 2018); FBI-302-001761 dated 9-24-2018, and FBI-302-001763 dated 9-26-2018 (Mata explaining that he cashed out Mr. Andrade's cryptocurrency for him for a fee); FBI-302-00523 reporting an interview from 8-24-2019 (same, and also noting that "[O]n or about May 2018 . . . Dillman stated Marcus Andrade needed to get a large quantity of Ethereum cleared within the next hour. . . . Mata liquidated all the crypto-currency and wired it to a bank account provided by Andrade," after subtracting a service fee; "Mata recalled the vast majority being Ethereum, but there may have been some Bitcoin."). By the time Mr. Andrade began converting the crypto received into dollars in May 2018, its value had declined significantly. At the time the cryptocurrency was used to buy AML tokens, the value was about $2,361,620. Through the transactions corresponding to the three dates shown on the Block Bits bank deposits into Mr. Andrade's NAC account, the bulk of the cryptocurrency was expended. In other words, despite having received over two million dollars worth of cryptocurrency, Mr. Andrade only was able to use about one-third of its original value.

(the income) does not match the amount paid by purchasers is a reflection of the large drop in the value of cryptocurrency during the period that Mr. Andrade possessed it; this drop does not impact the loss calculation but is noted to explain the difference in the figures.

*Finally,* the numbers from the government on which the guideline calculation is built are inconsistent, sometimes round and sometimes not, and devoid of any supporting schedules on which their reliability can be evaluated.[49]  *See, e.g.*, *United States v. Annamalai,* 939 F.3d 1216, 1235 (11th Cir. 2019) (reversing sentence and explaining that "[i]f the defendant objects, the government must prove its loss calculation by a preponderance using 'reliable and specific evidence'").  At a minimum, given the inconsistencies and the lack of backup, the presentence report should use the lower $4.5 million number, *see* PSR ¶ 33, for purchases starting with the ICO, rather than $5 million. *See*  PSR ¶  45.

### 3.    No Enhancement Should be Added for Running a Sophisticated Scheme or for a Substantial Part of the Scheme Committed from Outside the United States

The presentence report erroneously assesses a two-level increase for a sophisticated scheme without evidence of Mr. Andrade's alleged scheme being "especially complex or especially intricate" or a one in which "a substantial part" of the scheme "was committed from outside the United States."  Neither requirement of Section 2B1.1(10) was satisfied.

The government's version of the offense devotes only one sentence with no supporting authority to justify the imposition of the enhancement that a "substantial part" of  the scheme was committed from outside the United States.  Its one sentence carefully avoids mentioning that the alleged fraud is repeatedly described in the indictment as making public statements.[50]  There was no evidence that any of those statements about AML Bitcoin were made anywhere except in

---

[49]  Many of these numbers were presented at trial, but were not the subject of cross-examination because the amount of the alleged fraud does not matter to a determination of guilt.  For example, in the government's submission to Probation, the  the amount of loss after the pre-ICO period was first stated in $4.5 million in U.S. dollars and approximately $2,874,609 worth of cryptocurrency, but in a later paragraph the dollars grew to $5 million, with the same amount in cryptocurrency.

[50]  E.g., ECF-1 at ¶ ¶ 9a, 9b, and 9c.

Defendant's Sentencing Memorandum                                    Case Number:  3:20-cr-00249-RS

(Redacted)

the United States, let alone that a substantial part of them were made outside the United States; it

appears that the article writers and publishers are United States-based as well.[51]  This does not

come close to meeting the requirement that a "substantial part" of the scheme was "committed

from outside the United States."[52]

Even if the indictment were disregarded and the fraud were expanded to include

international travel to places discussed in the public statements issued in the United States,

amidst at least eight different sets of accusations of fraudulent conduct involving AML Bitcoin,

only one set (false statements about the Panama Canal) involved international travel.  That travel

was orchestrated by Abramoff, controlled by Abramoff's confidant Carlos De La Guardia,[53] and

Mr. Andrade's role in Panama was expressly limited.[54]  All the AML Bitcoin-related bank

accounts were also in the United States.  Regardless of Mr. Andrade's role in any international

travel, this slice of the case cannot qualify as a "substantial part" of the scheme under the

guidelines because even if some activity took place abroad, it was not a majority of the conduct

or an essential part of it, and therefore does not qualify for the enhancement.[55]

---

[51]  *See* Attach-6 FBI-00083481.

[52]  See, e.g., *United States v. Yan Zhu*, No. 09-00722 (JAP), 2012 WL 359734, at *4-5 (D.N.J. Feb. 2,  2012) (focusing in sentencing for wire fraud conviction on "when crime was committed" in determining whether a substantial part was committed from outside the United States).

[53]  2017.09.03 Abramoff Emails the Travel Plan for Panama from De La Guardia; 2017.09.06 Abramoff Emails Travel Plan Amendment (Abramoff drafted the email for De La Guardia and had De La Guardia send it to him, before then sending it on to Andrade).

[54]  Following what De La Guardia viewed as Mr. Andrade's poor appearance and performance in initial meetings with the Panama Maritime Authority and Morgan & Morgan, he told Abramoff that they needed to keep Mr. Andrade "hiding in a box," and "he should not be the face of the invention." Tr. 1181:7-22. Regarding the meetings, he said Mr. Andrade "felt like he didn't do anything today, but that was the idea." Tr. 1182:18-19 (emphasis added). De La Guardia viewed Mr. Andrade as a "clown." Tr. 1243:1-5. In the subsequent trip to Panama in December 2017 to present to Morgan & Morgan a second time, Abramoff messaged CrossVerify CEO Richard Naimer, "Make sure you take the lead not marcus." *See* 2017.12.11 Abramoff Messages to Naimer.

[55]  *See United States v. Ogunbanke*, 619 F. App'x 586, 587–88 (9th Cir. 2015) (noting definition of substantial includes "an essential part, point or feature," and finding "substantial part" requirement satisfied when "the majority of the fraudulent transactions occurr[ed] abroad").

---

What the government has offered to justify a sophisticated means enhancement does not even try to address what the guidelines require: the Sentencing Commission expressly confined the sophisticated means enhancement to "especially complex or especially intricate offense conduct." USSG Note 9(B) to 2B1.1 (emphasis added).[56]  Nothing in the government's version of the offense suggests that the means were especially complex or intricate; instead, the government at trial likened the conduct, over a relevance objection, to a pump and dump scheme.[57]  The only possible complex or intricate acts were the allegations of market manipulation, which were never proven to have occurred at all,[58] and in any event were conjured up and orchestrated by Abramoff, not Mr. Andrade,[59] and the enhancement is therefore unjustified.[60] *United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023).

---

Compare, e.g., *United States v. Luton*, No. 21-1285, 2022 U.S. App. LEXIS 19572, 2022 WL 2764202, at *5 (10th Cir. July 15, 2022) (citing *United States v. De Aguiar*, 453 F. App'x 927, 929 (11th Cir. 2012) (looking to "where the most important aspects of the fraudulent scheme occurred"); *United States v. Beckner*, No. CR 15-2218, 2023 WL 4157269, at *42 (D.N.M. June 23, 2023) (rejecting enhancement when "at most only . . . some part of the scheme took place abroad"); *Yan Zhu*, No. 09-00722, 2012 WL 359734, at *6 (holding that the fact that "the object of the scheme was conveyed from the United States to China" was "not enough to show that the scheme was substantially committed from China").

[56] *United States v. Montano*, 250 F.3d 709 (9th Cir. 2001) (reversing sophisticated means enhancement when facts relied upon were common and not especially sophisticated and were employed not to conceal but to carry out the scheme).

[57]  Tr. 1553:23; 1554:5-7.

[58]  The individual on whom the government pinned the NAC Foundation's market making efforts, John Bryan, testified that he took credit for market making attributable to organic price increases, Tr. 1584:16-21; he routinely took unjustified credit for market making, Tr. 1588:4-12; and he thought that Quintin Miller–of Polyblock Capital, "a very reputable company in the crypto space," Tr. 1576:18-25, recommended to the NAC Foundation by Morgan Stanley, Tr. 1579:15-16–by was lying to him about his own market making efforts, Tr. 1585:19-25. No record of even a single "market manipulation" trade was offered by the government at trial or produced to the defense during discovery.

[59]  John Bryan testified to an "investor relations plan" for market making that he created in conjunction with Abramoff for presentation to Mr. Andrade. Tr. 1576:21577:3, 1583:19-1584:15; Ex. 418.

[60]  *See United States v. Griffin*, 768 F.4th 724, 751 (7th Cir. 2023) ("the enhancement should be based on the defendant's own intentional conduct rather than on the basis of the sophistication of the overall scheme without a determination of whether the defendant's own conduct was sophisticated").

Witnesses after witness at trial described (or admitted to previously describing) Mr.
Andrade in different but colorful terms, all of which were the opposite of sophisticated: to those
who dealt with him, he was an "idiot," "fucking idiot," "lamebrain," "putz," "sucker," and
"clown," among other pejoratives.[61]  Witnesses also admitted to comparing him to Grimace from
the McDonald's Land commercials, Tr. 1784:11-13; and Captain Queeg from The Caine
Mutiny.[62]

This was borne out by the evidence of specific conduct in furtherance of the alleged
scheme that the government attempted to attribute to Mr. Andrade personally.  There was
nothing sophisticated about the transactions through which he funded his real estate purchases.
In a recording labeled 1D-39, the case agents told Abramoff that it was easy to follow the trail.[63]
Mr. Andrade used a local bank, went into the bank to conduct a transaction so his photo could be
taken, used the most simple means to make the needed quick and secure payment (a cashier's
check, which created a record with his name), and used no fake names, false identification,
foreign bank accounts, or shell companies.[64]

### C. The Court Should Not Follow the Recommendation of the Probation Office and Should Instead Sentence Mr. Andrade to 24 months

The presentence report does not explain why 84 months is "necessary to satisfy the
factors at 18 U.S.C. 3553(a)," as opposed to, say, 42 months, or 21 months, or a year and a day –
especially given its recognition that *"any length of time will be a significant punishment for Mr.
Andrade."*  ECF 706 at Recommendation, page 3 (emphasis added).  The Probation Office's own

---

[61]  Tr. 1757:8-1758:16, 1758:24-1759:5 (idiot); Tr. 1244:20-23 (fucking idiot), Tr. 1777:18-23
(lamebrain); Tr. 890:12-891:4 (putz); Tr. 1782:25-1783:21 (sucker); Tr. 1242:24-1243:5
(clown).

[62]  Tr. 1782:15-24.

[63]  Tr. 2075-78; 1D-39 Recording of FBI Interview of Abramoff (can be made available upon
request).

[64]  *See United States v. Valdez,* 726 F.3d 684 (5th Cir. 2013) (reversing sophisticated means
enhancement when defendant used no false names, fictitious entities, shell companies, or
complicated financial transactions).

recommendation of 72 months in the Miller case, despite the far higher guideline calculation in Miller, the many more aggravating circumstances there, and nowhere near the mitigating circumstances that are present in this case, shows how far out of kilter the 84-month recommendation is for this case.

This excessive recommendation can only be explained as having been the product of a discount from Probation's guideline calculation, but starting with the guideline calculation means that Probation began in the wrong ballpark. Its calculation suffers from being based on "fundamentally broken" and "irrational on their face" guideline provisions, and, for the reasons explained below, a series of erroneous enhancements added on top of those already-inflated provisions.[65]

Mr. Andrade acknowledges that some punishment is appropriate given the nature of his conviction, understands that the Court will use the consequence of prison time in light of the jury's verdict, and recognizes that his request may on first glance be beneath what the Court might have expected. But that is a result of the powerful array of mitigating factors in this case, which more than counterbalance any need for punishment (as well as possibly the residue from seeing a calculation based on a broken sentencing guideline). The primary factor under Section 3553 driving the lengthy sentence recommendation by Probation – if there is any such factor other than the guidelines themselves – appears to be the need for deterrence, but the need to "send a message" has diminished given extensive reporting on lengthy sentences received by a number of white-collar defendants. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005) ("there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); *United States v. Olis*, No. H-03-217-01, 2006 U.S. Dist. LEXIS 68281, at *43 (S.D. Tex. Sept. 22, 2006) ("The public in general, and potential

---

[65] The presentence report Addendum suggests that Mr. Andrade's objections to these enhancements remain unresolved, but the enhancements nonetheless are included in the guideline calculation at paragraphs 56-64 of the report.

1  white-collar criminals in particular, have become aware of the substantial risk of imprisonment

2  for lengthy periods if they commit crimes of this nature").

3          The accumulation of mitigating factors on the other side of the Section 3553(a) balancing

4  far outweigh any need for deterrence (or related interests in reflecting the seriousness of the

5  offense).  First, unlike the typical fraudster, Mr. Andrade came up with a concept of immense

6  value – the patents incorporating that concept were worth $100 million, according to both

7  government and defense witnesses.[66]  He then devoted immense effort and considerable funds to

8  turning that concept into a successful product.  That he wanted those who purchased his coins

9  and tokens to be rewarded is reflected not only in allowing AtenCoin holders to convert to AML

10  Bitcoin tokens, but also in his continued efforts to complete AML Bitcoin long after people

11  stopped purchasing the tokens.  The law may say that he can be guilty of making

12  misrepresentations about his product even if he truly believes in it and is trying to make it a

13  success, but his belief and his efforts should be recognized as a distinguishing and mitigating

14  factor in selecting the degree of punishment.

15          Second, Mr. Andrade's offense is mitigated by his horrific upbringing and his psychiatric

16  conditions.  AML Bitcoin was delayed and eventually failed in part because he lacked not just

17  the knowledge of how to run a business, but because his brain also lacked the social cognition,

18  executive function, and other traits needed to fully understand what was going on around him

19  and to make the right decisions.  Could AML Bitcoin have succeeded if he had heeded Todd

20  Hargreaves's advice on how to publicize AML Bitcoin instead of getting into a billing dispute

21  with him?  Could Mr. Andrade have built the coin more quickly, had he been able to distinguish

22  the good developers from the not-so-good ones, and had he been willing to stick with the good

23  ones instead of getting into disputes with them and falling for another developer's pitch?  Or if

24  _____

25  [66] *See* Tr. 2312:13-19 (Mr. Andrade's patent attorney, Jeffrey Tinker, testified that he received an offer for Mr. Andrade's patents for $100 million); Tr. 2395:23-2396:9 (Mr. Andrade's

26  compliance attorney, John Fahy, testified that Deloitte was expecting to receive $80-100 million for Mr. Andrade's patent portfolio); Tr. 1816:3-9 (Abramoff testified that he had negotiated an

27  offer for Mr. Andrade's patent portfolio for $100 million).

28

Defendant's Sentencing Memorandum                    Case Number:  3:20-cr-00249-RS
(Redacted)

he had learned a management style other than yelling at his employees?  These, too, are mitigating circumstances that distinguish him from other fraudsters, and that suggest that, with the treatment that he has begun to receive and is eager to continue, he will grow out of the possibility of any similar conduct in the future.

Third, Mr. Andrade's physical and psychiatric issues will make every day he spends in custody  much more difficult than for the typical prisoner.  He will be and will appear to be vulnerable.  He will not be able to get along with other prisoners or guards.  He will be bullied and tested, and will not be able to respond in appropriate ways, leading to further trouble.  As the presentence report reflects, "*any length of time will be a significant punishment for Mr. Andrade.*"

Fourth, the Court should take into account that Mr. Andrade served his country for four years as a Marine.  This district has recognized that those who do so deserve a better path at sentencing, having created a veterans' program for this purpose.  While the district chose to limit the availability of that program to veterans who pled guilty,[67] the recognition that this service is a mitigating factor should be considered in determining the length of his incarceration.

Finally, the Court should consider Mr. Andrade's wife Solmaz and his daughters Melody and Madeline, and the impact that his incarceration will have on them.  Mr. Andrade is, by all accounts, a wonderful father who is present, loving, reliable, caring, and protective of his family.  Given the government's banning of travel to Iran, where Solmaz's was born, where her mother and most of her other relatives reside, his family will have nowhere to go for help as there is no family support for her in this country.  Traditionally the government responds to this sort of pain resulting from incarceration by putting the blame on the defendant for committing the crime, but here our government's own foreign policies are also a cause of the problem, and the Court

---

[67] Like the penalties in the sentencing guidelines for those who go to trial and elect to exercise their right to appeal, these sorts of limitations appear to unconstitutionally burden a defendant's right to a jury trial.

Defendant's Sentencing Memorandum                                    Case Number:  3:20-cr-00249-RS
(Redacted)

1  should consider the impact of the government's policies as well as the damage to Solmaz and

2  their daughters – and the extra damage inflicted by the government – in imposing sentence.

3      All these mitigating factors, and the relative absence of any compelling aggravating

4  factors, suggest that the Court should impose a compassionate sentence.  A sentence of twenty-

5  four months would result in a meaningful time in jail while reflecting all the mitigating

6  circumstances, and would reduce the risk that incarceration would result in a setback of his

7  treatment, irreparable medical damage, or additional trauma, and would lessen the disruption of

8  his relationship with his daughters.

9  **IV.    OTHER SENTENCING CONSIDERATIONS**

10     **A.  Defendant is Unable to Pay a Fine**

11  Mr. Andrade agrees with the presentence report that he does not have the ability to pay a fine,

12  and no fine should therefore be imposed.  In the event the Court disagrees, collection on any fine

13  imposed should be stayed pending appeal pursuant to Fed. R. Crim. Pro. 38(c).  Where, as in this

14  case, Mr. Andrade's family's financial situation is precarious, it is not clear how the parties

15  interested in the proceeding or the public interest may be harmed by delaying payment of a fine,

16  and Mr. Andrade has raised some strong colorable arguments for appeal, a stay is appropriate.

17  *See Nken v. Holder*, 556 U.S. 418, 426 (2009) (articulating the factors for issuing a stay).

18     **B.  Restitution Orders Cannot Be Made**

19     Whatever amount the Court uses for loss under the sentencing guidelines does not

20  necessarily translate to restitution.  *See, e.g., United States v. Caputo*, 517 F.3d 935, 943 (7th Cir.

21  2008); *United States v. Chaika,* 695 F.3d 741, 748 (8th Cir. 2012).  This is because, unlike the

22  loss guideline, restitution must be based on actual loss, *United States v. Stoddard*, 150 F.3d 1140,

23  1147 (9th Cir. 1998), and, as a substitute for civil damages, requires more of an exact figure.

24  *Caputo*, 517 F.3d at 943.  Restitution also requires proof of reliance, as well as direct and

25  proximate causation, *see United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) ("the

26  parties agree that the government must show that the investors relied on Mr. Stein's fraudulent

27  information to satisfy the "but for" causation requirement under U.S.S.G. § 2B1.1"); *United*

28

*States v. Farano,* 749 F.3d 658, 666-67 (7th Cir 2014) (suggesting banks were not victims for restitution purposes absent evidence they relied on the defendants' original fraud).  In addition, restitution cannot go to co-conspirators, their nominees and others, and restitution obligations are offset by the value an alleged victim recovers from selling property obtained through the offense. Wright & Miller, 3 Fed. Prac. & Proc. Crim. § 546 (5th ed.).

Neither the government's submission to Probation[68] nor this report has proposed a specific restitution order or orders that Mr. Andrade could consider and to which he could object as appropriate, on the grounds set forth below and any others.  While Mr. Andrade is likely to have additional objections to specific order(s) once restitution is requested, several potential problems can already be identified with any restitution order based on the information from claimed victims that the government has produced.  In addition to the errors identified in Part IIIB2 above, we point out some of these problems now (especially relating to the amount of restitution sought), in advance of more formal objections at the appropriate time, and request an evidentiary hearing. *See* 18 U.S.C. § 3664(d)(4); *United States v. Lo*, 815 F.3d 1054 (9th Cir. 2016).

First, some, if not all of the victim information was submitted after the deadline established by statute.  *See* 18 USC 3664(d)(1).

Second, the government incorrectly collected only data about what purchasers claimed to have paid (and often obtained no documentation whatsoever), rather than what the purchasers lost – one difference between the two would be for those who sold some or all of their tokens on an exchange or otherwise.  There is ample evidence that some tokens were sold for value on exchanges.[69]  Especially in light of that fact, the data the government collected – and particularly

---

[68]  This pleading is not Mr. Andrade's response to the government's sentencing memo.  Any request for specific restitution raised by the government will be addressed in a later pleading.

[69]  *See* Attach-7 Transcript of 1D47-FBI-ELSUR-003783 at 2:11:05-2:13:25. David Mata, at FBI direction, recorded a conversation with Mr. Andrade and his attorney, Christina Ponig, wherein Mata bragged about turning half of a bitcoin into three while buying and selling AML Bitcoin tokens on the exchange.

what it collected during the limited period allowed by statute – falls well short of its burden, *see, e.g., United States v. Waknine,* 543 F.3d 546, 556 (9th Cir. 2008) (finding government did not present sufficient indicia of reliability to support its probable accuracy, even though victims filed affidavits, when the affidavits were too summary and too conclusory to be sufficiently reliable in light of the defense objections).  Nor is there any information about when the purchases were made, in order to determine whether they were within the conspiracy charged in the indictment.

Third, some of the claimants seem ineligible for restitution.  Among them are those who paid for Aten Coins as opposed to AML Bitcoin tokens, the only fraud charged in the indictment. *See United States v. May,* 706 F.3d 1209, 1214 (9th Cir. 2013) (a district court "may award restitution … only for loss that flows directly from the specific conduct that is the basis of the offense of conviction"); 18 USC 3664 and 18 USC 3771.  Some bought stock as opposed to tokens[70], and the government offered no proof that fraud infected stock sales.   And still others are co-conspirators and/or appeared to use money from Jack Abramoff, a co-conspirator, who as one of the wrongdoers is not entitled to restitution.  *See United States v. Lazarenko*, 624 F.3d 1247, 1251-52 (9th Cir. 2010)  ("in the absence of exceptional circumstances, a co-conspirator cannot recover restitution for crimes in which he or she participates . . . [and] as a general rule, an order of restitution to a co-conspirator is a 'fundamental' error that 'adversely reflect[s] on the public reputation of the judicial proceedings'" ); *United States v. Reifler,* 446 F.3d 65, 127 (2d Cir. 2005) (holding that co-conspirators are not victims for purposes of the MVRA, and explaining that "any order entered under the MVRA that has the effect of treating co-conspirators as 'victims,' and thereby requires 'restitutionary' payments to the perpetrators of the offense of conviction, contains an error so fundamental and so adversely reflecting on the public reputation of the judicial proceedings that we may, and do, deal with it sua sponte").

### C.   Forfeiture Issues are Not Ripe

---

[70]  *See* e.g., Trial Exhibit 3387 (Aten Group Limited shareholder purchase by Michael Witte for $10,000).

As this filing was being finalized, the government made forfeiture requests. In addition to anything he may include in his reply and/or in response to the government's forfeiture motion filed earlier today, and the similar issues raised in Part IVB above, Mr. Andrade objects to any forfeiture sought by the government, and requests a noticed- hearing so that he can raise his objections (not to mention grant an opportunity for other interested parties, such as Mr. Andrade's spouse or any beneficial owners, to respond to a preliminary order).

### D.   Recommendation to Bureau of Prisons

For the reasons explained in Jack Donson's declaration, Mr. Andrade requests the Court to include the following language in a recommendation about designation of placement to the Bureau of Prisons: "The court strongly requests the BOP designate Mr. Andrade to FMC Fort Worth to best address

his medical needs. If Fort Worth is not available, the court recommends the closest federal prison camp to his legal residence that will also meet his medical needs." Donson Declaration at 8.

### E.   Surrender date

Mr. Andrade requests a surrender date no earlier than October 14, 2025, after the completion of medical procedures scheduled at the VA that were postponed due to the trial schedule. *See* PSR ¶ 89. In addition, he will be seeking bond pending appeal, based on, among other things, the inclusion in his guideline calculation of two levels for money laundering, which is based on a jury verdict and instructions that violated his constitutional right to be convicted only for conduct charged by the grand jury.

### F.   Factual Issues in the Presentence Report

While not seeking to relitigate the facts of Mr. Andrade's case or to reargue the verdict, the defense worked with Probation to highlight statements throughout the presentence report, taken from a government submission, in which important mitigating evidence was omitted, or facts were presented in a way that exaggerated Mr. Andrade's culpability. In doing so, the defense provided citations to both the trial transcript and documentary exhibits which thoroughly

substantiated its claims.  Some of this material is entirely omitted; many of the defense's other objections to the draft presentence report are presented but not fully.

Among the most important omitted objections are: (1) with respect to ¶ 7, the fact that the AtenCoin AML/KYC features included a dual-signature digital wallet, as testified to by both Erik Min and government witness Evan Carlsen;[71] (2) with respect to ¶ 8, the government's erroneous attribution of claims regarding "the European banking industry and various agencies in the European Union" to AtenCoin, when any such claims were associated with AML Bitcoin;[72] (3) with respect to ¶ 10, the fact that government witness Brian Darrow explicitly testified that Mr. Andrade had *not* taken coins from his wallet, as Brandi Jodoin claimed;[73] (4) with respect to ¶ 11, the distinction between CrossVerify share sales and AtenCoin cryptocurrency sales and the erroneous inclusion of CrossVerify share sale proceeds as AtenCoin purchaser losses;[74] (5) with respect to ¶ 12, the fact that AML Bitcoin was more than a rebranding in that it included at least two new features–CrossVerify biometric ID verification integration and tokenization or "white label" capability;[75] (6) with respect to ¶¶ 24-25, the facts that Abramoff supplied the information for the *Observer.com* article, that the government presented no evidence that most of the claims in the article were false, and that the Panama meetings referenced in the articles were ones that Carlos De La Guardia had repeatedly affirmed were happening and/or had been successful;[76] (7) with respect to ¶ 27, the fact that Abramoff made the market making plan with Bryan, there was no trade data introduced to prove the market making occurred, and Bryan himself questioned whether it occurred, denied that the purpose was to manipulate prices, admitted he was lying to Abramoff and Mr. Andrade about what was happening, and did not think he was doing anything

---

[71] Mr. Andrade's Objections to the Draft Presentence Investigation Report, July 9, 2025, at 4.
[72] *Id.* at 4-5.
[73] *Id.* at 6.
[74] *Id.* at 7-8.
[75] *Id.* at 10-11.
[76] *Id.* at 17.

wrong;[77] (8) with respect to ¶ 41, the fact that it is common for funds in "investment" projects to be delivered to escrow accounts;[78] (9) with respect to ¶¶ 44 and 49, defense counsel's rebuttals to the purported attempted obstruction of justice involving Mr. De La Guardia, and the evidence that Mr. Andrade was merely asking Mr. De La Guardia to get confirmation of statements which Mr. De La Guardia had previously claimed he had been party to;[79] (10) with respect to ¶ 45, the facts reducing the government's alleged loss amount, such as the erroneous inclusion of CrossVerify share sales, inconsistency in loss figures across the government's presentation, inclusion of co-conspirator losses, and double-counting of certain money received in cryptocurrency;[80] (11) with respect to ¶¶ 50 and 60, Mr. Andrade's objection to being penalized for not accepting criminal responsibility as an unconstitutional burdening of his rights to trial and appeal;[81] (12) with respect to ¶¶ 51-52, Mr. Andrade's objection to his first amendment-protected comments regarding government investigative techniques being used as a reflection on his acceptance of responsibility and the omission of the government's amendment of an erroneous post called out by the defense; and (13) with respect to ¶ 56, Mr. Andrade's objections to the enhancement for sophisticated means as failing to meet the standard in USSG Note 9(B) to 2B1.1.[82]  All of these omitted facts pertain to important mitigation evidence and/or objections to enhancements, and should have been included and taken into account in the presentence report.

---

[77] *Id.* at 17-18.
[78] *Id.* at 22-23.
[79] *Id.* at 24 and 26.
[80] *Id.* at 24-26.
[81] *Id.* at 28 and 32.
[82] *Id.* at 29-31 (¶ 56 of the PSR was ¶ 53 in the draft PSR).

(Redacted)

The addendum to the report does not remedy these omissions. It does not include the substance of the objections, but merely notes that Mr. Andrade objected[83] and leaves any determinations on Mr. Andrade's objections to the Court.[84]

As to Mr. Andrade's remaining objections, the presentence report primarily inserts them in footnotes, prefaced with the phrase, "According to defense counsel," or words to that effect, even though every such objection was accompanied by citations to the trial transcript, exhibits, or reliable other source material, and even though no similar preface accompanied all or nearly all of the statements taken from the government.

Finally, with respect to ¶ 48, the data on victim impact is incorrect and the circumstances under which the cited victim impact statements were obtained deserves consideration. First, the approximation of 300 victims is flawed due to duplicate victim questionnaire entries; removing duplicates (and one prank entry) results in a figure of 234 victims, or about 5.8% of the 4000 victims the government claims suffered losses. That the government's yield was so low despite its active solicitation of victims among a small community (not to mention apparently asking others to do so as well) suggests a lack of familiarity by the alleged victims with any fraudulent misrepresentations, and/or a lack of reliance on them. Second, the government initially released the webpage for victim reporting with the inaccurate claim that "Black Gold Coin" was one of the "cryptocurrency products" Mr. Andrade sold, when in fact this was the name of a

---

[83] The addendum does not include Mr. Andrade's objections to ¶ 7, *See supra* n.73, and ¶ 41, *See supra* n.80.

[84] For example: (1) At n.2, the presentence report recounts that "Defense counsel advised" that "Black Gold" was removed from the Aten "Black Gold" Coin name because of a trademark litigation settlement agreement, but the presentence report includes no information about the settlement agreement that defense counsel provided in support; (2) At n.3 the presentence report states that "According to defense counsel, Aten Coin was not a fraud at all," and then lists a string of citations to the record and documentary evidence in support of a number of facts showing that AtenCoin was not a fraud, but the presentence report does not discuss any of the evidence presented within the cited documents or portions of the record; (3) At n.5, the presentence report states that "According to defense counsel, the NAC Foundation had a proceeds agreement with Tahoe Oil and Gas," when in fact defense counsel provided the proceeds agreement in question and the presentence report shows no review of it.

Defendant's Sentencing Memorandum                    Case Number: 3:20-cr-00249-RS

(Redacted)

cryptocurrency made by the fraudster Brian Darrow.  When this error was pointed out to the government by defense counsel, it agreed to amend its webpage.  This inaccuracy likely played some role in soliciting the sentiments of anger, stress, and devastation reflected in ¶ 48 (nearly all of which were expressly solicited in the government's releases).

## V.  CONCLUSION

For all the reasons set forth above, Mr. Andrade asks the Court to impose a compassionate sentence, specifically one in the range of 24 months, followed by a term of supervised release.

DATED:  _____July 23_____, 2025        Respectfully Submitted,

/s/

_____
MICHAEL J. SHEPARD,
CINDY A. DIAMOND, and
DAINEC STEFAN
Attorneys for Defendant
ROWLAND MARCUS ANDRADE

Defendant's Sentencing Memorandum                                Case Number:  3:20-cr-00249-RS

(Redacted)