# United States v. Andrade

# Defendant's Sentencing Memorandum

# ATTACHMENT-1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **UNITED STATES** | : | Case No.: 3:20cr00249-001 RS |
| | : | |
| v. | : | |
| | : | |
| **ROWLAND MARCUS ANDRADE** | : | Judge: Hon. RICHARD SEEBORG |

### AFFIDAVIT OF JACK DONSON

I, Jack Donson, hereby declare under penalty of perjury that the following is true and correct.

### STATEMENT OF EXPERTISE

I am the executive director of a non-profit organization called the Federal Prison Education and Reform Alliance. We provide consulting, training and expert witness testimony on federal prison issues. We also provide BOP training, education and support to the federal justice community, so they have a better understanding of policy and process for their advocacy and representation. I have worked directly with federal offenders for over 37 years and have testified in district courts throughout the country.

I was employed by the BOP for twenty-three years working directly with inmates in security classification, correctional programs, and treatment. I actively follow policy initiatives and attend training conferences, including the U.S. Sentencing Commission conference, which includes a presentation by BOP staff on current federal prison issues. I am an active member of both the American Bar Association (ABA) and National Association of Criminal Defense Lawyers' (NACDL) corrections committees. I have authored articles and book chapters on federal prison matters in national print media, legal periodicals and ABA publications. One of the chapters I have authored is relative to the prison implications of Autism Spectrum Disorder.

During my career, I worked directly with inmates and staff as a <u>Correctional Treatment Specialist</u> (case manager & case management coordinator). I was responsible for counseling, security classification, inmate discipline, program placement/evaluation and re-entry. I completed and/or delivered hundreds of BOP case management related training courses. I was also assigned collateral administrative responsibilities including training case management staff, mentoring, local policy writing, conducting facility audits, and overseeing institutional programs. I have worked in minimum (camp), low, medium, administrative (pre-trial and high security), and Witness Security (PCU) units. On several occasions, I was assigned to the BOP Philadelphia Regional Office (NERO) and the New York City Community Corrections Office. I have expertise with U.S. Parole Commission policy and process and BOP sentence computations. Prior to working for the federal government, I was employed in the Commonwealth of Pennsylvania as a Probation & Parole Officer where I wrote pre-sentence investigations, supervised the work release program and managed a caseload of adult and juvenile offenders.

My skillset has been molded by my regular interaction with BOP staff and administrators as well as inmates in the trenches of the federal prison system. This interaction has continued during my career through regular contacts with attorneys, non-governmental organizations, and email correspondence with incarcerated people from around the prison system. In my role with FedCURE as their National Director for Inmate Programs and Services, I regularly interacted with BOP central office staff regarding prison issues and was solicited for feedback on legislation such as the First Step Act. I have conducted First Step Act related training for the NACDL, AOUSC and federal defender organizations. I recently attended meetings with the GAO regarding a First Step Act audit and the DOJ for their Access to Justice initiative related to BOP legal communication.

I have been qualified as an expert witness in accordance with Federal Rule 702 (Daubert Standards) and have never been denied the ability to testify as an expert witness on BOP related issues.

I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I was a Lecturer at Marywood University for several years and taught Criminal Justice courses, including one entitled The American Prison.

A true and correct copy of my *Curriculum Vitae* is attached. I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

## SCOPE OF REVIEW

I have been asked by counsel to review the pre-sentence investigation and provide the court with my opinion regarding Mr. Andrade's security classification and correctional treatment needs to determine the most appropriate facility designation for his safety and rehabilitation. I offer my opinion from a BOP correctional treatment perspective.

## SUMMARY OF FINDINGS

Mr. Andrade likely will be vulnerable in any prison environment, and incarceration will feel extremely punitive given his physical and mental health limitations. Due to his health care needs and the limitation of available beds in the few federal camps that can provide him with proper medical care, Mr. Andrade will likely be housed in a secure facility with inmates who have more of a criminal orientation. I have had similarly situated inmates on my caseload throughout my career and have witnessed the adjustment difficulties of people with a lack of prior prison experiences in combination with cognitive disabilities. The cognitive deficits may make him subject to predation which increases the potential for isolation in protective custody. While the BOP has policies in place for the safety and welfare of inmates, staff shortages and the lack of programming resources make it difficult to ensure the safety and welfare of inmates, which is evident in several recent DOJ investigative reports and congressional oversight hearings. If a prison term is imposed, the service of a sentence will feel more punitive than the average white-collar offender without such disabilities.

## FACILITY & INMATE CLASSIFICATION (BRAVO)

The BOP classifies facilities into several categories including <u>minimum</u> security (camp), <u>low</u> and <u>medium</u> security federal correctional facilities, (FCIs), <u>high</u> security U.S. penitentiaries (USPs) and <u>administrative</u> (MCC/MDC/FDC & Medical Centers). In recent years, the agency has developed "*satellite*" low security facilities and various specialized restrictive housing unit programs including reintegration housing units (RHU), special management units (SMU) and communication management units (CMU). The last BOP SMU was recently closed after it became the focus of abusive correctional practices and the murders of several inmates housed there. [1]

Inmates also have a security classification, which is based on a point system and public safety factors (PSFs) to determine the degree of control and supervision for a facility designation. The inmate classification tool is known as "BRAVO" (Bureau Risk Assessment Verification and Observation). Some of the factors used in determining a person's security classification include their age, criminal history points, violence and/or escape history and characteristics of the instant offense. Each factor has a corresponding point value, which are then totaled to determine an overall security level. Below is a chart based on the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification).[2]

| Security Level | Male | Female |
| --- | --- | --- |
| MINIMUM | 0-11 Points | 0-15 Points |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24 + Points | 31 + Points |

Based on the PSR, I have estimated Mr. Andrade will be assigned three (3) security points which is ordinarily commensurate with minimum security, however, it is likely Mr. Andrade will be designated to a secure, FCI given his physical and mental health needs and associated care level. It should also be noted that inmates who are required to serve ten years or more are assigned to low security and automatically excluded from a minimum-security classification due to the sentence length.

## MEDICAL/MENTAL HEALTH CARE LEVELS

Inmates are assigned a medical classification (both physical and mental) during the designation process, which is a four-level system referred to as "*Care Levels*." The BOP publishes a clinical

---

[1] https://www.washlaw.org/wp-content/uploads/2023/07/Cruel-and-Usual-An-Investigation-Into-Prison-Abuse-at-USP-Thomson.pdf
[2] https://www.bop.gov/policy/progstat/5100_008cn.pdf

3

guide entitled Care Level Classifications for Medical and Mental Health Conditions, which describes the care levels as indicated below:[3]

> CARE LEVEL 1: Care Level 1 inmates are less than 70 years of age and are generally healthy.
>
> CARE LEVEL 2: Care Level 2 inmates are stable outpatients who require clinician evaluations monthly to every 6 months. Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring.
>
> CARE LEVEL 3: Care Level 3 inmates are outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications. They may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions.
>
> CARE LEVEL 4: Care Level 4 inmates require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited inpatient care. Functioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance. Example conditions: Cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical treatment, and high-risk pregnancy.

During the designation process, inmates with chronic care needs are referred to the BOP Office of Medical Designations and Transportation (OMDT) for review to determine if a medical designation is necessary. OMDT will assign a *"Provisional"* care level and process the designation of both care level 3 and 4 inmates. The care level will be reviewed by the designated facility's medical staff upon intake and made *"Non-provisional"* after a physical evaluation.

Medical center beds are extremely limited and costly, and only afforded to individuals who require frequent specialist appointments due to uncontrolled conditions and/or have the need for a surgical procedure. It is likely that Mr. Andrade will be a medical care level 3 due to his Type 1 Diabetes and there is also the potential for a mental health care level 3 classification. His medical needs will limit the facility designation because there are few care level 3 facilities in each region. In fact, there is only one care level three facility in the BOP's south-central region, which is an administrative medical center located in Fort Worth, TX. The other care level 3 facility in that region is in Carswell, Texas and only houses females. A FOIA request that I received in February of 2024 indicates there are only two minimum security care 3 camps, which are in Butner, North Carolina and Terre Haute, Indiana.[4] Ordinarily, these two care level 3 camps are at full capacity and even if there is a judicial recommendation for placement in a level 3 camp, it is unlikely .

---

[3] Care Level Classification for Medical and Mental Health Conditions or Disabilities, Federal Bureau of Prisons, May 2019, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.
[4]   https://drive.google.com/file/d/1TP0EcD9ISpy2-9htrb0f0MOuQv9kyfU0/view

4

The BOP attempts to designate inmates within five-hundred miles of their legal residence due to importance of maintaining family and community ties for visiting and the impact it has on institutional adjustment.

Mr. Andrade may either be designated far from his family in a care level 3 camp, or in the alternative, be housed in a secure (FCI) among inmates of more serious criminal histories.

## FACILITY ENVIRONMENTS

Minimum security prisons referred to as "*camps*" are typically docile environments with dormitory type living arrangements housing predominately non-violent drug and white-collar offenders. The risks for assault and/or exploitation are less than low and medium security prisons that house people serving lengthy sentences, sex offenders and inmates with more of significant criminal histories. Administrative facilities house all security levels including high security offenders.

Regardless of the specific security level environment, there are certain inmate sub-cultural practices that occur within prison that will be difficult for Mr. Andrade to navigate for someone with his deficits and lack of prison experiences. An unfortunate reality in the federal prison system is that when new inmates arrive, they are almost immediately approached by other inmates to "*show their papers*" in a sub-cultural vetting process. This process is done to identify cooperators (aka: "*rats*") and sex offenders (aka: "*chomos*"). When inmates are unable to produce court documents, other inmates will go as far as having people in the community conduct Google and PACER searches to determine the crime and/or look for case information, irregularities in docket entries, etc. One of the goals of the vetting process is monetary whereby individual inmates pressure vulnerable inmates to pay for protection.

The inmate vetting process has always been problematic within the prison system and as recently as November 18, 2020, a high severity disciplinary infraction was added to the inmate code of conduct entitled "ACT # 231- *Requesting, demanding, pressuring, or otherwise intentionally creating a situation, which causes an inmate to produce or display his/her own court documents for any unauthorized purpose to another inmate.*"

It is unknown how Mr. Andrade will react when vetted, which raises the potential of protective custody and isolation in the special housing unit known as the SHU. The SHU is often referred to as solitary confinement which is a separate housing unit where he would be confined to his cell for 23 hours daily. He would be offered one hour of recreation daily, which is ordinarily done in a small room or outdoor cage. He would also be fed in his cell and restricted to one telephone call every thirty days plus there would be additional visiting limitations.

Isolation in the SHU may occur if an inmate requests protective custody (PC) or if staff perceive he is at risk of victimization. Due to the increase of verified and unverified protection cases, the BOP developed a pilot reintegration housing unit known as the RHU in 2016, which subsequently expanded to several facilities. BOP policy defines the unit as "*The RHU targets male inmates identified as verified or unverified protective custody cases, who consistently*

*refuse to enter general population, ordinarily at multiple locations.*"[5] One of the problems with the RHU program is that inmates often repeat a cycle of isolation in the SHU, sometimes for months at a time before they are transferred there. RHUs are very restrictive, self-contained units, and inmates do not interact with the general population of the facility. They are undesirable because of their limited locations, programs and services. In February of last year, BOP Director Collette Peters appeared before the Judiciary Committee and testified that there were approximately 11,000 inmates in restrictive housing.

Inmates who do not succumb to the pressure of requesting protective custody after being threatened, extorted sometimes become involved in altercations which can increase their security classification. If a person fights back after being assaulted, they are also charged with fighting regardless of who initiated the altercation. Vulnerable inmates also move within the population with similarly situated inmates, referred to as a "*car.*" A car is a group of inmates that collectively move within the facility to protect each other and avoid certain areas of a facility that are without cameras and/or constant staff supervision. Mr. Andrade' social cognition deficits, executive functioning deficits, and memory retention limitations will make it difficult to be accepted in a car.

In 2024, the DOJ-IG released a report entitled Top Management and Performance Challenges Facing the Department of Justice[6] which indicated:

*"The Office of the Inspector General's (OIG) oversight reports have identified recurring issues that impede the BOP's efforts to consistently ensure the health, safety, and security of all staff and inmates within its custody. Last year, the Comptroller General for the first time added the BOP to the U.S. Government Accountability Office's high-risk list due to its 'long-standing challenges with managing staff and resources, and planning and evaluating programs that help incarcerated people successfully return to the community.'"*

In 2023, legislation was passed for federal prison oversight after investigative journalism by organizations such as the Associate Press and NPR several of which revolved around BOP medical care. The law called for an Ombudsman office, but no progress has been made on this under the current administration.

### COGNITIVE DEFICITS WITHIN A PRISON ENVIRONMENT

Aside from the detriments due to his lack of prior prison experiences, Mr. Andrade may face multiple challenges in a controlled prison environment. Sudden loud noises from the public address system, strong smells from inmates cooking in the housing unit, the lack of darkness and quiet when trying to sleep could all be triggers resulting in repercussions including behavior that could result in placement in the special housing unit (SHU). Equally, problematic is the inability to understand social cues, not only by staff but by the inmate population when it comes to prison subculture issues. For instance, the inability to immediately respond to verbal instructions during an emergency can result in an incident report, SHU placement and the loss of good time. He will also have difficulty in discerning the ulterior motives of predatory inmates making him

---

[5] https://www.bop.gov/policy/om/003_2016.pdf
[6] https://oig.justice.gov/tmpc/challenge-1

subject to exploitation. Aside from the inherent suicide risk in SHU isolation, acting out within the unit can result in forced cell moves and four-point restraints, which was the subject of a DOJ-OIG Management Advisory Memorandum issued earlier this month. The report detailed abusive treatment regarding restraint procedures after multiple complaints around the prison system of inmates who were placed in restraints for extended time periods and were assaulted or otherwise being mistreated.[7]

Other inmates may also take his social cognition deficits, such as hyperfocus about his special interests – including his literal interpretation of written rules, without recognition that others do not follow along - as disrespect. His lack of ability to read the room, understand and remember everything he's told, or interpret body language, combined with his difficulty regulating emotions (due to his bipolar disorder) and the difficulty following and accepting re-direction (due to both his ASD and his ADHD) will have negative ramifications in a carceral environment.

## GENERAL BOP PROGRAMING

The BOP has little to offer when it comes to ASD. The only program that references the word Autism in the May, 2025 First Step Act Programs guide is the Skills Program which is only offered at two BOP facilities. The facilities are FCI Danbury, CT (low security) and FCI Coleman, Florida (Medium).[8] Regardless of the facility designation, the BOP will not be able to maintain the continuity of care he is receiving in the community. The BOP is not staffed for individual, weekly clinical counseling and delivers programs in what are referred to as unit-based "residential therapeutic communities." Inmates within these units must interact in groups, counsel each other and abide by more stringent unit rules than that of the general population. Mr. Andrade's social cognition deficits, executive dysfunction, and memory retentions limitations – making him unable to accurately communicate what he means nor to accurately understand what other people mean from gestures, facial expressions, demeanor, or quickly delivered staff commands – will make it difficult to participate in other residential programs.

Like the limited BOP programming on ASD, ADHD is not even referenced in the First Step Act approved programs guide. There is a BOP clinical treatment guide on the diagnosis of ADHD that references it is to be controlled with medication and cognitive behavioral therapy; however, I have been informed by a clinical psychologist who recently worked for the BOP and now works with our non-profit organization, that none of the Cognitive Behavioral Therapy ("CBT") BOP programs are targeted at ADHD[9], and the medications that will be prescribed will treat symptoms such as anxiety and mood swings, but will not be the equivalent to the medications used as the standard of care in the community.

The implementation of the First Step Act has caused extensive waiting lists for programs. I have recently worked with inmates in the system that have been on waiting lists going back as far as 2022. The BOP simply doesn't have the staffing resources to deliver the programs as stated in their literature. A telling article written by Families Against Mandatory Minimums known as

---

[7] https://oig.justice.gov/sites/default/files/2025-07/07-01-2025.pdf
[8] https://www.bop.gov/inmates/fsa/docs/fsa-approved-program-guide.pdf?v=1.0.4
[9] https://www.bop.gov/resources/pdfs/adult_adhd_cd.pdf

FAMM and published by Medium, confirms the problems with the availability of programs. Specifically, the article written about the FCI Dublin *"Rape Club"* which gained national media attention for the widespread abuse of federal prisoners after a warden was convicted for sexual abuse, states:

*"It is an open secret that rehabilitative programming in the BOP is a problem. The Special Master was provided with a table of programs allegedly offered at FCI Dublin. She found, however, that many of the programs that the BOP said were offered had not been available to people in custody for years. Further, waitlists were extensive, staff were as confused as residents about which programs were and were not offered, and the programming that did exist was rarely as described."*[10]

Correctional officer staffing is near historic lows. Teachers and other staff who deliver programs are often required to perform correctional officer duties in what is referred to as *"augmentation,"* which has also exacerbated waiting lists.

## CONCLUSION

Mr. Andrade will have a difficult time in any prison setting given his physical and mental health needs and lack of a prior prison experience. While he meets the profile of a non-violent, minimum-security offender, he may be housed in a secure FCI or administrative facility which raises the potential for his victimization. His behavioral reactions to a prison environment also raise the potential for his placement in segregation and the loss of good conduct time. If the BOP feel his needs can be met in a minimum-security facility, he will be housed far from his family. Therefore, it is my professional opinion that a strongly worded judicial recommendation be made to better facilitate the most appropriate facility for his safety and rehabilitation. Second best would be a judicial recommendation to a facility closest to his family. While judicial recommendations are not binding on the BOP, the agency attempts to accommodate such recommendations and have historically tracked compliance at over 70 percent.

Therefore, the most practical language for such a recommendation would be as follows:

*"The court strongly requests the BOP designate Mr. Andrade to FMC Fort Worth to best address his medical needs. If Fort Worth is not available, the court recommends the closest federal prison camp to his legal residence that will also meet his medical needs".*

Executed on this 22nd day of July 2025, in New York, New York, under penalty of perjury.

Jack T. Donson, President and Founder  _____

---

[10] https://medium.com/famm/the-horrors-of-fci-dublin-a-look-inside-a-chaotic-prison-435ca0e0fef8

# Attachment: C.V. of Jack Donson



Jack Thomas Donson
Email: jack@mfpcllc.com
jack@bopera.org
Telephone (212) 461-2252

**Personal Information**
Education: BS-Sociology/Anthropology, MS-Criminal Justice
Dingmans Ferry, Pennsylvania

**Personal Statement**

I have worked directly with incarcerated people for over 36 years at the county, state and federal levels. I educate and support the federal justice community on BOP policy and process to obtain better outcomes in representation, advocacy and legislation. In 2011, I retired from the federal government and founded "*My Federal Prison Consultant*", LLC, after witnessing people being taken advantage of by high priced, predatory and uninformed prison consultants. This continues today and has exacerbated under the First Step Act! The lack of BOP education inhibits effective representation, legislation and fosters exploitation.

Most of my career, I managed a caseload within the trenches of the federal prison system as a Correctional Treatment Specialist.  I also served in administrative capacities (CMC/Unit Manager) conducting facility audits, involvement in policy writing work groups, program oversight and the training of case managers in classification and correctional programs. My unique perspective on the BOP is derived from directly applying policy in various prison environments including Pre-trial ( administrative/high security), Minimum, Low, Medium, & Witness Security units.

I received three national awards during my career and over thirty other performance awards. I have a pulse on the agency from working on both sides of the system and my knowledge of BOP policy, process and culture is extraordinary.  After twelve years in the private sector working with families and justice professionals, I saw a profound need for a more educated justice community regarding BOP issues. In addition, the lack of transparency and accountability of the BOP is unacceptable and it can be changed through education and the fostering of a positive relationship with the agency. I recently formed The Federal Prison Education and Reform Alliance (501C3) and serve as the Executive Director. The organization intends to be the primary stakeholder focused solely on BOP issues while also supporting people in prison.   Our organization has already conducted training around the country for Federal Defenders, Judges and the Administrative Office of the US Courts.

I have served pro bono for several non-profit organizations helping marginalized populations and their families navigate the prison system. (FedCURE/Out4Good/Choosing Integrity) I am a member of the Corrections Committees of the National Association of Criminal Defense Lawyers (NACDL) and the American Bar Association (ABA). I have testified in federal district courts throughout the United States and the United Kingdom. I was a lecturer at the university level and have taught several courses including one entitled "The American Prison."

My most recent rewarding government contract work as an expert is supporting post-conviction petitions by submitting formal declarations and testifying for juvenile and young adult lifers sentenced in the D.C. Superior Court regarding the Incarceration Reduction Amendment Act (IRAA) and Second Look Act.

My passion is federal prison reform, and my mantra is that many proactive reforms can be accomplished under the existing policy and statutory framework through leadership, accountability and transparency. My analytical ability in combination with my practical experience provides me with insights which is advantageous for clients, attorneys, legislators, the media and reform organizations. I have appeared on several national television and radio programs as a commentator and have been quoted in national print media. I have authored chapters in two ABA Books on mental health issues and articles in the Federal Sentencing Reporter, The Hill as a "Opinion Contributor" and Bloomberg Law Insights as an "Outside Editor."

**Current Work Experience**

***The Federal Prison Education and Reform Alliance-*** Executive Director -Non-profit providing education and support to the federal justice community and direct services to the incarcerated. July 26, 2023-Present

***My Federal Prison Consultant***, *LLC-* President& Founder, supports counsel, clients and families on both technical policy issues and general prison support on all areas of the BOP. I testify around the country on BOP issues relevant to mitigation. July 2011-Present www.mfpcllc.com

***Choosing Integrity,*** Board Member – CI staff have been visiting federal prisons and local jails for the past 10 years pro-bono offering classes in Forgiveness and mentoring the incarcerated. We recently coordinated the formulation of the Pike County, PA re-entry task force. https://www.choosingintegrity.org/about/

**Prior Work Experience**

***Prisonology***, VP- Operations & Co-founder, Consulted, testified and developed CLE's which are delivered to federal defenders, judges and CJA panel attorneys. September 2014- Feb. 2022.

***FedCURE***, Director of Programs and Case Management Services, Assist the incarcerated and their families relative to federal prison issues, pro bono via a designated BOP liaison in the central office. July 2011- June 30, 2023. www.fedcure.org

*Out4Good, LTD,* Executive Director- In charge of developing the "Correcting Corrections in America initiative", April 2013 to April 1, 2024. Stepped down to a regular board member position to focus on PERA.   www.out4good.org

*Marywood University,* Lecturer PA- Criminal Justice Professor- courses entitled: "Community Corrections," "Shadow and Service" and "The American Prison."  January 2013-January 2019

*Federal Bureau of Prisons*, Correctional Treatment Specialist & Case Mgt. Coordinator- I was responsible for the counseling, classification, inmate discipline and re-entry. I coordinated institution programs and trained staff in classification & correctional programs.
- Special expertise with high profile Organized crime figures, the Witness Protection (WITSEC) program & White-Collar Crime offenders
- Alternate Case Management Coordinator 1991 to 2011
- Assignments (TDY) in the Regional Office, Philadelphia, PA. (CIM Coordinator/Correctional Programs), New York City Community Corrections Office (processing designations and halfway house referrals) & several National (DC) policy writing work groups.
- Annual Training Instructor in the areas of security designation and classification, Central Inmate Monitoring (CIM,), FOIA/Privacy Act & Victim Witness program.
- Member of Hostage Negotiations Team in the capacity of Lead Negotiator.
- Received 3 **National** Awards for Excellence in Administration & Detention Procedures National Correctional Treatment Specialist of the Year &  Excellence in Training Award.
- Taught Institution familiarization orientation to new staff & was assigned as a mentor and trainer for college interns and newly appointed case managers and counselors.
- Held assignments as Camp Administrator, Case Management Coordinator, Unit Manager and held the position of Assistant Case Management Coordinator.
- Liaison for US Parole Commission, US Marshals, FBI and ICE
- Worked in minimum, low, medium, administrative (including high security) & Witness Security (WITSEC) units.

*Commonwealth of Pennsylvania,*  Probation and Parole Officer- Supervised a caseload of adults and juveniles. Appeared in court on a weekly basis, prepared pre-sentence reports, submitted parole recommendations to the court, provided community supervision of offenders and managed the work release and ARD programs. ( Internship with Scranton District Office of the PA Board of Probation and Parole).

 **Army National Guard,** (E-5) Easton, PA 1986-1995
- **Military Police** (MP-95 Bravo), Ft. McClellan, AL
- **Stinger Missile Gunner**    (16 Sierra), Ft. Gordon, Ga.

**Education**

Marywood University, Scranton, Pennsylvania
- **Master of Science in Criminal Justice** 1997 (Concentration in Public Administration)

East Stroudsburg University, East Stroudsburg, Pennsylvania
- **Bachelor's Degree in Sociology/Anthropology** 1985

**Awards**
- 1998 National Community Corrections Award
- 1990 National Correctional Treatment Specialist of the Year
- 1991 National Excellence in Annual Training Award
- Received thirty-two other monetary personal achievement awards.

**Other Activities/memberships**

- Testified on Capitol Hill to the Colson Task Force on Federal Corrections
- 32nd Annual National Seminar on Federal Sentencing on mental health training w/ Attorney Elizabeth Kelley for the NACDL/ABA/Tampa Federal Bar- Orlando, May 2023
- AOUSC Instructor (Defender Investigator and Paralegal Seminar) Houston TX May 2023
- AOUSC Instructor (Winning Strategies Seminar-BOP Mental Health) Austin, TX 2019
- Article on BOP Restrictive Housing in the Federal Sentencing Reporter
- Authored Chapter's in ABA Publications (Editor-Elizabeth Kelley) books on Autism Spectrum Disorders (2019) & Suicide and Its Impact on the Criminal Justice System (2021)
- Provides training on federal prison issues to federal defenders, Judges & the AOUSC
- Numerous National media outlet appearances for commentary (CNBN/Fox)
- NACDL Corrections Committee since 2011
- ABA Corrections Committee 2012- Chaired Standing sub-committee on BOP Policy
- Monthly contributor to the Sentencing Partners Newsletter from Joaquin & Duncan
- Finance Committee Chair-United Methodist Church
- Authored OP Eds in The Hill regarding BOP issues
- Member of the U.S. Ombudsman Association (USOA)
- Member of the PA Prison Society
- Overall offender advocacy & general federal prison & legislative reform efforts
- Hiking, Fishing, Leisure Travel

**References, testimonials and award letters are available upon request.**