# United States v. Andrade

# Defendant's Sentencing Memorandum

# ATTACHMENT-2

**Deposition of:**

Brandi Jodoin

**Case:**

NAC Foundation, LLC v. Corey Jodoin, et al.
A-18-770594-C

**Date:**

04/03/2020



400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV  89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY



Page 1

```
 1        DISTRICT COURT
 2     CLARK COUNTY, NEVADA
 3          * * * * * *
 4
 5   NAC FOUNDATION, LLC, a Nevada
     limited liability company,
 6
 7        Plaintiff,
                              Case No. A-18-770594-C
 8        vs.                 Dept. No. XIV
 9   COREY JODOIN, individually;
     BRANDI JODOIN, individually;
10   DOES 1 through 10; and ROE
     CORPORATIONS 1 through 10,
11
12
        Defendants.
13   _____
14
15
16   REMOTE VIDEOCONFERENCE DEPOSITION OF BRANDI JODOIN
17        Taken on April 3, 2020
18        At 1:05 p.m.
19
20
21
22
23   Reported by: Kimberly A. Farkas, RPR, CCR #741
24   Job No. 40110
25
```

Page 2

```
 1       Remote Videoconference Deposition of BRANDI
 2   JODOIN, taken on Friday, April 3, 2020, at 1:05 p.m.,
 3   before Kimberly A. Farkas, Certified Court Reporter in
 4   and for the State of Nevada.
 5
 6   APPEARANCES
 7
 8   For the Plaintiffs:
 9
10        ERIC R. OLSEN, ESQ.
          Garman Turner Gordon, LLP
11        7251 Amigo Street, Suite 210
          Las Vegas, Nevada 89119
12        (725) 777-3000
13
14
15   For the Defendants:
16
17        ADAM R. KNECHT, ESQ.
          Alverson Taylor & Sanders
18        6605 Grand Montecito Parkway, Suite 200
          Las Vegas, Nevada 89149
19        (702) 384-7000
20
21
22   Also present:  Corey Jodoin
23
24
25
```

Page 3

```
 1   DEPOSITION OF BRANDI JODOIN
 2        April 3, 2020
 3   Kimberly A. Farkas, CCR No. 741
 4          * * * * *
 5
 6          INDEX
 7                          Page
 8   BRANDI JODOIN
 9   Examination by Mr. Olsen          5
10          * * * * *
11
12        EXHIBITS
13   No.         Description        Page
14   Exhibit 1      Packet of Documents       4
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1       Friday, April 3, 2020
 2          1:05 p.m.
 3   DEPOSITION OF BRANDI JODOIN
 4          * * * * * *
 5   (Exhibit No. 1 was marked prior to
 6   commencement of the deposition.)
 7       THE STENOGRAPHER:  Good afternoon.  My name
 8   is Kim Farkas.  I am a Nevada certified stenographic
 9   reporter.  My CSR number is 741.  Today's date is
10   April 3, 2020.  The time is approximately 1:05 p.m.
11       This is the deposition of Brandi Jodoin in
12   the matter of NAC Foundation versus Corey Jodoin, et
13   al.  This case is venued in the District Court of the
14   State of Nevada for the County of Clark.  The case
15   number is A-18-770594-C.
16       At this time, I will ask counsel to identify
17   yourselves, state whom you represent, and agree on the
18   record that there is no objection to this deposition
19   officer administering a binding oath to the witness
20   through Zoom.
21       Let's start with the noticing attorney.
22       MR. OLSEN:  This is Eric Olsen representing
23   the plaintiff, NAC Foundation, LLC.  I have no
24   objection.  By the way, I was expecting my client to
25   join at some point.  He may join in, but he's not
```

Page 5

1  gotten onto the record yet here.  But I have no
2  objection.
3         MR. KNECHT:  This is Adam Knecht.  I
4  represent Brandi Jodoin.  I have no objection.  I also
5  represent Corey Jodoin who is listening in right now
6  with Brandi.
7         BRANDI JODOIN,
8  having been first duly sworn, was examined and
9  testified as follows:
10        EXAMINATION
11 BY MR. OLSEN:
12    Q.  So I'm glad that we got clarification on the
13 pronunciation of the name.  I know that Mr. Knecht and
14 I have both butchered it over the years, but it is
15 Jodoin, as I understand?
16    A.  Yes, that's correct.
17    Q.  Mrs. Jodoin, have you been deposed before?
18    A.  No, I have not.
19    Q.  Well, then let me go through a few of the
20 ground rules to make sure that we are all on the same
21 page.  Pardon me.  You've been placed under oath and
22 that is the same type of oath you would be under in a
23 court of law.  Do you understand that?
24    A.  Yes, I do.
25    Q.  It is, therefore, your obligation to answer

Page 6

1  the questions that I pose today truthfully and to the
2  best of your ability.  Do you understand that?
3     A.  Yes, I do.
4     Q.  To that heed, it's important that you
5  understand the question.  So if there are questions
6  that you do not understand, just let me know that and
7  I'll try to rephrase the questions.  It's also
8  important that we don't -- especially in this
9  particular format -- that we do not speak over each
10 other.  So let me finish my question before you give
11 your answer.
12        Your lawyer may also interpose an objection.
13 In most cases, the objection will be interposed, and
14 then you'll be asked to go ahead and answer the
15 question.  There may be certain instances where the
16 objection is one made to an attorney/client privileged
17 communication.  In that case, your lawyer may instruct
18 you not to answer.  But once the objections have been
19 resolved or made and resolved, then you'll be, in most
20 cases, asked to go ahead and respond.
21        Do not -- despite the fact we're on video,
22 the transcript is being taken down in writing so it's
23 important that you avoid nodding your head, shaking
24 your head, in response to questions.  That's very
25 difficult to pick up on paper, which is the record,

Page 7

1  official record, for this deposition, although the
2  video may be used.
3         "Uh-huh" and "huh-uh," those kinds of
4  answers, are also not good because it's really, again,
5  difficult to decipher your meaning.  So if there's a
6  yes or no question, then please answer yes or no.
7         Everything that is being taken down will be
8  put into booklet form.  You'll have an opportunity to
9  review that at some point, the transcript, and make
10 changes if you wish to correct something.  But I will
11 tell you that if you do make changes, I'm able to
12 comment on those changes, the fact they were made, at a
13 later time, for example, if we're in a trial situation.
14        Do you have any questions about the process
15 today?
16    A.  No.  I believe it's clear.
17    Q.  Okay.  Let me ask you, first of all, I think
18 we have your name as Brandi, B-R-A-N-D-I, Jodoin;
19 correct?
20    A.  That's correct.
21    Q.  Can you tell me what other names you've gone
22 by?  Do you have a maiden name, for example?
23    A.  My maiden name is Ortmeier, O-R-T-M-E-I-E-R.
24    Q.  Okay.  And are you a U.S. citizen?
25    A.  Yes, I am.

Page 8

1     Q.  Are you a dual citizen in Canada?
2     A.  No, I am not.
3     Q.  So you're a resident, permanent resident,
4  status in Canada?
5     A.  Yes, that is correct.
6     Q.  Do you pay taxes in the United States, any of
7  that, or just in Canada?
8     A.  I'm a homemaker so typically it is just done
9  through Canadian taxes.
10    Q.  Did you make income from your -- during your
11 time with NAC -- I'll refer to NAC Foundation as NAC
12 during the depo.
13        Did you make any reportable income working
14 for NAC?
15    A.  No, I did not.
16    Q.  Okay.  You are familiar with NAC, the
17 plaintiff in this case; yes?
18    A.  Yes, I am.
19    Q.  Tell me when you -- when you first became
20 aware of that entity, that company?
21    A.  I believe it was early in 2015.  My husband
22 informed me that he received a cold call offering an
23 investment opportunity.
24    Q.  Now, when you say -- first of all, that
25 conversation, you did not participate in the call;

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 9

1 correct?
2    A.   Not at all.
3    Q.   Do you know with whom you spoke?
4    A.   I believe it was Marco Diadamo.
5    Q.   And you're not certain whether Mr. Diadamo
6 used the term "investment;" right?
7    A.   Pardon?  Can you repeat that.
8    Q.   You're not certain whether Mr. Diadamo used
9 the term "investment;" correct?
10    A.   I have no idea.  I have no idea.
11    Q.   Did he -- do you know -- well, you weren't a
12 participant in the conversation; correct?
13    A.   That's correct.
14    Q.   And when your husband relayed that
15 conversation to you, what did he say at that time
16 beyond what you just told me?
17    A.   That he was approached for the opportunity to
18 purchase tokens or coins in a AML-compliant
19 cryptocurrency.  It wasn't live yet, but they were
20 hoping to put it live.  Similar to Bitcoin, but
21 different.
22    Q.   Okay.  Bear with me one second.  All right.
23 And we'll get into some more of the details of that
24 relationship as it evolved later, but let's get into
25 some procedural issues.  There was a prior litigation

Page 10

1 commenced by NAC against your husband in federal court.
2 You're aware of that; correct?
3    A.   Yes, I am.
4    Q.   And then this case was commenced in 2018
5 against both you -- by NAC against both you and your
6 husband; right?
7    A.   That's correct.
8    Q.   And then at a point, there was a counterclaim
9 filed by you and your husband claimed back, in other
10 words, against NAC in this case; correct?
11    A.   Yes.
12    Q.   And that counterclaim was dismissed; right?
13    A.   That's correct.
14    Q.   Okay.  And you were made aware of the
15 dismissal at or about the time that it occurred;
16 correct?
17    A.   It was later, I would say.
18         MR. KNECHT:  Objection.  That calls for
19 attorney/client privilege.
20         MR. OLSEN:  And let me be clear.  I don't
21 want to -- the timing of when you learned of something
22 isn't privileged, but I don't want you to discuss any
23 conversations, the content of any conversation, you had
24 with Mr. Knecht or any other lawyer on your behalf.  Do
25 you understand?

Page 11

1         THE WITNESS:  Yes.
2 BY MR. OLSEN:
3    Q.   Okay.  So that claim -- the counterclaims
4 were dismissed on August 14th, 2018.  I'll make that
5 representation to you.  Are you aware of that?
6    A.   No, I was not.
7    Q.   2019, I'm sorry.  Hang on.  Make sure I get
8 the dates right.  2019.  August 14th, 2019 is the date
9 of the Court's order.
10         You're aware the Court reached fact findings
11 in that order dismissing the claim?
12    A.   Yes.
13    Q.   Okay.  The allegations -- you read the
14 allegations of the counterclaim at some point; correct,
15 your counterclaim that you made against NAC?
16    A.   At some point, yes.  After it was filed, I
17 believe.
18    Q.   Okay.  Did you -- between the time it was
19 filed and the time that it was dismissed, did you
20 disagree with the allegations in any way that you had
21 made?
22    A.   We did not see the counterclaim until it was
23 dismissed.
24    Q.   Okay.  You didn't?
25    A.   No.

Page 12

1    Q.   Did you disagree with any of the allegations
2 that had been made on your behalf in the counterclaim?
3    A.   Yes.
4    Q.   Which allegations -- I'm not asking you to
5 cite to a paragraph, but which allegations, generally
6 speaking, did you disagree with?
7    A.   There was confusion in the counterclaim that
8 we maintained the hundred million -- we knew the $100
9 million valuation had been changed prior to submitting
10 our funds.  We knew that.
11    Q.   You did know that?
12    A.   Yes, we did.
13    Q.   Okay.  So that portion of the allegations --
14 and the Court's conclusion was that -- that you did
15 know that at a point in November, before the submission
16 of the -- before you paid the $275,000; correct?  So
17 that the Court found that?
18    A.   Yes.
19    Q.   So that -- I'm looking at the -- I don't
20 think you have this, but I'm looking at the
21 allegations.
22    A.   The counterclaim?
23    Q.   In the counterclaim.  And the only other --
24 the only other thing -- the counterclaim says, look,
25 you had -- you said, "As a result of these meetings

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 13

1  with Marcus, his representations in connection with the
2  NAC business plan, and the independent marketing
3  valuation, the Jodoins decided to invest in NAC."
4      So now you're telling me that the reference
5  to the independent marketing valuation as a basis was
6  not correct, that that was not a basis for you putting
7  your money in?
8      A.   That is correct.  It was the basis for us
9  agreeing to help before -- pardon me -- in October when
10 we were in Poland and Marcus asked us to come on board.
11 It was the business plan that he put forward and gave
12 us prior to that had $140 million asset valuation and
13 then us being invited without any prior knowledge to
14 the meeting between James Mawhinney and the core
15 members of NAC where the $100 million valuation was
16 being talked about.  That decision, while we were in
17 Poland to come on board, was made with those two
18 numbers.
19     When we got further into November, and the
20 problems with the contract with James Mawhinney, the
21 amount that he was charging were revealed and they knew
22 that they were going to withdraw from the contract, it
23 was still given a $40 million eval, and a promise that
24 we were going to continue with an IPO program with a
25 million dollar valuation, just not with

Page 14

1  James Mawhinney.  And not --
2      Q.   Sorry.  You knew --
3      A.   That was the events prior to us submitting
4  the money.
5      Q.   You knew the purpose of the Mawhinney
6  valuation, whether it was 140 or 40; correct?
7      A.   I don't understand your question.
8      Q.   You knew the purpose -- the purpose behind
9  the -- what was the purpose behind the valuation
10 Mr. Mawhinney was working on?
11     A.   I understood it, and when discussing it with
12 my husband Corey, we understood that that was the
13 valuation that the company was worth easily, and that
14 that was what you would value it to go to an IPO with.  We
15 were not -- I'm a housewife.  I was not overly familiar
16 with the idea that an IPO could be done simply to
17 generate cash.
18     Q.   Your husband is not a housewife; right?  I
19 mean, he was working directly with Mawhinney in email
20 exchanges which are part of the court record about what
21 the whole purpose of the valuation -- what he and
22 Mawhinney were trying to accomplish when they were
23 working together with that valuation; correct?
24     MR. KNECHT:  Objection.
25     THE WITNESS:  Yes.  Yes, it was, but it was

Page 15

1  still with the understanding that it was going to be a
2  long-term position on the stock market, and that that
3  was what the company was working -- that was what the
4  company was valued with.  It just needed to be
5  structured so it could be valued that way.
6  BY MR. OLSEN:
7      Q.   Okay.  You didn't have any -- well, so let me
8  ask you about the other, this reference to
9  representations in connection with the business plan
10 that was the other stated basis for making the
11 investment.  We had asked for documents relating to
12 that, and there haven't been any documents produced of
13 any other representations.  Are there any documents
14 besides this, the valuation discussion, any other
15 documents?
16     A.   Yes.
17     Q.   Have you produced -- has your attorney
18 produced those documents in this case?
19     A.   I believe that our attorney has a copy of
20 them.
21     Q.   What sort of documents are we talking about?
22     A.   It's a business plan.
23     Q.   Okay.  What does the business plan say, if
24 anything, about valuation?
25     A.   It has a asset evaluation with the different

Page 16

1  prices, Aten coin, and it has the projected value of
2  Aten coin, when it would be released, and it has a
3  value of $140 million projected.
4      Q.   Okay.  And is it -- are you telling me that
5  because you're a housewife, you don't really understand
6  the difference between the projection and the
7  valuation?
8      MR. KNECHT:  Objection.  Form.
9  BY MR. OLSEN:
10     Q.   You can answer the question.
11     A.   No.  I understand that it was a projection.
12 I understand that.  But you assume that there's some
13 basis of truth to it.  At least when my husband did
14 projections in our small construction business, they
15 had to be relatively accurate.
16     Q.   What do you base -- I'm inferring, from what
17 you said, that you don't think there's any basis of
18 truth in the projections.  What do you base that on,
19 that statement?
20     A.   No, I'm not saying I -- I said I assumed that
21 there was a great deal of basis of truth to it.
22     Q.   Okay.  Do you still believe that to be the
23 case?
24     A.   No.
25     Q.   And what leads you to believe that?

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 17

1   A.  My experience with what I feel to be the
2   duplicity of Marcus Andrade.
3   Q.  So how does that relate to the -- you believe
4   him not to be trustworthy, but tell me what leads you
5   to think there's no basis for the company having
6   some -- having made some projections?  What's wrong
7   with the projections?  I guess I'm asking you to look
8   back at the time when you were involved looking
9   forward, what was wrong at that point with the
10  projections, in your view, and the basis for them?
11  A.  At the time there, what was wrong with them?
12  Q.  Yeah.
13  A.  Nothing.  I felt that they were an adequate
14  projection of what it could do.
15  Q.  Okay.  And you went to work in a capacity as
16  at least a named officer at a later point for NAC;
17  correct?
18      MR. KNECHT:  Objection to form.  Calls for a
19  legal conclusion.
20      MR. OLSEN:  Let me rephrase that question.
21  BY MR. OLSEN:
22  Q.  You took on some duties for NAC at some
23  point; correct?
24  A.  Yes, I did.
25  Q.  And what was your title?

Page 18

1   A.  To begin with, I was simply supposed to be
2   helping with housekeeping, organizing policies and
3   procedures that they needed to put up a corporate
4   structure, giving view-back on the web, going to
5   organize the investor wine and cheese.  That was
6   originally what it was.
7       When we were in Poland in December and we
8   were working towards getting the corporate structure
9   together so you could go to an IPO position, the chief
10  positions needed to be filled.  Marcus had offered me a
11  more, like, head HR or more advanced position, and I
12  simply said I didn't have the qualifications for any of
13  these long-term titles.  I have no college degree.
14  I've been a housewife for many years.  I said, I'm
15  staying on until the IPO to help you set up your
16  policies and procedures.
17      But we had to have some type of title.  When
18  the group was meeting, I believe administration officer
19  was thrown out, and then someone suggested the chief
20  administrative officer.  Nobody had really heard of
21  that before, but that was the decision.  Marcus liked
22  that title, and that's what I went with.
23  Q.  Okay.  Your husband also became an officer of
24  the company; correct?
25  A.  Yes, he did.

Page 19

1       MR. KNECHT:  Objection to form.
2   BY MR. OLSEN:
3   Q.  What was his -- what was his title?
4   A.  COO.
5   Q.  Chief operating officer?
6   A.  That was correct.  Interim.
7   Q.  What was the last thing you said?
8   A.  It was an interim.
9   Q.  Interim COO?
10  A.  That's correct.  It was only --
11  Q.  Interim until what?
12  A.  The IPP was in steady progress.  And Corey
13  and I -- Corey, in my presence, told Marcus, we are not
14  qualified to take this to an international company, a
15  company that's worth $100 million.  You'll eventually
16  have to find somebody that has more experience.  And
17  then we were offered a position on the board when we
18  stepped down.
19      MR. OLSEN:  Okay.  Now, I want to ask you
20  about some of the answers to some requests for
21  admissions and some interrogatories that were served
22  upon you in this case at an earlier time.  It's about
23  25 after, just about.  So what I'm going to do is just
24  direct you for now to where those are on the exhibit.
25  I'm going to hop off the call for a few minutes.  But

Page 20

1   we will be looking at -- by the way, Madam court
2   reporter, I do want to -- you received the documents as
3   well; correct?
4       THE STENOGRAPHER:  Yes.
5       MR. OLSEN:  I'd like to offer the -- just to
6   designate the packet of documents that the witness has
7   as Exhibit 1.  That's going to be the sole exhibit
8   today.
9       And just for the record, Mrs. Jodoin, you do
10  have a packet of documents before you, which we'll call
11  Exhibit 1?
12      THE WITNESS:  Yes.
13      MR. OLSEN:  If you look at the lower,
14  right-hand corner of the first page, you'll see in tiny
15  print, BJodoin0001.  Do you see that?
16      THE WITNESS:  Yes, I do.
17      MR. OLSEN:  I will be referring to those
18  numbers throughout the rest of the deposition.  And for
19  your reference, the next documents I'm going to be
20  looking at are the ones that start with BJodoin0082,
21  the admissions responses, and then the answers to
22  interrogatories, which go through about 0095.
23      And so I will, with that, be getting off the
24  line for a bit.  I'm not really sure how to mute this.
25  There we go.  Got it.

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 21

1    (Whereupon, a recess was taken.)
2  BY MR. OLSEN:
3    Q.   Before we got off the record, Ms. Jodoin, I
4  directed you to the discovery responses that you had
5  provided in this case, the admissions responses and the
6  interrogatory responses.  I want to take a look at
7  those.  The first one I want to take a look at, this is
8  in the admissions, and on the second page of the
9  admissions, BJodoin0083 is the page.
10   A.   Okay.
11   Q.   The request was the following:  Admit that
12 reports, complaints, referrals and/or supplemental
13 information listed and/or described in your answers to
14 interrogatories."
15        And we'll talk about those, but there's
16 questions there about reports to governmental
17 authorities, that they included your allegation that
18 you relied upon a market valuation of $100 million or
19 more when you decided to remit the $275,000.
20        The point of that, what that boils down to
21 is, it's asking you to admit that when you made -- that
22 when you made statements to governmental authorities
23 about NAC, that you made reference specifically to the
24 market valuation of $100 million or more.  I'm asking
25 you to admit whether that was something you did.

Page 22

1    MR. KNECHT:  Objection to form.  Calls for a
2  legal conclusion as well.  Objection to form.
3  BY MR. OLSEN:
4    Q.   Okay.  That means you can go ahead and answer
5  it.
6        Did you make a statement to any governmental
7  agencies whether they asked you or you got in touch
8  with them, that you had relied upon, you and your
9  husband had relied upon, the valuation of $100 million
10 or more?
11   A.   No.  We would have -- we relied on the first,
12 like I had said earlier, the $140 million business
13 plan, the $100 million evaluation from James Mawhinney,
14 and then the $40 million with the promise to still
15 obtain IBO or IPO by April.
16   Q.   Okay.  Let me stop you on that last part.
17 The promise to do an IPO -- now, are we talking about
18 initial public offering or what they refer to in this
19 coin world as an initial coin offering, which is an
20 ICO, which is a little different?
21   A.   No.  It was the -- what they had hired
22 James Mawhinney to do, which was to have an initial
23 public offering.  When James Mawhinney was -- when they
24 parted ways, the plan was to still find someone who
25 could do that and work towards an IPO of -- reaching

Page 23

1  that evaluation through a public offering on the stock
2  market.
3    Q.   Okay.  So at this point, this point being
4  November, that's when you put your money in, into the
5  company, you had already purchased -- we'll call them
6  coins for a second -- you already purchased some Aten
7  coins; is that correct?
8    A.   Yes, we had.
9    Q.   And what was the form -- were those in the
10 form of a token that represented a coin?  What was the
11 form of that thing?
12   A.   It was tokens in form of the coins that were
13 to be -- were rolled over into coins.  Once it was to be
14 released on market, you could buy and sell coins.
15   Q.   Okay.  So the thing you had actually put your
16 money into before November, at least, you'd purchased
17 some what they call tokens, which are representative of
18 a cryptocurrency.  That particular -- well --
19   A.   No, that's incorrect.
20   Q.   Okay.  What is the token representative of?
21   A.   Yes, but it was not in November.  That had
22 been previous to October, from the first part of the
23 year up through to October that we had purchased in
24 various different times different tokens or coins.
25   Q.   Okay.  Bad question by me.

Page 24

1        The reference to November, that was when you
2  put in -- that's when you agreed to transfer money,
3  we'll say, to NAC, $275,000, for a different purpose.
4  But prior to that, you had purchased coins or tokens
5  representing coins; correct?
6    A.   Yes, that is correct.
7    Q.   Okay.  And that particular coin, that
8  never -- that one never got off the ground; correct?
9  There was a future coin that it was rolled into; is
10 that a fair way to put it?
11   A.   Yes, I believe so.  We have done nothing with
12 the coins since we left.
13   Q.   Okay.  But those prior purchases, those are
14 purchases of a thing, a cryptocurrency or something
15 that was to be a cryptocurrency, and that never
16 happened.  It rolled over into something else later.
17 Do you have coins though that -- or tokens that
18 represent coins issued by NAC?
19   A.   We have the original Aten coin.  They have
20 approached us to roll it over into the new coin and we
21 have not.
22   Q.   Okay.  So let me get back to these
23 interrogatories.  A more fundamental question that's in
24 the interrogatories themselves -- these are the
25 admissions, sorry.  This admission talks about reports,

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 25

1   complaints, referrals. Let me back up a second and ask
2   you, I understand from your answers and your husband's
3   answers to interrogatories, that you had -- that you
4   have spoken to the FBI concerning NAC and/or
5   Mr. Andrade at some point; correct?
6       A.   Yes, that is correct.
7       Q.   And I also understand from your answers to
8   interrogatories, you've spoken at some point to the
9   Alberta Securities Commission about the same subject
10  matter; correct?
11      A.   I did not.
12      Q.   Your husband did?
13      A.   Yes, he did.
14      Q.   And you overheard a discussion?
15      A.   Yes, part of the discussion. I listened in
16  on the discussion via he had it on speaker phone.
17      Q.   Okay. And there was also a conversation --
18  there was also -- did you also have a conversation, you
19  or your husband, with the Securities & Exchange
20  Commission in the United States?
21      A.   May I clarify a question? May I ask a
22  question?
23      Q.   Just let me -- you don't understand the
24  question or?
25      A.   He contacted SEC, but NAC or Marcus Andrade

Page 26

1   was never mentioned. It was a hypothetical question.
2       Q.   Okay. All right. We'll come back to that.
3       So the admission here that we're looking at,
4   when it talks about reports, complaints, referrals,
5   supplemental information, it's meant to address any
6   communications with the FBI, SEC, or ASC. And the
7   question again was, you know, admit that you disclosed
8   to any of those entities that you relied at least in
9   part on this market valuation. That's what it's
10  asking. And do you deny that?
11          MR. KNECHT: Objection to form.
12  BY MR. OLSEN:
13      Q.   You can answer the question.
14      A.   How do I say this? When it was mentioned to
15  the ASC, because that was the conversation that I was
16  privy to, all three numbers were given to them.
17      Q.   What do you mean "all three numbers?" Which
18  numbers?
19      A.   The $140 million, the business plan, the
20  million-dollar evaluation for the IP. And then after
21  this IP was unsuccessful with James Mawhinney, the
22  $40 million evaluation after that. So no one number
23  was given as a primary reason for submitting the
24  income -- the money, pardon me.
25      Q.   Well, when your husband had a conversation

Page 27

1   with the ASC, when was that?
2       A.   It was after March. I believe it was the end
3   of March or the first week or two of April.
4       Q.   Of what year?
5       A.   2016. I believe it was March.
6       Q.   Okay. And when you had the conversation --
7   when he had the conversation which you overheard with
8   the ASC in March, by that time, certainly, you knew
9   that the 140 or $100 million figure was not intended as
10  a valuation per se; right? You had already known that?
11      A.   That it wasn't from him looking at the -- I
12  don't -- I don't understand what you mean. Because, to
13  my opinion, it was still with hard work that was what
14  the evaluation would be on an IPO. I don't understand
15  anything other than that. I don't understand what
16  you're trying to say.
17      Q.   Your husband had already had conversations
18  with Mr. Mawhinney, working with him on the valuation
19  in which it was disclosed that the $140 million or
20  $100 million figure was not something that was an
21  actual valuation of the company; correct?
22      A.   Okay. Yes, that without hard work that the
23  $100 million was not guaranteed, that is correct. And
24  he said it was worth $40 million.
25      Q.   And Mr. Mawhinney also didn't guarantee that

Page 28

1   it was worth $40 million. That was a projection;
2   correct?
3       A.   I didn't understood it to be that.
4       Q.   Well, Mr. Mawhinney never guaranteed the
5   company was worth $40 million in discussions with you
6   or with your husband; right?
7       A.   No, he did not.
8       Q.   And Mr. Andrade never guaranteed to you that
9   the company was worth $40 million?
10          MR. KNECHT: Objection. Form.
11  BY MR. OLSEN:
12      Q.   You can answer that question.
13      A.   It was implied.
14      Q.   Yeah, but your husband was working with
15  Mawhinney on the valuations and projections, and he
16  never told you -- your husband never told you that it
17  was guaranteed it was worth $40 million, did he?
18      A.   No, but your -- it was still implied. My
19  husband has a company, and there's a value that you put
20  to it when you're doing your assets or your taxes. And
21  this was the value that it was evaluated at.
22      Q.   This company never, to your knowledge, had --
23  well, certainly at that point hadn't filed any tax
24  returns; correct?
25      A.   We found that out after, yes.

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 29

1    Q.  Well, it didn't have any income to file tax
2    returns at that point so it hadn't had any tax returns
3    filed.  So that wasn't the purpose of this valuation;
4    right?
5    A.  I disagree with that comment.
6    Q.  Well, let me break the question down.  You
7    disagree that the purpose -- strike that.
8        The purpose of this, these projections,
9    wasn't to pay taxes; right?
10   A.  Of course.  Of course, but I disagree with
11   the fact that it didn't have income.  It was selling
12   tokens.  As far as we were concerned, it had income.
13   Q.  Okay.  I asked a bad question.  It wasn't for
14   the same -- this paperwork wasn't prepared for the same
15   purpose that your husband would prepare his company
16   paperwork for an operating business that, you know, had
17   filed taxes and all that?  That wasn't the purpose of
18   these documents; correct?
19   A.  No, that is correct, but an evaluation for a
20   company when you're doing quarterly profits or
21   quarterly projections has nothing to do with taxes.
22   It's a proof to your business partners and to decide if
23   the business is viable.  When my husband did quarterly
24   projections, it was to make sure that the profit
25   margins were correct and that you could pay your bills.

Page 30

1    That was the expected value of the company.
2    Q.  Right.  But my point is what he does in his
3    business isn't the same kind of thing that was going on
4    here with NAC; correct?  I mean, that wasn't the
5    purpose of preparing these projections; right?
6    A.  To my knowledge, it was.  We did not
7    understand -- I especially did not understand that they
8    were not the same thing.
9    Q.  Okay.  Getting back to this question, this
10   admission number 1, what other -- hang on one second.
11       Have you described all of the documents and
12   representations that Mr. Andrade made on which you
13   relied in paying the $275,000?
14       MR. KNECHT:  Objection to form.
15       THE WITNESS:  There was various -- there were
16   various verbal conversations that we had.
17   BY MR. OLSEN:
18   Q.  Tell me what those were.
19   A.  Can you imagine by April that that would be
20   $5 million or various -- we'll need to set up trust
21   funds for the kids.  We'll need to -- we're going to
22   have to make a legacy of this because the amount of
23   money that we're going to be making.  I can't wait
24   until we take over Bitcoin.
25   Q.  Anything else?

Page 31

1    A.  No.  Just those general kind of
2    conversations, explaining the values of the patents.
3    Also he did explain the values of the patents and
4    showed us an offer where he had been offered two or
5    three million dollars to purchase the patents.
6    Q.  Okay.  Do you know the value of the patents
7    at this time?
8    A.  No idea.
9    Q.  Did you know the value of the patents at that
10   time?
11   A.  Two to three million dollars.
12   Q.  Okay.  But you don't know any different?
13   A.  No, nothing.
14   Q.  Okay.  In the next admission request, the
15   request includes the Court's finding made in this case
16   that Mr. Jodoin certainly knew as far back as
17   November 22nd that the projected valuation -- well,
18   what it says actually is, "Back as far as
19   November 22nd, 2015, Mr. Jodoin received an email
20   expressly referencing an original projected value of
21   only $40 million."
22       Thereafter stating that, "As it stands today,
23   the company is not worth $100 million without a lot of
24   planning and packaging in the right way for the
25   investment community."

Page 32

1        And the Court made those findings, and you
2    were asked to admit that the reports, complaints,
3    referrals, information provided to governmental
4    authorities were made after this finding by the
5    Court -- I'm sorry, in light of these facts.  And you
6    were asked to admit that they were false reports.  Your
7    answer was to deny that, but it was also to say,
8    "Discovery is ongoing, and defendant will supplement
9    this request as additional information is discovered."
10       Have you discovered any additional
11   information to support your denial that the allegation
12   made to these authorities was a false statement?
13       MR. KNECHT:  Objection to form.  Yeah,
14   objection to form.  Asked and answered.
15       You can go ahead and respond, Brandi.
16       THE WITNESS:  Once again, I'll tell you again
17   that we did not see the counterclaim, nor these.  It
18   was never to be if you would have -- it was, no, we
19   admit we knew before the 22nd.  We admit that and never
20   did we say it was only $100 million.  The number was
21   $140 million from Marcus, $100 million from
22   James Mawhinney.  And I will state the people involved
23   with NAC, the lawyer, the other people that we were --
24   the opinion was that was discussed afterwards, that
25   James Mawhinney had misrepresented what he could do for

Page 33

1  NAC, and now was putting out that number because he
2  wanted to be paid more to do more work.  That was part
3  of the argument there.  The $40 million, even
4  afterwards when James Mawhinney was dismissed, that was
5  still a substantial amount of money.  We knew that it
6  was $40 million.
7  BY MR. OLSEN:
8      Q.   Okay.  And when was the discussion about
9  Mawhinney being dismissed because, as I gather, he was
10 overstating things?  When was that discussion?
11     A.   It was various discussions through Skype and
12 audio.  And, to my knowledge, our largest complaint was
13 not that he was over-evaluating the company.  It's that
14 he had not disclosed to the people involved who signed
15 the contracts, Aga and Marcus, that to develop the
16 business corporate structure needed to do $100 million,
17 that was not included in their fee.  And after that
18 point, the fee was going to be too large that there was
19 absolutely no reason to do it.  It was never really
20 that he had over-evaluated what it could be.  It was
21 that he was going to charge too much for it.  The
22 expectation was to find someone else and still achieve
23 that $100 million.
24     Q.   The discussions about Mr. Mawhinney, when did
25 that take place, in January or --

Page 34

1      A.   No.  Between November and December.  By the
2  end of November, December.
3      Q.   Okay.  So before January of the following --
4  of '16?
5      A.   That's correct.
6      Q.   Was someone located to do new projections?
7      A.   Projections, you mean to facilitate an IPO?
8      Q.   Do a valuation or projections, whichever you
9  want to call them.
10     A.   Marcus was asked numerous times, and it was
11 always put off.
12     Q.   Okay.  Before the first of the year 2016, the
13 whole Mawhinney valuation or projection number set was
14 sort of put off to the side because NAC was looking for
15 someone new to do this work who wasn't going to benefit
16 from, in a fee structure, from just having a high
17 number; right?
18     A.   Correct.
19     Q.   Okay.  Take a look at the interrogatory
20 answers, which I'm starting on page BJodoin0086.  You
21 see Interrogatory No. 1 on that page?
22     A.   Yes.
23     Q.   Interrogatory No. 1 asks that you please list
24 all federal, state, provincial and/or local
25 authorities, including, but not limited to, agents or

Page 35

1  officers of any investigative or law enforcement agency
2  to which you reported any actions of the NAC Foundation
3  or Marcus Andrade, being sure to include the date of
4  each report, the parties to all communications
5  regarding the report, and the summary of each report or
6  communications.
7           You see that?
8      A.   Yes, I do.
9      Q.   Now, I will tell you, just because I've read
10 both sets of answers, this was a supplemental answer.
11 I want to make sure it's clear when I ask these
12 questions now that you understand by "report," I don't
13 mean a writing necessarily.  It could be something
14 verbal.  And I don't mean something initiated by you.
15 By "report," I mean something you told --
16     A.   A discussion?
17     Q.   -- told to somebody verbally, note to
18 somebody in writing, any form of communication.
19     A.   Okay.
20     Q.   The answer starts with, "I did not make a
21 report regarding the actions of NAC Foundation or
22 Marcus Andrade to any federal, state, provincial and/or
23 local authorities except as detailed below."
24           And there you listed -- you stated the FBI
25 and ASC.  Now, you mentioned that your husband got in

Page 36

1  touch with the SEC?
2      A.   Um-hum.
3      Q.   Is your answer based on the fact that you
4  didn't do it, he did it?
5      A.   Correct.  I was not present at all with the
6  SEC.  And I also know that when I discussed it with my
7  husband, he did not use NAC's name or Marcus Andrade.
8      Q.   Did he receive any follow-up from the SEC?
9           MR. KNECHT:  Objection.
10          MR. OLSEN:  Do you have an objection,
11 Counsel?
12          MR. KNECHT:  Objection to form.  Did you ask
13 whether Corey received anything?
14          MR. OLSEN:  I did.
15          MR. KNECHT:  Okay.  Objection to form.
16 BY MR. OLSEN:
17     Q.   You don't know or Corey didn't?
18     A.   I believe he had a phone call, call to him
19 afterwards.  I have no idea what was said.
20     Q.   Okay.  And then the answer goes on to say --
21 well, it says you listened.  The answer also says,
22 "With respect to the FBI, they contacted us through
23 counsel."
24           Again, I don't want you to tell me what your
25 counsel said, but I want to -- do you mean by that that

Page 37

1 the FBI reached out to your counsel and then after that
2 happened, you spoke to the FBI?
3   A.  That is correct.
4   Q.  Okay.  Do you know whether the FBI contacted
5 your counsel because he inquired of the FBI?
6   A.  Can you repeat that last part.
7   Q.  Who contacted -- did the FBI contact your
8 counsel or did your counsel contact the FBI, if you
9 know?
10   A.  The FBI informed us that they were
11 investigating Marcus Andrade, and they contacted our
12 lawyer.
13   Q.  When did that occur?
14   A.  I don't know when they contacted our lawyer,
15 but I know that we were in -- it says here August 27,
16 2019.  That's when we were in our lawyer's office with
17 the FBI.
18   Q.  That's 2019, not 2018?
19   A.  No.  2019.
20   Q.  Didn't you --
21   A.  Wait a minute.
22   Q.  Isn't that incorrect?
23   A.  Perhaps.
24   Q.  Just basing it -- just to put everything in
25 context, I'm looking back at --

Page 38

1     THE WITNESS:  Taylor was born in 2018, Corey
2 Taylor was born in 2018; right?
3     Yes, it would have been 2018.  I have an
4 email that I can double-check.
5 BY MR. OLSEN:
6   Q.  Has that email been -- is that email from
7 your attorney?
8   A.  Yes.
9   Q.  I don't need the email, but if you
10 double-check that date, that's fine.  You can make a
11 correction on the deposition.  But I understand now
12 that it's probably 2018?
13   A.  That is correct.  Our infant was only about
14 six months old, which would have been 2018.
15   Q.  Okay.  So at the time -- was that the first
16 time, on August 27, 2018, that you or your husband ever
17 communicated with the FBI concerning NAC or Mr. Andrade
18 in any way?
19   A.  The week prior to that I received an email
20 from Catherine confirming that we were going to be
21 there, but that was on their direction as well.  Prior
22 to the first contact by our lawyer to us, we had never
23 talked to the FBI before.
24   Q.  Putting aside speaking, had you contacted the
25 FBI and provided them any written information?

Page 39

1   A.  I have never contacted or communicated to the
2 FBI in any way.
3   Q.  Had your husband before that time?
4   A.  No.
5   Q.  If the date is correct --
6     MR. KNECHT:  Counsel, I just looked at that.
7 It's 2018.  August 27, 2018.
8     MR. OLSEN:  Okay.  So that's confirmed.  So
9 the interrogatory answer was incorrect, but that's
10 fine.  We see it's 2018.
11 BY MR. OLSEN:
12   Q.  All right.  So in the August 27, 2018 meeting
13 you had with the FBI -- first of all, who were the FBI
14 agents?
15   A.  Catherine Abbott and Rohan Wynar.
16   Q.  W-E-I-N-E-R?
17   A.  No.  W-Y-N-A-R, I believe.
18   Q.  And those agents, when they sat down with
19 you, where did that occur?
20   A.  In our lawyer's office.
21   Q.  And when they sat down with you in your
22 lawyer's office, I assume that they started the
23 conversation or the discussion.  What did they say to
24 you?
25   A.  They told us they had had a complaint from an

Page 40

1 investor or coin purchaser, I can't remember.  From the
2 second set of when Marcus had turned the coin into
3 another coin and re-branded, that there was an investor
4 or coin owner has been, they felt -- the coin owner
5 felt that they had been misled.  And they contacted the
6 FBI and the FBI launched an investigation on Marcus and
7 NAC.  And when going through their information, going
8 through different publications, they came across our
9 name.
10   Q.  Did they tell you how exactly they came
11 across your name, in what communications?
12   A.  I honestly cannot remember.
13   Q.  The person that was the complaint, who was
14 that?
15   A.  I have no idea.  They did not reveal that to
16 us.
17   Q.  Did they describe -- besides what you told me
18 already, did they describe specific to that person's
19 experience in going through the questions they asked of
20 you?
21   A.  Absolutely not.
22   Q.  Let me ask you what questions they asked of
23 you then.
24   A.  They asked us to, explain to us how we got
25 involved with NAC, if we were coin holders first.

Brandi Jodoin            NAC Foundation, LLC v. Corey Jodoin, et al.

Page 41

1  Agent Rohan was extremely interested if we had any
2  experience with the coding or had seen if it was -- the
3  technology was actually working, which we did not.
4  They asked us -- they walked us through our term at NAC
5  and then they asked us to explain why we became
6  hesitant in what we had seen there. And then they
7  asked us why we had left.
8     Q.  With respect to -- did you have a discussion
9  with them about putting in the $275,000?
10    A.  Yes, we did.
11    Q.  Did you tell them -- did you tell the FBI
12 that by the time you put in the $275,000, you knew that
13 the company was not worth $140 million?
14    A.  I don't know.
15    Q.  Did you tell the FBI at that point that by
16 the time you put in your money, that you thought it was
17 worth no more than $40 million?
18    A.  No. I don't know.
19    Q.  Did you tell the FBI that you had relied on
20 any representation of value in putting your money in?
21    A.  Well, yes.
22    Q.  And what did you tell them that
23 representation was or that value?
24    A.  The business plan, the proposed value from
25 the plan for the IPO, and Marcus' word. Our largest

Page 42

1  reason for believing it was Marcus convinced us that it
2  was worth that.
3     Q.  That's based upon the kind of statements you
4  told me Marcus made earlier in the deposition?
5     A.  Yes. We trusted Marcus.
6     Q.  And there wasn't anything else you said
7  beyond those, kind of, general statements that you
8  recall Marcus saying other than these things that were
9  for example, in the Mawhinney valuation?
10    A.  Well, all the way through when we had -- when
11 we had came to him and we would be asking questions,
12 one of his comments -- comment was, hold on tight.
13 Remember, we're going for that hundred-million
14 valuation. We're going to go public. Just hang on
15 tight. We're going for that legacy.
16    Q.  Okay. But in discussing why you made your
17 investment with the FBI, you did say to the FBI that
18 you had relied to some extent on the valuation of
19 Mawhinney; correct?
20    A.  To some extent, yes. Not completely.
21    Q.  But that was not true; right? Because you
22 knew by the time you put your money in that that
23 valuation wasn't 140, wasn't even $100 million, that
24 that purpose of that was projections to go forward to
25 an IPO; right?

Page 43

1     MR. KNECHT: Objection to form. Go ahead.
2     THE WITNESS: You need to understand we had
3  never encountered any kind of business like this
4  before. My husband runs a small business. We're a
5  construction company. He's been successful, but it is
6  small. When you are given those kind of numbers with
7  what we understand projections in business, even though
8  Jason -- James Mawhinney said it was $40 million, it's
9  not even worth that, in the group with Aga and Igor and
10 Marcus and the people that obviously knew more than we
11 did, the common thought was, he's -- he's just blowing
12 smoke because he wants to increase his fees.
13    Marcus didn't, Aga didn't, Igor didn't, no
14 one that had been there long term agreed with that
15 $40 million evaluation. It was, we will find someone
16 else. We'll put in the hard work necessary and
17 $100 million will be easy to attain. I don't -- even
18 now, I don't truly understand from a business
19 perspective the difference between a projection for an
20 IPO to state that it's not the actual real value. I
21 don't understand that.
22    So, to our knowledge, when you're sitting
23 there and the lawyers are saying yes and Marcus is so
24 focused on how James was trying to elicit more money
25 for a job that he agreed to, never was it discussed

Page 44

1  that we were canceling because the company was not
2  worth that $100 million. It was still an active goal
3  and promise that when we go to an IPO, this is what's
4  going to be.
5  BY MR. OLSEN:
6     Q.  Besides what you've told me already, when did
7  Mr. Andrade make a promise about any certain value,
8  whether it's 40 or some other value?
9     A.  Can I say he promised that it was a
10 guarantee -- it's what he said it was. We assumed he
11 was telling the truth. We assumed that it was not just
12 conjecture.
13    This was his business. This is what the
14 goals were. And he was extremely confident. Everyone
15 on the team was confident that this was easy and
16 attainable.
17    Q.  Okay. He was positive. He was a
18 cheerleader, Mr. Andrade; is that fair to say?
19    A.  Yes.
20    Q.  Now, your husband became the chief operating
21 officer at a point. And he was even involved -- he was
22 involved to -- in trying to get an IPO on the
23 Australian stock exchange; correct?
24    A.  Yes, he was.
25    Q.  And in speaking to people about that IPO --

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 45

1  he spoke to some people to try to make that happen;
2  right, some people outside the company?
3      A.   That's James Mawhinney and James Mawhinney's
4  partner, Jeff somebody.
5      Q.   Didn't your husband do an infomercial or a --
6      A.   Oh --
7      Q.   Let me finish -- promotional video with
8  Kathy Ireland to promote the stock and the potential
9  IPO?
10     A.   Yes.
11     Q.   Okay.  So he held himself out as a
12 representative of this company to try to do the same
13 thing, to encourage the success of an IPO; correct?
14          MR. KNECHT: Objection.  Objection.  Form.
15 Calls for a legal conclusion.  Go ahead.
16          THE WITNESS: Yes, he did.  It was based only
17 on those evaluations than what Marcus said because
18 Marcus refused to give over the financials to allow
19 Corey or anyone to do a proper projection or a business
20 plan.
21 BY MR. OLSEN:
22     Q.   So what you had seen up to that point,
23 including through the time that Corey did this
24 promotion, was not a proper business plan?
25     A.   It was a business plan that he gave, but

Page 46

1  there was no -- there was no financial records from the
2  accountant.
3      Q.   Yet, your husband promoted the stock as the
4  COO or the potential offering as the COO of the
5  company; correct?
6      A.   Yes, he did.
7      Q.   Now, let me get back again to the interview
8  you had with the FBI just so we're clear.  When you met
9  with the FBI -- first, was that the only meeting, on
10 August 27th, 2018?
11     A.   That is correct.
12     Q.   Was there any other conversation that you or
13 your husband had by phone with the FBI after that?
14     A.   No.
15     Q.   Did you provide to the FBI after that any
16 written documentation of any kind?
17     A.   During the meeting, we allowed them to take
18 all the correspondence that our lawyer had and all of
19 the information we had accumulated while we were in
20 NAC.
21     Q.   Did they ask for that or did you volunteer
22 it?
23     A.   They asked for it.
24     Q.   Did you provide them with any communications
25 from your lawyer at that time?

Page 47

1      A.   I have no idea.  We gave them permission to
2  take whatever information that the lawyer had.
3      Q.   In that meeting -- and I see the spelling of
4  the names here.  Apologize for putting you through the
5  spelling before -- with Agents Abbott and Wynar, you
6  did not tell them -- well, strike that.
7          When you had that meeting, you didn't tell
8  the FBI that at a point you didn't understand the 140,
9  $140 million valuation or $100 million valuation to be
10 accurate?  Did you tell them you didn't consider it to
11 be accurate?
12     A.   Can you repeat that.  At what point?  What do
13 you mean?
14     Q.   During your interview, you said that you
15 disclosed to the FBI having relied, at least in part,
16 on the Mawhinney projections?
17     A.   Um-hum.
18     Q.   Is that a "yes?"
19     A.   I was saying go on.  I apologize.
20     Q.   And you described the other part of what you
21 relied upon, you totally relied on the statements that
22 Mr. Andrade made that you've talked about already in
23 the deposition.  With respect to the first part, with
24 respect to your telling them that you relied to some
25 extent on the Mawhinney projections, you did not at any

Page 48

1  point in that discussion with the FBI tell them what
2  you just told us on the record, that you had doubts
3  about the $40 million, that you knew it wasn't a
4  specific valuation?  You didn't tell the FBI that, did
5  you?
6      A.   I don't -- during the conversation with the
7  FBI, I know that at some point in time towards the end,
8  I told him that in my opinion I believed, now that we
9  had left, that there was very little truth to any of
10 the documentation that Marcus gave us.
11     Q.   But you knew by January 2016 that the
12 Mawhinney documents weren't a specific representation
13 of the value of the company; right?  You've told me
14 that already today.
15     A.   Once again, I will say I did not understand
16 the difference.  I understood that James Mawhinney was
17 asking for too much.  I understood that this was
18 working towards -- because there was -- the policies
19 weren't put together.  The board of directors -- the
20 company was not structured to be a $100 million
21 company.  It was not structured to go live.  It wasn't
22 until we left and that we really -- or the end of
23 February where we started having a great deal of
24 difficulty with not seeing the financials and what not,
25 that we truly believed, that we became to realize, that

Brandi Jodoin                                              NAC Foundation, LLC v. Corey Jodoin, et al.

Page 49

1  it was not a valuation that you could sustain. Up
2  until then, we -- I was under the impression that it
3  was what we were working towards and it would be an
4  easily attainable goal. Once again, I did not
5  understand the difference between the projection and
6  the value.
7      Q. Okay. My question though is you didn't tell
8  the FBI you didn't understand the difference; right?
9          MR. KNECHT: Objection.
10         THE WITNESS: I didn't, no.
11 BY MR. OLSEN:
12     Q. And you didn't tell the FBI about the
13 discussion internally about Mawhinney wanting -- being
14 gotten rid of because he wanted too much money and
15 that's why he was making this projection. You didn't
16 have that discussion with the FBI, did you?
17     A. I believe we did. I believe because I
18 remember Rohan asking why did we not send flags up with
19 Mawhinney. And our answer was because we felt he was
20 unethical and we still trusted Marcus.
21     Q. Did the agents, either one of them, Abbott or
22 Wynar, at that meeting say anything to you about this
23 valuation or projection issue?
24     A. Not really. I don't feel that that was the
25 focus of their -- of their -- the majority of their

Page 50

1  questions or discussions.
2      Q. You told me that they asked, the FBI asked,
3  whether you thought the intellectual property was real,
4  whether it functioned. And what else did they -- did
5  they tell you something that this coin have had said
6  to them? Did they give you any of that information?
7      A. I don't know who that person is.
8      Q. Well, I know.
9      A. I don't know who that is.
10     Q. Okay. But did they say, like, for example,
11 well, this guy told us, you know, the company had this
12 problem or this is why it's not real. Or did they
13 suggest any thinking the FBI had about what they found
14 in their investigation so far?
15     A. No, they did not.
16     Q. Did the FBI agents tell you that Marcus had
17 done something wrong?
18     A. They were investigating him. They were under
19 the impression they felt that there could have been
20 wrongdoing done. That's why they were investigating
21 him.
22     Q. Is that your assumption because they were
23 doing an investigation or did they tell you, we're
24 investigating him because we think he did X, Y, Z?
25     A. I think that's an assumption I made.

Page 51

1      Q. Never assume that about law enforcement.
2          Let's talk about the Alberta Securities
3  Commission. First of all, I believe you said that
4  Corey contacted them first, the Commission; correct?
5      A. Yes.
6      Q. The interview that's referenced in your
7  answers in or about March 16, did that follow an
8  initial communication Corey had with the ASC? Did he
9  get in touch with them first and then this interview
10 came later?
11     A. I have no idea.
12     Q. You were listening to this call, and you
13 don't know if there was any previous communication
14 between Corey and the ASC?
15     A. No, I don't. I came in about five minutes
16 into it. We have 12 children. Somebody was upset. I
17 was not there for the first five minutes.
18     Q. Good on you, by the way, 12 children.
19         You said that Corey had initiated the
20 communication with the ASC though; right?
21     A. That is correct.
22     Q. What is it that he told the ASC?
23     A. I wasn't present when he was first there so I
24 can't tell you everything he said. In communications,
25 we had had our doubts about not really seeing the

Page 52

1  finances and him not being willing to give us any
2  shares. And we did not have an agreement. So I know
3  those were the questions that we were concerned about.
4  I don't know exactly what Corey said.
5      Q. Now, in your answer to interrogatory, this
6  interrogatory, you say, "I was on the call but did not
7  speak to anyone. The ASC informed us that Marcus was
8  not registered to sell securities."
9          Was that a statement that the ASC made in
10 that conversation that you heard?
11     A. Yes.
12     Q. You go on to say, "And that what NAC was
13 selling was a security."
14         The ASC didn't actually say that in that
15 call; correct?
16     A. That was the impression that I got, that it
17 was considered -- it would be considered an unsecured
18 security.
19     Q. Okay. That was the impression that you had.
20     A. That is what I remember. I cannot say
21 exactly how it was said, but I distinctly remember that
22 the legality of what was happening being questioned and
23 the legality firmly being listed that the tokens could
24 definitely be considered a security. And in his
25 opinion -- I felt like he was saying in his opinion it

Page 53

1  was.
2      Q.  What's the name of that person?
3      A.  I -- I have no idea.  You would have to ask
4  my husband's report on it, like his paperwork.
5      Q.  And I will do that, but let me ask you.  Were
6  you aware of any subsequent written or oral
7  communications that your husband had with the ASC after
8  that?
9      A.  I don't know.
10     Q.  The answer to interrogatory goes on to say,
11 "ASC explained that the Aten coin was a form of
12 unregistered security, and that selling the coin and
13 shares in the company not yet formed could be
14 considered an act in violation of securities laws."
15         Now, since that's in your answer to
16 interrogatory, this is you stating what the ASC
17 explained, I want to ask you, is this actually what the
18 ASC agent said to you or to your husband?
19     A.  I don't know if it was word for word.  This
20 is four years later.  I am trying to remember to the
21 best of my ability exactly what was said.
22     Q.  The ASC didn't have any real detail about the
23 Aten coin or coin token at the time of this
24 conversation, did it, just some oral representations
25 about what was -- what Corey was asking about?

Page 54

1      A.  Based on information my husband had given
2  them, that was the recommendation they made.
3      Q.  Well, doesn't sound like a recommendation to
4  me.  It says, "They explained -- they explained the
5  coin was a form of unregistered security and that
6  selling the coin and shares in the company not yet
7  formed could be considered an act in violation of
8  securities laws."
9          Could be?
10     A.  Um-hum.
11     Q.  There was never a statement by the ASC that
12 either of these things was a violation of the
13 securities laws, was there?
14         MR. KNECHT:  Objection to form.
15 BY MR. OLSEN:
16     Q.  You may answer the question.
17     A.  They told us, from what I understood and that
18 I can remember, that for Marcus to have taken our
19 investment with the promise of future shares in a
20 company was a violation.  They also then said that in
21 his opinion, that the selling of us gathering together
22 people and selling the coins or the tokens that could
23 be turned into coins would be considered a security.
24 And he asked us for the names and he said, they are not
25 registered in Canada to sell securities, and that they

Page 55

1  should be.  And that it was -- we were advised to get
2  out and to desist the selling of the coins and to
3  inform the other two investors on what we were told.
4      Q.  Didn't you go ahead after that call with a
5  meeting or conference or whatever in which you
6  introduced the coins and NAC to friends and relatives
7  of yours?
8      A.  No.  That was in January.
9      Q.  Okay.  January 2016?
10     A.  Yes.
11     Q.  What was the date in January?
12     A.  21st, I think.  I'd have to look back in my
13 notes.
14     Q.  Okay.
15     A.  Actually, I think it was the 16th.  It might
16 have been our son's birthday.
17     Q.  The meeting or conference you had with those
18 people to -- what was it that you were promoting at
19 that point?  Was it the tokens or coins?
20     A.  The tokens/coins.
21     Q.  Okay.  It was not an investment in shares in
22 NAC; correct?
23     A.  No.
24     Q.  But you already knew -- you already knew by
25 January, didn't you -- you had already been -- you had

Page 56

1  already been to the office in Las Vegas by that time,
2  hadn't you?
3      A.  Yes, I believe so.  I'm not -- I don't quite
4  remember if it was before or right after.  I believe it
5  was before.
6      Q.  The office was before?
7      A.  Yes.
8      Q.  You said in your pleadings that your visit,
9  in addition to these other issues, your visit to the
10 office had led you to have concerns about NAC; right?
11     A.  Yes.
12     Q.  But even though you had those concerns, you
13 still went forward with a conference in Alberta in
14 which you introduced the coin or the token, promoted
15 its sale to friends and relatives; correct?
16     A.  Yes, I did.
17     Q.  Now, you said that when you had this March
18 meeting then, or conversation you listened into with
19 the ASC, that you believe the officer, the person,
20 investigator, offered an opinion that the -- selling
21 the coins and/or the shares could be considered a
22 violation of the securities laws, both those things?
23     A.  He was quite firm that the offering us,
24 taking of our money for shares in a company that not
25 yet had been formed, that was definitely a violation,

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 57

1  and, in his opinion, the coins were dubious.
2      Q.  Okay.  Now, you say here in your answer to
3  the interrogatory, "ASC advised that we should let our
4  other investors know Marcus was not registered to sell
5  securities."
6      That's the first part.
7      A.  Yes.
8      Q.  Did that -- so that's based upon -- they
9  weren't investors in the company, you said.  So that's
10 based upon an opinion of ASC, the ASC officer, that the
11 coins were dubious?
12     A.  No, that is not correct.  The investors I am
13 talking about there are the two investors I contacted,
14 Tyler Hoff and Darren Wincura.
15     Can you hang on for a second.  I need the
16 battery charger for the computer.
17     Once again, we should let the other investors
18 know I am talking about the two investors that we had
19 found out that were offered a similar deal that we
20 were, Tyler Hoff, Darren Wincura, and one other fellow
21 that I didn't -- I believe was the baker from down
22 south, Alberta, but I was not -- I didn't have as much
23 information.
24     Q.  You contacted those three people, you or your
25 husband?

Page 58

1      A.  Yes, I contacted Darren Wincura and
2  Tyler Hoff.
3      Q.  And you told them that Marcus was unlicensed
4  and violating the law; right?
5      A.  No, I did not.
6      Q.  What did you tell them?
7      A.  I told them that Corey had contacted the ASC.
8  And I was very clear to not tell them that Marcus was a
9  scam or a crook.  I said that we were informed that he
10 was not able to sell securities and that you should not
11 be giving money into a company for shares in a company
12 that had not yet been formed.  I was very -- pardon.
13     Q.  Go ahead.  Finish?
14     A.  I was very clear to Tyler and Darren that I
15 was not saying he was a crook, that it might be
16 nothing.  All I asked them to do was two things, call
17 the ASC themselves, and/or go to a lawyer.  And before
18 they turn their money over, to have a contract with a
19 very specific exit strategy and a buy and sell
20 agreement detailing everything so they had some
21 protection for their investment.  That's what I told
22 them.
23     Q.  Didn't you tell them not to do it?
24     A.  No, I never, ever told them.  Darren Wincura
25 told me that he was going to go to Kent, Chicago, where

Page 59

1  the large law conference was going to be, and he was
2  going to blow that conference up.  And I specifically
3  told him not to do that, that I cannot guarantee that
4  he was a fraud, that this is just the advice I'm giving
5  him, and I wanted him to protect his investment.
6  That's all I told them.
7      Q.  You told him you felt you needed to protect
8  the investment.  And you told him, didn't you, also,
9  about this opinion of the officer of the ASC, that the
10 coin sale could also be a problem?
11     A.  I don't think so.  That I don't -- I truly do
12 not think so.  I know that Darren Wincura asked me
13 about the coins and I told him, Darren, you need to
14 contact them again.  I'm still hoping -- in March, and
15 I have other emails, we were being contacted still and
16 I encouraged people to do whatever they -- to call the
17 office, that this still could be -- I never criticized
18 the coins verbally to people.  We were still trying to
19 come to an agreement for ourselves.  I didn't want to
20 jeopardize their -- even if it was sold improperly, it
21 still could have went live and they still could have
22 redeemed their -- their coins and seen a return.  Some
23 of these people had put life savings into this.  That
24 was a serious concern that we did not jeopardize their
25 investment.

Page 60

1      Q.  People did see a return on the ultimate coin,
2  some people did; correct?
3      A.  I believe so.  I don't know.
4      Q.  You didn't solicit investments from Wincura
5  and the two investors yourself; right?
6      A.  No, I did not.
7      Q.  Your husband didn't?
8      A.  No.
9      Q.  And at the time you had this conversation or
10 he did with the ASC and then you reached out to these
11 people, you weren't still -- you and your husband --
12 were you still officers or acting as officers?
13     A.  Well, we were never terminated but Marcus
14 locked us out of the company and refused to allow
15 anybody to talk to us.
16     Q.  Prior to that call you had with Wincura and
17 the other person; right?
18     A.  Pardon?
19     Q.  The lockout was prior to the conversation you
20 had with Wincura where you were informing him about the
21 ASC's --
22     A.  Yes.
23     Q.  Why at that point, that you were no longer
24 working for the company, would you go ahead and make a
25 disclosure like that to a party you didn't even have a

Brandi Jodoin                                         NAC Foundation, LLC v. Corey Jodoin, et al.

Page 61

1  connection with?
2     A.  Mr. Olsen, I'm a housewife.  I'm a mom of 12,
3  and I've home-schooled them.  And we go to church.
4  When you have an officer of the law -- sorry -- inform
5  you that you could have been -- that it was likely that
6  you were participating in an illegal action, that is a
7  heavy responsibility, in my opinion.  In good
8  conscience, I could not let Tyler Hoff or
9  Darren Wincura proceed.
10        I had met Tyler at the conference.  He's an
11 oil field worker.  Most of Alberta is made up of
12 blue-collar workers.  I knew how much he had put in and
13 how much of that life savings it was to the coins.
14 When I heard the ASC say that, it was devastating.
15        He also was very clear, in my opinion, that
16 we could be held legally responsible if we didn't.  To
17 my opinion, if an officer of the law tells you to slow
18 down, it doesn't matter what the speed sign is.  It's
19 not a suggestion.  It's an expectation.
20     Q.  This person at the ASC, whether it was an
21 officer of the law or whoever he was, did the person
22 say that you had potential liability for the sale of
23 these interests to third parties?
24     A.  Yes, he did.
25     Q.  He did.  Which part, the shares or the coins?

Page 62

1     A.  The coins.
2     Q.  Okay.  So his opinion was it could be a
3  problem, and you could have liability and so,
4  therefore, you assumed you had liability and decided
5  you'd make some calls.  Is that how it went?
6     A.  He also was very clear that the selling of
7  shares -- taking of money for shares in a company not
8  yet formed was a violation and was illegal.
9     Q.  But you didn't do that?
10    A.  No, but that's how we had gotten involved.
11 And I knew that more than likely, that was the offer
12 Marcus had given them, which is why --
13    Q.  Go ahead.
14    A.  -- which is why I was very careful to simply
15 ask to encourage them whole-heartedly to have a lawyer
16 draw up the sale agreement or the investment agreement
17 so that they had actual collateral and that there was a
18 buy and sell agreement out, that they had a way to
19 protect themselves.
20    Q.  But you didn't do the sale, you didn't do the
21 agreement, you didn't know what the agreements were,
22 and by constantly contacting them, it suggests that
23 there was something wrong with their agreements; right?
24       MR. KNECHT:  Objection to form.
25       THE WITNESS:  I object to that.

Page 63

1       MR. KNECHT:  Objection to form.
2  BY MR. OLSEN:
3     Q.  I'm sorry, what did you say?
4     A.  I said, I object to that.  I called them
5  once.  That is not constantly contacting someone.  And
6  I was very clear that I was not suggesting that it was
7  fraud and that I was only asking them to do due
8  diligence.
9     Q.  On a deal that they had done before and to
10 document a deal they had already done before; right?
11    A.  No, they had not.  Previously, they were only
12 coin holders, which has a purchase agreement, which has
13 paperwork to fill out.  It was only concerning the fact
14 that Marcus had told us they were going to bring in
15 Darren Wincura and Tyler Hoff in a similar situation as
16 to what we had, that he was offering them a certain
17 percentage of shares of the upcoming company not yet
18 formed for an amount of money.  Not one of Marcus'
19 officers or partners had any kind of agreement or
20 written paper, which we found that out in January as
21 well.
22    Q.  Is that required?
23    A.  Would you do -- would you do legal work for
24 someone that didn't have a contract with you?
25    Q.  I've done it many times.  My question though

Page 64

1  is is that required?  You don't know whether that's
2  required or not?
3     A.  In good business it is.  In an ethical
4  situation it is.
5     Q.  By the law?
6     A.  I'm -- like I said, I'm a housewife.  I don't
7  know.  I can only go by what I deem to be ethically and
8  morally required of me, which is what I did.
9     Q.  Including talking to third parties to make
10 them aware of the opinions of the Alberta Securities
11 Commission?
12    A.  Yes.  And, in my opinion, it was not an
13 opinion.  This is their job.  If a doctor tells me that
14 I probably have cancer, I probably have cancer.
15    Q.  So in this scenario, to take your analogy
16 through, Doctor, this is how I feel, do you think I
17 have cancer, and he says you probably do?
18    A.  I do not think it was the same thing.
19       MR. KNECHT:  Objection.  Argumentative.
20 BY MR. OLSEN:
21    Q.  You don't know whether you've ever had a
22 conversation with Melissa Foteh?
23    A.  Pardon me?  Which one was that again?
24    Q.  This is number 3.  It's on the next page,
25 BJodoin0087.

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 65

1    A.  Okay.  No.  To the best of my ability, I have
2 never talked to her.
3    Q.  Has your husband?
4    A.  I don't know.
5    Q.  You have never communicated with
6 Jack Abramoff, but has your husband?
7    A.  No.
8    Q.  You have never communicated with Ralph Horn,
9 but has your husband?
10    A.  Did you say Horn?
11    Q.  Horn.
12    A.  In the interrogatory, it's Hone.
13    Q.  Well, in the answer it's Horn.  And maybe it
14 is in the interrogatory.  But have you ever had a
15 conversation with Ralph Horn, H-O-R-N?
16    A.  I believe Ralph Horn was a coin holder.  And
17 if that is the man that I am thinking of, I did call
18 him in December or email him in December, introduce
19 myself.  If I talked to him personally, I don't know.
20 I called and interviewed -- I called and introduced
21 myself to all the coin holders.  And I sent him an
22 email inviting him -- if he lives in Canada, the
23 sent an email to be invited to the wine and cheese.
24 But I looked up Ralph Hone.  I do not know Ralph Horn.
25 I believe he is a coin holder, but I was not given that

Page 66

1 name until right now.
2    Q.  Richard Naimer, you've never communicated
3 with him.  Has your husband?
4    A.  I don't know.
5    Q.  How about Louisa Murray?
6    A.  No.
7    Q.  Concerning Carl Weir, and we can take a break
8 after I ask questions about Carl, but you said in
9 response to the question whether you had ever had
10 communications with him concerning NAC or Marcus, you
11 said, "The only communication I had with Carl was
12 possibly a few emails and a meeting in London in or
13 about November or December of 2015."
14    A.  Yes.
15    Q.  So it also says, "All I remember is that Carl
16 thought it would be a good idea to attach the token to
17 a methane market or some other type of energy market.
18 Generally, I think there was a discussion about how to
19 increase the demand for Aten coin.  I emailed Carl
20 before the meeting about the parameters of the
21 meeting."  Et cetera.
22       So who was Carl Weir?
23    A.  Carl Weir was a fellow that Marcus brought to
24 our attention and that informed us that he wanted to
25 bring on board.  He was a name, had successfully

Page 67

1 brought a company to some kind of -- I don't exactly --
2 I think he was involved in some kind of Bitcoin or coin
3 operation.  He was from London.  Marcus really wanted
4 to get his expertise.  He had asked me to arrange a
5 meeting with him via email in December in London.  The
6 comments I have here, all I remember that Carl -- that
7 is all I can remember of the gist of the conversation
8 when we were in London.
9    Q.  Did Carl say anything to you about Marcus?
10    A.  No.  The three of us met him together.  And
11 after that, I never had any contact with him again.
12    Q.  And what was discussed at the meeting?  Was
13 it just these things here that are in the
14 interrogatory?
15    A.  There was -- it was a fairly lengthy
16 conversation.  At the time, I didn't understand much of
17 it.  I knew very little about Bitcoin or Aten coin when
18 we first started.  What really stuck out is the methane
19 market because it was about pigs.  That's why I
20 remember the specific.  I grew up in the country.  I
21 just thought it was funny that you would attach a token
22 to the methane market.
23    Q.  Was your husband there at that meeting?
24    A.  Yes, he was.
25    Q.  Where did you grow up?

Page 68

1    A.  I was born in Rapid City, South Dakota.  My
2 dad was a Vietnam vet.  After he came back in '75, we
3 moved to Canada.  I've lived most of my life in
4 Alberta, Canada.
5    Q.  Do you know if your husband has ever had a
6 communication with Lisa Tippett?
7    A.  No, I do not.
8    Q.  Maurice Musiitwa?
9    A.  Yes.
10    Q.  You said that you recognized the name
11 potentially as someone who completed the NAC website?
12    A.  Or some type of graphics design.
13    Q.  Was he a coin holder?  Do you know whether he
14 was?
15    A.  No.  If this is the gentleman I am thinking
16 of, he was a graphic designer on the web, where you
17 could go and put out a contest and whoever won the
18 contest, you would agree on a certain amount of money
19 and they would do graphic designs for you.  I believe
20 he was African, if this is the gentleman I am thinking
21 about.
22    Q.  African, but he lived in the United States,
23 this gentleman?
24    A.  No.  To my knowledge, the person that I'm
25 thinking about, I thought he lived in Africa because of

Page 69

1  the time difference when I needed to communicate with
2  him, it didn't -- that is news to me. I thought he was
3  African living in Africa.
4       MR. OLSEN: Let's take a five-minute break,
5  if we could.
6       MR. KNECHT: Okay. Sounds good.
7       (Whereupon, a recess was taken.)
8  BY MR. OLSEN:
9       Q. Mrs. Jodoin, I did want to clear something
10 up. And this may have been the result of my
11 questioning. But the first cryptocurrency was the Aten
12 coin. That was the Aten coin you had?
13      A. Yes.
14      Q. The Aten coin was -- I talked about tokens.
15 The Aten coin was a completed product, though; right?
16 It was a completed coin?
17      A. Yes, I believe it did go live after we --
18 after we left. But it didn't perform very well.
19      Q. Well, putting that aside -- it's a tough
20 market. But the coin went -- you think the coin went
21 live before you left or after?
22      A. I want to say it was after.
23      Q. Okay. Just for the record, is there a
24 distinction between a completed product and a coin
25 going live? Is there some interim stage?

Page 70

1       A. Yes. When I say that it went live, that's
2  when you could trade it for an American dollar or a
3  Bitcoin or another, like, Lykke or any one of the other
4  cryptocurrencies. That's what I meant -- that's what I
5  understood when you said, did it go to fruition.
6       Q. But it's a completed, I guess you could call
7  it a product, but it's in a different stage than just
8  an evolving token at some point and then it goes live
9  by being on the market; is that fair to say?
10      A. That wouldn't be how I would understand it.
11 In my opinion, you can't claim to be a currency until
12 somebody is trading in you.
13      Q. Is there an ID verification process involved
14 in the coin side of this?
15      A. There was, yes.
16      Q. And at what point -- did you go through that
17 process?
18      A. Yes, we did.
19      Q. Okay. At what point did you do that?
20      A. You mean us personally?
21      Q. Yeah. When did you do that? I don't mean
22 just in -- well, perhaps in time you could tell me when
23 in time that happened, but also at what stage. So you
24 buy coins; right? And then you go through the ID
25 verification process at a later point; correct?

Page 71

1       A. No. To be honest, investment is more my
2  husband's point so you would have to clarify the steps
3  with him to make sure that I have this accurately, but
4  from what I understood from us personally, we signed a
5  purchase agreement for a certain amount of tokens,
6  which would be put into our account as coins. They
7  would be able to be mined or any of those things, but
8  untraded. And then you would sign a purchase
9  agreement. You would send the money to the office.
10 Once the wire was received, that they would then ask
11 you to identify -- to go through the identification
12 verification process. And then Sachin would call you
13 to get a wallet downloaded onto your computer. And
14 then they would transfer a certain amount of tokens or
15 coins to your wallet.
16      Q. Okay. Do you know at what point they were
17 tokens versus coins?
18      A. It was used pretty much freely together when
19 the group -- when the team was together, we called them
20 coins because that's what we were going forward. Even
21 in January when we were selling -- when the
22 presentation to the investors, like the coin purchasers
23 were given, they were given as tokens mainly to make
24 sure they understood that it could not be live traded
25 yet.

Page 72

1       Q. Right. And you also mentioned that -- you
2  said "investment" a few times, but just to be clear,
3  you referred to the purchase agreement. The
4  acquisition of coins is by a purchase technically, not
5  an investment; correct?
6       A. That is correct. That is correct. I
7  apologize. That is my miss -- most of the people there
8  were -- it was a risky investment opportunity.
9  Everyone knew you were purchasing tokens in the hope
10 that it would go live and it would equate in value. It
11 was not an investment like a stock or a bond.
12      Q. Let's switch from that to the IPO again. I
13 just want to make sure we were clear on this. When
14 there was this discussion about the IPO and going to
15 the Australian market -- that was the eventual
16 discussion, going to Australia; correct?
17      A. Yes.
18      Q. That's a different thing than a purchase of
19 coins; correct?
20      A. That is correct.
21      Q. And that is more the typical investment we
22 would say in a stock. And there's a process by which
23 the company, NAC, went through to determine the best
24 venue for an IPO; is that right?
25      A. Um-hum. Yes.

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 73

1    Q.   Your husband was in charge of that process,
2  with consultation, but he was in charge of that process
3  at one point; correct?
4    A.   No.
5    Q.   He wasn't in charge of it or he wasn't
6  involved in it?
7    A.   He was not in charge.  When we got to Poland
8  at the conference, we were invited afterwards to
9  participate as viewers, in which James Mawhinney
10 presented to the team the opportunity and the plan to
11 take NAC to Australia.  That was already established
12 when we came in -- when we went there in October.  That
13 was the venue that Marcus had said that he had done due
14 diligence and that was the market that was most viable
15 for NAC.
16       What Corey was put in charge of was working
17 with James after the contract was signed to get -- to
18 be the liaison or the -- to give James whatever he
19 needed as the COO.
20    Q.   To actually -- sorry.  Go ahead.
21    A.   I was just going to say once James Mawhinney
22 withdrew or rejected, the team had multiple discussions
23 about where we should then go.  Aga suggested the
24 Ukraine.  Somebody said London.  Somebody said -- it
25 was a variety of choices.  Marcus is the one that chose

Page 74

1  London for the second opportunity.
2    Q.   With respect to, to Corey's duties, part of
3  those duties where they were going to do it was to
4  shepherd the IPO ahead, at least as long as he was
5  there, to appoint where it could happen; right?  Do you
6  understand what I mean by that?
7    A.   Yes.  Well, are you saying that he was
8  responsible for the overseeing of it?
9    Q.   Yeah, essentially, with input from everybody,
10 the group.  But he was tasked as the COO with sort of
11 making it -- getting it from the point where it was
12 when he came in, hopefully, to an actual initial public
13 offering; correct?
14    A.   Corey was the person James was to talk to and
15 Corey would then go back to Marcus.  Marcus would make
16 the decisions and Corey would go back to James.
17    Q.   How about when James was gone?
18    A.   After that, Marcus made the decisions where
19 we would consider to go.
20    Q.   And --
21    A.   All of the team members proposed, but Marcus
22 was the one that decided on London.
23    Q.   Once he decided, was Corey involved in trying
24 to move that forward?
25    A.   No.

Page 75

1    Q.   I want to go back.  We may have forgotten
2  about them, but the interrogatory answers, I'm looking
3  at page BJodoin0091, Interrogatory 15.  The
4  interrogatory asks, "Please list the name of each
5  person, aside from your attorney and the persons
6  specified in Interrogatories 3 through 12, with whom
7  you discussed NAC Foundation and/or Marcus between
8  January 1st, 2015 and November 30th, 2019."
9        And you offer up several pages here.  You
10 disclosed Marcus' personal contact information after
11 you left to some people to say, you know, get in touch
12 with Marcus if you want to find out what's going on or
13 basically follow-up with Marcus.  To whom did you give
14 that personal contact information?
15    A.   I know that there was a previous coin, old
16 owner, who called me, and he was quite angry.  And he
17 informed me -- I don't even remember his name.  I
18 didn't write it down.  I apologize.  He was quite angry
19 because he wanted these coins to be going live.  We had
20 promised in January they would be going live right
21 away.  I told him I was no longer with NAC, and I said,
22 please call the office.  He said, I cannot get ahold of
23 them.  And I said, here is Marcus' phone number.
24 Contact him.
25    Q.   Who else did you give Marcus' phone number

Page 76

1  to?
2    A.   When we were selling coins, I'm sure that it
3  was given to Andrea and Vince, I believe, had it.
4  Other than that, I don't -- the only number that I have
5  for him was the same number that we were given by
6  Marc Diadamo by Marcus himself when we were in Poland.
7  So I never gave them his personal home number.  To me,
8  it was just the number that was associated with Marcus.
9    Q.   Well, there was an office number; correct?
10    A.   Yes.
11    Q.   Is this the number you're talking about for
12 Marcus' office number?
13    A.   No, it was his cell number.
14    Q.   Well, the office number was not the same
15 thing as Marcus' cell number, was it?
16    A.   No, it was not.
17    Q.   So you gave some people his cell number?
18    A.   Yes.
19    Q.   Okay.  And giving them the cell number, that
20 was done without Marcus' permission; right?
21    A.   For the clients that called once we had left,
22 absolutely.
23    Q.   How about for Andrea and Vince?
24    A.   I'm not sure.
25    Q.   You knew that there was a difference because

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 77

1  the office number could be routed to Marcus, but the
2  office number, those calls were recorded; right?
3      MR. KNECHT:  Objection.  Calls for
4  speculation.
5  BY MR. OLSEN:
6      Q.  You can answer.  That was the standard
7  procedure, was to give the office number and not the
8  direct cell number; correct?
9      A.  I don't remember ever being told not to give
10 them the cell number.
11     Q.  Well, if it was going to route -- if it went
12 through the office and going to route to his cell number
13 number, the only reason to give someone his cell number
14 to call directly would be to not go through the office;
15 right?
16     A.  For these gentlemen that I said previously
17 that contacted me after, I'm pretty sure it was by
18 June, he had called the office numerous times.  He had
19 called me more than once.  And I did not pick up.  I
20 wanted him to leave us alone.  And it was Marcus' --
21 it's their problem.
22     Q.  Well, but it wasn't your number to give to
23 them; correct -- him?
24     A.  No, it was not my number.
25     Q.  And to the LeFevres, which we kind of glossed

Page 78

1  over, you also gave them Marcus' cell number, which
2  simply avoids going through the recorded office call;
3  right?
4      A.  I don't know.  I know I gave it to the
5  customer that called me in June.  I know that.
6      Q.  The LeFevres are friends of yours; right?
7      A.  Yes, they are.  But I do not know -- I would
8  have to look back through my conversations with Andrea.
9  I don't know if she got it from us or if Marcus had
10 contacted her.  Because there are clients that Marcus
11 would call and contact from his cell phone to discuss
12 the purchase of the coins.  I do know that I believe
13 they have it.  I don't know if it was from me.  I don't
14 remember.
15     Q.  But you do say in answer to interrogatory,
16 they're close friends and they were having trouble in
17 July 2016 receiving their coins; right?  So what
18 happened is you gave them Marcus' cell; right?
19     A.  We did not know that they were getting --
20 having difficult with the coins.  When we talked to
21 them in April, we explained we were no longer with NAC,
22 and that we were having difficulty.  We did not discuss
23 NAC again until she came to us after they had already
24 been having difficulty to tell us they had decided to
25 ask for their money back.  She told me she had been on

Page 79

1  numerous phone calls with the office and had contacted
2  Marcus.
3      Q.  You told her you were interviewed by the FBI?
4  You told Andrea?
5      A.  Yes.
6      Q.  And you told her the content of that
7  discussion; right?
8      A.  Not really.  It was very general, that the
9  FBI was investigating Marcus and they asked to
10 interview us.
11     Q.  And you told your good friend Andrea what you
12 said though; right?
13     A.  Let me think.  Not in any great particular
14 detail, I don't think.
15     Q.  What do you remember telling her?
16     A.  I remember telling her that we went to the
17 FBI and that I was scared out of my mind because I had
18 never been interrogated by any type of police officer
19 or interviewed by a police officer.  I told her that we
20 gave her our side of the story, and I told her I hoped
21 that Marcus would be stopped from harming other people.
22     Q.  So you implied that Marcus had harmed people,
23 including you; correct?
24     A.  That is my opinion, yes.
25     Q.  You also told, at some point, Andrea and/or

Page 80

1  Vince your understanding or your view of what the
2  Alberta Securities Commission had told your husband;
3  right?
4      A.  Correct.
5      Q.  Would that include your version of the ASC's,
6  what you call their opinion, that the coin sales could
7  be a violation of the Securities Act?
8      A.  Yes, I did.
9      Q.  You stated that it was a violation; correct?
10     A.  That I understood that it was, yes.  That it
11 very well could be.  I don't actually -- let me correct
12 myself.  I have never, I don't think, told anybody
13 100 percent that it was.  I told them that I was afraid
14 it was after hearing what they said, but I can't know
15 for sure and they did not say for sure it was.
16     Q.  If we asked her in a deposition, is she going
17 to remember it that way or remember it more like, you
18 know, Brandi told me that it was a violation?
19     MR. KNECHT:  Objection.  Calls for
20 speculation.
21 BY MR. OLSEN:
22     Q.  You may answer the question.
23     A.  I don't know.
24     Q.  Bert and Angie, they are relatives; correct?
25     A.  That is correct.

Brandi Jodoin                                              NAC Foundation, LLC v. Corey Jodoin, et al.

Page 81

1    Q.  You told them -- they're Corey's parents.
2    You told them that you were interviewed by the FBI?
3    A.  Yes.
4    Q.  And when did you talk to them about that?
5    A.  When we went to Las Vegas for it.
6    Q.  August 2018?
7    A.  Um-hum.
8    Q.  And what did you say to them about that
9    interview after it happened?
10   A.  Not much.  That I was told to meet an FBI
11   agent.  That they were -- that Marcus was being
12   investigated.
13   Q.  Unlike Andrea, you didn't tell them it was
14   scary?
15   A.  Andrea is my best friend.
16   Q.  Then in your answer to interrogatories you
17   say, "Bert and Angie are Corey's parents.  They knew we
18   were interviewed by the FBI.  Bert and Angie lost a
19   great deal of money in a Ponzi scheme approximately
20   four months ago."
21       I assume that's in 2019 sometime?
22   A.  Yes.
23   Q.  Does that, their losing money in a Ponzi
24   scheme, have anything to do with Marcus or NAC?  I'm
25   not sure why that's in the answer.

Page 82

1    A.  It was similar in the fact that they had
2    given money to somebody who had a product or was
3    promising a large -- a deal of some sort, and they did
4    not get documentation or a contract protecting their
5    money.  It was very similar in the fact that we gave
6    Marcus the money without having the contract or a
7    buyout position, and they wanted to talk to us about
8    what they should do.
9    Q.  Well, as far as the coins, you got the coins
10   in your deal?
11   A.  I'm talking about the $275,000 that we gave
12   Marcus for shares in a company that did not exist.
13   Q.  The company certainly existed; right?
14   A.  The one that he was going to give us shares
15   in did not.
16   Q.  So getting back to your in-laws, you
17   understand the difference between a Ponzi scheme and a
18   statement that it's possible that some sort of purchase
19   of a thing, like coins, might be a violation of some
20   securities law?
21   A.  That isn't what we were talking about.  We
22   did not talk about the coins.  We talked about the fact
23   that Marcus had promised us shares in a company that
24   did not yet exist and we gave him money with no
25   contract, no buy and sell agreement, no protection for

Page 83

1    ourselves.  They were in a similar situation, that they
2    had given money to a person who was promising a return
3    and they did not get a contract or any specific buy or
4    sell protection.  That is what the conversation was
5    about.  The coins were never brought into the
6    conversation.
7    Q.  And you told your in-laws that it was
8    similar?
9    A.  It is similar in the fact that they gave
10   money to someone that they are having a difficult time
11   getting it back and they have no written documentation.
12   Q.  You told somebody that your contract dispute
13   with NAC is like a Ponzi scheme?
14   A.  No, I did not.  I don't even -- to be honest,
15   I put in Ponzi scheme because I didn't know how to -- I
16   don't even know what a Ponzi scheme is.  I know that a
17   Ponzi scheme is when somebody is cheated of money.  I
18   put a Ponzi scheme in there because I did not know how
19   to write that they had been duped.
20   Q.  The -- just for one second, go back to
21   Andrea.  The coins that Andrea and her husband
22   purchased, you were the person from whom they purchased
23   them; right?
24   A.  Yes.  We signed the purchase agreement, yes.
25   Q.  And did you sign the, I want to say, quality

Page 84

1    and assurance form, something like that, that was part
2    of those transactions?
3    A.  I actually did not sign any of it, I don't
4    think.
5    Q.  Did Corey?
6    A.  I'm not sure.  I was not -- that was not
7    under my jurisdiction.  I didn't -- I had very little
8    to do with that.
9    Q.  Okay.  John and Cynthia Bokenfohr, you told
10   them in March of 2016, that John said he was going to
11   call NAC and inquire about the coins, and you said,
12   "they were informed what the ASC told us."
13       What did you tell them specifically, the
14   Bokenfohrs?
15   A.  The same thing I told Andrea, the same thing
16   we told everyone, that when we had called the ASC, that
17   they informed us that Marcus and Marc Diadamo were not
18   registered to sell securities, and that, in his
19   opinion, the coin or token could be considered a
20   security and it could be unlawful that it was being
21   sold.
22   Q.  Okay.  But the way you put it to the
23   Bokenfohrs was that it was unlawful; correct?
24   A.  No, I did not.  It was that it could be.
25   They asked my opinion.  I said, I don't know.  I sure

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 85

1  hope not. I hope that you can still realize a return.

2      Q. The next person on this list is

3  Chantal Ortmeier. It says you spoke to her in June of

4  2016, and explained -- you said, "I explained that we

5  were no longer with NAC. Chantal is my sister-in-law.

6  She knows Marcus is suing us, that we had been refused

7  our money and we went to Las Vegas to talk to the FBI."

8      See that?

9      A. Yes.

10     Q. Okay. When --

11     A. May I clarify? I am not sure if it was June.

12  It took us a fairly lengthy time to contact and share

13  with all of the few coin holders that we personally had

14  presented the opportunity to. As near as I can

15  remember, it was later than the rest. It could have

16  been earlier.

17     Q. Well, if you told her you went to the FBI --

18  to Las Vegas to talk to the FBI, was that after August

19  of 2018?

20     A. Yes. Well, she knew before. She knew before

21  we were traveling down there. She's my sister-in-law.

22  She knew that we were going down to the FBI. We needed

23  someone to help watch the kids.

24     Q. I was trying to get the timeline. So you

25  talked about 2016, possibly later. But that event took

Page 86

1  place in 2018; correct?

2      A. I apologize. I'm saying that the first part

3  of all of these we spoke to them between March and end

4  of June, first part of July. We told the ASC that

5  we had sold coins to what the ASC said and that we were

6  no longer with NAC. Then when we went to Las Vegas to

7  talk to the FBI, Chantal was told that we were going to

8  Las Vegas, and she would have been told that in August

9  before we went down to Las Vegas.

10     Q. Did she purchase her coins at the time you

11  had the conference in January, I think it was, of 2016?

12     A. Yes, within -- I don't know if she purchased

13  them that night, but within -- from the result of that

14  is when she purchased her coins, yes.

15     Q. Okay. And we already discussed the fact that

16  at the time the conference took place, you had

17  already -- there had already been this change in

18  expectations over the $140 million, $100 million

19  discussions with Mawhinney, and so you had already gone

20  through that process and already had some suspicions,

21  didn't you, about NAC?

22     A. I had suspicions about that it was not being

23  run efficiently. I did not start to doubt the legality

24  or the ethics of Marcus until after January, after the

25  conference.

Page 87

1      Q. Okay. The people at that conference bought

2  coins, though; right? They didn't buy --

3      A. That's correct.

4      Q. I'm going to assume you told

5  Angela McGonigal, when you told them about the ASC,

6  your testimony is you told them the same things you

7  told other people, and you've testified to that today?

8      A. Yes.

9      Q. However, when it comes to Tyler Hoff, and

10  this is on page BJodoin0093, you say that you spoke to

11  Tyler Hoff and to Darren, is it Wincura?

12     A. Wincura, I believe.

13     Q. You said that you talked to them between

14  April 25th and May 2nd, 2016, after the ASC informed

15  you -- "informed us we may be legally responsible if we

16  did not inform them of what we had learned after

17  talking to the ASC."

18     I think we already talked about -- you go on

19  to say, "I felt morally obligated to inform them."

20     We've already talked about the fact that you

21  felt a moral obligation, and it wasn't as though the

22  ASC had told you directly you're criminally liable for

23  this; correct? When you talked to Tyler --

24     A. I want to answer your question.

25     Q. Go ahead.

Page 88

1      A. In my opinion, he made it very clear that we

2  could be criminally liable and that we have an

3  obligation.

4      Q. Even though it was only his opinion with

5  respect to the coins?

6      A. Yes. And, actually, was not with respect to

7  the coins. Once again, it was Tyler and Darren Wincura

8  were giving money to purchase shares in a company that

9  did not yet exist.

10     Q. And, again, with respect to these two, you

11  were not involved in their purchase, potential

12  purchase, of shares, were you?

13     A. Given what Marcus had informed us, no.

14     Q. Right. So you didn't have any obligation or

15  potential liability to speak to these people about a

16  purchase of shares you were never involved with?

17     A. The ASC said we were. Because he asked us

18  when we explained how we would gotten involved and he

19  informed us that that was a violation, Corey asked, he

20  said, well, there's other people that are doing it,

21  too. Or he asked, is there other people. That somehow

22  it was brought up that did anyone else do it with you.

23  And we said, no, but there are three prospective people

24  that are being asked right now to do that. And he told

25  us, he said, you know, you have an obligation to tell

Brandi Jodoin                                      NAC Foundation, LLC v. Corey Jodoin, et al.

Page 89

1  them.  You could be criminally liable if you do not.
2  You could be held responsible if we do not.
3      Q.  By the time of that conversation with the
4  ASC, had you been locked out?  Had you left, ended your
5  association?
6      A.  Yes.
7      Q.  You had said you had been locked out.  Those
8  were your words.  So that had happened already by the
9  time of the ASC.  So you were no longer -- whatever
10  your position was, you no longer had that position and
11  Corey no longer had that position; correct?
12      A.  That's correct.
13      Q.  Was there a -- do you know whether Tyler Hoff
14  contacted the ASC?
15      A.  I do not know.  His affidavit said he did
16  not.  That's all I know.
17      Q.  Right.  His affidavit said -- disagreed with
18  your characterization of the conversation you had;
19  correct?
20      A.  Pardon me?  Can you repeat that.
21      Q.  Mr. Hoff's affidavit disagreed with what
22  you're telling me now.  He said that you had accused,
23  essentially accused, Marcus of fraud in that
24  conversation; correct?
25      MR. KNECHT:  Objection.  Document speaks for

Page 90

1  itself.
2  BY MR. OLSEN:
3      Q.  You can answer.
4      A.  I re-read it, and he doesn't say it exactly,
5  but it definitely seems like he disagrees with me, yes.
6      Q.  And it also says that Corey actually provided
7  the information.  He texted the name and the number of
8  the officer that he talked to from ASC in this answer;
9  correct?
10      A.  That's correct.
11      Q.  As you sit here today, do you know that name?
12      A.  No.  Can I clarify something?
13      Q.  Let me move on to a short question and we can
14  get out of these interrogatory answers.
15      A.  Sure.
16      Q.  If you can look at number 16 on page
17  BJodoin0094.  It says, "Please state the name of each
18  person listed in your response to Interrogatory 15" --
19  which we went through -- "to whom you made the false
20  statement about the NAC Foundation and/or Marcus,
21  including, but not limited to, the statement that you
22  relied on a market valuation of $100 million when you
23  decided to remit a total of $265,000 to NAC, as you
24  inferred in paragraph 41 of your counterclaim."
25      You see that?

Page 91

1      A.  Yes.
2      Q.  And you said it wasn't a false statement.
3  But who did you tell that as part or all of your
4  reliance, you relied upon a market valuation of
5  $100 million or more to make your investment?
6      A.  To be honest, I don't know.  We were informed
7  when we left and after we talked to the ASC and got
8  legal counsel, we could -- we should tell as little to
9  people as we could to not engage in discussions.
10  However, some of these are our friends and family and
11  we were angry.
12      Q.  So you were told you should contact some
13  people, but you shouldn't give detail?
14      A.  No, that's not what I'm saying.  When the ASC
15  told us -- and I want to be clear.  It's been five
16  years.  Listening to that conversation and hearing an
17  officer of the law tell us that we could have been
18  engaged in something that was illegal and we could have
19  invited our family and friends into it, was extremely
20  off-putting.  I walked away with that very convinced
21  that I could be held liable or responsible for not
22  informing at least Tyler and Darren.  The choice to
23  tell the coin holders that the ASC said about the coins
24  perhaps being -- we told our family and friends.  We
25  had used our good name to bring them into this and we

Page 92

1  needed to be as honest as we could to why we were
2  leaving.
3      When we contacted a lawyer, they asked us to
4  say as little as possible about it.  I can't say for
5  sure what I told my friends and family.  I tried to say
6  very little and stay very positive, but at the end,
7  when we were locked out, it became very apparent that I
8  cannot say I didn't share.  I was angry.
9      Q.  Bear with me one second, find my notes here.
10  I glossed over this so let me go back and ask you this.
11      When I mentioned the quality assurance forms,
12  what's the purpose of those forms?
13      A.  I don't know.
14      Q.  You signed one or several; right?
15      A.  I don't -- I don't know if I did or not.
16  Corey -- I was responsible for organizing the events.
17  And I was also trying to help pull policies and
18  procedures to make up a corporate policy.  Corey
19  understood the coin better.  He also has run his own
20  business.  So most of the sales he was responsible for
21  the actual filling out of the paperwork.
22      I do not remember filling out or signing one.
23  I'm not saying I didn't.  I would need to see them.  I
24  would suggest that most were done by Corey.
25      Q.  Okay.  But you knew what they were?  I mean,

Brandi Jodoin                                              NAC Foundation, LLC v. Corey Jodoin, et al.

Page 93

1  you had seen them; right?  You might have signed
2  something, you might not have?
3      A.  Yeah.  When we bought our own coins, I
4  believe the quality assurance, if I am remembering the
5  paperwork properly, was that you were buying coins --
6  it's to qualify, like you said earlier, it wasn't an
7  investment opportunity.  It was you were buying tokens
8  that right now had no monetary value.  I believe that's
9  what the quality assurance form was.
10     Q.  Okay.  And the idea that the person signing
11 them on behalf of the company was representing --
12     A.  Was stating that --
13     Q.  -- weren't being misled or anything --
14     A.  Yeah, it's not money.  I'm not selling you
15 $100 worth of American coins, yes.
16         Is that what it was?  Is that the right
17 paper?
18     Q.  You'll have to take a look at afterwards.
19     A.  Okay.
20     Q.  One more thing on the FBI.  Maybe I asked you
21 this, but did you, yourself, send any subsequent
22 documents?  You said that you had documents there for
23 them to look at, give them access, during the
24 interview.  Did you send anything subsequent to the
25 interview?

Page 94

1      A.  I believe I did.  I believe that we had some
2  extra copies of some of the emails on our computer.
3  And I believe I forwarded a shore bit (phonetic) or I
4  forwarded them to Adam.
5      Q.  For the purpose of getting them to the FBI?
6      A.  Yes.  I believe it was about the lobbyist.
7      Q.  Abramoff?
8      A.  Is he the black fellow?
9      Q.  No, definitely not.
10         Do you recall who the -- what was this
11 lobbyist for?  What was he doing?
12     A.  He was a lobbyist trying to get Congress to
13 pass a law stating that cryptocurrency had to be AML
14 compliant.  And he was an African American fellow.
15     Q.  Okay.  Do you know who Jack Abramoff is?  Did
16 you ever hear about his affiliation with the company?
17     A.  Only after you sent the name to me.  I
18 Googled him.
19     Q.  Do you know if he had any relationship to
20 this gentleman you're thinking of?
21     A.  I have no idea.  The lobbyist I never met or
22 contacted.  That was Corey and Marcus.
23     Q.  Can you tell me what the C-A-L-E form is?
24     A.  I don't know.
25     Q.  Has something to do with money laundering.

Page 95

1  Do you recall?
2      A.  Oh, C-A-L.
3      Q.  Maybe I got it wrong.  The money --
4      A.  Okay.  Okay.  Yes, that is -- now, let me see
5  if I can remember.  This is stuff I learned.  One of
6  the things about Aten coin was that it was AML
7  compliant.  It was also to use the same software the
8  American banks do, which was to prevent fraudulent use
9  of the coin.  There was also a form that we implemented
10 or a procedure that we had to prevent money laundering.
11 And there was countries, I believe, that we were not
12 willing to sell to.  That might have been because they
13 were wanting to not fund terrorist activities.
14     Q.  Right.  Did an officer or someone on behalf
15 of NAC sign those forms as well as the buyer?
16     A.  I believe so.
17     Q.  Did you sign any?
18     A.  I don't know.
19     Q.  Have you ever discussed, been contacted by or
20 contacted yourselves, the Internal Revenue Service in
21 the United States concerning NAC or Mr. --
22     A.  No.
23     Q.  Has the -- had the FBI ever mentioned that to
24 you?
25     A.  Not that I recall.

Page 96

1      Q.  Have you ever signed a written statement or
2  affidavit for either the FBI or the ASC?
3      A.  No.
4      Q.  Were you asked to?
5      A.  No.
6      Q.  How about for any other agency?
7      A.  No.
8      Q.  What did you understand your job as the
9  administrative officer to be?
10     A.  A girl Friday.  I was to oversee, help
11 Agnieszka Bilinska with the market -- marketing plan.
12 If she needed any help, to help her with that.  I was
13 to help edit and oversee the website and the graphic
14 designs.
15         When we were to be going towards, with
16 James Mawhinney, we had corporate structure.  So I was
17 supposed to be pulling corporate structure together,
18 working with Aga to do corporate structure.
19         When I was also placed in -- all the Canadian
20 customers I was supposed to introduce myself to and ask
21 them to come to the investment wine and cheese.  There
22 was some difficulties with everyone getting their
23 wallet downloaded.  They were asked to call us if we
24 had any -- to see if we could answer some of those
25 questions first, and if not, I was supposed to pass it

Page 97

1  on to Patti or Barb at the office.

2      When we were in Las Vegas and I discovered

3  the state of the files, Marcus had said I was to

4  contact the Canadian customers and rectify the

5  paperwork issues.

6      Q.  That was in that January visit to the office?

7      A.  Yes.

8      Q.  Okay.  You mentioned the oversight for

9  marketing, Agnieszka Bilinska and then the lawyer whose

10  name was escaping me.

11      A.  The lawyer was called Aga.

12      Q.  Okay.  So Agnieszka or Agnes, I'll call her,

13  she was doing work on the marketing and you were

14  overseeing her preparation of the marketing materials,

15  including for the Alberta conference; correct?

16      A.  Yeah.  We were more or less just working

17  together.

18      Q.  And that was not just graphics, but that was

19  the content that was put into that presentation; right?

20      A.  No.  We were to critique the way it looked,

21  color and design and what not.  Each one was given a

22  specific -- each one of the presenters were given a

23  specific task.  And they accumulated theirs and then

24  sent it to us for layout and look.  And then Marcus

25  critiqued whether or not something was allowed to be

Page 98

1  said.  Like, for example, Terence at the Polish

2  conference gave a very good presentation on crypto

3  crime, but his PowerPoint was black with red writing

4  and it was hard to read.  So we told him he should

5  switch the colors.  Not so much content.  We just got

6  them to switch colors.

7      I ordered the business cards.  I talked to

8  the caterer.

9      Q.  Documents that went out of the office, during

10  the time you were doing these things, documents that

11  went out of the office to coin holders, those went

12  through you; correct?

13      A.  Documents, as far as invitations went out.  I

14  introduced myself.  The 18 coin holders that were

15  missing legal parts of their purchase agreements and

16  compliance, I contacted them to tell them that they

17  needed to -- and I worked with Marc Diadamo to

18  encourage him to get these up to date.

19      Q.  You mentioned the website.  You put certain

20  material up on the website as well; correct?

21      A.  Like, the content of it?

22      Q.  Yeah.

23      A.  Are you asking if I'm the one -- I wrote some

24  of the content.

25      Q.  I'm not asking if you wrote everything.  I'm

Page 99

1  asking you wrote some of it and then you were the one

2  who put it up on the site?

3      A.  No, I don't have technical expertise for

4  that.

5      Q.  I did say that wrong.  You wrote some, and

6  then you instructed whoever actually had the technical

7  expertise to put it up on the site?

8      A.  Yes.  After Marcus gave me his approval.

9      Q.  Okay.

10      A.  I did not make a decision ever without

11  Marcus' approval.

12      Q.  You've mentioned Aga?

13      A.  Yes.

14      Q.  Cenzartowicz, I think?

15      A.  Yes.

16      Q.  She's a lawyer educated in the U.S., as I

17  understand it?

18      A.  Yes.

19      Q.  What were her responsibilities at NAC?

20      A.  She, in December, when we -- December, when

21  we were in Poland, we were informed that Aga was

22  responsible for all the European legal work.  She was

23  also supposed to get half of Aten Pay, I believe, or a

24  quarter of Aten Pay.  So she did all of the legal work

25  there.  When we were trying to put together a corporate

Page 100

1  structure for the NAC to go take it public, she was

2  appointed chief legal officer.  And then from that

3  point, she was supposed to bring all of the various

4  lawyers Marcus had doing various piecemeal work under

5  her direction and she was supposed to oversee it.

6      Aga and I also were the ones that were

7  working on policies and procedures.  I would pull

8  policies and procedures from various online sites, and

9  then I would forward to her and she would tell me if

10  legally this was applicable or not.

11      Q.  Okay.  So you would hunt for them.  You would

12  select things that you thought were appropriate, and

13  then she gave it the lawyer's look to see if it met the

14  legal criteria?

15      A.  Yes.  For example, like, perdiems when

16  they're traveling, gifts given to you when you're

17  working for a company, sick leave, that type of thing,

18  I would find those corporate policies from various

19  sources, and she would tell me which one would be the

20  best one to use.

21      Q.  The best one or the one that was legally the

22  best?

23      A.  Yes, legally the best.  Legally the best.

24      Q.  When you were talking about Marcus giving

25  approval on content, whether it was in presentations or

Page 101

1  the website, as I understood it, would he do that by
2  email, he'd give his approvals?
3     A.  Some email, some email.  Like large parts of
4  the presentation were sent to him.  We had wanted to
5  put -- Jarek had asked Corey if he could put the asset
6  valuation that was in the business plan that we had
7  been given.  Marcus said no, and asked him to remove it
8  because he felt that you didn't want to tip your hand
9  to too many people and reveal the worth of the company
10 or what could be the worth of the company.  And for
11 those, that was done via email.
12     We did a lot of Skype.  Particularly with the
13 website editing and graphics, we would go on Skype and
14 I would send different graphics and different parts of
15 it there.  And then towards the end of the conclusion
16 of the website, you could go on and it was like a
17 non-live model.  We could login to it and we could
18 scroll through it as if it was a website, but nobody
19 else could, if that makes sense.
20     Q.  Right.  During the construction of the
21 website?
22     A.  Yes.  Yes.  And then we would edit it via,
23 you know, like, writing on the screen, type thing.
24     Q.  Did Marcus ever do that or did you just take
25 that from, say, an email he sent you and you made

Page 102

1  edits?
2     A.  We did it both.  And, actually, we sent it to
3  Aga and Agnieszka and Corey as well.  And they all had
4  various opinions on it.  We would also do some stuff on
5  Google Docs.  There was a couple things Aga had sent to
6  me that I would respond, this seems odd or this is
7  worded incorrectly, what about this.  And then Marcus
8  would join and say yes or no.
9     Q.  Those emails that you would exchange with
10 Marcus about this kind of stuff, the content or
11 anything else, you still have copies of those emails
12 somewhere?
13     A.  Pardon me?
14     Q.  That was a sneeze.
15     A.  Okay.  I have certain copies that I printed
16 off.  It was an Aten coin email.  As soon as it got
17 shut down, we were completely locked out of it.
18     Q.  Did you use your personal email address for
19 any of these exchanges?
20     A.  In the beginning, I did, for a few things
21 when -- NAC was a member of the American Bankers
22 Association, ABA.  And they were wanting promotion
23 materials for -- in the ABA, if you join, you get a
24 banner page and you get some of that information.
25 Marcus asked me to take that over and work with

Page 103

1  Agnieszka and just give him final approval.  That
2  originally was done on Gmail, on my Gmail.  And then a
3  few of the contacts with some of the clients.  After
4  that I told him I didn't want my personal email being
5  used.  It was very, very early that he set me up an
6  Aten coin email.
7     Q.  You still have that personal email?  Do you
8  still use it?
9     A.  Yes, I do.  I do.
10     Q.  Okay.  Talking about approvals from Marcus,
11 there are -- and I think this has been in association
12 with either Alberta or possibly in the European
13 conference, but there are a bunch of bios I've seen
14 prepared.
15     A.  Yes.  Yes.
16     Q.  Those were done for the Alberta conference?
17     A.  Yes.
18     Q.  And those were done, I gather, by the
19 individuals?
20     A.  The basic -- I apologize.  Please continue.
21     Q.  That's okay.  I was lingering there.
22     Did you modify those based on information?
23     A.  No, I didn't.  I was responsible for
24 collecting it.  And then it went through Agnieszka
25 Bilinska.  And then I believe her name was Lisa

Page 104

1  Hafeeler (phonetic).  She was a marketing woman out in
2  New York.  She set up our LinkedIn account, Corey and
3  I.  And she also was responsible for the writing of the
4  biographies.
5     Q.  Right.  Corey wrote his biography; correct?
6     A.  No.  He wrote, like, a thumbnail and Lisa --
7  Lisa wrote it.
8     Q.  Thumbnail being, like, well, this is my
9  experience and this is how I've been doing this, and
10 she filled in the other stuff?
11     A.  She made it pretty.
12     Q.  Okay.  How about yours?  Because I saw you
13 had one.  You wrote the basic fact points and she made
14 it pretty?
15     A.  I just gave the basic facts.  I didn't really
16 recognize myself when she was done, to be honest.
17     Q.  What was it you didn't recognize?
18     A.  It made me sound much better than a
19 housewife.  Then they had to be given to Marcus to be
20 okayed.  And then they were sent back to me and I sent
21 them to the printer.
22     Q.  Okay.  Before it went to the printer, you saw
23 them, the bios; correct?
24     A.  That is correct.
25     Q.  You saw yours?

Brandi Jodoin
NAC Foundation, LLC v. Corey Jodoin, et al.

Page 105

1  A.  Yes.

2  Q.  And you sent that one and the others out to

3  the printer to be made part of a package?

4  A.  First I sent them to Marcus for approval.

5  And then once he approved it, then I sent them to the

6  printer, yes.

7  Q.  Okay.  Did you ever delete any emails -- you

8  mentioned the company emails.  Did you ever delete the

9  emails from your company email?

10  A.  Yeah.  You get emails that -- I'm sure I

11  probably did.  Not -- can I start over?  I did not ever

12  delete emails with the intention of deleting them to

13  erase the information.  I would assume that there was

14  some emails being deleted because they were simply

15  unnecessary.

16  Q.  Okay.  Since you say it that way, did you

17  ever delete any that were not unnecessary?

18  A.  Not that -- no.

19  Q.  What sort of --

20  A.  Not with the intent.

21  Q.  Was there categories of emails you would

22  delete, types of emails?

23  A.  There was a lot of ABA emails that were sent

24  to you, we're having this special, we're having this

25  conference.

Page 106

1  Q.  How about things that are to do specifically

2  with the company as opposed to just junk, ads, that

3  kind of thing?

4  A.  I can't think of anything.  I tried to keep

5  as much as I could and tried to keep it organized.

6  There might be some emails concerning all the graphic

7  design that were just getting too large that I cleaned

8  up, but I do not believe so.

9  Q.  Does that include emails that relate to

10  content of website presentation?

11  A.  Yes.  I really don't believe so.

12  Q.  Let me ask you -- let's try and move on.  I

13  know it's getting late there.  Let me try to move on to

14  another topic.

15  Do you know John Fahy?  Do you know that

16  name?

17  A.  John Fey?

18  Q.  F-A-H-Y.

19  A.  Yes.  F-E-Y?

20  Q.  I thought there was an H.  The person you're

21  thinking of, what does he do?

22  A.  He's a securities lawyer that has done work

23  prior to -- we were getting there and setting up,

24  overseeing I don't remember what it's called for the

25  coin sales.

Page 107

1  Q.  Did you communicate with Mr. Fahy or just

2  Corey?

3  A.  I believe that I was present on one phone

4  call with John Fahy, where Marcus and Corey were

5  talking to John Fahy concerning a judgment or an order

6  against NAC from Florida.  And then I emailed him once

7  or twice.  I emailed him once introducing Aga as the

8  new legal officer.

9  And then there was a confusion about the

10  compliance policies.  Aga went to John Fahy because she

11  was just updating them, and Marcus informed her that

12  John Fahy was supposed to do it all.  And so John Fahy

13  was received and I was CC'd in that email.  I believe

14  that's the only communication I had with him that I can

15  remember.

16  Q.  Okay.  It's likely, given what Corey was

17  doing, that he worked more with John?

18  A.  I don't really think so.  I think that much

19  of what John had done was established prior to us going

20  there.  Aga was the point that we dealt most with.

21  Q.  Okay.  How about there's a person named

22  Jarek; correct?

23  A.  Jarek.

24  Q.  Jarek, sorry.  Now that I'm seeing the last

25  name, it's Jarek.  What did Jarek do?

Page 108

1  A.  Jarek was in the banking or insurance

2  business.  And he was brought on by Aga and Igor to

3  help build the structure and the management of, like,

4  business operations.  And he was to be working with

5  Corey on the fast payment, the Federal Reserve fast

6  payment.  And then they were to be working on a more

7  comprehensive kind of company view of where we were

8  going to be going forward at kind of a streamlined how

9  we were going to develop Aten coin.

10  Q.  You mentioned Marc.  What was Marc's role

11  with the company?

12  A.  He was the salesperson that sold Corey the

13  coins.  And he was the head salesman and then he was

14  given the VP of sales.

15  Q.  When you went to the office in Las Vegas in

16  January of 2016, was Marcus there?

17  A.  Marcus?

18  Q.  Andrade.

19  A.  Yes, he was.

20  Q.  How about Diadamo?

21  A.  I do not believe so.

22  Q.  Okay.  Was Corey there?

23  A.  Yes.

24  Q.  Okay.  There was a Federal Reserve payment

25  task force thing that was in Chicago.  Was Marc at

Page 109

1 that?
2     A.  I do not believe so.  I know Corey went.  I'm
3 pretty sure that Marc was not there.  Marcus or Marc?
4     Q.  Marc Diadamo.
5     A.  As far as I know, Marco was not there.
6     Q.  So Marco wasn't there, but the one shortly
7 before even Las Vegas.  And he wasn't in Las Vegas.  Do
8 you know why?
9     A.  I don't.  I don't.  I don't remember him
10 being there.  And the reason why I think he really was
11 not because I then had to contact him about the missing
12 purchase orders and compliance forms and the CAL forms
13 that were missing out of his clients' files.
14     Q.  Why were they missing?
15     A.  Because they hadn't been done.
16     Q.  And so did you take charge at that point of
17 doing them?
18     A.  I took charge of gathering of -- Patti and
19 Barb were to go through each file, identify what was
20 missing.  Then they were to send me what was missing.
21 And I was to cooperate with Marco Diadamo getting them
22 finalized.
23     Q.  Was that after the Las Vegas meeting?
24     A.  Yes.  We actually used some of them.  Marco
25 got some of the clients that came to our investment --

Page 110

1 they were previous clients, but he got them to correct
2 the paperwork there.
3     Q.  If Marco -- sorry.  Hang on.
4         Had you expected Marco to be in Las Vegas for
5 that, to go through all these issues?
6     A.  I had no idea there were those issues
7 present.  We were to go down there to see the office,
8 to meet Carl.  And when I walked into the office, I was
9 appalled.
10     Q.  Okay.  If Marco has expressed -- would it
11 surprise you if he's expressed that he's uncomfortable
12 around you?
13     A.  And why is that?
14     Q.  Would it surprise you?
15     A.  No.
16     Q.  Why wouldn't it surprise you?  Has he
17 expressed that in some way before?
18     A.  No.
19     Q.  So why wouldn't it surprise you?
20     A.  Because I think we're vastly different
21 people.
22     Q.  Can you elaborate on that?
23     A.  Corey and I have been married for numerous
24 years.  We have 12 children.  We're devout Christians.
25 None of those were really Marco's bag.  He was very

Page 111

1 flashy.
2     Q.  Did that relationship -- he didn't show up to
3 Las Vegas.  Did that -- did your relationship with him
4 change after that?  Did he feel like he was getting
5 some hate from you, you think, over these issues?
6     A.  Yes, he did.  Because he was supposed to be
7 there and he wasn't.  I do remember.  I did ask him why
8 you weren't there.  And I said, I went in there and
9 there's problems.  We could get into a lot of trouble.
10     Q.  When you asked him why he wasn't there, what
11 did he tell you?
12     A.  He didn't -- he said he -- I don't really
13 remember.  It was more along the lines, I didn't think
14 I needed to be there.  I thought we could touch base.
15     Q.  He didn't express at that point what he's
16 expressed subsequently, that he's uncomfortable with
17 you?
18     A.  Gosh, no.
19     Q.  So would you say that the -- did the
20 relationship, working relationship or relationship with
21 Marco, change after he failed to show up in Las Vegas
22 and then you were asking him to complete these forms?
23     A.  I don't -- I don't really -- I don't know how
24 to answer that.  He was -- we were polite.  We were
25 courteous.  I don't necessarily think I was his

Page 112

1 favorite person, but I don't think he cared for me from
2 the beginning.  Like I said, I think we're just
3 different people.  He was never argumentative, and I
4 was never argumentative to him.
5     Q.  Did he ever try to instigate a personal
6 relationship of any kind?
7     A.  Oh, gosh, no.  No.
8     Q.  The lack of documents you found, you know,
9 completed documents you found in the case of Marco, you
10 said, was that true in the case of any other sales of
11 coins when you went to the office?
12     A.  I would have to look.  There was -- I don't
13 remember.  I've never met Brian, the other salesperson.
14 Nor had I ever -- he was not particularly active, as
15 far as I can remember.  Marco Diadamo was the person
16 that was taking care of them.
17     Q.  Even though you hadn't met these people, were
18 some of them responsible for these documents that may
19 have been incomplete?
20     A.  I have no idea.  I have no idea.  Marco
21 Diadamo was in charge of the sales.  Many of them were
22 his clients.  Some could have been Brian's, but at that
23 time, Marco Diadamo was in charge of the sales.  The
24 paperwork wasn't there.  It was important paperwork.
25     Q.  Excuse me one second.  Were you the one that

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 113

1  had asked Marco to come to Las Vegas for the meeting in
2  the first place?
3       A.   I had mentioned it to Marcus that I would
4  like him to come.   And then Marcus had said, well, if
5  you want him there, call him.   I had asked Marco to
6  come.   Honestly, I can't really remember if I knew
7  prior to me leaving he wasn't coming.   He was
8  resistant.   I had told him I would like -- Marcus had
9  said he was to come.   I know later on in January, he
10  told me, well, Marcus said it was up to him, and he
11  didn't feel he had to go.
12       Q.   Marcus was not originally going to go to the
13  office; right, on that trip to Las Vegas?
14       A.   I don't know.   I don't remember.
15       Q.   Was Corey originally going on that trip?
16       A.   Yes.   I believe the two people that were more
17  going was Corey and Marcus.   I was an afterthought.
18       Q.   Going backwards for just a second, make sure
19  I have this.   The issue again of the Aten coin, an
20  opinion that it could be a security or could be wrong
21  to sell it, that's the implication, right, that it
22  could have been a security and, therefore, selling it
23  in the way it was done was wrong?   Is that what your --
24       A.   That was my understanding, yes.
25       Q.   And when you told these people about that

Page 114

1  statement by the ASC, you told them specifically that
2  the -- well, I don't know if you said opinion or not,
3  but you told them that the ASC had said these coins are
4  security?
5       A.   I tried very hard to make it clear that that
6  was an opinion and that's what we were told.   Not so
7  much -- okay.   Let me rephrase that.   Not that it was
8  opinion, but it could be considered a security.   And in
9  his opinion, it -- that in his opinion that there was a
10  great deal of question to it being a security.
11       Q.   When you told other people about that
12  conversation, you weren't quite as slow and circumspect
13  in describing the situation; right?
14       A.   Probably not.   The conversation had only
15  happened a month before that.   This is five years.   I'm
16  trying to think about what I said rather than
17  paraphrasing it.
18       Q.   Pardon me a second.   Let me try to skip
19  through some of this stuff.
20          Do you work with Corey in his construction
21  business?
22       A.   Not officially.   I would help him with safety
23  documents when he needed it.   I would comply and edit
24  the policies and procedures.   I would plan functions
25  for the staff and customer appreciation when they

Page 115

1  needed help.
2       Q.   What's the name of that business?
3       A.   The one when he was there?   He was working
4  with his father and it was A&A Trenching.
5       Q.   So it's no longer in business?
6       A.   His father retired.   We work out of -- Corey
7  has a smaller, same type of business, we just run it
8  out of our office, out of our home, now.
9       Q.   As far as that one, do you work with him on
10  that one?
11       A.   I have 12 children and I home school eight of
12  them.
13       Q.   Okay.
14       A.   That is profoundly a blue job.
15       Q.   Understood.   My wife is from 10, but --
16       A.   If you could find the time in my day for me
17  to help him, he would be eternally grateful.
18       Q.   Did you ever work with someone named Brian
19  Darrow?
20       A.   Personally, like, work-work?
21       Q.   Do you know who that is?
22       A.   No.
23       Q.   Okay.   You don't know who Brian Darrow,
24  D-A-R-R-O-W is?
25       A.   Like "bureau" with a B and an A?   That name

Page 116

1  sounds vaguely familiar.
2       Q.   Do you know whether he worked for NAC prior
3  to your becoming an officer?
4       A.   Oh, is that the salesperson?
5          MR. KNECHT:   Objection to form.
6  BY MR. OLSEN:
7       Q.   It could be.   Is that the Brian you were
8  thinking of?
9       A.   That's the Brian that I know of.   I don't
10  know what Brian's last name was.   I would have to look
11  back into the --
12       Q.   Have you ever spoken with him?
13       A.   No, not that I can recall.
14       Q.   Do you know why he was -- why he left NAC?
15       A.   I don't really know.   I had heard rumors that
16  there was -- he had some personal issues.
17       Q.   Okay.   You don't have any personal knowledge
18  of what those issues were?
19       A.   I think he was drinking too much.   That's
20  what I had kind of heard.
21       Q.   Nothing directly related to the work he was
22  doing?
23       A.   I know that when I was present, there was
24  concern about once we had established he was no longer
25  with NAC, he had a website or a webmail or something

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 117

1  where he was contacting -- if this is the salesperson,
2  he had -- was contacting coin holders and trying to get
3  them to sell their coins to come on to another --
4  another venture.
5       We had a Skype conversation. Marcus Andrade
6  told me that. And he informed me that if this is this
7  Brian, that Brian had screwed himself. And I asked
8  Marcus why. And Marcus informed me that Brian had been
9  given a bonus of, I believe, 50,000 coins, and when
10  Marcus had found out what Brian had done, Marcus went
11  in and shut down his wallet.
12       And I was -- I was angry with Marcus. I told
13  him, you cannot do this. We have just been doing all
14  of this marketing that this is a theft-proof -- this is
15  a theft-proof currency. You can't go in and lock out a
16  person's wallet. You cannot do that. You need to have
17  Aga deal with it.
18       I sent the information to Aga. Marcus then
19  told me he was going to return the coins. And then him
20  and Aga dealt with that from that point on.
21       Q.  You don't know what ultimately happened with
22  those coins?
23       A.  I do not.
24       Q.  Okay. And you don't know what the written
25  contract, if any, Brian had with the company was?

Page 118

1       A.  He told me that -- Marcus told me that he
2  felt he could take those coins without Brian's
3  knowledge because in the contract he had violated the
4  contract because he was using the client base for
5  soliciting for other. And I told him, I said, I don't
6  care. It's wrong. You have to have legal -- you have
7  to inform him.
8       Q.  You don't know what his contract said,
9  though; right?
10       A.  No. Marcus told me.
11       Q.  But it might have said he could do that?
12       A.  Perhaps, he could. He never said he could.
13  When I told him -- when I informed Marcus, Marcus, you
14  have promised people that this was theft proof. You
15  are destroying the public image to be able to remove
16  coins from somebody's wallet. Marcus said, yeah, I
17  guess. I said, you need to talk to Aga. Aga needs to
18  deal with this. If you're taking those coins, it's got
19  to be through Aga.
20       Q.  You're not sure how it all worked out; right?
21       A.  I know that, like I told him, told him to
22  cease and desist. After that, I don't know.
23       Q.  Isn't one of the -- as I understand these
24  coins, isn't one of the benefits of these coins that if
25  there's criminal activity being detected, that it can

Page 119

1  be stopped, to put it simply? That it could be
2  detected and stopped and there could be some
3  interaction with the law? Isn't that the point of the
4  Aten coin?
5       A.  Yes, it is, but not -- but through the
6  appropriate law enforcement channels. We had in our --
7  in the presentation, and anytime I had ever heard it,
8  it was there that when the law enforcement had proof
9  and contacted Aten coin, that Aten coin would do all
10  that was necessary to freeze and prevent money
11  laundering. It was not that we could go in and decide
12  arbitrarily that somebody had done something wrong and
13  to take those coins.
14       Q.  Well, you'll agree with me, though, if Brian
15  had breached the contract, then that wasn't arbitrary;
16  right?
17       MR. KNECHT: Objection.
18       THE WITNESS: In my opinion, that was for the
19  legal team to decide. Why is it Marcus' job to decide
20  that he's violated a contract?
21  BY MR. OLSEN:
22       Q.  Well, you don't know what the contract said,
23  plus, you spoke with Aga at some point; correct?
24       A.  Not until after I informed Aga and encouraged
25  Marcus to talk to Aga. He had done it without

Page 120

1  discussing it with Aga.
2       Q.  When you and Corey first met with the NAC
3  team, that was in Warsaw; right?
4       A.  Yes.
5       Q.  And Aga was Polish; right?
6       A.  Yes.
7       Q.  In Warsaw at the time?
8       A.  Yes.
9       Q.  You met her initially?
10       A.  Yep.
11       Q.  Did Aga invite you to that or did you just
12  show up?
13       A.  No. Previous to us buying the last bit of
14  coins or in the process of the various purchasing of
15  coins, Marcus contacted Corey to get -- Corey wanted
16  more information. Marco Diadamo gave Marcus Corey's
17  number. Corey and Marcus discussed this. They
18  developed a relationship. Marcus would call and share
19  updates with Corey. We happened to be in home
20  schooling when Marcus called about the conference. He
21  was very excited about --
22       (Whereupon, audio transmission was lost and
23       the call was reestablished.)
24       THE WITNESS: He told Corey the political
25  figures and some of the well-known figures that were

Page 121

1  invited to this. He explained it, it was not so much
2  for purchasers, but it was to explore the need, to
3  paraphrase it, to explore the need for oversight on
4  digital currency and the problems digital currencies
5  can give to law enforcement and to government and the
6  way the governments could benefit from digital currency
7  and unbanked.
8       During that conversation, Marcus asked Corey,
9  that he really wanted Corey to come on board and be
10 involved because he deeply respected Corey and that
11 Marcus was -- was flailing a little bit in the business
12 aspect. That he was first and foremost a deeply
13 Christian man who was -- just wanted to do the research
14 and the coding. And Corey was, like, Marcus, I know
15 little to nothing about that. Come on board at least
16 as an advisor on the board or something.
17      And it was at that point that the offer --
18 Corey told him how excited he was to share Poland and
19 that would be an exciting venture to take part in and
20 look at. Marcus encouraged. He said, come down. I'd
21 love for you to come. We're not bringing any other
22 coin holders. It's mainly for the banking and the
23 government.
24      And then Corey said, well, I would love to.
25 And we talked about it. And he said, you know, Marcus,

Page 122

1  I'd like to take you up on that offer. And Marcus
2  asked us to please email him a request for the
3  invitation with all of our, like, our names, our
4  address, and what not so Aga could, for security and
5  then to issue the invitations, which we then got both
6  Agnieszka Bilinska and Aga emailed us welcoming us to
7  Warsaw.
8  BY MR. OLSEN:
9       Q.  Do you know someone named Scott Rodgers?
10      A.  Yes.
11      Q.  Who's Scott Rodgers?
12      A.  Scott Rodgers is a friend of ours that we know
13 through church. And he, at the time, was attending the
14 same church as us. We've been friends. Our kids have
15 been, you know, acquaintances and friends throughout
16 the years.
17      Q.  And did he buy Aten coins?
18      A.  Yes, he did.
19      Q.  Corey was his representative?
20      A.  Yes, it was.
21      Q.  Just for the record, when I say
22 representative, is that a term that was used? What was
23 the term used for people that made a sale?
24      A.  Well, typically, Brian and Marc were the
25 salespeople. Prior to us, Brian was the only. I don't

Page 123

1  believe that he had any other sales after we came on
2  board, but Marco was the salesperson. He was the head
3  of the sales team. It was only for this conference
4  that we were to be selling any coins.
5       Q.  The Alberta conference?
6       A.  Yes.
7       Q.  Did you or Corey tell Scott Rodgers to speak
8  to the ASC?
9       A.  I don't know. I was not present when Corey
10 talked to Scott afterwards. I don't even know if he
11 talked to Scott afterwards. If I may explain
12 something. The month of March, April, and May, we were
13 pregnant with a set of twins. We lost one and then we
14 lost the second. And I was in and out of the hospital
15 for at least a period of a couple of months.
16      Q.  That's in 2016?
17      A.  Yes.
18      Q.  Did you take a Barbados trip?
19      A.  Yes, in February.
20      Q.  Okay. And that was on behalf of or in
21 connection with NAC?
22      A.  Yes, it was. We had sponsored the
23 cryptocurrency event there.
24      Q.  Okay.
25      A.  Part of Agnieszka Bilinska's marketing plan

Page 124

1  was to get Aten coins present at some of the money
2  conferences and the independent cryptocurrency
3  conferences. And that was one that we had agreed to in
4  December that we would sponsor and then attend. Marcus
5  had first just encouraged me to attend and I did not
6  feel that I could do that job. So Agnieszka came as
7  somebody to build relationships and meet people.
8       Q.  By the Barbados trip, hadn't you and Corey
9  pretty much decided that you were going to part ways
10 with NAC?
11      A.  No. We were struggling. To be honest, I
12 still believed that -- I still believed in the product
13 and I still believed that Marcus was just mismanaging.
14 We had truly hoped that our fears and some of the
15 things that we could see were just mistakes. Because
16 Marcus was a coder who had stumbled upon this idea and
17 wasn't -- he had always said he wasn't really a
18 businessman, like, that he was a middle class worker
19 who struck on this big idea and started it to defend
20 the little person, and that he needed somebody to keep
21 him held accountable and do the housework. So even in
22 February, that was -- that was our hope.
23      Q.  Isn't that true about Marcus, that he's a
24 coder, he's a working class guy who's come upon an
25 idea, and if there's any flaws in this, it's in the

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 125

1  execution of a lack of business experience?
2      A.  I do not agree with that right now.
3      Q.  What makes you say that?
4      A.  He simply lied too many times for that to be
5  true.
6      Q.  Give me one.  Tell me one.
7      A.  The numerous times that he promised us while
8  we were trying to negotiate that he would give us our
9  money back and didn't.  The times he said that the
10  reasons why he couldn't agree on the term papers was
11  because he was waiting.
12        Terence and Aga and the rest of the team were
13  unhappy.  Afterwards, I contacted Aga.  Aga had never
14  -- Aga and Igor were part of the team.  They had never
15  seen our term paper.  They had only heard parts of it.
16        The last time we talked to him in April, May,
17  whatever it was, he agreed to give us back our money,
18  and he just said, please, we're going to London.  I
19  cannot have this IPO on here.  I'm sorry that it was --
20  I can't have this litigation.  If you were to sue me, I
21  can't have this.  I'm sorry it didn't work.  I can't
22  pay you out right away.  Give me a month to put it
23  together.  I promise you I'll get it done.
24        And day 28 I was served with a lawsuit after
25  Corey was served with a lawsuit after he promised that

Page 126

1  he was going to do this and he had no interest in
2  litigation or holding anything against us.
3      Q.  But you were -- you were in discussions,
4  negotiations, though; right?  He wasn't saying, I'll
5  cut you a check?
6      A.  No.  He said he was going to cut us a check.
7  He just needed time to get it done.  Please don't move
8  forward.  Please do not -- please do not -- he told me
9  to ignore the cease and desist order, that that was
10  something his lawyer put in, that he didn't want it.
11      Q.  Isn't it true in the first litigation,
12  particularly, in this litigation, too, but primarily
13  there, it was adamant there was dispute as to the terms
14  of the agreement or did you not read it?
15      A.  Yes and no.  I have Skype conversations
16  leading up to it.  All we were asking for was him to
17  turn over the financials.  Let us see your financials.
18  When we were not picking a person to go IPO, when that
19  was not being seen, we had no security.  We asked him
20  to put our names on NAC.  We said, it doesn't even have
21  to be voting shares.  We just want to own something.
22  He said yes, not once, but twice, and then backed down.
23  He said, we can't do it on NAC because that would get
24  us in trouble with the SEC.  But in London, when I
25  register, we'll go there and you'll be registered.

Page 127

1        He registered in London while we were -- and
2  had no intention.  The changes in the term paper, and I
3  have Skype conversations saying it, we told him -- we
4  just wanted some assurance.  We told him very clearly,
5  this change in term was a wake-up call.  Marcus, prove
6  to us that you are honest.  Prove to us that you are
7  valued, and give us some type of security, and we were
8  happy to continue.
9        MR. OLSEN:  Let's take a break.  We can
10  probably wrap this up soon.  Let's take a quick break.
11  I'm sure you've got other things to do.  Let's just
12  take a break and see if we can get this -- let's take
13  five minutes.
14        (Whereupon, a recess was taken.)
15  BY MR. OLSEN:
16      Q.  Ms. Jodoin, you were talking about your
17  reasons -- the times when Marcus hadn't been, in your
18  view, truthful with you.  We were talking about, really
19  talking about, the time after things had fallen apart
20  and you were negotiating a resolution.  You said --
21  your testimony was that you were -- and you were the
22  one, just so we're clear on the record, you were the
23  one having these discussions by email personally with
24  Marcus about trying to get your money back or trying to
25  resolve this dispute; right?

Page 128

1      A.  Yes, some of them with me, some of them with
2  Corey.
3      Q.  Okay.  And you said --
4      A.  Some of them together on the phone.
5      Q.  Okay.  And you said -- your testimony was
6  that you had been having these discussions and Marcus
7  said he was going to do this, that, and the other
8  thing, and that you were surprised to then have him
9  turn around and sue you?
10      A.  Yes.
11      Q.  Okay.  But if you look at the exhibit,
12  Exhibit 1, if you look at page BJodoin0048.
13      A.  48, okay.
14        MR. KNECHT:  Bottom, right-hand corner.
15        MR. OLSEN:  She's been doing a pretty good
16  job of finding it.
17        THE WITNESS:  Okay.  Yep.
18  BY MR. OLSEN:
19      Q.  This is a letter from Brandon Tesser at an LA
20  firm called Tesser Ruttenberg & Grossman.  This is
21  dated March 31st, 2016.  This is the demand letter sent
22  on your behalf before the litigation started.
23      A.  Yes.
24      Q.  Okay.  So you sent a demand letter to
25  Mr. Andrade on March 31st.  And if you look at page

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 129

1    0051.
2       A.   Yep.
3       Q.   It's not just a demand for return of the
4    $275,000 investment; right?
5       A.   Correct.
6       Q.   It's also a demand for reimbursement of
7    out-of-pocket costs in the amount of $37,209.19.  Do
8    you see that?
9       A.   Um-hum.
10      Q.   Yes?  That's a yes?
11      A.   Yes.
12      Q.   Okay.  And also a demand for compensation for
13   Corey's four months of work in the amount of $41,664,
14   and your compensation for four months of work in the
15   amount of $25,000.  You see this?
16      A.   Yes.
17      Q.   So these -- as far as the compensation, the
18   agreement was that there wasn't going to be any
19   compensation for your time until the IPO; right?
20      A.   That is correct.
21      Q.   Okay.  So does it come as any surprise to you
22   that your former lawyers, admittedly, your former
23   lawyers in California sent a demand that included a
24   demand for compensation prior to the time an IPO had
25   occurred?  Does it surprise you that the answer was to

Page 130

1    then get sued?
2       A.   Well, he, Brandon, advised us that this is
3    what we were to do, and that we took it on his.  Marcus
4    contacted us.  We had been talking to Marcus prior to
5    and then he refused.  We were not -- he contacted us
6    after he got this letter, and we had a very good
7    discussion.  And he asked us, do you really want to get
8    paid for this.  We said, Marcus, we would just like our
9    money back, and the expenses.
10      Q.   Certainly, that's not what -- on what basis
11   were you entitled to the expenses?  I'm trying to
12   understand that.
13      A.   Those were the expenses that he had promised
14   to pay for.  That was our flights and all of the
15   expenses of traveling on his behalf.  That was the
16   conference, the conference costs and the Barbados
17   conference, which were -- he was to pay those prior to.
18   The only thing we were asking for that wasn't the
19   salaries.
20      Q.   And -- so, again, you were asking for things
21   beyond what was anything to do with the reimbursement
22   of the $275,000.  So it couldn't have been -- even if
23   you had a conversation with Marcus after the letter, it
24   couldn't have been too much of a surprise that he also
25   retained a lawyer?

Page 131

1       A.   Yes, it can.  Yes, it can.  Because when I
2    told him prior to that I was going to send a letter, I
3    told him I was going to send a letter.  When a person
4    has a conversation with you and they ask you to please
5    not take any further legal action, do not do anything,
6    I'm getting ready to take this to an IPO in London,
7    we're getting ready, I beg you, please, it was simply a
8    misunderstanding, I promise you I'll get you your
9    money, just give me 30 days.  And I say, Marcus, I will
10   not do anything else, I believe you, fair enough.  And
11   then you sue me?  That does surprise me because you
12   lied.
13      Q.   Well, you don't know if he lied or he didn't
14   or if he got advice to file something --
15      A.   Then he would have made a phone call.
16      Q.   That's your big -- that's your biggest --
17      A.   Then he would have made a phone call.
18      Q.   That's your biggest example of Marcus being
19   not straight with you?
20      A.   There were others.
21           MR. KNECHT:  Objection to form.
22   Argumentative.
23           THE WITNESS:  I'm sorry, Adam?
24           MR. KNECHT:  Objection to form.
25   Argumentative.

Page 132

1           MR. OLSEN:  You already answered that.
2    BY MR. OLSEN:
3       Q.   You know, isn't it true, too, before the --
4    before this demand letter, you had demanded -- you and
5    your husband had demanded not just your payment of the
6    investment, you also had demanded this compensation
7    that you agreed wouldn't have been due until an IPO,
8    but you also wanted a bigger percentage of shares at
9    that point, didn't you?
10      A.   Yes, I did.  If you look at it at the bottom,
11   it said the shares were simply a way to express -- the
12   asking of that amount of shares was simply a way to
13   express the need to have some type of security.
14      Q.   And what --
15      A.   I have emails explaining that to Aga.  I have
16   emails explaining that to Marcus.
17      Q.   But that's a change in the deal.  You may not
18   have had it before, but that wasn't part of the deal to
19   have that security; right?
20      A.   Correct.  And it was also part of the deal
21   that he was not fulfilling was to give us the shares,
22   to surrender the financials, to act in good faith,
23   which he was not.
24      Q.   Where is the obligation to give you the
25   financials?  Is that in an agreement?

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 133

1   A.   It was a verbal agreement.
2   Q.   When was that made?
3   A.   Back in Poland and then in LA.
4   Q.   Let me just clear something up just to make
5   sure we get this right.  The way this -- there was
6   never -- the original deal, the $275,000, was to get a
7   membership percentage, I don't remember the percentage,
8   in NAC Foundation; right?
9   A.   No.  Into the company that was going to be
10  incorporated to go public.
11  Q.   Wasn't the structure -- and maybe you don't
12  know -- wasn't the structure of this was that company
13  that was going to go public in an offering was then
14  going to -- there was going to be, I'll call it, I
15  don't know, I don't have the language in front of me,
16  but essentially a buyout of NAC, in which case the NAC
17  shareholders were then going to receive, via purchase
18  of their membership interest, going to receive an
19  interest in the new company, whatever it was going to
20  be called?
21  A.   I don't -- I don't understand.  What I
22  understand is that NAC was to be turned into a
23  corporation almost immediately.  And that when that was
24  done, shares were to be given to us, Terence, and the
25  other members of the team.  That's what I understand.

Page 134

1   Q.   Okay.  So you don't -- wasn't the purpose of
2   waiting until the IPO to get your compensation is that
3   once you get an IPO, then the way you're going to get
4   an interest in that is to, I'll call it, transform,
5   it's not a legal term, but transform your interest in
6   NAC into an interest in this new company?
7   A.   No.  Because he told us because of the
8   corporate structure of NAC currently, that he couldn't
9   give us the shares.  So that we had to wait until that.
10  I don't remember why.  Corey could probably explain it
11  better.  But he said he couldn't.  He said it would be
12  difficult and he couldn't.  And then --
13  Q.   Okay.
14  A.   He asked us to wait until the actual -- and
15  when we first made that agreement, we were in Poland.
16  We had just been dazzled by this wonderful presentation
17  by James Mawhinney.  It was an easy thing to consider.
18  And then when James Mawhinney stopped, we still
19  believed that it was his fault, not Marcus'.
20  Q.   So when you were asking -- in the point of
21  negotiations when you say you were asking for shares in
22  the new company, were you asking for additional shares
23  then in the new company as opposed to an additional
24  piece of -- a larger piece of NAC?
25  A.   To be honest, we simply were just trying to

Page 135

1   save our relationship and to do a wake-up call.  We
2   were simply trying to get him to listen to how
3   absolutely frustrated we were with the runaround.  It
4   never was about getting more.
5   Q.   Well, at some point it was about getting
6   more, at least in terms and then it got to the letter?
7   A.   No, it wasn't.  Because those numbers were
8   advised to us by Brandon.  We told him we simply wanted
9   our investment and the $37,000.  He said, you ask for
10  more so there's room for negotiating.
11       MR. OLSEN:  I'm going to let you jump in on
12  this.
13       THE WITNESS:  I'm sorry?
14       MR. OLSEN:  So advice of counsel, is that --
15       MR. KNECHT:  It's previous counsel, yeah.
16       THE WITNESS:  Sorry?
17       MR. OLSEN:  We'll let that stand.
18  BY MR. OLSEN:
19  Q.   One more question as it relates to this.  And
20  that is, if there was -- you seem to be concerned about
21  the fact there hadn't been an IPO.  Initially, there
22  wasn't one in Australia, but then there was one in the
23  UK, but it was delayed.  Didn't you know -- let's say
24  you believed that you were going to get shares in that
25  company as opposed to your interest, membership

Page 136

1   interest, in NAC being purchased by new-co.  You knew
2   you couldn't get that interest then until that IPO
3   occurred; right?
4   A.   Which shares?  Can you --
5   Q.   Okay.  Your position was that you were
6   entitled to shares in something that hadn't occurred
7   yet, and this is what became the IPO in UK?
8   A.   No.  What was supposed to be the IPO in
9   Australia.
10  Q.   You'd agree that IPO in Australia didn't go
11  forward?
12  A.   That's correct.
13  Q.   Okay.  That wasn't a question of fault.
14  There were some reasons that went into that not
15  happening.  They were business reasons; right?
16  A.   Exactly.  It was what we felt to be James
17  Mawhinney's, the fee structure was not well -- it was
18  not prudent for the cost.
19  Q.   And then so somebody else came in to -- had a
20  different fee structure, and it had to be done -- it
21  was decided to be done in the UK?
22  A.   No.  We never -- we had talked about many
23  places and finally London was decided upon.  But we
24  had -- at this point, there was still nothing going
25  forward.  We had no one, as far as we knew, that was

Brandi Jodoin                                              NAC Foundation, LLC v. Corey Jodoin, et al.

Page 137

1  promising to do that for us.  That contract, that step
2  to engage somebody, was not happening.
3      Q.  Okay.  But there was a decision made
4  internally at least to go to the UK to do the IPO for
5  business reasons, we agreed.  And then the -- it hadn't
6  happened yet.  But you knew -- well, in your version of
7  the story, your interest was going to be in that new
8  company.  So it wasn't like you were entitled to,
9  according to your version of the story, any shares yet;
10 right?
11     A.  Well, I don't -- I don't agree with that.
12 What I know is that it was not happening.  And we
13 started to have grave concerns that it was ever going
14 to happen.  And we still could not get anything other
15 than that handwritten note written.  So we simply asked
16 for some security, could you then put not just our
17 name, but Aga and Terence's on NAC currently, and then
18 we could all have our security there.  We could have
19 proper buyout, sell out, we could have it all
20 structured there and we don't have to wait.
21     Q.  Who all owned interest in NAC?
22     A.  The only person who owned it was Marcus.
23     Q.  Okay.  And who was going to own most of the
24 interest, at least other than went to the public, in
25 new-co?

Page 138

1      A.  New company?  Marcus was.  Well, he would
2  have the majority.
3      Q.  An IPO happening would have benefited Marcus
4  more than anyone; correct?
5      A.  Yes.
6      Q.  When the money was paid -- this is really my
7  last question.  When the 275 was paid by you and your
8  husband, was there a reason it needed to be paid by a
9  certain date?
10     A.  Yes.  Because he was having cash flow issues.
11     Q.  Okay.  Was there a reason that that worked
12 out for the two of you as well?
13     A.  Not really.
14         MR. OLSEN:  Okay.  I have nothing further.
15         MR. KNECHT:  I don't have anything, counsel.
16         MR. OLSEN:  Good job, counsel.
17         MR. KNECHT:  Yep.
18         MR. OLSEN:  Thank you.  I know it's late up
19 there.  And I appreciate your hanging on so we can --
20 and going through the video process.  And to the court
21 reporter, her phone is still bouncing around.  Not sure
22 if she's hearing us, but thank you.
23         THE STENOGRAPHER:  I'm here.
24         MR. KNECHT:  I appreciate it.  Thanks Brandi,
25 Eric, Kim.  Appreciate it.

Page 139

1          THE STENOGRAPHER:  Mr. Knecht, do you want a
2  copy of this?
3          MR. KNECHT:  Yes, just a digital copy.
4          MR. OLSEN:  Thanks, everyone.  Enjoy the
5  weekend.  Stay safe.
6          MR. KNECHT:  Thank you.
7          (Whereupon, the deposition was concluded at
8  5:22 p.m.)
9                    *  *  *  *  *

Page 140

CERTIFICATE OF DEPONENT

PAGE    LINE    CHANGE              REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

          *  *  *  *  *

    I, BRANDI JODOIN, deponent herein, do hereby
certify and declare the within and foregoing
transcription to be my deposition in said action; that
I have read, corrected, and do hereby affix my
signature to said deposition under penalty of perjury.


    _____
         BRANDI JODOIN, Deponent




Job No. 40110

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 141

1         CERTIFICATE OF REPORTER

2   STATE OF NEVADA  )
                      ) ss;
3   COUNTY OF CLARK  )

4       I, Kimberly A. Farkas, a Certified Court Reporter

5   licensed by the State of Nevada, do hereby certify:

6   That I reported the deposition of BRANDI JODOIN, April

7   3, 2020, at 1:05 p.m.

8       That prior to being deposed, the witness was

9   duly sworn by me to testify to the truth.  That I

10  thereafter transcribed my said stenographic notes into

11  written form, and that the typewritten transcript is a

12  complete, true, and accurate transcription of my said

13  stenographic notes; that review of the transcript was

14  requested.

15      I further certify that I am not a relative,

16  employee or independent contractor of counsel or of any

17  of the parties involved in the proceeding; nor a person

18  financially interested in the proceeding.

19      IN WITNESS WHEREOF, I have set my hand in my

20  office in the County of Clark, State of Nevada, this

21  21st day of April, 2020.

22

23          Kimberly A. Farkas, CCR NO. 741

24

25

**WORD INDEX**

**< $ >**
**$100**  12:*8*  13:*15*
  19:*15*  21:*18*, *24*
  22:*9*, *13*  27:*9*, *20*,
  *23*  31:*23*  32:*20*, *21*
  33:*16*, *23*  42:*23*
  43:*17*  44:*2*  47:*9*
  48:*20*  86:*18*
  90:*22*  91:*5*  93:*15*
**$140**  13:*12*  16:*3*
  22:*12*  26:*19*
  27:*19*  32:*21*
  41:*13*  47:*9*  86:*18*
**$25,000**  129:*15*
**$265,000**  90:*23*
**$275,000**  12:*16*
  21:*19*  24:*3*  30:*13*
  41:*9*, *12*  82:*11*
  129:*4*  130:*22*
  133:*6*
**$37,000**  135:*9*
**$37,209.19**  129:*7*
**$40**  13:*23*  22:*14*
  26:*22*  27:*24*  28:*1*,
  *5*, *9*, *17*  31:*21*  33:*3*,
  *6*  41:*17*  43:*8*, *15*
  48:*3*
**$41,664**  129:*13*
**$5**  30:*20*

**< 0 >**
**0051**  129:*1*
**0095**  20:*22*

**< 1 >**
**1**  1:*10*, *10*  3:*14*
  4:*5*  20:*7*, *11*
  30:*10*  34:*21*, *23*
  128:*12*
**1:05**  1:*18*  2:*2*  4:*2*,
  *10*  141:*7*
**10**  1:*10*, *10*  115:*15*
**100**  80:*13*
**12**  51:*16*, *18*  61:*2*
  75:*6*  110:*24*
  115:*11*
**140**  14:*6*  27:*9*
  42:*23*  47:*8*

**14th**  11:*4*, *8*
**15**  75:*3*  90:*18*
**16**  34:*4*  51:*7*
  90:*16*
**16th**  55:*15*
**18**  98:*14*
**1st**  75:*8*

**< 2 >**
**200**  2:*18*
**2015**  8:*21*  31:*19*
  66:*13*  75:*8*
**2016**  27:*5*  34:*12*
  48:*11*  55:*9*  78:*17*
  84:*10*  85:*4*, *25*
  86:*11*  87:*14*
  108:*16*  123:*16*
  128:*21*
**2018**  10:*4*  11:*4*
  37:*18*  38:*1*, *2*, *3*, *12*,
  *14*, *16*  39:*7*, *7*, *10*,
  *12*  46:*10*  81:*6*
  85:*19*  86:*1*
**2019**  11:*7*, *8*, *8*
  37:*16*, *18*, *19*  75:*8*
  81:*21*
**2020**  1:*17*  2:*2*
  3:*2*  4:*1*, *10*  141:*7*,
  *21*
**210**  2:*11*
**21st**  55:*12*  141:*21*
**22nd**  31:*17*, *19*
  32:*19*
**25**  19:*23*
**25th**  87:*14*
**27**  37:*15*  38:*16*
  39:*7*, *12*
**275**  138:*7*
**27th**  46:*10*
**28**  125:*24*
**2nd**  87:*14*

**< 3 >**
**3**  1:*17*  2:*2*  3:*2*
  4:*1*, *10*  64:*24*
  75:*6*  141:*7*
**30**  131:*9*
**30th**  75:*8*
**31st**  128:*21*, *25*
**384-7000**  2:*19*

**4**  3:*14*
**40**  14:*6*  44:*8*
**40110**  1:*24*  140:*25*
**41**  90:*24*
**48**  128:*13*

**< 5 >**
**5**  3:*9*
**5:22**  139:*8*
**50,000**  117:*9*

**< 6 >**
**6605**  2:*18*

**< 7 >**
**702**  2:*19*
**725**  2:*12*
**7251**  2:*11*
**741**  1:*23*  3:*3*  4:*9*
  141:*23*
**75**  68:*2*
**777-3000**  2:*12*

**< 8 >**
**89119**  2:*11*
**89149**  2:*18*

**< A >**
**A-18-770594-C**  1:*7*
  4:*15*
**ABA**  102:*22*, *23*
  105:*23*
**Abbott**  39:*15*  47:*5*
  49:*21*
**ability**  6:*2*  53:*21*
  65:*1*
**able**  7:*11*  58:*10*
  71:*7*  118:*15*
**Abramoff**  65:*6*
  94:*7*, *15*
**absolutely**  33:*19*
  40:*21*  76:*22*  135:*3*
**access**  93:*23*
**accomplish**  14:*22*
**account**  71:*6*
  104:*2*
**accountable**  124:*21*
**accountant**  46:*2*

**accumulated**  46:*19*
  97:*23*
**accurate**  16:*15*
  47:*10*, *11*  141:*12*
**accurately**  71:*3*
**accused**  89:*22*, *23*
**achieve**  33:*22*
**acquaintances**
  122:*15*
**acquisition**  72:*4*
**act**  53:*14*  54:*7*
  80:*7*  132:*22*
**acting**  60:*12*
**action**  61:*6*  131:*5*
  140:*15*
**actions**  35:*2*, *21*
**active**  44:*2*  112:*14*
**activities**  95:*13*
**activity**  118:*25*
**actual**  27:*21*
  43:*20*  62:*17*
  74:*12*  92:*21*
  134:*14*
**ADAM**  2:*17*  5:*3*
  94:*4*  131:*23*
**adamant**  126:*13*
**addition**  56:*9*
**additional**  32:*9*, *10*
  134:*22*, *23*
**address**  26:*5*
  102:*18*  122:*4*
**adequate**  17:*13*
**administering**  4:*19*
**administration**
  18:*18*
**administrative**
  18:*20*  96:*9*
**admission**  24:*25*
  26:*3*  30:*10*  31:*14*
**admissions**  19:*21*
  20:*21*  21:*5*, *8*, *9*
  24:*25*
**Admit**  21:*11*, *21*,
  *25*  26:*7*  32:*2*, *6*, *19*,
  *19*
**admittedly**  129:*22*
**ads**  106:*2*
**advanced**  18:*11*
**advice**  59:*4*
  131:*14*  135:*14*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

**advised** 55:*1* 57:*3*
130:2 135:8
**advisor** 121:*16*
**affidavit** 89:*15, 17,*
*21* 96:2
**affiliation** 94:*16*
**affix** 140:*15*
**afraid** 80:*13*
**Africa** 68:25 69:*3*
**African** 68:*20, 22*
69:*3* 94:*14*
**afternoon** 4:7
**afterthought**
113:*17*
**Aga** 33:*15* 43:*9,*
*13* 73:*23* 96:*18*
97:*11* 99:*12, 21*
100:*6* 102:*3, 5*
107:*7, 10, 20* 108:2
117:*17, 18, 20*
118:*17, 17, 19*
119:*23, 24, 25*
120:*1, 5, 11* 122:*4,*
*6* 125:*12, 13, 13, 14*
132:*15* 137:*17*
**agencies** 22:7
**agency** 35:*1* 96:6
**Agent** 41:*1* 53:*18*
81:*11*
**agents** 34:*25*
39:*14, 18* 47:5
49:*21* 50:*16*
**Agnes** 97:*12*
**Agnieszka** 96:*11*
97:*9, 12* 102:*3*
103:*1, 24* 122:*6*
123:*25* 124:*6*
**ago** 81:*20*
**agree** 4:*17* 68:*18*
119:*14* 125:2, *10*
136:*10* 137:*11*
**agreed** 24:2 43:*14,*
*25* 124:*3* 125:*17*
132:7 137:*5*
**agreeing** 13:9
**agreement** 52:2
58:*20* 59:*19*
62:*16, 16, 18, 21*
63:*12, 19* 71:5, *9*
72:*3* 82:*25* 83:*24*
126:*14* 129:*18*

132:*25* 133:*1*
134:*15*
**agreements** 62:*21,*
*23* 98:*15*
**ahead** 6:*14, 20*
22:*4* 32:*15* 43:*1*
45:*15* 55:*4* 58:*13*
60:*24* 62:*13*
73:*20* 74:*4* 87:*25*
**ahold** 75:*22*
**al** 4:*13*
**Alberta** 25:*9* 51:2
56:*13* 57:*22*
61:*11* 64:*10* 68:*4*
80:2 97:*15*
103:*12, 16* 123:*5*
**allegation** 21:*17*
32:*11*
**allegations** 11:*13,*
*14, 20* 12:*1, 4, 5, 13,*
*21*
**allow** 45:*18* 60:*14*
**allowed** 46:*17*
97:*25*
**Alverson** 2:*17*
**American** 70:2
93:*15* 94:*14* 95:8
102:*21*
**Amigo** 2:*11*
**AML** 94:*13* 95:6
**AML-compliant**
9:*18*
**amount** 13:*21*
30:*22* 33:5 63:*18*
68:*18* 71:5, *14*
129:*7, 13, 15*
132:*12*
**analogy** 64:*15*
**Andrade** 17:2
25:5, *25* 28:8
30:*12* 35:*3, 22*
36:7 37:*11* 38:*17*
44:*7, 18* 47:*22*
108:*18* 117:*5*
128:*25*
**Andrea** 76:*3, 23*
78:8 79:*4, 11, 25*
81:*13, 15* 83:*21, 21*
84:*15*
**Angela** 87:*5*

**Angie** 80:*24* 81:*17,*
*18*
**angry** 75:*16, 18*
91:*11* 92:8 117:*12*
**answer** 5:*25* 6:*11,*
*14, 18* 7:6 16:*10*
22:*4* 26:*13* 28:*12*
32:7 35:*10, 20*
36:*3, 20, 21* 39:9
49:*19* 52:5 53:*10,*
*15* 54:*16* 57:2
65:*13* 77:6 78:*15*
80:*22* 81:*16, 25*
87:*24* 90:*3, 8*
96:*24* 111:*24*
129:*25*
**answered** 32:*14*
132:*1*
**answers** 7:4 19:*20*
20:*21* 21:*13* 25:*2,*
*3, 7* 34:*20* 35:*10*
51:7 75:2 90:*14*
**anybody** 60:*15*
80:*12*
**anytime** 119:7
**apart** 127:*19*
**Apologize** 47:*4, 19*
72:7 75:*18* 86:2
103:*20*
**appalled** 110:9
**apparent** 92:7
**APPEARANCES**
2:6
**applicable** 100:*10*
**appoint** 74:5
**appointed** 100:2
**appreciate** 138:*19,*
*24, 25*
**appreciation**
114:*25*
**approached** 9:*17*
24:*20*
**appropriate**
100:*12* 119:6
**approval** 99:*8, 11*
100:*25* 103:*1*
105:4
**approvals** 101:2
103:*10*
**approved** 105:*5*

**approximately**
4:*10* 81:*19*
**April** 1:*17* 2:2
3:2 4:*1, 10* 22:*15*
27:*3* 30:*19* 78:*21*
87:*14* 123:*12*
125:*16* 141:6, *21*
**arbitrarily** 119:*12*
**arbitrary** 119:*15*
**argument** 33:*3*
**Argumentative**
64:*19* 112:*3, 4*
131:*22, 25*
**arrange** 67:*4*
**ASC** 26:6, *15* 27:*1,*
*8* 35:*25* 51:*8, 14,*
*20, 22* 52:*7, 9, 14*
53:*7, 11, 16, 18, 22*
54:*11* 56:*19* 57:*3,*
*10, 10* 58:*7, 17*
59:*9* 60:*10* 61:*14,*
*20* 84:*12, 16* 86:*5*
87:*5, 14, 17, 22*
88:*17* 89:*4, 9, 14*
90:*8* 91:*7, 14, 23*
96:2 114:*1, 3*
123:*8*
**ASC's** 60:*21* 80:*5*
**aside** 38:*24* 69:*19*
75:*5*
**asked** 6:*14, 20*
13:*10* 15:*11* 22:7
29:*13* 32:2, 6, *14*
34:*10* 40:*19, 22, 24*
41:*4, 5, 7* 46:*23*
50:*2, 2* 54:*24*
58:*16* 59:*12* 67:*4*
79:*9* 80:*16* 84:*25*
88:*17, 19, 21, 24*
92:*3* 93:*20* 96:*4,*
*23* 101:5, *7* 102:*25*
111:*10* 113:*1, 5*
117:7 121:*8*
122:2 126:*19*
130:7 134:*14*
137:*15*
**asking** 12:*4* 17:7
21:*21, 24* 26:*10*
42:*11* 48:*17*
49:*18* 53:*25* 63:7
98:*23, 25* 99:*1*

111:22  126:16
130:18, 20  132:12
134:20, 21, 22
**asks** 34:23  75:4
**aspect** 121:12
**asset** 13:12  15:25
101:5
**assets** 28:20
**associated** 76:8
**association** 89:5
102:22  103:11
**assume** 16:12
39:22  51:1  81:21
87:4  105:13
**assumed** 16:20
44:10, 11  62:4
**assumption** 50:22,
25
**assurance** 84:1
92:11  93:4, 9
127:4
**Aten** 16:1, 2  23:6
24:19  53:11, 23
66:19  67:17
69:11, 12, 14, 15
95:6  99:23, 24
102:16  103:6
108:9  113:19
119:4, 9, 9  122:17
124:1
**attach** 66:16  67:21
**attain** 43:17
**attainable** 44:16
49:4
**attend** 124:4, 5
**attending** 122:13
**attention** 66:24
**attorney** 4:21
6:16  10:19  15:17,
19  38:7  75:5
**audio** 33:12
120:22
**August** 11:4, 8
37:15  38:16  39:7,
12  46:10  81:6
85:18  86:8
**Australia** 72:16
73:11  135:22
136:9, 10
**Australian** 44:23
72:15

**authorities** 21:17,
22  32:4, 12  34:25
35:23
**avoid** 6:23
**avoids** 78:2
**aware** 8:20  10:2,
14  11:5, 10  53:6
64:10

**< B >**
**back** 10:9  17:8
24:22  25:1  26:2
30:9  31:16, 18
37:25  46:7  55:12
68:2  74:15, 16
75:1  78:8, 25
82:16  83:11, 20
92:10  104:20
116:11  125:9, 17
127:24  130:9
133:3
**backed** 126:22
**backwards** 113:18
**Bad** 23:25  29:13
**bag** 110:25
**baker** 57:21
**Bankers** 102:21
**banking** 108:1
121:22
**banks** 95:8
**banner** 102:24
**Barb** 97:1  109:19
**Barbados** 123:18
124:8  130:16
**base** 16:16, 18
111:14  118:4
**based** 36:3  42:3
45:16  54:1  57:8,
10  103:22
**basic** 103:20
104:13, 15
**basically** 75:13
**basing** 37:24
**basis** 13:5, 6, 8
15:10  16:13, 17, 21
17:5, 10  130:10
**battery** 57:16
**Bear** 9:22  92:9
**becoming** 116:3
**beg** 131:7

**beginning** 102:20
112:2
**behalf** 10:24  12:2
93:11  95:14
123:20  128:22
130:15
**believe** 7:16  8:21
9:4  11:17  15:19
16:22, 25  17:3
18:18  24:11  27:2,
5  36:18  39:17
49:17, 17  51:3
56:3, 4, 19  57:21
60:3  65:16, 25
68:19  69:17  76:3
78:12  87:12  93:4,
8  94:1, 1, 3, 6
95:11, 16  99:23
103:25  106:8, 11
107:3, 13  108:21
109:2  113:16
117:9  123:1
131:10
**believed** 48:8, 25
124:12, 12, 13
134:19  135:24
**believing** 42:1
**benefit** 34:15
121:6
**benefited** 138:3
**benefits** 118:24
**Bert** 80:24  81:17,
18
**best** 6:2  53:21
65:1  72:23  81:15
100:20, 21, 22, 23,
23
**better** 92:19
104:18  134:11
**beyond** 9:16  42:7
130:21
**big** 124:19  131:16
**bigger** 132:8
**biggest** 131:16, 18
**Bilinska** 96:11
97:9  103:25  122:6
**Bilinska's** 123:25
**bills** 29:25
**binding** 4:19
**biographies** 104:4

**biography** 104:5
**bios** 103:13  104:23
**birthday** 55:16
**bit** 20:24  94:3
120:13  121:11
**Bitcoin** 9:20
30:24  67:2, 17
70:3
**BJodoin0001** 20:15
**BJodoin0048**
128:12
**BJodoin0082** 20:20
**BJodoin0083** 21:9
**BJodoin0086** 34:20
**BJodoin0087** 64:25
**BJodoin0091** 75:3
**BJodoin0093** 87:10
**BJodoin0094** 90:17
**black** 94:8  98:3
**blow** 59:2
**blowing** 43:11
**blue** 115:14
**blue-collar** 61:12
**board** 13:10, 17
19:17  48:19
66:25  121:9, 15, 16
123:2
**boils** 21:20
**Bokenfohr** 84:9
**Bokenfohrs** 84:14,
23
**bond** 72:11
**bonus** 117:9
**booklet** 7:8
**born** 38:1, 2  68:1
**Bottom** 128:14
132:10
**bought** 87:1  93:3
**bouncing** 138:21
**BRANDI** 1:9, 16
2:1  3:1, 8  4:3, 11
5:4, 6, 7  7:18
32:15  80:18
138:24  140:14, 19
141:6
**B-R-A-N-D-I** 7:18
**Brandon** 128:19
130:2  135:8
**breached** 119:15
**break** 29:6  66:7
69:4  127:9, 10, 12

**Brian** 112:*13*
115:*18, 23* 116:*7, 9*
117:*7, 7, 8, 10, 25*
119:*14* 122:*24, 25*
**Brian's** 112:*22*
116:*10* 118:*2*
**bring** 63:*14* 66:*25*
91:*25* 100:*3*
**bringing** 121:*21*
**brought** 66:*23*
67:*1* 83:*5* 88:*22*
108:*2*
**build** 108:*3* 124:*7*
**bunch** 103:*13*
**bureau** 115:*25*
**business** 13:*2, 11*
15:*9, 22, 23* 16:*14*
22:*12* 26:*19*
29:*16, 22, 23* 30:*3*
33:*16* 41:*24* 43:*3,*
*4, 7, 18* 44:*13*
45:*19, 24, 25* 64:*3*
92:*20* 98:*7* 101:*6*
108:*2, 4* 114:*21*
115:*2, 5, 7* 121:*11*
125:*1* 136:*15*
137:*5*
**businessman**
124:*18*
**butchered** 5:*14*
**buy** 23:*14* 58:*19*
62:*18* 70:*24*
82:*25* 83:*3* 87:*2*
122:*17*
**buyer** 50:*5* 95:*15*
**buying** 93:*5, 7*
120:*13*
**buyout** 82:*7*
133:*16* 137:*19*

**< C >**
**CAL** 109:*12*
**C-A-L** 95:*2*
**C-A-L-E** 94:*23*
**California** 129:*23*
**call** 8:*22, 25* 19:*25*
20:*10* 23:*5, 17*
34:*9* 36:*18, 18*
51:*12* 52:*6, 15*
55:*4* 58:*16* 59:*16*
60:*16* 65:*17* 70:*6*

71:*12* 75:*22*
77:*14* 78:*2, 11*
80:*6* 84:*11* 96:*23*
97:*12* 107:*4*
113:*5* 120:*18, 23*
127:*5* 131:*15, 17*
133:*14* 134:*4*
135:*1*
**called** 63:*4* 65:*20,*
*20* 71:*19* 75:*16*
76:*21* 77:*18, 19*
78:*5* 84:*16* 97:*11*
106:*24* 120:*20*
128:*20* 133:*20*
**calls** 10:*18* 17:*18*
22:*1* 45:*15* 62:*5*
77:*2, 3* 79:*1* 80:*19*
**Canada** 8:*1, 4, 7*
54:*25* 65:*22* 68:*3,*
*4*
**Canadian** 8:*9*
96:*19* 97:*4*
**canceling** 44:*1*
**cancer** 64:*14, 14,*
*17*
**capacity** 17:*15*
**cards** 98:*7*
**care** 112:*16* 118:*6*
**cared** 112:*1*
**careful** 62:*14*
**Carl** 66:*7, 8, 11, 15,*
*19, 22, 23* 67:*6, 9*
110:*8*
**Case** 1:*7* 4:*13, 14*
6:*17* 8:*17* 10:*4,*
*10* 15:*18* 16:*23*
19:*22* 21:*5* 31:*15*
112:*9, 10* 133:*16*
**cases** 6:*13, 20*
**cash** 14:*17* 138:*10*
**categories** 105:*21*
**caterer** 98:*8*
**Catherine** 38:*20*
39:*15*
**CC'd** 107:*13*
**CCR** 1:*23* 3:*3*
141:*23*
**cease** 118:*22* 126:*9*
**cell** 76:*13, 15, 17,*
*19* 77:*8, 10, 12, 13*
78:*1, 11, 18*

**Cenzartowicz**
99:*14*
**certain** 6:*15* 9:*5, 8*
44:*7* 63:*16* 68:*18*
71:*5, 14* 98:*19*
102:*15* 138:*9*
**certainly** 27:*8*
28:*23* 31:*16*
82:*13* 130:*10*
**CERTIFICATE**
140:*1* 141:*1*
**Certified** 2:*3* 4:*8*
141:*4*
**certify** 140:*14*
141:*5, 15*
**cetera** 66:*21*
**change** 86:*17*
111:*4, 21* 127:*5*
132:*17* 140:*2*
**changed** 12:*9*
**changes** 7:*10, 11,*
*12* 127:*2*
**channels** 119:*6*
**Chantal** 85:*3, 5*
86:*7*
**characterization**
89:*18*
**charge** 33:*21* 73:*1,*
*2, 5, 7, 16* 109:*16,*
*18* 112:*21, 23*
**charger** 57:*16*
**charging** 13:*21*
**cheated** 83:*17*
**check** 126:*5, 6*
**cheerleader** 44:*18*
**cheese** 18:*5* 65:*23*
96:*21*
**Chicago** 58:*25*
108:*25*
**chief** 18:*9, 19*
19:*5* 44:*20* 100:*2*
**children** 51:*16, 18*
110:*24* 115:*11*
**choice** 91:*22*
**choices** 73:*25*
**chose** 73:*25*
**Christian** 121:*13*
**Christians** 110:*24*
**church** 61:*3*
122:*13, 14*

**circumspect** 114:*12*
**cite** 12:*5*
**citizen** 7:*24* 8:*1*
**City** 68:*1*
**claim** 11:*3, 11*
70:*11*
**claimed** 10:*9*
**clarification** 5:*12*
**clarify** 25:*21* 71:*2*
85:*11* 90:*12*
**CLARK** 1:*2* 4:*14*
141:*3, 20*
**class** 124:*18, 24*
**cleaned** 106:*7*
**clear** 7:*16* 10:*20*
35:*11* 46:*8* 58:*8,*
*14* 61:*15* 62:*6*
63:*6* 69:*9* 72:*2,*
*13* 88:*1* 91:*15*
114:*5* 127:*22*
133:*4*
**clearly** 127:*4*
**client** 4:*24* 6:*16*
10:*19* 118:*4*
**clients** 76:*21*
78:*10* 103:*3*
109:*13, 25* 110:*1*
112:*22*
**close** 78:*16*
**coder** 124:*16, 24*
**coding** 41:*2*
121:*14*
**coin** 16:*1, 2* 22:*19,*
*19* 23:*10* 24:*7, 9,*
*19, 20* 40:*1, 2, 3, 4,*
*4, 25* 50:*5* 53:*11,*
*12, 23, 23* 54:*5, 6*
56:*14* 59:*10* 60:*1*
63:*12* 65:*16, 21, 25*
66:*19* 67:*2, 17*
68:*13* 69:*12, 12, 14,*
*15, 16, 20, 20, 24*
70:*14* 71:*22*
75:*15* 80:*6* 84:*19*
85:*13* 91:*23*
92:*19* 95:*6, 9*
98:*11, 14* 102:*16*
103:*6* 106:*25*
108:*9* 113:*19*
117:*12* 119:*4, 9, 9*
121:*22*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

**coins** 9:*18* 23:*6, 7, 12, 13, 14, 24* 24:*4, 5, 12, 17, 18* 54:*22, 23* 55:*2, 6, 19, 20* 56:*21* 57:*1, 11* 59:*13, 18, 22* 61:*13, 25* 62:*1* 70:*24* 71:*6, 15, 17, 20* 72:*4, 19* 75:*19* 76:*2* 78:*12, 17, 20* 82:*9, 9, 19, 22* 83:*5, 21* 84:*11* 86:*5, 10, 14* 87:*2* 88:*5, 7* 91:*23* 93:*3, 5, 15* 108:*13* 112:*11* 114:*3* 117:*3, 9, 19, 22* 118:*2, 16, 18, 24, 24* 119:*13* 120:*14, 15* 122:*17* 123:*4* 124:*1*
**cold** 8:*22*
**collateral** 62:*17*
**collecting** 103:*24*
**college** 18:*13*
**color** 97:*21*
**colors** 98:*5, 6*
**come** 13:*10, 17* 26:*2* 59:*19* 96:*21* 113:*1, 4, 6, 9* 117:*3* 121:*9, 15, 20, 21* 124:*24* 129:*21*
**comes** 87:*9*
**coming** 113:*7*
**commenced** 10:*1, 4*
**commencement** 4:*6*
**comment** 7:*12* 29:*5* 42:*12*
**comments** 42:*12* 67:*6*
**Commission** 25:*9, 20* 51:*3, 4* 64:*11* 80:*2*
**common** 43:*11*
**communicate** 69:*1* 107:*1*
**communicated** 38:*17* 39:*1* 65:*5, 8* 66:*2*
**communication** 6:*17* 35:*18* 51:*8,*

13, 20* 66:*11* 68:*6* 107:*14*
**communications** 26:*6* 35:*4, 6* 40:*11* 46:*24* 51:*24* 53:*7* 66:*10*
**community** 31:*25*
**company** 1:*5* 8:*20* 14:*13* 15:*3, 4* 17:*5* 18:*24* 19:*14, 15* 23:*5* 27:*21* 28:*5, 9, 19, 22* 29:*15, 20* 30:*1* 31:*23* 33:*13* 41:*13* 43:*5* 44:*1* 45:*2, 12* 46:*5* 48:*13, 20, 21* 50:*11* 53:*13* 54:*6, 20* 56:*24* 57:*9* 58:*11, 11* 60:*14, 24* 62:*7* 63:*17* 67:*1* 72:*23* 82:*12, 13, 23* 88:*8* 93:*11* 94:*16* 100:*17* 101:*9, 10* 105:*8, 9* 106:*2* 108:*7, 11* 117:*25* 133:*9, 12, 19* 134:*6, 22, 23* 135:*25* 137:*8* 138:*1*
**compensation** 129:*12, 14, 17, 19, 24* 132:*6* 134:*2*
**complainant** 40:*13*
**complaint** 33:*12* 39:*25*
**complaints** 21:*12* 25:*1* 26:*4* 32:*2*
**complete** 111:*22* 141:*12*
**completed** 68:*11* 69:*15, 16, 24* 70:*6* 112:*9*
**completely** 42:*20* 102:*17*
**compliance** 98:*16* 107:*10* 109:*12*
**compliant** 94:*14* 95:*7*
**comply** 114:*23*
**comprehensive** 108:*7*

**computer** 57:*16* 71:*13* 94:*2*
**concern** 59:*24* 116:*24*
**concerned** 29:*12* 52:*3* 135:*20*
**concerning** 25:*4* 38:*17* 63:*13* 66:*7, 10* 95:*21* 106:*6* 107:*5*
**concerns** 56:*10, 12* 137:*13*
**concluded** 139:*7*
**conclusion** 12:*14* 17:*19* 22:*2* 45:*15* 101:*15*
**conference** 55:*5, 17* 56:*13* 59:*1, 2* 61:*10* 73:*8* 86:*11, 16, 25* 87:*1* 97:*15* 98:*2* 103:*13, 16* 105:*25* 120:*20* 123:*3, 5* 130:*16, 16, 17*
**conferences** 124:*2, 3*
**confident** 44:*14, 15*
**confirmed** 39:*8*
**confirming** 38:*20*
**confusion** 12:*7* 107:*9*
**Congress** 94:*12*
**conjecture** 44:*12*
**connection** 13:*1* 15:*9* 61:*1* 123:*21*
**conscience** 61:*8*
**consider** 47:*10* 74:*19* 134:*17*
**considered** 52:*17, 17, 24* 53:*14* 54:*7, 23* 56:*21* 84:*19* 114:*8*
**constantly** 62:*22* 63:*5*
**construction** 16:*14* 43:*5* 101:*20* 114:*20*
**consultation** 73:*2*
**contact** 37:*7, 8* 38:*22* 59:*14* 67:*11* 75:*10, 14, 24*

78:*11* 85:*12* 91:*12* 97:*4* 109:*11*
**contacted** 25:*25* 36:*22* 37:*4, 7, 11, 14* 38:*24* 39:*1* 40:*5* 51:*4* 57:*13, 24* 58:*1, 7* 59:*15* 77:*17* 78:*10* 79:*1* 89:*14* 92:*3* 94:*22* 95:*19, 20* 98:*16* 119:*9* 120:*15* 125:*13* 130:*4, 5*
**contacting** 62:*22* 63:*5* 117:*1, 2*
**contacts** 103:*3*
**content** 10:*23* 79:*6* 97:*19* 98:*5, 21, 24* 100:*25* 102:*10* 106:*10*
**contest** 68:*17, 18*
**context** 37:*25*
**continue** 13:*24* 103:*20* 127:*8*
**contract** 13:*20, 22* 58:*18* 63:*24* 73:*17* 82:*4, 6, 25* 83:*3, 12* 117:*25* 118:*3, 4, 8* 119:*15, 20, 22* 137:*1*
**contractor** 141:*16*
**contracts** 33:*15*
**conversation** 8:*25* 9:*12, 15* 10:*23* 25:*17, 18* 26:*15, 25* 27:*6, 7* 39:*23* 46:*12* 48:*6* 52:*10* 53:*24* 56:*18* 60:*9, 19* 64:*22* 65:*15* 67:*7, 16* 83:*4, 6* 89:*3, 18, 24* 91:*16* 114:*12, 14* 117:*5* 121:*8* 130:*23* 131:*4*
**conversations** 10:*23* 27:*17* 30:*16* 31:*2* 78:*8* 126:*15* 127:*3*
**convinced** 42:*1* 91:*20*
**COO** 19:*4, 9* 46:*4,*

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

*4* 73:*19* 74:*10*
**cooperate** 109:*21*
**copies** 94:*2*
 102:*11, 15*
**copy** 15:*19* 139:*2,
 3*
**core** 13:*14*
**COREY** 1:*9* 2:*22*
 4:*12* 5:*5* 14:*12*
 19:*12, 13* 36:*13, 17*
 38:*1* 45:*19, 23*
 51:*4, 8, 14, 19* 52:*4*
 53:*25* 58:*7* 73:*16*
 74:*14, 15, 16, 23*
 84:*5* 88:*19* 89:*11*
 90:*6* 92:*16, 18, 24*
 94:*22* 101:*5*
 102:*3* 104:*2, 5*
 107:*2, 4, 16* 108:*5,
 12, 22* 109:*2*
 110:*23* 113:*15, 17*
 114:*20* 115:*6*
 120:*2, 15, 15, 17, 19,
 24* 121:*8, 9, 10, 14,
 18, 24* 122:*19*
 123:*7, 9* 124:*8*
 125:*25* 128:*2*
 134:*10*
**Corey's** 74:*2* 81:*1,
 17* 120:*16* 129:*13*
**corner** 20:*14*
 128:*14*
**corporate** 18:*3, 8*
 33:*16* 92:*18*
 96:*16, 17, 18* 99:*25*
 100:*18* 134:*8*
**corporation** 133:*23*
**CORPORATIONS**
 1:*10*
**correct** 5:*16* 7:*10,
 19, 20* 8:*5* 9:*1, 9,
 12, 13* 10:*2, 7, 10,
 13, 16* 11:*14* 12:*16*
 13:*6, 8* 14:*6, 23*
 17:*17, 23* 18:*24*
 19:*6, 10* 20:*3*
 23:*7* 24:*5, 6, 8*
 25:*5, 6, 10* 27:*21,
 23* 28:*2, 24* 29:*18,
 19, 25* 30:*4* 34:*5,
 18* 36:*5* 37:*3*

38:*13* 39:*5* 42:*19*
 44:*23* 45:*13* 46:*5,
 11* 51:*4, 21* 52:*15*
 55:*22* 56:*15*
 57:*12* 60:*2* 70:*25*
 72:*5, 6, 6, 16, 19, 20*
 73:*3* 74:*13* 76:*9*
 77:*8, 23* 79:*23*
 80:*4, 9, 11, 24, 25*
 84:*23* 86:*1* 87:*3,
 23* 89:*11, 12, 19, 24*
 90:*9, 10* 97:*15*
 98:*12, 20* 104:*5, 23,
 24* 107:*22* 110:*1*
 119:*23* 129:*5, 20*
 132:*20* 136:*12*
 138:*4*
**corrected** 140:*15*
**correction** 38:*11*
**correspondence**
 46:*18*
**cost** 136:*18*
**costs** 129:*7* 130:*16*
**counsel** 4:*16*
 36:*11, 23, 25* 37:*1,
 5, 8, 8* 39:*6* 91:*8*
 135:*14, 15* 138:*15,
 16* 141:*16*
**counterclaim** 10:*8,
 12* 11:*14, 15, 22*
 12:*2, 7, 22, 23, 24*
 32:*17* 90:*24*
**counterclaims** 11:*3*
**countries** 95:*11*
**country** 67:*20*
**COUNTY** 1:*2*
 4:*14* 141:*3, 20*
**couple** 102:*5*
 123:*15*
**course** 29:*10, 10*
**COURT** 1:*1* 2:*3*
 4:*13* 5:*23* 10:*1*
 11:*10* 12:*17*
 14:*20* 20:*1* 32:*1,
 5* 138:*20* 141:*4*
**courteous** 111:*25*
**Court's** 11:*9*
 12:*14* 31:*15*
**crime** 98:*3*
**criminal** 118:*25*

**criminally** 87:*22*
 88:*2* 89:*1*
**criteria** 100:*14*
**criticized** 59:*17*
**critique** 97:*20*
**critiqued** 97:*25*
**crook** 58:*9, 15*
**crypto** 98:*2*
**cryptocurrencies**
 70:*4*
**cryptocurrency**
 9:*19* 23:*18* 24:*14,
 15* 69:*11* 94:*13*
 123:*23* 124:*2*
**CSR** 4:*9*
**currencies** 121:*4*
**currency** 70:*11*
 117:*15* 121:*4, 6*
**currently** 134:*8*
 137:*17*
**customer** 78:*5*
 114:*25*
**customers** 96:*20*
 97:*4*
**cut** 126:*5, 6*
**Cynthia** 84:*9*


**< D >**
**dad** 68:*2*
**Dakota** 68:*1*
**Darren** 57:*14, 20*
 58:*1, 14, 24* 59:*12,
 13* 61:*9* 63:*15*
 87:*11* 88:*7* 91:*22*
**Darrow** 115:*19, 23*
**D-A-R-R-O-W**
 115:*24*
**date** 4:*9* 11:*8*
 35:*3* 38:*10* 39:*5*
 55:*11* 98:*18* 138:*9*
**dated** 128:*21*
**dates** 11:*8*
**day** 115:*16*
 125:*24* 141:*21*
**days** 131:*9*
**dazzled** 134:*16*
**deal** 16:*21* 48:*23*
 57:*19* 63:*9, 10*
 81:*19* 82:*3, 10*
 114:*10* 117:*17*

118:*18* 132:*17, 18,
 20* 133:*6*
**dealt** 107:*20*
 117:*20*
**December** 18:*7*
 34:*1, 2* 65:*18, 18*
 66:*13* 67:*5* 99:*20,
 20* 124:*4*
**decide** 29:*22*
 119:*11, 19, 19*
**decided** 13:*3*
 21:*19* 62:*4* 74:*22,
 23* 78:*24* 90:*23*
 124:*9* 136:*21, 23*
**decipher** 7:*5*
**decision** 13:*16*
 18:*21* 99:*10* 137:*3*
**decisions** 74:*16, 18*
**declare** 140:*14*
**deem** 64:*7*
**deeply** 121:*10, 12*
**defend** 124:*19*
**defendant** 32:*8*
**Defendants** 1:*10*
 2:*15*
**definitely** 52:*24*
 56:*25* 90:*5* 94:*9*
**degree** 18:*13*
**delayed** 135:*23*
**delete** 105:*7, 8, 12,
 17, 22*
**deleted** 105:*14*
**deleting** 105:*12*
**demand** 66:*19*
 128:*21, 24* 129:*3, 6,
 12, 23, 24* 132:*4*
**demanded** 132:*4, 5,
 6*
**denial** 32:*11*
**deny** 26:*10* 32:*7*
**depo** 8:*12*
**DEPONENT**
 140:*1, 14, 19*
**deposed** 5:*17*
 141:*8*
**DEPOSITION**
 1:*16* 2:*1* 3:*1* 4:*3,
 6, 11, 18* 7:*1* 20:*18*
 38:*11* 42:*4* 47:*23*
 80:*16* 139:*7*

Case 3:20-cr-00249-RS    Document 713-2    Filed 07/24/25    Page 45 of 72
Brandi Jodoin
NAC Foundation, LLC v. Corey Jodoin, et al.

140:*15*, *16*  141:*6*
**Dept**  1:*8*
**describe**  40:*17*, *18*
**described**  21:*13*
30:*11*  47:*20*
**describing**  114:*13*
**Description**  3:*13*
**design**  68:*12*
97:*21*  106:*7*
**designate**  20:*6*
**designer**  68:*16*
**designs**  68:*19*
96:*14*
**desist**  55:2  118:*22*
126:*9*
**despite**  6:*21*
**destroying**  118:*15*
**detail**  53:*22*  79:*14*
91:*13*
**detailed**  35:*23*
**detailing**  58:*20*
**details**  9:*23*
**detected**  118:*25*
119:2
**determine**  72:*23*
**devastating**  61:*14*
**develop**  33:*15*
108:*9*
**developed**  120:*18*
**devout**  110:*24*
**Diadamo**  9:*4*, *5*, *8*
76:6  84:*17*  98:*17*
108:*20*  109:*4*, *21*
112:*15*, *21*, *23*
120:*16*
**difference**  16:*6*
43:*19*  48:*16*  49:*5*,
*8*  69:*1*  76:*25*
82:*17*
**different**  9:*21*
15:*25*  22:*20*
23:*24*, *24*  24:*3*
31:*12*  40:*8*  70:*7*
72:*18*  101:*14*, *14*
110:*20*  112:*3*
136:*20*
**difficult**  6:*25*  7:*5*
78:*20*  83:*10*
134:*12*
**difficulties**  96:*22*

**difficulty**  48:*24*
78:*22*, *24*
**digital**  121:*4*, *4*, *6*
139:*3*
**diligence**  63:*8*
73:*14*
**direct**  19:*24*  77:*8*
**directed**  21:*4*
**direction**  38:*21*
100:*5*
**directly**  14:*19*
77:*14*  87:*22*
116:*21*
**directors**  48:*19*
**disagree**  11:*20*
12:*1*, *6*  29:*5*, *7*, *10*
**disagreed**  89:*17*, *21*
**disagrees**  90:*5*
**disclosed**  26:*7*
27:*19*  33:*14*
47:*15*  75:*10*
**disclosure**  60:*25*
**discovered**  32:*9*, *10*
97:2
**discovery**  21:*4*
32:*8*
**discuss**  10:*22*
78:*11*, *22*
**discussed**  32:*24*
36:*6*  43:*25*  67:*12*
75:*7*  86:*15*  95:*19*
120:*17*
**discussing**  14:*11*
42:*16*  120:*1*
**discussion**  15:*14*
25:*14*, *15*, *16*  33:*8*,
*10*  35:*16*  39:*23*
41:*8*  48:*1*  49:*13*,
*16*  66:*18*  72:*14*, *16*
79:*7*  130:*7*
**discussions**  28:*5*
33:*11*, *24*  50:*1*
73:*22*  86:*19*  91:*9*
126:*3*  127:*23*
128:*6*
**dismissal**  10:*15*
**dismissed**  10:*12*
11:*4*, *19*, *23*  33:*4*, *9*
**dismissing**  11:*11*
**dispute**  83:*12*

126:*13*  127:*25*
**distinction**  69:*24*
**distinctly**  52:*21*
**DISTRICT**  1:*1*
4:*13*
**Docs**  102:*5*
**doctor**  64:*13*, *16*
**document**  63:*10*
89:*25*
**documentation**
46:*16*  48:*10*  82:*4*
83:*11*
**Documents**  3:*14*
15:*11*, *12*, *13*, *15*, *18*,
*21*  20:*2*, *6*, *10*, *19*
29:*18*  30:*11*
48:*12*  93:*22*, *22*
98:*9*, *10*, *13*  112:*8*,
*9*, *18*  114:*23*
**doing**  28:*20*  29:*20*
50:*23*  88:*20*
94:*11*  97:*13*
98:*10*  100:*4*
104:*9*  107:*17*
109:*17*  116:*22*
117:*13*  128:*15*
**dollar**  13:*25*  70:*2*
**dollars**  31:*5*, *11*
**double-check**  38:*4*,
*10*
**doubt**  86:*23*
**doubts**  48:2  51:*25*
**downloaded**  71:*13*
96:*23*
**draw**  62:*16*
**drinking**  116:*19*
**dual**  8:*1*
**dubious**  57:*1*, *11*
**due**  63:*7*  73:*13*
132:*7*
**duly**  5:*8*  141:*9*
**duped**  83:*19*
**duplicity**  17:*2*
**duties**  17:*22*  74:*2*,
*3*

**< E >**
**earlier**  19:*22*
22:*12*  42:*4*  85:*16*
93:*6*

**early**  8:*21*  103:*5*
**easily**  14:*13*  49:*4*
**easy**  43:*17*  44:*15*
134:*17*
**edit**  96:*13*  101:*22*
114:*23*
**editing**  101:*13*
**edits**  102:*1*
**educated**  99:*16*
**efficiently**  86:*23*
**eight**  115:*11*
**either**  49:*21*  54:*12*
96:2  103:*12*
**elaborate**  110:*22*
**elicit**  43:*24*
**email**  14:*19*  31:*19*
38:*4*, *6*, *6*, *9*, *19*
65:*18*, *22*, *23*  67:*5*
101:*2*, *3*, *3*, *11*, *25*
102:*16*, *18*  103:*4*, *6*,
*7*  105:*9*  107:*13*
122:2  127:*23*
**emailed**  66:*19*
107:*6*, *7*  122:*6*
**emails**  59:*15*
66:*12*  94:2  102:*9*,
*11*  105:*7*, *8*, *9*, *10*,
*12*, *14*, *21*, *22*, *23*
106:*6*, *9*  132:*15*, *16*
**employee**  141:*16*
**encountered**  43:*3*
**encourage**  45:*13*
62:*15*  98:*18*
**encouraged**  59:*16*
119:*24*  121:*20*
124:*5*
**ended**  89:*4*
**energy**  66:*17*
**enforcement**  35:*1*
51:*1*  119:*6*, *8*
121:*5*
**engage**  91:*9*  137:*2*
**engaged**  91:*18*
**Enjoy**  139:*4*
**entities**  26:*8*
**entitled**  130:*11*
136:*6*  137:*8*
**entity**  8:*20*
**equate**  72:*10*
**erase**  105:*13*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

**ERIC** 2:*10* 4:*22*
138:*25*
**escaping** 97:*10*
**especially** 6:*8* 30:*7*
**ESQ** 2:*10, 17*
**essentially** 74:*9*
89:*23* 133:*16*
**established** 73:*11*
107:*19* 116:*24*
**et** 4:*12* 66:*21*
**eternally** 115:*17*
**ethical** 64:*3*
**ethically** 64:*7*
**ethics** 86:*24*
**European** 99:*22*
103:*12*
**eval** 13:*23*
**evaluated** 28:*21*
**evaluation** 15:*25*
22:*13* 23:*1* 26:*20,
22* 27:*14* 29:*19*
43:*15*
**evaluations** 45:*17*
**event** 85:*25* 123:*23*
**events** 14:*3* 92:*16*
**eventual** 72:*15*
**eventually** 19:*15*
**everybody** 74:*9*
**evolved** 9:*24*
**evolving** 70:*8*
**exactly** 40:*10* 52:*4,
21* 53:*21* 67:*1*
90:*4* 136:*16*
**Examination** 3:*9*
5:*10*
**examined** 5:*8*
**example** 7:*13, 22*
42:*9* 50:*10* 98:*1*
100:*15* 131:*18*
**Exchange** 25:*19*
44:*23* 102:*9*
**exchanges** 14:*20*
102:*19*
**excited** 120:*21*
121:*18*
**exciting** 121:*19*
**Excuse** 112:*25*
**execution** 125:*1*
**Exhibit** 3:*14* 4:*5*
19:*24* 20:*7, 7, 11*

128:*11, 12*
**EXHIBITS** 3:*12*
**exist** 82:*12, 24*
88:*9*
**existed** 82:*13*
**exit** 58:*19*
**expectation** 33:*22*
61:*19*
**expectations** 86:*18*
**expected** 30:*1*
110:*4*
**expecting** 4:*24*
**expenses** 130:*9, 11,
13, 15*
**experience** 17:*1*
19:*16* 40:*19* 41:*2*
104:*9* 125:*1*
**expertise** 67:*4*
99:*3, 7*
**explain** 31:*3*
40:*24* 41:*5*
123:*11* 134:*10*
**explained** 53:*11,
17* 54:*4, 4* 78:*21*
85:*4, 4* 88:*18*
121:*1*
**explaining** 31:*2*
132:*15, 16*
**explore** 121:*2, 3*
**express** 111:*15*
132:*11, 13*
**expressed** 110:*10,
11, 17* 111:*16*
**expressly** 31:*20*
**extent** 42:*18, 20*
47:*25*
**extra** 94:*2*
**extremely** 41:*1*
44:*14* 91:*19*

**< F >**
**facilitate** 34:*7*
**fact** 6:*21* 7:*12*
11:*10* 29:*11* 36:*3*
63:*13* 82:*1, 5, 22*
83:*9* 86:*15* 87:*20*
104:*13* 135:*21*
**facts** 32:*5* 104:*15*
**Fahy** 106:*15*
107:*1, 4, 5, 10, 12,*

*12*
**F-A-H-Y** 106:*18*
**failed** 111:*21*
**fair** 24:*10* 44:*18*
70:*9* 131:*10*
**fairly** 67:*15* 85:*12*
**faith** 132:*22*
**fallen** 127:*19*
**false** 32:*6, 12*
90:*19* 91:*2*
**familiar** 8:*16*
14:*15* 116:*1*
**family** 91:*10, 19,
24* 92:*5*
**far** 29:*12* 31:*16,
18* 50:*14* 82:*9*
98:*13* 109:*5*
112:*15* 115:*9*
129:*17* 136:*25*
**Farkas** 1:*23* 2:*3*
3:*3* 4:*8* 141:*4, 23*
**fast** 108:*5, 5*
**father** 115:*4, 6*
**fault** 134:*19*
136:*13*
**favorite** 112:*1*
**FBI** 25:*4* 26:*6*
35:*24* 36:*22* 37:*1,
2, 4, 5, 7, 8, 10, 17*
38:*17, 23, 25* 39:*2,
13, 13* 40:*6, 6*
41:*11, 15, 19* 42:*17,
17* 46:*8, 9, 13, 15*
47:*8, 15* 48:*1, 4, 7*
49:*8, 12, 16* 50:*2,
13, 16* 79:*3, 9, 17*
81:*2, 10, 18* 85:*7,
17, 18, 22* 86:*7*
93:*20* 94:*5* 95:*23*
96:*2*
**fears** 124:*14*
**February** 48:*23*
123:*19* 124:*22*
**federal** 10:*1* 34:*24*
35:*22* 108:*5, 24*
**fee** 33:*17, 18*
34:*16* 136:*17, 20*
**feel** 17:*1* 49:*24*
64:*16* 111:*4*
113:*11* 124:*6*
**fees** 43:*12*

**fellow** 57:*20*
66:*23* 94:*8, 14*
**felt** 17:*13* 40:*4, 5*
49:*19* 50:*19*
52:*25* 59:*7* 87:*19,
21* 101:*8* 118:*2*
136:*16*
**Fey** 106:*17*
**F-E-Y** 106:*19*
**field** 61:*11*
**figure** 27:*9, 20*
**figures** 120:*25, 25*
**file** 29:*1* 109:*19*
131:*14*
**filed** 10:*9* 11:*16,
19* 28:*23* 29:*3, 17*
**files** 97:*3* 109:*13*
**fill** 63:*13*
**filled** 18:*10* 104:*10*
**filling** 92:*21, 22*
**final** 103:*1*
**finalized** 109:*22*
**finally** 136:*23*
**finances** 52:*1*
**financial** 46:*1*
**financially** 141:*18*
**financials** 45:*18*
48:*24* 126:*17, 17*
132:*22, 25*
**find** 19:*16* 22:*24*
33:*22* 43:*15*
75:*12* 92:*9*
100:*18* 115:*16*
**finding** 31:*15*
32:*4* 128:*16*
**findings** 11:*10*
32:*1*
**fine** 38:*10* 39:*10*
**finish** 6:*10* 45:*7*
58:*13*
**firm** 56:*23* 128:*20*
**firmly** 52:*23*
**first** 5:*8* 7:*17*
8:*19, 24* 20:*14*
21:*7* 22:*11* 23:*22*
27:*3* 34:*12* 38:*15,
22* 39:*13* 40:*25*
46:*9* 47:*23* 51:*3,
4, 9, 17, 23* 57:*6*
67:*18* 69:*11* 86:*2,
4* 96:*25* 105:*4*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

113:2  120:2
121:12  124:5
126:11  134:15
**five**  51:15, 17
91:15  114:15
127:13
**five-minute**  69:4
**flags**  49:18
**flailing**  121:11
**flashy**  111:1
**flaws**  124:25
**flights**  130:14
**Florida**  107:6
**flow**  138:10
**focus**  49:25
**focused**  43:24
**follow**  51:7
**following**  21:11
34:3
**follows**  5:9
**follow-up**  36:8
75:13
**force**  108:25
**foregoing**  140:14
**foremost**  121:12
**forgotten**  75:1
**form**  7:8  16:8
17:18  19:1  22:1,
2  23:9, 10, 11, 12
26:11  28:10
30:14  32:13, 14
35:18  36:12, 15
43:1  45:14  53:11
54:5, 14  62:24
63:1  84:1  93:9
94:23  95:9  116:5
131:21, 24  141:11
**format**  6:9
**formed**  53:13
54:7  56:25  58:12
62:8  63:18
**former**  129:22, 22
**forms**  92:11, 12
95:15  109:12, 12
111:22
**forward**  13:11
17:9  42:24  56:13
71:20  74:24
100:9  108:8
126:8  136:11, 25

**forwarded**  94:3, 4
**Foteh**  64:22
**found**  12:17  28:25
50:13  57:19
63:20  112:8, 9
117:10
**FOUNDATION**
1:5  4:12, 23  8:11
35:2, 21  75:7
90:20  133:8
**four**  53:20  81:20
129:13, 14
**fraud**  59:4  63:7
89:23
**fraudulent**  95:8
**freely**  71:18
**freeze**  119:10
**Friday**  2:2  4:1
96:10
**friend**  79:11
81:15  122:12
**friends**  55:6  56:15
78:6, 16  91:10, 19,
24  92:5  122:14, 15
**front**  133:15
**fruition**  70:5
**frustrated**  135:3
**fulfilling**  132:21
**functioned**  50:4
**functions**  114:24
**fund**  95:13
**fundamental**  24:23
**funds**  12:10  30:21
**funny**  67:21
**further**  13:19
131:5  138:14
141:15
**future**  24:9  54:19

**< G >**
**Garman**  2:10
**gather**  33:9  103:18
**gathering**  54:21
109:18
**general**  31:1  42:7
79:8
**generally**  12:5
66:18
**generate**  14:17
**gentleman**  68:15,

20, 23  94:20
**gentlemen**  77:16
**getting**  18:8  20:23
30:9  74:11  78:19
82:16  83:11  94:5
96:22  106:7, 13, 23
109:21  111:4
131:6, 7  135:4, 5
**gifts**  100:16
**girl**  96:10
**gist**  67:7
**give**  6:10  45:18
50:6  52:1  73:18
75:13, 25  77:7, 9,
13, 22  82:14  91:13
93:23  101:2
103:1  121:5
125:6, 8, 17, 22
127:7  131:9
132:21, 24  134:9
**given**  13:23  26:16,
23  43:6  54:1
62:12  65:25
71:23, 23  76:3, 5
82:2  83:2  88:13
97:21, 22  100:16
101:7  104:19
107:16  108:14
117:9  133:24
**giving**  18:4  58:11
59:4  76:19  88:8
100:24
**glad**  5:12
**glossed**  77:25
92:10
**Gmail**  103:2, 2
**go**  5:19  6:14, 20
14:14  18:9  20:22,
25  22:4  32:15
42:14, 24  43:1
44:3  45:15  47:19
48:21  52:12  55:4
58:13, 17, 25  60:24
61:3  62:13  64:7
68:17  69:17  70:5,
16, 24  71:11  72:10
73:20, 23  74:15, 16,
19  75:1  77:14
83:20  87:18, 25
92:10  100:1
101:13, 16  109:19

110:5, 7  113:11, 12
117:15  119:11
126:18, 25  133:10,
13  136:10  137:4
**goal**  44:2  49:4
**goals**  44:14
**goes**  36:20  53:10
70:8
**going**  13:22, 24
15:1  18:4  19:23,
25  20:7, 19  30:3,
21, 23  33:18, 21
34:15  38:20  40:7,
7, 19  42:13, 14, 15
44:4  58:25  59:1,
2  63:14  69:25
71:20  72:14, 16
73:21  74:3  75:12,
19, 20  77:11, 12
78:2  80:16  82:14
84:10  85:22  86:7
87:4  96:15
107:19  108:8, 8, 9
113:12, 15, 17, 18
117:19  124:9
125:18  126:1, 6
128:7  129:18
131:2, 3  133:9, 13,
14, 14, 17, 18, 19
134:3  135:11, 24
136:24  137:7, 13,
23  138:20
**Good**  4:7  7:4
51:18  61:7  64:3
66:16  69:6  79:11
91:25  98:2
128:15  130:6
132:22  138:16
**Google**  102:5
**Googled**  94:18
**Gordon**  2:10
**Gosh**  111:18  112:7
**gotten**  5:1  49:14
62:10  88:18
**government**  121:5,
23
**governmental**
21:16, 22  22:6
32:3
**governments**  121:6
**Grand**  2:18

graphic 68:*16, 19*
96:*13* 106:*6*
graphics 68:*12*
97:*18* 101:*13, 14*
grateful 115:*17*
grave 137:*13*
great 16:*21* 48:*23*
79:*13* 81:*19*
114:*10*
grew 67:*20*
Grossman 128:*20*
ground 5:*20* 24:*8*
group 18:*18* 43:*9*
71:*19* 74:*10*
grow 67:*25*
guarantee 27:*25*
44:*10* 59:*3*
guaranteed 27:*23*
28:*4, 8, 17*
guess 17:*7* 70:*6*
118:*17*
guy 50:*11* 124:*24*

< H >
Hafeeler 104:*1*
half 99:*23*
hand 101:*8* 141:*19*
handwritten 137:*15*
Hang 11:*7* 30:*10*
42:*14* 57:*15* 110:*3*
hanging 138:*19*
happen 45:*1* 74:*5*
137:*14*
happened 24:*16*
37:*2* 70:*23* 78:*18*
81:*9* 89:*8* 114:*15*
117:*21* 120:*19*
137:*6*
happening 52:*22*
136:*15* 137:*2, 12*
138:*3*
happy 127:*8*
hard 27:*13, 22*
43:*16* 98:*4* 114:*5*
harmed 79:*22*
harming 79:*21*
hate 111:*5*
head 6:*23, 24*
18:*11* 108:*13*
123:*2*
hear 94:*16*

heard 18:*20* 52:*10*
61:*14* 116:*15, 20*
119:*7* 125:*15*
hearing 80:*14*
91:*16* 138:*22*
heavy 61:*7*
he'd 101:*2*
heed 6:*4*
held 45:*11* 61:*16*
89:*2* 91:*21* 124:*21*
help 13:*9* 18:*15*
85:*23* 92:*17*
96:*10, 12, 12, 13*
108:*3* 114:*22*
115:*1, 17*
helping 18:*2*
hesitant 41:*6*
high 34:*16*
hired 22:*21*
Hoff 57:*14, 20*
58:*2* 61:*8* 63:*15*
87:*9, 11* 89:*13*
Hoff's 89:*21*
hold 42:*12*
holder 65:*16, 25*
68:*13*
holders 40:*25*
63:*12* 65:*21*
85:*13* 91:*23*
98:*11, 14* 117:*2*
121:*22*
holding 126:*2*
home 76:*7* 115:*8,
11* 120:*19*
homemaker 8:*8*
home-schooled
61:*3*
Hone 65:*12, 24*
honest 71:*1* 83:*14*
91:*6* 92:*1* 104:*16*
124:*11* 127:*6*
134:*25*
honestly 40:*12*
113:*6*
hop 19:*25*
hope 72:*9* 85:*1, 1*
124:*22*
hoped 79:*20*
124:*14*
hopefully 74:*12*
hoping 9:*20* 59:*14*

Horn 65:*8, 10, 11,
13, 15, 16, 24*
H-O-R-N 65:*15*
hospital 123:*14*
housekeeping 18:*2*
housewife 14:*15,
18* 16:*5* 18:*14*
61:*2* 64:*6* 104:*19*
housework 124:*21*
HR 18:*11*
huh-uh, 7:*3*
hundred 12:*8*
hundred-million
42:*13*
hunt 100:*11*
husband 8:*21*
9:*14* 10:*1, 6, 9*
14:*12, 18* 16:*13*
18:*23* 22:*9* 25:*12,
19* 26:*25* 27:*17*
28:*6, 14, 16, 19*
29:*15, 23* 35:*25*
36:*7* 38:*16* 39:*3*
43:*4* 44:*20* 45:*5*
46:*3, 13* 53:*7, 18*
54:*1* 57:*25* 60:*7,
11* 65:*3, 6, 9* 66:*3*
67:*23* 68:*5* 73:*1*
80:*2* 83:*21* 132:*5*
138:*8*
husband's 25:*2*
53:*4* 71:*2*
hypothetical 26:*1*

< I >
IBO 22:*15*
ICO 22:*20*
ID 70:*13, 24*
idea 9:*10, 10*
14:*16* 31:*8* 36:*19*
40:*15* 47:*1* 51:*11*
53:*3* 66:*16* 93:*10*
94:*21* 110:*6*
112:*20, 20* 124:*16,
19, 25*
identification 71:*11*
identify 4:*16*
71:*11* 109:*19*
ignore 126:*9*
Igor 43:*9, 13*
108:*2* 125:*14*

illegal 61:*6* 62:*8*
91:*18*
image 118:*15*
imagine 30:*19*
immediately 133:*23*
implemented 95:*9*
implication 113:*21*
implied 28:*13, 18*
79:*22*
important 6:*4, 8,
23* 112:*24*
impression 49:*2*
50:*19* 52:*16, 19*
improperly 59:*20*
include 35:*3* 80:*5*
106:*9*
included 21:*17*
33:*17* 129:*23*
includes 31:*15*
including 34:*25*
45:*23* 64:*9* 79:*23*
90:*21* 97:*15*
income 8:*10, 13*
26:*24* 29:*1, 11, 12*
incomplete 112:*19*
incorporated
133:*10*
incorrect 23:*19*
37:*22* 39:*9*
incorrectly 102:*7*
increase 43:*12*
66:*19*
independent 13:*2,
5* 124:*2* 141:*16*
INDEX 3:*6*
individually 1:*9, 9*
individuals 103:*19*
infant 38:*13*
inferred 90:*24*
inferring 16:*16*
infomercial 45:*5*
inform 55:*3* 61:*4*
87:*16, 19* 118:*7*
information 21:*13*
26:*5* 32:*3, 9, 11*
38:*25* 40:*7* 46:*19*
47:*2* 50:*6* 54:*1*
57:*23* 75:*10, 14*
90:*7* 102:*24*
103:*22* 105:*13*
117:*18* 120:*16*

**informed** 8:22
37:10 52:7 58:9
66:24 75:17
84:12, 17 87:14, 15
88:13, 19 91:6
99:21 107:11
117:6, 8 118:13
119:24
**informing** 60:20
91:22
**initial** 22:18, 19, 22
51:8 74:12
**initially** 120:9
135:21
**initiated** 35:14
51:19
**in-laws** 82:16 83:7
**input** 74:9
**inquire** 84:11
**inquired** 37:5
**instances** 6:15
**instigate** 112:5
**instruct** 6:17
**instructed** 99:6
**insurance** 108:1
**intellectual** 50:3
**intended** 27:9
**intent** 105:20
**intention** 105:12
127:2
**interaction** 119:3
**interest** 126:1
133:18, 19 134:4, 5,
6 135:25 136:1, 2
137:7, 21, 24
**interested** 41:1
141:18
**interests** 61:23
**Interim** 19:6, 8, 9,
11 69:25
**Internal** 95:20
**internally** 49:13
137:4
**international** 19:14
**interpose** 6:12
**interposed** 6:13
**interrogated** 79:18
**interrogatories**
19:21 20:22
21:14 24:23, 24
25:3, 8 75:6 81:16

**interrogatory** 21:6
34:19, 21, 23 39:9
52:5, 6 53:10, 16
57:3 65:12, 14
67:14 75:2, 3, 4
78:15 90:14, 18
**interview** 46:7
47:14 51:6, 9
79:10 81:9 93:24,
25
**interviewed** 65:20
79:3, 19 81:2, 18
**introduce** 65:18
96:20
**introduced** 55:6
56:14 65:20 98:14
**introducing** 107:7
**invest** 13:3
**investigated** 81:12
**investigating** 37:11
50:18, 20, 24 79:9
**investigation** 40:6
50:14, 23
**investigative** 35:1
**investigator** 56:20
**investment** 8:23
9:6, 9 15:11
31:25 42:17
54:19 55:21
58:21 59:5, 8, 25
62:16 71:1 72:2,
5, 8, 11, 21 91:5
93:7 96:21
109:25 129:4
132:6 135:9
**investments** 60:4
**investor** 18:5 40:1,
3
**investors** 55:3
57:4, 9, 12, 13, 17,
18 60:5 71:22
**invitation** 122:3
**invitations** 98:13
122:5
**invite** 120:11
**invited** 13:13
65:23 73:8 91:19
121:1
**inviting** 65:22
**involved** 17:8
32:22 33:14

40:25 44:21, 22
62:10 67:2 70:13
73:6 74:23 88:11,
16, 18 121:10
141:17
**IP** 26:20, 21
**IPO** 13:24 14:14,
16 18:9, 15 22:15,
17, 25 27:14 34:7
41:25 42:25
43:20 44:3, 22, 25
45:9, 13 72:12, 14,
24 74:4 125:19
126:18 129:19, 24
131:6 132:7
134:2, 3 135:21
136:2, 7, 8, 10
137:4 138:3
**IPP** 19:12
**Ireland** 45:8
**issue** 49:23
113:19 122:5
**issued** 24:18
**issues** 9:25 56:9
97:5 110:5, 6
111:5 116:16, 18
138:10
**its** 56:15

**< J >**
**Jack** 65:6 94:15
**James** 13:14, 20
14:1 22:13, 22, 23
26:21 32:22, 25
33:4 43:8, 24
45:3, 3 48:16
73:9, 17, 18, 21
74:14, 16, 17 96:16
134:17, 18 136:16
**January** 33:25
34:3 48:11 55:8,
9, 11, 25 63:20
71:21 75:8, 20
86:11, 24 97:6
108:16 113:9
**Jarek** 101:5
107:22, 23, 24, 25,
25 108:1
**Jason** 43:8
**Jeff** 45:4

**jeopardize** 59:20,
24
**Job** 1:24 43:25
64:13 96:8
115:14 119:19
124:6 128:16
138:16 140:25
**JODOIN** 1:9, 9, 16
2:2, 22 3:1, 8 4:3,
11, 12 5:4, 5, 7, 15,
17 7:18 20:9
21:3 31:16, 19
69:9 127:16
140:14, 19 141:6
**Jodoins** 13:3
**John** 84:9, 10
106:15, 17 107:4, 5,
10, 12, 12, 17, 19
**join** 4:25, 25
102:8, 23
**judgment** 107:5
**July** 78:17 86:4
**jump** 135:11
**June** 77:18 78:5
85:3, 11 86:4
**junk** 106:2
**jurisdiction** 84:7

**< K >**
**Kathy** 45:8
**keep** 106:4, 5
124:20
**Kent** 58:25
**kids** 30:21 85:23
122:14
**Kim** 4:8 138:25
**Kimberly** 1:23
2:3 3:3 141:4, 23
**kind** 30:3 31:1
42:3, 7 43:3, 6
46:16 63:19 67:1,
2 77:25 102:10
106:3 108:7, 8
112:6 116:20
**kinds** 7:3
**KNECHT** 2:17
5:3, 3, 13 10:18, 24
14:24 16:8 17:18
19:1 22:1 26:11
28:10 30:14
32:13 36:9, 12, 15

39:6  43:1  45:14
49:9  54:14  62:24
63:1  64:19  69:6
77:3  80:19  89:25
116:5  119:17
128:14  131:21, 24
135:15  138:15, 17,
24  139:1, 3, 6
**knew**  12:8, 10
13:21  14:2, 5, 8
27:8  31:16  32:19
33:5  41:12  42:22
43:10  48:3, 11
55:24, 24  61:12
62:11  67:17  72:9
76:25  81:17
85:20, 20, 22  92:25
113:6  136:1, 25
137:6
**know**  5:13  6:6
9:3, 11  12:11, 15
26:7  29:16  31:6,
9, 12  36:6, 17  37:4,
9, 14, 15  41:14, 18
48:7  50:7, 8, 9, 11
51:13  52:2, 4
53:9, 19  57:4, 18
59:12  60:3  62:21
64:1, 7, 21  65:4, 19,
24  66:4  68:5, 13
71:16  75:11, 15
78:4, 4, 5, 7, 9, 12,
13, 19  80:14, 18, 23
83:15, 16, 16, 18
84:25  86:12
88:25  89:13, 15, 16
90:11  91:6  92:13,
15  94:15, 19, 24
95:18  101:23
106:13, 15, 15
109:2, 5, 8  111:23
112:8  113:9, 14
114:2  115:21, 23
116:2, 9, 10, 14, 15,
23  117:21, 24
118:8, 21, 22
119:22  121:14, 25
122:9, 12, 15  123:9,
10  131:13  132:3
133:12, 15  135:23
137:12  138:18

**knowledge**  13:13
28:22  30:6  33:12
43:22  68:24
116:17  118:3
**known**  27:10
**knows**  85:6

**< L >**
**LA**  128:19  133:3
**lack**  112:8  125:1
**language**  133:15
**large**  33:18  59:1
82:3  101:3  106:7
**larger**  134:24
**largest**  33:12
41:25
**Las**  2:11, 18  56:1
81:5  85:7, 18
86:6, 8, 9  97:2
108:15  109:7, 7, 23
110:4  111:3, 21
113:1, 13
**late**  106:13  138:18
**launched**  40:6
**laundering**  94:25
95:10  119:11
**law**  5:23  35:1
51:1  58:4  59:1
61:4, 17, 21  64:5
82:20  91:17
94:13  119:3, 6, 8
121:5
**laws**  53:14  54:8,
13  56:22
**lawsuit**  125:24, 25
**lawyer**  6:12, 17
10:24  32:23
37:12, 14  38:22
46:18, 25  47:2
58:17  62:15  92:3
97:9, 11  99:16
106:22  126:10
130:25
**lawyers**  43:23
100:4  129:22, 23
**lawyer's**  37:16
39:20, 22  100:13
**layout**  97:24
**leading**  126:16
**leads**  16:25  17:4

**learned**  10:21
87:16  95:5
**leave**  77:20  100:17
**leaving**  92:2  113:7
**led**  56:10
**LeFevres**  77:25
78:6
**left**  24:12  41:7
48:9, 22  69:18, 21
75:11  76:21  89:4
91:7  116:14
**legacy**  30:22  42:15
**legal**  17:19  22:2
45:15  63:23  91:8
98:15  99:22, 24
100:2, 14  107:8
118:6  119:19
131:5  134:5
**legality**  52:22, 23
86:23
**legally**  61:16
87:15  100:10, 21,
23, 23
**lengthy**  67:15
85:12
**letter**  128:19, 21,
24  130:6, 23  131:2,
3  132:4  135:6
**liability**  1:5  61:22
62:3, 4  88:15
**liable**  87:22  88:2
89:1  91:21
**liaison**  73:18
**licensed**  141:5
**lied**  125:4  131:12,
13
**life**  59:23  61:13
68:3
**light**  32:5
**liked**  18:21
**limited**  1:5  34:25
90:21
**line**  20:24  140:2
**lines**  111:13
**lingering**  103:21
**LinkedIn**  104:2
**Lisa**  68:6  103:25
104:6, 7
**list**  34:23  75:4
85:2

**listed**  21:13  35:24
52:23  90:18
**listen**  135:2
**listened**  25:15
36:21  56:18
**listening**  5:5
51:12  91:16
**litigation**  9:25
125:20  126:2, 11,
12  128:22
**little**  22:20  48:9
67:17  84:7  91:8
92:4, 6  121:11, 15
124:20
**live**  9:19, 20  48:21
59:21  69:17, 21, 25
70:1, 8  71:24
72:10  75:19, 20
**lived**  68:3, 22, 25
**lives**  65:22
**living**  69:3
**LLC**  1:5  4:23
**LLP**  2:10
**lobbyist**  94:6, 11,
12, 21
**local**  34:24  35:23
**located**  34:6
**lock**  117:15
**locked**  60:14  89:4,
7  92:7  102:17
**lockout**  60:19
**login**  101:17
**London**  66:12
67:3, 5, 8  73:24
74:1, 22  125:18
126:24  127:1
131:6  136:23
**long**  43:14  74:4
**longer**  60:23
75:21  78:21  85:5
86:6  89:9, 10, 11
115:5  116:24
**long-term**  15:2
18:13
**look**  12:24  17:7
20:13  21:6, 7
34:19  55:12  78:8
90:16  93:18, 23
97:24  100:13
112:12  116:10

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

121:*20*  128:*11*, *12*, *25*  132:*10*
**looked**  39:*6*  65:*24*  97:*20*
**looking**  12:*19*, *20*  17:*8*  20:*1*, *20*  26:*3*  27:*11*  34:*14*  37:*25*  75:*2*
**losing**  81:*23*
**lost**  81:*18*  120:*22*  123:*13*, *14*
**lot**  31:*23*  101:*12*  105:*23*  111:*9*
**Louisa**  66:*5*
**love**  121:*21*, *24*
**lower**  20:*13*
**Lykke**  70:*3*

**< M >**
**Madam**  20:*1*
**maiden**  7:*22*, *23*
**maintained**  12:*8*
**majority**  49:*25*  138:*2*
**making**  15:*10*  30:*23*  49:*15*  74:*11*
**man**  65:*17*  121:*13*
**management**  108:*3*
**Marc**  76:*6*  84:*17*  98:*17*  108:*10*, *25*  109:*3*, *3*, *4*  122:*24*
**March**  27:*2*, *3*, *5*, *8*  51:*7*  56:*17*  59:*14*  84:*10*  86:*3*  123:*12*  128:*21*, *25*
**Marco**  9:*4*  109:*5*, *6*, *21*, *24*  110:*3*, *4*, *10*  111:*21*  112:*9*, *15*, *20*, *23*  113:*1*, *5*  120:*16*  123:*2*
**Marco's**  110:*25*
**Marc's**  108:*10*
**Marcus**  13:*1*, *10*  17:*2*  18:*10*, *21*  19:*13*  25:*25*  32:*21*  33:*15*  34:*10*  35:*3*, *22*  36:*7*  37:*11*  40:*2*, *6*  41:*25*  42:*1*, *4*, *5*, *8*  43:*10*, *13*, *23*  45:*17*, *18*  48:*10*

49:*20*  50:*16*  52:*7*  54:*18*  57:*4*  58:*3*, *8*  60:*13*  62:*12*  63:*14*, *18*  66:*10*, *23*  67:*3*, *9*  73:*13*, *25*  74:*15*, *15*, *18*, *21*  75:*7*, *10*, *12*, *13*, *23*, *25*  76:*6*, *8*, *12*, *15*, *20*  77:*1*, *20*  78:*1*, *9*, *10*, *18*  79:*2*, *9*, *21*, *22*  81:*11*, *24*  82:*6*, *12*, *23*  84:*17*  85:*6*  86:*24*  88:*13*  89:*23*  90:*20*  94:*22*  97:*3*, *24*  99:*8*, *11*  100:*4*, *24*  101:*7*, *24*  102:*7*, *10*, *25*  103:*10*  104:*19*  105:*4*  107:*4*, *11*  108:*16*, *17*  109:*3*  113:*3*, *4*, *8*, *10*, *12*, *17*  117:*5*, *8*, *8*, *10*, *10*, *12*, *18*  118:*1*, *10*, *13*, *13*, *16*  119:*19*, *25*  120:*15*, *16*, *17*, *18*, *20*  121:*8*, *11*, *14*, *20*, *25*  122:*1*  124:*4*, *13*, *16*, *23*  127:*5*, *17*, *24*  128:*6*  130:*3*, *4*, *8*, *23*  131:*9*, *18*  132:*16*  137:*22*  138:*1*, *3*
**Marcus'**  134:*19*
**margins**  29:*25*
**marked**  4:*5*
**market**  15:*2*  21:*18*, *24*  23:*2*, *14*  26:*9*  66:*17*, *17*  67:*19*, *22*  69:*20*  70:*9*  72:*15*  73:*14*  90:*22*  91:*4*  96:*11*
**marketing**  13:*2*, *5*  96:*11*  97:*9*, *13*, *14*  104:*1*  117:*14*  123:*25*
**married**  110:*23*
**material**  98:*20*
**materials**  97:*14*  102:*23*
**matter**  4:*12*  25:*10*

61:*18*
**Maurice**  68:*8*
**Mawhinney**  13:*14*, *20*  14:*1*, *5*, *10*, *19*, *22*  22:*13*, *22*, *23*  26:*21*  27:*18*, *25*  28:*4*, *15*  32:*22*, *25*  33:*4*, *9*, *24*  34:*13*  42:*9*, *19*  43:*8*  45:*3*  47:*16*, *25*  48:*12*, *16*  49:*13*, *19*  73:*9*, *21*  86:*19*  96:*16*  134:*17*, *18*
**Mawhinney's**  45:*3*  136:*17*
**McGonigal**  87:*5*
**mean**  14:*19*  26:*17*  27:*12*  30:*4*  34:*7*  35:*13*, *14*, *15*  36:*25*  47:*13*  70:*20*, *21*  74:*6*  92:*25*
**meaning**  7:*5*
**means**  22:*4*
**meant**  26:*5*  70:*4*
**meet**  81:*10*  110:*8*  124:*7*
**meeting**  13:*14*  18:*18*  39:*12*  46:*9*, *17*  47:*3*, *7*  49:*22*  55:*5*, *17*  56:*18*  66:*12*, *20*, *21*  67:*5*, *12*, *23*  109:*23*  113:*1*
**meetings**  12:*25*
**Melissa**  64:*22*
**member**  102:*21*
**members**  13:*15*  74:*21*  133:*25*
**membership**  133:*7*, *18*  135:*25*
**mentioned**  26:*1*, *14*  35:*25*  72:*1*  92:*11*  95:*23*  97:*8*  98:*19*  99:*12*  105:*8*  108:*10*  113:*3*
**met**  46:*8*  61:*10*  67:*10*  94:*21*  100:*13*  112:*13*, *17*  120:*2*, *9*
**methane**  66:*17*

67:*18*, *22*
**middle**  124:*18*
**million**  12:*8*, *9*  13:*12*, *15*, *23*, *25*  16:*3*  19:*15*  21:*18*, *24*  22:*9*, *12*, *13*, *14*  26:*19*, *22*  27:*9*, *19*, *20*, *23*, *24*  28:*1*, *5*, *9*, *17*  30:*20*  31:*5*, *11*, *21*, *23*  32:*20*, *21*, *21*  33:*3*, *6*, *16*, *23*  41:*13*, *17*  42:*23*  43:*8*, *15*, *17*  44:*2*  47:*9*, *9*  48:*3*, *20*  86:*18*, *18*  90:*22*  91:*5*
**million-dollar**  26:*20*
**mind**  79:*17*
**mined**  71:*7*
**minute**  37:*21*
**minutes**  19:*25*  51:*15*, *17*  127:*13*
**misled**  40:*5*  93:*13*
**mismanaging**  124:*13*
**misrepresented**  32:*25*
**missing**  98:*15*  109:*11*, *13*, *14*, *20*, *20*
**mistakes**  124:*15*
**misunderstanding**  131:*8*
**model**  101:*17*
**modify**  103:*22*
**mom**  61:*2*
**monetary**  93:*8*
**money**  13:*7*  14:*4*  23:*4*, *16*  24:*2*  26:*24*  30:*23*  33:*5*  41:*16*, *20*  42:*22*  43:*24*  49:*14*  56:*24*  58:*11*, *18*  62:*7*  63:*18*  68:*18*  71:*9*  78:*25*  81:*19*, *23*  82:*2*, *5*, *6*, *24*  83:*2*, *10*, *17*  85:*7*  88:*8*  93:*14*  94:*25*  95:*3*, *10*  119:*10*  124:*1*  125:*9*, *17*

127:*24*  130:*9*
131:*9*  138:*6*
**Montecito**  2:*18*
**month**  114:*15*
123:*12*  125:22
**months**  38:*14*
81:*20*  123:*15*
129:*13, 14*
**moral**  87:*21*
**morally**  64:*8*
87:*19*
**move**  74:*24*  90:*13*
106:*12, 13*  126:7
**moved**  68:*3*
**multiple**  73:22
**Murray**  66:*5*
**Musiitwa**  68:*8*
**mute**  20:*24*

**< N >**
**NAC**  1:*5*  4:*12, 23*
8:*11, 11, 11, 14, 16*
10:*1, 5, 10*  11:*15*
13:*2, 3, 15*  17:*16,*
*22*  21:*23*  24:*3, 18*
25:*4, 25*  30:*4*
32:*23*  33:*1*  34:*14*
35:*2, 21*  38:*17*
40:*7, 25*  41:*4*
46:*20*  52:*12*  55:*6,*
*22*  56:*10*  66:*10*
68:*11*  72:*23*
73:*11, 15*  75:*7, 21*
78:*21, 23*  81:*24*
83:*13*  84:*11*  85:*5*
86:*6, 21*  90:*20, 23*
95:*15, 21*  99:*19*
100:*1*  102:*21*
107:*6*  116:*2, 14, 25*
120:*2*  123:*21*
124:*10*  126:*20, 23*
133:*8, 16, 16, 22*
134:*6, 8, 24*  136:*1*
137:*17, 21*
**NAC's**  36:*7*
**Naimer**  66:*2*
**name**  4:*7*  5:*13*
7:*18, 22, 23*  36:*7*
40:*9, 11*  53:*2*
66:*1, 25*  68:*10*
75:*4, 17*  90:*7, 11,*

*17*  91:*25*  94:*17*
97:*10*  103:*25*
106:*16*  107:*25*
115:*2, 25*  116:*10*
137:*17*
**named**  17:*16*
107:*21*  115:*18*
122:*9*
**names**  7:*21*  47:*4*
54:*24*  122:*3*
126:*20*
**near**  85:*14*
**necessarily**  35:*13*
111:*25*
**necessary**  43:*16*
119:*10*
**need**  30:*20, 21*
38:*9*  43:*2*  57:*15*
59:*13*  92:*23*
117:*16*  118:*17*
121:*2, 3*  132:*13*
**needed**  15:*4*  18:*3,*
*10*  33:*16*  59:*7*
69:*1*  73:*19*  85:*22*
92:*1*  96:*12*  98:*17*
111:*14*  114:*23*
115:*1*  124:*20*
126:*7*  138:*8*
**needs**  118:*17*
**negotiate**  125:*8*
**negotiating**  127:*20*
135:*10*
**negotiations**  126:*4*
134:*21*
**NEVADA**  1:*2, 5*
2:*4, 11, 18*  4:*8, 14*
141:*2, 5, 20*
**never**  24:*8, 8, 15*
26:*1*  28:*4, 8, 16, 16,*
*22*  32:*18, 19*  33:*19*
38:*22*  39:*1*  43:*3,*
*25*  51:*1*  54:*11*
58:*24*  59:*17*
60:*13*  65:*2, 5, 8*
66:*2*  67:*11*  76:*7*
79:*18*  80:*12*  83:*5*
88:*16*  94:*21*
112:*3, 4, 13*  118:*12*
125:*13, 14*  133:*6*
135:*4*  136:*22*

**new**  24:*20*  34:*6,*
*15*  104:*2*  107:*8*
133:*19*  134:*6, 22,*
*23*  137:*7*  138:*1*
**new-co**  136:*1*
137:*25*
**news**  69:*2*
**night**  86:*13*
**nodding**  6:*23*
**non-live**  101:*17*
**note**  35:*17*  137:*15*
**notes**  55:*13*  92:*9*
141:*10, 13*
**noticing**  4:*21*
**November**  12:*15*
13:*19*  23:*4, 16, 21*
24:*1*  31:*17, 19*
34:*1, 2*  66:*13*  75:*8*
**number**  4:*9, 15*
26:*22*  30:*10*
32:*20*  33:*1*  34:*13,*
*17*  64:*24*  75:*23, 25*
76:*4, 5, 7, 8, 9, 11,*
*12, 13, 14, 15, 17, 19*
77:*1, 2, 7, 8, 10, 13,*
*13, 22, 24*  78:*1*
90:*7, 16*  120:*17*
**numbers**  13:*18*
20:*18*  26:*16, 17, 18*
43:*6*  135:*7*
**numerous**  34:*10*
77:*18*  79:*1*
110:*23*  125:*7*

**< O >**
**oath**  4:*19*  5:*21, 22*
**object**  62:*25*  63:*4*
**objection**  4:*18, 24*
5:*2, 4*  6:*12, 13, 16*
10:*18*  14:*24*  16:*8*
17:*18*  19:*1*  22:*1,*
*2*  26:*11*  28:*10*
30:*14*  32:*13, 14*
36:*9, 10, 12, 15*
43:*1*  45:*14, 14*
49:*9*  54:*14*  62:*24*
63:*1*  64:*19*  77:*3*
80:*19*  89:*25*
116:*5*  119:*17*
131:*21, 24*

**objections**  6:*18*
**obligated**  87:*19*
**obligation**  5:*25*
87:*21*  88:*3, 14, 25*
132:*24*
**obtain**  22:*15*
**obviously**  43:*10*
**occur**  37:*13*  39:*19*
**occurred**  10:*15*
129:*25*  136:*3, 6*
**October**  13:*9*
23:*22, 23*  73:*12*
**odd**  102:*6*
**offer**  20:*5*  31:*4*
62:*11*  75:*9*
121:*17*  122:*1*
**offered**  18:*10*
19:*17*  31:*4*  56:*20*
57:*19*
**offering**  8:*22*
22:*18, 19, 23*  23:*1*
46:*4*  56:*23*  63:*16*
74:*13*  133:*13*
**office**  37:*16*  39:*20,*
*22*  56:*1, 6, 10*
59:*17*  71:*9*  75:22
76:*9, 12, 14*  77:*1, 2,*
*7, 12, 14, 18*  78:*2*
79:*1*  97:*1, 6*  98:*9,*
*11*  108:*15*  110:*7, 8*
112:*11*  113:*13*
115:*8*  141:*20*
**officer**  4:*19*  17:*16*
18:*18, 20, 23*  19:*5*
44:*21*  56:*19*
57:*10*  59:*9*  61:*4,*
*17, 21*  79:*18, 19*
90:*8*  91:*17*  95:*14*
96:*9*  100:*2*  107:*8*
116:*3*
**officers**  35:*1*
60:*12, 12*  63:*19*
**official**  7:*1*
**officially**  114:22
**off-putting**  91:*20*
**Oh**  45:*6*  95:*2*
112:*7*  116:*4*
**oil**  61:*11*
**Okay**  7:*17, 24*
8:*16*  9:*22*  10:*14*
11:*3, 13, 18, 24*

12:*13*  15:*7, 23*
16:*4, 22*  17:*15*
18:*23*  19:*19*
21:*10*  22:*4, 16*
23:*3, 15, 20, 25*
24:*7, 13, 22*  25:*17*
26:*2*  27:*6, 22*
29:*13*  30:*9*  31:*6,*
*12, 14*  33:*8*  34:*3,*
*12, 19*  35:*19*  36:*15,*
*20*  37:*4*  38:*15*
39:*8*  42:*16*  44:*17*
45:*11*  49:*7*  50:*10*
52:*19*  55:*9, 14, 21*
57:*2*  62:*2*  65:*1*
69:*6, 23*  70:*19*
71:*16*  76:*19*  84:*9,*
*22*  85:*10*  86:*15*
87:*1*  92:*25*  93:*10,*
*19*  94:*15*  95:*4, 4*
97:*8, 12*  99:*9*
100:*11*  102:*15*
103:*10, 21*  104:*12,*
*22*  105:*7, 16*
107:*16, 21*  108:*22,*
*24*  110:*10*  114:*7*
115:*13, 23*  116:*17*
117:*24*  123:*20, 24*
128:*3, 5, 11, 13, 17,*
*24*  129:*12, 21*
134:*1, 13*  136:*5, 13*
137:*3, 23*  138:*11,*
*14*
**okayed** 104:*20*
**old** 38:*14*  75:*15*
**OLSEN** 2:*10*  3:*9*
4:*22, 22*  5:*11*
10:*20*  11:*2*  15:*6*
16:*9*  17:*20, 21*
19:*2, 19*  20:*5, 13,*
*17*  21:*2*  22:*3*
26:*12*  28:*11*
30:*17*  33:*7*  36:*10,*
*14, 16*  38:*5*  39:*8,*
*11*  44:*5*  45:*21*
49:*11*  54:*15*  61:*2*
63:*2*  64:*20*  69:*4,*
*8*  77:*5*  80:*21*
90:*2*  116:*6*
119:*21*  122:*8*
127:*9, 15*  128:*15,*

18  132:*1, 2*  135:*11,*
*14, 17, 18*  138:*14,*
*16, 18*  139:*4*
**once** 6:*18*  23:*13*
32:*16*  48:*15*  49:*4*
57:*17*  63:*5*  71:*10*
73:*21*  74:*23*
76:*21*  77:*19*  88:*7*
105:*5*  107:*6, 7*
116:*24*  126:*22*
134:*3*
**ones** 20:*20*  100:*6*
**ongoing** 32:*8*
**online** 100:*8*
**operating** 19:*5*
29:*16*  44:*20*
**operation** 67:*3*
**operations** 108:*4*
**opinion** 27:*13*
32:*24*  48:*8*  52:*25,*
*25*  54:*21*  56:*20*
57:*1, 10*  59:*9*
61:*7, 15, 17*  62:*2*
64:*12, 13*  70:*11*
79:*24*  80:*6*  84:*19,*
*25*  88:*1, 4*  113:*20*
114:*2, 6, 8, 9, 9*
119:*18*
**opinions** 64:*10*
102:*4*
**opportunity** 7:*8*
8:*23*  9:*17*  72:*8*
73:*10*  74:*1*  85:*14*
93:*7*
**opposed** 106:*2*
134:*23*  135:*25*
**oral** 53:*6, 24*
**order** 11:*9, 11*
107:*5*  126:*9*
**ordered** 98:*7*
**orders** 109:*12*
**organize** 18:*5*
**organized** 106:*5*
**organizing** 18:*2*
92:*16*
**original** 24:*19*
31:*20*  133:*6*
**originally** 18:*6*
103:*2*  113:*12, 15*
**Ortmeier** 7:*23*
85:*3*

**O-R-T-M-E-I-E-R**
7:*23*
**out-of-pocket** 129:*7*
**outside** 45:*2*
**over-evaluated**
33:*20*
**over-evaluating**
33:*13*
**overheard** 25:*14*
27:*7*
**overly** 14:*15*
**oversee** 96:*10, 13*
100:*5*
**overseeing** 74:*8*
97:*14*  106:*24*
**oversight** 97:*8*
121:*3*
**overstating** 33:*10*
**owned** 137:*21, 22*
**owner** 40:*4, 4*
75:*16*

**< P >**
**p.m** 1:*18*  2:*2*  4:*2,*
*10*  139:*8*  141:*7*
**package** 105:*3*
**packaging** 31:*24*
**Packet** 3:*14*  20:*6,*
*10*
**Page** 3:*7, 13*  5:*21*
20:*14*  21:*8, 9*
34:*20, 21*  64:*24*
75:*3*  87:*10*  90:*16*
102:*24*  128:*12, 25*
140:*2*
**pages** 75:*9*
**paid** 12:*16*  33:*2*
130:*8*  138:*6, 7, 8*
**paper** 6:*25*  63:*20*
93:*17*  125:*15*
127:*2*
**papers** 125:*10*
**paperwork** 29:*14,*
*16*  53:*4*  63:*13*
92:*21*  93:*5*  97:*5*
110:*2*  112:*24, 24*
**paragraph** 12:*5*
90:*24*
**parameters** 66:*20*
**paraphrase** 121:*3*

**paraphrasing**
114:*17*
**Pardon** 5:*21*  9:*7*
13:*9*  26:*24*  58:*12*
60:*18*  64:*23*
89:*20*  102:*13*
114:*18*
**parents** 81:*1, 17*
**Parkway** 2:*18*
**part** 14:*20*  22:*16*
23:*22*  25:*15*  26:*9*
33:*2*  37:*6*  47:*15,*
*20, 23*  57:*6*  61:*25*
74:*2*  84:*1*  86:*2, 4*
91:*3*  105:*3*
121:*19*  123:*25*
124:*9*  125:*14*
132:*18, 20*
**parted** 22:*24*
**participant** 9:*12*
**participate** 8:*25*
73:*9*
**participating** 61:*6*
**particular** 6:*9*
23:*18*  24:*7*  79:*13*
**Particularly**
101:*12*  112:*14*
126:*12*
**parties** 35:*4*  61:*23*
64:*9*  141:*17*
**partner** 45:*4*
**partners** 29:*22*
63:*19*
**parts** 98:*15*  101:*3,*
*14*  125:*15*
**party** 60:*25*
**pass** 94:*13*  96:*25*
**patents** 31:*2, 3, 5,*
*6, 9*
**Patti** 97:*1*  109:*18*
**pay** 8:*6*  29:*9, 25*
99:*23, 24*  125:*22*
130:*14, 17*
**paying** 30:*13*
**payment** 108:*5, 6,*
*24*  132:*5*
**penalty** 140:*16*
**people** 32:*22, 23*
33:*14*  43:*10*
44:*25*  45:*1, 2*
54:*22*  55:*18*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

57:24  59:*16, 18, 23*
60:*1, 2, 11*  72:7
75:*11*  76:*17*
79:*21, 22*  86:*4*
87:*1, 7*  88:*15, 20,*
*21, 23*  91:9, *13*
101:9  110:*21*
112:*3, 17*  113:*16,*
*25*  114:*11*  118:*14*
122:*23*  124:7
**percent**  80:*13*
**percentage**  63:*17*
132:8  133:7, *7*
**perdiems**  100:*15*
**perform**  69:*18*
**period**  123:*15*
**perjury**  140:*16*
**permanent**  8:*3*
**permission**  47:*1*
76:*20*
**person**  40:*13*  50:7
53:*2*  56:*19*  60:*17*
61:*20, 21*  68:*24*
74:*14*  75:5  83:2,
*22*  85:2  90:*18*
93:*10*  106:*20*
107:*21*  112:*1, 15*
124:*20*  126:*18*
131:*3*  137:*22*
141:*17*
**personal**  75:*10, 14*
76:7  102:*18*
103:*4, 7*  112:5
116:*16, 17*
**personally**  65:*19*
70:*20*  71:4  85:*13*
115:*20*  127:*23*
**persons**  75:5
**person's**  40:*18*
117:*16*
**perspective**  43:*19*
**phone**  25:*16*
36:*18*  46:*13*
75:*23, 25*  78:*11*
79:*1*  107:*3*  128:*4*
131:*15, 17*  138:*21*
**phonetic**  94:*3*
104:*1*
**pick**  6:*25*  77:*19*
**picking**  126:*18*

**piece**  134:*24, 24*
**piecemeal**  100:*4*
**pigs**  67:*19*
**place**  33:*25*  86:*1,*
*16*  113:*2*
**placed**  5:*21*  96:*19*
**places**  136:*23*
**Plaintiff**  1:7  4:*23*
8:*17*
**Plaintiffs**  2:*8*
**plan**  13:2, *11*  15:*9,*
*22, 23*  22:*13, 24*
26:*19*  41:*24, 25*
45:*20, 24, 25*  73:*10*
96:*11*  101:*6*
114:*24*  123:*25*
**planning**  31:*24*
**pleadings**  56:*8*
**please**  7:6  34:*23*
75:*4, 22*  90:*17*
103:*20*  122:2
125:*18*  126:7, *8, 8*
131:*4, 7*
**plus**  119:*23*
**point**  4:*25*  7:*9*
10:*8*  11:*14, 16*
12:*15*  17:*9, 16, 23*
21:*20*  23:*3, 3*
25:*5, 8*  28:*23*
29:*2*  30:*2*  33:*18*
41:*15*  44:*21*
45:*22*  47:*8, 12*
48:*1, 7*  55:*19*
60:*23*  70:*8, 16, 19,*
*25*  71:*2, 16*  73:*3*
74:*11*  79:*25*
100:*3*  107:*20*
109:*16*  111:*15*
117:*20*  119:*3, 23*
121:*17*  132:*9*
134:*20*  135:*5*
136:*24*
**points**  104:*13*
**Poland**  13:*10, 17*
18:*7*  73:*7*  76:*6*
99:*21*  121:*18*
133:*3*  134:*15*
**police**  79:*18, 19*
**policies**  18:2, *16*
48:*18*  92:*17*

100:*7, 8, 18*  107:*10*
114:*24*
**policy**  92:*18*
**Polish**  98:*1*  120:*5*
**polite**  111:*24*
**political**  120:*24*
**Ponzi**  81:*19, 23*
82:*17*  83:*13, 15, 16,*
*17, 18*
**portion**  12:*13*
**pose**  6:*1*
**position**  15:2  18:*9,*
*11*  19:*17*  82:7
89:*10, 10, 11*  136:*5*
**positions**  18:*10*
**positive**  44:*17*
92:*6*
**possible**  82:*18*
92:*4*
**possibly**  66:*12*
85:*25*  103:*12*
**potential**  45:*8*
46:*4*  61:*22*  88:*11,*
*15*
**potentially**  68:*11*
**PowerPoint**  98:*3*
**pregnant**  123:*13*
**preparation**  97:*14*
**prepare**  29:*15*
**prepared**  29:*14*
103:*14*
**preparing**  30:*5*
**presence**  19:*13*
**present**  2:*22*  36:5
51:*23*  107:*3*
110:7  116:*23*
123:9  124:*1*
**presentation**  71:*22*
97:*19*  98:2  101:*4*
106:*10*  119:7
134:*16*
**presentations**
100:*25*
**presented**  73:*10*
85:*14*
**presenters**  97:*22*
**pretty**  71:*18*
77:*17*  104:*11, 14*
109:*3*  124:*9*
128:*15*

**prevent**  95:*8, 10*
119:*10*
**previous**  23:*22*
51:*13*  75:*15*
110:*1*  120:*13*
135:*15*
**Previously**  63:*11*
77:*16*
**prices**  16:*1*
**primarily**  126:*12*
**primary**  26:*23*
**print**  20:*15*
**printed**  102:*15*
**printer**  104:*21, 22*
105:*3, 6*
**prior**  4:5  9:*25*
12:9  13:*12, 13*
14:*3*  24:*4, 13*
38:*19, 21*  60:*16, 19*
106:*23*  107:*19*
113:7  116:2
122:*25*  129:*24*
130:*4, 17*  131:2
141:*8*
**privilege**  10:*19*
**privileged**  6:*16*
10:*22*
**privy**  26:*16*
**probably**  38:*12*
64:*14, 14, 17*
105:*11*  114:*14*
127:*10*  134:*10*
**problem**  50:*12*
59:*10*  62:*3*  77:*21*
**problems**  13:*20*
111:9  121:*4*
**procedural**  9:*25*
**procedure**  77:7
95:*10*
**procedures**  18:*3,*
*16*  92:*18*  100:7, *8*
114:*24*
**proceed**  61:9
**proceeding**  141:*17,*
*18*
**process**  7:*14*
70:*13, 17, 25*  71:*12*
72:*22*  73:*1, 2*
86:*20*  120:*14*
138:*20*

---

Brandi Jodoin                                        NAC Foundation, LLC v. Corey Jodoin, et al.

**produced** 15:*12,
17, 18*
**product** 69:*15, 24*
70:7 82:2 124:*12*
**profit** 29:*24*
**profits** 29:*20*
**profoundly** 115:*14*
**program** 13:*24*
**progress** 19:*12*
**projected** 16:*1, 3*
31:*17, 20*
**projection** 16:*6, 11*
17:*14* 28:*1* 34:*13*
43:*19* 45:*19* 49:*5,
15, 23*
**projections** 16:*14,
18* 17:*6, 7, 10*
28:*15* 29:*8, 21, 24*
30:*5* 34:*6, 7, 8*
42:*24* 43:*7* 47:*16,
25*
**promise** 13:*23*
22:*14, 17* 44:*3, 7*
54:*19* 125:*23*
131:*8*
**promised** 44:*9*
75:*20* 82:*23*
118:*14* 125:*7, 25*
130:*13*
**promising** 82:*3*
83:*2* 137:*1*
**promote** 45:*8*
**promoted** 46:*3*
56:*14*
**promoting** 55:*18*
**promotion** 45:*24*
102:*22*
**promotional** 45:*7*
**pronunciation** 5:*13*
**proof** 29:*22*
118:*14* 119:*8*
**proper** 45:*19, 24*
137:*19*
**properly** 93:*5*
**property** 50:*3*
**proposed** 41:*24*
74:*21*
**prospective** 88:*23*
**protect** 59:*5, 7*
62:*19*
**protecting** 82:*4*

**protection** 58:*21*
82:*25* 83:*4*
**prove** 127:*5, 6*
**provide** 46:*15, 24*
**provided** 21:*5*
32:*3* 38:*25* 90:*6*
**provincial** 34:*24*
35:*22*
**prudent** 136:*18*
**public** 22:*18, 23*
23:*1* 42:*14* 74:*12*
100:*1* 118:*15*
133:*10, 13* 137:*24*
**publications** 40:*8*
**pull** 92:*17* 100:*7*
**pulling** 96:*17*
**purchase** 9:*18*
31:*5* 63:*12* 71:*5,
8* 72:*3, 4, 18* 78:*12*
82:*18* 83:*24*
86:*10* 88:*8, 11, 12,
16* 98:*15* 109:*12*
133:*17*
**purchased** 23:*5, 6,
16, 23* 24:*4* 83:*22,
22* 86:*12, 14* 136:*1*
**purchaser** 40:*1*
**purchasers** 71:*22*
121:*2*
**purchases** 24:*13, 14*
**purchasing** 72:*9*
120:*14*
**purpose** 14:*5, 8, 8,
9, 21* 24:*3* 29:*3, 7,
8, 15, 17* 30:*5*
42:*24* 92:*12* 94:*5*
134:*1*
**put** 7:*8* 9:*20*
13:*11* 18:*3* 23:*4,
15* 24:*2, 10* 28:*19*
34:*11, 14* 37:*24*
41:*12, 16* 42:*22*
43:*16* 48:*19*
59:*23* 61:*12*
68:*17* 71:*6* 73:*16*
83:*15, 18* 84:*22*
97:*19* 98:*19* 99:*2,
7, 25* 101:*5, 5*
119:*1* 125:*22*
126:*10, 20* 137:*16*

**putting** 13:*6* 33:*1*
38:*24* 41:*9, 20*
47:*4* 69:*19*

**< Q >**
**qualifications** 18:*12*
**qualified** 19:*14*
**qualify** 93:*6*
**quality** 83:*25*
92:*11* 93:*4, 9*
**quarter** 99:*24*
**quarterly** 29:*20, 21,
23*
**question** 6:*5, 10,
15* 7:*6* 14:*7*
16:*10* 17:*20*
23:*25* 24:*23*
25:*21, 22, 24* 26:*1,
7, 13* 28:*12* 29:*6,
13* 30:*9* 49:*7*
54:*16* 63:*25* 66:*9*
80:*22* 87:*24*
90:*13* 114:*10*
135:*19* 136:*13*
138:*7*
**questioned** 52:*22*
**questioning** 69:*11*
**questions** 6:*1, 5, 7,
24* 7:*14* 21:*16*
35:*12* 40:*19, 22*
42:*11* 50:*1* 52:*3*
66:*8* 96:*25*
**quick** 127:*10*
**quite** 56:*3, 23*
75:*16, 18* 114:*12*

**< R >**
**Ralph** 65:*8, 15, 16,
24, 24*
**Rapid** 68:*1*
**reached** 11:*10*
37:*1* 60:*10*
**reaching** 22:*25*
**read** 11:*13* 35:*9*
98:*4* 126:*14*
140:*15*
**ready** 131:*6, 7*
**real** 43:*20* 50:*3,
12* 53:*22*
**realize** 48:*25* 85:*1*

**really** 7:*4* 16:*5*
18:*20* 20:*24*
33:*19* 48:*22*
49:*24* 51:*25* 67:*3,
18* 79:*8* 104:*15*
106:*11* 107:*18*
109:*10* 110:*25*
111:*12, 23* 113:*6*
116:*15* 121:*9*
124:*17* 127:*18*
130:*7* 138:*6, 13*
**reason** 26:*23*
33:*19* 42:*1* 77:*13*
109:*10* 138:*8, 11*
140:*2*
**reasons** 125:*10*
127:*17* 136:*14, 15*
137:*5*
**re-branded** 40:*3*
**recall** 42:*8* 94:*10*
95:*1, 25* 116:*13*
**receive** 36:*8*
133:*17, 18*
**received** 8:*22*
20:*2* 31:*19* 36:*13*
38:*19* 71:*10*
107:*13*
**receiving** 78:*17*
**recess** 21:*1* 69:*7*
127:*14*
**recognize** 104:*16,
17*
**recognized** 68:*10*
**recommendation**
54:*2, 3*
**record** 4:*18* 5:*1*
6:*25* 7:*1* 14:*20*
20:*9* 21:*3* 48:*2*
69:*23* 122:*21*
127:*22*
**recorded** 77:*2*
78:*2*
**records** 46:*1*
**rectify** 97:*4*
**red** 98:*3*
**redeemed** 59:*22*
**reestablished**
120:*23*
**refer** 8:*11* 22:*18*

**reference** 13:*4*
15:*8* 20:*19* 21:*23*
24:*1*
**referenced** 51:*6*
**referencing** 31:*20*
**referrals** 21:*12*
25:*1* 26:*4* 32:*3*
**referred** 72:*3*
**referring** 20:*17*
**refused** 45:*18*
60:*14* 85:*6* 130:*5*
**regarding** 35:*5, 21*
**register** 126:*25*
**registered** 52:*8*
54:*25* 57:*4* 84:*18*
126:*25* 127:*1*
**reimbursement**
129:*6* 130:*21*
**rejected** 73:*22*
**relate** 17:*3* 106:*9*
**related** 116:*21*
**relates** 135:*19*
**relating** 15:*11*
**relationship** 9:*24*
94:*19* 111:*2, 3, 20,
20, 20* 112:*6*
120:*18* 135:*1*
**relationships** 124:*7*
**relative** 141:*15*
**relatively** 16:*15*
**relatives** 55:*6*
56:*15* 80:*24*
**relayed** 9:*14*
**released** 16:*2*
23:*14*
**reliance** 91:*4*
**relied** 21:*18* 22:*8,
9, 11* 26:*8* 30:*13*
41:*19* 42:*18*
47:*15, 21, 21, 24*
90:*22* 91:*4*
**remember** 40:*1, 12*
42:*13* 49:*18*
52:*20, 21* 53:*20*
54:*18* 56:*4* 66:*15*
67:*6, 7, 20* 75:*17*
77:*9* 78:*14* 79:*15,
16* 80:*17, 17* 85:*15*
92:*22* 95:*5*
106:*24* 107:*15*
109:*9* 111:*7, 13*

112:*13, 15* 113:*6,
14* 133:*7* 134:*10*
**remembering** 93:*4*
**remit** 21:*19* 90:*23*
**REMOTE** 1:*16*
2:*1*
**remove** 101:*7*
118:*15*
**repeat** 9:*7* 37:*6*
47:*12* 89:*20*
**rephrase** 6:*7*
17:*20* 114:*7*
**report** 35:*4, 5, 5,
21* 53:*4*
**report,** 35:*12, 15*
**reportable** 8:*13*
**Reported** 1:*23*
35:*2* 141:*6*
**Reporter** 2:*3* 4:*9*
20:*2* 138:*21*
141:*1, 4*
**reports** 21:*12, 16*
24:*25* 26:*4* 32:*2, 6*
**represent** 4:*17*
5:*4, 5* 24:*18*
**representation**
11:*5* 41:*20, 23*
48:*12*
**representations**
13:*1* 15:*9, 13*
30:*12* 53:*24*
**representative**
23:*17, 20* 45:*12*
122:*19, 22*
**represented** 23:*10*
**representing** 4:*22*
24:*5* 93:*11*
**request** 21:*11*
31:*14, 15* 32:*9*
122:*2*
**requested** 141:*14*
**requests** 19:*20*
**required** 63:*22*
64:*1, 2, 8*
**re-read** 90:*4*
**research** 121:*13*
**Reserve** 108:*5, 24*
**resident** 8:*3, 3*
**resistant** 113:*8*
**resolution** 127:*20*

**resolve** 127:*25*
**resolved** 6:*19, 19*
**respect** 36:*22*
41:*8* 47:*23, 24*
74:*2* 88:*5, 6, 10*
**respected** 121:*10*
**respond** 6:*20*
32:*15* 102:*6*
**response** 6:*24*
66:*9* 90:*18*
**responses** 20:*21*
21:*4, 5, 6*
**responsibilities**
99:*19*
**responsibility** 61:*7*
**responsible** 61:*16*
74:*8* 87:*15* 89:*2*
91:*21* 92:*16, 20*
99:*22* 103:*23*
104:*3* 112:*18*
**rest** 20:*18* 85:*15*
125:*12*
**result** 12:*25* 69:*10*
86:*13*
**retained** 130:*25*
**retired** 115:*6*
**return** 59:*22* 60:*1*
83:*2* 85:*1* 117:*19*
129:*3*
**returns** 28:*24*
29:*2, 2*
**reveal** 40:*15* 101:*9*
**revealed** 13:*21*
**Revenue** 95:*20*
**review** 7:*9* 141:*13*
**Richard** 66:*2*
**rid** 49:*14*
**right** 5:*5* 9:*6, 22*
10:*6, 12* 11:*8*
14:*18* 26:*2* 27:*10*
28:*6* 29:*4, 9* 30:*2,
5* 31:*24* 34:*17*
38:*2* 39:*12* 42:*21,
25* 45:*2* 48:*13*
49:*8* 51:*20* 56:*4,
10* 58:*4* 60:*5, 17*
62:*23* 63:*10* 66:*1*
69:*15* 70:*24* 72:*1,
24* 74:*5* 75:*20*
76:*20* 77:*2, 15*
78:*3, 6, 17, 18* 79:*7,

12* 80:*3* 82:*13*
83:*23* 87:*2* 88:*14,
24* 89:*17* 92:*14*
93:*1, 8, 16* 95:*14*
97:*19* 101:*20*
104:*5* 113:*13, 21*
114:*13* 118:*9, 20*
119:*16* 120:*3, 5*
125:*2, 22* 126:*4*
127:*25* 129:*4, 19*
132:*19* 133:*5, 8*
136:*3, 15* 137:*10*
**right-hand** 20:*14*
128:*14*
**risky** 72:*8*
**Rodgers** 122:*9, 11,
12* 123:*7*
**ROE** 1:*10*
**Rohan** 39:*15* 41:*1*
49:*18*
**role** 108:*10*
**roll** 24:*20*
**rolled** 23:*13* 24:*9,
16*
**room** 135:*10*
**route** 77:*11, 12*
**routed** 77:*1*
**RPR** 1:*23*
**rules** 5:*20*
**rumors** 116:*15*
**run** 86:*23* 92:*19*
115:*7*
**runaround** 135:*3*
**runs** 43:*4*
**Ruttenberg** 128:*20*

**< S >**
**Sachin** 71:*12*
**safe** 139:*5*
**safety** 114:*22*
**salaries** 130:*19*
**sale** 56:*15* 59:*10*
61:*22* 62:*16, 20*
122:*23*
**sales** 80:*6* 92:*20*
106:*25* 108:*14*
112:*10, 21, 23*
123:*1, 3*
**salesman** 108:*13*
**salespeople** 122:*25*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

**salesperson** 108:*12*
112:*13* 116:*4*
117:*1* 123:*2*
**Sanders** 2:*17*
**sat** 39:*18, 21*
**save** 135:*1*
**savings** 59:*23*
61:*13*
**saw** 104:*12, 22, 25*
**saying** 16:*20* 42:*8*
43:*23* 47:*19*
52:*25* 58:*15* 74:*7*
86:*2* 91:*14* 92:*23*
126:*4* 127:*3*
**says** 12:*24* 31:*18*
36:*21, 21* 37:*15*
54:*4* 64:*17* 66:*15*
85:*3* 90:*6, 17*
**scam** 58:*9*
**scared** 79:*17*
**scary** 81:*14*
**scenario** 64:*15*
**scheme** 81:*19, 24*
82:*17* 83:*13, 15, 16,
17, 18*
**school** 115:*11*
**schooling** 120:*20*
**Scott** 122:*9, 11, 12*
123:*7, 10, 11*
**screen** 101:*23*
**screwed** 117:*7*
**scroll** 101:*18*
**se** 27:*10*
**SEC** 25:*25* 26:*6*
36:*1, 6, 8* 126:*24*
**second** 9:*22* 21:*8*
23:*6* 25:*1* 30:*10*
40:*2* 57:*15* 74:*1*
83:*20* 92:*9*
112:*25* 113:*18*
114:*18* 123:*14*
**Securities** 25:*9, 19*
51:*2* 52:*8* 53:*14*
54:*8, 13, 25* 56:*22*
57:*5* 58:*10* 64:*10*
80:*2, 7* 82:*20*
84:*18* 106:*22*
**security** 52:*13, 18,
24* 53:*12* 54:*5, 23*
84:*20* 113:*20, 22*
114:*4, 8, 10* 122:*4*

126:*19* 127:*7*
132:*13, 19* 137:*16,
18*
**see** 11:*22* 20:*14,
15* 32:*17* 34:*21*
35:*7* 39:*10* 47:*3*
60:*1* 85:*8* 90:*25*
92:*23* 95:*4* 96:*24*
100:*13* 110:*7*
124:*15* 126:*17*
127:*12* 129:*8, 15*
**seeing** 48:*24*
51:*25* 107:*24*
**seen** 41:*2, 6* 45:*22*
59:*22* 93:*1*
103:*13* 125:*15*
126:*19*
**select** 100:*12*
**sell** 23:*14* 52:*8*
54:*25* 57:*4* 58:*10,
19* 62:*18* 82:*25*
83:*4* 84:*18* 95:*12*
113:*21* 117:*3*
137:*19*
**selling** 29:*11*
52:*13* 53:*12* 54:*6,
21, 22* 55:*2* 56:*20*
62:*6* 71:*21* 76:*2*
93:*14* 113:*22*
123:*4*
**send** 49:*18* 71:*9*
93:*21, 24* 101:*14*
109:*20* 131:*2, 3*
**sense** 101:*19*
**sent** 65:*21, 23*
94:*17* 97:*24*
101:*4, 25* 102:*2, 5*
104:*20, 20* 105:*2, 4,
5, 23* 117:*18*
128:*21, 24* 129:*23*
**serious** 59:*24*
**served** 19:*21*
125:*24, 25*
**Service** 95:*20*
**set** 18:*15* 30:*20*
34:*13* 40:*2* 103:*5*
104:*2* 123:*13*
141:*19*
**sets** 35:*10*
**setting** 106:*23*
**shaking** 6:*23*

**share** 85:*12* 92:*8*
120:*18* 121:*18*
**shareholders**
133:*17*
**shares** 52:*2* 53:*13*
54:*6, 19* 55:*21*
56:*21, 24* 58:*11*
61:*25* 62:*7, 7*
63:*17* 82:*12, 14, 23*
88:*8, 12, 16* 126:*21*
132:*8, 11, 12, 21*
133:*24* 134:*9, 21,
22* 135:*24* 136:*4, 6*
137:*9*
**shepherd** 74:*4*
**shore** 94:*3*
**short** 90:*13*
**shortly** 109:*6*
**show** 111:*2, 21*
120:*12*
**showed** 31:*4*
**shut** 102:*17*
117:*11*
**sick** 100:*17*
**side** 34:*14* 70:*14*
79:*20*
**sign** 61:*18* 71:*8*
83:*25* 84:*3* 95:*15,
17*
**signature** 140:*16*
**signed** 33:*14* 71:*4*
73:*17* 83:*24*
92:*14* 93:*1* 96:*1*
**signing** 92:*22*
93:*10*
**Similar** 9:*20*
57:*19* 63:*15* 82:*1,
5* 83:*1, 8, 9*
**simply** 14:*16* 18:*1,
12* 62:*14* 78:*2*
105:*14* 119:*1*
125:*4* 131:*7*
132:*11, 12* 134:*25*
135:*2, 8* 137:*15*
**sister-in-law** 85:*5,
21*
**sit** 90:*11*
**site** 99:*2, 7*
**sites** 100:*8*
**sitting** 43:*22*

**situation** 7:*13*
63:*15* 64:*4* 83:*1*
114:*13*
**six** 38:*14*
**skip** 114:*18*
**Skype** 33:*11*
101:*12, 13* 117:*5*
126:*15* 127:*3*
**slow** 61:*17* 114:*12*
**small** 16:*14* 43:*4,
6*
**smaller** 115:*7*
**smoke** 43:*12*
**sneeze** 102:*14*
**software** 95:*7*
**sold** 59:*20* 84:*21*
86:*5* 108:*12*
**sole** 20:*7*
**solicit** 60:*4*
**soliciting** 118:*5*
**somebody** 19:*16*
35:*17, 18* 45:*4*
51:*16* 70:*12*
73:*24, 24* 82:*2*
83:*12, 17* 119:*12*
124:*7, 20* 136:*19*
137:*2*
**somebody's** 118:*16*
**son's** 55:*16*
**soon** 102:*16*
127:*10*
**sorry** 11:*7* 14:*2*
24:*25* 32:*5* 61:*4*
63:*3* 73:*20*
107:*24* 110:*3*
125:*19, 21* 131:*23*
135:*13, 16*
**sort** 15:*21* 34:*14*
74:*10* 82:*3, 18*
105:*19*
**sound** 54:*3* 104:*18*
**Sounds** 69:*6* 116:*1*
**sources** 100:*19*
**south** 57:*22* 68:*1*
**speak** 6:*9* 52:*7*
88:*15* 123:*7*
**speaker** 25:*16*
**speaking** 12:*6*
38:*24* 44:*25*
**speaks** 89:*25*
**special** 105:*24*

**specific** 40:*18*
48:*4, 12* 58:*19*
67:*20* 83:*3* 97:*22,
23*
**specifically** 21:*23*
59:*2* 84:*13* 106:*1*
114:*1*
**specified** 75:*6*
**speculation** 77:*4*
80:*20*
**speed** 61:*18*
**spelling** 47:*3, 5*
**spoke** 9:*3* 37:*2*
45:*1* 85:*3* 86:*3*
87:*10* 119:*23*
**spoken** 25:*4, 8*
116:*12*
**sponsor** 124:*4*
**sponsored** 123:*22*
**ss** 141:*2*
**staff** 114:*25*
**stage** 69:*25* 70:*7,
23*
**stand** 135:*17*
**standard** 77:*6*
**stands** 31:*22*
**start** 4:*21* 20:*20*
86:*23* 105:*11*
**started** 39:*22*
48:*23* 67:*18*
124:*19* 128:*22*
137:*13*
**starting** 34:*20*
**starts** 35:*20*
**State** 2:*4* 4:*14, 17*
32:*22* 34:*24*
35:*22* 43:*20*
90:*17* 97:*3* 141:*2,
5, 20*
**stated** 15:*10*
35:*24* 80:*9*
**statement** 16:*19*
22:*6* 32:*12* 52:*9*
54:*11* 82:*18*
90:*20, 21* 91:*2*
96:*1* 114:*1*
**statements** 21:*22*
42:*3, 7* 47:*21*
**States** 8:*6* 25:*20*
68:*22* 95:*21*

**stating** 31:*22*
53:*16* 93:*12* 94:*13*
**status** 8:*4*
**stay** 92:*6* 139:*5*
**staying** 18:*15*
**steady** 19:*12*
**STENOGRAPHER**
4:*7* 20:*4* 138:*23*
139:*1*
**stenographic** 4:*8*
141:*10, 13*
**step** 137:*1*
**stepped** 19:*18*
**steps** 71:*2*
**stock** 15:*2* 23:*1*
44:*23* 45:*8* 46:*3*
72:*11, 22*
**stop** 22:*16*
**stopped** 79:*21*
119:*1, 2* 134:*18*
**story** 79:*20* 137:*7,
9*
**straight** 131:*19*
**strategy** 58:*19*
**streamlined** 108:*8*
**Street** 2:*11*
**strike** 29:*7* 47:*6*
**struck** 124:*19*
**structure** 18:*4, 8*
33:*16* 34:*16*
96:*16, 17, 18* 100:*1*
108:*3* 133:*11, 12*
134:*8* 136:*17, 20*
**structured** 15:*5*
48:*20, 21* 137:*20*
**struggling** 124:*11*
**stuck** 67:*18*
**stuff** 95:*5* 102:*4,
10* 104:*10* 114:*19*
**stumbled** 124:*16*
**subject** 25:*9*
**submission** 12:*15*
**submitting** 12:*9*
14:*3* 26:*23*
**subsequent** 53:*6*
93:*21, 24*
**subsequently**
111:*16*
**substantial** 33:*5*
**success** 45:*13*

**successful** 43:*5*
**successfully** 66:*25*
**sue** 125:*20* 128:*9*
131:*11*
**sued** 130:*1*
**suggest** 50:*13*
92:*24*
**suggested** 18:*19*
73:*23*
**suggesting** 63:*6*
**suggestion** 61:*19*
**suggests** 62:*22*
**suing** 85:*6*
**Suite** 2:*11, 18*
**summary** 35:*5*
**supplement** 32:*8*
**supplemental**
21:*12* 26:*5* 35:*10*
**support** 32:*11*
**supposed** 18:*1*
96:*17, 20, 25* 99:*23*
100:*3, 5* 107:*12*
111:*6* 136:*8*
**sure** 5:*20* 11:*7*
20:*24* 29:*24* 35:*3,
11* 71:*3, 24* 72:*13*
76:*2, 24* 77:*17*
80:*15, 15* 81:*25*
84:*6, 25* 85:*11*
90:*15* 92:*5*
105:*10* 109:*3*
113:*18* 118:*20*
127:*11* 133:*5*
138:*21*
**surprise** 110:*11, 14,
16, 19* 129:*21, 25*
130:*24* 131:*11*
**surprised** 128:*8*
**surrender** 132:*22*
**suspicions** 86:*20,
22*
**sustain** 49:*1*
**switch** 72:*12* 98:*5,
6*
**sworn** 5:*8* 141:*9*

**< T >**
**take** 19:*14* 21:*6, 7*
30:*24* 33:*25*
34:*19* 46:*17* 47:*2*
64:*15* 66:*7* 69:*4*

**73:*11* 93:*18*
100:*1* 101:*24*
102:*25* 109:*16*
118:*2* 119:*13*
121:*19* 122:*1*
123:*18* 127:*9, 10,
12, 12* 131:*5, 6*
**Taken** 1:*17* 2:*2*
6:*22* 7:*7* 21:*1*
54:*18* 69:*7* 127:*14*
**talk** 21:*15* 51:*2*
60:*15* 74:*14* 81:*4*
82:*7, 22* 85:*7, 18*
86:*7* 118:*17*
119:*25*
**talked** 13:*16*
38:*23* 47:*22* 65:*2,
19* 69:*14* 78:*20*
82:*22* 85:*25*
87:*13, 18, 20, 23*
90:*8* 91:*7* 98:*7*
121:*25* 123:*10, 11*
125:*16* 136:*22*
**talking** 15:*21*
22:*17* 57:*13, 18*
64:*9* 76:*11* 82:*11,
21* 87:*17* 100:*24*
103:*10* 107:*5*
127:*16, 18, 19*
130:*4*
**talks** 24:*25* 26:*4*
**task** 97:*23* 108:*25*
**tasked** 74:*10*
**tax** 28:*23* 29:*1, 2*
**taxes** 8:*6, 9* 28:*20*
29:*9, 17, 21*
**Taylor** 2:*17* 38:*1,
2*
**team** 44:*15* 71:*19*
73:*10, 22* 74:*21*
119:*19* 120:*3*
123:*3* 125:*12, 14*
133:*25*
**technical** 99:*3, 6*
**technically** 72:*4*
**technology** 41:*3*
**tell** 7:*11, 21* 8:*19*
17:*4* 30:*18* 32:*16*
35:*9* 36:*24* 40:*10*
41:*11, 11, 15, 19, 22*
47:*6, 7, 10* 48:*1, 4*

Brandi Jodoin            NAC Foundation, LLC v. Corey Jodoin, et al.

49:7, *12*   50:5, *16*, *23*   51:24   58:6, *8*, *23*   70:22   78:24   81:*13*   84:*13*   88:25   91:*3, 8, 17, 23*   94:23   98:16   100:9, *19*   111:*11*   123:7   125:6

**telling**   13:*4*   16:4   44:*11*   47:24   79:*15, 16*   89:22

**tells**   61:*17*   64:*13*

**Terence**   98:*1*   125:*12*   133:24

**Terence's**   137:*17*

**term**   9:6, 9   41:*4*   43:*14*   122:22, *23*   125:*10, 15*   127:2, *5*   134:5

**terminated**   60:*13*

**terms**   126:*13*   135:6

**terrorist**   95:*13*

**Tesser**   128:*19, 20*

**testified**   5:*9*   87:7

**testify**   141:9

**testimony**   87:6   127:*21*   128:5

**texted**   90:7

**Thank**   138:*18, 22*   139:6

**Thanks**   138:*24*   139:*4*

**theft**   118:*14*

**theft-proof**   117:*14, 15*

**theirs**   97:*23*

**thing**   12:24   19:7   23:*11, 15*   24:14   30:*3, 8*   45:*13*   64:*18*   72:*18*   76:*15*   82:*19*   84:*15, 15*   93:20   100:*17*   101:*23*   106:*3*   108:*25*   128:8   130:*18*   134:*17*

**things**   33:*10*   42:8   54:*12*   56:22   58:*16*   67:*13*   71:7   87:6   95:6   98:*10*

100:*12*   102:5, *20*   106:*1*   124:*15*   127:*11, 19*   130:*20*

**think**   7:*17*   12:*20*   16:*17*   17:5   50:*24, 25*   55:*12, 15*   59:*11, 12*   64:*16, 18*   66:*18*   67:2   69:*20*   79:*13, 14*   80:*12*   84:*4*   86:*11*   87:*18*   99:*14*   103:*11*   106:*4*   107:*18, 18*   109:*10*   110:*20*   111:*5, 13, 25*   112:*1, 2*   114:*16*   116:*19*

**thinking**   50:*13*   65:*17*   68:*15, 20, 25*   94:*20*   106:*21*   116:8

**third**   61:*23*   64:9

**thought**   41:*16*   43:*11*   50:*3*   66:*16*   67:*21*   68:*25*   69:2   100:*12*   106:*20*   111:*14*

**three**   26:*16, 17*   31:5, *11*   57:24   67:*10*   88:23

**thrown**   18:*19*

**thumbnail**   104:*6, 8*

**tight**   42:*12, 15*

**time**   4:*10, 16*   7:*13*   8:*11*   9:*15*   10:*15*   11:*18, 19*   17:8, *11*   19:22   27:8   31:7, *10*   38:*15, 16*   39:3   41:*12, 16*   42:22   45:23   46:25   48:7   53:23   56:*1*   60:9   67:*16*   69:*1*   70:22, *23*   83:*10*   85:*12*   86:*10, 16*   89:*3, 9*   98:*10*   112:*23*   115:*16*   120:7   122:*13*   125:*16*   126:7   127:*19*   129:*19, 24*

**timeline**   85:*24*

**times**   23:*24*   34:*10*   63:*25*   72:2   77:*18*

125:*4, 7, 9*   127:*17*

**timing**   10:*21*

**tiny**   20:*14*

**tip**   101:*8*

**Tippett**   68:6

**title**   17:*25*   18:*17, 22*   19:*3*

**titles**   18:*13*

**today**   6:*1*   7:*15*   20:8   31:22   48:*14*   87:7   90:*11*

**Today's**   4:*9*

**token**   23:*10, 20*   53:*23*   56:*14*   66:*16*   67:*21*   70:8   84:*19*

**tokens**   9:*18*   23:*12, 17, 24*   24:*4, 17*   29:*12*   52:*23*   54:*22*   55:*19, 20*   69:*14*   71:5, *14, 17, 23*   72:9   93:7

**told**   9:*16*   19:*13*   28:*16, 16*   35:*15, 17*   39:*25*   40:*17*   42:*4*   44:*6*   48:2, *8, 13*   50:2, *11*   51:22   54:*17*   55:*3*   58:*3, 7, 21, 24, 25*   59:*3, 6, 7, 8, 13*   63:*14*   75:*21*   77:9   78:25   79:*3, 4, 6, 11, 19, 20, 25*   80:2, *12, 13, 18*   81:*1, 2, 10*   83:7, *12*   84:9, *12, 15, 16*   85:*17*   86:4, *7, 8*   87:*4, 5, 6, 7, 22*   88:24   91:*12, 15, 24*   92:5   98:*4*   103:*4*   113:*8, 10, 25*   114:*1, 3, 6, 11*   117:*6, 12, 19*   118:*1, 1, 5, 10, 13, 21, 21*   120:24   121:*18*   126:*8*   127:*3, 4*   131:*2, 3*   134:*7*   135:*8*

**topic**   106:*14*

**total**   90:*23*

**totally**   47:*21*

**touch**   22:7   36:*1*

51:9   75:*11*   111:*14*

**tough**   69:*19*

**trade**   70:2

**traded**   71:*24*

**trading**   70:*12*

**transactions**   84:2

**transcribed**   141:*10*

**transcript**   6:22   7:9   141:*11, 13*

**transcription**   140:*15*   141:*12*

**transfer**   24:2   71:*14*

**transform**   134:*4, 5*

**transmission**   120:22

**traveling**   85:*21*   100:*16*   130:*15*

**Trenching**   115:*4*

**trial**   7:*13*

**tried**   92:5   106:*4, 5*   114:*5*

**trip**   113:*13, 15*   123:*18*   124:8

**trouble**   78:*16*   111:9   126:*24*

**true**   42:*21*   112:*10*   124:*23*   125:5   126:*11*   132:*3*   141:*12*

**truly**   43:*18*   48:*25*   59:*11*   124:*14*

**trust**   30:*20*

**trusted**   42:5   49:*20*

**trustworthy**   17:*4*

**truth**   16:*13, 18, 21*   44:*11*   48:9   141:9

**truthful**   127:*18*

**truthfully**   6:*1*

**try**   6:7   45:*1, 12*   106:*12, 13*   112:5   114:*18*

**trying**   14:22   27:*16*   43:*24*   44:22   53:*20*   59:*18*   74:*23*   85:*24*   92:*17*   94:*12*   99:*25*   114:*16*   117:2   125:8   127:*24, 24*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

130:*11*  134:*25*
135:2
**turn** 58:*18*  126:*17*
128:*9*
**turned** 40:2  54:*23*
133:22
**Turner** 2:*10*
**twice** 107:7  126:22
**twins** 123:*13*
**two** 13:*17*  27:3
31:*4, 11*  55:3
57:*13, 18*  58:*16*
60:5  88:*10*
113:*16*  138:*12*
**Tyler** 57:*14, 20*
58:2, *14*  61:8, *10*
63:*15*  87:*9, 11, 23*
88:7  89:*13*  91:22
**type** 5:22  18:*17*
66:*17*  68:*12*
79:*18*  100:*17*
101:*23*  115:7
127:7  132:*13*
**types** 105:22
**typewritten** 141:*11*
**typical** 72:*21*
**typically** 8:*8*
122:*24*

**< U >**
**U.S** 7:*24*  99:*16*
**Uh-huh** 7:*3*
**UK** 135:*23*  136:7,
*21*  137:*4*
**Ukraine** 73:*24*
**ultimate** 60:*1*
**ultimately** 117:*21*
**Um-hum** 36:2
47:*17*  54:*10*
72:25  81:7  129:9
**unbanked** 121:7
**uncomfortable**
110:*11*  111:*16*
**understand** 5:*15,
23*  6:2, 5, 6  10:25
14:7  16:*5, 11, 12*
25:2, 7, *23*  27:*12,
14, 15*  30:7, 7
35:*12*  38:*11*  43:2,
7, *18, 21*  47:8
48:*15*  49:*5, 8*

67:*16*  70:*10*  74:6
82:*17*  96:8  99:*17*
118:23  130:*12*
133:*21, 22, 25*
**understanding**
15:*1*  80:*1*  113:*24*
**understood** 14:*11,
12*  28:3  48:*16, 17*
54:*17*  70:5  71:*4,
24*  80:*10*  92:*19*
101:*1*  115:*15*
**unethical** 49:*20*
**unhappy** 125:*13*
**United** 8:6  25:*20*
68:22  95:*21*
**unlawful** 84:*20, 23*
**unlicensed** 58:*3*
**unnecessary**
105:*15, 17*
**unregistered** 53:*12*
54:5
**unsecured** 52:*17*
**unsuccessful** 26:*21*
**untraded** 71:8
**upcoming** 63:*17*
**updates** 120:*19*
**updating** 107:*11*
**upset** 51:*16*
**use** 36:7  95:*7, 8*
100:*20*  102:*18*
103:8

**< V >**
**vaguely** 116:*1*
**valuation** 12:9
13:*3, 5, 12, 15, 25*
14:*6, 9, 13, 21, 23*
15:*14, 24*  16:7
21:*18, 24*  22:9
26:9  27:*10, 18, 21*
29:*3*  31:*17*  34:*8,
13*  42:*9, 14, 18, 23*
47:*9, 9*  48:*4*  49:*1,
23*  90:22  91:*4*
101:6
**valuations** 28:*15*
**value** 14:*14*  16:*1,
3*  28:*19, 21*  30:*1*
31:*6, 9, 20*  41:*20,
23, 24*  43:*20*  44:7,

8  48:*13*  49:6
72:*10*  93:8
**valued** 15:*4, 5*
127:7
**values** 31:2, *3*
**variety** 73:25
**various** 23:*24*
30:*15, 16, 20*  33:*11*
100:*3, 4, 8, 18*
102:4  120:*14*
**vastly** 110:*20*
**Vegas** 2:*11, 18*
56:*1*  81:5  85:7,
*18*  86:6, *8, 9*  97:2
108:*15*  109:7, *7, 23*
110:*4*  111:*3, 21*
113:*1, 13*
**venture** 117:*4*
121:*19*
**venue** 72:*24*  73:*13*
**venued** 4:*13*
**verbal** 30:*16*
35:*14*  133:*1*
**verbally** 35:*17*
59:*18*
**verification** 70:*13,
25*  71:*12*
**version** 80:5
137:*6, 9*
**versus** 4:*12*  71:*17*
**vet** 68:2
**viable** 29:*23*  73:*14*
**video** 6:*21*  7:2
45:7  138:*20*
**VIDEOCONFERE
NCE** 1:*16*  2:*1*
**Vietnam** 68:2
**view** 17:*10*  80:*1*
108:7  127:*18*
**view-back** 18:*4*
**viewers** 73:9
**Vince** 76:*3, 23*
80:*1*
**violated** 118:*3*
119:*20*
**violating** 58:*4*
**violation** 53:*14*
54:7, *12, 20*  56:22,
*25*  62:8  80:7, *9, 18*
82:*19*  88:*19*

**visit** 56:8, *9*  97:6
**volunteer** 46:*21*
**voting** 126:*21*
**VP** 108:*14*
**vs** 1:*8*

**< W >**
**wait** 30:*23*  37:*21*
134:9, *14*  137:*20*
**waiting** 125:*11*
134:2
**wake-up** 127:*5*
135:*1*
**walked** 41:*4*
91:*20*  110:8
**wallet** 71:*13, 15*
96:*23*  117:*11, 16*
118:*16*
**want** 10:*21, 22*
19:*19*  20:2  21:*6,
7*  34:*9*  35:*11*
36:*24, 25*  53:*17*
59:*19*  69:*9, 22*
72:*13*  75:*1, 12*
83:*25*  87:*24*
91:*15*  101:8
103:*4*  113:5
126:*10, 21*  130:7
139:*1*
**wanted** 33:2
49:*14*  59:5  66:*24*
67:*3*  75:*19*  77:*20*
82:7  101:*4*
120:*15*  121:9, *13*
127:*4*  132:8  135:8
**wanting** 49:*13*
95:*13*  102:22
**wants** 43:*12*
**Warsaw** 120:*3, 7*
122:7
**watch** 85:*23*
**way** 4:*24*  11:*20*
15:5  20:*1*  24:*10*
31:*24*  38:*18*  39:2
42:*10*  51:*18*
62:*18*  80:*17*
84:22  97:*20*
105:*16*  110:*17*
113:*23*  121:*6*
132:*11, 12*  133:5

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

134:*3*

**ways** 22:*24* 124:*9*
**web** 18:*4* 68:*16*
**webmail** 116:*25*
**website** 68:*11*
96:*13* 98:*19, 20*
101:*1, 13, 16, 18, 21*
106:*10* 116:*25*
**week** 27:*3* 38:*19*
**weekend** 139:*5*
**W-E-I-N-E-R**
39:*16*
**Weir** 66:*7, 22, 23*
**welcoming** 122:*6*
**Well** 5:*19* 9:*11*
15:*7* 20:*3* 22:*2*
23:*18* 26:*25* 28:*4,*
*23* 29:*1, 6* 31:*17*
36:*21* 38:*21*
41:*21* 42:*10* 47:*6*
50:*8, 11* 54:*3*
60:*13* 63:*21*
65:*13* 69:*18, 19*
70:*22* 74:*7* 76:*9,*
*14* 77:*11, 22* 80:*11*
82:*9* 85:*17, 20*
88:*20* 95:*15*
98:*20* 102:*3*
104:*8* 113:*4, 10*
114:*2* 119:*14, 22*
121:*24* 122:*24*
130:*2* 131:*13*
135:*5* 136:*17*
137:*6, 11* 138:*1, 12*
**well-known** 120:*25*
**went** 17:*15* 18:*22*
56:*13* 59:*21* 62:*5*
69:*20, 20* 70:*1*
72:*23* 73:*12*
77:*11* 79:*16* 81:*5*
85:*7, 17* 86:*6, 9*
90:*19* 98:*9, 11, 11,*
*13* 103:*24* 104:*22*
107:*10* 108:*15*
109:*2* 111:*8*
112:*11* 117:*10*
136:*14* 137:*24*
**we're** 6:*21* 7:*13*
26:*3* 30:*21, 23*
42:*13, 14, 15* 43:*4*
46:*8* 50:*23*

105:*24, 24* 110:*20,*
*24* 112:*2* 121:*21*
125:*18* 127:*6, 22*
131:*7*
**We've** 87:*20*
122:*14*
**WHEREOF** 141:*19*
**whichever** 34:*8*
**whole-heartedly**
62:*15*
**wife** 115:*15*
**willing** 52:*1* 95:*12*
**Wincura** 57:*14, 20*
58:*1, 24* 59:*12*
60:*4, 16, 20* 61:*9*
63:*15* 87:*11, 12*
88:*7*
**wine** 18:*5* 65:*23*
96:*21*
**wire** 71:*10*
**wish** 7:*10*
**withdraw** 13:*22*
**withdrew** 73:*22*
**witness** 4:*19* 11:*1*
14:*25* 20:*6, 12, 16*
30:*15* 32:*16* 38:*1*
43:*2* 45:*16* 49:*10*
62:*25* 119:*18*
120:*24* 128:*17*
131:*23* 135:*13, 16*
141:*8, 19*
**woman** 104:*1*
**won** 68:*17*
**wonderful** 134:*16*
**word** 41:*25* 53:*19,*
*19*
**worded** 102:*7*
**words** 10:*10* 89:*8*
**work** 17:*15* 22:*25*
27:*13, 22* 33:*2*
34:*15* 43:*16*
63:*23* 97:*13*
99:*22, 24* 100:*4*
102:*25* 106:*22*
114:*20* 115:*6, 9, 18*
116:*21* 125:*21*
129:*13, 14*
**worked** 98:*17*
107:*17* 116:*2*
118:*20* 138:*11*

**worker** 61:*11*
124:*18*
**workers** 61:*12*
**working** 8:*13*
14:*10, 19, 23* 15:*3*
18:*8* 27:*18* 28:*14*
41:*3* 48:*18* 49:*3*
60:*24* 73:*16*
96:*18* 97:*16*
100:*7, 17* 108:*4, 6*
111:*20* 115:*3*
124:*24*
**work-work** 115:*20*
**world** 22:*19*
**worth** 14:*13*
19:*15* 27:*24* 28:*1,*
*5, 9, 17* 31:*23*
41:*13, 17* 42:*2*
43:*9* 44:*2* 93:*15*
101:*9, 10*
**wrap** 127:*10*
**write** 75:*18* 83:*19*
**writing** 6:*22*
35:*13, 18* 98:*3*
101:*23* 104:*3*
**written** 38:*25*
46:*16* 53:*6* 63:*20*
83:*11* 96:*1*
117:*24* 137:*15*
141:*11*
**wrong** 17:*6, 9, 11*
50:*17* 62:*23* 95:*3*
99:*5* 113:*20, 23*
118:*6* 119:*12*
**wrongdoing** 50:*20*
**wrote** 98:*23, 25*
99:*1, 5* 104:*5, 6, 7,*
*13*
**Wynar** 39:*15* 47:*5*
49:*22*
**W-Y-N-A-R** 39:*17*

**< X >**
**XIV** 1:*8*

**< Y >**
**Yeah** 17:*12* 28:*14*
32:*13* 70:*21* 74:*9*
93:*3, 14* 97:*16*
98:*22* 105:*10*
118:*16* 135:*15*

**year** 23:*23* 27:*4*
34:*12*
**years** 5:*14* 18:*14*
53:*20* 91:*16*
110:*24* 114:*15*
122:*16*
**Yep** 120:*10*
128:*17* 129:*2*
138:*17*
**York** 104:*2*

**< Z >**
**Zoom** 4:*20*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

## WORD LIST

**< $ >**
$100  *(24)*
$140  *(9)*
$25,000  *(1)*
$265,000  *(1)*
$275,000  *(10)*
$37,000  *(1)*
$37,209.19  *(1)*
$40  *(15)*
$41,664  *(1)*
$5  *(1)*

**< 0 >**
0051  *(1)*
0095  *(1)*

**< 1 >**
1  *(10)*
1:05  *(5)*
10  *(3)*
100  *(1)*
12  *(6)*
140  *(4)*
14th  *(2)*
15  *(2)*
16  *(3)*
16th  *(1)*
18  *(1)*
1st  *(1)*

**< 2 >**
200  *(1)*
2015  *(4)*
2016  *(13)*
2018  *(17)*
2019  *(8)*
2020  *(7)*
210  *(1)*
21st  *(2)*
22nd  *(3)*
25  *(1)*
25th  *(1)*
27  *(4)*
275  *(1)*
27th  *(1)*
28  *(1)*
2nd  *(1)*

**< 3 >**
3  *(8)*
30  *(1)*
30th  *(1)*
31st  *(2)*
384-7000  *(1)*

**< 4 >**
4  *(1)*
40  *(2)*
40110  *(2)*
41  *(1)*
48  *(1)*

**< 5 >**
5  *(1)*
5:22  *(1)*
50,000  *(1)*

**< 6 >**
6605  *(1)*

**< 7 >**
702  *(1)*
725  *(1)*
7251  *(1)*
741  *(4)*
75  *(1)*
777-3000  *(1)*

**< 8 >**
89119  *(1)*
89149  *(1)*

**< A >**
A-18-770594-C  *(2)*
ABA  *(3)*
Abbott  *(3)*
ability  *(3)*
able  *(4)*
Abramoff  *(3)*
absolutely  *(4)*
access  *(1)*
accomplish  *(1)*
account  *(2)*
accountable  *(1)*
accountant  *(1)*
accumulated  *(2)*
accurate  *(4)*
accurately  *(1)*

accused  *(2)*
achieve  *(1)*
acquaintances  *(1)*
acquisition  *(1)*
act  *(4)*
acting  *(1)*
action  *(3)*
actions  *(2)*
active  *(2)*
activities  *(1)*
activity  *(1)*
actual  *(6)*
ADAM  *(4)*
adamant  *(1)*
addition  *(1)*
additional  *(4)*
address  *(3)*
adequate  *(1)*
administering  *(1)*
administration  *(1)*
administrative  *(2)*
admission  *(4)*
admissions  *(6)*
Admit  *(8)*
admittedly  *(1)*
ads  *(1)*
advanced  *(1)*
advice  *(3)*
advised  *(4)*
advisor  *(1)*
affidavit  *(4)*
affiliation  *(1)*
affix  *(1)*
afraid  *(1)*
Africa  *(2)*
African  *(4)*
afternoon  *(1)*
afterthought  *(1)*
Aga  *(35)*
agencies  *(1)*
agency  *(2)*
Agent  *(3)*
agents  *(6)*
Agnes  *(1)*
Agnieszka  *(9)*
ago  *(1)*
agree  *(7)*
agreed  *(7)*
agreeing  *(1)*
agreement  *(19)*

agreements  *(3)*
ahead  *(13)*
ahold  *(1)*
al  *(1)*
Alberta  *(12)*
allegation  *(2)*
allegations  *(8)*
allow  *(2)*
allowed  *(2)*
Alverson  *(1)*
American  *(5)*
Amigo  *(1)*
AML  *(2)*
AML-compliant
  *(1)*
amount  *(11)*
analogy  *(1)*
Andrade  *(16)*
Andrea  *(11)*
Angela  *(1)*
Angie  *(3)*
angry  *(5)*
answer  *(34)*
answered  *(2)*
answers  *(12)*
anybody  *(2)*
anytime  *(1)*
apart  *(1)*
Apologize  *(6)*
appalled  *(1)*
apparent  *(1)*
APPEARANCES
  *(1)*
applicable  *(1)*
appoint  *(1)*
appointed  *(1)*
appreciate  *(3)*
appreciation  *(1)*
approached  *(2)*
appropriate  *(2)*
approval  *(5)*
approvals  *(2)*
approved  *(1)*
approximately  *(2)*
April  *(14)*
arbitrarily  *(1)*
arbitrary  *(1)*
argument  *(1)*
Argumentative  *(5)*
arrange  *(1)*

ASC  *(47)*
ASC's  *(2)*
aside  *(3)*
asked  *(47)*
asking  *(21)*
asks  *(2)*
aspect  *(1)*
asset  *(3)*
assets  *(1)*
associated  *(1)*
association  *(3)*
assume  *(6)*
assumed  *(4)*
assumption  *(2)*
assurance  *(5)*
Aten  *(24)*
attach  *(2)*
attain  *(1)*
attainable  *(2)*
attend  *(2)*
attending  *(1)*
attention  *(1)*
attorney  *(7)*
audio  *(2)*
August  *(10)*
Australia  *(5)*
Australian  *(2)*
authorities  *(6)*
avoid  *(1)*
avoids  *(1)*
aware  *(7)*

< B >
back  *(28)*
backed  *(1)*
backwards  *(1)*
Bad  *(2)*
bag  *(1)*
baker  *(1)*
Bankers  *(1)*
banking  *(2)*
banks  *(1)*
banner  *(1)*
Barb  *(2)*
Barbados  *(3)*
base  *(4)*
based  *(7)*
basic  *(3)*
basically  *(1)*
basing  *(1)*

basis  *(10)*
battery  *(1)*
Bear  *(1)*
becoming  *(1)*
beg  *(1)*
beginning  *(2)*
behalf  *(7)*
believe  *(49)*
believed  *(7)*
believing  *(1)*
benefit  *(2)*
benefited  *(1)*
benefits  *(1)*
Bert  *(3)*
best  *(10)*
better  *(3)*
beyond  *(3)*
big  *(2)*
bigger  *(1)*
biggest  *(2)*
Bilinska  *(4)*
Bilinska's  *(1)*
bills  *(1)*
binding  *(1)*
biographies  *(1)*
biography  *(1)*
bios  *(2)*
birthday  *(1)*
bit  *(4)*
Bitcoin  *(5)*
BJodoin0001  *(1)*
BJodoin0048  *(1)*
BJodoin0082  *(1)*
BJodoin0083  *(1)*
BJodoin0086  *(1)*
BJodoin0087  *(1)*
BJodoin0091  *(1)*
BJodoin0093  *(1)*
BJodoin0094  *(1)*
black  *(2)*
blow  *(1)*
blowing  *(1)*
blue  *(1)*
blue-collar  *(1)*
board  *(9)*
boils  *(1)*
Bokenfohr  *(1)*
Bokenfohrs  *(2)*
bond  *(1)*
bonus  *(1)*

booklet  *(1)*
born  *(3)*
Bottom  *(2)*
bought  *(2)*
bouncing  *(1)*
BRANDI  *(17)*
B-R-A-N-D-I  *(1)*
Brandon  *(3)*
breached  *(1)*
break  *(6)*
Brian  *(13)*
Brian's  *(3)*
bring  *(4)*
bringing  *(1)*
brought  *(5)*
build  *(2)*
bunch  *(1)*
bureau  *(1)*
business  *(36)*
businessman  *(1)*
butchered  *(1)*
buy  *(8)*
buyer  *(2)*
buying  *(3)*
buyout  *(3)*

< C >
CAL  *(1)*
C-A-L  *(1)*
C-A-L-E  *(1)*
California  *(1)*
call  *(37)*
called  *(15)*
calls  *(9)*
Canada  *(7)*
Canadian  *(3)*
canceling  *(1)*
cancer  *(3)*
capacity  *(1)*
cards  *(1)*
care  *(2)*
cared  *(1)*
careful  *(1)*
Carl  *(10)*
Case  *(15)*
cases  *(2)*
cash  *(2)*
categories  *(1)*
caterer  *(1)*
Catherine  *(2)*

CC'd  *(1)*
CCR  *(3)*
cease  *(2)*
cell  *(11)*
Cenzartowicz  *(1)*
certain  *(11)*
certainly  *(5)*
CERTIFICATE
  *(2)*
Certified  *(3)*
certify  *(3)*
cetera  *(1)*
change  *(6)*
changed  *(1)*
changes  *(4)*
channels  *(1)*
Chantal  *(3)*
characterization
  *(1)*
charge  *(10)*
charger  *(1)*
charging  *(1)*
cheated  *(1)*
check  *(2)*
cheerleader  *(1)*
cheese  *(3)*
Chicago  *(2)*
chief  *(5)*
children  *(4)*
choice  *(1)*
choices  *(1)*
chose  *(1)*
Christian  *(1)*
Christians  *(1)*
church  *(3)*
circumspect  *(1)*
cite  *(1)*
citizen  *(2)*
City  *(1)*
claim  *(3)*
claimed  *(1)*
clarification  *(1)*
clarify  *(4)*
CLARK  *(4)*
class  *(2)*
cleaned  *(1)*
clear  *(17)*
clearly  *(1)*
client  *(4)*
clients  *(7)*

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

close  *(1)*
coder  *(2)*
coding  *(2)*
coin  *(63)*
coins  *(74)*
cold  *(1)*
collateral  *(1)*
collecting  *(1)*
college  *(1)*
color  *(1)*
colors  *(2)*
come  *(16)*
comes  *(1)*
coming  *(1)*
commenced  *(2)*
commencement  *(1)*
comment  *(3)*
comments  *(2)*
Commission  *(6)*
common  *(1)*
communicate  *(2)*
communicated  *(5)*
communication  *(8)*
communications
 *(8)*
community  *(1)*
company  *(67)*
compensation  *(7)*
complainant  *(1)*
complaint  *(2)*
complaints  *(4)*
complete  *(2)*
completed  *(6)*
completely  *(2)*
compliance  *(3)*
compliant  *(2)*
comply  *(1)*
comprehensive  *(1)*
computer  *(3)*
concern  *(2)*
concerned  *(3)*
concerning  *(8)*
concerns  *(3)*
concluded  *(1)*
conclusion  *(5)*
conference  *(22)*
conferences  *(1)*
confident  *(2)*
confirmed  *(1)*
confirming  *(1)*

confusion  *(2)*
Congress  *(1)*
conjecture  *(1)*
connection  *(4)*
conscience  *(1)*
consider  *(3)*
considered  *(9)*
constantly  *(2)*
construction  *(4)*
consultation  *(1)*
contact  *(13)*
contacted  *(29)*
contacting  *(4)*
contacts  *(1)*
content  *(9)*
contest  *(2)*
context  *(1)*
continue  *(3)*
contract  *(18)*
contractor  *(1)*
contracts  *(1)*
conversation  *(34)*
conversations  *(7)*
convinced  *(2)*
COO  *(6)*
cooperate  *(1)*
copies  *(3)*
copy  *(3)*
core  *(1)*
COREY  *(67)*
Corey's  *(5)*
corner  *(2)*
corporate  *(10)*
corporation  *(1)*
CORPORATIONS
 *(1)*
correct  *(101)*
corrected  *(1)*
correction  *(1)*
correspondence  *(1)*
cost  *(1)*
costs  *(2)*
counsel  *(15)*
counterclaim  *(12)*
counterclaims  *(1)*
countries  *(1)*
country  *(1)*
COUNTY  *(4)*
couple  *(2)*
course  *(2)*

**COURT**  *(13)*
**courteous**  *(1)*
**Court's**  *(3)*
**crime**  *(1)*
**criminal**  *(1)*
**criminally**  *(3)*
**criteria**  *(1)*
**criticized**  *(2)*
**critique**  *(1)*
**critiqued**  *(1)*
**crook**  *(2)*
**crypto**  *(1)*
**cryptocurrencies**
 *(1)*
**cryptocurrency**  *(8)*
**CSR**  *(1)*
**currencies**  *(1)*
**currency**  *(4)*
**currently**  *(2)*
**customer**  *(2)*
**customers**  *(2)*
**cut**  *(2)*
**Cynthia**  *(1)*

**< D >**
**dad**  *(1)*
**Dakota**  *(1)*
**Darren**  *(12)*
**Darrow**  *(2)*
**D-A-R-R-O-W**  *(1)*
**date**  *(8)*
**dated**  *(1)*
**dates**  *(1)*
**day**  *(3)*
**days**  *(1)*
**dazzled**  *(1)*
**deal**  *(15)*
**dealt**  *(2)*
**December**  *(10)*
**decide**  *(4)*
**decided**  *(10)*
**decipher**  *(1)*
**decision**  *(4)*
**decisions**  *(2)*
**declare**  *(1)*
**deem**  *(1)*
**deeply**  *(2)*
**defend**  *(1)*
**defendant**  *(1)*
**Defendants**  *(2)*

**definitely**  *(4)*
**degree**  *(1)*
**delayed**  *(1)*
**delete**  *(5)*
**deleted**  *(1)*
**deleting**  *(1)*
**demand**  *(9)*
**demanded**  *(3)*
**denial**  *(1)*
**deny**  *(2)*
**depo**  *(1)*
**DEPONENT**  *(3)*
**deposed**  *(2)*
**DEPOSITION**  *(17)*
**Dept**  *(1)*
**describe**  *(2)*
**described**  *(3)*
**describing**  *(1)*
**Description**  *(1)*
**design**  *(3)*
**designate**  *(1)*
**designer**  *(1)*
**designs**  *(2)*
**desist**  *(3)*
**despite**  *(1)*
**destroying**  *(1)*
**detail**  *(3)*
**detailed**  *(1)*
**detailing**  *(1)*
**details**  *(1)*
**detected**  *(2)*
**determine**  *(1)*
**devastating**  *(1)*
**develop**  *(2)*
**developed**  *(1)*
**devout**  *(1)*
**Diadamo**  *(13)*
**difference**  *(8)*
**different**  *(15)*
**difficult**  *(5)*
**difficulties**  *(1)*
**difficulty**  *(3)*
**digital**  *(4)*
**diligence**  *(2)*
**direct**  *(2)*
**directed**  *(1)*
**direction**  *(2)*
**directly**  *(4)*
**directors**  *(1)*
**disagree**  *(6)*

Brandi Jodoin                                         NAC Foundation, LLC v. Corey Jodoin, et al.

| | | | |
|---|---|---|---|
| disagreed (2) | eight (1) | exchanges (2) | February (3) |
| disagrees (1) | either (4) | excited (2) | federal (5) |
| disclosed (5) | elaborate (1) | exciting (1) | fee (5) |
| disclosure (1) | elicit (1) | Excuse (1) | feel (6) |
| discovered (3) | email (25) | execution (1) | fees (1) |
| discovery (2) | emailed (4) | Exhibit (8) | fellow (4) |
| discuss (3) | emails (18) | EXHIBITS (1) | felt (12) |
| discussed (8) | employee (1) | exist (3) | Fey (1) |
| discussing (3) | encountered (1) | existed (2) | F-E-Y (1) |
| discussion (17) | encourage (3) | exit (1) | field (1) |
| discussions (10) | encouraged (4) | expectation (2) | figure (2) |
| dismissal (1) | ended (1) | expectations (1) | figures (2) |
| dismissed (6) | energy (1) | expected (2) | file (3) |
| dismissing (1) | enforcement (5) | expecting (1) | filed (6) |
| dispute (3) | engage (2) | expenses (4) | files (2) |
| distinction (1) | engaged (1) | experience (6) | fill (1) |
| distinctly (1) | Enjoy (1) | expertise (3) | filled (2) |
| DISTRICT (2) | entities (1) | explain (5) | filling (2) |
| Docs (1) | entitled (3) | explained (9) | final (1) |
| doctor (2) | entity (1) | explaining (3) | finalized (1) |
| document (2) | equate (1) | explore (2) | finally (1) |
| documentation (4) | erase (1) | express (3) | finances (1) |
| Documents (23) | ERIC (3) | expressed (4) | financial (1) |
| doing (14) | escaping (1) | expressly (1) | financially (1) |
| dollar (2) | especially (2) | extent (3) | financials (6) |
| dollars (2) | ESQ (2) | extra (1) | find (8) |
| double-check (2) | essentially (3) | extremely (3) | finding (3) |
| doubt (1) | established (3) | | findings (2) |
| doubts (2) | et (2) | < F > | fine (2) |
| downloaded (2) | eternally (1) | facilitate (1) | finish (3) |
| draw (1) | ethical (1) | fact (14) | firm (2) |
| drinking (1) | ethically (1) | facts (2) | firmly (1) |
| dual (1) | ethics (1) | Fahy (7) | first (34) |
| dubious (2) | European (2) | F-A-H-Y (1) | five (5) |
| due (3) | eval (1) | failed (1) | five-minute (1) |
| duly (2) | evaluated (1) | fair (4) | flags (1) |
| duped (1) | evaluation (8) | fairly (2) | flailing (1) |
| duplicity (1) | evaluations (1) | faith (1) | flashy (1) |
| duties (3) | event (2) | fallen (1) | flaws (1) |
| | events (2) | false (4) | flights (1) |
| < E > | eventual (1) | familiar (3) | Florida (1) |
| earlier (5) | eventually (1) | family (4) | flow (1) |
| early (2) | everybody (1) | far (11) | focus (1) |
| easily (2) | evolved (1) | Farkas (6) | focused (1) |
| easy (3) | evolving (1) | fast (2) | follow (1) |
| edit (3) | exactly (7) | father (2) | following (2) |
| editing (1) | Examination (2) | fault (2) | follows (1) |
| edits (1) | examined (1) | favorite (1) | follow-up (2) |
| educated (1) | example (7) | FBI (55) | force (1) |
| efficiently (1) | Exchange (3) | fears (1) | foregoing (1) |

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

| | | | |
|---|---|---|---|
| foremost *(1)* | glossed *(2)* | hearing *(3)* | ignore *(1)* |
| forgotten *(1)* | Gmail *(2)* | heavy *(1)* | Igor *(4)* |
| form *(33)* | go *(59)* | he'd *(1)* | illegal *(3)* |
| format *(1)* | goal *(2)* | heed *(1)* | image *(1)* |
| formed *(6)* | goals *(1)* | held *(5)* | imagine *(1)* |
| former *(2)* | goes *(3)* | help *(12)* | immediately *(1)* |
| forms *(6)* | going *(77)* | helping *(1)* | implemented *(1)* |
| forward *(11)* | Good *(14)* | hesitant *(1)* | implication *(1)* |
| forwarded *(2)* | Google *(1)* | high *(1)* | implied *(3)* |
| Foteh *(1)* | Googled *(1)* | hired *(1)* | important *(4)* |
| found *(8)* | Gordon *(1)* | Hoff *(8)* | impression *(4)* |
| FOUNDATION *(9)* | Gosh *(2)* | Hoff's *(1)* | improperly *(1)* |
| four *(4)* | gotten *(4)* | hold *(1)* | include *(3)* |
| fraud *(3)* | government *(2)* | holder *(3)* | included *(3)* |
| fraudulent *(1)* | governmental *(4)* | holders *(9)* | includes *(1)* |
| freely *(1)* | governments *(1)* | holding *(1)* | including *(6)* |
| freeze *(1)* | Grand *(1)* | home *(4)* | income *(6)* |
| Friday *(3)* | graphic *(4)* | homemaker *(1)* | incomplete *(1)* |
| friend *(3)* | graphics *(4)* | home-schooled *(1)* | incorporated *(1)* |
| friends *(10)* | grateful *(1)* | Hone *(2)* | incorrect *(3)* |
| front *(1)* | grave *(1)* | honest *(8)* | incorrectly *(1)* |
| fruition *(1)* | great *(5)* | honestly *(2)* | increase *(2)* |
| frustrated *(1)* | grew *(1)* | hop *(1)* | independent *(4)* |
| fulfilling *(1)* | Grossman *(1)* | hope *(4)* | INDEX *(1)* |
| functioned *(1)* | ground *(2)* | hoped *(2)* | individually *(2)* |
| functions *(1)* | group *(4)* | hopefully *(1)* | individuals *(1)* |
| fund *(1)* | grow *(1)* | hoping *(2)* | infant *(1)* |
| fundamental *(1)* | guarantee *(3)* | Horn *(7)* | inferred *(1)* |
| funds *(2)* | guaranteed *(4)* | H-O-R-N *(1)* | inferring *(1)* |
| funny *(1)* | guess *(3)* | hospital *(1)* | infomercial *(1)* |
| further *(4)* | guy *(2)* | housekeeping *(1)* | inform *(5)* |
| future *(2)* | | housewife *(7)* | information *(20)* |
| | < H > | housework *(1)* | informed *(19)* |
| < G > | Hafeeler *(1)* | HR *(1)* | informing *(2)* |
| Garman *(1)* | half *(1)* | huh-uh, *(1)* | initial *(5)* |
| gather *(2)* | hand *(2)* | hundred *(1)* | initially *(2)* |
| gathering *(2)* | handwritten *(1)* | hundred-million | initiated *(2)* |
| general *(3)* | Hang *(5)* | *(1)* | in-laws *(2)* |
| generally *(2)* | hanging *(1)* | hunt *(1)* | input *(1)* |
| generate *(1)* | happen *(3)* | husband *(46)* | inquire *(1)* |
| gentleman *(4)* | happened *(10)* | husband's *(3)* | inquired *(1)* |
| gentlemen *(1)* | happening *(5)* | hypothetical *(1)* | instances *(1)* |
| getting *(18)* | happy *(1)* | | instigate *(1)* |
| gifts *(1)* | hard *(5)* | < I > | instruct *(1)* |
| girl *(1)* | harmed *(1)* | IBO *(1)* | instructed *(1)* |
| gist *(1)* | harming *(1)* | ICO *(1)* | insurance *(1)* |
| give *(26)* | hate *(1)* | ID *(2)* | intellectual *(1)* |
| given *(23)* | head *(5)* | idea *(18)* | intended *(1)* |
| giving *(6)* | hear *(1)* | identification *(1)* | intent *(1)* |
| glad *(1)* | heard *(7)* | identify *(3)* | intention *(2)* |

Brandi Jodoin                                           NAC Foundation, LLC v. Corey Jodoin, et al.

| | | | |
|---|---|---|---|
| interaction *(1)* | jeopardize *(2)* | leave *(2)* | looked *(3)* |
| interest *(12)* | Job *(10)* | leaving *(2)* | looking *(10)* |
| interested *(2)* | JODOIN *(25)* | led *(1)* | losing *(1)* |
| interests *(1)* | Jodoins *(1)* | LeFevres *(2)* | lost *(4)* |
| Interim *(5)* | John *(11)* | left *(11)* | lot *(4)* |
| Internal *(1)* | join *(4)* | legacy *(2)* | Louisa *(1)* |
| internally *(2)* | judgment *(1)* | legal *(15)* | love *(2)* |
| international *(1)* | July *(2)* | legality *(3)* | lower *(1)* |
| interpose *(1)* | jump *(1)* | legally *(6)* | Lykke *(1)* |
| interposed *(1)* | June *(5)* | lengthy *(2)* | |
| interrogated *(1)* | junk *(1)* | letter *(9)* | **< M >** |
| interrogatories *(9)* | jurisdiction *(1)* | liability *(5)* | Madam *(1)* |
| interrogatory *(19)* | | liable *(4)* | maiden *(2)* |
| interview *(8)* | **< K >** | liaison *(1)* | maintained *(1)* |
| interviewed *(5)* | Kathy *(1)* | licensed *(1)* | majority *(2)* |
| introduce *(2)* | keep *(3)* | lied *(3)* | making *(4)* |
| introduced *(4)* | Kent *(1)* | life *(3)* | man *(2)* |
| introducing *(1)* | kids *(3)* | light *(1)* | management *(1)* |
| invest *(1)* | Kim *(2)* | liked *(1)* | Marc *(9)* |
| investigated *(1)* | Kimberly *(5)* | limited *(3)* | March *(12)* |
| investigating *(5)* | kind *(17)* | line *(2)* | Marco *(17)* |
| investigation *(3)* | kinds *(1)* | lines *(1)* | Marco's *(1)* |
| investigative *(1)* | KNECHT *(42)* | lingering *(1)* | Marc's *(1)* |
| investigator *(1)* | knew *(31)* | LinkedIn *(1)* | Marcus *(149)* |
| investment *(26)* | know *(115)* | Lisa *(4)* | Marcus' *(1)* |
| investments *(1)* | knowledge *(8)* | list *(3)* | margins *(1)* |
| investor *(3)* | known *(1)* | listed *(4)* | marked *(1)* |
| investors *(9)* | knows *(1)* | listen *(1)* | market *(17)* |
| invitation *(1)* | | listened *(3)* | marketing *(9)* |
| invitations *(2)* | **< L >** | listening *(3)* | married *(1)* |
| invite *(1)* | LA *(2)* | litigation *(6)* | material *(1)* |
| invited *(5)* | lack *(2)* | little *(10)* | materials *(2)* |
| inviting *(1)* | language *(1)* | live *(13)* | matter *(3)* |
| involved *(16)* | large *(5)* | lived *(3)* | Maurice *(1)* |
| IP *(2)* | larger *(1)* | lives *(1)* | Mawhinney *(37)* |
| IPO *(37)* | largest *(2)* | living *(1)* | Mawhinney's *(2)* |
| IPP *(1)* | Las *(19)* | LLC *(2)* | McGonigal *(1)* |
| Ireland *(1)* | late *(2)* | LLP *(1)* | mean *(14)* |
| issue *(3)* | launched *(1)* | lobbyist *(4)* | meaning *(1)* |
| issued *(1)* | laundering *(3)* | local *(2)* | means *(1)* |
| issues *(9)* | law *(16)* | located *(1)* | meant *(2)* |
| its *(1)* | laws *(4)* | lock *(1)* | meet *(3)* |
| | lawsuit *(2)* | locked *(5)* | meeting *(19)* |
| **< J >** | lawyer *(19)* | lockout *(1)* | meetings *(1)* |
| Jack *(2)* | lawyers *(4)* | login *(1)* | Melissa *(1)* |
| James *(26)* | lawyer's *(4)* | London *(12)* | member *(1)* |
| January *(16)* | layout *(1)* | long *(2)* | members *(3)* |
| Jarek *(7)* | leading *(1)* | longer *(10)* | membership *(3)* |
| Jason *(1)* | leads *(2)* | long-term *(2)* | mentioned *(12)* |
| Jeff *(1)* | learned *(3)* | look *(20)* | met *(9)* |

methane  *(3)*
middle  *(1)*
million  *(52)*
million-dollar  *(1)*
mind  *(1)*
mined  *(1)*
minute  *(1)*
minutes  *(4)*
misled  *(2)*
mismanaging  *(1)*
misrepresented  *(1)*
missing  *(6)*
mistakes  *(1)*
misunderstanding
  *(1)*
model  *(1)*
modify  *(1)*
mom  *(1)*
monetary  *(1)*
money  *(44)*
Montecito  *(1)*
month  *(3)*
months  *(5)*
moral  *(1)*
morally  *(2)*
move  *(5)*
moved  *(1)*
multiple  *(1)*
Murray  *(1)*
Musiitwa  *(1)*
mute  *(1)*

< N >
NAC  *(78)*
NAC's  *(1)*
Naimer  *(1)*
name  *(27)*
named  *(4)*
names  *(5)*
near  *(1)*
necessarily  *(2)*
necessary  *(2)*
need  *(12)*
needed  *(17)*
needs  *(1)*
negotiate  *(1)*
negotiating  *(2)*
negotiations  *(2)*
NEVADA  *(10)*
never  *(41)*

new  *(11)*
new-co  *(2)*
news  *(1)*
night  *(1)*
nodding  *(1)*
non-live  *(1)*
note  *(2)*
notes  *(4)*
noticing  *(1)*
November  *(12)*
number  *(36)*
numbers  *(7)*
numerous  *(5)*

< O >
oath  *(3)*
object  *(2)*
objection  *(38)*
objections  *(1)*
obligated  *(1)*
obligation  *(6)*
obtain  *(1)*
obviously  *(1)*
occur  *(2)*
occurred  *(4)*
October  *(4)*
odd  *(1)*
offer  *(6)*
offered  *(5)*
offering  *(10)*
office  *(31)*
officer  *(22)*
officers  *(4)*
official  *(1)*
officially  *(1)*
off-putting  *(1)*
Oh  *(4)*
oil  *(1)*
Okay  *(113)*
okayed  *(1)*
old  *(2)*
OLSEN  *(57)*
once  *(19)*
ones  *(2)*
ongoing  *(1)*
online  *(1)*
operating  *(3)*
operation  *(1)*
operations  *(1)*
opinion  *(30)*

opinions  *(2)*
opportunity  *(8)*
opposed  *(3)*
oral  *(2)*
order  *(4)*
ordered  *(1)*
orders  *(1)*
organize  *(1)*
organized  *(1)*
organizing  *(2)*
original  *(3)*
originally  *(4)*
Ortmeier  *(2)*
O-R-T-M-E-I-E-R
  *(1)*
out-of-pocket  *(1)*
outside  *(1)*
over-evaluated  *(1)*
over-evaluating  *(1)*
overheard  *(2)*
overly  *(1)*
oversee  *(3)*
overseeing  *(3)*
oversight  *(2)*
overstating  *(1)*
owned  *(2)*
owner  *(3)*

< P >
p.m  *(6)*
package  *(1)*
packaging  *(1)*
Packet  *(3)*
Page  *(16)*
pages  *(1)*
paid  *(6)*
paper  *(5)*
papers  *(1)*
paperwork  *(10)*
paragraph  *(2)*
parameters  *(1)*
paraphrase  *(1)*
paraphrasing  *(1)*
Pardon  *(10)*
parents  *(2)*
Parkway  *(1)*
part  *(24)*
parted  *(1)*
participant  *(1)*
participate  *(2)*

participating  *(1)*
particular  *(4)*
Particularly  *(3)*
parties  *(4)*
partner  *(1)*
partners  *(2)*
parts  *(4)*
party  *(1)*
pass  *(2)*
patents  *(5)*
Patti  *(2)*
pay  *(8)*
paying  *(1)*
payment  *(4)*
penalty  *(1)*
people  *(40)*
percent  *(1)*
percentage  *(4)*
perdiems  *(1)*
perform  *(1)*
period  *(1)*
perjury  *(1)*
permanent  *(1)*
permission  *(2)*
person  *(24)*
personal  *(9)*
personally  *(6)*
persons  *(1)*
person's  *(2)*
perspective  *(1)*
phone  *(12)*
phonetic  *(2)*
pick  *(2)*
picking  *(1)*
piece  *(2)*
piecemeal  *(1)*
pigs  *(1)*
place  *(4)*
placed  *(2)*
places  *(1)*
Plaintiff  *(3)*
Plaintiffs  *(1)*
plan  *(18)*
planning  *(1)*
pleadings  *(1)*
please  *(13)*
plus  *(1)*
point  *(48)*
points  *(1)*
Poland  *(9)*

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

police  (2)
policies  (9)
policy  (1)
Polish  (2)
polite  (1)
political  (1)
Ponzi  (8)
portion  (1)
pose  (1)
position  (9)
positions  (1)
positive  (2)
possible  (2)
possibly  (3)
potential  (5)
potentially  (1)
PowerPoint  (1)
pregnant  (1)
preparation  (1)
prepare  (1)
prepared  (2)
preparing  (1)
presence  (1)
present  (8)
presentation  (7)
presentations  (1)
presented  (2)
presenters  (1)
pretty  (7)
prevent  (3)
previous  (6)
Previously  (2)
prices  (1)
primarily  (1)
primary  (1)
print  (1)
printed  (1)
printer  (4)
prior  (22)
privilege  (1)
privileged  (2)
privy  (1)
probably  (8)
problem  (4)
problems  (3)
procedural  (1)
procedure  (2)
procedures  (6)
proceed  (1)
proceeding  (2)

process  (11)
produced  (3)
product  (5)
profit  (1)
profits  (1)
profoundly  (1)
program  (1)
progress  (1)
projected  (4)
projection  (10)
projections  (17)
promise  (8)
promised  (7)
promising  (3)
promote  (1)
promoted  (2)
promoting  (1)
promotion  (2)
promotional  (1)
pronunciation  (1)
proof  (3)
proper  (3)
properly  (1)
property  (1)
proposed  (2)
prospective  (1)
protect  (3)
protecting  (1)
protection  (3)
prove  (2)
provide  (2)
provided  (4)
provincial  (2)
prudent  (1)
public  (10)
publications  (1)
pull  (2)
pulling  (1)
purchase  (19)
purchased  (10)
purchaser  (1)
purchasers  (2)
purchases  (2)
purchasing  (2)
purpose  (16)
put  (37)
putting  (7)

< Q >
qualifications  (1)

qualified  (1)
qualify  (1)
quality  (4)
quarter  (1)
quarterly  (3)
question  (30)
questioned  (1)
questioning  (1)
questions  (14)
quick  (1)
quite  (5)

< R >
Ralph  (5)
Rapid  (1)
reached  (3)
reaching  (1)
read  (5)
ready  (2)
real  (4)
realize  (1)
really  (26)
reason  (8)
reasons  (5)
re-branded  (1)
recall  (5)
receive  (3)
received  (7)
receiving  (1)
recess  (3)
recognize  (2)
recognized  (1)
recommendation
  (2)
record  (11)
recorded  (2)
records  (1)
rectify  (1)
red  (1)
redeemed  (1)
reestablished  (1)
refer  (2)
reference  (5)
referenced  (1)
referencing  (1)
referrals  (4)
referred  (1)
referring  (1)
refused  (4)
regarding  (2)

register  (1)
registered  (6)
reimbursement  (2)
rejected  (1)
relate  (2)
related  (1)
relates  (1)
relating  (1)
relationship  (10)
relationships  (1)
relative  (1)
relatively  (1)
relatives  (3)
relayed  (1)
released  (2)
reliance  (1)
relied  (14)
remember  (34)
remembering  (1)
remit  (2)
REMOTE  (2)
remove  (2)
repeat  (4)
rephrase  (3)
report  (5)
report,  (2)
reportable  (1)
Reported  (3)
Reporter  (6)
reports  (6)
represent  (4)
representation  (4)
representations  (5)
representative  (5)
represented  (1)
representing  (3)
request  (5)
requested  (1)
requests  (1)
required  (4)
re-read  (1)
research  (1)
Reserve  (2)
resident  (2)
resistant  (1)
resolution  (1)
resolve  (1)
resolved  (2)
respect  (8)
respected  (1)

Brandi Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

respond  *(3)*
response  *(3)*
responses  *(4)*
responsibilities  *(1)*
responsibility  *(1)*
responsible  *(11)*
rest  *(3)*
result  *(3)*
retained  *(1)*
retired  *(1)*
return  *(6)*
returns  *(3)*
reveal  *(2)*
revealed  *(1)*
Revenue  *(1)*
review  *(2)*
Richard  *(1)*
rid  *(1)*
right  *(82)*
right-hand  *(2)*
risky  *(1)*
Rodgers  *(4)*
ROE  *(1)*
Rohan  *(3)*
role  *(1)*
roll  *(1)*
rolled  *(3)*
room  *(1)*
route  *(2)*
routed  *(1)*
RPR  *(1)*
rules  *(1)*
rumors  *(1)*
run  *(3)*
runaround  *(1)*
runs  *(1)*
Ruttenberg  *(1)*

< S >
Sachin  *(1)*
safe  *(1)*
safety  *(1)*
salaries  *(1)*
sale  *(6)*
sales  *(9)*
salesman  *(1)*
salespeople  *(1)*
salesperson  *(5)*
Sanders  *(1)*
sat  *(2)*

save  *(1)*
savings  *(2)*
saw  *(3)*
saying  *(12)*
says  *(11)*
scam  *(1)*
scared  *(1)*
scary  *(1)*
scenario  *(1)*
scheme  *(8)*
school  *(1)*
schooling  *(1)*
Scott  *(6)*
screen  *(1)*
screwed  *(1)*
scroll  *(1)*
se  *(1)*
SEC  *(6)*
second  *(14)*
Securities  *(17)*
security  *(19)*
see  *(21)*
seeing  *(3)*
seen  *(8)*
select  *(1)*
sell  *(14)*
selling  *(14)*
send  *(8)*
sense  *(1)*
sent  *(18)*
serious  *(1)*
served  *(3)*
Service  *(1)*
set  *(8)*
sets  *(1)*
setting  *(1)*
shaking  *(1)*
share  *(4)*
shareholders  *(1)*
shares  *(31)*
shepherd  *(1)*
shore  *(1)*
short  *(1)*
shortly  *(1)*
show  *(3)*
showed  *(1)*
shut  *(2)*
sick  *(1)*
side  *(3)*
sign  *(6)*

signature  *(1)*
signed  *(7)*
signing  *(2)*
Similar  *(8)*
simply  *(15)*
sister-in-law  *(2)*
sit  *(1)*
site  *(2)*
sites  *(1)*
sitting  *(1)*
situation  *(5)*
six  *(1)*
skip  *(1)*
Skype  *(6)*
slow  *(2)*
small  *(3)*
smaller  *(1)*
smoke  *(1)*
sneeze  *(1)*
software  *(1)*
sold  *(4)*
sole  *(1)*
solicit  *(1)*
soliciting  *(1)*
somebody  *(16)*
somebody's  *(1)*
son's  *(1)*
soon  *(2)*
sorry  *(14)*
sort  *(6)*
sound  *(2)*
Sounds  *(2)*
sources  *(1)*
south  *(2)*
speak  *(4)*
speaker  *(1)*
speaking  *(3)*
speaks  *(1)*
special  *(1)*
specific  *(8)*
specifically  *(5)*
specified  *(1)*
speculation  *(2)*
speed  *(1)*
spelling  *(2)*
spoke  *(7)*
spoken  *(3)*
sponsor  *(1)*
sponsored  *(1)*
ss  *(1)*

staff  *(1)*
stage  *(3)*
stand  *(1)*
standard  *(1)*
stands  *(1)*
start  *(4)*
started  *(6)*
starting  *(1)*
starts  *(1)*
State  *(12)*
stated  *(3)*
statement  *(11)*
statements  *(4)*
States  *(4)*
stating  *(4)*
status  *(1)*
stay  *(2)*
staying  *(1)*
steady  *(1)*
STENOGRAPHER  *(4)*
stenographic  *(3)*
step  *(1)*
stepped  *(1)*
steps  *(1)*
stock  *(7)*
stop  *(1)*
stopped  *(4)*
story  *(3)*
straight  *(1)*
strategy  *(1)*
streamlined  *(1)*
Street  *(1)*
strike  *(2)*
struck  *(1)*
structure  *(14)*
structured  *(4)*
struggling  *(1)*
stuck  *(1)*
stuff  *(5)*
stumbled  *(1)*
subject  *(1)*
submission  *(1)*
submitting  *(3)*
subsequent  *(3)*
subsequently  *(1)*
substantial  *(1)*
success  *(1)*
successful  *(1)*
successfully  *(1)*

Brandi Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

sue  (3)
sued  (1)
suggest  (2)
suggested  (2)
suggesting  (1)
suggestion  (1)
suggests  (1)
suing  (1)
Suite  (2)
summary  (1)
supplement  (1)
supplemental  (3)
support  (1)
supposed  (10)
sure  (27)
surprise  (8)
surprised  (1)
surrender  (1)
suspicions  (2)
sustain  (1)
switch  (3)
sworn  (2)

< T >
take  (28)
Taken  (8)
talk  (12)
talked  (21)
talking  (16)
talks  (2)
task  (2)
tasked  (1)
tax  (3)
taxes  (6)
Taylor  (3)
team  (11)
technical  (2)
technically  (1)
technology  (1)
tell  (44)
telling  (7)
tells  (2)
Terence  (3)
Terence's  (1)
term  (11)
terminated  (1)
terms  (2)
terrorist  (1)
Tesser  (2)
testified  (2)

testify  (1)
testimony  (3)
texted  (1)
Thank  (3)
Thanks  (2)
theft  (1)
theft-proof  (2)
theirs  (1)
thing  (22)
things  (18)
think  (35)
thinking  (8)
third  (2)
thought  (10)
three  (7)
thrown  (1)
thumbnail  (2)
tight  (2)
time  (46)
timeline  (1)
times  (9)
timing  (1)
tiny  (1)
tip  (1)
Tippett  (1)
title  (4)
titles  (1)
today  (7)
Today's  (1)
token  (8)
tokens  (18)
told  (94)
topic  (1)
total  (1)
totally  (1)
touch  (5)
tough  (1)
trade  (1)
traded  (1)
trading  (1)
transactions  (1)
transcribed  (1)
transcript  (4)
transcription  (2)
transfer  (2)
transform  (2)
transmission  (1)
traveling  (3)
Trenching  (1)
trial  (1)

tried  (4)
trip  (4)
trouble  (3)
true  (7)
truly  (4)
trust  (1)
trusted  (2)
trustworthy  (1)
truth  (6)
truthful  (1)
truthfully  (1)
try  (7)
trying  (19)
turn  (3)
turned  (3)
Turner  (1)
twice  (2)
twins  (1)
two  (12)
Tyler  (13)
type  (10)
types  (1)
typewritten  (1)
typical  (1)
typically  (2)

< U >
U.S  (2)
Uh-huh  (1)
UK  (4)
Ukraine  (1)
ultimate  (1)
ultimately  (1)
Um-hum  (6)
unbanked  (1)
uncomfortable  (2)
understand  (39)
understanding  (3)
understood  (13)
unethical  (1)
unhappy  (1)
United  (4)
unlawful  (2)
unlicensed  (1)
unnecessary  (2)
unregistered  (2)
unsecured  (1)
unsuccessful  (1)
untraded  (1)
upcoming  (1)

updates  (1)
updating  (1)
upset  (1)
use  (6)

< V >
vaguely  (1)
valuation  (37)
valuations  (1)
value  (19)
valued  (3)
values  (2)
variety  (1)
various  (11)
vastly  (1)
Vegas  (19)
venture  (1)
venue  (2)
venued  (1)
verbal  (3)
verbally  (2)
verification  (3)
version  (3)
versus  (2)
vet  (1)
viable  (2)
video  (4)
VIDEOCONFERE
NCE  (2)
Vietnam  (1)
view  (4)
view-back  (1)
viewers  (1)
Vince  (3)
violated  (2)
violating  (1)
violation  (12)
visit  (3)
volunteer  (1)
voting  (1)
VP  (1)
vs  (1)

< W >
wait  (5)
waiting  (2)
wake-up  (2)
walked  (3)
wallet  (6)
want  (27)

| | |
|---|---|
| **wanted**  *(15)* | **wrong**  *(11)* |
| **wanting**  *(3)* | **wrongdoing**  *(1)* |
| **wants**  *(1)* | **wrote**  *(8)* |
| **Warsaw**  *(3)* | **Wynar**  *(3)* |
| **watch**  *(1)* | **W-Y-N-A-R**  *(1)* |
| **way**  *(22)* | |
| **ways**  *(2)* | **< X >** |
| **web**  *(2)* | **XIV**  *(1)* |
| **webmail**  *(1)* | |
| **website**  *(11)* | **< Y >** |
| **week**  *(2)* | **Yeah**  *(12)* |
| **weekend**  *(1)* | **year**  *(3)* |
| **W-E-I-N-E-R**  *(1)* | **years**  *(7)* |
| **Weir**  *(3)* | **Yep**  *(4)* |
| **welcoming**  *(1)* | **York**  *(1)* |
| **Well**  *(55)* | |
| **well-known**  *(1)* | **< Z >** |
| **went**  *(32)* | **Zoom**  *(1)* |
| **we're**  *(21)* | |
| **We've**  *(2)* | |
| **WHEREOF**  *(1)* | |
| **whichever**  *(1)* | |
| **whole-heartedly**  *(1)* | |
| **wife**  *(1)* | |
| **willing**  *(2)* | |
| **Wincura**  *(13)* | |
| **wine**  *(3)* | |
| **wire**  *(1)* | |
| **wish**  *(1)* | |
| **withdraw**  *(1)* | |
| **withdrew**  *(1)* | |
| **witness**  *(21)* | |
| **woman**  *(1)* | |
| **won**  *(1)* | |
| **wonderful**  *(1)* | |
| **word**  *(3)* | |
| **worded**  *(1)* | |
| **words**  *(2)* | |
| **work**  *(22)* | |
| **worked**  *(5)* | |
| **worker**  *(2)* | |
| **workers**  *(1)* | |
| **working**  *(22)* | |
| **work-work**  *(1)* | |
| **world**  *(1)* | |
| **worth**  *(16)* | |
| **wrap**  *(1)* | |
| **write**  *(2)* | |
| **writing**  *(6)* | |
| **written**  *(9)* | |