# United States v. Andrade

# Defendant's Sentencing Memorandum

# ATTACHMENT-3

**Deposition of:**

Corey Jodoin

**Case:**

NAC Foundation, LLC v. Corey Jodoin, et al.
A-18-770594-C

**Date:**

04/16/2020



400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV 89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

**Andrade App 000459**

Corey Jodoin                                           NAC Foundation, LLC v. Corey Jodoin, et al.

### Page 1

```
 1         DISTRICT COURT

 2       CLARK COUNTY, NEVADA

 3           * * * * * *

 4

 5   NAC FOUNDATION, LLC, a Nevada
     limited liability company,
 6

 7        Plaintiff,
                       Case No. A-18-770594-C
 8       vs.           Dept. No. XIV

 9   COREY JODOIN, individually;
     BRANDI JODOIN, individually;
10   DOES 1 through 10; and ROE
     CORPORATIONS 1 through 10,
11

12        Defendants.

13   _____

14

15

16   REMOTE VIDEOCONFERENCE DEPOSITION OF COREY JODOIN

17        Taken on April 16, 2020

18        At 1:18 p.m.

19

20

21

22

23   Reported by: Kimberly A. Farkas, RPR, CCR #741

24   Job No. 40188

25
```

### Page 2

```
 1   Remote Videoconference Deposition of COREY

 2   JODOIN, taken on Thursday, April 16, 2020, at 1:18

 3   p.m., before Kimberly A. Farkas, Certified Court

 4   Reporter in and for the State of Nevada.

 5

 6   APPEARANCES

 7

 8   For the Plaintiffs:

 9

10        ERIC R. OLSEN, ESQ.
          Garman Turner Gordon, LLP
11        7251 Amigo Street, Suite 210
          Las Vegas, Nevada 89119
12        (725) 777-3000

13

14

15   For the Defendants:

16

17        ADAM R. KNECHT, ESQ.
          Alverson Taylor & Sanders
18        6605 Grand Montecito Parkway, Suite 200
          Las Vegas, Nevada 89149
19        (702) 384-7000

20

21

22

23

24

25
```

### Page 3

```
 1   VIDEOCONFERENCE DEPOSITION OF COREY JODOIN

 2        April 16, 2020

 3   Kimberly A. Farkas, CCR No. 741

 4        * * * * *

 5

 6        INDEX

 7                  Page

 8   COREY JODOIN

 9   Examination by Mr. Olsen         5

10        * * * * *

11

12        EXHIBITS

13   No.      Description      Page

14

15   Exhibit 1   Bates Nos. 0001 - 0098    4

16   Exhibit 2   Bates Nos. 0099 - 0111    4

17   Exhibit 3   Bates Nos. 0112 - 0329    4

18   Exhibit 4   Bates Nos. 0330 - 0503    4

19   Exhibit 5   Bates Nos. 0504 - 0526    4

20

21

22

23

24

25
```

### Page 4

```
 1        LAS VEGAS, NEVADA

 2       Thursday, April 16, 2020

 3          1:18 p.m.

 4     DEPOSITION OF COREY JODOIN

 5          * * * * * *

 6        (Exhibit Nos. 1 through 5 were marked prior

 7   to commencement of the deposition.)

 8        THE STENOGRAPHER:  Good afternoon.  My name

 9   is Kimberly Farkas.  I am a Nevada certified court

10   reporter here on behalf of Oasis Reporting Services.

11   My CCR number is 741.

12        Today's date is April 16, 2020.  The time is

13   approximately 1:18 p.m.

14        This is the deposition of Corey Jodoin in the

15   matter of NAC Foundation versus Jodoin, venued in the

16   District Court of the State of Nevada for the County of

17   Clark, Case No. A-18-770594-C.

18        At this time I will ask counsel to identify

19   themselves, state whom they represent, and agree on the

20   record that there is no objection to this deposition

21   officer administering a binding oath to the witness

22   through remote video conferencing.  If no objection is

23   stated, we will proceed forward with the agreement of

24   all counsel.

25        We will begin appearances with the noticing
```

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 5

1    attorney, Mr. Olsen.
2         MR. OLSEN:  Yes.  This is Eric Olsen of
3    Garman Turner Gordon.  I represent the plaintiff, NAC
4    Foundation, LLC.
5         MR. KNECHT:  Adam Knecht with Alverson
6    Taylor.  I represent Defendant Corey Jodoin.
7
8              COREY JODOIN,
9    having been first duly sworn, was examined and
10   testified as follows:
11             EXAMINATION
12   BY MR. OLSEN:
13        Q.  Mr. Jodoin, go ahead and restate your name on
14   the record, please.
15        A.  Name is Corey M. Jodoin, Spruce Grove,
16   Alberta, Canada.
17        Q.  What's your address?
18        A.  Number 31 at 54108 Range Road 280, Spruce
19   Grove.
20        Q.  Have you ever had your deposition taken
21   before?
22        A.  No.
23        Q.  Well, let me go through a few ground rules
24   then.  I know you listened in on your wife's deposition
25   last week, but you probably weren't listening to this

Page 6

1    part.  This is a deposition pending in the Clark County
2    District Court, which you're familiar with.  You were
3    placed under an oath, the same oath you would be under
4    in a court of law, and you are obligated to give
5    truthful answers to the best of your ability in
6    response to my questions.
7         Do you understand that?
8         A.  I do understand.
9         Q.  Even though everything that we're doing here
10   is on video, it's also being taken down by the court
11   reporter, and that is going to be the official
12   transcript of this proceeding.  So it's important, for
13   purposes of that permanent record, that you understand
14   my questions when I ask them.  If you don't understand
15   a question, you can let me know that, and I will, to
16   the best of my ability, I will try to rephrase that
17   question.
18         It's also important that we not speak over
19   each other because the court reporter, especially in
20   this setting, has a difficult time taking down multiple
21   people speaking at the same time.  It's also important
22   that you, in response to yes or no answers, that you
23   say "yes" or "no" as opposed to shaking your head,
24   nodding your head, that sort of thing.  Also, saying
25   "uh-huh" or "huh-uh" is difficult to -- it's difficult

Page 7

1    to discern your meaning after the fact in a written
2    record so I'd ask that you also not use those
3    responses.
4         Do you understand that?
5         A.  I understand.
6         Q.  Everything being taken -- well, it's also the
7    case that you may hear objections by your counsel
8    interposed today during this proceeding.  In almost
9    every case you'll be instructed to answer the question
10   despite the objection.  The objection is just for the
11   record.  If there's a rare exception, it would be with
12   any attorney/client privileged communication, but aside
13   from that, you'll be instructed to go ahead and answer
14   the question.
15         Do you understand that?
16         A.  I understand.
17        Q.  As I said, everything is being taken down
18   today by the court reporter.  You'll have the chance to
19   review the written transcript of the deposition today,
20   but because I can comment on changes you may make after
21   the fact to the deposition transcript, it's important
22   that you give your most accurate answers today if
23   possible.  Understood?
24         A.  I understand.
25        Q.  Now, you should have --

Page 8

1         MR. OLSEN:  Counsel do you have anything to
2    add?
3         MR. KNECHT:  No.  No, I don't.
4    BY MR. OLSEN:
5         Q.  You should have received, I think we're up
6    to, five exhibit packets for this deposition today.
7    And as I go through the deposition, there will be a
8    number of those that I'll refer to.  You'll find on the
9    bottom right corner of each page in those different
10   exhibits a series of numbers.  Those are referred to as
11   Bates stamp number or I'll just refer to it by its page
12   number.  So that's how I will -- in the stack of
13   documents that may constitute an exhibit, I will refer
14   you to that and give you some time to locate the
15   particular item.
16         A.  I was not able to print all of them off.  Is
17   that something you would like me to do?
18        Q.  Well, we'll do the best -- do the best we
19   can.  It's possible we'll have to do a work around
20   that.  I'm not using all of them.  And if I have -- we
21   don't have the one that I'm focused on, we'll either
22   have to -- madam court reporter, I know we've had some
23   people publish the documents and hold them up to the
24   camera.  I'm not sure how that's going to work, but
25   what we may do is take a break and send that particular

APPX000461

Corey Jodoin                                        NAC Foundation, LLC v. Corey Jodoin, et al.

Page 9

1   page. We'll see how this works.
2       Did you look at any documents in preparation
3   for your deposition today?
4       A. I looked at a few, yes.
5       Q. What did you look at?
6       A. Mostly the timeline, just trying to get my
7   head around all that transpired. It's been five years.
8   So just trying to review.
9       Q. Okay. And the timeline, did you look at a
10  particular document? Did you have a timeline drawn out
11  or did you look at different documents to determine the
12  timeline?
13      A. Mostly different documents just to kind of
14  get an idea of what was going on. It's been five years
15  and I hadn't really looked at a whole lot of these
16  documents for a while. So just need to refresh.
17      Q. It's been an ongoing case since that time or
18  cases; correct?
19      A. Correct.
20      Q. So you still have a pretty good recollection
21  of the facts as they took place back in 2015-2016?
22      A. Fairly good idea.
23      Q. Okay. Do you recall, of the documents you
24  looked at, any of the particular documents you reviewed
25  to establish the timeline?

Page 10

1       A. Can you restate the question. I'm not sure I
2   understand.
3       Q. Name any of the documents you were talking
4   about that you looked at to refresh your recollection
5   of the timeline.
6       A. There's -- I don't have a document number. I
7   don't know how to answer that question.
8       Q. Just tell me what -- just describe them for
9   me and for the record. You don't need to give me --
10  they don't have to be the exhibits.
11      A. I see. I see. Well, when everything kind of
12  transpired, basically, Brandi had written sort of like
13  a timeline of certain events that happened throughout,
14  you know, the few months that we were with NAC. And so
15  I just reviewed that mostly.
16      Q. Okay. And when did she prepare that
17  timeline?
18      A. I believe that would have been in -- it was
19  updated probably March, somewhere March 2016, May,
20  April-May, somewhere in there.
21      Q. When was it last updated?
22      A. It's never been updated.
23      Q. I thought you said it's been updated.
24      So March 2016, there was a timeline prepared
25  by Brandi, and you've reviewed that?

Page 11

1       A. Correct.
2       Q. Has that timeline been produced in this case
3   to your attorney and then to plaintiffs?
4       A. Yes, that's correct.
5       Q. It has been produced?
6       A. Well, it's with my lawyers. So they have all
7   the documents.
8           MR. KNECHT: Objection. Work product.
9   BY MR. OLSEN:
10      Q. Brandi prepared that for the two of you to
11  look at or were you instructed by your lawyer to
12  prepare that?
13      A. I believe that we were instructed by a
14  lawyer. And I would also say that Brandi was very
15  accommodating to help write down notes and memories.
16  She remembers a lot more of the little details than I
17  do.
18      Q. And are you relying today, to some extent at
19  least, on your review of that timeline?
20      A. No.
21      Q. So you reviewed it and it served no purpose?
22      A. The only purpose that it actually had for me
23  was that it help put perspective in timeframes of when
24  things happened.
25      Q. Did that timeline include communications that

Page 12

1   you or your wife had with the
2   Alberta Securities Commission?
3       A. It did not.
4       Q. Did it include communications you or your
5   wife had with the FBI?
6       A. It did not.
7       Q. Did it include any other communications
8   relating to -- well, did it reference any other
9   communications with any other governmental agency?
10      A. I don't think so.
11      Q. So you became affiliated with NAC
12  Foundation -- if we refer to it as NAC, you'll know
13  what I'm talking about; right?
14      A. I do.
15      Q. -- and you became an officer in some fashion
16  of the company. What was your title?
17      A. Well, when Marcus and I had a relationship, I
18  guess before I was ever given a title, that
19  relationship would have been -- it was a cold call, I
20  guess, to buy some coins as an investment.
21      Q. I'm not asking you about that. I don't need
22  the story from the beginning. I'm asking you at the
23  point when you became -- the point where you were doing
24  some work for NAC, you got a title as an officer;
25  correct?

Page 13

1    A. Yes, I was an officer.
2    Q. And was that chief operating officer; is that
3  correct, COO?
4    A. It was originally CEO Marcus offered me, and
5  I refused it. Marcus is the face of the company, and I
6  was a bit surprised that he would offer that.
7    Q. So you took on the COO role?
8    A. He talked me into becoming a COO; correct.
9    Q. Okay. How would you describe what duties you
10  fulfilled when you had that role? What did you do?
11    A. Are you asking what I did or what I thought
12  my duties were?
13    Q. Start with what you thought your duties were.
14    A. Well, as a COO, I was very unqualified to be,
15  you know, a chief operating officer for a digital
16  company. So it was -- because it was a start-up
17  company, that it needed some help just to get things
18  rolling, I was more than happy to help Marcus out and
19  work things through, but at the end of the day, being a
20  COO, you know, I thought I'd be involved in promoting
21  the coin, promoting the company and make it grow.
22    Q. Okay. What are the qualifications for COO of
23  a cryptocurrency -- well, a technology company which is
24  designed to put out some sort of cryptocurrency at some
25  point? What are the qualifications?

Page 14

1    A. I'm not an expert in this digital currency.
2  I don't know what all the qualifications would be.
3    Q. You said you weren't qualified. So I'm
4  asking you do you know what the qualifications are?
5    A. Well, I would assume that there's
6  qualifications. You would need to be very good at
7  marketing, not just local but on the world stage. You
8  would need to have a very good understanding of what
9  the digital currency was. And I'm in a very big
10  learning curve so --
11    Q. Sorry. Go ahead.
12    A. -- I wasn't able to fulfill all of that.
13    Q. You took on the role, and you did undertake
14  certain tasks. Can you tell me what your recollection
15  of those tasks was?
16    A. I believe helping Marcus manage and build the
17  company was the biggest challenge that I had. Learning
18  the company, learning the currency or the environment
19  of the world, was another challenge that I had. Trying
20  to work with -- within the parameters of NAC. It's a
21  small company. Had to figure out who's doing what and
22  where.
23      So does that answer your question?
24    Q. Yeah. I mean, that would be true of any --
25  you've worked in small companies before. That would be

Page 15

1  true of any small company, you have to learn who is who
2  and what needs to be done?
3    A. I agree.
4    Q. Do you agree? Okay.
5      You ran -- I guess you have a business now;
6  correct?
7    A. I do.
8    Q. It's a construction business of some kind?
9    A. It is.
10    Q. And what is that business called?
11    A. C & B Excavating.
12    Q. And I assume from that it does excavation
13  related to land and construction projects?
14    A. That's correct.
15    Q. And at the time that you became involved with
16  NAC, you were associated with a different excavating
17  company, I think your wife mentioned; is that correct?
18    A. That is correct.
19    Q. What was the name of that company?
20    A. A & A Trenching.
21    Q. Did they do the same thing or is trenching
22  different than excavating?
23    A. Pretty much the same.
24    Q. Okay. And how big a company -- that company
25  is no longer in existence, I understand?

Page 16

1    A. That's correct.
2    Q. And how big a company was that? How many
3  employees?
4    A. We had, from off season, about 45 employees
5  all the way up to about 80.
6    Q. Would you say 80, is that during on season
7  for construction?
8    A. Yes.
9    Q. Okay. And what was your job for that
10  company? Were you the CEO for that company?
11    A. COO.
12    Q. Okay. Did you have multiple projects at any
13  given time? Did that company have multiple projects at
14  any given time?
15    A. We did.
16    Q. Okay. What sort is that? Commercial
17  construction?
18    A. Some commercial construction, some
19  residential construction.
20    Q. And commercial jobs in particular may be
21  interacting with other contractors and trades; correct?
22    A. Yes, we would.
23    Q. And you would be interacting with different
24  people within your company keeping everything sort of
25  organized; right, as COO?

Andrade App 000463

Corey Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 17

1    A.  Yes, as a COO, we do our best to make sure
2   everything is going the right way.
3    Q.  How long did you do -- sorry.  Go ahead.
4    A.  Quality and integrity.
5    Q.  Because you always want to act with quality
6   and integrity; correct?
7    A.  Well, that was the logo of our A & A
8   Trenching.
9    Q.  Really?  Did it mean anything?  Is it true
10  you always wanted to do quality work and act with
11  integrity?
12   A.  I think we all want to do that, don't we?
13   Q.  One would hope.
14       And how long did you do that for the
15  trenching company, A & A Trenching?
16   A.  As the COO, about 10, 12 years.
17   Q.  And you worked for the company before that
18  for how long?
19   A.  Another 15 years.
20   Q.  Did you have another officer role, another
21  title, for the 15 years?
22   A.  No.  I was a worker, employee.
23   Q.  When you -- before -- when you were
24  affiliated as COO of NAC, was it a member of the
25  American Bankers Association?

Page 18

1    A.  I believe we were.
2    Q.  Okay.  Did you participate in any way with
3   the American Bankers Association yourself?
4    A.  I did not.  Marcus and -- I think Marcus did
5   most of that.
6    Q.  Okay.  But you knew -- you knew it was
7   affiliated with the ABA.
8       Did Brandi have some interaction with the
9   ABA?
10   A.  She had some interaction with the ABA.
11   Q.  Do you know the nature of that interaction?
12   A.  Very little.  She was mostly just trying to
13  read up and understand what was going on.  She was
14  trying to understand when there were conferences or
15  bigger things to start getting involved in, a lot of
16  legwork.
17   Q.  And did you get involved in any or attend --
18  get involved in any ABA, American Bankers Association,
19  conferences or interact with that organization?
20   A.  I did not.
21   Q.  You told -- you told people, other people
22  outside the company, that NAC was affiliated with the
23  American Bankers Association; correct?
24   A.  Probably not.
25   Q.  You did promote the company; right?

Page 19

1    A.  I did.
2    Q.  In fact, you sold coins or tokens
3   representing coins to various buyers; correct?
4    A.  I did.
5    Q.  And did you -- so you don't know whether you
6   mentioned the ABA to anyone, either a buyer or just
7   someone you were interacting with as the COO?
8    A.  I don't recall.  Honestly, I know that in the
9   presentations there was mentions of the ABA, that we
10  were affiliated, but that's as far as that went.
11   Q.  And when you say "presentations," you
12  participated in making some presentations; correct, for
13  NAC?
14   A.  I did participate.
15   Q.  When you started with NAC and Aten Coin, you
16  became affiliated, was it the Aten Black Gold Coin, is
17  that what was -- the currency that was --
18   A.  Yes.
19   Q.  Okay.  And at some point they dropped the
20  "Black Gold" part; right?
21   A.  They did.
22   Q.  What was your understanding of why that
23  occurred?
24   A.  Well, I think -- I do not recall.  The name
25  Aten Coin came from Terence, Marcus' partner, other

Page 20

1   partner.  And it just meant that it's an invaluable
2   precious metal, an invaluable precious digital
3   currency.  And I believe that's sort of the new
4   re-branding that Marcus was looking at.
5    Q.  And you sold -- you're talking about selling
6   coins to various people.  You sold the Aten Coin to
7   various people; correct?
8    A.  That is correct.
9    Q.  On behalf of NAC?
10   A.  That is correct.
11   Q.  You mentioned Terence.  Is that Terence Poon?
12   A.  Yes, sir.
13   Q.  We'll come back to Terence.
14       I'm going to refer you -- probably the
15  easiest place to go for this, we'll see, is Exhibit 4.
16  Do you have Exhibit 4 printed out?
17   A.  Exhibit?
18   Q.  The exhibits should be numbered 1 through 5
19  and then there would be those page numbers that I
20  referred to earlier at the bottom right.
21   A.  Okay.  So is there a page number then?
22   Q.  I'm looking at page 330, 0330.
23   A.  Okay.  I have that.
24   Q.  Okay.  And this is -- can you tell me what
25  this document is?

App 000464

Corey Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 21

1    A.  This is the purchase agreement.
2    Q.  Okay.  And I will tell you that in Exhibit 4,
3  Exhibit 4 contains purchase agreements to the following
4  people.  And if you'll listen to this list, it isn't
5  listed anywhere, but rather than have you dig through
6  it, I'm going to give you some names.
7       Albert Jodoin, is that your father?
8    A.  That is.
9    Q.  Albert Jodoin, Andrea LeFevres, Chantal
10  Ortmeier, John Bokenfohr, Larry Wells -- is it
11  Purchase?  Does that ring a bell?  Larry Wells?
12    A.  I'm sorry, the question again, please?
13    Q.  I'm asking you do you know some people named
14  Purchase?
15    A.  No.  It's Larry Wells.
16    Q.  It's Larry Wells.  It's short.  Larry Wells,
17  Laura Rodgers, Michael Barter, Mitchell Bokenfohr,
18  Murray King, Paul McGonigal, Rebecka Hiatt,
19  Scott Rodgers, and Tim Gallant.
20       Do you recognize those names?
21    A.  I do.
22    Q.  Is there anyone else that you remember
23  selling the Aten Coin or Aten Coin token to?
24    A.  Is there anyone that I remember selling it
25  to?

Page 22

1    Q.  Yeah.  All of these are people that are
2  listed -- that are on purchase agreements that are
3  contained in Exhibit 4.  And all of those purchase
4  agreements are people that you sold the coins to.
5  Those names all ring a bell?
6    A.  They do.
7    Q.  And are there any others to whom you sold --
8    A.  I don't remember that there's anyone else
9  that I sold coins to.
10    Q.  Did you attempt to sell coins to other
11  people?
12    A.  There were still many or people interested.
13    Q.  Okay.  And were those people just in your
14  area, in Alberta, or were some of those people from
15  other places?
16    A.  I would only know the ones in Alberta.  I
17  don't know.  I don't know anyone else.
18    Q.  Okay.  Let's take a look at page starting at
19  330.  And you said this is the purchase agreement.
20  Take a look through it.  Take a look at this document
21  through page 342.  Go ahead and take a look through it.
22       Have you had a chance to take a look?
23    A.  Yes, sir.
24    Q.  So the people that I named are people that
25  you presented purchase agreements to.  You sold the

Page 23

1  coins to, and you presented the purchase agreements
2  that look like this one that is to -- this one is
3  actually to your dad, executed by your dad?
4    A.  That is correct.
5    Q.  Okay.  And you got some credit with NAC for
6  making these sales; correct, or getting these executed
7  purchase agreements?
8    A.  I don't know.  The idea was to have some sort
9  of credit, but that never came through.
10    Q.  Was it supposed to be credited against
11  amounts you owed to NAC?
12    A.  No.
13    Q.  That's not your understanding of the
14  agreement?
15    A.  That is correct.
16    Q.  Take a look at -- well, take a look at page
17  0336.  0336, there's signatures for Aga and then for
18  NAC Foundation.  And then there's a section called KYC
19  Compliance Information.  What is that referring to?
20    A.  I believe KYC means "know your customer."
21    Q.  Okay.  And what did that mean, just that
22  you're going to supply this information that's
23  contained here to NAC?
24    A.  Well, I believe it's just to prove that he's
25  a person and not just a random, fictitious person.  So

Page 24

1  he's a real person and --
2    Q.  Okay.  Take a look at the next page.  It's a
3  document called Validation and Quality Assurance Form.
4    A.  I have it.
5    Q.  Do you see that?
6    A.  I see it.
7    Q.  Okay.  And this has a number of questions,
8  eight questions.  And what does it say at the top?  The
9  first line that talks about this form, can you read
10  that paragraph into the record.
11    A.  "This form is to be asked to the client by
12  the office staff when calling the client and scheduling
13  for his or her wallet installation.  A copy of this
14  completed form must be in the file of every client."
15    Q.  Okay.  Did you ensure that each of the
16  contracts that is in the packet, each of the purchase
17  agreements that you got people to sign, had a
18  Validation and Quality Assurance Form associated with
19  it?
20    A.  We did.  I did.
21    Q.  You did?  And what was your understanding of
22  the reason for this form, which is different than the
23  KYC information?
24    A.  This was, I believe, the quality assurance
25  that was given to the office staff directed by Marcus,

Andrade App 000465

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

| Page 25 | Page 27 |
|---|---|

**Page 25**

1 of course, for quality assurance to show that whoever
2 sold the coins, that the company validated that they
3 were -- whoever sold the coins did it properly, yes.
4    Q.  Okay.  And in the case of all these
5 particular purchase agreements, you had sold the coins
6 and so you would hope there would be a Validation
7 Quality Assurance Form for each of those contracts;
8 correct?
9    A.  Well, I would.
10   Q.  Did you check to make sure there were for
11 each of these?
12   A.  I did not check to do each of them or, I'm
13 sorry, for all of them.  Because there was a concern
14 towards the end of -- this was Marcus' job.  This is
15 Marcus' office building; right.
16   Q.  That wasn't my question.  My question wasn't
17 whose job it was.  You're the person who sold.  I'm
18 just asking you as the seller whether you checked to
19 see whether each of those agreements ended up having a
20 Validation Quality Assurance Form?
21   A.  As the seller, I don't think that was my job.
22 I do -- I do believe that the office was to confirm
23 this was to happen.  And that information went to
24 Marcus.
25   Q.  I'm asking you a different question.  And the

**Page 26**

1 answer seems to be, no, you didn't check to see whether
2 each of these purchase agreements that you had entered
3 into on behalf of NAC with your friends and relatives
4 in Canada contained the Validation Quality Assurance
5 Form; correct?
6    A.  I did not check.
7    Q.  Now, the next page after that form on page
8 0339, that's the beginning of a document called Client
9 AML Evaluation or acronym C-A-L-E.
10       Are you familiar with the C-A-L-E or CALE
11 form?
12   A.  I've seen this form, yes.
13   Q.  Well, based on the next page, page 0340,
14 you've done more than see it.  You've signed it;
15 correct?
16   A.  That's correct.
17   Q.  Okay.  And is it the case that you -- is it
18 the case that you, I think, signed all of the purchase
19 agreements that you had obtained, the ones that are in
20 the exhibit, yourself?  You signed off on the CALE
21 form; correct?
22   A.  On these ones I did, yes.
23   Q.  Did you sign off on any others that were not
24 people that you had obtained the purchase agreement
25 from?

**Page 27**

1    A.  I don't recall.
2    Q.  Okay.  Could you read the first line just
3 under the title of this document on 0339.
4    A.  First line under the title?
5    Q.  Yeah.  It starts with "This form."
6    A.  "This form is to be asked to the client
7 representative based on his dealing with the client.
8 This is to be asked by an NAC authorized
9 representative."
10   Q.  Okay.  So you've indicated that you didn't
11 necessarily check to see if the Validation and Quality
12 Assurance Forms had been completed.  In the case of the
13 CALE forms on purchase agreements you obtained, you
14 signed those; correct?
15   A.  Could you repeat the question, please.
16   Q.  You signed all the CALE forms on the purchase
17 agreements that you obtained?
18   A.  I did.
19   Q.  So I want to ask you --
20   A.  On the ones -- the office would send the CALE
21 form back to me, and that's when I would go through it
22 and sign it.
23   Q.  And the calls to and from the office were
24 recorded; correct, at that time anyway for quality
25 assurance?

**Page 28**

1    A.  I believe so.
2    Q.  Okay.  Did you ever access any call tapes?
3    A.  Never.
4    Q.  Okay.  Did you ever direct anyone to any call
5 tapes?
6    A.  No, I never did.  And I've honestly never
7 been involved in that.  It's a tool I am not used to or
8 accustomed to.
9    Q.  Did you direct the FBI to any call tapes or
10 the existence of any call tapes?
11   A.  Absolutely not.
12   Q.  On this form -- well, as to this form and
13 anybody that you did not enter the purchase agreement,
14 you got the purchase agreement from, did you ever
15 sign -- as you signed here on page 0340, did you ever
16 sign any other CALE forms that you had not obtained the
17 purchase on?
18   A.  I don't recall.
19   Q.  If you had done so, why would you have done
20 so?
21   A.  I don't recall.  I don't think I would have
22 because I wouldn't have been selling; right?
23   Q.  Well, is it -- were you a client
24 representative with respect to anyone, as designated
25 here, with respect to anyone from whom you did not --

Andrade App 000466

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 29

1  well, a different party got the client -- purchase
2  agreement from? If you can understand that.
3      A. Can you repeat it.
4      Q. Did you sign as client representative on any
5  purchase agreements other than the ones that you
6  obtained from your Canadian clients?
7      A. I don't think so.
8      Q. And based upon looking at the last page of
9  this, well, page 0340, the page that you signed, read
10 that sentence in the box below your signature.
11     A. The one that says "NAC authorized
12 representative area?"
13     Q. And goes on to say, "Based on."
14     A. "Based on the information provided by the
15 client representative, do you feel that this needs to
16 be investigated further? If yes, you must submit this
17 form to our compliance officer."
18     Q. So the information contained in this form
19 that was obtained in the case of these contracts from
20 you, you filled out the form indicated here? When I
21 say "filled it out," it's just circling a bunch of
22 either Ys or Ns; right?
23     A. Well, I did sign the form.
24     Q. And you would have supplied the information
25 contained in the form on lines -- as to lines 1 through

Page 30

1  14 on this document; correct?
2      A. That is correct.
3      Q. Did you -- I don't know how these sales
4  worked, these purchase agreements. I know you went and
5  you made presentations and you got -- some people
6  signed purchase agreements; correct?
7      A. Some people did.
8      Q. Did you send to others or give to other
9  people whom you had made the pitch to or presentation
10 to purchase agreements which they just didn't sign and
11 return?
12     A. You mean did I send an obligation to people
13 who didn't purchase any coins at all?
14     Q. Not an obligation. Did you give them a
15 purchase agreement and say, Hey, here's the deal, if
16 you want to do it, sign this document, anything like
17 that?
18     A. Well, I would agree that, yes, I would have,
19 but there was a few people that it was still just a
20 phone call to see how they were doing. So I think not
21 all of them got a purchase agreement.
22     Q. Okay. How many, would you say, how many
23 people who didn't sign a purchase agreement received
24 one from you in one way or another?
25     A. Just a couple maybe.

Page 31

1      Q. Do you know who that would be?
2      A. Rick Stevens was one person that comes to
3  mind. And I had met him -- I had talked to him a few
4  times and he was on the fence. So I actually referred
5  him to Marco Diadamo. So I basically surrendered my
6  client representative so that he could have someone
7  else from the NAC group to walk him through the
8  purchase of the coins.
9      Q. Did Rick Stevens end up buying coins?
10     A. I have no idea.
11     Q. Anyone else? You mentioned there might have
12 been two people.
13     A. Maybe a couple I was talking to. I can't
14 remember right now, and I wouldn't know if they did
15 fulfill it so...
16     Q. Is Rick Stevens a local up there with you?
17     A. He lives in Alberta.
18     Q. Was NAC a member of the U.S. Federal Reserve
19 Faster Payment Task Force?
20     A. Yes, we were.
21     Q. And that was during the time you were the
22 COO; correct?
23     A. That is correct.
24     Q. In fact, you were designated the person to
25 interact with the task force; right?

Page 32

1      A. That is correct.
2      Q. And when was this interaction? The timeframe
3  is somewhere between, I guess, the fall of 2015 and
4  sometime March or so of 2016. That's the timeframe
5  that this would have occurred; right?
6      A. I agree.
7      Q. Where within that timeframe would you place
8  your interaction with the task force?
9      A. I would say December to February.
10     Q. What was that interaction? Did you have
11 meetings or conferences or what?
12     A. I attended one conference. Many of the
13 meetings were held over an online video or the notes
14 were reviewed or sent to those who were interested or
15 registered. And the Federal Reserve was looking for a
16 way to make faster payments. So they had invited a
17 conglomerate of people to get involved to know what the
18 Federal Reserve is looking for, and then present a
19 presentation.
20     Q. So you, on behalf of NAC, participated in
21 some online meetings?
22     A. Yes, I did.
23     Q. And then you attended a conference; is that
24 right?
25     A. That is correct.

NAC Foundation App. 000467

Corey Jodoin

NAC Foundation, LLC v. Corey Jodoin, et al.

### Page 33

1  Q.  When was that conference?
2  A.  That was the conference in Chicago.  I
3  believe it was in February.
4  Q.  Were you the only one there on NAC's behalf?
5  A.  I was.
6  Q.  So your wife was not there?
7  A.  She was not.
8  Q.  She had -- she told us in the deposition last
9  time her title.  What was her title with the company?
10  A.  Her title?
11  Q.  Yes.  She described her title, and I don't
12  recall the term off the top of my head, but do you
13  recall what it was?
14  A.  Everyone's assistant?
15  Q.  No.  I mean the title that was --
16  A.  The title that Marcus gave her was CAO, chief
17  administrative officer, the title Marcus gave to her.
18  Q.  So she was doing administrative things.  And
19  she was not in Chicago for the task force meeting;
20  correct?
21  A.  That is correct.
22  Q.  I understand, I think she said, you guys have
23  10 kids?
24  A.  We have 12.
25  Q.  12; okay.  Cheaper by the dozen.  I imagine

### Page 34

1  she's probably home taking care of the kids.
2     So when you were at the conference in
3  Chicago, what did you learn at that conference?
4  A.  Well, I learned that they were open to many
5  concepts, many different ways of doing business.  I
6  think they were really looking for some very, very
7  high-end alternatives.  And I think they were trying to
8  build community within -- you know, there were many
9  banking professionals there.  There were many digital
10  currencies, many faster payment processors
11  representatives there.  So they were trying to let the
12  mass people know their challenges, which were -- the
13  Federal Reserve's challenges, which were very difficult
14  to get money to everyone in a very timely, orderly
15  fashion, and they were asking for ways to make it
16  better.
17  Q.  You said -- I think you said, "high-end
18  solutions."  What do you mean by that?
19  A.  Well, there was a fairly strict -- I don't
20  remember all of it, of course, but there were some very
21  strict rules that they wanted to have because it's
22  dealing with money.  Nothing was quick and simple.  It
23  was --
24  Q.  I'm not sure if I know what you mean.  Did
25  you have to submit something to be able to attend the

### Page 35

1  conference, some sort of an application?
2  A.  Yes.  They were looking for applications
3  through either a video or some sort of presentation on
4  how you could help the Federal Reserve become better.
5  And there were some people or some businesses that
6  could make only parts of it better, and they would
7  still do their presentation.  At the conference, they
8  were letting us know what was their challenges, but
9  there was no one presenting at the conference.
10  Q.  As far as presentations, though, you put
11  together a presentation to make to the task force?
12  A.  Yes, we paid for a video.
13  Q.  Okay.  And it was a video?  In video form?
14  A.  That is correct.
15  Q.  And was it submitted to the task force?
16  A.  I don't believe so.
17  Q.  You actually worked on it yourself, along
18  with others, Marcus and others?
19  A.  I worked on it with Marcus and Jarek and with
20  Brandi, of course Brandi.
21  Q.  Did you appear in it, in the video?
22  A.  I did not appear in the video.
23  Q.  Okay.  Did anyone actually appear, any faces
24  appear?
25  A.  I asked Brandi to appear in the video.  And

### Page 36

1  the consensus was she has a very photogenic face.  And
2  she was asked.  She accepted.
3  Q.  So she actually appeared in the video, Brandi
4  did.  And did Brandi also work on the video?
5  A.  No.
6  Q.  Okay.  Are you sure that Marcus worked on it
7  or was it -- are you sure about that?
8  A.  I'm pretty sure Marcus knew about it and was
9  involved in it.  He had seen the video and he gave a
10  thumbs up for almost everything.
11  Q.  Okay.  So he knew about it, undoubtedly.  My
12  question was did he actually participate in creating
13  the video itself?
14  A.  I believe he did.
15  Q.  What did he do?
16  A.  He was very -- he was helpful for us to
17  understand how the transactions worked.
18  Q.  So I take that to mean you asked Marcus for
19  some information which was included in the video
20  presentation?
21  A.  Well, yes.  And -- well --
22  Q.  Anything else?
23  A.  Well, he wrote what he would want us to say
24  in that regard.  Because he's the expert in that, not
25  me.

App 000468

Corey Jodoin                                         NAC Foundation, LLC v. Corey Jodoin, et al.

---

**Page 37**

1  Q.  What do you mean he wrote it?
2  A.  He helped write the script to discuss how the
3  banking works with the digital currency.
4  Q.  How the banking works with the digital
5  currency.  You had to take information that you gleaned
6  from Marcus and maybe other sources and put it into the
7  video format; correct?
8  A.  As a group, we worked on it together.
9  Q.  Okay.  You told me what Marcus did.  Who else
10 was in that group that actually put the nuts and bolts
11 of it together?
12 A.  Well, I believe it was Brandi and Jarek.
13 Jarek helped me a little.  I can't remember how much
14 Jarek helped.  But the script was what we were working
15 on and then we did the video off the script.  And
16 Marcus helped us do the script.
17 Q.  He helped you do the script?
18 A.  Yes.
19 Q.  Okay.  Who was the primary author?  Was that
20 you or was it Jarek?
21 A.  Probably Marcus.
22 Q.  You said he helped you put together the
23 script.  You didn't say he wrote it.  He didn't write
24 it; correct?
25 A.  Yeah, he did.  He wrote it.

**Page 38**

1  Q.  That's different from what you told me
2  before.  So he wrote it, you read it, and put your wife
3  on the video.  That's not what happened, is it?
4  MR. KNECHT:  Objection to form.
5  BY MR. OLSEN:
6  Q.  I said, so now you're telling me that he
7  wrote it, your wife read it, and you put it up on
8  video.  And then I said, that's not how it worked, is
9  it?
10 A.  It's not what I said.  What I said was we
11 compiled it together.  So what we gave to Marcus,
12 Marcus said, no, this is wrong, rewrite this part,
13 rewrite that part.  And he changed our script.  He was
14 the major contributor in our script.
15 Q.  Okay.  Take a look at Exhibit 4.  Hopefully,
16 you have it printed out.  If you don't have it printed
17 out, you have it on your computer.  Page number
18 0099 is the beginning of it.  It is the Aten Group and
19 National Aten Coin Foundation Management Team packet.
20 MR. KNECHT:  Is this Exhibit 4, Counsel?
21 MR. OLSEN:  2, Exhibit 2.
22 THE WITNESS:  I don't have it printed, but I
23 have it on my computer.
24 MR. OLSEN:  Leave it up on your computer.
25 See if I can read this a little better.  Maybe not.

**Page 39**

1  Just have to go forward this way.
2  BY MR. OLSEN:
3  Q.  So this is a document -- actually, I talked
4  to your wife about these biographies in her deposition,
5  but this is a packet of biographies for the management
6  team for the Aten group; correct?
7  A.  Yes, biographies are in that video.
8  Q.  Well, 0099, is that part of the video or is
9  that just -- you're looking at a picture, that's what
10 you're telling me?
11 A.  Yeah.
12 Q.  Okay.  You mentioned Jarek.  And I was
13 looking for Jarek in this packet.  What is Jarek's last
14 name?
15 A.  I forget.
16 Q.  That's a different person than -- is that a
17 different person than Jaroslaw Sirko?
18 A.  No.  Jaroslaw Sirko, that's his name.
19 Q.  I do see that his -- that his bio is at page
20 0106.  Do you see that?
21 A.  No.  I have 0113 and on.
22 Q.  Okay.  I thought you had -- I thought you had
23 0099, the beginning of the packet; is that correct?
24 A.  I don't.  Exhibit 4?
25 Q.  No.  Exhibit 2.  Let me ask you, as far as

**Page 40**

1  Jarek, what did he do for you?  What was his -- what
2  jobs did he do for you?  According to this file, he was
3  manager of business development EU National Aten Coin.
4  That's what it says here.  Is that your understanding
5  of his title?
6  A.  Yes.  He hadn't really worked into his title
7  yet.  He was really trying to help us with our video
8  presentations.  He had a lot of contacts with the
9  banking industry in Europe.  And so we were still
10 trying to develop all of those strategies together.
11 Q.  Okay.  So he was a guy who, not only did he
12 work on the video, but he had banking contacts.  Looked
13 like he had been with Deutsche Bank in the past.  Is
14 that your understanding?
15 A.  I believe so.
16 Q.  According to this, he was with Deutsche Bank.
17 He was also with Raiffeisen Bank.  And he had a
18 master's in international business.  That's what his
19 bio says.  You have no reason to believe that's not
20 true; correct?
21 A.  I would agree.
22 Q.  You never had any reason to think that Jarek
23 was a dishonest person; right?
24 A.  I had no reason to believe that.
25 Q.  No reason to believe he misled you or anybody

---

Corey Jodoin

NAC Foundation, LLC v. Corey Jodoin, et al.

Page 41

1  about anything, whether it's his background or about
2  the product; correct?
3      A.  I would agree with that.
4      Q.  I'm also looking through this packet of the
5  team, and I see Agnieszka Bilinska, head of marketing
6  and PR.  Who's that person?
7      A.  Agnieszka Bilinska?
8      Q.  Yes.
9      A.  She was another sales and marketing member of
10 the Poland team.
11     Q.  And what did she bring to the table?  I know
12 you don't have the bio in front of you, but what did
13 she bring to the table for NAC?
14     A.  Well, Marcus brought her on.  I walked into
15 her being a part of the team so I don't have that
16 answer full right, but my understanding was her ability
17 to market and her contacts were very valuable.
18     Q.  And did you learn -- you didn't pick her.
19 You didn't know that at the beginning, but did you
20 learn that to be true, an accurate statement?
21     A.  She seemed very knowledgeable in her field.
22     Q.  Did she have contacts that she -- that she
23 utilized in her role?
24     A.  I would believe so.  She was a very big part
25 of the Polish conference.  There was a lot of dignified

Page 42

1  people there.
2      Q.  I guess what I'm saying is did you observe
3  her to be that person, to be a person who brought
4  value, during your time with the company?
5      A.  I did observe it.
6      Q.  Do you have any reason to think she was not
7  an honest person?
8      A.  I had no reason to think she was dishonest.
9      Q.  Did she have a contract with NAC?
10     A.  I believe she did.
11     Q.  Didn't you sign that contract?
12     A.  Yes, I did.
13     Q.  Do you know when that was?
14     A.  It was in Poland.
15     Q.  How many times were you in Poland for this?
16     A.  In Poland, in October and again in November
17 or December.  We were in Poland twice.
18     Q.  And when you were in Poland, what did you --
19 you were there for NAC; correct?
20     A.  Yes.
21     Q.  What did you do there during those trips?
22     A.  Well, we worked with Marcus to try to find
23 another office space.  We were looking at setting up
24 contracts with Agnieszka Cenzartowicz, finding some
25 more marketing people in Europe so we could develop our

Page 43

1  coin.
2      Q.  Is that when you signed the contract with
3  Ms. Bilinska?
4      A.  No, I don't believe so.
5      Q.  Bilinska, I should say.
6         It was a different time?
7      A.  Yeah.
8      Q.  Okay.  Was the second Poland -- well, were
9  the Poland trips successful?  Did you get some things
10 accomplished?
11     A.  Well, it seemed to.  There's a lot of things
12 that we would get done.  There would always be
13 something else we'd have to put back on our plate.  It
14 always seemed quite full.
15     Q.  How long were you there on those trips?
16 Let's take the first trip.  How long were you in
17 Poland?
18     A.  Three, four days.
19     Q.  And how about for the second trip?
20     A.  The same.
21     Q.  Okay.  So you mentioned Terence Poon before.
22 He was -- what was his role?  I'm trying to understand
23 what his role was within NAC.
24     A.  I believe -- my understanding of Terence Poon
25 was that he helped to write the code for the Aten Coin.

Page 44

1  And he helped to check it to see if it was KYC friendly
2  or approved or know your customer.  So I believe he was
3  involved with Marcus to develop the coin to have the
4  patents that it did.  That was my understanding.
5      Q.  Okay.  And there are some patents associated
6  with this technology; correct?
7      A.  I'm told there is.
8      Q.  Okay.  So Terence, he didn't have -- did he
9  have a title?  Was he the chief technology officer or
10 something?  What was his title?
11     A.  Terence didn't really have a title.  For the
12 conference, I think we gave him one.
13     Q.  So for the conference.  Which conference are
14 we talking about?
15     A.  The Alberta conference.
16     Q.  Okay.  Did he attend?
17     A.  He did attend.
18     Q.  Okay.  Did Marcus attend that conference?
19     A.  Yes, Marcus attended.
20     Q.  You attended, Terence attended, Marcus, and
21 then Brandi.  Anyone else?
22     A.  Jarek was there, Agnieszka was there, Igor
23 Solodovnik was there.  Agnieszka Bilinska was there.
24 Sachin was there.  Marco Diadamo was there.
25     Q.  Marco Diadamo, your wife and I spoke about

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 45

1  him the last time. He was another client
2  representative; correct?
3      A. I believe so. He was the head of sales for
4  NAC.
5      Q. You actually referred at least one --
6  Mr. Stevens referred him to Marco for purposes of
7  closing a deal; right?
8      A. I did.
9      Q. Let me ask you, as far as Terence, do you
10 have any reason to believe he's a dishonest person?
11     A. I have no reason to believe he's a dishonest
12 person.
13     Q. Did he ever make any misrepresentations to
14 you?
15     A. I don't believe so.
16     Q. Now, we talked about Jarek. You mentioned
17 Sachin. Who is Sachin?
18     A. Sachin is the wallet installer, technical
19 guy.
20     Q. Did he have a title with the company?
21     A. Sure. I don't remember.
22     Q. Did you ever give instructions to Sachin?
23 Was he somebody that you worked with?
24     A. No, I never gave instructions to Sachin.
25 Most instructions were done through Marcus. I had

Page 46

1  conversations with Sachin to install my own wallet into
2  my computer. I had conversations with Sachin to
3  understand what some of the hiccups were with his
4  wallets being downloaded on other computers.
5      Q. Okay. So installing the wallet. For the
6  record, a wallet is a thing; it's a place where you put
7  your coins; correct?
8      A. It is a digital wallet that -- where you
9  store your coins.
10     Q. Okay. And so when you described a -- what's
11 the wallet installer then?
12     A. I'm not sure I understand the question.
13     Q. What exactly is a wallet installer? Is that
14 how you download your wallet? You install it -- you
15 download it and somehow install it into a computer?
16     A. Yes, there's a download. You install it onto
17 your computer.
18     Q. So tell me about -- you were talking about,
19 with Sachin's assistance, downloading your wallet
20 because you had coins; correct?
21     A. I do have coins.
22     Q. You still have them?
23     A. I still have them.
24     Q. What's the process? Walk me through the
25 process of downloading the Aten Coin wallet.

Page 47

1      A. Well, you go to the website or the link. And
2  you would push the "download" button to install a
3  wallet. It would go through listing your name and your
4  address and verifying who you were.
5          Once that was complete, you had to choose
6  whether it was a Mac or a PC wallet that you needed.
7  And then you let it download.
8          Once the wallet was downloaded, then you had
9  to make a call to the office and needed to get ahold of
10 Sachin. Sachin would call you back and try to get your
11 wallet to get active.
12     Q. And what was involved -- was there an ID
13 verification process to get it active?
14     A. There was an ID verification process. It was
15 very slow and clumsy. And Marcus was trying to develop
16 that even more. He'd brought in other third-party
17 verifiers to kind of make that process quicker.
18     Q. Okay. And it was slow, but it worked; right?
19     A. Not always. Some computers were too old.
20 Some computers might.
21     Q. If it didn't work in a given instance, what
22 would be done to correct that?
23     A. I don't know. That was in Sachin's area.
24 And he would go to Marcus for that information.
25     Q. So, ultimately, people got coins in their

Page 48

1  wallet, as far as you know?
2      A. Yeah. The general thought was if you didn't
3  get the coins, you get your money back so --
4      Q. Now, you mentioned third parties. Weren't
5  there always third party companies that did the ID
6  verification?
7      A. For Aten Coin?
8      Q. Yeah. I mean, this is -- isn't part of this
9  downloading into the wallet, getting coins into the
10 wallet, isn't that part of that ID verification?
11     A. Yes. The whole premise of Aten Coin having
12 that was that it would be verified.
13     Q. Right. And weren't there always third
14 parties who were participating -- may have been
15 different third parties, but third parties that were --
16 that were involved in the ID verification?
17     A. Well, yes and no.
18     Q. Start with the "yes" part.
19     A. "Yes" part was Sachin would have been the
20 only one verifying. And that process was very, very
21 slow. And Sachin made comments that it's taking way
22 too long to verify. And so Marcus tried to get third
23 parties involved. So, yes, in the fact that Sachin is
24 a third party, but he's also NAC so --
25     Q. Sorry. Go ahead.

PROD 000471

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 49

1   A. -- reliability of NAC because Sachin is an
2   employee. Isn't that why you get a third party
3   involved?
4   Q. Right. And there were third parties that
5   were -- in fact, you actually -- you actually worked
6   with Marcus to try and recruit or get some other third
7   party providers; correct?
8   A. No.
9   Q. Well, was there an effort to get third-party
10  providers? I think you already said there was?
11  A. Yes, but, again, that wasn't in my scope of
12  work. Marcus let me listen in to one or two calls of
13  third-party verifiers, but --
14  Q. Isn't it true that NAC never built -- it
15  didn't have its own verification technology at that
16  point? Didn't it use someone else's verification
17  technology?
18  A. I'm not sure.
19  Q. I don't know if you ever found -- did you
20  ever find Exhibit 2, which is the one that begins at
21  0099 and goes through 0109?
22  A. I did not.
23  Q. If you could try to find page 0109, either on
24  your screen or on paper in Exhibit 2.
25  A. I think I found the page.

Page 50

1   Q. 0109. It says at the top, "How to download
2   an Aten Coin wallet."
3       You see that?
4   A. Yes, I see it now.
5   Q. Okay. So this is part of a package that had
6   the management team bios in it. In fact, the footer on
7   this page says at the bottom "management team" so it's
8   clearly part of the package; right?
9   A. Yes.
10  Q. Do you remember this being part of the
11  package?
12  A. It was part of the package at the conference.
13  Q. And you actually handed out the management
14  team packet, including this part of it, at your
15  conference, your sales conference, in Alberta; correct?
16  A. Yes, we did.
17  Q. Okay. Did you field questions about this
18  "How to download an Aten Coin wallet" or did people not
19  get to that point of asking those questions?
20  A. I'm sure we had some questions on how to
21  download a wallet. All the real technical stuff I
22  would direct more to Sachin.
23  Q. So in this document it gives two options for
24  downloading a wallet; correct? It says, option 1 you
25  call the Las Vegas office and request to schedule a

Page 51

1   time for tech support to download the wallet and then
2   tech support will help you with your credentials,
3   downloading the wallet, and help generate your first
4   wallet address.
5       That's option 1?
6   A. I see that.
7   Q. Okay. Did you use that process when you were
8   describing your interaction with Sachin on downloading
9   a wallet or did you do something else?
10  A. You mean -- can you repeat that? My
11  conversation with Sachin?
12  Q. No. You said -- well, let me just ask it
13  this way. Did you use, when you downloaded your
14  wallet, option 1 or option 2 on this sheet?
15  A. When I downloaded my wallet, I would call the
16  office, which would have been option 1., because option
17  2 wasn't developed yet.
18  Q. So you downloaded your wallet prior to the
19  time that this team, management team packet, was
20  completed?
21  A. That is correct.
22  Q. At some point after that, between that time,
23  the time you downloaded your coins and the time of the
24  conference, option 2 became available as described on
25  this page; correct?

Page 52

1   A. Option 2 became available, yeah, just before
2   the conference.
3   Q. Okay. And option 2 goes through some 12
4   steps; right?
5   A. I see that.
6   Q. Okay. The third step is that the person read
7   terms and conditions and accept those to go on; right?
8   A. I see that.
9   Q. Okay. And then there's a whole -- the next,
10  step 4, there's a verification email that's actually
11  sent back to the customer who is trying to download the
12  wallet; right?
13  A. That's correct.
14  Q. And then 4 says, "Click on the account
15  profile verification tab on the left-hand side --
16  sorry. That's 5. And 6 is complete the verification
17  process.
18      So at some point, the person who is on this
19  has to complete a verification process; right?
20  A. That is correct.
21  Q. Do you know what the process entailed?
22  A. The process, I believe, had to be a picture
23  of the person with some sort of ID in the picture with
24  the date.
25  Q. Okay. Anything else that you recall?

APP 000472

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 53

1  Anything else you recall?
2      A.  Don't really recall much else.  I know that
3  Sachin was involved to -- he was asked to verify.
4  That's about all I can really say, I guess.
5      Q.  Let me go back for a second to the
6  authentication, the ID authentication.
7          Do you recall a company called Authentic ID?
8      A.  Authentic ID sounds familiar.
9      Q.  Is that a company that you interviewed or
10 considered for that role of outside identification?
11     A.  No, I was never part of recruiting anything,
12 any of that verification process.
13     Q.  Did you discuss -- well, how about a name
14 called Junio, J-U-N-I-O?
15     A.  No clue what that is.
16     Q.  Couple more things about this packet and then
17 we'll take a break.  It also goes on to the next page
18 to talk about how you purchase Aten coins; right?
19     A.  On the next page, you said?
20     Q.  Correct, page 0110.
21     A.  I see that.
22     Q.  Okay.  And this packet, as I think you
23 indicated, the packet included bios and how-to
24 instructions on the wallet and how to purchase coins.
25 You said, I think, this was presented maybe other

Page 54

1  places, but certainly at the Calgary meeting,
2  conference?
3      A.  Can you repeat the question.
4      Q.  This packet of material, the management team
5  packet we've been looking at, it was presented to
6  potential buyers at the Calgary conference; correct?
7      A.  Well, those who attended, we gave them the
8  packet.  So they would have read it.  It wasn't in
9  Calgary.  It was Edmonton.
10     Q.  Edmonton.  I apologize.  I know that's a
11 thing.
12         And you actually paid to have this printed up
13 there in Edmonton; right?
14     A.  Yes, I paid for the printing.
15         MR. OLSEN:  Let's take a break.  It's time
16 for a break.
17         MR. KNECHT:  Sounds good.
18         MR. OLSEN:  Just five -- let's call it 10
19 minutes, actually.
20         MR. KNECHT:  Okay.
21         (Whereupon, a recess was taken.)
22 BY MR. OLSEN:
23     Q.  Let's get back to where we were.  I want to
24 ask you, Mr. Jodoin, a couple more questions about item
25 6 we looked at, the wallet download process, the

Page 55

1  completion of the verification process.  Just to make
2  sure we're clear on the record, Sachin's role in
3  option 1, which is what you utilized at the time that
4  you downloaded your wallet, was to guide you through
5  the process, essentially, of downloading the wallet;
6  right?
7      A.  I believe so.
8      Q.  That's what you recall?
9      A.  That's what I recall.
10     Q.  And when option 2 came into being, this is
11 the one that's part of the management team packet we
12 looked at and was presented to the folks in Edmonton,
13 did you have -- Sachin's role at that point was if
14 someone did call him, again, was just to help them get
15 through the verification process and one of these other
16 processes on this list; right?
17     A.  Sachin's role, as far as I understood, was to
18 make sure it was seamless.  So if there was an issue,
19 they would go to Sachin.
20     Q.  Now, as far as the verification process, you
21 said you still have a wallet; right?
22     A.  I do.
23     Q.  So you would anticipate or know that NAC
24 still has your biometric data, your ID verification
25 data; right?

Page 56

1      A.  Essentially, yes.
2      Q.  Okay.  That would be your expectation.  And
3  because you know they gathered it and there's no reason
4  if you still have a wallet, they wouldn't still have
5  it; right?
6      A.  I guess.
7      Q.  Right?  Yes?
8      A.  I said, I guess.
9      Q.  It's not really a guess.  You were a COO
10 and a coin holder.  You know that if you had a wallet and
11 they had your ID verification, they would still have
12 it?  That would be part of the deal; right?
13         MR. KNECHT:  Objection to form.
14 BY MR. OLSEN:
15     Q.  You can answer the question.
16     A.  You're asking me two different timeframes.
17 So at the time this was formatted, which was 2015-2016,
18 I had my wallet a year or so earlier.
19     Q.  Okay.  When did you get your wallet?
20     A.  I don't remember.  A year, maybe a year and a
21 bit before, 2014.
22     Q.  Okay.  So you were an early adopter.  But
23 your understanding was then, and as the COO you
24 presented to other people, that there was a
25 verification process and there was data.  You

Corey Jodoin                                      NAC Foundation, LLC v. Corey Jodoin, et al.

| Page 57 |
|---|

1 understood there was data that was collected?
2    A. I did understand that, yes.
3    Q. Okay. And, again, the expectation would be
4 for someone who still has a wallet, the company would
5 still have the data?
6    A. Absolutely.
7    Q. Okay. And the data -- I mentioned the
8 company Junio before. The data was also with the
9 verification company, which happens to be Junio. You
10 don't remember the name, you said, but with the
11 verification company; correct?
12    A. I wouldn't know.
13    Q. You wouldn't know -- are you saying you
14 didn't know whether or not there was a verification
15 company?
16    A. I'm saying I wouldn't know if they would hold
17 that information or if they would just verify the
18 information is true what is presented. I wouldn't know
19 if they hold information.
20    Q. So you know there was a company. You don't
21 know that it was Junio. You know they received the
22 information as part of the verification process, but
23 you don't know whether they retained it after that?
24    A. That's correct.
25    Q. It is the case, isn't it, that the two

| Page 58 |
|---|

1 people -- say the two companies that have access to
2 information collected by the ID verification company
3 would be NAC and then the company that gathered the
4 information; right?
5    A. I wouldn't know.
6    Q. You wouldn't know. In fact, Mr. Andrade
7 showed you how to log on and access the information as
8 COO of the company, access ID information, verification
9 information, that had been collected on all coin
10 holders; correct?
11    A. Well, I know that Marcus and NAC had the
12 information.
13    Q. And you logged on or watched him log on to
14 show you that; correct?
15    A. Yes, he logged on, yes.
16    Q. Okay. And you're just saying you don't know
17 whether Junio or the company, the independent ID
18 verification company, had that -- had access to that
19 same information?
20    A. Correct. I wouldn't know.
21    Q. Okay. And I know you didn't recall the name
22 Junio, but do you recall speaking with anyone at the
23 outside independent ID verification company?
24    A. No, I don't recall.
25    Q. And then I asked you before, and I think you

| Page 59 |
|---|

1 said you didn't recall participating in the process of
2 selecting a new company?
3    A. I was involved with Marcus in the
4 conversation that he allowed me to participate in, and
5 that's pretty much it.
6    Q. Okay. I had that wrong. He participated in
7 a conversation with a third party vendor of ID
8 verification, but you didn't run it or contact them; is
9 that what you're saying?
10    A. That's exactly what I'm saying.
11    Q. Okay. And you don't recall the name of those
12 companies?
13    A. Correct.
14    Q. Did you know that the contract between NAC
15 and Junio for third-party verification was entered into
16 probably mid-2015?
17    A. No, I didn't know.
18    Q. Okay. You're not saying that isn't true, you
19 just didn't know that?
20    A. That is correct.
21    Q. Okay. All right. Have you come across the
22 name Junio in any other context? I know it's a
23 publicly traded company. I think it's affiliated with
24 a former Facebook person, in fact, who owns the
25 company. It's a big company?

| Page 60 |
|---|

1    A. I don't -- it doesn't sound familiar to me at
2 all.
3    Q. Okay. Let me take a step back before we go
4 forward on something. How much money did you raise
5 through these people that you sold coins to in
6 Edmonton? How much money was raised?
7    A. I'm not sure how much money totally was
8 raised. I only know what sales we got.
9    Q. Sales you had was about a hundred thousand?
10    A. I thought they were a hundred thousand, but I
11 think these are a little less. So, yeah, somewhere
12 around there.
13    Q. Okay. Now, you had indicated that you
14 thought you could generate a million or two in sales at
15 that conference; correct?
16    A. Absolutely not.
17    Q. What was your projection?
18    A. I didn't have a projection. Marco Diadamo
19 was the one who said he could easily raise $2 million
20 because of all the past investors that were going to be
21 invited.
22    Q. And so you weren't disappointed or happy, one
23 way or another, because you didn't have an expectation
24 about how much would be raised at that conference?
25    A. I was slightly disappointed, but I knew that

Corey Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

| Page 61 | Page 63 |
|---|---|

**Page 61**

1  it was rather optimistic to have that high of an
2  expectation. I was very happy many people came up to
3  the conference. So I appreciated the support.
4     Q. So you never wrote down a projection or what
5  you estimated you could net from that conference, the
6  company?
7     A. There weren't any projections on that.
8     Q. Let me ask you, you'd mentioned Agnieszka
9  Cenzartowicz, Aga. She's in this same document I
10  believe on page 0104. And my understanding is she's a
11  lawyer and she was -- actually went to law school in
12  Chicago, I believe; is that right?
13     A. That's what I'm told.
14     Q. You knew her; right?
15     A. I met her several times.
16     Q. Okay. You didn't hire her?
17     A. I did not.
18     Q. You worked with her though?
19     A. She was already part of the team. And I
20  believe in one of the times that we were in Poland, we
21  as a group worked towards getting her away from working
22  in her business and being the legal lawyer for NAC. I
23  was involved with that.
24     Q. Okay. Did she sign a contract to do that?
25     A. I believe she did.

**Page 62**

1     Q. Okay. Did you ask her to sign that contract?
2     A. Marcus asked me.
3     Q. And you presented a contract to her and she
4  signed it?
5     A. Maybe we worked on the contract together and
6  Marcus approved it, and then she was ready to sign it.
7     Q. Okay. And you presented it to her was my
8  question. You presented it to her for signing after it
9  was worked on?
10     A. Yes, I was asked to present it.
11     Q. You don't consider her, Aga, to be a
12  dishonest person; right?
13     A. I have no reason to believe she is or isn't.
14     Q. Okay. You have no reason to believe -- you
15  have no opinion on it?
16     A. I have no opinion on it.
17     Q. You worked with her; right? She did work for
18  a company at which you were the COO; correct?
19     A. That is correct.
20     Q. You presented a contract to her, which you
21  may have worked out with Marcus, but you presented it
22  to her after a time she had been associated with the
23  company already; correct?
24     A. Agreed.
25     Q. You did not believe she was a dishonest

**Page 63**

1  person when you presented that contract; right?
2     A. At the time, I had no reason to believe she
3  was.
4     Q. Dishonest is the question?
5     A. Dishonest.
6     Q. Whether she was committing any kind of fraud
7  on you; right?
8     A. Right.
9     Q. You said, "at the time." Do you have a
10  different view today?
11     A. I haven't really thought much about it.
12     Q. Do you have any reason to think she's a
13  dishonest person? I'll ask you again now that you've
14  been thinking.
15     A. I don't really have a reason to think she's
16  dishonest, not at the moment.
17     Q. Okay. Are you going to do some more digging?
18  If not at the moment, what are you going to consider or
19  look at to determine whether or not you would change
20  your opinion about her honesty?
21        MR. KNECHT: Object to form.
22        THE WITNESS: You just asked a question that
23  I hadn't thought of.
24  BY MR. OLSEN:
25     Q. You don't think, based on your experience

**Page 64**

1  with Aga, that she's a dishonest person; correct?
2     A. I don't think she would be -- reason to
3  believe or otherwise.
4     Q. How about -- what's her husband's name again?
5     A. Igor.
6     Q. Igor. What was his -- what was his job,
7  association with the company?
8     A. I believe he was the person involved with
9  Aten Pay, which was a spin-off for Aten Coin, to be
10  able to do the -- perform the transactions.
11     Q. What happened with Aten Pay? Was it
12  developed?
13     A. I'm not sure where it's at or what all
14  happened to it.
15     Q. Do you have any discussion about Aten Pay
16  with anyone else at NAC during your tenure at COO?
17     A. We had some discussions about Aten Pay.
18     Q. And what were those discussions generally?
19     A. Well, the discussions were how to utilize
20  Aten Pay, how to get the coins to be utilized.
21     Q. And Igor was working on that process;
22  correct?
23     A. I assume so.
24     Q. Were you giving him any direction?
25     A. No.

APPR000475

Corey Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

**Page 65**

1    Q. He also has an American law degree, doesn't
2 he?
3    A. I don't know.
4    Q. That's what the -- that's what the team
5 management brochure that you paid for says. I just was
6 wondering if you'd know.
7        You don't have any reason to think that
8 either he or his wife are dishonest or frauds in any
9 way?
10   A. No reason.
11       MR. KNECHT: Objection to form.
12 BY MR. OLSEN:
13   Q. I could break it into two questions, but you
14 understood. You don't have any reason to believe
15 either of those two things; right, that they were
16 frauds or dishonest?
17   A. At the time, no.
18   Q. And you don't have any -- at this time, as
19 you sit here today, you don't have any reason to say
20 they're dishonest or frauds; is that correct?
21   A. I don't know. I don't know where you're
22 going with this. I don't understand.
23   Q. It doesn't matter where I'm going. I'm
24 asking you the question. You said before you didn't
25 have a reason to think they were dishonest. I'm asking

**Page 66**

1 you today do you have a reason to think they're
2 dishonest?
3    A. I don't think of anything dishonest or not.
4    Q. You can't think of anything -- okay.
5        Do you know who John Fahy is?
6    A. I'm aware John Fahy is a lawyer for NAC to
7 help navigate through the digital currency stuff. He
8 was an SEC lawyer before NAC.
9    Q. Right. But his specialty is SEC, Securities
10 & Exchange Commission, work; correct?
11   A. That was my understanding.
12   Q. And you spoke to Mr. Fahy?
13   A. I was on the phone with Mr. Fahy with
14 Marcus Andrade.
15   Q. How many times?
16   A. Once, maybe twice.
17   Q. And what was the nature of those calls? You
18 don't have to tell me the specifics of what was
19 discussed. What was the nature of those calls?
20   A. One of the calls was about the Florida state
21 disallowed the sales of digital currency, and I believe
22 Marcus wanted to get ahold of John Fahy in regard to
23 what their next steps were.
24   Q. After that -- after that did anyone on behalf
25 of NAC sell Aten coins in Florida or attempt to?

**Page 67**

1    A. At that time, I was told no one had sold
2 currency in Florida. And I had no idea if any other
3 coins were sold in Florida after that.
4    Q. It wasn't planned to sell coins in Florida
5 based on your participation and discussions at that
6 point with Marcus or with Fahy; correct?
7    A. No. It was concerning. Marco Diadamo was
8 from Florida.
9    Q. Okay. But there was no plan to disregard the
10 prohibition of the state of Florida at that point?
11   A. No, there was no plan to disregard it.
12   Q. Let me ask you -- we didn't really talk about
13 Mr. Mawhinney. I'm not sure how much we're going to
14 talk about him today. Do you know who Mr. Mawhinney
15 is? Do you know who I'm referring to?
16   A. James Mawhinney, Tandem Capital. I'm aware
17 of James.
18   Q. Did you ever record a conversation with
19 James?
20   A. I believe I recorded a conversation when we
21 were in California.
22   Q. A live conversation or a telephone
23 conversation?
24   A. A phone conversation.
25   Q. What was the subject matter of that

**Page 68**

1 conversation generally?
2    A. I think James wanted to discuss the refund
3 issue and try to continue recruiting us to be with
4 Tandem Capital in general. I think Marcus and I were
5 trying to get him to commit to refunding the money and
6 then we will discuss other options after that. In
7 general, that's what I remember.
8    Q. And why is it that you wanted him to refund
9 the money that had been paid to him and his company?
10   A. Because we refused his services. NAC refused
11 his services through direction from Marcus and Aga.
12 And I just felt that he wasn't asking the questions
13 right -- answering the questions right.
14   Q. Okay. And did he refund that money?
15   A. I don't know.
16   Q. Not during your tenure?
17   A. Correct.
18   Q. How much money was it again, roughly?
19   A. I vaguely remember 50 grand. I don't know.
20 Something like that.
21   Q. When you taped that conversation, how did you
22 tape it? Did you tape it on a tape-recorder? On your
23 phone? How did that record?
24   A. It was a phone recording.
25   Q. Okay. Do you still have that phone

Corey Jodoin                                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 69

1  recording?
2      A.  I don't.
3      Q.  When did you dispose of, lose -- when did
4  that disappear?
5      A.  It was on my previous two or three other
6  phones, and it just got destroyed.  I never even tried
7  to recover it.
8      Q.  When did you get rid of that phone?  Do you
9  remember what year?
10     A.  I'm not sure.
11     Q.  Roughly?
12     A.  I can't remember.  It was five years ago.
13     Q.  Bear with me one second.  Would you take a
14  look at Exhibit 5, which is a document beginning at
15  0504.  Do you have that printed out or available on
16  your computer?
17     A.  Just give me a moment.
18         MR. KNECHT:  What number was that, Counsel?
19         MR. OLSEN:  Well, the exhibit starts -- it's
20  Exhibit 5.  It starts at 0504.
21         MR. KNECHT:  Okay.
22         MR. OLSEN:  I'm going to delve a little
23  deeper into that document.
24         THE WITNESS:  I have it.
25

Page 70

1  BY MR. OLSEN:
2      Q.  So you do have it; okay.  If you go to, a few
3  pages into that, to 0517.
4      A.  Okay.  I got it.
5      Q.  Okay.  So this is an email from you dated
6  2/16/2016 to surecan.rick@shaw.ca.  Do you see that?
7      A.  Yes, I see that.
8      Q.  And who is surecan.rick?
9      A.  Rick is Rick Stevens, the one I mentioned
10  earlier.
11     Q.  Okay.  Now, you said with regard to Rick
12  Stevens that you had presented him with a purchase
13  agreement.  And I think this is the person that you
14  said you sent it to him and then he ended up closing
15  the deal with Diadamo, I think is what you said.  But
16  I'm reading this email and it says, "Hi, Rick.  I have
17  faxed the purchase agreement to the office."
18         So he got the purchase agreement to you; is
19  that correct?
20     A.  Sorry.  I was just reading that.  Can you
21  repeat the question.
22     Q.  You say, "Hi, Rick.  I have faxed the
23  purchase agreement to the office.  The office will be
24  contacting you in the next day or so."
25         So from this, it appears that he got an

Page 71

1  executed purchase agreement to you, and then you faxed
2  it to the office?
3      A.  Yeah, I vaguely remember this, but I don't
4  think he signed it.  And so -- or there was an issue
5  with payment or something.  But, anyway, I sent this to
6  Marco Diadamo to close this one.
7      Q.  Okay.  So it looks like there was an
8  agreement.  You seem to think it was completed but
9  ended up it wasn't completed and you tasked Marc with
10  following up?
11     A.  He was a potential buyer and I didn't think I
12  could close it.  So I asked Marco to get involved.
13     Q.  That doesn't make sense.  If you said, I
14  faxed the purchase agreement to the office, you would
15  have only faxed the purchase agreement to the office if
16  it was executed; right?
17     A.  No.
18     Q.  I'm trying to use logic.  And logic would
19  dictate you wouldn't send a blank form to the office
20  for them to follow-up with Rick; right?
21     A.  I already gave you my answer.
22     Q.  You appreciate that, but that makes no sense
23  based upon what you wrote on the 16th of February,
24  2016.
25     A.  I can understand why you're questioning it,

Page 72

1  but I think if you look into the details, you'll see
2  that it wasn't executed.
3      Q.  It's not attached here, but could you
4  describe what the attachment entitled "Letter Next
5  Steps," what that document is?
6      A.  Probably how to call the office and get ahold
7  of a wallet.
8      Q.  Right.  That's a form document, isn't it?
9      A.  Yes, it appears to be, yes.
10     Q.  Right.  It's not a letter you wrote.  It
11  looks like it's a form that NAC generated, would send
12  to people who had made purchases; correct?
13     A.  Yes, it does.
14     Q.  Okay.  So it would be surprising, again,
15  wouldn't it, if you sent to him, to Rick, that document
16  and you did not have a signed purchase agreement,
17  wouldn't it?
18     A.  Again, I can only tell you what I remember.
19  I don't remember it being executed and I needed help so
20  I sent it to the office to get help.
21     Q.  The next letter, again, I don't have a copy
22  here, but that letter did include, did it not,
23  something along the lines of what we looked at in the
24  "How to go download your Aten Coin wallet," paragraph
25  6, which indicated there was a verification process;

Corey Jodoin

NAC Foundation, LLC v. Corey Jodoin, et al.

Page 73

1  right?  That was included in that next steps letter?
2      A.  Perhaps.
3      Q.  You don't recall?
4      A.  I would assume so.
5      Q.  Bear with me.  It's always a bit easier
6  looking through the paper copy than it is the digital
7  one.
8          In this same exhibit, page 0511, it's an
9  email dated February 23rd, 2016 from you to Agnieszka
10  Bilinska and CC'd to Marcus.  Do you see that?
11      A.  I do see it.
12      Q.  Okay.  So this looks like -- it appears to
13  be -- the attachment says "How to purchase Aten coins."
14  It appears to be referring to the page out of the team
15  management brochure that you handed out to folks in
16  Edmonton.  Actually, it says, it's included how to
17  purchase Aten coins.  We looked at that before.
18  There's instructions on how one purchases -- it appears
19  to be referring to that same document.
20      A.  Okay.
21      Q.  And that was -- when did you say the
22  conference was in Alberta?
23      A.  I think it was in January.
24      Q.  Okay.  So it was before this email was sent?
25      A.  Before this.

Page 74

1      Q.  Were sending changes to.  Because, actually,
2  the email says, "Hi, team.  Marcus, please review and
3  make comments.  Also add details in the red items
4  below."
5          Were you working on modifying the "How to
6  purchase Aten coins" informational at that point?
7      A.  I believe this was just an informational to
8  give back to Susan Waters, which was at Kathy Ireland.
9      Q.  Okay.  And, for the record, Kathy Ireland,
10  that was a -- you participated in a presentation, video
11  presentation, hosted by, I guess we'll say, Kathy
12  Ireland that we've all heard about; correct?
13      A.  I did participate.
14      Q.  And you were the spokesperson for NAC in that
15  video; right?
16      A.  I was one of three people speaking for NAC.
17      Q.  Who else spoke?
18      A.  Marco Diadamo and Marcus Andrade.
19      Q.  And, I'm sorry, you said -- that took
20  place -- that takes place in March or February?
21      A.  What, the Kathy Ireland?
22      Q.  Kathy Ireland.
23      A.  Oh, that was back in December.
24      Q.  Okay.  Well, then this February 23rd email
25  can't be referring to the Kathy Ireland presentation;

Page 75

1  right?
2      A.  Yes, it is.  It took a while for Kathy
3  Ireland's production team to get us a copy of the
4  video.  And so before the Alberta conference and after
5  the Alberta conference, we were still working with
6  their production team to edit and finalize the final
7  copy.
8      Q.  Okay.  So this -- this document was, you're
9  saying, was going to be part of that final product and
10  Kathy Ireland video?
11      A.  That's what I assume.
12      Q.  Do you recall -- do you recall the video --
13  and there is a "How to purchase Aten coins" in that
14  video; correct?
15      A.  I believe so.  I don't remember offhand.  I
16  believe that was all part of it, trying to complete the
17  video with all the information we had.
18      Q.  Who is Mike Barter, B-A-R-T-E-R?
19      A.  Mike Barter is a gentleman that lives in this
20  area.
21      Q.  Okay.  Was he a coin buyer?
22      A.  I believe he was.
23      Q.  How did he get a purchase agreement?
24      A.  I believe I would have sent him one.
25      Q.  Okay.  Did he complete the transaction?  Did

Page 76

1  he sign it?
2      A.  I believe he did.
3      Q.  Did you speak to him about the -- what did
4  you say to Mike Barter to get him to sign a purchase
5  agreement?
6      A.  I wasn't in direct contact with Michael
7  Barter.
8      Q.  He's a guy in your area and he was a coin
9  purchaser.  You had no direct contact with him?
10      A.  He attended the conference.  And I don't
11  remember speaking with him at the conference.  And he
12  was probably talking to Brandi or the staff to just
13  purchase coins.  I never spoke to him directly.
14      Q.  So he might have spoken to Brandi or someone
15  else, but you didn't speak with him?
16      A.  That's correct.
17      Q.  We'll come back to Mike Barter, but in the
18  same exhibit, Exhibit 5, and this is at page 0520,
19  could you look for that for me, it says, "How to
20  purchase Aten coins online."
21      A.  I see it.
22      Q.  Okay.  Is this the -- this is several pages.
23  It actually goes from page 0520 all the way through
24  0525; correct?  Is that correct?
25      A.  Sorry.  I'm still looking.  Can you repeat

Corey Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

**Page 77**

the question again, please.

Q. This "How to purchase Aten coins online," I know we looked at the bullet point document before, but this is more of a glossy presentation on how you do that. You were involved in putting this together; right?

A. I was involved with putting this together, yeah.

Q. And was this what was made part of the Kathy Ireland video or was it simpler?

A. I actually don't recall. I know she got one copy. Whether it's this one or the other one, I don't remember. But it would have been just those two forms. The other pages were not part of the coin sales for the how to download a wallet.

Q. Okay. So in this document, the second page, it says, Step 1, and it has several boxes, I through 5, actually, through 7, 8. How was that disseminated to people, this document? Was it on the website or was it presented to people and sent to them?

A. I know that it was on the website for a while. I don't know if it had changed. And I can't remember at this time whether we distributed this one or not.

Q. It might have been?

**Page 78**

A. It might have, yeah.

Q. If you look on this page, page 0521, step 4, step 4 is the -- why don't you read step 4. If you can read step 4 on this page.

A. It says, "Select the identity verification section. Verify your identity by following the procedures stated in that section. Be sure to have your passport or government issued ID ready and make sure that you have a webcam installed on your computer."

Q. And it says -- it goes on to say, "(You will not be able to go to any other section until the identity verification section is completed.)"

Right?

A. Yes, it says that.

Q. Okay. So it was made clear, and you haven't really said anything different, I guess, but that in order to get your wallet, you had to go through this section in which identity was verified; right?

A. I agree with you.

Q. And, in fact, if you didn't have a camera to take a picture of yourself on your computer, you couldn't go any further?

A. That's correct.

Q. And on page 0524 of this same document, can

**Page 79**

you tell me what you see on that page?

A. Yes. This is a document that was sent after the meeting. And it just said "Purchasing Steps 1, 2, 3 and 4."

Q. When you say "the meeting," you mean the meeting in Edmonton?

A. The Alberta conference.

Q. And you think this is probably the document, the next steps document, that was sent to Rick Stevens or what do you think?

A. It could be. I don't know. This was more of a general email to all attendants, all conference attendants.

Q. Okay. And when it talks about purchasing steps in the middle of the letter, can you read what item Purchasing Step 3 says?

A. Item no. 3) "Proceed with Aten Wallet installation and verification."

Q. And as we saw from the document a few minutes ago, verification was sort of a roadblock. If you couldn't get verification, you couldn't move on to the next steps; correct?

A. Supposed to be that way.

Q. You don't have any knowledge that it wasn't that way, do you?

**Page 80**

A. I never downloaded a wallet after that so I have no knowledge of it being any different.

Q. You have no knowledge of it being any different than your experience is what you're saying; correct?

A. Can you repeat that.

Q. What's different about your experience from this process, which says you have to go through ID verification?

MR. OLSEN: Yeah. Looks like you froze. Maybe read that one back.

(Record read as requested.)

THE WITNESS: No, that's incorrect.

BY MR. OLSEN:

Q. What's different about your experience from this process, which says you have to go through ID verification?

A. The difference was, by February, enough development on the wallet had occurred that timing for procedures and notes was supposed to be far easier and quicker.

Q. Okay. You're not saying there wasn't a verification process. You're saying it was slower and more difficult until the changes were implemented in February?

A. Yes, other than the February. So the changes could have been implemented before that. I would assume that come January we were starting to implement

Corey Jodoin                         NAC Foundation, LLC v. Corey Jodoin, et al.

Page 81

1   them, but, anyway, yes.
2     Q. Okay. At some point, comparing your
3 experience to the subsequent experience, there was a
4 change in the speed and ease of verification?
5     A. (Inaudible response.)
6       MR. OLSEN: Could the court reporter hear
7 that response?
8       THE STENOGRAPHER: No.
9       MR. OLSEN: We couldn't hear you. You
10 started to respond to my last question. I'm going to
11 have the court reporter read the last question back and
12 then let you try it again.
13      (Record read as requested.)
14 BY MR. OLSEN:
15     Q. Is that correct?
16     A. That was my understanding. I never actually
17 downloaded a wallet to confirm or deny that.
18     Q. Oh, and one more thing about this letter we
19 were looking at, page 0524, the next steps letter,
20 whatever you want to call it. Whose signature appears
21 at the bottom?
22     A. It would have been my signature.
23     Q. Okay. As chief operations officer?
24     A. Yes, that's correct.
25     Q. I'm trying to find another -- let me ask you

Page 82

1 this while I'm looking for another letter. This is
2 still on the idea of the ID verification question. NAC
3 would only have, well, and its third-party identifier,
4 authentication people, would only have your biometric
5 information if you supplied it for the ID
6 identification or verification process for the coin;
7 correct?
8     A. Excuse me? I apologize. You went digital
9 again.
10     Q. NAC and their third-party verification
11 company would only have your biometric information if
12 you had supplied it as part of the ID verification
13 process for the coin; correct?
14     A. That's my understanding.
15     Q. Next time we have a break, we'll have one
16 more break probably, I need to come back and find
17 another document. Let me ask you this about the sales
18 that you made when you were with NAC. Did you feel
19 that you had defrauded anybody?
20     A. I did not.
21     Q. Did you feel that you had been dishonest with
22 anyone?
23     A. I did not.
24     Q. Do you feel that way today?
25     A. I feel a little bit.

Page 83

1     Q. Describe what it is -- why you feel that way
2 about your purchase agreements looking back.
3     A. I think the biggest thing that I would have
4 said or been more clear on was the coin was a great
5 idea. The coin is a great foundation. I think right
6 now the fact that it wasn't going live was paramount to
7 any sale that should have happened. And instead of
8 agreements, it should have been just like any coin on
9 the server, live on an exchange.
10     Q. Well, did it go live at some point?
11     A. I believe it did go live after I was gone.
12     Q. You have the coins in your wallet so you're
13 aware it went live at some point?
14     A. No. You can get coins before it is exchanged
15 live on an exchange.
16     Q. Right. Do the coins in your wallet, once
17 they go live, can you tell whether they've gone live
18 from your wallet?
19     A. I don't know.
20     Q. You haven't looked?
21     A. I haven't looked.
22     Q. Wasn't the coin at the time you were with the
23 company actually trading, I think, on the CEX Exchange,
24 CEX, I think?
25     A. No, it was not.

Page 84

1     Q. It was not trading on any exchange?
2     A. That's correct.
3     Q. You're certain of that?
4     A. It was supposed to be on the CEX Exchange.
5 I wasn't involved in that in any way. And I think it
6 was a mistake.
7     Q. You think what was a mistake?
8     A. Chose the wrong exchange, in my view.
9     Q. How? Well, okay.
10      Were you part of the choice of exchanges?
11     A. Nope.
12     Q. What would have been the right exchange?
13     A. Probably one that was renowned and very
14 popular, one that most currency exchanges are trading
15 on.
16     Q. Give me two examples.
17     A. Hang on a second here. Oh, boy. Well,
18 BitPath (phonetic) is on one, and they're very popular.
19 Coinbase is another one. Kraken is probably another
20 one you can get on, involved. Those are three very
21 credible ones.
22     Q. There are many, many exchanges for
23 cryptocurrency currently; correct?
24     A. Yes, very many.
25     Q. And not all of those exchanges will accept a

Corey Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 85

1  new currency at just any given time; right?
2     A.  I would agree with that.
3     Q.  You paid a visit to the Las Vegas office of
4  NAC sometime in early 2016; correct?
5     A.  That's correct.
6     Q.  When was that?
7     A.  I think it was before the Alberta conference.
8     Q.  Okay.  And did you have some issues or
9  concerns after visiting the office?
10    A.  Yes, we did.
11    Q.  And what were those issues or concerns at the
12 time?
13    A.  One of the big concerns were that the files
14 for personal and private information were just open on
15 a desk, not secured in a cabinet.  And I think the
16 other concern that I had was that their whole office
17 group had access to the NAC files.
18    Q.  Okay.  Let's take the first one.  So you're
19 saying you saw a file open with customer information?
20    A.  That is correct.
21    Q.  Okay.  And when you say -- you're saying you
22 thought that file should have been in a cabinet?
23    A.  What I'm saying was there were several files
24 that the office was trying to complete the information
25 for the CALE and the purchase agreement information.

Page 86

1  And through the cooperation of the customer, they were
2  still in limbo.  So I would expect that you would take
3  a file out of a drawer, you would deal with this
4  customer information, and you would put it back in the
5  drawer when you're done.
6     Q.  Were these files still -- are you sure all
7  these files were done with, file or files?
8     A.  I was told that these files were out because
9  they were still dealing with them.
10    Q.  Do you have any reason to know that's not
11 true?
12    A.  I'm not sure I understand the question.
13    Q.  Well, was that true or false, that they were
14 still dealing with them and that's why they were out?
15    A.  It's true.  They were still dealing with
16 them, in-completed purchase agreements.
17    Q.  Did you, as the chief operating officer,
18 after that day instruct people or suggest they be
19 instructed to handle security issues differently or
20 files differently?
21    A.  Yes.
22    Q.  And was your suggestion something other than
23 closing them when you're finished and put them in the
24 cabinet?  What were your suggestions?
25    A.  My suggestions were to Marcus to have the

Page 87

1  office be far more professional, have a closed, secured
2  server so that the other office members didn't have
3  access to it.  And that we need to deal with these --
4  these are customers that have been customers for months
5  and months and they were still unresolved.
6     Q.  Okay.  So that would be things -- you had
7  some policies and procedures that were looking at
8  suggesting be changed; is that fair to say?
9     A.  We had made an observation and a request to
10 Marcus that we need to deal with this.
11    Q.  Was there a third-party company that was
12 responsible for doing the files in compliance?
13    A.  To my knowledge, I am unaware of another
14 company.  The office was tasked with the responsibility
15 to complete those files.
16    Q.  Who was working in the office?
17    A.  I think Patti.
18    Q.  What's Patti's last name?
19    A.  It eludes me at this time.  Patti and Barb.
20    Q.  Do you remember when we looked at the quality and
21 assurance form as part of the purchase agreement, and
22 the same people were doing that quality and assurance
23 form that were looking at these files you were talking
24 about; right?  They were the people at the office
25 looking at these?

Page 88

1     A.  That is correct.
2     Q.  And I think Patti, in the example we looked
3  at of Albert Jodoin, Patti was the one who signed under
4  your signature on the CALE form; correct?
5     A.  Yes, sir.
6     Q.  Who did Patti work for?
7     A.  I'm not entirely sure.  I know that she was
8  hired by Marcus to work for NAC for a certain amount of
9  hours of the week.
10    Q.  There was a Barbara that worked there as
11 well; correct?
12    A.  That is correct.
13    Q.  And who did Barbara work for?
14    A.  Under the same premise, basically, they
15 worked for the office manager in Vegas, and Marcus
16 hired the office to do so many bookkeeping hours a
17 week.
18    Q.  Okay.  But they weren't NAC employees;
19 correct?  They were a third -- they were a contractor
20 brought in -- it says here that NAC representative was
21 Patti.  Didn't say she worked for the company.  So they
22 were a contractor that worked to handle these matters;
23 correct?
24    A.  They were hired for NAC to do bookkeeping.
25    Q.  But they were not NAC employees?

Corey Jodoin                                                    NAC Foundation, LLC v. Corey Jodoin, et al.

**Page 89**

1    A.  I don't know how you wouldn't think they
2  were.  They did work for NAC.
3    Q.  You own a business in construction.  You know
4  that not everybody that works on a project is an
5  employee.  They could be working for a subcontractor --
6  I mean, they bring in people.
7        Did you even bother to ask who Barbara and
8  Patti worked for?
9    A.  Fair enough.  I understand your point.  They
10  worked for an office staff that -- or company that
11  Marcus hired.  I don't know the name of the company.
12    Q.  Do you know somebody named Clifton, Dida
13  Clifton, or Dida Clifton?
14    A.  Sounds familiar.  Not sure.
15    Q.  Do you know a company called Office Squad?
16    A.  Yeah.
17    Q.  Pardon me?
18    A.  Is Office Squad the company that Dida works
19  for that Marcus hired?
20    Q.  I just asked if you know the name.
21    A.  Sounds familiar.
22    Q.  After the -- so after the visit to the office
23  and I guess you made some suggestions about how things
24  should be handled differently, was there also, after
25  that, some effort by the, we'll call them the Warsaw

**Page 90**

1  team, including Agnieszka Bilinska, to get office space
2  in Warsaw?
3    A.  We were trying to get -- NAC was trying to
4  get office space in Poland back in December.
5    Q.  And did that continue for a period, trying to
6  get office space or trying to get somebody to get
7  office space?
8    A.  I believe it did try to continue for a bit.
9    Q.  Was that still in discussion, that issue, by
10  the time you left the company?
11    A.  I don't think so.
12    Q.  It wasn't part of the discussion after you
13  went to the Las Vegas office; correct?
14    A.  No, it wasn't.
15    Q.  So after you went to the Las Vegas office,
16  there was a cessation in the idea of getting office
17  space in Warsaw?
18    A.  I'm not sure I understand the question.
19    Q.  Okay.  Is there any connection between your
20  visit to the office and no longer looking for Warsaw
21  space?
22    A.  None.  No connection.
23    Q.  Like a search for Warsaw space went on at
24  least for a brief time even after you were at the
25  Las Vegas office?

**Page 91**

1    A.  I don't recall.
2    Q.  Who is Andrea Lefebvre?
3    A.  Andrea Lefebvre is a person who lives in the
4  area.  She's a friend of ours.
5    Q.  Did she file a complaint with any government
6  agency against NAC or against Mr. Andrade?
7    A.  I have no idea.
8    Q.  She never spoke to you about that?
9    A.  No, she has not spoke to me about anything.
10    Q.  About something, but not about NAC?
11    A.  I meant about anything about a government
12  agency or complaints.
13    Q.  Or being called, contacted by, any government
14  agency?
15    A.  That's correct, she never told me anything
16  about that.
17    Q.  Are you aware of any of the people with whom
18  you and Brandi entered into purchase agreements, in
19  other words, you obtained the purchase agreements,
20  anyone who communicated with the
21  Alberta Securities Commission, any of those people?
22    A.  I have no idea if anyone else communicated.
23  There's only one person, Tyler Hoff, who I texted the
24  ASC's number.  I have no idea if he contacted them.
25    Q.  How did Andrea Lefebvre get Marcus Andrade's

**Page 92**

1  personal phone number?
2    A.  I'm not sure.
3    Q.  Did you give it to her?
4    A.  It's possible.
5    Q.  Giving over that phone number would have --
6  well, did you give it to her with Mr. Andrade's
7  permission?
8    A.  I did not specifically ask Marcus if Andrea
9  could get ahold of him.  But it was well understood
10  that I called Marcus on his cell phone way before, way
11  before, I even became involved with NAC on his personal
12  cell phone.
13    Q.  Except you had a nondisclosure agreement by
14  the time you were the COO and giving numbers to
15  Ms. Lefebvre for Mr. Andrade; correct?
16    A.  Sensitive information is not a phone number.
17    Q.  That's your legal opinion?
18        MR. KNECHT:  Objection.  Form.
19  BY MR. OLSEN:
20    Q.  You don't know whether it is or it isn't;
21  right?
22    A.  I don't know whether it is or it isn't.
23    Q.  We talked for a minute about the
24  Kathy Ireland video.  I don't know.  How do you
25  describe that?  Was it an infomercial?  What was it?

Corey Jodoin                                                    NAC Foundation, LLC v. Corey Jodoin, et al.

Page 93

1    A. I guess it's an infomercial.
2    Q. Did you -- you signed the contract for that
3  project with Kathy Ireland's company; correct?
4    A. I did.
5    Q. And what was your understanding at that time
6  of the goal of that project?
7    A. Well, the goal of the video was to have
8  people know more about the NAC and the Aten Coin and to
9  develop more of an awareness.
10   Q. When, roughly, did you sign that contract?
11   A. I signed the contract in the room with
12 Marcus, Brandi, and Marco Diadamo all in the room.
13   Q. When was that?
14   A. On the set, while we were on Kathy Ireland's
15 set.
16   Q. And that was in December, you said?
17   A. Yeah, I think so.
18   Q. December 2015?
19   A. I believe so.
20   Q. You had, by that time -- we know from other
21 evidence and testimony that by that time, you had
22 already learned that the initial projections -- we
23 talked about Mawhinney and his original projections of
24 $140 million and $100 million. You knew by that time
25 that the numbers that he had arrived at were

Page 94

1  projections, and certainly the value was no greater
2  than $40 million and that was just based on
3  projections; correct?
4    A. Yes.
5    Q. I think you said or maybe your wife said
6  there was an effort to maybe get someone else to
7  replace Mawhinney with a new company?
8    A. Well, there was a conversation to perhaps
9  hire someone other than Mawhinney.
10   Q. That did not occur; correct?
11   A. I was not involved with hiring or getting
12 another company.
13   Q. Okay. Okay. So you paid the $225,000 that's
14 been at issue in these cases, that you paid, you and
15 your wife paid, we'll get to that, paid by you as a
16 couple, I guess. That payment occurred early November;
17 correct?
18   A. Yes, that's correct.
19   Q. Okay. What was the date again?
20   A. November 6th.
21   Q. Excuse me one second. And you signed it,
22 just on the Kathy Ireland contract issue, you signed
23 the contract on the Kathy Ireland deal after that date;
24 correct?
25   A. You mean I signed the Kathy Ireland

Page 95

1  contract --
2    Q. Just for the record, for timeline, you signed
3  the Kathy Ireland contract after you had put in the
4  money or before?
5    A. Signed the Kathy Ireland contract after we
6  put in the money.
7    Q. Okay. Do you have a copy of that contract?
8    A. Which contract is that?
9    Q. The Kathy Ireland contract.
10   A. I do not.
11       MR. OLSEN: Let's take about a five-minute
12 break.
13       (Whereupon, a recess was taken.)
14 BY MR. OLSEN:
15   Q. Mr. Jodoin, we talked about John Fahy,
16 F-A-H-Y, before; correct?
17   A. We have.
18   Q. And he's an SEC attorney who was providing
19 services to NAC; correct?
20   A. Yeah, that was my understanding.
21   Q. Okay. And you indicated you didn't have much
22 contact with him, but would you be surprised if
23 Mr. Fahy said that he has a record of some 40 emails
24 exchanged with you?
25   A. That would be a surprise.

Page 96

1    Q. Is it not possible or would you say he's not
2  telling the truth or you just are surprised?
3    A. Well, first of all, I didn't have the
4  conversation with him. And I think the only details
5  you're getting at would have been Aga dealing with him
6  on legal issues. But I believe that I might have been
7  CC'd on most of those or some of those. Didn't deal
8  with John Fahy.
9    Q. Okay. So I'm going to rephrase my prior
10 question. I don't remember how I asked it, but as far
11 as -- I don't know if it's limited to conversations,
12 but as far as communications with Mr. Fahy, how many
13 communications did you have with him?
14   A. Well, I'm still not clear. So that I was
15 directly contacted?
16   Q. I'll start with directly contacted or
17 contacted him. Let's start there.
18   A. Well, I don't believe I really contacted John
19 Fahy. If I did, it was with Marcus on the line. If I
20 directed an email, it was probably to introduce Aga and
21 whatever else, but I was just privy to what they were
22 communicating back and forth mostly.
23   Q. Okay. How many communications, let's start
24 with emails, email communications, would you say that
25 you were copied on in an exchange with Mr. Fahy?

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 97

1    A. I couldn't count. I don't know. A few.
2    Q. How about telephone conversations? You
3    mentioned one telephone conversation in which you were
4    a participant. And I want to be sure to define
5    telephone conversations broadly. A call placed by you,
6    a call received by you involving Mr. Fahy, whether you
7    were the named person or not, how many calls?
8    A. I don't know.
9    Q. Less than 10?
10   A. Yes.
11   Q. So you would be surprised if he said there
12   were 30?
13   A. Yep.
14   Q. Is he being truthful or are you just
15   surprised it's that many and you've forgotten?
16   A. Could be both. I don't know -- I don't think
17   John Fahy was actually directly out to me personally.
18   Q. Well, let's put this in context. You were
19   the COO for most of this time you would have been
20   dealing with Mr. Fahy; correct?
21   A. Well, wouldn't the chief legal officer be
22   dealing with legal matters?
23   Q. I don't know, but you were an officer of the
24   company; right?
25   A. Yeah. So my knowledge of what's going on

Page 98

1    should be --
2    MR. KNECHT: Objection.
3    MR. OLSEN: Sorry. Are finished, Adam?
4    MR. KNECHT: Yeah. My objection is just
5    objection to form. Calls for a legal conclusion.
6    BY MR. OLSEN:
7    Q. Practical conclusion. Just in management of
8    a company, you wouldn't be surprised to be involved in
9    communications with the company's SEC lawyers when the
10   company consisted of less than a dozen management;
11   right?
12   A. Like I said, the people dealing with John
13   Fahy would have been the legal officer and the CEO. I
14   believe I was just privy to knowing what they were
15   talking about.
16   Q. In your prior company, the trenching company,
17   did you deal with lawyers?
18   A. As the COO, never. Never.
19   Q. Never? The company had legal troubles;
20   right? Went into receivership?
21   A. As an owner of the company, I dealt with
22   lawyers.
23   Q. Did they send two emails, lawyers to the
24   owners, and then one to the officers separately?
25   Probably not; right?

Page 99

1    MR. KNECHT: Objection.
2    BY MR. OLSEN:
3    Q. I'm going to direct you to Exhibit 1, the end
4    of Exhibit 1, starting with page 0085.
5    A. Just give me a second.
6    Q. Sure.
7    A. What page was that again, sir?
8    Q. 0085. It's toward the end of Exhibit 1.
9    A. I had that printed off.
10   Q. You probably did. Corey Jodoin's First
11   Supplemental Responses to Plaintiff's First Set of
12   Interrogatories. You've seen this document before;
13   correct?
14   A. Yes, I have.
15   Q. Your wife and I, in her deposition, talked at
16   some length about her interrogatories. I'm not going
17   to go through the whole process. The responses are
18   quite similar, if not in some points, identical. I
19   think, if you look at the second page of these
20   interrogatories, the answer to page -- sorry,
21   Interrogatory No. 1, I think we decided in speaking to
22   your wife that the statement, "The FBI interviewed me
23   and Brandi in August -- I think on August 27th," that
24   year was 2018; is that correct? Or was it 2019?
25   A. I think 2018 sounds right.

Page 100

1    Q. And that interview, that took place where?
2    A. In Las Vegas.
3    Q. Have you communicated with the FBI since that
4    interview by any means of communication?
5    A. I have not.
6    Q. Have you instructed your -- well, has your
7    lawyer, to your knowledge, communicated with the FBI
8    since the interview by any means?
9    A. I don't believe so, and not by my
10   instruction.
11   Q. Did you provide your interrogatory answers,
12   either this supplemental set or the original set, to
13   the FBI?
14   A. I don't believe so.
15   Q. Did anyone else do so?
16   A. I'm unaware if they have.
17   Q. Did you provide any other of the discovery
18   responses that you provided in this case, discovery
19   being requests for production, requests for admissions,
20   interrogatories, did you provide any of those other
21   documents to the FBI?
22   A. I don't believe so.
23   Q. And, to your knowledge, did anyone else do
24   so?
25   A. That is correct.

Andrade App 000484

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

Page 101

1  Q. Did you provide a copy of your counterclaim
2  in this action or the counterclaim in this action to
3  the FBI at any time?
4  A. No, I had not.
5  Q. In your meeting with the FBI, did you tell
6  the FBI that you felt you'd been defrauded by NAC or
7  Mr. Andrade?
8  A. I don't believe so.
9  Q. Did you tell them there was -- there were any
10 misrepresentations that you relied upon in dealing with
11 NAC, either putting your money in or becoming an
12 officer?
13 A. Yes.
14 Q. Did you make a statement that the
15 misrepresentations included the valuations that
16 Mr. Mawhinney had generated?
17 A. Well, they asked most of the questions.
18 Q. I'm not really interested in what they asked
19 you now as what you said to them. What were your
20 answers? Did you have an answer like that?
21 A. I did talk to them about a phone call so --
22 let me rephrase this. I did talk to them about the
23 valuation or the -- we felt was different than what
24 was -- I guess we gave them a general story what was
25 going on, which valuation was an issue.

Page 102

1  Q. What did you tell them about the valuation?
2  A. I don't recall every detail, but --
3  Q. Okay. Then let me break it down for you.
4  Did you tell them that the valuation that Mawhinney had
5  generated, valuations, were a misrepresentation made to
6  you?
7  A. No. I think those were Marcus' valuations.
8  Q. Well, okay. So the Mawhinney valuations, you
9  know what we're talking about, $100 million,
10 $140 million, $40 million, those valuations -- those
11 projections -- let me finish my question -- those
12 projections, you told the FBI that you relied on those
13 numbers to make an investment and that it was a
14 misrepresentation of the value; is that correct?
15 A. I think it's irrelevant. They didn't really
16 care --
17 Q. I don't really care -- I'm just asking you.
18 I don't know anything about what's relevant to the FBI.
19 I'm asking you your statements to the FBI. That's
20 what's important to me.
21 A. What I'm saying is I don't recall because it
22 didn't seem like it was a concern or an issue.
23 Q. If the FBI were to tell us that you made
24 statements like that, that you felt there was a
25 misrepresentation by Marcus based on those numbers that

Page 103

1  Mawhinney had generated and we talked about many times,
2  if I asked the FBI, they would tell me you've made
3  statements like that, wouldn't they?
4  A. Well, they probably would because they have
5  our file.
6  Q. What file do they have?
7  A. They have information. They took notes and
8  they took information from our counsel's office.
9  Q. And they could not reach a conclusion or they
10 could not even know the suggestion that you believe
11 that a statement of a dollar amount was a
12 misrepresentation just from looking at that picture of
13 the dollar amount? You had to say you felt that was a
14 misrepresentation upon which you relied; correct?
15 A. I'm sure I did.
16 Q. You also told the FBI, did you not, that
17 there was no ID verification done by NAC?
18 A. I don't recall that at all.
19 Q. So you don't think you said that?
20 A. I didn't think so.
21 Q. Did your wife say it?
22 A. I don't think so.
23 Q. The only interview that was with the FBI, you
24 were both in the same room together with the FBI;
25 right?

Page 104

1  A. Yes, except I was out of the room for a
2  couple of times answering phone calls.
3  Q. If the FBI said there was a representation by
4  you that the -- there was no ID verification, the FBI
5  wouldn't, to your knowledge, lie about that, would
6  they?
7  A. I'm just saying I don't recall.
8  Q. I'm sorry. I thought you said you didn't
9  make the statement. You don't know whether you
10 represented to the FBI that there was no ID
11 verification?
12 A. I don't recall that actual question being
13 asked by the FBI.
14 Q. Whether it was asked or not, did you make
15 that statement?
16 A. I don't believe I did.
17 Q. If you made that statement, you agree that it
18 would be inaccurate because we talked about the ID
19 verification today, and anything beyond your knowledge
20 would be pure speculation on your part; correct?
21 A. The only thing I can say about the ID
22 verification is that, to my knowledge, it was still a
23 work in process.
24 Q. And that's what you told the FBI, even though
25 you know that there was ID verification? You may not

702-476-4500                **Andrade App. 000485** /ICES, LLC                Page: 26 (101 - 104)

Corey Jodoin                                                                NAC Foundation, LLC v. Corey Jodoin, et al.

Page 105

1  know who it was, but you know there was ID
2  verification. In fact, you sent out statements,
3  representations on your own, to people buying these
4  coins that there was ID verification; isn't that
5  correct?
6          MR. KNECHT: Objection. Misstates previous
7  testimony. But go ahead.
8  BY MR. OLSEN:
9      Q. You can answer that. You remember your
10 testimony.
11     A. Well, you're fast-forwarding a lot of time
12 now. So your questioning isn't relevant to the
13 timeframe.
14     Q. The timeframe at which time you spoke with
15 the FBI.
16     A. You're saying right now that I, back in
17 February, when I wrote all these informations, we were
18 actively pursuing ID verification.
19     Q. Right. And you've not -- you testified -- in
20 fact, you've never testified that there was not ID
21 verification in this deposition today. You've
22 testified to the contrary. You testified that there
23 may have been other people sought as new contractors,
24 but not that it didn't exist. That's what you
25 testified to today.

Page 106

1      A. Yeah, I testified that the ID verification
2  did exist, but I can only account to what I know. And
3  the last time I knew that the verification was in
4  process, it was still a work in process.
5      Q. Well, you're contradicting your own
6  testimony. You said it existed. You're saying it was
7  a work in progress. I take that to mean that there was
8  a forward-looking attempt to do something new and
9  different; fair?
10     A. Wrong. You showed me three or four different
11 forms of ID verification, which goes to attest to my
12 actual testimony today that it was a work in process.
13 It was growing and it was evolving as we were getting
14 further down the road.
15     Q. So you made statements to purchasers that
16 there was ID verification and a process for ID
17 verification when you believed at the time it was a
18 work in progress? That's not your testimony on that
19 topic.
20     A. That's not what I said, and you're putting
21 words in my mouth.
22     Q. I'm putting words on the page that you said
23 earlier today. Let me ask it this way.
24         So you said -- you seem to be saying by work
25 in progress you mean there isn't any ID verification?

Page 107

1      A. That is not true.
2      Q. Okay. That is the impression you gave the
3  FBI in your meeting with the FBI; correct?
4      A. I have no clue. They didn't tell me that was
5  their impression so I wouldn't know.
6      Q. I've seen their impressions, and that's their
7  impression. It's because of the things you told them,
8  which were misrepresentations, were they not, about ID
9  verification at NAC by you?
10     A. In my knowledge of what the ID verification
11 had changed three times while I was there. The third
12 time it looked like it was seamless and it looked like
13 it was working well. That's all I can attest to.
14     Q. So, again, we talked about this before and I
15 don't want to beat a dead horse, but you're
16 distinguishing between ID verification in existence and
17 ID verification being more seamless and better over
18 time? You would agree it was more seamless and better
19 over time; correct?
20     A. It was getting better, yes.
21     Q. Okay.
22     A. I have no clue after working in 2016.
23     Q. Did you tell the FBI there isn't any -- NAC
24 doesn't have any technology?
25     A. Why would I say that?

Page 108

1      Q. That's a good question. If the FBI seem to
2  be saying that based on their interview with you, would
3  that be a misstatement by the FBI about what you said?
4      A. I don't know. They asked us if the
5  technology worked. We said yes. They asked us, does
6  it actually mine. We said yes. They asked us if
7  you've seen any patents. I had to say no, never did
8  see a patent from Marcus.
9      Q. Okay. That part is easy. Those are of
10 record so that part is easy. So you told the FBI that?
11     A. I did.
12     Q. Okay.
13         MR. OLSEN: Let's take a few-minute break. I
14 may be finished. Let's just break for a couple minutes
15 and regroup.
16         MR. KNECHT: Sounds good.
17         (Whereupon, a recess was taken.)
18 BY MR. OLSEN:
19     Q. We talked about when you went through the
20 wallet and verification process yourself back in 2014,
21 I think you said?
22     A. Something like that.
23     Q. Okay. We talked about the name Junio as the
24 third-party ID verification company. This is a few
25 years ago, I acknowledge, but you don't have any

Corey Jodoin                                      NAC Foundation, LLC v. Corey Jodoin, et al.

| Page 109 |
| --- |

1  recollection of the Junio logo actually appearing on
2  the screen?
3      A.  It could have been there.  I don't recall.
4      Q.  Okay.  You knew that there was some third
5  party, whoever it was, as we discussed, doing the ID
6  verification throughout the period which you were
7  either buying coins or working there; right?
8      A.  Well, originally, I just thought it would be
9  NAC doing that.  I didn't realize it would be a third
10  party.  But a third party makes perfect sense.  It's
11  not unbelievable, for sure.
12      Q.  Well, and you know that it was the case at
13  least for some period of time that there was a third
14  party?
15      A.  Yes, I'm well aware that there was definitely
16  a third party.
17      Q.  I have one more question.  There was some
18  discussion in your wife's deposition about Marco
19  Diadamo?
20      A.  Okay.
21      Q.  And on that question I asked this question,
22  it was a little more oblique, but do you have any
23  reason or any experience with your wife being disloyal
24  to you?
25      A.  Disloyal to me?

| Page 110 |
| --- |

1      Q.  Yes.
2      A.  In what way?
3      Q.  Any way that would have come up in the NAC
4  context.
5      MR. KNECHT:  Objection to form.  What do you
6  mean by disloyal?
7      MR. OLSEN:  The question is out there.
8      THE WITNESS:  Can you restate it or
9  something, give it more context?
10  BY MR. OLSEN:
11      Q.  Did she say anything, do anything, that was
12  in connection with NAC or NAC personnel that was
13  contrary to your agreements or things you discussed,
14  relationship, in the context of this company?
15      MR. KNECHT:  Same objection.
16      THE WITNESS:  You mean was she negative
17  towards someone on the team?
18  BY MR. OLSEN:
19      Q.  Did she contradict you or your instructions
20  with respect to dealing with NAC or the team?
21      A.  I don't believe so.
22      Q.  Did she have any personal relationships with
23  people on the NAC team that would, you know, that she
24  was in alliance of any kind, relationship with another
25  person on the NAC team that was, I don't know if I'd

| Page 111 |
| --- |

1  call it an alliance, but who did she work with that she
2  liked or got along with?
3      A.  Brandi got along with everybody.  Brandi is
4  very happy, very bubbly.  She's easy to talk to.  She's
5  a people person.
6      Q.  Did she complain to you about NAC, any NAC
7  team members, management team members?
8      A.  Not that I'm aware of.  She may not agree
9  with some of the decisions that Marcus would make, but
10  that doesn't mean she would ever say anything bad about
11  Marcus.
12      Q.  Or any other team members?  Did she get
13  sideways with any of the team members?
14      A.  Never.
15      Q.  Any of the Polish team?
16      A.  No.  She got along with everybody.
17      Q.  Marco?
18      A.  She might say bad things about her husband.
19      Q.  Well, we won't get my wife under oath.
20      MR. OLSEN:  I don't have anything else.
21      Counsel, anything?
22      MR. KNECHT:  I don't think so.  I'm fine.
23      MR. OLSEN:  That's it.  We will conclude it.
24  Thanks.
25      THE WITNESS:  Thank you very much.

| Page 112 |
| --- |

1      (Whereupon, the deposition was concluded at
2  4:44 p.m.)
3          * * * * *

Corey Jodoin                                        NAC Foundation, LLC v. Corey Jodoin, et al.

Page 113

```
 1          CERTIFICATE OF DEPONENT
 2   PAGE   LINE   CHANGE        REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13          *   *   *   *   *
14       I, COREY JODOIN, deponent herein, do hereby
     certify and declare the within and foregoing
15   transcription to be my deposition in said action; that
     I have read, corrected, and do hereby affix my
16   signature to said deposition under penalty of perjury.
17
18
19          _____
                COREY JODOIN, Deponent
20
21
22
23
24
25   Job No. 40188
```

Page 114

```
 1          CERTIFICATE OF REPORTER
 2   STATE OF NEVADA  )
 3                    )  ss:
     COUNTY OF CLARK  )
 4       I, Kimberly A. Farkas, a Certified Court Reporter
 5   licensed by the State of Nevada, do hereby certify:
 6   That I reported the deposition of COREY JODOIN, April
 7   16, 2020, at 1:18 P.M.
 8       That prior to being deposed, the witness was
 9   duly sworn by me to testify to the truth.  That I
10   thereafter transcribed my said stenographic notes into
11   written form, and that the typewritten transcript is a
12   complete, true and accurate transcription of my said
13   stenographic notes; that review of the transcript was
14   requested.
15       I further certify that I am not a relative,
16   employee or independent contractor of counsel or of any
17   of the parties involved in the proceeding; nor a person
18   financially interested in the proceeding.
19       IN WITNESS WHEREOF, I have set my hand in my
20   office in the County of Clark, State of Nevada, this
21   1st day of May, 2020.
22
23          _____
                Kimberly A. Farkas, CCR NO. 741
24
25
```

Corey Jodoin

NAC Foundation, LLC v. Corey Jodoin, et al.

## WORD INDEX

**< $ >**
**$100** 93:24 102:9
**$140** 93:24 102:10
**$2** 60:19
**$225,000** 94:13
**$40** 94:2 102:10

**< 0 >**
**0001** 3:13
**0085** 99:4, 8
**0098** 3:13
**0099** 3:13 38:18
39:8, 23 49:21
**0104** 61:10
**0106** 39:20
**0109** 49:21, 23
50:1
**0110** 53:20
**0111** 3:13
**0112** 3:13
**0113** 39:21
**0329** 3:13
**0330** 3:13 20:22
**0336** 23:17, 17
**0339** 26:8 27:3
**0340** 26:13 28:15
29:9
**0503** 3:13
**0504** 3:13 69:15,
20
**0511** 73:8
**0517** 70:3
**0520** 76:18, 23
**0521** 78:2
**0524** 78:25 81:19
**0525** 76:24
**0526** 3:13

**< 1 >**
**1** 1:10, 10 3:13
4:6 20:18 29:25
50:24 51:5, 14, 16
55:3 77:17, 17
79:3 99:3, 4, 8, 21
**1:18** 1:18 2:2 4:3,
13 114:7
**10** 1:10, 10 17:16
33:23 54:18 97:9

**12** 17:16 33:24, 25
52:3
**14** 30:1
**15** 17:19, 21
**16** 1:17 2:2 3:2
4:2, 12 70:6 114:7
**16th** 71:23
**1st** 114:21

**< 2 >**
**2** 3:13 38:21, 21
39:25 49:20, 24
51:14, 17, 24 52:1,
3 55:10 70:6 79:3
**200** 2:18
**2014** 56:21 108:20
**2015** 32:3 93:18
**2015-2016** 9:21
56:17
**2016** 10:19, 24
32:4 70:6 71:24
73:9 85:4 107:22
**2018** 99:24, 25
**2019** 99:24
**2020** 1:17 2:2
3:2 4:2, 12 114:7,
21
**210** 2:11
**23rd** 73:9 74:24
**27th,** 99:23
**280** 5:18

**< 3 >**
**3** 3:13 79:4, 16, 17
**30** 97:12
**31** 5:18
**330** 20:22 22:19
**342** 22:21
**384-7000** 2:19

**< 4 >**
**4** 3:13, 13, 13, 13,
13, 13 20:15, 16
21:2, 3 22:3
38:15, 20 39:24
52:10, 14 78:2, 3, 3,
4 79:4
**4:44** 112:2
**40** 95:23
**40188** 1:24 113:25

**45** 16:4

**< 5 >**
**5** 3:9, 13 4:6
20:18 52:16
69:14, 20 76:18
77:17
**50** 68:19
**54108** 5:18

**< 6 >**
**6** 52:16 54:25
72:25
**6605** 2:18
**6th** 94:20

**< 7 >**
**7** 77:18
**702** 2:19
**725** 2:12
**7251** 2:11
**741** 1:23 3:3
4:11 114:23
**777-3000** 2:12

**< 8 >**
**8** 77:18
**80** 16:5, 6
**89119** 2:11
**89149** 2:18

**< A >**
**A-18-770594-C** 1:7
4:17
**ABA** 18:7, 9, 10,
18 19:6, 9
**ability** 6:5, 16
41:16
**able** 8:16 14:12
34:25 64:10 78:12
**Absolutely** 28:11
57:6 60:16
**accept** 52:7 84:25
**accepted** 36:2
**access** 28:2 58:1,
7, 8, 18 85:17 87:3
**accommodating**
11:15
**accomplished** 43:10
**account** 52:14
106:2

**accurate** 7:22
41:20 114:12
**accustomed** 28:8
**acknowledge**
108:25
**acronym** 26:9
**act** 17:5, 10
**action** 101:2, 2
113:15
**active** 47:11, 13
**actively** 105:18
**actual** 104:12
106:12
**ADAM** 2:17 5:5
98:3
**add** 8:2 74:3
**address** 5:17 47:4
51:4
**administering** 4:21
**administrative**
33:17, 18
**admissions** 100:19
**adopter** 56:22
**affiliated** 12:11
17:24 18:7, 22
19:10, 16 59:23
**affix** 113:15
**afternoon** 4:8
**Aga** 23:17 61:9
62:11 64:1 68:11
96:5, 20
**agency** 12:9 91:6,
12, 14
**Agnieszka** 41:5, 7
42:24 44:22, 23
61:8 73:9 90:1
**ago** 69:12 79:20
108:25
**agree** 4:19 15:3, 4
30:18 32:6 40:21
41:3 78:20 85:2
104:17 107:18
111:8
**Agreed** 62:24
**agreement** 4:23
21:1 22:19 23:14
26:24 28:13, 14
29:2 30:15, 21, 23
70:13, 17, 18, 23
71:1, 8, 14, 15

Corey Jodoin

NAC Foundation, LLC v. Corey Jodoin, et al.

72:*16*  75:*23*  76:*5*
85:*25*  87:*21*  92:*13*
**agreements**  21:*3*
22:*2, 4, 25*  23:*1, 7*
24:*17*  25:*5, 19*
26:*2, 19*  27:*13, 17*
29:*5*  30:*4, 6, 10*
83:*2, 8*  86:*16*
91:*18, 19*  110:*13*
**ahead**  5:*13*  7:*13*
14:*11*  17:*3*  22:*21*
48:*25*  105:*7*
**ahold**  47:*9*  66:*22*
72:*6*  92:*9*
**Albert**  21:*7, 9*  88:*3*
**Alberta**  5:*16*  12:*2*
22:*14, 16*  31:*17*
44:*15*  50:*15*
73:*22*  75:*4, 5*
79:*7*  85:*7*  91:*21*
**alliance**  110:*24*
111:*1*
**allowed**  59:*4*
**alternatives**  34:*7*
**Alverson**  2:*17*  5:*5*
**American**  17:*25*
18:*3, 18, 23*  65:*1*
**Amigo**  2:*11*
**AML**  26:*9*
**amount**  88:*8*
103:*11, 13*
**amounts**  23:*11*
**Andrade**  58:*6*
66:*14*  74:*18*  91:*6*
92:*15*  101:*7*
**Andrade's**  91:*25*
92:*6*
**Andrea**  21:*9*  91:*2,
3, 25*  92:*8*
**answer**  7:*9, 13*
10:*7*  14:*23*  26:*1*
41:*16*  56:*15*
71:*21*  99:*20*
101:*20*  105:*9*
**answering**  68:*13*
104:*2*
**answers**  6:*5, 22*
7:*22*  100:*11*
101:*20*
**anticipate**  55:*23*

**anybody**  28:*13*
40:*25*  82:*19*
**anyway**  27:*24*
71:*5*  81:*1*
**apologize**  54:*10*
82:*8*
**appear**  35:*21, 22,
23, 24, 25*
**APPEARANCES**
2:*6*  4:*25*
**appeared**  36:*3*
**appearing**  109:*1*
**appears**  70:*25*
72:*9*  73:*12, 14, 18*
81:*20*
**application**  35:*1*
**applications**  35:*2*
**appreciate**  71:*22*
**appreciated**  61:*3*
**approved**  44:*2*
62:*6*
**approximately**  4:*13*
**April**  1:*17*  2:*2*
3:*2*  4:*2, 12*  114:*6*
**April-May**  10:*20*
**area**  22:*14*  29:*12*
47:*23*  75:*20*  76:*8*
91:*4*
**arrived**  93:*25*
**ASC's**  91:*24*
**aside**  7:*12*
**asked**  24:*11*  27:*6,
8*  35:*25*  36:*2, 18*
53:*3*  58:*25*  62:*2,
10*  63:*22*  71:*12*
89:*20*  96:*10*
101:*17, 18*  103:*2*
104:*13, 14*  108:*4, 5,
6*  109:*21*
**asking**  12:*21, 22*
13:*11*  14:*4*  21:*13*
25:*18, 25*  34:*15*
50:*19*  56:*16*
65:*24, 25*  68:*12*
102:*17, 19*
**assistance**  46:*19*
**assistant**  33:*14*
**associated**  15:*16*
24:*18*  44:*5*  62:*22*
**Association**  17:*25*
18:*3, 18, 23*  64:*7*

**assume**  14:*5*
15:*12*  64:*23*  73:*4*
75:*11*  80:*25*
**Assurance**  24:*3, 18,
24*  25:*1, 7, 20*  26:*4*
27:*12, 25*  87:*21, 22*
**Aten**  19:*15, 16, 25*
20:*6*  21:*23, 23*
38:*18, 19*  39:*6*
40:*3*  43:*25*  46:*25*
48:*7, 11*  50:*2, 18*
53:*18*  64:*9, 9, 11,
15, 17, 20*  66:*25*
72:*24*  73:*13, 17*
74:*6*  75:*13*  76:*20*
77:*2*  79:*17*  93:*8*
**attached**  72:*3*
**attachment**  72:*4*
73:*13*
**attempt**  22:*10*
66:*25*  106:*8*
**attend**  18:*17*
34:*25*  44:*16, 17, 18*
**attendants**  79:*12,
13*
**attended**  32:*12, 23*
44:*19, 20, 20*  54:*7*
76:*10*
**attest**  106:*11*
107:*13*
**attorney**  5:*1*  7:*12*
11:*3*  95:*18*
**August**  99:*23, 23*
**Authentic**  53:*7, 8*
**authentication**
53:*6, 6*  82:*4*
**author**  37:*19*
**authorized**  27:*8*
29:*11*
**available**  51:*24*
52:*1*  69:*15*
**aware**  66:*6*  67:*16*
83:*13*  91:*17*
109:*15*  111:*8*
**awareness**  93:*9*

**< B >**
**back**  9:*21*  20:*13*
27:*21*  43:*13*
47:*10*  48:*3*  52:*11*
53:*5*  54:*23*  60:*3*

74:*8, 23*  76:*17*
80:*8*  81:*11*  82:*16*
83:*2*  86:*4*  90:*4*
96:*22*  105:*16*
108:*20*
**background**  41:*1*
**bad**  111:*10, 18*
**Bank**  40:*13, 16, 17*
**Bankers**  17:*25*
18:*3, 18, 23*
**banking**  34:*9*  37:*3,
4*  40:*9, 12*
**Barb**  87:*19*
**Barbara**  88:*10, 13*
89:*7*
**Barter**  21:*17*
75:*18, 19*  76:*4, 7,
17*
**B-A-R-T-E-R**
75:*18*
**based**  26:*13*  27:*7*
29:*8, 13, 14*  63:*25*
67:*5*  71:*23*  94:*2*
102:*25*  108:*2*
**basically**  10:*12*
31:*5*  88:*14*
**Bates**  3:*13, 13, 13,
13, 13*  8:*11*
**Bear**  69:*13*  73:*5*
**beat**  107:*15*
**becoming**  13:*8*
101:*11*
**beginning**  12:*22*
26:*8*  38:*18*  39:*23*
41:*19*  69:*14*
**begins**  49:*20*
**behalf**  4:*10*  20:*9*
26:*3*  32:*20*  33:*4*
66:*24*
**believe**  10:*18*
11:*13*  14:*16*  18:*1*
20:*3*  23:*20, 24*
24:*24*  25:*22*  28:*1*
33:*3*  35:*16*  36:*14*
37:*12*  40:*15, 19, 24,
25*  41:*24*  42:*10*
43:*4, 24*  44:*2*
45:*3, 10, 11, 15*
52:*22*  55:*7*  61:*10,
12, 20, 25*  62:*13, 14,
25*  63:*2*  64:*3, 8*

Andrade App. 000490 VICES, LLC

Corey Jodoin                                                    NAC Foundation, LLC v. Corey Jodoin, et al.

65:14  66:21
67:20  74:7  75:15,
16, 22, 24  76:2
83:11  90:8  93:19
96:6, 18  98:14
100:9, 14, 22  101:8
103:10  104:16
110:21
**believed**  106:17
**bell**  21:11  22:5
**best**  6:5, 16  8:18,
18  17:1
**better**  34:16  35:4,
6  38:25  107:17, 18,
20
**beyond**  104:19
**big**  14:9  15:24
16:2  41:24  59:25
85:13
**bigger**  18:15
**biggest**  14:17  83:3
**Bilinska**  41:5, 7
43:3, 5  44:23
73:10  90:1
**binding**  4:21
**bio**  39:19  40:19
41:12
**biographies**  39:4, 5,
7
**biometric**  55:24
82:4, 11
**bios**  50:6  53:23
**bit**  13:6  56:21
73:5  82:25  90:8
**BitPath**  84:18
**Black**  19:16, 20
**blank**  71:19
**Bokenfohr**  21:10,
17
**bolts**  37:10
**bookkeeping**  88:16,
24
**bother**  89:7
**bottom**  8:9  20:20
50:7  81:21
**box**  29:10
**boxes**  77:17
**boy**  84:17
**BRANDI**  1:9
10:12, 25  11:10, 14
18:8  35:20, 20, 25

36:3, 4  37:12
44:21  76:12, 14
91:18  93:12
99:23  111:3, 3
**break**  8:25  53:17
54:15, 16  65:13
82:15, 16  95:12
102:3  108:13, 14
**brief**  90:24
**bring**  41:11, 13
89:6
**broadly**  97:5
**brochure**  65:5
73:15
**brought**  41:14
42:3  47:16  88:20
**bubbly**  111:4
**build**  14:16  34:8
**building**  25:15
**built**  49:14
**bullet**  77:3
**bunch**  29:21
**business**  15:5, 8,
10  34:5  40:3, 18
61:22  89:3
**businesses**  35:5
**button**  47:2
**buy**  12:20
**buyer**  19:6  71:11
75:21
**buyers**  19:3  54:6
**buying**  31:9  105:3
109:7

< C >
**cabinet**  85:15, 22
86:24
**CALE**  26:10, 20
27:13, 16, 20  28:16
85:25  88:4
**C-A-L-E**  26:9, 10
**Calgary**  54:1, 6, 9
**California**  67:21
**call**  12:19  28:2, 4,
9, 10  30:20  47:9,
10  50:25  51:15
54:18  55:14  72:6
81:20  89:25  97:5,
6  101:21  111:1
**called**  15:10  23:18
24:3  26:8  53:7,

14  89:15  91:13
92:10
**calling**  24:12
**calls**  27:23  49:12
66:17, 19, 20  97:7
98:5  104:2
**camera**  8:24  78:21
**Canada**  5:16  26:4
**Canadian**  29:6
**CAO**  33:16
**Capital**  67:16  68:4
**care**  34:1  102:16,
17
**Case**  1:7  4:17
7:7, 9  9:17  11:2
25:4  26:17, 18
27:12  29:19
57:25  100:18
109:12
**cases**  9:18  94:14
**CC'd**  73:10  96:7
**CCR**  1:23  3:3
4:11  114:23
**cell**  92:10, 12
**Cenzartowicz**
42:24  61:9
**CEO**  13:4  16:10
98:13
**certain**  10:13
14:14  84:3  88:8
**certainly**  54:1  94:1
**CERTIFICATE**
113:1  114:1
**Certified**  2:3  4:9
114:4
**certify**  113:14
114:5, 15
**cessation**  90:16
**CEX**  83:23, 24
84:4
**challenge**  14:17, 19
**challenges**  34:12,
13  35:8
**chance**  7:18  22:22
**change**  63:19  81:4
113:2
**changed**  38:13
77:22  87:8  107:11
**changes**  7:20  74:1
80:21, 23

**Chantal**  21:9
**Cheaper**  33:25
**check**  25:10, 12
26:1, 6  27:11  44:1
**checked**  25:18
**Chicago**  33:2, 19
34:3  61:12
**chief**  13:2, 15
33:16  44:9  81:23
86:17  97:21
**choice**  84:10
**choose**  47:5
**Chose**  84:8
**circling**  29:21
**CLARK**  1:2  4:17
6:1  114:3, 20
**clear**  55:2  78:16
83:4  96:14
**clearly**  50:8
**Click**  52:14
**client**  7:12  24:11,
12, 14  26:8  27:6, 7
28:23  29:1, 4, 15
31:6  45:1
**clients**  29:6
**Clifton**  89:12, 13,
13
**close**  71:6, 12
**closed**  87:1
**closing**  45:7  70:14
86:23
**clue**  53:15  107:4,
22
**clumsy**  47:15
**code**  43:25
**coin**  13:21  19:15,
16, 25  20:6  21:23,
23  38:19  40:3
43:1, 25  44:3
46:25  48:7, 11
50:2, 18  56:10
58:9  64:9  72:24
75:21  76:8  77:14
82:6, 13  83:4, 5, 8,
22  93:8
**Coinbase**  84:19
**coins**  12:20  19:2,
3  20:6  22:4, 9, 10
23:1  25:2, 3, 5
30:13  31:8, 9
46:7, 9, 20, 21

Corey Jodoin

NAC Foundation, LLC v. Corey Jodoin, et al.

47:25  48:3, 9
51:23  53:18, 24
60:5  64:20  66:25
67:3, 4  73:13, 17
74:6  75:13  76:13,
20  77:2  83:12, 14,
16  105:4  109:7
**cold**  12:19
**collected**  57:1
58:2, 9
**come**  20:13  59:21
76:17  80:25
82:16  110:3
**comes**  31:2
**commencement**  4:7
**comment**  7:20
**comments**  48:21
74:3
**Commercial**  16:16,
18, 20
**Commission**  12:2
66:10  91:21
**commit**  68:5
**committing**  63:6
**communicated**
91:20, 22  100:3, 7
**communicating**
96:22
**communication**
7:12  100:4
**communications**
11:25  12:4, 7, 9
96:12, 13, 23, 24
98:9
**community**  34:8
**companies**  14:25
48:5  58:1  59:12
**company**  1:5
12:16  13:5, 16, 17,
21, 23  14:17, 18, 21
15:1, 17, 19, 24, 24
16:2, 10, 10, 13, 24
17:15, 17  18:22, 25
25:2  33:9  42:4
45:20  53:7, 9
57:4, 8, 9, 11, 15, 20
58:2, 3, 8, 17, 18, 23
59:2, 23, 25, 25
61:6  62:18, 23
64:7  68:9  82:11
83:23  87:11, 14

88:21  89:10, 11, 15,
18  90:10  93:3
94:7, 12  97:24
98:8, 10, 16, 16, 19,
21  108:24  110:14
**company's**  98:9
**comparing**  81:2
**compiled**  38:11
**complain**  111:6
**complaint**  91:5
**complaints**  91:12
**complete**  47:5
52:16, 19  75:16, 25
85:24  87:15
114:12
**completed**  24:14
27:12  51:20  71:8,
9  78:13
**completion**  55:1
**Compliance**  23:19
29:17  87:12
**computer**  38:17,
23, 24  46:2, 15, 17
69:16  78:10, 22
**computers**  46:4
47:19, 20
**concepts**  34:5
**concern**  25:13
85:16  102:22
**concerning**  67:7
**concerns**  85:9, 11,
13
**conclude**  111:23
**concluded**  112:1
**conclusion**  98:5, 7
103:9
**conditions**  52:7
**conference**  32:12,
23  33:1, 2  34:2, 3
35:1, 7, 9  41:25
44:12, 13, 13, 15, 18
50:12, 15, 15  51:24
52:2  54:2, 6
60:15, 24  61:3, 5
73:22  75:4, 5
76:10, 11  79:7, 12
85:7
**conferences**  18:14,
19  32:11
**conferencing**  4:22

**confirm**  25:22
81:17
**conglomerate**  32:17
**connection**  90:19,
22  110:12
**consensus**  36:1
**consider**  62:11
63:18
**considered**  53:10
**consisted**  98:10
**constitute**  8:13
**construction**  15:8,
13  16:7, 17, 18, 19
89:3
**contact**  59:8  76:6,
9  95:22
**contacted**  91:13,
24  96:15, 16, 17, 18
**contacting**  70:24
**contacts**  40:8, 12
41:17, 22
**contained**  22:3
23:23  26:4  29:18,
25
**contains**  21:3
**context**  59:22
97:18  110:4, 9, 14
**continue**  68:3
90:5, 8
**contract**  42:9, 11
43:2  59:14  61:24
62:1, 3, 5, 20  63:1
93:2, 10, 11  94:22,
23  95:1, 3, 5, 7, 8, 9
**contractor**  88:19,
22  114:16
**contractors**  16:21
105:23
**contracts**  24:16
25:7  29:19  42:24
**contradict**  110:19
**contradicting**  106:5
**contrary**  105:22
110:13
**contributor**  38:14
**conversation**  51:11
59:4, 7  67:18, 20,
22, 23, 24  68:1, 21
94:8  96:4  97:3
**conversations**  46:1,
2  96:11  97:2, 5

**COO**  13:3, 7, 8, 14,
20, 22  16:11, 25
17:1, 16, 24  19:7
31:22  56:9, 23
58:8  62:18  64:16
92:14  97:19  98:18
**cooperation**  86:1
**copied**  96:25
**copy**  24:13  72:21
73:6  75:3, 7
77:12  95:7  101:1
**COREY**  1:9, 16
2:1  3:1, 8  4:4, 14
5:6, 8, 15  99:10
113:14, 19  114:6
**corner**  8:9
**CORPORATIONS**
1:10
**correct**  9:18, 19
11:1, 4  12:25
13:3, 8  15:6, 14, 17,
18  16:1, 21  17:6
18:23  19:3, 12
20:7, 8, 10  23:4, 6,
15  25:8  26:5, 15,
16, 21  27:14, 24
30:1, 2, 6  31:22, 23
32:1, 25  33:20, 21
35:14  37:7, 24
39:6, 23  40:20
41:2  42:19  44:6
45:2  46:7, 20
47:22  49:7  50:15,
24  51:21, 25  52:13,
20  53:20  54:6
57:11, 24  58:10, 14,
20  59:13, 20  60:15
62:18, 19, 23  64:1,
22  65:20  66:10
67:6  68:17  70:19
72:12  74:12
75:14  76:16, 24, 24
78:24  79:22  80:5
81:15, 24  82:7, 13
84:2, 23  85:4, 5, 20
88:1, 4, 11, 12, 19,
23  90:13  91:15
92:15  93:3  94:3,
10, 17, 18, 24  95:16,
19  97:20  99:13, 19
100:25  102:14

Corey Jodoin                                                    NAC Foundation, LLC v. Corey Jodoin, et al.

103:*14*  104:*20*
105:*5*  107:*3, 19*
corrected  113:*15*
counsel  4:*18, 24*
7:*7*  8:*1*  38:*20*
69:*18*  111:*21*
114:*16*
counsel's  103:*8*
count  97:*1*
counterclaim
101:*1, 2*
COUNTY  1:*2*
4:*16*  6:*1*  114:*3, 20*
couple  30:*25*
31:*13*  53:*16*
54:*24*  94:*16*
104:*2*  108:*14*
course  25:*1*  34:*20*
35:*20*
COURT  1:*1*  2:*3*
4:*9, 16*  6:*2, 4, 10,*
*19*  7:*18*  8:*22*
81:*6, 11*  114:*4*
creating  36:*12*
credentials  51:*2*
credible  84:*21*
credit  23:*5, 9*
credited  23:*10*
cryptocurrency
13:*23, 24*  84:*23*
currencies  34:*10*
currency  14:*1, 9,*
*18*  19:*17*  20:*3*
37:*3, 5*  66:*7, 21*
67:*2*  84:*14*  85:*1*
currently  84:*23*
curve  14:*10*
customer  23:*20*
44:*2*  52:*11*  85:*19*
86:*1, 4*
customers  87:*4, 4*

< D >
dad  23:*3, 3*
data  55:*24, 25*
56:*25*  57:*1, 5, 7, 8*
date  4:*12*  52:*24*
94:*19, 23*
dated  70:*5*  73:*9*
day  13:*19*  70:*24*

86:*18*  114:*21*
days  43:*18*
dead  107:*15*
deal  30:*15*  45:*7*
56:*12*  70:*15*  86:*3*
87:*3, 10*  94:*23*
96:*7*  98:*17*
dealing  27:*7*
34:*22*  86:*9, 14, 15*
96:*5*  97:*20, 22*
98:*12*  101:*10*
110:*20*
dealt  98:*21*
December  32:*9*
42:*17*  74:*23*  90:*4*
93:*16, 18*
decided  99:*21*
decisions  111:*9*
declare  113:*14*
deeper  69:*23*
Defendant  5:*6*
Defendants  1:*10*
2:*15*
define  97:*4*
definitely  109:*15*
defrauded  82:*19*
101:*6*
degree  65:*1*
delve  69:*22*
deny  81:*17*
DEPONENT
113:*1, 14, 19*
deposed  114:*8*
DEPOSITION
1:*16*  2:*1*  3:*1*  4:*4,*
*7, 14, 20*  5:*20, 24*
6:*1*  7:*19, 21*  8:*6,*
*7*  9:*3*  33:*8*  39:*4*
99:*15*  105:*21*
109:*18*  112:*1*
113:*15, 16*  114:*6*
Dept  1:*8*
describe  10:*8*
13:*9*  72:*4*  83:*1*
92:*25*
described  33:*11*
46:*10*  51:*24*
describing  51:*8*
Description  3:*13*
designated  28:*24*

31:*24*
designed  13:*24*
desk  85:*15*
despite  7:*10*
destroyed  69:*6*
detail  102:*2*
details  11:*16*  72:*1*
74:*3*  96:*4*
determine  9:*11*
63:*19*
Deutsche  40:*13, 16*
develop  40:*10*
42:*25*  44:*3*  47:*15*
93:*9*
developed  51:*17*
64:*12*
development  40:*3*
80:*16*
Diadamo  31:*5*
44:*24, 25*  60:*18*
67:*7*  70:*15*  71:*6*
74:*18*  93:*12*
109:*19*
dictate  71:*19*
Dida  89:*12, 13, 18*
difference  80:*15*
different  8:*9*  9:*11,*
*13*  15:*16, 22*  16:*23*
24:*22*  25:*25*  29:*1*
34:*5*  38:*1*  39:*16,*
*17*  43:*6*  48:*15*
56:*16*  63:*10*
78:*17*  80:*2, 4, 12*
101:*23*  106:*9, 10*
differently  86:*19,*
*20*  89:*24*
difficult  6:*20, 25,*
*25*  34:*13*  80:*21*
dig  21:*5*
digging  63:*17*
digital  13:*15*  14:*1,*
*9*  20:*2*  34:*9*  37:*3,*
*4*  46:*8*  66:*7, 21*
73:*6*  82:*8*
dignified  41:*25*
direct  28:*4, 9*
50:*22*  76:*6, 9*  99:*3*
directed  24:*25*
96:*20*
direction  64:*24*
68:*11*

directly  76:*13*
96:*15, 16*  97:*17*
disallowed  66:*21*
disappear  69:*4*
disappointed  60:*22,*
*25*
discern  7:*1*
discovery  100:*17,*
*18*
discuss  37:*2*  53:*13*
68:*2, 6*
discussed  66:*19*
109:*5*  110:*13*
discussion  64:*15*
90:*9, 12*  109:*18*
discussions  64:*17,*
*18, 19*  67:*5*
dishonest  40:*23*
42:*8*  45:*10, 11*
62:*12, 25*  63:*4, 5,*
*13, 16*  64:*1*  65:*8,*
*16, 20, 25*  66:*2, 3*
82:*21*
disloyal  109:*23, 25*
110:*6*
dispose  69:*3*
disregard  67:*9, 11*
disseminated  77:*18*
distinguishing
107:*16*
distributed  77:*23*
DISTRICT  1:*1*
4:*16*  6:*2*
document  9:*10*
10:*6*  20:*25*  22:*20*
24:*3*  26:*8*  27:*3*
30:*1, 16*  39:*3*
50:*23*  61:*9*  69:*14,*
*23*  72:*5, 8, 15*
73:*19*  75:*8*  77:*3,*
*16, 19*  78:*25*  79:*2,*
*8, 9, 19*  82:*17*
99:*12*
documents  8:*13,*
*23*  9:*2, 11, 13, 16,*
*23, 24*  10:*3*  11:*7*
100:*21*
doing  6:*9*  12:*23*
14:*21*  30:*20*
33:*18*  34:*5*  87:*12,*

APP 000493

Corey Jodoin                                    NAC Foundation, LLC v. Corey Jodoin, et al.

22 109:5, 9
dollar 103:11, 13
download 46:14, 15, 16 47:2, 7 50:1, 18, 21 51:1 52:11 54:25 72:24 77:15
downloaded 46:4 47:8 51:13, 15, 18, 23 55:4 80:1 81:17
downloading 46:19, 25 48:9 50:24 51:3, 8 55:5
dozen 33:25 98:10
drawer 86:3, 5
drawn 9:10
dropped 19:19
duly 5:9 114:9
duties 13:9, 12, 13

< E >
earlier 20:20 56:18 70:10 106:23
early 56:22 85:4 94:16
ease 81:4
easier 73:5 80:17
easiest 20:15
easily 60:19
easy 108:9, 10 111:4
edit 75:6
Edmonton 54:9, 10, 13 55:12 60:6 73:16 79:6
effort 49:9 89:25 94:6
eight 24:8
either 8:21 19:6 29:22 35:3 49:23 65:8, 15 100:12 101:11 109:7
else's 49:16
eludes 87:19
email 52:10 70:5, 16 73:9, 24 74:2, 24 79:12 96:20, 24
emails 95:23 96:24 98:23

employee 17:22 49:2 89:5 114:16
employees 16:3, 4 88:18, 25
ended 25:19 70:14 71:9
ensure 24:15
entailed 52:21
enter 28:13
entered 26:2 59:15 91:18
entirely 88:7
entitled 72:4
environment 14:18
ERIC 2:10 5:2
especially 6:19
ESQ 2:10, 17
essentially 55:5 56:1
establish 9:25
estimated 61:5
EU 40:3
Europe 40:9 42:25
Evaluation 26:9
events 10:13
everybody 89:4 111:3, 16
Everyone's 33:14
evidence 93:21
evolving 106:13
exactly 46:13 59:10
Examination 3:9 5:11
examined 5:9
example 88:2
examples 84:16
Excavating 15:11, 16, 22
excavation 15:12
exception 7:11
Exchange 66:10 83:9, 15, 23 84:1, 4, 8, 12 96:25
exchanged 83:14 95:24
exchanges 84:10, 14, 22, 25
Excuse 82:8 94:21
executed 23:3, 6 71:1, 16 72:2, 19

Exhibit 3:13, 13, 13, 13, 13 4:6 8:6, 13 20:15, 16, 17 21:2, 3 22:3 26:20 38:15, 20, 21 39:24, 25 49:20, 24 69:14, 19, 20 73:8 76:18, 18 99:3, 4, 8
EXHIBITS 3:12 8:10 10:10 20:18
exist 105:24 106:2
existed 106:6
existence 15:25 28:10 107:16
expect 86:2
expectation 56:2 57:3 60:23 61:2
experience 63:25 80:4, 12 81:3, 3 109:23
expert 14:1 36:24
extent 11:18

< F >
face 13:5 36:1
Facebook 59:24
faces 35:23
fact 7:1, 21 19:2 31:24 48:23 49:5 50:6 58:6 59:24 78:21 83:6 105:2, 20
facts 9:21
Fahy 66:5, 6, 12, 13, 22 67:6 95:15, 23 96:8, 12, 19, 25 97:6, 17, 20 98:13
F-A-H-Y 95:16
fair 87:8 89:9 106:9
Fairly 9:22 34:19
fall 32:3
false 86:13
familiar 6:2 26:10 53:8 60:1 89:14, 21
far 19:10 35:10 39:25 45:9 48:1 55:17, 20 80:17 87:1 96:10, 12

Farkas 1:23 2:3 3:3 4:9 114:4, 23
fashion 12:15 34:15
Faster 31:19 32:16 34:10
fast-forwarding 105:11
father 21:7
faxed 70:17, 22 71:1, 14, 15
FBI 12:5 28:9 99:22 100:3, 7, 13, 21 101:3, 5, 6 102:12, 18, 19, 23 103:2, 16, 23, 24 104:3, 4, 10, 13, 24 105:15 107:3, 3, 23 108:1, 3, 10
February 32:9 33:3 71:23 73:9 74:20, 24 80:15, 22, 23 105:17
Federal 31:18 32:15, 18 34:13 35:4
feel 29:15 82:18, 21, 24, 25 83:1
felt 68:12 101:6, 23 102:24 103:13
fence 31:4
few-minute 108:13
fictitious 23:25
field 41:21 50:17
figure 14:21
file 24:14 40:2 85:19, 22 86:3, 7 91:5 103:5, 6
files 85:13, 17, 23 86:6, 7, 7, 8, 20 87:12, 15, 23
filled 29:20, 21
final 75:6, 9
finalize 75:6
financially 114:18
find 8:8 42:22 49:20, 23 81:25 82:16
finding 42:24
fine 111:22
finish 102:11

Corey Jodoin                                                    NAC Foundation, LLC v. Corey Jodoin, et al.

finished 86:*23*
98:*3* 108:*14*
first 5:*9* 24:*9*
27:*2, 4* 43:*16*
51:*3* 85:*18* 96:*3*
99:*10, 11*
five 8:*6* 9:*7, 14*
54:*18* 69:*12*
five-minute 95:*11*
Florida 66:*20, 25*
67:*2, 3, 4, 8, 10*
focused 8:*21*
folks 55:*12* 73:*15*
following 21:*3*
71:*10* 78:*6*
follows 5:*10*
follow-up 71:*20*
footer 50:*6*
Force 31:*19, 25*
32:*8* 33:*19* 35:*11,*
*15*
foregoing 113:*14*
forget 39:*15*
forgotten 97:*15*
Form 24:*3, 9, 11,*
*14, 18, 22* 25:*7, 20*
26:*5, 7, 11, 12, 21*
27:*5, 6, 21* 28:*12,*
*12* 29:*17, 18, 20, 23,*
*25* 35:*13* 38:*4*
56:*13* 63:*21*
65:*11* 71:*19* 72:*8,*
*11* 87:*21, 23* 88:*4*
92:*18* 98:*5* 110:*5*
114:*11*
format 37:*7*
formatted 56:*17*
former 59:*24*
Forms 27:*12, 13,*
*16* 28:*16* 77:*13*
106:*11*
forth 96:*22*
forward 4:*23* 39:*1*
60:*4*
forward-looking
106:*8*
found 49:*19, 25*
FOUNDATION
1:*5* 4:*15* 5:*4*
12:*12* 23:*18*

38:*19* 83:*5*
four 43:*18* 106:*10*
fraud 63:*6*
frauds 65:*8, 16, 20*
friend 91:*4*
friendly 44:*1*
friends 26:*3*
front 41:*12*
froze 80:*7*
fulfill 14:*12* 31:*15*
fulfilled 13:*10*
full 41:*16* 43:*14*
further 29:*16*
78:*23* 106:*14*
114:*15*

< G >
Gallant 21:*19*
Garman 2:*10* 5:*3*
gathered 56:*3* 58:*3*
general 48:*2* 68:*4,*
*7* 79:*12* 101:*24*
generally 64:*18*
68:*1*
generate 51:*3*
60:*14*
generated 72:*11*
101:*16* 102:*5*
103:*1*
gentleman 75:*19*
getting 18:*15* 23:*6*
48:*9* 61:*21* 90:*16*
94:*11* 96:*5*
106:*13* 107:*20*
give 6:*4* 7:*22*
8:*14* 10:*9* 21:*6*
30:*8, 14* 45:*22*
69:*17* 74:*8* 84:*16*
92:*3, 6* 99:*5* 110:*9*
given 12:*18* 16:*13,*
*14* 24:*25* 47:*21*
85:*1*
gives 50:*23*
giving 64:*24* 92:*5,*
*14*
gleaned 37:*5*
glossy 77:*4*
go 5:*13, 23* 7:*13*
8:*7* 14:*11* 17:*3*
20:*15* 22:*21*
27:*21* 39:*1* 47:*1,*

3, 24 48:*25* 52:*7*
53:*5* 55:*19* 60:*3*
70:*2* 72:*24* 78:*12,*
*18, 23* 80:*13* 83:*10,*
*11, 17* 99:*17* 105:*7*
goal 93:*6, 7*
goes 29:*13* 49:*21*
52:*3* 53:*17* 76:*23*
78:*11* 106:*11*
going 6:*11* 8:*24*
9:*14* 17:*2* 18:*13*
20:*14* 21:*6* 23:*22*
60:*20* 63:*17, 18*
65:*22, 23* 67:*13*
69:*22* 75:*9* 81:*10*
83:*6* 96:*9* 97:*25*
99:*3, 16* 101:*25*
Gold 19:*16, 20*
Good 4:*8* 9:*20, 22*
14:*6, 8* 54:*17*
108:*1, 16*
Gordon 2:*10* 5:*3*
government 78:*8*
91:*5, 11, 13*
governmental 12:*9*
Grand 2:*18* 68:*19*
great 83:*4, 5*
greater 94:*1*
ground 5:*23*
group 31:*7* 37:*8,*
*10* 38:*18* 39:*6*
61:*21* 85:*17*
Grove 5:*15, 19*
grow 13:*21*
growing 106:*13*
guess 12:*18, 20*
15:*5* 32:*3* 42:*2*
53:*4* 56:*6, 8, 9*
74:*11* 78:*17*
89:*23* 93:*1* 94:*16*
101:*24*
guide 55:*4*
guy 40:*11* 45:*19*
76:*8*
guys 33:*22*

< H >
hand 114:*19*
handed 50:*13*
73:*15*

handle 86:*19*
88:*22*
handled 89:*24*
Hang 84:*17*
happen 25:*23*
happened 10:*13*
11:*24* 38:*3* 64:*11,*
*14* 83:*7*
happens 57:*9*
happy 13:*18*
60:*22* 61:*2* 111:*4*
head 6:*23, 24* 9:*7*
33:*12* 41:*5* 45:*3*
hear 7:*7* 81:*6, 9*
heard 74:*12*
He'd 47:*16*
held 32:*13*
help 11:*15, 23*
13:*17, 18* 35:*4*
40:*7* 51:*2, 3*
55:*14* 66:*7* 72:*19,*
*20*
helped 37:*2, 13, 14,*
*16, 17, 22* 43:*25*
44:*1*
helpful 36:*16*
helping 14:*16*
Hey 30:*15*
Hi 70:*16, 22* 74:*2*
Hiatt 21:*18*
hiccups 46:*3*
high 61:*1*
high-end 34:*7, 17*
hire 61:*16* 94:*9*
hired 88:*8, 16, 24*
89:*11, 19*
hiring 94:*11*
Hoff 91:*23*
hold 8:*23* 57:*16,*
*19*
holder 56:*10*
holders 58:*10*
home 34:*1*
honest 42:*7*
Honestly 19:*8*
28:*6*
honesty 63:*20*
hope 17:*13* 25:*6*
Hopefully 38:*15*
horse 107:*15*

**hosted** 74:*11*
**hours** 88:*9, 16*
**how-to** 53:*23*
**huh-uh** 6:*25*
**hundred** 60:*9, 10*
**husband** 111:*18*
**husband's** 64:*4*

**< I >**
**ID** 47:*12, 14* 48:*5,
10, 16* 52:*23* 53:*6,
7, 8* 55:*24* 56:*11*
58:*2, 8, 17, 23* 59:*7*
78:*8* 80:*13* 82:*2,
5, 12* 103:*17* 104:*4,
10, 18, 21, 25* 105:*1,
4, 18, 20* 106:*1, 11,
16, 16, 25* 107:*8, 10,
16, 17* 108:*24*
109:*5*
**idea** 9:*14, 22* 23:*8*
31:*10* 67:*2* 82:*2*
83:*5* 90:*16* 91:*7,
22, 24*
**identical** 99:*18*
**identification**
53:*10* 82:*6*
**identifier** 82:*3*
**identify** 4:*18*
**identity** 78:*5, 6, 13,
19*
**Igor** 44:*22* 64:*5, 6,
21*
**imagine** 33:*25*
**implement** 80:*25*
**implemented** 80:*21,
24*
**important** 6:*12, 18,
21* 7:*21* 102:*20*
**impression** 107:*2,
5, 7*
**impressions** 107:*6*
**inaccurate** 104:*18*
**Inaudible** 81:*5*
**include** 11:*25*
12:*4, 7* 72:*22*
**included** 36:*19*
53:*23* 73:*1, 16*
101:*15*
**including** 50:*14*

90:*1*
**in-completed** 86:*16*
**incorrect** 80:*10*
**independent** 58:*17,
23* 114:*16*
**INDEX** 3:*6*
**indicated** 27:*10*
29:*20* 53:*23*
60:*13* 72:*25* 95:*21*
**individually** 1:*9, 9*
**industry** 40:*9*
**infomercial** 92:*25*
93:*1*
**Information** 23:*19,
22* 24:*23* 25:*23*
29:*14, 18, 24* 36:*19*
37:*5* 47:*24* 57:*17,
18, 19, 22* 58:*2, 4, 7,
8, 9, 12, 19* 75:*17*
82:*5, 11* 85:*14, 19,
24, 25* 86:*4* 92:*16*
103:*7, 8*
**informational** 74:*6,
7*
**informations**
105:*17*
**initial** 93:*22*
**install** 46:*1, 14, 15,
16* 47:*2*
**installation** 24:*13*
79:*18*
**installed** 78:*9*
**installer** 45:*18*
46:*11, 13*
**installing** 46:*5*
**instance** 47:*21*
**instruct** 86:*18*
**instructed** 7:*9, 13*
11:*11, 13* 86:*19*
100:*6*
**instruction** 100:*10*
**instructions** 45:*22,
24, 25* 53:*24* 73:*18*
110:*19*
**integrity** 17:*4, 6, 11*
**interact** 18:*19*
31:*25*
**interacting** 16:*21,
23* 19:*7*

**interaction** 18:*8,
10, 11* 32:*2, 8, 10*
51:*8*
**interested** 22:*12*
32:*14* 101:*18*
114:*18*
**international** 40:*18*
**interposed** 7:*8*
**Interrogatories**
99:*12, 16, 20*
100:*20*
**Interrogatory**
99:*21* 100:*11*
**interview** 100:*1, 4,
8* 103:*23* 108:*2*
**interviewed** 53:*9*
99:*22*
**introduce** 96:*20*
**invaluable** 20:*1, 2*
**investigated** 29:*16*
**investment** 12:*20*
102:*13*
**investors** 60:*20*
**invited** 32:*16*
60:*21*
**involved** 13:*20*
15:*15* 18:*15, 17, 18*
28:*7* 32:*17* 36:*9*
44:*3* 47:*12* 48:*16,
23* 49:*3* 53:*3*
59:*3* 61:*23* 64:*8*
71:*12* 77:*5, 7*
84:*5, 20* 92:*11*
94:*11* 98:*8* 114:*17*
**involving** 97:*6*
**Ireland** 74:*8, 9, 12,
21, 22, 25* 75:*10*
77:*10* 92:*24*
94:*22, 23, 25* 95:*3,
5, 9*
**Ireland's** 75:*3*
93:*3, 14*
**irrelevant** 102:*15*
**issue** 55:*18* 68:*3*
71:*4* 90:*9* 94:*14,
22* 101:*25* 102:*22*
**issued** 78:*8*
**issues** 85:*8, 11*
86:*19* 96:*6*
**item** 8:*15* 54:*24*

79:*16, 17*
**items** 74:*3*
**its** 8:*11* 49:*15*
82:*3*

**< J >**
**James** 67:*16, 17,
19* 68:*2*
**January** 73:*23*
80:*25*
**Jarek** 35:*19* 37:*12,
13, 14, 20* 39:*12, 13*
40:*1, 22* 44:*22*
45:*16*
**Jarek's** 39:*13*
**Jaroslaw** 39:*17, 18*
**Job** 1:*24* 16:*9*
25:*14, 17, 21* 64:*6*
113:*25*
**jobs** 16:*20* 40:*2*
**JODOIN** 1:*9, 9, 16*
2:*2* 3:*1, 8* 4:*4, 14,
15* 5:*6, 8, 13, 15*
21:*7, 9* 54:*24*
88:*3* 95:*15*
113:*14, 19* 114:*6*
**Jodoin's** 99:*10*
**John** 21:*10* 66:*5,
6, 22* 95:*15* 96:*8,
18* 97:*17* 98:*12*
**Junio** 53:*14* 57:*8,
9, 21* 58:*17, 22*
59:*15, 22* 108:*23*
109:*1*
**J-U-N-I-O** 53:*14*

**< K >**
**Kathy** 74:*8, 9, 11,
21, 22, 25* 75:*2, 10*
77:*10* 92:*24* 93:*3,
14* 94:*22, 23, 25*
95:*3, 5, 9*
**keeping** 16:*24*
**kids** 33:*23* 34:*1*
**Kimberly** 1:*23*
2:*3* 3:*3* 4:*9*
114:*4, 23*
**kind** 9:*13* 10:*11*
15:*8* 47:*17* 63:*6*
110:*24*
**King** 21:*18*

Corey Jodoin                                          NAC Foundation, LLC v. Corey Jodoin, et al.

**KNECHT** 2:*17*
5:*5, 5* 8:*3* 11:*8*
38:*4, 20* 54:*17, 20*
56:*13* 63:*21*
65:*11* 69:*18, 21*
92:*18* 98:*2, 4*
99:*1* 105:*6*
108:*16* 110:*5, 15*
111:*22*
**knew** 18:*6, 6* 36:*8,*
*11* 60:*25* 61:*14*
93:*24* 106:*3* 109:*4*
**know** 5:*24* 6:*15*
8:*22* 10:*7, 14*
12:*12* 13:*15, 20*
14:*2, 4* 18:*11*
19:*5, 8* 21:*13*
22:*16, 17, 17* 23:*8,*
*20* 30:*3, 4* 31:*1, 14*
32:*17* 34:*8, 12, 24*
35:*8* 41:*11, 19*
42:*13* 44:*2* 47:*23*
48:*1* 49:*19* 52:*21*
53:*2* 54:*10* 55:*23*
56:*3, 10* 57:*12, 13,*
*14, 16, 18, 20, 21, 21,*
*23* 58:*5, 6, 11, 16,*
*20, 21* 59:*14, 17, 19,*
*22* 60:*8* 65:*3, 6, 21,*
*21* 66:*5* 67:*14, 15*
68:*15, 19* 77:*3, 11,*
*21, 22* 79:*11* 83:*19*
86:*10* 88:*7* 89:*1,*
*3, 11, 12, 15, 20*
92:*20, 22, 24* 93:*8,*
*20* 96:*11* 97:*1, 8,*
*16, 23* 102:*9, 18*
103:*10* 104:*9, 25*
105:*1, 1* 106:*2*
107:*5* 108:*4*
109:*12* 110:*23, 25*
**knowing** 98:*14*
**knowledge** 79:*24*
80:*2, 3* 87:*13*
97:*25* 100:*7, 23*
104:*5, 19, 22*
107:*10*
**knowledgeable**
41:*21*
**Kraken** 84:*19*

**KYC** 23:*18, 20*
24:*23* 44:*1*

**< L >**
**land** 15:*13*
**Larry** 21:*10, 11, 15,*
*16, 16*
**Las** 2:*11, 18* 4:*1*
50:*25* 85:*3* 90:*13,*
*15, 25* 100:*2*
**Laura** 21:*17*
**law** 6:*4* 61:*11*
65:*1*
**lawyer** 11:*11, 14*
61:*11, 22* 66:*6, 8*
100:*7*
**lawyers** 11:*6* 98:*9,*
*17, 22, 23*
**learn** 15:*1* 34:*3*
41:*18, 20*
**learned** 34:*4* 93:*22*
**learning** 14:*10, 17,*
*18*
**Leave** 38:*24*
**Lefebvre** 91:*2, 3,*
*25* 92:*15*
**LeFevres** 21:*9*
**left** 90:*10*
**left-hand** 52:*15*
**legal** 61:*22* 92:*17*
96:*6* 97:*21, 22*
98:*5, 13, 19*
**legwork** 18:*16*
**length** 99:*16*
**Letter** 72:*4, 10, 21,*
*22* 73:*1* 79:*15*
81:*18, 19* 82:*1*
**letting** 35:*8*
**liability** 1:*5*
**licensed** 114:*5*
**lie** 104:*5*
**liked** 111:*2*
**limbo** 86:*2*
**limited** 1:*5* 96:*11*
**line** 24:*9* 27:*2, 4*
96:*19* 113:*2*
**lines** 29:*25, 25*
72:*23*
**link** 47:*1*
**list** 21:*4* 55:*16*

**listed** 21:*5* 22:*2*
**listen** 21:*4* 49:*12*
**listened** 5:*24*
**listening** 5:*25*
**listing** 47:*3*
**little** 11:*16* 18:*12*
37:*13* 38:*25*
60:*11* 69:*22*
82:*25* 109:*22*
**live** 67:*22* 83:*6, 9,*
*10, 11, 13, 15, 17, 17*
**lives** 31:*17* 75:*19*
91:*3*
**LLC** 1:*5* 5:*4*
**LLP** 2:*10*
**local** 14:*7* 31:*16*
**locate** 8:*14*
**log** 58:*7, 13*
**logged** 58:*13, 15*
**logic** 71:*18, 18*
**logo** 17:*7* 109:*1*
**long** 17:*3, 14, 18*
43:*15, 16* 48:*22*
**longer** 15:*25* 90:*20*
**look** 9:*2, 5, 9, 11*
11:*11* 22:*18, 20, 20,*
*21, 22* 23:*2, 16, 16*
24:*2* 38:*15* 63:*19*
69:*14* 72:*1* 76:*19*
78:*2* 99:*19*
**looked** 9:*4, 15, 24*
10:*4* 40:*12* 54:*25*
55:*12* 72:*23*
73:*17* 77:*3* 83:*20,*
*21* 87:*20* 88:*2*
107:*12, 12*
**looking** 20:*4, 22*
29:*8* 32:*15, 18*
34:*6* 35:*2* 39:*9,*
*13* 41:*4* 42:*23*
54:*5* 73:*6* 76:*25*
81:*19* 82:*1* 83:*2*
87:*7, 23, 25* 90:*20*
103:*12*
**looks** 71:*7* 72:*11*
73:*12* 80:*7*
**lose** 69:*3*
**lot** 9:*15* 11:*16*
18:*15* 40:*8* 41:*25*
43:*11* 105:*11*

**< M >**
**Mac** 47:*6*
**madam** 8:*22*
**major** 38:*14*
**making** 19:*12* 23:*6*
**manage** 14:*16*
**Management**
38:*19* 39:*5* 50:*6,*
*7, 13* 51:*19* 54:*4*
55:*11* 65:*5* 73:*15*
98:*7, 10* 111:*7*
**manager** 40:*3*
88:*15*
**Marc** 71:*9*
**March** 10:*19, 19,*
*24* 32:*4* 74:*20*
**Marco** 31:*5* 44:*24,*
*25* 45:*6* 60:*18*
67:*7* 71:*6, 12*
74:*18* 93:*12*
109:*18* 111:*17*
**Marcus** 12:*17*
13:*4, 5, 18* 14:*16*
18:*4, 4* 19:*25*
20:*4* 24:*25* 25:*14,*
*15, 24* 33:*16, 17*
35:*18, 19* 36:*6, 8,*
*18* 37:*6, 9, 16, 21*
38:*11, 12* 41:*14*
42:*22* 44:*3, 18, 19,*
*20* 45:*25* 47:*15, 24*
48:*22* 49:*6, 12*
58:*11* 59:*3* 62:*2,*
*6, 21* 66:*14, 22*
67:*6* 68:*4, 11*
73:*10* 74:*2, 18*
86:*25* 87:*10* 88:*8,*
*15* 89:*11, 19* 91:*25*
92:*8, 10* 93:*12*
96:*19* 102:*7, 25*
108:*8* 111:*9, 11*
**marked** 4:*6*
**market** 41:*17*
**marketing** 14:*7*
41:*5, 9* 42:*25*
**mass** 34:*12*
**master's** 40:*18*
**material** 54:*4*
**matter** 4:*15* 65:*23*
67:*25*

NAC_000497

matters 88:22
97:22
Mawhinney 67:13,
14, 16 93:23 94:7,
9 101:16 102:4, 8
103:1
McGonigal 21:18
mean 14:24 17:9
23:21 30:12
33:15 34:18, 24
36:18 37:1 48:8
51:10 79:5 89:6
94:25 106:7, 25
110:6, 16 111:10
meaning 7:1
means 23:20
100:4, 8
meant 20:1 91:11
meeting 33:19
54:1 79:3, 6
101:5 107:3
meeting, 79:5
meetings 32:11, 13,
21
member 17:24
31:18 41:9
members 87:2
111:7, 7, 12, 13
memories 11:15
mentioned 15:17
19:6 20:11 31:11
39:12 43:21
45:16 48:4 57:7
61:8 70:9 97:3
mentions 19:9
met 31:3 61:15
metal 20:2
Michael 21:17
76:6
mid-2015 59:16
middle 79:15
Mike 75:18, 19
76:4, 17
million 60:14, 19
93:24, 24 94:2
102:9, 10, 10
mind 31:3
mine 108:6
minute 92:23
minutes 54:19

79:19 108:14
misled 40:25
misrepresentation
102:5, 14, 25
103:12, 14
misrepresentations
45:13 101:10, 15
107:8
misstatement 108:3
Misstates 105:6
mistake 84:6, 7
Mitchell 21:17
modifying 74:5
moment 63:16, 18
69:17
money 34:14, 22
48:3 60:4, 6, 7
68:5, 9, 14, 18 95:4,
6 101:11
Montecito 2:18
months 10:14
87:4, 5
mouth 106:21
move 79:21
multiple 6:20
16:12, 13
Murray 21:18

< N >
NAC 1:5 4:15
5:3 10:14 12:11,
12, 24 14:20 15:16
17:24 18:22
19:13, 15 20:9
23:5, 11, 18, 23
26:3 27:8 29:11
31:7, 18 32:20
41:13 42:9, 19
43:23 45:4 48:24
49:1, 14 55:23
58:3, 11 59:14
61:22 64:16 66:6,
8, 25 68:10 72:11
74:14, 16 82:2, 10,
18 85:4, 17 88:8,
18, 20, 24, 25 89:2
90:3 91:6, 10
92:11 93:8 95:19
101:6, 11 103:17
107:9, 23 109:9

110:3, 12, 12, 20, 23,
25 111:6, 6
NAC's 33:4
name 4:8 5:13, 15
10:3 15:19 19:24
39:14, 18 47:3
53:13 57:10
58:21 59:11, 22
64:4 87:18 89:11,
20 108:23
named 21:13
22:24 89:12 97:7
names 21:6, 20
22:5
National 38:19
40:3
nature 18:11
66:17, 19
navigate 66:7
necessarily 27:11
need 9:16 10:9
12:21 14:6, 8
82:16 87:3, 10
needed 13:17 47:6,
9 72:19
needs 15:2 29:15
negative 110:16
net 61:5
NEVADA 1:2, 5
2:4, 11, 18 4:1, 9,
16 114:2, 5, 20
never 10:22 23:9
28:3, 6, 6 40:22
45:24 49:14
53:11 61:4 69:6
76:13 80:1 81:16
91:8, 15 98:18, 18,
19 105:20 108:7
111:14
new 20:3 59:2
85:1 94:7 105:23
106:8
nodding 6:24
nondisclosure
92:13
Nope 84:11
Nos 3:13, 13, 13,
13, 13 4:6
notes 11:15 32:13
80:17 103:7

114:10, 13
noticing 4:25
November 42:16
94:16, 20
Ns 29:22
number 4:11 5:18
8:8, 11, 12 10:6
20:21 24:7 38:17
69:18 91:24 92:1,
5, 16
numbered 20:18
numbers 8:10
20:19 92:14
93:25 102:13, 25
nuts 37:10

< O >
Oasis 4:10
oath 4:21 6:3, 3
111:19
Object 63:21
objection 4:20, 22
7:10, 10 11:8
38:4 56:13 65:11
92:18 98:2, 4, 5
99:1 105:6 110:5,
15
objections 7:7
obligated 6:4
obligation 30:12, 14
oblique 109:22
observation 87:9
observe 42:2, 5
obtained 26:19, 24
27:13, 17 28:16
29:6, 19 91:19
occur 94:10
occurred 19:23
32:5 80:16 94:16
October 42:16
offer 13:6
offered 13:4
offhand 75:15
office 24:12, 25
25:15, 22 27:20, 23
42:23 47:9 50:25
51:16 70:17, 23, 23
71:2, 14, 15, 19
72:6, 20 85:3, 9, 16,
24 87:1, 2, 14, 16,
24 88:15, 16 89:10,

Corey Jodoin

NAC Foundation, LLC v. Corey Jodoin, et al.

*15, 18, 22* 90:*1, 4, 6, 7, 13, 15, 16, 20, 25* 103:*8* 114:*20*
**officer** 4:*21* 12:*15, 24* 13:*1, 2, 15* 17:*20* 29:*17* 33:*17* 44:*9* 81:*23* 86:*17* 97:*21, 23* 98:*13* 101:*12*
**officers** 98:*24*
**official** 6:*11*
**Oh** 74:*23* 81:*18* 84:*17*
**Okay** 9:*9, 23* 10:*16* 13:*9, 22* 15:*4, 24* 16:*9, 12, 16* 18:*2, 6* 19:*19* 20:*21, 23, 24* 21:*2* 22:*13, 18* 23:*5, 21* 24:*2, 7, 15* 25:*4* 26:*17* 27:*2, 10* 28:*2, 4* 30:*22* 33:*25* 35:*13, 23* 36:*6, 11* 37:*9, 19* 38:*15* 39:*12, 22* 40:*11* 43:*8, 21* 44:*5, 8, 16, 18* 46:*5, 10* 47:*18* 50:*5, 17* 51:*7* 52:*3, 6, 9, 25* 53:*22* 54:*20* 56:*2, 19, 22* 57:*3, 7* 58:*16, 21* 59:*6, 11, 18, 21* 60:*3, 13* 61:*16, 24* 62:*1, 7, 14* 63:*17* 66:*4* 67:*9* 68:*14, 25* 69:*21* 70:*2, 4, 5, 11* 71:*7* 72:*14* 73:*12, 20, 24* 74:*9, 24* 75:*8, 21, 25* 76:*22* 77:*16* 78:*16* 79:*14* 80:*19* 81:*2, 23* 84:*9* 85:*8, 18, 21* 87:*6* 88:*18* 90:*19* 94:*13, 13, 19* 95:*7, 21* 96:*9, 23* 102:*3, 8* 107:*2, 21* 108:*9, 12, 23* 109:*4, 20*
**old** 47:*19*

**OLSEN** 2:*10* 3:*9* 5:*1, 2, 2, 12* 8:*1, 4* 11:*9* 38:*5, 21, 24* 39:*2* 54:*15, 18, 22* 56:*14* 63:*24* 65:*12* 69:*19, 22* 70:*1* 80:*7, 11* 81:*6, 9, 14* 92:*19* 95:*11, 14* 98:*3, 6* 99:*2* 105:*8* 108:*13, 18* 110:*7, 10, 18* 111:*20, 23*
**Once** 47:*5, 8* 66:*16* 83:*16*
**ones** 22:*16* 26:*19, 22* 27:*20* 29:*5* 84:*21*
**ongoing** 9:*17*
**online** 32:*13, 21* 76:*20*
**online,** 77:*2*
**open** 34:*4* 85:*14, 19*
**operating** 13:*2, 15* 86:*17*
**operations** 81:*23*
**opinion** 62:*15, 16* 63:*20* 92:*17*
**opposed** 6:*23*
**optimistic** 61:*1*
**option** 50:*24* 51:*5, 14, 14, 16, 16, 24* 52:*1, 3* 55:*3, 10*
**options** 50:*23* 68:*6*
**order** 78:*18*
**orderly** 34:*14*
**organization** 18:*19*
**organized** 16:*25*
**original** 93:*23* 100:*12*
**originally** 13:*4* 109:*8*
**Ortmeier** 21:*10*
**out,** 29:*21*
**outside** 18:*22* 53:*10* 58:*23*
**owed** 23:*11*
**owner** 98:*21*
**owners** 98:*24*
**owns** 59:*24*

**< P >**
**p.m** 1:*18* 2:*3* 4:*3, 13* 112:*2* 114:*7*
**package** 50:*5, 8, 11, 12*
**packet** 24:*16* 38:*19* 39:*5, 13, 23* 41:*4* 50:*14* 51:*19* 53:*16, 22, 23* 54:*4, 5, 8* 55:*11*
**packets** 8:*6*
**Page** 3:*7, 13* 8:*9, 11* 9:*1* 20:*19, 21, 22* 22:*18, 21* 23:*16* 24:*2* 26:*7, 7, 13, 13* 28:*15* 29:*8, 9, 9* 38:*17* 39:*19* 49:*23, 25* 50:*7* 51:*25* 53:*17, 19, 20* 61:*10* 73:*8, 14* 76:*18, 23* 77:*16* 78:*2, 2, 4, 25* 79:*1* 81:*19* 99:*4, 7, 19, 20* 106:*22* 113:*2*
**pages** 70:*3* 76:*22* 77:*14*
**paid** 35:*12* 54:*12, 14* 65:*5* 68:*9* 85:*3* 94:*13, 14, 15, 15*
**paper** 49:*24* 73:*6*
**paragraph** 24:*10* 72:*24*
**parameters** 14:*20*
**paramount** 83:*6*
**Pardon** 89:*17*
**Parkway** 2:*18*
**part** 6:*1* 19:*20* 38:*12, 13* 39:*8* 41:*15, 24* 48:*8, 10, 18, 19* 50:*5, 8, 10, 12, 14* 53:*11* 55:*11* 56:*12* 57:*22* 61:*19* 75:*9, 16* 77:*9, 14* 82:*12* 84:*10* 87:*21* 90:*12* 104:*20* 108:*9, 10*
**participant** 97:*4*

**participate** 18:*2* 19:*14* 36:*12* 59:*4* 74:*13*
**participated** 19:*12* 32:*20* 59:*6* 74:*10*
**participating** 48:*14* 59:*1*
**participation** 67:*5*
**particular** 8:*15, 25* 9:*10, 24* 16:*20* 25:*5*
**parties** 48:*4, 14, 15, 15, 23* 49:*4* 114:*17*
**partner** 19:*25* 20:*1*
**parts** 35:*6*
**party** 29:*1* 48:*5, 24* 49:*2, 7* 59:*7* 109:*5, 10, 10, 14, 16*
**passport** 78:*8*
**patent** 108:*8*
**patents** 44:*4, 5* 108:*7*
**Patti** 87:*17, 19* 88:*2, 3, 6, 21* 89:*8*
**Patti's** 87:*18*
**Paul** 21:*18*
**Pay** 64:*9, 11, 15, 17, 20*
**Payment** 31:*19* 34:*10* 71:*5* 94:*16*
**payments** 32:*16*
**PC** 47:*6*
**penalty** 113:*16*
**pending** 6:*1*
**people** 6:*21* 8:*23* 16:*24* 18:*21, 21* 20:*6, 7* 21:*4, 13* 22:*1, 4, 11, 12, 13, 14, 24, 24* 24:*17* 26:*24* 30:*5, 7, 9, 12, 19, 23* 31:*12* 32:*17* 34:*12* 35:*5* 42:*1, 25* 47:*25* 50:*18* 56:*24* 58:*1* 60:*5* 61:*2* 72:*12* 74:*16* 77:*19, 20* 82:*4* 86:*18* 87:*22, 24* 89:*6* 91:*17, 21* 93:*8* 98:*12* 105:*3, 23* 110:*23* 111:*5*