MICHAEL J. SHEPARD (SBN 91281)
 *mshepard@kslaw.com*
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, California 94111
Telephone:    +1 415 318 1221

CINDY A. DIAMOND (SBN 124995)
 *cindy@cadiamond.com*
**ATTORNEY AT LAW**
58 West Portal Ave #350
San Francisco, CA 94127
Telephone:    +1 408 981 6307

DAINEC P. STEFAN (admitted *pro hac vice*)
 *dstefan@kslaw.com*
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Telephone:    +1 212 556 2291

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>Defendant. | Case No. 3:2-cr-00249-RS<br><br>**DEFENDANT'S REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**<br><br>Judge: Hon. Richard Seeborg, Chief Judge |

1

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     THE GOVERNMENT'S SENTENCING RECOMMENDATION FAILS TO
        PROPERLY ADDRESS THE SECTION 3553(A) FACTORS........................................ 1

        A.      Reflecting the Seriousness of the Offense, Deterrence, and Protecting the Public  1

        B.      Sentencing Disparities Suggest that Mr. Andrade's Sentence Should Be Far
                Lower, Not Higher ................................................................................................ 2

III.    THE GOVERNMENT'S SIDE-SHOWS ABOUT FINANCIAL REPORTING AND
        ACCEPTANCE OF RESPONSIBILITY AMOUNT TO NOTHING .............................. 5

        A.      The Government's Suggestion that Mr. Andrade Obfuscated His Financial
                Resources is False ................................................................................................ 6

        B.      The Government's Complaints About Acceptance of Responsibility are Meritless
                and Beside the Point............................................................................................. 8

IV.     THE GOVERNMENT'S DESCRIPTION OF OFFENSE CONDUCT IS OVERSTATED
        AND OMITS MITIGATING EVIDENCE .................................................................... 9

V.      THE CONTESTED GUIDELINE ENHANCEMENTS SHOULD BE REJECTED ...... 15

        A.      The Proposed Obstruction Enhancement Should Be Rejected............................. 15

        B.      The Government's Loss Calculation Is Wrong and Losses Do Not Exceed
                $9,500,000........................................................................................................... 16

        C.      Neither the Outside the United States Nor the Sophisticated Means Prongs of the
                Enhancement Are Satisfied.................................................................................. 17

VI.     THE GOVERNMENT'S REQUESTED RESTITUTION IS EXCESSIVE.................... 18

        A.      Some Claimants Are Ineligible for Restitution..................................................... 18

        B.      Some Claimants Have Offered Insufficient Information To Establish that They
                Are Eligible for Restitution.................................................................................. 19

        C.      Claimants Who Only State the Amount They Purchased, and Not the Amount
                They Lost, Should Not Be Awarded Restitution ................................................... 20

        D.      Due To Unique Facts, Some Claimants Should Not Be Awarded Restitution..... 21

        E.      Summary on Defense Position on Restitution ...................................................... 24

VII.    The Forfeiture of Mr. Andrade's Home Was Not Put To The Jury As Required by Rule
        32.2(b)(5)(A)................................................................................................................ 25

VIII.   CONCLUSION............................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

*United States v. Bailey,*
     973 F.3d 548 (6th Cir. 2020) .................................................................... 21, 22, 23

*United States v. Barket,*
     530 F.2d 189 (8th Cir. 1976) ................................................................................ 10

*United States v. Beckner,*
     No. CR 15-2218, 2023 WL 4157269 (D.N.M. June 23, 2023) ............................. 17

*United States v. Caputo,*
     517 F.3d 935 (7th Cir. 2008) ................................................................................ 18

*United States v. Donadeo,*
     910 F.3d 886 (6th Cir. 2018) ................................................................................ 21

*United States v. Ferguson,*
     942 F. Supp. 2d 1186 (M.D. Ala. 2013) ................................................................. 5

*United States v. Grullon,*
     996 F.3d 21 (1st Cir. 2021) .................................................................................... 4

*United States v. Hahn,*
     960 F.2d 903 (9th Cir. 1992) .................................................................................. 9

*United States v. Lazarenko,*
     624 F.3d 1247 (9th Cir. 2010) .............................................................................. 19

*United States v. Mancuso,*
     718 F.3d 780 (9th Cir. 2013) ................................................................................ 25

*United States v. May,*
     706 F.3d 1209 (9th Cir. 2013) .............................................................................. 18

*United States v. Ogunbanke,*
     619 F. Appx. 586 (9th Cir. 2015) ......................................................................... 17

*United States v. Phillips,*
     704 F.3d 754 (9th Cir. 2012) ................................................................................ 25

*United States v. Reifler,*
     446 F.3d 65 (2d Cir. 2006) ................................................................................... 19

*United States v. Stein,*
     846 F.3d 1135 (11th Cir. 2017) ............................................................................ 20

*United States v. Swiney,*
     203 F.3d 397 (6th Cir. 2000) ................................................................................ 21

*United States v. Waknine,*
     543 F.3d 546 (9th Cir. 2008) ................................................................................ 21

*United States v. Williams*,
   2011 U.S. Dist. LEXIS 167493 (D. Neb. 2011) ................................................................ 25

**Statutes**

18 U.S.C. § 3553(a)(6) ........................................................................................................... 4

18 U.S.C. § 3664 .................................................................................................................. 18

18 U.S.C. § 3664(d)(1) ......................................................................................................... 19

18 U.S.C. § 3664(d)(5) ......................................................................................................... 19

18 U.S.C. § 3771 .................................................................................................................. 18

Fed. R. Crim. P. 32.2(d) ....................................................................................................... 25

Fed. R. Crim. P. 38(e) .......................................................................................................... 18

**Other Authorities**

U.S.S.G. 1B1.3(a)(2) ......................................................................................................... 9, 10

U.S.S.G. 2B1.1 ..................................................................................................................... 17

## I.    INTRODUCTION

On the issues critical to determining a just sentence for Mr. Andrade – the mitigating facts of his upbringing and his psychiatric conditions, the mitigating aspects of some of his conduct, the excessiveness of the fraud guideline in high loss cases, and the fact that, as noted in the presentence report, "any length of time [in custody] will be a significant punishment for Mr. Andrade" – the government's sentencing memorandum has very little to say.  Instead, it offers a one-sided account of the facts of the case, a few weak justifications for some excessive enhancements it seeks, and some new but false accusations in an attempt to change the subject. No matter how hard the government tries to make Mr. Andrade a one-dimensional criminal, the Court's takeaway should be that, while Mr. Andrade should spend some time in jail, this case merits a compassionate sentence.

## II.    THE GOVERNMENT'S SENTENCING RECOMMENDATION FAILS TO PROPERLY ADDRESS THE SECTION 3553(A) FACTORS

### A.  Reflecting the Seriousness of the Offense, Deterrence, and Protecting the Public

While considerations like the seriousness of the offense suggest that Mr. Andrade should spend some time in jail (as his sentencing memorandum proposes), they offer at best limited insight into how much time is necessary.[1]  Mr. Andrade's Sentencing Memorandum addressed deterrence and why it does not require a long sentence, especially for someone with the

---

[1] The government's notion that a low-end fraud guideline sentence is necessary to reflect the seriousness of the offense is consistently rejected, not just in this district, but nationally.  For crimes involving fraud, theft, or embezzlement, 60.03% of defendants receive sentences below the guideline range.  U.S. Sentencing Commission, Sentence Imposed Relative to the Guideline Range by Type of Crime, Datafile, 2023, available https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-andsourcebooks/2023/Table31.pdf. For sentences for fraud, theft, or embezzlement, the average extent of departure is by 51.4%.  86 U.S. Sentencing Commission, Extent of Downward Variances by Type of Crime, Datafile, 2023, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-andsourcebooks/2023/Table40.pdf.

challenges that Mr. Andrade faces.  This is even more true of the supposed need to protect the public from future crimes by Mr. Andrade.  Not only is the rate of recidivism for defendants of Mr. Andrade's age relatively low,[2] but research unequivocally establishes that rehabilitation and prevention programs are more effective than incarceration in defeating recidivism.[3]  That is especially true for someone like Mr. Andrade, whose law-abiding future will be best ensured by minimizing the potentially shattering negative experiences that are likely for someone with his conditions, and by ensuring that he can get therapy and medication far beyond what will be available when he is in the custody of the Bureau of Prisons.

**B.  Sentencing Disparities Suggest that Mr. Andrade's Sentence Should Be Far Lower, Not Higher**

Declaring that "there is precedent for imposition of a significant custodial sentence in this case," Government Sentencing Memo, EXF 709 at 24, the government skips over the *Miller* case (cited by Mr. Andrade to Probation and in his Sentencing Memorandum), and instead lists cases

---

[2] A study done by the United States Sentencing Commission in 2017 found a direct link between age and the risk of reoffending: younger offenders were more likely to be rearrested than older offenders, they were rearrested faster than older offenders, and they committed more serious offenses after they were released than older offenders. United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, Dec 2017. Accessed at: https://www. ussc. gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age. pdf.   Specifically, the reincarceration rate was highest among those between the ages of 21 to 24 years old (38.6%) and declined in each subsequent age group; for someone aged 47 like Mr. Andrade, the recidivism rate falls to 17.4%. *Id*. at figure 15.

[3] See, e.g., Washington State Institute for Public Policy, *The Criminal Justice System in Washington State: Incarceration Rates, Taxpayer Costs, Crime Rates, and Prison Economics,* 292-294 (2003), 293. Available at: https://www. wsipp. wa. gov/ReportFile/824/Wsipp_The-Criminal-Justice-System-in-Washington-State-Incarceration-Rates-Taxpayer-Costs-Crime-Rates-and-Prison-Economics_Full-Report. pdf; Raymond Liedka, Anne Morrison Piehl & Bert Useem, *The Crime-Control Effect of Incarceration: Does Scale Matter?*, 5 Crime and Public Policy 245, 245-276 (2006).

wildly dissimilar to this one in which long sentences were imposed – and even then, none were as long as the government recommends in its Memorandum.  Take the first of the three Northern District of California cases listed by the government as an initial example.

In *United States v. Murray*, Cr 12-0278 EMC, the defendant was convicted of four separate fraud schemes, with at least half of the counts of conviction having been committed while the defendant was on bond, and, after being released on a second, more restrictive bond, the defendant "engaged in an audacious pattern of disregard for the Court by violating nearly every term of the Court's release order."  ECF 332 at 4.  In addition, and also unlike Mr. Andrade, the defendant was treated as a criminal history category II, *id.* at 5, perjured himself at trial, *id.* at 16, was convicted of obstruction of justice, *id.*, and refused to repatriate some of the stolen funds that remained in a foreign bank account.  *Id.* at 21.  And in further sharp contrast with Mr. Andrade, Murray had been "given every opportunity in life," with a childhood that "afforded defendant every advantage" and he never "suffer[ed] any traumatic experiences."  *Id.*

The other two Northern District of California cases cited by the government tell a similar story, in that they are markedly different from this case.  Neither defendant invested the time and money in an effort to make their products a success like Mr. Andrade did, and neither had a horrific upbringing or had a collection of mental and physical conditions like Mr. Andrade.  By contrast, Anderson "was raised by his parents in a nurturing and supportive home," "enjoyed many advantages," and had already been convicted of and sentenced to prison for a prior fraud. *United States v. Anderson*, CR 21-397 EMC, ECF 89 at 13, 15.  And Karlsson, like Murray, tried to "hoodwink the Court:" after agreeing to provide restitution based on ample assets he possessed in Thailand, he engaged in a series of deceptions, including sham sales of properties, *United States v. Karlsson*, 19-CR-00340 CRB, ECF 44 at 11, evasive financial disclosures offering only assets already identified by the government, *id.,* and claims that his wife was victimizing him, even though secretly recorded conversations between the two showed the opposite.  ECF 49 at 4.  In further contrast with Mr. Andrade, who sold his cryptocurrency and

1    returned the funds to his business, *see* Defendant's Sentencing Memorandum, ECF 713 at 28,

2    Karlsson hid his cryptocurrency. *Id.*

3    　　　Despite these fundamental differences between cases with long sentences and this one,

4    the government suggests a long sentence would be needed to avoid unwarranted sentencing

5    disparities.  But there is nothing unwarranted in disparities based on the justifications described

6    above – that is what Section 3553(a) effectively requires.  Not only does the government's

7    argument miss the fact that disparities between Mr. Andrade and the cases cited by the

8    government are justified, but it also fails to look under its own nose, to the massive disparity the

9    government itself seeks to author: the disparity between the guideline calculation given to co-

10   conspirator Abramoff (offense level 19, before acceptance of responsibility), and Mr. Andrade

11   (offense level 37), which translates to *a difference of 180 to 225 months.*  The vast bulk of this

12   disparity is driven by the government's lawless gift of 10 levels for the loss enhancement in

13   Abramoff's guideline calculation, compared to the 20 levels it seeks for Mr. Andrade.

14   　　　True, Abramoff is cooperating, but his cooperation is rewarded by the Court under

15   5K1.1; that the government also felt the need to further reward Abramoff by violating the

16   express terms of guidelines and commentary as a result of calculating loss using only Abramoff's

17   supposed gain instead of loss to victims underscores the government's own recognition that the

18   loss component of the fraud guideline is untenable and needlessly harsh in high loss cases, and

19   creates a massive disparity, to Mr. Andrade's severe detriment.  That this massive disparity

20   exists even in the guideline calculations *within the same case, and despite Abramoff's history as*

21   *one of the GOATs of 21st century fraudsters* is a disparity that should concern the Court far more

22   than the justifiable disparities with the very different defendants in the cases cited by the

23   government.  *See* 18 U.S.C. § 3553(a)(6) (requiring court to consider "the need to avoid

24   unwarranted sentencing disparities among defendants with similar records who have been found

25   guilty of similar conduct"); *see generally United States v. Grullon,* 996 F.3d 21, 35 (1st Cir.

26   2021) (expressing willingness to examine arguments about disparities with the sentence given to

27   a co-defendant).

28

As a result, even the normally pro-prosecution of the 3553(a) factors do not justify anything close to the government's recommendation for this case, and instead point toward a far more compassionate sentence.  This is even more true when the history and characteristics of the defendant are taken into account.  In the face of powerful mitigating evidence recognized in the presentence report – "a tumultuous upbringing,"" instability,"" abuse," "abandonment," a horrific experience that drove him to mutism, ASD, ADHD, anxiety, and bipolar disorder – the government has essentially nothing to say other than five dismissive and oblivious words: "Andrade asserts he faced hardships."  G. Mem at 20.  It then pivots to the claim that "he has experienced success," without identifying any success Mr. Andrade experienced.  He did not succeed in school – nine years of effort producing low grades and no advanced degree,  *see* ECF 713 at 5 – nor in the military, where he left with the same rank he had when he started, *see* PSR ¶ 103, nor in business, where his mental conditions undermined his ability to succeed, *see, e.g.,* ECF 713 at 34-35.

These are powerful mitigating circumstances, especially when combined with the fact, recognized in the presentence report, that Mr. Andrade was "truly passionate" about what he was doing, and also the fact, as shown at trial, that he devoted great personal effort and substantial sums of money in an effort to make his business a success.  All of this suggests that treatment is a far better solution than lengthy incarceration, *see, e.g., United States v. Ferguson,* 942 F. Supp. 2d 1186 (M.D. Ala. 2013), that the government's sentencing recommendation is in the wrong solar system, and that Probation's recommendation is also too high, especially when compared to its own recommendation in *Miller* (with far more aggravating facts and none of the extensive mitigating facts here, *see* ECF 713 at 16-17.  We respectfully submit that that the proper sentence is far closer to the defense recommendation.

## III.    THE GOVERNMENT'S SIDE-SHOWS ABOUT FINANCIAL REPORTING AND ACCEPTANCE OF RESPONSIBILITY AMOUNT TO NOTHING

In an effort to get some traction for a sentencing recommendation that cannot be justified

under Section 3553(a) and is nearly three times as high as Probation's, the government chooses to hint that Mr. Andrade lied about or hid financial resources from Probation, and even that he should not have appointed counsel. *See* ECF-709 at 21:2-10. & n.3. Although Mr. Andrade will be appealing his conviction and has not contested (except to preserve a constitutional issue) the lack of any reduction for acceptance of responsibility, the government also complains that he has not accepted responsibility. Neither of these diversions help the government. The first is false and the second is meritless and beside the point.

### A. The Government's Suggestion that Mr. Andrade Obfuscated His Financial Resources is False

The sole basis for the government's hint about Mr. Andrade's statements to Probation is the government's report on his financial activity, which according to the government shows him receiving considerably more income during the period December 2024-May 2025 than he reported in income on a form prepared for Probation in June, 2025. Nice try, but not close.

First, the $5000 Mr. Andrade reported to Probation accurately states his monthly income as of the time he filled out the form in June, 2025 (plus $800 per month in veterans benefits, also accurately reported), as well as his anticipated income in the period July through October, after which the $5000 per month will become zero.[4]

Second, the amount of monthly income over time has typically been $5000 per month and was actually somewhat *less* than $5000 per month for the entirety of 2024 as well;[5] the government omitted that fact by presenting an analysis that started in December.

Third, all the income was from sales of stock in a company that holds patents, with that fact (and his percentage of ownership in the patent-holding company) disclosed to Probation.

---

[4] In addition to fully completing the form, Mr. Andrade also authorized Probation to gain access to all of his financial data, allowing Probation to verify that his answers are accurate.

[5] In 2024, the total credits to Mr. Andrade's checking account, excluding transfers from his savings account – which is not income – amounts to $67,443.44. However, $10,000 dollars of that figure is made up of loans, making the total income figure $57,443.44, for an average income of $4,786.95 per month.

The income from stock sales varies from time to time,[6] but the government materially overstated the upward variation in the December-May period by counting all funds coming into Mr. Andrade's checking account, which means that its analysis includes not just income from outside sources (stock sales), but also money Mr. Andrade transferred from his savings account to his checking account to pay bills and other living costs.[7]  The amount of the overstatement was as high as $13,000 in the period April 14, 2025 and May 12, 2025, and the total overstatement for the December to May period appears to be at least $27,500.[8]

Trying to gild this illusory lily, the government tosses in a footnote with two even more scurrilous accusations.  It hints that Mr. Andrade's monthly expenses were too much for him to have CJA counsel, without acknowledging that Mr. Andrade initially retained counsel or that it would take massive wealth to have enough excess funds to pay retained counsel to handle the volume of discovery and the breadth of the issues in a case with 5TB of discovery, a wide-ranging array of accusations., and five years of extensive litigation in which the government had to be ordered repeatedly to make discovery it refused to make.  It also observes that he made close to $1000 in ATM cash withdrawals at the Hustler Club during the trial, without offering any reason to include these allegations other than for their prurient and prejudicial value.

Mr. Andrade has been on supervised release for five years without a single blemish.  He

---

[6] It appears that Mr. Andrade may have sold more shares in the period leading up to and during trial due to the anticipation of needing to pay living expenses in San Francisco during the trial, and/or based on the one-time availability of a buyer.  But as noted below, the government held on to this not-carefully-vetted accusation until it was too late for the defense to investigate it fully.

[7] Moreover, in March 2025, Mr. Andrade directed $17,500 from the proceeds of a stock sale with one investor towards BGC's international patent maintenance fees.  *See* Attach-1 Rene Blanchette Agreement (Blanchette paid $35,000 for shares, of which Mr. Andrade received only $17,500, with the rest directed to Mr. Andrade's attorneys for patent maintenance).

[8] In the three days between receiving the accusations in the government's sentencing memorandum and the filing of this reply, Mr. Andrade cannot prepare or present a full accounting, but can supply the stock sale agreements and bank statements on which these calculations and representations are based.

---

made an accurate report to Probation. If the Court wants more information, the defense can supply it, given additional time. But Mr. Andrade submits that this last-minute, unsupported diversion merely underscores the weakness of the government's position on the issues that matter to this sentencing.

### B. The Government's Complaints About Acceptance of Responsibility are Meritless and Beside the Point.

Mr. Andrade has a right to appeal his conviction, and believes he has meritorious issues (and therefore substantial issues for purposes of a stay) on appeal. He has not requested a two-level reduction for acceptance of responsibility, other than preserving his constitution-based objection to the current state of the law, which effectively precludes eligibility for the reduction absent an admission that would moot any appeal. This Court will therefore not give him a two-level reduction, and there is no need to address acceptance of responsibility. The government nonetheless devotes considerable attention to acceptance of responsibility, complaining about the fact that Mr. Andrade has not accepted responsibility, *see. e.g.*, ECF 709 at 1:9-10 ("Yet despite a jury verdict on all counts, Andrade refuses to accept responsibility for his criminal conduct"). The government expands this complaint to Mr. Andrade's efforts to add mitigating facts to the solely aggravating ones with which the government myopically filled its sentencing submissions to Probation and to this Court. *See, e.g., id.* at 20:22-23 (complaining that he "blames his investors," despite the fact that he has expressly eschewed doing so and merely has noted as mitigating evidence relating to good faith that he sold only tokens, not coins, and that he informed purchasers that the coin was not complete). And it complains about posts (all of which under Mr. Andrade's control have since been taken down) that express his disagreement with some of the government's conduct in this investigation, which is his right to do.[9]

---

[9] This Court's decision denying Mr. Andrade's misconduct motion did not exonerate the government for the challenged conduct, *see, e.g.,* ECF 535 at 7 ("Defendant fairly criticizes the

1    **IV.    THE GOVERNMENT'S DESCRIPTION OF OFFENSE CONDUCT IS**

2    **OVERSTATED AND OMITS MITIGATING EVIDENCE**

3         Lacking any meaningful way to respond to all the mitigating circumstances in the

4    presentence report, or to provide any explanation for why the 210 months at the low end of the

5    guideline range could possibly be a reasonable sentence, the government devotes a significant

6    portion of its brief to largely citation-free rhetoric that overhypes the offense and ignores the

7    mitigating evidence that would have put its hype in context.  As the Court heard weeks of

8    evidence at trial, rather than respond fully to all the hype, this section hits some of the highlights.

9         *Biogreen.*  The government begins by exhuming Biogreen from the grave into which it

10   was first put by the government itself, when, 16 years after Biogreen was founded, *see* Attach-2

11   Biogreen Certificate of Formation, the government's investigation into it was mothballed with

12   "no outstanding leads and no 1B evidence," *see* Attach-3 FBI-302-012121, no indictment, and no

13   substantive evidence collection—or at least retention.  This Court then buried it again in

14   excluding it in response to the government's offer of it as Rule 404(b) evidence, and the Court's

15   rationale for exclusion —its lack of intertwinement with and similarity to the charged offenses,

16   along with its temporal distance from the conduct at issue, *see* ECF 493 at 6[10]—is equally

17   applicable to the consideration of the evidence during sentencing.  *See* U.S.S.G. 1B1.3(a)(2);

18   *United States v. Hahn,* 960 F.2d 903, 910-11 (9th Cir. 1992) ("There must be sufficient similarity

19   and temporal proximity to reasonably suggest that repeated instances of criminal behavior

20   constitute a pattern of criminal conduct. . . . it is not enough that the extraneous conduct merely

21   amounts to the same offense as the offense for which the defendant was convicted," rather, a

22   district court "must consider whether *specific similarities* exist between the offense of conviction

23

24   government's obstinate participation in the discovery process"), but rather rejected a hearing on
     other grounds, such as that the defense "through diligent advocacy" ultimately obtained

25   discovery, *id.*, or that the defense did not meet standards for prejudice resulting from alleged
     wrongdoing.  *Id.* at 10.

26   [10] As this Court explained, "the use of some of the same marketing and sales techniques is

27   insufficient to meet the similarity requirements" and is "too distant temporally from the conduct
     at issue." ECF 493 at 6.

28

1   and the temporally remote conduct alleged to be relevant under Guidelines section 1B1.3(a)(2)"

2   (emphasis added)).

3        In any event, the government never offered proof that Biogreen was a fraud, as opposed

4   to a failed business.  What little evidence existed for Biogreen showed that the company was a

5   legitimate venture that failed after its co-founder, Benito Garza, Jr., signor on five Biogreen bank

6   accounts over which Mr. Andrade, in one of his earlier appearances as a sucker, had no control,

7   *see* Attach-4 FBI-MAIN-001336, absconded with over $150,000 in investor funds – about a

8   quarter of the total – crippling the company's ability to deliver on its objectives.  Attach-5

9   Biogreen Petition Against Benito Garza.

10       Even if there had been proof suggesting a fraud, the government failed to produce any

11  substantive evidence concerning Biogreen such that Mr. Andrade could defend against it.

12  Despite the attorney who dispatched the case claiming that she would "retain many of the

13  records gathered" in the Biogreen investigation, very little of the evidence reviewed by the

14  government appears to have survived or was produced by the government; dozens of emails,

15  corporate documents, invoices, and contracts were absent from government discovery and likely

16  no longer exist.  *See* ECF 425 at 6-7.  Moreover, the most important witness related to Biogreen,

17  co-founder Benito Garza, Jr., died on September 14, 2021, eradicating the only other possible

18  source of evidence. *Id.* at 8. This factual purging makes it as unfair to consider Biogreen for the

19  purposes of sentencing as it was determined to be unfair as uncharged acts during trial—without

20  evidence, the Court has no reliable proof of a fraud, and Mr. Andrade has no chance of testing

21  the government's naked assertions.  See, e.g., *United States v. Barket*, 530 F.2d 189 (8th Cir.

22  1976) (affirming dismissal of indictment on due process grounds based on prejudicial pre-

23  indictment delay due to loss of witnesses over a four period and government delay).

24       *AtenCoin.*  Mr. Andrade argued in considerable detail in his submission to the Probation

25  office that the government never proved that AtenCoin was a fraud, as opposed to a failed

26  business, and that, based on analysis by an expert and others (including the Jodoins), the coin

27

28

1  was fully functional, albeit with a third party doing ID verification,  Andrade Sentencing Memo

2  at 24:10-27:2.

3          Much of the government's memorandum focuses on reporting that AtenCoin was

4  inextricably intertwined with AML Bitcoin.  The Court did so rule (over Mr. Andrade's

5  objection), but admitting evidence because it was inextricably intertwined – meaning that the

6  AMLBitcoin story could not be told without the AtenCoin story – has nothing to do with whether

7  AtenCoin itself was a fraud.  There are a few lines in the government's memorandum that

8  purport to fill that vacuum and provide support for the notion that AtenCoin was a fraud, but the

9  support is illusory.  Some of it comes from the Jodoins, who cannot be believed, *see* ECF 713 at

10  26:10-27:2, and who expressly testified to the contrary anyway, see ECF 713 at 25 n.30, and

11  most of it is from the useless Ethan Quinn School of Testimony, in which a witness says only

12  that they "did not see it" (here, did not see it work), without ever declaring that they looked to

13  see whether it worked or if they were knowledgeable enough to have been able to recognize

14  whether it worked or not, in the event they had looked.[11]  The only remaining testimony cited is

15  from witnesses who described their "understanding."[12]  All this evidence fails in favor of

16  specific testimony from defense expert Erik Min, who examined the code in detail and found it

17  functional – as the Jodoins had previously stated. *See* ECF 713 at 24-25, n.30.

18          The only remaining mention of possible fraud involving AtenCoin is a reference to the

19  Texas Railroad Commission demanding that Aten Black Gold Coin stop claiming it was backed

20  by oil.  *See* ECF 709 at 4:12-13.  This is written as if to suggest that the coin was not backed by

21  oil, but once again the record shows the contrary, *see* ECF 706 at n.1, and leads to the conclusion

22

---

23  [11] See ECF 709 at 4:11, 23 (citing Tr. 295, 309 ,389 (Jodoin)); and 625, 627 (Acuna)).

24  [12] *See* ECF 709 at 4:23 (citing Tr. 1393) (Hung Tran testifying based apparently on what Mr.
    Andrade told him, seemingly the story that Mr. Andrade tested whether the third party

25  verification worked, learned that it did not work to his satisfaction and closed down the coin,
    started AML Bitcoin, and allowed AtenCoin holders to convert their coins to AML Bitcoin

26  tokens at no charge; *id* (citing Tr. 1264) (Evan Carlsen testifying to his understanding that

27  AtenCoin did not have the features that banks wanted, without describing the basis for his
    understanding or whether AtenCoin had ever promised to offer those features).

28

---

1  that the reason for the command was that, whether it was backed by oil or not, marketing it as

2  being backed by oil was impermissible.  When so told, Mr. Andrade promptly spread the word

3  that the coin could not be marketed as backed by oil, and there is no evidence to suggest that it

4  was ever marketed that way again.  *See* Tr. 456:11-21.

5      *Press reports, including about the Panama Canal the Port of San Francisco, and the*

6  *Super Bowl.*  The government's memorandum repeats its "see no mitigating evidence" version of

7  the facts, choosing to ignore the substantial amount of mitigating evidence that appears, largely

8  in footnotes, in the presentence report.  Rather than repeat that mitigating evidence here, a few of

9  the more egregious omissions are highlighted below.  Mr. Andrade recognizes that the jury did

10  not accept these defenses and will address that verdict and what led to it on appeal, but in the

11  context of this sentencing, asks the Court to consider the mitigating evidence to rebut the

12  government's claims that all he was interested in was "lies, deceit and misrepresentations." ECF

13  709 at 2:2.

14      First, Mr. Andrade made efforts to inform purchasers (as was apparent) that he was

15  selling tokens, not completed coins,[13] and said so directly to an undercover FBI agent who

16

17

18  [13] Tr. 544:24-545:5 640:20-25 683:15-20; Exs. 602 at 4 ("Coin purchaser understands that the
    AML Bitcoin is in the process of being upgraded to be compliant with anti-money laundering

19  laws. When that process is completed, Coin Purchaser will be able to convert AML Tokens to
    AML Bitcoins . . ." and "Upon the availability of AML Bitcoin, NAC shall deliver to Coin

20  Purchaser all information . . ." and "Upon the completion of the upgrade of the AML Bitcoin . .
    .", and at 7 ("NAC represents that it will use its best efforts to create a digital (or cybercurrency)

21  that will be compliant with he laws . . ."); 626 at 4 ("Upon completion and activation of the AML
    Bitcoin, AML Token holders will have the opportunity to exchange them for AML BitCoins on a

22  1:1 ratio.") and at **7** (chart compares incomplete AML Token with the to-be-completed AML
    Bitcoin); 2470 at 3 ("Once NAC has completed and activated its features, AML BitCoin will

23  replace the ATK and ATK holders . . ."), and at ¶ 2.4.1. ("Upon completion and activation of the
    AML Bitcoin, AML Token holder will have the opportunity to exchange them for AML

24  BitCoins on a 1:1 ratio . . ."); 2473 at ¶ 18 ("AML BitCoin and/or AML Token have no
    underlying collateral; the AML BitCoin and/or AML BitCoin Token is merely an unsecured

25  cyber currency or digital coin or in the case of the AML BitCoin Token, a digital token for the
    exchange to an AML BitCoin.") and ¶ 19 ("AML BitCoin and/or AML BitCoin Token will not

26  be redeemed by BGCI or NAC and You are not relying upon NAC to be a source of liquidity for
    You or Your purchase of AML BitCoin and/or AML BitCoin Token.").

27

28

1   apparently reached out to him in an effort to get him to say he was selling a completed coin.[14]

2   At the same time, Mr. Andrade was working hard, but ineffectively, to complete the coin, was

3   receiving encouraging updates,[15] and ultimately did complete the coin. *See* ECF 713 at 21:9-12

4   and n.16.

5          Second, Abramoff, not Mr. Andrade, orchestrated the press campaign;[16] the Court will

6   recall that Abramoff (according to his own testimony) reached out to Mr. Andrade to get back

7   involved, and spent months romancing him,[17] leading Mr. Andrade, again the sucker, to treat

8   him as a trusted expert and a rare person Mr. Andrade could rely on as a friend.[18]  Abramoff (not

9   Mr. Andrade, as the government asserts) then recruited his friend De La Guardia and repeatedly

10

11 _____

12  [14] *See, e.g.*, Tr. 2119:7-14; 2120:10-2121:7; Declaration of Cindy Diamond in Support of New
    Trial Motion (ECF 656-2) 2:6-4:4.

13
    [15] *See* Trial Exhibits 2327, 2333, 2334, and 2337; Defendant's Corrected Motion for New Trial
14  and for Judgement of Acquittal (ECF 656) at 28.

15  [16]  Darling testified that he sourced *all* of his articles through Abramoff, not Mr. Andrade.  Tr.
16  578:12-14, 691:2, 692:5, 692:15, 693:16, 705:25-706:1, 710:19, 711:19-22, 712:22-24, 743:8,
    751:11-13, and 755:7-10.  In fact, Darling denied ever receiving any information for his articles
17  from Mr. Andrade.  Tr. 755:21-23.  Abramoff testified that Mr. Andrade approved of all the
    articles he helped create with Darling and his cohorts, but Abramoff is a twice-convicted
18  fraudster who has relentlessly lied in efforts to mitigate his responsibility.  Tr. 1738-1754. *See
    also* PSR (ECF 706) at nn.8-11.
19
    [17] *See e.g.* Tr. 1846-1859 (Abramoff introduced Mr. Andrade to Congressman Roherbacher,
20  celebrity Randy Jackson, and *Duck Dynasty* showrunner Mike Odair, told him that they could
21  potentially get action star Jackie Chan to endorse AML Bitcoin, and voiced him sweet nothings
    like "We're going to change the world, my dear friend.").
22
    [18]  The government observes that Abramoff was a notorious convicted former lobbyist, Gvt
23  Sentencing Memorandum at 2:27, but fails to note that during the period he was romancing Mr.
24  Andrade, he was publicly proclaiming he had learned his lesson and gone straight. *See, e.g.,*
    News Release, *Jack Abramoff to Speak on Government Lobbying, Corruption and Ethics*, Mount
25  St. Mary's University (Feb. 7, 2017), https://news.msmary.edu/2017/02/2-20-2017_jack-
26  abramoff-to-speak-on-government-lobbying-corruption-and-ethics.html.html (announces
    Abramoff talk on government and personal ethics and "his transformation and redemption as a
27  result of the incidents of  his past," as a person who has "since rededicated himself to try to make
    amends for his actions").
28

communicated privately with De La Guardia;[19] unbeknownst to Mr. Andrade, De La Guardia proved to be untrustworthy, but he was telling Mr. Andrade he *was* meeting with Canal officials as the press reports suggested, and De La Guardia's testimony cited in the sentencing memorandum, that Mr. Andrade "knew that the PMA meeting had gone badly," ECF 709 at 7:22, was, like much of De La Guardia's testimony, contradicted in writing by him at the time. *See* ECF 713 at 19-21 and n. 9.  The NAC Foundation's social media postings after the fact are insufficient to establish Mr. Andrade's authorization given his initial lack of control over social media and the steps he took to correct postings once he was in control.[20]

Third, Mr. Andrade was informed by Dillman, who was close to Leslie Katz, a commissioner of the Port of San Francisco, that the releases in the fall of 2017 about the Port were accurate, and in the spring of 2018, after Abramoff and another Abramoff crony, Richard Naimer, prepared a press release about a meeting with the Port, Mr. Andrade insisted that it be run past Katz for her approval and nixed it when she did not approve. *See* ECF 706 at n.12.

Finally, and perhaps most notably, the government proclaims that "Andrade continues, even now, to deceptively assert that this rejection campaign was initially hidden from Mr. Andrade based on the correct belief that he would not have approved it." ECF 709 at 9:15-16. That the campaign was initially hidden from Mr. Andrade is unquestionably true: it was based on a text between John Bryan (who authored the campaign) and Abramoff, Ex. 897, that was argued extensively by the defense at trial, and the government never even tried to rebut the argument or offer an alternative explanation for the text.  *See* ECF 706 at n.15; Tr. 3072-80.

---

[19] Tr. 1827:14-16; 1732:2-10.

[20] Melissa Foteh was in charge of social media content when alleged misrepresentations were broadcast there. *See* Tr. 1127:8-11. Former NAC Foundation employees Bernadette Tran and Melanie Cowan testified to social media activity they performed on Mr. Andrade's behalf, but they did not deal with Mr. Andrade directly — and therefore added nothing to what and how posts were made on Twitter — until July 2018 (Tran) or August 2018 (Cowan), *see* ECF-656, fn. 18, and *every social media post the government introduced pre-dates Tran and Cowan working directly with Marcus.* This shows that when Mr. Andrade was in control of social media, no misrepresentations were made.

*Market manipulation.* Abramoff and John Bryan, not Mr. Andrade, designed the market making system, Tr. 1576:21577:3; 1583:19-1584:15; Ex. 418, but the government failed to prove that it was ever implemented – no record of any such trading was introduced, and the government's only witness on the subject, Bryan, questioned whether it ever occurred. Tr. 1577:8-1578:10; 1581:1-3. In any event, Bryan denied that the purpose was to manipulate prices, admitted that he was lying to Abramoff and Mr. Andrade about what was happening, and added that he did not think there was any wrongdoing. Tr. 1581:61582:9, 1585:19-25,1609:11-1610:18; 3104-06.

*Use of Proceeds.* The government makes much of Mr. Andrade's personal use of purchaser money, while entirely neglecting a crucial piece of mitigating evidence: former SEC attorney John Fahy's instruction to Mr. Andrade that he could spend purchaser funds how he pleased, and specifically, "the net proceeds could be used for purposes as he desires." *See* ECF 706 at 16 and n.18.

## V.   THE CONTESTED GUIDELINE ENHANCEMENTS SHOULD BE REJECTED

Mr. Andrade contests only three of the guideline enhancements, and the government's memorandum fails in its effort to justify any of them.

### A.  The Proposed Obstruction Enhancement Should Be Rejected

The government's memorandum does not try to justify its proposed obstruction enhancement based on Mr. Andrade's filing of litigation – litigation that was meritorious. *See* ECF . Instead, it argues only that the enhancement is justified based on Mr. Andrade's alleged contact with De La Guardia in 2020.[21] This argument fails for the

---

[21] Elsewhere in its factual discussion, the government asserts that Mr. Andrade "covered up his criminal conduct" by instructing his employees to correct statements the government contended at trial were misleading or false. See ECF at 10:23-11:2. This is a curious contention. First, it is based on an assumption – never proven by the government and contradicted by other evidence – that Mr. Andrade knew of the search of his Las Vegas office at the time he gave his employees that instruction. *See* ECF at 16; Tr. 2205:1-2206:24. Second, even if he did know, his instruction was hardly a cover up; there was never a claim that he instructed employees to

1  reasons set forth in Mr. Andrade's sentencing memorandum, but the government's

2  presentation of the argument in its sentencing memorandum underscores an additional

3  reason why Mr. Andrade's conduct is nowhere near what is required to constitute

4  obstruction.

5        As described in the government's sentencing memorandum, Mr. Andrade asked

6  De La Guardia to persuade members of the Panama Maritme Authority to say that the

7  quotes in the press release were accurately issued at least two years earlier, *see* ECF 709

8  at 18:3-10, which Mr. Andrade had a reasonable basis to believe based on what De La

9  Guardia had told him at the time they were dealing with the PMA.  Tr. 1221:19-1225:5

10 and Ex. 891; Tr. 1226:13-24 and Ex. 8; Tr. 1228:4-1229:12 and Ex. 2594.  According to

11 the government, De La Guardia responded by telling Mr. Andrade that was not true, and

12 by asking Mr. Andrade to put his request in writing, which Mr. Andrade never did.  ECF

13 709 at 11:11-20.  Based on these facts, the government asserts that Mr. Andrade tried to

14 "procure or coerce silence."  *Id.* at 18:10-11.

15       But even accepting the government's factual averments, this is a nothingburger,

16 Mr. Andrade had a reasonable basis to make the request he made, and De La Guardia told

17 him no.  Mr. Andrade then dropped the matter.  Contrary to what the government told

18 Probation, there was no pressure.  He made no request for silence.  He did nothing to

19 coerce anyone.

20       **B.  The Government's Loss Calculation Is Wrong and Losses Do Not Exceed**

21           **$9,500,000**

22       Mr. Andrade's Sentencing Memorandum identifies numerous items included in

23 the government's loss calculation that do not belong there; removing them (and/or many

24 combinations of some of them) would take the loss amount well below $9,500,000.  That

25 the Court held over objection that AtenCoin is inextricably intertwined with AML

26

27 destroy any record of prior statements; he just told them to make corrections, which would seem
   like a good thing rather than evidence of evil.

28

Bitcoin does not make AtenCoin fraudulent.  *See* ECF 713 at 24:10-27:2.  Mr. Andrade

filed a pretrial motion to exclude all evidence related to AtenCoin as irrelevant other acts

and improper character evidence, a position which he maintains, and one which would

render these same acts inadmissible as purportedly relevant conduct for sentencing.  *See*

Defendant's Motion in Limine to Exclude Allegations and Evidence of Uncharged Bad

Acts (ECF 425).

### C.  Neither the Outside the United States Nor the Sophisticated Means Prongs of the Enhancement Are Satisfied

The government's "outside the United States" argument proceeds as if showing

that come conduct occurred outside the United States is enough, but it is not.  *United*

*States v. Beckner*, No. CR 15-2218, 2023 WL 4157269, at *42 (D.N.M. June 23, 2023)

(rejecting enhancement when "at most only . . . some part of the scheme took place

abroad").  The government presented no evidence that an essential feature of the scheme

took place abroad, or that "the majority of the fraudulent transactions occurr[ed] abroad."

as explained in Mr. Andrade's sentencing memorandum. *See United States v.*

*Ogunbanke*, 619 F. App'x 586, 587–88 (9th Cir. 2015).

Equally flawed is the government's "sophisticated means" argument.  To qualify

for this enhancement, the government must show "especially complex or especially

intricate offense conduct."  U.S.S.G. note 9(b) to 2B1.1, but it tries to satisfy this standard

only by putting adjectives in front of conduct typical of fraud schemes.  It cites the

statement of one victim who uses the word "elaborate," backed only by a statement that

"there were notices about patents coming" and "high profile people allegedly promoting

the project."  ECF 709 at 17:5-8.  It also adds the adjective "sophisticated" in front of

what it calls an international press scheme, and notes the existence of multiple corporate

entities and bank accounts.  But there is no mention of, and no evidence of, offshore

accounts, corporate shells, or fictitious entities, which are the examples of conduct in the

application note., U.S.S.G. note 9(b) to 2B1.1, and no effort to show anything

1  "especially" complex or intricate as the application note requires.  *Id.*  Elaborate, perhaps;

2  "especially" complex or intricate – definitely not.

3  **VI.    THE GOVERNMENT'S REQUESTED RESTITUTION IS EXCESSIVE**

4        Now that the government has made a specific restitution request, the defense can begin

5  to formulate its response and objections – although three days in the midst of preparation of next

6  week's sentencing is hardly sufficient notice and does not provide adequate time to do so.

7  Nonetheless, Mr. Andrade can provide the Court with the broad outlines of his position, which

8  are (1) the government's request for restitution in the amount of $4,597,205.88 is substantially

9  inflated, with many claims not supported by the data provided and/or based on other evidence;

10  (2) absent a stipulation, a hearing would be required to sufficiently determine a figure for a

11  restitution award, *see, e.g., United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008); (3) Mr.

12  Andrade is prepared to offer a stipulation that, if accepted as a complete resolution, would

13  resolve restitution without a hearing; and (4) Mr. Andrade requests a stay of any restitution order

14  pending appeal. *See* Federal Rule of Criminal Procedure 38(e).

15        To the extent he has been able to formulate objections at this point, Mr. Andrade's

16  objections fall into four buckets: those who are ineligible to receive restitution; those who have

17  offered insufficient proof to justify restitution; those who may be eligible but whose awards

18  should be reduced; and those who, due to unique facts, should not be awarded restitution.

19        **A.   Some Claimants Are Ineligible for Restitution**

20        Broad categories of claimants are ineligible for restitution.  First, AtenCoin purchasers

21  are ineligible because AtenCoin was not part of the indictment – it was offered only as Rule

22  404(b) evidence – and restitution is limited to victims of the specific offense charged in the

23  indictment.  *See United States v. May,* 706 F.3d 1209, 1214 (9th Cir. 2013) (a district court "may

24  award restitution … only for loss that flows directly from the specific conduct that is the basis of

25  the offense of conviction"); 18 U.S.C. § 3664 and 18 U.S.C. § 3771.  Second, also on that same

26  basis, as well as the absence of proof of fraud, purchasers of stock in Mr. Andrade's businesses

27  cannot be awarded restitution.  Of the amounts that are discernible, the total of $614,386.35 is

28

attributable to AtenCoin sales or CrossVerify stock, and are not a result of the AML Bitcoin token sale fraud scheme.  The total claim for restitution should be reduced by this amount, minus any overlap with the unknown amounts below.

Third, others are excluded on that same basis because their purchases were outside the charged dates.  There are ninety-five claimants whose claims include dates that should exclude them from restitution, either partially or entirely.  Of these, some of the amounts are not discernible, because they are either omitted, given as cryptocurrency values only, estimated without backup documentation, or commingled with claims for AML Bitcoin tokens that may be legitimate but are presented with insufficient backup documentation, preventing the defense to be able to examine them.

Fourth, co-conspirators and their nominees are ineligible.  *See United States v. Lazarenko*, 624 F.3d 1247, 1251-52 (9th Cir. 2010); *United States v. Reifler,* 446 F.3d 65, 127 (2d Cir. 2006).  Fifth, the many purchasers who did not make claims by the statutory date should not be allowed restitution.  Statutory law provides that "not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution."  18 U.S.C. § 3664(d)(1).[22]  Due to the continual waterflow of new victim data produced to the defense quite late in the presentencing process, the defense has not yet been able to compute the amount of these reductions.

**B.  Some Claimants Have Offered Insufficient Information To Establish that They Are Eligible for Restitution**

There are thirteen names that do not appear in Mr. Andrade's spreadsheets of token sales,

---

[22]  The statute also provides that the government's attorney or the probation officer should inform the Court if victim's losses "are not ascertainable by the date that is 10 days prior to sentencing," 18 U.S.C. § 3664(d)(5).  Mr. Andrade was provided with the requested amount of restitution just three days ago, i.e. seven days before sentencing.  The remedy provided for failing to comply with the time requirements is to have a date be set for final determination of the loss amounts, not to exceed 90 days after sentencing.  *Id*.  Restitution issues may be referred to a magistrate judge or special master.  *Id*.

1    and the defense has no record of when or where they made purchases.[23]  Three of these people

2    failed to indicate an amount of purchase.  The total of these victims' claims - for those who

3    stated an amount - is $486,006.33.  The total claim for restitution should be reduced

4    accordingly.[24]

5          In addition, thirty-two claimants provided no indication of how much in United States

6    Currency or the equivalent value they purchased.  Some of these thirty-two fall into the

7    paragraph above; they gave no documentation and are unknown victims.  Some claimants

8    estimated their purchases based on recollection of transactions done with cryptocurrency but

9    without any documentation - not even any screenshots to support their estimations.  Some used

10   foreign currency and the government has not suggested how to determine the US Currency

11   equivalent.  Mr. Andrade does not know the monetary amount related to these claimants'

12   requests.

13         Third, there is a lack of proof for many claimants of reliance on misrepresentations.

14   Reliance is required for restitution.  *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017).

15   **C.  Claimants Who Only State the Amount They Purchased, and Not the Amount**

16   **They Lost, Should Not Be Awarded Restitution**

17         It appears that the government incorrectly collected only data about what purchasers

18   claimed to have paid (and often obtained no documentation whatsoever), rather than what the

19   purchasers lost – one difference between the two would be for those who sold some or all of their

20   tokens on an exchange or otherwise.  There is ample evidence that some tokens were sold for

21

22   _____

23   [23]  Mr. Andrade is preparing a list of claimants whose requests for restitution he is challenging,
     in the event the Court needs to determine the scope of his requested hearing to determine
24   restitution amounts.  The list will be delivered to the government and can be filed under seal if
     necessary prior to the sentencing hearing. Names are withheld from this document to protect the
25   privacy interests of the restitution claimants.

26   [24]  Some of these claimants are ineligible for restitution for multiple reasons; e.g. one alleged
27   victim who seeks restitution in the amount of  $438,559.00 was made from an alleged March
     2024 purchase, for which there is no documentation.
28

_____

1   value on exchanges.[25]  Especially in light of that fact, the data the government collected – and

2   particularly what it collected during the limited period allowed by statute – falls well short of its

3   burden, *see, e.g. United States v. Waknine,* 543 F.3d 546, 556 (9th Cir. 2008) (finding

4   government did not present sufficient indicia of reliability to support its probable accuracy, even

5   though victims filed affidavits, when the affidavits were too summary and too conclusory to be

6   sufficiently reliable in light of the defense objections).

7   **D.  Due To Unique Facts, Some Claimants Should Not Be Awarded Restitution**

8   Three additional sets of claimants should be excluded from restitution because they were

9   not the victims of fraud and/or were not the victims of any fraud for which Mr. Andrade was

10  responsible.

11  Before awarding restitution, the Court must determine whether the conduct from which

12  the losses occurred falls within "the scope of the criminal activity that the particular defendant

13  agreed to jointly undertake.'"  *United States v. Bailey*, 973 F.3d 548, 574-75 (6th Cir. 2020)

14  (restitution order reversed for exceeding that resulting from defendant's own conduct in the

15  charged conspiracy), citing *United States v. Donadeo*, 910 F.3d 886, 895 (6th Cir. 2018).  To

16  determine the scope of criminal activity that the defendant agreed to take, the *Bailey* Court

17  recommended review of factors including knowledge of the scope of the scheme.  In other

18  words, jointly undertaken criminal activity for Sentencing Guidelines and restitution purposes is

19  not as broad as conspiracy liability.  [Instead, the defendant can only be held accountable for 'the

20  criminal activity that the particular defendant agreed to jointly undertake.'"  *Bailey*, *id*., citing

21  *United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000).  The scope of restitution is

22  "significantly narrower than the conduct embraced by the law of conspiracy."  *Bailey*, *id*., citing

23  *Swiney*, id.

24  *Boyer.*  A portion of the restitution requested for Mr. Boyer represents Dillman and

25

---

26  [25] *See* ECF-713-7.  David Mata, at FBI direction, recorded a conversation with Mr. Andrade and his
27  attorney, Christina Ponig, wherein Mata bragged about turning half of a bitcoin into three while
    buying and selling AML Bitcoin tokens on the exchange.

28

1  Mata's Block Bits conspiracy alone, and not Mr. Andrade's fraud scheme: it was obtained by

2  Dillman without Mr. Andrade's "knowledge of the scheme," and was beyond 'the criminal

3  activity that the particular defendant agreed to jointly undertake.'" *Bailey*, *supra*, at 575.

4       Mr. Andrade proved at trial that Dillman and Mata were trading to churn AML Tokens

5  on exchanges and extract profits without telling Mr. Andrade (and by lying to him), and doing so

6  in a way that undermined Mr. Andrade's business.[26]  Since Mr. Andrade's own contracts and

7  terms of service prohibited any AML tokens from being involved with investment vehicles like

8  the special purchase vehicle called Block Bits AML Holdings, LLC[27], the token buying, selling,

9  and retention of money for purchases of shares in Dillman's company, Block Bits income and

10  profit from the cryptocurrency market is the goal of Dillman and Mata's Block Bits' conspiracy,

11  which was not Mr. Andrade's own.  Mr. Andrade did not "agree[] to jointly undertake," *Bailey*,

12  *supra*, investments in cryptocurrency markets, which was the heart of the Block Bits' schemes.

13  In that aspect, he was not their co-conspirator.

14       Ben Boyer and others testified at trial and evidence showed that his investment money,

15  sent to Dillman for his shares in Block Bits AML Holdings, LLC, on January 12, 2018, was sent

16  promptly to Mr. Andrade, with a request for a discount for future token purchases.  Based on the

17  jury's verdict, the Court might order restitution to Mr. Boyer in the amount of $850,000.  Months

18

19  [26]  See ECF-713-7 (recording of admission of Mata to Mr. Andrade in November 2018); see also
20  Trial Exhibit 3054 (Block Bits plans discussed in December 2017 email; Mr. Andrade is not
   included); Ling's trial testimony (undercover officer went to Dillman's seminar posing "as an
21  angel investor with associates who were interested in investing in cryptocurrency", Tr. at 2091:5-
   7, and 2115:5-9; testified that Mr. Andrade was not involved with the seminar, Tr. at 2114:2-16;
22  knew Mr. Andrade's own website's terms and conditions for sale during the ICO involved a
   prohibition on investments. Tr. at 2110 at 8-13 and Exhibit 2471).  (Mr. Andrade specified he
23  was selling tokens as a means of exchange not to be used as investments, while Dillman's
24  seminar offered investments); and Attachment 6 to this Reply (a 12-21-2018 email from Dillman
   to Mata admitting he hid how many tokens he bought from Mr. Andrade).
25
26  [27]  See for instance, Trial Exhibit 3170-2017 (non-assignability clause in BlockBits and Dillman's
   purchase agreement for AML Tokens, signed in October 2017: "Any other purported assignment
27  in violation of this Agreement Section shall be null and void and of no force and effect.")

28

1   later, Mr. Boyer also entered into two contracts with Mr. Andrade for a private sale of AML

2   Tokens on October 24, 2018 (brokered by Mata, without discussion with Mr. Andrade), for a

3   total of $125,000; given the jury's verdict, the Court might order restitution in this amount as

4   well.

5          But the same cannot be said for Boyer's other Block Bits AML Holdings LLC shares; the

6   evidence was insufficient to show that payment for those shares was forwarded to Mr. Andrade's

7   accounts.  No evidence whatsoever indicates that Mr. Boyer's private sales and exchange

8   purchases had anything whatsoever to do with Mr. Andrade, and it appears that these other

9   purchasers were part of Dillman and Mata's investment scheme that undermined the tenets of

10  Mr. Andrade's business.  Just as with money used in Dillman's investment scheme, Mr. Andrade

11  had no knowledge of Boyer's private trading activities and his profit or loss from that activity

12  was beyond "the criminal activity that [Mr. Andrade] agreed to jointly undertake." *Bailey*, *supra*,

13  at 575.  Therefore, the total amount of restitution for Mr. Boyer, should be $975,000.  Mr.

14  Andrade will stipulate to this amount.  Since the government submitted a request for restitution

15  for Boyer in the amount of $1,808,709.60[28], deducting the amount that is legitimately included in

16  a restitution order, the government's restitution request should be reduced by $833,709.60 (the

17  difference of the two sums).

18          *Certain other purchasers after the ICO.*  Others of the date-excluded claimants have

19  requested compensation for funds used to buy AML Bitcoin tokens after Mr. Andrade's ICO was

20  over, on February 18, 2018.  Therefore, sales of tokens before April 2020 occurred only through

21  private arrangements or exchanges.  After the coins launched in April 2020 there were no

22  additional sales of token or coins, and claimants wrongly requested compensation for AML

23

24  [28]  Mr. Andrade would like a hearing on how that amount was determined if the Court rejects the
       argument to aware Mr. Boyer only a portion of what he claimed. Discovery indicates that in

25     December 2018, when Mr. Boyer sought compensation for Dillman's misleading him through a
       buyout agreement, Mr. Boyer indicated the total amount of his expenditures were $1,759,898.

26     Mr. Andrade does not understand why the total loss went up $47,000 since December 2018.  *See*

27     2018.12.03 email thread, BOYER0001656-1657, filed as Attachment 7.

28

1  Bitcoin purchases in 2023-2025 (when there were no servers nor AML Bitcoin sales taking place

2  anywhere at all).  A handful of claimants appear to have bought tokens as investments through

3  Block Bits AML Holdings, since that company was selling tokens through the end of February

4  and early March 2018, after Mr. Andrade's ICO was over.  Applying Bailey, none of these

5  purchases were part of any criminal activity Mr. Andrade agreed to undertake.  Based on the

6  claimants' data, therefore, the total restitution award should be reduced by the amount of

7  $597,023.95, minus any overlap with the Unknown Amounts or AtenCoin data noted above.

8      *Daniel A.*  Daniel A was not the victim of fraud.  Mr. A bought tokens through private

9  purchase from NAC Foundation, brokered by David Mata, who refused Mr. Andrade's request to

10  meet Mr. A. personally in October 2018, and again in January 2019.  In early 2019, Mr. A. had a

11  direct conversation with Mr. Andrade, who told Mr. A that the AML Bitcoins were not ready,

12  that they were tokens, not coins, that were in place with firm deals for their use, and were not

13  being sold for investment purposes.  Mr. Andrade offered Mr. A. a full refund of his

14  expenditures, to compensate for his apparently having been misled by David Mata about the fact

15  that the tokens were being sold by Mr. Andrade personally, not a token-holder who had fallen on

16  rough times.  Mr. A. refused Mr. Andrade's offer of a refund, and chose to keep his AML tokens.

17  Since full disclosures were made by Mr. Andrade, who distanced himself from the investment-

18  scheme that Block Bits was running, and who disclosed that the company's owner was selling

19  his own tokens not a disinterested party, Mr. A.'s claimed losses of $300,00.00 were not the

20  result of a crime: at least not the result of a crime by Mr. Andrade.  The Court should either hold

21  a hearing or deduct $300,000.00 from the total amount of restitution ordered.[29]

22      **E.  Summary on Defense Position on Restitution**

23      In conclusion, if the government persists in seeking $4,597,205.88 in restitution,

24  principles of fairness and the need for accuracy in determining a proper restitution amount

25

26  [29]  There evidence relating to the Mata-Mr. A. transaction and Mr. A's conversation, oral and by

27  email, is voluminous and not suitable for attachment to the Reply; this is why Mr. Andrade

28  request this restitution request be included in any separate restitution hearing granted.

1  require that the Court hold a full restitution hearing on the amount to go to each claimant that fits

2  into the categories listed above.  At this time, based on the evidence and the victim loss

3  information provided by the government, Mr. Andrade would be willing to stipulate to restitution

4  in the amount of $1,766,079.65.

5  **VII.   The Forfeiture of Mr. Andrade's Home Was Not Put To The Jury As Required by**

6  **Rule 32.2(b)(5)(A).**

7        As with restitution, now that the government has made a specific forfeiture request, the

8  defense can begin to formulate its response and objections – although three days in the midst of

9  preparation of next week's sentencing is hardly sufficient notice and does not provide adequate

10  time to do so.  Nonetheless, Mr. Andrade can provide the Court with some of the broad outlines

11  of his position, which are (1) the government's request for forfeiture of money is substantially

12  inflated, (for many of the reasons described in Mr. Andrade's arguments about the loss

13  calculation and the objections to restitution); (2) a hearing would be required to sufficiently

14  determine the forfeiture amount; (3) the Court should consider the impact on Mr. Andrade and

15  his ability to have legal representation in upcoming legal proceedings (including the SEC's case

16  pending in this Court), given that he may be assessed a forfeiture based on gross proceeds

17  despite all the expenses he incurred, and then still ordered to pay restitution despite paying out

18  all the proceeds; and (4) Mr. Andrade requests a stay of any forfeiture order pending appeal.  *See*

19  Federal Rule of Criminal Procedure 32.2(d).[30]

20

21

_____

22  [30] In addition, to the extent the forfeiture request in the criminal case may ask for the forfeiture of real property, any such request would be procedurally flawed.  Fed. R. Crim. Pro. 32.2(b)(5)(A);

23  *United States v. Phillips,* 704 F.3d 754, 771 (9th Cir. 2012) ("a special jury verdict is available if the Government is seeking forfeiture of specific property; in that circumstance, the district court

24  must determine whether either party wants the jury to determine the forfeitability of specific property."  *See United States v. Williams*, 2011 U.S. Dist. LEXIS 167493 (D. Neb. 2011)

25  (finding that the court's failure to inquire regarding jury determination of forfeiture required the assembly of a new jury to consider forfeitability; *see generally United States v. Mancuso*, 718

26  F.3d 780, 798-99 (9th Cir. 2013) (district court's neglecting to make inquiry with the parties

27  regarding jury determination of the forfeiture of specific property found to be harmless error because defendant's counsel waiving the issue during a side bar).

28

1  **VIII.   CONCLUSION**

2          For all the reasons set forth above, Mr. Andrade asks the Court to set aside the

3  government's out-of-this-solar system recommendation and bring this sentence back down to

4  earth, to within a range of 24 months, followed by a term of supervised release.

5

6

7  DATED:  July 25, 2025                    Respectfully Submitted,

8                                                        /s/

9                                          _____

10                                         MICHAEL J. SHEPARD,
                                           CINDY A. DIAMOND, and
11                                         DAINEC STEFAN
                                           Attorneys for Defendant
12                                         ROWLAND MARCUS ANDRADE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28