MICHAEL J. SHEPARD (SBN 91281)
 *mshepard@kslaw.com*
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, California 94111
Telephone:    +1 415 318 1221

CINDY A. DIAMOND (SBN 124995)
 *cindy@cadiamond.com*
**ATTORNEY AT LAW**
58 West Portal Ave #350
San Francisco, CA 94127
Telephone:    +1 408 981 6307

DAINEC P. STEFAN (admitted *pro hac vice*)
 *dstefan@kslaw.com*
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Telephone:    +1 212 556 2291

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:2-cr-00249-RS |
| Plaintiff, | **DEFENDANT ROWLAND MARCUS ANDRADE'S OPENING BRIEF OBJECTING TO GOVERNMENT'S PROPOSED FORFEITURE AND RESTITUTION ORDERS** |
| v. | |
| ROWLAND MARCUS ANDRADE, | |
| Defendant. | Judge: Hon. Richard Seeborg, Chief Judge |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     THE GOVERNMENT'S REQUESTED FORFEITURES ARE INSUFFICIENTLY
        PROVEN AND EXCESSIVE ......................................................................... 1

        A.      The Government's Estimates Are Unreliable at Best ............................. 1

        B.      The Government Erroneously Included Funds Beyond the Crime of Conviction.. 2

        C.      The Government Erroneously Double-Counted Cryptocurrency Income .............. 4

        D.      The Government's Proposed Forfeiture Erroneously Includes Funds That Did Not
                Come to Rest with Mr. Andrade ........................................................... 6

        E.      The Government's Proposed Forfeiture Erroneously Includes Criminal Activity
                Mr. Andrade Did Not Agree To Undertake ............................................. 9

III.    THE GOVERNMENT'S REQUESTED RESTITUTION IS INSUFFICIENTLY
        PROVEN AND EXCESSIVE ......................................................................... 10

        A. No Restitution Should be Awarded ............................................................ 10

        B. If the Court Nonetheless Awards Restitution, It Should Award Far Less than the
                Government's Demand ........................................................................ 12

IV.     THERE IS NO STATUTORY BASIS FOR A MONEY JUDGMENT FORFEITURE
        AND ANY SUCH JUDGMENT IS UNCONSTITUTIONAL ....................................... 17

V.      ANY FORFEITURE OR RESTITUTION ORDER WOULD BE UNTIMELY ............. 19

        A.      The Government's Proposed Restitution Is Untimely ............................. 19

        B.      Any Forfeiture Order from the Court Is Untimely ................................ 20

VI.     THE GOVERNMENT'S COMBINED AND OVERLAPPING FORFEITURE AND
        RESTITUTION DEMANDS VIOLATE THE EIGHTH AMENDMENT .................... 22

VII.    ANY FORFEITURE OR RESTITUTION ORDERS SHOULD BE STAYED  PENDING
        APPEAL ............................................................................................... 23

VIII.   CONCLUSION ......................................................................................... 23

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Caplin & Drysdale Chartered v United States*,
    491 U.S. 617 (1989) ........................................................................... 23

4

5

*Honeycutt v. United States,*
    581 U.S. 443 (2017) ....................................................................... 6, 23

6

*Libretti v. United States*,
    516 U.S. 29 (1995) .............................................................................. 21

7

8

*Securities and Exchange Commission v. ICOBox et al.*,
    No. CV 19-8066 DSF (Ex) (C.D. Cal. Mar. 10, 2020) ......................... 7

9

*United States v King*,
    745 F. Supp. 3d 537 (E.D. Mich. 2024) ............................................. 21

10

11

*United States v. $493,850.00 in U.S. Currency*,
    518 F.3d 1159 (9th Cir. 2008) ...................................................... 19, 21

12

*United States v. Addonizio*,
    442 U.S. 178 (1979) ........................................................................... 21

13

14

*United States v. Allen***,**
    983 F.3d 463 (10th Cir. 2020) ........................................................... 15

15

*United States v. Bailey*,
    973 F.3d 548 (6th Cir. 2020) ..................................................... 9, 10, 17

16

17

*United States v. Bajakajian,*
    524 U.S. 321 (1998) ........................................................................... 23

18

*United States v. Batchelder,*
    442 U.S. 114 (1979) ........................................................................... 21

19

20

*United States v. Beecroft*,
    825 F.3d 991 (9th Cir. 2016) ............................................................. 23

21

*United States v. Brock-Davis*,
    504 F.3d 991 (9th Cir. 2007) ........................................................ 12, 13

22

23

*United States v. Cano-Flores*,
    796 F.3d 83 (D.C. Cir. 2015) ............................................................. 21

24

*United States v. Caputo*,
    517 F.3d 935 (7th Cir. 2008) ............................................................. 12

25

26

*United States v. Day*,
    416 F. Supp. 2d 79 (D.D.C. 2006) ..................................................... 19

27

*United States v. De Leon,*
    728 F.3d 500 (5th Cir. 2013) ............................................................. 15

28

*United States v. Farano,*
749 F.3d 658 (7th Cir 2014) .......................................................................... 11

*United States v. Garcia-Guizar,*
160 F.3d 511 (9th Cir. 1998) ........................................................................... 6

*United States v. Garcia-Sanchez,*
189 F.3d 1143 (9th Cir.1999) ........................................................................... 6

*United States v. Giltner,*
889 F.2d 1004 (11th Cir. 1989) ...................................................................... 12

*United States v. Gray,*
121 F. 4th 578 (6th Cir. 2024) ....................................................................... 15

*United States v. Griffin,*
76 F. 4th 724 (7th Cir. 2023) ..................................................................... 1, 14

*United States v. Hagege,*
273 Fed. Appx. 612 (9th Cir. 2008) ............................................................... 20

*United States v. Haleamau,*
887 F. Supp. 2d 1051 (D. Haw. 2012) ............................................................. 6

*United States v. King,*
231 F. Supp. 3d 872 (W.D. Okla. 2017) .................................................. 1, 6, 22

*United States v. Lo,*
839 F.3d 777 (9th Cir. 2016) ..................................................................... 3, 18

*United States v. Loreng,*
956 F. Supp. 2d 213 (D.D.C. 2013) ............................................................... 20

*United States v. Maddux,*
37 F. 4th 1170 (6th Cir. 2022) ...................................................................... 21

*United States v. May,*
706 F.3d 1209 (9th Cir. 2013) ...................................................................... 14

*United States v. One 1936 Model Ford V-8 De Luxe Coach,*
307 U.S. 219 (1939) ...................................................................................... 21

*United States v. Pease,*
331 F.3d 809 (11th Cir. 2003) ...................................................................... 21

*United States v. Real Prop. Located in El Dorado Cnty.,*
59 F.3d 974 (9th Cir. 1995) .......................................................................... 23

*United States v. Robbins,*
WL 3862054 (N.D. Iowa 2011) ....................................................................... 3

*United States v. Sheffield,*
939 F.3d 1274 (11th Cir. 2019) .................................................................... 12

*United States v. Stein*,
    846 F.3d 1135 (11th Cir. 2017) ............................................................................ 10

*United States v. Stump*,
    914 F.2d 170 (9th Cir. 1990) .................................................................................. 21

*United States v. Surgent*,
    WL 2525137 (E.D.N.Y. Aug. 17, 2009) ................................................................ 19

*United States v. Thompson*,
    990 F.3d 680 (9th Cir. 2021) ................................................................ 6, 8, 18, 22

*United States v. Waknine*,
    543 F.3d 546 (9th Cir. 2008) ...................................................................... 11, 12, 13

*United States v. Wiltberger*,
    18 U.S. 76 (1820) .................................................................................................... 19

**Statutes**

18 U.S.C. § 3663(a)(1)(A) ............................................................................................ 14, 15

18 U.S.C. § 3663(a)(1)(B) ............................................................................................ 14, 15

18 U.S.C. § 3664(d)(1) ........................................................................................................ 19

18 U.S.C. § 3664(d)(5) ........................................................................................................ 21

18 U.S.C. § 3664(f)(2) ........................................................................................................ 17

18 U.S.C. § 3664(f)(3) ........................................................................................................ 17

18 U.S.C. § 3664(h) ............................................................................................................ 17

18 U.S.C. § 981(a)(1)(D) .................................................................................................. 2, 18

18 U.S.C. § 981(d) .............................................................................................................. 21

18 U.S.C. § 982(a)(8) .......................................................................................................... 21

21 U.S.C. § 853(p) .............................................................................................................. 18

28 U.S.C. § 2461(c) ............................................................................................................ 21

31 U.S.C. § 5332(b)(4) ........................................................................................................ 19

Fed. R. Crim. P. 32.2 ...................................................................................................... 18, 20

Fed. R. Crim. P. 32.2(b)(4)(B) .......................................................................................... 21

Fed. R. Crim. P. 32.2(d) ...................................................................................................... 23

Fed. R. Crim. P. 38(e) .......................................................................................................... 23

**Other Authorities**

Stefan D. Cassella, *Criminal Forfeiture Procedure in 2012: An Annual Survey of Developments in the Case Law,* 48 No. 5 CRIM. LAW BULLETIN (Fall 2012) ................................................... 3

## I.    INTRODUCTION

The government has not put the Court in a position from which the Court can award restitution or impose forfeiture in the amounts requested by the government, or in any other amounts.  By ignoring the governing procedural rules, by providing only slapdash efforts at identifying and proving the amounts it seeks, and by proposing draconian totals, the government has left the Court with little choice but to award nothing in forfeiture and to deny at least substantial parts of the restitution request.

## II.    THE GOVERNMENT'S REQUESTED FORFEITURES ARE INSUFFICIENTLY PROVEN AND EXCESSIVE

While the government "does not have to prove forfeiture amounts with to-the-penny precision (or even anything very close to that)," the court must reject the government's proposal when it is excessive or is shown to be inaccurate.  *United States v. King,* 231 F. Supp 3d 872, 984, 915, 953 (W.D. Okla. 2017) (noting need for government to use "some semblance of intellectual rigor," and to offer "reliable reference points"); *see generally United States v. Griffin,* 76 F. 4th 724, 750 (7th Cir. 2023) (for restitution, if the defendant is able to create real doubt about reliability, the burden shifts to the government to demonstrate accuracy).  The forfeiture figure offered by the government is materially and demonstrably inaccurate, and it has no supporting schedule from which the accuracy of any portion of it can be confirmed.  The Court should therefore reject the government's requested forfeitures entirely, or at minimum, substantially reduce them.

### A.  The Government's Estimates Are Unreliable at Best

As explained more fully in the subsections below, the government's $10,474,609 demand sweeps in substantial amounts that do not qualify for forfeiture.  But even apart from including amounts not subject to forfeiture, what remains is unreliable.  The largest single component of the government's forfeiture demand is $5 million, which it says is the amount that was paid into

business bank accounts from the purchase of AML Bitcoin tokens from October 2017 to October, 2018.  Ex. 1520-003.  Needless to say, $5 million is a round number that must be an estimate, but the method by which the estimate was derived from bank records is unexplained; there is no supporting schedule and no description of the tools used that is sufficient to allow the estimate to be checked.  The second largest component of the $10.4 million is $2,874,609, which the government says is the amount paid in cryptocurrency to purchase tokens.  Ex. 1520-005; Tr. 1956:9-1959:5.  Again, no supporting schedule is provided so that the amounts (reportedly drawn by Ms Chiu from binders, which were not prepared by a CPA or otherwise audited or verified), or the cash valuation given to them, can be verified.

**B.  The Government Erroneously Included Funds Beyond the Crime of Conviction**

Despite acknowledging that its forfeiture from Mr. Andrade must be based on the activity "*for which he was convicted at trial,*" Government's Motion for Forfeiture Money Judgment at 6:1-2 (emphasis added), the government's $10,474,609 demand, *id.* 3:1-8, is an amount that necessarily includes substantial funds from activity for which Mr. Andrade was *not* convicted at trial.  *See* 18 U.S.C. § 981(a)(1)(D) (allowing only forfeiture of property that "represents or is traceable to the gross receipts obtained, directly to indirectly, from a violation of . . . section 1343 (relating to wire fraud)).  The most notable example is the $2.1 million that the government claims that Mr. Andrade obtained "from investors in his AtenCoin scheme, which the Court found was inextricably intertwined with the AML Bitcoin fraud."  *Id.* at 3:6-7; Government's Sentencing Memo, ECF 709, at 4:23-24.  This is wrong in at least three different ways.

First, the activity for which Mr. Andrade was convicted at trial did not begin until July 2017; Indictment (Count One), ECF 1 at 6:4-5 (defining period of fraud as July 2017 through on or about October 2018); by that time, AtenCoin was defunct, and all of the $2.1 million had already been paid. Tr. Ex. 1520-002.  This alone disqualifies AtenCoin funds from being used as part of the forfeiture.  *See, e.g., United States v. Robbins,* 2011 WL 3862054, at *5 (N.D. Iowa

2011), *report and recommendation adopted,* 2011 WL 3844094 (N.D. Iowa 2011); Stefan D.

Cassella, *Criminal Forfeiture Procedure in 2012: An Annual Survey of Developments in the Case Law,* 48 No. 5 CRIM. LAW BULLETIN (Fall 2012) ("[b]ecause the forfeiture is limited to the offense of conviction, its scope is limited to the period of time in which that offense occurred, as alleged in the indictment").[1]

Second, the rationale for including AtenCoin is that it was "inextricably intertwined" with AML Bitcoin. United States' Opposition to Defendant's Motion In Limine to Exclude Evidence of Uncharged Bad Acts, ECF 441, at 12:10-23. Mr. Andrade respectfully disagrees with the Court's decision that the two coins were inextricably intertwined, but finding that the two are inextricably intertwined means nothing more than that, in the Court's view, the story of AML Bitcoin would be "incomprehensible or incoherent" without the AtenCoin evidence, or perhaps that the AtenCoin evidence provides "contextual or background information to the jury." Marcus Andrade's Motion in Limine to Exclude Allegations and Evidence of Uncharged Bad Acts, ECF 425 at 15:1-16:21. Admitting evidence under Rule 404(b) based on such findings does not prove that AtenCoin was a fraud; Mr. Andrade has twice demonstrated that the government did not prove that AtenCoin was a fraud, *see* Defendant's Sentencing Memorandum, ECF 713, at 24:10-27:2; Defendant's Reply to Government's Sentencing Memorandum, ECF 716, at 10:24-12:4, and the government has been unwilling to join issue. The government offers no authority even hinting that restitution can be awarded for conduct not proven to be a fraud,

---

[1] The Ninth Circuit does not appear to have addressed this precise issue. In *United States v. Lo,* 839 F.3d 777, 794 (9th Cir. 2016), a case in which a defendant who pled guilty to some but not all of the mail and wire fraud charges in the indictment and argued that for purposes of forfeiture he could only be held responsible "for amounts traceable to his three specific uses of the wires or mail," the court explained that the proceeds for forfeiture are the funds obtained "as the result of the commission of the offense." It therefore allowed the government to seek forfeiture for the entire scheme alleged in the indictment, reasoning that by pleading guilty to one count of mail fraud that included the entire scheme, the defendant in effect pled guilty to the entire scheme. *Id.* But the entire scheme in Mr. Andrade's indictment started after AtenCoin was done, and alleges only fraud relating to AML Bitcoin.

merely because as an evidentiary matter the story of the charged offense would be incoherent without evidence of that conduct.

Third, while the government gives the impression that the entire $2.1 million is attributable to the purchase of AtenCoins (which is what assertedly was inextricably intertwined with AML Bitcoin), some of those funds—$884,050.53—were purchases from Mr. Andrade of shares of ownership of CrossVerify.[2]  Appendix D.  The government did not at trial, in its sentencing memorandum, or in its forfeiture motion, even claim that Cross Verify was a fraud, or, if it was, that Mr. Andrade, who held no leadership position within Cross Verify, participated in the supposed fraud or said anything about Cross Verify that was not based on reports he received from those who were working there.[3]  To the contrary, the evidence at trial was that CrossVerify, which was incorporating biometric identification into AML Bitcoin's blockchain, was a viable product that could be and was sold and used separately, and that garnered interest from numerous sophisticated institutions that examined it, such as the London Stock Exchange, Citigroup, Uphold, Barclay's, and Ernst & Young.[4]  As a result, there is no basis for including the proceeds of Cross Verify shares in the forfeiture.

## C.  The Government Erroneously Double-Counted Cryptocurrency Income

That the government's numbers have been presented in a way that cannot be checked should by itself cast sufficient doubt on their reliability, but even more importantly, it appears – and the defense can only speak of appearances given the absence of supporting schedules – that

[2] *See* Defendant's Sentencing Memorandum, ECF 713, at 23:7-24:9. Mr. Andrade's total personal share sales amounted to $1.2 million, of which $726,610.53 was directed to the business accounts the government used to calculate the $10.4 million loss figure. *See* Tr. Ex. 1520 at 2-5.

[3] *See, e.g.,* Attach-1,   (2016.01.12 WH Ireland CrossVerify Presentation) at 9 (showing Mr. Andrade was not a member of the board of directors and did not have a leadership position in the company); Attach-2 (2016.12.07 Companies House Registry), showing Mr. Andrade's Termination as a CrossVerify director in July 2016.

[4] *See* Attach-3 (2018.07.24 CrossVerify Weekly Management Update); Attach-4 (2018.08.14 CrossVerify Weekly Management Update); Attach-5 (2018.04.04 LSE Update Email).

1  the numbers include a material amount of double-counting.  That is, as the prices of digital

2  currencies were dropping dramatically,[5] Mr. Andrade sold his cryptocurrency and put into his

3  business at least $770,357.98 of the money received in cryptocurrency for ICO sales in 2017 and

4  early 2018: he did so in three deposits, made in May, June and July of 2018.[6]  These deposits

5  were made into the same accounts from which the government, based on deposits into the

6  account, derived its $5 million estimate.

7

8          As a result, the government double counted at least $770,257.98. That the government

9  likely made an error of this magnitude – over 15% of the $5 million it demands is ostensibly

10

11  [5] Between January 7, 2018 and July 15, 2018, Bitcoin fell from $17,597 to $6,256, a 64.5% drop,
12  while Ethereum fell from $1,153 to $449, a 61% drop. The remaining cryptocurrency income
    was expended to acquire the services of ICOBox for hosting the AML Bitcoin ICO (~$50,000 in
13  LiteCoin), *see* Attach-6 (2018.02.10 ICOBox Payment); and to list AML Bitcoin on the Ovis
    exchange ($138,698.64 in LiteCoin and Bitcoin, *see* Attach-7 (Ovis Listing Fee Payments on
14  Blockchain Explorer) and Attach-8 (2018.04.22 Ovis Listing Emails), Exrates exchange
    ($26,606 in Bitcoin, *see* Attach-9 (Exrates Listing Fee Payment on Blockchain Explorer) and
15  Attach-10 (2018.03.25 Exrates Listing Email), and C-CEX Exchange ($95,715 in Bitcoin, *see*
16  Attach-11 (2018.03.25 C-CEX Listing Fee Payment on Blockchain Explorer)), for a total of
    additional expenditures amounting to $311,019.

17

18  [6] Mr. Andrade, using Block Bits' services as coordinated by David Mata, converted
    cryptocurrency he had obtained in the early ICO sales. The income to NAC Payroll from May
19  ($235,261), June ($222,782.80), and July, 2018 ($312,314.18) total $770,357.98. *See* Attach-12
    (Block Bits LLC's bank statements, excerpts from account ending in 8602, May, June, and July
20  2018); Attach-13 (FBI-302-001761 dated 9-24-2018), and Attach-14 (FBI-302-001763 dated 9-
    26-2018, Mata explaining that he cashed out Mr. Andrade's cryptocurrency for him for a
21  fee);Attach-15 (page 1 of FBI-302-005323, reporting an interview from 8-24-2019, same, and
    also noting that "[O]n or about May 2018 . . . Dillman stated Marcus Andrade needed to get a
22  large quantity of Ethereum cleared within the next hour. . . . Mata liquidated all the crypto-
23  currency and wired it to a bank account provided by Andrade," after subtracting a service fee;
    "Mata recalled the vast majority being Ethereum, but there may have been some Bitcoin."). By
24  the time Mr. Andrade began converting the crypto received into dollars in May 2018, its value
    had declined significantly. At the time the cryptocurrency was used to buy AML tokens, the
25  value was about $2,361,620. Through the transactions corresponding to the three dates shown on
26  the Block Bits bank deposits into Mr. Andrade's NAC account, the bulk of the cryptocurrency
    was expended. In other words, despite having received over two million dollars worth of
27  cryptocurrency, Mr. Andrade only was able to use about one-third of its original value.

28

wrong – puts in question the accuracy of all the government's figures. At a minimum, it leaves those figures without 'sufficient indicia of reliability to support [their] probable accuracy.'" *See United States v. Garcia-Sanchez*, 189 F.3d 1143, 1148-49 (9th Cir.1999) (vacating a sentence and remanding, holding that "the district court had ... an independent obligation to ensure that the sentence was supported by sufficient, reliable evidence").

### D. The Government's Proposed Forfeiture Erroneously Includes Funds That Did Not Come to Rest with Mr. Andrade

Even assuming the accuracy of the government's assertion that Mr. Andrade received $10,474,609 from the sale of his coins and tokens, the government swept into that number various funds that it was required to identify and remove. The government made no effort to identify and remove funds that did not "[come] to rest" with Mr. Andrade. *United States v. Thompson*, 990 F.3d 680, 691 (9th Cir. 2021). This reduction is necessary to implement the determinations of the Supreme Court and the Ninth Circuit that forfeiture cannot be based merely on joint and several liability. *Honeycutt v. United States,* 581 U.S. 443 (2017); *Thompson,* 990 F.3d 680. The government bears the burden of proof on forfeiture by preponderance of the evidence, including on issues relating to joint and several liability. *King,* 231 F. Supp. 3d at XXX . *See generally United States v. Haleamau,* 887 F. Supp. 2d 1051, 1058 (D. Haw. 2012) (requiring government to prove that seized funds were traceable to the illegal structuring); *United States v. Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir. 1998) (finding that the government failed to prove that all of the recovered money from the defendants were proceeds of drug activity).

Of the $10.4 million claimed by the government, at least $1,283,987.24 to  $1,563,987.25 did not come to rest with Mr. Andrade, but instead ended up with one of his co-conspirators or their proxies: (1) David Mata received $75,000 in commissions for his role in facilitating post-

ICO purchase agreements;[7] (2) Jack Abramoff received at least $307,000 for his consulting services and commissions on sales, facilitated the delivery of $49,700 to his son Lev Abramoff for the aborted *Bitcoin Brigade* documentary, and facilitated delivery of $300,000 to Frames Per Second Productions, at least $20,000 of which the defense has been able to track as having gone into Abramoff's personal possession;[8] (3) John Bryan received $27,000 for his consulting services; (4) Japheth Dillman and the company for which he was a C-Suite member, ICO Box, received approximately $200,000 (326.8 LiteCoin, 7 Bitcoin, and 385 Ethereum), for supporting the AML Bitcoin ICO;[9] (5) BlockBits Capital (Dillman and Mata) received $300,000 (450 ETH) for other claimed services; and (6) for their work selling AtenCoin, Brian Darrow received $277,835, Bob Parsons – for whom Darrow was initially a contractor – received $113,429, and Mark DiAdamo – who also was initially contracted with Parsons – received $380,690.25. Appendix A; Attach-18 $25,000 receipt for check to John Bryan's company the Watley Group.

Of the listed individuals, the government has identified Abramoff, Mata, and Dillman as co-conspirators. *See* Government's Motion to Admit Co-Conspirator Statements, ECF 449, at 5:18-6:16. The government's claims regarding John Bryan and the testimony it elicited from him

---

[7] There is also evidence that Mr. Andrade provided $300,000 (450 Ethereum) to BlockBits Capital (Dillman and Mata) on April 28, 2018, *see* Attach-22 $300,000 Payment to Dillman and Mata, however, given the government's failure to properly identify or provide a schedule for cryptocurrency transactions in the case, the defense cannot verify whether this transaction was part of the $770,257.98 the government double-counted.

[8] See Attach-X FBI-302-019490 at 2. Mark Kalbfeld, owner of Frames Per Second, was directed by Abramoff to include $20,000 in the production budget for Abramoff's pay, which was in fact directed to Abramoff according to bank statements.

[9] Japheth Dillman was the Chief Strategy Officer for ICOBox. See Attach-17 (Dillman's employment contract addendum, provided in discovery, marked ANDRADE_DOJ00000_00022141). ICOBox was separately investigated by the Securities and Exchange Commission, which sued ICOBox for illegal securities offerings and for acting as unregistered brokers for digital assets, and ICO Box was ordered to disgorge over $16 million and pay civil penalties. *See Securities and Exchange Commission v. ICOBox et al.*, No. CV 19-8066 DSF (Ex) (C.D. Cal. Mar. 10, 2020).

at trial framed him as a co-conspirator.[10]  The same is true of salespeople Darrow, Parsons, and DiAdamo; the government characterized each of them as participants in Mr. Andrade's scheme to defraud with knowledge of the alleged falsity of the claims they were making about AtenCoin in pursuit of their 30-40% commissions.[11]

In each of these instances, the accounts where the co-conspirators received their funds were the funds' final resting place, and Mr. Andrade's accounts were mere "stops on the way to splitting up the money, not jointly controlled deposits where the money came to rest." *Thompson,* 990 F.3d at 691.  All these funds were only ever in Mr. Andrade's accounts while en route to co-conspirators, and cannot be the subject of a forfeiture order.

---

[10]  In closing argument, government counsel stated, "People that Andrade hired knew [that people would view the Super Bowl rejection campaign negatively if they knew about it]. John Bryan wrote, "The written proposal will pretend we really are buying a Super Bowl ad because if anybody gets this in discovery or something like that, I don't want it to look like *we* planned to do this." Well, members of the jury . . . that's exactly what *they* were trying to do." Tr. 2996:24-2997:6 (emphasis added). The government characterized statements between Abramoff and Bryan as co-conspirator statements to the Court. *See* Tr. 2061:24-2062:1. *See also* Government's Motion to Admit Co-Conspirator Statements, ECF 449, 20:20-21:20 (laying out Bryan's cooperation in creating Project Sunshine and engaging in allegedly secret market making on behalf of Mr. Andrade) and 18:20-19:20 (discussing John Bryan as the "anticipated trial witness leading the production of the Super Bowl "'ad'" and his efforts with Abramoff to hide the rejection campaign). *See also* Attach-21, FBI-302-005128, pages 2-3 (search warrant affidavit excerpt), where affiant Ethan Quinn indicates John Bryan is a co-conspirator with Mr. Andrade and others.

[11]  The government argued that government victims heard lies "firsthand from Marcus Andrade and one of his salespeople, Brian Darrow," who was "a known convicted fraudster, convicted felon, who Marcus Andrade hired," and "who had no scruples about calling people up to demand money from them for made-up products," and who took a "secret commission" on the money he brought in. *See* Tr. 3001:24-3002:12. Darrow testified that he was initially contracted with Parsons, *see* Tr. 446:4-11, expressed the method that he and other sales agents used with Parsons and Andrade to get paid, *see* Tr. 448:8-19, and stated that Parsons was the person who set his commission rate and was the person who initially received funds from NAC, *see* Tr. 459:11-25. Rene Acuna testified that Parsons was part of communications he had with the NAC Foundation when making his first AtenCoin purchase in 2015.  *See* Tr. 645:14-646:8. The government elicited testimony from Brandi Jodoin that DiAdamo was the VP of Sales for the NAC Foundation and was the first person to introduce her and Corey Jodoin to AtenCoin in a cold sales call, that he and Mr. Andrade appeared to have some type of friendship, *see* Tr. 263:23-264:21.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### E.  The Government's Proposed Forfeiture Erroneously Includes Criminal Activity Mr. Andrade Did Not Agree To Undertake

The government has errantly attempted to hold Mr. Andrade accountable for conduct unrelated to "the criminal activity that the particular defendant agreed to jointly undertake." *United States v. Bailey*, 973 F.3d 548, 574-75 (6th Cir. 2020) (holding that "criminal activity for sentencing guidelines purposes is not as broad as conspiracy liability," that defendants "can only be held accountable for the 'criminal liability that [they] agreed to jointly undertake,'" and that restitution is distinguishable because the sentencing guidelines "serve a punitive purpose"). Given that forfeiture, like the guidelines, is punitive, going beyond activity that Mr. Andrade jointly agreed to undertake overstates his allegedly ill-gotten gains.  Two sets of transactions should be excluded from forfeiture on this basis.

First, two co-conspirators, Dillman and Mata, using their entity Block Bits Capital and acting for their own investment purposes, bought $458,380 worth of AML Tokens, *see* Appendix B; the tokens were then used by Block Bits to conduct Dillman and Mata's own, separate fraud scheme, lining their own pockets and undermining a central tenet of Mr. Andrade's business – a subterfuge that was hidden from Mr. Andrade, and that he did not learn about until long after Dillman and Mata's separate scheme was completed.  ECF 713-7.  In addition, a significant portion of the funds attributable to transactions Boyer engaged in with Blockbits Capital— $1,105,000—were attributable to activities that Mr. Andrade not only did not participate in, but that also violated Mr. Andrade's company policies and were used to cheat Mr. Andrade.[12]  *See* Reply to the Government's Sentencing Memorandum, ECF 716, at 21:24-22:13; Appendix C. None of these transactions were part of the criminal activity that Mr. Andrade agreed to jointly

---

[12] This objection does not apply to funds that Mr. Boyer delivered to Mr. Andrade through private post-ICO purchase agreements, because those transactions–totaling $125,000–while facilitated by BlockBits Capital, were accomplished pursuant to contracts Mr. Boyer entered with Mr. Andrade directly.  *See* Tr. Ex. 602.

undertake and therefore should be excluded from the forfeiture calculation based on the principles for punitive aspects of sentencing articulated in *Bailey*.

In sum, the Court should reject the government's requested forfeitures entirely, but at minimum and subject to further arguments below, should reduce the forfeiture by at least $5,151,775.76 due to low-quality, unverifiable data, unreliable estimates, double-counting, inclusion of funds beyond the crime of conviction, inclusion of funds that came to rest with co-conspirators rather than Mr. Andrade, and inclusion of funds unrelated to activity in which Mr. Andrade jointly agreed to participate. *See* Appendix E.

## III.    THE GOVERNMENT'S REQUESTED RESTITUTION IS INSUFFICIENTLY PROVEN AND EXCESSIVE

The government's effort to meet its burden of proof on restitution can be charitably described as slapdash. Its request for restitution in the amount of $4,597,205.88 is substantially inflated with elementary oversights, erroneous inclusion of ineligible claims, and claims not supported by the data provided and/or based on other evidence. The Court should therefore order no restitution whatsoever. If the Court does order restitution, the amount should be reduced substantially.

### A. No Restitution Should be Awarded

No restitution should be awarded because the government made no effort to satisfy fundamental prerequisites for awarding it. The government made no effort to prove direct and proximate causation,[13] or, with only a few exceptions, reliance. *See United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) ("the parties agree that the government must show that the investors relied on Mr. Stein's fraudulent information to satisfy the "but for" causation requirement under U.S.S.G. § 2B1.1"); *United States v. Farano,* 749 F.3d 658, 666-67 (7th Cir

---

[13] As one example, Lisa T.'s claim seeks attorney's fees, among other things, for dealing with a default judgment entered against her; the government makes no effort to establish that Mr. Andrade was the proximate cause of any such loss.

2014) (suggesting banks were not victims for restitution purposes absent evidence they relied on the defendants' original fraud).

Nor did the government do basic checking of what it presented to the Court, such as removing duplicates. Its claim that "nearly 300 victims provided loss amounts or victim impact statements" *see* Government's Sentencing Memo, ECF 709, at 12:2-5, is false because it errantly includes one prankster and 24 duplicate victim entries, *see* Appendix F – only one of which the government caught and marked as "duplicate," a*nd then included it anyway.*[14] In addition, the government used for its total demand whatever the victims reported, even when the government's efforts to substantiate the victims' claims came up with a far lower number. *See* Appendix G. And the low-quality information the government collected addresses only what alleged victims *paid*, as opposed to what they *lost,* a meaningful difference given that there was selling on exchanges for value; as a result, without more, there is nothing to suggest that what victims paid equates to what they lost for restitution purposes. *See, e.g., United States v. Waknine,* 543 F.3d 546, 558 (9th Cir. 2008) (rejecting victim statements that were too summary, declaring it "unreasonable to expect a defendant to be able to counter evidence provided by the victim concerning attorneys' fees," and explaining that "it is the responsibility of the government, aided by the victim, to provide adequate reliable evidence").[15]

---

[14] Attach-19 (excerpt of government's restitution calculation).

[15] Although for the reasons in the text the government bears the burden of showing actual losses as opposed to merely purchases, there is ample evidence that substantial numbers of tokens were sold on exchanges, including by alleged victims who are seeking restitution. ECF 713-7. Other evidence exists in a movie format; to wit: Discord chats monitored by an undercover agent who recorded moving text indicated that Ben Boyer—on May 2, 2018—chatted about an AML Token investor who was willing to buy tokens for one dollar, and another user, victim-claimant Maurice M., who had invited Boyer to the chat, was interested in selling to Boyer. (Reference is found at *discord 5-2-18 full day.mov* at timestamp :25-:27 seconds.) In another recording of the text-based online conversation, it was discussed that claimants Lisa T. and Maurice M. had sold their tokens to private buyers the day before the tokens were listed on the exchange. (Reference is found at *discord 5-5 to 5-7 am.mov* at timestamp 2:12.) *See also* Attach-20 (3-9-2020 agreement between victim-claimant Daniel A. and Blockbits, to sell his ABTC via Block Bits' services); ECF 713-7 at 4 (Mata referencing making profits trading AML tokens).

---

This cavalier approach means that the government has failed to present "reliable and specific evidence" to support a restitution award, as it is required to do. *United States v. Sheffield*, 939 F.3d 1274, 1278 (11th Cir. 2019) (vacating restitution order); *United States v. Giltner,* 889 F.2d 1004, 1008 (11th Cir. 1989) ("right not to be sentenced on the basis of inaccurate or unreliable information"); *Waknine,* 543 F.3d at 556 ("the district court[may] utilize only evidence that possesses `sufficient indicia of reliability to support its probable accuracy'"). When a total is a simple computational exercise, "[r]estitution . . . requires an exact figure." *United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008). Having failed to satisfy numerous fundamental elements needed to award restitution, the government has not satisfied its burden of proof and its demand should be rejected *in toto*; it is neither the Court's nor the defendant's job to compute the correct figure. *Waknine,* 543 F.3d at 546 (district court abused its discretion by relying exclusively on summaries provided by victims); *United States v. Brock-Davis*, 504 F.3d 991, 1002 (9th Cir. 2007) ("[T]he government must provide the district court with more than just . . . general invoices . . . ostensibly identifying the amount of their losses").

## B. If the Court Nonetheless Awards Restitution, It Should Award Far Less than the Government's Demand

As further evidence of the government's failure – or, in the alternative, as a basis for a substantially lower restitution figure – specific errors are identified below, complete with names of victims for whom restitution should be rejected in whole or in part, and, for those whose claims should be rejected in part, a minimum amount by which their claims should be reduced.

The Government's Restitution Figure Erroneously Includes Duplicates

Appendix F identifies duplicate victims in the government's submission. As detailed therein, these duplicates represent $34,701 in claimed losses that must be excluded.

The Government's Figures Are Facially Inconsistent and Insufficiently Substantiated

Appendix G identifies restitution claims that lack substantiation or that are contradicted by more reliable evidence. The government's final restitution figure of $4,597,080.88 is nothing more than the sum of all victim claims (including the aforementioned 24 duplicates and the

prankster), without regard for their validity.[16]  The government had and employed means to check veracity, namely: (1) verification using bank records, (2) verification using an NAC Foundation-produced purchaser schedule (the one unaudited and unverified data mentioned above), and (3) verification using claimant-provided sources, but merely went with unsubstantiated victim claims, even when those claims were contradicted by other sources.

After removing duplicates and the prankster, 266 alleged victims remain, of which only 103 submitted any substantiation for their losses.  Appendix G.  Even allowing the government to fill in gaps in substantiation using bank records and the NAC Foundation purchaser schedule, ten alleged victims remain for whom the government has identified no substantiation whatsoever, amounting to $493,497.16 in claimed losses. Appendix H.  This is an insufficient basis for restitution.  *Waknine,* 543 F.3d at 546 (district court abused its discretion by relying exclusively on summaries provided by victims); *Brock-Davis*, 504 F.3d at 1002 ("[T]he government must provide the district court with more than just . . . general invoices . . . ostensibly identifying the amount of their losses").

Of the victims for whom there is substantiation, there are numerous conflicts between the government's cited sources, with the government occasionally presenting as many as four contradicting loss figures for a single victim.  For example, victim Kelly C. claimed $100,000 in losses, but the government's three sources of verification each conflict and none of them come anywhere near the claimed figure; the bank statements show $8,526.50 in purchases, the NAC Foundation schedule shows $30,000.33, and the victim's submitted evidence shows $40,480.06. Appendix G.  Nonetheless, the government included the full $100,000 in claimed losses within its restitution figure.  *Id.*  This pattern repeats across 127 claimants, with a total overstatement of at least $1.5 million.  *Id.*

The Government's Restitution Figure Includes Victims Ineligible for Restitution

---

[16] Inscrutably, the figure the government submitted to the Court exceeded its own already exaggerated sum of the victim's restitution claims by $3,000.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Some of the claimants are ineligible for restitution because their claims are founded on conduct other than that charged in the indictment and for which Mr. Andrade was convicted. *See United States v. May,* 706 F.3d 1209, 1214 (9th Cir. 2013) (a district court "may award restitution … only for loss that flows directly from the specific conduct that is the basis of the offense of conviction"); *Griffin,* 76 F. 4th at 724; 18 U.S.C. § 3663(a)(1)(A) ("when sentencing a defendant convicted of an offense under this title, the court may order "that the defendant "make restitution to any victim *of such offense"*); 18 U.S.C. § 3663(a)(1)(B) ("The court, in determining whether to order restitution under this section, shall consider . . . the amount of the loss sustained by each victim *as a result of the offense* (emphasis added).

*AtenCoin purchasers.* Among claimants are victims whose losses are only associated with AtenCoin as opposed to AML Bitcoin, the only fraud charged in the indictment. AtenCoin was not a fraud, or if it was, the extent of Mr. Andrade's culpability for it was never established, *see* Defendant's Sentencing Memo, ECF 713 at 24:10-27:2; regardless, Mr. Andrade was not charged with fraud related to AtenCoin, money spent purchasing AtenCoin is not loss flowing from the "*specific conduct* that is the basis of the offense of conviction," *May,* 706 F.3d at 1214 (emphasis added), and AtenCoin purchases were outside the dates charged in the indictment. Using the government's provided figures, as identified in Appendix 3, there are 18 such AtenCoin victims, accounting for $851,646.51 in AtenCoin cryptocurrency and investments in the NAC Foundation that should be excluded from restitution.[17] Appendix I.

*CrossVerify Share purchasers.* As extensively discussed in Mr. Andrade's sentencing memo, not only was CrossVerify not charged as part of the AML Bitcoin scheme, but the government never presented any evidence, either during trial or in the course of sentencing, that this well-financed, expertly-staffed company, with an impressive product and clientele suitors, was in any way fraudulent. *See* ECF 713, at 23:7-24:9. Using the government's provided

---

[17] Brandi Jodoin is the only victim to have made a claim for losses due to investments in the NAC Foundation , in the amount of $304,271.51 in addition to her claims for AtenCoin losses.

figures, among the victim claimants, two make claims for losses associated with CrossVerify share purchases totaling $95,000 that should be excluded from restitution.  Appendix I.

            *Purchasers outside the time period of the indictment.*  The government improperly seeks restitution for alleged victims who purchased coins or tokens before and after the time period charged in the indictment.  *See* Indictment (Count One), ECF 1 at 6:4-5 (defining period of fraud as July 2017 through on or about October 2018).  Making no effort to weed out those who purchased outside the time period of the indictment, the government included $851,646.51 from pre-indictment transactions, *see* Appendix I, and $100,000 from post-indictment transactions.[18]  *See* Appendix J.

        None of those transactions are eligible for restitution.  *United States v. De Leon,* 728 F.3d 500, 507 (5th Cir. 2013) (vacating restitution order, explaining in conspiracy case that "[r]estitution is limited to the loss actually caused by the offense of conviction, the time span of which is defined by the "*specific* temporal scope" of the indictment, and [t]hus, restitution cannot be awarded for "losses" attributable to conduct outside the temporal scope of the scheme charged); *United States v. Gray*, 121 F. 4th 578, 587 (6th Cir. 2024) (remanding conspiracy and fraud restitution award, explaining that "[e]very circuit to consider the question has looked at it the same way.  If an indictment alleges that a conspiracy began on a certain date, they all say, a defendant may not be held responsible for losses that occurred before that date"); *United States v. Allen*, 983 F.3d 463, 472-73 (10th Cir. 2020) (MVRA requirement that restitution be limited to the offense of conviction "necessarily includes the temporal limits of the offense as outlined in the indictment," holding that a restitution order cannot compensate for losses stemming from conduct that occurred outside the charged period); *see generally* 18 U.S.C. § 3663(a)(1)(A) ("when sentencing a defendant convicted of an offense under this title,  the court may order "that the defendant "make restitution to any victim *of such offense"*); 18 U.S.C. § 3663(a)(1)(B) ("The

---

[18] The pre-indictment transactions are also erroneously included on one of two other grounds mentioned in the text immediately above relating to AtenCoin and Cross Verify.

1   court, in determining whether to order restitution under this section, shall consider . . . the

2   amount of the loss sustained by each victim *as a result of the offense* (emphasis added).[19]

3          Restitution for conduct outside the indictment period is therefore prohibited.  That should

4   be especially true in this case, in which the government objected to, and the Court excluded,

5   defense evidence that post-dated the indictment period.

6          *Some of Ben Boyer's purchases.*  The claim of Ben Boyer includes $1,105,000 paid by

7   Boyer that Mr. Andrade did not solicit, that was a part of Dillman's investment scheme that was

8   hidden from Mr. Andrade and designed to make Dillman and Mata (and not Mr. Andrade)

9   billions, and that undermined a central tenet of Mr. Andrade's business by using AML Bitcoin

10  without Mr. Andrade's knowledge as an investment in Dillman's fund.[20]  *See* Appendix C.

11  Given the evidence that Block Bits Capital was selling AML Tokens in ways Mr. Andrade

12  prohibited and that Dillman and Mata were cheating Mr. Andrade, these purchases were "beyond

---

13

14  [19]  One of the purchasers who is ineligible for restitution because he purchased after the
15  indictment period, Daniel A, is also ineligible for an additional reason: he was not the victim of
    fraud.  **Daniel A.** bought tokens through a private purchase, brokered by David Mata, who
16  refused Mr. Andrade's request to meet Daniel A. personally in October 2018, and again in
    January 2019.  In early 2019, Daniel A. had a direct conversation with Mr. Andrade, who told
17  Daniel A that the AML Bitcoins were not ready, that they were tokens, not coins, that were in
    place with firm deals for their use, and that they were not being sold for investment purposes. If
18  the Court does not invalidate Daniel A.'s request based on the date of his purchase, the Court
    should either deduct $300,000.00 from the total amount of restitution ordered, or at least hold a
19  hearing (some of which may be after the date of the scheme).  If there is any dispute about these
    facts, Mr. Andrade requests a hearing.
20

21

22  [20] *See* ECF-713-7 (recording of Mata reporting profits in trading AML Bitcoin tokens); *see also*
    Trial Exhibit 3054 (Block Bits plans discussed in December 2017 email: Mr. Andrade is not
23  included); Ling's trial testimony (undercover officer; testified that he knew Mr. Andrade's own
    website's terms and conditions for sale during the ICO involved a prohibition on investments) at
24  Tr. at 2110 at 8-13 and *see* Exhibit 2471 (Mr. Andrade specified he was selling tokens as a
    means of exchange not to be used as investments, while Dillman's seminar offered investments);
25  and ECF 716-6, p.2  (12-21-2018 email from Dillman to Mata admitting he hid how many tokens
    he bought from Mr. Andrade).  *See also* ECF 716-7 at 3 (Boyer breaking down his token
26  purchases).  The government has not attempted to show, other than with the transaction in Count
    One, that the money went directly to Mr. Andrade, and Mata has admitted that Black Bits took
27  profits from these transactions.  See ECF 713-7.

28

---

the criminal activity that [Mr. Andrade] agreed to jointly undertake," and should not be a basis

for restitution. *Cf. Bailey, supra*, at 575. As a result, Boyer's claim for restitution from Mr.

Andrade should be reduced by $1,105,000.

<u>Any restitution should be apportioned</u>

According to the government, Mr. Andrade, Mata, Dillman, and Abramoff (among

others) were part of the same conspiracy or scheme. Given Mr. Andrade's lack of future income

as detailed in the presentence report, his three dependents who also lack income, and given the

liability of sophisticated and culpable co-schemers such as Abramoff, the Court should apportion

the restitution liability. *See* 18 U.S.C. § 3664(h) (where the court finds more than one defendant

"has contributed to the loss of a victim, the court may make each defendant liable for payment of

the full amount of restitution or may apportion liability among the defendants to reflect the level

of contribution to the victim's loss and economic circumstances of each defendant"). That the

government elected to charge Abramoff in a separate case instead of this one for its own strategic

reasons should not matter; otherwise the government could deprive the Court of its statutory

ability to apportion restitution.[21]

<u>The Most Generous Restitution Figure for Substantiated Victim Loss Claims Falls Far Below the</u>
<u>Government's Unsubstantiated, Contradictory, and Duplicative Claims</u>

While the government failed to meet its burden on restitution and the Court should

therefore not award any, based on the arguments above any restitution award has to be reduced

by at least $3,653,957.11. If the Court does award restitution in any amount, given Mr.

income and the fact that he has three dependents who also lack income, it should at most impose

a nominal periodic payment schedule under 18 U.S.C. § 3664(f)(2) and (3).

### IV.    THERE IS NO STATUTORY BASIS FOR A MONEY JUDGMENT

###         FORFEITURE AND ANY SUCH JUDGMENT IS UNCONSTITUTIONAL

---

[21] The same is true for Mata and Dillman, who were charged only with their own separate
scheme, again for the government's strategic benefit, while also being threatened with
prosecution for the scheme charged in Mr. Andrade's indictment.

1

2       Sprinkled within the government's request for a "forfeiture money judgment" are

3   references to Federal Rule of Criminal Procedure 32.2 and 18 U.S.C. § 981, but neither provides

4   a basis for a "money judgment" forfeiture.  To the contrary, the advisory committee in its notes

5   to Rule 32.2. goes out of its way to state that while "a number of cases have approved use of

6   money judgment forfeitures," the committee "takes no position on the correctness of those

7   rulings."  Fed. R. Crim. P. 32.2, Advisory Committee Notes (2000).  18 U.S.C. § 981(a)(1)(D)

8   says nothing about a "forfeiture money judgment;" rather, in describing the property that is

9   "subject to forfeiture," it authorizes taking something else entirely – "any property, real or

10  personal, which is or which is traceable to the gross receipts obtained, directly or  indirectly,

11  from a violation of . . . section 1343 (relating to wire fraud)."

12      The government makes no effort to say that Mr. Andrade possesses $10,474,609 – or any

13  other amount – that fits the description of being the receipts, or being traceable to the receipts,

14  obtained from wire fraud.  *See Thompson*, 990 F.3d at 690 ("there is nothing in the text of

15  Section 981 that extends forfeiture to property of a defendant that is not traceable to the proceeds

16  of the crime (outside the procedures set forth in Section 853(p).").[22]  Rather, the government

17  merely asserts – incorrectly, for the reasons stated elsewhere in this brief – that Mr. Andrade at

18  one point in time received that amount, without rebutting that most of those funds were used for

19  business expenses and therefore are no longer in his possession,[23] and that the few funds that are

20  currently in his possession likely came from other sources—primarily, the sale of his stock in

21  BGC, Inc. and his receipt of VA disability checks.

22      As a result, what the government is seeking is not what the statute allows; instead it is

23  seeking a judge-made remedy,[24] in defiance of the constitution (and without jury participation).

24
    ─────────────────────
25  [22] Section 853(p) refers to 21 U.S.C. § 853(p), which, given its placement in Title 21, applies to
    drug cases, and not to wire fraud.

26
    [23] *See supra* n.27.
27
    [24] S*ee, e.g.*, *Lo*, 839 F.3d at792-94.
28

*See United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment"); *United States v. Surgent*, 2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009) (declining to impose a "money judgment" forfeiture because there is no statutory authorization for doing so, with the exception of 31 U.S.C. § 5332(b)(4), which "demonstrates that when Congress intends to authorize personal money judgments, it does so explicitly"); *United States v. Day*, 416 F. Supp. 2d 79 (D.D.C. 2006) (same, explaining that "[n]otably absent from the applicable statutory framework, however, is a provision expressly authorizing money judgments. Implicitly acknowledging the lack of support for its position in the statutory language, the government instead argues that the practice of entering forfeiture money judgments is established in the case law as a unique aspect of *in personam* criminal forfeiture. For the reasons set forth below, the Court disagrees"); Martha Boersch, *Forfeiture Money Judgments: Will the Supreme Court Clamp Down on These Unconstitutional Judicial Punishments*, CHAMPION (June 2021) (current Chief of Criminal Division in N.D. Cal. United States Attorney's Office previously making the same argument made here); *see generally United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008) ("forfeiture statutes are strictly construed against the government").

## V.    ANY FORFEITURE OR RESTITUTION ORDER WOULD BE UNTIMELY

### A.    The Government's Proposed Restitution Is Untimely

The Court should not award either restitution or forfeiture given the government's repeated flouting of the rules governing the time requirements for the collection and distribution of information, and for making its requests for relief. The government did not comply with the requirement in 18 U.S.C. § 3664(d)(1) that it list the amounts subject to restitution "not later than 60 days prior to the date initially set for sentencing," and it wasn't even close.[25] Instead, over four months after the verdict and only a few days before the sentencing, the government

---

[25] The government first requested a money judgment forfeiture of $10,474,609 in a motion filed on July 23, 2025, 6 days before sentencing. See United States's Motion for Forfeiture Money Judgment, ECF 711, at 6.

proposed a restitution figure to the Court based only on trial testimony – a submission that it would have been "practical" to make immediately after the jury returned its verdict in early March. It continues to compound its violation of the rule, most recently by sending a revision – its fourth – more than *80 days* after the date set by the rule, and after the defense had completed its analysis for this filing.

Assuming that some prejudice is needed to remedy the government's repeated flouting of the rules,[26] the defense notes that it cannot keep up with the unending revisions and that, even with all of its rewrites, the government still has not addressed the flaws in its approach and gaps in its proof that the defense has previously identified, so that the defense cannot meaningfully address further the government's restitution claim. *See* Defendant's Sentencing Memorandum, ECF 713, at 36:18-38:23; Defendant's Reply to Government's Sentencing Memorandum, ECF 716, at 18:3-25:4; *see also United States v. Loreng,* 956 F. Supp. 2d 213 (D.D.C. 2013) (ordering no restitution due to failure to supply calculation until just before sentencing and failure to properly address issues Court raised about calculation).

## B.    Any Forfeiture Order from the Court Is Untimely

Just as it did with restitution, the government started the forfeiture process far too late – a few days before sentencing. *See* Federal Rule of Criminal Procedure 32.2 (requiring that "*as soon as practical after a verdict* . . . the Court must determine what property is subject to forfeiture under the applicable statute") (emphasis added). Having already put the Court in an impossible position, the government then made matters worse. Either the government gave the Court incorrect advice during the sentencing about whether the Court could say it was imposing forfeiture without imposing the amount of forfeiture, or the government needed to identify the circumstances under which such advice did or did not apply, but after following that advice, the Court thereafter entered its judgment (with its sentence) against Mr. Andrade. See ECF 719.

Fairly read, once the Court did so, the rules no longer allow the Court to do more with forfeiture. A forfeiture order is "part of the [defendant's] sentence in the criminal case," 28

---

[26] S*ee, e.g., United States v. Hagege*, 273 Fed. Appx. 612 (9th Cir. 2008).

U.S.C. § 2461(c); *see also* Fed. R. Crim. P. 32.2(b)(4)(B); *Libretti v. United States*, 516 U.S. 29, 38-39, (1995), and "once a court imposes a sentence, generally it may not 'change or modify that sentence unless such authority is expressly granted by statute.'" *United States v. Maddux*, 37 F. 4th 1170, 1175 (6th Cir. 2022). *See also United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979) ("once a sentence has been imposed, the trial judge's authority to modify it is" limited to Rule 35, which imposes a time period that "is jurisdictional and may not be extended"); *United States v. Stump*, 914 F.2d 170, 172 (9th Cir. 1990) ("District courts do not have inherent power to resentence defendants at any time; their 'authority to do so must flow either from the court of appeals mandate ... or from Federal Rule of Criminal Procedure 35'") (citation omitted). *See generally United States v. Pease*, 331 F.3d 809, 813 (11th Cir. 2003)

A statute does allow the Court to order *restitution* after it imposes sentence, 18 U.S.C. § 3664(d)(5), but that statute is limited to restitution and no such statute exists for forfeiture. The Court's initial order of forfeiture, as drafted by the government, cites Rule 32.2(e) as a basis for a post-sentence forfeiture award, but that rule relates only to property subject to forfeiture under an existing order of forfeiture that was located and identified after that order was entered, or substitute property that qualifies for forfeiture under an applicable statute – neither of which is present here. *See* 18 U.S.C. § 981(d); 18 U.S.C. § 982(a)(8). *See generally United States v King*, 745 F. Supp. 3d 537, 542-43 (E.D. Mich. 2024) (denying forfeiture, noting government's failure to meet Rule 32.2's deadlines, and explaining that order cannot be amended more than 14 days after sentencing). In any event, "forfeiture statutes are strictly construed against the government," *$493,850.00 in U.S. Currency*, 518 F.3d at 1169; *see also United States v. One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939) ("Forfeitures are not favored; they should be enforced only when within both letter and spirit of the law."), and because criminal forfeiture is a form of punishment for a criminal offense, any ambiguity in criminal forfeiture statutes must be resolved in favor of the defendant under the rule of lenity. *United States v. Cano-Flores*, 796 F.3d 83, 93-94 (D.C. Cir. 2015) (*citing United States v. Batchelder*, 442 U.S. 114, 121 (1979)). As a result, no forfeiture can now be awarded.

## VI.    THE GOVERNMENT'S COMBINED AND OVERLAPPING FORFEITURE AND RESTITUTION DEMANDS VIOLATE THE EIGHTH AMENDMENT

Although the vast bulk of what Mr. Andrade was paid for his tokens and coins went back into his business, and only $1.66 million went into his pocket,[27] the government's combined restitution and forfeiture requests total $15,071,814.88.  Even if each step in this process were supported by facts and case law, the result would be a penalty of over nine times what he allegedly pocketed – a total that is excessive and in violation of the eighth amendment.  *See, e.g., King*, 231 F. Supp. 3d at 872 (reducing requested money judgment forfeitures where result would be to sentence the defendants to "life terms of impoverishment or living off the books, or both," explaining that "judicial treatment of the Excessive Fines Clause," among other things, "tell[s] us that the statutory forfeiture tools wielded by the government in this case, powerful though they are, do not trump the limitations imposed by the Eighth Amendment").

This is an appropriate case to limit the forfeiture given factors such as the predominant amount of money returned to the business, *see King*, 231 F. Supp. 3d at 901 (considering factors such as the use of the forfeited property); *cf. Thompson*, 990 F.3d at 691 (limiting forfeiture to amount that "came to rest with [the defendant] as a result of his crimes"); the value of not putting Mr. Andrade, after paying victims, "in the service of the government . . . forever," *King,* 231 F. Supp. 3d at 1006; the fact that the amount of the requested forfeiture bears "no articulable

---

[27]  By the government's own calculations, Mr. Andrade spent most investor funds on business expenses. During the AtenCoin period between July 2014 and July 2017, the government estimated income from purchasers and investors totaling $2.1 million—including the improperly counted funds from CrossVerify share sales.  Tr. Ex. 1520-002.  Of this amount Mr. Andrade took $300,000 or 14% of the total.  During the AML Bitcoin period between July 2017 and October 2018, the government alleges Mr. Andrade received $8,374,609 from purchasers.  Tr. Ex. 1520-003; 005.  Of this money, $2,874,609 was estimated to be in cryptocurrency, the overwhelming value of which was lost to a nearly two-thirds drop in the crypto market, *see infra,* and the remainder of which Mr. Andrade sold and reinvested in the business.  Mr. Andrade took $2.1 million into his personal accounts, but he spent $740,000 of that money on business expenses ($300,000 for marketing, $300,000 transferred to business accounts, $60,000 for software and IT services, $40,000 for employees, and $40,000 for professional services), leaving $1.36 million which went to Mr. Andrade personally and which accounted for only 16% of purchaser funds.  *Id.* at 004; 008.  In sum, between AtenCoin and AML Bitcoin, Mr. Andrade's total income was $1,660,000—only 15.8% of funds received.

correlation to any injury suffered by the government," *United States v. Bajakajian,* 524 U.S. 321, 339-40 (1998); and the existence of the government's own misconduct, which also cuts against forfeiture. *See Caplin & Drysdale Chartered v United States*, 491 U.S. 617, 635 (1989); *see generally United States v. Real Prop. Located in El Dorado Cnty.*, 59 F.3d 974, 984-85 & n.10 (9th Cir. 1995) (judiciary must be vigilant given government's incentive to impose forfeitures because the government can use seized assets to finance law enforcement).

Equally important is the devastating impact the forfeiture will have on Mr. Andrade, his wife Solmaz, and his two daughters, Melody and Madeline; these are important and appropriate factors for the Court to apply in assessing the amount of the forfeiture. *See, e.g., El Dorado*, 59 F.3d at 985 (directing attention to "the hardship to the defendant, including the effect of the forfeiture on defendant's family or financial condition");. *Bajakajian*, 524 U.S. at 335, 340 n.15 (while deciding in defendant's favor on other grounds, court discusses Old English roots of the Excessive Fines Clause and the original consideration of the wrongdoer's financial condition); *United States v. Beecroft,* 825 F.3d 991, 994 (9th Cir. 2016), *abrogated by Honeycutt*, 137 S. Ct. at 1632, 1635 (remanding forfeiture order for review of excessiveness while wrongly applying principle of joint and several liability to criminal forfeiture prior to *Honeycutt*). The Court's 84-month sentence is more than enough to achieve sentencing objectives, with Mr. Andrade also paying restitution to victims.

## VII. ANY FORFEITURE OR RESTITUTION ORDERS SHOULD BE STAYED PENDING APPEAL

This Court has authority to stay any forfeiture or restitution orders pending appeal. See Federal Rule of Criminal Procedure 32.2(d) (forfeiture); 38(e) (restitution). In the event it orders forfeiture or restitution, it should stay such orders pending appeal based on the substantial statutory, constitutional, and other issues raised in this filing, in Mr. Andrade's misconduct motion, and in Mr. Andrade's new trial motion.

## VIII. CONCLUSION

The Court and Mr. Andrade deserve better than the government's tardy, slapdash effort that is

based on unreliable and contradictory data, and that seeks relief that exceeds statutory authority without regard to the crushing burden on Mr. Andrade's family.  The requests should be denied in their entirety, or, if not, substantially reduced.


DATED: August 22, 2025              Respectfully Submitted,

                                              /s/

                                    _____
                                    MICHAEL J. SHEPARD,
                                    CINDY A. DIAMOND, and
                                    DAINEC STEFAN
                                    Attorneys for Defendant
                                    ROWLAND MARCUS ANDRADE

## APPENDIX A

## Forfeiture Exclusions: Funds Resting with Co-Conspirators

### 1. Mark DiAdamo

| Bank | Account | Name | Bank Date | Description | Inflows to DiAdamo |
|------|---------|------|-----------|-------------|--------------------|
| Chase Bank | 619929891 | NAC Foundation | 21-Aug-14 | Mark Diadamo | $12,000.00 |
| Chase Bank | 619929891 | NAC Foundation | 3-Sep-14 | Mdi Marketing LLC | $4,900.00 |
| Chase Bank | 619929891 | NAC Foundation | 4-Sep-14 | Mdi Marketing LLC | $2,150.00 |
| Chase Bank | 619929891 | NAC Foundation | 16-Sep-14 | Mdi Marketing LLC | $100.00 |
| Chase Bank | 619929891 | NAC Foundation | 17-Sep-14 | Mdi Marketing LLC | $6,700.00 |
| Chase Bank | 619929891 | NAC Foundation | 24-Sep-14 | Mdi Marketing LLC | $2,900.00 |
| Chase Bank | 619929891 | NAC Foundation | 14-Oct-14 | Mdi Marketing LLC | $1,400.00 |
| Chase Bank | 619929891 | NAC Foundation | 14-Oct-14 | Mdi Marketing LLC | $5,100.00 |
| Chase Bank | 619929891 | NAC Foundation | 22-Oct-14 | Mdi Marketing LLC | $9,975.00 |
| Chase Bank | 619929891 | NAC Foundation | 24-Oct-14 | Mdi Marketing LLC | $4,875.00 |
| Chase Bank | 619929891 | NAC Foundation | 27-Oct-14 | Mdi Marketing LLC | $4,875.00 |
| Chase Bank | 619929891 | NAC Foundation | 6-Nov-14 | Mdi Marketing LLC | $7,150.00 |
| Chase Bank | 619929891 | NAC Foundation | 15-Dec-14 | Mdi Marketing LLC | $9,982.36 |
| Chase Bank | 619929891 | NAC Foundation | 23-Jan-15 | Mdi Marketing LLC | $3,950.00 |
| Chase Bank | 619929891 | NAC Foundation | 29-Jan-15 | Mdi Marketing LLC | $1,600.00 |
| Chase Bank | 619929891 | NAC Foundation | 17-Feb-15 | Mdi Marketing LLC | $1,450.00 |
| Chase Bank | 619929891 | NAC Foundation | 24-Feb-15 | Mdi Marketing LLC | $1,500.00 |
| Chase Bank | 619929891 | NAC Foundation | 16-Mar-15 | Mdi Marketing LLC | $1,450.00 |
| CitiBank | 205855554 | NAC Foundation | 10-Apr-15 | MDI Marketing LLC | $100.00 |
| CitiBank | 205855554 | NAC Foundation | 14-Apr-15 | MDI Marketing LLC | $4,400.00 |
| CitiBank | 205855554 | NAC Foundation | 15-Apr-15 | MDI Marketing LLC | $10,500.00 |
| CitiBank | 205855554 | NAC Foundation | 24-Apr-15 | MDI Marketing LLC | $6,500.00 |
| CitiBank | 205855554 | NAC Foundation | 19-May-15 | MDI Marketing LLC | $4,100.00 |
| CitiBank | 205855554 | NAC Foundation | 5-Jun-15 | MDI Marketing LLC | $2,600.00 |
| CitiBank | 205855554 | NAC Foundation | 17-Jun-15 | MDI Marketing LLC | $26,500.00 |
| CitiBank | 205855554 | NAC Foundation | 29-Jun-15 | MDI Marketing LLC | $1,569.60 |
| CitiBank | 205855554 | NAC Foundation | 6-Jul-15 | MDI Marketing LLC | $2,369.60 |
| CitiBank | 205855554 | NAC Foundation | 10-Jul-15 | MDI Marketing LLC | $14,673.60 |

| Bank | Account | Name | Bank Date | Description | |
|------|---------|------|-----------|-------------|---|
| CitiBank | 205855554 | NAC Foundation | 14-Aug-15 | MDI Marketing LLC | $3,685.09 |
| CitiBank | 205855554 | NAC Foundation | 8-Sep-15 | MDI Marketing LLC | $4,312.00 |
| CitiBank | 205855554 | NAC Foundation | 14-Sep-15 | MDI Marketing LLC | $9,525.00 |
| CitiBank | 205855554 | NAC Foundation | 2-Oct-15 | MDI Marketing LLC | $1,900.00 |
| CitiBank | 205855554 | NAC Foundation | 22-Oct-15 | MDI Marketing LLC | $8,300.00 |
| CitiBank | 205855554 | NAC Foundation | 4-Nov-15 | MDI Marketing LLC | $9,550.00 |
| CitiBank | 205855554 | NAC Foundation | 24-Nov-15 | MDI Marketing LLC | $15,100.00 |
| CitiBank | 205855554 | NAC Foundation | 1-Dec-15 | MDI Marketing LLC | $5,600.00 |
| CitiBank | 205855554 | NAC Foundation | 22-Dec-15 | MDI Marketing LLC | $5,400.00 |
| CitiBank | 205855554 | NAC Foundation | 1-Feb-16 | MDI Marketing LLC | $9,300.00 |
| CitiBank | 205855554 | NAC Foundation | 11-Mar-16 | MDI Marketing LLC | $11,475.00 |
| CitiBank | 205855554 | NAC Foundation | 13-Apr-16 | MDI Marketing LLC | $1,185.00 |
| CitiBank | 205855554 | NAC Foundation | 18-Apr-16 | MDI Marketing LLC | $2,750.00 |
| CitiBank | 205855554 | NAC Foundation | 28-Apr-16 | MDI Marketing LLC | $2,730.00 |
| CitiBank | 205855554 | NAC Foundation | 11-May-16 | MDI Marketing LLC | $4,750.00 |
| CitiBank | 205855554 | NAC Foundation | 2-Jun-16 | MDI Marketing LLC | $12,100.00 |
| CitiBank | 205855554 | NAC Foundation | 16-Jun-16 | MDI Marketing LLC | $4,158.00 |
| CitiBank | 205855554 | NAC Foundation | 29-Jul-16 | MDI Marketing LLC | $19,000.00 |
| CitiBank | 205855554 | NAC Foundation | 5-Aug-16 | Mark Diadamo | $4,000.00 |
| CitiBank | 205855554 | NAC Foundation | 12-Sep-16 | Mark Diadamo | $2,000.00 |
| CitiBank | 205855554 | NAC Foundation | 4-Oct-16 | Mark Diadamo | $5,000.00 |
| CitiBank | 205855554 | NAC Foundation | 6-Dec-16 | Mark Diadamo | $12,000.00 |
| Capital One | 3316731839 | Marcus Andrade | 8-Sep-17 | Mark Di Adamo | $5,000.00 |
| Wells Fargo | 1010297676883 | Marcus Andrade | 5-Aug-16 | Mark Diadamo | $4,000.00 |
| Wells Fargo | 1010297676883 | Marcus Andrade | 12-Sep-16 | Mark Diadamo | $2,000.00 |
| Wells Fargo | 1010297676883 | Marcus Andrade | 4-Oct-16 | Mark Diadamo | $5,000.00 |
| Wells Fargo | 1010297676883 | Marcus Andrade | 7-Dec-16 | Mark Diadamo | $12,000.00 |
| Wells Fargo | 1010297676883 | Marcus Andrade | 31-May-17 | Mark Diadamo | $12,000.00 |
| Wells Fargo | 1010297676883 | Marcus Andrade | 8-Sep-17 | Mark Diadamo | $5,000.00 |
| Chase Bank | 630263031 | MDI Marketing | 17-Jun-15 | MDI Marketing | $26,500.00 |
| | | | | **Total** | **$380,690.25** |

## 2.  Bob Parsons

| Bank | Account | Name | Bank Date | Description | Inflows to Parsons |
|------|---------|------|-----------|-------------|--------------------|
| CitiBank | 205855554 | NAC Foundation | 9-Oct-15 | Robert Parsons | $500.00 |
| CitiBank | 205855554 | NAC Foundation | 20-Oct-15 | Robert Parsons | $500.00 |
| CitiBank | 205855554 | NAC Foundation | 6-Nov-15 | Robert Parsons | $500.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 13-May-14 | Robert Parsons | $100.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 20-May-14 | Ontario Inc | $7,300.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 30-May-14 | Ontario Inc | $6,000.00 |

| Wells Fargo | 8048120458 | NAC Foundation | 10-Jun-14 | Ontario Inc | $16,550.00 |
|---|---|---|---|---|---|
| Wells Fargo | 8048120458 | NAC Foundation | 17-Jun-14 | Ontario Inc | $1,150.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 24-Jun-14 | Ontario Inc | $24,200.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 3-Jul-14 | Ontario Inc | $2,400.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 14-Jul-14 | Ontario Inc | $7,864.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 14-Jul-14 | Ontario Inc | $14,955.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 16-Jul-14 | Ontario Inc | $10,500.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 18-Jul-14 | Ontario Inc | $4,955.00 |
| Wells Fargo | 8048120458 | NAC Foundation | 1-Aug-14 | Ontario Inc | $15,955.00 |
|  |  |  |  | **Total** | **$113,429.00** |

### 3. Brian Darrow

| Bank | Account | Name | Bank Date | Description | Inflows to Darrow |
|---|---|---|---|---|---|
| CitiBank | 205855554 | NAC Foundation | 30-Mar-15 | Dmmc Corp | $100.00 |
| CitiBank | 205855554 | NAC Foundation | 31-Mar-15 | Dmmc Corp | $12,500.00 |
| CitiBank | 205855554 | NAC Foundation | 7-Apr-15 | Dmmc Corp | $6,500.00 |
| CitiBank | 205855554 | NAC Foundation | 10-Apr-15 | Dmmc Corp | $20,000.00 |
| CitiBank | 205855554 | NAC Foundation | 28-Apr-15 | Dmmc Corp | $4,700.00 |
| CitiBank | 205855554 | NAC Foundation | 30-Apr-15 | Dmmc Corp | $6,150.00 |
| CitiBank | 205855554 | NAC Foundation | 27-May-15 | Dmmc Corp | $1,700.00 |
| CitiBank | 205855554 | NAC Foundation | 5-Jun-15 | Dmmc Corp | $12,950.00 |
| CitiBank | 205855554 | NAC Foundation | 29-Jun-15 | Dmmc Corp | $2,066.80 |
| CitiBank | 205855554 | NAC Foundation | 10-Jul-15 | Dmmc Corp | $15,968.20 |
| CitiBank | 205855554 | NAC Foundation | 12-Nov-15 | Dmmc Corp | $10,300.00 |
| CitiBank | 205855554 | NAC Foundation | 1-Dec-15 | Dmmc Corp | $2,000.00 |
| CitiBank | 205855554 | NAC Foundation | 27-Jan-16 | Dmmc Corp | $600.00 |
| CitiBank | 205855554 | NAC Foundation | 11-May-16 | Dmmc Corp | $3,000.00 |
| CitiBank | 205855554 | NAC Foundation | 6-Jul-16 | Dmmc Corp | $5,000.00 |
| Chase Bank | 619929891 | NAC Foundation | 21-Aug-14 | Brian Darrow | $13,400.00 |
| Chase Bank | 619929891 | NAC Foundation | 12-Sep-14 | Dmmc Corp | $100.00 |
| Chase Bank | 619929891 | NAC Foundation | 12-Sep-14 | Dmmc Corp | $34,800.00 |
| Chase Bank | 619929891 | NAC Foundation | 26-Sep-14 | Dmmc Corp | $2,150.00 |
| Chase Bank | 619929891 | NAC Foundation | 7-Oct-14 | Dmmc Corp | $750.00 |
| Chase Bank | 619929891 | NAC Foundation | 14-Oct-14 | Dmmc Corp | $1,400.00 |
| Chase Bank | 619929891 | NAC Foundation | 15-Oct-14 | Dmmc Corp | $2,900.00 |

| Bank | Account | Name | Bank Date | Description | |
|---|---|---|---|---|---|
| Chase Bank | 619929891 | NAC Foundation | 22-Oct-14 | Dmmc Corp | $10,975.00 |
| Chase Bank | 619929891 | NAC Foundation | 23-Oct-14 | Dmmc Corp | $7,700.00 |
| Chase Bank | 619929891 | NAC Foundation | 6-Nov-14 | Dmmc Corp | $1,150.00 |
| Chase Bank | 619929891 | NAC Foundation | 26-Nov-14 | Dmmc Corp | $2,400.00 |
| Chase Bank | 619929891 | NAC Foundation | 3-Dec-14 | Dmmc Corp | $3,900.00 |
| Chase Bank | 619929891 | NAC Foundation | 5-Dec-14 | Dmmc Corp | $11,800.00 |
| Chase Bank | 619929891 | NAC Foundation | 24-Dec-14 | Dmmc Corp | $2,750.00 |
| Chase Bank | 619929891 | NAC Foundation | 29-Dec-14 | Dmmc Corp | $3,775.00 |
| Chase Bank | 619929891 | NAC Foundation | 12-Jan-15 | Dmmc Corp | $14,000.00 |
| Chase Bank | 619929891 | NAC Foundation | 20-Jan-15 | Dmmc Corp | $16,900.00 |
| Chase Bank | 619929891 | NAC Foundation | 23-Jan-15 | Dmmc Corp | $11,400.00 |
| Chase Bank | 619929891 | NAC Foundation | 29-Jan-15 | Dmmc Corp | $2,900.00 |
| Chase Bank | 619929891 | NAC Foundation | 2-Feb-15 | Dmmc Corp | $4,350.00 |
| Chase Bank | 619929891 | NAC Foundation | 9-Feb-15 | Dmmc Corp | $4,700.00 |
| Chase Bank | 619929891 | NAC Foundation | 17-Feb-15 | Dmmc Corp | $6,700.00 |
| Chase Bank | 619929891 | NAC Foundation | 24-Feb-15 | Dmmc Corp | $6,000.00 |
| Chase Bank | 619929891 | NAC Foundation | 16-Mar-15 | Dmmc Corp | $7,400.00 |
| | | | | **Total** | **$277,835.00** |

### 4.  John Bryan

| Bank | Account | Name | Bank Date | Description | Inflows to Bryan |
|---|---|---|---|---|---|
| Wells Fargo Bank | 5024549155 | NAC Payroll Services,Inc. | 25-May-18 | Wately Group | $2,000.00 |
| [1] | | NAC Payroll Services,Inc. | | The Watley Group LLC | $25,000.00 |
| | | | | | **$27,000.00** |

### 5.  Jack Abramoff

| Bank | Account | Name | Bank Date | Description | Inflows to Abramoff |
|---|---|---|---|---|---|
| Wells Fargo | 5024549155 | NAC Payroll Services,Inc. | 5-Mar-18 | Sepo Holdings LLC | $52,000.00 |

---

[1] *See* Attach-X

| Wells Fargo | 5024549155 | NAC Payroll Services,Inc. | 15-May-18 | Sepo Holding, LLC | $80,000.00 |
|---|---|---|---|---|---|
| Wells Fargo | 5024549155 | NAC Payroll Services,Inc. | 23-May-18 | Sepo Holdings LLC | $50,000.00 |
| Wells Fargo | 5024549155 | NAC Payroll Services,Inc. | 23-May-18 | Landfair Capital Consulting Inc | $50,000.00 |
| Capital One | 3316731839 | Marcus Andrade | 11-Sep-17 | Landfair Capital Consulting | $75,000.00 |
| Comerica | 1895067567 | Law Office of Neil M Sunkin Client Trust Account for NAC Foundation | 3-Jan-18 | Landfair Capital | $33,333.00 |
| Capital One | 3316731839 | Marcus Andrade | 19-Jan-18 | Frames Per Second Productions, Inc | $75,000.00 |
| Chase Bank | 252727620 | David Salmon & Associates Inc IOLTA | 22-Jan-18 | Frames Per Second Productions, Inc | $150,000.00 |
| Chase Bank | 252727620 | David Salmon & Associates Inc IOLTA | 25-Jan-18 | Frames Per Second Productions, Inc | $75,000.00 |
| Bank of America | 325062077280 | Landfair Capital Consulting, Inc. | 31-Jan-18 | Frames Per Second | $20,000.00 |
| | | | | **Total** | **$660,333.00** |

## 6. David Mata

| Bank | Account | Name | Bank Date | Description | Inflows to Mata |
|---|---|---|---|---|---|
| Wells Fargo Bank | 5024549155 | NAC Payroll Services,Inc. | 26-Sep-18 | David Mata | $37,500.00 |
| Wells Fargo Bank | 5024549155 | NAC Payroll Services,Inc. | 25-Oct-18 | DAVID B MATA | $25,000.00 |
| Wells Fargo Bank | 5024549155 | NAC Payroll Services,Inc. | 20-Nov-18 | David Mata | $12,500.00 |
| | | | | **Total** | **$75,000.00** |

## 7. Lev Abramoff

| Bank | Account | Name | Bank Date | Description | Inflows to Abramoff |
|---|---|---|---|---|---|
| Wells Fargo Bank | 5024549155 | NAC Payroll Services,Inc. | 4-Jun-18 | Lev Abramoff | $10,000.00 |
| Wells Fargo Bank | 5024549155 | NAC Payroll Services,Inc. | 27-Jul-18 | Lev Abramoff | $11,000.00 |
| Wells Fargo Bank | 5024549155 | NAC Payroll Services,Inc. | 23-May-18 | Blockchain Entertainment Inc | $28,700.00 |
| | | | | **Total** | **$49,700.00** |

8. **Japheth Dillman / ICO Box.** Mr. Andrade paid ICOBox, for which Japheth Dillman was the Chief Strategy Officer, approximately **$200,000** for its services during the AML Bitcoin ICO. *See* Attach-6 ICOBox Payment.

## APPENDIX B

## Forfeiture Exclusions: BlockBits Capital's Transactions

| Bank | Account | Name | Bank Date | Description | Inflows to NAC |
|------|---------|------|-----------|-------------|----------------|
| [2] | | NAC Foundation | | Block Bits Capital LLC | $129,400.00 |
| Capital One | 3316731839 | Marcus Andrade | 21-Nov-17 | Block Bits Capital LLC | $87,480.00 |
| Chase Bank | 252727620 | David Salmon & Associates Inc IOLTA | 5-Feb-18 | Block Bits Capital LLC | $47,000.00[3] |
| Chase Bank | 252727620 | David Salmon & Associates Inc IOLTA | 14-Feb-18 | Block Bits Capital LLC | $109,500.00[4] |
| Chase Bank | 252727620 | David Salmon & Associates Inc IOLTA | 16-Feb-18 | Block Bits Capital LLC | $85,000.00 |
| | | | | **Total** | **$458,380.00** |

---

[2] *See* Tr. Ex. 3170 at 212-20 (BlockBits Capital pre-ICO purchase agreement for $129,400).

[3] Reduced by $150,000 to avoid double-count of Boyer's payment to BlockBits Capital on Jan. 23, 2018.

[4] Reduced by $105,000 to avoid double-count of Boyer's payments to BlockBits Capital on Jan. 25 and 29, 2018.

**APPENDIX C**

**Forfeiture Exclusions: Boyer's Transactions with BlockBits Capital**

| Bank | Account | Name | Bank Date | Description | Inflows to BBC |
|---|---|---|---|---|---|
| Chase Bank | 238558602 | Block Bits Capital LLC | 12-Jan-18 | Benjamin Boyer | $730,000.00 |
| Chase Bank | 238558602 | Block Bits Capital LLC | 12-Jan-18 | Benjamin Boyer | $120,000.00 |
| Chase Bank | 238558602 | Block Bits Capital LLC | 23-Jan-18 | Benjamin Boyer | $150,000.00 |
| Chase Bank | 238558602 | Block Bits Capital LLC | 25-Jan-18 | Benjamin Boyer | $67,500.00 |
| Chase Bank | 238558602 | Block Bits Capital LLC | 29-Jan-18 | Benjamin Boyer | $37,500.00 |
| | | | | **Total** | **$1,105,000** |

## APPENDIX D

## Forfeiture Exclusions: CrossVerify Share Sales

| Bank | Account | Name | Bank Date | Description | Inflows to NAC |
|------|---------|------|-----------|-------------|----------------|
| CitiBank | 205855554 | NAC Foundation | 2016-03-09 | BRM H. Enterprises Inc. | $49,985.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-04-13 | Kent M. | $9,985.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-04-22 | Ron M. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-05-02 | Darren W. | $9,990.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-05-25 | Arthur T. | $5,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-06-01 | BRM H. Enterprises Inc. | $44,990.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-06-06 | Darryl M. | $7,490.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-06-10 | Arthur T. | $20,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-06-14 | Rene B. | $19,975.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-06-21 | Allied Consulting Services | $11,250.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-05 | Koehler B. | $9,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-05 | Koehler B. | $12,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-14 | Brandon H. | $5,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-22 | Darren W. | $9,990.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Koehler B. | $8,220.63 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Koehler B. | $13,714.38 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Koehler B. | $13,714.38 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Koehler B. | $13,714.38 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Koehler B. | $13,714.38 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Koehler B. | $13,714.38 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Peter B. | $54,907.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-26 | Brandon H. | $5,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-27 | Koehler B. | $11,980.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-27 | Koehler B. | $11,980.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-27 | Karl-Heinz H. | $37,835.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-28 | Koehler B. | $7,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-07-28 | Koehler B. | $12,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-08-09 | Michael W. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-08-10 | Koehler B. | $7,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-08-10 | Koehler B. | $12,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-08-15 | Michael W. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-08 | Thomas R. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-09 | Koehler B. | $5,980.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-09 | Koehler B. | $12,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-12 | Koehler B. | $4,985.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-27 | Thomas R. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-27 | Koehler B. | $10,980.00 |

| CitiBank | 205855554 | NAC Foundation | 2016-09-27 | Koehler B. | $12,480.00 |
|---|---|---|---|---|---|
| CitiBank | 205855554 | NAC Foundation | 2016-09-27 | Koehler B. | $12,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-28 | Koehler B. | $12,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-29 | Koehler B. | $2,490.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-09-29 | Peter B. | $83,862.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-10-31 | Thomas R. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-11-10 | Thomas R. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-11-10 | Tyler H. | $19,990.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-11-14 | F. Veterinary Service | $9,980.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-11-14 | Michael W. | $10,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-01 | Brandon H. | $5,000.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-02 | F. Veterinary Service | $9,980.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-02 | BRM H. Enterprises Inc. | $11,990.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-06 | Koehler B. | $12,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-06 | Peter B. | $24,982.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-06 | Paul G. | $59,975.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-07 | Peter B. | $17,982.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-08 | Koehler B. | $7,480.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-15 | Koehler B. | $6,980.00 |
| CitiBank | 205855554 | NAC Foundation | 2016-12-16 | Koehler B. | $4,985.00 |
|  |  |  |  | **Total** | **$884,050.53** |

## APPENDIX E

## Forfeiture Exclusions: Summary

| Exclusion | Amount |
|---|---|
| Funds Resting with Co-Conspirators | $1,783,987.25 |
| BlockBits Capital Transactions | $458,380.00 |
| Boyer—BlockBits Capital Transactions | $1,105,000 |
| CrossVerify Share Sales | $884,050.53 |
| Double-Counted Cryptocurrency Sales | $770,357.98 |
| **Total Exclusion** | **$5,001,775.76** |
|  |  |
| **Government's Claim** | **$10,474,609.00** |
| **Total Exclusion** | **$5,151,775.76** |
| **Remaining Forfeitures** | **$5,322,833.24** |

**APPENDIX F**

**Restitution Exclusions: Duplications**

| Name | Duplicated/Fake Victim Entries | Duplicated Losses |
|------|-------------------------------|-------------------|
| Adam B. | 1 | $0.00 |
| Alessandro V. | 1 | $764.00 |
| Alex B. | 1 | $400.00 |
| Ana R. | 1 | $0.00 |
| Charles A. | 1 | $204.00 |
| Dan B. | 1 | $214.00 |
| Diana F. | 1 | $10,000 |
| Joanna B. | 1 | $0.00 |
| Judie H. | 7 | $0.00 |
| John P. | 1 | $0.00 |
| Maša G. | 1 | $0.00 |
| Michael I. | 1 | $0.00 |
| Monica L. | 1 (prank entry) | $0.00 |
| Nicholas M. | 1 | $1,814.00 |
| Patrick G. | 2 | $400.00 |
| Philip E. | 1 | $20,151.00 |
| Salvatore C. | 1 | $500.00 |
| Niki M. | 1 | $344.00 |
| **Total** | **25** | **$34,701.00** |

# APPENDIX G

## 266 Non-Duplicate Victims—Claims vs. Substantiation

Methodology: Using the government's figures presented below (Columns 1-5, as copied directly from the government's master spreadsheet), the defense calculated substantiated losses as follows: (1) if bank statements were reported, bank statement figures were used as substantiation; (2) if no bank statements were available, the victim-provided sources were used; (3) if neither bank statements nor victim provided sources were available, Tr. Ex. 1470 was used. This resulted in a $1.5 million difference between claims and substantiated claims.

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Abhijit G. | $5,000.00 | Need Manual Check | $557.29 | | $4,442.71 |
| Abraham M. | $50,000.00 | $50,034.00 | $33,333.33 | | -$34.00 |
| Adam B. | $3,125.00 | $3,153.00 | $2,501.95 | $3,125.00 | -$28.00 |
| Aharonoff D. | $300,000.00 | $200,000.00 | Need Manual Check | | $100,000.00 |
| Albert J. | | $8,730.00 | Need Manual Check | | -$8,730.00 |
| Alessandro V. | $764.00 | $764.00 | $600.00 | $764.00 | $0.00 |
| Alex B. | $400.00 | Need Manual Check | $400.00 | | $0.00 |
| Alexander T. | $25,500.00 | Need Manual Check | $12,363.84 | | $13,136.16 |
| Alexis A. | $100.00 | Need Manual Check | $118.63 | | -$18.63 |
| Alexis D. | $217.00 | $197.00 | $200.00 | $217.00 | $20.00 |
| Alfred R. | $499.35 | Need Manual Check | $499.77 | | -$0.42 |
| Allie L. | $0.00 | Need Manual Check | $203.98 | $339.35 | -$203.98 |
| Amanda H. | $12.00 | Need Manual Check | Need Manual Check | | $12.00 |
| Amol C. | $300.00 | $314.00 | $240.00 | | -$14.00 |
| Amy R. | $314.00 | $314.00 | $251.20 | $314.00 | $0.00 |
| Ana R. | $375.00 | Need Manual Check | Need Manual Check | $375.00 | $375.00 |
| Ana Ro. | $389.00 | Need Manual Check | Need Manual Check | | $389.00 |
| Andrea D. | $6,000.00 | $6,000.00 | $4,000.00 | $6,000.00 | $0.00 |
| Andrew C. | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $0.00 |
| Andy V. | $314.00 | $628.00 | $0.00 | $314.00 | -$314.00 |
| Anjanette P. | $300.00 | Need Manual Check | $200.00 | $300.00 | $100.00 |
| Anne T. | $10,014.00 | $10,014.00 | $10,000.00 | $10,000.00 | $0.00 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Anthony P. | $5,000.00 | Need Manual Check | $3,422.99 | $5,096.25 | $1,577.01 |
| Aron C. | $1,000.00 | $1,014.00 | $1,000.00 | | -$14.00 |
| Arthur T. | $33,000.00 | $47,000.00 | $0.00 | $33,000.00 | -$14,000.00 |
| Arthur W. | $1.25 | Need Manual Check | $498.48 | | -$497.23 |
| Asuka N. | $500.00 | $500.00 | $500.00 | $500.00 | $0.00 |
| Ava C. | $300.00 | $300.00 | $200.00 | | $0.00 |
| Benjamin B. | $1,808,790.60 | $1,231,500.00 | $1,000.00 | $1,808,790.60 | $577,290.60 |
| Blake S. | $3,000.00 | Need Manual Check | $3,000.00 | $3,327.55 | $0.00 |
| Bradford G. | $21,500.10 | Need Manual Check | $1,518.99 | | $19,981.11 |
| Brandi J. | $328,271.51 | $342,440.00 | Need Manual Check | $275,000.00 | -$14,168.49 |
| Brandon B. | $500.00 | $514.00 | $500.00 | $500.00 | -$14.00 |
| Brandon T. | $500.00 | $514.00 | $333.33 | | -$14.00 |
| Brendan B. | $5,000.00 | $4,397.23 | $3,524.80 | | $602.77 |
| Brian S. | $667.42 | Need Manual Check | $600.00 | $679.52 | $67.42 |
| Carlos P. | $0.00 | Need Manual Check | Need Manual Check | | $0.00 |
| Carlos T. | $1,119.00 | Need Manual Check | $300.00 | | $819.00 |
| Carson L. | $10.00 | Need Manual Check | Need Manual Check | | $10.00 |
| Casey J. | $1,000.00 | $1,014.00 | $799.99 | $0.00 | -$14.00 |
| Cedric A. | $2,362.90 | Need Manual Check | $1,575.27 | | $787.63 |
| Chad D. | $5,378.00 | Need Manual Check | $5,274.99 | $4,923.00 | $103.01 |
| Charlene R. | $450.00 | $464.00 | $360.00 | $464.00 | -$14.00 |
| Charles A. | $204.00 | $214.00 | $200.00 | | -$10.00 |
| Charlie K. | $37,139.00 | $37,044.75 | $30,000.00 | | $95.00 |
| Cheyenne S. | $500.00 | $545.75 | $393.00 | | -$45.75 |
| Christian V. | $250.00 | Need Manual Check | $233.00 | | $17.00 |
| Christopher D. | $4,093.62 | Need Manual Check | $0.00 | $3,903.81 | $189.81 |
| Christopher Di. | $400.00 | Need Manual Check | $266.66 | | $133.34 |
| Chun L. | $6,000.00 | Need Manual Check | $2,548.38 | | $3,451.62 |
| Claudio C. | $449.34 | Need Manual Check | $50.00 | | $399.34 |
| Clinton L. | $1,000.00 | $300.00 | Need Manual Check | | $700.00 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Corey J. | $111,500.00 | $80,710.00 | Need Manual Check | $148,250.00 | $30,790.00 |
| Cory G. | $0.00 | Need Manual Check | $34.33 | | -$34.33 |
| Crystal W. | $100.00 | Need Manual Check | $31.80 | | $68.20 |
| Daenna F. | $5,000.00 | $5,000.00 | $4,000.00 | $5,000.00 | $0.00 |
| Dan B. | $214.00 | $200.00 | $200.00 | | $14.00 |
| Daniel G. | $50,000.00 | $1,750.00 | $1,400.00 | $2,802.22 | $48,250.00 |
| Daniel H. | $3,000.00 | $2,980.00 | Need Manual Check | $3,000.00 | $20.00 |
| Daniel S. | $3,000.00 | Need Manual Check | $470.00 | | $2,530.00 |
| Daniel T. | $300.00 | Need Manual Check | $300.00 | $300.18 | $0.00 |
| Daniel V. | $2,125.00 | $1,820.00 | $1,508.33 | $2,125.00 | $305.00 |
| Danika L. | $200.00 | $264.00 | $200.00 | | -$64.00 |
| David A. | $900.00 | Need Manual Check | $578.52 | | $321.48 |
| David J. | $1,500.00 | Need Manual Check | $0.00 | | $1,500.00 |
| David S. | $600.00 | $639.00 | $500.00 | | -$39.00 |
| David Ro. | $312.50 | $326.50 | $250.00 | | -$14.00 |
| David Ru. | $1,587.48 | Need Manual Check | $999.72 | $1,550.40 | $587.76 |
| David Sh. | $300.00 | $314.00 | $240.00 | | -$14.00 |
| Dejan S. | $0.00 | Need Manual Check | $48.81 | $97.87 | -$48.81 |
| Denita J. | $200.00 | Need Manual Check | $251.81 | $194.16 | -$51.81 |
| Deven C. | $300.00 | $314.00 | $240.00 | | -$14.00 |
| Diana F. | $10,000.00 | $10,200.00 | $8,160.00 | | -$200.00 |
| Diem N. | $517.00 | $492.00 | $500.00 | $500.00 | $25.00 |
| Dinesh G. | $26,500.00 | $26,528.00 | $21,200.00 | | -$28.00 |
| Dj D. | $0.00 | Need Manual Check | Need Manual Check | | $0.00 |
| Don K. | $8,000.00 | $7,997.00 | $5,333.33 | | $3.00 |
| Donald B. | $200.00 | $214.00 | $160.00 | | -$14.00 |
| Donald Be. | $126.64 | Need Manual Check | $98.71 | $128.73 | $27.93 |
| Du N. | $8,000.00 | $7,992.00 | $8,000.00 | | $8.00 |
| Duane E. | $345.00 | Need Manual Check | $230.00 | | $115.00 |
| Dustin H. | $0.00 | Need Manual Check | $500.00 | | -$500.00 |
| Dylan W. | $1,000.00 | Need Manual Check | $18.17 | | $981.83 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Edward F. | $17,200.00 | $17,200.00 | $13,760.00 | $12,200.00 | $0.00 |
| Efroim R. | $300.00 | Need Manual Check | $201.60 | | $98.40 |
| Elizabeth O. | $2,500.00 | $2,500.00 | $1,666.66 | $2,500.00 | $0.00 |
| Eric A. | $323.00 | Need Manual Check | $237.72 | $212.23 | $85.28 |
| Eric C. | $0.00 | Need Manual Check | $492.52 | | -$492.52 |
| Eric Ch. | | Need Manual Check | $915.00 | | -$915.00 |
| Eric Co. | $3,000.00 | $6,000.00 | $6,000.00 | | -$3,000.00 |
| Estelle N. | $1,500.00 | $750.00 | $500.00 | | $750.00 |
| Everett R. | $13,250.00 | $13,456.00 | $10,250.00 | $12,500.00 | -$206.00 |
| Everett Ro. | $307.00 | $13,456.00 | $10,250.00 | $300.00 | $0.00 |
| Faruk B. | $500.00 | Need Manual Check | $169.37 | | $330.63 |
| Frank C. | $400.00 | Need Manual Check | $322.30 | | $77.70 |
| Futsum W. | $10,728.00 | $10,728.00 | $7,199.74 | | $0.00 |
| Gabriella D. | $514.00 | $514.00 | $400.00 | | $0.00 |
| Gary S. | $2,014.00 | $2,014.00 | $2,000.00 | $2,014.00 | $0.00 |
| Gary Si. | $20,000.00 | Need Manual Check | $20,000.00 | | $0.00 |
| Gerald S. | $1,200.00 | Need Manual Check | $300.00 | | $900.00 |
| Gerhart R. | $1,250.00 | $1,264.00 | $1,000.00 | $1,250.00 | -$14.00 |
| Gregory C. | | Need Manual Check | $500.00 | | -$500.00 |
| Guangyu Z. | | Need Manual Check | $523.94 | $661.94 | -$523.94 |
| Harinder S. | $3,000.00 | $300.00 | $1,615.16 | | $2,700.00 |
| Hieu N. | $200.00 | Need Manual Check | $190.08 | | $9.92 |
| Homer M. | $3,000.00 | Need Manual Check | $1,076.39 | | $1,923.61 |
| Hunter F. | $250.00 | $200.00 | $160.00 | | $50.00 |
| Hyun K. | $1,485.00 | Need Manual Check | $928.36 | $1,417.38 | $556.64 |
| Igor D. | $1,550.00 | $1,530.00 | $1,020.00 | $1,550.00 | $20.00 |
| In C. | $205.00 | Need Manual Check | $204.44 | $181.87 | $0.56 |
| James B. | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $0.00 |
| James P. | $426.00 | Need Manual Check | $24.12 | | $401.88 |
| James Y. | $1,000.00 | $1,014.00 | $771.80 | | -$14.00 |
| Jamileth R. | $307.00 | Need Manual Check | $200.00 | $300.00 | $107.00 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Jasjot N. | $6,000.00 | $6,000.00 | $4,000.00 | $6,000.00 | $0.00 |
| Jaya C. | $5,000.00 | Need Manual Check | $2,303.01 | | $2,696.99 |
| Jean B. | $1,000.00 | $1,014.00 | $800.00 | | -$14.00 |
| Jeffery C. | $1.50 | Need Manual Check | $5,191.22 | $7,786.83 | -$5,189.72 |
| Jeffrey G. | $500.00 | Need Manual Check | $200.00 | | $300.00 |
| Jeffrey M. | $200.00 | $214.00 | $160.00 | | -$14.00 |
| Jennifer S. | $800.00 | $800.00 | $800.00 | $800.00 | $0.00 |
| Jeremy C. | $2,750.00 | Need Manual Check | $1,660.16 | | $1,089.84 |
| Jerry P. | $750.00 | $812.50 | $1,000.00 | | -$62.50 |
| Joanna B. | $0.00 | Need Manual Check | Need Manual Check | | $0.00 |
| John A. | $25.00 | Need Manual Check | $25.88 | | -$0.88 |
| John Am. | $214.00 | Need Manual Check | $160.00 | $214.00 | $54.00 |
| John B. | $35,000.00 | $35,700.00 | Need Manual Check | $35,000.00 | -$700.00 |
| John P. | $102.00 | Need Manual Check | $140.03 | | -$38.03 |
| Jonathan V. | $7,000.00 | Need Manual Check | $1,071.32 | | $5,928.68 |
| Joseph A. | $700.00 | Need Manual Check | $93.29 | | $606.71 |
| Joseph C. | $5,000.00 | $5,000.00 | $3,333.33 | | $0.00 |
| Joseph D. | $24,999.75 | $214.00 | $0.00 | | $24,785.75 |
| Joseph De. | $256.00 | Need Manual Check | $250.00 | | $6.00 |
| Joseph Du. | $2,000.00 | Need Manual Check | $2,003.00 | | -$3.00 |
| Joseph E. | $408.78 | Need Manual Check | $408.78 | $458.22 | $0.00 |
| Joseph H. | $750.00 | $764.00 | $600.00 | $764.00 | -$14.00 |
| Joseph M. | $800.00 | Need Manual Check | $0.00 | | $800.00 |
| Joshua L. | $3,100.00 | Need Manual Check | $3,000.00 | $3,001.80 | $100.00 |
| Joshua Y. | $800.60 | Need Manual Check | $800.60 | | $0.00 |
| Judie H. | $2,750.00 | $1,500.00 | Need Manual Check | | $1,250.00 |
| Kasey L. | $2,000.00 | $2,000.00 | Need Manual Check | $500.00 | $0.00 |
| Kelly C. | $100,000.00 | $8,526.50 | $30,000.33 | $40,480.06 | $91,473.50 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Ken T. | $1,151.00 | Need Manual Check | $500.00 | $91.00 | $651.00 |
| Kenneth S. | $37.33 | Need Manual Check | Need Manual Check | $76.99 | -$39.66 |
| Kevin K. | $103.82 | Need Manual Check | $100.00 | $204.36 | $3.82 |
| Kip D. | $200.00 | Need Manual Check | $200.00 | | $0.00 |
| Kristen B. | $2,000.00 | $2,000.00 | $1,600.00 | | $0.00 |
| Krunalkumar P. | $1,000.00 | Need Manual Check | $3,002.63 | | -$2,002.63 |
| Larry W. | $1,000.00 | $980.00 | Need Manual Check | $1,000.00 | $20.00 |
| Laurens B. | $0.00 | Need Manual Check | $654.42 | | -$654.42 |
| Lavern D. | $90,000.00 | $96,750.00 | Need Manual Check | | -$6,750.00 |
| Lee S. | $0.00 | Need Manual Check | Need Manual Check | | $0.00 |
| Lena O. | $600.00 | $928.00 | $900.00 | $600.00 | -$328.00 |
| Lisa T. | $1,892.00 | $1,867.00 | $1,500.00 | $2,000.00 | $25.00 |
| Lorie W. | $1,516.00 | Need Manual Check | $1,192.40 | $1,513.72 | $323.60 |
| Lyndon R. | $1,850.00 | $500.00 | Need Manual Check | $1,990.87 | $1,350.00 |
| Madjid K. | $214.00 | $214.00 | $200.00 | | $0.00 |
| Maggie L. | $550.00 | Need Manual Check | $425.86 | $413.24 | $124.14 |
| Marcellars M. | $200.00 | $314.00 | $200.00 | | -$114.00 |
| Marcia J. | $500.00 | $514.00 | $400.00 | $400.00 | -$14.00 |
| Margaret L. | $300.00 | $300.00 | $200.00 | $300.00 | $0.00 |
| Mark V. | $5,709.71 | Need Manual Check | $5,712.26 | | -$2.55 |
| Maša G. | $2,800.00 | Need Manual Check | $170.00 | | $2,630.00 |
| Matt R. | $60.00 | Need Manual Check | $32.28 | $22.29 | $27.72 |
| Matteo P. | $400.00 | Need Manual Check | $165.23 | $259.96 | $234.77 |
| Matthew P. | $1.00 | Need Manual Check | $884.86 | $614.41 | -$883.86 |
| Maurice M. | $3,200.00 | Need Manual Check | $12,000.00 | | -$8,800.00 |
| Mesut D. | $0.00 | Need Manual Check | $310.73 | | -$310.73 |
| Michael C. | $1,200.00 | $1,514.00 | $1,009.33 | | -$314.00 |
| Michael I. | $5,500.00 | $2,514.00 | $3,855.11 | | $2,986.00 |
| Michael M. | $528.00 | $514.00 | $500.00 | $514.00 | $14.00 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Michael R. | $40.00 | Need Manual Check | $30.80 | | $9.20 |
| Michael W. | $78,000.00 | $103,250.00 | Need Manual Check | $76,750.00 | -$25,250.00 |
| Michelle T. | $2,400.00 | Need Manual Check | Need Manual Check | $0.00 | $2,400.00 |
| Moises C. | $10,000.00 | Need Manual Check | $9,067.28 | $9,067.28 | $932.72 |
| Morgan F. | $500.00 | $514.00 | $500.00 | $500.00 | -$14.00 |
| Mosaab H. | $2,250.00 | $2,250.00 | $1,500.00 | | $0.00 |
| Moshe W. | $25,000.00 | $24,999.75 | $0.00 | | $0.25 |
| Muhammad Y. | $10,000.00 | Need Manual Check | $97.62 | | $9,902.38 |
| Murray K. | $875.00 | Need Manual Check | Need Manual Check | $875.00 | $0.00 |
| Nathan H. | $300.00 | $314.00 | $200.00 | | -$14.00 |
| Nathan W. | $110.57 | Need Manual Check | $108.67 | $106.73 | $1.90 |
| Nezam D. | $300.00 | $314.00 | $200.00 | | -$14.00 |
| Nicholas M. | $1,814.00 | Need Manual Check | $1,200.00 | | $614.00 |
| Niels S. | $700.00 | Need Manual Check | $564.78 | $673.02 | $135.22 |
| Niki M. | $344.00 | $314.00 | $240.00 | | $30.00 |
| Ohad I. | $2,500.00 | $2,500.00 | $2,000.00 | $2,500.00 | $0.00 |
| Pablo F. | $2,500.00 | $2,528.00 | $2,500.00 | $2,500.00 | -$28.00 |
| Pamela T. | $15,000.00 | $15,000.00 | $10,000.00 | | $0.00 |
| Patrick B. | $1,181.70 | Need Manual Check | $1,211.18 | | -$29.48 |
| Patrick G. | $200.00 | Need Manual Check | $22.68 | | $177.32 |
| Paul M. | $7,000.00 | $6,980.00 | Need Manual Check | $7,000.00 | $20.00 |
| Paul N. | $1,338.00 | $639.00 | $500.00 | | $699.00 |
| Paul P. | $1,100.00 | Need Manual Check | $273.32 | | $826.68 |
| Paul W. | $414.00 | Need Manual Check | $276.00 | $414.00 | $138.00 |
| Peter B. | $51,500.00 | Need Manual Check | $1,096.52 | | $50,403.48 |
| Philip C. | $6,069.20 | Need Manual Check | $4,046.13 | | $2,023.20 |
| Philip E. | $20,151.00 | $22,001.00 | $15,302.50 | | $4,849.00 |
| Phillip B. | $200.00 | Need Manual Check | $49.14 | | $150.86 |
| Pierre V. | $5,000.00 | $4,500.00 | $3,000.00 | | $500.00 |
| Raj P. | $1,250.00 | $1,250.00 | $1,000.00 | $1,250.00 | $0.00 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Ralph M. | $213.12 | Need Manual Check | $211.74 | | $1.38 |
| Rashaad C. | | Need Manual Check | $177.79 | | -$177.79 |
| Rashmikant G. | $7,500.00 | $7,514.00 | $5,000.00 | | -$14.00 |
| Renard C. | $300.00 | $300.00 | $200.00 | | $0.00 |
| Rene A. | $150,000.00 | $156,250.00 | $0.00 | | -$6,250.00 |
| Richard B. | $2,000.00 | $2,500.00 | Need Manual Check | | -$500.00 |
| Richard F. | $10,000.00 | Need Manual Check | $4,667.00 | | $5,333.00 |
| Richard J. | $70,000.00 | $9,316.00 | $7,957.00 | $0.00 | $60,684.00 |
| Richard W. | $7,940.79 | $520.00 | $0.00 | $2,071.90 | $7,420.79 |
| Rishi M. | $312.50 | $326.50 | $250.00 | $312.50 | -$14.00 |
| Robert D. | $3,014.00 | $3,014.00 | $2,000.00 | $3,000.00 | $0.00 |
| Robert E. | $100.00 | Need Manual Check | $41.70 | | $58.30 |
| Robert G. | $214.68 | Need Manual Check | $151.44 | | $63.24 |
| Robert M. | $199.21 | $100.00 | $304.68 | | $99.21 |
| Robert S. | $75.00 | Need Manual Check | $74.93 | | $0.07 |
| Robyn N. | $36,000.00 | Need Manual Check | $2,130.60 | | $33,869.40 |
| Ronald F. | $250.00 | $250.00 | $250.00 | $250.00 | $0.00 |
| Ronald H. | $438,559.00 | Need Manual Check | Need Manual Check | | $438,559.00 |
| Ronald W. | | Need Manual Check | $292.28 | | -$292.28 |
| Ryan A. | $0.00 | Need Manual Check | $749.88 | | -$749.88 |
| Salvatore C. | $500.00 | $500.00 | $333.33 | | $0.00 |
| Samantha W. | $250.00 | $264.00 | $250.00 | | -$14.00 |
| Sami U. | $0.00 | Need Manual Check | $48.45 | | -$48.45 |
| Samuel A. | $300.00 | Need Manual Check | $35.75 | $495.14 | $264.25 |
| Samuel F. | $1,379.94 | Need Manual Check | $901.65 | | $478.29 |
| Sanjaykumar T. | $500.00 | $514.00 | $400.00 | | -$14.00 |
| Santiago R. | $400.00 | $414.00 | $320.00 | | -$14.00 |
| Scott B. | $100,000.00 | $100,015.00 | $0.00 | $100,000.00 | -$15.00 |
| Scott G. | $19.94 | Need Manual Check | $19.94 | | $0.00 |
| Shane A. | $30,000.00 | $39,075.00 | $30,000.00 | | -$9,075.00 |
| Shauna M. | $226.00 | Need Manual Check | $133.33 | | $92.67 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Sherry W. | $314.00 | Need Manual Check | $0.00 | | $314.00 |
| Shraga O. | $5,000.00 | Need Manual Check | $160.00 | | $4,840.00 |
| Sithikone S. | $250.00 | $2,514.00 | Need Manual Check | | -$2,264.00 |
| Stanley D. | $2,000.00 | $2,000.00 | Need Manual Check | $2,000.00 | $0.00 |
| Stanley R. | $3,400.00 | $3,728.00 | $240.00 | | -$328.00 |
| Stephen C. | $200.00 | $200.00 | $160.00 | | $0.00 |
| Stephen E. | $2,250.00 | $4,250.00 | Need Manual Check | $2,250.00 | -$2,000.00 |
| Stephen F. | $3,500.00 | $3,514.00 | $3,500.00 | $3,500.00 | -$14.00 |
| Stephen J. | $1,400.00 | Need Manual Check | $393.93 | | $1,006.07 |
| Stephen L. | $100.00 | Need Manual Check | $102.49 | | -$2.49 |
| Stephen S. | $4,137.66 | Need Manual Check | $3,951.35 | $4,496.67 | $186.31 |
| Steven W. | | Need Manual Check | $4,500.00 | | -$4,500.00 |
| Talal A. | $0.00 | Need Manual Check | $1,400.00 | | -$1,400.00 |
| Tara B. | $5,000.00 | $5,000.00 | $4,000.00 | | $0.00 |
| Terry W. | $1,000.00 | $1,000.00 | $1,000.00 | | $0.00 |
| Theresa M. | $45,000.00 | Need Manual Check | Need Manual Check | | $45,000.00 |
| Thomas G. | $2,300.00 | Need Manual Check | $2,147.55 | | $153.00 |
| Thomas M. | $1,000.00 | Need Manual Check | $98.69 | | $901.31 |
| Thomas Mo. | $200.00 | $214.00 | $160.00 | $200.00 | -$14.00 |
| Thomas Mu. | $3.15 | Need Manual Check | $945.00 | $945.57 | -$941.85 |
| Tiffany N. | $7,516.16 | Need Manual Check | Need Manual Check | | $7,516.16 |
| Timothy B. | $500.00 | $500.00 | $385.00 | | $0.00 |
| Timothy F. | $1,000.00 | $214.00 | $278.55 | | $786.00 |
| Timothy P. | $900.00 | Need Manual Check | $692.33 | | $207.67 |
| Tinh H. | $5,000.00 | $6,028.00 | $5,000.00 | $5,000.00 | -$1,028.00 |
| Tomas K. | $2,500.00 | Need Manual Check | $100.00 | | $2,400.00 |
| Trevor H. | $160.00 | Need Manual Check | $96.94 | $89.80 | $63.06 |
| Trevor J. | $3,500.00 | Need Manual Check | $2,333.33 | | $1,166.67 |

| First and Last Name | Victim Report Amount | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Victim Provided Sources | Substantiation vs. Claim Difference |
|---|---|---|---|---|---|
| Tylor B. | | Need Manual Check | $153.54 | | -$153.54 |
| Valerie P. | $15,000.00 | $15,000.00 | $10,000.00 | $15,000.00 | $0.00 |
| Wayne W. | $3,000.00 | $2,985.00 | $0.00 | $3,000.00 | $15.00 |
| William A. | $0.00 | Need Manual Check | $250.00 | | -$250.00 |
| Yakov K. | $5,000.00 | Need Manual Check | $3,333.33 | | $1,666.67 |
| Zachary K. | $8,250.00 | Need Manual Check | $1,000.00 | $1,000.00 | $7,250.00 |
| **Total** | **$4,559,339.82** | **$2,895,403.48** | **$515,888.80** | **$2,709,222.42** | **$1,523,452.95** |

**APPENDIX H**

**Restitution Exclusions: Victims Without Any Substantiation for Loss Claims**

Note: For all victims the government indicated needing a "manual check"—which was not conducted prior to the government's submission to the Court—the defense performed a manual check of all discovery and verified a lack of substantiation for victim claims.

| First and Last Name | Victim Report Amount (Column V) | Loss Amount (USD) (From bank stmt) | Loss Amount (USD) (From EX1470) | Calculated amount based on Victim Provided Sources |
|---|---|---|---|---|
| Joanna B. | $0.00 | Need Manual Check | Need Manual Check | N/A |
| DJ D. | $0.00 | Need Manual Check | Need Manual Check | N/A |
| Ronald H. | $438,559.00 | Need Manual Check | Need Manual Check | N/A |
| Amanda H. | $12.00 | Need Manual Check | Need Manual Check | N/A |
| Carson L. | $10.00 | Need Manual Check | Need Manual Check | N/A |
| Theresa M. | $45,000.00 | Need Manual Check | Need Manual Check | N/A |
| Tiffany N. | $7,516.16 | Need Manual Check | Need Manual Check | N/A |
| Carlos P. | $0.00 | Need Manual Check | Need Manual Check | N/A |
| Lee S. | $0.00 | Need Manual Check | Need Manual Check | N/A |
| Michelle T. | $2,400.00 | Need Manual Check | Need Manual Check | N/A |
| **Total** | **$493,497.16** | Need Manual Check | Need Manual Check | N/A |

## APPENDIX I

## Restitution Exclusions: AtenCoin (pre-indictment) Purchasers and CrossVerify Investors

| First and Last Name | Victim Report Amount | Purchase Type |
|---|---|---|
| Albert J. | $0.00 | AtenCoins |
| Arthur T. | $33,000.00 | AtenCoins and CrossVerify Shares |
| Brandi J. | $328,271.51 | AtenCoins and NAC Foundation Investments |
| Corey J. | $111,500.00 | AtenCoins and NAC Foundation Investments |
| Daniel H. | $3,000.00 | AtenCoins |
| John B. | $35,000.00 | AtenCoins |
| Judie H. | $2,750.00 | AtenCoins |
| Kasey L. | $2,000.00 | AtenCoins |
| Larry W. | $1,000.00 | AtenCoins |
| Lavern D. | $90,000.00 | AtenCoins |
| Michael W. | $78,000.00 | AtenCoin and CrossVerify Shares |
| Murray K. | $875.00 | AtenCoins |
| Paul M. | $7,000.00 | AtenCoins |
| Rene A. | $150,000.00 | AtenCoins |
| Richard B. | $2,000.00 | AtenCoins |
| Stanley D. | $2,000.00 | AtenCoins |
| Stephen E. | $2,250.00 | AtenCoins |
| Wayne W. | $3,000.00 | AtenCoins |
| **Total** | **$851,646.51** | |

**APPENDIX J**

**Restitution Exclusions: Post-Indictment Period Transactions**

| First and Last Name | Victim Report Amount | Post-Indictment Purchase |
|---|---|---|
| Aharanoff D. | $300,000 | $50,000 for AML Bitcoin, Dec. 2018 |
| | **Total** | **$50,000** |

**APPENDIX K**

**Restitution Exclusions: Summary**

| Exclusion | Amount |
|---|---|
| Duplications | $34,701.00 |
| Ben Boyer Transactions | $1,105,000 |
| Totally Unsubstantiated Claims | $493,497.16 |
| Claim Amounts Exceeding Substantiation | $1,119,112.44 |
| AtenCoin Purchasers/CrossVerify Investors | $851,646.51 |
| Post-Indictment Period Purchase | $50,000 |
| | |
| **Total Restitution Claimed** | **$4,597,205.88** |
| **Total Exclusions** | **$3,653,957.11** |
| **Remaining Restitution** | **$943,248.77** |