1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  CHRISTIAAN HIGHSMITH (CABN 296282)
   DAVID WARD (CABN 239504)
5  Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
         FAX: (415) 436-7230
8        christiaan.highsmith@usdoj.gov
         david.ward@usdoj.gov
9
   Attorneys for United States of America
10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                        SAN FRANCISCO DIVISION
13

14 UNITED STATES OF AMERICA,              )  CASE NO. 20-CR-00249 RS
                                          )
15          Plaintiff,                    )  **UNITED STATES' BRIEF IN SUPPORT OF**
                                          )  **RESTITUTION AND FORFEITURE ORDERS**
16     v.                                 )  **AND OPPOSITION TO DEFENDANT**
                                          )  **ANDRADE'S OPENING BRIEF REGARDING**
17 ROWLAND MARCUS ANDRADE,                )  **RESTITUTION AND FORFEITURE**
                                          )
18          Defendant.                    )  Dept.: Courtroom 3 – 17th Floor
                                          )  Date:  September 16, 2025
19                                        )  Time: 2:30 p.m.
                                          )
20 ─────────────────────────────────────

21

22

23

24

25

26

27

28

**<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION .................................................................................................1

II.     THE COURT SHOULD ORDER A $10,474,609 PERSONAL MONEY
        JUDGMENT ......................................................................................................2

        A.      Applicable Law....................................................................................2

        B.      The Government's Forfeiture Calculation is Based on Reliable Evidence
                Introduced at Trial...............................................................................2

        C.      The Proposed Forfeiture Money Judgment Properly Includes Andrade's
                Proceeds from the Scheme as a Whole and Not Just the Counts of Conviction.................4

        D.      The Government Did Not Double Count Cryptocurrency Income....................5

        E.      The Government's Forfeiture Calculation Did Not Erroneously Include Funds
                That Did Not Come to Rest With Andrade........................................6

        F.      The Government's Proposed Forfeiture Order Does Not Erroneously Include
                Criminal Activity That Andrade Did Not Agree to Undertake.......................9

III.    THE COURT SHOULD ORDER RESTITUTION OF EITHER $4,020,739.59 OR
        $3,101,800.29 ...................................................................................................10

        A.      Applicable Law..................................................................................10

        B.      The Full Amount of Restitution for Andrade's Fraud Scheme is Either
                $4,020,739.59 or $3,101,800.29 .......................................................11

        C.      Victims Declare $4,020,739.59 in Losses via Victim-Impact Statement
                Questionnaire ...................................................................................12

        D.      Bank Records, Trial Evidence, and Victim-Provided Documentation Supports
                a $3,101,800.29 Restitution Order....................................................14

        E.      The Court's Restitution Order Should Include All Losses Caused by
                Andrade's Cryptocurrency Fraud Scheme and Not Only the Counts of
                Conviction.......................................................................................14

        F.      The Court Should Make its Restitution Order Joint and Several But Should
                Not Apportion Liability Among Defendants .......................................16

IV.     IMPOSITION OF A FORFEITURE MONEY JUDGMENT IS PERMITTED BY
        LAW ..............................................................................................................16

V.      THE PROPOSED RESTITUTION AND FORFEITURE ORDERS ARE TIMELY...................17

        A.      The Proposed Restitution Order is Timely .......................................17

        B.      The Proposed Forfeiture Money Judgment is Timely .......................18

VI.     THE GOVERNMENT'S REQUESTED FORFEITURE AND RESTITUTION
        ORDERS DO NOT VIOLATE THE 8TH AMENDMENT ......................................18

VII.    THE COURT SHOULD NOT STAY ITS RESTITUTION AND FORFEITURE ORDERS ...................................................................................................................21

VIII.    CONCLUSION ...........................................................................................................21

1

## TABLE OF AUTHORITIES

2 **Federal Cases**                                                                    Page(s)

3 *Honeycutt v. United States*, 581 U.S. 443 (2017) ................................................... 6, 7

4 *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273 (9th Cir. 2015) ................................... 15

5 *Saccoccia v. United States*, 955 F.3d 171 (1st Cir. 2020) ........................................... 7

6 *SEC v. Metter*, 706 F. App'x 699 (2d Cir. 2017) ................................................... 8

7 *United States v. $132,245.00 in U.S. Currency*, 764 F.3d 1055 (9th Cir. 2014) ................................... 20

8 *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304 (11th Cir. 1999) ................................... 20

9 *United States v. Abhijit Prasad*, 18 F.4th 313 (9th Cir. 2021) ................................... 19

10 *United States v. Al Sharairei*, 130 F.4th 656 (8th Cir. 2025) ................................... 19

11 *United States v. Bajakajian*, 524 U.S. 321 (1998) ................................... 20

12 *United States v. Bane*, 948 F.3d 1290 (11th Cir. 2020) ................................... 7

13 *United States v. Bangiyev*, 359 F. Supp. 3d 435 ................................... 8

14 *United States v. Beecroft*, 825 F.3d 991 (9th Cir. 2016) ................................... 20

15 *United States v. Booth*, 309 F.3d 566 (9th Cir. 2002) ................................... 11, 14

16 *United States v. Bradley*, 969 F.3d 585 (6th Cir. 2020) ................................... 8

17 *United States v. Brandel*, Case No. 13-cr-439, 2019 WL 2110504 (D. Nev. May 14, 2019) ................................... 15

18 *United States v. Brock-Davis*, 504 F.3d 991 (9th Cir. 2007) ................................... 15

19 *United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007) ................................... 4

20 *United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006) ................................... 19

21 *United States v. Dadyan*, 76 F.4th 955 (9th Cir. 2023) ................................... 10, 11, 12, 14, 16

22 *United States v. Darji*, 609 F. App'x. 320 (6th Cir. 2015) ................................... 19

23 *United States v. Davis*, 706 F.3d 1081 (9th Cir. 2013) ................................... 11, 19

24 *United States v. Fujinaga*, 2022 WL 671018 (9th Cir. Mar. 7, 2022) ................................... 9

25 *United States v. Gossi*, 608 F.3d 574 (9th Cir. 2010) ................................... 10, 12, 17

26 *United States v. Grice*, 319 F.3d 1174 (9th Cir. 2003) ................................... 15

27 *United States v. Harris*, Case No. 17-cr-00001, 2018 WL 6184878 (D. Haw. Nov. 27, 2018) ................................... 2, 4

28 *United States v. Jergensen*, 797 F. App'x 4 (2d Cir. 2019) ................................... 8, 18

*United States v. Lo*, 839 F.3d 777 (9th Cir. 2016) ................................................................ passim

*United States v. Monsanto*, 491 U.S. 600 (1989) ..................................................................... 19

*United States v. Nejad*, 933 F.3d 1162 (9th Cir. 2019) ........................................................ 2, 16

*United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011) .............................................. 2, 11, 19

*United States v. Omidi*, 125 F.4th 1283 (9th Cir 2025) ............................................................ 19

*United States v. Potts*, 765 F. App'x 638 (3d Cir. 2019) ........................................................... 8

*United States v. Riley*, 335 F.3d 919 (9th Cir. 2003) .......................................................... 11, 14

*United States v. Smith*, 656 F.3d 821 (8th Cir. 2011) ............................................................... 19

*United States v. Tanner*, 942 F.3d 60 (2d Cir. 2019) ................................................................. 8

*United States v. Thompson*, 990 F.3d 680 (9th Cir. 2021) ................................................... 6, 8, 9

*United States v. Venturella*, 585 F.3d 1013 (7th Cir. 2009) ...................................................... 4

**Federal Statutes**

18 U.S.C. § 981(a)(1)(C) ............................................................................................................ 4

18 U.S.C. § 981(a)(1) .................................................................................................................. 2

18 U.S.C. § 3664(d)(1) .............................................................................................................. 17

18 U.S.C. § 3664(d)(5) .............................................................................................................. 10

18 U.S.C. § 3664(e) ................................................................................................................... 10

18 U.S.C. §§ 3663A .................................................................................................................. 10

18 U.S.C. §§ 3663A(a)(1) ............................................................................................... 11, 12, 17

21 U.S.C. § 853(p) ..................................................................................................................... 16

28 U.S.C. § 2461(c) ............................................................................................................... 2, 16

**Federal Rules**

Fed. R. Crim. P. 32.2(b)(1)(B) .................................................................................................. 18

Fed. R. Crim. P. 32.2(b)(2)(B) .................................................................................................. 18

U.S.S.G. § 2B1.1(b) ............................................................................................................... 4, 10

§ 2B1.1(b) ................................................................................................................................. 10

## I.      INTRODUCTION

Defendant Rowland Marcus Andrade engaged in a multi-year cryptocurrency fraud scheme that defrauded investor-victims out of $10,474,609. *See generally* PSR; Dkt. 717 (Minute Entry) & 720 (Statement of Reasons). His scheme started in 2014 when he incorporated the National Aten Coin ("NAC") Foundation. Shortly thereafter, Andrade's NAC Foundation launched Aten Black Gold Coin, which morphed into AtenCoin and then AML Bitcoin. At trial, evidence and testimony established that from January 2014 to June 2017, AtenCoin investors lost approximately $2.1 million to Andrade's cryptocurrency fraud scheme. The evidence also established that between mid-2017 and October 2018, investors lost approximately $8.4 million to Andrade's scheme. These AML Bitcoin losses consisted of $5.5 million in deposits into Andrade's bank accounts plus $2.9 million worth of in cryptocurrency purchases (based on the value of the cryptocurrency used to purchase AML Bitcoin at the time of the purchase).

At sentencing, the Court adopted the findings in the Probation Office's PSR, thereby adopting the PSR's stated loss amount of $10,474,609 caused by Andrade's cryptocurrency fraud scheme. *See generally* PSR; Dkt. 717, 720. The government's sentencing memoranda sought a forfeiture money judgment in the amount of $10,474,609, representing the full proceeds of Andrade's scheme, and restitution to identifiable victims of $4,597,205.88. Dkt. 709, at 28-29. Andrade's sentencing memoranda stated that forfeiture was not ripe for determination and requested a separate, future hearing on forfeiture and restitution. Def. Sent. Memo. (Dkt. 713), at 37-39. The Court ordered a hearing for sentencing on forfeiture and restitution on September 16, 2025. Dkt. 717. The defense proposed, and the government agreed to, a restitution and forfeiture briefing schedule. Dkt. 726.

The government submits that the Court should order Andrade to forfeit all the proceeds of his fraud scheme via a forfeiture money judgment in the amount of $10,474,609. Further, the Court should order restitution to the 263 unique, identifiable victims of Andrade's fraud scheme in one of two amounts: either (1) $4,020,739.59 based on the victims' loss submissions, or (2) $3,101,800.29, which is the amount of unique identifiable victim losses corroborated by documentary evidence.

II.    **THE COURT SHOULD ORDER A $10,474,609 PERSONAL MONEY JUDGMENT**

A.    **Applicable Law**

The Court is required to order forfeiture of all proceeds that constitute or are derived from Andrade's fraud scheme because the government included notice of the forfeiture in the indictment and Andrade was convicted of wire fraud, an offense for which 18 U.S.C. § 981 authorizes forfeiture. *United States v. Lo*, 839 F.3d 777, 789 (9th Cir. 2016) (citing 28 U.S.C. §§ 981 & 2461 and *United States v. Newman*, 659 F.3d 1235, 1239 (9th Cir. 2011)); *see also United States v. Harris*, Case No. 17-cr-00001, 2018 WL 6184878, at *5 (D. Haw. Nov. 27, 2018) (citing *Lo*, 839 F.3d at 791).

Proceeds subject to forfeiture are "not limited solely to the amounts alleged in the count(s) of conviction," they include proceeds from the fraud scheme as a whole. *Lo*, 839 F.3d at 793 (internal citations and quotations omitted). The government established at trial that Andrade obtained—and investors lost—approximately $10,474,609 as a result of Andrade's digital currency fraud scheme. Accordingly, that is the appropriate amount for forfeiture. Under the forfeiture statutes alleged in the indictment—18 U.S.C. § 981(a)(1), (a)(1)(C), and 28 U.S.C. § 2461(c)—a personal money judgment is permissible. *United States v. Nejad*, 933 F.3d 1162, 1164 (9th Cir. 2019) ("we have held in a series of cases that personal money judgments are permissible") (internal citations omitted).

B.    **The Government's Forfeiture Calculation is Based on Reliable Evidence Introduced at Trial**

The government's methodology for calculating the $10,474,609 loss and forfeiture amount was reliable and satisfies the preponderance of the evidence standard. At trial, the government established a nexus between Andrade's cryptocurrency fraud scheme and the $10,474,609 in proceeds he received from the scheme. Ex. 1520; Tr. 1958-59; Dkt. 709, at 15-18 (government sentencing memorandum detailing loss attributable to Andrade). FBI Forensic Accountant Theresa Chiu testified at trial about her analysis of bank records for approximately 20 Andrade-controlled bank accounts, which she detailed in a summary chart of voluminous bank records. Dkt. 709, at 17 (citing Ex. 1517, Ex. 1520, and Tr. 1941-44). Examining Andrade's bank records, Forensic Accountant Chiu identified investor names and investor deposits into Andrade's bank accounts associated with Andrade's digital currency products, and then she totaled those investor deposits into Andrade's bank accounts. Ex. 1517; Ex. 1520; Tr. 1941-44.

1  Forensic Accountant Chiu's analysis was reliable because she only counted verified investment deposits

2  where bank records or some form of evidence established that the deposits were connected to Andrade's

3  digital currency. She likely undercounted the total investment losses because some investors probably

4  deposited money into Andrade's accounts without explicitly identifying the deposit or transfer as being

5  connected to AtenCoin, AML Bitcoin, or one of Andrade's digital currency products.

6      Based on her bank records analysis, Forensic Accountant Chiu testified that victim-investors

7  deposited approximately $7.6 million in U.S. currency into Andrade's bank accounts. She further

8  testified that this amount consisted of approximately $2.1 million in victim-investor deposits from 2014

9  to June 2017 for the Aten Black Gold Coin and AtenCoin products and approximately $5.5 million in

10  victim-investor deposits from July 2017 to October 2018 for the AML Bitcoin product. Ex. 1520; Tr.

11  1944-46.

12      In addition, Forensic Accountant Chiu analyzed two black binders seized from the NAC

13  Foundation containing approximately 200 pages detailing investor purchases of AML Bitcoin using

14  legitimate cryptocurrencies such as Bitcoin, Ethereum, Litecoin, and Bitcoin Cash. Tr. 1956-58; Ex.

15  1520-005. Her calculations were rigorous and conservative. For each purchase with legitimate

16  cryptocurrency, spanning October 2017 through February 2018, Forensic Accountant Chiu used the

17  value of that cryptocurrency on the day of the purchase.[1] Adding each individual purchase (using the

18  cryptocurrency's value of the day of the purchase), she calculated that the value of all the purchases

19  reflected in the NAC Foundation's binders was approximately $2,874,609. Tr. 1958; Ex. 1520-005.

20      According to reliable evidence introduced and subjected to cross-examination at trial, investors

21  lost—and Andrade obtained in proceeds—a total of $10,474,609. This consisted of $7.6 million in U.S.

22  currency deposited into Andrade's bank accounts (split between $2.1 million for AtenCoin-related

23  investment and $5.5 million in AML Bitcoin-related investment) and approximately $2,874,609 worth

24  of cryptocurrency used to purchase AML Bitcoin.

25

26

27  _____

[1] Forensic Accountant Chiu did not use the 2025 value of the cryptocurrency. Using the blended daily average price—the price of the cryptocurrency on the date of the purchase in 2017 or 2018—resulted in a far lower loss amount than would have resulted if she had used the cryptocurrency's price as of the date she conducted her analysis.

28

### C.    The Proposed Forfeiture Money Judgment Properly Includes Andrade's Proceeds from the Scheme as a Whole and Not Just the Counts of Conviction

At sentencing, the Court agreed with the government and the Probation Office's PSR and ruled that Andrade's cryptocurrency fraud scheme resulted in $10,474,609 in losses attributable to Andrade under U.S.S.G. § 2B1.1(b)(1)(K). The Court's loss calculation and rulings at the sentencing hearing reflected that Andrade's digital currency fraud scheme spanned 2014 to 2018 and included losses connected to Aten Black Gold Coin, AtenCoin, AML Bitcoin, and CrossVerify. Now, Andrade improperly seeks to relitigate the extent of his fraud scheme in his forfeiture and restitution briefing. *See Harris*, 2018 WL 6184878, at *9 (rejecting defendant's attempts to relitigate the amount of fraud loss established at trial via forfeiture and restitution briefing).

It is well-settled in the Ninth Circuit "that defendants must forfeit the total proceeds of the scheme to defraud." *Id.* at *7 (citing *Lo*, 839 F.3d at 793-94; *United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009); *United States v. Capoccia*, 503 F.3d 103, 117 (2d Cir. 2007). As discussed above, the government established that the total proceeds of Andrade's cryptocurrency fraud scheme was $10,474,609; accordingly, Andrade must forfeit that amount. *United States v. Lo* is instructive. There, the Ninth Circuit ruled that the district court's forfeiture order should encompass the proceeds of the defendant's scheme to defraud as a whole and not just the proceeds of the counts of conviction. 839 F.3d at 792-94. Thus, the Ninth Circuit rejected the defendant's challenge to the $2.2 million forfeiture order and the defendant's argument that the forfeiture order was an illegal sentence because it was not limited to proceeds that constitute or are derived from the counts of conviction, which were $78,750. *Id.* at 792. The Ninth Circuit explained that "[t]he language of the forfeiture statute broadly makes forfeitable any property, obtained by the defendant directly or indirectly, as a result of the commission of a … wire fraud offense." *Id.* at 793 (discussing 18 U.S.C. § 981(a)(1)(C), (a)(2)(A)). The Court reasoned that wire fraud contains "the element that the alleged acts are completed in furtherance of a scheme to defraud." *Id.* (internal citations omitted). And because the commission of a wire fraud offense "necessarily includes a fraudulent scheme as a whole, the proceeds of the crime of conviction consist of the funds involved in that fraudulent scheme, including additional executions of the scheme that were not specifically charged or on which the defendant was acquitted." *Id.* (internal citations and quotations

1  omitted). Because Andrade's digital currency fraud scheme spanned 2014 to 2018 and included the Aten

2  Black Gold Coin, AtenCoin, AML Bitcoin, and CrossVerify products, both the loss amount at

3  sentencing and the forfeiture amount properly include the total proceeds of the scheme, $10,474,609.

4       Andrade also attempts to relitigate the issue of whether his sale of CrossVerify shares should be

5  counted as fraud loss and, therefore, fraud proceeds subject to forfeiture. Dkt. 728, at 10; Dkt. 713, at

6  23:7-24:9. At sentencing, the Court rejected Andrade's argument that sales of his CrossVerify shares

7  should not be counted as fraud proceeds and adopted the findings in the PSR, the PSR's loss amount,

8  and the government's calculated loss amount of $10,474,609. Dkt. 720. This is consistent with

9  testimony at trial establishing that CrossVerify was part of Andrade's fraud scheme. Investor-Victim

10  Michael Witte testified that he invested in CrossVerify, which was a product he assumed "was going to

11  be AML Bitcoin" because it was the "biometric identification … that was going to be worked into the

12  AML Bitcoin." Tr. 427. Similarly, Carlos De La Guardia testified that CrossVerify was the biometric

13  identification piece of AML Bitcoin. Tr. 1234. Developers Evan Carlson and Hung Tran testified that

14  they traveled to London at Andrade's invitation to see how the CrossVerify product would be integrated

15  into AML Bitcoin. Tr. 1265-67, 1269, 1273, 1409-12. In short, the Court's conclusion that Andrade's

16  sales of CrossVerify shares and investments into CrossVerify were part of the fraud scheme was well-

17  founded in the evidence. Accordingly, proceeds from Andrade's sales of CrossVerify shares to investors

18  such as Michael Witte is properly deemed proceeds of his fraud scheme subject to forfeiture.

19       **D.**    **The Government Did Not Double Count Cryptocurrency Income**

20       Andrade's argument that the government double counted cryptocurrency income is wrong. Dkt.

21  728, at 10. Andrade specifically claims that the government double-counted $770,357.98 in

22  cryptocurrency income transferred from a Block Bits Capital bank account to an Andrade account. *Id.* at

23  11. Forensic Accountant Chiu did not include the $770,357.98 deposited by Block Bits into Andrade's

24  accounts in her loss calculations because the deposits lacked sufficient indicia of reliability to indicate

25  that they constituted the proceeds of or investments in Andrade's digital currency products. Declaration

26  of FBI Forensic Accountant Theresa Chiu ("Chiu Decl."), at 6, ¶ 15.

27       There is no evidence in the record to indicate that Forensic Accountant Chiu double counted any

28  cryptocurrency purchases. The cryptocurrency purchases are distinct and separate from the U.S.

currency purchases deposited into Andrade's bank accounts. Andrade's bank records would not have represented a cryptocurrency purchase as a cash deposit, transfer, or wire from an investor-victim. If the bank records reflected a cryptocurrency purchase at all, it would have shown a cash transfer from a digital currency exchange or as cash from Andrade himself. But Forensic Accountant Chiu did not include such transfers in her calculation of investor deposits into Andrade's bank accounts. She focused on U.S. currency deposits by an identified investor corroborated by evidence that the deposit was connected to Andrade's digital currency products. Andrade's bank records were in evidence, as were the black binders detailing purchases using cryptocurrency. Andrade did not choose to present separate testimony regarding his analysis of the bank records or the black binders at trial. He did not introduce evidence comparing U.S. currency purchases from his bank records with cryptocurrency purchases detailed in the NAC Foundation's black binders. He could have done so but chose not to. Forensic Accountant Chiu undertook a rigorous and detailed analysis of the relevant bank records and cryptocurrency purchase records and concluded there was no overlap between the two.

### E. The Government's Forfeiture Calculation Did Not Erroneously Include Funds That Did Not Come to Rest With Andrade

Andrade argues that the Court's forfeiture order cannot include proceeds that he received and then paid out in AML Bitcoin token sales commissions, consulting services, television marketing efforts, Super Bowl rejection campaign expenses, initial coin offering (ICO) expenses, AtenCoin sales commissions, and other expenses related to propagation of his digital currency fraud scheme. Dkt. 728, at 12-13. Relying on *Honeycutt v. United States*, 581 U.S. 443 (2017), and *United States v. Thompson*, 990 F.3d 680, 691 (9th Cir. 2021), Andrade contends that because some of these proceeds ultimately went to others, he cannot be ordered to pay forfeiture for those proceeds because they "did not come to rest" with him. Andrade is wrong.

In *Honeycutt*, the Supreme Court barred the imposition of forfeiture liability against the defendant-employee for the proceeds that went to the leader of the organization—his brother—because those proceeds were proceeds the defendant as an employee never obtained.  581 U.S. at 446-50.  By contrast, *Honeycutt* stated that a mastermind of a criminal organization—such as Andrade—obtains the proceeds that flow through an underling. *Id.* at 448. Indeed, as the core part of its rationale, the Court in

*Honeycutt* provided an example with a "mastermind" and a low-level employee:

> Suppose a farmer masterminds a scheme to grow, harvest, and distribute marijuana on local college campuses. The mastermind recruits a college student to deliver packages and pays the student $300 each month from the distribution proceeds for his services. In one year, the mastermind earns $3 million. The student, meanwhile, earns $3,600. If joint and several liability applied, the student would face a forfeiture judgment for the entire amount of the conspiracy's proceeds: $3 million. The student would be bound by that judgment even though he never personally acquired any proceeds beyond the $3,600.

*Id.* at 448-49.

The total drug proceeds in the hypothetical is $3 million, so the government is entitled to forfeit $3 million from the mastermind but only $3,600 from the student-courier, because that is what each respective role "obtained" in the course of the conspiracy. *See id.* at 449-50. Thus, the mastermind is liable for the full amount, even though he paid $3,600 to the student. This result stems from the Supreme Court recognizing that the mastermind obtained all the proceeds from the drug conspiracy, while the student employee only received what he was paid. *Id.*

The Supreme Court reinforced the fact that the mastermind obtains all the proceeds—including the amount subsequently paid out to the courier—stating, the "mastermind might receive payments directly from drug purchasers or he might arrange to have drug purchasers pay an intermediary such as the college student. In all instances, he ultimately obtains the property—whether directly or indirectly." *Id.* (citations and quotations omitted) (characterizing the proceeds to include "the $3 million that the mastermind acquired").

Several other circuit courts have read *Honeycutt* in this manner. For example, the First Circuit upheld a forfeiture order post-*Honeycutt* where the undisputed facts showed the defendant controlled the bank account from which the funds at issue flowed and oversaw the distribution of those funds. *Saccoccia v. United States*, 955 F.3d 171, 175–76 (1st Cir. 2020). This is exactly the situation here, where Andrade controlled the bank accounts that criminal proceeds flowed into and oversaw the distribution of those funds to pay for expenses to perpetuate the fraud scheme, including by paying others to further and enhance the scheme. Similarly, the Eleventh Circuit held that *Honeycutt* would not provide relief to a defendant where it was "undisputed that [defendant] was the owner and operator of the two companies and the mastermind behind the fraud" and where the defendant "has failed to prove that he was not responsible for the entire proceeds of the fraud." *United States v. Bane*, 948 F.3d 1290,

1297–98 (11th Cir. 2020) (citation omitted).[2] So, too, here. *See United States v. Tanner*, 942 F.3d 60, 67–68 (2d Cir. 2019) ("*Honeycutt*'s bar against joint and several forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes"); *United States v. Jergensen*, 797 F. App'x 4, 8 (2d Cir. 2019) (rejecting defendants' *Honeycutt* argument because defendants had "approved every transfer" of the relevant monies and "thus each acquired or used the tainted funds"); *SEC v. Metter*, 706 F. App'x 699, 702 n.2 (2d Cir. 2017) (finding *Honeycutt* did not apply in part because the defendant "ha[d] control of [the criminal organization] . . . and thus could control the distribution of proceeds").

Here, the trial testimony established—and Andrade does not dispute—that David Meta, Jack Abramoff, John Bryan, Japheth Dillman, Brian Darrow and Bob Parsons were employed by him and paid for services they rendered to the business he masterminded. Andrade was the founder and CEO of the cryptocurrency companies at the center of this fraud scheme. Andrade controlled the bank accounts, the flow of money out of those accounts, and he directed a small army of employees and consultants to perpetuate his cryptocurrency fraud. Trial testimony also established—and Andrade does not dispute— that the funds he paid to others involved in his cryptocurrency projects flowed through bank accounts he controlled. In that regard, this case is on all fours with *Honeycutt*. *See also United States v. Bradley*, 969 F.3d 585, 588-89 (6th Cir. 2020) (rejecting defendant's argument that "forfeiture of a crime's proceeds … does not include money received by the defendant from the crime but paid to coconspirators," and holding that "it is beside the point whether the money stayed in [the defendant's] pocket (e.g., kept as profits) or went toward the costs of running the conspiracy (e.g., used to pay coconspirators).").

Andrade's reliance on *Thompson* is misplaced because *Thompson* did not involve a mastermind or a defendant with control over the bank accounts that housed all the fraud proceeds. 990 F.3d at 691 (conceding that the result would be different if one defendant had "unfettered right to enjoy the whole [of the proceeds]"). The Ninth Circuit has already rejected Andrade's argument that a forfeiture order

---

[2] *See also United States v. Potts*, 765 F. App'x 638, 640 (3d Cir. 2019) (declining to apply *Honeycutt* where the defendant did "not rebut[ ] the record evidence showing that he, *a co-owner of the organization*, received . . . proceeds as a result of *his* participation in the organization" (original emphasis)); *United States v. Bangiyev*, 359 F. Supp. 3d 435, 440 (E.D. Va.) (concluding that *Honeycutt* does not apply where a defendant is "at the center of" the conspiracy and "where the defendant held a position of control in the criminal operation"), *aff'd*, 771 F. App'x 328 (4th Cir. 2019).

for the full amount of the fraud scheme's proceeds violates *Honeycutt* where the defendant, like Andrade, "had full and exclusive authority over the [bank] accounts." *United States v. Fujinaga*, 2022 WL 671018, at *6 (9th Cir. Mar. 7, 2022). Indeed, the Ninth Circuit specifically distinguished *Thompson*, because "*Thompson*, like *Honeycutt*, did not involve a situation in which the defendant had exclusive control of the property." *Id.* (citing *Thompson*, 990 F.3d at 689).

**F.  The Government's Proposed Forfeiture Order Does Not Erroneously Include Criminal Activity That Andrade Did Not Agree to Undertake**

Again, Andrade improperly seeks to relitigate issues settled at trial and at this Court's sentencing hearing. Andrade argues that he did not participate in wire transaction specifically charged in Count One of the indictment, Ben Boyer's purchase of AML Bitcoin tokens on January 12, 2018. Dkt. 728, at 15, 38. The jury found Andrade guilty of wire fraud in connection with Boyer's purchase of AML Bitcoin tokens through Block Bits Capital, an entity run by two individuals—Japheth Dillman and David Mata—who worked and sold AML Bitcoin tokens for Andrade. Indeed, Dillman served as AML Bitcoin's Chief Strategy Officer and reported to Andrade. Based on the jury's verdict, evidence introduced at trial, and the Probation Office's PSR, the Court ruled that Boyer's AML Bitcoin purchases through Block Bits were losses attributable to Andrade. Andrade's argument that he did not agree to undertake AML Bitcoin token sales to Ben Boyer flies directly in the face of overwhelming evidence introduced at trial, the fact that Ben Boyer's investments flowed directly into bank accounts Andrade controlled, and this Court's prior rulings on loss at sentencing.

Similarly, Andrade's argument that he did not agree to undertake sales of AML Bitcoin tokens to Block Bits Capital—run by two individuals who worked for Andrade and who received sales commissions from Andrade—is not supported by logic or evidence. Andrade claims he received $458,380 from Block Bits that he never wanted. This strains credulity. Andrade presents no evidence that he returned those funds or that he did not seek to sell AML Bitcoin tokens via Dillman and Mata, two individuals Andrade paid to sell AML Bitcoin tokens on his behalf. Further, as discussed in detail above, Forensic Accountant Chiu only included in her loss calculation deposits into Andrade's bank accounts traced to specific investors. Andrade does not undermine the reliability of Ms. Chiu's loss calculation by identifying inflows to NAC Foundation bank accounts from Block Bits Capital.

1    Andrade was the leader and organizer of this cryptocurrency fraud scheme. He employed

2    numerous people—including Dillman and Mata—to sell his tokens and further his scheme. There is no

3    evidence to support his contention that he did not agree to undertake AML Bitcoin token sales by Block

4    Bits, Dillman, or Mata. The $10,474,609 loss amount established at trial and applied to Andrade's

5    § 2B1.1(b) loss Guidelines at sentencing is a reliable estimate of the proceeds of Andrade's fraud

6    scheme and should be ordered as forfeiture in a personal money judgment against Andrade.

7    **III.    THE COURT SHOULD ORDER RESTITUTION OF EITHER $4,020,739.59 OR**
     **$3,101,800.29**

8

9    **A.    Applicable Law**

10    The Mandatory Victim Restitution Act of 1996 ("MVRA") provides that for any title 18 offense

11    that causes an identifiable victim certain recoverable losses, the imposition of full restitution for those

12    recoverable losses is mandatory. 18 U.S.C. §§ 3663A *et seq*. If the victim's losses are not ascertainable

13    prior to sentencing, "the court shall set a date for the final determination of the victim's losses, not to

14    exceed 90 days after sentencing." 18 U.S.C. § 3664(d)(5). "The burden of demonstrating the amount of

15    the losses sustained by a victim as a result of the offense shall be on the attorney for the Government."

16    18 U.S.C. § 3664(e). "Any dispute as to the proper amount or type of restitution shall be resolved by the

17    court by the preponderance of the evidence." *Id.* "In resolving such a dispute, the district court must rely

18    on evidence that possesses sufficient indicia of reliability to support its probably accuracy." *United*

19    *States v. Dadyan*, 76 F.4th 955, 960 (9th Cir. 2023) (internal quotation and citation omitted).

20    "The district court is entitled to draw reasonable inferences when coming to its restitution

21    calculation." *Id.* (internal citation omitted). "Exact precision is not required and district courts do have a

22    degree of flexibility in accounting for a victim's complete losses." *Id.* (internal citation omitted). "The

23    district court is entitled to draw reasonable inferences when coming to its restitution calculation." *Id.* at

24    961 (internal citation omitted). The purpose of restitution is to put the victim back in the position he or

25    she would have been but for the defendant's criminal conduct." *United States v. Gossi*, 608 F.3d 574,

26    581 (9th Cir. 2010) (citations and quotation omitted). Because "[t]he primary and overarching goal of

27    the MVRA is to make victims of crime whole[,] . . . uncertainties [should be] resolved with a view

28    toward achieving fairness to the victim." *Id.* at 580 (quotation omitted).

Restitution is not limited to the offense of conviction; the restitution order may permissibly encompass all losses related to a scheme or conspiracy and need not be limited to those associated with the counts to which the defendant pleaded guilty. *See Dadyan*, 76 F.4th at 958 (citing *United States v. Riley*, 335 F.3d 919, 931 (9th Cir. 2003)); *United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) ("The district court did not abuse its discretion in ordering restitution from [the defendant] for the entire amount of loss caused to victims of the scheme."). And while there is no rule that restitution must equal the loss amount under the Sentencing Guidelines, "MVRA restitution calculations … and Guidelines section 2B1.1(b)(1) loss calculations do share common ground." *Id.* at 959. Indeed, "restitution and Guidelines-loss figures often mirror one another when the Guidelines calculation is based on actual (rather than intended) loss." *Id.*

Further, the Court should order both restitution and forfeiture, as they serve different purposes. *United States v. Davis*, 706 F.3d 1081, 1082-84 (9th Cir. 2013); *Lo*, 839 F.3d at 789 (quoting *Newman*, 659 F.3d at 1241 ("Criminal forfeiture is … separate from restitution, which serves an entirely different purpose."). Restitution seeks to make victims whole by reimbursing them for their losses; forfeiture seeks to deprive criminals of their ill-gotten proceeds. *Davis*, 706 F.3d at 1082-84; *see also Newman*, 659 F.3d at 1241.

### B. The Full Amount of Restitution for Andrade's Fraud Scheme is Either $4,020,739.59 or $3,101,800.29

The Court must impose the full amount of restitution for the identifiable victims' losses caused by Andrade cryptocurrency fraud scheme. 18 U.S.C. §§ 3663A(a)(1), (a)(2), (c)(1)(A)(ii) and 3664(e), (f)(1)(A). The government has identified 263 unique victims of Andrade's scheme. Chiu Decl. ¶ 8. Those unique victims self-reported $4,020,739.59 in losses. *Id.* Because of the difficulty associated with identifying specific victims, the number of identified victims is far less than the thousands of victims in evidence at trial; therefore, the restitution amount ($4 million) is far less than the loss amount established at trial ($10.5 million). Nevertheless, because the self-reported losses are consistent with the loss amount presented at trial, and because the government has removed duplicate victim entries and victim entries unrelated to Andrade's scheme, the $4,020,739.59 figure is sufficiently reliable to meet the preponderance of the evidence standard necessary to support a restitution order.

1    Alternatively, the government has taken the additional step of corroborating the loss amounts

2    provided by the 263 unique victims against bank records, records of digital currency purchases

3    maintained by Andrade's companies and introduced at trial, and transaction records provided by the

4    victims themselves. This corroborated loss figure amounts to $3,101,800.29, Chiu Decl. ¶ 14, and is

5    sufficiently reliable to meet the preponderance of the evidence standard necessary to support a

6    restitution order.

7    **C.**    **Victims Declare $4,020,739.59 in Losses via Victim-Impact Statement Questionnaire**

8    Based on evidence and testimony introduced at trial, and by adopting the findings in the

9    Probation Office's PSR, the Court ruled at sentencing that Andrade's cryptocurrency fraud scheme

10    spanned 2014 through 2018; included Aten Black Gold Coin, Aten Coin, and AML Bitcoin; and caused

11    approximately $10.5 million in losses to thousands of victims. Dkt. 720 (Statement of Reasons). The

12    government has specifically identified 263 unique victims who suffered losses due to Andrade's

13    cryptocurrency fraud scheme. These victims provided victim impact statements and reported how much

14    money or cryptocurrency they lost to Andrade's cryptocurrency scheme. Victims provided their impact

15    statements and loss claims via an FBI-website that generated a victim impact statement spreadsheet.

16    Some victims provided supporting documentation; others did not. After receiving a total of 305 victim

17    responses, the government removed 31 duplicate entries and 11 individuals with no documentary

18    evidence connecting them to Andrade's fraud scheme. Chiu Decl. ¶ 7. The remaining 263 unique

19    victims claimed a total of $4,020,739.59 in losses. *Id.*

20    The Court can order Andrade to pay this amount—$4,020,739.59—in restitution to the

21    specifically identified victims of his cryptocurrency fraud scheme. The victims' responses to the FBI's

22    victim impact questionnaire are "evidence that possesses a sufficient indicia of reliability to support its

23    probable accuracy." *Dadyan*, 76 F.4th at 960. While these victim impact responses are not a perfect

24    accounting of their losses, "exact precision is not required." *Id.* (internal quotation and citation omitted).

25    The "primary and overarching goal of the MVRA is to make victims of crime whole[,]" therefore,

26    "uncertainties [should be] resolved with a view toward achieving fairness to the victim." *Gossi*, 608 F.3d

27    at 580. The claimed restitution is far below the $10.5 million loss amount because the government could

28    only specifically identify 263 unique victims out of thousands of victims. Further, many of Andrade's

victims purchased his digital currency products using a legitimate, established digital currency such as Ether or Bitcoin, which are worth far more today than they were at the time they used it to purchase Andrade's digital currency products. Therefore, the ultimate restitution order will be far below Andrade's potential restitution exposure. Further, Forensic Accountant Chiu corroborated that each of the 263 unique victims were in fact victims Andrade's cryptocurrency scheme by checking their names against Andrade's bank records, business ledgers introduced at trial (Ex. 1470), and documents provided by the victims themselves. This is a sufficient indicia of reliability to establish causation for restitution.[3]

Andrade's claim that the government's restitution evidence is not sufficiently reliable is belied by Forensic Accountant Chiu's analysis. *See generally* Chiu Decl. Further, the Court ruled at sentencing that all investments into Andrade's cryptocurrency scheme spanning 2014 to 2018 were losses attributable to Andrade's fraud scheme totaling nearly $10.5 million. Dkt. 720. In so finding, the Court ruled that all investments paid into Andrade's bank accounts for his cryptocurrency products constituted losses. The Court did not offset investor losses with sales on exchanges because, contrary to Andrade's unsupported contention, there was no concrete evidence of any meaningful sales activity of Andrade's digital currency products on cryptocurrency exchanges. This is well-supported by evidence at trial. *See, e.g.*, Tr. 421 (no reasonable volume of transactions on the exchange that would enable Michael Witte to sell his coins); Tr. 472 (Q: "What happened when you tried to start selling … your coins on the C-CEX exchange?" A: "The market crashed"); Tr. 638-39 ("there was very little activity on the – in the coin" so Rene Acuna did not try to sell his coins on the exchange); Tr. 1522 (there were "no buyers" on the exchange). Further, Forensic Accountant Chiu's list of 263 unique victims is a subset of the thousands of victims presented at trial whom the Court already ruled suffered losses caused by Andrade's scheme.

Accordingly, the government has established causation sufficient to support a restitution order.

//

//

---

[3] Andrade cites victim Lisa T. as an example of the government's unreliable restitution calculation. Dkt. 728, at 16 n.13. But Andrade gets the calculation wrong. Lisa T. only requested $1,892 in restitution. *See* Chiu Decl., Exhibit 1, "1. All Victims Report" tab, row 131, column AI. Her victim impact statement discusses thousands of dollars in legal fees and "devastating" financial loss caused by Andrade after he sued her. *Id.* at column Z. But Lisa T. only seeks restitution corresponding to the AML Bitcoin tokens she purchased.

### D. Bank Records, Trial Evidence, and Victim-Provided Documentation Supports a $3,101,800.29 Restitution Order

Alternatively, should the Court require an even greater indicia of reliability, it can order restitution in the amount of $3,101,800.29. This represents the total loss amount for the 263 unique identified victim corroborated by documentary evidence. Chiu Decl. ¶¶ 9-14. For each of the 263 unique identified victims, Forensic Accountant Chiu compared the reported loss amount against three types of documentary evidence—bank records, NAC Foundation purchase ledgers (Ex. 1470), and victim-supplied transaction records. *Id.* ¶ 9. Where the documentary evidence contradicted victims' reported loss amount, Ms. Chiu replaced the victim reported loss amount with the loss amount supported by the documentary evidence. *Id.* ¶ 14. Ms. Chiu added the corroborated loss amount for all 263 unique identifiable victims and calculated a total loss amount of $3,101,800.29 attributable to Andrade's fraud scheme. For all the reasons stated above, and because this total loss amount is supported by documentary evidence, this is a sufficiently reliable calculation to satisfy the preponderance of the evidence standard for a restitution order.[4]

### E. The Court's Restitution Order Should Include All Losses Caused by Andrade's Cryptocurrency Fraud Scheme and Not Only the Counts of Conviction

Without citing any Ninth Circuit law, Andrade argues that the restitution order cannot include losses caused by Andrade's fraud scheme prior to July 2017 because the indictment defined the period of fraud as July 2017 through October 2018. Dkt. 728, at 21. Andrade is wrong because Ninth Circuit precedent makes clear that a restitution order may permissibly encompass all losses related to a fraud scheme and is not limited to the specific counts of conviction. *See Dadyan*, 76 F.4th at 958 (citing *Riley*, 335 F.3d at 931, and *Booth*, 309 F.3d at 576) ("The district court did not abuse its discretion in ordering restitution from [the defendant] for the entire amount of loss caused to victims of the scheme."); *see also Lo*, 839 F.3d at 788 ("when the crime of conviction is mail fraud or other crime requiring proof of a

---

[4] Andrade also attacks the government's restitution calculation as unreliable by citing victim Kelly C., who reported a loss amount of $100,000 but for whom the government calculated $35,979.54 of corroborated losses. Chiu Decl., Exhibit 1, "3. Corroborated Victims Report" tab, line 6. The government's corroborated $3,101,800.29 restitution figure lists Kelly C.'s corroborated loss amount as $35,979.54 rather than $100,000. *Id.*

scheme, a court is authorized to order restitution on related but uncharged conduct that is part of a fraud scheme, and is not limited to the harm caused by the particular count of conviction").

Here, Andrade was convicted of participating in a wire fraud scheme involving his numerous cryptocurrency products. According to evidence introduced at trial, Andrade's scheme spanned Aten Black Gold Coin, AtenCoin, AML Bitcoin, and CrossVerify. Andrade employed some underlings to sell one product and others to sell multiple products. And his digital currencies fell under the umbrella of the National AtenCoin (NAC) Foundation. Many victims invested in Andrade's scheme by purchasing several of his cryptocurrency products. Based on the evidence introduced at trial, the PSR treated Andrade's cryptocurrency products as being part of a single fraud scheme and concluded that Andrade was responsible for $10,474,609 in losses, which constituted the full amount of the criminal proceeds he obtained from the scheme. PSR ¶ 45. The 263 unique identifiable victims of Andrade's fraud scheme are a small subset of the thousands of victims introduced at trial. These 263 victims include, among others, trial witnesses Michael Witte and Rene Acuna, who seek restitution for losses attributable to Andrade's AtenCoin sales. These victims' losses are properly included in the Court's restitution order because they are "'based on related but uncharged conduct that is part of a fraud scheme.'" *United States v. Brandel*, Case No. 13-cr-439, 2019 WL 2110504, at *4 (D. Nev. May 14, 2019) (quoting *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015); *Lo*, 839 F.3d at 788; *United States v. Brock-Davis*, 504 F.3d 991, 999 (9th Cir. 2007); United States v. Grice, 319 F.3d 1174, 1178-79 (9th Cir. 2003)).[5]

The Court should also reject Andrade's argument that the restitution order should exclude Ben

---

[5] Likewise, victims who invested in AML Bitcoin after October 2018 should be included in the restitution order because their losses were caused by Andrade's cryptocurrency fraud scheme. The Court need not reach this issue, however. The defense has only identified one investor, Daniel A., as purchasing Andrade's digital currency after October 2018. Dkt. 728 at 22 n.19. Daniel A. reported $300,000 in losses but the government's corroborated restitution amount is $200,000 based on bank records. Chiu Decl., Exhibit 1, "3. Corroborated Victims Report" tab, line 21. While the government's bank records analysis does not reflect when Daniel A. purchased his AML Bitcoin, Trial Exhibit 1470 reflects that Daniel A. paid nearly $197,447.33 for AML Bitcoin and that his purchase was audited on May 17, 2018, which falls within the period of the charged wire fraud. *Id.*, Exhibit 1, "Trial Exhibit 1470" tab, line 3354, columns M & P. This is a sufficient indicia of reliability to support the government's proposed corroborated restitution amount of $3,101,800.29.

Boyer's purchases of AML Bitcoin tokens via Block Bits Capital. Dkt. 728, at 22. Again, Andrade seeks to relitigate an issue that was decided at trial and again at sentencing. The jury found Andrade guilty of Count One, which specifically charged Andrade with causing Boyer's $720,000 wire transfer to Block Bits. Andrade cannot legitimately claim that this amount—or any other Boyer investment in AML Bitcoin—should be excluded from restitution. The proceeds of Boyer's AML Bitcoin investment traveled to Block Bits' bank account and shortly thereafter to bank accounts controlled by Andrade. Dillman, who solicited Boyer's investment, worked for Andrade. The Court adopted the PSR's findings that all of Ben Boyer's investments in AML Bitcoin—even when made through Block Bits—were part of and caused by Andrade's fraud scheme.

### F. The Court Should Make its Restitution Order Joint and Several But Should Not Apportion Liability Among Defendants

Under the MVRA, the Court has two options when it "finds that more than 1 defendant has contributed to the loss of a victim." *Dadyan*, 76 F.4th at 962 (quoting 18 U.S.C. § 3664(h)). The Court may make each defendant jointly and severally liable for payment of the full amount of restitution or it may apportion liability among the defendants. *Id.* (citing § 3664(h)).

Here, defendants Andrade and Jack Abramoff contributed to victims' losses. Japheth Dillman and David Mata have not been charged with participating in Andrade's cryptocurrency fraud scheme; therefore, the Court cannot apportion them restitution liability for it. Given the impracticality of apportioning liability among Andrade and Abramoff, the government recommends that the Court order that Andrade's restitution order be joint and several with co-schemer Jack Abramoff.

## IV.    IMPOSITION OF A FORFEITURE MONEY JUDGMENT IS PERMITTED BY LAW

Andrade's argument that there is no statutory basis for a forfeiture money judgment has been considered, and rejected, by the Ninth Circuit. *See Nejad*, 933 F.3d at 1164 ("we have held in a series of cases that personal money judgments are permissible") (internal citation omitted). The Ninth Circuit has deemed personal money judgments "necessary to avoid undermining Congress's objectives in enacting mandatory forfeiture sanctions, pointing in particular to the substitute-property provision found in 21 U.S.C. § 853(p), which is incorporated by reference in 28 U.S.C. § 2461(c). *Id.* at 1165 & n.2. Substitute property eligible for forfeiture is not limited to property the defendant owns at sentencing. *Id.* at 1165.

Therefore, "the court may order forfeiture in the form of a personal money judgment against the defendant, and … the government may attempt to satisfy the judgment with any substitute property it locates in the future." *Id.* (internal citations omitted). "A contrary rule would allow an insolvent defendant to escape the mandatory forfeiture penalty Congress has imposed simply by spending or otherwise disposing of his criminal proceeds before sentencing." *Id.* (internal citations omitted).

## V.    THE PROPOSED RESTITUTION AND FORFEITURE ORDERS ARE TIMELY

### A.    The Proposed Restitution Order is Timely

Andrade contends that the Court should reject the MVRA's mandatory restitution provision for victim losses and order no restitution to victims of Andrade's crimes because the government did not provide sufficient advance notice to Andrade of the victims' claim losses. Dkt. 728, at 25-26. Andrade cites no valid authority for his claim. Indeed, his claim violates the MVRA's mandatory restitution requirement.[6] *See* 18 U.S.C. § 3663A(a)(1). The law specifically permits the Court to set a date for a restitution hearing "90 days after sentencing." *Id.* § 3664(d)(5). Accordingly, the Court set September 16, 2025, for a hearing to determine restitution.

Further, Andrade's timeliness claims are not supported by the facts. The government provided Andrade's counsel with loss information for identifiable victims as early as May 19, 2025. As additional victims provided loss information, the government promptly shared that information with the defense. The government provided victim loss information in via a single Excel spreadsheet, which enabled the defense to manipulate, review, and analyze victims' claimed losses and associated information. And while all victims did not provide loss information in a timely fashion, the government shared victim loss information as soon as the government received it. The defense has a full and complete set of victim loss information and the FBI's analysis of victim loss information well in advance of sentencing. Andrade should not be permitted to evade a restitution order designed to make whole the victims of his crime based on an unsupported timeliness argument. *Cf. Gossi*, 608 F.3d at 581 ("The primary and overarching goal of the MVRA is to make victims of crime whole"; thus, "uncertainties [should be] resolved with a

---

[6] Andrade misleadingly quotes 18 U.S.C. § 3664(d)(1), which states: "Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identifiable victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution."

view toward achieving fairness to the victim.") (internal citations and quotation omitted).

**B.    The Proposed Forfeiture Money Judgment is Timely**

After asking the Court to set separate forfeiture hearing, dkt. 713, at 39, Andrade now seeks to evade forfeiture by arguing that the Court cannot bifurcate sentencing and set a separate sentencing hearing to address forfeiture. Dkt. 728, at 26. Andrade cites no valid law to support his argument. Andrade cites nothing indicating that a Court is prohibited from bifurcating sentencing such that imposition of the custodial portion of the sentence would be entered at the initial hearing but final imposition of sentence would be done at a subsequent hearing to address the defendant's objections to the requested forfeiture and restitution orders. That is exactly what the Court did here when it ruled that Andrade's forfeiture order would "be determined in conjunction with restitution," dkt. 719, at 7, and that an Amended Judgment would be issued after the September 16 restitution and forfeiture hearing, *id.*, at 6.

Forfeiture is part of sentencing, and if forfeiture is contested the court must conduct a hearing after a guilty verdict if either party requests it. Fed. R. Crim. P. 32.2(b)(1)(B). Accordingly, sentencing in this case is not yet closed: the Court has set a hearing on forfeiture (and restitution) for September 16 after which sentencing will close. The cases Andrade cites in support of his timeliness argument are all distinguishable because they involved attempts to re-open sentencing after sentencing proceedings had closed. Here, in contrast, sentencing remains open until the September 16 sentencing hearing on restitution and forfeiture.[7]

## VI.    THE GOVERNMENT'S REQUESTED FORFEITURE AND RESTITUTION ORDERS DO NOT VIOLATE THE 8TH AMENDMENT

Andrade argues that imposition of forfeiture and restitution violates the 8th Amendment. Dkt. 728, at 28-29. His only articulated rationale is that forcing him to restore his victims and to forfeit his ill-

---

[7] That sentencing remains open accords with Federal Rule of Criminal Procedure 32.2. The government moved for a preliminary order of forfeiture on July 23, 2025. Dkt. 711. The Court entered a preliminary order of forfeiture on July 31, 2025, dkt. 721, and set a sentencing hearing for forfeiture and restitution on September 16, 2025. Dkt. 719. The Court's preliminary order was entered sufficiently in advance of the September 16 sentencing hearing "to allow the parties to suggest revisions or modifications before the order becomes final" the hearing. Fed. R. Crim. P. 32.2(b)(2)(B). The Court's preliminary order stated that the amount of a forfeiture money judgment shall be determined by the Court at the restitution hearing, dkt. 721, to be held on September 16.

gotten gains will sentence him "to life terms of impoverishment or living off the books, or both." *Id.* at 28.

It is well settled that restitution and forfeiture are both mandatory. *Newman*, 659 F.3d at 1240; *United States v. Omidi*, 125 F.4th 1283, 1287 (9th Cir 2025) ("When applicable, such forfeiture is mandatory."); *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (by using the phrase "shall order" in a different forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"). Further, restitution and forfeiture are separate and do not offset each other. *Davis*, 706 F.3d at 1084 ("criminal forfeiture and restitution are separate remedies with different purposes", "[e]ven if the same government entity will receive both forfeiture and restitution, there simply is no double recovery" because "[t]he two payments represent different types of funds: punitive and compensatory" and "[t]hey are different in nature, kind, and purpose"); *Newman*, 659 F.3d at 1240; ("[a]lthough Defendants must pay both restitution and criminal forfeiture, that result is not an impermissible 'double recovery'").

Moreover, forfeiture (and restitution) is based on the criminal proceeds obtained by the defendant, not on the defendant's current or anticipated financial condition. The Ninth Circuit has repeatedly held that that money judgments are independent of a defendant's finances, even in cases with insolvent defendants. *United States v. Abhijit Prasad*, 18 F.4th 313, 319 (9th Cir. 2021) (quoting Newman, 659 F.3d at 1243) ("We have explained that '[r]equiring imposition of a money judgment on a defendant who currently possesses no assets furthers the remedial purposes of the forfeiture statute by ensuring that all eligible criminal defendants receive the mandatory forfeiture sanction Congress intended and disgorge their ill-gotten gains, even those already spent.'"); *see also United States v. Casey*, 444 F.3d 1071, 1074–76 (9th Cir. 2006); *United States v. Darji*, 609 F. App'x. 320, 332 (6th Cir. 2015).

Indeed, "[a] defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, nor is it even the correct inquiry." *United States v. Al Sharairei*, 130 F.4th 656, 667 (8th Cir. 2025) (quoting *United States v. Smith*, 656 F.3d 821, 828 (8th Cir. 2011)). "Rather, the Excessive Fines Clause is violated when the forfeiture amount is disproportionate to the gravity of the offense, not to the defendant's financial circumstances." *Id.*; *see*

1  *also United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1311 (11th Cir. 1999) ("The Supreme Court,

2  however, has made clear that whether a forfeiture is 'excessive' is determined by comparing the amount

3  of the forfeiture to the gravity of the offense . . . and not by comparing the amount of the forfeiture to the

4  amount of the owner's assets. In other words, excessiveness is determined in relation to the

5  characteristics of the offense, not in relation to the characteristics of the offender.").

6  "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the

7  gravity of a defendant's offense." *United States v. Bajakjian*, 524 U.S. 321, 334 (1998). Courts in the

8  Ninth Circuit "generally consider four factors when weighing the gravity of an offense: "(1) the nature

9  and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other

10  penalties that may be imposed for the violation, and (4) the extent of the harm caused." United States v.

11  Beecroft, 825 F.3d 991, 1000 (9th Cir. 2016) (citation omitted).

12  Applying these factors demonstrates that requiring forfeiture of the full amount of ill-gotten

13  gains obtained by Andrade would not violate the 8th Amendment. Andrade's crime was substantial. He

14  orchestrated a massive fraud that operated for many years and spanned the globe, leaving thousands of

15  victims in its wake. The second factor, whether the violation was related to other illegal activities, is

16  essentially neutral here, as what the forfeiture is of unlawful proceeds of the fraud and not other

17  activities. Regarding the third factor, Courts consider both the term of imprisonment and the fine

18  suggested by the Guidelines. *United States v. $132,245.00 in U.S. Currency*, 764 F.3d 1055, 1060 (9th

19  Cir. 2014). Here, the other penalties that could be imposed for the offense are substantial; Andrade's

20  total offense level before variances was 35 and he faced an advisory Guidelines range of 168-210

21  months imprisonment and a potential Guidelines fine of $40,000 to $400,000. Dkt. 720, at 1. And as

22  noted above, the harm caused by his criminal conduct was extensive and resulted in nearly $10.5 million

23  in losses to victims.

24  Andrade's reliance on *Beecroft* is misplaced. In *Beecroft*, the $107 million forfeiture amount the

25  Ninth Circuit found to be excessive was "more than 5,000 times greater than the lower-end of the

26  Guidelines range." 825 F.3d at 1001 (emphasis in original). Moreover, there the government "ha[d] not

27  attempted to argue that the $107 million otherwise corresponds to injuries sustained by the government

28  or the banks." *Id.* at 1002. Here, the forfeiture sought corresponds directly to the amount of fraudulent

1  funds obtained by Andrade (nearly $10.5 million).[8]

2  **VII.    THE COURT SHOULD NOT STAY ITS RESTITUTION AND FORFEITURE ORDERS**

3          Andrade asks the Court to stay any restitution and forfeiture order pending his appeal. He

4  provides no valid basis to stay the imposition of the Court's orders. The Court has already denied

5  Andrade's numerous pre-trial and post-conviction motions. Andrade is unlikely to succeed on appeal.

6  The court should not stay any restitution or forfeiture order pending Andrade's appeal.

7  **VIII.   CONCLUSION**

8          For the foregoing reasons, the government respectfully requests that the Court impose a

9  forfeiture money judgment of $10,474,609 and a restitution order of either $4,020,739.59 or

10  $3,101,800.29.

11

12  DATED:  September 6, 2025                          Respectfully submitted,

13                                                     CRAIG H. MISSAKIAN
                                                       United States Attorney
14

15                                                     _____/s/_____
                                                       CHRISTIAAN H. HIGHSMITH
16                                                     Assistant United States Attorney

17

18

19

20

21

22

23

24

25

26

27  _____
[8] Andrade's references to "the amount of the requested forfeiture [bearing] no articulable correlation to
28  any injury suffered by the government" and "the existence of the government's own misconduct" are
   nonsensical.