IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNA

UNITED STATES OF AMERICA,

      Plaintiff

v.

ROWLAND MARCUS ANDRADE,

Defendant

CASE No. 3:20-cr-00249-RS-1

**DEFENDANT'S REPLY TO GOV. OPP. MOTION FOR ADMIN RELIEF TO EXTEND SURRENDER DATE AND NINTH CIRCUIT UPDATE**

Judge: Hon. Richard Seeborg

# EXHIBIT - I

# DECLARATION OF ROWLAND MARCUS ANDRADE

John M. Pierce (Bar No. 250443)
jpierce@johnpiercelaw.com
**JOHN PIERCE LAW P.C.**
21550 Oxnard Street, 3rd Floor
Woodland Hills, CA 91367
Tel. (321) 961-1848

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:20-CR-00249-RS |
| Plaintiff, | **DECLARATION OF ROWLAND MARCUS ANDRADE ISO DEFENDANT'S REPLY TO GOV. OPP. MOTION FOR ADMINISTRATIVE RELIEF TO EXTEND SURRENDER DATE AND NINTH CIRCUIT UPDATE** |
| v. | |
| ROWLAND MARCUS ANDRADE, | |
| Defendant. | Judge:    Hon. Richard Seeborg |

DECLARATION OF ROWLAND MARCUS ANDRADE

This declaration incorporates by reference all the facts set forth in the prior declarations

filed at docket numbers 788-2 and 808-3. I, Rowland Marcus Andrade, declare as follows:

1.  The documents attached hereto are true and correct and were filed in the Ninth Circuit

   case.

2.  If the Court authorizes me to attend my surgery, I will provide all updated medical

   records to the probation department once the surgeries and testing are completed.

- 1 -

1    I declare under penalty of perjury under the laws of the United States that the forefoing is

2    true and correct. Executed on December 24, 2025.

3

4

5

6    _R. Marcus Andrade_

/s/ Rowland Marcus Andrade

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          - 2 -

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. 25-5095; 25-6056; 25-6507 |
| Plaintiff-Appellee, | D.C. No. 3:20-cr-00249-RS-1 |
| v. | Northern District of California, |
| ROWLAND MARCUS ANDRADE, | San Francisco |
| Defendant-Appellant. | **DEFENDANT'S MOTION REQUESTING THE REMOVAL OF APPOINTED CJA COUNSEL & REQUEST FOR A 90-DAY EXTENSION OF THE BRIEFING SCHEDULE TO GET OFF OF CJA** |

# EXHIBIT -B

## ANDRADE COMMUNICATIONS WITH CJA COUNSEL

## Re: Notice Regarding Motion for Subsitution of CJA Appellate Counsel (9th Cir. Case 25-5095)

| | |
|---|---|
| From | ████████████████████████████ |
| To | Sandy Baggett ████████████ |
| CC | $████████████████████████ |
| Date | Saturday, November 15th, 2025 at 10:47 AM |

Dear Sandy,

Thank you for your response. I appreciate your willingness to discuss the details of my case. To help me better understand your ability to handle this matter, I would greatly appreciate it if you could answer the following questions:

1. Case Load: According to PACER, you currently have nearly 20 active district-level cases. Given the size and complexity of my case, with nearly 800 docket entries, I'm concerned about whether you have sufficient time and resources to take on a case of this magnitude. Do you feel that you can dedicate the necessary attention to this case?

2. Appellate Experience: I was unable to find any appellate cases on PACER where you have been involved. Do you have experience handling appellate cases, particularly in the federal appellate courts?

3. Judicial Misconduct Concerns: As you may be aware, an attorney filed a judicial misconduct complaint against the Chief Judge of the Northern District of California related to actions that are relevant to my case. This complaint was not drafted by Mr. Pierce who only came on to my case a few months ago. I have attached it here for your review. It will likely be transferred to another Circuit for review.

    a. Could this situation potentially cause any potential issues for you?

    b. Will you be concerned about possible repercussions or reprisal due to your involvement in this case or the utilization of any of the arguments referenced in the Judaical Complaint regarding the actions of the Chief Judge in the NDCA on the appeal?

4. CIPA and National Security Experience: Although your background is certainly impressive, I noticed that you may not have experience with CIPA (Classified Information Procedures Act) or national security-related cases. If that is the case, would you be open to requesting assistance from CJA for support in handling these issues?

5. Withheld Classified Documents: In my case, there are highly sensitive CIPA-NSA related documents that were not allowed to be reviewed by my previous counsel at the district court level. Although we are aware that they include the spying on me and my counsels, and the Jack Abramoff's informant file that contains a list of actions that he was authorized to engage in with the utilization of my company. Would you be willing to request that the Ninth Circuit review these withheld CIPA files, given their importance to my appeal?

Thank you for taking the time to consider these questions. Your responses will help me determine the best path forward. I look forward to hearing from you.

Best regards,
R. Marcus Andrade

On Saturday, November 15th, 2025 at 9:54 AM, Sandy Baggett <

Rowland, I apologize for not being able to speak to you on the phone yesterday. I have no interest in opposing your motion. However, maybe you don't know very much about me or my background? I've only taken CJA cases for a few years. Prior to that I was a prosecutor in New York, Singapore, and London specializing in economic sanctions, global corruption, and money laundering. Following that, I worked at one of the world's largest law firms (Freshfields) representing corporations accused of corruption and money laundering with a focus on Asia. Do whatever you think is best.
Sandy

On Nov 15, 2025, at 6:59 AM,

Dear Sandy,

I hope you're doing well.

I wanted to let you know that I intend to file a motion requesting your removal from my case. I want to explain the basis for this request in advance so there's transparency and no misunderstanding.

### 1. Case Load and Capacity
My appeal involves nearly 800 docket entries and a significant number of large exhibits, including days worth of recordings that had to be physically delivered to the Court. Given the size and complexity of this case, I am concerned that your current CJA district-level caseload which

consists of nearly 20 cases may not allow you the time and resources necessary to review the full record in depth.

## 2. Specialized Expertise

This case raises highly complex issues involving **CIPA**, **national security**, and **government informant activity**. The CIA, FBI, and the NSA were all part of my case. Because the case centers on the misuse of my company's digital currency in connection with government sanctioned international money-laundering activity which is now subject to the current Russa-Gate investigation, it is essential that appellate counsel have prior experience in these specific areas and not spending countless hours doing research trying to meet the current expertise of the governments current counsels. Without that expertise, any misstep could be perceived publicly as political bias or as assisting the Court or government in the suppression. The attached recording is of the government informant Jack Abramoff. This also supports the need for a certain skill set in my case.   This is why my prior counsel requested that any appointed CJA attorney possess these qualifications before your appointment.

## 3. Dependence on CJA Funding

I am also concerned that reliance on CJA funding could expose you to potential reprisal, case related restraint, or undue influence. For example, a judicial complaint has been filed by an attorney who isn't on my case with the Ninth Circuit re███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████Cross Fire Hurricane investigation. ██████████████████████ CJA attorney whose dependency on CJA funding ████████████████████████████████

██████████████. These experiences highlight the importance of independent counsel not reliant solely on CJA appointments for fear of reprisal.

## 4. Conflict Check

Lastly, I was not given the opportunity to provide a list of people for a conflict-of-interest review prior to your appointment. The existing conflict list includes nearly 100 individuals, several of whom reside in the same area as you. This presents a potential concern that should have been addressed in advance. If either you or the CJA Office had reached out before your appointment, these issues could have been discussed and clarified.

I want to also bring to your attention that prior counsels have encountered serious privacy issues while representing me, including:

- Government interception of attorney–client communications at counsel's office.

- One of the attorney's phone being hacked while on a family vacation, with personal family photos captured and added to discovery materials.

- The recruitment of a different attorney that worked at the same firm as my Counsel to provide confidential information to the government.

I also had an attempt on my life, corroborated by communications recovered from a government informant's device (see attached). I mention all of this not to alarm you, but so you fully understand the circumstances and potential risks associated with this case.

Please let me know whether you intend to oppose the forthcoming motion that will be filed no later than Monday afternoon. I attempted to reach you by phone yesterday but was unsuccessful. Feel free to call or email me if you would like to discuss this.

Thank you for your time and understanding.

Best regards,

Rowland Marcus Andrade

361-244-0156

Sent with Proton Mail secure email.
<2018 Washington DC Hotel Attack.png>
<25-5095 Dkt. 23.2.pdf>
<Ex-A of Judicial Complaint (1).pdf>
<CTA.m4a>

**1.03 MB**   1 file attached

Judicial Complaint to 9th Office of the Circuit Executive.pdf 1.03 MB

## Re: Notice Regarding Motion for Subsitution of CJA Appellate Counsel (9th Cir. Case 25-5095)



From    Sandy Baggett <

To

CC

Date    Saturday, November 15th, 2025 at 11:48 AM

I am an appellate attorney in the Ninth and Tenth Circuits. I find the 9th circuit resource counsels very helpful and generous with approving additional resources where warranted. If I find that I do not have the expertise or resources to handle your appeal, I have an ethical obligation to withdraw.

On Nov 15, 2025, at 8:47 AM, r

Dear Sandy,

Thank you for your response. I appreciate your willingness to discuss the details of my case. To help me better understand your ability to handle this matter, I would greatly appreciate it if you could answer the following questions:

1. Case Load: According to PACER, you currently have nearly 20 active district-level cases. Given the size and complexity of my case, with nearly 800 docket entries, I'm concerned about whether you have sufficient time and resources to take on a case of this magnitude. Do you feel that you can dedicate the necessary attention to this case?

2. Appellate Experience: I was unable to find any appellate cases on PACER where you have been involved. Do you have experience handling appellate cases, particularly in the federal appellate courts?

3. Judicial Misconduct Concerns: As you may be aware, an attorney filed a judicial misconduct complaint against the Chief Judge of the Northern District of California related to actions that are relevant to my case. This complaint was not drafted by Mr. Pierce who only came on to my case a few months ago. I have attached it here for your review. It will likely be transferred to another Circuit for review.

   a. Could this situation potentially cause any potential issues for you?

   b. Will you be concerned about possible repercussions or reprisal due to your involvement in this case or the utilization of any of the arguments referenced in the





2025

United States Court of Appeals for the Ninth Circuit
Office of the Circuit Executive
P.O. Box 193939
San Francisco, CA 94119-3939
Via Registered Mail

**Re: Request to Exceed 5 Page Limit for the attached Judicial Misconduct Complaint.**

Dear Office of the Circuit Executive,

I respectfully submit this request for permission to exceed the 5-page limit for my attached

judicial misconduct complaint only against Judge Richard Seeborg, pursuant to the Judicial

Conduct and Disability Act (28 U.S.C. §§ 351–364) and the Rules for Judicial-Conduct and

Judicial-Disability Proceedings adopted by the Judicial Conference of the United States.

Under Local Rule 6.1(b)(1), complaints are limited to five pages. However, due to the

complexity of the issues involved—particularly allegations related to the suppression of evidence

concerning Russia Collusion and U.S. Election Interference—I request that an additional two

pages be allowed in order to provide a complete and detailed account of the matter. The attached

complaint primarily addresses Judge Seeborg's conduct during United States v. Andrade (No. 20-

cr-00249 RS, N.D. Cal.), where his actions assisted the government in suppressing evidence

related to its approval of informant Jack Abramoff's use of Mr. Andrade's digital currency to

facilitate Russian-linked international money laundering for U.S. election interference. Notably,

Abramoff was reportedly working with the FBI and members of the Crossfire Hurricane

Investigation at the time that worked on the Russia Collusion investigation.

Judge Seeborg's actions during the Andrade case not only undermined the integrity of the

proceedings but also compromised public confidence in the impartiality of the judiciary, creating

an appearance of impropriety and violating multiple provisions of the Code of Conduct for

United States Judges.

The complaint includes four key requests:

1. That Judge Seeborg be investigated for violations of Canon 1,[1] which mandates that a
   judge "uphold the integrity and independence of the judiciary"; Canon 2,[2] which requires
   that a judge "avoid impropriety and the appearance of impropriety in all activities"; and
   Canon 3,[3] which states that a judge "perform the duties of the office fairly, impartially,
   and diligently."
2. That all actions taken by Judge Seeborg in United States v. Andrade, No. 20-cr-00249 RS
   (N.D. Cal.), be thoroughly investigated, not just those listed in the complaint.
3. The temporary removal of Judge Seeborg from all cases pending investigation.[4]

---

[1] Canon 1 of the **Code of Conduct for United States Judges** also states: *"An honorable judiciary is indispensable to justice in our society. A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved."*

[2] As the United States Supreme Court has long held, *"to perform its high function in the best way, 'justice must satisfy the appearance of justice.'"* (*Offutt v. United States*, 348 U.S. 11, 14 (1954) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955))).

[3] Canon 3 of the Code of Conduct of United States Judges provides that "a judge should perform the duties of the office fairly, impartially, and diligently." (Emphasis added.) The Commentary to Canon 3A states that "[t]he duty to be respectful includes the responsibility to avoid comment or behavior that could be interpreted as harassment, **prejudice or bias**." See Hon. Carl E. Stewart, Abuse of Power and Judicial Misconduct: A Reflection on Contemporary Ethical Issues Facing Judges, 1 U. St. Thomas L.J. 464, 477 (Issue no. 1, 2003) ("A hallmark of the judiciary has been its historical posture of **neutrality and impartiality** toward litigants and the disputes they bring to the courts for resolution.

[4] Complainant respectfully requests that the Judicial Council exercise its authority pursuant to 28 U.S.C. § 354(a)(1)(C) and (a)(2)(A)(i), as well as Rule 20(b)(1)(D) and (b)(1)(D)(ii) of the **Rules for Judicial-Conduct and Judicial-Disability Proceedings**, by ordering Judge Seeborg's temporary removal from all pending cases and by prohibiting the assignment of any new cases to him while this complaint remains under review. Such action by the

4.  The transfer of this investigation to a different circuit.[5] Other Judicial Councils have authorized such transfers in order to protect the integrity of the process.[6] Additionally, other Judicial Councils allow the inclusion of additional pages to a complaint as long as a request is made.

Given the gravity of these allegations and the necessity for a thorough investigation, I respectfully request authorization to exceed the five-page limit by an additional two pages. The judicial complaint, which is seven pages in length, is attached to this letter. Should the Circuit Executive determine that this complaint cannot be filed as submitted, I kindly ask for detailed information regarding the appellate process. Additionally, I request that this letter remain part of the attached complaint throughout the entire investigative process.

---

Judicial Council will serve both as a deterrent and as a reminder to all federal judges of their solemn obligation to uphold the commitments they made to the United States Senate and to faithfully adhere to the Constitution and the rule of law.

[5] Pursuant to Rule 26 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings, Complainants respectfully request that the Judicial Council of the Ninth Circuit petition the Chief Justice of the United States to transfer this proceeding to the judicial council of another circuit. Rule 26 expressly authorizes such transfers where appropriate. The Commentary to Rule 26 provides that "[s]uch transfers may be appropriate . . . where the issues are highly visible and a local disposition may weaken public confidence . . . ." In light of the circumstances presented, a transfer is warranted to preserve the appearance of impartiality and maintain public confidence in the integrity of the judiciary.

[6] Judicial Councils in other circuits have similarly authorized transfers in proceedings involving complaints against federal district and appellate judges when necessary to protect the integrity of the process.
Complaint against D. Mass. Judge *Ponsor (2024)* transferred from the First Circuit to the Fourth Circuit.
(https://www.ca4.uscourts.gov/JCOrders/JCOrders/04-24-90094--CJorder.pdf)
Complaint against D. D.C. Judge *Walton* transferred (2024) from the D.C. Circuit to the Third Circuit
(https://www.ca3.uscourts.gov/sites/ca3/files/03-24-90134_03-24-90135.O.pdf)
Complaint against CA11 Judge Pryor and N.D. Ala. Judge *Maze* (2021) transferred from the Eleventh Circuit to the Second Circuit (https://fingfx.thomsonreuters.com/gfx/legaldocs/zdpxrwqobpx/11012023pryor.pdf)
Complaint against two unidentified circuit judges (2020) transferred from unknown circuit to the Third Circuit
(https://www.ca3.uscourts.gov/sites/ca3/files/03-20-90043_44.J.pdf)
Complaint against then-CADC Judge Kavanaugh (2019) transferred from the D.C. Circuit to the Eleventh Circuit
()https://media.cadc.uscourts.gov/conduct/docs/2019/03/DC-18-90089.T.pdf
Complaint against CA9 Judge Kozinski (2017) transferred from the Ninth Circuit to the Second Circuit
(https://images.law.com/contrib/content/uploads/documents/403/7281/Misconduct_Complaint_Transfer.pdf)
Complaint against D. D.C. Judge *Roberts* (2016) transferred from the D.C. Circuit to the Tenth Circuit
(https://media.cadc.uscourts.gov/conduct/docs/2016/05/DC-16-90009.J.pdf)

Thank you for your attention to this request.



cc:    The Honorable Jim Jordan
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
U.S. Senate
Washington, D.C. 20510

The Honorable Jamie Raskin
Ranking Member, House Committee on the Judiciary

The Honorable Richard J. Durbin
Ranking Member, Senate Committee on the Judiciary

## JUDICIAL MISCONDUCT COMPLAINT

### I.    Introduction

This complaint addresses serious allegations of suppression of evidence by Chief Judge

Richard Seeborg, whose actions in this case support violations of Canon 1, Canon 2, and Canon

3 of the Code of Conduct for United States Judges. This complaint confirms Russian collusion

and international money laundering into the United States aimed at interfering with U.S.

elections, facilitated by Jack Abramoff through Mr. Rowland Marcus Andrade's digital currency

(**See Ex. A**).With specificity, this complaint details Judge Seeborg's involvement in suppressing

evidence to benefit the FBI and the DOJ.[1] As outlined, Judge Seeborg's actions in District Case

No. 20-cr-000249-RS go beyond merely creating the appearance of impropriety. These actions

will undermine public confidence in the judicial system. It may even bolster arguments in favor

of judicial reform. Therefore, I request the following:

1. An investigation against Chief Judge Richard Seeborg for violations of Canon 1, Canon 2, and Canon 3.
2. A thorough investigation into all actions taken by Judge Seeborg in U.S. v. Andrade, No. 20-cr-00249 RS, where the investigation is not limited to misconduct examples listed in this complaint but the entire case.
3. The temporary removal of Judge Seeborg from all cases pending investigation.
4. A transfer of this investigation to a different judicial circuit, preferably the Fifth Circuit.

Chief Judge Richard Seeborg of the United States District Court for the NDCA, is located

in San Francisco—the same city that houses the United States Court of Appeals for the 9th

Circuit. Given any potential relationships between Judge Seeborg, his staff, and members of the

9th Circuit, as well as the potential partisan-political dynamics surrounding this case, there exists

a legitimate concern about the appearance of impropriety or a conflict of interest. Pursuant to

---

[1] See U.S. v. Rowland Marcus Andrade 20-cr-000249-RS, Dkt. 777 at 22:8–22, Dkt. 777-9, Dkt. 777-15 and a recording of Jack Abramoff (Dkt. 777-16). It also highlights government misconduct (Dkt. 777 at 23:6–16, Dkt. 347, Dkt. 165, Dkt. 548-1) and additional evidence in Ninth Circuit Case No. 25-5095 (Dkts. 21, 21-3, 21-5, 23-1, 23-2).

1

Rule 26 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings, Complainants

respectfully request that the Judicial Council of the Ninth Circuit petition the Chief Justice of the

United States to transfer this proceeding to the judicial council of another circuit.

## II.    Factual Background

On May 19, 2020, Judge Vincent Chhabria against whom there is no allegation of misconduct,

presided over a civil case by the USDOJ against Andrade that relates to the same people,

allegations, and facts in Andrade's criminal case. (Case No. 20-cv-2013, ECF No.19.) Judge

Chhabria had four pending motions before him, which included a motion by Andrade for

sanctions which the record no longer reflects. Judge Chhabria had issued a ruling right before the

hearings on these motions (Dkt. 30). Judge Chhabria ordered:

**"If the Court determines that the government is reflexively and unnecessarily withholding documents from Andrade, it will consider sanctioning the lawyers and law enforcement entities involved."**

Immediately afterwards, the government then indicted Mr. Andrade (United States v. Andrade,

20-CR-00249 RS) and Judge Chhabria was immediately removed from all related Andrade cases

by the Executive Committee of the NDCA, and was replaced by Judge Seeborg which prompted

Andrade to file a writ of mandamus with the 9th Circuit against the entire Executive Committee

for violating its own local rules (9th Cir. No. 20-72001). Andrade had to refile all pending

motions before Judge Seeborg which were all denied.

## III.    Judge Richard Seeborg's Misconduct

### 1. Erroneous Statement in the Classified Information Procedures Act (CIPA) Order

On **October 4, 2024**, the district court issued an order allowing the government to

withhold classified evidence, presumably related to Abramoff's informant file. See Dkt. 367.

The government had filed its CIPA motion on July 13, 2024 (Dkt. 322). In granting the motion

to withhold evidence from Andrade, the court erroneously stated in its public order that the defense had not explained why Mr. Andrade needed access to the CIPA-protected materials (Dkt. 367 at 3:2–3). This statement was false. As demonstrated in 9th Circuit Case No. 25-5095 at Dkt. 23.2 — The public version of Ex Parte Declaration in Support of the Release of the CIPA Evidence to Andrade that was given to Judge Seeborg — Paragraph 24 explicitly references the need for the informant file. The declaration describes in detail how Mr. Abramoff used Mr. Andrade's digital currency to facilitate international money laundering, the existence of **multiple schemes**, and it explains why this evidence is exculpatory.

2. **Failure to Hold an Evidentiary Hearing Regarding Suppression of Evidence**

On January 24, 2025, Defense counsel filed a Motion for an Evidentiary hearing to Address Government Misconduct. Judge Seeborg refused to hold an evidentiary hearing, despite knowing that two former government CHS agents were going to testify about international money laundering and the suppression of evidence material to Andrade's case (Dkt. 499 at 6:26-17).

Defense counsel informed the court that an FBI agent and a former government employee at the U.S. Department of Treasury would testify that they were instructed to suppress exculpatory evidence favorable to the defense. Defense counsel stated in a declaration,

"*Buma would testify that one of the ways the FBI suppressed information about Abramoff was by instructing agents not to include damaging information – regardless of its relevance – about Abramoff in their FBI 302 reports,*" and "*…that he and the other agents present for the meeting with the CHS in February 2020 were ordered to edit the 302 Report to remove some of the information about Abramoff as it relates to Mr. Andrade's case, and that other 302 Reports authored by Buma in connection with Mr. Andrade's case were not produced in discovery at all.*" (Dkt. 498-3 at ¶7: 10-16).

Defense counsels declaration further stated that the second "*witness would also testify about the government's suppression of evidence relating to information about **Landfair Capital Consulting, LLC**, the company that was owned by Abramoff's college-aged son and was used by Abramoff to engage in illegal lobbying and money laundering activities during the relevant time period.*" See (Dkt. 498-3 at ¶8: 21-14).

3

Defense counsel provided a sworn declaration regarding specific statements that the government employees would say if allowed to provide testimony. (Dkt. 548-1 at 2:16-24 and at 3:1-10; and ECF#656; Exhibit-A, Declaration of Kerrie C. Dent, para. 9). Although Discovery Magistrate Judge Laura Beeler recognized the relevance of Landfair Capital to this case—specifically as a proxy company benefiting Abramoff—Judge Seeborg disregarded it (Dkt. 165).[2]

Defense counsel informed Judge Seeborg that the FBI deployed an undercover confidential informant (UCI) to secretly record privileged attorney-client communications between Andrade and his legal counsel, concerning matters directly related to the indictment (ECF #498-3 ¶¶ 33-40). Despite the government's knowledge of Andrade's case strategy, the court deemed it harmless, reasoning that the recording would not be used against Andrade at trial (ECF #535 at 12:16-18). Additionally, the court was aware that the FBI, through its UCI, had recruited an attorney to confirm that attorney-client communications with Andrade were ongoing, all while concealing the attorney's collaboration with the government and its informants to potentially orchestrate criminal conduct (ECF #498-3 ¶ 41; Dkt. 777 at 21:7-14; Exhibit-I at Dkt. 777-14).

3. **Failure to Afford Mr. Andrade His Constitutional Right to a Fair Trial**

The proposed jury instructions were filed with the Court on January 17, 2025 (Dkt. 480), which included a request for a multiple-conspiracy instruction (Dkt. 480 at 43). Andrade's trial began on February 10, 2025, but the Court deferred ruling on the proposed instructions until just before jury deliberations on March 5, 2025 (Dkt. 631 at Trial Tr. 2673:24-13). The Court suppressed

4

---

[2] Discovery Order (Apr. 7, 2023), ECF #165 at 6-7, 12 ("It is not just about Mr. Abramoff or Mr. Andrade and AML Bitcoin. It is about the larger context of the business model for cryptocurrency, whether Mr. Abramoff may have been working against Mr. Andrade, and how that affects Mr. Andrade's responsibility and scienter.").

evidence during trial regarding Abramoff's involvement in multiple schemes and then denied the
request for a multiple-conspiracy jury instruction.[3]

The Court didn't allow the introduction of trial evidence that proved Abramoff was
involved in international money laundering behind Andrade's back and that Abramoff was
working with foreign oligarchs. Mr. Andrade had documentary evidence to show that Abramoff
was engaged in a separate scheme that related to laundering money for a Ukrainian billionaire
and his U.S. associates.[4]

The Court prohibited Andrade at trial from obtaining testimony from Agent Quinn (who
worked with Agent Buma) regarding the documents Quinn seized in 2018. In fact, Quinn did not
prepare a report on these documents that he had seized from Butina's house nor did he inform
the prosecutors of their existence. The Court's response was "*so*" and "*this is not an area -- you
know this is not an area to go into.*" The Court immediately took this action after Quinn
confirmed the existence of a separate investigation. The Court's actions forbade the defense from
creating a trial record that would have also supported a **multiple schemes** jury instruction.[5]

---

[3] In denying Andrade's motion for bail pending appeal, the Court justified its decision to reject the multiple-
conspiracy jury instruction by stating that there was no spillover between Andrade's charges and Abramoff's actions
(Dkt. 781 at 6:7-27). However, the Court was aware that Abramoff had masterminded and produced all the press
releases for which Andrade was charged, and that Abramoff's intent was to further a different scheme. Lobbyist and
Article Writer Brian Darling testified that he sourced all of his articles through Abramoff, not Mr. Andrade. Dkt. 570
at Trial Trans. 743:8, 751:11-19, and 755:7-10. Darling denied ever receiving any information for his articles from
Mr. Andrade. Tr. 755:21-23. The Court and the government even had access to all evidence listed in **Dkt. 777 at
Fn. 7 (Contents of a USB drive)** which also supports the Courts knowledge that people knew the state of the
technology prior to the token being sold. See Dkt. 777 at 18:5-22; Dkt-777-19 at 17; and 9th Case 25-5095 Dkt. 21-2
at 21. In a complete disregard for the constitution, the court didn't allow the jury to see exculpatory evidence. See
Dkt. 657.

[4] See Dkt. 656 at 34:16-24 and Fn. 35 regarding Ex. 3261 (shown to Abramoff at Tr. 1841:5) (May 2017
communications between Abramoff and his friend Eliezer Scheiner regarding the need to assist Ukrainian billionaire
and notorious money launderer Gennadiy Bogolyubov with his money issues after Bogolyubov's assets were frozen
by law enforcement in the United Kingdom — which directly preceded Abramoff reaching out to Mr. Andrade to
convince him to do an ICO); Ex. 3262 (shown to Abramoff at Tr. 1858:25 to 1861:7) (Abramoff claims he does not
recall the $1 billion deal that involved Abramoff and some of his friends laundering money through Angola using
AML Bitcoin). The Court didn't allow the evidence to be admitted since Abramoff stated that he didn't recall the
conversation. See Dkt. 625 which is the transcript.

[5] See Dkt. 628 at Trial Tr. 2283-84; Trial Exhibit 2360 at Dkt. 662, and Dkt. 777 at 13:16-3; Dkt. 777-9; 777-9 at
98; and offered but not allowed to admit exhibits attached to Dkt. 657-A.

After the government elicited testimony from, and played recordings made by, an FBI agent working undercover who arranged to talk to Mr. Andrade in an effort to get Mr. Andrade to make false statements, the Court cut off any use by the defense of exculpatory statements made by Mr. Andrade to the undercover agent that would have impeached him. (Dkt.656 at 33:1-13 and 34:1-15) The Court had over 40 trial errors that all supported suppression of evidence. (Dkt. 656 at 52:14).

### 4. Improper Use of Prejudicial Political Statements

The Court allowed the government to admit evidence, which contained communications between Andrade and a government witness from 2020, well after the indictment period. These communications were fully displayed for the jury. See Dkt. 568 (Trial Tr. 417:7). The San Francisco jury was exposed to irrelevant and highly prejudicial political statements made by Andrade regarding Liberals in California who did not share his political views. While the government read only the first part of a sentence about the SEC, it allowed the jury to see the second part of the same sentence, which contained inflammatory content. See Dkt. 568 (Trial Tr. 422:11-17) and Dkt. 671-12 (Trial Ex. 1448).

### 5. Forfeiture Issues & Pre Trial Supervising Report Concerns

On October 14, 2025, the Court granted the government's forfeiture money judgment, which included both penalties and restitution, and denied Mr. Andrade's request to stay the forfeiture pending appeal (Dkt. 789). Among other issues, the Court was aware that proceeds from Abramoff's international money laundering schemes had flowed through Andrade's company and subsequently returned to Abramoff and his proxies. Despite this knowledge, the Court approved the money judgment without entering a factual order or allowing an evidentiary hearing, which Mr. Andrade had specifically requested. The Court also ignored the government's

6

misrepresentation of key facts during the September 16, 2025, forfeiture hearing. See Dkt. 777 at 25–27; Dkt. 777-19; Dkt. 780; Dkt. 737-2; Dkt. 713-4, 713-5, 713-7; and Dkt 713 Fn. 45, 46, 47, and 69. Additionally, the government failed to correct these misrepresentations, despite being explicitly asked to do so. See 9th Cir. 25-5095, Dkt. 23.1. On July 29, 2025, the court then ordered the suppression of favorable evidence within the PSR Report.[6]

6. **Restricting Counsels from Creating a Record & Proper Appellate Review**

Each example regarding suppression individually and cumulatively prevented Andrade from creating a record and it substantially impaired the 9th Circuit's ability to conduct meaningful appellate review of the evidence.[7]



---

[6] The probation department's PSR report included some of Andrade's objections that were supported by trial evidence. The PSR included over 18 footnotes listing those objections (Dkt. 706). Without the government's request, the Court ordered the removal of all footnotes from the PSR report during Andrade's sentencing on July 29, 2025. See Dkt. 717 and Dkt. 733 (Trial Tr. 3:25-5:3).

[7] Additional examples include the June 24, 2025 retrial hearing where the Court prohibited Andrade from speaking on the record about any old issues. See Dkt. 718 (Tr. 3:23-15). Andrade told the Court that there was additional information in Ms. Dent's final declaration and the Court confirmed that it didn't want to hear anything about misconduct which prohibited the creation of additional evidence being introduced into the record. See Dkt. 718 (Tr. 28:11-15). The Court was even aware that the government didn't provide the financial data until right before trial knowing that this case included a money laundering charge and forfeiture allegations. See Dkt. 718 (Tr. 72:9-1). The Court then made inaccurate statements in its order denying the retrial (Dkt. 694 at 11:10-12). The court ignored the Decl. by Defense Counsel Kerrie Dent regarding the testimony of two government whistleblowers and how one of them could confirm Abramoff's informant status. (Dkt. 548-1, Paragraphs 4-5). The court denied an additional request for witness testimony without explanation. (See Dkt. 550). In what appears to be a further attempt to suppress evidence, Judge Seeborg took over two other cases from Judge James Donato. See Case 20-cr-00249 at Dkts. 199 & 200 (Aug. 9, 2023 Order); Case 23-cr-00140-RS at Dkts. 65 & 66 (Oct. 28, 2025 Order); and Case 22-cr-00171-RS at Dkts. 34 & 35.

FD-1036 (Rev. 10-16-2009)

UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION

### Import Form

**Form Type:** FD-1023                                               **Date:** ▮▮▮▮▮▮

**Title:** (U) S-00083719-A-077.pdf

**Approved By:** PEARLSTEIN ADAM D

**Drafted By:** Johnathan C. Buma

**Case ID #:**  58D-SF-2113481          (U) Operation Clutch Council
                                        CDPO-Federal Bribery - Other
                                        SENSITIVE INVESTIGATIVE MATTER
              813C-HQ-3178392           (S//NF) POSITIVE FOREIGN INTELLIGENCE
                                        COLLECTION PROGRAM - COLLECTION REQUEST
                                        /APPROVAL, UKRAINE

**Synopsis:**  (U) Consultation on Abramoff's hand-written notes

**Enclosure(s):** Enclosed are the following items:
1.  (U) DELTA Imported Attachment


◆◆

UNCLASSIFIED

*was P far*,

2 campaigns:

    1) Anti-Corruption
    2) Pro-V/V

## **Anti Corruption**:

                        — MUSt be strong

- Need details on P corruption from AL/et al
- Proof cases
- Build case

                      Need new UA anti corruption
                      - EU based?    10 complts

1. Engage US groups
    a. Public Citizen
    b. CREW
    c. Common Cause
    d. Represent.us
    e. Etc
2. UA diaspora groups
    a. Ukrainian Americans: Clean Up Our Homeland
3. Congress
    a. Foreign Affairs
        i. Senator Risch
        ii. Congressman Rohrabacher
    b. Finance Committees
        i. Senator Hatch
        ii. Congressman Hensarling
    c. Leadership
    d. Ukrainian Members of Congress
        i. Senator Mike Enzi
        ii. Martin Howrylak (R-MI)
    e. Citizens Committee Against Corruption in Ukraine
        i. Wayne Gretzky
        ii. Jim Furyk
4. Administration
    a. White House
        i. Bolton
        ii. Kudlow
    b. Treasury
        i. Mandelker
    c. State

      v. Peace and Prosperity
      vi. Security
      vii. Agriculture
      viii. Tourism: Ukrainian diaspora organizing tool
✗ b. Vataliy Book?
  c. Media
  d. Congressional support
  e. Administration Statements
  f. Think tanks
      i. Carnegie Institute
      ii. Heritage Foundation
2. Celebrity
  a. Servant of the People
      i. US rights/remake/ like Israeli shows
      ii. Cast Trump friendly – Sinclair Broadcasting
      iii. Vladimir here to do press  — Producer
      iv. Fund Development
        1. Significant director/cast
      v. KEY: ANNOUNCEMENTS
3. Corruption
  a. 10 Commandments against Ukrainian Corruption    VA group
      i. Cornerstone of campaign
      ii. Trips of anti-corruption officials from around the world to Ukraine to make statements against P

7 months

Contributions
    Anti-Corruption Groups  100K
    Heritage/etc        100K

NEED US 501C4

✗ Television Show rights acquire/development

Lobbyists FOR C4
    Turnberry         30/6 180k
    Liberty Consulting   15/6 90k
    PIC            20/6 120k
    ADI            20/6 120K
    media       35K
    Ladzin     100/7    CRYPTO    1.5

Ambassador remove - ✱
    Biden -
    called meeting 1+1 - invite 1 yes
    theater re Israel -

'Who is Ukraine Lobbyist -
                    AK guy

Michael Cohen payment was to
create problem for Trump -
order of Biden - Nuland -
Cohen - sucker -  Set up
BBC - leak from Poroshenko -
Paul Wood   23 May 2010

Dana - no more Until. Lobby

hearing = July -

text JA address to Alex re Josh.

Need list of journalists

Whatsapp - Alex - list of research we need
        - K - Ludfin - wire -

Jack Abramoff

2017-10-11 6 53 58 PM(UTC-0)

We will use digital currencies (bitcoin) to get this done. in particular, we'll use AML, Bitcoin (AML), which is the only digital currency that is designed to be accepted by governments. Here is the procedure:

1. There have to be at least 2 Angolan participants
2. Each participant will designate to RE the Angolan bank (where they have deposits) that they will be using to participate in transaction
3. The participants need to confirm to RE that the Angolan bank can make a transfer to a US account on behalf of Participants, in South African Rand. Assuming the bank can do so...
4. Each Participant will send RE their passport (clear jpg file)
5. Each will sign a contract (attached) with Marcus Andrade and NAC Foundation (owners of the AML) to do a test run transfer of coins
6. The test run will be $1M for each Participant, which will be wired to an attorney trust account in the US (the account information will be available if the transaction proceeds). The funds will be held in that escrow account until the transaction proceeds. If it cannot proceed, the attorney will return the funds to the Participants' bank account.
7. After receipt of signed contracts, passports and confirmation of wire to attorney trust accounts, AML will run KYC (know your customer) check to ensure participants are not on OFAC or terror watch lists.
8. Assuming participants are clear, funds will clear to AML from attorney trust accounts; AML will set up participants' AML Bitcoin wallets (deposit accounts); $1M in AML will be deposited into each wallet.
9. Phase 2: AML will sell $100M of AML (75M total coins) to Participant number 1 (P1). P1 will wire $100M to AML account, after which AML will deposit 75M AML from P1 for $100M (or market price – coin price will increase based on market)
10. Participant 2 (P2) will buy 75M AML from P1 for $100M (or market price – coin price will increase based on market) (through a digital coin exchange that AML will arrange for participants, likely HIT btc).
11. P1 will receive $100M (or sale price) for sale.
12. P1 will transfer 75M AML into P2 wallet.
13. P1 will deposit $100M (or sale price) into P1 Dubai Account – minus fee to RE (20% of funds deposited in P1 Dubai account, to be paid to RE account)
14. P1 will then buy 75M AML from P2 (through a digital coin exchange, likely HIT btc) for new Rand funds wired from Angola bank, wired to AML for P2's account [price will be market price; the higher the price the more P1 and P2 can transfer]
15. P2 will transfer 75M AML to P1 wallet; P2 will deposit sales price ($100M plus market price increase) in P2 Dubai account
- minus fee to RE (20% of funds deposited in P2 Dubai account, to be paid to RE account).
16. Process repeats
17. This approach could enable deposits of more than US$1B per month in each Dubai account

Jack Abramoff

2017-10-11 6 54 06 PM(UTC-0)

I am sending the contract in a minute